**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

---

[1]    The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (the "Motion")[2] for the relief set forth herein.  In support of this Motion, the Debtors respectfully submit the First Day Declaration, the *Declaration of Holly Etlin in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* (the "Etlin DIP Declaration"), and the *Declaration of David Kurtz in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* (the "Kurtz DIP Declaration"), filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state the following:

### Introduction

1.    The Debtors file these cases in severe and largely unprecedented financial distress.  As described in the First Day Declaration, the Debtors ended 2021 and began 2022 with multiple disappointing earnings misses.  This was the culmination of a failed strategy shift by the Company's prior management team to focus on private label brands and a remodeled in-store

---

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in:  (a) the *Declaration of Holly Etlin, Chief Financial Officer and Chief Restructuring Officer of Bed Bath & Beyond Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"); (b) the *Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Credit Agreement"), filed contemporaneously with this Motion and incorporated by reference herein; and (c) the Interim Order.

experience.  These efforts, undertaken at a time in which the entire retail industry grappled with the reduced customer store visits resulting from the COVID-19 pandemic, proved unsuccessful, disrupting the Debtors' relationships with their vendors and customer base.  Among other operational missteps, the Debtors' failed to modernize their business model to stay apace with industry wide trends, including through building a robust omnichannel platform. Negative macroeconomic forces, namely record levels of inflation and supply chain problems induced by the COVID-19 pandemic, resulted in higher inventory and labor costs as well as reductions in consumer discretionary spending.  This led to an aggressive lease optimization strategy, resulting in the closure of hundreds of underperforming stores.  Additionally, the Company's stock experienced extreme volatility resulting from, among other things, "meme" stock investor Ryan Cohen's decision to sell massive amounts of Bed Bath & Beyond shares.

2.    To address their liquidity challenges, in August 2022, the Debtors secured financing commitments for more than $500 million of new financing, including their newly-expanded $1.13 billion ABL Facility and a new $375 million FILO Facility.  The proceeds of this "bridge" financing were allocated to fund the Company's turnaround plan, which helped extend the Company's operating runway and stave off a more comprehensive restructuring solution. Entry into the Amended Credit Agreement provided the Debtors with much-needed liquidity ahead of the 2022 holiday season, and the Debtors hoped that the holidays might stem the tide of operational losses.  However, the Debtors' vendor base did not fully return its support in time, deepening the Debtors' liquidity troubles.

3.    In light of these operational and financial challenges, the Debtors decided to engage legal, financial, and restructuring advisors to explore strategic and financial alternatives. Those alternatives included, among other things, potential liability management exercises,

a marketing process for all or a substantial portion of the Company's assets, and a potential full-scale chapter 11 restructuring. The Debtors, with the assistance of their advisors, thereafter commenced transparent discussions with their existing lenders to convey the worsening state of play and potential go-forward solutions. At the same time, the Debtors and their advisors reached out to third parties and investors to gauge interest in a going-concern sale transaction and/or potential postpetition financing—all of which is further discussed below and in the Kurtz DIP Declaration.

4.      Despite tireless efforts to right the ship, the Debtors' financial position quickly became untenable. On January 13, 2023, the Debtors delivered a notice of default to JPMorgan Chase Bank, N.A. and Sixth Street Specialty Lending, Inc. as agents under the Prepetition ABL Facility and Prepetition FILO Facility respectively. The default notice informed the agents that the Debtors had failed to timely deliver the weekly borrowing base certificates and comply with the fixed charge coverage ratio for the fiscal quarter ending November 26, 2022, as required under the Prepetition Credit Agreement. Further, the Company subsequently triggered an additional Event of Default under the Prepetition Credit Agreement for failure to prepay revolving loans that were over-advanced well in excess of what was otherwise permitted under the credit agreement.

5.      On January 23, 2023, JPMorgan Chase Bank, N.A. ("JPMorgan"), in its capacity as Prepetition Administrative Agent, advised the Debtors that as a result of the foregoing Event of Default, a cash dominion period had occurred under the Prepetition Credit Agreement (the "Cash Dominion Period"). JPMorgan delivered the applicable dominion notices under each deposit account control agreement and securities account control agreement. Two days later, JPMorgan accelerated the loans under the Prepetition Credit Agreement and provided notice to the Debtors of the effectiveness of default interest accrual (the "Notice of Acceleration").

6.      As a result, the Debtors, along with their advisors, engaged in round-the-clock discussions with their secured lenders and advisors to determine the best path forward for all stakeholders.  These discussions centered on the need to provide a combined postpetition financing proposal between the Prepetition ABL Lenders and Sixth Street (together, the "Prepetition Secured Lenders"), given that the Prepetition Credit Agreement (as amended) delineated their respective rights and relative priorities in the event of a subsequent debtor-in-possession financing.

7.      Simultaneously with these discussions, the Debtors attempted to facilitate a transaction that would avoid a bankruptcy filing and offer the Company additional runway to capitalize on management's turnaround plan.  To that end, in late January, Hudson Bay Capital Management, LP ("HBC") approached the Debtors' advisors with a proposal to underwrite a public offering (the "Offering") of the Debtors' preferred stock and warrants.  The Offering ultimately contemplated raising approximately $225 million of gross proceeds with the potential to raise an additional approximately $800 million of gross proceeds through future issuances.

8.      The Debtors engaged in extensive and hard-fought negotiations with HBC that culminated in the close of the Offering on February 6, 2023.  Concurrently, the Debtors and the Prepetition Secured Lenders entered into a waiver and amendment to the Amended Credit Agreement (the "Second Amendment to the Credit Agreement"), pursuant to which the Prepetition Secured Lenders agreed to (i) waive any outstanding defaults under the credit facilities; and (ii) rescind the implementation of acceleration, the requirement to cash collateralize letters of credit obligations, and the default interest owed on outstanding obligations, as each is set out under the credit facilities.  Notably, the Second Amendment to the Credit Agreement decreased the total revolving commitment from approximately $1.13 billion to $565 million.  To secure the consent of the ABL Lenders, and to facilitate consummation of the HBC Offering, the FILO Lenders

agreed to increase the FILO Facility by $100 million (the "FILO Upsize") from $375 million to $475 million.

9.    The Debtors used the net proceeds from the initial closing of the Offering, along with the FILO Upsize, to repay outstanding revolving loans under the Debtors' Prepetition ABL Facility.  While the Offering was critical to reducing burdensome funded-debt obligations and paying vendors and other business counterparties, the Debtors continued to suffer operating losses and struggled to improve operating cash flow that would have allowed for greater reinvestment in the business consistent with management's turnaround plan.  Making matters worse, the Debtors' stock price continued to drop, jeopardizing their prospects for additional equity investment. Against this backdrop, the Prepetition FILO Lenders were unwilling to approve the Debtors' projected budget, approval of which was a condition under the Second Amendment to the Credit Agreement.  In view of these circumstances, the Debtors were no longer eligible to seek an additional injection of capital from HBC.

