**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re:<br>BED BATH & BEYOND INC., *et al*.,<br>Debtors.[1] | Chapter 11<br><br>Case No. 23-13359 (VFP)<br><br>(Joint Administration Requested) |

<div align="center">

**DEBTORS' MOTION FOR ENTRY OF AN**
**ORDER (I)(A) APPROVING THE AUCTION AND**
**BIDDING PROCEDURES, (B) APPROVING STALKING**
**HORSE BID PROTECTIONS, (C) SCHEDULING BID DEADLINES**
**AND AN AUCTION, (D) APPROVING THE FORM AND MANNER OF NOTICE**
**THEREOF, (E) APPROVING THE FORM APA, AND (II) (A) ESTABLISHING**
**NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT**

</div>

---

[1]  The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.   The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

**OF CONTRACTS AND LEASES, (B) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF ASSUMED CONTRACTS, (C) AUTHORIZING THE SALE OF
ASSETS AND (D) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
respectfully state the following in support of this motion (the "Motion"):

**Relief Requested**

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"):  (a) approving the proposed marketing, auction, and bidding procedures

attached as Exhibit 1 to the Order (the "Bidding Procedures"), by which the Debtors will solicit

and select the highest or otherwise best offer(s) for the sale or sales (the "Sale Transactions") of

all, substantially all, or any portion of the Debtors' assets (the "Assets"); (b) approving the

break-up fee and expense reimbursements relating to a stalking horse bidder (the "Stalking Horse

Bid Protections"); (c) establishing certain dates and deadlines related thereto and scheduling an

auction or auctions, if any, for the Sale Transactions (the "Auction"); (d) approving the manner of

notice of the Auction and sale hearing (the "Sale Hearing") as may be necessary; approving a form

of Asset purchase agreement, substantially in the form attached to the Bidding Procedures as

Schedule 2 (the "Form APA"); (e) approving procedures for the assumption and assignment of

certain Executory Contracts (as defined below) and Unexpired Leases (as defined below) in

connection with the Sale Transaction, if any; (f) providing that, in light of the fact that the Debtors'

privacy policy does not prohibit the transfer of personal identifiable information, the appointment

of a consumer privacy ombudsman is not required; and (g) granting related relief.

2.      Additionally, the Debtors will seek entry of one or more orders at the Sale Hearing

(the "Sale Order") (a) authorizing and approving the Sale Transaction with the Successful Bidder

on the terms substantially set forth in the Successful Bid; and (b) authorizing and approving the

sale of the Debtors' Assets free and clear of liens, claims, encumbrances, and other interests to the

extent set forth in an asset purchase agreement with a Successful Bidder; (c) authorizing the

assumption and assignment of executory contracts and leases as set forth in an asset purchase

agreement with a Successful Bidder; and (d) granting any related relief.

3.      In support of this motion, the Debtors respectfully submit the *Declaration of David*

*Kurtz in Support of the Debtors' Motion for Entry of an Order (I) Approving the Auction and*

*Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid*

*Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving*

*the Form APA, (VI) Establishing Notice and Procedures for the Assumption and Assignment of*

*Contracts and Leases, (VII) Authorizing the Assumption and Assignment of Assumed Contracts,*

*(VIII) Authorizing the Sale of Assets and (IX) Granting Related Relief*, (the "Kurtz Declaration")

and the *Declaration of Elise S. Frejka, CIPP/US, in Support of the Debtors' Motion Seeking Entry*

*of an Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid*

*Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner*

*of Notice Thereof, (V) Approving the Form APA, (VI) Establishing Notice and Procedures for the*

*Assumption and Assignment of Contracts and Leases, (VII) Authorizing the Assumption and*

*Assignment of Assumed Contracts, (VIII) Authorizing the Sale of Assets and (IX) Granting Related*

*Relief*, (the "Frejka Declaration") (filed contemporaneously herewith).[2]

## Jurisdiction and Venue

4.      The United States Bankruptcy Court for the District of New Jersey (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of*

---

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the
*Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc.,*

*Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and rules 6004-1, 6004-2, and 9013-1(a)(3) of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

7.      On April 23, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases is set forth in greater detail in the First Day Declaration, filed contemporaneously herewith and incorporated by reference herein.

8.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the

---

*in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), the Kurtz Declaration, or the Frejka Declaration, as applicable.

appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### Disclosures Under Local Rule 6004-1

9.     Local Rule 6004-1 requires, among other things, that a debtor include the "material terms of the proposed sale" in a sale motion.  As set forth above, the Debtors and their professionals have conducted a comprehensive marketing of the Debtors' assets.  Nevertheless, the Debtors do not, as yet, have an actionable offer in hand.  Moreover, because the Debtors continue to have discussions with parties in interest, they cannot, as of yet, identify, with any reasonable specificity, the terms of the sale of the Assets. Accordingly, the Debtors are unable, at this time, to make the disclosures required under Local Rule 6004-1.  In the event the Debtors secure one or multiple Stalking Horse Bidder(s), the Debtors will file the Stalking Horse purchase agreement and make the requisite disclosures.

### Introduction

10.     As described in the First Day Declaration, the Debtors commenced these chapter 11 cases following a year of financial tumult.  Poor earnings reports in early 2022 led to multiple downgrades to the Debtors' credit rating, and a subsequent purchase and sale of a massive stake in Bed Bath & Beyond by "meme" stock investors sent share prices plummeting.  These problems were exacerbated by the shifting consumer behavior in the wake of the COVID-19 pandemic and the supply chain crisis that followed.  As the Debtors' liquidity picture worsened over the past twelve months, efforts by prior management to reorient the Debtors' business around private-label products proved unsuccessful, leading to strained relationships with the Debtors' key stakeholders, including customers and vendors.  Despite the best efforts of the new management team to right the ship, facing a severely constricted liquidity picture, outstanding debt defaults, and rapidly

declining year over year sales, the Debtors determined to evaluate all strategic alternatives, including a sale of the Debtors' businesses.

11.     In December 2022, Lazard Frères & Co. LLC ("Lazard") commenced a process to solicit interest in a going-concern sale transaction, as well as to solicit interest in providing chapter 11 financing.  Lazard initially reached out to a group of potential financial and strategic investors who are experienced in investing in the retail sector, operational turnarounds and/or distressed situations and held meetings with certain of those investors in late December 2022. This initial group was comprised of approximately twenty investors, nine of which had executed confidentiality agreements by the second week of January 2023.  Those parties included various financial sponsors, strategic buyers, and money center banks.  Several of the parties contacted could have potentially been acquirers of some or all of the Debtors businesses, as well as providers of post-petition financing to fund a going-concern reorganization.

12.     In mid-January 2023, efforts to identify a potential plan sponsor and investors to provide post-petition financing intensified, the universe of potential investors that Lazard engaged with expanded, and diligence continued.  The Debtors and Lazard shared diligence materials and financial projections, discussed the structuring of potential transactions, and conducted in-person or telephonic meetings with certain of these parties and the Debtors' management.  The Debtors also received unsolicited inbounds from potential third-party financing sources who expressed some level of interest in potentially providing post-petition financing, which Lazard explored. At the same time, the Debtors' liquidity position was deteriorating rapidly.  By the end of January 2023, as the number of investors that Lazard was engaging with had increased and as investors continued to conduct diligence, it became apparent that the process was unlikely to yield a plan sponsor that would facilitate a going-concern reorganization.  By that time, Lazard had engaged

with approximately sixty potential investors to solicit interest in serving as a plan sponsor, acquiring some or all of the Debtors' assets or businesses, or providing post-petition financing. Thirty of those parties had executed confidentiality agreements.

13.    In January 2023, the Debtors executed a second engagement letter with Lazard to broaden the scope of the engagement, including to explore a potential sale and restructuring transaction to be implemented either out of court or in chapter 11.  In mid-April 2023, Lazard once again reengaged with potential investors in an effort to identify a plan sponsor in connection with a chapter 11 restructuring or a provider of post-petition financing.  In connection with that process, Lazard engaged with over 30 parties to assess interest in acquiring all or part of the business or providing DIP financing and no viable buyer was identified and no investors were willing to provide actionable DIP financing proposals.  In total, Lazard engaged with over 100 potential investors since December 2022; over 50 of those parties executed NDAs.  As set forth in my declaration in support of the postpetition financing motion, the Debtors again found themselves in an untenable liquidity position, necessitating the commencement of these chapter 11 cases.

14.    As set forth in the First Day Declaration, the prepetition sale process proved unsuccessful, producing limited interest in a viable proposal to acquire the Debtors' assets. Through the filing of these chapter 11 cases and this Motion, the Debtors seek to continue the process to sell any portion, all, or substantially all of the Debtors' Assets, either as a going concern or as a liquidation (whichever is most value maximizing to the Debtors' estates) to one or more third-party buyers.  That process will run in tandem with the continued liquidation of the business,

which is being implemented with the support of Hilco Merchant Resources, LLC ("Hilco")

pursuant to the wind-down procedures, filed contemporaneously herewith.

15.    The Debtors commenced these chapter 11 cases with committed postpetition

financing in the form of the DIP Facility, granting the Debtors with runway to pursue a sale

transaction while in bankruptcy.  Thus, time is of the essence.  Pursuant to the DIP Credit

Agreement, the Debtors must satisfy certain milestones (the "DIP Milestones") for the sale of their

Assets t, including:

- any bid deadline must be no more than 35 days from the Petition Date.

- the Bankruptcy Court shall have entered an order or orders approving the sale(s) of all or substantially all of the Debtors' assets no later than 45 days from the Petition Date.

16.    Conducting a thorough yet expedited bidding process and consummating a Sale

Transaction are vitally important to the Debtors' efforts to maximize value by selling the Assets.

Failure to comply with the DIP Milestones would place the Debtors in default under the DIP Credit

Agreement.  Such a result can, and should, be avoided in order to provide the Debtors with the

best chance to maximize the value of their estates through the sale of some or all of the Assets.

Such a Sale Transaction would benefit not only the Debtors, but their vendors, lenders, dedicated

employees, and other key stakeholders, as well.

17.    To preserve the value of the Debtors' estates—and to offer the Debtors a chance to

increase the ultimate value provided by the monetization and disposition of their assets—the

Debtors propose the Bidding Procedures contemplated herein.  The Bidding Procedures provide

substantial flexibility with respect to the structure of any transaction(s).  The Debtors will consider

all viable options in accordance with the Bidding Procedures before determining if selling Assets

will, in their business judgment, maximize value for the estate.  Any delay would hinder the

Debtors' efforts to maximize value. Accordingly, the proposed Bidding Procedures should be approved.

**Proposed Sale Process and Selection of Stalking Horse Bidder**

**I.     The Bidding Procedures.**

18.     The Debtors seek approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of bids in a fair, accessible, and expeditious manner. The Bidding Procedures contemplate that all parties that execute confidentiality agreements in accordance with the Bidding Procedures will continue to have access to the virtual data room throughout the sale process.

19.     The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and any person or entity interested in purchasing the Assets (a "Potential Bidder") with the need to run an expeditious and efficient sale process or processes. The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids. The Debtors believe that the Bidding Procedures and the timeline set forth therein are in the best interests of the Debtors' estates, will establish the extent of the market for the Debtors' Assets, and provide interested parties with sufficient opportunity to participate. Because the Bidding Procedures are attached as Exhibit 1 to the Order, they are not restated in their entirety herein. Generally speaking, however, the Bidding Procedures establish the following, among other things:[3]

> a.     **Public Announcement of Auction**. As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall (i) serve on the

---

[3]     This summary is provided in accordance with Local Rule 6004-2(b) and for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects.

parties that receive notice of this Motion, including the Consultation Parties (as defined in the Bidding Procedures), a notice (A) setting forth (I) the date, time, and place of the (a) Auction and (b) the Sale Hearing (as defined below) and (II) the deadlines and procedures for objecting to the proposed Sale Transaction(s), (B) the Bidding Procedures Order and the Bidding Procedures in the form attached to the Bidding Procedures as <u>Schedule 1</u> (the "<u>Auction Notice</u>"), (ii) publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times (National Edition)* to provide notice to any other potential interested parties, and (iii) post the Auction Notice on their case website, <u>https://restructuring.ra.kroll.com/bbby</u>.  The Auction Notice shall include a complete list and general description of the Assets for sale (such Assets, the "<u>Specified Assets</u>").

*See* Bid. Proc., at § II.

b.    **Potential Bidder Qualifications**.  Each Potential Bidder must deliver or have previously delivered to the Debtors the following preliminary documentation:

    1.    an executed confidentiality agreement (a "<u>Confidentiality Agreement</u>") in form and substance acceptable to the Debtors;

    2.    sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or substantially all of the Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties; and

    3.    a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

*See* Bid. Proc., at § III.

c.    **Qualified Bid Requirements**.  To participate in the Auction, Potential Bidders that have submitted necessary and acceptable documentation (each, an "<u>Acceptable Bidder</u>") must submit to the Debtors and their advisors an irrevocable offer for the purchase of some or all of the Assets (each, a "<u>Bid</u>") meeting the criteria set forth in the Bidding Procedures prior to the bid deadline, (each, a "<u>Qualified Bid</u>"), including:

    1.    (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c)

as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern or to liquidate the business;

2.  cash deposit in the amount equal to 10% of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"); *provided* that the Agents shall not be required to submit a Good Faith Deposit.  To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction;

3.  the Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities (the "Purchase Price"), (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable Assets; *provided* that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation. The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis. Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as separate Bid for one or more sets of Assets;

4.  to the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

5.  each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include: (a) form of purchase agreement, (b) a schedule of contracts and leases to be assumed to the extent applicable to the Bid, (c) with respect to the purchase agreement, a redline of such agreement marked to reflect the amendments and

modifications made to the form of the purchase agreement attached to the Bidding Procedures as <u>Schedule 2</u>, (d) any other material documents integral to such Bid, and (e) a statement from the Acceptable Bidder that  (i) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than ten (10) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "<u>Bid Deadline</u>")) and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best bid (the "<u>Back-Up Bid</u>") until the consummation of the Sale Transaction;

6.  the Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid.  If the Acceptable Bidder does not intend to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid, the Acceptable Bidder must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are primarily employed in connection with the applicable Assets, and a description of any contemplated incentive plan, to the extent applicable;

7.  evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

8.  compliance in all respects with the Debtors' consumer privacy policy, which does not restrict the transfer of the personally identifiable information of its customers, and contain a statement acknowledging such compliance;

9.  acknowledgement in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction.  For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential

Bidder(s) with the Debtors' prior written consent (email shall suffice);

10. the Bid includes a statement that in the event a Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale Transaction;

11. providing that the Acceptable Bidder will serve as a back-up bidder (the "Back-Up Bidder") if the Acceptable Bidder's Bid is the next highest or otherwise best bid (the "Back-Up Bid");

12. each Bid must (i) identify any executory contracts (the "Executory Contracts") and any unexpired leases (the "Unexpired Leases") to be assumed or assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all cure amounts (the "Cure Amounts") related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code; and

13. submitting to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Plan, the Sale documents, and the Closing, as applicable.

Notwithstanding anything to the contrary in this Motion or the Bidding Procedures, any Bid submitted by the Agents or their assignees shall be a Qualified Bid.

*See* Bid. Proc., at § IV.

d. **Stalking Horse Bid Protections**. In the event that the Debtors receive one or more Qualified Bids, at any time until May 22, 2023, at 5:00 p.m. (prevailing Eastern Time), the Debtors shall be authorized, but not obligated, in an exercise of their reasonable business judgment, in consultation with the Consultation Parties and with the consent of the DIP Agent, to (a) select one or more Acceptable Bidders to act as the stalking horse bidder (the "Stalking Horse Bidder") in connection with the Auction for such Assets, and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder provide a break-up fee (the "Break-Up Fee") and agree to reimburse the reasonable and documented out of pocket fees

and expenses, subject to a cap to be agreed upon by the Debtors, in their business judgment (the "Expense Reimbursement"), in an aggregate amount not to exceed three percent of the proposed Purchase Price.

See Bid. Proc., at § IX.

20.    Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value, and, as such, do not impair the Debtors' ability to consider all Qualified Bid proposals, and preserve the Debtors' right to modify the Bidding Procedures in accordance with its terms as necessary or appropriate to maximize value for their estates.

## II.    The Sale and Auction Dates and Deadlines Schedules.

21.    The Debtors are seeking approval of the Bidding Procedures and the following proposed timeline for the sale process (the dates set forth below, respectively, the "Sale Schedule") to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that allows the Debtors to consummate a Sale Transaction.  Moreover, the Debtors, in their sound business judgment, reserve the right to alter the timing of the Sale Schedule as necessary under the circumstances, or to conduct multiple Sale Transactions across one or more Auctions in order to maximize the value of the estates, in each case in accordance with the Bidding Procedures.  The Debtors respectfully request that the Court approve the Sale Schedule.

