**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

*Proposed Co-Counsel for Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF DAVID KURTZ
IN SUPPORT OF THE DEBTORS' MOTION
FOR ENTRY OF AN ORDER (I)(A) APPROVING THE AUCTION
AND BIDDING PROCEDURES, (B) APPROVING STALKING
HORSE BID PROTECTIONS, (C) SCHEDULING BID DEADLINES
AND AN AUCTION, (D) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (E) APPROVING THE FORM APA, AND (II) (A) ESTABLISHING**

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/BBBY. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

**NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS, (C) AUTHORIZING THE SALE OF ASSETS AND (D) GRANTING RELATED RELIEF**

I, David Kurtz, declare as follows under penalty of perjury:

1. I submit this declaration (this "<u>Declaration</u>") in support of the relief requested in the *Debtors' Motion Seeking Entry of an Order (I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, (E) Approving the Form APA, and (II)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts, (C) Authorizing the Sale of Assets and (D) Granting Related Relief*, (the "Motion") filed contemporaneously herewith.[2]

2. Unless otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of information that I have obtained from the Debtors and their advisors, the Debtors' books and records, information learned from my review of relevant documents related thereto, and employees of Lazard working directly with me and under my supervision. Specifically, Lazard has been engaged by the Debtors since August 2022 and, in that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings. I am not being specifically compensated for this testimony other than through payments received by Lazard as a professional proposed to be retained by the Debtors. I am over the age of 18 years and authorized to submit this declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion and in the Bidding Procedures. The material terms of the Bidding Procedures are set forth in greater detail in the Motion.

**Background and Qualifications**

3. I am a Vice Chairman and the Global Head of the Restructuring Group of the firm Lazard Frères & Co. LLC ("Lazard"). Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority. Lazard is a full-service independent investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring advice, across a broad range of industries. Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 175 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. Since 1990, Lazard professionals have been involved in over 500 restructurings, representing well over $1 trillion in debtor assets.

4. Lazard provides a broad range of financial advisory and investment banking services to its clients, including (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising. Lazard and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases. Lazard's business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including: *In re Rockall Energy Holdings, LLC*, No. 22-90000 (MXM) (Bankr. N.D. Tex. Apr. 27, 2022); *In re Alto Maipo Delaware LLC*, No. 21-11507 (KBO) (Bankr. D. Del. Dec. 17, 2021); *In re Belk, Inc.*, No. 21-30630 (MI) (Bankr. S.D. Tex. Mar. 31, 2021); *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del.

July 15, 2019); *In re Sears Holdings Corp.,* No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018); *In re Nine West Holdings, Inc.*, No. 18-10847 (SCC) (Bankr. S.D.N.Y. June 5, 2018); *In re FirstEnergy Solutions Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio May 8, 2018); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Apr. 4, 2018); *In re GST AutoLeather*, *Inc.*, No. 17-12100 (LSS) (Bankr. D. Del. Oct. 27, 2017); *In re Gymboree Corporation*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. Sept. 10, 2015); *In re Standard Register Co.*, No. 15-10541 (BLS) (Bankr. D. Del. Apr. 13, 2015); *In re AWI Delaware, Inc.*, No. 14-12092 (KJC) (Bankr. D. Del. Sep. 17, 2014); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 24, 2013); *In re Maxcom Telecomm., S.A.B. de C.V.*, No. 13-11839 (PJW) (Bankr. D. Del. Aug. 15, 2013); *In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. July 24, 2013); *In re A123 Sys., Inc.*, No. 12-12859 (KJC) (Bankr. D. Del. Nov. 9, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 28, 2012); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Nov. 3, 2011); *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2011).

5.      I have been employed by Lazard since 2002 and have extensive experience as an advisor in corporate restructurings. I advised several retailers in the context of stressed situations, financings, sale processes and restructuring transactions, including Belk, Express, JCPenney, Neiman Marcus, J.Crew, Toys "R" Us, Gymboree, RadioShack, and Claire's. Specifically, I have extensive experience representing companies, creditors, and other constituencies in transactions involving the sale of all or substantially all of the Company's assets.

6.      Prior to joining Lazard, I was a partner at Mayer, Brown & Platt from 1986 to 1989, a partner at Jones Day from 1989 to 1999, and a senior partner in the Corporate Restructuring

Department at Skadden, Arps, Slate, Meagher & Flom LLP from 1999 to 2002. I hold FINRA Series 7 General Securities Representative, Series 79 Investment Banking Representative, and Series 24 General Securities Principal licenses. I have a J.D. and B.A. from Case Western Reserve University. I am a fellow of the American College of Bankruptcy, and served as a member of the Board of Directors from 2005 to 2011. I am also a frequent lecturer on bankruptcy- and reorganization-related topics and I have co-authored "Representing the Unsecured Creditors' Committee in Insolvency Restructurings," Workout & Turnarounds II (1999), Wiley and Sons.

