**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

**DECLARATION OF DAVID KURTZ IN SUPPORT
OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING
ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, David Kurtz, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"),[2] filed contemporaneously herewith, seeking authority to, among other things: (a) obtain senior secured postpetition financing on a super priority basis provided by Sixth Street Specialty Lending, Inc., ("Sixth Street") as administrative agent and the lenders party thereto pursuant to which (i) new money term loans will, subject to the satisfaction of certain conditions, be advanced and made available to the Debtors in the aggregate principal amount of $40 million and (ii) $200 million in loan obligations under the Prepetition FILO Facility will be converted, or rolled, into debtor in possession loans (collectively, the "DIP Facility"); and (b) immediately use the cash collateral of the prepetition secured lenders on a consensual basis.[3]

2. Based on my professional experience and my involvement in and knowledge of the negotiations around the DIP Facility, and as explained below, the DIP Facility: (a) is the product

---

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the DIP Motion, the Interim DIP Order, or the DIP Credit Agreement, as applicable.

[3] Any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Credit Agreement and the Interim DIP Order.

of arm's-length, good-faith negotiation processes; (b) in light of the marketing process described below, is the best presently available postpetition financing option for the Debtors; and (c) contains reasonable financial terms and conditions under the circumstances.

3. The statements in this Declaration are, except where specifically noted, based on personal knowledge of information that I have obtained from the Debtors and their advisors, the Debtors' books and records, information learned from my review of relevant documents related thereto, and employees of Lazard Frères & Co. LLC ("Lazard") working directly with me and under my supervision. Specifically, Lazard has been engaged by the Debtors since August 2022, and, in that capacity, I have been directly involved over the last few months in the matters leading up to the Debtors' chapter 11 filings. I am not being specifically compensated for this testimony other than through payments received by Lazard as a professional whose retention the Debtors will be seeking to obtain at a later date. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background and Qualifications

4. I am a Vice Chairman and the Global Head of the Restructuring Group of Lazard. I have a broad range of experience in financial advisory assignments, including extensive experience with chapter 11 restructurings. During the course of my career, I have advised companies and creditor groups in connection with raising capital in the bankruptcy context, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession and exit financing loans. I also have extensive experience representing companies, creditors, and other constituencies in transactions involving the sale of all or substantially all of a company's assets. Additionally, I have performed numerous enterprise valuations in the bankruptcy context.

5.     I have been employed by Lazard since 2002 and have extensive experience as an advisor in corporate restructurings. I have advised companies, creditors, and investors in connection with numerous in-court and out-of-court restructurings and recapitalizations. Specifically, I have represented companies and creditor groups in connection with raising capital in the bankruptcy context, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession financing, exit financing loans, and equity rights offerings. I advised several retailers in the context of stressed situations, financings, sale processes and restructuring transactions, including Belk, Express, JCPenney, Neiman Marcus, J.Crew, Toys "R" Us, Gymboree, RadioShack, and Claire's. I have submitted declarations and provided expert testimony related to those matters in a number of chapter 11 cases.

6.     Prior to joining Lazard, I was a partner at Mayer, Brown & Platt from 1986 to 1989, a partner at Jones Day from 1989 to 1999, and a senior partner in the Corporate Restructuring Department at Skadden, Arps, Slate, Meagher & Flom LLP from 1999 to 2002. I hold FINRA Series 7 General Securities Representative, Series 79 Investment Banking Representative, and Series 24 General Securities Principal licenses. I have a J.D. and B.A. from Case Western Reserve University. I am a fellow of the American College of Bankruptcy and served as a member of the Board of Directors from 2005 to 2011. I am also a frequent lecturer on bankruptcy- and reorganization-related topics, and I co-authored "Representing the Unsecured Creditors' Committee in Insolvency Restructurings," Workout & Turnarounds II (1999), Wiley and Sons.

7.     Lazard is the primary U.S. operating subsidiary of an international financial investment banking, financial advisory, and asset management firm. Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority. Together with its predecessors and affiliates, Lazard has been

advising clients around the world for more than 175 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and buyers in chapter 11 proceedings.

