**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

**DECLARATION OF HOLLY ETLIN IN SUPPORT
OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING
ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Holly Etlin, hereby declare under penalty of perjury as follows:

1. I am a Partner & Managing Director at AlixPartners, LLP ("AlixPartners") and the Chief Financial Officer and Chief Restructuring Officer of Bed Bath & Beyond, Inc., a corporation organized under the laws of New York and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, collectively, the "Company" or "Bed Bath & Beyond"). I have served as a financial advisor to the Debtors since late December 2022, and in February 2023, I was appointed as Interim Chief Financial Officer of the Debtors. On April 22, 2023, I was also appointed as Chief Restructuring Officer and Chief Financial Officer of the Debtors.

2. I have more than 30 years of experience in providing turnaround services for companies in the retail industry and have frequently been appointed as Interim CEO, Interim CFO, and Chief Restructuring Officer of these businesses. I am admitted to the American College of Bankruptcy and the International Insolvency Institute and am a Certified Turnaround Professional (CTP) and Certified Insolvency Reorganization Advisor.

3. I have been employed by AlixPartners since 2007. AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these chapter 11 cases. Since its inception in 1981, AlixPartners, its predecessor entities, and its affiliate, AP Services, LLC, have provided restructuring or crisis management

2

services in numerous large cases. Some notable, publicly-disclosed restructuring assignments that I have personally led include Tailored Brands, Inc., Barneys New York, Inc., BCBG Max Azria Group, LLC, Bon Tron Stores, Inc., Pier 1 Imports, Inc., Borders Group, Inc., The Gymboree Corporation, and New Century Financial Corp.

4. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am also familiar with the Debtors' supply chain and the status of the Debtors' relationships with various vendors, suppliers, and service-providers.

5. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"),[2] filed contemporaneously herewith, which seeks authority to, among other things: (a) obtain senior secured postpetition financing provided by Sixth Street Specialty Lending, Inc. and certain of its affiliates ("Sixth Street" or the "DIP Lenders"), under which (i) new money term loans will, subject to the satisfaction of certain conditions, be advanced and made available to the Debtors in the aggregate principal amount of $40 million and (ii) $200 million in prepetition first-in last-out term loans will be converted, or rolled, into debtor in possession loans (collectively, the "DIP

---

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the DIP Motion, the Interim DIP Order, or the DIP Credit Agreement, as applicable.

Facility"); and (b) immediately use the cash collateral of the prepetition secured lenders on a consensual basis.[3]

6.  Except as otherwise indicated herein, the statements and facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' management team and advisors, including the AlixPartners team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my experience and knowledge.  Specifically, I have overseen an AlixPartners team which, since late December 2022, has been one of the principal advisors for the Debtors, and, in that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings.  I am over 18 years of age and authorized to submit this declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

7.  As described below, it is my opinion that the Debtors require immediate access to the liquidity provided by the proposed DIP Facility to pay the costs necessary to administer these chapter 11 cases, operate their business, pay employees, and effectuate an orderly wind-down of the Debtors' business.

**AlixPartners Retention**

8.  The Debtors engaged AlixPartners in late December 2022 to serve as their restructuring advisor.  The Debtors sought AlixPartners' services to commence contingency preparations in the event that a chapter 11 filing became necessary and to advise the Debtors on strategic and business alternatives and liquidity management.  Since commencing its engagement,

---

[3] Any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the DIP Credit Agreement and the Interim DIP Order, as applicable.

AlixPartners has evaluated the Debtors' operations and cash requirements to operate their businesses during these chapter 11 cases, including by assisting in the development of the Debtors' 13-week and long-term cash flow forecasts. In addition, AlixPartners has assisted the Debtors in the development of the Debtors' detailed business plan, strategic alternatives, and financing-related workstreams. AlixPartners has worked closely with the Debtors' management and other restructuring professionals and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

9. Immediately following its engagement in late December 2022, AlixPartners began obtaining diligence from the Debtors and evaluating the Company's operations and cash requirements for the restructuring and debtor-in-possession financing process. AlixPartners worked with key members of the Company—including, but not limited to, members of the legal, human resources, corporate financing, and insurance groups—to evaluate and understand the Debtors' cash flows, inventory management, borrowing base reporting, and general operations.

