

The New York Times Company

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

April 28, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

4/28/2023, NY & NATL, pg B5

Larnyce Tabron

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.04.28 12:12:48 -04'00'

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: BED BATH & BEYOND INC., *et al.*, Debtors.[1] | Chapter 11<br>Case No. 23-13359 (VFP)<br>(Joint Administration Requested) |

**NOTICE OF (I) DISCLOSURE PROCEDURES APPLICABLE TO CERTAIN HOLDERS OF COMMON STOCK OR PREFERRED STOCK, (II) DISCLOSURE PROCEDURES FOR TRANSFERS OF COMMON STOCK AND PREFERRED STOCK, AND (III) FINAL HEARING ON THE APPLICATION THEREOF**

**TO: ALL ENTITIES (AS DEFINED BY SECTION 101(15) OF THE BANKRUPTCY CODE) THAT MAY HOLD BENEFICIAL OWNERSHIP OF THE EXISTING CLASSES OF COMMON STOCK (THE "COMMON STOCK") OR SERIES A CONVERTIBLE PREFERRED STOCK (THE "PREFERRED STOCK") OF BED BATH & BEYOND INC.:**

**PLEASE TAKE NOTICE** that on April 23, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed petitions with the United States Bankruptcy Court for the District of New Jersey (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Subject to certain exceptions, section 362 of the Bankruptcy Code operates as a stay of any act to obtain possession of property of or from the Debtors' estates or to exercise control over property of or from the Debtors' estates.

**PLEASE TAKE FURTHER NOTICE** that on the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 23] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that on April 25, 2023, the Court entered the *Interim Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 101] (the "Interim Order") approving procedures for certain transfers of Common Stock and Preferred Stock set forth in Exhibit 1 attached to the Interim Order (the "Procedures").[2]

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, a Substantial Shareholder may not consummate any purchase, sale, or other transfer of Common Stock Preferred Stock or Beneficial Ownership of Common Stock or Preferred Stock in violation of the Procedures, and any such transaction in violation of the Procedures shall be null and void *ab initio*.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, the Procedures shall apply to the holding and transfers of Common Stock or Preferred Stock or any Beneficial Ownership therein by a Substantial Shareholder or someone who may become a Substantial Shareholder.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, upon the request of any entity, the proposed noticing, claims, and solicitation agent for the Debtors, Kroll Restructuring Administration LLC, will provide a copy of the Interim Order and a form of each of the declarations required to be filed by the Procedures in a reasonable period of time. Such declarations are also available via PACER on the Court's website at https://ecf.njb.uscourts.gov/ for a fee or free of charge by accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/bbby.

**PLEASE TAKE FURTHER NOTICE** that the final hearing (the "Final Hearing") on the Motion shall be held on May 16, 2023, at 2:00.p.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 5:00 p.m., prevailing Eastern Time, on May 9, 2023, and shall be served on: (i) the Debtors, Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, Attn: David Kastin; (ii) proposed co-counsel to the Debtors, (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Emily E. Geier, P.C., Derek I. Hunter, and Ross J. Fiedler, (b) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn.: Michael D. Sirota, Esq., Warren A. Usatine, Esq., and Felice R. Yudkin, Esq.; (iii) counsel to the Prepetition ABL Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Adam L. Shpeen (adam.shpeen@davispolk.com), Steven Z. Szanzer (steven.szanzer@davispolk.com), and Michael Pera (michael.pera@davispolk.com); (iv) counsel to any statutory committee appointed in these Chapter 11 Cases; (v) counsel to the DIP Agent, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, Attn: David M. Hillman (dhillman@proskauer.com) and Megan R. Volin (mvolin@proskauer.com); and (vi) the Office of the United States Trustee for the District of New Jersey, One Newark Center, 108 Raymond Boulevard, Suite 2100, Newark, New Jersey 07102 (collectively, the "Notice Parties").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, failure to follow the procedures set forth in the Interim Order shall constitute a violation of, among other things, the automatic stay provisions of section 362 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that nothing in the Interim Order shall preclude any person desirous of acquiring any Common Stock or Preferred Stock from requesting relief from the Interim Order from this Court, subject to the Debtors' and the other Notice Parties' rights to oppose such relief.

**PLEASE TAKE FURTHER NOTICE** that other than to the extent that the Interim Order expressly conditions or restricts trading in Common Stock or Preferred Stock, nothing in the Interim Order or in the Motion shall, or shall be deemed to, prejudice, impair, or otherwise alter or affect the rights of any holders of Common Stock or Preferred Stock, including in connection with the treatment of any such stock under any chapter 11 plan or any applicable bankruptcy court order.

**PLEASE TAKE FURTHER NOTICE** that any prohibited purchase, sale, other transfer of Common Stock or Preferred Stock, or the Beneficial Ownership thereof in violation of the Interim Order is prohibited and shall be null and void *ab initio* and may be subject to additional sanctions as this court may determine.

