UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-13359-VFP |
| | . | |
| BED BATH & BEYOND INC., | . | M.L.K. Federal Building |
| | . | 50 Walnut Street, 3rd Floor |
| Debtor. | . | Newark, NJ 07102 |
| | . | |
| | . | April 24, 2023 |
| . . . . . . . . . . . . | . | 2:16 p.m. |

TRANSCRIPT OF FIRST DAY MOTIONS

BEFORE HONORABLE VINCENT F. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Cole Schotz P.C.
                          BY:  MICHAEL D. SIROTA, ESQ.
                               WARREN A. USATINE, ESQ.
                               FELICE R. YUDKIN, ESQ.
                          25 Main Street
                          Hackensack, New Jersey 07601

                          Kirkland & Ellis LLP
                          BY:  JOSHUA A. SUSSBERG, ESQ.
                               EMILY E. GEIER, ESQ.
                               DEREK I. HUNTER, ESQ.
                               ROSS J. FIEDLER, ESQ.
                               CHARLES B. STERRETT, ESQ.
                          601 Lexington Avenue
                          New York, New York 10022

Audio Operator:          Juan Filgueiras

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

APPEARANCES (Continued):

| | |
|---|---|
| For the U.S. Trustee: | U.S. Department of Justice<br>Office of the U.S. Trustee<br>BY:  FRAN B. STEELE, ESQ.<br>     ALEXANDRIA NIKOLINOS, ESQ.<br>     MARTHA HILDEBRANDT, ESQ.<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102 |
| For the Pre-Petition ABL<br>ABL Administrative Agent: | Greenberg Traurig, LLP<br>BY:  ALAN J. BRODY, ESQ.<br>500 Campus Drive, Suite 400<br>Florham Park, New Jersey 07932 |
| | Davis Polk<br>BY:  MARSHALL HUEBNER, ESQ.<br>     ADAM L. SHPEEN, ESQ.<br>450 Lexington Avenue<br>New York, New York 10017 |
| For Sixth Street<br>Specialty Lending, Inc.: | Duane Morris LLP<br>BY:  MORRIS S. BAUER, ESQ.<br>     SOMMER ROSS, ESQ.<br>1 Riverfront Plaza<br>1037 Raymond Boulevard<br>Suite 1800<br>Newark, New Jersey 07102 |
| | Proskauer Rose<br>BY:  DAVID M. HILLMAN, ESQ.<br>     CHARLES A. DALE, ESQ.<br>     MEGAN R. VOLIN, ESQ.<br>     REUVEN C. KLEIN, ESQ.<br>11 Times Square<br>New York, New York 10036 |
| For Hilco Merchant<br>Resources, LLC and<br>Gordon Brothers Retail<br>Partners, LLC: | Troutman Pepper Hamilton Sanders<br>LLP<br>BY:  JESSICA D. MIKHAILEVICH, ESQ.<br>875 Third Avenue<br>New York, New York 10022 |
| | Troutman Pepper Hamilton Sanders<br>LLP<br>BY:  STEPHEN M. FOX, ESQ.<br>400 Berwyn Park<br>899 Cassatt Road<br>Berwyn, Pennsylvania 19312 |

TELEPHONIC APPEARANCES:

For Unsecured Bond            Glenn Agre Bergman and Fuentes
Holders:                     BY:  KURT A. MAYR, ESQ.
                             1185 Avenue of the Americas
                             22nd Floor
                             New York, New York 10036

                             National Association of Attorneys
                             General
                             BY:  KAREN CORDRY, ESQ.
                             1850 M Street NW, 12th Floor
                             Washington, DC 20036

                             - - - - -

## I N D E X

### EXHIBITS

| Number | Description | Evid |
|--------|-------------|------|
| 10 | Ms. Etlin's declaration | 30 |
| 36 | Mr. Kurtz's declaration | 32 |
| 37 | Ms. Etlin's second declaration | 31 |

1          THE COURT:  Okay.  Good afternoon.  It is Monday,

2    April 24, 2023.  This is the United States Bankruptcy Court for

3    the District of New Jersey and we are here on 16 first day

4    matters in the case of Bed Bath & Beyond Inc., 23-13359, and

5    the many affiliated debtors that also filed.

6          Well, welcome to all that are here and I will ask for

7    appearances, but it looks like there's a lot of appearances

8    here.  So why don't we get started with the debtor.

9          MR. SIROTA:  Your Honor, Michael Sirota.  I'm here

10   with my partners, Warren Usatine, Felice Yudkin, Cole Schotz

11   P.C., co-counsel to the debtors and it's great to see you in

12   person.  It's been a long time.

13         THE COURT:  Yep.  Since the pandemic almost.

14         MR. SIROTA:  Exactly.  I'd like to introduce a great

15   friend, and more importantly, a great lawyer, Joshua Sussberg,

16   from Kirkland & Ellis, and Mr. Sussberg will introduce his

17   colleagues.  And after appearances are entered, Mr. Sussberg

18   will, with the Court's permission, provide an overview, if

19   that's acceptable.

20         THE COURT:  Okay.  That sounds like a fine way to

21   proceed.

22         MR. SIROTA:  Thank you.

23         THE COURT:  Mr. Sussberg?

24         MR. SIROTA:  Just your appearance.

25         MR. SUSSBERG:  Thank you, Your Honor.  Joshua

6

1  Sussberg from Kirkland & Ellis on behalf of Bed Bath & Beyond.

2  I wasn't sure if you were taking appearances of everyone in the

3  courtroom or you just wanted to get into it.

4          THE COURT:  Well, I guess, Mr. Sirota was saying that

5  he was going to -- you were going to make your appearance and

6  introduce your colleagues and then we were going --

7          MR. SUSSBERG:  You'll take --

8          THE COURT:  -- take the other --

9          MR. SUSSBERG:  -- other appearances.

10         THE COURT:  -- appearances and --

11         MR. SUSSBERG:  Happy to do so.  I am joined by my

12 partners, Emily Geier and Derek Hunter and Ross Fiedler and

13 Charles Sterrett.  Thank you, Your Honor.

14         THE COURT:  Good afternoon and welcome.

15         MS. STEELE:  Good afternoon, Your Honor.  Fran

16 Steele, Alex Nikolinos, and Martha Hildebrandt on behalf of the

17 United States Trustee.

18         THE COURT:  Good afternoon.

19         MR. BRODY:  Good afternoon, Your Honor.  Alan Brody,

20 Greenberg Traurig, on behalf of JPMorgan Chase, the prepetition

21 ABL administrative agent.

22         And, Your Honor, I'd also like to introduce, from

23 David Polk, Marshall Huebner and Adam Shpeen, whose admissions

24 *pro hac* have been filed and, of course, Your Honor, we ask that

25 they be allowed to appear today.

1          THE COURT:  Okay.  That's, of course, I'll

2   perfunctorily if anyone has any objection, but I'm going to

3   allow their *pro hac vice* appearance today.  Certainly given the

4   circumstances, it's appropriate.

5          MR. BRODY:  Thank you, Your Honor.

6          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  It's

7   an honor to be in front of you.

8          THE COURT:  Good afternoon.

9          MR. BAUER:  Good afternoon, Your Honor.  Mo Bauer and

10  Sommer Ross, with Duane Morris, on behalf of Sixth Street

11  Specialty Lending, the FILO agent.  And I have with me David

12  Hillman, Chad Dale, Megan Volin, and Reuven Klein of the

13  Proskauer Rose firm, and we filed motions for their *pro hac*

14  *vice* admissions with Your Honor, which are obviously pending,

15  and we would like them to be able to speak today also.

16         THE COURT:  Well, good afternoon and the same applies

17  to you.

18         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

19         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20         MR. BAUER:  Thank you, Your Honor.

21         THE COURT:  There are no other appearances?

22         MS. MIKHAILEVICH:  And, Your Honor, Jessica

23  Mikhailevich, from Troutman Pepper LLP, on behalf of Hilco

24  Merchant Resources, LLC and Gordon Brothers Retail Partners,

25  LLC.  I'm also going to apply for admissions *pro hac vice*, also

1  in the file for docket, for Stephen Fox from Riemer Braunstein.

2          THE COURT:  Okay.  Good afternoon.

3          MR. FOX:  Good afternoon, Your Honor.

4          THE COURT:  And your appearance reminds me of one

5  little procedural matter is that if you could, if you're going

6  to appear or participate in any of the hearings, to just come

7  up to the podium so that we can hear you and you can actually,

8  more importantly, be recorded -- or as importantly be recorded.

9  Thank you.

10          There were a number of people, as I understand it,

11  that requested appearances on listen only, which is, you know,

12  a relic of ours, Court Solutions also appearances.  But if no

13  one else is appearing, then I think we are on to Mr. Sussberg.

14          MR. MAYR:  Your Honor?  Your Honor, can you hear me?

15          THE COURT:  Oh, yes.  I'm sorry.

16          MR. MAYR:  Yeah, sorry.  This is -- I can't make it

17  to the podium obviously, but this is Kurt Mayr from Glenn Agre

18  Bergman & Fuentes.  We're appearing today for a group of

19  unsecured bond holders, a number of investment funds and

20  institutional holders of the unsecured bonds of the debtor.

21          THE COURT:  Okay.  Thank you.

22          MS. CORDRY:  And Your Honor?

23          THE COURT:  You did not come through for some reason

24  just before.  Okay.

25          Any other appearances --

1           MS. CORDRY:  This is --

2           THE COURT:  -- from -- via Zoom?

3           MS. CORDRY:  Your Honor, this is Karen Cordry.  Can

4    you hear me?

5           THE COURT:  Yes.

6           MS. CORDRY:  Yes.  Hi.  I'm with the National

7    Association of Attorneys General, the bankruptcy counsel there.

8    I am not trying to file a *pro hac* appearance yet.  Had a few

9    comments on the going-out-of-business sale motion that I want

10   to be able to make as appropriate when the time came.  It would

11   be representing states if we have an issue going forward.

12   Hopefully, they will be relatively minor comments and we can

13   wrap them up.  Thank you.

14          THE COURT:  Thank you.

15          Okay.  Seems to be it, Mr. Sussberg.

16          MR. SUSSBERG:  Thank you, Your Honor.  Again, for the

17   record, Joshua Sussberg, from Kirkland & Ellis, on behalf of

18   Bed Bath & Beyond.

19          First and foremost, I wanted to thank you and your

20   staff for hearing us on such short notice.  It's very important

21   some of the relief we're seeking, all of the relief, but most

22   importantly we have a payroll due on Thursday --

23          THE COURT:  Uh-huh.

24          MR. SUSSBERG:  -- and we have 14,000 employees that

25   are counting on that payroll.  And in order to be in a position

1  to have Mr. Huebner's clients do whatever it is they do at

2  JPMorgan to turn the accounts back on, it was important to be

3  in court quickly.  So thank you, Your Honor.

4          THE COURT:  You're quite welcome and we really

5  certainly recognize the urgency of the situation from the

6  papers that were filed.

7          MR. SUSSBERG:  Thank you.  Thank you.

8          As I look around the room, a lot of friends and

9  colleagues and people that I have met throughout the course of

10 this matter, there's a ton of collective retail experience in

11 many shapes and sizes.  But when it comes to Bed Bath & Beyond,

12 at least for me, there are a lot of firsts.

13         There was my first day at college where I went with

14 my mother to Bed Bath & Beyond on Erie Boulevard in Syracuse,

15 New York.

16         THE COURT:  Ah.

17         MR. SUSSBERG:  There was my first day of law school

18 in New York City where I went, again, with my mother to Bed

19 Bath & Beyond to get whatever I needed for my new apartment.

20 There was the first --

21         THE COURT:  Well, I'm a little older than you so I

22 went with my daughter.

23         MR. SUSSBERG:  There you go.

24         (Laughter.)

25         MR. SUSSBERG:  Well, then I -- and then I moved in

11

1  with my then girlfriend, now wife, and we had an apartment and

2  went to Bed Bath & Beyond on East 61st Street in New York to

3  get that apartment ready.  And then we had our first son and I

4  made 100 trips to Bed Bath & Beyond on the west side because I

5  never got the right formula or the right diapers.

6        And that's the first time I visit my now in-laws and

7  I saw the Bed Bath & Beyond coupon stacked from floor to

8  ceiling and I might have taken a few.  And then, of course,

9  when we moved out to Westchester, New York, I remember visiting

10 on the very first day we were there the Bed Bath & Beyond on

11 Central Avenue.

12        It's also the first time that I have advised a

13 company that received an acceleration notice from its lenders

14 and the entire secured cash stack.  And on the heals of that

15 notice, it's the first time I have ever represented a company

16 in distress that was able to access the equity markets not

17 once, but twice.

18        And I also hope, Your Honor, that this is the first

19 time that we have started a wind-down and halted it because we

20 figured out a going-concern solution.  And we will spend some

21 time today talking, Your Honor, about what we're going to do

22 and what we have continued to do to figure out a way to save

23 some or all of Bed Bath & Beyond and buybuy BABY.  I know

24 everybody on the company's side is going to do everything in

25 its power to do just that.

1          I do have a presentation that I wanted to run through

2    to give Your Honor some background, but I want to make a few

3    introductions first in the courtroom.

4          THE COURT:  Okay.

5          MR. SUSSBERG:  Today, we have Ms. Sue Gove, who is

6    our chief executive officer, and we'll talk about the company

7    under Ms. Gove's leadership.  We have David Kastin, the

8    company's general counsel; Susie Kim, she is our Senior Vice

9    President Investor Relations and Treasury; and we have Julie

10   Strider.  Where's Julie?  She is the vice president of

11   Communications.

12         You have also seen, Your Honor, that we submitted

13   three declarations or maybe four declarations.  Ms. Geier will

14   clean that up for me.  The first was Ms. Holly Etlin's

15   declaration.  She is the recently appointed chief restructuring

16   officer and interim CFO from AlixPartners.  And we have

17   Mr. David Kurtz from Lazard, the company's proposed investment

18   banker, and we'll get into those declarations as we proceed.

19         THE COURT:  Okay.

20         MR. SUSSBERG:  So if we could please share the

21   presentation?  No clicker.

22         Briefly, Your Honor, and I think you have heard from

23   folks, but the debtors' professionals, Kirkland Cole Schotz,

24   Lazard, AlixPartners were being advised by A&G Realty Partners,

25   C Street Advisory Group on communications and Kroll is our

1    proposed claims and noticing agent.

2            So if we go to the next slide, you have heard from

3    folks, the ABL facility, Davis Polk & Greenberg, as well as FTI

4    Consulting, and then the FILO is Proskauer, Duane Morris, M3,

5    Houlihan Lokey.  I'm sure we'll hear from Mr. Hillman and

6    Mr. Huebner throughout the course of the day.

7            As far as a business overview and a little bit of

8    history here, Your Honor, this is a 52-year-old company that, I

9    don't say this lightly, is an iconic brand and it all started

10   pretty humble beginnings.

11           1971, Warren Eisenberg and Leonard Feinstein, here in

12   New Jersey, opened the first what was then called Bed 'n Bath

13   and they started this company with $100,000 and it was humble

14   beginnings.  The stores were 2,500 square feet.  But they had

15   left another retail company because they saw an opportunity

16   where department stores were lagging and speciality retail

17   really had a chance to become something.

18           By 1985, they had 11 Bed 'n Bath stores and they had

19   moved out to the West Coast.  By 1987, as the company as was

20   expanding and changing, they were spending money on merchandise

21   not to make the stores pretty, but they decided to change their

22   name because of the treasure trove experience at the stores,

23   hence the beginnings of Bed Bath & Beyond.

24           And it's important to note that in the 1980s, and I

25   think this will be thematic throughout what we talk about, in

14

1  the face of significant competition, Linens 'N Things and many

2  other stores that came into the space, these people and this

3  company adapted.  And they opened its first superstore in

4  Springfield, New Jersey, and that was 20,000 square feet.  And

5  the superstore experience and the merchandise that was

6  available really gave the company an edge and that adaptation

7  was important because it led to wild success.

8       And as you'll see, in 1992 the company was first

9  listed on NASDAQ, BBBY.  In 1999, sales exceeded one billion

10  dollars for the first time and I think it's important the

11  company decided that rather than using newspaper circular

12  advertising, we're going to use these coupons, and it became a

13  rage and a craze.  And I'm pretty sure my mother-in-law still

14  has -- I'm not going to say dozens, thousands of coupons and

15  she did call for advice as to how to utilize those coupons, but

16  we'll get there another moment.

17       In 2003 the company had grown, as you can see on the

18  map, to 575 stores in 44 different states and also in Puerto

19  Rico and the growth continued in 2007 with stores that were

20  opened in Canada.  And we'll talk a bit today about what

21  happened in Canada and what's going on in Canada, but those

22  stores have been closed.

23       2008 was an announcement of a joint venture in

24  Mexico.  2018, sales exceeded 12 billion dollars and there were

25  880 stores operating across North America and the company had

15

grown every single year.  And we will talk about what happened

in 2019, which was the first year that the company experienced

significant losses and led to everything that has happened to

date.

        Clicker may be lagging a bit behind.  Apologies, Your

Honor.

        THE COURT:  That's okay.

        MR. SUSSBERG:  There we go.

        THE COURT:  Oh.

        MR. SUSSBERG:  The two main brands, I think

everyone's aware, Bed Bath & Beyond, linens, house appliances,

air purifiers, anything you can imagine formed in a racetrack-

type setting as the founders had envisioned, so that if you

went in to get a mattress linen, you were not leaving with just

a mattress linen; you were leaving with lots of other things

and I remember that well at college and law school.

        And then buybuy BABY, prenatal, post-natal,

strollers, whatever it could be, and the registry there is one

I was familiar with when we were having children and, again,

many, many, many trips to buybuy BABY on 7th Avenue.

        The company currently operates 360 Bed Bath & Beyond

stores and 120 buybuy BABY stores and that was part of the

transformation plan that Ms. Gove put in place when she took

over during the summer of 2022.  And it's really the

transformation plan that we had sought to implement, and we'll

1    talk about briefly, with some of the equity capital that we

2    were fortunate enough to raise.

3            On the organizational chart, Your Honor, you

4    recognize we have 74 debtor entities.  I just wanted to quickly

5    note the non-debtor entities so Your Honor is aware.  Those

6    first two boxes at the top are the Canadian entities.  Those

7    are part of a Canadian proceeding.  We are close to being

8    complete with winding down all Canadian operations, but we will

9    be presenting a motion for a coordination amongst the courts,

10   something that we have done in similar circumstances.

11           The bottom left are the Mexican joint ventures.

12   Those are not part of these proceedings.

13           And then finally, Oak Insurance Company, that's our

14   captive insurer so we did not include that entity in the

15   filing, nor could we.

16           THE COURT:  Okay.

17           MR. SUSSBERG:  From a governance perspective, Your

18   Honor, I did want to note that we have added three different

19   independent directors to various of the companies' boards.  As

20   you'll see at the top, which we note is the sole note issuer of

21   our three series of unsecured bonds that Mr. Mayr is

22   representing, we added Carol Flaton as a director.

23           And then at all of our subsidiary entities, we added

24   Pamela Corrie and John Foster as independent directors and they

25   will be working together to investigate prepetition matters and

17

1  to deal with any conflict issues that arise in connection with

2  the filing, and Kirkland & Ellis and Cole Schotz will be

3  jointly advising them on their investigation, which commenced

4  prior to the filing of these bankruptcy cases.

5         The capital structure, Your Honor, is relatively

6  straightforward.  At the top, we have the ABL that's secured on

7  the inventory in a first priority position, as well as cash and

8  other items of the sort.

9         Behind them is the FILO facility.  That's the 6th

10 Street facility.  That was entered into in 2022 in the fall

11 designed to provide the company with liquidity to implement

12 Ms. Gove's turnaround plan and buy inventory.  And as we note,

13 that facility was increased over the course of the last couple

14 of months in connection with the equity raised.  And as I sit

15 here today, it's 547 million outstanding.  We also have letters

16 of credit and finance leases.  And then as I mentioned, the

17 three series of unsecured bonds.

