**McMANIMON, SCOTLAND & BAUMANN, LLC**
75 Livingston Avenue, Ste. 201
Roseland, NJ 07068
(973) 622-1800
Anthony Sodono, III (asodono@msbnj.com)
Sari B. Placona (splacona@msbnj.com)
*Attorneys for Creditor, Salmar Properties, LLC*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors. | (Jointly Administered) |

<div align="center">

**CERTIFICATION OF IAN SIEGEL IN SUPPORT OF LIMITED OBJECTION OF SALMAR PROPERTIES, LLC TO DEBTORS' MOTION TO ENTRY OF AN ORDER (I) AUTHORIZING (A) REJECTION OF CERTAIN UNEXPIRED LEASES AND (B) ABANDONMENT OF ANY PERSONAL PROPERTY, EFFECTIVE AS OF THE REJECTION DATE AND (II) GRANTING RELATED RELIEF**

</div>

**Ian Siegel,** of full age, hereby certifies and states as follows:

1.      I am the property manager for real property located at 850 Third Avenue, Brooklyn, New York 11232 (the "Building").  The Debtor operated at the Building.

2.      Except where specifically noted, the statements in this Certification are based on my personal knowledge, belief or opinion, and submitted in support of Salmar Properties, LLC's ("Salmar") limited objection to the Debtor's Motion for an Order, amongst other things, to reject certain unexpired leases.

3.      If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4.      Salmar, as landlord, entered into a certain Retail Lease with Bed Bath & Beyond, Inc. (the "Debtor") dated December 31, 2014, as the same may have been amended, modified and/or supplemented, including without limitation by that certain First Amendment to Lease entered into as of March 16, 2016, and Rent Commencement and Expiration Date Agreement as of August 2, 2018 (collectively, the "Lease") concerning certain premises located on the second floor (the "Premises") of the building located at the Building, which Premises are more particularly described in the Lease.

5.      The Lease has an initial fifteen year term.  The Debtor is required to make monthly payments to Salmar pursuant to the terms of the Lease.  The Lease expires in 2032.  A copy of the Lease is attached as Exhibit A.

6.      As of May 1, 2023, the Debtor owes Salmar $818,324.92 for including but not limited to, late fees, utility charges, common area maintenance (CAM) charges and adjustments, storage rent, and base rent.  See Exhibit B.

I hereby certify that the foregoing statements made by me are true.  If any of the foregoing statements made by me are willfully false, I am subject to punishment.

*/s/ Ian Siegel*
Ian Siegel

Dated: May 9, 2023

2

# EXHIBIT A

# <u>RETAIL LEASE</u>

**SALMAR PROPERTIES, LLC,**

Landlord

and

**BED BATH & BEYOND INC.,**

Tenant

Premises:

A portion of the Building known as 850 Third Avenue, Brooklyn,
New York 11232, as shown on attached Exhibit A

Date: December 31 , 2014

# TABLE OF CONTENTS

**Page**

Article 1. Basic Terms and Definitions ........................................................................ 1
Article 2. Demise; Rent ............................................................................................... 6
Article 3. Use; Rules and Regulations; Tenant Operations; Signs ............................ 7
Article 4. Condition of the Premises; Landlord's Work; Measurement of Premises ....... 20
Article 5. Tenant's Work .............................................................................................. 24
Article 6. Tax Payments .............................................................................................. 32
Article 7. Expense Payments ....................................................................................... 37
Article 8. Utilities; Services ........................................................................................ 42
Article 9. Common Areas ............................................................................................ 45
Article 10. Repairs and Maintenance .......................................................................... 50
Article 11. Laws .......................................................................................................... 52
Article 12. Subordination; Estoppel Certificates ....................................................... 53
Article 13. Insurance ................................................................................................... 55
Article 14. Casualty .................................................................................................... 58
Article 15. Condemnation ........................................................................................... 61
Article 16. Assignment and Subletting ....................................................................... 63
Article 17. Access; Changes in Building and Real Property ...................................... 69
Article 18. Default ....................................................................................................... 70
Article 19. Remedies ................................................................................................... 71
Article 20. Renewal Option ........................................................................................ 75
Article 21. Right of First Offer .................................................................................... 76
Article 22. Notices; Consents and Approvals ............................................................. 79
Article 23. No Representations; Liability; Tenant Indemnity ..................................... 79
Article 24. End of Term ............................................................................................... 82
Article 25. Special Reporting and other Requirements ............................................... 83
Article 26. Miscellaneous ........................................................................................... 84
Article 27. Environmental Matters .............................................................................. 89
Article 28. Landlord's Covenants, Warranties and Representations. .......................... 92
Article 29. Tenant's Property ....................................................................................... 93
Article 30. Limitation of Tenant's Liability ................................................................ 93
Article 31. Designated Parcel ...................................................................................... 93
Article 32. Scaffolding ................................................................................................ 94

Riders
Basic Lease Terms
IDA Rider

Exhibits

Exhibit A    –    Premises
Exhibit A-1 –    Real Property
Exhibit B    –    Landlord's Work
Exhibit C    –    Site Plans and Floor Plans
Exhibit C-1 –    Alternate Site Plan
Exhibit D    –    Commencement Date Agreement
Exhibit E    –    Rules and Regulations
Exhibit F    –    Sign Drawings (Building and Pylon)
Exhibit G    –    Form of Required Disclosure Statement
Exhibit H    –    Employment and Benefits Report (EDC)
Exhibit I    –    Subtenant's Employment & Benefits Report (IDA)
Exhibit J    –    Permitted Encumbrances
Exhibit K    –    Form of Subordination, Non-Disturbance and Attornment Agreement
Exhibit L    –    Form of Subtenant Recognition Agreement
Exhibit M    –    Form of Delivery Date Notice
Exhibit N    –    Form of Delivery Date Certification
Exhibit O    –    Existing Exclusives
Exhibit P    –    Prohibited Uses
Exhibit Q    –    Certified LOD
Exhibit R    –    Easement Agreement
Exhibit S    –    Tenant's Permits
Exhibit T    –    Landlord's Environmental Reports
Exhibit U    –    Agency Lease Agreement

# RETAIL LEASE

Lease dated December 31 , 2014 between SALMAR PROPERTIES, LLC, a New York limited liability company ("Landlord"), and BED BATH & BEYOND INC., a New York corporation ("Tenant").

## Article 1.  Basic Terms and Definitions

Section 1.1    AAA. The American Arbitration Association.

Section 1.2    Additional Rent. All sums, other than the Fixed Rent, payable by Tenant to Landlord under this Lease, including the payment of deficiencies and increases in the Security, if any.

Section 1.3    Affiliate: A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

Section 1.4    Building. The building and improvements located at 850 Third Avenue, Brooklyn, New York 11232 and described as Parcel I on Exhibit A-1.

Section 1.5    Certified LOD. As defined in Section 4.3(c).

Section 1.6    Commencement Date. The Delivery Date, as herein defined in Section 4.3.

Section 1.7    Common Areas. The "Common Areas" are those areas and facilities which may be furnished by Landlord (or others on behalf of Landlord) in or near the Building for the non-exclusive common use of tenants and other occupants of the Building, their employees, customers, and invitees, including lobbies (but not the second level retail lobby, which shall be deemed included within the Premises), hallways, lavatories, stairwells, elevators, accessways, parking areas adjacent to or in the vicinity of the Building (including, without limitation, the parking spaces located upon the Parking Lot Parcel) and used by the tenants and occupants of the Building and their invitees, access areas (other than public streets), driveways, loading docks and loading areas, sidewalks, lighting facilities, cooling towers, air handlers, and other similar facilities and other similar common areas, facilities or improvements (the foregoing shall include without limitation the "Front Entry Feature" as shown on Exhibit F hereto, provided that the foregoing shall not affect Tenant's exclusive right to maintain its Signs thereon as hereinafter provided). Without limiting the foregoing provisions of this Section 1.7, if Landlord or any of its Affiliate(s) hereafter acquires the Designated Parcel and develops the same as an integrated part of the Parking Lot Parcel as described in Article 31 hereof

(and as depicted on the alternative site plan shown on <u>Exhibit C-1</u> attached hereto), then the parking spaces and other "common areas" located therein shall also be deemed a part of the Common Areas for the purposes of this Lease.

**Section 1.8** <u>Consent Request</u>. As defined in <u>Section 16.5</u>.

**Section 1.9** <u>Default</u>. As defined in <u>Section 18.1</u>.

**Section 1.10** <u>Delivery Date</u>. As defined in <u>Section 4.3</u>.

**Section 1.11** <u>Delivery Date Certification</u>. As defined in <u>Section 4.5</u>.

**Section 1.12** <u>Delivery Date Notice</u>. As defined in <u>Section 4.2</u>.

**Section 1.13** <u>Designated Parcel</u>. Shall mean that parcel of land located on the corner of 2nd Avenue and 32nd Street, Brooklyn, New York which as of the date hereof is not owned by Landlord, as shown on <u>Exhibit C</u> hereof.

**Section 1.14** <u>Easement Agreement</u>. Shall mean that certain Easement Agreement dated as of the date hereof from Salmar 870, LLC in favor of Landlord over the Parking Lot Parcel, a full and complete copy of which is attached to this Lease as <u>Exhibit R</u>, which Easement Agreement is being executed and delivered simultaneously with this Lease.

**Section 1.15** <u>EDC</u>. The New York City Economic Development Corporation.

**Section 1.16** <u>Election Notice</u>. As defined in <u>Section 21.1</u>.

**Section 1.17** <u>Environmental Laws</u>. As defined in <u>Section 27.1</u>.

**Section 1.18** <u>Exclusive Items</u>. As defined in <u>Section 3.10</u>.

**Section 1.19** <u>Existing Exclusives</u>. As defined in <u>Section 3.11</u>.

**Section 1.20** <u>Excused Periods</u>: Periods during which Tenant's failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

**Section 1.21** <u>Expense Payment</u>. As described in <u>Section 7.3</u>.

**Section 1.22** <u>Expense Statement</u>. As described in <u>Section 7.4</u>.

**Section 1.23** <u>Expiration Date</u>. The expiration of the fifteenth (15th) Lease Year, subject to the extension of the Term in accordance with <u>Article 20</u> herein.

**Section 1.24** <u>Fixed Rent</u>. The Fixed Rent as shown in the Basic Lease Provisions.

**Section 1.25** <u>Floor Area</u>: The actual number of square feet of space contained within the space in respect of which such definition is used.

**Section 1.26** <u>Future Exclusives</u>. As defined in Section 3.11.

**Section 1.27** <u>Final Landlord's Plans and Specifications</u>. As defined in Section 5.13(i).

**Section 1.28** <u>Hazardous Substances</u>. As defined in <u>Section 27.1</u>.

**Section 1.29** <u>HVAC Units</u>. As defined in <u>Section 10.3</u>.

**Section 1.30** <u>ICAP</u>. The New York City Industrial and Commercial Abatement Program.

**Section 1.31** <u>IDA</u>. The New York City Industrial Development Agency.

**Section 1.32** <u>Landlord's Work</u>. The work described in <u>Exhibit B</u> to this Lease.

**Section 1.33** <u>Laws</u>. All present and future laws, rules, regulations, orders, ordinances, judgments, requirements and (if Landlord adopts same) recommendations (collectively, "<u>Laws</u>") of the United States of America, the State of New York, the city, town, village, municipality and/or county in which the Premises are located, or any present or future subdivision or instrumentality thereof, any court, agency, department, commission, board, bureau, and any fire insurance rating body (collectively, "<u>Authority</u>" or "<u>Authorities</u>").

**Section 1.34** <u>Lease Interest Rate</u>. The then effective prime rate as published from time to time in the "Money Rates" section of the Wall Street Journal (or any successor publication thereto) plus two (2%) percent.

**Section 1.35** <u>Lease Year</u>. Each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February after the Rent Commencement Date, if the Rent Commencement Date is not the first day of a month, or commencing on the Rent Commencement Date and each February 1 thereafter, if the Rent Commencement Date is February 1. The period from the Rent Commencement Date through January 31 first occurring thereafter, shall be included in the first Lease Year.

3

**Section 1.36** Legal Compliance Work.  As defined in Section 11.1.

**Section 1.37** Mortgages, Mortgagees, Superior Landlord and Superior Leases, shall have the meanings ascribed to them in Section 12.1.

**Section 1.38** Offer Notice.  As defined in Section 21.1.

**Section 1.39** Offer Space.  As defined in Section 21.1.

**Section 1.40** Offer Space Delivery Date.  As defined in Section 21.2.

**Section 1.41** Offer Space Commencement Date.  As defined in Section 21.1.

**Section 1.42** Operating Expenses.  As defined in Section 7.2.

**Section 1.43** Original Tenant.  Shall mean Bed Bath & Beyond Inc., a New York corporation.

**Section 1.44** Parking Areas.  As defined in Section 7.1.

**Section 1.45** Parking Area Expenses.  As defined in Section 7.1.

**Section 1.46** Parking Lot Parcel.  That parcel of land on which the parking lot serving the retail portion of the Real Property is located, which is commonly known as 870 Third Avenue, Brooklyn, New York and is more particularly described as Parcel II on Exhibit A-1 hereto.  If Landlord or any of its Affiliate(s) acquires the Designated Parcel and develops the same as an integrated part of the Parking Lot Parcel as described in Article 31 hereof (and as depicted on the alternative site plan shown on Exhibit C-1 attached hereto), then the Designated Parcel shall thereupon be deemed included within the Parking Lot Parcel for the purposes of this Lease.

**Section 1.47** Permitted Encumbrances.  As defined in Section 3.10.

**Section 1.48** Permitted Use.  As set forth in the Basic Lease Terms.

**Section 1.49** PILOT Agreement.  A payment in lieu of taxes agreement.

**Section 1.50** Premises.  A certain portion of the Building located on the second level thereof and so shown and designated on Exhibit A to this Lease.

**Section 1.51** Proportionate Share.  As set forth in the Basic Lease Terms.

**Section 1.52** Real Estate Taxes.  As defined in Section 6.1.

4

**Section 1.53** <u>Real Property</u>.  The Building and the land on which it is located, and the appurtenant parking areas, including, without limitation, the Parking Lot Parcel.

**Section 1.54** <u>Recapture Date</u>.  As defined in <u>Section 3.4</u>.

**Section 1.55** <u>Recapture Termination Date</u>.  As defined in <u>Section 16.2</u>.

**Section 1.56** <u>Related Land</u>.  Shall mean any land contiguous or adjacent to the Real Property (including, without limitation, any land that would be contiguous or adjacent to the Real Property but for any intervening road, street, alley or highway) now or hereafter owned or controlled by Landlord or any of its Affiliate(s), and shall include, without limitation the Designated Parcel in the event such parcel is acquired by Landlord or any of its Affiliate(s).

**Section 1.57** <u>Renewal Notice</u>.  As defined in <u>Section 20.1</u>

**Section 1.58** <u>Renewal Term</u>.  As defined in <u>Article 20</u> hereof.

**Section 1.59** <u>Renewal Term Commencement Date</u>.  As defined in <u>Section 20.1</u>.

**Section 1.60** <u>Renewal Term Expiration Date</u>.  As defined in <u>Section 20.1</u>.

**Section 1.61** <u>Renewal Term Notice Date</u>.  As defined in <u>Section 20.1</u>.

**Section 1.62** <u>Rent</u>.  The Fixed Rent and all Additional Rent.

**Section 1.63** <u>Rent Commencement Date</u>. The 90th day following Commencement Date (i.e., the Delivery Date).

**Section 1.64** <u>Intentionally Omitted</u>.

**Section 1.65** <u>Rules</u>.  The rules and regulations annexed hereto as <u>Exhibit E</u> and such reasonable changes therein (whether by modification, restatement, elimination or addition) as Landlord may make at any time or times hereafter and as communicated to Tenant.

**Section 1.66** <u>Signs</u>.  All signs, designs, monuments, logos, banners, projected images, awnings, canopies, pennants, decals, advertisements, pictures, notices, lettering, numerals, graphics, and decorations.

**Section 1.67** <u>Substantially Completed or Substantial Completion</u>:  The completion of specified work at the Real Property (including, without limitation, as applicable, Landlord's Work) to the extent that only "punch list items" of such work shall not be completed.

**Section 1.68** <u>Tax Estimate Statement</u>. As defined in <u>Section 6.3</u>.

**Section 1.69** <u>Tax Payment</u>. As described in <u>Section 6.3</u>.

**Section 1.70** <u>Tax Year</u>. As defined in <u>Section 6.2</u>.

**Section 1.71** <u>Tenant's Initial Work</u>. As defined in <u>Section 5.12</u>.

**Section 1.72** <u>Tenant's Permits</u>. As defined in <u>Section 4.3(b)</u>.

**Section 1.73** <u>Tenant's Plans</u>. As defined in <u>Section 5.2</u>.

**Section 1.74** <u>Tenant's Property</u>. All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

**Section 1.75** <u>Tenant's Renewal Right</u>. As described in <u>Section 20.1</u>.

**Section 1.76** <u>Tenant's Work</u>. Tenant's Initial Work and any changes, improvements or alterations made by Tenant to the Premises during the Term in accordance with <u>Article 5</u> hereof.

**Section 1.77** <u>Term</u>. The period commencing on the Rent Commencement Date and ending on the Expiration Date, subject to earlier termination or extension of this Lease pursuant to the terms hereof.

**Section 1.78** <u>Utility Cap</u>. As defined in <u>Section 8.1(b)</u>.

**Section 1.79** <u>Certain Other Definitions</u>. Any reference in this Lease to (a) "<u>legal action</u>", includes any suit, proceeding or other legal, arbitration or administrative process, and any appellate proceedings in connection therewith, (b) "<u>person</u>" includes any individual or entity, (c) "<u>this Lease</u>" includes the Rules and the other Exhibits to this Lease, and (d) "<u>including</u>" means "<u>including without limitation</u>."

## Article 2. <u>Demise; Rent</u>

**Section 2.1**    Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, together with the right to use the Parking Lot Parcel as provided in this Lease pursuant to the Easement Agreement, for the Term, at the Rent and on the other terms of this Lease.

**Section 2.2**    Tenant shall pay Landlord the Rent, without notice, abatement, deduction or offset (except as expressly provided in this Lease), in lawful money of the United States of America, by Tenant's check or another method approved by Landlord, at Landlord's Notice Address or another address Landlord designates, and as provided in this Lease. The Fixed Rent shall be paid in equal monthly installments, in advance, on the first day of each calendar month during the Term. Rent shall be pro-rated for any partial month according to the number of days in the month occurring during the Term. Landlord's delay in rendering, or failure to render, any statement required to be rendered by Landlord for any Rent for any period shall not waive Landlord's right to render a statement or to collect that Rent for that or any subsequent period. The rendering of an incorrect statement shall not waive Landlord's right to render a corrected statement for the period covered by the incorrect statement and collect the correct amount of the Rent, which Tenant shall pay within thirty (30) days after its receipt of the corrected statement.

**Section 2.3**    Tenant is not required to pay Fixed Rent until the Rent Commencement Date; and if the Rent Commencement Date is not the first day of a month, the Fixed Rent for the month in which the Rent Commencement Date occurs shall be apportioned according to the number of days in that month and shall be due and payable when invoiced.

**Section 2.4**    Unless otherwise specified in this Lease, all Additional Rent shall be paid by Tenant within thirty (30) days after Tenant is billed therefor.

**Section 2.5**    At the request of either, Landlord and Tenant shall execute an agreement setting forth the Commencement Date, the Rent Commencement Date and the Expiration Date in the form attached hereto as <u>Exhibit D</u>. Upon determination of the Rent Commencement Date, Landlord shall deliver to Tenant a completed and signed IRS Form W-9; the delivery of the Form W-9 shall be a condition precedent to the payment of Rent.

## Article 3.  <u>Use; Rules and Regulations; Tenant Operations; Signs</u>

**Section 3.1**    Tenant shall use the Premises only for the Permitted Use, subject, however, to the provisions of this Lease. Subject to the further provisions of this Lease, Tenant, at its sole cost and expense, shall acquire any and all permits, licenses, certificates and approvals required by Laws for the Permitted Use and the conduct of Tenant's operations in the Premises. Tenant shall store in the Premises only the merchandise that Tenant sells on a retail basis for the Permitted Use of the Premises.

**Section 3.2**    Tenant shall not use the Premises, or any part thereof, in violation of any applicable occupancy permit, if any, for the Premises or the Building or Laws applicable thereto.

7

**Section 3.3**    Tenant shall, and shall cause its employees, contractors, and invitees to, comply with the Rules.  Landlord is not required to enforce the Rules against Tenant or any other tenant or occupant, their employees, contractors or invitees, and Landlord shall not be liable to Tenant for any violation of the Rules by another tenant or occupant or any of their employees, contractors or invitees.  Landlord's failure to enforce the Rules against Tenant or any other occupant of the Building shall not be considered a waiver of the Rules, provided that the Rules shall not be enforced in a discriminatory manner.  Notwithstanding anything to the contrary contained herein and in Section 1.65 hereof, Tenant shall comply with changes or modifications to the Rules as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Building and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

**Section 3.4**    Subject to the other provisions of this Lease, Tenant shall initially open at least fifty percent (50%) of the Floor Area of the Premises for retail business to the public for at least one (1) day, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Section 3.4 or any other provision of this Lease [other than by reason of a Default]).  In the event that Tenant does not operate or cause to be operated retail business to the public within at least fifty percent (50%) of the Floor Area of the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 180-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so

8

determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for period subsequent to the Recapture Date.

      **Section 3.5**    Tenant shall, at its expense:  (a) keep the inside of all glass in the doors and windows of the Premises clean; (b) maintain and replace the window shades originally installed by Landlord as part of Landlord's Work, which must be: Roche Industries, clutch roller shade with "Alken2 Solar Screen 3000 Net" fabric, white/beige with a 3% openness; (c) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests and shall arrange for extermination at regular intervals, not less frequently than monthly and more often as necessary; (d) keep any garbage, trash, rubbish or other refuse in vermin-proof containers within the interior of the Premises that are kept closed until removed; (e) deposit such garbage, trash, rubbish and refuse, on a daily basis, in receptacles provided or required by Landlord in the Common Areas pursuant to the terms of this Lease or as otherwise directed by Landlord; (f) remove from the Premises all rubbish resulting from and/or remaining after any fire or other similar casualty in the Premises; (g) keep all mechanical apparatus and equipment free of vibration and noise which may be transmitted beyond the Premises; (h) keep in the Premises and maintain in good working order one or more dry chemical fire extinguishers; and (i) prevent any odors or any noise which would constitute a nuisance from transmitting beyond the Premises.

      **Section 3.6**    Tenant shall not (and Landlord shall ensure that other tenants or other occupants of the Building shall not) (a) obstruct, or permit its employees, contractors, customers or invitees to obstruct, any Common Areas; (b) use or permit the use of any advertising medium which would constitute a nuisance (such as, without limitation, loudspeakers, phonographs, public address systems, sound amplifiers, reception of radio or television broadcasts within the Building); (c) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or without the Premises; (d) solicit business in any Common Areas, including without limitation through distribution of handbills or other advertising matter in any Common Areas or the display of any merchandise in the Common Areas (the foregoing being subject to the applicable provisions of Section 3.8(b) below); (e) receive or ship articles of any kind outside the designated loading areas, if any, for the Premises; (f) conduct or permit to be conducted any auction, fire sale (except to liquidate inventory in response to an actual fire and only if such sale is not conducted for more than forty-five (45) days), going out of business sale (except, one time only, to liquidate inventory at the end of the term of this Lease and only if such sale is not conducted for more than forty-five (45) days), bankruptcy sale (unless directed by court order), or other similar type sale in or connected with the Premises (but this provision is not intended to limit Tenant's freedom in setting its own selling prices); (g) use the Premises for any hazardous activity or in such manner as to constitute a nuisance of any kind (public or private); (h) cause waste; (i) permit its employees, invitees or deliverymen to loiter immediately outside the Premises or the

Building or within the Common Areas or to park cars in the Common Areas with "For Sale" signs (or signs of similar import) on them; or (j) place or maintain any merchandise, on the exterior Common Areas.

### Section 3.7

(a)    (i)    No Sign shall be exhibited, installed, inscribed, painted or affixed, without the prior consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, on any part of the outside of the Building or on the windows or doors of the Premises; or are otherwise visible from the outside of the Building; provided, however, Tenant shall have the exclusive right during the Term to maintain Signs on the exterior of the Building within those respective "sign band" areas shown on Exhibit F hereto (and upon the two-story freestanding "Front Entry Feature" also as shown on Exhibit F); such Signs shall be subject to the requirements and approval of the State Historic Preservation Office ("SHPO") and subject to Landlord's approval, not to be unreasonably withheld, conditioned or delayed and substantially as shown on Exhibit F. Landlord's approval rights shall include the content and color of the signage within the "sign band" areas and upon the "Front Entry Feature," provided that such approval right shall not extend to the content or color of Tenant's signs if such signs are Tenant's then current prototypical signs or the prototypical signs of any national or regional retail tenant occupying at least ten thousand (10,000) square feet of Floor Area. Notwithstanding the foregoing, no neon Signs or blinking or flashing Signs are permitted (except that Tenant shall be permitted to maintain neon Signs solely within the Premises, i.e., not on the exterior of the Building or within the first level lobby). Unless otherwise expressly permitted, Tenant may not (and Landlord shall ensure that no other tenant or occupant of the Building shall) install Signs advertising a fire sale, liquidation sale, distress sale, foreclosure sale, receiver's or sheriff's sale, going out of business sale, lost lease sale, or Signs of similar import. Landlord shall supply and install, as part of Landlord's Work, the Signs shown on Exhibit F (which shall include without limitation Tenant's signs on the exterior Building, and graphics, directory signage and advertising screens (e.g., televisions) within the first level lobby) in accordance with Exhibit B, and with the additional provisions of this Lease. Thereafter, Tenant shall have the right during the Term, at its sole cost and expense, to erect, maintain and replace on the exterior of the Building Signs within the sign band(s) on the exterior of the Building shown on Exhibit F (and within the first level lobby also as shown on Exhibit C), subject to compliance with applicable Laws (and as then applicable, the requirements and approval of SHPO) and subject to Landlord's approval of the content thereof, provided that such approval right shall not extend to the content of Tenant's signs if such signs are Tenant's then current prototypical signs, or the prototypical signs of any national or regional retail tenant occupying at least ten thousand (10,000) square feet of Floor Area. Notwithstanding anything herein contained, Landlord hereby agrees that any and all Signs located on, or visible from, the outside of the Building during the Term shall be limited to those of retail tenants of the Building and shall as to all other retail tenants of the Building be located

only within those respective areas designated as "Tenant's Exterior Signage Option One" and "Tenant's Exterior Signage Option Two," each as shown on Exhibit F (subject to the further terms and conditions of this Section 3.7(a), including without limitation Tenant's right to select the specific location of all of its sign bands within either such applicable area in the manner further described in clause (ii) of this Section 3.7(a)). Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared. Tenant shall, at its own expense, obtain all required licenses and permits for any Signs installed by Tenant, and renew them as required by applicable Laws. All Sign(s) shall be installed and removed in a good and workmanlike manner, without damaging the Real Property, and in compliance with all applicable Laws and the applicable provisions of this Lease. Prior to installing any permitted Sign, Tenant shall deliver to Landlord any permits or approvals required by applicable Laws in connection with such installation. Tenant shall maintain any permitted Signs in good, clean, neat and safe condition, and at the expiration or sooner termination of this Lease, Tenant shall cause such Signs to be removed. The signage rights granted to Tenant pursuant to this Section 3.7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable laws.

(ii)    Without limiting Tenant's right to maintain its other Signs as described in clause (i) of this Section 3.7(a) and shown on Exhibit F hereto, reference is made to Tenant's right to maintain Signs on the exterior of the Building within each of those two respective "sign band" areas comprising "Tenant's Exterior Building Signage Option One" as shown on Page of Exhibit F hereto [i.e., upon each of the "South Elevation" and the "North Elevation"], it being agreed that subject to the further provisions of this clause (ii) of Section 3.7(a), Tenant shall be entitled during the Term to maintain six (6) separate sign bands within each of said two respective sign band areas (for a total of twelve (12) sign bands, the specific location of each such sign band to be selected by Tenant), said twelve (12) sign bands being collectively referred to as "Tenant's Preferred Exterior Building Signage". Landlord and Tenant hereby agree that if despite Landlord's diligent and good faith efforts (at Landlord's cost and expense), the applicable governmental authority and/or SHPO fails to approve all of Tenant's Preferred Exterior Building Signage as described herein (whether attributable to the size, location and/or design of Tenant's Preferred Exterior Building Signage), then Landlord and Tenant shall work diligently and in good faith to designate (and resubmit) for approval to the applicable governmental authority and/or SHPO) an alternative to Tenant's Preferred Exterior Building Signage (the "Alternative Exterior Building Signage"); so long as the location, size and general design of such Alternative Exterior Building Signage is materially similar to that previously submitted hereunder (as Tenant's Preferred Exterior Building Signage), then the cost and expense of such resubmission shall be at Landlord's cost and expense; otherwise such cost and expense shall be the responsibility of Tenant (and Tenant shall reimburse Landlord for all reasonable costs and expenses so incurred by Landlord in connection with such resubmission, notwithstanding the subsequent failure

11

by the applicable governmental authority and/or SHPO to approve the Alternative Exterior Building Signage). If, despite Landlord's diligent and good faith efforts, the applicable governmental authority and/or SHPO fails to approve all of the Alternative Exterior Building Signage (whether attributable to the size, location and/or design of same), then provided that Tenant remains unwilling in its sole discretion to accept whatever of the Alternative Exterior Building Signage has in fact then been approved (as applicable), then Tenant's Signs as described in this clause (ii) of this Section 3.7(a) shall instead be located within the "sign band" area designated as "Tenant's Exterior Building Signage Option Two" on Page 1 of Exhibit F hereto [i.e., upon the South Elevation only] and Tenant shall in such event be entitled during the Term to maintain a total of six (6) separate sign bands within such sign band area, the specific location of each such sign band to be selected by Tenant. Notwithstanding anything contained in this clause (ii) of Section 3.7(a), if the applicable governmental authority and/or SHPO approves Tenant's Preferred Exterior Building Signage (or, as applicable, the Alternative Exterior Building Signage) pursuant to the provisions of this clause (ii) of Section 3.7(a), then Landlord shall be deemed to have consented to same as well (provided that with respect to the Alternative Exterior Building Signage, same is reasonably consistent with exterior building signage located within first class shopping centers in the New York Metropolitan Area). Landlord hereby agrees that any application submitted to the applicable governmental authority and/or SHPO pursuant to this clause (ii) of Section 3.7 hereto, whether pertaining to the Tenant's Preferred Exterior Building Signage and/or the Alternative Exterior Building Signage, shall (x) be submitted prior to any other application pertaining to exterior signage for the Building, and (y) not include or cover any other proposed signage affecting the Building (it being agreed, however, that the foregoing shall not prevent such application from requesting approval from the applicable governmental authority and/or SHPO for the specific "number" of sign bands as shown within the area designated as "Tenant's Exterior Building Signage Option One" on Page 1 of Exhibit F hereto).

(iii)    Tenant shall reimburse Landlord for a portion of the total reasonable cost incurred by Landlord for the construction of the Front Entry Feature, in an amount equal to (A) the total reasonable cost so incurred, less (B) the reasonable cost that Landlord would have incurred had Landlord instead constructed as the Front Entry Feature a one-story fabric canopy at the same location. Such amount shall be payable by Tenant to Landlord within thirty (30) days following Tenant's receipt from Landlord of reasonable supporting information as to the respective costs described in the preceding clauses (A) and (B). Subject to Section 10.1 (d) below, all ongoing repair and maintenance of the Front Entry Feature shall be performed during the Term by Tenant at its sole cost and expense.

(b)    Tenant shall also be entitled, at Tenant's sole cost and expense, to install and maintain, during the period commencing on the Temporary Sign Date (hereinafter defined) and ending on the day that is thirty (30) days following the date

upon which Tenant opens for business to the public, temporary Signs on the outside of the Building as shown in Exhibit F hereto. As used in this paragraph, the term "Temporary Sign Date" shall mean the date that is three (3) days following the earlier of (a) the installation by Landlord of the pylon sign structure as described in this Lease, or (b) April 15, 2015.

      (c)    Landlord agrees to install, as part of Landlord's Work, a pylon sign for the benefit of retail occupants of the Building, which shall contain both (i) Tenant's pylon panels, and (ii) an LED message board (the *"LED Board"*) that shall operate on a 24-hour, 365-day basis (subject to applicable Laws) to display Tenant's continuous messages, as shown on Exhibit F, which pylon sign shall be visible from the Gowanus Expressway. The pylon sign shall be in the location shown on Exhibit C and shall be of the type described and depicted on Exhibits B and F. In addition, Tenant's time allocation during the Term for the display of its messages upon the LED Board shall be determined by Tenant's then pro rata share of the total Floor Area of all retail tenants of the Building, which pro rata share shall at no time be less than 66.6% (it being further acknowledged and agreed that Tenant's, and other tenants' messages shall run continuously, as opposed to running only during certain designated times of the day). Tenant shall have the right to control both its pylon panels and its messages upon the LED Board as described above, subject to compliance with applicable Laws and the following additional terms and conditions: (a) Tenant's pylon panels, but not the LED Board, shall be subject to Landlord's approval of the content and color thereof, provided that such approval right shall not extend to the content or color of Tenant's signs if such signs are Tenant's then current prototypical signs, or the prototypical signs of any national or regional retail tenant occupying at least ten thousand (10,000) square feet of Floor Area within the Premises, and (b) Tenant's messages upon the LED Board shall at all times be consistent with those contained in LED message boards located within first class shopping centers in the New York Metropolitan Area. In no event shall the pylon sign or any portion thereof (including without limitation the LED Board) be used for any advertising or promotions or any other content for anyone other than retail tenants of the Building (which retail tenants shall be bound by the requirement that their signage and their messages upon the LED Board shall at all times be consistent with those contained on pylons and upon LED message boards located within first class shopping centers in the New York Metropolitan Area). Landlord shall not change or alter the location, structure, height or general appearance of the pylon sign without obtaining Tenant's consent, which shall not be unreasonably withheld or delayed. Landlord also agrees to install as part of Landlord's Work a monumental/directional sign as shown on Exhibit F (which sign shall name retail occupants of the Building, including without limitation Tenant).

      (d)    Landlord, upon request, shall execute any consents or applications which may be required by applicable Laws to permit the placement, installation, and/or replacement by Tenant of any Signs on any part of the Premises, or on any pylon or monument, to which Tenant may be entitled under this Lease.

(e)        During the Term, no exterior identification Signs attached to the Building shall be of the following type: (i) flashing, moving or audible Signs; (ii) Signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard Signs, temporary Signs (exclusive of contractor Signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.  No billboard signs shall be permitted on the Building.

(f)        Notwithstanding anything to the contrary contained in this Lease, Landlord shall, subject to applicable laws, use commercially reasonable and good faith efforts to minimize any obstructions (including, without limitation, scaffolding or architectural details, but any such scaffolding shall also be subject to Article 32 below) which may obscure the front exterior walls of the Building or any pylons, monuments or other freestanding Signs.  Landlord shall, subject to applicable laws, properly trim any trees, bushes or other landscaping to prevent the same becoming an unruly obstruction of any Building or pylon signage.

**Section 3.8**   (a)        Landlord and Tenant acknowledge that public access to the Premises shall be provided through a common lobby on the first level of the Building with Tenant having exclusive vertical transportation to a second level retail lobby, which second retail level lobby is part of the Premises and shall be under the exclusive control of Tenant.  Landlord shall provide, in accordance with Exhibit B, the means for the common lobby on the first floor to be closed by Tenant and wholly inaccessible to third parties at all times when Tenant is closed to the public for business, which closure shall at all times be under the exclusive control of Tenant and shall, without limitation, prevent ingress to and egress between the first level lobby and (i) the front vestibule doors shown on Exhibit C hereto, and (ii) any tenantable premises located on the first level of the Building.  Access between the exterior of the Building and the common elevators via the first level lobby may be prevented by Tenant at all times that the first level lobby is closed to the public by Tenant in accordance with this Section 3.8(a) and at such times Landlord shall provide alternative exterior access to and from such common elevators as shown on Exhibit C hereto.  Without limiting the foregoing, any and all access to the Premises from all the common elevators shall be locked-off and shall be controlled by Tenant outside of Tenant's business hours.  Notwithstanding that Tenant shall have control of the times during which the first level lobby is open to the public, and hence control the access to any other retail premises having ingress and egress through the first level lobby, if Tenant fails to have the first level lobby open to the public for a minimum of the typical retail hours for comparable businesses in Brooklyn, New York (and in any event open to the public 7:30 a.m. each morning at the latest), then

Landlord shall have the right to require (i) that Tenant has the first level common lobby open during such minimum hours, and (ii) if Tenant continues to fail materially to open the common lobby during such minimum hours, then Landlord shall be entitled to have Tenant surrender such control of the first level common lobby to Landlord; any dispute as to the determination of such "typical retail hours" shall be resolved by arbitration in accordance with the provisions of Section 19.10 below. Tenant shall have the right during the Term, at its expense, to install and maintain signage over the first level lobby entrance substantially as shown on Exhibit F, subject to the provisions of Section 3.7, all applicable Laws, and the requirements and approval of SHPO. Tenant shall maintain, repair and replace Tenant's signs in accordance with all applicable provisions of this Lease.

(b)    The first level common lobby and second level retail lobby areas shall be constructed and finished by Landlord and shall contain the following vertical transportation (each as shown on Exhibit B and Exhibit C) that shall be dedicated to the Premises: (a) two new passenger elevators, (b) a stairway, (c) an escalator system, and (d) a Vermaport or similar shopping cart conveyor (collectively "Tenant's Exclusive Vertical Transportation"), all of which shall be in accordance with specifications set forth in Exhibit B and which will be maintained by Tenant during the Term. The first level lobby is part of the Common Areas and shall be maintained by Landlord as such. Landlord shall permit only Tenant (and up to three other retail tenants of the Building, each of whose premises shall cover at least 10,000 square feet of Floor Area and shall be located adjacent to the first level lobby) to (A) use wall display cases and electronic screens for the display of merchandise in the first level lobby, subject to Section 3.8(c) below (except that in no event shall such wall display cases or electronic screens be located within that area designated as "No Display Area" on Exhibit C), and (B) maintain signs in the first level lobby, subject to Section 3.8(c) below; such wall display cases, electronic screens and signs shall at all times be maintained in a manner consistent with first class shopping centers in the New York Metropolitan Area. The second level retail lobby is for the sole use of Tenant and will be maintained by Tenant as part of the Premises. Tenant shall have the right, in Tenant's sole discretion, to determine how the second level retail lobby is used and the nature and location of any fixtures, fillings and displays therein and the layout thereof. Common elevators shall be Common Areas and shall be maintained by Landlord. Landlord shall assign to Tenant, or enforce on Tenant's behalf, the benefit of any warranties applicable to any vertical transportation to be maintained by Tenant pursuant to this Lease.

(c)    Landlord and Tenant shall work together diligently and in good faith to agree upon (i) that portion of Landlord's Work constituting the design, materials and finishes for the first level lobby, for that portion of the second floor constituting the walkway and the respective openings above the first level lobby (collectively the "Walkway/Openings") and for Tenant's Exclusive Vertical Transportation, it being agreed that all such design, materials and finishes shall be consistent with first-class

15

shopping centers in the New York City Metropolitan Area, (ii) the exact location of the Walkway/Openings, it being agreed that same shall in any event be located wholly within that certain rectangular area designated as "Walkway/Openings" on Page 3 of Exhibit C hereto, and (iii) the specific locations of the respective wall display cases, electronic screens and signs in the first level lobby as described in Section 3.8(b) above (subject to the "No Display Area" as described therein), and (iv) the manner of access between the first level lobby and all of the retail premises located on the first floor of the Building, it being agreed that all such access shall be restricted to those two respective locations designated as "Third Party Retail Access" on Exhibit C hereof.

(d)     Following Landlord's installation of design, materials and finishes for the first level lobby as agreed to by Landlord and Tenant hereunder, any future modifications by Landlord to same shall be subject to Tenant's prior written approval not to be unreasonably withheld. Any future modifications to the Walkway/Openings shall also be subject to Tenant prior written approval, which may be withheld by Tenant in its sole discretion.

**Section 3.9**     Landlord will operate a centralized shipping and receiving system with a dock master for the Building, which dock master shall be on duty 24-hours per day, 7 days per week, in a commercially reasonable manner entitling Tenant to have shipments received at a loading dock with reasonable proximity to the Premises and to accompany goods from the time they are off loaded from trucks to their delivery to the Premises. Landlord agrees that Tenant shall have access to and the exclusive use of four (4) loading docks as shown labeled "Tenant's Exclusive Docks" on Exhibit C, and four (4) freight elevators as shown labeled "Tenant's Exclusive Freight Elevators" on Exhibit C, which exclusive use shall occur between 7:00 PM and 7:00 AM, seven (7) days per week ("Tenant's Exclusive Loading Hours"), subject to continuing coordination with the dock master. Notwithstanding the foregoing (but without limiting Tenant's Exclusive Hours as so described), Tenant shall be permitted to use, on a non-exclusive basis, all loading docks and freight elevators located in the Building. Landlord shall provide to Tenant during the Term (a) adjacent to Tenant's Exclusive Docks fronting Second Avenue, in the location shown labeled "Tenant's Secured Loading Area/Secured Storage Area (24 hours per day, 7 days a week)" on Exhibit C, an area at all times exclusive to Tenant, secured by solid partitions (and doors), for the unloading of Tenant's inventory, merchandise and fixtures, (b) adjacent to Tenant's Exclusive Docks fronting 30th Street, in the location shown labeled "Tenant's Secured Loading Area (from 7PM to 7AM seven days a week)" an Exhibit C, an area exclusive to Tenant only during Tenant's Exclusive Loading Hours,  secured by solid partitions (and doors), for the unloading of Tenant's inventory, merchandise and fixtures, and (c) also in the location shown labeled "Tenant's Secured Loading Area/Secured Storage Area (24 hours per day, 7 days a week)" on Exhibit C, an area at all times exclusive to Tenant, secured by solid partitions (and doors) for Tenant's temporary storage of inventory, merchandise and fixtures prior to same being delivered to the Premises. In addition, Landlord shall during

16

the Term provide to Tenant during the Term a dedicated customer pick-up area for Tenant's customers to load their vehicles, which shall be located as shown labeled "Tenant's Customer Pick-Up Area" on Exhibit C. The reasonable costs associated with the operation of the Common Areas described in this Section 3.9 ("Shipping and Receiving Operating Costs") shall be included in, and subject to the terms and conditions associated with, Operating Expenses. Landlord shall use its best efforts to cause the dock master to reasonably cooperate with Tenant.

Section 3.10 (a) Landlord shall not hereafter enter into a lease nor permit any other premises in the Building or on any Related Land to be used for the primary use for the sale of (i) linens and domestics, (ii) bathroom items, (iii) housewares, (iv) frames and wall art, (v) window treatments, (vi) closet, shelving and storage items; (vii) infant, juvenile and children's furniture and equipment; (viii) clothing, layettes, apparel, shoes and/or accessories for infants, juveniles and children 0-4 years in age and maternity clothing; (ix) merchandise, products and services targeted for use by or for infants, juveniles and children's: toys, books, food, formula, indoor and/or outdoor play and recreational equipment, audio and video cassettes or equipment, safety items, feeding items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom items, (including, without limitation, personal care devices and other bathroom appliances, accessories and toiletries), and/or (x) pre-packaged gourmet foods and beer and wine for off-premises consumption. In addition, Landlord shall not hereafter enter into a lease nor permit any other premises in the Building or on any Related Land to be used (x) as any type of store which sells, rents or distributes Christmas and/or other seasonal or holiday merchandise in more than 20% of the Floor Area of its premises or as an off-price single point store, such as but not limited to, Dollar Tree Stores and Dollar General, or (y) for the retail primary use for the sale of health and beauty items, fragrances, cosmetics and/or drug remedies (the items set forth in this Section 3.10, either singly or in any combination, are hereinafter called the "Exclusive Items"), all subject to the terms of the currently existing lease to Micro Center (the "Micro Center Lease") and subject to permitted encumbrances set forth on Exhibit J attached hereto and made a part hereof ("Permitted Encumbrances"). The Micro Center Lease shall nevertheless be subject to the restrictions contained in this Section 3.10 in the event that: (i) the Micro Center Lease requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) except where permitted under the terms of the Micro Center Lease, Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

(b) Landlord shall construct, lease, operate, maintain and manage the Real Property as a first-class property. Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Real Property or any Related Land for any of the "Prohibited Uses" as set forth in Exhibit P hereto annexed, provided, however, that as to any future Related Land, the foregoing restriction shall not apply to the extent that any

Prohibited Uses are otherwise permitted under leases entered into prior to the date on which such land becomes Related Land.  Tenant shall not use, operate or sublease any part of the Premises for any of the "Prohibited Uses" as set forth in Exhibit P hereto annexed; without limiting the foregoing, Tenant agrees that so long as the Micro Center Lease shall remain in effect, the following language contained therein shall also be binding with respect to Tenant's use of the Premises: "No portion of [the retail area of the Building] shall be used for any purpose that would place a greater burden on the use of the Parking Area than a retail store use, meaning certain uses such as, by way of example, a fitness club, movie theater, sports bar, etc. may not be operated."

(c)      The exclusive rights granted to Tenant in this Section 3.10 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises whose business includes the sale of the Exclusive Items.

(d)      The exclusive rights granted to Tenant with respect to any respective category listed in the foregoing Section 3.10(a) shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during Excused Periods and for periods of time not exceeding twelve (12) consecutive months); provided, however, that if Tenant ceases to use portions of the Premises for the sale, rental or distribution of items contained in a category (other than during Excused Periods) for more than twelve (12) consecutive months, then Tenant's exclusive rights in that category shall permanently lapse but only if Tenant fails to recommence the sale, rental or distribution of items contained in that category within thirty (30) days after receiving notice from Landlord after the expiration of said 12-month period.  For the purposes of this Section 3.10(d), Tenant shall not be deemed to be selling a given category of Exclusive Items if Tenant is selling a de minimis number of items from such category for the purposes of circumventing this Section.

(e)      (i)      Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Building or Real Property or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 3.10 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (ii) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all rights and remedies provided in this Lease or given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(ii)      If any person or entity other than Landlord and other than Micro Center under the terms of the Micro Center Lease, shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to

18

violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under applicable Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

**Section 3.11** (a) Tenant shall honor the exclusive granted by Landlord to Micro Center pursuant to the terms of the Micro Center Lease (hereinafter, "Existing Exclusive") [a true and complete listing and description of such Existing Exclusive being attached hereto as Exhibit O], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit O). Landlord represents and warrants that no Existing Exclusive(s) exist other than the Micro Center exclusive listed on Exhibit O hereto and that Exhibit O is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. If Landlord replaces Micro Center with a tenant with substantially the same use of Micro Center then Tenant shall recognize the Micro Center Exclusive in favor of such replacement tenant. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

(b)    Tenant shall honor certain exclusives granted by Landlord to certain other retail tenants in the Real Property pursuant to the terms of leases which are executed from and after the date hereof (hereinafter, "Future Exclusives"), and shall not sublease, occupy or use the Premises (or, in the event of a sublease, any applicable portion of the Premises), or permit the Premises (or, in the event of a sublease, any applicable portion of the Premises) to be leased, occupied or used, whether by Tenant or any sublessee, assignee, licensee or other occupant, in violation of any such Future Exclusive; provided, and on the condition that:

(i)    The Future Exclusive shall bind Tenant only to the extent that it restricts Tenant from operating primarily for the same primary use as that engaged in

by the beneficiary of the Future Exclusive (*e.g.*, primarily as a bookstore, an office supplies store, a sporting goods store, a toy store, *etc.*);

(ii) Landlord shall notify Tenant of the granting of such Future Exclusive within ten (10) business days after the execution of a lease containing such Future Exclusive, and, at the time Tenant receives such notice, (i) Tenant shall not have previously entered into an assignment of this Lease or a sublease of the Premises (or any portion thereof) which specifically permits a primary use which would violate such Future Exclusive; or (ii) neither Tenant nor any assignee of this Lease or subtenant of the Premises (or any portion thereof) shall then be engaged in a primary use which would violate such Future Exclusive;

(iii) the premises occupied by the tenant benefiting from such Future Exclusive shall contain at least ten thousand (10,000) square feet of Floor Area;

(iv) such Future Exclusive shall not relate to the sale, rental or distribution of soft goods, or men's, women's, and/or children's apparel or footwear (unless such Future Exclusive relates to specialized apparel, such as, for example, maternity apparel only, formalwear only, larger-sized apparel only, or uniforms only);

(v) Landlord and the tenant or occupant benefiting from the Future Exclusive shall have entered into a lease or other occupancy agreement for its premises within two (2) years after the Rent Commencement Date;

(vi) the beneficiary of the Future Exclusive shall be a national retail tenant; and

(vii) no Future Exclusive shall be granted for the sale of any or all of the Exclusive Items.

Tenant agrees that if any such future retail tenant is Ross-Dress for Less, Nordstrom Rack, TJ Maxx, Michael's or Marshalls, that Tenant will enter into Tenant's then standard exclusives side-letter with such tenant (if then existing) which nullifies or modifies Tenant's Exclusive and such tenant's exclusive with regard to the Real Property, which side-letter agreement shall be on such terms as are agreed and typically implemented by Tenant and such other retail tenant at that time (as applicable).

(c) Except as expressly set forth in this Section 3.11, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Real Property or in any other property owned by Landlord or Landlord's Affiliate.

## Article 4.  Condition of the Premises; Landlord's Work.

**Section 4.1**   Landlord shall, at its expense, perform Landlord's Work, in accordance with, and subject to, the applicable provisions of this Lease including,

without limitation, Exhibit B hereto. Tenant shall not impede, delay, obstruct or interfere with, Landlord's performance of any and all of Landlord's Work. Any other work required by Tenant to ready the Premises for Tenant's use and occupancy thereof shall be Tenant's responsibility and shall be subject to all applicable provisions of this Lease.

**Section 4.2**    Landlord's Work shall be deemed substantially complete when it is completed in accordance with this Lease and all applicable Laws, except for minor details of construction, decoration and mechanical adjustments to be performed by Landlord, i.e., punch list items, the non-completion of which does not (and the completion of which will not) materially interfere with Tenant's use of the Premises or the performance of Tenant's Work. Such punch list items shall be completed by Landlord within thirty (30) days after the Delivery Date; if Landlord fails to complete any item on said punch list within said 30-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. Landlord agrees to use all commercially reasonable efforts to effect the Delivery Date no later than June 1, 2016. Landlord agrees to provide Tenant with at least ninety (90) days prior notice of the anticipated date of Delivery Date in the form set forth on Exhibit M attached hereto (the "Delivery Date Notice"). If the substantial completion of Landlord's Work, if any, or delivery of possession of the Premises by Landlord to Tenant, is delayed due to any act or omission of Tenant or Tenant's employees, agents or contractors occurring after the Delivery Date Notice (a) Landlord's Work shall be deemed Substantially Complete and the Delivery Date shall be deemed to have occurred (subject to the satisfaction of the other Delivery Date Conditions) on the date Landlord's Work would have been Substantially Complete but for that act or omission, and (b) Tenant shall reimburse Landlord for all additional costs incurred by Landlord as the result of the delay. This Section constitutes an express provision to the contrary pursuant to Section 223-a of the New York Real Property Law (or any similar Laws, hereinafter defined), which Landlord and Tenant agree is inapplicable to this Lease (and Tenant hereby waives any right to damages or to rescind this Lease which Tenant might otherwise have thereunder).

**Section 4.3**    Delivery Date. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Section 4.2 above and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "Delivery Date") following the day on which all of the following conditions (the "Delivery Date Conditions") shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 4.5 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition,

21

with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises, including without limitation permits required for the installation by Tenant of its store fixtures (but excluding any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business, which licenses are set forth in Exhibit S hereto (collectively, "Tenant's Permits")), which permits and approvals shall include, without limitation, SHPO approvals, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Building;

(c)    The Common Areas, and all of the improvements thereto shown on Exhibit C hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for Tenant to open for business in the Premises shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, SHPO approvals, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)    The representations and warranties of Landlord set forth in Section 12.3 and Article 28 below shall then be true and in effect;

(e)    The Easement Agreement shall be fully executed and delivered and recorded in Register's Office of Kings County, New York and superior to all mortgages, deeds of trust and other liens affecting the Real Property; and

(f)    Landlord shall have delivered to Tenant, in recordable form, a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit K executed by each holder of any mortgage or deed of trust encumbering or affecting the Real Property or any portion thereof (it being understood and agreed that this Section 4.3(f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 12.1 hereof).

**Section 4.4**    Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to

22

the Delivery Date established in the Delivery Date Notice. No event of Force Majeure, or delay caused by Tenant, occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established. Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in Section 4.3 above, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in Section 4.3 above , then, in addition to any other remedies available to Tenant under this Lease, Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of: (i) One Hundred Fifty Thousand Dollars ($150,000), plus (ii) Five Thousand Dollars ($5,000) for each day that the Delivery Date established in Section 4.2 above is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

Section 4.5    Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit N.

Section 4.6    Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 4.7    Landlord shall give Tenant at least five (5) business days notice of the installation of the sill or base plate on which Landlord shall erect the demising wall for the Premises and Tenant shall have the right to have a representative present for such installation to ensure that the location of such sill or base plate is as shown on the Certified LOD.

Section 4.8    Throughout the Term Landlord shall at its sole cost and expenses procure and maintain (and, as applicable, renew from time to time) (a) the Certificate of Occupancy for the Building, and (b) any other governmental permits or approvals required for the operation of the Building or the Common Areas or otherwise relating to Landlord's Work (except that from and after the Delivery Date, Tenant shall at its sole cost and expense maintain, and, as applicable, renew from time to time, the governmental permits or approvals required in connection with Tenant's Exclusive Vertical Transportation, subject to Landlord's compliance with the last sentence of Section 3.8(b) of this Lease).

23

## Article 5.  Tenant's Work

**Section 5.1**    Except as may be expressly provided in this Lease, Tenant shall not make any changes, improvements, alterations or additions to the Premises, the Real Property, the Building systems, or any part thereof, without Landlord's prior consent, provided, however that this shall exclude Tenant's Initial Work which shall not require Landlord's consent.  Landlord's consent shall not be required if Tenant's Work (a) is nonstructural, and (b) does not (i) affect any part of the Real Property outside the Premises (including the Building roof) or the exterior of the Premises, (ii) affect any structural element of the Building, (iii) adversely affect any Building system up to the point of such system's initial connection to the Premises, or (iv) require an amendment of any certificate of occupancy permit for the Building.  Further, Landlord's consent shall not be required with respect to such of Tenant's Work as are cosmetic alterations (such as painting the interior of the Premises, carpeting, and installation of shelving and display cases) inside the Premises, provided Tenant complies with the other applicable provisions of this Lease.  Tenant's Work shall be performed, at Tenant's expense, with diligence when started so as to promptly complete it in a good and workman-like manner using new materials of first class quality and in compliance with this Lease, all Laws and Tenant's Plans (as defined in Section 5.2) as approved by Landlord (where Landlord's consent is required).  Tenant's Work shall be fully paid for by Tenant when payment is due.  Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.  Tenant shall have the right to subdivide the Premises into two (2) or more separate stores, each of which may have its own access to the loading docks and freight elevator, as well as separately sub-metered utilities.  Subject to applicable law, Tenant shall have the right to erect and maintain an antenna and a satellite dish, and/or such other equipment as Tenant shall reasonably desire, on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.  If any violation of any applicable Legal Requirement which is noted against the Real Property or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

**Section 5.2**    Prior to performing any Tenant's Work which, pursuant to this Article, requires Landlord's consent, Tenant shall, at Tenant's expense (a) deliver to Landlord, detailed plans and specifications for Tenant's Work that are reasonably satisfactory to Landlord prepared and certified by a registered architect or licensed engineer, and suitable for filing with the applicable Authority, if filing is required by Law ("Tenant's Plans"), (b) obtain Landlord's approval of Tenant's Plans (which shall not be unreasonably withheld or delayed to the extent Landlord's consent to Tenant's Work shown on Tenant's Plans is not to be unreasonably withheld or delayed pursuant to this Article), (c) obtain (and deliver to Landlord copies of) all required authorizations of any Authority, and (d) deliver to Landlord certificates (in form reasonably acceptable to Landlord) of worker's compensation insurance (covering all persons to be employed by Tenant, and all contractors and subcontractors performing any Tenant's Work), commercial general liability insurance (naming Landlord, Landlord's managing agent, if any, any Superior Landlord and any Mortgagee as additional insureds) and Builder's risk insurance (issued on a completed value basis), in form, with companies, for periods and in amounts reasonably required by Landlord, naming Landlord, Landlord's managing agent, if any, any Superior Landlord and any Mortgagee as additional insureds.  Within twenty (20) days after submission to Landlord of Tenant's Plans, Landlord shall either approve same or shall set forth in writing the particulars in which Landlord does not approve same, in which latter case Tenant shall, within ten (10) days after Landlord's notification, return to Landlord appropriate corrections thereto.  Such corrections shall be subject to Landlord's approval not to be unreasonably withheld as provided above.

**Section 5.3**    Landlord's consent to Tenant's Work and Landlord's approval of Tenant's Plans shall be without liability to or recourse against Landlord, shall not release Tenant from its obligations to comply strictly with the provisions of this Lease, and shall not constitute any representation or warranty by Landlord regarding the adequacy for any purpose of Tenant's Work or Tenant's Plans or their compliance with Laws, and shall not relieve Tenant from obtaining Landlord's express written approval to revisions thereto. Tenant shall, after the completion of any aspect of Tenant's Work for which Tenant is required to obtain any permits or approvals in accordance with Section 5.10 below, obtain and deliver to Landlord copies of, all sign-offs and approvals required to close out, and Tenant shall close out, all such permits and approvals.

**Section 5.4**    Tenant shall, prior to the commencement of any work upon the Premises, do all things necessary to prevent the filing of any mechanics' or other liens against the Building, the Premises or any part thereof by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Premises, or any part thereof, through or under Tenant.  If any such lien or notice thereof shall at any time be filed against the Premises, then Tenant shall either cause the same to be discharged of record within thirty (30) days after Tenant receives notice thereof or, if Tenant, in Tenant's discretion and in good faith, determines that such lien should be contested, furnish such security as may be necessary or required to prevent any

25

enforcement or foreclosure proceedings against Premises during the pendency of such contest. If Tenant shall fail to discharge such lien within such period or fail to furnish such security, then, in addition to any other right or remedy of Landlord resulting from such default, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien in such manner as is, or may be, prescribed by law. Tenant shall repay to Landlord, as additional rent, all sums disbursed or deposited by Landlord pursuant to the foregoing provisions of this Section, including interest at the Default Rate and the costs, expenses and reasonable attorneys' fees incurred by Landlord in connection therewith. Notice is hereby given that the Landlord shall not be liable for any labor or materials furnished or to be furnished to Tenant upon credit, and that no mechanic's or other lien for any such labor or materials shall attach to or affect the reversion or the estate or interests of the Landlord in and to the Premises or the Building.

> **Section 5.5**    All construction managers, contractors and subcontractors performing work, for which a license is required by applicable Laws, shall be licensed by the appropriate Authorities.

> **Section 5.6**    Tenant shall require all its contractors and their subcontractors to work in harmony with other laborers working or providing services at the Real Property, and will take such steps as are reasonably required to avoid the employment of people whose employment would cause other laborers at the Real Property to picket or strike. Immediately after notice from Landlord that Tenant's contractors, mechanics or laborers are interfering or causing conflict with other contractors, mechanics, laborers or Landlord's personnel or that the performance of Tenant's Work is causing a violation of any union contract affecting the Real Property, Tenant shall take such steps as are reasonably required to cause all its contractors, mechanics or laborers who are causing the interference or conflict to leave the Real Property and shall take such other action as may be reasonably necessary to resolve such interference or conflict.

> **Section 5.7**    At Tenant's request, Landlord shall join in any applications for any authorizations required from any Authority in connection with Tenant's Work to which Landlord has consented, and otherwise cooperate with Tenant in connection with Tenant's Work, but Landlord shall not be obligated to incur any third-party, out-of-pocket expense or obligation in connection with any such applications or cooperation. Landlord may, at any time and from time to time, in addition to any other right of access given to Landlord pursuant to the terms of this Lease, enter upon the Premises with one or more engineers and/or architects of Landlord's selection to determine the course and degree of completion of Tenant's Work and its compliance with Tenant's Plans and the terms and conditions of this Lease.

> **Section 5.8**    Tenant shall not place a load on any floor of the Premises exceeding the floor load per square foot which the floor was designed to carry (i.e., 300 pounds per square foot), or which is prohibited by any Laws.

**Section 5.9**   Tenant shall be liable for any damage caused to any part of the Real Property, including its fixtures and equipment, arising from, or as a result of, Tenant's Work and/or its installation and/or removal of its Signs, except to the extent that such damage is caused by the acts or omissions of Landlord or its employees, agents or contractors.

**Section 5.10**  Subject to the further provisions of this Lease, all required building and other permits and fees with respect to Tenant's Work will be obtained and paid for by Tenant or Tenant's Contractor and posted as required within the Premises. Tenant shall be responsible for the following with respect to Tenant's Work: all filings required by the New York City Department of Buildings ("DOB"); obtaining DOB approval for all drawings; and obtaining all required departmental sign-offs. Upon request from Landlord, Tenant shall provide Landlord with copies of all such approvals, drawings and sign-offs. Tenant shall cure any violations of any Laws resulting from Tenant's Work within 72 hours after Tenant's receipt of notice thereof. If Landlord reasonably requires from Tenant any information, documentation or any other requirements for Landlord to obtain an update of any occupancy permit for the Building, Tenant shall provide the same to Landlord within 72 hours following Landlord's request therefor. Notwithstanding the foregoing, the provisions of this Section 5.10 shall not apply to Tenant's Initial Work and Landlord shall obtain on Tenant's behalf any fixturing permits specified in Exhibit B required by law for Tenant's Initial Work.

**Section 5.11**  On or before the Expiration Date or sooner termination of this Lease, if applicable, Tenant shall, at Tenant's expense, remove from the Building (a) all Tenant's Work which Landlord designates for removal in a notice given by Landlord to Tenant on or before the date which is thirty (30) days prior to the Expiration Date (or prior to the sooner termination of this Lease, if applicable) and (b) Tenant's Property. Tenant shall repair any damage to the Premises, and/or the Real Property, caused by the installation or removal of Tenant's Property, Signs or Tenant's Work. Except as expressly provided in this Section, Tenant's Work shall not be removed. Any Tenant's Property or Tenant's Work that Tenant was required to remove and which is not removed by Tenant by the Expiration Date or sooner termination of this Lease shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Tenant's expense.

**Section 5.12**  Landlord shall, at its sole cost and expense, perform Landlord's Work in accordance with Exhibits B, C and F, hereto, and the "Final Landlord's Plans and Specifications" (hereinafter defined in Section 5.13), and shall deliver possession of the Premises to Tenant in the condition described therein. Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all other work (hereinafter referred to as "Tenant's Initial Work") which Tenant desires to adapt the Premises to Tenant's use.

**Section 5.13** Plan Approvals.

(a) Landlord and Tenant have agreed to the proposed footprint, column layout and interior clear dimensions of the Premises [and the atrium of the Building to be located adjacent thereto] as shown on Exhibit Q (the "Certified LOD"). Any further changes to the Certified LOD shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements. Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.

(b) Prior to March 1, 2015, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively, "Tenant's Initial Plans"), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(c) Within one hundred eighty (180) days after receipt of Tenant's Plans, Landlord shall prepare and deliver to Tenant, in a single submission, "Landlord's Plans and Specifications" (as defined in Exhibit B hereto), and each of the plans which collectively constitute Landlord's Plans and Specifications shall be at least 85% complete, in Tenant's reasonable judgment. Landlord's Plans and Specifications shall be substantially consistent with Tenant's Initial Plans, the Certified LOD, and Exhibits A, B, C, and F hereto.

(d) Within twenty (20) days after its receipt of Landlord's Plans and Specifications, Tenant shall give Landlord notice of the respects, if any, in which said Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Initial Plans, and/or Exhibits A, B, C and F hereto.

(e) Within twenty (20) days after the date on which Landlord receives Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a single submission, revised Landlord's Plans and Specifications, which shall be 100% complete and shall address all of Tenant's comments.

(f) Within fifteen (15) days after its receipt of the revised Landlord's Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted.

(g) In the event that the Landlord's re-submittal of Landlord's Plans and Specifications is not approved by Tenant, then Landlord shall further revise Landlord's Plans and Specifications to address all Tenant comments and re-submit them to Tenant for Tenant's review and approval. The re-submittal described in the preceding sentence shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice that the previous submittal has not been approved. The process described in this

subparagraph (g) and subparagraph (f) above shall be repeated until Landlord has secured Tenant's approval of Landlord's Plans and Specifications. Landlord's Plans and Specifications as finally approved by Tenant are referred to herein as the "Final Landlord's Plans and Specifications". Landlord and Tenant shall use commercially reasonable and good faith efforts to finalize the Final Landlord's Plans and Specifications by June 30, 2015. Landlord shall apply for all permits and approvals required to be obtain by Landlord under Section 4.3 above on or before twenty (20) days after agreement of the Final Landlord's Plans and Specifications.

(h) Upon Tenant's approval of the Final Landlord's Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Landlord's Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit C, and/or Exhibit F hereto, and the terms and provisions of the Final Landlord's Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit C, and Exhibit F shall govern and prevail.

(i) All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Landlord's Plans and Specifications, the Final Landlord's Plans and Specifications, and the measurements required under Section 3.4.1 and 3.4.2 below shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad 2002"* up to *"Autocad 2010"*.

### Section 5.14   Plan Changes.

(a) Tenant shall have the right to make changes from the standards and specifications set forth in Exhibit B hereto (collectively, the "Standards/Specifications"), and/or to require Landlord to subsequently make changes to Landlord's Plans and Specifications and/or the Final Landlord's Plans and Specifications in accordance therewith (the "Changes"). Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change, which notice shall be accompanied by all back-up supporting the cost increases or delays. If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(b) Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 5% subcontractor profit and 5% general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require).

Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen, but in no event earlier than the Delivery Date.

(c) If the Changes occur during the preparation of any of the plans described above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the dates set forth in clauses (a) and (b) of Section 5.15(c) below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Section 4.4 above, the Delivery Date shall be extended by the number of days of such net delay.

### Section 5.15    Performance of Work.

(a) Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits. Landlord shall pay any and all impact fees and related governmental charges in connection with the Real Property and the Premises. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Real Property, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

(b) During the performance of Tenant's Initial Work, Landlord shall provide for Tenant's exclusive use a staging area of at least forty thousand (40,000) square feet in the ground floor Common Area in the location shown labeled "Tenant's Initial Staging Area" on Exhibit C for the staging of Tenant's equipment, materials and fixtures. Tenant's Initial Staging Area shall (i) be completed as described in Exhibit B hereto; and (ii) be available for use by Tenant from the Delivery Date until Tenant opens to the public for business in the Premises.

(c) If: (a) Landlord's Work has not been commenced by August 1, 2015, or (b) the Delivery Date shall not have occurred by September 1, 2016 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or

the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(A) terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease; and/or

(B) avail itself of the remedies set forth in Section 19.9 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(C) extend one or more times the dates set forth in clauses (A) and/or (B) of this Section 5.15 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

(d) Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

(e) Landlord shall maintain the Real Property in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

**Section 5.16** Landlord shall not, without obtaining Tenant's prior written consent in each instance, make any alterations (other than those that are immaterial) to (a) the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises), it being agreed that Tenant's consent thereto may be withheld in Tenant's sole discretion, or (b) the common lobby on the first floor of the Building, or (c) the exterior of the Building, including without limitation the Front Entry Feature (other than the rear of the Building, which shall not be so restricted).

31

**Section 5.17** Tenant shall be entitled to receive any and all ***"Incentives"*** (hereinafter defined) which would typically be available to a tenant and which Tenant may negotiate with, or derive from governmental, non-governmental, private or public utility, or other entities pertaining to construction and/or remodeling (including without limitation Tenant's Work) of the Premises, hiring of employees, or other business operations of Tenant which would cause an owner or occupant of the Premises to be entitled to an Incentive. As used herein, the term ***"Incentive"*** shall include, without limitation, any cost reduction, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, property tax abatements or grants, sales tax refunds or grants, tax credits, governmental grants, utility rebates or refunds, or any other benefit or amount negotiated by, or otherwise allowed to Tenant). If any such Incentive is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Incentive in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Incentive during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Incentive, Landlord shall pay Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Incentive against the next succeeding installment(s) of Rent then payable under the Lease.

## Article 6.  Tax Payments

**Section 6.1**    (a)    The term "Real Estate Taxes" (each, individually, a "Real Estate Tax") shall mean all taxes, assessments and special assessments, general or special, ordinary or extraordinary, foreseen or unforeseen, of any kind or nature whatsoever, including without limitation, municipal, school, county, open space taxes and business improvement and special improvement district assessments, levied, assessed or imposed at any time by any Authority upon or against the Real Property and/or any part thereof, and any rights or interests appurtenant thereto, and the Common Areas as herein defined (hereinafter collectively referred to as the "taxable property"), including any taxes imposed on leasehold improvements, and as the same may be affected by a payment in lieu of taxes program currently in effect (the "PILOT") and the Industrial and Commercial Abatement Program (the "ICAP").  Landlord hereby (i) represents that the Building qualifies for ICAP and covenants to timely file all applications, to submit all required supporting documentation and otherwise use good faith diligent efforts to obtain and maintain in effect the ICAP, and (ii) agrees that Real Estate Taxes shall be determined on the basis that the PILOT and (once in effect) the ICAP shall during the entire Term run concurrently. Notwithstanding anything contained herein, if (x) either of the PILOT and/or (once in effect) the ICAP are terminated in whole or in part prior to the full original term thereof, or are suspended or reduced in benefits, in each case for any reason (including without limitation as a result of a default by Landlord or any other party thereunder, or as a result of any failure on the part of Landlord or such other party to comply fully with the legal or administrative requirements imposed by the PILOT

32

and/or ICAP), or (y) the ICAP is not obtained with respect to the Real Property by reason of a default or failure by Landlord or any other party in the manner described in the foregoing clause (x), then so long as the foregoing was not caused by Tenant, Real Estate Taxes shall be determined as if such programs had remained in effect for the full respective original terms thereof and without such suspension or reduction in benefits; however, this sentence shall not apply, as applicable, to (A) any event described in the foregoing clause (x) or clause (y) that results solely from the unilateral action of the applicable Authority(ies) and not in connection with any action or inaction by Landlord or any third party, or (B) that certain reduction in the standard term of a certain component of the ICAP from 25 years to not less than 15 years by reason of retail tenants in the Building occupying more than 10% of the total Floor Area thereof, provided, however, that for the purposes of this Lease any such reduction in term shall apply only with respect to those ICAP benefits specifically attributable to retail tenants to the extent they occupy in excess of said 10% of the total Floor Area of the Building. Landlord represents that except for the PILOT (and, once in effect, the ICAP), no portion of the Real Property is currently subject to or the beneficiary of an abatement in Real Estate Taxes.

(b)     If, due to a future change in the method of taxation or in the taxing authority, a franchise, license, income, transit, profit or other tax, fee, or governmental imposition, however designated, shall be levied, assessed or imposed against Landlord, the taxable property (or any part thereof) or the rent or profit therefrom in lieu of, or as a substitute for, all or any part of the Real Estate Taxes, then such franchise, license, income, transit, profit, or other tax, fee, or governmental imposition shall be deemed to be included within the definition of Real Estate Taxes for the purposes hereof. Notwithstanding the foregoing, Real Estate Taxes shall not include any (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Building is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Real Property to an Affiliate of Landlord or more than once every five (5) years; or (5) fees imposed upon Landlord in connection with Landlord's development of the Real Property (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Article 6 shall be determined as if the Real Property was the only property owned by Landlord.

(c)     Reference is made to that certain Agency Lease Agreement, dated as of September 1, 2011, between the New York City Industrial Development Agency and Landlord, a full and complete copy of which is attached hereto as Exhibit U (the "PILOT Agreement"). Landlord covenants, represents and warrants to Tenant that:

(i)    the PILOT Agreement is in full force and effect, has to date not been modified or amended and is (and shall remain) superior to all mortgages and related liens affecting the Building;

(ii)    Landlord shall not amend, or modify the PILOT Agreement if such amendment or modification could materially diminish the rights or increase the obligations of Tenant under this Lease; and

(iii)    pursuant to the terms and conditions of the PILOT Agreement, Landlord's Work shall be deemed included within the "Additional Improvements" as defined therein.

### Section 6.2    Taxes.

(a)    "Base Taxes" shall mean with respect to all Real Estate Taxes, the Real Estate Taxes payable for the Tax Year immediately following the Tax Year during which the Real Property is "fully assessed" by the New York City Department of Finance to reflect the physical improvements made to the Real Property Building prior to the date of this Lease and also pursuant to the Final Landlord's Plans and Specifications (such subsequent Tax Year being referred to herein as the "Base Tax Year"). The parties hereto agree that with respect to Real Estate Taxes affecting that portion of the Real Property allocable to land only, the Base Year shall reflect the then actual assessed valuation of such land with the then prevailing Tax rate applying thereto.

(b)    "Comparison Year" shall mean with respect to all Real Estate Taxes, each Tax Year commencing subsequent to the first day of the Base Tax Year.

(c)    "Statement" shall mean a statement containing a comparison of the Base Taxes and the Real Estate Taxes for any Comparison Year, and including copies of the applicable tax bills issued by the applicable taxing authority for the Base Tax Year and Comparison Year.

(d)    "Tax Year" shall mean with respect to all Real Estate Taxes, each twelve month period from July 1 through June 30 (or such other periods as hereinafter may be duly adopted by any applicable governmental authority as its fiscal year for real estate tax purposes).

(e)    If the Real Estate Taxes payable for any Tax Year after the Base Tax Year exceed the Base Taxes, Tenant shall pay to Landlord Tenant's Proportionate Share of such excess ("Tenant's Tax Payment"). For each Comparison Year in which any such Tax Year commences, Landlord shall furnish to Tenant a statement setting forth Tenant's Tax Payment for such Tax Year. Tenant shall pay Landlord in the amount required by this Section 6.2 within thirty (30) days after receipt of such bill (but in no event earlier

than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

    (f)  In the event that Landlord's mortgagee shall require Landlord to escrow monthly payments for Taxes, then, so long as such escrow shall be so required and all other tenants and occupants of the Real Property are similarly required to make monthly payments to Landlord with respect to Taxes, Tenant shall, in lieu of making payments pursuant to subparagraph (b) above, pay to Landlord on the 1st day of each month during such Comparison Year an amount equal to 1/12th of the Tax Estimate for such Tax Year. If Landlord furnishes a Tax Estimate for a Comparison Year subsequent to the commencement thereof, then (i) until the 1st day of the month following the month in which the Tax Estimate is furnished to Tenant, Tenant shall pay to Landlord on the 1st day of each month an amount equal to the monthly sum payable by Tenant to Landlord under this Section 6.2 for the last month of the preceding Comparison Year; (ii) promptly after the Tax Estimate is furnished to Tenant or together therewith, Landlord shall give notice to Tenant stating whether the installments of the Tax Estimate previously made for such Comparison Year were greater or less than the installments of the Tax Estimate to be made for such Comparison Year in accordance with the Tax Estimate, and (x) if there shall be a deficiency, Tenant shall pay the amount thereof within thirty (30) days after demand, or (y) if there shall have been an overpayment, Landlord shall credit the amount thereof against subsequent payments of rent next coming due hereunder (or with respect to the last Lease Year, shall promptly pay to Tenant the amount thereof, which obligation shall survive the termination of this Lease); and (iii) on the 1st day of the month following the month in which the Tax Estimate is furnished to Tenant, and on the 1st day of each month thereafter throughout the remainder of such Comparison Year, Tenant shall pay to Landlord an amount equal to 1/12th of the Tax Estimate. Landlord may, during each Comparison Year, furnish to Tenant a revised Tax Estimate for such Comparison Year, and in such case, Tenant's Tax Payment for such Comparison Year shall be adjusted and any deficiencies paid or overpayments credited, as the case may be, substantially in the same manner as provided in the preceding sentence. After the end of each Comparison Year, Landlord shall furnish to Tenant a Statement of Real Estate Taxes applicable to Tenant's Tax Payment payable for such Comparison Year and (A) if such Statement shall show that the sums so paid by Tenant were less than Tenant's Tax Payment due for such Comparison Year, Tenant shall pay to Landlord the amount of such deficiency within twenty thirty (30) days after delivery of the Statement to Tenant, or (B) if such Statement shall show that the sums so paid by Tenant were more than such Tenant's Tax Payment, Landlord shall credit such overpayment against subsequent payments of Tenant's Tax Payment next coming due hereunder. If there shall be any increase in the Taxes for any Tax Year, whether during or after such Tax Year, or if there shall be any decrease in the Taxes for any Tax Year, Tenant's Tax Payment for such Comparison Year shall be appropriately adjusted and any deficiencies paid or overpayments credited, as the case may be, substantially in the same manner as provided in the preceding sentence.

35

(g)    If the Base Taxes are reduced, the Rent previously paid or payable on account of Tenant's Tax Payment hereunder for all Comparison Years shall be recomputed on the basis of such reduction, and Tenant shall pay to Landlord, within thirty (30) days after demand therefor, any deficiency between the amount of such Rent previously computed and paid by Tenant to Landlord, and the amount due as a result of such recomputation.  If the Base Taxes are increased, then Landlord shall either pay to Tenant, or at Landlord's election, credit against subsequent payments of rent due, the amount by which such Rent previously paid on account of Tenant's Tax Payment exceeds the amount actually due as a result of such recomputation.  If Landlord receives a refund of Real Estate Taxes for any Comparison Year, Landlord shall, at its election, either pay to Tenant, or credit against subsequent payments of Tenant's Tax Payment due hereunder (or with respect to the last Lease Year, shall promptly pay to Tenant the amount thereof, which obligation shall survive the termination of this Lease), an amount equal to Tenant's Proportionate Share of the refund, net of any reasonable expenses incurred by Landlord in achieving such refund, which amount shall not exceed Tenant's Tax Payment paid for such Comparison Year.

(h)    At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Real Estate Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Real Estate Taxes is received, Tenant shall be entitled to Tenant's Proportionate Share thereof (after deducting reasonable and customary expenses).

(i)    Should Tenant's obligation for the payment of Real Estate Taxes pursuant to this Lease originate or terminate for less than a full tax year, Tenant's liability for Real Estate Taxes shall be subject to a pro rata adjustment based on the number of days of said tax year for which Tenant's obligation to pay Real Estate Taxes is in effect.

(j)    Tenant shall pay promptly when due all taxes directly or indirectly imposed or assessed on Tenant's business operations, machinery, equipment, improvements, inventory and other personal property or assets, whether such taxes are assessed against Tenant, Landlord or the Industrial Center as a single entity.  In the event that such taxes are imposed or assessed against Landlord or the Industrial Center, Landlord, upon request, shall furnish Tenant with all applicable tax bills, public charges and other assessments or impositions.

**Section 6.3**    In addition to the Tax Payments, Tenant shall pay any and all taxes assessed against any leasehold interest or personal property of any kind that is owned by or placed in, on, or about the Premises by Tenant.

36

**Section 6.4**    The Additional Rent payable by Tenant pursuant to this Article shall be paid by Tenant notwithstanding the fact that Tenant may be exempt, in whole or in part, from the payment of any Real Estate Taxes by reason of Tenant's diplomatic, charitable, or otherwise tax exempt status, or for any other reason whatsoever.

**Section 6.5**    The expiration of this Lease shall not relieve Tenant of the obligation to make Tax Payments on a pro rata basis for the portion(s) of the applicable Tax Years preceding such expiration. Any Real Estate Tax Year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Proportionate Share of Real Estate Taxes. If, by law, any Real Estate Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

## Article 7.  **Expense Payments**

**Section 7.1**    Subject to Section 7.2(b) below, as used herein "Parking Area Expenses" means all costs and expenses paid or incurred by Landlord or on Landlord's behalf with respect to the operation, servicing, management, maintenance, improvement and repair (including replacements that are not reimbursed) of the parking and access areas appurtenant to the Building located wholly within the Parking Lot Parcel (the "Parking Areas") as shown on Exhibit C, including without limiting the foregoing all costs and expenses incurred for: (i) salaries and benefits for employees (below manger level) employed full-time with respect to the Parking Areas, of if employed less than full-time the proportionate share thereof; (ii) electric and other utilities used for the Parking Areas, including taxes thereon; (iii) striping and painting; (iv) all insurance maintained with respect to the Parking Areas and the maintenance and operation thereof, including property damage, liability, and fidelity insurance; (v) equipment rentals; (vi) cleaning and security services and equipment, including alarm services, for the Parking Areas; (vii) services of independent contractors and agents; (viii) repairs and replacements, whether ordinary or extraordinary, capital or non-capital; (ix) operation, maintenance and repair of the loading facilities; (x) lighting of Parking Areas, (xi) intentionally omitted; (xii) legal, architectural, engineering and other professional fees (excluding management fees) incurred in connection with the operation, servicing, maintenance and repair of the Parking Areas; (xiii) removal of water, snow, ice, trash, and debris; (xiv) installing and maintaining signs; (xv) fire protection and emergency protection; (xvi) maintenance, repair and replacement of paving, curbs, sewer systems, walkways, sidewalks, landscaping, drainage, pipes, ducts, conduits, lighting and similar items; (xvii) extermination; (xviii) costs of the repair, maintenance and operation of the Pylon Sign; and (xix) all other charges properly allocable to the operation, servicing, maintenance and

repair of the Parking Areas and administrative and management costs equal to five (5%) percent of the total Parking Area Expenses (the "Parking Area Administrative Fee"), but excluding from the computation of such Parking Area Administration Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible charge hereunder), the cost of electricity and other utilities, and the cost of insurance which Landlord is required to maintain under this Lease. Commencing with the first Lease Year, Tenant shall pay Tenant's Proportionate Share of the Parking Area Expenses. Notwithstanding the foregoing, except as provided in the next sentence, in no event shall Tenant's Proportionate Share of the Parking Area Expenses (including the Parking Area Administrative Fee) for the period from the Rent Commencement Date until the expiration of the first full calendar year thereafter exceed Ninety Thousand and 00/100 ($90,000.00) Dollars per annum, and with respect to any other calendar year thereafter (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases during such calendar year) in no event shall Tenant's Proportionate Share exceed one hundred five percent (105%) of the Tenant's Proportionate Share of Parking Area Expenses payable by Tenant for the immediately preceding calendar year (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases during such calendar year). Notwithstanding the foregoing, if Landlord or any of its Affiliate(s) acquires the Designated Parcel and develops the same as an integrated part of the Parking Lot Parcel as described in Article 31 hereof (and as depicted on the alternative site plan shown on Exhibit C-1 attached hereto), then, as from the date of such integration, the Parking Area Expenses shall include those incurred with respect to the Designated Parcel and as from such date Landlord shall be entitled to proportionately increase the applicable dollar cap then in effect for Tenant's Proportionate Share of the Parking Area Expenses, as having been determined as described in the immediately preceding sentence, by a proportionate amount (based upon relative lot area).

        **Section 7.2**    (a)    As used herein, "Operating Expenses" means all costs and expenses paid or incurred by Landlord or on Landlord's behalf with respect to the operation, servicing, management, maintenance, improvement and repair (including replacements that are not reimbursed) of the Common Areas within the Building only (the "Interior Common Areas"), including without limiting the foregoing all costs and expenses incurred for: (i) salaries and benefits for employees (below manger level) employed full-time with respect to the Interior Common Areas, of if employed less than full-time the proportionate shall thereof; (ii) water, gas, electric and other utilities used for the Interior Common Areas, including taxes thereon; (iii) painting and decoration (excluding painting and decorating any tenant's space); (iv) all insurance maintained with respect to the Building and the maintenance and operation thereof, including property damage, rent interruption, liability and fidelity insurance; (v) equipment rentals; (vi) cleaning and security services and equipment, including alarm services, for the Interior Common Areas; (vii) services of independent contractors and agents; (viii) non-capital repairs and replacements; (ix) operation, maintenance and repair of the loading facilities; (x) lighting of Interior Common Areas, (xi) operation, repairs

and maintenance of the Building's heating system; (xii) legal, architectural, engineering and other professional fees incurred in connection with the operation, servicing, management, maintenance and repair of the Interior Common Areas; (xiii) removal of trash and debris; (xiv) intentionally omitted; (xv) fire protection and emergency protection; (xvi) intentionally omitted; (xvii) extermination; (xviii) the HVAC equipment and facilities (other than the cooling towers); and (xix) all other charges properly allocable to the operation, servicing, maintenance and repair of the Interior Common Areas and administrative costs equal to five (5%) percent of the total Operating Expenses(the "Operating Expense Administration Fee"), but excluding from the computation of such Operating Expense Administration Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible Operating Expense hereunder), the cost of electricity and other utilities, and the cost of insurance which Landlord is required to maintain under this Lease.

(b)    Notwithstanding anything to the contrary contained in Section 7.1 hereof and this Section 7.2, the terms "Operating Expenses" and "Parking Area Expenses" shall not include the following:  (1) the capital cost of any additions to the Interior Common Areas or Parking Areas; (2) the cost of any replacements or capital improvements to the Interior Common Areas or Parking Areas, except that the cost of repaving the Parking Areas may be included within Parking Area Expenses so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles (or successor accounting standards), and is not incurred (A) prior to the expiration of the fifth (5th) full calendar year of the Term, or (B) more than once during each five (5) full calendar years of the Term; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Section 27.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) intentionally omitted; (6) Taxes or other taxes levied or assessed against Landlord or the Real Property (provided, however, subject to Article 6 hereof, Parking Area Expenses shall include Real Estate Taxes with respect to the Parking Lot Parcel); (7) the cost of compliance with laws which relate to (A) environmental laws, (B) the negligence of Landlord or any other tenant or any of their respective agents or employees, (C) contesting or curing violations of pre-existing laws, (D) a capital expenditure, provided that in the event that the cost of compliance with law involves a capital expenditure then such cost shall be included in Common Area Charges to the extent of that portion of the cost amortized in a particular year), or (E) the specific needs of any other tenant in the Building; (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 13.5 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 13.5 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to

Landlord by any other tenant in the Building other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Operating Expenses; (11) sums paid or owed by Landlord to any tenant in the Building; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Building (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation [except as expressly permitted pursuant to item 21 below]; (17) intentionally omitted; (18) Landlord's advertising, entertainment and promotional costs for the Building (including, without limitation, holiday decorations); (19) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Real Property; (20) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (21) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles (or successor accounting standards)); (22) reserves for anticipated future expenses; (23) except for the Parking Area Administrative Fee and the Operating Expense Administrative Fee provided for hereinabove, any cost or expense relating to the administration and management of the Interior Common Areas or Parking Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; (24) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Interior Common Areas or Parking Areas, to the extent that such costs and expenses exceed competitive market rates; (25) except as specifically provided in Section 3.8 and 7.1 hereof, any costs relating to any pylon signs or other signage identifying tenants of the Building; or (26) costs and expenses relating to the ongoing repair and maintenance of the Front Entry Feature as shown on Exhibit F hereto, it being acknowledged and agreed that pursuant to Section 3.7(a)(iii) above, such repair and maintenance shall be performed during the Term by Tenant at its sole cost and expense.

(c)    Tenant shall have no liability for Operating Expenses from the Rent Commencement Date until the end of the first full calendar year after the Rent Commencement Date.  Commencing with the second full calendar year, Tenant shall pay Tenant's Proportionate Share of the increase in Operating Expenses over the first full calendar year after the Rent Commencement Date (the "Base Year") provided, however with respect to any other calendar year thereafter (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases during such calendar year) such annual increase shall not exceed one hundred five percent (105%) of the Tenant's Proportionate Share of Operating Expenses (including the Operating Expense

Administrative Fee) for the immediately preceding calendar year (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases during such calendar year). If any Common Areas within the Building are not operational during the Base Year then, from time to time during the Term, as such areas become operational, for the purposes of calculating Tenant's Proportionate Share of Operating Expenses the Operating Expenses for the Base Year shall be deemed to have been increased by an amount equal to the reasonable estimate of the Operating Expense for the Base Year for those Common Areas becoming operational after the Base Year.

**Section 7.3**    Tenant's obligation herein to pay its Proportionate Share of the Parking Area Expenses and the Operating Expenses is herein referred to as the "Expense Payment." Tenant shall pay Landlord, in advance, upon Landlord's request, the Expense Payment as reasonably estimated by Landlord for each calendar year during the Term. Such estimated payment shall be paid in equal monthly installments on the first day of each month (or on the first day of such other period) during the calendar year. If Landlord first requests, or revises, the estimated monthly or other installments of the Expense Payment after the commencement of a calendar year, Tenant shall (i) until such request is made, continue paying the installments of estimated Expense Payment (if any) payable during the prior calendar year and (ii) within thirty (30) days following Tenant's receipt of Landlord's request or revision, pay Landlord an amount equal to the requested or revised installments of the estimated Expense Payment for such calendar year retroactive to the beginning of that calendar year to the extent such amount exceeds the estimated payments (if any) paid by Tenant for that calendar year (or if they are less, Landlord shall credit the difference against the next payments under this Lease), or with respect to the last Lease Year, Landlord shall promptly pay to Tenant the amount of such difference, which obligation shall survive the termination of this Lease.

**Section 7.4**    Landlord shall, following the end of each calendar year, deliver to Tenant a statement showing Tenant's Expense Payment (the "Expense Statement") for that calendar year in detail reasonably satisfactory to Tenant in accordance with generally accepted accounting principles consistently applied. Such Expense Statement shall be certified by Landlord as being accurate and shall be sent to Tenant within ninety (90) days after the end of such calendar year; provided that the foregoing time limit shall not preclude Landlord from correcting any errors or omissions in the Expense Statement after the expiration of such period. If the aggregate estimated amounts collected by Landlord from Tenant for that calendar year (if any) are less than the Expense Payment shown on that Expense Statement, Tenant shall pay the deficiency to Landlord within thirty (30) days following Tenant's receipt of such Expense Statement. If the aggregate estimated amounts collected by Landlord from Tenant are greater than the Expense Payment shown on such Expense Statement, Landlord shall credit the excess against Tenant's next Rent payable under this Lease or, if any excess is due Tenant at the Expiration Date, Landlord shall promptly pay such excess to Tenant, which obligation shall survive the termination of this Lease.

41

**Section 7.5**        Tenant shall have the right, within three (3) years after receiving any Expense Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of the Expense Payment as reflected therein and Tenant's Proportionate Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Proportionate Share of the Expense Payment, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant an Expense Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Laws, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 19.10 below. In no event shall Tenant employ an auditing service or accountant to audit Landlord's books or records if such service or accountant is paid on a contingency basis.

**Section 7.6**        If the Rent Commencement Date is a date other than the first day of a calendar year, of if the Expiration Date is a date other than the last day of a calendar year, Tenant's Expense Payment for that calendar year shall be apportioned according to the number of days of that calendar year within the Term.

## Article 8.  <u>Utilities; Services</u>

**Section 8.1**        (a)        Subject to the further provisions of this Article 8, Landlord shall provide to the Premises all utilities set forth in <u>Exhibit B</u> and separate utility meters or submeters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant shall be responsible for obtaining its own telephone, cable television and internet service to the Premises (and Landlord shall provide Tenant with access to those areas of the Building that are necessary for Tenant to effect the foregoing). Tenant shall be solely responsible for and shall promptly pay, to Landlord or to the utility company, as the case may be, as and when the same become due and payable, all charges for water, sewer, electricity, gas, telephone, cable service, internet service, steam, and any other utility or other

communication device used or consumed in the Premises by Tenant from and after the date of Delivery Date and supplied by a public utility or public authority or any other person, firm, or entity supplying same.

(b)     Tenant agrees that Landlord shall have the right at its option to submeter Tenant's electric usage (including without limitation such electric current as shall be necessary to operate the heating, ventilating and air conditions systems servicing the Premises) for the Premises and Tenant will pay Landlord or Landlord's designated agent, as additional rent for the supplying of electric current the sum of (x) an amount computed by applying Tenant's consumption and demand for the billing period in question (as measured by the meter(s) or submeter(s) installed in the Premises for that purpose) to the rates charged to Landlord by the utility supplier, and (y) five (5%) percent of such amount; provided, however, that the aggregate amount payable by Tenant for such service(s) and administration fee shall not exceed the cost of the same utility service if Tenant had obtained such utility service directly from Tenant's preferred utility service provider otherwise available for the Premises as identified by Tenant prior to the Delivery Date, either on a single-store or multi-store basis (the "Utility Cap"). Where more than one (1) meter or submeter (as the case may be) measures the service of Tenant in the Building, the service rendered through each meter or submeter (as the case may be) may be computed and billed separately in accordance with the rates herein. Bills therefor shall be rendered at such times as Landlord may elect (but no more frequently than once per month) and the amount, as computed from a meter or submeter (as the case may be), shall be deemed to be, and shall be paid as, additional rent within thirty (30) days of rendition thereof. It any tax is imposed on Landlord's receipt from the sale or resale of electric energy or any other utility service furnished by Landlord to Tenant, Tenant covenants and agrees that where permitted by law, Tenant's Proportionate Share of such taxes shall be passed on to, and included in the bill of Landlord to, and paid by, Tenant, subject to the Utility Cap. If any meters, submeters or other equipment must be installed to furnish electric service to the Premises on a submetered basis, as herein provided, the same shall be installed by Landlord as Tenant's expense, and Tenant shall pay therefor as additional rent within thirty (30) days after demand by Landlord.

(c)     Landlord shall supply domestic water to the Premises either for consumption or for stand-by purposes within the sprinkler system, and Tenant agrees to accept same and to pay the charges imposed by Landlord therefor on a submetered basis. Tenant will pay Landlord or Landlord's designated agent, as additional rent for the supplying of domestic water the sum of (x) an amount computed by applying Tenant's consumption for the billing period in question (as measured by the meter(s) or submeter(s) installed in the Premises for that purpose) to the rates charged to Landlord for domestic water usage, and (y) three (3%) percent of such amount. Where more than one (1) meter or submeter (as the case may be) measures the service of Tenant in the Building, the service rendered through each meter or submeter (as the case may be) may be computed and billed separately in accordance with the rates herein. Bills therefor

shall be rendered at such times as Landlord may elect (but no more frequently than once per month) and the amount, as computed from a meter or submeter (as the case may be), shall be deemed to be, and shall be paid as, additional rent within thirty (30) days of rendition thereof. It any tax is imposed on Landlord's receipt from the sale or resale of water furnished by Landlord to Tenant, Tenant covenants and agrees that where permitted by law, Tenant's pro rata share of such taxes shall be passed on to, and included in the bill of Landlord to, and paid by, Tenant. If any meters, submeters or other equipment must be installed to furnish domestic water service to the Premises on a submetered basis, as herein provided, the same shall be installed by Landlord as part of Landlord's Work.

(d)     Landlord shall supply condenser water to the Premises for the operation of the HVAC system serving the Premises, and Tenant agrees to accept same and to pay the charges imposed by Landlord therefor on a submetered basis. Tenant will pay Landlord or Landlord's designated agent, as additional rent for the supplying of condenser water an amount computed by applying Tenant's consumption for the billing period in question (as measured by the meter(s) or submeter(s) installed in the Premises for that purpose) to the rates reasonable determined by Landlord for condenser water usage from time to time (Landlord hereby estimating that the cost of condenser water currently being supplied to the Building is $0.0000081 per BTU). Where more than one (1) meter or submeter (as the case may be) measures the service of Tenant in the Building, the service rendered through each meter or submeter (as the case may be) may be computed and billed separately in accordance with the rates herein. Bills therefor shall be rendered at such times as Landlord may elect (but no more frequently than once per month) and the amount, as computed from a meter or submeter (as the case may be), shall be deemed to be, and shall be paid as, additional rent within thirty (30) days of rendition thereof. It any tax is imposed on Landlord's receipt from the sale or resale of water furnished by Landlord to Tenant, Tenant covenants and agrees that where permitted by law, Tenant's pro rata share of such taxes shall be passed on to, and included in the bill of Landlord to, and paid by, Tenant. If any meters, submeters or other equipment must be installed to furnish condenser water service to the Premises on a submetered basis, as herein provided, the same shall be installed by Landlord as part of Landlord's Work.

(e)     Landlord shall at all times during the Term supply heated water to the Building for the operation of, and shall operate, the Building's heating system. Tenant shall reimburse Landlord, within thirty (30) days after Tenant's receipt of an invoice therefor with reasonable supporting detail) for Tenant's Proportionate Share of the cost of natural gas for the heating of the Building based upon the measurement thereof as shown by the master gas meter for the Building, (subject to the Utility Cap (as defined in Section 8.1 below).

**Section 8.2**        Tenant shall not overload the electrical system serving the Premises, and shall not at any time overburden or exceed the capacity of the mains, feeders, ducts, conduits, pipes, valves, or other facilities by which electric and other utilities are supplied to, distributed in or serve the Premises.  If Tenant desires to install any equipment that shall require additional utility facilities, such installation shall be subject to Landlord's prior approval of Tenant's plans and specifications therefor.  If such installation is approved by Landlord and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant agrees to pay Landlord, on demand, as Additional Rent, the cost for providing such additional utility facilities.

**Section 8.3**   Landlord has no obligation to provide to Tenant or the Premises any services except as expressly set forth in this Lease.  Landlord does not represent or warrant that any utility or other service provided by Landlord, or any utility or other service used or to be used by Tenant at the Premises, (a) shall be adequate for Tenant's particular purposes or (b) shall be free from interruption or reduction.

**Section 8.4**   If any utility or other service (a) becomes unavailable from any public utility company, public authority or any other person or entity supplying or distributing same (excluding Landlord), or (b) is temporarily interrupted by reason of Laws, the making of any repairs or improvements, or measures taken which are necessary to secure the safety of the Real Property, or the safety and welfare of its tenants or occupants, or the public, or by reason of any cause beyond Landlord's reasonable control, (i) Landlord shall not be liable to Tenant in damages or otherwise, (ii) Tenant may not abate Rent or be relieved of any of its obligations under this Lease, except as otherwise provided herein, and (iii) such lack of availability or interruption shall not constitute an actual or constructive eviction, or a disturbance of Tenant's use of the Premises. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord causes the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated given the extent, and during the period, of the disruption.

**Section 8.5**   Tenant shall provide for daily removal of Tenant's trash in accordance with reasonable procedures to be established by Landlord subject to any applicable Rules.

### Article 9.  Common Areas

**Section 9.1**   (a)        Landlord will operate and maintain, or shall cause to be operated and maintained, the Common Areas in a commercially reasonable manner. Landlord shall have the right (i) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas, subject, however, to Section 3.3 hereof;

45

(ii) to enter into, modify and terminate any easement and other agreements pertaining to the use and maintenance of the Common Areas, subject, however, to Article 33 hereof; (iii) to close all or any portion of the Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (iv) to close temporarily any or all portions of the Common Areas to perform repairs and alterations; (v) to discourage non-customer parking; and (vi) to do and perform such other acts in and to said areas and improvements as Landlord shall reasonably determine to be advisable, provided, however, such acts shall not adversely affect access to the Premises or Real Property or visibility of the Premises or Tenant's Signs.  Notwithstanding anything to the contrary contained herein, no entrances, exits, approaches and means of ingress and egress to, from, and/or within the Real Property or the Premises as shown on Exhibit C hereto shall be interrupted or disturbed by any act or omission of Landlord or any third party during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Laws, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August (through Labor Day), November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

        (b)    Notwithstanding anything to the contrary contained herein, Landlord shall not, without obtaining Tenant's prior written consent in each instance (it being agreed that (A) as to clause (i) below, such consent by Tenant shall be not be unreasonably withheld or delayed, and (B) as to clauses (ii) and (iii) below, such consent by Tenant may be withheld in Tenant's sole discretion): (i) alter the location, availability, or size of any Common Area improvement on the ground floor of the Building or on the Parking Lot Parcel, from that shown on Exhibit C hereto; (ii) construct or permit to be constructed any structures within the Common Areas (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Parking Areas or the first level lobby), other than as shown on Exhibit C hereto, provided, however, that: (A) Landlord may construct a parking deck on that part of the Parking Lot Parcel shown labeled "Potential Parking Deck Area" on Exhibit C provided that adequate temporary parking is provided during the construction period and during the period of the construction thereof Landlord minimizes any interference with the normal operation of Tenant's business; and (B) from and after the Rent Commencement Date, Landlord shall have the right to allow a single newsstand and/or coffee bar within the first level lobby, at the location so designated on Exhibit C (referred to herein as the "Newsstand"), subject to the terms and conditions described in Section 9.1(c) below;  or (iii) materially change the entrances or exits to and from the Real Property, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas, or, subject to Section 9.2(a) below, the number,

location or layout of parking spaces, from those shown on <u>Exhibit C</u> hereto; the foregoing reference to "parking spaces" shall not be deemed to include those parking spaces located within the Parking Lot Parcel that are designated as "Supplementary Parking Spaces" on <u>Exhibit C</u> hereto. Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Real Property, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August (through Labor Day), November and December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.

      (c)    At such time during the Term that Landlord first intends to allow the Newsstand, Landlord shall notify Tenant thereof (the "<u>Initial Newsstand Notice</u>") and Tenant shall thereupon have the exclusive right to install and operate the Newsstand, at no additional rent or other charge to Tenant, subject, however, to the following terms and conditions: (A) Tenant shall notify Landlord of its decision to install and operate the Newsstand by notice delivered to Landlord no later than fifteen (15) days following its receipt of Landlord's Initial Newsstand Notice (and if Tenant elects to install and operate the Newsstand as aforesaid, then it shall thereafter proceed in a commercially reasonable manner to effect such installation and operation); (B) if Tenant notifies Landlord that it elects not to install and operate the Newsstand as aforesaid (or, as applicable, fails to notify Landlord timely in the aforesaid manner), then Tenant shall be deemed to have elected not to install and operate the Newsstand, subject to the further provisions of this Section 9.1(c), (C) if Tenant elects (or is deemed to have elected) not to install and operate the Newsstand (or, having at any time elected to install and operate the same, fails to proceed in a commercially reasonable manner to do so or, as applicable, at any time thereafter ceases operation of the Newsstand, subject to Excused Periods), then Landlord shall thereupon have the right to license the Newsstand to a third party, and (D) each time during the Term that Landlord licenses the Newsstand to a third party as aforesaid, then following the expiration or earlier termination of such license agreement (or if such third party thereafter fails to commence, or ceases, its operation of the Newsstand, subject to Excused Periods), Landlord shall notify Tenant in writing of same and Tenant shall again have the right to install and operate the Newsstand in accordance with the same terms and conditions as described in this Section 9.1(c).

      **Section 9.2**    (a)    Landlord further agrees that there shall be a minimum of three hundred seventy (370) parking spaces, designated for use only by customers of the retail tenants located on the first and second levels of the Building (and not on any other level thereof) (the ***"Designated Retail Tenants"***), on the Parking Lot Parcel as shown on <u>Exhibit C</u> thereto, with all of the foregoing spaces have individual dimensions of at least nine (9) feet in width and eighteen (18) feet in length (it being agreed that the reference to "parking spaces" in this Section 9.2 shall not be deemed to include those parking spaces located within the Parking Lot Parcel that are designated as "Supplementary Parking Spaces" on <u>Exhibit C</u> hereto); without limiting the foregoing, Landlord hereby agrees that

any reduction in the total number of parking spaces from those shown on Exhibit C hereto shall be in any event not be taken from that area designated as "No Parking Spaces Reduced" on Exhibit C hereto, subject to any requirements of Laws relating specifically to the parking spaces contained therein. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. All tenants or other occupants of the Building who are not Designated Retail Tenants and their employees, customers, contractors and agents shall be prohibited from parking on the Parking Lot Parcel. Landlord agrees to employ a "license-plate reader system" for the Parking Areas to discourage all parties who are not customers of the Designated Retail Tenants from parking within the Parking Lot Parcel; the particular license-plate reader system (and any company selected by Landlord to operate same) shall be subject to the reasonable written approval of Tenant. Landlord and Tenant shall cooperate in good faith so as to allow Landlord to enforce the above restrictions contained herein, provided that Landlord shall not be required to take any enforcement measures unless requested in writing by Tenant, in which event, Landlord shall comply with the reasonable requirements of Tenant with regard to such enforcement, including, without limitation, Landlord towing any vehicles parked on the Parking Lot Parcel for more than five (5) hours on any single day. Landlord shall, at Tenant's request, provide to Tenant from time to time, any information derived from the license-plate reader system operated by Landlord, including the average number of parking spaces used per hour and the average duration that each retail customers parks in the Parking Areas. Landlord agrees that signs will be prominently displayed throughout the Parking Areas to the effect that cars will be towed if their owners are not patrons of the retail stores. Landlord will provide "Cart Corrals" within the Parking Areas as shown on Exhibit C hereto (to the extent permitted without any material impact on parking ratio requirements, it being agreed that the spaces designated on Exhibit C for such Cart Corrals shall be deemed separate and apart from the minimum three hundred seventy (370) parking spaces described above) for the collection of Tenant's shopping carts; Tenant will use reasonable efforts to periodically remove its shopping carts from the Common Areas.

(b)      Landlord shall not designate specific parking spaces within the Parking Areas for use by other retail tenants or occupants of the Building; notwithstanding the foregoing, Landlord shall maintain those parking spaces shown within the area designated as "Expectant Mother Parking Area" on Exhibit C hereto as reserved for the exclusive use of expectant mothers and/or parents with infants who are customers of Tenant (the *"Expectant Mother Parking Spaces"*). The Expectant Mother Parking Spaces shall be prominently marked and/or signed as reserved for expectant mothers and/or parents with infants who are customers of Tenant. Except as provided in Section 9.4 below and except with respect to Tenant's 25 Available Parking Spaces, there shall be no charge whatsoever levied for the use of any parking areas within the Real Property. Landlord shall not permit overnight parking in the Real Property.

(c)    Throughout the Term, Landlord shall keep the exterior Common Areas fully lighted and open to the customers of the Building seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 10:00 p.m. on Sunday ("Normal Hours"). Upon request of Tenant, Landlord shall keep the exterior Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting. In addition to the foregoing, Landlord shall provide for low level security lighting within the exterior Common Areas from one (1) hour after the close of business in the Premises until dawn.

Section 9.3    Except for the Tenant's 25 Available Parking Spaces (hereinafter defined), no vehicles owned or operated by Tenant, its employees or its permittees (other than its customers) shall be permitted to be parked in any portion of the Parking Areas. Tenant shall, upon request, promptly furnish Landlord the license numbers of the motor vehicles operated by such employees and permittees.

Section 9.4    Landlord currently leases from the City of New York a parking area located across 2nd Avenue from the Building, located 31st Street and 2nd Avenue (the "NYC Parking Lot"), which lease expires December 31, 2014. Landlord will endeavor to extend such lease to provide during the Term additional parking for approximately seven hundred (700) vehicles, which parking (x) may be used on a non-exclusive basis by Tenant and its employees, and (y) will be able to accommodate vans as well as standard cars. Tenant shall pay the market rate for any parking spaces used by Tenant in such lot, provided that Tenant shall not be liable to pay a rate which is any higher than the lowest rate charged to any other tenant of the Real Property.

Section 9.5    Landlord agrees to make available to Tenant the capacity to park a total of up to twenty-five (25) vehicles, which spaces shall be for the use by Tenant's employees within either the NYC Parking Lot or the interior parking area located on the third level of the Building ("Tenant's 25 Available Parking Spaces") at then monthly market rates, provided in no event greater than that charged by Landlord for the employees of any other tenant of the Building. Tenant shall only be required to pay Landlord the monthly rate for that month that such spaces are actually used and then only for the months and based upon the number of spaces used by Tenant, provided that such capacity shall be available to Tenant at all times during the Term.

Section 9.6    During the Term, any material construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas shall:

(a)    not be performed during the months of August (through Labor Day), November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Laws;

(b)      be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)      be performed in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

**Section 9.7**    Except for use of the first level lobby in accordance with Section 3.8 of this Lease, Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes.  Landlord shall not permit any solicitation, distribution or handbills, picketing or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Laws.

**Section 9.8**    No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Real Property, other than on the roof of the Building.

**Section 9.9**    Tenant shall be permitted non-exclusive use of the portion of the Common Areas designated on Exhibit C hereto as "Garbage/Trash Compactor Area" and the garbage/trash compactor therein. The tenants sharing use of the garbage/trash compactor will pay for the costs thereof in proportion to their use of the garbage/trash compactor, based on key pad access or some other method of determining usage implemented by Landlord. Landlord covenants and agrees to and with Tenant that (i) the Garbage/Trash Compactor Area and the garbage/trash compactor located therein will be sufficient to service the needs of the retail tenants of the Real Property, including Tenant; and (ii) Landlord will monitor the garbage/trash compactor, and remove or cause to be removed the compacted garbage/trash on a regular and timely basis such that the garbage/trash compactor is always available for use.

## Article 10.  Repairs and Maintenance

**Section 10.1**  Subject to the provisions of Articles 13 and 14 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)      the structure, columns, exterior walls, floor, structural elements of the Building, the footings, foundation, roof, roof joists, gutters, flushing, downspouts and scuppers and repainting the exterior walls of the Building  (including, without limitation, the exterior walls of the Premises) as same may be reasonably required from time to time during the Term;

(b)       the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises (including, without limitation, any fire pump facilities or electrical switch gear serving the Premises);

(c)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises;

(d)    the non-structural elements of the Premises (including without limitation, the maintenance, repair and replacement of the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees (unless such contractors', manufacturers', vendors', or insurers' warranties or guarantees are assigned to, and enforceable by, Tenant); and

(e)    any damage to the Premises or the Building which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Operating Expenses).

**Section 10.2**   Subject to Articles 14 and 15 and Section 10.1: Tenant shall make, at Tenant's sole expense, all repairs and replacements needed to maintain in good condition and order the non-structural, interior elements of the Premises and all installations, equipment and facilities therein, including all interior walls, and all maintenance, repairs and replacements needed to any plumbing, water, waste, heating, ventilating and air conditioning units ("HVAC Units"), including electric conduits, lines and equipment located outside the Premises that serve only the Premises (it being acknowledged and agreed that the foregoing obligation by Tenant shall not apply to those portions of the HVAC Units constituting cooling towers and related equipment, or as may be applicable, any roof-top HVAC Units) and Landlord shall provide Tenant with 24-hour access to those areas of the Building that are necessary for Tenant to comply with the foregoing. Without limiting the foregoing, but subject to Articles 14 and 15 and Section 10.1, Tenant shall make all repairs and replacements required with respect to the HVAC Units, electrical and plumbing systems within the Premises and any HVAC Units or equipment located outside of the Premises and serving only the Premises, any plumbing fixtures within the Premises (including sinks and toilets), and the plumbing lines, valves, and pipes connected to or running from such fixtures from the point at which such lines, valves and pipes connect with the Premises, including such plumbing lines or ducts connecting any roof-top HVAC Units or other utility or service to the Premises. Tenant shall be responsible, at Tenant's sole cost and expense, for maintaining, in good order and repair and in compliance with all Laws, those elements of the sprinkler system within the Premises, including the repair and replacement of the sprinkler heads and pipes. If Tenant's Work (excluding the Initial Tenant's Work) requires the modification of the sprinkler system in the Premises, Tenant shall install or modify such

system as part of Tenant's Work, at Tenant's expense. Landlord shall not be responsible for maintenance, repairs or replacement of any element of the sprinkler system within the Premises. All such repairs and replacements shall be made in compliance with the provisions of this Lease (including Article 5). Notwithstanding anything contained in this Section 10.2, Tenant's obligation to repair and replace any conduits, lines, equipment, units and other items located outside the Premises shall be subject to same being readily accessible to Tenant, it being agreed that any items located in the street or outside the footprint of the Building shall be deemed inaccessible to Tenant).

Section 10.3 Subject to Section 13.6, Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all damage to the Building resulting from any act or omission of Tenant, Tenant's subtenants, or any of Tenant's or subtenants' employees, agents, employees, invitees or contractors.

Section 10.4 Landlord shall have no liability to Tenant, the Rent shall not be abated, and Tenant shall not be deemed actually or constructively evicted by reason of Landlord performing any repairs or other work to all or any portion of the Premises and/or the Real Property. Landlord shall endeavor to perform such repairs or other work in a manner that reasonably minimizes interference with the conduct of Tenant's business in the Premises (and with Tenant's use of the Common Areas, including without limitation the Parking Lot Parcel as provided in this Lease pursuant to the Easement Agreement) and damage to the Premises, Tenant's Work and Tenant's Property, but Landlord is not required to employ overtime labor or incur additional expenses to do so.

## Article 11. Laws

Section 11.1 Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Operating Expenses), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (i.e., are not of general applicability to tenants and occupants of the Building); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Laws, and (y) the repairs required in this Lease. As used herein, "Legal Compliance Work" shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Building, the Real Property, or any part thereof, as applicable, which may be required by reason of any Laws.

Section 11.2 Tenant shall have no claim against Landlord for any damages should Tenant's use and occupancy of Premises for the purpose set forth in this Lease be

prohibited or substantially impaired by reason of any Laws or by reason of any act of any Authority.

Section 11.3  Tenant shall promptly deliver to Landlord a copy of any communication or other materials relating to the Premises, the Building (including the Building systems), Tenant's Property or Tenant's Work received by Tenant from, or sent by Tenant to, any Authority.

Section 11.4  If Tenant conducts any auction, fire sale, going out of business sale, bankruptcy sale, or similar type of sale at the Premises in accordance with the provisions of this Lease, and after receiving Landlord's written consent therefor, Tenant shall obtain, and deliver to Landlord, prior to commencement of such auction or sale, any necessary permits, licenses and/or approvals required by any applicable Laws in connection therewith.

Section 11.5  Subject to the further applicable provisions of this Lease, Tenant shall, at its own cost and expense, secure and maintain throughout the Term, all necessary licenses and permits from such Authorities as shall be necessary for, or incidental to, the conduct of its business in the Premises and shall comply with all Laws relating to the operation of its business.  Landlord does not covenant, warrant or make any representation that any Authority license or permit that may be required in connection with the operation of Tenant's business will be granted, or if granted, will be continued in effect or renewed, and any failure to obtain, maintain, or renew such license or permit, or its revocation after issuance, shall not affect Tenant's obligations under this Lease.

## Article 12.  Subordination; Estoppel Certificates

Section 12.1  This Lease, and the rights of Tenant under this Lease, are subject and subordinate in all respects to all present and future underlying leases of the Real Property, including all modifications, extensions and replacements thereof ("Superior Leases") and all present and future mortgages encumbering or affecting on any Superior Lease or the Building and/or the Real Property including all increases, renewals, modifications, extensions, supplements, consolidations and replacements thereof ("Mortgages"), and all advances under any Mortgage; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit K hereto, in recordable form, and (b) subject to Section 12.3 below, any Superior Landlord (as hereinafter defined) shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Building and/or the Real Property or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant and in form for recording, which shall include the following provisions: (i) the Superior Landlord will not, in the exercise of any of the rights arising or which may arise out of

such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the Superior Lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Superior Landlord and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Superior Landlord shall recognize and be bound thereto.. In addition to the foregoing, Tenant shall, within thirty (30) days following receipt of Landlord's request, sign, acknowledge and deliver any reasonable instrument that Landlord, any landlord under a Superior Lease ("Superior Landlord") or any mortgagee under a Mortgage ("Mortgagee") may request to evidence such subordination. In the event that Landlord shall fail to deliver to Tenant, within ninety (90) days following the date of this Lease, the instrument(s) described in the foregoing clauses (a) and (b) of this Section 12.1 with respect to any presently existing Superior Leases and/or Mortgages, then Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.

   **Section 12.2** Subject to Landlord's compliance with Section 12.1 above, if any Mortgagee or any Superior Landlord or any successor or assignee thereof or any purchaser at a foreclosure sale or by deed in lieu of foreclosure succeeds to the rights of Landlord under this Lease, then at the request of same, Tenant shall attorn to such Mortgagee, Superior Landlord, successor, assignee or purchaser as Tenant's landlord under this Lease. Tenant shall, within thirty (30) days following request by such Mortgagee, Superior Landlord, successor or assignee, sign, acknowledge and deliver any instrument that such Mortgagee, Superior Landlord, successor, assignee, or purchaser requests to evidence the attornment.

   **Section 12.3** Landlord hereby represents and warrants to Tenant that as of the date hereof (i) Salmar Properties, LLC has, and as of the Delivery Date shall have, both a fee simple interest in the Building and the land described as Parcel I in Exhibit A-1 hereto (the "Building Parcel"), a sub-leasehold interest in such property by virtue of a lease to and a sublease back from the IDA and an exclusive parking and access easement over the Parking Lot Parcel from Salmar 870, LLC; and (ii) Salmar 870, LLC has a fee simple interest in the Parking Lot Parcel. The respective interests of both Landlord and Salmar 870, LLC as described herein are free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit J hereto. Salmar Properties, LLC is entering into this Lease as both the fee

simple owner and sub-sublessor of the Building Parcel. In the event of the termination of the lease to, and sublease from, the IDA by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the such lease and shall terminate or expire for any reason before any of the dates provided in this Lease for the termination of the initial or renewal terms of this Lease and if immediately prior to such surrender, termination or expiration this Lease shall be in full force and effect, Tenant shall not be made a party in any removal or eviction action or proceeding nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises be disturbed or in any way interfered with, and this Lease shall continue in full force and effect as a direct lease between Salmar Properties, LLC and Tenant.

**Section 12.4** Landlord and Tenant shall, at any time and from time to time, within thirty (30) days following its receipt of a request from the other party, sign, acknowledge and deliver to the requesting party or any other person designated by that party a certification (a) that this Lease is in full force and effect and has not been modified (or, if modified, setting forth all modifications), (b) stating the date to which the Rent has been paid, (c) stating whether or not, to its actual knowledge, the other party is in default of its obligations under this Lease and if so, describing the default, including any event that has occurred which, with the serving of notice or the passage of time, or both, would give rise to a default, and (d) stating to its actual knowledge, any other factual matters reasonably requested by the other party or any person designated by the other party. Any certification delivered pursuant to this Section may be relied upon only by the requesting party or any mortgagee, bona fide prospective purchaser, assignee or sublessee of the requesting party, but shall not, as between Landlord and Tenant, affect their respective rights.

## Article 13.  Insurance

**Section 13.1** Tenant shall at all times during the Term maintain in full force and effect insurance in accordance with the Rider hereto annexed, and, in any event, in compliance with the following insurance in standard from generally in use in the state in which the Building is located with insurance companies with an AM Best rating of A-/VIII or better (or a comparable rating in the event that the AM Best rating is no longer published) and authorized to do business in said state:

(a) Commercial general liability insurance in the amount of at least Ten Million Dollars ($10,000,000) per any occurrence resulting in bodily injury, personal injury or property damage and fire legal liability in the amount of at least $500,000 per occurrence.

(b) Tenant further agrees that any contractor Tenant hires to perform any alterations to the Premises shall furnish Tenant with certificates showing evidence of comprehensive general liability and damage insurance in the amount of at least

$3,000,000 plus required workmen's compensation and employer's liability insurance coverage to the extent required by law.

(c)    Tenant shall at all times, maintain worker's compensation and employer's liability insurance to comply with applicable Laws of the state in which the Building is located.

**Section 13.2**  All insurance required to be maintained under Sections 13.1, may be: (i) insured under an individual policy covering this location, or a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (ii) self-insured by Tenant via a deductible, a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iii) insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.

**Section 13.3**  Landlord shall maintain in full force and effect on and after the date of this Lease and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as an "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.

**Section 13.4**  Landlord shall procure and maintain in full force and effect on and after the date of this Lease and throughout the Term, Special Form (so-called "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for overages for flood, earthquake, windstorm, earth movement [sinkholes], Ordinance or Law coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the Building and other insurable improvements in the Real Property; provided, however, in no event shall such insurance cover Tenant's Property.  All policies required to be maintained by Landlord pursuant to this Section 13.4 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article 14 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding Two Hundred Fifty Thousand Dollars ($250,000) without Tenant's prior consent.

**Section 13.5**  (a)    All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the State of New York, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal

56

of any policy required hereunder. Each policy carried by either party shall be written as a primary policy not contributing with, and not in excess of, coverage carried by the other. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 13.1, 13.2, 13.4 and 13.5 above.

(b)    The liability insurance requirements under Sections 13.1 and 13.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Real Property shall be re-evaluated from time to time at the request of either Landlord or Tenant.

Section 13.6 (a)    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (so-called "All-Risk") and time element insurance required to be maintained hereunder, provided, however, that the foregoing waiver and release by Tenant shall not apply to damages suffered by Tenant to any or all of its leasehold improvements, fixtures, or merchandise caused by seepage or flooding from any premises located on level(s) above the Premises. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b) Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Real Property, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

Section 13.7 The provisions of this Article shall apply to any subtenant or other occupant of the Premises.

## Article 14.  Casualty

**Section 14.1**  If all or a portion of (a) the Premises are damaged by fire or other casualty, or (b) the Building (including any Building system) or the Common Areas (including all improvements thereto) are damaged by fire or other casualty, then subject to the provisions of this Article 14: (i) Landlord shall, at Landlord's expense, promptly repair, rebuild and restore  the damage to the Premises, the Building and the Common Areas to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements, and shall not include any of Tenant's Property, and (ii) Tenant shall, at Tenant's expense, promptly remove Tenant's Property from the Premises to the extent required by Landlord in connection with Landlord's repair of the damage and shall promptly after Landlord's substantial completion of the repair to the Premises (and a applicable, restoration of Tenant's access thereto), commence to diligently repair Tenant's Property in order to resume its normal business in the Premises. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 13.5 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Real Property in the manner provided in this Section 14.1.  Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be substantially completed.

**Section 14.2**  Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises, which changes are otherwise permitted under, and are performed in accordance with, the terms of this Lease, in the course of, and as part of, such rebuilding or restoration work.  To the extent that the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 14.4 below shall be appropriately adjusted to the extent of such net delay.

**Section 14.3** If, in Tenant's reasonable judgment, any condition affecting, or damage to, the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any condition affecting, or damage to, the Real Property, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

**Section 14.4** In the event that:

(a)      Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or the Buildings as required pursuant to this Article 14 within thirty (30) days after Landlord's receipt of all permits and approvals required for such restoration (following Landlord's having proceeded diligently to obtain permits and approvals), or Landlord thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed sixty (60) days in the aggregate); or

(b)      the required repairs and restorations to the Premises, the Common Areas, or the Building are not substantially completed by Landlord in accordance with the provisions of this Article 14 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed ninety (90) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(c)      after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) pertaining to the Premises or the Parking Lots on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Section 14.4, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Section 13.5 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(d)        seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Real Property is located; or

(e)        terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or the Buildings cannot be completed by Landlord in accordance with the provisions of this Article 14 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

**Section 14.5** If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional 7.5 Lease Year period by exercising an option pursuant to Article 20 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

**Section 14.6** Notwithstanding any other provision of this Article 14, in the event that the Building is substantially destroyed by fire or other casualty the restoration of which would exceed fifty (50%) percent of the then replacement cost of the Building, and the Premises are directly physically affected by such casualty and that Landlord elects not to rebuild and restore the Building, then Landlord, acting in good faith, shall have the right to terminate this Lease as of the date of such damage or destruction by giving notice thereof to Tenant within sixty (60) days following such damage or destruction; provided, however, that no such notice of termination shall be effective unless it is accompanied by a certification from Landlord that all other leases in the Building have also been terminated, and provided further that if Landlord or any Affiliate of Landlord actually (AA) commences the reconstruction or restoration of a premises to be leased for retail purposes on or before the date which is three (3) years after the effective date of the termination of this Lease, or (BB) Substantially Completes the reconstruction or restoration of the Building on or before the date which is three (3) years after the effective date of the termination of this Lease, then Landlord shall be obligated to offer to Tenant, at the time of the commencement of the reconstruction or restoration, or at the time of the Substantial Completion of the reconstruction or restoration of the improvements, the option to lease a portion of the Real Property equal in size to the floor area of the Premises upon all the terms and conditions of this Lease (including without limitation, the amount of Fixed Rent which would otherwise have been paid hereunder); provided, however, that: (i) all dates set forth in the Lease shall be appropriately extended; and (ii) at the time of Substantial Completion of the reconstruction or

60

restoration of the Premises, the remaining Term is at least 7.5 Lease Years, which, notwithstanding the casualty or Landlord's termination of this Lease as aforesaid, Tenant may achieve by exercising an available Renewal Option pursuant to Article 20. In the event Tenant elects, within thirty (30) days after such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after such offer, to exercise such option, Landlord shall be free to lease such premises to any other person or entity [except that, with respect to the Fixed Rent, if the premises are rebuilt and restored to substantially the same condition and location as existed immediately prior to the destruction and the proposed lease with such other person or entity shall include Fixed Rent in an amount less than ninety-five (95%) percent of the annual Fixed Rent that Tenant was paying when the Lease was terminated, then Landlord shall re-offer the space to Tenant]. The provisions of this Section 14.6 shall survive the expiration or earlier termination of this Lease pursuant to this Section.

Section 14.7 This Article constitutes an express agreement governing any damage to or destruction of the Premises or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, and any other similar Laws shall have no application to a fire or other casualty.

Section 14.8 Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to this Article 14, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

## Article 15. Condemnation

Section 15.1 If as the result of a taking by condemnation or similar legal action of an Authority or a taking by an Authority effected in any other manner (a "Taking" or "Taken") all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

Section 15.2 In the event that:

(a) as a consequence of any Taking: (i) portions of the Real Property shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Real Property, or (ii) the Real Property no longer has all of the entrances from both 2nd Avenue and 3rd Avenue,

and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Real Property at the grade of any street adjoining the Real Property or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(c)    any portion of the Real Property shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(d)    more than twenty-five (25%) percent of the total Floor Area of the Building (other than the Premises) is Taken; or

(e)    five (5%) percent or more of the parking spaces located in the Parking Areas are Taken so that there are not at least three hundred fifty (350) parking spaces available on the Parking Lot Parcel (the foregoing references to "parking spaces" being deemed not to include those parking spaces located within the Parking Lot Parcel that are designated as "Supplementary Parking Spaces" on Exhibit C hereto);

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Section 15.3 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

**Section 15.3** If this Lease is not terminated pursuant to this Article 15, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 15.6 below. Landlord shall give Tenant at least

ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

**Section 15.4** In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

**Section 15.5** Any dispute between the parties with respect to this Article 15 shall be resolved by arbitration in accordance in New York City, administered by the AAA under the AAA's Commercial Arbitration Rules, Expedited Procedures.

**Section 15.6** Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to this Article 15, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

## Article 16. Assignment and Subletting

**Section 16.1** Except as provided in this Article, Tenant shall not, without Landlord's prior consent, assign, encumber or otherwise transfer this Lease or any interest in this Lease, by operation of law or otherwise, or sublet or permit others to occupy all or any part of the Premises, or license concessions or lease departments in the Premises, and any assignment, encumbrance, transfer, sublet, occupancy agreement, license or department lease shall be void ab initio if not in accordance with this Article.

**Section 16.2** Except with respect to any transaction covered under Section 16.3 hereof, if Tenant desires to assign this Lease or to sublet in a single transaction, all or substantially all of the Premises, then upon Landlord's receipt of the Consent Request (hereinafter defined), together with the documents and information required under Section 16.5, Landlord may, at its option, elect to terminate this Lease by notice (the "Termination Notice") given to Tenant, which notice shall specify a date for the termination of this Lease (the "Recapture Termination Date"). Such option shall be exercised by giving Tenant notice of exercise within fifteen (15) days after the date Landlord receives the Consent Request and the documents and information required under Section 16.4. The Recapture Termination Date shall be the ninetieth (90th) day after the date on which Tenant receives Landlord's Termination Notice. Upon the Recapture Termination Date, this Lease and the term thereof shall end and expire as fully and completely as if such date were the date set forth herein as the stated Expiration Date. Tenant shall thereupon quit, surrender and vacate the Premises, without prejudice,

however, to Landlord's rights and remedies against Tenant under the lease provisions in effect prior to the Recapture Termination Date or with respect to periods prior to the Recapture Termination Date, and any Rent owing shall be paid up to such date and any payments of Rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. If Landlord so terminates this Lease, Landlord may, at its option and without liability to Tenant, lease the Premises to any person or entity that was negotiating with Tenant or that signed a lease, sublease or assignment agreement with Tenant for the Premises. Upon the Recapture Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the "Rescission Notice"), within ten (10) days after receiving the Termination Notice, of its rescission of the Consent Request, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Consent Request. If Landlord does not give the Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Consent Request.

**Section 16.3** In addition to, and not in limitation of, Tenant's other rights set forth in this Article 16, Tenant shall have the right from time to time, without the consent of Landlord and without Landlord having any termination or recapture rights, to assign Tenant's interest in this Lease and/or to sublet or license:

(a)    all or any portion of the Premises to an Affiliate of Tenant;

(b)    all or any portion of the Premises to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates, including all of Tenant's stores in the New York metropolitan area;

(c)    all or any portion of the Premises to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the New York metropolitan area;

(d)    all or any portion of the Premises in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s);

(e)     all or any portion of the Premises as may be required by any Legal Requirement;

(f)     any portion of the Premises to any unrelated third party which was previously a subtenant or a licensee of Tenant operating a license department within the Premises;

(g)     any portion of the Premises to the occupant of a department integrated into Tenant's business being operated in the Premises; and

(h)     any portion of the Premises which do not qualify as Severable Subleased Premises (as defined in Section 16.4 below).

In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all or any of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.

Section 16.4 Except with respect to any transaction described in Section 16.3 above, in the event Tenant intends to sublet any portion of the Premises which is commercially severable from the remainder of the Premises (meaning that such space can be separately demised for subletting to an independent third party and accessed through the first level lobby and the second level retail lobby without transiting through any other part of the Premises ("Severable Subleased Premises"), Tenant shall first give notice thereof (the "Subletting Notice") to Landlord, which notice shall specify the name and address of the proposed sublessee, the specific sublet premises and the proposed use of the Premises to be made by such sublessee. Within fifteen (15) days after receipt of a Subletting Notice, Landlord may elect to recapture the proposed sublet premises by notice in writing to Tenant (the "Partial Recapture Notice"). Should Landlord exercise its partial recapture rights pursuant to this Section 16.4, then as of the ninetieth (90th) day (the "Partial Recapture Date") following Tenant's receipt of the Partial Recapture Notice, the following shall apply:

(a)     as of the Partial Recapture Date, this Lease shall terminate with respect to the proposed sublet space only and all references in this Lease to the "Premises" shall thereafter refer only to that portion of the Premises not so recaptured by Landlord (the "Retained Premises") (it being acknowledged and agreed that (i) this Lease shall thereafter remain in full force and effect with respect to the Retained Premises, and (ii) Landlord and Tenant shall proceed diligently and in good faith to execute and deliver an amendment to this Lease (together with a short form of such amendment, in recordable form, which instrument, however, shall not set forth the Fixed Rent payable by Tenant with respect to the Retained Premises) which reflects the applicable provisions of this Section and Landlord and Tenant shall upon such Partial Recapture Date be released from any and all liabilities thereafter accruing hereunder with respect to the

proposed sublet premises only and all Rent payable by Tenant hereunder (including without limitation the determination of Tenant's Proportionate Share hereunder) shall (1) effective as of the Partial Recapture Date, be reduced to reflect the Floor Area of the Retained Premises (as opposed to the Floor Area of the entire Premises), it being further agreed that the Taxes and Operating Expenses attributable to the Base Tax Year and Base Year respectively (and Tenant's share of Parking Area Expenses) shall thereupon be equitably reduced to reflect the Floor Area of the Retained Premises, and (2) be apportioned as of the Partial Recapture Date, and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Partial Recapture Date); and

(b)    Landlord shall, on or before the Partial Recapture Date, at its sole cost and expense, construct the demising wall (taped and spackled) necessary to subdivide the Retained Premises and separate the utilities from the Premises required in order to subdivide the Premises between the sublet space and the Retained Premises, so that each space has separately sub-metered utilities (it being agreed that the construction plans for such work and the construction schedule pertaining thereto shall be subject to Tenant's prior written approval; all such work by Landlord shall comply fully with the terms and conditions of this Lease, it being agreed that Landlord shall at all times proceed diligently and in good faith to minimize disruption of Tenant's business operations at the Retained Premises).

If this Lease is terminated pursuant to the provisions of this Section, then as a material inducement to Tenant for granting Landlord the aforesaid termination right, Landlord hereby agrees that that part of the Premises recaptured by Landlord shall be subject to Section 3.10 above, which restriction shall run with and be binding upon such premises for the Term. If Landlord does not exercise its right of partial recapture within the aforesaid fifteen (15) day period, Landlord shall conclusively be deemed to have waived its rights under this Section, and Tenant may sublet the Premises pursuant to its Subletting Notice, without the requirement to obtain any further consent from Landlord with respect thereto. Tenant may issue a Rescission Notice with respect to any partial subletting covered by this Section.

**Section 16.5** Tenant acknowledges that the character and nature of the stores, store management and operations within the Building are important to Landlord and to the success of the Building. Subject to Tenant's compliance with the applicable provisions of this Article, where Landlord's consent is required, Landlord agrees not to unreasonably withhold, condition or delay its consent to a proposed assignment of this Lease or sublease of all or a portion of the Premises provided all the following conditions are met; and shall be granted or denied in writing to Tenant no later than twenty (20) days after the date Landlord receives the Consent Request:

(a)      such assignee or subtenant shall use and occupy the Premises only for the Permitted Use, or such other lawful retail use which is not the same as or in conflict with the use of another retail tenant within the Real Property;

(b)      Tenant delivers to Landlord a written request (the "Consent Request") for Landlord's consent which shall include (i) the name and address of the proposed subtenant or assignee, (ii) the nature and character of the business of the proposed subtenant or assignee, (iii) current financial and other credit information on the proposed subtenant or assignee, and (iv) a copy of the proposed assignment or sublease, which assignment or sublease shall be in compliance with the requirements of this Article.  Tenant shall promptly supply Landlord with such additional information as Landlord may reasonably request;

(c)      at the time of such assignment or sublet, there is no Default;

(d)      if Tenant assigns this Lease, Tenant delivers to Landlord a fully executed assignment and assumption agreement, duly acknowledged, in form and substance reasonably satisfactory to Landlord; and

(e)      if Tenant subleases the Premises, Tenant delivers to Landlord a fully executed sublease, in form reasonably satisfactory to Landlord, that among other things provides the sublease is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subject and subordinate.

**Section 16.6**  If Tenant sublets any part of the Premises other than Severable Subleased Premises which are subject to Section 16.4 above, Tenant shall pay Landlord, within fifteen (15) days following payment to Tenant fifty (50%) percent of the excess, if any, of the rents, additional charges and/or other consideration paid in connection with a sublease over the Rent allocable to the subleased premises (which Rent shall be allocated equally throughout the Premises) accruing during the term of that sublease after Tenant recovers therefrom all reasonable costs incurred by Tenant in connection with that sublease which have been paid or are then due and payable.  For purposes of this Section, the phrase "reasonable costs incurred by Tenant" shall mean customary brokerage commissions, the cost of any standard alteration made by Tenant to prepare the Premises for such subtenant's occupancy, and reasonable attorneys' fees incurred in connection with such sublease. This Section shall not apply to any transaction described in subsections (a) through (g) inclusive of Section 16.3 above.

**Section 16.7**  If this Lease is assigned or the Premises are sublet, in whole or in part, Tenant shall remain liable for the performance of all of the terms, covenants and conditions of this Lease on the part of Tenant to be performed or observed.  Tenant's liability hereunder shall not be affected by any modification of this Lease or agreement made between Landlord and any assignee or subtenant, or by reason of any delay or failure on Landlord's part to enforce any of its rights under this Lease; provided that if

any such modification or agreement increases the obligation of the assignee under this Lease, the liability of the assignor-Tenant under this Lease shall continue to be no greater than if such modification or agreement had not been made unless such assignee is a person or entity that directly or indirectly controls, is controlled by or is under common control with Tenant.

**Section 16.8** The consent by Landlord to any assignment, transfer, sublet, occupancy, encumbrance or other transaction described in Section 16.1, shall not in any way be deemed to relieve Tenant from obtaining the express consent of Landlord prior to any further such transaction or any proposed assignment of sublease or sub-sublease.

**Section 16.9** The acceptance by Landlord of Rent following any assignment, sublease, encumbrance, license, occupancy, or other transaction in violation of this Article, shall not be deemed a consent by Landlord to such transaction, nor a waiver of any right or remedy of Landlord hereunder.

**Section 16.10** In addition to Tenant's other rights set forth in this Article 16, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. As used herein, "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

**Section 16.11** (a)   If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Subject to 16.11(b) below, Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

(b)   If this Lease is terminated because of: (i) a Default of such assignee, or (ii) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Laws of any State or of the United States, or any other Laws affecting creditors' rights, then, subject to Section 16.11(c) below, Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord ("New Lease"), provided that the Original Tenant shall have remedied all Defaults of the assignee hereunder, unless such Defaults are personal to the assignee and/or not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Defaults as a condition to the exercise of its rights under this Section 16.11(b). Upon the Original

68

Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Terms). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Section 16.11(b) shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Section 16.11(b) were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

(c)     Notwithstanding the foregoing provision of Section 16.11, if Landlord elects in writing to Tenant to release Tenant from liability under this Lease, then Landlord shall have no obligations under this Section 16.11 to copy Original Tenant with respect to any default notice given to any assignee or to grant Original Tenant a new Lease of the Premises in the event of a termination of this Lease as set forth in Section 16.11 (b) above.

**Section 16.12** <u>Recognition Agreement</u>. In the event Tenant subleases all or any portion of the Premises (comprising at least ten thousand (10,000) square feet of Severable Subleased Premises (as defined in Section 16.4)) to an Affiliate, or for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of <u>Exhibit L</u> hereto, in recordable form.

## Article 17.  <u>Access; Changes in Building and Real Property</u>

**Section 17.1** Landlord reserves the right to (a) place and have access to concealed ducts, pipes and conduits running through conduit and utility shafts running through the Premises, and (b) enter the Premises at reasonable times on reasonable prior notice, which may be oral (but prior notice shall not be required in an emergency), to inspect the Premises, to show the Premises to others or to perform any work or make any improvement Landlord deems necessary or desirable to the Premises or the Building or for the purpose of complying with Laws.

**Section 17.2** Subject to the provision of Article 9 hereof, Landlord reserves the right at any time and from time to time to (a) construct additions to the Building (which right includes the right to make use of structural elements of the Premises,

including without limitation columns and footings, for such construction, provided such use does not encroach on the interior of the Premises), and (b) change the name, number or designation by which the Real Property and/or Building is known.  Landlord's exercise of its rights pursuant to this Section shall not reduce the number of parking spaces serving the Real Property below that required by Section 9.2 above.

**Section 17.3**  Landlord shall exercise Landlord's rights under this Article in a manner which reasonably minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises, Tenant's Work and Tenant's Property (all of which shall promptly be repaired by Landlord, at its expense), but Landlord is not required to employ overtime labor or incur additional expenses.

## Article 18.  <u>Default</u>

**Section 18.1**  Each of the following (a "<u>Default</u>") is a material default by Tenant under this Lease:

(a)  Tenant fails to pay when due any Rent and the failure continues for ten (10) days following Landlord's notice (which notice shall also be considered any demand required by any Laws);

(b)  Tenant fails to comply with Article 25 (the foregoing to exclude non-compliance by Tenant that is of a di minimis nature, it being agreed that Tenant shall in such event proceed in good faith in connection with same) or

(c)  Tenant fails to comply with any other term of this Lease, including, without limitation Article 25, and the failure continues for thirty (30) days following Landlord's notice (the foregoing to exclude non-compliance by Tenant that is of a di minimis nature, it being agreed that Tenant shall in such event proceed in good faith in connection with same).  If, however, compliance cannot, with diligence, reasonably be fully accomplished within that thirty (30) day period, Tenant shall have an additional period, provided Tenant notifies Landlord of its intention to comply (with reasonably detailed steps to be taken) and commences compliance within that thirty (30) day period and thereafter pursues compliance to completion with diligence.

**Section 18.2**  If a Default occurs, this Lease is subject to the conditional limitation that Landlord may, at any time during the continuance of the Default, give notice to Tenant that this Lease shall terminate on the date specified in that notice, which date shall not be less than five (5) days after Landlord gives such notice to Tenant.  If Landlord gives that notice, this Lease and the Term shall expire and come to an end on the date set forth in that notice as if said date were the date originally fixed in this Lease as the Expiration Date and Tenant shall quit and surrender the Premises to Landlord (but Tenant shall remain liable as provided in this Lease).

**Section 18.3** If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to any items Landlord sees fit.

## Article 19.  Remedies

**Section 19.1** If this Lease is terminated pursuant to Article 18 or Landlord reenters or obtains possession of the Premises by summary proceedings or any other legal action with or without terminating this Lease, the following provisions of this Section shall apply (in addition to any other applicable provisions of this Lease).

(a)      Tenant, and all other occupants, shall vacate and surrender to Landlord the Premises in accordance with this Lease.

(b)      Landlord, at Landlord's option, may relet the Premises, or any portion of the Premises, from time to time, in the name of Landlord, Tenant or otherwise, as determined by Landlord, to any person and on any terms, but Landlord shall have no obligation to relet the Premises, or any portion of the Premises, or to collect any rent (and the failure to relet the Premises, or any portion of the Premises, or to collect any rent shall not impose any liability or obligation on Landlord or relieve Tenant of any obligation or liability under this Lease).

(c)      Tenant shall pay Landlord all Rent payable to the date on which this Lease is terminated or Landlord re-enters or obtains possession of the Premises.

(d)      Tenant shall also pay to Landlord, as damages, any deficiency between (i) the aggregate Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the monthly Additional Rent for each year thereof to be 1/12th of Additional Rent that was payable for the year immediately preceding the termination, re-entry or obtaining of possession) and (ii) the rents, if any, applicable to that period collected under any reletting of all or any portion of the Premises. Tenant shall pay any deficiency in monthly installments on the days specified in this Lease for payment of installments of the Fixed Rent, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same arises. No suit to collect the deficiency for any month shall prejudice Landlord's right to collect the deficiency for any subsequent month. Tenant shall not be entitled to any rents payable (whether or not collected) under any reletting, whether or not those rents exceed the Rent. If Landlord relets the Premises, or any portion of the Premises, together with other space in the Building, the rents collected under the reletting and the expenses of the reletting shall be equitably apportioned for the purposes of this Article.

(e)      Landlord shall be entitled to recover from Tenant, and Tenant shall pay Landlord, in lieu of any further deficiency pursuant to the preceding paragraph of this

71

Section (as liquidated damages for such deficiency) the amount (if any) by which (i) at the time of the award, the unpaid Rent for the period which otherwise would have constituted the unexpired portion of the Term (not including unexercised Renewal Options) exceeds (ii) the then fair market rental value of the Premises, including the Additional Rent for the same period, both discounted to present value at an annual rate of interest equal to the Lease Interest Rate. The provisions of this Section 19.1(e) shall apply only from and after the date upon which Landlord terminates this Lease, as applicable.

(f)     Nothing contained in this Lease shall be considered to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages or otherwise by any Laws; provided, however, that Landlord may not accelerate any element of the Rent.

(g)     Upon a Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

(h)     Notwithstanding anything to the contrary contained herein, Landlord shall use all reasonable efforts to relet the Premises or any portion thereof.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of any Default by, or any other act of, Tenant.

**Section 19.2**  The words "re-enter," "re-entry" and "re-entered" as used in this Lease shall not be considered to be restricted to their technical legal meanings. Landlord shall have the right to enjoin any Default and the right to invoke any remedy allowed by any Laws in addition to any remedies provided in this Lease, except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by Laws.  All remedies provided in this Lease are cumulative and Landlord's right to invoke, or the invocation of, any remedy shall not preclude Landlord from invoking any other remedy under this Lease or under any and all Laws.

**Section 19.3**  Landlord and Tenant each hereby waive trial by jury in any legal action brought by either party against the other in connection with this Lease. If Landlord commences any summary proceeding against Tenant, Tenant shall not interpose any counterclaim in that proceeding (unless the failure to impose the counterclaim would preclude Tenant from asserting in a separate legal action the claim which is the subject of the counterclaim), and shall not seek to consolidate the proceeding with any other legal action.

**Section 19.4** If Tenant fails to comply with any of its obligations under this Lease, after Tenant's receipt of notice and expiration of the applicable cure period, Landlord may, at its option, cure such breach of this Lease. All reasonable costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Landlord in that connection shall be paid by Tenant to Landlord as Additional Rent within fifteen (15) days after Tenant is billed therefor.

**Section 19.5** Tenant shall also reimburse Landlord for all reasonable costs and expenses  (including reasonable attorneys' fees and disbursements), incurred by Landlord in connection with a default by Tenant, including instituting, prosecuting and/or defending any legal action by or against Tenant whether a non-payment or holdover proceeding, or other proceeding, if Landlord prevails in such legal action, together with interest thereon at the Default Rate (hereinafter defined).

**Section 19.6** The failure of Landlord to seek redress for a Default, or of Landlord or Tenant to insist upon the strict performance of any term of this Lease, shall not prevent Landlord from redressing a subsequent Default or Landlord or Tenant from thereafter insisting on strict performance. The receipt by Landlord of the Rent with knowledge of a Default or Tenant's failure to strictly perform under this Lease shall not be deemed a waiver of the Default or failure. No term of this Lease shall be considered waived by Landlord or Tenant unless the waiver is in a writing signed by the waiving party. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent shall be considered other than on account of the next installment of the Rent, or as Landlord may elect to apply same. No endorsement or statement on any check or letter accompanying any check or payment shall prevent Landlord from cashing the check or otherwise accepting the payment, without prejudice to Landlord's right to recover the balance of the Rent or pursue any other remedy.

**Section 19.7** Tenant acknowledges that late payments by Tenant to Landlord of amounts due from Tenant under this Lease will cause Landlord to incur costs not otherwise contemplated by this Lease, the exact amount of which is extremely difficult or impractical to determine. Therefore, without limiting Landlord's other rights under this Lease for a payment default by Tenant, if more than two (2) times during any twelve (12) month period an installment of Fixed Rent due from Tenant is not received by Landlord within ten (10) days after the applicable due date, or at any time Additional Rent is not paid within ten (10) days after the applicable due date, then, commencing on the third (3rd) and subsequent late payment of Fixed Rent during such twelve (12) month period or with any such late payment of Additional Rent, Tenant shall pay to Landlord (i) interest on the amount due at the Lease Interest Rate from the date payment was due until payment is made and (ii) an additional sum equal to Two Hundred Fifty ($250.00) Dollars for each such late payment as a late charge. Acceptance of any late charge shall not constitute a waiver by Landlord of Tenant's default with respect to the overdue

amount, and shall not prevent Landlord from exercising any of the other rights and remedies available to Landlord for any other event of default under this Lease.

**Section 19.8**

(a)    All legal actions relating to this Lease shall be adjudicated in the courts of the State of New York having jurisdiction in the county in which the Building is located.  Tenant irrevocably consents to the personal and subject matter jurisdiction of those courts in any legal action relating to this Lease or any guaranty of Tenant's obligations under this Lease, and Tenant shall not assert, by way of motion, as a defense or otherwise, any objection to any such court being the venue of such legal action or claim that such venue is an inconvenient forum for Tenant or any principal of Tenant.

(b)    Tenant irrevocably waives and shall not assert, by way of motion, as a defense or otherwise (i) any objection to any such court being the venue of any legal action relating to this Lease, (ii) any claim that any legal action relating to this Lease brought in any such court has been brought in an inconvenient forum or (iii) any claim that Tenant is not personally subject to the jurisdiction of that court.

(c)    Service in any legal action relating to this Lease may be made by delivery of the summons and complaint, or the petition and notice of petition, by certified or registered mail, return receipt requested, sent to Tenant at Tenant's Notice Address or sent to Landlord at Landlord's Notice Address.

**Section 19.9**  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "Landlord's Default," it being agreed that the foregoing shall exclude a failure of performance or observance or a breach by Landlord that is of a di minimis nature, it being further agreed that Landlord shall in such event proceed in good faith in connection with same), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)    offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid.

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed, without limitation, that any water infiltration into the Premises from within or without the Premises, or mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

**Section 19.10**    In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in New York City, before one arbitrator in accordance with the procedural rules of the American Arbitration Association, Expedited Procedures (or any successor thereto) then in effect. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

### Article 20.  Renewal Option

**Section 20.1**

(a)    Subject to and in accordance with the provisions of this Article, Tenant shall have the right ("Tenant's Renewal Right") to extend the Initial Term with respect only to the entire Premises for two (2) successive periods of 7.5 Lease Years each (each, a  "Renewal Term").

(b)    Subject to the provisions of this Article, the Renewal Term for which an option has been duly exercised shall commence on the date immediately following the expiration of the then Term (the "Renewal Term Commencement Date") and shall expire on the day preceding the 7.5 year anniversary of the Renewal Term

Commencement Date (the "Renewal Term Expiration Date"), unless the Renewal Term shall sooner end pursuant to any of the terms, covenants or conditions of this Lease or pursuant to law. Tenant must give Landlord written notice (a "Renewal Notice") of Tenant's intention to exercise Tenant's Renewal Right to extend the Term for the period of the subject Renewal Term no earlier than three hundred sixty-five (365) days and no later than two hundred seventy (270) days prior to expiration of the then Term (the "Renewal Term Notice Date"); provided, however, that the Term of this Lease shall not expire unless and until Tenant fails to exercise a Tenant's Renewal Right within fifteen (15) days after receiving notice from Landlord that the Renewal Term in question has not been exercised (Landlord's notice shall not be given prior to the 270th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Tenant's Renewal Rights. If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 24 hereof. If Landlord then gives Tenant such notice and Tenant exercises its Tenant's Renewal Right, then the effective date of such exercise shall be retroactive to the Expiration Date. Upon the giving of the Renewal Term Notice, subject to the provisions of this Article, the Term of the Lease shall be extended without execution or delivery of any other or further document, with the same force and effect as if the Renewal Term had originally been included in the Term. All of the terms, covenants and conditions of the Lease shall continue in full force and effect during the Renewal Term, except as herein specifically set forth.

(c)     The Renewal Term shall be upon all of the terms and conditions set forth in this Lease, except that:

(i)     The Fixed Annual Rent shall be as provided in the Basic Lease Terms; and

(ii)     Tenant shall accept the Premises in its "as is" condition at the commencement of the Renewal Term (subject to Sections 10 and 14 of this Lease, as applicable), and Landlord shall not be required to perform Landlord's Work or any other work, to render any services to make the Premises ready for Tenant's use and occupancy or to provide any abatement of Fixed Annual Rent or Additional Rent as required under the Lease for the Initial Term.

## Article 21.  Right of First Offer

**Section 21.1** Provided (i) Tenant shall not then be in Default under this Lease, and (ii) subject to the further terms of this Section 21.1, Tenant is open to the public for business in at least seventy-five (75%) percent of the Premises, at the time of the delivery of the Offer Notice and on the Offer Space Delivery Date, if the premises on the second floor in the Building immediately adjacent the Premises, or any other retail premises on the first floor of the Building (the "Offer Space") shall become available for

leasing during the Term and Landlord shall intend to offer such Space on the open market, Landlord shall give notice thereof to Tenant (the "Offer Notice"), which Offer Notice shall set forth the material terms and conditions upon which Landlord is prepared to lease such Space to an unrelated third party in an arm's length transaction in the then real estate marketplace for a term expiring not later than the Expiration Date, including, without limitation, the date on which Landlord expects to deliver such Space to the tenant thereof (the "Space Commencement Date"); the foregoing condition "(ii)" of this Section 21.1 shall not be required with respect to premises on the second floor of the Building that shall become available for leasing as aforesaid prior to the date that is the one hundred eightieth (180th) day after the Rent Commencement Date. If Tenant desires to lease all, but not less than all, of the Space, Tenant shall give notice (the "Election Notice") to Landlord within thirty (30) days after the delivery by Landlord to Tenant of the Offer Notice, time being of the essence, it being understood, however, that Tenant shall not be permitted to use the Space for retail purposes if the same would exceed the amount of floor area of the Building which is permitted to be used for retail purposes pursuant to the IDA Lease Agreement identified in the Rider hereto. If Tenant shall fail to deliver the Election Notice to Landlord within such thirty (30) day period, time being of the essence, then except as otherwise expressly set forth herein, Landlord shall be free to lease all or any portion of such Space that is the subject of the Offer Notice to any third party upon substantially the same terms and conditions as those offered to Tenant, provided that such lease is executed within six (6) months after Tenant has delivered (or has failed to timely deliver the Election Notice) Landlord's offer with respect to the Space. Notwithstanding the foregoing, Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available. As used herein, the phrase *"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant. Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 19.10 above.

**Section 21.2** If Tenant shall timely deliver the Election Notice to Landlord as aforesaid, then, on the date (the "Offer Space Delivery Date") on which possession of the entire Space is delivered to Tenant, (a) the Space shall be added to and deemed to be a part of the Premises upon the same terms and conditions of the Lease, as amended hereby, except to the extent expressly set forth in the Offer Notice; (b) the Fixed Rent on account of the Premises shall be increased in an amount equal to the fixed rent set forth in the Offer Notice; (c) the Space shall be delivered in its "as is" condition on the Delivery Date and Landlord shall have no obligation to perform any work in or to the Space (subject, as applicable, to the substantial completion of any "Landlord's Work" to be performed by Landlord in accordance with the provisions of the Offer Notice); (d) Tenant's Proportionate Share and Tenant's share of Parking Area Expenses shall be

increased accordingly, provided that there shall be a proportionate adjustment in such costs for the base year before determining Tenant's share thereof; and (e) Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (i) contain the terms and conditions set forth in the Offering Notice, (ii) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and (iii) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21.

Section 21.3   If Landlord is unable to give possession of the Space to Tenant on the Space Commencement Date because of the holding over or retention of possession of any tenant, undertenant or occupant or for any other reason, Landlord shall have no liability to Tenant therefor and the validity of the Lease, as amended hereby, or Tenant's exercise of the option set forth herein shall not be impaired under such circumstances, nor shall the same be construed in any way to extend the Term with respect to the Premises or the Space, but the rent payable with respect to the Space shall be abated (provided Tenant is not responsible for the inability to obtain possession) until Landlord shall have given Tenant notice that Landlord is able to deliver possession of the Space to Tenant. Notwithstanding the foregoing, if for any reason Landlord fails to deliver possession of the Space to Tenant within nine (9) months of the Space Commencement Date, Tenant may terminate its exercise of the option under this Section with respect to the Space at any time after the expiration of such nine (9) month period by delivering written notice thereof to Landlord prior to Landlord's delivery of possession of the Space to Tenant. If Tenant shall deliver such notice of termination, Tenant's exercise of its option under this Section with respect to the Space shall expire upon the date specified in such notice, and thereafter (a) neither party shall have any rights or obligations hereunder with respect to such Space, and (b) Tenant shall have no right to lease all or any portion of such Space pursuant to the terms of this Section (even if such Space shall again become available for leasing during the Term and Landlord shall intend to offer such Space on the open market). If Tenant fails to deliver such notice of termination to Landlord prior to Landlord's delivery of possession of the Space to Tenant, Tenant shall be deemed to have waived the right to cancel its exercise of such option by reason of the contingency contained in this Section. The provisions of this Section are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law.

Section 21.4   Any termination, cancellation or surrender of the Lease, as amended hereby, shall terminate any rights of Tenant under this Section. Time shall be of the essence with respect to the exercise by Tenant of its rights under this Section. Tenant agrees to keep all information with respect to Landlord's intentions relating to the Space in strict confidence.

## Article 22.  Notices; Consents and Approvals

**Section 22.1**  Subject to the further provisions of this Article 22, whenever it is provided herein that any notice, demand, request, consent, approval or other communication ("Notice") shall or may be given to either of the parties by the other, it shall be in writing and, any Laws to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Notice Address or to Tenant at Tenant's Notice Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) W. John Park, Cole, Schotz, Meisel, Forman & Leonard, P.A., 25 Main Street, Hackensack, New Jersey 07601, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  If Landlord shall consist of more than one person or entity, notices delivered by Tenant to Landlord's Notice Address shall be deemed to be delivered to, and effective notice to, all such persons or entities comprising Landlord.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee, provided, however, that if a deadline for the giving of any notice under this Lease occurs on Saturday, Sunday, or a legal holiday, then such deadline shall be extended to the next business day thereafter occurring.  Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Proportionate Share of Taxes as described in Article 6 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Proportionate Share of Expense Payments as described in Article 7 of this Lease.

**Section 22.2**  If any provision of this Lease requires Landlord's consent or approval, such consent or approval shall be effective only if given in writing.

**Section 22.3**  Any Notice or other communication given by Landlord to Tenant in accordance with this Article may be signed and given by Landlord's attorney or managing agent, if any, with the same force and effect as if signed and given by Landlord.

## Article 23.  No Representations; Liability; Tenant Indemnity

**Section 23.1**  Neither Landlord nor Landlord's managing agent, if any, has made any warranties, representations, statements or promises with respect to the Premises, the Real Property, the Building systems, any Additional Rent, any Laws or any other matter, unless expressly set forth in this Lease.  This Lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of this Lease, and any previous agreements between Landlord and Tenant are merged in this Lease,

which alone expresses their agreement. Tenant is entering into this Lease after full investigation, and is not relying on any warranties, representations, statements or promises made by Landlord or any other person not expressly set forth in this Lease, and is not acquiring any rights of any nature, by implication or otherwise, except as expressly set forth in this Lease.

**Section 23.2**  Any employee of Landlord, Landlord's managing agent, if any, or the Real Property to whom any property is entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to that property and neither Landlord nor Landlord's managing agent, if any, shall be liable for any damages to or loss of property of Tenant or others entrusted to employees, agents or contractors of Landlord, Landlord's managing agent, if any, or the Real Property.

**Section 23.3**  Neither Landlord nor Landlord's managing agent, if any, shall be liable for any injury, damage or loss to Tenant, Tenant's Property, Tenant's Work, Tenant's business or to any other person or property resulting from any cause, except to the extent caused by the negligence or willful misconduct of Landlord, Landlord's managing agent, if any, or their respective employees, agents or contractors, subject to Section 13.4.

**Section 23.4**  In the event of a transfer or lease of the entire Building (a) the transferor or lessor shall be and hereby is (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) relieved of all obligations and liabilities of Landlord under this Lease accruing after the effective date of the transfer or lease, and (b) the transferee or lessee shall be deemed to have assumed all of Landlord's obligations and liabilities under this Lease effective from and after the effective date of the transfer or lease, but such covenants, liabilities and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

**Section 23.5**  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Real Property, Tenant shall, on and after the Commencement Date, look only to Landlord's estate and property in the Real Property (or the proceeds from the sale of all or any portion thereof) and net income derived from the Real Property for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.5 shall not be deemed or construed to limit

Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

   **Section 23.6**  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

   **Section 23.7**  This Lease and the obligations of Tenant to pay the Rent and perform Tenant's other obligations under this Lease are separate, distinct and independent of Landlord's obligations under this Lease.

   **Section 23.8**  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "Force Majeure"), then the performance of any such act shall be excused for a period equal to the period of the delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease (except for delays resulting from cyber-attacks, power failures, or other events of Force Majeure  affecting the availability of funds); or (ii) delays occurring in the course of complying with applicable Laws that could have been avoided through the exercise of due diligence by a party hereto.  A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of *Force Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

   **Section 23.9**  Except as otherwise provided in Section 13.6 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

**Section 23.10**  Except as otherwise provided in Section 13.6 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Real Property (excluding the Premises and the respective premises of other tenants of the Real Property), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

## Article 24.  End of Term

**Section 24.1**  On the Expiration Date (a) Tenant (and all other occupants) shall vacate and surrender the Premises, leaving the Premises vacant, broom clean and in good order and condition, except for ordinary wear and tear and damage for which Tenant is not responsible under this Lease, and otherwise as may be required by this Lease, and (b) Tenant shall remove all of Tenant's Property.  If the last day of the Term is not a business day, this Lease shall expire on the immediately preceding business day. Tenant waives, for itself and for any person claiming under Tenant, any right which Tenant or any such person may have under Section 2201 of the New York Civil Practice Law and Rules or under any similar Laws.

**Section 24.2**  If the Premises are not vacated and surrendered in accordance with this Lease (whether by Tenant or any occupant related to Tenant), on the date required by this Lease, Tenant shall be liable to Landlord for per diem use and occupancy in respect of the Premises at a rate equal to one hundred fifty (150%) percent of the Fixed Rent payable under this Lease for the last year of the Term (which Landlord and Tenant agree is the Fixed Rent that is contemplated by them as being fair and reasonable under such circumstances and is not a penalty).  In no event, however, shall this Section be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date.

**Section 24.3**  If during the last ninety (90) days of the Term, substantially all of Tenant's Property has been removed from the Premises, and Tenant has ceased operating in the Premises, Landlord or any person designated by Landlord may immediately enter and alter the Premises, without releasing Tenant from any obligation or liability under this Lease, including the payment of Rent, or incurring any liability or obligation to Tenant.

**Section 24.4**  Unless otherwise specifically provided:  (a) any obligation of Landlord or Tenant under this Lease which by its nature or under the circumstances can only be, or by the terms of this Lease may be, performed after the Expiration Date; (b)

any liability for a payment with respect to any period ending on or before the Expiration Date; and, (c) all indemnity and hold harmless provisions in this Lease, shall survive the Expiration Date.

### Article 25.  <u>Special Reporting and other Requirements.</u>

**Section 25.1**  Tenant acknowledges that the Building is receiving certain economic benefits from the Energy Cost Savings Plan, ICAP, EDC and IDA, which may, without representation and warranty, include a PILOT agreement and other economic benefits to Tenant through its obligations under this Lease.  In further thereof, and throughout the term of the Lease, Tenant agrees to comply and cooperate with all reasonable requirements of the EDC and the IDA, including, without limitation of completion of all filing requirements, reporting requirements, submission of financial documents and submission of employment information which is required of tenants or building occupants pursuant to any such programs.  In the event Tenant fails to cooperate as aforesaid Tenant shall hold harmless and indemnify Landlord from and liability or damage caused as a result thereof.

**Section 25.2**  Tenant covenants and agrees to report the following information to Landlord for each July 1– June 30 fiscal year period during the Term of this Lease: Items 1-5, 15 and 16 of the Employment and Benefits Report hereto annexed as <u>Exhibit H</u> (with the dates therein updated to reflect the applicable fiscal year) and to sign and to submit same to Landlord before August 1 following the end of each such fiscal year.

**Section 25.3**  Tenant agrees to receive and in good faith consider such proposals as the EDC and its related entities may make with regard to jobs Tenant will seek to fill in relation to its activities on or concerning the Premises, and to provide the EDC and such entities with the opportunity (i) to refer candidates who are New York City residents having the requisite experience for the positions in question, and/or (ii) to create a program to train New York City residents for those jobs, and to report to the EDC, upon the EDC's request, regarding the status of its consideration of such proposals. Landlord and EDC and their respective successors and assigns shall be beneficiaries of such agreement by Tenant.  Landlord and its successors and assigns hereby reserves the right, on behalf of itself and the EDC and its successors, designees and assigns, as third party beneficiaries, to seek performance by Tenant, at the expense of Tenant, of the obligations set forth in Sections 25.1 and 25.2.

**Section 25.4**  Tenant hereby agrees to use the Premises in accordance with the Rider hereto annexed and made a part hereof.

**Section 25.5**  Tenant agrees, upon Landlord's request, to complete and submit the IDA Disclosure Statement hereto annexed as <u>Exhibit G</u>.

**Section 25.6** If at any time during the Term of this Lease, the IDA obtains information indicating that Tenant is a Non-Compliant Person (as defined in the Rider), Tenant agrees to promptly provide the IDA a completed background investigative questionnaire using the IDA's then current form.

**Section 25.7** Tenant recognizes the importance to Landlord and the tenants and occupants of the Building of Tenant's timely submission of the reports required pursuant to this Article 25.  If Tenant fails to timely submit any such reports to landlord within ten (10) days following notice of such failure, in addition to Landlord rights and remedies on account thereof, Tenant shall pay to Landlord, as additional rent, $200.00 per day from said 10th day until the completed subject report is submitted to landlord, and Tenant shall indemnify and hold Landlord harmless from all costs, losses, expenses and liability, including, without limitation, loss of economic benefits to the Building and Real Property arising therefrom.

## Article 26.  Miscellaneous

**Section 26.1** Patriot Act.  Tenant certifies and represents, both on the date of execution and delivery of this Lease, that, to the best of Tenant's knowledge, Tenant is not acting directly or indirectly for or on behalf of, any group, entity, or nation, named by any Executive Order of the President of the United States or the United States Treasury Department as a terrorist or other "Specially Designated National and Blocked Person," or other person, entity, nation or transaction banned or blocked pursuant to any law, order, rule or regulation that is enforced or administered by the United States Office of Foreign Assets Control or any successor entity, agency or department (an "SDN.  Any renewal right contained in this Lease is void and of no force or effect if Tenant is listed as an SDN at the date of renewal.

**Section 26.2** Financial Statements.  Within thirty (30) days after Landlord's request (which request may be made no more than once for each fiscal year of Tenant), Tenant shall deliver to Landlord Tenant's financial statements, in form and scope reasonably satisfactory to Landlord, for Tenant's most recent fiscal year (or the preceding fiscal year, if the most recent fiscal year ended only within the last 90 days before Landlord's request). The financial statements Tenant delivers to Landlord shall be audited only if such financial statements are audited for any other purpose, and if not audited, shall be certified as true and complete by Tenant's chief operating officer or chief financial officer. Tenant shall promptly notify Landlord of any material event or occurrence that relates to Tenant's creditworthiness.  For so long as Tenant is a publicly listed entity Tenant shall not be required to provide any information pursuant to this Section.

**Section 26.3** Broker.  Tenant represents to Landlord that it has dealt with no broker in connection with this Lease other than the Broker.  Tenant shall indemnify, defend and hold harmless Landlord from and against any claims for any brokerage

commissions or other compensation which are made by any broker (other than the Broker) alleging to have dealt with Tenant in connection with this Lease, and all costs, expenses, liabilities and damages in connection therewith, including reasonable attorneys' fees and expenses. Landlord shall pay any commission due the Broker pursuant to a separate agreement between Landlord and the Broker. Landlord shall indemnify, defend and hold harmless Tenant from and against all claims, costs, expenses, liabilities and damages including reasonable attorneys' fees and expenses (a) arising from Landlord's failure to comply with its obligation in the preceding sentence and (b) any claims for any brokerage commissions or other compensation by any broker (other than the Broker) with whom Landlord, but not Tenant, has had dealings in connection with this Lease.

**Section 26.4** <u>General</u>.

(a)      Subject to the provisions of this Lease, this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns. No person is intended to be a third party beneficiary of this Lease.

(b)      This Lease may not be changed or terminated, in whole or in part, except in a writing signed by Landlord and Tenant.

(c)      Notwithstanding any provision of this Lease, or any Laws, to the contrary, or the execution of this Lease by Tenant, this Lease shall not bind or benefit Landlord or Tenant, unless and until this Lease is signed and delivered by both Landlord and Tenant.

(d)      No act or omission of Landlord or Tenant, or their respective employees, agents or contractors, including the delivery or acceptance of keys, shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless it is in a writing signed by Landlord.

(e)      The captions in this Lease are for reference only and do not define the scope of this Lease or the intent of any term. All Article and Section references in this Lease shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this Lease.

(f)      If any provision of this Lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this Lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by all applicable Laws.

(g)    There shall be no presumption against Landlord because Landlord drafted this Lease or for any other reason.

(h)    If there is then no Default, Tenant may peaceably and quietly enjoy the Premises without hindrance by Landlord or any person lawfully claiming under Landlord, subject however, to the terms of this Lease.

(i)    Tenant hereby waives any rights Tenant may have in connection with any zoning lot merger, zoning application, or subdivision or transfer of development rights with respect to the Real Property or any part thereof, including any rights Tenant may have to be a party to or to execute or contest any instrument providing for such merger, subdivision or transfer.

(j)    If Landlord is comprised of two or more persons, the liability of those persons under this Lease shall be joint and several.  Wherever appropriate in this Lease, personal pronouns shall be considered to include the other gender and the singular to include the plural.

(k)    Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum, which shall be in recordable form, and such form and substance as either party shall reasonably request; Landlord and Tenant shall cooperate in the recordation thereof.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

(l)    This Lease shall be governed by, and construed in accordance with, the Laws of the State of New York.

(m)    Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

(n)    Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

(o)    Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable

of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

(p)     Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

(q)     Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Laws.

(r)     Grammatical Usages and Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

(s)     Table of Contents, Line Numbering and Paragraph Headings.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

(t)     Definition of Hereunder, Herein, etc.  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

(u)     Entire Agreement and Modification.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.

(v)    No Joint Venture or Partnership Created by Lease. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

(w)    Tenant's Tradename. Except as a nominative fair use (e.g., to show the location of the Premises in the Building or to indicate that Tenant is a tenant in the Building), Landlord shall not make use of any of Tenant's tradenames in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

(x)    Timely Billing of Charges. Notwithstanding any provision of this Lease to the contrary, any Additional Rent for which Tenant is to be billed or charged by Landlord shall be billed or charged within one hundred eighty (180) days after the close of the calendar year (or fiscal tax year, in the case of Real Estate Taxes) for which the amount is incurred by Landlord, failing which, Landlord shall be deemed to have waived its right to payment of such Additional Rent.

(y)    Counterparts. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

(z)    Ethical Conduct Policy. It is the policy of Tenant and its subsidiaries and affiliates (collectively, "the Company") to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including, but not limited to, the U.S. Foreign Corrupt Practices Act). No individual employed by or representing the Company, and no individual or entity contracting with the Company or otherwise performing services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services. This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Lease, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party. Any individual or entity having a business relationship with the Company shall require any subcontractor (of any level) to adhere to the same standards and are expected to appropriately monitor their subcontractors to ensure such adherence. If any such improper actions are observed, please contact the Tenant's Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

(aa)    Confidentiality. Landlord shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the economic or other business terms of this Lease (including, without limitation, the Term and the Rent), except as required by Laws; or for disclosure to Landlord's accountants, attorneys, bona fide

prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Real Property, provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord.

## Article 27.  Environmental Matters.

Section 27.1 Definitions.

(a)    As used herein, the term "Environmental Laws" shall mean any and all Laws concerning the protection of the environment, human health or safety.

(b)    As used herein, the term "Hazardous Substances" shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)    As used herein, the term "Environmental Notice" shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Real Property or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Real Property or any contiguous property; or (iii) any underground storage tanks on the Premises or the Real Property.

(d)    As used herein, the term "Releasing" or "Release" shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term "Compliance Costs" shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term "Tenant Related Parties" shall mean Tenant's agents, servants, employees, contractors or licensees.

**Section 27.2** Compliance with Environmental Laws. Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Real Property and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Real Property and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

**Section 27.3** Responsibility for Releases of Hazardous Substances. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Real Property which were introduced by Tenant or Tenant Related Parties (hereinafter "Tenant Releases"), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Real Property, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Notwithstanding the foregoing provisions of this subsection 27.3, Landlord's liability under this section 27.3 and Landlord's agreement to indemnify, defend and hold Tenant harmless shall not apply with respect to Hazardous Substances (i) which are introduced to the Real Property or the Premises after the Delivery Date by any party other than Landlord or any party related to Landlord or any contractor, employee, agent or representative of Landlord, and (ii) for which Landlord is not otherwise responsible under applicable laws, subject to the following conditions: (A) Landlord shall otherwise comply with its duties and obligations under this Section 27, (B) upon request by Tenant, Landlord shall at its expense commence such actions or proceedings on Tenant's behalf against the party who shall have introduced (or be legally responsible for the introduction of) such Hazardous Substances to the Real Property or the Premises and thereafter diligently pursue same, and (C) should the introduction of such Hazardous Substances as aforesaid materially interfere with the normal conduct of Tenant's business in the Premises, its use and enjoyment of the Common Areas or its other rights and benefits under this Lease, and such Hazardous Substances (i) were introduced to the Real Property prior to the Delivery Date, or (ii) were introduced on or after the Delivery Date by Landlord or any party related to Landlord or any contractor, employee, agent or representative of Landlord, then Tenant shall be entitled to an equitable abatement of Rent and, in the event such material interference continues for a period of one hundred twenty (120) days after discovery of such Hazardous Materials and Landlord is unable (or elects not) to remediate (or cause the remediation of) such Hazardous Substances as required by law within such period of one hundred twenty (120) days, then Tenant shall be entitled to terminate this Lease at any time prior to the completion of such remediation upon thirty (30) days prior notice to Landlord. Except in the event of an emergency, instances in which work is required to prevent a default under any mortgage held by Landlord's Mortgagee or if compelled by

applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

      **Section 27.4** <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Real Property shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Real Property is being used.

      **Section 27.5** <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Real Property, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Laws, including, without limitation, Environmental Laws, affecting the Real Property, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to Landlord's actual knowledge, except as shown in those certain reports listed on Exhibit T: (A) no Hazardous Substances are located at, on, in, under or emanating from the Real Property, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Real Property or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 27.

      **Section 27.6** <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

      **Section 27.7** <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 27; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 27; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Article 27.

Section 27.8 <u>Survival</u>. The obligations of the parties under this Article 27 shall survive the renewal, expiration, breach or earlier termination of this Lease.

Section 27.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Article 27 and any other provision of this Lease, the provisions of this Article 27 shall control.

### Article 28. <u>Landlord's Covenants, Warranties and Representations.</u>

Section 28.1 To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)      In the event the legal description of the Real Property described in <u>Exhibit A-1</u> hereto indicates that the Real Property is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(b)      Except for the approvals required from Landlord's existing mortgagee, no third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the date of this Lease, governmental permits and approvals);

(c)      Except as set forth on <u>Exhibit O</u> (and the final sentence of Section 3.10 (a) above), there are no exclusive use provisions or prohibited use restrictions that would apply to Tenant's use of the Building in accordance with the terms and conditions of this Lease;

(d)      The Real Property now has, and, on the Delivery Date, shall have, access to and from 2nd Avenue and 3rd Avenue, as shown on <u>Exhibit C</u> hereto, for the passage of vehicular traffic;

(e)      Without limiting Landlord's obligation otherwise to perform Landlord's Work in compliance with all Laws, the Premises as described in this Lease, including without limitation the contemplated square foot area thereof, complies with all applicable resolutions of the New York City Board of Standards and Appeals, including without limitation that certain Resolution adopted by such Board on January 14, 2014.

(f)      This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Real Property, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Real Property (including, without limitation, any rights of first offer or first refusal or the like);

(g)      There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the uses permitted under this Lease; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)      As of the date of this Lease, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on <u>Exhibit F</u> hereof.  With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Laws; and

(i)      As of the date of this Lease there is no "Related Land" in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land).

## Article 29.  <u>Tenant's Property</u>

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term (provided that Tenant repairs any damage to the Building caused by such removal).  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## Article 30.  <u>Limitation of Tenant's Liability</u>

Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

## Article 31.  <u>Designated Parcel</u>

The parties acknowledge that it is Landlord's intention to acquire (on behalf of itself or any of its Affiliate(s)) the Designated Parcel if the Department of Health and Human Services "pull-back" the existing deed for the Designated Parcel and New York City issues a Request For Proposals to the public for the sale thereof.  In such event, Landlord shall use good-faith, commercially reasonable efforts to acquire the Designated Parcel and develop the same as an integrated part of the Parking Lot Parcel as depicted on the alternative site plan shown on Exhibit C-1 attached hereto.  Until such time as Landlord acquires and integrates the Designated Parcel as aforesaid, Landlord shall construct a physical and visual barrier between the Designated Parcel and the Parking Lot Parcel, as part of Landlord's Work, in accordance with Exhibit B hereto.  If Landlord or any of its Affiliate(s) acquires the Designated Parcel and develops the same as an integrated part of the Parking Lot Parcel as described above, then Landlord shall cause the entity acquiring the Designated Parcel to enter into an easement agreement in favor of Landlord and Tenant on substantially the same terms as the Easement Agreement and shall further amend the Easement Agreement to allow for access to and from the Designated Parcel across the Parking Lot Parcel.

### Article 32.  Scaffolding

During the Term, Landlord shall not, unless same constitutes "Required Scaffolding" (as hereinafter defined), without Tenant's written consent which may be withheld in Tenant's sole discretion, erect or permit to be erected, any scaffolding on the sidewalk or street contiguous to the front or side walls of the Building. Notwithstanding the foregoing, if any alterations, changes, improvements, replacements and/or repairs which are either required or permitted to be made under this Lease or pursuant to applicable Legal Requirements requires scaffolding to be erected on the front or side walls of the Building ("Required Scaffolding"), Landlord may install same so long as Landlord satisfies the following requirements: (i) Landlord shall provide Tenant with no less than ten (10) days prior notice of the erection of such Required Scaffolding (except in the event of an emergency or as required under applicable Legal Requirements, in which event Landlord shall provide Tenant with whatever advance notice is reasonable under the circumstances); (ii) Landlord shall construct and maintain the Required Scaffolding in good order and repair, at Landlord's sole cost, and subject to Legal Requirements, erect same in a way so as not to materially impair or materially restrict free access to Tenant's store and delivery entrance(s), (iii) subject to Legal Requirements, the Required Scaffolding shall permit adequate pedestrian flow to, from and through the sidewalks contiguous to the Building and the passageway under the Required Scaffolding shall be illuminated, (iv) subject to Legal Requirements, the Required Scaffolding shall minimize, to the extent reasonably practical, structural supports, and (v) subject to Legal Requirements, the Required Scaffolding shall minimize blockage or concealment of Tenant's signs and display windows. If any of Tenant's signs, or any portion thereof, are blocked by such Required Scaffolding, Landlord, at Landlord's cost, shall use reasonable efforts to obtain approvals, to the extent required by applicable Legal Requirements, from

the applicable governmental authorities to allow the installation of signs of the same size (to the extent feasible and/or permitted under applicable Legal Requirements) and otherwise approved by Tenant, as those being blocked by the Required Scaffolding; such signage shall be erected on the Required Scaffolding or on the exterior of the Building and in as prominent a position on the Required Scaffolding or exterior of the Building as is reasonably possible (taking into account the reasonable requirements of other tenants in the Building). Landlord shall, at Landlord's cost and expense, install and maintain in good order and repair such signs on the exterior of the Required Scaffolding or Building until the Required Scaffolding is removed, and shall cause such signs (to the extent permitted under applicable Legal Requirements) to be illuminated in the same manner as Tenant's Building signage. Landlord shall use commercially reasonable efforts, in good faith, to minimize loitering in the walkway, all at Landlord's sole cost. Landlord shall perform (or cause to be performed) the work requiring the Required Scaffolding in an expeditious manner so as to minimize, as reasonably possible, the length of time the same is erected and Landlord shall promptly remove same (and restore the area affected thereby to the condition same was in immediately prior to the installation of such Required Scaffolding) at such time that the work no longer necessitates or requires Scaffolding.

## Article 33.  Easement for Parking Lot Parcel

**Section 33.1**  Landlord covenants, represents and warrants to Tenant that: (i) the Easement Agreement has not been modified, amended or terminated; (ii) the Easement Agreement is currently in full force and effect; (iii) no default under the Easement Agreement exists thereunder beyond any applicable notice and cure period; and (iv) the Easement Agreement is, and shall remain, superior in lien to all mortgages and related liens affecting the Real Property and all other land which is encumbered by the Easement Agreement.  Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the Easement Agreement, subject to the provisions of this Section 33.

**Section 33.2**  Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the Easement Agreement on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the Easement Agreement; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the Easement Agreement.

**Section 33.3**  Whenever, pursuant to the Easement Agreement, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the

conduct of Tenant's business therein or Tenant's use of the Common Areas including without limitation the Parking Lot Parcel as provided in this Lease pursuant to the Easement Agreement, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

**Section 33.4** Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the Easement Agreement, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease (including without limitation Tenant's use of the Common Areas, including without limitation the Parking Lot Parcel as provided in this Lease pursuant to the Easement Agreement).

**Section 33.5** Landlord shall not amend, or modify the Easement Agreement if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein or Tenant's use of the Common Areas and of the Parking Lot Parcel as provided in this Lease pursuant to the Easement Agreement, nor shall Landlord terminate the Easement Agreement.

**Section 33.6** In the event Landlord defaults in the performance of any of its obligations under the Easement Agreement or fails to enforce the obligations of any other obligee under the Easement Agreement, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the Easement Agreement and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the Easement Agreement. Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the Easement Agreement or enforcing the obligations of any obligee under the Easement Agreement, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

**Section 33.7** As between Landlord and Tenant, in the event of any conflict between the Easement Agreement and this Lease, this Lease shall in all respects control.

[The balance of this page is intentionally left blank. Signatures follow.]

**In Witness Whereof**, Landlord and Tenant have executed this Lease on the date of this Lease.

Landlord

**SALMAR PROPERTIES, LLC**
By:    Salmar Realty, LLC,
        its Managing Member

By: _____
    Name: *MARVIN Schron*
    Title: *MANAG. Member*

Tenant

**BED BATH & BEYOND INC**

By: _____
    Steven H. Temares
    Chief Executive Officer

## BASIC LEASE TERMS OF THE LEASE AGREEMENT

### BETWEEN

## SALMAR PROPERTIES LLC AND SALMAR 870, LLC, LANDLORD

### AND

## BED BATH & BEYOND INC., TENANT

### DATED: DECEMBER 31 , 2014

1.  Landlord:     SALMAR PROPERTIES, LLC.

2.  Landlord Address for Notices, etc.: 850 Third Avenue, Brooklyn, New York 11232; copy to:  Leslie J. Levine, Esq., Ackermam, Levine, Cullen, Brickman & Limmer LLP, 1010 Northern Boulevard, Suite 400, Great Neck, New York 11021.

3.  Tenant:     BED BATH & BEYOND INC.

4.  Tenant Taxpayer Identification No.: 11-22-50488.

5.  Tenant's Address for Notices, etc.:  650 Liberty Avenue, Union, New Jersey 07083, Attn:  Mr. Warren Eisenberg (with copies to the respective parties listed in clauses (i) and (ii) of Section 22.1 hereof), or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Section 22.1 hereof.

6.  Premises on the second floor of the Building are shown by cross-hatching on Exhibit A.

7.  Lease Term:
    (a)    Initial Term:  Fifteen (15) full Lease Years.
    (b)    Renewal Terms:  Two (2) successive terms of 7.5 Lease Years each.

8.  Fixed Rent for the initial Lease Term and any Renewal Term(s) is set forth in the following table:

| Annual Fixed Rent | Monthly Fixed Rent |
|---|---|
|  |  |

| | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1st Lease Year | $4,320,000.00 | $360,000.00 |
| 2nd Lease Year | 4,354,800.00 | 362,900.00 |
| 3rd Lease Year | 4,389,948.00 | 365,829.00 |
| 4th Lease Year | 4,425,447.00 | 368,787.00 |
| 5th Lease Year | 4,461,302.00 | 371,775.00 |
| 6th Lease Year | 4,515,600.00 | 376,300.00 |
| 7th Lease Year | 4,570,800.00 | 380,900.00 |
| 8th Lease Year | 4,627,200.00 | 385,600.00 |
| 9th Lease Year | 4,683,600.00 | 390,300.00 |
| 10th Lease Year | 4,741,200.00 | 395,100.00 |
| 11th Lease Year | 3,979,200.00 | 331,600.00 |
| 12th Lease Year | 4,058,400.00 | 338,200.00 |
| 13th Lease Year | 4,140,000.00 | 345,000.00 |
| 14th Lease Year | 4,222,800.00 | 351,900.00 |
| 15th Lease Year | 4,306,800.00 | 358,900.00 |
| 16th Lease Year | 4,832,400.00 | 402,700.00 |
| 17th Lease Year | 4,929,600.00 | 410,800.00 |
| 18th Lease Year | 5,028,000.00 | 419,000.00 |
| 19th Lease Year | 5,128,800.00 | 427,400.00 |
| 20th Lease Year | 5,230,800.00 | 435,900.00 |
| 21st Lease Year | 5,335,200.00 | 444,600.00 |
| 22nd Lease Year | 5,442,000.00 | 453,500.00 |
| First half 23rd Lease Year | 2,275,600.00* | 379,267.00 |
| Second half 23rd Lease Year | 3,114,600.00* | 519,100.00 |
| 24th Lease Year | 6,354,000.00 | 529,500.00 |
| 25th Lease Year | 6,481,200.00 | 540,100.00 |
| 26th Lease Year | 6,610,800.00 | 550,900.00 |
| 27th Lease Year | 6,742,800.00 | 561,900.00 |
| 28th Lease Year | 6,877,200.00 | 573,100.00 |
| 29th Lease Year | 7,015,200.00 | 584,600.00 |
| 30th Lease Year | 7,155,600.00 | 596,300.00 |

*Total rent for the six-month period, not annual amount.

9.     Permitted Use:  Tenant shall use the Premises for the following use and for no other use or purpose:

As a typical Bed Bath & Beyond, Buy Buy Baby, Christmas Tree Shops or And That, Cost Plus World Market and/or Harmon or Harmon Face Values store and for any other lawful retail purpose which does not violate the existing tenant's exclusive use provisions set forth on Exhibit O hereto annexed, a Future Exclusive pursuant to Section 3.11 (b) of this Lease, or a use which is prohibited under the IDA lease (which is, static storage and adult entertainment), including for the duly licensed sales of beer, wine and food for on or off-Premises consumption (provided, however, that the on-premises consumption of beer and wine shall be (A) incidental to the sale of food or to another primary use, and (B) conducted in a manner that is consistent with the operation of a first class shopping center in the New York Metropolitan Area (and Tenant shall procure such liability insurance relating to such activity as may be reasonably required)).

10.    Rent Commencement Date shall be the 90th day following Delivery Date.

11.    Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes shall be 11%.

12.    Operating Expenses:  Tenant pays Tenant's Proportionate  Share of increases over the Base Year, subject , thereafter, to a 5% annual cap (See Article 7).

13.    Tenant's Share of Parking Area Expenses:  49%.

14.    Parking Area Expenses:  Tenant pays Tenant's Share of Parking Area Expenses, such share not to exceed $90,000.00 for the first full Lease Year subject thereafter, to a 5% annual cap. (See Article 7)

15.    Tax Payment:  Tenant pays Tenant's Proportionate Share of increases in Real Estate Taxes over Base Year, as more particularly described in this Lease (See Article 6).

16.    Broker shall mean: CPEX Real Estate and CBRE.

## RIDER TO LEASE AGREEMENT DATED DECEMBER 31 , 2014

| | |
|---|---|
| LANDLORD: | SALMAR PROPERTIES, LLC |
| TENANT: | BED BATH & BEYOND INC. |
| FLOOR(S)/ UNIT(S): | 2nd Floor |
| TENANT'S EIN #: | 11-22-50488 |
| BUILDING: | 850 Third Avenue<br>Brooklyn, New York 10271 |
| NYCIDA: | New York City Industrial Development Agency |
| IDA LEASE AGREEMENT: | Lease Agreement between NYCIDA and Landlord, dated as of September 1, 2011, wherein NYCIDA leases the Premises to Landlord. |

1. **Acknowledgment and Release**. Tenant acknowledges that NYCIDA holds a leasehold estate in the entire Building; and Tenant releases NYCIDA from any past, present or future claims that Tenant has or may have against NYCIDA.

2. **Representation Regarding Relocation**. Tenant represents that as a result of entering into the Lease and occupying the Premises, it will not have relocated any of its plants or facilities from outside of New York City (but within the State of New York) to the Premises; nor will Tenant have abandoned any of its plants or facilities outside of New York City (but within the State of New York).

3. **Representation and Covenants Regarding Compliance**. Neither Tenant, nor any of the Principals of the Entity, nor any Person that directly or indirectly Controls, is Controlled by, or is under common Control with the Entity is, nor at any time during the term of the Lease, shall be a Non-Compliant Person.

As used herein, the following capitalized terms shall have the respective meanings set forth below:

"City" shall mean The City of New York.

"Control" or "Controls" shall mean the power to direct the management and policies of a Person (x) through the ownership, directly or indirectly, of not less than a majority of its voting securities, (y) through the right to designate or elect not less than a majority of the members of its board of directors or trustees or other Governing Body, or (z) by contract or otherwise.

"Entity" shall mean any of a corporation, general partnership, limited liability company, limited liability partnership, joint stock company, trust, estate, unincorporated organization, business association, tribe, firm, joint venture, governmental authority or governmental instrumentality, but shall not include an individual.

"Governing Body" shall mean, when used with respect to any Person, its board of directors, board of trustees or individual or group of individuals by, or under the authority of which, the powers of such Person are exercised.

"Non-Compliant Person" shall mean an individual or any Entity that:

(a)     is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with the Agency or the City, unless such default or breach has been waived in writing by the Agency or the City, as the case may be;

(b)     has been convicted of a felony and/or any crime involving moral turpitude in the preceding ten (10) years;

(c)     has received written notice of default in the payment to the City of any taxes, sewer rents or water charges in excess of $5,000 that has not been cured or satisfied, unless such default is then being contested with due diligence in proceedings in a court or other appropriate forum; or

(d)     has, at any time in the three (3) preceding years, owned any property which, while in the ownership of such Person, was acquired by the City by in rem tax foreclosure, other than a property in which the City has released or is in the process of releasing its interest to such Person pursuant to the Administrative Code of the City.

"Person" shall mean an individual or any Entity.

"Principal(s)" shall mean, with respect to any Entity, the most senior three officers of such Entity, any Person with a ten percent (10%) or greater ownership interest in such Entity, and any Person as shall have the power to Control such Entity, and "principal" shall mean any of such Persons.

4.     **Subordination**.  Tenant acknowledges and agrees that this Lease is subject and subordinate to the IDA Lease Agreement and that any conflict between the terms of the IDA Lease Agreement and the terms of this Lease shall be resolved in favor of the former.

5.     **Indemnity**.  Tenant agrees to defend, indemnify and hold harmless NYCIDA, its officers, directors, employees and agents from and against any and all losses,

claims, suits, damages, costs, expenses and liabilities arising from or attributable to any act or omission of Tenant, its employees or agents in the use or occupancy of the Premises.

6. **Insurance**. Without limiting the provisions of the Lease, Tenant agrees to obtain and maintain throughout the term of the Lease, Commercial General Liability insurance ("CGL") on a per occurrence basis in the following amounts: minimum $1,000,000 per occurrence and minimum $2,000,000 in the aggregate per location. Tenant additionally agrees that:

(a) The CGL policy shall contain coverage for contractual liability, premises operations, and products and completed operations; and

(b) The CGL policy shall be written on Form CG-0001; and

(c) The CGL policy shall name NYCIDA as an additional insured; and

(d) Tenant shall provide to Landlord at any time upon Landlord's request, and, in any event, at least thirty (30) days before expiration of the CGL policy (and to NYCIDA upon NYCIDA's request), an ACORD certificate evidencing that Tenant has obtained CGL; and that such ACORD certificate shall indicate NYCIDA as an additional insured as follows: *New York City Industrial Development Agency is an additional insured on a primary and non-contributory basis for Commercial General Liability which is written on Form CG-0001 without modification to the contractual liability or waiver-of-subrogation provisions therein and covering the following premises:* _____.

7. **Employment Information**. Tenant acknowledges that under this Lease, Landlord (or Landlord's affiliate) is obligated to provide to NYCIDA employment information pertinent to all occupants of the Building; accordingly, Tenant agrees to provide to Landlord and, if requested by NYCIDA, to NYCIDA, information regarding Tenant's employment at the Premises, including the then-current New York State Department of Labor's Form NYS-45; and NYCIDA's employment and benefits report form for subtenants, a form of which is annexed hereto as Exhibit I (or any replacement and/or successor form as may be required by the Agency as a result of a change in law or as required by New York States agencies).

3

8.    **Incorporation in Lease; Third-Party Beneficiary**.  Tenant agrees and
acknowledges that this RIDER is a part of an incorporated in the Lease; and that
NYCIDA is a third-party beneficiary of the foregoing provisions of this RIDER.


SALMAR PROPERTIES, LLC                    BED BATH & BEYOND INC.

By:    Salmar Realty, LLC

By: _____              By: _____
                                             Steven H. Temares
    _____                  Chief Executive Officer
    Members, Member

4

Exhibit A
Premises



2ND FLOOR RETAIL

Exhibit A - PREMISES

12·29·14

Exhibit A-1
Description of Real Property

Parcel I
850 3rd Avenue, Brooklyn, New York
BLOCK 671 LOT 1
ALL THAT TRACT, PIECE OR PARCEL OF LAND, SITUATE IN THE BOROUGH OF
BROOKLYN, KINGS COUNTY, NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT WHERE THE EASTERLY LINE OF SECOND AVENUE
INTERSECTS THE PROLONGATION OF THE NORTHERLY LINE OF THIRTY-FIRST
STREET;
RUNNING THENCE NORTH 38° 23' 03" EAST, 200.35 FEET TO ITS INTERSECTION
WITH THE PROLONGATION OF THE SOUTHERLY LINE OF SAID THIRTIETH STREET;
SAID POINT ALSO BEING THE NORTHERLY FACE OF THE SO-CALLED FEDERAL
BUILDING NUMBER 2 AT STREET LEVEL;
THENCE SOUTH 51° 36' 57" EAST, ALONG THE PROLONGATION OF THE SOUTHERLY
LINE OF SAID THIRTIETH STREET AND THE SOUTHERLY LINE OF SAID THIRTIETH
STREET FOR A DISTANCE OF 700.00 FEET TO ITS INTERSECTION WITH WESTERLY
LINE OF SAID THIRD AVENUE;
THENCE SOUTH 38° 23' 03" WEST, ALONG THE WESTERLY LINE OF SAID THIRD
AVENUE 200.35 FEET TO ITS INTERSECTION WITH THE NORTHERLY LINE OF SAID
THIRTY-FIRST STREET;
THENCE NORTH 51° 36' 57" WEST, ALONG THE NORTHERLY LINE OF SAID THIRTY-
FIRST STREET AND CONTINUING ALONG THE NORTHERLY PROLONGATION OF SAID
THIRTY-FIRST STREET FOR A DISTANCE OF 700.00 FEET TO THE POINT OF
BEGINNING.

PARCEL II
870 3rd Avenue, Brooklyn, New York
BLOCK 675 LOT 10
ALL THAT TRACT, PIECE OR PARCEL OF LAND, SITUATE IN THE BOROUGH OF
BROOKLYN, KINGS COUNTY, NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT WHERE THE EASTERLY LINE OF SECOND AVENUE
INTERSECTS THE PROLONGATION OF THE NORTHERLY LINE OF THIRTY-FIRST
STREET;RUNNING THENCE SOUTH 51° 36' 57" EAST, ALONG THE PROLONGATION OF
THE NORTHERLY LINE OF SAID THIRTYFIRST STREET 675.00 FEET TO THE
WESTERLY TERMINUS OF SAID THIRTY-FIRST STREET; THENCE SOUTH 28° 55' 19"
WEST, ALONG THE WESTERLY TERMINUS OF SAID THIRTY-FIRST STREET 60.82 FEET
TO ITS INTERSECTION WITH THE SOUTHERLY LINE OF SAID THIRTY-FIRST STREET;
THENCE SOUTH 51° 36' 57" EAST, ALONG THE SOUTHERLY LINE OF SAID THIRTY-
FIRST STREET 15.00 FEET TO ITS INTERSECTION WITH THE FIRST MENTIONED
WESTERLY LINE OF SAID THIRD AVENUE;

2

THENCE SOUTH 38° 23' 03" WEST, ALONG THE WESTERLY LINE OF SAID THIRD AVENUE 200.35 FEET TO ITS INTERSECTION WITH THE NORTHERLY LINE OF SAID THIRTY-SECOND STREET;

THENCE NORTH 51° 36' 57" WEST, ALONG THE NORTHERLY LINE OF SAID THIRTY-SECOND STREET 20.00 FEET TO THE WESTERLY TERMINUS OF SAID THIRTY-SECOND STREET;

THENCE SOUTH 38° 23' 03" WEST ALONG THE WESTERLY TERMINUS OF SAID THIRTY-SECOND STREET 30.00 FEET TO ITS INTERSECTION WITH THE CENTERLINE OF SAID THIRTY-SECOND STREET;

THENCE NORTH 51° 36' 57" WEST, ALONG THE CENTERLINE OF SAID THIRTY-SECOND STREET 367.00 FEET TO A POINT, THE LAST MENTIONED COURSE ALSO BEING THE DIVISION LINE BETWEEN THE LANDS OF 1-10 INDUSTRY ASSOCIATES, LLC ON THE SOUTH AND THE UNITED STATES OF AMERICA ON THE NORTH; THENCE THROUGH THE LANDS OF THE UNITED STATES OF AMERICA THE FOLLOWING TWO COURSES: (1) NORTH 38° 23' 03" EAST, 138.00 FEET TO A POINT; AND (2) NORTH 51° 36' 57" WEST, 313.00 FEET TO ITS INTERSECTION WITH THE EASTERLY LINE OF SAID SECOND AVENUE; THENCE NORTH 38° 23' 03" EAST ALONG THE EASTERLY LINE OF SAID SECOND AVENUE, 152.35 FEET TO THE POINT OF BEGINNING.

*Brooklyn, NY*

Exhibit B - Landlord's Work

12/30/14

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease.  The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D.  It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

I.    **Landlord's Plans & Specifications**

A.    Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following:

1)    Tenant's Plans

a)    **Bed Bath & Beyond Tenant's Plans**: Site-specific design-development drawings prepared by Tenant which shall include:
F1 - FIXTURE PLAN/BANNER LOCATION
F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
F4 - LIGHTING PLANS AND NOTES
F5 - HIGH PILE STORAGE PLAN
Additional F-drawings as may be required to address atypical site-specific conditions

b)    **Buy Buy Baby Tenant's Plans :** Site-specific design-development drawings prepared by Tenant which shall include:
F1 - FIXTURE PLAN
F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
F4 - LIGHTING PLANS AND NOTES
F5 - HIGH PILE STORAGE PLAN
Additional F-drawings as may be required to address atypical site-specific conditions

c)    **Cost Plus World Market Tenant's Plans** : Site-specific design-development drawings prepared by Tenant which shall include :
F1 -   FIXTURE PLAN
F1.1 – BLOCKING PLAN
F2 – FLOOR FINISH PLAN
F3 – POWER PLAN
F4 – LIGHTING PLAN
F5 – HIGH PILE STORAGE PLAN
Additional F-drawings as may be required to address atypical site-specific conditions

d)    **And That! Tenant's Plans** : Site-specific design-development drawings prepared by Tenant which shall include :
F1 - FIXTURE PLANS
F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
F4 - LIGHTING PLANS AND NOTES
Additional F-drawings as may be required to address atypical site-specific conditions

Page **1** of **12**

e) **Harmon Tenant's Plans**: Site specific design – development drawings prepared by tenant which shall include:
F1 - FIXTURE PLAN
F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
F3 - POWER / SPECIALITY LIGHTING PLANS AND NOTES
F3.1 - POWER/ SPECIALTY LIGHTING DETAILS AND NOTES
F4 - LIGHTING PLANS AND NOTES
Additional F-drawings as may be required to address atypical site-specific conditions

f) **1st Floor Plans (Lobby/ Receiving):** Site specific design – development drawings prepared by tenant which shall include:
F1 - FIXTURE PLAN
F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
F3 - POWER / SPECIALITY LIGHTING PLANS AND NOTES
F3.1 - POWER/ SPECIALTY LIGHTING DETAILS AND NOTES
F4 - LIGHTING PLANS AND NOTES
Additional F-drawings as may be required to address atypical site-specific conditions

g) **2nd Floor Lobby Plans :** Site specific design – development drawings prepared by tenant which shall include:
F1 - FIXTURE PLAN
F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
F3 - POWER / SPECIALITY LIGHTING PLANS AND NOTES
F3.1 - POWER/ SPECIALTY LIGHTING DETAILS AND NOTES
F4 - LIGHTING PLANS AND NOTES
Additional F-drawings as may be required to address atypical site-specific conditions

2. Tenant's Prototype Drawings & Specifications

a) **Bed Bath & Beyond – PROTOTYPE VERSION 1.2013** – Drawings and Project Manual dated 10/15/13 as developed by Casco Corporation ,St. Louis, MO.

b) **Buy Buy Baby – PROTOTYPE VERSION 2013.A** – Drawings and  Project Manual dated 09/01/13 as developed by MCG Architecture, Cleveland, OH.

c) **Cost Plus World Market – PROTOTYPE VERSION 1.2014.A** – Drawings and Project Manual dated 09/15/14 as developed by MCG Architects, Cleveland, OH.

d) **and That!  – PROTOTYPE VERSION 1.2013** – Drawings and Project Manual dated 08/02/13 as developed by Casco Corporation ,St. Louis, MO.

e) **Harmon – PROTOTYPE VERSION 2012.A** – Drawings (dated 02/09/2012) developed by Tricarico Architecture and Design PC

3. Lease Exhibits -  Landlord's Plans & Specifications shall conform to all provisions of Exhibits B, and F to this Lease.

4. Landlord's Plans & Specifications shall also include the following items :

   a) All available architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.
   b) Available architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.
   c) Available civil engineering documents for the Shopping Center.
   d) Available geo-technical and storm-water design reports.

5. Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements. Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings & Specifications". Such Requirements may include (but shall not be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas [incl. protection of openings through fire-rated partitions]; Disability access; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc..   Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

B. Hierarchy :

1. In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern :
   a) Lease Exhibits B [excluding Tenant's Prototype], & F
   b) Tenant's Plans
   c) Tenant's Prototype Drawings and Specifications
   d) Landlord's Plans and Specifications

2. To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised (prior to construction) to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant.

C. Quality Control Review :

1. At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete full size set and one (1) complete ½ size set. Tenant may (at Tenant's option) employ a third party consultant to review the submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost (**$5000 USD**) related to such third party review. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

2. Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications. Tenant may (at Tenant's option) employ a third party consultant to review each subsequent submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost (**$3000 USD**) related to such third party review. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

3. Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant. Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications. Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease. Tenant reserves the right to disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

4. Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

D. Landlord's Plans and Specifications shall indicate all existing items which are to remain (i.e. - HVAC equipment, ductwork, doors, electrical equipment, etc.) and are (in Tenants reasonable judgment) required to (i) properly convey the complete design intent for the building, (ii) allow Tenant to confirm all required functions and accessories are provided, and (iii) to ensure coordination of existing items with new equipment and installations. Omission of such items from the Landlord's Plans and Specifications shall be grounds for Tenant to reject the submittal and return without review.

## II. Site Specifications

A. All parking areas and traffic drives in the Shopping Center shall consist of a minimum 12" of compacted sub-base (95% compacted), 3" asphalt base, and 2" asphalt surface finish.  Grading of these areas shall not exceed a slope of 2% unless specifically approved in writing by Tenant.  Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited.

B. All truck access drives in the Shopping Center shall consist of a minimum 12" of compacted sub-base (95% compacted), 6" asphalt base, and 3" asphalt surface finish.  Grading of these areas are not to exceed a slope of 3% unless specifically approved in writing by Tenant.

C. Tenant's truck ramp, Trash Compactor Pad and Trash Container Pad shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 6" Portland cement concrete surface finish.  Tenant's truck ramp shall include #4 re-bars at 18" on center each direction.  Tenant's recessed truck ramp shall not exceed slope of 6%.

D. If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

E. The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be two (2) foot-candles, measured 30" above grade.  Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of Landlord's Plans & Specifications.  Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level.  Landlord shall also provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

## III. Project Specific Building Requirements

The following section (a) highlights elements of Landlords Work which are already outlined in "Tenant's Prototype Drawings & Specifications" ; (b) identifies project-specific elements of Landlord's Work which are in addition to the scope detailed in "Tenant's Prototype Drawings & Specifications" and (c) describes items that may remain as-is if determined by Tenant (at Tenant's sole discretion) to be in good working order as well as in good condition and appearance.

A. 1st floor Lobby – LL's work shall include all Demising walls, Elevators/Escalators/Cart Conveyor/stairs, Vestibules/sliding doors, Floor/wall/ceiling/column finishes, Lighting, Electric, HVAC, Sprinkler/FA, Directory signs, kiosk.

B. 1st Floor Receiving - LL's work shall include all Demising walls, Elevators/stairs, Floor/wall/ceiling/column finishes, Lighting, Electric, HVAC, and Sprinkler/FA.

C. 2nd Floor Lobby - Floor/wall/ceiling/column finishes, Storefronts and demising walls separating Lobby from stores, General lobby lighting, Electric (including stub-ups to the various kiosks, etc), HVAC (including venting), Plumbing (stub-ups to the various kiosks, etc), Sprinkler/FA

D. Demolition : Landlord shall remove all existing obsolete miscellaneous items and equipment in their entirety throughout the Premises including (but not limited to) partitions, doors, frames, soffits, studs, furring, insulation, suspended ceiling systems, plumbing fixtures, mechanical equipment, electrical equipment, roof mounted equipment, devices, etc. unless specifically approved by Tenant in writing that such items may remain.  Landlord shall repair and patch all surfaces which are to remain and coordinate all demolition work with new construction.

E. Clear Height: **All Building Systems shall be designed to allow Tenant to stock merchandise to a minimum of 8'-6"a.f.f.**  Various systems shall be designed to conform with the following criteria :

  a) 10'-6" minimum clear height to underside of all structural system components.

b) 9'-6" minimum clear height to underside of all plumbing & electrical system components [excluding lighting]
c) 9'-3" minimum clear height to underside of all mechanical system components [i.e. - ductwork]
d) 9'-6" minimum clear height to underside of all fire protection sprinkler piping (main and branch lines)
e) 1" minimum and 2" maximum from fire sprinkler heads to underside of floor deck above.

F.   Utilities: Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas, water, fire protection water, sanitary sewer & phone services) are properly sized as defined below and separately metered exclusive of all other tenants and occupants in the Shopping Center.

  a) Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date.  If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

  b) Landlord shall provide to the Premises all utilities set forth in Exhibit B and separate utility meters or sub-meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).

  c) Tenant shall be responsible for obtaining its own telephone, cable television and internet service to the Premises. Landlord shall be responsible to install all means (conduit, pull boxes, etc.) from service entrance to location shown on exhibit B.

  d) Tenant agrees that Landlord shall have the right at its option to submeter Tenant's electric usage (including without limitation such electric current as shall be necessary to operate the heating, ventilating and air conditions systems servicing the Premises) for the Premises .

  e) Landlord shall supply domestic water to the Premises either for consumption or for stand-by purposes within the sprinkler system, and Tenant agrees to accept same and to pay the charges imposed by Landlord therefor on a submetered basis.

  f) Landlord shall supply condenser water to the Premises for the operation of the HVAC system serving the Premises, and Tenant agrees to accept same and to pay the charges imposed by Landlord therefor on a submetered basis.

  g) Landlord shall at all times during the Term supply heated water to the Building for the operation of, and shall operate, the Building's heating system.

IV.  Fire Protection: Landlord shall furnish and install both a fire alarm  (FA) system and a fire sprinkler (FS) system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

A.  Landlord shall issue one complete submittal each for: (a) the fire alarm system and (b) the fire sprinkler system (per Sections 01340, 15300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval.  Each initial submittal must be received by Tenant's Consultant no later than (12) weeks prior to projected Delivery Date.  Prior to the commencement of Consultant's review, Landlord shall pay a fixed fee ($2500 USD for Fire Alarm + $2500 USD for Fire Sprinkler) directly to Tenant's Consultant.  If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant then Landlord shall revise the submittal to address all Consultant comments and resubmit.  Prior to the commencement of Consultant's review of any resubmittal, Landlord shall pay a fixed fee ($2500 USD each) directly to Tenant's Consultant.

B.  Landlord shall be responsible for monitoring the fire alarm system up to 90 days following the Delivery Date.

C. Landlord shall purchase all Fire Alarm equipment and devices thru Tenant's National Account Vendor : **FE Moran , 201 W. University Ave., Champaign, IL 61820, Phone: 217-366-2419, Contact: Susan Hirstein, E-mail: bbb@femoransecurity.com**

D. The sprinkler system shall be designed to allow merchandise to be stored to 8'-6" AFF. The system shall comply with 2007 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity and a limited amount of Group A plastics on solid shelves, minimum 4-foot aisles [typical requirement = 0.49 GPM/sf over a 2000 sf area]. The sprinkler system shall be separate, stand alone and dedicated to Tenant's premise.

E. The sprinkler system shall utilize a fire pump. If water pressure is inadequate and system cannot be designed to properly function without incorporating changes to the fire pump, then Landlord shall complete those changes to accommodate Tenant's requirements. Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 8 of 2008 Edition), and shall otherwise maintain the fire pump.

F. Consulting Services : If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials. If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

G. Landlord shall pay a fixed fee (**$2,500 USD**) plus travel expenses to have Tenant's National Fire Protection Consultant (listed below) conduct a detailed field observation of the sprinkler system to confirm the system has been installed in compliance with the approved shop drawing submittal. Such field observation shall occur no later than ten days prior to the established Delivery Date. Landlord shall pay the fixed fee directly to Tenant's Consultant prior to commencement of the site visit.

H. Tenant's National Fire Protection Consultant :

Mr. Will Smith / Code Consultants, Inc. (CCI)
2043 Woodland Pkwy, Ste. 300
St. Louis, MO   63146-4136
(314) 991-2633 [ph]
(314) 991-4614 [fax]
wills@codeconsultants.com

A. Sanitary Survey - Landlord shall perform two videographic, fiber optic camera surveys of the existing sanitary drainage system (one within 7 days of the start of construction + one 7 days prior to Delivery). The survey shall include the entire sanitary line serving the Premises to a minimum of 50-feet outside the building. Sanitary lines shall be "jetted" prior to starting the survey to remove any existing waste, construction debris or standing clogs. Camera recording shall indicate the operating camera depth. Camera recording shall include a verbal narrative by the technician (including technician's name, company name, store number, store address, starting location of survey, and a brief description of any problems, deficiencies or points of interest identified throughout the inspection). Camera recording shall be submitted in VHS or DVD format and shall contain only the camera survey for this project. Camera recording shall be clearly labeled with store number, store address, date of inspection, name of inspector and inspection company. Camera recording shall be accompanied by a written evaluation report highlighting any problems, deficiencies or points of interest and shall include a schematic diagram of the sanitary line which indicates the size, slope and material of the pipe and all cleanout locations. Landlord shall repair the sanitary sewer line as required to ensure proper function (i.e. – no standing water/waste).

B.  <u>Mechanical Equipment</u> : Landlord shall furnish and install all new HVAC equipment (Air Curtain) Landlord shall Test & Balance all mechanical equipment in accordance with Tenant's Prototypical Drawings and Specifications.

## Description of Base Building system consists of the following:

The following is a description of the base building cores systems and standard distributions:

### Condenser Water System

a.    The condenser water system is an open loop system with pumps and cooling towers located on the roof. There are three independent tower systems with vertical risers located by the building core in each zone. The condenser water control system will maintain a condenser water temperature 7°F above ambient wet bulb temperature. On a design cooling day, the water temperature is expected to be approximately 85°F. The system is designed for a 10°F ΔT.

b.    Condenser water is supplied to each zone by condenser water pumps located on the roof. These pumps vary the flow to the risers to meet building set differential pressures. Each zone has a 6" valved connection per floor. Tenant is responsible for installation of tenant AC units and connections to the building condenser water system.

c.    The Tenant will be billed for condenser water as per the lease, currently $0.0000081/Btu. The standard building meters are set to measure Btu usage, not ton-hours. Tenant will install building standard Btu meter at their connection(s) to the building condenser water risers. The cost per Btu includes the building's electrical, water, and chemical costs to operate the tower, along with depreciation and maintenance of the towers and pumps. A 5% meter reading fee is included in the number.  This charge typically is escalated over the course of the lease, as per the lease language.

### Hot Water System

a.    The hot water system is a closed loop primary system with pumps and boilers located in the rooftop boiler room. There are three independent risers located by the building core in each zone. Supply temperature will be controlled by the building BMS based on outside air temperature. The system is designed for a 20°F ΔT.

b.    Hot water is supplied to each zone by hot water pumps in the boiler room. These pumps vary the flow to the risers to meet building set differential pressures. Tenant is responsible for providing heat distribution and heating of ventilation air and connections to the building hot water system.

### Outside Air

a.    Outside air is delivered through three main shafts, one for each zone. The outside air is not tempered. It must be heated and cooled by the tenant AC units using the building hot water and condenser water systems. The outside air fans are modulated by the building BMS to maintain static pressure setpoint in the outside air riser.

### Relief Air/Smoke Purge

a.    Relief air is delivered though three main shafts, one for each zone. The relief air fans are modulated by the building BMS to maintain static pressure setpoint in the relief air riser. These fans are also used by the building for post fire smoke purge


## HVAC Distribution Options

The following describes Tenant HVAC distribution. Noise Criteria for the spaces is approximately NC 45.

a. Water-Cooled Package AC units – (Building Standard System – no additional cost)

The system consists of water cooled package AC units installed in core mechanical rooms located next to the building outside air risers. Ductwork distribution from these units will be rectangular duct, with bottoms of the main trunk ducts at approximately 9'3". Heating will be provided by heating coils in the mechanical rooms for treating the OA air, and fan powered boxes with hot water coils located at the perimeter of the spaces. AC units will be located in either one (1) or two (2) mechanical rooms per zone, depending

on the final architectural program. The air distribution will likely be VAV, depending on final zoning and program. Fan powered boxes will provide perimeter heat.

## Outdoor ventilation air:

The Landlord is providing ducted outdoor air which is untreated, having adequate air volume for code compliance and delivered to the zone equipment rooms from a variable capacity ventilation system. All that is required is hydronic heating and cooling coils within a cabinet attached to the landlord provided duct connection to provide conditioning for the entire outdoor air sensible and latent load. Conditioned outdoor ventilation air is ducted to each chilled beam diffuser using small round ducts. Conditioning for the room sensible and latent loads is provided by the chilled beam diffusers.

Outdoor air ventilation requirements are based on ASHRAE std 62.1 or more specifically, the 2012 International Mechanical Code. For retail area the outside air requirements are based on two components – the population and the total square feet of floor space: 15 occupants /1000 ft^2, 7.5 cfm/occupant, 0.12 cfm/ft^2.

A.  Electrical System: The electrical service shall be a minimum 2000 amp / 480/277v / 3 phase / 4 wire service]. Re-use of existing electrical system components within the Premises shall be prohibited. Power Wall Assembly shall be in the location shown on Tenant's Plans.

B.  Floor Slab: Landlord shall provide Ardex SD-T with Diamond Quest (Ardex Version) over existing floor slab in all areas designated as CC-1 on Tenant's Plans. Slab prep / floor prep shall be in accordance with Tenant's Prototype Drawings and Specifications.

C.  Autoslider: Landlord shall provide new autoslider doors in accordance with Tenant's Prototypical criteria. (Auto sliders are used at interior vestibule doors.

D.  Intumescent Paint: In the event that fire-proofing of exposed structural elements is required, then Landlord shall use intumescent fire resistant coating to achieve the required fire rating. Application shall be neat & clean and in accordance with manufacturer's recommendations.

E.  Temporary Banners: Landlord shall provide eyehooks on the building facade for temporary banners as detailed on Tenant's prototype. Locations to be determined in the field by Tenant.

F.  Exit Signs: Landlord (at Landlord's cost) shall remove any existing Self Luminous Exit Signs containing Tritium Gas.

G.  Security Equipment: Landlord shall provide and install new security equipment (including Electronic Article Surveillance [EAS] and Closed Circuit Television [CCTV]) in accordance with Tenant requirements. Landlord shall purchase such EAS equipment directly from Tenant's National Account Vendor (WG Security Products, Inc. / Attn: Tim Gates / 704-232-8891 / tgates@wgspl.com) Landlord shall purchase such CCTV equipment directly from Tenant's National Account Vendor (Sensormatic / Attn: Doug Thomas / 804-739-8144 / douglasthomas@adt.com).

H.  Existing Rooms/Spaces: All existing demised rooms/spaces which have been retained in Tenant's Plans shall be repaired to "like new" condition and shall receive new finishes in accordance with Tenant's Prototypical criteria.

I.  Food Prep Facilities: If Tenant's Plans include a Food Department and/or a Beer & Wine Department, then Landlord shall consult with Tenant's contact (Rhoda Regalado / 925-376-2794 [w] / 925-998-0287 [c] / Rhoda.Regalado@cpwm.com) to determine applicable requirements for the display, storage, preparation and sampling of food, alcohol and related items. Refer to drawing A9.2 from Tenant's Prototype Drawings & Specifications for typical Food Prep Room provisions. At the time Tenant's Plans are issued, Landlord shall coordinate with Tenant's Architectural Project Manager to determine which of the following Food Sampling categories will apply:

*Simple Sampling*:

1. Sampling of pre-packaged non-temperature-sensitive foods (only items sold in the store) plus coffee and tea sampling. (i.e. - snacks, savories, dessert items, sauces, condiments, beverages, etc.)
2. Coffee is brewed in commercial grade coffee makers via water being plumbed directly into the coffee maker. The coffee is brewed directly into airpots which are then transported to the sales floor for customers to self-serve. No milk or temperature-sensitive dairy products are provided. Powdered milk/cream (or equivalent) is provided for customer use.
3. A coffee grinder may be available for customers to grind their own beans
4. This type of sampling may require a separate food prep room (refer to Prototype A9.2)
5. A portable hand wash sink may be required at the sample station

*Expanded Sampling*:

1. Sampling of temperature sensitive foods that must be chilled, warmed and maintained at specific temperatures plus everything listed in the "Simple Sampling" category. (i.e. - pasta, soups, "heat-and-eat" items, "ready-to-eat meals", etc. // all items sold in the store).
2. A separate food prep room will be required (refer to Prototype A9.2)
3. A portable hand wash sink may be required at the sample station.

J.    Leak Mitigation: Landlord shall be obligated to provide a complete system (including installation of water proof membranes at the floor located above premise, overflow drains, drip pans, etc.) in order to mitigate any potential infiltration of water, sewage, etc. from plumbing systems related to restrooms, food preparation areas, break rooms, janitor's closets, and the like located above the Premises.    All related work shall be fully detailed within Landlord's Plans & Specifications and shall be subject to Tenant's review and approval.

K.    Vertical Transportation – Landlord shall provide and install all vertical transportation equipment (including but not limited to - lifts, passenger elevators, freight elevators, escalators, shopping cart escalators, scissor lifts, dedicated service stairs, etc.) in accordance with Tenant's Plans and "Tenant's Prototype Drawings & Specifications". Vertical transportation equipment installation by the Landlord shall be complete and fully code compliant and shall allow Tenant to fixture, merchandise and open for business to the public in the Premises. All equipment shall be operational a minimum of (2) two weeks prior to the Delivery Date to allow for proper "burn-in" in accordance with Tenant's Prototype Specifications Sections 14205, 14255 and 14305. Final sizes and locations of all equipment shall be in accordance with Tenant's Plans.

L.    Register Sign Lights – Landlord shall provide and install register sign lights at each register bay location. Register sign lights shall be purchased from Tenant's National Account Vendor.

## III.  Construction Coordination Requirements

A.    Schedule: Landlord shall provide Tenant with a critical path construction schedule prior to commencement of Landlord's Work. Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every two weeks until Landlord's Work is complete.

B.    Photographs: Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address : BBB.2000photos@bedbath.com

C.    Vendor Coordination: Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.

D. <u>Certification</u>: Whenever testing, certification, or verification is required in Tenant's Prototype Drawings & Specifications, Landlord shall, at Tenant's request, provide Tenant with copies of tests, certifications, or verifications, and shall otherwise cooperate with Tenant's reasonable informational requests.

## IV. **Building and Site Signs**

At a minimum, all signage rights granted to previous tenant shall be granted to Tenant. Building signs and pylon/monument signs shall be provided by Landlord in accordance with Tenants prototype details and specifications.

A. <u>Building Signs</u> -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only. Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations. Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date. If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease. If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

B. <u>Remote Building Sign(s)</u> – [*Building Sign(s) not located on Premises*] Landlord shall furnish and install all remote building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only. Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all remote sign locations. Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date. If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease. If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

C. <u>Pylon/Monument Signs</u> -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics). Landlord to furnish, install and remove (at Tenant's request) temporary non-stick vinyl graphics as detailed in Exhibit F.

D. <u>Temporary Signs</u> -- Commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, ~~Landlord~~ Tenant shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below. Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
  1. Two double-sided temporary banners mounted to the Premises bearing the phrase :
     a) Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
     b) Banner #2 - "Why Wait? Shop Online" (side a) and "Now Open" (side b).
  2. Four single-sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
     a) Banners #1 & #2 – "Coming Soon"
     b) Banners #3 & #4 - "Now Open"
  3. One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
     a) "Now Hiring" (side a) and "Now Open" (side b).
  4. At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.
  5. Landlord shall secure banners through the following vendor:
     Auna Foote / Corporate Identification Solutions
     5563 North Elston Avenue
     Chicago, IL 60630
     (773) 763-9600 [ph]

(773) 763-9606 [fax]
afoote@corporateidsolutions.com
www.corporateidsolutions.com

E. <u>Shop Drawings</u>: Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval no later than twelve (12) weeks prior to the Delivery Date.

## VI. <u>Permits and Approvals</u>

A.  Landlord shall be obligated to secure <u>all</u> permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises.  Such permits may include (but shall not be limited to) the following: Building Permit, Health Permit [for  the sale of prepackaged foods], Fixture Permit, Seismic Permit, High Pile Storage Permit [for storage of merchandise above 12'-0-"] and Signage Permits.

If seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date. Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of the permit application.  Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).
Seizmic Inc., Sal Fateen / Genie Fateen / Keri Putnam, 161 Atlantic Street, Pomona, CA 91768,  (909) 869-0989 [ph]

Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.

## VII. <u>Construction Closeout</u>

A.  <u>Electronic Format</u>: Within thirty (30) days following the "Substantial Completion" date, Landlord shall be responsible for uploading all required documents to the Digital Reliance Inc. (DRI) website [http//www.closeoutassistant.com].   For additional information or assistance contact DRI at 614-430-5950. Special software is not required.  All documents shall be uploaded in pdf format to the DRI website within thirty (30) days following "substantial completion".  Landlord shall pay the mandatory $725 service fee to DRI prior to uploading files.  All payments must be made in US Dollars or the foreign equivalent thereof.  DRI will confirm submittal meets base requirements and shall inform Landlord or Landlord's Contractor if certain documents are missing.  DRI will not review items for content.  The content will be reviewed by the BBB Construction Manager after posting of all documents is complete.  Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord or Landlord's Contractor from BBB's Construction Manager.  Landlord shall resubmit amended document(s) to DRI until approved by BBB's Construction Manager.  Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700

B.  <u>Warranties</u>: Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work.  All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord shall forward a written report to Tenant outlining the condition of all warranty items.

C.  <u>Late Closeouts</u> : If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure.  If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D.   Itemized Budget: Landlord shall provide Tenant with its itemized "budget" and "final cost" for all of Landlord's Work within thirty (30) days following the Substantial Completion Date.

E.   Energy Rebate Information : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy rebate programs that are in force by the Authority

Exhibit C
Site Plans and Floor Plans





32nd Street
ASPHALT PAVEMENT
LOADING BERTH NO. 2
LOADING BERTH NO.
(2) LOADING BERTHS
Tenant's Exclusive Loading Docks (from 7 PM to 7 AM seven days a week)
RENOVATED 8 STORY MASONRY BUILDING
Tenant's Customer Pick-up Area
Garbage/Trash Compactor Area
Tenant's Exclusive Loading Docks (from 7 PM to 7 AM seven days a week)
Tenant ENTRY
RETAINING WALL
CONC. SIDEWALK
2nd Avenue
(16) LOADING DOCKS
Garbage/Trash Compactor Area
RETAINING WALL
CURB CUT SPLAYS
CONC. CURB
119'-11 3/4"
Potential Parking Deck Area
No Parking Spa
Border defines Parking Lot Parcel
Designated Parcel
Border defines Parking Lot Parcel
REMAINS OF INACTIVE TRACK
BLUESTONE CURB
ASPH.
STONE DW
CONCRETE
ASPHALT
CONC.
CONC.
30th Street
GATE
2 STORY STUCCO
1 STORY STUCCO
1 STORY BRICK BUILDING
CHAIN LINK FENCE W/BARBED WIRE

**First Floor Plan**



**Second Floor Plan**

Exhibit C-1
Alternate Site Plan



TAX BLOCK 667 LOT 1

30th STREET

TAX BLOCK 671 LOT 1
140247.2 S.F.
3.22 ACRES MORE OR LESS
EASEMENT AREAS NOT INCLUDED

2nd AVENUE
(80' WIDE)

LOADING DOCK
(FILED UNDER SEPARATE APPLICATION)

PARKING FOR 490 PARKING SPOTS

32nd STREET

**Exhibit C-1 ALTERNATE SITE PLAN**



Exhibit D
Commencement Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT,
made as of the _____ day of _____, 201___, by and between
_____ (*"Landlord"*) and BED BATH & BEYOND [OF
_____] INC. (*"Tenant"*).

# W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as
_____ (the *"Shopping Center"*), situated in _____,
_____;

WHEREAS, by that certain Lease Agreement dated as of _____, 201__
(the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to
Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease
has commenced; and

WHEREAS, under Section ____ of the Lease, Landlord and Tenant agreed to enter
into an agreement setting forth certain information in respect of the Premises and the
Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____,
201___.

2.      The **Initial Term** of the Lease shall expire on January 31, 20___, unless
Tenant exercises any option to extend the Term of the Lease or unless the Lease
terminates earlier as provided in the Lease.

3.      The date of commencement of the **first Renewal Period** shall be
February 1, 20___, if Tenant effectively exercises its option in respect thereof (the
deadline for such exercise being ___[insert date]___), and if Tenant does so, the Term of
the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further
extend the Term of the Lease or unless the Lease terminates earlier as provided in the
Lease.

4.      The date of commencement of the **second Renewal Period** shall be
February 1, 20___, if Tenant effectively exercises its option in respect thereof (the
deadline for such exercise being ___[insert date]___), and if Tenant does so, the Term of
the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further

extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.     Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

<u>**LANDLORD:**</u>

_____

By:_____
Name:_____
Title:_____

Exhibit E
Rules and Regulations

Tenant shall faithfully observe and comply with the following Rules and Regulations (collectively, these "**Rules**"). Capitalized terms have the meanings defined in the Lease.

1. Tenant shall provide Landlord with keys or combinations to all locks at the Premises (or, in the alternative, Tenant shall at all times provide Landlord with Tenant's 365-day, 24-hour contact information (i.e., e-mail address and phone number) for use at any time during the Term that Landlord requires entry into the Premises by reason of an emergency situation). Upon termination of the Lease, all keys to the Premises shall be surrendered to Landlord. All doors opening to public corridors in the Building shall be kept closed at all times except for normal ingress and egress to the Premises.

2. All lavatories, lavatory fixtures and facilities shall be used only for the intended purpose, and no inappropriate materials of any kind shall be disposed of therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees, agents or invitees, shall have caused such damage.

3. Tenant shall not permit or allow the Premises to be occupied or used in an offensive or objectionable manner by reason of excessive noise, noxious odors, or vibrations, or unreasonably interfere in any way with Landlord, other tenants or those having business therein.

4. Tenant shall not bring into or keep within the Premises animals (except service animals for the disabled, the police department or other governmental agencies) or vehicles of any kind (except forklifts and similar equipment). The Building is a No Smoking building and Tenant shall not permit smoking in any portion of the Premises.

5. Tenant, its employees and agents shall not loiter in, nor obstruct, the sidewalks, entrances, corridors, lobby, halls, stairways, elevators, or shipping/receiving facilities in the Building, and shall use the same only as a means of ingress and egress and for deliveries to and from the Premises.

6. Tenant shall store all trash and garbage in a neat, sanitary and lawful manner in the Premises, and shall arrange for its timely pick-up at its sole cost and expense, or if Landlord elects to provide for trash pick-up and disposal and provided that Tenant elects to participate therein, Tenant shall comply with all reasonable, Landlord-established procedures and shall pay all reasonable costs levied by Landlord for such services. No material shall be placed in the trash boxes or receptacles if such material is of such nature (e.g., medical, hazardous or toxic waste, batteries, and similar materials) that it may not be disposed of in the ordinary and customary manner of removing and

C-3

disposing of trash and refuse without violation of any Landlord or refuse carter policy or procedure or any Laws governing such disposal.

7.   Tenant shall comply with all safety, fire protection and evacuation procedures and regulations of any governmental agency or as may be reasonably established by Landlord.

8.   Tenant shall assume all responsibility for protecting the Premises from theft, robbery and pilferage, which includes keeping doors locked and other means of entry to the Premises secured.

9.   Landlord shall have the right to reasonably change the name of the Building.  In no event shall the name of the Building be that of any retail tenant or occupant of the Building.

10.   Tenant shall comply with and shall advise and cause all shippers to and from the Building to deliver and ship all shipments in compliance with all reasonable rules and procedures established from time to time by Landlord for the operation of the Building's shipping and receiving facilities provided that in no event shall the following be restricted: (i) hours and days of delivery, (ii) size or type of truck or vehicle or (iii) truck carrier used by Tenant (the "Shipping and Receiving Procedures").

11.   All deliveries and pick-ups must be made to designated shipping or receiving areas as provided in the Lease and Tenant shall require all trucks to approach their shipping or receiving areas by designated access routes that can easily be maneuvered by such trucks, except no restrictions shall be applicable to trucks, vans and vehicles such as Federal Express, UPS, U.S. Postal Service, Brinks, vending machine, repair and utility companies vehicles and such   and in full compliance with the Shipping and Receiving Procedures.

12.   Tractor trailers which must be temporarily unhooked or parked must use steel plates under dolly wheels to prevent damage to the paving surface.  In addition, wheel blocking must be used when appropriate. Tractor trailers must be removed from the loading areas reasonably promptly after loading or unloading.  No trucks or trailers may be parked for any longer than may be reasonably required to load or unload a given shipment and complete any associated paperwork, and may not, in any circumstance, be parked while not in use or overnight.

13.   Except as provided herein, automobiles and other vehicles of Tenant and its employees, agents and visitors (other than customers of retail tenants) shall not be parked on any Parking Areas, except for any areas within the Building that are designated as paid parking areas for the general public or tenants occupying the Building.  Landlord shall have the right to remove or cause to be removed any automobile or other vehicle of Tenant, its employees, invitees or agents that may be parked in any such areas in

violation of this rule, except as otherwise provided herein. Any such removal shall be without liability of any kind to Tenant, its agents, invitees and employees and Tenant hereby indemnifies and agrees to hold Landlord free and harmless against all such liability pursuant to the indemnity provisions contained in this Lease. Tenant shall, from time to time, upon written request from Landlord, supply Landlord with a list of all of Tenant's employees' automobile models and license plate numbers.

14.     All floor areas within the Premises, including vestibules, entrances and returns, doors, fixtures, windows and plate glass, shall be maintained by Tenant in a safe, neat and clean condition, subject to the provisions of the Lease.

15.     Except as otherwise expressly provided in the Lease, Tenant shall not permit or suffer any advertising medium to be placed on the Building's walls, on the Premises' exterior walls or windows, on the sidewalks or on the parking lot areas or light poles. Except as provided in the Lease, no permission, expressed or implied, is granted to exhibit or display any banner, pennant, sign and trade or seasonal decoration of any size, style or material on or within the Building, or outside the Premises, but in no event shall the foregoing restrict Tenant's use of the interior of the Premises. No sale of merchandise by tent sale, truck load sale or the like, shall be permitted on the Building's drives, parking lot or other Common Facilities.

16.     Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television. No radio, television or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere in or on the Building outside the Premises, without Landlord's prior written consent.

17.     Tenant shall not permit or suffer any portion of the Premises to be used for residential, lodging purposes, sleeping, or any immoral or illegal purpose.

18.     Tenant shall not, in or on any part of the Common Facilities, or directed to or impacting other tenants in the Building:

　　　　a.     Create a nuisance.

　　　　b.     Throw, discard or deposit any refuse or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind.

　　　　c.     Deface, damage, or demolish any sign, light standard or fixture, landscaping materials or other improvements within the Building or adjacent areas, or the property of other tenants, business invitees or employees situated within the Building or adjacent areas.

C-5

19.     Tenant shall employ only such labor as will not result in jurisdictional disputes with any labor unions or strikes, demonstrations or picketing against or involving Landlord or the Building and which shall not cause any conflict with any union contract to which Landlord, or its contractors or subcontractors, may be a party.

20.     Tenant shall not canvass, peddle, solicit, and distribute handbills or any other written materials outside the Premises.

21.     These Rules supplement and are in addition to the terms, covenants, agreements, and conditions of the Lease.

22.     Landlord shall enforce these Rules in a reasonably uniform manner, provided Rules and their enforcement may vary for retail tenants as contrasted with industrial tenants. Landlord may, for good cause, waive or modify any one or more of these Rules for the benefit of any particular tenant or tenants, or class thereof, but no such waiver by Landlord shall be construed as a waiver of such Rules in favor of any other tenant or tenants, nor prevent Landlord from thereafter enforcing any such Rules against any or all tenants of the Building.

23.     Landlord reserves the right to reasonably change these Rules, or to make reasonable Rules as may from time to time be necessary for the operation, management, safety, care and cleanliness of the Building and Common Facilities, and for the preservation of good order therein, as well as for the convenience of all occupants and tenants therein, but only to the extent that such shall not diminish or alter Tenant's rights hereunder in any material respect. Landlord shall not be responsible or liable to Tenant or to any other person for the non-observance of the Rules by another tenant or other person. Subject to the foregoing and to variances appropriate to different classes of tenants, Landlord agrees that it shall enforce these rules and regulations in a reasonably non-discriminatory manner.

Exhibit F
Sign Drawings (Building and Pylon)



Tenant loading dock doors sign in front of loading dock doors

**South Elevation (31st Street - Parking Lot Side)**



Tenant's Exterior Building Signage Option One (subject to SHPO approval). Tenant's channel-lit LED signs, at Tenants discretion, can be placed in any six of the sign bands shown.

Tenants Temporary Sign location (SHPO approval not required). Logo's, text, artwork all at Tenant's sole discretion.

**North Elevation (30th Street - Prison Side)**

Tenants Temporary Sign location (SHPO approval not
required). Logo's, text, artwork and location at any
three consecutive floors within the border shown all at
Tenant's sole discretion.

Front Entry Feature - Frestanding steel structure (not attached
to building) with open wire metal grid finish and Tenant's signs
mounted on horizontal bands. Front Entry Feature design and
details by Tenant to be submitted to Landlord for approval which
can not be unreasonably withheld



**East Elevation (3rd Ave)**

Tenant loading dock sign
on sidewalk in front of
overhead doors



WEST ELEVATION ( 2ND AVE



**Plan**

3ʳᵈ AVENUE

18'- 9"

18'9' x 13'-4' LED DISPLAY
TWO SIDED 'V' @ 30 DEGREES

# BED BATH & BEYOND®

13'-4"

Tenants (Bed Bath & Beyond, Buy Buy Baby, Cost Plus World Market, And That!, Harmon Face Values) static sign panel, which will be externally lit, is to be a maximum 13' high x 15' wide overall and oriented for optimum visibility from 3rd Ave. The location, size, orientation (parallel or perpendicular to 3rd Ave) and number of sides (a single side if parallel and two sides if perpendicular) of the panel on the pylon pole as well as the signage within the area shown is to be determined at Tenant's sole discretion at a later date via an on-site study after Landlord has erected the main pylon structure. MicroCenter and 3rd tenant signage on the static panel will be allowed only if there is available space.

12'

40'-0"

Top of expressway above

26'-8"

15'-0"

22'-6"

16'-0"

15'-0"

**Elevation**

**Pylon Sign**

12·29·14

**Exhibit F - Signs**
Page 3 of 4

Brooklyn, NY



3RD AVENUE

Monument sign structure

**Plan**

Static sign panel (Tenant's signs to be in top positions)



Static sign panel (Tenant's signs to be in top positions)

Open metal structure

Metal base

**Elevation**

## Monument Sign

**NOTE:**

A single sided (text facing north) illuminated sign with height, width and final monument sign design to be determined at a later date via an on-site study to determine optimum conditions. Tenants signs (Bed Bath & Beyond, Buy Buy Baby, Cost Plus World Market, And That!, Harmon Face Values) to be in the top positions on the monument sign.

12·29·14

**Exhibit F - Signs**
Page 4 of 4
Brooklyn, NY

## EXHIBIT G
### [FORM OF REQUIRED DISCLOSURE STATEMENT]

The undersigned, an authorized representative of _____, a _____ organized and existing under the laws of the State of _____, DOES HEREBY CERTIFY, REPRESENT AND WARRANT to the New York City Industrial Development Agency (the "Agency") pursuant to [Section 8.9] of that certain Agency Lease Agreement, dated as of September 1, 2011, between the Agency and Salmar Properties, LLC, a limited liability company organized and existing under the laws of the State of New York (the "Lease Agreement") THAT:

Neither the above-referenced Entity, nor any of the Principals of such Entity, nor any Person that directly or indirectly Controls, is Controlled by, or is under common Control with such Entity:

(1)     is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with the Agency or the City, unless such default or breach has been waived in writing by the Agency or the City, as the case may be;

(2)     has been convicted of a felony and/or any crime involving moral turpitude in the preceding ten (10) years;

(3)     has received written notice of default in the payment to the City of any taxes, sewer rents or water charges in excess of $5,000 that has not been cured or satisfied, unless such default is then being contested with due diligence in proceedings in a court or other appropriate forum; or

(4)     has, at any time in the three (3) preceding years, owned any property which, while in the ownership of such Person, was acquired by the City by in rem tax foreclosure, other than a property in which the City has released or is in the process of releasing its interest to such Person pursuant to the Administrative Code of the City.

As used herein, the following capitalized terms shall have the respective meanings set forth below:

"City" shall mean The City of New York.

"Control" or "Controls" shall mean the power to direct the management and policies of a Person (x) through the ownership, directly or indirectly, of not less than a majority of its voting securities, (y) through the right to designate or elect not less than a majority of the members of its board of directors or trustees or other Governing Body, or (z) by contract or otherwise.

"Entity" shall mean any of a corporation, general partnership, limited liability company, limited liability partnership, joint stock company, trust, estate, unincorporated organization, business association, tribe, firm, joint venture, governmental authority or governmental instrumentality, but shall not include an individual.

"Governing Body" shall mean, when used with respect to any Person, its board of directors, board of trustees or individual or group of individuals by, or under the authority of which, the powers of such Person are exercised.

"Person" shall mean an individual or any Entity.

"Principal(s)" shall mean, with respect to any Entity, the most senior three officers of such Entity, any Person with a ten percent (10%) or greater ownership interest in such Entity, and any Person as shall have the power to Control such Entity, and "principal" shall mean any of such Persons.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of _____, 20__.

**[NAME OF CERTIFYING ENTITY]**

By: _____
Name:
Title:

## <u>EXHIBIT H</u>

**EMPLOYMENT and BENEFITS REPORT**
<u>For the Fiscal year July 1, xxx – June 30, xxxx (FY'xx)</u>

In order to comply with Local Law reporting requirements. the Company is required to complete and return this form to NYCEDC, 110 William Street. Attention: Compliance, New York. NY 10038 no later than **August 1, xxxx.**

**PLEASE SEE THE ATTACHED INSTRUCTIONS AND DEFINITIONS OF CAPITALIZED TERMS USED ON THIS PAGE.**

1.   Number of permanent Full-Time Employees as of June 30, 2006 _____

2.   Number of n onpermanent Full-Time Employees as of June 30, 2006 _____

3.   Number of permanent Part-Time Employees as of June 30. 2006. _____

4.   Number of non-permanent Part-Time Employees as of June 30, 2006 . _____

5.   Number of Contract Employees as of June 30, 2006 _____

6.   Total Number of employees of the <u>Company and its Affiliates</u> included in Items 1, 2, 3 and 4 _____

For each employee included in this item 6, attach the NYS-45 Quarterly Combined Withholding, Wage Reporting and Unemployment Insurance Return for the period including *June* 30, 2006.

7.   Number of employees included in item 6 above who reside in the City of New York _____

8.   Do the Company and its Affiliates offer health benefits to all Full-Time Employees?     Y     N (please circle Y or N)

Do the Company and its Affiliates offer health benefits to all Part-Time Employees?     Y     N (please circle Y or N)

<u>If the answer to item 6 above is 250 or more employees. please complete Item 9 through 13 below:</u>

9.   Number of employees in Item 6 who are "Exempt" _____

10. Number of employees n Item 6 who are "Non-Exempt" _____

11. Number of employees in item 10 that earn up to $25,000 annually _____

12. Number of employees in item 10 that earn $25,001 - $40,000 annually _____

13. Number of employees in item 10 that earn $40,001 - $50,000 annually _____

<u>For Items 14 through 16, indicate the value of the benefits realized at Project Locations during FY'06:</u>

14. Value of sales and use tax exemption benefits _____

15. Value of Commercial Expansion Program ("CEP") benefits

16. Value of Relocation and Employment Assistance Program ("REAP") benefits     Y     N (please circle Y or N) _____

17. Were physical improvements made to any Project Location during FY '06 at a cost exceeding 10% of the current assessed value of the existing improvements at such Project Location?
If the Company and/or its Affiliates have applied for Industrial and Commercial Incentive Program ("ICIP") benefits for new physical improvements at Project Location(s), please provide the ICIP application number(s) _____

Certification: I, the undersigned, an authorized officer or principal owner of the Company/Affiliate/Tenant, hereby certify to the best of my knowledge and belief, that all information contained in this report is true and complete. This form and information provided pursuant hereto may be disclosed to the New York City Economic Development Corporation ("NYCEDC") and may be disclosed by NYCEDC in connection with the administration of the programs of NYCEDC and/or the City of New York; and, without limiting the foregoing, such information may be included in (x) reports prepared by NYCEDC pursuant to New York City Charter Section 1301 et. seq., (y) other reports required of NYCEDC, and (z) any other reports or disclosure required by law.
Entity Name: _____

Signature By: _____     Date: _____

Name (print): _____     Title: _____

## DEFINITIONS

"Affiliate" ;s (;) a business entity in which more loan fifty percent is owned by, or is subject to a power or right of control of or as managed by an entity which is a party to a Project Agreement. or (0) a business entity that owns more than fifty percent of an entity which is a party to n Project Agreement or that exercises a power or right of control of such entity

'Company" includes any entity that is a party to a Project Agreement.

"Contract Employee' is a person Who is an independent contractor (i e . a person who is not an employee"). or is employed by an independent contractor (an entity other than the Company or its Affiliate a Tenant or a subtenant of a Tenant), who provides services at a Project Location,

"Full-Time  Employee" is an employee who works at least 35 hours per week at a

Project Location, "Part-Time Employee is an employee who works less than 35 hours

per week at a Project Location,

"Project Agreement" is any agreement or instrument (such as a lease agreement or deed) pursuant to which an entity purchases or leases (directly or by assignment from NYCEDC) property from NYCEDC.

"Project Location" is any location that is leased (directly or by assignment from NYCEDC) or purchased by the Company from NYCEDC.

"Tenant" is a tenant or subtenant (excluding the Company and its Affiliates) that leases or subleases facilities from the Company or its Affiliates at any Project Location.

**ITEM INSTRUCTIONS For each Project Agreement, please submit one report that covers (i) the Company and its Affiliates and (ii) Tenants and subtenants of Tenants at all Project Locations covered by the Project Agreement.** Each Tenant must complete items 15, 15 and 16 on this form with regard to itself and its subtenants and return it to the Company. The Company must include in its report information collected by the Company from its Affiliates and Tenants. The Company must retain for six (6) years all forms completed by its Affiliates and Tenants and at NYCEDC's request must permit NYCEDC upon reasonable notice to inspect such forms and provide NYCEDC with a copy of such forms.

1- 4.    Items 1, 2, 3 and 4 must be determined as of June 30th of the applicable fiscal year and must include all permanent and non-permanent Full-Time Employees and Part-Time Employees at all Project Locations, including, without limitation, those employed by the Company or its Affiliates and by Tenants and subtenants of Tenants at the Project Locations. Do not include Contract Employees in Items 1, 2, 3 and 4.

5.    Report all Contract Employees providing services to the Company and its Affiliates and Tenants and subtenants of Tenants at all Project Locations.

6-14.    Report information requested only with respect to the Company and its Affiliates at all Project Locations. For item 6, report only the permanent and non-permanent Full-Time Employees and Part-Time Employees of the Company and its Affiliates. Do not report employees of Tenants. Do not report Contract Employees.

9.    Indicate the number of employees included in item 6 who are classified as "Exempt", as defined in the federal Fair Labor Standards Act.  Generally, an Exempt employee is not eligible for overtime compensation.

10.    Indicate the number of employees included in item 6 who are classified as "Non-Exempt, as defined in the federal Fair Labor Standards Act. Generally, a Non-Exempt employee is eligible for overtime compensation.

14.    Report all sales and use tax exemption benefits realized at all Project Locations by the Company and its Affiliates and granted by virtue of the exemption authority of the City of New York. Do not include any sales and use tax savings realized under the NYS Empire Zone Program.

15.    Report all CEP benefits received by the Company and its Affiliates and any Tenants and subtenants of Tenants at all Project Locations. CEP is a package of tax benefits designed to help qualified businesses to relocate or expand in designated relocation areas in New York City. For more information regarding CEP, please visit http://www.nyc,gov/dof.

16.    Report all REAP benefits received by the Company and its Affiliates and any Tenants and subtenants of Tenants at all Project Locations. REAP is designed to encourage qualified businesses to relocate employees to targeted areas within New York City. REAP provides business income tax credits based on the number of qualified jobs connected to the relocation of employees. For more information regarding REAP, please visit http://www.nyc.gov/dof.

## EXHIBIT I

 New York City Industrial Development Agency

**SUBTENANT'S EMPLOYMENT & BENEFITS REPORT**
For the Fiscal Year July 1, 2010 – June 30, 2011 (FY'11)

In order to comply with State and Local Law reporting requirements, please complete and return this form no later than **August 1, 2011. PLEASE SEE BELOW FOR THE INSTRUCTIONS AND DEFINITIONS OF CAPITALIZED TERMS USED ON THIS PAGE.**

**Please copy this form and have each subtenant occupying space at an NYCIDA project location complete a Subtenant's Employment and Benefits Report. All Subtenant employment info should be aggregated, combined with Company employees (where appropriate), and reported on the Company's Employment and Benefits Report. Please include the completed Subtenant's Employment and Benefits Report(s) along with the Company's Employment and Benefits Report when submitting to NYCIDA.**

1.  Number of permanent Full-Time Employees as of June 30th, 2011 ........................................ _____

2.  Number of non-permanent Full-Time Employees as of June 30th, 2011 ............................... _____

3.  Number of permanent Part-Time Employees as of June 30th, 2011 ..................................... _____

4.  Number of non-permanent Part-Time Employees as of June 30th, 2011 .............................. _____

5a. Number of "non-Construction" Contract Employees as of June 30th, 2011 ........................... _____

5b. <u>Average</u> number of Construction Employees during Fiscal Year ending June 30th, 2011 ...................................................................................................................................... _____

6.  Does the Company receive Relocation and Employment Assistance Program ("REAP") benefits?     ☐Yes  ☐No
    If yes, what was the value realized during FY'11
    $_____

7.  Does the Company receive Relocation and Employment Assistance Program ("REAP") benefits?     ☐Yes  ☐No
    If yes, what was the value realized during FY'11
    $_____

**DEFINITIONS:**

"**Construction Employee**" is a person who is an independent contractor or subcontractor, or an employee thereof, who provides construction services to the Subtenant at a Project Location.

"**Contract Employee**" is a person who is an independent contractor (i.e., a person who is not an "employee"), or is employed by an independent contractor (an entity other than the Company, an Affiliate or a subtenant), who provides services at a Project Location.

"**Full-Time Employee**" is an employee who works at least 35 hours per week at a Project Location.

"**Part-Time Employee**" is an employee who works less than 35 hours per week at a Project Location.

**INSTRUCTIONS:** Each Subtenant should complete a separate Subtenant's Employment and Benefits Report.

**Item 1- 4.** Items 1, 2, 3 and 4 must be determined as of June 30, 2011 and must include all permanent and non-permanent Full-Time Employees and Part-Time Employees at all Project Locations of the Subtenant at the Project Locations. Do not include Contract or Construction Employees in Items 1, 2, 3 and 4.

**Item 5.(a)** Report all Contract Employees providing services to the Subtenants at all Project Locations. <u>Do not include Construction Employees in question 5a.</u> **(b)** Report the 12 month average of Construction Employees providing services to the Subtenants at all Project Locations for the previous fiscal year. Use the number of construction employees on the last payroll date of each month to compute this average.

**Item 6**. Report all CEP benefits received by the Subtenants at all Project Locations. CEP is a package of tax benefits, administered by the New York City Department of Finance, designed to help qualified businesses to relocate or expand in designated relocation areas in New York City. For more information regarding CEP, please visit http://www.nyc.gov/dof.

**Item 7**. Report all REAP benefits received by the Subtenants at all Project Locations. REAP is administered by the New York City Department of Finance, and is designed to encourage qualified businesses to relocate employees to targeted areas within New York City. REAP provides business income tax credits based on the number of qualified jobs connected to the relocation of employees. For more information regarding REAP, please visit http://www .nyc.gov/dof.

Certification: I, the undersigned, an authorized officer or principal owner of the Company/Affiliate/Tenant, hereby certify to the best of my knowledge and belief that all information contained in this report is true and complete. This form and information provided pursuant hereto may be disclosed to the New York City Economic Development Corporation ("NYCEDC"), New York City Industrial Development Agency ("NYCIDA") and/or New York City Capital Resource Corporation ("NYCCRC") and may be disclosed by NYCEDC, NYCIDA and/or NYCCRC in connection with the administration of the programs of


New York City
Industrial Development Agency

## SUBTENANT'S EMPLOYMENT & BENEFITS REPORT
For the Fiscal Year July 1, 2010 – June 30,
2011 (FY'11)

NYCEDC, NYCIDA and/or NYCCRC and/or the City of New York; and, without limiting the foregoing, such information may be included in (x) reports prepared by NYCEDC pursuant to New York City Charter Section 1301 et. seq., (y) other reports required of NYCIDA, NYCCRC or NYCEDC, and (z) any other reports or disclosure required by law.

Subtenant
Name_____

Project
Name_____

Signature_____

Date_____

Name_____

Title_____

<u>Exhibit J</u>

<u>Permitted Encumbrances</u>

**[INSERT AT END OF LIST]** Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

**[INSERT AFTER EACH REFERENCE TO A MEMORANDUM OF LEASE]** The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

Exhibit J

Permitted Encumbrances

1.   Railroad Consents in deeds recorded on 4/27/1904 in Section 3 Liber 33 Cp 153
     and Cp 156.

2.   Agreement to Install and Maintain Rail Lines made between Bush Terminal
     Railroad Company and Bush Terminal Buildings Company recorded in Liber 3298
     Cp 360.

3.   Restriction and Consent recorded on 6/6/1936 in Liber 5503 Cp 348.

4.   Covenants and Restrictions, Reservations and Conditions in deed made by the
     United States of America to New York City Industrial Economic Development
     Corporation dated 8/15/2011 and recorded 8/26/2011 as CRFN 2011000303251.

5.   Covenants and Restrictions, Reservations and Conditions in deed made by the
     New York City Industrial Economic Development Corporation to Salmar
     Properties, LLC dated as of 8/15/20 11 and recorded 8/26/2011 as CRFN
     2011000303255.

6.   Terms, covenants, conditions and agreements contained in a company lease made
     by and between Salmar Properties, LLC, Lessor, and New York City Industrial
     Development Agency, Lessee, a memorandum of which dated 9/1/2011 was
     recorded on 10/11/2011 in (as) CRFN 2011000357052.

7.   Subject to Sections 4.3 and 12.1 of the Lease, Mortgage, Assignment of Rents,
     Security Agreement and Fixture Filing, made by SALMAR PROPERTIES, LLC
     AND NEW YORK CITY INDUSTRIAL DEVELOPMENT AGENCY to
     GOLDMAN SACHS BANK USA in the amount of $30,000,000.00 dated
     9/22/2011, recorded 10/11/2011 as CRFN 2011000357053.

8.   Terms, covenants, conditions and agreements contained in an agency lease made
     by and between New York City Industrial Development Agency, Lessor, and
     Salmar Properties, LLC, Lessee, a memorandum of which dated 9/22/2011 was
     recorded on 10/11/2011 in (as) CRFN 2011000357051.

9.   Declaration of Zoning Lot Restrictions and Zoning Lot Certifications that are
     recorded as: CRFN #s 201100030352, 53 and 54

10.  Subject to Sections 4.3 and 12.1 of the Lease, a Financing Statement:
     Debtor: Salmar Properties, LLC and Salmar 870, LLC;
     Secured Party:  Goldman Sachs Bank USA;
     File No.:  CRFN 2011000354928.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises in accordance with the terms of this Lease.

<u>**EXHIBIT K**</u>

**FORM OF SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT**

After recording return to:
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attention: Alan Freeman, Esq.

**SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT**

**THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
AGREEMENT** (the "Agreement") made and entered into as of the _____ day of
December, 2014 by and between GOLDMAN SACHS BANK USA ("Secured Party"),
having an address at 222 South Main Street, Salt Lake City, UT 84101 and BED BATH
& BEYOND INC., a New York corporation ("Tenant"), having an address at 650 Liberty
Avenue, Union, New Jersey 07083,

**WHEREAS**, Tenant and SALMAR PROPERTIES, LLC, a New York limited
liability company ("Landlord") have entered into a certain Lease dated as of December
_____, 2014 (the "Lease") pursuant to which Tenant has leased from Landlord certain
premises located at 850 Third Avenue, Brooklyn, New York, as more particularly shown
on <u>Exhibit A</u> hereto (the "Premises"); and

**WHEREAS**, Secured Party is the present owner and holder of (i) that certain
Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated September
22, 2011 and made by Landlord and New York City Industrial Development Agency (the
"NYCIDA") to Secured Party and recorded October 11, 2011 in the Office of the City
Clerk of Kings County, New York as CRFN 2011000357053 (including all amendments,
modifications and restatements thereto), and (ii) that certain Mortgage, Assignment of
Rents, Security Agreement and Fixture Filing dated September 22, 2011 and made by
Salmar 870, LLC to Secured Party and recorded October 11, 2011 in the Office of the
City Clerk of Kings County, New York as CRFN 2011000357054 (including all
amendments, modifications and restatements thereto) ((i) and (ii) above collectively, the

1

"Superior Agreement"), which Superior Agreement encumbers the property being more particularly described on Exhibit A-1 hereto (the "Real Property"); and

**WHEREAS,** Tenant has agreed to subordinate the Lease to the Superior Agreement and to the lien thereof and Secured Party has agreed to grant non-disturbance to Tenant under the Lease on the terms and conditions set forth herein.

**WHEREAS,** Secured Party and Tenant desire to evidence their understanding with respect to the Superior Agreement and the Lease as hereinafter provided;

**NOW THEREFORE**, in consideration of the mutual agreements hereinafter set forth, the parties hereto hereby agree as follows:

**Section 1. Nondisturbance**. So long as Tenant is not in default (beyond any period given Tenant under the Lease to cure such default) in the payment of rent or other sums payable by Tenant under the Lease or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed, possession and right of use of the Premises and Tenant's rights and privileges under the Lease, or any extensions or renewals thereof which may be affected in accordance with any option therefor in the Lease, shall not be diminished or interfered with by Secured Party; and Secured Party will not join Tenant as a party defendant in any action or proceeding for the purpose of terminating Tenant's interest under the Lease. Notwithstanding anything to the contrary in the Superior Agreement, all insurance and condemnation proceeds or awards paid or payable with respect to the Premises, the vertical access between the first floor and the Premises, and those common areas of the Real Property that are critical to the normal operation of Tenant's business at the Premises (e.g., the ground floor retail lobby and Tenant's loading facilities) shall be made available by Secured Party to be held, applied and paid in the manner set forth in the Lease.

**Section 2. Attornment.**

**2.1. Succession by Secured Party.** If the interest of Landlord shall be transferred to and owned by Secured Party or a purchaser at foreclosure sale (collectively with Secured Party, a "New Owner") by reason of foreclosure or other proceedings, or by any other manner, and the New Owner succeeds to the interest of the Landlord under the Lease, Tenant shall be bound to the New Owner under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining and any extensions or renewals thereof which may be effected in accordance with any option therefor in the Lease, with the same force and effect as if the New Owner were the Landlord under the Lease, and Tenant does hereby attorn to the New Owner as its landlord, said attornment to be effective and self-operative without the execution of any further instruments on the part of either party hereto immediately upon the New Owner succeeding to the interest of

2

Landlord under the Lease. Notwithstanding anything to the contrary contained herein, after notice is given to Tenant by Secured Party that the Landlord is in default under the Superior Agreement and that the rental payments due under the Lease should be paid to Secured Party pursuant to the terms of the assignment of leases and rents executed and delivered by Landlord to Secured Party in connection therewith, Tenant shall thereafter pay to Secured Party or as directed by the Secured Party, all rentals and all other monies due or to become due to Landlord under the Lease and Landlord hereby expressly authorizes Tenant to make such payments to Secured Party and hereby releases and discharges Tenant from any liability to Landlord on account of any such payments. The respective rights and obligations of Tenant and the New Owner upon such attornment, to the extent of the then remaining balance of the term of the Lease and any such extensions and renewals, shall be and are the same as now set forth therein; it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

**2.2. Limitation of Duties of New Owner.** If the New Owner shall succeed to the interest of Landlord under the Lease, the New Owner shall be bound to Tenant under all the terms, covenants and conditions of the Lease, and Tenant shall, from and after the New Owner's succession to the interest of Landlord under the Lease, have the same remedies against the New Owner for the breach of any agreement contained in the Lease that Tenant might have had under the Lease against Landlord if the New Owner had not succeeded to the interest of Landlord; provided, however, that the New Owner shall not be (i) liable for any act or omission of Landlord or for any event or occurrence of Landlord, whether prior to or after New Owner's succession to Landlord's interest under the Lease, except for the obligation to cure defaults that exist at the time of the New Owner's succession to the extent such defaults continue after such succession; or (ii) bound by any rent, additional rent or other sums which Tenant might have paid to Landlord for more than one month in advance, except to the extent that such payment is required pursuant to the Lease; or (iii) bound by any amendment, termination or modification of the Lease made without its consent (except only if such amendment or modification is specifically required pursuant to the terms and conditions of the Lease or such termination is granted to Tenant as a unilateral right of Tenant under the Lease), such consent not to be unreasonably withheld or delayed; or (iv) bound by any construction-related obligation of Landlord under the Lease, provided that failure of such obligation shall not lessen or diminish any right by Tenant to terminate the Lease pursuant to the applicable terms and conditions thereof, provided further, however, that for the purposes of this section the term "construction-related obligation" shall not include any repair or any casualty restoration obligation of Landlord under the Lease; or (v) required to make any capital improvements to the Real Property or to the Premises demised under the Lease which Landlord may have agreed to make, but had not completed, or to perform or provide any services not related to possession or quiet

3

enjoyment of the Premises demised under the Lease; or (vi) subject to any offsets, defenses, abatements or counterclaims which shall have accrued to Tenant against Landlord prior to the date upon which the New Owner shall become the owner of the Real Property, except to the extent such offsets are expressly provided under the Lease and Secured Party has received prior written notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease; or (vii) liable for the return of rental security deposits, if any, paid by Tenant to Landlord in accordance with the Lease unless such sums are actually received by the New Owner; or (viii) bound to make any payment to Tenant which was required under the Lease, or otherwise, to be made prior to the time the New Owner succeeded to Landlord's interest; or (ix) required to make any repairs to the Real Property or to the Premises demised under the Lease required as a result of fire, or other casualty or by reason of condemnation unless the New Owner shall be obligated under the Lease to make such repairs; or (x) bound by any assignment of the Lease or sublease of the Real Property, or any portion thereof, made prior to the time the New Owner succeeded to Landlord's interest other than if pursuant to the provisions of the Lease.

## Section 3.  Subordination of Lease.

**3.1.  Subordination.**  Tenant covenants, stipulates and agrees that the Lease is hereby, and shall continue to be, subordinated and made secondary and inferior in each and every respect to the Superior Agreement and the lien thereof and to any and all renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Superior Agreement, but any and all such renewals, modifications, extensions, substitutions, replacements and/or consolidations shall nevertheless be subject to and entitled to the benefits of the terms of this Agreement.

**Section 4.  Secured Party's Consent.**  Tenant shall not, without obtaining the prior written consent of Secured Party, (a) enter into any agreement amending, modifying or terminating the Lease, (b) prepay any of the rents, additional rents or other sums due under the Lease for more than one (1) month in advance of the due dates thereof, unless expressly required by the terms of the Lease, (c) voluntarily surrender the Premises demised under the Lease or terminate the Lease without cause or shorten the term thereof, unless granted to Tenant as a unilateral right of Tenant under the Lease, or (d) assign the Lease or sublet the Premises demised under the Lease or any part thereof other than pursuant to the provisions of the Lease; and any such amendment, modification, termination, prepayment, voluntary surrender, assignment or subletting, without Secured Party's prior consent, shall not be binding upon Secured Party.

## Section 5.  Miscellaneous.

WHP 556407978v2

**5.1. Waiver.** No purported waiver by either party of any default by the other party of any term or provision contained herein shall be deemed to be a waiver of such term or provision unless the waiver is in writing and signed by the waiving party. No such waiver shall in any event be deemed a waiver of any subsequent default under the same or any other term or provision contained herein.

**5.2. Entire Agreement.** This Agreement sets forth the entire understanding between the parties concerning the subject matter of this Agreement and incorporates all prior negotiations and understandings. There are no covenants, promises, agreements, conditions or understandings, either oral or written, between the parties relating to the subject matter of this Agreement other than those set forth herein. No representation or warranty has been made by or on behalf of either party to this Agreement (or any officer, director, employee or agent thereof) to induce the other party to enter into this Agreement or to abide by or consummate any transactions contemplated by any terms of this Agreement, except representations and warranties, if any, expressly set forth herein. No alteration, amendment, change or addition to this Agreement shall be binding upon either party unless in writing and signed by the party to be charged.

**5.3. Successors.** Each and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**5.4. Joint and Several Liability.** If Tenant consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Secured Party and Tenant and their respective successors and assigns.

**5.5. Notices.** Any consent, waiver, notice, demand, request or other instrument required or permitted to be given under this Agreement shall be in writing and be (a) sent by certified or registered United States mail, return receipt requested, or (b) delivered by personal or overnight courier delivery, postage prepaid, in each case addressed:

> If to Tenant:
> Warren Eisenberg,
> c/o Bed Bath & Beyond Inc.,
> 650 Liberty Avenue,
> Union, New Jersey 07083
>
> With a copy to:
> Allan N. Rauch, Esq.,
> c/o Bed Bath & Beyond Inc.,

5

650 Liberty Avenue,
Union, New Jersey 07083,

With a copy to:
W. John Park,
Cole, Schotz, Meisel, Forman & Leonard, P.A.,
25 Main Street,
Hackensack, New Jersey 07601

If to Secured Party:
Goldman Sachs Bank USA
22 South Main Street
Salt Lake City, UT 84101
Facsimile No.: (801) 884-1525

With a copy to:
Greenberg Traurig, LLP
445 Hamilton Avenue, 9th Floor
White Plains, NY 10601
Attention: Gregory P. Murphy
Facsimile No.: (914) 206-4563

Any such consent, waiver, notice, demand, request or other instrument shall be deemed given upon receipt or upon the refusal of the addressee to receive the same as indicated on the return receipt. Either party may change its address for notices by notice in the manner set forth above.

     **5.6. Captions.** The captions and section numbers appearing in this Agreement are inserted only as a matter of convenience. They do not define, limit, construe or describe the scope or intent of the provisions of this Agreement.

     **5.7. Partial Invalidity.** If any term or provision of this Agreement or the application thereof to any person, firm or corporation, or circumstance, shall be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons, firms or corporations, or circumstances, other than those as to which it is held invalid, shall both be unaffected thereby, and each term or provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law. Notwithstanding the foregoing, the provisions of Section 1 are of the essence of this Agreement, and any invalidity or unenforceability of Section 1 shall render this entire Agreement invalid and unenforceable.

6

**5.8. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements to be performed in the State of New York.

**5.9. Counterparts.** This Agreement may be executed in counterparts, each of which when executed by the parties hereto shall be deemed an original and all of which together shall be deemed the same Agreement.

**5.10. Further Acts.** Tenant will, at the cost of Tenant, and without expense to Secured Party, do, execute, acknowledge and deliver all and every such further acts and assurances as Secured Party shall, from time to time, reasonably require, to confirm the rights and the agreements hereunder, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording this Agreement, or for complying with all applicable laws.

**5.11. Limitations on Liability.** Tenant acknowledges that it is not a third-party beneficiary under the Superior Agreement or the loan documents related thereto. In no event shall Secured Party or the Secured Parties or any purchaser of the Real Property at foreclosure sale or any grantee of the Real Property named in a deed-in-lieu of foreclosure, nor any heir, legal representative, successor, or assignee of Secured Party or the Secured Parties or any such purchaser or grantee (Secured Party, the Secured Parties, and any such purchaser, grantee, heir, legal representative, successor or assignee, collectively, the "Subsequent Landlord") have any personal liability for the obligations of Landlord under the Lease and should the Subsequent Landlord succeed to the interests of the Landlord under the Lease, Tenant shall look only to the estate and property of any such Subsequent Landlord in the Real Property for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by any Subsequent Landlord as landlord under the Lease, and no other property or assets of any Subsequent Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease; provided, however, that Tenant may exercise any other right or remedy provided thereby or by law in the event of any failure by Subsequent Landlord to perform any such material obligation.

**5.12. Agreement Negotiated Based upon Specific Circumstances; Form of Agreement Not Intended to Constitute Precedent.** Tenant hereby acknowledges and agrees that this Agreement was negotiated by Secured Party based upon specific circumstances concerning the Superior Agreement. As such, this Agreement is not and shall not be deemed by the parties as a precedent form of Subordination, Non-Disturbance and Attornment Agreement with respect to any other transaction, present or future, involving Secured Party, any of Secured Party's affiliates and/or Secured Party's counsel.

**Section 6. Secured Party's Right to Cure.**

7

**6.1.  Notice to Secured Party.**  Notwithstanding anything to the contrary in the Lease or this Agreement, before exercising any Termination Right or Offset Right, Tenant shall provide Secured Party with notice of the breach or default by Landlord giving rise to same (the "Default Notice") simultaneously with the transmission of such notices to the Landlord and, thereafter, the opportunity to cure such breach or default as provided for below.

**6.2.  Secured Party's Cure Period.**  After Secured Party receives a Default Notice, Secured Party shall have a period of thirty days beyond the time available to Landlord under the Lease in which to cure the breach or default by Landlord, but not less than thirty days after receipt of the Default Notice.  Secured Party shall have no obligation to cure (and shall have no liability or obligation for not curing) any breach or default by Landlord, except to the extent that Secured Party agrees or undertakes otherwise in writing.

**6.3.  Extended Cure Period.**  In addition, as to any breach or default by Landlord the cure of which requires possession and control of Landlord's Premises, provided only that Secured Party undertakes to Tenant by written notice to Tenant within thirty days after receipt of the Default Notice to exercise reasonable efforts to cure or cause to be cured such breach or default within the period permitted by this paragraph, Secured Party's cure period shall continue for such additional time (the "*Extended Cure Period*") as Secured Party may reasonably require to either (a) obtain possession and control of Landlord's Premises and thereafter cure the breach or default with reasonable diligence and continuity or (b) obtain the appointment of a receiver and give such receiver a reasonable period of time in which to cure the default, provided, however, that the Extended Cure Period shall not exceed 120 days following the Secured Party's receipt of the Default Notice as aforesaid.

**[signature page follows]**

8

The parties hereto have caused this Agreement to be executed as of the day and year first above written.

**SECURED PARTY:**

**GOLDMAN SACHS BANK USA**

In the Presence of:

_____          By:_____

_____          Name:_____

                                                      Title:

_____

## ACKNOWLEDGMENT

STATE OF _____          )

_____)ss.:

COUNTY OF _____          )

On the ____ day of _____ in the year 2014, before me, the undersigned, a Notary
Public in and for said state, personally appeared _____ personally known to
me or proved to me on the basis or satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his
capacity, and that by his signature on the instrument, the person, or the entity upon behalf of
which the person acted, executed the instrument, and that such individual made such appearance
before the undersigned in the County of New York, State of New York.

_____

NOTARY PUBLIC

9

TENANT:

In the Presence of:

**BED BATH & BEYOND INC.**, a New
York corporation

By:_____

               Warren Eisenberg
               Co-Chairman

## ACKNOWLEDGMENT

STATE OF NEW JERSEY       )
                             ) ss.:
COUNTY OF UNION         )

On the _____ day of December in the year 2014, before me, the undersigned, a Notary Public in and for said state, personally appeared Warren Eisenberg, personally known to me or proved to me on the basis or satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his
capacity, and that by his signature on the instrument, the person, or the entity upon behalf of
which the person acted, executed the instrument, and that such individual made such appearance
before the undersigned in the County of Union, State of New Jersey.

_____

NOTARY PUBLIC

10

The undersigned accepts and agrees to
the provisions of <u>Section 2.1</u> hereof:

LANDLORD:

SALMAR PROPERTIES, LLC,
a New York limited liability company


By: _____
     Name:
     Title:


## ACKNOWLEDGMENT

STATE OF _____)
_____)ss.:
COUNTY OF _____)

    On the ____ day of _____ in the year 2014, before me, the undersigned, a Notary
Public in and for said state, personally appeared _____ personally known to
me or proved to me on the basis or satisfactory evidence to be the person whose name is
subscribed to the within instrument and acknowledged to me that he executed the same in his
capacity, and that by his signature on the instrument, the person, or the entity upon behalf of
which the person acted, executed the instrument, and that such individual made such appearance
before the undersigned in the County of _____, State of _____.


_____
NOTARY PUBLIC

WHP 556407978v2

Exhibit A (to form of SNDA)

Description of Premises

Exhibit A-1 (to form of SNDA)

Description of Real Property

Parcel I

850 3rd Avenue, Brooklyn, New York

BLOCK 671 LOT 1

ALL THAT TRACT, PIECE OR PARCEL OF LAND, SITUATE IN THE BOROUGH OF BROOKLYN, KINGS COUNTY, NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHERE THE EASTERLY LINE OF SECOND AVENUE INTERSECTS THE PROLONGATION OF THE NORTHERLY LINE OF THIRTY-FIRST STREET;

RUNNING THENCE NORTH 38° 23' 03" EAST, 200.35 FEET TO ITS INTERSECTION WITH THE PROLONGATION OF THE SOUTHERLY LINE OF SAID THIRTIETH STREET; SAID POINT ALSO BEING THE NORTHERLY FACE OF THE SO-CALLED FEDERAL BUILDING NUMBER 2 AT STREET LEVEL;

THENCE SOUTH 51° 36' 57" EAST, ALONG THE PROLONGATION OF THE SOUTHERLY LINE OF SAID THIRTIETH STREET AND THE SOUTHERLY LINE OF SAID THIRTIETH STREET FOR A DISTANCE OF 700.00 FEET TO ITS INTERSECTION WITH WESTERLY LINE OF SAID THIRD AVENUE;

THENCE SOUTH 38° 23' 03" WEST, ALONG THE WESTERLY LINE OF SAID THIRD AVENUE 200.35 FEET TO ITS INTERSECTION WITH THE NORTHERLY LINE OF SAID THIRTY-FIRST STREET;

THENCE NORTH 51° 36' 57" WEST, ALONG THE NORTHERLY LINE OF SAID THIRTY-FIRST STREET AND CONTINUING ALONG THE NORTHERLY PROLONGATION OF SAID THIRTY-FIRST STREET FOR A DISTANCE OF 700.00 FEET TO THE POINT OF BEGINNING.


PARCEL II

870 3rd Avenue, Brooklyn, New York

BLOCK 675 LOT 10

ALL THAT TRACT, PIECE OR PARCEL OF LAND, SITUATE IN THE BOROUGH OF BROOKLYN, KINGS COUNTY, NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHERE THE EASTERLY LINE OF SECOND AVENUE INTERSECTS THE PROLONGATION OF THE NORTHERLY LINE OF THIRTY-FIRST STREET;RUNNING THENCE SOUTH 51° 36' 57" EAST, ALONG THE

PROLONGATION OF THE NORTHERLY LINE OF SAID THIRTYFIRST STREET 675.00 FEET TO THE WESTERLY TERMINUS OF SAID THIRTY-FIRST STREET; THENCE SOUTH 28° 55' 19" WEST, ALONG THE WESTERLY TERMINUS OF SAID THIRTY-FIRST STREET 60.82 FEET TO ITS INTERSECTION WITH THE SOUTHERLY LINE OF SAID THIRTY-FIRST STREET; THENCE SOUTH 51° 36' 57" EAST, ALONG THE SOUTHERLY LINE OF SAID THIRTY-FIRST STREET 15.00 FEET TO ITS INTERSECTION WITH THE FIRST MENTIONED WESTERLY LINE OF SAID THIRD AVENUE;

THENCE SOUTH 38° 23' 03" WEST, ALONG THE WESTERLY LINE OF SAID THIRD AVENUE 200.35 FEET TO ITS INTERSECTION WITH THE NORTHERLY LINE OF SAID THIRTY-SECOND STREET;

THENCE NORTH 51° 36' 57" WEST, ALONG THE NORTHERLY LINE OF SAID THIRTY-SECOND STREET 20.00 FEET TO THE WESTERLY TERMINUS OF SAID THIRTY-SECOND STREET;

THENCE SOUTH 38° 23' 03" WEST ALONG THE WESTERLY TERMINUS OF SAID THIRTY-SECOND STREET 30.00 FEET TO ITS INTERSECTION WITH THE CENTERLINE OF SAID THIRTY-SECOND STREET;

THENCE NORTH 51° 36' 57" WEST, ALONG THE CENTERLINE OF SAID THIRTY-SECOND STREET 367.00 FEET TO A POINT, THE LAST MENTIONED COURSE ALSO BEING THE DIVISION LINE BETWEEN THE LANDS OF 1-10 INDUSTRY ASSOCIATES, LLC ON THE SOUTH AND THE UNITED STATES OF AMERICA ON THE NORTH; THENCE THROUGH THE LANDS OF THE UNITED STATES OF AMERICA THE FOLLOWING TWO COURSES: (1) NORTH 38° 23' 03" EAST, 138.00 FEET TO A POINT; AND (2) NORTH 51° 36' 57" WEST, 313.00 FEET TO ITS INTERSECTION WITH THE EASTERLY LINE OF SAID SECOND AVENUE; THENCE NORTH 38° 23' 03" EAST ALONG THE EASTERLY LINE OF SAID SECOND AVENUE, 152.35 FEET TO THE POINT OF BEGINNING.

Exhibit L
Form of Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 201__, by and between _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ ("**Landlord**"); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("**Tenant**"); and _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ ("**Subtenant**").

R E C I T A L S:

A.     Landlord and Tenant have entered into a certain Lease Agreement (the "*Lease*") dated as of _____ __, 201__, a short form of which has been recorded in _____, which demises certain premises (the "*Premises*") located in the _____**[City], [State]**, which Real Property is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.     Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.     Pursuant to a Sublease dated as of _____ (the "*Sublease*"), Tenant has subleased **[a portion of]** the Premises to Subtenant (the "*Subleased Premises*").

D.     The parties hereto desire to effectuate the provisions of Section 16.2 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Landlord warrants and represents as follows:

(a)     that it is the fee owner of the Premises,

(b)     that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(c)     that the term of the Lease expires on _____, but is subject to [three] renewal periods of [five] years each and

(d)      that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.      Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.      Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease.

4.      Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.      In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease) and Subtenant shall attorn to Landlord as its direct landlord under the terms and conditions of such direct lease.

6.      Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

2

7.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "*Notice*") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and

_____, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

9.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**<u>LANDLORD</u>:**

_____

By:_____
Name:_____
Title:_____

**<u>TENANT</u>:**

BED BATH & BEYOND INC., a New York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

**<u>SUBTENANT</u>:**

_____

By:_____
Name:_____
Title:_____

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

_____

STATE OF NEW JERSEY          )
                             ) : ss.
COUNTY OF UNION              )

     On this ___ day of _____, 201__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                      _____

                                        Notary Public

My Commission Expires:


_____


                _____

5

<u>Exhibit M</u>

<u>Form of Delivery Date Notice</u>

[Letterhead of Landlord]

_____, 201\_\_

[via Federal Express or other
recognized overnight delivery
service per Article 22 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Lease Agreement dated as of _____, 201\_\_ (the "*Lease*"), between [name of
         Landlord], as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as tenant
         ("*Tenant*"), with respect to certain retail premises (the "*Premises*") located in the
         _____,_____[City], [State]_____.

Gentlemen:

        In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby informs Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 201\_\_.  This notice shall constitute the Delivery Date Notice referred to
in Subsection 2.3.2 of the Lease.

                                        [NAME OF LANDLORD]

                                        By:_____
                                             _____, (Vice) President

cc:     [_____, Esq.]
         [Allan N. Rauch, Esq.]

<u>Exhibit N</u>

<u>Form of Delivery Date Certification</u>

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 22 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Lease Agreement dated as of _____, 201__ (the "***Lease***"), between [name of Landlord], as landlord ("***Landlord***"), and Bed Bath & Beyond Inc., as tenant ("***Tenant***"), with respect to certain retail premises (the "***Premises***") located in the _____, _____ [City], [State] _____

Gentlemen:

      In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term is defined in the Lease) will be deemed to be _____, 201__ . This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

[NAME OF LANDLORD]

By:_____
      _____, (Vice) President

cc:    [_____, Esq.]
     [Allan N. Rauch, Esq.]

## Exhibit O

## Existing Exclusives

EXHIBIT   O

**Section 1.11** <u>Consumer Electronics</u>.   Desktop and laptop computers and netbooks, tablets and electronic book readers, smartphones and other mobile telephones, game consoles, music players and systems and stereo and similar music equipment, monitors, televisions and other computer and video display equipment whether stationary or mobile, cameras and photography equipment, and accessories, software and content associated with all of the foregoing, as all of the items referred to in this definition may change over time as

technology advances, with computer equipment and related products meaning, without limitation, computers and computer-related equipment such as servers, printers, ink, toner, cartridges, ink cartridges, printer ink, printer cartridge, toner cartridge and their respective refills.

**Section 3.4**   Landlord covenants and agrees that it shall not hereafter either directly or indirectly enter into a lease for any space in the Retail Area of the Building, or consent to the subletting or permit the occupancy in the Building of or for the operation of any business that is devoted primarily to the display, sales, leasing rental or subscription of office, home office and/or business machines and Consumer Electronics, and related equipment, accessories and supplies, such as those businesses currently being operated by Best Buy, Staples, Radio Shack, Fry's, H.H. Gregg, Tiger Direct, CompUSA, Systemax, the Apple Store, Dell, Microsoft, P.C. Richard's, J&R, B&H Photo Video and such other business as may be presently, or hereafter, operating such a business.

Exhibit P

Prohibited Uses

As used in this Lease, the term ***Prohibited Uses**" shall mean any of the following uses:

A.    As to the Real Property, any of the following uses:

(1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for the dumping or disposing of garbage or refuse;

(2)    Any distilling, refining, smelting, agricultural, or mining operation;

(3)    Any "second hand" store, "surplus" store;

(4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers servicing the Building);

(6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)    Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Building shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)    Any bowling alley or skating rink;

(10)    Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use;

(11)    Any living quarters, sleeping apartments, or lodging rooms;

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)   Any mortuary or funeral home;

(14)   Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class real properties in the State in which the Building is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class Real Properties in the State in which the Building is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit P];

(15)   Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)   Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, provided, however, that Tenant shall be permitted to sell, on an incidental basis, alcoholic beverages for off-premises consumption, subject to applicable Laws;

(17)   Any catering or banquet hall;

(18)   Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

(19)   Unless (x) the subject premises is located entirely above the second floor of the Building, and (y) the tenant thereof (and its employees, customers, contractors and agents) are expressly prohibited from parking on the Parking Lot Parcel and the Additional Parking Area, as more particularly described pursuant to Section 9.2 of this Lease (such conditions (x) and (y) being collectively referred to herein as the *"Special Restrictions"*), any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Building;

2

(20)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics or medical offices;

(27)    Any supermarket, except a gourmet style supermarket in no more than thirty thousand (30,000) square feet of Floor Area;

(28)    hotel/motel;

(29)    subject to the Special Restrictions as to such use, a daycare center;

(30)    subject to the Special Restrictions as to such use, a children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(31)    subject to the Special Restrictions as to such use, a karate center;

(32)    movie theater;

(33)    subject to the Special Restrictions as to such use, a restaurant serving meals for on- or off-premises consumption (it being acknowledged and agreed that any such restaurant shall be of the type located in first-class shopping centers in the New York Metropolitan Area);

(34)    beauty parlor or nail salon;

(35)    subject to the Special Restrictions as to such use, health spa, exercise facility or similar type business. ; or

3

(36)    a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction.

B.    As to <u>Related Land</u>, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22, and 25 above.

**<u>EXHIBIT Q</u>**

**<u>CERTIFIED LOD</u>**



2ND FLOOR RETAIL

Exhibit Q - CERTIFIED LOD

12·29·14

## EXHIBIT R

## EASEMENT AGREEMENT

This Easement Agreement was prepared by
and after recording should be returned to:

Jerry Siegelman
Ackerman, Levine, Cullen, Brickman & Limmer, LLP
1010 Northern Boulevard, Suite 400
Great Neck, New York 11021

### EASEMENT AGREEMENT

Between

SALMAR PROPERTIES, LLC

And

SALMAR 870, LLC

Affecting:

(i) Lot 1, Block 671, Kings County, City and State of New York
(ii) Lot 10, Block 675, Kings County, City and State of New York

2 [no page 1]

<u>EASEMENT AGREEMENT</u>

THIS EASEMENT AGREEMENT (this "Agreement") made this ___ day of _____, 2014 by and between SALMAR PROPERTIES, LLC ("Grantee"), a New York limited liability company, having an address at 850 Third Avenue, Brooklyn, New York 11232, and SALMAR 870, LLC ("Grantor"), a New York limited liability company, having an address at 850 Third Avenue, Brooklyn, New York 11232.

W I T N E S S E T H:

WHEREAS:

A.      Grantee is the owner of the property known as 850 Third Avenue, Brooklyn, New York, designated as Lot 1, Block 671, Kings County, City and State of New York, and more fully described in Exhibit A hereto annexed ("850 Site");

B.      Grantor is the owner of the property known as 870 Third Avenue, Brooklyn, New York, designated as Lot 10, Block 675, Kings County, City and State of New York, and more fully described in Exhibit B hereto annexed ("870 Site"); and

C.      Grantor has agreed to grant to Grantee an exclusive easement for parking and access over and across the 870 Site for the benefit of Grantee, the tenants and occupants of the 850 Site and their respective employees, customers and invitees, on the terms of this Agreement;

NOW, THEREFORE, in consideration of the covenants, agreements and conditions herein contained, the parties hereto do hereby agree as follows:

1.      As used herein, the term "Common Areas" shall mean all parking areas, drives, curb cuts, landscaped areas, entrances, exits, lighting facilities and sidewalks of the 870 Site intended by Grantee and Grantor for the common use by Grantee and the tenants and occupants of the 850 Site and their respective employees, customers and invitees. Grantee shall have the right to revise and reconfigure the Common Areas from time to time so long as (a) the Common Areas, as so revised and reconfigured, contain not less than 350 parking spaces allocated for use by customers of the retail tenants of the 850 Site, and (b) pedestrian and vehicular access to and from the 850 Site over and across the Common Areas is not negatively impacted in any material respect.

2.      Grantor hereby grants to Grantee and to the tenants and occupants of the 850 Site, and their respective employees, customers and invitees, a perpetual exclusive right and easement for the parking of motor vehicles and for pedestrian and vehicular access to and from the 850 Site over and across the Common Areas as the same may exist

from time to time. The rights granted to Grantee herein include the exclusive right to design, construct, repair, maintain, oversee and occupy the Common Areas and such other rights as may be necessary for Grantee's commercially reasonable exercise of the rights granted hereunder. Except as otherwise provided herein, the easements granted herein shall endure perpetually.

3.     Grantee agrees to keep and maintain the Common Areas in good condition and repair, including, without limitation: throughout the term maintaining, repairing and repaving the Common Areas; keeping the Common Areas properly cleaned, drained, clear of snow, ice, water, rubbish and other obstructions, and in a safe, neat, orderly and sanitary condition; providing appropriate security; keeping the Common Areas suitably lighted; maintaining signs, markers, painted lines; maintaining entrances and exits; and maintaining any plantings and landscaped areas; and replacing all of the foregoing portions of the Common Areas as and when needed to keep them in good order and repair.

4.     Throughout the Term, Grantee shall keep Grantor insured as a named party against all statutory and common law liabilities for damages on account of damage to property or injuries and loss of life sustained by any person or persons within the Common Areas, under an insurance policy or policies with insurances affording coverage and having coverage limits that are commercially reasonable from time to time during the Term. Any such policies shall bear endorsements to the effect that Grantor shall be notified by the insurer(s) not less than thirty (30) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, shall be promptly delivered to Grantee.

5.     Grantee shall and hereby does indemnify Grantor from and shall defend and hold Grantor harmless against any and all claims, including, without limitation, reasonable legal fees and expenses, for personal injury, death and property damage occurring on the Common Areas during the Term (except and only to the extent of those which shall result, in whole or in part, directly or indirectly, from any negligent or tortuous act or omission of Grantor or its agents, employees, contractors, assignees, sublessees or licensees).

6.     Grantee shall pay before delinquency all real estate taxes and assessments imposed on the 870 Site ("RE Taxes") and shall pay to Grantor as consideration for the rights granted hereunder an additional amount equal to five (5%) percent of each payment of RE Taxes ("Easement Consideration") on or before the date on which any RE Taxes are due and payable. Grantee and Grantor may change the amount and/or time for payment of Easement Consideration by written agreement between them. Grantor's sole remedy if Grantee fails to pay any installment of RE Taxes or Easement Consideration or any other amount due hereunder when due is an action for money damages to recover any such sums, with interest at eight (8%) percent per annum from the due date. In no event

shall this Easement be terminated by reason of any late or non-payment of RE Taxes or Easement Consideration or any other amount due hereunder.

7.    If Grantee shall breach or fail to perform any obligation imposed on it in this Agreement with respect to the Common Areas, and such breach or default shall continue for thirty (30) days after notice thereof by Grantor to Grantee (provided that emergency repairs which are Grantee's responsibility under this Agreement, and which are necessary in Grantor's reasonable judgment, may be made without any notice to Grantee, except that Grantor will make a reasonable effort to give such notice, including telephone notice, as may be reasonable under the circumstances), then Grantor may (but shall not be obligated to) do all necessary work and make all necessary payments in connection therewith, and Grantee shall, on demand, pay Grantor forthwith the amount so due to or paid by Grantor, together with interest thereon at the rate of eight (8%) percent per annum.

8.    If either party shall be prevented or delayed from punctually performing any obligation or satisfying any condition under this Agreement by any strike, lockout, labor dispute, inability to obtain labor or materials or reasonable substitutes therefor, act of God, governmental restriction, regulation or control, enemy or hostile governmental action, civil commotion, insurrection, sabotage, fire or other casualty, or any other condition beyond the reasonable control of such party, then the time to perform such obligation or satisfy such condition shall be extended by the delay caused by such event, except for the payment of amounts due Grantor or Grantee hereunder. If either party shall, as a result of any such event, be unable to exercise any right or option within any time limit provided therefor in this Agreement, such time limit shall be deemed extended for a period equal to the duration of the delay caused by such event.

9.    Notices required under this Agreement shall be in writing and deemed to be properly served if personally delivered with a receipt obtained or sent by certified or registered mail or by overnight delivery service to Grantor or to Grantee at its address as set forth on the first page of this Agreement or to any subsequent address which Grantor or Grantee shall designate for such purpose. Any such notice shall be deemed given on the second day following the date on which such notice is deposited in a post office of the United States Postal Service, or date received or delivered if personally delivered.

10.    The failure of either party to seek redress for violation of, or to insist upon the strict performance of any term, covenant or condition contained in this Agreement shall not prevent a similar subsequent act from constituting a default under this Agreement.

11.    This Agreement may not be terminated by the parties without the written consent of each retail tenant under a then effective written lease for any portion of the first or second floors of the building situated on the 850 Site, which written lease has not expired or been terminated or surrendered.

12.    The conditions, covenants and agreements contained in this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  All covenants and agreements of this Agreement shall run with the land.

13.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

**SALMAR PROPERTIES, LLC**, a New York limited liability company
By:  Salmar Realty, LLC
    Its Manager


By: _____


**SALMAR 870, LLC**, a New York limited liability company


By: _____

STATE OF NEW YORK )

: ss.:

COUNTY OF _____ )

      On the _____ day of _____ in the year 2014 before me, the undersigned, a Notary Public in and for said state personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

 

_____

Notary Public
Commission Expires: _____

STATE OF NEW YORK )

: ss.:

COUNTY OF _____ )

      On the _____ day of _____ in the year 2014 before me, the undersigned, a Notary Public in and for said state personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

 

_____

Notary Public
Commission Expires: _____

## MORTGAGEE CONSENT AND JOINDER

Reference is made to the above Easement Agreement (the "Easement") to which this document is attached between Salmar Properties, LLC and Salmar 870, LLC, relating to certain property located in Brooklyn, New York (the "Property").

_____, having an office at _____ being the mortgagee under a Mortgage, which encumbers the Property, dated _____ and recorded on _____ in the official records of Kings County, New York in Book ___, page ____ (hereinafter called the "Mortgage") HEREBY consents to the Easement and subordinates the lien of the Mortgage to the Easement so that any foreclosure or other similar action taken to enforce the Mortgage against the Property shall in no event cause a termination of the Easement which shall continue to apply to the Property notwithstanding such foreclosure or similar action.

EXECUTED under Seal as of the _____ day of _____ 2014.

_____

By:_____

Title:_____

8

## EXHIBIT A (to Easement Agreement)

### 850 Site

**<u>EXHIBIT B (to Easement Agreement)</u>**


**870 Site**

## EXHIBIT S

## TENANT'S PERMITS

12.29.14

## Exhibit S – Tenant's Permits

1. Building Permits (Cafe, Demonstration Area, Kiosks)
2. Business License
3. On-Premise Bar License
4. Appearance Enhancement License (NYS)

## EXHIBIT T

## LANDLORD'S ENVIRONMENTAL REPORTS

All Appropriate Inquiry (AAI)
Phase I Environmental Site Assessment (ESA)
ASTM E1527-05
Dated:  March 14, 2011
Prepared for Salmar Properties, LLC
Prepared by Merritt Environmental Consulting Corp.

Focused Subsurface Site Investigation
Dated:  March 29, 2011
Prepared for Jacobi, Sieghardt, Bousanti, Piazza & Fitzpatrick
Prepared by Merritt Environmental Consulting Corp.

# **EXHIBIT U**

## **LEASE AGENCY AGREEMENT**

# EXHIBIT U

EXECUTION COPY

---

## AGENCY LEASE AGREEMENT

Dated as of September 1, 2011

by and between

## NEW YORK CITY INDUSTRIAL DEVELOPMENT AGENCY

and

## SALMAR PROPERTIES, LLC,

a limited liability company organized and existing under
the laws of the State of New York, 36th Fl.
having its principal office at 120 Broadway
New York, New York 10271

Affecting the Land generally known by the street address
850 Third Avenue, Brooklyn, New York 11232
Section 3, Block 671 and Lot 1
in the County of Kings,
City and State of New York,
as more particularly described in
Exhibit A to this Agency Lease Agreement
on the Official Tax Map of Kings County

**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
Attention: Patricia A. Mollica, Esq.
File No.: 90570.295

---

NY:1348523.11

# TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

ARTICLE I       DEFINITIONS AND CONSTRUCTION ................................................5

    Section 1.1    Definitions .................................................................5
    Section 1.2    Construction ............................................................18

ARTICLE II     REPRESENTATIONS AND WARRANTIES..........................................19

    Section 2.1    Representations and Warranties by Agency......................................19
    Section 2.2    Representations and Warranties by the Lessee ..................................19

ARTICLE III    LEASEHOLD INTEREST CONVEYED TO THE AGENCY; THE PROJECT;
                 MAINTENANCE; REMEDIATION REMOVAL OF PROPERTY AND TITLE
                 INSURANCE..............................................................22

    Section 3.1    The Company Lease...................................................22
    Section 3.2    Appointment as Agent.................................................22
    Section 3.3    The Project Work, Timing and Manner of Project Completion. ..................23
    Section 3.4    Maintenance. ..........................................................24
    Section 3.5    Alterations and Improvements. ........................................25
    Section 3.6    Removal of Property of the Facility.....................................25
    Section 3.7    Implementation of Agency's Interest in New Property........................26
    Section 3.8    Leasehold Title Insurance .............................................26
    Section 3.9    Environmental Remediation............................................27
    Section 3.10   SHPO Requirements...................................................27
    Section 3.11   NYCDOT Requirements. ..............................................28

ARTICLE IV    LEASE OF FACILITY AND RENTAL PROVISIONS ................................28

    Section 4.1    Lease of the Facility ...................................................28
    Section 4.2    Duration of Term.......................................................28
    Section 4.3    Rental Provisions......................................................29
    Section 4.4    Rental Payments Payable Absolutely Net ................................29
    Section 4.5    Nature of Lessee's Obligation Unconditional ............................29
    Section 4.6    Reserved...............................................................29
    Section 4.7    Advances by Agency...................................................29
    Section 4.8    No Warranty of Condition or Suitability..................................30

ARTICLE V     AGENCY FINANCIAL ASSISTANCE (PAYMENTS IN LIEU OF TAXES, SALES
                 TAX EXEMPTION AND MORTGAGE RECORDING TAX DEFERRAL);
                 RECAPTURE OF PUBLIC BENEFITS ....................................30

    Section 5.1    Payments in Lieu of Real Estate Taxes. ..................................30
    Section 5.2    Sales Tax Exemption...................................................35
    Section 5.3    Mortgage Recording Tax Deferral. ......................................37
    Section 5.4    Recapture of Public Benefits............................................38

ARTICLE VI    DAMAGE, DESTRUCTION AND CONDEMNATION ............................40

    Section 6.1    Damage, Destruction and Condemnation..................................40

NY:1348523.11

| | | |
|---|---|---|
| Section 6.2 | Loss Proceeds. | 40 |
| Section 6.3 | Election to Rebuild or Terminate. | 41 |
| Section 6.4 | Effect of Election to Build | 41 |

**ARTICLE VII    COVENANT OF THE AGENCY** ... 42

| | | |
|---|---|---|
| Section 7.1 | Quiet Enjoyment | 42 |

**ARTICLE VIII    COVENANTS OF THE LESSEE** ... 43

| | | |
|---|---|---|
| Section 8.1 | Insurance. | 43 |
| Section 8.2 | Indemnity. | 48 |
| Section 8.3 | Compensation and Expenses of the Agency and Agency Administrative and Project Fees. | 50 |
| Section 8.4 | Current Facility Personalty Description | 50 |
| Section 8.5 | Signage at Facility Site | 50 |
| Section 8.6 | Environmental Matters. | 51 |
| Section 8.7 | Employment Matters. | 51 |
| Section 8.8 | Non-Discrimination. | 52 |
| Section 8.9 | Assignment, Transfer or Sublease. | 52 |
| Section 8.10 | Retention of Title to or of Interest in Facility; Grant of Easements; Release of Portions of Facility. | 55 |
| Section 8.11 | Discharge of Liens. | 56 |
| Section 8.12 | Recording and Filing | 56 |
| Section 8.13 | No Further Encumbrances Permitted | 56 |
| Section 8.14 | Automatically Deliverable Documents. | 56 |
| Section 8.15 | Requested Documents | 57 |
| Section 8.16 | Periodic Reporting Information for the Agency. | 58 |
| Section 8.17 | Taxes, Assessments and Charges | 60 |
| Section 8.18 | Compliance with Legal Requirements. | 60 |
| Section 8.19 | Operation as Approved Facility and as a "Project"; Use and Restrictions on Use of the Facility. | 61 |
| Section 8.20 | Restrictions on Dissolution and Merger. | 61 |
| Section 8.21 | Further Assurances | 63 |

**ARTICLE IX    REMEDIES AND EVENTS OF DEFAULT** ... 63

| | | |
|---|---|---|
| Section 9.1 | Events of Default. | 63 |
| Section 9.2 | Remedies on Default | 65 |
| Section 9.3 | Remedies Cumulative. | 66 |
| Section 9.4 | No Additional Waiver Implied by One Waiver | 66 |
| Section 9.5 | Effect on Discontinuance of Proceedings. | 66 |
| Section 9.6 | Agreement to Pay Fees and Expenses of Attorneys and Other Consultants | 66 |
| Section 9.7 | Certain Continuing Representations | 67 |
| Section 9.8 | Late Delivery Fees. | 67 |

**ARTICLE X    TERMINATION** ... 68

| | | |
|---|---|---|
| Section 10.1 | Lessee's Option to Terminate Company Lease and this Agreement. | 68 |
| Section 10.2 | Termination of Company Lease and this Agreement on Agency Notice. | 68 |
| Section 10.3 | Actions Upon Termination. | 68 |
| Section 10.4 | Survival of Lessee Obligations. | 69 |

NY:1348523.11

ARTICLE XI        MISCELLANEOUS ............................................................................69
    Section 11.1      Unavoidable Delay ..............................................................69
    Section 11.2      Priority.................................................................................70
    Section 11.3      Amendments.........................................................................70
    Section 11.4      Service of Process ...............................................................70
    Section 11.5      Notices.................................................................................70
    Section 11.6      Consent to Jurisdiction .......................................................72
    Section 11.7      Prior Agreements Superseded .............................................72
    Section 11.8      Severability..........................................................................72
    Section 11.9      Effective Date; Counterparts ...............................................72
    Section 11.10     Binding Effect .....................................................................72
    Section 11.11     Third Party Beneficiaries.....................................................72
    Section 11.12     Law Governing.....................................................................72
    Section 11.13     Waiver of Trial by Jury .......................................................72
    Section 11.14     Recourse Under This Agreement ..........................................73

## EXHIBITS

Exhibit A - Description of the Land
Exhibit B - Description of the Facility Personalty
Exhibit C - Authorized Representative
Exhibit D - Principals of Lessee
Exhibit E - Project Cost Budget
Exhibit F - Form of Required Disclosure Statement
Exhibit G-1 - Form of Substantial Completion Certificate
Exhibit G-2 - Form of Project Completion Certificate
Exhibit H - Form of Sales Tax Letter
Exhibit I - Project Finance Plan
Exhibit J - Deed
Exhibit K – NYCEDC Contract
Exhibit L – NYCDOT Memorandum
Exhibit M -1– Subtenant Survey
Exhibit M -2– Certificate Required by Section 5.1(d)
Exhibit N –Annual Employment and Benefits Report
Exhibit O – Rider to Sublease Agreement
Exhibit P – Certificate Required by Section 8.9(b)(ii)
Exhibit Q – Certificate Required by Section 8.16(f)
Exhibit R – Location and Information Contact Form

NY:1348523.11

## AGENCY LEASE AGREEMENT

This **AGENCY LEASE AGREEMENT**, made and entered into as of September 1, 2011 (this "Agreement"), by and between **NEW YORK CITY INDUSTRIAL DEVELOPMENT AGENCY**, a corporate governmental agency constituting a body corporate and politic and a public benefit corporation of the State of New York, duly organized and existing under the laws of the State of New York, having its principal office at 110 William Street, New York, New York 10038, party of the first part, and the Lessee, party of the second part (capitalized terms used but not defined herein shall have the respective meanings assigned to such terms in Section 1.1 of this Agreement);

### WITNESSETH:

**WHEREAS**, the Enabling Act authorizes and provides for the creation of industrial development agencies in the several counties, cities, villages and towns in the State and empowers such agencies, among other things, to acquire, construct, reconstruct, lease, improve, maintain, equip and furnish land, any building or other improvement, and all real and personal properties, including machinery and equipment deemed necessary in connection therewith, whether or not now in existence or under construction, which shall be suitable for manufacturing, warehousing, research, commercial or industrial purposes, to the end that such agencies may be able to promote, develop, encourage, assist and advance the job opportunities, health, general prosperity and economic welfare of the people of the State and to improve their prosperity and standard of living; and

**WHEREAS**, pursuant to and in accordance with the provisions of the Enabling Act, the Agency was established by the Agency Act for the benefit of the City and the inhabitants thereof; and

**WHEREAS**, to accomplish the purposes of the Act, the Agency has entered into negotiations with the Lessee for a "project" within the meaning of the Act within the territorial boundaries of the City and located on the Land described in Exhibit A — "Description of the Land"; and

**WHEREAS**, the Project will further the purposes of the Act and promote job opportunities for the benefit of the City and the inhabitants thereof; and

**WHEREAS**, to facilitate the Project, the Agency, the Lessee has entered into negotiations to enter into a Straight-Lease Transaction pursuant to which (i) the Lessee has leased the Facility Realty to the Agency pursuant to the Company Lease, (ii) the Agency will sublease the Facility Realty, and lease the Facility Personalty, to the Lessee pursuant to this Agreement, and (iii) the Lessee will sub-sublease the Facility Realty to Permitted Sublessees; and

**WHEREAS**, in furtherance of the Straight-Lease Transaction, the Agency adopted its Inducement Resolution and its Authorizing Resolution inducing and authorizing the undertaking of the Project and the Project Work, the lease of the Facility Realty by the Lessee to the Agency, the sublease of the Facility Realty and the lease of the Facility Personalty by the Agency to the Lessee, and the sub-sublease of the Facility Realty to Permitted Sublessees; and

**WHEREAS**, the provision by the Agency of Financial Assistance to the Lessee through a Straight-Lease Transaction has been determined to be necessary to induce the Lessee to acquire, construct, renovate, furnish and equip the Facility and provide competitive rents to enable tenancy by commercial, industrial and manufacturing tenants upon its completion; and if the Agency does not provide such Financial Assistance, the Lessee could not feasibly proceed with the Project; and

NY:1348523.11

**WHEREAS**, the cost of the Project is being financed in accordance with the Project Finance Plan;

**NOW, THEREFORE**, in consideration of the premises and the respective representations and agreements hereinafter contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION

**Section 1.1**      **Definitions**.  In addition to the definitions set forth in Sections 5.1(a), 5.3(a), 5.4 and 8.1(a), the following terms shall have the respective meanings in this Agreement:

**Act** shall mean, collectively, the Enabling Act and the Agency Act.

**Additional Improvements** shall mean any buildings, structures, foundations, related facilities, fixtures, and other improvements constructed, erected, placed and/or installed on, under and/or above the Land, when such improvements are not part of the Project Work, including but not limited to all replacements, improvements, additions, extensions and substitutions to the Existing Improvements and/or the Project Improvements.

**Additional Rent** shall have the meaning set forth in Section 4.3(b).

**Adjusted CRET** shall mean CRET as reduced by the Industrial and Commercial Abatement Program ("ICAP"), or any other applicable as-of-right benefit for which the Project may be eligible other than an as-of-right benefit whose application arises from the eligibility and acceptance of the Project Improvements under the as-of-right program in question.

**Adjusted ELT** shall mean ELT as reduced by ICAP or any other any applicable as-of-right benefit for which the Project may be eligible other than an as as-of-right benefit whose application arises from the eligibility and acceptance of the Project Improvements under the as-of-right program in question.

**Adjusted Initial CRET** shall mean Initial CRET as reduced by any applicable as-of-right benefit other than an as-of-right benefit whose application arises from the eligibility and acceptance of the Project Improvements under the as-of-right program in question.

**Adjustment Date(s)** means the July 1 after the fourth-year anniversary of the Completion Date and thereafter every fifth-year year anniversary of such July 1 within the PILOT Term excepting the last one.

An **Affiliate** of a Person shall mean a Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

**Agency** shall mean the New York City Industrial Development Agency, a corporate governmental agency constituting a body corporate and politic and a public benefit corporation of the State, duly organized and existing under the laws of the State, and any body, board, authority, agency or other governmental agency or instrumentality which shall hereafter succeed to the powers, duties, obligations and functions thereof.

**Agency Act** shall mean Chapter 1082 of the 1974 Laws of New York, as amended.

**Agreement** shall mean this Agency Lease Agreement, dated as of the date set forth in the first paragraph hereof, between the Agency and the Lessee, and shall include any and all amendments hereof and supplements hereto hereafter made in conformity herewith.

**Annual Administrative Fee** shall mean that annual administrative fee established from time to time by the Agency's Board of Directors as generally applicable to Entities receiving or that have received Financial Assistance (subject to such exceptions from such general applicability as may be established by the Agency's Board of Directors).

**Approved Facility** shall mean the Facility as occupied, used and operated by the Permitted Sublessees substantially for the Approved Project Operations, including such other activities as may be substantially related to or substantially in support of such operations, all to be effected in accordance with this Agreement.

**Approved Project Operations** shall mean, collectively, Industrial Use, Retail Use and Other Use of the Facility as and to the extent required by Section 8.19(d).

**Authorized Representative** shall mean, (i) in the case of the Agency, the Chairperson, Vice Chairperson, Treasurer, Assistant Treasurer, Secretary, Assistant Secretary, Executive Director, Deputy Executive Director, General Counsel or Vice President for Legal Affairs, or any other officer or employee of the Agency who is authorized to perform specific acts or to discharge specific duties, (ii) in the case of the Lessee, a person named in Exhibit C — "Authorized Representative", or any other officer or employee of the Lessee who is authorized to perform specific duties hereunder or under any other Project Document and of whom another Authorized Representative of the Lessee has given written notice to the Agency, (iii) in the case of any Guarantor which shall constitute an Entity (other than the Lessee), a person named in Exhibit C — "Authorized Representative", or any other officer or employee of such Guarantor who is authorized to perform specific duties hereunder or under any other Project Document and of whom another Authorized Representative of such Guarantor has given written notice to the Agency, and (iv) in the case of any individual Guarantor, such individual Guarantor; provided, however, that in each case for which a certification or other statement of fact or condition is required to be submitted by an Authorized Representative to any Person pursuant to the terms of this Agreement or any other Project Document, such certificate or statement shall be executed only by an Authorized Representative in a position to know or to obtain knowledge of the facts or conditions that are the subject of such certificate or statement.

**Authorizing Resolution** shall mean the resolution of the Agency adopted on June 14, 2011 providing for Financial Assistance and authorizing the Project Documents to which the Agency is a party.

**Average Equivalent Full Time Employee Number** shall mean the following:

(i)       With respect to the first Adjustment Date, the higher of (A) the average of the Equivalent Full Time Employee Numbers for the twelve months preceding the first Adjustment Date, or (B) the annual average of the Equivalent Full Time Employee Numbers for the four years preceding the first Adjustment Date; or

(ii)       With respect to Adjustment Dates subsequent to the first Adjustment Date, the higher of (A) the average of the Equivalent Full Time Employee Number for twelve months preceding the Adjustment Date, or (B) the annual average of the Equivalent Full Time Employee Numbers for the five years preceding the Adjustment Date.

**Base Rent** shall mean the rental payment described in Section 4.3(a).

6

**Benefits** shall have the meaning set forth in Section 5.4(a).

**Business Day** shall mean any day that shall not be:

    (i)    a Saturday, Sunday or legal holiday;

    (ii)    a day on which banking institutions in the City are authorized by law or executive order to close; or

    (iii)    a day on which the New York Stock Exchange is closed.

**Cessation Date** shall mean the date on which the Facility Realty is no longer exempt from Real Estate Taxes by operation of law including, but not limited to by means of the expiration (on the Expiration Date) or sooner termination of the Company Lease and the demise conveyed thereunder; and/or the expiration (on the Expiration Date) or sooner termination of this Agreement and the demise conveyed hereunder.

**City** shall mean The City of New York, New York.

**City Tax Fiscal Year** shall mean each annual period commencing on July 1, and ending on the immediately succeeding June 30, or such other annual period as shall be established by lawful authority as the City's "tax fiscal year" or its equivalent.

**Claims** shall have the meaning set forth in Section 8.2(a).

**Commencement Date** shall mean September 22, 2011, on which date this Agreement was executed and delivered.

**Company Lease** shall mean the Company Lease Agreement, dated as of the date hereof, between the Lessee, as landlord, and the Agency, as tenant, as the same may be amended and supplemented in accordance with its terms and as permitted by the terms thereof.

**Completed Improvements Rentable Square Footage** shall mean approximately 1,100,000 rentable square feet, the rentable square footage of the Improvements upon completion of the Project Work.

**Completion Date** shall mean September 30, 2016.

**Control** or **Controls**, including the related terms "controlled by" and "under common control with", shall mean the power to direct the management and policies of a Person (x) through the ownership, directly or indirectly, of not less than a majority of its voting securities, (y) through the right to designate or elect not less than a majority of the members of its board of directors or trustees or other Governing Body, or (z) by contract or otherwise.

**CRET** or Current Real Estate Taxes shall mean an amount equal to Real Estate Taxes applicable to Improvements at a point in time without reduction for any applicable as-of-right or discretionary benefit.

**Deed** shall mean the deed dated August 15, 2011 from NYCEDC to the Lessee, a copy of which is set forth in Exhibit J hereto.

7

**DLP** or Differential Land Product shall mean, when the OLP is greater than the SLP, the amount of such difference.

**DOL** shall have the meaning set forth in Section 8.7(c).

**Due Date** shall have the meaning set forth in Section 9.8.

**ELT** or Equivalent Land Tax shall mean an amount equal to Real Estate Taxes applicable to the Land at a point in time without reduction for any applicable as-of-right or discretionary benefit.

**Employment Information** shall have the meaning set forth in Section 8.7(c).

**Enabling Act** shall mean the New York State Industrial Development Agency Act, constituting Title I of Article 18-A of the General Municipal Law, Chapter 24 of the Consolidated Laws of New York, as amended.

**Entity** shall mean any of a corporation, general partnership, limited liability company, limited liability partnership, joint stock company, trust, estate, unincorporated organization, business association, tribe, firm, joint venture, governmental authority or governmental instrumentality, but shall not include an individual.

**Environmental Audit** shall mean that certain Phase I Site Assessment Report dated March 14, 2011, prepared by the Environmental Auditor and that certain Focused Subsurface Site Investigation, dated March 29, 2011 prepared by the Environmental Auditor.

**Environmental Auditor** shall mean Merritt Environmental Consulting Corp.

**Environmental Remediation** shall mean the environmental remediation required pursuant to Section 3.9.

**Equivalent Full Time Employee(s)** shall mean one full-time employee working a minimum of thirty-five (35) hours per week, or two part-time employees, each working a minimum of twenty hours per week, and employed by either the Lessee or any Permitted Sublessee.

**Equivalent Full Time Employee Number** shall mean the number of Equivalent Full Time Employees working at the Facility Realty as such number is included in any annual report required pursuant to law.

**Estimated Project Cost** shall mean $44,429,433.

**Event of Default** shall have the meaning specified in Section 9.1.

**Exempt Fixtures** shall mean those fixtures (and their components) to be acquired by or on behalf of the Agency pursuant to the Sales Tax Letter as part of the Project Work and which are to be part of the Improvements and incorporated in the Facility Realty.

**Exempt Materials** shall mean those construction materials (exclusive of fixtures or their components) to be acquired by or on behalf of the Agency pursuant to the Sales Tax Letter as part of the Project Work and which are to be incorporated in the Improvements.

8

**Exempt Mortgage** shall mean a Mortgage the recording of which is exempt from Mortgage Recording Taxes by reason of the Agency being a mortgagor thereunder provided that such Mortgage(s) shall not exceed an aggregate principal amount of $44,500,000.

**Exempt Personalty** shall mean those items of machinery, equipment and other items of personalty (exclusive of Exempt Materials and Exempt Fixtures) to be acquired by or on behalf of the Agency pursuant to the Sales Tax Letter as part of the Project Work for installation and use at the Facility Realty; provided, however, that "Exempt Personalty" shall not include "Ineligible Personalty".

**Exempt Property** shall mean, collectively, the Exempt Fixtures, the Exempt Materials and the Exempt Personalty.

**Existing Facility Property** shall have the meaning set forth in Section 3.6(a).

**Expiration Date** shall mean June 30, 2037.

**Existing Improvements** shall mean, if any, all buildings, structures, foundations, related facilities, fixtures, and other improvements erected, placed and/or situated on, over and/or under the Land and existing on the Commencement Date other than all or any part of the foregoing that (i) is intended to be demolished as part of the Project Work, and (ii) is in fact demolished by the Completion Date.

**Facility** shall mean, collectively, the Facility Personalty and the Facility Realty.

**Facility Personalty** shall mean the Exempt Personalty, described in Exhibit B —"Description of the Facility Personalty", together with all repairs, replacements, improvements, substitutions and renewals thereof or therefor, and all parts, additions and accessories incorporated therein or affixed thereto. Facility Personalty shall, in accordance with the provisions of Sections 3.6 and 6.4, include all property substituted for or replacing items of Facility Personalty and exclude all items of Facility Personalty so substituted for or replaced, and further exclude all items of Facility Personalty removed as provided in Section 3.6.

**Facility Realty** shall mean, collectively, the Land and the Improvements.

**Final Project Cost Budget** shall mean that certain budget of costs paid or incurred for the Project to be submitted by the Lessee pursuant to Section 3.3(f) upon completion of the Project.

**Financial Assistance** shall have the meaning assigned to that term in the Enabling Act.

**Fiscal Year** shall mean a year of 365 or 366 days, as the case may be, commencing on January 1 and ending on December 31 of calendar year, or such other fiscal year of similar length used by the Lessee for accounting purposes as to which the Lessee shall have given prior written notice thereof to the Agency at least ninety (90) days prior to the commencement thereof.

**Fixed Date Deliverables** shall have the meaning set forth in Section 9.8(a)(ii).

**GAAP** shall mean those generally accepted accounting principles and practices that are recognized as such by the American Institute of Certified Public Accountants or by the Financial Accounting Standards Board or through other appropriate boards or committees thereof, and that are consistently applied for all periods, after the Commencement Date, so as to properly reflect the financial position of the Lessee, as applicable, except that any accounting principle or practice required to be changed by the Financial Accounting Standards Board (or other appropriate board or committee of the

said Board) in order to continue as a generally accepted accounting principle or practice may be so changed.

**Gap Mortgage** shall mean, upon any refinancing of the outstanding principal balance of the indebtedness secured by an existing Exempt Mortgage, the separate mortgage that will initially secure the New Money.

**Governing Body** shall mean, when used with respect to any Person, its board of directors, board of trustees or individual or group of individuals by, or under the authority of which, the powers of such Person are exercised.

**Guarantors** shall mean, collectively, the Lessee and Schein Family Partners, LLC and each other Person as shall be a Guarantor under the Guaranty Agreement, and their respective permitted estates, administrators, successors and assigns.

**Guaranty Agreement** shall mean the Guaranty Agreement, dated as of even date herewith, from the Guarantors to the Agency, and shall include any and all amendments thereof and supplements thereto hereafter made in conformity therewith.

**Hazardous Materials** shall include any flammable explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, or related materials defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 5101, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6901, et seq.), and in the regulations adopted and publications promulgated pursuant thereto, or any other federal, state or local environmental law, ordinance, rule, or regulation.

**Implementation Date(s)** shall mean the January 1 following the first Adjustment Date and thereafter every fifth-year anniversary of such January 1 within the PILOT Term excepting the last one.

**Impositions** shall have the meaning set forth in Section 8.17(a).

**Improvements** shall mean, collectively, the Existing Improvements, if any, and the Project Improvements and any Additional Improvements. In the alternative, "Improvements" shall mean: (i) all buildings, structures, foundations, related facilities and other improvements existing on the Commencement Date and erected or situated on the Land, if any, and (ii) any other buildings, structures, foundations and related facilities and other improvements erected or constructed on the land throughout the term of this Agreement (including any improvements or demolitions made as part of the Project Work pursuant to Section 3.3), and (iii) all other replacements, improvements, additions, extensions, substitutions, restorations and repairs to any of the foregoing.

**Indemnification Commencement Date** shall mean June 14, 2011, the date on which the Agency first adopted a resolution with respect to the Project.

**Indemnified Parties** shall have the meaning set forth in Section 8.2(a).

**Independent Accountant** shall mean an independent certified public accountant or firm of independent certified public accountants selected by the Lessee and approved by the Agency (such approval not to be unreasonably withheld, delayed or conditioned).

NY:1348523.11

**Inducement Resolution** shall mean the resolution of the Agency adopted on June 14, 2011 inducing the Project.

**Industrial Employee** shall mean a Equivalent Full Time Employee of a Tenant occupying space for an Industrial Use.

**Industrial Use** shall mean any industrial or manufacturing use permitted under the Zoning Resolution, including ancillary, administrative, wholesale and storage uses incidental to such industrial or manufacturing use but excluding any retail uses included within use groups (or use sub-groups) that are denominated as "industrial" or "semi-industrial" or "manufacturing" under the Zoning Resolution. For avoidance of doubt, only that portion of any space subleased to a Tenant that is used by such Tenant for predominately retail uses shall be excluded from Industrial Use under the proviso in the preceding sentence for the purpose of making the calculation described in Section 8.19(d).

**Ineligible Personalty** shall mean (i) vehicles of any sort, including watercraft and rolling stock, (ii) personalty having a useful life of one year or less, (iii) fine art, (iv) objects d'art and other similar decorative items, (v) plants, whether potted or landscaped, (vi) ordinary office supplies such as pencils, paper clips and paper, and (vii) any cost of utilities, cleaning services or supplies or other costs of operation.

**Information Recipients** shall have the meaning set forth in Section 8.7(c).

**Initial Annual Administrative Fee** shall mean $850.

**Initial CRET** shall mean CRET applicable to the Existing Improvements on the Commencement Date.

**Initial Project Work** shall mean, collectively, (i) the replacement or restoration of the roof and façade, (ii) the replacement or restoration of all utilities, mechanical and life safety systems, (iii) the installation of at least one bank of operational elevators, (iv) the completion of the Environmental Remediation and (v) the completion of SHPO Requirements set forth in Section 3.10(a).

**Land** shall mean that certain lot, piece or parcel of land in Section 3, Block 671 and Lot 1, generally known by the street address 850 Third Avenue, Brooklyn, New York 11232, all as more particularly described in Exhibit A — "Description of the Land", together with all easements, rights and interests now or hereafter appurtenant or beneficial thereto; but excluding, however, any real property or interest therein released pursuant to Section 8.10(c).

**Land Square Footage** shall mean approximately 140,000 square feet.

**Legal Requirements** shall mean the Constitutions of the United States and the State of New York and all laws, statutes, codes, acts, ordinances, resolutions, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, certificates of occupancy, directions and requirements (including zoning, land use, planning, environmental protection, air, water and land pollution, toxic wastes, hazardous wastes, solid wastes, wetlands, health, safety, equal opportunity, minimum wages, and employment practices) of all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers, including those of the City, foreseen or unforeseen, ordinary or extraordinary, that are applicable now or may be applicable at any time hereafter to (i) the Lessee, (ii) the Facility or any part thereof, or (iii) any use or condition of the Facility or any part thereof.

NY:1348523.11

**Lessee** shall mean Salmar Properties, LLC, a limited liability company, a organized and existing under the laws of the State of New York, and its successors and assigns; provided, however, that nothing contained in this definition shall be deemed to limit or modify the obligations of the Lessee under Section 8.9 or 8.20.

**Lessee's Property** shall have the meaning set forth in Section 3.5(d).

**Liability** shall have the meaning set forth in Section 8.2(a).

**Liens** shall have the meaning set forth in Section 8.11(a).

**Loss Event** shall have the meaning set forth in Section 6.1.

**Merge** shall have the meaning specified in Section 8.20(a)(v).

**Modified Exempt Mortgage** shall mean an Exempt Mortgage as assigned, modified, extended, consolidated and/or otherwise amended.

**Mortgagees** shall mean each Person, if any, who shall be the mortgagee under a Mortgage.

**Mortgage Loans** shall mean each Mortgage Loan, if any, referred to in the Project Finance Plan.

**Mortgage Notes** shall mean each mortgage note, if any, referred to in the Project Finance Plan.

**Mortgage Recording Taxes** shall mean those taxes imposed by the City and the State upon the recording of mortgages against real property in the City.

**Mortgages** shall mean each mortgage, if any, referred to in the Project Finance Plan, and each other mortgage creating a lien upon the Facility Realty and to which an Authorized Representative of the Agency shall consent in writing.

**Net Proceeds** shall mean, when used with respect to any insurance proceeds or condemnation award, compensation or damages, the gross amount of any such proceeds, award, compensation or damages less all expenses (including reasonable attorneys' fees and any extraordinary expenses of the Agency or any Mortgagee) incurred in the collection thereof.

**New Money** shall mean, upon any refinancing of the outstanding principal balance of the indebtedness secured by an existing Exempt Mortgage, any additional loan proceeds that may be advanced as part of such mortgage refinancing.

**Non-Exempt Principal** shall mean that portion of the indebtedness secured by an existing Exempt Mortgage that may be outstanding on the Expiration Date (as may be reasonably calculated by the Agency at a given point in time) or on any earlier termination of this Agreement, as the context requires.

**Notification of Failure to Deliver** shall have the meaning specified in Section 9.8(b).

**NPV** shall mean a net-present-value calculation of an amount due at a future date using such discount rate as may be required by the Agency from time to time.

**NPV-PILOMRT** shall mean the net-present-value calculation of a PILOMRT due at the Expiration Date using such discount rate as may be required by the Agency from time to time.

12

**NYCDOF** shall mean the New York City Department of Finance.

**NYCDOT Requirements** shall mean the NYCDOT Requirements set forth in Section 3.11.

**NYCEDC** shall mean New York City Economic Development Corporation, and any successor thereof.

**NYCEDC Contract** shall mean the Contract of Sale dated May 3, 2011, between NYCEDC and the Lessee, a copy of which is set forth in Exhibit K hereto and made a part hereof.

**OLP** or **Original Land Product** shall mean $766,000, i.e., the product of the Original Equivalent Full Time Employee Number and $500.

**Operations Commencement Date** shall have the meaning set forth in Section 5.4 hereof.

**Opinion of Counsel** shall mean a written opinion of counsel for the Lessee, any other Guarantor or any other Person (which counsel shall be reasonably acceptable to the Agency) with respect to such matters as required under any Project Document or as the Agency may otherwise reasonably require, and which shall be in form and substance reasonably acceptable to the Agency.

**Organizational Documents** shall mean, (i) in the case of an Entity constituting a limited liability company, the articles of organization or certificate of formation, and the operating agreement of such Entity, (ii) in the case of an Entity constituting a corporation, the articles of incorporation or certificate of incorporation, and the by-laws of such Entity, and (iii) in the case of an Entity constituting a general or limited partnership, the partnership agreement of such Entity.

**Original Equivalent Full Time Employee Number** shall equal 1,532 Equivalent Full Time Employees – i.e., the number of Employees expected to be employed by the Permitted Sublessees and/or Lessee by the Operations Commencement Date.

**Other Employee** shall mean a Full Time Equivalent Employee of a Tenant occupying space for an Other Use.

**Other Use** shall mean any use other than a Retail Use or an Industrial Use except (i) uses not permitted under the Zoning Resolution, and (ii) use by passive warehousing and/or storage businesses, and (iii) use by an adult establishment as defined in Section 12-10 of the Zoning Resolution, and (iv) residential use.

**Per Diem Fees** shall mean, collectively, the Per Diem Late Fee and the Per Diem Supplemental Late Fee.

**Per Diem Holdover Rental Amount** shall mean $10.00 per day or such other per diem rental amount established from time to time by the Agency's Board of Directors generally imposed upon Entities receiving or that have received Financial Assistance (subject to such exceptions from such general applicability as may be established by the Agency's Board of Directors) and that have failed to terminate the Company Lease and this Agreement within the ten (10) day period referred to in Section 10.2.

**Per Diem Late Fee** shall mean $10.00 per day or such other per diem late fee established from time to time by the Agency's Board of Directors generally imposed upon Entities receiving or that have received Financial Assistance (subject to such exceptions from such general applicability as may be

NY:1348523.11

established by the Agency's Board of Directors) and that have not (x) paid to the Agency the Annual Administrative Fee on the date required under Section 8.3, (y) delivered to the Agency all or any of the Fixed Date Deliverables on the respective dates required under Section 8.14 or 8.16, and/or (z) delivered to the Agency all or any of the Requested Document Deliverables under Section 8.15 within five (5) Business Days of the Agency having made the request therefor.

**Per Diem Supplemental Late Fee** shall mean $10.00 per day or such other supplemental per diem late fee established from time to time by the Agency's Board of Directors generally imposed upon Entities receiving or that have received Financial Assistance (subject to such exceptions from general applicability as may be established by the Agency's Board of Directors).

**Permitted Encumbrances** shall mean:

(i)       this Agreement, the Company Lease, the Mortgages, any Permitted Sublease and any other form of occupancy agreements hereinafter entered into as permitted herein;

(ii)       liens for real estate taxes, assessments, levies and other governmental charges, the payment of which is not yet due and payable;

(iii)       any mechanic's, workmen's, repairmen's, materialmen's, contractors', warehousemen's, carriers', suppliers' or vendors' lien, security interest, encumbrance or charge or right in respect thereof, placed on or with respect to the Facility or any part thereof, if payment is not yet due and payable, or if such payment is being disputed pursuant to Section 8.11(b);

(iv)       utility, access and other easements and rights of way, restrictions and exceptions that an Authorized Representative of the Lessee certifies to the Agency will not materially interfere with or impair the Lessee's use and enjoyment of the Facility as herein provided;

(v)       such minor defects, irregularities, encumbrances, easements, rights of way and clouds on title as normally exist with respect to property similar in character to the Facility as do not, as set forth in a certificate of an Authorized Representative of the Lessee delivered to the Agency, either singly or in the aggregate, render title to the Facility unmarketable or materially impair the property affected thereby for the purpose for which it was acquired and held by the Agency hereunder or purport to impose liabilities or obligations on the Agency;

(vi)       those exceptions to title to the Facility Realty enumerated in the title insurance policy delivered pursuant to Section 3.8 insuring the leasehold interest of the Agency in the Facility Realty, a copy of which is on file at the offices of the Agency;

(vii)       liens arising by reason of good faith deposits with the Lessee in connection with the tenders, leases of real estate, bids or contracts (other than contracts for the payment of money), deposits by the Lessee to secure public or statutory obligations, or to secure, or in lieu of, surety, stay or appeal bonds, and deposits as security for the payment of taxes or assessments or other similar charges;

(viii)       any lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to

14

enable the Lessee to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with workmen's compensation, unemployment insurance, old age pensions or other social security, or to share in the privileges or benefits required for companies participating in such arrangements;

(ix)    any judgment lien against the Lessee, so long as the finality of such judgment is being contested in good faith and execution thereon is stayed, or that is less than $10,000;

(x)    any purchase money security interest in movable personal property, including equipment leases and financing;

(xi)    liens on property due to rights of governmental entities or third party payors for recoupment of excess reimbursement paid;

(xii)    a lien, restrictive declaration or performance mortgage with respect to the operation of the Facility arising by reason of a grant or other funding received by the Lessee from the City, the State or any governmental agency or instrumentality;

(xiii)    any additional leasehold interest in the Facility or any portion thereof granted by the Lessee to the Agency and any sublease, sale, assignment or other transfer of such leasehold interest by the Agency to the Lessee or any trustee for bonds of the Agency; and

(xiv)    any lien, security interest, encumbrances or charge approved in writing by the Agency from time to time, in its sole discretion.

**Permitted Sublease** shall mean a Tenant Lease entered into and in compliance with Sections 8.9 and 8.19.

**Permitted Sublessee** shall mean a Tenant occupying space at the Facility pursuant to a Permitted Sublease.

**Person** shall mean an individual or any Entity.

**Policy(ies)** shall have the meaning set forth in Section 8.1(a)

**PILOMRT** shall mean payment(s) in lieu of mortgage recording taxes as such payments are calculated using the mortgage recording tax rate in effect at time of payment.

**PILOT** shall mean payments in lieu of City real estate taxes with respect to the Facility Realty.

**PILOT Bill** shall mean the semi-annual statement of account sent by NYCDOF for the payment of PILOT in respect of the Facility Realty.

**PILOT Commencement Date** shall mean July 1, 2012.

**PILOT Depository** shall mean The Bank of New York Mellon, a banking corporation organized and existing under the laws of the State of New York, or its successors.

**PILOT Payment Default** shall mean that particular Event of Default described and set forth in Section 9.1(a).

15

NY:1348523.11

**PILOT Term** shall mean the period commencing on the PILOT Commencement Date and ending on the Expiration Date.

**Predecessor Lessee** shall have the meaning set forth in Section 8.20(b)(ii).

**Principals** shall mean, with respect to any Entity, the most senior three officers of such Entity having discretionary authority to act with respect to such Entity, any Person with a ten percent (10%) or greater ownership interest in such Entity, and any Person as shall have the power to Control such Entity, and "principal" shall mean any of such Persons.

**Project** shall mean the acquisition, construction, re-construction, renovation and furnishing of an approximately 1,100,000 square foot building on an approximately 140,000 square foot parcel of land located at 850 Third Avenue, Brooklyn, New York 11232, to be subleased by the Lessee to Permitted Sublessees.

**Project Application Information** shall mean the eligibility application and questionnaire submitted to the Agency by or on behalf of the Lessee, for approval by the Agency of the Project and the providing of Financial Assistance by the Agency therefor, together with all other letters, documentation, reports and financial information submitted in connection therewith.

**Project Cost Budget** shall mean that certain budget as set forth by the Lessee in Exhibit E — "Project Cost Budget".

**Project Counsel** shall mean attorneys or a firm of attorneys that are recognized for their expertise in municipal finance law and are selected by the Agency to render legal advice to the Agency in connection with the transactions contemplated by this Agreement.

**Project Documents** shall mean the Company Lease, this Agreement, the Sales Tax Letter, the Guaranty Agreement, each Mortgage and each Mortgage Note.

**Project Fee** shall mean $365,200, representing the $370,200 Agency financing fee, less the application fee of $5,000.

**Project Finance Plan** shall mean the plan for financing of the costs of the Project set forth in Exhibit I — "Project Finance Plan".

**Project Improvements** shall mean all buildings, structures, foundations, related facilities, fixtures and other improvements resulting from the Project Work, including but not limited to Exempt Fixtures and Exempt Materials.

**Project Payments** shall have the meaning set forth in Section 10.1.

**Project Work** shall mean, collectively, the Initial Project Work, the completion of the NYCDOT Requirements, the completion of SHPO Requirements set forth in Section 3.10(b) and any subsequent or additional the work required to complete the construction and/or renovation portion of the Project as such work is further explained by reference to the Project Cost Budget.

**Real Estate Taxes** shall mean the real property taxes levied by the City on real property within the City.

**Recapture Event** shall have the meaning set forth in Section 5.4(a).

16

**Recapture Period** shall have the meaning set forth in Section 5.4(a).

**Rental Payments** shall mean, collectively, Base Rent and Additional Rent.

**Requested Document Deliverables** shall have the meaning set forth in Section 9.8(a).

**Required Disclosure Statement** shall mean that certain Required Disclosure Statement in the form of Exhibit F — "Form of Required Disclosure Statement".

**Retail Employee** shall mean a Full Time Equivalent Employee of a Tenant occupying space for a Retail Use.

**Retail Use** shall mean any retail use permitted under the Zoning Resolution exclusive of an adult establishment as defined in Section 12-10 of the Zoning Resolution.

**Sales Taxes** shall mean City and State sales and/or compensating use taxes imposed pursuant to Sections 1105, 1107, 1109, and 1110 of the New York State Tax Law, as each of the same may be amended from time to time (including any successor provisions to such statutory sections).

**Sales Tax Letter** shall mean the Letter of Authorization for Sales Tax Exemption, substantially in the form set forth in Exhibit H — "Form of Sales Tax Letter" and to be delivered pursuant to Section 5.2(c) on the Commencement Date.

**Sales Tax Letter Expiration Date** shall mean one (1) year after the Substantial Completion Date.

**Sales Tax Savings** shall mean all exemptions from Sales Taxes realized by or for the benefit of the Lessee pursuant to this Agreement and/or the Sales Tax Letter by reason of the Agency's interest in the Project or any part thereof.

**SHPO** shall mean the New York State Office of Parks, Recreation & Historic Preservation.

**SHPO Requirements** shall mean the SHPO Requirements set forth in Section 3.10.

**Sign** shall have the meaning set forth in Section 8.5.

**SLP** or **Subsequent Land Product** shall mean the product of a Average Equivalent Full Time Employee Number on a particular Adjustment Date and $500.

**State** shall mean the State of New York.

**Straight-Lease Transaction** shall have the meaning assigned to that term in the Enabling Act.

**Subsequent Equivalent Full Time Employee Number** shall mean the Average Equivalent Full Time Employee Number for any five-year period ending on an Adjustment Date.

**Substantial Completion Date** shall mean September 30, 2013.

**Successor Lessee** shall have the meaning set forth in Section 8.20(b)(ii).

**Tenant** shall mean any subtenant, sub-subtenant or permittee occupying space at the Facility.

17

**Tenant Lease** shall mean any agreement relating to the leasing or subleasing of space at the Facility.

**Termination Date** shall mean such date on which this Agreement may terminate pursuant to its terms and conditions prior to the Expiration Date.

**Transfer** shall have the meaning set forth in Section 8.20(a)(iv).

**Unavoidable Delay** shall mean any cause beyond the reasonable control and without the fault or negligence of Lessee, including but not limited to:  orders of any court of competent jurisdiction, industry-wide labor disputes including strikes and slow downs, acts of God, enemy action, terrorist activity, civil commotion, inability to obtain materials as a result of a national disaster and fire or other casualty, inability to obtain governmental permits provided the Lessee complied with its requirements and standard timeframe for processing applies.

**Zone** shall mean any area within the City which has been defined by statute, or created pursuant to statute, for economic development purposes or for community renewal and improvement or for neighborhood and landmark preservation.

**Zoning Resolution** shall mean the Zoning Resolution of The City of New York.

Section 1.2    <u>Construction</u>.  In this Agreement, unless the context otherwise requires:

(a)    The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms, as used in this Agreement, refer to this Agreement, and the term "hereafter" shall mean after, and the term "heretofore" shall mean before, the Commencement Date.

(b)    Words of the masculine gender shall mean and include correlative words of the feminine and neuter genders and words importing the singular number shall mean and include the plural number and vice versa.

(c)    Words importing persons shall include firms, associations, partnerships (including limited partnerships and limited liability partnerships), trusts, corporations, limited liability companies and other legal entities, including public bodies, as well as natural persons.

(d)    Any headings preceding the texts of the several Articles and Sections of this Agreement, and any table of contents appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

(e)    Unless the content indicates otherwise, references to designated "Exhibits," "Appendices," "Schedules," "Articles", "Sections", "Subsections", "clauses" and other subdivisions are to the designated Exhibits, Appendices, Schedules, Articles, Sections, Subsections, clauses and other subdivisions of or to this Agreement.

(f)    The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

(g)    The word "will" shall be construed to have the same meaning and effect as the word "shall".

18

(h)     Any definition of or reference to any agreement, instrument or other document herein shall be construed to refer to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth therein).

(i)     Any reference to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

**Section 2.1** <u>**Representations and Warranties by Agency**</u>.  The Agency  makes the following representations and warranties:

(a)     The Agency is a corporate governmental agency constituting a body corporate and politic and a public benefit corporation duly organized and existing under the laws of the State.

(b)     Assuming the accuracy of representations made by the Lessee, the Agency is authorized and empowered to enter into the transactions contemplated by this Agreement and any other Project Documents to which the Agency is a party and to carry out its obligations hereunder and thereunder.

(c)     By proper action of its board of directors, the Agency has duly authorized the execution and delivery of this Agreement and each of the other Project Documents to which the Agency is a party.

**Section 2.2** <u>**Representations and Warranties by the Lessee**</u>.  The Lessee makes the following representations and warranties:

(a)     The Lessee is an Entity of the type, and duly organized under the laws of the state, set forth on the cover page of this Agreement, is validly existing and in good standing under the laws of its state of organization, is duly qualified to do business and in good standing under the laws of the State, is not in violation of any provision of any of the Lessee's Organizational Documents, has the requisite power and authority to own its property and assets, to carry on its business as now being conducted by it and to execute, deliver and perform this Agreement and each other Project Document to which it is or shall be a party.

(b)     This Agreement and the other Project Documents to which the Lessee is a party (x) have been duly authorized by all necessary action on the part of the Lessee, (y) have been duly executed and delivered by the Lessee, and (z) constitute the legal, valid and binding obligations of the Lessee, enforceable against the Lessee in accordance with their respective terms.

(c)     The execution, delivery and performance of this Agreement and each other Project Document to which the Lessee is or shall be a party and the consummation of the transactions herein and therein contemplated will not (x) violate any provision of law, any order of any court or agency of government, or any of the Lessee's Organizational Documents, or any indenture, agreement or other instrument to which the Lessee is a party or by which it or any of its property is bound or to which it or any of its property is subject, (y) be in conflict with or result in a breach of or constitute (with due notice and/or lapse of time) a default under any such indenture, agreement or other instrument or (z) result

19

in the imposition of any lien, charge or encumbrance of any nature whatsoever other than Permitted Encumbrances.

(d)       There is no action or proceeding pending or, to the best of the Lessee's knowledge, after diligent inquiry, threatened, by or against the Lessee by or before any court or administrative agency that would adversely affect the ability of the Lessee to perform its obligations under this Agreement or any other Project Document to which it is or shall be a party.

(e)       The Financial Assistance provided by the Agency to the Lessee through the Straight-Lease Transaction as contemplated by this Agreement is necessary to induce the Lessee to proceed with the Project.

(f)       The transactions contemplated by this Agreement shall not result in the removal of any facility or plant of the Lessee or any other occupant or user of the Facility from one area of the State outside of the City to within the City or in the abandonment of one or more facilities or plants of the Lessee or any other occupant or user of the Facility located within the State, but outside of the City.

(g)       The transactions contemplated by this Agreement shall not provide Financial Assistance in respect of any project where facilities or property that are primarily used in making retail sales of goods or services to customers who personally visit such facilities constitute more than one-third of the total project costs.  For purposes of this Section 2.2(g), "retail sales" shall mean (i) sales by a registered vendor under article twenty-eight of the New York Tax Law primarily engaged in the retail sale of tangible personal property, as defined in subparagraph (i) of paragraph four of subdivision (b) of section eleven hundred one of the New York Tax Law, or (ii) sales of a service to such customers.

(h)       Undertaking the Project is anticipated to serve the public purposes of the Act by preserving permanent, private sector jobs or increasing the overall number of permanent, private sector jobs in the State.

(i)       No funds of the Agency shall be used by the Lessee in connection with the transactions contemplated by this Agreement for the purpose of preventing the establishment of an industrial or manufacturing plant or for the purpose of advertising or promoting materials which depict elected or appointed government officials in either print or electronic media, nor shall any funds of the Agency be given hereunder to any group or organization which is attempting to prevent the establishment of an industrial or manufacturing plant within the State.

(j)       The Facility will be the Approved Facility and a qualified "project" within the meaning of the Act.

(k)       Except as permitted by Section 8.9, and except for any Permitted Sublessee, no Person other than the Lessee is or will be in use, occupancy or possession of any portion of the Facility.

(l)       The Lessee has obtained all authorizations, consents and approvals of governmental bodies or agencies required to be obtained by it as of the Commencement Date in connection with the execution and delivery of this Agreement and each other Project Document to which it shall be a party or in connection with the performance of its obligations hereunder and under each of the Project Documents.

(m)      The Project will be designed, and the operation of the Facility will be, in compliance with all applicable Legal Requirements.

20

(n)    The Lessee is in compliance, and will continue to comply, with all applicable Legal Requirements relating to the Project, the Project Work and the operation of the Facility.

(o)    The Lessee has delivered to the Agency a true, correct and complete copy of the Environmental Audit.

(p)    The Lessee has not used Hazardous Materials on, from, or affecting the Facility in any manner that violates any applicable Legal Requirements governing the use, storage, treatment, transportation, manufacture, refinement, handling, production or disposal of Hazardous Materials.

(q)    The Project Cost Budget attached as <u>Exhibit E</u> — "Project Cost Budget" represents a true, correct and complete budget as of the Commencement Date of the proposed costs of the Project; the Estimated Project Cost is a fair and accurate estimate of the Project Cost as of the Commencement Date; and that portion of the Estimated Project Cost as shall not derive from Mortgage Loans shall be provided from the sources set forth on <u>Exhibit E</u> — "Project Cost Budget". The Lessee has no reason to believe that funds or financing sufficient to complete the Project will not be obtainable.

(r)    The amounts provided to the Lessee pursuant to the Mortgage Loans, together with other moneys available to the Lessee, are sufficient to pay all costs in connection with the completion of the Project.

(s)    All of the Land comprises one complete tax lot and no portion of any single tax lot.

(t)    Subject to Section 3.6 and Article VI, no property constituting part of the Facility shall be located at any site other than at the Facility Realty.

(u)    The Completed Improvements Rentable Square Footage and the Land Square Footage are true and correct.

(v)    The Fiscal Year is true and correct.

(w)    None of the Lessee, the Principals of the Lessee, or any Person that directly or indirectly Controls, is Controlled by, or is under common Control with the Lessee:

(i)    is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with the Agency or the City, unless such default or breach has been waived in writing by the Agency or the City, as the case may be;

(ii)    has been convicted of a felony and/or any crime involving moral turpitude in the ten (10) preceding years;

(iii)    has received written notice of default in the payment to the City of any taxes, sewer rents or water charges in excess of $5,000 that has not been cured or satisfied, unless such default is then being contested with due diligence in proceedings in a court or other appropriate forum; or

(iv)    has, at any time in the three (3) preceding years, owned any property which, while in the ownership of such Person, was acquired by the City by in rem tax foreclosure, other than a property in which the City has released or is in the process of releasing its interest to such Person pursuant to the Administrative Code of the City.

21

(x)      The Project Application Information was true, correct and complete as of the date submitted to the Agency, and no event has occurred or failed to occur since such date of submission which would cause any of the Project Application Information to include any untrue statement of a material fact or omit to state any material fact required to be stated therein to make such statements not misleading.

(y)      Information as to the Principals of the Lessee, and their respective ownership interests in the Lessee, as set forth in Exhibit D — "Principals of the Lessee", is true, correct and complete.

(z)      The approximate square footage of the Existing Improvements is 1,100,000 square feet.

# ARTICLE III

## LEASEHOLD INTEREST CONVEYED TO THE AGENCY; THE PROJECT; MAINTENANCE; REMEDIATION REMOVAL OF PROPERTY AND TITLE INSURANCE

**Section 3.1        The Company Lease.**

(a)      Pursuant to the Company Lease, the Lessee has leased to the Agency the Land, and all rights or interests therein or appertaining thereto, together with all Improvements existing thereon or therein as of the date thereof, free and clear of all liens, claims, charges, encumbrances, security interests and servitudes other than Permitted Encumbrances.

(b)      A valid leasehold interest in all Improvements incorporated or installed in the Facility Realty as part of the Project shall vest in the Agency immediately upon delivery to or installation or incorporation into the Facility Realty or payment therefor, whichever shall occur first.

(c)      The Lessee shall take all action necessary to so vest a valid leasehold interest in such Improvements in the Agency and to protect such leasehold interest and title claims against claims of any third parties.

**Section 3.2        Appointment as Agent.**

The Agency hereby appoints the Lessee its true and lawful agent, and the Lessee hereby accepts such agency for purposes of undertaking the Project Work, with the same powers and with the same validity and effect as the Agency could do if acting in its own behalf, including:

(i)      effecting the Project Work,

(ii)      making, executing, acknowledging and delivering any contracts, orders, receipts, writings and instructions with any other Persons (subject in each case to Section 5.2), and in general doing all things which may be requisite or proper, all for the purposes of undertaking the Project Work,

(iii)      paying all fees, costs and expenses incurred in the Project Work from funds made available therefor in accordance with or as contemplated by this Agreement, and

(iv)      asking, demanding, suing for, levying, recovering and receiving all such sums of money, debts due and other demands whatsoever that may be due, owing and payable to

22

the Agency under the terms of any contract, order, receipt or writing in connection with the Project Work and to enforce the provisions of any contract, agreement, obligation, bond or other performance security entered into or obtained in connection with the Project Work.

**Section 3.3**   **The Project Work, Timing and Manner of Project Completion**.

(a)   Subject to Unavoidable Delays, the Lessee shall: (i) commence the Initial Project Work within six (6) months of the Commencement Date and shall upon the expiration of such six (6) months, certify to the Agency in writing whether it has commenced the Initial Project Work, (ii) complete the Initial Project Work, or cause the Initial Project Work to be completed, by the Substantial Completion Date, and (iii) complete all Project Work or cause the Project Work to be completed by the Completion Date. The Lessee shall complete all Project Work in a first class workmanlike manner, free of defects in materials and workmanship (including latent defects); provided, however, the Lessee may revise the scope of the Project Work, subject to the prior written consent of the Agency (which consent shall not be unreasonably withheld, delayed or conditioned). Notwithstanding anything to the contrary provided herein, in no event shall Unavoidable Delays for purposes of this paragraph together aggregate more than twenty-four (24) months.

(b)   In undertaking the Project Work, the Lessee shall take such action and institute such proceedings as shall be necessary to cause and require all contractors, manufacturers and suppliers to complete their agreements relating to the Project Work in accordance with the terms of the contracts therefor including the correction of any defective work.

(c)   The cost of the Project Work shall be financed substantially in accordance with the Project Finance Plan. In the event moneys derived from the Mortgage Loans, if any, are not sufficient to pay the costs necessary to complete the Project Work in full, the Lessee shall pay or cause to be paid that portion of such costs of the Project Work as may be necessary to complete the Project Work and shall not be entitled to any reimbursement therefor from the Agency, nor shall the Lessee be entitled to any diminution of the Rental Payments to be made under this Agreement.

(d)   The Lessee shall pay (i) all of the costs and expenses in connection with the preparation of any instruments of conveyance, the delivery thereof and of any instruments and documents relating thereto and the filing and recording of any such instruments of conveyance or other instruments or documents, if required, (ii) all taxes and charges payable in connection with the vesting with the Agency of a leasehold estate in the Facility Realty and title to the Facility Personalty, or attributable to periods prior to such vesting, as set forth in Sections 3.1 and 3.2, and (iii) all shipping and delivery charges and other expenses or claims incurred in connection with the Project Work.

(e)   The Lessee will perform or cause to be performed the Project Work in accordance with all applicable Legal Requirements and with the conditions and requirements of all policies of insurance with respect to the Facility and the Project Work. Promptly upon finishing of the Project Work and the completion of the Project Improvements, the Lessee will obtain or cause to be obtained all required permits, authorizations and licenses from appropriate authorities, if any be required, authorizing the occupancy, operation and use of the Facility as an Approved Facility and shall furnish copies of same to the Agency immediately upon the Agency's demand therefor.

(f)   Upon completion of the Initial Project Work, the Lessee shall deliver to the Agency (i) a Preliminary Project Cost Budget, which budget will include a comparison with the Project Cost Budget, and indicate the source of funds (i.e., borrowed funds, equity, etc.) for each cost item, and (ii) evidence of completion of the Initial Project Work by delivering to the Agency a certificate of an

23

Authorized Representative of the Lessee in substantially the form set forth in Exhibit G-1 — "Form of Substantial Completion Certificate", together with all attachments required thereunder.

(g)    Upon completion of the Project Work, the Lessee shall deliver to the Agency (i) the Final Project Cost Budget, which budget will include a comparison with the Project Cost Budget, and indicate the source of funds (i.e., borrowed funds, equity, etc.) for each cost item, (ii) a temporary certificate of occupancy for the entire Facility, and (iii) evidence completion of the Project by delivering to the Agency a certificate of an Authorized Representative of the Lessee in substantially the form set forth in Exhibit G-2 — "Form of Project Completion Certificate", together with all attachments required thereunder.

(h)    Upon request by the Agency, the Lessee shall make available to the Agency copies of any bills, invoices or other evidences of costs as shall have been incurred in the effectuation of the Project Work.

(i)    In the event that the aggregate costs of the Project Work upon the completion thereof shall be significantly different from the estimated costs thereof set forth in the Project Cost Budget (i.e., more than a ten percent (10%) difference in either total Project costs or in major categories of Project Work cost), on request of the Agency, the Lessee shall provide evidence to the reasonable satisfaction of the Agency as to the reason for such discrepancy, and that the scope of the Project Work as originally approved by the Agency has not been modified in a material manner without the prior written consent of the Agency.

(j)    On or prior to the Substantial Completion Date, the Lessee shall use all diligent efforts to obtain LEED Core & Shell Silver Certification.

(k)    The Lessee shall notify the Agency and NYCEDC in writing whenever it claims an Unavoidable Delay has occurred or is continuing and shall specify the nature of the delay, any deadline which may be effected by such delay, and, to the extent practicable, the anticipated duration of the delay.

**Section 3.4    Maintenance.**

(a)    During the term of this Agreement and except to the extent impacted by the Project Work provided that the Project Work is performed in accordance with this Agreement, the Lessee will:

(i)    keep the Facility in good and safe operating order and condition, ordinary wear and tear excepted,

(ii)    occupy, use and operate the Facility, or cause the Facility to be occupied, used and operated, as the Approved Facility, and

(iii)    make or cause to be made all replacements, renewals and repairs thereto (whether ordinary or extraordinary, structural or nonstructural, foreseen or unforeseen) necessary to ensure that the operations of the Lessee and the Permitted Sublessees at the Facility shall not be materially impaired or diminished in any way.

(b)    All replacements, renewals and repairs shall be similar in quality, class and value to the original Project Work and be made and installed in compliance with all applicable Legal Requirements.

24

NY:1348523.11

(c)     The Agency shall be under no obligation to replace, service, test, adjust, erect, maintain or effect replacements, renewals or repairs of the Facility, to effect the replacement of any inadequate, obsolete, worn out or unsuitable parts of the Facility, or to furnish any utilities or services for the Facility, and the Lessee hereby agrees to assume full responsibility therefor.

**Section 3.5      Alterations and Improvements.**

(a)     The Lessee shall have the privilege from time to time of making Additional Improvements as it may determine in its discretion to be desirable for its uses and purposes, provided that:

(i)     as a result of the Additional Improvements, the fair market value of the Facility is not reduced below its value immediately before the Additional Improvements are made and the usefulness, structural integrity or operating efficiency of the Facility is not materially impaired,

(ii)     the Additional Improvements are effected with due diligence, in a good and workmanlike manner and in compliance with all applicable Legal Requirements,

(iii)     the Additional Improvements are promptly and fully paid for by the Lessee in accordance with the terms of the applicable contract(s) therefor, and

(iv)     the Additional Improvements do not change the nature of the Facility so that it would not constitute an Approved Facility.

(b)     All Additional Improvements shall constitute a part of the Facility, subject to the Company Lease and this Agreement.

(c)     If at any time after the Operations Commencement Date, the Lessee shall make any Additional Improvements, the Lessee shall (i) notify an Authorized Representative of the Agency of such Additional Improvements by delivering written notice thereof within thirty (30) days after the completion of the Additional Improvements, and (ii) take the actions required by Section 5.1(f)(i)(3).

(d)     In addition to the Facility Personalty, the Lessee shall have the right to install or permit to be installed at the Facility Realty, machinery, equipment and other personal property at the Lessee's own cost and expense (the "**Lessee's Property**"). Once so installed, the Lessee's Property shall not constitute Facility Personalty and shall not be subject to the Company Lease or this Agreement, nor constitute part of the Facility, provided that the same is not made fixtures appurtenant to the Facility Realty. The Lessee shall have the right to create or permit to be created any mortgage, encumbrance, lien or charge on, or conditional sale or other title retention agreement with respect to, the Lessee's Property, without the consent of or notice to the Agency.

**Section 3.6      Removal of Property of the Facility.**

(a)     The Lessee shall have the right from time to time to remove from the Facility any fixture constituting part of the Facility Realty or any machinery, equipment or other item of personal property constituting part of the Facility Personalty (in any such case, "Existing Facility Property"), and thereby remove such Existing Facility Property from the leasehold estates of the Company Lease and this Agreement; provided however:

25

(b)      such Existing Facility Property is substituted or replaced by property (y) having equal or greater fair market value, operating efficiency and utility and (z) free of all mortgages, liens, charges, encumbrances, claims and security interests other than Permitted Encumbrances, and

(c)      no such removal shall be effected if (w) such removal would change the nature of the Facility as the Approved Facility, (x) such removal would materially impair the usefulness, structural integrity or operating efficiency of the Facility, (y) such removal would materially reduce the fair market value of the Facility below its value immediately before such removal, or (z) there shall exist and be continuing an Event of Default hereunder.

(d)      Within thirty (30) days after receipt of written request of the Lessee, the Agency shall deliver to the Lessee appropriate documents conveying to the Lessee all of the Agency's right, title and interest in any property removed from the Facility pursuant to Section 3.6(a).

(e)      The removal from the Facility of any Existing Facility Property pursuant to the provisions of Section 3.6(a) shall not entitle the Lessee to any abatement or reduction in the Rental Payments payable by the Lessee under this Agreement or under any other Project Document.

**Section 3.7      Implementation of Agency's Interest in New Property**.

(a)      In the event of any Additional Improvements or substitution or replacement of property pursuant to Section 3.5 or 3.6, such Additional Improvements or substitute or replacement property shall be deemed subject to the Company Lease and this Agreement and the Agency shall have a leasehold interest in such property in accordance with the terms thereof.

(b)      The Lessee agrees to pay all costs and expenses (including reasonable counsel fees) incurred by the Agency in subjecting to, or releasing from, the Company Lease, this Agreement and the Permitted Subleases, if applicable, any property installed or placed on, or removed from, the Facility as part of the Facility pursuant to Section 3.5 or 3.6.

(c)      Reference is made to Section 8.15(d) and (e) pursuant to which the Lessee has agreed to furnish a report or certificate to the Agency of any action taken by the Lessee pursuant to the provisions of Section 3.5 or 3.6.

**Section 3.8      Leasehold Title Insurance**.  On or prior to the Commencement Date, the Lessee will obtain and deliver to the Agency (y) a leasehold title insurance policy (in form and substance acceptable to the Agency) in the amount of $500,000 insuring the Agency's leasehold interest under the Company Lease in each of the Land and the Existing Improvements against loss as a result of defects in title, subject only to Permitted Encumbrances, and (z) a current or updated survey of each of the Land and the Existing Improvements certified to the Lessee, the title company issuing such title insurance policy and the Agency.  The title insurance policies shall be subject only to Permitted Encumbrances and shall provide for, among other things, the following: (1) full coverage against mechanics' liens; (2) no exceptions other than those approved by the Agency; (3) an undertaking by the title insurer to provide the notice of title continuation or endorsement; and (4) such other matters as the Agency shall request.  Any proceeds of such leasehold title insurance shall be paid to the Lessee and applied by the Lessee to remedy the applicable defect in title in respect of which such proceeds shall be derived.  If not so capable of being applied or if a balance remains after such application, the proceeds or the remaining balance of proceeds, as the case may be, derived from any such title insurance policy insuring the Agency's leasehold interest shall be applied to the payment of any Rental Payments then due hereunder; and any balance thereafter may be used by the Lessee for its authorized purposes.

26

Section 3.9      **Environmental Remediation**

    (a)    On or before the Substantial Completion Date, the Lessee shall at its sole cost and expense remove and/or encapsulate all asbestos containing materials ("**ACM**") from the Facility and undertake any remediation related to the removal and/or encapsulation of such ACM, so as to comply with all Legal Requirements, including but not limited to New York State Department of Environmental Conservation ("**NYSDEC**"), New York City Department of Environmental Protection ("**NYCDEP**") rules and regulations, the Occupational Safety and Health Act and its implementing regulations (collectively, "**OSHA**"). The Lessee's obligations under this Section 3.9 (a) shall include but not be limited to the following: (i) performing an asbestos survey of the facility; (ii) making appropriate filings with, and obtaining necessary permits from, NYCDEP, all in connection with the abatement of ACM in the Facility; (iv) maintaining records of all ACM remedial actions; (v) taking air samples and fulfilling all other requirements for the protection of workers; (vi) lawfully disposing of ACM to the extent it is not encapsulated. On or before the Substantial Completion Date, the Lessee shall provide a written report to the Agency, in form and substance acceptable to the Agency, detailing all remedial actions taken and evidencing that all required remedial actions were taken in compliance with the Legal Requirements and such report shall include copies of any applicable ACM disposal documents.

    (b)    The Lessee shall conduct an XRF survey of the Facility to identify areas of peeling LBP or deteriorated subsurfaces (as defined in 28 RCNY § 11-04) upon which there is LBP, or may assume all peeling paint and deteriorated subsurfaces have LBP, and shall remediate any such areas through wet scraping and repainting, removal, encapsulation, enclosure and/or replacement. The Lessee shall notify the Agency in writing to indicate whether it plans to conduct a survey or assume all paint is LBP. If a survey is conducted, the Lessee shall provide the Agency with a copy of the results within ten (10) days of receipt by the Lessee. On or before the Substantial Completion Date, the Lessee shall (i) at its sole cost and expense remove all LBP from the Facility and undertake any remediation related to the removal and/or encapsulation of such LBP so as to comply with all Legal Requirements, including but not limited to NYSDEC and NYCDEP rules and regulations, OSHA, and all other applicable federal, state and local laws, ordinances, rules and regulations appertaining thereto and (ii) provide a written report to the Agency, in form and substance acceptable to the Agency, detailing all remedial actions taken and evidencing that all required remedial actions were taken compliance with the Legal Requirements and such report shall include copies of any applicable LBP disposal documents.

Section 3.10      **SHPO Requirements.**

    (a)    The Initial Project Work and Project Work must conform to *Standards for Preservation and Guidelines for Preserving Historic Buildings* as promulgated by the Secretary for the U.S. Department of the Interior. Until the Substantial Completion Date, the Lessee shall on January 1, April 1, July 1 and October 1 of each year certify to the Agency in writing that it is performing the Initial Project Work in accordance with these standards. On the Substantial Completion Date, the Lessee shall deliver to the Agency a certificate of an architect certifying that the Initial Project Work conforms to such standards.

    (b)    Within one (1) year of the Substantial Completion Date, the Lessee shall (i) issue a report and, in consultation with SHPO, prepare a photographic record which shall qualify as a *Historic American Buildings Survey* (collectively, the "**HAB Survey**"), (ii) provide a copy of HAB Survey to Agency, and (iii) deposit copies of the HAB Survey in SHPO-required repositories.

27

**Section 3.11**      **NYCDOT Requirements.**

(a)      The Lessee shall take all actions required by the memorandum dated June 2, 2011 (the "**NYCDOT Memorandum**") from the New York City Department of Transportation ("**NYCDOT**") to NYCEDC, a copy of which is set forth in Exhibit L — "the NYCDOT Memorandum" and incorporated by reference herein.  The Lessee shall take such actions in consultation with NYCDOT and in accordance with the NYCDOT Memorandum.

(b)      Within sixty (60) days following the first Adjustment Date, the Lessee shall perform three (3) traffic-trip assessments – i.e., an AM assessment, a midday assessment, and PM assessment; and each of these assessments shall pertain to all of the four (4) traffic intersections bracketing the Facility Realty.  Within fifteen (15) days of the completion of such assessments, the Lessee shall provide to the Agency in writing the results of such assessments.  If the traffic-trip statistics generated by such assessments are respectively less than (i) 535 AM trips or (ii) 183 midday trips, or (iii) 601 PM trips, the Lessee need take no further action; if however the statistics are equal to or greater than any one of the foregoing base-line statistics, the Lessee shall proceed to analyze traffic at the four (4) intersections in order to determine whether the increase in traffic trips adversely impacts traffic at the four (4) intersections.

(c)      In the event analysis as to adverse impact is required pursuant to paragraph (b) immediately preceding, then, the Lessee shall do or complete the following within the time periods indicated:  (i) the Lessee shall complete the analysis and within six (6) months following the first Adjustment Date shall in writing notify the Agency whether or not the analysis demonstrates an adverse impact on traffic; and (ii) if the analysis reveals an adverse impact on traffic, the Lessee shall in writing notify the Agency within eight (8) months of the first Adjustment Date that the Lessee, in consultation with NYCDOT, has completed a transportation system management plan to mitigate the adverse impact (the "Traffic Plan"); and (iii) within twelve (12) months following the first Adjustment Date, the Lessee shall have completed implementation of the Traffic Plan; and (iv) within thirteen (13) months following the first Adjustment Date, the Lessee shall notify the Agency in writing that it has fully implemented the Traffic Plan to the satisfaction NYCDOT.

(d)      If the analysis demonstrates no adverse impact, Lessee shall so notify the Agency.  If the analysis demonstrates an adverse impact, the Lessee shall so notify the Agency and proceed to create and implement a transportation system management plan to mitigate the adverse impact.  The Lessee shall complete implementation of the plan, and notify the Agency of such completion, within one (1) year of the first Adjustment Date.

## ARTICLE IV

## LEASE OF FACILITY AND RENTAL PROVISIONS

**Section 4.1**      **Lease of the Facility.**  The Agency hereby leases the Facility Personalty and subleases the Facility Realty to the Lessee, and the Lessee hereby leases the Facility Personalty and subleases the Facility Realty from the Agency, for and during the term herein and subject to the terms and conditions herein set forth.  The Agency hereby delivers to the Lessee, and the Lessee hereby accepts sole and exclusive possession of the Facility.

**Section 4.2**      **Duration of Term.**  The term of this Agreement shall commence on the Commencement Date and shall expire at 11:58 p.m. (New York City time) on the earlier of the Expiration Date or the Termination Date, if any.

28

**Section 4.3**        **Rental Provisions**.

(a)        The Lessee shall pay Base Rent to the Agency, without demand or notice, on the Commencement Date in the amount of $1.00 (receipt of which is acknowledged by the Agency), which shall constitute the entire amount of Base Rent payable hereunder.

(b)        Throughout the term of this Agreement, the Lessee shall pay to the Agency (except as otherwise provided in Section 5.1) any additional amounts required to be paid by the Lessee to or for the account of the Agency hereunder, and any such additional amounts shall be paid as, and shall represent payment of, Additional Rent.

(c)        In the event the Lessee should fail to make or cause to be made any Rental Payment, the item or installment not so paid shall continue as an obligation of the Lessee until the amount not so paid has been paid in full, together with interest thereon from the date due at the applicable interest rate stated in this Agreement where so provided, or if not so provided, at twelve percent (12%) per annum, compounded daily.

**Section 4.4**        **Rental Payments Payable Absolutely Net**.  The obligation of the Lessee to pay Rental Payments shall be absolutely net to the Agency without any abatement, recoupment, diminution, reduction, deduction, counterclaim, set-off or offset whatsoever, so that this Agreement shall yield, net, to the Agency, the Rental Payments provided for herein, and all costs, expenses and charges of any kind and nature relating to the Facility, arising or becoming due and payable during or after the term of this Agreement, shall be paid by the Lessee and the Indemnified Parties shall be indemnified by the Lessee for, and the Lessee shall hold the Indemnified Parties harmless from, any such costs, expenses and charges.

**Section 4.5**        **Nature of Lessee's Obligation Unconditional**.  The Lessee's obligations under this Agreement to pay Rental Payments shall be absolute, unconditional and general obligations, irrespective of any defense or any rights of set-off, recoupment or counterclaim or deduction and without any rights of suspension, deferment, diminution or reduction it might otherwise have against the Agency or any other Person.  Such obligations of the Lessee shall arise whether or not the Project has been completed as provided in this Agreement and whether or not any Mortgagee shall be honoring its obligations under the related financing documents.  The Lessee will not suspend or discontinue payment of any Rental Payment due and payable hereunder or terminate this Agreement (other than such termination as is provided for hereunder) or suspend the performance or observance of any covenant or agreement required on the part of the Lessee hereunder for any cause whatsoever, and the Lessee waives all rights now or hereafter conferred by statute or otherwise to quit, terminate, cancel or surrender this Agreement or any obligation of the Lessee under this Agreement except as provided in this Agreement or to any abatement, suspension, deferment, diminution or reduction in the Rental Payments hereunder.

**Section 4.6**        **Reserved**.

**Section 4.7**        **Advances by Agency**.  In the event the Lessee fails to make any payment or to perform or to observe any obligation required of it under this Agreement, the Agency, after first notifying the Lessee in writing of any such failure on its part (except that no prior notification of the Lessee shall be required in the event of an emergency condition that, in the reasonable judgment of the Agency, necessitates immediate action), may (but shall not be obligated to), and without waiver of any of the rights of the Agency under this Agreement or any other Project Document to which the Agency is a party, make such payment or otherwise cure any failure by the Lessee to perform and to observe its other obligations hereunder.  All amounts so advanced therefor by the Agency shall become an additional obligation of the Lessee to the Agency, which amounts, together with interest thereon at the rate of twelve

29

percent (12%) per annum, compounded daily, from the date advanced, the Lessee will pay upon demand therefor by the Agency. Any remedy herein vested in the Agency for the collection of Rental Payments or other amounts due hereunder shall also be available to the Agency for the collection of all such amounts so advanced.

**Section 4.8**    **No Warranty of Condition or Suitability.** THE AGENCY HAS MADE AND MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY, CONDITION, FITNESS, DESIGN, OPERATION OR WORKMANSHIP OF ANY PART OF THE FACILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, THE QUALITY OR CAPACITY OF THE MATERIALS IN THE FACILITY, OR THE SUITABILITY OF THE FACILITY FOR THE PURPOSES OR NEEDS OF THE LESSEE OR ANY TENANT OR THE EXTENT TO WHICH FUNDS AVAILABLE TO THE LESSEE WILL BE SUFFICIENT TO PAY THE COST OF COMPLETION OF THE PROJECT. THE LESSEE ACKNOWLEDGES THAT THE AGENCY IS NOT THE MANUFACTURER OF THE FACILITY PERSONALTY NOR THE MANUFACTURER'S AGENT NOR A DEALER THEREIN. THE LESSEE, IS SATISFIED THAT THE FACILITY IS SUITABLE AND FIT FOR PURPOSES OF THE LESSEE. THE AGENCY SHALL NOT BE LIABLE IN ANY MANNER WHATSOEVER TO THE LESSEE OR ANY OTHER PERSON FOR ANY LOSS, DAMAGE OR EXPENSE OF ANY KIND OR NATURE CAUSED, DIRECTLY OR INDIRECTLY, BY THE PROPERTY OF THE FACILITY OR THE USE OR MAINTENANCE THEREOF OR THE FAILURE OF OPERATION THEREOF, OR THE REPAIR, SERVICE OR ADJUSTMENT THEREOF, OR BY ANY DELAY OR FAILURE TO PROVIDE ANY SUCH MAINTENANCE, REPAIRS, SERVICE OR ADJUSTMENT, OR BY ANY INTERRUPTION OF SERVICE OR LOSS OF USE THEREOF OR FOR ANY LOSS OF BUSINESS HOWSOEVER CAUSED.

## ARTICLE V

## AGENCY FINANCIAL ASSISTANCE (PAYMENTS IN LIEU OF TAXES, SALES TAX EXEMPTION AND MORTGAGE RECORDING TAX DEFERRAL); RECAPTURE OF PUBLIC BENEFITS

**Section 5.1**    **Payments in Lieu of Real Estate Taxes.**

(a)    Reserved.

(b)    Description and Address of Project; Representation. The Project consists of the acquisition, construction, re-construction, renovation and furnishing of an approximately 1,100,000 square foot building on an approximately 140,000 square foot parcel of land to be subleased by the Lessee to Permitted Sublessees. The Facility Realty is located at 850 Third Avenue, Brooklyn, New York 11232, being Section 3, Block 671 and Lot 1. The Lessee and the Agency acknowledge that the Facility Realty is located in a Zone.

(c)    Payments Prior to PILOT Commencement Date. Until the PILOT Commencement Date, or such later date as the Facility Realty is determined to be exempt from Real Estate Taxes, the Lessee shall pay to the City all Real Estate Taxes with respect to the Facility Realty at such times, in such manner and in such amounts as would be applicable if the Facility Realty were not leased to the Agency.

(d)    PILOT Generally.

30

(i)　　It is recognized that under the provisions of the Act the Agency is required to pay no Real Estate Taxes upon any of the property acquired by it or under its jurisdiction or control or supervision or upon its activities.  The Agency and the Lessee agree, however, that the Lessee shall be required to pay PILOT with respect to the Facility Realty in accordance with the provisions of this Section 5.1, as follows: (i) with respect to the Land, PILOT shall be in the amounts determined pursuant to Sections 5.1(e), (h) and (j); and (ii) with respect to the Improvements, PILOT shall be in the amounts determined pursuant to Sections 5.1(f), (g), (h) and (j).

(ii)　　The Agency makes no representation as to the availability of an exemption from Real Estate Taxes for the Facility Realty.  The Lessee acknowledges that the Agency has not represented the availability of any such exemption for the Facility Realty, and the Lessee hereby releases the Agency from any claim arising from any loss of the Financial Assistance that was contemplated hereunder.

(iii)　　The Lessee acknowledges that the PILOT Commencement Date will not be deferred notwithstanding any loss of Financial Assistance contemplated hereunder in the event that the City does not recognize the Agency's exemption from Real Estate Taxes on the PILOT Commencement Date.

(iv)　　The Agency shall have no obligation to take any action to correct any defect or deficiency that may prevent the Facility Realty from being recognized as exempt from Real Estate Taxes by the City.

(v)　　The Agency, in its sole discretion and in furtherance of the purposes of the Act, may waive, in whole or in part, the payment of PILOT for good cause shown.

(vi)　　Nothing herein contained shall be construed to prevent Lessee at any time from applying for any additional real estate tax abatements or reductions for the Facility.

(e)　　<u>PILOT with Respect to the Land</u>.  During the PILOT Term, PILOT with respect to the Land shall be payable in accordance with Section 5.1(g) in the amounts described below.

(i)　　From the PILOT Commencement Date up until the first Implementation Date, PILOT payable with respect to the Land shall equal zero.

(ii)　　PILOT payable with respect to the Land for each of the successive five-year periods between the first Implementation Date and the last three and one-half years of the PILOT Term, shall equal Adjusted ELT less the SLP for the five-year period in question (as determined on the appropriate Adjustment Date); *provided, however,* that the following shall apply:

(1)　　PILOT shall never be less than zero;

(2)　　PILOT shall equal zero if the SLP is greater than or equal to the OLP; and

(3)　　PILOT shall equal the DLP if the SLP is less than the OLP.

31

(iii)     Within ninety (90) days following each Adjustment Date, the Lessee shall deliver to the Agency a certificate (in the form of Exhibit M-2 annexed hereto) certifying the Average Equivalent Full Time Employee Number for that Adjustment Date.

(iv)     For the last three and one-half years of the PILOT Term, PILOT payable with respect to the Land shall equal the amounts provided below for the respective periods indicated.  (For purposes of the following: "**Fourth Land PILOT**" shall mean the PILOT payable with respect to the Land as of the third Adjustment Date; and, in the event the third Implementation Date is delayed (i.e., the Completion Date is delayed because of Unavoidable Delays), the period indicated immediately below (i.e., 01/01/34 – 06/30/37) may be shortened and the scheduled PILOT amounts may be adjusted, all in the discretion of the Agency.)

| 01/01/34 - 06/30/34 | [Fourth Land PILOT] + [(Adjusted ELT – Fourth Land PILOT) x (.0.2)] |
| 07/01/34 - 06/30/35 | [Fourth Land PILOT] + [(Adjusted ELT – Fourth Land PILOT) x (.0.4)] |
| 07/01/35 - 06/30/36 | [Fourth Land PILOT] + [(Adjusted ELT – Fourth Land PILOT) x (.0.6)] |
| 07/01/36 - 06/30/37 | [Fourth Land PILOT] + [(Adjusted ELT – Fourth Land PILOT) x (.0.8)] |

(f)     PILOT with Respect to the Improvements.

(i)     During the PILOT Term, but subject to Sections 5.1(d) and (i), PILOT with respect to the Improvements shall be payable in accordance with Section 5.1(g) in the amounts described below.

(1)     Existing Improvements.  From the PILOT Commencement Date through June 30, 2033, PILOT payable with respect to the Existing Improvements shall equal Adjusted Initial CRET.

(2)     Project Improvements. From the PILOT Commencement Date through June 30, 2033, PILOT payable with respect to the Project Improvements shall equal zero.   Upon completion of the Project Improvements (and notwithstanding the foregoing sentence), the Lessee shall promptly request the appropriate officer of the City to reassess the Improvements.

(3)     Additional Improvements.   From the PILOT Commencement Date through and including June 30, 2033, PILOT payable with respect to the Additional Improvements, if any, shall equal the Adjusted CRET applicable to such Additional Improvements.  Upon completion of Additional Improvements, if any, the Lessee shall promptly comply with the requirements of Section 3.5 and request the appropriate officers of the City to reassess the Improvements.

(4)     From January 1, 2034, through June 30, 2037, PILOT payable with respect to the Improvements shall equal the amounts respectively indicated for the periods set forth below.  (For purposes of the following: "**Adjusted Initial CRET**" applies only to the Existing Improvements ; and, in the event the Completion Date is delayed because of Unavoidable Delays, the period indicated immediately below (i.e., 01/01/34 – 06/30/37) may be shortened and the scheduled PILOT amounts may be adjusted, all in the discretion of the Agency.)

32

| | |
|---|---|
| 01/01/34 - 06/30/34 | [Adjusted Initial CRET] + [(Adjusted CRET – Adjusted Initial CRET) x (.0.2)] |
| 07/01/34 - 06/30/35 | [Adjusted Initial CRET] + [(Adjusted CRET – Adjusted Initial CRET) x (.0.4)] |
| 07/01/35 - 06/30/36 | [Adjusted Initial CRET] + [(Adjusted CRET – Adjusted Initial CRET) x (.0.6)] |
| 07/01/36 - 06/30/37 | [Adjusted Initial CRET] + [(Adjusted CRET – Adjusted Initial CRET) x (.0.8)] |

(g)   Payment Provisions.

(i)   The Lessee agrees to pay all PILOT required to be paid under this Section 5.1, seven (7) Business Days prior to July 1 or January 1 (as the case may be), in the amounts specified in PILOT Bills. The Agency agrees to request appropriate officers of NYCDOF to provide the Lessee with PILOT Bills. The Lessee understands and agrees that the failure of NYCDOF to send the Lessee a PILOT Bill shall not relieve the Lessee of its obligation hereunder to pay the amount of PILOT required in accordance with this Section 5.1. The Lessee may send all inquiries concerning PILOT Bills to pilot@finance.nyc.gov or: **PILOT Unit, NYC Department of Finance, 59 Maiden Lane, 22nd floor, New York, New York 10038.**

(ii)   Until such time the Agency may in writing require otherwise, the Lessee shall pay PILOT to the PILOT Depository and the Lessee shall make such payments by certified check or by bank draft payable at a bank in New York, New York. Notwithstanding the foregoing, if at any time the annual PILOT payments due by the Lessee are equal to or greater than $300,000, the Lessee shall make such payments by wire transfer and shall obtain the necessary wire transfer information from the NYCDOF.

(iii)   Upon the occurrence of a PILOT Payment Default, the amount of PILOT so in default shall continue as an obligation of the Lessee and the Lessee agrees to pay same to the PILOT Depository, together with the lesser of (aa) the maximum amount of interest permitted by law, and (bb) the greater of (i) interest thereon at the same rate per annum and compounded at the same frequency as is charged from time to time by the City with respect to the delinquent payment Real Estate Taxes, and (ii) a late payment fee of 5% of the amount of PILOT that was not paid when due and, for each month or part thereof that a payment is delinquent beyond the first month, an additional late payment fee of 1% per month on the original amount or portion thereof that was not paid when due that remains unpaid during such month or part thereof.

(iv)   Nothing contained herein shall limit or impair the Lessee's right, to the extent permitted by law, to do the following:

(1)   to obtain reductions in the valuation of the Facility Realty; or

(2)   to apply for as-of-right benefits that would reduce Real Estate Taxes with respect to the Facility Realty (as if the Facility Realty were not exempt from Real Estate Taxes); *provided, however,* that the foregoing shall not be construed to reduce PILOT payable under the this Section 5.1.

(h)   Apportionment of Payments after Cessation Date.

(i)   The Agency shall cause the appropriate officer or officers of the City to return the Facility Realty to the tax rolls as of the Cessation Date. During the City Tax Fiscal

33

Year in which the Cessation Date occurs, the Lessee and/or other subsequent owner of the Facility Realty shall be responsible for paying the Real Estate Taxes due for the portion of such City Tax Fiscal Year that remains from and after the Cessation Date.

        (ii)      With respect to the semi-annual period of the City Tax Fiscal Year during which the Cessation Date occurs, the Agency shall cause the appropriate officer or officers of the City to apportion that part of PILOT previously remitted for such semi-annual period (if any), which is attributable to the period commencing on the Cessation Date and ending on the June 30 or December 31 following (as the case may be), as a credit against the Real Estate Taxes owed for such semi-annual period.

      (i)      <u>Reduction or Withdrawal of Financial Assistance; Loss of Exemption.</u>

        (i)      *Sublettings.*  If any portion of the Facility Realty is occupied by any Person other than the Lessee or Permitted Sublessees, for so long as such use and/or occupancy continues, Lessee shall pay or cause to be paid additional PILOT in an amount which, as pro-rated to such used and/or occupied space, shall equal Adjusted CRET.

        (ii)      *Special Events of Default.*  The PILOT shall automatically increase (without notice other than the prior notice required for certain Events of Default) in an amount equal to Adjusted ELT as to the Land and Adjusted CRET as to the Improvements if:

           (1)      on the first Adjustment Date, the number of Industrial Employees fails to equal at least 1,300 as calculated according to at least one of the following two methods: (A) the average for the twelve months preceding the first Adjustment Date, or (B) the annual average for the four years preceding the first Adjustment Date; or

           (2)      on Adjustment Dates subsequent to the first Adjustment Date, the number of Industrial Employees fails to equal at least 1,300 as calculated according to at least one of the following two methods: (A) the average of the twelve months preceding the Adjustment Date, or (B) the annual average for the five years preceding such Adjustment Date; or

           (3)      upon the occurrence of a default by the Lessee under Section 8.19(d) hereof.

        (iii)      *Events of Default.*  Upon the occurrence of an Event of Default (other than the circumstances set forth in Section 5.1(i)(ii) above) and including but not limited to a PILOT Payment Default, the Agency may increase PILOT (without notice other than the prior notice required for certain Events of Default) in an amount equal to Adjusted ELT as to the Land and Adjusted CRET as to the Improvements.

        (iv)      *Loss of Exemption.*  Upon the occurrence of a Cessation Date, the Facility Realty shall be deemed automatically restored to the tax rolls, whether or not procedurally such restoration has in fact occurred, and the Lessee shall pay Real Estate Taxes with respect to the Facility Realty from and after such Cessation Date.

NY:1348523.11

**Section 5.2**        **Sales Tax Exemption**.

(a)        Any exemption from Sales Taxes resulting from or occasioned by the Agency's involvement with the Project shall be limited to purchases of Exempt Property effected by the Lessee as agent for the Agency pursuant to the Sales Tax Letter, it being the intent of the parties hereto that no operating expenses of the Lessee and no purchases of other personal property (other than Exempt Property) shall be subject to an exemption from Sales Taxes because of the Agency's title to or leasehold interest in the Facility or involvement with the Project Work.

(b)        The Lessee shall include language which is substantially in the form of paragraph 5 of the Sales Tax Letter (through an attached rider or otherwise) in and as part of each contract, agreement, invoice, bill or purchase order entered into by the Lessee as agent for the Agency in connection with the Project.  If the Lessee shall fail to include, incorporate by reference or otherwise cause the contract, agreement, invoice, bill or purchase order to be, together with the vendor or contractor, subject to the above referenced language in substantially the form thereof, such contract, agreement, invoice, bill or purchase order, shall not be an undertaking on behalf of the Agency and shall not be entitled to any of the Benefits that the Agency can confer, and the Lessee shall not claim any sales or use tax benefits or exemptions with respect to any such contract, agreement, invoice, bill or purchase order, and the Lessee shall return to the Agency or pay at its direction any such benefits or exemptions so taken, together with interest on such amount at the annual rate of twelve percent (12%) per annum, compounded daily from the date of such taking.

(c)        On the Commencement Date, the Agency shall make the Sales Tax Letter available to the Lessee in substantially the form of Exhibit H — "Form of Sales Tax Letter".  The Agency, at the sole cost and expense of the Lessee, shall also execute such other authorizations, letters and documents (and such amendments to the Sales Tax Letter) as may be reasonably necessary to permit the Lessee to obtain the intended benefits hereunder.  Subject to the terms of this Agreement, it is intended that the aggregate scope of the sales and use tax benefits received by the Lessee pursuant to this Agreement and the Sales Tax Letter shall be limited in both duration and amount as follows:

(i)        The initial Sales Tax Letter shall be dated the Commencement Date and shall be effective for a term commencing on its date and expiring upon the earliest of (A) September 1, 2014, (B) the termination of this Agreement, or (C) the termination of the Sales Tax Letter pursuant to Section 9.2.  If the initial Sales Tax Letter expires on September 1, 2014, neither of the circumstances set forth in the preceding clauses "(B)" and "(C)" have occurred, and the Substantial Completion Date has been extended due to Unavoidable Delays, the Agency shall promptly deliver to the Lessee a replacement Sales Tax Letter which shall expire on the earliest of (A) the Sales Tax Letter Expiration Date, (B) the termination of this Agreement, or (C) the termination of the Sales Tax Letter pursuant to Section 9.2.

(ii)        The authorizations set forth in the Sales Tax Letter shall automatically be suspended twenty (20) days after notice to the Lessee that the Lessee shall be in default under this Agreement until the Lessee shall pay any amounts due, and perform all of its obligations, with respect to any such default.

(iii)        The sales and use tax exemption to be provided pursuant to the Sales Tax Letter:

(A)        shall not be available for any items of personalty or payment of any costs other than the costs of the Exempt Property,

(B)      shall only be utilized for items of Exempt Property which shall be purchased, incorporated, completed or installed for use only by the Lessee at the Facility Realty (and not with any intention to sell, transfer or otherwise dispose of any such items of Exempt Property to a Person as shall not constitute the Lessee), it being the intention of the Agency and the Lessee that the sales and use tax exemption shall not be made available with respect to any item of Exempt Property unless such item is used solely by the Lessee at the Facility Realty,

(C)      shall not be available for any date after the Sales Tax Letter shall have been suspended as provided in Section 5.2(c)(ii), provided, however, that in the event the Lessee shall thereafter cure any defaults under this Agreement, or the Agency shall thereafter waive such suspension, as applicable, the sales and use tax exemption shall again be available from the date of such cure or such waiver,

(D)      shall not be available for any item the acquisition or leasing of which would otherwise be exempt from Sales Tax absent the involvement by the Agency,

(E)      shall not be available for any cost of utilities, cleaning service or supplies or other costs of operation, and

(F)      shall not be available subsequent to the expiration of the Sales Tax Letter.

(iv)      In the event that the Lessee shall utilize the sales or use tax exemption authorization provided pursuant to the Sales Tax Letter in violation of the provisions of Section 5.2 (c)(iii), the Lessee shall promptly deliver notice of same to the Agency, and the Lessee shall, upon demand by the Agency, pay to or at the direction of the Agency a return of sales or use tax exemptions in an amount equal to all such unauthorized sales or use tax exemptions together with interest at the rate of twelve percent (12%) per annum compounded daily from the date and with respect to the dollar amount for which each such unauthorized sales or use tax exemption was availed of by the Lessee.

(v)      Upon request by the Agency with reasonable notice to the Lessee, the Lessee shall make available at reasonable times to the Agency and/or the Independent Accountant all such books, records, contracts, agreements, invoices, bills or purchase orders of the Lessee, and require all appropriate officers and employees of the Lessee to respond to reasonable inquiries by the Agency and/or the Independent Accountant, as shall be necessary (y) to indicate in reasonable detail those costs for which the Lessee shall have utilized the Sales Tax Letter and the dates and amounts so utilized, and (z) to permit the Agency to determine any amounts owed by the Lessee under this Section 5.2.

(vi)      Section 874(9) of the Enabling Act and New York State Department of Taxation and Finance Form ST-60 "IDA Appointment of Project or Agent" (**"Form ST-60"**) require that within thirty (30) days of the date that the Agency or its agent directly or indirectly appoint a project operator or other person or entity to act as agent of the Agency for purposes of extending a sales or use tax exemption to such person or entity, the Agency must file a completed Form ST-60 with respect to such person or entity. Promptly following any such appointment by

36

or on behalf of the Lessee, the Lessee shall electronically submit to the Agency a Form ST-60 completed with the information required therein as provided in Annex B to the Sales Tax Letter.

(d)      The Lessee shall observe and comply with the terms and conditions of the Sales Tax Letter including without limitation Annex B to the Sales Tax Letter relative to compliance with certain required procedures, and upon the termination, expiration or cancellation of the Sales Tax Letter, the Lessee shall promptly surrender the same to the Agency.

(e)      Reference is made to Section 8.16(c) pursuant to which the Lessee has agreed to file (y) Form ST-340 (or any successor or additional mandated form) with regard to use of the Sales Tax Letter, and (z) a completed Sales Tax Exemption Report.

### Section 5.3      **Mortgage Recording Tax Deferral**.

(a)      Reserved.

(b)      The Lessee acknowledges that the Agency has deferred the payment of Mortgage Recording Taxes on each Exempt Mortgage for a term, such term to commence on the date of recording of such Exempt Mortgage and to end on the earliest to occur of (i) the Expiration Date, (ii) the Termination Date, (iii) the maturity or sooner termination of such Exempt Mortgage, or (iv) an Event of Default that remains uncured beyond any applicable cure period as provided in Section 9.1 hereof.

[If there is no deferral of Mortgage Recording Taxes at closing, this paragraph will be replaced by the following: "On or before the Completion Date, the Lessee may require the Agency to defer the payment of Mortgage Recording Taxes on each Exempt Mortgage for a term, such term to commence on the date of recording of such Exempt Mortgage and to end on the earliest to occur of (i) the Expiration Date, (ii) the Termination Date, (iii) the maturity or sooner termination of such Exempt Mortgage, or (iv) an Event of Default that remains uncured beyond any applicable cure period as provided in Section 9.1 hereof."]

(c)      The Lessee acknowledges and agrees that the Agency is not obligated to defer the payment of Mortgage Recording Taxes for the recording of any mortgage other than an Exempt Mortgage; nor is the Agency obligated to defer the payment of Mortgage Recording Taxes on any extension, modification or other amendment to, or any assignment, consolidation or restatement of, an Exempt Mortgage except as otherwise provided in paragraph (d) of this Section 5.3.

(d)      The Agency agrees that if, in connection with the refinancing of an Exempt Mortgage, the Lessee (i) causes the mortgagee of the Exempt Mortgage to assign the Exempt Mortgage to a new mortgagee, and/or (ii) causes the Exempt Mortgage to be modified, extended, consolidated or otherwise amended, the Agency will not object to any resulting continuation of the deferral of the Mortgage Recording Taxes originally applicable to the Exempt Mortgage; *provided, however, that* the following conditions are satisfied: (aa) the Agency is made a party to the Modified Exempt Mortgage; and (bb) the Modified Exempt Mortgage has provisions reasonably acceptable to the Agency; and (cc) a Gap Mortgage is concurrently delivered to secure New Money, if any; and (cc) if applicable, at the time the refinancing is closed and the Modified Exempt Mortgage is executed and delivered, the Lessee shall make the following payments to NYCDOF:

(i)      Mortgage Recording Taxes with respect to any Gap Mortgage unless such Gap Mortgage is exempt from Mortgage Recording Tax by reason other than the Agency's exemption; and

37

(ii)    NPV-PILOMRT with respect to any Non-Exempt Principal less the amount of any principal for which Mortgage Recording Taxes and/or PILOMRT and/or NPV-PILOMRT have already been paid or are being concurrently paid.

(e)    If this Agreement terminates prior to the Expiration Date and, as a result there is Non-Exempt Principal for which Mortgage Recording Taxes, PILOMRT, NPV-PILOMRT and/or a payment under Section 5.4 has not been paid, the Lessee shall either pay PILOMRT with respect to such Non-Exempt Principal or deliver in-lieu thereof a satisfaction of the Exempt Mortgage to the Agency.

(f)    The Lessee agrees that, notwithstanding delivery by the Lessee of a satisfaction of an Exempt Mortgage on the Expiration Date or on any earlier date when this Agreement may be terminated, or evidence of any reduction in the anticipated amount of Non-Exempt Principal outstanding as of the Expiration Date, the Agency shall not be obligated to refund to the Lessee any amounts of PILOMRT or NPV-PILOMRT previously paid.

**Section 5.4    Recapture of Public Benefits.**  It is understood and agreed by the parties to this Agreement that the Agency is entering into this Agreement in order to provide financial assistance to the Lessee for the Project and to accomplish the public purposes of the Act.  In consideration therefor, the Lessee hereby agrees as follows:

(a)    For purposes of this Section 5.4, the following terms shall have the meanings specified below:

**Benefits** shall mean, collectively:

(i)    all real estate tax benefits that have accrued to the benefit of the Lessee during such time as the Agency had a leasehold or controlling interest in the Facility Realty, such tax benefits to be computed by subtracting PILOT paid from those payments that the Lessee would have paid during the term of this Agreement (i.e., Adjusted ELT and, as to the Improvements, Adjusted CRET) had the Agency not had a leasehold or controlling interest in the Facility Realty during such term; and

(ii)    all miscellaneous benefits derived from the Agency's participation in the Straight-Lease Transaction contemplated by this Agreement, including any deferral from any applicable mortgage recording taxes, Sales Taxes, and filing and recording fees.

**Operations Commencement Date** shall mean the July 1 occurring after the fourth anniversary of the Completion Date.

**Recapture Event** shall mean any one of the following events:

(i)    The Lessee shall have failed to complete, or caused to be completed, the Initial Project Work by the Substantial Completion Date.

(ii)    The Lessee shall have failed to complete, or caused to be completed, the Project Improvements by the Completion Date.

(iii)    Except as permitted by written consent of the Agency pursuant to and in accordance with Section 8.20, the Lessee shall have liquidated all or substantially all of its operating assets or shall have ceased all or substantially all of its operations.

38

(iv)    The Lessee shall have substantially changed the scope and nature of their operations at the Facility or some or all of the Tenants at the Facility to such extent that the Facility has ceased to be an Approved Facility.

(v)    Except as permitted by written consent of the Agency pursuant to and in accordance with Section 8.20, the Lessee shall have sold, leased or otherwise disposed of all or substantially all of the Facility Realty.

(vi)    The Lessee shall have subleased all or part of the Facility Realty in violation of Section 8.9.

Notwithstanding the foregoing, a Recapture Event shall not be deemed to have occurred if the Recapture Event:

(A)    shall have arisen as a direct, immediate result of (x) an Unavoidable Delays, (y) a taking or condemnation by governmental authority of all or substantially all of the Facility Realty, or (z) the inability at law of the Lessee to rebuild, repair, restore or replace the Facility Realty after the occurrence of a Loss Event to substantially its condition prior to such Loss Event, which inability shall have arisen in good faith through no fault on the part of the Lessee, or any Affiliate, or

(B)    is deemed, in the sole discretion of the Agency, to be (y) minor in nature, or (z) a cause of undue hardship to the Lessee if the Agency were to recapture any Benefits.

**Recapture Period** shall mean the period of time commencing on the Commencement Date, and expiring on the date which is the tenth anniversary of the Operations Commencement Date.

(b)    If there shall occur a Recapture Event during the Recapture Period, but such Recapture Event is prior to the Operations Commencement Date, the Lessee shall pay to the Agency as a return of Financial Assistance conferred by the Agency, the following amounts upon demand by the Agency: (i) all Benefits; and (ii) interest described in Section 5.4(c)(iii).

(c)    If there shall occur a Recapture Event during the Recapture Period, but such Recapture Event occurs after the Operations Commencement Date, the Lessee shall pay to the Agency as a return of Financial Assistance conferred by the Agency, the following amounts (as applicable) upon demand by the Agency:

(i)    If the Recapture Event occurs within the first six (6) years after the Operations Commencement Date, one hundred percent (100%) of the Benefits.

(ii)    If the Recapture Event occurs within any month during any one of the seventh, eighth, ninth or tenth years after the Operations Commencement Date, X percent of the Benefits (where "X" is a percent equal to 100% less Y, and where "Y" equals the product of 1.666% and the number of months elapsed commencing with the first month of the seventh year through and including the month in which the Recapture Event occurs).

(iii)    The principal of the Benefits to be recaptured, whether pursuant to clause (i) or (ii) above, shall bear interest at a rate equal to the lesser of (x) the maximum amount of interest permitted by law, and (y) the statutory judgment rate, compounded daily, commencing

39

from the date that any amount of Benefit principal has accrued to the Lessee, through and including the date such principal is repaid in full; such that (x) Benefit principal comprising mortgage recording taxes, or filing and recording fees, shall be deemed to have accrued to the Lessee on the Commencement Date, and (y) Benefit principal comprising real estate tax benefits shall be deemed to have accrued to the Lessee on each date upon which the Lessee shall make a payment of PILOT, and (z) Benefit principal comprising Sales Tax Savings shall be deemed to have accrued to the Lessee on each date upon which such Sales Tax Saving shall have been received by reason of the use by the Lessee of the Sales Tax Letter, provided, however, that if the Lessee cannot establish to the Agency's satisfaction the applicable date of receipt, the Agency shall deem the date of receipt (and therefore the date on which the Benefit principal accrued) to be the first day of the calendar year for which exemption was reported by the Lessee to the State Department of Taxation and Finance on Form ST-340, or, if the Lessee shall have failed to file Form ST-340, the Commencement Date.  The "statutory judgment rate" shall be the statutory judgment rate in effect on the date of the Agency's demand.

For purposes of this Section 5.4, demand for payment by the Agency shall be made in accordance with the notice requirements of this Agreement and the due date for payment shall be not less than seven (7) Business Days from the date of the notice.

(d)      The Lessee shall furnish the Agency with written notification of any Recapture Event within ten (10) days of its occurrence and shall subsequently provide to the Agency in writing any additional information that the Agency may request.

(e)      The provisions of this Section 5.4 shall survive the termination of this Agreement for any reason whatsoever, notwithstanding any provision of this Agreement to the contrary.

## ARTICLE VI

## DAMAGE, DESTRUCTION AND CONDEMNATION

**Section 6.1**      **Damage, Destruction and Condemnation.**  In the event that at any time during the term of this Agreement the whole or part of the Facility shall be damaged or destroyed, or taken or condemned by a competent authority for any public use or purpose, or by agreement to which the Lessee and those authorized to exercise such right are parties, or if the temporary use of the Facility shall be so taken by condemnation or agreement (a "Loss Event"):

(i)      the Agency shall have no obligation to rebuild, replace, repair or restore the Facility,

(ii)      there shall be no abatement, postponement or reduction in the Rental Payments payable by the Lessee under this Agreement or any other Project Document to which it is a party, and the Lessee hereby waives the provisions of Section 227 of the New York Real Property Law or any law of like import now or hereafter in effect, and

(iii)      the Lessee will promptly give written notice of such Loss Event to the Agency, generally describing the nature and extent thereof.

**Section 6.2**      **Loss Proceeds**.

(a)      The Agency and the Lessee shall cooperate and consult with each other in all matters pertaining to the settlement, compromise, arbitration or adjustment of any claim or demand on

40

account of any Loss Event, and the settlement, compromise, arbitration or adjustment of any such claim or demand shall, as between the Agency and the Lessee, be subject to the written approval of the Lessee.

(b)     The Lessee shall be entitled to the Net Proceeds of any insurance proceeds or condemnation award, compensation or damages attributable to the Lessee's Property, provided that nothing contained in this Agreement shall be deemed to modify the obligations of the Lessee pursuant to any Mortgage with respect to property insurance proceeds and condemnation awards. The obligations of the Lessee hereunder shall be independent of any such other obligations relating to insurance proceeds and condemnation awards.

**Section 6.3**        **Election to Rebuild or Terminate**.

(a)     In the event a Loss Event shall occur, the Lessee shall either:

(i)     at its own cost and expense (except to the extent paid from the Net Proceeds), within two (2) years of the Loss Event, promptly and diligently rebuild, replace, repair or restore the Facility to substantially its condition immediately prior to the Loss Event, or to a condition of at least equivalent value, operating efficiency and function, regardless of whether or not the Net Proceeds derived from the Loss Event shall be sufficient to pay the cost thereof, and the Lessee shall not by reason of payment of any such excess costs be entitled to any reimbursement from the Agency, or

(ii)     exercise its option to terminate this Agreement as provided in Section 10.1;

provided that if all or substantially all of the Facility shall be taken or condemned, or if the taking or condemnation renders the Facility unsuitable for use by the Lessee or the Permitted Sublessees as contemplated hereby, the Lessee shall exercise its option to terminate this Agreement as provided in Section 10.1.

(b)     As soon as practicable but no later than ninety (90) days after the occurrence of the Loss Event, the Lessee shall advise the Agency in writing of the action to be taken by the Lessee under this Section 6.3, a failure to advise the Agency timely being deemed an election in favor of Section 6.3(a)(ii).

**Section 6.4**        **Effect of Election to Build**.

(a)     All rebuilding, replacements, repairs or restorations of the Facility in respect of or occasioned by a Loss Event shall:

(i)     automatically be deemed a part of the Facility and shall be subject to the Company Lease and this Agreement,

(ii)     be effected only if the Lessee shall deliver to the Agency an Opinion of Counsel acceptable to the Agency to the effect that such rebuilding, replacement, repair or restoration shall not change the nature of the Facility as the Approved Facility and a qualified "project" as defined in the Act,

(iii)     be effected with due diligence in a good and workmanlike manner, in compliance with all applicable Legal Requirements and be promptly and fully paid for by the Lessee in accordance with the terms of the applicable contract(s) therefor,

41

(iv)    restore the Facility to substantially its condition immediately prior to the Loss Event, or to a condition of at least equivalent value, operating efficiency and function, and to a state and condition that will permit the Lessee to use and operate the Facility as the Approved Facility that will qualify as a qualified "project" as defined in the Act, and

(v)    be effected only if the Lessee shall have complied with Section 8.1(c).

(b)    The date of completion of the rebuilding, replacement, repair or restoration of the Facility shall be evidenced to the Agency by a certificate of an Authorized Representative of the Lessee stating (i) the date of such completion, (ii) that all labor, services, machinery, equipment, materials and supplies used therefor and all costs and expenses in connection therewith have been paid for or arrangement for payment, reasonably satisfactory to the Agency, has been made (iii) that the Facility has been rebuilt, replaced, repaired or restored to substantially its condition immediately prior to the Loss Event, or to a condition of at least equivalent value, operating efficiency and function, (iv) that the Agency has good and merchantable title to all Facility Personalty and a good and valid leasehold interest in all property constituting part of the Facility Realty, and all property of the Facility is subject to the Company Lease (except in the case of the Facility Personalty) and this Agreement, subject to Permitted Encumbrances, and (v) that the restored Facility is ready for occupancy, use and operation for its intended purposes. Notwithstanding the foregoing, such certificate may state (x) that it is given without prejudice to any rights against third parties by the Lessee that exist at the date of such certificate or that may subsequently come into being, (y) that it is given only for the purposes of this Section and (z) that no Person other than the Agency may benefit therefrom.

(c)    The certificate delivered pursuant to Section 6.4(b) shall be accompanied by (i) a certificate of occupancy (either temporary or permanent, provided that if it is a temporary certificate of occupancy, the Lessee will proceed with due diligence to obtain a permanent certificate of occupancy), if required, and any and all permissions, licenses or consents required of governmental authorities for the occupancy, operation and use of the Facility for the purposes contemplated by this Agreement; (ii) a certificate of an Authorized Representative of the Lessee that all costs of rebuilding, repair, restoration and reconstruction of the Facility have been paid in full, together with releases of mechanics' liens by all contractors and materialmen who supplied work, labor, services, materials or supplies in connection with the rebuilding, repair, restoration and reconstruction of the Facility (or, to the extent that any such costs shall be the subject of a bona fide dispute, evidence to the Agency that such costs have been appropriately bonded or that the Lessee shall have posted a surety or security at least equal to the amount of such costs); and (iii) a search prepared by a title company, or other evidence satisfactory to the Agency, indicating that there has not been filed with respect to the Facility any mechanic's, materialmen's or any other lien in connection with the rebuilding, replacement, repair and restoration of the Facility and that there exist no encumbrances or those encumbrances consented to by the Agency.

## ARTICLE VII

## COVENANT OF THE AGENCY

**Section 7.1    Quiet Enjoyment.** The Agency covenants and agrees that, subject to the terms and provisions of the Permitted Encumbrances (and any other impairments of title whether or not appearing on the title insurance policy referred to in Section 3.8), so long as the Lessee shall pay the Rental Payments payable by it under this Agreement and shall duly observe all the covenants, stipulations and agreements herein contained obligatory upon it and an Event of Default shall not exist hereunder, the Agency shall not disturb the peaceful, quiet and undisputed possession of the Facility by the Lessee under this Agreement, and the Agency (at the sole cost and expense of the Lessee) shall from time to time take all necessary action to that end.

42

## ARTICLE VIII

## COVENANTS OF THE LESSEE

**Section 8.1**       **Insurance**.

(a)       Definitions.  For purposes of this Section 8.1, the following terms shall have the meanings specified below:

**Certificate** means an ACORD certificate evidencing insurance.

**CGL** means commercial general liability insurance.

**Contractor(s)** means, individually or collectively, a contractor or subcontractor providing materials and/or labor and/or other services in connection with any Construction, but not including a GC, CM or any architect or engineer providing professional services.

**CM** means a construction manager providing construction management services in connection with any Construction.

**Construction** means any construction, reconstruction, restoration, renovation, alteration and/or repair on, in, at or about the Facility Realty, including the Project Work or any other construction, reconstruction, restoration, alteration and/or repair required under this Agreement in connection with the Facility, provided, that, one or both of the following conditions applies to the foregoing:  (i) the cost thereof, labor and materials combined, is $500,000 or greater, or (ii) the work being performed, whether in whole or in part, is roof work or work that is performed at a height of more than eight (8) feet above the ground.

**GC** means any general contractor providing general contracting services in connection with any Construction.

**Insured** means the Lessee.

**Insurer** means any entity writing or issuing a Policy.

**ISO** means the Insurance Services Office or its successor.

**ISO Form CG-0001** means the CGL form published by ISO at the Commencement Date.

**Policy(ies)** means, collectively or individually, the policies required to be obtained and maintained pursuant to Section 8.1(b) and (c).

**SIR** means self-insured retention.

**U/E** means Umbrella or Excess Liability insurance.

**Workers' Compensation** means Workers' Compensation, disability and employer liability insurance.

43

(b)    <u>Required Insurance</u>. Throughout the term of this Agreement, except during periods of Construction, each Insured shall obtain and maintain for itself as a primary insured the following insurance:

(i)    CGL with $1,000,000 minimum per occurrence and $2,000,000 minimum in the aggregate, per-location aggregate, and on a per occurrence basis. This Policy shall contain coverage for contractual liability, premises operations, and products and completed operations.

(ii)    U/E with $24,000,000 minimum per occurrence on terms consistent with CGL. The excess coverage provided under U/E shall be incremental to the CGL to achieve minimum required coverage of $25,000,000 per occurrence; such incremental coverage must also apply to auto liability (when such coverage applies; see Section 8.1(b)(iii)), whether auto liability coverage is provided by endorsement to the Insured's CGL or by a stand-alone policy.

(iii)    Auto liability insurance with $2,000,0000 combined single limit and $2,000,000 for uninsured or under-insured vehicles. If neither of the Insureds owns any vehicles, each shall obtain auto liability insurance in the foregoing amounts for hired and non-owned vehicles. Notwithstanding, in the event that the Authorized Representative for the Lessee deliver a certificate to the Agency certifying that it does not own, hire, rent or uses a vehicle of any sort, the Agency shall deem such certifications to satisfy the requirements of this sub-section "iii."

(iv)    Workers Compensation satisfying State statutory limits. Coverage for employer liability shall be in respect of any work or operations in, on or about the Facility Realty.

(c)    <u>Required Insurance During Periods of Construction</u>. In connection with any Construction and throughout any period of such Construction, the Lessee shall cause the following insurance requirements to be satisfied:

(i)    Each Insured shall obtain and maintain for itself Policies in accordance with all requirements set forth in Section 8.1(b), except that CGL and U/E shall be in an aggregate minimum amount of $40,000,000 per project aggregate.

(ii)    Any GC or CM shall obtain and maintain for itself as a primary insured the following Policies:

(A)    CGL and U/E in accordance with the requirements in Section 8.1(b), subject to the following modifications: (x) coverage shall be in an aggregate minimum amount of $10,000,000 per project aggregate, and (y) completed operations coverage shall extend (or be extended) for an additional five (5) years after completion of the Construction;

(B)    Auto liability insurance in accordance with the requirements in Section 8.1(b); and

(C)    Workers' Compensation in accordance with the requirements in Section 8.1(b).

(iii)    Each Contractor shall obtain and maintain for itself as a primary insured the following insurance:

44

(A)     CGL and U/E in accordance with the requirements in Section 8.1(b) except that, in addition, completed operations coverage shall extend (or be extended) for an additional five (5) years after completion of the Construction;

(B)     Auto Liability insurance in accordance with the requirements in Section 8.1(b); and

(C)     Workers' Compensation in accordance with the requirements in Section 8.1(b).

Notwithstanding the foregoing, the coverage amounts (for CGL and U/E) required in this subsection (c) may be modified provided that at no time during any period of Construction shall the combined aggregate of CGL and U/E be less than $50,000,000.

(d)     Required Policy Attributes.   Except as the Agency shall expressly otherwise agree in writing in its sole and absolute discretion:

(i)     The Lessee shall cause each Policy (other than Worker's Compensation insurance) to name the Agency as an additional insured on a primary and non-contributory basis as more particularly required in Section 8.1(f)(i).

(ii)     No Policy shall have a deductible in excess of $25,000.

(iii)     CGL shall not be subject to SIR.

(iv)     CGL and Auto Liability shall be written on, respectively, ISO Form CG-0001 and ISO Form CA-0001, or on such other equivalent forms as same may be reasonably acceptable to the Agency but only if the substitute form being proposed as equivalent is provided to the Agency sixty (60) days prior to the intended effective date.

(v)     The Lessee acknowledges that the Agency is materially relying upon the content of ISO Form CG-0001 (or its equivalent if applicable) to implement the Agency's insurance requirements under this Section 8.1; accordingly, the Lessee agrees that non-standard exclusions and other modifications to ISO Form CG-0001 (or to its equivalent if applicable) are prohibited under the terms and conditions of this Section 8.1.  By way of example and not limitation, no Policy delivered hereunder shall limit (whether by exception, exclusion, endorsement, script or other modification) any of the following coverage attributes:

(A)     contractual liability coverage insuring the contractual obligations of the Insureds;

(B)     the right of the Insureds to name additional insureds including the Agency;

(C)     the applicability of CGL coverage to the Agency as an additional insured in respect of liability arising out of any of the following claims: (x) claims against the Agency by employees of an Insured, or (y) claims against the Agency by any GC, CM, Contractor, architect or engineer or by the employees of any of the foregoing, or (z) claims against the Agency arising out of any work performed by a GC, CM, Contractor, architect or engineer.

45

(vi)     U/E shall follow the form of CGL except that U/E may be broader.

(vii)     The Policies for CGL and U/E shall each provide primary insurance and the issuing Insurer shall not have a right of contribution from any other insurance policy insuring the Agency.

(viii)     In each Policy, the Insurer shall waive, as against any Person insured under such Policy including any additional insured, the following: (x) any right of subrogation, (y) any right to set-off or counterclaim against liability incurred by a primary insured or any additional insured, and (z) any other deduction, whether by attachment or otherwise, in respect of any liability incurred by any primary insured or additional insured.

(ix)     The Agency shall not be liable for any insurance premium, commission or assessment under or in connection with any Policy.

(e)     Required Insurer Attributes.  All Policies must be issued by Insurer satisfying the following requirements:

(i)     Insurer shall have a minimum AM Best rating of A minus.

(ii)     Each Insurer must be an authorized insurer in accordance with Section 107(a) of the New York State Insurance Law.

(iii)     Insurer must be admitted in the State; provided, however, that if an Insured requests the Agency to accept a non-admitted Insurer, and if the Agency reasonably determines that for the kind of operations performed by the Insured an admitted Insurer is commercially unavailable to issue a Policy or is non-existent, then the Agency shall provide its written consent to a non-admitted Insurer.  For purposes of this paragraph, an "admitted" Insurer means that the Insurer's rates and forms have been approved by the State Insurance Department and that the Insurer's obligations are entitled to be insured by the State's insurance guaranty fund.

(f)     Required Evidence of Compliance.  The Lessee shall deliver or cause to be delivered, throughout the term of this Agreement, evidence of all Policies required hereunder as set forth in this Section 8.1(f):

(i)     All Policies with respect to all Policies on which an Insured is to be a primary insured, the Insured shall deliver to the Agency a Certificate or Certificates evidencing all Policies required by this Section 8.1: (x) at the Commencement Date, (y) prior to the expiration or sooner termination of Policies, and (z) prior to the commencement of any Construction.  If the Certificate in question evidences CGL, such Certificate shall name the Agency as an additional insured in the following manner:

*New York City Industrial Development Agency is an additional insured on a primary and non-contributory basis for both CGL and Umbrella/Excess.  The referenced CGL is written on ISO Form CG-0001 without modification to the contractual liability or waiver-of-subrogation provisions therein, covering the following premises:  850 Third Avenue, Brooklyn, New York 11232;*

(ii)     CGL.  With respect to CGL on which an Insured is to be a primary insured, such Insured shall additionally deliver to the Agency the following:

46

(A)    Prior to the Commencement Date the Insured shall deliver to the Agency the declarations page and the schedule of forms and endorsements pertinent thereto.

(B)    Upon the expiration or sooner termination of any CGL, the Insured shall deliver to the Agency a declarations page and schedule of forms and endorsements pertinent to the new or replacement CGL.

(C)    Prior to the commencement of any Construction, the Insured shall deliver to the Agency a declarations page and a schedule of forms and endorsements pertinent to the CGL under which the Insured is to be the primary insured during the period of such Construction.

(iii)    Insurance to be obtained by GCs and CMs.  Prior to the commencement of any Construction that entails the services of a GC or CM, the Lessee shall provide to the Agency, in a form satisfactory to the Agency, evidence that the GC or CM (as the case may be) has obtained the Policies that it is required to obtain and maintain in accordance with Section 8.1(c).

(iv)    Insurance to be obtained by Contractors.    In connection with any Construction, the Lessee shall, upon the written request of the Agency, cause any or all Contractors to provide evidence satisfactory to the Agency, that such Contractors have obtained and maintain the Policies that they are required to obtain and maintain in accordance with the requirements of Section 8.1(c).

(g)    Required Notices. (i) The Lessee shall immediately give the Agency notice of each occurrence that is reasonably probable to give rise to a claim under the insurance required to be maintained by this Section 8.1. (ii) The Lessee shall in writing immediately notify the Agency of the cancellation of any Policy. (iii) In the event that any of the Policies pertain to and cover properties (other than the Facility Realty that are not disclosed in Sub-Section (h)(i) of this Section 8.1, the Lessee shall in writing notify the Agency of such additional properties.

(h)    Miscellaneous.

(i)    The Lessee represents that the Policies pertain to and cover the Facility Realty exclusively.

(ii)    In the event that any of the Policies pertain to and cover properties (other than the Facility Realty) that are not set forth in sub-section "i" preceding, the Agency shall have the right to demand higher Policy amounts therefor provided that the incremental coverage demanded by the Agency is reasonably related to such additional or substitute properties and the operations carried out or to be carried out thereon.

(iii)    If, in accordance with the terms and conditions of this Section 8.1, an Insured is required to obtain the Agency's consent, the Lessee shall request such consent in a writing provided to the Agency at least thirty (30) days in advance of the commencement of the effective period (or other event) to which the consent pertains.

(iv)    Throughout the term of this Agreement, delivery by an Insured of a Certificate evidencing auto liability insurance for hired and non-owned vehicles shall, unless

47

otherwise stated by the Lessee to the contrary, constitute a representation and warranty from the Insured to the Agency that the Insured does not own vehicles.

(v)     An Insured shall neither do nor omit to do any act, nor shall it suffer any act to be done, whereby any Policy would or might be terminated, suspended or impaired.

(vi)     If, throughout the term of this Agreement, insurance industry standards applicable to properties similar to the Facility Realty and/or operations similar to the operations of the Lessee, materially change; and if, as a consequence of such change, the requirements set forth in this Section 8.1 become inadequate in the reasonable judgment of the Agency for the purpose of protecting the Agency against third-party claims, then the Agency shall have the right to supplement and/or otherwise modify such requirements, provided, however, that such supplements or modifications shall be commercially reasonable.

(vii)     Nothing contained in this Agreement shall be deemed to modify the obligations of the Lessee pursuant to any Mortgage with respect to property insurance or the application of proceeds thereof and said Mortgage. The obligations of the Lessee hereunder shall be independent of any such other obligations relating to insurance.

(viii)     The Agency, in its sole discretion and without obtaining the consent of any Mortgagee or any Guarantor or any other party to the transactions contemplated by this Agreement, may waive particular requirements under this Section 8.1. Notwithstanding, the Lessee shall be estopped from claiming that the Agency has made any such waiver unless the Agency has executed and delivered a written instrument for the purpose of effectuating such waiver.

(ix)     THE AGENCY DOES NOT REPRESENT THAT THE INSURANCE REQUIRED IN THIS SECTION 8.1, WHETHER AS TO SCOPE OR COVERAGE OR LIMIT, IS ADEQUATE OR SUFFICIENT TO PROTECT THE INSURED AND THEIR OPERATIONS AGAINST CLAIMS AND LIABILITY.

**Section 8.2**     **Indemnity**.

(a)     The Lessee shall at all times indemnify, defend, protect and hold the Agency, and any director, member, officer, employee, servant, agent (excluding for this purpose the Lessee, which is not obligated hereby to indemnify its own employees, Affiliates or affiliated individuals) thereof and persons under the Agency's control or supervision, and the PILOT Depository (collectively, the "**Indemnified Parties**" and each an "**Indemnified Party**") harmless of, from and against any and all claims (whether in tort, contract or otherwise), taxes (of any kind and by whomsoever imposed), demands, penalties, fines, liabilities, lawsuits, actions, proceedings, settlements, costs and expenses, including attorney and consultant fees, investigation and laboratory fees, court costs, and litigation expenses (collectively, "**Claims**") of any kind for losses, damage, injury and liability (collectively, "**Liability**") of every kind and nature and however caused (except, with respect to any Indemnified Party, Liability arising from the gross negligence or willful misconduct of such Indemnified Party), arising during the period commencing on the Indemnification Commencement Date, and continuing throughout the term of this Agreement, arising upon, about, or in any way connected with the Facility, the Project, or any of the transactions with respect thereto, including:

(i)     the financing of the costs of the Facility or the Project,

48

(ii)    the planning, design, acquisition, site preparation, Project Work, construction, renovation, equipping, installation or completion of the Project or any part thereof or the effecting of any work done in or about the Facility, or any defects (whether latent or patent) in the Facility,

(iii)    the maintenance, repair, replacement, restoration, rebuilding, construction, renovation, upkeep, use, occupancy, ownership, leasing, subletting or operation of the Facility or any portion thereof,

(iv)    the execution and delivery by an Indemnified Party, the Lessee or any other Person of, or performance by an Indemnified Party, the Lessee or any other Person, as the case may be, of, any of their respective obligations under, this Agreement or any other Project Document, or other document or instrument delivered in connection herewith or therewith or the enforcement of any of the terms or provisions hereof or thereof or the transactions contemplated hereby or thereby,

(v)    any damage or injury to the person or property of any Person in or on the premises of the Facility,

(vi)    any imposition arising from, burden imposed by, violation of, or failure to comply with any Legal Requirement, including failure to comply with the requirements of the City's zoning resolution and related regulations,

(vii)    the presence, disposal, release, or threatened release of any Hazardous Materials that are on, from, or affecting the Facility; any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Materials; any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Materials, and/or any violation of Legal Requirements, including demands of government authorities, or any policies or requirements of the Agency, which are based upon or in any way related to such Hazardous Materials, or

(viii)    any liability incurred by the Agency in connection with the excess profits disgorgement provisions under 40 U.S.C. Sec. 545(b)(8).

(b)    The Lessee releases each Indemnified Party from, and agrees that no Indemnified Party shall be liable to the Lessee or its Affiliates for, any Claim or Liability arising from or incurred as a result of action taken or not taken by such Indemnified Party with respect to any of the matters set forth in Section 8.2(a) including any Claim or Liability arising from or incurred as a result of the negligence or willful misconduct of such Indemnified Party, or at the direction of the Lessee or any Guarantor with respect to any of such matters above referred to.

(c)    An Indemnified Party shall promptly notify the Lessee in writing of any claim or action brought against such Indemnified Party in which indemnity may be sought against the Lessee pursuant to this Section 8.2; such notice shall be given in sufficient time to allow the Lessee to defend or participate in such claim or action, but the failure to give such notice in sufficient time shall not constitute a defense hereunder nor in any way impair the obligations of the Lessee under this Section 8.2.

(d)    Anything to the contrary in this Agreement notwithstanding, the covenants of the Lessee contained in this Section 8.2 shall be in addition to any and all other obligations and liabilities that the Lessee may have to any Indemnified Party in any other agreement or at common law, and shall remain in full force and effect after the termination of this Agreement until the later of (i) the expiration

49

of the period stated in the applicable statute of limitations during which a claim or cause of action may be brought and (ii) payment in full or the satisfaction of such claim or cause of action and of all expenses and charges incurred by the Indemnified Party relating to the enforcement of the provisions herein specified.

(e)     The Lessee covenants and agrees that any failure by the United States of America, acting by and through its General Services Administration, to remediate all or a portion of the Facility shall not be a defense to any obligations of the Lessee under this Section 8.2 nor shall the Lessee assert such defense with respect to its obligations under this Section 8.2.

**Section 8.3     Compensation and Expenses of the Agency and Agency Administrative and Project Fees**.

(a)     The Lessee shall pay the fees, costs and expenses of the Agency together with any fees and disbursements incurred by lawyers or other consultants in performing services for the Agency in connection with this Agreement or any other Project Document.

(b)     On the Commencement Date, the Lessee shall pay to the Agency the following amounts: (i) the Initial Annual Administrative Fee, and (ii) the Project Fee.

(c)     The Lessee further agrees to pay the Annual Administrative Fee to the Agency on each July 1 following the Commencement Date until the earlier of the Expiration Date or the Termination Date. In the event the Lessee shall fail to pay the Annual Administrative Fee on the date due, the Agency shall have no obligation to deliver notice of such failure to the Lessee.

**Section 8.4     Current Facility Personalty Description**. The Lessee covenants and agrees it will cause Exhibit B — "Description of the Facility Personalty" to be an accurate and complete description of all current items of Facility Personalty. To this end, the Lessee covenants and agrees that (y) no item of Facility Personalty shall be substituted or replaced by a new item of machinery, equipment or other tangible personal property except pursuant to Section 3.6(a) or Article VI, and (z) no item of Facility Personalty shall be delivered and installed at the Facility Realty as part of the Facility, unless in each case such item of machinery, equipment or other item of tangible personal property shall be accurately and sufficiently described in Exhibit B — "Description of the Facility Personalty", and the Lessee shall from time to time prepare and deliver to the Agency supplements to such Exhibit in compliance with the foregoing. Such supplements shall be executed and delivered by the appropriate parties.

**Section 8.5     Signage at Facility Site**. Upon commencement of the Project renovations and/or construction of the Project Improvements at the Facility (including the commencement of any demolition and/or excavation), the Lessee shall erect on the Facility site, at its own cost and expense, to the extent permitted by law, within easy view of passing pedestrians and motorists, a large and readable sign with the following information upon it (hereinafter, the "**Sign**"):

*FINANCIAL ASSISTANCE PROVIDED*
*THROUGH THE*
*NEW YORK CITY INDUSTRIAL*
*DEVELOPMENT AGENCY*
*Mayor Michael R. Bloomberg*

In addition, the Sign shall satisfy the following requirements:  (x) format and appearance generally shall be as stipulated by the Agency in writing or electronically; (y) the minimum size of the Sign shall be four (4) feet by eight (8) feet; and (z) the Sign shall have no other imprint upon it other than that of the

50

Agency. The Sign shall remain in place at the Facility until completion of the renovations and/or construction. The Lessee may erect other signs in addition to the Sign.

**Section 8.6      Environmental Matters**.

(a)      On or before the Commencement Date, the Lessee shall provide to the Agency a letter from the Environmental Auditor addressed to the Agency, stating that the Agency may rely upon the Environmental Audit as if it was prepared for the Agency in the first instance.

(b)      The Lessee shall not cause or permit the Facility or any part thereof to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce or process Hazardous Materials, except in compliance with all applicable Legal Requirements, nor shall the Lessee cause or permit, as a result of any intentional or unintentional act or omission on the part of the Lessee or any occupant or user of the Facility, a release of Hazardous Materials onto the Facility or onto any other property.

(c)      The Lessee shall comply with, and require and enforce compliance by, all occupants and users of the Facility with all applicable Legal Requirements pertaining to Hazardous Materials, whenever and by whomever triggered, and shall obtain and comply with, and ensure that all occupants and users of the Facility obtain and comply with, any and all approvals, registrations or permits required thereunder.

(d)      The Lessee shall conduct and complete all investigations, studies, sampling, and testing, and all remedial, removal and other actions necessary to clean up and remove all Hazardous Materials, on, from, or affecting the Facility in accordance with all applicable Legal Requirements.

(e)      The parties hereto agree that the reference in Section 2.2(o) to the Environmental Audit is not intended, and should not be deemed to intend, to modify, qualify, reduce or diminish the Lessee's obligations to carry out and perform all of the covenants stated throughout this Section 8.6 and in Section 8.2.

**Section 8.7      Employment Matters**.

(a)      Except as is otherwise provided by collective bargaining contracts or agreements, new employment opportunities created as a result of the Project shall be listed with the New York State Department of Labor Community Services Division, and with the administrative entity of the service delivery area created by the Workforce Investment Act of 1998 (29 U.S.C. §2801) in which the Facility Realty is located. Except as is otherwise provided by collective bargaining contracts or agreements, the Lessee agrees, where practicable, to consider first, and cause each of its Affiliates at the Facility to consider first, persons eligible to participate in the Workforce Investment Act of 1998 (29 U.S.C. §2801) programs who shall be referred by administrative entities of service delivery areas created pursuant to such Act or by the Community Services Division of the New York State Department of Labor for such new employment opportunities.

(b)      Upon the Agency's written request, the Lessee shall provide to the Agency any employment information in the possession of or obtained by the Lessee which is pertinent to the Lessee and the Tenants and the employees of the Lessee and the Tenants to enable the Agency and/or NYCEDC to comply with its reporting requirements required by City Charter §1301 and any other applicable laws, rules or regulations.

51

(c)     The Lessee hereby authorizes any private or governmental entity, including The New York State Department of Labor ("**DOL**"), to release to the Agency and/or NYCEDC, and/or to the successors and assigns of either (collectively, the "**Information Recipients**"), any and all employment information under its control and pertinent to the Lessee or the Tenants and the employees of the Lessee or of the Tenants to enable the Agency and/or NYCEDC to comply with its reporting requirements required by City Charter §1301 and any other applicable laws, rules or regulations.  Information released or provided to Information Recipients by DOL, or by any other governmental entity, or by any private entity, or by the Lessee or by the Tenants, or any information previously released as provided by all or any of the foregoing parties (collectively, "**Employment Information**") may be disclosed by the Information Recipients in connection with the administration of the programs of the Agency, and/or NYCEDC, and/or the successors and assigns of either, and/or the City, and/or as may be necessary to comply with law; and, without limiting the foregoing, the Employment Information may be included in (x) reports prepared by the Information Recipients pursuant to City Charter §1301, (y) other reports required of the Agency, and (z) any other reports required by law.  This authorization shall remain in effect throughout the term of this Agreement.

(d)     Upon the request of the Agency, the Lessee shall cooperate with the Agency in the development of programs for the employment and/or training of members of minority groups in connection with performing work at the Facility.

(e)     Nothing in this Section shall be construed to require the Lessee to violate any existing collective bargaining agreement with respect to hiring new employees.

**Section 8.8**     **Non-Discrimination**.

(a)     At all times during the maintenance and operation of the Facility, the Lessee shall not discriminate nor permit any of its Affiliates to discriminate against any employee or applicant for employment because of race, color, creed, age, sex or national origin.  The Lessee shall use its best efforts to ensure that employees and applicants for employment with the Lessee or any of its Affiliates are treated without regard to their race, color, creed, age, sex or national origin.  As used herein, the term "treated" shall mean and include the following:  recruited, whether by advertising or other means; compensated, whether in the form of rates of pay or other forms of compensation; selected for training, including apprenticeship; promoted; upgraded; downgraded; demoted; transferred; laid off; and terminated.

(b)     The Lessee shall, in all solicitations or advertisements for employees placed by or on behalf of the Lessee state that all qualified applicants will be considered for employment without regard to race, color, creed or national origin, age or sex.

(c)     The Lessee shall furnish to the Agency all information required by the Agency pursuant to this Section and will cooperate with the Agency for the purposes of investigation to ascertain compliance with this Section.

**Section 8.9**     **Assignment, Transfer or Sublease**.

(a)     The Lessee shall not at any time, except as permitted by Section 8.20, assign or transfer this Agreement without (1) providing the Agency written notice of such intended use and/or occupancy before such use and/or occupancy actually occurs and (2) the prior written consent of the Agency (such consent to be requested by the Lessee of the Agency in the form prescribed by the Agency, and such consent of the Agency to take into consideration the Agency's policies as in effect from time to time), and provided that:

52

(i)      the Lessee shall remain primarily liable to the Agency for the payment of all Rental Payments hereunder and for the full performance of all of the terms, covenants and conditions of this Agreement and of any other Project Document to which it shall be a party;

(ii)     any assignee or transferee of the Lessee shall have assumed in writing (and shall have executed and delivered to the Agency an instrument in form for recording) and have agreed to keep and perform all of the terms of this Agreement and each other Project Document on the part of the Lessee to be kept and performed, shall be jointly and severally liable with the Lessee for the performance thereof, shall be subject to service of process in the State, and, if a corporation, shall be qualified to do business in the State;

(iii)    any assignee or transferee shall utilize the Facility as the Approved Facility and a qualified "project" within the meaning of the Act;

(iv)     such assignment or transfer shall not violate any provision of this Agreement or any other Project Document;

(v)      such assignment or transfer shall in no way diminish or impair the Lessee's obligation to carry the insurance required under Section 8.1 and the Lessee shall furnish written evidence satisfactory to the Agency that such insurance coverage shall in no manner be diminished or impaired by reason of such assignment or transfer;

(vi)     any such assignee or transferee shall deliver to the Agency a Required Disclosure Statement in form and substance satisfactory to the Agency, provided that if any modification to the form of such Required Disclosure Statement is not acceptable to the Agency acting in its sole discretion, then the Lessee shall be in default under this Agreement; and

(vii)    the Lessee shall furnish or cause to be furnished to the Agency a copy of any such assignment or transfer in substantially final form at least thirty (30) days prior to the date of execution thereof.

(b)     The Lessee shall not at any time sublet any part of the Facility unless:

(i)      the Lessee shall remain primarily liable to the Agency for the payment of all Rental Payments hereunder and for the full performance of all of the terms, covenants and conditions of this Agreement and of any other Project Document to which it shall be a party;

(ii)     the Lessee delivers to the Agency a certificate of an Authorized Representative of the Lessee in the form attached hereto as Exhibit P certifying that the Lessee is in compliance with Section 8.19(d) hereof and will be continue to be in compliance with said section after entering into the Tenant Lease;

(iii)    the Tenant shall utilize the Facility as the Approved Facility and a qualified "project" within the meaning of the Act;

(iv)     the Tenant shall not be a Non-Compliant Person;

(v)      the Tenant Lease shall contain a description of the Tenant's operations and intended use of the leased premises, and, as executed by both the Lessee and the Tenant, the Rider to Sublease Agreement set forth as Exhibit O hereto;

53

(vi)    the Tenant shall utilize the Facility in accordance with the Rider to Sublease Agreement set forth as <u>Exhibit O</u> hereto; and

(vii)    the Tenant Lease shall not violate any provision of this Agreement or any other Project Document;

(viii)    such Tenant Lease sh all in no way diminish or impair the Lessee's obligation to carry the insurance required under Section 8.1 and the Lessee shall furnish written evidence satisfactory to the Agency that such insurance coverage shall in no manner be diminished or impaired by reason of such sublease.

(c)    The Agency may at any time during the term of a Tenant Lease request the Lessee to cause the Tenant under a Tenant Lease to submit a completed Disclosure Statement in the form of <u>Exhibit F</u> hereto. If at any time during the term of a Tenant Lease, the Agency obtains information indicating that the Tenant under such Tenant Lease is a Non-Compliant Person (as such term is defined in the Rider to Sublease Agreement as set forth in <u>Exhibit O</u> hereto), the Lessee, on request by the Agency, shall cause such Tenant to provide to the Agency a completed background investigative questionnaire using the Agency's then-current form for such questionnaire.

(d)    Within twenty (20) days after the date of execution of the Tenant Lease, the Lessee shall provide to the Agency (i) a fully executed copy of the Tenant Lease (including the Rider to Sublease Agreement set forth in <u>Exhibit O</u> hereto), (ii) the ACORD certificate evidencing that the Tenant has satisfied the insurance requirements set forth in the Rider to Sublease Agreement and (iii) the certificate required by Section 8.9 (b)(ii).

(e)    Any consent by the Agency to any act of assignment, transfer or sublease shall be held to apply only to the specific transaction thereby authorized. Such consent shall not be construed as a waiver of the duty of the Lessee, or the successors or assigns of the Lessee, to obtain from the Agency consent to any other or subsequent assignment, transfer or sublease, or as modifying or limiting the rights of the Agency under the foregoing covenant by the Lessee.

(f)    If the Facility or any part thereof is sublet or occupied by any Person other than the Lessee, the Agency, in the event of the Lessee's default in the payment of Rental Payments hereunder may, and is hereby empowered to, collect Rental Payments from any sublessee or any occupant during the continuance of any such default. In case of such events, the Agency may apply the net amount received by it to the Rental Payments herein provided, and no such collection shall be deemed a waiver of the covenant herein against assignment or transfer of this Agreement, or sublease in whole or in part of the Facility, or constitute the acceptance of the undertenant or occupant as tenant, or a release of the Lessee from the further performance of the covenants herein contained on the part of the Lessee.

(g)    The Lessee covenants and agrees that it shall not, without the prior written consent of the Agency (which consent shall not be unreasonably withheld, conditioned or delayed), (i) amend, modify, terminate or assign, or to suffer any material amendment or modification of any Tenant Lease entered into in accordance with this Section if such amendment, modification or assignment would cause the Lessee to be in default under any provision of this Agreement; or (ii) amend, modify or terminate the Rider to Sublease Agreement made a part of such Tenant Lease.

(h)    For purposes of this Section 8.9, any license or other right of possession or occupancy granted by the Lessee with respect to the Facility (but excluding a right of use of and access to the Facility which does not include possession or occupancy such as, but not limited to, a cell tower and satellite dish) shall be deemed a Tenant Lease subject to the provisions of this Section 8.9.

NY:1348523.11

(i)    The Agency agrees to amend paragraph (b) of the definition of Non-Compliant Person (as defined in Exhibit O hereto) to reflect any lesser time period that may be adopted by the City in its sole discretion.

**Section 8.10    Retention of Title to or of Interest in Facility; Grant of Easements; Release of Portions of Facility.**

(a)    Neither the Lessee nor the Agency shall sell, assign, encumber (other than Permitted Encumbrances), convey or otherwise dispose of its respective title to or leasehold estate in the Facility, including the Improvements, or any part of the Facility or interest therein during the term of this Agreement, except as set forth in Sections 3.6, Article VI, 8.9 and 9.2 or in this Section, without the prior written consent of the other, and any purported disposition without such consent shall be void.  In addition, the Lessee shall not convey or otherwise dispose of its title to the Facility within ten (10) years from the date of the Deed without the prior written consent of the Agency and NYCEDC.

(b)    The Lessee may, upon prior written notice to the Agency, so long as there exists no Event of Default hereunder, grant such rights of way or easements over, across, or under, the Facility Realty, or grant such permits or licenses in respect to the use thereof, free from the leasehold estate of the Company Lease and of this Agreement as shall be necessary or convenient in the opinion of the Lessee for the operation or use of the Facility, or required by any utility company for its utility business, provided that, in each case, such rights of way, easements, permits or licenses shall not adversely affect the use or operation of the Facility as the Approved Facility.  The Agency agrees, at the sole cost and expense of the Lessee, to execute and deliver any and all instruments necessary or appropriate to confirm and grant any such right of way or easement or any such permit or license and to release the same from the leasehold estate of the Company Lease and of this Agreement.

(c)    So long as there exists no Event of Default hereunder, the Lessee may from time to time request in writing to the Agency the release of and removal from the leasehold estate of the Company Lease and of this Agreement of any unimproved part of the Land (on which none of the Improvements, including the buildings, structures, major appurtenances, fixtures or other property comprising the Facility Realty, is situated) provided that such release and removal will not adversely affect the use or operation of the Facility as the Approved Facility.  Upon any such request by the Lessee, the Agency shall, at the sole cost and expense of the Lessee, execute and deliver any and all instruments necessary or appropriate to so release and remove such unimproved Land from the leasehold estates of the Company Lease and of this Agreement, subject to the following:  (i) any liens, easements, encumbrances and reservations to which title to said property was subject on the Commencement Date, (ii) any liens, easements and encumbrances created at the request of the Lessee or to the creation or suffering of which the Lessee consented; (iii) any liens and encumbrances or reservations resulting from the failure of the Lessee to perform or observe any of the agreements on its respective part contained in this Agreement or any other Project Document; (iv) Permitted Encumbrances (other than the liens of the Company Lease and of this Agreement); and (v) any liens for taxes or assessments not then delinquent; provided, however, no such release shall be effected unless there shall be delivered to the Agency a certificate of an Authorized Representative of the Lessee, dated not more than sixty (60) days prior to the date of the release, stating that, in the opinion of the Person signing such certificate, the unimproved Land and the release thereof so proposed to be made is not needed for the operation of the Facility, will not adversely affect the use or operation of the Facility as the Approved Facility and will not destroy the means of ingress thereto and egress therefrom.

(d)    No conveyance or release effected under the provisions of this Section 8.10 shall entitle the Lessee to any abatement or diminution of the Rental Payments payable under Section 4.3 or

55

any other payments required to be made by the Lessee under this Agreement or any other Project Document to which it shall be a party.

**Section 8.11      Discharge of Liens.**

(a)      If any lien, encumbrance or charge is filed or asserted (including any lien for the performance of any labor or services or the furnishing of materials), or any judgment, decree, order, levy or process of any court or governmental body is entered, made or issued or any claim (such liens, encumbrances, charges, judgments, decrees, orders, levies, processes and claims being herein collectively called "**Liens**"), whether or not valid, is made against the Facility or any part thereof or the interest therein of the Agency, the Lessee or against any of the Rental Payments payable under the Company Lease, under this Agreement or the interest of the Agency or the Lessee under the Company Lease or under this Agreement, other than Liens for Impositions not yet payable, Permitted Encumbrances, or Liens being contested as permitted by Section 8.11(b), the Lessee forthwith upon receipt of notice of the filing, assertion, entry or issuance of such Lien (regardless of the source of such notice) shall give written notice thereof to the Agency and take all action (including the payment of money and/or the securing of a bond) at its own cost and expense as may be necessary or appropriate to obtain the discharge in full thereof and to remove or nullify the basis therefor.  Nothing contained in this Agreement shall be construed as constituting the express or implied consent to or permission of the Agency for the performance of any labor or services or the furnishing of any materials that would give rise to any Lien against the Agency's interest in the Facility.

(b)      The Lessee may at its sole cost and expense contest (after prior written notice to the Agency), by appropriate action conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any Lien, if (i) such proceeding shall suspend the execution or enforcement of such Lien against the Facility or any part thereof or interest therein, or in the Company Lease or in this Agreement, of the Agency or the Lessee or against any of the Rental Payments payable under the Company Lease, under this Agreement, (ii) neither the Facility nor any part thereof or interest therein would be in any danger of being sold, forfeited or lost, (iii) neither the Lessee nor the Agency would be in any danger of any civil or any criminal liability, other than normal accrual of interest, for failure to comply therewith, and (iv) the Lessee shall have furnished such security, if any, as may be required in such proceedings or as may be reasonably requested by the Agency.

**Section 8.12      Recording and Filing.**  A memorandum of this Agreement, shall be recorded by the Lessee at its sole cost and expense in the appropriate office of the Register of The City of New York, or in such other office as may at the time be provided by law as the proper place for the recordation thereof.

**Section 8.13      No Further Encumbrances Permitted.**  The Lessee shall not create, permit or suffer to exist any mortgage, encumbrance, lien, security interest, claim or charge against the Facility or any part thereof, or the interest of the Agency or the Lessee in the Facility or the Company Lease or this Agreement, except for Permitted Encumbrances.  Notwithstanding the foregoing, in no event shall the lien of any Mortgage include the rights of the Lessee under this Agreement or any rentals or other amounts paid or payable hereunder or thereunder, except for rentals directly related to the payment of amounts due under any Mortgage Notes.

**Section 8.14      Automatically Deliverable Documents.**

(a)      The Lessee shall immediately notify the Agency of the occurrence of any Event of Default, or any event that with notice and/or lapse of time would constitute an Event of Default under any Project Document.  Any notice required to be given pursuant to this subsection shall be signed by an

56

Authorized Representative of the Lessee and set forth a description of the default and the steps, if any, being taken to cure said default. If no steps have been taken, the Lessee shall state this fact on the notice.

(b)    The Lessee shall promptly provide written notice to the Agency if any representation or warranty made by the Lessee pursuant to Section 2.2(w) would, if made on any date during the term of the Agreement and deemed made as of such date, be false, misleading or incorrect in any material respect.

(c)    Within five (5) Business Days after receipt from the Agency of any subtenant survey and questionnaire pertaining to the Facility in the form of Exhibit M hereto, the Lessee shall complete and execute such survey and questionnaire and return the same to the Agency.

(d)    The Lessee shall deliver all insurance-related documents required by Sections 8.1(f) and 8.1(g).

(e)    Within 120 days after the close of each Fiscal Year during which action was taken by the Lessee pursuant to Section 3.5, the Lessee shall deliver written notice of the Additional Improvement(s) in excess of $50,000 to the Agency.

(f)    If a removal involving property having a value in the aggregate exceeding $250,000 was taken by the Lessee pursuant to Section 3.6(a), the Lessee shall deliver written notice of such removal to the Agency within five (5) Business Days following such removal.

(g)    Promptly following completion of the Project, but no later than five (5) Business Days following the receipt of a temporary or permanent certificate of occupancy with respect to the Facility Realty, the Lessee shall deliver to the Agency the certificate as to Project completion in substantially the form set forth in Exhibit G-2 — "Form of Project Completion Certificate", together with all attachments required thereunder, and the original of the Sales Tax letter and all copies thereof.

(h)    Within five (5) Business Days following any appointment of an agent in connection with the use of the Sales Tax Letter as provided in Section 5.2(c)(vi), the Lessee shall submit Form ST-60 electronically to the Agency as provided therein.

(i)    If the Lessee shall request the consent of the Agency under Section 8.9 to any sublease in whole or in part of the Facility, or to any assignment or transfer of this Agreement, the Lessee shall submit such request to the Agency in the form prescribed by the Agency.

**Section 8.15    Requested Documents.** Upon request of the Agency, the Lessee shall deliver or cause to be delivered to the Agency within thirty (30) Business Days of the date so requested:

(a)    a copy of the most recent annual audited or reviewed financial statements of the Lessee and of its subsidiaries, if any, ( including balance sheets as of the end of the Fiscal Year and the related statement of revenues, expenses and changes in fund balances and, if applicable, income, earnings, and changes in financial position) for such Fiscal Year, prepared in accordance with GAAP and certified by an Independent Accountant;

(b)    a certificate of an Authorized Representative of the Lessee that the insurance the Lessee maintains complies with the provisions of Section 8.1, that such insurance has been in full force and effect at all times during the preceding Fiscal Year, and that duplicate copies of all policies or certificates thereof have been filed with the Agency and are in full force and effect and the evidence required by Section 8.1(f);

57

(c)      copies of any (x) bills, invoices or other evidences of cost as shall have been incurred in connection with the Project Work, and (y) permits, authorizations and licenses from appropriate authorities relative to the occupancy, operation and use of the Facility;

(d)      if no action was taken by the Lessee pursuant to Section 3.5 or no action involving the removal of property having a value in the aggregate exceeding $250,000 was taken by the Lessee pursuant to Section 3.6(a), a certificate of an Authorized Representative of the Lessee certifying to the fact that no such action was taken by the Lessee pursuant to such Section 3.5 or 3.6(a) during such preceding Fiscal Year;

(e)      if action was taken by the Lessee pursuant to Section 3.5 or involving the removal of property having a value in the aggregate exceeding $250,000 pursuant to Section 3.6(a), a written report of an Authorized Representative of the Lessee summarizing the action taken by the Lessee and stating that, in his/her opinion, such action complied with the provisions of Section 3.5 or 3.6(a), as applicable.

(f)      a certificate of an Authorized Representative of the Lessee as to whether or not, as of the close of the immediately preceding Fiscal Year, and at all times during such Fiscal Year, the Lessee was in compliance with all the provisions that relate to the Lessee in this Agreement and in any other Project Document to which it shall be a party, and if such Authorized Representative shall have obtained knowledge of any default in such compliance or notice of such default, he shall disclose in such certificate such default or defaults or notice thereof and the nature thereof, whether or not the same shall constitute an Event of Default hereunder, and any action proposed to be taken by the Lessee with respect thereto;

(g)      upon twenty (20) days prior request by the Agency, a certificate of an Authorized Representative of the Lessee either stating that to the knowledge of such Authorized Representative after due inquiry there is no default under or breach of any of the terms hereof that, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, exists or specifying each such default or breach of which such Authorized Representative has knowledge;

(h)      employment information requested by the Agency pursuant to Section 8.7(b); and

(i)      information regarding non-discrimination requested by the Agency pursuant to Section 8.8.

### Section 8.16      Periodic Reporting Information for the Agency.

(a)      The Lessee shall not assert as a defense to any failure of the Lessee to deliver to the Agency any reports specified in this Section 8.16 that the Lessee shall not have timely received any of the forms from or on behalf of the Agency unless, (i) the Lessee shall have requested in writing such form from the Agency not more than thirty (30) days nor less than fifteen (15) days prior to the date due, and (ii) the Lessee shall not have received such form from the Agency at least one (1) Business Day prior to the due date. For purposes of this Section 8.16, the Lessee shall be deemed to have "received" any such form if it shall have been directed by the Agency to a website at which such form shall be available. In the event the Agency, in its sole discretion, elects to replace one or more of the reports required by this Agreement with an electronic or digital reporting system, the Lessee shall make its reports pursuant to such system.

58

(b)      Annually, by August 1 of each year, commencing in 2012, until the termination of this Agreement, the Lessee shall submit or cause to be submitted to the Agency the Annual Employment and Benefits Report relating to the period commencing July 1 of the previous year and ending June 30 of the year of the obligation of the filing of such report, in substantially the form set forth in Exhibit N hereto (or such replacement and/or successor form as may be required by the Agency as a result of a change in law or as required by New York States agencies ), certified as to accuracy by an officer of the Lessee.  Upon termination of this Agreement, the Lessee shall submit or cause to be submitted to the Agency the Annual Employment and Benefits Report relating to the period commencing the date of the last such Report submitted to the Agency and ending on the last payroll date of the preceding month in the form prescribed by the Agency, certified as to accuracy by the Lessee.

(c)      If and for so long as the same shall be required by law, the Lessee shall annually (currently, by each February 28 with respect to the prior calendar year) file a statement with the New York State Department of Taxation and Finance, on a form and in a manner and consistent with such regulations as is or may be prescribed by the Commissioner of the New York State Department of Taxation and Finance (Form ST-340 or any successor or additional mandated form), of the value of all Sales Tax Savings claimed by the Lessee or agents of the Lessee in connection with the Project and the Facility as required by Section 874(8) of the New York State General Municipal Law (as the same may be amended from time to time), including consultants or subcontractors of such agents, under the authority granted pursuant to this Agreement.  The Lessee shall furnish a copy of such annual statement to the Agency at the time of filing with the Department of Taxation and Finance.  Should the Lessee fail to comply with the foregoing requirement, the Lessee shall immediately cease to be the agent for the Agency in connection with the Project (such agency relationship being deemed to be immediately revoked) without any further action of the parties, the Lessee shall be deemed to have automatically lost its authority as agent of the Agency to purchase and/or lease Exempt Property in the Agency's behalf, and shall desist immediately from all such activity, and shall immediately and without demand return to the Agency the Sales Tax Letter issued to the Lessee by the Agency that is in the Lessee's possession or in the possession of any agent of the Lessee.  Nothing herein shall be construed as a representation by the Agency that any property acquired as part of the Project is or shall be exempt from Sales Taxes under the laws of the State.  To the extent that the Lessee shall have received Sales Tax Savings, the Lessee agrees to include information with respect thereto in its Sales Tax Exemption Report required to be filed pursuant to Section 8.16(e).

(d)      The Lessee shall file with the Agency by February 1 of each year commencing February 1, 2012, a certificate of an Authorized Representative of the Lessee with respect to all tenancies in effect at the Facility, if any, in the form of the Subtenant Survey attached hereto as Exhibit M — "Subtenant Survey".

(e)      If the Sales Tax Letter shall have been in effect at any time during the twelve-month period terminating on the immediately preceding June 30, the Lessee shall file with the Agency by the next following August 1, a certificate of an Authorized Representative of the Lessee with respect to Sales Tax Savings with respect to such twelve-month period, in the form prescribed by the Agency.

(f)      The Lessee shall file with Agency by February 1 of each year commencing February 1, 2012, a certificate of an Authorized Representative of the Lessee certifying that (i) it is in compliance with Section 8.19(d) hereof, (ii) no portion of the Facility is being used or occupied for any purpose that does not qualify as a Retail Use, an Industrial Use, or an Other Use, and (iii) after the first Adjustment Date, that at least 1,300 Equivalent Full Time Employees are Industrial Employees.

(g)      If the Lessee shall have had the benefit of a Business Incentive Rate at any time during the twelve-month period terminating on the immediately preceding June 30, the Lessee shall

deliver to the Agency by the next following August 1, a completed Business Incentive Rate Report with respect to such twelve-month period, in the form prescribed by the Agency.

(h)     The Lessee shall deliver to the Agency on August 1 of each year, commencing on the August 1 immediately following the Commencement Date, a completed location and contact information report in the form set forth in Exhibit R hereto.

**Section 8.17     Taxes, Assessments and Charges.** (a)  The Lessee shall pay when the same shall become due all taxes (other than those taxes for which PILOT is payable) and assessments, general and specific, if any, levied and assessed upon or against the Facility Realty, the Company Lease, this Agreement, any ownership estate or interest of the Agency or the Lessee in the Facility, or the Rental Payments or other amounts payable under the Company Lease, hereunder during the term of this Agreement, and all water and sewer charges, special district charges, assessments and other governmental charges and impositions whatsoever, foreseen or unforeseen, ordinary or extraordinary, under any present or future law, and charges for public or private utilities or other charges incurred in the occupancy, use, operation, maintenance or upkeep of the Facility Realty, all of which are herein called "**Impositions**". The Lessee may pay any Imposition in installments if so payable by law, whether or not interest accrues on the unpaid balance. The Agency shall forward, as soon as practicable, to the Lessee any notice, bill or other statement received by the Agency concerning any Imposition.

(b)     In the event the Facility Realty is exempt from Impositions (other than real estate taxes in respect of PILOT is payable) solely due to the Agency's leasehold estate in the Facility Realty, the Lessee shall pay all Impositions to the appropriate taxing authorities equivalent to the Impositions that would have been imposed on the Facility Realty if the Lessee were the owner of record of the Facility Realty and the Agency had no leasehold estate in the Facility Realty.

(c)     The Lessee may at its sole cost and expense contest (after prior written notice to the Agency), by appropriate action conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any Imposition, if (i) such proceeding shall suspend the execution or enforcement of such Imposition against the Facility or any part thereof or interest therein, or in the Company Lease or in this Agreement, of the Agency or the Lessee or against any of the Rental Payments payable under the Company Lease or under this Agreement, (ii) neither the Facility nor any part thereof or interest therein would be in any danger of being sold, forfeited or lost, (iii) neither the Lessee nor the Agency would be in any danger of any civil or any criminal liability, other than normal accrual of interest, for failure to comply therewith, and (iv) the Lessee shall have furnished such security, if any, as may be required in such proceedings or as may be reasonably requested by the Agency.

**Section 8.18     Compliance with Legal Requirements.**

(a)     The Lessee shall not occupy, use or operate the Facility, or allow the Facility or any part thereof to be occupied, used or operated, for any unlawful purpose or in violation of any certificate of occupancy affecting the Facility or for any use which may constitute a nuisance, public or private, or make void or voidable any insurance then in force with respect thereto.

(b)     Throughout the term of this Agreement and at its sole cost and expense, the Lessee shall promptly observe and comply with all applicable Legal Requirements, whether foreseen or unforeseen, ordinary or extraordinary, that shall now or at any time hereafter be binding upon or applicable to the Lessee, the Facility, any occupant, user or operator of the Facility or any portion thereof, and will observe and comply with all conditions, requirements, and schedules necessary to preserve and extend all rights, licenses, permits (including zoning variances, special exception and non-conforming uses), privileges, franchises and concessions. The Lessee will not, without the prior written consent of the

60

Agency (which consent shall not be unreasonably withheld or delayed), initiate, join in or consent to any private restrictive covenant, zoning ordinance or other public or private restrictions limiting or defining the uses that may be made of the Facility or any part thereof.

(c)    The Lessee may at its sole cost and expense contest in good faith the validity, existence or applicability of any of the matters described in Section 8.18(b) if (i) such contest shall not result in the Facility or any part thereof or interest therein being in any danger of being sold, forfeited or lost, (ii) such contest shall not result in the Lessee or the Agency being in any danger of any civil or any criminal liability for failure to comply therewith, and (iii) the Lessee shall have furnished such security, if any, as may be reasonably requested by the Agency for failure to comply therewith.

**Section 8.19    Operation as Approved Facility and as a "Project"; Use and Restrictions on Use of the Facility**.

(a)    The Lessee will not take any action, or suffer or permit any action, if such action would cause the Facility not to be the Approved Facility.

(b)    The Lessee will not fail to take any action, or suffer or permit the failure to take any action, if such failure would cause the Facility not to be the Approved Facility.

(c)    The Lessee will permit the Agency, or its duly authorized agent, upon reasonable notice, at all reasonable times, to enter the Facility, but solely for the purpose of assuring that the Lessee is operating the Facility, or is causing the Facility to be operated, as the Approved Facility consistent with the Approved Project Operations and with the public purposes of the Agency.

(d)    The Lessee covenants and agrees that at all times during the term of this Agreement no more than fifteen percent (15%) of the rentable square footage of the Facility may be used, in the aggregate, for Retail Uses and Other Uses. Notwithstanding the foregoing, such fifteen percent (15%) may be expanded to the extent that NYCEDC has consented to "Additional Uses" pursuant to Section 7(d) of the NYCEDC Contract, provided the Lessee has notified the Agency thereof by providing to the Agency a copy of NYCEDC's written consent. The Lessee agrees that any portion of the Facility that is not vacant, or that is not used (to the restricted extent permitted in this subsection "d") for Retail Uses or Other Uses or Additional Uses, shall be occupied and used for Industrial Uses.

**Section 8.20    Restrictions on Dissolution and Merger.**

(a)    The Lessee covenants and agrees that at all times during the term of this Agreement (except resulting from a permitted transfer pursuant to Section 8.9, or as provided below in this Section 8.20), it will

(i)    maintain its existence as the type of Entity set forth on the cover page of this Agreement,

(ii)    continue to be subject to service of process in the State,

(iii)    continue to be organized under the laws of, or qualified to do business in, the State,

(iv)    not, as transferor, liquidate, wind-up, dissolve, transfer or otherwise dispose of to another Entity all or substantially all of its property, business or assets **("Transfer")** remaining after the Commencement Date, except as provided in Section 8.20(b),

61

(v)     not, as transferee, take title to all or substantially all of the property, business or assets (also **"Transfer"**) of and from another Entity, except as provided in Section 8.20(b),

(vi)    not consolidate with or merge into another Entity or permit one or more Entities to consolidate with or merge into it (**"Merge"**), except as provided in Section 8.20(b), and

(vii)   not change or permit the change of any Principal of the Lessee or a change in the relative ownership and/or Control of the Lessee or any of the existing Principals, except in each case as provided in Section 8.20(c) and (d).

(b)     With the prior written consent of the Agency and subject to Section 8.20(d), the Lessee may Merge or participate in a Transfer if the following conditions are satisfied on or prior to the Merger or Transfer, as applicable:

(i)     when the Lessee is the surviving, resulting or transferee Entity,

(1)     the Lessee shall have a net worth (as determined by an Independent Accountant in accordance with GAAP) at least equal to that of the Lessee immediately prior to such Merger or Transfer, and

(2)     the Lessee shall deliver to the Agency a Required Disclosure Statement with respect to itself as surviving Entity in form and substance satisfactory to the Agency; or

(ii)    when the Lessee is not the surviving, resulting or transferee Entity (the **"Successor Lessee"**),

(1)     the predecessor Lessee (the **"Predecessor Lessee"**) shall not have been in default under this Agreement or under any other Project Document,

(2)     the Successor Lessee shall be solvent and subject to service of process in the State and organized under the laws of the State, or under the laws of any other state of the United States and duly qualified to do business in the State,

(3)     the Successor Lessee shall have assumed in writing all of the obligations of the Predecessor Lessee contained in this Agreement and in all other Project Documents to which the Predecessor Lessee shall have been a party,

(4)     the Successor Lessee shall have delivered to the Agency a Required Disclosure Statement in form and substance acceptable to the Agency acting in its sole discretion,

(5)     each Principal of the Successor Lessee shall have delivered to the Agency a Required Disclosure Statement in form and substance acceptable to the Agency acting in its sole discretion,

(6)     the Successor Lessee shall have delivered to the Agency, in form

62

and substance acceptable to the Agency, an Opinion of Counsel to the effect that the Project Documents to which the Successor Lessee shall be a party will constitute the legal, valid and binding obligations of the Successor Lessee, and that such Project Documents are enforceable in accordance with their terms; and

(7)    the Successor Lessee shall have delivered to the Agency such statements, in form and substance acceptable to the Agency, an opinion of an Independent Accountant to the effect that the Successor Lessee has a net worth (as determined in accordance with GAAP) after the Merger or Transfer at least equal to that of the Predecessor Lessee immediately prior to such Merger or Transfer.

(c)    After the Operations Commencement Date, if there is a change in Principals of the Lessee, or a change in the relative ownership and/or Control of the Lessee or any of the existing Principals, the Lessee shall deliver to the Agency prompt written notice thereof (including all details that would result in a change to Exhibit D — "Principals of Lessee") to the Agency together with a Required Disclosure Statement in form and substance acceptable to the Agency acting in its sole discretion.

(d)    In addition to the foregoing, until the later of (x) completion of the Minimum Build for the Project, and (y) the fifth (5th) anniversary of completion of the Federal Building Minimum Build (as such terms are defined in Section 4(g)(1) the NYCEDC Contract, a copy of which is set forth in Exhibit K hereto), the prior written approval the Agency and NYCEDC in their sole discretion shall be required for (i) any sale, transfer or assignment of membership interests of the Lessee, (ii) any issuance of any additional membership interest in the Lessee, and (iii) any change in the interest of any member of the Lessee in the Lessee. Notwithstanding the foregoing, if the actions set forth in clauses (i), (ii) and (iii) above, effect a transfer to existing beneficial owners of such interest, or to members of their respective families or to trusts for the benefit of any such persons, the same shall not require prior approval of the Agency and NYCEDC provided that Selim Rusi or Marvin Schein, or, after the death or incapacity of either or both of Selim Rusi or Marvin Schein, adult members of their respective families retain control or continue to be responsible for the day to day management and operations of the Lessee. With respect to any transfer which requires the approval by the Agency and/or NYCEDC, the Lessee agrees to provide the Agency and NYCEDC with such information as the Agency and NYCEDC shall require in deciding whether to give any approval required hereby. Any request for approval by the Agency and NYCEDC of any of the above matters, and any notice to the Agency and NYCEDC, and any notice of approval or disapproval by the Agency and NYCEDC, shall be in writing and delivered to the Agency as set forth in Section 11.5 hereof and to NYCEDC as set forth in Section 13 of the NYCEDC Contract.

**Section 8.21    Further Assurances.** The Lessee will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered such further acts, instruments, conveyances, transfers and assurances, at the sole cost and expense of the Lessee, as the Agency deems reasonably necessary or advisable for the implementation, effectuation, correction, confirmation or perfection of this Agreement and any rights of the Agency hereunder and under any other Project Document.

## ARTICLE IX

## REMEDIES AND EVENTS OF DEFAULT

**Section 9.1    Events of Default.** Any one or more of the following events shall constitute an "**Event of Default**" hereunder:

63

(a)    Failure of the Lessee to pay PILOT in accordance with Section 5.1 on or before the due date provided in a PILOT Bill and in the amount required in a PILOT Bill;

(b)    Failure of the Lessee to pay any Rental Payment (except as se t forth in Section 9.1(a)) within fifteen (15) days of the due date thereof;

(c)    The occurrence of a Recapture Event;

(d)    Failure of the Lessee to observe and perform any covenant or agreement on its part to be performed under Section 8.9 or 8.19;

(e)    Failure of the Lessee to observe and perform any covenant or agreement on its part to be performed under Section 8.1, and continuance of such failure for a period of ten (10) days after receipt by the Lessee of written notice specifying the nature of such default from the Agency;

(f)    Failure of the Lessee to observe and perform any covenant, condition or agreement on its part to be performed under Sections 3.9, 3.10, 3.11, 5.1 (except as set forth in Section 9.1(a)), 5.2, 5.3, 5.4, 8.2, 8.3, 8.8, 8.9, 8.11, 8.13, 8.17, 8.18, 8.20, 9.8, 11.2 or 11.3 or Article VI, and continuance of such failure for a period of thirty (30) days after receipt by the Lessee of written notice specifying the nature of such default from the Agency;

(g)    Failure of the Lessee to observe and perform any covenant or agreement on its part to be performed under Section 4.7, and continuance of such failure for a period of fifteen (15) days after receipt by the Lessee of written notice specifying the nature of such default from the Agency;

(h)    Failure of the Lessee to observe and perform any covenant, condition or agreement hereunder on its part to be performed (except as set forth in Section 9.1(a), (b), (c), (d), (e), (f) or (g)) and (i) continuance of such failure for a period of thirty (30) days after receipt by the Lessee of written notice specifying the nature of such failure from the Agency, or (ii) if by reason of the nature of such failure the same can be remedied, but not within the said thirty (30) days, the Lessee fails to commence and thereafter proceed with reasonable diligence after receipt of said notice to cure such failure or fails to continue with reasonable diligence its efforts to cure such failure or fails to cure such failure within sixty (60) days of receipt of said notice;

(i)    The Lessee or any other Guarantor shall (i) apply for or consent to the appointment of or the taking of possession by a receiver, liquidator, custodian or trustee of itself or of all or a substantial part of its property, (ii) admit in writing its inability, or be generally unable, to pay its debts as such debts generally become due, (iii) make a general assignment for the benefit of its creditors, (iv) commence a voluntary case under the Federal Bankruptcy Code (as now or hereafter in effect), (v) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up, or composition or adjustment of debts, (vi) fail to controvert in a timely or appropriate manner, or acquiesce in writing to, any petition filed against itself in an involuntary case under the Federal Bankruptcy Code, (vii) take any action for the purpose of effecting any of the foregoing, or (viii) be adjudicated a bankrupt or insolvent by any court;

(j)    A proceeding or case shall be commenced, without the application or consent of the Lessee or any other Guarantor in any court of competent jurisdiction, seeking, (i) liquidation, reorganization, dissolution, winding up or composition or adjustment of debts, (ii) the appointment of a trustee, receiver, liquidator, custodian or the like of the Lessee or any other Guarantor or of all or any substantial part of its respective assets, or (iii) similar relief under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such proceeding or

64

case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of ninety (90) days; or any order for relief against the Lessee or any other Guarantor shall be entered in an involuntary case under the Federal Bankruptcy Code; the terms "dissolution" or "liquidation" of the Lessee or any other Guarantor as used above shall not be construed to prohibit any action otherwise permitted by Section 8.20, or Section 3.6 of the Guaranty Agreement;

(k)     Any representation or warranty made by the Lessee or any other Guarantor (i) in the application and related materials submitted to the Agency for approval of the Project or the transactions contemplated by this Agreement, (ii) herein or in any other Project Document, or (iii) by or on behalf of the Lessee or any other Person in any Required Disclosure Statement, or (iv) in any report, certificate, financial statement or other instrument furnished pursuant hereto or any of the foregoing, shall in any case prove to be false, misleading or incorrect in any material respect as of the date made;

(l)     The commencement of proceedings to appoint a receiver or to foreclose any mortgage lien on or security interest in the Facility;

(m)     Any loss of the leasehold estate of the Agency in the Facility Realty;

(n)     If any Required Disclosure Statement delivered to the Agency under any Project Document is not acceptable to the Agency acting in its sole discretion;

(o)     An "Event of Default" under the Guaranty Agreement, the NYCEDC Contract or any other Permitted Encumbrance, including any Mortgage, shall occur and be continuing beyond the expiration of any applicable notice or cure period;

(p)     A reversion of the fee estate of the Lessee to NYCEDC pursuant to the Deed.

**Section 9.2      Remedies on Default**.   (a) Whenever any Event of Default referred to in Section 9.1 shall have occurred and be continuing after the expiration of any applicable notice or cure period, the Agency may take any one or more of the following remedial steps:

(i)     The Agency may terminate this Agreement (with the effect that the term of this Agreement shall be deemed to have expired on such date of termination as if such date were the original Expiration Date of this Agreement) in which case this Agreement and all of the estate, right, title and interest herein granted or vested in the Lessee shall cease and terminate, and convey all of the Agency's right, title and interest in the Facility to the Lessee, which the Agency may accomplish by executing and recording, at the sole cost and expense of the Lessee, lease termination agreements to terminate the Company Lease and this Agreement of record as required by law and a bill of sale for the conveyance of the Facility Personalty to the Lessee (to the extent of any interest, if any, of the Agency in the Facility Personalty).   The Lessee hereby waives delivery and acceptance of such termination agreements as a condition to their validity, and appoints the Agency its true and lawful agent and attorney-in-fact (which appointment shall be deemed to be an agency coupled with an interest) with full power of substitution to file on its behalf all affidavits, questionnaires and other documentation necessary to accomplish the recording of such termination agreements;

(ii)     The Agency may bring an action for damages, injunction or specific performance;

NY:1348523.11

(iii)    The Agency may take whatever action at law or in equity as may appear necessary or desirable to collect the Rental Payments then due, or to enforce performance or observance of any obligations, agreements or covenants of the Lessee under this Agreement; or

(iv)    The Agency may suspend or terminate the Sales Tax Letter or require the Lessee to surrender the Sales Tax Letter to the Agency for cancellation.

(v)    The Agency may require the Lessee to pay, as if the date of demand by the Agency were the Expiration Date, any NPV-PILOMRT that may be due under and in accordance with Section 5.3(d)(y).

(b)    No action taken pursuant to this Section 9.2 (including termination of this Agreement pursuant to this Section 9.2 or by operation of law or otherwise) shall, except as expressly provided herein, relieve the Lessee from the Lessee's obligations hereunder, including the obligations of the Lessee under Sections 5.1 (until such time as a Cessation Date occurs and, by reason thereof, the Lessee shall again pay Real Estate Taxes with respect to the Facility Realty), 5.2, 5.3, 5.4, 8.2, 9.2, 9.6, 9.7, 9.8, 11.4, 11.5, 11.6, 11.11, 11.13 and 11.14, all of which shall survive any such action.

**Section 9.3    Remedies Cumulative.** The rights and remedies of the Agency under this Agreement shall be cumulative and shall not exclude any other rights and remedies of the Agency allowed by law with respect to any default under this Agreement. Failure by the Agency to insist upon the strict performance of any of the covenants and agreements herein set forth or to exercise any rights or remedies upon default by the Lessee hereunder shall not be considered or taken as a waiver or relinquishment for the future of the right to insist upon and to enforce by mandatory injunction, specific performance or other appropriate legal remedy a strict compliance by the Lessee with all of the covenants and conditions hereof, or of the rights to exercise any such rights or remedies, if such default by the Lessee be continued or repeated.

**Section 9.4    No Additional Waiver Implied by One Waiver.** In the event any covenant or agreement contained in this Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder. No waiver shall be binding unless it is in writing and signed by the party making such waiver. No course of dealing between the Agency and the Lessee or any delay or omission on the part of the Agency in exercising any rights hereunder or under any other Project Document shall operate as a waiver.

**Section 9.5    Effect on Discontinuance of Proceedings.** In case any proceeding taken by the Agency under this Agreement or under any other Project Document on account of any Event of Default hereunder or thereunder shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Agency, then, and in every such case, the Agency shall be restored to its former position and rights hereunder and thereunder, and all rights, remedies, powers and duties of the Agency shall continue as in effect prior to the commencement of such proceedings.

**Section 9.6    Agreement to Pay Fees and Expenses of Attorneys and Other Consultants.** In the event the Lessee should default under any of the provisions of this Agreement and the Agency should employ outside attorneys or other consultants or incur other out of pocket expenses for the collection of the Rental Payments payable hereunder or the enforcement of performance or observance of any obligation or agreement on the part of the Lessee herein contained or contained in any other Project Document, the Lessee agrees that it will on demand therefor pay to the Agency the reasonable fees and disbursements of such attorneys or other consultants and such other expenses so incurred.

66

**Section 9.7**    <u>**Certain Continuing Representations**</u>.  If at any time during the term of this Agreement, any representation or warranty made by the Lessee pursuant to Section 2.2(w) would, if made on any date during the term of this Agreement and deemed made as of such date, be false, misleading or incorrect in any material respect, then, the Lessee shall be deemed to be in default under this Agreement unless the Agency shall, upon written request by the Lessee, either waive such default in writing or consent in writing to an exception to such representation or warranty so that such representation or warranty shall no longer be false, misleading or incorrect in a material respect.

**Section 9.8**    <u>**Late Delivery Fees**</u>.

(a)    In the event the Lessee shall fail:

(i)    to pay the Annual Administrative Fee on the date required under Section 8.3,

(ii)    to file and/or deliver any of the documents required of the Lessee under Section 8.14 or Section 8.16 by the date therein stated (collectively, the "**Fixed Date Deliverables**"), or

(iii)    to deliver to the Agency any of the documents as shall have been requested by the Agency of the Lessee under Section 8.15 within five (5) Business Days of the date so requested (collectively, the "**Requested Document Deliverables**"),

then the Agency may charge the Lessee on a daily calendar basis commencing with the day immediately following the date on which the payment, filing or delivery was due (the "**Due Date**"), the Per Diem Late Fee.

(b)    If the Agency shall deliver written notice (a "**Notification of Failure to Deliver**") to the Lessee of such failure to deliver on the Due Date the Annual Administrative Fee, a Fixed Date Deliverable and/or a Requested Document Deliverable, and such payment or document shall not be delivered to the Agency within ten (10) Business Days following delivery by the Agency to the Lessee of the Notification of Failure to Deliver, then, commencing from and including the eleventh (11th) Business Day following the delivery by the Agency to the Lessee of the Notification of Failure to Deliver, the Agency may charge the Lessee on a daily calendar basis the Per Diem Supplemental Late Fee in respect of each noticed failure which shall be in addition to, and be imposed concurrently with, the applicable Per Diem Late Fee.

(c)    The Per Diem Late Fee and the Per Diem Supplemental Late Fee shall each, if charged by the Agency, (i) accrue until the Lessee delivers to the Agency the Annual Administrative Fee, the Fixed Date Deliverable(s) and/or the Requested Document Deliverable(s), as the case may be, and (ii) be incurred on a daily basis for each such Annual Administrative Fee, Fixed Date Deliverable and/or Requested Document Deliverable as shall not have been delivered to the Agency on the Due Date.

(d)    No default on the part of the Lessee under Section 8.3, 8.14, 8.15 or 8.16 to deliver to the Agency an Annual Administrative Fee, a Fixed Date Deliverable or a Requested Document Deliverable shall be deemed cured unless the Lessee shall have delivered same to the Agency and paid to the Agency all accrued and unpaid Per Diem Fees in connection with the default.

NY:1348523.11

## ARTICLE X

## TERMINATION

**Section 10.1**    **Lessee's Option to Terminate Company Lease and this Agreement**.  The Lessee shall have the option to terminate the Company Lease and this Agreement by paying all Rental Payments and any other amounts due and payable under this Agreement (collectively, the "**Project Payments**").  The Lessee shall exercise such option by delivering to the Agency a written notice of an Authorized Representative of the Lessee to the Agency stating that the Lessee has elected to exercise its option under this Section 10.1 and the date on which such termination is to be effective (which date shall not be earlier than forty-five (45) days after the date of such notice).  On a scheduled termination date, the Lessee shall take the actions required by Section 10.3(a).  Such termination shall become effective on such scheduled termination date, subject, however, to Section 10.4.

**Section 10.2**    **Termination of Company Lease and this Agreement on Agency Notice**.

(a)    On or after the Expiration Date, upon receipt of ten (10) days prior written notice from the Agency directing termination of the Company Lease and this Agreement, the Lessee shall take the actions described in Section 10.3(a) and terminate the Company Lease and this Agreement.

(b)    In the event the Lessee does not terminate the Company Lease and this Agreement (including taking all actions required to be taken by the Lessee pursuant to Section 10.3(a) within such ten (10) day period), then, commencing on the eleventh (11th) day after transmittal of the notice directing termination as provided in Section 10.2(a), the Lessee shall, in addition to all other payment obligations due to the Agency hereunder, make rental payments to the Agency in the amount of the Per Diem Holdover Rental Amount until the Lessee shall have terminated the Company Lease and this Agreement in accordance with the provisions thereof and hereof.

**Section 10.3**    **Actions Upon Termination**.

(a)    On the termination date provided for pursuant to Section 10.1 or 10.2, the Lessee shall:

(i)    pay to NYCDOF any amounts due and payable pursuant to Section 5.1(i);

(ii)    pay any and all other Project Payments then due plus one dollar ($1.00),

(iii)    perform all accrued obligations hereunder,

(iv)    surrender the Sales Tax Letter to the Agency for cancellation, if applicable, and

(v)    deliver or cause to be delivered to the Agency (x) with respect to any Exempt Mortgage or Modified Exempt Mortgage (as the case may be), an executed satisfaction of such Mortgage in recordable form, executed by the Mortgagee, and (y) with respect to any Mortgage on the Facility to which the Agency shall be a party and intended to continue beyond the termination of this Agreement but with respect to which Mortgage the Agency shall not have granted any deferral of Mortgage Recording Taxes, a release of the Agency from such Mortgage in recordable form executed by all other parties to such Mortgage.

68

(b)      On the date of the termination of the Agency's interest in the Facility pursuant to Section 10.1 or 10.2, the Agency will, upon Lessee's performance of its obligations pursuant to Section 10.3(a), deliver or cause to be delivered to the Lessee:

(i)      termination agreements and all other necessary documents confirming the release of the Agency's right, title and interest in and to the Facility Realty and terminating the Company Lease and this Agreement,

(ii)      a bill of sale with respect to the Facility Personalty (to the extent of any interest, if any, of the Agency in the Facility Personalty), and

(iii)      all necessary documents releasing all of the Agency's rights and interests in and to any rights of action (other than as against the Lessee or any insurer of the insurance policies under Section 8.1), or any insurance proceeds (other than liability insurance proceeds for the benefit of the Agency) or condemnation awards, with respect to the Facility or any portion thereof.

(c)      Upon termination of the Company Lease and this Agreement, the Agency, upon the written request and at the sole cost and expense of the Lessee, shall execute such instruments as the Lessee may reasonably request or as may be necessary to discharge this Agreement and the Company Lease as documents of record with respect to the Facility Realty, subject to Section 10.4.

**Section 10.4      Survival of Lessee Obligations.**  Upon release of the Agency's interest in the Facility pursuant to Section 10.2 or 10.3, this Agreement and all obligations of the Lessee hereunder shall be terminated except the obligations of the Lessee under Sections 5.1 (until such time as the Agency shall cease to have a leasehold estate in the Facility and, by reason thereof, the Lessee shall again pay Full Land Taxes and CRET with respect to the Facility Realty), 5.2, 5.3, 5.4, 8.2, 9.2, 9.6, 9.7, 9.8, 11.4, 11.5, 11.6, 11.11, 11.13 and 11.14 shall survive such termination.

## ARTICLE XI

## MISCELLANEOUS

**Section 11.1      Unavoidable Delay.**  In case by reason of Unavoidable Delay either party hereto shall be rendered unable wholly or in part to carry out its obligations under this Agreement, then except as otherwise expressly provided in this Agreement, if such party shall give notice and full particulars of such Unavoidable Delay in writing to the other party within a reasonable time after occurrence of the event or cause (other than (i) the obligations of the Lessee to make any payments required under the terms hereof, or (ii) the obligations of the Lessee to comply with Sections 8.1 or 8.2), so far as they are affected by such Unavoidable Delay, shall be suspended during the continuance of the inability then claimed, which shall include a reasonable time for the removal of the effect thereof, but for no longer period, and such party shall endeavor to remove or overcome such inability with all reasonable dispatch.

The Lessee shall promptly notify the Agency upon the occurrence of each Unavoidable Delay, describing such Unavoidable Delay and its effects in reasonable detail.  The Lessee shall also promptly notify the Agency upon the termination of each such Unavoidable Delay.  The information set forth in any such notice shall not be binding upon the Agency, and the Agency shall be entitled to dispute the existence of any Unavoidable Delay and any of the contentions contained in any such notice received from the Lessee.

**Section 11.2**     **Priority.**   The Company Lease and this Agreement shall be subject and subordinate to any Mortgage and to the mortgage liens and security interests so created thereby and the Agency, within ten (10) days of a request by the Lessee and at the sole cost and expense of the Lessee, agrees to confirm the same in writing to the holder of any such Mortgage; provided, however, that nothing in any Mortgage shall impair the Agency's ability to enforce its rights against the Lessee or any other Guarantor.

**Section 11.3**     **Amendments.**  This Agreement may only be amended by a written instrument executed and delivered by the parties hereto.

**Section 11.4**     **Service of Process.**   The Lessee represents that it is subject to service of process in the State and covenants that it will remain so subject until all obligations, covenants and agreements of the Lessee under this Agreement shall be satisfied and met.  If for any reason the Lessee should cease to be so subject to service of process in the State, the Lessee hereby irrevocably consents to the service of all process, pleadings, notices or other papers in any judicial proceeding or action by designating and appointing Marvin Schein and Selim Rusi, c/o Salmar Properties, LLC, 120 Broadway, 36th Floor, New York New York 10271, as its agent upon whom may be served all process, pleadings, notices or other papers which may be served upon the Lessee as a result of any of its obligations under this Agreement.  If such appointed agent shall cease to act or otherwise cease to be subject to service of process in the State, the Lessee hereby irrevocably designates and appoints the Secretary of State of the State of New York as its agent upon whom may be served all process, pleadings, notices or other papers which may be served upon the Lessee as a result of any of its obligations under this Agreement; provided, however, that the service of such process, pleadings, notices or other papers shall no t constitute a condition to the Lessee's obligations hereunder.

For such time as any of the obligations, covenants and agreements of the Lessee under this Agreement remain unsatisfied, the Lessee's agent(s) designated in this Section 11.4 shall accept and acknowledge on the Lessee's behalf each service of process in any such suit, action or proceeding brought in any such court.  The Lessee agrees and consents that each such service of process upon such agents and written notice of such service to the Lessee in the manner set forth in Section 11.5 shall be taken and held to be valid personal service upon the Lessee whether or not the Lessee shall then be doing, or at any time shall have done, business within the State and that each such service of process shall be of the same force and validity as if service were made upon the Lessee according to the laws governing the validity and requirements of such service in the State, and waives all claim of error by reason of any such service.

Such agents shall not have any power or authority to enter into any appearance or to file any pleadings in connection with any suit, action or other legal proceedings against the Lessee or to conduct the defense of any such suit, action or any other legal proceeding except as expressly authorized by the Lessee.

**Section 11.5**     **Notices.**   All notices, certificates or other communications hereunder shall be sufficient if sent (i) by registered or certified United States mail, return receipt requested and postage prepaid, (ii) by a nationally recognized overnight delivery service for overnight delivery, charges prepaid or (iii) by hand delivery, with a copy, in each case, by electronic mail, addressed, as follows:

70

(1)     if to the Agency, to

New York City Industrial Development Agency
110 William Street
New York, New York 10038
Attention:     General Counsel (with copies to the
Executive Director of the Agency and the
Director of Compliance at the
same address)

and

(2)     if to the Lessee, to

Salmar Properties, LLC
120 Broadway, 36th Floor
New York, New York 10271
Attention: Marvin Schein and Selim Rusi
marvos@aol.com; srusi@benmaintenance.com

with a copy to

Ackerman, Levine, Cullen, Brickman & Limmer, LLP
1010 Northern Boulevard
Great Neck, New York 11021
Attention: Leslie J. Levine, Esq.
llevine@alcllp.com

and

Jacobi, Sieghardt, Bousanti, Piazza & Fitzpatrick, P.C.
235 Forest Avenue
Staten Island, New York 10301
Attention: Mordecai Jacobi, Esq.
jsbbplst@aol.com

The Agency shall deliver to any Mortgagee (to the extent that the Lessee shall have delivered to the Agency the written notice address for such Mortgagee) a copy of any notice of default or notice of its intent to convey its leasehold interest in the Facility to the Lessee that the Agency delivers to the Lessee. Such copies shall be delivered at the same time and in the same manner as such notice is required to be given to the Lessee.

The Agency and the Lessee may, by like notice, designate any further or different addresses to which subsequent notices, certificates or other communications shall be sent. Any notice, certificate or other communication hereunder shall, except as may expressly be provided herein, be deemed to have been delivered or given (i) three (3) Business Days following posting if transmitted by mail, (ii) one (1) Business Day following sending if transmitted for overnight delivery by a nationally recognized overnight delivery service, or (iii) upon delivery if given by hand delivery, with refusal by an Authorized Representative of the intended recipient party to accept delivery of a notice given as prescribed above to constitute delivery hereunder.

71

**Section 11.6**     **Consent to Jurisdiction.** The Lessee irrevocably and unconditionally (i) agrees that any suit, action or other legal proceeding arising out of this Agreement or any other Project Document, the Facility, the Project, the relationship between the Agency and the Lessee, the Lessee's ownership, use or occupancy of the Facility and/or any claim for injury or damages may be brought in the courts of record of the State in New York County or the United States District Court for the Southern District of New York; (ii) consents to the jurisdiction of each such court in any such suit, action or proceeding; (iii) waives any objection which it may have to the venue of any such suit, action or proceeding in such courts; and (iv) waives and relinquishes any rights it might otherwise have (w) to move to dismiss on grounds of forum non conveniens, (x) to remove to any federal court other than the United States District Court for the Southern District of New York, and (y) to move for a change of venue to a New York State Court outside New York County.

If the Lessee commences any action against the Agency in a court located other than the courts of record of the State in New York County or the United States District Court for the Southern District of New York, the Lessee shall, upon request from the Agency, either consent to a transfer of the action or proceeding to a court of record of the State in New York County or the United States District Court for the Southern District of New York, or if the court where the action or proceeding is initially brought will not or cannot transfer the action, the Lessee shall consent to dismiss such action without prejudice and may thereafter reinstitute the action in a court of record of the State in New York County or the United States District Court for the Southern District of New York.

**Section 11.7**     **Prior Agreements Superseded.** This Agreement shall completely and fully supersede all other prior understandings or agreements, both written and oral, between the Agency and the Lessee relating to the Facility, other than the Company Lease or any other Project Document.

**Section 11.8**     **Severability.** If any one or more of the provisions of this Agreement shall be ruled illegal or invalid by any court of competent jurisdiction, the illegality or invalidity of such provision(s) shall not affect any of the remaining provisions hereof, but this Agreement shall be construed and enforced as of such illegal or invalid provision had not been contained herein.

**Section 11.9**     **Effective Date; Counterparts.** The date of this Agreement shall be for reference purposes only and shall not be construed to imply that this Agreement was executed on the date first above written. This Agreement was delivered on the Commencement Date. This Agreement shall become effective upon its delivery on the Commencement Date. It may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 11.10**     **Binding Effect.** This Agreement shall inure to the benefit of the Agency, the Lessee and the Indemnified Parties, and shall be binding upon the Agency and the Lessee and their respective successors and assigns.

**Section 11.11**     **Third Party Beneficiaries.** It is the intention of the parties hereto that nothing contained herein is intended to be for, or to inure to, the benefit of any Person other than the parties hereto and the Indemnified Parties.

**Section 11.12**     **Law Governing.** This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard or giving effect to the principles of conflicts of laws thereof.

**Section 11.13**     **Waiver of Trial by Jury.** The Lessee does hereby expressly waive all rights to a trial by jury on any cause of action directly or indirectly involving the terms, covenants or conditions

NY:1348523.11

of this Agreement or any matters whatsoever arising out of or in any way connected with this Agreement, the Lessee's obligations hereunder, the Facility, the Project, the relationship between the Agency and the Lessee, the Lessee's ownership, use or occupancy of the Facility and/or any claim for injury or damages.

The provision of this Agreement relating to waiver of a jury trial and the right of re-entry or re-possession shall survive the termination or expiration of this Agreement.

**Section 11.14** **Recourse Under This Agreement**. All covenants, stipulations, promises, agreements and obligations of the Agency contained in this Agreement shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Agency, and not of any member, director, officer, employee or agent of the Agency or any natural person executing this Agreement on behalf of the Agency in such person's individual capacity, and no recourse shall be had for any reason whatsoever hereunder against any member, director, officer, employee or agent of the Agency or any natural person executing this Agreement on behalf of the Agency. In addition, in the performance of the agreements of the Agency herein contained, any obligation the Agency may incur for the payment of money shall not subject the Agency to any pecuniary or other liability or create a debt of the State or the City, and neither the State nor the City shall be liable on any obligation so incurred and any such obligation shall be payable solely out of amounts payable to the Agency by the Lessee hereunder.

NY:1348523.11

**IN WITNESS WHEREOF**, the Agency has caused its corporate name to be subscribed unto this Agency Lease Agreement by its duly authorized Chairman, Vice Chairman, Executive Director, Deputy Executive Director, General Counsel or Vice President for Legal Affairs and the Lessee has caused its name to be hereunto subscribed by its duly Authorized Representative, all being done as of the year and day first above written.

**NEW YORK CITY INDUSTRIAL
DEVELOPMENT AGENCY**

By: _____
    Richard E. Marshall
    Vice President for Legal Affairs

**SALMAR PROPERTIES, LLC**
By:  Salmar Realty, LLC, its
     Managing Member

By: _____
    Marvin H. Schein, Member

NY:1348523.9

**IN WITNESS WHEREOF**, the Agency has caused its corporate name to be subscribed unto this Agency Lease Agreement by its duly authorized Chairman, Vice Chairman, Executive Director, Deputy Executive Director, General Counsel or Vice President for Legal Affairs and the Lessee has caused its name to be hereunto subscribed by its duly Authorized Representative, all being done as of the year and day first above written.

**NEW YORK CITY INDUSTRIAL
DEVELOPMENT AGENCY**

By: _____
    Richard E. Marshall
    Vice President for Legal Affairs

**SALMAR PROPERTIES, LLC**
By:  Salmar Realty, LLC, its
     Managing Member

By: _____
    Marvin H. Schein, Member

STATE OF NEW YORK      )
                          : ss.:

COUNTY OF NEW YORK   )

On the 20th day of September, in the year 2011, before me, the undersigned, personally appeared Richard E. Marshall, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public/Commissioner of Deeds

JUDITH A. CAPOLONGO
Commissioner of Deeds, City of New York
No. 5-1425
Cert. Filed in New York County
Commission Expires October 23, 2011

STATE OF NEW YORK      )
                           : ss.:
COUNTY OF NEW YORK   )

On the __22__ day of September, in the 2011, before me, the undersigned, personally appeared Marvin H. Schein, personally known to me or proved to me on the basis of satisfactory evidence to me the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ALBERT L RISI
Notary Public, State of New York
No. 01RI6192988
Qualified in Richmond County
Commission Expires 09/08/2012

**APPENDICES**

NY:1348523.11

**EXHIBIT A**

**DESCRIPTION OF THE LAND**

NY:1348523.11

# First American Title Insurance Company

Title No. CHAR 11-12630
Block 671 Lot 1 - Kings County

## SCHEDULE A

ALL that certain plot, piece or parcel of land, with buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn and County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point where the easterly line of Second Avenue intersects the prolongation of the northerly line of Thirty- First Street

RUNNING THENCE North 38 degrees 23 minutes 03 seconds East, along the easterly line of Second Avenue, 200.35 feet to its intersection with the prolongation of the southerly line of said Thirtieth Street;

RUNNING THENCE South 51 degrees 36 minutes 57 seconds East along the prolongation of the southerly line of said Thirtieth Street and the southerly line of said Thirtieth Street for a distance of 700.00 feet to its intersection with westerly line of said Third Avenue;

RUNNING THENCE South 38 degrees 23 minutes 03 seconds West, along the westerly line of said Third Avenue, 200.35 feet to its intersection with the northerly line of said Thirty-First Street ;

RUNNING THENCE North 51 degrees 36 minutes 57 seconds West, along the northerly line of said Thirty-First Street and continuing along the northerly prolongation of said Thirty-First Street for a distance of 700.00 feet to the point of BEGINNING (being 3.220 acres of land more or less)

Grantor further assigns to the Grantee and its successors and assigns, certain access rights in the land owned by the United States of America under custody and control of the Federal Bureau of Prisons, that lies along the northeasterly boundary of the Property, commonly known as 30th Street, between 2nd and 3rd Avenue. Said access rights are assigned subject to specific conditions and restrictions set forth herein.

1.      A perpetual and non-exclusive right of access to the eastern end of 30th Street, running from its intersection with Third Avenue to the existing fence, approximately 61 feet, for access to the existing street entrance at the rear of Federal Building #2. All deliveries accessing the area shall be subject to inspection by United States of America Federal Bureau of Prisons Metropolitan Detention Center (MDC), Brooklyn staff. Access may be temporarily suspended at the discretion of the Warden, MDC Brooklyn, should it be determined by the Warden, MDC Brooklyn, that access would likely create disruptions to safe and orderly operation of the MDC.

2.      A perpetual and non-exclusive right of access to pass and repass over and across a portion of 30th Street, between 2nd and 3rd Avenues that measures 20 feet from the rear of Federal Building #2 for the following purpose: trucks and construction equipment for rehabilitation and repair work to Federal Building #2. Access will be in accord with and subject to the provisions of Paragraph 4 below.

3.      A perpetual and non-exclusive right of access to pass and repass over and across a portion of 30th Street, between 2nd and 3rd Avenues, that measures 30' 1" from the rear of Federal Building #2 for the following purposes: Emergency vehicles and emergency egress from Federal Building #2; and, the installation, maintenance and repair of utilities in and under 30th Street and the transformers adjacent to Federal Building #2.   Access will be in accord with and subject to the provisions of Paragraph 4 below.   The MDC will not place anything in this area that will permanently encroach upon the area subject to this right of access, and this restriction shall be binding on any assigns of the MDC.

# EXHIBIT B

## DESCRIPTION OF THE FACILITY PERSONALTY

NY:1348523.11

## EXHIBIT C

### AUTHORIZED REPRESENTATIVE

**LESSEE:**

| Name | Title | Signature |
|------|-------|-----------|
| Marvin H. Schein | Manager of Managing Member | |
| Selim Rusi | Manager of Managing Member | |

**GUARANTOR:**

| Name | Title | Signature |
|------|-------|-----------|
| Marvin H. Schein | Manager | |

| Name | Title | Signature |
|------|-------|-----------|
| | | |
| | | |

| Name | Title | Signature |
|------|-------|-----------|
| | | |
| | | |

**[TO BE COMPLETED BY LESSEE]**

Exhibit C-1

NY:1348523.4

**EXHIBIT D-1**

**PRINCIPALS**

**LESSEE:**

| Name | Title |
|---|---|
| Marvin H. Schein | Manager of Managing Member |
| Selim Rusi | Manager of Managing Member |

Exhibit D-1-1

**EXHIBIT D-2**

**OWNERS OF THE LESSEE**

| INDIVIDUAL OWNERS | |
|---|---|
| Name | % Ownership or Control of the Lessee |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| ENTITY OWNERS | |
|---|---|
| Name | % Ownership or Control of the Lessee |
| | |
| Schein Family Partners LLC | 49.5% |
| S. Susi Family LLC | 49.5% |
| Salmar Realty, LLC | 1%, Managing Member |
| | |
| | |

| OWNERS OF THOSE ENTITIES THAT OWN OR CONTROL MORE THAN 10% OF THE LESSEE ("10% ENTITIES") | | |
|---|---|---|
| 10% Entity (Name And Actual %) | Individual And Entity Owners | % Ownership or Control |
| S. Rusi Family LLC | See attached Schedule A | |
| | | |
| Schein Family Partners LLC | See attached Schedule B | |
| | | |
| | | |
| | | |
| | | |

Exhibit D-2-1

NY:1348523.11

"SCHEDULE A"

## S. RUSI FAMILY LLC 27-1841877
### List of Member Percentage, I.D. Number and Address

| Member Name and Address | % Interest | EIN/SSN |
|---|---|---|
| Selim Rusi, Sr.<br>177 Benedict Road<br>Staten Island, NY 10304 | 100 | 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 |

295811.2

" SCHEDULE B "

## Ownership Analysis

| Partner Number | Partner Name | 12/31/2010 Percent Ownership |
|---|---|---|
| **Schein Family Partners LLC** | | |
| 1 | Trust U/ART 5TH U/W/O Henry Schein F/B/O Marvin Schein | 1.9864% |
| 2 | Trust U/ART 3RD Henry Schein F/B/O Peter Schein | 1.0108% |
| 3 | Trust U/ART 3RD Henry Schein F/B/O Kate Schein | 1.0419% |
| 4 | Charles Schein | 0.1438% |
| 5 | Michael Schein | 0.1680% |
| 6 | Marvin Schein 1993 Trust (Final in 1998 - continued in a Grantor | 1.6433% |
| 7 | Trust U/Art 2nd F/B/O Charles Schein U/W/O Esther Schein | 0.0487% |
| 8 | Trust U/Art 2nd F/B/O Michael Schein U/W/O Esther Schein | 0.0487% |
| 9 | Marvin Schein | 0.0000% |
| 10 | Michael Schein 2004 Trust U/I/D 10/8/98 | 2.0566% |
| 11 | Peter A Schein 2004 Trust U/I/D 10/8/98 | 2.0566% |
| 12 | Kate-Ann Schein 2004 Trust U/I/D 10/8/98 | 2.0566% |
| 13 | Charles M. Schein 2004 Trust U/I/D 10/8/98 | 2.0566% |
| 14 | Michael Schein 2004 Trust U/I/D 4/6/2000 | 6.8714% |
| 15 | Peter A Schein 2004 Trust U/I/D 4/6/2000 | 4.7971% |
| 16 | Kate-Ann Schein 2004 Trust U/I/D 4/6/2000 | 5.8764% |
| 17 | Charles M Schein 2004 Trust U/I/D 4/6/2000 | 6.7423% |
| 22 | Marvin H. Schein 2008 GRAT | 8.8323% |
| 23 | Marvin H. Schein 2009 GRAT | 2.2765% |
| 24 | Marvin H. Schein 2002 Family Trust | 15.1023% |
| 25 | Marvin Schein 2010 GRAT | 29.1838% |
| 26 | Clause Second Marvin H Schein 2002 Family trust fbo Peter Schei | 1.5000% |
| 27 | Clause Second Marvin H Schein 2002 Family trust fbo Charles Sch | 1.5000% |
| 28 | Clause Second Marvin H Schein 2002 Family trust fbo Michael Sc | 1.5000% |
| 29 | Schein 2010 Grandchildren's Trust | 1.5000% |
| | | 100.0000% |

\* Ownership percentages change each year due to requisite annuity
distributions by the listed trusts to Marvin Schein and the
transfer by Mr. Schein of the interests so distributed into new
trusts for estate planning purposes. The above percentages
represent the most recent percentages that can be calculated at
this time.

**EXHIBIT E**

**PROJECT COST BUDGET**

|  | Mortgage Loan* | Funds of Lessee | Total |
|---|---|---|---|
| Land and Building Acquisition | $     - 0 - | $10,000,000 | $10,000,000 |
| Renovation/Building Improvements | 26,853,143 |  |  |
| Equipment | 4,970,000 |  |  |
| Fees/Other Soft Costs | 2,606,289 |  |  |
| Total | $34,429,432 | $10,000,000 | $44,429,432 |

---

*    On the Commencement Date, the Lessee, as debtor, and the Agency, as mortgager entered into a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (Fee and Leasehold), dated September 22, 2011, in the principal amount of $30,000,000.

Exhibit E-1

## EXHIBIT F

## [FORM OF REQUIRED DISCLOSURE STATEMENT]

The undersigned, an authorized representative of _____, a
_____ organized and existing under the laws of the State of _____, DOES
HEREBY CERTIFY, REPRESENT AND WARRANT to the New York City Industrial Development
Agency (the "Agency") pursuant to [Section 8.20] [Section 8.9] of that certain Agency Lease Agreement,
dated as of September 1, 2011, between the Agency and Salmar Properties, LLC, a limited liability
company organized and existing under the laws of the State of New York (the "Lease Agreement")
THAT:

**[if being delivered pursuant to 8.20 of the Lease Agreement]** None of the surviving, resulting
or transferee Entity, any of the Principals of such Entity, or any Person that directly or indirectly Controls,
is Controlled by, or is under common Control with such Entity:

**[if being delivered pursuant to 8.9 of the Lease Agreement]** Neither the above-referenced
Entity, nor any of the Principals of such Entity, nor any Person that directly or indirectly Controls, is
Controlled by, or is under common Control with such Entity:

(1)      is in default or in breach, beyond any applicable grace period, of its obligations under any
written agreement with the Agency or the City, unless such default or breach has been waived in writing
by the Agency or the City, as the case may be;

(2)      has been convicted of a felony and/or any crime involving moral turpitude in the
preceding ten (10) years;

(3)      has received written notice of default in the payment to the City of any taxes, sewer rents
or water charges in excess of $5,000 that has not been cured or satisfied, unless such default is then being
contested with due diligence in proceedings in a court or other appropriate forum; or

(4)      has, at any time in the three (3) preceding years, owned any property which, while in the
ownership of such Person, was acquired by the City by in rem tax foreclosure, other than a property in
which the City has released or is in the process of releasing its interest to such Person pursuant to the
Administrative Code of the City.

As used herein, the following capitalized terms shall have the respective meanings set forth
below:

"City" shall mean The City of New York.

"Control" or "Controls" shall mean the power to direct the management and policies of a Person
(x) through the ownership, directly or indirectly, of not less than a majority of its voting securities, (y)
through the right to designate or elect not less than a majority of the members of its board of directors or
trustees or other Governing Body, or (z) by contract or otherwise.

"Entity" shall mean any of a corporation, general partnership, limited liability company, limited
liability partnership, joint stock company, trust, estate, unincorporated organization, business association,
tribe, firm, joint venture, governmental authority or governmental instrumentality, but shall not include an
individual.

NY:1348523.11

"Governing Body" shall mean, when used with respect to any Person, its board of directors, board of trustees or individual or group of individuals by, or under the authority of which, the powers of such Person are exercised.

"Person" shall mean an individual or any Entity.

"Principal(s)" shall mean, with respect to any Entity, the most senior three officers of such Entity, any Person with a ten percent (10%) or greater ownership interest in such Entity, and any Person as shall have the power to Control such Entity, and "principal" shall mean any of such Persons.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of _____, 20__.

<div align="center">

**[NAME OF CERTIFYING ENTITY]**

</div>

By: _____

Name:
Title:

<div align="center">

Exhibit F-2

</div>

## EXHIBIT G-1

## SUBSTANTIAL COMPLETION CERTIFICATE OF LESSEE AS REQUIRED BY SECTION 3.3(F) OF THE LEASE AGREEMENT

The undersigned, an Authorized Representative (as defined in the Lease Agreement referred to below) of Salmar Properties, LLC, a limited liability company organized and existing under the laws of the State of New York (the "Lessee"), HEREBY CERTIFIES that this Certificate is being delivered in accordance with the provisions of Section 3.3(f) of that certain Agency Lease Agreement, dated as of September 1, 2011 (the "Lease Agreement"), between the New York City Industrial Development Agency (the "Agency") and the Lessee, and FURTHER CERTIFIES THAT (capitalized terms used but not defined herein shall have the respective meanings assigned to such terms in the Lease Agreement):

(i)     the Initial Project Work is complete; and

(ii)     the Agency has good and valid merchantable title to the Facility Personalty and has a good and valid leasehold estate in the Facility Realty, and all property constituting the Facility is subject to the Company Lease (other than the Facility Personalty), the Lease Agreement, subject only to Permitted Encumbrances; and

(iii)     to the extent available, attached hereto is one of the following (check only one and attach the indicated document):

☐     certificate of occupancy, or

☐     partial temporary certificate of occupancy, or

☐     temporary certificate of occupancy, or

☐     amended certificate of occupancy, or

☐     letter of no objection; or

☐     none of the foregoing is available.

(iv)     in accordance with all applicable laws, regulations, ordinances and guidelines, the portion(s) of Facility covered by the temporary certificate of occupancy, if any, are ready for occupancy, use and operation for its intended purpose under the Lease Agreement and such occupancy, use and operation has in fact commenced; and

(v)     check as applicable:

☐     all costs for Initial Project Work have been paid, or

☐     all costs for Initial Project Work have been paid except for

☐     amounts not yet due and payable (attach itemized list) and/or

☐     amounts the payments for which are being contested in good faith (attach itemized list with explanations; and

Exhibit G-1-1

(vi)    releases of mechanics' liens have been obtained from the general contractor and from all contractors and materialmen who supplied work, labor, services, machinery, equipment, materials or supplies in connection with the Project Work, except for releases-of-liens pertinent to (y) amounts not yet due and payable, or (z) any amount the payment of which is being contested in good faith;

**[ATTACH to this Certificate copies of all such releases of liens.]**

(vii)    attached to this Certificate is evidence that all real property taxes and assessments, and payments in lieu of taxes, if any, due and payable under Sections 5.1 and 8.17 of the Lease Agreement in respect of the Facility have been paid in full;

(viii)    attached hereto is evidence that the Facility has received LEED Core & Shell Silver Certification;

(ix)    attached hereto is evidence of the Environmental Remediation required by Section 3.9 of the Lease Agreement; and

(xi)    the Initial Project Work was completed in accordance with Section 3.10 of the Lease Agreement and attached hereto is a certificate of the Lessee's architect certifying that the Initial Project Work conforms to *Standards for Preservation Guidelines for Historic Building*.

*Notwithstanding anything herein or elsewhere that may be inferred to the contrary, the undersigned hereby understands and agrees on behalf of the Lessee as follows:* (i) the Agency does not waive its right to require delivery of releases-of-liens in connection with the Cost of Work; and (ii) the Agency does not waive its right under the Lease Agreement to demand the discharge of mechanics' and materialmens' liens encumbering the Facility Realty, whether by bond or otherwise; and (iii) this Certificate shall be deemed incomplete if costs of the Initial Project Work are due, unpaid, and not being contested in good faith; and (iv) this Certificate shall be deemed incomplete if, in the Agency's sole discretion, the Lessee is not contesting in good faith the payment of the Cost of Work when such payment is otherwise due; and (v) the Certificate shall be deemed incomplete if, in the Agency's sole discretion, the Lessee has unreasonably failed to bond or otherwise discharge the Cost of Work when payment for same is due.

This Certificate is given without prejudice to any rights of the Lessee against third parties existing on the date hereof or which may subsequently come into being and no Person other than the Agency may benefit from this Certificate.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of _____, _____.

**SALMAR PROPERTIES, LLC**

By:_____
Name:
Title:

Exhibit G-1-2

**EXHIBIT G-2**

## PROJECT COMPLETION CERTIFICATE OF LESSEE AS REQUIRED BY SECTIONS 3.3(G) AND 8.14(G) OF THE LEASE AGREEMENT

The undersigned, an Authorized Representative (as defined in the Lease Agreement referred to below) of Salmar Properties, LLC, a limited liability company organized and existing under the laws of the State of New York (the "Lessee"), HEREBY CERTIFIES that this Certificate is being delivered in accordance with the provisions of Section 3.3(g) and 8.14(g) of that certain Agency Lease Agreement, dated as of September 1, 2011 (the "Lease Agreement"), between the New York City Industrial Development Agency (the "Agency") and the Lessee, and FURTHER CERTIFIES THAT (capitalized terms used but not defined herein shall have the respective meanings assigned to such terms in the Lease Agreement):

(i)     the Project Work is finished and the Project Improvements have been completed substantially in accordance with the plans and specifications therefor and the date of completion of the Project Improvements was _____; and

(ii)     the Agency has good and valid merchantable title to the Facility Personalty and has a good and valid leasehold estate in the Facility Realty, and all property constituting the Facility is subject to the Company Lease (other than the Facility Personalty), the Lease Agreement, subject only to Permitted Encumbrances; and

(iii)     attached hereto is one of the following (check only one and attach the indicated document):

☐     certificate of occupancy, or

☐     temporary certificate of occupancy.

(iv)     other than as provided pursuant to "iii" preceding, there is no certificate, license, permit, written approval or consent, or other document required to permit the occupancy, operation and use of the Facility as contemplated under the Lease Agreement; and

(v)     in accordance with all applicable laws, regulations, ordinances and guidelines, the Facility is ready for occupancy, use and operation for its intended purpose under the Lease Agreement and such occupancy, use and operation has in fact commenced; and

(vi)     check as applicable:

☐     all costs for Project Work have been paid, or

☐     all costs for Project Work have been paid except for

☐     amounts not yet due and payable (attach itemized list) and/or

☐     amounts the payments for which are being contested in good faith (attach itemized list with explanations; and

(vii)     releases of mechanics' liens have been obtained from the general contractor and from all contractors and materialmen who supplied work, labor, services, machinery, equipment, materials or

G-2-1

NY:1348523.11

supplies in connection with the Project Work, except for releases-of-liens pertinent to (y) amounts not yet due and payable, or (z) any amount the payment of which is being contested in good faith;

**[ATTACH to this Certificate are copies of all such releases of liens.]**

(viii)    attached to this Certificate is evidence that all real property taxes and assessments, and payments in lieu of taxes, if any, due and payable under Sections 5.1 and 8.17 of the Lease Agreement in respect of the Facility have been paid in full;

(ix)    the NYCDOT Requirements have been completed in accordance with Section 3.11 of the Lease Agreement;

*Notwithstanding anything herein or elsewhere that may be inferred to the contrary, the undersigned hereby understands and agrees on behalf of the Lessee as follows:* (i) the Agency does not waive its right to require delivery of releases-of-liens in connection with the Cost of Work; and (ii) the Agency does not waive its right under the Lease Agreement to demand the discharge of mechanics' and materialmens' liens encumbering the Facility Realty, whether by bond or otherwise; and (iii) this Certificate shall be deemed incomplete if costs of the Project Work are due, unpaid, and not being contested in good faith; and (iv) this Certificate shall be deemed incomplete if, in the Agency's sole discretion, the Lessee is not contesting in good faith the payment of the Cost of Work when such payment is otherwise due; and (v) the Certificate shall be deemed incomplete if, in the Agency's sole discretion, the Lessee has unreasonably failed to bond or otherwise discharge the Cost of Work when payment for same is due.

This Certificate is given without prejudice to any rights of the Lessee against third parties existing on the date hereof or which may subsequently come into being and no Person other than the Agency may benefit from this Certificate.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of _____, ____.

**SALMAR PROPERTIES, LLC**

By:_____
        Name:
        Title:

G-2-2

**EXHIBIT H**

**[FORM OF SALES TAX LETTER]**

**LETTER OF AUTHORIZATION FOR SALES TAX EXEMPTION
EXPIRATION DATE: [SEPTEMBER 1, 2014]
ELIGIBLE LOCATION FOR CAPITAL IMPROVEMENTS
AND FACILITY PERSONALTY:
850 Third Avenue, Brooklyn, New York 11232**

September ___, 2011

TO WHOM IT MAY CONCERN

Re:    New York City Industrial Development Agency
(2011 Salmar Properties, LLC Project)

Ladies and Gentlemen:

The New York City Industrial Development Agency (the "Agency"), by this notice, hereby advises you as follows:

1.    The Agency constitutes a corporate governmental agency and a public benefit corporation under the laws of the State of New York, and therefore, in the exercise of its governmental functions, is exempt from the imposition of any New York State or New York City sales and use tax. As an exempt governmental entity, no exempt organization identification number has been issued to the Agency nor is one required.

2.    Pursuant to a resolution adopted by the Agency on June 14, 2011, and a certain Agency Lease Agreement, dated as of September 1, 2011 (the "Lease Agreement"), between the Agency and Salmar Properties, LLC, a limited liability company organized and existing under the laws of the State of New York (the "Company"), the Agency has authorized the Company to act as its agent in connection with the acquisition, construction, re-construction, renovation and furnishing of an approximately 1,100,000 square foot building on an approximately 140,000 square foot parcel of land located at 850 Third Avenue, Brooklyn, New York 11232 (the "Facility"), to be leased by the Company to various industrial, manufacturing and commercial tenants, Capitalized words and terms used herein, and not defined herein, shall have the meanings ascribed to them in the Lease Agreement.

3.    In connection with such resolution, the Lease Agreement and this Letter of Authorization for Sales Tax Exemption and pursuant to the authority therein and herein granted, the Agency authorizes the Company to act as its agent in connection with the acquisition, construction, re-construction, renovation and furnishing of the Facility and authorizes the Company to use this Letter of Authorization for Sales Tax Exemption as its agent only for purpose of (a) purchasing or leasing materials, equipment, machinery, goods and supplies and (b) purchasing certain services, solely in connection with the Project, and subject to the scope and limitations described in Annex A attached hereto.  Subject to the provisions of this letter, this agency appointment includes the power of the Company to delegate from time to time such agency appointment, directly or indirectly, in whole or in part, to agents, subagents, contractors, subcontractors, materialmen, suppliers and vendors of the Company and for such parties in turn to delegate, in whole or in part and from time to time, to such other parties as the Company chooses provided that any such delegation is limited to the acquisition, construction, re-construction, renovation

H-1

NY:1348523.11

and furnishing of the Facility and any such activities are effected in compliance with the Letter of Authorization for Sales Tax Exemption (each party so designated, hereinafter an "Agent").

4.      If the Company, or an Agent appointed directly or indirectly by the Company, intends to appoint an Agent to act as the Agency's agent for the purpose of effecting purchases exempt from sales or use tax pursuant to authority of this Letter of Authorization for Sales Tax Exemption, the Company shall, and shall require and cause each such Agent, to comply with the required procedures set forth on Annex B hereto with respect to the filing by the Agency of New York State Department of Taxation and Finance Form ST-60 "IDA Appointment of Project or Agent" ("Form ST-60"), a form of which is attached as Addendum A to Annex B.

5.      As agent for the Agency, the Company agrees that each contract, agreement, invoice, bill or purchase order entered into by the Company or by an Agent, as agent for the Agency for the acquisition, construction, re-construction, renovation and furnishing of the Facility, shall include language in substantially the following form:

"This [contract, agreement, invoice, bill or purchase order] is being entered into by _____, a _____ organized and existing under the laws of the State of _____ [or _____] (the "Agent"), as agent for and on behalf of the New York City Industrial Development Agency (the "Agency") in connection with a certain project of the Agency for the Agent and for Salmar Properties, LLC, a limited liability company organized and existing under the laws of the State of New York (the "Company") being the acquisition, construction, renovation and equipping of a commercial facility (the "Facility"), consisting of the acquisition, construction, re-construction, renovation and furnishing of an approximately 1,100,000 square foot building on an approximately 140,000 square foot parcel of land located at 850 Third Avenue, Brooklyn, New York  11232 (the "Project").   The [purchase, lease, rental, use] of the [materials, machinery, equipment, goods, services and supplies] which are the subject of this [contract, agreement, invoice, bill or purchase order], which has been entered into with or presented to [insert name and address of vendor (the "Vendor")] shall be exempt from the sales and use tax levied by the State of New York and The City of New York subject to and in accordance with the terms and conditions set forth in the attached Letter of Authorization for Sales Tax Exemption of the Agency, and the Agent hereby represents that this [contract, agreement, invoice, bill or purchase order] is in compliance with the terms of the Letter of Authorization for Sales Tax Exemption.

The [Company or Agent] has provided the Vendor with a copy of an executed New York State Department of Finance Form ST-60 "IDA Appointment of Project or Agent" to evidence that the Agency has appointed the Agent as its agent.  The Vendor must retain in its records a copy of the Letter of Authorization for Sales Tax Exemption, the completed Form ST-60 and the [contract, agreement, invoice, bill or purchase order] as evidence that the Vendor is not required to collect sales or use tax in connection with this [contract, agreement, invoice, bill or purchase order].

H-2

This [contract, agreement, invoice, bill or purchase order] is nonrecourse to the Agency, and the Agency shall not be directly or indirectly or contingently liable or obligated hereunder in any manner or to any extent whatsoever, and the Agent shall be the sole party liable hereunder. By execution or acceptance of this [contract, agreement, invoice, bill or purchase order], the Vendor hereby acknowledges and agrees to the terms and conditions set forth in this paragraph."

6.    The Agency shall have no liability or performance obligations under any contract, agreement, invoice, bill or purchase order entered into by the Company or any Agent as agent for the Agency hereunder. The Agency shall not be liable, either directly or indirectly or contingently, upon any such contract, agreement, invoice, bill or purchase order in any manner and to any extent whatsoever, and the Company or, as applicable, any Agent, shall be the sole party liable thereunder.

7.    By execution by the Company of its acceptance of the terms of this Letter of Authorization for Sales Tax Exemption, the Company agrees to accept the terms hereof and represents and warrants to the Agency that the use of this Letter of Authorization for Sales Tax Exemption by the Company or by any Agent is strictly for the purposes above stated.

8.    Accordingly, until the earlier of (i) the Expiration Date referred to above, (ii) the termination of the Lease Agreement, or (iii) the receipt by the Company of notice from the Agency of the termination of this Letter of Authorization for Sales Tax Exemption (in each case as so terminated, the "Termination Date"), all Vendors are hereby authorized to rely on this Letter of Authorization for Sales Tax Exemption (or on a photocopy or fax of this Letter of Authorization for Sales Tax Exemption) as evidence that purchases of the Project property, to the extent effected by the Company or by an Agent as agent for the Agency, are exempt from all New York State and New York City sales and use taxes. Upon the Termination Date, the agency appointed by the Agency of the Company and each Agent shall terminate, and (i) the Company shall immediately notify each Agent in writing of such termination; (ii) the Company shall surrender, and cause each Agent to surrender, this Letter of Authorization for Sales Tax Exemption (including any copy or facsimile hereof) to the Agency for cancellation; and (iii) the Company shall cause each Agent to perform all of its obligations as set forth in Annex B and in the Agency Agreement referred to therein.

9.    Notwithstanding any contrary provisions in the Lease Agreement, ten (10) days prior to the Expiration Date of this Letter of Authorization for Sales Tax Exemption, the Company shall surrender, and cause each Agent to surrender, this letter to the Agency for renewal. The Company and any Agent may continue to use a facsimile copy of this Letter of Authorization for Sales Tax Exemption until its stated Expiration Date. Within ten (10) days of receipt of this Letter of Authorization for Sales Tax Exemption, the Agency shall provide such annual renewal of the letter to the Company if and to the extent required under the Lease Agreement.

H-3

The signature of a representative of the Company where indicated below will indicate that the Company has accepted the terms hereof.

**NEW YORK CITY INDUSTRIAL
DEVELOPMENT AGENCY**

By:_____
        Name:
        Title:

**ACCEPTED AND AGREED TO BY:**

**SALMAR PROPERTIES, LLC**
By:  Salmar Realty, LLC, its
        Managing Member


By: _____
        Marvin H. Schein, Member

H-4

## ANNEX A

The Company and each Agent appointed directly or indirectly by the Agency in connection with the Project shall be entitled to claim an exemption from sales or use tax levied by the State of New York and The City of New York in connection with the following transactions:

(i)     **Capital Improvements.**  With respect to capital improvements to the Facility Realty (as defined in the Lease Agreement):

(a)     purchases of materials, goods, machinery, equipment and supplies that are incorporated into and made an integral component part of the Facility Realty;

(b)     purchases of materials, goods, machinery, equipment and supplies that are to be used and substantially consumed in the course of construction or renovation of the Facility Realty (but excluding fuel, materials or substances that are consumed in the course of operating machinery and equipment or parts containing fuel, materials or substances where such parts must be replaced whenever the substance is consumed); and

(c)     leases of machinery and equipment solely for temporary use in connection with the construction or renovation of the Facility Realty.

(ii)    **Personal Property.**

*[List   the   Personal   Property:  **TO   BE   PROVIDED   BY   THE   LESSEE]**

_____

_____

_____

*[If including personal property, state the following:*  Purchases or leases of any item of materials, goods, machinery, equipment, furniture, furnishings, trade fixtures and other tangible personal property must have a useful life of one year of more, may include mainframe computers (and peripherals), personal computers, telecommunications equipment, business machines and software, but shall exclude vehicles of any sort (including watercraft and rolling stock), fine art, plants (whether potted or landscaped), objects d'art and other similar decorative items, ordinary office supplies such as pencils, paper clips and paper, and any cost of utilities, cleaning service or supplies or other costs of operation].

(iii)   **Services.**  With respect to the eligible items identified in (i)(a) above: purchases of freight, installation, maintenance and repair services required in connection with the shipping, installation, use, maintenance or repair of such items; provided that maintenance shall mean, with respect to any of the above categories of property having a useful life of one year or more, the replacement of parts (but excluding materials or substances that are consumed in the operation of machinery and equipment or parts containing materials or substances where such parts must be replaced whenever the substance is consumed) or the making of repairs, but shall not include maintenance of the type as shall constitute janitorial services.

NY:1348523.11

## ANNEX B

## FORM ST-60--REQUIRED PROCEDURES

**Introduction.** Section 874(9) of Article 18-A of the General Municipal Law and New York State Department of Taxation and Finance Form ST-60 "IDA Appointment of Project or Agent" ("Form ST-60") require that within thirty (30) days of the date that the Agency or its agent directly or indirectly appoint a project operator or other person or entity to act as agent of the Agency for purposes of extending a sales or use tax exemption to such person or entity, the Agency must file a completed Form ST-60 with respect to such person or entity. Certain capitalized terms used in this exhibit shall have the meanings ascribed thereto in the Letter of Authorization for Sales Tax Exemption.

**Required Procedures.** In order to comply with the foregoing law and other Agency requirements, the Company must, and must ensure that its Agents, comply with the following procedures. Failure to follow such procedures may result in the loss of sales and use tax exemptions derived from the use of the Letter of Authorization for Sales Tax Exemption in connection with the Project.

1.  Agency Agreement. Prior to submitting to the Agency a completed Form ST-60 with respect to a proposed Agent, the Company, or its Agents, as applicable, must enter into an Agency Agreement with such Agent that describes the work to be performed and/or the materials to be provided by such Agent pursuant to a contract (the "Agent's Contract") entered into in connection with the Project. The Agency Agreement (which may be incorporated in the Agent's Contract) shall include the following provisions substantially in the form below (instructions are in *italics*):

"a)  The Agent is hereby appointed as an agent of the Agency in connection with the materials to be provided by such Agent pursuant to a contract between Agent and *[identify Company or Company Agent]* _____ dated _____, 200_ (the "Agent's Contract") for the purposes described in, and subject to the conditions and limitations set forth in, the Letter of Authorization for Sales Tax Exemption attached as <u>Exhibit A</u> *[attach Letter of Authorization for Sales Tax Exemption from the Agency to the Company].*

b)  Pursuant to the exemptions from sales and use taxes available to the Agent under the Letter of Authorization for Sales Tax Exemption, the Agent shall avail itself, on behalf of the Company, of such exemptions when purchasing eligible materials in connection with the Contract and shall not include such taxes in its Contract price, bid or reimbursable costs, as the case may be.

c)  The effectiveness of the appointment of the Agent as an agent of the Agency is expressly conditioned upon the execution by the Agency of New York State Department of Taxation and Finance Form ST-60 "IDA Appointment of Project or Agent" ("Form ST-60") to evidence that the Agency has appointed the Agent as its agent (the form of which to be completed by Agent and the Company and is attached to the Letter of Authorization for Sales Tax Exemption as Addendum A to Annex B).

d)  Agent shall provide a copy of the executed Form ST-60 to each vendor to whom it presents the Letter of Authorization for Sales Tax Exemption in order to effect a sales tax exempt purchase. All such purchases shall be made in compliance with the terms, provisions and conditions of the Letter of Authorization for Sales Tax Exemption.

NY:1348523.11

e)   The Agent must retain for at least six (6) years from the date of expiration of its Contract copies of (a) the Agency Agreement, (b) all contracts, agreements, invoices, bills or purchases entered into or made by such Agent using the Letter of Authorization for Sales Tax Exemption, and (c) the executed Form ST-60 appointing the Agent as an agent of the Agency and to make such records available to the Agency upon reasonable notice. This provision shall survive the expiration or termination of the Agency Agreement.

f)   In order to assist the Company in complying with its obligation to file New York State Department of Taxation and Finance Form ST-340 "Annual Report of Sales and Use Tax Exemptions Claimed by Project Operator of Industrial Development Agency/Authority" ("Form ST-340"), the Agent covenants and agrees that it shall file annually with the Company (no later than January 15th following each calendar year in which it has claimed sales and use tax exemptions in connection with the Project) a written statement of all sales and use tax exemptions claimed by such Agent for the preceding calendar year in connection with the Project and the Facility. If the Agent fails to comply with the foregoing requirement, the Agent shall immediately cease to be the agent for the Agency in connection with the Project (such agency relationship being deemed to be immediately revoked) without any further action of the parties, the Agent shall be deemed to have automatically lost its authority to make purchases as agent for the Agency, and shall desist immediately from all such activity, and shall immediately and without demand return to the Company or the Agency its copy of the Letter of Authorization for Sales Tax Exemption issued to the Company by the Agency that is in the Agent's possession or in the possession of any agent of such Agent.

g)   The Agent agrees that if it fails to comply with the requirements for sales and use tax exemptions, as described in the Letter of Authorization for Sales Tax Exemption, it shall pay any and all applicable New York State sales and use taxes, and no portion thereof shall be charged or billed to the Agency or to the Company directly or indirectly, the intent of the Agency Agreement being that neither the Agency nor the Company shall be liable for any of the sales or use taxes described above. This provision shall survive the expiration or termination of the Agency Agreement.

h)   The Agent represents and warrants that, except as otherwise disclosed to the Agency, none of the Agent, the Principals of the Agent, or any Person that directly or indirectly Controls, is Controlled by, or is under common Control with the Agent:

   i.   is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with the Agency or The City of New York (the "City"), unless such default or breach has been waived in writing by the Agency or the City, as the case may be;

   ii.   has been convicted of a felony and/or any crime involving moral turpitude in the preceding ten (10) years;

   iii.   has received written notice of default in the payment to the City of any taxes, sewer rents or water charges in excess of $5,000 that has not been cured or satisfied, unless such default is then being contested with due diligence in proceedings in a court or other appropriate forum; or

   iv.   has, at any time in the three (3) preceding years, owned any property which, while in the ownership of such Person, was acquired by the City by in rem tax

Addendum B-2

foreclosure, other than a property in which the City has released or is in the process of releasing its interest to such Person pursuant to the Administrative Code of the City.

"Control" or "Controls" shall mean the power to direct the management and policies of a Person (x) through the ownership, directly or indirectly, of not less than a majority of its voting securities, (y) through the right to designate or elect not less than a majority of the members of its board of directors or trustees or other Governing Body, or (z) by contract or otherwise.

"Entity" shall mean any of a corporation, general partnership, limited liability company, limited liability partnership, joint stock company, trust, estate, unincorporated organization, business association, tribe, firm, joint venture, governmental authority or governmental instrumentality, but shall not include an individual.

"Governing Body" shall mean, when used with respect to any Person, its board of directors, board of trustees or individual or group of individuals by, or under the authority of which, the powers of such Person are exercised.

"Person" shall mean an individual or any Entity.

i)      The appointment of the Agent as agent of the Agency shall expire at the earlier of (i) the expiration of the Agent's Contract, or (ii) the Expiration Date of the Letter of Authorization for Sales Tax Exemption, unless renewed; provided, however, that the expiration or termination of the Company's status as agent of the Agency shall result in the immediate termination of the Agent's status as an agent of the Agency.

j)      The Agency shall be a third party beneficiary of the Agency Agreement."

2.      Complete and Submit Form ST-60 to the Agency. Following the execution and delivery of an Agency Agreement, the Company must submit to the Agency a Form ST-60 completed with the information required in each of the shaded areas shown on the example form attached hereto as Addendum A.

The Agency requires the Company to submit Form ST-60 electronically. Please download Form ST-60 via the internet by typing www.tax.state.ny.us/pdf/2002/fillin/st/st60_702_fill_in.pdf into the address bar of your internet browser and saving the "fill-in" PDF of the form (using adobe acrobat). The downloaded form may then be completed electronically, saved and transmitted to the Agency.

Upon completion of the form by the Agent, the Company must submit the form to the Agency by emailing it to Compliance@nycedc.com.

The appointment of such Agent as an agent for the Agency shall be effective upon execution of the completed Form ST-60 by the Agency. The Agency will insert the date on which the Agent is appointed on the date when the Form ST-60 is executed by the Agency. The determination whether or not to approve the appointment of an Agent by executing the Form ST-60 shall be made by the Agency, in its sole discretion. If executed, a completed copy of Form ST-60 shall be sent to the Company within five (5) business days following such execution. The Company shall provide a copy of such executed Form ST-60 to the Agent within five (5) business days after receipt thereof by the Company.

Addendum B-3

**ADDENDUM A**

**FORM ST-60**

NY:1348523.11

# EXHIBIT I

## PROJECT FINANCE PLAN

The plan for financing the cost of the Project Work, which the Lessee estimates to be $_____, from the following sources:

(i)    a loan in the principal amount of $_____ to be made by _____ (the "First Mortgagee") to the Lessee (the "First Mortgage Loan") on the Commencement Date, and to be evidenced by a certain mortgage note (as the same may be amended or supplemented, the "First Mortgage Note") dated the Commencement Date and in the principal amount of the First Mortgage Loan, and to be secured by a first mortgage on the Facility Realty pursuant to a certain mortgage and security agreement dated the Commencement Date (as the same may be amended or supplemented, the "First Mortgage") from the Lessee and the Agency to the First Mortgagee;

(ii)    a loan in the principal amount of $_____ to be made by _____ (the "Second Mortgagee") to the Lessee (the "Second Mortgage Loan") on a date subsequent to the Commencement Date, and to be evidenced by a certain mortgage note (as the same may be amended or supplemented, the "Second Mortgage Note") and in the principal amount of the Second Mortgage Loan, and to be secured by a second mortgage on the Facility Realty pursuant to a certain mortgage and security agreement to be granted after the Commencement Date (as the same may be amended or supplemented, the "Second Mortgage") from the Lessee and the Agency to the Second Mortgagee;

(iii)    a bridge loan in the principal amount of $_____ to be made by the First Mortgagee to the Lessee (the "Bridge Mortgage Loan") on the Commencement Date in anticipation of and to be paid from the future Second Mortgage Loan, and to be evidenced by a certain mortgage note (as the same may be amended or supplemented, the "Bridge Mortgage Note") dated the Commencement Date and in the principal amount of the Bridge Mortgage Loan, and to be secured by a second mortgage on the Facility Realty pursuant to a certain mortgage and security agreement dated the Commencement Date (as the same may be amended or supplemented, the "Bridge Mortgage") from the Lessee and the Agency to the First Mortgagee;

(iv)    other loans not constituting Mortgage Loans in the amount of $_____ from _____; and

(v)    equity from the Lessee in the amount of $_____.

Exhibit I-1

**EXHIBIT J**

**DEED**

NY:1348523.11

Deed

NYCEDC to Salmar Properties, LLC

Brooklyn, Block 671, Lot 1

(Parcel A)

Closed:  8/15/2011

PARCEL A DEED

THIS INDENTURE, dated as of ___August 15___, 2011, between NEW YORK CITY
ECONOMIC DEVELOPMENT CORPORATION ("**Grantor**"), a local development corporation
incorporated under Section 1411 of the New York State Not-for-Profit Corporation Law, having
an office at 110 William Street, New York, New York 10038, and SALMAR PROPERTIES,
LLC ("**Grantee**"), a New York State limited liability company, having an office at 120
Broadway, New York, New York 10271.

<u>W I T N E S S E T H</u>

WHEREAS, the Property (hereinafter defined) is the same Property as was conveyed on
August 15, 2011 by the United States of America, acting by and through its General Services
Administration ("**GSA**"), hereafter called the "**Government**," to Grantor (the "**GSA Deed**") and
intended to be recorded prior hereto; and

WHEREAS, the Property will be developed in accordance with this deed primarily for
light industrial uses, which shall, at a minimum, include (i) with respect to Federal Building #2:
complete roof replacement or restoration and façade restoration; utilities, mechanical and life
safety systems distributed throughout the entire building; and at least one bank of elevators
installed and operational throughout the building ("**Federal Building Minimum Build**"), and
(ii) with respect to the adjacent parcel (the "**Adjacent Parcel**") being conveyed simultaneously
herewith by Grantor to Grantee's affiliate for the Project (Block 675, Lot 10 on the Tax Map of
Brooklyn (the "**City Tax Map**")), the development requirements set forth in the deed ("**Parcel B
Deed**") for such conveyance (the "**Parcel B Minimum Build**" and collectively with the Federal
Building Minimum Build, the "**Minimum Build**"), the Adjacent Parcel and the Property being
herein referred to as the "**Project**."

NOW, THEREFORE, Grantor, in consideration of the sum of NINE MILLION ONE
HUNDRED TWENTY-SEVEN THOUSAND TWO HUNDRED AND 00/100 DOLLARS
($9,127,200.00), paid by Grantee, and other valuable consideration, does hereby grant and release
unto Grantee, its successors and assigns forever, all those certain plots, pieces or parcels of land,
designated Block 671, Lot 1 on the City Tax Map with the approximately 1.1 million square foot,
eight story industrial building and improvements thereon referred to herein as "Federal Building
#2", being fully described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes,
with all improvements thereon (the "**Property**").

SAID Property being also generally known as 850 Third Avenue.

TO HAVE AND TO HOLD said Property herein granted unto Grantee, the
successors and assigns of Grantee forever.

(A)     Grantee, on behalf of itself, its successors and assigns, covenants, within six (6)
months from the date hereof, subject to Unavoidable Delays (as hereinafter defined), to
commence construction with respect to the Federal Building Minimum Build and thereafter to
diligently and continuously prosecute such construction to completion within two (2) years from
the date hereof subject to Unavoidable Delays.  For purposes of this deed, "**Unavoidable Delay**"
shall mean any cause beyond the reasonable control and without the fault or negligence of

Grantee, including but not limited to: orders of any court of competent jurisdiction, industry-wide labor disputes including strikes and slow downs, acts of God, enemy action, terrorist activity, civil commotion, inability to obtain materials as a result of a national disaster and fire or other casualty, inability to obtain governmental permits provided Grantee complied with its requirements and standard timeframe for processing applies, but not including Grantee's financial condition or inability to obtain financing, provided Grantee shall have notified Grantor no later than thirty (30) days after the occurrence of such event.  In no event shall Unavoidable Delays together aggregate more than twenty-four (24) months.

(B)     If Grantee transfers a leasehold interest in all or any part of the Property to New York City Industrial Development Agency ("**IDA**") and IDA leases back the Property or part thereof to Grantee, all in connection with obtaining financial assistance, then, Grantee, on behalf of itself and Grantee's successors, covenants that, so long as it or its successor leases back the Property or part thereof from IDA or a successor agency, (x) Grantee or Grantee's successor will be bound by and will complete the Minimum Build required by Paragraph (A) above as if Grantee or Grantee's successor had never conveyed a leasehold interest in the Property to IDA and (y) IDA is not responsible for any obligation on the part of Grantee hereunder including the provisions of Paragraph G hereunder.  Grantor will not require that IDA or a successor agency (i) do such Minimum Build or (ii) comply with any obligations hereunder or (iii) have recourse against IDA or a successor agency in connection therewith.

(C)     Grantee, on behalf of itself, its successors and assigns, covenants that under no circumstances shall the Property or any portion thereof be used (i) for any adult establishment, as defined in Section 12-10 of the Zoning Resolution or (ii) exclusively for any passive warehouse and/or storage businesses.

(D)     Grantee, on behalf of itself, its successors and assigns, further covenants that, for a period of thirty (30) years from the date of completion of the Federal Building Minimum Build, the Property shall be occupied and used only by industrial businesses for their business operations, including ancillary administrative and storage use incidental to such industrial businesses and up to 15% of rentable floor area of the improvements of the Project may be used for retail uses currently allowed under the M3-1 zoning regulations for the Property existing at the time hereof, and for no other purposes, except with the prior written approval of Grantor (the "**Permitted Uses**").  This restriction and covenant shall run with the land.  Notwithstanding anything to the contrary contained herein but subject however to the provisions of Paragraph B above, if, at any time prior to the end of such thirty (30) year period but not before the later of four (4) years after the date hereof or two (2) years after the entire building is available and usable for leasing, Grantee is unable to rent the Property for Permitted Uses, despite having used commercially reasonable efforts to do so, such that the Property, over a period of not less than one (1) year, produces revenue sufficient to enable Grantee to pay all expenses of operating the Property, including interest and principal on indebtedness with an Institutional Lender of up to the "initial development cost" as defined below, Grantee may request Grantor's consent to an expansion of the Permitted Uses under this Paragraph D to include any use permitted under the

M3-1 zoning regulations for the Property at the time hereof ("**Additional Uses**"). In connection with any such request, Grantee shall provide Grantor with written documentation signed by Grantee's chief executive officer reasonably detailing (i) the commercially reasonable efforts taken to lease or cause to be occupied the available rentable space, (ii) market information that supports the view that leasing will significantly increase the amount of leased or occupied rentable space within the Property, and (iii) rental income derived from rental of the Property, including rental income at a market rental rate for space occupied by Grantee-affiliated entities, and expenses of operating the Property. The rental income and expenses information must be certified by Grantee's Chief Financial officer and supported by Grantee's financial statements and/or tax returns. Grantee shall respond to all reasonable requests of Grantor to enable Grantor to evaluate Grantee's request. Provided Grantee's request for Grantor's consent meets the requirements set forth herein, Grantor will in good faith reasonably consider and respond to such request; however, Grantor's consent to expand the Permitted Uses to include Additional Uses shall be at Grantor's sole discretion. For purposes hereof, the "initial development cost" shall only include the cost of purchasing the Property plus the cost actually spent on the initial renovation and leasing of the entire Property, including any carrying costs. For purposes of this Paragraph D, building operating expenses, other than mortgage interest and amortization, shall be consistent with that incurred by a third-party owner/manager for a similar property. For purposes of clarity, Additional Uses shall not include any use permitted as a result of a change in zoning regulations applicable to the Property or a variance resulting, in either case, from an application therefor made directly or indirectly by Grantee, and Grantee further covenants that it shall not directly or indirectly make or cause to be made such application. In addition to the foregoing, any request for Grantor's consent to an expansion of Permitted Uses to uses not permitted under M3-1 zoning regulations for the Property on the date hereof shall be exercisable by Grantor at its sole and absolute discretion, and Grantee further covenants that it shall not directly or indirectly make or cause to be made such application. The above restrictions in this Paragraph D shall not apply to the Property after a foreclosure sale or a transfer in lieu of foreclosure under a mortgage held by an Institutional Lender securing financing with regard to the purchase of the Property by Grantee or construction financing with regard to construction on the Property or a permanent "take-out" loan with regard to such construction financing. For the purposes hereof, "**Institutional Lender**" shall mean a savings bank, a savings and loan association, a commercial bank or trust company (whether acting individually or in a fiduciary capacity), an insurance company organized and existing under the laws of the United States of America or any state thereof, an investment bank or its affiliate, a religious, or educational institution, a federal, state or municipal employee's welfare, benefit, pension or retirement fund, any governmental agency or entity insured by a governmental agency, or any combination of the preceding; provided, that each of the above entities shall qualify as an Institutional Lender only if it shall (a) be subject to the jurisdiction of the courts of the State of New York in any actions pertaining to or arising in connection with the Contract, and (b) have net assets of not less than $500,000,000, or such lower amounts as are deemed acceptable in Grantor's sole discretion.

(E)    Grantee, on behalf of itself, its successors and assigns, covenants that, for a period of ten (10) years from the date hereof, it shall not convey the Property (or any improvements thereon) or any interest in either, except (i) a conveyance of a leasehold interest in the Property to IDA in connection with financial assistance provided by IDA to Grantee in connection with Grantee's purchase of the Property and/or construction required hereby to be constructed on the Property, which is deemed a "Permitted Transfer" (as hereinafter defined), (ii) or with the prior written approval of Grantor. The above restrictions and covenants in this Paragraph shall run with the land. The above restrictions and covenants in this Paragraph shall not prohibit, or apply to, a foreclosure sale or a transfer in lieu of foreclosure under a mortgage held by an Institutional Lender securing financing with regard to the purchase of the Property by Grantee or construction financing with regard to construction on the Property or a permanent "take-out" loan with regard to such construction financing, nor to any sale or other transfer subsequent to such a foreclosure sale or transfer in lieu of foreclosure.

(F)    In addition to the foregoing, until the later of (x) completion of the Minimum Build for the Project, and (y) the fifth (5th) anniversary of completion of the Federal Building Minimum Build, Grantor's prior written approval at its sole discretion shall be required for (i) any sale, transfer or assignment of membership interests of Grantee, (ii) any issuance of any additional membership interest in Grantee, and (iii) any change in the interest of any member of Grantee in Grantee. Notwithstanding the foregoing, if the actions set forth in clauses (i), (ii) and (iii) above, effect a transfer to existing beneficial owners of such interests, or to members of their respective families or to trusts for the benefit of any such persons, the same shall not require Grantor's prior approval provided that Selim Rusi or Marvin Schein retain control or continue to be responsible for the day to day management and operations of Grantee (hereinafter referred to as "**Permitted Transfers**"). With respect to any transfer which requires Grantor's approval, Grantee agrees to provide Grantor with such information as Grantor needs in deciding whether to give any approval required hereby. Any request for approval by Grantor of any of the above matters, and any notice to Grantor, and any notice of approval or disapproval by Grantor, shall be in writing and given by mailing the same by certified or registered mail addressed as follows, or to such other address as either party designates to the other in writing in the manner set forth below:

If to Grantor:
New York City Economic Development Corporation
110 William Street
New York, New York 10038
Attn: General Counsel

With a copy to:

New York City Economic Development Corporation
110 William Street
New York, New York 10038
Attn: Executive Vice President for Development

G:\jcapolongo\LANDSALE\Projects\Federal Building\Deed A EDC-Salmar v5-08-12-11 - (# Legal 3107181).doc

4

If to Grantee:

Salmar Properties, LLC
c/o Platinum Maintenance Corp.
120 Broadway, 36th Floor
New York, New York 10271
Attn: Selim Rusi and Marvin Schein

With copies to:

Ackerman, Levine, Cullen, Brickman & Limmer, LLP
1010 Northern Boulevard, Suite 400
Great Neck, NY 11021

     and

Jacobi, Sieghardt, Bousanti, Piazza & Fitzpatrick, PC
235 Forest Avenue
Staten Island, NY 10301

(G)     Grantee further agrees and covenants by acceptance of this deed to the Property that, in its use and occupancy of the Property it will comply with all applicable Environmental Laws (as hereinafter defined) with respect to the Property. Nothing in this Paragraph G is intended to deprive Grantee of any rights it is entitled to under the GSA Deed respecting the obligations of the Government under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq. ("**CERCLA**") for environmental conditions at the Property, which rights are assigned by Grantor to Grantee, run with the Property conveyed hereunder, and for which Grantee shall be a beneficiary thereof.

(1)     For purposes of this deed, "**Hazardous Substances**" shall mean any (1) "hazardous substance" as defined under CERCLA, or (2) "hazardous waste" as defined under the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., or (3) "hazardous materials" as defined under the Hazardous Materials Transportation Authorization Act, 49 U.S.C. Section 5101 et seq., or (4) "hazardous waste" as defined under New York Environmental Conservation Law, Section 27-0901 et seq., or (5) "petroleum" as defined under New York Navigation Law, Section 172.15 et. Seq., or (6) "hazardous substance" as defined under the Clean Water Act, 33 U.S.C. Section 1321 et seq., and the regulations adopted and publications promulgated pursuant to the above, and all other applicable laws, rules or regulations of all Federal, State and local authorities having jurisdiction over the Property.

(2)     For purposes of this deed, "**Environmental Laws**" shall mean, collectively, CERCLA, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., the Hazardous Materials Transportation Authorization Act, 49 U.S.C. Section 5101 et seq., the New York Environmental Conservation Law, Section 27-0901 et seq., New York Navigation Law, Article 12 et. Seq., the Clean Water Act, 33 U.S.C. Section 1321 et seq., and any Federal, State, or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to,

or imposing liability or standards of conduct concerning, any hazardous, toxic, radioactive, biohazardous or dangerous waste, substance or materials, including any regulations adopted and publications promulgated with respect thereto.

(3)     Grantee, for itself and its successors and assigns, hereby absolutely waives, and agrees that neither it nor its successors and assigns, if any, shall make any claim for damages, contribution, indemnification or otherwise against Grantor or the Government, as applicable, which Grantee or its successors or assigns may now or hereafter have or discover in connection with Hazardous Substances on, in, at, under, beneath, emanating from or affecting the Property, or in connection with any voluntary or required removal or remediation thereof (including, without limitation, claims relating to the release, threatened release, disturbance, emission or discharge of Hazardous Substances).  Grantor and the Government shall have no liability to Grantee, or its successors or assigns, with regard to Hazardous Substances, on, at, in, under, beneath, emanating from or affecting the Property.  Such waiver of liability shall cover, without limitation, any and all liability to Grantee, both known and unknown, present and future, for any and all environmental liabilities, including without limitation any and all strict and other liability, costs, claims, fines, penalties, damages under any and all Environmental Laws with respect to investigating, remediating, mitigating, removing, treating, encapsulating, containing, monitoring, abating, or disposing of any Hazardous Substance, and any costs incurred to come into compliance with Environmental Laws. Grantee shall include in any and all future deeds for the Property a provision providing that this release is a covenant running with the land.

(H)     Grantee, on behalf of itself, its successors and assigns, further covenants that, for a period of three (3) years from the date hereof, if at any time within the three-year period from the date hereof, Grantee or its successors or assigns, shall sell or enter into agreements to sell the Property, either in a single transaction or in a series of transactions, all proceeds received or to be received in excess of Grantee's or a subsequent seller's actual allowable costs will be promptly remitted to the GSA.  Grantee further agrees that in the event of a sale of less than the entire Property, actual allowable costs will be apportioned to the portion sold based on a fair and reasonable determination by the GSA.

(i)     For purposes of this covenant, Grantee's or a subsequent seller's allowable costs shall include the purchase price of acquiring the Property and the direct costs actually incurred and paid for physical improvements on the Property for the following: improvements on the Property which serve only such Property, including road construction, storm and sanitary sewer construction, other public facilities or utility construction, building rehabilitation and demolition, landscaping, grading, and other site or public improvements; the direct costs actually incurred and paid for design and engineering services with respect to the improvements described above, provided, however, that none of these costs or the costs described above will be allowable if defrayed by Federal grants or if used as matching funds to secure Federal grants; the

finance charges actually incurred and paid in conjunction with loans obtained to meet any of the allowable costs enumerated above.

(ii)    In order to verify compliance with the terms and conditions of this covenant, Grantee, or its successors or assigns, shall submit to GSA an annual report for each of the subsequent three years on the anniversary date of this deed, which annual report shall include a certification by an officer of Grantee as to the accuracy and completeness of the information being transmitted to the GSA. Each report will identify the Property, indicate the sale price of any property resold, the purchaser and the proposed land use, and enumerate any allowable costs incurred for physical improvements on the Property that would offset any profit realized. If no resale has been made, the report shall so state. Failure to file timely reports will extend the operation of the covenant for an additional one-year period for each late or omitted report. Grantee acknowledges that GSA has reserved the right to monitor the Property and inspect records related thereto to ensure compliance with the terms and conditions of this covenant and may take any actions which it deems reasonable and prudent to recover any excess profits realized through the resale of the Property. Grantee further agrees to indemnify, defend, reimburse, and hold harmless Grantor and IDA and their respective officials, officers, directors, employees, agents, successors, and assigns, and each of them from and against any and all liabilities respecting the remittance of excess profits to the GSA.

(I)    If Paragraphs A through F above are not complied with (or if Grantor is exercising its reverter rights under the Parcel B Deed), then Grantor, at its option, and after giving Grantee or any subsequent owner of the Property notice and sixty (60) days opportunity to cure such default or such longer period as required to effect the cure thereof so long as Grantee promptly commences and diligently pursues the cure to completion, shall, without paying Grantee (or any subsequent owner of the Property (or any improvements thereon) or any interest in either) any consideration, shall have the right to re-enter and take possession of the Property (together with any improvements thereon), and the estate conveyed hereby to Grantee shall thereupon terminate, and fee simple title to the Property, and any improvements thereon, shall revest in Grantor forever in the same manner and to the same extent as if the conveyance made by this deed had not been made, except, however, that Grantor's reacquisition of the Property (together with any improvements thereon) shall be subject to the lien of mortgages held by Institutional Lenders securing financing with regard to the purchase of the Property by Grantee or construction financing with regard to construction on the Property or a permanent "take-out" loan with regard to such construction financing. Upon Grantor's exercise of such option to re-enter and reacquire, Grantee (and/or any subsequent owner of the Property (or any improvements thereon) or any interest in either), upon demand by Grantor, shall execute and deliver to Grantor a deed(s) for the Property (and any improvements thereon) in form and substance satisfactory to Grantor, conveying the Property, together with any improvements thereon, to Grantor. The execution and delivery of the foregoing deed(s) shall not, however, be construed as a condition precedent to Grantor's acquisition, as aforesaid, of the Property (and any improvements thereon). Notices

G:\jcapolongo\LANDSALE\Projects\Federal Building\Deed A EDC-Salmar v5-08-12-11 - (# Legal 3107181).doc

7

pursuant to this Paragraph shall be in writing and sent by certified or registered mail, and shall be addressed as follows, or to such other address as Grantor or Grantee designates to the other in writing in the manner indicated below:

If to Grantor:
New York City Economic Development Corporation
110 William Street
New York, New York 10038
Attn: General Counsel

With a copy to:

New York City Economic Development Corporation
110 William Street
New York, New York 10038
Attn: Executive Vice President for Development

If to Grantee:

Salmar Properties, LLC
c/o Platinum Maintenance Corp.
120 Broadway, 36th Floor
New York, New York 10271
Attn: Selim Rusi and Marvin Schein

With copies to:

Ackerman, Levine, Cullen, Brickman & Limmer, LLP
1010 Northern Boulevard, Suite 400
Great Neck, NY 11021

        and

Jacobi, Sieghardt, Bousanti, Piazza & Fitzpatrick, PC
235 Forest Avenue
Staten Island, NY 10301

Any attorney costs or fees incurred by Grantor in exercising the above right to re-enter and reacquire the Property (together with any improvements thereon) or any interest in either shall be paid by Grantee. Grantor's right to re-enter and reacquire the Property (together with any improvements thereon) shall not be in effect during the period that IDA is leasing the Property from Grantee and leasing back the Property to Grantee. Whenever Grantor or Grantee is referred to in this Paragraph, it shall mean Grantor and its successors and assigns or Grantee and its successors and assigns, respectively.

(J)     The transfer of the Property is further subject to the terms of the GSA Deed.

(K)     The transfer of the Property is subject to the trust fund provisions of Section 13 of the New York State Lien Law.

(L)     The restrictions and covenants of Grantee hereunder shall run with the land and bind Grantee's successors and assigns. With respect to any violation of this deed, Grantor shall retain each and every other defense, right, and remedy which Grantor has, will have, or may have pursuant to this deed, or any other agreement between Grantor and Grantee or under law, equity,

G:\jcapolongo\LANDSALE\Projects\Federal Building\Deed A EDC-Salmar v5-08-12-11 - (# Legal 3107181).doc

or otherwise.

IN WITNESS WHEREOF, Grantor has caused its corporate seal to be hereunto affixed and has executed this deed by having it signed by its duly authorized officer, and Grantee has duly executed this deed, the day and year first above written.

NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION

By: _____
Name:  Patrick O'Sullivan, Jr.
Title:  EVP

SALMAR PROPERTIES, LLC
By: Salmar Realty, LLC, its manager

By: _____
Name:  Selim Rusi
Title:  Manager

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK   )

On the 15 day of August, in the year 2011, before me, the undersigned, personally appeared
Patrick J. O'Sullivan Jr., personally known to me or proved to me on the basis of satisfactory
evidence to be the individual whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his capacity, and that by his signature on the
instrument, the individual, or the person on behalf of which the individual acted, executed the
instrument.

ALBERT L RISI
Notary Public, State of New York
No. 01RI6192988
Qualified in Richmond County
Commission Expires 09/08/2012

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK   )

On the 15 day of August, in the year 2011, before me, the undersigned, personally appeared
_____ Selim Rusi _____, personally known to me or proved to me on the basis
of satisfactory evidence to be the individual whose name is subscribed to the within instrument
and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her
signature on the instrument, the individual, or the person on behalf of which the individual acted,
executed the instrument.

ALBERT L RISI
Notary Public, State of New York
No. 01RI6192988
Qualified in Richmond County
Commission Expires 09/08/2012

<u>Exhibit A</u>

Legal Description of the Property

All that tract, piece or parcel of land, situate in the Borough of Brooklyn, Kings County, New York, bounded and described as follows:

Beginning at a point where the easterly line of Second Avenue intersects the prolongation of the northerly line of Thirty-First Street; running thence North 38°23'03" East, 200.35 feet to its intersection with the prolongation of the southerly line of said Thirtieth Street; said point also being the northerly face of the so-called Federal Building number 2 at street level; running thence South 51°36'57" East, along the prolongation of the southerly line of said Thirtieth Street and the southerly line of said Thirtieth Street for a distance of 700.00 feet to its intersection with westerly line of said Third Avenue; running thence South 38°23'03" West, along the westerly line of said Third Avenue 200.35 feet to its intersection with the northerly line of said Thirty-First Street; running thence North 51°36'57" West, along the northerly line of said Thirty-First Street and continuing along the northerly prolongation of said Thirty-First Street for a distance of 700.00 feet to the point of beginning, being 3.220 acres of land more or less.

Grantor further assigns to the Grantee and its successors and assigns, certain access rights in the land owned by the United States of America under custody and control of the Federal Bureau of Prisons, that lies along the northeasterly boundary of the Property, commonly known as 30th Street, between 2nd and 3rd Avenue. Said access rights are assigned subject to specific conditions and restrictions set forth herein.

1.    A perpetual and non-exclusive right of access to the eastern end of 30th Street, running from its intersection with Third Avenue to the existing fence, approximately 61 feet, for access to the existing street entrance at the rear of Federal Building #2. All deliveries accessing the area shall be subject to inspection by United States of America Federal Bureau of Prisons Metropolitan Detention Center (MDC), Brooklyn staff. Access may be temporarily suspended at the discretion of the Warden, MDC Brooklyn, should it be determined by the Warden, MDC Brooklyn, that access would likely create disruptions to safe and orderly operation of the MDC.

2.    A perpetual and non-exclusive right of access to pass and repass over and across a portion of 30th Street, between 2nd and 3rd Avenues that measures 20 feet from the rear of Federal Building #2 for the following purpose: trucks and construction equipment for rehabilitation and repair work to Federal Building #2. Access will be in accord with and subject to the provisions of Paragraph 4 below.

3.    A perpetual and non-exclusive right of access to pass and repass over and across a portion of 30th Street, between 2nd and 3rd Avenues, that measures 30' 1" from the rear of Federal Building #2 for the following purposes: Emergency vehicles and emergency egress from Federal Building #2; and, the installation, maintenance and repair of utilities in and under 30th Street and the transformers adjacent to Federal Building #2.  Access will be in accord with and subject to the provisions of Paragraph 4 below.  The MDC will not place anything in this area that will permanently encroach upon the area subject to this right of access, and this restriction shall be binding on any assigns of the MDC.

4.    The following conditions are imposed regarding the rights of access set forth in Paragraphs 2 and 3, as amended, herein:

    a.    Use of the rights of access by Grantee shall be done with as little inconvenience to the MDC as is consistent with reasonable progress, and any damage to the land subject to the rights of access, including fences, roads, or other facilities, shall be properly corrected to the satisfaction of the Warden, MDC Brooklyn.

b.    Grantee shall perform all activities in a manner which complies with all pertinent Federal and State environmental laws and in a manner so as to prevent and avoid any threatened or actual release or disposal of any hazardous substance as identified in accordance with any pertinent Federal or State environmental laws. In the event any liability does arise under Federal and/or State environmental laws, as a result of activities of Grantee associated with the rights of access, Grantee shall indemnify the United States of America to the extent permitted by law for any remediation costs, response costs, natural resource damages, penalties, or any other costs for which the United States of America is found liable, including the cost of any studies and investigations necessary to determine an appropriate response to the contamination, and of any clean up or other response costs which the United States of America is required or obliged to undertake.

c.    Grantee shall at all times keep the Warden, MDC Brooklyn, informed of any activity incident to access, including information on the beginning and completion of access, including 72 hour notification prior to ingress to the affected land.    Access may be delayed or temporarily suspended at the discretion of the Warden, MDC Brooklyn, should it be determined that access would likely create disruptions to safe and orderly operation of the MDC.  The notice requirements set forth herein do not apply to access for emergency vehicles and emergency egress from Federal Building #2.

d.    Grantee shall maintain, modify, construct, and reconstruct such drainage facilities as necessary to provide elimination of surface water resulting from Grantee's activities without causing destructive erosion to the property of the United States of America, and also assume all responsibility for damage by flooding resulting from its activities.

e.    Grantee shall relocate any and all existing gas lines, sewer lines, water lines, poles and all other utility lines and pipes which are to be disturbed because of its activities.

f.    Grantee shall protect any existing boundary markers removed by construction and reset them in their original location.

g.    Grantee shall observe any and all regulations of the MDC regarding the storage of tools, machinery, and equipment including the supervision of motor vehicles on, or in the proximity of the property under the custody and control of the MDC.

5.    These terms may be amended by joint agreement of the Grantee, its successors or assigns, and the United States of America General Services Administration or its assigns.

NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION

to

SALMAR PROPERTIES, LLC

DEED

The land affected by the
within instrument lies in

Block 671, Lot 1

on the Tax Map for the
Borough of Brooklyn

Record & Return:

Ackerman, Levine, Cullen, Brickman & Limmer, LLP
1010 Northern Boulevard, Suite 400
Great Neck, NY 11021

**EXHIBIT K**

**NYCEDC CONTRACT**

Exhibit K-1

**EXHIBIT L**

**NYCDOT MEMORANDUM**

Exhibit L-1

NY:1348523.11



## Department of Transportation

JANETTE SADIK-KHAN, Commissioner

To:     Douglas Rice, Vice President
        Economic Development Corporation

From:   Naim Rasheed, Director
        Traffic Planning

Re:     Sunset Marketplace (aka Federal Building No. 2)
        Environmental Assessment Form

Date:   June 2, 2011

        We have completed our review of the Environmental Assessment Form (EAF) for the above referenced project. The proposed action is seeking performance-based financial assistance from the New York City Industrial Development Agency (IDA) for the development of an estimated 1,008,000 sq. ft. of light industrial use (based on 97% occupancy) and 77,600 sq. ft. of neighborhood retail (based on 97% occupancy). The development site consists of an estimated 1.12 M sq. ft. eight-story vacant industrial. The project site is located in an industrial/manufacturing waterfront area along the Gowanus Bay in the Sunset Park area of Brooklyn and is bounded by 30th Street to the north, 3rd Avenue on the east, 32nd Street on the south, and 2nd Avenue on the west.

        To the north of the property, commonly referred to as Federal Building #2 is the Metropolitan Detention Center, which was the site of Federal Building #1. A large portion of Federal Building #1 was demolished to accommodate the federal prison in 1990, and the remaining portion was demolished in 1999 for the federal prison expansion. It was the intention of the federal government to use Federal Building #2 as a support building servicing the adjacent federal prison. However, the city expressed a desire to acquire the building and have it occupied with industrial uses in keeping with the goals of the city's Industrial Policy-the attraction and retention of industrial businesses in this area of Sunset Park.

        In the absence of the proposed action, the project site would be developed as-of-right, as allowed under the current zoning. The EAF analyzes the incremental differences between the proposed action and the future without the proposed action (as-of-right development). The estimated net incremental difference between Future No-Action and Future With-Action condition of vehicle trips (autos + taxis) during the AM, Midday and PM peak hours were 27, 7 and 30, respectively. The estimated net incremental difference between Future No-Action and Future With-Action condition of pedestrian trips (pedestrians + transit) during the AM, Midday and PM peak hours were 84, 185 and 128, respectively.

        The applicant has proposed to perform, at its expense, a trip generation assessment study to verify the trips to generated by the proposed action (industrial and neighborhood retail) and credit taken for the as-of-right development when the project is built and occupied by performing a DOT approved survey of Federal Building #2. The applicant would also undertake at its own expense the analysis and implementation of any subsequent Transportation System Management (TSM) improvement measures at the immediate intersections around the project site, should the

NYC Department of Transportation
Division of Traffic Operations
55 Water Street, 6th Floor, New York, NY 10041
T:212-839-7710 F: 212-839-7777
www.nyc.dot.gov

Douglas Rice, Vice President
Economic Development Corporation
Re: Sunset Marketplace (aka Federal Building No. 2)
Environmental Assessment Form
June 2, 2011

Page 2 of 2


survey indicate that the proposed project's peak hour vehicle trip generation is 50 or greater than the as-of-right building.

    If you have any questions, please call me at (212)839-7710 or Marjorie Bryant at (212) 839-7756.


c:    D/C G. Soffian, A/C R. Russo, B/C J. Palmieri, S. Ahmed, M. Bryant, File
c:/docs/Bryant/Sunset Marketplace 2

NYC Department of Transportation
Division of Traffic Operations
55 Water Street, 6th Floor, New York, NY 10041
T:212- 839-7710  F: 212-839-7777
www.nyc.dot.gov

**EXHIBIT M-1**

**SUBTENANT SURVEY**

**For Calendar Year 20—**

Salmar Properties, LLC
120 Broadway
New York, New York 10271

Complete this Survey for calendar year 20__ and return to the Agency no later than February 1, 20 _____

**COMPANY:** **Salmar Properties, LLC**

**PROJECT LOCATION:** **850 Third Avenue, Brooklyn, NY 11232**

**Part 1:** TOTAL BUILDING SQUARE FOOTAGE AT THIS PROJECT LOCATION: _____ square feet

TOTAL LAND SQUARE FOOTAGE AT THIS PROJECT LOCATION: _____ square feet

**Part 2:** LIST TENANT(S) AND PROVIDE DETAILS:

| Name of Tenant | Name of Tenant's Principal | Tenant Affiliation to Company, if any | EIN # | Floor | Square Footage Leased | % of Leased Space/Total Rentable Square Footage at Facility | Use of Leased Space; Choose one: (a) Industrial Use or (b) Retail / Other Use | Gross Rent for prior annual period | Annual Base Rent | Average of Industrial Employees for 12 months ending Dec 31 | Annual Average of Industrial Employees for 5 year period ending Dec. 31 | Lease Begins | Lease Expiration |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

(Please continue on a separate page if necessary)

**Part 3:** I, the undersigned, hereby certify that the information reported above is true, correct and complete for the calendar year indicated above and that the tenants listed above are the only occupants, subtenants and/or licensees at the Project Location. I understand that this information is submitted pursuant to the requirements of the Agreement.

Name: _____      Date: _____

Signature: _____      Phone Number: _____

Title: _____      Email: _____

**Return documents via Fax to: 212-618-5738 or Mail to: NYCIDA Attention: Compliance Dept., 110 William Street, 3rd Flr, New York, NY 10038**
**For questions about the Subtenant Occupancy Survey please call: the Compliance Hotline at 212-312-3963**
Compliance Website: www.nycedc.com/ComplianceReporting

Exhibit M-1

NY:1348523.11

## EXHIBIT M-2

### CERTIFICATE REQUIRED PURSUANT TO
### SECTION 5.1(d)(ii) OF LEASE AGREEMENT

      The undersigned, an authorized representative of Salmar Properties, LLC (the "Lessee"), a limited liability company organized and existing under the laws of the State of New York, DOES HEREBY CERTIFY, REPRESENT AND WARRANT to the New York City Industrial Development Agency (the "Agency") pursuant to Section 5.1(d)(iii) of that certain Agency Lease Agreement, dated as of September 1, 2011, between the Agency and the Lessee (the "Lease Agreement") that as of [*insert applicable Adjustment Date*] that the Average Equivalent Full time Employee Number was _____.

      Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to such terms in the Lease Agreement.

      IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of
_____, ____.

**SALMAR PROPERTIES, LLC**

By:_____
          Name:
          Title:

**ida** New York City
Industrial Development Agency

~~ANNUAL EMPLOYMENT & BENEFITS REPORT~~
For the Fiscal Year July 1, 2010 – June 30, 2011 (FY'11)

## EXHIBIT N

## ANNUAL EMPLOYMENT AND BENEFITS REPORT

In order to comply with State and Local Law reporting requirements, the Company is required to complete and return this form to NYCIDA, 110 William Street, Attention: Compliance, New York, NY 10038 no later than **August 1, 2011.** PLEASE SEE THE ATTACHED INSTRUCTIONS AND DEFINITIONS OF CAPITALIZED TERMS USED ON THIS PAGE.

1.  Number of permanent Full-Time Employees (including Subtenant's employees) as of June 30th, 2011 .......... _____

2.  Number of non-permanent Full-Time Employees (including Subtenant's employees) as of June 30th,2011 .......... _____

3.  Number of permanent Part-Time Employees (including Subtenant's employees) as of June 30th, 2011 .......... _____

4.  Number of non-permanent Part-Time Employees (including Subtenant's employees) as of June 30th,2011 .......... _____

5a. Number of "non-Construction" Contract Employees as of June 30th, 2011 .......... _____

5b. Average number of Construction Employees during Fiscal Year ending June 30th, 2011 .......... _____

6.  Total Number of employees of the Company and its Affiliates included in Items 1, 2, 3 and 4 .......... _____
    (Excluding Subtenants)

For each employee included in item 6, attach the Summary Page of the NYS-45 Quarterly Combined Withholding, Wage Reporting and Unemployment Insurance Return for the period including June 30, 2011.

7.  Number of employees included in item 6 above who reside in the City of New York .......... _____

8.  Do the Company and its Affiliates offer health benefits to all Full-Time Employees? ......... ☐Yes    ☐No    All Part-Time Employees?....☐Yes    ☐No

If the answer to item 6 above is fewer than 250 employees, please skip questions 9 - 13 and continue with questions 14 - 18.

9.  Number of employees in Item 6 who are "Exempt" .......... _____

10. Number of employees in Item 6 who are "Non-Exempt" .......... _____

11. Number of employees in item 10 that earn up to $25,000 annually .......... _____

12. Number of employees in item 10 that earn $25,001 - $40,000 annually .......... _____

13. Number of employees in item 10 that earn $40,001 - $50,000 annually .......... _____

For Items 14 - 18, indicate the value of the benefits realized by the Company and its Affiliates at Project Locations during FY '11.

14. What was the value of sales and use tax exemption savings realized by the Company and its Affiliates as a result of the Company's receipt of NYCIDA Financial Assistance during the FY'11. (Do not include any sales and use tax savings realized under the NYS Empire Zone Program or through a not-for-profit exemption) .......... $_____

15. What was the value of BIR Energy Assistance realized by the Company and its Affiliates during the FY'11 .......... $_____

16. Does the Company and/or its Affiliates receive Commercial Expansion Program ("CEP") benefits? .......... ☐Yes    ☐No

If yes, what was the value realized during FY'11. .......... $_____

17. Does the Company and/or its Affiliates receive Relocation and Employment Assistance Program ("REAP") benefits? ☐Yes    ☐No

If yes, what was the value realized during FY'11 .......... $_____

18. Has the Company and/or its Affiliates applied for Industrial and Commercial Abatement Program ("ICAP") or Industrial and Commercial Incentive Program ("ICIP") benefits for new physical improvements at the Project Location(s)? .......... ☐Yes    ☐No

If yes, please provide the application number(s) .......... _____

Certification: I, the undersigned, an authorized officer or principal owner of the Company/Affiliate/Tenant, hereby certify to the best of my knowledge and belief that all information contained in this report is true and complete. This form and information provided pursuant hereto may be disclosed to the New York City Economic Development Corporation ("NYCEDC"), New York City Industrial Development Agency ("NYCIDA") and/or New York City Capital Resource Corporation ("NYCCRC") and may be disclosed by NYCEDC, NYCIDA and/or NYCCRC in connection with the administration of the programs of NYCEDC, NYCIDA and/or NYCCRC and/or the City of New York; and, without limiting the foregoing, such information may be included in (x) reports prepared by NYCEDC pursuant to New York City Charter Section 1301 et. seq., (y) other reports required of NYCIDA, NYCCRC or NYCEDC, and (z) any other reports or disclosure required by law.

Project Name: _____

Signature By: _____    Date: _____

Name (print): _____    Title: _____

Exhibit N-1

NY:1348523.11

**ida** New York City
Industrial Development Agency

# DEFINITIONS & INSTRUCTIONS
For the Fiscal Year July 1, 2010 – June 30, 2011 (FY'11)

"**Affiliate**" is (i) a business entity in which more than fifty percent is owned by, or is subject to a power or right of control of, or is managed by, an entity which is a party to a Project Agreement, or (ii) a business entity that owns more than fifty percent of an entity which is a party to a Project Agreement or that exercises a power or right of control of such entity.

"**Agreement**" is the Lease Agreement, Installment Sale Agreement and/or the Project Agreement pursuant to which an entity received or receives Financial Assistance.

"**Company**" includes any entity that is a party to an Agreement.

"**Construction Employee**" is a person who is an independent contractor or subcontractor, or an employee thereof, who provides construction services to the Company, an Affiliate or a Subtenant at a Project Location.

"**Contract Employee**" is a person who is an independent contractor (i.e., a person who is not an "employee"), or is employed by an independent contractor (an entity other than the Company, an Affiliate or a Tenant), who provides services at a Project Location.

"**Financial Assistance**" is any of the following forms of financial assistance provided by or at the direction of NYCIDA and/or NYCEDC: a loan, grant, tax benefit and/or energy benefit pursuant to the Business Incentive Rate (BIR) or New York City Public Utility Service (NYCPUS) program.

"**Full-Time Employee**" is an employee who works at least 35 hours per week at a Project Location.

"**Part-Time Employee**" is an employee who works less than 35 hours per week at a Project Location.

"**Project Location**" is any location (a) with regard to which Financial Assistance has been provided to the Company and/or its Affiliates during the fiscal year reporting period covered by the Employment and Benefits Report, or (b) that is occupied by the Company and/or its Affiliates at which such entities have employees who are eligible to be reported per the terms of the Agreement with the Company and/or its Affiliates.

"**Subtenant**" is a tenant or subtenant (excluding the Company and its Affiliates) that leases or subleases facilities from the Company or its Affiliates (or from tenants or subtenants of the Company or its Affiliates) at any Project Location.

**INSTRUCTIONS** *For each Project Agreement, please submit one report that covers (i) the Company and its Affiliates and (ii) Subtenants at all Project Locations covered by the Project Agreement.*

Each Subtenant should complete a separate Subtenant's Employment and Benefits Report. All Subtenant employment info should be aggregated, combined with employment information for the Company and its Affiliates at all Project Locations, and reported on the Company's Employment and Benefits Report. Additionally, please include the completed Subtenant's Employment and Benefits Report(s) along with the Company's Employment and Benefits Report when submitting to NYCIDA. The Company must retain for six (6) years all forms completed by its Affiliates and Subtenants and at NYCIDA's request must permit NYCIDA upon reasonable notice to inspect such forms and provide NYCIDA with a copy of such forms.

**1- 4.** Items 1, 2, 3 and 4 must be determined as of June 30, 2011 and must include all permanent and non-permanent Full-Time Employees and Part-Time Employees at all Project Locations, including those employed by the Company or its Affiliates and by Subtenants at the Project Locations. **Do not include Contract Employees or Construction Employees in Items 1, 2, 3 and 4.**

**5.(a)** Report all Contract Employees providing services to the Company and its Affiliates and Subtenants at all Project Locations. Do not include Construction Employees in question 5a. **(b)** Report the 12 month average of Construction Employees providing services to the Company and its Affiliates and Subtenants at all Project Locations for the previous fiscal year. Use the number of construction employees on the last payroll date of each month to compute this average.

**6-13.** Report information requested only with respect to the Company and its Affiliates at all Project Locations. For item 6, report only the permanent and non-permanent Full-Time Employees and Part-Time Employees of the Company and its Affiliates. **Do not report employees of Subtenants. Do not report Contract Employees & Construction Employees.**

**9.** Indicate the number of employees included in item 6 who are classified as "Exempt", as defined in the federal Fair Labor Standards Act. Generally, an Exempt employee is not eligible for overtime compensation.

**10.** Indicate the number of employees included in item 6 who are classified as "Non-Exempt", as defined in the federal Fair Labor Standards Act. Generally, a Non-Exempt employee is eligible for overtime compensation.

**16.** Report all CEP benefits received by the Company and its Affiliates and any Subtenants at all Project Locations. CEP is a package of tax benefits, administered by the New York City Department of Finance, designed to help qualified businesses to relocate or expand in designated relocation areas in New York City. For more information regarding CEP, please visit http://www.nyc.gov/dof.

**17.** Report all REAP benefits received by the Company and its Affiliates and any Subtenants at all Project Locations. REAP is administered by the New York City Department of Finance, and is designed to encourage qualified businesses to relocate employees to targeted areas within New York City. REAP provides business income tax credits based on the number of qualified jobs connected to the relocation of employees. For more information regarding REAP, please visit http://www.nyc.gov/dof.

**14.** Report all sales and use tax exemption benefits realized at all Project Locations by the Company and its Affiliates and granted by virtue of the exemption authority of NYCIDA or the City of New York. Do not include any savings realized under the NYS Empire Zone Program or through a not-for-profit exemption.

**15.** For purposes of this form, "BIR Energy Assistance Agreement" is any agreement with the NYCEDC pursuant to which the Company and/or its affiliates receive BIR Energy Assistance. "BIR Energy Assistance" is any reduction in energy delivery charges or other benefits or energy discounts provided pursuant to the Business Incentive Rate (BIR) program administered by Consolidated Edison Company of New York, Inc. or its affiliates.

Exhibit N-2

**ida** New York City
Industrial Development Agency

# LOCATION AND CONTACT INFORMATION
For the Fiscal Year July 1, 2010 — June 30, 2011 (FY'11)

Please review the information required below for the location or locations that are receiving benefits and make any necessary changes.

**Eligible Project Locations:**

_____

_____

_____

_____

_____

_____

**Please review the current Project Contact Information below and make any necessary changes:  (Please print CLEARLY)**

Project Name: _____

Name: _____    Title: _____

Address: _____

Phone: _____  Fax: _____  E-mail: _____

Signature: _____

**Backup Contact Information:**

Name: _____    Title: _____    Phone: _____

**PLEASE MAIL TO:**
**New York City Industrial Development Agency**
**Attention: Compliance Department**
**110 William Street**
**New York, NY 10038**

**OR FAX YOUR RESPONSE TO: 212-618-5738**

**QUESTIONS?** Please contact the Compliance Hotline at (212) 312-3963

Exhibit N-3

 **New York City Industrial Development Agency**

## SUBTENANT'S EMPLOYMENT & BENEFITS REPORT
For the Fiscal Year July 1, 2010 – June 30, 2011 (FY'11

In order to comply with State and Local Law reporting requirements, please complete and return this form no later than **August 1, 2011.**
**PLEASE SEE BELOW FOR THE INSTRUCTIONS AND DEFINITIONS OF CAPITALIZED TERMS USED ON THIS PAGE.**

**Please copy this form and have each subtenant occupying space at an NYCIDA project location complete a** Subtenant's Employment and Benefits Report. **All** Subtenant employment info should be aggregated, combined with Company employees (where appropriate), and reported on the Company's Employment and Benefits Report. Please include the completed Subtenant's Employment and Benefits Report(s) along with the **Company's Employment and Benefits Report when submitting to NYCIDA.**

1.  Number of permanent Full-Time Employees as of June 30th, 2011 ................................................................. _____

2.  Number of non-permanent Full-Time Employees as of June 30th, 2011 ......................................................... _____

3.  Number of permanent Part-Time Employees as of June 30th, 2011 ................................................................ _____

4.  Number of non-permanent Part-Time Employees as of June 30th, 2011 ......................................................... _____

5a. Number of "non-Construction" Contract Employees as of June 30th, 2011 .................................................... _____

5b. Average number of Construction Employees during Fiscal Year ending June 30th, 2011 ............................... _____

6.  Does the Company receive Relocation and Employment Assistance Program ("REAP") benefits?     ☐Yes  ☐No
    If yes, what was the value realized during FY'11
    $_____

7.  Does the Company receive Relocation and Employment Assistance Program ("REAP") benefits?     ☐Yes  ☐No
    If yes, what was the value realized during FY'11
    $_____

**DEFINITIONS:**

"Construction Employee" is a person who is an independent contractor or subcontractor, or an employee thereof, who provides construction services to the Subtenant at a Project Location.

"Contract Employee" is a person who is an independent contractor (i.e., a person who is not an "employee"), or is employed by an independent contractor (an entity other than the Company, an Affiliate or a subtenant), who provides services at a Project Location.

"Full-Time Employee" is an employee who works at least 35 hours per week at a Project Location.

"Part-Time Employee" is an employee who works less than 35 hours per week at a Project Location.

**INSTRUCTIONS:** Each Subtenant should complete a separate Subtenant's Employment and Benefits Report.

**Item 1- 4.** Items 1, 2, 3 and 4 must be determined as of June 30, 2011 and must include all permanent and non-permanent Full-Time Employees and Part-Time Employees at all Project Locations of the Subtenant at the Project Locations. Do not include Contract or Construction Employees in Items 1, 2, 3 and 4.

**Item 5.(a)** Report all Contract Employees providing services to the Subtenants at all Project Locations. Do not include Construction Employees in question 5a. **(b)** Report the 12 month average of Construction Employees providing services to the Subtenants at all Project Locations for the previous fiscal year. Use the number of construction employees on the last payroll date of each month to compute this average.

**Item 6.** Report all CEP benefits received by the Subtenants at all Project Locations. CEP is a package of tax benefits, administered by the New York City Department of Finance, designed to help qualified businesses to relocate or expand in designated relocation areas in New York City. For more information regarding CEP, please visit http://www.nyc.gov/dof.

**Item 7.** Report all REAP benefits received by the Subtenants at all Project Locations. REAP is administered by the New York City Department of Finance, and is designed to encourage qualified businesses to relocate employees to targeted areas within New York City. REAP provides business income tax credits based on the number of qualified jobs connected to the relocation of employees. For more information regarding REAP, please visit http://www .nyc.gov/dof.

Certification: I, the undersigned, an authorized officer or principal owner of the Company/Affiliate/Tenant, hereby certify to the best of my knowledge and belief that all information contained in this report is true and complete. This form and information provided pursuant hereto may be disclosed to the New York City Economic Development Corporation ("NYCEDC"), New York City Industrial Development Agency ("NYCIDA") and/or New York City Capital Resource Corporation ("NYCCRC") and may be disclosed by NYCEDC, NYCIDA

Exhibit N-5



**SUBTENANT'S EMPLOYMENT & BENEFITS REPORT**
For the Fiscal Year July 1, 2010 — June 30, 2011 (FY'11)

and/or NYCCRC in connection with the administration of the programs of NYCEDC, NYCIDA and/or NYCCRC and/or the City of New York; and, without limiting the foregoing, such information may be included in (x) reports prepared by NYCEDC pursuant to New York City Charter Section 1301 et. seq., (y) other reports required of NYCIDA, NYCCRC or NYCEDC, and (z) any other reports or disclosure required by law.

Subtenant
Name_____

Project
Name_____

Signature_____
Date_____

Name_____
Title_____

Exhibit N-6

NY:1348523.11

## EXHIBIT O

### RIDER TO SUBLEASE AGREEMENT DATED _____, 20__

| SUBLESSOR: | |
|---|---|
| SUBLESSEE: | |
| FLOOR(S)/ UNIT(S): | |
| SUBLESSEE'S EIN #: | |
| PREMISES: | 850 Third Avenue<br>Brooklyn, New York 10271 |
| NYCIDA: | New York City Industrial Development Agency |
| LEASE AGREEMENT: | Lease Agreement between NYCIDA and Sublessor, dated as of _____, 20__, wherein NYCIDA leases the Premises to Sublessor. |

1. **Acknowledgment and Release.** Sublessee acknowledges that NYCIDA holds a leasehold estate in the entire Premises; and Sublessee releases NYCIDA from any past, present or future claims that Sublessee has or may have against NYCIDA.

2. **Representation Regarding Relocation.** Sublessee represents that as a result of entering into the Sublease Agreement and occupying the Sublease Premises, it will not have relocated any of its plants or facilities from outside of New York City (but within the State of New York) to the Sublease Premises; nor will Sublessee have abandoned any of its plants or facilities outside of New York City (but within the State of New York).

3. **Representation and Covenants Regarding Compliance.** Neither the Sublessee, nor any of the Principals of the Entity, nor any Person that directly or indirectly Controls, is Controlled by, or is under common Control with the Entity is, nor at any time during the term of the Sublease Agreement, shall be a Non-Compliant Person.

As used herein, the following capitalized terms shall have the respective meanings set forth below:

"City" shall mean The City of New York.

"Control" or "Controls" shall mean the power to direct the management and policies of a Person (x) through the ownership, directly or indirectly, of not less than a majority of its voting securities, (y) through the right to designate or elect not less than a majority of the members of its board of directors or trustees or other Governing Body, or (z) by contract or otherwise.

"Entity" shall mean any of a corporation, general partnership, limited liability company, limited liability partnership, joint stock company, trust, estate, unincorporated organization, business association, tribe, firm, joint venture, governmental authority or governmental instrumentality, but shall not include an individual.

"Governing Body" shall mean, when used with respect to any Person, its board of directors, board of trustees or individual or group of individuals by, or under the authority of which, the powers of such Person are exercised.

"Non-Compliant Person" shall mean an individual or any Entity that:

(a)      is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with the Agency or the City, unless such default or breach has been waived in writing by the Agency or the City, as the case may be;

(b)      has been convicted of a felony and/or any crime involving moral turpitude in the preceding ten (10) years;

(c)      has received written notice of default in the payment to the City of any taxes, sewer rents or water charges in excess of $5,000 that has not been cured or satisfied, unless such default is then being contested with due diligence in proceedings in a court or other appropriate forum; or

(d)      has, at any time in the three (3) preceding years, owned any property which, while in the ownership of such Person, was acquired by the City by in rem tax foreclosure, other than a property in which the City has released or is in the process of releasing its interest to such Person pursuant to the Administrative Code of the City.

"Person" shall mean an individual or any Entity.

"Principal(s)" shall mean, with respect to any Entity, the most senior three officers of such Entity, any Person with a ten percent (10%) or greater ownership interest in such Entity, and any Person as shall have the power to Control such Entity, and "principal" shall mean any of such Persons.

4.  **Subordination.**  Sublessee acknowledges and agrees that the Sublease Agreement is subject and subordinate to the Lease Agreement and that any conflict between the terms of the Lease Agreement and the terms of the Sublease Agreement shall be resolved in favor of the former.

5.  **Indemnity.**  Sublessee agrees to defend, indemnify and hold harmless NYCIDA, its officers, directors, employees and agents from and against any and all losses, claims, suits, damages, costs, expenses and liabilities arising from or attributable to any act or omission of Sublessee, its employees or agents in the use or occupancy of the Sublease Premises.

6.  **Insurance.**  Sublessee agrees to obtain and maintain throughout the term of the Sublease Agreement, Commercial General Liability insurance ("CGL") on a per occurrence basis in the following amounts:  minimum $1,000,000 per occurrence and minimum $2,000,000 in the aggregate per location.  The Sublessee additionally agrees that:

   a.  The CGL policy shall contain coverage for contractual liability, premises operations, and products and completed operations; and
   b.  The CGL policy shall be written on Form CG-0001; and
   c.  The CGL policy shall name NYCIDA as an additional insured; and
   d.  The Sublessee shall provide to the Sublessor at least thirty (30) days before expiration of the CGL policy (and to NYCIDA upon NYCIDA's request), an ACORD certificate evidencing that the Sublessee has obtained CGL; and that such ACORD certificate shall indicate NYCIDA as an additional insured as follows:  *New York City Industrial Development Agency is an additional insured on a primary and non-contributory basis*

*for Commercial General Liability which is written on Form CG-0001 without modification to the contractual liability or waiver-of-subrogation provisions therein and covering the following premises:* _____.

7. **Employment Information.** Sublessee acknowledges that under the Lease Agreement, Sublessor (or Sublessor's affiliate) is obligated to provide to NYCIDA employment information pertinent to all occupants of the Premises; accordingly, Sublessee agrees to provide to Sublessor and, if requested by NYCIDA, to NYCIDA, information regarding Sublessee's employment at the Sublease Premises, including the then-current New York State Department of Labor's Form NYS-45; and NYCIDA's employment and benefits report form for subtenants, a form of which is annexed hereto (or any replacement and/or successor form as may be required by the Agency as a result of a change in law or as required by New York States agencies ).

8. **Incorporation in Sublease Agreement; Third-Party Beneficiary.** Sublessee agrees and acknowledges that this RIDER is a part of and incorporated in the Sublease Agreement; and that NYCIDA is a third-party beneficiary of the foregoing provisions of this RIDER.

SUBLESSOR _____

By: _____

Name: _____

Title: _____

Date: _____

SUBLESSEE _____

By: _____

Name: _____

Title: _____

Date: _____

NY:1348523.11

**EXHIBIT P**

**CERTIFICATE REQUIRED PURSUANT TO
SECTION 8.9(b)(ii) OF LEASE AGREEMENT**

The undersigned, an authorized representative of Salmar Properties, LLC (the "Lessee"), a limited liability company organized and existing under the laws of the State of New York, DOES HEREBY CERTIFY, REPRESENT AND WARRANT to the New York City Industrial Development Agency (the "Agency") pursuant to Section 8.9(b)(ii) of that certain Agency Lease Agreement, dated as of September 1, 2011, between the Agency and the Lessee (the "Lease Agreement") THAT:

1.      Attached hereto is a fully executed copy of a certain sublease agreement and Rider to Sublease, dated _____ (the "Tenant Lease"), by and between the Lessee and _____.

2.      Lessee is in compliance with Section 8.19(d) of the Lease Agreement and will continue to be in compliance with said section on and after the effective date of such Tenant Lease.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of _____, _____.

**SALMAR PROPERTIES, LLC**

By:_____
          Name:
          Title:

NY:1348523.11

**EXHIBIT Q**

**CERTIFICATE REQUIRED PURSUANT TO
SECTION 8.16(f) OF LEASE AGREEMENT**

The undersigned, an authorized representative of Salmar Properties, LLC (the "Lessee"), a limited liability company organized and existing under the laws of the State of New York, DOES HEREBY CERTIFY, REPRESENT AND WARRANT to the New York City Industrial Development Agency (the "Agency") pursuant to Section 8.16(f) of that certain Agency Lease Agreement, dated as of September 1, 2011, between the Agency and the Lessee (the "Lease Agreement") THAT:

1.      The Lessee is in compliance with Section 8.19(d) of the Lease Agreement.

2.      No portion of the Facility is being used or occupied for any purpose that does not qualify as an Industrial, a Retail Use, or an Other Use.

3.      There are at least 1,300 Equivalent Full Time Employees constituting Industrial Employees employed at the Facility.

Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to such terms in the Lease Agreement.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this _____ day of _____, ____.

**SALMAR PROPERTIES, LLC**

By:_____
           Name:
           Title:

Signed 3/16/16

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (the *"First Amendment"*) entered into as of the _16_ day of March, 2016, by and between SALMAR PROPERTIES, LLC, a New York limited liability company, having an office at 850 Third Avenue, Brooklyn, New York 11232 (*"Landlord"*) and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

## W I T N E S S E T H :

WHEREAS, Landlord and Tenant are parties to that certain Retail Lease dated as of December 31, 2014 (the *"Lease"*), covering premises located in the building known as 850 Third Avenue, Brooklyn, New York (the "*Premises*"), as more particularly described in the Lease; and

WHEREAS, Landlord and Tenant desire to amend the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this First Amendment and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.     The recitals hereinabove set forth are incorporated into this First Amendment by this reference. Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.     Exhibit A (Premises) and Exhibit Q (Certified LOD) to the Lease are each hereby deleted and the respective Exhibit A and Exhibit Q attached to this First Amendment are substituted therefor.

3.     "Exhibit C – Site Plan and Floor Plans, Page 3 of 3" to the Lease is hereby deleted and the "Exhibit C – Site Plan and Floor Plans, Page 3 of 3" attached to this First Amendment (*"Replacement Page 3"*) is substituted therefor.

4.     Reference is made to the Rider attached to the Lease that is entitled "Basic Lease Terms" (the *"Basic Rider"*). Paragraph 8 of the Basic Rider is hereby modified so that the Fixed Rent for the first ten (10) Lease Years shall instead be as follows:

|  | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1st Lease Year | $3,480,000.00 | $290,000.00 |

1

| | | |
|---|---|---|
| 1st Lease Year | $3,480,000.00 | $290,000.00 |
| 2nd Lease Year | 3,514,800.00 | 292,900.00 |
| 3rd Lease Year | 3,549,948.00 | 295.829.00 |
| 4th Lease Year | 3,585,447.00 | 298,787.25 |
| 5th Lease Year | 3,621,302.00 | 301,775.17 |
| 6th Lease Year | 3,675.600.00 | 306,300.00 |
| 7th Lease Year | 3,730,800.00 | 310,900.00 |
| 8th Lease Year | 3,787,200.00 | 315,600.00 |
| 9th Lease Year | 3,843,600.00 | 320,300.00 |
| 10th Lease Year | 3,901,200.00 | 325,100.00 |

5.      There shall be added to the Lease a new "Section 2.6," which shall read in its entirety as follows:

"Section 2.6   Percentage Rent

(a)      Payment. During and for each full calendar year during the Term, Tenant shall pay annual percentage rent (*"Percentage Rent"*) equal to four percent (4%) percent (the *"Percentage Multiple"*) of all "Gross Sales" (hereinafter defined in Subsection 2.6(b)) resulting from business conducted in, on or from the Premises during such calendar year in excess of Fifty Million Dollars ($50,000,000) **(the *"Sales Break Point"*)**. Within ninety (90) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year. The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Notwithstanding the foregoing, no Percentage Rent shall

2

be payable with respect to the period commencing on the Rent Commencement Date and ending on the December 31 next following the Rent Commencement Date. Notwithstanding anything contained in this Lease, the aggregate amount of Percentage Rent paid by Tenant during the Term shall not exceed the amount of Three Million Six Hundred Thousand Dollars (\$3,600,000); the final installment of Percentage Rent paid by Tenant pursuant to this Section 2.6 shall be pro rated as necessary to reflect the foregoing.

(b)      Definition of Gross Sales. As used herein, the term **"Gross Sales"** shall mean the total amount of all merchandise or services sold and fulfilled from the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises (for purposes of this Subsection 2.6(b) only, collectively, "**Tenant**"), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards. Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term **"Gross Sales"** shall exclude: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, **(2)** bona fide transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, **(6)** receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year), **(8)** fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year), **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates and/or gift cards, **(15)** forfeited deposits, (16) sales of alcoholic beverages, but only if local liquor licensing laws require that Landlord be considered a beneficiary of such liquor sales, and thus subject to licensure under such laws, (17) sales of merchandise fulfilled from the Premises but where payment is not made at the Premises (e.g., online or at another store); and (18) sales of merchandise where payment is made at the Premises but not fulfilled from the Premises.

3

(c)     Books and Records. Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles (or successor accounting standards) and practices consistently applied and shall be retained by Tenant for at least two (2) years following the end of the calendar year to which they refer.

(d)     Landlord's Right to Audit. Landlord and/or Landlord's auditor shall have the right, upon at least thirty (30) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency. If such deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

(e)     Confidentiality. Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Real Property (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

(f)     Any dispute between the parties relative to the provisions of this Section 2.8, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 19.10 of this Lease."

6.     There shall be added to the Lease a new "Section 4.9," which shall read in its entirety as follows:

"Section 4.9  Tenant's Contribution

(a)     Tenant shall contribute an amount equal to Twelve Million Four Hundred Thousand Dollars ($12,400,000) as its sole contribution toward the hard and soft costs incurred by Landlord to perform Landlord's Work in full accordance with the terms and

4

conditions of this Lease (*"Tenant's Contribution"*), as more particularly hereinafter set forth. Simultaneously with full satisfaction of the terms and conditions set forth in Subsection 4.9(f) below, Tenant shall deposit into escrow the entire Tenant's Contribution, as more particularly described in said Subsection 4.9(f).

(b)     Landlord shall receive progress payments of Tenant's Contribution (each a *"Progress Payment"*), subject in each case to a 10% percent retention by the Escrow Agent (hereinafter defined) and not more frequently than one Progress Payment for each calendar month. The Progress Payments shall be delivered to Landlord on a pari passu basis, such that (i) the percentage that the aggregate sum of all Progress Payments then paid or payable to Landlord hereunder bears to the entire Tenant's Contribution (the *"Progress Payment Percentage"*) shall at no time exceed (ii) the percentage of the entire Landlord's Work then Substantially Completed (the *"Landlord's Work Percentage Completion"*), subject to the further terms and conditions of this Section 4.9. It shall be a condition to Landlord's receipt of each respective Progress Payment that Landlord shall not then be in material default of this Lease beyond expiration of the applicable notice and cure period (it being understood that such an event of default will only hold Landlord's receipt of the affected Progress Payment in abeyance until such time that such default has been cured by Landlord).

(c)     Each respective Progress Payment (excluding the Final Progress Payment, hereinafter defined) shall be paid to Landlord within thirty (30) days after Tenant's receipt or the occurrence, as the case may be, of all of the following:

(i)     notice to Tenant as to the then applicable Landlord's Work Percentage Completion, as certified to Tenant by Landlord's licensed architect;

(ii)     a copy of a fully-executed standard form of general contractor's requisition indicating the then applicable Landlord's Work Percentage Completion;

(iii)     a written statement from Landlord setting forth the then applicable Progress Payment Percentage (accompanied by reasonable supporting information) and requesting payment of the applicable Progress Payment then deemed payable to Landlord; and

(iv)     reasonable evidence that Landlord has complied with the then corresponding construction draw requirement(s) of its construction lender in connection with the Real Property.

Upon full satisfaction by Landlord of all terms and conditions required under this Section 4.9 with respect to a given Progress Payment requested by Landlord hereunder, Landlord shall receive from the Escrow Agent (hereinafter defined) the applicable Progress Payment subject to the 10% retention referred to above. In the event of an inconsistency between the information provided by Landlord's architect and Landlord's general contractor with regard to the then applicable Landlord's Work Percentage Completion, the lesser percentage figure shall apply. Following Landlord's receipt of the penultimate Progress Payment hereunder, the remaining balance of the

Tenant's Contribution, including without limitation the entire 10% retention referred to above, shall be delivered to Landlord as described in the following subsection 3.9(d).

(d)    The balance of the Tenant's Contribution, which shall comprise all sums then still held by the Escrow Agent (the *"Final Progress Payment"*) shall be paid to Landlord within thirty (30) days following Tenant's receipt or the occurrence, as the case may be, of all of the following, but in no event sooner than the occurrence of the Delivery Date:

(i)    Substantial Completion of Landlord's Work in full accordance with the Final Landlord's Plans and Specifications and the further requirements of this Lease, as certified to Tenant by Landlord's licensed architect;

(ii)    a copy of a fully executed standard form of the general contractor's requisition indicating Substantial Completion of all of Landlord's Work in in full accordance with the Final Landlord's Plans and Specifications and the further requirements of this Lease;

(iii)    written request from Landlord for payment of the Final Progress Payment (with reasonable supporting information);

(iv)    Tenant's Permits (as defined in Section 4.3(b) of this Lease); and

(v)    reasonable evidence that Landlord has complied with the then corresponding construction draw requirement(s) of its construction lender in connection with the Real Property.

In the event of a Landlord's Default in the performance of Landlord's Work (including without limitation the Supplementary Landlord's Work, hereinafter defined), Tenant shall be entitled to the prompt return of the Tenant's Contribution and shall be entitled to exercise its rights pursuant to Section 19.9 and the other applicable provisions of the Lease.

(e)    Tenant alone shall be entitled to the benefits of ownership of Landlord's Work to the extent of the Tenant's Contribution, including, without limitation, depreciation of same as an asset for tax purposes.

(f)    Landlord and Tenant shall proceed diligently and in good faith to cause each of the following to occur within fifteen (15) days following the execution and delivery by both parties of this First Amendment:

(i)    the mutual selection by Landlord and Tenant of a third party agent (the *"Escrow Agent"*) to hold in escrow the entire Tenant's Contribution, as hereinafter described (it being agreed that Goldman Sachs & Company is acceptable as the Escrow Agent to both Landlord and Tenant); and

(ii)    the execution and delivery by each of Landlord, Tenant and the Escrow Agent of an escrow agreement (the *"Escrow Agreement"*), which instrument shall provide for the Escrow Agent to hold in escrow the entire Tenant's Contribution and, as and when applicable, to deliver the respective

Progress Payments to Landlord in full accordance with the terms and conditions of this Section 4.9 and the further relevant terms and conditions of this Lease, which Escrow Agreement shall contain such other provisions that may be reasonably requested by Landlord, Tenant and/or the Escrow Agent. Any reasonable fee or other compensation required by Escrow Agent in consideration for services rendered pursuant to the Escrow Agreement shall be shared equally between Landlord and Tenant.

Following satisfaction of each of the foregoing conditions described in this subsection 4.9(f), Tenant shall deliver promptly to the Escrow Agent the entire Tenant's Contribution, which shall be held and distributed by the Escrow Agent in full accordance with the requirements of the Escrow Agreement."

7. There shall be added to the Lease a new "Section 4.10," which shall read in its entirety as follows:

"Section 4.10 Tenant Allowance. Landlord shall grant to Tenant an allowance in the liquidated sum of Four Hundred Fifty Thousand Dollars ($450,000) (the *"Tenant Allowance"*) with respect to Landlord's (a) procurement and delivery of the kitchen appliances to four (4) separate areas located within the second level retail lobby, and (b) procurement and installation of glass enclosures for each of the two new passenger elevators to be dedicated to the Premises pursuant to the Lease (collectively, the *"Allowance Work"*). Landlord and Tenant hereby acknowledge and agree that the Tenant Allowance shall be in addition to Landlord's Work; however, the Allowance Work shall be deemed included within Landlord's Work for the purposes of this Lease. Landlord alone shall be entitled to depreciate the Allowance Work, to the extent of the Tenant Allowance only, as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance. In the event that the costs expended by Landlord for the Allowance Work (which shall be competitively priced) exceed the Tenant Allowance, then Tenant shall reimburse Landlord for such excess amount (the *"Excess Allowance Amount"*) within thirty (30) days following Landlord's completion of the Allowance Work and its written notice to Tenant requesting payment of the Excess Allowance Amount (which notice shall be accompanied by reasonable supporting information)."

8. Landlord's Work as described in Exhibit B to the Lease shall be deemed to incorporate, at no cost to Tenant, the installation by Landlord of (a) that certain corridor on the second level of the Building designated as "Egress Corridor" on Replacement Page 3, and (b) that certain area on the second level of the Building designated as "Freight Elevator Staging Area" on Replacement Page 3, it being agreed that all references in the Lease to "Landlord's Work" shall for all purposes be deemed to include without limitation such Egress Corridor and Freight Elevator Staging Area.

9. All references in the Lease to "Common Areas" shall be deemed to include without limitation the above-described Egress Corridor and Freight Elevator Staging Area.

10. Reference is made to that certain "Tenant's Exclusive Freight Elevator (from 7PM to 7AM seven days a week)" designated as "Elev. 5" on Replacement Page 3

7

(*"Freight Elevator 5"*). Tenant hereby acknowledges and agrees that if at any time during the Term, the freight elevator designated as "Elev. 6" on Replacement Page 3 (*"Freight Elevator 6"*) becomes non-operational, then so long as such non-operation continues, the other tenant(s) or occupant(s) of the second level of the Building shall, following reasonable prior e-mail or telephonic notice to Tenant, be allowed use of Freight Elevator 5 during Tenant's Exclusive Loading Hours, subject to the following terms and conditions: (a) in the event of any conflict as to scheduling and/or use of Freight Elevator 5, Tenant's selected scheduling and use shall take priority (it being agreed that Tenant shall in such event reasonably cooperate with the other tenant(s) or occupant(s) so as to ensure their effective use of Freight Elevator 5 hereunder), (b) during its (their) use of Freight Elevator 5, the other tenant(s) or occupant(s) shall at all times proceed with its(their) loading and unloading activities in a manner so as not to disrupt the normal operation of Tenant's business within the Premises, and (c) Landlord shall at all times proceed diligently and in good faith to cause resumption of the full operation of Freight Elevator 6, whereupon such tenant(s) or occupant(s) shall immediately cease use of Freight Elevator 5 hereunder.

11.    Reference is made to that certain roll-down security door to be installed, as part of Landlord's Work, within that specific area of the Common Areas designated as "Security Door" on Replacement Page 3 (the *"Special Security Door"*). Landlord hereby acknowledges and agrees that throughout the Term Tenant shall have exclusive control of the Special Security Door as follows (a) during Tenant's Exclusive Loading Hours (i.e., between 7:00 PM and 7:00 AM, seven (7) days per week), Tenant shall have the right in its sole discretion to determine those hours that the Special Security Door is to be rolled down and locked (subject, as applicable, to the terms and conditions of Section 6 of this First Amendment), and (b) during those hours that are not Tenant's Exclusive Loading Hours, Tenant shall not roll down or lock the Special Security Door so as to block access to and/or the non-exclusive use of Freight Elevator 5 during such hours by the other tenants or occupants of the second floor of the Building.

12.    Section 5.13 of the Lease is hereby modified to read in its entirety as follows:

"Section 5.13   Plan Approvals.

(a)    Landlord and Tenant have timely agreed to the proposed footprint, column layout and interior clear dimensions of the Premises as shown on Exhibit Q (the "Certified LOD"). Any further changes to the Certified LOD shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements. Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.

(b)    Tenant has timely delivered to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively, "Tenant's

8

Initial Plans"), all of which are substantially consistent with the Certified LOD (as same
may be reasonably modified by Tenant, as noted above).

(c)   Landlord has timely prepared and delivered to Tenant, in a single
submission, "Landlord's Plans and Specifications" (as defined in Exhibit B hereto), and
each of the plans which collectively constitute Landlord's Plans and Specifications are
at least 85% complete and substantially consistent with Tenant's Initial Plans, the
Certified LOD, and Exhibits A, B, C, and F hereto.

(d)   Tenant has given Landlord timely notice of the respects in which
said Plans fail to meet Tenant's reasonable approval and/or fail to conform to the
Certified LOD, Tenant's Initial Plans, and/or Exhibits A, B, C and F hereto.

(e)   Tenant has received from Landlord the revised Landlord's Plans
and Specifications, which Tenant has reviewed. On December 23, 2015, Tenant
delivered to Landlord its handwritten comments to the revised Landlord's Plans and
Specifications (respectively stamped or otherwise identified by Tenant as "Revise and
Resubmit" or "Approved as Noted") (collectively, "Tenant's December 23
Resubmission").

(f)   Landlord has approved Tenant's December 23 Resubmission and
shall proceed diligently to further revise Landlord's Plans and Specifications so as to
incorporate all of Tenant's comments contained in Tenant's December 23
Resubmission and to re-submit the further revised Landlord's Plans and Specifications
for Tenant's review and approval. The process described in this subparagraph (f) shall
be repeated until Landlord has secured Tenant's approval of Landlord's Plans and
Specifications. Landlord's Plans and Specifications as finally approved by Tenant are
referred to herein as the "Final Landlord's Plans and Specifications". Landlord and
Tenant shall use commercially reasonable and good faith efforts to finalize the Final
Landlord's Plans and Specifications by February 29, 2016. Landlord hereby represents
that it has applied for all permits and approvals required to be obtained by Landlord
under Section 4.3 above.

(g)   Any further changes to the Final Landlord's Plans and
Specifications (and, as applicable, any changes to the Supplementary Landlord's Work,
hereinafter defined, as described in the First Amendment to Lease) shall be subject to
Tenant's prior written approval. Unless specifically noted on a separate summary sheet
attached to the Final Landlord's Plans and Specifications (or, as applicable noted in a
separate summary sheet with respect to the Supplementary Landlord's Work
hereinafter defined), to the extent of any conflict between the terms and provisions of
Tenant's Plans, Exhibit B, Exhibit C, and/or Exhibit F hereto, and the terms and
provisions of the Final Landlord's Plans and Specifications (and/or the Supplementary
Landlord's Work), then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit C,
and Exhibit F shall govern and prevail, provided, however, that as to any items of
architecture or construction that are included within the Final Plans and Specifications
(and/or the Supplementary Landlord's Work) but are not reflected in the Tenant's Plans

9

or the foregoing Exhibits to the Lease, then the Final Landlord's Plans and Specifications (and/or the Supplementary Landlord's Work) shall govern and prevail.

(h)     Landlord and Tenant acknowledge and agree that any Non-Material Changes (hereinafter defined) made to the Landlord's Plans and Specifications pursuant to Section 5.13(f) of this Lease and/or to the Final Landlord's Plans and Specifications and/or to the Supplementary Landlord's Work (hereinafter defined), whether involving hard or soft costs, shall not result in any payments, credits or other dollar adjustments as between Landlord and Tenant. As used herein, "Non-Material Changes" shall refer to changes that are not material in nature relative to the entire scope of Landlord's Work."

13.     Section 5.14 of the Lease is hereby deleted in its entirety and shall be replaced by the following new "Section 5.14":

"Section 5.14   Supplementary Landlord's Work. Notwithstanding anything contained in the Lease, Landlord's Work shall also include certain additional work with respect to the Premises, the Building and/or the Common Areas not otherwise reflected in the Final Landlord's Plans and Specifications, which additional work shall also be performed at Landlord's sole cost and expense (collectively, the **"Supplementary Landlord's Work"**), which Supplementary Work shall include without limitation the following:

(a)     all of the architectural elements and exterior/interior signage shown or otherwise described in certain renderings dated January 22, 2016 as prepared by Nelson Architects and presented to Landlord at the Building on January 26, 2016;

(b)     placement of lighting fixtures within the entire Premises, substantially consistent with the Tenant's December 23 Resubmission; and

(c)     architectural elements and mechanical, electrical and plumbing (MEP) systems with respect to the first floor retail lobby and the second floor retail lobby (including without limitation for Tenant's anticipated restaurant, cooking and demonstration areas within the second floor retail lobby), each of the foregoing to be consistent with ongoing discussions being held between Landlord and Tenant.

Landlord and Tenant hereby acknowledge and agree that Landlord's obligation to perform the Supplementary Landlord's Work at its sole cost and expense hereunder shall supersede any express or implied obligation by Tenant under the Lease to pay for or contribute towards any portion of the work covered thereby; the foregoing shall apply without limitation to (A) Tenant's reimbursement to Landlord with respect to the Front Entry Feature as described in Section 3.7(a)(iii) of the Lease, and (B) any term or condition in the Lease that would require Tenant to procure or install any Signs, lobby signage and/or pylon panels and/or to pay for or contribute towards the cost thereof (each of the preceding superseded provisions of the Lease to be of no further force or effect). The Supplementary Landlord's Work shall for all purposes under the Lease be

10

deemed incorporated within the definition of "Landlord's Work," including without limitation with respect to the determination of the Delivery Date and as described in Sections 5.12 and 5.15 of the Lease, except where the specific context within the Lease clearly reflects otherwise."

14.    The reference to "September 1, 2016" in Section 5.15(c) of the Lease (Performance of Work) is hereby modified to read "the first (1st) anniversary of the date upon which Tenant approves the Final Landlord's Plans and Specifications pursuant to Section 5.13 of the Lease (or as applicable, the first anniversary of such earlier date upon which Tenant would have approved the Final Landlord's Plans and Specifications had Landlord complied fully with its obligations under Section 5.13 of this Lease)".

15.    The reference to "June 1, 2016" in Section 4.2 of the Lease is hereby modified to read "August 1, 2016."

16.    Reference is made to Section 14255 (Passenger/Freight Elevators), Subsection 1.04B (Warranty Closeout Documents) of Tenant's Prototype Project Manual. Landlord and Tenant hereby acknowledge and agree that the reference in said Subsection 1.04B to "2 years after the Date of Substantial Completion" shall be modified to read "4 years after the Date of Substantial Completion," at no cost or expense to Tenant. All references in the Lease, including without limitation Exhibit B thereto, to "Tenant's Prototype Drawings & Specifications" and words of like import shall be deemed to incorporate the aforesaid modification to said Subsection 1.04B.

17.    Landlord hereby represents that the term of its existing lease of the NYC Parking Lot has been extended to June 30, 2016. The terms and conditions of Section 9.4 shall otherwise remain in full force and effect during the Term.

18.    Exhibit P to the Lease is hereby amended as follows:

(a)    Clause (10) is hereby modified to read in its entirety as follows:

"(10)    Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use, provided that the foregoing shall not prevent Tenant from having events within the Premises for its customers, which shall include without limitation product demonstrations, instruction sessions and promotional events. Each such event shall at all times (i) be consistent with the operation of a first class shopping center in the New York Metropolitan Area, and (ii) comply with all applicable Legal Requirements;"

(b)    Clause (16) is hereby modified to read in its entirety as follows:

"(16)    Any bar, tavern or other establishment selling alcoholic beverages for on- or off-premises consumption, provided, however, that (a) the foregoing shall not lessen or diminish Tenant's right to operate a café and/or restaurant business as described in

11

Clause (33) of this <u>Exhibit P</u>, and (b) Tenant shall be permitted to sell, on an incidental basis, alcoholic beverages for off-premises consumption, subject to applicable Laws;"

(c)     Clause (17) is hereby modified to read in its entirety as follows:

"(17)   Unless (x) the subject premises is located entirely above the second floor of the Building, and (y) the tenant thereof (and its employees, customers, contractors and agents) are expressly prohibited from parking within the Parking Lot Parcel or within Tenant's 25 Available Parking Spaces, as more particularly described in Sections 9.2 and 9.5 of this Lease (such conditions (x) and (y) being collectively referred to herein as the **"Special Restrictions"**), any catering or banquet hall;"

(d)     Clause (19) is hereby modified to read in its entirety as follows:

"(19) Unless the Special Restrictions are fully complied with as to such use, any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to the customer instruction sessions referred to Clause (10) above or on-site employee training by an occupant incidental to the conduct of its business at the Building;"

(e)     Clause (33) is hereby modified to read in its entirety as follows:

"(33)   Unless the Special Restrictions are fully complied with as to such use, any restaurant serving meals for on- or off-premises consumption (it being acknowledged and agreed that any permitted restaurant hereunder shall be of the type located in first-class shopping centers in the New York Metropolitan Area); the foregoing shall not prohibit (a) any tenant of the Building (including without limitation Tenant) from operating a café or cafeteria within its own premises for the exclusive use of its on-site employees, or (b) as applicable, the operation by Tenant of the Newsstand within the first floor lobby as described in Section 9.1 of this Lease, or (c) the operation by Tenant of a café and/or restaurant business open to the general public within that portion of the Premises constituting the second level retail lobby, so long as all of the uses permitted under this Clause (33) are operated in compliance with all applicable Laws, (Tenant hereby acknowledges and agrees that any café and/or restaurant business open to the general public as permitted hereunder shall not be entitled to (x) maintain any Signs on the exterior of the Building (or upon the two-story freestanding "Front Entry Feature") as described in Section 3.7(a) of this Lease, or (y)

maintain a panel on the pylon sign (or display messages on the LED Board) as described in Section 3.7(c) of the Lease);"

(f)     Clause (34) is hereby modified to read in its entirety as follows:

"(34) beauty parlor or nail salon, provided that the foregoing shall not prohibit the operation of a blowout bar as an incidental use within the Premises;" and

(g)     The respective references in Clauses (29), (30), (31) and (35) to "subject to the Special Restrictions" are each modified to read instead "Unless the Special Restrictions are fully complied with."

19.     Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, by any lender or beneficiary of a mortgage or deed of trust) are required in order for the terms and provisions of this First Amendment to be in full force and effect, except for the consent of Goldman Sachs Bank USA, whose consent is appended hereto.

20.     It is the policy of Tenant and its parent company, subsidiaries and affiliates to conduct all its business transactions in accordance with the highest ethical standards: No individual who is employed by or who represents the company is permitted to solicit, accept or pay any bribe, kickback or any other improper payment of money, products or services in exchange for (i) the company's execution of this First Amendment, (ii) any action taken by such individual on behalf of the company, or (iii) any action taken by a third party. If any such improper actions are observed, please contact our Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

21.     The terms and conditions of this First Amendment shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.  Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect.  In the event of any conflict or inconsistency between the terms and provisions of the Lease and this First Amendment, the terms and provisions of this First Amendment shall govern and control.

22.     This First Amendment may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one First Amendment to Lease.

**[signature page follows]**

IN WITNESS WHEREOF, Landlord and Tenant have executed this First Amendment to Lease as of the day and year first above written.

22.    This First Amendment may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one First Amendment to Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this First Amendment to Lease as of the day and year first above written.

Landlord

**SALMAR PROPERTIES, LLC**
By:    Salmar Realty, LLC,
       its Managing Member

By:_____
    Name: ꞏꞏꞏꞏꞏ
    Title: ꞏꞏꞏꞏꞏ

Tenant

**BED BATH & BEYOND INC**

By:_____
    Steven H. Temares
    Chief Executive Officer

13

## CONSENT OF MORTGAGEE

The undersigned hereby confirms that it is the sole mortgagee or beneficiary of a mortgage or deed of trust encumbering the real property located at 850 Third Avenue, Brooklyn, New York, referred to in the Lease as the "Real Property"; and as such mortgagee hereby consents and agrees to the foregoing First Amendment to Lease dated as of the ___ day of February, 2016 by and between Salmar Properties, LLC and Bed Bath & Beyond Inc.

GOLDMAN SACHS BANK USA

Date: February___, 2016

By: _Chvez_

Name: GOSIA LEWIS

Title: VICE PRESIDENT

Address: 200 WEST S

NEW YORK, NY 10282

# EXHIBIT B

Salmar Properties LLC
Salmar Properties LLC
850 3rd Avenue
Brooklyn, NY  11232

|  | **5/1/2023** | **ACCOUNT NUMBER** |
|---|---|---|

Bed Bath & Beyond Inc.                    INVOICE #:
850 Third Avenue
Suite 200                                                          00000238          1
Brooklyn, NY  11232

**MAKE CHECKS PAYABLE TO:**   Salmar Properties LLC          BALANCE DUE          818,324.92

| Date | Code | Description | Charges | Payments | Amount Due |
|---|---|---|---|---|---|
| 6/19/2020 | LTE | June 2020 Late Fees | 13,953.41 | .00 | 13,953.41 |
| 11/10/2022 | PPR | Overpayment | -80.35 | -.14 | -80.21 |
| 2/9/2023 | PPR | Overpayment | -.14 | .00 | -.14 |
| 2/14/2023 | WSR | Water 11/1/22-2/1/23 | 1,794.23 | .14 | 1,794.09 |
| 2/15/2023 | EER | Liberty Elevator Inv 1/31/23 | 687.82 | .00 | 687.82 |
| 2/15/2023 | RMR | Big Apple - Hot water coil rpr | 1,317.38 | .00 | 1,317.38 |
| 2/15/2023 | RMR | Kaback - Hot water coil burst | 1,982.07 | .00 | 1,982.07 |
| 2/15/2023 | RMR | Vulkan - Hot water coil rpr | 3,353.35 | .00 | 3,353.35 |
| 2/23/2023 | ELR | Electric 01.12-02.13 | 24,369.30 | .00 | 24,369.30 |
| 2/27/2023 | GAS | Gas 1.20-2.17.23 | 4,777.46 | .00 | 4,777.46 |
| 3/6/2023 | CA1 | Jan 2023 CAM Adjustment | 2,239.45 | .00 | 2,239.45 |
| 3/6/2023 | CA1 | Feb 2023 CAM Adjustment | 2,239.45 | .00 | 2,239.45 |
| 3/6/2023 | CA1 | March 2023 CAM Adjustment | 2,239.45 | .00 | 2,239.45 |
| 3/6/2023 | CR1 | 2022 CAM Settlement | 5,442.06 | .00 | 5,442.06 |
| 3/6/2023 | EER | Elevator A& B Emergency Phone | 441.00 | .00 | 441.00 |
| 3/6/2023 | PCR | Jan 2023 Parking Adjustment | 673.38 | .00 | 673.38 |
| 3/6/2023 | PCR | Feb 2023 Parking Adjustment | 673.38 | .00 | 673.38 |
| 3/6/2023 | PCR | March 2023 Parking Adjustment | 673.38 | .00 | 673.38 |
| 3/6/2023 | PCR | 2022 Y/E Parking True Up | -8,391.22 | .00 | -8,391.22 |
| 3/6/2023 | RMR | Vulkan HVAC Inv Balance | 2,504.13 | .00 | 2,504.13 |
| 3/8/2023 | HVR | HVAC 01.12-02.13 | 1,748.31 | .00 | 1,748.31 |

Salmar Properties LLC
Salmar Properties LLC
850 3rd Avenue
Brooklyn, NY  11232

| | 5/1/2023 | | ACCOUNT NUMBER | |
|---|---|---|---|---|

Bed Bath & Beyond Inc.          INVOICE #:          00000238          1
850 Third Avenue
Suite 200
Brooklyn, NY  11232

**MAKE CHECKS PAYABLE TO:**   Salmar Properties LLC          BALANCE DUE          818,324.92

| Date | Code | Description | Charges | Payments | Amount Due |
|---|---|---|---|---|---|
| 4/1/2023 | CA1 | CAM-Retail | 8,533.09 | .00 | 8,533.09 |
| 4/1/2023 | PCR | Parking CAM Reimbursements | 14,968.74 | .00 | 14,968.74 |
| 4/1/2023 | RR1 | Base Rent Retail | 310,900.00 | .00 | 310,900.00 |
| 4/1/2023 | RR3 | Storage Rent | 12,060.64 | .00 | 12,060.64 |
| 4/1/2023 | RR4 | Rent-Parking | 4,800.00 | .00 | 4,800.00 |
| 4/4/2023 | GAS | Gas 2.17-3.21.23 | 4,160.08 | .00 | 4,160.08 |
| 4/4/2023 | LTE | Feb 2023 Late Fees | 2,184.80 | .00 | 2,184.80 |
| 4/6/2023 | ELR | Electric 02.13-03.15 | 20,665.45 | .00 | 20,665.45 |
| 4/6/2023 | HVR | HVAC 02.13-03.15 | 1,656.61 | .00 | 1,656.61 |
| 4/14/2023 | LTE | 04.14 Feb-March Late Fees | 4,914.09 | .00 | 4,914.09 |
| 4/30/2023 | LTE | 4.14-4.30 Feb-April Late Fees | 4,364.21 | .00 | 4,364.21 |
| 5/1/2023 | CA1 | CAM-Retail | 8,533.09 | .00 | 8,533.09 |
| 5/1/2023 | ELR | Electric 03.15-04.13 | 12,237.39 | .00 | 12,237.39 |
| 5/1/2023 | GAS | Gas 3.21-4.20.23 | 2,087.70 | .00 | 2,087.70 |
| 5/1/2023 | HVR | HVAC 03.15-04.13 | 892.35 | .00 | 892.35 |
| 5/1/2023 | PCR | Parking CAM Reimbursements | 14,968.74 | .00 | 14,968.74 |
| 5/1/2023 | RR1 | Base Rent Retail | 310,900.00 | .00 | 310,900.00 |
| 5/1/2023 | RR3 | Storage Rent | 12,060.64 | .00 | 12,060.64 |
| 5/1/2023 | RR4 | Rent-Parking | 4,800.00 | .00 | 4,800.00 |

| | 5/1/2023 | | ACCOUNT NUMBER | |
|---|---|---|---|---|

Please send this portion of the statement with your remittance.          INVOICE #:          00000238          1
                                                                         Bed Bath & Beyond Inc.

Salmar Properties LLC
Signature Bank
ABA:026013576
Acct: 1503910310,

| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
|---|---|---|---|---|---|
| 755,687.62 | 10,482.77 | 38,281.33 | 0.00 | 13,873.20 | 818,324.92 |