# EXHIBIT A

## Lease

**LEASE AGREEMENT**

Between

**COLE TAYLOR BANK,**
not personally but as Trustee under
Trust Agreement dated October 27, 1993, and
known as Trust Number 934188

Landlord,

and

**BED BATH & BEYOND OF LINCOLN PARK INC.,**

Tenant.

Dated: December 13, 1993

COLE, SCHOTZ, BERNSTEIN, MEISEL & FORMAN, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800

COLE01/SYS:\DMS\EMS.DIR\0143813.03

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| SECTION 1. | DEFINITIONS AND BASIC TERMS | 1 |
| SECTION 2. | LEASE OF PREMISES | 6 |
| SECTION 3. | LEASE TERM | 6 |
| SECTION 4. | PAYMENT OF FIXED MINIMUM RENT | 6 |
| SECTION 5. | TENANT'S RIGHT OF TERMINATION | 7 |
| SECTION 6. | IMPROVEMENTS | 8 |
| SECTION 7. | REAL ESTATE AND OTHER TAXES | 11 |
| SECTION 8. | PERMITTED AND PROHIBITED USES | 12 |
| SECTION 9. | UTILITIES | 14 |
| SECTION 10. | MUTUAL RELEASE, WAIVER OF SUBROGATION AND MUTUAL INDEMNIFICATION | 14 |
| SECTION 11. | SIGNS | 15 |
| SECTION 12. | ALTERATIONS AND PROPERTY IN PREMISES | 16 |
| SECTION 13. | ACCESS TO SHOPPING CENTER | 17 |
| SECTION 14. | COMMON AREAS | 17 |
| SECTION 15. | PARKING AREAS | 19 |
| SECTION 16. | TENANT'S INSURANCE | 21 |
| SECTION 17. | REPAIRS | 22 |
| SECTION 18. | TENANT DEFAULT | 24 |
| SECTION 19. | LANDLORD DEFAULT | 26 |
| SECTION 20. | LANDLORD'S ENTRY | 26 |
| SECTION 21. | FIRE AND OTHER CASUALTY | 26 |
| SECTION 22. | EMINENT DOMAIN | 28 |
| SECTION 23. | EXCLUSIVE IN CENTER | 30 |
| SECTION 24. | RIGHT TO MORTGAGE | 30 |
| SECTION 25. | TENANT ASSIGNMENT AND SUBLETTING | 31 |
| SECTION 26. | NOTICE | 33 |
| SECTION 27. | SHORT FORM LEASES | 33 |
| SECTION 28. | ENTIRE AGREEMENT | 34 |
| SECTION 29. | SEVERABILITY | 34 |
| SECTION 30. | GRAMMATICAL USAGES AND CONSTRUCTION | 34 |
| SECTION 31. | TABLE OF CONTENTS, PARAGRAPH HEADINGS | 34 |
| SECTION 32. | NO JOINT VENTURE OR PARTNERSHIP CREATED BY LEASE | 34 |
| SECTION 33. | BROKER'S COMMISSION | 34 |

SECTION 34.    RIGHTS CUMULATIVE . . . . . . . . . . . . 35

SECTION 35.    NON-WAIVER . . . . . . . . . . . . . . 35

SECTION 36.    LIMITATION OF LANDLORD'S LIABILITY . . . . . 36

SECTION 37.    SURRENDER OF PREMISES . . . . . . . . . . 36

SECTION 38.    SUCCESSORS AND ASSIGNS . . . . . . . . . 36

SECTION 39.    FORCE MAJEURE . . . . . . . . . . . . . 36

SECTION 40.    HOLD OVER . . . . . . . . . . . . . . 37

SECTION 41.    CONSENTS . . . . . . . . . . . . . . 37

SECTION 42.    DECLARATION OF CONTRACTUAL LIABILITY . . . . . 37

SECTION 43.    QUIET ENJOYMENT . . . . . . . . . . . . 37

SECTION 44.    ESTOPPEL CERTIFICATE . . . . . . . . . . 37

SECTION 45.    COSTS . . . . . . . . . . . . . . . 38

SECTION 46.    OPTIONS TO EXTEND TERM . . . . . . . . . 38

SECTION 47.    GOVERNING LAW . . . . . . . . . . . . 39

SECTION 48.    ATTORNEYS' FEES . . . . . . . . . . . . 39

SECTION 49.    PAYMENT UNDER PROTEST . . . . . . . . . 39

SECTION 50.    WORK PERFORMED UNDER PROTEST . . . . . . . 40

SECTION 51.    DISCONTINUANCE OF BUSINESS OPERATIONS . . . . 40

SECTION 52.    ABATEMENT OF RENT CHARGES . . . . . . . . 41

SECTION 53.    LIMITATION OF TENANT'S LIABILITY . . . . . 41

SECTION 54.    LANDLORD'S WARRANTIES AND REPRESENTATIONS . . 41

SECTION 55.    ARBITRATION . . . . . . . . . . . . . 43

SECTION 56.    DEFINITION OF HEREUNDER, HEREIN, ETC. . . . . 43

SECTION 57.    RIGHTS OF FIRST REFUSAL . . . . . . . . . 43

EXHIBIT A - Legal Description of Shopping Center
EXHIBIT B - Site Plan
EXHIBIT C - Commencement Date Agreement
EXHIBIT D - Specifications for Landlord's Work
EXHIBIT E - Permitted Encumbrances
EXHIBIT F - Signs

### LEASE AGREEMENT

**THIS LEASE AGREEMENT** ("Lease") is executed on December |3 , 1993 by COLE TAYLOR BANK, not personally but as Trustee under Trust Agreement dated October 27, 1993, and known as Trust Number 934188, having an office in care of CMR Limited Partnership, 212 East Ohio Street, Suite 500, Chicago, Illinois 60611 ("Landlord"), and BED BATH & BEYOND OF LINCOLN PARK INC., an Illinois corporation, having an office at 715 Morris Avenue, Springfield, New Jersey 07081 ("Tenant").

**W I T N E S S E T H:**

**SECTION 1.    DEFINITIONS AND BASIC TERMS.** The following terms shall have the meanings set forth in this Section 1 except as otherwise expressly provided herein:

**Landlord's Mailing Address:** In care of CMR Limited Partnership, 212 East Ohio Street, Suite 500, Chicago, Illinois 60611, Attn: Charles R. Malk, Esq., or such other place as Landlord may notify Tenant in writing from time to time.

**Tenant's Mailing Address:** 715 Morris Avenue, Springfield, New Jersey 07081, Attn: Mr. Warren Eisenberg or such other place as Tenant may notify Landlord in writing from time to time.

**Shopping Center:** The shopping center commonly known as Clybourn Square located on the property described in Exhibit A. Landlord shall not change the name of the Shopping Center without at least ninety (90) days prior written notice to Tenant.

**Premises:** The premises leased by Tenant, being the area cross-hatched on Exhibit B, containing approximately thirty-three thousand two hundred (33,200) square feet of retail area on the first floor and ten thousand (10,000) square feet of storage area on the second floor, which areas are measured to the exterior of outside walls of the building and centerline of common walls. Within thirty (30) days after the Delivery Date (as hereinafter defined), exact measurements of the square footage of the gross floor areas (excluding any non-selling mezzanine areas) of the Premises shall be made and certified to

by Landlord's licensed architect or engineer, and if said measurements shall indicate square footage figures for the Premises less than those recited in this Lease, the parties hereto shall promptly execute a supplemental instrument reducing, as applicable, the Fixed Minimum Rent (as hereinafter defined) to conform to the exact measurements but in not event shall Tenant be required to accept less than thirty-two thousand five hundred (32,500) square feet of first floor space (excluding any mezzanine areas) or less than ten thousand (10,000) square feet on the second floor.  Such reduction shall be based upon the rates of Fourteen and 31/100 ($14.31) Dollars per square foot for first floor area (excluding any non-selling mezzanine area) and of Two and 50/100 ($2.50) Dollars per square foot for second floor area, for the first five (5) years of the Term and proportionately thereafter based upon the increases in Fixed Minimum Rent set forth herein.  If Tenant shall have made any payments to Landlord prior to the determination of such exact measurements, an appropriate adjustment shall be made by the parties to reflect the accurate figures.  In the determination of such square footage figures, the same shall be computed on the basis of the exterior of exterior walls and the center of interior or dividing walls and shall exclude non-selling mezzanine areas and exterior areas.  Any dispute between the parties with respect to the measurement of the Premises shall be determined by arbitration in accordance with the provisions of this Lease.

Term:  An original fifteen (15) year period beginning on the Commencement Date and, if the Commencement Date shall occur on the first day of February, ending at midnight on the day immediately preceding the fifteenth (15th) anniversary of the Commencement Date; but if the Commencement Date is not the first day of February, then the Term shall be extended and shall end at midnight on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.  As used herein, "Term" shall refer to the original Term and any extension thereof exercised pursuant to Section 46, as the context shall require.

Commencement Date:  The first to occur of the following two (2) dates: (i) the date which Tenant shall establish as its grand opening but not later than ten (10) days after the date upon which Tenant shall open for business in the Premises, or (ii) the date that is sixty (60) days after the Delivery Date;

except, however, if the date established pursuant to (ii) occurs between November 1 and the following March 31, Tenant shall have the option of delaying the Commencement Date without payment or penalty until the next April 1. Within ten (10) days after the Commencement Date has been determined, Landlord and Tenant shall execute, acknowledge and deliver to each other a recordable agreement in the form provided in Exhibit C setting forth the Commencement Date, the date of expiration of the Term and the dates of commencement of the Renewal Periods (as hereinafter defined).

<u>Fixed Minimum Rent</u>: The following amounts for the periods indicated:

(a) For the first five (5) year period, the sum of Five Hundred Thousand ($500,000.00) Dollars payable in equal monthly installments in advance on the first day of each and every calendar month in the amount of Forty-one Thousand Six Hundred Sixty-Six Thousand and 67/100 ($41,666.67) Dollars;

(b) For the second five (5) year period, the sum of Five Hundred Fifty Thousand ($550,000.00) Dollars per year payable in equal monthly installments in advance on the first day of each and every calendar month in the amount of Forty-Five Thousand Eight Hundred Thirty-Three and 33/100 ($45,833.33) Dollars;

(c) For the third five (5) year period, the sum of Six Hundred Five Thousand ($605,000.00) Dollars per year payable in equal monthly installments in advance on the first day of each and every calendar month in the amount of Fifty Thousand Four Hundred Sixteen and 67/100 ($50,416.67) Dollars;

(d) For the first five (5) year Renewal Period the sum of Six Hundred Sixty-Five Thousand Five Hundred ($665,500.00) Dollars per year payable in equal monthly installments in advance on the first day of each and every calendar month in the amount of Fifty-Five Thousand Four Hundred Fifty-Eight and 33/100 ($55,458.33) Dollars;

(e) For the second five (5) year Renewal Period the sum of Seven Hundred Thirty-Two Thousand Fifty ($732,050.00) Dollars per year payable in equal monthly installments in advance

on the first day of each and every calendar month in the amount of Sixty-One Thousand Four and 17/100 ($61,004.17) Dollars; and

(f)  For the third five (5) year Renewal Period the sum of Eight Hundred Five Thousand Two Hundred Twenty-Five ($805,255.00) Dollars per year payable in equal monthly installments in advance on the first day of each and every calendar month in the amount of Sixty-Seven Thousand One Hundred Four and 58/100 ($67,104.58) Dollars.

