

**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

May 30, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

 5/30/2023, NY & NATL, pg B4

*Larnyce Tabron*



JOHN McGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.05.30 11:21:37 -04'00'

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

In re:                          Chapter 11
BED BATH & BEYOND INC., *et al.,*    Case No. 23-13359 (VFP)
Debtors.¹                       (Jointly Administered)

**NOTICE OF LEASE AUCTION
AND POTENTIAL LEASE SALE HEARING**

**PLEASE TAKE NOTICE** that on May 22, 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief [Docket No. 422] (the "Lease Sale Procedures Order"), by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct an auction (the "Lease Auction") for the sale of certain unexpired leases, including with any ancillary agreement(s) thereto or through the sale of designation rights related thereto (the "Lease Assets"), a schedule of which is attached hereto as **Schedule 1**. The Debtors, in consultation with the Consultation Parties, reserve their rights to amend, supplement, or otherwise modify the schedule of Lease Assets prior to the Lease Auction.

**PLEASE TAKE NOTICE** that the Debtors are soliciting offers for the sale, liquidation, or other disposition of certain of the Debtors' Lease Assets consistent with the Lease Sale Procedures approved by the Court by entry of the Lease Sale Procedures Order. **All interested bidders should carefully read the Lease Sale Procedures and Lease Sale Procedures Order.** To the extent that there are any inconsistencies between this notice and the Lease Sale Procedures or Lease Sale Procedures Order, the Lease Sale Procedures or Lease Sale Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Lease Sale Procedures, the Debtors will conduct a Lease Auction of certain of the Debtors' Lease Assets **on or about June 26, 2023, at 10:00 a.m. (prevailing Eastern Time)** at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022 (or at any other location as the Debtors may hereafter designate on proper notice).

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Lease Sale(s) at the hearing scheduled to commence on or before **July 18, 2023, at 2:30 p.m. (prevailing Eastern Time)** (the "Lease Sale Hearing") before the Honorable Vincent F. Papalia, at the Court, Courtroom 3B, Martin Luther King Jr. Federal Building, 50 Walnut Street, 3rd Floor, Newark, NJ 07102.

**PLEASE TAKE FURTHER NOTICE** that objections to approval of the proposed Lease Sale, the proposed assumption and assignment, and/ or to the Successful Bidder's proposed form of adequate assurance of future performance must file a written objection (each, a "Lease Sale Objection") so that such objection is filed with the Court so as to be **actually received** by **July 11, 2023, at 5:00 p.m., (prevailing Eastern Time)** and serve such Objection on: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Joshua A. Sussberg, P.C., Emily E. Geier, P.C., Derek I. Hunter, and Ross J. Fiedler; and Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Esq., Warren A. Usatine, Esq., and Felice R. Yudkin, Esq.,

proposed co-counsel to the Debtors; (b) the Office of the United States Trustee for the District of New Jersey, Attn: Fran B. Steele and Alexandria Nikolinos; (c) Pachulski Stang Ziehl & Jones LLP, 780 3rd Ave #34, New York, NY 10017, Attn: Robert J. Feinstein, Bradford J. Sandler, Paul J. Labov and Colin R. Robinson, proposed counsel to the Committee; (d) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Adam Shpeen, Steven Szanzer, counsel to the Prepetition ABL Agent; and (e) Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, Attn: David M. Hillman and Charles A. Dale, counsel to the DIP Agent.

**CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION
ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A LEASE SALE ON OR BEFORE THE TRANSACTION OBJECTION DEADLINE IN ACCORDANCE WITH THE LEASE SALE PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH LEASE SALE, INCLUDING WITH RESPECT TO THE DISPOSITION OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN SUCH OTHER AGREEMENT WITH THE SUCCESSFUL BIDDER.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Lease Sale Procedures Motion, Lease Sale Procedures, and the Lease Sale Procedures Order, as well as all related exhibits, including the form assumption and assignment agreement and form lease termination agreement, are available: (a) upon request to Kroll Restructuring Administration LLC (the notice and claims agent retained in these Chapter 11 Cases) by calling (833) 332-9937 (toll free) or, for international callers, +1 (646) 440-4757; (b) by visiting the website maintained in these Chapter 11 Cases at https://restructuring.ra.kroll.com/bbby; or (c) for a fee via PACER by visiting http://www.njb.uscourts.gov.

