# EXHIBIT "A"

# LEASE AGREEMENT

Between

## WATER TOWER SQUARE ASSOCIATES,
a Pennsylvania limited partnership
Landlord

And

## BED BATH & BEYOND INC.,
a New York corporation,
Tenant

## WATER TOWER SQUARE
Montgomeryville, Pennsylvania

Dated as of: ~~June~~ July 9, 2015

* * * * * *

bbBaby

**TABLE OF CONTENTS**

Page

ARTICLE 1  BASIC TERMS AND DEFINITIONS ............................................................ 1
    Section 1.1        Basic Terms and Definitions............................................. 1

ARTICLE 2  LEASE OF PREMISES; LEASE TERM; DELIVERY DATE.................... 5
    Section 2.1        Lease of Premises ........................................................... 5
    Section 2.2        Term ................................................................................. 5
    Section 2.3        Delivery Date .................................................................. 6
    Section 2.4        Slack Period .................................................................... 7
    Section 2.5        Permits Contingency ....................................................... 7

ARTICLE 3  IMPROVEMENTS ......................................................................................... 7
    Section 3.1        Landlord's Work and Tenant's Work................................ 7
    Section 3.2        Plan Approvals ................................................................ 8
    Section 3.3        Performance of Work ....................................................... 8

ARTICLE 4  FIXED RENT, TAXES: DETERMINATION AND PAYMENT ........... 12
    Section 4.1        Fixed Rent ..................................................................... 12
    Section 4.2        Payment of Rent............................................................. 12
    Section 4.3        Real Estate and Other Taxes .......................................... 12

ARTICLE 5  COMMON AREAS, THEIR USE AND CHARGES............................... 14
    Section 5.1        Common Areas: Maintenance......................................... 14
    Section 5.2        Common Areas: Restrictions .......................................... 17

ARTICLE 6  UTILITIES .................................................................................................. 20
    Section 6.1        Utility Service ................................................................ 20
    Section 6.2        Interruption.................................................................... 20

ARTICLE 7  SIGNS .......................................................................................................... 20
    Section 7.1        Tenant's Building Signage.............................................. 20
    Section 7.2        Pylon/Monument Signage.............................................. 20
    Section 7.3        Signage: Alteration/Removal/Allocation ....................... 21
    Section 7.4        Cooperation ................................................................... 21
    Section 7.5        Signage and Building Restrictions and Criteria.............. 21

ARTICLE 8  ALTERATIONS AND IMPROVEMENTS ............................................. 22
    Section 8.1        Alterations and Improvements........................................ 22

ARTICLE 9  REPAIRS...................................................................................................... 24
    Section 9.1        Tenant's Repairs ............................................................ 24
    Section 9.2        Landlord's Repairs ......................................................... 24
    Section 9.3        Legal Compliance Work ................................................ 25

ARTICLE 10  INDEMNIFICATION, INSURANCE AND WAIVER OF
SUBROGATION ............................................................................................................... 25
    Section 10.1      Mutual Release, Waiver of Subrogation and Mutual Indemnification 25
    Section 10.2      Tenant's Insurance ......................................................... 26
    Section 10.3      Landlord's Insurance ...................................................... 27
    Section 10.4      General Insurance Requirements .................................... 27

ARTICLE 11  FIRE AND OTHER CASUALTY; EMINENT DOMAIN .................... 28
    Section 11.1      Fire and Other Casualty ................................................. 28
    Section 11.2      Eminent Domain ............................................................ 30
    Section 11.3      Abatement of Rent Charges ........................................... 31

ii

bbBaby

ARTICLE 12  COVENANTS, REPRESENTATIONS AND WARRANTIES.............. 31
 Section 12.1  Quiet Enjoyment ...................................................................... 31
 Section 12.2  Authority ................................................................................... 31
 Section 12.3  Landlord's Covenants, Warranties and Representations .............. 32
 Section 12.4  Environmental Matters.............................................................. 33

ARTICLE 13  USES AND RESTRICTIONS .......................................................... 35
 Section 13.1  Permitted and Prohibited Uses................................................. 35
 Section 13.2  Tenant's Exclusive in Center ................................................... 35
 Section 13.3  Exclusives Which Tenant Must Honor ..................................... 37

ARTICLE 14  CONDUCT OF BUSINESS OPERATIONS....................................... 37

ARTICLE 15  TENANT ASSIGNMENT AND SUBLETTING................................ 38
 Section 15.1  Assignment and Subletting ...................................................... 38
 Section 15.2  Liability of Tenant ................................................................... 39
 Section 15.3  Collateral Assignment.............................................................. 40
 Section 15.4  Cure Rights of Original Tenant................................................. 40
 Section 15.5  Recognition Agreement ............................................................ 41

ARTICLE 16  DEFAULT AND DISPUTE RESOLUTION .................................... 41
 Section 16.1  Tenant Default ......................................................................... 41
 Section 16.2  Landlord Default ...................................................................... 42
 Section 16.3  Arbitration ............................................................................... 43

ARTICLE 17  RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
CERTIFICATE .................................................................................................... 43
 Section 17.1  Right to Mortgage and Non-Disturbance................................... 43
 Section 17.2  Estoppel Certificate.................................................................. 44
 Section 17.3  Existing Mortgages and Ground Leases .................................... 44

ARTICLE 18  NOTICE ......................................................................................... 45

ARTICLE 19  TENANT'S PROPERTY .................................................................. 45

ARTICLE 20  END OF TERM ............................................................................... 45
 Section 20.1  Surrender of Premises .............................................................. 45
 Section 20.2  Hold Over ................................................................................ 45

ARTICLE 21  INTENTIONALLY DELETED......................................................... 46

ARTICLE 22  ONGOING CO-TENANCY ............................................................. 46

ARTICLE 23  MISCELLANEOUS......................................................................... 46
 Section 23.1  Loading Facilities..................................................................... 46
 Section 23.2  Liens ........................................................................................ 47
 Section 23.3  Broker's Commission ............................................................... 47
 Section 23.4  Force Majeure .......................................................................... 47
 Section 23.5  Consents .................................................................................. 48
 Section 23.6  Costs........................................................................................ 48
 Section 23.7  Attorneys' Fees ........................................................................ 48
 Section 23.8  Survival of Obligations............................................................. 48
 Section 23.9  Non-Waiver.............................................................................. 48
 Section 23.10  Rights Cumulative .................................................................... 48
 Section 23.11  Definition of Landlord .............................................................. 48
 Section 23.12  Successors and Assigns............................................................. 48
 Section 23.13  Limitation of Landlord's Liability ............................................ 49
 Section 23.14  Limitation of Tenant's Liability................................................ 49
 Section 23.15  Joint and Several Liability ........................................................ 49

iii

bbBaby

Section 23.16    Severability ................................................................ 49
Section 23.17    Grammatical Usages and Construction.......................................... 49
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings ........ 49
Section 23.19    Definition of Hereunder, Herein, etc ........................................... 49
Section 23.20    Short Form Lease ................................................................ 49
Section 23.21    Entire Agreement and Modification ........................................... 49
Section 23.22    No Joint Venture or Partnership Created by Lease......................... 50
Section 23.23    Tenant's Tradename................................................................ 50
Section 23.24    Counterparts........................................................................ 50
Section 23.25    Waiver of Trial by Jury........................................................... 50
Section 23.26    Timely Billing of Charges ....................................................... 50
Section 23.27    Ethical Conduct Policy ........................................................... 50
Section 23.28    Confidentiality .................................................................... 50
Section 23.29    Governing Law ................................................................... 51

## EXHIBITS

Exhibit A        Legal Description of Shopping Center
Exhibit B        Site Plan
Exhibit C        Form of Rent Commencement and Expiration Date Agreement
Exhibit D        Specifications for Landlord's Work
Exhibit D-1      Exterior Elevations of the Premises, and Sidewalk Plan
Exhibit E        Permitted Encumbrances
Exhibit F        Tenant's Signage
Exhibit G        Form of Subordination, Non-Disturbance and Attornment Agreement
Exhibit H        Form of Subtenant Recognition Agreement
Exhibit I        Home Depot Consent
Exhibit J        Form of Delivery Date Certification
Exhibit K-1      Existing Exclusives
Exhibit K-2      Existing Leases
Exhibit L        Alternate Rent
Exhibit M        Prohibited Uses

bbBaby

iv

## LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of June *July 9*, 2015, by and between WATER TOWER SQUARE ASSOCIATES, a Pennsylvania limited partnership, having an office at c/o Goldenberg Management, Inc., 350 Sentry Parkway, Building 630, Suite 300, Blue Bell, PA 19422 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

## W I T N E S S E T H:

### ARTICLE 1
### BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent (defined in Subsection 1.1.11 below).

1.1.2    Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  As defined in and payable in the manner set forth in Exhibit L attached hereto.

1.1.4    Common Areas:  All areas in the Shopping Center (defined in Subsection 1.1.30 below) which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas and utility lines serving such common areas and facilities.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6    Delivery Date:  As defined in Section 2.3 hereof.

1.1.7    Effective Date:  The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10    Exhibits:  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11    Fixed Rent:  The following amounts for the periods indicated:

(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the Initial Term (defined in Subsection 1.1.39 below), at the rate of Two Hundred Fifty-Three Thousand Nine Hundred Twenty-Four and 00/100 ($253,924.00) Dollars per year [based on Eleven and 00/100 ($11.00) Dollars per square foot of Floor Area (defined in Subsection 1.1.12 below) in the Premises].

(b)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period (defined in Subsection 1.1.27 below), at the rate of Two Hundred Seventy-Seven Thousand Eight and 00/100 ($277,008.00) Dollars per year [based on Twelve and 00/100 ($12.00) Dollars per square foot of Floor Area in the Premises].

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Three Hundred Thousand Ninety-Two and 00/100 ($300,092.00) Dollars per year [based on Thirteen and 00/100 ($13.00) Dollars per square foot of Floor Area in the Premises].

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Three Hundred Twenty-Three Thousand One Hundred Seventy-Six and 00/100 ($323,176.00) Dollars per year [based on Fourteen and 00/100 ($14.00) Dollars per square foot of Floor Area in the Premises].

1.1.12    _Floor Area_:  The actual number of square feet of space contained on all floors within any building or permanently enclosed structure in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants or occupants (other than exterior loading dock areas, trash compactor areas and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13    _Force Majeure_:  As defined in Section 23.4 hereof.

1.1.14    _Ground Lessor_:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15    _Hazardous Substances_:  As defined in Subsection 12.4.1 hereof.

1.1.16    _Landlord_:  As defined in the preamble and Section 23.11 hereof.

1.1.17    _Landlord's Mailing Address_:  c/o Goldenberg Management, Inc., 350 Sentry Parkway, Building 630, Suite 300, Blue Bell, PA 19422 , or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

1.1.18    _Landlord's Post-Delivery Date Work_:  As defined in Section 3.1 hereof.

1.1.19    _Landlord's Pre-Delivery Date Work_:  As defined in Section 3.1 hereof.

1.1.20    _Landlord's Work_:  As defined in Section 3.1 hereof.

2

bbBaby

1.1.21  Lease Interest Rate:  The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.22  Legal Requirements:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof, including, without limitation, the Americans with Disabilities Act and federal, state, and local governmental interpretations thereof.

1.1.23  Mortgagee:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24  Permitted Use:  The sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of the following: infant's, juvenile's and children's furniture, furnishings, beds (including, without limitation, mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, maternity clothing and related items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food or formula for infants, juveniles and children, feeding items, safety items, nursing items, health and beauty care items, food and beverages, drug remedies, diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, pregnancy books, magazines, computer software, audio and video cassettes or tapes, picture frames, portrait studio items and services, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items, hair cutting services, fitness center development and learning services, and any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.25  Premises:  Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and, for all purposes of this Lease, deemed to contain twenty-three thousand eighty-four (23,084) square feet of Floor Area, notwithstanding the actual number of square feet of Floor Area within the Premises.

1.1.26  Renewal Option:  As defined in Subsection 2.2.2 hereof.

1.1.27  Renewal Period(s):  Three successive periods of five (5) years each, as provided in Subsection 2.2.2 hereof.

1.1.28  Rent:  Fixed Rent and/or Additional Rent.

1.1.29  Rent Commencement Date:  As defined in Section 2.2 hereof.

1.1.30  Shopping Center:  The shopping center commonly known as Water Tower Square, containing approximately two hundred sixty-five thousand (265,000) square feet of Floor Area, on the property located at Horsham Road and North Wales Road, Montgomeryville, Pennsylvania, and more particularly described in Exhibit A hereto.

3

bbBaby

Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.31   Substantially Completed or Substantial Completion: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Post-Delivery Date Work) to the extent that only so called "punch list items" of such work shall not be completed.

1.1.32   Taxes: As defined in Subsection 4.3.3 hereof.

1.1.33   Tenant: As defined in the preamble hereof.

1.1.34   Tenant's Mailing Address: 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.35   Tenant's Permits: As defined in Subsection 12.3(k) hereof.

1.1.36   Tenant's Property: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.37   Tenant's Pro Rata Share: A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than ten (10%) percent (*"Tenant's Maximum"*).  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.  Notwithstanding the foregoing, to the extent that any tenant or collection of tenants (other than Tenant) or an owner of any portion of the Shopping Center, pays the real estate taxes, costs of maintaining the Common Areas and/or the insurance premiums relative to such owner('s)(s') or tenant('s)(s') portion(s) (each, a *"Stand-Alone Tenant"*), then:  (a) the amounts thereof shall not be included in the Taxes and/or Common Areas Charges, as the case may be, for which Tenant is responsible; and (b) the denominator used to determine Tenant's Pro Rata Share of Taxes and/or Common Areas Charges shall be reduced by the Floor Area of the Stand-Alone Tenant and Tenant's Pro Rata Share shall be adjusted accordingly; and (c) Tenant's Pro Rata Share as so adjusted shall be deemed Tenant's Maximum with respect to such items; the foregoing, however, shall be subject to the following terms and conditions:  (A) with respect to Taxes, such tenant(s) (or, as applicable owner(s)) shall in any event remain responsible for a proportionate share of Taxes allocable to the Common Areas based on the proportion which the Floor Area of its building bears to the total Floor Area of the Shopping Center (which proportionate share of Taxes shall be excluded from Taxes in the manner described in the preceding clause (a) of this Subsection 1.1.37), and (B) with respect to Common Areas Charges including without limitation insurance costs, such tenant(s) (or, as applicable owner(s)) shall in any event remain responsible for the proportionate share of Common Areas Charges based on the proportion which the Floor Area of its building bears to the total Floor Area of the Shopping Center (which proportionate share of Common Areas Charges shall be excluded from Common Areas Charges in the manner described in

4

the preceding clause (a) of this Subsection 1.1.37). Notwithstanding the foregoing, any allocation of Common Areas Charges shall at all times remain equitable.

        1.1.38   Tenant's Work:  As defined in Section 3.1 hereof.

        1.1.39   Term:  A period (the *"Initial Term"*) of approximately ten    (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Subsection 2.2.2 below; provided, however, in no event shall the Term, including all Renewal Periods exceed twenty-nine (29) years eleven (11) months from the Delivery Date; and (ii) *"Expiration Date"* shall mean the date on which the Term expires.

        1.1.40   Theater Tract:  That part of the Shopping Center shown labeled "Theater Tract" on Exhibit B hereto.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

        Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

        Section 2.2    Term.

