**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP** Joshua A.
Sussberg, P.C. (admitted *pro hac vice*) Emily E. Geier, P.C.
(admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and Debtors-in-Possession*

In re:

BED BATH & BEYOND INC., *et al*.,

    Debtors. [1]

Chapter 11

Case No. 23-13359 (VFP)

(Jointly Administered)

Order Filed on June 15, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

**DATED: June 15, 2023**

_____
**Honorable Vincent F. Papalia**
**United States Bankruptcy Judge**

---

[1]    The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

**ORDER AUTHORIZING
DEBTORS TO (I) RETAIN
AP SERVICES, LLC, (II) DESIGNATE
HOLLY F. ETLIN AS CHIEF RESTRUCTURING
OFFICER AND CHIEF FINANCIAL OFFICER EFFECTIVE
AS OF THE PETITION DATE, AND (IIII) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered four (4) through seven (7), is

**ORDERED**.

(Page | 3)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | Order Authorizing Debtors to (I) Retain AP Services, LLC, (II) Designate Holly F. Etlin as Chief Restructuring Officer and Chief Financial Officer Effective as of the Petition Date, and (III) Granting Related Relief |

Upon the application (the "Application")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") authorizing the Debtors to (a) retain and employ AP Services, LLC ("APS"), (b) designate Holly F. Etlin as Chief Restructuring Officer ("CRO") and Chief Financial Officer ("CFO"), each pursuant to the terms of the engagement letter by and among the Debtors and APS, dated as of April 21, 2023 (the "Engagement Letter"), a copy of which is attached hereto as **Exhibit 1**, effective as of the Petition Date, and (c) granting related relief, all as more fully set forth in the Application; and upon consideration of the Etlin Declaration; and the Court having found that APS is a "disinterested person" as such term is defined under section 101(14) of the Bankruptcy Code, as supplemented by section 1107(b) of the Bankruptcy Code; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and the Court having found that this is core proceeding pursuant to pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Application is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Application and opportunity for a hearing on

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

(Page | 4)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | Order Authorizing Debtors to (I) Retain AP Services, LLC, (II) Designate Holly F. Etlin as Chief Restructuring Officer and Chief Financial Officer Effective as of the Petition Date, and (III) Granting Related Relief |

the Application were appropriate and no other notice need be provided; and the Court having

reviewed the Application; and the Court having heard the statements in support of the relief

requested therein at a hearing before this Court; and the Court having determined that the legal

and factual bases set forth in the Application establish just cause for the relief granted herein; and

upon all of the proceedings had before the Court and after due deliberation and sufficient cause

appearing therefor, and the Court having been advised that all formal and informal objections to

the Application were resolved,

**IT IS HEREBY ORDERED THAT**:

1.     The Application is approved as set forth in this Order.

2.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are

authorized to (i) retain and employ APS and (ii) designate Holly F. Etlin as CRO and CFO,

effective as of the Petition Date, and in accordance with the terms and conditions set forth in the

Engagement Letter attached hereto as **Exhibit 1**.

3.     The terms of the Engagement Letter, including, without limitation, the

indemnification provisions, are reasonable and are approved in all respects, as set forth in this

Order.

4.     APS is authorized to apply the Retainer and advanced payments to satisfy any

unbilled or other remaining prepetition fees and expenses that APS becomes aware of during its

ordinary course billing review and reconciliation.  The balance of the Retainer shall be treated as

an evergreen retainer and held by APS as security throughout these Chapter 11 Cases.

5.     Upon employment and retention by the Debtors, Ms. Etlin shall be empowered and

authorized to carry out all duties and responsibilities set forth in the Engagement Letter.

(Page | 5)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | Order Authorizing Debtors to (I) Retain AP Services, LLC, (II) Designate Holly F. Etlin as Chief Restructuring Officer and Chief Financial Officer Effective as of the Petition Date, and (III) Granting Related Relief |

6.      Notwithstanding anything to the contrary in the Application or the Engagement Letter, APS's engagement is subject to the following terms:

a.      APS and its affiliates shall not act in any other capacity (for example, and without limitation, as a financial advisor or investor/acquirer) in connection with these Chapter 11 Cases.

b.      In the event the Debtors seek to have APS Personnel assume executive officer positions that are different than the position(s) disclosed in the Application, or to materially change the terms of the engagement by either (i) materially modifying the functions of personnel, or (ii) altering or expanding the scope of the engagement, a motion to modify the retention shall be filed.

c.      Notwithstanding anything to the contrary contained in the Application, the Engagement Letter or any exhibits hereto, during the course of these Chapter 11 Cases, APS will only seek reimbursement of actual and necessary expenses.

d.      APS may from time to time add or remove staff.  APS will file staffing reports monthly that will reflect the APS Personnel that provided services on a monthly basis ("Staffing Reports").  Staffing Reports shall include the names and functions filled of the individuals assigned.  All staffing shall be subject to review by the Court in the event an objection is filed.

