# Exhibit A

**LEASE AGREEMENT**

Between

**MAD RIVER DEVELOPMENT LLC,**

Landlord

and

**BED BATH & BEYOND INC.,**
a New York corporation,

Tenant

**RIVER FRONT CENTER**
Clifton, New Jersey

Dated:  October    , 2004

* * * * * *

**TABLE OF CONTENTS**

Page

ARTICLE 1        BASIC TERMS AND DEFINITIONS ................................................ 1
Section 1.1      Basic Terms and Definitions ........................................................ 1

ARTICLE 2        LEASE OF PREMISES; LEASE TERM; DELIVERY DATE.......... 4
Section 2.1      Lease of Premises........................................................................ 4
Section 2.2      Term ............................................................................................ 5
Section 2.3      Delivery Date .............................................................................. 5
Section 2.4      Unseasonable Delivery: Slack Period ........................................ 7
Section 2.5      Initial Co-Tenancy Condition ..................................................... 8
Section 2.6      Permits Contingency ................................................................... 9

ARTICLE 3        IMPROVEMENTS ......................................................................... 9
Section 3.1      Landlord's Work and Tenant's Work .......................................... 9
Section 3.2      Plan Approvals ............................................................................ 9
Section 3.3      Performance of Work ................................................................ 11
Section 3.4      Measurement; Adjustment of Rent ........................................... 13

ARTICLE 4        FIXED RENT, TAXES: DETERMINATION AND PAYMENT ... 14
Section 4.1      Fixed Rent ................................................................................. 14
Section 4.2      Payment of Rent ........................................................................ 14
Section 4.3      Real Estate and Other Taxes ..................................................... 14
Section 4.4      Percentage Rent ........................................................................ 16

ARTICLE 5        COMMON AREAS, THEIR USE AND CHARGES...................... 17
Section 5.1      Common Areas: Maintenance ................................................... 16
Section 5.2      Common Areas: Restrictions ..................................................... 20

ARTICLE 6        UTILITIES .................................................................................. 22
Section 6.1      Utility Service ........................................................................... 22
Section 6.2      Interruption ............................................................................... 22

ARTICLE 7        SIGNS ......................................................................................... 23
Section 7.1      Tenant's Building Signage ......................................................... 23
Section 7.2      Pylon/Monument Signage ......................................................... 23
Section 7.3      Signage: Alteration/Removal/Allocation ................................... 23
Section 7.4      Cooperation ............................................................................... 23
Section 7.5      Signage Restrictions and Criteria .............................................. 24

ARTICLE 8        ALTERATIONS AND IMPROVEMENTS ..................................... 24
Section 8.1      Alterations and Improvements ................................................... 24

ARTICLE 9        REPAIRS ..................................................................................... 25
Section 9.1      Tenant's Repairs......................................................................... 25
Section 9.2      Landlord's Repairs ..................................................................... 25
Section 9.3      Legal Compliance Work ............................................................ 26

ARTICLE 10       INDEMNIFICATION, INSURANCE AND WAIVER OF
                 SUBROGATION ......................................................................... 27
Section 10.1     Mutual Release, Waiver of Subrogation and Mutual Indemnification27
Section 10.2     Tenant's Insurance ..................................................................... 27
Section 10.3     Landlord's Insurance ................................................................. 28
Section 10.4     General Insurance Requirements ............................................... 29

ARTICLE 11       FIRE AND OTHER CASUALTY; EMINENT DOMAIN ............. 29
Section 11.1     Fire and Other Casualty ............................................................ 29
Section 11.2     Eminent Domain ........................................................................ 32

i

Section 11.3        Abatement of Rent Charges ................................................... 33

ARTICLE 12        COVENANTS, REPRESENTATIONS AND WARRANTIES ...... 33
Section 12.1        Quiet Enjoyment ................................................................ 33
Section 12.2        Authority .......................................................................... 33
Section 12.3        Landlord's Covenants, Warranties and Representations ................. 34
Section 12.4        Environmental Matters ........................................................ 35

ARTICLE 13        USES AND RESTRICTIONS ................................................. 38
Section 13.1        Permitted and Prohibited Uses ............................................. 38
Section 13.2        Tenant's Exclusive in Center ............................................... 38
Section 13.3        Exclusives Which Tenant Must Honor ..................................... 40

ARTICLE 14        CONDUCT OF BUSINESS OPERATIONS ................................ 41

ARTICLE 15        TENANT ASSIGNMENT AND SUBLETTING ........................... 42
Section 15.1        Assignment and Subletting .................................................. 42
Section 15.2        Liability of Tenant ............................................................. 42
Section 15.3        Collateral Assignment ........................................................ 42
Section 15.4        Cure Rights of Original Tenant ............................................. 42
Section 15.5        Recognition Agreement ....................................................... 43

ARTICLE 16        DEFAULT AND DISPUTE RESOLUTION ............................... 43
Section 16.1        Tenant Default .................................................................. 44
Section 16.2        Landlord Default ............................................................... 45
Section 16.3        Arbitration ....................................................................... 46

ARTICLE 17        RIGHT TO MORTGAGE AND NON-DISTURBANCE;
                    ESTOPPEL CERTIFICATE .................................................. 46
Section 17.1        Right to Mortgage and Non-Disturbance .................................. 46
Section 17.2        Estoppel Certificate ........................................................... 46
Section 17.3        Existing Mortgages ............................................................ 47

ARTICLE 18        NOTICE ........................................................................... 47

ARTICLE 19        TENANT'S PROPERTY ....................................................... 47

ARTICLE 20        END OF TERM .................................................................. 48
Section 20.1        Surrender of Premises ........................................................ 48
Section 20.2        Hold Over ....................................................................... 48

ARTICLE 21        TENANT'S RIGHT OF FIRST OFFER ................................... 48

ARTICLE 22        ONGOING CO-TENANCY ................................................... 48

ARTICLE 23        MISCELLANEOUS ............................................................. 48
Section 23.1        Loading Facilities .............................................................. 48
Section 23.2        Liens .............................................................................. 49
Section 23.3        Broker's Commission ......................................................... 49
Section 23.4        Force Majeure .................................................................. 49
Section 23.5        Consents ......................................................................... 49
Section 23.6        Costs .............................................................................. 49
Section 23.7        Attorneys' Fees ................................................................ 49
Section 23.8        Survival of Obligations ....................................................... 50
Section 23.9        Non-Waiver ..................................................................... 50
Section 23.10       Rights Cumulative ............................................................. 50
Section 23.11       Definition of Landlord ........................................................ 50
Section 23.12       Successors and Assigns ....................................................... 50
Section 23.13       Limitation of Landlord's Liability .......................................... 50
Section 23.14       Limitation of Tenant's Liability ............................................ 50

Section 23.15    Joint and Several Liability ......................................................... 51
Section 23.16    Severability ................................................................................. 51
Section 23.17    Grammatical Usages and Construction ....................................... 51
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings ......... 51
Section 23.19    Definition of Hereunder, Herein, etc........................................... 51
Section 23.20    Short Form Lease ....................................................................... 51
Section 23.21    Entire Agreement and Modification ........................................... 51
Section 23.22    No Joint Venture or Partnership Created by Lease...................... 51
Section 23.23    Tenant's Tradename..................................................................... 51
Section 23.24    Counterparts ............................................................................... 51
Section 23.25    Waiver of Trial by Jury ............................................................... 51
Section 23.26    Governing Law............................................................................ 52

## EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevations of the Shopping Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K | Existing Exclusives |
| Exhibit L | Alternate Rent |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Pier 1 Side Letter |

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of October     , 2004 by and between MAD RIVER DEVELOPMENT LLC, a New Jersey limited liability company, having an office at Glenpointe Center East, 300 Frank W. Burr Boulevard, P.O. Box 309, Teaneck, New Jersey 07666 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

**W I T N E S S E T H:**

ARTICLE 1
BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  As defined in and payable in the manner set forth in Exhibit L attached hereto.

1.1.4    Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas and common utility lines.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6    Delivery Date:  As defined in Section 2.3 hereof.

1.1.7    Effective Date:  The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10 Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11 Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to either or both of Sections 3.4 or 4.2 hereof):

(a)    For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date, at the rate of Five Hundred Twenty-Nine Thousand Seven

Hundred Sixty ($529,760.00) Dollars per year [based on Twenty-Two ($22.00) Dollars per square foot of Floor Area];

       (b)    For the period commencing on the first February 1 occurring after the tenth (10th) anniversary of the Rent Commencement Date and ending on the last day of the *"Initial Term"* (defined in Subsection 1.1.38 below), at the rate of Five Hundred Fifty-Three Thousand Eight Hundred Forty ($553,840.00) Dollars per year [based on Twenty-Three ($23.00) Dollars per square foot of Floor Area];

       (c)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Five Hundred Seventy-Seven Thousand Nine Hundred Twenty ($577,920.00) Dollars per year [based on Twenty-Four ($24.00) Dollars per square foot of Floor Area];

       (d)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Six Hundred Two Thousand ($602,000.00) Dollars per year [based on Twenty-Five ($25.00) Dollars per square foot of Floor Area];

       (e)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Six Hundred Twenty-Six Thousand Eighty ($626,080.00) Dollars per year [based on Twenty-Six ($26.00) Dollars per square foot of Floor Area] and

       (f)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Six Hundred Fifty Thousand One Hundred Sixty ($650,160.00) Dollars per year [based on Twenty-Seven ($27.00) Dollars per square foot of Floor Area].

    1.1.12 <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, second floor or, except as set forth above, any exterior areas.

    1.1.13 *Force Majeure*:  As defined in Section 23.4 hereof.

    1.1.14 <u>Ground Lessor</u>:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

    1.1.15 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

    1.1.16 <u>Inducement Tenants</u>:  As defined in Subsection 2.3.1 hereof.

    1.1.17 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

    1.1.18 <u>Landlord's Mailing Address</u>:  Glenpointe Center East, 300 Frank W. Burr Boulevard, P.O. Box 309, Teaneck, New Jersey 07666, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

    1.1.19 <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

    1.1.20 <u>Lease Interest Rate</u>:  The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.21 <u>Legal Requirements</u>:  All federal, state and local laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.22 <u>Mortgagee</u>:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.23 <u>Permitted Use</u>:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items and cosmetics, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the ***"Permitted Items"***); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.24 <u>Premises</u>:  Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) twenty-four thousand eighty (24,080) square feet of Floor Area, (ii) six thousand (6,000.00) square feet of non-selling space on the second floor level for non-selling storage purposes, and (iii) one thousand (1,000) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall such non-selling second floor and mezzanine space result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.  Tenant shall have the sole right, subject to governing building codes, to determine/establish the positions and configurations of the second floor non-selling space and the mezzanine level space within the Premises.

