UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-13359-VFP |
| | . | |
| BED BATH & BEYOND, INC., | . | M.L.K. Federal Building |
| et al., | . | 50 Walnut Street, 3rd Floor |
| | . | Newark, NJ 07102 |
| Debtors. | . | |
| | . | June 14, 2023 |
| . . . . . . . . . . . . | . | 11:07 a.m. |

TRANSCRIPT OF FINAL DIP ORDER, ALIXPARTNERS RETENTION
APPLICATION, ASSUMPTION AND ASSIGNMENT MOTION OF
CERTAIN LEASES TO WORLD MARKET
BEFORE HONORABLE VINCENT F. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Kirkland & Ellis LLP
                            By:  EMILY E. GEIER, ESQ.
                                 ROSS J. FIEDLER, ESQ.
                                 OLIVIA ACUNA, ESQ.
                            601 Lexington Avenue
                            New York, NY 10022

For the U.S. Trustee:       Office of the United States Trustee
                            By:  FRAN B. STEELE, ESQ.
                            One Newark Center
                            1085 Raymond Boulevard, Suite 2100
                            Newark, NJ  07102

Audio Operator:             Mariela Primo

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

```
For The Committee of      Pachulski Stang Ziehl & Jones
Unsecured Creditors:      By:  BRADFORD J. SANDLER, ESQ.
                          919 North Market Street, 17th Floor
                          Wilmington, DE  19801

                          Pachulski Stang Ziehl & Jones
                          By:  ROBERT J. FEINSTEIN, ESQ.
                                PAUL J. LABOV, ESQ.
                          780 Third Avenue, 34th Floor
                          New York, NY  10017

For Sixth Street          Proskauer Rose
Specialty Lending, Inc.:  By:  DAVID M. HILLMAN, ESQ.
                          11 Times Square
                          New York, NY 10036

Ad Hoc Committee and      Genova Burns
Bond Holders:             By:  DANIEL M. STOLZ, ESQ.
                          494 Broad Street
                          Newark, NJ  07102

                          Glenn Agre Bergman & Fuentes
                          By:  ANDREW K. GLENN, ESQ.
                          1185 Avenue of the Americas
                          22nd Floor
                          New York, NY  10036
```

TELEPHONIC APPEARANCES:

```
For Texas Taxing          Linebarger, LLP
Authorities:              By:  TARA L. GRUNDEMEIER, ESQ.
                          4828 Loop Central Drive, Suite 600
                          Houston, TX  77081

                          Ansell Grimm & Aaron, P.C.
                          By:  JOSHUA S. BAUCHNER, ESQ.
                          1500 Lawrence Avenue
                          Ocean, NJ  07712

For the Pre-Petition      Davis Polk & Wardwell LLP
ABL Administrative        By:  ADAM L. SHPEEN, ESQ.
Agent:                    450 Lexington Avenue
                          New York, NY 10017
```

- - -

# **I N D E X**

| **EXHIBIT** | **ID.** | **EVD.** |
|---|---|---|
| Ms. Etlin's declaration | -- | 78 |

4

1          THE COURT:  Okay, good morning.  It is Wednesday,

2   June 14th, 2023.  This is the United States Bankruptcy Court

3   for the District of New Jersey and we are here on the case of

4   Bed Bath & Beyond Inc., 23-13359 and various matters on the

5   notice of amended agenda that was sent out it looks like

6   yesterday right around midnight.

7          MR. FIEDLER:  A little late.  Sorry about that, Your

8   Honor.

9          THE COURT:  Yes.  Zero, zero, two-thirty.  Okay, so

10  why don't we get appearances as you speak because we have a lot

11  of people appearing on the matter either here or on Zoom so

12  please go ahead.

13         MR. FIEDLER:  Okay, great.  Ross Fiedler of Kirkland

14  & Ellis on behalf of the debtors.  I'm joined in the courtroom

15  by my colleagues Ms. Geier and Ms. Acuna.

16         THE COURT:  Okay, good morning.  You want to go

17  through the agenda?

18         MR. FIEDLER:  Oh, yes.

19         THE COURT:  Yes.

20         MR. FIEDLER:  Thank you, Your Honor.  Your Honor,

21  before we go through the agenda, I'd just like to thank the

22  Court for accommodating our schedule and adjourning the hearing

23  to today.  We really appreciate the flexibility.  I would also

24  like to thank the Court for, you know, entering some of the

25  orders we've submitted on a consensual basis to avoid the need

1 | for a hearing so I really appreciate that.

2 | THE COURT:  No problem.  I consider it my job so I

3 | try to do my job correctly.  That's it.  Thank you.

4 | MR. FIEDLER:  Thank you.  So turning to the revised

5 | agenda that we filed last night at Docket Number 717, you'll

6 | note we're only going forward today on the DIP motion on a

7 | final basis, the AlixPartners retention application and an

8 | assumption and assignment motion of certain leases to world

9 | market.

10 | THE COURT:  Right.

11 | MR. FIEDLER:  We did adjourn the final cash

12 | management order to the June 27th hearing and an assumption and

13 | assignment motion of certain leases to Burlington to the July

14 | omnibus hearing.

15 | As you'll see reflected on the agenda, these matters

16 | are largely going forward consensually and uncontested and

17 | we'll get to some of the slim issues that remain, but we are

18 | going forward on a consensual DIP order other than one issue

19 | with the Texas Taxing Authorities and that's in large part to,

20 | you know, all the work that's been done by the advisors in this

21 | room and the advisors on the phone.  So, the debtors are very

22 | grateful for all the work that's been done to get us to where

23 | we are today.

24 | THE COURT:  All right, so just for me to be clear on

25 | it, I did see the objections of the Texas Taxing Authorities in

1  Maricopa County and the latest redline that showed the changes

2  that dealt specifically with Texas.  But I didn't see something

3  that dealt specifically with Maricopa but I understood what you

4  were just saying is that you have actually resolved all those

5  issues?

6          MR. FIEDLER:  Well, we have -- we're actually not

7  fully resolved on that language.  We've been working in good

8  faith over the past, you know, two weeks with them to get to a

9  resolved language in the order, but we will address that when

10 we go through the changes that are in the order.

11         THE COURT:  Okay.

12         MR. FIEDLER:  And I believe the entities that are

13 referenced in the footnote account for Maricopa but to the

14 extent they don't, we'll make sure that they're in there.

15         THE COURT:  Okay.

16         MR. FIEDLER:  So, Your Honor, turning to Agenda Item

17 1 which is a final DIP order, as Your Honor is aware, the

18 interim order was entered at Docket Number 76 after the first

19 day hearing and at the first day hearing we entered into the

20 record the declarations of Holly Etlin and David Kurtz in

21 support of the DIP motion at Docket Numbers 36 and 37.  Last

22 night, late last night we filed the revised form of order at

23 Docket 716 which attaches the approved budget at Exhibit B.

24 This morning though we filed a further revised order at Docket

25 Number 718 and to the extent Your Honor doesn't have the

1    redline, I have a few extra here and I'm glad to --

2          THE COURT:  I printed it out here.  We don't have a

3    color printer so it's really a blackline but that's -- I do

4    have it.

5          MR. FIEDLER:  All right, as long as you have it.  So

6    I know we got the order to you quite late so I'm happy to walk

7    through the changes from the interim order to the proposed

8    final order but as I said, that form of order reflects a

9    consensual resolution between the UCC, the DIP lenders and the

10   debtors.

11         THE COURT:  And I will say I'm very appreciative of

12   the efforts to get to that point and I know I'm sure it was not

13   easy at all so I mean I think, you know, when you say walk

14   through the changes, I get a number of the changes were

15   reflecting that it's a final order temporally and all that so I

16   would say using your, you know, discretion as to what is more

17   kind of substantive --

18         MR. FIEDLER:  Yeah.

19         THE COURT:  -- amendments and how they might affect

20   parties, particularly, you know, parties that still have

21   objections outstanding.

22         MR. FIEDLER:  Of course.  I'll just hit the material

23   changes.

24         THE COURT:  And if someone thinks that you did not

25   address a substantive change, they certainly have the

1  opportunity to be heard on it.

2      MR. FIEDLER:  Certainly, Your Honor.  So the first

3  change is, and I'll just preview this, in Section G which are

4  the debtors' stipulations, there's some revised language in

5  here to reflect the transition of the agent role and to the

6  pre-petition credit agreement from the revolving agent to Sixth

7  Street which is the FILO agent and just to reflect that

8  transition.  I imagine Mr. Hillman for the DIP lenders may want

9  to speak to that, but just previewing that change up front.

10     Turning to Paragraph 10 which deals with the

11 reserves, as Your Honor will recall, as part of the interim DIP

12 order we negotiated with the DIP lenders three reserves in an

13 amount of $36 million.  That was the priority claims reserve,

14 the WARN reserve and the wind down reserve.  In connection with

15 the final DIP order, the DIP lenders have agreed that these

16 reserves will be released and funded no later than ten days

17 after entry of the final order.  Previously it had been upon

18 the expiration of the challenge period.  And for that agreement

19 to release the funds earlier than expected and all the other

20 changes in the DIP order, the challenge period will expire upon

21 either the earlier of the release of those funds or July 4th

22 which was the previous date of the challenge period.

23     THE COURT:  As to parties other than -- I understood

24 the changes to indicate that the Committee challenge is

25 resolved by the terms of the stipulation.

1            MR. FIEDLER:  Correct.  The Committee and all its

2   members have waived its right to bring a challenge but that

3   challenge period is applying to third parties who get requisite

4   standing.

5            THE COURT:  I'm sorry.  I need to interrupt you one

6   more time.

7            MR. FIEDLER:  Yup.

8            THE COURT:  When you referred to like Paragraph 10,

9   if you could just give me the page number as well?

10            MR. FIEDLER:  Certainly.

11            THE COURT:  I have it.

12            MR. FIEDLER:  Okay.

13            THE COURT:  Page 42.  But just going forward.

14            MR. FIEDLER:  Okay.  Yeah.  But sticking with

15   Paragraph 10, additionally, the DIP lenders have agreed that

16   the priority claims reserve and the wind down reserve may be

17   collapsed such that we have, you know, 16 million available to

18   be distributed in accordance with the DIP order and so that

19   provides more flexibility for the debtors to, you know, release

20   the funds as they see fit in accordance with the order.

21            There's also an agreement that any excess funds in

22   the WARN reserves to the extent all allowed WARN claims have

23   been paid will be released to the debtors and unencumbered and

24   to be used in accordance with the DIP order.

25            THE COURT:  Okay.

1          MR. FIEDLER:  The last point is there was a reduction

2     in the priority claims reserve by $5 million.  This was agreed

3     to between the DIP lenders and the debtors simply to reflect an

4     increase in the run rate of expenses to administer the cases

5     and the anticipated sales in connection with the wind down.

6          Turning now to the crux of the order which is the

7     negotiated settlement that was reached between the FILO, the

8     UCC and the debtors, this begins at Paragraph 47 which, if just

9     give me a moment, is Page -- this is Page 103 of the redline.

10    So here in Paragraph 47 we've agreed to the inclusion of

11    essentially a marshaling agreement.  The concept here is the

12    DIP lenders and the pre-petition secured lenders have agreed to

13    look first to the DIP collateral and the pre-petition

14    collateral as a source of recovery other than certain proceeds

15    of certain specified claims and causes of action which are laid

16    out in Paragraph 60.

17         And so Paragraph 60 is really the meat of the

18    settlement between the DIP lenders, the UCC and the debtors and

19    that begins on Page 115 of the redline.  And so this deals with

20    the application of proceeds of collateral as between the FILO

21    and the estate for the benefit of the general unsecured

22    creditor pool.  So if Your Honor recalls at the interim hearing

23    we made reference to, sorry, at the first day hearing we made

24    reference to certain make-whole amounts that were payable under

25    the pre-petition credit docs to the FILO lenders and that make-

1  whole served as, you know, the bedrock for the negotiated

2  settlement between the UCC and the FILO lenders.

3      And so just to summarize the settlement at a high

4  level, there are two constructs for the sharing of collateral

5  proceeds as between the FILO and the estate and that is on Page

6  116.  Basically, the first threshold which we call the initial

7  sharing threshold there's not going to be any sharing of

8  collateral proceeds as between the FILO and the general

9  unsecured creditors until two things happen, first, the ABL

10 obligations are paid off in full and, second, the FILO lenders

11 must recover $515 million in cash plus interest on account of

12 the FILO secured obligations and the DIP obligations and, you

13 know, a portion of that goes to the make-whole amount I

14 referenced earlier.

15      So, once those two conditions are met, then 100

16 percent of the proceeds of the collateral will go to the FILO

17 except with respect to certain proceeds of claims and causes of

18 action that are delineated in Paragraph 60.  So, those include

19 avoidance actions, shipping and price gouging claims and

20 certain other litigation claims that I won't really get into.

21 But I'll refer to those as the specified recovery baskets.

22      So, with respect to the proceeds of those baskets,

23 there will be an allocation split between the FILO and the

24 general unsecured creditors as to each basket.  And so, for

25 example, 100 percent of the proceeds of avoidance actions will

12

1 go to the estate for the benefit of the general unsecured

2 creditors whereas, you know, 80 percent of the shipping and

3 price gouging claims proceeds will go to the FILO with the 20

4 percent going to the estate for the benefit of the general

5 unsecured creditors.

6　　　　　　THE COURT:  So, who would be bringing those claims?

7　　　　　　MR. FIEDLER:  So, those are all estate claims, and so

8 those are claims that, you know, the debtors would bring, for

9 example, against some of the shipping containers litigation

10 that has been ongoing or, you know, avoidance actions and the

11 like.

