# EXHIBIT A

<u>**Execution Copy**</u>

## LEASE AGREEMENT

between

THE NATIONAL 1031 EXCHANGE CORPORATION
a California corporation

as Landlord

and

BED BATH & BEYOND INC.,
a New York corporation

as Tenant

# TABLE OF CONTENTS

Page

ARTICLE 1 .................................................................................................................................1

    1.1 Lease of Premises; Title and Condition ........................................................................1
    1.2 Use ................................................................................................................................3
    1.3 Terms ............................................................................................................................3
    1.4 Rent ..............................................................................................................................4

ARTICLE 2 .................................................................................................................................5

    2.1 Net Lease .....................................................................................................................5
    2.2 Taxes and Assessments; Compliance with Law ..........................................................6
    2.3 Liens ............................................................................................................................9
    2.4 Indemnification ...........................................................................................................9
    2.5 Maintenance and Repair ............................................................................................10
    2.6 Permitted Contests ....................................................................................................10

ARTICLE 3 ...............................................................................................................................11

    3.1 Procedure Upon Purchase .........................................................................................11
    3.2 Condemnation and Casualty .....................................................................................12
    3.3 Rejectable Offer ........................................................................................................14
    3.4 Rejection and Acceptance of Rejectable Offer .........................................................15
    3.5 Less than Major Condemnation or Casualty .............................................................16
    3.6 Insurance ...................................................................................................................20
    3.7 Alterations .................................................................................................................25
    3.8 Easements ..................................................................................................................28
    3.9 Right of First Offer ...................................................................................................30

ARTICLE 4 ...............................................................................................................................31

    4.1 Assignment and Subletting .......................................................................................31

ARTICLE 5 ...............................................................................................................................34

    5.1 Conditional Limitations; Default Provisions ............................................................34
    5.2 Bankruptcy or Insolvency .........................................................................................38
    5.3 Additional Rights of Landlord ..................................................................................41

ARTICLE 6 ...............................................................................................................................42

    6.1 Notices and Other Instruments .................................................................................42
    6.2 Estoppel Certificates, Financial Information ............................................................43

ARTICLE 7 ...............................................................................................................................45

    7.1 Environmental Covenant and Warranty ....................................................................45
    7.2 Environmental Indemnity ..........................................................................................50
    7.3 Notice ........................................................................................................................51
    7.4 Survival .....................................................................................................................51

ARTICLE 8 .................................................................................................................51

    8.1 Holdover ..........................................................................................................51

ARTICLE 9 .................................................................................................................51

ARTICLE 10 ...............................................................................................................51

    10.1  No Merger .....................................................................................................51
    10.2  Surrender .......................................................................................................52
    10.3  Merger, Consolidation or Sale of Assets ...................................................52
    10.4  Separability; Binding Effect .......................................................................54
    10.5  Table of Contents and Headings .................................................................54
    10.6  Counterparts .................................................................................................54
    10.7  Recording of Lease .....................................................................................54
    10.8  Rating of the Transaction ............................................................................54
    10.9  No Brokers ...................................................................................................55
    10.10 No Waiver, Amendments ..........................................................................56
    10.11 Governing Law .........................................................................................56
    10.12 Waiver of Jury Trial .................................................................................56
    10.13 Conveyance by Landlord ..........................................................................56
    10.14 Relationship of the Parties .......................................................................56
    10.15 Representation by Counsel ........................................................................56
    10.16 Access to Premises ...................................................................................57
    10.17 Showing ....................................................................................................57
    10.18 True Lease .................................................................................................57
    10.19 Landlord's Consent and Standards ...........................................................57
    10.20 Quiet Enjoyment ......................................................................................58
    10.21 [Reserved] ................................................................................................58
    10.22 Force Majeure ..........................................................................................58
    10.23 Certain Agreements ..................................................................................59

**Schedule A**- Premises
**Schedule B**- Permitted Exceptions
**Schedule C**- Primary Term and Extended Terms
**Schedule D**- Basic Rent
**Schedule E**- Stipulated Loss Values
**Schedule F**- **[Reserved]**
**Schedule G**- Make Whole Premium
**Schedule H**- Rate
**Schedule I**- Form of Subordination, Non Disturbance and Attornment Agreement
**Schedule J**- RVI Provisions
**Schedule K**- Upgrade Work

## INDEX OF DEFINITIONS

Section

| | |
|---|---|
| Acceptable Bond | 3.7(a)(iii) |
| Acceptable Letter of Credit | 3.5(b) |
| Additional Rent | 1.4(b) |
| Alterations | 3.7(a) |
| Appraiser | 3.7(a)(i) |
| Architect | 3.5(b) |
| Assignee | 5.2(d) |
| Assurance | 5.2(b)(ii) |
| Basic Rent | 1.4(a) |
| Broker | 10.9 |
| Business Day | 1.4(a) |
| Casualty | 3.2(a) |
| Compensation | 3.2(a) |
| Completion Date | 3.7(a)(xi) |
| Condemnation | 3.2(a) |
| CPI | 1.4(d) |
| Credit Enhancement Facility | 10.3 |
| Depository | 3.6(b) |
| Duff & Phelps | 3.5(b) |
| Eligible Bank | 3.5(b) |
| Environmental Claim | 7.1(h)(iv) |
| Environmental Laws | 7.1(a)(i) |
| Environmental Violation | 7.1(h)(iv) |
| Estimated Cost | 3.7(a) |
| Estimated Premiums | 3.6(b) |
| Event of Default | 5.1(a) |
| Existing Permitted Use | 1.2 |
| Extended Terms | 1.3 |
| Failure to Complete Payment | 3.3(b) |
| Failure to Complete Payment Date | 3.3(b) |
| Failure to Complete Rejectable Offer | 3.3(b) |
| Fitch | 3.5(b) |
| Force Majeure | 10.22 |
| Governmental Authority | 7.1(c) |
| Hazardous Substance | 7.1(a)(iii) |
| Impositions | 2.2(a) |
| Improvements | 1.1(a)(ii) |
| Indemnified Liabilities | 2.4(b) |
| Indemnified Party | 2.4(a) |
| Indenture | 3.6(c) |
| Indemnitee | 2.4(a) |

Investment Grade Rating ................................................................................................ 3.5(b)
Land ................................................................................................................ 1.1(a)(i)
Landlord ................................................................................................ Heading; 10.13
Late Charge ................................................................................................................ 1.4(b)
Lease ........................................................................................................................ Heading
Lease Termination Date ................................................................................................ 3.2(b)
Legal Requirements ...................................................................................................... 2.2(b)
Lender ............................................................................................................................ 3.6(c)
Liquidated Damages ...................................................................................................... 5.1(g)
Major Casualty ............................................................................................................... 3.2(b)
Major Condemnation ..................................................................................................... 3.2(b)
Make Whole Premium .................................................................................................. 3.1(b)
Material Alteration ........................................................................................................ 3.7(a)
Merger and Sale Conditions ......................................................................................... 10.3
Merger and Sale Event .................................................................................................. 10.3
Moody's .......................................................................................................................... 2.2(c)
Net Proceeds .................................................................................................................. 3.2(a)
Offer Price ...................................................................................................................... 3.9
Operative Documents .................................................................................................... 10.8(c)
Paying Agent .................................................................................................................. 1.4(a)(ii)
Payment Dates ............................................................................................................... 1.4(a)
Permitted Exceptions .................................................................................................... 1.1(a)(ii)
Person ............................................................................................................................. 3.8
Premises ......................................................................................................................... 1.1(a)
Primary Term ................................................................................................................. 1.3
Qualified Sublease ......................................................................................................... 4.1(b)
Qualified Sublessee ....................................................................................................... 4.1(b)
REMIC Opinion ............................................................................................................ 10.13
Rent ................................................................................................................................. 1.4(c)
Rate ................................................................................................................................. 1.4(b)
Rating Agencies ............................................................................................................. 3.5(b)
Regulated Activity ......................................................................................................... 7.1 (a)(iii)
Rejectable Offer ............................................................................................................. 3.3(a)
Related Document .......................................................................................................... 2.4
Remedial Work .............................................................................................................. 7.1 (c)
REMIC Opinion ............................................................................................................ 10.3
Responsible Officer ....................................................................................................... 3.2(b)
Restoration Cost ............................................................................................................ 3.5(a)
S&P ................................................................................................................................. 2.2(c)
Standby Letter of Credit ................................................................................................ 10.3
Stipulated Loss Value .................................................................................................... 3.3(a)
Structural Work .............................................................................................................. 3.7(a)
Tenant ............................................................................................................................. Heading
Tenant's Notice .............................................................................................................. 3.9
Tenant's Compensation ................................................................................................. 3.2(a)

Tenant's Personal Property ........................................................................... 1.1(a)(ii)
Term ...................................................................................................................... 1.3
Treasury Rate ..................................................................................................... 5.1(g)
Upgrade Work....................................................................................................... 3.7(a)
Work ..................................................................................................................... 3.7(a)

THIS LEASE AGREEMENT, dated as of June 30, 1999 (this "Lease"), is made and entered into between THE NATIONAL 1031 EXCHANGE CORPORATION, a California corporation (together with its successors and assigns, herein called "Landlord") having an address at 156 West Neal Street, Pleasanton, CA 94566, Attention: Naomi Nadeau, and BED BATH & BEYOND INC., a New York corporation (together with its successors and assigns, herein called "Tenant"), having an address at 650 Liberty Avenue, Union, New Jersey 07083.

ARTICLE 1

1.1    Lease of Premises; Title and Condition.

(a)    In consideration of the rents and covenants herein stipulated to be paid and performed by Tenant and upon the terms and conditions herein specified, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the premises (the "Premises") consisting of:

(i)    that certain parcel of land more particularly described on **Schedule A**, attached hereto and made a part hereof, together with all of Landlord's right, title and interest, if any, in and to (1) all easements, rights-of-way, appurtenances, and other rights and benefits now or hereafter belonging to said parcel of land, and (2) all public or private streets, roads, avenues, alleys, or passageways, open or proposed, on or abutting said parcel of land, and any award made or to be made in lieu thereof (collectively, the "Land"); and

(ii)    all buildings now or hereafter located on the Land, together with all plumbing, electrical, ventilating, heating, cooling, lighting and other utility systems, equipment, ducts and pipes attached to or comprising a part thereof (collectively, the "Improvements"). Notwithstanding anything to the contrary in the foregoing, the Premises shall not include trade fixtures (provided the same are not attached to the Premises in a manner that the same cannot be removed or severed from the Premises without causing material damage thereto), business machinery, equipment, motorized vehicles, tools, supplies and materials, security systems, cameras, inventory and other personal property and materials placed in or upon the Premises by or on behalf of Tenant or necessary for the operation of Tenant's business (such personal property being referred to collectively as the "Tenant's Personal Property"), which shall remain the property of Tenant.

The Premises are leased to Tenant in their present condition without representation or warranty by Landlord and subject to the rights of parties in possession, to the existing state of title and any state of facts which an accurate survey or physical inspection might reveal, to all applicable Legal Requirements (as hereinafter defined) now or hereafter in effect and to those matters listed in **Schedule B** (the "Permitted Exceptions").

(b)    Tenant has examined the Premises and title to the Premises and has found all of the same satisfactory for all purposes. Tenant acknowledges that Tenant is fully familiar with the physical condition of the Premises and that Landlord makes no representation or warranty, express or implied, with respect to same. THE LEASE OF THE PREMISES IS ON AN "AS IS" BASIS, IT BEING AGREED THAT TENANT WILL LEASE THE PREMISES IN

50112v18

ITS PRESENT CONDITION, WITH ALL FAULTS. LANDLORD HEREBY DISCLAIMS ANY AND ALL EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE RELATIVE TO THE PREMISES OR ANY COMPONENT PART THEREOF. Tenant acknowledges and agrees that no representations or warranties, express or implied, have been made by Landlord, or by any person, firm or agent acting or purporting to act on behalf of Landlord, as to (i) the presence or absence on or in the Premises of any particular materials or substances (including, without limitation, asbestos, hydrocarbons or hazardous or toxic substances), (ii) the condition or repair of the Premises or any portion thereof, (iii) the value, expense of operation or income potential of the Premises, (iv) the accuracy or completeness of any title, survey, structural reports, environmental audits or other information provided to Tenant by any third party contractor relative to the Premises (regardless of whether the same were retained or paid for by Landlord), or (v) any other fact or condition which has or might affect the Premises or the condition, repair, value, expense of operation or income potential thereof. Tenant represents that the officers of Tenant are knowledgeable and experienced in the leasing of properties comparable to the Premises and agrees that Tenant will be relying solely on Tenant's inspections of the Premises in leasing the Premises. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION BY LANDLORD OF, AND LANDLORD DOES HEREBY DISCLAIM, ANY AND ALL WARRANTIES BY LANDLORD, EXPRESS OR IMPLIED, WITH RESPECT TO THE PREMISES OR ANY PORTION THEREOF, WHETHER ARISING PURSUANT TO THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT OR OTHERWISE, AND TENANT HEREBY ACKNOWLEDGES AND ACCEPTS SUCH EXCLUSION, NEGATION AND DISCLAIMER.

Tenant hereby fully and forever releases and discharges Landlord, and Landlord's officers, employees and agents, of and from any and all claims, demands, agreements, contracts, covenants, actions, suits, causes of action, obligations, controversies, debts, costs, expenses, accounts, damages, judgments, losses and liabilities, of whatsoever kind or nature, in law, equity or otherwise, whether known or unknown, whether asserted or unasserted, whether or not concealed or hidden which Tenant has had, may have had or now has in connection with or arising out of the delivery of the Premises to Tenant under the terms of the Lease, including but not limited to any claims regarding late delivery or defects in the condition of the Premises.

IT IS EXPRESSLY UNDERSTOOD that Section 1542 of the Civil Code of California provides as follows:

"1542. A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

50112v18                                    2

Except as provided hereinabove and without limitation or diminution of such provisions, the provisions of said Section 1542 of the Civil Code of California ARE HEREBY WAIVED by Tenant and Tenant acknowledges that this waiver is an essential term of this Agreement without which Landlord would not have executed this Agreement.

1.2    <u>Use</u>.    Tenant may use the Premises as a retail store and for any other lawful purpose so long as such other lawful purpose would not (i) materially increase (when compared to use as a retail store) the likelihood that Tenant, Landlord or Lender (if any) would incur liability under any provisions of any Environmental Laws, (ii) result in or give rise to any material environmental deterioration or degradation of the Premises, or (iii) be in violation of any Legal Requirement.    In no event shall the Premises be used for any purpose which would constitute a public or private nuisance or waste or which would violate any of the provisions of any Permitted Exceptions, any Legal Requirements or any policies required to be carried pursuant to Section 3.6 hereof (the "<u>Insurance Requirements</u>").    Tenant agrees that with respect to the Permitted Exceptions and any covenants, restrictions or agreements hereafter created by or consented to by Tenant in writing, Tenant shall observe, perform and comply with and carry out the provisions thereof required therein to be observed and performed by Landlord or the owner of the Premises.    Tenant shall not be required to occupy, or operate its business on, the Premises.

Subject to Tenant's rights under Section 2.6 hereof, Tenant shall not permit any unlawful occupation, business or trade to be conducted on the Premises or any use to be made thereof contrary to applicable Legal Requirements or Insurance Requirements.    Subject to Tenant's rights under Section 2.6, Tenant shall not use, occupy or permit the Premises to be used or occupied, nor do or permit anything to be done in or on the Premises, in a manner which would (i) make void or voidable any insurance which Tenant is required hereunder to maintain (or cause to be maintained) then in force with respect to any of the Premises, (ii) adversely affect the ability of Tenant to obtain any insurance which Tenant is required to furnish (or cause to be furnished) hereunder, (iii) cause any injury or damage (other than to a de minimis extent) to any of the Improvements, fixtures or personalty unless pursuant to Alterations permitted under Section 3.7 hereof, or (iv) violate any certificate of occupancy or equivalent certificate issued with respect to or affecting the Premises.

1.3    <u>Terms</u>.    The Premises are leased for a primary term commencing on the date hereof and ending on January 31, 2022 (the "<u>Primary Term</u>"), and, at Tenant's option, for up to six additional five year terms (each, an "<u>Extended Term</u>"), unless and until the term of this Lease shall expire or be terminated pursuant to any provision hereof.    The Primary Term and each Extended Term (sometimes, collectively, the "<u>Term</u>") shall commence and expire on the dates set forth in **Schedule C**.    So long as no Event of Default shall have occurred and be continuing, Tenant may elect to exercise its option to extend the term of this Lease for an Extended Term by giving notice thereof to Landlord not less than two years prior to the expiration of the then existing Term; provided, however, that Tenant shall not forfeit its right to exercise an option with respect to an Extended Term for failure to timely give such notice of exercise unless Tenant fails to give such notice of exercise within thirty days after Tenant receives notice from Landlord advising Tenant of its failure to timely give such notice of exercise; provided, further, that

however, in any event, failure of Tenant to give such notice on or prior to the applicable expiration date of the then existing Term shall cause the option to expire. Each notice of election to extend the term of this Lease given in accordance with the provisions of this Section 1.3 shall automatically extend the term of this Lease for the Extended Term selected, without further writing; provided, however, either party, upon request of the other, shall execute and acknowledge, in form suitable for recording, an instrument confirming any such extension. Each Extended Term shall be upon the same terms as provided in this Lease for the Primary Term, except as otherwise stated herein. Tenant shall not be entitled to extend the Term of this Lease for any Extended Term unless Tenant shall have extended the Term of this Lease for the preceding Extended Term, if any.

      1.4    Rent.

      (a)    (i) During the Term, Tenant shall pay to Landlord by federal funds wire transfer in immediately available funds as basic rent for the Premises in advance on the date of execution and delivery of this Lease, $1,909.60, and thereafter the amounts set forth in **Schedule D-1** (collectively, the "Basic Rent") on the dates set forth therein (the "Payment Dates"), to such account or to such address or to such person as Landlord from time to time may designate in writing. The Basic Rent for the Extended Terms is set forth on **Schedule D-2**. If any Payment Date falls on a day which is not a Business Day, the Basic Rent due and payable on such date shall be due and payable on the next succeeding Business Day without interest or penalty if paid on such succeeding Business Day and such day shall be deemed the Payment Date. A "Business Day" is defined as any day other than a Saturday or Sunday or other day on which banks in New York, New York are authorized or required to be closed.

      (ii)    Landlord acknowledges and agrees that, for administrative purposes, Tenant has designated BBBY Management Corporation (the "Paying Agent") to make all Basic Rent payments (and, at Tenant's election, any Additional Rent) due to Landlord under this Lease on behalf of Tenant. All acts or omissions of Paying Agent shall be deemed attributable to Tenant and Tenant shall be fully liable therefor under this Lease or otherwise. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to Paying Agent. Paying Agent shall derive no rights or benefits under this Lease, nor shall Landlord have any right to bring any actions against Paying Agent, and Paying Agent shall have no liability to Landlord for any obligation whatsoever (including, without limitation, the obligation to pay Rent). All payments of Rent received by Landlord from Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

      (b)    All taxes, costs, expenses and other amounts which Tenant is required to pay pursuant to this Lease (other than Basic Rent), together with every charge, interest and cost which may be added for non-payment or late payment thereof, shall constitute additional rent ("Additional Rent"). If Tenant shall fail to pay any such Additional Rent when the same shall become due, Landlord shall have all rights, powers and remedies with respect thereto as are provided herein or by law in the case of non-payment of any Basic Rent and shall, except as expressly provided herein, have the right to pay the same on behalf of Tenant. Tenant shall pay

to Landlord interest at a rate (the "Rate") as described in <u>Schedule H</u> (but in no event shall the Rate exceed the maximum amount permitted by law), on all overdue Basic Rent and with respect to any Additional Rent required to be paid to Landlord, Lender or any Indemnified Party, as applicable, Additional Rent from the due date thereof (determined as if there were no grace period permitted under Section 5.1(a)(i)) until paid by Tenant. In addition, if Tenant fails to make any payment of Basic Rent or Additional Rent to Landlord on the date on which payment is due, Tenant shall pay a late charge equal to five percent of the amount past due (determined as if there were no grace period permitted under Section 5.1(a)(i)) (the "Late Charge").   Tenant shall perform all its obligations under this Lease at its sole cost and expense, and shall pay all Basic Rent and Additional Rent when due and payable, without offset, notice or demand.

(c)   All Basic Rent and Additional Rent shall be payable in U.S. dollars and shall, individually and collectively, constitute "Rent" payable to Landlord hereunder.

(d)   Any reference herein to an amount being adjusted for CPI changes shall mean that such amount shall be increased or decreased, as the case may be, to reflect percentage increases or decreases, as the case may be, to the CPI published with respect to the calendar month in which this Lease is executed and delivered.   "CPI" shall mean the Consumer Price Index published by the Bureau of Labor Statistics of the United States Department of Labor for "All Urban Consumers" in the table entitled "Consumer Price Index: United States City Average", All Items (1982-84=100), or any successor index thereto, for the month and year in question.   In the event that the CPI is converted to a different standard reference base or otherwise revised, the determinations to be made based on the CPI pursuant hereto shall be made with the use of such conversion factor, formula or table for converting the CPI as may be published by the Bureau of Labor Statistics or, if not so published, then with the use of such conversion factor, formula or table as may be published by Prentice-Hall, Inc. or any other nationally recognized publisher of similar statistical information, or if a conversion factor, formula or table is unavailable, Landlord and Tenant shall agree on another method to adjust the CPI or any successor thereto.

ARTICLE 2.

2.1   <u>Net Lease</u>.

(a)   This Lease is an absolutely net lease and, any present or future law to the contrary notwithstanding, shall not terminate except as otherwise expressly provided in Sections 3.2(b), 3.4, 3.9 and 5.1(i), nor shall Tenant be entitled to any abatement, reduction, diminution, set-off, counterclaim, defense or deduction with respect to any Basic Rent or Additional Rent, nor shall the obligations of Tenant hereunder be affected, by reason of: any damage to or destruction of the Premises or any portion thereof (except as specifically provided in Article 3); any defect in the condition, design, operation or fitness for use of the Premises or any portion thereof; any taking of the Premises or any part thereof by condemnation or otherwise (except as specifically provided in Article 3); any prohibition, limitation, interruption, cessation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises, or any interference with such use, occupancy or enjoyment by any person; any eviction by paramount title or otherwise

(except as specifically provided in Article 3); any default by Landlord hereunder or under any other agreement; the impossibility or illegality of performance by Landlord, Tenant or both; any action of any governmental authority (including, without limitation, changes in Legal Requirements) (except as specifically provided in Article 3); construction on or renovation of the Premises or any portion thereof; or any failure in the Premises to comply with Legal Requirements, or any other cause whether similar or dissimilar to the foregoing. All costs, expenses and obligations of every kind and nature whatsoever relating to the Premises (except the loan secured by the Indenture) and the appurtenances thereto and the use and occupancy thereof which may arise or become due and payable with respect to the period which ends on the expiration or earlier termination of the Term in accordance with the provisions hereof (whether or not the same shall become payable during the Term or thereafter) shall be paid by Tenant except as otherwise expressly provided herein. It is the purpose and intention of the parties to this Lease that the Basic Rent and Additional Rent due hereunder shall be absolutely net to Landlord and that this Lease shall yield, net to Landlord, the Basic Rent and Additional Rent provided in this Lease. The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated pursuant to an express provision of this Lease.

(b)     Tenant shall remain obligated under this Lease in accordance with its terms and shall not take any action to terminate, rescind or avoid this Lease, notwithstanding any bankruptcy, insolvency, reorganization, liquidation, dissolution or other proceeding affecting Landlord or any action with respect to this Lease which may be taken by any trustee, receiver or liquidator or by any court.

(c)     Except as otherwise expressly provided in Sections 3.2(b), 3.4, 3.9 and 5.1(i), Tenant waives all rights to terminate or surrender this Lease, or to any abatement or deferment of Basic Rent or Additional Rent.

2.2     Taxes and Assessments; Compliance with Law.

(a)     (i)     Subject to the provisions of Section 2.6 hereof relating to contests and Section 2.2(a)(ii) below, Tenant shall, before interest or penalties are due thereon, pay and discharge (all of the following being herein collectively called the "Impositions"): all taxes of every kind and nature (including real, *ad valorem*, personal property, gross income, franchise, withholding, profits and gross receipts taxes) on or with respect to the Premises; all charges and/or taxes for any easement or agreement maintained for the benefit of the Premises, all general and special assessments, levies, permits, inspection and license fees on or with respect to the Premises; all water and sewer rents and other utility charges on or with respect to the Premises; and all other public charges and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, imposed or assessed upon or with respect to the Premises, prior to or during the Term against Landlord, Tenant or any of the Premises as a result of or arising in respect of the occupancy, leasing, use, maintenance, operation, management, repair or possession thereof, or any activity conducted on the Premises, or the Basic Rent or Additional Rent, including without limitation, any gross income tax, sales tax, occupancy tax or excise tax levied

by any governmental body on or with respect to such Basic Rent or Additional Rent.  If received by Landlord, Landlord shall promptly deliver to Tenant any bill or invoice with respect to any Imposition.

(ii)      Nothing herein shall obligate Tenant to pay, and the term "Impositions" shall exclude, federal, state, or local (A) transfer taxes as the result of a conveyance by (or suffered by) Landlord (except any such taxes as a result of a purchase of the Premises by Tenant pursuant to the provisions hereof), (B) franchise, capital stock or similar taxes if any, of Landlord, (C) net income, withholding, profits, excess profits or other taxes, if any, imposed on Landlord, in each case, determined on the basis of or measured by its net income, or (D) any estate, inheritance, succession, gift, capital levy or similar taxes, unless the taxes referred to in clauses (B) and (C) above are in lieu of or a substitute for any other tax or assessment upon or with respect to any of the Premises which, if such other tax or assessment were in effect at the commencement of the Term, would be payable by Tenant.  In the event that any assessment against any of the Premises may be paid in installments, Tenant shall have the option to pay such assessment in installments; and in such event, Tenant shall be liable only for those installments which become due and payable during the Term.  Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Impositions.  Tenant shall deliver to Landlord and Lender (if any), (i) within twenty (20) days after Landlord's or Lender's written request therefor, copies of all statements and notices pertaining to the Impositions which may be issued by any governmental authority and (ii) subject to Tenant's right to contest as set forth in Section 2.6, within thirty (30) days after the due date for payment thereof, receipts for payments of all Impositions payable during the Term.

(b)      Subject to Tenant's right to contest as set forth in Section 2.6, Tenant shall comply with and cause the Premises to comply with, shall use the Premises in accordance with, and shall assume all obligations and liabilities with respect to, (i) all laws, ordinances and regulations, and other governmental rules, orders and determinations presently in effect or hereafter enacted, made or issued, both foreseen and unforeseen and ordinary and extraordinary applicable to the Premises or the ownership, operation, use or possession thereof and (ii) all contracts (including, but not limited to, insurance policies required to be maintained by Tenant hereunder (including, without limitation, to the extent necessary to prevent cancellation thereof and to ensure full payment of any claims made under such policies), but excluding any residual value insurance policy maintained with respect to the Premises), agreements, covenants, conditions and restrictions now or hereafter applicable to the Premises or the ownership, operation, use or possession thereof, including but not limited to all such contracts, agreements, covenants, conditions and restrictions which require structural, unforeseen or extraordinary changes (collectively, "Legal Requirements").  So long as no Event of Default has occurred and is continuing, Landlord shall not enter into or affirmatively consent to in writing unless requested by Tenant any such contract, agreement, covenant, condition or restriction affecting the Premises or binding on Tenant without obtaining Tenant's prior written consent (not to be unreasonably withheld, conditioned or delayed).

(c)      Anything contained herein to the contrary notwithstanding, at any time (x) after the occurrence of any Event of Default or (y) if Tenant's long-term senior unsecured debt

obligations are then rated by one or more Rating Agencies and such rating is below BB+ (with respect to S&P, Fitch or Duff & Phelps) or Ba1 (with respect to Moody's), Tenant agrees that upon Landlord's request it shall deposit with Landlord or, if directed by Landlord, to Lender or Lender's designee, as depository (the long term senior unsecured debt obligations of which shall be rated at least "BBB" by Standard & Poor's Rating Group ("S&P") or "Baa2" by Moody's Investors Service Inc. ("Moody's") (such depository, a "Depository")), (and Landlord hereby irrevocably directs Tenant to make such deposits with Lender or Lender's designee as long as the Indenture shall remain outstanding) on each Payment Date, as Additional Rent, one twelfth (1/12) of all Impositions (which, for the purposes of this Section shall exclude transfer, recording and stamp taxes) for the Premises for the year then in effect as reasonably estimated by Landlord. To the extent permitted by applicable law, the Depository shall not be required to maintain such amounts in an account separate from other funds of such party or to deposit any such amounts in an interest-bearing account, provided, however, in the event such amounts are maintained in an interest bearing account and no Event of Default shall have occurred and be continuing hereunder, Tenant shall be entitled to receive the interest earned thereon on a quarterly basis in excess of such Depository's fees. At Landlord's or Lender's written request, Tenant shall deposit with Depository, prior to the date which is thirty days prior to the due date of any Imposition, such additional amount as may be necessary to provide Depository with sufficient funds in such deposit account to pay each such charge at least thirty days in advance of the due date thereof. Depository shall apply the aforesaid deposits for such purpose not later than the last day on which any such charges may be paid without penalty or interest (and shall, at Tenant's request, advise Tenant with respect thereto). If, at any time, the amount of any Imposition is increased or Landlord or Lender receives written notice that such Imposition will be increased, and if the monthly deposits then being made by Tenant for this purpose (if continued) would not make up a fund sufficient to pay such Imposition thirty days prior to the due date, said monthly deposits thereupon shall be increased and Tenant shall, promptly upon receipt of demand therefor, deposit with the Depository, on demand, sufficient moneys so that the moneys then on hand for the payment of said Imposition, plus the increased payments and such additional sums demanded, shall be sufficient so that the Depository shall have received from Tenant adequate amounts to pay such Imposition at least thirty days before such Imposition becomes due and payable. For the purpose of determining whether the Depository has on hand sufficient moneys to pay any particular Imposition at least thirty days prior to the due date therefor, deposits for different categories of Impositions shall be treated collectively, it being the intention that the Depository may apply deposits made for any particular Imposition for the payment of the same or for any other Imposition (and, as a result thereof, the Depository may use moneys deposited for the payment of an item not yet due and payable to the payment of an item that is due and payable). Depository may, if Tenant fails to make any deposit required hereunder, apply deposits made for any one Imposition for the payment of the same, any other Imposition or any outstanding Basic Rent or Additional Rent. If this Lease shall be terminated by reason of any Event of Default, all deposits then held by the Depository shall be applied on account of any and all sums due under this Lease and Tenant shall forthwith pay the resulting deficiency in accordance with the terms hereof. If Landlord ceases to have any interest in the Premises, subject to the Indenture, Landlord shall direct the Depository to transfer to the person or entity who owns or acquires such interest in the Premises and is the transferee of Landlord's interest in this Lease, the deposits made pursuant to the provisions hereof. In addition, in the event that Lender (or a servicing agent on

Lender's behalf) is the Depository, Lender shall have the right to transfer the deposits (or to cause its servicing agent to transfer such deposits) to any transferee of the Indenture or to the holder of any substitute Indenture. Upon any such transfer of the deposits and notice thereof to Tenant, the transferor shall be deemed to be released from all liability with respect thereto and Tenant agrees to look to the transferee solely with respect thereto, and the provisions hereof shall apply to each successive transfer of the said deposits.

2.3    Liens. Subject to Tenant's right to contest as set forth in Section 2.6, Tenant will within 30 days after obtaining knowledge thereof, remove and discharge any charge, lien, security interest or encumbrance upon the Premises or any Basic Rent or Additional Rent payable hereunder which arises for any reason, including all liens which arise out of the possession, use, occupancy, construction, repair or rebuilding of the Premises or by reason of labor or materials furnished or claimed to have been furnished to Tenant or for the Premises, but not including (i) the Permitted Exceptions, and (ii) any mortgage, charge, lien, security interest or encumbrance created by, or attributable solely to, Landlord without the consent of, or other than at the request of, Tenant (it being agreed that the Indenture, for purposes of this sentence, will be deemed to have been created without the consent of Tenant). Nothing contained in this Lease shall be construed as constituting the consent or request of Landlord, express or implied, to or for the performance by any contractor, laborer, materialman, or vendor of any labor or services or for the furnishing of any materials for any construction, alteration, addition repair or demolition of or to the Premises or any part thereof. Notice is hereby given that Landlord will not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding an interest in the Premises or any part thereof through or under Tenant, and that no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to the Premises.

