# EXHIBIT A

# LEASE

41618404.3

# LEASE AGREEMENT

### Between

## WATER TOWER PLACE SHOPPING CENTER, L.C.,
**an Iowa limited liability company,**

### Landlord

### and

## BED BATH & BEYOND INC.,
**a New York corporation,**

### Tenant

## WATER TOWER PLACE SHOPPING CENTER
**4100 University Avenue**
**West Des Moines, Iowa**

**Dated as of:** __12 | 9__ , 2011

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

## TABLE OF CONTENTS

Page

ARTICLE 1        BASIC TERMS AND DEFINITIONS ................................................ 1
   Section 1.1        Basic Terms and Definitions............................................... 1

ARTICLE 2        LEASE OF PREMISES; LEASE TERM; DELIVERY DATE............. 4
   Section 2.1        Lease of Premises ........................................................... 4
   Section 2.2        Term .............................................................................. 5
   Section 2.3        Delivery Date ................................................................. 5
   Section 2.4        Unseasonable Delivery:  Slack Period............................. 7
   Section 2.5        Initial Co-Tenancy Condition ......................................... 7
   Section 2.6        Permits Contingency....................................................... 8

ARTICLE 3        IMPROVEMENTS........................................................................ 8
   Section 3.1        Landlord's Work and Tenant's Work ............................... 8
   Section 3.2        Plan Approvals................................................................ 9
   Section 3.3        Performance of Work....................................................... 9

ARTICLE 4        FIXED RENT AND TAXES:  DETERMINATION AND
                 PAYMENT.................................................................................. 12
   Section 4.1        Fixed Rent ...................................................................... 12
   Section 4.2        Payment of Rent.............................................................. 12
   Section 4.3        Real Estate and Other Taxes ........................................... 12

ARTICLE 5        COMMON AREAS, THEIR USE AND CHARGES.......................... 13
   Section 5.1        Common Areas:  Maintenance........................................ 13
   Section 5.2        Common Areas:  Restrictions ......................................... 16

ARTICLE 6        UTILITIES .................................................................................. 18
   Section 6.1        Utility Service ................................................................ 18
   Section 6.2        Interruption..................................................................... 18

ARTICLE 7        SIGNS......................................................................................... 19
   Section 7.1        Tenant's Building Signage............................................... 19
   Section 7.2        Pylon/Monument Signage................................................ 19
   Section 7.3        Signage:  Alteration/Removal/Allocation......................... 19
   Section 7.4        Cooperation..................................................................... 19
   Section 7.5        Signage and Building Restrictions and Criteria................. 19

ARTICLE 8        ALTERATIONS AND IMPROVEMENTS ..................................... 20
   Section 8.1        Alterations and Improvements......................................... 20

ARTICLE 9        REPAIRS..................................................................................... 22
   Section 9.1        Tenant's Repairs.............................................................. 22
   Section 9.2        Landlord's Repairs.......................................................... 22
   Section 9.3        Legal Compliance Work .................................................. 23

ARTICLE 10       INDEMNIFICATION, INSURANCE AND WAIVER OF
                 SUBROGATION ........................................................................ 23
   Section 10.1       Mutual Release, Waiver of Subrogation and Mutual
                 Indemnification................................................................ 23
   Section 10.2       Tenant's Insurance .......................................................... 24
   Section 10.3       Landlord's Insurance ...................................................... 24
   Section 10.4       General Insurance Requirements ..................................... 25

ARTICLE 11       FIRE AND OTHER CASUALTY; EMINENT DOMAIN ................. 25
   Section 11.1       Fire and Other Casualty .................................................. 25

Section 11.2      Eminent Domain .......................................................................... 27
Section 11.3      Abatement of Rent Charges ......................................................... 28

ARTICLE 12      COVENANTS, REPRESENTATIONS AND WARRANTIES .......... 28
Section 12.1      Quiet Enjoyment ......................................................................... 28
Section 12.2      Authority ..................................................................................... 28
Section 12.3      Landlord's Covenants, Warranties and Representations ................ 28
Section 12.4      Environmental Matters ................................................................ 30
Section 12.5      OEA ............................................................................................. 31

ARTICLE 13      USES AND RESTRICTIONS ...................................................... 33
Section 13.1      Permitted and Prohibited Uses .................................................... 33
Section 13.2      Tenant's Exclusive in Center ...................................................... 33
Section 13.3      Exclusives Which Tenant Must Honor ......................................... 35

ARTICLE 14      CONDUCT OF BUSINESS OPERATIONS ........................................ 35

ARTICLE 15      TENANT ASSIGNMENT AND SUBLETTING ................................ 36
Section 15.1      Assignment and Subletting ......................................................... 36
Section 15.2      Liability of Tenant ...................................................................... 37
Section 15.3      Collateral Assignment ................................................................ 37
Section 15.4      Cure Rights of Original Tenant .................................................... 37
Section 15.5      Recognition Agreement ............................................................... 38

ARTICLE 16      DEFAULT AND DISPUTE RESOLUTION ....................................... 38
Section 16.1      Tenant Default ............................................................................ 38
Section 16.2      Landlord Default ......................................................................... 39
Section 16.3      Arbitration .................................................................................. 40

ARTICLE 17      RIGHT TO MORTGAGE AND NON-DISTURBANCE;
                       ESTOPPEL CERTIFICATE .......................................................... 40
Section 17.1      Right to Mortgage and Non-Disturbance ..................................... 40
Section 17.2      Estoppel Certificate .................................................................... 40
Section 17.3      Existing Mortgages and Ground Leases ........................................ 41

ARTICLE 18      NOTICE ..................................................................................... 41

ARTICLE 19      TENANT'S PROPERTY .............................................................. 41

ARTICLE 20      END OF TERM ........................................................................... 42
Section 20.1      Surrender of Premises ................................................................. 42
Section 20.2      Hold Over ................................................................................... 42

ARTICLE 21      TENANT'S RIGHT OF FIRST OFFER ............................................. 42

ARTICLE 22      ONGOING CO-TENANCY .......................................................... 43

ARTICLE 23      MISCELLANEOUS ..................................................................... 43
Section 23.1      Loading Facilities ....................................................................... 43
Section 23.2      Liens ........................................................................................... 43
Section 23.3      Broker's Commission .................................................................. 43
Section 23.4      Force Majeure ............................................................................. 43
Section 23.5      Consents ..................................................................................... 44
Section 23.6      Costs ........................................................................................... 44
Section 23.7      Attorneys' Fees .......................................................................... 44
Section 23.8      Survival of Obligations ............................................................... 44
Section 23.9      Non-Waiver ................................................................................. 44
Section 23.10    Rights Cumulative ....................................................................... 44
Section 23.11    Definition of Landlord ................................................................. 44

Section 23.12    Successors and Assigns.................................................................. 45
Section 23.13    Limitation of Landlord's Liability ................................................. 45
Section 23.14    Limitation of Tenant's Liability...................................................... 45
Section 23.15    Joint and Several Liability .............................................................. 45
Section 23.16    Severability ..................................................................................... 45
Section 23.17    Grammatical Usages and Construction............................................ 45
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings ........ 45
Section 23.19    Definition of Hereunder, Herein, etc. ............................................. 45
Section 23.20    Short Form Lease ............................................................................ 45
Section 23.21    Entire Agreement and Modification ................................................ 45
Section 23.22    No Joint Venture or Partnership Created by Lease.......................... 46
Section 23.23    Tenant's Tradename......................................................................... 46
Section 23.24    Counterparts .................................................................................... 46
Section 23.25    Waiver of Trial by Jury ................................................................... 46
Section 23.26    Governing Law ................................................................................ 47

## EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Intentionally Omitted |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Intentionally Omitted |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Alternate Rent |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Mechanics' Lien indemnification |
| Exhibit O | Form of Declaration of Restrictions Against Related Land |

# **LEASE AGREEMENT**

THIS LEASE AGREEMENT (***"Lease"***) is entered into as of ᗪᗴᑕᗴᗰᗷᗴᖇ 9 , 2011 by and between WATER TOWER PLACE SHOPPING CENTER, L.C., an Iowa limited liability company, having an office at 3101 Ingersoll Ave., Suite 300, Des Moines, Iowa 50312 (***"Landlord"***), and BED BATH & BEYOND, INC. a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (***"Tenant"***).

## **W I T N E S S E T H :**

### ARTICLE 1
### BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, ***"control"*** shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  As defined in and payable in the manner set forth in Exhibit L attached hereto.

1.1.4    Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and utility lines serving such common areas and facilities.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.5A    Critical Area:  As defined in Section 5.2.2 hereof.

1.1.6    Delivery Date:  As defined in Section 2.3 hereof.

1.1.7    Effective Date:  The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business:  (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10    Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11    Fixed Rent:  The following amounts for the periods indicated:

(a)    For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the fifth (5th) anniversary of the Rent Commencement Date, at the rate of Two Hundred Seventy-Two Thousand Three Hundred Forty-Nine and 00/100 ($272,349.00) Dollars per year [based on ten and 50/100 ($10.50) Dollars per square foot of Floor Area in the Premises];

(b)    For the period commencing on the first February 1 occurring after the fifth (5th) anniversary of the Rent Commencement Date and ending on the first January 31

occurring after the tenth (10th) anniversary of the Rent Commencement Date, at the rate of Two Hundred Ninety-One Thousand Eight Hundred Three and 00/100 ($291,803.00) Dollars per year [based on eleven and 25/100 ($11.25) Dollars per square foot of Floor Area in the Premises];

(c)   In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Three Hundred Eleven Thousand Two Hundred Fifty-Six and 00/100 ($311,256.00) Dollars per year [based on twelve and 00/100 ($12.00) Dollars per square foot of Floor Area in the Premises];

(d)   In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Three Hundred Thirty Thousand Seven Hundred Ten and 00/100 ($330,710.00) Dollars per year [based on twelve and 75/100 ($12.75) Dollars per square foot of Floor Area in the Premises]; and

(e)   In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Three Hundred Fifty Thousand One Hundred Sixty-Three and 000/100 ($350,163.00) Dollars per year [based on thirteen and 50/100 ($13.50) Dollars per square foot of Floor Area in the Premises]; and

(f)   In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Three Hundred Sixty-Nine Thousand Six Hundred Seventeen and 00/100 ($369,617.00) Dollars per year [based on fourteen and 25/100 ($14.25) Dollars per square foot of Floor Area in the Premises].

1.1.12   <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than loading dock areas, trash compactor areas, trash container areas, and up to a total of 1,000 square feet of exterior patio areas leased to or exclusively used by one or more tenants).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13   <u>*Force Majeure*</u>:  As defined in Section 23.4 hereof.

1.1.14   <u>Ground Lessor</u>:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15   <u>Intentionally Omitted</u>.

1.1.16   <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17   <u>Inducement Tenant</u>:  Best Buy.

1.1.18   <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19   <u>Landlord's Mailing Address</u>:  3101 Ingersoll Ave., Suite 300, Des Moines, Iowa  50312,  or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

1.1.20   <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21   <u>Lease Interest Rate</u>:  The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

2

1.1.22    Legal Requirements:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23    Mortgagee:  Any state or federally regulated:  bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24    Intentionally Omitted.

1.1.25    Intentionally Omitted.

1.1.26    Intentionally Omitted.

1.1.27    Permitted Use:  The sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of the following:  infant's, juvenile's and children's furniture, furnishings, beds (including, without limitation, mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, maternity clothing and related items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food or formula for infants, juveniles and children, feeding items, safety items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, pregnancy books, magazines, computer software, audio and video cassettes or tapes, picture frames, portrait studio items and services, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items, hair cutting services, fitness center development and learning services, and any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28    Premises:  Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and containing approximately:  (i) twenty-five thousand nine hundred thirty-eight (25,938) square feet of Floor Area and (ii) up to one thousand (1,000) square feet of mezzanine level space for office purposes.  In no event shall such mezzanine space (or any space used for fire pump facilities or electrical switch gear) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29    Renewal Option:  As defined in Section 2.2.2 hereof.

1.1.30    Renewal Period(s):  Four (4) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31    Rent:  Fixed Rent and/or Additional Rent.

