44531-008-402 Bed Bath & Beyond

# LEASE AGREEMENT

Between

## A – S 60 HWY 75 - LOY LAKE, L.P.,

Landlord

and

## BED BATH & BEYOND INC.,
a New York corporation,

Tenant

Sherman Town Center
Sherman, Texas

Dated: ~~September~~ October 2, 2003

27641/0443-1284250v7

## TABLE OF CONTENTS

<div align="right">Page</div>

| | | |
|---|---|---|
| ARTICLE 1 | BASIC TERMS AND DEFINITIONS | 1 |
| Section 1.1 | Basic Terms and Definitions | 1 |
| | | |
| ARTICLE 2 | LEASE OF PREMISES; LEASE TERM; DELIVERY DATE | 5 |
| Section 2.1 | Lease of Premises | 5 |
| Section 2.2 | Term | 5 |
| Section 2.3 | Delivery Date | 6 |
| Section 2.4 | Unseasonable Delivery: Slack Period | 8 |
| Section 2.5 | Initial Co-Tenancy Condition | 8 |
| | | |
| ARTICLE 3 | IMPROVEMENTS | 9 |
| Section 3.1 | Landlord's Work and Tenant's Work | 9 |
| Section 3.2 | Plan Approvals | 9 |
| Section 3.3 | Performance of Work | 11 |
| Section 3.4 | Measurement; Adjustment of Rent | 13 |
| | | |
| ARTICLE 4 | FIXED RENT & TAXES: DETERMINATION AND PAYMENT | 14 |
| Section 4.1 | Fixed Rent | 14 |
| Section 4.2 | Payment of Rent | 14 |
| Section 4.3 | Real Estate and Other Taxes | 15 |
| | | |
| ARTICLE 5 | COMMON AREAS, THEIR USE AND CHARGES | 16 |
| Section 5.1 | Common Areas: Maintenance | 16 |
| Section 5.2 | Common Areas: Restrictions | 20 |
| | | |
| ARTICLE 6 | UTILITIES | 22 |
| Section 6.1 | Utility Service | 22 |
| Section 6.2 | Interruption | 22 |
| | | |
| ARTICLE 7 | SIGNS | 23 |
| Section 7.1 | Tenant's Building Signage | 23 |
| Section 7.2 | Pylon/Monument Signage | 23 |
| Section 7.3 | Signage: Alteration/Removal/Allocation | 24 |
| Section 7.4 | Cooperation | 24 |
| Section 7.5 | Signage Restrictions and Criteria | 24 |
| | | |
| ARTICLE 8 | ALTERATIONS AND IMPROVEMENTS | 24 |
| Section 8.1 | Alterations and Improvements | 24 |
| | | |
| ARTICLE 9 | REPAIRS | 25 |
| Section 9.1 | Tenant's Repairs | 25 |
| Section 9.2 | Landlord's Repairs | 26 |
| Section 9.3 | Legal Compliance Work | 27 |
| | | |
| ARTICLE 10 | INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION | 27 |
| Section 10.1 | Mutual Release, Waiver of Subrogation and Mutual Indemnification | 27 |
| Section 10.2 | Tenant's Insurance | 28 |
| Section 10.3 | Landlord's Insurance | 28 |
| Section 10.4 | General Insurance Requirements | 29 |
| | | |
| ARTICLE 11 | FIRE AND OTHER CASUALTY; EMINENT DOMAIN | 30 |
| Section 11.1 | Fire and Other Casualty | 30 |
| Section 11.2 | Eminent Domain | 32 |
| Section 11.3 | Abatement of Rent Charges | 33 |

<div align="center">i</div>

| ARTICLE 12 | COVENANTS, REPRESENTATIONS AND WARRANTIES ...... 34 |
| Section 12.1 | Quiet Enjoyment ................................................................ 34 |
| Section 12.2 | Authority .......................................................................... 34 |
| Section 12.3 | Landlord's Covenants, Warranties and Representations ................. 34 |
| Section 12.4 | Environmental Matters ........................................................ 35 |
| Section 12.5 | OEA................................................................................. 37 |

| ARTICLE 13 | USES AND RESTRICTIONS ............................................... 39 |
| Section 13.1 | Permitted and Prohibited Uses ............................................. 39 |
| Section 13.2 | Tenant's Exclusive in Center ................................................ 39 |
| Section 13.3 | Exclusives Which Tenant Must Honor ..................................... 41 |

| ARTICLE 14 | CONDUCT OF BUSINESS OPERATIONS................................ 42 |

| ARTICLE 15 | TENANT ASSIGNMENT AND SUBLETTING............................ 43 |
| Section 15.1 | Assignment and Subletting .................................................. 43 |
| Section 15.2 | Liability of Tenant.............................................................. 45 |
| Section 15.3 | Collateral Assignment......................................................... 45 |
| Section 15.4 | Cure Rights of Original Tenant.............................................. 45 |
| Section 15.5 | Recognition Agreement ....................................................... 46 |

| ARTICLE 16 | DEFAULT AND DISPUTE RESOLUTION ................................ 46 |
| Section 16.1 | Tenant Default................................................................... 46 |
| Section 16.2 | Landlord Default ................................................................ 48 |
| Section 16.3 | Arbitration ........................................................................ 48 |

| ARTICLE 17 | RIGHT TO MORTGAGE AND NON-DISTURBANCE; |
| | ESTOPPEL CERTIFICATE ................................................... 49 |
| Section 17.1 | Right to Mortgage and Non-Disturbance .................................. 49 |
| Section 17.2 | Estoppel Certificate ............................................................ 49 |
| Section 17.3 | Existing Mortgages ............................................................ 49 |

| ARTICLE 18 | NOTICE ........................................................................... 50 |

| ARTICLE 19 | TENANT'S PROPERTY ....................................................... 50 |

| ARTICLE 20 | END OF TERM .................................................................. 50 |
| Section 20.1 | Surrender of Premises ......................................................... 50 |
| Section 20.2 | Hold Over ......................................................................... 50 |

| ARTICLE 21 | TENANT'S RIGHT OF FIRST OFFER...................................... 51 |

| ARTICLE 22 | ONGOING CO-TENANCY ................................................... 51 |

| ARTICLE 23 | MISCELLANEOUS.............................................................. 52 |
| Section 23.1 | Loading Facilities............................................................... 52 |
| Section 23.2 | Liens ............................................................................... 52 |
| Section 23.3 | Broker's Commission........................................................... 52 |
| Section 23.4 | *Force Majeure*................................................................... 52 |
| Section 23.5 | Consents ........................................................................... 53 |
| Section 23.6 | Costs ............................................................................... 53 |
| Section 23.7 | Attorneys' Fees ................................................................. 53 |
| Section 23.8 | Survival of Obligations ........................................................ 53 |
| Section 23.9 | Non-Waiver....................................................................... 53 |
| Section 23.10 | Rights Cumulative.............................................................. 53 |
| Section 23.11 | Definition of Landlord ......................................................... 54 |
| Section 23.12 | Successors and Assigns......................................................... 54 |
| Section 23.13 | Limitation of Landlord's Liability .......................................... 54 |
| Section 23.14 | Limitation of Tenant's Liability.............................................. 54 |
| Section 23.15 | Joint and Several Liability .................................................... 54 |

Section 23.16   Severability .................................................................................... 54
Section 23.17   Grammatical Usages and Construction ............................................ 54
Section 23.18   Table of Contents, Line Numbering and Paragraph Headings ......... 54
Section 23.19   Definition of Hereunder, Herein, etc. ............................................. 55
Section 23.20   Short Form Lease ............................................................................. 55
Section 23.21   Entire Agreement and Modification ................................................ 55
Section 23.22   No Joint Venture or Partnership Created by Lease .......................... 55
Section 23.23   Tenant's Tradename ......................................................................... 55
Section 23.24   Counterparts .................................................................................... 55
Section 23.25   Waiver of Trial by Jury ................................................................... 55
Section 23.26   Assignment of Rent by Landlord ..................................................... 56
Section 23.27   Governing Law ................................................................................ 56

27641/0443-1284250v7

## EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of Premises and Sidewalk Plan; Exterior Elevations of the Shopping Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Tenant's Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Recognition Agreement |
| Exhibit I | Delivery Date Notice |
| Exhibit J | Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |
| Exhibit M | Pier One Agreement |

27641/0443-1284250v7

## LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of ~~September~~ October 2, 2003 by and between A – S 60 HWY 75 - LOY LAKE, L.P., a Texas limited partnership, having an office at c/o NewQuest Properties, having an address at 8807 W. Sam Houston Parkway N., Suite 200, Houston, Texas 77040 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

## WITNESSETH:

## ARTICLE 1
## BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions. The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent: Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate: A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be. As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent: Payment of an amount equal to fifty (50%) percent of Fixed Rent which would have been payable during the Alternate Rent period. Alternate Rent shall be payable on the dates set forth herein for the payment of Fixed Rent.

1.1.4    Common Areas: All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck service ways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and common utility lines.

1.1.5    Common Areas Charges: As defined in Section 5.1 hereof.

1.1.6    Delivery Date: As defined in Section 2.3 hereof.

1.1.7    Effective Date: The date hereof.

1.1.8    Event of Default: As defined in Section 16.1 hereof.

1.1.9    Excused Periods: Periods during which Tenant's (or, in the case of Subsection 13.3.2, a tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises (or, in the case of Subsection 13.3.2, another tenant's premises), the duration of which shall not exceed two hundred ten (210) days for any particular alteration or renovation, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10    Exhibits. The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11   Fixed Rent: The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)   For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.41 below), at the rate of One Hundred Forty-Eight Thousand Five Hundred and 00/100 ($148,500.00) Dollars per year [based on Eight and 25/100 ($8.25) Dollars per square foot of Floor Area in the Premises];

(b)   In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of One Hundred Sixty-Two Thousand and 00/100 ($162,000.00) Dollars per year [based on Nine and 00/100 ($9.00) Dollars per square foot of Floor Area in the Premises];

(c)   In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of One Hundred Seventy-Five Thousand Five Hundred and 00/100 ($175,500.00) Dollars per year [based on Nine and 75/100 ($9.75) Dollars per square foot of Floor Area in the Premises];

(d)   In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of One Hundred Eighty-Nine Thousand and 00/100 ($189,000.00) Dollars per year [based on Ten and 50/100 ($10.50) Dollars per square foot of Floor Area in the Premises];

(e)   In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Two Hundred Two Thousand Five Hundred and 00/100 ($202,500.00) Dollars per year [based on Eleven and 25/100 ($11.25) Dollars per square foot of Floor Area in the Premises]; and

(f)   In the event Tenant exercises the fifth Renewal Option, for the fifth five (5) year Renewal Period, at the rate of Two Hundred Sixteen Thousand and 00/100 ($216,000.00) Dollars per year [based on Twelve and 00/100 ($12.00) Dollars per square foot of Floor Area in the Premises].

1.1.12   Floor Area: The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and the Home Depot Tract and Target Tract, as applicable, and with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas). All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center or the Home Depot Tract and Target Tract, as applicable, include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13   _Force Majeure_: As defined in Section 23.4 hereof.

1.1.14   Ground Lessor: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15   Hazardous Substances: As defined in Subsection 12.4.1 hereof.

1.1.16   Home Depot Tract: As defined in the OEA.

1.1.17   Inducement Tenants: As defined in Subsection 2.3.1 hereof.

1.1.18   Landlord: As defined in the preamble and Section 23.11 hereof.

1.1.19  <u>Landlord's Mailing Address</u>: c/o NewQuest Properties, 8807 Sam Houston Parkway N., Suite 200, Houston, Texas 77040, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.20,  <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21  <u>Lease Interest Rate</u>:  The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.22  <u>Legal Requirements</u>:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23  <u>Mortgagee</u>:  Any bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24  <u>OEA</u>:  As defined in Section 12.5 hereof.

1.1.25  <u>Outparcels</u>:  The outparcels designated on <u>Exhibit B</u> hereto as "Pad 1," "Pad 2," "Pad 3A," "Pad 3B," "Pad 4," "Pad 5," "Pad 6," "Pad 7," "Pad 8," "Pad 9," "Pad 10," "Pad 11" and "Pad 12."

1.1.26  <u>Permitted Use</u>:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items and cosmetics, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services [provided that the provision of such food and non-alcoholic beverage services complies with the terms of the OEA, including Section 5.1(E)(i) thereof]; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Sections 13.1.1 and 13.3 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.27  <u>Premises</u>:  Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) eighteen thousand (18,000) square feet of Floor Area, and (ii) one thousand (1,000) square feet of ground level space for office purposes (the *"Office Space"*), subject to adjustment in accordance with the provisions of Section 3.4 below. Notwithstanding anything to the contrary contained herein, in no event shall such Office Space (or any space used for fire pump facilities) result in any charge to Tenant by way of Fixed Rent or any Additional

3

Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share and/or Tenant's CAM Share.

1.1.28   Renewal Options:  As defined in Section 2.2.2 hereof.

1.1.29'  Renewal Periods:  Five (5) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.30   Rent:  Fixed Rent and/or Additional Rent.

1.1.31   Rent Commencement Date:  As defined in Section 2.2 hereof.

1.1.32   Shopping Center:  The part of the shopping center commonly known as Sherman Town Center owned by Landlord, containing approximately three hundred fifty thousand (350,000) square feet of Floor Area, on the property located on U.S. Highway 75 in the City of Sherman, County of Grayson, State of Texas, and more particularly described in Exhibit A hereto. Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant in the name of the Shopping Center.

·1.1.33   Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.34   Target Tract:  As defined in the OEA.

1.1.35   Taxes:  As defined in Section 4.3.3 hereof.

1.1.36·  Tenant:  As defined in the preamble hereof.

1.1.37   Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.38   Tenant's Permits:  As defined in Section 2.3.1(b) hereof.

1.1.39   Tenant's Property:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.40   Tenant's Pro Rata Share:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but excluding, as to Taxes, any separately taxed parcel(s) that includes an allocable share of the Common Areas and excluding, as to Common Area Charges, any separately maintained parcels. In no event, however, shall Tenant's Pro. Rata Share be greater than six (6%) percent, unless a particular occupant(s) within the Shopping Center occupies a separately taxed parcel that includes an allocable share of the Common Areas and pays all Taxes assessed thereon directly to the taxing authority or a particular occupant(s) within the Shopping Center maintains, at its own cost and expense, a part of the Common Areas reasonably proportionate to the size of their own premises; in either of which events the aforesaid maximum Tenant's Pro Rata Share will be adjusted accordingly. Floor Area shall be deemed added to or removed from the

4

Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center, Home Depot Tract and Target Tract.

      1.1.41    Tenant's Work:  As defined in Section 3.1 hereof.

      1.1.42    Term:  A period (the *"Initial Term"*) of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date. As used herein: (i) *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) *"Expiration Date"* shall mean the date on which the Term expires.

<div align="center">

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

</div>

      Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority (including, without limitation, those rights, benefits, privileges and easements arising out of the OEA), including, without limitation, the non-exclusive right to use the Common Areas in common with other tenants and occupants of the Shopping Center.

      Section 2.2  ·  Term.

      2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the sixtieth (60th) day following the Delivery Date (the *"Rent Commencement Date"*). The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

      2.2.2    Renewal Options.  Provided Tenant is not, at the time of the exercise of the applicable Renewal Option (as hereinafter defined), in default of any of Tenant's monetary obligations hereunder beyond any applicable notice and/or grace period, Tenant shall have the right and options (individually, a *"Renewal Option,"* and collectively, the *"Renewal Options"*) to extend the Initial Term from the date on which it would otherwise expire for five (5) successive renewal periods of five (5) years each (individually, a *"Renewal Period,"* and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth; it being agreed that Landlord shall not be obligated to make any alterations or improvements to the Premises not otherwise required hereunder or to provide an allowance or credit therefor in consideration of the exercise of any Renewal Period. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period. In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 180th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options. If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this

<div align="center">5</div>

Lease but without the application of Article 20 hereof. If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    Delivery Date.