10.    Following termination of the HBC transaction, the Debtors announced a second "at-the-market" equity transaction (the "ATM Transaction") to offer and sell up to $300 million of shares of its common stock from time to time.  While the ATM Transaction produced nearly $50 million of cash proceeds, it was insufficient in addressing the Company's inventory and liquidity problems.  Without sufficient liquidity to satisfy operational expenses, the Debtors were forced to request emergency additional funding from their lenders in excess of the borrowing base provided under the Amended Credit Agreement.  Without such funding, the Debtors would have been unable to fund critical freight, payroll, and tax obligations necessary to make an orderly filing possible.  On Friday, April 21, 2023, the DIP Lenders (in their capacity as Prepetition FILO Lenders) and the Prepetition ABL Lenders approved an emergency overadvance of $54 million to

ensure payment of critical expenses including, among other things, the Debtors' payroll and tax obligations (the "Emergency Rescue Loan").

11. In the absence of workable third-party financing proposals, and in light of the requirement under the Prepetition Credit Agreement to secure the support of both Sixth Street and the Prepetition ABL Lenders for any postpetition financing, the Debtors pushed the DIP Lenders to provide a unified financing proposal. Following round-the-clock, hard-fought negotiations, the Debtors and the DIP Lenders agreed upon the terms of a debtor-in-possession financing in the form of senior secured postpetition financing on a superpriority basis under (1) a new money single draw term loan facility consisting of up to $40 million, and (2) a roll-up of Prepetition FILO Secured Obligations (as defined in the Interim Order) in the amount of $200 million pursuant to the terms and conditions of the Interim Order and the DIP Credit Agreement attached hereto as **Exhibit B**.

12. The Debtors commence these cases in dire and unprecedented financial straits. Absent immediate access to incremental liquidity in the form of postpetition financing and Cash Collateral, the Debtors risk a disorderly liquidation from the outset of these cases. Entry into the DIP Facility will preserve and maximize the value of the Debtors' estates in the immediate term, allowing the Debtors to pursue an orderly wind-down of their estates in parallel with a sale, liquidation, or other disposition of their assets. To that end, contemporaneously herewith, the Debtors filed a motion seeking approval of bidding procedures, which will allow the Debtors to continue their extensive prepetition sale process, and a motion to implement wind-down procedures to govern the wind-down of the Debtors' businesses with the support of Hilco Merchant Resources, LLC ("Hilco").

13.    If the Court approves the DIP Facility, the Debtors will use the proceeds of the DIP Facility to, among other things:  (a) provide working capital for the Debtors; (b) finance interest, fees, expenses, and other costs related to the DIP Facility; (c) make payments in respect of the Carve-Out and the Reserves; (d) satisfy any adequate protection obligations owed under the DIP Orders; and (e) make permissible payments, including, but not limited to, honoring employee wages and benefits and procuring goods and services, all in accordance with a budget agreed to by the Debtors and the DIP Lenders (the "Approved Budget") attached hereto as Schedule 1 to **Exhibit A**.

14.    Thus, for the reasons set forth herein, in the First Day Declaration, the Etlin DIP Declaration, and the Kurtz DIP Declaration, the Debtors believe that approval of the DIP Facility will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and is an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the relief requested herein and enter an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders").

**Jurisdiction and Venue**

15.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

16.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

17.    The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-3 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

**Relief Requested**

18.    By this Motion, the Debtors seek entry of the Interim Order and the Final Order:

a.    authorizing, upon entry of the Interim Order, the Debtors to obtain senior secured postpetition financing on a superpriority basis under (1) a new money single draw term loan facility (the "DIP Facility") consisting of up to $40 million (the "New Money Amount"), and (2) a roll-up of Prepetition FILO Secured Obligations (as defined below) in the amount of $200 million pursuant to the terms and conditions of this Interim Order and the DIP Credit Agreement- attached hereto as **Exhibit B**, by and among the Borrowers, the other loan parties party thereto, Sixth Street Specialty Lending, Inc., as administrative agent (in such capacity, the "DIP Agent"), and the lenders party thereto from time to time, (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties");

b.    approving the terms of, and authorizing the Debtors party thereto to execute and deliver, the DIP Credit Agreement and any other agreements, instruments and documents related thereto (collectively, the "DIP Documents"), which shall be on terms consistent with the DIP Credit Agreement and otherwise in form and substance acceptable to the Required DIP Lenders (as defined in the DIP Credit Agreement) (or as otherwise provided in the DIP Documents), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents

c.    authorizing the Debtors to execute and deliver the DIP Documents, to incur all obligations owing thereunder to the DIP Secured Parties (collectively, the "DIP Obligations"), grant the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), subject to the Carve-Out and otherwise perform all of their respective obligations under the DIP Documents;

d.    subject to the Carve-Out, granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code, (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit

or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) other than payroll, trust, tax withholding and employee benefit accounts, or accounts located outside of the United States, or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (together, "Cash Collateral"), which liens shall be subject to the priorities set forth herein;

e.      authorizing and directing the Debtors to use proceeds of the DIP Facility and Cash Collateral to: (a) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, commitment fees and the fees and disbursements of the DIP Lender Professionals (as defined in the Interim Order); (b) make permitted adequate protection payments; (c) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses; and (d) to fund the Carve-Out and the Reserves, all to the extent provided in, and in accordance with, the Approved Budget, the Interim Order and the DIP Documents;

f.      authorizing the Debtors to use the Prepetition Collateral (as defined in the Interim Order), including all property constituting Cash Collateral of the Prepetition Secured Parties under the Prepetition Credit Documents (each term as defined Interim Order) on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral ("Diminution in Value"), subject to the restrictions set forth in the DIP Documents and the Interim Order;

g.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent set forth herein solely to the extent necessary to permit the Debtors, their affiliates, and the Prepetition Secured Parties implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

h.      authorizing payment of the DIP Fees (as defined in the Interim Order);

i.      waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order;

j.      scheduling a final hearing (the "Final Hearing") to consider the relief requested herein on a final basis and approving the form of notice with respect to the Final Hearing. and

k.      granting related relief.

## Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-3

**I.      Concise Statement regarding the DIP Facility.**

19.     The below chart contains a summary of the material terms of the proposed DIP

Facility, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-3.[3]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Bed Bath & Beyond Inc.<br>BUY BUY BABY, Inc.<br>Decorist, LLC<br>Harmon Stores, Inc.<br>Bed Bath & Beyond of California Limited Liability Company<br><br>*See* DIP Credit Agreement, § 1.01 |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | The direct and indirect subsidiaries of the Borrowers listed on <u>Annex E</u> to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, <u>Annex E</u> |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Sixth Street Specialty Lending, Inc.<br><br>*See* DIP Credit Agreement, § 1.01 |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Sixth Street Specialty Lending, Inc.<br>Sixth Street Lending Partners<br>TAO Talents<br>1903 Partners, LLC<br>WhiteHawk Finance LLC<br>Second Avenue Capital Partners LLC<br>Callodine Commercial Finance SPV, LLC<br>Callodine Asset Based Loan Fund II, LP<br>Callodine Perpetual ABL Fund SPV LLC<br><br>*See* DIP Credit Agreement, <u>Annex D</u> |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes standard and customary conditions that require the Borrower to provide periodic reports to the DIP Agent and their respective professionals regarding the Approved Budget, consolidated financial statements of the Borrower's subsidiaries, working capital analysis and debt/cash balances; and financial materials provided to Holdings' board of directors and certain other matters.  The failure of the Borrowers to |

---

[3]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | comply with such reporting obligations will cause an Event of Default that may permit the DIP Agent, on behalf of the DIP Lenders, to exercise remedies against the Borrowers, including terminating the DIP Facility.<br><br>*See* DIP Credit Agreement, <u>Annex F</u> |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-3 | "Maturity Date" means the earliest of (a) the Interim Facility Maturity Date, (b) [___], 2023, (c) the filing of a motion by the Loan Parties seeking dismissal of any of the Cases, the dismissal of any of the Cases, or the filing of a motion by the Loan Parties seeking to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (d) the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order entered by the Bankruptcy Court in any of the Cases, (e) the date a sale of all or substantially all of the Loan Parties' assets is consummated under Section 363 of the Bankruptcy Code, (f) the acceleration of the Obligations and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the DIP Orders and the other Loan Documents, and (g) the date on which the Bankruptcy Court orders the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code.<br><br>*See* DIP Credit Agreement, § 1.01. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Initial Term Loan Commitment:  $40,000,000<br>Roll-Up Term Loans:  $200,000,000<br><br>*See* DIP Credit Agreement § 2.01 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | *Conditions to Closing*.  The DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP Credit Agreement § 4.01 |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Loans shall bear interest at the sum of the ABR *plus* 6.75% for ABR Borrowings and 7.75% for Term Benchmark Borrowings.<br><br>*See* DIP Credit Agreement § 2.13 |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-3 | The Company shall use the proceeds of the Loans in accordance with the Approved Budget (subject to any Permitted Variances) and the DIP Orders.  Subject to entry of the Interim DIP Order, the Company shall use the proceeds of the Roll-Up Term Loans to partially repay the Prepetition FILO Secured Obligations held by the Lenders (or their Affiliates and Approved Funds), in their capacities as Prepetition Secured Parties, in an amount equal to the amount of such proceeds, which shall reduce the principal amount of the Prepetition FILO Secured Obligations under the Prepetition Credit Agreement on a dollar-for-dollar basis.<br><br>*See* DIP Credit Agreement § 5.08. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | *Prepetition ABL AP Liens*.  Subject to the Carve-Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Secured Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Administrative Agent, for the benefit of itself and the Prepetition ABL Secured Parties, a continuing, valid, binding, enforceable, and perfected postpetition security interest in and |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | lien on all DIP Collateral subject to the priorities set forth in Paragraph 14(ii)(a) below (the "Prepetition ABL AP Liens").<br><br>*Prepetition FILO AP Liens.* Subject to the Carve-Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition FILO Secured Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition FILO Agent, for the benefit of itself and the Prepetition FILO Secured Parties, (i) continuing, valid, binding, enforceable, and perfected postpetition security interests in and senior liens on Postpetition FILO Priority Collateral,[4] and (ii) continuing, valid, binding, enforceable, and perfected postpetition security interests in and junior liens on Postpetition ABL Priority Collateral (the "Prepetition FILO AP Liens," and together with the Prepetition ABL AP Liens, the "Adequate Protection Liens").<br><br>*Prepetition ABL Superpriority Claim.* Subject and subordinate to the Carve-Out, as further adequate protection of the interests of the Prepetition FILO Secured Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition FILO Priority Collateral, the Prepetition FILO Agent, on behalf of itself and the Prepetition FILO Secured Parties, is hereby granted pursuant to section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (the "Prepetition FILO Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").<br><br>*Prepetition FILO Superpriority Claim.* Subject and subordinate to the Carve-Out, as further adequate protection of the interests of the Prepetition FILO Secured Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition FILO Priority Collateral, the Prepetition FILO Agent, on behalf of itself and the Prepetition FILO Secured Parties, is hereby granted pursuant to section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (the "Prepetition FILO Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").<br><br>*Adequate Protection Payments and Protections for Prepetition ABL Secured Parties.* As further adequate protection, the Debtors shall pay the following: (a) interest on the Prepetition ABL Secured Obligations at the default rate due under the Prepetition Credit Documents, payable in cash (but subject to the Challenge rights to the extent preserved in Paragraph 43 of the Interim Order), (b) immediately upon entry of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Administrative Agent arising prior to the Petition Date and reimbursable under the Prepetition Credit Documents, including, without limitation, the fees and expenses of the Prepetition Administrative Agent Advisors and (c) in accordance with the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Administrative Agent on and subsequent to the Petition Date and reimbursable under the Prepetition Credit Documents, including the Prepetition Administrative Agent |