### The Sale Schedule

| Action | Description | Deadline |
|---|---|---|
| Stalking Horse Deadline | The deadline by which the Debtors may choose a Stalking Horse Bidder. | May 22, 2023 at 5:00 p.m. prevailing Eastern Time. |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | May 28, 2023 at 12:00 p.m. prevailing Eastern Time. |
| Auction | The date and time of the Auction, if one is needed, which will be held at the offices of Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, 10022. | June 2, 2023 at 10:00 a.m. prevailing Eastern Time, if needed. |
| Notice of Successful Bidder | As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder (as defined in the Bidding | As soon as reasonably practicable after the conclusion of the Auction (if necessary). |

14

| Action | Description | Deadline |
|---|---|---|
|  | Procedures) (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder, Assets, and key terms of the agreement. |  |
| Sale Hearing | The hearing before the Court to consider approval of the Winning Bid or Winning Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale. | June 7, 2023 at 10:00 a.m. prevailing Eastern Time, or as soon thereafter as the Debtors may be heard. |

22.    The timelines contemplated in the foregoing Sale Schedule are essential to maximize value for the Debtors' estates and could enable a faster emergence from chapter 11. The Debtors believe that the relief sought by this Motion appropriately balances the need to provide all parties in interest with notice and due process, afford the Debtors sufficient time to generate interest in any or all of the Assets, and provide the Debtors with an expeditious process commensurate with the Debtors' liquidity constraints.  In short, the relief sought by this Motion is the Debtors' best chance to preserve going-concern value.  Accordingly, the Debtors believe the relief requested herein is in the best interest of the Debtors' estates, will provide interested parties with sufficient opportunity to participate in the process, and, therefore, should be approved.

**III.    Form and Manner of Auction Notice**.

23.    The Auction, if needed, will be held on June 2, 2023 at 10:00 a.m. prevailing Eastern Time (or such other date as selected by the Debtors) at the offices of the proposed co-counsel to the Debtors:  Kirkland & Ellis LLP, 601 Lexington Ave., New York, NY 10022.

24.    As soon as practicable after entry of the Order, the Debtors will cause the Auction Notice to be served on the parties that receive notice of this Motion.  In addition, as soon as practicable after entry of the Order, the Debtors will post the Auction Notice on their restructuring website, https://restructuring.ra.kroll.com/bbby and publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National

Edition), to provide notice to any other potential interested parties.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

25.      The Auction Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale Transaction, including the date, time, and place of the Auction (if any), the Bidding Procedures, and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Auction Notice be approved and no other or further notice of the Auction be required.

### Basis for Relief

## I.    The Relief Sought in the Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.

26.      "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold."  John J. Jerome & Robert D. Drain, Bankruptcy Court is Newest Arena for M&A Action, N.Y.L.J., June 3, 1991; *see In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Adams Res. Expl. Corp.*, No. 17-10866, 2017 WL 5493616, at *1 (Bankr. D. Del. May 24, 2017) ("The Sale Procedures are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estates under the circumstances of this case.").  In furtherance of that goal, bidding procedures and bid protections, such as those proposed here, may be used in court-supervised asset sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers," and maximize value.  Jerome & Drain (1991) at 8, col. 4; *see In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (recognizing that bid

protections "encourage a prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the prospective bidder that it will receive compensation for that undertaking if it is unsuccessful"); *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that bidding procedures "intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Metaldyne Corp.,* 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer").  In overseeing an asset sale subject to an auction process, the bankruptcy court must weigh:

> on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.

*In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992).  Because the bankruptcy court must perform this balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it."  *Id.* at 169–70; *see Dura Automotive*, 2007 WL 7728109, at *90

("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.").

27.     Here, the Debtors submit that the Bidding Procedures are a valid exercise of their business judgment, fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this circuit, and in the best interest of their estates.  Courts have consistently held that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.'  If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *Schipper*, 933 F.2d at 515 (internal citations and quotations omitted) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see Integrated Res.*, 147 B.R. at 656 (applying business judgment rule to bidding procedures and incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence");.

28.     The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value of their assets for the benefit of the Debtors' estates.  The proposed Bidding Procedures will allow the Debtors to conduct any Sale Transactions in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who can demonstrate the ability to close a Sale Transaction.  In particular, the Bidding Procedures contemplate an open and public marketing process with

minimum barriers to entry and provide Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  In addition, the Order provides that the Debtors may alter the Sale Schedule and/or run multiple Auctions as necessary, thereby preserving the Debtors' ability to run a tailored, value-maximizing process for any particular group of Assets.

29.     The Debtors respectfully submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings in bankruptcy proceedings, and are consistent with the controlling legal standard in the Third Circuit.  Accordingly, the Debtors request that the Court approve the Bidding Procedures as a valid exercise of the Debtors' business judgment.

## II.    The Bid Protections Have a Sound Business Purpose and Should Be Approved.

30.     In the event the Debtors seek to appoint a Stalking Horse Bidder, the Debtors seek authority to offer customary bid protections, consisting of a Break-Up Fee and Expense Reimbursement, in an aggregate amount not to exceed three percent of the applicable purchase price.  The use of a stalking horse in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).

31.     Generally, bidding protections, such as break-up fees, are a normal and, in many cases, necessary component of significant sales under the Bankruptcy Code.  *See Integrated Res.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . . In fact, because the . . . corporation has a duty to encourage

19

bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value.") (emphasis

added).  As a result, courts routinely approve such bidding protections in connection with proposed

bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.

*See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he

allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees

[a]re actually necessary to preserve the value of the estate.") (internal quotations omitted)

(alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010);

*O'Brien*, 181 F.3d 527.   The Debtors believe that the allowance of the Stalking Horse Bid

Protections are in the best interests of the Debtors' estates and their creditors, as a Stalking Horse

Bidder, if designated, will establish a floor for further bidding that may increase the consideration

given in exchange for the Assets for the benefit of the Debtors' estates.

32.     In the Third Circuit, bidding protections, such as those proposed here, are subject

to the general standard used for administrative expenses under section 503 of the Bankruptcy Code.

*Energy Future*, 904 F.3d at 313 (citing *O'Brien*, 181 F.3d at 535); *Reliant Energy*, 594 F.3d at 206

(holding that the general standard used for all administrative expenses applies to break-up fees).

Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon

the requesting party's ability to show that the fees were actually necessary to preserve the value of

the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181

F.3d at 535).

33.     The Debtors propose to pay the Stalking Horse Bid Protections only in the event

they determine, after good faith, arm's-length negotiations, that designating a Stalking Horse

Bidder would be necessary and beneficial for their estates.   Courts in this district have routinely

approved break-up fees and/or expense reimbursements offered to stalking horse bidders.   *See,*

*e.g.*, *In re Alliant Techs., L.L.C.*, No. 21-19748 (JKS) (Bankr. D.N.J. Jan. 21, 2022) [Docket No. 101] (approving bidding procedures and bidding protections including an expense reimbursement payable to the stalking horse bidder); *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (approving bidding procedures and bidding protections including a break-up fee payable to the stalking horse bidder); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72] (same); *In re New England Motor Freight, Inc.*, No. 19-12809 (JKS) (Bankr. D.N.J. April 8, 2019) [Docket No. 427] (same); *In re Aceto Corp.*, No. 19-13448 (VFP) (Bankr. D.N.J. Mar. 19, 2019) [Docket No. 174] (same).

34.    Without the Stalking Horse Bid Protections, a potential bidder may elect not to participate in the process at all to the detriment of the Debtors' estates.  The Bidding Procedures do not require the payment of the Stalking Horse Bid Protections.  Rather, the Debtors have the option of paying or otherwise incurring such obligations in the event that offering such Stalking Horse Bid Protections is necessary to foster a competitive bidding process that will maximize the value of the Debtors' estates.  In that instance, the value created for the Debtors' estates will likely greatly outweigh the cost of any Stalking Horse Bid Protections.  In any case, granting the Debtors authority to offer the Stalking Horse Bid Protections sends a strong signal to the market that the Debtors are serious about running a competitive sale process to generate the best result for the Debtors and their estates.

35.    The Stalking Horse Bid Protections shall not exceed three percent of the proposed purchase price.  This is an amount that is well within market for transactions of this type, and which has been routinely approved by courts in this district.  *See, e.g.*, *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (approving break-up fee of up to three percent of the proposed purchase price); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK)

(Bankr. D.N.J. July 13, 2020) [Docket No. 72] (same); *In re New England Motor Freight, Inc.*,

No. 19-12809 (JKS) (Bankr. D.N.J. April 8, 2019) [Docket No. 427] (same); *In re Aceto Corp.*,

No. 19-13448 (VFP) (Bankr. D.N.J. Mar. 19, 2019) [Docket No. 174] (approving break-up fee of

up to two percent of the cash component of the proposed purchase price); *In re East Orange Gen.

Hosp.*, No. 15-31232 (VFP) (Bankr. D.N.J. Dec. 15, 2015) [Docket No. 171] (approving break-up

fee of approximately four percent of the proposed aggregate consideration).

36.    Accordingly, for the reasons set forth above, the Debtors respectfully submit that

the Court grant the Debtors the authority to incur and pay the Stalking Horse Bid Protections to

the extent the Stalking Horse Bid Protections are necessary to preserve the value of the Debtors'

estates.

**III.    The Form and Manner of Notice Should Be Approved**.

37.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors

with 21 days' notice of the Auction.  Pursuant to Bankruptcy Rule 2002(c), such notice must

include the time and place of the Auction and the deadline for filing any objections to such a sale.

38.    As soon as reasonably practicable following entry of the Order, the Debtors will

cause the Auction Notice to be served upon (a) the United States Attorney's Office for the District

of New Jersey, (b) the Internal Revenue Service, (c) the attorneys general for the states in which

the Debtors operate, (d) any parties known or reasonably believed to have expressed an interest in

the Debtors' assets, (e) all entities known or reasonably believed to have asserted a lien,

encumbrance, claim, or other interest in any of the Debtors' assets, and (f) any party that has

requested notice pursuant to Bankruptcy Rule 2002.

39.    The Debtors submit that the Auction Notice constitutes good and adequate notice

of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of,

the applicable requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.  Accordingly, no

further notice is necessary and the Debtors request that this Court approve the form and manner of the notice of the Auction Notice.

**IV.    The Assumption and Assignment Procedures Are Appropriate and Should be Approved.**

40.    As set forth above, the Sale Transaction contemplates the assumption and assignment of Executory Contracts and Unexpired Leases to the Successful Bidder.  In connection with this process, the Debtors believe it is necessary to establish assumption and assignment procedures by which: (a) the Debtors and Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure payments (the "Assumption and Assignment Procedures").  As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure payments identified in the Contract Assumption Notice.  *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

41.    The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

**V.      The Sale Transaction Should be Approved as an Exercise of Sound Business Judgment.**

42.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm, of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

43.      Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'"  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *Integrated Res*., 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

**a.      A Sound Business Purpose Exists for the Sale.**

44.      Here, a sound business purpose exists for the Sale Transaction because the Debtors believe that the Sale Transaction will maximize the value of their Assets, exposing them to the

market as part of a competitive, arms' length process.  Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative.  *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure[, t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").  Also, because any sale of the Debtors' Assets will likely contemplate the assumption of certain of the Debtors' Executory Contracts and Unexpired Leases, it will result in payment in full for a number of the Debtors' creditors.

45.    Thus, the Debtors submit that the Successful Bid will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into a purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**b.    Adequate and Reasonable Notice of the Auction and Sale Will be Provided.**

46.    The Auction Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale Transaction.  Significantly, the form and manner of the Sale Notice will have been approved by

this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

      **c.**      **The Sale and Purchase Price Reflects a Fair Value Transactions.**

47.      It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat 'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P 'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

48.      As noted above, prior to the Bid Deadline, Lazard will continue to market the Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary the purchase price will, conclusively, be deemed fair value.

      **d.**      **The Sale Transaction Has Been Proposed in Good Faith Without Collusion, and the Successful Bidder Is a "Good-Faith Successful Bidder."**

49.      The Debtors request that the Court find the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of Assets.

50.      Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b)
> or (c) of this section of a sale or lease or property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

51.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good-faith finding may not be made.  *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788

F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th

Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a

judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the

trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy

Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608,

610 (S.D.N.Y. 1988) (same).

52.     The Debtors submit that the Successful Bidder(s), will be "good faith purchasers"

within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse purchase

agreement, if any, or the Form APA, or any marked versions thereof, would be a good-faith, arms'-

length agreement entitled to the protections of section 363(m) of the Bankruptcy Code.[4]  *First,* as

---

[4]    The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code
will be appropriate for any Successful Bidder.  Pursuant to the Bidding Procedures, any Successful Bidder will
have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose

set forth in more detail above, the consideration to be received by the Debtors from a Successful

Bidder will be substantial, fair, and reasonable.  *Second,* any sale agreement with a Successful

Bidder will presumably be the culmination of a competitive Auction process in which all parties

will be represented by counsel and all negotiations will be conducted on an arm's-length, good-

faith basis.  *Third,* there is no indication of any "fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar

conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy

Code.  And, with respect to potential bidders, the Bidding Procedures are designed to ensure that

no party is able to exert undue influence over the process.  *Finally,* any bids that the Debtors

ultimately determine to be Successful Bids will have been evaluated and approved by the Debtors

in consultation with their advisors.  Accordingly, the Debtors believe that the Successful Bidder,

if any, and any purchase agreement associated with a Successful Bid should be entitled to the full

protections of section 363(m) of the Bankruptcy Code.

> **e.     The Sale Transaction Should be Approved "Free and Clear" Under Section 363(f).**

53.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and

clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such

a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale

price of the property exceeds the value of all liens on the property; (d) the interest is the subject of

a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable

proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

---

as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith
under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court
with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the
Bankruptcy Code has been satisfied.

54.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all Encumbrances, except with respect to any interests that may be assumed liabilities under the applicable Purchase Agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

55.    The Debtors submit that any interest in the Assets that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Successful Bidder, if any, free and clear of all encumbrances, with any such encumbrances to attach to the proceeds of the Sale Transaction.

**VI.    The Assumption and Assignment of the Contracts Should be Approved.**

   **a.    The Assumption and Assignment of the Executory Contracts and Unexpired Leases Reflects the Debtors' Reasonable Business Judgment.**

56.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether

executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.")

57.     Here, the Court should approve the decision to assume and assign certain designated Executory Contracts and Unexpired Leases (the "Assumed Contracts") in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment. *First,* certain of the Executory Contracts and Unexpired Leases are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. *Second,* it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the Executory Contracts and Unexpired Leases needed to manage the Debtors' day-to-day operations were included in the transaction. *Third,* any Stalking Horse purchase agreement and any marked copy of the Form APA submitted by Potential Bidder will likely provide that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, a proposed Sale. *Finally,* the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

58.     Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**b.      Defaults Under the Assumed Contracts Will Be Cured Through the Sale Transaction.**

59.     Upon finding that a debtor has exercised its business judgment in determining that assuming an Executory Contract or Unexpired Lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  Section 365 "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

60.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because any Stalking Horse purchase agreement and any marked copy of the Form APA submitted by Potential Bidder will require that the Debtors cure all defaults associated with, or that are required to properly assume, any Executory Contracts or Unexpired Leases.  Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure payments or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Executory Contract or Unexpired Lease counterparties (the "Contract Counterparties").

**c.      Contract Counterparties Will Be Adequately Assured of Future Performance.**

61.      Similarly, the Debtors submit that the third requirement of section 365(b) of the

Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts

and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted

from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic

construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19

B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the

required assurance will fall considerably short of an absolute guarantee of performance." *In re*

*Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate

assurance may be given by demonstrating the assignee's financial health and experience in

managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B R. 596, 605-

06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective

assignee has financial resources and has expressed a willingness to devote sufficient funding to a

business to give it a strong likelihood of succeeding).

62.      The Debtors believe that they can and will demonstrate that the requirements for

assumption and assignment of the Assumed Contracts to the Successful Bidder will be satisfied.

As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of

potential bidders before designating such party a Qualified Bidder *(e.g.,* financial credibility,

willingness, and ability of the interested party to perform under any Contracts to be assumed) and

will demonstrate such financial wherewithal, willingness, and ability to perform under any

Contracts to be assumed and assigned to a Successful Bidder.  Further, the Assumption and

Assignment Procedures provide the Court and other interested parties ample opportunity to

evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate

assurance of future performance and object to the assumption of the Contracts or proposed cure payments.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the any Executory Contract or Unexpired Lease to be assumed and assigned to any Successful Bidder.

## VII.    The Sale of Personally Identifiable Information Should be Allowed Without Appointment of a Consumer Privacy Ombudsman.

63.    Section 101(41A) of the Bankruptcy Code defines "personally identifiable information" ("Personally Identifiable Information") as an individual's name, residence address, email address, telephone number, social security number, or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual.  11 U.S.C. § 101(41A).  Section 332 of the Bankruptcy Code requires the appointment of a consumer privacy ombudsman (an "Ombudsman") only when a debtor seeks to sell or transfer Personally Identifiable Information in contravention of the debtor's privacy policy with respect to the transfer of such Personally Identifiable Information.  *See* 11 U.S.C. § 363 (b)(1)(A).