### Marketing Process

7. In August 2022, the Debtors engaged Lazard to pursue a debt exchange transaction to address the Senior Unsecured Notes. Specifically, Lazard analyzed and developed potential offers to exchange any and all of the then-outstanding Senior Unsecured Notes via a public exchange with the goal of reducing the Company's debt and interest expense and addressing the near-term maturity of the 2024 Notes. In addition, Lazard assisted the Company with negotiating and implementing two private debt-for-equity exchanges in November 2022. As described in the First Day Declaration, the Company terminated the public exchange transaction on January 5, 2023.

8. In December 2022, Lazard commenced a process to solicit interest in a going-concern sale transaction that could be effectuated in chapter 11, as well as to solicit interest in providing post-petition financing. Lazard initially reached out to a group of potential financial and strategic investors who are experienced in investing in the retail sector, operational turnarounds and/or distressed situations and held meetings with certain of those investors in late December 2022. This initial group was comprised of approximately twenty investors, nine of which had executed confidentiality agreements by the second week of January 2023. Those parties

5

included various financial sponsors, strategic buyers, and money center banks. Several of the parties contacted could have potentially been acquirers of some or all of the Debtors businesses, as well as providers of post-petition financing to fund a going-concern reorganization.

9. In mid-January 2023, efforts to identify a potential plan sponsor and investors to provide post-petition financing intensified, the universe of potential investors that Lazard engaged with expanded, and diligence continued. The Debtors and Lazard shared diligence materials and financial projections, discussed the structuring of potential transactions, and conducted in-person or telephonic meetings with certain of these parties and the Debtors' management. The Debtors also received unsolicited inbounds from potential third-party financing sources who expressed some level of interest in potentially providing post-petition financing, which Lazard explored. At the same time, the Debtors' liquidity position was deteriorating rapidly. By the end of January 2023, as the number of investors that Lazard was engaging with had increased and as investors continued to conduct diligence, it became apparent that the process was unlikely to yield a plan sponsor that would facilitate a going-concern reorganization. By that time, Lazard had engaged with approximately sixty potential investors to solicit interest in serving as a plan sponsor, acquiring some or all of the Debtors' assets or businesses, or providing post-petition financing. Thirty of those parties had executed confidentiality agreements.

10. In January 2023, the Debtors executed a second engagement letter with Lazard to broaden the scope of the engagement, including to explore a potential sale and restructuring transaction that could be implemented through chapter 11. Over the past several months, Lazard has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring efforts and has become well-acquainted with the Debtors' capital structure, financing needs, and business operations.

11. In mid-April 2023, Lazard once again reengaged with potential investors in an effort to identify a plan sponsor in connection with a chapter 11 restructuring or a provider of post-petition financing. In connection with that process, Lazard engaged with over 30 parties to assess interest in acquiring all or part of the business or providing DIP financing and no viable buyer was identified and no investors were willing to provide actionable DIP financing proposals. In total, Lazard engaged with over 100 potential investors since December 2022; over 50 of those parties executed NDAs. As set forth in my declaration in support of the postpetition financing motion, the Debtors again found themselves in an untenable liquidity position, necessitating the commencement of these chapter 11 cases.

12. While the Debtors did not receive any actionable offers for an acquisition of their Assets before the Petition Date, the Debtors and Lazard are continuing their efforts to market all or a portion of the Assets (in whole or in part) and, if appropriate, enter into an agreement with a Stalking Horse Bidder. The Debtors are committed to achieving the highest or otherwise best bid for some or all of the Debtors' Assets by marketing those Assets pursuant to the Bidding Procedures, and, if necessary, conducting an auction for such assets as well as any additional assets of the Debtors. I am confident that the Bidding Procedures and the other relief requested in the Motion, including setting a schedule for an auction (if necessary), represent the last, best chance for the Debtors to realize a going concern value for some or all of their Debtors' Assets. I believe the proposed Bidding Procedures will facilitate the sale of the Debtors' Assets, including the Debtors' trademarks, for the highest or otherwise best value, and potentially preserve jobs for their dedicated employees. The Debtors anticipate that any stores which a potential purchaser does not seek to acquire will be wound down through store closing sales. I believe that the proposed Bidding Procedures provide for substantial flexibility with respect to the structure of any Sale

Transaction, and the Bidding Procedures are the best path to garner interest in the Assets and maximize value for all stakeholders.

**The Bidding Procedures and Sale Timeline Are Appropriate and Are Supported by a Sound Business Purpose**

13. The Debtors intend to continue the marketing process for 35 days post-petition, in accordance with the sale milestones set forth in the Interim DIP Order. The Debtors are committed to implementing a marketing process on an expedited timeline to conform with the prepetition lenders' demands to conduct a sale as soon as possible, as reflected in the Interim DIP Order sale milestones. Additionally, as noted in the Motion, the timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and Potential Bidders with the need to run an expeditious and efficient sale process. The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids promptly. Based on my experience, I believe that the Bidding Procedures and the timeline set forth therein are in the best interests of the Debtors' estates, will establish whether and to what extent any additional market for the Assets exists, and provide interested parties with sufficient opportunity to participate.