### Lazard Retention

8. In August 2022, the Debtors engaged Lazard to pursue a debt exchange transaction to address the Senior Unsecured Notes. Specifically, Lazard analyzed and developed potential offers to exchange any and all of the then-outstanding Senior Unsecured Notes via a public exchange with the goal of reducing the Company's debt and interest expense and addressing the near-term maturity of the 2024 Notes. In addition, Lazard assisted the Company with negotiating and implementing two private debt-for-equity exchanges in November 2022. As described in the First Day Declaration, the Company terminated the public exchange transaction on January 5, 2023.

9. In January 2023, the Debtors executed a second engagement letter with Lazard to broaden the scope of the engagement, including to explore a potential sale and restructuring transaction that could be implemented through chapter 11. Over the past several months, Lazard has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring efforts and has become well-acquainted with the Debtors' capital structure, financing needs, and business operations.

**The Debtors' Prepetition Capital Structure**

10. As of the Petition Date, the Debtors have approximately $1.8 billion in total funded debt obligations. This consists of approximately (a) $80 million in aggregate principal amount outstanding under the Prepetition ABL Facility (*plus* $103 million of outstanding letters of credit), (b) $547 million in aggregate principal amount outstanding under the Prepetition FILO Facility, (c) $1.03 billion in outstanding Senior Unsecured Notes spread across three separate issuances with varying maturity dates and interest rates, and (d) $61.5 million of aggregate capital lease obligations.

11. As noted in the First Day Declaration, the Prepetition Credit Facilities are secured on a first priority basis (subject to customary exceptions) on substantially all assets of Bed Bath & Beyond, Inc. and its subsidiaries that are borrowers or guarantors under the Prepetition Credit Agreement (the "Prepetition Loan Parties")—all of which are Debtors in these chapter 11 cases.[4]

12. More specifically, I understand that the Debtors' obligations under the Prepetition Credit Facility are secured, subject to certain exceptions, by a first priority lien in favor of the Prepetition ABL Secured Parties on accounts and credit card receivables, inventory, cash and cash equivalents, deposit accounts, securities and commodities accounts, and all intellectual property (the "Prepetition ABL Collateral") and a second priority lien in favor of the Prepetition FILO Secured Parties on the Prepetition ABL Collateral. I further understand that the Debtors' obligations under the Prepetition Credit Facility are secured, subject to certain exceptions,

---

[4] The Prepetition Credit Facilities are not, however, secured by any real property or equipment located in the United States that is owned by, or leased to, the Company or any of its subsidiaries that has a net book value (after deduction of accumulated depreciation) in excess of 1.0% of Consolidated Net Tangible Assets (as defined in the Prepetition Credit Agreement) (together with any other unencumbered value, the "Unencumbered Property").

including Unencumbered Property, by a first priority lien in favor of the Prepetition FILO Secured Parties on substantially all assets (other than the Prepetition ABL Collateral) of the Prepetition Loan Parties, including chattel paper, equipment, documents, general intangibles, instruments, investment property, letters of credit, and commercial tort claims, each as described in the Prepetition Credit Agreement (the "Prepetition FILO Term Loan Collateral") and a second priority lien in favor of the Prepetition ABL Secured Parties on the Prepetition FILO Collateral.

### The Debtors' Prepetition Marketing and Financing Efforts

I.   **Outreach to Potential Transaction Counterparties and Potential Postpetition Financing Providers.**

13.   As described in the First Day Declaration, the Debtors have suffered through significant financial and operational turmoil over the past year. On August 31, 2022, Sixth Street provided significant new money commitments in the form of the Prepetition FILO Term Loan Facility. The proceeds of this financing were used to fund the Company's turnaround plan and acquire inventory to stock the Company's stores. In connection with the debt raise, the parties amended the Prepetition Credit Agreement to delineate the rights and relative priorities afforded to the Prepetition ABL Lenders and Prepetition FILO Term Loan Lenders in the event of a chapter 11 filing and subsequent debtor-in-possession financing. I understand that Schedule 9.23 of the Prepetition Credit Agreement, entitled "Agreement Among Revolving Lenders and FILO Term Loan Lenders" (the "Agreement Among Lenders"), serves to outline such rights and priorities.