10. As part of an evaluation of the Debtors' liquidity position, AlixPartners assisted in the development of the Debtors' 13-week and long-term cash flow forecasts. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider the effects of the chapter 11 filing, including incremental administrative costs of a complex chapter 11 filing with a large number of diverse stakeholders, required operational payments, and the cost-saving initiatives that have already been undertaken and that are contemplated to be undertaken.

11. AlixPartners ran a series of analyses to assess the Debtors' potential liquidity needs both during and following these chapter 11 cases. These cash-flow analyses assumed significant store closure and inventory sale plans developed by the Debtors, among other things.

**The Debtors' Capital Structure**

12.    As of the Petition Date, the Debtors have approximately $1.8 billion in total funded debt obligations.  This consists of approximately $80 million in aggregate principal amount under the senior secured asset-based revolving credit facility (*plus* $103 million of outstanding letters of credit), $547 million in aggregate principal amount outstanding under the Debtors' senior secured asset-based first-in last-out term loan facility, $1 billion in senior unsecured notes with varying maturity dates and interest rates, and $61 million of aggregate obligations under certain finance leases.  A capitalization table depicting the Debtors' prepetition capital structure as of the Petition Date is set forth in the DIP Motion.

**The Debtors' Immediate Need for Access to the DIP Facility and Cash Collateral**

13.    The Debtors enter these cases in dire financial straits—the Debtors were in cash dominion, $54 million over-advanced under their prepetition credit facilities, and did not have a clear path to further financing out-of-court.  This acute liquidity condition, as I describe in my First Day Declaration, stems from several factors—challenging macroeconomic conditions (namely, high inflation); competitive pressures from online retailers; an overextended store footprint; and a high debt burden.  Further, as described in the First Day Declaration, while the Offering provided the Debtors with incremental liquidity, the cash proceeds were required to be allocated to pay down existing debt obligations, which limited the Debtors' ability to adequately reinvest in the business.  As a result, coupled with ongoing losses from operations, the Debtors were unable to maintain sufficient cash flows to sustain their operations long term and implement much-needed operational changes.  Despite additional prepetition efforts to monetize assets and improve operational efficiencies through store closures and headcount reductions, the Debtors failed to curb significant declines in sales and saw net losses widen, ultimately precipitating the filing of these cases.

14. Substantially all of the Debtors' cash represents Cash Collateral, and accordingly, the Debtors will not be able to meet their near-term liquidity needs without access to Cash Collateral.

15. Through these cases, the Debtors seek to effectuate an orderly wind-down of their businesses, while simultaneously gauging market interest in a potential sale of all or a portion of their assets. While the Debtors anticipate cost-savings and proceeds from store closures and inventory sales during the first few weeks of these cases, the Debtors require funding to operate their businesses long enough to effectively capture those proceeds. Without access to Cash Collateral and the proceeds of the DIP Facility, I do not believe the Debtors will be able to avoid an immediate, value-destructive, and disorganized liquidation of their businesses, to the detriment of their estates, including the collateral positions of their secured lenders.

16. Accordingly, the Debtors require immediate access to liquidity. The proposed DIP Facility provides just that. Interim approval of the DIP Facility will permit the Debtors to access up to $40 million of new money term loans. Additionally, based on my experience in the restructuring industry generally and these last several months with the Debtors in particular, it is my opinion that approval of the use of cash collateral during the interim period will be critical to the Debtors' ability to continue operating and successfully administer these cases.