**PLEASE TAKE FURTHER NOTICE** that the requirements set forth in the Interim Order are in addition to the requirements of applicable law and do not excuse compliance therewith.

Dated: April 26, 2023, */s/ Michael D. Sirota*, **COLE SCHOTZ P.C.,** Michael D. Sirota, Esq., Warren A. Usatine, Esq., Felice R. Yudkin, Esq., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Telephone: (201) 489-3000, Email: msirota@coleschotz.com, wusatine@coleschotz.com, fyudkin@coleschotz.com -and- **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C. (*pro hac vice* pending), Emily E. Geier, P.C. (*pro hac vice* pending), Derek I. Hunter (*pro hac vice* pending), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: josuha.sussberg@kirkland.com, emily.geier@kirkland.com, derek.hunter@kirkland.com, *Proposed Co-Counsel for Debtors and Debtors in Possession*

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Interim Order or the Motion, as applicable.

**MEDIA | INVESTIGATIONS**

# NBCUniversal Faces Questions After a Firing

FROM FIRST BUSINESS PAGE

Will Mr. Roberts pursue a sale or a full acquisition of the streaming service Hulu, which NBCUniversal owns jointly with Disney?

And will the NBC broadcast network give up an hour of its prime-time lineup and hand it over to local affiliates, or begin negotiations for broadcast rights for the National Basketball Association?

NBCUniversal is far from being in dire straits. It is the home of fabled institutions like "Saturday Night Live" and "Today," as well as lucrative franchises like "Despicable Me" and "The Real Housewives." It generated $39 billion in revenue last year, a 14 percent increase from the year before.

But the company also owns several cable networks such as USA and Bravo that are hemorrhaging viewers. Its streaming service, Peacock, is growing quickly but still has far fewer subscribers than many of its competitors and is projected to lose $3 billion this year.

These issues, which have been looming for months, were brought back to the forefront after Mr. Shell's sudden departure. Comcast announced on Sunday that Mr. Shell was leaving the company after an investigation into a complaint of "inappropriate conduct."

His exit came after Hadley Gamble, a senior international correspondent at CNBC, had filed an internal complaint that leveled accusations of sexual harassment and sex discrimination, according to

DREW ANGERER/GETTY IMAGES

**Mike Cavanagh is the acting chief executive at NBCUniversal.**

her lawyer, Suzanne McKie. Comcast executives began an investigation after Ms. Gamble filed the complaint in late March. On Monday, the company said in a filing Mr. Shell had been fired after an investigation corroborated accusations of sexual harassment.

Mr. Roberts and Mr. Cavanagh met with Mr. Shell at the offices of a law firm in Philadelphia on Friday and told Mr. Shell he was being fired, according to two people with knowledge of the internal discussions who were not authorized to speak publicly.

Mr. Shell was taken aback by the sudden turn of events. He had been meeting with lawmakers in Washington in the days leading up to his firing, and making plans to attend the White House Correspondents' Association dinner on Saturday, according to two people familiar with the matter. He has hired a high-profile crisis communications expert, Risa Heller, and a well-known lawyer.

Mr. Shell declined to comment on the circumstances of his departure but said in a statement that he was "profoundly upset with how much pain and embarrassment I have brought to my family."

"I am solely focused on making amends to them," Mr. Shell said.

Comcast is still looking into elements of Ms. Gamble's complaint related to sexual discrimination, according to two people familiar with the investigation.

Comcast declined to comment on the investigation.

Mr. Roberts has sought to reassure investors since Mr. Shell's departure. On the earnings call on Thursday, he made a brief statement in support of Mr. Cavanagh and NBCUniversal's executives. He praised NBCUniversal's bench of veteran leaders, and said Mr. Cavanagh would "step in at the helm" of the company while remaining president of Comcast after a "tough moment."

Comcast's share price rose about 10 percent after the company's earnings call on Thursday.

In a show of support, Mr. Roberts joined Mr. Cavanagh in New York for NBCUniversal's executive committee meeting, which Mr. Shell used to run, according to three people with knowledge of the gathering. During the meeting, Mr. Cavanagh reassured assembled leaders that he would be there for the foreseeable future. Next week, Mr. Cavanagh is expected to head out to Los Angeles to meet with West Coast executives.

There is a consensus among executives at NBCUniversal that Mr. Shell's departure will not greatly affect the company's TV, film and news assets in the short term. Mr. Shell's biggest decisions needed approval from Mr. Cavanagh and Mr. Roberts, who have final say on the big issues facing the company. "I don't think the business is going to miss a beat," Mr. Cavanagh said during the earnings call.

Mr. Cavanagh is unlikely to give up responsibilities across the broader Comcast empire, which includes cable and wireless businesses, and he is widely believed to be the most likely internal candidate to succeed Mr. Roberts. A full-time job running just NBCUniversal would in some ways be a demotion. He is the only president in the company's history who doesn't belong to the Roberts family, which controls Comcast.