18        So why we are here, Your Honor, you know, I talked

19 about the company adapting back in the '80s and '90s and moving

20 to the superstore experience and the enlarged space to deal

21 with competition.  And while the company has weathered the

22 recession of 2008, as well as the challenging competitive

23 environment in the '80s and '90s, the company did not adapt to

24 the retail e-commerce boom and the founder was quoted in an

25 article saying, "We missed the boat on the internet."

1           And the problem became such that competitors were

2     doing same day or day after pickup at the stores or delivery.

3     And in order to implement that over a period of time takes

4     resources and dedication and the company, at the time back in

5     2010 during the internet boom, did not put the resources in.

6           And ultimately, I think this really is one of the

7     reasons why it led to the ultimate demise of Bed Bath & Beyond.

8     And if you look, in January 2014, right, the internet really

9     started taking hold 2010 with the explosion of Amazon, but in

10    January '14, Bed Bath & Beyond stock was trading at $80 a

11    share.  When you look at 2018, it was down to $14 a share and

12    that represented a loss of $15 billion in value and I think a

13    lot of that is attributed to a failure to adapt, which is

14    really, really important in a retail environment.

15          THE COURT:  Has that been fixed?

16          MR. SUSSBERG:  It has been fixed.  The question

17    became it was a little bit --

18          THE COURT:  Too late.

19          MR. SUSSBERG:  -- too late.

20          Point there.

21          So in early 2019, Your Honor, the company reported

22    its seventh consecutive quarter of declining same store sales

23    and its first annual loss and sales decline in 30 years.

24    Profits were down 48 percent year over year.  Again, it's first

25    unprofitable year.

1           And so, as a result of unprofitability and unrest,

2   there was an activist campaign, as you can see, and that led to

3   the CEO of 16 years stepping down and an overhaul of the board

4   of directors.  And several of the board members that were

5   appointed in '19 remain on the board today.

6           And then in November of 2019, a new CEO was appointed

7   and this was a former merchandising expert at Target.  And he

8   came in and had a different vision and he was going to move to

9   private label and really kind of retool the business, which was

10  successful at Target, at Bed Bath & Beyond with many different

11  private labels.  And unfortunately, as we'll talk about, it

12  missed all expectations and the consumer was not interested.

13  The consumer wanted the KitchenAid brands.  The consumer wanted

14  the brands that it had come to know and it did not have an

15  ability to understand nor comprehend the expedited nature in

16  which these private labels were introduced.

17          And so on the next slide, and we'll get into some of

18  this, but we just wanted to highlight that there really were

19  both internal and external disruptions.  The activist campaign

20  reshaped the board and management and then the shift away from

21  private label products, you know, really caused harm to the

22  business.

23          We had a share buyback, that I will address, for a

24  billion dollars because people thought that the intrinsic value

25  of the equity did not reflect reality and it ultimately ended

20

1  up causing the company to burn significant cash that otherwise

2  should have been used for operations.

3          We had another management change.  Ms. Gove took over

4  in the summer of 2022 and we note the shareholder action at the

5  top on the right related to the meme stock craze, which we will

6  also speak about.

7          And obviously COVID is part of the story, Your Honor,

8  as you're well aware, and I know you presided over the Modell's

9  case, which happened right when COVID happened and I had a

10 similar experience with Pier 1.

11         THE COURT:  Right.

12         MR. SUSSBERG:  We were in court one week.  We were

13 home the next.  It was devastating from a retailer's

14 perspective and it was the cause for a host of consternation

15 across the industry.  And then also, we have had supply chain

16 issues that caused deterioration in product and a host of

17 problems that led us to where we are today.

18         Just briefly, Your Honor.  You know the pitfalls of

19 private label, I think we hit it very well in Ms. Etlin's

20 declaration.  We tried to move too fast and too quick into a

21 whole new strategy that effectively lost sight of the consumer

22 and the consumer's preference.  And implementing nine different

23 private label products as quickly as we were trying to do just

24 didn't take hold and then, of course, the pandemic to pile on

25 and it really caused a lot of disruption.

1          Now private label products carry higher margin but if

2    you implement it over time, maybe you reap the rewards, but we

3    went too quickly and it proved to be a problem.  It also

4    strained the supply chain as we note in the slide.  It's longer

5    lead times for private label products.

6          And as you're implementing that and then dealing with

7    the pandemic, the supply chain was highly disrupted as a result

8    not just because of the private label, but because of the macro

9    environment.  And as a result, as we note, we ran short on 200

10   of our best selling products costing the debtors an estimated

11   $100 million in sales.

12         THE COURT:  I read somewhere there was unfulfilled

13   orders that year, is that right?

14         MR. SUSSBERG:  Unfulfilled orders.

15         THE COURT:  Okay.

16         MR. SUSSBERG:  Yes.

17         THE COURT:  Of over --

18         MR. SUSSBERG:  And close --

19         THE COURT:  -- 100 --

20         MR. SUSSBERG:  -- to $200 million.

21         THE COURT:  Over 200 million.

22         MR. SUSSBERG:  Yes.  COVID, I don't need to belabor,

23   but COVID cost the company.  Obviously shutdown all of its

24   locations for a period of time.  It was a difficult time for

25   any retailer with workforce issues and furloughs, as well as

22

1  not understanding local mandates across the country where you

2  have stores that you want to be able to operate.  Maybe you get

3  an emergency relief to do so, but it caused major disruption at

4  a time where the company really could not afford that

5  disruption.

6        I mentioned -- go back one -- the billion dollar

7  share buyback.  That occurred beginning in late 2020.  This is

8  at a time where the company had a billion five of cash and a

9  billion two of debt and the company endeavored on a share

10 buyback program, again, because they believed that the

11 intrinsic value was priced too low and that it was going to

12 increase ultimate value for shareholders and for the company.

13       It proved to be a cash strain on the company at a

14 time where no one anticipated that COVID was going to wreck

15 havoc that it did and prove to be very disruptive from a

16 business standpoint.

17       Then the meme stock madness.  Ryan Cohen, well-known

18 meme stock investor, seized on the opportunity at Bed Bath,

19 similar to GameStop, as well as others.  He purchased a ten

20 percent stake in the company with a large call option.  And

21 then March to August, he exited his position.  And as soon as

22 he exited, literally overnight with Securities filings, the

23 stock tanked and caused it to crash pretty significantly.  And

24 on the heels of that, you see the shareholder action for 1.2

25 billion in securities fraud that was filed around that time.

1            So now Ms. Gove takes over during the summer of 2022

2    and, you know, I say all the time, she had the job of turning

3    around the Titanic.  And when I tell you, I don't think I have

4    ever met someone with more conviction, dedication and

5    perseverance than Ms. Gove, every single day she works because

6    she cares about the people and she believes in the thesis and

7    she's still doing it today, and that's why all of us are going

8    to do everything we can to help her turn that Titanic around.

9            And she really went back to basics and she removed

10   several of the private labels and went out and sought to repair

11   vendor relationships.  Now the problem after not using those

12   vendors, the KitchenAids and the Calphalons, they go place

13   their products elsewhere.  And so bringing the vendors back

14   into the mix, it takes time and it takes resources and it takes

15   confidence in the business, all of which Ms. Gove was tasked

16   with doing in a very short period of time.

17           But she also announced an intention to close

18   significant underperforming stores and, frankly, that's how we

19   got to the footprint we have today because it was her vision

20   that a company could be restructured around the base that we

21   have in place, the 360-or-so Bed Bath stores and the 120 buybuy

22   BABY stores.  And you also see, you know, very difficult

23   reductions in force, as well as reductions in overhead, all of

24   which was spearheaded at Ms. Gove's direction.

25           Some of the initiatives that she undertook to help

1  right the business, there was the raising of the 6th Street

2  FILO.  That was in the fall of 2022.  There was a sale process.

3  Mr. Kurt speaks about this in length in the course of his

4  declaration.  Lazard has left no stone unturned, reached 60

5  different parties, 30 of which signed NDAs, some of whom are

6  still looking at the asset, many of whom have dropped out of

7  the process.

8          We had a first at the market offering.  That was

9  100 -- $75 million.  Helped re-balance inventory and address

10  the balance sheet.  Ms. Gove had a fall supplier engagement

11  where she got everyone together to try to build confidence in

12  the business and then we did launch an exchange offer that,

13  unfortunately, failed in 2022.

14          Unfortunately, following the holiday season, the all

15  important holiday season in '22, there was no reprieve, and

16  there has been no reprieve throughout the course of 2023.  And

17  in early 2023, we received a notice of acceleration, as well as

18  the application of default interest and, frankly, all the

19  professionals in this room were tasked with preparing

20  contingency plans and potentially being in front of Your Honor

21  all the way back January.

22          And so how did we get to the end of April?  We had

23  two different parties approach the company interested in

24  investing.  I know it's wild for a restructuring lawyer who's

25  preparing for Chapter 11 to appreciate this concept,  but two

1   different investors were interested in buying equity in the

2   company.  And the reason that the Hudson Bay proposal was so

3   attractive, Your Honor, is because based upon where share price

4   was, depending upon the time of the tranche of commitment from

5   Hudson Bay, the company had an opportunity to access up to a

6   billion dollars of capital.

7         And that billion dollars of capital, over the course

8   of a year, so long as the stock price stayed above certain

9   minimum thresholds, would have provided Ms. Gove and the team

10  with the money and the resources to turn that business around

11  and implement the various pillars that Ms. Gove sought to

12  implement back in the summer of 2022, including getting all the

13  merchandise and the inventory suppliers back into the company.

14        And that's the reason why the board thought it made

15  complete sense and, frankly, it's the reason why, I think, we

16  were able to convince our lenders that back in February, we

17  needed to pause.  We needed to de-accelerate the loans.  We

18  needed to amend and modify the credit agreements and we needed

19  to take an opportunity to capitalize on this once-in-a-lifetime

20  opportunity to bring equity into this company and see if we

21  could access the remaining billion dollars.

22        And the reality, Your Honor, as you have seen in the

23  pleadings, while we were able to get over 300 million dollars

24  from Hudson Bay, we ended up not keeping the share price at a

25  certain point that we were able to access additional capital

1  and, as a result, the Hudson Bay deal was terminated.

2        Just to note, Your Honor, because this was part of

3  the calculus in convincing our lenders and ultimately the board

4  making a decision, Ms. Gove's vision really focused on three

5  buckets:  customer centric focus; again, rightsizing the

6  operations; closing additional underperforming stores and

7  investing in inventory.  And it was with these three pillars

8  and potentially a billion dollars of capital from Hudson Bay

9  that we really thought we had a chance to turn things around.

10        Now, on the heels of the Hudson Bay transaction

11  terminating, we actually were able, yet again, to pull a rabbit

12  out of a hat and get another ATM equity transaction with B

13  Reilly Securities.  And, again, kudos to Ms. Gove, Mr. Kastin,

14  and the Lazard team for pulling this through.  It allowed us to

15  sell up to $300 million of shares at a time through the market

16  that we were able to capitalize on and we were able to secure

17  additional equity proceeds.

18        And yet, again, our lenders modified, amended their

19  documents to allow this to happen so that we could get more

20  time because this really was a function of getting more time

21  because, at the end of the day, if we ran out of these

22  opportunities we all knew what the Chapter 11 would ultimately

23  look like, notwithstanding the sale process that we're running

24  and so we did take advantage of that.

25        As far as where we are now, Your Honor, and the path

1  forward, you know, I think it's pretty clear in the pleadings

2  that obviously the company has significant overhead and cost

3  and we need to minimize that burn as quickly as we can.  And as

4  a result, we have affected and are in the process, and we'll be

5  seeking authority from Your Honor, to run a dual-track process.

6  We are going to commence the wind-down of all of our open

7  locations, but we are not, under any circumstances, giving up

8  on a going concern for some or all of the remaining stores and

9  there will be nothing that would make me happier than be able

10  to stand up here in front of Your Honor in a month or two

11  months' time and say, we found a buyer for 200, 300 or 400 of

12  the remaining stores.  We're going to get all of our vendors

13  together.  We're going to start a new inventory program, all of

14  which we will continue to explore because, frankly, I think the

15  generations that come should have an opportunity to go to a Bed

16  Bath & Beyond with their mother or their wife or for their kid,

17  just like I was able to.

18          And no one on our side is going to stop working until

19  we have run out every single ground ball.  And you can have our

20  word for that and I want to assure everyone out there that

21  would like to shop at a Bed Bath & Beyond again that we are

22  committed to doing everything we possibly can to --

23          THE COURT:  Well, if you can --

24          MR. SUSSBERG:  -- make that come to fruition.

25          THE COURT:  If you can do that, there will be a lot

of happy people, including myself, and many other people here
because that's what we're ultimately here for and try to do the
best we can for the various stakeholders and I see where you're
headed.

MR. SUSSBERG:  Thank you, Your Honor.  Thank you,
Your Honor.

Just briefly, I'm going to cede the podium to
Ms. Geier to talk about our DIP financing.  We did have a
pretty healthy agenda.  I'm hopeful many of these are non-
controversial.  We'll try to go through them quickly, but I do
think it makes sense, if it's okay with Your Honor, to take up
the DIP financing first.

THE COURT:  That's what I was -- I was going to ask
you if that's the order.  I was going to ask the parties what
order they wanted to go in and if you think the DIP should go
first, let's go first.

MR. SUSSBERG:  Yeah.  We'd like the DIP to go first
and then we'll follow the agenda in order.

THE COURT:  Okay.

MS. GEIER:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. GEIER:  Emily Geier from Kirkland & Ellis on
behalf of the debtors.

THE COURT:  Yes.  Go ahead.  I have got --

MS. GEIER:  Nice --

1          THE COURT:  -- I have gotten some pleadings from you

2    and some pretty long orders and --

3          MS. GEIER:  Just a few.  And --

4          THE COURT:  -- and --

5          MS. GEIER:  -- it's just me putting them all together

6    too, so I have been pretty tired.

7          Your Honor, there is, obviously, an army involved to

8    get this number of papers prepared, but this is sort of the

9    point of it all.  How are we going to pay for it?  How are we

10   going to get through these cases and get to what should be a

11   Chapter 11 plan.

12         So let's -- perhaps we can get the less interesting

13   parts out of the way regarding the declarations.

14         THE COURT:  Okay.

15         MS. GEIER:  On this slide, I have just listed the

16   various docket numbers.  As I'm sure Your Honor noticed, the

17   DIP documents have trickled in throughout the day and so

18   there's a lot of docket numbers involved.

19         But the most important one before we get there is

20   actually Docket Number 10, which is Ms. Etlin's declaration in

21   support of the filing of the cases and the various first day

22   motions.  I was wondering if Your Honor would view this as an

23   appropriate time to go ahead and admit that into evidence?

24         THE COURT:  Okay.  Well, so what --

25         MS. GEIER:  Whatever your --

30

1          THE COURT:  -- I -- the way --

2          MS. GEIER:  -- preference is.

3          THE COURT:  -- I handle that is to say that -- and

4  now you're talking about Docket Number 10 of Miss --

5          MS. GEIER:  That's correct, Your Honor.

6          THE COURT:  Yeah.  Ms. Etlin's declaration in support

7  of the first day motions.  And I will -- the way I do that is I

8  ask if there's anyone who is participating who has any

9  objection to the admission of that declaration as evidence and

10 whether they would seek to cross-examine on that or the direct

11 testimony.  I ask about that as a matter of course and so I'll

12 do it again today.

13         MS. STEELE:  The U.S. Trustee has no objection, Your

14 Honor, and we hope that we won't have the need for cross-

15 examination.

16         THE COURT:  Okay.  Anyone else?

17                  (No audible response.)

18         THE COURT:  All right.  So Ms. Etlin's declaration at

19 Docket Number 10 is admitted into evidence.

20              (Docket #10 admitted into evidence.)

21         MS. GEIER:  Fantastic.  Thank you, Your Honor.

22         And then also on Docket Number 36 is the declaration

23 of David Kurtz of Lazard, our investment banker, in support of

24 the debt motion as well.

25         THE COURT:  And I make the same statement as to

1 Docket Number 37, the second Etlin declaration in support of

2 the DIP motion.

3       MS. STEELE:  No objection, Your Honor.

4       THE COURT:  And having heard no other responses,

5 we'll admit that Docket Number 37 into evidence.

6       (Docket #37 admitted into evidence.)

7       MS. GEIER:  Thank you, Your Honor.  And then,

8 finally, Docket Number 37 is the declaration of Ms. Etlin again

9 but in support of the debt motion.  So --

10       THE COURT:  Right.

11       MS. GEIER:  Same person.

12       THE COURT:  Yep.

13       MS. GEIER:  Different motion.

14       MS. STEELE:  No objection, Your Honor.

15       THE COURT:  Okay.

16       MS. GEIER:  So just to confirm, Your Honor.  Do we

17 have Docket Numbers 36 and 37 admitted into evidence?

18       THE COURT:  I thought --

19       MS. GEIER:  I just want --

20       THE COURT:  -- you said --

21       MS. GEIER:  -- to make sure --

22       THE COURT:  -- 37.

23       MS. GEIER:  I apologize.

24       THE COURT:  I thought you had them both.

25       MS. GEIER:  It very well could be --

```
 1              THE COURT:  Yeah.  Yeah.

 2              MS. GEIER:  -- probably almost certainly is my brain

 3  saying --

 4              THE COURT:  All right.  Well --

 5              MS. GEIER:  -- the wrong numbers out loud.

 6              THE COURT:  -- you were talking also Mr. Kurtz's then

 7  at 36?

 8              MS. GEIER:  That's correct, Your Honor.

 9              THE COURT:  All right.  The same statement?

10              MS. STEELE:  Yes, Your Honor.  No objection.

11              THE COURT:  All right.  And having heard no other

12  objections, Number 36 will also be admitted.

13                  (Docket #36 admitted into evidence.)

14              MS. GEIER:  Thank you, Your Honor.  I think --

15              THE COURT:  Thank you.

16              MS. GEIER:  -- we are done now with the --

17              THE COURT:  With the --

18              MS. GEIER:  -- with at least the declarations.

19              THE COURT:  Okay.

20              MS. GEIER:  So --

21              THE COURT:  They may not have been exciting, but

22  there's a lot of stuff --

23              MS. GEIER:  -- they -- they're --

24              THE COURT:  -- in from there.

25              MS. GEIER:  There is a lot of exciting stuff in there
```

33

1  to read.  I will not read them directly to the group because

2  that's -- we have a lot to get through today.

3          Okay.  So I just wanted to back up for one moment

4  before the petition date and sort of take us through a bit of

5  the time taking us from where we were, say in February through

6  the petition date, and then what we propose for the DIP

7  financing.  I think it's helpful to see that the numbers as

8  they changed and effectively the FILO came to sit where the ABL

9  position was.  The FILO sort of took on more and more of that

10 role.

11         Here, in February 2023, you see the FILO facility at

12 475 million.  That was after they injected 100 million of

13 additional loans, sort of subbing out the position of the ABL

14 to facilitate the equity transactions that Mr. Sussberg went

15 over earlier.

16         So they were at 375 originally, then they were at

17 475.  And then as we got to -- and you can see obviously that

18 sizable over advanced position that the debtors were in, as of

19 that date just prior to the infusion of the equity capital.

20         So when we reached the petition date -- well, you can

21 see there's another ABL over advance.  That was a new over

22 advance because last week we found ourselves returning to the

23 over advance position.  There were critical obligation that the

24 debtors needed to pay.  These included payroll, freight, taxes,

25 not items that could be delayed.

34

1       And so the lenders joined together and both

2   approved -- and by "both" I mean the ABL lenders and the

3   FILO -- approved this ABL over advance position, which, of

4   course, had the effect of putting the FILO lenders an

5   additional 45 million -- I'm sorry -- 54 million behind.

6       But the company got these critical funds that at

7   least enabled it to sort of land into Chapter 11, but we are

8   not done because we still need the additional -- there we go.