Permitted Use:  During the Term, Tenant may use and occupy the first floor of the Premises for the sale at retail of a variety of linens, domestics, home furnishings and bath accessories, including but not limited to sheets, towels, bedspreads, comforters, pillows, pillow covers and shower curtains, as well as housewares, such as utensils, cookware, bakeware, dishes and china, glassware, kitchen and bathroom appliances, decorative accessories, and shelving systems, together with any and all other items commonly sold from time to time in Bed, Bath & Beyond stores (all such items are hereinafter collectively called the "Permitted Items").  The second floor of the Premises may be used and occupied only for storage.  Tenant shall initially open the Premises for business to the public but Tenant shall not be obligated to conduct or to remain open for the conduct of any business in the Premises.  If Tenant is no longer involved in the operation of business in the Premises, then there may be sold in the Premises such merchandise as is commonly sold by similar bed, bath, linen and housewares stores and all such items shall be deemed to be included in the definition of Permitted Items.  In the event Tenant proposes to lawfully sell merchandise or lawfully provide services in the Premises other than the Permitted Items, it shall first give notice (the "Additional Items Notice") thereof to Landlord, which Additional Items Notice shall specify the proposed new merchandise to be sold or services to be provided in the Premises.  In such event, Landlord shall have the option, to be exercised by written notice to Tenant given not later than thirty (30) days after the date on which Landlord receives the

Additional Items Notice, to cancel and terminate this Lease, in which event this Lease shall terminate upon the date (the "Termination Date") which is ninety (90) days after the date on which Tenant receives Landlord's termination notice as if such date was originally set forth herein as the expiration date of the Term and Landlord and Tenant shall upon such termination be released from any and all liability thereafter accruing hereunder except for any unpaid monetary obligations then existing. Notwithstanding any Additional Items Notice given by Tenant to Landlord, Tenant shall have the right within ten (10) days after receipt of a termination notice to give Landlord notice (hereinafter called the "Recision Notice") of its recision of its Additional Items Notice and upon receipt of the Recision Notice by Landlord, the termination notice previously given by Landlord shall be deemed null and void and Tenant shall not have the right to sell the proposed new merchandise described in its Additional Items Notice. Time shall be of the essence with respect to the said ten (10) day period. The giving of a Recision Notice by Tenant shall not prejudice its right to thereafter give Landlord an Additional Items Notice. If Landlord does not execute its option to terminate this Lease, Tenant shall thereafter have the right to sell the merchandise and provide the services specified in its notice to Landlord and such items shall thereafter be deemed to be included in the definition of Permitted Items herein.

Common Areas: All areas which are, from time to time, available for the joint use and benefit of Landlord, Tenant and other tenants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including but not limited to parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, loading docks, courts, landscaped areas and utility lines.

Tenant's Pro Rata Share: A fraction whose numerator is the total number of square feet of the Premises (exclusive of the second floor of the Premises and of any non-selling mezzanine

areas) from time to time, and whose denominator is the annual average number of square feet of leasable floor area (exclusive of the second floor of the Premises and of any non-selling mezzanine areas) in the buildings existing in the Shopping Center, including the Premises. Landlord shall certify to Tenant such leasable area of the Shopping Center and the calculation of Tenant's Pro Rata Share as statements are issued to Tenant. Tenant's Pro Rata Share shall be redetermined any time buildings are added to, or removed from, the Shopping Center.

**SECTION 2.** **LEASE OF PREMISES.** Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the Premises and the non-exclusive right to use the Common Areas.

**SECTION 3.** **LEASE TERM.** Tenant shall have and hold the Premises for the Term, unless sooner terminated as herein provided.

**SECTION 4.** **PAYMENT OF FIXED MINIMUM RENT.** Commencing on the Commencement Date and continuing throughout the balance of the Term, Tenant shall pay to Landlord the Fixed Minimum Rent, payable in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Minimum Rent for any partial calendar month in which the Commencement Date occurs shall be prorated and paid on such Commencement Date. Fixed Minimum Rent shall be paid without deduction or set-off (except as may be otherwise expressly provided herein). Whenever Tenant is required hereunder to pay any monies to Landlord, other than Fixed Minimum Rent, the same shall be deemed to be "additional rent". Landlord shall have the same remedies with respect to the non-payment of additional rent as it has for the nonpayment of Fixed Minimum Rent pursuant to the terms of this Lease. The term "rent" as used herein shall mean Fixed Minimum Rent and/or additional rent. All amounts payable under this Section 4, as well as all other amounts payable by Tenant to Landlord pursuant to the other terms of this Lease, shall be paid at Landlord's mailing address set forth above, or at such other place as Landlord may from time to time designate by written notice to Tenant, in lawful money of

the United States which shall be legal tender for the payment of all debts and dues, public and private, at the time of payment.

SECTION 5.    **TENANT'S RIGHT OF TERMINATION.**

On or at any time after the ninth (9th) anniversary of the Commencement Date, Tenant shall have the right to give Landlord notice (the "Termination Notice") that Tenant elects to terminate this Lease as of that date (the "Termination Date") which is twelve (12) months after the date such Termination Notice is given to Landlord.  Tenant may, at its sole election, use and occupy the Premises for not more than six (6) months after giving Landlord the Termination Notice, during which period of use and occupation Tenant shall pay its Fixed Minimum Rent and additional rent as otherwise herein provided and within fifteen (15) days after its cessation of business in and vacation of the Premises, Tenant shall pay Landlord an amount equal to the Fixed Minimum Rent for the balance of the aforesaid one (1) year period and thereafter this Lease shall be deemed terminated as if such date was originally set forth herein as the expiration date of the Term and Landlord and Tenant shall upon such termination be released from any and all liability thereafter accruing hereunder except for any unpaid monetary obligations then existing. Landlord shall have the right, at any time after receipt of the Termination Notice, to give Tenant notice (the "Early Possession Notice") that Landlord elects to accelerate the Termination Date to such date (the "Early Termination Date") as Landlord may specify in the Early Possession Notice but in no event earlier than ninety (90) days after giving Tenant the Early Possession Notice, in which event Tenant shall cease its operations and vacate the Premises on or before the Early Termination Date and Tenant shall pay Landlord Fixed Minimum Rent through the Early Possession Date and thereafter this Lease shall be deemed terminated as if such date was originally set forth herein as the expiration date of the Term and Landlord and Tenant shall upon such termination be released from any and all liability thereafter accruing hereunder except for any unpaid monetary obligations then existing.

SECTION 6.    **IMPROVEMENTS.**

(a)  Within fifteen (15) days after the date of this Lease, Landlord shall prepare and provide Tenant with an accurate plan of the column layout (the "Column Layout") of the Premises and within thirty (30) days thereafter, based upon the Column Layout, Tenant shall prepare and provide Landlord with its fixture plan, reflective ceiling plan and office plan (collectively, "Tenant's Plans").  Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant its preliminary plans and specifications for the construction of the Premises.  Tenant shall review such preliminary plans and specifications to determine whether they conform to the Column Layout, Tenant's Plans and the Specifications for Landlord's Work described in Exhibit D attached hereto and made a part hereof and to approve the proposed front elevation of the Premises, and shall advise Landlord with respect thereto within fifteen (15) days after receipt of the preliminary plans and specifications.  Landlord shall prepare final plans and specifications based upon its preliminary plans and specifications and any changes required by Tenant therein.  Such final plans and specifications are herein referred to as "Landlord's Work" and shall not be changed without Tenant's prior written approval.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (herein called "Tenant's Work") which Tenant desires to adapt the Premises to Tenant's use.  Both parties shall do their respective work in a manner required by applicable governmental regulation and codes so that Landlord will be able to secure for Tenant any and all required permits and approvals from applicable governmental authorities to enable Tenant to open and conduct its business in the Premises.  If such permits and approvals cannot be obtained because Landlord's Work has not been completed or has been done improperly (and not because of the manner in which Tenant shall have done its work), or by reason of any condition of the Shopping Center or the building containing the Premises, then it shall be the responsibility of Landlord to remedy the

situation so as to enable it to obtain such permits and approvals. Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, utilizing only new, first class materials, and in accordance with all applicable laws, ordinances, codes and insurance company requirements. In the event that Landlord's Work has not been commenced by April 1, 1994, or is not substantially completed on or before September 1, 1994, Tenant, in either case, may thereafter, at any time when Landlord's Work has not been commenced or substantially completed, as the case may be, terminate this Lease by notice to Landlord, in which event this Lease shall be terminated and of no force or effect, without any further liability on the part of either Landlord or Tenant hereunder. The term "substantially completed" as set forth in this Section 6 shall be defined to mean that only so-called "punch list" items of Landlord's Work shall not be completed and that the completion thereof will not interfere, in any material fashion, with Tenant's Work or the subsequent operations of Tenant's business in the Premises. The provisions of Force Majeure as defined and described in Section 39 below shall not extend the dates set forth in this Section 6. Any dispute between the parties with respect to this sub-paragraph 6.(a) shall be submitted to arbitration in accordance with the provisions of this Lease.

(b) Landlord shall, in good faith, endeavor to give Tenant at least sixty (60) days prior notice of the date on which Landlord shall deliver possession of the Premises to Tenant pursuant to this sub-paragraph 6.(b) Landlord shall be deemed to have delivered possession of the Premises (hereinbefore and hereinafter called "Delivery Date") to Tenant on the date on which the latest of all of the following shall have occurred:

(i) Actual possession of the Premises shall have been delivered to Tenant free of all leases (other than this Lease) and occupants, and Landlord shall then be the owner of the fee simple of the Shopping Center free and clear of any liens and encumbrances except the Permitted Encumbrances described in Section 54.(a) hereof;

(ii)   Any permits and approvals required from applicable governmental authorities to enable Tenant to occupy the Premises and use the Premises for the normal conduct of its business have been obtained (copies of which shall have been delivered to Tenant);

(iii)   The Common Areas (including the pylon and monument signs) shall have been completed and Landlord's Work shall have been substantially completed (including but not limited to the connection of utilities to and in the Premises);

(iv)   The zoning of the Shopping Center and all other laws, orders and regulations shall then permit the occupancy of the Premises for the sale of the Permitted Items and shall then permit the parking of private automobiles in the Common Areas where parking is shown on Exhibit B hereto;

(v)   Landlord shall have delivered to Tenant, Subordination, Non-Disturbance and Attornment Agreements duly executed by any then holders of any vendor's lien, mortgage or deed of trust on the Shopping Center whose lien is superior to this Lease, which Subordination, Non-Disturbance and Attornment Agreement shall be in the form and content described in Section 24 below;

(vi)   There are no restrictions or other legal impediments either imposed by law (including applicable zoning and building ordinances) or by any instrument which would prevent (I) the use of the Premises for the sale of the Permitted Items, (ii) the use of the parking facilities, access roads, and other common areas in the manner contemplated by this Lease, or (iii) the performance of Tenant's Work in the Premises in the manner contemplated by this Lease;

(c)   Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay the Fixed Minimum Rent and/or other charges hereunder, but Tenant (i) shall endeavor to give Landlord

at least three (3) days telephonic notice of any such intended entry, and (ii) shall indemnify and hold Landlord harmless from against any claims or losses arising from Tenant's entry upon the Premises.  Tenant agrees that Landlord shall have no liability to Tenant for damage to any property of Tenant stored on the Premises except for damages caused by the gross negligence or willful acts of Landlord or its employees, agents, invitees or contractors.  Tenant and its contractors shall maintain insurance reasonably satisfactory to Landlord covering Tenant's construction activities in the Premises.

SECTION 7.   **REAL ESTATE AND OTHER TAXES.**

(a)   Landlord shall pay on or before the due dates thereof all real estate taxes and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special) other than personal property taxes levied against tenants ("Taxes").  On and after the Commencement Date, Tenant shall be obligated for the payment of Tenant's Pro Rata Share of the Taxes.  Taxes, as used herein, shall not include, any (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease, or (ii) taxes on rents, gross receipts or revenues of Landlord from the Premises, all of which shall be the obligation of Landlord.  Notwithstanding the foregoing, if at any time during the Term the present method of taxation shall be so changed that the whole or any part of the Taxes imposed on real estate and improvements thereon shall be discontinued and in whole or partial substitution therefor taxes, assessments, levies, impositions, or charges shall be levied, assessed and/or imposed wholly or partially as a capital levy or otherwise on the rents, gross receipts, revenues, or profits received from real estate or the rents, gross receipts, revenues, or profits reserved herein or any part thereof, then such substitute taxes, assessments, levies, impositions, or charges, to the extent so levied, assessed, or imposed, shall be deemed to be Taxes for the purpose of this Lease.  All Taxes payable by Tenant pursuant to

this Section 7 shall be determined as if the Shopping Center was the only property owned by Landlord.

(b)   For the years in which this Lease commences and terminates, Tenant shall only pay a proportionate share of Taxes, based on a ratio of the Term within the tax year to the full tax year.

(c)   Tenant shall pay its Pro Rata Share of Taxes to Landlord in monthly installments based upon one-twelfth (1/12th) of the amount applicable to the Premises for the prior tax year or as otherwise reasonably estimated by Landlord.  Promptly after Landlord receives the actual bill(s) for Taxes covering a tax year for which Tenant has made such monthly payments, Landlord shall furnish Tenant with (i) a copy of such bill(s) together with copies of any and all notices concerning assessments, changes of assessments and tax rates, and (ii) a statement showing the exact amount actually payable by Tenant for the tax year in question, the amount paid by Tenant with respect thereto, and the method of calculation used to determine Tenant's Pro Rata Share thereof.  If such statement indicates that any amounts are due from Tenant for that tax year, Tenant shall pay Landlord the same within thirty (30) days thereafter, and if such statement indicates that any amounts are due to Tenant for that tax year, Landlord shall reimburse Tenant for the same within that same period of time.