Dated: May 25, 2023, /s/ Michael D. Sirota COLE SCHOTZ P.C., Michael D. Sirota, Esq., Warren A. Usatine, Esq., Felice R. Yudkin, Esq., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Telephone: (201) 489-3000, Email: msirota@coleschotz.com, wusatine@coleschotz.com, fyudkin@coleschotz.com -and- KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP, Joshua A. Sussberg, P.C. (admitted pro hac vice), Emily E. Geier, P.C. (admitted pro hac vice), Derek I. Hunter (admitted pro hac vice), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: joshua. sussberg@kirkland.com, emily.geier@kirkland.com, derek.hunter@ kirkland.com, Proposed Co-Counsel for Debtors and Debtors in Possession

¹  The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Lease Sale Procedures Order or the Debtors' Motion for Entry of an Order (I) Establishing Sales Procedures, (II) Approving the Sale of Certain Real Property and Leases, and (III) Granting Related Relief [Docket No. 193], as applicable.

**AVIATION | TECHNOLOGY**

# New York City Moves to Regulate the Use of A.I. in Hiring Decisions

FROM FIRST BUSINESS PAGE

those questions," said Julia Stoyanovich, an associate professor at New York University and director of its Center for Responsible A.I.

But even before it takes effect, the New York City law has been a magnet for criticism. Public interest advocates say it doesn't go far enough, while business groups say it is impractical.

The complaints from both camps point to the challenge of regulating A.I., which is advancing at a torrid pace with unknown consequences, stirring enthusiasm and anxiety.

Uneasy compromises are inevitable.

Ms. Stoyanovich is concerned that the city law has loopholes that may weaken it. "But it's much better than not having a law," she said. "And until you try to regu-

> ### 'Until you try to regulate, you won't learn how.'
> Julia Stoyanovich, director of the Center for Responsible A.I. at New York University.

late, you won't learn how."

The law applies to companies with workers in New York City, but labor experts expect it to influence practices nationally. At least four states — California, New Jersey, New York and Vermont — and the District of Columbia are also working on laws to regulate A.I. in hiring. And Illinois and Maryland have enacted laws limiting the use of specific A.I. technologies, often for workplace surveillance and the screening of job candidates.

The New York City law emerged from a clash of sharply conflicting viewpoints. The City Council passed it during the final days of the administration of Mayor Bill de Blasio. Rounds of hearings and public comments, more than 100,000 words, came later — overseen by the city's Department of Consumer and Worker Protection, the rule-making agency.

The result, some critics say, is overly sympathetic to business interests.

"What could have been a landmark law was watered down to lose effectiveness," said Alexandra Givens, president of the Center for Democracy & Technology, a policy and civil rights organization.

That's because the law defines an "automated employment decision tool" as technology used "to substantially assist or replace discretionary decision making," she said. The rules adopted by the city appear to interpret that phrasing narrowly so that A.I. software will require an audit only if it is the lone or primary factor in a hiring decision or is used to overrule a human, Ms. Givens said.

That leaves out the main way the automated software is used, she said, with a hiring manager invariably making the final choice. The potential for A.I.-driven discrimination, she said, typically comes in screening hundreds or thousands of candidates down to a handful or in targeted online recruiting to generate a pool of candidates.

Ms. Givens also criticized the law for limiting the kinds of groups measured for unfair treatment. It covers bias by sex, race and ethnicity, but not discrimination against older workers or those with disabilities.

"My biggest concern is that this becomes the template nationally when we should be asking much more of our policymakers," Ms. Givens said.

The law was narrowed to sharpen it and make sure it was focused and enforceable, city officials said. The Council and the worker protection agency heard from many voices, including public-interest activists and software companies. Its goal was to weigh trade-offs between innovation and potential harm, officials said.