        2.2.1   Initial Term.  Although this Lease shall become effective upon execution hereof, subject to the provisions of this Article 2, the Term shall begin on the earlier of (such earlier date being referred to herein as the *"Rent Commencement Date"*): (a) the date upon which Tenant shall initially open the Premises to the general public for business, or (b) the one hundred fiftieth (150th) day following the later to occur of the (A) Delivery Date, or (B) the Permit Contingency Date (hereinafter defined in Section 2.5). The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date, and Landlord shall deliver to Tenant a completed and signed IRS Form W-9 contemporaneously therewith; the delivery of the Form W-9 shall be a condition precedent to the payment of Rent.

        2.2.2   Renewal Options.  Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth (provided that the Fixed Rent payable for each Renewal Period shall be as set forth in Subsection 1.1.11 above).  Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s); provided, however, that the Term shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord (the *"Reminder Notice"*) that the Renewal Option in question has not been exercised (the Reminder Notice shall not be given prior to the two hundred eighty-fifth (285th) day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options.  If Landlord fails to give Tenant the Reminder Notice prior to the

bbBaby

Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof, and the Term will be deemed reinstated and extended automatically on a month-to-month basis at the Fixed Rent then in effect until the earlier to occur of (a) the date which is fifteen (15) days after the date Tenant has received the Reminder Notice, in which case Tenant shall be entitled to exercise the applicable Renewal Option prior to expiration of such fifteen (15) day period, or (b) the date Tenant surrenders the Premises to Landlord.  Upon any exercise of a Renewal Option by Tenant in accordance with this subsection, the Term shall be extended for the applicable Renewal Period and the Fixed Rent for such Renewal Period shall be adjusted as of the commencement of such Renewal Period in accordance with Section 1.1.11 above and concurrently with the exercise of such Renewal Option Tenant shall pay Landlord any unpaid balance of the Fixed Rent due during the Renewal Period that has accrued as of the date of such notice of extension.  Tenant shall have no further election to extend the Term beyond the third (3rd) Renewal Period.

Section 2.3    Delivery Date.

2.3.1    Definition.  Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Subsection 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises (together with the premises immediately adjacent to the Premises containing approximately seventeen thousand nine hundred forty-eight (17,948) square feet of Floor Area that is identified on Exhibit B hereto as "Cost Plus World Market Premises" (the *"Cost Plus World Market Premises"*), that Landlord has leased to Tenant by the execution of a Lease Agreement executed simultaneously with this Lease (the "Cost Plus Lease")) shall have been delivered to Tenant in the condition described in Exhibit D, with all of Landlord's Pre-Delivery Date Work completed;

(b)    The representations and warranties of Landlord set forth in subparagraphs (a) through (k) of Section 12.3 below shall then be true and in effect; and

(c)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(c) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

2.3.2    Failure to Complete Landlord's Post -Delivery Date Work.  If Landlord's Post-Delivery Date Work  is not Substantially Completed on or before July 31, 2015 (subject to Force Majeure and delays resulting from the acts or omissions of Tenant or any of Tenant's agents, contractors or employees (*"Tenant Delays"*) provided that Landlord shall have given Tenant notice of such event of Force Majeure or Tenant Delay promptly after its occurrence), (i) Tenant shall have all of its remedies set forth in Section 16.2 below, and (ii) Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of Five Thousand Dollars ($5,000) for each day until Landlord's Post-Delivery Date Work is Substantially Completed.  The foregoing liquidated reimbursement represents the parties' good faith agreement as to an

6

bbBaby

agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

       2.3.3   Delivery Date Certification. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

       2.3.4   No Waiver. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

      Section 2.4   Slack Period. If the Rent Commencement Date occurs during the period from November 1st and ending on the March 31st next following (the "*Slack Period*"), Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. Notwithstanding the foregoing, if Landlord completes Landlord's Pre-Delivery Date Work and the Delivery Date occurs on or prior to July 20, 2015, there shall be no Slack Period and the foregoing provisions of this Section 2.4 shall not apply.

      Section 2.5   Permits Contingency.

       2.5.1   Tenant shall use diligent efforts to obtain all of Tenant's Permits (defined in Section 12.3(k) below) on or before September 1, 2015. Notwithstanding anything contained herein to the contrary, if Tenant's Permits have not been obtained by September 1, 2015, Landlord shall have the right, within fifteen (15) days thereafter, at Landlord's sole option, to seek to obtain Tenant's Permits on Tenant's behalf, at Tenant's sole cost and expense, until December 15, 2015 (the "*Outside Permit Date*"). Notwithstanding the provisions of this Article 2 to the contrary, if, despite Tenant's diligent efforts, all Tenant's Permits have not been obtained by the Outside Permit Date, Tenant shall have the right, upon notice given to Landlord after the Outside Permit Date, to terminate this Lease by notice to Landlord given on or before December 31, 2015 and Tenant shall have no further rights or obligations hereunder. Notwithstanding the foregoing, upon the earlier to occur of (a) December 31, 2015, without this Lease being terminated by Tenant as described above, or (b) the date upon which Tenant commences the construction of Tenant's Work (if sooner than the date upon which Tenant obtains the Tenant's Permits), Tenant's Permits shall be deemed to have been unconditionally granted. The date on which all Tenant's Permits are unconditionally granted or are deemed pursuant hereto to have been unconditionally granted is referred to herein as the "*Permit Contingency Date*".

       2.5.2   In the event this Lease is terminated pursuant to this Section 2.5, this Lease shall cease and be deemed canceled and terminated as of the date set forth in Tenant's or Landlord's notice of such termination and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.

ARTICLE 3
IMPROVEMENTS

      Section 3.1   Landlord's Work and Tenant's Work. Landlord shall, at its sole cost and expense, perform the work and obligations described in Article I and Article II of Exhibit D hereto (collectively, "*Landlord's Pre-Delivery Date Work*") and the work and obligations described Article III of Exhibit D hereto (collectively, "*Landlord's Post-Delivery Date Work*" and together with Landlord's Pre-Delivery Date Work,

7

*"**Landlord's Work**"*).  Except for Landlord's Pre-Delivery Date Work, Landlord shall have no obligation to perform or cause the performance of construction of any improvements of the Premises prior to the Delivery Date.  Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"**Tenant's Work**"*) which Tenant desires to adapt the Premises to Tenant's use, including, but not limited to, the construction of the demising wall separating the Premises from the Cost Plus World Market Premises in the location shown on Tenant's Plans (defined in Subsection 3.2(c) below).

Section 3.2    Plan Approvals.

(a)    Prior to the Effective Date, Landlord has delivered to Tenant the following plans (the *"**Existing Plans**"*), to the extent such Existing Plans are in Landlord's possession: (i) a dimensioned building floor plan for the Premises which denotes egress, ingress, vertical transportation, receiving area (truck access), and trash compactor and trash container locations; (ii) building elevations for the Premises and the Cost Plus World Market Premises; (iii) exterior wall sections of the Premises; (iv) a sidewalk plan showing improvements located within the area from the back of the front curb to the front wall of the Premises and the Cost Plus World Market Premises (including, without limitation, sidewalks, depressed curbing, cart corral locations, and planters); (v) roof plan of the Premises (including, without limitation, roof construction, location of heating, ventilation and air conditioning units, drainage, and penetrations); and (vi) dimensioned structural drawing showing interior layout and exterior facade column layout of the Premises (including, without limitation, column sizes for each).

(b)    Landlord and Tenant have approved the drawings shown the footprint, column layout and Floor Area measurement of the Premises, as prepared by Tenant (the *"**Certified LOD**"*).

(c)    On or before June 1, 2015, Tenant shall deliver to Landlord Tenant's plans (*"**Tenant's Plans**"*) depicting Tenant's Work.  Landlord shall have thirty (30) days from its receipt of Tenant's Plans (or revisions thereto, as applicable) to approve or disapprove Tenant's Work depicted thereon, which plans and work shall be approved so long as they: (i) comply with all Legal Requirements, and (ii) are substantially consistent with Exhibits B, D-1, and F attached hereto.  If Landlord shall fail to disapprove Tenant's Plans with reasonable specificity within said thirty (30) day period, Tenant's Plans shall be deemed approved.  This Lease is subject to and conditioned upon Landlord's approval (or deemed approval) of Tenant's Plans.

Section 3.3    Performance of Work.

3.3.1    Tenant's Work shall be performed (a) in accordance with Tenant's Plans (in the form approved or deemed approved by Landlord), (b) in a good and workmanlike manner, (c) in compliance with all applicable Legal Requirements, (d) utilizing only new, first-class materials, (e) in such a manner as not to interfere with the operations of any other tenant or occupant of the Shopping Center and (f) in a manner that it will not cause any labor unrest.  Landlord's Work shall be performed (i) in a good and workmanlike manner, (ii) in compliance with all applicable Legal Requirements, (d) utilizing only new, first-class materials, (iii) in such a manner as not to interfere with the operations of any other tenant or occupant of the Shopping Center, (iv) in a manner that it will not cause any labor unrest and (v) in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Premises except where, and to the extent that, such impact fees and related governmental charges relate specifically to Tenant's specific use of the Premises.  Subject to Tenant's obligations set forth in subsection D of Article III of Exhibit D attached hereto, if Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall, unless Landlord terminates this Lease as hereinafter provided, remedy the situation

8

bbBaby

so as to enable Tenant to obtain Tenant's Permits as part of Landlord's Post-Delivery Date Work. Subject to Tenant's obligations set forth in subsection D of Article III of Exhibit D attached hereto, where the issuance of Tenant's Permits is refused as a result, or conditioned upon the cure, of any then existing condition of the Shopping Center, Landlord's obligation to cure such then existing condition shall not exceed the sum of Thirty Thousand and 00/100 Dollars ($30,000.00), and if the estimated cost of such cure is reasonably estimated to exceed such sum then Landlord shall have the right to terminate this Lease upon notice to Tenant, provided that Tenant shall have the right to nullify Landlord's termination by agreeing to pay the amount of the cost of such cure in excess of such sum. If this Lease is terminated pursuant to this Section 3.3.1, neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, attorneys' fees, and the performance of Tenant's Work), not to exceed Seventy-Five Thousand and 00/100 ($75,000.00) Dollars.

3.3.2    If the Delivery Date shall not have occurred by August 1, 2015 (subject to Force Majeure, not to exceed thirty (30) days in the aggregate, and Tenant Delays and provided that Landlord shall have given Tenant notice of such event of Force Majeure or Tenant Delay promptly after its occurrence) (the "*Outside Delivery Date*"), Tenant may thereafter, during such time as the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)    terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, attorneys' fees, and the performance of Tenant's Work), not to exceed Seventy-Five Thousand and 00/100 ($75,000.00) Dollars; and/or

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)    extend one or more times the date set forth in this Subsection 3.3.2 above to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of taking measurements, making plans, and erecting temporary or permanent signs without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such entry, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

bbBaby

9

3.3.4    Tenant's Leasehold Improvements. Subject to Subsection 3.3.8 below, Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

3.3.5    Work After the Delivery Date. Following the Delivery Date, any construction by Landlord (i) affecting any portion of the entrances or exits of the Shopping Center or in the Critical Area (defined in Subsection 5.2.2 below), (ii) adversely affecting Tenant's use and occupancy of the Premises and/or (iii) adversely affecting access to the Premises from the Common Areas (collectively, *"Material Landlord Construction"*), shall be subject to the following terms and conditions:

(a)    staging and storage of materials and parking of construction vehicles engaged in Material Landlord Construction shall not occur within the Critical Area;

(b)    Landlord shall use reasonable efforts to ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of Material Landlord Construction shall take place in a manner which will interfere (other than de minimus interferences) with vehicular access to the Premises from the roads adjacent to the Shopping Center or otherwise materially interfere with the normal conduct of any business operations in the Premises, with access to the loading and trash facilities or the visibility of Tenant's signage; and

(c)    Landlord shall use reasonable efforts to ensure that Material Landlord Construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.6    Tenant's Trailer. Tenant shall have the right, subject to applicable Legal Requirements and Tenant's receipt of appropriate governmental approvals, to place a trailer on the Common Areas in an area immediately adjacent to the Premises, in the location shown on Exhibit B hereto, during the period commencing on the forty-fifth (45th) day prior to date on which Tenant has scheduled for the commencement of its fixturing in the Premises, until the twentieth (20th) day after said fixturing date (but not later than the date Tenant opens for business in the Premises), for the purpose of conducting employee interviews and recruiting and for no other purpose or use whatsoever. Tenant's use of such trailer shall be subject to the requirements and obligations of Tenant set forth in Article 10 below.

3.3.7    Tenant Allowance. Landlord shall pay Tenant the liquidated sum of One Million Two Hundred Sixty-Nine Thousand Six Hundred Twenty and 00/100 ($1,269,620.00) Dollars [based on Fifty-Five and 00/100 ($55.00) Dollars per square foot of Floor Area (defined in Subsection 1.1.12) in the Premises] (the *"Tenant Allowance"*) in consideration for Tenant's construction of Landlord's Special Improvements (defined in this Subsection 3.3.7 below). Landlord shall pay the Tenant Allowance to Tenant within twenty (20) days after the later to occur of Substantial Completion of Tenant's Work in accordance with the Tenant's Plans, as certified by Tenant's architect, Tenant's initial opening of its store for business to the public in the Premises as required pursuant to Article 14 below and Landlord's receipt of all of the following:

(i)    a copy of the Application and Certificate for Payment (G702), Continuation Sheet (G703), and the Sworn Statement;

(ii)    final lien releases/waivers from Tenant's general contractor and each subcontractor and/or material supplier providing construction services or supplies for Tenant's Work whose contract with Tenant's general contractor in the aggregate exceeds Ten Thousand and 00/100 Dollars ($10,000.00) (unless

bbBaby

10

Landlord's Mortgagee agrees in writing to increase such sum to Twenty-Five Thousand and 00/100 Dollars ($25,000.00) in which event such agreed amount up to $25,000 shall apply to this clause rather than $10,000), provided that Landlord will pay the portion of the Tenant Allowance for which lien waivers are provided (notwithstanding that some lien waivers may not be forthcoming due to disputes); and

(iii)    a temporary or permanent certificate of occupancy (or its local equivalent), unless such certificate is not available for any reason other than Tenant's failure to perform Tenant's Work in compliance with all Legal Requirements; and

(iv)    a current estoppel certificate (in form and substance reasonably acceptable to the current Mortgagee).

If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion thereof within twenty (20) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to a credit against one hundred (100%) percent of the Rent payable by Tenant hereunder, together with interest thereon at a rate equal to the then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus five (5%) percent. The Tenant Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of Tenant's Work (the *"Landlord's Special Improvements"*) (which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease). Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance. Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the Tenant's Allowance, and Tenant's Work (except for Landlord's Special Improvements), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes.