e.      APS shall submit reports of compensation earned and expenses incurred on a monthly basis ("Compensation Reports") to the Court with copies to the U.S. Trustee and provide notice of the same to the Notice Parties. Compensation reports shall contain summary charts which describe the services provided, and identify the compensation earned and expenses incurred by each interim officer and APS Personnel/staff employee.  The Notice Parties shall have fourteen days after the date each Compensation Report is served upon them to object.  Such compensation and expenses will be subject to Court review in the event an objection is filed.

f.      For hourly based fees, APS shall append to the Compensation Reports time records that contain detailed time entries describing the tasks performed on a daily basis and the corresponding charges (time multiplied by hourly rate) organized by project category.  The time entries shall identify the time spent completing such tasks in tenth of an hour (.1) increments and the corresponding charge (time multiplied by hourly rate) for each task (by

(Page | 6)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | Order Authorizing Debtors to (I) Retain AP Services, LLC, (II) Designate Holly F. Etlin as Chief Restructuring Officer and Chief Financial Officer Effective as of the Petition Date, and (III) Granting Related Relief |

daily project category entry).  Where personnel are providing services at a flat/fixed rate, the time entries shall be kept in hourly increments; *provided* that such requirement will only apply to time entries following entry of this Order.  All compensation shall be subject to review by the Court in the event an objection is filed.

g.　No principal, employee, or independent contractor of APS and its affiliates shall serve as a director of any of the above-captioned Debtors during the pendency of these Chapter 11 Cases.

h.　The Debtors are permitted to indemnify those persons serving as corporate officers on the same terms as provided to the Debtors' other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the Debtors' D&O policy.

i.　There shall be no indemnification of APS or its affiliates.

j.　The limitation of liability section in the Engagement Letter will be eliminated for the duration of these Chapter 11 Cases.

k.　Success fees, transaction fees, or other back-end fees shall be approved by the Court at the conclusion of the case on a reasonableness standard and shall not be pre-approved under section 328(a) of the Bankruptcy Code by entry of this Order.  No success fee, transaction fee, or back-end fee shall be sought upon conversion of the case, dismissal of the case for cause, or appointment of a trustee.

l.　For a period of three years after the conclusion of the engagement, neither APS nor any of its affiliates shall make any investments in the Debtors or the reorganized Debtors.

m.　APS Personnel serving as corporate officers of the Debtors shall be subject to the same fiduciary duties and obligations applicable to other persons serving in such capacity.

n.　APS shall follow the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules regarding limitations on reimbursement of expenses.

o.　APS shall make appropriate disclosures of any and all facts that may have a bearing on whether APS, its affiliates, or any individuals working on the engagement hold/represent any interest adverse to, the Debtors, their

(Page | 7)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | Order Authorizing Debtors to (I) Retain AP Services, LLC, (II) Designate Holly F. Etlin as Chief Restructuring Officer and Chief Financial Officer Effective as of the Petition Date, and (III) Granting Related Relief |

creditors, or other parties in interest. The obligation to disclose identified in this subparagraph is a continuing obligation.

7.      The relief granted herein shall be binding upon any chapter 11 trustee appointed in these Chapter 11 Cases, or upon any chapter 7 trustee appointed in the event of a subsequent conversion of these Chapter 11 Cases to cases under chapter 7.

8.      Notwithstanding anything in the Motion or the Engagement Letter to the contrary, APS shall:  (a) pass through the cost of Contractors to the Debtors at the same rate that APS pays the Contractors; (b) with respect to costs incurred by the Contractors, seek reimbursement for actual, reasonable, and documented costs only; (c) ensure that the Contractors are subject to the same conflict checks as were required for APS in accordance with this retention; and (d) filed with the Court such disclosures as are required by Bankruptcy Rule 2014.

9.      In the event APS seeks reimbursement for attorneys' fees and expenses, the invoices and supporting time records for the attorneys' fees and expenses shall be included in APS's fee and expense applications, and these invoices and time records shall be in compliance with the Local Rules and shall be subject to the U.S. Trustee Guidelines and the approval of the Court pursuant to sections 330 and 331 of the Bankruptcy Code, but without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code, and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code. Furthermore, APS shall not seek reimbursement of any fees or costs, including attorney fees and costs, arising from the defense of any of APS's fee applications in the cases.

(Page | 8)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | Order Authorizing Debtors to (I) Retain AP Services, LLC, (II) Designate Holly F. Etlin as Chief Restructuring Officer and Chief Financial Officer Effective as of the Petition Date, and (III) Granting Related Relief |

10.     To the extent there is any inconsistency between the terms of the Engagement Letter, the Application, and this Order, the terms of this Order shall govern.

11.     APS shall use its reasonable efforts to avoid any unnecessary duplication of services provided by any retained professionals in these Chapter 11 Cases.

12.     Notice of the Application as provided therein shall be deemed good and sufficient notice of such Application and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

13.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

14.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

15.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

16.     During the pendency of these chapter 11 cases, the arbitration provision in the Engagement Letter shall not be applicable and the Court shall have exclusive jurisdiction over APS's engagement during the pendency of these chapter 11 cases.

17.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Application or otherwise waived.