1.1.25 <u>Renewal Option</u>:  As defined in Section 2.2.2 hereof.

1.1.26 <u>Renewal Period(s)</u>:  Four successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.27 <u>Rent</u>:  Fixed Rent and/or Additional Rent.

1.1.28 <u>Rent Commencement Date</u>:  As defined in Section 2.2 hereof.

1.1.29 <u>Shopping Center</u>:  The shopping center commonly known as River Front Center Shopping Center, containing approximately one hundred fifteen thousand (115,000) square feet of Floor Area, on the property located State Highway Route 3 in Clifton, New Jersey, and more particularly described in <u>Exhibit A</u> hereto.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior

notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.30 <u>Substantially Completed or Substantial Completion</u>: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only *"Punch List Items"* of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.31 <u>Taxes</u>: As defined in Section 4.3.3 hereof.

1.1.32 <u>Tenant</u>: As defined in the preamble hereof.

1.1.33 <u>Tenant's Mailing Address</u>: 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.34 <u>Tenant's Permits</u>: As defined in Section 2.3.1(b) hereof.

1.1.35 <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.36 <u>Tenant's Pro Rata Share</u>: A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than twenty (20%) percent, provided however, that if upon site plan approval the total Floor Area which may be constructed in the Shopping Center is more or less than one hundred fifteen thousand (115,000) square feet then the aforesaid twenty (20%) percent maximum shall be adjusted to the ratio, expressed as a percentage, that the Floor Area of the Premises bears to the Floor Area permitted to be constructed in the Shopping Center under the Site Plan approval, plus four (4%) percentage points. Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.37 <u>Tenant's Work</u>: As defined in Section 3.1 hereof.

1.1.38 <u>Term</u>: A period (the *"Initial Term"*) of approximately fifteen (15) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the fifteenth (15th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the fifteenth (15th) anniversary of the Rent Commencement Date. As used herein: (i) *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) *"Expiration Date"* shall mean the date on which the Term expires.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1 <u>Lease of Premises</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits,

4

privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center, which right and easement to use the Common Areas shall terminate upon the termination of this Lease.

Section 2.2    Term.

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term shall begin on the sixtieth (60th) day following the Delivery Date (the "*Rent Commencement Date*").  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2    Renewal Options.  So long as Tenant is not then in default under this Lease beyond any notice and cure period in the payment of Rent, Tenant shall have the right and option (hereinafter a "*Renewal Option*") to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a "*Renewal Period*", and collectively, the "*Renewal Periods*") upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s).  In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the two hundred seventieth (270th) day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options.  If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof.  If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    Delivery Date.

2.3.1    Definition.  Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "*Delivery Date*") following the day on which all of the following conditions (the "*Delivery Date Conditions*") shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy, fixture and merchandise (including, without limitation "High Pile" permits, i.e. any permits required for the conditions for the height of stacking of Tenant's merchandise) and use the Premises for the conduct of its

business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, *"Tenant's Permits"*)), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date (provided that such temporary certificate of occupancy shall allow Tenant to enter onto the Premises and perform Tenant's Work and thereafter to open for business), and (3) Landlord shall, subject to the completion of Tenant's Work, prior to the expiration of the temporary certificate of occupancy, obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work);

(c)    The Common Areas, and all of the improvements thereto shown on Exhibit B hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental approvals, as and if required, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(e)    Leases or other occupancy agreements shall have been entered into with Harmon Stores, Inc. and at least sixty-five (65%) percent of the balance of the Floor Area of the Shopping Center with national or regional retail tenants typically found in a first class retail center in the northern New Jersey area (excluding the Premises) (hereinafter collectively referred to as the *"Inducement Tenants"*) on the following terms, for occupancy of the premises designated for them on Exhibit B; such leases shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant; and

(f)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

2.3.2    Delivery Date.

(a)    Landlord shall give Tenant at least one hundred (100) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease

to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice, then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of: (i) Eighty-Five Thousand ($85,000.00) Dollars, plus (ii) Two Thousand Five Hundred ($2,500.00) Dollars for each day that the Delivery Date established in the Delivery Date Notice is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment. Notwithstanding the foregoing, if the Delivery Date does not occur by the date established therefor in the Delivery Date Notice due to any of the following occurring after the Delivery Date Notice has been given: (x) delays caused by a Tenant Delay (as defined below), (y) Force Majeure, or (z) a delay described in Section 3.2.2(d) hereof, then the Delivery Date shall be adjourned day for day for each day of such delay, provided that Landlord has notified Tenant within ten (10) days of the occurrence of such Tenant Delay, Force Majeure or of the delay described in Section 3.2.2(d) hereof. For purposes of this Lease "*Tenant Delay*" shall mean a delay resulting by reason of the acts or omissions or willful misconduct of Tenant or Tenant's agents, employees, servants or contractors.

(c)    Notwithstanding the provisions of subparagraphs (a) and (b) above, Landlord may postpone, on one occasion only, a Delivery Date from that previously established in a Delivery Date Notice by delivering to Tenant a revised Delivery Date Notice at least seventy (70) days prior to the Delivery Date established in the original Delivery Date Notice, which revised notice shall set forth the date to which the Delivery Date will be postponed which shall be at least one hundred (100) days after the date of the revised Delivery Date Notice. If a revised Delivery Date Notice is timely given hereunder, the liquidated reimbursement to Tenant referred to in Section 2.3.2(b), if any, shall only be deemed to accrue after the new Delivery Date established in the revised Delivery Date Notice. If a revised Delivery Date Notice is not given prior to the aforesaid 70-day period it shall not serve to avoid the accrual of liquidated reimbursement to Tenant referred to in Section 2.3.2(b) above, provided that such accrual shall nevertheless be subject to the penultimate sentence of Section 2.3.2(b) hereof.

2.3.3    Delivery Date Certification. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4    No Waiver. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4    Unseasonable Delivery: Slack Period. If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on October 1 and ending on the March 31 next following (the "*Slack Period*"), then Tenant shall have, in addition to any other remedies, the right to:

(a)    accept delivery of physical possession of the Premises; or

(b)    if the Delivery Date occurs after October 15, defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the April 1 next following the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the March 31 next following; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. In the event Tenant defers the acceptance of physical possession of the Premises as set forth in this Section 2.4, the per diem late charge of Two Thousand Five Hundred and 00/100 ($2,500.00) Dollars payable by Landlord to Tenant under Section 2.3.2(b) shall cease to accrue as of the date the Delivery Date would have occurred had Tenant not elected to defer acceptance, but shall recommence on the date later in the Slack Period which Tenant designates for delivery of the Premises if Landlord fails to deliver the Premises with all Delivery Date Conditions satisfied on such date. Notwithstanding the foregoing, Tenant shall have no right to terminate this Lease pursuant to the provisions of Section 3.3.2, if the Delivery Date would have occurred by October 31, 2006 but for the exercise by Tenant of its right to defer acceptance of possession and delay the Delivery Date under this Section 2.4.

Section 2.5    Initial Co-Tenancy Condition.

2.5.1    As used herein, the *Initial Co-Tenancy Condition* shall mean that each and every Inducement Tenant shall have accepted possession of its entire premises, such premises shall have been substantially completed, and each Inducement Tenant shall, if not already open for business, then be actively and continuously engaged in the fitting out of the premises, the performance of each such tenant's fixturing work and merchandising therein.

2.5.2    If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within ninety (90) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) for those obligations

which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work, not to exceed Thirty-Five Thousand ($35,000.00) Dollars.

ARTICLE 3

IMPROVEMENTS

Section 3.1    <u>Landlord's Work and Tenant's Work</u>.  Landlord shall, at its sole cost and expense, perform the work and obligations described on <u>Exhibit D</u> and <u>Exhibit F</u> hereto, and the ***"Final Plans and Specifications"*** (hereinafter defined in Section 3.2) (collectively, ***"Landlord's Work"***), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as ***"Tenant's Work"***) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    <u>Plan Approvals</u>.

3.2.1    <u>Preparation of Plans and Specifications</u>.

(a)    Within thirty (30) days after the date Landlord obtains unappealable approvals in accordance with Sections 2.3.1 and 3.3.2 hereof, Landlord shall deliver to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the ***"Preliminary LOD"***) [Limits of Demised], which shall be subject to any reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially consistent with <u>Exhibit B</u>, <u>Exhibit D</u> and <u>Exhibit D-1</u> hereto.

(b)    Within thirty (30) days after Tenant's receipt of the Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the "***Revised LOD***"), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions.

(c)    Within fifteen (15) days after Landlord's receipt of the Revised LOD, Landlord shall deliver to Tenant a final LOD (the "***Certified LOD***"), certified by Landlord, which shall incorporate all of the elements of the Revised LOD. Within fifteen (15) days after its receipt of the Certified LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements. After Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord, except such costs and delays as may otherwise be caused by any governmental agencies having jurisdiction in which event the party incurring the cost shall bear the same.

(d)    Within thirty (30) days after Tenant's receipt of the Certified LOD (but no earlier than thirty (30) weeks prior to the anticipated Delivery Date), Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details  (F2); Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4) (collectively, ***"Tenant's Plans"***), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

9

(e)     Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and specifications (the ***"Preliminary Plans"***) for Landlord's Work (which shall include, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans [including, without limitation, a site lighting plan with photometrics]), and each of the plans which collectively constitute the Preliminary Plans shall be at least eighty-five (85%) percent complete, in Tenant's reasonable judgment.  The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibit B, Exhibit D, Exhibit D-1 and Exhibit F hereto.

(f)     Within thirty (30) days after its receipt of the Preliminary Plans, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibit B, Exhibit D, Exhibit D-1 and Exhibit F hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

(g)     Within thirty (30) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the ***"Final Plans and Specifications"***), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(h)     Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval.  Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1 and/or Exhibit F hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1 and Exhibit F shall govern and prevail.

(i)     All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans, and the Final Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad"* up to *"Autocad 2002"*.