12　　　　　　THE COURT:  Right.  I was thinking about the

13 avoidance actions in particular.  And I also saw there's a very

14 quick timeline on getting a plan confirmed even.  I guess I was

15 just asking about in a way the timing and who was bringing all

16 these kinds of claims which look like they might take some time

17 to resolve.

18　　　　　　MR. FIEDLER:  Yeah, certainly.  And I think we

19 actually got a modest extension to the confirmation timeline.

20 But during the cases those claims would obviously be brought by

21 the debtors' estates and then will be determined in connection

22 with any plan negotiation.

23　　　　　　THE COURT:  Well, it just seems like you guys have

24 quite a bit on your plate and also on top of that bring

25 litigation, you know, within the next couple of months, you

13

1 know, seems to make the plate, you know, even fuller or perhaps

2 overflowing.

3          MR. FIEDLER:  Understood.  And, you know, these are

4 what we see as valid claims and causes of action that will, you

5 know, serve as a big recovery for the estate for the benefit of

6 all creditors and so we are focused on pursuing those claims.

7 So that's the initial sharing threshold.

8          For the second sharing threshold there are two

9 conditions, once the debtors' estates have recovered at least

10 25 million of proceeds from those specified recovery baskets

11 that I just mentioned and the FILO lenders have recovered $550

12 million on account of the DIP obligations and FILO secured

13 obligations, then there will be a new sharing construct,

14 basically, 80 percent of the DIP collateral and pre-petition

15 collateral will be allocated to the FILO lenders with 20

16 percent being allocated to the estate for the benefit of the

17 general unsecured creditors.  There will also be new allocation

18 split with respect to those specified recovery baskets that are

19 more favorable to the estate than they were in the first

20 initial sharing threshold.

21          THE COURT:  So, when you use those two numbers, the

22 515 and the 550 million, it says plus interest and fees, so

23 does that mean the 515 or 550 includes payments on account of

24 principal, interest and fees or --

25          MR. FIEDLER:  Yeah, that's right, Your Honor.

14

1          THE COURT:  -- is that plus, after the 515 and the

2     550?

3          MR. FIEDLER:  That's additional, on top of the

4     principal amount which I believe was 475 and so plus the fees.

5          THE COURT:  So, in other words, on the second

6     threshold if there was -- I'm sorry.

7          MR. FIEDLER:  So, it's actually 475 which is the

8     initial principal amount, and then you have the new money

9     advanced under the DIP which gets us to 515 plus additional

10    interest and fees.

11         THE COURT:  All right, but interest and fees are

12    being paid on that currently?

13         MR. FIEDLER:  I believe they are, yes, Your Honor.

14         THE COURT:  So, I'm just trying to get a handle on

15    what that plus is, is what I'm asking.  Is that a big number or

16    is that a --

17         MR. FIEDLER:  I don't believe it's a big number, Your

18    Honor.  I think the intention of the settlement is the 515

19    which is the 475 --

20         THE COURT:  Plus 40.

21         MR. FIEDLER:  -- plus the principal and then a

22    portion of the make-whole is settled as part of that.

23         THE COURT:  Okay.

24         MR. FIEDLER:  So, that's, you know, the crux of the

25    settlement that was reached between the DIP lenders, the UCC

1  and the debtors.  There are additional provisions, you know,

2  the professionals for the Committee, the DIP lenders and the

3  debtors will remain coordinated on, you know, the allocation of

4  proceeds of the sales.  And also, in exchange for these

5  agreements, as you mentioned earlier, Your Honor, the Committee

6  has agreed to waive the challenge period and has agreed that

7  the debtors' stipulations are binding on the Committee and its

8  members.

9       Additionally, as shown in Paragraphs 46 and 48 which

10  is back on Page 101, I believe, yeah, the Committee and its

11  members have, you know, consented to the standard provisions

12  around 506(c) and 552.  And so that's generally the settlement

13  with the Committee and the FILO.  There are additional changes

14  to the order which reflect reservation of rights language that

15  we agreed to with Chubb, Arch Insurance, American Greetings

16  Corporation and Comenity Capital Bank which are highlighted in

17  Paragraphs 63 through 66.

18       So, that's the balance.  I mean, we do have

19  outstanding, the Texas Taxing Authorities' objection.  I

20  understand Mr. Hillman may want to be heard in connection with

21  some of the changes to the order so I'm happy to proceed

22  however you'd like if you want to address the Taxing

23  Authorities now or if you'd like to go through the changes with

24  Mr. Hillman.

25       THE COURT:  Will Mr. Hillman's changes relate to

1 Texas and Maricopa or other things?

2        MR. HILLMAN:  I think we can isolate Texas for after.
3 I'd just like to supplement the record of what you heard from
4 debtors' counsel.

5        THE COURT:  Okay, so then I think it makes sense for
6 you to go now.

7        MR. HILLMAN:  Perfect.

8        THE COURT:  Okay.

9        MR. SHPEEN:  Judge, may I be heard?

10        THE COURT:  I'm not sure who that is.

11        MR. SHPEEN:  Judge, it's Adam Shpeen of Davis Polk on
12 behalf of JPMorgan.  We also would like to speak with respect
13 to the DIP order and happy to go after Mr. Hillman and before
14 the Texas Taxing Authorities.

15        THE COURT:  Right.  Who do you represent, Mr. Shpeen?

16        MR. SHPEEN:  JPMorgan Chase Bank, Your Honor in its
17 capacity as the pre-petition administrative agent.

18        THE COURT:  Okay.

19        MR. HILLMAN:  Good morning, Your Honor.

20        THE COURT:  So they've already made their presence
21 known.

22        MR. HILLMAN:  Great.  Good morning, Your Honor.

23        THE COURT:  Good morning.

24        MR. HILLMAN:  For the record, David Hillman,
25 Proskauer Rose.  I'm here today on behalf of Sixth Street

1  Specialty Lending as the DIP agent and the FILO agent.  It's a

2  pleasure to be back before Your Honor.

3          THE COURT:  Welcome.

4          MR. HILLMAN:  So, I think you've made some comments

5  from the bench recognizing that this wasn't easy.  You're

6  looking at a 109-page final DIP order which is the product of

7  intense, hard-fought negotiations which reflect a balance, a

8  compromise.  We didn't get everything we wanted.  What we

9  wanted from the beginning, the FILO lenders, the DIP agent, was

10 a DIP order that looked exactly like the interim DIP order.  We

11 didn't get that.  The debtors didn't get everything they wanted

12 and the Committee didn't get everything they wanted but

13 together from the day the Creditors Committee was formed, we

14 have engaged in on-going, constructive, at times tense

15 negotiations and I think Your Honor has witnessed this from the

16 sidelines because we kept on adjourning hearings.  We weren't

17 done.

18          And so I think what Mr. Fiedler did on behalf of the

19 company to walk through this DIP order was an excellent

20 roadmap, the top of the wave.  But I think it's also important

21 to recognize that the words on the page are what matter and not

22 the descriptions of counsel in describing there because every

23 word, every comma was carefully negotiated here.

24          So, why don't I start backwards on some of the issues

25 that I think Your Honor had some questions about so that I can

1  clear up any misunderstandings?  You asked about the Paragraph

2  60 and the economic sharing that the DIP lenders and FILO

3  lenders have agreed to, with the company and its creditors to

4  in effect share some collateral value before we are

5  indefeasibly paid in full.

6          THE COURT:  Right.

7          MR. HILLMAN:  And you asked questions specifically

8  about 515 and plus interest and fees and so 515 does represent,

9  as you heard, 475 of principal pre-petition plus 40 million of

10 the new money DIP.  That's your 515.  On top of that before

11 there's any sharing are interest and fees and the interest and

12 fees are set forth for the DIP in the DIP credit agreement and

13 for the pre-petition there's a provision providing for the

14 payment of continuing interest as adequate protection.

15          So, you asked a question what's the size of the

16 number and is it being paid currently?  It is being paid

17 currently.  There's no way I can possibly answer the quantum

18 but it's a negotiated interest rate that hasn't changed from

19 the pre-petition documents or from the DIP loan.  Nothing has

20 changed on the interest rate.  There are a number of fees

21 including legal fees.  Those have been paid in due course.  We

22 followed the procedures that have been set forth in the DIP

23 order for getting fees.  So, yes, there's an additional

24 quantum.  It's unknown but it's being paid currently.

25          THE COURT:  Well, that was really where I was headed.

1  I guess I had two questions, right, and I think you answered

2  them both because the 515, right, when it says, and I'm in

3  60(b), so really, my questions were kind of two and maybe

4  combined into one.  Is it 515 in cash in respect of principal

5  plus interest on such principal amount plus fees and, you know,

6  I believe that every word was carefully negotiated and everyone

7  thought about them completely and everyone is clear on what

8  they mean as between the principal parties.  But I guess as to

9  me and maybe some other parties, when you say in respect of

10 principal plus interest on such principal amount, arguably you

11 could read that to say 515 includes interest as well as

12 principal and fees or it could be the way I understood it was

13 said, what it meant was that it's really 515 is principal and

14 then plus on top of the 515, interest and fees.  That's Number

15 1.  Am I right?

16         MR. HILLMAN:  This discussion has now made crystal

17 clear that there is no longer an ambiguity because the record

18 of today's hearing makes clear it is 515 million plus an

19 incremental of interest to be determined plus an additional

20 incremental amount of fees, also an amount to be determined.

21 So the precise threshold sharing is 515 plus an indeterminate

22 amount at this moment in time.

23         THE COURT:  But which is currently accruing and being

24 paid?

25         MR. HILLMAN:  Correct.

1          THE COURT:  And that was really the second -- I guess

2     both of them are somewhat substantive but the second

3     substantive part of it that I was asking about was I was just

4     trying to see how in addition to being clear, how high of a

5     threshold the debtor had to reach to get to these sharings.

6     And I want to be sure everybody was on the same page.

7          MR. HILLMAN:  Everyone is on the same page.  It's

8     akin to saying what's the payoff of the DIP.  Well, it depends

9     on the day you pay it off because interest will accrue and fees

10    will accrue so we peg the number and there are incremental

11    costs associated so I appreciate the opportunity to clarify any

12    perceived ambiguity.

13         THE COURT:  Great.

14         MR. HILLMAN:  So, the other point worthy of a quick

15    flyover which you heard from the debtor is this notion of some

16    language as it relates to the successor agent being Sixth

17    Street and the right to credit bid which is in Page 39.  This

18    one is pretty easy.  There's carefully-negotiated language as

19    between the FILO lenders who I represent and the ABL lenders

20    who Mr. Shpeen represents who will presumably make some

21    comments in a bit.

22         From our perspective there's been a positive

23    development in the case in that the ABL lenders have for all

24    intents and purposes been paid, right?  Their debt has been

25    satisfied.  They have some contingent exposure on account of

1 LCs that's been cash collateralized and what the finance

2 lawyers have is very specific definitions including discharge

3 of revolving obligations.

4        And so I think there are some reservations of rights.

5 Exactly what that means, for us it's pretty clear, they've been

6 paid.  We intend to become the agent for the facility.  Mr.

7 Shpeen will explain to the Court that JPM is in the process of

8 resigning and I believe he's going to confirm that will happen

9 this week.  And we intend potentially to credit bid.  There's a

10 bid deadline on Friday.  And we added some language in

11 Paragraph 39 that talks about our ability to credit bid.

12        THE COURT:  What page are you on?  I'm sorry?

13        MR. HILLMAN:  I have the redline.  It's 91.

14        THE COURT:  Yes, I'm on the redline also.

15        MR. HILLMAN:  Yeah, 91.  It's what I would describe

16 as some inter-lender provisions in Paragraph 39.  And so those

17 reflect language that we've agreed to with the ABL lenders.  I

18 don't expect there to be any issues when you have for all

19 intents and purposes a lender, admittedly a senior lender,

20 right, we're the last lender, for all intents and purposes

21 they've been paid off but there's ministerial plumbing that has

22 to happen for someone to declare that that has actually

23 happened.  We believe that's happened and if for some reason

24 down the road JPM or Davis Polk feels differently, they know

25 where this court is, they know how to find you.  There's just

1   some language in there that I wanted to highlight for Your

2   Honor's attention.

3           You asked a question about plan confirmation.  That

4   has been accelerated and the goal is professional fees and the

5   fees of administering the case are burdensome and wind up

6   impairing the recovery of all stakeholders, so the company, the

7   creditors, the DIP lender, the FILO lenders have all agreed

8   let's move forward with all deliberate speed.

9           And, lastly, you asked about the claims and causes of

10  action.  The good news is we have reached this economic

11  settlement on how to whack up, allocate, share the proceeds of

12  I guess I would call them softer assets, these litigation-type

13  claims.  Those claims will proceed in due course.  I don't

14  think there's a time clock for someone to file an action by

15  tomorrow or next week.

16          So, Your Honor was concerned about how many balls can

17  this company actually juggle at one time because there are a

18  number.  I'm not aware of any impending statutes of limitations

19  and I think we will all work collectively to figure out what's

20  the best path to maximize the assets so that we can maximize

21  the recovery for not only the FILO lenders and the DIP lenders

22  but, I think from the Committee's perspective, for all

23  stakeholders.

24          So, before I yield the podium, I want to make sure

25  I'm responsive to any questions that you may have about the DIP

1  order or any things I've said today.