2.4    Indemnification.

(a)    Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and any Lender and their respective members, managers (and members and managers thereof) and the directors, officers, employees, servants and agents of each thereof (each, an "Indemnitee" or an "Indemnified Party") from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising from the Premises or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of the Premises, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon, whether or not such Indemnitee has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said injury, death, loss, damage or other claim; except to the extent that any such liability, loss, damage, penalty, cost, expense, cause of action, suit, claim, demand or judgment is the result of the gross negligence of such Indemnitee or the intentional wrongful act of such Indemnitee provided Tenant shall have the burden of proving such gross negligence or intentional wrongful act. In case any action or proceeding is brought against an Indemnitee by reason of any such claim against which Tenant has agreed to defend, pay, protect, indemnify, save and hold harmless pursuant to the preceding

sentence, Tenant covenants upon notice from such Indemnitee to resist or defend such Indemnitee in such action, with the expenses of such defense paid by Tenant, and such Indemnitee will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant.

(b)    The obligations of Tenant under this Section 2.4 shall survive any termination of this Lease.

2.5    Maintenance and Repair.

(a)    Tenant at its own expense, will maintain all parts of the Premises in good repair and condition in all material respects, except for ordinary wear and tear and, except as permitted pursuant to Sections 3.2, 3.5 and 3.7, and will take all action and will make all structural and non-structural, foreseen and unforeseen and ordinary and extraordinary changes, repairs and replacements which may be required to keep all parts of the Premises in good repair and condition in all material respects. Tenant shall do or cause others to do all shoring of the Premises or of the foundations and walls of the Improvements and every other act necessary or appropriate for preservation and safety thereof, by reason of or in connection with any excavation or other building operation upon the Property, and Landlord shall have no obligation to do so. Landlord shall not be required to maintain, repair or rebuild all or any part of the Premises. Tenant waives the right to (i) require Landlord to maintain, repair or rebuild all or any part of the Premises, or (ii) make repairs at the expense of Landlord pursuant to any Legal Requirement.

(b)    Subject to Section 2.6, in the event that all or any part of the Improvements shall encroach upon any property, street or right-of-way adjoining or adjacent to the Premises, or shall violate any Legal Requirement, or shall hinder, obstruct or impair any easement or right-of-way to which the Premises is subject, then, upon written request of Landlord (unless such encroachment, violation, hindrance, obstruction or impairment is a Permitted Exception or is imposed by Landlord subsequent to the date hereof without the consent of Tenant) or of any person so affected, Tenant shall, at its expense, either (i) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting therefrom, or (ii) make such changes, including alteration or removal, to the Improvements and take such other action as shall be necessary to remove or eliminate such encroachments, violations, hindrances, obstructions or impairments, provided that, if Landlord's consent is required for such changes pursuant to this Lease, Landlord's consent shall have been obtained, which consent shall not be unreasonably withheld, conditioned or delayed.

2.6    Permitted Contests.

(a)    After prior written notice to Landlord and only so long as no Event of Default has occurred and is continuing, Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement or (iii) discharge or remove any lien or encumbrance so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (A) the commencement of enforcement action relating to, the collection of, or other realization

50112v18                                        10

upon, the Imposition or lien or encumbrance so contested, including with respect to the matters described in clause (B) below (provided that Tenant shall be entitled to bond, discharge or otherwise remove such Imposition, lien or encumbrance within five days after the commencement of such enforcement action), (B) the sale, forfeiture or loss (or the institution of any proceedings to accomplish the same) of any portion of the Premises, any Basic Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement, (C) any interference with the use or occupancy of any of the Premises, (D) any interference with the payment of any Basic Rent or any Additional Rent and (E) the cancellation of any fire or other insurance policy.

(b)    In no event shall Tenant pursue any contest with respect to any Imposition, Legal Requirement, lien, or encumbrance, referred to above in such manner that exposes Landlord or any Lender to (i) criminal liability, penalty or sanction, (ii) any liability for damages, civil liability, penalty or sanction for which Tenant has not made provisions reasonably acceptable to Landlord and Lender (it being agreed that, in the case of this clause (ii), if Tenant has an Investment Grade Rating from each Rating Agency then rating Tenant, no Event of Default has occurred and is continuing, and the amount of the applicable liability, penalty or action does not exceed $250,000 (inclusive of interest, if any), Tenant shall be deemed to have made such provision) or (iii) defeasance of its interest in the Premises.

(c)    Tenant agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, have the right to attempt to settle or compromise such contest through negotiations.  Tenant shall pay and save Lender and Landlord harmless against any and all losses, judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.

## ARTICLE 3.

3.1    Procedure Upon Purchase.

(a)    If Tenant shall purchase the Premises or any portion thereof pursuant to the provisions of this Lease, upon payment in full of all sums due hereunder, Landlord shall convey or cause to be conveyed title thereto, the state of which shall be as good as the state of title which existed in Landlord with respect to Landlord's interests in the Premises on the date on which this Lease commenced, except for liens and encumbrances created by, through, under or with the consent of Tenant, and Tenant or its designee shall accept such title, subject, however, to the condition of the Premises on the date of purchase, the Permitted Exceptions, all liens and encumbrances created by, through, under or with the consent of Tenant and all applicable Legal Requirements, and free of the lien of the Indenture (or subject to the lien of the Indenture, as applicable herein) and free of liens, and encumbrances and other matters of title resulting from acts of Landlord taken without the consent of Tenant.

(b)    Upon the date fixed for any purchase of any interests in the Premises or any portion thereof hereunder, Tenant shall, by wire transfer of immediately available funds, pay to Landlord, at the address or the account to which Basic Rent is then being paid (or such other place or account in the United States which Lender, or if there is no Lender, Landlord may direct in writing), the purchase price therefor specified herein (including Make Whole Premium, if applicable), together with all Basic Rent, Additional Rent and, in the case of a purchase pursuant to Section 3.3(a) the Make Whole Premium, if applicable, then due and payable hereunder to and including such date of purchase, and there shall be delivered to Tenant a good and sufficient grant deed, assignment of ground lease and such other instrument or instruments as may be appropriate, which shall transfer all of Landlord's interest in the Premises then required to be conveyed to Tenant hereunder, and any other instruments necessary to convey the title thereto described in Section 3.1(a) and to assign any other property then required to be assigned by Landlord pursuant hereto. In addition, on the date fixed for purchase, Landlord shall deliver or cause to be delivered to Tenant all Net Proceeds. All such transfer and assignment documentation shall be reasonably acceptable to Tenant.  Tenant shall pay, on an after-tax basis, (i) all Landlord's reasonable out-of-pocket charges incident to such conveyance and assignment, including, without limitation, reasonable counsel fees, escrow fees, recording fees, title insurance premiums, transfer taxes and all other applicable taxes (other than any income, franchise or related taxes of Landlord) which may be imposed by reason of such conveyance and assignment and the delivery of said deed or conveyance and other instruments (ii) all reasonable and customary costs and expenses incurred by Landlord and any Lender in connection with a defeasance or prepayment, as the case may be, of all or any portion of the indebtedness secured by the Indenture, including, without limitation, reasonable attorneys' fees and expenses of Landlord, Lender and the Rating Agencies, any revenue, documentary stamp or intangible taxes, or any other tax or charge due in connection with the transfer or creation of the note or notes which evidence the indebtedness secured by the Indenture or the defeased indebtedness (but in no event any income, franchise or related taxes payable by said parties), and (iii) all customary costs and expenses associated with the release or assignment of the lien of the Indenture, as applicable. Upon the completion of any purchase of Landlord's entire interest in the Premises as provided herein (but not of any lesser interest) but not prior thereto (whether or not any delay or failure in the completion of such purchase shall be the fault of Landlord), this Lease shall, unless Tenant otherwise elects in accordance with the provisions hereof, terminate, except with respect to obligations and liabilities of Tenant hereunder, actual or contingent, which have arisen on or prior to such completion of purchase. "Make Whole Premium" shall have the meaning set forth in Schedule G hereto.  At such time as Landlord receives a calculation of the applicable Make Whole Premium, Landlord shall give notice thereof to Tenant.

3.2    Condemnation and Casualty.

(a)    General Provisions.  Subject to the further provisions of Section 3.1, this Section and Section 3.5, Tenant hereby irrevocably assigns to Landlord any award, compensation or insurance payment to which Tenant may become entitled by reason of Tenant's interest in the Premises (i) if the use, occupancy or title of the Premises or any part thereof is taken, requisitioned or sold in, by or on account of any actual or threatened eminent domain proceeding or other action by any person having the power of eminent domain ("Condemnation") or (ii) if

the Premises or any part thereof is damaged or destroyed by fire, flood or other casualty ("Casualty"). Any such irrevocable assignment to Landlord of any award, compensation or insurance payment with respect to a Casualty shall exclude all awards and payments made to Tenant under Tenant's leasehold title insurance policy, Tenant's insurance for its Personal Property, Tenant's insurance with respect to business interruption (provided Tenant is separately maintaining a rental loss insurance policy for the benefit of Landlord and Lender as required by this Lease) and all awards based on Tenant's goodwill or any other award based upon items other than the Premises provided that any such awards or payments to be made to Tenant shall not reduce any award, compensation or insurance otherwise payable to Landlord (such excluded awards and payments to Tenant being collectively referred to herein as "Tenant's Compensation"). "Compensation" shall mean all awards, compensations, and insurance payments (including any right to receive any of the foregoing) on account of any Condemnation or Casualty, other than Tenant's Compensation. All Compensation so received by Landlord shall be held in a segregated account maintained in a Depository. In the event of any Casualty, or in the event of a Condemnation or threatened Condemnation, Tenant shall give prompt notice thereof to Landlord and any Lender (which notice shall set forth Tenant's good faith estimate of the cost of repairing or restoring any damage or destruction caused thereby), or, if Tenant cannot reasonably estimate the anticipated cost of restoration, Tenant shall nonetheless give Landlord and any Lender prompt notice of the occurrence of any such Casualty or Condemnation, and will diligently proceed to obtain estimates to enable Tenant to quantify the anticipated cost of such restoration, whereupon Tenant shall promptly notify Landlord of such good faith estimate. Landlord may, if it reasonably so elects, participate in any such proceeding or action to negotiate, prosecute and adjust any claim for any Compensation, and Landlord shall collect any such Compensation. Tenant shall pay all reasonable costs and expenses in connection with each such proceeding, action, negotiation, prosecution and adjustment. Notwithstanding Landlord's right to participate therein, (x) Tenant shall initiate and conduct any such proceeding, action, negotiation, prosecution or adjustment and Tenant may settle any such insurance claims of less than $350,000 (as adjusted for CPI changes, but not above $500,000); provided that no Event of Default shall have occurred and be continuing (in which Landlord or Lender, as the case may be, shall exclusively settle insurance claims). With respect to any insurance claim (x) equal to or greater than $350,000 (as adjusted for CPI changes, but not above $500,000), or (y) arising during any period when an Event of Default has occurred and is continuing, Landlord shall have the sole right to conduct any such proceeding, actions, negotiations, prosecutions and adjustments in good faith with a view to maximizing the settlement amount, provided Landlord shall not settle a claim in excess of $350,000 (as adjusted for CPI changes, but not above $500,000) without Tenant's consent, not to be unreasonably withheld. Lender may exercise the rights set forth above on Landlord's behalf so long as the lien of the Indenture is outstanding. In the event Tenant receives conflicting notices from Landlord and Lender, Tenant shall be able to rely on Lender's notice. In addition, Tenant, at its option, may prosecute a separate claim against any taking authority, or join with Landlord in its proceeding against any taking authority, for recovery of Tenant's Compensation, so long as any recovery by Tenant shall be separately stated and shall not diminish the award to Landlord. All Compensation shall be applied pursuant to the applicable provisions of Article 3, and all such Compensation (less the reasonable costs and expenses of Landlord, Tenant and Lender, if applicable, in collecting such Compensation), is herein called the "Net Proceeds".

(b)     Major Condemnation and Major Casualty. If a Condemnation or Casualty shall affect all or a substantial portion of the Premises and (x) shall, in Tenant's good faith business judgment, render the Premises unsuitable for restoration in accordance with the terms hereof for continued use and occupancy in Tenant's business, or (y) the Improvements cannot be restored on the Premises in all material respects in accordance with Section 3.5 (by reason of a Condemnation, zoning changes or otherwise) (herein, a "Major Casualty" or a "Major Condemnation", as the case may be), then Tenant shall, not later than thirty days after such Major Condemnation or Major Casualty, as the case may be, deliver to Landlord (i) notice of its intention to terminate this Lease on the next Payment Date (the "Lease Termination Date") which occurs not less than 120 days and not more than 150 days after the delivery of such notice (it being understood that in all events under this Lease, the Lease Termination Date must be the first Business Day of a calendar month), (ii) a certificate of Tenant (signed by the president, the chief financial officer or the treasurer of Tenant or the senior executive officer of Tenant in charge of managing Tenant's real estate (herein, a "Responsible Officer"), in either case on behalf of Tenant and not in his or her individual capacity, which certificate (A) describes the event(s) giving rise to the Major Casualty or Major Condemnation, as the case may be, and (B) states that Tenant's board of directors has determined that such event has rendered the Premises unsuitable for restoration in accordance with the terms hereof for continued use and occupancy in Tenant's business, and (iii) documentation to the effect that termination of this Lease will not be in violation of any agreement then in effect with which Tenant is obligated to comply pursuant to this Lease. If the Lease Termination Date occurs during the Primary Term, such notice must be accompanied by a Rejectable Offer, as described in Section 3.3, in which event the provisions of such Section shall be controlling.

3.3     Rejectable Offer.

(a)     In the event of a Major Casualty or Major Condemnation during the Primary Term, Tenant shall deliver to Landlord, together with the notice and other items required to be delivered by Tenant pursuant to Section 3.2(b), an irrevocable rejectable written offer (the "Rejectable Offer") to purchase Landlord's interest in the Premises on the Lease Termination Date for a price equal to the "Stipulated Loss Value" computed in accordance with **Schedule E** attached hereto, plus all other amounts (if any) due and owing to Landlord or Lender by reason of default by Tenant in complying with its obligations under this Lease. Within 90 days after the date Landlord receives such offer, Landlord shall deliver notice of its election to either accept or reject the Rejectable Offer (with a failure to respond during such period constituting an acceptance of such Rejectable Offer (it being agreed that, in such case, no acceptance by Lender or any other party shall be required). Any rejection by Landlord of a Rejectable Offer shall comply with and be accomplished in accordance with the provisions of Section 3.4. In the event of an acceptance or deemed acceptance of a Rejectable Offer, on the applicable Lease Termination Date, Landlord's interest in the Premises shall be conveyed to Tenant or its designee pursuant to Section 3.1. If an Event of Default has occurred and is continuing at the time of the Rejectable Offer or on the Lease Termination Date, the Make Whole Premium shall be due hereunder.

(b)    In the event Tenant fails to complete the Upgrade Work (as defined herein) in accordance with Section 3.7(a) by the Completion Date (including, without limitation, delivery of all the documents required thereby), Tenant shall, on the Completion Date, deliver to Landlord an irrevocable rejectable written offer (the "Failure to Complete Rejectable Offer") to purchase Landlord's interest in the Premises on the first Payment Date that is at least ten days after the date of Landlord's acceptance of such Failure to Complete Rejectable Offer (the "Failure to Complete Payment Date"), for a price equal to the Stipulated Loss Value computed in accordance with **Schedule E** attached hereto plus an amount equal to the Make Whole Premium, plus all other amounts (if any) due and owing to Landlord or Lender by reason of default by Tenant in complying with its obligations under this Lease (all such amounts, the "Failure to Complete Payment") on the Failure to Complete Payment Date.  Within 90 days after the date Landlord receives such offer, Landlord shall deliver notice of its election to either accept or reject the Failure to Complete Rejectable Offer (with a failure to respond during such period constituting an acceptance of such Failure to Complete Rejectable Offer (it being agreed that, in such case, no acceptance by Lender or any other party shall be required).  Any rejection by Landlord of a Failure to Complete Rejectable Offer shall comply with and be accomplished in accordance with the provisions of Section 3.4(b).  In the event of an acceptance or deemed acceptance of a Failure to Complete Rejectable Offer, on the applicable Failure to Complete Payment Date, Landlord's interest in the Premises shall be conveyed to Tenant or its designee pursuant to Section 3.1.

(c)    Tenant agrees that until the lien of the Indenture has been released and the indebtedness secured by the Indenture has been paid in full, Tenant shall deliver to Lender, concurrently with the delivery thereof to Landlord, a copy of any Rejectable Offer and any Failure to Complete Rejectable Offer, together with all items required to be delivered pursuant to Section 3.2(a).

3.4    Rejection and Acceptance of Rejectable Offer.

(a)    If Landlord and Lender, if any, reject a Rejectable Offer made pursuant to Section 3.3(a) by a notice given to Tenant within the time period set forth in Section 3.3(a), then this Lease shall terminate on the Lease Termination Date and any Net Proceeds, if any, payable in connection with a Major Casualty or Major Condemnation (or the right to receive the same when made if payment therefor has not yet been made) shall be assigned or paid and belong to Lender or Landlord in that order, and, in addition, Tenant shall pay to Lender or Landlord in that order an amount equal to any deductible or self insurance amount in effect under the policy or policies insuring the risk relating to such Major Casualty, all Basic Rent and Additional Rent accrued and unpaid as of such Lease Termination Date and all other amounts then accrued  or due and payable by Tenant under this Lease.  During such time as an Indenture encumbers the Premises, no rejection of a Rejectable Offer shall be effective unless countersigned by Lender.  In addition, Lender may accept Tenant's Rejectable Offer by written notice to Tenant delivered in accordance herewith and within the time periods provided herein (notwithstanding any notice by Landlord to the contrary) and, in such event, Tenant's Rejectable Offer shall be deemed accepted for all purposes hereof.

(b)      If Landlord and Lender, if any, reject a Failure to Complete Rejectable Offer made pursuant to Section 3.3(b) by a notice given to Tenant within the time period set forth in Section 3.3(b), then this Lease shall terminate on the first Payment Date that is at least ten days after the rejection of such Failure to Complete Rejection Offer, and Tenant shall pay all Basic Rent and Additional Rent accrued and unpaid as of such Payment Date and all other amounts then accrued or due and payable by Tenant under this Lease.  During such time as an Indenture encumbers the Premises, no rejection of a Failure to Complete Rejectable Offer shall be effective unless countersigned by Lender.  In addition, Lender may accept Tenant's Failure to Complete Rejectable Offer by written notice to Tenant delivered in accordance herewith and within the time periods provided herein (notwithstanding any notice by Landlord to the contrary) and, in such event, Tenant's Failure to Complete Rejectable Offer shall be deemed to have been accepted for all purposes hereof.

3.5      <u>Less than Major Condemnation or Casualty</u>.

(a)      If a Condemnation or Casualty does not constitute a Major Condemnation or Major Casualty, respectively, then this Lease shall continue in full force and effect and Tenant shall, at its expense, promptly rebuild, replace or repair the Premises in conformity with the requirements of Sections 2.5 and 3.7 so as to restore the Premises (in the case of Casualty, with respect to size, as nearly as practicable, and in the case of Condemnation, with respect to size, condition and fair market value, as nearly as practicable) to the size, condition and fair market value thereof immediately prior to such occurrence (or if the Premises were under construction at such time, to the size, condition and fair market value thereof as contemplated at the time of completion).  Prior to any such rebuilding, replacement or repair, Tenant shall cause its Architect to deliver to Landlord and Lender (if any) its reasonable estimate of the cost thereof (the "<u>Restoration Cost</u>").

(b)      If the repair constitutes a Material Alteration, the Restoration Cost shall be confirmed by a reputable independent architect selected by Tenant and reasonably acceptable to Landlord registered or licensed as such in the state in which the Premises are located (an "<u>Architect</u>"), and if the Restoration Cost is more than the amount of Net Proceeds, Tenant shall deliver or cause to be delivered to Landlord (or, if the lien of Indenture is then outstanding, to Lender) or Lender's designee, at Tenant's election (i) cash collateral in an amount equal to such excess, or (ii) an unconditional, irrevocable, clean sight draft letter of credit (an "<u>Acceptable Letter of Credit</u>"), in form and substance, and issued by a bank (x) that is a member of the New York Clearinghouse and has its principal place of business in The City of New York and (y) the long-term senior unsecured debt obligations of which are rated "AA" by S&P and "Aa2" by Moody's (an "<u>Eligible Bank</u>"), in each case in the amount of such excess, or (iii) an Acceptable Bond in the amount of such excess, or (iv) evidence reasonably acceptable to Landlord and, if the Indenture is then outstanding, to Lender, that the excess has been expended in performing the restoration work prior to any funds being drawn from the Net Proceeds; provided, however, Tenant shall not be required to deliver any of the items set forth (i) through (iv) above as long as (x) the amount of the Restoration Cost in excess of the Net Proceeds is not more than $1,000,000, (y) no Event of Default shall have occurred and be continuing and (z) at such time and thereafter until completion of such Material Alterations, Tenant has an Investment Grade

Rating by all of the Rating Agencies then rating Tenant. Tenant shall deliver its portion of the Restoration Cost (or the security described in Section 3.5(b)(i), (ii) and (iii) above, as the case may be) to Lender or Lender's designee unless notified by Landlord (and acknowledged by Lender) to deliver the same to Landlord. For the purposes of this Lease, the term (x) "Investment Grade Rating" shall mean that Tenant's long-term senior unsecured debt obligations are rated (A) BBB- or better by S&P or Baa3 or better by Moody's, and (B) if rated by Fitch IBCA, Inc. ("Fitch"), BBB- or better and if rated by Duff & Phelps Credit Rating Co. ("Duff & Phelps"), BBB- or better, (and if such rating of a Rating Agency is BBB- or Baa3, as the case may be, not subject to credit watch, outlook or similar listing with negative implications) and (y) "Rating Agencies" shall mean S&P, Moody's, Fitch and Duff & Phelps, or any of their respective successors, or any other nationally recognized credit rating agency or agencies which is rating securities issued in connection with any securitizations or other secondary market transaction in which include the loan secured by the Indenture is included.

(c)     The Restoration Cost shall be paid first out of Tenant's own funds to the extent that the Restoration Cost exceeds the Net Proceeds payable in connection with such occurrence. The Restoration Cost shall be disbursed in accordance with the procedure set forth in Section 3.5(e) below. Any Net Proceeds relating to (x) a Casualty, or (y) a Condemnation (if such amount with respect to Condemnation is less than $100,000) remaining after final payment has been made for such work and after Tenant has been reimbursed for any portions it contributed to the Restoration Cost shall be retained by Tenant, and no adjustment shall be made to Basic Rent. If such remaining Net Proceeds relating to a Condemnation exceed $100,000, such Net Proceeds shall be retained by Tenant (but not in an amount greater than $100,000), and any excess shall be retained by Landlord (to be used to prepay a portion of the principal amount of the Loan). In the event of any temporary Condemnation, this Lease shall remain in full force and effect and, so long as no Event of Default has occurred and is continuing, the Net Proceeds allocable to such temporary Condemnation shall be paid to Tenant, unless such Net Proceeds from temporary Condemnation are in excess of $500,000, in which event the amount of such Net Proceeds in excess of $500,000 shall be delivered to Landlord or, if the Indenture is outstanding, Lender, to be applied towards the payment of Basic Rent as the same becomes due (with any balance delivered to Tenant, except that such portion of the Net Proceeds allocable to the period after the expiration or termination of the Term shall be paid to Landlord). If the cost of any rebuilding, replacement or repair required to be made by Tenant pursuant to this Section shall exceed the amount of such Net Proceeds, the deficiency shall be paid by Tenant.

(d)     Basic Rent and Additional Rent payable under the provisions of this Lease shall not be affected, altered or reduced by any Casualty or Condemnation (except as specifically set forth in Sections 3.1 and 3.4 with respect to a termination of the Lease upon payment of the amounts, if any, required therein). Tenant's obligation to continue to pay Basic Rent and Additional Rent shall continue notwithstanding any such Condemnation or Casualty, subject to the further provisions hereof.

(e)     If Net Proceeds are required to be held by Landlord or Lender pursuant to this Lease, then, so long as the lien of the Indenture has not been discharged, Landlord hereby directs that such Net Proceeds shall be held by Lender or Lender's designee and shall be paid out

from time to time to Tenant as the work progresses (less any reasonable out-of-pocket cost to Lender or Landlord of recovering and paying out such proceeds, including, without limitation, reasonable attorneys', trustees' or escrow fees relating thereto and costs allocable to inspecting the work and the plans and specifications therefor, but not including any internal overhead costs), subject to each of the following conditions:

(i)    Each request for payment shall be made on not less than ten Business Days' prior notice to Landlord and Lender and shall be accompanied by an officer's certificate (or if such work is being performed under the supervision of an Architect, by a certificate of such Architect), stating (A) in the case of an officer's certificate only, that no Event of Default exists hereunder, (B) that, based upon an inspection of the Premises, all of the work completed has been done in substantial compliance with the approved plans and specifications, if required, (C) that the sum requested is validly required to reimburse Tenant for payments by Tenant, or is validly due to the contractor, subcontractors, materialmen, laborers, engineers, architects or other persons rendering services or materials for the work (giving a brief description of such services and materials), and that when added to all sums previously paid out by Landlord or Lender, as the case may be, does not exceed the value of the work done to the date of such certificate, (D) if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Premises, that title to the personal property items covered by the request for payment is vested in Landlord or Tenant, as applicable, and (E) the remaining cost to complete such work and that the remaining amount held by Landlord or Lender, as the case may be (together with any amounts contemporaneously deposited by Tenant with Landlord or Lender in connection therewith, including the undrawn amount of any Acceptable Letter of Credit then held by Landlord, Lender or Lender's designee pursuant to Section 3.5(b)) shall be sufficient to cover such cost of completion; provided, however, that if such certificate is given by an Architect, such Architect shall certify as to clause (B) above, and Tenant shall certify as to the remaining clauses above. Each request for payment shall contain a statement signed by Tenant approving both the work done to date and the work covered by the request for payment in question.

(ii)    Subject to Section 2.6, each request for payment shall be accompanied by waivers of lien reasonably satisfactory to Landlord and Lender covering that part of the work for which payment or reimbursement has been made as of the date shown as the current request and, if required by Landlord or Lender, a search prepared by a title company or licensed abstractor, or by other evidence satisfactory to Landlord and Lender that there has not been filed with respect to the Premises any mechanic's, or other lien or instrument for the retention of title relating to any part of the work not discharged of record and such other contractor's affidavits, plots of survey and evidence of cost, payment and performance as Landlord or Lender may reasonably request. Additionally, as to any personal property covered by the request for payment, Landlord and Lender shall be furnished with evidence of payment therefor and such further evidence satisfactory to assure Lender of its valid first lien on and security interest in the personal property.

(iii)    Landlord and Lender (and their respective architects and construction representatives) shall have the right to inspect the work at all reasonable times upon

reasonable prior notice and may condition any disbursement of Net Proceeds upon the satisfactory completion, as determined in the reasonable discretion of Landlord and Lender, of any portion of the work for which payment or reimbursement is being requested. Neither the approval by Lender or Landlord of any required plans and specifications for the work nor the inspection by Lender or Landlord of the work shall make Lender or Landlord responsible for the preparation of such plans and specifications or the compliance of such plans and specifications, or of the work, with any applicable Legal Requirement.

      (iv)    Net Proceeds shall not be disbursed more frequently than once every thirty days. No disbursement made prior to final completion of any item of work shall cause the aggregate amount disbursed with respect to such item of work to exceed 90% of the value of the portion of such item of work which has been completed unless at the time of such disbursement, Tenant is then maintaining an Investment Grade Rating.

Net Proceeds held by Landlord or Lender in accordance with this Section shall be held in a segregated interest bearing account if (A) such an account is available at the institution at which Lender holds such Net Proceeds, and (B) Landlord or Lender, as the case may be, determines, in its reasonable judgment, that holding the Net Proceeds in such an account is practical under the then existing circumstances. Any interest earned on Net Proceeds shall be a part of Net Proceeds and shall be held and disbursed in accordance with the provisions hereof.

      (f)    Notwithstanding any other provision of this Section, if Tenant is then currently maintaining an Investment Grade Rating and in Tenant's reasonable judgment the cost of the Work is less than $350,000 (as adjusted for CPI changes, but not above $500,000) with respect to any one Casualty or partial Condemnation (and the cost of all outstanding Work at such time is less than $750,000), such Work can be completed in less than one hundred twenty days and no Event of Default has occurred and is continuing, then Landlord, upon request by Tenant, shall permit Tenant to receive the Net Proceeds directly from the insurer or payor thereof (and Landlord shall advise such insurer or payor and Lender to pay over such Net Proceeds directly to Tenant), provided that Tenant shall promptly and diligently commence and complete such Work in a good and workmanlike manner.

      (g)    If an Event of Default shall have occurred and be continuing, then (x) Tenant shall not be entitled to disbursements of Net Proceeds hereunder, and (y) in addition to all other rights available hereunder, at law or in equity, Landlord or Lender, or any receiver of the Premises or any portion thereof, upon five days prior notice to Tenant (except in the event of emergency in which case no notice shall be required), may (but shall have no obligation to) perform or cause to be performed such Work, and may take such other steps as either Landlord or Lender reasonably deems advisable (but such performance shall not cure the default of Tenant). In addition, Tenant acknowledges that if an Event of Default shall have occurred and be continuing, Landlord, and to the extent the lien of the Indenture is outstanding, Lender, may apply any Net Proceeds to continue the restoration and repair of the Premises or towards payment of the indebtedness secured by the Indenture, or both, which payment shall not relieve Tenant of any of its obligations hereunder, and Tenant hereby waives, for Tenant and all others holding under or through Tenant, any claim, other than for gross negligence or willful misconduct

(subject to the provisions of Section 10.19(b)), against Landlord and Lender and any receiver arising out of any act or omission of Landlord or Lender or such receiver pursuant hereto, and Landlord or Lender may apply all or any portion of the Net Proceeds (without the need to fulfill any other requirements forth in this Section) to reimburse Landlord or Lender or such receiver, for all reasonable amounts actually incurred in connection with the Work, and any costs not reimbursed to such parties shall be paid by Tenant to Landlord (or such other party) on demand, together with interest thereon at the Rate from the date such amounts are advanced until the same are paid by Tenant.

3.6    Insurance.

(a)    Tenant will maintain insurance on the Premises of the following character:

(i)    Insurance with respect to the Improvements against all perils included within the classification "All Risk of Physical Loss", covering such risks as shall be customarily insured against with respect to improvements similar in construction, location and use including by way of example, earthquake, flood, sprinkler leakage, debris removal, act of municipal authority (building ordinance or law, increased cost of construction or demolition), malicious mischief, water damage, boiler and machinery explosion or damage and the like, with extended coverage, and in amounts at all times not less than the greater of (x) 100% of the actual replacement cost (determined annually by an insurer, a recognized independent broker or an independent appraiser in each case selected by Tenant, and approved by Landlord) of the Improvements (exclusive of foundations and excavations), without regard to depreciation, and (y) such other amount as is necessary to prevent any reduction in such policy by reason of and to prevent Landlord, Lender or any other insured thereunder from being deemed to be a co-insurer. If as of the date hereof, or at any time during the term of this Lease, the Premises are not in compliance with all Legal Requirements such that in the event of a partial or total casualty or destruction such Legal Requirements would prohibit Landlord or Tenant from restoring or rebuilding the Premises to the specifications and condition of the Premises prior to such casualty or destruction, then Tenant shall be required to carry agreed value insurance.

(ii)    Commercial general public liability insurance insuring Tenant, with Landlord and Lender named as additional insureds, against all claims for damages to person or property or for loss of life or of property occurring upon, in, or about the Premises, in limits of at least $1,000,000 per occurrence, $2,000,000 in the aggregate, with excess or umbrella coverage of at least $10,000,000, or such greater limits as may be reasonably required from time to time by Landlord or Lender, consistent with insurance coverage on properties similarly constructed, occupied and maintained.

(iii)    Worker's compensation insurance (including employers' liability insurance, if requested by Landlord or Lender) to the extent required by the law of the state in which the Premises are located.

(iv)    Flood insurance in an amount equal to 100% of the actual replacement cost of the Premises or the maximum amount available through the National Flood

Program or any successor program, whichever is less, if all or any portion of the Improvements related to the Premises are located in an area which has been designated by the Secretary of Housing and Urban Development or the Federal Emergency Management Agency as having special flood hazards, and if flood insurance is available under the National Flood Insurance Act.

(v)    Broad form boiler and machinery insurance (without exclusion for explosion) against loss or damage from explosion of steam boilers, air conditioning equipment, pressure vessels or similar apparatus now or hereafter installed at the Premises, in an amount not less than $5,000,000 or such greater amount as Landlord or Lender may from time to time reasonably require and which are customarily required with respect to similar properties similarly situated.