1.1.32    Rent Commencement Date:  As defined in Section 2.2 hereof.

1.1.33    Intentionally Omitted.

1.1.34    Shopping Center:  The shopping center commonly known as Water Tower Place Shopping Center, containing approximately two hundred seventy-five thousand (275,000) square feet of Floor Area, on the property located at the southeast corner of University Avenue and 42nd Street, in West Des Moines, Iowa, and more particularly described

3

in <u>Exhibit A</u> hereto.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

        1.1.35       <u>Substantially Completed or Substantial Completion</u>:  The completion of specified work at the Shopping Center (including, without limitation, as applicable,  Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

        1.1.36       <u>Taxes</u>:  As defined in Section 4.3.3 hereof.

        1.1.37       <u>Tenant</u>:  As defined in the preamble hereof.

        1.1.38       <u>Tenant's Mailing Address</u>:  650 Liberty Avenue, Union, New Jersey 07083, Attn:  Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

        1.1.39       <u>Tenant's Permits</u>:  As defined in Section 2.3.1(b) hereof.

        1.1.40       <u>Tenant's Property</u>:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

        1.1.41       <u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than ten (10%) percent.  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

        1.1.42       <u>Tenant's Work</u>:  As defined in Section 3.1 hereof.

        1.1.43       <u>Term</u>:  A period (the "***Initial Term***") of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) "***Term***" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) "***Expiration Date***" shall mean the date on which the Term expires.

ARTICLE 2

LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

      Section 2.1   <u>Lease of Premises</u>.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

4

Section 2.2    Term.

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the earlier to occur of (a) the date Tenant opens for business to the public in the Premises or (b) the one hundred fiftieth (150th) day following the later of the Delivery Date or the "Permit Contingency Date" (hereinafter defined in Section 2.6) (such earlier date being referred to herein as the *"Rent Commencement Date"*).  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date, and Landlord shall deliver to Tenant a completed and signed IRS Form W-9 contemporaneously therewith; the delivery of the Form W-9 shall be a condition precedent to the payment of Rent.

2.2.2    Renewal Options.  Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s), provided, however, that  the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 180th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options.  If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof.  If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    Delivery Date.

2.3.1    Definition.  Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, broom clean and free of any previous tenant's or occupant's furniture, fixtures, and equipment, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of building permits which may be necessary for the performance of Tenant's Work and any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively *"Tenant's Permits"*)), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a certificate of occupancy for the Premises (unless a certificate of occupancy for the Premises cannot be obtained solely as a result of Tenant's Work not having been commenced or completed, in which event the delivery of a certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date);

(c)    The Common Areas, and all of the improvements thereto shown on Exhibit B hereto shall be in substantially the same condition as of the Effective Date and otherwise in good condition and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the

1  Shopping Center to open for business and for Tenant to receive a permanent certificate of
2  occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall
3  have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals
4  required from applicable governmental authorities to enable the Common Areas to be developed,
5  operated, and used for the purposes herein contemplated, which permits and approvals shall
6  include, without limitation, zoning, building code, environmental requirements, curb cut and site
7  plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s)
8  thereon), construction, and development and use permits;

9            (d)     The representations and warranties of Landlord set forth in
10  subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

11            (e)     Leases or other occupancy agreements shall have been entered into with
12  (i) the Inducement Tenant for occupancy of the premises designated for it on Exhibit B and (ii) national
13  retailers of the type typically found in first-class regional shopping centers located in the Des Moines
14  metropolitan area collectively occupying at least one hundred thousand (100,000) square feet of Floor
15  Area in the Shopping Center (exclusive of the Premises and the premises shown as "Best Buy" on Exhibit
16  B attached hereto); all such leases shall not be cancelable by any of the tenant thereunder, except for
17  injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for
18  other reasons similar to those for which this Lease is cancelable by Tenant;

19            (f)     Landlord shall have delivered to Tenant, in recordable form:  (i) a
20  subordination, non-disturbance and attornment agreement substantially in the form attached hereto as
21  Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the
22  Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1 (f) is
23  not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required
24  pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content
25  described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor;

26            (g)     The Declaration of Restrictions (hereinafter defined in Section 13.2.5) is
27  (x) fully executed, delivered and recorded in the Polk County, State of Iowa, Recorder's Office and (y)
28  superior to all mortgages, deeds of trust and other liens affecting the Related Land; and

29            (h)     Landlord shall have delivered to Tenant a fully-executed letter agreement
30  amending the Whole Foods exclusive as same pertains to Tenant, signed by Whole Foods Market Group,
31  Inc., in the form attached hereto in Exhibit K-1 of the Lease.

32        2.3.2        Delivery Date.

33            (a)     Landlord shall cause the Delivery Date to occur on January 1,
34  2012. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery
35  Date be deemed to occur prior such date.

36            (b)     Landlord acknowledges that if it shall fail to satisfy all of the
37  Delivery Date Conditions by the Delivery Date as established in subparagraph (a) above, Tenant
38  will sustain substantial, additional costs and expenses, including, without limitation, costs
39  incurred in connection with contractors and subcontractors hired to perform Tenant's Work, the
40  exact amount of which would be impracticable or extremely difficult to ascertain.  If the
41  Delivery Date does not occur by the date established in subparagraph (a) above, then, in addition
42  to any other remedies available to Tenant under this Lease, Tenant shall be entitled to a credit
43  against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a
44  penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of Two
45  Thousand Five Hundred Dollars ($2,500) for each day that the Delivery Date established in
46  subparagraph (a) above is delayed.  The foregoing liquidated reimbursements represent the
47  parties' good faith agreement as to an amount which shall have been incurred by Tenant and
48  which shall otherwise not be susceptible of exact ascertainment.  Notwithstanding the foregoing,
49  if the Delivery Date does not occur by the date established therefor in subparagraph (a) above
50  due solely to (x) delays caused by a Tenant Delay or (y) Force Majeure (either of which first
51  occur after the Effective Date hereof), then the Delivery Date shall be delayed day for day for
52  each day of such delay, provided that Landlord has notified Tenant of such delay within five (5)
53  days of the occurrence of such Tenant Delay or Force Majeure.  For purposes of this Lease
54  **"Tenant Delay"** shall mean a net delay resulting by reason of the acts or omissions or willful
55  misconduct of Tenant or Tenant's agents, employees, servants or contractors.

2.3.3     <u>Delivery Date Certification</u>. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as <u>Exhibit J</u>.

2.3.4     <u>No Waiver</u>. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4   <u>Unseasonable Delivery: Slack Period</u>. If, for any reason (including, without limitation, Force Majeure), the Delivery Date (or the Permit Contingency Date, if later) occurs during the period commencing on May 1 and ending on the November 1 next following (the ***"Slack Period"***), then Tenant shall have, in addition to any other remedies, the right to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. In the event that Tenant elects to defer the Delivery Date pursuant to this Section, the accrual of any per diem liquidated reimbursement under Section 2.3.2(b) above shall be suspended for the period of such deferment.

Section 2.5   <u>Initial Co-Tenancy Condition</u>.

2.5.1     As used herein, the ***"Initial Co-Tenancy Condition"*** shall mean that (i) the Inducement Tenant and (ii) national retailers of the type typically found in first-class regional shopping centers located in the Des Moines metropolitan area collectively occupying at least one hundred thousand (100,000) square feet of Floor Area in the Shopping Center (exclusive of the Premises and the premises shown as "Best Buy" on Exhibit B attached hereto), shall have accepted possession of their respective premises (meaning, with respect to the Inducement Tenant, the premises designated for it on <u>Exhibit B</u>), such premises shall have been substantially completed, and all such retailers shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising of their respective premises.

2.5.2     If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3     In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date

established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work, not to exceed Fifty Thousand Dollars ($50,000).

Section 2.6    Permits Contingency.

2.6.1    Tenant shall use diligent efforts to obtain all of Tenant's Permits (defined in Section 2.3.1(b) above) on or before February 15, 2012. Notwithstanding the provisions of this Article 2 to the contrary, if, despite Tenant's diligent efforts, all Tenant's Permits have not been obtained by said date, Tenant shall promptly notify Landlord (such notice the *"Permit Failure Notice"*) of Tenant's inability to obtain Tenant's Permits and Landlord shall have the right to assist Tenant in obtaining same (including, without limitation, Landlord applying for and/or otherwise pursuing, at Landlord's sole cost and expense, such application(s) on Tenant's behalf). Landlord must elect to so assist Tenant, if at all, by written notice to Tenant given within seven (7) days of Landlord's receipt of the Permit Failure Notice. Notwithstanding the provisions of this Article 2 to the contrary, if despite Tenant's (or Landlord's, as the case may be) diligent efforts, all Tenant's Permits have not been obtained by March 15, 2012 or Landlord fails timely to elect to assist Tenant as provided for in this Section 2.6.1, then Tenant shall have the right, upon notice given to Landlord prior to the unconditional grant of all of Tenant's Permits, to: (a) delay its acceptance of physical possession of the Premises to the date on which all of the Tenant's Permits have been obtained, whereupon the Delivery Date shall be deemed to have occurred on such date (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); or (b) terminate this Lease. Tenant's exercise of its rights under (a) above shall not preclude the subsequent exercise of its rights under (b) above. The date on which all Tenant's Permits are unconditionally granted is referred to herein as the *"Permit Contingency Date"*.

2.6.2    If all of Tenant's Permits have not been obtained within three hundred sixty-five (365) days after the date set forth in the first sentence of Section 2.6.1 above for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option, upon notice given to Tenant prior to the unconditional grant of all Tenant's Permits, to terminate this Lease, provided, however, that Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, of Tenant's waiver of its rights under Section 2.6.1 above, whereupon Landlord's termination notice shall be rendered null and void.

2.6.3    In the event Tenant or Landlord elects to terminate this Lease pursuant to this Section 2.6, this Lease shall cease and be deemed canceled and terminated as of the date set forth in Tenant's or Landlord's notice of such termination and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.

## ARTICLE 3
## IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work. Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D and Exhibit D-1 (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein. Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    <u>Plan Approvals</u>.

3.2.1    <u>Preparation of Plans</u>.

(a)    Landlord and Tenant acknowledge that Landlord has delivered to Tenant the existing as-built plans and civil/site plans for the Premises (collectively, "***Shell Drawings***") to the extent in Landlord's possession, which plans Landlord represents and warrants are true and correct and accurately depict the building in which the Premises are located, and acknowledges that Tenant is relying on the accuracy of such plans.

(b)    Within thirty (30) days after the Effective Date hereof, Tenant shall deliver to Landlord Tenant's plans (***"Tenant's Plans"***) depicting Tenant's Work.  Landlord shall have ten (10) days from its receipt of Tenant's Plans (or revisions thereto, as applicable) to approve or disapprove Tenant's Work depicted thereon, which plans and work shall be approved so long as they:  (i) comply with all Legal Requirements, and (ii) are substantially consistent with <u>Exhibits B</u>, <u>D</u>, <u>D-1</u>, and <u>F</u> attached hereto and (iii) do not materially reduce the structural soundness of the building containing the Premises.  If Landlord shall fail to disapprove Tenant's Plans with reasonable specificity within said 10-day period, Tenant's Plans shall be deemed approved.  This Lease is subject to and conditioned upon Landlord's approval (or deemed approval) of Tenant's Plans.

3.2.2    <u>Plan Changes</u>.

(a)    After Tenant approves the Shell Drawings, it shall have the right to require Landlord to subsequently make changes thereto (the "***Changes***").  Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay that may be occasioned by such Change.  If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(b)    Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 5% subcontractor profit and 5% general contractor profit thereon), taking into consideration all savings realized by Landlord as a result of the Changes.  Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen.

(c)    Intentionally Omitted.

(d)    If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such Changes), then:  (i) the Rent Commencement Date shall be determined as if such delay had not occurred; (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Effective Date hereof, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3    <u>Performance of Work</u>.

3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials.  Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Premises.  If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the

9

1    Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for
2    each day of delay occasioned thereby.