2.3.1    Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises [exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, *"Tenant's Permits"*)], which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work);

(c)    The Common Areas, the common areas on the Target Tract, and all of the improvements to such Common Areas and the common areas on the Target Tract shown on Exhibit B hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained or caused to have been obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas and the common areas on the Target Tract to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage [and Tenant's panel(s) thereon], construction, and development and use permits;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(e)    (i) at least two (2) of the following retailers: "Target", "Home Depot", and "Cinemark" shall own parcels within the Shopping Center, Target Tract or Home Depot Tract, as applicable, or shall have entered into leases or occupancy

agreements; and (ii) leases or other occupancy agreements shall have been entered into with at least three (3) of the following retailers: "Borders", "Best Buy", "Marshall's", "Belks", "Michaels" or "Hobby Lobby" [provided that if leases and/or occupancy agreements shall have been entered into with both "Michaels" and "Hobby Lobby," Landlord may only count one as an Inducement Tenant (as hereinafter defined) for purposes of this Subsection 2.3.1(e)(ii)], "Ross", "Old Navy", "Gart Sport Mart" and "Sports Authority" [the retailers listed in (i) and (ii) being herein each individually referred to as an *"Inducement Tenant"* and collectively referred to as the *"Inducement Tenants"*] for occupancy of not less than ninety (90%) percent of the premises designated for them on Exhibit B; and such leases shall each have minimum terms of ten (10) years [except that a lease with Old Navy may have a minimum term of five (5) years] and shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, or for other reasons similar to those customarily contained in a lease with an "anchor" tenant of a first class shopping center (specifically excluding, without limitation, any so called "economic kickout" for a tenant's failure to achieve certain sales);

(f)     Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor; and

(g)     Any third-party approvals required under the OEA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto) and Tenant's Work shall have been obtained, including, without limitation, approval of the Conceptual Plans (as defined in the OEA) under Section 3.3(B) of the OEA.

2.3.2   Delivery Date.

(a)     Landlord shall give Tenant at least one hundred twenty (120) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. Following delivery by Landlord to Tenant of the Delivery Date Notice, Landlord shall have a one-time right to extend the Delivery Date established in the Delivery Date Notice by a second notice to Tenant (the *"Second Delivery Date Notice"*) delivered to Tenant no later than the twenty-first (21st) day following the date upon which the Delivery Date Notice has been delivered to Tenant, to a date that is not beyond sixty (60) days following the Delivery Date established in the Delivery Date Notice (and in no event earlier than the Delivery Date established in the Delivery Date Notice).

(b)     Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice (or the Second Delivery Date Notice, as the case may be), Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice (or the Second Delivery Date Notice, as the case may be), then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for

7

all of the aforesaid costs incurred by Tenant, the sum of: (i) Seventy-Five Thousand
Dollars ($75,000), plus (ii) Five Thousand Dollars ($5,000) for each day that the Delivery
Date established in the Delivery Date Notice (or the Second Delivery Date Notice, as the
case may be) is delayed. The foregoing liquidated reimbursements represent the parties'
good faith agreement as to an agreed upon amount which shall have been incurred by
Tenant and which shall otherwise not be susceptible of exact ascertainment.

      2.3.3   Delivery Date Certification. Upon the satisfaction of all of the
Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery
Date Certification attached hereto as Exhibit J.

      2.3.4   No Waiver. Neither Tenant's acceptance of physical possession of
the Premises nor Tenant's opening of the Premises for business to the public prior to the
Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date
Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such
condition or obligation is expressly waived in writing by Tenant.

    Section 2.4   Unseasonable Delivery; Slack Period. If, for any reason
(including, without limitation, Force Majeure), the Delivery Date occurs during the
period commencing on September 15 and ending on the March 15 next following (the
*"Slack Period"*), then Tenant shall have, in addition to any other remedies expressly
provided herein, the right to:

        (a)   accept delivery of physical possession of the Premises; or

        (b)   defer its acceptance of delivery of physical possession of the
Premises to a later date within the Slack Period, whereupon the Delivery Date
shall be deemed to have occurred on the date that Tenant actually accepts physical
possession of the Premises (subject to the other provisions of this Article 2 and the
continuing satisfaction of the Delivery Date Conditions), provided that in such
event the liquidated reimbursement in Section 2.3.2(b) above shall not apply solely
by reason of the deferment of the Delivery Date under this Section [i.e., the
accrual of the reimbursement in Section 2.3.2(b) above shall be suspended for the
period commencing upon the date on which Tenant exercises its right to defer its
acceptance of physical possession of the Premises under this subparagraph (b) and
ending upon the date that Tenant elects to accept possession of the Premises under
this subparagraph]; and

in either event, if the Rent Commencement Date occurs before the March 16 next
following the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed
Rent for the period commencing on the Rent Commencement Date and ending on the
March 15 next following; any benefit which Tenant may realize thereby shall constitute a
reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in
connection with this Lease.

    Section 2.5   Initial Co-Tenancy Condition.

      2.5.1   As used herein, the *"Initial Co-Tenancy Condition"* shall mean
that each and every Inducement Tenant shall have accepted possession of its entire
premises (or the land beneath its premises in the case of Target, Home Depot, Hobby
Lobby and Belks, as each such tenant or occupant is constructing its own building), such
premises shall have been substantially completed, and each Inducement Tenant shall, if
not already open for business, then be actively and continuously engaged in fixturing and
merchandising therein.

      2.5.2   If, on the Delivery Date, the Initial Co-Tenancy Condition has not
been satisfied, Tenant shall have the right, at its sole option, to:

        (a)   accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established in the Delivery Date Notice (or the Second Delivery Date Notice, as applicable) (the *"Outside Co-Tenancy Date"*), then Tenant shall have the right, prior to the satisfaction of the Initial Co-Tenancy Condition, but not later than thirty (30) days after the Outside Co-Tenancy Date (the *"Outside Notice Date"*), upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work, not to exceed Fifty Thousand Dollars ($50,000). In the event Tenant has not elected to terminate this Lease on or before the Outside Notice Date, then, from and after the Outside Notice Date, the provisions of this Section 2.5.3 shall be deemed deleted from this Lease and, in the event Tenant had not yet opened the Premises to the general public for business on or before such Outside Notice Date, the Rent Commencement Date shall be the earlier of the date on which Tenant opens to the public for business or the Outside Notice Date.

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work. Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein. Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Prior to the Effective Date, Landlord delivered to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the *"Preliminary LOD"*).

(b)    Prior to the Effective Date, Tenant delivered to Landlord its revisions thereto (the *"Revised LOD"*), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and

9

arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any revisions to the interior clear dimensions.

(c)   Prior to the Effective Date, Landlord delivered to Tenant a final LOD (the *"Certified LOD"*), certified by Landlord, which incorporated the elements of the Revised LOD, which Certified LOD has been approved by Tenant. Any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements. Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.

(d)   Prior to the Effective Date, Tenant delivered to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4) (collectively, *"Tenant's Plans"*).

(e)   Prior to the Effective Date, Landlord prepared and submitted to Tenant, Landlord's preliminary plans and specifications (the *"Preliminary Plans"*) for Landlord's Work [which included, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans (including, without limitation, a site lighting plan with photometrics)], and each of the plans which collectively constitute the Preliminary Plans are at least 85% complete, in Tenant's reasonable judgment. The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(f)   Prior to the Effective Date, Tenant gave Landlord notice of the respects, if any, in which said Preliminary Plans failed to meet Tenant's reasonable approval and/or failed to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

(g)   Within thirty (30) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the *"Final Plans and Specifications"*), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(h)   Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(i)   All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans, and the Final Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad,"* up to *"Autocad 2002."*

10

### 3.2.2    Plan Changes.

(a)    Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in Exhibit D hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the *"Changes"*).  Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change.  If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(b)    Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes [exclusive of any charges for overhead and profit, other than sums not exceeding seven and one-half (7.5%) percent subcontractor profit and seven and one-half (7.5%) percent general contractor profit thereon], taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require).  Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices and receipts.

(c)    Landlord shall pay to Tenant fifty (50%) percent of the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes [exclusive of any charges for overhead and profit, other than sums not exceeding seven and one-half (7.5%) percent subcontractor profit and seven and one-half (7.5%) percent general contractor profit thereon].  At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices and receipts.  Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d)    If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes.  If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

### Section 3.3    Performance of Work.

3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements.  Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center.  If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping

11

Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2    If: (a)  Landlord's Work has not been commenced (*i.e.*, if Landlord has not yet poured foundation footings for the Premises) by December 30, 2003, or (b) the Delivery Date shall not have occurred by June 1, 2004 [subject to *Force Majeure*, not to exceed forty-five (45) days in the aggregate, and Tenant Delay (as hereinafter defined), provided that Landlord shall have given Tenant notice of such event of *Force Majeure* or Tenant Delay within five (5) business days after its occurrence], Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion and as its sole remedies [other than the liquidated reimbursements under Section 2.3.2(b) above], elect to:

(i)    terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000); and/or

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)    extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section.

3.3.3    Landlord's Work Performed After Delivery of Possession. On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined).  Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within fifteen (15) business days after it receives a copy of said punch list.  If Landlord fails to complete any item on said punch list within said fifteen (15) business day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand.  If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work.  As used herein, the term *"Punch List Items"* shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may

12

be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

      3.3.5   Intentionally Omitted.

      3.3.6   Work Requirements After Delivery Date. Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

      (a)   staging and storage of materials and parking of construction vehicles shall occur only within the portions of the Shopping Center designated as "Staging" on Exhibit B hereto;

      (b)   Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on Exhibit B hereto; and

      (c)   Landlord shall use commercially reasonable efforts to maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

      3.3.7   Tenant's Trailer. Landlord shall, at its sole cost and expense, cause to be installed a trailer for Tenant's exclusive use in conducting employee interviews and recruiting, in accordance with Exhibit D hereto, in the location shown on Exhibit B hereto. Said trailer shall be installed and operational at least forty-five (45) days prior to the Delivery Date, and shall be removed within twenty (20) days [but not sooner than ten (10) days] after the Delivery Date. Landlord may, at its option, provide vacant space in the Shopping Center in lieu of such trailer for Tenant's exclusive use in conducting employee interviews and recruiting (the *"Substitute Space"*), provided that such Substitute Space shall (a) be storefront space in a good and broom clean condition within the "in-line" buildings in the Shopping Center or in the building on the premises labeled "Pad 7" on Exhibit B; (b) have the same facilities and features as the trailer is required to have pursuant to Exhibit D hereto; (c) be subject to Tenant's reasonable approval; and (d) be utilized without cost or expense to Tenant; provided, however, that Landlord shall be obligated to provide the Substitute Space if the trailer described in the first sentence of this Subsection 3.3.7 is prohibited by the OEA or if Landlord fails to obtain the approval of the Approving Parties (as defined in the OEA) under the OEA for use of such trailer.

    Section 3.4   Measurement; Adjustment of Rent.

      3.4.1   Measurement of Premises and Shopping Center. Within five (5) days after the completion of the first course of masonry for the exterior walls of the Premises and demising walls of the Premises [and at least sixty (60) days prior to the Delivery Date], Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear dimensions and the Floor Area of the Premises, and Floor Area of the Shopping Center, Home Depot Tract and Target Tract, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer. If the interior clear dimensions and/or the Floor Area of the Premises vary from those

13

shown on the Certified LOD (as may be modified by any applicable Changes), then Landlord shall correct such work to conform to the Certified LOD (as may be modified by any applicable Changes).

       3.4.2   <u>Measurement of Storage Area/Mezzanine</u>. Within five (5) days after the completion of the walls enclosing the Office Space, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of said Office Space, the measurement of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If the square footage of the Office Space varies from that shown on the Final Plans and Specifications, then, at Tenant's request, Landlord shall correct such work to conform to the Final Plans and Specifications.

       3.4.3   <u>Adjustment of Fixed Rent and Tenant's Pro Rata Share</u>. Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.27 above, the Fixed Rent and any other applicable provision of this Lease [including, without limitation, Tenant's Pro Rata Share and Tenant's CAM Share (as hereinafter defined in Section 5.1.2)] shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord. If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Subsection 1.1.27 hereof, neither Fixed Rent, Tenant's Pro Rata Share, nor Tenant's CAM Share shall be increased by reason thereof; provided, however, if such excess amount of Floor Area over the Floor Area of the Premises set forth in Subsection 1.1.27 above is due solely to a Change authorized by Tenant, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share and Tenant's CAM Share) shall be increased to include such excess amount of Floor Area due solely to a Change authorized by Tenant, and Tenant shall pay to Landlord, within thirty (30) days after any such determination, any Additional Rent due from Tenant to Landlord by reason of Tenant having previously paid to Landlord lesser amounts of Rent based on the Floor Area specified in Subsection 1.1.27 above. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, Tenant's CAM Share or any other applicable provisions of this Lease, made pursuant to this Section 3.4. Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of the Office Space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

<div align="center">ARTICLE 4<br>FIXED RENT & TAXES: DETERMINATION AND PAYMENT</div>

       Section 4.1   <u>Fixed Rent</u>. Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

       Section 4.2   <u>Payment of Rent</u>. All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the *"Paying Agent"*), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by

<div align="center">14</div>

Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1 ' Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center, except that Tenant acknowledges that the Target Tract, Home Depot Tract and those parcels labeled "(Not A Part) Out Parcel #4 55,000 SF" and "(Not A Part) Out Parcel #3 55,000 SF" on Exhibit B (collectively, the *"Included Tracts"*) may be included within the tax parcels and lots covering the Shopping Center and such Included Tracts until, but not later than, the first anniversary of the Delivery Date. From the Rent Commencement Date until the Shopping Center is maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center, Tenant's Pro Rata Share of Taxes shall be the sum of (a) the product of (i) Taxes attributable to all improvements contained on the applicable tax bills for the Shopping Center and Included Tracts, and (ii) a fraction, the numerator of which shall be the Floor Area of the Demised Premises, and the denominator of which shall be the Floor Area of the Shopping Center and the Included Tracts, and (b) the product of: (i) Tenant's Pro Rata Share, and (ii) the product of the Taxes attributable to all land contained on the applicable tax bills for the Shopping Center and Included Tracts, and a fraction, the numerator of which shall be the aggregate number of square feet of land in the Shopping Center, and the denominator of which shall be the aggregate number of square feet of land contained on the applicable tax bills for the Shopping Center and the Included Tracts. From and after the Effective Date, Landlord shall use diligent and reasonable commercial efforts to cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3    As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents

15

(other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting from an increase in the assessment caused solely by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees); (7) so-called rollback taxes; or (8) Taxes on unimproved portions of the Shopping Center until the same are either improved by improvements or buildings which become an integral part of the Shopping Center or such portions are incorporated into the Common Areas. Notwithstanding the foregoing, if at any time during the Term the present method of taxation shall be so changed that the whole or any part of the Taxes imposed on real estate and improvements thereon shall be discontinued and in whole or partial substitution therefor, taxes, assessments, levies, impositions, or charges shall be levied, assessed and/or imposed wholly or partially as a capital levy or otherwise on rents, gross receipts, revenues, or profits received from real estate or the rents, gross receipts, revenues, or profits reserved herein or any part thereof, then such substitute taxes, assessments, levies, impositions, or charges, to the extent so levied, assessed, or imposed, shall be deemed to be Taxes for the purpose of this Lease. All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).

4.3.4    At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace (or cause to be operated, maintained, repaired and replaced) the Common Areas as required by this Lease and the terms of the OEA and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance,

16

supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements. Tenant acknowledges that, if Landlord provides security for the Common Areas, the same is not to be construed as a warranty by Landlord that no acts of vandalism or other criminal activity will occur, but does obligate Landlord to provide that level of security services which is similar to the level of security services provided from time to time by other landlords in the State of Texas which own shopping centers which are comparable in size and quality to the Shopping Center.