---

[4] "Postpetition FILO Priority Collateral" means all DIP Collateral other than Postpetition ABL Priority Collateral.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Advisors, and (d) the Prepetition ABL Secured Obligations in accordance with the Approved Budget.<br><br>*Adequate Protection Payments and Protections for Prepetition FILO Secured Parties.* Subject to the Carve-Out and Reserves, as further adequate protection, in accordance with this Interim Order, the Debtors shall (a) pay in cash all interest on the Prepetition FILO Secured Obligations (net of the Roll-Up Amount) at the default rate due under the Prepetition Credit Documents (but subject to the Challenge rights to the extent preserved in Paragraph 43 below), and (b) pay in cash the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition FILO Agent and Prepetition FILO Lenders on, prior to, and subsequent to the Petition Date and reimbursable under the Prepetition Credit Documents, subject to the procedures set forth in Paragraph 37 of the Interim Order.<br><br>*Access to Books and Records.* The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Secured Parties and the Prepetition Secured Parties, all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order, or the Prepetition Credit Documents, as applicable or as otherwise reasonably requested by the DIP Secured Parties or the Prepetition Secured Parties, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Secured Parties and the Prepetition Secured Parties to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective senior management independent public accountants to the extent required by the DIP Documents or the Prepetition Credit Documents, and (iv) permit the DIP Secured Parties, the Prepetition Secured Parties, and their consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, as provided for in the DIP Documents.<br><br>*See* Interim Order ¶¶ 14, 21 |
| **Roll-Up**<br>Local Rule 4001-2(a)(i)(E) | Upon entry of the Interim Order, subject only to paragraph 43 of the Interim Order, Prepetition FILO Secured Obligations in an aggregate amount of up to $200 million shall be converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations, without any further action by the Debtors or any other party.<br><br>*See* DIP Credit Agreement, <u>Annex A</u>; Interim Order ¶ 8. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-3<br><br>**[Variance Covenant]**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | *See* DIP Credit Agreement § Annex B; Interim Order ¶ 16.<br><br>*Permitted Variances.* Each Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances. "<u>Permitted Variances</u>" shall mean, as of any Testing Date, (i) for the first two full calendar weeks following the Petition Date, a cumulative Receipts Variance up to 15% or a cumulative Disbursements Variance up to 15% on an aggregate basis contained in the Approved Budget (excluding professional fees); (ii) for the first three full calendar weeks following the Petition Date, a cumulative Receipts Variance up to 12.5% or a cumulative Disbursements Variance up to 12.5% on |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | an aggregate basis contained in the Approved Budget (excluding professional fees); and (iii) for the first four full calendar weeks following the Petition Date, and the trailing four-week period for each Testing Date thereafter, a cumulative Receipts Variance up to 10% or a cumulative Disbursements Variance up to 10% on an aggregate basis contained in the Approved Budget (excluding professional fees) (the two, three, and four-week periods set forth in these clauses (i)–(iii) each, a "Testing Period").  Each Testing Period shall begin on the applicable Sunday and end on the Saturday immediately prior to the applicable Testing Date. <br><br> *See* Interim Order ¶ 17. |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-3 | Usual and customary for financings of this type, including failure to obtain entry of the Interim Order. <br><br> *See* DIP Credit Agreement § 7.01. |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Documents and Interim Order contain indemnification provisions ordinary and customary for DIP financings of this type by the Borrowers and each Guarantor in favor of the DIP Agent, the DIP Lenders, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them subject to customary carve-outs. <br><br> *See* DIP Credit Agreement § 9.03. |
| **Entities with Interests in Cash Collateral** <br> Bankruptcy Rule 4001(b)(l)(B)(i) | As of the Petition Date, the Prepetition Secured Parties, as defined in the Prepetition Credit Agreement, have an interest in Cash Collateral subject to the terms of the DIP Credit Agreement and Interim Order. <br><br> *See* DIP Credit Agreement § 8.07 |
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-3 | The Interim Order provides a "Carve Out" of the sum of (a) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (c) below); (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (c) below); (c) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee, if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons"). <br><br> *See* Interim Order ¶ 34. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-3 | <u>DIP Origination Fee</u>.  The DIP Facility provides for a non-refundable origination fee equal to 1.00 % of the Initial Term Loan Commitment (as described above), which is fully earned and due and payable to the Administrative Agent upon the entry of the Interim DIP Order and such DIP Origination Fee shall be paid in cash on such date. <br><br> *See* DIP Credit Agreement § 2.12. |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) | *Section 506(c) Claims*.  Subject to entry of a Final Order, except to the extent of the Carve-Out, (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition Secured Parties with respect to the DIP Collateral |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Local Rule 4001-3<br><br>**Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | or the Prepetition Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Secured Parties.<br><br>*Section 552(b)*. The DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral, as applicable; provided that the foregoing waiver shall be without prejudice to any provisions of the Final Order.<br><br>*See* Interim Order ¶¶ 47, 49. |
| **Liens on Avoidance Actions**<br>Local Rule 4001-3 | Avoidance Proceeds shall be subject to liens upon entry of the Final Order.<br><br>*See* Interim Order ¶ 5, fn. 9. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-3 | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition ABL Lenders' claims and liens.<br><br>*See* Interim Order ¶ G(i)-(vi). |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-3 | The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve-Out and shall have the priorities set forth in Paragraph 14(ii)(a) below. Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens with respect to the DIP Collateral.<br><br>*See* Interim Order ¶ 6. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Borrowers shall comply with the following milestones in connection with the chapter 11 cases:<br><br>The DIP Credit Parties shall be required to meet the following milestones (each, a "<u>DIP Milestone</u>" and, collectively, the "<u>DIP Milestones</u>"):<br><br>(a)   On the Petition Date, the Debtors shall have filed (i) motions in form and substance satisfactory to the DIP Agent requesting approval from the Bankruptcy Court to (a) continue going out of business ("<u>GOB</u>") sales at all retail locations, and (b) assume their prepetition Letter Agreement dated as of September 11, 2020 and Letter Agreement |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | dated as of March 2, 2021 (each as amended and supplemented from time to time) with Hilco Merchant Resources, LLC, and (ii) a motion seeking approval of a Bidding Procedures Order (as defined below), which motion shall be in form and substance reasonably acceptable to the Required DIP Lenders. |
| | (b)      On or before (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order and the Cash Management Order; |
| | (c)      On or before seven (7) days after the Petition Date, the Court shall have entered an order in form and substance reasonably acceptable to the Required DIP Lenders, approving the bidding and auction procedures with respect to the sale by the Debtors of any, all or substantially all of the Debtors' assets (the "Bidding Procedures Order"); |
| | (d)      On or before twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order and the final Cash Management Order; |
| | (e)      On or before thirty-five (35) days after the Petition Date, the deadline for submission of bids for all or substantially all of the Debtors' assets shall have occurred pursuant to the Bidding Procedures Order; |
| | (f)      On or before forty (40) days after the Petition Date, the Debtors shall conduct an auction for all or substantially all of their assets pursuant to the Bidding Procedures Order; |
| | (g)      On or before forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered an order or orders approving the sale(s) of all or substantially all of the Debtors' assets; |
| | (h)      On or before ninety (90) days after the Petition Date, the Debtors shall have completed GOB sales at all retail locations; |
| | (i)      On or before ninety (90) days after the Petition Date, the Debtors shall have filed a chapter 11 plan (the "Plan"), which plan shall be in form and substance acceptable to the Required DIP Lenders; and |
| | (j)      On or before one-hundred twenty (120) days after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Plan. |
| | *See* Interim Order, Exhibit C. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | *Challenge Period.*  No later than (a) sixty (60) calendar days following the date of formation of a Committee (if appointed) or (b) 75 calendar days following entry of the Interim Order if no Committee is appointed.<br><br>*See* Interim Order ¶ 44. |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order, including to:  (a) permit the Debtors to grant the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as either the Prepetition Agent or the DIP Agent may reasonably request to assure the perfection and priority of |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under this Interim Order and the DIP Documents; and (d) authorize the Debtors to pay, and the DIP Secured Parties and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order<br><br>*See* Interim Order ¶ 19. |

## II.    The Debtors' Prepetition Capital Structure

20.    The following table summarizes the Debtors prepetition capital structure:

| ($ in millions) | Maturity | Principal |
|---|---|---|
| **Secured Debt Facilities** | | |
| ABL Facility | August 9, 2026 | $80.3 |
| FILO Term Loan Facility | August 31, 2027 | $547.1 |
| Letters of Credit | | $102.6 |
| Finance Leases | — | $61.5 |
| **Total Secured Debt** | | **$791.5** |
| **Unsecured Notes** | | |
| 3.749% Senior Notes Due 2024 | August 1, 2024 | $215.4 |
| 4.915% Senior Notes due 2034 | August 1, 2034 | $209.7 |
| 5.165% Senior Notes due 2044 | August 1, 2044 | $604.8 |
| **Total Unsecured Debt** | | **$1,029.9** |
| **Total Funded Debt** | | **$1,821.4** |