64.    As set forth in the Frejka Declaration, on November 6, 2006, the Debtors adopted a now common practice of permitting the transfer of Personally Identifiable Information to an unaffiliated third-party as part of a broader business transaction.  Since the Debtors adopted this practice, any consumer who voluntarily provided the Company with Personally Identifiable Information has affirmatively consented, or opted-in,[5] to the collection and use of Personally Identifiable Information, the transfer of such Personally Identifiable Information as part of a business transaction, and to look to the Company's website(s) to determine whether there has been

---

[5]    "Opt-in" consent requires affirmative steps by a consumer to allow the collection and/or use of information; "Opt-out" consent requires affirmative steps to prevent the collection and/or use of information.

a change to the Privacy Policy or the Company's use and disclosure of Personally Identifiable Information.  As such, if a consumer originally provided the Company with Personally Identifiable Information in 2004, for example, and continued to access the websites and engage in transactions with the Company in 2023, such consumer has been deemed to consent to the current privacy policy which permits the sale of Personally Identifiable Information as part of a corporate transaction.

65.    Thus, because consumers[6] affirmatively consented to the transfer of their Personally Identifiable Information as part of a sale when they (a) subscribed to receive communications from the Company, (b) registered for Welcome Rewards, (c) entered a sweepstakes or other promotion, (d) created an account with the Debtors, or (e) otherwise continued to interface with the Company, the appointment of an Ombudsman is necessary or required to effectuate a transfer of the Debtors' customer data to an unaffiliated third-party.

## VIII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

66.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease ... is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The

---

[6]  The Debtors will focus on any limitations imposed on the sale or transfer of Personally Identifiable Information by the European Union (EU) General Data Protection Regulation (2016/679), the UK Data Protection Act of 2018, the California Consumer Privacy Act of 2018 ("CCPA") (Cal. Civ. Code §§ 1798.100-1798.199) and other state data protection laws once a buyer is identified but this is not a basis to appoint a consumer privacy ombudsman.  While the Company does not intentionally collect Personally Identifiable Information from residents of the United Kingdom or the European Union, consumers visiting from those countries may have signed up for marketing messages to receive coupons and other discounts while in the United States.

Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

67.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

68.     To maximize the value received for the Assets, the Debtors seek to close the Sale Transaction as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**<u>Request of Waiver of Stay</u>**

69.     To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to operate their business and preserve the value of their estates.

**Waiver of Memorandum of Law**

70.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

**Reservation of Rights**

71.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the Motion are valid, and the rights of all parties are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**No Prior Request**

72.    No prior request for the relief sought in this Motion has been made to this Court or any other court.

**Notice**

73.    The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the DIP Agent counsel thereto; (e) Davis Polk & Wardwell, LLP, and Greenberg Traurig, LLP, in their capacity as counsel to the Prepetition ABL Agent; (f) the indenture trustee to the Debtors' Senior Unsecured Notes; (g) the United States Attorney's Office for the District of New Jersey; (h) the Internal Revenue Service; (i) the U.S. Securities and Exchange Commission; (j) the attorneys general in the states where the Debtors conduct their business operations; (k) the monitor in the CCAA proceeding and counsel thereto; (l) the Debtors' Canadian Counsel; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: April 23, 2023

<div style="margin-left: 45%;">

/s/ Michael D. Sirota
<hr>

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email:    josuha.sussberg@kirkland.com
          emily.geier@kirkland.com
          derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and Debtors in Possession*

</div>

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | |
| Debtors.[1] | Case No. 23-13359 (VFP) |
| | (Joint Administration Requested) |

## ORDER (I) APPROVING THE AUCTION
## AND BIDDING PROCEDURES, (II) APPROVING
## STALKING HORSE BID PROTECTIONS, (III) SCHEDULING BID
## DEADLINES AND AN AUCTION, (IV) APPROVING THE FORM AND
## MANNER OF NOTICE THEREOF, AND (V) GRANTING RELATED RELIEF

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

The relief set forth on the following pages, numbered three (3) through and including nine (9), is **ORDERED**.

(Page | 3)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

Upon the *Debtors' Motion Seeking Entry of an Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving the Form APA, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VII) Authorizing the Assumption and Assignment of Assumed Contracts, (VIII) Authorizing the Sale of Assets and (IX) Granting Related Relief,*[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) approving the proposed marketing, auction, and bidding procedures attached as Exhibit 1 to the Order (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale or sales (the "Sale Transactions") of all, substantially all, or any portion of the Debtors' assets (the "Assets"); (b) approving the break-up fee and expense reimbursements relating to a stalking horse bidder (the "Stalking Horse Bid Protections"); (c) establishing certain dates and deadlines related thereto and scheduling an auction or auctions, if any, for the Sale Transactions (the "Auction"); (d) approving the manner of notice of the Auction and sale hearing (the "Sale Hearing") as may be necessary; (e) approving a form of Asset purchase agreement, substantially in the form attached to the Bidding Procedures as Schedule 2 (the "Form APA"); (f) approving procedures for the assumption and assignment of certain Executory Contracts (as defined below) and Unexpired Leases (as defined below) in connection with the Sale Transaction, if any; (g) providing that, in light of the fact that the Debtors' privacy policy does not

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

(Page | 4)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

prohibit the transfer of personal identifiable information, the appointment of a consumer privacy ombudsman is not required; and (h) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; the Kurtz Declaration; and the Frejka Declaration filed in support of the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of the Debtors'

| (Page \| 5) | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

enterprise, including with respect to the proposed procedures for providing Stalking Horse Bid Protections as determined by the Debtors in an exercise of their business judgment in accordance with the Bidding Procedures.

3.      The Debtors' proposed notice of the Motion and the Hearing was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and (iii) adequate and sufficient under the circumstances of these Chapter 11 cases, and no other or further notice is required.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to all interested persons and entities.

4.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

I.      **Important Dates and Deadlines**.

5.      **Final Bid Deadline**.  May 28, 2023, at 12:00 p.m., prevailing Eastern Time, is the deadline by which all Qualified Bids must be **actually received** by the parties specified in the Bidding Procedures.

6.      **Stalking Horse Bidders and Bid Protections**.  The Debtors, upon entry of this Order, shall be authorized, but are not obligated or directed, in an exercise of their reasonable business judgment, in consultation with the Agents and any official committee of unsecured creditors appointed in these cases; *provided*, *however*, that to the extent any Agent submits a Bid for any Assets, such Agent shall not be a Consultation Party with respect to the evaluation and qualification of competing Bids for the Assets included in the Agent's Bid or with respect to

(Page | 6)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

seeking and/or obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in the Bidding Procedures (the "Consultation Parties") and with the consent of the DIP Agent, to select one or more Stalking Horse Bidders with respect to some or all of the Debtors' Assets by no later than May 22, 2023, at 5:00 p.m., prevailing Eastern Time, enter into a Stalking Horse Agreement, and, subject to paragraph 7, to provide such Stalking Horse Bidders with Stalking Horse Bid Protections without further action or order by this Court.

7.     In the event that the Debtors enter into a Stalking Horse Agreement with one or more Stalking Horse Bidders, within two business days of entry, the Debtors shall file a notice and proposed form of order with the Court (the "Stalking Horse Notice") and serve the Stalking Horse Notice on the Stalking Horse Bidder and the U.S. Trustee.  The Stalking Horse Notice shall: (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (ii) set forth the amount of the Stalking Horse Bid and what portion (if any) is cash; (iii) state whether the Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid; (iv) specify any proposed Bid Protections (including the amount and calculation thereof); (v) specify the Assets included in the Stalking Horse Bid; (vi) attach the Stalking Horse Agreement, including all exhibits, schedules and attachments thereto; and (vii) set forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections.  If there are no objections to the Stalking Horse Notice within five business days of filing with the Court, (the "Notice Period"), the Debtors  may submit an order to the Court that incorporates any comments received during the Notice Period that authorizes the Debtors to designate a Stalking Horse Bidder and to

(Page | 7)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

enter into a Stalking Horse Agreement, without the need for further hearing. If a party timely files an objection to the Stalking Horse Notice in accordance with the Bidding Procedures, the Court shall hold a hearing after the expiration of the Notice Period and as soon thereafter as the Court is available.

8.      Upon entry of the order that authorizes the Debtors to designate a Stalking Horse Bidder and to enter into a Stalking Horse Agreement or otherwise approves the Stalking Horse's Plan Term Sheet, as applicable, the Debtors are authorized, but not directed, to incur and pay the Stalking Horse Bid Protections to each Stalking Horse Bidder in an aggregate amount not to exceed three percent of the proposed Purchase Price.

9.      Except as otherwise set forth in the Bidding Procedures, no person or entity, other than a Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

10.      **Auction**. The date and time of the Auction, if needed, is June 2, 2023, at 10:00 a.m. prevailing Eastern Time, which time may be extended by the Debtors in consultation with the Consultation Parties, upon written notice with the Court. The Auction will be held at the offices of the proposed co-counsel to the Debtors:  Kirkland & Ellis LLP, 601 Lexington Ave., New York, NY 10022. Only the Debtors, the Consultation Parties, Qualified Bidders, the U.S. Trustee, and any other parties as the Debtors may determine to include in their reasonable

(Page | 8)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

discretion, in consultation with the Consultation Parties, in each case, along with the representatives and advisors, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make Overbids (as defined in the Bidding Procedures) at the Auction. The Debtors shall send written notice of the date, time, and place of the Auction to the Qualified Bidders and the U.S. Trustee no later than two business days before such Auction, and will post notice of the date, time, and place of the Auction no later than two business days before such Auction on the website of the Debtors' notice, claims, and solicitation agent, Kroll Restructuring Administration LLC (the "Notice and Claims Agent"), at https://restructuring.ra.kroll.com/bbby. For the avoidance of doubt, the Debtors may also conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets.

11.     **Notice of Successful Bidder**.  Upon conclusion of the Auction, the Debtors shall file a Notice of Successful Bidder.

12.     **Sale Objection Deadline.**  Objections to the sale, if any, must be made on or before May 31, 2023.

13.     **Sale Hearing**.  June 7, 2023, at 10:00 a.m. prevailing Eastern Time, is the date and time for the hearing for the Court to consider the Successful Bid or Successful Bids, if needed. Nothing in this Order or the Bidding Procedures shall be deemed to be a consent by the Agents to any Bid chosen by the Debtors to be the Successful Bid.

**II.     Auction, Bidding Procedures, Auction Notice, and Related Relief**.

14.     The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall

(Page | 9)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

govern the submission, receipt, and analysis of all Bids relating to any proposed Sale Transaction. Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order. The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures. Subject to the terms of the Bidding Procedures, the Debtors may modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

15. Any deposit (including any Good Faith Deposit) provided by a Qualified Bidder shall be held in escrow by the Debtors or their agent, and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the applicable escrow agreement, the Bidding Procedures, or order of this Court, as applicable.

16. The Auction Notice, substantially in the form attached hereto as **Exhibit 2**, is hereby approved. As soon as reasonably practicable following the entry of this Order, the Debtors will cause the Auction Notice to be served upon (a) the United States Attorney's Office for the District of New Jersey, (b) the Internal Revenue Service, (c) the attorneys general for the states in which the Debtors operate, (d) the Consultation Parties, (e) any parties known or reasonably believed to have expressed an interest in the Debtors' assets, and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.

17. Pursuant to Local Rule 6004-2: (a) each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bidding Procedures; (b) the Auction shall be conducted openly; and (c) the Auction shall be transcribed or videotaped.

(Page | 10)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

**III.    Assumption and Assignment Procedures.**

18.    The procedures set forth below regarding the assumption and assignment of the Executory Contracts and Unexpired Leases proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder, if any, pursuant to section 364(f) of the Bankruptcy Code in connection with the Sale are hereby approved to the extent set forth herein.

19.    These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtors' Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the Sale under the Stalking Horse APA, if any, subject to the payment of any amount necessary to satisfy all defaults and actual pecuniary loss to the counterparty resulting from such defaults including, but not limited to, all claims, demands, charges, rights to refunds and monetary and non-monetary obligations that the relevant counterparty can assert under an Executory Contract or Unexpired Lease, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to a Contract (the foregoing amounts as stated in the Contract Assumption Notice, the "Cure Payments"):

(a)    **Contract Assumption Notice.**  No later than [•], 2023 (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a notice of contract assumption (the "Contract Assumption Notice"), in substantially the form attached hereto as **Exhibit 3** via first class mail on the Contract Counterparties and provide a copy of the same to the Consultation Parties. The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the

(Page | 11)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

extent applicable, (i) the title of the executory contract or lease, (ii) the name of the counterparty to the executory contract or lease, (iii) Debtors' good faith estimates of the Cure Payments, if any, required in connection with the executory contract or lease, and (iv) the Sale Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any Contract listed thereon is an executory contract or that such stated Cure Payment constitutes a claim against the Debtors or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

(b)    **Cure Payments.**  The payment of the applicable Cure Payments by the Debtors and/or the Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Contracts by the Debtors and the assignment of such Contracts to the Successful Bidder, constitute adequate assurance of future performance thereof.

(c)    **Supplemental Contract Assumption Notice.**  To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Executory Contracts or Unexpired Leases that may be assumed by and assigned to the Successful Bidder, (ii) remove any Executory Contracts or Unexpired Leases from the list attached to the Contract Assumption Notice, (iii) and/or modify the previously stated Cure Payment associated with any Executory Contract or Unexpired Lease, the Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the Contract Counterparties affected by the Supplemental Assumption Notice. Each Supplemental Assumption Notice will include the same information with respect to listed Contracts as was included in the Contract Assumption Notice.  A Successful Bidder may designate additional Contracts to be assumed and assigned up to two business days prior to closing and may remove Executory Contracts or Unexpired Leases from the list of Executory Contracts and Unexpired Leases up to two business days prior to closing.

(Page | 12)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

(d) **Objections.** Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtors, (b) counsel to the Stalking Horse Bidder, if any, (c) the Bid Notice Parties (as defined in the Bidding Procedures), and (v) any other party that has filed a notice of appearance in these chapter 11 cases, so as actually to be received on or before the Sale Objection Deadline or deadline set forth in the Supplemental Assumption Notice, as applicable.

(e) **Dispute Resolution.** In the event that the Debtors and a Contract Counterparty cannot resolve an objection to a Cure Payment, the Executory Contract or Unexpired Lease at issue may be assumed by the Debtors and assigned to the Successful Bidder, *provided that* the Debtors shall segregate the Cure Payment that the Contract Counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties. Any objection to the proposed assumption and assignment of a contract or related Cure Payment proposed in connection with the Sale Transaction that remained unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

(f) **Contract Assumption.** No Executory Contract or Unexpired Lease shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Executory Contract or Unexpired Lease or (ii) the date the Sale Transaction has closed.

20.     Any party failing to timely file an objection to the Cure Payments or the proposed assumption and assignment of an Executory Contract or Unexpired Lease listed on the Contract Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such

(Page | 13)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

Cure Payment, (b) the assumption and assignment of such Executory Contract or Unexpired Lease, (c) the related relief requested in the Motion, and (d) the Sale Transaction. Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Executory Contract or Unexpired Lease, adequate assurance of future performance, the relief requested in the Motion, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Executory Contract or Unexpired Lease.

**IV.    Miscellaneous**.

21.    Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies or defenses that any party (including the sureties, the Debtors, the Debtors' lenders, and the agents under their respective credit agreements, the Stalking Horse Bidder, if applicable, or any other prospective purchaser) has or may have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, surety bonds or related agreements or any letters of credit relating thereto, or any rights, remedies, or defenses of the Debtors with respect thereto, including seeking Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale Transaction, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

22.    The Debtors are authorized to revise the Sale Schedule in consultation with the Consultation Parties. The Debtors are further authorized, but not directed, to conduct multiple

(Page | 14)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

Sale Transactions and/or Auctions (as necessary) in substantial conformity with the Sale Schedule and Bidding Procedures established through this Order.

23.     The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

24.     The Court, at the request of the Debtors in consultation with the Consultation Parties and subject to its availability, may modify the dates of and adjourn any hearing set by this Order without further Order of this Court, *provided* that the Debtors will serve notice to all requisite parties informing them of such modification.

25.     The Debtors, in consultation with the Consultation Parties, may modify any of the deadlines set forth herein or provide for additional deadlines within a Sale Schedule, *provided* that the Debtors will disclose all applicable deadlines in the applicable Auction Notice.

26.     The Debtors may modify any Good Faith Deposit, in consultation with the Consultation Parties, as necessary or appropriate, based on the Assets being sold.

27.     Notwithstanding anything to the contrary contained in this Order or the Bidding Procedures, the Agents are each permitted to discuss any Sale Transaction with one another with no further action necessary on their part, and such discussions shall be deemed to be in compliance with the Bidding Procedures.

28.     In the event of any inconsistencies between this Order and the Motion and/or the Bidding Procedures, this Order shall govern in all respects.

(Page | 15)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption: | Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief. |

29.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

30.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

31.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

32.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

33.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

## BIDDING PROCEDURES FOR THE
## SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS
## IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS

On April 23, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Court").