14. As more fully described in the Bidding Procedures, the Bidding Procedures contain provisions relating to, among other things: (a) requirements to participate in the bidding process; (b) access to due diligence by Acceptable Bidders; (c) Bid Protections for the Stalking Horse Bidder (if any); (d) Bid Requirements; (e) the evaluation of Qualified Bids by the Debtors; (f) an Auction; (g) the acceptance of any Successful Bids; and (h) the designation of any Back-Up Bidders.

Declaration of David Kurtz in Support of the Debtors Motion for Entry of    Page 9 of 12

15. The Debtors' proposed dates and deadlines to pursue one or more Sale Transactions that may be consummated either pursuant to section 363 of the Bankruptcy Code or under a chapter 11 plan (the "<u>Proposed Bidding Procedures</u>") are as follows:

a. **<u>The Sale Schedule</u>**

| Action | Description | Deadline |
|---|---|---|
| Stalking Horse Deadline | The deadline by which the Debtors may choose a Stalking Horse Bidder. | May 22, 2023 at 5:00 p.m. prevailing Eastern Time. |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | May 28, 2023 at 12:00 p.m. prevailing Eastern Time. |
| Auction | The date and time of the Auction, if one is needed, which will be held at the offices of Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, New York, 10022. | June 2, 2023 at 10:00 a.m. prevailing Eastern Time, if needed. |
| Notice of Successful Bidder | As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder (as defined in the Bidding Procedures) (the "<u>Notice of Successful Bidder</u>"), identifying the applicable Successful Bidder, Assets, and key terms of the agreement. | As soon as reasonably practicable after the conclusion of the Auction (if necessary). |
| Sale Hearing | The hearing before the Court to consider approval of the Winning Bid or Winning Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Sale. | June 7, 2023 at 10:00 a.m. prevailing Eastern Time, or as soon thereafter as the Debtors may be heard. |

16. Based on my experience, I believe that the proposed Bidding Procedures are designed with the intent to enhance the value for all stakeholders by facilitating a competitive bidding process in which potential bidders are encouraged to participate and submit competing bids within the specified timeframe. The proposed Bidding Procedures provide appropriate time for the Debtors to complete their comprehensive marketing process, receive and evaluate bids, and, if necessary, hold an Auction to determine the highest or otherwise best bid. The proposed dates and deadlines are critical to driving the Debtors' restructuring to an efficient and value-maximizing conclusion, particularly in light of the Debtors' liquidity constraints, which necessitate a timely process. At the same time, the proposed Bidding Procedures seek to minimize the time

9

and expense in chapter 11. The Bidding Procedures will provide the Debtors with optionality, expedite resolution of these chapter 11 cases, reduce the expenses associated with administering these cases, and permit the Debtors to restructure in a timely manner. It is my view that the Proposed Bidding Procedures, including, without limitation, the timeline, are reasonable and appropriate under the circumstances. Additionally, given the public nature of the Debtors' chapter 11 cases, it is now well-publicized that the Assets are available for acquisition. Under the proposed Bidding Procedures, the Debtors will have an opportunity to consider all offers and select the offer that they deem to be the highest or otherwise best.

### There Is a Sound Business Purpose for Appointing a Stalking Horse Bidder and Offering Bid Protections

17. To the extent the Debtors seek to appoint a Stalking Horse Bidder, the Bid Protections identified in the Motion, in my experience, are customary and usual, and are in line with bid protections that stalking horse bidders typically require. In the event the Debtors seek to appoint a Stalking Horse Bidder, such an appointment will be sought on notice to all parties to these chapter 11 cases such that no party will be prejudiced by the appointment of a Stalking Horse Bidder. The allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors, as a Stalking Horse Bidder, if designated, will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates. Without the Bid Protections, a potential bidder may elect not to participate in the process at all to the detriment of the Debtors' estates. I believe the ability to appoint a Stalking Horse Bidder and provide such bidder with the Bid Protections offers the Debtors the necessary flexibility to pursue a value-maximizing transaction.

18. Further, in my experience, the Stalking Horse Bid Protections, which include a break-up fee and reimbursement expenses which, combined, do not exceed three percent of any

proposed purchase price, are customary, usual, and in line with bid protections offered to stalking horse parties in similar contexts.

19. Accordingly, for the reasons set forth herein, I believe the Bidding Procedures are reasonable and appropriate and best position the Debtors for success in these chapter 11 case.

[*Remainder of page intentionally left blank.*]

11

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

| | |
|---|---|
| Dated: April 24, 2023<br>New York, New York | By: */s/ David Kurtz*<br>Name: David Kurtz<br>Title: Vice Chairman and Global Head of Restructuring<br>Lazard Frères & Co. LLC<br>*Proposed Investment Banker and Financial Advisor to the Debtors and Debtors-in-Possession* |