14.   As the full picture of the Debtors' underperformance and diminishing liquidity position became clear during the holiday period, it became increasingly evident that the public debt exchange would not provide a comprehensive solution to address the Company's capital structure issues. Further, around this time, the Debtors were unable to utilize the "at the market" common stock offering program that had been implemented in August 2022 to augment their

liquidity position as a result of a late filing of the Company's quarterly report on Form 10-Q for the period ended November 26, 2022. As a result, the Debtors asked Lazard to engage with potential investors or acquirers for the Company's businesses in an effort to raise capital, identify a party that could potentially serve as a plan sponsor in connection with a Chapter 11 process, or both.

15. In December 2022, Lazard commenced a process to solicit interest in a going-concern sale transaction, as well as to solicit interest in providing chapter 11 financing. Lazard initially reached out to a group of potential financial and strategic investors who are experienced in investing in the retail sector, operational turnarounds and/or distressed situations and held meetings with certain of those investors in late December 2022. This initial group was comprised of approximately twenty investors, nine of which had executed confidentiality agreements by the second week of January 2023. Those parties included various financial sponsors, strategic buyers, and money center banks. Several of the parties contacted could have potentially been acquirers of some or all of the Debtors businesses, as well as providers of post-petition financing to fund a going-concern reorganization.

16. In mid-January 2023, efforts to identify a potential plan sponsor and investors to provide post-petition financing intensified, the universe of potential investors that Lazard engaged with expanded, and diligence continued. The Debtors and Lazard shared diligence materials and financial projections, discussed the structuring of potential transactions, and conducted in-person or telephonic meetings with certain of these parties and the Debtors' management. The Debtors also received unsolicited inbounds from potential third-party financing sources who expressed some level of interest in potentially providing post-petition financing, which Lazard explored. At the same time, the Debtors' liquidity position was deteriorating rapidly. By the end of January

2023, as the number of investors that Lazard was engaging with had increased and as investors continued to conduct diligence, it became apparent that the process was unlikely to yield an equity investor and funding provider that would facilitate a going-concern reorganization. By that time, Lazard had engaged with approximately sixty potential investors to solicit interest in serving as an equity investor or plan sponsor, acquiring some or all of the Debtors' assets or businesses, or providing post-petition financing. Thirty of those parties had executed confidentiality agreements.

17. In late January 2023, the Debtors and Lazard were approached by an investor (via another investment bank) regarding a potential equity transaction and began negotiating the terms of a potential transaction. Shortly thereafter, a second investor, Hudson Bay Capital Management, LP ("HBC"), approached the Debtors and expressed an interest in acquiring the equity securities of the Company.

18. The Debtors engaged in extensive negotiations with the two equity investors, culminating in the closing of an underwritten public offering ("Public Offering") of (i) shares of the Series A convertible preferred stock (the "Preferred Stock"), (ii) warrants to purchase shares of Series A Convertible Preferred Stock (the "Preferred Stock Warrants") and (iii) warrants to purchase Common Stock on February 7, 2023. The Company received gross proceeds of approximately $225 million on the closing date of the Public Offering and could have received up to an additional approximately $800 million of gross proceeds upon the forced exercise of the Preferred Stock Warrants pursuant to the terms and conditions thereof. Concurrently, to allow the Public Offering to close, the Debtors and the Prepetition Secured Lenders negotiated a waiver and amendment to the Amended Credit Agreement (the "Second Amendment to the Credit Agreement"). Under the Second Amendment to the Credit Agreement, the Prepetition Secured Lenders agreed to (i) waive any outstanding defaults under the credit facilities, and (ii) rescind the

implementation of acceleration, the requirement to cash collateralize letter of credit obligations, and the default interest owed on outstanding obligations. The Second Amendment to the Credit Agreement also decreased the total revolving commitment from approximately $1.13 billion to $565 million and provided for an increase of $100 million in the FILO facility (the "FILO Upsize") from $375 million to $475 million. The Public Offering provided the Debtors with a much-needed cash infusion, which averted the need for a chapter 11 filing in February 2023.