17. Over the preceding months, I and other AlixPartners professionals assisted and advised the Debtors in evaluating the amount of funding that the Debtors will require in these chapter 11 cases. I had several discussions and meetings with the Debtors' management team and advisors. Based on those discussions and meetings, my experience in restructuring, and my familiarity with the Debtors, I believe that the Debtors' estates would benefit by entering into a new postpetition financing agreement and receiving access to Cash Collateral. The size of the

DIP Facility and the amount requested on an interim basis has been determined based on a thorough analysis conducted by myself and others at AlixPartners, together with the Debtors' management team and other advisors. The amount was derived from a cash-flow projection that AlixPartners developed from an analysis of the Debtors' projected receipts and disbursements (the "Budget," attached hereto as **Exhibit A**). Based on my experience in numerous large-scale corporate bankruptcy cases, my familiarity with the Debtors' operations, extensive discussions with the Debtors' management team and advisors, including a team from AlixPartners acting under my supervision, I believe the Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

18. Given these estimates, the DIP Facility will provide the Debtors with sufficient liquidity to meet their near-term liquidity needs, as the Debtors implement an orderly wind down of their operations while simultaneously seeking a potential going-concern transaction. Moreover, the DIP Facility provides for a Priority Claims Reserve, a Wind-Down Reserve, and a WARN Reserve, which provide, subject to the terms of the Interim Order, the Debtors with adequate funding to confirm a chapter 11 plan and wind-down their estates, as necessary. Subject to the Interim Order, the Priority Claims Reserve provides the Debtors with up to $15 million to fund allowed undisputed and unpaid administrative and priority claims, the Wind-Down Reserve provides the Debtors with up to $5 million to fund costs associated with the orderly wind-down of the Debtors' business, and the WARN Reserve provides the Debtors with up to $16 million to fund potential costs associated with the Worker Adjustment and Retraining Notification Act and state law equivalents. Absent the creation and funding of such reserves, the Debtors' pathway to a successful emergence from these chapter 11 cases would be uncertain. And, to the extent that a full wind-down is necessary, the lack of such reserves would potentially lead to a haphazard, value

destructive and disorderly process.  Furthermore, access to the DIP Facility will allow the Debtors to maintain business relationships with certain vendors, suppliers and customers, make payroll, pay certain taxes, and satisfy other working capital and operational needs, all in accordance with the Budget.

19. Based on the Debtors' forecasts, the Debtors anticipate that they will be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover the projected restructuring costs of these chapter 11 cases without access to the postpetition financing provided by the DIP Facility.  The liquidity provided by the DIP Facility is therefore necessary to provide the Debtors' customers, vendors, and employees with comfort that the Debtors will continue to operate while in chapter 11.

### The DIP Milestones

20. The Debtors must meet certain milestones (the "Milestones") to avoid default under the DIP Facility, as set forth at **Exhibit C** to the proposed Interim DIP Order.  Such Milestones include providing the Debtors with forty (40) days after the Petition Date to conduct an auction for all or substantially all of their assets; ninety (90) days after the Petition Date to complete GOB sales at all retail locations and to file a chapter 11 plan (the "Plan"); and one-hundred twenty (120) days after the Petition Date to seek and obtain confirmation of the Plan.

21. The Milestones, as with the other terms of the DIP Facility, are the product of a hard-fought negotiation between the Debtors and the DIP Lender.  Simply put, the Milestones were a necessary inducement to ensure the DIP Lender that their commitment was time-bound and that they would not be required to fund a protracted and non-accretive stay in chapter 11.  Under the Milestones, the Debtors have adequate time to pursue a value-maximizing sale of some or all of their assets, to hold an auction—if necessary, to conduct GOB sales, and to effectuate an orderly winddown in the absence of an interested purchaser for some or all of the Debtors' assets.

22. While the timeline contemplated by the Milestones is aggressive, I believe that the Debtors are well positioned to adhere to it, particularly with the financial support available to them through the DIP Facility.

**Conclusion**

23. I believe that access to the DIP Facility and Cash Collateral will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, pursue their restructuring goals in the interim period, and responsibly administer these chapter 11 cases throughout the period that the Debtors expect will be necessary to implement and effectuate their restructuring efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 23, 2023  
Newark, New Jersey

*/s/ Holly Etlin*  
Name: Holly Etlin  
Title: Chief Restructuring Officer / Chief Financial Officer  
Bed Bath & Beyond, Inc.