Still, some executives at NBCUniversal think the media assets need a dedicated leader. There are too many decisions to be taken across a wide variety of businesses — including theme parks, film studios and TV programming — as well as more existential decisions to be made for it to be anyone's part-time job.

Mr. Cavanagh believes that Comcast has a stronger hand than many of its competitors in the media industry, which include Disney and Warner Bros. Discovery. Profits from Comcast's broadband and wireless businesses insulate the company somewhat from the ad sales slump affecting many of its peers, giving it cash to invest in streaming.

And NBCUniversal's movie studio and theme parks businesses are growing, with recent bright spots including the opening of "Super Nintendo World" at Universal Studios and the release of "The Super Mario Bros. Movie," which has been a hit at the box office. On Thursday, Comcast said its profits grew slightly in the first quarter despite a decrease in ad revenue and slower growth in its broadband business.

The speculation that Mr. Roberts and Mr. Cavanagh might spin off NBCUniversal has swirled for months, fueled by reports that they considered combining the company with the video game studio Electronic Arts last year. With many of NBCUniversal's rivals teaming up to beef up their streaming businesses, some analysts have speculated that Mr. Roberts and Mr. Cavanagh are hunting for another big deal.

One potential target discussed by analysts is Warner Bros. Discovery, the newly minted media colossus created by the fusion of WarnerMedia — owner of HBO and the Warner Bros. movie studio — and Discovery, owner of cable networks like HGTV and TLC.

Craig Moffett, a senior managing director of the SVB MoffettNathanson research firm, said that such a deal could give the combined company enough heft to pay for all the movies and TV shows that would win over enough subscribers to make the service profitable. "But most Comcast investors hate that idea," he added.

"I think Mike will inevitably put his stamp on the business," Mr. Moffett said, "and in this case that inevitably means some role for mergers and acquisitions, or divestitures."

# Newsmax Ratings Rise After Carlson's Exit at Fox

By MICHAEL M. GRYNBAUM

Newsmax, the niche conservative news channel that has long played David to Fox News's Goliath, has seized on Tucker Carlson's shock dismissal from its rival network and declared itself the true TV home for right-wing Americans.

So far, the strategy is showing some promise.

Viewership of Newsmax remains far below that of Fox News. But its audience at certain hours has doubled, and in some time slots tripled, in the immediate aftermath of Mr. Carlson's exit — an abrupt spike that has turned heads in conservative circles and the cable news industry.

On Monday evening, Eric Bolling's 8 p.m. Newsmax program drew 531,000 viewers, according to Nielsen. One week earlier, it had 146,000. On Tuesday, Mr. Bolling's audience grew to 562,000 viewers, equal to about 80 percent of Anderson Cooper's CNN viewership that evening. Newsmax's other prime-time shows also experienced big jumps.

The sharp rise in viewership can be timed almost to the minute of Fox News's announcement on Monday that it was parting ways with Mr. Carlson, in part because of private messages sent by the anchor that included offensive and crude remarks.

Executives at Newsmax quickly sensed an opportunity.

Starting on Monday, Newsmax programming has aggressively pushed a narrative that Mr. Carlson's dismissal was a capitulation to the left by Fox News and the Murdoch family.

One pundit mused on the air that Lachlan Murdoch, the executive chairman of the Fox Corporation, was "much more liberal" than his father, Rupert. Andrew Napolitano, a Newsmax pundit who was fired by Fox News in 2021 over a harassment allegation, said Fox News dismissing its top-rated anchor "is like the 1927 Yankees firing Babe Ruth for his table manners — I don't get it."

Anchors and guests harped on a recent appearance by Representative Alexandria Ocasio-Cortez, a New York Democrat, in which she called for Mr. Tucker's firing. "A.O.C. speaks, and now Fox listens," grumbled the Newsmax anchor Chris Salcedo. "These really are end times."

By Thursday morning, the network was inviting viewers to vote in a poll: "Is it right for Fox News to fire Tucker Carlson?"

"Fox has been moving to embrace more of an establishment position," Newsmax's chief executive, Christopher Ruddy, said in an interview on Thursday. "They want to renounce some of the Trumpisms and populist MAGA stuff that Tucker was echoing." Mr. Ruddy said he preferred to "embrace all sides of the Republican Party."

Over all, Newsmax remains a ratings minnow. On Tuesday evening, "Hannity" on Fox News drew 2.1 million viewers; "The Ingraham Angle" attracted 1.6 million. Fox News has pointed to Nielsen data showing that in the first three months of the year, it was the highest-rated network across all of cable TV. And the network has bounced back from losing stars like Bill O'Reilly and Glenn Beck.

But the absence of Mr. Carlson, its biggest prime-time star, has been felt.