9   So this is --

10      THE COURT:  Oh.

11      MS. GEIER:  -- the petition date and here we are

12  showing what we propose for the debtor-in-possession financing.

13  So you can see the 54 million and 129 of the ABL facility

14  listed above.  And then now we have introduced the DIP

15  facility.  This is the funding that we need for these cases.

16      Then I'll explain later why we need it right now, but

17  just wanted to show visually sort of where it would sit in the

18  stack.  This is 40 million of new money, along with 200 million

19  of prepetition FILO loans that sort of get rolled into the DIP.

20      On the next slide, there's key terms to highlight and

21  you can see here again the 40 million of new money, referenced

22  to this rescue loan.  One of the most important things that we

23  see when we look at this roll-up is that there's actually 96

24  million at stake -- or there's 94 million at stake because you

25  have the 54 million over advance that was on just prior to the

1 filing and then this additional 40 million.

2        So when you look at them together, you're really

3 talking more about a 2-to-1 roll-up and we previewed that in

4 our papers, but I think it's an important point to sort of

5 level set on what may otherwise be, like, a more in -- what

6 people might find a more interesting aspect of this DIP.

7        And the second point to make, I think, is that these

8 are retail DIPs and particularly in a potential wind-down

9 scenario as we are facing here if the going concern is not

10 found, you often see full roll-up through the creeping ABL roll

11 ups.  You know, here we are in the slightly unusual position of

12 having this term loan of new money provided.

13        But what you see is very similar to what we have in

14 other retail deals.  You know, even my last retailer of -- in a

15 similar situation was Pier 1 and they had effectively the same

16 ratio involved.

17        And then finally, although the roll-ups do need to

18 occur -- the roll-up does need to occur upon entry of this

19 interim order, we do have -- I think very little harm comes

20 from it, simply because there are not really significant

21 unencumbered assets and the assets that are there, you know,

22 most of those are subject to final entry of the order.  So we

23 will still have the final order to really take up those issues.

24        A couple of other points on this slide is just to

25 highlight that there are very fair economic terms here.

1 Mr. Kurtz negotiating would point out that there is, you know,

2 a very reasonable origination fee and the rate on the DIP term

3 loan is actually lower than the prepetition FILO.  So the more

4 that is rolled up, you're actually paying a lower interest

5 rate.  So --

6          THE COURT:  But it's basically, what, five plus the

7 775, is that what it is or --

8          MS. GEIER:  Exactly.

9          THE COURT:  -- five --

10          MS. GEIER:  Yeah, in terms of the rate.  So the

11 prepetition FILO interest rate, so for the purpose of adequate

12 protection is that is that the default rate of SOFA, plus 9.75

13 and here we have SOFA plus 7.75.  So it's not insignificant

14 that we are able to pay a lower interest rate on that amount.

15          So why do we need this $40 million and what -- why do

16 we need it today?

17          THE COURT:  And the 54 million came in last week

18 for -- in the last --

19          MS. GEIER:  That's correct --

20          THE COURT:  -- several days?

21          MS. GEIER:  -- Your Honor.  Exactly.  So the debtors

22 had important freight obligations to pay.  You know, we have

23 really been playing catch-up as much as possible trying to keep

24 those -- we can't ship it out freight.  We can't move our

25 products from warehouses and distribution centers without those

1  freight costs, so those were critical.

2          There was payroll in there because although -- and

3  you'll hear from my partner, Mr. Hunter, about the various

4  aspects of the wages, but the weekly rates are paid at the

5  distribution center.  So that was a payroll week for

6  distribution centers and so that funding did need to go out and

7  without that funding, we wouldn't have been able to file here

8  because we couldn't be late.

9          But we still have a hole to fill and it's highlighted

10  right there.  So this is the budget that was filed with the DIP

11  credit agreement and it was actually filed, just to help with

12  reference, the docket number -- it was filed at Docket Number

13  41.  So in case you didn't see it when it was buried in all the

14  thousands of pages, we put it here.

15          So this is the hole that we need to fill this week.

16  So not in the future, this is right now.  And through this

17  first week, we pay payroll and benefits of 42 million and that

18  includes the funding of a $16 million WARN reserve and I can

19  talk about that in a moment.

20          It includes rent payment to our landlords.  It

21  includes May rent and it includes a portion of April stub rent

22  as well.  So we can talk about that a little bit more, if Your

23  Honor would like.  The freight is also in here.  That continues

24  to be a major cost throughout this process you'll see.  So

25  that's provided for, as well.

38

1          All these things together produce -- although we do

2     take in receipts from these sales, it produces still a deficit

3     of 30 million, so we do need the funding to occur so that we

4     can make sure we meet our obligations.

5          I want to highlight a couple of other very key and

6     important aspects from the DIP from the debtors' perspective,

7     key features that we have negotiated for that are contingent on

8     sort of this process working as we have set out.

9          There are three reserves provided for in the DIP that

10    are also our preserved path to a Chapter 11 plan.  The first is

11    a $15 million priority claims reserve.  So that insures that

12    the cost of doing business in Chapter 11 is you pay your

13    administrative and priority claims.

14         The debtors are aware of this and that's why this

15    reserve was created.  We have negotiated this with the DIP

16    lenders and they're committed to funding under certain

17    conditions.

18         The second is the WARN reserve.  As I mentioned, this

19    has been -- this is being funded this week.  This is WARN

20    dollars, so these are dollars that occur as a result of sending

21    WARN notices and there are certain requirements for paying a

22    set amount of wages in various states.

23         New Jersey, as Your Honor is probably aware, has a

24    new law in place that requires additional WARN payments to be

25    made.  So we have a lot of what you might consider WARN

39

1  payments in the regular payroll line of the budget.  But then

2  there's also the ones that get paid sort of more at the end,

3  and that's what this reserve is for.

4         THE COURT:  And that's the reserve is based on your

5  estimate of the liability or is it because I also read that you

6  intended to keep many employees on, even though you sent them

7  WARN Act notices?

8         MS. GEIER:  That's correct, Your Honor.  So although

9  we send the WARN Act notices, and we are in the process of

10 sending them today and the employees are aware of that, they

11 have been part of those conversations, for those that do

12 receive the WARN notices, they are going out today.

13        Parties do work through that time.  So we still need

14 employees in place to do all the important work of making sure

15 that these sales go through, facilitating the going-concern

16 sale process that we are still very much pursuing, and ensuring

17 that we can meet the various obligations of, you know,

18 employees, landlords.

19        We sort of need the whole army behind us and also the

20 store employees.  Obviously, we need them to be able to sell --

21        THE COURT:  Well --

22        MS. GEIER:  -- anything at the stores.

23        THE COURT:  -- oh, I'm sure.  I know you need the

24 employees.  I was just asking if that number is an estimate of

25 your liability giving effect to that you're going to keep a lot

1   of the people on or that's, like, a high number that is being

2   conservative and may --

3           MS. GEIER:  It may --

4           THE COURT:  -- be lower --

5           MS. GEIER:  It may be conservative.  There is

6   actually, we would say, that the total number is, in some ways,

7   33 million.  So 17 million of payroll going out that some folks

8   call working WARN.  It's WARN notice dollars.  You have been

9   noticed.  You continue to be paid through that period.  Those

10  dollars are provided for in the payroll line item of the budget

11  and so 17 million is already just agreed paid out for.  This

12  additional 16 million is for items, like, additional severance

13  weeks that come on top pursuant to New Jersey law.  Additional

14  time.

15          There are -- there's a very complicated calculation

16  that we can provide to Your Honor.  I'm probably not the right

17  lawyer of the group to provide it, but this does represent what

18  we believe to be the full liability and may -- may be even a

19  conservative estimate of that.

20          THE COURT:  Uh-huh.  Okay.

21          MS. GEIER:  And then additionally, there's the wind-

22  down reserve just to make sure that we can finalize the order

23  to leave wind-down of the debtors if we do reach that

24  circumstance.

25          THE COURT:  So, Ms. Geier, I'm just going to ask you

41

1  a question.  I'm going to stop you for a second and I'm --

2        MS. GEIER:  Yes, sir.

3        THE COURT:  -- I just want to ask a question as to

4  how this is all working in practical terms in the sense of you

5  have this, you know, as you called it, the $30 million hole to

6  fill in the first week, it appears, and then there's this $15

7  million reserve, $16 million reserve, $5 million --

8        MS. GEIER:  Uh-huh.

9        THE COURT:  -- reserve and there's a roll-up.

10        MS. GEIER:  Uh-huh.

11        THE COURT:  This might be a little bit of a -- I

12  don't know if you can answer it quickly or not but just for the

13  benefit of myself and I think for everyone around, because

14  there's a lot of words that are going around here and a lot of

15  documents, but it just, in simple terms, to understand how

16  these reserves are going to be funded --

17        MS. GEIER:  Um-hum.

18        THE COURT:  -- when there's only, right, 15, plus 16,

19  plus 5 is 36.  And so that did -- you know, there -- and I know

20  that's -- those are different items.  But I'm just saying --

21        MS. GEIER:  That's a great --

22        THE COURT:  -- it's a lot of money.

23        MS. GEIER:  Thank you, Your Honor.  You're -- that's

24  absolutely right, Your Honor.  Let me clarify.  These are not

25  all funded day one.  So the WARN reserve is funded day one.

42

1   The rest are funded through receipts coming in as we liquidate

2   the inventory.

3          So those are spread over time and they'll eventually

4   be fully reserved WARN dollars going in.  So $40 million draw,

5   single draw, today -- or rather tomorrow, assuming that we get

6   approval today.  We get the $40 million in.  The roll-up occurs

7   right away, so it becomes a $240 million DIP obligation with

8   the debtors.

9          Then we, while we have the WARN reserve immediately

10  funded, these other two reserves are funded over time.  And

11  then upon the satisfaction of certain conditions in the order,

12  those are released and all DIP liens, other liens are released

13  and so the -- those dollars just become the debtors' at the

14  point.

15         THE COURT:  Is there a line for the funding of the

16  reserve in the forecast that you have there?

17         MS. GEIER:  Yes, Your Honor.  If you go to

18  supplemental items, way --

19         THE COURT:  Yeah.

20         MS. GEIER:  -- down at the bottom right above net

21  cash flow is a line that says, "supplemental items," and it is

22  approximately a million dollars a week.  You can only see a

23  little bit of it here, but the rest of it is funded, you know,

24  throughout and over time.

25         THE COURT:  Okay.

43

1           MS. GEIER:  Just briefly.  There's also an adequate

2   protection package available and provided for under the DIP

3   financing, because it's also, of course, our consensual use of

4   cash collateral.  So we just wanted to show typical adequate

5   protection package and then this chart, which, you know, there

6   will be a quiz on later but I certainly hope we don't want to

7   go through in detail.

8           The DIP milestones are very similar to the ones that

9   Mr. Sussberg already highlighted, but I'll just briefly share

10  what our process looks like from here.  This is the time that

11  we have to finalize our plan to pursue our going-concern sale

12  process and either find our buyer or commence an orderly wind-

13  down through a Chapter 11 plan.  So we have 120 days

14  effectively to do that and we think that's enough time to get

15  it done.

16          THE COURT:  I hope so.

17          MS. GEIER:  So with that, Your Honor, unless you have

18  any questions about the details of the DIP, papers that we

19  filed, I do want to highlight that we did file a revised order

20  at Docket Number 69, I believe, just reflecting certain

21  resolutions with landlord, counsel representing various

22  landlords and also the Texas taxing authorities.

23          THE COURT:  And so just when you went to that

24  explanation with the supplemental items, which is the -- is one

25  million dollars a week essentially.

44

1          MS. GEIER:  Yes, Your Honor.

2          THE COURT:  And then right above that, it says,

3  "other RX flows," and I just don't know what an "RX flow" is.

4          MS. GEIER:  It's an excellent question, Your Honor.

5  I don't -- I know which line item you're talking about and I

6  don't know exactly what the substance of it is.

7          THE COURT:  Because RX is a prescription or

8  something.

9          (Laughter.)

10          MS. GEIER:  Well, fortunately those are not all the

11  costs of my medication.  I have --

12          THE COURT:  Well, I don't think that --

13          MS. GEIER:  -- a pretty good health plan.

14          THE COURT:  I don't think that's what that is.

15          (Laughter.)

16          THE COURT:  But I just -- I honest --

17          THE COURT:  -- you know, I'm being very frank.  I

18  don't know what that means, so --

19          MS. GEIER:  I can get that answer in, like, one

20  second --

21          THE COURT:  Okay.

22          MS. GEIER:  -- if you give -- okay.

23          THE COURT:  Yeah.  Right there would be good.

24          UNIDENTIFIED SPEAKER:  It's definitely not

25  prescriptions.

45

1            UNIDENTIFIED SPEAKER:  Sure it is.

2            THE COURT:  I'm sorry?

3            UNIDENTIFIED SPEAKER:  Same thing.

4            UNIDENTIFIED SPEAKER:  It's definitely not

5    prescriptions.

6            THE COURT:  No, no, I know.  I figured you guys were

7    going to answer though.

8            UNIDENTIFIED SPEAKER:  That's the other case.

9            MS. GEIER:  Your Honor, the various other

10   restructuring costs are reflected in that line item.  They're

11   not professional fees.  They're other costs of this case

12   process.  So I think any more detail than that and I think we

13   will actually have to get our declarant up here to answer the

14   question.

15           THE COURT:  Okay.  All right.

16                          (Pause)

17           MS. GEIER:  Thank you for that pause, Your Honor.

18           THE COURT:  Okay.  No problem.

19           MS. GEIER:  The line items though includes U.S.

20   Trustee fees for that's expected restructuring outflow.  In

21   addition, utility deposits so that's why there's that up-tick

22   in week three.  It reflects that deposit being placed.  And

23   then also freight items also appear in that line item --

24           THE COURT:  That was a big number --

25           MS. GEIER:  -- as well.

46

1          THE COURT:  -- the freight --

2          MS. GEIER:  Yes.

3          THE COURT:  -- the freight items was --

4          MS. GEIER:  Yes.

5          THE COURT:  -- a big number, like --

6          MS. GEIER:  Exactly.

7          THE COURT:  -- 17 million or something like that.

8  And so that -- in other words, that's going to be -- okay.  So

9  that's just going to be paid from the cash flow, in other

10 words?

11         MS. GEIER:  That's correct, Your Honor.

12         THE COURT:  Okay.  All right.

13         MS. GEIER:  So --

14         THE COURT:  Those are my questions.  Thank you,

15 Ms. Geier.

16         MS. GEIER:  You're welcome.

17         THE COURT:  I hope I pronounced --

18         MS. GEIER:  Thank you, Your Honor.

19         THE COURT:  -- your name correctly.

20         MR. HILLMAN:  Good afternoon, Your Honor.

21         THE COURT:  Good afternoon.

22         MR. HILLMAN:  David Hillman, Proskauer Rose, on

23 behalf of 6th Street Specialty Lending as the DIP agent and

24 FILO agent.

25         May I be heard just to talk about the DIP and not

47

1  spend too much time on how we got here, but just to offer --

2  you heard from Mr. Sussberg who walked through, in about 30

3  minutes, the company's perspective of how we landed here.  I'd

4  like to use three minutes --

5          THE COURT:  Okay.

6          MR. HILLMAN:  -- to just give you the perspective of

7  the --

8          THE COURT:  You could take four or five.

9          MR. HILLMAN:  Okay.

10         THE COURT:  It's okay.

11         MR. HILLMAN:  I won't go over that.

12         So our perspective.  You heard from Mr. Sussberg

13  about the company having been around for 52 years.  6th

14  Street's relationship with the company is not even a year old.

15  The initial loan that 6th Street and the FILO lenders made was,

16  as you heard, $375 million in August and it was to provide

17  liquidity for the company's turnaround plan that you heard

18  Mr. Sussberg describe.

19         The company used those loan proceeds, in part, to pay

20  overdue vendors and to get vendor support going forward.  Going

21  into, as Mr. Sussberg talked about, the critical holiday

22  season, the company was significantly off its plan and, you

23  know, the poor results during the holiday season started a

24  rapid, downward spiral.  So within a quarter, after making that

25  loan, the company's liquidity position was substantially off.

1  I think the numbers are more than 530 million off their plan.

2      During the next four months the company, while in the

3  some extreme distress, did try the maneuvers that Mr. Sussberg

4  outlined and they were unsuccessful.  And during that entire

5  time, 6th Street and FILO lenders worked with the company to

6  try to right the ship.  This was a challenge.  At all times we

7  worked with the company to try to avoid the collapse of an

8  iconic brand and we provided hundreds of millions of dollars to

9  the company, which preserved jobs and it supported payments to

10  landlords, vendors, shippers and suppliers.

11      This is interesting.  In four months, 6th Street and

12  the FILO lenders agreed to amend or waive their loan agreements

13  five times.  And you heard Mr. Sussberg talk about that support

14  of the lenders, including by way of paving the way to provide

15  $100 million in February, which allowed for the de-acceleration

16  of the loan that you heard about.  This created some additional

17  liquidity to operate, but the company was hemorrhaging cash and

18  you heard about the two equity transactions.

19      Last week -- now I'm approaching into the DIP here --

20  the company approached 6th Street about providing DIP financing

21  for an orderly liquidation.  At that point, the company's

22  financial situation was so dire they needed money just to get

23  into bankruptcy.  You asked about when that loan was made.  It

24  was a two-step process.  The loan was funded one business day

25  ago, Friday at 9:15 in the morning.

1           THE COURT:  Oh.

2           MR. HILLMAN:  Now, I think it's clear.  We had I'll

3 call it a pre-DIP rescue loan on Friday and here we are today,

4 $54 million on Friday morning and here we are Monday, 3:15 with

5 another $40 million.  So the FILO lenders would have much

6 preferred to make a DIP today, not one on Friday and not one

7 today for 94, 95 million dollars.  That wasn't an option.

8           The company needed the what I'm referring to as "the

9 rescue loans" to make some critical payments and the rescue

10 loan nominally was made by the ABL lenders.  But because of the

11 over advance that you saw on the chart that was put up in

12 connection with the DIP, for all intents and purposes, it was

13 funded by 6th Street and the FILO lenders because their

14 recovery is last out.

15          So that was our economic stake that funded Friday.

16 So when you think about this, we didn't want to make a loan on

17 the eve of bankruptcy.  We did it again to support the company

18 and so the second step of the process is the more traditional

19 piece of this DIP, the $40 million.

20          So, look, we wish that there was a different outcome

21 and I'm going to walk through the DIP and I want to tackle the

22 questions that you asked Ms. Geier, so that there's no

23 ambiguity or confusion for Your Honor.

24          You asked about the funding of the reserves and you

25 got the numbers right.  They're in the DIP order.  It's in

1  paragraph 10.  And they are funded, the priority reserve is

2  funded roughly $900,000 a week from the proceeds of the

3  liquidation of the inventory.

4          THE COURT:  Right.

5          MR. HILLMAN:  And that's what the budget

6  contemplates.  There's a cadence to the funding of the reserve.

7  All the reserves are funded in accordance with the budget.

8          You heard about the WARN reserve.  I believe the

9  budget contemplates that that's funded next week and the other

10  reserve, the wind-down reserve, is filed later in the cadence

11  of the budget.

12          We talked about the roll up.  And, again, I think

13  this is an important piece.  We should look at the totality of

14  the economic context.  And when you look at the totality of the

15  economic context, it's for all intents and purposes a $95

16  million DIP with a $200 million roll-up.  And, yes, that is

17  contemplated to happen at the interim order.

18          So my job is to make sure that if there's any

19  ambiguity in your mind about the DIP or any of its terms, that

20  I'm here to answer them directly and concretely, so anything

21  that you have to ask, I want to be responsive.

22          THE COURT:  Well, I mean I think that the question

23  people have is, you know, how that 200 million impacts the rest

24  of the stakeholders and how that changes things so that, you

25  know, obviously you or your client is not doing it

1 altruistically.  It's a business and this is a tough situation

2 and I completely understand that, but I think that's where the

3 people might have questions.