(d)   If Tenant so requests, Landlord shall contest any assessment of Taxes, provided that Tenant shall bear the cost of such contest which shall not exceed thirty-five (35%) percent of the savings resulting from such contest. If, as a result of any such contest, any rebate or refund of Taxes is received, Tenant shall be entitled to its Pro-Rata share thereof after deducting the costs of the contest.

SECTION 8.   PERMITTED AND PROHIBITED USES.

(a)   Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, provided the same are reasonable and do not adversely affect the operations of Tenant's business on the Premises.  Any

rules and regulations established by Landlord shall be uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.

(b)  When Tenant is operating its business in the Premises, it will keep the Premises fully fixtured with an adequate staff of employees and a full inventory of stock and merchandise, all in a first class manner consistent with the standard practices of other stores operated by Tenant's affiliates in the Chicago metropolitan area.  Tenant will not (i) permit any objectionable or unpleasant odors to emanate from the Premises, (ii) permit any radio, television, loudspeaker or amplifier operated in the Premises to be heard outside the Premises, (iii) allow the Premises to be used for any immoral or illegal purposes, (iv) use or store any hazardous or inflammable products other than minimal quantities of cleaning products in the Premises in violation of any insurance company requirements or environmental laws, (v) commit waste, or (vi) take any action which will materially interfere with the use of the Common Areas by any other tenant of the Shopping Center.

(c)  Landlord agrees that the Shopping Center shall be constructed, leased, operated, maintained and managed as a first class shopping center and that no premises in the Shopping Center shall, without prior written consent of Tenant, be used for any non-retail purposes except that (i) offices, storage, repairs and alterations incidental to retailing and not more than three thousand one hundred fifty-five (3,155) square feet of office space on the second floor of the existing two story building at the corner of Willow and Clybourn Streets shall be allowed provided that no office tenant shall utilize parking spaces in excess of normal office tenant requirements, and (ii) with Tenant's prior written approval which will not be unreasonably withheld or delayed, service establishments may be allowed provided that they also cater to retail customers (i.e., a travel agency, automatic teller bank facility, but not medical or dental offices, stock brokerage firm or any other uses specifically prohibited by the other provisions of this sub-paragraph) and

where the reasonable expectation is that the customers of such establishments will not utilize parking spaces for a period of time in excess of that which is customary for a retail shopper. Landlord also agrees that no other premises in the Shopping Center or on any land contiguous to the Shopping Center owned now or at any time in the future by Landlord or any affiliated company shall, without prior written consent of Tenant, be used or occupied for the following additional uses:  restaurants other than the existing Goose Island Brewery restaurant, any pornographic use, for manufacturing or for use as a bowling alley, off-track betting parlor or other gambling establishment, funeral parlor, skating rink, meeting hall, pool hall, movie theater,  sporting event, auditorium, warehouse, health club after the expiration of the present health club lease which Landlord covenants and agrees not to renew, or other uses where the reasonable expectation is that the customers will utilize parking spaces for a period of time in excess of that which is customary for a retail shopper.

    **SECTION 9.**   **UTILITIES.**  From the Delivery Date and continuing throughout the Term, Tenant shall be responsible for paying, and as necessary shall contract for, in its own name, the cost and expense of all utility services rendered or furnished to the Premises, including heat, air conditioning, water, gas (if available to the Premises), electricity and telephone.  All utilities not contracted for in Tenant's own name for space other than the Premises will be separately metered by Landlord at its expense.

    **SECTION 10.**   **MUTUAL RELEASE, WAIVER OF SUBROGATION AND MUTUAL INDEMNIFICATION.**  Landlord and Tenant hereby release each other and anyone claiming through or under the other by way of subrogation or otherwise from any and all liability for any loss or damage to property, whether caused by the negligence or fault of the other party, which is insured under any fire and standard extended coverage insurance policy or under any other insurance policy now or hereafter issued covering the Premises or the contents thereof or the Shopping Center.  In addition, Landlord

and Tenant shall cause each such insurance policy carried by them insuring the Premises or the Shopping Center or the contents thereof to provide that the insurer waives all rights of recovery by way of subrogation against the other party hereto in connection with any loss or damage covered by the policy or such policies shall otherwise permit, and shall not be voided by, the releases provided for in this Section 10.  Subject to the foregoing release and waiver, Landlord and Tenant agree to indemnify and hold each other harmless from and against any and all claims, damages or causes of action for damages brought on account of injury to any person or persons or property, or loss of life, arising, in the case of Landlord, out of the negligence of Landlord or Landlord's employees, agents or contractors in the use, operation or maintenance of the Shopping Center (including the Common Areas) and, in the case of Tenant, the negligence of Tenant's employees, agents or contractors in the use, operation or maintenance of the Premises, respectively.

SECTION 11.   SIGNS.

(a)  Tenant may erect and maintain in the interior of the Premises any signs it may desire.  Tenant shall, at its own cost and expense, have the exclusive privilege of erecting and maintaining on the storefront and exterior walls of the Premises and on the wall of the 12,000 square foot building facing North Marcey Street as shown on Exhibit B, signs and replacement signs in conformity with the signs depicted on Exhibit F attached hereto and made a part hereof and signs of such other size, design and color as Tenant, from time to time, may desire, subject only to compliance with all local governmental laws, ordinances and regulations and to Landlord's prior approval which shall not be unreasonably withheld, delayed or conditioned.  All of Tenant's signs shall be properly constructed and lawfully maintained by Tenant, and Tenant shall repair, at its own cost and expense, all damage caused by Tenant's signs, including repair, painting and/or replacement (if necessary) of the building fascia surface where signs are attached.

(b)  Landlord shall provide a sign pylon at the location shown on Exhibit B.  Tenant shall have the right, at

Tenant's sole cost and expense, of placing and maintaining its sign at the top of such pylon and only other retail tenants of the Shopping Center occupying at lease eight thousand (8,000) square feet of space shall be allowed to place their signs on the pylon below Tenant's sign. The cost of maintenance of the pylon and of the cost of any electricity used to illuminate the same, shall be included in Common Area Costs.

### SECTION 12.    ALTERATIONS AND PROPERTY IN PREMISES.

(a)  Tenant shall not make structural changes or alterations to the Premises without the prior written approval of Landlord, which shall not be unreasonably withheld, delayed or conditioned. All work done in connection with such changes or alterations shall be done at Tenant's sole cost and expense in a good and workmanlike manner and in compliance with all governmental approvals. Landlord agrees to execute all instruments reasonably necessary to obtain licenses and permits to make such alterations from the applicable governmental authorities.

(b)  Tenant may, at its own cost and expense, without the prior approval of Landlord, make non-structural alterations and improvements to the interior of the Premises, including but not limited to, mechanical systems, electrical systems, HVAC, installation of fixtures and equipment, painting, papering and floor coverings, provided that the structural integrity of the building of which the Premises are a part shall not be adversely affected thereby.

(c)  All fixtures, equipment and property of any nature which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Landlord waives any right it may have in said fixtures, equipment, and property. Tenant may assign, lien, encumber, mortgage or create a security interest in or upon its equipment, fixtures or other property in the Premises without the consent of Landlord and may remove said property at any time during the Term. Upon the request of Tenant, Landlord agrees to provide Tenant, within ten (10) days of such request, a written waiver in form reasonably satisfactory

to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's fixtures, equipment and other property.

(d)  To the extent Landlord may have a lien on or security interest in the fixtures, equipment and personal property of Tenant pursuant to this Lease, by law or otherwise, Landlord hereby waives and agrees not to assert such lien or security interest.

(e)  Within thirty (30) days after notice of the filing thereof, Tenant agrees to discharge (either by payment or by filing of the necessary bond, or otherwise) any mechanic's materialmen's, or other lien against the Premises and/or Landlord's interest therein, which liens may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.

(f)  Tenant shall have the right, in accordance with all applicable governmental requirements, to erect and maintain an antenna for its interior music system and a satellite dish on the roof of the Premises.

SECTION 13.  ACCESS TO SHOPPING CENTER.  Landlord covenants that all entrances, exits, approaches and means of entrance and approach to and from the Shopping Center as shown on Exhibit B shall not be materially interrupted or disturbed by any act of Landlord during the Term.  Landlord shall not erect or permit a kiosk, sign, object or improvement in any part of the Common Area, or in any way materially obstruct the view of the Premises from the Shopping Center or adjoining roads, except the pylons shown on Exhibit B.

SECTION 14.  COMMON AREAS.

(a)  Landlord shall furnish, operate and maintain in good operating condition and repair; keep clean and free from snow, ice, rubbish and debris; and adequately illuminate and drain, the Common Areas of the Shopping Center.  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Landlord hereby undertakes and assumes all duties, responsibilities in regard to maintenance, repairs, replacements,

operation, supervision, use, striping, security and control of all Common Areas and shall comply with all laws, ordinances, orders, rules and regulations applicable thereto.

(b)   Landlord shall procure and maintain in full force and effect commercial general liability insurance insuring Tenant and Landlord, covering all Common Areas of the Shopping Center. Such insurance shall have limits of liability of not less than Five Million ($5,000,000.00) Dollars combined single limit for personal injury and property damage.   Any loss shall be paid notwithstanding any act or negligence of Landlord and Tenant. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties.   Upon request, Landlord shall provide Tenant with a certificate or other evidence of the insurance described in this Section 14.(b).

(c)   On and after the Commencement Date, Tenant shall pay Tenant's Pro Rata Share of the reasonable costs (the "Common Areas Charges") paid by Landlord to own, operate, insure and maintain the Common Areas.   Tenant's Pro Rata Share shall be paid in monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.   At the end of each calendar year, Landlord shall submit to Tenant a computation of Tenant's Pro Rata Share for the prior calendar year, together with a reasonably detailed statement certified by Landlord and containing actual costs and the calculation of Tenant's Pro Rata Share, and thereafter, Landlord shall furnish Tenant with copies of such bills as Tenant may request.   If Tenant's actual Pro Rata Share shall be more than the amount paid by Tenant during the prior year, Tenant shall pay to Landlord the difference within thirty (30) days after receipt of such notice.   If the total amount paid by Tenant for the prior year exceeds the actual amount due from Tenant for such period, such excess shall be refunded by Landlord to Tenant simultaneously with submission of the detailed statement setting forth Tenant's Pro Rata Share.   Common Areas Charges shall not include (i) the capital cost of any additions to the Common Areas

pursuant to an expansion of the Shopping Center's leasable square footage, (ii) the cost of any replacements or capital improvements to the Common Areas (for example, the cost of repaving the parking areas as opposed to patching), (iii) any debt service, (iv) the cost of maintaining, repairing or providing security for interior portions of buildings, and (v) Taxes, but may include an administrative and management charge not to exceed ten (10%) percent of actual Common Areas Charges exclusive of Taxes and insurance premiums.

(d)   Tenant shall have the right, at Tenant's cost and expense, to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share for a period of one (1) year after the delivery of Landlord's statement thereof.   In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant.   In the event of an error in Landlord's favor of more than three (3%) percent of the Common Areas Charges, Tenant shall also have the right to immediate reimbursement from Landlord for the reasonable expenses of the audit.   Tenant shall keep any such audit and the results thereof confidential.   Any dispute by Landlord with respect to such an audit by Tenant shall be submitted to arbitration in accordance with the provisions of this Lease.

**SECTION 15.**   **PARKING AREAS.**

(a)   The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads are designated on Exhibit B.   All that portion of the Shopping Center not designated as building, future building area, or service area on Exhibit B, are Common Areas for the use of all tenants, their customers, business invitees and employees.   ~~Any additional buildings or improvements in the Shopping Center not shown on Exhibit B, including signs and kiosks, must be constructed in a manner that will not impair the visibility of or access to the Premises.~~   Landlord shall not (i) materially alter the area of the Shopping Center or the location or size of any building or

improvement, (ii) change the number, location or lay-out of parking spaces, (iii) construct additional structures or buildings, or (iv) change the entrances or exists to and from the Shopping Center, without obtaining Tenant's prior written consent in each instance, which consent may be withheld by Tenant in its sole discretion without the application of Section 41 below.

(b)   Landlord further agrees and warrants that the Shopping Center contains the number of parking spaces shown on Exhibit B.  If Landlord fails to maintain that number of parking spaces [except in the case of a taking of parking spaces by eminent domain, as to which Section 22.(d) below shall apply], Tenant shall, in addition to remedies of specific performance and/or injunctive relief, have the right to terminate this Lease by giving notice to Landlord within sixty (60) days from the date of said failure.  The notice shall include a date of termination which shall not be less than ninety (90) days nor more than one hundred eighty (180) days from the date of the notice.  Such termination shall not be effective if Landlord has cured such default within sixty (60) days after its receipt of the notice of the termination.  The rights accorded to Tenant pursuant to this Section 15.(b) are in addition to all other remedies available to it in law or at equity.