"This is a significant regulatory success toward ensuring that A.I. technology is used ethically and responsibly," said Robert Holden, who was the chair of the Council committee on technology when the law was passed and remains a committee member.



Julia Stoyanovich, an associate professor at N.Y.U., is concerned that the law has loopholes that may weaken it.　MARY INHEA KANG FOR THE NEW YORK TIMES

New York City is trying to address new technology in the context of federal workplace laws with guidelines on hiring that date

to the 1970s. The main Equal Employment Opportunity Commission rule states that no practice or method of selection used by em-

ployers should have a "disparate impact" on a legally protected group like women or minorities.

Businesses have criticized the

law. In a filing this year, the Software Alliance, a trade group that includes Microsoft, SAP and Workday, said the requirement for independent audits of A.I. was "not feasible" because "the auditing landscape is nascent," lacking standards and professional oversight bodies.

But a nascent field is a market opportunity. The A.I. audit business, experts say, is only going to grow. It is already attracting law firms, consultants and start-ups.

Companies that sell A.I. software to assist in hiring and promotion decisions have generally come to embrace regulation. Some have already undergone outside audits. They see the requirement as a potential competitive advantage, providing proof that their technology expands the pool of job candidates for companies and increases opportunity for workers.

"We believe we can meet the law and show what good A.I. looks like," said Roy Wang, general counsel of Eightfold AI, a Silicon Valley start-up that produces software used to assist hiring managers.

The New York City law also takes an approach to regulating A.I. that may become the norm. The law's key measurement is an "impact ratio," or a calculation of the effect of using the software on a protected group of job candidates. It does not delve into how an algorithm makes decisions, a concept known as "explainability."

In life-affecting applications like hiring, critics say, people have a right to an explanation of how a decision was made. But A.I. like ChatGPT-style software is becoming more complex, perhaps putting the goal of explainable A.I. out of reach, some experts say.

"The focus becomes the output of the algorithm, not the working of the algorithm," said Ashley Casovan, executive director of the Responsible AI Institute, which is developing certifications for the safe use of A.I. applications in the workplace, health care and finance.

---

# Cathay Pacific Is Fighting to Emerge From the Pandemic's Long Shadow

FROM FIRST BUSINESS PAGE

vals "have emerged leaner, fitter and eager to take customers away from us," the company's chief executive, Ronald Lam, said in a video message to employees in January, trying to rally them around a plan "to survive and thrive." Cathay Pacific climbed back to 50 percent of its prepandemic flight capacity only in March.

The problems continue. Last week, in an internal memo, Mr. Lam informed Cathay Pacific's staff that three employees had been fired after an audio recording went viral of cabin crew members ridiculing a passenger's English. Mr. Lam said the employees had caused "significant damage to the image of Hong Kong and Cathay."

The episode was a reminder of the delicate task Cathay Pacific faces in navigating its relationship with China. China is a vital market for the airline, but its economy is still recovering after being closed off to Hong Kong and the rest of the world for nearly three years. Before the pandemic, Cathay flew from Hong Kong to 119 places in 35 countries, including 26 destinations in China. Its convenient flight times from cities across China allowed passengers to change planes in Hong Kong by

night and arrive in the United States or Europe by morning or early afternoon.

At the height of the Omicron outbreak in January 2022, when the Hong Kong government banned inbound flights from countries including the United States, Australia and the United Kingdom, the airline was flying at only 2 percent of its passenger flight capacity.

In a statement, the airline said it aimed to return to 70 percent

> ## An airline that relied on Hong Kong's role as a gateway to Asia.

flight capacity and 80 destinations by the end of 2023, with 160 flights per week to 16 airports in mainland China.

Even after Hong Kong removed its Covid-related rules and quarantine requirements, Beijing's determined influence over the former British colony still threatens the reputation it has enjoyed for decades as an attractive, freewheeling destination for business.