Without limitation of the rights granted to Tenant in the immediately preceding sentence, to secure payment to Tenant of the Tenant Allowance in accordance with the terms of this Lease, on the Effective Date Landlord shall deliver to Tenant an unconditional, irrevocable, evergreen, negotiable commercial letter of credit (the *"Letter of Credit"*) in the amount of the Tenant Allowance, naming Tenant as beneficiary. If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion thereof within twenty (20) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to draw on the Letter of Credit for the amount of the non-payment by Landlord. The Letter of Credit shall authorize the beneficiary to draw on the Issuing Bank (as hereinafter defined) in said amount, or any portion thereof, available by the beneficiary's sight draft, without presentation of any other documents, statements or authorizations. The Letter of Credit shall be issued by a bank which is a member of the New York Clearing House Association (the *"Issuing Bank"*) and shall be in form and substance reasonably acceptable to Tenant. The Letter of Credit shall provide, among other things, that it shall be drawable, either in partial draws or in one draw for the full amount, upon the delivery to the Issuing Bank of Tenant's draw to such effect. The Letter of Credit shall be transferable and all transfer fees shall be paid by Landlord. The Letter of Credit shall be subject to the International Standby Practices (ISP98), International Chamber of Commerce, Publication No. 590. (THE "ISP"), and to the extent not inconsistent with the ISP, be subject to laws of the State of New York. The Letter of Credit shall be evergreen with an initial term of at least twelve (12) months, and it shall by its terms be renewed, automatically, each year by the Issuing Bank, unless the Issuing Bank gives written notice to the beneficiary, at least sixty (60) days prior to the expiration date of the then existing term that the Issuing Bank elects that it not be renewed. If the Issuing Bank gives such notice of non-renewal, Landlord shall, at least thirty (30) days prior to the date on which the Letter of Credit will cease to be available, either furnish to Tenant a renewal or extension of the Letter of Credit or a new Letter of Credit, equal to the Tenant Allowance. Failure to comply with the provisions of the preceding sentence shall be deemed to be a breach under this Lease for which the Tenant's sole remedy shall be that Tenant may, at any time during said 30-day

11

bbBaby

period, draw upon the Letter of Credit and retain as a cash security for the payment of the Tenant Allowance. Upon payment in full of the Tenant Allowance Tenant shall deliver the original Letter of Credit to Landlord for cancellation. Notwithstanding the foregoing, the form of letter of credit from M&T Bank that Landlord has provided to Tenant for Tenant's pre-approval is acceptable to Tenant, and is hereby deemed by to have satisfied all the letter of credit requirements set forth above, subject to actual delivery of same in such format.

ARTICLE 4
FIXED RENT, TAXES: DETERMINATION AND PAYMENT

Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without notice, deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    Payment of Rent.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant may designate a corporation or other entity to act as a paying agent (the *"Paying Agent"*), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1    Landlord shall pay on or before the due dates thereof all Taxes (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center. Tenant shall pay prior to delinquency all taxes, assessments, fees and charges imposed on Tenant's Property.

4.3.2    (a)    Tenant shall pay to Landlord as Additional Rent, Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after

12

bbBaby

receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

(c)     In the event that Landlord's Mortgagee shall require Landlord to escrow monthly payments for Taxes, then, so long as such escrow shall be so required and all other tenants and occupants of the Shopping Center are similarly required to make monthly payments to Landlord with respect to Taxes, Tenant shall, in lieu of making payments pursuant to subparagraph (b) above, pay Landlord monthly with each installment of Fixed Rent an amount equal to one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's (or Landlord's Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within thirty (30) days following the issuance by the taxing authority of the bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Pro Rata Share thereof for such year (the *"Tax Reconciliation Statement"*). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) copies of the applicable tax bills, (y) a calculation of Tenant's Pro Rata Share of Taxes, and (z) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Pro Rata Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by Tenant in respect of said fiscal tax year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. If Landlord fails to timely remit to Tenant the amount of any overpayment, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

4.3.3    As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special, foreseen or unforeseen, ordinary or extraordinary), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord at a consideration which is in excess of the market value of the Shopping Center; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement , exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would

13

exist in the absence of such district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full calendar year after the Shopping Center has been completed and fully assessed will be approximately Two and 00/100 ($2.00) Dollars per square foot of Floor Area in the Premises.

4.3.4    At Tenant's request, Landlord shall assess whether or not it would be prudent to contest the amount or validity of any assessed valuation or Taxes for the coming tax year and if Landlord has elected not to contest the amount or validity of any assessed valuation or Taxes for the coming tax year, Landlord shall notify Tenant of the reasons for such decision. If Landlord fails to respond to Tenant or Landlord's decision not to contest is manifestly unreasonable, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Notwithstanding the foregoing, if Tenant is the sole occupant of the tax lot on which the Premises is located, then Tenant shall have the right to contest the assessed valuation or Taxes without first requesting that Landlord do so.

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    <u>Common Areas: Maintenance.</u>

5.1.1    <u>Maintenance of Common Areas.</u> Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which common areas of reputable shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    <u>Tenant's Pro Rata Share of Common Areas Charges.</u>

(a)    During the Term, Tenant shall pay to Landlord as Additional Rent, Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) incurred by Landlord to operate, maintain, insure and repair the Shopping Center (including the Common Areas), which shall include the reasonable premiums for insurance required to be maintained by Landlord under Section 10.3 below. Landlord shall be permitted to include in Common Areas Charges (in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas) for each calendar year an administrative fee (the *"Administrative Fee"*) equal to seven and one-half percent (7.5%) of the Common Areas Charges for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible Common Areas Charge hereunder), the cost of electricity and other utilities, and the cost of insurance which Landlord is required to maintain under this Lease. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)    Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably

bbBaby

satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles (or successor accounting standards) consistently applied (the ***"CAC Reconciliation Statement"***).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year.  If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Common Areas Charges next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. .Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges from the Rent Commencement Date through the end of the 2016 calendar year exceed One and 20/100 ($1.20) Dollars per square foot of Floor Area per annum, and with respect to any other calendar year thereafter (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases, during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases, during such calendar year).

        5.1.3   <u>Exclusions from Common Areas Charges</u>.

        (a)   Common Areas Charges shall not include: (1)  the capital cost of any additions or improvements to the Common Areas pursuant to an expansion of the Shopping Center; (2)  the cost of any capital replacements to the Common Areas, except that the capital costs of replacement to the Common Areas may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over their useful life, as determined in accordance with generally accepted accounting principles (or successor accounting standards); (3) the cost of investigating, monitoring or remedying any environmental condition or Hazardous Substances or any other Compliance Costs (defined in Subsection 12.4.1(e) below); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements except that Common Areas Charges shall include the cost of compliance with laws affecting only the Common Areas provided that same shall (A) apply only to laws enacted after the Rent Commencement Date, (B) not be necessitated by the acts or omissions of Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or employees, (C) benefit all tenants in the Shopping Center equally, (D) be amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, if they are deemed to be capital expenditures according to generally accepted accounting principles(and such costs shall also be subject to the CAM cap in Section 5.1.2(b) above), and (E) be similarly imposed on all other tenants in the Shopping Center; (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to

15

Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation [except as expressly permitted pursuant to item 23 below]; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court or exterior dining area in the Shopping Center); (18) intentionally omitted; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) intentionally deleted; (23) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles (or successor accounting standards)); (24) reserves for anticipated future expenses; (25) except for the Administrative Fee, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; (26) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; or (27) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; or (28) except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs or other signage identifying tenants of the Shopping Center.

(b)     In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into account, for example, the relationship of the size of the Common Areas maintained by the other tenant or occupant to the size of its premises.

(c)     Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    Tenant's Right to Audit. Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days

bbBaby

16

after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas; Restrictions.

5.2.1    Continuous Access. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord, nor shall Landlord consent to any other tenant or occupant causing such interruption or disturbance, during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during October, November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

5.2.2    No Alterations. Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location, availability, or size of any Common Area improvement located within the portions of the Shopping Center designated as "Critical Area" on Exhibit B hereto (the *"Critical Area"*), (ii) materially change the number, location, or layout of parking spaces in the Critical Area, (iii) construct any structures or buildings (including, without limitation, any kiosks, booths, signs or similar structures) within the Critical Area, or (iv) materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks within the Critical Area or other Common Area, from those shown on Exhibit B hereto. In the event Tenant consents to any such work, except for emergencies, it shall not be performed during August (through Labor Day), November and December of any year, and shall be undertaken in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises or Tenant's rights under this Lease.

5.2.3    Outparcels. In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the Outparcel (the *"Outparcel"*) designated on Exhibit B hereto as "Future Outparcel": (a) no building shall exceed a maximum height of thirty (30) feet as measured from the finished floor level to the highest point on such building or structure (inclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae); and (b) the aggregate Floor Area of all buildings constructed on the Outparcel shall not exceed ten thousand (10,000) square feet. For purposes of this Subsection 5.2.3, the Floor Area of any building constructed on the Outparcel shall also be deemed to include outdoor

17

bbBaby

balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service).

        5.2.4   <u>Parking Area</u>. During the Term (but subject to Article 11 below), Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, or (ii) four and two-tenths (4.2) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space in the Critical Area shown on <u>Exhibit B</u> hereto being at least nine (9) feet in width and eighteen (18) feet in length (or such smaller dimensions as may exist on the date of this Lease). Landlord shall not reduce the number of parking spaces in the Critical Area from the number of parking spaces shown on <u>Exhibit B</u>, unless required by Legal Requirements. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Tenant shall have the right to designate the two (2) parking spaces identified as "CP" on <u>Exhibit B</u> hereto for pick up and delivery of bulky items to and from the vehicles of Tenant's employees, agents, subtenants, concessionaires, licensees, customers, and invitees (the *"Customer Pick Up Spaces"*), and the four (4) parking spaces identified as "EM" on <u>Exhibit B</u> hereto as parking for expectant mothers (the *"Expectant Mother Spaces"*) by marking and/or signing such spaces as shown on <u>Exhibit F</u> hereto or otherwise with the approval of Landlord (which approval by Landlord shall not be unreasonably withheld, delayed or conditioned). Notwithstanding the foregoing, Tenant's right to designate and use the Customer Pick Up Spaces and the Expectant Mother Spaces is subject to the consent letter from Home Depot attached hereto as <u>Exhibit I</u>. Except for the Customer Pick Up Spaces and the Expectant Mother Spaces, subject to the rights of tenants under Existing Leases, Landlord shall not designate specific parking spaces within the Critical Area shown on Exhibit B hereto for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their employees, agents, subtenants, concessionaires, licensees, customers, and invitees. Landlord shall use commercially reasonable and diligent efforts to enforce the foregoing restrictions. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Subject to the rights of tenants under Existing Leases, Landlord shall not permit overnight parking in the Shopping Center.

        5.2.5   <u>Lighting</u>. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week at least from dusk until 11: 00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*). In addition to the foregoing, if the Common Areas are not fully lighted 24-hours per day, Landlord shall provide for commercially reasonable security lighting from one (1) hour after the close of business in the Premises until dawn.

        5.2.6   <u>Repairs</u>. During the Term, any construction or repair by Landlord of the Premises, or in the Critical Area, permitted or required under this Lease shall:

        (a)   not be performed during the months of October, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

        (b)   be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

        (c)   be performed in accordance with the requirements of Subsection 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

        5.2.7   <u>Rules and Regulations</u>. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii)

18

bbBaby

do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8    <u>Miscellaneous</u>.

(a)    <u>No Promotional Use</u>. Landlord shall not use or permit the use of all or any portion of the Critical Area for retail sales or for promotional purposes. In no event shall Tenant have the right to use any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales in front of their respective stores only, provided that Landlord shall use commercially reasonable efforts to require that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in reputable shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or the business operations of other tenants in their respective premises nor materially impair the visibility of Tenant's (or other tenants') signage. Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)    <u>Trash Compactor and Containers</u>. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)    <u>Shopping Carts</u>. Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on <u>Exhibits B</u> and <u>D-1</u> hereto (which cart corrals, if permitted, shall be installed by Tenant at its sole cost and expense). With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)    <u>Cellular Towers</u>. No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center except in the rear of the Shopping Center; provided such towers shall not be located behind the building of which the Premises is a part or in the Critical Area and shall be clear of all truck access ways and loading areas; provided however the foregoing shall not restrict either (i) a concealed cell phone antenna erected upon or as part of a pylon sign structure so long as the same is visually and structurally integrated into the pylon sign structure so as not to be distinguishable therefrom, (ii) antenna located on the roof of any building, or (iii) any existing transmission and/or reception tower or antenna.

(e)    <u>Temporary Storage</u> Containers. If any other tenant is given the right to keep a storage container in the Common Areas then during the Term Tenant shall be permitted to maintain temporary storage containers or trailers in a location to be reasonably agreed between Landlord and Tenant, subject to applicable Legal Requirements.

(f)    <u>Control of Common Areas</u>. The Common Areas shall at all times be subject to the exclusive control and management of Landlord.

19

bbBaby

ARTICLE 6
UTILITIES

Section 6.1    Utility Service. From and after the later of the Permit Contingency Date and the Delivery Date (unless Tenant accepts in writing possession of the Premises prior thereto) and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord. The parties hereto acknowledge that on the Effective Date, the utility meters that serve the Premises also serve the Cost Plus World Market Premises and agree that Tenant shall accept the same in its as-is condition on the Effective Date. As part of Tenant's Work, Tenant may provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the later of the Permit Contingency Date or the Delivery Date pursuant to Subsection 3.3.3 above shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to such date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other tenants or occupants of the Shopping Center. Landlord shall permit Tenant and its telecommunications provider access to, and use of, those telecommunications conduits in the Shopping Center that are controlled by Landlord for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2    Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

ARTICLE 7
SIGNS

Section 7.1    Tenant's Building Signage. Subject to Tenant's receipt of all required governmental approvals and permits, Tenant shall have the exclusive right, in connection with Tenant's Work, and thereafter during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, Tenant's signs (including, without limitation, under-canopy (e.g., blade) signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags as set forth in Exhibit F hereto. Tenant shall also be entitled, at Tenant's sole cost and expense and subject to Tenant's receipt of all required governmental approvals and permits, to install and maintain, during the period commencing on the Effective Date and ending on the day prior to the Rent Commencement Date, a temporary sign near the site of the main entrance to the Shopping Center which states "buybuy BABY Coming Soon" (which sign is more particularly shown in Exhibit F hereto). Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided same are professionally prepared. Tenant shall keep its building signage lighted during all hours that the Premises is open to the public.

Section 7.2    Pylon/Monument Signage. Landlord shall provide pylons and monuments at the locations shown on Exhibit B hereto during the entire Term. Landlord shall use commercially reasonable efforts to obtain all permits and approvals required for the addition of an additional sign panel to each of the pylons for the use of Tenant in its capacity as tenant under the Buy Buy Baby Lease, as shown on Exhibit F hereto (the

20

"*Pylon Expansion Approvals*").  Landlord shall be responsible for one hundred (100%) percent of the out of pocket costs incurred by Landlord to obtain the Pylon Expansion Approvals, up to Ten Thousand Dollars ($10,000.00), and if the out of pocket costs incurred by Landlord to obtain the Pylon Expansion Approvals exceed Ten Thousand Dollars ($10,000.00) then Landlord shall have the right to cease it efforts to obtain the Pylon Expansion Approvals upon notice to Tenant unless Tenant agrees to reimburse Landlord for the costs thereof to the extent the same exceed Ten Thousand Dollars ($10,000.00).  Tenant shall have the right, at its sole cost and expense, to erect and maintain its identification sign, as shown on <u>Exhibit F</u> hereto (and having colors as shown on <u>Exhibit F</u> hereto), on both sides of the Shopping Center pylons at the locations shown on <u>Exhibit B</u> hereto.  Tenant may, at its sole option, share its sign panel on any pylon in respect of which Landlord does not obtain the Pylon Expansion Approvals, with the occupant of the premises demised under the Cost Plus Lease.  If Landlord succeeds in obtaining the Pylon Expansion Approvals, then Tenant shall be entitled to one panel on each such pylon and with the occupant of the premises demised under the Cost Plus Lease shall be entitled to use the additional panel as provided in the Cost Plus Lease.  Tenant, as part of Tenant's Work, shall obtain all governmental approvals and permits for Tenant's sign panel(s).  For each pylon sign for which Landlord obtains the Pylon Expansion Approvals Landlord shall install the new illuminated panel box thereon, at Landlord's cost, as part of Landlord's Post-Delivery Work.  Landlord shall not materially change or alter the location, structure, height or general appearance of such pylons without obtaining Tenant's prior consent.  The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges; however, neither the cost of individual tenants' signs thereon, nor the cost of the construction of the pylons and monuments, shall be includable in Common Areas Charges.