## **EXHIBIT 1**

**Engagement Letter**



April 21, 2023

Harriet Edelman
Chair of the Board of Directors
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083

**Re:    Agreement for Interim Management Services**

Dear Ms. Edelman:

This letter, together with the attached Schedule(s), Exhibit and General Terms and Conditions, sets forth the agreement ("Agreement") between AP Services, LLC ("APS"), and Bed Bath & Beyond Inc. and certain of its affiliates and subsidiaries (the "Company") for the engagement of APS to provide interim management services to the Company.  Execution of this instrument serves as the parties' mutual understanding that the agreement between APS and the Company dated February 6, 2023 (the "Initial Engagement Letter") is hereby superseded and replaced with this Agreement.  Any outstanding fees and expenses due and owing to APS under the Initial Engagement Letter, if any, will be promptly paid by the Company upon execution of this Agreement

All defined terms shall have the meanings ascribed to them in this letter and in the attached Schedule(s), Exhibit and General Terms and Conditions. The Company and APS are each a "party," and together the "parties."

The engagement of APS, including any APS employees who serve in Executive Officer positions, shall be under the supervision of and report directly to an ad hoc committee of the Board of Directors comprised of Pamela Corrie, Carol Flaton, Jonathan Foster and Joshua Schechter (the "Committee").

**Objectives and Tasks**

Subject to APS's (i) internal approval from its Risk Management Committee, (ii) confirmation the Company has a Directors and Officers Liability insurance policy in accordance with Section 7 of the General Terms and Conditions regarding Directors and Officers Liability Insurance coverage, and (iii) receipt of a copy of the signed Board of Directors' resolution (or similar document as required by the Company's governance documents) as official confirmation of the appointment, APS agrees to provide Holly Etlin to serve as the Company's Chief Restructuring Officer ("CRO"), Pursuant to the Initial Engagement Letter, APS also agreed to provide Holly Etlin as the Chief Financial Officer ("CFO").  Ms. Etlin will manage the Chapter 11 cases and court-supervised liquidation and sale process, and continue to lead the overall engagement, including the interim CFO assignment, and will work collaboratively with the senior management team, the Company's appointed advisors, and other Company employees, and provide reports to the Committee and the Board of Directors as requested.

CRO Scope of Services

- Prepare budgets and 13-week cash forecasts and evaluate variances thereto, as required by the Company's lenders.

# AP Services

Bed Bath & Beyond Inc.
Page 2 of 14

- Communicate with, and meet information needs of, its various constituencies, including potential exit lenders.

- Strengthen the Company's core competencies in the finance organization, particularly cash management, planning, general accounting and financial reporting information management.

- Develop the Company's revised business plan, and such other related forecasts as may be required by the Company's lenders in connection with negotiations or by the Company for other corporate purposes.

- Develop a short-term operating plan designed to minimize cash requirements while maintaining the efficiency of operations, sustaining vendor relationships, and minimizing the impact on the Company's customer base.

- Design, negotiate and implement a restructuring strategy designed to maximize enterprise value, taking into account the unique interests of key constituencies.

- Prepare for and file a Bankruptcy Petition, coordinating and providing administrative support for the proceeding and developing the Company's Plan of Reorganization or other appropriate case resolution, if necessary.

- In connection with a bankruptcy, prepare (i) a Disclosure Statement and Plan of Reorganization, (ii) a liquidation analysis, (iii) statements of financial affairs and schedules of assets and liabilities, (iv) a potential preferences analysis, (v) a claims analyses, and (vi) monthly operating reports and other regular reporting required by the U.S. Bankruptcy Court.

- Manage the "working group" professionals who are assisting the Company in the reorganization process or who are working for the Company's various stakeholders to improve coordination of their effort and individual work product to be consistent with the Company's overall restructuring goals.

- Create and communicate materials for diligence purposes and manage the flow of information to potential acquirers in connection a potential sale of the Company's assets.

- Assist the Company with such other matters as may be requested by the Company and are mutually agreeable.

<u>CFO Scope of Services</u>

- Have direct reporting of all FP&A, Procurement and Treasury personnel.
- Establish and operate weekly (direct) operational 13-week cash flow forecasting process and deliver weekly forecast reports to management in an agreed form.
- Lead negotiations with the Company's vendors and suppliers about ensuring products continue to be shipped to the Company and services continue to be performed, on terms and conditions favorable to the Company.

**AP**Services

Bed Bath & Beyond Inc.
Page 3 of 14

- Identify both structural (vs one-time) and / or near-term tactical cost and effectiveness improvement opportunities (including cost and time to achieve) as well as ways to accelerate existing initiatives.

- Advise on prioritization of key operational improvements to increase effectiveness, efficiency, and control and reduce risk, and the operational metrics and KPIs associated with the realization thereof.

- Work synergistically and in collaboration with both management and the Company's third-party advisers.

- Lead the Finance and Accounting departments consistent with the practices and requirements of a chief finance officer of a publicly-traded company.

- Undertake detailed planning and lead / support rapid execution/implementation of key changes, and manage the initiative pipeline and ongoing reporting, including, among other things, enhance the FP&A department to better provide business analysis and forecasting.