3.2.2  Plan Changes.

(a)     Tenant shall have the right to make changes from the standards and specifications set forth in ***"Tenant's Prototype Drawings and Specifications"*** and/or the "Project Manual", referred to in Exhibit D hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the *"Changes"*), provided, however, that such Changes shall not include changes to the foot print of the Premises or changes that would require an approval, permit or variance from the Planning Board of the City of Clifton.  Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change.  If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(b)     Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding five (5%) percent subcontractor profit and five (5%) percent general contractor

10

profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen, but in no event earlier than the Delivery Date.

(c)    Landlord shall pay to Tenant the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums not exceeding five (5%) percent subcontractor profit and five (5%) percent general contractor profit thereon). At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen. Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d)    If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3    Performance of Work.

3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits. Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2    If: (a) the Landlord's permits and approvals, as described in Section 2.3.1(b) and more particularly defined below, have not been obtained by January 1, 2006, or (b) Landlord's Work has not been commenced (i.e., if Landlord has not commenced site work) by February 1, 2006, or (c) the Delivery Date shall not have occurred by October 31, 2006 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)    terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed Thirty-Five Thousand ($35,000.00) Dollars and/or

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)    extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity. For the purposes of this Section and Section 2.3.1 hereof, the phrase: (a) "approvals" shall mean the approvals of all applicable governmental entities, which approvals are final and irrevocable as evidenced by duly adopted resolutions, a dedication of applicable agency or board in power to issue said approvals and which are no longer subject to appeal and are otherwise beyond any and all applicable appeal; and (b) "permits" shall mean all permits, certificates, licenses, waivers, variances (including zoning variances), authorizations and other approvals, and issuance of all necessary and proper building permits, for the construction to be performed on and the use of the Shopping Center and the Premises.

3.3.3    Landlord's Work Performed After Delivery of Possession. On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the *"Punch List Items"* (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list, provided that if Landlord, proceeding diligently, is not reasonably able to complete a particular Punch List Item within such ten (10) day period then the period shall be extended for that particular item to such period as would be reasonably required if Landlord shall promptly commence and thereafter diligently proceeds to cure the same. If Landlord fails to complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work. As used herein, the term *"Punch List Items"* shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4    Tenant's Right of Entry. Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession of or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall

indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5 _Work Requirements After Delivery Date_. Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a) staging and storage of materials and parking of construction vehicles shall not occur within that part of the Shopping Center designated as "Tenant's Protected Area" on _Exhibit B_ hereto;

(b) Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on _Exhibit B_ hereto; and

(c) Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.6 _Tenant's Trailer_. Subject to all applicable Legal Requirements and the approvals (as defined in Section 3.3.2), Tenant, at its sole cost and expense, including, without limitation, any utility costs, may install a trailer for Tenant's exclusive use in conducting employee interviews and recruiting, in accordance with Tenant's Prototypical Specifications, in the location shown on _Exhibit B_ hereto. Said trailer shall be installed and operational at least forty-five (45) days' prior to the Delivery Date, and shall be removed within twenty (20) days after the Delivery Date or earlier opening.

Section 3.4    _Measurement; Adjustment of Rent_.

3.4.1 _Measurement of Premises and Shopping Center_. Within five (5) days after the completion of the first course of masonry for the exterior walls of the Premises (and at least sixty (60) days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear dimensions and the Floor Area of the Premises, and Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer. If the interior clear dimensions and/or the Floor Area of the Premises vary from those shown on the Certified LOD (as may be modified by any applicable Changes) by more than two hundred fifty (250) square feet of Floor Area, then Landlord shall correct such work to conform to the Certified LOD (as may be modified by any applicable Changes).

3.4.2 _Measurement of Storage Area/Mezzanine_. Within five (5) days after the completion of the structural floor system and installation of the floor track for all interior partitions, if applicable, with respect to walls enclosing non-selling space on the storage second floor level and the office mezzanine, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of each of said non-selling space(s), the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If the square footage of the non-selling space on either or both of the storage second floor level, or the office mezzanine, varies from that shown on the Final Plans and Specifications, then, at Tenant's request, Landlord shall correct such work to conform to the Final Plans and Specifications.

3.4.3  Adjustment of Fixed Rent and Tenant's Pro Rata Share.  Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.24 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.24 hereof (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

## ARTICLE 4
## FIXED RENT, TAXES : DETERMINATION AND PAYMENT

Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    Payment of Rent.

(a)    All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the *"Paying Agent"*), to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

(b)    Notwithstanding anything to the contrary contained in Section 1.1.11 hereof, if at any time during the Term Landlord enters into a Lease for premises within the Shopping Center to Pier 1, then as from the date upon which Pier 1 opens for business the Fixed Rent shall be reduced for the balance of the Term, including any Renewal Periods then or thereafter exercised, by an amount equal to Two ($2.00) Dollars per square foot of Floor Area of the Premises and the rates of Fixed Rent per square foot set forth in Section 1.1.11 hereof shall be adjusted accordingly.

Section 4.3    Real Estate and Other Taxes.

4.3.1  Landlord shall pay on or before the due dates thereof all *"Taxes"* (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2  (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3.  Any

14

Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

(c)    In the event that Landlord's Mortgagee shall require Landlord to escrow monthly payments for Taxes, then, so long as such escrow shall be so required and all other tenants and occupants of the Shopping Center are similarly required to make monthly payments to Landlord with respect to Taxes, Tenant shall, in lieu of making payments pursuant to subparagraph (b) above, pay Landlord monthly with each installment of Fixed Rent an amount equal to one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's (or Landlord's Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within thirty (30) days following the issuance by the taxing authority of the bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Pro Rata Share thereof for such year (the *"Tax Reconciliation Statement"*). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) copies of the applicable tax bills, (y) a calculation of Tenant's Pro Rata Share of Taxes, and (z) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Pro Rata Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by Tenant in respect of said fiscal tax year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. If Landlord fails to timely remit to Tenant the amount of any overpayment, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

4.3.3    As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments

15

imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) are included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full calendar year of the Term will be approximately Four and 00/100 ($4.00) Dollars per square foot of Floor Area in the Premises.

4.3.4 At Tenant's request, Landlord shall consult an expert as to whether it is commercially reasonable to appeal the amount or validity of any assessed valuation of the Shopping Center. If Landlord determines that it is not commercially reasonable to appeal the amount or validity of any assessed valuation, then Landlord shall advise Tenant of such conclusion in writing and shall give Tenant the reasons for such conclusion and in such case, if Landlord's conclusion is commercially reasonable, Landlord shall have no obligation to appeal such assessed valuation. If Landlord fails to provide a commercially reasonable conclusion as aforesaid, Landlord shall so appeal the assessed valuation of the Shopping Center. In the event Landlord fails to file any such contest or appeal where it is so required to do so hereunder, Tenant shall have the right to appeal the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any appeal or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). For the purposes of this Article 4, "Taxes" shall include the reasonable out-of-pocket costs incurred by Landlord in respect of any contesting of Taxes, provided that any such costs over and above the cost of valuers and other experts in respect of such contest, shall only be included to the extent of the reduction in Taxes achieved.

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1 <u>Common Areas: Maintenance.</u>

5.1.1 <u>Maintenance of Common Areas.</u> Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, <u>including, without limitation,</u> snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements. This Section 5.1 is subject to the last sentence of Section 9.1 hereof.

16

5.1.2  <u>Tenant's Pro Rata Share of Common Areas Charges.</u>

(a)    During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the **"Common Areas Charges"**) paid by Landlord to operate, maintain, insure, replace and repair the Common Areas (including, but not limited to gardening and landscaping; storm drainage systems and other Common Area utility systems; traffic control equipment, line painting, lighting, sanitary sewer drainage, removal of snow, trash, and other refuse; the cost of personnel to implement such services, to direct parking and to police the Common Areas). Landlord shall be permitted to include in Common Area Charges (in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas) for each calendar year an administrative fee (the *"Administrative Fee"*) equal to five (5%) percent of the Common Areas Charges for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible Common Areas Charge hereunder), the cost of electricity and other utilities, and the cost of insurance which Landlord is required to maintain under this Lease. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)    Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the **"CAC Reconciliation Statement"**). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder within sixty (60) days after receipt of Notice from Tenant, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges with respect to the first full calendar year of the Term exceed Two ($2.00) Dollars per square foot of Floor Area. With respect to any calendar year thereafter in no event shall Tenant's Pro Rata Share of Common Areas Charges (exclusive of the costs of insurance rate increases, snow removal, utility rate increases, such excluded items being hereinafter called the **"CAC Cap Excluded Items"**) exceed one hundred five (105%) percent of the Tenant's Pro Rata Share of Common Areas Charges for the immediately preceding calendar year (exclusive of the costs of the CAC Cap Excluded Items during such preceding calendar year) (the **"CAC Cap"**). If in any year(s) during the Term Tenant's Pro Rata Share of Common Areas Charges increases by less than five (5%) percent (exclusive of the CAC Cap Excluded Items), then Landlord may carry forward as a credit against increases in Common Area Charges in future years which exceed five (5%) percent the positive difference between (i) five (5%) percent, minus (ii) the actual percentage increase in Tenant's Pro Rata Share of Common Areas Charges for that year over the prior year (exclusive of the CAC Cap Excluded Items) (such difference being hereinafter referred to as the **"Credit"**). The Credit may be applied by Landlord to enable Landlord to collect in a particular year more than the CAC Cap for that year, in any future year(s) when the percentage increase in Tenant's Pro Rata Share of Common Areas Charges exceeds five

1   (5%) percent, so that Landlord may apply the amount of any available Credit to recover
2   the amount by which Tenant's Pro Rata Share of Common Areas Charges for such future
3   year exceeds the CAC Cap for that year (up to the amount of the available Credit).  The
4   Credit may be applied in part if the available Credit exceeds the amount by which the
5   actual percentage increase in Tenant's Pro Rata Share of Common Areas Charges is
6   greater than five (5%) percent.  The total Credit available to be used by Landlord shall be
7   reduced by the amount of Credit actually applied by Landlord in any year so that each
8   percentage of Credit may only be used in one particular year by Landlord.

9              5.1.3  Exclusions from Common Areas Charges.