2         THE COURT:  Well, that did respond to the questions

3  and I guess I will note that I'm glad to hear that the ABL

4  lenders have been substantially paid in full except for those

5  other items that might remain and I'm glad that you're

6  considering credit bidding.

7         MR. HILLMAN:  Yes.

8         THE COURT:  So, those are good things.

9         And then this is a question that I had from last time

10  and it goes to the budget and I didn't ask this there but in

11  the budget that was provided it says like about two-thirds or

12  three-quarters of the way down after professional fees, DIP

13  flows and other RX flows and we were going to determine what RX

14  flows means.

15         MR. HILLMAN:  Yes.  The good news is I get to phone a

16  friend here where I have Mr. Fiedler behind me who I think last

17  time was able to phone a friend.  I believe it was other

18  restructuring costs and expenses that weren't precisely the

19  debtors' professional fees.  I think one of the items in there

20  may be the claims and noticing agent.  I'll defer to the debtor

21  for anything else that may be within that line item.

22         But I can tell you that another reason why it took us

23  time to get here is the budget is complicated.  There are, you

24  know, significant amounts at issue and from our perspective as

25  a DIP lender we wanted to make sure we're not paying one penny

1  more than is necessary to get the job done and to monetize

2  these assets.

3          So, from my perspective there's healthy checks and

4  balances as to what's in here because the last thing we want to

5  do as a DIP lender or as a pre-petition lender is see more

6  money on the budget than is necessary.  So, if that gives Your

7  Honor some comfort, I can tell you that that process has taken

8  place and that the budget does also represent a negotiated

9  compromise.

10         THE COURT:  You know, like you said, it ends up being

11 a pretty big number.  It looks like a $45 million number total

12 on the budget.  But the anticipation here under this budget,

13 when would that first threshold be met?  Do you have that or

14 no?

15         MR. HILLMAN:  That's a very important question.  The

16 short answer is no in part because there are variables we don't

17 know yet.  There are asset sales for which there will be

18 competitive bidding and an auction so I don't think anybody

19 wants to prejudge, especially on the public record what people,

20 the company, the lenders, the Creditors Committee expect to be

21 recovered and then to put that into a spreadsheet and say okay,

22 look, by Week 17 here's what we expect.  We would like

23 everyone's expectations to be exceeded and I would hate to put

24 a chill on market competition.

25         THE COURT:  I understand that completely.  I was just

1  asking was it anticipated within this budget period?

2        MR. HILLMAN:  Oh.  Well, I think the short answer to

3  that is no because there are also I described them as soft

4  assets, right, some litigation claims that will need to --

5  there is already pending litigation claims.  I think you made

6  reference to the price gouging complaint that's been filed.  So

7  it's going to take a consolidated, concerted effort from the

8  professionals on this side of the courtroom to get every asset

9  monetized and to keep paying down the senior most creditors

10 first so there's wood to chop.

11       THE COURT:  And maybe you got me thinking very

12 positively with saying the ABL was pretty much paid in full.

13       MR. HILLMAN:  Well, they're the first --

14       THE COURT:  It's pretty early on.

15       MR. HILLMAN:  They were the first ones to get paid so

16 now we're into the FILO.

17       THE COURT:  Okay.

18       MR. HILLMAN:  I have no doubt that Mr. Shpeen will

19 take issue with whether it's been, quote, paid in full.  It's a

20 defined term, capital letters, 15 paragraphs of what it means.

21 I'm just trying to give you a sense that they've been paid.

22 There's cash collateral backstopping their LCs.  We're trying

23 to do our best to make them as irrelevant as they could

24 possibly be at this point in the case.

25       THE COURT:  I thought I said, you know, substantially

1  --

2        MR. HILLMAN:  Yes.

3        THE COURT:  -- except for those things.

4        MR. HILLMAN:  I heard that.

5        THE COURT:  Okay, why don't we let Mr. Shpeen --

6        MR. HILLMAN:  Thank you very much, Your Honor.

7        THE COURT:  Thank you.  Thank you, Mr. Herman (sic).

8        MR. SHPEEN:  Thank you, Your Honor.  May I be heard?

9        THE COURT:  Yes.  Of course.

10       MR. SHPEEN:  Thank you.  For the record, again, Adam

11  Shpeen of Davis Polk & Wardwell on behalf of JPMorgan and Chase

12  Bank as the pre-petition agent.  I want to just say

13  unequivocally at the outset we are supportive of the entry of

14  the DIP order and we support the relief requested.  And I agree

15  with Mr. Hillman that this is sort of an easy issue in the

16  grand scheme of things that we wanted to discuss with Your

17  Honor very briefly.  I think this can be brief.

18       Just by way of background to repeat what Mr. Hillman

19  said, after entry of the interim order in April, as the company

20  liquidated our collateral and sold its inventory and collected

21  its pre-petition AR, our facility has been periodically repaid

22  on a weekly basis and as of Friday, and we confirmed this just

23  yesterday morning with JP Morgan's operations team, as of

24  Friday the last payment we received, the entirety of the ABL

25  loans have been repaid and all of the letters of credit

1 outstanding have now been fully cash collateralized.  It took a

2 little bit of time to confirm that because some of the letters

3 of credit issued in CAD, Canadian dollars, but we now confirm

4 that.

5        Under the credit agreement, as Mr. Hillman alluded

6 to, once the discharge of revolving obligations has occurred,

7 JP Morgan is obligated to resign as administrative agent and we

8 intend to do that, Your Honor.  The issue is the discharge of

9 revolving obligations has three components.  It includes the

10 discharge of the loans which have been repaid, the cash

11 collateralization of the LCs which has occurred and then the

12 last component is to confirm that all other obligations have

13 been satisfied in a manner satisfactory to us and that includes

14 banking service obligations.

15        JP Morgan serves as the treasury service and manager

16 for the company, so we do intraday wires and sweeps for the

17 company and sometimes that can result in overdraft obligations

18 and cash management obligations being outstanding.  There's

19 also professional fee obligations.  So, you know, in fact, we

20 just got off a call with JP Morgan about an hour ago and we are

21 hard at work confirming that all of these remaining

22 obligations, the third bucket of obligations are going to be

23 satisfied in very short order.  Normally, when you do these

24 agent transitions, it takes sometimes weeks but we're working

25 at warp speed to accommodate Sixth Street and so we're hopeful

1  that we can get out of the picture and resign, you know, by the

2  end of the week.

3         So, I've agreed ahead of this hearing to state on the

4  record.  I'll just read this for Your Honor's benefit.  On

5  behalf of JP Morgan we can confirm that JP Morgan will use

6  commercially-reasonable efforts to confirm that the discharge

7  of revolving obligations has occurred and resign as agent prior

8  to the end of the week which we hope to do and then be out of

9  the picture.

10         Just one wrinkle, Your Honor, and this is a bit of a

11  late breaking development.  It occurred after the DIP order was

12  filed and arises out of our conversation with JP Morgan this

13  morning.  The letters of credit, as I said, have now been fully

14  cash collateralized and some of the letters of credit are long

15  dated and it may be the case that in the future they're drawn

16  and the letter of credit issuer has a reimbursement -- there's

17  a reimbursement obligation out of the LC cash collateral

18  account to that letter of credit issue.  The letter of credit

19  issue is JP Morgan.  So, what we'd like to do is remain as

20  agent under the facility solely for the purposes of

21  administering that LC cash collateral account.

22         I'm told that Sixth Street is okay with this.  Also I

23  understand -- I received an e-mail not long ago from Ms. Geier

24  that Kirkland is okay with this, so if Your Honor would allow

25  me, I would like to just read into the record language that I

1  think will appear in a future iteration of the DIP order once

2  it's submitted to Your Honor.

3      THE COURT:  Well, has this language been seen by the

4  other parties or is it just coming out?

5      MR. SHPEEN:  Your Honor, apologies if I misspoke.  It

6  has been seen by Proskauer and they've confirmed that they're

7  okay with it.  It's been seen by Kirkland & Ellis.  And so for

8  the benefit of all parties-in-interest I wanted to read it into

9  the record just to confirm no issues.

10     THE COURT:  Okay, does anyone have any objection to

11 that?

12                 (No audible response)

13     THE COURT:  No objection so go ahead, please.

14     MR. SHPEEN:  Sure.  So, it begins, Your Honor,

15 notwithstanding anything herein or in the pre-petition credit

16 documents, Clause X, JP Morgan Chase Bank N.A. shall remain as

17 agent under the pre-petition credit agreement solely with

18 respect to the administration of all accounts holding cash

19 collateral that cash collateralizes outstanding letters of

20 credit issued under the pre-petition credit agreement and

21 Clause Y, nothing herein shall release any liens granted under

22 or in connection with the pre-petition creditor.

23     So, again, Your Honor, that just confirms that we'll

24 stay as agent solely for the purpose of drawing money out of

25 the cash collateral account if and when LC are drawn in the

1  ordinary course.  And that's it, Your Honor.

2          THE COURT:  Mr. Hillman is rising.  He's coming to

3  the podium.

4          MR. HILLMAN:  Yes.  Thank you, Your Honor.  David

5  Hillman, Proskauer.  I was aware of the reservation or the

6  statement that Mr. Shpeen would make on the record.  At the end

7  of the day you heard everything that we've heard.  We're

8  planning on credit bidding on Friday.  They've been paid in

9  full.  We're not planning on going through the agent, the ABL

10 agent, for us to do what we need to do to protect and preserve

11 the value of the assets and if there's an issue that we have to

12 deal with later in life, we'll deal with it, but I think we

13 should put a fork in this issue and now move on.

14         THE COURT:  The fork would be, in other words, to

15 just leave it.  Mr. Shpeen, read what he read and you're, you

16 know --

17         MR. HILLMAN:  Thank you.

18         THE COURT:  -- may or may not be okay with it, but

19 you're going to deal with it and it'll get resolved just like

20 these other things have gotten resolved.

21         MR. HILLMAN:  I have nothing further.

22         THE COURT:  All right, Mr. Shpeen, did you hear that?

23         MR. SHPEEN:  Yeah.  I just want to confirm because

24 this is an important point for JP Morgan.  There's, you know,

25 almost $100 million in an LC cash collateral account.  We just

1    want to make sure over time that's administered properly.

2          So, to be clear, we have no issues with whatever

3    rights Sixth Street has to credit bid.  We don't want to

4    interfere with those rights.  They have whatever rights they

5    have and they'll likely credit bid.  But I just want to confirm

6    that it is our understanding that Sixth Street is supportive of

7    JP Morgan remaining as agent solely for the purposes of the LC.

8    I don't think that was a dispute.  I just want to confirm that

9    Mr. Hillman agrees.

10          MR. HILLMAN:  David Hillman, Proskauer Rose, DIP

11    lender, FILO agent.  I confirm.

12          THE COURT:  He confirmed it.

13          MR. SHPEEN:  Okay, thank you, Your Honor.  That's all

14    for me.

15          THE COURT:  All right.  Yes, sir.  Please just state

16    your name and who you represent for the record.

17          MR. FEINSTEIN:  Certainly, Your Honor.  Robert

18    Feinstein, Pachulski Stang Ziehl & Jones.  We are proposed

19    counsel for the Official Creditors Committee.  I'm joined by my

20    partners, Brad Sandler and Paul Labov here in the courtroom.

21          So, Your Honor, first of all, it's a pleasure to

22    appear in front of you and I do want to provide some

23    perspective of the Committee on the landscape as when the

24    Committee was formed and the settlement that was reached and

25    the rationale behind it.

32

1          As I know on May 31st, Mr. Sandler announced that the

2     Committee had reached an agreement in principal with the

3     lenders but didn't disclose it because there was still wood to

4     chop to document that, to get the debtor on board so there

5     really hasn't been visibility until the filing of the order on

6     a number of the points of resolution that Mr. Fiedler described

7     and Mr. Hillman described.  But I do want to provide for the

8     Court and to unsecured creditors who are listening the work

9     done by the Committee and perspective of the Committee.

10          So, with that, Your Honor, I just, you know, will

11     note that the case was filed on April 23rd.  There was a first

12     day hearing on April 24th and the Committee was not appointed

13     until May 5th and then we were hired as proposed counsel to the

14     Committee on May 8th which is just a little over a month ago.

15          So, while Mr. Sandler and I listened to the first day

16     hearing, we obviously couldn't appear and be heard so the

17     parties before the Court at the first day were essentially the

18     debtor, the secured lenders and the U.S. Trustee.  So, things

19     happened on the first day that affected the Committee's role in

20     the case, ability to negotiate in the case and specifically,

21     Your Honor, Your Honor granted a roll-up of $200 million of

22     debt at the first day hearing and that included two make-whole

23     claims that are within the secured debt of the FILO lenders.

24          These were controversial from the Committee's

25     perspective because the roll-up in particular took a pre-

1  petition debt claim of 200 million that only had recourse to

2  certain designated items of collateral, made it a post-petition

3  super priority claim but more importantly, granted a blanket

4  lien on all the unencumbered assets for the benefit of the

5  secured lender and that was something the Committee once it was

6  formed was very concerned about because those unencumbered

7  assets, in our view, should have been made available to pay

8  general unsecured creditors and the estate and not given to the

9  secured lender who was already getting fees and the like for

10  the loan.

11        The five-to-one roll-up, again, basically granted

12  them a $200 million lien on unencumbered assets.  And, you

13  know, part of the Committee's immediate investigation was are

14  there unencumbered assets and you can see listed in the sharing

15  paragraphs, in Paragraph 60 the categories of what we believe

16  are valuable litigation claims that the lenders did not have a

17  lien on pre-petition.  Basically, you know, the UCC provides

18  that if you are a lender and you want to get a lien on a cause

19  of action, it has to be specifically described in the UCC

20  filing and here, we did our investigation, there were no

21  references to any litigation claims.