(vi)    Such other insurance as may from time to time be reasonably required by Landlord or Lender in order to protect their respective interests, provided that such insurance is then customarily maintained by prudent operators, managers or owners or is then customarily required by prudent institutional lenders with respect to mortgage loans secured by properties similar to the Premises.

(vii)    Rental loss insurance, business interruption insurance or similar such insurance covering at least 18 months of rental interruption, in an amount equal to 18 months of Basic Rent and estimated Impositions.

(viii)    During any period during which construction is conducted on the Premises and during which period the construction and materials are not covered by the existing policies, premium prepaid insurance policies covering the Premises (which during construction shall be on an "All-Risk" perils, including theft, "Builder's Risk", "Completed Value" form) in amounts equal to the replacement costs of the Improvements (including construction materials and personal property on or off site) covering insurance risks no less broad than those covered under a Standard Multi Peril (SMP) policy form, which contains a 1987 Commercial ISO "Causes of Loss-Special Form", with coverage for such other expenses as Landlord or Lender may reasonably require, including, without limitation, coverage for hired automobiles and other automobiles not owned by Tenant. Such insurance shall contain an agreed amount endorsement (such amount to include foundation and underground pipes) and bear a 100% co-insurance clause. Said policies shall contain a permission to occupy endorsement.

(ix)    During any period when construction is conducted on the Premises, worker's compensation, employers' liability, commercial auto liability, and commercial general liability insurance (including contractual liability and completed operations coverage) for each general contractor written on a 1986, 1993 or 1996 standard ISO occurrence basis form or equivalent and excess umbrella coverage, carried during the course of construction, with general liability insurance limits as set forth in clause (ii) above.

(x)    Earthquake insurance in an amount equal to 100% of the full replacement value of the Premises, including foundations and excavations, with a permitted

deductible or self-insured retention of 5% of the value of the Premises at time of loss, subject to a minimum deductible of $100,000.

(b)    Such insurance shall be issued by companies authorized to transact business in the state in which the Premises are located and having an A. M. Best Company rating of "A-" or better and financial size category of not less than VII, and an S&P rating of "A-" or better as to claims paying ability, provided that with respect to worker's compensation insurance such insurance company must have an A. M. Best Company rating of "A-" or better and financial size category of not less than VII. If any insurance company providing any insurance hereunder shall cease to have a rating at least equal to that required by the preceding sentence, Tenant shall, within ninety days following such insurance company's express notification (or Tenant's actual knowledge of) loss of such minimum rating, replace the policy issued by such insurance company with a policy meeting the requirements of this Section 3.6(b) issued by a company having a rating at least equal to that required by the preceding sentence and otherwise meeting the requirements of this Section 3.6.    No liability insurance policy maintained by Tenant hereunder shall provide for a deductible or self-insured retention in excess of $50,000, unless Tenant then maintains an Investment Grade Rating and no Event of Default shall have occurred and be continuing, in which event the retention shall not be in excess of $250,000 per claim, accident or occurrence.    No casualty or other insurance policy maintained by Tenant (other than liability policies) hereunder shall provide for a deductible or self-insured retention in excess of $50,000 unless Tenant then maintains an Investment Grade Rating and no Event of Default shall have occurred and be continuing hereunder, in which event the deductible or the self insured retention shall not be in excess of $250,000 per claim, accident or occurrence.    Notwithstanding the foregoing, if Tenant maintains an Investment Grade Rating and no Event of Default shall have occurred and be continuing hereunder, the deductible or the self insured retention shall not be in excess of the following amounts: (i) $100,000 for general property damage, (ii) $100,000 for boiler damage, (iii) $100,000 for flood damage, and (iv) 2% of the insurable value of the Property for wind (including hurricane) damage.    Tenant shall, promptly upon receipt but in no event less than ten days prior to the expiration date of any of the insurance policies required to be maintained pursuant to this Lease, deliver to Landlord and Lender originals or certified copies of certificates evidencing the renewal of such policies.    All such insurance shall be written by insurance companies which are legally qualified to issue such insurance.    If at any time during the Term of this Lease, (x) an Event of Default shall have occurred and be continuing, or (y) if Tenant's long-term senior unsecured debt obligations are then rated by one or more Rating Agencies then rating a securitization or other secondary market transaction that includes the loan secured by the Indenture, such rating is below BB+ (with respect to S&P, Fitch or Duff & Phelps) or Ba1 (with respect to Moody's), then Landlord shall, at its option, have the right to require Tenant to deposit, and Tenant agrees that it shall deposit with Landlord or, if directed by Landlord, to Lender or its designee (and Landlord directs Tenant to make such deposits with Lender or its designee as long as the Indenture shall remain outstanding) on each Payment Date, as Additional Rent, one twelfth (1/12) of all estimated insurance premiums in respect of all insurance required to be maintained by Tenant hereunder (collectively, the "Estimated Premiums") for the year then in effect as reasonably estimated by Landlord.    In addition, Tenant shall have the right at its option on each Payment Date to deposit such Estimated Premiums for the year then in effect as reasonably estimated by Landlord.    To the extent permitted by

applicable law, neither Landlord nor Lender or its designee, as Depository, shall be required to maintain the Estimated Premiums in an account separate from other funds of such party or to deposit any such amounts in an interest-bearing account, provided, however, in the event such amounts are maintained in an interest bearing account and no Event of Default shall have occurred and be continuing hereunder, Tenant shall be entitled to receive any interest earned thereon on a quarterly basis. Tenant shall deposit with Depository, prior to the date which is thirty days prior to the due date of insurance premiums, such additional amount as may be necessary to provide Depository with sufficient funds in such deposit account to pay each such insurance premium at least thirty days in advance of the due date thereof. Depository shall apply the aforesaid deposits for such purpose not later than the last day on which any such insurance premiums are due. If, at any time, the amount of any insurance premiums are increased or Landlord or Lender receives written notice that such insurance premiums will be increased, and if the monthly deposits then being made by Tenant for this purpose (if continued) would not make up a fund sufficient to pay such insurance premiums thirty days prior to the due date, said monthly deposits thereupon shall be increased and Tenant immediately shall deposit with the Depository, on demand, sufficient moneys so that the moneys then on hand for the payment of said Insurance Premiums, plus the increased payments and such additional sums demanded, shall be sufficient so that the Depository shall have received from Tenant adequate amounts to pay such Insurance Premiums at least thirty days before such insurance premiums become due and payable. For the purpose of determining whether the Depository has on hand sufficient moneys to pay any particular insurance premium at least thirty days prior to the due date therefor, deposits for each category of insurance premium shall be treated separately, it being the intention that the Depository shall not be obligated to use moneys deposited for the payment of an item not yet due and payable to the payment of an item that is due and payable. Depository may, if Tenant fails to make any deposit required hereunder, apply deposits made for any one insurance premium for the payment of the same, any other insurance premium or any outstanding Basic Rent or Additional Rent. If this Lease shall be terminated by reason of any Event of Default, all deposits then held by the Depository shall be applied on account of any and all sums due under this Lease and Tenant shall forthwith pay the resulting deficiency in accordance with the terms hereof. If Landlord ceases to have any interest in the Premises, Landlord shall direct the Depository to transfer to the person or entity who owns or acquires such interest in the Premises and is the transferee of Landlord's interest in this Lease, the deposits made pursuant to the provisions hereof. In addition, in the event that Lender (or a servicing agent on Lender's behalf) is the Depository, Lender shall have the right to transfer the deposits (or to cause its servicing agent to transfer such deposits) to any transferee of the Indenture or to the holder of any substitute Indenture. Upon any such transfer of the deposits and notice thereof to Tenant (together with a written acknowledgment by the transferee that it has assumed the obligations of the transferor), the transferor shall be deemed to be released from all liability with respect thereto and Tenant agrees to look to the transferee solely with respect thereto, and the provisions hereof shall apply to each successive transfer of the said deposits.

(c)     Every such policy (other than any general public liability, auto liability or worker's compensation policy) shall bear a mortgagee's loss payable clause or a mortgagee or beneficiary endorsement in favor of the mortgagee (if any or whether one or more, and together with its or their successors, assigns and designees, the "Lender") under each mortgage, deed of

trust or similar security instrument creating a lien on the interests of Landlord in the Premises (whether one or more, the "Indenture"), and any loss under any such policy shall be payable to Lender which has a first lien on such interests (if there is more than one first Lender, then to the trustee for such Lenders) to be held and applied pursuant to this Section.

(d)     All such insurance (other than any worker's compensation policy) shall be endorsed to provide that:

(i)     such insurance will not be canceled, modified or amended for any reason whatsoever, including, without limitation, by reason of non-payment of premium, except after 30 days' written notice to Landlord and Lender;

(ii)     Landlord and Lender are each an additional insured with the understanding that any obligation imposed upon the insured (including, without limitation, the liability to pay premiums, but excluding any obligation of the insured to cooperate with any insurer or any insurer's representative in the investigation, defense or settlement of any claim covered under such insurance) shall be the sole obligation of Tenant and not that of any other insured;

(iii)     all insurance proceeds payable under any policy of insurance with respect to the Premises, other than with respect to any of Tenant's Compensation (so long as no Event of Default has occurred and is continuing), shall be paid to Landlord (or so long as the lien of the Indenture is outstanding, Lender) to be applied in accordance with Article III;

(iv)     the interests of Lender shall not be invalidated by any action or inaction of Landlord, Tenant or any other person, and such insurance shall insure Lender regardless of any breach or violation by Tenant, Landlord or any other person of any warranties, declarations or conditions contained in the policies relating to such insurance or application therefor;

(v)     [reserved];

(vi)     the insurer thereunder waives all rights of subrogation against Lender and Landlord and waives any right of set-off and counterclaim and any other right of deduction, whether by attachment or otherwise;

(vii)     such insurance shall be primary to Tenant without right of contribution from any other insurance carried by or on behalf of Tenant (with respect to Tenant's operation only) or Landlord or Lender or any other person with respect to its interest in the Premises;

(viii)     all terms, conditions, insuring agreements and endorsements, with the exception of limits of liability, shall operate in the same manner as if there were a separate policy covering each insured, including, without limitation, that if any such policy is a blanket policy covering other properties in addition to the Premises, Tenant shall provide evidence

satisfactory to Landlord that the insurance premiums for each of the other properties and the Premises are separately allocated under such policy.

(e)    In the event of any transfer by Landlord of Landlord's interest in the Premises or any financing or refinancing of Landlord's interest in the Premises, Tenant shall, upon not less than ten days' prior written notice, deliver to Landlord or any Lender providing such financing or refinancing, as the case may be, certificates of all insurance required to be maintained by Tenant hereunder naming such transferee or such Lender, as the case may be, as an additional insured to the extent required herein effective as of the date of such transfer, financing or refinancing. Tenant shall not obtain or carry separate insurance concurrent in form or contributing in the event of loss with that required by this Section 3.6 unless Landlord is named an additional insured therein and unless there is a Lender endorsement in favor of Lender with loss payable as provided herein. Tenant shall immediately notify Landlord whenever any such separate insurance is obtained and shall deliver to Landlord and Lender the policies or certificates evidencing the same.  Any insurance required hereunder may be provided under blanket policies provided that the Premises and the applicable coverage applicable thereto are specified therein so that no loss at any other property shall reduce the amount payable with respect to the Premises and Tenant shall not procure co-insurance with respect to such insurance.

(f)    Landlord may insure its interest in the Premises at no cost or expense to Tenant.

(g)    If Tenant fails to maintain and deliver or fails to cause to be maintained and delivered to Landlord certificates of insurance (and, following the occurrence and during the continuance of an Event of Default, upon request by Landlord or Lender, the original policies) required by this Lease, Landlord may, at its option, procure such insurance, and Tenant shall reimburse Landlord in the amount of all such premiums thereon promptly, upon demand by Landlord, with interest thereon at the Rate from the date paid by Landlord to the date of repayment; provided, however, that this sentence shall not prevent any default under this Section 3.6 from becoming an Event of Default.

(h)    The requirements of this Section 3.6 shall not be construed to negate or modify Tenant's obligations under Section 2.4.

3.7    Alterations.

(a)    Tenant may, at its expense, make additions to and alterations of the Improvements, and construct additional Improvements (collectively, "Alterations"), provided that (x) the fair market value, the ability to use the Premises as a retail store, and useful life of the Premises following completion of such Alteration shall not have been reduced or lessened thereby, and such Alteration will not materially and adversely affect the building systems and equipment, and (y) such Alterations shall be diligently completed in a good and workmanlike manner, free and clear of liens and encumbrances, and in compliance with all applicable Legal Requirements and the requirements of all insurance policies required to be maintained by Tenant hereunder. "Material Alteration" is defined as Work with respect to which the Estimated Cost is

in excess of $350,000 (as adjusted for CPI changes but not above $500,000), and shall include the Work to upgrade the Premises described in the plans and specifications identified in **Schedule L** attached hereto (the "Upgrade Work"). "Structural Work" is defined as Work which involves in any material respect any roof, load-bearing wall, structural beams, columns, supports, foundation or any other structural element of the Premises (it being agreed that Work on the front facade of the Improvements and work relating to Tenant's exterior signage shall not constitute Structural Work merely because such Work involves the foregoing). "Estimated Cost" is defined as the estimated cost of materials, construction and labor (not including architects, engineers or other professionals), as estimated by Tenant's licensed Architect, which estimate together with a reasonably adequate description of the Work and all related work shall be delivered to Lender and Landlord before the commencement of any Work hereunder. In addition to the limitations set forth in (x) and (y) above, Tenant agrees that all Alterations, Material Alterations, Structural Work, restoration, repair and any other work which Tenant shall be required or permitted to do under the provisions of this Lease (hereinafter collectively called the "Work") shall be performed in each case subject to the following:

(i)    Tenant shall give Landlord and Lender not less than 30 days notice of any Material Alterations or Work on the front facade of the Improvements. Such notice shall be accompanied by detailed plans and specifications (including, as applicable, layout, architectural, mechanical and structural drawings), prepared by an Architect (including, with respect to any Structural Work, the opinion of the Architect that the making thereof will have no materially adverse structural impact upon the Improvements.) No Material Alteration shall be undertaken without the prior written consent of Landlord and Lender which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Tenant shall not be required to obtain such consent if it shall have provided to Landlord and Lender, prior to the commencement of such Work, an opinion of a qualified, nationally-recognized real estate appraiser (an "Appraiser") (selected by Landlord from a list of not less than five Appraisers provided by Tenant) to the effect that such Material Alteration complies with clause (x) of the first sentence of Section 3.7(a).

(ii)    All Work shall be commenced only after all required municipal and other governmental permits, authorizations and approvals shall have been obtained by Tenant, at its own cost and expense, and copies thereof delivered to Landlord. Landlord will, on Tenant's written request, promptly execute any documents necessary to be signed by Landlord to obtain any such permits, authorizations and approvals, provided that Tenant shall bear any reasonable out-of-pocket expense and any liability incurred by Landlord or Lender in connection therewith; and provided further that none of the foregoing shall result in (A) a material reduction in the fair market value of the Premises, or (B) a change in zoning with respect to the Premises, without in either case the prior consent of Landlord and Lender.

(iii)    If the Work shall constitute a Material Alteration, it shall not be commenced until Tenant shall have obtained and delivered to Landlord and Lender, either (A) a performance bond and a labor and materials payment bond (issued by a corporate surety licensed to do business in the state in which the Premises are located and satisfactory to Landlord and Lender and in an amount equal to the Estimated Cost of such Work and in form otherwise

reasonably satisfactory to Landlord and Lender (an "Acceptable Bond")), (B) an Acceptable Letter of Credit having a stated amount at least equal to the estimated cost of the Work, or (C) such other security as shall be reasonably satisfactory to Landlord and Lender; provided, however, that if at the time the Work is commenced, Tenant then maintains and continues to maintain until such Work is completed an Investment Grade Rating and no Event of Default shall have occurred and be continuing and Estimated Cost of the Work does not exceed $1,000,000, Tenant shall not be required to comply with this subsection.

(iv)    All Work shall be performed in a first-class workmanlike manner, and in accordance with all Legal Requirements, as well as any plans and specifications therefor referred to in clause (i) above. All Work shall be commenced and completed in a commercially reasonable manner. No Material Alteration, Structural Work or Work on the front facade of the Improvements shall be undertaken except under the supervision of an Architect. Upon completion of any Material Alteration, Tenant shall certify to Landlord and Lender that such Material Alteration has been made in compliance with the provisions hereof.

(v)    Subject to the terms of Section 2.6 hereof, the cost of all Work shall be paid promptly, in cash, so that the Premises and Tenant's leasehold estate therein shall at all times be free from (A) liens for labor or materials supplied or claimed to have been supplied to the Premises or Tenant, and (B) chattel mortgages, conditional sales contracts, title retention agreements, security interest and agreements, and financing agreements and statements.

(vi)    Upon completion of any Work, Tenant, at Tenant's expense, shall obtain certificates of final approval of such Work required by any governmental or quasi-governmental authority and shall furnish Landlord and Lender with copies thereof, and, if the Work constituted Material Alterations, together with "as-built" plans and specifications for such Work, as applicable.

(vii)    Any Work shall be subject to inspection at any time and from time to time by any of Landlord or, if the Indenture is outstanding, Lender, their respective architect(s), or their duly authorized representatives at reasonable times and upon reasonable notice to Tenant.

(viii)    Except as may be expressly provided to the contrary hereunder with respect to Tenant's Personal Property, all Alterations installed in or upon the Premises at any time during the Term shall become the property of Landlord and shall remain upon and be surrendered with the Premises.

(ix)    Except as provided in Section 3.5(g), Landlord shall not make any Alterations or perform any Work.

(x)    No Work shall be performed by Tenant if the same would (A) materially reduce the usable square footage of the Premises, (B) weaken, temporarily or permanently, the structure of the Premises or any part thereof or, (C) reduce in any material respect the permitted uses thereof under applicable zoning laws.

(xi)    Tenant shall complete the Upgrade Work and deliver the following by the date nine months from the date hereof (the "Completion Date"): (i) an estoppel certificate by Tenant addressed to Landlord and Lender hereto to the effect that (A) no default by Landlord exists under the Lease and (B) Tenant is satisfied with the completion of and accepts the completed Upgrade Work; (ii) a certificate from the general contractor with respect to the Upgrade Work stating that the Upgrade Work has been completed in a good and workman-like manner and in compliance with the Legal Requirements and substantially in accordance with the plans and specifications identified in **Schedule L** attached hereto; (iii) lien waivers from the general contractor and any and all subcontractors and materialmen performing the Upgrade Work undercontracts in excess of $150,000; (iv) a certificate of the Architect, if any, stating that the Upgrade Work has been completed in accordance with the plans and specifications identified in **Schedule L** attached hereto; and (v) all permits and approvals (if required to be reissued) required for the normal use and occupancy of the Premises after the completion of the Upgrade Work (including a certificate of occupancy or its equivalent for the Building (if required to be reissued)) which shall have been issued by the appropriate governmental authorities having jurisdiction and shall be final and unappealable.

(xii)    If Tenant makes any Alterations to the Improvements as provided in this section, the Alterations shall not be commenced until 15 days after the Landlord has received notice from Tenant stating the date the installation of the Alterations is to commence so that Landlord can post and record an appropriate notice of nonresponsibility; provided, however that this Section 3.7(a)(xii) shall not apply to the Upgrade Work so long as Tenant notifies Landlord on the date the Upgrade Work commences and posts the notice of nonresponsibility in a conspicuous place in the job site.

(b)    Tenant may, at its cost and expense, install, or place upon or reinstall, or replace and remove from the Premises any of Tenant's Personal Property. Subject to and conditioned upon compliance with the provisions of Section 3.7(a) above, Tenant may make Alterations or undertake construction which requires sharing the use of existing facilities and utilities, provided that reciprocal easement agreements and joint use agreements allocate ownership, use and expenses to the reasonable satisfaction of Landlord, and provided that the same comply with the provisions of Section 3.8. No such construction shall impair the structural and functional integrity of the Premises as an independent commercial property, in compliance with Legal Requirements, at the time the Alterations are made or at the end of the term of this Lease. Tenant will take such action at the end of the Term, at Tenant's sole cost and expense, as Landlord or Lender may reasonably request to ensure such compliance as of the end of the Term.

3.8    Easements.

(a)    Landlord agrees from time to time during the term of this Lease, at the request of Tenant (and within 30 days after all documentation required by Landlord to consummate the relevant transaction shall have been provided to Landlord), without additional consideration, and with the prior written consent of Lender, which shall not be unreasonably withheld or delayed (1) to sell, assign, convey, or otherwise transfer an interest in the Premises of

a nature described in this Section 3.8 to any Person legally empowered to take such interest who has indicated that it intends to take such interest under the power of eminent domain, (2) to grant easements, licenses, rights of way and other rights and privileges in the nature of easements of such nature, extent and duration as Tenant may reasonably request provided that such easements, licenses, rights of way and other rights and privileges are customarily granted by prudent operators, manager, or owners of properties similar to the Premises; (3) to release or relocate existing easements and appurtenances which are for the benefit of the Premises; (4) to dedicate or transfer unimproved portions of the Premises for road, highway or other public purposes; (5) to execute petitions to have the Premises annexed to any municipal corporation or utility district; (6) to execute amendments to any covenants and restrictions affecting the Premises; and (7) to execute and deliver any instrument necessary or appropriate to confirm or effect any such grant, release, dedication, transfer, petition or amendment in each of the foregoing instances, the same to be without consideration, but only if (i) such grant, release, dedication, transfer, petition or amendment is not materially detrimental to the proper conduct of business of Tenant on the Premises and does not render the use of the Premises dependent upon any other property or condition the use of the Premises upon the use of any other property, (ii) such grant, release, dedication, transfer, petition or amendment does not adversely affect the value of the Premises, (iii) for so long as this Lease is in effect, Tenant will perform all obligations, if any, of Landlord under the applicable instrument, and (iv) Landlord and Lender shall have received (X) a certificate from the appropriate officer of Tenant (on behalf of Tenant only and not in his or her individual capacity) certifying, in his or her reasonable business judgment, as to the satisfaction of the conditions described in clause (i) through (iii) above; (Y) a duly authorized undertaking of Tenant, in form and substance reasonably satisfactory to Landlord, to the effect that Tenant will remain obligated hereunder, to the same extent as if such grant, release dedication, transfer, petition or amendment had not been made; and (Z) such instruments, certificates (including evidence of authority), surveys, title insurance policy endorsements and opinions of counsel reasonably acceptable to Landlord, as Landlord may reasonably request. Any easement that imposes any obligation or liability on Landlord shall expressly provide that it is without recourse to Landlord (except to the extent of Landlord's interest in the Premises), and that any lien arising by virtue of the nonperformance of obligations under such easement shall be subordinate to the lien of any Indenture. Tenant shall be responsible for the payment of all reasonable costs and expenses (including the reasonable out-of-pocket costs and expenses of Landlord and Lender) incurred in connection with this Section. Subject to the provisions of Sections 3.2 and 3.5, any consideration received for the grants, releases, dedications, transfers, petitions or amendments outlined in this Section shall be the property of Landlord or the Premises. For the purposes of this Lease, "Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated associated, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

(b)     Without limiting the generality of any other provision of this Lease requiring payments of Additional Rent, if the Premises are presently, or should at sometime in the future be, affected by an easement or any other agreement affecting or relating to the Premises, including but not limited to the Permitted Exceptions, but subject to the last sentence of Section 2.2(b) and this Section 3.8(b), Tenant agrees during the term of this Lease (i) to pay,

perform and assume all of the duties, liabilities and obligations of Landlord under any such easement or other agreement (including, without limitation, paying any and all costs, charges and assessments imposed thereunder), (ii) Tenant shall comply with, all of the terms, conditions, covenants, provisions, restrictions and agreements set forth in any such easement or other agreement, (iii) except as provided as of the date hereof in the Permitted Exceptions, that any obligation or liability arising under any such easement or other agreement shall be nonrecourse to Landlord (except to the extent of Landlord's interest in the Premises and this Lease), (iv) except as provided in the Permitted Exceptions, that any lien against the Premises arising by virtue of the nonperformance of obligations under any such easement or other agreement shall be subordinate to the lien of any Indenture and (v) to indemnify, defend and hold the Indemnified Parties harmless from and against every, any and all demands, claims and assertions of liability, or action relating to Tenant's failure to comply with the obligations set forth in this Section. Landlord agrees that it shall not (except as may be required by any governmental agency or in connection with any condemnation proceeding) enter into an easement or other agreement without the prior written consent of Tenant, which consent shall not be unreasonably withheld or delayed.

3.9    Right of First Offer.  (a)  Subject to the provisions of Section 3.9(b) hereof and provided no Event of Default shall have occurred and be continuing hereunder, if the Landlord intends to offer to sell or transfer Landlord's interest in the Premises during the Term and as long as the Tenant under this Lease is (i) Bed Bath & Beyond Inc. or the surviving entity of a merger or consolidation of Bed Bath & Beyond Inc. or the transferee of the sale of all or substantially all of the assets of Bed Bath & Beyond Inc. which surviving entity or transferee, as the case may be, shall have satisfied all of the Merger and Sale Conditions ("BBB") or (ii) a wholly-owned subsidiary of BBB, then Landlord shall notify Tenant of the provisions of Landlord's proposed offer to sell the Premises and the offer price thereof (the "Offer Price"). Tenant (or, if BBB has assigned its interest hereunder pursuant to Section 4.1(a) hereof, references in this Section 3.9(a) to "Tenant" shall be deemed to be references to BBB) shall be entitled, within thirty (30) days after receipt of the Landlord's notice (time being of the essence as of such date), to elect by written notice to the Landlord ("Tenant's Notice") to purchase the Premises for the Offer Price and upon the other provisions stated in the Landlord's notice (including whether the Indenture is to be assumed by the purchaser in connection with such sale), except that title shall close thirty (30) days after delivery of Tenant's Notice (time being of the essence as of such date). Should the Tenant fail to exercise this right within the time and manner required above, or waives such right in writing, Landlord shall be free to enter into an agreement of sale relating to the sale of the Premises by Landlord for a stated purchase price (subject to adjustments) in an amount equal to or greater than 90% of the Offer Price on such other terms and conditions as Landlord shall elect and to consummate the sale of the Premises in accordance with the terms and conditions of such agreement of sale within 280 days following the Tenant's receipt of the Landlord's notice as provided above without reoffering to sell the Premises to Tenant. In the event that following the giving of a Landlord's notice as provided above, Landlord shall elect to enter into an agreement of sale relating to the Premises for a stated purchase price (subject to adjustments) which is less than 90% of the Offer Price, Landlord shall first deliver a notice to Tenant of the revised Offer Price (which shall be such stated purchase price) and Tenant shall have a period of five (5) Business Days following receipt of such notice (time being of the essence as of such date) to

elect to accept Landlord's revised Offer Price by delivery of written notice thereof to Landlord. In the event that Tenant shall fail to accept Landlord's revised Offer Price within said five (5) Business Day period, Tenant shall be deemed to have rejected such revised Offer Price and Landlord shall be free to sell within 280 days following the expiration of such 5 Business Day period the Premises for an Offer Price which is equal to or greater than 90% of such revised Offer Price as provided above. If Tenant elects to accept such revised offer, Tenant shall be required to purchase the Premises within thirty (30) days following Tenant's notice to Landlord accepting such revised offer (time being of the essence as of such date) in accordance with the terms and conditions of this Lease.

(b) Notwithstanding the provisions of Section 3.9(a) hereof: (i) the right of first offer granted to Tenant in Section 3.9(a) shall not apply to any transfer of Landlord's interest in the Premises pursuant to or in connection with a foreclosure of the Indenture (which foreclosure arose due to an "Event of Default" under the Indenture caused by or attributable to an Event of Default hereunder) or any transfer of the Premises by Landlord to Lender or its designee in lieu thereof and (ii) in the event of any transfer of the Premises pursuant to or in connection with a foreclosure of the Indenture which foreclosure arose due to a default under the Indenture caused by or attributable to an Event of Default hereunder or any transfer of the Premises to a Lender or its designee in lieu thereof the provisions of Section 3.9(a) shall be automatically deemed null and void and of no further force and effect, and (iii) if the Indenture is to be assumed by Tenant (as specified in the Offer Price notice delivered to Tenant), any transfer of the Premises upon an exercise of the right of first offer granted to Tenant shall be subject to any conditions and/or prohibitions contained in the Indenture applicable to a transfer by Landlord of its interest in the Premises. In addition, in the event that Tenant shall exercise the right of first offer granted to Tenant pursuant to Section 3.9(a) hereof, Tenant shall be required to (i) form a single purpose, bankruptcy remote entity satisfactory to the Lender, in Lender's sole discretion, to acquire the Premises and (ii) otherwise comply with the terms and conditions of the Indenture in connection with the acquisition of the Premises. In addition, no such transfer shall be permitted if such transfer could result in a merging of the fee and leasehold estates.

## ARTICLE 4.

4.1    Assignment and Subletting.

(a)    Without the prior written consent of Landlord, neither this Lease, nor any interest of Tenant in this Lease or in the Premises, shall be sold, assigned, or otherwise transferred, directly or indirectly, whether by operation of law or otherwise. Subject to Section 10.3, none of the issued or outstanding capital stock of Tenant shall be sold, assigned or transferred, nor shall additional stock in Tenant be issued if the issuance of additional stock will result in a change of the controlling stock ownership of Tenant as held by the shareholders thereof on the date hereof (or on the date that Landlord approved the transfer to the holder of Tenant's leasehold interest in this Lease). For purposes of this Section 4.1, the terms "control" or "controlling" shall mean possession of the direct power to direct, or cause the direction of, the management and policies of any person or entity, whether through the ownership of voting

securities, partnership interests, or otherwise.   Notwithstanding anything to the contrary contained herein, the transfer of stock of Tenant for the purposes of this Section 4.1 shall not include the sale of shares pursuant to a secondary market transaction, which sale is effected through the stock market maintained by The Nasdaq Stock Market, Inc. or any other nationally recognized stock exchange.   Notwithstanding the foregoing provisions of this Section 4.1(a), Tenant may, without obtaining Landlord's consent, assign its interest in this Lease and in the Premises in whole (and not in part) to an entity that executes and delivers, for the benefit of Landlord and Lender, an agreement pursuant to which such entity assumes the obligations of Tenant hereunder (such agreement to be accompanied by customary certificates and opinions of counsel), provided that no such assignment shall relieve Tenant of any liability or obligation under this Lease, and all such obligations shall continue in full force and effect as obligations of primary obligor and not a guarantor or surety as if no assignment had been made. In the event of an assignment pursuant to this Section 4.1(a), Landlord and Lender shall permit Tenant to cure an Event of Default or an event or condition which with the giving of notice or lapse of time (or both) would constitute an Event of Default as applicable and in accordance with the express provisions of this Lease.

(b)   So long as no Event of Default shall have occurred and be continuing, Tenant may sublet the Premises (including, but not limited to, subleases to affiliates of Tenant) provided, however, (i) each such sublease shall expressly be made subject to the provisions hereof, (ii) the term of any subletting shall not extend beyond the Term hereof, (iii) no sublease shall affect or reduce any obligation of Tenant or right of Landlord hereunder, and (iv) all obligations of Tenant hereunder shall continue in full force and effect as the obligations of a principal and not of a guarantor or surety, as though no subletting had been made.  Neither this Lease nor the term hereby demised shall be mortgaged or pledged by Tenant, nor shall Tenant mortgage or pledge its interest in any sublease of any portion of the Premises or the rentals payable thereunder.   Any such mortgage or pledge, any sublease made otherwise than as expressly permitted by this Section 4.1, and any assignment of Tenant's interest hereunder shall be void.  Tenant shall, within 10 days after the execution of any sublease, deliver a conformed copy thereof to Landlord.

(c)   So long as no Event of Default shall have occurred and be continuing, Tenant may grant nondisturbance and recognition rights (and Landlord will, at Tenant's request, enter into an agreement with Tenant and a Qualified Sublessee acknowledging such rights of recognition and nondisturbance) to a sublessee who qualifies as a Qualified Sublessee and who subleases the entire Premises pursuant to a Qualified Sublease so long as no Event of Default shall have occurred and be continuing under such Qualified Sublease.  A "Qualified Sublease" shall:

(i)   meet the requirements for subleases set forth in Section 4.1(b):

(ii)   be a bondable "triple net lease" in accordance with industry practice and shall contain provisions substantially identical to those set forth herein (including with respect to the possession, operation, use, maintenance and return of the Premises, but excluding Section 3.9 and 5.1(i)) and shall prohibit further subleasing and assignments;

32

provided, however, that on or after termination of the Primary Term (or Extended Term, if entered into) and provided that (x) the Qualified Sublessee has been granted recognition and non-disturbance as aforesaid and has attorned to Landlord and (y) no event of default has occurred and is continuing under such Qualified Sublease, such Qualified Sublessee may, without the consent of Landlord, sublet the Premises pursuant to a Qualified Sublease (for such purpose, references to "Tenant" and "Lease" in the definition of "Qualified Sublease" and in this sentence to be deemed to refer to such Qualified Sublessee and the Qualified Sublease under which it is a tenant, respectively; and provided further that this provision shall not apply with respect to such further Qualified Sublease.)