3           3.3.2        If: (a) Landlord's Work has not been commenced by October 15,
4    2011, or (b) the Delivery Date shall not have occurred by March 1, 2012 (subject to *Force*
5    *Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have
6    given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may
7    thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date
8    has not occurred, as the case may be, consider Landlord to be in default hereunder and, at
9    Tenant's option in its sole discretion, elect to:

10                    (i)       terminate this Lease, if Landlord shall fail to fully cure
11    such default within thirty (30) days after receiving Tenant's notice thereof, in which
12    event neither party shall have any further liability hereunder, except:  (i) for those
13    obligations which survive the expiration or other termination of this Lease pursuant to
14    the express terms of this Lease, and (ii) Landlord shall be obligated to promptly
15    reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its
16    reasonable third-party costs and expenses incurred in connection with this Lease
17    (including, without limitation, costs associated with the preparation and review of plans
18    and specifications, attorney's fees, and the performance of Tenant's Work), not to
19    exceed Twenty-Five Thousand Dollars ($25,000); and/or

20                    (ii)      avail itself of the remedies set forth in Section 16.2 below
21    (provided, however, that the cure period set forth therein shall not be applicable); and/or

22                    (iii)     extend one or more times the dates set forth in clauses (a)
23    and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice
24    given to Landlord, and as to any extension granted with respect to the clause 3.3.2(b)
25    above, in addition to any other rights and remedies to which Tenant may be entitled, the
26    Rent Commencement Date shall be postponed by two (2) days for each day of the
27    extension granted as to clause 3.3.2(b) above.

28    The election by Tenant of any one or more of the foregoing remedies shall not preclude the
29    subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in
30    equity.

31           3.3.3       Landlord's Work Performed After Delivery of Possession. On or
32    before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-
33    through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined).
34    Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-
35    through.  Landlord shall complete any Punch List Items within ten (10) days after it receives a
36    copy of said punch list.  If Landlord fails to complete any item on said punch list within said
37    10-day period, Tenant shall have the right to complete such item(s) using its own contractors and
38    receive reimbursement from Landlord for the reasonable costs and expenses thereof upon
39    demand.  If reasonably required by Tenant, any portion of Landlord's Work which is performed
40    after Tenant accepts physical possession of the Premises shall occur only "after hours", when
41    neither Tenant nor any of its agents, contractors, employees and servants are working within the
42    Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by
43    Tenant by reason of such "after hours" performance of Landlord's Work.  As used herein, the
44    term *"Punch List Items"* shall mean such minor items of a cosmetic nature which, when
45    considered as a whole, do not adversely affect either the performance of Tenant's Work or
46    Tenant's ability to conduct its normal business operations in the Premises.

47           3.3.4       Tenant's Right of Entry. Prior to the Delivery Date, Tenant may
48    enter upon the Premises for the purposes of inspecting the work, taking measurements, making
49    plans, erecting temporary or permanent signs and doing such other work as may be appropriate
50    or desirable without being deemed thereby to have taken possession or obligated itself to pay
51    Rent, provided, however, that Tenant shall not, during the course of such work, materially
52    interfere with the performance of Landlord's Work and shall indemnify and hold Landlord
53    harmless from and against any and all claims or losses arising from Tenant's entry upon the
54    Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

1            3.3.5            Tenant's Leasehold Improvements. Subject to Section 3.3.8
2  below, Tenant's Work and all other improvements erected by Tenant with respect to the
3  Premises, together with any replacements thereof, shall be and remain the property of Tenant
4  throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof,
5  including, but not limited to, depreciation of same as an asset for tax purposes.

6            3.3.6            Work Requirements After Delivery Date. Following the Delivery
7  Date, any construction by Landlord or other tenants or occupants of the Shopping Center
8  affecting any portion of the Shopping Center shall be subject to the following terms and
9  conditions:

10            (a)     staging and storage of materials and parking of construction
11  vehicles shall occur only within the portions of the Shopping Center designated as "Staging" on
12  Exhibit B hereto;

13            (b)     Landlord shall diligently ensure that, from and after Tenant's
14  opening for business to the public, no ingress, egress or passage of any construction, delivery and
15  related vehicles engaged in the performance of such work or other construction activities shall
16  take place except through the entrance/exit drive designated as the "Construction Drive" on
17  Exhibit B hereto; and

18            (c)     Landlord shall maintain the Shopping Center in a clean, safe, and
19  sightly condition, and shall use reasonable efforts to ensure that such construction shall not
20  materially adversely interfere with the normal conduct of any business operations in the
21  Premises.

22            3.3.7            Tenant's Trailer. Tenant shall have the right, subject to applicable
23  Legal Requirements, to place a trailer on the Common Areas, in the location shown on Exhibit B
24  hereto, during the period commencing on the forty-fifth (45th) day prior to date on which Tenant
25  has scheduled for the commencement of its fixturing in the Premises, until the twentieth (20th)
26  day after said fixturing date (but not later than the date Tenant opens for business in the
27  Premises), for the purpose of conducting employee interviews and recruiting. Landlord shall
28  install, at Landlord's expense, utility hookups to the trailer in accordance with the specifications
29  set forth in Exhibit D hereto.

30            3.3.8            Tenant Allowance. Landlord shall pay Tenant the liquidated sum
31  of One Million One Hundred Ninety-Three Thousand One Hundred Forty-Eight and 00/100
32  ($1,193,148.00) Dollars [based on forty-six and 00/100 ($46.00) Dollars per square foot of Floor
33  Area in the Premises] (the *"Tenant Allowance"*) in consideration for Tenant's construction of
34  "Landlord's Special Improvements" (defined below). Landlord and Tenant hereby acknowledge
35  and agree that the Tenant Allowance shall be in addition to Landlord's Work. Landlord shall
36  pay the Tenant Allowance to Tenant within thirty (30) days after the later to occur of Substantial
37  Completion of Tenant's Work in accordance with the Tenant's Plans, as certified by Tenant's
38  architect, and Landlord's receipt of all of the following:

39            (i)     Tenant's certification that Tenant's Work has been
40  Substantially Completed;

41            (ii)     at Tenant's discretion, either (y) a lien waiver from
42  Tenant's general contractor or (z) an agreement regarding mechanics' and materialman's liens in
43  the form attached hereto as Exhibit N; and

44            (iii)     a temporary or permanent certificate of occupancy (or its
45  local equivalent), unless such certificate is not available for any reason other than Tenant's
46  failure to perform Tenant's Work in compliance with all Legal Requirements.

47         If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion
48  thereof within thirty (30) days of Landlord's receipt of the applicable documentation or
49  occurrence of all of the events set forth above, then in addition to the rights and remedies under
50  Section 16.2 of this Lease, Tenant shall have the right to a credit against one hundred percent
51  (100%) of the Rent payable by Tenant hereunder, together with interest thereon at a rate equal to
52  the then effective prime rate as published from time to time in the "Money Rates" section of *The*

11

1    *Wall Street Journal* (or any successor publication thereto) <u>plus</u> five percent (5%).  The Tenant
2    Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord,
3    of Tenant's Work (the ***"Landlord's Special Improvements"***) (which Landlord's Special
4    Improvements, together with any replacements thereof, when completed shall be the property of
5    Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this
6    Lease).  Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as
7    an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant
8    Allowance.  Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's
9    Work in excess of the Tenant's Allowance, and Tenant's Work (except for Landlord's Special
10   Improvements), together with any replacements thereof, shall be and remain the property of
11   Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership
12   thereof, including, without limitation, depreciation of same as an asset for tax purposes.

13                          ARTICLE 4
14       FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

15       Section 4.1   <u>Fixed Rent</u>.  Commencing on the Rent Commencement Date and
16   continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal
17   successive monthly installments, in advance, on the first day of each and every calendar month
18   throughout the Term, except that Fixed Rent payable for any partial calendar month during the
19   Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or
20   set-off, except to the extent otherwise expressly provided herein.

21       Section 4.2   <u>Payment of Rent</u>.  All Rent shall be mailed or otherwise delivered to
22   Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to
23   such other address as Landlord may from time to time designate.  Landlord acknowledges and
24   agrees that for administrative purposes, Tenant may designate a corporation or other entity to act
25   as a paying agent (the ***"Paying Agent"***), to make all Rent payments due to Landlord under this
26   Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and
27   shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent,
28   and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of
29   Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such
30   payments of Rent had been made by Tenant directly to Landlord.  In addition, with respect to
31   any installment of Rent which becomes due and payable by Tenant hereunder but is not paid
32   within ten (10) days after Tenant's receipt of a reminder notice from Landlord, Tenant shall pay
33   to Landlord a late charge equal to three (3%) percent of such unpaid amount (it being agreed that
34   Landlord shall not be required to notify Tenant more often than two (2) times during any twelve-
35   month period during the Term as a condition to Landlord's being entitled to receive such late
36   charge hereunder).

37       Section 4.3   <u>Real Estate and Other Taxes</u>.

38          4.3.1         Landlord shall pay on or before the due dates thereof all "Taxes"
39   (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.
40   Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within
41   tax parcels and lots that exclude any property not a part of the Shopping Center.

42          4.3.2      (a)     Tenant shall pay to Landlord Tenant's Pro Rata Share of
43   the Taxes which are payable during the Term, subject to the provisions of this Section 4.3.  Any
44   Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be
45   adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent
46   Commencement Date or the date on which the Term expires or earlier terminates, as the case
47   may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by law, any Taxes
48   may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on
49   the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of
50   installments, and Landlord shall pay the same as they come due and before any fine, penalty,
51   interest or cost may be added thereto for nonpayment thereof.

52               (b)     Landlord shall submit to Tenant a copy of the bill for Taxes issued
53   by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and
54   proof of the payment of Taxes for the previous payment period, as well as copies of all notices
55   concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount

1  required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event
2  earlier than the thirtieth (30th) day prior to the date on which such Taxes would become
3  delinquent).

4          4.3.3        As used herein, *"Taxes"* shall mean all general, *ad valorem* real
5  estate taxes, and assessments for betterments and improvements that are levied or assessed by
6  any lawful authority on the Shopping Center (general or special), including any substitution
7  therefor, in whole or in part, due to a future change in the method of taxation.  Taxes shall be
8  reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from
9  the taxing authorities.  For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall
10  not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer,
11  franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under
12  this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by
13  retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of
14  Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part
15  thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event
16  of Default); (4) assessment for a public improvement arising from the initial construction or
17  expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed
18  during the Term which are permitted to be included within Taxes hereunder shall, for the
19  purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the
20  maximum number of installments permitted by the applicable taxing authority); (5) Taxes
21  resulting directly from an increase in the assessment caused by a sale or ground lease of all or
22  any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5)
23  years; or (6) fees imposed upon Landlord in connection with Landlord's development of the
24  Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by
25  Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only
26  property owned by Landlord.  Landlord represents to Tenant that, as of the Effective Date and, to
27  the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the
28  Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or
29  phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in
30  any special improvement district(s) which would result in higher sales taxes or other similar
31  impositions than would exist in the absence of such district(s).  Landlord estimates that the
32  Tenant's Pro Rata Share of Taxes for the first full calendar year after the Rent Commencement
33  Date will be approximately $3.87 per square foot of Floor Area in the Premises.
34  Notwithstanding the foregoing provisions of this Section 4.3.3, Taxes may include any tax or
35  assessment on rentals payable under this Lease provided that (i) such tax or assessment is in lieu
36  of or substitution of existing ad valorem taxes, (ii) such tax or assessment is calculated as if the
37  Shopping Center is the only property owned by Landlord, and (iii) all commercial property
38  owners in the taxing district in which the Shopping Center is located are required to pay such tax
39  or assessment.

40          4.3.4        At Tenant's request, Landlord shall contest the amount or validity
41  of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the
42  assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon
43  Landlord shall cooperate with Tenant, execute any and all documents required in connection
44  therewith and, if required by any governmental authority having jurisdiction, join with Tenant in
45  the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Taxes
46  is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and
47  customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid
48  to the party which incurred such expense).  Notwithstanding the foregoing, if Tenant is the sole
49  occupant of the tax lot on which the Premises is located, then Tenant shall have the right to
50  contest the assessed valuation or Taxes without first requesting that Landlord do so.