### 5.1.2    Tenant's CAM Share of Common Areas Charges.

(a)    During the Term, Tenant shall pay to Landlord Tenant's CAM Share (as hereinafter defined) of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) paid by Landlord to operate, maintain, insure, repair and, to the extent expressly permitted hereunder, replace the Common Areas and, if required pursuant to the OEA, the common areas on the Home Depot Tract and Target Tract. For purposes hereof, the phrase "Tenant's CAM Share" shall mean (i) in respect of any item of Common Areas Charges hereunder payable in respect of the Shopping Center and either or both the Home Depot Tract and the Target Tract, a fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center and Home Depot Tract and Target Tract, as applicable, provided that in no·event shall such fraction exceed four (4%) percent; and (ii) in respect of any other items of Common Areas Charges shall mean Tenant's Pro Rata Share; as may be limited pursuant to Section 1.1.40 hereof. Notwithstanding the foregoing, the maximum percentage on Tenant's CAM Share set forth in subparagraph (i) of this Section 5.1.2(a) shall be equitably adjusted if a particular occupant(s) within the Shopping Center maintain, at its own expense, a part of the Common Areas reasonably proportionate to the size of its own premises, or the occupant(s) of the Home Depot Tract and/or the Target Tract become Self Maintenance Parties (as defined in the OEA). Tenant's CAM Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)    Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with sound accounting practices consistently applied (the *"CAC Reconciliation Statement"*). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's CAM Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's CAM Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant; provided that in no event shall Landlord be obligated to deliver more than one hundred (100) pages of such back-up materials to Tenant in any single calendar year. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's CAM Share of Common Areas Charges with respect to the first full calendar year of the Term, excluding insurance premiums, exceed Seventy-Five ($0.75) Cents per square foot of Floor Area in the Premises, excluding the Office Space. With respect to any other calendar year thereafter (exclusive of the costs of

17

snow removal, insurance rate increases, and utility rate increases, for the Common Areas during such calendar year), Tenant's CAM Share of Common Areas Charges shall not exceed one hundred five percent (105%) of the Tenant's CAM Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the costs of snow removal, insurance rate increases, and utility rate increases, for the Common Areas during such calendar year). Landlord estimates that Tenant's CAM Share of insurance premiums included in Common Areas Charges for the first full calendar year of the Term shall be Thirty ($0.30) Cents per square foot of Floor Area in the Premises, excluding the Office Space.

### 5.1.3    Exclusions from Common Areas Charges.

(a)    Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any replacements or capital improvements to the Common Areas, except that (A) the actual and reasonable cost of repaving the parking areas of the Shopping Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over a period of the greater of (i) five (5) years or (ii) the useful life thereof under generally accepted accounting principles, and is not incurred prior to the expiration of the fifth (5th) full calendar year of the Term, or more than once during each five (5) full calendar years of the Term, and (B) the cost of a total or partial repainting of all the buildings comprising the Shopping Center, including the Premises, may be included within Common Area Charges so long as such cost is amortized on a straight-line basis over a period of the greater of (i) five (5) years or (ii) the useful life thereof under generally accepted accounting principles, and is not incurred prior to the expiration of the fifth (5th) full calendar year of the Term, or more than once during each five (5) full calendar years of the Term; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof; (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation (except as expressly permitted pursuant to item 23 below); (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" (hereinafter defined in Section 5.2), other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to

18

Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(22)** repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; **(23)** the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); **(24)** reserves for anticipated future expenses; **(25)** any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses, but in lieu thereof, Landlord shall be permitted to include in Common Areas Charges for each calendar year an administrative fee (the *"Administrative Fee"*) equal to seven and one-half (7.5%) percent of the Common Areas Charges for the calendar year at issue, but excluding from the computation of such Administrative Fee the cost of any replacement or improvements of a capital nature (if such capital item may be included in Common Areas Charges hereunder), utilities and insurance; **(26)** costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; **(27)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; or **(28)** any costs or expenses relating to a Tract (as defined in the OEA) owned by a Self-Maintenance Party (as defined in the OEA). The aforesaid exclusions shall apply to any costs payable with respect to the Home Depot Tract and Target Tract as if such exclusions referred to the Home Depot Tract and Target Tract and the common areas on, such Home Depot Tract and Target Tract. Common Areas Charges shall be reduced by the amount of any contribution to Common Areas Charges made by any Self-Maintenance Party (as defined in the OEA).

    **(b)** In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's CAM Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant.

    **(c)** Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

    **5.1.4** <u>Tenant's Right to Audit</u>. Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's CAM Share thereof. Upon Tenant's request, Landlord shall make available to Tenant, at Landlord's principal offices in the continental United States of America, relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds five (5%) percent of Tenant's CAM Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of

19

any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2   Common Areas: Restrictions.

5.2.1   Continuous Access. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the area designated as "Critical Area" on Exhibit B hereto (the *"Critical Area"*) or the Premises shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

5.2.2   No Alterations. Except to the extent required by Legal Requirements, Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) decrease the area of the Shopping Center or the location, availability, or size of any Common Area improvement located within the Critical Area; (ii) construct or permit to be constructed any structures in the Critical Area (including, without limitation, any buildings, kiosks, booths, signs or similar structures), other than as shown on Exhibit B hereto; or (iii) materially change the entrances or exits to and from the Shopping Center located within, or adjacent to, the Critical Area, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas located within, or adjacent to, the Critical Area, or the number, location or layout of parking spaces located within the Critical Area from those shown on Exhibit B hereto. From and after the Delivery Date, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center located within, or adjacent to, the Critical Area, or the Premises (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.

5.2.3   Intentionally Deleted.

5.2.4   Parking Area. During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) five (5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, except if due to a taking of parking spaces under the authority of eminent domain (in which case Section 11.2 shall apply). Each such parking space in the Shopping Center shall be at least nine (9) feet in width and eighteen (18) feet in length. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center.

27641/0443-1284250v7

5.2.5   <u>Lighting</u>. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 10:30 p.m. Monday through Saturday and until 9:30 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, <u>provided</u> Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (<u>excluding</u>, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn. In addition, Landlord shall cause the common areas on the Target Tract to be kept lighted for as long after Normal Hours as Tenant shall request, <u>provided</u> (a) Tenant gives Landlord at least twenty (20) days' prior notice of such request; and (b) Tenant pays its share of the required prepayments to Landlord required under Section 5.2 of the OEA, which share shall be equal to the product of (i) the required prepayment, and (ii) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area occupied by tenants within the Shopping Center (including the Premises) that require the Target Tract to be lighted after Normal Hours. Tenant shall thereafter be entitled to a prompt refund of any prepayment made by Landlord for any period during which Tenant does not require the Target Tract to be lighted after Normal Hours.

5.2.6   <u>Repairs</u>. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)   not be performed within, or adjacent to, the Critical Area during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)   with respect to the Critical Area, be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)   be performed in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises, including access to and visibility of the Premises from the roads and highways abutting the Shopping Center.

5.2.7   <u>Rules and Regulations</u>. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8   <u>Miscellaneous</u>.

(a)   <u>No Promotional Use</u>. Except as expressly permitted by the OEA, Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A)

21

be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b) <u>Trash Compactor & Containers</u>. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep such trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c) <u>Shopping Carts</u>. Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on <u>Exhibits B</u> and <u>D-1</u> hereto. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas. With respect to shopping carts provided by Landlord or any other tenants or occupants of the Shopping Center for use of their respective customers, Landlord will use reasonable efforts to periodically remove shopping carts provided by Landlord from the Common Areas and will use reasonable efforts to cause shopping carts provided by any other tenants or occupants of the Shopping Center to be removed from the Common Areas.

(d) <u>Cellular Towers</u>. No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.

ARTICLE 6
UTILITIES

Section 6.1    <u>Utility Service</u>. From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2    <u>Interruption</u>. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof and ceases to conduct its normal business in the Premises, Rent shall be abated commencing at the expiration of the aforementioned forty-eight (48) hour period and ending when the disrupted utilities are restored. A disruption of utility

22

services caused by the acts or omissions of Landlord, its agents, contractors, servants, or employees shall not entitle Tenant to terminate this Lease, nor shall it constitute a constructive or actual eviction of Tenant provided Landlord acts reasonably under the circumstances to restore the affected utility service as promptly as reasonably possible.

<div align="center">

ARTICLE 7
SIGNS

</div>

Section 7.1    Tenant's Building Signage. Landlord shall supply and install signage (and obtain all permits and approvals thereof) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease. Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with the terms of the OEA and applicable Legal Requirements. Landlord covenants and agrees that Tenant's storefront sign shall be at least ten (10') feet in height and forty (40') feet in length. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    Pylon/Monument Signage. Landlord shall provide pylons and monuments that will include Tenant's identification sign(s) at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of the pylon designated as "Entrance Road Shared Pylon Sign," and the most northerly pylon designated as "Junior Pylon Sign Type 'A'" ("Pylon A") on Exhibit B, in accordance with the provisions of Article 3 and Exhibits D and F hereto. The position and dimensions of Tenant's pylon sign panel(s) shall be as shown on Exhibit F. In addition, Tenant shall have the option to have its identification sign displayed on the pylon designated as "Pecan Grove Road Shared Pylon Sign – Type C" (the "Pecan Pylon") on Exhibit B, provided that Tenant notifies Landlord of its election to exercise such option within thirty (30) days after the Effective Date, and reimburses Landlord for its Sign Share (as hereinafter defined) of the costs incurred by Landlord to construct either "Pylon A" or the "Pecan Pylon," whichever shall be less costly to Tenant. Tenant's "Sign Share" shall mean the product of (a) the reasonable and actual third party hard costs incurred by Landlord to construct the applicable pylon, and (b) a fraction, the numerator of which is the square footage of Tenant's identification sign on such pylon and the denominator of which is the total square footage of space available on such pylon for the display of all identification signs. Tenant's Sign Share, if applicable, shall be payable within thirty (30) days after Tenant's receipt of Landlord's request therefor accompanied by back-up information reasonably supporting such costs, including, without limitation, invoices and receipts; provided, however, that Tenant's Sign Share shall in no event be due prior to the Rent Commencement Date. At no time may any other tenant or occupant in the Shopping Center occupying less than thirty thousand (30,000) square feet of Floor Area be entitled to have sign panels on more pylons and monuments in the Shopping Center than Tenant. If Landlord intends to offer or allow any tenant or occupant occupying less than thirty thousand (30,000) square feet of Floor Area identification signs on more pylons and monuments that Tenant, Landlord shall simultaneously make an unconditional irrevocable offer to Tenant to display its identification sign on such other pylons and monuments as is necessary to avoid a breach of the immediately preceding sentence. Landlord shall maintain all pylons and monuments in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Tenant shall, at Tenant's sole cost and expense, maintain its individual signage on the pylons and monuments in the Shopping Center. Landlord shall not change or alter

<div align="center">23</div>

the location, structure, height or general appearance of the pylons or monuments bearing Tenant's sign panel(s) without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) [but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments] and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges

Section 7.3    Signage: Alteration/Removal/Allocation. Subject to the terms of the OEA, Tenant (and any sublessee) shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces, that the method of construction and attachment is substantially the same and that such new sign is Tenant's or any sublessee's then prototypical sign (either regionally or nationally). Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4    Cooperation. Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5    Signage Restrictions and Criteria.

7.5.1    During the Term, any and all exterior identification signs attached to any building of the Shopping Center shall be in compliance with the terms and conditions of the OEA in effect as of the Effective Date. No billboard signs shall be permitted within the Shopping Center.

7.5.2    Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs. No premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have: (i) building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, except that the building signage on the premises labeled "Exempt Premises" on Exhibit B may have a maximum height greater than the maximum height of Tenant's building signage if due solely to the downward grade from the Demised Premises to the Exempt Premises, or (ii) a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent. All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole

24

cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2 'Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3 Tenant shall have the right to subdivide the Premises into two (2) or more separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4 Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, (v) erects and maintains such equipment in accordance with applicable Legal Requirements, (vi) agrees to indemnify and hold Landlord harmless from any loss, cost, liability or expense incurred by Landlord as a result of the voiding of a roof warranty which resulted from the installation of such equipment, and (vii) such equipment is, to the extent reasonable for such equipment's proper use and operation, screened from the view of customers in the Common Areas of the Shopping Center.

8.1.5 Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6 If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7 Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) unless such alterations are approved by Tenant (which approval shall not be unreasonably withheld if the alterations to the Premises are substantially similar to alterations performed to the remainder of premises within the Shopping Center) nor shall Landlord construct an additional floor or floors above the Premises. Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center (as shown on Exhibit D-1 hereto) which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

ARTICLE 9
REPAIRS

Section 9.1    Tenant's Repairs. Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in

27641/0443-1284250v7

good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs. Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair [including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)] as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor slab (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date (except to the extent any such repair or replacement is necessitated by the negligence of Tenant, its agents, employees or contractors and such negligence voids any contractors', manufacturers', vendors', or insurers' warranties or guarantees that would have covered such repair or replacement), and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises,

26

Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within thirty (30) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    <u>Legal Compliance Work</u>.  Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    <u>Mutual Release, Waiver of Subrogation and Mutual Indemnification</u>.

10.1.1    <u>Mutual Waiver of Claims</u>.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2    <u>Waiver of Subrogation</u>.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3    <u>Mutual Indemnification</u>.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises,

27

or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)  Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), Home Depot Tract and Target Tract, or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees or servants, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2   Tenant's Insurance.

10.2.1   Tenant's Insurance. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2   Self-Insurance. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000) as determined in accordance with generally accepted accounting principles; or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3   Landlord's Insurance.

10.3.1   Liability Insurance. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate

policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2   Special Form Property Insurance.  Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance [including loss of rents for a minimum period of one (1) year] and endorsements for coverages for flood, earthquake, windstorm, earth movement, sinkholes, demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property.  All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall name the Landlord's Mortgagee as a loss payee and provide that any proceeds thereof shall be deposited with Landlord's Mortgagee if required by the terms of the deed of trust pursuant to which Landlord's Mortgagee is the beneficiary or the mortgage held by Landlord's Mortgagee, or if none exists or such deed of trust or mortgage shall not so provide that proceeds thereof shall be deposited with the Mortgagee, then to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3   Tenant's CAM Share of Insurance Premiums.  Tenant shall reimburse Landlord for Tenant's CAM Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, to the extent such rates are included in Common Areas Charges the amount of such increase shall be excluded from Common Areas Charges.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's CAM Share of such dividend, credit, rebate, or return to Tenant.  Tenant's CAM Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4   General Insurance Requirements.

10.4.1   All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2   The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. .The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

27641/0443-1284250v7

## ARTICLE 11
## FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1   <u>Fire and Other Casualty.</u>

11.1.1 ' (a)   Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include any of Tenant's Property. Notwithstanding anything to the contrary in the immediately preceding sentence, if immediately prior to the occurrence of the damage to any of the aforesaid areas Tenant is not open to the public for business in the Premises, other than for an Excused Period, then Landlord may give to Tenant, within sixty (60) days of the date of the damage, notice of its intention not to restore the damaged area (the *"Non-Restoration Notice"*) and, unless Tenant confirms by notice to Landlord before the expiration of sixty (60) days after Tenant's receipt of the Non-Restoration Notice Tenant's intention to re-open the Premises to the public for business within one hundred fifty (150) days after the completion by Landlord of the restoration, Landlord shall have no obligation to complete the restoration and in such event this Lease shall be deemed to have been terminated as of the date of the damage and all Rent payable hereunder shall be adjusted between Landlord and Tenant as of such termination date. If, in response to the Non-Restoration Notice, Tenant confirms its intention to reopen the Premises, Tenant shall initially open for business to the public in the Premises for at least one (1) day, not later than the one hundred fiftieth (150th) day after the completion by Landlord of the restoration [which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord]. In addition, Landlord shall not be obligated to rebuild or restore (i) the improvements situated on the Target Tract or Home Depot Tract; provided, however, that Landlord shall diligently enforce the provisions of Section 4.3(B) of the OEA, (ii) the building on the portion of the Shopping Center labeled "Developer Tract 11" on <u>Exhibit B</u> that is currently leased to "Cinemark"; or (iii) the improvements situated on any Outparcel; provided, however, in the case of (ii) and (iii), that if Landlord shall elect not to rebuild or restore as permitted thereunder, Landlord shall promptly demolish the damaged improvements on such Developer Tract 11 or Outparcel, as applicable, and the balance thereof if unusable and restore the cleared area to either a hard surface condition or a landscaped condition. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.

(b)   Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from

30

such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated (based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business).

11.1.2    In the event that:

(a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other such buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)    the required repairs and restorations to the Premises, the Common Areas, or other such buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction [which period may be extended by reason of an event of *Force Majeure*, not to exceed ninety (90) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence],

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    after giving thirty (30) days' prior notice to Landlord, terminate this Lease; provided, however, that Landlord shall have the right to nullify Tenant's termination of this Lease if Landlord substantially completes the repairs and restorations to the Premises, the Common Areas and other such buildings of the Shopping Center as required under the provisions of this Section 11.1 within such thirty (30) day period.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and

31

restorations to the Premises, the Common Areas or other such buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

      11.1.3   If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

      11.1.4   If Landlord is required to repair or rebuild the Premises as herein provided, Tenant shall repair or replace Tenant's Property. Provided Landlord complies with the provisions of this Section 11.1, any insurance proceeds in excess of the cost to rebuild or repair the Premises, Common Areas and such other buildings in the Shopping Center pursuant to this Section 11.1 shall be the property of Landlord.