## III.    Funded Indebtedness.

### A.    The Prepetition ABL and FILO Term Loan Facility.

21.    Bed Bath & Beyond, Inc., as parent borrower, certain of its U.S. and Canadian subsidiaries, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "Prepetition ABL Agent" or "JPMorgan"), Sixth Street Specialty Lending, Inc. as the "first-in, last-out" agent (the "Prepetition FILO Agent" or "Sixth Street," together with JPMorgan, the "Lenders"), and certain lenders, are parties to that certain Amended and Restated

Credit Agreement, dated as of August 9, 2021.[5]  Over the course of the several amendments the Prepetition Credit Agreement the aggregate revolving commitments are permanently reduced from $1,130,000,000 to $300,000,000 (the "Prepetition ABL Facility").    The Prepetition Credit Agreement also provides for a "first-in, last-out" term loan facility of $475,000,000 (the "Prepetition FILO Term Loan Facility" and together with the Prepetition ABL Facility, the "Prepetition Credit Facilities").  The Prepetition ABL Facility matures on August 9, 2026 (or on May 1, 2024 if the 2024 Notes (as defined below) are outstanding on such date).  The Prepetition FILO Term Loan Facility matures on August 31, 2027 (or May 1, 2024 if the 2024 Notes (as defined below) on such date).

22.    The Prepetition Credit Facilities are secured on a first priority basis (subject to customary exceptions) on substantially all assets (other than certain real property or equipment located in the United States that is owned by, or leased to, the Company or any of its subsidiaries exceeding a certain threshold) of Bed Bath & Beyond and its subsidiaries that are borrowers or guarantors under the Prepetition Credit Facilities.  Amounts available to be drawn from under the Prepetition ABL Facility (including, in part, in the form of the issuance of letters of credit) are equal to the lesser of (i) outstanding revolving commitments under the Prepetition Credit Agreement and (ii) a borrowing base.  The term loans under the Prepetition FILO Term Loan Facility are also subject to a borrowing base.

---

[5]    As amended by the First Amendment to the Amended and Restated Credit Agreement, dated as of August 31, 2022, as further amended by the Second Amendment to the Amended and Restated Credit Agreement, dated as of February 7, 2023, as further amended by the Third Amendment to Amended and Restated Credit Agreement and Waiver, dated as of March 6, 2023, as further amended by the Fourth Amendment to Amended and Restated the Credit Agreement and Waiver, dated as of March 30, 2023, as further amended by the Fifth Amendment to the Amended and Restated Credit Agreement, dated as of April 6, 2023, and as may otherwise be amended, restated, supplemented, or otherwise modified from time to time (the "Prepetition Credit Agreement").

23.    As of the Petition Date, $547.1 million in borrowings remain outstanding under the Prepetition FILO Term Loan Facility.

**B.    The Prepetition Unsecured Bonds.**

24.    Bed Bath & Beyond, Inc. is also obligated under the following three tranches of unsecured debt securities (collectively, the "Senior Unsecured Notes"):

(i)    **3.479% senior notes due 2024 (the "2024 Notes")**.  On July 17, 2014, Bed Bath & Beyond issued $300 million of 3.478% senior unsecured notes due August 1, 2024 (approximately $215.4 million of which remains outstanding as of the Petition Date).  No other Debtor guarantees or is otherwise obligated under the notes.

(ii)    **4.915% senior notes due 2034 (the "2034 Notes")**.  On July 17, 2014, Bed Bath & Beyond issued $300 million of 4.915% senior unsecured notes due August 1, 2034 (approximately $209.7 million of which remains outstanding as of the Petition Date).  No other Debtor guarantees or is otherwise obligated under the senior notes.

(iii)    **5.165% senior notes due 2044 (the "2044 Notes")**.  On July 17, 2014, Bed Bath & Beyond issued $900 million of 5.165% of senior unsecured notes due August 1, 2044 (approximately $604.8 million of which remains outstanding as of the Petition Date).  No other Debtor guarantees or is otherwise obligated under the notes.

**C.    Finance Leases**

25.    The Company executed that certain Dedicated Warehousing Agreement, dated as of July 2021, by and between Bed Bath & Beyond Inc. and Ryder and that Service Agreement, dated as of July 9, 2021 and any corresponding Statement of Works (the "DWA") to provide the Company with warehousing and logistics services at warehouse locations specific to the Frackville, Pennsylvania location.

26.    The Company executed that certain Industrial Lease Agreement, dated as of April 2021, by and between Bed Bath & Beyond Inc. and NP New Castle, LLC (the "ILA" and together with the DWA, the "Finance Leases") for the lease of the premises with all of the related improvements, all located in Frackville, Pennsylvania for distribution, warehousing, and general office use.

27.     As of the Petition Date, approximately $61.5 million remains outstanding under the Finance Leases.

**D.     Preferred Stock.**

28.     As of the Petition Date Bed Bath & Beyond has 180 shares of Series A convertible preferred stock (the "Series A Convertible Preferred Stock").

**E.     Common Stock.**

29.     Shares of Bed Bath & Beyond's common stock have traded on Nasdaq exchange under the symbol "BBBY."  As of the Petition Date, approximately 428,120,000 shares of voting common shares were outstanding.

**The DIP Facility**

**I.     The Debtors' Need for Access to Financing and the Use of Cash Collateral.**

30.     As described in the First Day Declaration and the Etlin DIP Declaration, the Debtors enter these cases in dire financial straits.  As of the Petition Date, the Debtors' total cash balance is insufficient to operate their enterprise in the immediate term.  *See* Etlin DIP Decl. ¶ 13.  As a result of a constrained borrowing base and persistent substantial operating losses, the Debtors effectively have little to no access to liquidity under their Prepetition Credit Facility. *See* Etlin DIP Decl. ¶ 19.  Substantially all of the Debtors' cash represents Cash Collateral, and accordingly, the Debtors will not be able to meet their near-term liquidity needs without access to the additional financing afforded by the DIP Facility.  *See* Etlin DIP Decl. ¶ 14.

31.     Through these cases, the Debtors seek to effectuate an orderly wind-down of their businesses, while simultaneously gauging market interest in a potential going-concern sale of all or a portion of their assets.  Without the DIP Facility and access to Cash Collateral, the Debtors

face an immediate and disorderly liquidation, to the detriment of their estates, including the collateral positions of their secured lenders. *Id.* at ¶ 15.

32.     Prior to the Petition Date, the Debtors, in consultation with their proposed restructuring advisor, AlixPartners LLP ("Alix"), reviewed and analyzed their projected cash needs and prepared a projection (as updated from time to time in accordance with the terms of the DIP Documents, the "Budget") of postpetition cash needs of the Debtors in the initial 13 weeks of the Debtors' chapter 11 cases. *Id.* at ¶ 17. The Debtors believe that the Budget and the projections therein provide a good faith estimate of their funding requirements over the identified period and are reasonable and appropriate under the circumstances. *Id.* The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases.