On [__], 2023, the Court entered the *Order (I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, (E) Approving the Form APA, and (II)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts, (C) Authorizing the Sale of Assets and (D) Granting Related Relief*, [Docket No. [__]] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures (the "Bidding Procedures") setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "Auction") for a sale or disposition (collectively, the "Sale," and each, a "Sale Transaction") of all or substantially all of the Debtors' Assets (as defined herein) or any portion thereof, either as a going-concern or as a liquidation.

Any Sale, will be implemented pursuant to section 363 of the Bankruptcy Code or a chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan").

---

[1]     The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

[2]     All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order.

Copies of the Bidding Procedures Order or any other documents in the Debtors' chapter 11 cases are available upon request to Kroll Restructuring Administration LLC by calling (833) 570-5355 (toll free) or (646) 440-4806 (international) or visiting the Debtors' restructuring website at (https://restructuring.ra.kroll.com/bbby).

## I.    Assets to be Auctioned.

The Debtors are seeking to sell all of their assets, or any portion thereof, either as a going-concern or as a liquidation.  These assets include, but are not limited to, the Debtors' going-concern business, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, insurance proceeds, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances (collectively, the "Assets").

## II.    Public Announcement of Auction.

As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall (i) serve on the parties that receive notice of this Motion, including the Consultation Parties (as defined below), a notice (A) setting forth (I) the date, time, and place of the (a) Auction and (b) the Sale Hearing (as defined below) and (II) the deadlines and procedures for objecting to the proposed Sale Transaction(s), (B) the Bidding Procedures Order and the Bidding Procedures in the form attached to the Bidding Procedures as Schedule 1 (the "Auction Notice"), (ii) publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times (National Edition)* to provide notice to any other potential interested parties, and (iii) post the Auction Notice on their case website, https://restructuring.ra.kroll.com/bbby.  The Auction Notice shall include a complete list and general description of the Assets for sale (such Assets, the "Specified Assets").

## III.    Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets (a "Potential Bidder") must deliver or have previously delivered to the Debtors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors; and

b.    sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or substantially all of the Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties.

c.    a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

2

The Debtors, in consultation with their advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a bid (such Potential Bidder, an "Acceptable Bidder"). The Debtors shall promptly inform the Consultation Parties of any entity that becomes an Acceptable Bidder. Notwithstanding anything to the contrary herein, the DIP Agent, Prepetition FILO Agent, and Prepetition ABL Agent (collectively, the "Agents"), and any of their respective designees, shall each be an Acceptable Bidder.

## IV.  Qualified Bid Requirements.

To participate in the Auction, an Acceptable Bidder must deliver to the Debtors and their advisors an irrevocable offer for the purchase of some or all of the Assets (each, a "Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline (as defined below):

a.  **Purchased Assets and Assumed Liabilities**:  Each Bid must clearly state the following:  (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern or to liquidate the business.

b.  **Good Faith Deposit**:  Except with respect to any Credit Bid, the Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"); *provided* that the Agents shall not be required to submit a Good Faith Deposit.  To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction;

c.  **Purchase Price**:  Each Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities (the "Purchase Price"), (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable Assets; *provided* that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation.  The Purchase Price should be a single point value in U.S. Dollars for the applicable Assets on a cash-free, debt-free basis.  Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as separate Bid for one or more sets of Assets;

d.  **Same or Better Terms; Bid Documents**:  Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include:  (a) form of purchase agreement, (b) a schedule of

contracts and leases to be assumed to the extent applicable to the Bid, (c) with respect to the purchase agreement, a redline of such agreement marked to reflect the amendments and modifications made to the form of the purchase agreement attached hereto as **Schedule 2**, (d) any other material documents integral to such Bid, and (e) a statement from the Acceptable Bidder that (i) it is prepared to enter into and consummate the transactions contemplated in the form purchase agreement, no later than ten (10) business days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline")) and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best bid (the "Back-Up Bid") until the consummation of the Sale Transaction;

e.   **No Qualified Bidder Bid Protections**:  A Qualified Bid must include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable Assets;

f.   **Employee Obligations**:  Each Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid.  If the Acceptable Bidder does not intend to hire all employees who are primarily employed in connection with the applicable Assets included in such Bid, the Acceptable Bidder must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are primarily employed in connection with the applicable Assets, and a description of any contemplated incentive plan, to the extent applicable;

g.   **Sources of Financing**:  To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

h.   **Contingencies; No Financing or Diligence Outs**:  The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial

performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline.

i.    **Identity**:  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties.  Each Bid must also include contact information for the specific person(s) whom Lazard and Kirkland & Ellis LLP should contact regarding such Bid;

j.    **As-Is, Where-Is**:  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder:  (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

k.    **Authorization**:  Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

l.    **Joint Bids**:  The Debtors will be authorized to approve joint Bids in their reasonable business judgment, in consultation with the Consultation Parties, on a case-by-case basis, so long as a joint bid meets the Qualified Bid Requirements and the applicable bidders otherwise comply with these Bidding Procedures;

m.    **Adequate Assurance of Future Performance**:  Each Bid must (i) identify any executory contracts (the "Executory Contracts") and any unexpired leases (the "Unexpired Leases") to be assumed or assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all cure amounts (the "Cure Amounts") related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties (as defined herein), that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, and (iv) provide the following documentation:

        (i)    The legal name of the proposed assignee of Unexpired Leases (the "Proposed Assignee") and any guarantors, as applicable;

(ii)     Financial statements for the calendar or fiscal years ended 2021 and 2022 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

(iii)    Summary documentation regarding the Proposed Assignee's and any guarantor's, as applicable, retail experience and present retail operations;

n.     **Acknowledgement of Compliance with Bidding Procedures, Bidding Order, Bankruptcy Code, and Non-Bankruptcy Law;**  Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, Bankruptcy Code and any applicable non-bankruptcy law;

o.     **Privacy Policy**:  The Acceptable Bidder must comply in all respects with the Debtors' consumer privacy policy, which does not restrict the transfer of the personally identifiable information of its customers, and each Bid must contain a statement acknowledging such compliance;

p.     **No Collusion**:  The Acceptable Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction.  For the avoidance of doubt, (a) this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice) and (b) notwithstanding anything to the contrary herein, nothing in these Bidding Procedures shall prohibit or limit any discussion, communication, negotiation or coordination between or among the Prepetition ABL Lenders, the Prepetition FILO Lenders, the DIP Lenders, or their respective Agents, and no conduct shall be deemed to be "collusion" in connection herewith;

q.     **Good Faith Offer**:  The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction;

r.     **Irrevocable**:  Each Bid must state that in the event such Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale Transaction;

s.     **Back-Up Bid**: Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder (as defined below) if the Acceptable Bidder's Bid is the next highest or otherwise best bid;

t.     **Regulatory Approvals and Covenants**:  A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction, if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals

6

(and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty days following execution and delivery of the applicable purchase agreement and/or confirmation of the Plan, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible);

u. **Expected Closing Date**:  Each Bid must state the Acceptable Bidder's expected date of closing of the Sale Transaction;

v. **Time Frame for Closing**:  A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtors, in consultation with the Consultation Parties;

w. **No Fees**:  Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation; *provided, however*, that nothing in these Bidding Procedures shall limit, alter or impair the rights of any party to payment and reimbursement of expenses that are set forth in the DIP Orders, and parties entitled to payment or reimbursement of expenses under the DIP Orders shall be entitled to payment or reimbursement of expenses incurred in connection with these Bidding Procedures and the matters contemplated hereby;

For the avoidance of doubt, each Acceptable Bidder (except with respect to the Agents and any of their respective designees) by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code; *provided* that the Debtors are authorized in their reasonable business judgment, in consultation with the Consultation Parties, to provide the Stalking Horse Bid Protections (as defined below) to one or more stalking horse bidders (each, a "Stalking Horse Bidder") in accordance with these Bidding Procedures;

x. **Adherence to Bidding Procedures**:  By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction;

y. **Consent to Jurisdiction**:  The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the Closing, as applicable; and

z.    **Conditions to Closing**:  Each Bid must identify with particularity each and every condition to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required.

Only Bids fulfilling all of the preceding requirements contained in this section may, or otherwise in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, be deemed to be "Qualified Bids," and only those parties submitting Qualified Bids may, at the Debtors' reasonable business judgment, in consultation with the Consultation Parties, be deemed to be "Qualified Bidders"; *provided* that, notwithstanding anything to the contrary herein, any Bid submitted by any of the Agents or their respective designees, shall be a Qualified Bid.

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Assets.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the applicable Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale Transaction.  Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale Transaction.

Within one (1) business day after the Bid Deadline, the Debtors, in consultation with the Consultation Parties, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction.

## V.    **Right to Credit Bid.**

The DIP Agent, Prepetition ABL Agent, their respective designees and any other Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates each (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; *provided*, *further*, that the rights of the DIP Agent and Prepetition ABL Agent to credit bid shall be as set forth in the DIP Orders.

Any Credit Bid made by the DIP Agent, the Prepetition ABL Agent or their respective assignees, as applicable, will be deemed to be, and will be evaluated by the Debtors and the

Consultation Parties as, a cash Bid solely for purposes of evaluating Bids (including evaluating Bids (including evaluating Qualified Bids and Subsequent Bids). Notwithstanding anything to the contrary contained herein or the Bidding Procedures Order, the DIP Agent, the Prepetition ABL Agent or their respective assignees, as applicable, whether as a Stalking Horse Bidder or otherwise, shall not be subject to the Good Faith Deposit requirement (whether for a Credit Bid or otherwise), are hereby deemed Qualified Bidders (and their Bids (including, for the avoidance of doubt, any Credit Bids) are hereby deemed Qualified Bids with respect to the Assets.

**VI.    Obtaining Due Diligence Access.**

Only Acceptable Bidders shall be eligible to receive due diligence information, access to the Debtors' electronic data room, and additional non-public information regarding the Debtors. ***No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***. Beginning on the date the Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the Debtors will provide such Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request. The Debtors shall promptly consult with the Consultation Parties (a) with respect to any due diligence disputes that arise concerning any Acceptable Bidder and (b) prior to revoking due diligence access to any such entity. The Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room for the benefit of all Acceptable Bidders. To the extent the Debtors provide any material written information to an Acceptable Bidder that the Debtors had not previously provided to a Consultation Party, the Debtors shall make such information available to such Consultation Party.

Acceptable Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Sale Transaction. For any bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right, in consultation with the Consultation Parties, to withhold or modify any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

A.    **Communications with Acceptable Bidders (including Qualified Bidders).**

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be through Lazard.

B.    **Due Diligence from Acceptable Bidders (including Qualified Bidders).**

Each Acceptable Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors and their respective advisors, regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated transaction. Failure by an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder, if any) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, to determine that such bidder is no longer an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder, if any) or that a bid made by such bidder is not a Qualified Bid.

> **Brendan Shea and Erik Overman at Lazard shall coordinate all requests for additional information and due diligence access on behalf of the Debtors. They can be reached at project.butterfly.2023.wg@lazard.com**

**VII.    Bid Deadline.**

Binding Bids must be submitted in writing to the following parties (the "Bid Notice Parties") so as to be **actually received** no later than 5:00 p.m. (prevailing Eastern Time) on May 28, 2023 (the "Bid Deadline").

(i)    proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com), Emily E. Geier, P.C., (emily.geier@kirkland.com), and Derek I. Hunter (derek.hunter@kirkland.com);

(ii)    proposed co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601 Attn: Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), and Felice R. Yudkin (fyudkin@coleschotz.com); and

(iii)    the Debtors' proposed investment banker, Lazard Frères & Co, LLC, 300 N. LaSalle Street, 23rd Floor, Chicago, Illinois 60654, Attn: David S. Kurtz (david.kurtz@lazard.com) and Lazard Frères & Co, LLC, 30 Rockefeller Plaza, New York, New York 10112, Attn: Jason Wooten (jason.wooten@lazard.com) and Christian Tempke (christian.tempke@lazard.com).

The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, in Consultation with the Consultation Parties, for all or certain Acceptable Bidders.

## VIII.    Evaluation of Qualified Bids.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' business judgment, and in consultation with the Consultation Parties,[3] the highest or otherwise best Qualified Bid or combination of Qualified Bids for any Assets (the "Starting Bid"). The Debtors shall promptly provide to the Consultation Parties copies of all Bids received by the Debtors, including the Starting Bid, but in no event later than the next business day following receipt; *provided* that the Consultation Parties must treat such Bids and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the applicable bidder.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors, in addition to any other factors that the Debtors deem appropriate:  (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid.  Prior to commencing the Auction, the Debtors shall notify the Stalking Horse Bidder, if any, and all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction with respect to the applicable assets.  At such time, the Debtors shall also distribute copies of the Starting Bid to the Stalking Horse Bidder, if any, and each Qualified Bidder.

## IX.    Stalking Horse Bid Protections.

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder, if any, is entitled to the Stalking Horse Bid Protections (as defined below) in the amounts set forth in, and in accordance with the terms of the Bidding Procedures Order.  For the avoidance of doubt, except for the Stalking Horse Bidder, and as otherwise set forth herein, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, or similar fee or payment.

In the event that the Debtors receive multiple Qualified Bids, at any time until May 22, 2023, at 5:00 p.m. (prevailing Eastern Time)], the Debtors shall be authorized, but not obligated, in an exercise of their reasonable business judgment, in consultation with the Consultation Parties and with the consent of the DIP Agent, to (a) select one or more Acceptable Bidders to act as the Stalking Horse Bidder in connection with the Auction for such assets, and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder, (x) provide a break-up fee and (y)

---

[3]    The term "Consultation Parties" shall mean the Agents and any official committee of unsecured creditors appointed in these cases; *provided*, *however*, that to the extent any Agent submits a Bid for any Assets, such Agent shall not be a Consultation Party with respect to the evaluation and qualification of competing Bids for the Assets included in the Agent's Bid or with respect to seeking and/or obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in these Bidding Procedures.

agree to reimburse the reasonable and documented out of pocket fees and expenses the "Stalking Horse Bid Protections") in an aggregate amount not to exceed three percent of the Purchase Price. Any such Stalking Horse Bid Protections are authorized pursuant to the Bidding Procedures.

In the event that the Debtors enter into a Stalking Horse Agreement with one or more Stalking Horse Bidders, within two business days of entry, the Debtors shall file a notice and proposed form of order with the Court (the "Stalking Horse Notice") and serve the Stalking Horse Notice on the Stalking Horse Bidder and the U.S. Trustee. The Stalking Horse Notice shall: (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (ii) set forth the amount of the Stalking Horse Bid and what portion (if any) is cash; (iii) state whether the Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid; (iv) specify any proposed Bid Protections (including the amount and calculation thereof); (v) specify the Assets included in the Stalking Horse Bid; (vi) attach the Stalking Horse Agreement, including all exhibits, schedules and attachments thereto; and (vii) set forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections. If there are no objections to the Stalking Horse Notice within five business days of filing with the Court, (the "Notice Period"), the Debtors may submit an order to the Court that incorporates any comments received during the Notice Period that authorizes the Debtors to designate a Stalking Horse Bidder and to enter into a Stalking Horse Agreement, without the need for further hearing. If a party timely files an objection to the Stalking Horse Notice, the Court shall hold a hearing after the expiration of the Notice Period and as soon thereafter as the Court is available.

Upon entry of the order that authorizes the Debtors to designate a Stalking Horse Bidder and to enter into a Stalking Horse purchase agreement, the Debtors are authorized, but not directed, to incur and pay the Stalking Horse Bid Protections to each such Stalking Horse Bidder in an aggregate amount not to exceed three percent of the proposed Purchase Price.

Except as otherwise set forth herein, no person or entity, other than a Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

## X.    No Qualified Bids.

If no Qualified Bids other than the Bid submitted by the Stalking Horse Bidder (the "Stalking Horse Bid"), if any, are received for the Assets included in the Stalking Horse Bid by the Bid Deadline, then the Debtors may cancel the Auction with respect to such Assets. If any Stalking Horse Bid is the only Qualified Bid received by the Bid Deadline, the Debtors may decide, in their reasonable business judgment, after consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid (as defined below) as to the applicable Assets and pursue entry of an order approving a Sale Transaction with respect to such Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement. The Debtors shall promptly file notice

of any cancellation of the Auction and/or designation of the Stalking Horse Bid, where applicable, as the Successful Bid with the Court.

## XI.    Auction.

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets by the Bid Deadline, the Debtors shall conduct the Auction to determine the Successful Bidder in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Assets or portion of Assets.  If the Debtors do not receive a Qualified Bid for any particular Asset by the Bid Deadline, the Debtors will not conduct the Auction with respect to such Asset. If one or more Qualified Bids (other than the Stalking Horse Bid, if any) are received by the Bid Deadline with respect to the applicable Assets, then the Debtors shall conduct the Auction with respect to such Assets in accordance with the Auction Procedures (as defined below).