19.     Following the closing of the Public Offering, Lazard commenced a process to raise incremental liquidity to facilitate additional inventory purchases and refinance the Prepetition Lenders. As part of this process, Lazard reengaged with many of the parties that were involved in the process to identify a plan sponsor or post-petition financing provider in December and January. Lazard and the Debtors analyzed and proposed a range of potential financing structures, hosted management presentations, and facilitated diligence. One of the compelling reasons for potential investors to provide the financing was the projected receipt of up to an additional $800 million of equity proceeds upon exercise of the Preferred Stock Warrants. However, the Company's share price declined over the near term, which jeopardized the Company's ability to meet the conditions, including maintaining a minimum share price, to force the exercise of the Preferred Stock Warrants in the future and continue to raise capital per the terms of the Preferred Stock Warrants. As the Company's stock price declined in the weeks following the closing of the Public Offering, it became apparent that potential financing parties did not have confidence that the Debtors would ultimately receive such additional proceeds. Between February 7, 2023 and March 27, 2023, the holder of the Preferred Stock Warrants exercised the Preferred Stock Warrants for aggregate gross proceeds to the Company of $135,014,000. In total, the Company received approximately $360,000,000 of aggregate gross proceeds in connection with the Public Offering.

20. In an effort to satisfy certain provisions of the Public Offering and regain confidence in obtaining additional equity proceeds, on March 14, 2023, the Company amended the Preferred Stock Warrants to temporarily adjust the minimum price threshold enabling the Company to force exercise of the Preferred Stock Warrant to $1.00 until April 3, 2023 and amended the Prepetition Credit Agreement to facilitate the receipt of additional equity proceeds. Following these amendments, as Lazard continued to engage with potential investors around a financing transaction, the Company's share price continued to decline. On March 30, 2023, after raising an aggregate of $360 million in connection with the Public Offering, the Company exchanged the remaining Preferred Stock Warrants for shares of common stock. Concurrently with the exchange of the remaining Preferred Stock Warrants, the Company entered into a sales agreement with B. Riley Securities, Inc., as sales agent, to offer and sell up to $300 million of shares of its common stock from time to time through an "at-the-market" offering program (the "<u>B. Riley ATM Program</u>") with a maximum aggregate offering amount of up to $300 million. Efforts to obtain financing to replace the Prepetition Secured Lenders were ultimately unsuccessful given the uncertainty surrounding the Debtors go-forward liquidity position and the continued deterioration of the business; over forty potential investors were contacted in connection with that financing process, and while certain parties expressed interest in providing some amount of new capital, no party provided a proposal that represented an actionable or comprehensive solution.

21. The Public Offering and the B. Riley ATM Program provided the Debtors with much-needed cash infusions, which averted the need for a chapter 11 filing in February or March 2023. However, the Debtors' cash burn continued apace, preventing the Debtors from implementing their anticipated long-term transformation plan while maintaining compliance under the Prepetition Credit Agreement. Further, according to a schedule, the amendment to the

11

Prepetition Credit Agreement that the Debtors entered into in connection with the B. Riley ATM Program contemplated the receipt of a minimum amount of equity proceeds in accordance with the schedule required under the Prepetition Credit Agreement, and as the Debtors' share price continued to decline further, it became clear that the Debtors would not be able to raise the minimum amount of equity proceeds. In April 2023, Lazard once again reengaged with potential investors in an effort to identify a plan sponsor in connection with a chapter 11 restructuring or a provider of post-petition financing. In connection with that process, Lazard engaged with over thirty parties to assess interest in acquiring all or part of the business or providing DIP financing and no viable buyer was identified and no investors were willing to provide actionable DIP financing proposals. In total, Lazard engaged with over 100 potential investors since December 2022 and over fifty of those parties executed confidentiality agreements. As such, the Debtors again found themselves in an untenable liquidity position, necessitating the commencement of these chapter 11 cases and entry into the DIP Credit Agreement.

22.   Based on my discussions with the Debtors' management and their advisor AlixPartners, I understand that the Debtors determined, based on their forecasts, that they would require immediate access to postpetition financing and related postpetition cash collateral to provide sufficient liquidity to operate, and eventually wind-down (absent a going-concern transaction), the Debtors' businesses during these chapter 11 cases. I understand that the Debtors' ability to continue making such payments during these chapter 11 cases is essential to the Debtors' ability to maximize the value of their assets. On Friday, April 21, 2023, the DIP Lenders (in their capacity as Prepetition FILO Lenders) approved, and the Prepetition ABL Lenders approved and funded, an emergency overadvance of $54 million to ensure payment of critical expenses including, among other things, the Debtors' payroll and tax obligations (the "Emergency Rescue

Loan"). By facilitating the Emergency Rescue Loan, I believe that the FILO Lenders and the Prepetition ABL Lenders enabled the Debtors to enter these proceedings on a more stable footing.