On Tuesday, Fox News lost to both CNN and MSNBC in the 8 p.m. hour among adults ages 25 to 54, an exceedingly rare defeat for the network in the key demographic for cable news advertisers. The "Fox & Friends" co-host Brian Kilmeade, sitting in for Mr. Carlson, fell short to Mr. Cooper on CNN and Chris Hayes on MSNBC in that coveted demographic, although he was first in total viewership.

Newsmax is surging shortly after Fox News paid $787.5 million to settle a defamation lawsuit brought by Dominion Voting Systems, an election technology firm. Evidence in that case showed that Fox News executives were deeply concerned by Newsmax's growth after the 2020 election, when President Donald J. Trump denounced the Murdoch-owned network for its projection that Joseph R. Biden Jr. would win Arizona.

At the time, Newsmax saw a burst in viewership, even recording higher ratings than the Fox News anchor Martha MacCallum one evening in December 2020. (Ms. MacCallum was switched to a different time slot not long afterward.) But its audience eventually shrank. And despite Mr. Trump's complaints, Fox News continued as the undisputed ratings king of cable news, powered in part by Mr. Carlson's increasingly provocative program.

So would Mr. Ruddy consider hiring the now-former Fox anchor for Newsmax?

"We would definitely be open to having a conversation with him," Mr. Ruddy said, though he speculated that Mr. Carlson might follow the likes of Joe Rogan and pursue an independent podcast. "He's one of the most influential and significant voices in conservative media, and he shouldn't be ignored."

SCOTT MCINTYRE FOR THE NEW YORK TIMES

**"Fox has been moving to embrace more of an establishment position," said Christopher Ruddy, the Newsmax chief.**

# F.B.I. Searches Home of a Former Top Executive at FTX

By MATTHEW GOLDSTEIN and DAVID YAFFE-BELLANY

The F.B.I. carried out a search on Thursday morning at the Potomac, Md., home of Ryan Salame, a former FTX executive who was a major campaign contributor to Republican political candidates, two people with knowledge of the matter said.

Mr. Salame, who ran FTX's Bahamian subsidiary, was part of the close circle of advisers around Sam Bankman-Fried, the cryptocurrency exchange's founder, before the firm filed for bankruptcy in November.

Federal prosecutors have charged Mr. Bankman-Fried with orchestrating a vast fraud and illegal campaign finance scheme at FTX. He has pledged to fight the charges. Three of his former top executives have pleaded guilty in connection with the investigation and agreed to cooperate against their former boss.

Mr. Salame has been under particular scrutiny over the $24 million in campaign contributions he made during last year's midterm elections. In court filings, federal authorities have claimed that most of the $90 million contributed to political candidates by a handful of former FTX employees, including Mr. Salame, had been misappropriated from customers of the exchange.

The search of Mr. Salame's $4 million house signals that federal authorities are not done with their investigation into FTX's collapse as they prepare for Mr. Bankman-Fried's trial set in October. They are scrutinizing an array of employees and advisers in the former crypto mogul's orbit, including Mr. Bankman-Fried's younger brother.

Jason Linder, a lawyer for Mr. Salame, did not respond to a request for comment.

***Federal authorities examine $24 million in political donations.***

An F.B.I. spokeswoman declined to comment.

It is unclear what the authorities were looking for during the search, which took place around 7 a.m., according to a person who sent a photo of F.B.I. agents gathered outside the home to The New York Times.

A native of Sandisfield, Mass., a town in the Berkshires, Mr. Salame worked for EY, the global accounting and consulting firm, before working for Mr. Bankman-Fried at Alameda Research, a crypto hedge fund that was based in Hong Kong.

He soon became one of Mr. Bankman-Fried's most trusted lieutenants. After FTX relocated to the Bahamas in 2021, Mr. Salame served as an intermediary between the company and the local government, and he was appointed co-chief executive of FTX Digital Markets, the exchange's Bahamian business entity.

Mr. Salame became enormously wealthy as the crypto market boomed and FTX reached a $32 billion valuation. Bankruptcy lawyers and advisers for FTX said in March that Mr. Salame received $87 million in bonuses and loans from Alameda. He was one of a half-dozen top executives who received a total of $3.2 billion in payouts.

Mr. Salame split his time between Washington and the Bahamas, and he started dating Michelle Bond, who ran a crypto lobbying group and campaigned unsuccessfully for Congress as a Republican from Long Island. At home in the Berkshires, Mr. Salame bought several local restaurants, some that were struggling during the height of the pandemic, which earned him a reputation as a hometown hero.

Mr. Salame and Ms. Bond also bought the home that was searched on Thursday, located in an exclusive Washington suburb.

Prosecutors have said Mr. Bankman-Fried orchestrated a "straw donor" scheme to avoid limits on campaign contributions, recruiting executives to serve as proxies for his company and donate tens of millions of dollars to both parties.

A revised indictment against Mr. Bankman-Fried recently identified Mr. Salame's donations as part of the scheme.

Emily Flitter contributed reporting.