4          MR. HILLMAN:  Right.  And so the roll-up was always

5 part of the economic consideration for doing the transactions

6 for providing yet another round of additional capital.  And

7 importantly, the roll-up is subject to the challenge period and

8 that's specifically set forth in the order that's before Your

9 Honor.  So I think that's the sort of safety net to deal with

10 this.  It happens on the interim and it is an inextricable

11 component to the willingness to provide this company with yet

12 another round of additional capital, right?

13          We stepped up in August to provide financing.  We

14 stepped up in February to provide another 100 million.  Five

15 amendments in four months.  We have provided stabilizing

16 capital in support for the company and to do it yet again, this

17 is simply the terms of the proposal holistically before the

18 Court and that the parties have been able to reach at the

19 negotiating table.

20          The other piece that I would mention, there's the

21 interest that I think you asked about on the roll-up.  It's not

22 paid in cash.  It PIKs.  So that's another piece that provides

23 additional liquidity to the company.

24          THE COURT:  Well --

25          MR. HILLMAN:  Have I answered your questions?

52

1          THE COURT:  -- that's --

2          MR. HILLMAN:  Okay.

3          THE COURT:  -- that --

4          MR. HILLMAN:  I --

5          THE COURT:  The PIK is a payment in kind?

6          MR. HILLMAN:  Yeah.  Yes.

7          THE COURT:  Yeah.

8          MR. HILLMAN:  So I appreciate you allowing me the

9   time to share our perspective and look forward to an

10  opportunity to be before Your Honor and to work with the other

11  stakeholders in the case.  And any questions about this that

12  needs to be directed to me, I'm here and ready to answer those

13  questions.

14          THE COURT:  Well, and here -- Mister -- I just want

15  to say.  The FILO facility at -- is right, I guess, the

16  principal is 547 million.  The ABL is 80 million ahead of it.

17  That's, like, 620 million.  Between the two of them, as I

18  understand it, that is collateralized by maybe not every singe

19  asset of the debtor's, but substantially all the assets of the

20  debtor's?

21          MR. HILLMAN:  There are some assets that are not

22  currently encumbered, some property and some real estate.

23          THE COURT:  That's not --

24          MR. HILLMAN:  And I believe it's also when you

25  identify the litany of claims, I think there are also 100

53

1  million of letters of credit outstanding, as well.

2         THE COURT:  Okay.  All right.  Thank you.

3         MR. HILLMAN:  Thank you.

4         THE COURT:  Thank you, sir.  That was helpful.

5         MR. HUEBNER:  Good afternoon, Your Honor.  For the

6  record --

7         THE COURT:  Good afternoon.

8         MR. HUEBNER:  -- Marshall Huebner of Davis Polk on

9  behalf of JPMorgan as ABL agent.

10        I will take about two minutes.  So --

11        THE COURT:  Okay.

12        MR. HUEBNER:  -- I'm well shorter than Mr. Hillman.

13        First, let me begin by noting that Mr. Sussberg's

14 lyrical and entirely appropriate opening was, in some ways, too

15 modest because he shared with this Court the aspiration that

16 people would be able to go with their wives and mothers to Bed

17 Bath for many decades to come, but yet he described himself, of

18 course, as a father --

19        THE COURT:  Uh-huh.

20        MR. HUEBNER:  -- and a husband who's done that.  And

21 as someone took four girls to college and moved three of them

22 into apartments and two of them through pregnancy, I could echo

23 those stories of all the different Bed Baths in --

24        THE COURT:  As I can.

25        MR. HUEBNER:  -- in one's life.  So I guess I'm in-

54

1  between the generations here since --

2          THE COURT:  Yeah.  Yeah.

3          MR. HUEBNER:  -- I have grandchildren --

4          THE COURT:  I'll give you that.

5          MR. HUEBNER:  -- as well.  So just a couple of other

6  quick things, Your Honor.

7          Number one, in terms of the support of the lenders,

8  and to be a little bit more precise about a couple of things,

9  there were actually five amendments in the last three months as

10 the debtors worked through trying to raise money.  The ABL over

11 advance that was done last Friday with the consent of the FILO

12 lenders by the ABL lenders was $54 million and closed late

13 morning.  Your Honor, to be clear, as I think was ultimately

14 corrected, but let's say it once and say it right, there's $83

15 million -- I think it's 82.8 -- of outstanding loans and about

16 102 million at LCs.  Those are the ABL obligations.  It's those

17 two things together.  It's letters of credit, as well as the

18 borrowings.

19         Your Honor, Mr. Sussberg talked about a series of

20 firsts.  I'm going to talk about a professional first certainly

21 for me and I have been doing this for a rather long time.  The

22 deceleration of the ABL facility is something that in more than

23 30 years of practice I have never even not only not seen,

24 didn't even imagine was possible to get 100 percent syndicate

25 vote in a broadly syndicated ABL facility to put essentially

1   the debtor back in the ability to borrow.

2          The debtors use that ability intensely, as they were

3   supposed to and should have and did.  Just so the Court is

4   aware, there were approximately 40 borrowings since the

5   February reinstatement essentially of the facility that totaled

6   $757.528 million.  So in addition to having access to segments

7   of the equity proceeds that were raised and the like, the re-

8   opening of the tap was another expression of support by the

9   lenders to let the debtors explore.  As you have heard today,

10  they will continue to explore every possible available option

11  to figure out how to do the best they can by the many

12  stakeholders of this storied and, indeed, iconic brand.

13         Your Honor, the only other thing I would mention and

14  with that I'm done as I promised you -- I have very little to

15  say this morning -- is that the DIP order, while it's called

16  the DIP motion and the DIP order, as Ms. Geier pointed out near

17  the end of her presentation, also contains the adequate

18  protection package for the secured lenders.  It's not, I think,

19  particularly analytically interesting.  I don't imagine it's

20  going to drawn much attention from anybody.  We are an ABL

21  lender and that is an extremely safe facility that has a first

22  lien as the Court asked about and was answered.  Not only a

23  blanket lien on virtually all assets, but in particular in a

24  retail case, a blanket lien on all current assets, right?

25              THE COURT:  Uh-huh.

56

1      MR. HUEBNER:  And so you're talking about inventory

2  and receivables and cash and securities and net equity and LCs.

3  And so ABLs are designed to be lost cost facilities because

4  they are very, very safe and they are very, very over secured

5  and so I don't imagine that we will be interesting to anybody

6  in this case.  But should we end up interesting, obviously

7  we're here to explain not only what the ABL --

8      THE COURT:  But --

9      MR. HUEBNER:  -- lenders did but they're, I think,

10  quite extraordinary support of extraordinary efforts by a

11  company to figure out how to do the best that it can.

12      THE COURT:  But between -- as I was saying before, -

13  between the ABL and the FILO, there's, you know, whatever,

14  seven-or-so hundred million that's out there.  And that is --

15  but one way or another, however this all shook out in the

16  Chapter 11 reorganization or wherever we would be, that 700

17  million was secured by virtually everything except the real

18  estate and whatever else exceptions there are.

19      MR. HUEBNER:  Yeah.  And even the real estate, Your

20  Honor, it was some of the real estate that was outside and just

21  so the Court knows, today is certainly not the day for this

22  conversation.  I don't think any day will be the day for this

23  conversation.

24      But so that the Court is aware, their presentation

25  referred to an over advance of $193 million in February.  I

57

1  actually believe the exact number was 198.33, but that's okay.

2  On that date, so the Court knows, there was approximately $694

3  million outstanding.  I believe that the collateral was very

4  comfortably double that, even at the lowest possible point.

5  When you add up all of the inventory, all of the receivables,

6  the debtors' own auction rate securities, they own extremely

7  valuable intellectual property, as you might imagine.

8        In many sort of, you know, precedent, iconic retailer

9  cases, Polaroid, Kodak, and the like, you know, the IP alone

10  fetched very, very substantial value.  And so Your Honor is

11  correct.  The current loan balance, you know, when you add our,

12  whatever it is, 185 to the 575-ish of the FILO, you measure

13  that against virtually the company's entire asset base, and

14  even back in February, I don't think there's any possible

15  question.

16        My memory is that the gross inventory alone was

17  assessed at 1.072 billion on the date of the over advance when

18  the borrowing base certificate was delivered and that's even

19  leaving aside hundreds of millions of dollars.

20        Again, please don't hold me to this.  I'm doing this

21  from ancient, tired memory.  I think the IP forced liquidation

22  value is really, like, 168.  I mean there's just another 100

23  here and another 40 there and auction rate securities that were

24  actually monetized after the February over-advanced date for

25  tens of millions of dollars.

58

1           And so, yes, I think that, you know, we'd be

2    surprised if anyone did not share the view that there was over

3    collateralization to a very substantial degree at all points as

4    an ABL facility is designed to have.

5           THE COURT:  Okay.  Thank you, sir.

6           MR. HUEBNER:  So unless there are further questions,

7    Your Honor, have a good afternoon.

8           THE COURT:  Thank you.

9           Ms. Steele?

10          MS. STEELE:  Thank you, Your Honor.  Good afternoon.

11   Fran Steele on behalf of the U.S. Trustee.

12          Your Honor, as you're aware, the interim order that

13   was filed, and I'm showing Your Honor, is well over 100 pages.

14   Holding it up for you.  And as you can imagine, the attorneys

15   involved had days, weeks, months to negotiate and look at this

16   order and we were given the order on Saturday, which we

17   appreciate receiving in advance, but the fact of the matter is,

18   is that the order was put on the docket yesterday, which gives

19   most parties in interest one day to review this order.

20          And the order contains various extraordinary

21   provisions including the roll-up.  And the US Trustee worked

22   with counsel regarding many of the extraordinary provisions and

23   our changes were accepted and they're reflected in this order.

24          The remaining issue is the request for the roll-up

25   today one day after the case was filed.  And we don't object to

the roll-up *per se*, Your Honor.  We object to the timing.  We submit that the roll-up should not be granted on this first day but, instead, should be on a second day hearing after a Committee has had a chance to review.  And we respectfully inform the Court that the challenge period doesn't adequately give the Committee a chance to totally review the roll-up.

And on that basis, the U.S. Trustee objects to the roll-up and we ask Your Honor not to grant the roll-up today, to push the roll-up provision to the second day hearing.  And in the event Your Honor does grant the roll-up today, then we would ask that there be some provision in the order allowing the Committee to actually review the roll-up provision and unwind the provision should it be warranted.

THE COURT:  Didn't we just hear from counsel that one of the reasons that it's -- well, that it was critical, first of all, that it was a key component of the deal and without it, there would not have been a deal.  But didn't we just hear from them -- from -- I'm sorry.  I don't remember which man it was that --

MR. HILLMAN:  Mr. Hillman.

THE COURT:  Yes.  So that it was -- the challenge to that is allowed and it's preserved.

MS. STEELE:  And does that challenge provide for the unwinding of the roll-up should the Committee find that it's not proper --

1           THE COURT:  Well --

2           MS. STEELE:  -- and not warranted or does it --

3           THE COURT:  -- but --

4           MS. STEELE:  -- just challenge the validity of the

5    liens?

6           THE COURT:  Well, I mean, if you're challenging the

7    validity of the lien or you're challenging the roll-up or

8    whatever you're challenging, there's a pretty significant

9    person behind the counsel there and I mean, to me, that means

10   if it's -- the purpose of challenging it is to get it back, I

11   guess.  I don't know what else it is.

12          MS. STEELE:  If that's --

13          THE COURT:  I don't know --

14          MS. STEELE:  -- what Your Honor is saying, that that

15   challenge encompasses that, then the U.S. Trustee would accept

16   that representation and if that's in the order, then we would

17   not object today.  But we just wanted to make sure, as Your

18   Honor knows, the Committee review is extremely important and we

19   want the Committee to be able to review these provisions.

20          THE COURT:  Okay.

21          MR. HILLMAN:  May I approach, Your Honor?

22          THE COURT:  Absolutely.

23          MR. HILLMAN:  Thank you, Your Honor.  For the record,

24   David Hillman for the FILO agent and DIP agent.  So paragraph 8

25   of the order says that upon entry of the interim order and

1   subject to paragraph 43, the roll-up occurs.  Paragraph 43 is

2   the so-called challenge period.

3        So the issue is the challenge period is, I would say,

4   plain vanilla, garden variety things that a party with standing

5   can challenge and it is lien priority.  It is validity.  If

6   there's something defective with the debt that's rolled up,

7   there is a remedy.

8        But I think what we're hearing from the U.S. Trustee

9   is something different.  The U.S. Trustee wants to preserve the

10  ability for someone to come back here at the final order and

11  say, don't roll up valid debt or roll-up less valid debt.  That

12  is foreclosed.  That decision -- and this is a point that I

13  don't think I made before that I think is worth emphasizing.

14  The $40 million DIP is a single-draw term loan.  It's out the

15  door tomorrow.  It's out the -- maybe even out the door today.

16  Okay.

17        THE COURT:  Yes.

18        MR. HILLMAN:  So if we're going to provide the

19  benefit of our bargain, then the panoply of rights that we're

20  expecting can't be yanked back from us after we've provided

21  that capital.

22        Now, the safety net is what the Court has seen in

23  innumerable cases before you of a challenge period, but it is

24  not the freedom to come back and simply undo the roll-up unless

25  they bring a challenge.  The challenge is, among other things,

1  the validity and priority of a debt and there's a long list of

2  the things typical, right down the middle of the fairway,

3  challenge period.

4         The relief that the U.S. Trustee, with all due

5  respect, is asking for is far broader and effectively would

6  require the Court to deny the roll-up.  And I think I have been

7  clear on this, and the debtors can supplement this point, there

8  is no possibility of doing the $40 million financing without

9  the roll-up.

10        They are intrinsically linked and it's subject to the

11  challenge period.  And I think that is the protection that

12  could give the Court comfort to know that if someone seeks to

13  challenge the rolled-up debt for any one of the reasons in the

14  paragraph 43, they have the ability to do so.

15        THE COURT:  Well, and isn't that the way it always

16  goes?  I mean that's the way it is.  It's if you challenge it,

17  the challenge doesn't happen in one minute.  It happen --

18  there's an adversary proceeding or a motion or something filed

19  and my guess is -- I don't know, maybe I'm going out on a

20  limb -- I would say a challenge would be vigorously defended.

21        So I think the issue about taking it -- you know,

22  taking it back or immediately or -- I don't know.  It sounds

23  like a disgorgement or forfeiture you're talking about.  That's

24  not my understanding of a challenge.  So that -- I was -- and

25  even to Ms. Steele's comment and, I guess, objection is that

63

1  the Creditors' Committee is going to be appointed, what, in

2  about a week?

3          MS. STEELE:  Yes, Your Honor.

4          THE COURT:  Right.  And they're going to get on this

5  right away.  They're going to get on it immediately, like

6  happens in every case when there's this kind of thing at stake,

7  and if they have an issue, they'll let you know about it and

8  you'll see what it is and if they, you know, want to challenge

9  it, they'll challenge it.

10         But they have to challenge it in accordance with due

11 process and all those things and it'll be a -- probably a

12 contested matter one way or another that would allow,

13 ultimately, for that money to come back --

14         MR. HILLMAN:  And I think --

15         THE COURT:  -- but only after you win --

16         MR. HILLMAN:  -- and I --

17         THE COURT:  Well, not you.  But, you know, the -- but

18 after the Committee wins or whoever has standing wins.

19         MR. HILLMAN:  And I appreciate Your Honor's color and

20 I think what we're saying is the same thing.  That is, the

21 unwind is not the remedy at the final order.  It is the ability

22 to bring a successful challenge under paragraph 43 of the DIP

23 order to the debt, not to the roll-up.  And if there's an issue

24 with the debt as a result of a successful challenge, then

25 there's an ability to deal with that.

1          THE COURT:  Well, and then they're also saying the

2    priority and validity.  I think they're saying --

3          MR. HILLMAN:  Oh, yes, yes.  I'm sorry.

4          THE COURT:  Yeah.

5          MR. HILLMAN:  Yes.  But not --

6          THE COURT:  But --

7          MR. HILLMAN:  -- not the roll --

8          THE COURT:  -- not just the debt.

9          MR. HILLMAN:  Not the roll-up.  The roll-up is a

10   today issue.  The roll-up cannot be undone by simply raising an

11   objection at the final hearing in 30 days.  There is a path

12   under paragraph 43 to bring a challenge.

13         THE COURT:  Um-hum.  But 40 million is not coming in

14   otherwise, is what I'm hearing.  Okay.

15         MS. STEELE:  And I understand that, Your Honor, and

16   with those representations that the Court stated regarding the

17   challenge and the ability of the Creditor's Committee, the U.S.

18   Trustee will withdraw its objection.

19         THE COURT:  Oh, okay.  Well, that's -- I'm glad to

20   hear it.  And I don't think I said anything different than

21   what's in there, so --

22         MS. STEELE:  Oh, you clarified, Your Honor.

23         THE COURT:  I --

24         MR. HILLMAN:  Yeah.

25         THE COURT:  Color.

1              MR. HILLMAN:  Because the color and clarification is

2  so critical to the DIP lender's perspective, I think it would

3  be important for me to unequivocally state that once the Court

4  enters the DIP order, the roll-up cannot be reviewed at the

5  final order.  The remedy for a Creditor's Committee or a party

6  with interest withstanding is to bring a challenge under

7  paragraph 43 of the DIP order.  Is that your understanding --

8              THE COURT:  You could --

9              MR. HILLMAN:  -- Your Honor?

10             THE COURT:  That could not be clearer and I

11 appreciate the candor and directness.

12             MR. HILLMAN:  Thank you.

13             THE COURT:  Ms. Geier?

14             MS. GEIER:  Your Honor, I think we heard that the

15 United States Trustee's objection was withdrawn.  So we are

16 now --

17             THE COURT:  I heard that.

18             MS. GEIER:  -- fully consensual.

19             (Laughter.)

20             MS. GEIER:  I'm not sure who accomplished it, but --

21             THE COURT:  So you have nothing --

22             MS. GEIER:  -- here we are.

23             THE COURT:  -- to address right now?

24             MS. GEIER:  So --

25             THE COURT:  Is that it or that -- or you still have

1  something to address?

2          MS. GEIER:  No, Your Honor.  I came --

3          THE COURT:  Oh.

4          MS. GEIER:  -- back to the podium because I was

5  hoping to seek your approval and also, you know, just to get on

6  with the other items that we have after it because --

7          THE COURT:  Yeah.  Yeah.

8          MS. GEIER:  -- we do have a busy day.

9          THE COURT:  And I just want to say that then, before

10  you start, Ms. Geier, is that I did review the papers and the

11  debtors are represented by some of the most sophisticated,

12  knowledgeable, experienced professionals, not just legally but

13  financially and business-wise in every way.

14          And if there was one thing that came through from the

15  papers, and even this last presentation, is that this 40 -- two

16  crystal clear things.  This 40 million was not coming unless

17  they got the protections in the order and in the roll-up, as an

18  example, and without the 40 million, this iconic brand was

19  probably going to go into a fire sale unorganized, very valued

20  depreciating liquidation immediately.

21          And, you know, business judgment, the business

22  judgment in this case is far beyond me and I can't question the

23  recommendations and advice of all these extremely knowledgeable

24  professionals.  It was -- it's something that needed to be

25  done.  The only way it could be done and is the only way that's

67

1  going to give everyone on that Bed Bath & Beyond side the

2  chance to make another thing happen that people didn't think

3  could happen.  And I hope that's the way it goes, but either

4  way, there's a pathway to do it in an organized way without the

5  facilities that we have here.  That pathway was burning and I'm

6  -- and I don't think that's the proper result.  So I'll approve

7  the DIP financing order.

8          MS. GEIER:  Thank you, Your Honor.

9          MR. MAYR:  Your Honor --

10         THE COURT:  Oh.

11         MR. MAYR:  May I be heard?

12         THE COURT:  I'm sorry.

13         MR. MAYR:  Yeah.

14         THE COURT:  Who is that?

15         MR. MAYR:  This is --

16         THE COURT:  Mr. Mayr?

17         MR. MAYR:  Yeah.  This is Mayr, Glenn Agre --

18         THE COURT:  There's a --

19         MR. MAYR:  Bergman and Fuentes.

20         THE COURT:  There's -- I'm on -- something happened

21 on my screen here.