(c)   The Common Areas shall be lighted by Landlord on each day that business shall be conducted by Tenant in the Shopping Center from dusk until one (1) hour after Tenant closes.

(d)   ~~Tenant shall use reasonable efforts to have its employees park their motor vehicles in the area designated as "Employee Parking" on Exhibit B and Landlord shall take all reasonable measures to have other tenants of the Shopping Center do the same.~~

(e)   There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center (other than costs incurred in maintaining Common Areas, as provided in Section 14 above).

(f)   Without Tenant's written approval, Landlord covenants and agrees that Landlord will not make any material

change in the existing parking areas, approaches, exits, entrances, roadways, and the like. Landlord covenants and agrees that it will not change the location or size of the parking spaces unless required to do so by applicable law. For the purposes of this sub-paragraph and of sub-paragraph 15.(a) above, the terms "material change" and "materially alter" shall be deemed to mean a change or alteration which will adversely affect the normal conduct of Tenant's business in the Premises.

(g)   In the event any construction is undertaken in the Common Areas or in any other portion of the Shopping Center during such time as the Premises shall be open for business to the public, all such construction shall be conducted in a manner which will not materially interfere with the normal operation of Tenant's business in the Premises.

(h)   In no event shall Tenant be required to join, participate in or contribute to any promotional fund marketing fund or merchants' association.

**SECTION 16.   TENANT'S INSURANCE.**

(a)   Tenant, at its own cost and expense, agrees to secure and keep in force throughout the Term (i) commercial general liability insurance protecting and insuring Tenant and Landlord in an amount not less than Five Million ($5,000,000.00) Dollars combined single limit for personal injury and damage to property; and (ii) fire insurance, with extended coverage, vandalism and malicious mischief endorsements, in an amount adequate to cover the full insurable replacement value of all fixtures, equipment, and other items of personal property of Tenant located on or within the Premises. Tenant shall use all reasonable efforts to obtain endorsements to its policies to provide that no cancellations shall be effective until at least thirty (30) days after receipt by Landlord of written notice thereof.

(b)   Duly executed certificates evidencing the coverage required hereunder shall be delivered to Landlord within thirty (30) days after the Commencement Date.

(c)   Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it owns or leases.

(d)   The deductible for Tenant's insurance shall not exceed One Hundred Thousand ($100,000.00) Dollars.  Landlord shall not unreasonably withhold or delay its consent to an increase in such amount.

SECTION 17.   **REPAIRS**.

(a)   Tenant shall keep the interior of the Premises, including the plate glass, in good condition and repair, except for ordinary wear and tear, damage by casualty or condemnation, and any work done by the Landlord.  If the Premises are part of an entire building containing general electricity, plumbing and/or mechanical systems, Tenant shall have no responsibility for the repair of the same beyond the Premises nor for any portions thereof running through, in, under or across the Premises but not exclusively serving the same.  Landlord shall keep such general systems in repair so that the portions thereof which are a part of and serve the Premises will function properly if those portions are kept in good condition and repair by Tenant.  Landlord shall make all replacements and repairs to the Premises:  (i) to the extent, if any, of contractors', manufacturers', vendors', or insurers' warranties or guarantees, (ii) during the twelve (12) month period on and after the Commencement Date occasioned by defective labor or materials furnished by Landlord as part of Landlord's Work, and (iii) which are occasioned by the wilful act or negligence of Landlord, its employees, agents or contractors.

(b)   Landlord shall, at its own cost and expense, make as the same shall from time to time be necessary all repairs and replacements required of it pursuant to subsection (a) above as well as to the structural elements of the Premises, including, but not limited to, the roof, gutters, downspouts, scuttles, exterior walls (except plate glass or storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware and painting or other treatment of interior walls);

floor (but not the floor covering) of the Premises; the structural portions of any building of which the Premises may be a part; the sewer, gas, wiring and public utility connections outside the Premises; and all utility lines and ducts in or passing through the Premises that serve other tenants in the Shopping Center or that are located outside the Premises but that serve the Premises.

(c)   Any addition, alteration, improvement, or rebuilding, structural or otherwise to or of the Premises or any part thereof, which may be required by reason by any law, rule, regulation or order promulgated by competent governmental authority and in effect on the date of this Lease or which is hereafter enacted and is not required due to Tenant's specific use of the Premises shall be made by and at the cost and expense of Landlord, except that any such work which is required due to Tenant's specific use and would not otherwise be required, shall be made by and at the cost and expense of Tenant. If it is determined that the Landlord's Work, performed in accordance with all presently existing laws and regulations and the present interpretations thereof, does not comply with the Americans with Disabilities Act, Landlord shall bear all costs of effecting such compliance.

(d)   All rebuilding, altering and repairing of structural portions of the Premises required by this Section shall be made in accordance with plans and specifications approved by Tenant and Landlord.

(e)   Landlord has the right to enter the Premises periodically and shall have access to the Premises during Tenant's business hours upon at least five (5) days prior notice (or without such notice in case of emergency) for inspection and to make any repairs or replacements required of it to be made; provided, however, that Landlord's employees, agents, and contractors shall identify themselves to the store manager upon entering the Premises.

(f)   Maintenance of the air conditioning and heating equipment shall be Landlord's responsibility during the twelve

(12) month period on and after the Commencement Date and thereafter shall be Tenant's sole responsibility throughout the remainder of the Term.

SECTION 18.   TENANT DEFAULT.

(a)   Tenant shall not be in default in payment of rent hereunder until the expiration of ten (10) days after receipt of written notice specifying the amount and details of the unpaid rent.  If Tenant shall so default in payment of rent, Tenant will, with respect to each occurrence, pay Landlord, on demand, a late charge equal to five (5%) percent of the past due amount. Provisions for such late charge shall be in addition to all other rights and remedies available to Landlord hereunder or at law or in equity and shall not be construed as liquidated damages or limiting Landlord's remedies in any matter.

(b)   Tenant agrees that a breach by it of any of its covenants contained in this Lease, other than the payment of rent or any other sums due hereunder, which shall continue for a period of over thirty (30) days after receipt by Tenant of notice from Landlord of such breach shall constitute a default under this Lease, provided that any and all breaches of a covenant by Tenant which are capable of being remedied by the performance of affirmative acts shall be deemed cured if Tenant shall commence the performance of said affirmative acts within thirty (30) days after the receipt of said notice and shall thereafter diligently prosecute the same to completion.

(c)   Upon default by Tenant, Landlord shall have all remedies given to it by law or in equity, including the following:

(i)   to bring suit for the collection of the rent or other amounts for which Tenant may be in default or for the performance of any other covenant or agreement devolving upon Tenant;

(ii) upon at least five (5) days' prior written notice to Tenant, to terminate this Lease, or to terminate Tenant's right of possession, reenter the Premises and take possession thereof.  If Landlord shall so elect to terminate this

Lease, all rights and obligations of Landlord shall cease and terminate, except that Landlord shall have and retain full right to sue for and collect all rents and other amounts for the payment of which Tenant shall then be in default and all damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver up the Premises to Landlord and upon any default by Tenant in so doing, Landlord shall have the right to recover possession by summary proceedings.  If Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at the address specified for notice to Landlord herein all rental and other amounts payable to Landlord pursuant to the terms of this Lease which have accrued to the date of repossession, plus rental (fixed minimum and percentage) plus Tenant's Pro Rata share of the Common Areas charge, insurance payment and Tax payment, when and as required to be paid by Tenant to Landlord during the remainder of the Lease term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting expenses incurred by Landlord).  In no event shall Tenant be entitled to any excess of any rental obtained by such reletting over and above the rental herein reserved.  Actions to collect amounts due by Tenant to Landlord as provided herein may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease term.

(d)   In case of any event of default, Tenant shall also be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises, the costs of removing and storing Tenant's or other occupant's property; the cost of repairing; and all expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies including reasonable attorneys' fees.

(e)   In the event of a Tenant default, any amounts paid by Landlord to cure said default and any rental payments not paid after notice shall bear interest at the then effective prime rate

as announced from time to time by the Wall Street Journal plus two (2%) percent.

(f)  Landlord agrees to use all reasonable efforts to relet the Leased Premises to mitigate its damages.

SECTION 19.   **LANDLORD DEFAULT**.  If Landlord fails to make any repairs or do any work required of Landlord by the provisions of this Lease, or if Landlord shall at any time be in default in the observance or performance of any of the other covenants and agreements required to be performed and observed by Landlord hereunder, and such failure continues for a period of thirty (30) days after written notice thereof is given by Tenant to Landlord, or, if such failure requires more than thirty (30) days to cure in the exercise of due diligence, unless Landlord commences to cure same within said thirty (30) day period and continues to cure same with all due diligence, (i) Tenant may, if the failure materially interferes with Tenant's use and enjoyment of the Premises, terminate this Lease without waiving its rights to damages for Landlord's failure to perform, and/or (ii) Tenant may, but shall not be obligated to, make such repairs or perform such work in accordance with the provisions of this Lease all on behalf of and at the expense of the Landlord, and/or (iii) without terminating this Lease, bring suit for the collection of any amounts for which Landlord may be in default, or for the performance of any other covenant or agreement devolving upon Landlord, including costs and reasonable attorneys' fees, together with interest thereon at the then effective prime rate as announced from time to time by the Wall Street Journal plus two (2%) percent.

SECTION 20.   **LANDLORD'S ENTRY**.  Tenant shall permit Landlord to enter upon the Premises during all business hours, after at least five (5) days prior notice to Tenant, to exhibit same to prospective bona-fide purchasers and mortgagees of the Shopping Center.

SECTION 21.   **FIRE AND OTHER CASUALTY**.

(a)  If any part of the Premises, the Common Areas or other buildings in the Shopping Center shall be damaged by fire

or other casualty, Landlord agrees to promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty. To the extent that all or any portion of the proceeds from Landlord's insurance policies may be paid directly to Landlord, such proceeds shall be retained by Landlord in trust and applied to the costs of restoration. In the case of damage to the Premises rendering the Premises untenantable, or in the case of damage to the Shopping Center which materially interferes with the normal conduct of Tenant's business in the Premises, a just proportion of Fixed Minimum Rent and other charges payable hereunder shall be suspended and abated until the damaged or destroyed area(s) are rebuilt as required.

(b) If Landlord does not commence the repair and restoration work required pursuant to this Section within ninety (90) days after the date of such destruction, or if the required repairs and restorations are not completed by Landlord in accordance with all provisions of this Section within a period of twelve (12) months after the date of destruction, Tenant shall have the right, at its sole discretion and option, to: (i) after giving thirty (30) days prior written notice to Landlord perform the required repairs and restoration work at the sole cost of Landlord, which Landlord shall pay to Tenant during the course of such repairs within ten (10) days of invoice (and reasonable evidence supporting the same) by Tenant; or (ii) seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located, or (iii) terminate this Lease by thirty (30) days written notice to Landlord thereby waiving Tenant's rights to damages for Landlord's failure to perform its covenants and obligations hereunder. The rights granted to Tenant herein shall be in furtherance and not in limitation to any other rights Tenant may have pursuant to this Lease.

(c) If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the gross leasable area thereof, either Landlord or Tenant shall have the right to

terminate this Lease as of the date of such damage or destruction by giving written notice within thirty (30) days following such damage or destruction, unless Tenant shall agree to extend the Term for an additional five (5) year period by exercising an option pursuant to Section 46, if available, within ten (10) days after receipt of a termination notice from Landlord.

(d)    Landlord shall at all times during the Term carry standard "All Risk" fire and extended coverage insurance on all of the buildings and permanent improvements in the Shopping Center for the full replacement value of said buildings and improvements.  The policy or policies shall provide that any loss will be paid notwithstanding any act or negligence of Landlord or Tenant.  Tenant shall pay Landlord its Pro Rata Share of Landlord's insurance premiums attributable to the Shopping Center in monthly installments based upon one-twelfth (1/12th) of the amount billed for the prior tax year or as otherwise reasonably estimated by Landlord.  Promptly after Landlord receives its premium bill(s), for which Tenant has made such monthly payments, Landlord shall furnish Tenant with a copy of such bill(s) together with such other information as Tenant may reasonably request in connection therewith, and a statement showing the exact amount actually payable by Tenant with respect to such bill(s) the amount paid by Tenant in connection therewith, and the method of calculation used to determine Tenant's Share thereof.  If such statement indicates that any amounts are due from Tenant, Tenant shall pay Landlord the same within thirty (30) days thereafter, and if such statement indicates that any amounts are due to Tenant, Landlord shall reimburse Tenant for the same within that same period of time.  Upon request, Landlord shall provide Tenant with a certificate or other evidence of the insurance described in this Section 21.(d).