Just as Hong Kong was the world's portal to China, Cathay Pacific was a vanguard in con-



The pandemic lockdowns that came on the heels of the turmoil of pro-democracy protests hit Cathay Pacific hard.　ANTHONY KWAN FOR THE NEW YORK TIMES

necting emerging economies in Asia to New York, London and Paris. Founded in 1946, it was one of the city's most important brands, known for its punctuality and premium service. The airport's third runway opened last year to accommodate Beijing's plans to integrate Hong Kong with Macau and nine cities in the Guangdong province into a tech hub known as the Greater Bay Area.

Cathay Pacific said it doesn't expect a full recovery until next year. Its most immediate challenges are restoring its pilot and cabin crew head count, and increasing flight capacity.

To cut costs, Cathay has slashed pilot base salaries by about 40 percent, angering many members of its aircrew. In January, in response to the airline's use of fewer flight attendants per flight and reduction of recovery time between long flights, the Cathay Pacific Flight Attendants Union introduced a "work to rule" campaign: discouraging flight attendants from performing duties beyond the scope of company guidelines. Officials with Hong Kong's Airport Authority said in May that they had observed a trend of lower taxiing speeds among Cathay pilots after the airline's new pay

structure in effect gave them a disincentive from completing flights earlier than scheduled.

"They said we've got to save cash, but there's not much point saving cash if you haven't got an airline at the end of it," said Paul Weatherilt, chairman of the Hong Kong Aircrew Officers Associa-

tion, a pilot's union, and a Cathay Pacific pilot for nearly three decades. "And that's sort of the position they're in now. They have half the airline."

Before 2019, the airline had 3,840 pilots. Since then, 1,900 have resigned, according to the Aircrew Officers Association. The number of captains, the most senior pilots, has been halved. And while Cathay Pacific rehired dozens of pilots from the shuttered Cathay Dragon division in 2021 and 2022, many had to take pay cuts and demotions when accepting their offers. The lack of flights during the pandemic slowed the development of the training that first and second officers need to become captains. Senior pilot trainers and flight simulator instructors quit.

Despite its struggles, some industry analysts are optimistic that Cathay Pacific will recover. The company reported an annual profit last year, its first since 2019. Its flights are about 90 percent full, which is better than before the pandemic, and high ticket prices have helped revenue. During the pandemic, business from cargo flights kept the airline afloat.

But no market is as important now to Cathay Pacific, or as potentially fraught, as China.

The most recent trouble stemmed from the complaint of a passenger who had flown on May 21 from the southwestern Chinese city of Chengdu to Hong Kong and posted a recording of flight attendants overheard in the galley

laughing about a passenger who had apparently requested a "carpet" instead of a blanket. "If you cannot say 'blanket' in English, you cannot have it," one flight attendant said in the recording.

The recording dominated discussions on Chinese social media, with people posting about what they saw as a history of snubs by the airline's flight attendants against mainland passengers. Xinhua, a state media agency criticized the airline for "arrogance," "bad service" and a lack of sincerity. "If it doesn't correct its old habits, Cathay Pacific won't fly far," read the headline of an editorial article.

Hong Kong's top government leader, John Lee, joined the rebukes. "The words and deeds of the flight attendants hurt the feelings of compatriots in Hong Kong and the mainland and destroyed Hong Kong's traditional culture and values of respect and courtesy," he said in a Facebook post.

Cathay Pacific apologized on Weibo on Tuesday and said that the airline would open an investigation. By Wednesday, three flight attendants had been fired.

"We had to respond and act swiftly, which was necessary to protect the interest of the company and in turn our people overall," Mr. Lam wrote in the internal memo to employees on Thursday.

He added that the remarks were a blow to the airline's reputation. "Whilst the incident has caused a setback to our rebuild journey, let's embrace it as a valuable lesson," he wrote.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

[Legal notices and bankruptcy sale hearing notices appear in small print in the bottom columns of the page, including notices of auction and potential lease sale hearing for BED BATH & BEYOND INC., et al., Case No. 23-13359 (VFP), and related Chapter 11 bankruptcy proceedings.]