Section 7.3    <u>Signage: Alteration/Removal/Allocation.</u>  Subject to Tenant's receipt of all required governmental approvals and permits, Tenant shall have the right, from time to time, without Landlord's approval (except as may be required under the next sentence), to change its signs on the storefront and exterior of the Premises, as well as on any pylon, <u>provided</u> that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same.  Notwithstanding the foregoing, if Tenant does not operate at least twenty-five (25) other stores, then Landlord shall have the right to approve changes to any signage permitted by Section 7.2 or located on the Premises that is visible from the exterior of the Premises (other than professionally prepared interior signs).  Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises; provided that in no event shall Tenant place or permit the placement of more than one (1) separate identification panel on each side of a single pylon signage structure.  All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4    <u>Cooperation.</u>  Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5    <u>Signage and Building Restrictions and Criteria.</u>

7.5.1    During the Term, subject to the rights of tenants under Existing Leases, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the

21

installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises and other than vinyl panel signs, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import and the foregoing shall not be applicable to the Theater Tract. No billboard signs shall be permitted within the Shopping Center that are located along North Wales Road or Horsham Road. No billboard sign shall display any signage or advertising relating to any of Tenant's direct competitors, such as Babies "R" Us.

7.5.2    Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any structural or exterior (except for signage as permitted herein), alterations or structural or exterior improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent. All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3    Tenant shall have the right to subdivide the Premises into two (2) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4    Tenant shall have the exclusive right to erect and maintain an antenna and a satellite dish, and/or such other equipment as Tenant shall reasonably desire, on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, (v) erects and maintains such equipment in accordance with applicable Legal Requirements and (vi) such equipment is not visible to customers in the Shopping Center.

8.1.5    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after

22

bbBaby

Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6    If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord shall neither make nor permit to be made (except to the extent another tenant or occupant is otherwise permitted under an Existing Lease) any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a reputable shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

8.1.8    Tenant shall have the exclusive right to erect and maintain on the roof of the Premises, a passive solar array for the production of electricity (the "*System*"), provided that Tenant: (i) obtains Landlord's prior approval of its plans and specifications for the System and the location thereof on the roof, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while the System is present, (iv) repairs any damage to the roof (including any necessary replacement of the roof) caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any component of the System, (v) erects and maintains the System in accordance with applicable Legal Requirements; (vi) the installed System is not visible to customers in the Shopping Center; and (vii) uses the System solely for supplementing Tenant's own energy needs in the Premises and not for the resale of energy to third parties.  The System shall be deemed to be part of Tenant's Property  Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator of the System and Landlord shall have no right, title or interest in such equipment or any component thereof, notwithstanding that any such equipment may be physically mounted or adhered to the Premises. Landlord acknowledges and agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (a) the electricity generated by the System, (b) the environmental attributes of the System, and (c) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever entitled, resulting from the environmental or related attributes of the System.  Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System.

8.1.9    Landlord and Tenant agree that in the event that Tenant shall perform or cause to be performed any alterations or improvements (including without limitation Tenant's Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined),then Tenant shall be solely entitled to the benefit of such Energy Rebate.  As used herein, an "*Energy Rebate*" shall be deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax credits, governmental grants, utility rebates or refunds) given by a governmental, non-governmental, private or public utility, or other entity as a result of efforts to conserve energy or other utilities or cause property or processes to be more environmentally friendly.  In addition to the foregoing, Tenant shall be entitled to receive any and all other incentives which Tenant may negotiate

bbBaby

with state and local officials pertaining to construction and/or remodeling of the Premises, hiring of employees, property tax abatements, sales tax refunds and/or any other "Incentives" (hereinafter defined) secured. The term *"Incentive"* is to include, but is not limited to, any cost reduction, rebate, or any other benefit negotiated by Tenant and obtained by Landlord that may directly or indirectly benefit Tenant. If any such Energy Rebate and/or Incentive is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate and/or Incentive in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate and/or Incentive during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate and/or Incentive, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate and/or Incentive against the next succeeding installment(s) of Rent then payable under the Lease.

ARTICLE 9
REPAIRS

Section 9.1    <u>Tenant's Repairs.</u>  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, making replacements when necessary, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, and serving, exclusively the Premises); (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises; (iii) the improvements which constitute Tenant's Work and (iv) subject to Section 10.1 below, any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Tenant, its employees, agents or contractors, or (B) any breach by Tenant of any provision of this Lease. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements. Tenant shall throughout the Term carry, at its cost, a commercially reasonable maintenance and service contract with a qualified vendor which covers the HVAC facilities exclusively serving the Premises in accordance with the manufacturer's recommendations.

Section 9.2    <u>Landlord's Repairs.</u>  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (<u>including</u>, without limitation,  repainting the exterior of the Premises, but <u>excluding</u> plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers of the Premises;

(d)    the gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises or, with respect to the electric lines, to the electrical room serving the Premises (including, without limitation, any fire pump facilities or electrical switch gear serving the Premises);

24

bbBaby

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges, except for periodic painting of the exterior of the Premises, not more often than once every five (5) years), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses within thirty (30) days after Tenant's demand therefor. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within thirty (30) days after Tenant's demand therefor, Tenant shall have the right to offset such amounts against fifty (50%) percent of the next due installments of Fixed Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    Legal Compliance Work.    Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and includable in Common Areas Charges to the extent permitted in Section 5.1 above), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (i.e., are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1    Mutual Waiver of Claims.    Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other

25

bbBaby

party, which is normally insured under Special Form property insurance and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2   Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3   Mutual Indemnification.

(a)      Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)      Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2   Tenant's Insurance.

10.2.1   Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the later of the Permit Contingency Date or the Delivery Date (unless Tenant accepts in writing possession of the Premises prior thereto), and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord, Landlord's Mortgagee and Landlord's property management company (to the extent Tenant is notified thereof), as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.

10.2.2   Self-Insurance. All insurance required to be maintained under this Section 10.2 may be: (i) insured under an individual policy covering this location, or, a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (ii) self-insured by Tenant via a deductible, a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations

bbBaby

26

under this Lease maintains, during the period of such self-insurance, a net worth of at least One Hundred Fifty Million Dollars ($150,000,000.00); **or** (iii) insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.

Section 10.3    Landlord's Insurance.

10.3.1    Liability Insurance.    Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as an "additional insured-lessee" with respect to the Common Areas, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000.00) for bodily injury, death and property damage liability.

10.3.2    Special Form Property Insurance.    Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], Ordinance or Law coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Twenty-Five Thousand Dollars ($125,000.00) without Tenant's prior consent.

10.3.3    Tenant's Pro Rata Share of Insurance Premiums.    Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4    General Insurance Requirements.

10.4.1    All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each policy carried by either party shall be written as a primary policy not contributing with, and not in excess of, coverage carried by the other. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Subsection 10.2.1 and Section 10.3 above.

10.4.2    The liability insurance requirements under Subsections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the

bbBaby

minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11

FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1   <u>Fire and Other Casualty.</u>

11.1.1   (a)   Except as otherwise provided in this Section 11.1.1, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly (x) rebuild and restore the Premises and the Common Areas to the condition existing immediately prior to such fire or other casualty (which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant), and (y) rebuild and restore at least fifty percent (50%) of the additional Floor Area of the Shopping Center (exclusive of the Premises), so that same shall be occupied or ready for occupancy following reconstruction (all of the foregoing work is hereinafter referred to as the *"Primary Restoration"*). With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (aa) rebuild and restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (bb) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner (all of the foregoing work is hereinafter referred to as the *"Secondary Restoration"*). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration (it being agreed that subject to the provisions of this Lease, such proceeds delivered to Landlord's Mortgagee may be disbursed in accordance with such Mortgagee's commercially reasonable disbursement requirements). In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1. Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

(b)   Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Subsection 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)   If, in Tenant's reasonable judgment, any condition affecting, or damage to, the Premises renders all or any portion of the Premises unusable for the

28

bbBaby

conduct of Tenant's business or, in the case of any condition affecting, or damage to, the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2   In the event that:

(a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate and by reason of an event of *Force Majeure*, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence); or

(b)    the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) affecting the Premises, the loading facilities serving the Premises, trash container facilities or Tenant's cart corals or the Common Areas immediately adjacent to the Premises, on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Section 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Landlord, the required repairs and restorations to the Premises or to the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord notice thereof, which notice, in order to be effective, must be received by Landlord within thirty (30) days following Tenant's receipt of such opinion of an independent licensed architect designated by Landlord.

bbBaby

11.1.3   If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2    Eminent Domain.

11.2.1   As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2   If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3   In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has all of the entrances from Montgomery Glen Drive, North Wales Road and Horsham Road, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)    there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)    any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)    five (5%) percent or more of the parking spaces located in the Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four (4.0) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking

30

bbBaby

pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4   If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below. Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5   In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, Tenant's Work, Tenant's Property and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for such Taking.

11.2.6   Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

11.2.7   Tenant acknowledges that during the Term, the portion of the Shopping Center identified on Exhibit B hereto as "Future Condemnation Area" (the "*Future Condemnation Area*") may be Taken. Tenant agrees that notwithstanding anything contained in this Lease to the contrary, Tenant shall have no rights or remedies hereunder with respect to any Taking related to the Future Condemnation Area, and that any Taking of the Future Condemnation Area shall not be subject to this Section 11.2.

Section 11.3   Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is ninety (90) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1   Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2   Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or

bbBaby

31

any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3    <u>Landlord's Covenants, Warranties and Representations.</u>  To induce Tenant to execute this Lease, and in consideration thereof, Landlord warrants and represents to Tenant as follows:

(a)    As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on <u>Exhibit E</u> hereto (the *"Permitted Encumbrances"*);

(b)    In the event the legal description of the Shopping Center described in <u>Exhibit A</u> hereto indicates that the Shopping Center is composed of more than one parcel or lot, there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    Except for the consents required from Landlord's Mortgagee, no non-governmental third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work. Landlord has obtained from Home Depot, Home Depot's written consent to the changes to the parking lot shown on <u>Exhibit B</u> and described in <u>Exhibit D</u> hereto, a copy of which consent is attached hereto as <u>Exhibit I</u>;

(d)    Except with respect to the Prohibited Uses (defined in <u>Exhibit M</u> hereto), and the Existing Exclusives shown on <u>Exhibit K-1</u>, Tenant's use of the Premises for sale of Permitted Items will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have, access to and from Montgomery Glen Drive, North Wales Road and Horsham Road, as shown on <u>Exhibit B</u> hereto, for the passage of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)    As of the Effective Date, there are no restrictive covenants, uniform sign plans or other private signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on <u>Exhibit D-1</u> and <u>Exhibit F</u> hereto.  With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Legal Requirements;

(h)    As of the Effective Date there is no Related Land (defined in Subsection 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(i)    Attached hereto as <u>Exhibit K-2</u> is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping

32

Center.  Such leases and any assignments, extensions, or renewals thereof are referred to herein as the *"Existing Leases"*;

(j)    Subject to Landlord's completion of Landlord's Post-Delivery Date Work and subject to Tenant's obligations set forth in subsection D of Article III of Exhibit D attached hereto, the Common Areas, and all of the improvements thereto shown on Exhibit B hereto have been completed and are operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for Tenant to receive a permanent certificate of occupancy have been completed; and

(k)    As of the Effective Date, Landlord has obtained all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the operation of a typical buybuy BABY store (that does not sell alcoholic beverages) in the Premises (exclusive of building permits which may be necessary for the performance of Tenant's Work and permits and approvals for Tenant's proposed building signage (collectively *"Tenant's Permits"*), any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business and a certificate of occupancy for the Premises), which permits and approvals shall include, without limitation, zoning and building code approvals and environmental requirements.

Section 12.4    Environmental Matters.

12.4.1  Definitions.

(a)    As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of   . which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)    As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance

33

bbBaby

of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

        (f)     As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

        12.4.2  Compliance with Environmental Laws. Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

        12.4.3  Responsibility for Releases of Hazardous Substances. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or the Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or the Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Notwithstanding anything to the contrary in this Lease, if any Hazardous Substances are found in or on the Premises (including, without limitation, in the roof system thereof) or the Shopping Center which pre-date the Delivery Date, then Landlord shall promptly remove the same in compliance with all applicable laws at Landlord's sole cost and expense, and, to the extent such work delays Tenant's Work, then the Rent Commencement Date and the date on which Tenant is required to open for business under Article 14 hereof shall be delayed on a day for day basis for each day of such delay, and Landlord shall reimburse Tenant for any and all reasonable costs incurred by Tenant in connection with such delay. Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of October, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises. If the presence of Hazardous Substances, or Landlord's remediative work relative thereto, interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

        12.4.4  Standards. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or the Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

        12.4.5  Landlord's Representations and Warranties. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no actual knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to Landlord's actual knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

bbBaby

12.4.6  <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7  <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8  <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9  <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1  <u>Permitted and Prohibited Uses.</u>

13.1.1  <u>Tenant's Permitted Use</u>. The Premises may be used and occupied for the Permitted Use; provided, however, notwithstanding anything contained in this Lease to the contrary, Tenant shall not use the Premises in violation of any of the Prohibited Uses or the Existing Exclusives, to the extent then applicable. Tenant hereby covenants to Landlord that, Tenant shall (a) not intentionally use the plumbing facilities in the Premises for any purpose other than that for which they were constructed, nor dispose of any foreign substances therein; (b) not use, or permit to be used, the Premises in a manner that would constitute a nuisance; (c) not commit waste on the Premises; (d) not overload the floor (or place a load on any floor exceeding the floor load per square foot which such floor was designed to carry), or any mechanical, electrical, plumbing or utility systems serving the Premises; (e) not permit obnoxious odors to emanate from the Premises; and (f) not use any apparatus or machine which makes undue noise or causes vibration in any portion of the Shopping Center or otherwise interferes with or disturbs any other tenant in its normal business operations.

13.1.2  <u>Prohibited Uses</u>. Landlord shall lease, operate, maintain and manage the Shopping Center as a reputable shopping center comparable to other reputable shopping centers in the state in which the Shopping Center is located. Subject to the rights of tenants under Existing Leases, Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center or any Related Land for any of the Prohibited Uses that pertain to the Shopping Center or the Related Land, as the case may be (as set forth in Exhibit M hereto), provided, however, that as to any future Related Land, the foregoing restriction shall not apply to the extent that any Prohibited Uses are otherwise permitted under leases entered into prior to the date on which such land becomes Related Land and to any assignments, extensions, or renewals of such leases. As used in this Lease, the term **"Related Land"** shall mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled by Landlord or its Affiliate(s).