- Identify the need and provide (or assist in the sourcing and hiring of) necessary support for longer term performance improvement opportunities in support of line management (as agreed), including, among other things, payment processing, cash management and financial close process, and related reporting.

- Provide weekly financial and other reports, both verbal and written, to the Board.

- Provide financial and other reports (as needed and required as well as requested) to the Board and third parties, including the Company's lenders (as set forth in the Credit Agreement).

- Manage and be responsible for the Company's reporting obligations under the Credit Agreement.

- Assist the Company with such other matters as may be requested by the Company and are mutually agreeable.

## Staffing

APS will provide the Company with the individuals set forth on Exhibit A ("Temporary Staff"), subject to the terms and conditions of this Agreement, with the titles, pay rates and other descriptions set forth therein.

The Temporary Staff may be assisted by or replaced by other professionals at various levels, as required, who shall also become Temporary Staff. APS will keep the Company informed as to APS's staffing.

## Timing, Fees, and Retainer

APS will commence this engagement on or about April 23, 2023 after receipt of a copy of this executed Agreement accompanied by the Retainer, as set forth on Schedule 1 and pending confirmation of the Company's compliance with the requirements set forth in the first paragraph of the Objective and Tasks section above.

The Company shall compensate APS for its services, and reimburse APS for expenses, as set forth on Schedule 1.



Bed Bath & Beyond Inc.
Page 4 of 14

In the event the Company seeks protection under the U.S. Bankruptcy Code, the Company will promptly apply to the Bankruptcy Court to obtain approval of APS's retention effective as of the date of filing.  APS acknowledges that its retention and the terms thereof are subject to Bankruptcy Court approval.

\* \* \*

If these terms meet with your approval, please sign and return a copy of this Agreement and wire transfer the amount to establish the Retainer.

We look forward to working with you.

Sincerely yours,

AP SERVICES, LLC

DocuSigned by:
87182CC51FEE486...

Holly Etlin
Partner & Managing Director

DocuSigned by:
A685BCB4D70E4DB...

Kent Percy
Partner & Managing Director

Acknowledged and Agreed to:

BED BATH & BEYOND INC.

By:    DocuSigned by:
*Harriet Edelman*
CE1516A264BC479...

Its:

Dated:



**AP Services, LLC**

**Exhibit A**

Temporary Staff

Individuals with Executive Officer Positions

| Name | Description | Weekly Rate | Commitment Full[1] or Part[2] Time |
|---|---|---|---|
| Holly Etlin | Chief Financial Officer & Chief Restructuring Officer | $70,000 | Full Time |

Additional Temporary Staff

| Name | Description | Hourly Rate | Commitment Full[1] or Part[2] Time |
|---|---|---|---|
| Kent Percy | Partner & Managing Director | $1,220 | Part Time |
| James Horgan | Partner | $1,115 | Part Time |
| Pete Madden | Director | $1,070 | Part Time |
| Jarod Clarrey | Director | $950 | Part Time |
| Isabel Arana de Uriarte | Director | $880 | Part Time |
| Gary Bacon | Senior Vice President | $860 | Part Time |
| Rob Bennett | Senior Vice President | $825 | Part Time |
| Hart Ku | Senior Vice President | $805 | Part Time |
| Jon Bryant | Senior Vice President | $805 | Part Time |
| Nathan Kramer | Senior Vice President | $805 | Part Time |
| Rahul Yenumula | Senior Vice President | $735 | Part Time |
| Yernar Kades | Senior Vice President | $735 | Part Time |
| Kehui Wang | Vice President | $605 | Part Time |

**AP**Services

The parties agree that Exhibit A can be amended by AP Services, LLC from time to time to add or delete staff, and the Monthly Staffing Reports shall be treated by the parties as such amendments.

[1] Full time is defined as substantially full time.

[2] Part time is defined as approximately two to three days per week, with some weeks more or less depending on the needs and issues facing the Company at that time.



**Schedule 1**

**Fees and Expenses**

1.  **Fees:** APS's fees will be based on the hours spent by APS personnel at APS's hourly rates, which are:

| | |
|---|---|
| Partner & Managing Director | US $1,140 – US $1,400 |
| Partner | US $1,115 |
| Director | US $880 – US $1,070 |
| Senior Vice President | US $735 – US $860 |
| Vice President | US $585 – US $725 |
| Consultant | US $215 – US $565 |
| Paraprofessional | US $360 – US $380 |

APS generally reviews and revises its billing rates semi-annually.

2.  **Completion Fee:** APS shall earn a completion fee of $750,000 upon the earliest to occur of any of the following:  (i) confirmation of a Chapter 11 Plan, (ii) a sale of all or substantially all of the Company's assets under section 363 of the Bankruptcy Code or otherwise, (iii) the consummation of any material recapitalization or debt restructuring of the Company, or (iv) consummation of one or more transactions, in any form, that effectively transfers a significant portion of the business as a going concern to another entity or entities or that results in a change in structure of the Board.

    The Completion Fee shall be due and payable immediately when the success objective or objectives determined as described above have been achieved.

3.  **Expenses:** In addition to the Fees set forth in this Schedule, the Company shall pay directly, or reimburse APS upon receipt of periodic billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging and meals.