10             (a)     Common Areas Charges shall not include: (1)  the capital cost
11  of any additions to the Common Areas pursuant to an expansion of the Shopping Center;
12  (2)  the cost of any capital improvements to the Common Areas or the cost of any capital
13  replacement except, in relation to capital replacements if Landlord incurs a capital
14  expenditure relating to a replacement to a replacement not required as a result of the
15  act or omission of Landlord, after the first five (5) years after the Rent Commencement
16  Date, the same may be included in Common Areas Charges provided that the same shall
17  be amortized in accordance with generally accepted accounting principles (*"GAAP"*), at
18  the time such expenditures are incurred, over the useful life of the item so amortized, and
19  only the amortized portion applicable to each year shall be included in Common Areas
20  Charges and then only to the extent the capital expenditure is for a replacement similar in
21  nature and quality to the improvement replaced; (3) the cost of investigating, monitoring
22  or remedying any environmental condition or *"Hazardous Substances"* or any other
23  "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1), except for the
24  removal of such items as tires, gasoline, or batteries left in the Shopping Center by third
25  parties up to a maximum cost to Tenant in any one year of Five Hundred Dollars
26  ($500.00) Dollars; (4) any debt service (including principal and interest) or payments of
27  any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or
28  providing security for interior portions of buildings; (6) Taxes or other taxes levied or
29  assessed against Landlord or the Shopping Center; (7) the cost of compliance with laws
30  which relate to (A) environmental laws, (B) the negligence of Landlord or any other
31  tenant or any of their respective agents or employees, (C) contesting violations or curing
32  violations of pre-existing laws, (D) a capital expenditure, provided that in the event that
33  the cost of compliance with law involves a capital expenditure after the first five (5) years
34  after the Rent Commencement Date, then such cost shall be included in Common Area
35  Charges to the extent of that portion of the cost amortized over the useful life or ten (10)
36  years whichever is shorter, in a particular year, (E) the initial construction of the
37  Shopping Center or any expansion thereof, and (F) the specific needs of any other tenant
38  in the Shopping Center; (8) any costs resulting from insurance deductibles or any
39  payments made under any self-insurance policy maintained by Landlord where the
40  deductible or self insurance policy is in excess of Fifty Thousand ($50,000.00) Dollars
41  per annum; (9) any costs which would have been reimbursed or paid for by insurance
42  proceeds had Landlord maintained the insurance required under Section 10.3 hereof and
43  the amount of any judgment or other charge entered or costs assessed against Landlord in
44  excess of the policy limits of the insurance maintained by Landlord under Section 10.3
45  hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to
46  Landlord by any other tenant in the Shopping Center other than through the payment of
47  such tenant's proportionate share of insurance premiums otherwise includable as part of
48  Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the
49  Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or
50  construction of improvements for, any tenant in the Shopping Center (including, without
51  limitation, brokerage commissions and legal fees); (13) costs incurred in connection with
52  lawsuits or other legal actions (including, without limitation, arbitrations and mediations)
53  instituted or defended by Landlord not reimbursed as a result of such lawsuit or other
54  legal actions, provided, however, that so long as said lawsuits or other legal actions affect
55  the Common Areas only (or the costs therefor can be properly apportioned to the
56  Common Areas) and are resolved in favor of Landlord, then, without limiting the further
57  provisions of this Section 5.13, the reasonable attorneys fees and court costs incurred by

18

Landlord in connection therewith shall be included within Common Areas Charges so long as (A) the matter of any such lawsuit or other legal action first arises after the Rent Commencement Date, (B) any such lawsuit or other legal action does not result from the negligent or willful acts or omissions of Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or employees, (C) any such lawsuit or other legal action does not arise from Landlord's Work, any matter of title, any dispute with Landlord's insurance carrier or any condemnation proceeding, (D) the decision in favor of Landlord will benefit all tenants of the Shopping Center, and (E) such Common Areas Charges shall be similarly imposed on all other tenants of the Shopping Center; (14) sums incurred as late payment fees, penalties or interest, unless due to a Tenant Event of Default; (15) ground rent; (16) depreciation, [except as expressly permitted pursuant to item 23 below]; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the *"Normal Hours"* [hereinafter defined in Section 5.2], other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or its Affiliate to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) the cost in excess of Five Thousand ($5,000.00) Dollars for any one item, of any mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life not to exceed ten (10) years, as determined in accordance with generally accepted accounting principles); (23) reserves for anticipated future expenses; (24) except for the Administrative Fee provided for in Subsection 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses;(25) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; or (26) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates.

(b)  In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant.

(c)  Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4  <u>Tenant's Right to Audit</u>.  Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds five (5%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall

19

have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2   Common Areas: Restrictions.

5.2.1   Continuous Access. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof, or (iii) in the event maintenance and repair of the Common Areas requires temporary closing thereof, but only on thirty (30) days prior notice to Tenant.

5.2.2   No Alterations. The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads are substantially designated on Exhibit B. Landlord shall not (i) except as required by Legal Requirements and except as may be required as the result of a condemnation, in the area depicted as the Tenant's Protected Area on Exhibit B or in all entrances and exits to the Shopping Center and driveways and access aisles therefrom to the Tenant's Protected Area (collectively, the *"Control Area"*) alter the Shopping Center as shown on Exhibit B, (ii) construct or permit to be constructed any sign, tower or other structure or improvement, but Landlord shall have the right within the Control Area to construct items or amenities customary in first-class retail centers, such as light standards, benches and directional signage, provided the same do not unreasonably interfere with access to the Premises or visibility of the Tenant's signage (iii) change the number, location, or layout of parking spaces within the Tenant's Protected Area except as required by Legal Requirements; (iv) construct additional structures or buildings in the Shopping Center except as shown in the Permitted Building Areas on Exhibit B; or (v) in the Control Area, change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks except as may be necessary to conform to Legal Requirements; without obtaining Tenant's prior written consent in each instance, which consent may be withheld by Tenant in its sole discretion, exercised in good faith, without the application of Section 23.5 below. Notwithstanding any provision herein to the contrary, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center, including the Premises, (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be granted or denied in Tenant's sole and unfettered

discretion, reasonably or unreasonably exercised.  Except as provided above, Landlord shall have the right to make reasonable changes to the Common Areas outside of the Control Area, provided that, unless Landlord obtains the prior consent of Tenant, such changes do not unreasonably interfere with Tenant's business, visibility of the Premises or of Tenant's signage, ingress, egress or parking by Tenant and its customers, employees, contractors, agents and invitees.

5.2.3 <u>Parking Area</u>.  During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, or (ii) four (4) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length (except to the extent that a limited number of compact car parking spaces are permitted by the Clifton Planning Board).  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Except for three (3) parking spaces immediately in the front of "Anchor D" and five (5) parking spaces immediately in the rear of "Anchor D" to be designated for use by "Circuit City" and two (2) parking spaces immediately adjacent to the "Pad" designated for use by the occupant of the "Pad", Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees.  There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center.

5.2.4 <u>Lighting</u>.  Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*).  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (<u>excluding</u>, however, those tenants and occupants who separately control and pay for their own Common Area lighting).  In addition to the foregoing, Landlord shall provide from one (1) hour after the close of business in the Premises until dawn for security lighting at such a level as is required by applicable Legal Requirements or which is otherwise typical in comparable centers in the same locality as the Shopping Center in light of the incidence of crime and the need therefor.

5.2.5 <u>Repairs</u>.  During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)     not be performed during the months of August, November, or December of any year, except for minor pothole repairs, repairs conducted entirely outside of normal business hours, or in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)     be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)     be performed in accordance with the requirements of Section 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.6 <u>Rules and Regulations</u>.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within

21

sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.7  Miscellaneous.

(a)    No Promotional Use.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.  Landlord shall not permit any solicitation, distribution of handbills or picketing in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)    Trash Compactor & Containers.  Subject to compliance with applicable Legal Requirements, Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad".  Tenant, at its sole cost and expense, shall provide its own trash removal services and shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)    Shopping Carts.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant shall regularly monitor the Common Areas to insure the regular removal of such shopping carts from the Common Areas.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibit B and Exhibit D hereto.

ARTICLE 6
UTILITIES

Section 6.1  Utility Service.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such commercially reasonable requirements as Landlord may impose.

Section 6.2  Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the

Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

ARTICLE 7

SIGNS

Section 7.1   Tenant's Building Signage.  Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibit D, Exhibit D-1 and Exhibit F hereto, and with the additional provisions of this Lease.  Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements.  Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2   Pylon/Monument Signage.  Landlord shall provide pylons and monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor.  Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylons and monuments, in accordance with the provisions of Article 3 and Exhibit F hereto.  The dimensions of Tenant's pylon sign panel(s) shall be at least as large as those of other occupants of the Shopping Center, and shall be located above the signs of all other tenants of the Shopping Center.  In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas, such signage shall also include Tenant's identification sign, as shown on Exhibit F hereto, which shall be higher than and at least as large as the largest sign made available to such other tenant or tenants.  Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent.  The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) [but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments] and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.

Section 7.3   Signage: Alteration/Removal/Allocation.  Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same, that such signage complies with all Legal Requirements.  Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4   Cooperation.  Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

23

Section 7.5    Signage Restrictions.

7.5.1    During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that the tenants shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import. No billboard signs shall be permitted within the Shopping Center.

7.5.2    Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical storefront elevation shall not require Landlord's consent so long as such alteration is harmonious with the balance of the Shopping Center and in compliance with all applicable Legal Requirements. All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3    Tenant shall have the right to subdivide the Premises into no more than two (2) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.

24

8.1.5  Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) business days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6  If any violation by Landlord of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7  Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance and other prototype features) without the prior consent of Tenant. If Tenant does not object to any approval sought by Landlord pursuant to this Section 8.1.7 within ten (10) days after Tenant's receipt of Landlord's request, then, provided such request outlines clearly in **bold** and all CAPITALIZED lettering on the first page thereof the consequences of Tenant's failure to respond, Tenant's approval shall be deemed to have been given.

ARTICLE 9
REPAIRS

Section 9.1  <u>Tenant's Repairs</u>.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning (***"HVAC"***) units exclusively serving the Premises.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.  Subject to Section 10.1 hereof, Tenant shall repair any damage to the Shopping Center or the Premises due to the negligent acts or omissions of Tenant, its employees, agents or contractors or any breach by Tenant of the provisions of this Lease.