22        So, you know, before the petition date there were, in

23  our view, very valuable causes of action out there that didn't

24  belong to the lenders.  So, when the lenders were granted a

25  lien on those on the first day, we had two choices which was

1 either to litigate that or to settle it.  Litigating it would

2 have involved conceivably moving for reconsideration of the

3 interim order.  We couldn't appeal it because there was an

4 interlocutory order.  We could appeal the final order if it was

5 unchanged.

6      But we did much better which is that we engaged

7 immediately in negotiations with the secured lenders to

8 basically call back the roll-up, the blanket lien on the rolled

9 up debt because now you can see that once the principal is

10 recovered, and that's the 515 million -- that's 475 million of

11 pre-petition debt, 40 million of new funds, everything above

12 that from 510 to I believe it's 585 million is make-whole

13 claims and the like that are treated differently than principal

14 under our settlement.

15      So, basically, unless and until the lenders get to

16 515 million, they're going to recover out of their hard

17 collateral.  But once they hit 515 plus the interest on the

18 515, then you see that the sharing formula kicks in.  And so

19 from 515 to 550 there's a certain set of formulas and then

20 after that, the formula changes so you can see that the secured

21 lenders have made concessions to allow significant portions of

22 the recoveries from those formerly unencumbered assets to be

23 received by the estate for distribution to general creditors.

24      And it was very concerning to us that, you know, on

25 the first day of the case, Your Honor, because there was no

1 representative of unsecured creditors, didn't have the benefit

2 of a full record, an evidentiary record and this is why we

3 thought the first day roll-up was very controversial in that

4 really, nobody had the wherewithal, the ability to articulate

5 to the Court that there are significant unencumbered assets

6 that were being liened up that day without notice to, you know,

7 most of the parties in the case.

8        So, fortunately, we were able to fix that.  And, you

9 know, we worked intensively to try to basically dig ourselves

10 out of a hole where, you know, all the assets were liened on

11 the first day and we got to the resolution that we did and that

12 took a tremendous amount of hard work and negotiation with our

13 counter parties.  We're very pleased that we got there.

14        And I won't repeat Mr. Fiedler's accurate recitation

15 of the settlement.  I do want to highlight a couple of things

16 and that is, you know, aside from the make-whole of the roll-

17 up, another big issue for the Committee was the surcharge

18 waiver and we wanted to be sure before agreeing to a surcharge

19 waiver that the budget, the DIP budget was robust and we wanted

20 to be sure that all expected administrative expenses in the

21 case were going to be paid because if there were any

22 administrative expenses that were not included in the budget

23 and the lender got a surcharge waiver, then basically, the rest

24 of the unsecured creditors would have to bear those costs and

25 that didn't seem appropriate.

1          So, we did a larger settlement than typically you see

2     in a DIP order in that we waived our challenge period in

3     exchange for these concessions to share in the proceeds of

4     these previously unencumbered assets.  We also dealt I think in

5     an appropriate way with the make-whole claims which we had

6     potential challenges to.  You can see that those claims are

7     only going to be paid once we're in a sharing mode once the 515

8     is recovered.

9          So, a couple of other small points.  Somebody said

10    before the words of the order matter.  The Committee has waived

11    the challenge period.  The Committee is supportive of the

12    surcharge waiver.  Not its members.  We don't represent the

13    members so we really can't speak for them and the order talks

14    about the Committee and not members because we can't bind them.

15    I don't expect, you know, that the Committee is going to come

16    out of left field because the Committee was kept fully

17    apprised.  And to be clear, it's a seven-person committee.  It

18    includes vendors, landlords and importantly, the indentured

19    trustee for the unsecured notes.  So, all those parties were

20    intimately involved in our analysis, in our negotiations and

21    kept fully apprised.

22         So, the benefits of the settlement should be clear,

23    Your Honor.  But to be clear, we are eliminating a lot of the

24    friction costs in the case.  We didn't have a big contested DIP

25    hearing.  We agreed beyond the typical DIP issues to share in

37

these recoveries from the various litigation claims.  To

address Your Honor's point before, there's no intention to

start and finish these litigations before confirmation.  The

best we can do is investigate them.  We could start litigation.

But the litigation is going to have to be pursued post-

confirmation by a liquidation trust or the estate or what have

you, but we do think there are valuable claims out there and a

number of varieties of them.

So, you know, while we're then getting to share in

these assets, we're also cutting down on the administrative

costs of the estate because there's not going to be any

fighting.  So, you know, this will maximize the recoveries by

the estate and will eliminate the burden, if you will.  Our

next step after entry of the order if Your Honor enters it

today will be to turn to working on a plan.  We've had some

preliminary discussions with the lenders and with the debtors.

We still have some wood to chop.  But we think it would be in

everybody's best interest to get a consensual plan on file as

quickly as possible, move to confirmation and then, again, cut

down further on the administrative expense of secured lenders'

counsel, the Committee counsel, debtors' counsel and just have

one entity, whether it's a trust or the estate, pursue these

claims for the benefit of the remaining creditors.

So, it's a lot that we've accomplished in four weeks

but the Committee is very pleased with the outcome and supports

1  entry of the order.  I'm happy to answer any questions Your

2  Honor may have.

3          THE COURT:  No, no.  I just want to repeat that I'm

4  very appreciative of the efforts and how much hard work had to

5  go into it and the issues that you raise are certainly

6  important and significant ones and I think that as is almost

7  always the case, a negotiated resolution is better than

8  litigation in a lot of ways and, you know, there are some

9  exceptions to that rule but I think in this particular case

10 with the expedited time frame and, you know, the situation

11 where it was, it was really important to get things moving

12 quickly and get the going out of business sales and

13 administration funded which is what you did and then the

14 Committee did its job.  I think it's a prime example of the

15 process working and I appreciate it.

16         MR. FEINSTEIN:  Thank you, Your Honor.  Thanks very

17 much.

18         MR. STOLZ:  Your Honor, may I be heard?

19         THE COURT:  Yes.

20         MR. STOLZ:  Good afternoon, Your Honor.  Daniel

21 Stolz, Genova Burns, co-counsel to the Ad Hoc Committee and

22 bond holders.  I'd like to introduce Your Honor to Andrew

23 Glenn, my co-counsel, who wants to say some words on behalf of

24 our clients.

25         THE COURT:  Okay, sure.

1          MR. GLENN:  Thank you, Your Honor.  Andrew Glenn,

2     Glenn Agre Bergman & Fuentes, on behalf of the Unsecured Bond

3     Committee, Ad Hoc Bond Committee.  Your Honor, that's all our

4     2019.   We have around 150 million bonds in our group.  That

5     number is growing.  We are in touch with many other holders.

6     The bonds in this case are widely held by retail holders which

7     is somewhat unusual.  We filed a reservation of rights with the

8     Court earlier this week.  We have reached out to the Creditors

9     Committee to try to get involved in the negotiations and

10    discussions about this resolution particularly after it was

11    announced at the last hearing that the Committee had reached a,

12    quote unquote, case settlement.

13          Now, we're appreciative of the Committee doing its

14    job.  We understand it has a job to do.  But that does not

15    excuse us from being excluded from the process.  The bonds in

16    this case in toto are a billion dollars for the largest

17    economic stakeholder and so, you know, we got the settlement

18    last night when we asked Mr. Sussberg and Kirkland and they

19    graciously provided it as soon as available.  The Committee has

20    not communicated with us at all beyond one phone call where

21    they refused to include us in the settlement, give us any

22    details about the settlement, so we heard about it just last

23    night.

24          The provision that's most concerning to us at this

25    point is Paragraph 60.  Paragraph 60 provides that the

1 challenge period is now cut off for everybody on the earlier, I

2 believe, of ten days after Your Honor enters the order or I

3 believe the prior challenge cut off date of around July 4th.

4 The settlement that Your Honor is being asked to approve in the

5 DIP order may be perfectly fine.  It may be a fair and

6 reasonable settlement.  But beyond the podium presentation by

7 my colleague we don't really have any details about why this is

8 a good deal for the estate.

9 So, what I would respectfully request, Your Honor, is

10 that parties-in-interest be given 30 days to review the

11 settlement to have a new challenge period set and I think the

12 reasoning for that is as follows.  Okay, first, if this were a

13 9019 settlement, you couldn't do it on that kind of notice.  It

14 would be a longer notice period traditionally.  Number 2 and

15 what's concerning to me is that the Committee has an

16 obligation, a covenant in this DIP order to oppose anyone else

17 from challenging the settlement or challenging the liens and

18 claims.  So, we're kind of boxed out.

19 If the Committee would come meet with us and talk to

20 us about their share, their reasoning and more of their work

21 product, maybe we could get comfortable very quickly with this,

22 maybe not, I don't know.  But if parties-in-interest need to

23 review the settlement on their own and replicate some of the

24 Committee's work, unfortunately, then I don't think it's fair

25 as a matter of due process for the Court to approve that today

1  if the period is going to be ten days.  That's a practical

2  impossibility for anybody to do anything.  The Committee has

3  been at this for the better part of, I believe, you know, 45

4  days or so.  Ten days is just not enough.  So, you know, we're

5  not here to get in the way of the company having access to its

6  DIP.  That's fine.

7         Challenge periods in these cases are routinely

8  extended by Courts for cause shown and here I think it's really

9  a matter of due process for parties-in-interest to have a

10 realistic, meaningful opportunity to examine the fairness of

11 the settlement because we agree that the litigation in this

12 case is the most valuable asset of this estate from the

13 perspective of the general unsecured creditors and here we have

14 an announcement, you know, the night before the hearing of most

15 of what that settlement is going to be and the practical

16 reality is we are sharing a lot of that settlement with the

17 lenders who got a very, very rich roll-up at the beginning of

18 the case.  So, that's my request, Your Honor.  I'm happy to

19 answer any questions.

20        THE COURT:  Well, I guess I'd like to hear from the

21 other parties as to the debtors' and the Committee's and the

22 lenders' position on that request.

23        MR. FEINSTEIN:  Thank you, Your Honor.  Let me begin.

24 Robert Feinstein, Pachulski Stang, for the Committee.  A couple

25 of important facts, Your Honor.  The indentured trustee for the

1 notes that are held by Mr. Glenn's group is on the Committee

2 and was privy to all of the analysis of unencumbered assets,

3 the negotiations back and forth throughout the process.  The

4 Committee represents in total almost I think a billion five of

5 liabilities and one billion of that is the indentured trustee

6 for these notes so they were fully apprised.

7       Mr. Glenn did approach us at a time when we were

8 still negotiating.  It was just inappropriate to disclose to

9 him the status of privileged negotiations between us and the

10 lenders and the debtor.  And, importantly, you know, Mr.

11 Glenn's group are not restricted so far as I know.  The

12 Committee has confidentiality obligation.  We have a fiduciary

13 obligation to all the creditors including Mr. Glenn's group

14 which we think we fulfilled.  And Mr. Glenn does not have a

15 fiduciary duty.  I mean he has his own group of note holders

16 that hold maybe it's ten percent of the notes or so forth.

17       So, the way the system works is that the Committees

18 are given confidential information and have a fiduciary duty to

19 represent all the creditors.  Again, with the indentured

20 trustee on board with the settlement, we think we fully

21 fulfilled that obligation.  There are dates and deadlines to

22 get a final DIP order entered.  I think that deadline will be

23 blown if we defer entry of this order for a month while Mr.

24 Glenn --

25       THE COURT:  I don't think that's what he was saying.

1  I think he was saying he just wants an extension of the

2  deadline to challenge.  Maybe I'm wrong.

3          MR. FEINSTEIN:  I'm not sure.  If it's the extension

4  of the challenge period, I'll leave that up to Mr. Hillman to

5  address.  If it's deferring entry of this order, we think that

6  would poorly serve the interest of the unsecured creditors.

7          MR. GLENN:  To be clear, Judge, it's only the

8  challenge period, that's it.

9          MR. FEINSTEIN:  Then I'm going to leave that to Mr.

10  Hillman.  I will address this one point which is we did agree

11  with the lenders to oppose other people seeking to bring a

12  challenge because we fully vetted this and we compromised our

13  challenges in exchange for very valuable consideration, sharing

14  the very same assets Mr. Glenn was concerned about being liened

15  on.

16          THE COURT:  But, Mr. Feinstein, now that it's clear

17  that he's just asking for an extension of the challenge period

18  --

19          MR. FEINSTEIN:  I'm going to sit down.

20          THE COURT:  -- are you saying the Committee has no

21  position on that or --

22          MR. FEINSTEIN:  That's up to Mr. Hillman.  The

23  secured lenders are the beneficiaries of the challenge period.

24  It's not my place to grant an extension.  That's between Mr.

25  Glenn and Mr. Hillman so I'm going to sit down.

1                    THE COURT:  All right.

2                    MR. HILLMAN:  For the record, David Hillman,

3     Proskauer Rose, counsel to Sixth Street as DIP agent and FILO

4     agent.  This is the first time I've heard a request for an

5     extension of the challenge period.  I saw there was a

6     reservation of rights filed.  So I'll start with the headline

7     and then work backwards.

8                    Under no circumstances would we agree to a further

9     extension of the challenge period.  It is part of the

10    negotiated bargain that was struck.  That's the headline.