(iii)    not contain provisions that would conflict with Tenant's obligations hereunder;

(iv)    require the payment of (x) monthly rent, payable in lawful money of the United States of America, free and clear of any withholdings, in an amount which at all times is at least equal to the Basic Rent payments during such period under this Lease, and (y) the payment of Stipulated Loss Value and Additional Rent under the circumstances, in the amounts and in the manner required to be paid by Tenant hereunder; and

(v)    have a term of five years or more;

(vi)    be assigned to Landlord as additional security for Tenant's obligations hereunder; and

(vii)    be entered into with one sublessee that, at the time such Qualified Sublease is entered into, has an Investment Grade Rating (a "Qualified Sublessee").

Tenant shall deliver to Landlord, and so long as the lien of the Indenture has not been discharged, Lender promptly after entering into a Qualified Sublease so granting rights of recognition and non-disturbance (1) a Qualified Sublease assignment with respect to such Qualified Sublease in form and substance satisfactory to Landlord, (2) an opinion of counsel for the Qualified Sublessee in form and substance and from counsel reasonably satisfactory to Landlord as to the due authorization, execution and delivery and legal, valid, binding and enforceable nature of such Qualified Sublease assignment, (3) an opinion of counsel in form and substance, and from counsel, reasonably satisfactory to Landlord and Lender to the effect that such Qualified Sublease is a valid, binding and enforceable obligation of the Qualified Sublessee thereunder (subject only to bankruptcy, insolvency and other customary exceptions) and (4) an executed counterpart (which shall be the chattel paper original) of such Qualified Sublease to Lender.

(d)    Neither this Lease nor the term hereby demised shall be mortgaged, pledged or assigned as security by Tenant, nor shall Tenant mortgage or pledge its interest in any sublease of the Premises or the rentals payable thereunder. Any such mortgage or pledge, any sublease made otherwise than as expressly permitted by this Section 4.1, and any assignment of

Tenant's interest hereunder made otherwise than as expressly permitted by this Section 4.1 shall be void. Tenant shall, within 10 days after the execution of any sublease, deliver a certified copy thereof to Landlord.

(e)    Without implying any authority of Tenant to assign this Lease except as specifically set forth above, if this Lease is assigned pursuant to the provisions hereof, or if the Premises or any part thereof is sublet or occupied by any person or entity other than Tenant, Landlord may, after an Event of Default has occurred and is continuing, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Basic Rent and Additional Rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, subtenant or occupant as Tenant, or a release of Tenant from the further performance by Tenant of the terms, covenants, and conditions on the part of Tenant to be observed or performed hereunder, and, subsequent to any assignment or subletting, Tenant's liability hereunder shall continue notwithstanding any subsequent modification or amendment hereof or the release of any subsequent tenant hereunder from any liability, to all of which Tenant hereby consents in advance.

## ARTICLE 5.

5.1    <u>Conditional Limitations; Default Provisions</u>.

(a)    Any of the following occurrences or acts shall constitute an "<u>Event of Default</u>" under this Lease:

(i)    if Tenant shall (1) fail to pay (regardless of the pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings, in law, in equity or before any administrative tribunal which had or might have the effect of preventing Tenant from complying with the provisions of this Lease) any Basic Rent or Additional Rent on or before the third Business Day following notice of such failure given to Tenant by Landlord or Lender or Lender's designee or (2) fail to observe or perform any other provision hereof (except a covenant, term or condition, the observance or performance of which is elsewhere dealt with in this Section 5.1(a)(i)) and such failure shall continue for thirty days after notice thereof given to Tenant by Landlord or Lender or Lender's designee (provided, that in the case of any such failure which is capable of being cured but cannot be cured by the payment of money and cannot with due diligence be cured within such 30-day period, if Tenant shall commence promptly to cure the same and thereafter prosecute the curing thereof with diligence, the time within which such failure may be cured shall be extended for such period (but in any case not to exceed a total of 365 days) as is necessary to complete the curing thereof with diligence; provided, that Tenant has commenced to cure such default within such 30-day period, subject to Force Majeure, and is actively, diligently and in good faith proceeding with continuity to remedy such default); or

(ii)    if any material representation or warranty of Tenant set forth herein or in any notice, certificate, demand, request or other document or instrument delivered to Landlord in connection with this Lease shall prove to be incorrect in any material respect as of

the time when the same shall have been made and such failure shall continue for 30 days after notice to Tenant of such failure (provided, that in the case of any such failure which is capable of being cured but cannot be cured by the payment of money and cannot with diligence be cured within such 30-day period, if Tenant shall commence promptly to cure the same and thereafter prosecute the curing thereof with diligence, the time within which such failure may be cured shall be extended for such period as is necessary to complete the curing thereof with diligence); or

(iii)    if Tenant shall file a petition in bankruptcy or for reorganization or for an arrangement, administration, liquidation or receivership pursuant to any federal or state law or shall be adjudicated a bankrupt or become insolvent or shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts generally as they become due, or if a petition or answer proposing the adjudication of Tenant as a bankrupt or its reorganization pursuant to any federal or state bankruptcy, liquidation, voluntary administration, administration, receivership, moratorium or trust law or any similar federal or state or foreign law shall be filed in any court and Tenant shall consent to or acquiesce in the filing thereof or such petition or answer shall not be discharged or denied within ninety days after the filing hereof; or

(iv)    if a receiver, trustee, administrator or liquidator of Tenant or of all or substantially all of the assets of Tenant or of the Premises or Tenant's estate therein shall be appointed in any proceeding brought by Tenant, or if any such receiver, trustee or liquidator shall be appointed in any proceeding brought against Tenant and shall not be discharged within ninety (90) days after such appointment, or if Tenant shall consent to or acquiesce in such appointment; or

(v)    if, subject to Section 10.3, Tenant shall dissolve, liquidate or otherwise fail to maintain its legal existence; or

(vi)    if Tenant shall default under Sections 4.1 or 10.3 of this Lease and such failure shall continue for five Business Days after notice to Tenant of such failure; or

(vii)    if Tenant shall fail to make the Failure to Complete Rejectable Offer if required to do so pursuant to Section 3.3(b);

(viii)    if Tenant shall fail to pay any premium (or any other amount due) under any insurance required to be maintained by Tenant in accordance with the terms and conditions of Section 3.6 hereof on the fifth day prior to the date on which such insurance shall lapse or terminate; or

(ix)    if Tenant shall fail to maintain any insurance (other than as a result of any failure described in clause (viii) above) and such failure shall continue until the first to occur of (x) the fifth Business Day after notice by Landlord or Lender to Tenant of such failure, or (y) if the applicable insurance company has delivered written notice to Tenant informing Tenant that such insurance will lapse or terminate in the next 30-day period, the fifth day prior to such lapse or termination.

(b)    If an Event of Default shall have occurred and be continuing Landlord shall be entitled to all remedies available at law or in equity. Without limiting the foregoing, Landlord shall have the right to give Tenant notice of Landlord's termination of the term of this Lease. Upon the giving of such notice, the term of this Lease and the estate hereby granted shall expire and terminate on such date as fully and completely and with the same effect as if such date were the date herein fixed for the expiration of the term of this Lease, and all rights of Tenant hereunder shall expire and terminate, but Tenant shall remain liable as hereinafter provided.

(c)    If an Event of Default shall have occurred and be continuing, Landlord shall have the immediate right, whether or not the term of this Lease shall have been terminated pursuant to Section 5.1(b), to re-enter and repossess the Premises and the right to remove all persons and property therefrom by summary proceedings, ejectment, any other legal action or in any lawful manner Landlord determines to be necessary or desirable. Landlord shall be under no liability by reason of any such re-entry, repossession or removal. No such re-entry, repossession or removal shall be construed as an election by Landlord to terminate this Lease unless a notice of such termination is given to Tenant pursuant to Section 5.1(b).

(d)    At any time or from time to time after a re-entry, repossession or removal pursuant to Section 5.1(c), whether or not the term of this Lease shall have been terminated pursuant to Section 5.1(b), Landlord may (but shall be under no obligation to) relet the Premises or any portion thereof for the account of Tenant, in the name of Tenant or Landlord or otherwise, without notice to Tenant, for such term or terms and on such conditions and for such uses as Landlord, in its absolute discretion, may determine. Landlord may collect any rents payable by reason of such reletting. Landlord shall not be liable for any failure to relet the Premises or any portion thereof or for any failure to collect any rent due upon any such reletting.

(e)    No expiration or earlier termination of the term of this Lease pursuant to Section 5.1(b), by operation of law or otherwise, and no re-entry, repossession or removal pursuant to Section 5.1(c) or otherwise, and no reletting of the Premises pursuant to Section 5.1(d) or otherwise, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, re-entry, repossession, removal or reletting.

(f)    In the event of the expiration or earlier termination of the term of this Lease or re-entry or repossession of the Premises or removal of persons or property therefrom by reason of the occurrence of an Event of Default, Tenant shall pay to Landlord all Basic Rent, Additional Rent and other sums required to be paid by Tenant, in each case together with interest thereon at the Rate from the due date thereof to and including the date of such expiration, termination, re-entry, repossession or removal; and thereafter, Tenant shall, until the end of what would have been the then-current term of this Lease in the absence of such expiration, termination, re-entry, repossession or removal and whether or not the Premises or any portion thereof shall have been relet, be liable to Landlord for, and shall pay to Landlord, as liquidated and agreed current damages: (i) all Basic Rent and Additional Rent that would be payable under this Lease by Tenant in the absence of any such expiration, termination, re-entry, repossession or removal, less (ii) the net proceeds, if any, of any reletting effected for the account of Tenant pursuant to Section 5.1(d), after deducting from such proceeds all reasonable expenses of

Landlord in connection with such reletting (including, without limitation, all repossession costs, brokerage commissions, reasonable attorneys' fees and expenses (including fees and expenses of appellate proceedings), employees' expenses, alteration costs and expenses of preparation for such reletting). Tenant shall pay such liquidated and agreed current damages on the dates on which Basic Rent would be payable under this Lease in the absence of such expiration, termination, re-entry, repossession or removal, and Landlord shall be entitled to recover the same from Tenant on each such date.

(g)    At any time after any such expiration or termination of the term of this Lease or re-entry or repossession of the Premises or removal of persons or property thereon by reason of the occurrence of an Event of Default, whether or not Landlord shall have collected any liquidated and agreed current damages pursuant to Section 5.1(f), Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, as and for liquidated and agreed final damages for Tenant's default and in lieu of all liquidated and agreed current damages beyond the date of such demand as set forth in Section 5.1(f) above (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to, at the election of Landlord (approved by Lender) in its sole discretion, (A) the excess, if any, of (a) the aggregate of all Basic Rent that would be payable under this Lease, in each case from the date of such demand (or, if it be earlier, the date to which Tenant shall have satisfied in full its obligations under Section 5.1(f) to pay liquidated and agreed current damages) for what would be the then-unexpired term of the then current term of this Lease in the absence of such expiration, termination, re-entry, repossession or removal, discounted at a rate equal to the then yield on U.S. Treasury obligations of comparable maturity to the Term (the "Treasury Rate") over (b) the then fair rental value of the Premises over the then unexpired term of this Lease, discounted at the Treasury Rate for the same period (such excess being hereinafter referred to as "Liquidated Damages") or (B) an amount equal to the greater of (i) the then fair market sales value of the Premises and (ii) the sum of the Stipulated Loss Value applicable to the Premises as specified on **Schedule E** annexed hereto and made a part hereof as of the immediately preceding Payment Date, plus an amount equal to the Make Whole Premium, and any Additional Rent
then due and payable as of the date of such demand under this Lease (in which case Landlord shall, upon Tenant's payment of such amounts to Landlord, convey the Premises to Tenant in accordance with Section 3.1). For the purposes of determining value pursuant to this Section 5.1(g), the following shall apply: (a) determinations of fair rental value and fair market sales value shall be made by an independent MAI appraiser (engaged by Landlord and paid by Tenant) that is a member of the American Institute of Appraisers, with copies of such determinations and supporting analysis to be provided to Tenant; and (b) all determinations of Liquidated Damages shall be binding on Tenant in the absence of manifest error. If any law shall limit the amount of liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such law.

(h)    [Reserved]

(i)    In the event of an occurrence or act described in Section 5.1(a)(i)(2) which is nonmonetary and Tenant is diligently prosecuting the cure thereof but the same cannot be cured within the 365-day period set forth in Section 5.1(a)(i)(2), after the expiration of such 365-

day period (but only if Landlord shall have terminated this Lease or shall have initiated proceedings for the termination hereof or for the eviction of Tenant, in each case solely as a result of the occurrence of such Event of Default), Tenant shall have the right to purchase the Premises on the purchase date referred to below, for a purchase price equal to the greater of (i) the aggregate Stipulated Loss Value applicable to the Premises as specified on **Schedule E** hereto as of the immediately preceding Payment Date plus an amount equal to the Make Whole Premium and (ii) 100% of the original cost of the Premises. Such purchase option may only be exercised by delivery from Tenant to Landlord and Lender of written notice of the exercise of such purchase option on or prior to the 10th day following later of (i) the expiration of such 365-day period and (ii) Landlord's having terminated this Lease or having initiated proceedings for the termination hereof or for the eviction of tenant, which notice shall specify the purchase date, which shall be the Payment Date next occurring at least 30 days following the date of such notice. The exercise of such purchase option by Tenant shall be irrevocable. Upon exercise of such purchase option, such purchase shall be consummated on such purchase date. On such purchase date, the purchase shall be accomplished in accordance with the provisions of Section 3.1, including, without limitation, the payment of such purchase price, the payment of all other amounts (including Basic Rent and Additional Rent), costs and expenses described in Section 3.1, and the delivery of the other items described in said Section 3.1 (it being understood that for purposes of satisfying the requirements of and complying with Section 3.1, such purchase date shall be considered to be a Lease Termination Date), and subject to the further provisions hereof). Upon payment of such purchase price and all other such amounts, costs and expenses required to be paid by Tenant as outlined in Section 3.1, and upon satisfaction of the other requirements set forth in Section 3.1 with respect to the purchase of the Premises by Tenant, this Lease shall, at Tenant's option, terminate. In the event that Tenant does not deliver the notice within the period described above, Tenant shall have waived its right to exercise such purchase option. In the event that Tenant shall deliver such notice and thereafter fail to consummate the purchase of the Premises, Tenant shall be in default under the Lease and, in addition to any other remedies allowed Landlord hereunder, Landlord shall be entitled to an action for specific performance. In the event that Landlord shall default in its obligation to transfer the Premises to Tenant under this Section, Tenant shall be entitled to enforce such obligation by an action for specific performance.

    5.2   <u>Bankruptcy or Insolvency</u>.

    (a)   In the event that Tenant shall become a debtor in a case filed under Chapter 7 of the Bankruptcy Code and Tenant's trustee or Tenant shall elect to assume this Lease for the purpose of assigning the same or otherwise, such election and assignment may be made only if the provisions of Sections 5.2(b) and 5.2(d) are satisfied as if the election to assume were made in a case filed under Chapter 11 of the Bankruptcy Code. If Tenant or Tenant's trustee shall fail to elect to assume this Lease within 60 days after the filing of such petition or such additional time as provided by the court within such 60-day period, this Lease shall be deemed to have been rejected. Immediately thereupon Landlord shall be entitled to possession of the Premises without further obligation to Tenant or Tenant's trustee and this Lease upon the election of Landlord shall terminate, but Landlord's right to be compensated for damages (including, without limitation, liquidated damages pursuant to any provision hereof) or the

exercise of any other remedies in any such proceeding shall survive, whether or not this Lease shall be terminated.

(b) (i)  In the event that Tenant shall become a debtor in a case filed under Chapter 11 of the Bankruptcy Code, or in a case filed under Chapter 7 of the Bankruptcy Code which is transferred to Chapter 11, Tenant's trustee or Tenant, as debtor-in-possession, must elect to assume this Lease within 120 days from the date of the filing of the petition under Chapter 11 or the transfer thereto or Tenant's trustee or the debtor-in-possession shall be deemed to have rejected this Lease.  In the event that Tenant, Tenant's trustee or the debtor-in-possession has failed to perform all of Tenant's obligations under this Lease within the time periods (excluding grace periods) required for such performance, no election by Tenant's trustee or the debtor-in-possession to assume this Lease, whether under Chapter 7 or Chapter 11, shall be permitted or effective unless each of the following conditions has been satisfied:

(1)    Tenant's trustee or the debtor-in-possession has cured all Events of Default under this Lease, or has provided Landlord with Assurance (as defined below) that it will cure all Events of Default susceptible of being cured by the payment of money within 10 days from the date of such assumption and that it will cure all other Events of Default under this Lease which are susceptible of being cured by the performance of any act promptly after the date of such assumption.

(2)    Tenant's trustee or the debtor-in-possession has compensated Landlord, or has provided Landlord with Assurance that within 10 days from the date of such assumption it will compensate Landlord, for any actual pecuniary loss incurred by Landlord arising from the default of Tenant, Tenant's trustee, or the debtor-in-possession as indicated in any statement of actual pecuniary loss sent by Landlord to Tenant's trustee or the debtor-in-possession.

(3)    Tenant's trustee or the debtor-in-possession has provided Landlord with Assurance of the future performance of each of the obligations of Tenant, Tenant's trustee or the debtor-in-possession under this Lease, and, if Tenant's trustee or the debtor-in-possession has provided such Assurance, Tenant's trustee or the debtor-in-possession shall also (i) deposit with Landlord, as security for the timely payment of rent hereunder, an amount equal to three installments of Basic Rent (at the rate then payable) which shall be applied to installments of Basic Rent in the inverse order in which such installments shall become due provided all the terms and provisions of this Lease shall have been complied with, and (ii) pay in advance to Landlord on the date each installment of Basic Rent is payable a pro rata share of Tenant's annual obligations for Additional Rent pursuant to this Lease, such that Landlord shall hold funds sufficient to satisfy all such obligations as they become due.  The obligations imposed upon Tenant's trustee or the debtor-in-possession by this Section shall continue with respect to Tenant or any assignee of this Lease after the completion of bankruptcy proceedings.

(4)    The assumption of this Lease will not breach or cause a default under any provision of any other lease, mortgage, financing arrangement or other agreement by which Landlord is bound.

(ii)    For purposes of this Section 5.2, Landlord and Tenant acknowledge that "Assurance" shall mean no less than: Tenant's trustee or the debtor-in-possession has and will continue to have sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that sufficient funds will be available to fulfill the obligations of Tenant under this Lease, and (x) there shall have been deposited with Landlord, or the Bankruptcy Court shall have entered an order segregating, sufficient cash payable to Landlord, and/or (y) Tenant's trustee or the debtor-in-possession shall have granted a valid and perfected first lien and security interest and/or mortgage in property of Tenant, Tenant's trustee or the debtor-in-possession, acceptable as to value and kind to Landlord, to secure to Landlord the obligation of Tenant, Tenant's trustee or the debtor-in-possession to cure the Events of Default under this Lease, monetary and/or non-monetary, within the time periods set forth above.

(c)    In the event that this Lease is assumed in accordance with Section 5.2(b) and thereafter Tenant is liquidated or has filed against it (without dismissal within 60 days thereafter) or files a subsequent petition under Chapter 7 or Chapter 11 of the Bankruptcy Code, Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder by giving Tenant notice of its election to so terminate within 100 days after the occurrence of any such event.

(d)    If Tenant's trustee or the debtor-in-possession has assumed this Lease pursuant to the terms and provisions of Sections 5.2(a) or 5.2(b) for the purpose of assigning (or elects to assign) this Lease, this Lease may be so assigned only if the proposed assignee (the "Assignee") has provided adequate assurance of future performance of all of the terms, covenants and conditions of this Lease to be performed by Tenant. Landlord shall be entitled to receive all cash proceeds of such assignment. As used herein "adequate assurance of future performance" shall mean no less than that each of the following conditions has been satisfied:

(i)    the Assignee has furnished Landlord with either (1) (x) a copy of a credit rating of Assignee which Landlord reasonably determines to be sufficient to assure the future performance by Assignee of Tenant's obligations under this Lease and (y) a current financial statement of Assignee audited by a certified public accountant indicating a net worth and working capital in amounts which Landlord reasonably determines to be sufficient to assure the future performance by Assignee of Tenant's obligations under this Lease, or (ii) a guarantee or guarantees, in form and substance satisfactory to Landlord, from one or more persons with a credit rating and net worth equal to or exceeding the credit rating and net worth of Tenant as of the date hereof.

(ii)    Landlord has obtained all consents or waivers from others required under any lease, mortgage, financing arrangement or other agreement by which Landlord is bound to permit Landlord to consent to such assignment.

(e)    When, pursuant to the Bankruptcy Code, Tenant's trustee or the debtor-in-possession shall be obligated to pay reasonable use and occupancy charges for the use of the

Premises, such charges shall not be less than the Basic Rent or Additional Rent payable by Tenant under this Lease.

(f)    Neither the whole nor any portion of Tenant's interest in this Lease or its estate in the Premises shall pass to any trustee, receiver, assignee for the benefit of creditors, or any other person or entity, by operation of law or otherwise under the laws of any state having jurisdiction of the person or property of Tenant unless Landlord shall have consented to such transfer.  No acceptance by Landlord of rent or any other payments from any such trustee, receiver, assignee, person or other entity shall be deemed to constitute such consent by Landlord nor shall it be deemed a waiver of Landlord's right to terminate this Lease for any transfer of Tenant's interest under this Lease without such consent.

(g)    In the event of an assignment of Tenant's interests pursuant to this Section 5.2, the right of Assignee to extend the term of this Lease for an extended term beyond the then term of this Lease shall be extinguished.

5.3    Additional Rights of Landlord.

(a)    No right or remedy hereunder shall be exclusive of any other right or remedy, but shall be cumulative and in addition to any other right or remedy hereunder or now or hereafter existing.  Failure to insist upon the strict performance of any provision hereof or to exercise any option, right, power or remedy contained herein shall not constitute a waiver or relinquishment thereof for the future.  Receipt by Landlord of any Basic Rent or Additional Rent payable hereunder with knowledge of the breach of any provision hereof shall not constitute waiver of such breach, and no waiver by Landlord of any provision hereof shall be deemed to have been made unless made in writing duly executed by Landlord.  Landlord shall be entitled to injunctive relief in case of the violation, or attempted or threatened violation, of any of the provisions hereof, or to a decree compelling performance of any of the provisions hereof, or to any other remedy allowed to Landlord by law or equity.

(b)    Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have to redeem any portion of the Premises or to have a continuance of this Lease after termination of Tenant's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease, or after the termination of the term of this Lease as herein provided, and (ii) the benefits of any law which exempts property from liability for debt or for distress for rent.

(c)    If Tenant shall be in default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under any of the provisions of this Lease, then, without thereby waiving such default, Landlord may, but shall be under no obligation to, take all action, including, without limitation, entry upon the Premises to perform the obligation of Tenant hereunder immediately and without notice in the case of an emergency and upon five days' notice to Tenant in other cases.  All expenses incurred by Landlord in connection therewith, including reasonable attorneys' fees and expenses (including those

incurred in connection with any appellate proceedings), together with interest thereon at the Rate from the date any such expenses were incurred by Landlord until the date of payment by Tenant, shall constitute Additional Rent and shall be paid by Tenant to Landlord upon demand.

Landlord shall deliver written notice to Tenant of any work done on an emergency basis not later than 10 days after having completed such work.

(d)    If Tenant shall be in default in the performance of any of its obligations hereunder, Tenant shall pay to Landlord or Lender, as appropriate, on demand, all reasonable expenses incurred by Landlord or Lender as a result thereof, including reasonable attorneys' fees and expenses (including those incurred in connection with any appellate proceedings).    If Landlord or Lender shall be made a party to any litigation commenced against Tenant and Tenant shall fail to provide Landlord or Lender with counsel reasonably approved by Landlord or Lender, as appropriate, and pay the expenses thereof, Tenant shall pay all costs and reasonable attorneys' fees and expenses in connection with such litigation (including fees and expenses incurred in connection with any appellate proceedings).

## ARTICLE 6.

6.1    <u>Notices and Other Instruments</u>.    All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if sent by (i) certified or registered United States mail, postage prepaid, return receipt requested, or (ii) expedited prepaid delivery service, either overnight delivery service of a nationally recognized courier, commercial or United States Postal Service, with proof of attempted delivery, addressed as follows:

| | |
|---|---|
| To Landlord: | The National 1031 Exchange Corporation<br>156 West Neal Street<br>Pleasanton, CA 94566<br>Attention: Naomi Nadeau |
| With copy to: | Dollinger & Dollinger, P.A.<br>365 West Passaic Street<br>Rochelle Park, NJ 07662<br>Attn:   Martin E. Dollinger, Esq. |
| With copy to: | Lender (and parties required to be copied on notices given to Lender) |
| To Lender: | at the address directed by Landlord |
| With copy to: | Lender's attorneys, as directed by Landlord |

42

To Tenant:                     Bed Bath & Beyond Inc.
                               650 Liberty Avenue
                               Union, New Jersey  07083
                               Attention:  Allan Rauch, Esq., General Counsel

With copy to:                  Bed Bath & Beyond Inc.
                               650 Liberty Avenue
                               Union, New Jersey  07083

                               Attention:  Warren Eisenberg, Co-Chief Executive Officer

Such address may be changed by any party in a written notice to the other parties hereto in the manner provided for in this Section.  A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.  A party receiving a notice which does not comply with the technical requirements for notice under this Section may elect to waive any deficiencies and treat the notice as having been properly given.  A copy of any notice given by Landlord to any assignee or sublessee of Tenant pursuant to Section 4.1 hereof shall be given simultaneously to Tenant.  In the event of an assignment pursuant to Section 4.1.  Landlord shall give to Tenant a copy of any notice of default given to such assignee.

   6.2    Estoppel Certificates, Financial Information.

        (a)    Tenant shall at any time and from time to time during, the term of this Lease upon not less than ten days after prior notice from Landlord, execute, acknowledge and deliver to Landlord or to any prospective purchaser, assignee or mortgagee or third party designated by Landlord, a certificate stating: (i) that this Lease is unmodified and in force and effect (or if there have been modifications, that this Lease is in force and effect as modified, and identifying the modification agreements); (ii) the date to which Basic Rent has been paid; (iii) whether there is (A) any Event of Default or any existing default by Tenant in the payment of Basic Rent and (B) to the best of Tenant's knowledge, any other existing default by either party hereto (including an existing default by Tenant in the payment of any Additional Rent) and, if there is any such default or Event of Default, specifying the nature and extent thereof and the action taken to cure the same; (iv) whether there are to the best of Tenant's knowledge any actions or proceedings pending against the Premises before any governmental authority to condemn the Premises or any portion thereof or any interest therein and whether, to the best of Tenant's knowledge, any such actions or proceedings have been threatened, (v) whether there exists any material unrepaired damage to the Premises from fire or other casualty; (vi) whether, to the best of Tenant's knowledge, there is any existing default by Landlord under this Lease; and (vii) other items that may be reasonably requested by Landlord or Lender.  Any such certificate may be relied upon by Lender and any other actual or prospective mortgagee or purchaser of the Premises.

(b)    Landlord shall at any time and from time to time during the term of this Lease upon not less than ten days after request by Tenant, execute, acknowledge and deliver to Tenant, a certificate stating: (i) that this Lease is unmodified and in force and effect (or if there have been modifications, that this Lease is in force and effect as modified, and identifying the modification agreements); (ii) the date to which Basic Rent has been paid; (iii) whether, to the actual knowledge of Landlord, there is any existing default by Tenant under this Lease; and (iv) other items that may be reasonably requested to the extent that Landlord has actual knowledge thereof.

(c)    Tenant agrees, upon prior written notice, to meet with Landlord and Lender during normal business hours at mutually convenient times, from time to time (but in any case not more than once annually), to discuss this Lease and such information about Tenant's business and financial condition (exclusive of proprietary information) as is generally made available to banks and other lenders or to shareholders.  Tenant will deliver to Landlord and to Lender, as soon as practicable, copies of all financial statements, reports, notices and proxy statements sent by Tenant to its stockholders or to the Securities and Exchange Commission and shall deliver to Lender as soon as practicable such other information generally made available to banks and other Lenders; provided, however, that if such statements and reports do not include the following information (it being agreed that current reports on Form 8-K, as applicable, quarterly reports on Form 10-Q and annual reports on Form 10-K, in each case as filed with the Securities and Exchange Commission, shall be deemed to include the information set forth in clauses (i) and (ii) below), Tenant will deliver to Landlord and Lender the following:

(i)    Within 90 days after the end of each fiscal year of Tenant, an audited balance sheet of Tenant and its consolidated subsidiaries as at the end of such year, an audited consolidated statement of changes in financial position, an audited consolidated statement of stockholders' equity, and an audited statement of profits and losses of Tenant and its consolidated subsidiaries for such year setting forth in each case, in comparative form, the corresponding figures for the preceding fiscal year in reasonable detail and scope and certified by independent certified public accountants of recognized national standing selected by Tenant; and within 60 days after the end of each fiscal quarter of Tenant a balance sheet of Tenant and its consolidated subsidiaries as at the end of such quarter, a consolidated statement of changes in financial position and a consolidated statement of stockholders' equity and statements of profits and losses of Tenant and its consolidated subsidiaries for such quarter setting forth in each case, in comparative form, the corresponding figures for the similar quarter of the preceding year, in reasonable detail and scope to Landlord and Lender, and certified by the chief financial officer of Tenant, the foregoing financial statements all being prepared in accordance with generally accepted accounting principles, consistently applied; and

(ii)    With reasonable promptness, such additional information (including copies of public reports filed by Tenant) regarding the business affairs and financial condition of Tenant as Landlord or Lender may reasonably request.

(d)    Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any mortgage or deed of trust now or hereafter encumbering or affecting all or

any portion of the Premises, provided, however, that each holder of any such mortgage or deed of trust shall execute and deliver to Tenant an agreement in the form of Schedule J in recordable form.

## ARTICLE 7.

7.1    Environmental Covenant and Warranty.

(a)    Tenant represents and warrants to Landlord and Lender that:

(i)    the Premises complies with all present and Tenant shall cause the Premises to comply with all future, federal, state or local law, statute, regulation or ordinance, and any judicial or administrative order or judgment thereunder, and judicial opinions or orders, pertaining to health, industrial hygiene, Hazardous Substances or the environment, including, but not limited to, each of the following, as enacted as of the date hereof or as hereafter amended: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §6901 et seq.; the Toxic Substance Control Act, 15 U.S.C. §2601 et seq.; the Water Pollution Control Act (also known as the Clean Water Act), 33 U.S.C. §1251 et seq.; the Clean Air Act, 42 U.S.C. §7401 et seq.; and the Hazardous Materials Transportation Act, 49 U.S.C. 1801 et seq. (collectively, the "Environmental Laws");

(ii)    no notices, complaints or orders of violation or non-compliance with Environmental Laws have been received by Tenant and, to the best of Tenant's actual knowledge, no federal, state or local environmental investigation or proceeding is pending or threatened with regard to the Premises or any use thereof or any alleged violation of Environmental Laws with regard to the Premises;

(iii)    Neither the Premises, nor any portion thereof, has been used by Tenant or, to the best of Tenant's knowledge, after due inquiry (or as set forth in the Phase I Environment Site Assessment dated February 19, 1999, and the related letter regarding asbestos dated May 17, 1999, each prepared by EMG, with respect to the Premises, by any prior owner for the generation, manufacture, storage, handling, transfer, treatment, recycling, transportation, processing, production, refinement or disposal (each, a "Regulated Activity") of any material, waste or substance which is (1) included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in or pursuant to any Environmental Law, or subject to regulation under any Environmental Law; (2) listed in the United States Department of Transportation Optional Hazardous Materials Table, 49 C.F.R. §172.101, as enacted as of the date hereof or as hereafter amended, or in the United States Environmental Protection Agency List of Hazardous Substances and Reportable Quantities, 40 C.F.R. Part 302, as enacted as of the date hereof or as hereafter amended; or (3) explosive, radioactive, asbestos, a polychlorinated biphenyl, petroleum or a petroleum product or waste oil (herein "Hazardous Substance");

(iv)    no underground storage tanks or surface impoundments have been installed in the Premises in violation of applicable Environmental Laws and there exists no Hazardous Substance contamination in violation of applicable Environmental Laws to the Premises which originated on or off the Premises; and

(v)    the Premises is free of Hazardous Substances and friable asbestos, the removal of which is required or the maintenance of which is prohibited or penalized by any Environmental Law.