51                  ARTICLE 5
52          COMMON AREAS, THEIR USE AND CHARGES

53          Section 5.1    Common Areas:  Maintenance.

54          5.1.1        Maintenance of Common Areas.  Landlord shall operate,
55  maintain, repair and replace the Common Areas as required by this Lease and otherwise to the
56  standard by which Common Areas of first-class shopping centers in the state in which the
57  Shopping Center is located are operated, maintained, repaired and replaced, including, without

13

1   limitation, snow, ice, rubbish and debris removal (including installation and maintenance of
2   sidewalk refuse containers), landscaping (including, without limitation, the trimming and
3   pruning of trees to avoid interference with the use or visibility of canopies or signs on the
4   exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot repair,
5   sealing and striping, drainage, security (as reasonably required), monitoring and testing of the
6   municipally mandated fire safety monitoring system serving the entire Shopping Center (the
7   "*Fire Monitoring System*") and control of all Common Areas, and Landlord shall comply with
8   all applicable Legal Requirements.

9          5.1.2          Tenant's Pro Rata Share of Common Areas Charges.

10         (a)   During the Term, Tenant shall pay to Landlord Tenant's Pro Rata
11  Share of the reasonable costs (hereinafter referred to as the "*Common Areas Charges*") paid by
12  Landlord to operate, maintain, insure and repair the Common Areas, which shall include the
13  reasonable premiums for insurance required to be maintained by Landlord under Section 10.3
14  below.  Landlord shall be permitted to include in Common Area Charges (in lieu of any cost(s)
15  or expense(s) relating to the administration and management of the Common Areas) for each
16  calendar year an administrative fee (the "*Administrative Fee*") equal to six percent (6%) of the
17  Common Areas Charges for the calendar year in question, but excluding from the computation of
18  such Administrative Fee the cost of any replacement or improvement of a capital nature (if such
19  capital item is a permissible Common Areas Charge hereunder), the cost of electricity and other
20  utilities, and the cost of insurance which Landlord is required to maintain under this Lease.
21  Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments
22  on the first day of each calendar month, in advance, during each calendar year based on
23  Landlord's reasonable budget.

24         (b)   Within sixty (60) days after the end of each calendar year,
25  Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of
26  Common Areas Charges for such year, which statement shall be prepared in accordance with
27  generally accepted accounting principles (or successor accounting standards) consistently
28  applied (the "*CAC Reconciliation Statement*").  The CAC Reconciliation Statement shall be
29  certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's
30  Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any
31  overpayment made by Tenant during the preceding calendar year.  If Tenant's Pro Rata Share of
32  the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly
33  installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the
34  deficiency within forty-five (45) days after receipt of such notice.  Upon Tenant's request,
35  Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not
36  limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If
37  Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall
38  have the right (in addition to any rights and remedies to which it may be entitled under this
39  Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due
40  hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance
41  is due until reimbursement or full satisfaction by credit.  Notwithstanding any provision hereof to
42  the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges from the
43  Rent Commencement Date through the end of the first full calendar year of the Term exceed
44  $1.29 per square foot of Floor Area per annum, and with respect to any other calendar year
45  thereafter (exclusive of the increased cost of snow removal, insurance rate increases, and utility
46  rate increases during such calendar year) exceed one hundred five percent (105%) of the
47  Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately
48  preceding calendar year (exclusive of the increased cost of snow removal, insurance rate
49  increases, and utility rate increases during such calendar year).

50         5.1.3          Exclusions from Common Areas Charges.

51         (a)   Common Areas Charges shall not include:  **(1)** the capital cost of
52  any additions to the Common Areas pursuant to an expansion of the Shopping Center; **(2)** the
53  cost of any replacements or capital improvements to the Common Areas, except that the cost of
54  repaving the parking areas of the Shopping Center may be included within Common Areas
55  Charges so long as such cost is amortized on a straight-line basis over the useful life thereof
56  under generally accepted accounting principles (or successor accounting standards), and is not
57  incurred (A) prior to the expiration of the fifth (5th) full calendar year of the Term, or (B) more

than once during each five (5) full calendar years of the Term; **(3)** the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); **(4)** any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; **(5)** the cost of maintaining, repairing or providing security for interior portions of buildings; **(6)** Taxes or other taxes levied or assessed against Landlord or the Shopping Center; **(7)** the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); **(8)** any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; **(9)** any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); **(10)** those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; **(11)** sums paid or owed by Landlord to any tenant in the Shopping Center; **(12)** costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); **(13)** costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; **(14)** sums incurred as late payment fees, penalties or interest; **(15)** ground rent; **(16)** depreciation [except as expressly permitted pursuant to item 23 below]; **(17)** costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court or exterior dining area in the Shopping Center); **(18)** electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; **(19)** Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; **(21)** costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(22)** intentionally omitted; **(23)** the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles (or successor accounting standards)); **(24)** reserves for anticipated future expenses; **(25)** except for the Administrative Fee provided for in Subsection 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; **(26)** except for the Fire Monitoring System (defined in Section 5.1.1 hereof), costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; **(27)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; **(28)** except as specifically provided in Section 7.2 hereof and except for the main water-feature sign identifying the Shopping Center as existing as of the Effective Date, any costs relating to any pylon signs or other signage identifying tenants of the Shopping Center or **(29)** any portion of the cost of insurance which Landlord is required to maintain under this Lease, which is attributable to any betterments or improvements contained within any other tenant's premises within the Shopping Center.

   **(b)** In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into account, for example, the relationship of the size of the Common Areas maintained by the other tenant or occupant to the size of its premises.

15

1                (c)   Common Areas Charges for any period during the Term which
2  constitutes less than a full calendar year shall be equitably prorated.

3            5.1.4          <u>Tenant's Right to Audit</u>. Tenant shall have the right, within three
4  (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to
5  audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges
6  as reflected therein and Tenant's Pro Rata Share thereof.  Upon Tenant's request, Landlord shall
7  promptly deliver to Tenant copies of relevant backup materials (including, but not limited to,
8  contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an
9  error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days
10  after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro
11  Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of
12  the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have
13  the right (in addition to any rights and remedies to which it may be entitled under this Lease, at
14  law, or in equity) to offset such amount from payments of Rent next becoming due hereunder,
15  together with interest thereon at the Lease Interest Rate from the date such remittance is due until
16  reimbursement or full satisfaction by credit.  Landlord shall maintain all books and records
17  pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC
18  Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit
19  confidential, provided that nothing contained herein shall restrict Tenant from disclosing such
20  information as may be required by applicable Legal Requirements, or to its accountants,
21  attorneys or <i>bona fide</i> prospective assignees or subtenants (provided that each of such recipients
22  shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute
23  by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance
24  with the provisions of Section 16.3 below.  Tenant agrees that in conducting such audit it shall
25  not use an auditor that is paid on a contingent fee basis.

26            5.1.5          In no event shall Tenant be required to join, participate in or
27  contribute to any promotional fund, marketing fund or merchants' association.

28         Section 5.2    <u>Common Areas:  Restrictions</u>.

29            5.2.1          <u>Continuous Access</u>. No entrances, exits, approaches and means of
30  ingress and egress to, from, and/or within the Critical Area (defined in Section 5.2.2 hereof) or
31  the Premises as shown on <u>Exhibit B</u> hereto shall be interrupted or disturbed by any act or
32  omission of Landlord during the Term, except:  (i) in the event of an emergency or as may be
33  otherwise required by applicable Legal Requirements, in which event Landlord shall use
34  reasonable efforts to give Tenant advance notice of same and to minimize interference to
35  Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that
36  Landlord is required to temporarily close the Common Areas, for the minimum time legally
37  necessary to prevent a dedication thereof or an accrual of any rights in any person or the public
38  generally therein; <u>provided</u> that such closure shall not occur during August (through Labor Day),
39  November or December of any calendar year, and Landlord shall give Tenant at least thirty (30)
40  days' prior notice thereof.

41            5.2.2         <u>No Alterations</u>.  Landlord shall not, without obtaining Tenant's
42  prior written consent in each instance, which consent may be withheld in its sole discretion:
43  (i) alter the area of the Shopping Center or the location, availability, or size of any Common
44  Area improvement located within the area designated as "Critical Area" on <u>Exhibit B</u> hereto, (the
45  <i>"Critical Area"</i>), from that shown on <u>Exhibit B</u> hereto; (ii) construct or permit to be constructed
46  any structures in the Critical Area of the Shopping Center (including, without limitation, any
47  buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on
48  <u>Exhibit B</u> hereto; or (iii) materially change the entrances or exits to and from the Shopping
49  Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common
50  Areas, or the number, location or layout of parking spaces, located within the Critical Area from
51  those shown on <u>Exhibit B</u> hereto.  Landlord shall neither perform nor permit to be performed,
52  any construction, repairs, replacements or maintenance to any portion of the Shopping Center,
53  including the Premises (other than emergency repairs to utilities and Common Areas) during the
54  months of August (through Labor Day), November and December of any year, without the prior
55  consent of Tenant, which consent may be withheld in Tenant's sole discretion.  Notwithstanding
56  the foregoing, Tenant hereby expressly acknowledges and agrees that Landlord may, in its sole

discretion, expand, enlarge or reconfigure the building currently occupied by Marshall's provided Landlord first obtains the prior written consent of Tenant.

### 5.2.3 Intentionally Omitted.

5.2.4 <u>Parking Area</u>. During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) four and one-half (4.5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate within the Critical Area any specific parking spaces for use by other tenants or occupants of the Shopping Center. Landlord shall not permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. Notwithstanding the foregoing, Landlord shall maintain in the location identified on <u>Exhibit B</u> as the "Expectant Mother Parking Area", a minimum of six (6) parking spaces reserved for the exclusive use of expectant mothers and/or parents with infants who are customers of Tenant (the ***"Expectant Mother Parking Spaces"***). The Expectant Mother Parking Spaces shall be prominently marked and/or signed as reserved for expectant mothers and/or parents with infants who are customers of Tenant. Tenant may use commercially reasonable efforts to enforce the exclusive use of the Expectant Mother Parking Space. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center, except that Tenant shall be entitled to park overnight in the parking lot located in front of the Premises one box truck that is used exclusively for delivery of merchandise purchased by Tenant's customers.

5.2.5 <u>Lighting</u>. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 1:00 a.m. Monday through Saturday, excluding holidays, and until 10:00 p.m. on Sunday (***"Normal Hours"***). Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, <u>provided</u> Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (<u>excluding</u>, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6 <u>Repairs</u>. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a) not be performed during the months of August (through Labor Day), November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b) be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c) be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7 <u>Rules and Regulations</u>. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against

all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

### 5.2.8    Miscellaneous.

(a)    No Promotional Use.  Landlord shall not use or permit the use of all or any portion of the Critical Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, subject to compliance with Legal Requirements, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall:  (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.  Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)    Trash Compactor and Containers.  Tenant shall be permitted to maintain and operate, at no extra charge:  (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)    Shopping Carts.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)    Cellular Towers.  No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center except in the area shown as "Cell Tower Area" on Exhibit B hereto.

### ARTICLE 6
### UTILITIES

Section 6.1    Utility Service.  From and after the later of the Permit Contingency Date and the Delivery Date, and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the later of the Permit Contingency Date or the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to such date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.  Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2    Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If such disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.  In no other event shall Landlord be liable for any interruption or failure in the supply of any utilities to the Premises.

1                                    ARTICLE 7
2                                      SIGNS

3          Section 7.1    Tenant's Building Signage.  Subject to compliance with applicable Legal
4   Requirements, Tenant shall have the exclusive right, in connection with Tenant's Work, and
5   thereafter during the Term, at its sole cost and expense, to erect, maintain, and replace on the
6   storefront and exterior walls of the Premises, and on the side walls of any entrance design
7   element, if any, signs (including, without limitation, under-canopy (e.g., blade) signs), banners
8   (including temporary banners placed on the storefront of the Premises and such other walls of the
9   Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant,
10  from time to time, may desire.  Tenant shall also be entitled, at Tenant's sole cost and expense, to
11  install and maintain, during the period commencing on the Effective Date and ending on the day
12  prior to the Rent Commencement Date, a temporary sign near the site of the main entrance to the
13  Shopping Center which states "buy buy BABY Coming Soon" (which sign is more particularly
14  shown in Exhibit F hereto).  Tenant may erect and maintain in the interior of the Premises any
15  signs it may desire, provided same are professionally prepared.