      11.1.5   If a fire or casualty occurs during the period commencing on the Delivery Date and ending one (1) day prior to the Rent Commencement Date, then, notwithstanding any other provision of this Lease, the Rent Commencement Date shall be deemed delayed one (1) day for each day which elapses between the occurrence of such fire or other casualty and the date upon which the damaged or destroyed area(s) are fully rebuilt and restored.

Section 11.2  -  Eminent Domain.

      11.2.1   As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

      11.2.2   If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

      11.2.3   In the event that:

      (a)   any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

      (b)   as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has all of the entrances and exits to and from Pecan Grove Road, U.S. Highway 75 and North Creek Drive that are located within or adjacent to the Critical Area, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

      (c)   there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

<div align="center">32</div>

(d)    any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

'(e)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)    five (5%) percent or more of the parking spaces located in the Critical Area are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four and one-half (4.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4    If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to a tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below. If Landlord is required to repair or rebuild the Premises as herein provided, Tenant shall be responsible for the repair or replacement of Tenant's Property.

11.2.5    In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6    Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3    Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

33

## ARTICLE 12
### COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1    Quiet Enjoyment.  Provided Tenant is not then in default of its obligations under this Lease beyond the expiration of any applicable notice and grace periods for the curing of such default, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2    Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3    Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date Landlord shall have, good and indefeasible fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for (i) the encumbrances described on Exhibit E hereto, (ii) customary utility easements required for the development of the Shopping Center, provided that no such easements (1) interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (2) conflict with any right granted Tenant under this Lease, (3) impose on Tenant any obligation(s) in excess of those set forth in this Lease, (4) are located beneath the Premises, and (5) will interfere with Tenant's use and enjoyment of the Premises; and (iii) mechanics liens filed against the Shopping Center after the recordation of the Memorandum of Lease in the appropriate public records as contemplated by Section 23.20 hereof, provided that Tenant's quiet use and enjoyment of the Premises in accordance with Section 12.1 is not disturbed as a result thereof;

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)    Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.26 above) will not violate the OEA or any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have, access to and from Town Center Street, Pecan Grove Road, U.S. Highway 75 and North Creek Drive, as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the

34

terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)   There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)   As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof;

(i)   As of the Effective Date there is no "Related Land" (defined in 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(j)   Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the "*Existing Leases*"); and

(k)   Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4   Environmental Matters.

12.4.1   Definitions.

(a)   As used herein, the term "*Environmental Laws*" shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)   As used herein, the term "*Hazardous Substances*" shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)   As used herein, the term "*Environmental Notice*" shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local

governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2    Compliance with Environmental Laws.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3    Responsibility for Releases of Hazardous Substances.
Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases; it being agreed that the foregoing is not intended to benefit any third party other than any Tenant Related Parties.  Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4    Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5    Landlord's Representations and Warranties.  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws,

36

affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; (iii) to the best of Landlord's knowledge based solely on that certain Environmental Site Assessment Phase I for NewQuest Properties dated July, 2002 prepared by Associated Environmental Consultants, Inc. and that certain Environmental Site Assessment Phase II for Target Corporation and NewQuest Properties dated December, 2002 prepared by Associated Environmental Consultants, Inc.: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center or the Premises in violation of Environmental Laws; and (B) no underground storage tank exists at the Shopping Center or the Premises; and (iv) to Landlord's actual knowledge, no Hazardous Substances are located at, on, in, under or emanating from any contiguous properties in violation of Environmental Laws.

12.4.6   Documents. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7   Indemnity. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8   Survival. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9   Conflict. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5   OEA.

12.5.1   As used in this Lease, the term *"OEA"* shall mean that certain Operation and Easement Agreement between Target Corporation, Home Depot U.S.A., Inc. and Landlord, dated as of February 12, 2003 and recorded on February 13, 2003 in the Official Records of Grayson County, State of Texas (the *"Clerk's Office"*) in Volume 3399, Page 350, *et seq.*, as Document Number 0004395.

12.5.2   Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 12.5. During the Term of this Lease, Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises.

12.5.3   Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations

37

of the OEA. Tenant shall defend, indemnify and hold harmless Landlord from and against any and all claims, demands, causes of action, suits, damages, liabilities and expenses of any nature arising out of a breach of the terms of the OEA by Tenant.

12.5.4    Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5    Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6    Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7    In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, within thirty (30) days after Tenant's demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8    As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

12.5.9    Landlord shall obtain any third-party approvals required under the OEA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's business in the Premises.

12.5.10    Landlord hereby warrants, covenants and represents to Tenant that Landlord shall not assign its rights as an "Approving Party" under the OEA separate and apart from its interest as Landlord under this Lease. Landlord further warrants, covenants and represents to Tenant that any assignment of its rights as an Approving Party under the OEA shall be set forth in a written instrument.

38

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1    Permitted and Prohibited Uses.

13.1.1 ᐧ Tenant's Permitted Use. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.26 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit L hereto annexed) or the "Future Exclusives" (hereinafter defined in Subsection 13.3.2), to the extent then applicable.

13.1.2    Prohibited Uses. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or the "Contiguous Land" (as hereinafter defined) now or hereafter owned or controlled by Landlord or its Affiliates(s), to be occupied [except to the extent otherwise permitted under any lease for space in the Shopping Center or the "Contiguous Land" existing as of the Effective Date and except to the extent otherwise permitted under any lease for space on the Contiguous Land existing as of the date Landlord or its Affiliate acquired the Contiguous Land (or the portion thereof that is encumbered by such lease)] for any of the "Prohibited Uses" (defined in Exhibit L hereto annexed), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall not apply to (a) any business existing on any "Contiguous Land" owned or controlled by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the time it became Landlord hereunder, already owned or controlled such "Contiguous Land" (excluding, however, the Landlord originally named herein and its Affiliates); or (b) "Ross Dress for Less," "Belk's," "Cinemark," "Red Lobster," "Wendy's," and "Chuck E. Cheese." The *"Contiguous Land"* shall mean the Home Depot Tract, Target Tract and the parcels labeled "(NOT A PART) OUTPARCEL #1," "(NOT A PART) OUTPARCEL #2," "(NOT A PART) OUTPARCEL #3 55,000 SF" and "(NOT A PART) OUTPARCEL #4 55,000 SF" on Exhibit B.

Section 13.2    Tenant's Exclusive in Center. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1    Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land (as hereinafter defined) to be occupied (except to the extent otherwise permitted under any lease or other occupancy agreement for space in the Related Land existing prior to the acquisition of the Related Land by Landlord or its Affiliate), whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (y) one thousand five hundred (1,500) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed

39

five hundred (500) square feet]. Any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned or controlled by Landlord or its Affiliate(s), shall be herein referred to as the *"Related Land."*

13.2.2   (a)   The restrictions set forth in Subsection 13.2.1 above shall not apply to (i) a full-line national or regional (A) department store (for example, Wal-Mart, Macy's, or Target), (B) discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club), or (C) home improvement center (for example, Home Depot or Lowe's), commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least seventy thousand (70,000) square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date); (ii) the tenant under the Existing Lease between Landlord, as lessor, and Belk, Inc., as lessee, dated June 9, 2003 (the *"Belk's Lease"*); provided, however, that the tenant under the Belk's Lease shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that (A) the Belk's Lease requires the consent of Landlord (or Landlord's Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (B) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental or distribution of the Exclusive Items.

(b)   The restriction on the sale, rental or distribution of bathroom items set forth in Subsection 13.2.1(b) shall not apply to the sale of health and beauty aids and/or personal care products by the retailer commonly known as "Ulta" or "Ulta 3," operating a store in a manner typical of a majority of "Ulta" or "Ulta 3" stores as of the Effective Date, provided that Landlord enters into a lease with such retailer within three hundred sixty-five (365) days after the Effective Date.

(c)   If Landlord enters into a lease with Marshalls for premises in the Shopping Center during the Term and at that time Tenant and Marshalls have in effect an agreement governing their exclusive use provisions that is applicable to the Shopping Center, Tenant agrees that such exclusive agreement shall supersede Section 13.2.1 hereof and govern the obligation of Marshalls to honor Tenant's exclusive use under Section 13.2.1 hereof.

(d)   If Landlord enters into a lease with Old Navy for premises in the Shopping Center during the Term and at that time Tenant and Old Navy have in effect an agreement governing their exclusive use provisions that is applicable to the Shopping Center, Tenant agrees that such exclusive agreement shall supersede Section 13.2.1 hereof and govern the obligation of Old Navy to honor Tenant's exclusive use under Section 13.2.1 hereof.

(e)   If Landlord enters into a lease with Michaels Arts and Crafts for premises in the Shopping Center during the Term and at that time Tenant and Michaels Arts and Crafts have in effect an agreement governing their exclusive use provisions that is applicable to the Shopping Center, Tenant agrees that such exclusive agreement shall supersede Section 13.2.1 hereof and govern the obligation of Michaels Arts and Crafts to honor Tenant's exclusive use under Section 13.2.1 hereof.

(f)   Provided that either prior to or within three hundred sixty-five (365) days after the Effective Date, Landlord shall have entered into a lease with Pier One, Tenant agrees to execute an deliver an agreement in the form of Exhibit M.

13.2.3   The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least seventy percent (70%) of the Floor Area of the Premises.

13.2.4    The exclusive rights granted to Tenant with respect to any specific category listed in Subsection 13.2.1 above shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category [other than during "Excused Periods" (defined in Section 1.1.9 above) and for periods of time not exceeding one hundred eighty (180) consecutive days]. In the event Tenant shall fail to use the Premises in the manner herein described with respect to any of the six (6) respective categories of merchandise listed as (a) through (f) in Section 13.2.1 above, the exclusive shall cease to be of any force and effect with respect to such category without the necessity of any notice or further action by Landlord.

13.2.5    (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and if Landlord fails to cure such breach within sixty (60) days after the earlier of the date on which Landlord actually becomes aware of such breach or the date on which Tenant gives Landlord notice of such breach, Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1    Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

41

13.3.2  Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which are executed from and after the Effective Date (hereinafter, *"Future Exclusives"*), and shall not sublease, occupy or use the Premises (or, in the event of a sublease, any applicable portion of the Premises), or permit the Premises (or, in the event of a sublease, any applicable portion of the Premises) to be leased, occupied or used, whether by Tenant or any sublessee, assignee, licensee or other occupant, in violation of any such Future Exclusives; provided, and on the condition that:

(a)  any Future Exclusive shall bind Tenant only to the extent that it restricts Tenant from selling in more than twenty-five (25%) percent of the Floor Area of the Premises the merchandise which is the subject of the Future Exclusive;

(b)  Landlord shall notify Tenant of the Future Exclusives then in effect within ten (10) days after Tenant's request therefor, and, (i) Tenant shall not have entered into an assignment of this Lease or a sublease of the Premises (or any portion thereof) which specifically permits a use which would violate any Future Exclusive prior to the grant of the applicable Future Exclusive; or (ii) neither Tenant nor any assignee of this Lease or subtenant of the Premises (or any portion thereof) shall have engaged in a use which would violate any Future Exclusive prior to the grant of the applicable Future Exclusive;

(c)  the premises occupied by the tenant benefiting from such Future Exclusive shall contain at least ten thousand (10,000) square feet of Floor Area;

(d)  such Future Exclusive shall not relate to the sale, rental or distribution of men's, women's, and/or children's apparel (unless such Future Exclusive relates to specialized apparel, such as, for example, maternity apparel only, formalwear only, larger-sized apparel only, or uniforms only) or footwear (provided that, with respect to footwear, Landlord may grant a Future Exclusive for the sale or distribution of footwear provided the Future Exclusive does not prohibit Tenant's use of the Premises for the sale or distribution of footwear for other than a primary use);

(e)  the beneficiary of the Future Exclusive shall be a national or regional tenant of the Shopping Center;

(f)  no Future Exclusive shall be granted for the sale of any or all of the Exclusive Items;

(g)  notwithstanding anything to the contrary contained in this Subsection 13.3.2, no Future Exclusive may limit the operation of (i) a Bed Bath & Beyond store as the same are typically operated in a majority of such stores in the Dallas-Fort Worth area from time to time, or (ii) a Christmas Tree Shop or Harmon store as the same are typically operated in a majority of such stores from time to time;

(h)  if the tenant benefiting from the Future Exclusive shall fail to use its premises for the sale of any category of merchandise covered by the Future Exclusive other than during an Excused Period, the Future Exclusive shall thereafter cease to be of any force and effect with respect to Tenant with respect to such category.

13.3.3  Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive or primary use granted by Landlord to any tenant in the Shopping Center.

## ARTICLE 14
## CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the one hundred eightieth (180th) day after the

42

Delivery Date [which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord] (the *"Opening Requirement"*). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof [it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease (other than by reason of an Event of Default)]. In the event that Tenant does not fulfill the Opening Requirement, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the thirtieth (30th) day after Tenant fails to fulfill the Opening Requirement, provided that Landlord's election to terminate this Lease shall be nullified if Tenant opens its store for business to the public for at least one (1) day prior to the Recapture Date (as hereinafter defined). In addition, in the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days, Landlord shall also have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires. If Landlord exercises either right of termination described above, this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting. ·

15.1.1    Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

15.1.2    Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, at least ten thousand (10,000) square feet of Floor Area of the Premises, it shall first give notice thereof (the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises. Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by: (a) giving notice to Tenant (the *"Termination Notice"*) thereof within fifteen (15) days after receipt of an Assignment/Subletting Notice from Tenant, and (b) paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by

43

Tenant to the Premises, in which event this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid fifteen (15)-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice. In the event that Landlord does not exercise its right to terminate this Lease, as aforesaid, then except for any sublease or assignment effected pursuant to the provisions of Subsection 15.1.3 or Section 15.3 below, in the event that Tenant (i) assigns Tenant's interest in this Lease; or (ii) subleases the Premises or any portion of the Premises, Tenant shall pay to Landlord fifty (50%) percent of the Profits (as hereinafter defined) obtained from such assignment or subleasing, as the case may be, in accordance with the provisions of this Subsection. *"Profits"* from assignment or subleasing shall not include amounts attributable to good will and shall be determined by subtracting from any consideration or subrents received from such assignee or subtenant (A) the reasonable costs and expenses incurred by Tenant in connection with such assignment or sublease, including, without limitation, any advertising costs, legal fees, brokerage commissions, and the costs of any remodeling or alterations; (B) any bona fide amounts (not in excess of fair market value as reasonably determined by Tenant) paid by any assignee or sublessee for Tenant's trade fixtures, furniture, furnishings and equipment; and (C) in the event of a sublease, all Fixed Minimum Rent and Additional Rent paid by Tenant to Landlord during the period of the sublease multiplied by a fraction, the numerator of which is the number of square feet being subleased to such subtenant and the denominator of which shall be the entire Floor Area of the Premises. In the event of an assignment of Tenant's interest in this Lease, the fifty (50%) percent of the Profits shall be paid by Tenant to Landlord within thirty (30) days after the later to occur of (a) the receipt by Tenant of the payment of the full consideration from the assignee on account of the assignment, and (b) the lapsing of any contingencies to the effectiveness of the assignment. In the event of a sublease of the Premises or any portion of the Premises, the fifty (50%) percent of the Profits shall be paid by Tenant to Landlord within thirty (30) days after the receipt of the monthly subrent; provided, however, that the entire dollar amount of all costs and amounts described in subsections (A) through (C) above shall be recouped by Tenant from the first subrents payable by the subtenant prior to such payment to Landlord.

        15.1.3   In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the State of Texas; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2    Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the later of (a) the expiration of the Initial Term or (b) the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million ($100,000,000) Dollars.

Section 15.3    Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4    Cure Rights of Original Tenant.