33.     Based on these analyses, the Debtors determined that they would require incremental liquidity of approximately $40 million to meet their near-term liquidity needs. Immediate access to the DIP Facility and Cash Collateral is essential to not only meet working capital and business operating needs, but also to fund the administration of these chapter 11 cases, enabling the Debtors to wind-down their estates in an orderly fashion while pursuing a sale, liquidation, or other disposition of their assets. *Id.* at ¶ 18.

34.     Therefore, the Debtors believe the DIP Facility is essential to preserve and maximize the value of their estates and responsibly administer these chapter 11 cases.

**A.     Alternative Sources of Financing Are Not Available on Better Terms.**

35.     In anticipation of these chapter 11 cases, and in an effort to support a marketing and sale process, the Debtors commenced a marketing process to obtain postpetition financing and solicit interest in a going-concern sale transaction. Given the Debtors' need for near-term liquidity to shore up their operations, the Debtors and their advisors designed the process to generate interest

from a transaction counterparty who would serve as both a source of debtor-in-possession financing and a stalking horse purchaser or chapter 11 plan sponsor. *See* Kurtz DIP Decl. ¶ 16.

36.     In December 2022, the Debtors, with the assistance of Lazard Frères & Co. LLC ("Lazard"), commenced a process to solicit interest in a going-concern sale transaction that could be effectuated in chapter 11, as well as to solicit interest in providing post-petition financing. Lazard initially reached out to a group of potential financial and strategic investors who are experienced in investing in the retail sector, operational turnarounds and/or distressed situations and held meetings with certain of those investors in late December 2022. This initial group was comprised of approximately twenty investors. Those parties included various financial sponsors, strategic buyers, and money center banks. Several of the parties contacted could have potentially been acquirers of some or all of the Debtors businesses, as well as providers of post-petition financing to fund a going-concern reorganization. *See* Kurtz DIP Decl. ¶ 15. The Debtors solicited interest in a potential junior, unsecured, or administrative expense DIP from the outreach parties. *Id*. at ¶ 26.

37.     In total, nine parties entered into NDAs with the Debtors. *Id*. at ¶ 15. Following execution of the NDAs, several potential counterparties requested additional information and received access to a virtual data room. Kurtz DIP Decl. ¶ 16. The Debtors shared diligence materials (including proposed budgets and cash projections) with certain of these parties to discuss the structuring of a potential transaction. *Id*. In addition, certain parties conducted in-person meetings with the Debtors' management or held telephonic diligence meetings with Lazard. *Id*. The Debtors also received unsolicited inbounds from potential third-party financing sources who had some level of interest in potentially providing postpetition financing. *Id*. However, no viable third-party postpetition financing sources nor any plan sponsors or stalking horse purchaser

emerged given the uncertainty surrounding the Debtors' go-forward viability. *Id.* No party was willing to provide financing to the Debtors on a junior, unsecured, or administrative priority basis. *Id.* The Debtors lack sufficient unencumbered assets are insufficient to secure the magnitude of financing required to meet the Debtors' near-term liquidity needs. And no party that Lazard engaged with as part of the postpetition financing process (other than the DIP Lenders) was interested in providing a postpetition financing package in a sufficient amount to fund the Debtors' liquidity needs, either on a junior, unsecured, *pari passu*, or priming basis, even as the Debtors' imminent liquidity issues became public knowledge. *Id.* at ¶ 26.

38. During discussions with the advisors to the DIP Lenders, the DIP Lenders made it clear that that they would not consent to the Debtors' incurrence of priming financing by any other party. *Id.* at ¶ 28. Absent such consent, the Debtors risk a potentially costly and protracted non-consensual priming dispute between any postpetition lenders and the Debtors' prepetition secured lenders at a time when the Debtors' simply lack sufficient liquidity to engage in such a fight. *Id.* Furthermore, given the lack of alternatives available, the Debtors believe that providing the Roll-Up is a sound exercise of their business judgment. The DIP Facility is one of the central pillars of the proposed restructuring and the Roll-Up was a necessary prerequisite to the provision of loans set forth in the DIP Facility by the DIP Lenders. Absent the Emergency Rescue Loan and $40 million in new financing from the DIP Lenders, it is likely that the Debtors would have no alternative other than to launch a value-destructive, disorderly liquidation of their businesses at the outset of these chapter 11 cases. *Id.* at ¶ 29.

**B.    Negotiation of the DIP Facility.**

39. In the days leading up to the Petition Date, the Debtors and their advisors engaged in round-the-clock negotiations with the DIP Lenders around the terms of the DIP Facility. *Id.* at ¶ 23. Critically, pursuant to the terms of the Prepetition Credit Agreement, the Debtors required

the consent of both the Prepetition ABL Lenders and the Prepetition FILO Lenders prior to receiving debtor-in-possession funds from either party. *Id.* Accordingly, through their negotiations with the DIP Lenders, the Debtors encouraged the Prepetition ABL Lenders and the Prepetition FILO Lenders to reach consensus on a combined proposal. *Id.*

40.    The Debtors shared numerous draft term sheets and mark-ups, and held multiple telephone conferences with both the advisors to, and principals of, the DIP Lenders. *Id.* at ¶ 24. Despite the necessarily condensed timeframe for reaching a deal on postpetition financing, the Debtors marshaled information as quickly as possible and provided a number of critical due diligence items to the DIP Lenders. The parties engaged in hard-fought, arm's-length negotiations in an effort to reach the best available materials terms under the circumstances. *Id.*

**Basis for Relief**

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

    **A.     Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

41.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and use Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer

to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

42.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

43.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP Lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition

facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern

District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*** This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

44.    The Debtors' determination to move forward with the DIP Facility is an exercise

of their sound business judgment following an arm's length process and careful evaluation of

available alternatives.  Specifically, the Debtors and their advisors determined that the Debtors

would require significant postpetition financing to meet their near-term liquidity needs, and to

permit an orderly wind-down of their businesses.  Without the Emergency Rescue Loan and the

DIP Facility, the Debtors would have been unable to commence an orderly liquidation of their

business.  Both forms of financing were absolutely critical to the Debtors' strategy for entering

these cases on stable footing.  The DIP Facility will allow the Debtors to:  (a) provide working

capital for the Debtors; (b) finance interest, fees, expenses, and other costs related to the DIP

Facility; (c) make payments in respect of the Carve-Out and the Reserves; (d) satisfy any adequate

protection obligations owed under the DIP Orders; and (e) make permissible payments, including,

but not limited to, honoring employee wages and benefits and procuring goods and services, all in

accordance with a budget agreed to by the Debtors and the DIP Lenders .  The Debtors negotiated

the DIP Facility and other DIP Documents with the DIP Lenders in good faith, at arm's length,

and with the assistance of their respective advisors, and the Debtors believe that they have obtained

the best financing available under the circumstances.  Accordingly, the Court should authorize the

Debtors' entry into the DIP Credit Agreement, as it is a reasonable exercise of the Debtors'

business judgment.

### B.  The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.

45.    The Debtors propose to obtain financing under the DIP Facility by providing

security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the

Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders postpetition

security interest in and liens on the DIP Collateral (as defined in the Interim Order)  that are valid,

perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or

subordination immediately upon entry of the Interim Order.