The Auction shall commence on June 2, at 10:00 a.m. (prevailing Eastern Time), or such later time or other place as the Debtors determine in consultation with the Consultation Parties.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.    the Auction will be conducted openly;

b.    except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at the Auction;

c.    the Qualified Bidders, including any Stalking Horse Bidders, if any, must appear in person or through duly-authorized representatives at the Auction;

d.    bidding shall begin with the Starting Bid;

e.    subsequent bids (each, an "Overbid") may only be made at the Auction and shall be at least (i) a 2% increase in cash, cash equivalents, or other such consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of a secured creditor to credit bid any remaining amount of its secured claims) over the previous bid *plus* (ii) in the event that the Debtors have entered into a Stalking Horse Agreement with respect to the Assets to which the Overbid relates, the aggregate amount of Bid Protections (including, for the avoidance of doubt, any break-up fees and/or expense reimbursements) under such Stalking Horse Agreement (a "Minimum Overbid"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid.  The Debtors may, in their reasonable business judgment, in consultation with the Consultation Parties, announce increases or reductions to the Minimum Overbid at any time during the Auction.  For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at the Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent

13

(including the right of a secured creditor to credit bid any remaining amount of its secured claims) that exceeds the then existing highest Bid by at least the amount of the Minimum Overbid;

f.    at the commencement of the Auction, the Debtors, in consultation with the Consultation Parties, may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s);

g.    each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors in consultation with the Consultation Parties;

h.    during the course of the Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view, in consultation with the Consultation Parties, the highest or otherwise best bid(s) for the applicable Assets;

i.    the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

j.    each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Sale Transaction. For the avoidance of doubt, (a) this requirements does not restrict Qualified Bidder(s) from working with other Qualified Bidder(s) with the Debtors' prior written consent;

k.    each Qualified Bidder will be required to confirm that its bid is a good faith, *bona fide* offer and it intends to consummate the Sale Transaction if selected as the Successful Bid in accordance with these Bidding Procedures (as may be modified in accordance herewith at the Auction);

l.    the Court and the Debtors will not consider bids made after the Auction has been closed;

m.    the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale Transaction, or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders;

n.    the Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably

necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction;

o.     the Debtors reserve the right, in their reasonable business judgment, and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, , and in consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

p.     notwithstanding anything herein to the contrary, the Debtors may, in consultation with the Consultation Parties, at any time choose to adjourn the Auction by announcement at the Auction.  The Debtors shall promptly file notice of such adjournment with the Court.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors, in consultation with counsel).

Any Auction rules adopted by the Debtors will not modify any of the terms of the Stalking Horse purchase agreement or the rights of the Stalking Horse Bidder, if any, without the consent of the Stalking Horse Bidder, if any.

Except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only (i) the Debtors, (ii) the Consultation Parties, (iii) the Office of the United States Trustee, (iv) any statutory committee appointed in these Chapter 11 Cases, (v) any other Qualified Bidders, and (vi) the respective representatives and professionals of the foregoing parties shall be entitled to attend the Auction.

## XII.    Acceptance of the Successful Bid.

The Auction shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the Debtors determine, in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, and in consultation with the Consultation Parties, is the highest or otherwise best bid to purchase the applicable Assets (each, a "Successful Bid"), and (ii) the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, the Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Consultation Parties, may consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration, which includes but is not limited to, assumed liabilities

15

(administrative liabilities, cure payments), and the amount of executory contracts and leased locations being assumed; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid; and (e) any other consideration that may impact the Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a "<u>Successful Bidder</u>" with respect to the Assets contemplated for the purchase pursuant to such Successful Bid. The Debtors shall promptly file notice of the Successful Bid and the Successful Bidder with the Court. Following conclusion of the Auction and selection of a Successful Bidder, the Debtors shall present the results of the Auction at a hearing (the "<u>Sale Hearing</u>") and shall seek Court approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "<u>Definitive Purchase Agreement Order</u>"). For the avoidance of doubt, the Definitive Purchase Agreement Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtors shall not solicit and /or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that the Debtors determined in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder (including both the Stalking Horse Bidder, if any, and Back-Up Bidder, if applicable) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement; *provided* that the Agents shall not be required to make any deposit. Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

**XIII.  Designation of Back-Up Bidder.**

The Back-Up Bid to purchase any applicable Assets (the "<u>Back-Up Bidder</u>") will be determined by the Debtors at the conclusion of the Auction, in consultation with the Consultation Parties, and will be announced at that time to all the Qualified Bidders participating in the Auction; *provided* that, notwithstanding anything herein to the contrary, the Agents shall not be deemed to be Back-Up Bidders and any Successful Bid by any Agent shall not be a Back-Up Bid unless such Agent so agrees in writing. Following consultation with the Consultation Parties, the Debtors' selection of a Back-Up Bid shall be deemed final and the Debtors shall not accept any further bids or offers to submit a bid after such selection. The Debtors will be authorized, but not required, to consummate the Transaction with the Backup Bidder without further order of the Court, so long as such Backup Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.

If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale Transaction with the Debtors as soon as is reasonably practicable without further order of the Court, upon 24 hours advance notice filed with the Court.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) forty-five (45) days after completion of the Auction, (ii) consummation of a Sale Transaction with one or more Successful Bidders at an Auction, and (iii) the release of such Back-Up Bid by the Debtors in writing (the "Back-Up Termination Date").  The Debtors shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Termination Date.

## XIV.    Approval of the Sale Transaction.

A hearing to consider approval of each Sale Transaction (the "Sale Hearing"), is currently scheduled to take place on June 7, 2023, at 11:00 a.m. (prevailing Eastern Time), before the Honorable Judge Papalia, at the United States Bankruptcy Court for the District of New Jersey, 50 Walnut Street, 3rd Floor, Courtroom 3B, Newark, New Jersey 07102, or conducted consistent with the procedures established pursuant to the Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoom.

At the Sale Hearing certain findings will be sought from the Court regarding the Auction, including, among other things, that:  (1) the Auction was conducted, and the Successful Bidder was selected, in accordance with the Bidding Procedures; (2) the Auction was fair in substance and procedure; (3) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (4) consummation of any Sale Transaction as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the applicable Assets and is in the best interests of the Debtors and their estates.  **The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending notice to creditors or other parties in interest prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder, if any).**

Objections to the Sale Transaction(s), and entry of any order approving the sale (the "Sale Order") must (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to by **actually received** by the Debtors, the Consultation Parties, the Bid Notice Parties, and the foregoing parties' respective counsel by May 31, 2023, at 5:00 p.m. (prevailing Eastern Time).[4]

---

[4] To the extent the Debtors, in consultation with the Consultation Parties, reasonably determine in their business judgment to pursue a Sale Transaction pursuant to a Plan, a separate deadline to object to such Sale Transaction shall be set by order of the Court.

## XV.    Return of Good Faith Deposit.

The Good Faith Deposit(s) of the Successful Bidder or Successful Bidders, if any, will, upon consummation of the Successful Bid or Successful Bids, become property of the Debtors' estates and be credited to the portion of such Successful Bidder's or Successful Bidders' applicable Purchase Price.

If the Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable), if any, fails to consummate the Successful Bid or Successful Bids (or Back-Up Bid or Back-Up Bids, if applicable), then the Good Faith Deposit(s) of such Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable) will be irrevocably forfeited to the Debtors and may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors.

The Good Faith Deposits of any unsuccessful Qualified Bidders (except for any Back-Up Bidder or Back-Up Bidders and any Stalking Horse Bidders) will be returned within five business days after consummation of the applicable Sale Transaction or upon the permanent withdrawal of the applicable proposed Sale Transaction.

The Good Faith Deposit(s) of any Back-Up Bidder or Back-Up Bidders, if any, will be returned to such Back-Up Bidder or Back-Up Bidders no later than five (5) business days of the Back-Up Termination Date.

The return of any Good Faith Deposits of any Stalking Horse Bidders will be subject to the terms of such Stalking Horse Bidders' Plan or purchase agreement, as applicable.  All such deposits shall be held in escrow and at no time shall be deemed property of the Debtors' estates absent further order of the Court.

## XVI.    Reservation of Rights.

The Debtors, in consultation with the Consultation Parties, reserve their rights to modify these Bidding Procedures in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional customary terms and conditions on the sale of the applicable Assets, including, without limitation:  (1) extending the deadlines set forth in the Bidding Procedures; (2) adjourning the Auction without further notice; (3) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (4) canceling the Auction; (5) rejecting any or all Bids or Qualified Bids; and (6) adjusting the applicable minimum overbid increment; *provided, however,* that (a) the Debtors may not amend these Bidding Procedures, the Bidding Procedures Order or the bidding process to reduce or otherwise modify their obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court and (b) without the prior written consent of the Agents, the Debtors shall not adopt new rules, procedures or deadlines or otherwise modify these Bidding Procedures or the Bidding Procedures Order in a manner that (i) makes it materially more burdensome to be a Qualified Bidder or a Qualified Bid or (ii) alters or limits the rights of, or imposes additional burdens on, the Agents, including by (x) requiring the Agents, to include a deposit as part of a Credit Bid or (y) removing, limiting, or imposing additional

conditions on, the rights of such parties to Credit Bid and/or to be deemed an Acceptable Bidder and/or Qualified Bidder (and their Bids deemed Qualified Bids). All such modifications and additional rules will be communicated in advance to each of the Consultation Parties and the U.S. Trustee, Acceptable Bidders and Qualified Bidders; *provided, further,* that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction.  If any of the Agents, the U.S. Trustee or any official committee of unsecured creditors appointed in these cases determines in good faith that any modification to these Bidding Procedures or the Bidding Procedures Order, or any adoption of new rules, procedures or deadlines, would not be consistent with this paragraph or these Bidding Procedures or the Bidding Procedures Order, such Agent, U.S. Trustee, or Committee may file an objection with the Bankruptcy Court, and no such modification or adoption shall become effective until such objection is resolved.   The Debtors shall provide advance notice in writing of any such modification to the Consultation Parties and the U.S. Trustee and any Qualified Bidder, including any Stalking Horse Bidder.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Court relief with regard to the Auction, the Bidding Procedures, the Sale Transaction, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

Each reference in these Bidding Procedures and the Bidding Procedures Order to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith. All Consultation Parties will be permitted to seek relief from the Bankruptcy Court on an expedited basis if they disagree with any actions or decisions made by the Debtors as part of these Bidding Procedures.  The rights of all Consultation Parties with respect to the outcome of the Auction are reserved.

## XVII.  Consent to Jurisdiction.

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the Sale any Sale Transaction if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XVIII. Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor to take any action or to refrain

from taking any action related to any sale transaction or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

## **Schedule 1**

**Auction Notice**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

<div align="center">

**NOTICE OF SALE BY AUCTION AND SALE HEARING**

</div>

    **PLEASE TAKE NOTICE** that on [\_\_], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the  *(I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, (E) Approving the Form APA,*

---

[1]    The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.   The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

*and (II)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts, (C) Authorizing the Sale of Assets and (D) Granting Related Relief* [Docket No. [__]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of substantially all or a portion of the Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court pursuant to the Bidding Procedures Order. **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.** To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Assets **on June 2, 2023, at 10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors.

**PLEASE TAKE FURTHER NOTICE** that only the Debtors, the Consultation Parties, Qualified Bidders, the U.S. Trustee, and any other parties as the Debtors may determine to include in their reasonable discretion, in consultation with the Consultation Parties, in each case, along with their representatives and advisors, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make Overbids at the Auction. **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order.**

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale Transaction at a hearing scheduled to commence on or before **June 7, 2023, at 11:00 a.m. (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable Judge Papalia, at the United States Bankruptcy Court for the District of New Jersey, 50 Walnut Street, 3rd Floor, Courtroom 3B, Newark, New Jersey 07102, or conducted consistent with the procedures established pursuant to the Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoomgov.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of the Sale and each Sale Transaction must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** **on or before May 31, 2023, at 5:00 p.m. (prevailing Eastern Time)**[3] by the following parties: (i) the

---

[2]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

[3]    To the extent the Debtors, in consultation with the Consultation Parties, reasonably determine to pursue a Sale pursuant to a Plan, a separate hearing to consider such Sale shall be set.

Debtors, Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, Attn: [●]; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Emily E. Geier, P.C., Derek I. Hunter, and Ross J. Fiedler; (iii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Esq., Warren A. Usatine, Esq., and Felice R. Yudkin, Esq.; (iv) counsel to the Prepetition ABL Agent, Attn: Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner (marshall.huebner@davispolk.com), Adam L. Shpeen (adam.shpeen@davispolk.com), Steven Z. Szanzer (steven.szanzer@davispolk.com) and Michael Pera (michael.pera@davispolk.com); (v) counsel to the DIP Agent, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman and Megan R. Volin, (vi) Office of the United States Trustee for Region 3, District of New Jersey, Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn: Fran B. Steele; (vii) proposed counsel to the Creditors' Committee, [●], and [●], and (b) [●], [ADDRESS], Attn: [●]; and (viii) counsel to any Stalking Horse Bidder, [●], and [●], and (b) [●], [ADDRESS], Attn: [●].

## **CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE OR A SALE TRANSACTION, AS APPLICABLE, ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT OR THE PLAN, AS APPLICABLE.**

Dated: [_____], 2023

|  |
|---|
| /s/ *DRAFT* |
| **COLE SCHOTZ P.C.** |

Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800

3

Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com
            emily.geier@kirkland.com
            derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and
Debtors in Possession*

**<u>Schedule 2</u>**

**Form Asset Purchase Agreement**

**FOR DISCUSSION PURPOSES ONLY**

---

**ASSET PURCHASE AGREEMENT[1]**

**DATED AS OF [●], 2023**

**BY AND AMONG**

**[●], AS PURCHASER,**

**AND**

**BED BATH & BEYOND INC.**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

---

*This is a draft agreement only, and delivery or discussion of this draft agreement is not, and will not be deemed or construed to be, an offer or commitment with respect to the proposed transaction to which this draft agreement relates. Notwithstanding the delivery of this draft agreement or any other past, present or future written or oral indications of assent, or indications of the result of negotiations or agreements, no party to the proposed transaction (and no person or entity related to any such party) will be under any legal obligation whatsoever with respect to the proposed transaction unless and until the definitive agreement providing for such transaction has been executed and delivered by all parties thereto.*

---

[1] **Note to Draft**: Transaction structure subject to ongoing tax and accounting diligence and review. Agreement subject to material revision based on ultimate transaction structure and Seller's ongoing review and comment.

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS;  ASSUMPTION OF ASSUMED LIABILITIES**................................................................................**1**
1.1      Purchase and Sale of the Acquired Assets ......................................1
1.2      Excluded Assets ...............................................................................3
1.3      Assumption of Certain Liabilities ...................................................5
1.4      Excluded Liabilities ........................................................................6
1.5      Assumption/Rejection of Certain Contracts ...................................6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ..........................................**8**
2.1      Consideration; Payment ...................................................................8
2.2      Deposit .............................................................................................9
2.3      Closing .............................................................................................9
2.4      Closing Deliveries by Sellers ..........................................................9
2.5      Closing Deliveries by Purchaser ...................................................10
2.6      Withholding ...................................................................................10

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ....................**10**
3.1      Organization and Qualification .....................................................11
3.2      Authorization of Agreement ..........................................................11
3.3      Conflicts; Consents .......................................................................11
3.4      Equity Interests of Acquired Entities.............................................11
3.5      Financial Statements ......................................................................12
3.6      Title to Properties ..........................................................................12
3.7      Contracts ........................................................................................13
3.8      No Litigation ..................................................................................14
3.9      Permits; Compliance with Laws ....................................................14
3.10     Environmental Matters ..................................................................14
3.11     Intellectual Property......................................................................15
3.12     Tax Matters ....................................................................................16
3.13     Assumed Benefit Plans ..................................................................16
3.14     Employees ......................................................................................17
3.15     Affiliate Transactions....................................................................17
3.16     Brokers ...........................................................................................17
3.17     No Other Representations or Warranties .......................................18

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .................**18**
4.1      Organization and Qualification......................................................18
4.2      Authorization of Agreement ..........................................................19
4.3      Conflicts; Consents .......................................................................19
4.4      Financing........................................................................................20
4.5      Brokers ...........................................................................................20
4.6      No Litigation ..................................................................................20
4.7      Investment Representation; Investigation......................................20
4.8      Certain Arrangements ....................................................................20
4.9      No Foreign Person .........................................................................20
4.10     Solvency.........................................................................................21