## II.    Negotiation of the DIP Facility.

23.    In the days leading up to the Petition Date, the Debtors and their advisors engaged in round-the-clock negotiations with the DIP Lenders around the terms of the DIP Facility. Critically, I understand that pursuant to the terms of the Agreement Among Lenders, the Debtors required the consent of both the Prepetition ABL Lenders and the Prepetition FILO Term Loan Lenders prior to receiving debtor-in-possession funds (including the use of cash collateral) from either party. Accordingly, through their negotiations with the DIP Lenders, the Debtors encouraged the Prepetition ABL Lenders and the Prepetition FILO Lenders to reach consensus on a combined proposal.

24.    The Debtors shared numerous proposals and held multiple telephone conferences with both the advisors to and principals of the DIP Lenders. The parties engaged in hard-fought, arm's-length negotiations in an effort to reach the best available materials terms under the circumstances described above. Ultimately, the terms of the DIP Facility reflect both the limited amount of time the parties had to negotiate, and the limited market interest in providing alternative financing. Those terms are reflected in the DIP Facility.

### The Terms of the Proposed DIP Facility Are the Best Terms Available under the Circumstances and Should Be Approved

## I.    Alternative Sources of Financing on Better Terms than the DIP Facility are Not Available to the Debtors.

The proposed DIP Facility consists of (1) a new money single draw term loan facility in the aggregate principal amount of up to $40 million and (2) a roll-up of Prepetition FILO Secured Obligations in the aggregate amount of $200 million (the "Roll-Up"), pursuant to the terms and conditions of the Interim Order and the DIP Credit Agreement.

25. Based on the Debtors' efforts to secure postpetition financing, my experience in obtaining postpetition financing, current market conditions, the Debtors' circumstances, and my participation in the negotiations around the proposed DIP Facility, I believe that there are no alternative sources of financing available on both better and more executable terms than the DIP Facility. Accordingly, the terms of the DIP Facility are fair and reasonable under the circumstances. I believe that the DIP Facility represents the best option available to address the Debtors' near-term liquidity needs, fund the wind-down process, and provide near-term runway for the Debtors to attempt to salvage a potential going-concern transaction or an orderly wind-down.

26. As discussed above, the Debtors did not receive any actionable postpetition financing proposals from parties outside their existing capital structure. I believe that this is due, in part, to the fact that the Debtors have limited unencumbered assets capable of collateralizing postpetition financing. Such unencumbered assets are insufficient to secure the magnitude of financing required to meet the Debtors' near-term liquidity needs. And no party that Lazard engaged with as part of the postpetition financing process (other than the DIP Lenders) was interested in providing a postpetition financing package in a sufficient amount to fund the Debtors' liquidity needs, either on a junior, unsecured, or *pari passu* basis, even as the Debtors' imminent liquidity issues became public knowledge.

27. I therefore believe that the DIP Lenders are particularly well-positioned to provide postpetition financing because they hold obligations and commitments under the Prepetition FILO Term Loan Facility, and first liens on the Prepetition FILO Term Loan Collateral. Thus, the DIP Lenders, along with the Prepetition ABL Lenders who consent to the proposed DIP Facility and use of their Cash Collateral, are the Debtors' "fulcrum" stakeholder constituency. I understand

that pursuant to section 364(d)(1) of the Bankruptcy Code, a priming lien may only be granted (a) with the consent of the affected secured lenders, or (b) if adequate protection exists for such priming lien. The consent of the DIP Lenders is, therefore, required before the Debtors obtain senior secured debtor-in-possession financing from any source.

28. During discussions with the advisors to the DIP Lenders, the DIP Lenders made it clear that that they would not consent to the Debtors' incurrence of priming financing by any other party. Absent such consent, the Debtors risk a potentially costly and protracted non-consensual priming dispute between any postpetition lenders and the Debtors' prepetition secured lenders at a time when the Debtors' simply lack sufficient liquidity to engage in such a fight. Further, any such dispute would erode the value of the Debtors' estates to the detriment of all stakeholders. No third-party priming proposal justified taking on that level of risk, and the Debtors were simply unwilling to bet the company on their ability to win such an adequate protection fight.