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY**

| In re: DAVID'S BRIDAL, LLC, *et al.*, Debtors.[1] | Chapter 11 Case No. 23-13131 (CMG) |
|---|---|

**NOTICE OF SALE BY AUCTION AND SALE HEARING**

1. **SALE MOTION**. On April 17, 2023, the above-captioned debtors and debtors in possession (the "Debtors") filed a motion [Docket No. 19] (the "Motion")[2] with the United States Bankruptcy Court for the District of New Jersey (the "Court") seeking, *inter alia*, entry of an order authorizing and approving: (a) a sale (the "Sale") of all or substantially all of the Debtors' Assets or any portion thereof free and clear of all Encumbrances, except as set forth in a Stalking Horse APA or an alternative asset purchase agreement with a Successful Bidder at auction, and (b) the assumption and assignment of certain executory contracts and unexpired leases (the "Contracts").

2. **BIDDING PROCEDURES**. The Debtors are soliciting offers for the Sale of their Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court by entry of an order on April 19, 2023 [Docket No. 72] (the "Bidding Procedures Order"). **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or the Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

3. **AUCTION**. If the Debtors receive qualified competing bids that satisfy the requirements of the Bidding Procedures, they will conduct an auction (the "Auction") for the Assets on **June 1, 2023 at 10:00 a.m. (ET)** at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022-4611 (or at any other location as the Debtors may hereafter designate on proper notice).

4. **SALE HEARING**. The Debtors will seek approval of the Sale at a hearing scheduled for **June 12, 2023, at 10:00 a.m. (ET)** (the "Sale Hearing") before the Honorable Christine M. Gravelle, United States Bankruptcy Judge for the Bankruptcy Court for the District of New Jersey, Clarkson S. Fisher US Courthouse, Courtroom 3, 402 East State Street, Trenton, NJ 08608.

5. **OBJECTIONS**. Except as set forth in the Bidding Procedures Order with respect to objections to proposed cure payments or the assumption and assignment of Contracts, objections to the relief requested in the Motion ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** **on or before May 31, 2023 at 5:00 p.m. (ET)** by the parties listed in paragraph 6 of the Bidding Procedures; *provided* that any objection to the Sale to the Successful Bidder or adequate assurance of future performance under any executory contract or unexpired lease shall be filed on or before **June 8, 2023 at 5:00 p.m. (ET)**.

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY OBJECT TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

6. Copies of the Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, including the Form APA, the Stalking Horse APA, if any, and the proposed Bidding Procedures Order, are available: (a) free of charge upon request to Omni Agent Solutions (the notice and claims agent retained in these chapter 11 cases) by calling (888) 482-0174 (U.S./Canada toll-free), +1 (747) 293-0079 (international); (b) by visiting the website maintained in these chapter 11 cases at https://omniagentsolutions.com/DavidsBridal (the "Case Website") or (c) for a fee via PACER by visiting http://www.njb.uscourts.gov. You may obtain additional information concerning the above-captioned chapter 11 cases at the Case Website.

Dated: April 24, 2023, Hackensack, NJ, **COLE SCHOTZ P.C.**, 25 Main Street, Hackensack, NJ 07601, Telephone: (201) 489-3000 and **KIRKLAND & ELLIS LLP** and **KIRKLAND & ELLIS INTERNATIONAL LLP,** 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, *Proposed Counsel to the Debtors and Debtors in Possession*

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); and Blueprint Registry, LLC (2335). The location of debtor David's Bridal, LLC's principal place of business and the debtors' service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Order.

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY**

| In re: BED BATH & BEYOND INC., *et al.*, Debtors.[1] | Chapter 11 Case No. 23-13359 (VFP) (Joint Administration Requested) |
|---|---|

**NOTICE OF (I) DISCLOSURE PROCEDURES APPLICABLE TO CERTAIN HOLDERS OF COMMON STOCK OR PREFERRED STOCK, (II) DISCLOSURE PROCEDURES FOR TRANSFERS OF COMMON STOCK AND PREFERRED STOCK, AND (III) FINAL HEARING ON THE APPLICATION THEREOF**

**TO: ALL ENTITIES (AS DEFINED BY SECTION 101(15) OF THE BANKRUPTCY CODE) THAT MAY HOLD BENEFICIAL OWNERSHIP OF THE EXISTING CLASSES OF COMMON STOCK (THE "COMMON STOCK") OR SERIES A CONVERTIBLE PREFERRED STOCK (THE "PREFERRED STOCK") OF BED BATH & BEYOND INC.:**

**PLEASE TAKE NOTICE** that on April 23, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed petitions with the United States Bankruptcy Court for the District of New Jersey (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Subject to certain exceptions, section 362 of the Bankruptcy Code operates as a stay of any act to obtain possession of property of or from the Debtors' estates or to exercise control over property of or from the Debtors' estates.