22         Okay.  Go ahead, sir.

23         MR. MAYR:  Can you hear me okay?

24         THE COURT:  Yes.  Yeah.

25         MR. MAYR:  Great.

68

1          THE COURT:  I just couldn't --

2          MR. MAYR:  Thank you.

3          THE COURT:  -- see you.

4          MR. MAYR:  Thank you.  It's hard when you're not in

5   the courtroom and I guess I'll start thank you for indulging me

6   today to participate remotely.  I just couldn't physically get

7   there from Connecticut in time today.  And I also want to say

8   it's nice to see Mr. Sussberg without the full arm sling on

9   that he had last week in court.  He looks like he's -- oh, it's

10  there.

11         THE COURT:  Oh.  It's still --

12         MS. GEIER:  He still has it.

13         THE COURT:  It's still here.  It's still --

14         MR. MAYR:  He --

15         THE COURT:  -- here, but he --

16         MR. MAYR:  He was wearing at the -- but he was

17  wearing at the podium last week.  So there's some --

18         THE COURT:  Yeah.

19         MR. MAYR:  -- improvement.  Uh-huh.

20         THE COURT:  That was --

21         MR. SUSSBERG:  Progress.

22         THE COURT:  He showed it to me, though.

23         MR. MAYR:  You know, as I mentioned, we represent a

24  number of investment funds and institutional investors who own

25  the unsecured bonds of the company.  The unsecured bonds are,

1  as you have seen today, you know, a billion dollars and the

2  largest part of -- the largest segment of the company's

3  financed debt.

4          We're here to, you know -- we want to work

5  collaboratively with the debtor.  We want to maximize value.

6  We want to be, you know, constructive to get to a resolution

7  that works for all stakeholders.

8          We do have some concerns about the process, as you

9  would imagine, but -- and primarily, you know, with respect to

10 the cost and the timing of the process, we don't want a rushed

11 process that's serving only the secured lender's agenda.  I'm

12 not saying that's the case now, but it is something that we

13 want to discuss with the debtors in terms of where they've been

14 and how they want to get to where they want to go.

15         We also did want to -- no objections today on an

16 interim basis obviously given that you've already ruled, as

17 well, but we do want -- you know, we do reserve rights to the

18 final hearing.  Particular would note that, you know, we may

19 have issue with a certain incremental collateral or liens on

20 avoidance actions going to the DIP.

21         But at the end of the day, our clients, like you've

22 heard today, believe in this iconic brand and, in particular,

23 the valuable asset in buybuy BABY, value NOLs and various other

24 pockets of value that we've heard Mr. Huebner speak to today

25 that we hope will lead to distributions well beyond the secured

1  creditors in this case.

2          So, you know, we look forward to working with the

3  Court and the debtors' representatives to find the best

4  possible outcome here for the states and their stakeholders and

5  we reserve our rights for the final hearing.

6          THE COURT:  All rights reserved.  And I -- and if

7  past is prolonged, Mr. Mayr, you know, the -- it seems like

8  there's been a lot of hard fought, but good faith negotiations

9  between the parties that allowed things to happen, you know,

10  when things didn't seem like they could happen, when deadlines

11  were passing, and my hope is that it continues going forward.

12  And it's not just my hope, it's my belief that that's the way

13  things will go.

14          MR. MAYR:  Share your hope.  Thank you.

15          THE COURT:  So thank you, sir.  All right.  So no --

16  there's still no objections, Ms. Geier.

17          MS. GEIER:  Thank you, Your Honor.  I thought I was

18  going to have to invoke the enshrined courtroom rule of no

19  take-backs.

20          (Laughter.)

21          MS. GEIER:  But I'm glad that we did not reach that.

22          Your Honor, if we have closed the DIP chapter, I

23  might move toward the next item on the agenda, which is the

24  bidding procedures motion.

25          THE COURT:  Okay.  Let's go.  Bidding procedures.

71

1          MS. GEIER:  Bidding procedures.

2          THE COURT:  Oh, there's a --

3          MS. GEIER:  And just one --

4          THE COURT:  I'm being handed a revised order.

5          MS. GEIER:  That's correct, Your Honor.  You are.

6  You're being handed a revised order that has been submitted to

7  chambers.  It is not on file yet, to my knowledge, but we

8  wanted Your Honor to have what is the fully agreed form of

9  order in your hands while we went through it.

10          But just to take a step back for one moment, the

11  original motion was filed at Docket Number 29.  It contained

12  all of the documents, so you didn't have to go hunting through

13  the rest of the docket for the declarations and such.  But what

14  you'll see in Mister -- in the Lazard declaration and

15  Mr. Kurtz's declaration is a long process that has been ongoing

16  for some time seeking for strategic investors, going-concern

17  buyers.  There was financing searches in there, as well.

18          So really where we are now is the continuation of

19  that six-month process, except now we get to do it on a

20  national stage.  We get to do it with everyone aware that Bed

21  Bath & Beyond and buybuy BABY are for sale.  They're available

22  to the highest bidder and we want those bidders to come forward

23  and we are prepared to work with them as quickly as we need to,

24  to document that transaction in whatever form it takes.

25          So obviously we are looking for, first and foremost,

1 a going-concern buyer for this company.  We want -- we have not

2 only an iconic brand to protect, but we also have 14,000

3 employees that we want to be able to keep as many of those jobs

4 intact as possible.

5 That's it.  I, you know, share everyone's experiences

6 with Bed Bath and I want to be able to take my daughter college

7 shopping there, too.  I want to take my sons there college

8 shopping if we're fortunate enough for them to make it to

9 college.  The daughter definitely.  We'll see about the boys.

10 (Laughter.)

11 THE COURT:  I hold out hope there, too.

12 MS. GEIER:  And so to the extent --

13 MR. HUEBNER:  Your Honor, I'm counsel to her son and

14 I object.

15 (Laughter.)

16 MS. GEIER:  I knew that he would retain excellent

17 counsel, so that is concerning for my future then.

18 So on this, there are a lot of documents attached

19 here and there's a full suite of there are stalking horse

20 bidding protections.  You know, there's a form APA.  There's

21 the form and notice of auctions.  There are notice of

22 procedures for the assumption and assignment of those contracts

23 and leases attached should we find that going-concern buyer.

24 That's because we cannot afford delay in having all

25 of that in place should someone come knocking on our door.  So

73

1  we want to make sure that those items are in place and we have

2  very specific milestones to meet and, you know, if it's not

3  going-concern buyer, then maybe it's these iconic brands.  And

4  certainly these iconic brands have a lot of value and will

5  continue to this day.

6       You know, we know that brands like Toys 'R Us,

7  they -- the actual stores didn't make it through the

8  restructuring process, but the name did and so it's now

9  reviving and that's, at the very least, the story we want to be

10  able to tell here for Bed Bath & Beyond and buybuy BABY.

11       So with that, Your Honor, the -- I think the most

12  important aspects of this are the tight timeline.  So we would

13  have an auction.  We have a bid deadline of May 28th.  If a

14  party wants to serve as our stalking horse bidder, that's

15  May 22nd, so not a lot of time from now.  Those are dictated by

16  the DIP required milestones, so these are not flexible end

17  dates, although we do have built in flexibility in the motion

18  to move dates around.  At the end of the day, our DIP budget --

19  our DIP order says what it says and we have to have that sale

20  hearing and order approved on June 7th in order to get that

21  approved.

22       We have added in a couple of extra dates into the

23  schedule, so adequate assurance packages need to be delivered

24  by May 29th, which is the day after the bid deadline to ensure

25  that landlords have adequate time to review those packages.

74

1          We have moved the objection deadline to two days

2    before the sale hearing to June 5th instead of June -- so

3    June 7th would be the sale hearing, June 5th being the

4    objection deadline.  So we are -- we have made a few changes

5    around the edges, but the absolute dates have not changed,

6    which is that June 7th end date.  That's 45 days from the

7    petition date under the DIP milestones and we will use every

8    bit of that time to ensure that we get the best value possible

9    for the company and/or its brands.

10         One thing I do want to flag is that this motion does

11   not cover one-off lease sale -- you know, one-off lease

12   assumption assignments, one-off lease termination agreements.

13   Those will be pursuant to a separate motion that we are getting

14   on file as soon as humanly possible.

15         And so you won't see that in these documents but just

16   going to point out those are not covered here.

17         THE COURT:  Those are things that are percolating or

18   that those are things that are -- that you're talking about

19   now --

20         MS. GEIER:  Exactly.

21         THE COURT:  -- the one-offs?

22         MS. GEIER:  Exactly.  You know, we do have A&G Realty

23   as the sort of the restructuring real estate advisors involved

24   in this process, as well.  So they're out there soliciting and

25   looking for potential parties that may be interested in an

75

assumption and assignment of certain leases or with particular

landlords may want to enter into those individual termination

agreements as we exit the stores over time through the going-

out-of-business sales.

But for right now, you know, this is our main primary

absolute focus, but we will be doing that sort of

simultaneously to ensure that we have maximized all value and

resources that we have to monetize.

So there are a couple of declarations attached to

this motion that I just want to flag all together at Docket

Number 29. So I just want to ensure that those get into the

record. There is the Lazard declaration. Mr. Kurtz also

served as declarant for this motion, as well as Elise Frejka.

She is the party that reviewed the consumer data privacy

provisions to sort of get out in front of any concerns where we

have -- if we have consumer data involved here.

It's her review of the policy that just says we're

not asking for relief around it. We're just -- it merely says

a consumer privacy omnibus likely is not required here simply

because we have done all this review and, in her opinion --

she's done this in many, many cases -- in her opinion, this

data and what the bounds would be to make it part of a sale

process is sort of laid out in there and why we don't really

need a consumer privacy omnibus here.

THE COURT: I'm sure the U.S. --

1           MS. STEELE:  I --

2           THE COURT:  -- Trustee will --

3           MS. STEELE:  Yes, Your Honor.  We preliminarily

4    reviewed the privacy policy and we have had some preliminary

5    discussions and we don't believe that a privacy ombudsman will

6    be necessary based on the specific language that allows the

7    company to enter into a sale and give the information to the

8    perspective purchaser.

9           So as we stand today, we don't believe that we need

10   one.

11          THE COURT:  Okay.  Thank you, Ms. Steele.  Thank you.

12          MS. GEIER:  So with that, Your Honor, I do have the

13   redlines in front of me if there are any specific questions

14   that you have or would like to go over.  I'm happy --

15          THE COURT:  The --

16          MS. STEELE:  -- to do so.

17          THE COURT:  The bid protections, the expense

18   reimbursement and the break-up fee --

19          MS. STEELE:  That's right.

20          THE COURT:  -- the way I understand it is that that

21   is also going to be the subject of negotiation and back and

22   forth as to the stalking horse.  And then the -- because this

23   is a little bit of an unusual situation how that works going

24   forward in terms of the substantiation of the fee.

25          MS. STEELE:  Yes, Your Honor.  There are bid

77

1  protections requested in this motion order.  The reason why

2  they're requested here, as opposed to at a sale hearing, is

3  simply because we don't have much time in the schedule to come

4  back and see if we can get that.

5           If a going-concern buyer comes forward and they have

6  put together a package that says, you know, this is going to be

7  a fantastic stalking horse bidder or I -- not just going

8  concern, but any package that we think is -- should serve as a

9  stalking horse bidder, we don't want to disrupt that process by

10 coming back.  So we have requested a reasonable -- what we

11 think are reasonable bid protections, but we will continue to

12 negotiate those.  We are not automatically handing those out,

13 by any means.

14          THE COURT:  Okay.  And then by then they'll be a

15 committee, I think, and they'll maybe chime in, as well.

16 They're a consultation party, right?

17          MS. GEIER:  Yes.  Absolutely, Your Honor.  And they

18 have the -- that was one of the points requested by the United

19 States Trustee was to make sure that the Committee, when

20 appointed, would be a consultation party and have all of the

21 same notice rights involvement and so they have been

22 incorporated, as well.  So yes.

23          THE COURT:  Great.  All right.  I obviously have

24 not -- I think it is on the docket at -- looks like at 3:24

25 today it got on the docket.

1          MS. GEIER:  Fantastic.

2          THE COURT:  So --

3          MS. GEIER:  Fantastic news.

4          THE COURT:  -- you have got quite the team going on

5     back there.

6          MS. GEIER:  I know.  I told you.  I went back to my

7     back to my desk for one second, submitted it, came back.  It's

8     very quick.

9          THE COURT:  All right.  But I obviously haven't had a

10    chance to review it, but -- and I don't know if you -- were

11    most of these comments from the U.S. Trustee or --

12         MS. GEIER:  That's correct, Your Honor.  So majority

13    of the United States Trustee and also a couple of landlord

14    tweaks, just around the timeline in particular.  The United

15    States Trustee made sure that the Committee was involved as a

16    noticed party throughout.  Those were the key -- sort of key

17    points.

18         THE COURT:  All right.  So it maybe just -- as long

19    as those parties have it and you represent to me that they have

20    signed off on, you know, the changes that you -- sounds like

21    you have agreed to already, then, again, it's a different --

22    and I'm not going to say just completely unique, but it's a

23    different situation because you've had -- it looks like you

24    have had a semi-wind down process going on for quite some time

25    and a sale process, in a sense, going on for a long time and

1 there isn't a long timeline on the -- on trying to get it done.

2        So I think these are the circumstances in which you

3 have to make adjustments and not have the usual procedure,

4 because the usual procedure just doesn't really fit this time.

5 And I appreciate that you worked with the U.S. Trustee's Office

6 and the landlords in getting it done, so I'm sure I'm fine --

7 I'm sure I'm going to be fine with it, okay?  I just --

8        MS. GEIER:  Thank you very much.

9        THE COURT:  I don't want to keep everybody here while

10 I flip through the redline.  I don't --

11        MS. GEIER:  Yes.  And apologies for submitting it on

12 the docket so later in the day.  We try to make it so that

13 everyone can get their comments in and get heard and I think,

14 at least, everyone could represent if necessary, that they are

15 signed off.  I think we do have landlord representation in the

16 courtroom today.  If you'd like to hear from them --

17        THE COURT:  Yeah.  That'll be fine.  And you know

18 what?  We didn't do that with the DIP order.  Is that in final

19 form?

20        MS. GEIER:  Yes, Your Honor.

21        THE COURT:  It is in final form?

22        MS. GEIER:  Yes.  That was the submitted final order.

23        THE COURT:  Okay.

24        MS. GEIER:  Final form of interim order.

25        THE COURT:  Okay.  Great.

1                Come on up.

2                MR. HAIG:  Good afternoon, Your Honor.  Robert Lee
3    Haig, Kelley, Drye & Warren.

4                Your Honor, we represent approximately 16 landlords
5    at over 80 locations at this point, including Oak Street
6    Capital, the headquarter's landlord, 11 other locations, site
7    centers, Kite Realty Group, Brookfield, a number of other
8    landlords, Your Honor.

9                Your Honor, these procedures are far from perfect and
10   they certainly are unusual, but we absolutely understand the
11   situation the company's in.  We can't promise you that we won't
12   need some of your help if it does turn out that there is a
13   going-concern buyer and there's adequate assurance issues and
14   we need some time to assess those.

15               But with the changes that debtors' counsel was
16   willing to make, and the lenders -- and we understand there's a
17   big team and there's a lot going on -- it's a very tight,
18   compressed process, Your Honor.  And even with the adjustments
19   that they have made, it may be very difficult for our clients
20   to get the information, adequate insurance information, assess
21   it and know whether or not they have to object.  But given the
22   reality to the situation and the movements that were made, you
23   know, we're willing to move forward with this process, and
24   specifically under the understanding that this is for a going-
25   concern bid, something that may save the company.  And at the

1  process, we're doing one-off lease assignments, et cetera.  It

2  would be subject to a separate set of procedures.

3          THE COURT:  That's -- yeah.

4          MR. HAIG:  So we really appreciate the work of the

5  debtors' counsel, the debtors' team and everybody else involved

6  in getting back to us quickly and promptly.  It's certainly far

7  from perfect, Your Honor, but at this point, we were signed

8  off.  I also --

9          THE COURT:  Well, that --

10         MR. HAIG:  -- worked in coordination with Leslie --

11  I'm sorry -- Laurel Roglen from Ballard Spahr, Scott Fleischer

12  from Damon Barclay.  They're also here.  They can get up if

13  needed, but they were also involved in the process and we

14  certainly appreciate their help in helping us get comments to

15  counsel for the debtors and great response from the Kirkland

16  and the Cole Schotz teams, Your Honor.

17         THE COURT:  Well, I'm glad to hear that.  I'm not

18  surprised to hear it, but I'm glad you're here and I appreciate

19  your working with those things and I'm certainly here to help

20  where I can.  I try to be reasonable and I try to be -- give

21  people a fair shot at doing what they need to do and having

22  enough time to do what they need to do with regard working with

23  a compressed time frame here.

24         And the way I'm seeing this, sir, is in a way this is

25  setting up some guidelines for sales that are to be determined

1  that are -- that's not even really here yet.  It's almost like

2  the motion is going to be when the actual bids come in and

3  people and it comes before the Court and you reserve your

4  rights.  Everybody reserves their rights and we'll deal with it

5  as best we can.

6        MR. HAIG:  Thank you, Your Honor.  Happy to answer

7  any other questions you may have.

8        THE COURT:  No, no.  I have no more questions.

9  That's good.  Thank you --

10        MR. HAIG:  Thank you very much.

11        THE COURT:  -- sir.  I appreciate it.

12        MS. STEELE:  Yes, Your Honor.  Fran Steele on behalf

13  of the U.S. Trustee.

14        As counsel said, we did provide comments.  We asked

15  for certain provisions to be incorporated, which they were,

16  certain deleted.  And so based on that, we have no objection to

17  the form of order, Your Honor.

18        THE COURT:  Great.  Does anyone else wish to be

19  heard?

20                  (No audible response.)

21        THE COURT:  Okay.  Having heard no response about the

22  bid procedures order as revised will also -- is also approved.

23        MS. GEIER:  Thank you very much, Your Honor.  I

24  appreciate your time today.  I'm going to cede the podium to my

25  partner, Derek Hunter.

1          THE COURT:  Okay.  Thank you.

2          MR. HUNTER:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. HUNTER:  Derek Hunter from Kirkland & Ellis on

5   behalf of the debtors.  I'll see if I can't pick up the pace of

6   the agenda items a little bit here.

7          THE COURT:  Are you saying it was slow before or was

8   it me?

9          MR. HUNTER:  No, no, no.  Hopefully these are less

10  controversial.

11         THE COURT:  All right.

12         MR. HUNTER:  The next one being the cash management

13  motion.  That's agenda item 3 at Docket Number 18, Your Honor.

14         THE COURT:  Yep.

15         MR. HUNTER:  By this motion, we're seeking to

16  continue to operate our cash management system in the ordinary

17  course.  It looks a lot like a cash management system you have

18  probably seen in other retail cases, store level deposit

19  accounts, there are collection accounts.  They're swept daily

20  and we have 14 disbursement accounts.

21         We also make inter-company transfers in the ordinary

22  course.  We're not seeking to make intercompany transfers to

23  any non-debtors during the cases.  We pay standard bank fees

24  and processing fees and the like.

25         We don't have a redline to hand up.  The U.S.

84

1  Trustee's Office has been great working late and over the

2  weekend and so all -- you know, their comments are already

3  incorporated.  They may have statements they want on 345(b), I

4  understand, but the changes are in the order as I understand

5  it.

6          On the business forms, we're going to print the DIP

7  label on new checks, but otherwise exhaust existing checks.

8  And then on 345(b), we have agreed to a 30-day extension or

9  suspension of that requirement and we'll work through it with

10 the U.S. Trustee and we'll try to work something out, I think,

11 by the time of the final order for that issue.