SECTION 22.    EMINENT DOMAIN.

(a)    If (i) the whole of the Premises shall be taken under the power of eminent domain or such a portion thereof shall be so taken that it is commercially unreasonable or unfeasible for Tenant, in its sole judgment, to continue its business in the

Premises; or (ii) as a consequence of any taking under the power of eminent domain, (A) portions of the Shopping Center shall be divided or separated in any manner that materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center or (B) the portion of the Shopping Center wherein the Premises are situate no longer has at least two (2) entrances to and from Willow Street and Willow Street no longer has direct access to Clybourn Street, and, in either case, as a result it is commercially unreasonable or unfeasible for Tenant, in its sole judgment, to continue its business in the Premises; or (iii) any portion of the Shopping Center shall be so taken that materially interferes with parking, visibility or access to the Premises and as a result of such taking it is commercial unreasonable or unfeasible for Tenant, in its sole judgment, to continue its business in the Premises; or (iv) more than twenty-five (25%) percent of the buildings (other than the Premises) are taken; then, within sixty (60) days of any such event, Tenant shall have the right to terminate this Lease by giving sixty (60) days written notice to the Landlord, in which event this Lease shall so terminate without further liability on the part of either Landlord or Tenant except for an adjustment between the parties for Fixed Minimum Rent and other charges payable by Tenant hereunder.  Subsequent to any partial taking of the Premises, the rent shall be reduced in proportion to the amount taken.

(b)  If Tenant shall not have the right to cancel this Lease, or having such right elects to continue in possession, Landlord, at its own cost and expense, shall with reasonable dispatch repair and restore the damaged area to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the taking, pursuant to plans and specifications approved by Tenant.  During the period of said repairs and restoration, until the Premises are rendered tenantable, all rental shall abate, provided that Tenant is not open for business during said period.

(c)   In connection with any taking or partial taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which adversely affects the award payable to Landlord for its fee interest in the Premises.

(d)   Notwithstanding the foregoing, if five (5%) percent or more of the parking spaces shown on Exhibit B, shall be taken under the power of eminent domain, then Tenant shall have the right to cancel this Lease in the same manner and with the same effect as set forth in subsection (a) above.

(e)   Any dispute between the parties with respect to this Section 22 shall be determined by arbitration in accordance with the provisions of this Lease.

SECTION 23.   **EXCLUSIVE IN CENTER.**

(a)   To induce Tenant to execute this Lease, Landlord covenants and agrees that Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied for the sale of linens, domestics, home furnishings, bath accessories or housewares, except on an incidental basis.

(b)   Upon breach of the aforesaid covenant by Landlord, Tenant shall have all remedies given to it at law and in equity, including the right to injunctive relief and damages.  If any person or entity other than Landlord shall violate any of the provisions herein set forth (other than tenants under existing leases as aforesaid), or shall indicate that it intends to violate any of said provisions, Landlord shall promptly commence legal proceedings and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to commence such proceedings, or shall fail thereafter to vigorously prosecute the same, Tenant shall have the right to conduct and prosecute such legal proceedings in its own name, and at the expense of Landlord if a court determines there was a breach of said covenant.

SECTION 24.   **RIGHT TO MORTGAGE.**  Landlord reserves the right to subject and subordinate this Lease at all times to the

lien of any mortgage now or hereafter placed upon Landlord's interest in the Premises; provided, however, (i) no default by Landlord under any mortgage shall affect Tenant's rights under this Lease, so long as tenant substantially performs the obligations imposed upon it hereunder, and is not in default of such obligations beyond the applicable notice and grace periods provided herein, and (ii) the holder of any such mortgage will execute a Subordination, Non-Disturbance and Attornment Agreement in form reasonably satisfactory to Tenant.

SECTION 25.   TENANT ASSIGNMENT AND SUBLETTING.

(a)   Tenant shall have the right from time to time, without the consent of Landlord, to sublet, concession or license a portion or portions of the Premises but not the whole of the Premises, provided that the subtenant, concessionaire or licensee uses the Premises for the sale of Permitted Items and/or for the sale of apparel and apparel accessories and such uses are conducted in a first class manner consistent with other shopping centers in the Lincoln Park area.  No such subletting, licensing or concessioning shall release Tenant from any of its obligations hereunder, nor shall it entitle Tenant to additional signage or additional entrances to the Premises.

(b)   Except as set forth in subsection (c) below, in the event Tenant proposes to assign this Lease or sublet the whole of the Premises, it shall first give notice thereof (hereinafter called the "Assignment/Subletting Notice") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the entire terms of the assignment or subletting.  Within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, Landlord may elect by notice (hereinafter called the "Termination Notice") in writing to Tenant to terminate this Lease and recapture the Premises, in which event this Lease shall automatically terminate on the sixtieth (60th) day (hereinafter called the "Termination Date") following Tenant's receipt of the Termination Notice with the same force and effect as if said Termination Date had been designated as the expiration date of this Lease and Landlord and

Tenant shall upon such Termination Date be released from any and all liabilities thereafter accruing hereunder. All Fixed Minimum Rent and additional charges payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding any Termination Notice given to Tenant by Landlord within the aforesaid thirty (30) day period, Tenant shall have the right within ten (10) days thereafter to give Landlord notice (hereinafter called the "Recision Notice") of its recision of the Assignment/Subletting Notice and upon the receipt of the Recision Notice the Termination Notice previously given by Landlord shall be deemed null and void and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord fails to respond to an Assignment/Subletting Notice within the aforesaid thirty (30) day period, Landlord shall conclusively be deemed to have consented to the proposed assignment of subletting, as the case may be. Landlord, in addition to exercising such termination right, may withhold its consent to any proposed assignment or subletting of the whole Premises, in which case Tenant may not effect the same; provided, however, that Landlord's consent shall be subject to the provisions of Section 41 of this Lease and shall not be required if (i) the proposed assignee or sublessee has past experience in operating the kind of business permitted by this Lease to be conducted on the Premises and has operated such a business of the size and scope contemplated and permitted by this Lease, and (ii) the use of the Premises by the proposed assignee or sublessee is permitted by this Lease.

(c) Notwithstanding the provisions of subsections (a) and (b) above, Tenant shall have the unrestricted right, from time to time and without the consent of Landlord, to (i) assign this Lease and/or sublet the whole of the Premises to any parent, subsidiary or affiliated company, (ii) assign this Lease to any

company which purchases all or substantially all of the assets of Tenant's parent company, (iii) assign this Lease to any company which purchases at least a majority of the Bed, Bath & Beyond stores or all of the Bed, Bath & Beyond stores in the State in which the Premises are located, (iv) assign this Lease in conjunction with any merger, consolidation or public offering of stock involving Tenant, its parent or an affiliated company, and (v) assign this Lease and/or sublet the whole of the Premises to a third party for the sale of apparel and apparel accessories.

(d)   No assignment or subletting by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder or the liability of the Guarantor (defined below) under its Guaranty of this Lease.

SECTION 26.   **NOTICE.**  Whenever a notice is required or permitted in this Lease, it shall mean a written notice (i) sent by certified mail, return receipt requested, addressed to Landlord at Landlord's Mailing Address with a copy to Charles R. Malk, Esq., c/o Malk & Harris, Esqs., Suite 500, 212 East Ohio Street, Chicago, Illinois 60611, or to Tenant at Tenant's Mailing Address with a copy to Edward M. Schotz, Esq., c/o Cole, Schotz, Bernstein, Meisel & Forman, P.A., 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602-0800, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party, and such notice shall be deemed to be received five (5) days after deposit in the United States mail, or (ii) a written notice delivered to the addresses stated above by Federal Express or other recognized overnight delivery service which obtains a receipt for any such delivery, which notice shall be effective upon receipt at the address of the addressee.

SECTION 27.   **SHORT FORM LEASES.**  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease for recording, which shall contain such form and substances as either party shall reasonably request, with the exception of the Fixed Minimum Rent reserved hereunder.

**SECTION 28.    ENTIRE AGREEMENT.**  This Lease constitutes the entire agreement of the parties hereto; all prior agreements between the parties, whether written or oral, are merged herein and shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

**SECTION 29.    SEVERABILITY.**  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

**SECTION 30.    GRAMMATICAL USAGES AND CONSTRUCTION.**  In construing this Lease, feminine or neuter pronouns shall be submitted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the draft party shall not be applicable hereto.

**SECTION 31.    TABLE OF CONTENTS, PARAGRAPH HEADINGS.**  The table of contents, if any, and paragraph headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

**SECTION 32.    NO JOINT VENTURE OR PARTNERSHIP CREATED BY LEASE.**  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

**SECTION 33.    BROKER'S COMMISSION.**  Landlord represents and warrants to Tenant that to Landlord's knowledge no real estate broker, agent or finder has negotiated any provisions of

this Lease with Tenant or shown Tenant the Shopping Center and Tenant warrants and represents to Landlord that no real estate broker, agent or finder negotiated the provisions of this Lease or showed the Shopping Center to Tenant, except for Mid West Commercial Realty and Grubb & Ellis, to whom Landlord agrees to pay a commission pursuant to a separate agreement; and, except with respect to Mid West Commercial Realty and Grubb & Ellis, each party agrees to indemnify and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Lease claimed to be in breach of the foregoing warranty.

SECTION 34.    **RIGHTS CUMULATIVE.**    Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by law. All obligations of Landlord hereunder will be construed as covenants, not conditions. The term "Landlord" shall mean only the owner, for the time being, of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall thereupon be released and discharged from all covenants and obligations of the Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

SECTION 35.    **NON-WAIVER.**    The failure of Landlord or Tenant to enforce against the other any provision, covenant or condition herein, by reason of either of them committing any breach of or default under this Lease shall not be deemed a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach of default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver

of the right to exercise that same kind of option upon any subsequent occasion.

SECTION 36.   **LIMITATION OF LANDLORD'S LIABILITY**.  On and after the Delivery Date, Tenant shall look only to Landlord's estate and property in the Shopping Center (or the proceeds thereof) for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by the Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.

SECTION 37.   **SURRENDER OF PREMISES**.  At the expiration of the Term Tenant will quit and surrender the Premises in as good a state and condition as received, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder excepted.

SECTION 38.   **SUCCESSORS AND ASSIGNS**.  Subject to the provisions of Section 25, the provisions of this Lease shall bind and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns.

SECTION 39.   **FORCE MAJEURE**.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder (other than payment of Fixed Minimum Rent or other amounts due hereunder) by reason of strikes, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reasons of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease (all of such reasons or causes referred to in this Lease as "Force Majeure"), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay.  Any time either party is experiencing delay under this provision, such party will give notice to the

other party detailing the nature of the delay and giving an estimate as to how long the delay is expected to be.

SECTION 40.   HOLD OVER.   Except as set forth in Section 46.(b) hereof, if Tenant fails to deliver possession of the Premises at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Minimum Rent on a monthly basis in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all other charges payable by Tenant hereunder.

SECTION 41.   CONSENTS.   Whenever under this Lease provision is made for either party's securing the consent or approval of the other party, such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 42.   DECLARATION OF CONTRACTUAL LIABILITY.   If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

SECTION 43.   QUIET ENJOYMENT.   Provided Tenant is not in default of its obligations under this Lease beyond the applicable notice and grace periods for the curing of such default, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hinderance from Landlord or any party claiming by, through, or under Landlord.

SECTION 44.   ESTOPPEL CERTIFICATE.   Upon written request of Landlord or Tenant, the other party, within ten (10) days of the date of such request, agrees to execute and deliver to the requesting party, without charge, a written statement:  ratifying this Lease; certifying that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; certifying that all conditions and agreements under this Lease to be satisfied and performed have been satisfied and performed, except as shall be stated; reciting the amount of

advance rental, if any, paid by Tenant and the date to which
rental has been paid; and certifying to such other matters as the
requesting party may reasonably require.

SECTION 45.    COSTS.  Whenever this Lease requires the
performance of an act by either party, such party shall perform
the act at its own cost and expense, unless expressly provided to
the contrary.

SECTION 46.    OPTIONS TO EXTEND TERM.