Section 13.2  <u>Tenant's Exclusive in Center.</u>  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

35

bbBaby

13.2.1    Subject to the rights of tenants under Existing Leases, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) infant, juvenile and children's furniture and equipment (including, without limitation, infant, juvenile and children's: cribs, beds, mattresses, bedding, changing tables, gliders, rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, play pens, car seats, booster seats, cradles, carriages, strollers, toy and clothing chests, swings, or any other furniture or equipment similar to the foregoing enumerated items) (collectively, *"Restricted Furniture"*); (b) clothing, layettes, apparel, shoes and/or accessories for infants, juveniles and children 0-4 years in age; and maternity clothing (collectively, *"Restricted Clothing"*); and (c) merchandise, products and services targeted for use by or for infants, juveniles and children 0-4 years in age (including, without limitation, infant, juvenile and children's: toys, books, food, formula, indoor and/or outdoor play and recreational equipment, audio and video cassettes or equipment, safety items, feeding items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom items (including, without limitation, personal care devices and other bathroom appliances, accessories and toiletries)) (collectively, *"Restricted Products"*) (which items in clauses (a), (b) and (c) above, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (A) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (B) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. In addition to the foregoing, Landlord shall not lease, rent or occupy or permit any other tenant or occupant of the Shopping Center or Related Land to operate a (x) hair cutting salon specializing primarily to a clientele of infants, juveniles or children, which, for example, would not include unisex hair salons such as Supercuts, Great Clips or Hair Cuttery; (y) photo studio specializing primarily to a clientele of infants, juveniles or children; and/or (z) development, learning or fitness center specializing primarily to a clientele of infants, juveniles and children 0-4 years in age similar to a Gymboree, My Gym or Little Gym.    As to any future Related Land, the foregoing restrictions shall not apply to the extent that any Exclusive Items are otherwise permitted under leases entered into prior to the date on which such land became Related Land and to any assignments, extensions, or renewals of such leases. Tenants under Existing Leases and existing tenants of any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the storage, sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

13.2.2    The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department store [for example, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in reputable shopping centers in the state in which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).    In addition to the foregoing, nothing contained herein shall prohibit Landlord from leasing or renting any other premises in the Shopping Center to: (i) full-line furniture stores (e.g. Raymour & Flanagan, Ashley Furniture and American Signature Furniture, as such stores are currently operated (as of the Effective Date); (ii) full-line supermarkets or grocery stores, which, for example,

36

bbBaby

would not include Dean & Deluca or Zabar's, (iii) full-line shoe stores (e.g., Payless, DSW and Famous Footwear, as such stores are currently operated (as of the Effective Date)), (iv) full-line cosmetics stores, such as Ulta as it operates on the Effective Date, (v) a discount merchandise store selling teen and pre-teen oriented products such as those stores currently operated under the trade name "Five Below", (vi) mattress stores (e.g. Sleepy's and Mattress Firm, as such stores are currently operated (as of the Effective Date)), (vii) book stores, provided the primary business shall not be the retail sale of infant or children's books, (viii) clothing stores normally found in first class shopping centers similar to the Shopping Center that sell its merchandise under a private label, such as, by way of example, Gap, Gap Outlet and Old Navy, as such stores are currently operated (as of the Effective Date), (ix) drug stores (e.g. CVS, Walgreens, Rite Aid, etc.), (x) national or regional discount department stores (e.g. TJ Maxx, Marshalls, Ross Dress For Less, Stein Mart, Nordstrom Rack, Saks Off Fifth and Kohl's, as such stores are currently operated (as of the Effective Date) or (xi) national or regional home furnishings stores (e.g. Bed Bath & Beyond and Cost Plus World Market, as such stores are currently operated (as of the Effective Date)).

13.2.3    The exclusive rights granted to Tenant pursuant to this Section 13.2, shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4    The exclusive rights granted to Tenant with respect to any respective category listed in this Section 13.2 above shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category other than during Excused Periods and/or for periods of time not exceeding twelve (12) consecutive months (the "*use it or lose it*" provision); provided, however, that said twelve-month period shall not begin until after Tenant has received written notice from Landlord that Landlord intends to delete such category if Tenant fails to sell, rent or distribute same for a period of twelve (12) months.

13.2.5    (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3    Exclusives Which Tenant Must Honor.

37

bbBaby

13.3.1   Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1 hereto). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 hereto is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2   Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center or in any other property owned by Landlord or Landlord's Affiliate.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 and Subsection 12.4.3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day as a typical buybuy BABY store, fully stocked, staffed and fixtured, not later than the  thirtieth (30th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant following the expiration of such one hundred eighty (180) day period (unless Tenant reopens for the conduct of retail business at the Premises), whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1   Assignment and Subletting.

15.1.1   Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

15.1.2   Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the "*Assignment/Subletting Notice*") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of Tenant's net costs and expenses (after deduction of the Tenant Allowance) incurred in connection with the preparation of plans and specifications for and the costs of Tenant's Work (amortized on a straight-line basis over the Initial Term) ("*Tenant's Reimbursable Costs*"). Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(i)   giving notice to Tenant (the "*Termination Notice*") thereof within fifteen (15) days after receipt of an Assignment/Subletting Notice from Tenant, and

(ii)   paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's Reimbursable Costs,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the "*Termination Date*") after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the "*Rescission Notice*"), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice.

15.1.3   In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the Commonwealth of Pennsylvania; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2   Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate

39

(collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate. For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a tangible net worth of at least Five Hundred Million Dollars ($500,000,000).

Section 15.3    Collateral Assignment.    In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to any Lender (defined in this Section 15.3 below), whether one or more, as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4    Cure Rights of Original Tenant.

15.4.1    If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named herein or its Affiliate (collectively, the *"Original Tenant"*), and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2    If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are personal to the assignee and/or not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. .Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

40

Section 15.5    <u>Recognition Agreement.</u>  In the event Tenant subleases all of the Premises (i) to Buy Buy Baby, Inc., a Delaware corporation, or (ii) for a term of at least five (5) years to a single sublessee or guarantor thereof having, if the subtenant under the sublease is not an Affiliate of Tenant, a tangible net worth of at least Twenty Million and 00/100 ($20,000,000.00) Dollars, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and such subtenant in the form of Exhibit H hereto, in recordable form.  Said agreement shall provide, among other things, that the sublease shall continue in full force and effect as a direct lease between Landlord and subtenant provided that in such event subtenant shall, for the then remainder of the term of the sublease, pay rent in an amount equal to the greater of (x) the Rent then payable under this Lease, or (y) the rent then payable under the sublease.

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

Section 16.1    <u>Tenant Default.</u>

16.1.1    If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an ***"Event of Default"***.

16.1.2    Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Section 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach as provided in Subsection 16.1.3 below, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant, to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting

41

reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3    Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4    Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5    Landlord shall use all commercially reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default, provided that Landlord shall not be required to give any preference to the leasing of the Premises in lieu of other then available space in the Shopping Center. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

16.1.6    Tenant acknowledges that late payments by Tenant to Landlord of amounts due from Tenant under this Lease will cause Landlord to incur costs not otherwise contemplated by this Lease, the exact amount of which is extremely difficult or impractical to determine. Therefore, without limiting Landlord's other rights under this Lease for a payment default by Tenant, if more than two (2) times during any twelve (12) month period an installment of Fixed Rent due from Tenant is not received by Landlord within ten (10) days after the applicable due date, or at any time after the first installment for each type of Additional Rent is paid, if any item of Additional Rent is not paid within ten (10) days after the applicable due date, then, commencing on the third (3rd) and subsequent late payment of Fixed Rent during such twelve (12) month period or with any such late payment of Additional Rent, Tenant shall pay to Landlord (i) interest on the amount due at the Lease Interest Rate from the date payment was due until payment is made and (ii) an additional sum equal to Two Hundred Fifty ($250.00) Dollars for each such late payment as a late charge. Acceptance of any late charge shall not constitute a waiver by Landlord of Tenant's default with respect to the overdue amount, and shall not prevent Landlord from exercising any of the other rights and remedies available to Landlord for any other event of default under this Lease.

Section 16.2    Landlord Default.    If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "*Landlord's Default*"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

42

bbBaby

(b)      bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)      offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)      terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed, without limitation, that any water infiltration into the Premises from within or without the Premises, or mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3    Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Montgomery County, Pennsylvania, before one arbitrator in accordance with the procedural rules of the American Arbitration Association (or any successor thereto) then in effect. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1    Right to Mortgage and Non-Disturbance. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, it being agreed, however, that Tenant shall not unreasonably withhold its consent to another form of subordination, non-disturbance and attornment agreement, in recordable form; provided, however, that such other form shall in any event provide that (i) no default

43

bbBaby

by Landlord under any such lien shall affect Tenant's rights under this Lease so long as Tenant is not then in default of such obligations beyond the applicable notice and grace periods provided herein, (ii) Tenant will not be named as a party in any foreclosure or other proceedings with respect to any such lien, unless specifically required to be so named by applicable law, provided Tenant's rights under this Lease are not diminished nor its obligations hereunder (iii) the holder of any such lien shall agree that the insurance proceeds resulting from any fire or other casualty and the proceeds payable from the any taking by eminent domain of the Shopping Center will be made available for restoration of the Premises and Shopping Center to the extent provided in this Lease, and (iv) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required herein and the holder of any such lien shall recognize and be bound thereto, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; provided Tenant is not then in default of any of its obligations hereunder beyond any applicable notice or grace periods; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, except to the extent required by Legal Requirements to fully protect said mortgagee's interests, provided Tenant's rights under this Lease are not diminished nor its obligations increased hereunder, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease, provided Tenant is not then in default of any of its obligations hereunder beyond any applicable notice or grace periods; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2  <u>Estoppel Certificate.</u>  Upon written request of Landlord or Tenant, the other party, within thirty (30) days after the date of receipt of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement:  (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3  <u>Existing Mortgages and Ground Leases.</u>  If a mortgage, deed of trust, or other security instrument, or any ground or underlying lease, encumbers the Shopping Center or any part thereof on the Effective Date, then within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as <u>Exhibit G</u>, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to so deliver such

44

instrument(s) by the Outside Delivery Date, Tenant shall have the right to exercise any of the remedies for such failure set forth in Subsection 3.3.2 above.

## ARTICLE 18
### NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address, with copies of notices to Landlord also given to Klehr Harrison Harvey Branzburg, LLP, 1835 Market Street, Suite 1400, Philadelphia, Pennsylvania 19103, Attention: Lee R. Sussman, Esq. or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, NJ07601, Attention: W. John Park, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. If Landlord shall consist of more than one person or entity, notices delivered by Tenant to Landlord's Mailing Address shall be deemed to be delivered to, and effective notice to, all such persons or entities comprising Landlord. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee; provided, however, that if a deadline for the giving of any notice under this Lease occurs on Saturday, Sunday, or a legal holiday, then such deadline shall be extended to the next business day thereafter occurring. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

## ARTICLE 19
### TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## ARTICLE 20
### END OF TERM

**Section 20.1** <u>Surrender of Premises.</u> At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, <u>however,</u> reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

**Section 20.2** <u>Hold Over.</u> If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and

bbBaby

shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

ARTICLE 21
INTENTIONALLY DELETED

ARTICLE 22
ONGOING CO-TENANCY

If, at any time during the Term, more than sixty (60%) percent of the total Floor Area of all buildings in the Shopping Center, as set forth in Subsection 1.1.30 above (excluding the Premises), is not open for the operation of any business not prohibited under the terms of this Lease, unless any such closure results from alterations or renovations being performed in and to the applicable building in the Shopping Center or has been caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure (such condition being hereinafter referred to as an "*Excess Vacancy*"), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if Tenant pays Alternate Rent hereunder for a period in excess of five hundred forty-five (545) continuous days, to terminate this Lease, exercisable by giving Landlord, within sixty (60) days after the expiration of such 545-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 60-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens by more than fifteen percent (15%); and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy. Notwithstanding the foregoing, if Tenant is entitled to pay Alternate Rent hereunder and Tenant is not open for business to the public in the Premises as a fully stocked and staffed retail store, then Alternate Rent shall be equal to fifty (50%) percent of the amount of Fixed Rent which otherwise would have been payable during such period.

ARTICLE 23
MISCELLANEOUS

Section 23.1   Loading Facilities.

(a)    Tenant shall have the co-exclusive right, together with the then tenant of the Cost Plus World Market Premises from time to time (the "*Adjacent Tenant*"), to utilize the exterior loading facilities serving the Premises on a "24 hour a day", "365 days a year" basis.

(b)    Landlord hereby grants to Tenant a co-exclusive license to utilize the Shared Interior Loading Area (so designated on Exhibit B hereto) on a "24 hour a day", "365 days a year" basis for Tenant's normal loading activities. Subject to Articles 10 and 11 of this Lease, Tenant shall be responsible to repair any damage to the Shared Interior Loading Area which is occasioned by the act or omission of Tenant, its employees, agents, delivery services or other contractors and Tenant shall keep the Shared Interior Loading Area in a clean, safe and sightly condition. Tenant shall not interfere with the commercially reasonable use of the Shared Interior Loading Area by the Adjacent Tenant. Except to the extent that a portion of the Shared Interior Loading Area is allocated to the Premises , Landlord shall not require Tenant to pay any charges with respect to its use of the Shared Interior Loading Area.

46

(c)      Landlord shall (x) ensure that each new lease following the expiration or early termination of the Cost Plus Lease with respect to the Adjacent Premises shall require the Adjacent Tenant thereunder at all times to (A) keep the Shared Interior Loading Area in a clean, safe, and sightly condition, and (B) honor Tenant's license with respect to the Shared Interior Loading Area as herein described and cooperate reasonably with Tenant in connection with Tenant's and the Adjacent Tenant's respective loading activities within the Shared Interior Loading Area.  Landlord shall enforce the aforementioned requirements contained in each such new lease as same affect the Shared Interior Loading Area and Tenant's use thereof in connection with its normal loading activities.

(d)      Tenant shall (A) keep the Shared Interior Loading Area in a clean, safe, and sightly condition, and (B) honor the Adjacent Tenant's license with respect to the Shared Interior Loading Area as herein described and cooperate reasonably with Adjacent Tenant in connection with Tenant's and the Adjacent Tenant's respective loading activities within the Shared Interior Loading Area.

(e)      Subject to the foregoing, Landlord shall be permitted to grant to the Adjacent Tenant a co-exclusive license to utilize the Shared Interior Loading Area on a "24-hour a day", "365 days a year" basis for the Adjacent Tenant's normal loading activities in the same manner (and subject to the same corresponding terms and conditions described above) as Tenant's right to utilize the Shared Interior Loading Area as described above.

Section 23.2    Liens.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3    Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for CBRE, Inc. (formerly Fameco) (the "*Broker*").  Landlord shall pay the Broker a commission pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4    *Force Majeure.*  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for a period equal to the period of the delay.  Notwithstanding the foregoing provisions, the following shall not constitute *Force Majeure*: (i) the financial inability of a party to perform its obligations under this Lease (except for delays resulting from cyber-attacks, power failures, or other events of *Force Majeure* affecting the availability of funds); or (ii) delays occurring in the course of

47

bbBaby

complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto. A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of *Force Majeure* and shall, at that time, specify the reasons therefor, the specific *provision of this Lease* which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5    Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6    Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7    Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8    Survival of Obligations. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9    Non-Waiver. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10    Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11    Definition of Landlord. The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12    Successors and Assigns. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

48

bbBaby

Section 23.13  Limitation of Landlord's Liability. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14  Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15  Joint and Several Liability. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16  Severability. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17  Grammatical Usages and Construction. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18  Table of Contents, Line Numbering and Paragraph Headings. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19  Definition of Hereunder, Herein, etc. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20  Short Form Lease. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum, which shall be in recordable form, and such form and substance as either party shall reasonably request; Landlord and Tenant shall cooperate in the recordation thereof. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21  Entire Agreement and Modification. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth

49

bbBaby

herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  No Joint Venture or Partnership Created by Lease.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23  Tenant's Tradename.  Except as a nominative fair use (e.g., to show the location of the Premises in the Shopping Center or to indicate that Tenant is a tenant in the Shopping Center), Landlord shall not make use of any of Tenant's tradenames [*i.e.*, "*buybuy BABY*®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24  Counterparts.  This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25  Waiver of Trial by Jury.  Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26  Timely Billing of Charges.  Notwithstanding any provision of this Lease to the contrary, any Additional Rent for which Tenant is to be billed or charged by Landlord shall be billed or charged within one hundred eighty (180) days after the close of the calendar year (or fiscal tax year, in the case of Taxes) for which the amount is incurred by Landlord, failing which, Landlord shall be deemed to have waived its right to payment of such Additional Rent.