4.  **Break Fee:** APS does not seek a break fee in connection with this engagement.

5.  **Retainer:** The Company provided APS with a retainer of $500,000 pursuant to the Initial Engagement Letter (the "Initial Retainer"), which is hereby transferred to this Agreement. Under this Agreement, the Company will provide an additional retainer of $500,000 (the "Additional Retainer" and, together with the Initial Retainer, the "Retainer"), making the total Retainer held $1,000,000. Such Retainer will be held and applied against fees and expenses as set forth in this Schedule and in accordance with Section 2 of the General Terms and Conditions.

**APServices**

6.   **Payment:** APS will submit monthly invoices for services rendered and expenses incurred. All invoices shall be due and payable immediately upon receipt.

**AP**Services

**Data Protection Schedule**

**Description of Transfer**

**1.  Categories of Data Subjects**

 X   Employees / Members / Contractors of Data Controller

 X   Clients of Data Controller

____  Other:

**2.  Types of Personal Data**

____  Background Check Data (Criminal History, Drug Test Results, References, etc.)

____  Biometric Data (Facial Recognition, Fingerprints, Voice Recording, etc.)

____  Browsing Data (Cookies, Website History, IP Address, etc.)

 X   Contact Information (Contact Details, Address, Email Address, Phone Numbers, etc.)

____  Education and Skills (Academic Transcripts, Educational Degrees, Languages, Training, etc.)

 X   Employment Information (Compensation, Job Title, Personnel Number, Workers Comp, Office Location, etc.)

____  Family Information (Children, Parents, etc.)

 X   Financial Personal Information (Bank Accounts, Credit Card Numbers, etc.)

____  Genetic Information (Genetic Sequence)

 X   Government Identifiers (National Identification Number, SSN, Driving License, etc.)

____  Personal Identifiers (Name, Age, Date of Birth, Race, Video/Photo, Signature, etc.)

____  Professional Experience & Affiliations (Trade Union Membership, Qualifications/Certifications, etc.)

____  Social Media Data (Social Media Accounts, Social Media History, etc.)

____  Travel and Expense (Travel History, Expense Details, etc.)

____  User Account Information (Account Age, Account Number, Account Password, etc.)

____  Workplace Welfare (Harassment Reports, Disciplinary Action, etc.)

____  Other:

**3.  Frequency of Data Transfers**

The frequency of the transfer will be continuous (multiple transfers).

**4.  Processing by APS**

4.1. Nature of processing: The nature of processing will include receiving, storing, analyzing, transmitting to appropriate parties, and disposing of Personal Data.

4.2. Purpose of the data transfer and further processing: The purpose of processing is to provide the services described in the agreement above.

4.3. The period for which the personal data will be retained, or if the period is not known, the criteria used to determine the period: APS will process Personal Data for the duration of the engagement.

4.4. Transfer to Sub-processors: Sub-processors may process Personal Data for the duration of the engagement life cycle and for the purposes specified above. See https://www.alixpartners.com/policies/subprocessors/ for a list of sub-processors.

| AP Services, LLC |
|---|
| General Terms and Conditions |

These General Terms and Conditions ("Terms") are incorporated into the Agreement to which these Terms are attached. In case of conflict between the wording in the letter and/or schedule(s) and these Terms, the wording of the letter and/or schedule(s) shall prevail.

### Section 1. Company Responsibilities

The Company will undertake responsibilities as set forth below:

1. Provide reliable and accurate detailed information, materials, documentation and

2. Make decisions and take future actions, as the Company determines in its sole discretion, on any recommendations made by APS in connection with this Agreement.

APS's delivery of the services and the fees charged are dependent on (i) the Company's timely and effective completion of its responsibilities; and (ii) timely decisions and approvals made by the Company's management.

### Section 2. Retainer, Billing, Payments and Taxes

**Retainer.** Upon execution of the Agreement, the Company shall promptly pay APS the agreed-upon advance retainer as set forth on Schedule 1. Invoices shall be offset against the retainer. Payments of invoices will be used to replenish the retainer to the agreed-upon amount. Any unearned portion of the retainer will be applied against the final invoice or returned to the Company at the end of the engagement.

**Billing and Payments.** All payments to be made to APS shall be due and payable upon delivery of invoice via check or wire transfer to APS's bank account, as shown on the invoice. All amounts invoiced are based on services rendered and expenses incurred to date and, other than the Success Fee, are not contingent upon future services or Work Product (as defined below), or the outcome of any case or matter. "Fees," as used in this Agreement, shall include all amounts payable by the Company to APS in accordance with Schedule 1, but excluding any success fee or reimbursable expenses.

**Taxes.** APS's fees are exclusive of taxes or similar charges, which shall be the responsibility of the Company (other than taxes imposed on APS's income generally). If APS's fees are subject to any taxes, such as State sales tax, Goods and Services Tax/Harmonized Sales Tax or Value Added Tax, then APS will include such taxes on its invoices as separate line items.

### Section 3. Relationship of the Parties

The parties intend that an independent contractor relationship will be created by the Agreement. As an independent contractor, APS will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its

business. Employees of APS will not be entitled to receive from the Company any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. APS will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business.