Section 9.2  <u>Landlord's Repairs</u>.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)  the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)  the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (<u>including</u>, without limitation, repainting, but <u>excluding</u> plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)  the roof, gutters, flashings, downspouts and scuppers;

25

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    the non-structural elements of the Premises (including, without limitation, the maintenance and repair of the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)    upon receipt from Tenant of notice of the need therefor, any damage to the Premises or the Shopping Center which is occasioned by (A) the negligent or willful act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges, provided that the cost of repairs under Section 9.2(d) and (e) may be included in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least three (3) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  Notwithstanding anything to the contrary in this paragraph, during the Renewal Periods, Tenant shall be responsible for paying to Landlord the reasonable costs and expenses of the maintenance and repair of the roof, gutters, flashings, downspouts and scuppers of the Premises.  If during any of the Renewal Periods the roof, gutters, flashings, downspouts and scuppers cannot be properly repaired and are in need of replacement then Landlord shall replace the same at Landlord's cost and expense, provided that Tenant shall reimburse Landlord for the reasonable cost of any such replacement (but not for the replacement of the roof, gutters, flashings, downspouts and scuppers of any other building in the Shopping Center), provided that the cost of such replacement is amortized at a rate of eight (8%) percent over a period of ten (10) years and only the portion of such cost amortized in a particular year shall be payable by Tenant in that year and Tenant shall have no liability for any amount amortized on such basis after the expiration of the Term.

Section 9.3    Legal Compliance Work.  Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and to the extent expressly excluded in Section 5.1.3 hereof not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined).  Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease.  As used herein, "***Legal Compliance Work***" shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

26

ARTICLE 10

INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1 Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1 Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the negligent or willful acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any negligent or willful act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2 Tenant's Insurance.

10.2.1 Tenant's Insurance. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million ($10,000,000.00) Dollars for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an

amount adequate to cover the full insurable replacement value of all of Tenant's Property
. Tenant may carry any of its insurance under "blanket policies" covering the Premises
and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the
amount of the total insurance available shall be at least the protection equivalent to
separate policies in the amounts herein required, and (ii) in all other respects, any such
policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 Self-Insurance. All insurance required to be maintained under this
Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a
blanket policy or policies which includes other liabilities, properties and locations of
Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any
guarantor of Tenant's obligations under this Lease maintains, during the period of such
self-insurance, a net worth of at least One Hundred Fifty Million ($150,000,000.00)
Dollars; or (iv) a combination of any of the foregoing insurance programs. To the extent
any deductible is permitted or allowed as a part of any insurance policy carried by Tenant
in compliance with this Section 10.2, then Tenant shall be deemed to be covering the
amount thereof under an informal plan of self-insurance; provided, however, that in no
event shall any deductible exceed Two Hundred Fifty Thousand ($250,000.00) Dollars
unless Tenant complies with the requirements regarding self-insurance pursuant to clause
(iii) above.

Section 10.3  Landlord's Insurance.

10.3.1 Liability Insurance. Landlord shall maintain in full force and effect
on and after the Effective Date and throughout the Term commercial general liability
insurance with regard to the Common Areas protecting and insuring Landlord, naming
Tenant as "additional insured-lessee", and having a combined single limit of liability of
not less than Ten Million ($10,000,000.00) Dollars for bodily injury, death and property
damage liability. Landlord shall have the right to carry its insurance under "blanket
policies" covering the Shopping Center and other properties provided that: (i) the amount
of the total insurance available shall be at least the protection equivalent to separate
policies in the amounts herein required, and (ii) in all other respects, any such policy or
policies shall comply with the applicable provisions of this Article 10.

10.3.2 Special Form Property Insurance. Landlord shall procure and
maintain in full force and effect on and after the Effective Date and throughout the Term,
Special Form (formerly known as "All-Risk") property insurance (including loss of rents
for a minimum period of one (1) year) and endorsements for coverages for flood,
earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of
construction and contingent operation of building laws coverages, on a replacement cost
basis, in an amount adequate to cover the full insurable replacement value of all of the
buildings (including the Premises) and other insurable improvements in the Shopping
Center ; provided, however, in no event shall such insurance cover Tenant's Property.
All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2
shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or
if none, to Landlord, in either event to be held in trust by such party and disbursed only in
accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.
The property insurance required to be maintained by Landlord pursuant to this Section
shall not have deductibles exceeding One Hundred Thousand ($100,000.00) Dollars
without Tenant's prior consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall
reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums
attributable to the policies required to be maintained by Landlord pursuant to this Section
10.3 as part of Common Areas Charges. If the rates for any insurance Landlord is
required to carry hereunder are increased solely as a result of the use or other activity of
any other occupant of the Shopping Center and Tenant provides Landlord with clear
evidence thereof from a professional insurance consultant, the amount of such increase
shall be excluded from Common Areas Charges. To the extent that Landlord receives a

dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease. Tenant agrees to pay any increase in Landlord's insurance premiums resulting solely from the use or other activity of Tenant in the Premises provided that Landlord provides Tenant with clear evidence thereof from a professional insurance consultant.

Section 10.4  General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

## ARTICLE 11
## FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1  Fire and Other Casualty.

11.1.1 (a)    Except as otherwise provided in this Section 11.1.1, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly (x) rebuild and restore the Premises and the Common Areas to the condition existing immediately prior to such fire or other casualty (which restoration shall exclude all Tenant's Work and all other leasehold improvements performed by Tenant and all work and leasehold improvements performed by other tenants of the Shopping Center, and shall not include any of Tenant's Property), and (y) rebuild and restore at least forty thousand (40,000) square feet of additional Floor Area (exclusive of the Premises), to substantially the condition in which same existed immediately prior to such fire or other casualty so that same shall be occupied or ready for occupancy following reconstruction (all of the foregoing work is hereinafter referred to as the *"Primary Restoration"*). With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (aa) rebuild and restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (bb) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner (all of the foregoing work is hereinafter referred to as the *"Secondary Restoration"*). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 10.3 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration (it being agreed that subject to

the provisions of this Lease, such proceeds delivered to Landlord's Mortgagee may be disbursed in accordance with such Mortgagee's commercially reasonable disbursement requirements). In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.1.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, subject to compliance with applicable Legal Requirements and Landlord's ability to obtain permits and approvals therefor, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work, including the cost of obtaining approvals and permits therefor, is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

(d)    Notwithstanding any other provision of this Article, in the event of a fire or other casualty which damages or destroys all or a portion of the Premises, the buildings in the Shopping Center and/or the Common Areas, which fire or other casualty is not insurable or for which Landlord is not required, pursuant to Article 10 above to provide coverage (and has not so provided such coverage), then Landlord's responsibility for the repair and restoration of such damage or destruction shall be limited to an expenditure of Two Hundred Thousand and 00/100 Dollars ($200,000.00) in addition to any insurance proceeds which may have been paid to or on behalf of Landlord (collectively, the "Uninsured Obligation"). In the event that the expenditure of the amount represented by the Uninsured Obligation is not sufficient to rebuild and restore the Premises, the other buildings and/or the other portions of the Common Areas, as the case may be, then Landlord shall have no obligation to rebuild and restore the same (but may, in any event, elect to do so) provided that Landlord gives notice to Tenant within forty-five (45) days after Landlord's insurer declines coverage of Landlord's elections not to perform such restoration, which notice shall include an independent architect's certification as to the estimated cost of the repair and restoration work to the Premises and Common Areas (the "Restoration Cost"). Tenant shall have the right, but not the obligation, exercisable within thirty (30) days after receipt of Landlord's notice, to give Landlord notice of its intention to provide the funds (the "Remaining Funds") for the repair and restoration of the Premises and the Common Areas, which Remaining Funds shall not exceed the Restoration Cost less the Uninsured Obligation. In the event Tenant elects to provide the Remaining Funds, then Landlord shall diligently prosecute the completion of such rebuilding and restoration as otherwise provided and subject to the provisions of this Article, and the Remaining Funds shall be paid to Landlord within the same period of time as is specified in Section 11.1.1 (b) above for the payment of net costs and expenses resulting from Tenant changes. In the event Tenant does not elect to

provide the Remaining Funds for such rebuilding and restoration, then Tenant shall have the right to terminate this Lease as of the end of the thirty (30) day period described above, and in such event neither party shall have any liability to the other hereunder (except as expressly provided for herein). Notwithstanding the foregoing, if (A) this Lease has terminated pursuant to this Section 11.1.1(d) and (B) Landlord or any of Landlord's affiliates actually commences to reconstruct the Shopping Center (or a shopping center of a substantially similar type to the Shopping Center on the same site) on or before the date that is three (3) years after the date of the casualty, then Landlord shall be obligated to offer to Tenant, at the time of the commencement of the construction, the option to lease a portion of the Shopping Center (or a portion of such shopping center) equal in size to at least twenty-two thousand (22,000) square feet (but not greater than twenty-six thousand (26,000) square feet) upon all the terms and conditions of this Lease [including, without limitation, the amount of Fixed Rent per square foot which is not greater than (but which may be less than) the then applicable Fixed Rent per square foot set forth herein for the remaining Term of the Lease (and any unexercised Renewal Options)]. In the event Tenant elects, within thirty (30) days after such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after such offer, to exercise such option, Landlord shall be free to lease such premises to any other person or entity, upon any terms and provisions acceptable to Landlord. The provisions of this Paragraph shall survive the expiration or earlier termination of this Lease.

11.1.2 In the event that:

(a) Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of the adjustment of insurance proceeds and the acquisition by Landlord of all necessary governmental approvals, which Landlord shall diligently pursue, or thereafter fails to diligently pursue the completion of such repair and restoration work; or

(b) the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within fifteen (15) months after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i) after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within fifteen (15) months after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2 Eminent Domain.

11.2.1 As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)    more than fifteen (15%) percent of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center (provided that this shall not apply to the acceptance of the driveway labeled "Bridge Driveway" on Exhibit B as a public street), or (ii) the Shopping Center no longer has at least two (2) entrances from State Route 3 and one entrance from Bridewell Place, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)    subject to the specific standards set forth in sub-clauses (a), (b), (d) and (e) of this Section 11.2.3, any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(d)    more than thirty-three (33%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(e)    if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four (4) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least ninety (90) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to make a separate claim for an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3 Abatement of Rent Charges. Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after the Substantial Completion by Landlord of such repairs and restoration work as Landlord is obligated to perform hereunder.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1 Quiet Enjoyment. Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2 Authority. Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained

herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3  Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date, Landlord is the contract purchaser of, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that on information and belief there exist no strips or gores between such parcels or lots which are not owned by Landlord (provided that this shall not apply to the acceptance of the driveway labeled "Bridge Driveway" on Exhibit B as a public street);

(c)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)    Tenant's use of the Premises for sale of *"Permitted Items"* (defined in Section 1.1.23 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have, access to and from State Highway Route 3 and Bridewell Place, as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)    There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work ;

(h)    As of the Effective Date there is no *"Related Land"* (defined in 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(i)    There are no fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center; and

(j)    Landlord shall use its best efforts to promptly forward to Tenant any notice or other communication received by Landlord from any owner of

34

property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4 Environmental Matters.