11                   THE COURT:  Can we just go through it and just tell

12    me where -- because it sounded like there was a couple of dates

13    that were said and --

14                   MR. HILLMAN:  I want to walk Your Honor through all

15    of that and you heard briefly from Mr. Fiedler on this so --

16    are you in the redline?

17                   THE COURT:  I'm in the redline, yes.

18                   MR. HILLMAN:  Give me a second.  Let me just flip to

19    the redline.  If you allow me to just introduce one defined

20    term which will then help us with the challenge period --

21                   THE COURT:  All right.

22                   MR. HILLMAN:  -- I think that will be an easier way

23    to do it.  I believe it's Paragraph 10.  I'm just getting there

24    myself, Paragraph 10.  It starts on 39 of the redline.  I'm now

25    in the redline at Page 42 so it's 10(c).  Let me know when

1  you're at 10(c), Page 42.

2          THE COURT:  I'm there.

3          MR. HILLMAN:  Okay.  So, ten calendar days after

4  entry of this final order defined term the reserve release date

5  all funds in the priority claim reserve and the wind down

6  reserve shall be released to the debtors free and clear of the

7  DIP lines, pre-petition liens and adequate protection liens.

8  And then it goes on to say that the liens are collapsed such

9  that the 15 million can be used by the debtors without regard

10 to allocation as set forth in 10(b).

11         I know we're building to the challenge period but

12 this is an important predicate.  We were not prepared to

13 release the funds in this provision and the debtors' and the

14 Creditors Committee were advocating for a release of these

15 funds.  You may recall I stood before you at the first day

16 hearing and we talked about the funds that we were setting

17 aside in these reserves and they were always subject to, and

18 I'm trying to find the language here, it's all struck.  If you

19 look at Page 40, 41, you could see a lot of redlining there

20 which was 10(c) and 10(d) and 10(e).

21         Rather than read you the redline, I'll tell you in

22 substance what it said.  If a party obtained standing and

23 brought a challenge, we would revoke the funds in these

24 reserves.  We weren't going to give these funds and release

25 them from our liens until we knew we were free and clear of a

1 challenge.  The Committee insisted that we yield on this point

2 in order for us to get to a deal.

3          As you can imagine from the position of the DIP

4 lender and pre-petition lender, imagine we give, whether it was

5 36 million or $16 million and then it turns out we are

6 embroiled in litigation.  So, we were prepared to give on this

7 important negotiated compromise with a caveat and that's the

8 definition of reserve release date, that we'll wait ten days.

9          So, now if you go to the challenge period which I

10 believe is Paragraph 43 on the redline, it starts at Page 95 --

11 let me know when you're there, 43.

12          THE COURT:  95.

13          MR. HILLMAN:  Yup.  And so you can see the change to

14 the timing of the challenge period which appears on Page --

15 it's a carryover, 95 to 96, the challenge period by no later

16 than, it says the earlier of the reserve release date, so

17 roughly ten days from today, June 25th, or July 4th which was

18 the original, you know, I guess it was 75 days from the filing

19 of the case.  That's not a new date.  That's just hardwiring

20 what the original order said.

21          So, the request from the lenders was to shorten the

22 challenge period by ten days in exchange for something

23 meaningful to the Creditors Committee and to the estate freeing

24 these reserves.  It is unfair to isolate one quid pro quo

25 within a larger bargain but those were the two inextricably

1 tied together.

2        So, if there were any extension, we would say -- I'm
3 not authorized to say this but I would certainly recommend that
4 we're not going to release funds until that challenge period
5 expired.  If I said that, that's going to pull one thread
6 that's going to cause, I think, I don't want to prejudge
7 things, this carefully-negotiated settlement to collapse.

8        I also want to point out a couple of other pieces to
9 give Your Honor some, again, big picture perspective.  The day
10 the Creditors Committee was formed --

11        Can you help me out?  When were you formed?

12        MR. FEINSTEIN:  May 5th.

13        MR. HILLMAN:  May 5th, either May 5th or May 6th we
14 provided -- actually, it may have come from my colleagues at
15 Davis Polk, a care package with all of the claims, all of the
16 credit agreements and a detailed perfection memo, not just
17 dropping UCCs, but a memo that was prepared to enable the
18 reader to understand very specifically how and to what extent
19 we were fully perfected on all of those assets so we gave them
20 that care package.

21        And so there's ten days left on the clock.  No one
22 has asked us for any of our perfection documents.  We've given
23 it to the estate fiduciary.  And I think when you think about
24 fundamental fairness, I think it's important to take into
25 consideration as an important factor what you heard from Mr.

48

1  Feinstein and that is the indentured trustee is on the

2  Committee.  So, estate fiduciaries charged not with looking out

3  for their own pecuniary interest both on the debtors' side and

4  on the Committee's side have determined the deal is in the best

5  interest of creditors and a small group of interested

6  stakeholders seek something that will upset that carefully-

7  calibrated compromise.

8          THE COURT:  Small?

9          MR. HILLMAN:  Small relative to the size of the

10 Committee and creditors at large, so it's a relative term.

11         THE COURT:  Is it small in comparison to creditors at

12 large?

13         MR. HILLMAN:  I was referring to -- I think I heard

14 --

15         THE COURT:  Small in how many there are maybe but I

16 mean --

17         MR. HILLMAN:  I only meant --

18         THE COURT:  -- the number is huge.

19         MR. HILLMAN:  I only meant relative to the entire

20 unsecured creditor class represented by the Committee as a

21 court-appointed fiduciary.  I was making a comparison of an Ad

22 Hoc group and its members relative to the size of an estate

23 fiduciary.  I'm sorry if I used a term that brought us down a

24 detour.

25         THE COURT:  No need to be sorry.  I was just trying

1  to understand what you were saying --

2          MR. HILLMAN:  Yeah.

3          THE COURT:  -- because I didn't --

4          MR. HILLMAN:  Relative size.

5          THE COURT:  I have a hard time with a billion being

6  small.

7          MR. HILLMAN:  No.  Relative size.

8          THE COURT:  I'm a public servant.

9          MR. HILLMAN:  I'm a kid from Queens.  I can relate,

10 trust me.  What I meant was relative size to the Committee.

11         THE COURT:  All right.

12         MR. SHPEEN:  Your Honor, may I be heard briefly?

13         THE COURT:  Wait a minute.  I'm sorry, that was Mr.

14 Shpeen again.  Go ahead.

15         MR. SHPEEN:  Yeah.  Your Honor, very briefly.  Adam

16 Shpeen again of Davis Polk & Wardwell on behalf of JP Morgan

17 Chase.  We are pre-petition secured creditors so we do have an

18 interest in this dispute.

19         Just to be clear, Your Honor, I'm scratching my head

20 hearing Mr. Glenn speak because fundamentally, what he's

21 talking about is prosecuting estate causes of action, not bond

22 holder causes of action -- estate causes of action, and the

23 estate who is the holder of these causes of action has made a

24 business judgment to settle them in connection with this DIP

25 order and the only other fiduciary in these estates, the UCC

1   has signed off on that settlement.  They're the only other

2   potentially appropriate plaintiff in this action and they've

3   agreed to settle.  The bond holders cannot be plaintiffs here.

4           And so, I'm confused as to why this is being raised

5   at all.  The bond holders have had almost two months to

6   approach us and to approach Sixth Street if they wanted more

7   information.  They have not done so.  The challenge period here

8   is appropriate.  It's customary.  And from our perspective

9   there should and can be no changes just in light of the

10  circumstances and a settlement in this DIP order.  Thank you,

11  Your Honor.

12          THE COURT:  Well then what was the purpose of giving

13  in the challenge period parties other than the Committee the

14  ability to potentially make a challenge?  Doesn't it apply to

15  other parties-in-interest?

16          MR. SHPEEN:  Certainly, Your Honor.  They have two

17  months to come to us, ask questions, we can provide

18  information.  Just as we did when the Committee was empaneled,

19  we provided, as Mr. Hillman said, a care package of all the

20  perfection documents we had at our fingertips and provided that

21  immediately.  They can raise a challenge, file a standing

22  motion, but there has to be finality and that's why the

23  challenge period has an expiration date.  It's appropriate.

24  it's been two months.

25          Given the pace of these cases and the likelihood that

1 we could be, you know, at a confirmation stage in very short

2 order, there's just no reason to have more delay here.  And so

3 we support the estate fiduciaries, the debtors, the UCC -- we

4 defer to their business judgment and it's just a surprise to us

5 that this is coming out of the blue at this hour.

6          THE COURT:  Okay.  Thank you.

7          UNIDENTIFIED ATTORNEY:  Your Honor --

8          MR. BAUCHNER:  Your Honor, if we're moving on to the

9 next matter, I'd ask to be heard on behalf of the Texas Taxing

10 Authorities.

11          THE COURT:  Wait -- I don't know who's speaking now

12 but --

13          MR. BAUCHNER:  This is Joshua Bauchner of Ansell,

14 Grimm and Aaron, Your Honor.  I'm not sure if we're advancing

15 on to the next issue or if we're still addressing the bond

16 holder's concern.

17          THE COURT:  We're still addressing the bond holder

18 matter, so, sorry about that.

19          MR. BOCK:  Thank you.

20          MR. FIEDLER:  Your Honor, for the record, Ross

21 Fiedler of Kirkland and Ellis on behalf of the debtors.  I just

22 want to echo the same comments that Mr. Shpeen and Mr. Hillman

23 made which is this is a good deal for the debtors and the

24 negotiation point that the DIP lenders will release and fund

25 these critical reserves no later than ten days after the entry

1  of the order, was a heavily negotiated point.  And to stip out

2  one point from the overall settlement is just not appropriate.

3            I will say the challenge period hasn't expired.

4  There's ten days from when these reserves are funded for the

5  bond holders to file their standing motion.  And that's a

6  lifetime in the restructuring community so they have that

7  right.

8            Also, it's quite of an expensive proposition to

9  extend the challenge period.  You know, there is a provision in

10  the DIP order which says, you know, the ABL indemnity reserve

11  will be increased to $5 million if there's a valid challenge

12  filed.  And so that is, obviously, something the estate wants

13  to avoid but, you know, at the same time, the bond holders have

14  their rights for the next ten days to bring a challenge if

15  that's in their interest to do so.

16            THE COURT:  Well, what if I consider an extension?

17  I'm not saying I'm granting an extension.  What if they're tied

18  into, you know, that point in 10(c) and that the reserve

19  release date is moved to the extended, if any, challenge

20  period?

21            MR. FIEDLER:  Well, the issue is, this was a heavy

22  negotiated point and those funds that are going to be put in

23  the reserves are critical for the debtors' estates and it was -

24  -

25            THE COURT:  But they're already in the reserves,

1  right?

2          MR. FIEDLER:   Say that again, Your Honor?

3          THE COURT:  They're not already in a reserve?

4          MR. FIEDLER:  Well, they'll be released from the

5  reserve by the DIP lenders upon the order, the final order

6  being entered in no later than ten days after the order's

7  entered.

8          THE COURT:  But the funds in the reserve could be

9  used, right, or no -- they couldn't be used until the release

10  datge?

11          MR. FIEDLER:   That's correct.

12          THE COURT:  Okay.  Your colleague was --

13          MS. GEIER:  No, good afternoon, Your Honor.  Emily

14  Geier from Kirkland and Ellis on behalf of the debtors.  I just

15  wanted to remind and sort of bring attention to the Court from

16  where we were at the first day hearing to where we are today

17  with this agreement.  The original provision required that only

18  upon no challenge being filed would those reserves actually be

19  released to the debtors and that is the critical funding to

20  ensure that we can reach a plan confirmation process.

21          So, we are still in that same position except, you

22  know, the UCC pushed for this point as well these critical

23  reserves being released to the debtor so that we have those

24  funds and they are not wrapped up in that process is absolutely

25  essential to pushing forward on these cases.  And, frankly, I

54

1  don't know what happens to the rest of the settlement when this

2  provision changes.

3          At the end of the day, Your Honor, of course, you

4  will do what you think you must do.  I think we would have to

5  go back -- I'm assuming that we'd have to go back, you know,

6  and discuss and sort of figure out the path for it because it

7  is such an important part to have that -- those funds reserved

8  and released.  Those funds are, you know, just to remind Your

9  Honor, those are at this point $31 million of important funding

10 for employees, priority and administrative claims and to fund

11 the wind down of the estates.

12         THE COURT:  Right.  Right.

13         MS. GEIER:  And maybe --

14         THE COURT:  It's not being released anyway for ten

15 days under the settlement, right?  So --

16         MS. GEIER:  You are correct, Your Honor.  We will not

17 be utilizing those funds necessarily during that time period --

18 or we certainly won't be using them for the next ten days.  And

19 I will say we will be working with the ad hoc group to answer

20 all their questions.  I think all of us will be working with

21 them to share information and get their support of this

22 settlement.  I think it is a very good deal and I think they'll

23 come to see that.  And you heard from counsel.  He doesn't

24 necessarily opposed it.  He just hasn't had a chance to review

25 and we have ten days here to use to see if there actually is an

1 issue at all.

2        THE COURT:  Okay.  Thank you.

3        Mr. Herman's coming back.

4        MR. HILLMAN:  Yeah, David Hillman for the record.

5        THE COURT:  And then Mr. Glen wants to speak so, why
6 don't we just --

7        MR. HILLMAN:  Sure, I just want to be clear a fine
8 point on a change that we walked through on Page 10.

9        THE COURT:  On page?

10        MR.  HILLMAN:  Sorry, Page 40, Paragraph 10.  The
11 current deal, you're right, Your Honor.  Ten days passes
12 regardless of what happens, the reserves are released.  That's
13 the current deal.  The prior deal, which is reflected in red
14 line says the funds are forfeited, they come back to the DIP
15 lender, if there is a challenge.  That's not part of this deal.