(b)    Tenant covenants that during the Term of this Lease it (i) shall comply, and cause the Premises to comply, with all Environmental Laws applicable to the Premises, (ii) shall not use and shall prohibit the use of the Premises for Regulated Activities or for the storage or handling of any Hazardous Substance (other than in connection with the operation and maintenance of the Premises and then only in commercially reasonable quantities as a consumer thereof, subject to, in any event, compliance with Environmental Laws), (iii) shall not install or permit the installation on the Premises of any underground storage tanks or surface impoundments (other than in connection with the use, operation and maintenance of the Premises and then only in compliance with applicable Environmental Laws and all other applicable laws, rules, orders, ordinances, regulations and requirements now or hereafter enacted or promulgated of every government and municipality having jurisdiction over the Premises and of any agency thereof) and shall not permit there to exist any petroleum contamination in violation of applicable Environmental Laws to the Premises originating on or off the Premises or asbestos-containing materials, and (iv) shall cause any alterations of the Premises to be done in a way so as to not expose the persons working on or visiting the Premises to Hazardous Substances and in connection with any such alterations shall remove any Hazardous Substances present upon the Premises which are not in compliance with Environmental Laws or which present a danger to persons working on or visiting the Premises.

(c)    If any investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (collectively, the "Remedial Work") is required on the Premises pursuant to an order or directive of any Governmental Authority (as defined below) or under any applicable Environmental Law, or in Landlord's opinion, based upon recommendations of qualified environmental engineer reasonably acceptable to Landlord, after notice to Tenant, is reasonably necessary to prevent future liability under any applicable Environmental Law, because of or in connection with the current or future presence, suspected presence, release, or suspected release of a Hazardous Substance (whether or not arising out of or in any manner connected with Tenant's occupancy of the Premises during the Term) into the air, soil, ground water, surface water, or soil vapor on, under or emanating from the Premises or any portion thereof, Tenant shall (at Tenant's sole cost and expense), or shall cause such responsible third parties to, promptly commence and diligently prosecute to completion all such Remedial Work. In all events, such Remedial Work shall be commenced within thirty (30) days (or such shorter period as may be required under any applicable Environmental Law) after the earlier to occur of Tenant's actual knowledge that remediation is required under applicable Environmental Laws or any written demand reasonably made therefor by Landlord; provided, however, Tenant shall not be required to commence such Remedial Work within the above-specified time periods

if (x) prevented from doing so by any Governmental Authority, (y) commencing such Remedial Work within such time periods would result in Tenant or such Remedial Work violating any Environmental Law or (z) Tenant is contesting in good faith and by appropriate proceedings the applicability of the relevant Environmental Laws in accordance with Section 2.6 of this Lease; provided, further, that such contest shall not permit or materially increase the risk of the spread, release or suspected release of any Hazardous Substance into the air, soil, ground water, surface water, or soil vapor on, under or emanating from the Premises or any portion thereof during the pendency of such contest. "Governmental Authority" shall mean any federal, state, regional or local government or political subdivision thereof and any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

(d)    All Remedial Work shall be performed by contractors, and under the supervision of a consulting engineer, each approved in advance by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed). All costs and expenses reasonably incurred in connection with such Remedial Work and Landlord's or Lender's reasonable monitoring or review of such Remedial Work which Lender or Landlord may, but are not obligated to, do (including reasonable attorneys, fees and disbursements, but excluding internal overhead, administrative and similar costs of Lender and Landlord) shall be paid by Tenant. If Tenant does not timely commence and diligently prosecute to completion the Remedial Work, then Landlord or Lender may (but shall not be obligated to) cause such Remedial Work to be performed. Tenant agrees to bear and shall pay or reimburse Landlord or Lender, as the case may be, on demand for all reasonable out-of-pocket advances and expenses (including reasonable attorneys' fees and disbursements, but excluding internal overhead, administrative and similar costs of Lender or Landlord) reasonably relating to or incurred by Landlord or Lender in connection with monitoring, reviewing or performing any such Remedial Work.

(e)    Except with Landlord's and Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, Tenant shall not commence any Remedial Work or enter into any settlement agreement, consent decree or other compromise relating to any Hazardous Substances or Environmental Laws which might, in Landlord's and Lender's judgment, impair the value of the Premises to a material degree. Landlord's and Lender's prior written consent shall not be required, however, if the presence or threatened presence of Hazardous Substances on, under or about the Premises poses an immediate threat to the health, safety or welfare of any person or is of such a nature that an immediate remedial response is necessary, or if Lender or Landlord, as applicable, fails to respond to any notification by Tenant hereunder within twenty (20) Business Days from the date of such notification. In such event, Tenant shall notify Lender and Landlord as soon as practicable of any action taken.

(f)    Upon reasonable prior notice, Landlord and Lender and their agents, representatives and employees shall have the right at all reasonable times and during normal business hours and on not less than two Business Day's prior notice (such notice not required in the circumstances described in the second sentence of Section 7.1(e)), except to the extent such access is limited by applicable law, to enter upon and inspect all or any portion of the Premises, provided that such inspections shall not unreasonably interfere with the operation thereof. Landlord or Lender, at their sole expense, except as provided in Section 7.1(g), (i) may retain an

environmental consultant to conduct and prepare reports of such inspections and (ii) Tenant shall be given a reasonable opportunity to review any and all reports, data and other documents or materials reviewed or prepared by any such consultant so retained by Landlord or Lender, and to submit comments and suggested revisions or rebuttals to same. The inspection rights granted to Landlord and Lender in this Section shall be in addition to, and not in limitation of, any other inspection rights granted to Landlord or Lender in this Lease, and shall expressly include the right to conduct soil borings and other customary environmental tests, assessments and audits in compliance with applicable Legal Requirements; provided, however, that except as set forth in Section 7.1 (g), Lender or Landlord, as applicable, shall cause to be repaired any damage caused by such borings, tests, assessments or audits.

(g)    Tenant agrees to bear and shall pay or reimburse Landlord and Lender on demand for all reasonable out of pocket expenses (including reasonable attorneys, fees and disbursements, but excluding internal overhead, administrative and similar costs of Lender or Landlord) reasonably relating to or incurred by Lender or Landlord in connection with the inspections, tests and reports described in this Section 7.1 in the following situations (all of which shall, to the extent reasonably practicable, be conducted without unreasonable interference to Tenant's business operations):

(i)    If Landlord or Lender, as applicable, has reasonable grounds to believe at the time any such inspection is ordered, that there exists an Environmental Violation or that a Hazardous Substance is present on, under or emanating from the Premises, or is migrating to or from adjoining property, except under conditions permitted by applicable Environmental Laws and not prohibited by this Lease;

(ii)    If any such inspection reveals an Environmental Violation or that a Hazardous Substance is present on, under or emanating to or from the Premises or is migrating from adjoining property, except under conditions permitted by applicable Environmental Laws and not prohibited by this Lease; or

(iii)    If an Event of Default exists at the time any such inspection is ordered.

(h)    To the extent that Tenant has actual knowledge thereof, Tenant shall promptly provide notice to Landlord and Lender of:

(i)    any proceeding or investigation commenced or threatened by any Governmental Authority with respect to the presence of any Hazardous Substance on, under or emanating from the Premises;

(ii)    any proceeding or investigation commenced or threatened by any Governmental Authority, against Tenant or Landlord, with respect to the presence, suspected presence, release or threatened release of Hazardous Substances from any property not owned by Landlord, including, but not limited to, proceedings under the

48

Federal Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.;

(iii)    all claims made or any lawsuit or other legal action or proceeding brought by any Person against (A) Tenant or Landlord or the Premises or any portion thereof, or (B) any other party occupying the Premises or any portion thereof, in any such case relating to any loss or injury allegedly resulting from any Hazardous Substance or relating to any violation or alleged violation of Environmental Law;

(iv)    the discovery of any occurrence or condition on the Premises or on any real property adjoining or in the vicinity of the Premises, of which Tenant becomes aware, which reasonably could be expected to lead to the Premises or any portion thereof being in violation of any Environmental Law or subject to any restriction on ownership, occupancy, transferability or use under any Environmental Law including, without limitation, Tenant discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Premises that could cause the Premises or any part thereof to be classified as "border-zone property" under the provisions of California Health and Safety Code, §25220 et seq. or any regulation adopted in accordance therewith (collectively, an "Environmental Violation") or which might subject Landlord or Lender to an Environmental Claim.    "Environmental Claim" shall mean any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or resulting from (A) the presence, or release into the environment, of any Hazardous Substance at the Premises or (B) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; and

(v)    the commencement and completion of any Remedial Work.

(i)    Tenant will promptly transmit to Landlord and Lender copies of any citations, orders, notices or other communications received by Tenant from any Person with respect to the notices described in Section 7.1(h) hereof.

(j)    Landlord and Lender may, but are not required to, join and participate in, as a party if they so determine, any legal or administrative proceeding or action concerning the Premises or any portion thereof under any Environmental Law, if, in Landlord's or Lender's reasonable judgment, the interests of Landlord or Lender, as applicable, will not be adequately protected by Tenant.  Tenant agrees to bear and shall pay or reimburse Landlord and Lender, on demand for all reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements, but excluding internal overhead, administrative and similar costs of Lender and Landlord) relating to or reasonably incurred by Landlord and Lender in connection with any such action or proceeding.

7.2    <u>Environmental Indemnity</u>.  Tenant agrees to indemnify, reimburse, defend, and hold harmless the Indemnified Parties for, from, and against all demands, claims, actions or

causes of action, assessments, losses, damages, liabilities, costs and expenses, including, without limitation, interest, penalties, punitive and consequential damages, costs of any Remedial Work, reasonable attorneys, fees, disbursements and expenses, and reasonable consultants' fees, disbursements and expenses (but excluding internal overhead, administrative and similar costs of the Indemnified Parties), asserted against, resulting to, imposed on, or incurred by the Indemnified Parties, directly or indirectly, in connection with any of the following:

(a) the events, circumstances, or conditions, past, present or future, which are alleged to, or do, (1) relate to the presence, or release into the environment, of any Hazardous Substance at the Premises or related to circumstances forming the basis of any violation, or alleged violation, of any Environmental Law by Tenant or any other entity or person or with respect to the Premises, and in either case, result in Environmental Claims, or (2) constitute Environmental Violations;

(b) any pollution or threat to human health or the environment that is related in any way to Tenant's or any previous owner's or operator's management, use, control, ownership or operation of the Premises, including, without limitation, all onsite and offsite activities involving Hazardous Substances, and whether occurring, existing or arising prior to or from and after the date hereof;

(c) any Environmental Claim against any Person whose liability for such Environmental Claim Landlord or Tenant has or may have assumed or retained either contractually or by operation of law;

(d) any Remedial Work required to be performed pursuant to any Environmental Law or the terms hereof; or

(e) the breach of any environmental representation, warranty or covenant set forth in this Lease,

including in each case, without limitation, with respect to each of the Indemnified Parties, as the case may be, to the extent such Environmental Claims result from their respective negligence, except in each case, to the extent that they result solely from their respective gross negligence or willful misconduct (subject to the provisions of Section 10.19(b)).

7.3    Notice.    Immediately upon obtaining knowledge thereof, Tenant shall give to Landlord notice of the occurrence of any of the following events: (i) the failure of the Premises to comply with any Environmental Law in any manner whatsoever except for the use or disposal of incidental amounts of Hazardous Substances customarily used in the operation of similar buildings similarly situated in a commercially reasonably manner and in compliance with Legal Requirements; (ii) the issuance to Tenant or any tenant of space in the Premises or any assignee or licensee of Tenant of any notice, request for information, complaint or order of violation or non-compliance or liability of any nature whatsoever with regard to the Premises or the use thereof with respect to Environmental Laws; (iii) any notice of a pending or threatened investigation as to whether Tenant's (or its "subtenants" or "assignees") operations on the

Premises are in compliance with or may lead to liability to Tenant under, any Environmental Law; or (iv) the occurrence of an event or the existence of a situation which is likely to result in a violation of an Environmental Law at the Premises or which is likely to result in Tenant being liable to Landlord by virtue of the indemnity given by Tenant pursuant to Section 7.2.

7.4    Survival.  The indemnity obligations of Tenant and the rights and remedies of Landlord under this Article 7 shall survive the termination of this Lease for an indefinite period of time.

## ARTICLE 8.

8.1    Holdover.  If Tenant shall continue to occupy the Premises after the Expiration Date or earlier termination of this Lease, then Tenant shall be deemed to be a holdover tenant, the tenancy of which shall be from month to month upon the same provisions and conditions set forth in this Lease, except that Basic Rent for the holdover period shall be an amount equal to the greater of (i) fair market rental value (determined pursuant to the penultimate sentence of Section 5.1(g)) and (ii) one hundred twenty-five percent (125%) of the Basic Rent in effect immediately prior to the holdover period.  This Article 8 does not amount to a waiver of Landlord's right of reentry or any other right granted under Article 5 and shall not constitute a consent to any holdover by Tenant.

## ARTICLE 9.

[Reserved]

## ARTICLE 10.

10.1    No Merger.  There shall be no merger of this Lease or of the leasehold estate hereby created with the fee estate in the Premises by reason of the fact that the same person acquires or holds, directly or indirectly, this Lease or the leasehold estate hereby created or any interest herein or in such leasehold estate as well as the fee estate in the Premises or any interest in such fee estate.

10.2    Surrender.  Upon the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the condition in which the Premises were originally received from Landlord, except as repaired, rebuilt, restored, altered or added to as permitted or required hereby and except for ordinary wear and tear and subject to Section 3.2.  Tenant shall remove from the Premises on or prior to such expiration or termination all property situated thereon which is not owned by Landlord and shall repair any damage caused by such removal. Property not so removed shall become the property of Landlord, and Landlord may cause such property to be removed from the Premises and disposed of, but the cost of any such removal and disposition and of repairing any damage caused by such removal shall be borne by Tenant. However, notwithstanding the foregoing, Landlord shall be allowed (and Tenant hereby grants to Landlord the option) to purchase such Tenant's Personal Property from Tenant for an amount

equal to the fair market value of Tenant's Personal Property. Tenant's Personal Property shall only be deemed to be retained by Landlord if Landlord specifically elects to retain the same by written notice to Tenant (and Landlord shall promptly determine whether to so elect if requested to do so by Tenant by notice given by Tenant to Landlord reasonably in advance (not to exceed one year) prior to the date of such expiration or termination). If Tenant abandons Tenant's Personal Property, it shall become the property of Landlord as outlined above. The fair market value of Tenant's Personal Property shall be determined by the mutual agreement of Landlord and Tenant, and if the parties cannot agree, by appraisal by an unrelated third-party appraiser. The provisions of this Section shall survive the termination or expiration of this Lease.

10.3    Merger, Consolidation or Sale of Assets. Without waiving the provisions of Section 4.1(a), it shall be a condition precedent to the merger of Tenant into another entity, to the consolidation of Tenant with one or more other entities, and to the sale or other disposition of all or substantially all the assets of Tenant to one or more other entities (a "Merger and Sale Event") that (i) the surviving entity of any merger or consolidation or transferee of assets, as the case may be, shall deliver to Landlord and Lender an acknowledged instrument in recordable form assuming all obligations, covenants and responsibilities of Tenant hereunder and under any instrument executed by Tenant, relating to the Premises or this Lease, including, without limitation, any consent to the assignment of Landlord's interest in this Lease to Lender as security for indebtedness, (ii) no Event of Default then exists under this Lease, (iii) the surviving entity of any merger or consolidation or the transferee of such assets, as the case the may be, must be organized in, or otherwise subject to service of process in and to the jurisdiction of courts within, the United States, (iv) Tenant shall have delivered such estoppels, certificates and/or opinions of counsel as may be reasonably required by Landlord, Lender or such Rating Agencies in connection with such transaction, including but not limited to a REMIC Opinion, (v) the surviving entity of any merger or consolidation or the transferee of such assets, as the case may be, must be a solvent entity, and (vi) the surviving entity of any merger or consolidation or the transferee of such assets, as the case may be, must provide an opinion in form reasonably acceptable to Landlord and to Lender and acceptable to the Rating Agencies that such consent to jurisdiction is enforceable and valid, (vii) the surviving entity of any merger or consolidation or the transferee of such assets, as the case may be, must either (A) have an Investment Grade Rating or Tenant shall provide a Credit Enhancement Facility, as provided below (if Tenant had an Investment Grade Rating from any Rating Agency then rating Tenant immediately prior to such Merger and Sale Event) or (B) have a tangible net worth not less than Tenant's tangible net worth and a credit rating not lower than Tenant's credit rating, in each case immediately prior to such Merger and Sale Event or Tenant shall provide a Credit Enhancement Facility, as provided below (if Tenant did not have an Investment Grade Rating from any Rating Agency then rating Tenant immediately prior to such Merger and Sale Event) and (viii) Lender and Landlord shall be given, as a prerequisite to such merger or consolidation, a written certification of Tenant (signed by its chief financial officer), that the provisions of this Section have been satisfied (collectively, the "Merger and Sale Conditions"). Tenant covenants that it will not engage in a Merger and Sale Event unless the Merger and Sale Conditions have been satisfied. Except as required by law or court order or in connection with any enforcement by Landlord of its rights and remedies under this Lease, for a period which is the earlier of (x) twelve months following receipt thereof by Landlord, or (y) until such information shall be disclosed to the public (other than by reason of a

disclosure thereof by Landlord in violation of this Lease), Landlord shall not disclose the content of any information provided by Tenant to Landlord in connection with any Merger and Sale Event to any party other than (i) Landlord's beneficiaries (or the beneficial owners of any beneficiaries of Landlord) or their respective accountants, consultants or counsel, and (ii) Lender and the Rating Agencies or their respective accountants, consultants or counsel. Any failure by Landlord to comply with the foregoing covenant shall not give Tenant any right to cancel or terminate this Lease, or to abate, reduce or make deduction from or offset against any Basic Rent, Additional Rent or other sum payable under this Lease, or to fail to perform or observe any other covenant, agreement or obligation hereunder or to recover any damages against Landlord resulting therefrom (except for any damages resulting solely from Landlord's gross negligence or willful misconduct). Tenant shall be responsible for all costs and expenses of Landlord, Lender and/or the Rating Agencies (including reasonable attorneys' fees and expenses) in connection with the transactions contemplated by this Section. "Credit Enhancement Facility" shall mean any one or more of the following: (i) the delivery by Tenant of a clean, unconditional, transferable, irrevocable standby letter of credit (the "Standby Letter of Credit") as security for the full and faithful performance by Tenant of each of its obligations under this Lease, including, without limitation, the payment of all Basic Rent and Additional Rent as and when due and payable by Tenant hereunder, which Standby Letter or Credit shall be (a) in form and substance satisfactory to Landlord and Lender (as long as the Indenture is outstanding), (b) held by, and shall be subject to draw by, Landlord or solely by Lender (as long as the Indenture shall remain outstanding), (c) payable at sight upon the failure of Tenant to pay any Basic Rent or Additional Rent as and when due and payable hereunder or upon the occurrence of any other Event of Default by Tenant under this Lease, (d) issued by an Eligible Bank, (e) in an amount equal to the aggregate payments of Basic Rent and Additional Rent (as estimated by Landlord and approved by Lender) due and payable from the date of the consummation of the Merger and Sale Event through the expiration of the then current term of this Lease (which amount shall be subject to increase from time to time upon demand of Landlord or Lender in the event that the amount of the Standby Letter of Credit is estimated in good faith to be less than the amount required to fully satisfy the obligations of Tenant under this Lease through and including the expiration of the then current term of this Lease; in which case Tenant shall be required to amend the Standby Letter of Credit to increase the amount thereof or to deliver a substitute Standby Letter of Credit in such increased amount and which otherwise satisfies the requirements set forth above), or (ii) or such other security which is satisfactory to Landlord, Lender and any Rating Agencies involved in any secondary market transaction relating to the Indenture. "REMIC Opinion" shall mean an opinion of counsel satisfactory to Lender and the Rating Agencies stating that any securitization vehicle formed in connection with a securitization which includes the loan secured by the Indenture which has elected to be treated as a "real estate mortgage investment conduit" within the meaning of Section 860(D) of the Internal Revenue Code, as amended "REMIC", will not fail to maintain such REMIC status as a result of Merger and Sale Event and that such Merger and Sale Event, does not constitute a "significant modification" of the loan secured by the Indenture under Section 1001 of the Internal Revenue Code, as amended, or otherwise cause a tax to be imposed on a "prohibited transaction" by any securitization vehicle electing to be treated as a REMIC.

10.4    Separability; Binding Effect.    Each provision hereof shall be separate and independent and the breach of any provision by Landlord shall not discharge or relieve Tenant

from any of its obligations hereunder.  Each provision hereof shall be valid and shall be enforceable to the extent not prohibited by law.  If any provision hereof or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby.  All provisions contained in this Lease shall be binding upon, inure to the benefit of, and be enforceable by, the successors and assigns of Landlord to the same extent as if each such successor and assign were named as a party hereto.  All provisions contained in this Lease shall be binding upon the successors and assigns of Tenant and shall inure to the benefit of and be enforceable by the permitted successors and assigns of Tenant in each case to the same extent as if each such successor and assign were named as a party hereto.

10.5    Table of Contents and Headings.  The table of contents and the headings of the various Sections and Schedules of this Lease have been inserted for reference only and shall not to any extent have the effect of modifying the express terms and provisions of this Lease.

10.6    Counterparts.  This Lease may be executed in two or more counterparts and shall be deemed to have become effective when and only when one or more of such counterparts shall have been signed by or on behalf of each of the parties hereto (although it shall not be necessary that any single counterpart be signed by or on behalf of each of the parties hereto, and all such counterparts shall be deemed to constitute but one and the same instrument), and shall have been delivered by each of the parties to each other.

10.7    Recording of Lease.  Tenant will execute, acknowledge, deliver and cause to be recorded or filed, in the manner and place required by any present or future law, a memorandum of this Lease and all other instruments which shall be reasonably requested by Landlord.  Tenant shall be responsible for all costs and expenses in connection with the recording of this Lease or a memorandum hereof.

10.8    Rating of the Transaction.  During the period commencing on the commencement date of the Primary Term and ending on the second anniversary thereof, Tenant will, at Landlord's request, cooperate in good faith with Landlord and Lender in (i) effecting any secondary market transaction relating to the Loan and (ii) implementing all requirements imposed by the Rating Agencies involved in any such secondary market transaction, including, without limitation:

(a)    to provide such financial and other information with respect to the Premises and Tenant and to perform or permit or cause to be performed or permitted such site inspections, appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), engineering reports and other due diligence investigation of the Premises as may be reasonably requested by Landlord, Lender or the Rating Agencies or as may be necessary or appropriate in connection with any such secondary market transaction, together, if customary, with appropriate verification of such information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies; provided that if any inspection, appraisal, market study, environmental review, report or other due diligence delivered

in connection with the execution and delivery of this Lease did not recommend that further investigation or procedures be undertaken and Landlord or Lender request a further inspection, appraisal market, study, environmental review, report or other due diligence, as the case may be, Tenant shall not be required to pay the cost of providing the same;

    (b)    at Tenant's expense to cause counsel to render opinions customary in secondary market transactions with respect to the Premises and Tenant, which counsel and opinions shall be reasonably satisfactory to Lender and shall be acceptable to the Rating Agencies;

    (c)    to make such representations and warranties, as of the closing date of any such secondary market transaction, with respect to the Premises and Tenant and the documents executed in connection with the leasing of the Premises hereunder by Tenant, Landlord and Lender the ("Operative Documents") to which Tenant is a party, as are customarily provided in securitization transactions in which Lender or one of its affiliates is the issuer and as may be requested by the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in or pursuant to the Operative Documents to which Tenant is a party; and

    (d)    to execute modifications to any Operative Document to which Tenant is a party acceptable to the Rating Agencies, provided, however, that any such modification shall be subject to Landlord's prior approval;

provided, however, that no action required to be taken by Tenant under this Section (including executing any modifications to any Operative Document pursuant to clause (d) above) shall (i) cause Tenant to incur any material liability, or (ii) increase Tenant's obligations or reduce Tenant's rights pursuant to such Operative Documents in any material respect.

    10.9   No Brokers. Landlord and Tenant each represent that no real estate broker or other party engaged by it (other than, with respect to Tenant, Asset Finance Ltd. (the "Broker"), is entitled to any commission as a result of the purchase and leasing of the Premises. Tenant shall be responsible for the payment of a commission to the Broker. Tenant shall indemnify Landlord against the claims of brokers claiming through Tenant and from any loss, liability, cost and expense (including, without limitation, reasonable attorneys' fees) arising from a breach by Tenant under this Section.

    10.10   No Waiver; Amendments. No failure, delay, forbearance or indulgence on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, or as an acquiescence in any breach, nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No term or provision hereof may be amended, changed, waived, discharged or terminated orally, but only by an instrument signed by the party against whom enforcement thereof is sought. No modification to, or early termination by Tenant of, this Lease shall be effective without the prior written consent of Lender.

10.11  Governing Law.  This Lease shall be governed by the laws of the State of California.  To the fullest extent permitted by law, Tenant hereby unconditionally and irrevocably waives any claim to assert that the law of any jurisdiction other than the State of California.

10.12  Waiver of Jury Trial.  LANDLORD AND TENANT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS LEASE.

10.13  Conveyance by Landlord.  The word "Landlord" as used in this Lease means only the owner for the time being of the Premises, so that, if there is a transfer of an owner's interest, the transferor shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder, except any covenants, agreements and obligations which accrued prior to the date of transfer, and it shall be deemed and construed, without further agreement between the parties or between the parties and the transferee of·the Premises, that the transferee has assumed and has agreed to carry out any and all of Landlord's covenants and obligation hereunder from and after the date of transfer.

10.14  Relationship of the Parties.  Nothing contained in this Lease shall be construed in any manner to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.  Without limitation, Landlord and Tenant shall not be considered partners or co-venturers for any purpose on account of this Lease.

10.15  Representation by Counsel.  Tenant and Landlord each acknowledge that it was represented by counsel in connection with the negotiation and execution of this Lease, and the parties hereby agree that any rule of interpretation to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease.

10.16  Access to Premises.  Tenant will permit Landlord, any Lender, any prospective Lender or purchaser and their duly authorized representatives to enter upon the Premises and to inspect the same at any and all reasonable times, upon reasonable advance notice, and at any time in the case of an emergency without the giving of notice, and for any purpose reasonably related to the rights of Landlord and any Lender under this Lease.  Any access to the Premises by Landlord or Lender or their representatives shall be at their sole cost and expense with respect to one access per calendar year, and at Landlord's, Lender's or such representative's sole cost and expense for any further access during such calendar year, unless an Event of Default has occurred and is continuing or unless such access is allowed or required at Tenant's expense pursuant to a specific provision hereof, in which case such access shall be at Tenant's sole cost and expense.

10.17  Showing.  During the three year period preceding the date on which the Term shall be scheduled to terminate or expire, Landlord, if accompanied by a representative of Tenant and subject to the rights of any subtenant not affiliated with Tenant, may show the Premises to prospective tenants or purchasers at such reasonable times during normal business hours as Landlord may select upon reasonable prior notice to Tenant, provided that Landlord does not materially interfere with Tenant's normal business operations.

10. 18  <u>True Lease</u>.  This Lease is intended as, and shall constitute, an agreement of lease, and nothing herein shall be construed as conveying to Tenant any right, title or interest in or to the Premises nor to any remainder or reversionary estates in the Premises held by any Person, except, in each instance, as a tenant.  Under no circumstances shall this Lease be regarded as an assignment of all of Landlord's interests in and to the Premises; instead Landlord and Tenant shall have the relationship between them of landlord and tenant, pursuant to the provisions of this Lease.  Landlord and Tenant each shall reflect the transaction represented herein in all applicable books and records (including income tax returns) in a manner consistent with "true lease" treatment, rather than "financing treatment".

10. 19  <u>Landlord's Consent and Standards</u>.

(a)  Whenever Landlord is allowed or required to give its consent or approval of any matter under this Lease or to deliver any estoppel or other instrument, Tenant's sole remedy for Landlord's failure to give such consent or approval or to deliver such instrument in accordance with the applicable provision of this Lease shall be to compel such approval or delivery.  Any withholding or delay of any consent required to be given by Landlord or Lender in respect of (i) any Alterations or (ii) the granting of any easement or any other agreement affecting or relating to the Premises, will not be deemed unreasonable if such withholding or delay is at the direction of any residual value insurer (it being understood that the obligation of the initial residual value insurer to grant such consent is governed by the initial residual value insurance policy, the relevant provisions of which are attached as Schedule J).  In no event and under no circumstance shall Tenant be entitled to any monetary damages for such failure or to terminate or otherwise modify this Lease.

(b)  Under no circumstance shall Landlord be deemed to have acted negligently, grossly negligently or willfully merely by Landlord's ownership of the Premises, and in no event shall any occurrence relating to the Premises, whether negligent, grossly negligent or willful, be imputed to Landlord by reason of Landlord's interest in the Premises, it being understood that all obligations with respect to the Premises are the responsibility of Tenant under this Lease.  In order to have acted negligently, grossly negligently or willfully, Landlord must have committed an affirmative act.

10.20  <u>Quiet Enjoyment</u>.  Landlord covenants that, so long as Tenant shall faithfully perform the agreements, terms, and covenants and conditions hereof, Tenant shall and may peaceably and quietly have, hold and enjoy the Premises for the term hereby granted without molestation or disturbance by or from Landlord. Notwithstanding the preceding sentence, (a) Landlord may exercise its rights and remedies under Article 5 upon the occurrence and during the continuance of an Event of Default and (b) Landlord, Lender, or their agents may enter upon and inspect the Premises during normal business hours and after reasonable notice to Tenant; provided that (i) Tenant shall have the right to accompany Landlord, Lender and such agents in any such inspection and (ii) Landlord, Lender and such agents shall use their good faith efforts not to interfere with Tenant's operations. Any failure by Landlord to comply with the foregoing covenant shall not give Tenant any right to cancel or terminate this Lease, or to abate, reduce or

make deduction from or offset against any Basic Rent, Additional Rent or other sum payable under this Lease, or to fail to perform or observe any other covenant, agreement or obligation hereunder or to recover any damages against Landlord resulting therefrom (except for any damages resulting solely from Landlord's gross negligence or willful misconduct).

10.21 [Reserved]

10.22 <u>Force Majeure</u>  The term "Force Majeure", as used in this Lease, shall mean delays caused by acts of God, strikes and other similar events beyond the control of Tenant. However, the duration of any delay excused by Force Majeure shall be limited to the actual amount of time caused by the event giving rise to the Force Majeure.  In addition, no performance by Tenant under this Lease shall be excused by Force Majeure unless the requirement for performance set forth in this Lease specifically states that it is subject to Force Majeure.  Tenant shall notify Landlord and Lender within five Business Days after the occurrence of an event of Force Majeure.

10.23 <u>Certain Agreements</u>.

(a)  Tenant waives the provisions of Civil Code §1932(a) and Civil Code §1933(4) with respect to any destruction of the Premises, and agrees that Tenant's rights in case of destruction shall be governed solely by the provisions of this Lease.

(b)  Each party waives the provisions of Code of Civil Procedure §1265.130 allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Premises.

(c)  Tenant waives the provisions of Civil Code Sections 1941 and 1942 with respect to any obligations of Landlord for tenantability of the Premises and any right of Tenant to make repairs and deduct the expenses of such repairs from rent.

(d)  The following statutes are hereby deemed to be included in the definition of Environmental Laws as that term is used throughout this Lease:  the Porter-Cologne Water Control Act; the Waste Management Act of 1980; the Toxic Pit Cleanup Act; the Underground Tank Act of 1984; the California Water Quality Improvement Act; and California Health and Safety Codes §§ 25117 and 25316.

10.24 <u>Assignments</u>.  Subject to the terms of this Lease (including without limitation Section 3.9 hereof in connection with the sale of the Premises) this Lease shall be fully assignable by the Landlord without the consent of Tenant.

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed as of the date first above written.

Landlord:          THE NATIONAL 1031 EXCHANGE CORPORATION,
                   ~~a Delaware limited liability company~~ *California Corporation*

                   By: *[signature]*
                   Title: *Senior Vice President*

Tenant:            BED BATH & BEYOND INC.,
                   a New York corporation


                   By:_____
                   Title:_____

50112v15

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed as of the date first above written.