16         Section 7.2    Pylon/Monument Signage.  Landlord shall provide the pylon sign structure
17  at the location shown on Exhibit B hereto during the entire Term, and obtain all permits and
18  approvals therefor.  Tenant shall have the right, at its sole cost and expense, to erect and maintain
19  its identification sign, as shown on Exhibit F hereto (and having colors as shown on Exhibit F
20  hereto), on all sides of such structure in the position shown on Exhibit F hereto.  In addition, if
21  Landlord constructs an additional sign structure intended for use by more than one tenant in the
22  Shopping Center (except for the sign structure to be constructed only for Best Buy and Whole
23  Foods located at the intersection of 42nd Street and University Avenue), Landlord shall also
24  include on such sign structure Tenant's identification sign panel(s), which sign panel(s) shall be
25  equal to or larger than (including size of lettering therein) the largest sign made available to all
26  other occupants of the Shopping Center whose premises contain less Floor Area than Tenant, and
27  shall be located above the sign panel(s) of all other occupants whose premises contain less Floor
28  Area than Tenant.  Landlord shall maintain the pylon sign structure at the location shown on
29  Exhibit B (and any additional future pylons and monuments), and Tenant's signs thereon, in
30  good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and
31  expense.  Landlord shall not change or alter the location, structure, height or general appearance
32  of the pylon sign structure at the location shown on Exhibit B without obtaining Tenant's prior
33  consent.  The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) and
34  the cost of any electricity used to illuminate them, shall be includable in Common Areas
35  Charges; however, neither the cost of individual tenants' signs thereon, nor the cost of the
36  construction of the pylon sign structure (and any additional future pylons and monuments), shall
37  be includable in Common Areas Charges.

38         Section 7.3    Signage: Alteration/Removal/Allocation.  Tenant shall have the right,
39  from time to time, without Landlord's approval, to change its signs on the storefront and exterior
40  of the Premises, as well as on any pylon or monument, provided that the area of the new sign is
41  no larger than the area of the sign which it replaces and that the method of construction and
42  attachment is substantially the same.  Upon the expiration or earlier termination of the Lease,
43  Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from
44  any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights
45  granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between
46  Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by
47  Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

48         Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents or
49  applications which may be required by applicable Legal Requirements to permit the placement,
50  installation, and/or replacement by Tenant of any signs on any part of the Premises or on any
51  pylon or monument, to which Tenant may be entitled under this Lease.

52         Section 7.5    Signage and Building Restrictions and Criteria.

53             7.5.1        During the Term, no exterior identification signs attached to the
54  exterior of any building of the Shopping Center shall be of the following type: (i) flashing,
55  moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed
56  ballast boxes, or exposed transformers, provided that, subject to Legal Requirements, Tenant

                                         19

1    (and all other tenants of the Shopping Center) shall have the right to employ any methods
2    necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper
3    or cardboard signs other than professionally prepared interior window signs within the subject
4    premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however,
5    the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small
6    stickers or decals which indicate hours of business, emergency telephone numbers, credit cards
7    accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase
8    "no solicitation" or words of like import.  No billboard signs shall be permitted within the
9    Shopping Center.

10           7.5.2           Landlord shall not permit any obstructions (including, without
11   limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure
12   Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or
13   other freestanding signs.  Except as otherwise permitted under Existing Leases (hereinafter
14   defined in Section 12.3(j)), no premises in the building shown as "Sports Authority" on Exhibit
15   B hereto containing less Floor Area than the Floor Area of the Premises shall have:  (i) building
16   signage possessing more total square footage than the total square footage available for use by
17   Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as
18   measured from the finished floor level to the highest point on such signage, or (ii) a building and
19   entrance design element higher, wider, or which projects farther than the height, width, or
20   projection of the building and entrance design element of the Premises.

21                                        ARTICLE 8
22                          ALTERATIONS AND IMPROVEMENTS

23           Section 8.1     Alterations and Improvements.

24           8.1.1           Tenant shall not perform any structural alterations or structural
25   improvements to the Premises (except to the extent same pertain to Tenant's Work) without the
26   prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the
27   Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's
28   consent provided such alterations are architecturally harmonious with the Shopping Center
29   (Tenant shall provide Landlord with written notice prior to any such alteration).  All work
30   performed by Tenant in connection with structural and non-structural alterations or
31   improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike
32   manner and in compliance with all applicable Legal Requirements.  The provisions of this
33   Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the
34   applicable provisions of Article 7 above.

35           8.1.2           Tenant may, from time to time, at its sole cost and expense,
36   without the prior approval of Landlord, make non-structural alterations and non-structural
37   improvements to the Premises as Tenant deems necessary or desirable, including, but not limited
38   to, electrical systems, heating, ventilation and air conditioning and other mechanical systems,
39   installation of fixtures and equipment, painting, and wall and floor coverings.

40           8.1.3           Tenant shall have the right to subdivide the Premises into two (2)
41   or more separate stores, each of which may have its own front entrance and access to the loading
42   docks in the rear of the Premises, as well as separately sub-metered utilities.

43           8.1.4           Tenant shall have the exclusive right to erect and maintain an
44   antenna and a satellite dish, and/or such other equipment as Tenant shall reasonably desire, on
45   the roof of the Premises, provided that Tenant:  (i) obtains Landlord's prior approval of its plans
46   for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord
47   for all roof penetrations so as not to violate or invalidate any roof warranties maintained by
48   Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is
49   present, (iv) repairs any damage to the roof caused by the making of the roof penetrations,
50   including, but not limited to, the repair of the roof penetrations upon the removal of any
51   equipment installed thereon, and (v) erects and maintains such equipment in accordance with
52   applicable Legal Requirements.

1            8.1.5        Landlord shall execute and return to Tenant all appropriately
2 completed building department or equivalent applications within ten (10) days after Tenant's
3 request therefor, and will reasonably cooperate with Tenant in the permitting process.

4            8.1.6        If any violation of any applicable Legal Requirement which is
5 noted against the Shopping Center or the Premises (other than a violation caused by Tenant)
6 prevents Tenant from obtaining a building permit for any alterations or a certificate of
7 occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such
8 violation to be removed of record to the extent required to permit Tenant to obtain its building
9 permit or certificate of occupancy, as the case may be.

10            8.1.7        Landlord shall not make any alterations to the Premises
11 (including, without limitation, changing the design, color or materials of the exterior of the
12 Premises) nor shall Landlord construct an additional floor or floors above the Premises.
13 Landlord shall neither make nor permit to be made any alterations to the exterior architectural
14 theme of the remainder of the Shopping Center which would be inconsistent with a first-class
15 shopping center in the state in which the Shopping Center is located (exclusive of other tenants'
16 entrance features) without the prior consent of Tenant. Notwithstanding the foregoing, Tenant
17 hereby expressly acknowledges and agrees that Landlord may, in its sole discretion, expand,
18 enlarge or reconfigure the building currently occupied by Marshall's provided Landlord first
19 obtains the prior written consent of Tenant.

20            8.1.8        Tenant shall have the exclusive right to erect and maintain on the
21 roof of the Premises, a passive solar array for the production of electricity (the *"System"*),
22 provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the
23 System, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as
24 not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area
25 where roof penetrations are made while the System is present, (iv) repairs any damage to the roof
26 caused by the making of the roof penetrations, including, but not limited to, the repair of the roof
27 penetrations upon the removal of any component of the System, and (v) erects and maintains the
28 System in accordance with applicable Legal Requirements. The System shall be deemed to be
29 part of Tenant's Property (including, without limitation, for insurance purposes under Section
30 10.2 below). Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be
31 the exclusive owner and operator of the System and Landlord shall have no right, title or interest
32 in such equipment or any component thereof, notwithstanding that any such equipment may be
33 physically mounted or adhered to the Premises. Landlord acknowledges and agrees that,
34 notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or
35 transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the
36 environmental attributes of the System, and (iii) any and all credits (including tax credits),
37 rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever
38 entitled, resulting from the environmental or related attributes of the System. Without the
39 express written consent of Tenant, Landlord shall not make or publish any public statement or
40 notice regarding any environmental incentive relating to the System or any environmental
41 attribute of the System or the energy output from the System.

42            8.1.9        Landlord and Tenant agree that in the event that Tenant shall
43 perform or cause to be performed any alterations or improvements (including without limitation
44 Tenant's Work) to, or within, the Premises which would cause an owner or occupant of the
45 Premises to be entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely
46 entitled to the benefit of such Energy Rebate. As used herein, an *"Energy Rebate"* shall be
47 deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary
48 inducement (such as, for examples only, energy efficiency incentives, property tax abatements,
49 sales tax refunds, tax credits, governmental grants, utility rebates or refunds) given by a
50 governmental, non-governmental, private or public utility, or other entity as a result of efforts to
51 conserve energy or other utilities or cause property or processes to be more environmentally
52 friendly. If any such Energy Rebate is required to be paid or credited directly to Landlord, then:
53 (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then
54 in the shortest number of installments possible, so as to permit Tenant to recoup the full amount
55 of the Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after
56 Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such
57 amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy
58 Rebate against the next succeeding installment(s) of Rent then payable under the Lease.

21

1          ARTICLE 9
2          REPAIRS

3    Section 9.1 <u>Tenant's Repairs</u>.  Subject to the provisions of Articles 10 and 11 hereof,
4 and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition
5 and repair, at its sole cost and expense:  (i) the non-structural, interior elements of the Premises
6 (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in,
7 and serving exclusively the Premises); (ii) the heating, ventilation and air conditioning
8 ("**HVAC**") units exclusively serving the Premises and (iii) the improvements which constitute
9 Tenant's Work.  All repairs and replacements on Tenant's part to be performed hereunder shall
10 be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in
11 accordance with all applicable Legal Requirements.

12    Section 9.2 <u>Landlord's Repairs</u>.  Subject to the provisions of Articles 10 and 11
13 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and
14 replacements to the following:

15      (a) the buildings of the Shopping Center as necessary to maintain
16 same in good condition and repair (including, without limitation, repainting the exterior walls of
17 the buildings of the Shopping Center (including, without limitation, the Premises)) as same may
18 be reasonably required from time to time during the Term;

19      (b) the structural elements of the Premises, which shall be deemed to
20 include, without limitation, the roof joists, columns, footings, foundation, exterior walls
21 (<u>including</u>, without limitation, repainting, but <u>excluding</u> plate glass, storefront windows, doors,
22 door closure devices, window and door frames, molding, locks and hardware, and painting or
23 other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as
24 a result of a floor defect or settling), and the structural elements of any building of which the
25 Premises may be a part;

26      (c) the roof, gutters, flashings, downspouts and scuppers;

27      (d) the electric, gas, water, sanitary sewer, and other public utility lines
28 serving the Premises, to the point of connection to the Premises (including, without limitation,
29 any fire pump facilities or electrical switch gear serving the Premises);

30      (e) all electric, gas, water, sanitary sewer, and other public utility lines
31 and ducts in or passing through the Premises which do not exclusively serve the Premises; and

32      (f) the non-structural elements of the Premises (including, without
33 limitation, the maintenance, repair and replacement of the HVAC units (assuming that the
34 HVAC unit will be replaced with new units as part of Tenant's Work) and the electrical,
35 plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the
36 first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the
37 extent any such non-structural elements are covered by any contractors', manufacturers',
38 vendors', or insurers' warranties or guarantees; and

39      (g) any damage to the Premises or the Shopping Center which is
40 occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or
41 (B) any breach by Landlord of any provision of this Lease.

42    All repairs and replacements on Landlord's part to be performed hereunder shall be at
43 Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in
44 a good and workmanlike manner in accordance with all applicable Legal Requirements, and
45 without material interference with or disruption to the normal conduct of any business operations
46 in the Premises.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or
47 replacements to, or which would otherwise affect the normal conduct of any business operations
48 in, the Premises (except in the case of an emergency posing imminent risk of material harm to
49 persons or property, in which event Landlord shall only be required to give such notice as is
50 reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs
51 would materially interfere with or disrupt the normal conduct of any business operations in the
52 Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant

and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse
Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after
hours" repairs, including, without limitation, utilities charges and security expenses.  In the event
Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten
(10) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights
and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such
amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of
outlay until reimbursement or full satisfaction by credit.