15.4.1 · If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2    If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, . unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  Tenant agrees to indemnify and hold Landlord harmless from all loss, cost, liability or expense incurred by Landlord as a result of any claims of Tenant's assignee in connection with the exercise by Tenant

45

of any of Tenant's rights under this Section 15.4. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5   Recognition Agreement. In the event Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

Section 16.1   Tenant Default.

16.1.1   If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2   Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)   to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)   without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)   upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)   upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of

46

repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3   Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4   Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid; it being agreed, however, that commencing with the third Event of Default by Tenant in the payment of Rent during any one (1) calendar year, such interest shall accrue from and after the due date of such Rent for the remainder of such calendar year.

16.1.5   Landlord shall use all commercially reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

16.1.6   Tenant recognizes that late payment of any Rent will result in administrative expense to Landlord, the extent of which is extremely difficult and economically impractical to ascertain. Tenant therefore agrees that if (a) Fixed Minimum Rent is unpaid ten (10) days after such amount is due, or (b) Additional Rent is unpaid thirty (30) days after such amounts are due under Section 4.3 or Section 5.1, then the amount of such Fixed Rent or Additional Rent, as the case may be, shall be increased by an amount (the *"Penalty Amount"*) equal to four percent (4%) of the unpaid amount or, if less, the maximum amount allowed under applicable law. The increased amount shall be deemed to be liquidated damages for the additional expense incurred by Landlord. Notwithstanding the foregoing, no Penalty Amount shall be charged by Landlord with respect to either (i) the first two (2) times, in any one (1) calendar year, when a Penalty Amount would have been due and payable with respect to a failure to timely pay Fixed Minimum Rent, or (ii) the first two (2) times, in any one (1) calendar year, when a Penalty Amount would have been due and payable with respect to a failure to timely pay Additional Rent. The provisions of this Subsection 16.1.6 shall not be in lieu of Landlord's other remedies pursuant to this Lease.

16.1.7   Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by written agreement of Landlord to Tenant. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute (except that Landlord waives any rights to accelerate any element of Rent, and any right of distraint, which may be granted to Landlord by law). In addition to any other remedies provided in this Lease, Landlord

47

shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation or attempted or threatened violation, of any of the covenants, agreements, conditions or provisions of this Lease, or to a decree compelling performance of any of the covenants, agreements, conditions or provisions of this Lease, or to any other remedy allowed to Landlord at law or in equity (except that Landlord waives any rights to accelerate any element of Rent, and any right of distraint, which may be granted to Landlord by law).

Section 16.2   Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)   as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)   bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)   offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)   may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, Tenant may, at its election, and with notice to Landlord that is practical under the circumstances, exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3   Arbitration.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Grayson County, Texas, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and

48

expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17
## RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1    Right to Mortgage and Non-Disturbance.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2    Estoppel Certificate.  Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement:  (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, (6) stating which options to extend the Lease Term have been exercised, if any, and (7) certifying to such other matters as may reasonably be requested by the party requesting the estoppel.

Section 17.3    Existing Mortgages.  If a mortgage, deed of trust, or other security instrument encumbers the Shopping Center or any part thereof on the Effective Date, then within forty-five (45) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid). Should Landlord fail to so deliver such instrument(s) within said forty-five (45)-day period, Tenant shall have the right by notice given to Landlord at any time prior

49

to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000).

<div align="center">

ARTICLE 18
NOTICE
</div>

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's CAM Share of Common Areas Charges as described in Section 5.1 of this Lease.

<div align="center">

ARTICLE 19
TENANT'S PROPERTY
</div>

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

<div align="center">

ARTICLE 20
END OF TERM
</div>

Section 20.1    Surrender of Premises. At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2    Hold Over. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at

<div align="center">50</div>

sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
## TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease any additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date that is the earlier of (i) the date on which the lease or other occupancy agreement with the initial tenant or other occupant of such space expires or terminates; and (ii) the date that is one (1) year after the Effective Date. At such time that Landlord has knowledge that such space (*"Offered Space"*) is or will become available, Landlord will give Tenant notice (the *"Offering Notice"*) of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer. In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (a) contain the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21. Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any contiguous space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space. As used herein, the phrase *"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant. Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above.

## ARTICLE 22
## ONGOING CO-TENANCY

If, at any time during the Term, (a) less than two (2) of the following tenants or owners (in the case of "Target" and "Home Depot") are open and operating in the premises designated for them on Exhibit B without being replaced by a Replacement Tenant (as hereinafter defined) or Replacement Tenants: "Target," "Home Depot," or "Cinemark," and/or (b) less than three (3) of the following tenants are open and operating in the premises designated for them on Exhibit B without being replaced by a Replacement Tenant (as hereinafter defined) or Replacement Tenants: "Borders," "Best Buy," "Marshalls," "Belks," "Michaels" or "Hobby Lobby" [provided, however, if leases and/or occupancy agreements shall have been entered into with both "Michaels" and "Hobby Lobby," Landlord may only count one for purposes of this Article 22], "Ross Dress for Less," "Old Navy," "Gart Sports Mart," "Academy Sports" and "Sports

51

Authority" (such condition being hereinafter referred to as an *"Excess Vacancy"*), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such three hundred sixty-five (365)-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (A) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (B) Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of any alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired portion of the Term. If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid one hundred twenty (120)-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens due to the closure of any additional tenant or Replacement Tenant named above in this Article 22; and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy. A *"Replacement Tenant"* shall mean a national or regional retailer found in first class shopping centers containing at least one hundred twenty-five (125) stores throughout the United States (in the case of a national retailer) or containing at least fifty (50) stores (in the case of a regional retailer). The Replacement Tenant must occupy at least eighty-five (85%) percent of the space previously occupied by the tenant or owner (in the case of "Target" or "Home Depot") that the Replacement Tenant is replacing.

<div align="center">

ARTICLE 23
MISCELLANEOUS

</div>

Section 23.1    Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2    Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within fifteen (15) days after the commencement of any action of foreclosure or execution thereon, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3    Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for The Weitzman Group (the *"Broker"*). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4    *Force Majeure*. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the

<div align="center">52</div>

performance of any act required hereunder by reason of strikes, inability to procure materials, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall be excused for a period equal to the period of the delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto. Further, any time period provided for in this Lease which specifies or requires that Landlord perform an obligation by a date certain shall be extended, day for day, for each day of Tenant Delay directly related thereto. As used herein, the term "Tenant Delay" shall mean either of the following: (i) any delay resulting from a failure by Tenant to respond to a request for approval, consent, acceptance or designation within the time period required therefor in this Lease that is not caused by Landlord, and (ii) any delay resulting from any direction by Tenant that Landlord suspend work or otherwise delay construction of any portion of the construction to be performed by Landlord hereunder because of or due to a possible Change therein by Tenant or for any other reason that is not caused by Landlord.

Section 23.5 · Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6 . Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7 Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8 Survival of Obligations. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9 Non-Waiver. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

53

Section 23.11 <u>Definition of Landlord</u>. The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (<u>except</u> to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 <u>Successors and Assigns</u>. Subject to the provisions of Section 15 hereof, the provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 <u>Limitation of Landlord's Liability</u>. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 <u>Limitation of Tenant's Liability</u>.

Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for

convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 Definition of Hereunder, Herein, etc. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 Short Form Lease. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 Entire Agreement and Modification. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 No Joint Venture or Partnership Created by Lease. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 Tenant's Tradename. Landlord shall not make use of Tenant's tradename [i.e., "Bed Bath & Beyond"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24 Counterparts. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 Waiver of Trial by Jury. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

[Signature Page Follows]



1

Section 23.26  <u>Assignment of Rent by Landlord</u>.  Subject to the terms of any subordination, non-disturbance and attornment agreement to which Tenant is a party, in the event Landlord for any reason assigns the rents and other sums payable by Tenant hereunder and gives to Tenant appropriate notice thereof, together with a copy of the instrument of assignment and a statement of the mailing and office address of Landlord's said assignee and written instructions to make future rental and other payments hereunder to said assignee, Tenant shall no later than thirty (30) days thereafter (after actual receipt of such notice by Tenant) make rental or other payments subsequently accruing hereunder to the party named in such instrument to receive such rental or other payments by mailing or delivering same to such party at the address specified  in such notice; provided, however, that nothing contained in such instrument shall operate to increase or enlarge the obligations or in any manner diminish or impair the rights of Tenant hereunder; and in no event shall Tenant be required or in any way be obligated to split its rental and other payments hereunder or pay same to more than one person; and provided, further, that payment by Tenant of any amount to any such assignee or Landlord pursuant to any such notice shall constitute payment of such amounts to Landlord for all purposes under this Lease (and the receipt by such assignee or any of its agents or representatives therefor shall be fully binding upon Landlord) as to all such payments made prior to such later time when Tenant shall have actually received notice signed by both Landlord and said assignee directing that rental and other payments thereafter accruing to Landlord hereunder be paid to Landlord.

Section 23.27  <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

A – S 60 HWY 75 - LOY LAKE, L.P., a
Texas limited partnership

By:   A – S 60, L.C., a Texas limited
liability company, general partner

By:_____
Name:___Jay K. Sears___
Title:___member - manager___

[SEAL]

**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman of the Board of
Directors

Name:_Alan M. Freeman_
Title: (Assistant) Secretary

[SEAL]

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of Premises and Sidewalk Plan; Exterior Elevations of the Shopping Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Subtenant Recognition Agreement |
| Exhibit I | Delivery Date Notice |
| Exhibit J | Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |
| Exhibit M | Pier One Agreement |

27641/0443-1284250v7

## Exhibit A

### Legal Description of Shopping Center

1  Being Lots 1 and 2 in Block 1; Lot 1 in Block 2; Lots 1 through 6 in Block 3; Lots 1, 3, 4,
2  5 and 6 in Block 4; Restricted Reserve "A;" and Restricted Reserve "B," all of the Final
3  Plat of SHERMAN TOWN CENTER, an Addition to the City of Sherman, as shown by
4  Plat filed of record on February 13, 2003, in Volume 16, Page 42, Plat Records, Grayson
5  County, Texas.

A-1

<u>**Exhibit B**</u>

<u>**Site Plan**</u>

27641/0443-1284250v7



EXHIBIT 'B'
SITE PLAN
SHERMAN, TEXAS
GENERAL NOTES
SITE PLAN LEGEND
U.S. HIGHWAY 75
HIGHWAY 82

## Exhibit C

### Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, le as of the ____ day of _____, 200__, by and between A – S 60 HWY 75 - Y LAKE, L.P. (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

### WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as :rnan Town Center (the *"Shopping Center"*), situated in Sherman, Texas;

WHEREAS, by that certain lease dated _____, 2003 (the *"Lease"*), idlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter ׀ an agreement setting forth certain information in respect of the Premises and the ׀se.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____,
᾿___.

2.    The Initial Term of the Lease shall expire on January 31, 20___, unless ιant exercises any option to extend the Term of the Lease or unless the Lease ninates earlier as provided in the Lease.

3.    The date of commencement of the first Renewal Period shall be February :0___, if Tenant effectively exercises its option in respect thereof, and if Tenant does the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any ion to further extend the Term of the Lease or unless the Lease terminates earlier as vided in the Lease.

4.    The date of commencement of the second Renewal Period shall be ᾿ruary 1, 20___, if Tenant effectively exercises its option in respect thereof, and if ιant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant rcises any option to further extend the Term of the Lease or unless the Lease ninates earlier as provided in the Lease.

5.    The date of commencement of the third Renewal Period shall be February :0___, if Tenant effectively exercises its option in respect thereof, and if Tenant does the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates lier as provided in the Lease.

6.    The date of commencement of the fourth Renewal Period shall be ᾿ruary 1, 20___, if Tenant effectively exercises its option in respect thereof, and if ιant does so, the Term of the Lease shall expire on January 31, 20___, unless the ιse terminates earlier as provided in the Lease.

7.    The date of commencement of the fifth Renewal Period shall be February :0___, if Tenant effectively exercises its option in respect thereof, and if Tenant does the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates lier as provided in the Lease.

8.    Capitalized terms used, but not defined, herein shall have the meanings ribed to them in the Lease.

C-1

IN WITNESS WHEREOF, the parties hereto have caused this Rent
mmencement and Expiration Date Agreement to be executed the date and year first
ove written.

**LANDLORD:**

A – S 60 HWY 75 - LOY LAKE, L.P., a
Texas limited partnership

By:   A – S 60, L.C., a Texas limited
      liability company, general partner

      By:_____
      Name:_____
      Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:  Warren Eisenberg
Title:    Co-Chief Executive Officer

C-2

<u>Exhibit D</u>

<u>Specifications for Landlord's Work</u>

D-1

*Sherman, Texas*

**Exhibit D - Standard Landlord's Work**

5/14/03

I capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the use. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of **Exhibit D**, to the extent not inconsistent with the terms of this **Exhibit D**. It is specifically understood and eed that all materials and supplies shall be installed in strict accordance with all manufacturers' cifications.]

**Landlord's Final Plans and Specifications**

dlord shall provide three (3) complete full size sets, three (3) complete ½ size sets and one (1) copy of electronic of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. dlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5). Tenant's Plans are project-specific design-development documents. In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail. Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

Tenant's Prototype Drawings and Specifications entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2003, dated 2-15-03 developed by Ignarri-Lummis Architects, comprise the following drawings and specifications:

At the time the Preliminary Plans are 85% complete, LL shall be obligated to issue Preliminary Plans to "BBBY Consultant" for review against "Quality Control Checklist". The cost to LL for this review is $2000.00 plus reimbursable associated with printing and shipping. If Preliminary Plans are "rejected" or noted "revise and resubmit" by the BBBY consultant then LL shall be obligated for all expenses related to these subsequent reviews until Preliminary Plans are deemed approved. Project specific BBBY consultants to be determined by BBBY post lease execution. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

| [EET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|--------|---------------|---------------|--------------|
| A0.1 | Code Data, Project Data, Responsibility Schedule | Prototype Version 1.2003 | 02/15/03 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2003 | 02/15/03 |
| A1.1 | Site Details | Prototype Version 1.2003 | 02/15/03 |
| A1.2 | Demolition Plan | Prototype Version 1.2003 | 02/15/03 |
| A2.1 | Store Fixture Plan & Notes | Prototype Version 1.2003 | 02/15/03 |
| A2.2 | Floor Plan & Partition Types | Prototype Version 1.2003 | 02/15/03 |
| A2.3 | Floor Finish Plan, Transition Strip Details & Finishes Legend | Prototype Version 1.2003 | 02/15/03 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2003 | 02/15/03 |
| A2.5 | Roof Plan & Notes | Prototype Version 1.2003 | 02/15/03 |
| A3.1 | Door & Finish Schedules, Door & Storefront Types, Vestibule Elevations | Prototype Version 1.2003 | 02/15/03 |
| A3.2 | Finish Hardware Schedule | Prototype Version 1.2003 | 02/15/03 |
| A3.3 | BBB National Account Vendors & Distribution Schedule | Prototype Version 1.2003 | 02/15/03 |
| A3.4 | BBB Specified Manufacturers & Distribution Schedule | Prototype Version 1.2003 | 02/15/03 |
| A4.1 | Exterior Elevations | Prototype Version 1.2003 | 02/15/03 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2003 | 02/15/03 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2003 | 02/15/03 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2003 | 02/15/03 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2003 | 02/15/03 |
| A5.5 | Interior Wall Sections | Prototype Version 1.2003 | 02/15/03 |
| A5.6 | *Alternate* Scissor Lift Plan Details | Prototype Version 1.2003 | 02/15/03 |
| A6.1 | Exterior Details | Prototype Version 1.2003 | 02/15/03 |
| A7.1 | Large Scale Plans | Prototype Version 1.2003 | 02/15/03 |
| A7.2 | Large Scale Plans | Prototype Version 1.2003 | 02/15/03 |