46.    The above-described liens on encumbered and unencumbered assets are common

features of postpetition financing facilities, and were a necessary feature to provide security for

the proposed financings.  Indeed, postpetition financing facilities approved in this Circuit and

elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets such as

leaseholds that are subject to leases that prohibit the impositions of liens thereon.  *See, e.g.*, *In re

Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (approving DIP liens on

collateral including any leasehold interests or the proceeds thereof as permitted by applicable law);

*In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re Am.

Apparel, LLC*, No. 16-12551 (Bankr. D. Del. Dec. 12, 2016) (same); *In re Vestis Retail Grp., LLC*,

No. 16-10971 (Bankr. D. Del. Jun. 1, 2016) (same); *In re Quicksilver, Inc.*, No. 15-11880 (Bankr.

D. Del. Oct. 28, 2015) (same).

47.    The statutory requirement for obtaining postpetition credit under section 364(c) is

a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit

allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.  the credit transaction is necessary to preserve the assets of the estate; and

c.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

48.  As described above and as set forth in the Kurtz DIP Declaration, no third-party lender indicated it would be willing to provide postpetition DIP financing on an unsecured, *pari passu*, or junior-lien basis to the Prepetition Secured Parties. *See* Kurtz DIP Decl. ¶ 26. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders. Absent the DIP Facility, which will provide assurances that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the Debtors would likely need to launch a value-destructive, disorderly liquidation of their businesses at the outset of these chapter 11 cases. *Id.* at ¶ 29. Without postpetition financing, due to the Cash Dominion Period the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these chapter 11 cases. *See* Etlin DIP Decl. ¶ 19. Given the Debtors' dire financial

circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents, are reasonable as more fully set forth above and in the Kurtz DIP Declaration.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

49.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

50.    Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) Prepetition Secured Parties interest in collateral are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur

"priming" liens under the DIP Facility if either (a) their Prepetition Secured Parties have consented or (b) Prepetition Secured Parties interests in collateral are adequately protected.

51.    Here, in the last three days, the DIP Lenders have facilitated $94 million of new money financing:  a $54 million Emergency Rescue Loan and a $40 million New Money DIP Facility.  Given that no third party would provide the same amount or terms for such financing, the liens, claims, and other forms of adequate protection afforded to the DIP Lenders and Prepetition Secured Parties are both reasonable and necessary.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.    No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.**

52.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

53.     As noted above, the Debtors do not believe that a more favorable alternative DIP

financing is reasonably available given the realities imposed by the Debtors' existing capital

structure, the Debtors' lack of significant unencumbered value, and the Debtors' solicitation of

alternative financing proposals.  Thus, the Debtors have determined that the DIP Facility provides

the only viable means through which the Debtors can secure mission-critical liquidity in the near

term.  Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest

cost available while ensuring that the Debtors have runway to effectuate an orderly wind-down of

their businesses, or achieve a going-concern sale transaction.  Therefore, the Debtors submit that

the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable

terms be unavailable to the Debtors is satisfied.

**D.     The Repayment Features of the DIP Facility Are Appropriate.**

54.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease

property, other than in the ordinary course of business, with court approval.  It is well settled in

the Third Circuit that such transactions should be approved when they are supported by a sound

business purpose.  *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the

Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b)

of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business

justification for the proposed transaction).    The business judgment rule shields a debtor's

management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business

by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

55.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature

in debtor in possession financing arrangements.  Courts in this Circuit have approved similar DIP

features, including on the first day of the case.  *See, e.g.*, *In re ATD Corporation*, No. 18-12221

(KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to the DIP order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to the DIP order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to the DIP order); *In re Real Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to the Interim Order and a full roll-up pursuant to the Final Order of approximately $266 million prepetition debt); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included a full ABL roll-up of approximately $22 million prepetition debt pursuant to Interim Order).[6]

56.     The DIP Facility will roll up $200 million in indebtedness outstanding under the FILO tranche of the Prepetition Credit Agreement (the "Prepetition FILO Term Loan Facility"). The roll up of funds is a sound exercise of the Debtors' business judgment, is a material component of the DIP Facility, and was required by the DIP Lenders as a condition to their commitments to provide postpetition financing. *See* Kurtz DIP Decl. ¶ 29. The Debtors were unable to obtain DIP financing on similar terms that did not provide for the repayment of prepetition amounts. *Id.* Moreover, by entering into the DIP Facility and agreeing to the Roll-Up with the support of both the DIP Lenders and the Prepetition ABL Lenders, the Debtors will receive immediate access to

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Cash Collateral of the Prepetition Secured Parties, which the Debtors likely could not have secured under a postpetition financing provided by a third-party.[7] The DIP Lenders have agreed that the proceeds of the DIP Facility and DIP Collateral may be used, in part, (i) to fund chapter 11 administrative expense claims in connection with the Debtors' goal of confirming a plan of reorganization, and (ii) to fund expenses incurred in connection with the orderly wind-down and/or other disposition of their assets following confirmation of the plan of reorganization. Importantly, the DIP Lenders have also agreed to fund (in full) any required payments related to the Company's implementation of workforce reductions. These commitments are critical to the Debtors' ability to successfully administer these chapter 11 cases and preserve value of their estates for the benefit of all creditors.

57.    Furthermore, as discussed above, the FILO Lenders have provided the Company with significant liquidity in the prior months to afford the Company runway to execute on its turnaround plan, despite the possibility of a larger scale restructuring. Much of the rolled-up loans are loans made to the Company in the weeks prior to the filing; they are not "old money." The upsize to the FILO Facility in February 2023 and the overadvance in the days prior to the filing have served as a "pre-DIP" form of financing. The Debtors used the proceeds of these credit facilities to provide cash for working capital and pay professional fees necessary to facilitate a value-maximizing chapter 11 restructuring.

---

[7]    The proposed roll up must be viewed against a total new money infusion of $94 million since Friday, April 21. Absent the Debtors' urgent need for pre-bankruptcy funding, the New Money amount of the DIP Facility would have been $94 million and the Roll Up Amount would have been little more than a 2 to 1 ratio. However, the Debtors' need for prebankruptcy funds to pay critical expenses that would make possible an orderly liquidation, the FILO Lenders facilitated a separate $54 million funding (Emergency Rescue Loan). Viewed together, the Emergency Rescue Loan and New Money portion of the DIP Facility illustrate how reasonable the proposed Roll Up Amount truly is.

58.     Critically, the roll up of loans under the Prepetition FILO Term Loan Facility will not prejudice other parties in interest.  All other secured creditors have consented to the roll up provided under the DIP Facility.  Importantly, the roll-up will not prejudice any rights a party may otherwise have to challenge the amount, validity, perfection, enforceability, priority, or extent of the debt or liens associated therewith.  Pursuant to the procedures set forth in the Interim DIP Order, any official committee appointed in these chapter 11 cases and any other parties in interest have the ability to bring a challenge proceeding in accordance with applicable law.  Interim DIP Order ¶ 44.  These procedures were developed to ensure that no party in interest would be prejudiced by the relief requested herein and to provide the Court with comfort that any amounts provided on account of the refinancing can be disgorged, refunded, or repaid to the extent the DIP Facility debt or liens are successfully challenged.  Given these circumstances, the roll up is a sound exercise of the Debtors' business judgment and should be approved.