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---:|
| 4.11 | No Additional Representations or Warranties | 21 |
| 4.12 | No Outside Reliance | 21 |
| | | |
| **ARTICLE V BANKRUPTCY COURT MATTERS** | | **22** |
| 5.1 | Bankruptcy Actions | 22 |
| 5.2 | Cure Costs | 23 |
| 5.3 | Sale Order | 24 |
| 5.4 | Approval | 24 |
| | | |
| **ARTICLE VI COVENANTS AND AGREEMENTS** | | **24** |
| 6.1 | Conduct of Business of Sellers | 24 |
| 6.2 | Access to Information | 27 |
| 6.3 | Employee Matters | 28 |
| 6.4 | Regulatory Approvals | 31 |
| 6.5 | Antitrust Notification | 31 |
| 6.6 | Reasonable Efforts; Cooperation | 33 |
| 6.7 | Further Assurances | 33 |
| 6.8 | Insurance Matters | 34 |
| 6.9 | Receipt of Misdirected Assets; Liabilities | 34 |
| 6.10 | Acknowledgment by Purchaser | 34 |
| 6.11 | [Guaranty | 36 |
| 6.12 | Directors' and Officers' Indemnification | 37 |
| | | |
| **ARTICLE VII CONDITIONS TO CLOSING** | | **37** |
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 37 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 38 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 38 |
| 7.4 | Waiver of Conditions | 39 |
| | | |
| **ARTICLE VIII TERMINATION** | | **39** |
| 8.1 | Termination of Agreement | 39 |
| 8.2 | Effect of Termination | 40 |
| | | |
| **ARTICLE IX TAXES** | | **41** |
| 9.1 | Transfer Taxes | 41 |
| 9.2 | Allocation of Purchase Price | 41 |
| 9.3 | Cooperation | 42 |
| 9.4 | Preparation of Tax Returns and Payment of Taxes | 42 |
| | | |
| **ARTICLE X MISCELLANEOUS** | | **43** |
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 43 |
| 10.2 | Expenses | 43 |
| 10.3 | Notices | 43 |
| 10.4 | Binding Effect; Assignment | 44 |
| 10.5 | Amendment and Waiver | 45 |

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 10.6 | Third Party Beneficiaries | 45 |
| 10.7 | Non-Recourse | 45 |
| 10.8 | Severability | 45 |
| 10.9 | Construction | 45 |
| 10.10 | Schedules | 45 |
| 10.11 | Complete Agreement | 46 |
| 10.12 | Specific Performance | 46 |
| 10.13 | Jurisdiction and Exclusive Venue | 47 |
| 10.14 | Governing Law; Waiver of Jury Trial | 47 |
| 10.15 | No Right of Set-Off | 48 |
| 10.16 | Counterparts and PDF | 48 |
| 10.17 | Publicity | 48 |
| 10.18 | Bulk Sales Laws | 49 |
| 10.19 | Fiduciary Obligations | 49 |
| 10.20 | Time of Essence | 49 |
| 10.21 | Sellers' Representative | 49 |

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS .......................49**
| | | |
|---|---|---|
| 11.1 | Certain Definitions | 49 |
| 11.2 | Index of Defined Terms | 56 |
| 11.3 | Rules of Interpretation | 57 |

### INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT
[EXHIBIT B    FORM OF PATENT ASSIGNMENT AGREEMENT]
EXHIBIT C    FORM OF TRADEMARK ASSIGNMENT AGREEMENT
[EXHIBIT D    FORM OF SALE ORDER]

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of [●], 2023, is made by and among [●], a [●] ("<u>Purchaser</u>"),[2] [●], a [●] ("<u>Guarantor</u>"), and Bed Bath & Beyond Inc., a New York corporation ("<u>BBBY</u>") and the Subsidiaries of BBBY that are indicated on the signature pages attached hereto (together with BBBY, each a "<u>Seller</u>" and collectively "<u>Sellers</u>"). Purchaser and Sellers are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used herein shall have the meanings set forth herein or in <u>Article XI</u>.

WHEREAS, on February [__], 2023, Sellers, together with other of Sellers' Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>"), which cases are jointly administered for procedural purposes under Case No. 23-[●] ([●]) (Bankr. D.N.J.) (collectively, the "<u>Bankruptcy Cases</u>"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and

---

[2]    <u>Note to Draft</u>: If Purchaser is a newly formed or undercapitalized entity, Purchaser will be required to provide a guarantee of its obligations under this Agreement from a creditworthy Affiliate; see Section 6.11. In addition, if Purchaser presents enforceability concerns or regulatory risk (including, *e.g.*, regarding ability to deliver cash to the U.S.), this Agreement will include further provisions mitigating, or compensating Seller for, such Purchaser risks.

interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)      subject to <u>Section 1.5</u>, all Contracts to which any Seller is a party, including the Contracts listed on <u>Schedule 1.1(a)</u>, and all purchase orders, to the extent assignable under applicable Law (the "<u>Assigned Contracts</u>");

(b)      all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;

(c)      all Documents;

(d)      the Leased Real Property listed on <u>Schedule 1.1(d)</u> (the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(e)      all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and any tangible assets on order to be delivered to any Seller;

(f)      all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

(g)      all shares of capital stock or other equity interests that any Seller owns in the Persons set forth on <u>Schedule 1.1(g)</u> (the "<u>Transferred Subsidiaries</u>" and, together with the Subsidiaries of any Transferred Subsidiary, the "<u>Acquired Entities</u>")[3], including any securities convertible into, or exchangeable or exercisable for, any such shares of capital stock or other equity interests, investments or contributions in the Transferred Subsidiaries;

(h)      to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(i)      the sponsorship of, and all rights, interests and assets associated with, the Seller Plans (collectively, the "<u>Assumed Benefit Plans</u>");

(j)      all Intellectual Property of Sellers, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and

---

[3]      **<u>Note to Draft</u>**: Parties to discuss inclusion of certain non-debtor subsidiaries and joint ventures.

recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

        (k)      all Inventory and supplies of the Sellers; and

        (l)      all goodwill, payment intangibles and general intangible assets and rights of Sellers.

        1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "<u>Excluded Assets</u>"):

        (a)      all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

        (b)      the Excluded Store Contracts and all Contracts of Sellers listed on <u>Schedule 1.2(b)</u> (the "<u>Excluded Contracts</u>");

        (c)      all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, (iii) that any Seller is required by Law to retain or (iv) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; <u>provided</u> that Purchaser shall have the right to make copies of any portions of such Documents to the extent not prohibited by applicable Law;

        (d)      all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the transactions contemplated hereby or thereby, or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, including any privileged materials, documents and records that are in the possession of any Acquired Entity, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of the Acquired Assets

or the Assumed Liabilities or any portion thereof, and (vi) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;

(e)        all current and prior insurance policies of any Seller that are not Assumed Benefit Plans, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)        all stock, membership interests or other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests, in all cases, other than any of the foregoing issued by any Acquired Entity;

(g)        [4] (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)        Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(i)        all Tax refunds, Tax attributes and Tax assets;

(j)        all tangible assets located at, or on order to be delivered to, any Excluded Store;

(k)        every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in the Ordinary Course, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

(l)        all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date;

---

[4]    **Note to Draft**: Retained assets under review by Seller.

(m)     all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries;

(n)     Privileged Materials; and

(o)     the properties, rights, interests and assets set forth on Schedule 1.2(o).

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)     all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)     all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets, in each case, by Purchaser from and after the Closing Date;

(d)     all current Liabilities, including all accounts payable and trade payables existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable), of Sellers, other than any such Liabilities of any Excluded Store;

(e)     all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Sellers) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(f)     all Liabilities related to, resulting from or arising out of, prior to, on or after the Closing, any (i) unredeemed refund amounts, gift cards, gift certificates, coupons or similar items, (ii) customer deposits or (iii) customer promotions and loyalty programs;

(g)     without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; (ii) all non-income Taxes with respect to the Acquired Assets for any Straddle Period; and (iii) all Taxes or other Liabilities with respect to the Acquired Assets with respect to which "responsible person" or similar claims may be made against any of any Seller's or any Affiliate of any Seller's employees, managers, officers, directors or similar persons, including pursuant to any wage payment statute ("Responsible Person Liabilities"); provided that such Responsible Person Liabilities shall

5

constitute Assumed Liabilities solely to the extent Sellers are unable to discharge such Responsible Person Liabilities due to the operation of the Bankruptcy Code or a lack of available funds; provided, further, that (A) Sellers shall take all commercially reasonable steps to discharge Responsible Person Liabilities in a way that avoids such Taxes becoming Assumed Liabilities and (B) Sellers shall promptly notify Purchaser if they become aware of a material possibility that any Responsible Person Liabilities will become Assumed Liabilities;

(h)     the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the Assumed Benefit Plans and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9;

(i)     all Liabilities owed to vendors and customers that are providing goods or services to, or purchasing products or services from, BBBY or are reasonably expected to, after the Closing, provide goods or services to, or purchase products or services from, BBBY, other than any such Liabilities of any Excluded Store;

(j)     all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement;

(k)     all Liabilities arising under section 503(b)(9) of the Bankruptcy Code;

(l)     all Liabilities owing to any Acquired Entity; and

(m)     all Liabilities set forth on Schedule 1.3(m).[5]

1.4     Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). Purchaser hereby acknowledges and agrees that no Liability of any Acquired Entity shall be an Excluded Liability and that all Liabilities of any Acquired Entity as of the Closing shall continue to be the Liabilities of such Acquired Entity following the Closing.

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers

---

[5]     **Note to Draft**: Scope of Assumed Liabilities under review by Seller.

and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to <u>Section 1.5(b)</u>. At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)    <u>Excluding or Adding Assigned Contracts Prior to Closing</u>. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than purchase orders) that it does not wish to assume or a Contract (other than any Excluded Store Contract) to which any Seller is a party that Purchaser wishes to add as an Assigned Contract up to one Business Day prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract (other than any Excluded Store Contract) that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(c)    <u>Non-Assignment</u>.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court,

7

including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this clause (ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases, if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, (x) the provisions of this Section 1.5(c) shall not apply to any consent or approval required under the HSR Act and any Foreign Competition Laws, which consent or approval shall be governed by Section 6.4 and (y) no Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1    Consideration; Payment.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $[●] (the "Cash Payment").

(b)    At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers the Cash Payment less the Deposit (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2    Deposit.

(a)    Purchaser has, on or prior to the date hereof, made an earnest money deposit with [_____] (the "Escrow Agent") in the amount equal to 10% of the Cash Payment (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the Bidding Procedures Order. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)    If this Agreement has been terminated by Sellers pursuant to Section 8.1(d) or 8.1(f) (or by Purchaser pursuant to Section 8.1(b) or 8.1(c), in each case in circumstances where Sellers would be entitled to terminate this Agreement pursuant to Section 8.1(d) or 8.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.

(d)    The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to Sellers.

2.3    Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by the applicable Sellers;

(b)     [a short-form patent assignment agreement substantially in the form of Exhibit B, duly executed by the applicable Sellers;]

(c)     a short-form trademark assignment agreement substantially in the form of Exhibit C, duly executed by the applicable Sellers;

(d)     instruments of transfer of the equity interests of the Transferred Subsidiaries, in customary form, duly executed by the applicable Sellers;

(e)     an IRS Form W-9 or IRS Form W-8, as applicable, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; and

(f)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of BBBY certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

2.5     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)     the Closing Date Payment;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser; and

(c)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6     Withholding. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a Seller's failure to satisfy its obligations under Section 2.4(e).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS[6]

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with the SEC by BBBY in respect of Sellers and their business to the extent publicly available on the SEC's EDGAR database (the "Filed SEC Documents") (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature), (ii) disclosed in any forms, statements or other documents filed with the Bankruptcy Court, or (iii) set forth in the Schedules delivered by Sellers concurrently herewith and subject to Section 10.10, Sellers jointly and severally represent and warrant to Purchaser as follows.

---

[6]     **Note to Draft**: Representations and warranties subject to ongoing Sellers review.

3.1     <u>Organization and Qualification</u>. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation.

3.2     <u>Authorization of Agreement</u>. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3     <u>Conflicts; Consents</u>. Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on <u>Schedule 3.3</u> are made, given or obtained (as applicable), and (c) the requirements of the HSR Act and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Body ("<u>Foreign Competition Laws</u>") are complied with, neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the transactions contemplated hereby or thereby, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Seller, except, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4     <u>Equity Interests of Acquired Entities</u>.

(a)     The authorized and outstanding capital stock or other equity interests of each of the Acquired Entities are as set forth on <u>Schedule 3.4(a)</u>. All of the outstanding capital stock or other equity interests of the Acquired Entities have been duly authorized, validly issued, fully paid and are non-assessable (where such concepts are legally recognized in the jurisdictions

of organization of such Acquired Entities). Except as set forth on Schedule 3.4(a), there are no outstanding options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, sale or repurchase of any capital stock or other equity interests issued by the Acquired Entities containing any equity features, or Contracts, commitments, understandings, arrangements or other obligations by which any of the Acquired Entities is bound to issue, deliver or sell, or cause to be issued, delivered or sold, additional capital stock or other equity interests, or options, warrants, convertible, exercisable or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to any capital stock or other equity interests of the Acquired Entities, or that otherwise give any Person the right to receive any benefits or rights similar to any rights enjoyed by or accruing to the holders of shares of capital stock or other equity securities of any Acquired Entity (including any rights to receive any payment in respect, or based on the price or value, thereof). None of the Sellers or the Acquired Entities is a party to any shareholders' agreement, voting trust agreement, registration rights agreement or other similar agreement or understanding relating to any such securities or any other agreement relating to the disposition, voting or dividends with respect to any such securities. Except as set forth on Schedule 3.4(a), the Sellers own all of the outstanding capital stock or other equity interests of the Acquired Entities, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)    Except as set forth on Schedule 3.4(b), there are no other corporations, limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which the Acquired Entities own as of the date of this Agreement, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

3.5    Financial Statements. Attached to Schedule 3.5 are Sellers' audited consolidated balance sheets as of February 26, 2022 and as of February 27, 2021, and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for each fiscal year then ended (collectively, the "Audited Financial Statements") and unaudited consolidated balance sheets as of November 26, 2022 and November 27, 2021, and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for the portion of each fiscal year then ended (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"). The Financial Statements have been prepared in all material respects in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of Unaudited Financial Statements, subject to normal year-end audit adjustments, none of which would have a Material Adverse Effect, to the absence of notes and to any other adjustments described therein, including in any notes thereto) and fairly present in all material respects the consolidated financial position of the Sellers and their respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

3.6    Title to Properties.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, one or more of the Sellers has a good and valid

leasehold interest to all real property leased by Sellers (the "<u>Leased Real Property</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances). None of the Sellers owns any real property.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Sellers hold good title to, or a valid leasehold interest in, all of the material tangible property necessary in the conduct of their business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Sellers and the Acquired Assets, taken as a whole.

3.7    <u>Contracts</u>.

(a)    <u>Schedule 3.7</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $[1,000,000], other than letters of credit;

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $[5,000,000] pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Sellers of more than $[1,000,000] after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions supplies, merchandise, Inventory, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, Inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Sellers);

(iv)    is a Contract (other than purchase orders) for the purchase of materials, supplies, goods, services, Inventory, Equipment, or other assets pursuant to which Sellers would reasonably be expected to make payments of more than $[5,000,000] during any fiscal year; or

(v)    contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of any Seller Intellectual Property that is material to Sellers, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses <u>(A)</u> and <u>(B)</u>, other than (1) a Contract that can be terminated on 90 days' notice or less without resulting in a breach or

13

violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (2) Contracts entered into in the Ordinary Course granting exclusive rights to certain of Sellers, services or containing "most favored nation" provisions with respect to certain of Seller's, products or (z) any provision in any license agreements for Intellectual Property limiting Seller's, use of such Intellectual Property to specified fields of use or specified territories.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.8     No Litigation. There are no Actions pending or, to Sellers' knowledge, threatened against or affecting any of the Sellers that will adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

3.9     Permits; Compliance with Laws. Each Seller is, and has been since January 1, 2023, in compliance in all material respects with all state or federal laws, statutes, ordinances, codes, rules or regulations ("Laws") or Orders, applicable to such Seller, and each Seller holds all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of its respective business (collectively, "Permits"), except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2023, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

3.10     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Sellers are, and have been since January 1, 2023, in compliance with all applicable Environmental Laws, (b) since January 1, 2023, Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Sellers possesses and are in compliance with all Permits required under Environmental Laws for the operation of their businesses as currently

14

conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in writing against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, and (f) no Seller has released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Sellers to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers own all of the rights, title and interest in and to the Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property is subsisting, valid and enforceable.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Sellers as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Sellers have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this Section 3.11(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(d).

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property owned by or exclusively licensed to any such Seller or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2022, (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to Sellers and (ii) the operation of the business of Sellers has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(e)    The consummation of the transactions contemplated hereby will not result in the grant of any right or license to any third party of any Intellectual Property that is owned by or exclusively licensed to any Seller and is material to any such Seller.

3.12    <u>Tax Matters</u>.

(a)    Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns with respect to the Acquired Assets required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.

(b)    All material Taxes with respect to the Acquired Assets owed by a Seller that are due (whether or not shown on any Tax Return) have been timely paid or have been adequately reserved against in accordance with GAAP.

(c)    There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)    None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(e)    Except to the extent that doing so would not adversely impact the Acquired Assets or the Purchaser's ownership of the Acquired Assets, none of the Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(f)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.12</u> and <u>Section 3.13</u> (insofar as they relate to Taxes) shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    <u>Assumed Benefit Plans</u>.

(a)    With respect to each material Assumed Benefit Plan, Sellers have made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document or a written description of the material terms thereof, including any amendments thereto, other than any document that any Seller is prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by each Seller, (iv) the most recent summary plan description and (v) each current material related insurance Contract or trust agreement.