29. Furthermore, given the lack of alternatives available, the Debtors believe (and I agree) that providing the Roll-Up is a sound exercise of their business judgment. The Roll-Up is a necessary prerequisite to the provision of postpetition financing by the DIP Lenders which, if the DIP is approved, will have facilitated an infusion of $94 million in new capital within less than a week to ensure that the Debtors commenced these cases in a financially stable condition. Absent the $54 million Emergency Rescue Loan pre-filing and the additional $40 million in new financing from the DIP Lenders, the Debtors would have no path to the orderly liquidation and sale process provided in these chapter 11 cases. Additionally, the DIP Lenders (in their capacity as Prepetition FILO Lenders) consented to, and the Prepetition ABL Lenders funded, approximately $54 million in overadvances on the last business day prior to the Petition Date so that the Debtors could continue to meet ordinary course operating expenses and be prepared to commence these chapter

11 cases. I believe that absent the additional $54 million of advances, the Debtors risked a disorderly liquidation of their businesses and the new money DIP need would have been substantially larger than the New-Money Amount. For these reasons, the Roll-Up amount ($200 million) is reasonable when compared to the overall infusion of capital that afforded the Debtors an opportunity to commence and execute their strategy in these bankruptcy cases..

30. Moreover, as discussed in the First Day Declaration, as a result of the ongoing prepetition event of default under the Prepetition Credit Agreement, a cash dominion period (the "Cash Dominion Period") occurred, under which the Debtors must seek approval of the Prepetition Administrative Agent prior to using any cash on-hand. By entering into the DIP Facility with the support of both the DIP Lenders and the Prepetition ABL Lenders, the Debtors will receive immediate access to Cash Collateral of the Prepetition Secured Parties, which the Debtors likely could not have secured under a postpetition financing provided by a third-party. The Debtors, in a sound exercise of their business judgment, have determined that the benefit of securing immediate access to cash collateral (which will be used to effectuate an orderly wind-down of their businesses while dual tracking a potential going-concern sale transaction) outweighs the costs associated with effectuating the Roll-Up.

31. Moreover, as a result of the Cash Dominion Period, the Prepetition ABL Lenders control access to and disbursement of funds from the Debtors' cash accounts. Accordingly, I believe that it is unclear whether the Debtors could have secured access to the Prepetition ABL Lenders' cash collateral on a non-consensual basis, or through entry into a DIP facility with an alternative financing provider.

**II.     The Economic Terms of the DIP Facility are Competitive and the Fees and Milestones Provided Thereunder are Reasonable.**

32.     The Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent, arrangers, and the DIP Lenders pursuant to the DIP Documents as consideration for the extension of postpetition financing. These fees constitute one (1) percent of the $40 million initial term loan commitment being provided by the DIP Agent and DIP Lenders. There is no fee on account of the Roll-Up. In addition, the interest rate on the DIP Facility (SOFR + 7.75%) is two (2) percent less than the current default rate that would otherwise be payable on the Prepetition FILO Facility. Additionally, the proposed DIP Facility provides for certain milestones that the Debtors must meet through the chapter 11 cases. Failure to meet any such milestones constitutes an event of default under the DIP Credit Agreement.

33.     These fees and milestones were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing. Under the Debtors' circumstances, I believe that the fees and milestones provided for in the DIP Facility are reasonable and appropriate, and are the best terms available.

## Conclusion

34.     The DIP Facility is expected to provide the Debtors with the liquidity necessary to fund their operations as they initiate the wind-down of their businesses and attempt to find a going-concern counterparty. Based on discussions with management, I believe that failure to access the DIP Facility and Cash Collateral will cause immediate and irreparable harm to the Debtors and their estates.

35.     Based on my experience in general and my involvement in and supervision of the marketing and negotiation of the DIP Facility in this matter, it is my view that the DIP Facility

(and the access to cash collateral contemplated in the Interim DIP Order) is the best available postpetition financing option for the Debtors. The DIP Facility is fully committed and offers necessary liquidity. I also believe that the DIP Facility contains terms that are reasonable given the circumstances. Further, I believe that the negotiation process was full and fair, was comprehensive, and produced the best available financing options under the circumstances. In short, the DIP Facility provides the most favorable executable transaction available to the Debtors for its financing needs.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: April 23, 2023  
New York, New York

*/s/ David Kurtz*
_____
David Kurtz  
Vice Chairman  
Lazard Frères & Co. LLC