**PLEASE TAKE FURTHER NOTICE** that on the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 23] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that on April 25, 2023, the Court entered the *Interim Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 101] (the "Interim Order") approving procedures for certain transfers of Common Stock and Preferred Stock set forth in Exhibit 1 attached to the Interim Order (the "Procedures").[2]

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, a Substantial Shareholder may not consummate any purchase, sale, or other transfer of Common Stock Preferred Stock or Beneficial Ownership of Common Stock or Preferred Stock in violation of the Procedures, and any such transaction in violation of the Procedures shall be null and void *ab initio*.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, the Procedures shall apply to the holding and transfers of Common Stock or Preferred Stock or any Beneficial Ownership therein by a Substantial Shareholder or someone who may become a Substantial Shareholder.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, upon the request of any entity, the proposed noticing, claims, and solicitation agent for the Debtors, Kroll Restructuring Administration LLC, will provide a copy of the Interim Order and a form of each of the declarations required to be filed by the Procedures in a reasonable period of time. Such declarations are also available via PACER on the Court's website at https://ecf.njb.uscourts.gov/ for a fee or free of charge by accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/bbby.

**PLEASE TAKE FURTHER NOTICE** that the final hearing (the "Final Hearing") on the Motion shall be held on May 16, 2023, at 2:00 p.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 5:00 p.m., prevailing Eastern Time, on May 9, 2023, and shall be served on: (i) the Debtors, Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, Attn: David Kastin; (ii) proposed co-counsel to the Debtors, (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C., Emily E. Geier, P.C., Derek I. Hunter, and Ross J. Fiedler, (b) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn.: Michael D. Sirota, Esq., Warren A. Usatine, Esq., and Felice R. Yudkin, Esq.; (iii) counsel to the Prepetition ABL Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Adam L. Shpeen (adam.shpeen@davispolk.com), Steven Z. Szanzer (steven.szanzer@davispolk.com), and Michael Pera (michael.pera@davispolk.com); (iv) counsel to any statutory committee appointed in these Chapter 11 Cases; (v) counsel to the DIP Agent, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, Attn: David M. Hillman (dhillman@proskauer.com) and Megan R. Volin (mvolin@proskauer.com); and (vi) the Office of the United States Trustee for the District of New Jersey, One Newark Center, 1085 Raymond Boulevard, Suite 2100, Newark, New Jersey 07102 (collectively, the "Notice Parties").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Interim Order, failure to follow the procedures set forth in the Interim Order shall constitute a violation of, among other things, the automatic stay provisions of section 362 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that nothing in the Interim Order shall preclude any person desirous of acquiring any Common Stock or Preferred Stock from requesting relief from the Interim Order from this Court, subject to the Debtors' and the other Notice Parties' rights to oppose such relief.

**PLEASE TAKE FURTHER NOTICE** that other than to the extent that the Interim Order expressly conditions or restricts trading in Common Stock or Preferred Stock, nothing in the Interim Order or in the Motion shall, or shall be deemed to, prejudice, impair, or otherwise alter or affect the rights of any holders of Common Stock or Preferred Stock, including in connection with the treatment of any such stock under any chapter 11 plan or any applicable bankruptcy court order.

**PLEASE TAKE FURTHER NOTICE** that any prohibited purchase, sale, other transfer of Common Stock or Preferred Stock, or the Beneficial Ownership thereof in violation of the Interim Order is prohibited and shall be null and void *ab initio* and may be subject to additional sanctions as this court may determine.

**PLEASE TAKE FURTHER NOTICE** that the requirements set forth in the Interim Order are in addition to the requirements of applicable law and do not excuse compliance therewith.

Dated: April 26, 2023, /s/ Michael D. Sirota, **COLE SCHOTZ P.C.**, Michael D. Sirota, Esq., Warren A. Usatine, Esq., Felice R. Yudkin, Esq., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Telephone: (201) 489-3000, Email: msirota@coleschotz.com, wusatine@coleschotz.com, fyudkin@coleschotz.com -and- **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP**, Joshua A. Sussberg, P.C. (*pro hac vice* pending), Emily E. Geier, P.C. (*pro hac vice* pending), Derek I. Hunter (*pro hac vice* pending), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: josuha.sussberg@kirkland.com, emily.geier@kirkland.com, derek.hunter@kirkland.com, *Proposed Co-Counsel for Debtors and Debtors in Possession*

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Interim Order or the Motion, as applicable.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| In re: VIRGIN ORBIT HOLDINGS, INC., *et al.*,[1] Debtors. | Chapter 11 Case No. 23-10405 (KBO) (Jointly Administered) |
|---|---|

**NOTICE OF DEADLINE FOR FILING OF PROOFS OF CLAIM, INCLUDING FOR CLAIMS ASSERTED UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE**

On April 4, 2023 (the "**Petition Date**"), the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

Please take further notice that on April 26, 2023, the Court entered an order (the "**Bar Date Order**")[2] establishing certain dates by which parties holding prepetition claims against the Debtors must file proofs of claim, including requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code[3] (the "**Proof(s) of Claim**").