12         THE COURT:  On the normal course, the U.S. Trustee's

13 Office asked for the DIP to -- designation to be on the

14 accounts, but maybe --

15         MS. STEELE:  Right.  We did agree with that, Your

16 Honor.

17         THE COURT:  Yeah.  So -- and really, everyone knows

18 that Bed Bath & Beyond is a DIP at this point.  So maybe not a

19 DIP --

20         MR. HUNTER:  Yeah.

21         THE COURT:  -- but a debtor.

22         MR. HUNTER:  Yes.  I think that theme will come up a

23 little bit later, Your Honor.

24         I would -- I think Ms. Etlin would chastise me if I

25 did not reiterate that payroll is this week and so it's

85

1 critical we get access to our bank accounts opened up.  And so

2 cash management here and wages next, obviously critical for us

3 to be able to, you know, make payroll this week as we expect

4 to.

5          THE COURT:  All right.

6          MS. STEELE:  Yeah.  Yeah.

7          MR. HUNTER:  Yeah.  I'll cede at the moment --

8          MS. STEELE:  Thank you.

9          MR. HUNTER:  -- at the podium.

10          MS. STEELE:  If Your Honor would just indulge me just

11 a moment, we have no objection to the cash management order.

12 We resolved our objection with the debtor.  The order provides

13 for a limited waiver of Section 345 providing for a 30-day

14 review by the U.S. Trustee.

15          And recent bank failures highlight the importance of

16 the debtors' compliance with Section 345 for the benefit of all

17 the stakeholders.  And as Your Honor is aware, Section 345

18 places an obligation on the debtor-in-possession to require

19 protections for its monies from institutions which hold such

20 monies.  And the U.S. Trustee, in its advisory role, assists

21 with this protection by its entry into uniform depository

22 agreements.  Those are UDAs, which obligate the depository to

23 maintain collateral of deposits, which exceeds the FDIC limits.

24          And here, as a result of the importance of

25 protections of the debtors' funds and the requirements of

86

1   Section 345, the order does provide a limited waiver of Section

2   345 and an opportunity for the U.S. Trustee to review.

3           So, Your Honor, we're hopeful that the debtors will

4   act promptly to ensure full compliance with Section 345 and we

5   reserve our right to be heard at the final hearing.

6           THE COURT:  Okay.

7           MS. STEELE:  Thank you.

8           THE COURT:  Well, and again, I appreciate you working

9   together with the debtor and counsel to get it done.

10          MS. STEELE:  Thank you, Your Honor.

11          THE COURT:  Thank you.  Thank you, Ms. Steele.

12          All right.  And I have reviewed that order, you know.

13  I can't say I read every single word in there because that

14  wouldn't --

15          MR. HUNTER:  Understood.

16          THE COURT:  -- be true.  But I tried to read as much

17  as I could.  And there's a lot of words again, but it doesn't

18  seem like it's anything unusual or inappropriate, so I'll

19  approve the order especially with the consent of the United

20  States Trustee's Office.

21          MS. STEELE:  Thank you, Your Honor.

22          MR. HUNTER:  Thank you, Your Honor.

23          THE COURT:  All right.

24          MR. HUNTER:  Next item on the agenda is our wages

25  motion, item number 4, at Docket Number 11.  Again, another one

87

where we shared with the U.S. Trustee and worked through their
issues in advance.  This is a standard wages motion, Your
Honor, seeking to pay ordinary course amounts, amounts that
could come due post-petition, as well.

          We have 14,000 employees, as we have talked about.
Over 12,000 of those are store level employees.  They're
hearing a lot in the news and it's critical to be able to
reinforce that, you know, they're going to get paid for their
work, you know, post-Chapter 11 filing.  I'm happy to -- and I
would flag no amounts above the statutory cap.  We're not
seeking relief for that.  There's nothing that implicates
503(c) here, so we think it's a --

          THE COURT:  Even after the final order no amount?

          MR. HUNTER:  We don't expect there to be any amounts.
I will come back to you if there is, but we don't expect there
to be even on a final basis, but certainly not today.

          THE COURT:  But to -- right.  So there's really two
questions I had was -- one was whether, on the final order
basis, you're looking for in excess of the 507 caps and you
just you may be.  Is that --

          MR. HUNTER:  We do not expect to.

          THE COURT:  But you -- yeah.

          MR. HUNTER:  But yes.

          THE COURT:  Yeah.  And the second one was whether --
I'm just not 100 percent clear on it, but whether you're also

1  seeking to pay expenses -- amounts that were due before the

2  period or that even are, you know, maybe several months old and

3  for --

4            MR. HUNTER:  No.  Well, generally, Your Honor, we're

5  seeking to continue ordinary course so, you know, we --

6            THE COURT:  Just ordinary course.

7            MR. HUNTER:  Exactly.  Exactly.

8            THE COURT:  Okay.  All right.  That's what I wanted

9  to know.  Thank you.

10           MR. HUNTER:  Great.  And unless you have any further

11 questions or anyone in the courtroom, we ask that enter the

12 wages order.

13           THE COURT:  All right.  That is also approved.

14           MR. HUNTER:  Thank you.

15           THE COURT:  Thank you.

16           MR. HUNTER:  Moving along.  Next one is the store

17 closing motion.  That's at item number 5, Docket 28.

18           As you heard from my colleagues, Mr. Sussberg and

19 Ms. Geier, you know, while we're continuing to market our

20 business, we do intend to immediately commence liquidating our

21 stores.  You know, in our business judgment, we do need to

22 begin that process in an effort to maximize value.  So this

23 really is critical, Your Honor.  You know, I do think it looks

24 like other store closing motions you may have seen in the past.

25 We're seeking to assume a consulting agreement with Hilco and

1  others.

2       We're seeking to close, you know -- begin the process

3  for all of our stores.  It's wave five of our closing process,

4  which I think you heard has been going on for some time now out

5  of court, and we're seeking authority to pay customary bonuses

6  to our store level employees to complete the process in making

7  modifications to our customer programs.

8       This is one that typically the landlord bar care

9  about.  In particular, they reached out soon after the order

10 was filed.  Again, they were great working with us getting us

11 comments last night hours after the motion was filed.  We have

12 worked through that and I think we have resolution on their

13 issues through some new language in the orders, which I don't

14 believe you have, but I can hand up in a second if you'd like

15 to flip through.

16      Before I do, just two things that I would -- I

17 promised certain counsel I'd say on the record.  One is that,

18 you know, the -- it is important to certain landlords' counsel

19 that we work through side letters with their particular

20 landlord --

21      THE COURT:  Uh-huh.

22      MR. HUNTER:  -- to govern the GOB process.  We have,

23 you know, obviously no issues with that and, you know, we're

24 going to start that process expeditiously and we plan to work

25 through it in good faith with them.

1          It's typically not something you can get done in a

2    day and so, you know, they don't have us a certain that's

3    necessarily locked in now, but they're willing to support the

4    interim orders, I understand, based on the representation that

5    we'll work with them quickly and in good faith to get the side

6    letters for those that want it.

7          And second, Your Honor, there is a provision in the

8    interim order that requires certain parties to surrender

9    property if it is property of the debtors.  I think that's

10   standard in these types of orders.  But, you know, of course

11   there could be a debate about is it -- you know, what is the

12   debtors in property, does the landlord think they have an

13   interest in property.  I think, you know, the landlords, their

14   rights are reserved on that front.  If they find that there's

15   some issue there, they can come back to you on it.

16         So I just want to make those couple statements on the

17   record.  I do have a redline.  If I may approach, I can give it

18   to Your Honor.

19         THE COURT:  Okay.  Yep.  Thank you.

20         So, Ms. Steele, this is -- this reflects your

21   comments, as well?

22         MS. STEELE:  It does, Your Honor, except I do have

23   one comment that I'd like to put on the record, one objection.

24         THE COURT:  Uh-huh.

25         MS. STEELE:  But other than that, it does reflect all

1 of our comments.

2          THE COURT:  Okay.

3          MR. HUNTER:  And so what I'd suggest is that I don't

4 believe it's really a language issue, so I'm happy to answer

5 questions but I'd let Ms. Steele kind of, you know, talk about

6 what her issue is and then I'm happy to address it.

7          MS. STEELE:  Thank you.  Fran Steele on behalf of the

8 U.S. Trustee.

9          Your Honor, our only objection is that the order

10 provides that you have 30 days to return goods to the stores,

11 but only 14 days to use your gift card and we would suggest to

12 the Court that those days should be the same, that the gift

13 card should be extended to the 30 days as when you can return

14 something because it seems unfair to the consumer to go into

15 the store on day 16 to return something and have in their

16 pocket a gift card only to get to the register to find out that

17 they can return something, but that they can't use the gift

18 card, and we would suggest that it's just more practical for

19 those days to be the same.  And based on that, we would object

20 to that provision.

21          THE COURT:  all right.  I understand.  I understand

22 what you're saying, but isn't -- I guess two things.  Isn't

23 that kind of classic business judgment and also isn't that

24 classic business judgement as to whether they might think it's

25 better to get somebody in the store with a gift card that -- so

92

1  they go buy other things, like they used to do, and extend that

2  period?

3          MS. STEELE:  I agree --

4          THE COURT:  I --

5          MS. STEELE:  -- Your Honor.  But --

6          THE COURT:  I know.  But I can't -- I don't feel I

7  can force the debtor to do that.  I think that's a business

8  judgment.

9          MS. STEELE:  True.

10         THE COURT:  All --

11         MS. STEELE:  And we have asked the debtor to extend

12 the time for the gift cards, even if they -- if it, perhaps,

13 goes out one further week.  But even with the limited time, the

14 case was just filed yesterday and I don't know -- I mean, I

15 couldn't figure it out, but I don't even know if they have

16 until the full weekend, next weekend or does it cut off on

17 Saturday.

18         It just seems like a very limited amount of time to

19 use those gift cards and we would suggest that it should be if

20 it's not extended to 30 days, perhaps 21 just allowing a little

21 more time for the gift cards.

22         MS. CORDRY:  And, Your Honor --

23         THE COURT:  Are you saying Mr. Hunter --

24         MS. CORDRY:  -- this is Mr. Cordry, if I could speak

25 to this point?

1              THE COURT:  Oh, yes.

2              MS. CORDRY:  From the National Association of

3    Attorneys General, Karen Cordry.

4              These orders, yes, these are very standard orders.

5    We spent a lot of time starting in the Great Recession

6    negotiating the terms of these orders and they have practically

7    become I think black letter law almost at this point.

8              But the point about gift cards was one of the most

9    heavily negotiated and fought over issues in many, many, many

10   of these cases.  I don't recall any of them being as short as

11   14 days.  I think there's some real notice issues to customers.

12             And one of my other questions would be, if you do

13   start limiting it to that kind of time period, what notice are

14   customers going to be given; how much information is going to

15   go out to them to tell them that these cards they were promised

16   they could use forever are now going to be no good after only

17   14 days and, of course, the 14 highest priced days of the sale.

18             You know, we have litigated over that and I think the

19   states might be willing to come back in and push the issue

20   further on that point.  So that is definitely one of the points

21   that we have a concern with in the order.

22             Also related to that is the question about latent

23   defects.  We have had language in other orders that are much

24   more clear about the fact that people can -- speaking about

25   this point about returning items, that people could return

94

1 items if they buy it and it has a latent defect in it.  I would

2 like to suggest that that language could, perhaps, be tweaked

3 slightly.

4          Two other points I was concerned about but seem like

5 they're okay is, one, is the question, I just want to emphasize

6 that sign-walkers and so forth that there could be safety

7 issues in that so that I just want to make sure that debtors'

8 aware that we -- the states would retain that right under the

9 health and safety governmental regulation kind of piece of it.

10          And the last piece was the question about personally

11 identifiable information.  The motion, at one point, said, yes,

12 we're going to make sure there's no information passed on, but

13 at another point said we're going to use reasonably

14 commercially reasonable efforts.

15          But I do think the motion -- the final order is clear

16 that they will destroy the information.  It will -- none of it

17 will be passed on with registers and so forth.  So I do come

18 back to just basically those two points, the gift cards and the

19 latent defects that I think could be dealt with and then I

20 would go back to the states and say, you know, it fits within

21 our black letter law, but think right now, those two provisions

22 are somewhat less clear than what we have used in the past.

23          THE COURT:  Mr. Hunter, do you want to respond?

24          MR. HUNTER:  Yes, Your Honor.  So I think, if I hear

25 right on the last two, the sign-walker issue and the privacy

95

1  information, it sounds like maybe those are final order issues.

2  You know, I do think the order is clear that health and safety

3  laws, you know, we have to comply with those.

4          MS. STEELE:  Yeah.

5          MR. HUNTER:  We heard about -- our expert had

6  submitted a declaration in connection with bidding procedures

7  on privacy and so I think we have actually put information out

8  on that front on a broader basis and so the debtors are taking

9  that very seriously.  So that's what I'd say on those two.

10         Backing up to latent defects, the order has clear

11 language that the debtors will comply with all state and

12 federal laws relating to warrantees -- or latent defects.  I'm

13 happy though to engage with Ms. Cordry on a final order if

14 they're -- it could be clearer, but that's obviously the intent

15 and so if it's a language issue, we have no problem there.

16         THE COURT:  Did you hear that, Ms. Cordry?

17         MS. CORDRY:  Yes.  And we do have some language that

18 I can pass on, because I do think it's a little clearer because

19 people might not know what a latent defect is, but the way we

20 have used it in some other orders does spell out what the

21 problem is but, yes, I'll be happy to pass that onto him.

22         MR. HUNTER:  Okay.

23         THE COURT:  Because I read it and I thought I saw the

24 provision about latent defects and maybe it's not clear exactly

25 what a latent defect is, but if you could work out that

1  language real quickly that would be great.

2          MR. HUNTER:  Okay.  We will do that.

3          THE COURT:  All right.

4          MR. HUNTER:  And then on the gift card issue, I

5  totally understand where the U.S. Trustee is coming from.  You

6  know, Your Honor, this is an economic issue.  I think you

7  pointed out, it's a business judgment issue.  You know, I think

8  it's a good point from a notice perspective.

9          I don't think anyone is surprised or doesn't know

10 that Bed Bath is here.  You know, frankly, our recent troubles

11 and challenges have been very well publicized.  Recent filings

12 have said point-blank if something doesn't happen, we will file

13 for bankruptcy; we are considering bankruptcy.  It's been very

14 clear.  So I don't think the consumer was not on notice that

15 there was risk in this area.  And, of course, it's a little

16 different to file and -- and make it very clear you have 14

17 days.  We understand that, but we have a noticing agent.

18         We're doing broad notice on top of, I think, the fact

19 that this is very mainstream at this point and I would just

20 emphasize, again, you know, it's economic.  It's part of a hard

21 negotiation about the DIP budget, what we were going to fund,

22 what we weren't and, you know, it costs $10 million a week for

23 gift card redemption.

24         So it's a material number that in the context of a

25 lot of issues, a lot of things that we did get covered, you

97

1  know, through the DIP, Ms. Geier walked through it, you know,

2  specific reserves to make sure we can do the right thing in

3  this case.  This is one where we think 14 days was the right

4  balance between all those competing interests and that's why we

5  think it's appropriate, Your Honor.

6          UNIDENTIFIED SPEAKER:  Your Honor?

7          MS. CORDRY:  And, again, our point would be that if

8  you are going to have that short of a period, which is, again,

9  short -- and that's very different from knowing they're in

10  bankruptcy.  I may know that you're in bankruptcy, but unless

11  you are specifically telling me in those notice provisions,

12  perhaps emailing to all those customers, that you have all

13  those -- information that you send out emails on -- unless I'm

14  getting notice that's telling me that my gift card is no good

15  after 10 days -- or 14 days, I'm sure, that's a very different

16  thing from knowing that there's a bankruptcy and I would want

17  to be sure that that is emphasized, that that needs to be part

18  of the noticing provisions.

19          MR. HUNTER:  On the notice front, the liquidator is

20  going to be issuing a press release that has these details.  So

21  it's going to be a literal press release to the world and these

22  details will on there.

23          THE COURT:  And on the website?

24          MR. HUNTER:  It's on the website.  I checked this

25  morning.

98

1                THE COURT:  Did you get that --

2                MS. CORDRY:  And emails to customers will -- can an

3    email be sent to all your customer base?

4                MR. HUNTER:  I don't know if we have that kind of

5    information.  There's a --

6                THE COURT:  You do.  My wife gets those emails all

7    the time.

8                (Laughter.)

9                MR. HUNTER:  I don't know if she'll be happy about

10   more.

11               MS. CORDRY:  And it may not be everyone who has a

12   gift card, but everyone who was one of your customers should be

13   able to get that notice.

14               THE COURT:  I mean, in a way, couldn't you frame it

15   as a positive almost?  Gift cards expire in 14 days, so come in

16   quickly.  I don't know.

17               MR. HUNTER:  No.  Your Honor, we're doing everything

18   we can to publicize the liquidation sale and emphasize these

19   provisions.  If there's supplemental things we can do, we're

20   happy to go back and look at it.

21                We are noticing our customers far and wide on the

22   impacts of liquidation, what their customer programs -- you

23   know, what this means with respect to the customer programs.  I

24   think they're rolling.  And if we're not already emailing all

25   customers that we have email addresses for, we will do that.

1              THE COURT:  Okay.  Did you hear that, Ms. Cordry?

2              MS. CORDRY:  I hear that and the states will consider

3   whether that's sufficient or whether they want to object to a

4   final order --

5              THE COURT:  Well --

6              MS. CORDRY:  -- on still the same issues, because

7   there are some other points that are out there, as well.  Thank

8   you.

9              THE COURT:  All right.

10             MR. DALE:  Your Honor, may I?

11             THE COURT:  Yes, please.

12             MR. DALE:  Charles Dale of Proskauer Rose with

13  Mr. Hillman.  I represent 6th Street Specialty Lending.

14             Judge, we spent a lot of time calibrating the

15  interests of stakeholders that had pre-petition priority claims

16  just like consumers.  You heard today about money that will be

17  spent to pay freight vendors, taxing authorities.  A

18  substantial amount of money will be devoted to employees,

19  including employees who may have claims under the WARN act.

20             Your Honor, this is an eight figure liability that we

21  have provided for and we have calibrated what consumers ought

22  to get and I think it's safe to say, given the media coverage

23  of this case, Judge, there's not a consumer in America or

24  several other countries that doesn't know Bed Bath is in

25  bankruptcy and they ought to use their gift cards.

1          Even Mr. Sussberg's mother-in-law called him to get

2   advice on that.

3          THE COURT:  Yeah.

4          MR. DALE:  Thank you --

5          THE COURT:  I --

6          MR. DALE:  -- Your Honor.

7          THE COURT:  I would say that I think, you know,

8   the -- you know, as the coupon was so popular and effective,

9   also I think Bed Bath & Beyond has become effective with that

10  because my wife does tell me, you know, about the coupon and I

11  was going to, you know, go to get whatever it was.  But -- so I

12  think that's an easy thing to send to people and I think people

13  do pay attention to that and I didn't realize the number was

14  that big.  I had no idea that the number was that big.

15          And just anecdotally, I think there's a big

16  difference between notice of a bankruptcy and notice of how

17  long you have to redeem a gift card.  I agree with that point.

18  But on the notice issue, anecdotally, when I came in today, the

19  guard said to me, "I hear you got Bed Bath & Beyond," and I

20  said, "I do."  He said, "Three days to return" -- "three days

21  to get your 20 percent."  So --

22          (Laughter.)

23          THE COURT:  -- that --

24          MS. CORDRY:  Yeah.

25          THE COURT:  -- so people are aware and I think if

1  they --

2          MS. CORDRY:  Yeah.

3          THE COURT:  -- if you put -- especially if you put an

4  email, maybe if it can be done, all the marketing people in a

5  positive way, maybe that'll be --

6          MR. HUNTER:  And, Your Honor, I --

7          MR. DALE:  Thank you.

8          MR. HUNTER:  -- while I was on the side, I found out

9  that if you are a customer of Bed Bath, you have already

10  received this.  They have actual -- the company's actually

11  already sent it out.