(a)  Tenant shall have the right and option to extend
the original Term from the date upon which it would otherwise
expire for three (3) separate renewal periods of five (5) years
each (each such period being herein called a "Renewal Period")
upon the same terms and conditions as are herein set forth,
except that the Fixed Minimum Rent during such Renewal Periods
shall be as set forth in Section 1 hereof.  If Tenant elects to
exercise any one or more of said options to extend, it shall do
so by giving notice of such election to Landlord at any time
during the term of this Lease (including any Renewal Period) on
or before the date which is one hundred eighty (180) days before
the beginning of the Renewal Period or Renewal Periods for which
the term hereof is to be extended by the exercise of such option
or options.  If Tenant fails to exercise any one of said options
to extend, it shall not have the right to exercise any later
options to extend.

(b)  In order to prevent the inadvertent failure of
Tenant to exercise any of the aforesaid options within the time
specified above, it is agreed that Landlord may not terminate
this Lease until and unless Landlord notifies Tenant in writing
and points out that the option to extend or to further extend, as
the case may be, has not been exercised.  Tenant's option to
extend, in each instance, shall continue for a period of fifteen
(15) days after receipt of such notice from Landlord; but if
Tenant does not send written notice of the exercise of such
option to Landlord within said fifteen (15) day period, Tenant's
option to extend shall thereafter terminate.  If Landlord fails
to give Tenant such notice prior to the expiration of the

original Term or of any option term, as the case may be, and if Tenant shall remain in possession of the Premises after the expiration of the then current Term, then Tenant shall remain in possession as a tenant from month to month, subject to the provisions of this Lease insofar as the same may be made applicable to a tenant from month to month, but without the application of Section 40 hereof.  If Landlord then gives Tenant such notice and Tenant exercises its option to extend, then the effective date of such exercise shall be retroactive to the expiration date of the original Term or of the previously extended Term, whichever is appropriate.

SECTION 47.    GOVERNING LAW.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

SECTION 48.    ATTORNEYS' FEES.  In any action or proceeding hereunder, the prevailing party shall be entitled to recover from the other party, the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees.  If either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees.

SECTION 49.    PAYMENT UNDER PROTEST.  If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", which payment shall not be regarded as voluntary payment, and there shall survive the right on the part of such party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of such party to pay such sum or any part thereof, such party shall be entitled to recovery from the other party such sum or so much thereof as it

was not legally required to pay under the provisions of this Lease.

SECTION 50.   **WORK PERFORMED UNDER PROTEST**.  If at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest", performance of such work in no event to be regarded as a voluntary performance, and there shall survive the right on the part of such party to institute suit for recovery of the cost of such work.  If it shall be adjudged that there was no legal obligation on the part of such party to perform such work or any part thereof, such party shall be entitled to recover from the other party the cost of such work or the cost of so much thereof as such party was not legally required to perform under this Lease.

SECTION 51.   **DISCONTINUANCE OF BUSINESS OPERATIONS**. Notwithstanding any other provisions of this Lease, Tenant shall have the right, at any time after its initial opening of the Premises to the public for business, to discontinue the operations of its business in the Premises.  Should Tenant do so, however, it shall give Landlord notice in writing of such discontinuance at least ninety (90) days prior to the date on which Tenant proposes to discontinue its operations (the "Closing Date") and shall continue to be liable for the performance of its obligations hereunder, including without limitation, the payment of rent.  In such event Landlord shall have the option to be exercised by written notice to Tenant given at any time after the date on which Landlord receives Tenant's notice, to cancel and terminate this Lease, in which event this Lease shall terminate upon the date (the "Termination Date") which is thirty (30) days after the last to occur of (i) the date on which Tenant receives Landlord's termination notice, or (ii) the Closing Date, as if such dates were originally set forth herein as the expiration dates of the Term and Landlord and Tenant shall upon such termination be released from any and all liabilities thereafter

accruing hereunder except for any unpaid monetary obligations then existing.

SECTION 52.   ABATEMENT OF RENT CHARGES.   Notwithstanding any other provisions of this Lease, if the Fixed Minimum Rent and charges payable by Tenant hereunder shall be abated pursuant to Sections 21 or 22, such abatement shall terminate upon the first to occur of (a) the date on which Tenant shall reopen the Premises to the public for business or (b) the expiration of a period of ninety (90) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased; provided, however, that if said sixty (60) day period shall terminate during the period between November 1 and March 31 of any year, then termination of said sixty (60) day period shall be extended until the next April 1 unless Tenant reopens for business within said period.

SECTION 53.   LIMITATION OF TENANT'S LIABILITY.   Landlord acknowledges that Tenant is now and will probably remain a so-called "shell corporation" and has not now and probably will not at any time in the future have any assets and that the operations of Tenant's business will be conducted by BED BATH & BEYOND INC. (herein referred to as "Guarantor"), which may also own all or a part of Tenant's fixtures, equipment and inventory. Landlord agrees that in no event will it seek to pierce the corporate veil of Tenant in an attempt to hold Guarantor liable beyond its guaranty based upon the provisions of the previous sentence of this Section. This Section 53 shall not diminish Guarantor's liability under its Guaranty of this Lease.

SECTION 54.   LANDLORD'S WARRANTIES AND REPRESENTATIONS. To induce Tenant to execute this Lease, and in consideration thereof, Landlord warrants and represents, and covenants and agrees as follows:

(a)   As of the date hereof, Landlord has a bona-fide contract to purchase the Shopping Center free and clear of all easements, restrictions, liens, encumbrances, leases and the

like, except the Permitted Encumbrances described on Exhibit E attached hereto and made a part hereof;

(b)    Tenant's use of the Premises for sale of Permitted Items will not violate any exclusive provision granted to another tenant in the Shopping Center; and

(c)    Prior to the Delivery Date, Landlord shall cause to be delivered to Tenant a Subordination, Non-Disturbance and Attornment Agreement from all then holders of any mortgage on the Shopping Center, which Subordination, Non-Disturbance and Attornment Agreement shall conform to the provisions of Section 24 hereof.

(d)    The portion of the Shopping Center in which the Premises are located now has access to Willow Street and Willow Street has direct access to Clybourn Street for the purpose of vehicular traffic, and throughout the Term trucks shall have access to the service areas serving the Premises substantially as shown on Exhibit B hereto.

(e)    Landlord shall, at its sole cost and expense, cause the Shopping Center to comply with all environmental laws and regulations applicable to the Shopping Center and the uses made thereof, including, without limitation, laws and regulations relating to hazardous substances; provided, however, that the provisions of this subsection shall not apply to any environmental laws and regulations applicable to Tenant's specific use of the Premises (as opposed to general retail use of the Premises), to the manner in which Tenant conducts its business in the Premises, or to any acts or omission of Tenant, all of which shall be remedied by Tenant at its sole cost and expense. At Tenant's request, Landlord shall provide Tenant with a copy of an environmental report prepared for the Shopping Center, provided Tenant executes Landlord's standard indemnity agreement relating to release of the report by Landlord to third parties.

(f)    This Lease does not violate the provisions of any instrument heretofore executed and binding on Landlord, and the

execution of this Lease has been duly and validly authorized on behalf of Landlord.

SECTION 55.   **ARBITRATION**.

(a)   In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Chicago, Illinois before one arbitrator in accordance with the then procedural rules of the American Arbitration Association or any successor thereto.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.

(b)   Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

SECTION 56.   **DEFINITION OF HEREUNDER, HEREIN, ETC.**  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section or paragraph hereof.

SECTION 57.   **RIGHTS OF FIRST REFUSAL**

(a)   If, at any time during the term of this Lease or any Renewal Period, any offer for the purchase of all or any portion of Landlord's interest in the Demised Premises and/or Shopping Center be made to Landlord, Landlord shall (if Landlord intends to accept same) send Tenant notice of such offer together with, in all instances, a copy of the executed documents

pertaining hereto. Tenant is hereby granted fifteen (15) days after receipt of such notice and documents within which to give Landlord notice of its intention to purchase Landlord's said estate on the same terms and conditions as therein contained, and within the following fifteen (15) days Landlord and Tenant will execute a contract consistent with the contract entered into by Landlord with the original purchaser but if no such contract was entered into, then upon the terms and conditions stated in Landlord's original notice to Tenant, but with closing to take place on the later of thirty (30) days after the date set for closing in the offer to purchase or a date mutually convenient to Landlord and Tenant. This right shall be a continuing right which shall survive any sale of Landlord's interest to others (notwithstanding Tenant's failure to exercise any rights hereunder as to any prior sale) and shall bind Landlord, its successors and assigns.

(b) If, at any time during the term of this Lease or any Renewal Period, any offer for the lease of all or any portion of the premises presently leased to Goose Island Brewery is made to Landlord, Landlord shall (if Landlord intends to accept same) send Tenant notice of such offer together with, in all instances, a copy of the executed documents pertaining thereto. Tenant is hereby granted fifteen (15) days after receipt of such notice and documents within which to give Landlord notice of its intention to lease such space on the same business terms and conditions as therein contained, and within the following fifteen (15) days Landlord and Tenant will execute an amendment to this Lease incorporating the Goose Island Brewery premises into the Premises herein and modifying the business terms of this Lease to incorporate the business terms and conditions stated in Landlord's original notice to Tenant. This right shall be a continuing right which shall survive any lease of the said premises to others (notwithstanding Tenant's failure to exercise any rights hereunder as to any prior lease) and shall bind Landlord, its successors and assigns.

(c)    Any dispute between the parties with respect to this Section 57 shall be submitted to arbitration in accordance with the provisions of this Lease.

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease as of the day and year first above written.

WITNESS:

Trustee's Exoneration Rider Attached Hereto And Made A Part Hereof

COLE TAYLOR BANK, not personally but as Trustee under Trust Agreement dated October 27, 1993, and known as Trust Number 934188 (Landlord)

By: _____
Title: Assistant Vice President    Mario V. Gotanco

ATTEST:

BED BATH & BEYOND OF LINCOLN PARK INC. (Tenant)

By: _____
Title: President

## LESSOR EXONERATION RIDER

This LEASE is executed as lessor by COLE TAYLOR BANK, not personally, but solely as Trustee as aforesaid and it is expressly understood and agreed by and between the parties hereto, anything in this Lease to the contrary notwithstanding, that each and all of the covenants, undertakings and agreements in this Lease contained are made and intended not as personal covenants, undertakings and agreements of COLE TAYLOR BANK, or any of its officers, agents or employees, but this Lease is executed and delivered by the undersigned Lessor solely as Trustee as aforesaid and no personal liability or personal responsibility is assumed by, or shall at any time be asserted or enforced against COLE TAYLOR BANK, its officers, agents or employees, on account of any covenants, representations, undertakings or agreements in this Lease contained, or otherwise, either express or implied, all such personal liability, if any, being hereby expressly waived and released, it being understood that the Lessee or anyone claiming by, through or under the Lease shall look solely to the trust property for the enforcement or collection of any such liability. By way of illustration only and without limitation of the foregoing, it is further understood and agreed that neither the Lessor nor the said COLE TAYLOR BANK individually shall have any duty whatsoever with reference to the upkeep, maintenance or repair of said premises and makes no representations with reference to the condition of, or the title to, said premises. The Lessee hereunder is hereby charged with knowledge that the Lessor does not, in fact, have possession of nor exercise any dominion over the trust property or the income or avails therefrom. It is further expressly understood and agreed that this lease is signed by the undersigned Lessor solely for the purpose of subjecting the title to the trust property to the terms of this Lease and for no other purpose whatsoever. Any conveyance of the demised premises by the undersigned Lessor shall operate to release the Lessor and COLE TAYLOR BANK in every capacity from any and all obligations, if any, under this Lease. It is further expressly understood and agreed that no duty shall rest upon the Lessor or COLE TAYLOR BANK to sequester the trust property or the rents, issues and profits arising therefrom, or the profits arising from any sale or other disposition thereof.

## GUARANTY OF LEASE

**THIS GUARANTY** is made and entered into this 13th day of December, 1993, by BED BATH & BEYOND INC., a New York corporation ("Guarantor"), with an address at 715 Morris Avenue, Springfield, New Jersey 07081, to COLE TAYLOR BANK, not personally but as Trustee under Trust Agreement dated October 27, 1993, and known as Trust Number 934188 ("Landlord"), with an office in care of CMR Limited Partnership, 212 East Ohio Street, Suite 500, Chicago, Illinois 60611.