Section 23.27  Ethical Conduct Policy.  It is the policy of Tenant and its subsidiaries and Affiliates (collectively, the *"Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including, but not limited to, the U.S. Foreign Corrupt Practices Act).  No individual who is employed by or who represents the Company is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services from or to the Company.  This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Lease, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.  Any individual or entity having a business relationship with the Company shall require any subcontractor (of any level) to adhere to the same standards and are expected to appropriately monitor their subcontractors to ensure such adherence.  If any such improper actions are observed, please contact the Tenant's Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

Section 23.28  Confidentiality.  Landlord shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the Rent payable hereunder, except as required by Legal Requirements; or for disclosure to Landlord's accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center, provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord.

bbBaby

Section 23.29  <u>Governing Law.</u>  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

[Signature page follows]

51

bbBaby

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.


WITNESS:

[SEAL]


ATTEST:

_____
Name:  Alan M.  Freeman
Title:    Assistant Secretary

[SEAL]

**LANDLORD:**

WATER TOWER SQUARE
ASSOCIATES,
 a Pennsylvania limited partnership

By:    WTS Management Corporation,
a Pennsylvania corporation, its general partner

By:_____
Name: Kenneth N. Goldenberg
Title:___  President


**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By:_____
Name:  Steven H. Temares
Title:    Chief Executive Officer


bbBaby

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Tenant's Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Home Depot Consent |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Alternate Rent |
| Exhibit M | Prohibited Uses |

bbBaby

Exhibit A

Legal Description of Shopping Center

ALL THAT CERTAIN tract of land situate in the Township of Montgomery, County of Montgomery, Commonwealth of Pennsylvania, as shown on Sheet 1 of 17, titled Land Development Plan dated December 4, 1991, and prepared by Showalter & Associates of Chalfont, Pennsylvania, bounded and described as follows to wit:

BEGINNING at a corner on the westerly right-of-way line of Montgomery Glen Drive, and lands of N/F Montgomery County Industrial Development Authority, said corner being located the following course and distance from the centerline of Doylestown Pike (SR 202), and running across Doylestown Pike and along the right-of-way line of Montgomery Glen Drive, South 49 degrees 05 minutes 10 seconds East, a distance of 343.04 feet to the true point of beginning and running THENCE; 1) along the right-of-way line of Montgomery Glen Drive, South 49 degrees 05 minutes 10 seconds East, a distance of 1152.08 feet to a corner, a corner also to lands of Montgomery Glen Development; 2) along lands N/F Montgomery Glen Development, South 37 degrees 12 minutes 41 seconds West, a distance of 956.73 feet to a found concrete monument corner; 3) along same, South 43 degrees 00 minutes 00 seconds West, a distance of 125.00 feet to a corner, a corner also to lands of N/F Southland Corporation; 4) along lands of Southland Corporation, North 47 degrees 00 minutes 00 seconds West, a distance of 200.00 feet to a corner; 5) along same, South 43 degrees 00 minutes 00 seconds West, a distance of 225.00 feet to a corner in or near the centerline of Horsham Road (S.R. 463); 6) along Horsham Road, North 47 degrees 00 minutes 00 seconds West, a distance of 122.45 feet to a point; 7) along same North 47 degrees 57 minutes 00 seconds West, a distance of 381.12 feet to a point; 8) along same, North 50 degrees 13 minutes 52 seconds West, a distance of 457.29 feet to a point a corner; 9) along lands of Montgomery County Industrial Development Authority and crossing Horsham Road, North 39 degrees 06 minutes 56 seconds East, a distance of 1294.98 feet to the point and place of BEGINNING.

BEING Tax Parcel 46-00-01186-00-1

BEING the same premises which Water Tower Square Associates, a Pennsylvania limited partnership, by Deed dated 06/20/1992 and recorded 06/30/1992 in Montgomery County at Deed Book 5011, Page 544, granted and conveyed unto Water Tower Square Associates, a Pennsylvania limited partnership, in fee.

A-1

bbBaby

Exhibit B

Site Plan

bbBaby

B-1





PREMISES

106"−8 1/2" CLEAR

188'-2" CLEAR

171'-2" CLEAR

228"−1" CLEAR

121"−5" CLEAR

17'-0" CLEAR

16'-7" CLEAR

41'-5 1/2" CLEAR

15'-3" CLEAR

16'-7" CLEAR

ENLARGED PLAN

MONTGOMERYVILLE, PA
buy buy BABY
EXHIBIT B (2 OF 2)

LOADING FACILITIES

TRASH COMPACTOR PAD

Exhibit C

Form of Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 201__, by and between WATER TOWER SQUARE ASSOCIATES (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

# WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as Water Tower Square (the *"Shopping Center"*), situated in Montgomeryville, Pennsylvania;

WHEREAS, by that certain Lease Agreement dated as of _____, 201__ (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____, 201__.

2.    The **Initial Term** of the Lease shall expire on January 31, 201___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the **first Renewal Period** shall be February 1, 201___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise being **[insert date]**), and if Tenant does so, the Term of the Lease shall expire on January 31, 201___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the **second Renewal Period** shall be February 1, 201___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise being **[insert date]**), and if Tenant does so, the Term of the Lease shall expire on January 31, 201___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The date of commencement of the **third Renewal Period** shall be February 1, 201___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise being **[insert date]**), and if Tenant does so, the Term of the Lease shall expire on January 31, 201___, unless the Lease terminates earlier as provided in the Lease.

6.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

bbBaby

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

LANDLORD:

WATER TOWER SQUARE
ASSOCIATES,
 a Pennsylvania limited partnership

By:   WTS Management Corporation,
a Pennsylvania corporation, its general
partner

By:_____
Name: Kenneth N. Goldenberg
Title: President

TENANT:

BED BATH & BEYOND INC.,
a New York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

C-2

<u>Exhibit D</u>

<u>Specifications for Landlord's Work</u>

D-1

*Montgomeryville, PA*



### Exhibit D - Landlord's Obligations

04/15/15

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

## I. General Provisions

A. **"As-Is":** Except as otherwise provided in the Lease and the Exhibits thereto, Landlord shall deliver the Premises to Tenant in its present "As-Is" physical condition. The foregoing reference to the Premises being delivered in "As-Is" condition shall not relieve the Landlord of any maintenance or repair obligations (including structural defects) with respect to the Premises otherwise specifically set forth in the Lease as the responsibility of the Landlord. Subject to the above, the Premises shall be delivered to Tenant in substantially the same condition and state of repair as existed on the date of Tenant's inspection thereof on 02/11/2015.

B. **Existing Documents:** Landlord has provided to Tenant (in both hard copy and electronic format) all available Construction Documents and Reports describing the Premises and the Shopping Center including, but not limited to the following: As-Built Drawings & Specifications for the Premises ; Elevations for both Pylon Signs; Civil engineering ALTA & Utility documents for the Shopping Center, and Geotechnical reports for the Shopping Center.

C. **Broom Clean:** The Premises shall be delivered to the Tenant by Landlord in a neat and broom clean condition, free of all prior tenants and occupants, and free of all store fixtures, furniture, equipment and the like from prior occupants with any damage to the Premises caused by the removal of such fixtures having been repaired (at Landlord's cost) to Tenant's reasonable satisfaction.

D. **Water Tight:** The Premises shall be delivered to Tenant by Landlord with the roof watertight (with all gutters, downspouts, roof drains, etc. in good working order and repair).

E. **Secure & In Good Repair:** The Premises shall be delivered to Tenant by Landlord in a secured condition with the structural components (including, without limitation, the foundation, exterior walls, structural supports, floor slab and roof) in good order and repair.

F. **Quality:** All work, whether performed by Landlord or Tenant, shall be done in accordance with Section 3.3.1 of the Lease (as applicable).

G. **Cooperation:** Landlord agrees to reasonably cooperate with Tenant (at no cost to Landlord) and to assist Tenant in obtaining all required building permits for Tenant's Work, and in obtaining an unconditional permanent certificate of occupancy, or the local equivalent thereof. Examples of same include signing permit applications, providing records of paid property taxes, and items of similar nature)

## II. Delivery Conditions

A. **Common Areas:** All parking areas, traffic drives, access drives and Tenant's recessed truck ramp are existing and as shown on Exhibit B. Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited.

B. **Site Lighting:** The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) are existing to remain. Landlord shall also provide low level security lighting for the Shopping Center pursuant to Section 5.2.5 of the Lease.

C. **Demising Walls:** The demising wall between the Premises and Planet Fitness is an existing CMU wall. Tenant shall be responsible for constructing the demising wall separating the Premises from the Cost Plus World Market Premises.

D. **Utilities:** All existing electric, gas, water (fire and domestic), sanitary and phone utilities shall be dedicated to serve Tenant's Premises and shall be in good working order. Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date. Tenant shall transfer all utility accounts from Landlord (Landlord shall assist Tenant) so that Tenant may assume responsibility for utility costs commencing on the Delivery Date. If Landlord and Tenant are unable to complete transfer at time of the Delivery Date, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed. Landlord shall, for the full term of the Lease, routinely inspect, test, and maintain the Backflow Preventer as required, the cost of which shall be includable in Common Area Charges.

E. **Hazardous Materials:** The Premises shall be free from asbestos material and other Hazardous Substances including any existing Self Luminous Exit Signs containing Tritium Gas which shall be removed from the Premises at Landlord's cost.

F. **Building Signs:** Subject to Tenant's receipt of all required governmental approvals and permits, Tenant may furnish and install all building signs shown on Exhibits D-1 and F of the Lease.

G. **Pylon Signs:** The Shopping Center has (2) two double sided pylon signs as shown on Exhibits B & F. Subject to Landlord's review and approval, which shall not be unreasonably withheld or delayed, Tenant is responsible for furnishing and installing all pylon sign panel graphics and logos (logo, colors & layouts at Tenant's option). Landlord shall use commercially reasonable efforts to obtain all permits and approvals required for the addition of an additional sign panel to each of the pylons in accordance with Section 7.2 of the Lease. If approved, Landlord shall provide additional sign panel(s) to applicable pylon(s) at Landlords cost.

H. **Temporary Signs:** Tenant shall supply and install building and site temporary banners as shown on Exhibits B and D-1 bearing the phrase "buybuy BABY Coming Soon / buybuy BABY Now Hiring / buybuy BABY Now Open / buybuy BABY Shop Online / buybuy BABY Grand Opening ", etc. as shown on Exhibits B & F.

## III. <u>Common Area Improvements</u>

Landlord shall perform the following items after the Delivery Date in accordance with the lease:

A. <u>Entry Drive</u>:  Landlord shall mill, repave and restripe the existing main entry/exit drive off Horsham Road.

B. <u>Raised Island Modifications</u>:  Landlord shall provide (2) curb cut  throughs at the existing raised landscaped island parallel to Tenant's entry and shall include any modifications to the existing landscaping as required.  Landlord shall also stripe the parking space adjacent to cut throughs to prohibit parking as shown on Exhibits B & D-1.

C. <u>Handicapped Parking</u>:  Landlord shall restripe 1st parking row parallel to Tenant's entry to indicate new Handicapped Parking designated spaces and provide/install applicable signage as shown on Exhibits B & D-1.

D. <u>Site Lighting Bases</u>.  Landlord shall patch/repair/repaint all site lighting bases within the Critical Area (as shown on Exhibit B) and ensure they are in proper working order.

E. <u>Development Work</u>:  Subject to Section 3.3.1 of the Lease, in the event that additional on-site and/or off-site development work is required by governmental authorities in order for Tenant to obtain permits, use, or occupancy rights, Landlord shall perform such work at its sole cost and expense in accordance with the lease.

Exhibit D-1

Exterior Elevations of Premises and Sidewalk Plan

E-1

bbBaby



MONTGOMERYVILLE, PA

FRONT ELEVATION

buybuyBABY EXHIBIT D-1

SIDEWALK PLAN

Exhibit E

Permitted Encumbrances

1.  Rights granted to Pennsylvania Electric Company and Bell Telephone Company of Pennsylvania as set forth in Deed Book 1161, Page 134 and Deed Book 5022, Page 311.

2.  Rights granted to Pennsylvania Electric Company as set forth in Deed Book 3594, Page 883; Deed Book 4759, Page 1901 and Deed Book 5030, Page 539.

3.  Easement over that portion as condemned for sanitary sewer purposes as of CP-77-6091, a Declaration of Taking as set forth in Deed Book 4190, Page 448.

4.  Deed of Dedication to Township of Montgomery as set forth in Deed Book 4769, page 2232.

5.  Covenant Running with Land as set forth in Deed Book 4931, Page 1634, Amendment to Covenant in Deed Book 5010, Page 267, Amendment to Covenant in Deed Book 5011, Page 1945, Amendment recorded in Deed Book 5024, Page 1440 and Third Amendment recorded in Deed Book 5473, Page 1162.

6.  Deed of Easements as set forth in Deed Book 5002, Page 161.

7.  Deed of Dedication of Public Water Easement as set forth in Deed Book 5003, Page 1877 and Deed Book 5045, Page 2487.

8.  Deed of Dedication of Easement as set forth in Deed Book 5019, Page 400.

9.  Subdivision and Land Development Agreement as set forth in Deed Book 5005, Page 2311.

10. Land Development Agreement as set forth in Deed Book 5010, Page 214.

11. Restrictions as set forth in Deed Book 5011, Page 429.

12. Terms and conditions of Lease to Ross Stores Inc. as evidenced by a Memorandum thereof recorded in Deed Book 5011, Page 577.  The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

13. Terms and conditions of Lease to Home Depot U.S.A., Inc. as evidenced by a Memorandum thereof recorded in Deed Book 5043, Page 1119.  The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

14. Deed of Dedication as set forth in Deed Book 5096, Page 2322 and Deed Book 5097, Page 1718.

15. Rights granted to Bell Atlantic - Pennsylvania, Inc. as set forth in Deed Book 5166, Page 2098 and Deed Book 5189, Page 1854.

16. Grant of Easement as set forth in Deed Book 5068, Page 2371 and Deed Book 5064, Page 1398.

17. Land Development Agreement as set forth in Deed Book 5460, Page 1769.

18. Declaration of Covenants and Restrictions as set forth in Deed Book 5461, Page 1165.

E-1

19.     Terms and conditions of Lease to Metro PCS Pennsylvania as evidenced by a Memorandum thereof recorded in Deed Book 5737, Page 986. The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

20.     Subject to Section 2.3.1(d) and 17.3 of the Lease, [Mortgage].

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

bbBaby

E-2

**Exhibit F**

**Tenant's Signage**

bbBaby

F-1













## buy buy BABY.
Expectant Mother Parking Sign

Sign Logo: Red
Pantone 186 C

Sign & Base: Blue
Pantone 2718 C

10.12"

PARKING
for Expectant Mothers
and Parents with Newborns

6.25"

18"

PARKING
for Expectant Mothers
and Parents with Newborns

McCue
Corporation
3/5/10

### EXPECTANT MOTHER
### PARKING SIGN
(TENANT'S PARKING FIELD)

## EXHIBIT 'F' (7 OF 7)
### BUY BUY BABY
### MONTGOMERYVILLE,
### PA

Exhibit G

Form of Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 201__, by and between _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ (the "*Mortgagee*") and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the "*Tenant*").