APS is not an accounting firm and does not give accounting advice or guidance. While APS' work may involve analysis of accounting, business and other related records, this engagement does not constitute an audit in accordance with either generally accepted auditing standards or the standards of the Public Company Accounting Oversight Board or any other similar governing body.

APS is not authorized to practice law or provide legal advice. No services provided under this Agreement are intended to be, nor should be construed to be, legal services.

### Section 4. Confidentiality

Each party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party during the performance of APS's services hereunder (the "Confidential Information"), and neither party will disclose any Confidential Information to any other person or entity. "Confidential Information" includes the terms of this Agreement, non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models or any work product relating to the business of either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants.

The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, APS from making such disclosures of Confidential Information that APS reasonably believes, based on advice from counsel, are required by law or any regulatory requirement or authority to clear client conflicts. APS may also disclose Confidential Information to its partners, directors, officers, employees, independent contractors and agents who have a need to know the Confidential Information as it relates to the services being provided under this Agreement, provided APS is responsible for any breach of these confidentiality obligations by any such parties. APS may make reasonable disclosures of Confidential Information to third parties, such as the Company's suppliers and/or vendors, in connection with the performance of APS's obligations and assignments hereunder, provided APS reasonably believes that such third party is bound by confidentiality obligations. In addition, APS will have the right to disclose to any person that it provided

| **AP Services, LLC** |
| General Terms and Conditions |

services to the Company or its affiliates and a general description of such services, but shall not provide any other information about its involvement with the Company. The obligations of the parties under this Section 4 shall survive the end of any engagement between the parties for a period of three (3) years.

Work Product (as defined in Section 5) may contain APS proprietary information or other information that is deemed to be Confidential Information for purposes of this Agreement, and the parties may not want to make public. Therefore, the parties acknowledge and agree that (i) all information (written or oral), including advice and Work Product (as defined in Section 5), generated by APS in connection with this engagement is intended solely for the benefit and use of the Company in connection with this Agreement, and (ii) no such information shall be used for any other purpose or disseminated to any third parties, or, quoted or referred to with or without attribution to APS at any time in any manner or for any purpose without APS's prior approval (not to be unreasonably withheld or delayed), except as required by law.  The Company may not rely on any draft or interim Work Product.

## Section 5. Intellectual Property

All analyses, final reports, presentation materials, and other work product (other than any Engagement Tools, as defined below) that APS creates or develops specifically for the Company and delivers to the Company as part of this engagement (collectively known as "Work Product") shall be owned by the Company and shall constitute Company Confidential Information as defined above. APS may retain copies of the Work Product and any Confidential Information necessary to support the Work Product subject to its confidentiality obligations in this Agreement.

All methodologies, processes, techniques, ideas, concepts, know-how, procedures, software, tools, templates, models, utilities and other intellectual property that APS has created, acquired or developed or will create, acquire or develop (collectively, "Engagement Tools"), are, and shall be, the sole and exclusive property of APS. The Company shall not acquire any interest in the Engagement Tools other than a limited worldwide, perpetual, non-transferable license to use the Engagement Tools to the extent they are contained in the Work Product.

The Company acknowledges and agrees, except as otherwise set forth in this Agreement, that any Engagement Tools provided to the Company are provided "as is" and without any warranty or condition of any kind, express, implied or otherwise, including, implied warranties of merchantability or fitness for a particular purpose.

## Section 6. Framework of the Engagement

The Company acknowledges that it is retaining APS solely to assist and advise the Company as described in the Agreement. This engagement shall not constitute

an audit, review or compilation, or any other type of financial statement reporting engagement.

## Section 7. Indemnification and Other Matters

The Company shall indemnify, hold harmless and defend AlixPartners and its affiliates and its and their partners, directors, officers, employees and agents (collectively, the "AlixPartners Parties") from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with the engagement of AlixPartners that is the subject of the Agreement (collectively, "Losses"), except to the extent that it is determined by a court of competent jurisdiction in a final, non-appealable judgement or other review that such Losses resulted solely from the gross negligence, bad faith, or willful misconduct of such AlixPartners Parties. The Company shall pay damages and expenses as incurred, including reasonable legal fees and disbursements of counsel. If, in the opinion of counsel, representing both parties in the matter covered by this indemnification creates a potential conflict of interest, the AlixPartners Parties may engage separate counsel to represent them at the Company's expense.

In addition to the above indemnification, APS employees serving as directors or officers of the Company or affiliates will receive the benefit of the most favorable indemnification provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise.

The Company shall specifically include and cover APS employees and agents serving as directors or officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees ("D&O insurance"). Prior to APS accepting any officer position, the Company shall, at the request of APS a copy of its current D&O policy, a certificate(s) of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other documents as APS may reasonably request evidencing the appointment and coverage of the indemnitees. The Company will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Company disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Company is unable to include APS employees and agents under the Company's policy or does not have first dollar coverage acceptable to APS in effect for at least $10 million (e.g., there are outstanding or threatened claims against officers and directors alleging prior acts that may give rise to a claim), APS may, at its option, attempt to purchase a separate D&O insurance policy that will cover APS employees and agents only. The cost of the policy shall be invoiced to the Company as an out-of-pocket expense. If APS is unable or unwilling to purchase such D&O insurance, then APS reserves the right to terminate the Agreement.