12.4.1 Definitions.

(a)    As used herein, the term *Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)    As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 Compliance with Environmental Laws. Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at,

35

the Shopping Center and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter "*Tenant Releases*"), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.   Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4 If Tenant's operations on the Premises now or hereafter constitute an "Industrial Establishment" subject to the requirements of the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K6 et seq., and the regulations pertaining thereto, N.J.A.C. 7:26B-1 et seq. ("ISRA"), then prior to the expiration or sooner termination of this Lease and upon any and every condemnation, casualty, assignment or sublease, change in ownership or control of Tenant or any other closure, transfer or event which is subject to the requirements of ISRA, Tenant shall comply with all requirements of ISRA pertaining to an Industrial Establishment closing or transferring operations, at its sole cost and expense, to the satisfaction of the Department of Environmental Protection of New Jersey ("DEP"). Without limitation of the foregoing, Tenant's obligations shall include (A) the proper filing of the initial notice to the DEP required by N.J.A.C. 7:26B-3.2, (B) the performance to DEP's satisfaction of all air, soil, ground water and surface water sampling and tests required by N.J.A.C. 7:26B-4.1-4.3 and (C) either (x) the filing of a "negative declaration" with DEP under N.J.A.C. 7:26B-5.2 which has been approved by DEP or (y) the performance of a proper and approved cleanup plan to the full satisfaction of DEP in accordance with N.J.A.C. 7:26B-5.3. Tenant shall immediately provide Landlord with copies of all correspondence, reports, notices, orders, findings, declarations and other materials pertinent to Tenant's compliance and DEP's requirements under ISRA, as any of same are issued or received by Tenant from time to time.

12.4.5 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.6 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties (except as set forth in that certain Letter of No Further Action from the New Jersey Department of Environmental Protection dated April 13, 1998); and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.7 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.8 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.9 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.10    <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5 <u>Purchase and Sale Contract</u>.

12.5.1 Landlord represents and warrants to Tenant that, as of the Effective Date:  (a) it is the vendee under that certain Purchase and Sale Agreement dated January 6, 2003 by and between JPMorgan Chase Bank and Grace A Anderson, as Trustees of the Trust created under the will of William P. Aldrich, as seller, and Landlord, as purchaser, with respect to the Shopping Center (the "***Contract***"); (b) the Contract is in full force and effect; (c) it has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contract; and (d) the Shopping Center consists of approximately twenty-two (22) acres, and currently constitutes all of the property to be purchased under the Contract.  Landlord shall proceed diligently and in good faith to acquire fee title to the Shopping Center under the Contract.

12.5.2 In the event that Landlord and Tenant have executed a short form or memorandum of this Lease for recording pursuant to Section 23.20 below prior to Landlord's closing of title to the Shopping Center, Landlord shall cause such short form or memorandum to be duly recorded immediately after the deed of conveyance to Landlord, at Landlord's expense.  Within five (5) days after the closing of title to the Shopping Center pursuant to the Contract, Landlord shall give Tenant notice thereof.

12.5.3 (a)    In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease on or before January 1, 2006, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease.  Should Tenant so terminate this Lease, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, the preparation of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under the Contract, such reimbursement by Landlord shall not exceed the aggregate sum of Thirty-Five Thousand ($35,000.00) Dollars, plus reasonable legal fees, and the provisions of Section 23.13 hereof shall not apply, to the extent of such aforementioned reimbursement.  If Landlord's failure to acquire such fee title is attributable to Landlord's uncured default or uncured breach under the Contract, the provisions of Section 23.13 hereof shall not apply.

(b)    In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease on

or before January 1, 2006, which failure by Landlord is not attributable to Landlord's default or breach under the Contract, then Landlord may at its election, upon notice to Tenant, given at any time after said date (and in any event prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease.

12.5.4 If this Lease is terminated pursuant to Subsection 12.6.3 above, and Landlord or its Affiliate acquires title to the Shopping Center within two (2) years after the date on which the Lease termination becomes effective hereunder, then Landlord shall offer to Tenant, at the time of Landlord's (or its Affiliate's) acquisition of title to the Shopping Center, the option to lease the Premises upon the terms and conditions of this Lease; provided, however, that all dates set forth in this Lease shall be appropriately extended. In the event Tenant elects, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord shall be free to lease the Premises to any other person or entity, upon economic terms which are not materially more favorable to the tenant than those contained in this Lease. The provisions of this Subsection 12.5.4 shall survive the termination of this Lease.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1 Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.23 above). Tenant shall not use the Premises for any of the *"Prohibited Uses"* (defined in Exhibit M hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable or the Future Exclusives (hereinafter defined in Subsection 13.3.2), to the extent then applicable.

13.1.2 Prohibited Uses. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or any land (the *"Related Land"*) contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned or controlled by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center or the Related Land existing as of the Effective Date) for any of the *"Prohibited Uses"* (defined in Exhibit M hereto annexed), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall not apply to any business existing on any Related Land owned or controlled by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the time it became Landlord hereunder, already owned or controlled such Related Land (excluding, however, the Landlord originally named herein and its Affiliates).

Section 13.2 Tenant's Exclusive in Center. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding (i) furniture, and major appliances or "white goods" such as a typical P. C. Richards as the same is operated on the Effective Date, (ii) mattresses and boxsprings and similar bedding as

38

typically sold by a Rockaway Bedding as the same is operated on the Effective Date, and (iii) a furniture store such as "Huffman Koos" as the same is operated on the Effective Date); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five (5%) percent of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet. Existing tenants of the Shopping Center and any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items. The foregoing exclusive shall not prohibit a lease of premises in the Shopping Center to the tenants listed on Exhibit K hereof provided, however, that in the case of Circuit City, Circuit City shall enter into the standard "side letter" agreement modifying the Circuit City's exclusive with respect to Tenant. Tenant hereby agrees that if requested by Landlord that Tenant shall enter into a side-letter with Pier 1 in the form attached hereto as Exhibit O.

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department store [for example, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).

13.2.3 The exclusive rights granted to Tenant with respect to any respective category listed in the foregoing Section 13.2.1 shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during Excused Periods and for periods of time not exceeding six (6) consecutive months); provided, however, that if Tenant ceases to use portions of the Premises for the sale, rental or distribution of items contained in a category (other than during Excused Periods) for more than six (6) consecutive months, then Tenant's exclusive rights in that category shall lapse only if Tenant fails to recommence the sale, rental or distribution of items contained in that category within ninety (90) days after receiving notice from Landlord after the expiration of said six-month period. The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty (50%) percent of the Floor Area of the Premises.

13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), which breach continues for a period of thirty (30) days after notice thereof from Tenant to Landlord, the Rent payable hereunder shall be reduced by fifty (50%) percent for so long as such violation shall

continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3  Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted or to be granted by Landlord as part of its initial lease-up of the Shopping Center to certain other tenants in the Shopping Center as set forth on Exhibit K (hereinafter, *"Existing Exclusives"*) and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K hereto and that Exhibit K is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which are executed from and after the Effective Date (hereinafter, *"Future Exclusives"*), and shall not sublease, occupy or use the Premises (or, in the event of a sublease, any applicable portion of the Premises), or permit the Premises (or, in the event of a sublease, any applicable portion of the Premises) to be leased, occupied or used, whether by Tenant or any sublessee, assignee, licensee or other occupant, in violation of any such Future Exclusive; provided, and on the condition that:

(a)    The Future Exclusive shall bind Tenant only to the extent that it restricts Tenant from operating primarily for the same primary use as that engaged in by the beneficiary of the Future Exclusive (*e.g.*, primarily as a bookstore, an office supplies store, a sporting goods store, a toy store, *etc.*);

(b)    Landlord shall notify Tenant of the granting of such Future Exclusive within ten (10) business days after the execution of a lease containing such Future Exclusive, and, at the time Tenant receives such notice, (i) Tenant shall not have previously entered into an assignment of this Lease or a sublease of the Premises (or any portion thereof) which specifically permits a primary use which would violate such Future Exclusive; or (ii) neither Tenant nor any

assignee of this Lease or subtenant of the Premises (or any portion thereof) shall then be engaged in a primary use which would violate such Future Exclusive;

(c)    the premises occupied by the tenant benefiting from such Future Exclusive shall contain at least twenty thousand (20,000) square feet of Floor Area;

(d)    such Future Exclusive shall not relate to the sale, rental or distribution of soft goods, or men's, women's, and/or children's apparel or footwear (unless such Future Exclusive relates to specialized apparel, such as, for example, maternity apparel only, formalwear only, larger-sized apparel only, or uniforms only);

(e)    Landlord and the tenant or occupant benefiting from the Future Exclusive shall have entered into a lease or other occupancy agreement for its premises within one (1) year after the Effective Date;

(f)    the beneficiary of the Future Exclusive shall be a national or regional tenant of the Shopping Center; and

(g)    no Future Exclusive shall be granted for the sale of any or all of the Exclusive Items.

13.3.3 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 & 3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the one hundred twentieth (120th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than two hundred seventy (270) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)    giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 270-day period expires, and

(b)    paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations or improvements made by Tenant and permitted under this Lease,

whereupon this Lease shall terminate upon the sixtieth (60th) day (the "***Recapture Date***") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such

41

1  termination, Landlord and Tenant shall each be released from any and all liabilities
2  thereafter accruing hereunder, except for those obligations which survive the expiration
3  or other termination of this Lease pursuant to the express terms of this Lease. All Rent
4  payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant
5  shall promptly pay to Landlord any amounts so determined to be due and owing by
6  Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any
7  amounts prepaid by Tenant for periods subsequent to the Recapture Date.

8                                   ARTICLE 15
9                    TENANT ASSIGNMENT AND SUBLETTING

10        Section 15.1  Assignment and Subletting.  Tenant shall have the right from time to
11  time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to
12  sublet, concession or license all or any portion of the Premises, subject to all of the terms
13  and conditions of this Lease.