16        So, what the Creditor's Committee  and company
17 negotiated for is an assurance that on the tenth day, if Your
18 Honor approves this order, on the tenth day after that moment,
19 these reserves get released from our liens, as it says in this
20 paragraph.

21        THE COURT:  Even if a challenge is filed.

22        MR. HILLMAN:  That's what this document says, Your
23 Honor, correct.

24        THE COURT:  Even if a challenge is filed.

25        MR. HILLMAN:  Correct.  The prior deal, the interim

1  order --

2          THE COURT:  I understand.

3          MR. HILLMAN:  -- did not say that and I think that is

4  a very important give that I wanted to highlight.  Thank you.

5          THE COURT:  All right.

6          MR. SHPEEN:  Your Honor, may I just make one quick

7  point, Your Honor?  It's Adam Shpeen from Davis Polk.

8          THE COURT:  Okay.

9          MR. SHPEEN:  Your Honor, just very briefly, I just

10 want to emphasize that the challenge period in the final DIP

11 order is no different than the challenge period that was

12 approved in the interim order.  We're not shortening the

13 challenge period.  The July 4th is the 60 day period that was

14 agreed to previously.  Now that we have a settlement --

15         THE COURT:  It was 75, though.  It was 75, sir.

16         MR. SHPEEN:  It was 75?

17         THE COURT:  Yes.  So it is shorter.

18         MR. SHPEEN:  Well --

19         THE COURT:  That's what Mr. Herman (sic) just told

20 me, I though.

21         MR. HILLMAN:  David Hillman, for the record.  Just so

22 we can avoid any ambiguity, Paragraph 43 includes the challenge

23 period.  Paragraph 43 is on Page -- starts on Page 95.  It says

24 no later than the reserve release date, which is ten days from

25 today, effectively, June 25th or July 4th.  The July 4th date

1  was always the same outside date.  We just took words and

2  converted it into a date certain.

3          Do you have any questions about that, Your Honor?

4          MR. SHPEEN:  That's the point I was making, Your

5  Honor.  July 4th is the same as the 60 days after date that was

6  in the interim order.

7          THE COURT:  So --

8          MR. SHPEEN:  And so, it --

9          THE COURT:  Wait a minute.  Just let me catch up with

10 you, okay?  By no later than 60 days following the date of

11 formation of the Committee which was May 5th as I understand

12 it.  And that would take it --

13         MR. SHPEEN:  July 4th.

14         THE COURT:  To July 4th.  Or 75 days following the

15 entry of the interim order if no Committee is appointed.

16         MR. HILLMAN:  That clause is superfluous because a

17 committee was appointed.

18         MR. SHPEEN:  Exactly.

19         THE COURT:  Okay.

20         MR. SHPEEN:  Exactly.

21         THE COURT:  I got it.

22         MR. SHPEEN:  So, my point, Your Honor, is that we're

23 not shortening the period at all and if there were no

24 settlement before Your Honor and Mr. Glenn stood up and asked

25 for an extension, he's articulated no cause for the extension.

1  And this was the period that was approved at the interim order

2  phase.  And he's had two months to do his work.  And to come at

3  the last minute to ask for an extension without cause is

4  mystifying.  But now there's certainly no cause because we have

5  two estate fiduciaries saying that they've done the work and

6  there's no challenge that's viable and so they've decided t

7  settle the actions on behalf of the estate.

8         So, that's the only point I wanted to make, Your

9  Honor.  And with that, I'll go on mute.

10         THE COURT:  Okay.  Mr. Glenn?

11         MR. GLENN:  Thank you, Your Honor.  Just a couple

12  clarifying points.  We signed an NDA with the debtor, I

13  believe, a couple of weeks ago.  We asked for information

14  regarding the lenders and challenge issues and we were told

15  that we were not going to get that.  We have tried to

16  communicate with our indentured trustee on the Committee.  The

17  indentured trustee has been completely unresponsive.

18         But I want to make something very clear, okay?  Ms.

19  Geier is correct,  it could be very well that we think this is

20  a great settlement.  We don't know because we don't have the

21  information and what we're now being told is, yes, you had

22  until July 4th, but now it's ten days.  There's been no proffer

23  about when the company actually needs the money to pay the

24  bills from that reserve.  So, we don't know if the company is

25  going to suffer any prejudice if the reserves can't be released

1  until the challenge period actually ends.

2          And, look, I understand people have their fiduciary

3  duties but they have fiduciary duties to the stakeholders  And

4  the people with the money on the line deserve (a) due process.

5  The Bankruptcy Code provides that we are a party in interest.

6  And we were told you can't get the information.  You can't

7  participate in the settlements and now the Committee has an

8  obligation to block us from trying to do the right thing if we

9  determine -- not because we're going to bring direct claims,

10  that someone would have to bring estate claims.

11          I understand it's an unusual construct and I hope we

12  don't have to do it.  But at the end of the day, the bond

13  holders have a billion dollars on the line here.  We have a

14  plan settlement, okay, with the most valuable asset here.  (a)

15  we deserve an explanation, (b) we deserve due process and I

16  haven't heard anything that indicates that we shouldn't get

17  those fundamental things.

18          So, you know, I'm happy to answer any questions.

19  We're happy to move as quickly as Your Honor will give us.  I

20  asked for 30 days.  We'll accept July 4th if Your Honor is not

21  inclined to give us the full 30 days, but we'd like some period

22  of time.  No one else has to get that period of time.  I'm the

23  only one right now raising this objection.  If they make me --

24  our client (indiscernible) satisfied, then we'll consent and it

25  will be over.  But I'm not comfortable being in the position

1  where someone has announced the day before a hearing very

2  little information is provided and there is a very compressed

3  time frame within which we can get the information that we need

4  to do our fiduciary duties to our clients to figure out whether

5  this is the right thing to do.  I don't think that's a big ask.

6         Thank you very much.

7         THE COURT:  Okay.  All right.

8         I think, Mr. Feinstein -- we need to -- I need to

9  move this on.

10        MR. FEINSTEIN:  For the record, Robert Feinstein.  I

11 hope I can make a constructive suggestion.

12        THE COURT:  Okay.

13        MR. FEINSTEIN:  There are ten days left in the

14 challenge period.  We were unable to talk to Mr. Glenn when we

15 were in the midst of negotiations because it was all 408

16 discussions.  The terms are now disclosed.  The Committee,

17 including the indentured Trustee for that billion dollar bond

18 issue which Mr. Glenn's clients hold, fully supports the

19 settlement as being in the best interest of the creditors of

20 the estate.

21        THE COURT:  But he's saying they didn't give him any

22 information.

23        MR. FEINSTEIN:  Right.  So, my constructive

24 suggestion is this, Your Honor.  Let's leave it at the ten

25 days.  And I just heard, really, for the first time that Mr.

1  Glenn has an NDA with the estate.  If we can have an NDA with

2  the Committee, we will show him our lien perfection remote,

3  because we did the analysis.

4        I've already noted for the record that all of these

5  litigation claims that are part of the sharing formula were

6  unencumbered on the petition date before the roll-out.  There's

7  no dispute as to that.  And Mr. Glenn probably understands the

8  UCC as well that there's no lien on those assets on the

9  petition date but a lien was granted on the roll-out.

10        So, we can meet with Mr. Glenn now that this is

11  public and we're not bound by 408 discussion on a settlement

12  that hadn't been concluded, and we'll give him a download and

13  he can make a judgment whether to seek an extension of the ten-

14  day period that's baked into the order, risking the reserves,

15  and we'll impress upon him the importance of having those

16  reserves available to the estate because, again, one of our big

17  concerns was administrative solvency.

18        THE COURT:  I was looking for the right to request an

19  extension of the challenge period.

20        MR. FEINSTEIN:  I'm working from memory that there's

21  an extension for cause shown provision in there.

22        MR. HILLMAN:  There's not.

23        MR. FEINSTEIN:  There's not?  Okay.

24        THE COURT:  That's why I couldn't find it

25        MR. FEINSTEIN:  Okay.  Well, what can I tell you?  We

62

1  will give him a hurry up education in the ten days and,

2  hopefully, he'll come to the conclusion that the indentured

3  trustee for his billion dollar bond issuance did with the

4  benefit of being a fiduciary on the Creditor's Committee, being

5  a fiduciary to the note holders as an indentured trustee and

6  explain the judgment that was reached and why this is a very

7  favorable deal for unsecured creditors who would otherwise get

8  wiped out.  And, again, if he impacts the release of the

9   reserves, we've got a big problem in the bankruptcy case.

10         So, I hope in the next ten days we can impress upon

11  him all the benefits of the settlement, the results of our lien

12  search and so forth and I guess he can draw his conclusions

13  from there.  But we're happy to provide that now that this is

14  public.  We couldn't before.

15         THE COURT:  When is our next hearing date on -- I

16  know there's one on the 21st which is just a week away.  Is

17  that right?

18         MR. FEINSTEIN:  June 27th, Your Honor.

19         THE COURT:  Twenty-seventh?

20         MR. FEINSTEIN:  Yeah.

21         THE COURT:  Oh, that got moved again, right?  That's

22  the --

23         MR. FEINSTEIN:  Yeah, it's the sale hearing date on

24  the 27th.

25         THE COURT:  Okay.  So, what I'm going to do is I'm

1  going to give -- I'm going to include that they can request an

2  extension of the challenge date for cause for a period to July

3  4th by no later than June 25th.  And I'll deal with it on the

4  27th if need be.  But I'm basing that on the representations

5  that were made that now that there are non-disclosure

6  agreements in place or will be in place and information will be

7  provided, I will grant an extension of that date for the

8  challenge for cause shown but not beyond the July 4th date, in

9  any event, so that everybody has a chance and the bond holders

10 can, I would say, further examine this because I know it's true

11 that this deal was just presented today.

12         But the bond holders did have representation on the

13 Committee and for whatever reason, the information was, you

14 know, as I understand it, because of the fiduciary obligations

15 and lack of a NDA at the moment with the Committee was not

16 disclosed.  Well, now there is going to be an NDA and the

17 disclosure is going to come.

18         So, you have ten days to try to, you know, to go

19 through that information and if there is not -- if the bond

20 holders are not satisfied, they can ask for an extension on

21 June 25th by short letter as to why -- for cause, why someone -

22 - why they need more time, not just that an extension will be

23 granted.

24         MR. HILLMAN:  Can I ask a question, Your Honor?

25         THE COURT:  For the record, David Hillman, Proskauer

64

1  Rose.  You asked me -- you asked the courtroom was there a for

2  cause extension.  I said there wasn't.  In the DIP order, in

3  the challenge period, Paragraph 43 on Page 96 of the red line -

4  - let me know when you're at that page.

5          THE COURT:  Ninety-six you said?

6          MR. HILLMAN:  Yeah, 96 of the red line.

7          THE COURT:  Uh-huh.

8          MR. HILLMAN:  Do you see there is some red line in

9  the middle, towards the bottom?

10          THE COURT:  Right.

11          MR. HILLMAN:  Right after the red line it says the

12  filing of a motion seeking standing to file a challenge before

13  the expiration of the challenges, which attached as a proposed

14  challenge, shall extend with that party for two days until

15  after the Court deals with the standing motion.  And so the

16  question I ask, there is already a provision dealing with a

17  party in interest who wants to do something before the

18  challenge period.  Can the existing language, which is part of

19  the negotiated deal which, admittedly, is a heavier burden than

20  what you just described, I would ask you to allow the parties

21  to at least have what's already imbedded in the order as

22  opposed to simply a letter, quote, for a cause?

23          That's a request that will allow at least the

24  parties to go back to their respective clients and say nothing

25  changed in the order and it gives Mr. Glenn the opportunity to

1  do -- there's an escape hatch that's already built into the

2  order.  Admittedly, you have to, you know, put your money where

3  your mouth is and come up with a motion for standing and attach

4  the proposed challenge.  That's my request to Your Honor -- to

5  stick with the four corners.

6           THE COURT:  But if the answer is that they don't have

7  the information to make a challenge, then what happens?

8           MR. HILLMAN:  I think that what I've heard, and I

9  won't belabor the record, I will respect Your Honor's ruling,

10 just what I heard was there will be full cooperation from the

11 Committee to share the information.  And I would ask if the

12 Committee can make that happen in the next 24 and 48 hours so

13 that there's at least eight days on the clock and they have the

14 information.

15          MR. FEINSTEIN:  Subject to a confidentiality

16 agreement with the Committee, we're fine with that.

17          THE COURT:  Okay.

18          MR. GLENN:  Your Honor?

19          THE COURT:  Yes?

20          MR. GLENN:  I will live with that for July 4th but

21 ten days -- to have a motion ready in ten days to extend?  And

22 I'm not sure what Mr. Hillman's looking for in that motion.  I

23 don't see the difference between a letter and motion.  If the

24 cause is I need more time and more information, you know, a

25 short letter versus a motion, I don't understand why, you know,

1  as the party with a ten-day period has to be put to a -- to

2  that higher burden.  July 4th I understand -- that was the

3  challenge period to begin with, but since we're compressing the

4  time, I think there should be some relaxation and we should go

5  with Your Honor's suggestion.

6          MR. HILLMAN:  I would beg for the Court's indulgence.

7  Let's take up the Texas Taxing Authority .  Maybe there will be

8  an opportunity after that discussion to take a five minute

9  recess.  And I think what I will go back to our clients with is

10  July 4th with the language that's in the DIP order of filing a

11  motion seeking standing, attaching the proposed challenge which

12  is far more than a letter saying I need some more time versus

13  ten days.  I would like to ask the clients that question.