Landlord:        THE NATIONAL 1031 EXCHANGE CORPORATION,
                    a Delaware limited liability company

                    By:_____
                         Title:_____

Tenant:         BED BATH & BEYOND INC.,
                    a New York corporation

                    By:_____
                         Title:   President

# **SCHEDULE A**

## Legal Description

2806241

# EXHIBIT "A"

**PARCEL A:**

Those portions of Parcels 5, 6, 7, 23 and 24 of Parcel Map 93-144, in the City of Mission Viejo, County of Orange, State of California, as per map filed in book 280, page 14 to 23 of Parcel Maps, in the office of the County Recorder of said County.

Shown and defined as Parcel 1 on Lot Line Adjustment No. 94-10, recorded November 29, 1994 as Instrument No. 94-0686984 of Official Records.

EXCEPTING therefrom all previously unreserved minerals, oil, gas, petroleum, other hydrocarbon substances and all underground water in or under or which may be produced from said property which underlies a plane parallel to and 500 feet below the present surface of said property for the purpose of prospecting for, the exploration, development, production, extraction and taking of said minerals, oil, gas, petroleum and other hydrocarbon substances and water from said property but without the right to enter upon the surface or any portion thereof above said plane parallel to and 500 feet below the present surface of the said property for any purpose whatsoever, as reserved by Mission Viejo Co. in deed recorded December 20, 1994 as Instrument No. 94-0723407 of Official Records.

**PARCEL B:**

Non-exclusive easements and rights of way for vehicular and pedestrian access, ingress and egress and for such other purposes, all as described in that certain Amended and Restated Declaration of Covenants, Conditions and Restrictions and Reservation of Easements recorded on December 2, 1993 as Instrument No. 93-0837938, as amended by instruments recorded January 11, 1994 as Instrument No. 94-0023664 and recorded September 22, 1994 as Instrument No. 94-0575103, and in that certain Declaration Regarding Joint Maintenance of Real Property recorded December 2, 1993 as Instrument No. 93-0837941, all in Official Records of Orange County, California.

**PARCEL C:**

Non-exclusive easements for access, ingress and egress as set forth in that certain instrument entitled "Parcel 4/5 Reciprocal Easement Agreement" recorded September 30, 1994 as Instrument No. 94-0587908 of Official Records, and as amended by instrument recorded December 16, 1994 as Instrument No. 94-0718024 of Official Records.

2806241

**PARCEL D:**

Non-exclusive easements for access, ingress, egress, and parking and other purposes as set forth in a "Reciprocal Easement Agreement" recorded December 20, 1994 as Instrument No. 94-0723408 of Official Records.

## **SCHEDULE B**

### Permitted Exceptions

JUN-28-99 11:02 FROM: UATOR & W-LL AGS

2806241

Exhibit B

## SCHEDULE B

THIS POLICY DOES NOT INSURE AGAINST LOSS OR DAMAGE BY REASON OF THE
FOLLOWING:

A.      General and special real estate taxes, including any assessments collected with taxes,
to be levied for the fiscal year 1999-2000, which are a lien not yet payable.

B.      The lien of supplemental real estate taxes, if any, assessed pursuant to the provisions
of Section 75, et seq. of the Revenue and Taxation Code of the State of California,
resulting from change of ownership or completion of construction occurring on or after date
of policy, none yet due or payable.

C.      Notice of Special Tax Authorization pursuant to the requirements of Section 3114.5
of the Streets and Highway Code. The special tax is authorized to be imposed within the
Community Facilities District shown below which has now been officially formed. The
rate and method of apportionment of the authorized special tax will be annually levied,
none yet due or payable.

Community Facilities
District No:        92-1 (La Paz Channel) of the City of Mission Viejo
Notice by:          Document
Recorded:           October 14, 1992 as Instrument No. 92-696284, Official Records

All amounts due are paid current and collected with the property taxes.

1.      An easement for the purpose shown below and rights incidental thereto as set forth
in document

Granted to:         Southern California Edison Company
Purpose:            Public Utilities
Recorded:           June 16, 1966 in book 7962, page 126, Official Records

Affects:            a portion of said land, being a strip of land 200 feet in width as
                    shown on survey dated November 30, 1994, last revised June 22,
                    1999, made by Robert Bein, William Frost & Associates, Job
                    No. 10-100150 (JN 31490) (the "Survey").

2.      The fact that the ownership of said land does not include rights of access to or from
the street or highway abutting said land, such rights having been severed from said land by
the document

Recorded:           November 9, 1967 in book 8431, page 388, Official Records
Affects:            San Diego Freeway

ALTA Owner's Policy

2806241

Said land, however, abuts upon a public thoroughfare other than San Diego Freeway
referred to above over which rights of vehicular ingress and egress have not been
relinquished.

3.      The fact that the ownership of said land does not include rights of access to or from
the street or highway abutting said land, such rights having been severed from said land by
the document

Recorded:          April 15, 1970 in book 9264, page 904, Official Records
Affects:           San Diego Freeway

Said land, however, abuts upon a public thoroughfare other than San Diego Freeway
referred to above over which rights of vehicular ingress and egress have not been
relinquished.

4.      An easement for the purposes shown below and rights incidental thereto as shown or
as offered for dedication on the recorded map shown below

Map of:            Parcel Map 85-452
Purpose:           storm drain dedicated to the City of Mission Viejo

Affects:           that certain strip of land 16 feet in width lying within Parcels 7, 8, 9,
                   13, 14, 25, 25 and 26 of Parcel Map 93-144 and as depicted upon
                   said Parcel Map 93-144

5.      A document subject to all the terms, provisions and conditions therein contained.

Entitled:          Public Improvements, Facilities and Benefits Agreement
Dated:             May 28, 1991
Executed by:       City of Mission Viejo, a municipal corporation and Mission Viejo
                   Company, a California corporation
Recorded:          December 20, 1991 as Instrument No. 91-702603, Official Records

Reference is made to said document for full particulars.

6.      Covenants, conditions and restrictions (deleting any restrictions indicating any
preference, limitation or discrimination based on race, color, religion, sex, handicap,
familial status or national origin) as set forth in the document

Recorded:          May 24, 1993 as Instrument No. 93-0348794, Official Records

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat
or render invalid the lien of any mortgage or deed of trust made in good faith and for
value.

ALTA Owner's Policy

2806241

7.   An easement for the purposes shown below and rights incidental thereto as shown or as offered for dedication on the recorded map shown below

Map of:            Parcel Map 93-144
Purpose:          storm drain dedicated to the City of Mission Viejo

Affects:           a portion of Parcel B

8.   The following matters set forth of said Parcel Map 93-144 which, in part, recites:

Note:  Pursuant to Section 66426(C) of the Subdivision Map Act, this map is excluded from being defined as a Final Map in that the land is zoned Commercial or Industrial.

Note:  Parcels 16 and 17 shall be deeded to the property owners association for landscaping purposes and are not separate building sites.

Improvement Certificate:

Pursuant to the provisions of Section 66411.1 of the Subdivision Map Act, notice is hereby given that the following improvements are required to be constructed prior to processing any subsequent development of this Parcel Map:

   1.     El Paseo improvements including pavement, curb and gutter, drive
           approaches, bus turnouts, lighting and storm drains.

9.   Covenants, conditions, restrictions, provisions (deleting any restrictions indicating any preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin), easements, liens and charges as set forth in a Declaration of Restrictions

Recorded:  .          as Instrument No. 91-633780, Official Records

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

On December 2, 1993, said Declaration of Restrictions was amended and restated by an instrument recorded as Instrument No. 93-0837938 of Official Records.

Modification(s) of said covenants, conditions and restrictions

Recorded:            January 11, 1994 as Instrument No. 94-0023664, Official Records

Modification(s) of said covenants, conditions and restrictions

Recorded:            September 22, 1994 as Instrument No. 94-0575103, Official Records

ALTA Owner's Policy

2806241

10.    Covenants, conditions, restrictions, provisions (deleting any restrictions indicating any preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin), easements, assessments, liens and charges as set forth in a Declaration of Restrictions

Recorded:            December 2, 1993 as Instrument No. 93-0837939, Official Records

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

Said instrument also provides for the levy of assessments, the lien of which are stated to be subordinate to the lien of a first mortgage or first deed of trust made in good faith and for value.

11.    Covenants, conditions and restrictions (deleting any restrictions indicating any preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin) as set forth in the document

Recorded:            December 2, 1993 as Instrument No. 93-0837940, Official Records

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value.

Affects:            Parcels B and D

12.    A document subject to all the terms, provisions and conditions therein contained.

Entitled:            Declaration Regarding Joint Maintenance of Real Property
Dated:            December 1, 1993
Executed by:            Mission Viejo Company
Recorded:            December 2, 1993 as Instrument No. 93-0837941, Official Records

Reference is made to said document for full particulars.

The matters contained in a document entitled "First Amendment of Declaration Regarding Joint Maintenance of Real Property" recorded June 14, 1994 as Instrument No. 94-0401328 of Official Records.

Reference is made to said document for full particulars.

The matters contained in a document entitled "Second Amendment of Declaration Regarding Joint Maintenance of Real Property" recorded August 5, 1994 as Instrument No. 94-0523047 of Official Records.

Reference is made to said document for full particulars.

ALTA Owner's Policy

2806241

The matters contained in a document entitled "Third Amendment of Declaration Regarding Joint Maintenance of Real Property" recorded December 1, 1994 as Instrument No. 94-0692153 of Official Records.

Reference is made to said document for full particulars.

The matters contained in a document entitled "Fourth Amendment of Declaration Regarding Joint Maintenance of Real Property" recorded December 16, 1994 as Instrument No. 94-0718025 of Official Records.

Reference is made to said document for full particulars.

13.    An easement for the purpose shown below and rights incidental thereto as set forth in document

Granted to:        Mission Viejo Freeway Center Owners Association, a California
                   corporation
Purpose:           Public Utilities
Recorded:          December 7, 1993 as Instrument No. 93-0852472, Official Records

Affects:           a portion of said land

14.    An easement for the purpose shown below and rights incidental thereto as set forth in document

Granted to:        Pacific Bell
Purpose:           Public Utilities
Recorded:          March 24, 1994 as Instrument No. 94-0210062, Official Records

Affects:           those portions of Parcels 3 to 5, and 7 of Parcel Map 93-144 in the
                   City of Mission Viejo, County of Orange, State of California, as per
                   map filed in book 280, pages 14 to 23 of Parcel Maps, in the office
                   of the County Recorder of said County, described therein

15.    An easement for the purpose shown below and rights incidental thereto as set forth in document

Granted to:        San Diego Gas & Electric Company
Purpose:           Public Utilities
Recorded:          April 27, 1994 as Instrument No. 94-0290657, Official Records

Affects:           a portion of said land

ALTA Owner's Policy

2806241

16.    An easement for the purpose shown below and rights incidental thereto as set forth
in document

Granted to:        Moulton-Niguel Water District
Purpose:           sewer lines and water
Recorded:          June 14, 1994 as Instrument No. 94-0398113, Official Records

Affects:           a portion of said land

17.    A document subject to all the terms, provisions and conditions therein contained.

Entitled:          Parcel 4/5 Reciprocal Easement Agreement
Dated:             September 27, 1994
Executed by:       Mission Viejo Company and Bradford H. Barrett
Recorded:          September 30, 1994 as Instrument No. 94-0587908, Official Records

The matters contained in a document entitled "First Amendment of Parcel 4/5 Reciprocal
Easement Agreement" recorded December 16, 1994 as Instrument No. 94-0718024 of
Official Records.

Reference is made to said document for full particulars.

18.    An easement for the purpose shown below and rights incidental thereto as set forth
in document

Granted to:        Times Mirror Cable Television of Orange County, Inc., a corporation
Purpose:           cable television
Recorded:          October 24, 1994 as Instrument No. 94-0626715, Official Records

Affects:           described therein

19.    Covenants, conditions and restrictions (deleting any restrictions indicating any
preference, limitation or discrimination based on race, color, religion, sex, handicap,
familial status or national origin) as set forth in the document

Recorded:          December 20, 1994 as Instrument No. 94-0723407, Official Records

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat
or render invalid the lien of any mortgage or deed of trust made in good faith and for
value.

20.    A document subject to all the terms, provisions and conditions therein contained.

Entitled:          Reciprocal Easement Agreement
Dated:             December 12, 1994
Executed by:       Recreational Equipment, Inc. and Mission Viejo Company

2806241

Recorded:                 December 20, 1994 as Instrument No. 94-0723403, Official Records

Reference is made to said document for full particulars.

21.    An easement for the purpose shown below and rights incidental thereto as set forth in document

Granted to:        Moulton-Niguel Water District
Purpose:           sewer, water, reclaimed water pipelines
Recorded:          as Instrument No. 95-0040801, Official Records

Affects:           a portion of said land

22.    An easement for the purpose shown below and rights incidental thereto as set forth in document

Granted to:        Moulton-Niguel Water District
Purpose:           sewer, water, reclaimed water pipelines
Recorded:          as Instrument No. 95-0040802, Official Records

Affects:           a portion of said land

23.    Any rights, interests, or claims which may exist or arise by reason of the following facts shown on a survey plat

Entitled:          Job No. 10-100.50 (JN 31490)
Dated:             November 30, 1994, last revised May 13, 1999
Prepared by:       Robert Bein, William Frost & Associates

a)  The fact that (2) 3 foot wide curb and gutters and a gunite "V" ditch encroach into the easement recorded in book 7962, page 126, Official Records.

b)  The fact that 4 parking spaces encroach upon the easement for storm drains in favor of the City of Mission Viejo, dedicated on Parcel Map No. 85-432, P.M.B. 265/18-26.

c)  The fact that 4 parking spaces encroach upon the easement recorded April 27, 1994 as Instrument No. 94-0290657.

24.    An unrecorded lease, affecting the premises herein stated, executed by and between the parties named herein, for the term and upon the terms, covenants, conditions, and provisions therein contained.

Type of Lease:     Commercial
Dated:             June ___, 1999
Lessor:            Triple B Mission Viejo, LLC, a Delaware Limited Liability Company
Lessee:            Bed Bath & Beyond, Inc., a New York Corporation

ALTA Owner's Policy

2806241

Disclosed by:       Memorandum of Lease
Recorded:           June __, 1999 as Instrument No. PROFORMA, Official Records

Said Lease, among other things, provides for:

A right of first offer.

25.    A deed of trust to secure an indebtedness in the amount shown below:

Amount:         $PROFORMA
Dated:          PROFORMA
Trustor:        Triple B Mission Viejo, LLC, a Delaware Limited Liability Company
Trustee:        Commonwealth Land Title Company
Beneficiary:    Capital Lease Funding, L.P.
Recorded:       PROFORMA, as Instrument No. PROFORMA, Official Records

Note:  This is a 'Pro Forma policy,' it is not a policy of title insurance and does not
       reflect the present condition of title.  No liability is assumed hereby.  This Pro
       Forma policy is furnished to the proposed insured only.  This Pro Forma policy
       indicates only the kind of coverage the Company would expect to issue if all
       necessary documentation is furnished and all acts performed to the satisfaction of the
       Company for a title insurance product to be issued in this form.

In addition to all matters set forth in Schedule B above, the title policy will except from
coverage:

       1.  Any existing defects, liens, encumbrances or other matters not released or
otherwise eliminated to the satisfaction of the Company.

       2.  Any defects, liens, encumbrances or other matters which arise, occur or are
disclosed to the Company between the date of the preparation of this Pro Forma and
issuance of any policy of insurance.

This Pro Forma policy is for information only and is not a commitment to insure or
statement of condition of title, and no liability is assumed hereby.

Endorsements:  203 103.4 103.7 116 110.1 116.1 103.5 116.7 253 110.9 103.1 103.3
116.4 123.2 Special Special

ALTA Owner's Policy

## **SCHEDULE C**

Primary and Extended Terms

Primary Term commences on June 30, 1999 and ends on January 31, 2022. The Term may be extended for (i) an additional five (5) years from February 1, 2022 to January 31, 2027, and (ii) thereafter for an additional five (5) years from February 1, 2027 to January 31, 2032, and (iii) thereafter for an additional five (5) years from February 1, 2032 to January 31, 2037, and (iv) thereafter for an additional five (5) years from February 1, 2037 to January 31, 2042 and (v) thereafter for an additional five (5) years from February 1, 2042 to January 31, 2047 and (vi) thereafter for an additional five (5) years from February 1, 2047 to January 31, 2052.

## SCHEDULE D-1

### Basic Rent for the Term

## PRIMARY TERM
## RENT PAYMENT SCHEDULE

| Date | Rent Payment |
|---|---|
| 01-Jul-99 | $57,288.11 |
| 01-Aug-99 | 57,288.11 |
| 01-Sep-99 | 57,288.11 |
| 01-Oct-99 | 57,288.11 |
| 01-Nov-99 | 57,288.11 |
| 01-Dec-99 | 57,288.11 |
| 01-Jan-2000 | 57,288.11 |
| 01-Feb-2000 | 57,288.11 |
| 01-Mar-2000 | 57,288.11 |
| 01-Apr-2000 | 57,288.11 |
| 01-May-2000 | 57,288.11 |
| 01-Jun-2000 | 57,288.11 |
| 01-Jul-2000 | 57,288.11 |
| 01-Aug-2000 | 57,288.11 |
| 01-Sep-2000 | 57,288.11 |
| 01-Oct-2000 | 57,288.11 |
| 01-Nov-2000 | 57,288.11 |
| 01-Dec-2000 | 57,288.11 |
| 01-Jan-2001 | 57,288.11 |
| 01-Feb-2001 | 57,288.11 |
| 01-Mar-2001 | 57,288.11 |
| 01-Apr-2001 | 57,288.11 |
| 01-May-2001 | 57,288.11 |
| 01-Jun-2001 | 57,288.11 |
| 01-Jul-2001 | 57,288.11 |
| 01-Aug-2001 | 57,288.11 |
| 01-Sep-2001 | 57,288.11 |
| 01-Oct-2001 | 57,288.11 |
| 01-Nov-2001 | 57,288.11 |
| 01-Dec-2001 | 57,288.11 |
| 01-Jan-2002 | 57,288.11 |
| 01-Feb-2002 | 57,288.11 |
| 01-Mar-2002 | 57,288.11 |
| 01-Apr-2002 | 57,288.11 |
| 01-May-2002 | 57,288.11 |
| 01-Jun-2002 | 57,288.11 |
| 01-Jul-2002 | 57,288.11 |
| 01-Aug-2002 | 57,288.11 |
| 01-Sep-2002 | 57,288.11 |
| 01-Oct-2002 | 57,288.11 |
| 01-Nov-2002 | 57,288.11 |
| 01-Dec-2002 | 57,288.11 |
| 01-Jan-2003 | 57,288.11 |

BED BATH & BEYOND - MISSION VIEJO, CA

## PRIMARY TERM
## RENT PAYMENT SCHEDULE

| Date | Rent Payment |
|------|--------------|
| 01-Feb-2003 | 57,288.11 |
| 01-Mar-2003 | 57,288.11 |
| 01-Apr-2003 | 57,288.11 |
| 01-May-2003 | 57,288.11 |
| 01-Jun-2003 | 57,288.11 |
| 01-Jul-2003 | 57,288.11 |
| 01-Aug-2003 | 57,288.11 |
| 01-Sep-2003 | 57,288.11 |
| 01-Oct-2003 | 57,288.11 |
| 01-Nov-2003 | 57,288.11 |
| 01-Dec-2003 | 57,288.11 |
| 01-Jan-2004 | 57,288.11 |
| 01-Feb-2004 | 57,288.11 |
| 01-Mar-2004 | 57,288.11 |
| 01-Apr-2004 | 57,288.11 |
| 01-May-2004 | 57,288.11 |
| 01-Jun-2004 | 57,288.11 |
| 01-Jul-2004 | 57,288.11 |
| 01-Aug-2004 | 57,288.11 |
| 01-Sep-2004 | 57,288.11 |
| 01-Oct-2004 | 57,288.11 |
| 01-Nov-2004 | 57,288.11 |
| 01-Dec-2004 | 57,288.11 |
| 01-Jan-2005 | 67,288.11 |
| 01-Feb-2005 | 57,288.11 |
| 01-Mar-2005 | 57,288.11 |
| 01-Apr-2005 | 57,288.11 |
| 01-May-2005 | 57,288.11 |
| 01-Jun-2005 | 57,288.11 |
| 01-Jul-2005 | 57,288.11 |
| 01-Aug-2005 | 57,288.11 |
| 01-Sep-2005 | 57,288.11 |
| 01-Oct-2005 | 57,288.11 |
| 01-Nov-2005 | 57,288.11 |
| 01-Dec-2005 | 57,288.11 |
| 01-Jan-2006 | 57,288.11 |
| 01-Feb-2006 | 57,288.11 |
| 01-Mar-2006 | 57,288.11 |
| 01-Apr-2006 | 57,288.11 |
| 01-May-2006 | 57,288.11 |
| 01-Jun-2006 | 57,288.11 |
| 01-Jul-2006 | 57,288.11 |
| 01-Aug-2006 | 57,288.11 |

BED BATH & BEYOND - MISSION VIEJO, CA

## PRIMARY TERM
## RENT PAYMENT SCHEDULE

| Date | Rent Payment |
|------|------|
| 01-Sep-2006 | 57,288.11 |
| 01-Oct-2006 | 57,288.11 |
| 01-Nov-2006 | 57,288.11 |
| 01-Dec-2006 | 57,288.11 |
| 01-Jan-2007 | 57,288.11 |
| 01-Feb-2007 | 57,288.11 |
| 01-Mar-2007 | 57,288.11 |
| 01-Apr-2007 | 57,288.11 |
| 01-May-2007 | 57,288.11 |
| 01-Jun-2007 | 57,288.11 |
| 01-Jul-2007 | 57,288.11 |
| 01-Aug-2007 | 57,288.11 |
| 01-Sep-2007 | 57,288.11 |
| 01-Oct-2007 | 57,288.11 |
| 01-Nov-2007 | 57,288.11 |
| 01-Dec-2007 | 57,288.11 |
| 01-Jan-2008 | 57,288.11 |
| 01-Feb-2008 | 57,288.11 |
| 01-Mar-2008 | 57,288.11 |
| 01-Apr-2008 | 57,288.11 |
| 01-May-2008 | 57,288.11 |
| 01-Jun-2008 | 57,288.11 |
| 01-Jul-2008 | 57,288.11 |
| 01-Aug-2008 | 57,288.11 |
| 01-Sep-2008 | 57,288.11 |
| 01-Oct-2008 | 57,288.11 |
| 01-Nov-2008 | 57,288.11 |
| 01-Dec-2008 | 57,288.11 |
| 01-Jan-2009 | 57,288.11 |
| 01-Feb-2009 | 57,288.11 |
| 01-Mar-2009 | 57,288.11 |
| 01-Apr-2009 | 57,288.11 |
| 01-May-2009 | 57,288.11 |
| 01-Jun-2009 | 57,288.11 |
| 01-Jul-2009 | 57,288.11 |
| 01-Aug-2009 | 57,288.11 |
| 01-Sep-2009 | 57,288.11 |
| 01-Oct-2009 | 57,288.11 |
| 01-Nov-2009 | 57,288.11 |
| 01-Dec-2009 | 57,288.11 |
| 01-Jan-2010 | 57,288.11 |
| 01-Feb-2010 | 57,288.11 |
| 01-Mar-2010 | 57,288.11 |

BED BATH & BEYOND - MISSION VIEJO, CA

## PRIMARY TERM
## RENT PAYMENT SCHEDULE

| Date | Rent Payment |
|------|-------------|
| 01-Apr-2010 | 57,288.11 |
| 01-May-2010 | 57,288.11 |
| 01-Jun-2010 | 57,288.11 |
| 01-Jul-2010 | 57,288.11 |
| 01-Aug-2010 | 57,288.11 |
| 01-Sep-2010 | 57,288.11 |
| 01-Oct-2010 | 57,288.11 |
| 01-Nov-2010 | 57,288.11 |
| 01-Dec-2010 | 57,288.11 |
| 01-Jan-2011 | 57,288.11 |
| 01-Feb-2011 | 57,288.11 |
| 01-Mar-2011 | 57,288.11 |
| 01-Apr-2011 | 57,288.11 |
| 01-May-2011 | 57,288.11 |
| 01-Jun-2011 | 57,288.11 |
| 01-Jul-2011 | 57,288.11 |
| 01-Aug-2011 | 57,288.11 |
| 01-Sep-2011 | 57,288.11 |
| 01-Oct-2011 | 57,288.11 |
| 01-Nov-2011 | 57,288.11 |
| 01-Dec-2011 | 57,288.11 |
| 01-Jan-2012 | 57,288.11 |
| 01-Feb-2012 | 57,288.11 |
| 01-Mar-2012 | 57,288.11 |
| 01-Apr-2012 | 57,288.11 |
| 01-May-2012 | 57,288.11 |
| 01-Jun-2012 | 57,288.11 |
| 01-Jul-2012 | 57,288.11 |
| 01-Aug-2012 | 57,288.11 |
| 01-Sep-2012 | 57,288.11 |
| 01-Oct-2012 | 57,288.11 |
| 01-Nov-2012 | 57,288.11 |
| 01-Dec-2012 | 57,288.11 |
| 01-Jan-2013 | 57,288.11 |
| 01-Feb-2013 | 57,288.11 |
| 01-Mar-2013 | 57,288.11 |
| 01-Apr-2013 | 57,288.11 |
| 01-May-2013 | 57,288.11 |
| 01-Jun-2013 | 57,288.11 |
| 01-Jul-2013 | 57,288.11 |
| 01-Aug-2013 | 57,288.11 |
| 01-Sep-2013 | 57,288.11 |
| 01-Oct-2013 | 57,288.11 |

BED BATH & BEYOND - MISSION VIEJO, CA

# PRIMARY TERM
## RENT PAYMENT SCHEDULE

| Date | Rent Payment |
|---|---|
| 01-Nov-2013 | 57,288.11 |
| 01-Dec-2013 | 57,288.11 |
| 01-Jan-2014 | 57,288.11 |
| 01-Feb-2014 | 57,288.11 |
| 01-Mar-2014 | 57,288.11 |
| 01-Apr-2014 | 57,288.11 |
| 01-May-2014 | 57,288.11 |
| 01-Jun-2014 | 57,288.11 |
| 01-Jul-2014 | 57,288.11 |
| 01-Aug-2014 | 57,288.11 |
| 01-Sep-2014 | 57,288.11 |
| 01-Oct-2014 | 57,288.11 |
| 01-Nov-2014 | 57,288.11 |
| 01-Dec-2014 | 57,288.11 |
| 01-Jan-2015 | 57,288.11 |
| 01-Feb-2015 | 57,288.11 |
| 01-Mar-2015 | 57,288.11 |
| 01-Apr-2015 | 57,288.11 |
| 01-May-2015 | 57,288.11 |
| 01-Jun-2015 | 57,288.11 |
| 01-Jul-2015 | 57,288.11 |
| 01-Aug-2015 | 57,288.11 |
| 01-Sep-2015 | 57,288.11 |
| 01-Oct-2015 | 57,288.11 |
| 01-Nov-2015 | 57,288.11 |
| 01-Dec-2015 | 57,288.11 |
| 01-Jan-2016 | 57,288.11 |
| 01-Feb-2016 | 57,288.11 |
| 01-Mar-2016 | 57,288.11 |
| 01-Apr-2016 | 57,288.11 |
| 01-May-2016 | 57,288.11 |
| 01-Jun-2016 | 57,288.11 |
| 01-Jul-2016 | 57,288.11 |
| 01-Aug-2016 | 57,288.11 |
| 01-Sep-2016 | 57,288.11 |
| 01-Oct-2016 | 57,288.11 |
| 01-Nov-2016 | 57,288.11 |
| 01-Dec-2016 | 57,288.11 |
| 01-Jan-2017 | 57,288.11 |
| 01-Feb-2017 | 57,288.11 |
| 01-Mar-2017 | 57,288.11 |
| 01-Apr-2017 | 57,288.11 |
| 01-May-2017 | 57,288.11 |

BED BATH & BEYOND - MISSION VIEJO, CA

## PRIMARY TERM
## RENT PAYMENT SCHEDULE

| Date | Rent Payment |
|---|---|
| 01-Jun-2017 | 57,288.11 |
| 01-Jul-2017 | 57,288.11 |
| 01-Aug-2017 | 57,288.11 |
| 01-Sep-2017 | 57,288.11 |
| 01-Oct-2017 | 57,288.11 |
| 01-Nov-2017 | 57,288.11 |
| 01-Dec-2017 | 57,288.11 |
| 01-Jan-2018 | 57,288.11 |
| 01-Feb-2018 | 57,288.11 |
| 01-Mar-2018 | 57,288.11 |
| 01-Apr-2018 | 57,288.11 |
| 01-May-2018 | 57,288.11 |
| 01-Jun-2018 | 57,288.11 |
| 01-Jul-2018 | 57,288.11 |
| 01-Aug-2018 | 57,288.11 |
| 01-Sep-2018 | 57,288.11 |
| 01-Oct-2018 | 57,288.11 |
| 01-Nov-2018 | 57,288.11 |
| 01-Dec-2018 | 57,288.11 |
| 01-Jan-2019 | 57,288.11 |
| 01-Feb-2019 | 57,288.11 |
| 01-Mar-2019 | 57,288.11 |
| 01-Apr-2019 | 57,288.11 |
| 01-May-2019 | 57,288.11 |
| 01-Jun-2019 | 57,288.11 |
| 01-Jul-2019 | 57,288.11 |
| 01-Aug-2019 | 57,288.11 |
| 01-Sep-2019 | 57,288.11 |
| 01-Oct-2019 | 57,288.11 |
| 01-Nov-2019 | 57,288.11 |
| 01-Dec-2019 | 57,288.11 |
| 01-Jan-2020 | 57,288.11 |
| 01-Feb-2020 | 57,288.11 |
| 01-Mar-2020 | 57,288.11 |
| 01-Apr-2020 | 57,288.11 |
| 01-May-2020 | 57,288.11 |
| 01-Jun-2020 | 57,288.11 |
| 01-Jul-2020 | 57,288.11 |
| 01-Aug-2020 | 57,288.11 |
| 01-Sep-2020 | 57,288.11 |
| 01-Oct-2020 | 57,288.11 |
| 01-Nov-2020 | 57,288.11 |
| 01-Dec-2020 | 57,288.11 |

BED BATH & BEYOND - MISSION VIEJO, CA

## PRIMARY TERM
## RENT PAYMENT SCHEDULE

| Date | Rent Payment |
|------|-------------|
| 01-Jan-2021 | 57,288.11 |
| 01-Feb-2021 | 57,288.11 |
| 01-Mar-2021 | 57,288.11 |
| 01-Apr-2021 | 57,288.11 |
| 01-May-2021 | 57,288.11 |
| 01-Jun-2021 | 57,288.11 |
| 01-Jul-2021 | 57,288.11 |
| 01-Aug-2021 | 57,288.11 |
| 01-Sep-2021 | 57,288.11 |
| 01-Oct-2021 | 57,288.11 |
| 01-Nov-2021 | 57,288.11 |
| 01-Dec-2021 | 57,288.11 |
| 01-Jan-2022 | 57,288.11 |

--

BED BATH & BEYOND - MISSION VIEJO, CA

## SCHEDULE D-2

Basic Rent for the Extended Terms

## RENEWAL TERMS
## RENT PAYMENT SCHEDULE

| Renewal Option | Dates | Monthly Rent Payment due on the 1st day of Each Month |
|---|---|---|
| 1 | 02/01/2022-01/31/2027 | $51,559.30 |
| 2 | 02/01/2027-01/31/2032 | 51,559.30 |
| 3 | 02/01/2032-01/31/2037 | 51,559.30 |
| 4 | 02/01/2037-01/31/2042 | 51,559.30 |
| 5 | 02/01/2042-01/31/2047 | 51,559.30 |
| 6 | 02/01/2047-01/31/2052 | 51,559.30 |

BED BATH & BEYOND - MISSION VIEJO, CA

## **SCHEDULE E**

### Stipulated Loss Values

The "Stipulated Loss Value" on a particular Lease Termination Date will be equal to the applicable percentage set forth below, multiplied by the purchase price of $7,348,570.