Section 9.3    Legal Compliance Work.  Except as hereinafter expressly provided,
Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas
Charges), for performing all "Legal Compliance Work" (hereinafter defined).  Notwithstanding
the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of
Legal Compliance Work:  (a) pertaining to the interior elements of the Premises which are
neither structural nor comprise the major building systems serving the Premises; or (b) required
solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general
applicability to tenants and occupants of the Shopping Center); provided, however, that the
foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in
accordance with all Legal Requirements, and (y) the repairs required in this Lease.  As used
herein, "***Legal Compliance Work***" shall mean any obligation, addition, alteration, improvement,
or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part
thereof, as applicable, which may be required by reason of any Legal Requirement.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1    Mutual Waiver of Claims.  Landlord and Tenant, on their own
behalf and on behalf of anyone claiming under or through either one by way of subrogation,
hereby release and waive all rights of recovery and causes of action against each other and their
respective Affiliates from any and all liability for any loss or damage to property or resulting
from damage to such property (and, in either case, any resulting loss of business or rental
income), whether caused by the negligence or fault of the other party, which is normally insured
under Special Form property insurance (so-called "All-Risk") and time element insurance
required to be maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or
maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the
party maintaining the deductible hereby releases the other party from any liability arising from
any event which would have been covered had the required insurance been obtained and/or the
deductible not been maintained.

10.1.2    Waiver of Subrogation.  Landlord and Tenant shall cause each
property insurance policy carried by either of them insuring the Premises, the contents thereof, or
the Shopping Center, to provide that the insurer waives all rights of recovery by way of
subrogation or otherwise against the other party hereto (and all of such other party's Affiliates)
in connection with any loss or damage which is covered by such policy or that such policy shall
otherwise permit, and shall not be voided by the releases provided above.

10.1.3    Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2
above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from
and against any and all claims, actions, damages, liability and expense, including reasonable
attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property
arising from or out of any occurrence in or upon the Premises, or any part thereof, or
(y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors,
employees, servants, or licensees, except to the extent such claims, actions, damages, liability
and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees,
employees, or other tenants and occupants, or for which any of said parties may be statutorily
liable.

1        (b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2
2    above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and
3    against any and all claims, actions, damages, liability and expense, including reasonable
4    attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property
5    arising from or out of any occurrence in or upon any portion(s) of the Shopping Center
6    (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord,
7    its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees,
8    <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or
9    omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said
10    parties may be statutorily liable.

11    Section 10.2   <u>Tenant's Insurance</u>.

12    10.2.1    <u>Tenant's Insurance</u>. Tenant, at its own cost and expense, shall
13    maintain in full force and effect from and after the later of the Permit Contingency Date or the
14    Delivery Date, and throughout the Term: (i) commercial general liability insurance protecting
15    and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the
16    use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this
17    Lease, and having a combined single limit of liability of not less than Ten Million Dollars
18    ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form
19    (so-called "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to
20    cover the full insurable replacement value of all of Tenant's Property.

21    10.2.2    <u>Self-Insurance</u>. All insurance required to be maintained under this
22    Section 10.2 may be: (i) insured under an individual policy covering this location, or a blanket
23    policy or policies which includes other liabilities, properties and locations of Tenant or its
24    Affiliates; (ii) self-insured by Tenant via a deductible, a formal plan of self-insurance, or
25    otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease
26    maintains, during the period of such self-insurance, a net worth of at least One Hundred Million
27    Dollars ($100,000,000); or (iii) insured or self-insured by Tenant through a combination of any
28    of the foregoing insurance programs.

29    Section 10.3   <u>Landlord's Insurance</u>.

30    10.3.1    <u>Liability Insurance</u>. Landlord shall maintain in full force and
31    effect on and after the Effective Date and throughout the Term commercial general liability
32    insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as
33    an "additional insured-lessee", and having a combined single limit of liability of not less than
34    Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.

35    10.3.2    <u>Special Form Property Insurance</u>. Landlord shall procure and
36    maintain in full force and effect on and after the Effective Date and throughout the Term, Special
37    Form (so-called "All-Risk") property insurance (including loss of rents for a minimum period of
38    one (1) year) and endorsements for coverages for flood and/or earthquake (but only to the extent
39    Landlord reasonably determines that the procurement and maintenance of flood and/or
40    earthquake coverage is commercially reasonable, with due regard being given to whether or not
41    such coverage is being procured and maintained by a majority of owners of other shopping
42    centers in the Des Moines, Iowa metropolitan area), windstorm, earth movement [sinkholes],
43    Ordinance or Law coverage, on a replacement cost basis, in an amount adequate to cover the full
44    insurable replacement value of all of the buildings (including the Premises) and other insurable
45    improvements in the Shopping Center; provided, however, in no event shall such insurance cover
46    Tenant's Property. All policies required to be maintained by Landlord pursuant to this
47    Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's
48    Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed
49    only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.
50    The property insurance required to be maintained by Landlord pursuant to this Section shall not
51    have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior
52    consent.

53    10.3.3    <u>Tenant's Pro Rata Share of Insurance Premiums</u>. Tenant shall
54    reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums
55    attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as

24

part of Common Areas Charges.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4    <u>General Insurance Requirements</u>.

10.4.1    All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2    The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1    <u>Fire and Other Casualty</u>.

11.1.1    (a)    Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements, and shall not include any of Tenant's Property.  The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.  Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work.  If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

25

(c)    If, in Tenant's reasonable judgment, any condition affecting, or damage to, the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any condition affecting, or damage to, the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2    In the event that:

(a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)    the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3    If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2    _Eminent Domain._

11.2.1    As used in this Section 11.2, **_"Taking"_** or **_"Taken"_** shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2    If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3    In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking:  (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has all of the entrances from both University Avenue and 42nd Street, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)    there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)    any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)    five (5%) percent or more of the parking spaces located in the Critical Area are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four (4.0) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4    If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable

27

judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below.  Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5    In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises (provided further, and notwithstanding the foregoing, any unpaid portion of the Tenant Allowance (defined in Section 3.3.8 hereof) that may be due and owing to Tenant shall be reimbursed in full from the proceeds of any such award).

11.2.6    Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3    Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is one hundred fifty (150) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1    Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2    Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3    Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)    Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

28

1            (e)    The Shopping Center now has, and, on the Delivery Date, shall
2 have, access to and from University Avenue and 42nd Street, as shown on Exhibit B hereto, for
3 the passage of vehicular traffic;

4            (f)    This Lease does not violate the provisions of any instrument
5 heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping
6 Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this
7 Lease conflict with any rights granted by Landlord to any other tenant or occupant in the
8 Shopping Center (including, without limitation, any rights of first offer or first refusal or the
9 like);

10           (g)    There shall be no restrictions or other legal impediments imposed
11 by any public or private instrument which would prevent: (i) the use of the Premises for the
12 Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the
13 manner contemplated by this Lease; or (iii) the performance of Tenant's Work (provided any
14 permit or other authorization to proceed with Tenant's Work shall have been obtained by
15 Tenant);

16           (h)    As of the Effective Date, there are no sign ordinances, restrictive
17 covenants, uniform sign plans or other signage restrictions which would prevent the Premises
18 from having the signage (including, without limitation, the square foot area and size of letters) as
19 depicted on Exhibit D-1 and Exhibit F hereof.  With respect to any and all exit signs containing
20 tritium gas that are located within or upon the Premises, Landlord shall cause same to be
21 removed from the Premises prior to the Delivery Date and thereafter disposed of in full
22 compliance with all applicable Legal Requirements.

23           (i)    As of the Effective Date there is no "Related Land" (defined in
24 Section 13.1.2 below) in existence other than the Existing Related Land (defined below).  Except
25 for the Existing Related Land,  there will not be any other Related Land in existence as of the
26 Delivery Date (or, if there shall be other Related Land in existence, Landlord shall promptly
27 notify Tenant thereof and promptly execute any recordable instrument reasonably requested by
28 Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting
29 Related Land).  As used herein, the term "*Existing Related Land*" shall mean the parcel of land
30 adjacent to and contiguous with the Shopping Center shown on Exhibit B as the "Famous
31 Footwear Parcel."  The parties acknowledge the Existing Related Land is subject to a lease
32 between Brown Group Retail, Inc., as tenant, and University Limited Company, as landlord,
33 dated March 28, 2001 (the "*Famous Footwear Lease*");

34           (j)    Attached hereto as Exhibit K-2 is a complete list of all fully
35 executed and delivered leases in effect on the Effective Date with respect to the Shopping Center
36 (the "*Existing Leases*"); and

37           (k)    Landlord shall promptly forward to Tenant any notice or other
38 communication received by Landlord from any owner of property adjoining or adjacent to the
39 Shopping Center or from any municipal or other governmental authority, in connection with any
40 hearing or other administrative proceeding relating to any proposed zoning, building code,
41 signage, or related variance affecting the Shopping Center or any adjoining or adjacent property,
42 which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct
43 of Tenant's business therein, or Tenant's rights and benefits under this Lease.  Landlord, at its
44 sole cost and expense, shall appear in such proceeding and shall contest such proposed variance.
45 If Landlord fails so to appear and contest such proposed variance after receiving five (5) days'
46 notice from Tenant (or such shorter notice as may be practicable under the circumstances), then
47 Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of
48 Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with
49 Tenant, provide such information, and execute any documents or other instruments as Tenant
50 may reasonably request in connection with any such proceeding.

1         Section 12.4   Environmental Matters.

2              12.4.1        Definitions.

3                    (a)   As used herein, the term *"Environmental Laws"* shall mean any
4 and all Legal Requirements concerning the protection of the environment, human health or
5 safety.

6                    (b)   As used herein, the term *"Hazardous Substances"* shall mean each
7 and every element, compound, material, mixture, substance, waste, hazardous substance,
8 hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those
9 terms are defined in any of the Environmental Laws or the presence of which may cause liability
10 at common law, including, without limitation, asbestos and/or asbestos-containing products,
11 whether or not currently friable.

12                    (c)   As used herein, the term *"Environmental Notice"* shall mean a
13 summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal
14 pleading, letter or other communication, written or oral, actual or threatened, from the United
15 States Environmental Protection Agency or other federal, state or local governmental agency or
16 authority, or any other private individual or entity concerning (i) any Hazardous Substances at,
17 on, in, under or emanating from the Premises, the Shopping Center or any contiguous property;
18 (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping
19 Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the
20 Shopping Center.

21                    (d)   As used herein, the term *"Releasing"* or *"Release"* shall mean
22 releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any
23 substance into the environment or into any building or other improvements in violation of
24 Environmental Laws.

25                    (e)   As used herein, the term *"Compliance Costs"* shall mean any and
26 all costs incurred by a party in complying with applicable Environmental Laws, including,
27 without limitation, consultant's and engineer's fees; laboratory costs; contractor's and
28 subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of
29 soil or other substrate, surface water, groundwater, or buildings or other improvements;
30 equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees;
31 other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure
32 until paid in full; and other similar or related costs.

33                    (f)   As used herein, the term *"Tenant Related Parties"* shall mean
34 Tenant's agents, servants, employees, contractors or licensees.

35              12.4.2        Compliance with Environmental Laws.  Tenant shall comply with
36 all applicable requirements of Environmental Laws governing its use of, and operations at, the
37 Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of
38 Environmental Laws relating to the Shopping Center and the Premises, except to the extent such
39 requirements arise from Tenant's operations thereon.

40              12.4.3        Responsibility for Releases of Hazardous Substances.
41 Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of
42 Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center
43 which were introduced by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*),
44 including, without limitation, any Compliance Costs required to address Tenant Releases.
45 Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the
46 Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to
47 such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.
48 Notwithstanding anything to the contrary in this Lease, if any Hazardous Substances are found in
49 or on the Premises (including, without limitation, in the roof system thereof) or the Shopping
50 Center which pre-date the Delivery Date, then Landlord shall promptly remove the same in
51 compliance with all applicable laws at Landlord's sole cost and expense, and, to the extent such
52 work delays Tenant's Work, then the Rent Commencement Date and the date on which Tenant is
53 required to open for business under Article 14 hereof shall be delayed on a day for day basis for

each day of such delay, and Landlord shall reimburse Tenant for any and all reasonable costs incurred by Tenant in connection with such delay. Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August (through Labor Day), November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises. If the presence of Hazardous Substances, or Landlord's remediative work relative thereto, interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

12.4.4    _Standards._ Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5    _Landlord's Representations and Warranties._ Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6    _Documents._ Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7    _Indemnity._ Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8    _Survival._ The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9    _Conflict._ In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5    _OEA._

12.5.1    As used in this Lease, the term "**_OEA_**" shall mean that certain Reciprocal Easement and Operation Declaration for Water Tower Place PUD Subdivision located at West Des Moines, Iowa, dated as of January 14, 1998 and recorded on January 15, 1998 in the Polk County, State of Iowa, Recorder's Office (the "**_Clerk's Office_**") in Book 7808, Page 493.