1

| | | | |
|---|---|---|---|
| A7.2a | *Alternate* Large Scale Plans (38k SF Building) | Prototype Version 1.2003 | 02/15/03 |
| A8.1 | Interior Details | Prototype Version 1.2003 | 02/15/03 |
| A8.2 | Interior Details | Prototype Version 1.2003 | 02/15/03 |
| A8.3 | Customer Service Desk | Prototype Version 1.2003 | 02/15/03 |
| A8.4 | Register Bays | Prototype Version 1.2003 | 02/15/03 |
| A8.5 | Remote Service Desks | Prototype Version 1.2003 | 02/15/03 |
| A9.1 | Interior Elevations | Prototype Version 1.2003 | 02/15/03 |
| A9.1a | *Alternate* Interior Elevations & Details (38K SF Building) | Prototype Version 1.2003 | 02/15/03 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2003 | 02/15/03 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2003 | 02/15/03 |
| IP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2003 | 02/15/03 |
| CH-1 | Fine China – Floor / Framing / Ceiling Plans & Schedules | Prototype Version 1.2003 | 02/15/03 |
| CH-2 | Fine China – Wall Sections & Details | Prototype Version 1.2003 | 02/15/03 |
| CH-3 | Fine China – Electrical Plans, Details & Notes | Prototype Version 1.2003 | 02/15/03 |
| S1.1 | Structural General Information & Schedules | Prototype Version 1.2003 | 02/15/03 |
| S2.1 | Foundation Plan | Prototype Version 1.2003 | 02/15/03 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2003 | 02/15/03 |
| S3.1 | Structural Wall Sections | Prototype Version 1.2003 | 02/15/03 |
| S3.2 | Typical Structural Details | Prototype Version 1.2003 | 02/15/03 |
| ME1.1 | Plumbing, Mechanical & Electrical General Information | Prototype Version 1.2003 | 02/15/03 |
| P1.1 | Plumbing General Information & Schedules | Prototype Version 1.2003 | 02/15/03 |
| P1.2 | Plumbing Riser Diagrams | Prototype Version 1.2003 | 02/15/03 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2003 | 02/15/03 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2003 | 02/15/03 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2003 | 02/15/03 |
| M1.1 | Mechanical General Information | Prototype Version 1.2003 | 02/15/03 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2003 | 02/15/03 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2003 | 02/15/03 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2003 | 02/15/03 |
| M4.2 | ETM Wiring Details for Lennox RTU's | Prototype Version 1.2003 | 02/15/03 |
| M4.2a | *Alternate* ETM Wiring Details for non-Lennox RTU's | Prototype Version 1.2003 | 02/15/03 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2003 | 02/15/03 |
| E2.1 | Power Plan | Prototype Version 1.2003 | 02/15/03 |
| E2.2 | Lighting Layout Plan | Prototype Version 1.2003 | 02/15/03 |
| E2.3 | Lighting Circuiting Plan | Prototype Version 1.2003 | 02/15/03 |
| E2.4 | Specialty Lighting Plan | Prototype Version 1.2003 | 02/15/03 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2003 | 02/15/03 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2003 | 02/15/03 |
| E3.3 | Specialty Lighting Power Diagrams | Prototype Version 1.2003 | 02/15/03 |
| E3.4 | Electrical Details | Prototype Version 1.2003 | 02/15/03 |
| E4.1 | Electrical Schedules | Prototype Version 1.2003 | 02/15/03 |
| E4.2 | Electrical Schedules | Prototype Version 1.2003 | 02/15/03 |
| E4.3 | ETM Wiring Details for Lennox RTU's | Prototype Version 1.2003 | 02/15/03 |
| E4.3a | *Alternate* ETM Wiring Details for Non-Lennox RTU's | Prototype Version 1.2003 | 02/15/03 |
| E5.1 | Powerwall Details | Prototype Version 1.2003 | 02/15/03 |
| E5.2 | Powerwall Schedules | Prototype Version 1.2003 | 02/15/03 |
| E6.1 | *Bid Alternate:* Electrical Details | Prototype Version 1.2003 | 02/15/03 |
| E6.2 | *Bid Alternate:* Electrical Schedules | Prototype Version 1.2003 | 02/15/03 |
| E6.3 | *Bid Alternate:* Novar Wiring Details for Lennox RTU's | Prototype Version 1.2003 | 02/15/03 |
| E6.3a | *Bid Alternate:* Alt. Novar Wiring Details for non-Lennox RTU's | Prototype Version 1.2003 | 02/15/03 |
| E7.1 | *Bid Alternate:* Modular Wiring (Fastlane) Plans | Prototype Version 1.2003 | 02/15/03 |

E7.2    *Bid Alternate:* Modular Wiring (Fastlane)    Prototype Version 1.2003    02/15/03
       Details

ject Manual for Bed Bath & Beyond, dated February 15, 2003.

Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements. Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

ddition, Landlord shall include the following items as part of the Final Plans and Specifications:

All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

Complete civil engineering documents that describe planned improvements to the Shopping Center, including geo-technical and stormwater design reports.

### Site Specifications

All parking areas and traffic drives in the Shopping Center shall consist of a minimum 12" of compacted sub-base (95% compacted), 3" asphalt base, and 2" asphalt surface finish. Grading of these areas shall not exceed a slope of 2%. Utilization of any portion of the parking field for above ground storm water retention/detention is not acceptable to Tenant.

All truck access drives in the Shopping Center shall consist of a minimum 12" of compacted sub-base (95% compacted), 6" asphalt base, and 3" asphalt surface finish. Grading of these areas are not to exceed a slope of 3%.

All truck ramps and dumpster pads shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 5" Portland cement concrete surface finish. All truck ramps shall consist of #4 re-bars, 18" o/c. each direction. Recessed truck ramps shall not exceed slope of 5%.

andlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-nical report recommendations shall supersede the criteria stated in items A, B, and C above.

The minimum lighting level throughout the Shopping Center (parking areas, traffic drives. service drives, etc.) shall be at least two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of the Final Plans and Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

### Building Requirements

: following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's totype Drawings and Specifications:

Clear Height - Building systems (mechanical, plumbing, electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. All mechanical, plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures. Fire protection sprinkler piping shall be located at least 16'-6" a.f.f., sprinkler heads shall be located at least 18'-0" a.f.f. Bottom of all structural elements shall be located at least 18'-0" a.f.f.

Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law. Landlord shall be responsible for monitoring the fire alarm system up to (and including) the Delivery Date. Landlord shall be obligated to contract directly with "ADT" to provide required FA system.

1ˢᵗ Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4". Structural system shall be rated to accept 125 lb. per square foot of live load. If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab.

3

Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads. System shall comply with NFPA 231-C and or NFPA13, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required.

Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate Fire Pump outside of Premises. Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant. Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to TVA for their review end approval no later than (16) weeks prior to projected delivery date. The fixed cost to LL for this initial review is $550.00 plus reimbursables associated with printing and shipping. If subsequent reviews are required by TVA due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis. The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then LL shall directly pay consultant for all time and materials. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

|  | Gerald Lingenfelter<br>TVA Fire and Life Safety<br>Work:     973-398-1445x.4525<br>Fax:       973-398-1442<br>200 Valley Road Suite 306<br>Mt. Arlington, NJ 07856 |
|---|---|

If fire-proofing of structural elements is required, then Landlord shall use intumescent fire resistive coating. All edges of application shall be neat, clean and straight. All edges of material to be parallel to structural element being treated.

### Construction Coordination Requirements

Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed

Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at BBB.2000photos@bedbath.com

### Building and Site Signs

Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord required to execute purchase order with Tenant's specified vendor within 10 weeks prior to Delivery Date. If Landlord fails to execute purchase order within this time frame, then at Tenant's option. Tenant may execute purchase order with Tenant's specified vendor and deduct all costs from rent, (or , at Tenant's option , receive a credit against "Changes" under the lease). If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute purchase order.

Remote Building Signs -- (Building Sign not located on Premises) Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with sign manufacturer. Conduit to be installed continuously from Tenant's panel in Premises or other source to remote sign location(s).

4

Pylon/Monument/Directional Signs -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).

Temporary Signs -- commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall install and maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign near the site of the [future] main entrance to the Shopping Center, bearing the phrase "Bed Bath & Beyond Coming Soon". At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed.

Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval at least (12) weeks prior to delivery date.

### Permits and Approvals

Landlord to secure all permits required to allow Tenant to fixture, merchandise (including without limitation permits for it's for prepackaged foods), and open for business to the public in the Premises.

If Seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than (12) weeks prior to delivery. Seizmic Inc. shall provide the necessary services to assist Landlord in securing the fixture permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of permit.

> Seizmic Inc.
> Contact: Sal Fateen or Genie Fateen
> 161 Atlantic Street, Pomona, CA 91768
> Ph. # 909 869 0989

> Landlord shall be obligated to take possession of Fixture permit and transfer permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to delivery date.

Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

### Construction Closeout

Landlord shall deliver to Tenant's Construction Project Manager two (2) hard-copy sets of as-built drawings of the Premises, one (1) electronic copy CD-ROM ("Auto Cad" Rel. 14 Format) of As-built along with all close-out books and warranty information, as specified within Tenant's Prototype Drawings and Specifications (refer to Section 01700 for complete list of closeout documents) within thirty (30) days after the "Substantial Completion Date".

Warranties - Landlord shall provide Tenant with a list of contractors' and subcontractors' contacts and addresses, and a guarantee, including parts and labor, for a period of at least one (1) year after the Rent Commencement Date. Landlord shall deliver all warranties of equipment, service manuals, and as-built drawings to Tenant's construction project manager within thirty (30) days after the "Substantial Completion Date". Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord must forward a written report to Tenant on the condition of all warranty items.

If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraphs A and B within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

Itemized Budget - Landlord shall provide Tenant with its itemized "budget" and "final cost" within thirty (30) days after the Substantial Completion Date.

Landlord shall provide to Tenant (within 30 days of Tenants written request) copies of information required for Tenant to pursue Energy rebates with the utility provider. Requested information shall include manufacturers invoices and/or manufacturers cut sheets for the following :
    1. Roofing (if material is reflective and holds an Energy Star rating)

5

2. Gas Powered Equipment (i.e. - Rooftop HVAC Units, Unit Heaters, Hot Water Heaters, etc.)
3. Electrically Powered Equipment (i.e. - Lighting)
4. Plumbing Fixtures

### Exhibit D-1

#### Exterior Elevations of Premises and Sidewalk Plan



## Exhibit E

### Permitted Encumbrances

Easement granted to Chevron U.S.A., Inc. recorded in Volume 1896, Page 575 in the Real Property Records of Grayson County, Texas.

Reservation of oil, gas and/or other minerals as set forth a Warranty Deed with Vendor's Lien recorded in Volume 2427, Page 786 in the Official Public Records of Grayson County, Texas.

Easement and Right-of-Way granted to Texas Power and Light Company recorded in Volume 1465, Page 677 in the Deed Records of Grayson County, Texas.

Easements granted to Texas Power and Light Company recorded in Volume 248, Page 353 and Volume 246, Page 335 in the Deed Records of Grayson County, Texas.

Mutual Access and Utility Easement and Maintenance Agreement dated December 17, 1993 by and between Susan Hill Cockerell and Wal-Mart Stores, Inc. recorded in Volume 2309, Page 603 in the Real Property Records of Grayson County, Texas.

Mutual Access and Utility Easement and Maintenance Agreement dated January 13, 1994 by and between Susan Hill Cockerell and Wal-Mart Stores, Inc. recorded in Volume 2314, Page 901 in the Real Property Records of Grayson County, Texas.

Easement and Right of Way granted to Lone Star Gas recorded in Volume 982, Page 274 in the Deed Records of Grayson County, Texas.

Easement granted to Texas Power and Light Company recorded in Volume 1061, Page 446 in the Deed Records of Grayson County, Texas.

Easement granted to Texas Power and Light Company recorded in Volume 1136, Page 35 in the Deed Records of Grayson County, Texas.

Easement granted to Texas Power and Light Company recorded in Volume 1512, Page 232 in the Deed Records of Grayson County, Texas.

Easement and Right of Way in favor of Texas Power and Light Company recorded in Volume 1618, Page 137 in the Deed Records of Grayson County, Texas.

Easement and Right of Way in favor of Texas Power and Light Company recorded in Volume 391, Page 68 in the Deed Records of Grayson County, Texas.

Agreement between John Blaine and Minnie Blaine, his wife, and the Texas Power and Light Company recorded in Volume 585, Page 409 in the Deed Records of Grayson County, Texas.

Conveyance of oil, gas and other mineral rights in a Warranty Deed recorded in Volume 1300, Page 266 of the Deed Records of Grayson County, Texas.

Reservation of mineral rights contained in Deed recorded in Volume 1841, Page 265 in the Real Property Records of Grayson County, Texas.

Deed Granting Utility Easement in favor of the City of Sherman, Texas recorded in Volume 1362, Page 167 in the Real Property Records of Grayson County, Texas.

41/0443-1284230v7

- Declaration of Covenants and Restrictions by Landlord recorded in Volume 3399, Page 325 in the Official Records of Grayson County, Texas.

- Reciprocal Access and Restrictive Covenant Agreement by and between Landlord and Susan Hill Cockerell recorded in Volume 3399, Page 221 in the Official Records of Grayson County, Texas.

- Utility Improvements Agreement between Landlord and Susan Hill Cockerell recorded in Volume 3399, Page 274 in the Official Records of Grayson County, Texas.

- OEA recorded in Volume 3399, Page 350 in the Official Records of Grayson County, Texas, subject, however, to the terms of this Lease applicable thereto including, without limitation, Section 12.5 hereof.

- Memorandum of Development Agreement between Landlord and Home Depot U.S.A., Inc. recorded in Volume 3399, Page 504 in the Official Records of Grayson County, Texas.

- Memorandum of Developers Rights Agreement between Landlord and Target Corporation recorded in Volume 3399, Page 466 in the Official Records of Grayson County, Texas.

- Memorandum of Developers Rights Agreement between Landlord and Home Depot U.S.A., Inc. recorded in Volume 3399, Page 474 in the Official Records of Grayson County, Texas.

Landlord represents and warrants that (i) none of the foregoing will interfere with prevent Tenant from operating its Premises in accordance with the terms of this Lease, ) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any ligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing sements or rights of way (a) are located beneath the Premises, or (b) will interfere with :nant's use and enjoyment of the Premises.

41/0443-1284250v7



BED BATH & BEYOND
EXHIBIT          F
PYLON SIGN TYPE A
SHERMAN, TEXAS

PYLON PANEL WITH WHITE
BED BATH & BEYOND LOGO
WITH BLACK BACKGROUND

(PANELS ON BOTH SIDES OF PYLON)

2" PERIMETER
ACCENT BORDER
(COLOR WHITE)

JUNIOR
PYLON SIGN
TYPE "A"

FRONT ELEVATION

PAINTED BRACKET

PAINTED STEEL BOX BEAM

PAINTED STRUCTURAL
COLUMNS

MASONRY TO MATCH
CENTER



BED BATH & BEYOND
EXHIBIT 'F'
PYLON SIGN ENTRANCE
SHERMAN, TEXAS



BED BATH & BEYOND
EXHIBIT     F
PYLON SIGN TYPE C
SHERMAN, TEXAS





# BED BATH & BEYOND
## EXHIBIT F
## SHERMAN, TEXAS

TYPICAL SELF-CONTAINED DETAIL
SCALE: NTS

COLORS:
FACES:
(FACE COLOR TO BE DETERMINED BY LOCATION)
3/16" 7328 WHITE PCD
RETURNS:
OUTSIDE:
WHITE
INSIDE:
PAINT WHITE
RETAINER:
1" TRIMCAP (COLOR TO MATCH RETURNS)

ELECTRICAL SPECS:
WHITE NEON / 30mA TRANSFORMER(S)
AMPS: 68.25
# OF 20 AMP CIRCUITS (RECOMMENDED): 6
VOLTS: 120

NOTES:
MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE TRIM AND FACE TO THE SIGN BODY. THE MAXIMUM SPACING SHALL NOT EXCEED 1'-8" AND NO FEWER THAN (4) FOUR SCREWS ARE TO BE USED PER FACE. SHELLAC IS TO BE APPLIED TO EACH COPPER WIRE TIE TO PREVENT LOOSENING OF THE WIRE TIE.
ALL SIGNAGE WILL BE U.L. LISTED AND CARRY U.L. LABELS.
**EQUIPMENT GROUND REQUIRED.
ACTUAL # OF CIRCUITS TO BE DETERMINED BY A LICENSED ELECTRICAL CONTRATOR.