## II.     The Debtors Should Be Authorized to Use the Cash Collateral.

59.     Section 363 of the Bankruptcy Code generally governs the use of estate property.  Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.  Here, the DIP Lenders and the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

60.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate

protection on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

### A.     Adequate Protection Provided to the Prepetition Secured Parties.

61.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection (the "Adequate Protection Obligations") to protect against the postpetition diminution in value of the Cash Collateral resulting from the use,

sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay, including:

(a) *Prepetition FILO AP Liens*. Subject to the Carve-Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition FILO Secured Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition FILO Agent, for the benefit of itself and the Prepetition FILO Secured Parties, (i) continuing, valid, binding, enforceable, and perfected postpetition security interests in and senior liens on Postpetition FILO Priority Collateral,[8] and (ii) continuing, valid, binding, enforceable, and perfected postpetition security interests in and junior liens on Postpetition ABL Priority Collateral (the "Prepetition FILO AP Liens," and together with the Prepetition ABL AP Liens, the "Adequate Protection Liens").

(b) *Prepetition ABL Superpriority Claim*. Subject and subordinate to the Carve-Out, as further adequate protection of the interests of the Prepetition FILO Secured Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition FILO Priority Collateral, the Prepetition FILO Agent, on behalf of itself and the Prepetition FILO Secured Parties, is hereby granted pursuant to section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (the "Prepetition FILO Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").

(c) *Prepetition FILO Superpriority Claim*. Subject and subordinate to the Carve-Out, as further adequate protection of the interests of the Prepetition FILO Secured Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition FILO Priority Collateral, the Prepetition FILO Agent, on behalf of itself and the Prepetition FILO Secured Parties, is hereby granted pursuant to section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (the "Prepetition FILO Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").

---

[8] "Postpetition FILO Priority Collateral" means all DIP Collateral other than Postpetition ABL Priority Collateral.

(d)     *Adequate Protection Payments and Protections for Prepetition ABL Secured Parties*.  As further adequate protection, the Debtors shall pay the following:  (a) interest on the Prepetition ABL Secured Obligations at the default rate due under the Prepetition Credit Documents, payable in cash (but subject to the Challenge rights to the extent preserved in Paragraph 43 of the Interim Order), (b) immediately upon entry of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Administrative Agent arising prior to the Petition Date and reimbursable under the Prepetition Credit Documents, including, without limitation, the fees and expenses of the Prepetition Administrative Agent Advisors and (c) in accordance with the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Administrative Agent on and subsequent to the Petition Date and reimbursable under the Prepetition Credit Documents, including the Prepetition Administrative Agent Advisors, and (d) the Prepetition ABL Secured Obligations in accordance with the Approved Budget.

(e)     *Adequate Protection Payments and Protections for Prepetition FILO Secured Parties*.  Subject to the Carve-Out and Reserves, as further adequate protection, in accordance with this Interim Order, the Debtors shall (a) pay in cash all interest on the Prepetition FILO Secured Obligations (net of the Roll-Up Amount) at the default rate due under the Prepetition Credit Documents (but subject to the Challenge rights to the extent preserved in Paragraph 43 below), and (b) pay in cash the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition FILO Agent and Prepetition FILO Lenders on, prior to, and subsequent to the Petition Date and reimbursable under the Prepetition Credit Documents, subject to the procedures set forth in Paragraph 37 of the Interim Order.The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders Under the DIP Documents.**

62.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lender.  In particular, as noted above, the Debtors have agreed to pay a 1.00% origination fee relating to the New Money Amount in addition to the the other economics set forth in the DIP Credit Agreement.

63.    Courts in this district and others have approved similar aggregates in fees in large chapter 11 cases. *See [In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (approving a cash fee approximately 2.0 percent of the overall DIP facility); *In re PES Holdings LLC*, No. 18-10122 (KG) (Bankr. D. Del. Jan. 22, 2018) (same); *In re Toys "R" US, Inc.,* No. 17-34665 (KLP) (Bankr. E.D.Va. Sept. 19, 2017) (approving aggregate fees that were just less than 3.0 percent of the overall DIP facility).

64.    It is understood and agreed by all parties, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  *See* Kurtz DIP Decl. ¶ 32.  These fees constitute approximately 1 percent of the $40 million in initial term loan commitment being provided by the DIP Agent and DIP Lenders and there is no fee on account of the Roll-Up.  *Id*.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

65.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

66.     As explained herein, in the  the Kurtz DIP Declaration, the DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

67.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and an

appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents or applicable law.

68.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event).

**VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

69.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the Motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

70.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Facility. Absent access to the DIP Facility and the use of Cash Collateral, the Debtors will likely need to launch a

value-destructive liquidation at the outset of these chapter 11 cases. The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash. The Debtors will use cash to fund the operation of their business for a sufficient amount of time to either conduct an orderly wind-down of their businesses, or to pursue a going-concern sale transaction. Substantially all of the Debtors' available cash constitutes the Cash Collateral of the Prepetition Secured Parties. The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. *See* Etlin DIP Decl. ¶ 15. In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

71.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility. The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, and to implement the relief requested in the Debtors' other "first day" motions. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## **Request for Final Hearing**

72.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 28 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Request of Waiver of Stay**

73.     To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  Further, to the extent applicable, the Debtors request that the Court find that the provisions of Bankruptcy Rule 6003 are satisfied.  As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.

**Waiver of Memorandum of Law**

74.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

**No Prior Request**

75.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

**Notice**

76.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (c) the agents under the Debtors prepetition secured facilities and counsel thereto; (d) the DIP Agent counsel thereto; (e) Davis Polk & Wardwell, LLP, and Greenberg Traurig, LLP, in their capacity as counsel to the Prepetition ABL Agent; (f) the indenture trustee to the Debtors' Senior Unsecured Notes; (g) the United States Attorney's Office for the District of New Jersey; (h) the Internal Revenue Service; (i) the U.S. Securities and Exchange Commission; (j) the attorneys general in the states where the Debtors conduct their business operations; (k) the monitor in the CCAA

proceeding and counsel thereto; (l) the Debtors' Canadian Counsel; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally blank*]

**WHEREFORE**, the Debtors respectfully request that the Court enter DIP Orders, in substantially the forms submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: April 23, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:        msirota@coleschotz.com
                    wusatine@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email:        josuha.sussberg@kirkland.com
                    emily.geier@kirkland.com
                    derek.hunter@kirkland.com


*Proposed Attorneys for Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Interim Order**

*[Filed Separately]*

**<u>Exhibit B</u>**

**DIP Credit Agreement**

*[Filed Separately]*