(b)    Each Assumed Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Assumed Benefit Plan which could reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental

16

Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan. The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to Purchaser.

(c)    None of the Sellers maintains, contributes to, or has any Liability with respect to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code or (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(d)    No Assumed Benefit Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(e)    The consummation of the transactions contemplated hereby will not (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Assumed Benefit Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (each such term as defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by Purchaser or any of its Affiliates.

3.14    _Employees_. None of the Sellers is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of a Seller. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) no demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union and (ii) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the employees of any Seller. Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

3.15    _Affiliate Transactions_. Except as set forth on _Schedule 3.16_ or in the "Certain Relationships and Related Transactions, and Director Independence" disclosure in the Filed SEC Documents, to the Knowledge of Sellers, no Affiliate of any Seller, or any officer or director of BBBY or any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $[2,000,000], other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.16    _Brokers_. Except for Lazard, the fees and expenses of which will be paid by Sellers, to the Knowledge of Sellers no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the

reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Lazard) (the "Information Presentation") or in that certain datasite administered by Intralinks (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the transactions contemplated by this Agreement or any discussions with respect to any of the foregoing information.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

4.1    Organization and Qualification. Purchaser is a [●] duly formed, validly existing and in good standing under the laws of the State of [●] and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2    <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the transactions contemplated hereby. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (i) requisite Bankruptcy Court approvals are obtained, (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3(a)</u>[7] are made, given or obtained (as applicable), and (iii) the requirements of the HSR Act and Foreign Competition Laws are complied with, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the transactions contemplated hereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (A)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)    Except as set forth on <u>Schedule 4.3(a)</u>, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except (i) [any filings required to be made under the HSR Act], or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby.

---

[7]    **Note to Draft**: Purchaser to schedule any Foreign Competition Law requirements to which Purchaser is subject in connection with the transaction.

4.4     Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     Brokers. Except for [●], all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6     No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.7     Investment Representation; Investigation. Purchaser is acquiring the capital stock or other equity interests of the Acquired Entities for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which the Acquired Entities operate and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded full access to the books and records, facilities and personnel of the Acquired Entities for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of the Acquired Entities and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.8     Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of managers (or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.9     No Foreign Person. As of Closing, Purchaser will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof.

4.10    Solvency. Purchaser is, and immediately after giving effect to the transactions contemplated by this Agreement shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the transactions contemplated hereby, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

4.11    No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Sellers acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

4.12    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the transactions contemplated by this Agreement. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Acquired Assets are being acquired by Purchaser "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Information Presentation, the Dataroom, any Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of any Seller, or the quality, quantity or condition of any Seller's assets (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each

21

case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1    <u>Bankruptcy Actions</u>.

(a)    Within two (2) Business Days following the date hereof, Sellers shall file a notice with the Bankruptcy Court in accordance with the Bidding Procedures Order attaching the proposed form of an Order approving the execution, delivery, and performance of this Agreement by Seller (including payment of the and Expense Reimbursement pursuant to <u>Section 8.2(b)</u> or Breakup Fee pursuant to <u>Section 8.2(c)</u>), other than the performance of those obligations to be performed at or after the Closing (the "<u>Agreement Order</u>"), which Agreement Order shall be in form and substance acceptable to Purchaser. The foregoing notice shall be served in accordance with the Bidding Procedures Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

(b)    The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Sellers may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications being acceptable to Purchaser in its commercially reasonable discretion.

(c)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Sale Order.

(d)    The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Sale Order. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Sale Order, and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of

the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Sellers from the Bankruptcy Court with respect to the transactions contemplated by this Agreement.

(e)    If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the later of (i) 30 days following the hearing to consider the Sale Order and (ii) such other date as this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(f)    Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(g)    Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(h)    Nothing in this Section 5.1 shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

5.2    Cure Costs. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all

other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3     Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.4     Approval. Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Sellers. [8]

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement

---

[8]     **Note to Draft**:  Interim operating covenants subject to Sellers' ongoing review.

is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall use their commercially reasonable efforts to carry on their business in the Ordinary Course except as would not reasonably be expected to be material to Sellers; <u>provided</u> that no action by any Seller with respect to matters specifically addressed by <u>Section 6.1(b)</u> shall be deemed to be a breach of this <u>Section 6.1(a)</u> unless such action would constitute a breach of <u>Section 6.1(b)</u>.

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not:

(i)     (A) other than transactions among the Sellers and the Acquired Entities, issue, sell, encumber or grant any shares of the capital stock or other equity or voting interests of the Acquired Entities, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for any shares of such capital stock or other equity or voting interests, or any rights, warrants or options to purchase any shares of such capital stock or other equity or voting interests; (B) other than transactions among the Sellers and the Acquired Entities, redeem, purchase or otherwise acquire any of the outstanding shares of capital stock or other equity or voting interests of the Acquired Entities, or any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, (C) establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any shares of the capital stock or other equity or voting interests of the Acquired Entities, other than dividends and distributions by an Acquired Entity to another Acquired Entity, or (D) split, combine, subdivide or reclassify any shares of the capital stock or other equity or voting interests of the Acquired Entities;

(ii)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "<u>Indebtedness</u>"), except (1) for intercompany Indebtedness among Sellers and their Affiliates, (2) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (3) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $[5,000,000] outstanding at any time and (4) for Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; <u>provided</u> that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any

25

greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this underline clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements other than in the Ordinary Course or (C) make any loans, capital contributions or advances to, or investments in, any Person other than (1) as permitted pursuant to Section 6.1(b)(v) or (2) in the Ordinary Course;

(iii)       sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets for consideration, individually or in the aggregate, in excess of $[5,000,000], except (A) Ordinary Course dispositions of Inventory and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Sellers, (B) transfers among the Sellers, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

(iv)       make or authorize capital expenditures, including for property, plant and Equipment, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (B) otherwise in an aggregate amount for all such capital expenditures made pursuant to this clause (B) not to exceed $[10,000,000] in the aggregate;

(v)       except as permitted under Section 6.1(b)(iv), and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities or business (including by merger), except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to include acquisitions of Inventory in the Ordinary Course);

(vi)       except (A) in the Ordinary Course or (B) pursuant to the terms of any Seller Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any employee whose base salary exceeds $[300,000] per annum, (5) establish, adopt, enter into, materially amend or terminate any material Assumed Benefit Plan or (6) take any action to accelerate any rights or benefits under any Assumed Benefit Plan; provided that the foregoing shall not restrict any Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(vii)       make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Liabilities or results of operations of Sellers, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-

governmental authority (including the Financial Accounting Standards Board or any similar organization);

(viii)    grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i);

(ix)    settle any pending or threatened Action against any Seller that would result in an Assumed Liability in an amount in excess of $[1,000,000]; or

(x)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by any Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1 and (ii) any action taken, or omitted to be taken, by a Seller to protect the business of such Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its sole and reasonable discretion (any action or inaction described in clauses (i) or (ii) of this Section 6.1(c), a "COVID-19 Response"), shall in no event be deemed to constitute a breach of this Section 6.1.

6.2    Access to Information.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Sellers (in their discretion) will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Lazard or such other Person(s) as Sellers may designate in writing from time to time and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the transactions contemplated by this Agreement are not consummated, (B) would require any Seller to disclose any financial or proprietary information of or regarding the Affiliates of any Seller or otherwise disclose information regarding the

Affiliates of any Seller that such Seller deems to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws (including the HSR Act and Foreign Competition Laws) or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty. Notwithstanding anything to the contrary contained herein, no COVID-19 Response by any Seller shall be deemed to violate or breach this <u>Section 6.2</u> in any way or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)    The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of consummating the transactions contemplated hereby, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)    From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Acquired Entities, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)    Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, its business or the transactions contemplated by this Agreement without the prior written consent of Seller for each such contact.

6.3    <u>Employee Matters</u>.

(a)    At least 15 Business Days prior to Closing, Purchaser shall extend to each employee of Sellers a written offer of employment reviewed by Sellers, and which Sellers have had an opportunity to comment on, providing for a position that is the same or no less favorable

than such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") and that, if accepted, shall become effective immediately after the Closing. Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees." Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates.

(b)     For a period of one year from and after the Closing Date, Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is no lower than that provided to such Transferred Employee as of immediately prior to the Closing; (ii) cash bonus opportunities that are no less favorable than those provided to such Transferred Employee as of immediately prior to the Closing; and (iii) other employee benefits (including severance benefits) that are no less favorable than those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date (the "Purchaser Plans"), each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)     Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due the following: (i) all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date; (ii) all cash retention and cash long term incentive plans and similar obligations and Liabilities; and (iii) all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, severance and termination pay, notice, and benefits (including any employer Taxes or other payments related thereto), in each case of this

clause (iii), accruing, incurred or arising as a result of employment or separation from employment with Purchaser on or after the Closing Date with respect to Transferred Employees.

(e)    The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)    Effective as of the Closing, Purchaser and Purchaser's Affiliates shall assume all obligations, Liabilities and commitments in respect of claims made by any Transferred Employee (or any other individual claiming that he or she is or should be a Transferred Employee) for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of Contract) arising out of, relating to or in connection with any failure to offer employment to, or to continue the employment of, any such Transferred Employee (or other individual claiming that he or she is or should be a Transferred Employee) on terms and conditions that would preclude any claims of actual or constructive dismissal or similar claims under any Law or other failure to comply with the terms of this Agreement.

(g)    Purchaser will, or will cause its Affiliates to, provide any required notice under the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") and to otherwise comply with the WARN Act with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Sellers or Transferred Employees (including as a result of the consummation of transactions contemplated by this Agreement) and occurring on and after the Closing. Purchaser will not, and will cause its Affiliates not to, take any action on or after the Closing Date that would cause any termination of employment of any employees by Sellers or their Affiliates occurring prior to or at the Closing to constitute a "plant closing," "mass layoff" or group termination or similar event under the WARN Act, or to create any Liability or penalty to Sellers or any of their Affiliates for any employment terminations under Law.

(h)    Purchaser shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9.

(i)    For any Transferred Employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

30

6.4    <u>Regulatory Approvals</u>.

(a)    Subject to <u>Section 6.5</u>, Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to <u>Section 6.4(b)</u>, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(a)</u> or <u>Section 6.4(b)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)    Subject to <u>Section 6.5</u>, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, if any, (ii) cooperate with Sellers in exchanging such information and providing such assistance as Sellers may reasonably request in connection with any filings made by a Seller pursuant to <u>Section 6.4(a)</u>, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(b)</u> or <u>Section 6.4(a)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

6.5    <u>Antitrust Notification</u>.

(a)    Sellers and Purchaser will, as promptly as practicable and no later than 10 Business Days following the date hereof, (i) file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the transactions contemplated by this Agreement, which form will request early termination of the waiting period prescribed by the HSR Act, and (ii) make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws set forth on <u>Schedule 7.1</u>. Each Seller and Purchaser shall (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such Foreign Competition Laws, and will respond to any requests made for any supplemental information by any Governmental Body as promptly as practicable. Sellers and Purchaser shall not extend any waiting period or enter into any agreement or understanding with any Governmental Body without the prior written consent of the other; <u>provided</u> that such consent shall not be unreasonably withheld, conditioned, or delayed. Purchaser will be solely responsible for payment of all filing fees payable in connection with such filings.

(b)    Subject to the immediately following sentence, Sellers and Purchaser will use their reasonable best efforts to as promptly as practicable (and in any event prior to the Outside Date) obtain any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations required under the HSR Act or such Foreign Competition Laws for the consummation of this Agreement and the transactions contemplated hereby and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Purchaser will take, and will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that

31

may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously close the transactions contemplated by this Agreement, including (i) opposing at Purchaser's cost and expense any motion or action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the transactions contemplated by this Agreement, and exhausting all avenues of appeal, including appealing properly any adverse decision or Order by any Governmental Body, (ii) entering into a consent decree, consent agreement, settlement or other agreement or arrangement (including any customary ancillary agreements) containing Purchaser's agreement to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) such assets (whether tangible or intangible), rights, properties, products or businesses of Purchaser and its Affiliates (including, after the Closing, the Acquired Assets), (iii) agreeing to the termination, modification, or assignment of existing relationships, joint ventures, contracts or obligations of Purchaser and its Affiliates and (iv) agreeing to such limitations on conduct or actions of members of Purchaser and its Affiliates after the Closing as may be required in order to obtain satisfaction of the closing conditions set forth in Section 7.1(a) prior to the Outside Date, in each case, so as to allow the consummation of this Agreement and the transactions contemplated hereby as soon as practicable and, in any event, prior to the Outside Date.

(c)      The Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite obtaining any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under the HSR Act or Foreign Competition Laws at the earliest practicable dates and, in any event, prior to the Outside Date. Such reasonable best efforts and cooperation shall include each Party and its respective counsel undertaking to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any communication received by such Person from a Governmental Body in connection with the filings made pursuant to this Section 6.5 and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to any Governmental Body in connection with this Agreement and the transactions contemplated hereby and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the receipt of any non-action, action, clearance, Consent, approval, waiver, or other authorizations, (B) the expiration or termination of any waiting period, (C) the commencement or proposed or threatened commencement of any investigation, litigation or administrative or judicial Action or proceeding under applicable Laws, including any proceeding initiated by a private party, and (D) the nature and status of any objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the transactions contemplated hereby. Neither Sellers nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion. Sellers will have the right to review and approve the content of any draft notifications, formal notifications, filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this Section 6.5, each Party may (1) designate such material as restricted to "outside

counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets.

(d)    Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that could reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under the HSR Act or Foreign Competition Laws from any Governmental Body necessary to consummate the transactions contemplated by this Agreement, (ii) increase the risk of any Governmental Body entering an Order preventing, delaying or prohibiting the consummation of the transactions contemplated by this Agreement or (iii) delay the consummation of the transactions contemplated by this Agreement.[9]

6.6    <u>Reasonable Efforts; Cooperation</u>.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Sellers will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)    The obligations of Sellers pursuant to this Agreement, including this <u>Section 6.6</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Sale Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.7    <u>Further Assurances</u>. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

---

[9]    <u>**Note to Draft**</u>: Subject to discussion with Purchaser of applicable regulatory approvals and required licensure. Purchaser to confirm any Foreign Competition Laws or CFIUS filings that may be required.

6.8    <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.<u>Receipt of Misdirected Assets; Liabilities</u>.

(a)    From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)    From and after the Closing, if any Seller or any of its respective Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall accept such Liability.

6.10    <u>Acknowledgment by Purchaser</u>.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Sellers, and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have relied solely on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member

of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, or the quality, quantity or condition of any Seller's assets, are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Sellers, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this <u>Section 6.10</u>, including any such Action with respect

to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this <u>Section 6.10</u> (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this <u>Section 6.10</u>, Seller would not enter into this Agreement.

6.11    [10][Guaranty.

(a)    Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to <u>Sections 2.1</u> (the matters set forth in <u>clauses (i)</u>, <u>(ii)</u>, and <u>(iii)</u>, collectively, "<u>Guaranteed Obligations</u>").

(b)    If Purchaser fails to perform any of the Guaranteed Obligations, then Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)    Notwithstanding any other provision of this <u>Section 6.11</u>, nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless the Seller against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this <u>Section 6.11</u>, including <u>Section 6.11(f)</u> and <u>6.11(h)</u>.

(d)    The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this <u>Section 6.11</u> and all dealings between Sellers and Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this <u>Section 6.11</u>.

(e)    Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to Guarantor but not available to Purchaser, and Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)    The guarantee by Guarantor contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by Purchaser of all of

---

[10]    **Note to Draft**: Depending on Purchaser structure.

the Guaranteed Obligations and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and Guarantor shall stand discharged of all of its obligations under this guarantee. Guarantor shall indemnify Sellers for any costs and expenses incurred by Sellers in enforcing this Section 6.11, including the fees and expenses of counsel and other Advisors of Sellers in the investigation and prosecution of any Action with respect hereto. Guarantor's obligations under this Section 6.11 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser from any of Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(g)    The liability of Guarantor under this Section 6.11 shall be unlimited and unconditional, and this Section 6.11 shall be a continuing guaranty.

(h)    Guarantor hereby makes the representations and warranties set forth in Article IV as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein.]

6.12    Directors' and Officers' Indemnification.

(a)    Following the Closing until the sixth (6th) anniversary thereof, Purchaser shall (a) cause the Acquired Entities not to amend, repeal or otherwise modify the Acquired Entities' constitutive documents as in effect at the Closing, in any manner that would adversely affect the rights thereunder of individuals who are or were directors or officers of the Acquired Entities (the "Indemnified Persons") and (b) cause the Acquired Entities to honor and pay, the indemnification, advancement of expenses and exculpation provisions of each of the Acquired Entities' constitutive documents as in effect at the Closing, in any manner; provided that all rights to indemnification in respect of any Action pending or asserted or any claim made within such period shall continue until the disposition of such Action or resolution of such claim. Purchaser shall not cancel or otherwise reduce coverage under any "tail" insurance policies purchased by the Acquired Entities prior to the Closing; provided that no payments shall be required of the Acquired Entities or the Purchaser Group with respect to such policies after the Closing.