**BAR DATES.** The Bar Date Order establishes the following bar dates for filing Proofs of Claim in the Chapter 11 Cases (collectively, the "**Bar Dates**"):

***General Bar Date***. Except as otherwise set forth herein, on or before ***5:00 p.m. (prevailing Eastern Time) on May 26, 2023*** (the "**General Bar Date**"), all persons or entities holding or wishing to assert a Claim against the Debtors or their estates arising or accruing prior to the Petition Date, including a Claim arising under Bankruptcy Code section 503(b)(9), are required to file a separate, completed, and executed Proof of Claim in accordance with the requirements of the Bar Date Order.

(a) ***Governmental Bar Date***. All governmental units holding claims against the Debtors that arose or are deemed to have arisen before the Petition Date are required to file Proofs of Claim by ***October 2, 2023 at 5:00 p.m., prevailing Eastern Time***. The Governmental Bar Date applies to all governmental units holding claims against the Debtors (whether secured, unsecured priority, or unsecured non-priority) that arose on or before the Petition Date, including governmental units with claims against the Debtors for unpaid taxes, whether such claims arise from prepetition tax years or periods or prepetition transactions to which the Debtors were a party.

(b) ***Rejection Damages Bar Date.*** Unless otherwise ordered by the Court, any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease must file a Proof of Claim based on such rejection by the later of (a) the General Bar Date or the Government Bar Date, for any government units who are contract counterparties; or (b) 5:00 p.m. (prevailing Eastern Time) on the date that is 30 days following service of an order on the affected counterparty approving such rejection (the "**Rejection Damages Bar Date**").

(c) ***Amended Schedules Bar Date.*** If the Debtors amend their schedules of assets and liabilities (collectively, the "**Schedules**"),[4] then the deadline to submit a Proof of Claim for those creditors affected by any such amendment will be the later of (a) the applicable Bar Date or (b) 5:00 p.m. (prevailing Eastern Time) on the date that is 30 days from the date that the Debtors provide written notice to the affected creditor that the Schedules have been amended (the "**Amended Schedules Bar Date**").

**PERSONS OR ENTITIES WHO MUST FILE A PROOF OF CLAIM.** Unless not required to file a Proof of Claim pursuant to the terms of the Bar Date Order, any person or entity (including, without limitation, each individual, partnership, joint venture, corporation, estate, trust, and governmental unit), that holds, or seeks to assert, a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtors that arose, or is deemed to have arisen, before the Petition Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; including, without limitation, unsecured priority claims (including, without limitation, claims entitled to priority under sections 507(a)(4) through 507(a)(10) and 503(b)(9) of the Bankruptcy Code), and unsecured non-priority claims (the holder of any such claim, the "**Claimant**"), must properly file a Proof of Claim on or before the applicable Bar Date, in order to receive a distribution from the Debtors' estates; *provided*, *however*, that a Claimant shall be able to receive distributions under any plan of reorganization or liquidation in the Chapter 11 Cases on account of a claim that is identified in the Debtors' Schedules on behalf of such Claimant as undisputed, non-contingent and liquidated, in the amount set forth in the Schedules.

Under the Bar Date Order, the filing of a Proof of Claim Form will be deemed to satisfy the procedural requirements for the assertion of administrative priority claims under section 503(b)(9) of the Bankruptcy Code. All other administrative claims under section 503(b) of the Bankruptcy Code must be made by separate requests for payment in accordance with section 503(a) of the Bankruptcy Code and will not be deemed proper if made by Proof of Claim. No deadline has yet been established for the filing of administrative claims other than claims under section 503(b)(9) of the Bankruptcy Code. **Claims under section 503(b)(9) of the Bankruptcy Code must be filed by the applicable Bar Date**.

Acts or omissions of the Debtors that occurred or arose before the Petition Date may give rise to claims against the Debtors that must be filed by the applicable Bar Date, notwithstanding that such claims may not have matured, are contingent, or have not become fixed or liquidated before or as of the Petition Date.

**CLAIMS FOR WHICH NO PROOF OF CLAIM IS REQUIRED TO BE FILED.** Notwithstanding the above, holders of the following claims are **NOT** required to file a Proof of Claim on or before the applicable Bar Date solely with respect to such claim: (a) a claim against the Debtors for which a signed Proof of Claim has already been properly filed with the Clerk of the Court or Kroll Restructuring Administration LLC ("**Kroll**") in a form substantially similar to Official Bankruptcy Form No. 410; (b) a claim that is listed on the Debtors' Schedules if and only if (i) such claim is not scheduled as "disputed," "contingent," or "unliquidated," **and** (ii) the holder of such claim agrees with the amount, nature, and priority of the claim as set forth in the Schedules, **and** (iii) the holder of such claim agrees that the claim is an obligation of the specific Debtor that listed the claim in its Schedules; (c) an administrative expense claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an expense of administration (other than any claim allowable under section 503(b)(9) of the Bankruptcy Code); (d) an administrative expense claim for postpetition fees and expenses incurred by any professional allowable under sections 330, 331, and 503(b) of the Bankruptcy Code; (e) a claim that has been paid in full by the Debtors in accordance with the Bankruptcy Code or an order of the Court; (f) a claim that has been allowed by an order of the Court entered on or before the applicable Bar Date; (g) a claim of any Debtor against another Debtor; (h) any fees payable to the United States Trustee under 28 U.S.C. § 1930; (i) a claim of any DIP Secured Party and Prepetition Secured Lender; and (j) a claim for which specific deadlines have been fixed by an order of the Court entered on or before the applicable Bar Date.