12          THE COURT:  I'm sorry?

13          MR. HUNTER:  The company's already sent out an

14  email --

15          THE COURT:  Oh.

16          MR. HUNTER:  -- with these deadlines.

17          THE COURT:  See?

18          MS. CORDRY:  Okay.

19          THE COURT:  I knew you could do it.

20          MS. CORDRY:  I would say that the -- Your Honor, I

21  would say that the website does not have that on there yet it

22  does not appear, so if it could be added to the -- that front

23  page of the website, that would be very helpful to people, as

24  well, I think.

25          MR. HUNTER:  We -- it's in the FAQs related to

1  Chapter 11.  I clicked through it today.  But we'll -- if

2  there's a way to make it more prominent, we'll work on that but

3  I do know it's on the website.

4          MS. CORDRY:  Well --

5          THE COURT:  All right.

6          MS. CORDRY:  -- it's not on the front of the website,

7  because I'm looking at it right now.

8          THE COURT:  Oh, okay.

9          MS. CORDRY:  Okay.  Thank you.  Thank you very much,

10  Your Honor.

11          THE COURT:  Thank you.

12          MS. STEELE:  Your Honor, the U.S. Trustee understands

13  the comments.  We're disappointed for those customers that go

14  in on day 15 or take their gift cards when they go to return

15  things, but we understand it's their business judgment.  But

16  we're hopeful this doesn't set a precedent in further cases

17  that the gift card return policy will be so short.

18          THE COURT:  Yeah.  Yeah.  I -- the only precedent is

19  that I think it's a -- there's a business judgment precedent --

20          MS. STEELE:  Right.

21          THE COURT:  -- that I -- and this is unique to these

22  circumstances that they have this compressed timeline and all

23  that and I just can't -- I don't think I'm permitted to

24  substitute my judgment for theirs on this point.

25          MS. STEELE:  And I understand that.  I just wanted to

1  voice our concerns.

2          THE COURT:  It's a legitimate --

3          MS. STEELE:  Thank you.

4          THE COURT:  -- concern.  You and Ms. Cordry voiced it

5  very well.

6          MS. STEELE:  Thank you.

7          THE COURT:  And it seems like someone else wants to

8  voice a concern.

9          MR. FLEISCHER:  Good afternoon, Your Honor.  Scott

10 Fleischer of Barclay Damon on behalf of a number of the

11 landlords, as was referenced earlier today.  Just a narrow

12 issue to change the subject off of gift cards here.

13         THE COURT:  Um-hum.

14         MR. FLEISCHER:  One aspect of the sale guidelines,

15 right, which cover these store closing sales, allows the

16 debtors to use the verbiage "going out of business" on their

17 large exterior signs in certain shopping centers now.  So we

18 thought that that was not really the best way to introduce the

19 public to these sort of new and improved store closing sales.

20 And for the landlord parochial interests, we don't want a giant

21 sign that says going out of business when there doesn't have to

22 be.

23         So especially now with the posture of the case being

24 that there is still a possibility of a sale out there, whether

25 in part or in whole, who knows, it didn't seem appropriate to

1  have going out of business out there right now.  And I

2  understand this is probably something the debtors don't want

3  either.  I would imagine this was probably something that

4  was -- that turned on the finances of the sales and they

5  probably think they can -- maybe the lenders think they can get

6  some more value out of it if it says going out of business.

7  But it seems like there should be, perhaps, a date when we can

8  pivot from something that says "store closing," which is

9  accurate now to "going out of business" down the road, such as

10 pass the bid deadline if there's no going concern, you know,

11 buyer that comes available.  So --

12        THE COURT:  And you're how many -- how many stores do

13 you represent?

14        MR. FLEISCHER:  I'm still getting a count.  So, so

15 far, let's see, one -- looks like five groups of landlords.  We

16 have:  RPT Realty, DLC Management, Inland Commercial Real

17 Estate Services, Rivercrest Realty Associates, Westfield and

18 possibly others.  Still gathering the list.  Somewhere in the

19 double digits.  I don't know how high it's gotten so far.

20        THE COURT:  One -- all right.  Well, Mr. Hunter, do

21 you want to respond?

22        MR. HUNTER:  Yes.

23        THE COURT:  I thought it did say things like you

24 could say things like in the general area of going out of

25 business and --

1          MR. HUNTER:  Yes.  The order does provide, you know,

2    I think, customary latitude to advertise these sales as the

3    liquidators and the company sees fit.  It's a business judgment

4    issue.  And so -- but, of course, it relates to costs and the

5    sales being effective but, you know, the advertisements are,

6    you know -- cost money.

7          We have planned for these going out of business

8    sales.  We have been doing them already.  And at the end of the

9    day, while we are, as Mr. Sussberg puts it, running out every

10   ground ball and, you know, we hope that there's a value

11   maximizing transaction here, the company's business judgment is

12   to begin store liquidation sales immediately and what that goes

13   along with.

14         And whether every store says going out of business or

15   not, I don't know.  I leave that to the company and Hilco.  But

16   they're going to pursue it promptly in the way that they seek

17   to maximize value and that's really all we're trying to do at

18   the end of the day.

19         Of course, if we had -- if we thought it made sense

20   to wait around for weeks without, you know, going out of

21   business signs on the stores, that's what we would do.  But

22   practical reality is that's just not where we are right now and

23   we want to maximize value regardless of what happens.  And by

24   do -- you know, we think doing that just, you know, requires us

25   to have this flexibility, which is customary, Your Honor.

1          THE COURT:  All right.  Mister -- and there's nothing

2    that prevents you from speaking with debtors or Hilco or

3    whatever and Mr. Fleischer and trying to work that out.  Maybe

4    if it's a cost issue, you -- and you want it, you can help them

5    defray the cost somehow or another.  I'm just trying to offer

6    solutions --

7          MR. FLEISCHER:  That's an interesting ask, Your

8    Honor.  I think we'll have to think about a cost problem.

9    Again, I think it was more of a it's a combination of their

10   just being a notice issue almost to the public, right, that is

11   not necessarily going out of business.  We all hope that it's

12   not going out of business.  So to have those signs up there

13   just doesn't seem like the best way to start.  And, again, they

14   do have that flexibility and, you know, we talk about whether

15   there should, you know, be a carve out of some kind perhaps,

16   but it did seem like at least if not a bid deadline issue, a

17   final order issue to have actual going out of business.

18         It's very common in these orders that at -- on the

19   interim, you can't say going out of business.  You could stay

20   store closing sale and everything and we have, you know, plenty

21   of samples with Kirkland and others with those orders.  It's

22   usually triggered by an actual shift to an entire GOB through a

23   separate order or a final order on store closing.

24         THE COURT:  But -- and I appreciate what you're

25   saying and what you're saying makes sense, but I turn to the

1  same thing that I said to Ms. Steele is that, how do I -- if

2  the experts say this is how they want to do it to maximize the

3  sale, how do I say that's not the right way to do it.  I just I

4  don't know how.  I don't think I have that authority, frankly,

5  and, you know, I'm -- you can do a side letter.  We just talked

6  about the --

7              MR. FLEISCHER:  I --

8              THE COURT:  -- side letter.

9              MR. FLEISCHER:  I certainly will.

10             THE COURT:  Yeah.

11             MR. FLEISCHER:  I certainly will.  We do them all the

12 time.  I'm very confident we'll be able to reach agreement on a

13 letter.  We had discussed this particular issue and we resolved

14 many of our other issues through the order that you'll see in a

15 redline on here on bid procedures and DIP.  So this was just

16 that last piece we wanted to get through.  So we'll look to

17 revisit this perhaps at another time.

18             THE COURT:  All right.  I appreciate it and, you

19 know, I just like I say, I can't -- I don't feel it appropriate

20 to substitute my judgment for the experts and I'm going to

21 let -- I'm going to leave it to their good judgment as to how

22 that issue gets resolved and that --

23             MR. FLEISCHER:  Understood, Your Honor.

24             THE COURT:  -- and hopefully you can come to an

25 accommodation.

1          MR. FLEISCHER:  Thank you very much.

2          THE COURT:  Thank you, Mr. Fleischer.

3          MR. HUNTER:  Your Honor, with that we did submit --

4   you know, I handed up a redline.  I do believe it's resolved

5   with all parties other than those issues we just talked about.

6   So I'm happy to flip through the specific changes if you'd

7   like; otherwise, you know, I do think it's resolved and we

8   would ask that you enter the order.

9          THE COURT:  Just one -- I had a question about the

10  additional goods.

11         Is there some kind of guideline on that or is it just

12  that whatever additional goods there are can be brought in?

13         MR. HUNTER:  Yeah.  It's like "goods of similar

14  quality," I believe is the wording.  It's something along those

15  lines.

16         THE COURT:  There's a lot of goods --

17         MR. HUNTER:  Yeah.

18         THE COURT:  -- with similar qualities --

19         MR. HUNTER:  Yeah.

20         THE COURT:  -- right?  I mean it could -- that's a

21  broad universe.

22         MR. HUNTER:  It's a benefit of a Bed Bath & Beyond,

23  Your Honor.

24         THE COURT:  Yeah.

25         MR. HUNTER:  So it can't be wholly unrelated.  It

1 can't degrade the sale process or the business.  It's meant

2 to go along with similar products that are already sold and

3 we -- I think we have consistent language with other going out

4 of business sales as it relates to that.

5           THE COURT:  So the answer is there is no limit, it's

6 just that constraint?

7           MR. HUNTER:  You mean a quantity limit?

8           THE COURT:  Yeah.

9           MR. HUNTER:  Oh, no.  I don't think there is.  You

10 can put as many of those as the liquidator and the company

11 think makes sense and facilitates the sale.

12           THE COURT:  And the debtor gets 7.5 percent of that?

13           MR. HUNTER:  Exactly, Your Honor.

14           THE COURT:  All right.  Okay.  I don't -- it's 4:30

15 and I don't want to keep all these people here if we don't have

16 to.  I just -- I didn't go through the specific changes.  I

17 don't -- I will go through them.  I have it right here and I'm

18 sure they're fine, as everyone has agreed to them except for

19 the points that were raised about the -- I guess, well,

20 actually about the latent defects.  I mean but that would go in

21 this order, right?

22           MR. HUNTER:  Yes.  There's language already in the

23 order.  I think the point was Ms. Cordry thought it was

24 insufficient.

25           THE COURT:  Yeah.

1          MR. HUNTER:  So we're happy to look at her language

2    quickly.  Maybe what it makes sense to do is we'll end up

3    probably making a few tweaks.  We'll submit it to Your Honor's

4    chambers after the hearing once we have agreed on that.

5          THE COURT:  Okay.

6          MS. STEELE:  Yes.

7          THE COURT:  Yes?

8          MS. STEELE:  Your Honor, I'm getting ready to send in

9    the language right now.  So --

10          THE COURT:  Okay.

11          MS. STEELE:  -- they will see that on the latent

12    defects.

13          THE COURT:  Sending you language.

14          MR. HUNTER:  Okay.

15          THE COURT:  All righty.

16          MR. HUNTER:  Great.

17          THE COURT:  Thank you.

18          MR. HUNTER:  So we --

19          MS. STEELE:  Thank you.

20          MR. HUNTER:  -- we would just ask that if we could --

21    you know, when we're in agreement with Ms. Cordry and submit an

22    order --

23          THE COURT:  Just submit it --

24          MR. HUNTER:  -- at the end of the day.

25          THE COURT:  -- and tell me that's what happened.  And

1  if not, you'll tell me what the disagreement is and I'll just

2  decide it right there.

3             MR. HUNTER:  Okay.

4             THE COURT:  Okay?

5             MR. HUNTER:  Thank you, Your Honor.  With that, my

6  part is done here.  I'll turn it over to my colleague,

7  Mr. Fiedler.

8             THE COURT:  Okay.

9             MR. FIEDLER:  Good afternoon, Your Honor.  For the

10 record, Ross Fiedler of Kirkland & Ellis on behalf the debtors.

11            In the same spirit as Mr. Hunter, I'll try to be

12 quick.

13            THE COURT:  Okay.

14            MR. FIEDLER:  The next item on the agenda is the lien

15 holder motion.  This was filed at Docket Number 22.  By this

16 motion, we're seeking authorization to make payments to folks

17 who have a prepetition claim for goods or services delivered in

18 which such claimants may assert potential liens against the

19 debtors.  These folks consist mainly of freight vendors and

20 third party warehousemen.  And as was made clear in the

21 presentation, it's imperative that the company be able to

22 efficiently and expeditiously route merchandise from its

23 distribution centers to the stores.

24            I understand there are no comments from the U.S.

25 Trustee.  So unless Your Honor has any comments, we'd

1  respectfully request entry of the order.

2          THE COURT:  Right.  So the one thing that was unusual

3  about this, to me, was that it was to pay prepetition secured

4  claims and it wasn't to pay any other, you know, critical

5  vendors and I don't see that motion here at all.

6          MS. STEELE:  That's a good thing, Your Honor.

7          THE COURT:  Yeah.  No.  I mean it's different.  It's

8  different.  It's just different and --

9          MR. FIEDLER:  Yeah.

10         THE COURT:  -- so I understand it's just different

11  and that was what -- that's what popped out to me.  I -- as was

12  demonstrated by counsel for the lender, you know, the -- all

13  these things were gone over with a fine tooth comb.  You can

14  see it.  You can see it in the words and what is being said

15  here today.  So I really -- I don't have any issues with that

16  and I will enter the order.

17         MR. FIEDLER:  Thank you, Your Honor.

18         Next is agenda item 7.  This is the surety -- surety

19  and insurance bond motion.  This is standard motion.  We're

20  seeking interim relief to continue the debtors' ordinary course

21  insurance and surety bond program.  We have approximately 50

22  insurance policies, 10 surety bonds outstanding.

23         We understand we're largely consensual on the motion.

24  We haven't received any further comments from the U.S. Trustee.

25  So if Your Honor has any questions, I'd be happy to answer

1 them.

2          THE COURT:  No.  We want you to have insurance.  I'm

3 in favor of that, as is the U.S. Trustee.

4          MS. STEELE:  Yes, Your Honor.

5          THE COURT:  Thank you.  So that'll be approved, as

6 well.

7          MR. FIEDLER:  Thank you, Your Honor.

8          Next is agenda item 8 filed at Docket Number 12.

9 This is the taxes motion.  Again, very standard.  We're seeking

10 authorization to pay sales and use taxes, as well as certain

11 regulatory assessments and other permitting fees, so obviously

12 these are critical to continue operating the business.

13         If Your Honor has any questions, I'd be happy to

14 answer those but we are resolved on the issues.

15         THE COURT:  Well, I -- again, I'm not sure I saw

16 exactly where the funding for all these payments came from, but

17 I guess you make them if you can and I know you have to pay the

18 taxes as well, so I'll approve that also.

19         MR. FIEDLER:  Okay.  Great, Your Honor.  That's it

20 for me.  So now I'll turn it over to my colleague,

21 Mr. Sterrett.

22         THE COURT:  Okay.  Thank you.

23         MR. STERRETT:  Good afternoon, Your Honor.  Charlie

24 Sterrett of Kirkland & Ellis on behalf of the debtors.

25         THE COURT:  Good afternoon.

1          MR. STERRETT:  I'm going to try to set the record for

2    the quickest pace here on the Kirkland side.

3          THE COURT:  No problem.

4          MR. STERRETT:  I'll be taking us to the balance of

5    the agenda this afternoon.

6          THE COURT:  Okay.  Great.

7          MR. STERRETT:  We'll start with the utilities motion

8    filed at Docket Number 21.  This seeks customary utilities

9    relief and affixes an adequate assurance amount for the debtors

10   at half of a month's utilities expense based on the run rate

11   prepetition, less any amounts currently on deposit with the

12   utilities.  Those are offset.

13         We're fully resolved with all parties on this order,

14   including the U.S. Trustee.  We took one comment in the version

15   order we'll be submitting to the Court later this afternoon

16   from a landlord and it's, you know, purely reservation-of-

17   rights type language.

18         And so, you know, with that, I'd like to ask the

19   Court, if you'd prefer, we submit all of our orders once more

20   at the end of this hearing this evening for you to review and

21   sign or, you know, should we go only with those that have

22   changed?

23         THE COURT:  That's a good point because it does get

24   confusing for Mr. Fiedler.  Yes, there is on -- when, you know,

25   some of them are final and some of them aren't.  But that's

1  probably your -- that's probably a very good idea.  So why

2  don't you -- the only thing that means is that, you know, it's

3  4:30 now and I'm not sure.

4          Is it critical that they be entered or is tomorrow

5  morning also -- I actually have motions tomorrow morning, but

6  you'll let me know.

7          MR. HUNTER:  Well, Your Honor, I think there --

8          MR. STERRETT:  It's --

9          MR. HUNTER:  -- are a few that it's critical that we

10  get entered today so that the payroll can get processed.  That

11  would be cash management, wages, the DIP, and joint

12  administration.  The rest, no problem.

13          THE COURT:  Cash management, wages, DIP and joint

14  administration.  Well, of those, we did -- we didn't do joint

15  administration and the wages we did.  So just -- well, those

16  four, right --

17          MR. HUNTER:  Yes.

18          THE COURT:  -- will be done.

19          MR. HUNTER:  Thank you, Your Honor.

20          THE COURT:  Okay, Mr. Fielder?

21          MR. FIEDLER:  No problem.

22          THE COURT:  All right.  But still with that same

23  process and if we could get a few more entered, we'll do that,

24  as well.

25          MR. HUNTER:  Okay.

116

1         MR. STERRETT:  Thank you, Your Honor.  We endeavor to

2    make everyone's lives a little easier if we can.

3         THE COURT:  Okay.

4         MR. STERRETT:  And, you know, absent any objections

5    from the courtroom, we request your entry of the utilities

6    order.

7         THE COURT:  Yeah.  No.  I saw what -- you know, the

8    application seemed very reasonable and, you know, the deposits

9    are there and it's an interim order, like a lot of these are,

10   so I'm happy to enter the order.

11        MR. STERRETT:  Thank you, Your Honor.

12        The next is the NOL motion filed at Docket Number 23.

13   Through this order, the debtors are seeking approval of

14   procedures for certain transfers of common and preferred stock.

15   The debtors have considerable tax attributes that are valuable

16   and in a case where value is cut so thin and we're, you know,

17   focused on efficiency and preserving value of the estates, this

18   is an incredibly important motion at this juncture.

19        And all we're seeking to do is provide control to the

20   estates and the debtors in terms of understanding what

21   transfers are being made and giving an opportunity to object to

22   any that would threaten the tax attributes.

23        We're fully resolved with all parties and interests

24   that have raised concerns and the U.S. Trustee's language is

25   incorporated into the order that's with the Court.  So absent

1  any questions, we'd request your entry of the NOL order.

2          THE COURT:  All right.  I -- on this one, I just --

3  this one actually bleeds over into another one about the

4  waiving the requirement of the list of equity security holders,

5  which it sounds like you're handling.  And I understand the

6  part about the common shareholders and all that.

7          But like if, for example, in this one, if a

8  substantial shareholder is an entity that has beneficial

9  ownership of 4.5 percent and I was wondering -- and then in

10  order to send them this notice, you have to know that there's

11  someone who has 4.5 percent, right?

12          MR. STERRETT:  That's right, Your Honor.  Well,

13  however I'll state that we are noticing this to all, you know,

14  known registered equity holders, common and preferred, to the

15  extent, you know, we have the information necessary to do so.

16  Our claim -- proposed claims and noticing agent, Kroll, is

17  working with AST, American Stock Transfer, to get as much

18  noticing information for common equity holders as possible.

19          So, you know, we are trying to notice as much as we

20  can and, you know, this contemplates 4.5 percent holders of

21  common and preferred, but it also, you know, is anybody who's

22  interested in owning 4.5 percent of common.  So that --

23          THE COURT:  Right.  Right.  But like I said, I was

24  kind of focused on the other one, on the one where you were

25  waiving the list of equity holders and I understand it, again,

1  as to the common stock.