## W I T N E S S E T H :

In order to induce Landlord to demise to BED BATH & BEYOND OF LINCOLN PARK INC., a Illinois corporation (hereinafter with its successors and assigns to be referred to as "Tenant"), certain store premises in the shopping center known as Clybourn Square in Chicago, Illinois, pursuant to a lease of even date herewith (the "Lease"), Guarantor agrees as follows:

A.    That it does hereby unconditionally and absolutely guarantee to Landlord the full, prompt and complete payment by Tenant of the rent and all other sums payable by Tenant under the Lease during the Initial Guaranty Period or Secondary Guaranty Period (as such terms are hereinafter defined), whichever is applicable. The Initial Guaranty Period shall commence on the date hereof and shall expire on the earlier of (i) the date next preceding the ninth (9th) anniversary of the Commencement Date (as defined in the Lease) or (ii) the date on which the Lease may be terminated through no fault of Tenant.  The Secondary Guaranty Period shall be a single one (1) year period which shall commence upon a default by Tenant beyond the applicable notice and grace periods for the payment of rent or any other sum due and payable by Tenant under the Lease.

B.    That it does hereby waive notice of acceptance hereof and any and all other notices which by law or under the terms and provisions of the Lease are required to be given to Tenant, and it also waives any demand for or notice of default of the payment of rent and other sums payable by Tenant under the Lease; and Guarantor does further expressly hereby waive any legal obligation, duty or necessity for Landlord to proceed first against Tenant or to exhaust any remedy Landlord may have against Tenant, it being agreed that in the event of default in the full, prompt and complete payment by Tenant of the rent and all other sums payable by Tenant under the Lease, Landlord may proceed and have right of action solely against either Guarantor or Tenant or jointly against Guarantor and Tenant.

C.    That any modification, amendment, change or extension (collectively a "Modification") of any of the terms, covenants or conditions of the Lease which Tenant (which term shall include, without limitation, a trustee in bankruptcy) and Landlord may hereafter make, or any forbearance, delay, neglect or failure on the part of Landlord in enforcing any of the terms, covenants, conditions or provisions of the Lease, or any assignment of the Lease by Tenant (whether voluntarily or by operation of law), shall not in any way affect, impair or discharge Guarantor's unconditional liability to Landlord hereunder, nor shall Guarantor's liability hereunder be impaired, affected or discharged by any act done or omitted to be done or by any waiver by either Landlord or Tenant notwithstanding that Guarantor may not have consented thereto or may not have notice or knowledge thereof; provided, however, that Guarantor shall have no liability with respect to any Modification of the Lease made without Guarantor's consent by Landlord and an assignee of Tenant.

D.    That this Guaranty shall be in effect only during the Initial Guaranty Period or Secondary Guaranty Period and

thereafter with respect to each of Tenant's unpaid obligations, if any, which were due and payable during and relate solely to the Initial Guaranty Period or Secondary Guaranty Period, whichever is applicable. If on the date on which this Guaranty would otherwise expire, Tenant shall be in default in the payment of any of Tenant's obligations under the Lease arising during and applicable only to the Initial Guaranty Period or Secondary Guaranty Period, whichever is applicable, then, in such event, the term of this Guaranty shall continue only with respect to such unpaid obligations, but shall nevertheless expire and be of no further force or effect as to all obligations of Tenant which shall accrue or relate to any period subsequent to the Initial Guaranty Period or Secondary Guaranty Period, whichever is applicable; it being specifically agreed that any liability of Guarantor hereunder for the applicable Guaranty Period shall be determined as if the Lease had not been terminated.

E.    That Guarantor shall not be entitled to assert any defense against any claim asserted by Landlord in any suit or action instituted by Landlord to enforce this Guaranty or the Lease or be excused from any liability hereunder which Tenant could not make or invoke, and Guarantor hereby expressly waives any defense in law or in equity which is not or would not be available to Tenant, it being the intent hereof that the liability of Guarantor hereunder is primary and unconditional.

F.    That in the event suit or action be brought upon and in connection with the enforcement of this Guaranty, the prevailing party shall be entitled to receive reasonable attorneys' fees and all court costs incurred in connection with such suit or action.

G.    That this Guaranty shall be binding upon the successors and assigns of Guarantor and shall inure to the benefit of Landlord and it successors and assigns.

H.    That the officers signing for Guarantor do hereby certify that the same is a corporation duly organized, legally existing and in good standing under the laws of the State in which it is incorporated, and that the execution of this Guaranty has been authorized by appropriate action of its Board of Directors.

I.    That the execution and delivery of the Lease by Landlord shall be deemed conclusively to be an acceptance of and agreement to the provisions of this Guaranty.

Executed the date first above written.

ATTEST:                           BED BATH & BEYOND INC.

_____         By: _____
Assistant Secretary                   Warren Eisenberg, Chairman

## EXHIBIT A

## LEGAL DESCRIPTION OF SHOPPING CENTER

PARCEL 1:

Lots 1 to 6 and 21 to 26, all inclusive, in Block 6 in the subdivision of Lots 1 and 2 of Block 8 in Sheffield's addition to Chicago, situated in the west 1/2 of the south east 1/4 of Section 32, Township 40 North, Range 14 east of the third principal meridian, in Cook County, Illinois.

PARCEL 2:

Lots 4, 5, 6, 7, 8, 9 and that part of Lot 3 lying north and northwesterly of a line described as follows:

Beginning at a point in the west line of Sheffield Avenue, 244.47 feet south of the intersection of said west line of Sheffield Avenue with the southwesterly line of Clybourn Avenue thence west at right angles to said west line of Sheffield Avenue 81.58 feet more or less to its intersection with a line drawn parallel to and 164.47 feet southeasterly of the southeasterly line of Willow Street as now occupied; thence southwesterly along said parallel line 91.71 feet more or less to its intersection with the northeasterly line of Marcey Street; all in Block 9 in the subdivision of Lots 1 and 2 in Block 8 in Sheffield's addition to Chicago in the south 1/2 of Section 32, Township 40 North, Range 14 east of the third principal meridian, in Cook County, Illinois.

**EXHIBIT B**

**SITE PLAN**



**EXHIBIT C**

**THIS AGREEMENT**, made as of this _____ day of _____, 199_, by and between COLE TAYLOR BANK, not personally but as Trustee under Trust Agreement dated October 27, 1993, and known as Trust Number 934188, (hereinafter called "Landlord"), and BED BATH & BEYOND OF LINCOLN PARK INC. (hereinafter called "Tenant").

**W I T N E S S E T H:**

**WHEREAS**, Landlord is the owner of that certain real property described on Exhibit A, annexed hereto and made a part hereof; and

**WHEREAS**, by a certain Lease Agreement ("Lease") dated the ____ day of December, 1993, Landlord leased to Tenant a portion (hereinafter called the "Premises") of the real property described on Exhibit A hereto, a Memorandum of which Lease was recorded in the office of the _____ County Recorder of Deeds on the _____ day of _____, 199_ as Document No. _____; and

**WHEREAS**, Tenant is now in possession of the Premises and has commenced the payment of Fixed Minimum Rent pursuant to the terms of the Lease; and

**WHEREAS**, pursuant to Section 3 of the Lease, Landlord and Tenant agree to execute, acknowledge and deliver to each other an agreement setting forth the Commencement Date of the Lease, the expiration date of the original term of the Lease and the commencement dates of the extended periods.

**NOW, THEREFORE**, Landlord and Tenant agree as follows:

1. The Commencement Date was _____ day of _____, 199_.

2. The original term of the Lease expires on the 31st day of January, 200_.

3. The commencement date of the first extended period shall be the 1st day of February 200_.

4. The commencement date of the second extended period shall be the 1st day of February, 200_.

5. The commencement date of the third extended period shall be the 1st day of February, 20__.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Agreement to be executed the day and year first above written.

SIGNED IN THE PRESENCE OF:

    COLE TAYLOR BANK, not personally but as Trustee under Trust Agreement dated October 27, 1993, and known as Trust Number 934188

_____

    By:_____

    BED BATH & BEYOND OF LINCOLN PARK INC., an Illinois corporation

_____

    _____

STATE OF ILLINOIS          )
                           ) SS.:
COUNTY OF                  )

    I CERTIFY that on                    , 19,
           personally came before me and this person
acknowledged under oath, to my satisfaction, that:

    (a)  this person signed, sealed, and delivered the attached
document as                    of COLE TAYLOR BANK;

    (b) the proper corporate seal was affixed; and

    (c) this document was signed and made by the corporation as
its voluntary act and deed by virtue of authority from its Board
of Directors.

                          _____

STATE OF NEW JERSEY        )
                           ) SS.:
COUNTY OF UNION            )

    I CERTIFY that on _____, 19,
           personally came before me and this person
acknowledged under oath, to my satisfaction, that:

    (a)  this person signed, sealed, and delivered the attached
document as President of BED BATH & BEYOND OF LINCOLN PARK INC.;

    (b) the proper corporate seal was affixed; and

    (c) this document was signed and made by the corporation as
its voluntary act and deed by virtue of authority from its Board
of Directors.

                          _____

                  [ADD EXHIBIT A FROM LEASE]

## EXHIBIT D

## SPECIFICATIONS FOR LANDLORD'S WORK

1.   **Plans**- Landlord to provide for tenant's use six (6) complete sets of all required architectural and engineering drawings to complete landlord's work.  In addition, landlord to include tenant's fixture plan.

2.   **Flooring**- Combination carpet/wood floor to cover all sales area, layout per tenant's floor plan.  Type of carpet and wood per spec below.  Substitution only with tenant's approval.

a) All areas under wood floor to include a vinyl vapor barrier sub-flooring.  "Snap-T" or like molding to be installed wherever carpet meets wood flooring.  Color of molding to match carpet. Cove base in White-White to be installed on all exposed walls of selling floor and office.

b) Steps to mezzanine office to have rubber-type stair treads.

c) Stock room floor to be sealed concrete.

d) Lunchroom floor to be vinyl tile, spec below.  Area of lunchroom per tenant's specification.

e) Vestibule flooring, spec below.

f) Bathroom flooring, full ceramic tile floors and walls.

**Specifications:**
    Carpet - **mfg:** Stevens; **style:** Gulistan Connexus, 28 oz., with unitary backing; **color:** Stone Grey
    Wood - **mfg:** Hartco; **style:** Patterns Plus; **color:** Curry; **size:** 36" lengths to be installed on a 45 degree angle, or equal.
    Vinyl - **mfg:** Armstrong; **style:** Imperial Texture; **color:** 51904 Sterling
    Vestibule flooring: Interface Walk Off tile; **color:** charcoal

BED BATH & BEYOND            1

RCV. BY:COLE, SCHOTZ, BERNSTEIN;           ;     PM ;           03→    ....;12014891539;# 2

From:LAURA

3.  **Insulation**- 2" minimum insulation between exterior roof membrane and decking.

4.  **Ceiling**- Underside of roof shall be open and exposed, painted with two coats of white paint.

5.  **Ceiling Clearance**- 20' minimum clearance below all structure and sprinkler heads.  Sprinkler system should be designed to allow fixturing and storage to be within 18" of heads.

6.  **Painting**- In addition to ceiling, and including all pipes, ductwork, steel and decking, all interior walls and columns are to be primed and painted two coats Benjamin Moore Regal Aquaglo White #333-01.

7.  **Exposed Columns**- To be "boxed out" with white low pressure laminate (melamine) 3" O.C. slatwall up to 14', at corners install 1/4 round molding painted white per #6 above.

8.  **Lighting**- Fixtures to be provided as a combination of the following, per tenant's layout.

    - Robert Manufacturing: style S-7127-120V with P4 hanger including 250W metal halide lamp), bottom of fixture to be 12'6" above finished floor.

    - 8' fluorescent strip fixtures, to accommodate 2 high-output cool-white, energy efficient lamps (F96T12HO/CW/SS or similar), energy saving electronic high-output ballast, with reflector that has a 12% aperture option and pendant mounted at a height of 15'6" above finished floor to bottom of reflector.  Fluorescent lighting to be mounted on unistrut mounted to ceiling structure to enable tenant to adjust spacing between rows of lighting as necessary.

    - Up to 500 ft. Juno single circuit Trackmaster lighting track, 325 Juno style V689 track light fixtures with 75PAR30 lamps, and up to 50 Indy 701T-50 fluorescent wall-wash fixtures with General Electric 50W Biax 4100K lamps, to be distributed throughout the store per tenant's final layout.

9.  **Exit/Emergency Lights**- Per code as needed per tenant's fixture plan.

10.  **Outlets**- Standard duplex wall outlets provided per tenant's plan.  Outlets and outlet covers to be white.  Provide up to 20 trenched flush-to-floor outlets with covers per tenant's plan. In addition, two 110/220 receptacles on dedicated circuits provided for both telephone and alarm equipment to be located per tenant's plan.

All register bays and Cash Room, and Customer Service area to

BED BATH & BEYOND                    2

RCV.BY:COLE.SCHOTZ.BERNSTE    JA-D-BY-J-:4:14PM :        CC.  G3→   ....,12014891536:# 3
From:LAURA

include 2 quad receptacles (Hubbell 1G5362) or equivalent.
Island-type service desks to have 1 quad receptacle. For
additional information see "Addendum A", also see #11 below.