W I T N E S S E T H:

WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*") covering a parcel of land owned by WATER TOWER SQUARE ASSOCIATES, Pennsylvania limited partnership (the "*Landlord*") together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the "*Shopping Center*" and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain Lease Agreement heretofore entered into between Landlord and Tenant dated as of _____ (as amended and/or modified, the "*Lease*"), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the "*Premises*"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

[**For mortgages existing as of the date Lease is executed**: WHEREAS, as an inducement to Tenant to enter into the Lease, [Section 2.3.1/Section 17.3] thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

[**For mortgages occurring after the Lease is executed**: WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

G-1

3.     Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)     Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)     The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)     All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.     If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)     Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)     Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)     liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)     subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease

G-2

bbBaby

and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one (1) month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent (unless Mortgagee's consent is not required under the terms of the Mortgage); notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(vi)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease. It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, NJ07601, Attention: W. John Park, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing

G-3

bbBaby

executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[TO ADD IF OUR MEMORANDUM OF LEASE HAS BEEN RECORDED PRIOR TO THE SUBJECT MORTGAGE:]** NOTE:  THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

<u>**MORTGAGEE:**</u>

ATTEST:

By:_____        By:_____
Name:_____        Name:_____
Title:  (Assistant) Secretary           Title:   (Vice) President

[SEAL]

<u>**TENANT:**</u>

ATTEST:                                          BED BATH & BEYOND INC., a New
                                                      York corporation

By:_____        By:_____
Name: Alan M. Freeman                Name:  Warren Eisenberg
Title:   Assistant Secretary            Title:   Co-Chairman

[SEAL]

G-4

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

**[JURAT FOR PARENT:]**

STATE OF NEW JERSEY    )
                           ) : ss.

COUNTY OF UNION       )

       On this ___ day of _____, 201__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                              _____
                                              Notary Public

My Commission Expires:

**[JURAT FOR SUBSIDIARY:]**

STATE OF NEW JERSEY    )
                           ) : ss.

COUNTY OF UNION       )

       On this ___ day of _____, 201__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is President of Bed Bath & Beyond of _____ Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                              _____
                                              Notary Public

My Commission Expires:

<u>Exhibit H</u>

<u>Recognition Agreement</u>

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 201__, by and between _____, a [_____] [corporation] [limited] [general] [partnership], having an address at WATER TOWER SQUARE ASSOCIATES ("*Landlord*"); BED BATH & BEYOND INC., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*"); and _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ ("*Subtenant*").

R E C I T A L S :

A.    Landlord and Tenant have entered into a certain Lease Agreement (the "*Lease*") dated as of _____, 201__, a short form of which has been recorded in _____, which demises certain premises (the "*Premises*") located in Water Tower Square, Montgomeryville, Pennsylvania, which Shopping Center is more particularly described on <u>Exhibit A</u> annexed hereto and made a part hereof.

B.    Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.    Pursuant to a Sublease dated as of _____ (the "*Sublease*"), Tenant has subleased [a portion of] the Premises to Subtenant (the "*Subleased Premises*").

D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(a)    that it is the fee owner of the Premises,

(b)    that the Lease is unmodified (except as may be otherwise set forth in <u>Exhibit B</u> annexed hereto, if any) and is in full force and effect,

(c)    that the term of the Lease expires on _____, but is subject to three renewal periods of five years each and

(d)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.    Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.    Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in

H-1

bbBaby

accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.       Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.       In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

6.       Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.       Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as *"Notice"*) given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, NJ07601, Attention: W. John Park, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.       No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

bbBaby

9.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

WATER TOWER SQUARE
ASSOCIATES,
 a Pennsylvania limited partnership

By:    WTS Management Corporation,
a Pennsylvania corporation, its general
partner

By:_____
Name: Kenneth N. Goldenberg
Title: President

**TENANT:**

BED BATH & BEYOND INC.,
a New
York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

bbBaby                                                    H-3

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

_____

**[JURAT FOR PARENT:]**

STATE OF NEW JERSEY       )
                          ) : ss.
COUNTY OF UNION                )

On this ___ day of _____, 201__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
                                          Notary Public
My                            Commission
                                                        Expires:

_____

_____

**[JURAT FOR SUBSIDIARY:]**

STATE OF NEW JERSEY )
                    ) : ss.
COUNTY OF UNION          )

On this ___ day of _____, 201__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is President of Bed Bath & Beyond of _____ Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
                                          Notary Public
My                            Commission
                                                        Expires:

_____

_____

bbBaby

Exhibit I

Home Depot Consent



2455 Paces Ferry Road • Atlanta, GA 30339
(770)433-8211

April 23, 2015

**VIA EMAIL & OVERNIGHT MAIL**

Goldberg Management, Inc.
Attn: Adam Rosenzweig
350 Sentry Parkway, Bldg 630, Suite 300
Blue Bell, PA 19422
arosenzweig@goldenberggroup.com

RE:    Lease dated January 27, 1993 by and between Water Tower Square Associates, a
       Pennsylvania limited partnership ("Landlord") and Home Depot U.S.A., Inc., a
       Delaware corporation ("Home Depot"), as amended by First Amendment to Lease
       dated August 27, 2003 by and between Landlord and Tenant (the "First
       Amendment") and Second Amendment to Lease dated October 6, 2003 by and
       between Landlord and Tenant for certain premises within the retail shopping center
       known as "Water Tower Square" (the "Shopping Center") located at the
       intersection of Horsham Road and North Wales Road in Montgomeryville,
       Pennsylvania (collectively, the "Lease"),
       Home Depot # 4104 Montgomeryville, PA

Dear Adam:

Home Depot received your e-mail dated April 6, 2015 on behalf of Landlord stating Landlord's
desire to make certain modifications to the parking lot of the Shopping Center as shown on the
site plan attached hereto and incorporated herein as Exhibit A (the "Site Plan"), including (a) the
installation of two (2) cart corrals in the locations shown on the Site Plan, (b) the installation of
two (2) recessed walkways in the locations shown on the Site Plan, (c) the designation as
"expectant mother" parking spaces of those parking spaces identified as "EM" on the Site Plan,
and (d) the designation as handicapped parking spaces of those parking spaces identified as "&"
on the Site Plan (collectively, the "Parking Lot Modifications").

Home Depot considered the request and hereby approves of the Parking Lot Modifications,
subject to the following condition:

    A.    Landlord agrees not to commence any work on the Parking Lot Modifications until
          after July 4, 2015.

I-1

Home Depot's approval of the above is in no way a representation (or agreement) by Home Depot that same is in compliance with any laws, rules, regulations or codes or that the same will be permitted by any relevant governing authority.  Such approval is not a waiver of any other rights contained in the Lease.   Except as expressly set forth herein, no other provisions of the Lease shall be deemed waived, supplemented or modified hereby, and all of said covenants, terms, obligations and conditions shall remain in full force and effect.

Please contact Tom Gallagher, Sr. Manager, Real Estate at 410-804-5043 if you should have any questions or comments with respect to the foregoing.

Sincerely,
Home Depot U.S.A., Inc.

Jessica Borgert
Senior Corporate Counsel

Cc;    Tom Gallagher, Sr. Real Estate Manager, The Home Depot (via email only)

bbBaby

I-2



I-3

bbBaby

Exhibit J

Form Of Delivery Date Certification

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Lease Agreement, dated as of _____, 201__ (the *"Lease"*),
       between Water Tower Square Associates, as landlord (*"Landlord"*),
       and Bed Bath & Beyond Inc., as tenant (*"Tenant"*), with respect to
       certain retail premises (the *"Premises"*) located in Water
       Tower Square, Montgomeryville, Pennsylvania

Gentlemen:

    In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date
Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
Date (as such term is defined in the Lease) will be deemed to be _____, 201__.
This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
of the Lease.

WATER TOWER SQUARE
ASSOCIATES,
a Pennsylvania limited partnership

By:    WTS Management Corporation,
a Pennsylvania corporation, its general
partner

By:_____
Name: Kenneth N. Goldenberg
Title: President

cc:    Allan N. Rauch, Esq.

bbBaby

Exhibit K-1

Existing Exclusives

Home Depot

**ARTICLE VIII ~ USE AND ASSIGNMENT**

 8.1  Use.

The Premises may be used for any lawful purpose other than primarily for the sale of books, office supplies, sporting goods or men's or women's fashions except in each case in connection with the operation of a department store, junior department store or general merchandise store; nor shall the Premises be used as a

(i) supermarket or for the sale of groceries other than as incidental items for two (2) years after Tenant's opening for business and thereafter so long as a supermarket is operating in the shopping center plus a period of an additional 365 days or (ii) in violation of exclusives granted by Landlord to other tenants or occupants of the Shopping Center or in conflict with restrictive uses imposed on the Shopping Center, provided that without Tenant's consent (which may be withheld in Tenant's sole discretion) Landlord shall only grant exclusives in the Shopping Center to tenants or occupants utilizing as a single use at least twenty thousand (20,000) square feet of gross leasable area. A grant of an exclusive to a tenant or occupant using less than twenty thousand (20,000) square feet of gross leasable area shall not be binding upon Tenant, its successors or assigns, or upon the Premises. Notwithstanding anything herein to the contrary, Tenant shall not be bound by exclusives granted to any tenant or occupant except to the extent specified in this Section 8.1 and then only for those tenants to whom the exclusive was granted in the original lease document and any succeeding tenants whose use is the same as the original tenant's exclusive The failure of any tenant having an exclusive to operate for such use for a period of six (6) months or more shall terminate such exclusive. Notwithstanding anything herein to the contrary, Landlord shall not grant any exclusives prohibiting Tenant's use of the Premises as a general merchandise store, department store or discount store.

Tenant acknowledges that Landlord has apprised Tenant that Landlord has agreed to certain restrictions as a consequence for a termination agreement by and between Landlord and Giant Food Stores which may affect the Premises. Tenant agrees that it has actual notice of such restriction as same may be in effect as of the Execution Date hereof and any violation that it may undertake thereof shall be at Tenant's sole risk, cost and expense.

Landlord represents and warrants that Landlord has granted no exclusives and has not entered into nor is the Shopping Center subject to any restrictive use agreements other than those listed on Exhibit "F" attached hereto and made a part hereof by this reference ("Restrictive Use Agreements").

Notwithstanding anything herein to the contrary, the original Tenant shall be permitted to (i) use the sidewalks contiguous with the Premises for purposes of providing refreshments to employees and customers and for promotional events, (ii) conduct seasonal sales in the Common Areas and (iii) install and operate pay telephones on the exterior wall of the Premises or sidewalk in front of the Premises.

8.2  Exclusive.  Landlord hereby covenants, warrants and represents that Landlord has not leased and will not lease any space in the Shopping Center or within one mile of the perimeter of the Shopping Center (except with respect to Landlord's mortgagee) to, or allow the use of any such space by, anyone occupying 15,000 square feet or less of gross leasable area whose principal business is the sale of (a) paint; (b) wallpaper; (c) carpeting; (d) floor coverings; (e) cabinets; (f) lighting fixtures; (g) plumbing fixtures or (h) Christmas trees. Except as otherwise provided in this Lease, Landlord shall not, during the term of this Lease and during any extensions thereof, grant any exclusive to any tenant or other party occupying space in the Shopping Center which will apply to the Premises. Landlord acknowledges that the foregoing covenant and warranty was a material inducement to Tenant entering into this Lease, and agrees that Tenant shall have the right to enforce the provisions of this Section by appropriate injunctive or other equitable relief in addition to any and all remedies at law, provided that Landlord shall reimburse Tenant for all expenses incurred by Tenant in enforcing its exclusive rights hereunder, including reasonable attorney's fees, through any and all actions, including appeals.

K-1-1

Neither Landlord nor any party, other than Tenant, shall be permitted to conduct the sale of Christmas trees within the Shopping Center. Tenant shall also be permitted to conduct seasonal sales within the Shopping Center, including within those areas designated as Common Areas, subject to governmental approvals. Any Christmas Tree and seasonal sales conducted by Tenant within the Common Areas shall be restricted to the area designated Tenant's "Seasonal Sales Area" on the Site Plan.

For purposes of this Section 8.2 and the other terms and provisions of this Lease, Landlord includes any affiliate of Landlord, i.e., any person or business entity which Landlord controls, or by which Landlord is controlled.

### 8.3   Objectionable Uses

No portion of the Shopping Center shall be used for any non-retail use other than retail service uses customary to first-class shopping centers such as banks and travel agencies. Moreover, Landlord shall not lease to or permit any portion of the Shopping Center to be used for any of the following purposes: bookstore or other establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials; a so-called "head shop"; video or other type of gameroom or arcade within 200 feet of any boundary of the Building; off-track betting parlor; pawn shop; business selling so-called "second-hand goods"; junk yard; flea market; recycling facility or stockyard; motor vehicle or boat dealership, vehicle repair shop (including lubrication and/or service center), body and fender shop, car wash facility, motor vehicle or boat storage facility; theater (except for the existing building in the Shopping Center) auditorium, bar, sports or other entertainment viewing facility, within 200 feet of any boundary of the Building (whether live, film, audio/visual or video); discotheque, dance hall, or night club; bowling alley; skating rink; billiard parlor; health spa or exercise facility; restaurant/bar within 200 feet of any boundary of the Building, fast food restaurant or other restaurants; office usage other than incidental in connection with non-prohibited uses and except for retail service usage (such as a real estate office or a travel agency); dry cleaning or laundry plant (except as to an establishment which receives and dispenses items for laundering and/or dry cleaning but the processing of which items is done elsewhere); industrial or manufacturing uses (other than such manufacturing use as is conducted in conjunction with Tenant's home improvement center business); training or educational facility or house of worship. "Training or educational facility" shall mean a beauty school, barber college, reading room, place of instruction or any other activity catering primarily to students or trainees as opposed to customers.

Landlord further agrees that the following shall not be allowed to operate in the Shopping Center or Common Areas: traveling carnivals, fairs, auctions, shows, kiosks, (except as shown on the Site Plan) booths for the sale of fire works, sales by transient merchants utilizing vehicles or booths and other promotions of any nature. In the event that the parking areas of the Shopping Center are at any time utilized by unauthorized persons or for any authorized purpose, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be reasonably necessary to prevent said unauthorized utilization.

K-2-2

bbBaby

OfficeMax

## ARTICLE X

10.1  **Use of Premises.**  Tenant shall have the right to use and occupy the Premises for any lawful use. Notwithstanding the foregoing, Tenant shall not use the Premises for the purposes set forth in EXHIBIT "H" attached hereto and made a part hereof, provided that nothing contained in EXHIBIT "H" shall restrict or affect the right to Tenant to use the Premises for the retail sale of office, home office, business, school and art supplies, office furniture, computer hardware, electronics, computer software, luggage, breakroom supplies, printing, duplicating, facsimile, and copy center services; U.P.S., Federal Express, and other miscellaneous items and services customarily or normally sold in an office products retail store.

10.2  **Restrictions.**

(a)  During the initial term of this Lease or during any renewal period hereunder, no portion of the Shopping Center (except the Premises) shall be used:

(i)  For the primary purpose of, or which is permitted to be, the sale of office, home office, school or business products; computers and computer products; office, home office, school or business supplies or equipment; office furniture; or electronics or for use as a copy center (all of which are hereinafter referred to as the "Prohibited Uses");

(ii)  For any purpose which would permit more than (A) one thousand (1,000) square feet of space to be used for any Prohibited Uses, or (B) five percent (5%) of such user's floor area to be used for purposes of any Prohibited Uses, whichever is less; or

(iii)  For any purpose which, taken in the aggregate for the entire Shopping Center, would permit more than five thousand (5,000) square feet of space in the Shopping Center to be used for any of the Prohibited Uses.