**AP Services, LLC**
General Terms and Conditions

The Company's indemnification obligations in this Section 7 shall be primary to, and without allocation against, any similar indemnification obligations that APS may offer to its personnel generally, and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to, and without allocation against, any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by APS or otherwise). APS is not responsible for any third-party products or services separately procured by the Company. The Company's sole and exclusive rights and remedies with respect to any such third party products or services are against the third-party vendor and not against APS, whether or not APS is instrumental in procuring such third-party product or service.

The Company shall not be responsible for any fees and expenses related to any document discovery request or production, to the extent that any APS Party does not utilize the computer servers or computer applications provided by the Company.

### Section 8. Governing Law and Arbitration

The Agreement is governed by and shall be construed in accordance with the laws of the State of New York with respect to contracts made and to be performed entirely therein and without regard to choice of law or principles thereof.

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration. Each party shall appoint one non-neutral arbitrator. The two-party arbitrators shall select a third arbitrator. If within 30 days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (AAA). The arbitration shall be conducted in New York, New York under the AAA's Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Notwithstanding the foregoing, either party may proceed directly to a court of competent jurisdiction to enforce the terms of this Agreement for any claim in connection with (i) the non-payment of Fees or expenses due under this Agreement, or (ii) the non-performance of obligations under Section 7. For the purposes of this paragraph, the parties expressly consent to the jurisdiction of all Federal and state courts located in New York, New York.

In any court proceeding arising out of this Agreement, the parties hereby waive any right to trial by jury.

### Section 9. Termination and Survival

The Agreement may be terminated at any time by written notice by one party to the other; provided, however, that notwithstanding such termination APS will be entitled to any Fees and expenses due under the provisions of the Agreement through the date of termination (pro rata for any partial month)). Such payment obligation shall inure to the benefit of any successor or assignee of APS.

Additionally, unless the Agreement is terminated by the Company due to APS' material breach (and such material breach continues after 30 days' written notice thereof and opportunity to cure) APS shall remain entitled to the success fee(s), if any, that otherwise would be payable during the 12 months after the date of termination of the Agreement solely to the extent that all of the condition precedent to APS being entitled to a success fee have been satisfied and such satisfaction was the direct result of the work performed by APS.

Sections 2, 4, 5, 7, 8, 9, 10, 11, 12 and 13 of these Terms, the provisions of Schedule 1 and the obligation to pay accrued fees and expenses shall survive the expiration or termination of the Agreement.

### Section 10. Non-Solicitation of Employees

The Company acknowledges and agrees that APS has made a significant monetary investment recruiting, hiring and training its personnel. During the term of this Agreement and for a period of two years after the final invoice is rendered by APS with respect to this engagement (the "Restrictive Period"), the Company and its affiliates agree not to directly or indirectly hire, contract with, or solicit the employment of any of APS's Partners & Managing Directors, Partners, Directors, or other employees/ contractors the Company or its affiliates had interactions with or gained knowledge about as a result of the services provided under this Agreement.

If during the Restrictive Period the Company or its affiliates directly or indirectly hires or contracts with any of APS's Managing Directors, Directors, or other employees/contractors in violation of the preceding paragraph, the Company agrees to pay to APS as liquidated damages and not as a penalty the sum total of: (i) for a Partner & Managing Director, $1,000,000; (ii) for a Partner or  Director, $500,000; and (iii) for any other employee/contractor, $250,000. The Company acknowledges and agrees that liquidated damages in such amounts are (x) fair, reasonable and necessary under the circumstances to reimburse APS for the costs of recruiting, hiring and training its employees as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that APS has made in its Partners & Managing Directors, Partners, Directors, and other employees/ consultants; and (y) appropriate due to the difficulty of calculating the exact amount and value of that investment.

The provisions of this Section shall apply except to the extent the provisions conflict with applicable law.

### Section 11. Limitation of Liability

THE APS PARTIES SHALL NOT BE LIABLE TO THE COMPANY, OR ANY PARTY ASSERTING CLAIMS ON

| **AP Services, LLC** |
| General Terms and Conditions |

BEHALF OF THE COMPANY, EXCEPT FOR DIRECT DAMAGES FOUND IN A FINAL DETERMINATION TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE, BAD FAITH, SELF-DEALING OR INTENTIONAL MISCONDUCT OF APS PARTIES. THE APS PARTIES SHALL NOT BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, LOST PROFITS, LOST DATA, REPUTATIONAL DAMAGES, PUNITIVE DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY CIRCUMSTANCES, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE APS PARTIES' AGGREGATE LIABILITY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, IS LIMITED TO THE AMOUNT OF FEES PAID TO APS FOR SERVICES UNDER THIS AGREEMENT (OR IF THE CLAIM ARISES FROM AN ADDENDUM TO THIS AGREEMENT, UNDER THE APPLICABLE ADDENDUM) (THE "LIABILITY CAP"). The Liability Cap is the total limit of the APS Parties' aggregate liability for any and all claims or demands by anyone pursuant to this Agreement, including liability to the Company, to any other parties hereto, and to any others making claims relating to the work performed by APS pursuant to this Agreement. Any such claimants shall allocate any amounts payable by the APS Parties among themselves as appropriate, but if they cannot agree on the allocation, it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the APS Parties pursuant to this Agreement exceed the Liability Cap.