14        Section 15.2  Liability of Tenant.  Unless otherwise agreed to in writing by
15  Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce,
16  diminish, or otherwise affect the liability of Tenant hereunder.

17        Section 15.3  Collateral Assignment.  In addition to Tenant's other rights set forth
18  in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to
19  one or more *"Lenders"* (hereinafter defined), as collateral security for an indebtedness or
20  other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute
21  all documentation reasonably requested by Tenant or any such Lender in connection
22  therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant
23  to an Affiliate of Tenant a license to operate all of Tenant's business operations at the
24  Premises, without such Affiliate having assumed any liability for the performance of
25  Tenant's obligations under this Lease. As used herein, *"Lender"* shall mean a state or
26  federally regulated: bank, savings and loan association, insurance company, pension
27  fund, credit union, real estate investment trust, or other institutional lender.

28        Section 15.4  Cure Rights of Original Tenant.

29        15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord,
30  when giving notice to said assignee or any future assignee in respect of any default, shall
31  also give a copy of such notice to the Original Tenant, and no notice of default shall be
32  effective until a copy thereof is so given to Original Tenant. Original Tenant shall have
33  the same period after receipt of such notice to cure such default as is given to Tenant
34  therefor under this Lease.

35        15.4.2 If this Lease is terminated because of: (a) an Event of Default of
36  such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or
37  on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal
38  Requirement of any State or of the United States, or any other Legal Requirements
39  affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice
40  thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord
41  within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter
42  into a new lease of the Premises with Landlord (*"New Lease"*), provided that the
43  Original Tenant shall have remedied all Events of Default of the assignee hereunder,
44  unless such Events of Default (not constituting monetary obligations) are not reasonably
45  susceptible of cure by the Original Tenant, in which event the Original Tenant shall not
46  be obligated to cure such Events of Default as a condition to the exercise of its rights
47  under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of
48  Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of
49  Landlord's rights against such assignee (whether arising as a result of bankruptcy court
50  proceedings or otherwise). The term of said New Lease shall begin on the date of
51  termination of this Lease and shall continue for the remainder of the Term (including any
52  Renewal Periods). Such New Lease shall otherwise contain the same terms and
53  conditions as those set forth herein, except for requirements which are no longer

                                        42

applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5  Recognition Agreement.  In the event Tenant sublets the Premises, in whole or in part, to a national or regional retail tenant having a tangible net worth of at least Twenty-Five Million ($25,000,000.00) Dollars, Landlord, upon Tenant's request and at Tenant's cost and expense, as to Landlord's reasonable third party legal fees in respect thereof, shall execute, acknowledge and deliver to any subtenant whose sublease satisfied the conditions hereinafter set forth, a recordable instrument in the form annexed hereto as Exhibit H. The conditions applicable to any subtenant entitled to receive a non-disturbance agreement as aforesaid are as follows:

(a)  such sublet premises contain approximately the same consistent depth as that applicable to the Premises generally, subject, however, to such subtenant's reasonable loading, storage, ingress/egress and corridor requirements;

(b)  the sublease obligates the subtenant to pay at least the same fixed annual rent and additional rent on a per square foot basis as is payable under this Lease or the subtenant would on the implementation of any such non-disturbance agreement be obligated to pay Landlord at least the same fixed annual rent and additional rent on a per square foot basis as is payable under this Lease;

(c)  if the sublease is not for all of the Premises, the sublease is for premises which are contiguous to either side exterior wall of the Premises;

(d)  the sublease is on terms and conditions which are no more onerous to the sublessor thereunder, and giving the sublessor thereunder no less rights, than those pertaining to Landlord under this Lease or the subtenant would on the implementation of any such non-disturbance agreement be obligated to Landlord under terms and conditions which are no more onerous to the Landlord than those pertaining to Landlord under this Lease;

(e)  upon the implementation of any such non-disturbance agreement the subtenant attorns to Landlord upon the terms and conditions set forth in the sublease;

(f)  the term of the sublease, inclusive of renewal options, shall not exceed the Term, inclusive of renewal options;

(g)  if pursuant to the terms of the aforesaid non-disturbance agreement, Landlord and any subtenant become bound to each other as landlord and tenant on the terms set forth in the Sublease, then (A) Landlord shall not be liable to Tenant for any prior default of the sublessor under the sublease, (B) Landlord shall not be bound by the payment of rent more than one (1) month in advance and (C) Landlord shall not be bound by any amendment of the sublease not received by Landlord or which does not meet the standards set forth in this Section 15.5).

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

Section 16.1 _Tenant Default._

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting including reasonable attorney's fees). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in

44

enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2  Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)  as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)  bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)  offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid. Notwithstanding anything to the contrary contained herein, if Tenant is owed any amount by Landlord pursuant to this Lease, except with respect to an offset owed with respect to Tenant's completion of Landlord's Work under Article 3 or Landlord's restorations obligations under Article 11, any offset, withholding or deduction of such amount shall in no event exceed thirty (30%) percent of each of the next succeeding monthly installments of the Fixed Rent until a court of competent jurisdiction renders a final unappealable judgment that Landlord is in default under this Lease and thereafter the aforesaid limitation shall no longer be applicable. Further, if Tenant shall be unable to recoup the amounts owing to Tenant by offsetting or withholding the foregoing thirty (30%) percent of fixed rent during the remainder of the Term, the thirty (30%) percent limitation shall be increased to an amount each month required to enable Tenant to recover such amount monthly, amortized over the remaining months of the Term; and/or

(d)  may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

45

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3 Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (i.e., in Sections 3.4, 5.1 and 11.2 hereof) (but not otherwise), the same shall be settled by arbitration in Clifton, New Jersey, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

ARTICLE 17

RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1 Right to Mortgage and Non-Disturbance. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2 Estoppel Certificate. Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid and the

46

amounts of Fixed Rent and Additional Rent; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3 <u>Existing Mortgages</u>.  If a mortgage, deed of trust, or other security instrument encumbers the Shopping Center or any part thereof on the Effective Date, then within sixty (60) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as <u>Exhibit G</u>, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within said 60-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Thirty-Five Thousand ($35,000.00) Dollars.

## ARTICLE 18
## NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address Herten, Burstein, Sheridan, Cevasco, Bottinelli, Litt, Toskos & Harz, LLC, Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601 or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.  Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the

Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within fifteen (15) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## ARTICLE 20
## END OF TERM

Section 20.1  Surrender of Premises.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2  Hold Over.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
## INTENTIONALLY OMITTED

## ARTICLE 22
## ONGOING CO-TENANCY

If, at any time during the Term, less than forty thousand (40,000) square feet of Floor Area in the Shopping Center (excluding the Premises), is used for the operation of retail business by national or regional tenants of the type typically found in first-class regional shopping centers located in the New York metropolitan area (such condition being hereinafter referred to as an "*Excess Vacancy*"), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (A) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (B) Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of any alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired portion of the Term.  If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens by more than ten (10%) percent; and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

## ARTICLE 23
## MISCELLANEOUS

Section 23.1  Loading Facilities.  Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis subject to applicable Legal Requirements.

Section 23.2 Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3 Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for DLR Commercial Real Estate (the "**Broker**"). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4 Force Majeure. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for a period equal to the period of the delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the commercially reasonable exercise of due diligence by a party hereto. A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of Force Majeure and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5 Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6 Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7 Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the

49

reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8  Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9  Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11 Definition of Landlord.  The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 Successors and Assigns.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 Limitation of Landlord's Liability.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 Limitation of Tenant's Liability.

Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u> Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 <u>Short Form Lease</u>. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 <u>Entire Agreement and Modification</u>. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 <u>No Joint Venture or Partnership Created by Lease</u>. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 <u>Tenant's Tradename</u>. Landlord shall not make use of Tenant's tradename [*i.e.*, "*Bed Bath & Beyond* "®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 <u>Waiver of Trial by Jury</u>. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

[Signature page follows]

51

Section 23.26 Governing Law. This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

WITNESS:

**LANDLORD:**
MAD RIVER DEVELOPMENT LLC

By: _____
Name: Laury Pensa
Title: _____

ATTEST:

**TENANT:**
BED BATH & BEYOND INC., a New York corporation

Name: Alan M. Freeman
Title: Assistant Secretary

By: _____
Name: Steven H. Temares
Title:  President/CEO

52

DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-9714A09F9F6D

Store No. 1096
Clifton, NJ

## LEASE MODIFICATION

THIS LEASE MODIFICATION ("*Modification*"), dated as of the 13ᵗʰ day of JANUARY, 2022 ("*Modification Date*") by and between MAD RIVER DEVELOPMENT LLC, a New Jersey limited liability company ("*Landlord*"), having an office at 240 Paramus Road, Ridgewood, New Jersey 07450 and BED BATH & BEYOND INC., a New York corporation ("*Tenant*"), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

## WITNESSETH:

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated as of October 29, 2004 (as amended and/or modified thereafter, the "*Lease*"), with respect to premises ("*Premises*") consisting of approximately 24,080 square feet of Floor Area and located at the River Front Center Shopping Center in Clifton, New Jersey ("*Shopping Center*"); and

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Modification and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Modification by this reference.  Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to certain terms and provisions of the Lease to the extent outlined in Schedule A hereto shall govern and control from and after the Modification Date.

3.      Landlord hereby waives (i) any monetary default by Tenant under the Lease existing as of the Modification Date relating to any failure of Tenant to pay Rent in a timely manner as a result of the COVID-19 pandemic, and (ii) all late fees, interest charges, attorney fees or other charges as a result of any monetary default existing as of the Modification Date relating to any failure of Tenant to pay Rent in a timely manner as a result of the COVID-19 pandemic.