14          THE COURT:  Okay.

15          MR. HILLMAN:  And I think if that gives us an

16  opportunity to at least take a breath to evaluate next steps.

17  Is that acceptable?

18          THE COURT:  That's acceptable to me.

19          MR. HILLMAN:  Thank you, Your Honor.

20          THE COURT:  Absolutely.

21          MR. FIEDLER:  So, Your Honor, for the record, Ross

22  Fiedler of Kirkland and Ellis on behalf of the debtors, next is

23  the Texas Taxing Authorities' objection.

24          THE COURT:  Right.

25          MR. FIEDLER:  You know, Your Honor, we deal with this

67

1  on many cases and often, most often, we get to a resolution.

2  So, really hoping we can get there today.  We've been in

3  discussions with their lawyers for the past week or two on

4  language, but the crux of the objection is, you know, the

5  taxing authorities assert $5 million worth of pre-petition tax

6  claims that are secured by the debtors' tangible property in

7  Texas.  They argue that the DIP motion fails to demonstrate

8  that the authorities are adequately protected to the extent the

9  motion seeks to prime their liens through the DIP liens and the

10  adequate protection liens.

11      So, further, they've asked that the debtors establish

12  a segregated account to reserve funds for any collateral

13  subject to their liens.  So, the debtors and the DIP lenders

14  don't necessarily disagree but I'll let Mr. Hillman speak to

15  that.  We agree that they hold, you know. secured tax claims

16  against the estate.  What the amount is is still undetermined.

17  In the last week we've received a breakout of their claims for

18  both estimated 2023 and backdated taxes from 2022 and, I think,

19  two years before.

20      So, there needs to be a reconciliation process to

21  determine what their actual claim amount is but that's besides

22  the point because the authorities are already protected by what

23  is in the DIP order currently.  First, the DIP budget already

24  provides for the payment of these sort of tax claims.  And the

25  taxes order that we got at the first day hearing gives the

1  debtors the authority to make those payments.  But more

2  importantly, we already have reserve accounts, as we've

3  discussed, that cover these sorts of tax claims.

4        We have a priority claims reserve and a WARN reserve

5  and a wind down reserve.  And as we discussed, the priority

6  claims reserve is going to be collapsed with the WARN reserve

7  such that you have $26 million worth of value to be distributed

8  to, you know, claim holders with allowed claims such as the

9  Texas Taxing Authorities.

10        So, there's no need for an additional reserve.  We

11  already have the reserves in place and we've agreed that the

12  Texas Taxing Authorities' liens, you know, to the extent

13  there's any shortfall in the DIP budget, we'll attach to the

14  reserves.  And so we already have the, you know, segregated

15  reserve and there's no reason to establish what is now going to

16  be a forth reserve just because a party is requesting it.

17        THE COURT:  All right.

18        MR. BAUCHNER:  Good afternoon, Your Honor, Joshua

19  Bauchner with Ansell Aaron on behalf of the Texas Taxing

20  Authorities.  If I may be heard?

21        THE COURT:  Yes, of course.

22        MR. BAUCHNER:  Thank you, Your Honor.  With me is Ms.

23  tara Grundemeier who has an application for a pro hac vice

24  admission pending and, with your permission, she will address

25  the issue?

1          THE COURT:  Yes, absolutely.  There's no concern

2   about that.

3          MR. BAUCHNER:  Thank you.

4          MS. GRUNDEMEIER:  Good afternoon, Your Honor.  Tara

5   Grundemeier on behalf of the Texas Taxing Authorities.

6   Appreciate you allowing me appear via Zoom from Texas.

7          THE COURT:  No problem at all.  And pro hac for today

8   -- you already have the application.

9          MS. GRUNDEMEIER:  Thank you, Your Honor.  The Texas

10  Taxing Authorities filed their objection at Docket Number 283.

11  Some of the representations are correct, some of them I would

12  like to explain a little bit further.  The Texas Taxing

13  Authorities' liens is correct, they are senior secured tax

14  liens.  They prime all other lien holders pursuant to the Texas

15  Tax Code, so they are the number one creditor to be paid.  And

16  to have the Texas tax liens to be paid from a priority reserve

17  that is for priority tax claims, administrative claims that

18  don't even address the secured tax liens -- the secured tax

19  liens are not priority tax claims.  They're not administrative

20  claims.  So, arguably, the secured tax claims don't even belong

21  in this reserve.

22          Number (2), how do we know, how do my clients know,

23  that there is going to be enough money left after you pay the

24  WARN claims?  Whatever those amounts are going to be, whatever

25  the other priority claims are going to be, whatever the other

1  administrative claims are going to be, there's going to be

2  enough money left to pay my client's senior secured tax claims.

3        You heard on the record today that the ABL has been

4  paid, a creditor that has a lien behind the tax liens has been

5  paid.  The FILO liens are going to get paid, and I don't

6  understand how it is equitable that you allow a senior secured

7  tax claim to not -- to have to attach it to Code C in a general

8  nature, just sitting in the debtors' coffers, that can be spent

9  on admin expenses and other claims without those funds being

10 reserved for the taxing entities.

11       I think that Section 363 is clear that if a secured

12 creditor objects to the use of their cash collateral, they have

13 to be adequately protected and I think to adequate protect the

14 tax claims, a reserve should be set up, set aside just for the

15 (indiscernible) tax entities in Texas.

16       This reserve is not an absolute.  It doesn't say that

17 the claims are going to be allowed in this amount, and allowed

18 for a reconciliation.  It's not a cap but it's also not an

19 allowance for the claim.  The debtors have their opportunity to

20 do a reconciliation as long as they need to, but those funds

21 will be reserved for the tax entities so that we can ensure

22 that there's enough money to pay the taxes.

23       THE COURT:  Okay.  And so you're saying that you're

24 not adequately protected because you're not sure that there's

25 sufficient funds in between the budget and these reserves which

1  they're granting you a lien on to pay the 5 million?

2          MS. GRUNDEMEIER:  That's correct.  I understand these

3  taxes are in the budget but, Your Honor, where is that money?

4  Is it being spent on other fees?  On other expenses --

5  professional fees?

6          THE COURT:  Okay.

7          MR. FIEDLER:  Your Honor, if I may?

8          THE COURT:  Yes.

9          MR. FIEDLER:  Just a few points.  On the first point

10 about the priority claims reserve, and if you look at the

11 language which was heavily negotiated, it includes Chapter 11

12 administrative expense claims, priority and other claims.  So,

13 there's no saying that the secured tax claims of the Texas

14 Taxing Authorities don't fit squarely within that definition.

15         The second point I'd make is we have represented that

16 the budget accounts for the payment of these sort of claims.

17 Obviously, we need to go through the reconciliation process.

18 But whatever shortfall there is, we've already agreed to grant

19 -- to attach their liens with the same priority as before to

20 the reserves which will be unencumbered by any other lien.

21 And so they have first dibs on those reserves and there's no

22 reason to put more money at stake for a separate reserve than

23 what has already been reserved for by the DIP lenders and the

24 debtors.

25         THE COURT:  How much is in the priority claims

1  reserve?

2        MR. FIEDLER:  We have ten million.

3        THE COURT:  Okay.  All right.

4        MS. GRUNDEMEIER:  Your Honor, if I may, of that ten

5  million, just for the tax claims alone it's about $5.4 million

6  for just the Texas tax claims.

7        THE COURT:  This is half of that, yes.

8        MR. FIEDLER:  Well, subject to the reconciliation.  I

9  mean, we just received breakouts and part of the tax claims are

10 for estimated 2023 tax claims which still need to be worked

11 through with our financial advisor.  And that process is

12 undergoing right now.  But we imagine that number is going to

13 be slightly lower.

14        THE COURT:  All right.  Well, I understand the

15 position of the Texas Taxing Authorities and I think the

16 provisions that have been made here in Paragraph 61 do, in

17 fact, provide adequate protection and segregate the funds in

18 some respect.  The adequate protection is in the form of the

19 civil forms -- it's in the budget to pay claims like this.

20 It's in the priority claims reserve and that does include

21 secured claims, as just represented on the record.  And then

22 there's also the lien that attaches to not only the priority

23 claims reserve but the Warn Act reserve which is another -- I'm

24 not sure exactly how many millions are in the Warn Act reserve

25 but --

1          MR. FIEDLER:  Sixteen.

2          THE COURT:  -- it says it right here.

3          MR. FIEDLER:  Sixteen, so it's 26 in total.

4          THE COURT:  So, it's 26 million and change.  To me,

5     that's adequate protection while the claims get reconciled.

6          MR. FIEDLER:  Thank you, Your Honor.

7          MS. GRUNDEMEIER:  Your Honor, if I could just talk

8     about Paragraph 61, at your indulgence?  If you look towards

9     the end of that paragraph and it says the Texas tax liens shall

10    be paid by the debtors and shall attach the priority claim

11    reserve and WARN reserve to the extent of any shortfall.  So, I

12    think that's unclear.  Are the debtors going to pay the tax

13    claims from sale proceeds and to the extent of any shortfall

14    from any sale proceeds, then are the taxes being paid from the

15    reserve?

16         THE COURT:  You --

17         MS. GRUNDEMEIER:  That's number one.  And number two

18    --

19         MR. FIEDLER:  If there's any shortfall in the DIP

20    budget for the purported claims that the Texas Taxing

21    Authorities are asserting, then the liens will attach with the

22    same priority as before to the reserves which, again, 26

23    million far exceeds the -- what we think is going to be a claim

24    in between two and five million.

25         THE COURT:  So, Ms. Grundemeier, I think he's saying

1 -- and maybe if it requires a little bit of tweaking to the

2 language, he is saying that it's going to be paid.  It was in

3 the budget but to the extent there is any shortfall in the

4 budget, it attaches to the priority claim reserve and WARN

5 reserves in the same priority.

6        MS. GRUNDEMEIER:  Thank you, Your Honor.  And so from

7 what I heard, representation made by the debtors' counsel, that

8 the tax claims will be paid first from these reserves.

9        THE COURT:  I'm not sure he said that.  I don't think

10 he said that.  He said it's going to be paid in the same order

11 and its priority in which you have the lien.  I didn't think he

12 said paid first.

13        MS. GRUNDEMEIER:  Well, perhaps I misunderstood but I

14 believe they were --

15        THE COURT:  Did you say that, sir?  I don't --

16        MR. FIEDLER:  No, you accurately represented.  And I

17 think the language stands on its own.

18        THE COURT:  Yes.  I mean, but I understand what Ms.

19 Grundemeier is saying is that -- can you just change the words

20 to say that shall be paid by the debtors in accordance with the

21 budget.  And to the extent there's any shortfall in payment to

22 Texas, its lien, shall attach to the priority claims reserve to

23 the extent of the shortfall?

24        MR. FIEDLER:  Yeah, that works, Your Honor.  That's

25 the intention of the language, so, we'll add that.

1          THE COURT:  I think it kind of says that anyway but I

2    understand Ms. Grundemeier's position and think those are just

3    by way of clarification, really.

4          MR. FIEDLER:  So, Your Honor, I believe that was the

5    last issue on the DIP order, so, unless you have any --

6          THE COURT:  Well, I know they're not five million,

7    but what about Maricopa County?

8          MR. FIEDLER:  They are accounted for in this

9    language, I believe, in the footnote, their entities should be

10   accounted for.  Let me pull it up.

11         THE COURT:  I know you said -- I didn't see that

12   particularly, but I might not have caught it.  I know you said

13   that earlier.

14         MR. FIEDLER:  Let me collect on our side and just

15   make sure that they're accounted for in this footnote.  But if

16   they're not, we'll make sure they're included.

17         THE COURT:  Okay.  So you were talking about --

18         MR. FIEDLER:  Footnote 16.

19         THE COURT:  Yes, I didn't read all those counties to

20   be honest with you.

21         MR. FIEDLER:  Neither did I.  They've got to be in

22   there somehow -- but we'll make sure they're in there, Your

23   Honor.

24         THE COURT:  All right.  Well, I think, certainly

25   what's good for the $5 million Texas claim is good for the

1  Maricopa County 49, or so thousand dollar claim.

2          MR. FIEDLER:  That's right, Your Honor.

3          THE COURT:  Okay.

4          MS. GRUNDEMEIER:  Your Honor, just looking through

5  the definitions, I don't think Maricopa County is included.

6          THE COURT:  I'm sorry, Ms. Grundemeier?

7          MS. GRUNDEMEIER:  I was looking through the

8  definitions of the counties and I don't believe Maricopa County

9  is included in the footnote.  Not that I represent Maricopa

10 County, but --

11         THE COURT:  You're in the government general

12 protection mode.  I understand.

13         MS. GRUNDEMEIER:  Indeed.

14         THE COURT:  Yes, but you know what, they can do a

15 search and if it's not there, then they got to put it in,

16 that's it, very simple.

17         MR. FIEDLER:  Okay.  Thank you, Your Honor.

18         So, I believe we have more issue on the --

19         THE COURT:  We have one item left from the DIP

20 financing cash collateral.  Mr. Herman (sic) was going to talk

21 to his client about a recommendation, and then we certainly

22 have to give Mr. Allen (phonetic) a right to be heard.