Stipulated Loss Values

| Month | Day | Year | Stipulated Loss Value as a % of Purchase Price |
|---|---|---|---|
| 7 | 1 | 1999 | 115.3769% |
| 8 | 1 | 1999 | 116.0939% |
| 9 | 1 | 1999 | 116.0331% |
| 10 | 1 | 1999 | 115.9718% |
| 11 | 1 | 1999 | 115.9100% |
| 12 | 1 | 1999 | 115.8476% |
| 1 | 1 | 2000 | 115.7847% |
| 2 | 1 | 2000 | 115.7212% |
| 3 | 1 | 2000 | 115.6571% |
| 4 | 1 | 2000 | 115.5925% |
| 5 | 1 | 2000 | 115.5274% |
| 6 | 1 | 2000 | 115.4616% |
| 7 | 1 | 2000 | 115.3792% |
| 8 | 1 | 2000 | 115.2962% |
| 9 | 1 | 2000 | 115.2126% |
| 10 | 1 | 2000 | 115.1282% |
| 11 | 1 | 2000 | 115.0433% |
| 12 | 1 | 2000 | 114.9577% |
| 1 | 1 | 2001 | 114.8714% |
| 2 | 1 | 2001 | 114.7845% |
| 3 | 1 | 2001 | 114.6968% |
| 4 | 1 | 2001 | 114.6086% |
| 5 | 1 | 2001 | 114.5196% |
| 6 | 1 | 2001 | 114.4300% |
| 7 | 1 | 2001 | 114.3397% |
| 8 | 1 | 2001 | 114.2487% |
| 9 | 1 | 2001 | 114.1570% |
| 10 | 1 | 2001 | 114.0645% |
| 11 | 1 | 2001 | 113.9714% |
| 12 | 1 | 2001 | 113.8776% |
| 1 | 1 | 2002 | 113.7831% |
| 2 | 1 | 2002 | 113.6878% |
| 3 | 1 | 2002 | 113.5918% |
| 4 | 1 | 2002 | 113.4951% |
| 5 | 1 | 2002 | 113.3977% |
| 6 | 1 | 2002 | 113.2995% |
| 7 | 1 | 2002 | 113.2006% |

BED BATH & BEYOND - MISSION VIEJO, CA

Stipulated Loss Values

| Month | Day | Year | Stipulated Loss Value as a % of Purchase Price |
|---|---|---|---|
| 8 | 1 | 2002 | 113.1009% |
| 9 | 1 | 2002 | 113.0005% |
| 10 | 1 | 2002 | 112.8993% |
| 11 | 1 | 2002 | 112.7973% |
| 12 | 1 | 2002 | 112.6946% |
| 1 | 1 | 2003 | 112.5911% |
| 2 | 1 | 2003 | 112.4868% |
| 3 | 1 | 2003 | 112.3818% |
| 4 | 1 | 2003 | 112.2759% |
| 5 | 1 | 2003 | 112.1693% |
| 6 | 1 | 2003 | 112.0618% |
| 7 | 1 | 2003 | 111.9536% |
| 8 | 1 | 2003 | 111.8445% |
| 9 | 1 | 2003 | 111.7346% |
| 10 | 1 | 2003 | 111.6239% |
| 11 | 1 | 2003 | 111.5123% |
| 12 | 1 | 2003 | 111.4000% |
| 1 | 1 | 2004 | 111.2867% |
| 2 | 1 | 2004 | 111.1727% |
| 3 | 1 | 2004 | 111.0577% |
| 4 | 1 | 2004 | 110.9420% |
| 5 | 1 | 2004 | 110.8253% |
| 6 | 1 | 2004 | 110.7078% |
| 7 | 1 | 2004 | 110.5894% |
| 8 | 1 | 2004 | 110.4701% |
| 9 | 1 | 2004 | 110.3500% |
| 10 | 1 | 2004 | 110.2289% |
| 11 | 1 | 2004 | 110.1070% |
| 12 | 1 | 2004 | 109.9841% |
| 1 | 1 | 2005 | 109.8604% |
| 2 | 1 | 2005 | 109.7357% |
| 3 | 1 | 2005 | 109.6101% |
| 4 | 1 | 2005 | 109.4835% |
| 5 | 1 | 2005 | 109.3560% |
| 6 | 1 | 2005 | 109.2276% |
| 7 | 1 | 2005 | 109.0982% |
| 8 | 1 | 2005 | 108.9679% |
| 9 | 1 | 2005 | 108.8366% |
| 10 | 1 | 2005 | 108.7043% |

BED BATH & BEYOND - MISSION VIEJO, CA

## Stipulated Loss Values

| Month | Day | Year | Stipulated Loss Value as a % of Purchase Price |
|---|---|---|---|
| 11 | 1 | 2005 | 108.5711% |
| 12 | 1 | 2005 | 108.4369% |
| 1 | 1 | 2006 | 108.3017% |
| 2 | 1 | 2006 | 108.1655% |
| 3 | 1 | 2006 | 108.0282% |
| 4 | 1 | 2006 | 107.8900% |
| 5 | 1 | 2006 | 107.7508% |
| 6 | 1 | 2006 | 107.6105% |
| 7 | 1 | 2006 | 107.4692% |
| 8 | 1 | 2006 | 107.3269% |
| 9 | 1 | 2006 | 107.1835% |
| 10 | 1 | 2006 | 107.0391% |
| 11 | 1 | 2006 | 106.8936% |
| 12 | 1 | 2006 | 106.7471% |
| 1 | 1 | 2007 | 106.5995% |
| 2 | 1 | 2007 | 106.4508% |
| 3 | 1 | 2007 | 106.3010% |
| 4 | 1 | 2007 | 106.1501% |
| 5 | 1 | 2007 | 105.9981% |
| 6 | 1 | 2007 | 105.8450% |
| 7 | 1 | 2007 | 105.6908% |
| 8 | 1 | 2007 | 105.5355% |
| 9 | 1 | 2007 | 105.3790% |
| 10 | 1 | 2007 | 105.2214% |
| 11 | 1 | 2007 | 105.0626% |
| 12 | 1 | 2007 | 104.9027% |
| 1 | 1 | 2008 | 104.7416% |
| 2 | 1 | 2008 | 104.5794% |
| 3 | 1 | 2008 | 104.4160% |
| 4 | 1 | 2008 | 104.2514% |
| 5 | 1 | 2008 | 104.0856% |
| 6 | 1 | 2008 | 103.9185% |
| 7 | 1 | 2008 | 103.7503% |
| 8 | 1 | 2008 | 103.5809% |
| 9 | 1 | 2008 | 103.4102% |
| 10 | 1 | 2008 | 103.2383% |
| 11 | 1 | 2008 | 103.0651% |
| 12 | 1 | 2008 | 102.8907% |
| 1 | 1 | 2009 | 102.7151% |
| 2 | 1 | 2009 | 102.5381% |
| 3 | 1 | 2009 | 102.3599% |
| 4 | 1 | 2009 | 102.1804% |
| 5 | 1 | 2009 | 101.9996% |
| 6 | 1 | 2009 | 101.8175% |
| 7 | 1 | 2009 | 101.6341% |

BED BATH & BEYOND - MISSION VIEJO, CA

**Stipulated Loss Values**

| Month | Day | Year | Stipulated Loss Value as a % of Purchase Price |
|---|---|---|---|
| 8 | 1 | 2009 | 101.4493% |
| 9 | 1 | 2009 | 101.2633% |
| 10 | 1 | 2009 | 101.0759% |
| 11 | 1 | 2009 | 100.8871% |
| 12 | 1 | 2009 | 100.6970% |
| 1 | 1 | 2010 | 100.5055% |
| 2 | 1 | 2010 | 100.3312% |
| 3 | 1 | 2010 | 100.1556% |
| 4 | 1 | 2010 | 99.9786% |
| 5 | 1 | 2010 | 99.8004% |
| 6 | 1 | 2010 | 99.6207% |
| 7 | 1 | 2010 | 99.4398% |
| 8 | 1 | 2010 | 99.2574% |
| 9 | 1 | 2010 | 99.0737% |
| 10 | 1 | 2010 | 98.8886% |
| 11 | 1 | 2010 | 98.7022% |
| 12 | 1 | 2010 | 98.5143% |
| 1 | 1 | 2011 | 98.3250% |
| 2 | 1 | 2011 | 98.1151% |
| 3 | 1 | 2011 | 97.9038% |
| 4 | 1 | 2011 | 97.6909% |
| 5 | 1 | 2011 | 97.4765% |
| 6 | 1 | 2011 | 97.2606% |
| 7 | 1 | 2011 | 97.0431% |
| 8 | 1 | 2011 | 96.8241% |
| 9 | 1 | 2011 | 96.6035% |
| 10 | 1 | 2011 | 96.3814% |
| 11 | 1 | 2011 | 96.1576% |
| 12 | 1 | 2011 | 95.9323% |
| 1 | 1 | 2012 | 95.7054% |
| 2 | 1 | 2012 | 95.4768% |
| 3 | 1 | 2012 | 95.2466% |
| 4 | 1 | 2012 | 95.0148% |
| 5 | 1 | 2012 | 94.7813% |
| 6 | 1 | 2012 | 94.5461% |
| 7 | 1 | 2012 | 94.3093% |
| 8 | 1 | 2012 | 94.0708% |
| 9 | 1 | 2012 | 93.8306% |
| 10 | 1 | 2012 | 93.5887% |
| 11 | 1 | 2012 | 93.3451% |
| 12 | 1 | 2012 | 93.0997% |
| 1 | 1 | 2013 | 92.8526% |
| 2 | 1 | 2013 | 92.6037% |
| 3 | 1 | 2013 | 92.3531% |
| 4 | 1 | 2013 | 92.1007% |

BED BATH & BEYOND - MISSION VIEJO, CA

## Stipulated Loss Values

| Month | Day | Year | Stipulated Loss Value as a % of Purchase Price |
|---|---|---|---|
| 5 | 1 | 2013 | 91.8465% |
| 6 | 1 | 2013 | 91.5905% |
| 7 | 1 | 2013 | 91.3327% |
| 8 | 1 | 2013 | 91.0731% |
| 9 | 1 | 2013 | 90.8116% |
| 10 | 1 | 2013 | 90.5483% |
| 11 | 1 | 2013 | 90.2831% |
| 12 | 1 | 2013 | 90.0161% |
| 1 | 1 | 2014 | 89.7471% |
| 2 | 1 | 2014 | 89.4763% |
| 3 | 1 | 2014 | 89.2035% |
| 4 | 1 | 2014 | 88.9288% |
| 5 | 1 | 2014 | 88.6522% |
| 6 | 1 | 2014 | 88.3736% |
| 7 | 1 | 2014 | 88.0930% |
| 8 | 1 | 2014 | 87.8105% |
| 9 | 1 | 2014 | 87.5260% |
| 10 | 1 | 2014 | 87.2395% |
| 11 | 1 | 2014 | 86.9509% |
| 12 | 1 | 2014 | 86.6603% |
| 1 | 1 | 2015 | 86.3677% |
| 2 | 1 | 2015 | 86.0730% |
| 3 | 1 | 2015 | 85.7763% |
| 4 | 1 | 2015 | 85.4774% |
| 5 | 1 | 2015 | 85.1764% |
| 6 | 1 | 2015 | 84.8734% |
| 7 | 1 | 2015 | 84.5682% |
| 8 | 1 | 2015 | 84.2608% |
| 9 | 1 | 2015 | 83.9513% |
| 10 | 1 | 2015 | 83.6396% |
| 11 | 1 | 2015 | 83.3258% |
| 12 | 1 | 2015 | 83.0097% |
| 1 | 1 | 2016 | 82.6914% |
| 2 | 1 | 2016 | 82.3709% |
| 3 | 1 | 2016 | 82.0481% |
| 4 | 1 | 2016 | 81.7230% |
| 5 | 1 | 2016 | 81.3957% |
| 6 | 1 | 2016 | 81.0661% |
| 7 | 1 | 2016 | 80.7342% |
| 8 | 1 | 2016 | 80.3999% |
| 9 | 1 | 2016 | 80.0634% |
| 10 | 1 | 2016 | 79.7244% |
| 11 | 1 | 2016 | 79.3831% |
| 12 | 1 | 2016 | 79.0394% |
| 1 | 1 | 2017 | 78.6933% |

BED BATH & BEYOND - MISSION VIEJO, CA

## Stipulated Loss Values

| Month | Day | Year | Stipulated Loss Value as a % of Purchase Price |
|---|---|---|---|
| 2 | 1 | 2017 | 78.3447% |
| 3 | 1 | 2017 | 77.9938% |
| 4 | 1 | 2017 | 77.6404% |
| 5 | 1 | 2017 | 77.2845% |
| 6 | 1 | 2017 | 76.9261% |
| 7 | 1 | 2017 | 76.5652% |
| 8 | 1 | 2017 | 76.2018% |
| 9 | 1 | 2017 | 75.8359% |
| 10 | 1 | 2017 | 75.4674% |
| 11 | 1 | 2017 | 75.0963% |
| 12 | 1 | 2017 | 74.7227% |
| 1 | 1 | 2018 | 74.3464% |
| 2 | 1 | 2018 | 73.9675% |
| 3 | 1 | 2018 | 73.5860% |
| 4 | 1 | 2018 | 73.2018% |
| 5 | 1 | 2018 | 72.8150% |
| 6 | 1 | 2018 | 72.4254% |
| 7 | 1 | 2018 | 72.0331% |
| 8 | 1 | 2018 | 71.6382% |
| 9 | 1 | 2018 | 71.2404% |
| 10 | 1 | 2018 | 70.8399% |
| 11 | 1 | 2018 | 70.4366% |
| 12 | 1 | 2018 | 70.0305% |
| 1 | 1 | 2019 | 69.6216% |
| 2 | 1 | 2019 | 69.2098% |
| 3 | 1 | 2019 | 68.7952% |
| 4 | 1 | 2019 | 68.3776% |
| 5 | 1 | 2019 | 67.9572% |
| 6 | 1 | 2019 | 67.5339% |
| 7 | 1 | 2019 | 67.1076% |
| 8 | 1 | 2019 | 66.6784% |
| 9 | 1 | 2019 | 66.2462% |
| 10 | 1 | 2019 | 65.8110% |
| 11 | 1 | 2019 | 65.3727% |
| 12 | 1 | 2019 | 64.9315% |
| 1 | 1 | 2020 | 64.4871% |
| 2 | 1 | 2020 | 64.0397% |
| 3 | 1 | 2020 | 63.5892% |
| 4 | 1 | 2020 | 63.1356% |
| 5 | 1 | 2020 | 62.6788% |
| 6 | 1 | 2020 | 62.6370% |
| 7 | 1 | 2020 | 62.6030% |
| 8 | 1 | 2020 | 62.5771% |
| 9 | 1 | 2020 | 62.5594% |
| 10 | 1 | 2020 | 62.5504% |

BED BATH & BEYOND - MISSION VIEJO, CA

## Stipulated Loss Values

| Month | Day | Year | Stipulated Loss Value as a % of Purchase Price |
|---|---|---|---|
| 11 | 1 | 2020 | 62.5501% |
| 12 | 1 | 2020 | 62.4740% |
| 1 | 1 | 2021 | 62.4033% |
| 2 | 1 | 2021 | 62.3384% |
| 3 | 1 | 2021 | 62.2792% |
| 4 | 1 | 2021 | 62.2261% |
| 5 | 1 | 2021 | 62.1792% |
| 6 | 1 | 2021 | 62.1387% |
| 7 | 1 | 2021 | 62.1047% |
| 8 | 1 | 2021 | 62.0774% |
| 9 | 1 | 2021 | 62.0571% |
| 10 | 1 | 2021 | 62.0438% |
| 11 | 1 | 2021 | 62.0379% |
| 12 | 1 | 2021 | 62.0396% |
| 1 | 1 | 2022 | 61.4928% |
| 2 | 1 | 2022 | 60.9423% |

BED BATH & BEYOND - MISSION VIEJO, CA

## SCHEDULE F

### [Reserved]

## SCHEDULE G

Make Whole Premium

The "<u>Make Whole Premium</u>" is an amount equal to a prepayment consideration in an amount equal to (i) the present value as of the date such payment is tendered (the "<u>Prepayment Date</u>") of the remaining scheduled payments of principal and interest under the loan secured by the initial Indenture from the Prepayment Date through the 15th day of January, 2022 (the "<u>Maturity Date</u>") (including any balloon payment) determined by discounting such payments at the Discount Rate (as hereinafter defined), less (ii) the amount of principal being tendered.  As used herein, the "<u>Discount Rate</u>" is the rate which, when compounded monthly, is equivalent to the Treasury Rate (hereinafter defined) when compounded semi-annually.  The "<u>Treasury Rate</u>" is the yield calculate by the linear interpolation of the yields, as reported in Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the Prepayment Date, of U.S. Treasury constant maturities with maturity dates (one longer and one shorter) most nearly approximating the Maturity Date.

## **SCHEDULE H**

### Rate

The "<u>Rate</u>" means the rate equal to four percent (4%) above the Applicable Interest Rate. The "<u>Applicable Interest Rate</u>" means the greater of (a) 8% per annum and (b) the prime lending rate as published, from time to time, in the <u>Wall Street Journal</u> or, if not so published, <u>The New York Times</u>.

## **SCHEDULE I**

Form of Subordination, Non-Disturbance and Attornment Agreement

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "**Agreement**") is executed the ___ day of ___, 1999, effective as of _____, 1999, between ~~_____~~, a ~~_____~~ ("**Lender**"), BED, BATH & BEYOND INC., a New York corporation("**Tenant**"), and TRIPLE B MISSION VIEJO, LLC, a Delaware limited liability company ("**Landlord**").

### RECITALS

A.    Tenant is the tenant under a certain lease with Landlord (the "**Lease**") dated June ___, 1999, of premises described in **Exhibit A** attached hereto and made a part hereof (the "**Property**"), together with the buildings and improvements located (or to be located) on the Property and the equipment and fixtures attached to such buildings and improvements (collectively with the Property, the "**Premises**").  A memorandum or short form of the Lease was or is intended to be recorded with the Registry of Deeds/Office of the Clerk in the county and state where the Property is located (the "**Registry**").

B.    This Agreement is being entered into in connection with a mortgage loan (the "**Loan**") from Lender to Landlord, secured by, inter alia: (a) a first mortgage or deed of trust encumbering the Premises (the "**Indenture**") dated as of even date herewith to be recorded with the Registry immediately prior to the recording of this Agreement; and (b) an assignment of lease and rents (the "**Assignment of Lease and Rents**") dated as of even date herewith to be recorded with the Registry immediately prior to the recording of this Agreement. The Indenture and the Assignment of Lease and Rents are hereinafter collectively referred to as the "**Security Documents**".

### AGREEMENT

For mutual consideration, including the mutual covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.    Lender hereby consents to and approves the Lease and the terms thereof, including the options to extend the term as set forth in the Lease and the option to purchase the Premises as more particularly set forth in the Lease.

2.    Subject to the further provisions of this Agreement, Tenant agrees that the Lease is and shall be, at the option of Lender upon notice to Tenant, at any time and from time to time, either subject and subordinate, or superior, to the Security Documents and to all present or future advances under the obligations secured thereby and all renewals, amendments, modifications, consolidations, replacements and extensions of the secured obligations and the Security Documents, to the full extent of all amounts secured by the Security Documents from time to time.  Such options of the Lender may be exercised an unlimited number of times.  If

53666

subordinated, said subordination is to have the same force and effect as if the Security
Documents and such renewals, modifications, consolidations, replacements and extensions
thereof had been executed, acknowledged, delivered and recorded prior to the Lease, any
amendments or modifications thereof and any memorandum or short form thereof. This
Agreement shall constitute notice to Tenant that for the time being, until further written notice to
the contrary, Lender elects that the Lease is and shall be subject and subordinate as aforesaid. In
addition, to the extent that the Lease shall entitle Tenant to notice of any mortgage, this
Agreement shall constitute such notice to Tenant with respect to the Indenture.

3.        Notwithstanding the provisions of Section 2 hereof, Lender agrees that, if the
Lender exercises any of its rights under the Security Documents, including, without limitation, an
entry by Lender pursuant to the Indenture or a foreclosure of, or exercise of any power of sale
under, the Indenture or any sale or transfer in lieu thereof then, so long as no "Event of Default"
(as defined in the Lease) shall have occurred and be continuing:

a. Tenant shall not be named or joined as a party or otherwise in any suit, action
or proceeding for the foreclosure of the Indenture or to enforce any rights under the Security
Documents or under the note or other obligation secured thereby except to the extent required by
Applicable Law; and

b. The possession by Tenant of the Premises and Tenant's rights thereto shall not
be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or
otherwise affected by (i) any suit, action or proceeding brought upon the Security Documents or
the bond or note or other obligation secured thereby, or for the foreclosure of the Indenture or the
enforcement of any rights under the Security Documents, or by any judicial sale or execution or
other sale of the Premises, or any deed given in lieu of foreclosure, or by the exercise of any
other rights given to any holder of the Security Documents or other documents as a matter of law,
or (ii) any default under the Security Documents or the bond or note or other obligation secured
thereby.

4.        Tenant agrees that, in the event of a foreclosure of the Indenture by Lender or the
acceptance of a conveyance in lieu of foreclosure by Lender or any other succession of Lender to
ownership of Landlord's interest in the Premises, Tenant will attorn to and recognize Lender as
its landlord under the Lease for the remainder of the term of the Lease (including all extension
periods which have been or are hereafter exercised) upon the same terms and conditions as are
set forth in the Lease, and Tenant hereby agrees to pay and perform all of the obligations of
Tenant pursuant to the Lease. Upon the written request of either Lender or Tenant to the other
given on or after any such foreclosure, acceptance of a conveyance in lieu of foreclosure or other
succession of Lender to ownership of Landlord's interest in the Premises, Lender, as landlord,
and Tenant, as tenant, shall execute a lease of the Premises containing, subject to the terms
hereof, all of the same terms, provisions, options and conditions as are contained in the Lease
between Landlord and Tenant, which lease shall be for the then unexpired portion of the term of
the Lease (including all extension periods available to Tenant under the Lease).

53666

5.      So long as no Event of Default has occurred and is then continuing under the Lease, all condemnation awards and insurance proceeds paid or payable with respect to the Premises shall be applied and paid in the manner set forth in the Lease.

6.      Neither the Indenture nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other similar personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.      Tenant agrees that, in the event Lender succeeds to the interest of Landlord under the Lease, the Lease shall continue in full force and effect, without the necessity for executing any new lease, as a direct lease between Tenant and Lender (as "landlord" under the Lease), upon all of the same terms, conditions and provisions contained in the Lease, except that Lender shall not be:

a.      liable for any act or omission of any prior Landlord (including, without limitation, the then defaulting Landlord), or

b.      subject to any defense or offsets which Tenant may have against any prior Landlord (including, without limitation, the then defaulting Landlord), or

c.      bound by any payment of "Basic Rent" or "Additional Rent" (as such terms are defined in the Lease) which Tenant might have paid for more than one month in advance of the due date under the Lease to any prior Landlord (including, without limitation, the then defaulting Landlord), or

d.      bound by any obligation of any prior Landlord to make any payment to Tenant which was required to be made prior to the time Lender succeeded to any such prior Landlord's interest, or

e.      accountable for any monies deposited with any prior Landlord (including security deposits), except to the extent such monies are actually received by Lender, or

f.      bound by any amendment or modification of the Lease for which the consent of Lender is required under the Lease (which consent, under certain circumstances expressly set forth in the Lease, is not to be unreasonably withheld by Lender) or by any waiver or forbearance on the part of any prior Landlord (including, without limitation, the then defaulting Landlord) made or given without the written consent of Lender, or

g.      liable with respect to warranties or indemnities of any nature whatsoever made by any prior Landlord (including, without limitation, the then defaulting Landlord), including any warranties or indemnities regarding use, compliance with zoning, hazardous

-3-

wastes or environmental laws, Landlord's title, Landlord's authority, habitability, fitness for purpose, or possession.

In the event that Lender shall acquire title to the Premises, Lender shall have no obligation, nor incur any liability, beyond Lender's then equity interest, if any, in the Premises, and Tenant shall look exclusively to such equity interest of Lender, if any, in the Premises for the payment and discharge of any obligations or liability imposed upon Lender hereunder, under the Lease or under any new lease of the Premises.

8.    Tenant hereby agrees to give to Lender copies of all notices of Landlord default(s) under the Lease in the same manner as, and whenever, Tenant shall give any such notice of default to Landlord, and no such notice of default shall be deemed given to Landlord unless and until a copy of such notice shall have been so delivered to Lender. Tenant shall accept performance by Lender of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. Lender's cure of Landlord's default shall not be considered an assumption by Lender of Landlord's other obligations under the Lease. If, in curing any such default, Lender requires access to the Premises to effect such cure, Tenant shall furnish access to the Premises to Lender as required by Lender to effect such cure at all reasonable times; provided that Tenant's occupancy, use and enjoyment of the Premises is not unreasonably disrupted thereby. No Landlord default under the Lease shall exist or shall be deemed to exist (i) as long as Lender, in good faith, shall have commenced to cure such default within the applicable time period and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, or (ii) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by Lender, as long as Lender, in good faith, shall have notified Tenant that Lender intends to institute proceedings under the Security Documents, and, thereafter, as long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence. In the event of the termination of the Lease by reason of any default thereunder by Landlord, upon Lender's written request, which must be given (if at all) within thirty (30) days after any such termination, Tenant, within fifteen (15) days after receipt of such request, shall execute and deliver to Lender or its designee or nominee a new lease of the Premises for the remainder of the term of the Lease upon all of the terms, covenants and conditions of the Lease (including all extension periods available to Tenant under the Lease), subject, however, to the curing of the default giving rise to such termination (unless such default is not susceptible to a cure). Neither Lender nor its designee or nominee shall become liable under the Lease unless and until Lender or its designee or nominee is, and then only with respect to periods in which Lender or its designee or nominee becomes, the owner of Landlord's interest in the Premises. Lender shall have the right, without Tenant's consent but subject to the provisions of this Agreement, to foreclose, or exercise any power of sale under, the Indenture or to accept a conveyance in lieu of foreclosure of the Indenture or to exercise any other remedies under the Security Documents.

9.    Tenant agrees that Tenant shall not, without the prior written consent of Lender, (a) amend or modify the Lease, (b) terminate, cancel or surrender the Lease except in accordance with the express provisions of Sections 3.2(b), 3.4, 3.9 or 5.1(i), or enter into any agreement with

-4-

Landlord to do so, or (c) pay any installment of Basic Rent or Additional Rent under the Lease more than one month in advance of the due date thereof or otherwise than in the manner provided for in the Lease.  Tenant agrees that no prepayment of Basic Rent or Additional Rent paid under the Lease more than one month in advance of its due date thereof, no amendment or modification of the Lease that requires Lender's prior written consent pursuant to the Lease, no surrender, termination or cancellation of the Lease (except in accordance with the express provisions of Sections 3.2(b), 3.4, 3.9 or 5.1(i)), and no waiver or consent by Landlord under the terms of the Lease, shall be binding upon or as against Lender, as holder of the Security Documents and as Landlord under the Lease if it succeeds to that position, unless consented to in writing by Lender.

10.     Tenant shall furnish to Lender, in the manner specified in the Lease for the furnishing thereof by Tenant to Landlord, each of the following: copies of bills, invoices and/or statements for all **"Taxes"** and **"Impositions"** (as defined in the Lease) and receipts (or if receipts are not immediately available, copies of canceled checks evidencing payment with receipts to follow promptly after they become available) of the appropriate taxing authority, or other evidence satisfactory to Lender, evidencing the payment thereof.

11.     Tenant has no knowledge of any prior assignment or pledge of the rents accruing under the Lease by Landlord.  Tenant hereby consents to the Assignment of Lease and Rents. Tenant acknowledges that the interest of the Landlord under the Lease is to be assigned to Lender solely as security for the purposes specified in said assignment, and Lender shall have no duty, liability or obligation whatsoever under the Lease or any extension or renewal thereof, either by virtue of said assignment or by any subsequent receipt or collection of rents thereunder, unless Lender shall specifically undertake such liability in writing.

12.     Upon a default under the Lease beyond any applicable notice and/or cure period (a **"Lease Default"**), and during the continuation of such Lease Default, Tenant agrees that Lender and/or Landlord shall have the right to inspect the books and records of Tenant relating to the operation of the Premises itself (as opposed to the operation of Tenant's business at the Premises), as well as the financial statements of Tenant required to be provided under the Lease, at Tenant's office during normal business hours and upon not less than three (3) business days notice.  In connection with any such examination by Lender and/or Landlord, Lender and/or Landlord (as applicable) agrees to treat, and to instruct their respective employees, accountants and agents to treat, all information as confidential and not to disclose it to any other person except (i) to Lender and/or Landlord and their respective employees, professionals and consultants on a "need to know" basis, (ii) as may be required by law, and (iii) in connection with any litigation or arbitration under this Agreement or the Lease.  In addition, upon the occurrence and during the continuation of a Lease Default, Tenant agrees to permit Lender and/or Landlord and Lender's and/or Landlord's representatives access to, and an opportunity to inspect, the Premises during normal business hours and upon reasonable notice.

13.     Tenant has notice that pursuant to that certain Assignment of Lease and Rents delivered by Landlord to the Lender and dated as of the effective date hereof (the **"Assignment of Lease"**), all of the interest of Landlord in and to the Lease will be or has been assigned to Lender and that all Basic Rent, Additional Rent and other rent and payments payable to Landlord

-5-

under the Lease shall be paid directly by Tenant to Lender (or its designee) in accordance with the provisions contained therein. Tenant hereby agrees, without further notice, to so pay all such rent and other sums due under the Lease to Lender as required pursuant to written notice from Lender. Tenant hereby confirms that any notice required to be given by Lender to Tenant under the Lease for the purpose of granting rights to mortgagees under the Lease has been duly given.

14.    Tenant consents to the Assignment of Lease, and agrees to pay and deliver to Lender all rentals and other sums assigned to Lender pursuant to the Assignment of Lease in accordance with the provisions of the Lease without offset, deduction, defense, deferment or abatement. Tenant shall not for any reason whatsoever seek to recover from Lender any moneys paid to Lender by virtue of the Assignment. All sums payable to Lender pursuant to the Assignment shall be paid to Lender in immediately available funds on the due date thereof to the address and/or account as shall be designated by Lender by written notice to Tenant. No payment made by Tenant shall be effective to discharge the obligations of Tenant under the Lease to make such payments or be of any other force or effect unless paid to Lender. Tenant shall deliver to Lender duplicate original copies of all notices, undertakings, demands, statements, offers, documents and other instruments or communications which it is or may be required or permitted to give, make, serve or deliver pursuant to the Lease. Tenant acknowledges that no delivery of such notice, demand, statement, offer or other communication shall be of any force and effect unless a duplicate copy is delivered to Lender (or its designee).

15.    Tenant shall not enter into any agreement amending, modifying, or waiving any provision of the Lease without the prior consent of Lender. Except as provided in the Lease, any attempted assignment, amendment, modification, waiver, or termination without Lender's written communication shall be void. If the Lease shall be amended as therein permitted, the Lease as so amended shall continue to be subject to the Assignment without the necessity of any further act by any of the parties thereto.

16.    Tenant agrees that it shall remain obligated under the Lease in accordance with its terms, and shall not take any action to rescind or avoid the Lease, notwithstanding any action with respect to the Tenant which may be taken by any trustee or receiver of Landlord or of any assignee of Landlord or by any court in any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution or other proceeding affecting Landlord or any assignee of Landlord.

17.    If Tenant is a corporation, each individual executing this Agreement on behalf of such corporation represents and warrants that such individual is duly authorized to execute and deliver this Agreement on behalf of such corporation, in accordance with a duly adopted resolution of the Board of Directors of such corporation or in accordance with the by-laws of said corporation, and that this Agreement is binding upon such corporation in accordance with its terms. If Tenant is a partnership, each individual executing this Agreement on behalf of said partnership represents and warrants that such individual is duly authorized to execute and deliver this Agreement on behalf of such partnership in accordance with the partnership agreement for such partnership.

53666

18.     Any notice, election, communication, request or other document or demand required or permitted under this Agreement shall be in writing and shall be deemed delivered on the earlier to occur of (a) receipt or (b) the date of delivery, refusal or nondelivery indicated on the return receipt, if deposited in a United States Postal Service Depository, postage prepaid, sent certified or registered mail, return receipt requested, or if sent via a recognized commercial courier service providing for a receipt, addressed to Tenant or Lender, as the case may be, at the following addresses:

If to Tenant:

> Bed Bath & Beyond Inc.
> 650 Liberty Avenue
> Union, New Jersey 07083
> Attention: Allan Rauch, Esquire, General Counsel

with a copy to:

> Bed Bath & Beyond Inc.
> 650 Liberty Avenue
> Union, New Jersey 07083
> Warren Eisenberg, Co-Chief Executive Officer

If to Lender:




> Attention: _____

with a copy to:



> Attention: _____

19.     The term "Lender" as used herein includes any successors or assigns of the Lender named herein, including without limitation, any co-lender at the time of making the Loan, any purchaser at a foreclosure sale and any transferee pursuant to a conveyance in lieu of foreclosure, and their successors and assigns, and the term "Tenant" as used herein includes the Tenant named herein (the **"Original Tenant"**) and any successors or assigns of the Original Tenant.

20.     If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed

-7-

deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect.