12.5.2    Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain,

31

superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 12.5. Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance).

12.5.3    Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

12.5.4    Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5    Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6    Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7    In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA  or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8    As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

12.5.9    Landlord represents and warrants that no third-party approvals are required under the OEA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's business in the Premises.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1    <u>Permitted and Prohibited Uses</u>.

13.1.1    <u>Tenant's Permitted Use</u>. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2    <u>Prohibited Uses</u>. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Subject to the rights of tenants under Existing Leases, Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center or any "Related Land" (hereinafter defined) for any of the "Prohibited Uses" that pertain to the Shopping Center or the Related Land, as the case may be (as set forth in <u>Exhibit M</u> hereto annexed), <u>provided, however</u>, that as to any future Related Land, the foregoing restriction shall not apply to the extent that any Prohibited Uses are otherwise permitted under leases entered into prior to the date on which such land becomes Related Land. As used in this Lease, the term *"Related Land"* shall mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled by Landlord or its Affiliate(s) and shall include the Existing Related Land (defined in Section 12.3(i) hereof).

Section 13.2    <u>Tenant's Exclusive in Center</u>. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1    Subject to the rights of tenants under Existing Leases (and, with respect to Tenant's rights hereunder affecting the Existing Related Land only, the Famous Footwear Lease (defined in Section 12.3(i) hereof)), Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) infant, juvenile and children's furniture and equipment (including, without limitation, infant, juvenile and children's: cribs, beds, mattresses, bedding, changing tables, gliders, rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, play pens, car seats, booster seats, cradles, carriages, strollers, toy and clothing chests, swings, or any other furniture or equipment similar to the foregoing enumerated items) (collectively, *"Restricted Furniture"*); (b) clothing, layettes, apparel, shoes and/or accessories for infants, juveniles and children 0-4 years in age; and maternity clothing (collectively, *"Restricted Clothing"*); and (c) merchandise, products and services targeted for use by or for infants, juveniles and children 0-4 years in age (including, without limitation, infant, juvenile and children's: toys, books, food, formula, indoor and/or outdoor play and recreational equipment, audio and video cassettes or equipment, safety items, feeding items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom items (including, without limitation, personal care devices and other bathroom appliances, accessories and toiletries)) (collectively, *"Restricted Products"*) (which items in clauses (a), (b) and (c) above, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (A) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (B) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises; <u>provided, however</u>, in no event shall any tenant or subtenant have the right to sell more than one thousand (1,000) square feet of Floor Area within such tenant's or subtenant's premises for the sale of Restricted Furniture. In addition to the foregoing, Landlord shall not lease, rent or occupy or permit any other tenant or occupant of the Shopping Center or Related Land to operate a (x) hair cutting salon specializing primarily to a clientele of infants, juveniles or children; (y) photo studio specializing primarily to a clientele of infants, juveniles or children; and/or (z) development, learning or fitness center specializing

33

primarily to a clientele of infants, juveniles and children 0-4 years in age similar to a Gymboree, My Gym or Little Gym.  With respect to Related Land, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, any premises in the Related Land for the operation of a Direct Competitor.  The term *"Direct Competitor"* shall mean any tenant or other occupant operating as a baby specialty store selling a variety of products for infants, juveniles and children 0-4 years in age.  A Direct Competitor shall include a store such as, by way of example only and not by way of limitation, Babies R Us and USA Baby as such stores are operated as of the Effective Date.  As to any future Related Land, the foregoing restrictions shall not apply to the extent that a Direct Competitor exists pursuant to a lease entered into prior to the date on which such land became Related Land.  Existing tenants of the Shopping Center and any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that:  (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items (and, with respect to tenants on Related Land only, such expansion results in such tenant becoming a Direct Competitor).

13.2.2    The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national: (i) department store [for example, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 50,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).

13.2.3    The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4    (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(a)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

13.2.5    Simultaneously with the execution and delivery of this Lease, Landlord shall execute and record, or cause to be executed and recorded, a Declaration of Restrictions substantially in the form attached hereto as <u>Exhibit O</u> (the *"Declaration"*), against all Related Land existing as of the Effective Date.  Such Declaration shall remain effective throughout the term hereof and Landlord shall not amend or modify the Declaration nor shall

34

Landlord terminate the Declaration. Landlord shall, during the Term, diligently enforce, at its sole expense, the covenants, agreements, and obligations of the Declaration.

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1    Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2    Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center or in any other property owned by Landlord or Landlord's Affiliate.

## ARTICLE 14
## CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 and Section 12.4.3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)    giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, and

(b)    paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations or improvements made by Tenant and permitted under this Lease,

whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly

reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture
Date.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1    Tenant shall have the right from time to time, without the consent
of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or
any portion of the Premises, subject to all of the terms and conditions of this Lease.
Notwithstanding anything to the contrary contained herein, Landlord hereby acknowledges that
Tenant intends to sublet the entire Premises to Buy Buy Baby, Inc. (the "**BBB Sublet**") and
Landlord hereby consents to such subletting without the need for any further action on the part of
Tenant.

15.1.2    Except with respect to any transaction covered under
Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or
sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the
"**Assignment/Subletting Notice**") to Landlord, which notice shall specify the name and address
of the proposed assignee or sublessee and the proposed use of the Premises to be made by such
assignee or sublessee, together with a statement certified by Tenant of the amount of the then
unamortized costs (amortized on a straight-line basis over the Initial Term) of Tenant's Work
and any alterations performed by Tenant to the Premises.  Thereafter, Landlord shall have the
option to terminate this Lease, which option shall be exercisable by:

(a)    giving notice to Tenant (the "**Termination Notice**") thereof within
fifteen (15) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)    paying to Tenant, within thirty (30) days after such notice is given,
all of Tenant's costs and expenses incurred in connection with the preparation of plans
and specifications for, and the then unamortized costs (amortized on a straight-line basis
over the Initial Term) of Tenant's Work and any alterations performed by Tenant to the
Premises,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the
"**Termination Date**") after the date on which Tenant receives Landlord's Termination Notice,
with the same force and effect as if the Termination Date had been designated as the expiration
date of this Lease.  Upon the Termination Date, Landlord and Tenant shall each be released from
any and all liabilities thereafter accruing hereunder, except for those obligations which survive
the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All
Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant
shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to
Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by
Tenant for periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant
shall have the right to avoid Landlord's termination by giving notice to Landlord (the
"**Rescission Notice**"), within ten (10) days after receiving the Termination Notice, of its
rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall
be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the
Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not give the
Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed
to have waived its termination rights hereunder with respect to such proposed assignment or
subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in
accordance with its Assignment/Subletting Notice.  If Landlord terminates the Lease hereunder,
then, for a period of two (2) years after the Termination Date, Landlord shall not lease, rent or
occupy or permit the Premises or any portion thereof to be occupied as a store which operates
primarily as a store selling baby items; the foregoing shall survive the termination of this Lease.

15.1.3    In addition to, and not in limitation of, Tenant's other rights set
forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of
Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of
the Premises: (a) to an Affiliate of Tenant (such as Buy Buy Baby, Inc.); (b) to any entity which

36

purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the Des Moines metropolitan area; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2   Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (such as Buy Buy Baby, Inc.) (collectively, the "*Original Tenant*") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term "*Major Assignee*" or "*Major Guarantor*", as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million ($100,000,000) Dollars.

Section 15.3   Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, "*Lender*" shall mean a state or federally regulated:  bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4   Cure Rights of Original Tenant.

15.4.1      If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2      If this Lease is terminated because of:  (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are personal to the assignee and/or not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original

Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5    Recognition Agreement.  In the event Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form. The parties shall execute such agreement in connection with the BBB Sublet within thirty (30) days after Tenant's request therefor.

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1    Tenant Default.

16.1.1        If Tenant shall fail to:  (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2        Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, except as may be expressly permitted below in subsection 16.1.2(e), and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent and any damages to Landlord by reason of any such breach as provided in Section 16.1.3 below, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term; and/or

(e)    if Landlord shall elect to terminate this Lease as provided in subsection 16.1.2(c), then Landlord shall be entitled to recover from Tenant, and Tenant shall

38

pay to Landlord, on demand (as and for liquidated and agreed final damages), in lieu of and in respect of Rent due and owing following the date of termination of this Lease, an amount equal to the amount (if any) by which (a) the Rent reserved hereunder for the period which otherwise would have constituted the balance of the Term from the latest of the date of termination of this Lease, the date of reentry or the date through which monthly deficiencies shall have been paid in full (conclusively presuming the Additional Rent component of Rent to be the same as payable for the year immediately preceding such termination or reentry or the date through which monthly deficiencies shall have been paid in full), exceeds (b) the fair and reasonable market rental value of the Premises at the time of such election for such period, both discounted to present worth at the Lease Interest Rate.

16.1.3    Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4    Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5    Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2    Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "***Landlord's Default***"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)    offset against fifty percent (50%) of each successive installment of Fixed Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid (it being agreed that (x) Tenant shall, as applicable, be entitled to offset against larger percentages of each successive installment of Rent if the aforesaid fifty percent (50%) offset is insufficient to reimburse Tenant in full, taking into account the then remaining number of installments of Rent due and payable by Tenant hereunder, and (y) the reference in this subsection (c) to "fifty percent (50%)" shall be increased to "one hundred percent (100%)" with respect to offsets pertaining to offsets to which Tenant may be entitled under Subsection 2.3.2(b) hereof, Section 3.3.8 hereof, Tenant's performance of Landlord's Work, restoration of the Premises under Article 11 or the payment of Taxes under Section 4.3; and/or

(d)    terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal

39

conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed, without limitation, that any water infiltration into the Premises from within or without the Premises, or mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3    Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Des Moines before one arbitrator in accordance with the procedural rules of the American Arbitration Association (or any successor thereto) then in effect. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17
### RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1    Right to Mortgage and Non-Disturbance. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2    Estoppel Certificate. Upon written request of Landlord or Tenant, the other party, within thirty (30) days after the date of receipt of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned,

40

1   supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to
2   which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's
3   actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of
4   such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend
5   the Lease Term have been exercised, if any.  Each request for a written statement pursuant to this
6   Section 17.2 made within twelve (12) months of an earlier request for such a written statement
7   shall be accompanied by a payment, from the requesting party to the other party, in the amount
8   of Five Hundred ($500) Dollars (increased by One Hundred ($100) Dollars on each date that the
9   Fixed Rent increases pursuant to Section 1.1.11 hereof).

10        Section 17.3   Existing Mortgages and Ground Leases.  If a mortgage, deed of trust, or
11  other security instrument, or any ground or underlying lease, encumbers the Shopping Center or
12  any part thereof on the Effective Date, then within thirty (30) days after the Effective Date,
13  Landlord shall deliver to Tenant, in recordable form:  (x) a subordination, non-disturbance and
14  attornment agreement substantially in the form attached hereto as Exhibit G, in recordable form,
15  executed by each and every holder of any mortgage, deed of trust or any other existing lien
16  encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner
17  recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in
18  recordable form, executed by any Ground Lessor (and, as may be required, consented to by the
19  holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to
20  so deliver such instrument(s) within said 30-day period, Tenant shall have the right by notice
21  given to Landlord at any time prior to the date on which such instrument(s) are delivered, to
22  terminate this Lease, in which event, neither party shall have any further liability hereunder,
23  except: (i) for those obligations which survive the expiration or other termination of this Lease
24  pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly
25  reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection
26  with this Lease, including, without limitation, the preparation and review of plans and
27  specifications, and the performance of Tenant's Work, provided, however, that such
28  reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars
29  ($50,000).