JB 9.6.07

COLLINS SIGNS

| | |
|---|---|
| Customer | BED BATH & BEYOND |
| Page | PRESENTATION |
| Description | 10'-0" & 40'-0" STACKED LAYOUT SELF-CONT. CHL |
| Location | VARIOUS |
| Scale | 1:54 |
| Drawn by | JOHNSON |
| Drawing No. | BED13601 |

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

 THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
REEMENT, made as of the _____ day of _____, 200__, by and between
_____, a _____ [corporation] [limited] [general]
:tnership] [national banking association], having an office at _____
_____ (the *"Mortgagee"*) and Bed Bath & Beyond Inc., a
v York corporation, having an office at 650 Liberty Avenue, Union, New Jersey
83 (the *"Tenant"*).

WITNESSETH:

WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage"*) covering a
:cl of land owned by _____, a _____ [corporation],
ited] [general] [partnership] (the *"Landlord"*) together with the improvements [to
erected thereon (said parcel of land and improvements thereon being hereinafter
rred to as the *"Shopping Center"* and being more particularly described on Exhibit A
ched hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and
ant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion
he Shopping Center, as more particularly described in the Lease (the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
ch is hereby acknowledged; and

[For mortgages existing as of the date Lease is executed: WHEREAS, as an
ucement to Tenant to enter into the Lease, [Section 2.3.1/Section 17.3] thereof
vides that the Lease is conditioned upon Landlord obtaining this Agreement from
rtgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
non-disturbance of Tenant by the holder of the Mortgage; and]

[For mortgages occurring after the Lease is executed: WHEREAS, Section
1 of the Lease provides that the Lease shall become subject and subordinate to a
rtgage encumbering the fee interest of Landlord in and to the Shopping Center if and
en a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to
Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

NOW, THEREFORE, in consideration of the premises and of the mutual
'enants and agreements herein contained, the parties hereto, intending to be legally
ind hereby, agree as follows:

1.     Mortgagee hereby consents to and approves the Lease and the term thereof,
luding the options to extend the term as set forth in the Lease, and covenants and
ees that the exercise by Tenant of any of the rights, remedies and options therein
itained shall not constitute a default under the Mortgage.

2.     Tenant covenants and agrees with Mortgagee that the Lease hereby is made
I shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and
ill modifications and extensions thereof (and such subordination shall not lessen or
ninish Tenant's rights under the Lease), subject, however, to the provisions of this
reement.

11/0443-1284250v7

3.      Mortgagee agrees that so long as the Lease shall be in full force and effect, so long as Tenant shall not be in default under the Lease beyond any applicable :e and grace period:

(a)     Tenant shall not he named or joined as a party or otherwise in any action or proceeding for the foreclosure of the Mortgage or to enforce any rights :r the Mortgage or the bond or note or other obligation secured thereby, unless not to ɔ would be disadvantageous procedurally to Mortgagee, in which cases, such joinder enant as a part shall not extinguish or interfere with any rights of Tenant under the :e, nor shall Tenant be evicted or moved or its possession or right to possession under erms of the Lease be disturbed or in any way interfered with;

(b)     The possession by Tenant of the Premises and Tenant's rights :to shall not be disturbed, affected or impaired by, nor will the Lease or the term :of be terminated or otherwise affected by (i) any suit, action or proceeding brought 1 the Mortgage or the bond or note or other obligation secured thereby, or for the :losure of the Mortgage or the enforcement of any rights under the Mortgage, or by judicial sale or execution or other sale of the Premises or the Shopping Center, or any l given in lieu of foreclosure, or by the exercise of any other rights given to any cr of the Mortgage or other documents as a matter of law, or (ii) any default under Mortgage or the bond or note or other obligation secured thereby; and

(c)     All condemnation awards and insurance proceeds paid or payable . respect to the Premises or any other part of the Shopping Center shall be applied and in the manner set forth in the Lease.

4.      If Mortgagee or any future holder of the Mortgage shall become the owner ie Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the pping Center shall be sold as a result of any action or proceeding to foreclose the tgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall .inue in full force and effect, without necessity for executing any new lease, as a ct lease between Tenant and the then owner of the Shopping Center, as "landlord", a all of the same terms, covenants and provisions contained in the Lease, and in such it:

(a)     Tenant shall be bound to such new owner under all of the terms, :nants and provisions of the Lease for the remainder of the term thereof (including the ewal Periods, if Tenant elects or has elected to exercise its options to extend the term) Tenant hereby agrees to attorn to such new owner and to recognize such new owner landlord" under the Lease; and

(b)     Such new owner shall be bound to Tenant under all of the terms, :nants and provisions of the Lease for the remainder of the term thereof (including the ewal Periods, if Tenant elects or has elected to exercise its options to extend the term) ch such new owner hereby agrees to assume and perform and Tenant shall, from and r the date such new owner succeeds to the interest of "landlord" under the Lease, have same remedies against such new owner for the breach of any covenant contained in Lease that Tenant might have had under the Lease against Landlord if such new ier had not succeeded to the interest of "landlord"; provided, however, that such new ier shall not be:

(i)     liable for any act or omission of any prior landlord (including dlord) unless such act or omission continues from and after the date upon which the · owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any ·r landlord (including Landlord) unless resulting from any default or breach by such ·r landlord which continues from and after the date upon which the new owner :eeds to the interest of such prior landlord;

G-2

(iii)   subject to any offsets which Tenant may have against any
ır lundlord, except to the extent such offsets are expressly provided under the Lease
Mortgagee has received notice thereof and the opportunity to cure within the
licable time periods set forth in the Lease (it being further agreed that offsets under
Lease that were deducted by Tenant prior to the date upon which the new owner
:eeds to the interest of such prior landlord shall not be subject to challenge);

(iv)   bound by any fixed rent or additional rent which Tenant
·ht have paid for more than one month in advance of its due date under the Lease to
prior landlord (including Landlord), unless such additional rent is paid in accordance
ı the applicable provisions of the Lease; or

(v)   bound by any amendment or modification of the Lease made
ıout its consent; notwithstanding the foregoing, Mortgagee acknowledges that the
se specifically provides for amendments thereof upon the occurrence of certain events
:ribed in the Lease (such as, for example, an amendment to the Lease confirming the
ısurement of the Premises), and, by its execution below, Mortgagee agrees to
ıgnize such amendments as part of the Lease, and Mortgagee further agrees that such
· owner shall also be bound by such amendment(s) to the Lease, without any consent
he part of Mortgagee or such new owner.

(c)   Tenant's obligations hereunder shall be effective only so long as
.tgagee is bound to Mortgagee's obligations hereunder.

5.   Tenant will notify Mortgagee of any default by Landlord under the Lease
ch would entitle Tenant to terminate the Lease or abate the rent payable thereunder
agrees that notwithstanding any provision of the Lease, no notice of termination
eof nor any abatement shall be effective unless Mortgagee has received the aforesaid
ce and has failed to cure the subject default within the same time period allowed
dlord under the Lease. It is understood that the abatement provisions of this Section
te to abatements by reason of Landlord's default and do not apply to provisions of the
se whereby Tenant has the automatic right to abate rentals such as, for example,
ement upon casualty or condemnation.

6.   Neither the Mortgage nor any other security instrument executed in
ıection therewith shall encumber or be construed as subjecting in any manner to the
thereof, any trade fixtures, signs or other personal property at any time furnished or
ılled by or for Tenant or its subtenants or licensees on the aforementioned property
ırdless of the manner or mode of attachment thereof.

7.   Any notices of communications given under this Agreement shall be in
ing and shall be given by registered or certified mail, return receipt requested, or by
recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if
Iortgagee, at the address of Mortgagee as hereinabove set forth or at such other
:ess or persons us Mortgagee may designate by notice in the manner herein set forth,
ı) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies
\llan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New
ey 07083, and  Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman &
nard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New
:y 07601, or such other address or persons us Tenant may designate by notice in the
ner herein set forth.  All notices given in accordance with the provisions of this
ion shall be effective upon receipt (or refusal of receipt) at the address of the
·essee.

8.   This Agreement shall bind and inure to the benefit of and be binding upon
enforceable by the parties hereto and their respective successors, assigns, and
essees.

G-3

9.    This Agreement contains the entire agreement between the parties and
ιot be changed, modified, waived or canceled except by an agreement in writing
:uted by the party against whom enforcement of such modification, change, waiver or
:ellation is sought.

10.    This Agreement and the covenants herein contained are intended to run
ι and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this
ordination, Non-Disturbance and Attornment Agreement as of the day and year first
ve written.

## MORTGAGEE:

ΓEST:                                    _____

                                         By:_____
ne:_____          Name:_____
e:  (Assistant) Secretary                Title:   (Vice) President

:AL]

## TENANT:

TEST:                                    BED BATH & BEYOND INC., a New
                                         York corporation

                                    .
:_____          By:_____
me:_____          Name:  Warren Eisenberg
le:  (Assistant) Secretary               Title:   Co-Chief Executive Officer

:AL]

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

ATE OF NEW JERSEY )
                ) : ss.
UNTY OF UNION    )

On this ___ day of _____, 200__, before me personally came Warren
:nberg to me known, who being by me duly sworn, did depose and say that he is the
Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and
ch executed the above instrument and that he signed his name thereto by order of the
ird of Directors of said corporation.

_____
Notary Public

Commission Expires:

_____

Exhibit H

Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____,
)__, by and between _____, a [_____] [corporation]
nited] [general] [partnership], having an address at
_____ ("*Landlord*"); Bed Bath & Beyond [of
_____] Inc., a [_____] corporation, having an address at 650
erty Avenue, Union, New Jersey 07083 ("*Tenant*"); and
_____, a [_____] [corporation] [limited]
neral] [partnership], having an address at
_____ ("*Subtenant*").

# R E C I T A L S:

A.     Landlord and Tenant have entered into a certain lease (the "*Lease*") dated
of _____, 200__, a short form of which has been recorded in
_____, which demises certain premises (the "*Premises*") located in the
_____ Shopping Center, Sherman, Texas, which Shopping Center is more
ticularly described on Exhibit A annexed hereto and made a part hereof.

B.     Section 15.5 of the Lease provides that in the event Tenant subleases all or
ortion of the Premises for a term of at least five (5) years, Landlord shall, upon
nant's request, execute and deliver a Recognition Agreement among Landlord, Tenant
i each such subtenant in the form attached to the Lease, in recordable form.

C.     Pursuant to a Sublease dated as of _____ (the "*Sublease*"),
nant has subleased [a portion of] the Premises to Subtenant (the "*Subleased
emises*").

D.     The parties hereto desire to effectuate the provisions of Section 15.5 of the
ase with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements
rein contained, the parties hereto, intending to be legally bound hereby, agree as
llows:

1.     Landlord warrants and represents as follows:

(a)     that it is the fee owner of the Premises,

(b)     that the Lease is unmodified (except as may be otherwise set forth in
thibit B annexed hereto, if any) and is in full force and effect,

(c)     that the term of the Lease expires on _____, but is subject
five renewal periods of five years each and

(d)     that Tenant is not in default under the Lease nor has any event
:curred which would after notice to Tenant and the passage of time become a default of
:nant under the Lease.

2.     Landlord hereby acknowledges receipt of a copy of, and consents to and
)proves, the Sublease and all of the terms, covenants and provisions thereof, and agrees
at the exercise by Subtenant of any of its rights, remedies and options contained therein
iall not constitute a default under the Lease.

3.     Landlord agrees that whenever it has an obligation with respect to the
remises, or its consent or approval is required for any action of Tenant under the Lease,
ien, to the extent such obligation, consent or approval relates to the Subleased Premises

641/0443-1234250v7

:btenant's use and occupation thereof, it will perform such obligation in accordance
the terms and conditions of the Lease.

4. Landlord shall not, in the exercise of any of the rights arising or which may
: out of the Lease or of any instrument modifying or amending the same or entered
in substitution or replacement thereof (whether as a result of Tenant's default or
rwise), disturb or deprive Subtenant in or of its possession or its rights to possession
ie Subleased Premises or of any right or privilege granted to or inuring to the benefit
ubtenant under the Sublease, provided that Subtenant is not in default under the
lease beyond the expiration of any applicable notice and cure period.

5. In the event of the termination of the Lease by reentry, notice, conditional
tation, surrender, summary proceeding or other action or proceeding, or otherwise, or,
c Lease shall terminate or expire for any reason before any of the dates provided in
Sublease for the termination of the initial or renewal terms of the Sublease and if
iediately prior to such surrender, termination or expiration the Sublease shall be in
force and effect and Subtenant pays to Landlord the Rent (as defined in the Lease)
etofore accrued and unpaid by Tenant, Subtenant shall not be made a party in any
oval or eviction action or proceeding nor shall Subtenant be evicted or removed of its
:ession or its right of possession of the Subleased Premises be disturbed or in any way
rfered with, and the right of Subtenant to occupy the Subleased Premises shall be
iect to the terms and provisions of the Lease pursuant to the Sublease.

6. Landlord hereby waives and relinquishes any and all rights or remedies
inst Subtenant, pursuant to any lien, statutory or otherwise, that it may have against
property, goods or chattels of Subtenant in or on the Subleased Premises.

7. Any notices, consents, approvals, submissions, demands or other
imunications (hereinafter collectively referred to as "*Notice*") given under this
cement shall be in writing. Unless otherwise required by law or governmental
:lation, Notices shall be deemed given if sent by registered or certified mail, return
:ipt requested, or by any recognized overnight mail carrier, with proof of delivery slip,
tage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or
h other address or persons as Landlord may designate by Notice to the other parties
:to, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate
:ics to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue,
ion, New Jersey 07083, and Edward M. Schotz, Esq., Cole, Schotz, Meisel, Forman &
mard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or
h other address or persons as Tenant may designate by Notice to the other parties
:to, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such
er address or persons as Subtenant may designate by Notice to the other parties hereto.
ring the period of any postal strike or other interference with the mails, personal
ivery shall be substitute for registered or certified mail. All Notices shall become
:ctive only on the receipt or rejection of same by the proper parties.

8. No modification, amendment, waiver or release of any provision of this
reement or of any right, obligation, claim or cause of action arising hereunder shall be
id or binding for any purpose whatsoever unless in writing and duly executed by the
ty against whom the same is sought to be asserted.

[Signature Page Follows]

9.     This Agreement shall be binding on and shall inure to the benefit of the
ies hereto and their respective heirs, legal representatives, successors, assigns and
essees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to
xecuted under seal the date first above written.

**LANDLORD:**

A – S 60 HWY 75 - LOY LAKE, L.P., a
Texas limited partnership

By:   A – S 60, L.C., a Texas limited
      liability company, general partner

      By:_____
      Name:_____
      Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chief Executive Officer

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]

\TE OF NEW JERSEY )
          ,    ) : ss.
UNTY OF UNION     )

    On this ___ day of _____, 200__, before me personally came Warren
:nberg to me known, who being by me duly sworn, did depose and say that he is the
Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and
ch executed the above instrument and that he signed his name thereto by order of the
ird of Directors of said corporation.

                                    _____

                                    Notary Public

Commission Expires:

_____

Exhibit I

Delivery Date Notice

[Letterhead of Landlord]

_____, 200__

ı Federal Express or other
ɔgnized overnight delivery
ʹice per Article 18 of the foregoing
ıe]

l Bath & Beyond Inc.
ł Liberty Avenue
ion, NJ 07083
n: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 200__ (the *"Lease"*),
between A – S 60 Hwy 75 – Loy Lake, L.P., as landlord
(*"Landlord"*), and Bed Bath & Beyond Inc., as tenant (*"Tenant"*),
with respect to certain retail premises (the *"Premises"*) located in the
Sherman Town Center Shopping Center, Sherman, Texas.

ntlemen:

In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
ʹeby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 200__. This notice shall constitute the Delivery Date Notice referred to
Subsection 2.3.2 of the Lease.

A – S 60 HWY 75 - LOY LAKE, L.P., a
Texas limited partnership

By:   A – S 60, L.C., a Texas limited
liability company, general partner

By:_____
Name:_____
Title:_____

cc:    Edward M. Schotz, Esq.
Allan N. Rauch, Esq.

I-1

Exhibit J

Delivery Date Certification

[Letterhead of Landlord]

_____, 200__

a Federal Express or other
ognized overnight delivery
vice per Article 18 of the foregoing
se]

d Bath & Beyond Inc.
) Liberty Avenue
ion, NJ 07083
m: Warren Eisenberg

Re: Agreement of Lease, dated _____, 200__ (the "*Lease*"),
between A – S 60 Hwy 75 – Loy Lake, L.P., as landlord
("*Landlord*"), and Bed Bath & Beyond Inc., as tenant ("*Tenant*"),
with respect to certain retail premises (the "*Premises*") located in the
Sherman Town Center Shopping Center, Sherman, Texas.

ntlemen:

In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
:eby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
nditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
.te (as such term is defined in the Lease) will be deemed to be _____, 200__ .
is notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
the Lease.