(b)    This Section 6.12 is intended to be for the benefit of each of the Indemnified Persons and may be enforced by any such Indemnified Person as if such Indemnified Person were a party to this Agreement. The obligations of the Purchaser under this Section 6.12 will not be terminated or modified in such a manner as to adversely affect any Person to whom this Section 6.12 applies without the consent of such affected Person.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

7.1    Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    the expiration or termination of any waiting period under the HSR Act or under the Foreign Competition Laws set forth in Schedule 7.1 related to the transactions contemplated by this Agreement, and receipt of any necessary approval related to the transactions

37

contemplated by this Agreement under the Foreign Competition Laws or other regulations set forth in <u>Schedule 7.1</u>;

(b)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect; and

(c)    the Bankruptcy Court shall have entered the Sale Order and this Agreement shall become effective in accordance with its terms.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.5</u> or in <u>Section 3.7</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.16</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)    Sellers shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by Sellers under this Agreement on or prior to Closing; and

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

7.3    <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)     Purchaser shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

7.4     Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

## ARTICLE VIII
## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Sellers and Purchaser;

(b)     by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)     by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before [●] (the "Outside Date") (or such later date as provided in Section 5.1(e)); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)     by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Sellers may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which that the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Sellers at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)     by written notice from Purchaser to Sellers, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     by written notice from Sellers to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(g)     by written notice from Sellers to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)     by written notice of either Purchaser or Sellers, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

(i)     by written notice from Purchaser to Sellers, if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction.

8.2     Effect of Termination.

(a)     In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2, Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the transactions contemplated by this Agreement lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

40

(b)    [If this Agreement is terminated other than (i) by Sellers pursuant to Section 8.1(c) or (ii) pursuant to Sections 8.1(a), 8.1(d), or 8.1(f), then BBBY will to Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed $[●] ("Expense Reimbursement").]

(c)    [In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 8.1(e), 8.1(g), 8.1(h), or 8.1(i), Seller shall pay to Purchaser a break-up fee in an amount equal to $[●][11] or in an amount provided for in the Agreement Order (the "Breakup Fee"); provided that the Breakup Fee shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Seller. Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.2(c) are an integral part of this Agreement and that the and Expense Reimbursement and the Breakup Fee are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such and Expense Reimbursement or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.]

(d)    Subject in all cases to Section 10.12, prior to the applicable Closing, in the event of any breach by Seller of this Agreement, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 8.1 and, if applicable, to receive the and Expense Reimbursement or the Breakup Fee, as applicable, in accordance with Section 8.2(c). Pursuant to the Bidding Procedures Order and subject to approval by the Bankruptcy Court and entry of the Agreement Order, the claim of Purchaser in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against the Seller under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case.

## ARTICLE IX
## TAXES

9.1    Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2    Allocation of Purchase Price. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price

---

[11]    **Note to Draft**: Amounts subject to limitations in Bidding Procedures Order. Stalking horse protections and related provisions (e.g., Agreement Order) to be included only to the extent that the Debtors select a Stalking Horse; otherwise to be removed.

(and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the methodology set forth in Schedule 9.2 (the "Allocation Methodology"). As soon as commercially practicable, but no later than 45 days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "Allocation"). If Sellers deliver a written objection within 30 days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within 30 days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Sellers, on the other hand, and the resolution of such dispute shall be final and binding on the Parties. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the Tax Code.

9.3     Cooperation. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4     Preparation of Tax Returns and Payment of Taxes.

(a)     Except as otherwise provided by Section 9.1, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Sellers.

(b)     Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets for any Tax period ending after the Closing Date. With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall provide Seller with a draft of such Tax Returns at least 30 days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Tax Returns. Purchaser shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.4(b).

(c)     Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position that has the effect of increasing any Tax that is payable or otherwise borne by Sellers, unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than 45 days' notice of such position before filing any such Tax Return. In the event Sellers disagree with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Sellers, on the other hand. The determination of such independent national

accounting firm or law firm shall be binding on all Parties and any Tax Return shall be filed consistently with such resolution.

## ARTICLE X
## MISCELLANEOUS

10.1     <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for 5 years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for 5 years and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. The Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the transactions contemplated hereby.

10.2     <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all fees and expenses in connection with any filing or submission that is necessary under the HSR Act and any Foreign Competition Laws will be allocated pursuant to <u>Section 6.4</u>, (b) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.2</u>.

10.3     <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the

number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

[_____]
[_____]
[_____]
Attention:        [_____]
Email:            [_____]

with a copy to (which shall not constitute notice):

[_____]
[_____]
[_____]
Attention:        [_____]
Email:            [_____]

Notices to Sellers:

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attention:        General Counsel
E-mail:            arlene.hong@bedbath.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:        Josh Sussberg, P.C.
                  Steve Toth
                  Daniel Elizondo
                  Emily Geier
                  Derek Hunter
Email:            jsussberg@kirkland.com
                  steve.toth@kirkland.com
                  daniel.elizondo@kirkland.com
                  emily.geier@kirkland.com
                  derek.hunter@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order and Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns,

including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are

or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11  <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the executive version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The

remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, <u>plus</u> ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13    <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the transactions contemplated hereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "<u>Agreement Dispute</u>") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the United States federal courts for the Southern District of New York (the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.14    <u>Governing Law; Waiver of Jury Trial</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT

ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16    Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17    Publicity. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable

efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18    Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19    Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

10.20    Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.21    Sellers' Representative. Each Party agrees that BBBY has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by BBBY on behalf of the Sellers.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(b)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Sellers or (ii) a material portion of the Acquired Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates shall not be an Alternative Transaction.

(e)    "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)    "<u>Bidding Procedures Order</u>" means the *Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. [___]][12].

(g)    "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(h)    "<u>Cash and Cash Equivalents</u>" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(i)    "<u>Confidentiality Agreement</u>" means that certain letter agreement, dated as of [●], by and between [●] and [●].[13]

(j)    "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(k)    "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

---

[12]    **Note to Draft**:  To be updated when entered.

[13]    **Note to Purchaser**:  Please complete details of your respective NDA.

(l)    "Debtors" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

(m)    "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(n)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(o)    "Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(p)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(q)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(r)    "Excluded Stores" means [the stores set forth on Schedule [___]].

(s)    "Excluded Store Contracts" means [the contracts set forth on Schedule [___]].

(t)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(u)    "GDPR" means Regulation (EU) 2016/679 and section 3 of the European Union (Withdrawal) Act 2018 and the UK Data Protection Act 2018.

(v)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(w)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity,

instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(x)    "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(y)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

(z)    "Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) computer software; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property.

(aa)    "Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by, stored by or on behalf of, or in transit to, any of Sellers.

(bb)    "Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of [●], none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(cc)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(dd)    "Lazard" means Lazard Ltd.

(ee)    "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(ff)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(gg)    "Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any Equipment or supplies necessary to or used in the provision of services by any Seller (including any resulting inability to meet customer demands or fulfill purchase orders and any resulting breaches of Contracts); (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body (including, for the avoidance of doubt, any such items related to Section 6.5) and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii ) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement, or pendency of this Agreement or the transactions contemplated hereby, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the transactions contemplated hereby; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules or in the Filed SEC Documents; (x) Effects in, arising from or relating to any action

required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules or in the Filed SEC Documents and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules or in the Filed SEC Documents; or (xv) (A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the Sale Order or the reorganization or liquidation of Sellers, (3) the Agreement Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith.

(hh)    "Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(ii)    "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and past practice in light of the current pandemic, epidemic or disease outbreak; provided that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the ordinary course of business.

(jj)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vii) any Encumbrances set forth on Schedule 11.1(jj), and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

(kk)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(ll)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(mm)    "Sale Order" means the sale Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to sections 363 and 365 of the Bankruptcy Code and (ii) approving and authorizing Sellers to consummate the transactions contemplated hereby[, substantially in the form attached hereto as Exhibit D].

(nn)    "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(oo)    "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by any Seller that is an Acquired Asset.

(pp)    "Seller Parties" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(qq)    "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(rr)    "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(ss)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(tt)    "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(uu)    "<u>Tax Code</u>" means the United States Internal Revenue Code of 1986, as amended.

(vv)    "<u>Tax Return</u>" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(ww)    "<u>Transaction Agreements</u>" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(xx)    "<u>Willful Breach</u>" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

11.2    <u>Index of Defined Terms</u>.

Acquired Assets .......................................... 1
Acquired Entities ....................................... 2
Acquired Leased Real Property ................. 2
Agreement.................................................. 1
Agreement Dispute ................................... 47
Agreement Order ...................................... 22
Allocation.................................................. 42
Allocation Methodology ........................... 42
Assigned Contracts ................................... 2
Assignment and Assumption Agreement.... 9
Assumed Benefit Plans ............................. 2
Assumed Liabilities .................................. 5
Audited Financial Statements .................. 12
Backup Bidder .......................................... 23
Bankruptcy Cases...................................... 1
Bankruptcy Code ...................................... 1
Bankruptcy Court...................................... 1
BBBY......................................................... 1
Breakup Fee ............................................. 41
Cash Payment............................................ 8
Chosen Courts........................................... 47
Closing ...................................................... 9
Closing Date.............................................. 9
Closing Date Payment............................... 8
COVID-19 Response ................................. 27
Cure Costs ................................................. 5
Dataroom................................................... 18
Deposit ...................................................... 9
Effect......................................................... 53
Enforceability Exceptions......................... 11
Environmental Permits.............................. 15
Escrow Agent............................................. 9

Excluded Assets ........................................ 3
Excluded Contracts ................................... 3
Excluded Liabilities .................................. 6
Expense Reimbursement........................... 41
Express Representations ........................... 18
Filed SEC Documents............................... 10
Foreign Competition Laws ....................... 11
Fundamental Representations ................... 38
Guaranteed Obligations ............................ 36
Guarantor .................................................. 1
Indebtedness.............................................. 25
Indemnified Persons.................................. 37
Information Presentation........................... 18
Laws .......................................................... 14
Material Contract ...................................... 13
Outside Date.............................................. 39
Parties........................................................ 1
Party .......................................................... 1
Permits ...................................................... 14
Projections................................................. 35
Purchase Price........................................... 8
Purchaser................................................... 1
Purchaser Plans ........................................ 29
Responsible Person Liabilities.................. 5
Seller ......................................................... 1
Sellers........................................................ 1
Successful Bidder...................................... 23
Transfer Offer ........................................... 29
Transfer Taxes .......................................... 42
Transferred Employees ............................. 29
Transferred Subsidiaries .......................... 2
Unaudited Financial Statements .............. 12

56

WARN Act.................................................. 30

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)      Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; <u>provided</u> that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)      A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[*Signature pages follow.*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

**[PURCHASER]**


By: _____
Name: _____
Title: _____

**SELLERS:**

[TO COME]

By: _____

Name: _____

Title: _____

## **EXHIBIT A**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

[*See attached.*]

## <u>EXHIBIT B</u>

**[FORM OF PATENT ASSIGNMENT AGREEMENT]**

[*See attached.*]

## EXHIBIT C

**FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

[*See attached.*]

## **Exhibit 2**

**Auction Notice**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

<div align="center">

**NOTICE OF SALE BY AUCTION AND SALE HEARING**

</div>

**PLEASE TAKE NOTICE** that on [__], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *(I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, (E) Approving the Form APA,*

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

*and (II)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts, (C) Authorizing the Sale of Assets and (D) Granting Related Relief* [Docket No. [__]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of substantially all or a portion of the Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court pursuant to the Bidding Procedures Order. **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.** To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Assets **on June 2, 2023, at 10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors.

**PLEASE TAKE FURTHER NOTICE** that only the Debtors, the Consultation Parties, Qualified Bidders, the U.S. Trustee, and any other parties as the Debtors may determine to include in their reasonable discretion, in consultation with the Consultation Parties, in each case, along with their representatives and advisors, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make Overbids at the Auction. **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order.**

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale Transaction at a hearing scheduled to commence on or before **June 7, 2023, at 11:00 a.m. (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable Judge Papalia") before the United States Bankruptcy Court for the District of New Jersey, 50 Walnut Street, 3rd Floor, Courtroom 3B, Newark, New Jersey 07102, or conducted consistent with the procedures established pursuant to the Court's standing orders regarding remote hearings in bankruptcy cases due to the COVID-19 pandemic, all of which are facilitated via Zoomgov.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of the Sale and each Sale Transaction must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before May 31, 2023,  at 5:00 p.m. (prevailing Eastern Time)**[3] by the following parties:  (i) the

---

[2]    Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

[3]    To the extent the Debtors, in consultation with the Consultation Parties, reasonably determine to pursue a Sale pursuant to a Plan, a separate hearing to consider such Sale shall be set.

Debtors, Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, Attn: [●]; (ii) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Emily E. Geier, P.C., Derek I. Hunter, and Ross J. Fiedler; (iii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Esq., Warren A. Usatine, Esq., and Felice R. Yudkin, Esq.; (iv) counsel to the Prepetition ABL Agent, Attn: Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner (marshall.huebner@davispolk.com), Adam L. Shpeen (adam.shpeen@davispolk.com), Steven Z. Szanzer (steven.szanzer@davispolk.com) and Michael Pera (michael.pera@davispolk.com); (v) counsel to the DIP Agent, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman and Megan R. Volin, (vi) Office of the United States Trustee for Region 3, District of New Jersey, Raymond Boulevard, Suite 2100, Newark, NJ 07102, Attn: Fran B. Steele; (vii) proposed counsel to the Creditors' Committee, [●], and [●], and (b) [●], [ADDRESS], Attn: [●]; and (viii) counsel to any Stalking Horse Bidder, [●], and [●], and (b) [●], [ADDRESS], Attn: [●].

### **CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE OR A SALE TRANSACTION, AS APPLICABLE, ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT OR THE PLAN, AS APPLICABLE.**

Dated: [_____], 2023

/s/ *DRAFT*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800

Facsimile:  (212) 446-4900
Email:       joshua.sussberg@kirkland.com
             emily.geier@kirkland.com
             derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and
Debtors in Possession*

4

## **Exhibit 3**

**Contract Assumption Notice**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al*., | |
| Debtors.[1] | Case No. 23-13359 (VFP) |
| | (Joint Administration Requested) |

<div align="center">

### NOTICE TO CONTRACT PARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

</div>

---

[1]    The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.   The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
> OR ONE OF YOUR AFFILIATES ARE A COUNTERPARTY TO AN
> EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
> OF THE DEBTORS AS SET FORTH ON **EXHIBIT A** ATTACHED HERETO.

**PLEASE TAKE NOTICE** that on [ __ ], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Auction and Bidding Procedures, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. [ __ ]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the contract or agreement listed on **Exhibit A** to which you are a counterparty, upon approval of the Sale Transaction. The Debtors have conducted a review of their books and records and have determined that the Cure Payments for unpaid monetary obligations under such Executory Contract or Unexpired Lease is as set forth on **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Payments, object to a proposed assignment to the Successful Bidder of any Executory Contract or Unexpired Lease, or dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payments, state the correct Cure Payments alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received no later than [•],** at **5:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**") by the Court and the following parties: (i) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Emily E. Geier, P.C., Derek I. Hunter, and Ross J. Fiedler; (ii) co-counsel to the Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Esq., Warren A. Usatine, Esq., and Felice R. Yudkin, Esq.; (iii) counsel to the Prepetition ABL Agent, Attn: Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner (marshall.huebner@davispolk.com), Adam L. Shpeen (adam.shpeen@davispolk.com), Steven Z. Szanzer (steven.szanzer@davispolk.com) and Michael Pera (michael.pera@davispolk.com); (iv) counsel to the DIP Agent, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman (DHillman@proskauer.com) and Megan R. Volin (MVolin@proskauer.com), (v) Office of the United States Trustee for Region 3, District of New Jersey, Raymond Boulevard, Suite 2100,

---

[2] Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

Newark, NJ 07102, Attn: Fran B. Steele; (vi) proposed counsel to the Creditors' Committee, [●], and [●], and (b) [●], [ADDRESS], Attn: [●]; and (vii) counsel to any Stalking Horse Bidder, [●], and [●], and (b) [●], [ADDRESS], Attn: [●].

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Payments, (b) the proposed assignment and assumption of any Executory Contract or Unexpired Lease, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Payments as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Payments are due under the Executory Contract or Unexpired Lease, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale Transaction.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Executory Contract or Unexpired Lease or related Cure Payments in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Executory Contract or Unexpired Lease on the Contract Assumption Notice or any Supplemental Assumption Notice does not require or guarantee that such Executory Contract or Unexpired Lease will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved. Moreover, the Debtors explicitly reserve the right, in their reasonable discretion, to seek to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Executory Contract or Unexpired Lease as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Executory Contracts or Unexpired Leases or the validity, priority, or amount of any claims of a counterparty to any Contract against the Debtors that may arise under such Executory Contract or Unexpired Lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Executory Contract or Unexpired Lease against the Debtors that may arise under such Executory Contract or Unexpired Lease.

Dated: [_____], 2023

/s/ DRAFT
_____

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com
            emily.geier@kirkland.com
            derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and
Debtors in Possession*