**Please take notice that any Claimant exempted from filing a Proof of Claim pursuant to paragraph A above must still properly and timely file a Proof of Claim for any other claim that does not fall within the exemptions provided by paragraph A above.** As set forth above, creditors are not required to file a Proof of Claim with respect to any amounts that have already been paid by the Debtors.

**WHEN AND WHERE TO FILE.** All Claimants must submit (by overnight mail, courier service, hand delivery, regular mail, or in person) an original, written Proof of Claim that substantially conforms to the Proof of Claim Form so as to be **actually received** by Kroll, the Debtors' claims and notice agent, by no later than 5:00 p.m. (prevailing Eastern Time) on or before the applicable Bar Date at the following address: Virgin Orbit Holdings, Inc. Claims Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232.

**Alternatively, Claimants may submit a Proof of Claim electronically by completing the Proof of Claim Form that can be accessed at Kroll's website, https://cases.ra.kroll.com/virginorbit/EPOC-Index.**

Proofs of Claim will be deemed timely filed only if **actually received** by Kroll on or before the applicable Bar Date. **It is NOT sufficient for the Proof of Claim to be post-marked by the applicable Bar Date. It must be RECEIVED by the applicable Bar Date.** Proofs of Claim may **not** be delivered by facsimile, telecopy, or electronic mail transmission. Any facsimile, telecopy, or electronic mail submissions will **not** be accepted and will **not** be deemed filed until a Proof of Claim is submitted to Kroll by overnight mail, courier service, hand delivery, regular mail, in person, or through Kroll's website listed above.

**CONSEQUENCES OF FAILURE TO FILE PROOF OF CLAIM BY THE BAR DATE.** Any Claimant that is required to file a Proof of Claim in the Chapter 11 Cases pursuant to the Bankruptcy Code, the Bankruptcy Rules, or the Bar Date Order with respect to a particular claim against the Debtors, but that fails to do so properly by the applicable Bar Date, will not be treated as a creditor with respect to such claim for purposes of voting and distribution; *provided*, *however*, that a holder of a claim shall be able to assert and vote upon any undisputed, noncontingent and liquidated claims identified in the Schedules on behalf of such holder, in the amount set forth in the Schedules, and receive distributions under any plan of reorganization or liquidation in these cases on account of such scheduled claim.

**ADDITIONAL INFORMATION.** The Schedules, the Proof of Claim Form, and Bar Date Order are available free of charge on Kroll's website at https://cases.ra.kroll.com/virginorbit. If you have questions concerning the filing or processing of Claims, you may contact the Debtors' claims agent, Kroll, by phone at: (833) 570-5269 (Toll Free U.S./Canada), +1 (646) 440-4773 (International) or by email at VirginOrbitInfo@ra.kroll.com. If you require additional information regarding the filing of a Proof of Claim, you may contact counsel for the Debtors in writing at the addresses below.

[1] The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: Virgin Orbit Holdings, Inc. (6914); Virgin Orbit National Systems, LLC (3801) ("**VO-NS**"); Vieco USA, Inc. (0492); Virgin Orbit, LLC (9648); and JACM Holdings, Inc. (1445). The Debtors' address, other than Debtor VO-NS, is 4022 East Conant Street, Long Beach, CA 90808. Debtor VO-NS's address is 1960 E. Grand Avenue, El Segundo, CA 90245.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bar Date Order, unless otherwise noted.

[3] Section 503(b)(9) of the Bankruptcy Code authorizes an allowed administrative expense in a chapter 11 case for the value of any goods received by a debtor within 20 days before the date of commencement of a chapter 11 case in which such goods have been sold to a debtor in the ordinary course of business. 11 U.S.C. § 503(b)(9).

[4] As used in this Notice, the term "**creditor**" has the meaning given to it in section 101(10) of the Bankruptcy Code, and includes all persons, entities, estates, trusts, governmental units, and the United States Trustee. In addition, the terms "**persons**," "**entities**," and "**governmental units**" are defined in sections 101(41), 101(15), and 101(27) of the Bankruptcy Code, respectively. The term "**claim**" or "**Claim**" has the meaning given to it in section 101(5) of the Bankruptcy Code, and includes as to or against the Debtors: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.