2          I'm just wondering why you wouldn't want to, if you

3  know it and it seems like you know it, you wouldn't want to

4  just specifically -- why you wouldn't be able to specifically

5  list those equity holders at more than 4.5 percent and -- yeah.

6  I don't -- I'm just not sure why you would -- why it -- is that

7  a problem or is it to list those people that have --

8          MR. STERRETT:  We're happy to do so.  We're happy to

9  list --

10          THE COURT:  -- well --

11          MR. STERRETT:  -- equity holders with --

12          THE COURT:  -- if so.  I mean people -- I think

13  people, if there's one thing that lawyer -- sometimes lawyers

14  and other people look at is, like, who owns this and I think

15  you -- I don't think it's that hard to do.  So and I don't want

16  to put an undue burden on.  I just want to -- especially people

17  that are subject to this, why not notice them and put them on

18  the list.

19          MR. STERRETT:  We're happy to.

20          THE COURT:  All right.

21          MR. STERRETT:  Absolutely.

22          THE COURT:  Great.  Thank you.

23          MR. STERRETT:  All right.  So absent any further

24  questions, we'd respectfully request your entry of the NOL

25  order.

1          THE COURT:  Yeah.  And I think we might have just

2    covered two with one.

3          MR. STERRETT:  I'll take it.  Yeah.

4          THE COURT:  All right.

5          MR. STERRETT:  Great.  Absolutely.  We'll move on

6    then to the joint administration order entered or at -- filed

7    at Docket Number 5.

8          THE COURT:  Uh-huh.

9          MR. STERRETT:  We have 75 affiliated entities and

10   we're seeking routine relief to administer these complex cases

11   under the publicly traded name of the -- the name of the

12   publicly traded parent company, Bed Bath & Beyond, Inc.

13         MS. STEELE:  Yes, Your Honor.  And the U.S. Trustee

14   has no objection and the debtor did place language in the order

15   that we requested that the monthly operating reports, under the

16   new guidelines, are filed in each case and that was agreed to

17   and put into the order.

18         THE COURT:  Okay.  Yeah.  Well, I mean the --

19   certainly, this is a good base to be jointly administered and

20   you addressed that concern, so it would be not a good case to

21   not have jointly administered, so that's a pretty easy one.

22         MR. STERRETT:  We agree wholeheartedly.  Thank you,

23   Your Honor.

24         We'll move onto the case management motion, which is

25   filed at Docket Number 7.  We're aware of the 2009 general

120

1    order in place in the District of New Jersey.  However, you

2    know, a lot of time has passed in, you know, since 2009 and

3    our -- we seek with our case management procedures to, you

4    know, move things into the, you know, 2020s here.

5              THE COURT:  Right.  Yeah.  I -- that's a little bit

6    of a shot, but I'll take it.

7              MR. STERRETT:  Made respect of -- respectfully, of

8    course.

9              THE COURT:  All right.  It's okay.  I got it.

10             MR. STERRETT:  And so these are --

11             THE COURT:  I'm going to have to talk to the chief

12   judge about that one.

13             MR. STERRETT:  And these are routine procedures and

14   are seeking to, you know, ease the administrative burden on the

15   Court and the parties in terms of, you know, setting the table

16   for the administration of these cases.  And so happy to discuss

17   and, you know, we've been thinking about scheduling and we're

18   happy to do so now or at the end.  But -- or separately

19   through, you know, discussing with chambers, but that's what

20   would be accomplished as part of this motion.  So absent any

21   questions, we'd request your entry of the case management

22   order.

23             THE COURT:  You went -- the U.S. Trustee's okay with

24   this one?

25             MS. STEELE:  Yes, Your Honor.  No objection.

1            THE COURT:  Yeah.  I think it's a good thing to have

2       those case management procedures and guidelines updated, as

3       well, and to -- makes sense to me, so we'll approve that order,

4       as well.

5            MR. STERRETT:  Great.  Thank you, Your Honor.

6            Next up is the claims agent 156(c), retention

7       application for Kroll filed at Docket Number 6.  Here we have

8       got Kroll, who's, you know, amply capable of handling the

9       responsibilities of claims and noticing agent in these cases.

10      They will serve as noticing agent on the case website and

11      assist with the, you know, copious noticing required in this

12      case, thousands of stakeholders, and we think they're up for

13      the case.  So absent any questions, we'd request your entry of

14      order.

15           THE COURT:  No.  They're certainly well-known and

16      well regarded and I have no problem with them serving as the

17      agent that way.

18           MR. STERRETT:  Thank you.

19           THE COURT:  So we'll approve that, as well.

20           MR. STERRETT:  Great.

21           MS. STEELE:  No objection, Your Honor.

22           THE COURT:  All right.  I'm sorry.  Thank you.  Thank

23      you.  I rule quickly.

24           MR. STERRETT:  We're moving at a break-neck pace.  So

25      next up is the creditor matrix motion filed at Docket Number 8,

1  which you mentioned earlier.  We might have, you know, killed

2  two birds with one stone.  I just want to flag that, you know,

3  here -- with herein, we are working with redaction of

4  personally identifiable information and that includes home and

5  email addresses of individual creditors and all personally

6  identifiable information of minors.  I understand we're

7  resolved with the U.S. Trustee on that point and all other

8  objections and requested information's incorporated in this

9  order.  So absent any questions, we'd request your entry.

10          THE COURT:  Anyone have any comments?

11          MS. STEELE:  No objection, Your Honor.

12          THE COURT:  Well, I think this is a very standard and

13  appropriate order, as well, and that you addressed personally

14  identifiable information issues.  So that will be entered, as

15  well.

16          MR. STERRETT:  Thank you, Your Honor.  Two more to

17  go.

18          THE COURT:  All right.

19          MR. STERRETT:  We have the SOFA and schedule

20  extension, timeline extension, motion filed at Docket Number 9.

21  Herein, we're requesting a 20-day extension of the timeline by

22  which we must replay our schedules and statements.  This is

23  trying strike a balance between the shortened timeline for

24  these cases and the massive amounts of leases, contracts and

25  other books and records of the company.

123

1          THE COURT:  So I have no problem with that obviously,

2    but I -- and I think this almost goes without saying, and I

3    know it'll happen, is that, of course, when the Committee gets

4    appointed, you'll be -- exchange with them the information that

5    they reasonably request so that they can get up to speed on all

6    kinds of different issues, including the liens and all other --

7    and that.

8          You know, because normally they need the schedules to

9    do at least part of that investigation.  So, like I say, I have

10   no problem with the 20 days, but I do think I'm informally or,

11   you know, unofficially saying that also assumes that you're

12   going to be cooperating with them and providing them, answering

13   their reasonable requests.

14         MR. STERRETT:  Of course.

15         MS. STEELE:  Yes, Your Honor.  And just with respect

16   to the U.S. Trustee, we have spoken to counsel and that puts

17   the date that the schedules would be filed on or around

18   May 30th and we have sent -- set a tentative date for the 341

19   for June 5th.  So we're hopeful that there won't be any

20   extensions for requests for the schedules and Statement of

21   Affairs so we can receive them on or about the 30th in order to

22   prepare for the 341 meeting.

23         THE COURT:  Yeah.  You know we actually had a

24   different date.  I think it fell on a Saturday, but maybe

25   that's --

1          MS. STEELE:  Okay.

2          THE COURT:  -- why you're saying the --

3          MS. STEELE:  Oh, that's -- because Monday is Memorial

4   Day.  So I moved it --

5          THE COURT:  Memorial -- yeah.  That's -- so that's

6   why you're saying it.

7          MS. STEELE:  I moved it to Tuesday.

8          THE COURT:  Yeah.  Yeah.  So --

9          MR. STERRETT:  We'll take the free days at the end of

10  our --

11         THE COURT:  Oh, yeah.  Yeah.

12         MR. STERRETT:  Yeah.  Right.

13         THE COURT:  You have got to --

14         MR. STERRETT:  Absolutely.

15         THE COURT:  You know add an extra day bonus you got.

16         MR. STERRETT:  Yeah.  So absent any further questions

17  or comments, we'd respect --

18         THE COURT:  Well --

19         MR. STERRETT:  -- respectfully request --

20         THE COURT:  -- I --

21         MR. STERRETT:  -- your entry of that order.

22         THE COURT:  That's good.  That'll be approved, as

23  well.

24         MR. STERRETT:  Great.  Thank you, Your Honor.

25         And that takes us to the last item on the debtors'

1  agenda today and that's a largely administrative and, you know,

2  procedural order on cross-border protocols.  That's filed at

3  Docket Number 24.

4       By these protocols, we seek to just put in place kind

5  of the guidelines and framework for the interplay between -- if

6  necessary, any interplay between the debtors can -- non-debtor

7  affiliates Canadian proceeding in Canada.  That's anticipated

8  to wrap up in short order, but to the extent there's any

9  overlap and interplay between the U.S. proceeding and the

10  Canadian proceeding, we want to put these in place in the

11  interest of comity, you know, cross-border judicial

12  administration efficiency.

13       THE COURT:  Well, I do have one question on that one

14  is that --

15       MR. STERRETT:  Okay.

16       THE COURT:  -- was that presented to the Canadian

17  court?

18       MR. STERRETT:  It hasn't been presented to the

19  Canadian court and based on the timeline of the CCWA, it may

20  not need to be.  But we want to make sure that our piece of the

21  puzzle is in place in case anything comes up where they need to

22  present this to the court.

23       THE COURT:  But in the interest of comity, so to be

24  consistent, wouldn't it make sense that both of us are okay

25  with it before it gets entered in one?  Unless that's a

1  problem.  I just I want to do what the order says is what I'm

2  saying.

3          MR. STERRETT:  That's --

4          THE COURT:  The order is saying that we should be in

5  comity with each other, right?  I mean being in comity with

6  each other, to me, means that you are on the same page on

7  things and I don't have any problem with anything I read in

8  there.

9          But, you know, I just I -- as much as I'm saying it

10 for notice purposes, I'm saying it out of respect and comity

11 purposes, so if you could just tell me.  Is your Canadian

12 counsel going to --

13         MR. STERRETT:  Okay.  Let us confer with Canadian

14 counsel on this.  I think we can, you know -- I don't think

15 there's anything urgent and pressing cross-border between --

16         THE COURT:  Yeah.  This doesn't --

17         MR. STERRETT:  -- the U.S. proceeding --

18         THE COURT:  -- seem urgent.

19         MR. STERRETT:  -- I think we're --

20         THE COURT:  Out of all the things in this case --

21         MR. STERRETT:  Right.

22         THE COURT:  -- this one does not seem urgent.

23         MR. STERRETT:  Right.  I think --

24         THE COURT:  So I --

25         MR. STERRETT:  Yeah.  We don't foresee any issues on

a cross-border basis between the Canadian and U.S. proceedings

here.  This was purely, you know, administrative and, you know,

relatively standard in retail, cross-border retails.  However,

we understand your concern and we can come back to this after

we have conferred --

THE COURT:  All right.

MR. STERRETT:  -- with Canadian --

THE COURT:  So we'll hold off --

MR. STERRETT:  -- counsel.

THE COURT:  -- on that one until you give us the

heads up that it's okay.  And that -- and I don't know if

you're handling this part or --

MR. STERRETT:  I feel like someone's right behind me.

THE COURT:  Yeah.  Yeah, he is.  Yeah, because we

need to set dates or a date --

MS. GEIER:  When am I not hovering over your --

MR. STERRETT:  It's okay.

THE COURT:  -- we need to --

MR. STERRETT:  -- I'll cede the podium to --

THE COURT:  -- we need to set dates --

MR. STERRETT:  -- Ms. Geier.

THE COURT:  -- for the final hearings.  Is that why

you're getting up?

MS. GEIER:  Yes, Your Honor.  Emily Geier again on

behalf of the debtors just here to talk about dates.  I believe

128

1  Your Honor wanted to get on the record, we have -- I think we

2  have discussed and agreed on May 16th assuming other parties

3  don't have an issue with that and that works for Your Honor's

4  schedule or at least that was what had been --

5          THE COURT:  Well, here --

6          MS. GEIER:  -- discussed to some extent.

7          THE COURT:  -- is the thing, right?  Here's the

8  thing, right, that I actually have somewhat of a heavy motion

9  calendar tomorrow and because I was provided with a lot of

10 reading materials, I had to put off a couple of the more

11 substantive things to May 16th.

12         MS. GEIER:  I see, Your Honor.

13         THE COURT:  And that I already did that and I -- in

14 fact, I think one of the attorneys that got up here,

15 Mr. Fleischer, is the attorney on one of the cases, just a

16 completely different case.  But --

17         MS. GEIER:  Do you think Mr. Fleischer would like to

18 continue that one and make this easier on us?

19         THE COURT:  I know that --

20         MS. GEIER:  I'm sure we can find another date.

21         THE COURT:  Yeah.  So --

22         MS. GEIER:  That's no problem.

23         THE COURT:  So anyway, so that, I know, is already a

24 heavy motion day that morning and so then it would be in the

25 afternoon, I think.  Is that -- or I don't know if there's

1 travel schedules or issues or --

2          MR. HUNTER:  That's fine.

3          MS. GEIER:  The afternoon is fine for the debtors,

4 Your Honor.  If that's an issue for anyone else, otherwise --

5          MS. STEELE:  The afternoon is fine for the U.S.

6 Trustee, Your Honor.

7          THE COURT:  Okay.  All right.  Or I could give you

8 another date if, you know, the -- and the other -- I have a lot

9 of scheduling things that I need to discuss.  Another one is

10 that I have -- you see there's all these books behind me and I

11 have had an ongoing trial that is basically Wednesdays, then

12 Fridays, because that's the days that I have.

13          And they just told me the last day that it's likely

14 go into June or July.  So I have hearings every Tuesday and

15 Thursday and I have trials -- not every Wednesday and Friday,

16 because people have scheduling conflicts, but a lot of

17 Wednesdays and Fridays.

18          So on the omnibus dates, it felt like maybe we

19 would -- well, I have two -- there's two minds on that because

20 I think the 16th could be a very important and busy one and it

21 could be a number of things on that day, but then as the case

22 progresses, they get less heavy.

23          So, you know, we could -- like I say, if there's a

24 week that I have some flexibility, it's probably -- when do --

25 that's the week we don't have a trial, only one day, right?

130

1          MR. STERRETT:  Well, we do on the --

2          THE COURT:  The --

3          MR. STERRETT:  -- 17th.

4          THE COURT:  -- May 14th week -- May 15th week one?

5          MR. STERRETT:  Right.  And we do have on the 17th.

6          THE COURT:  We do have it on the 17th.

7          MR. STERRETT:  Yeah.

8          THE COURT:  Yeah.  So anyway, I -- if you want to do

9  it on the afternoon of the 16th, we'll do it on the afternoon

10  of the 16th.

11          MS. GEIER:  Okay.  Thank you, Your Honor.

12          MS. STEELE:  Thank you, Your Honor.

13          MS. GEIER:  Are there --

14          THE COURT:  Then --

15          MS. GEIER:  -- other dates that you wanted to discuss

16  or --

17          THE COURT:  Yeah.  So another thing is that I

18  actually have a longstanding family vacation planned.  It's

19  actually not much of a -- it's not really a vacation.  It's to

20  do something with my wife's family and I'm leaving Sunday and I

21  won't be back until the following Sunday.

22          So it seems like things are under control and it

23  won't be an issue, but if there is an issue, I'm going to be

24  out of pocket.  And if there is an issue, you know, you just

25  contact Mr. Fugetis and he'll -- or my -- or one of my clerks

1  and let them know that you need a hearing or you need -- and I

2  have already spoke to one or two of my colleagues and I'll --

3  you know, it depends on the day, but people, you know --

4  someone else will be available if some kind of emergent issue

5  comes up.

6        MS. GEIER:  Thank you so much, Your Honor.  We will

7  strive to make every, every effort that no issue comes up

8  during that time and I'm sure we can resolve anything pending

9  your return.  But --

10        THE COURT:  Well, I'm okay if you go to somebody else

11  resolves it.

12        (Laughter.)

13        MS. GEIER:  We wouldn't dream of it.

14        We believe that the objection deadline is set by

15  Local Rules seven days in advance from the 16th, but please let

16  me know if that is incorrect and we'll make sure to plug in the

17  correct date for the objection deadline for the hearing.

18        THE COURT:  Yeah.

19        MS. GEIER:  Seven days, correct?

20        THE COURT:  Yeah.

21        MS. GEIER:  Yes?

22        THE COURT:  That's right.

23        MS. GEIER:  Okay.

24        THE COURT:  Yeah.

25        MS. STEELE:  And, Your Honor --

1              MS. GEIER:  Perfect.

2              MS. STEELE:  -- just with respect to the objection

3    date.  You know, we're going to try to form the Committee as

4    fast as possible, but I'm sure if the Committee would need a

5    day or so, I'm sure they could reach out to counsel.  I see

6    everyone nodding their heads, so I just wanted to put that --

7              THE COURT:  Yeah.

8              MS. STEELE:  -- on the record.

9              MS. GEIER:  Of course.

10             THE COURT:  Yeah.  And if there's --

11             MS. STEELE:  Thank you.

12             THE COURT:  -- a scheduling issue, you come to me and

13   I'll resolve it and --

14             MS. STEELE:  Thank you, Your Honor.

15             THE COURT:  -- and I'll try to be reasonable.  That's

16   what I try to do.

17             MR. HUNTER:  Thank you.

18             MS. GEIER:  Amazing.  Thank you so much, Your Honor,

19   for hearing us on such short notice and reading all of the

20   thousands of pages that we sent you.  So thank you very much

21   for your time.

22             THE COURT:  No, no.  We're glad to be of assistance

23   and I -- you know, many cases -- you always want the cases to

24   turn out well, but as we started out today with the initial

25   presentation, this is a different case and a special case and

1  especially want it to succeed and we -- and I'm very, very

2  convinced that the right team is there to -- and I'm not just

3  speaking about the debtors' side.

4        I'm speaking about all the parties that the --

5  because I have seen it.  It's evident in the papers.  And all

6  the parties working together, that's what this process is

7  really ultimately all about, as you all know, and I wish you

8  much luck and I know that there's going to be a hard -- a lot

9  of hard work and hopefully success, okay?

10        MS. GEIER:  Thank you, Judge.

11        ATTORNEYS:  Thank you, Your Honor.

12        THE COURT:  Thank you.

13        ATTORNEYS:  Thank you.

14        THE COURT:  Thank you.

15        MS. GEIER:  Your Honor --

16        UNIDENTIFIED SPEAKER:  Judge, just want to set the

17  time.

18        THE COURT:  Two -- oh, yeah, 2:00.

19        MS. STEELE:  2:00.

20        UNIDENTIFIED SPEAKER:  2:30 or we might have --

21        THE COURT:  2:00 -- I think that could be a little

22  bit of a heavy day.  It's possible to be a heavy day.

23        UNIDENTIFIED SPEAKER:  So 2:30 then?

24        THE COURT:  2:00.

25        UNIDENTIFIED SPEAKER:  2:00.

1          MS. STEELE:  2:00.

2          UNIDENTIFIED SPEAKER:  Okay.

3          MS. STEELE:  Thank you, Your Honor.

4          ATTORNEYS:  Thank you, Your Honor.

5          UNIDENTIFIED SPEAKER:  Thank you, Judge.

6          MS. GEIER:  Thank you, Your Honor.

7          THE COURT:  Thank you.  Have a good afternoon.

8                      * * * * *

1

**C E R T I F I C A T I O N**

2

      I, RUTH ANN HAGER, court-approved transcriber,

3

certify that the foregoing is a correct transcript from the

4

official electronic sound recording of the proceedings in the

5

above-entitled matter, and to the best of my ability.

6

7

/s/ Ruth Ann Hager

8

RUTH ANN HAGER

9

J&J COURT TRANSCRIBERS, INC.      DATE:  May 1, 2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25