**11. Phone/Electric Conduits**- To "cash room" (designated on floor
plan) provide 2" conduit with drawstring from local telco
demarcation point. To register bays provide Walker duct complete
with drawstrings. To island-type service desks provide dual-
chamber power poles isolating phone from electric service,
painted white per #6 above.

**12. P.O.S/Computer Conduit**- See Addendum "A".

**13. Sign Conduit**- Conduit to be installed from panel box to
outdoor sign location(s). Also, necessary circuit feeds provided
to location(s) per tenant's plan, along with timer(s).

**14. Vestibule**- Interior or exterior vestibule to consist of
glass in anodized metal frames, and automatic doors (see #15
below). Flooring in vestibule to be tenant specified walk-off
tiles (see #2 above). All wall surfaces to be panelled in
Marlite. Bumper molding to be provided on all walls including
glass at tenant specified height. Bumper molding to consist of
aluminum channel with rubber or vinyl insert.

**15. Pay Phone**- Landlord to arrange for and provide a pay phone
within our store front area.

**16. Automatic Doors**- All sets to be Stanley's Dura Glide 2000
complete package, quantity per tenant's layout. Door should have
a lock set compatible with the Best core. Landlord to provide
for an electric strike on one door, designated by tenant as the
"Employee Entrance" door.

**17. Cart Corral**- Landlord to provide a cart corral for up to 100
shopping carts within and alongside the store front area.

**18. Loading Dock**- Trenched ramp (truck bed at store level)
loading dock to be provided with bumpers and 4' x 4' dock
leveler.

**19. Waste Removal**- Provide suitable pad and opening with door
for chute and standard compactor. In addition, provide
additional and/or special sprinkler protection in the area in
front of the chute opening to satisfy local codes.

**20. Receiving Area**- To include two (2) electrically operated 10'
wide roll-up doors. Reznor or similar type heater(s) provided
for receiving area. Also include heat curtain or similar heater
at each door opening. Provide conduit for tenant installed
doorbell/intercom system at the man door.

BED BATH & BEYOND                3

RCV BY:COLE SCHOTZ BERNSTE;    A- 9-23 ; 1:31PM ;    CS?? → ..... ;2014891589;# 4

From:LAURA

**21. Mezzanine Office-** Elevated mezzanine office to be constructed per tenant's specifications. Included should be up to four private offices as well as a general work area. All walls to be sound insulated. One office (cash room) to have automatic door closure and peep hole. All offices to have door hardware that will accept the Best core. Size and height of office, depending on height of ceiling, approximately 1000 sq. ft. General Office area and Cash Room to have built-in counter per tenant's floorplan.

**22. Lunch Room-** Layout as per tenants plan, to include painted walls, vinyl floor (as specified above), cabinets, counters and sink. There should be 4 duplex outlets installed for: refrigerator, microwave oven and vending machine(s) located per tenant's specifications.

**23. Lockers-** Provide up to 4 sets of boxed lockers, Republic model #753893, 18 lockers per set, 6 high x 3 wide, box size: 12" x 15", grey; with number plates, model #700405; with built-in Combination Locks, model #1654RH, include 2 master keys.

**24. Bathrooms-** As per code (proportioned to size of store) with power-Flush (tankless type) toilets. Each rest room to include a wall mounted infant changing table (JBJ Industries Koala Bear Care or equivalent) and a C-fold towel dispenser with an in-wall mounted stainless steel trash receptacle. Bathroom entrance to have "Men" and "Women" graphic braille signs on door or at entrance, and accessible route signs if necessary. Floor and walls to be full ceramic tiled.

**25. Mechanical System-** See Addendum "B".

**26. Refrigerated Water Fountain-** With filter located per tenant's floorplan.

**27. Fire Exits and Rear Door-** All to be equipped with local audible alarm "Detex" type locking panic bar systems that will accept the Best core.

**28. Fire Extinguisher-** Landlord to provide all fire extinguisher as required per local code.

**29. Fire Protection/Sprinkler-** Landlord shall provide a sprinkler and fire alarm system, which will provide the necessary sprinkler heads and fire alarm for the demised premises, as required by local authorities.

**30. Disability Access-** Provide wheelchair lift to mezzanine area per Federal guidelines.

**31. Utility Services-** See Addendum "C"

BED BATH & BEYOND                4

RCV BY:COLE SCHOTZ BERNSTE;    A  6-99  1:19PM ;    COI  3→  ..... 12014891596 # 5
From:LAURA

**32.** **Delivery**- Sixty (60) day written notice of delivery.

BED BATH & BEYOND                 5

RCV.BY:COLE, SCHOTZ, BERNSTEI    A⁻ 6⁻89⁻ : 1:14PM ;           CC1    3⁻    .... ..12014891599;# 8
                                                                        From:LAURA

ADDENDUM "A"

### Items Provided By General Contractor

1.   Contractor to provide a 4' x 8' x 3/4" plywood backboard for
     the local telco for their demarcation (coordinate with local
     telco), and all other necessary structures and/or accesses
     (e.g. conduits) for local telco use to bring phone trunks to
     the tenant's space, if not already provided. This
     requirement must be met at least one (1) month prior to
     tenant occupancy and must be coordinated with the local
     telco.

2.   A second plywood backboard, supported by unistrut, 8'H x 7'W
     x 3/4", in the Cash Room for a wiring wallfield, mounted 3"
     above the finished ceiling. The plywood must be painted
     fire-retardant white prior to the installation of any
     Contractor or telephone company wiring equipment.

     There should be approximately 3" of clearance between the
     plywood and the sheetrock wall. The two quad power
     receptacles must be flush with the front of the plywood.

     Please reference the Cash Room drawings.

3.   Floorboxes and conduits.

4.   Four (4) shelves in MIS Room. Approximately 6' W x 15" D.
     Please refer to Cash requirements drawing for the placement
     of the shelves.

5.   Lock on Cash Room door.

### Items Provided By Electrical Contractor

1.   AC CIRCUITS

All POS equipment must be on AC circuits dedicated to POS
equipment only. Electrician must use 1 circuit for every 2
terminals so that if 1 circuit is lost the remainder of the
system will function. POS equipment must be on a separate panel.
It MUST NOT be on a panel that supplies power to electric motors,
machines, or any inductively coupled load. All outlets must be
surge suppressed by a main surge suppressor attached to the
panel.

2.   AC RECEPTACLES

All POS terminals, peripherals, or equipment they communicate
with MUST be plugged into insulated/isolated ground outlets. Use

BED BATH & BEYOND                    6

Hubbell IG5362 Duplex receptacles beneath each POS terminal.
Every bay with 2 POS terminals will have 2 duplex receptacles.
In addition, each bay must have 2 duplex outlets on a separate
circuit and panel for non-POS equipment power.

3.    GROUNDING

All insulated/isolated ground wiring for Hubbel IG5362 outlets
must be run in conduit and grounded to the panel.  DO NOT ground
to the electrical conduit.

BED BATH & BEYOND                    7

RCV BY:COLE SCHOTZ BERNSTEI          001  97         12014881598;# 8
From:LAURA

## ADDENDUM "B"

### MECHANICAL

Provide air conditioning and heating systems capable of
maintaining space cooling and heating temperature of 78 F.Db,
65 F.Wb summer and 68 F.Db winter.

The system shall have the capacity to handle space exterior skin
load, outside air ventilation load, plus an internal heat load of
4.5 Watts/square foot. (Total load approximately 300-350 sq.
ft./ton).

The system shall have an economizer cycle to provide free cooling
in winter months.

The system shall operate at minimum efficiency as described in
local or state energy codes.

The system shall be fully automatic with programmable start/stop
and night setback.  Thermostats should be Honeywell T7400, with
remote sensors located for optimum efficiency.  All thermostats
to be located centrally in the Cash Office room on the mezzanine
level.

The system shall be zoned for interior and exterior exposures.

Landlord to assign all applicable warranties to tenant.

Provision shall be made for exhaust systems to the outdoors as
follows:

          1.   Toilet exhaust
          2.   Smoking room exhaust
          3.   Pantry exhaust

BED BATH & BEYOND              8

RCV BY:COLE, SCHOTZ, BERNSTEI ;10:19A ;      ;2014881536;# 8
From:LAURA

## ADDENDUM "C"

PLUMBING

Provide 3 1/2" valved and metered water service to demised
premise in agreed location.  Provide 4" plugged sanitary line to
demised premises in agreed location.  Provide 1230 F 1" capped
hot water line with associated reciprocation system to demised
premise in agreed location.  Provide 4" valved metered natural
gas service to demised premises capable of providing a minimum of
3000 ofh at 8" gas pressure.

ELECTRICAL

Provide electrical service feeder, main service switch and
separate utility metering sized to handle a 4.5 watts per square
foot load for lighting and miscellaneous power and a 1750 watts
per ton load for air conditioning to demised premise in agreed
location.

All utility service metering to be set up for the best possible
rate.  Consult tenant.

BED BATH & BEYOND                    9

## EXHIBIT E

## PERMITTED ENCUMBRANCES

1.   Unpaid real estate taxes for 1992 and 1993 which Landlord covenants and agrees to pay.

2.   Reservation of a royalty interest in any coal, oil, gas, casinghead gas, water, iron ore, and other ores and minerals of every kind and nature underlying the land contained in the deed dated June 16, 1987 and recorded June 17, 1987 as Document 87331856.   The company hereby insures that said reservation does not give the holder thereof the right to go on the insured land to extract any ores or minerals and does not obligate the owner of the insured land to mine or extract said minerals.

3.   (a)   Encroachment of the signs located on the land as follows:

(i)   Encroachment of the sign located on the northeasterly corner of Lot 9 onto the property northeasterly and adjoining by an undisclosed distance.

(ii)   Encroachment of the sign located on the southwesterly corner of Lot 1 onto the property southerly and adjoining by an undisclosed distance.

(iii)   Encroachment of the sign located on the easterly side of Lot 24 onto the property easterly and adjoining by an undisclosed distance.

(b)   Encroachment of the canopies located on the land as follows:

(i)   Encroachment of the canopy located on the easterly side of Lots 21 and 22 onto the property easterly and adjoining by an undisclosed distance.

(ii)   Encroachment of the canopy located on the easterly side of Lot 25 onto the property easterly and adjoining by an undisclosed distance.

(c)   Encroachment of the building located on the land onto the property southerly and adjoining by approximately 0.03 feet (building located on Lot 1).

(d)   Encroachment of the corrugated metal enclosed stairwell located on the land onto the property westerly and adjoining by approximately 0.32 feet to 0.46 feet (located on Lots 2 and 3).

(e)   Encroachment of fire escape over and upon the land lying southeasterly and adjoining Lot 1 in Block 6 as disclosed by survey noted at J.

(f)   Encroachment of metal grates over light wells over and upon the land lying southeasterly and adjoining Lots 1 and 26 in Block 6 as disclosed by survey noted at J.

(g)   Encroachment of concrete pavement over and upon the southeasterly 0.02 of a foot of land lying northwesterly and adjoining Lot 21 in Block 6 as disclosed by survey noted at J.

(h)   Encroachment of gate post over and upon the northwesterly 0.17 of a foot of Lot 6 in Block 6 as disclosed by survey noted at J.

(i)   Encroachments of building located on the land over and upon land lying northeasterly and adjoining as noted above:

(i)   The southwesterly 0.40 of a foot of that part lying northwesterly and adjoining Lot 22 in Block 6.

(ii)   The southwesterly 0.03 of a foot of that part lying northwesterly and adjoining Lots 23 and 24 in Block 6.

(iii)   The southwesterly 0.35 of a foot of that part lying northwesterly and adjoining Lot 25 in Block 6.

(iv)   The southwesterly 0.32 of a foot of that part lying northwesterly and adjoining Lot 26 in Block 6 as disclosed by survey noted at J.

(j)   Encroachment of stone coping above the first floor over and upon the southwesterly 1.46 feet of that part of the land lying northeasterly and adjoining Lot 26 in Block 6 as disclosed by survey noted at J.

(k)   Encroachment of stone coping at the second floor over and upon the northwesterly 0.70 of a foot of the land lying southeasterly and adjoining as disclosed by survey noted at J.

(l)   Encroachment of walk over and upon the northeasterly 0.31 of a foot of Lot 9 in Block 9 as disclosed by survey by Chicago Guarantee Surety Company Order No. 8611020 dated November 25, 1986, and Order No. 9304020 dated June 30, 1993.

**EXHIBIT F**

**SIGNS**



Sign letters shall be individually channelled.
Colors shall be blue and white.