Notwithstanding the foregoing:

(iv)  The restrictions set forth above shall not be applicable to those existing leases with tenants at the Shopping Center which are set forth in EXHIBIT "H", attached hereto and made a part hereof, to the extent such existing leases permit such tenants to use their respective premises for the Prohibited Uses; provided, however, that upon any assignment or subletting under such leases, Landlord shall enforce Tenant's rights set forth above unless (A) such assignment or subletting is for a purpose presently permitted by such leases and (B) Landlord is not presently permitted, pursuant to the terms of such lease, to enforce Tenant's rights hereunder in connection with such assignment or sublease.  In addition, the restrictions set forth above shall not be applicable to any replacement tenants for any of the designated anchor tenants on EXHIBIT "H", provided that (A) such replacement tenant shall occupy substantially all of the floor area presently leased to such designated anchor tenant, and (B) the permitted use of the Premises by such replacement tenant is not primarily for the purposes set forth in Section 10.2(a)(ii) above.

(v)  The restrictions set forth in Sections 10.2(a)(ii) and 10.2(a)(iii) above, and the restrictions against the sale of electronics in Section 10.2(a)(i) above, shall not be applicable to any leases executed by Landlord after the date of execution hereof with a proposed tenant whose primary use is permitted to be the sale of residential consumer electronics, including by way of

example the product mix sold by those businesses presently operated by Circuit City, Fretter, and Radio Shack. For purposes of this Section 10.2(a)(iv), "residential consumer electronics" shall mean the sale of (A) televisions, VCRs, radios, answering machines, camcorders, stereos, electronic games, telephones, kitchen and laundry appliances, and other similar products, and (B) personal computers intended primarily for residential consumer use, provided that the floor area used for the sale of such computer products does not exceed twenty-five percent (25%) of such tenant's premises. Notwithstanding the foregoing, (A) Landlord shall enforce Tenant's rights set forth above unless upon any subletting or assignment under any such leases, to the extent the proposed use of such premises by such proposed assignee or subtenant is different from the permitted use of such premises as set forth above, Landlord shall enforce the restrictions contained in Sections 10.2(a)(ii) and 10.2(a)(iii) above; provided, however, that (B) if Landlord is not presently permitted, pursuant to the terms of such lease, Landlord shall not be required to enforce such Tenant's rights hereunder in connection with such assignment or sublease.

(vi)   Landlord shall have the right to execute a lease with a tenant for purposes of the Prohibited Uses upon the satisfaction of the following conditions:

(A)   Tenant shall discontinue its operations in the Premises for a continuous period in excess of ninety (90) days (excluding any such discontinuance due to damage or destruction of the Premises, condemnation, redecoration, remodeling and/or refurbishing of the Premises, any permitted assignment or subletting of the Premises, or any other causes beyond Tenant's reasonable control);

(B)   Landlord shall have delivered written notice to Tenant of such proposed lease, which notice shall also set forth the nature and scope of the proposed use by such tenant in violation of the restrictions set forth in Section 10.2(a) above (the "Proposed Use"); and

(C)   Within fifteen (15) days after receipt of such written notice from Landlord, Tenant shall not have delivered written notice to Landlord either that (1) Tenant shall reopen for business in the Premises within sixty (60) days after the date of such written notice to Landlord, or (2) Tenant has assigned the Lease or sublet the Premises to an assignee or subtenant who shall reopen for business in the Premises within sixty (60) days after the date of such written notice to Landlord.

If all of the conditions set forth in (A)-(C) above are satisfied, then Landlord shall have the right to execute such proposed lease with such proposed tenant for purposes of the Proposed Use, and the restrictions set forth in Section 10.2(a) above shall not be applicable to such proposed lease to the extent the Proposed Use permits the use of such premises by such tenant for purposes for the Prohibited Uses and/or Restricted Uses. Notwithstanding the foregoing, upon any assignment or subletting under such proposed lease, to the extent Landlord has the right to consent to any subletting or assignment under such proposed lease, Landlord shall enforce Tenant's rights hereunder unless (i) such assignment or subletting is for a purpose presently permitted by such leases and (ii) Landlord is not presently permitted, pursuant to the terms of such lease, to enforce Tenant's rights hereunder in connection with such proposed assignment or sublease. Notwithstanding the foregoing, if Landlord does not execute such proposed lease within one hundred eighty (180) days after the expiration of Tenant's fifteen (15) day notice period set forth in (C) above, or if the proposed use of the Premises by such proposed tenant is changed or modified from the Proposed Use set forth in Landlord's notice to

bbBaby

K-4-4

Tenant under (B) above, then Landlord shall again deliver the written notice to Tenant of such proposed lease in accordance with (B) above prior to the execution of such proposed lease by Landlord, and the execution of such proposed lease shall again be subject to the terms and conditions of (A)-(C) above.

(vii)   If Tenant either assigns this Lease or subleases the entire Premises as permitted under ARTICLE XI for any use other than the Prohibited Uses, the restrictions set forth above in Sections 10.2(a)(i)-10.2(a)(iii) shall terminate and be of no further force or effect, so long as Landlord grants to Tenant's assignee or subtenant (whichever is applicable) an exclusive in the Shopping Center with respect to such assignee's or subtenant's primary use.   The description of the primary use subject to such exclusive shall be subject to the reasonable approval of Landlord and such assignee or subtenant, and the scope of such exclusive shall otherwise be on the same terms and conditions, and with the same exceptions, as that contained in this Section 10.2(a, including without limitation the remedies granted to Tenant hereunder for a violation of such exclusive.   Such exclusive shall commence as of the effective date that Landlord and such assignee or subtenant agree upon the description of such exclusive.   Any existing tenant or other occupant of the Shopping Center as of such effective date, and any such tenant's or occupant's assigns or sublessees, shall not be bound by the exclusive granted to Tenant's assignee or subtenant as set forth above, to the extent such existing lease and/or other agreement with such tenant or occupant permits or does not prohibit such tenant or occupant (or such tenant's or occupant's assigns or sublessees) from using its respective premises for purposes of the uses prohibited by such exclusive.

(b)   During the initial term of this Lease or during any renewal period hereunder:

(i)   No portion of the Shopping Center located within two hundred fifty linear feet (250') of the demising walls of the Premises shall be used as a restaurant, delicatessen, nightclub, pool hall, skating rink, or other entertainment facility, or for commercial purposes (such as medical or office uses), or as a game arcade, bowling alley, theatre, movie theatre, health club or spa, adult book store or any other purpose which includes the display or sale of pornographic or obscene materials or entertainment, off-track betting facility, flea market, massage parlor (all of which are hereinafter referred to as the "Restricted Uses"); and

(ii)   No outlot (or any portion thereof) within the Shopping Center shall be used for purposes of any of the Restricted Uses if such outlot shall have the right to use any of the parking areas located within one hundred feet (100') of the Premises.

The restrictions set forth above shall not be applicable to those existing leases with tenants at the Shopping Center which are set forth in EXHIBIT "H", attached hereto and made a part hereof, to the extent such existing leases permit such tenants to use their respective premises for the Restricted Uses; provided, however, that upon any assignment or subletting under such leases, Landlord shall enforce Tenant's rights set forth above unless (i) such assignment or subletting is for a purpose presently permitted by such leases and (ii) Landlord is not presently permitted, pursuant to the terms of such lease, to enforce Tenant's rights hereunder in connection with such assignment or sublease.   In addition, Landlord shall have the right to replace any existing tenant under such existing leases with another tenant operating for the same purpose as such existing tenant, provided that the floor area occupied by such replacement tenant shall not exceed the floor area presently occupied by such existing tenant.

6.   **Prohibited Uses.** Section 10.2(b)(i) of the Original Lease is deleted in its entirety and the following is substituted in lieu thereof:

"No portion of the Shopping Center located within two hundred fifty linear feet (250') of the demising walls of the Premises shall be used as a restaurant, delicatessen, nightclub, pool hall, skating rink or for medical uses (other than medical uses typically found in first-class retail shopping centers, such as Aspen Dental, America's Best Eyeglasses, Beltone Hearing, Good Sheppard, Mercy Health, and similar operations, which shall be permitted within the Shopping Center) or non-medical office uses (other than banks and small loan offices and other financial service agencies, insurance agencies, travel agencies and similar uses open to the public, within the Shopping Center), or as a game arcade, theatre, movie theatre, adult book store or any other purpose which includes the display or sale of pornographic or obscene materials or entertainment, off-track betting facility, flea market, massage parlor (all of which are hereinafter referred to as the "Restricted Uses"); and"

## Planet Fitness

9.   **USE OF PREMISES**

9.1   Use.

Subject to the primary use exclusives and prohibited uses applicable to the Shopping Center as set forth on Exhibit E attached hereto (collectively, the "Shopping Center Exclusives and Prohibited Uses"), any future exclusive uses or prohibitions granted to any tenant or occupant of the Shopping Center (each a "Future Exclusive"), provided that each such Future Exclusive does not limit Tenant from engaging in Tenant's Permitted Use and the Additional Prohibited Uses (as hereinafter defined in Section 9.2), the Premises shall be used by Tenant or any permitted Transferee (as hereinafter defined in Section 10) as a full service physical fitness facility open to the public, which use shall not include indoor sports activities of a team or group nature and may include, but not be limited to, cardiovascular, strength and free weight training, exercise training and supervision, massage chairs, tanning and other legal activities incidental to health club membership ("Tenant's Permitted Use"), and for no other purpose during the entire Term. Tenant may also maintain refrigerated units within the Premises containing pre-bottled soft drinks and juices and a snack counter, containing pre-packaged snack or nutritional bars for the comfort

and convenience of Tenant's members. Tenant shall operate under the trade name Planet Fitness, or such other trade name as reasonably desirable for Tenant's business operations. Landlord warrants and represents that Tenant's use of the Premises as a physical fitness facility with tanning is not prohibited by the terms of any other agreement or lease (including those existing as of the date hereof) or, if prohibited, such prohibition has been waived as described in Section 9.2 below.

9.4   Tenant's Exclusive.

Provided that Tenant is in possession of the Premises and operating for Tenant's Permitted Use therein and no Event of Default exists, Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant whose use under such lease shall be for the operation of a business whose primary use is for a tanning facility or a health club or fitness facility which operates for Tenant's Permitted Use (the "Exclusive Use"). Notwithstanding anything to the contrary herein, the Exclusive Use shall not be applicable to any existing Shopping Center tenant whose lease as of the date of this Lease does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns, or replacements. Landlord and Tenant acknowledge that the Exclusive Use has been included herein at the sole request of Tenant. Any breach of this provision by Landlord shall be deemed a material default of this Lease, and Tenant shall be allowed and entitled to pursue any and all remedies available to Tenant at law or in equity, including, but not limited to, injunctive relief.

<u>Exhibit K-2</u>

<u>Existing Leases</u>

1. Lease between Landlord and Home Depot U.S.A., Inc.
2. Lease between Landlord and OfficeMax North America, Inc.
3. Lease between Landlord and Frank Theatres Montgomeryville, LLC
4. Lease between Landlord and Rhino Montgomeryville, Inc.

bbBaby                                   K-2-1

Exhibit L

Alternate Rent

1.    During the applicable period(s) described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay as *"Alternate Rent"* an amount equal to three (3%) percent of all Gross Sales (defined in this Exhibit L below) resulting from business conducted in, on or from the Premises, not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period (the *"Cap"*).

2.    As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services fulfilled from the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises (for purposes of this Paragraph 2 only, collectively, *"Tenant"*), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards (regardless of where or how such gift certificates and gift cards were purchased). Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term *"Gross Sales"* shall exclude: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (8) fees paid to independent third party credit card, charge card, and debit card companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, as applicable, (9) proceeds from delivery, gift-wrapping and check cashing charges [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, (14) sales of gift certificates or gift cards, (15) forfeited deposits, and (16) sales of alcoholic beverages for off-premises consumption.

3.    Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Alternate Rent payable for, such month.

4.    Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be permitted to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period

L-1

bbBaby

provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles (or successor accounting standards) and practices consistently applied and shall be retained by Tenant for not less than one (1) year following the end of the calendar year to which they refer.

5.      Provided that the Alternate Rent payable for a calendar month does not exceed the Cap, Landlord and/or its auditor shall have the right, upon at least thirty (30) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises for such calendar month.

6.      Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Alternate Rent paid or payable by Tenant, provided, however, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law, or to its accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or Ground Lessor(s) of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

L-2

bbBaby

<u>Exhibit M</u>

<u>Prohibited Uses</u>

As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:

A.    As to the Shopping Center (excluding the Theater Tract), any of the following uses:

(1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

(2)    Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)    Any "second hand" store, "surplus" store;

(4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)    Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)    Any bowling alley or skating rink, other than in connection with the operation of a first class entertainment center such as Dave & Buster's, Chuck E. Cheese or Revolutions Entertainment, provided that such uses are located within the Permitted Supermarket/Entertainment/Retail Office Area or on the Outparcel;

(10)    Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use;

(11)    Any living quarters, sleeping apartments, or lodging rooms;

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in reputable shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently

bbBaby

M-1

operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in reputable shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M];

(15)   Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)   Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption; provided, however, that (i) Tenant or any Affiliate of Tenant shall be permitted to sell, on an incidental basis, alcoholic beverages for off-premises consumption and/or on-site tastings, subject to applicable Legal Requirements; and (ii) the sale of alcoholic beverages for on- or off-premises consumption shall be permitted as an incidental part of the operations of a restaurant, subject to the restrictions on such use below.

(17)   Any catering or banquet hall;

(18)   Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall, other than in connection with the operation of a first class entertainment center such as Dave & Buster's, Chuck E. Cheese or Revolutions Entertainment, provided that such uses are located within the Permitted Supermarket/Entertainment/Retail Office Area or on the Outparcel;

(19)   Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)   Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)   Any unlawful use;

(22)   Any pawn shop, check-cashing store, tattoo parlor, or gun shop, except a gun shop shall be permitted as an incidental part of a first-class sporting goods store such as Dick's Sporting Goods, The Sports Authority, or Academy Sports;

(23)   Any church or other place of religious worship;

(24)   Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility;

(25)   Any carnival, amusement park or circus;

M-2

bbBaby

(26)   Any medical clinics or medical offices;

(27)   Any supermarket except if located within the portion of the Shopping Center that is identified as "Permitted Supermarket/Entertainment/Retail Office Area" on Exhibit B hereto (the "*Permitted Supermarket/Entertainment/Retail Office Area*") or within the portion of the Shopping Center that is identified as "Building A" on Exhibit B hereto, which is currently occupied by "Planet Fitness" ("*Building A*");

(28)   Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar reputable shopping centers in the Philadelphia metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located within the Permitted Supermarket/Entertainment/Retail Office Area or on the Outparcel, and not more than ten thousand (10,000) square feet of Floor Area in the portion of the Shopping Center outside of the Theater Tract, in the aggregate, shall be devoted to such uses;

(29)   hotel/motel;

(30)   daycare center;

(31)   veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and located at least 100 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises; no pet or pet supply store shall be located within 100 feet of the Premises;

(32)   children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's") except if located within the Permitted Supermarket/Entertainment/Retail Office Area or on the Outparcel;

(33)   movie theater;

(34)   restaurant serving meals for on- or off-premises consumption except if located on the Outparcel or within Building A, so long as the main entrance of any such restaurant located within "Building A" faces Horsham Road;

(35)   health spa, exercise facility or similar type business except if located within Building A;

(36)   a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Groseman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; provided, however, that nothing contained in this Section shall be deemed to prohibit the operation in the Shopping Center of stores of the type operated by "Christmas Tree Shops", "and That!", "TJ Maxx", "Marshall's", "Ross Dress For Less", "Burlington Coat Factory", "H&M", "Nordstrom Rack", "DSW", "Payless ShoeSource", "Dollar General" or comparable stores.  Further, nothing contained in this lease shall be deemed to prohibit "clearance" or similar sales in any premises of merchandise previously offered for sale therein at the prices charged by the occupant thereof when it is not having such a "clearance" or similar sale.

B.     As to the Theater Tract and any Related Land, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22, and 25 above.

M-3

bbBaby