**Section 12. General**

**Equitable Remedies.** Each party acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of the Agreement. Each party agrees that the non-breaching party shall have the right to seek a restraining order and/or an injunction for any breach of the Agreement. If any provision of the Agreement is found to be invalid or unenforceable, then it shall be deemed modified or restricted to the extent and in the manner necessary to render the same valid and enforceable.

**Severability.** If any portion of the Agreement shall be determined to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent possible.

**Entire Agreement.** This Agreement, including the letter, the Terms and the schedule(s), contains the entire understanding of the parties relating to the services to be rendered by APS and supersedes any other communications, agreements, understandings, representations, or estimates among the parties (relating to the subject matter hereof) with respect to such services. The Agreement, including the letter, the Terms and the schedule(s), may not be amended or modified in any respect except in a writing signed by the parties. APS is not responsible for performing any services not specifically described herein or in a subsequent writing signed by the parties.

**Related Matters.** If an APS Party is required by applicable law, legal process or government action to produce information or testimony as a witness with respect to this Agreement, the Company shall reimburse APS for any professional time and expenses (including reasonable external and internal legal costs and e-discovery costs) incurred to respond to the request, except in cases where an APS Party is a party to the proceeding or the subject of the investigation.

**Joint and Several.** If more than one party signs this Agreement, the liability of each party shall be joint and several. In addition, in the event more than one entity is included in the definition of Company under this Agreement, the Company shall cause each other entity which is included in the definition of Company to be jointly and severally liable for the Company's liabilities and obligations set forth in this Agreement.

**Third-Party Beneficiaries.** The APS Parties shall be third-party beneficiaries with respect to Section 7 hereof.

**Notices.** All notices required or permitted to be delivered under the Agreement shall be sent, if to APS, to:

    AlixPartners, LLP
    2000 Town Center, Suite 2400
    Southfield, MI 48075
    Attention: General Counsel

and if to the Company, to the address set forth in the Agreement, to the attention of the Company's General Counsel, or to such other name or address as may be given in writing to APS. All notices under the Agreement shall be sufficient only if delivered by overnight mail. Any notice shall be deemed to be given only upon actual receipt.

**Section 13. Bankruptcy Related Matters**

Notwithstanding any to the contrary in these Terms, in the event the Company files for protection under the U.S. Bankruptcy Code, the following provisions will prevail:

The Company shall promptly apply to the Bankruptcy Court for approval of the Company's retention of AlixPartners under the terms of the Agreement. The form of retention application and proposed order shall be reasonably acceptable to AlixPartners. AlixPartners shall have no obligation to provide any further services if the Company becomes a debtor under the U.S. Bankruptcy Code unless AlixPartners' retention under the terms of the Agreement is approved by a final order of the Bankruptcy Court reasonably acceptable to AlixPartners. The Company shall assist, or cause its counsel to assist, with filing, serving and noticing of papers related to AlixPartners' fee and expense matters.

The Company and AlixPartners agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement.

**AP Services, LLC**
General Terms and Conditions

AlixPartners will have the right to obtain independent legal counsel to obtain advice with respect to its services under this engagement. The Company will reimburse AlixPartners' for the reasonable fees and expenses of such independent legal counsel.

AlixPartners acknowledges that, during the pendency of any Bankruptcy Court approved retention, the indemnification provisions and Liability Cap set forth above may be subject to modification as stated within the Bankruptcy Court's retention order.

Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the date of filing, AlixPartners may have incurred but not billed fees and reimbursable expenses which relate to the prepetition period. AlixPartners will seek Bankruptcy Court approval to apply the retainer to these amounts.

If AlixPartners finds it desirable to augment its consulting staff with independent contractors (an "I/C") in this case, (i) AlixPartners will file, and require the I/C to file, 2014 affidavits indicating that the I/C has reviewed the list of the interested parties in this case, disclosing the I/C's relationships, if any, with the interested parties and indicating that the I/C is disinterested; (ii) the I/C must remain disinterested during the time that AlixPartners is involved in providing services on behalf of the Company; and (iii) the I/C must represent that he/she will not work for the Company or other parties in interest in this case during the time AlixPartners is involved in providing services to the Company. AlixPartners' standard practice is to charge for an I/C's services at the rate equal to the compensation provided by AlixPartners to such I/C.

**Section 14. Data Protection**

To the extent applicable, the Company and APS shall comply with the terms of the APS Data Protection Addendum (located at: https://www.alixpartners.com/policies/processor-data-protection-addendum/), which form part of the Agreement. The Data Protection Schedule of this Agreement shall apply to the Data Protection Addendum.