4.      Section 1.1.18 (Landlord's Mailing Address) and Article 18 (Notice) of the Lease shall be modified to provide that Landlord's Mailing Address is now as follows:

Landlord Mailing Address:    Mad River Development LLC
240 Paramus Road
Ridgewood, New Jersey 07450
Attention:  Laury Pensa

5.      Section 1.1.33 (Tenant's Mailing Address) and Article 18 (Notice) of the Lease shall be modified to provide that Tenant's Mailing Address is now as follows:

Tenant Mailing Address:    Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attention:  Vice President – Real Estate

With a separate copy to:    Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attention:  General Counsel

DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-9714A09F9F0D

| With a separate copy to: | Bed Bath & Beyond Inc. |
|---|---|
| | 650 Liberty Avenue |
| | Union, New Jersey 07083 |
| | Attention: Lease Administration |
| | |
| With a separate copy to: | Hill Ward Henderson |
| | 101 East Kennedy Boulevard, Suite 3700 |
| | Tampa, Florida 33602 |
| | Attention: Thomas J. Goeglein, Esq. |

6.      It is the policy of Tenant (together with its subsidiaries and affiliates, collectively, the *"Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act). Landlord shall not, directly or indirectly, solicit or accept from, nor offer, promise or pay any individual or entity (including, but not limited, to any government official) any bribe, kickback or any other improper payment of money or anything else of value. This includes, but is not limited to, any improper payment in exchange for the Company's execution of this Modification. Landlord will also require any subcontractor (of any level) to adhere to the same standards, and will appropriately monitor its subcontractors to ensure such adherence. In addition, any individual who is employed by or who represents the Company is prohibited from soliciting, accepting, offering, promising or paying any bribe, kickback or any other improper payment of money or anything else of value. If any such improper actions are observed, Landlord shall inform the Company's Legal Department (Attention: General Counsel) by (i) notice to the address set forth in the Lease, as amended hereby or (ii) by telephoning 908-688-0888.

7.      Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Modification, except for Retail Consulting Services (*"Tenant's Broker"*). Tenant shall pay any commission due to Tenant's Broker in connection with this Modification pursuant to a separate written agreement between Tenant and Tenant's Broker. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Tenant's Broker) with respect to this Modification in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. The provisions of this Section shall survive the expiration or earlier termination of the Lease.

8.      Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Modification to be in full force and effect or, if any such consent is required, Landlord has obtained same prior to its execution hereof. The parties represent and warrant to each other that the person signing on behalf of either Landlord or Tenant, as the case may be, has the authority to do so and for this Modification to be deemed in full force and effect.

9.      Upon the request of either party following the execution and delivery of this Modification, Landlord and Tenant shall execute an amended/restated short form lease or memorandum for recording, which shall be in form and substance as reasonably acceptable to both parties. In no event shall the amount of Rent or any other monetary terms hereof be included in any such short form lease or memorandum. Further, after the expiration or earlier termination of the Lease, Tenant agrees, upon Landlord's request, to execute and deliver a termination of such short form lease or memorandum in recordable form and this obligation shall survive expiration or termination of the Lease. The party requesting such document shall record any such short form lease or memorandum at its expense.

10.      The terms and conditions of this Modification shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns. Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect. In the event of any

2

DocuSign Envelope ID: BC376D6F-EFE3-4561-8FAA-9714A09F9F0D

conflict or inconsistency between the terms and provisions of the Lease and this Modification, the terms and provisions of this Modification shall govern and control.

    11.    This Modification may be executed electronically and in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Modification to Lease. The execution and transmission of an image of any signed document or document signed by DocuSign (or a similar application) will have the same binding effect as an original bearing an original signature. No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

    IN WITNESS WHEREOF, the parties hereto have executed this Lease Modification as of the day and year first above written.

**LANDLORD:**

MAD RIVER DEVELOPMENT LLC,
a New Jersey limited liability company
By:    Smugglers Capital Corp.,
       a New Jersey corporation, its Managing Member
By:    _____
Name: Laury Pensa
Title:  President

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By:    _____
Name:  Gregg Melnick
Title:   EVP, Chief Stores Officer

3

DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-977AA09F9F0D

## SCHEDULE A

The following provisions shall be added to, or amended within, the Lease:

1.    The third sentence in Section 5.2.3 of the Lease is modified to read: "Except for three (3) parking spaces immediately in the front of "Anchor D" and five (5) parking spaces immediately in the rear of "Anchor D" designated for use by the occupant of Anchor D, two (2 ) parking spaces in front of Unit "C-1" designated for use by the occupant of Unit C-1, two (2) parking spaces immediately adjacent to the "Pad" depicted on the Plan attached as Appendix 1 to Exhibit M to the Lease and designated for use by the occupant of the "Pad", and the "Curbside Pickup Area" described below, Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees."

2.    Subject to applicable Legal Requirements and other tenants' leases in the Shopping Center as of the Modification Date (each a *"Current Tenant"*), Landlord hereby consents to Tenant:  (a) using no more than four (4) parking stalls directly in front of the Premises for curbside pickup for Tenant's customers (*"Curbside Pickup Area"*); and (b) installing signs designating the Curbside Pickup Area (*"Curbside Pickup Signs"*).  In the event that Tenant's use of the Curbside Pickup Area and/or the installation of the Curbside Pickup Signs violates a Current Tenant's lease and Landlord is advised of such violation by the applicable Current Tenant, then Landlord shall request such Current Tenant's consent to the Curbside Pickup Area and Curbside Pickup Signs.  In the event Landlord is unable to obtain such consent after requesting such consent, then Landlord shall notify Tenant and Tenant shall promptly discontinue its use of the Curbside Pickup Area and/or remove any Curbside Pickup Signs, as applicable.  In the event Tenant does not remove any Curbside Pickup Signs within five (5) business days of Landlord's notice, Landlord shall have the immediate right to do so at Tenant's expense."

3.    Landlord shall pay to Tenant the sum of Two Hundred Thousand and 00/100 Dollars ($200,000.00) (the *"Landlord Payment"*), which Landlord Payment shall be unconditional and shall be payable within 30 days after Landlord's execution of this Modification.  Tenant may use the Landlord Payment for any purpose which Tenant, in its sole and absolute discretion, considers appropriate.  In the event Landlord does not pay Tenant the Landlord Payment within the required time period described above, Tenant shall have the right to offset such unpaid amount against Rent payable by Tenant under the Lease, plus interest at the Lease Interest Rate, until reimbursement or full satisfaction by credit.

4.    The Lease Plan Layout attached as "Appendix 1" (*"Plan"*) is deemed added as "Appendix 1" to Exhibit M to the Lease.

5.    The following subparagraphs of Section "A." of Exhibit M to the Lease (which Exhibit M is entitled "Prohibited Uses") shall be modified as follows:

•    Subparagraph (8) shall state: "Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation, except a Carvana or similar operation (*i.e.*, a national online-only e-commerce retailer that buys and sells used automobiles) on the "Pad" shown on the Plan attached as Appendix 1;"

•    Subparagraph (26) is deleted in its entirety.

•    Subparagraph (27) shall state:  "Any supermarket, except a supermarket that shall occupy a maximum of 25,000 square feet of Floor Area;"

•    Subparagraph (28) shall state:  "Any office use, other than: (w) office space used in connection with and ancillary to a permitted retail use hereunder; (x) retail offices providing services commonly found in similar first-class shopping centers in the New York metropolitan area (for example, financial services, real estate brokerage,

DocuSign Envelope ID: BC376D8F-EFE3-4581-8FAA-5744009AF4AD

insurance agency, banking, travel agency); (y) veterinarians offices in compliance with the provisions of subparagraph (31);and (z) medical offices and clinics of the type commonly found in first-class shopping centers in the State of New Jersey."

- Subparagraph (30) shall state: "daycare center, except on the "Pad" identified on the Plan;"

- Subparagraph (31) shall state: "veterinary office, except as may be incidental to a full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area (unless such excepted veterinary office is part of a national chain of veterinary offices, in which case such excepted veterinary office may be of any size) and located at least 200 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from the Common Areas;"

- Subparagraph (35) shall state: "restaurant serving meals for on- or off-premises consumption, except (i) one such restaurant located in the premises labeled "Pad" on the Plan attached as Appendix 1 (in a maximum of six thousand (6,000) square feet of Floor Area), (ii) one such restaurant located in either "B-4", "B-5", or "B-6" identified on the Plan attached as Appendix 1 (in a maximum of three thousand (3,000) square feet of Floor Area), (iii) one such restaurant located in either "B-7", "B-8", or "B-9" identified on the Plan attached as Appendix 1 (in a maximum of three thousand four hundred (3,400) square feet of Floor Area), (iv) one such restaurant located in "B-10" identified on the Plan attached as Appendix 1 (in a maximum of five thousand (5,000) square feet of Floor Area), (v) one such restaurant located in "B-11" identified on the Plan attached as Appendix 1 (in a maximum of four thousand (4,000) square feet of Floor Area), or (vi) one or more such restaurants located in "Building C" comprised of "C-1", "C-2", "C-3", "C-4", "C-5", and "C-6" identified on the Plan attached as Appendix 1 (in a maximum aggregate of seven thousand eight hundred (7,800) square feet of Floor Area);"

- Subparagraph (36) is deleted in its entirety.

- Subparagraph (37) shall state: "health spa, exercise facility or similar type business, except one (1) such health spa, exercise facility or similar type business of the type commonly found in first-class shopping centers in the State of New Jersey that shall occupy a maximum of three thousand (3,000) square feet of Floor Area."

6.      Notwithstanding any language in the contrary set forth in the Lease, including, but not limited to, any language to the contrary set forth in Article 8 of the Lease, Tenant may repaint and otherwise alter and upgrade the facade of the Premises as more particularly described in the "Elevation Images" attached to this Modification as Appendix 2. Landlord consents to all such alterations and upgrades to the facade of the Premises (the "Facade Renovation"). In addition, in conjunction with such alterations and upgrades to the facade of the Premises, Tenant may, during the period January 1, 2022 through March 30, 2022, use the areas of the Shopping Center depicted on the "Staging Plan" attached to this Modification as Appendix 3 as "Temporary Storage Container" and "Open Top Dumpster" for the placement of storage containers and dumpsters. Tenant shall obtain, at Tenant's sole expense, any and all required governmental permits and approvals in relation to the use of storage containers and dumpsters, and in relation to the placement of the storage containers and dumpsters pursuant to the Staging Plan and with respect to the Facade Renovation. Landlord expressly consents to this described placement of storage containers and dumpsters by Tenant during this period of January 1, 2022 through March 30, 2022.

DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-9F14069F5F4D

Appendix I

Lease Plan Layout



DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-9F14A03F970D

## Appendix 2

### Elevation Images



DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-5714A05F5F0D



DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-9714A09F4F0D



DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-9714D603F9F6D



DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-9714009F8F0D



DocuSign Envelope ID: BC376D6F-EFE3-4581-8FAA-9714A09F9F0D

<u>Appendix 3</u>

<u>Staging Plan</u>