23         MR. HILLMAN:  Your Honor, David Hillman, Proskauer,

24 it's five to 12.  I think I --

25         THE COURT:  Five to 1 I have.

77

1          MR. HILLMAN:  Oh, you're right, five to 1.  We don't

2    need a long break but I would appreciate the Court's indulgence

3    for a 15 minute break and then we can knock on your chambers'

4    door and reconvene and I can tell you where I've landed with

5    the clients and take it from there?

6          THE COURT:  Absolutely.  Not a problem for me.

7          MR. HILLMAN:  So, that brings us --

8          THE COURT:  But I think we should finish what we have

9    here, right?  We should finish what we have on the agenda and

10   then just leave that one item for a little later.

11         MR. FIEDLER:  Great, Your Honor.  That was going to

12   be my suggestion.  Thank you.

13         THE COURT:  Oh, there you go.

14         MR. FIEDLER:  So, if we move, then, to Agenda Item 2,

15   this is the AlixPartners' retention application.  It's to

16   retain AP Services, LLC to designate Holly Etlin as the chief

17   restructuring and chief financial officer effective as of the

18   petition date.  The application was filed at Docket Number 350.

19   A supplemental declaration was filed in support of the

20   application at Docket Number 621.

21         So, at this time, I'd like to submit Ms. Etlin's

22   declaration into evidence.

23         THE COURT:  Any objections?  Any one wish to cross

24   examine the declaration -- the witness making the declaration?

25         Having heard no response, I will admit it into

1    evidence.

2           MR. FIEDLER:  Thank you, Your Honor.  So, Your Honor,

3    we have submitted a consensual form of order to your chambers

4    that's incorporated comments we've received from the United

5    States Trustee.  I believe we're fully resolved, so, unless you

6    have any questions, we'd, respectfully, request entry of the

7    order.

8           THE COURT:  No, I saw that that was the

9    representation.  I'll ask Ms. Steele if she wishes to be heard?

10          MS. STEELE:  Yes, Your Honor, thank you.  Good

11   afternoon.  Fran Steele on behalf of the U.S. Trustee.  No,

12   Your Honor, the U.S. Trustee and counsel did agree to the form

13   of order and, with that, the U.S. Trustee has no objection.

14          THE COURT:  All right.  Well, I'm not going to

15   interfere with the parties' positions on this and, you know,

16   they're certainly a necessary part to get this restructuring

17   concluded or this reorganization concluded as quickly as

18   possible.  And I'll approve the application.

19          MR. FIEDLER:  Thank you, Your Honor.

20          The final item on the agenda is going to be handled

21   by my colleague, Ms. Acuna, which is the World Market

22   assumption and assignment motion.

23          THE COURT:  Okay.  Thank you.

24          MS. ACUNA:  Good afternoon, Your Honor.  Olivia Acuna

25   of Kirkland and Ellis on behalf of the debtors.

1          THE COURT:  Good afternoon.

2          MS. ACUNA:  And I will note that my pro hac

3    application is pending and just wanted to request permission to

4    proceed?

5          THE COURT:  You have that permission.

6          MS. ACUNA:  Okay.  Great.  So, the final item on

7    today's agenda is the debtors' motion to assume and assign

8    certain unexpired leases.  And that motion is filed at Docket

9    Number 428.  And pursuant to this motion, the debtors were

10   seeking authority to assume and assign ten unexpired leases to

11   World Market, LLC.  But as reflected in the revised proposed

12   order that was filed on Monday at Docket Number 705, we're

13   adjourning the motion with respect to one of the leases

14   identified as Store Number 6383.  So, pursuant to the revised

15   proposed order, the debtors are seeking to assume and assign

16   nine leases to World Market, LLC.

17          We did receive other informal comments from certain

18   parties and all of these comments have been addressed in the

19   revised proposed form of order.

20          So, unless Your Honor has any questions, the debtors

21   respectfully request that the Court enter the revised proposed

22   form of order filed at Docket Number 705.

23          THE COURT:  Right.  This one is the leases that,

24   really, World Market is agreeing to pay the cure costs and it's

25   not really any consideration, any separate consideration being

1  provided for the assumption and assignment.

2          MS. ACUNA:  That's correct, Your Honor.  They're

3  currently the sub-lessees in each of these stores.

4          THE COURT:  All right.  Does anyone wish to be heard

5  on this application?

6          Having heard no response -- again this seems like a

7  very appropriate exercise of the debtors' business judgment,

8  and it's also been vetted by the Committee and the banks, and I

9  will approve the motion.

10          MS. ACUNA:  Great.  Thank you, Your Honor, and thank

11  you to the World Market counsel for their help in this process.

12          THE COURT:  Okay.  Thank you.

13          All right.  So, Mr. Glenn, I think you heard that Mr.

14  Herman (sic) is going to talk to his client about the date that

15  we've been discussing.  And I guess -- I don't know if he's

16  already out discussing but -- and then I don't know if it makes

17  sense for then Mr. Herman (sic) and Mr. Glenn to speak and

18  whether you need to get anyone else involved before you come

19  back to me, or you just want to come back to me?

20          Why don't you propose that?  Why doesn't someone

21  propose that to Mr. Herman?  And you'll let us know when you

22  need to come back.

23          MR. FIEDLER:  Great.  Thank you, Your Honor.

24          THE COURT:  Thank you.

25                          (Off the record)

1          THE COURT:  Good afternoon.  We are back on the

2    record on the Bed, Bath & Beyond case.  And I first have to

3    apologize to Mr. Hillman because I've been saying Herman.  And

4    it's pointed out to me that it's Hillman.  Apologies.

5          MR. HILLMAN:  No, no, all good.  I appreciate that,

6    Your Honor.  David Hillman, for the record, Proskauer Rose,

7    counsel for the DIP agent and FILO agent.  Appreciate the

8    break.  We used it productively.

9          I spoke to our client.  I also spoke to Mr. Glenn.

10   And I'm pleased to report that we took your commercial

11   practical suggestion, tweaked it a little bit, and we have a

12   path forward that I think is agreed on all major points and

13   there's probably one quasi-substantive point that I'd like to

14   be heard on.

15         So, we're dealing with the challenge period and, as

16   you know, the challenge period current structure is ten days

17   from the date the Court enters the order or July 4th -- the

18   earlier of those dates.  So, we know that July 25th is, in

19   effect, the current challenge period, based on the form of the

20   order.

21         So, first, the ad hoc group will receive a diligence

22   package, a care package, from the Creditor's Committee within

23   24 hours after Mr. Glenn's clients sign an NDA with respect to

24   the information.  The Creditor's Committee counsel has told me

25   during the break that they will use commercially reasonably

1  efforts to cooperate with Mr. Glenn and his clients to give

2  them information as it relates to understanding whether there

3  are any potential challenges to be asserted.

4         The ad hoc group, if they are seeking an extension of

5  the June 25th challenge period, they can do so by filing a

6  letter, a notice, a motion -- whatever it is that Your Honor

7  would prefer as to the vehicle for that extension, citing cause

8  for an extension.  The outside date of that extension sought,

9  or any extension granted, would be July 4th.

10        So, we would have a hearing if such a request for an

11 extension was made.  We would have a hearing on that on June

12 27th, obviously, they would have to seek the extension before

13 June 25th.  We would have a hearing on June 27th.  If there

14 were an extension for cause of the challenge period, there

15 would also be an extension of the reserve release date.

16        So, for example, the reserve release date currently

17 is set at ten days after the Court enters the order.  If Your

18 Honor grants a two-day extension, the reserve release date

19 would also be extended by two days.  The place where I think

20 Mr. Glenn and I may have a disagreement is what does he need to

21 do to convince Your Honor that there is cause for an extension.

22 We would suggest to the Court that he gives some indication as

23 to what the open issues are and the potential challenges are.

24 Something less, admittedly, than a full-blown standing motion

25 but something more than we need more time.

1            I think Mr. Glenn is fearful of tying his hands to a

2    standard before he knows what cause is but I would just ask

3    Your Honor to apply what -- I will defer to Your Honor if you -

4    - I think you are ready and able and capable to determine

5    what's cause.  And so I don't know if we have to legislate what

6    it is but I want to make clear that it's -- you know, the

7    reason why I say we need more time, that rings hollow to me

8    because they appeared at the first day hearing in this case and

9    I can remember Mr. Glenn's partner was on the Zoom and I think

10   he made a comment that he couldn't travel from Connecticut to

11   New Jersey.  They've been on scene.

12           And so I know Mr. Glenn has made a point of there's

13   only ten days left on the clock, but I would submit, Your

14   Honor, there's been I don't know how many days since the case

15   was filed -- almost 60 days.  There's been a lot of time that

16   has already run off the clock.  So, I don't want anybody to be

17   surprised -- just more time is going to be met with a

18   vociferous objection.

19           THE COURT:  How about good cause shown as determined

20   by the Court?

21           MR. HILLMAN:  I can't argue with that.

22           THE COURT:  Mr. Glenn?

23           MR. GLENN:  Yeah, that's fine with me, Your Honor.  I

24   don't know the extent of the cooperation, the speed of the

25   cooperation that I'm going to receive.  I don't know what

84

1 information there is.  So, I understand -- I think we all

2 understand what's on the table now and I've already issued

3 information request to Kirkland.  I've asked for the NDA from

4 the Pachulski firm.  And so, we're going to work as fast as we

5 can.  Not knowing what's out there, I'm not going to pre-agree

6 to any specific standard for cause.  I understand I have to

7 persuade Your Honor.

8 　　　　　THE COURT:  Yes, I understand all of that, but on

9 both ends, like, there's countervailing points that are being

10 made.  Number (1) is that the bond holders have been on the

11 phone, or have been involved, since the beginning.  That is

12 true.  And I'm not inclined -- and, well,  you guys already

13 agreed to it so I'm not going to say anything more.

14 　　　　　Number (2) is, though, that apparently for valid

15 reasons that you really haven't gotten the information that you

16 wanted t see yet and I will -- and I think, you know, with a

17 non-disclosure you should see it and that will be fine.

18 　　　　　So, I think this is a good way to address those

19 issues in a very limited period of time and allow the process

20 to work itself through a little bit.  But I'm going to consider

21 all the factors and I just have to remind everyone that this

22 is, you know, as I understand it, the deal is that whether the

23 reserve date gets extended -- reserve release date gets

24 extended or not and whether or not a challenge is filed -- I

25 guess this is to you, Mr. Hillman, and whether or not a

1  challenge is filed, the reserve is going to be released on

2  whatever date that is.  Was I clear on that?

3  　　　　MR. HILLMAN:  Allow me just to restate what I think

4  you've said.  In this hypothetical where there's an extension

5  of the June 25th challenge date, not until after July 4th, and

6  a challenge is met.  And there are very specific rules as to

7  what one must do to make a challenge.  And we're not going

8  anywhere near what those provisions in this final order say.

9  They say what they say and there's a very high standard and if

10 that standard is satisfied and if there is a challenge, you are

11 correct that there is -- the reserves no longer are forfeited

12 upon a challenge but they are going to be delayed.

13 　　　　THE COURT:  By whatever the extension is.

14 　　　　MR. HILLMAN:  We're talking about ten days here --

15 　　　　THE COURT:  Yes.  Yes.

16 　　　　MR. HILLMAN:  And I am very confident, and I'll just

17 say this and sit down, there won't be a challenge here and

18 we'll see what happens in the next ten days.

19 　　　　THE COURT:  Yes.  Well, you stole my thunder a little

20 bit because I don't think Mr. Feinstein and Mr. Sandler and

21 their team, or the debtors made what they felt was a bad or

22 unfair deal and I'm looking at this in a broad context, so, you

23 know, everyone will do what they have to do but I'm considering

24 all those things.

25 　　　　And by the way, it doesn't have to be a motion.  It

1  can be, like, a two or three page letter requesting the

2  extension and saying why and you can submit a two or three page

3  letter in response.  Or -- I'm not setting a limit, I'm just

4  saying it doesn't have to be a full-blown motion, you know, or

5  a hundred page order or anything like that.

6       It's just -- I'll keep it simple and anyone can

7  respond.  In other words, it sounds like there might be -- if

8  Mr. Glenn says I didn't get this from the Committee, then the

9  Committee might want to respond.  So, whoever needs to respond

10 will respond -- or, I didn't get this from the debtor -- I

11 don't know, whatever.

12      MR. HILLMAN:  Thank you, Your Honor, appreciate your

13 time.

14      THE COURT:  All right.

15      Mr. Glenn, are we good?

16      MR. GLENN:  Thank you.  Yes, Your Honor, thank you.

17      THE COURT:  We're good.  All right.  So, then we just

18 need a slightly revised order to reflect that small change but,

19 nonetheless, significant one and also a slight tweak in the

20 Texas order language.

21      MR. FIEDLER:  Great.  Thank you, Your Honor.  I think

22 that's it for today.

23      THE COURT:  Thanks so much.  Again, I'm repeating

24 myself, and I can't emphasize enough how much I appreciate all

25 the effort that must go into this by the parties and how you

87

1   are achieving this in a very professional and competent but

2   also arm's length matter that if I was every convinced that

3   parties are fully well represented and negotiating to the best

4   of their ability to get the best deal they can for the clients,

5   here we are.  This is the case.  Okay?

6          MR. FIEDLER:  Thank you, Your Honor.  We appreciate

7   that.

8          THE COURT:  Thank you very much.  Have a good

9   afternoon and we'll see you soon -- 22nd.

10                          * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

We, ALYCE H. STINE and MARY POLITO, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Mary Polito

MARY POLITO


/s/ Alyce H. Stine
ALYCE H. STINE

J&J COURT TRANSCRIBERS, INC.     DATE:  June 19, 2023