21.     Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

22.     This Agreement shall be construed in accordance with the laws of the state or commonwealth in which the Property is located.

23.     This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute one complete instrument.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

53666

WITNESS the execution hereof as of the day and year first above written.

<u>LENDER</u>:

By: _____

         Name:

         Title:

STATE of CALIFORNIA

                           ss:

COUNTY of _____

     BEFORE ME, the undersigned Notary Public in and for said County and State, this
_____ day of  u  , 1999, personally appeared the above-named _____ _____
known to me individually and as the _____ c        who, being duly sworn, acknowledged that the statements therein are true and that she did sign
the foregoing instrument as her free act and deed, and in her capacity as
_____ of _____ and that the same is the duly
authorized act and deed of

     WITNESS my hand and official seal.

_____

Notary Public

53666

Signature Page for

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

<u>TENANT</u>:

BED BATH & BEYOND INC. a New York
corporation

By: _____(SEAL)
      Name:
      Title:

STATE of

                ss:

CITY of

     BEFORE ME, the undersigned Notary Public in and for said County and State, this
_____ day of  :\c, 1999, personally appeared the above-named _____ known to me
individually and as the _____ of Bed Bath and Beyond Inc., who, being duly sworn,
acknowledged that the statements therein are true and that he did sign the foregoing instrument as
his free act and deed, and in his capacity as _____ of Bed Bath and Beyond Inc., and that
the same is the duly authorized act and deed of Bed Bath and Beyond  Inc.

     WITNESS my hand and official seal.

_____
Notary Public

-10-

53666

LANDLORD:

TRIPLE B MISSION VIEJO, LLC,
a Delaware limited liability company


By:_____
   Name:
   Title:


STATE of

              ss:

CITY OF

    BEFORE ME, the undersigned Notary Public in and for said County and State, this
_____ day of _ne, 1999, personally appeared the above-named _____ known to me
individually as the _____ of Triple B Mission Viejo, LLC, who, being duly sworn,
acknowledged that the statements therein are true and that he did sign the foregoing instrument as
his free act and deed, and in his capacity as such trustee of Triple B Mission Viejo, LLC and that
the same is the duly authorized act and deed of Triple B Mission Viejo, LLC.

    WITNESS my hand and official seal.



_____
Notary Public

53666

## Schedule J

the Additional Named Insured shall have consented to any modifications or additions to the Property where such consent is required under the Loan without the prior written consent of the Company, which consent of the Company will not be unreasonably withheld, conditioned or delayed;

title to the Property shall be good and marketable fee simple absolute, in the same condition as it exists as of the date of execution of the Policy, free of all encumbrances other than Permitted Encumbrances (as set forth in Schedule A hereto) and other matters consented to by FSL in writing, and except as set forth on Schedule A or consented to by FSL as of the Termination Date, there shall be no deed of trust, mortgage or mechanic's lien on any part of the Property. Without the prior consent of FSL, Owner shall not have entered into any restrictive covenants or easements with regard to the Property, except to the extent Owner is obligated to do so under the Lease or the Loan Documents; and

## **SCHEDULE K**

Plans and Specifications Regarding the Upgrade Work

**Construction Document Sheet Index**

Architectural

| | |
|---|---|
| T0.00 | Cover Sheet (Rev.2, 6/3/99) |
| D1.00 | Demolition Plan (Rev. 1, 5/7/99) |
| C1.00 | Sign Details (Rev. 1, 5/7/99) |
| A1.00 | Floor Plan (Rev.2, 6/3/99) |
| A1.10 | Fixture Plan (Rev.2, 6/3/99) |
| A1.20 | Finish Plan (Rev.2, 6/3/99) |
| A1.30 | Reflected Ceiling Plans (Rev.2, 6/3/99) |
| A2.00 | Enlarged Plans & Misc. Details (Rev.2, 6/3/99) |
| A2.10 | Plan Details (4/28/99) |
| A2.20 | Enlarged Loading Area Plan and Details (Rev. 1, 5/7/99) |
| A3.00 | Roof Plan (Rev. 1, 5/7/99) |
| A4.00 | Building Elevations (Rev.2, 6/3/99) |
| A5.00 | Wall Sections/Building Section (4/28/99) |
| A5.10 | Misc. Details/Sections (Rev.2, 6/3/99) |
| A5.20 | Misc. Details (Rev.2, 6/3/99) |
| A5.30 | SHEET OMITTED (Rev. 1, 5.7/99) |
| A6.00 | Schedules (Rev.2, 6/3/99) |
| A6.10 | Accessibility Notes & Details (Rev.2, 6/3/99) |

Structural

| | |
|---|---|
| S1.00 | Structural Notes & Details (Rev. 2, 6/2/99) |
| S2.00 | Structural Plans & Mezzanine Details (Rev. 2, 6/2/99) |
| S3.00 | Roof Structure Plan (Rev. 2, 6/2/99) |

Mechanical

| | |
|---|---|
| ENV1 | Envelope Certification (Rev. 2, 6/3/99) |
| M1.00 | Compliance Form (4/28/99) |
| M2.00 | Mechanical Floor Plan (Rev. 2, 6/3/99) |
| M3.00 | Mechanical Details (Rev. 2, 6/3/99) |
| M4.00 | Plumbing Floor Plan (Rev. 2, 6/3/99) |
| M5.00 | Plumbing Details (Rev. 2, 6/3/99) |

Electrical

| | |
|---|---|
| E1.00 | Electrical Schedules & Riser Diagram (Rev. 2, 6/3/99) |
| E2.00 | Lighting Plan (Rev. 2, 6/3/99) |
| E3.00 | Electrical/Power Plan (Rev. 2, 6/3/99) |
| E4.00 | Electrical Details (Rev. 2, 6/3/99) |

## GENERAL INDEX

### BED, BATH & BEYOND

### Mission Viejo, CA

### DATE 04/28/99

**TITLE**                                                         **PAGE NOS.**

**DIVISION 1 - GENERAL REQUIREMENTS**

| | | |
|---|---|---|
| GC1 | - General Conditions | GC-1 thru GC-5 |
| 1A | - General Provisions and Bidding Information | 1A-1 thru 1A-4 |
| 1B | - General Provisions for Mechanical & Electrical Work | 1B-1 thru 1B-8 |
| 1C | - Supplementary General Provisions | 1C-1 |
| 1D | - NOT USED | |
| 1E | - Proposal Forms | (6 pages) |
| | - Exhibit J – Schedule of Values and Contract Sum | (5 pages) |
| | - Exhibit K – Unit Pricing Schedule | (1 page) |
| 1F | - List of Drawings | Under Separate Cover |
| 1G | - BBBY's Forms/Requirements | 1G-1 thru 1G-3 |

**DIVISION 2 - SITE WORK**

| | | |
|---|---|---|
| 2A | - Testing | 2A-1 thru 2A-2 |
| 2B | - Site Grading | 2B-1 thru 2B-4 |
| 2C | - Excavation and Backfill | 2C-1 thru 2C-3 |
| 2D | - Site Drainage | 2D-1 thru 2D-2 |
| 2E | - Paving | 2E-1 thru 2E-5 |
| 2F | - Seeding and Landscaping | 2F-1 thru 2F-2 |
| 2G-2H | - NOT USED | |
| 2I | - Soil Treatment | 2I-1 thru 2I-2 |
| 2J | - Demolition | 2J-1 |

**DIVISION 3 - CONCRETE**

| | | |
|---|---|---|
| 3A | - Concrete | 3A-1thru 3A-17 |

**DIVISION 4 - MASONRY**

| | | |
|---|---|---|
| 4A | - Unit Masonry Work | 4A-1 thru 4A-18 |
| 4B | - Mechanically Supported Masonry Veneer | 4B-1 thru 4B-3 |

**DIVISION 5 - METALS**

| | | |
|---|---|---|
| 5A | - Structural Steel | 5A-1 thru 5A-6 |
| 5B | - Steel Joist Girders | 5B-1 thru 5B-4 |
| 5C | - Steel Joists | 5C-1 thru 5C-4 |
| 5D | - Metal Roof Deck | 5D-1 thru 5D-3 |
| 5E | - Miscellaneous Metals | 5E-1 thru 5E-7 |
| 5F | - Cold Rolled Structural Metals | 5F-1 thru 5F-2 |

**TITLE**                                             **PAGE NOS.**

**DIVISION 6 - CARPENTRY**

| 6A | - Carpentry | 6A-1 thru 6A-6 |
| 6B | - Interior Architectural Woodwork | 6B-1 thru 6B-3 |

**DIVISION 7 - MOISTURE CONTROL**

| 7A | - Building Insulation | 7A-1 thru 7A-3 |
| 7B | - Single Ply Membrane Roofing Mechanically Fastened | 7B-1 thru 7B-5 |
| 7C | - Single Ply Membrane Roofing Fully Adhered | 7C-1 thru 7C-6 |
| 7D | - Flashing and Sheet Metal | 7D-1 thru 7D-2 |
| 7E | - Roof Accessories | 7E-1 thru 7E-2 |
| 7F | - Preformed Metal Soffit Panels | 7F-1 thru 7F-2 |
| 7G | - Joint Sealants | 7G-1 thru 7G-3 |
| 7H | - Exterior Insulation and Finish System | 7H-1 thru 7H-5 |

**DIVISION 8 - DOORS, WINDOWS & GLASS**

| 8A | - Hollow Metal Work | 8A-1 thru 8A-5 |
| 8B | - Aluminum Frames and Windows | 8B-1 thru 8B-4 |
| 8C | - Glass and Glazing | 8C-1 thru 8C-3 |
| 8D | - Special Doors | 8D-1 |
| 8E | - Rolling Steel Doors | 8E-1 thru 8E-3 |
| 8F | - Automatic Sliding Doors | 8F-1 thru 8F-4 |
| 8G | - Wood Doors | 8G-1 thru 8G-2 |
| 8H | - Aluminum Frames and Windows | 8H-1 thru 8H-5 |
| 8I | - Finish Hardware | 8I-1 thru 8I-5 |

**DIVISION 9 - FINISHES**

| 9A | - Painting | 9A-1 thru 9A-9 |
| 9B | - Gypsum Drywall | 9B-1 thru 9B-7 |
| 9C | - Ceramic Tile | 9C-1 thru 9C-2 |
| 9D | - Suspended Acoustical Ceiling Systems | 9D-1 thru 9D-3 |
| 9E | - Resilient Flooring | 9E-1 thru 9E-4 |
| 9F | - Carpeting | 9F-1 thru 9F-2 |
| 9G | - Wood Flooring | 9G-1 thru 9G-4 |
| 9H | - Wall Covering | 9H-1 thru 9H-2 |
| 9I | - Special Coatings | 9I-1 thru 9I-6 |

**DIVISION 10 - SPECIALTIES**

| 10A | - Toilet Partitions | 10A-1 thru 10A-4 |
| 10B | - Toilet Room Accessories | 10B-1 |
| 10C | - Toilet Partitions | 10C-1 thru 10C-2 |
| 10E | - Lockers | 10E-1 |

**DIVISION 11 - EQUIPMENT**

| 11A | - Loading Dock Equipment | 11A-1 thru 11A-3 |

**DIVISION 12 - 13 NOT USED**

**TITLE**                                                                      **PAGE NOS.**


**DIVISION 14 - CONVEYING SYSTEMS**

    14A    - Lifts                                       14A-1 thru 14A-3

**DIVISION 15 - MECHANICAL WORK**

    15A    - Basic Materials, Methods and Requirements    15A-1 thru 15A-7
    15B    - Basic Requirements for Piping Systems    15B-1 thru 15B-9
    15C    - Plumbing Systems    15C-1 thru 15C-8
    15D    - HVAC Systems and Equipment    15D-1 thru 15D-5
    15E    - Air Distribution Systems and Accessories    15E-1 thru 15E-5
    15F    - Fuel Systems    15F-1
    15G    -Fire Protection Systems    15G-1

**DIVISION 16 - ELECTRICAL WORK**

    16A    - Electrical Requirements    16A-1 thru 16A-9
    16B    - Basic Materials and Methods    16B-1 thru 16B-9
    16C    - Electrical Service Entrance    16C-1
    16D    - Electrical Distribution Systems    16D-1 thru 16D-4
    16E    - Lighting    16E-1 thru 16E-2
    16F    - Signal and Communications Systems    16F-1 thru 16F-2
    16G    - Building Automation System and Temperature    16G-1
                    Control

This Side-Letter shall be governed by the laws of the State of California.

TRIPLE B MISSION VIEJO, LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

54112v1

**Scheduled Debt Service Payments**

| Period | Date | Interest Expense | Principal Payment |
|---|---|---|---|
| 0 | 7/15/99 | 21,835.82 | 0.00 |
| 1 | 8/15/99 | 50,390.34 | 6,726.42 |
| 2 | 9/15/99 | 50,345.50 | 6,771.26 |
| 3 | 10/15/99 | 50,300.36 | 6,816.40 |
| 4 | 11/15/99 | 50,254.92 | 6,861.84 |
| 5 | 12/15/99 | 50,209.17 | 6,907.59 |
| 6 | 1/15/00 | 50,163.12 | 6,953.64 |
| 7 | 2/15/00 | 50,116.76 | 7,000.00 |
| 8 | 3/15/00 | 50,070.10 | 7,046.66 |
| 9 | 4/15/00 | 50,023.12 | 7,093.64 |
| 10 | 5/15/00 | 49,975.83 | 7,140.93 |
| 11 | 6/15/00 | 49,928.22 | 7,188.54 |
| 12 | 7/15/00 | 49,880.30 | 7,236.46 |
| 13 | 8/15/00 | 49,832.06 | 7,284.70 |
| 14 | 9/15/00 | 49,783.49 | 7,333.27 |
| 15 | 10/15/00 | 49,734.60 | 7,382.16 |
| 16 | 11/15/00 | 49,685.39 | 7,431.37 |
| 17 | 12/15/00 | 49,635.85 | 7,480.91 |
| 18 | 1/15/01 | 49,585.97 | 7,530.79 |
| 19 | 2/15/01 | 49,535.77 | 7,580.99 |
| 20 | 3/15/01 | 49,485.23 | 7,631.53 |
| 21 | 4/15/01 | 49,434.35 | 7,682.41 |
| 22 | 5/15/01 | 49,383.13 | 7,733.63 |
| 23 | 6/15/01 | 49,331.58 | 7,785.18 |
| 24 | 7/15/01 | 49,279.68 | 7,837.08 |
| 25 | 8/15/01 | 49,227.43 | 7,889.33 |
| 26 | 9/15/01 | 49,174.83 | 7,941.93 |
| 27 | 10/15/01 | 49,121.89 | 7,994.87 |
| 28 | 11/15/01 | 49,068.59 | 8,048.17 |
| 29 | 12/15/01 | 49,014.93 | 8,101.83 |
| 30 | 1/15/02 | 48,960.92 | 8,155.84 |
| 31 | 2/15/02 | 48,906.55 | 8,210.21 |
| 32 | 3/15/02 | 48,851.81 | 8,264.95 |
| 33 | 4/15/02 | 48,796.71 | 8,320.05 |
| 34 | 5/15/02 | 48,741.25 | 8,375.51 |
| 35 | 6/15/02 | 48,685.41 | 8,431.35 |
| 36 | 7/15/02 | 48,629.20 | 8,487.56 |
| 37 | 8/15/02 | 48,572.62 | 8,544.14 |
| 38 | 9/15/02 | 48,515.66 | 8,601.10 |
| 39 | 10/15/02 | 48,458.32 | 8,658.44 |
| 40 | 11/15/02 | 48,400.59 | 8,716.17 |
| 41 | 12/15/02 | 48,342.49 | 8,774.27 |
| 42 | 1/15/03 | 48,283.99 | 8,832.77 |
| 43 | 2/15/03 | 48,225.11 | 8,891.65 |
| 44 | 3/15/03 | 48,165.83 | 8,950.93 |
| 45 | 4/15/03 | 48,106.15 | 9,010.61 |
| 46 | 5/15/03 | 48,046.08 | 9,070.68 |

## Scheduled Debt Service Payments

| Period | Date | Interest Expense | Principal Payment |
|---|---|---|---|
| 47 | 6/15/03 | 47,985.61 | 9,131.15 |
| 48 | 7/15/03 | 47,924.74 | 9,192.02 |
| 49 | 8/15/03 | 47,863.46 | 9,253.30 |
| 50 | 9/15/03 | 47,801.77 | 9,314.99 |
| 51 | 10/15/03 | 47,739.67 | 9,377.09 |
| 52 | 11/15/03 | 47,677.16 | 9,439.60 |
| 53 | 12/15/03 | 47,614.22 | 9,502.54 |
| 54 | 1/15/04 | 47,550.87 | 9,565.89 |
| 55 | 2/15/04 | 47,487.10 | 9,629.66 |
| 56 | 3/15/04 | 47,422.90 | 9,693.86 |
| 57 | 4/15/04 | 47,358.28 | 9,758.48 |
| 58 | 5/15/04 | 47,293.22 | 9,823.54 |
| 59 | 6/15/04 | 47,227.73 | 9,889.03 |
| 60 | 7/15/04 | 47,161.80 | 9,954.96 |
| 61 | 8/15/04 | 47,095.44 | 10,021.32 |
| 62 | 9/15/04 | 47,028.63 | 10,088.13 |
| 63 | 10/15/04 | 46,961.38 | 10,155.38 |
| 64 | 11/15/04 | 46,893.67 | 10,223.09 |
| 65 | 12/15/04 | 46,825.52 | 10,291.24 |
| 66 | 1/15/05 | 46,756.91 | 10,359.85 |
| 67 | 2/15/05 | 46,687.85 | 10,428.91 |
| 68 | 3/15/05 | 46,618.32 | 10,498.44 |
| 69 | 4/15/05 | 46,548.33 | 10,568.43 |
| 70 | 5/15/05 | 46,477.87 | 10,638.89 |
| 71 | 6/15/05 | 46,406.95 | 10,709.81 |
| 72 | 7/15/05 | 46,335.55 | 10,781.21 |
| 73 | 8/15/05 | 46,263.67 | 10,853.09 |
| 74 | 9/15/05 | 46,191.32 | 10,925.44 |
| 75 | 10/15/05 | 46,118.48 | 10,998.28 |
| 76 | 11/15/05 | 46,045.16 | 11,071.60 |
| 77 | 12/15/05 | 45,971.35 | 11,145.41 |
| 78 | 1/15/06 | 45,897.05 | 11,219.71 |
| 79 | 2/15/06 | 45,822.25 | 11,294.51 |
| 80 | 3/15/06 | 45,746.95 | 11,369.81 |
| 81 | 4/15/06 | 45,671.15 | 11,445.61 |
| 82 | 5/15/06 | 45,594.85 | 11,521.91 |
| 83 | 6/15/06 | 45,518.04 | 11,598.72 |
| 84 | 7/15/06 | 45,440.71 | 11,676.05 |
| 85 | 8/15/06 | 45,362.87 | 11,753.89 |
| 86 | 9/15/06 | 45,284.51 | 11,832.25 |
| 87 | 10/15/06 | 45,205.63 | 11,911.13 |
| 88 | 11/15/06 | 45,126.22 | 11,990.54 |
| 89 | 12/15/06 | 45,046.29 | 12,070.47 |
| 90 | 1/15/07 | 44,965.82 | 12,150.94 |
| 91 | 2/15/07 | 44,884.81 | 12,231.95 |
| 92 | 3/15/07 | 44,803.27 | 12,313.49 |
| 93 | 4/15/07 | 44,721.18 | 12,395.58 |

## Scheduled Debt Service Payments

| Period | Date | Interest Expense | Principal Payment |
|---|---|---|---|
| 94 | 5/15/07 | 44,638.54 | 12,478.22 |
| 95 | 6/15/07 | 44,555.35 | 12,561.41 |
| 96 | 7/15/07 | 44,471.61 | 12,645.15 |
| 97 | 8/15/07 | 44,387.31 | 12,729.45 |
| 98 | 9/15/07 | 44,302.44 | 12,814.32 |
| 99 | 10/15/07 | 44,217.01 | 12,899.75 |
| 100 | 11/15/07 | 44,131.02 | 12,985.74 |
| 101 | 12/15/07 | 44,044.44 | 13,072.32 |
| 102 | 1/15/08 | 43,957.30 | 13,159.46 |
| 103 | 2/15/08 | 43,869.57 | 13,247.19 |
| 104 | 3/15/08 | 43,781.25 | 13,335.51 |
| 105 | 4/15/08 | 43,692.35 | 13,424.41 |
| 106 | 5/15/08 | 43,602.85 | 13,513.91 |
| 107 | 6/15/08 | 43,512.76 | 13,604.00 |
| 108 | 7/15/08 | 43,422.07 | 13,694.69 |
| 109 | 8/15/08 | 43,330.77 | 13,785.99 |
| 110 | 9/15/08 | 43,238.86 | 13,877.90 |
| 111 | 10/15/08 | 43,146.34 | 13,970.42 |
| 112 | 11/15/08 | 43,053.21 | 14,063.55 |
| 113 | 12/15/08 | 42,959.45 | 14,157.31 |
| 114 | 1/15/09 | 42,865.07 | 14,251.69 |
| 115 | 2/15/09 | 42,770.06 | 14,346.70 |
| 116 | 3/15/09 | 42,674.41 | 14,442.35 |
| 117 | 4/15/09 | 42,578.13 | 14,538.63 |
| 118 | 5/15/09 | 42,481.20 | 14,635.56 |
| 119 | 6/15/09 | 42,383.63 | 14,733.13 |
| 120 | 7/15/09 | 42,285.41 | 14,831.35 |
| 121 | 8/15/09 | 42,186.54 | 14,930.22 |
| 122 | 9/15/09 | 42,087.00 | 15,029.76 |
| 123 | 10/15/09 | 41,986.80 | 15,129.96 |
| 124 | 11/15/09 | 41,885.94 | 15,230.82 |
| 125 | 12/15/09 | 41,784.40 | 15,332.36 |
| 126 | 1/15/10 | 41,682.18 | 15,434.58 |
| 127 | 2/15/10 | 41,579.29 | 15,537.47 |
| 128 | 3/15/10 | 41,475.70 | 15,641.06 |
| 129 | 4/15/10 | 41,371.43 | 15,745.33 |
| 130 | 5/15/10 | 41,266.46 | 15,850.30 |
| 131 | 6/15/10 | 41,160.79 | 15,955.97 |
| 132 | 7/15/10 | 41,054.42 | 16,062.34 |
| 133 | 8/15/10 | 40,947.34 | 16,169.42 |
| 134 | 9/15/10 | 40,839.54 | 16,277.22 |
| 135 | 10/15/10 | 40,731.03 | 16,385.73 |
| 136 | 11/15/10 | 40,621.79 | 16,494.97 |
| 137 | 12/15/10 | 40,511.82 | 16,604.94 |
| 138 | 1/15/11 | 40,401.12 | 16,715.64 |
| 139 | 2/15/11 | 40,289.68 | 16,827.08 |
| 140 | 3/15/11 | 40,177.50 | 16,939.26 |

## Scheduled Debt Service Payments

| Period | Date | Interest Expense | Principal Payment |
|---|---|---|---|
| 141 | 4/15/11 | 40,064.57 | 17,052.19 |
| 142 | 5/15/11 | 39,950.89 | 17,165.87 |
| 143 | 6/15/11 | 39,836.45 | 17,280.31 |
| 144 | 7/15/11 | 39,721.25 | 17,395.51 |
| 145 | 8/15/11 | 39,605.28 | 17,511.48 |
| 146 | 9/15/11 | 39,488.54 | 17,628.22 |
| 147 | 10/15/11 | 39,371.02 | 17,745.74 |
| 148 | 11/15/11 | 39,252.71 | 17,864.05 |
| 149 | 12/15/11 | 39,133.62 | 17,983.14 |
| 150 | 1/15/12 | 39,013.73 | 18,103.03 |
| 151 | 2/15/12 | 38,893.04 | 18,223.72 |
| 152 | 3/15/12 | 38,771.55 | 18,345.21 |
| 153 | 4/15/12 | 38,649.25 | 18,467.51 |
| 154 | 5/15/12 | 38,526.13 | 18,590.63 |
| 155 | 6/15/12 | 38,402.20 | 18,714.56 |
| 156 | 7/15/12 | 38,277.43 | 18,839.33 |
| 157 | 8/15/12 | 38,151.84 | 18,964.92 |
| 158 | 9/15/12 | 38,025.40 | 19,091.36 |
| 159 | 10/15/12 | 37,898.13 | 19,218.63 |
| 160 | 11/15/12 | 37,770.00 | 19,346.76 |
| 161 | 12/15/12 | 37,641.03 | 19,475.73 |
| 162 | 1/15/13 | 37,511.19 | 19,605.57 |
| 163 | 2/15/13 | 37,380.48 | 19,736.28 |
| 164 | 3/15/13 | 37,248.91 | 19,867.85 |
| 165 | 4/15/13 | 37,116.46 | 20,000.30 |
| 166 | 5/15/13 | 36,983.12 | 20,133.64 |
| 167 | 6/15/13 | 36,848.90 | 20,267.86 |
| 168 | 7/15/13 | 36,713.78 | 20,402.98 |
| 169 | 8/15/13 | 36,577.76 | 20,539.00 |
| 170 | 9/15/13 | 36,440.83 | 20,675.93 |
| 171 | 10/15/13 | 36,302.99 | 20,813.77 |
| 172 | 11/15/13 | 36,164.23 | 20,952.53 |
| 173 | 12/15/13 | 36,024.55 | 21,092.21 |
| 174 | 1/15/14 | 35,883.94 | 21,232.82 |
| 175 | 2/15/14 | 35,742.38 | 21,374.38 |
| 176 | 3/15/14 | 35,599.89 | 21,516.87 |
| 177 | 4/15/14 | 35,456.44 | 21,660.32 |
| 178 | 5/15/14 | 35,312.04 | 21,804.72 |
| 179 | 6/15/14 | 35,166.67 | 21,950.09 |
| 180 | 7/15/14 | 35,020.34 | 22,096.42 |
| 181 | 8/15/14 | 34,873.03 | 22,243.73 |
| 182 | 9/15/14 | 34,724.74 | 22,392.02 |
| 183 | 10/15/14 | 34,575.46 | 22,541.30 |
| 184 | 11/15/14 | 34,425.18 | 22,691.58 |
| 185 | 12/15/14 | 34,273.91 | 22,842.85 |
| 186 | 1/15/15 | 34,121.62 | 22,995.14 |
| 187 | 2/15/15 | 33,968.32 | 23,148.44 |

## Scheduled Debt Service Payments

| Period | Date | Interest Expense | Principal Payment |
|---|---|---|---|
| 188 | 3/15/15 | 33,814.00 | 23,302.76 |
| 189 | 4/15/15 | 33,658.65 | 23,458.11 |
| 190 | 5/15/15 | 33,502.26 | 23,614.50 |
| 191 | 6/15/15 | 33,344.83 | 23,771.93 |
| 192 | 7/15/15 | 33,186.35 | 23,930.41 |
| 193 | 8/15/15 | 33,026.81 | 24,089.95 |
| 194 | 9/15/15 | 32,866.21 | 24,250.55 |
| 195 | 10/15/15 | 32,704.54 | 24,412.22 |
| 196 | 11/15/15 | 32,541.79 | 24,574.97 |
| 197 | 12/15/15 | 32,377.96 | 24,738.80 |
| 198 | 1/15/16 | 32,213.04 | 24,903.72 |
| 199 | 2/15/16 | 32,047.01 | 25,069.75 |
| 200 | 3/15/16 | 31,879.88 | 25,236.88 |
| 201 | 4/15/16 | 31,711.63 | 25,405.13 |
| 202 | 5/15/16 | 31,542.27 | 25,574.49 |
| 203 | 6/15/16 | 31,371.77 | 25,744.99 |
| 204 | 7/15/16 | 31,200.14 | 25,916.62 |
| 205 | 8/15/16 | 31,027.36 | 26,089.40 |
| 206 | 9/15/16 | 30,853.43 | 26,263.33 |
| 207 | 10/15/16 | 30,678.34 | 26,438.42 |
| 208 | 11/15/16 | 30,502.08 | 26,614.68 |
| 209 | 12/15/16 | 30,324.65 | 26,792.11 |
| 210 | 1/15/17 | 30,146.04 | 26,970.72 |
| 211 | 2/15/17 | 29,966.23 | 27,150.53 |
| 212 | 3/15/17 | 29,785.23 | 27,331.53 |
| 213 | 4/15/17 | 29,603.02 | 27,513.74 |
| 214 | 5/15/17 | 29,419.60 | 27,697.16 |
| 215 | 6/15/17 | 29,234.95 | 27,881.81 |
| 216 | 7/15/17 | 29,049.07 | 28,067.69 |
| 217 | 8/15/17 | 28,861.95 | 28,254.81 |
| 218 | 9/15/17 | 28,673.59 | 28,443.17 |
| 219 | 10/15/17 | 28,483.97 | 28,632.79 |
| 220 | 11/15/17 | 28,293.08 | 28,823.68 |
| 221 | 12/15/17 | 28,100.92 | 29,015.84 |
| 222 | 1/15/18 | 27,907.48 | 29,209.28 |
| 223 | 2/15/18 | 27,712.75 | 29,404.01 |
| 224 | 3/15/18 | 27,516.73 | 29,600.03 |
| 225 | 4/15/18 | 27,319.39 | 29,797.37 |
| 226 | 5/15/18 | 27,120.75 | 29,996.01 |
| 227 | 6/15/18 | 26,920.77 | 30,195.99 |
| 228 | 7/15/18 | 26,719.47 | 30,397.29 |
| 229 | 8/15/18 | 26,516.82 | 30,599.94 |
| 230 | 9/15/18 | 26,312.82 | 30,803.94 |
| 231 | 10/15/18 | 26,107.46 | 31,009.30 |
| 232 | 11/15/18 | 25,900.73 | 31,216.03 |
| 233 | 12/15/18 | 25,692.62 | 31,424.14 |
| 234 | 1/15/19 | 25,483.13 | 31,633.63 |

Scheduled Debt Service Payments

| Period | Date | Interest Expense | Principal Payment |
|---|---|---|---|
| 235 | 2/15/19 | 25,272.24 | 31,844.52 |
| 236 | 3/15/19 | 25,059.94 | 32,056.82 |
| 237 | 4/15/19 | 24,846.23 | 32,270.53 |
| 238 | 5/15/19 | 24,631.09 | 32,485.67 |
| 239 | 6/15/19 | 24,414.52 | 32,702.24 |
| 240 | 7/15/19 | 24,196.50 | 32,920.26 |
| 241 | 8/15/19 | 23,977.04 | 33,139.72 |
| 242 | 9/15/19 | 23,756.10 | 33,360.66 |
| 243 | 10/15/19 | 23,533.70 | 33,583.06 |
| 244 | 11/15/19 | 23,309.81 | 33,806.95 |
| 245 | 12/15/19 | 23,084.43 | 34,032.33 |
| 246 | 1/15/20 | 22,857.55 | 34,259.21 |
| 247 | 2/15/20 | 22,629.16 | 34,487.60 |
| 248 | 3/15/20 | 22,399.24 | 34,717.52 |
| 249 | 4/15/20 | 22,167.79 | 34,948.97 |
| 250 | 5/15/20 | 21,934.80 | 35,181.96 |
| 251 | 6/15/20 | 21,700.25 | 35,416.51 |
| 252 | 7/15/20 | 21,464.14 | 35,652.62 |
| 253 | 8/15/20 | 21,226.46 | 35,890.30 |
| 254 | 9/15/20 | 20,987.19 | 36,129.57 |
| 255 | 10/15/20 | 20,746.32 | 36,370.44 |
| 256 | 11/15/20 | 20,503.85 | 36,612.91 |
| 257 | 12/15/20 | 20,259.77 | 36,856.99 |
| 258 | 1/15/21 | 20,014.05 | 37,102.71 |
| 259 | 2/15/21 | 19,766.70 | 37,350.06 |
| 260 | 3/15/21 | 19,517.70 | 37,599.06 |
| 261 | 4/15/21 | 19,267.04 | 37,849.72 |
| 262 | 5/15/21 | 19,014.71 | 38,102.05 |
| 263 | 6/15/21 | 18,760.70 | 38,356.06 |
| 264 | 7/15/21 | 18,504.99 | 38,611.77 |
| 265 | 8/15/21 | 18,247.58 | 38,869.18 |
| 266 | 9/15/21 | 17,988.45 | 39,128.31 |
| 267 | 10/15/21 | 17,727.59 | 39,389.17 |
| 268 | 11/15/21 | 17,465.00 | 39,651.76 |
| 269 | 12/15/21 | 17,200.66 | 39,916.10 |
| 270 | 1/15/22 | 16,934.55 | 2,540,182.21 |

** TOTAL PAGE.07 **