30                            ARTICLE 18
31                            NOTICE

32        Subject to the further provisions of this Article 18, whenever it is provided herein that
33  any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may
34  be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to
35  the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by
36  registered or certified mail, postage prepaid, return receipt requested, or by any recognized
37  overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing
38  Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given
39  to:  (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New
40  Jersey 07083, and (ii) Thomas J. Phillips, Esq., Brown Rudnick LLP, One Financial Center,
41  Boston, Massachusetts 02111, or to such other person or other address as may, from time to time,
42  be specified by either party in a written notice to the other party.  If Landlord shall consist of
43  more than one person or entity, notices delivered by Tenant to Landlord's Mailing Address shall
44  be deemed to be delivered to, and effective notice to, all such persons or entities comprising
45  Landlord.  All notices given in accordance with the provisions of this Section shall be effective
46  upon receipt (or refusal of receipt) at the address of the addressee.  Notwithstanding the
47  foregoing, Landlord shall instead send the following items to Tenant (Attention:  Lease
48  Administration) at Tenant's Mailing Address:  (A) all bills, notices (but not notices of default)
49  and related information pertaining to Tenant's Pro Rata Share of Taxes as described in
50  Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default),
51  statements, bills and related information pertaining to Tenant's Pro Rata Share of Common
52  Areas Charges as described in Section 5.1 of this Lease.

53                            ARTICLE 19
54                       TENANT'S PROPERTY

55        All of Tenant's Property which may be installed or placed in or upon the Premises by
56  Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber,
57  mortgage or create a security interest in or upon Tenant's Property in the Premises without the

41

consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

ARTICLE 20
END OF TERM

Section 20.1    <u>Surrender of Premises</u>.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, <u>excepting</u>, <u>however</u>, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2    <u>Hold Over</u>.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

ARTICLE 21
TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to and located to the south of the Premises and which may become available on and after the date of this Lease.  At such time that Landlord has knowledge that such space (*"Offered Space"*) is or will become available, Landlord will give Tenant notice (the *"Offering Notice"*) of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer.  In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (a) contain the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21.  Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space.  As used herein, the phrase *"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant.  Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above.

ARTICLE 22
ONGOING CO-TENANCY

If, at any time during the Term, (i) either Whole Foods or the Inducement Tenant is closed for business in the premises designated for such retailers as shown on Exhibit B hereto and (ii) less than fifty thousand (50,000) square feet of Floor Area in the Shopping Center (excluding the Premises and the premises designated for Whole Foods and the Inducement Tenant as shown on Exhibit B hereto) is open for retail business by national tenants of the type typically found in first-class regional shopping centers located in the Des Moines metropolitan area (such condition being hereinafter referred to as an *"Excess Vacancy"*), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if Tenant pays Alternate Rent hereunder for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (A) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (B) Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of Tenant's Work and any alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired portion of the Term.  If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens by more than five percent (5%); and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

ARTICLE 23
MISCELLANEOUS

Section 23.1   Loading Facilities.  Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2   Liens.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3   Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Christopher Burton of Legend Retail and Buyers Realty (collectively, the *"Broker"*).  Landlord shall pay the Broker a commission pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4   *Force Majeure*.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party

43

1   (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall
2   be excused for a period equal to the period of the delay.  Notwithstanding the foregoing
3   provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party
4   to perform its obligations under this Lease; or (ii) delays occurring in the course of complying
5   with applicable Legal Requirements that could have been avoided through the exercise of due
6   diligence by a party hereto.  A party wishing to invoke this Section shall give the other party
7   notice of that intention within fifteen (15) days of the commencement of any event of *Force*
8   *Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this Lease
9   which will be delayed as a result, and the period of such extension, if known, or if not known, a
10  reasonable estimate thereof.

11      Section 23.5   Consents.  Except as may be otherwise expressly set forth in this Lease,
12  whenever under this Lease provision is made for either party's securing the consent or approval
13  of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably
14  withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have
15  an implied obligation of reasonableness.

16      Section 23.6   Costs.  Whenever this Lease requires the performance of an act by a party,
17  such party shall perform the act at its own cost and expense, unless expressly provided to the
18  contrary.

19      Section 23.7   Attorneys' Fees.  In any action or proceeding hereunder (whether to
20  enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be
21  entitled to recover from the other party the prevailing party's reasonable costs and expenses in
22  such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as
23  otherwise set forth herein, if either party is sued by a third party as a result of a violation of a
24  covenant or warranty herein contained by the other party hereto, then the party who has violated
25  the covenant or warranty shall be responsible for the reasonable costs and expenses in such
26  action or proceeding against the non-violating party, including reasonable attorneys' fees, costs
27  and expenses.

28      Section 23.8   Survival of Obligations.  The obligation to pay any sums due to either
29  party from the other that by the terms herein would not be payable, or are incapable of
30  calculation, until after the expiration or sooner termination of this Lease shall survive and remain
31  a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the
32  expiration or earlier termination of this Lease.

33      Section 23.9   Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict
34  performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to
35  be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same
36  covenant or condition on the occasion of any subsequent breach or default; nor shall the failure
37  of either party to exercise any option in this Lease upon any occasion arising therefor be deemed
38  or construed to be a waiver of the right to exercise that same kind of option upon any subsequent
39  occasion.

40      Section 23.10  Rights Cumulative.  Unless expressly provided to the contrary in this
41  Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be
42  cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by
43  applicable Legal Requirements.

44      Section 23.11  Definition of Landlord.  The term *"Landlord"* shall mean only the person
45  or entity which, from time to time, shall then own the Shopping Center, and in the event of the
46  transfer by such owner of its interest in the Shopping Center, such owner shall (except to the
47  extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of
48  the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against
49  Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon
50  be released and discharged from all covenants and obligations of Landlord thereafter accruing,
51  but such covenants and obligations shall be binding during the Term upon each new owner for
52  the duration of such owner's ownership.

44

Section 23.12 <u>Successors and Assigns</u>. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 <u>Limitation of Landlord's Liability</u>. Except with respect to (i) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center and (ii) the Tenant Allowance (defined in Section 3.3.8 hereof), Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 <u>Limitation of Tenant's Liability</u>. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u> Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 <u>Short Form Lease</u>. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum, which shall be in recordable form, and such form and substance as either party shall reasonably request; Landlord and Tenant shall cooperate in the recordation thereof. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 <u>Entire Agreement and Modification</u>. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an

45

1    agreement in writing, signed by the party against whom enforcement of the change, modification
2    or discharge is sought.

3          Section 23.22  <u>No Joint Venture or Partnership Created by Lease</u>.  Nothing contained
4    herein shall be deemed or construed as creating the relationship of principal and agent or of
5    partnership or of joint venture between the parties hereto.

6          Section 23.23  <u>Tenant's Tradename</u>.  Landlord shall not make use of Tenant's or its
7    Affiliates tradename(s) [including, but not limited to, *"Bed Bath & Beyond"* ® and *"buybuy*
8    *BABY"*®] in any advertising or marketing material, including, without limitation, on any internet
9    website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's
10   sole and absolute discretion.  Notwithstanding the foregoing, after the Effective Date, Landlord
11   may use such tradename(s) for the sole purpose of listing Tenant as a tenant of the Shopping
12   Center (provided no provisions of this Lease, financial or otherwise, may be used in connection
13   therewith).

14         Section 23.24  <u>Counterparts</u>.  This instrument may be executed in several counterparts,
15   each of which shall be deemed an original.  The signatures to this instrument may be executed
16   and notarized on separate pages, and when attached to this instrument, shall constitute one
17   complete document.

18         Section 23.25  <u>Waiver of Trial by Jury</u>.  Landlord and Tenant hereby mutually waive any
19   and all rights which either may have to request a jury trial in any proceeding between them at
20   law or in equity.

21                       [Signature page follows]

Section 23.26 <u>Governing Law</u>. This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

WATER TOWER PLACE SHOPPING CENTER, L.C., an Iowa limited liability company

By:   Water Tower Management, L.C., an Iowa limited liability company, its Manager

[SEAL]

By: _____
Name:  Ronald L. Daniels
Title:    President

**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New York corporation

By: _____
Name:  Alan M. Freeman
Title:  Assistant Secretary

By: _____
Name:  Steven Temares
Title:    Chief Executive Officer

[SEAL]

47

1

## INDEX OF EXHIBITS

2    Exhibit A               Legal Description of Shopping Center

3    Exhibit B               Site Plan

4    Exhibit C               Form of Rent Commencement and Expiration Date Agreement

5    Exhibit D               Specifications for Landlord's Work

6    Exhibit D-1           Exterior Elevations of the Premises, and Sidewalk Plan

7    Exhibit D-2           Intentionally Omitted

8    Exhibit E               Permitted Encumbrances

9    Exhibit F               Signage

10    Exhibit G               Form of Subordination, Non-Disturbance and Attornment Agreement

11    Exhibit H               Form of Subtenant Recognition Agreement

12    Exhibit I               Intentionally Omitted

13    Exhibit J               Form of Delivery Date Certification

14    Exhibit K-1           Existing Exclusives

15    Exhibit K-2           Existing Leases

16    Exhibit L               Alternate Rent

17    Exhibit M               Prohibited Uses

18    Exhibit N               Form of Mechanics' Lien Indemnification

19    Exhibit O               Form of Declaration of Restrictions Against Related Land

20

21

1    Exhibit A

2    Legal Description of Shopping Center

3
4
5    AN IRREGULAR SHAPED TRACT OF LAND THAT IS LOCATED IN THE N.E. 1/4 OF
6    SECTION 5 T78N R25 WEST OF THE 5TH P.M. WEST DES MOINES, POLK COUNTY,
7    IOWA, IS DESCRIBED AS FOLLOWS:
8
9    COMMENCING AT THE NORTH 1/4 CORNER OF SECTION 5, T78N, R25 WEST
10    OF THE 5TH P.M. WEST DES MOINES, POLK COUNTY, IOWA, THENCE S00°-
11    00'-00"E, ALONG THE WEST LINE OF THE N.E. 1/4 OF SAID SECTION 5, 40.0
12    FEET, THENCE S89°-03'-03"E, PARALLEL WITH AND 40.0 FEET SOUTH OF THE
13    NORTH LINE OF THE N.E. 1/4 OF SAID SECTION 5, 33.0 FEET, TO THE POINT
14    OF BEGINNING, THENCE CONTINUING S89°-03'-03"E, PARALLEL WITH AND
15    40.0 FEET SOUTH OF THE NORTH LINE OF THE N.E. 1/4 OF SAID SECTION 5,
16    AND ALONG THE SOUTH RIGHT-OF-WAY LINE OF UNIVERSITY AVENUE, AS
17    IT IS PRESENTLY ESTABLISHED, 888.44 FEET, THENCE S0°-00'-04"E, 638.45
18    FEET, TO THE S.W. CORNER OF THE WEST DES MOINES WATER WORKS
19    WATER TOWER SITE, THENCE S89°-32'-49"E, ALONG THE SOUTH LINE OF
20    SAID WATER TOWER SITE, 250.09 FEET, TO THE S.E. CORNER OF SAID
21    WATER TOWER SITE, THENCE S0°-00'-09"E, 87.36 FEET, THENCE N90°-00'-
22    00"W, 36.40 FEET, THENCE S0°-00'-00"E, 313.67 FEET, THENCE N89°-34'-48"W,
23    213.71 FEET, THENCE S1°-03'-07"E, 10.07 FEET, THENCE N89°-33'-53"W, 888.51
24    FEET, TO A POINT THAT IS ON THE EAST RIGHT-OF-WAY LINE OF 42ND
25    STREET, AS IT IS PRESENTLY ESTABLISHED, THENCE N0°-00'-00"E,
26    PARALLEL WITH AND 33.0 FEET EAST OF THE WEST LINE OF THE N.E. 1/4 OF
27    SAID SECTION 5, AND ALONG THE EAST RIGHT-OF-WAY LINE OF SAID 42ND
28    STREET, 1057.92 FEET, TO THE POINT OF BEGINNING.
29
30    AND
31
32    LOT 1 IN WATER TOWER PLACE PLAT 1, AN OFFICIAL PLAT, NOW INCLUDED IN
33    AND FORMING A PART OF THE CITY OF WEST DES MOINES, POLK COUNTY, IOWA.