A – S 60 HWY 75 - LOY LAKE, L.P., a
Texas limited partnership

By: A – S 60, L.C., a Texas limited
liability company, general partner

By:_____
Name:_____
Title:_____

cc: Edward M. Schotz, Esq.
Allan N. Rauch, Esq.

41/0443-1284250v7

## EXHIBIT "K-1"

### EXISTING EXCLUSIVE USES

inomark.

As partial consideration for the execution of this Lease by Tenant, Landlord jrees that it and/or any entity of which Landlord or any principal of Landlord Is a irt shall not lease or sell any space in the Shopping Center, including out-parcels, ids, or future phases or additions to the Shopping Center to any other entity (other an Tenant) for the operation of a motion picture theatre. Landlord and Tenant jree that this clause is given as an inducement to Tenant to enter into this Lease, id Is not in any way to be construed as an attempt to restrain the free trade of other nants or occupants of the Shopping Center, but merely designed to provide the est mixture of tenants at the Shopping Center. Landlord further agrees not to lease sell any space in the Shopping Center, including out-parcels, pads or future iases or additions to the Shopping Center to any entity for the purpose of operating bowling alley, bingo parlor, bar or lounge (except in conjunction with a restaurant hich derives at least 50% of its gross revenues from the sale of food), liquor store, ia market, "bulk" candy store, popcorn vendor, pool hall, massage parlor, skating ik, arcade (other than an arcade of less than 1,000 square feet which Is located ithin a restaurant, and except for a Chuck E. Cheese's or Pied Piper type slaurant which is at least 300 feet from the Theatre), or adult (i.e. pomographic) iok store; and Landlord shall not lease or sell any space in the Shopping Center ithin 500 feet of the Demised Premises for any post office or video rental or tape iles.    The foregoing use restrictions shall not be effective If Tenant shall scontinue operations in the Demised Premises as a movie theatre for a period in iccess of 180 days and such cessation of operations is not due to renovations and pairs, fire or other casualty, or inability to operate due to delays set forth in Article XXIX hereof.

huck E Cheese's.

Throughout the Term of the Lease, Landlord shall not use, sell or lease for o primary use, permit any tenant or occupant of the Developer Tract to use any irt of the Developer Tract for the primary use of:  (i) a CiCi's Pizza or the like, (ii) an cade or game room (including, without limitation, video games) exceeding 200 iuare feet of Floor Area; (iii) a business primarily providing physical play activities r children (including, but not limited to, Jeepers, Club Disney, Leaps and Bounds, eter Piper, Pistol Pete's or similar concept); or (iv) the use of kiddie rides within an ea greater than 500 square feet of Floor Area.  Notwithstanding the foregoing, iwever, the restrictions set forth hereunder shall not apply to (a) buildings within e Shopping Center conlaining 50,000 or more square feet of Floor Area, (b) any nant whose lease was fully executed on the Effective Date hereof, and (c) the ome Depot Tract, the Target Tract or the applicable portions of the Developer Tract icupied by Ross Stores Texas, L.P. (and/or any of its affiliates or permitted isigns, "Ross") and Belk, Inc. (and/or any of its affiliates or permitted assigns, lelk"), respectively, as shown on the Site Plan.

etco.

During the term of the Lease, Tenant shall have the exclusive right to sell pet od; pet supplies; fish, birds and other small live animals; reptiles; pet grooming irvices; pet training services; and veterinary services within the Developer Tract ie "Exclusive Use"). This covenant shall run with the land on which the Developer act is located during the term of the Lease, but only for so long as the Premises e used as a pet food and supply store and provided that Tenant has not ceased isiness operations within the Premises and elected to Go Dark (as defined In the iase). Notwithstanding anything to the contrary contained in this paragraph, iwever, such Exclusive Use rights shall not cover and shall not apply to the Home epot Tract, the Target Tract, the applicable portion of the Developer Tract occupied

Ross Stores Texas, L.P. (or any of its affiliates or permitted assigns, "Ross") and
a applicable portion of the Developer Tract occupied by Belk, Inc. (or any of its
iliates or permitted assigns, "Belk"). Subject to the provisions of this paragraph,
indlord agrees not to sell to, lease to, nor approve any sublease or assignment of
ase, or change in use, unless prevented by the terms of any lease then currently in
ce and effect, for any tenant, sub-tenant, assignee or user of any space located
thin the Developer Tract (except as otherwise provided above), who or which
uld violate the foregoing Exclusive Use, except for the incidental sales of such
ms or services. Incidental Sales shall mean the sale or display of such items or
rvices not as the primary use of the competing tenant and taking up no more than
0 square feet of the Floor Area (as defined in Section 1.7 of the OEA) and not
ceeding ten (10%) percent of the competing tenant's total sales.

**er 1 Imports:**

long as Pier 1 is open for business in the Shopping Center, Landlord shall not
ase space in the Shopping Center for the primary use or purpose of selling or
splaying for sale wicker or rattan furniture or decorative household furnishings that
of an imported nature and is intended to be used in sunrooms, living, dining and
chen areas and on patios, or housewares imported from the Far East or Europe
istomarily sold in Pier 1's retail stores unless such use is incidental to such
isiness. As used herein, incidental sales shall not exceed ten percent (10%) of the
or area for such business.          [The foregoing restrictions are subject to that
rtain agreement dated September 17, 2003 between Pier 1 Imports (U.S.),
c. and Bed Bath & Beyond Inc., a copy of which is attached to this Lease as
chibit M.]

**Existing Leases**

**Exhibit K-2**

lk.

ound Lease dated as of June 9, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as landlord, and
lk, Inc., as tenant.

nemark.

ase dated as of February 12, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as landlord, and
nemark USA, Inc., as tenant.

uck E Cheese.

ase Agreement dated as of July 16, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as landlord,
d CEC Entertainment, Inc., as tenant.

ess Barn.

ase Agreement dated as of September ___, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as
idlord, and Dress Barn, Inc., as tenant.

e Mart Express.

ase Agreement dated as of August 5, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as
idlord, and Eyemart Express, Ltd., as tenant.

mous Footwear.

ase Agreement dated as of September ___, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as
idlord, and Brown Group Retail, Inc., as tenant.

ıbby Lobby.

ase Agreement dated as of September 12, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as
idlord, and Hob-Lob Limited Partnership, as tenant.

ıgan's Roadhouse.

ound Lease dated as of September ___, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as
idlord, and Logan's Roadhouse, Inc., as tenant.

attress Giant.

ase Agreement dated as of September _____, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P.,
landlord, and Mattress Giant I Limited Partnership, as tenant.

ayless Shoes.

ase Agreement dated as of September _____, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P.,
landlord, and PayLess ShoeSource, Inc., as tenant.

ıtco.

etco Lease dated as of August 7, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as landlord, and
etco Southwest, L.P., as tenant.

er One.

ase Agreement dated as of September 23, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as
ıdlord, and Pier 1 Imports (U.S.), Inc., as tenant.

oss Dress for Less.

ase dated as of September _____, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as landlord,
ıd Ross Stores Texas, L.P., as tenant.

endy's.

round Lease dated as of August 13, 2003, by and between A-S 60 Hwy 75-Loy Lake, L.P., as lessor,
ıd Wendy's International, Inc., as lessee.

## Exhibit L

### Prohibited Uses

used in this Lease, the term *"Prohibited Uses"* shall mean as to the Shopping Center
l the Contiguous Land, (i) any of the uses prohibited or restricted (but only to the
ent so restricted), as of the Effective Date, by the OEA; and (ii) any of the following
:s:

(1)     Any use which emits or results in strong, unusual or offensive fumes, dust
vapors, is a public or private nuisance, creates a hazardous condition, or is used, in
ole or in part, as or for warehousing;

(2)     Any fictitious going-out-of-business sale, lost-our-lease sale or similarly
vertised event;

(3)     Any central laundry, dry cleaning plant, or laundromat within a 250-foot
lius of the Premises; provided, however, that any such use in the Shopping Center
ill, if it performs dry cleaning on-site, utilize a "green earth" type dry-cleaning plant
iich does not utilize perchloroethane in its processing;

(4)     Any boat sales, leasing or display;

(5)     Any live performance theater, auditorium, meeting hall, sporting event, or
ier entertainment use or movie theater (except that a theater may be located in the
ermitted Theater Area" designated on Exhibit B);

(6)     Any catering or banquet hall;

(7)     Any night club or discotheque;

(8)     Any pawn shop, gun shop, or tattoo parlor;

(9)     Any church or other place of religious worship;

(10)     Any automobile repair shop, or any business servicing motor vehicles in
.y respect, including, without limitation, any quick lube oil change service, tire center or
soline or service station or facility; except that one (1) quick lube oil change service
ieration may he located on the Outparcels labeled "Pad 1" or "Pad 2" on Exhibit B;

(11)     Any carnival, amusement park or circus;

(12)     Any medical clinics or medical offices within a 250-foot radius of the
:emises;

(13)     Any office use, other than: (x) office space used in connection with and
icillary to a permitted retail use hereunder; and (y) retail offices providing services
>mmonly found in similar first-class shopping centers in the State of Texas (for
:ample, financial services, real estate brokerage, insurance agency, banking, travel
jency), provided that such uses are located at least 150 feet away from the Premises;

(14)     daycare center within a 150-foot radius of the Premises;

(15)     veterinary office, except as may be incidental to a full-line pet and pet
ipply store operating in at least 15,000 square feet of Floor Area and located at least 200
:et away from the Premises (except that a full-line pet and pet supply store shall be
:rmitted to be located within the Premises); such occupant shall use reasonable efforts
i prevent its customers from allowing their pets to urinate or defecate in the Common
.reas and will promptly remove any "dog dirt" from the Common Areas;

L-1

(16)    children's entertainment or activity facility (such as "Discovery Zone", or 1uck E. Cheese's") other than on the Outparcel labeled "Pad 9" on Exhibit B;

(17)    karate center within a 150-foot radius of the Premises;

(18)    restaurant serving meals for on- or off-premises consumption within a 250-t radius of the Premises;

(19)    beauty parlor or nail salon within a 150-foot radius of the Premises; or

(20)    health spa, exercise facility or similar type business within a 300-foot ius of the Premises.

Exhibit M

Pier One Agreement



Beyond any store of its kind.

rate Office
certy Avenue
NJ 07053
58-0888                                                September 17, 2003

ck Blackwelder
resident of Real Estate
Imports (U.S.), Inc.
immerce Street, Suite 600
'orth, Texas  76161-0020

Sherman Town Center, Sherman, Texas  (the "*Shopping Center*")

Ar. Blackwelder:

Pier 1 Imports (U.S.), Inc. ("*Pier 1*") and Bed Bath & Beyond Inc. ("*BBB*") are each either negotiating or
xecuted a lease (the "*BBB Lease*" and the "*Pier 1 Lease*", respectively) for retail premises in the Shopping
(the "BBB Premises" and the "Pier 1 Premises", respectively).  Notwithstanding the "exclusive use"
ions contained or to be contained in the BBB Lease and the Pier 1 Lease (the "*BBB Exclusive*" and the "*Pier
lusive*", respectively, copies of which are attached hereto as Exhibit A), BBB and Pier 1 hereby agree as
's:

1.      Notwithstanding the BBB Exclusive, BBB hereby consents to the operation of a Pier 1 store in the
Premises (as same typically operates), subject to and conditioned upon the following terms:

Pier 1 shall have the right to utilize any portion of the Floor Area of the Pier 1 Premises
for the sale, rental or distribution of the Exclusive Items, provided, that at all times: (a) the Pier 1
Lease remains in full force and effect, (b) Pier 1 shall not have assigned its interest in the Pier 1
Lease or sublet more than fifty percent (50%) of the Pier 1 Premises to an assignee or subtenant
which does not utilize the pier 1 Premises as a retail store primarily selling those items typically
found in a Pier 1 store, (c) the Floor Area of the Pier 1 Premises does not exceed ten thousand
(10,000) square feet, and (d) in no event shall Pier 1 be permitted to utilize a Floor Area in excess
of one thousand (1,000) square feet of the selling area of its premises (including an allocable
portion of the aisle space adjacent to such selling space) for the sale, rental or distribution of
towels, shower curtains, bath mats and other items intended primarily for use in a bathroom, and
linens and domestics (which term "linens and domestics", for purposes of this letter agreement
only, shall be deemed to include only those linens and domestics which are primarily used on or
primarily associated with a bed).

2.      Notwithstanding the Pier 1 Exclusive, Pier 1 hereby approves the operation in the BBB Premises of
1 Bath & Beyond store by BBB and its affiliates, and/or its assignees and sublessees (provided that such
lees and/or sublessees operate in the premises primarily as a store selling a mix of merchandise substantially
ir to the mix of merchandise commonly sold in a bed Bath & Beyond stores [such as, for purposes of
ation only, those stores currently operated as Linens N' Things]).

dS LXCUJ5 v1;Pier 1 Sherman, TX.doc

441/0443-1284250v9                                      M-1

. Imports (U.S.), Inc.
man, TX)
mber 17, 2003
2

3.      It shall be a condition precedent to the agreements herein set forth that BBB and Pier 1 each shall
entered into the BBB Lease and the Pier 1 Lease, respectively, within one year after the date hereof; upon the
action of such condition precedent, the provisions of this agreement shall continue in force for so long as the
Lease and the Pier 1 Lease (and any renewals, extensions or replacements thereof) remain in full force and

4.      Landlord may rely on the terms herein contained, subject to the restrictions herein contained.

Please sign both of the enclosed counterparts of this letter agreement and return to the undersigned one
executed counterpart of this letter agreement to confirm your acceptance of and agreement to the foregoing.
< you for your time and cooperation.

Very truly yours,

BED BATH & BEYOND, INC.

By: _____

Seth Geldzahler
Vice President - Real Estate

EPTED AND AGREED TO THIS
_ day of September, 2003:

I IMPORTS (U.S.), INC.,
aware corporation

_____
Richard T. Blackwelder
Sr. Vice President - Real Estate

. Imports (U.S.), Inc.
man, TX)
:mber 17, 2003
3

## Exhibit A

Exclusive: Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on
:elated Land to be occupied (except to the extent otherwise permitted under any lease for space in the
ping Center or the Related Land existing as of the Effective Date or existing prior to the acquisition of the
:d Land by Landlord or its Affiliate), whether by a tenant, sublessee, assignee, licensee or other occupant or
for the sale, rental or distribution, either singly or in any combination, of items contained in any of the
:ing respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing
:are); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art
ided that a fine art gallery shall not be precluded); (e) window treatments: and/or (f) closet, shelving and
;e items (which items, either singly or in any combination, are hereinafter referred to as the "Exclusive
"). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall
the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an
gate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or
pution area) not to exceed the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's
ses, or (y) one thousand five hundred (1,500) square feet of Floor Area within such tenant's or subtenant's
ses. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of
Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its
demised premises in which any and all Exclusive Items are sold shall not exceed five hundred (500) square
The foregoing restrictions shall not apply to any national or regional tenant of the Shopping Center
iying in excess of seventy thousand (70,000) square feet of Floor Area with the Shopping Center. The
sive rights granted to Tenant herein shall inure to the benefit of any assignee of Tenant's interest in this Lease
) any sublessee of at least seventy percent (70%) of the Floor Area of the Premises.

Exclusive Use: So long as Pier 1 is open for business in the Shopping Center, Landlord shall not lease space
Shopping Center for the primary use or purpose of selling or displaying for sale wicker or rattan furniture or
ative household furnishings that is of an imported nature and is intended to be used in sunrooms, living,
; and kitchen areas and on patios, or housewares imported from the Far East or Europe customarily sold in
's retail stores unless such use is incidental to such business. As used herein, incidental sales shall not exceed
:rcent (10%) of the floor area for such business. Notwithstanding the above, this paragraph does not apply to
t leases executed prior to the execution of the Pier 1 lease.

400|44531|T|200401|LF|Bed. Bath+Beyond|10 2-03