EXHIBIT A

LEASE AGREEMENT PART 1

**LEASE AGREEMENT**

**Between**

**NC FAYETTEVILLE SKIBO, LLC,**
a North Carolina limited liability company

**Landlord**

**and**

**BED BATH & BEYOND INC.,**
**a New York corporation,**

**d/b/a BUY BUY BABY**

**Tenant**

**FREEDOM TOWN CENTER**
**at the corner of Skibo Road and Cliffdale Road**
**Fayetteville, NC**

Dated as of: October $\underline{31}$ , 2016

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

**TABLE OF CONTENTS**

Page

ARTICLE 1          BASIC TERMS AND DEFINITIONS ............................................. 1
  Section 1.1      Basic Terms and Definitions ...................................................... 1

ARTICLE 2          LEASE OF PREMISES; LEASE TERM; DELIVERY DATE .......... 5
  Section 2.1      Lease of Premises....................................................................... 5
  Section 2.2      Term ........................................................................................... 6
  Section 2.3      Delivery Date ............................................................................ 6
  Section 2.4      Unseasonable Delivery: Slack Period ........................................ 9
  Section 2.5      Initial Co-Tenancy Condition .................................................... 9
  Section 2.6      Intentionally Omitted ............................................................... 10

ARTICLE 3          IMPROVEMENTS ..................................................................... 10
  Section 3.1      Landlord's Work and Tenant's Work ....................................... 10
  Section 3.2      Plan Approvals ......................................................................... 10
  Section 3.3      Performance of Work................................................................ 13
  Section 3.4      Measurement; Adjustment of Rent .......................................... 15

ARTICLE 4          FIXED RENT, TAXES & PERCENTAGE RENT:
                   DETERMINATION AND PAYMENT....................................... 16
  Section 4.1      Fixed Rent ............................................................................... 16
  Section 4.2      Payment of Rent....................................................................... 16
  Section 4.3      Real Estate and Other Taxes .................................................... 16
  Section 4.4      Percentage Rent........................................................................ 17

ARTICLE 5          COMMON AREAS, THEIR USE AND CHARGES..................... 20
  Section 5.1      Common Areas: Maintenance.................................................... 20
  Section 5.2      Common Areas: Restrictions .................................................... 23

ARTICLE 6          UTILITIES ................................................................................ 26
  Section 6.1      Utility Service ......................................................................... 26
  Section 6.2      Interruption.............................................................................. 26

ARTICLE 7          SIGNS ...................................................................................... 27
  Section 7.1      Tenant's Building Signage....................................................... 27
  Section 7.2      Pylon/Monument Signage........................................................ 27
  Section 7.3      Signage: Alteration/Removal/Allocation ................................. 27
  Section 7.4      Cooperation .............................................................................. 27
  Section 7.5      Signage and Building  Restrictions and Criteria....................... 28

ARTICLE 8          ALTERATIONS AND IMPROVEMENTS ................................. 28
  Section 8.1      Alterations and Improvements ................................................. 28

ARTICLE 9          REPAIRS .................................................................................. 30
  Section 9.1      Tenant's Repairs....................................................................... 30
  Section 9.2      Landlord's Repairs................................................................... 30
  Section 9.3      Legal Compliance Work .......................................................... 32

ARTICLE 10         INDEMNIFICATION, INSURANCE AND WAIVER OF
                   SUBROGATION ....................................................................... 32
  Section 10.1     Mutual Release, Waiver of Subrogation and Mutual Indemnification 32
  Section 10.2     Tenant's Insurance ................................................................... 33
  Section 10.3     Landlord's Insurance................................................................ 33
  Section 10.4     General Insurance Requirements .............................................. 34

ARTICLE 11         FIRE AND OTHER CASUALTY; EMINENT DOMAIN .............. 34

Section 11.1    Fire and Other Casualty ................................................. 34
Section 11.2    Eminent Domain ........................................................... 36
Section 11.3    Abatement of Rent Charges ........................................... 38

ARTICLE 12    COVENANTS, REPRESENTATIONS AND WARRANTIES ...... 38
Section 12.1    Quiet Enjoyment .......................................................... 38
Section 12.2    Authority ...................................................................... 38
Section 12.3    Landlord's Covenants, Warranties and Representations ................. 38
Section 12.4    Environmental Matters .................................................. 40
Section 12.5    OEA ............................................................................. 42
Section 12.6    Purchase and Sale Contract ........................................... 43

ARTICLE 13    USES AND RESTRICTIONS ....................................... 44
Section 13.1    Permitted and Prohibited Uses ...................................... 44
Section 13.2    Tenant's Exclusive in Center ......................................... 45
Section 13.3    Exclusives Which Tenant Must Honor ............................ 47

ARTICLE 14    CONDUCT OF BUSINESS OPERATIONS........................ 47

ARTICLE 15    TENANT ASSIGNMENT AND SUBLETTING................... 48
Section 15.1    Assignment and Subletting ........................................... 48
Section 15.2    Liability of Tenant........................................................ 49
Section 15.3    Collateral Assignment................................................... 49
Section 15.4    Cure Rights of Original Tenant....................................... 49
Section 15.5    Recognition Agreement ................................................. 50

ARTICLE 16    DEFAULT AND DISPUTE RESOLUTION ..................... 50
Section 16.1    Tenant Default.............................................................. 50
Section 16.2    Landlord Default .......................................................... 51
Section 16.3    Arbitration ................................................................... 52

ARTICLE 17    RIGHT TO MORTGAGE AND NON-DISTURBANCE;
                ESTOPPEL CERTIFICATE ............................................ 52
Section 17.1    Right to Mortgage and Non-Disturbance.......................... 52
Section 17.2    Estoppel Certificate ...................................................... 52
Section 17.3    Existing Mortgages and Ground Leases ........................... 53

ARTICLE 18    NOTICE ..................................................................... 54

ARTICLE 19    TENANT'S PROPERTY ............................................... 54

ARTICLE 20    END OF TERM ........................................................... 54
Section 20.1    Surrender of Premises ................................................... 54
Section 20.2    Hold Over..................................................................... 54

ARTICLE 21    TENANT'S RIGHT OF FIRST OFFER............................ 55

ARTICLE 22    ONGOING CO-TENANCY ........................................... 55

ARTICLE 23    MISCELLANEOUS...................................................... 55
Section 23.1    Loading Facilities......................................................... 55
Section 23.2    Liens ............................................................................ 55
Section 23.3    Broker's Commission .................................................... 56
Section 23.4    *Force Majeure* ........................................................... 56
Section 23.5    Consents ...................................................................... 57
Section 23.6    Costs ............................................................................ 57
Section 23.7    Attorneys' Fees ............................................................ 57
Section 23.8    Survival of Obligations ................................................. 57
Section 23.9    Non-Waiver.................................................................. 57

Section 23.10    Rights Cumulative.................................................................. 57
Section 23.11    Definition of Landlord ............................................................ 57
Section 23.12    Successors and Assigns............................................................ 58
Section 23.13    Limitation of Landlord's Liability ........................................... 58
Section 23.14    Limitation of Tenant's Liability ............................................... 58
Section 23.15    Joint and Several Liability ....................................................... 58
Section 23.16    Severability ............................................................................. 58
Section 23.17    Grammatical Usages and Construction.................................... 58
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings ......... 58
Section 23.19    Definition of Hereunder, Herein, etc....................................... 58
Section 23.20    Short Form Lease .................................................................... 58
Section 23.21    Entire Agreement and Modification ........................................ 59
Section 23.22    No Joint Venture or Partnership Created by Lease................... 59
Section 23.23    Tenant's Tradename................................................................. 59
Section 23.24    Counterparts ........................................................................... 59
Section 23.25    Waiver of Trial by Jury ........................................................... 59
Section 23.26    Timely Billing of Charges....................................................... 59
Section 23.27    Ethical Conduct Policy............................................................ 59
Section 23.28    Confidentiality........................................................................ 59
Section 23.29    Governing Law........................................................................ 61

## EXHIBITS

Exhibit A          Legal Description of Greater Shopping Center
Exhibit A-1        Legal Description of Shopping Center
Exhibit B          Site Plan
Exhibit C          Form of Rent Commencement and Expiration Date Agreement
Exhibit D          Specifications for Landlord's Work
Exhibit D-1        Exterior Elevations of the Premises, and Sidewalk Plan
Exhibit D-2        Exterior Elevations of the Shopping Center
Exhibit E          Permitted Encumbrances
Exhibit F          Signage
Exhibit G          Form of Subordination, Non-Disturbance and Attornment
                   Agreement
Exhibit H          Form of Subtenant Recognition Agreement
Exhibit I          Form of Delivery Date Notice
Exhibit J          Form of Delivery Date Certification
Exhibit K-1        Existing Exclusives
Exhibit K-2        Existing Leases
Exhibit L          Intentionally Omitted
Exhibit M          Prohibited Uses
Exhibit N          Form of OEA

1       **LEASE AGREEMENT**

2       THIS LEASE AGREEMENT (*"Lease"*) is entered into as of October $3\underline{1}$, 2016
3   by and between NC FAYETTEVILLE SKIBO, LLC, a North Carolina limited liability
4   company, having an office at 550 South Main Street, Suite 300, Greenville, South
5   Carolina 29601 (*"Landlord"*), and BED BATH & BEYOND INC., a New York
6   corporation, d/b/a Buy Buy Baby, having an office at 650 Liberty Avenue, Union, New
7   Jersey 07083 (*"Tenant"*).

8       **W I T N E S S E T H:**

9       ARTICLE 1
10      BASIC TERMS AND DEFINITIONS

11      Section 1.1    Basic Terms and Definitions.  The following terms shall have the
12  meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

13      1.1.1    Additional Rent:  Any monies which Tenant is required to pay to
14  Landlord under the terms and conditions of this Lease, other than Fixed Rent.

15      1.1.2    Affiliate:  A corporation, partnership, limited liability company,
16  person or other entity which is controlling, controlled by, or under common control with,
17  Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the
18  possession, direct or indirect, of the power to direct or cause the direction of the
19  management and policies of a person or entity, whether through the ownership of voting
20  securities or rights, by contract, or otherwise.

21      1.1.3    Alternate Rent:  Payment of Percentage Rent (except that for
22  purposes of this paragraph, the Sales Break Point shall be deemed to be One ($1.00)
23  Dollar), not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise
24  would have been payable during such period (the *"Cap"*).  Alternate Rent shall be
25  payable within thirty (30) days after the end of the calendar month to which it pertains,
26  and shall be payable in lieu of Fixed Rent and Percentage Rent normally payable under
27  Article 4 below.  If the Alternate Rent for a calendar month does not exceed the Cap,
28  such payment shall be accompanied by a statement prepared by an officer of Tenant
29  setting forth the amount of "Gross Sales" (hereinafter defined in Subsection 4.4.2)
30  achieved during, and the amount of Alternate Rent payable for, such month.
31  Notwithstanding anything in this Lease to the contrary, the payment of Alternate Rent by
32  Tenant when permitted under the terms of this Lease (in lieu of the payment of Fixed
33  Rent and Percentage Rent), shall not alleviate Tenant's obligation to pay Additional Rent.

34      1.1.4    Common Areas:  All areas in the Greater Shopping Center which
35  are, from time to time, available for the joint use and benefit of Tenant and other tenants
36  and occupants of the Greater Shopping Center, and their respective employees, agents,
37  subtenants, concessionaires, licensees, customers and other invitees, including, but not
38  limited to, any and all parking areas, parking spaces, driveways, truck serviceways,
39  passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas,
40  retention or detention areas, and utility lines serving such common areas and facilities.

41      1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

42      1.1.6    Delivery Date:  As defined in Section 2.3 hereof.

43      1.1.7    Effective Date:  The date hereof.

44      1.1.8    Event of Default:  As defined in Section 16.1 hereof.

45      1.1.9    Excused Periods:  Periods during which Tenant's failure to conduct
46  the operations of its business or any other business: (x) resulted from alterations or
47  renovations being performed in and to the Premises, (y) was caused by damage or
48  destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused
49  by any act or omission of Landlord, or its employees, agents, or contractors.

1              1.1.10 Exhibits.  The exhibits listed in the Table of Contents annexed to this
2 Lease have been agreed to by the parties and attached hereto, it being the intention of the
3 parties that they shall become a binding part of this Lease as if fully set forth herein.

4              1.1.11 Fixed Rent:  The following amounts for the periods indicated
5 (subject to adjustment pursuant to Section 3.4 hereof):

6              (a)    For the period commencing on the Rent Commencement Date
7 and ending on the first January 31 occurring after the fifth (5th) anniversary of the Rent
8 Commencement Date, at the rate of One Hundred Sixty-Four Thousand Six Hundred
9 Forty-Six and 00/100 Dollars ($164,646.00) per year based on Nine and 00/100 Dollars
10 ($9.00) per square foot of Floor Area in the Premises;

11              (b)    For the period commencing on the first February 1 occurring
12 after the fifth (5th) anniversary of the Rent Commencement Date and ending on the last
13 day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of One
14 Hundred Eighty-One Thousand One Hundred Ten and 60/100 Dollars ($181,110.60) per
15 year based on Nine and 90/100 Dollars ($9.90) per square foot of Floor Area in the
16 Premises;

17              (c)    In the event Tenant exercises the first Renewal Option,  for
18 the first five (5) year Renewal Period, at the rate of One Hundred Ninety-Nine Thousand
19 Two Hundred Twenty-One and 66/100 Dollars ($199,221.66) per year based on Ten and
20 89/100 Dollars ($10.89) per square foot of Floor Area in the Premises;

21              (d)    In the event Tenant exercises the second Renewal Option, for
22 the second five (5) year Renewal Period, at the rate of Two Hundred Nineteen Thousand
23 One Hundred Sixty-Two and 12/100 Dollars ($219,162.12) per year based on Eleven and
24 98/100 Dollars ($11.98) per square foot of Floor Area in the Premises; and

25              (e)    In the event Tenant exercises the third Renewal Option, for
26 the third five (5) year Renewal Period, at the rate of Two Hundred Forty-One Thousand
27 One Hundred Fourteen and 92/100 Dollars ($241,114.92) per year based on Thirteen and
28 18/100 Dollars ($13.18) per square foot of Floor Area in the Premises; and

29              (f)    In the event Tenant exercises the fourth Renewal Option, for
30 the fourth five (5) year Renewal Period, at the rate of Two Hundred Sixty-Five Thousand
31 Two Hundred Sixty-Three and 00/100 Dollars ($265,263.00) per year based on Fourteen
32 and 50/100 Dollars ($14.50) per square foot of Floor Area in the Premises; and

33              (g)    In the event Tenant exercises the fifth Renewal Option, for
34 the fifth five (5) year Renewal Period, at the rate of Two Hundred Ninety-One Thousand
35 Seven Hundred Eighty-Nine and 30/100 Dollars ($291,789.30) per year based on Fifteen
36 and 95/100 Dollars ($15.95) per square foot of Floor Area in the Premises.

37              1.1.12 Floor Area:  The actual number of square feet of space contained on
38 all floors within any building area in the Greater Shopping Center (including the
39 Premises) and, with respect to exterior areas, including all exterior areas leased to or
40 exclusively used by one or more tenants (other than exterior loading dock areas, trash
41 compactor areas, and trash container areas).  All measurements pursuant to this Section
42 shall be from the exterior of outside walls or store front and/or to the centerline of any
43 common walls, but in no event shall Floor Area within either the Premises or the
44 remainder of the Greater Shopping Center include any non-selling or storage space areas
45 within any mezzanine, lower floor, second floor or, except as set forth above, any exterior
46 areas.

47              1.1.13 Force Majeure:  As defined in Section 23.4 hereof.

2

1            1.1.13A. <u>Greater Shopping Center</u>:  The Greater Shopping Center is
2   located at the SE corner of Skibo Road and Cliffdale Road, in Fayetteville, North
3   Carolina and commonly known as Freedom Town Center.  The Greater Shopping Center
4   is comprised of:  (i) the Section I Shopping Center, (ii) the Section II Shopping Center,
5   (iii) the Shopping Center, and (iv) the Road Parcel, as more particularly described on
6   <u>Exhibit A</u> and shown on <u>Exhibit B</u>.  The Greater Shopping Center, when constructed,
7   shall contain approximately three hundred eighty-two (382,000) square feet of Floor
8   Area.  Landlord shall not change the name of the Greater Shopping Center or the
9   Shopping Center without giving at least ninety (90) days prior notice to Tenant, and
10  Landlord shall not include the name of any tenant (other than Tenant) in the name of the
11  Greater Shopping Center or Shopping Center.

13           1.1.14 <u>Ground Lessor</u>: The landlord under any existing or future ground or
14  underlying leases encumbering or affecting all or any part of the Shopping Center.

15           1.1.15 <u>Intentionally Omitted</u>.

16           1.1.16 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

17           1.1.17 <u>Inducement Tenants</u>:  As defined in Subsection 2.3.1 hereof.

18           1.1.18 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

19           1.1.19 <u>Landlord's Mailing Address</u>:  550 South Main Street, Suite 300,
20  Greenville, South Carolina 29601, or such other place and/or to the attention of such
21  other person as Landlord may notify Tenant from time to time by notice given in
22  accordance with the provisions of Article 18 hereof.  If the "Landlord" consists of more
23  than one person, then notices given to the entity listed in Landlord's Mailing Address will
24  be deemed to have been given automatically to all of the parties which constitute
25  Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said
26  entity.

27           1.1.20 <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

28           1.1.21 <u>Lease Interest Rate</u>: The then effective prime rate as published from
29  time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor
30  publication thereto) plus two (2%) percent.

31           1.1.22 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances,
32  judgments, decrees, authorizations, directions and requirements of, and agreements with,
33  all governmental departments, commissions, boards, courts, authorities, agencies,
34  officials and officers, which now or at any time hereafter may be applicable to the
35  Premises, the Greater Shopping Center, or any part(s) thereof, including, without
36  limitation, the Americans with Disabilities Act and federal, state, and local governmental
37  interpretations thereof.

38           1.1.23 <u>Mortgagee</u>:  Any state or federally regulated: bank, savings and loan
39  association, insurance company, pension fund, credit union, real estate investment trust,
40  or other institutional lender, which is not an Affiliate of Landlord, and which holds a
41  mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering
42  the Shopping Center.

43           1.1.24 <u>Intentionally Omitted</u>.

44           1.1.25 <u>Percentage Multiple</u>:  Three (3%) percent.

45           1.1.26 <u>Percentage Rent</u>:  As defined in Section 4.4 hereof.

1          1.1.27 <u>Permitted Use</u>:  The sale (including the incidental rental), at retail of
2  infant, juvenile and children's goods and services, including, but not limited to, a variety
3  (in Tenant's sole discretion as to the mix and proportions) of the following: infant's,
4  juvenile's and children's  furniture, furnishings, beds (including, without limitation,
5  mattresses and bedding), changing tables, gliders and rockers (including coordinating
6  ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats,
7  carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games
8  and toys, bedding accessories, maternity clothing and related items, clothing and
9  accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food
10  or formula for infants, juveniles and children, feeding items, safety items, nursing items,
11  health and beauty care items, food and beverages, drug remedies, diapers, wipes,
12  bathroom and personal care devices and items, indoor or outdoor play and recreational
13  equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's
14  books, pregnancy books, magazines, computer software, audio and video cassettes or
15  tapes, picture frames, portrait studio items and services, party supplies, invitations,
16  greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources,
17  other educational and multi-media children's items, hair cutting services, fitness center
18  development and learning services, and any and all other items sold or services
19  (including, without limitation, the operation of Demonstration Areas, defined below)
20  provided from time to time in any store owned or operated by Tenant or its Affiliate(s)
21  (the aforementioned items are hereinafter collectively referred to as the ***"Permitted***
22  ***Items"***); and for any other lawful retail use not specifically prohibited by the provisions
23  of Subsection 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the
24  Premises for storage and office uses incidental to the Permitted Use.  As used herein,
25  ***"Demonstration Areas"*** shall mean an area or areas located within the Premises, for the
26  purpose of demonstrating to Tenant's customers and invitees various products (including,
27  without limitation, food and cooking products), which Demonstration Areas shall be at all
28  times be operated in full compliance with all Legal Requirements.

29          1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having
30  dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) eighteen thousand
31  two hundred ninety-four  (18,294) square feet of Floor Area, subject to adjustment in
32  accordance with the provisions of Section 3.4 below.  In no event shall any space used for
33  fire pump facilities or electrical switch gear result in any charge to Tenant by way of
34  Fixed Rent or any Additional Rent, nor shall such space be included in the determination
35  of Tenant's Pro Rata Share.

36          1.1.29 <u>Renewal Option</u>:  As defined in Subsection 2.2.2 hereof.

37          1.1.30 <u>Renewal Period(s)</u>: Five (5) successive periods of five (5) years
38  each, as provided in Subsection 2.2.2 hereof.

39          1.1.31 <u>Rent</u>:  Fixed Rent and/or Additional Rent.

40          1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

41          1.1.33 <u>Sales Break Point</u>:    As defined in Subsection 4.4.1 hereof.

42          1.1.34 <u>Shopping Center</u>:  That portion of the Greater Shopping Center more
43  particularly described in <u>Exhibit A-1</u> and designated as the "Section III Shopping Center"
44  on <u>Exhibit B</u> (which Shopping Center, when constructed, shall contain approximately one
45  hundred fifty-nine thousand one hundred seventeen (159,117) square feet of Floor Area).

46          1.1.35 <u>Substantially Completed or Substantial Completion</u>:  The completion
47  of specified work at the Greater Shopping Center (including, without limitation, as
48  applicable,  Landlord's Work) to the extent that only "Punch List Items" of such work
49  (defined in Subsection 3.3.3 below) shall not be completed.

4

1        1.1.36 <u>Taxes</u>:  As defined in Subsection 4.3.3 hereof.

2        1.1.37 <u>Tenant</u>:  As defined in the preamble hereof.

3        1.1.38 <u>Tenant's Mailing Address</u>:  c/o Buy Buy Baby, Inc., 650 Liberty
4 Avenue, Union, New Jersey 07083, Attn: Warren Eisenberg, or such other place and/or to
5 the attention of such other person as Tenant may notify Landlord from time to time by
6 notice given in accordance with the provisions of Article 18 hereof.

7        1.1.39 <u>Tenant's Permits</u>:  As defined in Subsection 2.3.1(b) hereof.

8        1.1.40 <u>Tenant's Property</u>:  All of Tenant's personal property, including,
9 without limitation, phone and alarm systems, satellite antennae, shelving, computers,
10 furniture, cash registers and customer service counters, specialty lighting, track lighting,
11 millwork, conveyor systems, storage racks and signage and any and all other personal
12 property of Tenant which is capable of being removed from the Premises without
13 material damage thereto, but which shall not include electrical systems, heating,
14 ventilation and air conditioning systems, and other mechanical systems, flooring, carpet,
15 elevators, standard lighting and wiring installed within the walls of the Premises.

16        1.1.41 <u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is the Floor
17 Area of the Premises and whose denominator is the Floor Area of the Shopping Center as
18 may be re-determined any time a building (and/or Floor Area) is added to or removed
19 from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than
20 Thirteen (13%) percent.  Floor Area shall be deemed added to or removed from the
21 Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially
22 Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the
23 case may be, with respect to such Floor Area.  Within thirty (30) days following written
24 request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area
25 of the Shopping Center.

26        1.1.42 <u>Tenant's Work</u>:  As defined in Section 3.1 hereof.

27        1.1.43 <u>Term</u>:  A period (the "***Initial Term***") of approximately ten (10) years
28 beginning on the Rent Commencement Date and expiring at midnight on the last day of
29 January following the tenth (10th) anniversary of the Rent Commencement Date, unless
30 the Rent Commencement Date is February 1, in which event the Expiration Date shall be
31 the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used
32 herein: (i) ***"Term"*** shall refer to the Initial Term, as the same may be extended by any
33 Renewal Period exercised pursuant to Subsection 2.2.2 below; and (ii) ***"Expiration***
34 ***Date"*** shall mean the date on which the Term expires.

35        ARTICLE 2
36    LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

37    Section 2.1   <u>Lease of Premises</u>.  Landlord hereby leases to Tenant, and Tenant
38 hereby leases from Landlord, the Premises together with any and all rights, benefits,
39 privileges and easements, now or hereafter appurtenant to either or each of the Premises,
40 the Shopping Center, and the Greater Shopping Center arising out of any public or
41 private grant or authority, including, without limitation, the non-exclusive right and
42 easement to use the Common Areas in common with other tenants and occupants of the
43 Greater Shopping Center. Landlord acknowledges that following the Effective Date,
44 Tenant intends to sublease the Premises (the "Sublease") to its wholly owned subsidiary,
45 Buy Buy Baby, Inc., a Delaware corporation ("Buy Buy Baby"), and Landlord agrees to
46 accept performance of Tenant's obligations hereunder by Buy Buy Baby.
47 Notwithstanding the immediately preceding sentence, in no event shall Tenant be
48 released from its obligations arising under this Lease as a result of the Sublease to Buy
49 Buy Baby.

5

1    Section 2.2   Term.

2    2.2.1  Initial Term.  Subject to the provisions of this Article 2, the Term of
3  this Lease shall begin on the sixtieth (60th) day following the Delivery Date (the *"Rent
4  Commencement Date"*).  The Term shall expire on the Expiration Date, unless earlier
5  terminated as herein provided.  When the Rent Commencement Date has been
6  determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge
7  and deliver, each to the other, a written statement in the form attached hereto as Exhibit C
8  specifying the Rent Commencement Date, and Landlord shall deliver to Tenant a
9  completed and signed IRS Form W-9 contemporaneously therewith; the delivery of the
10  Form W-9 shall be a condition precedent to the payment of Rent.

11    2.2.2  Renewal Options.  Provided that on the date of exercise of each
12  applicable Renewal Option there exists no Event of Default, Tenant shall have the right
13  and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on
14  which it would otherwise expire for five (5) successive renewal periods of five (5) years
15  each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon
16  the same terms and conditions as are herein set forth.  Each Renewal Option shall be
17  exercisable by notice given to Landlord at least one hundred fifty (150) days prior to the
18  commencement of the applicable Renewal Period(s); provided, however, that  the Term
19  of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option
20  within fifteen (15) days after receiving notice from Landlord that the Renewal Option in
21  question has not been exercised (Landlord's notice shall not be given prior to the 150th
22  day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that
23  it will not be exercising any remaining Renewal Options.  If Landlord fails to give Tenant
24  such notice prior to the Expiration Date, and Tenant occupies the Premises after the
25  Expiration Date, then Tenant shall remain in possession subject to the provisions of this
26  Lease but without the application of Article 20 hereof.  If Landlord then gives Tenant
27  such notice and Tenant exercises its Renewal Option, then the effective date of such
28  exercise shall be retroactive to the Expiration Date.

29    Section 2.3   Delivery Date.

30    2.3.1  Definition.  Subject to Landlord's delivery to Tenant of the Delivery
31  Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's
32  timely compliance therewith, Landlord shall be deemed to have delivered possession of
33  the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day
34  on which all of the following conditions (the *"Delivery Date Conditions"*) shall have
35  occurred and Tenant shall have received from Landlord the Delivery Date Certification in
36  accordance with the provisions of Subsection 2.3.3 below, which shall constitute
37  Landlord's written certification that all of the following shall have occurred:

38    (a)  Actual possession of the Premises shall have been delivered
39  to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound
40  condition, with all of Landlord's Work Substantially Completed, which Substantial
41  Completion shall be evidenced by a written certification by Landlord's architect to
42  Tenant;

43    (b)  Landlord shall have obtained (and delivered copies thereof to
44  Tenant, upon request) all permits and approvals required from all applicable
45  governmental authorities to enable Tenant to occupy and use the Premises for the conduct
46  of its business in the Premises (exclusive of any permits, licenses and approvals which
47  Tenant may be required to obtain in order to open and operate its specific business and
48  not a general retail business (collectively, *"Tenant's Permits"*)), which permits and
49  approvals shall include, without limitation, zoning and building code approvals,
50  environmental requirements, and a permanent certificate of occupancy for the Premises
51  (unless a permanent certificate of occupancy for the Premises cannot be obtained solely

6

as a result of the failure to complete Tenant's Work in the manner required hereunder or cannot be obtained until Punch List Items (as defined in Section 3.3.3 herein) have been completed, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date,  (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and  (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work and/or the Punch List Items, if applicable);

(c)    The Road Parcel, the Common Areas within the Shopping Center and the Section I Shopping Center (and all of the improvements to said Common Areas shown on Exhibit B), and the Section III Inline Space (hereinafter defined in Exhibit M) shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, and storm drainage improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; and Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas within the Shopping Center and the Section I Shopping Center and all of the improvements thereto to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, to the extent applicable, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon signage, if any, (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(e)    Leases or other occupancy agreements shall have been entered into with (i) five (5) of the following tenants or occupants (hereinafter collectively referred to as the *"Named Inducement Tenants"*) on the following terms, for occupancy of the premises designated for them on Exhibit B; and (ii) such leases shall not be cancelable by any of the Named Inducement Tenants, except for failure of Landlord to complete the Greater Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant:

| Inducement Tenants | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Field & Stream | 50,000 | 10 Years |
| Hobby Lobby | 60,000 | 10 Years |
| Dick's Sporting Goods | 50,000 | 10 Years |
| HomeGoods | 21,000 | 10 Years |
| DSW | 16,000 | 10 Years |
| Petco | 12,500 | 10 Years |
| Burkes | 21,000 | 10 Years |

(f)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3

1   hereof), and (ii) a fee owner recognition agreement in the form and content described in
2   clause (b) of Section 17.1 hereof executed by any existing Ground Lessor; and

3               (g)    The OEA (hereinafter defined in Section 12.5) is (x) fully
4   executed and delivered and recorded in Clerk's Office of the Cumberland County, North
5   Carolina, and (y) superior to all mortgages, deeds of trust and other liens affecting the
6   Greater Shopping Center, including the Shopping Center.

7           2.3.2  Delivery Date.

8               (a)    Landlord shall give Tenant at least one hundred twenty (120)
9   days prior notice of the Delivery Date, using the form of Delivery Date Notice attached
10  hereto as Exhibit I (the *"Delivery Date Notice"*).  Landlord's delivery of the Delivery
11  Date Notice shall be a condition precedent to the Rent Commencement Date.
12  Notwithstanding any provision of this Lease to the contrary, in no event shall the
13  Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery
14  Date Notice.  No event of Force Majeure occurring prior to the giving of the Delivery
15  Date Notice shall serve to delay the Delivery Date thereby established.

16              (b)    Landlord acknowledges that if it shall fail to satisfy all of the
17  Delivery Date Conditions by the Delivery Date as established in the Delivery Date
18  Notice, Tenant will sustain substantial, additional costs and expenses, including, without
19  limitation, storage costs for fixtures, equipment, and inventory, employee costs during the
20  waiting period, and additional advertising and promotional costs, the exact amount of
21  which would be impracticable or extremely difficult to ascertain.  If the Delivery Date
22  does not occur by the date established therefor in the Delivery Date Notice, then, in
23  addition to any other remedies available to Tenant under this Lease, Tenant shall be
24  entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated
25  reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an
26  amount equal to the sum of: (i) One Hundred Thousand Dollars ($100,000), plus
27  (ii) Three Thousand Dollars ($3,000) for each day that the Delivery Date established in
28  the Delivery Date Notice is delayed.  The foregoing liquidated reimbursements represent
29  the parties' good faith agreement as to an agreed upon amount which shall have been
30  incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.
31  If Landlord fails to satisfy all of the Delivery Date Conditions by the Delivery Date as
32  established in the Delivery Date Notice, and Tenant collects liquidated reimbursements as
33  provided in this Section 2.3.2(b), Tenant shall not be entitled to seek additional monetary
34  damages from Landlord for the period of such delay, provided, however, Tenant reserves
35  all other rights and remedies reserved under this Lease for such delay.

36              (c)    Notwithstanding the foregoing, if the Delivery Date does not
37  occur by the date established therefor in the Delivery Date Notice due solely to (x) delays
38  caused by a Tenant Delay (hereinafter defined) that occurs after the Delivery Date Notice
39  is given, or (y) Force Majeure that occurs after the Delivery Date Notice is given, then
40  the Delivery Date shall be extended on a day for day basis for each day of such delay,
41  provided that Landlord has notified Tenant within ten (10) days of the occurrence of such
42  Tenant Delay or Force Majeure. As used herein, *"Tenant Delay"* shall mean those acts or
43  omissions of Tenant or its agents, employees, or contractors which materially and
44  adversely interfere with Landlord's capacity to perform Landlord's Work and which are
45  not within the scope of customary and usual delays in the construction process.  Within
46  ten (10) days after the occurrence of a Tenant Delay, Landlord shall notify Tenant, in
47  reasonable detail, of the nature and existence of such Tenant Delay and the estimated
48  delay in completion of Landlord's Work as a result of the Tenant Delay.  Landlord's
49  failure to so notify Tenant of such Tenant Delay within the ten (10) day period shall be
50  deemed a waiver of such Tenant Delay.

8

2.3.3  Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4  No Waiver.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4  Unseasonable Delivery: Slack Period.  If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on September 1 and ending on the March 31 next following (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to:

(a)  accept delivery of physical possession of the Premises; or

(b)  defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent and Percentage Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.  In the event that Tenant elects to defer the Delivery Date pursuant to this Section, the accrual of any per diem liquidated reimbursement under Subsection 2.3.2(b) above shall be suspended for the period of such deferment.

Section 2.5  Initial Co-Tenancy Condition.

2.5.1  As used herein, the *"Initial Co-Tenancy Condition"* shall mean that at least (i) five (5) of the Named Inducement Tenants have accepted possession of the Floor Area designated for the such Named Inducement Tenant on Exhibit B, and are open to the public for the operation of retail business, and, if not open then such tenants shall be actively and continuously engaged in the fixturing and merchandising their respective premises, and (ii) at least sixty-five (65%) percent of Floor Area of the Section III Inline Space (excluding the Premises), shall be open to the public for the operation of retail business by national tenants or regional tenants of the type typically found in comparable regional shopping centers located in the Fayetteville, NC metropolitan area, and, if not open then such tenants shall be actively and continuously engaged in the fixturing and merchandising therein.  As used in this Lease, (i) *"national retailer"* shall mean a retail company operating at least one hundred (100) stores, in the aggregate, in the continental United States, under a single tradename in first-class shopping centers, and (ii) *"regional retailer"* shall mean a retail company operating at least twenty-five (25) stores in the states of Virginia, North Carolina, South Carolina and Georgia, in the aggregate, under a single tradename in first-class shopping centers.

2.5.2  If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)  accept delivery of physical possession of the Premises; or

(b)  defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-

9

1      Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof),
2      whereupon the Delivery Date shall be deemed to have occurred on the date that
3      Tenant actually accepts physical possession of the Premises (subject to the other
4      provisions of this Article 2 and the continuing satisfaction of the Delivery Date
5      Conditions); and

6      in either event, if the Rent Commencement Date occurs before the satisfaction of the
7      Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of
8      Fixed Rent and Percentage Rent until the Initial Co-Tenancy Condition is satisfied and
9      the Landlord gives Tenant notice thereof, subject to any other applicable provisions of
10    this Article 2.

11      2.5.3  In addition to the provisions of Subsection 2.5.2 above, if the Initial
12    Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery
13    Date established pursuant to Subsection 2.3.2(a) above, then Tenant shall have the right,
14    at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving
15    Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as
16    of the date specified in said notice.  Landlord may negate such termination by causing the
17    Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on
18    which said termination notice is given.  If this Lease is terminated hereunder, neither
19    party shall have any further liability under this Lease, except: (i) for those obligations
20    which survive the expiration or other termination of this Lease pursuant to the express
21    terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its
22    reasonable third-party costs and expenses incurred in connection with this Lease,
23    including, without limitation, costs associated with the preparation and review of plans
24    and specifications, attorney's fees, and the performance of Tenant's Work, not to exceed
25    Fifty Thousand Dollars ($50,000).

26      Section 2.6   Intentionally Omitted.

27                  ARTICLE 3
28              IMPROVEMENTS

29      Section 3.1   Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost
30    and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and
31    Exhibit F hereto, and the "Final Landlord's Plans and Specifications" (hereinafter defined
32    in Section 3.2) (collectively, "*Landlord's Work*"), and shall deliver possession of the
33    Premises to Tenant in the condition described therein.  Except for Landlord's Work,
34    Tenant shall, at its own cost and expense, do any and all non-structural work to the
35    interior of the Premises (hereinafter referred to as "*Tenant's Work*") which Tenant
36    desires to adapt the Premises to Tenant's use.

37      Section 3.2   Plan Approvals.

38         3.2.1   Preparation of Plans and Specifications.

39             (a)   Within thirty (30) days after the Effective Date, Landlord
40    shall deliver to Tenant drawings showing the proposed footprint, column layout, and
41    interior clear dimensions of the Premises (the "*Preliminary LOD*") [Limits of Demised],
42    which shall be subject to any reasonable modifications indicated by Tenant as provided
43    below. The Preliminary LOD shall be substantially consistent with Exhibits B, D, and D-
44    1 hereto.

45             (b)   Within thirty (30) days after Tenant's receipt of the
46    Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the "*Revised
47    LOD*"), showing the location of the interior structural grid (column layout), storefront
48    opening, and office core, the location and arrangement of the loading facilities, trash

compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions.

(c)    Within fifteen (15) days after Landlord's receipt of the Revised LOD, Landlord shall deliver to Tenant a final LOD (as approved by Tenant, the *"Certified LOD"*), certified by Landlord, which shall incorporate all of the elements of the Revised LOD.  Within fifteen (15) days after its receipt of such final LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements.  After Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.

(d)    Within thirty (30) days after Tenant's receipt of the Certified LOD, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(e)    Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and deliver to Tenant, in a single submission, *"Landlord's Plans and Specifications"* (as defined in Exhibit D hereto), and each of the plans which collectively constitute Landlord's Plans and Specifications shall be at least 85% complete, in Tenant's reasonable judgment.  Landlord's Plans and Specifications shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(f)    Within thirty (30) days after its receipt of Landlord's Plans and Specifications, Tenant shall give Landlord notice of the respects, if any, in which said plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto.

(g)    Within fifteen (15) days after the date on which Landlord receives Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a single submission, revised Landlord's Plans and Specifications, which shall be 100% complete and shall address all of Tenant's comments.

(h)    Within fifteen (15) days after its receipt of the revised Landlord's Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted.

(i)    In the event that the Landlord's re-submittal of Landlord's Plans and Specifications is not approved by the Tenant, then Landlord shall further revise Landlord's Plans and Specifications to address all Tenant comments and re-submit them to Tenant for Tenant's review and approval.  The re-submittal described in the preceding sentence shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice that the previous submittal has not been approved.  The process described in this subparagraph (i) and subparagraph (h) above shall be repeated until Landlord has secured Tenant's approval of Landlord's Plans and Specifications.  Landlord's Plans and Specifications as finally approved by Tenant are referred to herein as the *"Final Landlord's Plans and Specifications"*.

11

1   (j)   Upon Tenant's approval of the Final Landlord's Plans and
2   Specifications, any further changes thereto shall be subject to Tenant's prior written
3   approval. Unless specifically noted on a separate summary sheet attached to the Final
4   Landlord's Plans and Specifications, to the extent of a conflict between the terms and
5   provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto,
6   and the terms and provisions of the Final Landlord's Plans and Specifications, then the
7   terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F
8   shall govern and prevail.

9   (k)   All submissions by the parties of the Preliminary LOD, the
10   Revised LOD, the Certified LOD, the Tenant's Plans, the Landlord's Plans and
11   Specifications, the Final Landlord's Plans and Specifications, and the measurements
12   required under Subsections 3.4.1 and 3.4.2 below shall be made (or accompanied) by the
13   computer files thereof formatted in any version of *"Autocad 2002"* up to *"Autocad*
14   *2010"*.

15   3.2.2   Plan Changes.

16   (a)   Tenant shall have the right to make changes from the
17   standards and specifications set forth in "Tenant's Prototype Drawings and
18   Specifications" and/or the "Project Manual", referred to in Exhibit D hereto (collectively,
19   the ***"Prototype Standards/Specifications"***), and/or to require Landlord to subsequently
20   make changes to Landlord's Plans and Specifications and/or the Final Landlord's Plans
21   and Specifications in accordance therewith (the ***"Changes"***).  Within ten (10) business
22   days after receiving Tenant's request for any Change, Landlord shall give Tenant notice
23   of the cost or savings, and any delay, that may be occasioned by such Change, which
24   notice shall be accompanied by all back-up supporting the cost increases or delays.  If
25   Tenant fails to authorize such Change within five (5) business days after receiving
26   Landlord's notice, Tenant shall be deemed to have disapproved such Change. If, after
27   delivering Tenant's Plans to Landlord pursuant to Subsection 3.2.1(d) above, Tenant
28   subsequently revises Tenant's Plans, and such changes result in Changes to the
29   Landlord's Plans and Specifications or the Final Landlord's Plans and Specifications,
30   Tenant shall not be responsible for any costs ("hard" or "soft") associated therewith as to
31   the first set of changes to the Tenant's Plans only, provided that: (i) the revised Tenant's
32   Plans do not materially deviate from the Prototype Standards/Specifications and are
33   delivered to Landlord at least thirty (30) weeks prior to the Delivery Date, in Tenant's
34   reasonable estimation, and (ii) the Changes associated therewith do not impact the design
35   of the building shell.

36   (b)   Tenant shall pay to Landlord the net reasonable additional
37   third-party costs of Landlord's Work resulting directly and solely from the aggregate
38   Changes (exclusive of any charges for overhead and profit, other than sums not
39   exceeding 5% subcontractor profit and 5% general contractor profit thereon), taking into
40   consideration any and all actual costs and savings resulting from all Changes, in the
41   aggregate (including, without limitation, reasonable costs approved by Tenant in advance
42   associated with any acceleration of the work schedule which Tenant, at its sole option,
43   may require).  Such payment shall be due and payable within thirty (30) days after
44   Tenant's receipt of backup information reasonably supporting all such costs, including,
45   without limitation, invoices, receipts and lien waivers of subcontractors and materialmen,
46   but in no event earlier than the Delivery Date.

47   (c)   Landlord shall pay to Tenant the net reasonable cost savings
48   resulting from the aggregate Changes, taking into consideration all reasonable additional
49   third-party costs of Landlord's Work directly and solely resulting from the Changes
50   (exclusive of any charges for overhead and profit, other than sums not exceeding 5%
51   subcontractor profit and 5% general contractor profit thereon). At Tenant's request,
52   Landlord shall deliver to Tenant backup information reasonably supporting all such

1    additional costs, including, without limitation, invoices, receipts, and lien waivers of
2    subcontractors and materialmen.  Such payment shall be due and payable within thirty
3    (30) days after the Delivery Date.

4                    (d)    If the Changes occur during the preparation of any of the
5    plans described in Subsection 3.2.1 above, then the deadlines for preparation and delivery
6    of the plans then being prepared shall be extended as reasonably necessary to incorporate
7    such Changes.  If, despite Landlord's diligent efforts in performing Landlord's Work, the
8    Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into
9    consideration any time reductions resulting from such changes), then: (i) the Rent
10   Commencement Date shall be determined as if such delay had not occurred, (ii) the
11   commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of
12   Subsection 3.3.2 below, shall be extended by the number of days of such net delay; and
13   (iii) with respect to Changes requested after the Delivery Date Notice is given, for
14   purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery
15   Date shall be extended by the number of days of such net delay.

16        Section 3.3   Performance of Work.

17                    3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a
18   good and workmanlike manner, in compliance with all applicable Legal Requirements,
19   utilizing only new, first-class materials, and in accordance with all insurance company
20   requirements.  Landlord shall perform Landlord's Work in a manner such that Tenant
21   will be able to obtain Tenant's Permits.  Landlord shall pay any and all impact fees and
22   related governmental charges in connection with the Greater Shopping Center and the
23   Premises.  If Tenant's Permits cannot be obtained because Landlord's Work has not been
24   completed or has been performed improperly or by reason of any then existing condition
25   of the Greater Shopping Center, Landlord shall remedy the situation so as to enable
26   Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for
27   Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

28                    3.3.2   If: (a) Landlord's Work has not been commenced (*i.e.*, if Landlord
29   has not yet poured foundation footings for the Premises) by April 15, 2017, or (b) the
30   Delivery Date shall not have occurred by October 1, 2017 (subject to (i) *Force Majeure*,
31   not to exceed sixty (60) days in the aggregate, and (ii) Tenant Delays, provided that
32   Landlord shall have given Tenant notice of such event of *Force Majeure* or Tenant Delay
33   promptly after its occurrence), Tenant may thereafter, during such time as Landlord's
34   Work has not been commenced or the Delivery Date has not occurred, as the case may
35   be, consider Landlord to be in default hereunder and, at Tenant's option in its sole
36   discretion, elect to:

37                    (i)    terminate this Lease, if Landlord shall fail to fully cure
38   such default within thirty (30) days after receiving Tenant's notice thereof, in
39   which event neither party shall have any further liability hereunder, except: (i) for
40   those obligations which survive the expiration or other termination of this Lease
41   pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to
42   promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof,
43   for all its reasonable third-party costs and expenses incurred in connection with
44   this Lease (including, without limitation, costs associated with the preparation and
45   review of plans and specifications, attorney's fees, and the performance of
46   Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000); and/or

47                    (ii)    avail itself of the remedies set forth in Section 16.2
48   below (provided, however, that the cure period set forth therein shall not be
49   applicable); and/or

50                    (iii)   extend one or more times the dates set forth in clauses
51   (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in

13

1    notice given to Landlord, and as to any extension granted with respect to the
2    clause 3.3.2(b) above, in addition to any other rights and remedies to which
3    Tenant may be entitled, the Rent Commencement Date shall be postponed by two
4    (2) days for each day of the extension granted as to clause 3.3.2(b) above.

5    The election by Tenant of any one or more of the foregoing remedies shall not preclude
6    the subsequent election of any alternative remedy provided in this Section, this Lease, at
7    law, or in equity.

8        3.3.3    Landlord's Work Performed After Delivery of Possession.    On or
9    before the Delivery Date, Landlord's and Tenant's representatives together shall conduct
10   a walk-through of the Premises to compile a punch list of the "Punch List Items"
11   (hereinafter defined).  Tenant shall deliver to Landlord a copy of said punch list within
12   five (5) days after the walk-through.  Landlord shall complete any Punch List Items
13   within fifteen (15) days after it receives a copy of said punch list or such additional
14   period of time as may reasonably be necessary with respect to any particular Punch List
15   Item that cannot reasonably be completed within such 15-day period, provided Landlord
16   is diligently pursuing completion of such work (but in no event shall such additional time
17   period exceed an additional 30 days).  If Landlord fails to complete any item on said
18   punch list within said time period, Tenant shall have the right to complete such item(s)
19   using its own contractors and receive reimbursement from Landlord for the reasonable
20   costs and expenses thereof upon demand.  If reasonably required by Tenant, any portion
21   of Landlord's Work which is performed after Tenant accepts physical possession of the
22   Premises shall occur only "after hours", when neither Tenant nor any of its agents,
23   contractors, employees and servants are working within the Premises, and Landlord shall
24   reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of
25   such "after hours" performance of Landlord's Work.  As used herein, the term "**Punch
26   List Items"** shall mean such minor items of a cosmetic nature which, when considered as
27   a whole, do not adversely affect either the performance of Tenant's Work or Tenant's
28   ability to conduct its normal business operations in the Premises.

29       3.3.4    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may
30   enter upon the Premises for the purposes of inspecting the work, taking measurements,
31   making plans, erecting temporary or permanent signs and doing such other work as may
32   be appropriate or desirable without being deemed thereby to have taken possession or
33   obligated itself to pay Rent, provided, however, that Tenant shall not, during the course
34   of such work, materially interfere with the performance of Landlord's Work and shall
35   indemnify and hold Landlord harmless from and against any and all claims or losses
36   arising from Tenant's entry upon the Premises, except to the extent caused by Landlord,
37   its agents, employees, or contractors.

38       3.3.5    Intentionally Omitted.

39       3.3.6    Work Requirements After Delivery Date.  Following the Delivery
40   Date, any construction by Landlord or other tenants or occupants of the Shopping Center
41   affecting any portion of the Shopping Center shall be subject to the following terms and
42   conditions:

43           (a)    No staging and storage of materials and parking of
44   construction vehicles shall occur within the portions of the Shopping Center identified as
45   "Critical Area" on Exhibit B hereto (the "*Critical Area*");

46           (b)    Landlord shall diligently ensure that, from and after Tenant's
47   opening for business to the public, no ingress, egress or passage of any construction,
48   construction related delivery and related vehicles engaged in the performance of such
49   work or other construction activities within the Section III Inline Space shall take place
50   except through the entrance/exit drive designated as the "Construction Drive" on  Exhibit
51   B hereto.  Further, with respect to any construction work occurring on the Outparcels,

14

Landlord shall proceed diligently to ensure that no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall unreasonably interfere with the normal conduct of any business operations in the Premises; and

(c)    Landlord shall maintain, or cause to be maintained, the Greater Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7  Tenant's Trailer. Landlord shall install a trailer containing two (2) offices for Tenant's exclusive use, together with Cost Plus, Inc., in conducting employee interviews and recruiting, in accordance with Exhibit D hereto, in the location shown on Exhibit B hereto. Said trailer shall be installed and operational at least forty-five (45) days prior to the Delivery Date, and shall be removed within twenty (20) days (but not sooner than ten (10) days) after the Delivery Date. Landlord shall have the right to temporarily relocate the trailer location to accommodate Landlord's final construction (e.g., striping parking lot or landscaping) to a location mutually agreeable to Landlord and Tenant.

Section 3.4    Measurement; Adjustment of Rent.

3.4.1  Measurement of Premises and Shopping Center. Within five (5) days after the completion of the first course of masonry for the exterior walls of the Premises and demising walls of the Premises (and at least sixty (60) days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear dimensions and the Floor Area (with the dimensions on which it is based) of the Premises and the Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer. If the interior clear dimensions and/or the Floor Area of the Premises vary from those shown on the Certified LOD (as may be modified by any applicable Changes), then Landlord shall correct such work to conform to the Certified LOD (as may be modified by any applicable Changes).

3.4.2  Intentionally Omitted.

3.4.3  Adjustment of Fixed Rent and Tenant's Pro Rata Share. Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord. If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Subsection 1.1.28 hereof (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4. Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space, or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

15

ARTICLE 4
FIXED RENT, TAXES AND PERCENTAGE RENT: DETERMINATION AND
PAYMENT

Section 4.1   Fixed Rent.   Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2   Payment of Rent.   All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant may designate a corporation or other entity to act as a paying agent (the *"Paying Agent"*), to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3   Real Estate and Other Taxes.

4.3.1  Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2  (a)   Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3.  Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)   Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3  (a)   As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation.  Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities.  For purposes of computing

16

1    Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise,
2    profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or
3    assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents
4    (other than to the extent that such taxes are customarily paid by retail tenants in the state
5    in which the Shopping Center is located), gross receipts or revenues of Landlord from the
6    Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof,
7    which Landlord or its lender failed to timely pay (except if same are caused by an Event
8    of Default); (4) assessment for a public improvement arising from the initial construction
9    or expansion of the Greater Shopping Center or the Premises (it being agreed that all
10    assessments imposed during the Term which are permitted to be included within Taxes
11    hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be
12    deemed to have been paid in the maximum number of installments permitted by the
13    applicable taxing authority); (5) Taxes resulting directly from an increase in the
14    assessment caused by a sale or ground lease of all or any portion of the Shopping Center
15    to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed
16    upon Landlord in connection with Landlord's development of the Greater Shopping
17    Center (including, without limitation, trip generation fees). All Taxes payable by Tenant
18    pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only
19    property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date
20    and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion
21    of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement,
22    exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar
23    charges, or (iii) included in any special improvement district(s) which would result in
24    higher sales taxes or other similar impositions than would exist in the absence of such
25    district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full
26    calendar year after the Shopping Center has been completed and fully-assessed will be
27    approximately $2.25 per square foot of Floor Area in the Premises.

28           4.3.4   At Tenant's request, Landlord shall contest the amount or validity of
29    any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the
30    assessed valuation or Taxes by appropriate proceedings conducted in good faith,
31    whereupon Landlord shall cooperate with Tenant, execute any and all documents
32    required in connection therewith and, if required by any governmental authority having
33    jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or
34    otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's
35    Pro Rata Share thereof (after deducting reasonable and customary expenses).
36    Notwithstanding the foregoing, if Tenant is the sole occupant of the tax lot on which the
37    Premises is located, then Tenant shall have the right to contest the assessed valuation or
38    Taxes without first requesting that Landlord do so.

39        Section 4.4   <u>Percentage Rent</u>.

40           4.4.1   <u>Payment</u>. During and for each full calendar year during the Term,
41    Tenant shall pay annual percentage rent (***"Percentage Rent"***) equal to three (3%) percent
42    (the ***"Percentage Multiple"***) of all "Gross Sales" (hereinafter defined in Subsection
43    4.4.2) resulting from business conducted in, on or from the Premises during such calendar
44    year in excess of Five Million Dollars ($5,000,000.00) and less than or equal to Seven
45    Million Dollars ($7,000,000.00) (the Five Million Dollars ($5,000,000.00) and Seven
46    Million Dollars ($7,000,000.00) break points are each referred to as the ***"Sales Break***
47    ***Point"*** as the context requires. Each Sales Break Point shall be adjusted when the Fixed
48    Rent increases by the same percentage as the Fixed Rent increases (so, for example, as of
49    the period commencing on the first February 1 occurring after the fifth (5th) anniversary
50    of the Rent Commencement Date, the $5,000,000 Sales Break Point shall be increased by
51    10% (being the percentage increase from $9.00 per square foot of Floor Area to $9.90 per
52    square foot of Floor Area) to $5,500,000, and the $7,000,000 Sales Break Point shall
53    increase by 10% to $7,700,000). Within sixty (60) days after the close of each calendar
54    year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant

1   setting forth the amount of Gross Sales during the preceding calendar year and showing
2   the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar
3   year, provided, however, that Tenant shall not be required to provide such compilation if
4   the amount of Gross Sales for such calendar year is less than ninety percent (90%) of the
5   Sales Break Point.  The full amount of any Percentage Rent due shall be paid to Landlord
6   simultaneously with the furnishing of said compilation.  Notwithstanding the foregoing,
7   no Percentage Rent shall be payable with respect to the period commencing on the Rent
8   Commencement Date and ending on the December 31 next following the Rent
9   Commencement Date, and Gross Sales generated during any period when Alternate Rent
10  is payable under this Lease shall be excluded from the determination of Gross Sales for
11  purposes of computing Percentage Rent hereunder.

12          4.4.2  Definition of Gross Sales.  As used herein, the term *"Gross Sales"*
13  shall mean the total amount of all merchandise or services sold and fulfilled from the
14  Premises by Tenant or any sublessee, licensee or concessionaire of Tenant (subject,
15  however, to Subsection 4.4.6) and any other person or entity operating in the Premises
16  (for purposes of this Subsection 4.4.2 only, collectively, *"Tenant"*), whether for cash,
17  credit or otherwise, including redemption of gift certificates and gift cards.  Tenant shall
18  record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit
19  or otherwise, in a cash register or cash registers, or in such electronic or computer device
20  which records sales in a manner which is generally acceptable by industry standards.  The
21  term *"Gross Sales"* shall exclude: **(1)** proceeds from any sales tax, gross receipts tax or
22  similar tax, by whatever name called, which are separately stated and are in addition to
23  the sales price, **(2)** *bona fide* transfers or exchanges of merchandise from the Premises to
24  any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to
25  shippers and manufacturers for credit, **(3)** refunds or credits given to customers for
26  merchandise returned or exchanged at the Premises (regardless of where or how
27  purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of
28  Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when
29  written off the books of Tenant, provided that any collections made on account of such
30  bad debts shall be included in Gross Sales when received, **(6)** receipts from vending
31  machines installed solely for the use of Tenant's employees and receipts from pay
32  telephones, **(7)** sales to employees of Tenant at discount (which, for the purposes of
33  determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross
34  Sales per calendar year or pro rata portion thereof, as applicable), **(8)** fees paid to
35  independent third party credit card, charge card, debit card, and check
36  verification/guaranty companies in connection with sales charged to or debited from
37  customers' credit cards, charge cards, or debit cards, or sales paid for by customers by
38  checks, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing
39  charges (which, for the purposes of determining Percentage Rent hereunder, shall not
40  exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as
41  applicable), **(10)** sums and credits received in settlement of claims for loss or damage to
42  merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar
43  value of coupons utilized by customers in the purchase of merchandise from the
44  Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of
45  gift certificates and/or gift cards, **(15)** forfeited deposits; **(16)** sales of alcoholic
46  beverages, but only if local liquor licensing laws require that Landlord be considered a
47  beneficiary of such liquor sales, and thus subject to licensure under such laws, **(17)** sales
48  of merchandise fulfilled from the Premises but where payment is not made at the
49  Premises (e.g., online or at another store); and **(18)** sales of merchandise where payment
50  is made at the Premises but not fulfilled from the Premises.

51          4.4.3  Books and Records.  Tenant shall maintain at the Premises or at its
52  principal office, complete books and records reflecting all elements of Gross Sales.
53  Tenant shall be allowed to maintain its books and records in a computerized form;
54  provided, however, that (i) such computerized books and records provide the same level
55  of information as the books and records described above, are retained for the full record

1 retention period provided for herein, and (ii) promptly upon request, printed copies of any
2 such books and records are made available at Tenant's principal office for inspection by
3 Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books
4 and records as provided herein. Such books and records shall be kept in accordance with
5 generally accepted accounting principles (or successor accounting standards) and
6 practices consistently applied and shall be retained by Tenant for at least two (2) years
7 following the end of the calendar year to which they refer.

8       4.4.4 <u>Landlord's Right to Audit</u>. Landlord and/or Landlord's auditor
9 shall have the right, upon at least thirty (30) days prior notice to Tenant (but not more
10 than once per annum), to inspect and/or audit the records of Tenant relating to Gross
11 Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant,
12 Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such
13 deficiency. If such deficiency is in excess of five (5%) percent of the Gross Sales
14 reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's
15 reasonable costs of the inspection and audit. Tenant has not and does not make any
16 representation or warranty as to the amount of Gross Sales which are anticipated from the
17 Premises.

18       4.4.5 <u>Confidentiality</u>. Landlord shall not disclose to any third party
19 Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant,
20 provided, <u>however</u>, that (i) such information was not previously disclosed by Tenant to
21 such third party or to the public generally, and (ii) nothing contained herein shall restrict
22 Landlord from disclosing such information as may be required by applicable Legal
23 Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or
24 current or prospective Mortgagees or underlying lessors of all or any portion of
25 Landlord's interest in the Shopping Center (provided that each of such recipients shall be
26 bound to the same non-disclosure provisions as are imposed upon Landlord).

27       4.4.6 <u>Licensees</u>. If Tenant enters into any agreement(s) with any non-
28 Affiliate person or entity (hereinafter, the *"Licensees"*) permitting the Licensees to
29 operate businesses or concessions within the Premises, then, in lieu of including the
30 Gross Sales actually achieved by such Licensee(s) from such licensed portion of the
31 Premises, Tenant may elect to include in Gross Sales an amount equal to the product
32 obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average
33 Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the unlicensed portion)
34 of the Premises. The provisions of this Subsection 4.4.6 shall not apply to more than
35 4,000 square feet of Floor Area, in the aggregate, in the Premises at any one time. If
36 more than 4,000 square feet of the Floor Area of the Premises is licensed to Licensees at
37 any one time, then Tenant shall have the right to designate, from time to time, those
38 portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

39       4.4.7 <u>Adjustment for Assignees and Sublessees</u>. In the event an assignee
40 of this Lease or any sublessee of all or any portion of the Floor Area of the Premises does
41 not use the Premises (or, as applicable, the subleased portion thereof) as a store
42 specializing primarily in the sale of the Permitted Items, then the Percentage Multiple and
43 the Sales Break Point shall be amended, with respect to the Premises (or, as applicable,
44 the subleased portion thereof), to such other percentage (the *"Adjusted Percentage*
45 *Multiple"*) and such other break point (the *"Adjusted Break Point"*) as shall, as of the
46 effective date of such assignment or sublease, be then generally applicable to such use of
47 the Premises (or, as applicable, the subleased portion thereof) by normal and accepted
48 business standards applicable to such use, taking into consideration (i) the location of the
49 Shopping Center, and (ii) the nature of the Shopping Center (*e.g.*, strip center, mall,
50 power center, etc.) [it being agreed that with respect to any sublease covering less than all
51 of the Floor Area of the Premises, the following shall apply: (1) the Sales Break Point
52 relating to any portion of the Premises so subleased shall be the quotient of (aa) the
53 annual base subrent payable by each sublessee under the terms of its sublease on account

1   of the calendar year for which Percentage Rent is being determined, divided by (bb) the
2   Adjusted Percentage Multiple applicable to such sublessee, and (2) the Sales Break Point
3   relating to the non-subleased portions of the Premises shall be determined by dividing the
4   product of (x) the Fixed Rent for the calendar year for which Percentage Rent is being
5   determined per square foot of the Premises, and (y) the Floor Area of such retained
6   portion of the Premises, by the Percentage Multiple.

7           4.4.8   Any dispute between the parties relative to the provisions of this
8   Section 4.4, including, without limitation, the amount of Percentage Rent payable by
9   Tenant, shall be submitted to arbitration in accordance with the provisions of Section
10  16.3 of this Lease.

11                              ARTICLE 5
12              COMMON AREAS, THEIR USE AND CHARGES

13      Section 5.1   Common Areas: Maintenance.

14          5.1.1   Maintenance of Common Areas.  Landlord shall operate, maintain,
15  repair and replace the Common Areas as required by this Lease and otherwise to the
16  standard by which Common Areas of comparable shopping centers in the state in which
17  the Shopping Center is located are operated, maintained, repaired and replaced,
18  including, without limitation, snow, ice, rubbish and debris removal (including
19  installation and maintenance of sidewalk refuse containers), landscaping (including,
20  without limitation, the trimming and pruning of trees to avoid interference with the use or
21  visibility of canopies or signs on the exterior of the Premises), adequate lighting,
22  insurance, supervision, use, parking lot paving and striping, drainage, security (as
23  reasonably required), and control of all Common Areas, and Landlord shall comply with
24  all applicable Legal Requirements.  Notwithstanding anything in this Lease to the
25  contrary, during any time period Landlord no longer owns the Section I Shopping Center
26  and/or the Section II Shopping Center (or any portion thereof), Landlord agrees to use
27  commercially reasonable efforts to enforce its rights under the OEA to cause the Section I
28  Shopping Center and/or the Section II Shopping Center (or any portion thereof not owned
29  by Landlord, as the case may be), to be operated and maintained in the condition required
30  by the OEA.

31          5.1.2   Tenant's Pro Rata Share of Common Areas Charges.

32              (a)   During the Term, Tenant shall pay to Landlord Tenant's Pro
33  Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas
34  Charges"*) paid by Landlord to operate, maintain, insure and repair the Common Areas
35  within the Shopping Center, which shall include the reasonable premiums for insurance
36  required to be maintained by Landlord under Section 10.3 below and the Shopping
37  Center's share of costs to maintain the Road Parcel and certain improvements serving the
38  entire Greater Shopping Center pursuant to the OEA (and defined therein as the
39  "Common Area Maintenance Contribution").  Tenant's Pro Rata Share of Common
40  Areas Charges shall be paid in equal monthly installments on the first day of each
41  calendar month, in advance, during each calendar year based on Landlord's reasonable
42  budget.

43              (b)   Within ninety (90) days after the end of each calendar year,
44  Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant,
45  of Common Areas Charges for such year, which statement shall be prepared in
46  accordance with generally accepted accounting principles (or successor accounting
47  standards) consistently applied (the *"CAC Reconciliation Statement"*).  The CAC
48  Reconciliation Statement shall be certified by Landlord as being accurate and shall be
49  accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges,
50  and payment to Tenant in the amount of any overpayment made by Tenant during the
51  preceding calendar year.  If Tenant's Pro Rata Share of the actual Common Areas

1  Charges for a calendar year shall exceed the aggregate monthly installments paid by
2  Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within
3  sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall
4  promptly deliver to Tenant copies of relevant backup materials (including, but not limited
5  to, contracts, correspondence and paid invoices) reasonably required by Tenant. If
6  Landlord fails to timely remit to Tenant the amount of any overpayment hereunder,
7  Tenant shall have the right (in addition to any rights and remedies to which it may be
8  entitled under this Lease, at law, or in equity) to offset such amount from payments of
9  Rent next becoming due hereunder, together with interest thereon at the Lease Interest
10  Rate from the date such remittance is due until reimbursement or full satisfaction by
11  credit. Notwithstanding any provision hereof to the contrary, in no event shall the
12  Tenant's Pro Rata Share of Common Areas Charges (inclusive of the insurance premiums
13  reimbursable by Tenant pursuant to Section 10.3.3) from the Rent Commencement Date
14  through the end of the first full calendar year of the Term exceed $1.50 per square foot of
15  Floor Area per annum, and with respect to any other calendar year thereafter (exclusive
16  of the increased cost of snow removal, insurance rate increases and utility rate increases
17  during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro
18  Rata Share of Common Areas Charges paid by Tenant for the immediately preceding
19  calendar year (exclusive of the increased cost of snow removal, insurance rate increases
20  and utility rate increases during such calendar year).

21          5.1.3  Exclusions from Common Areas Charges.

22                  (a)    Common Areas Charges shall not include: **(1)** the capital cost
23  of any additions to the Common Areas pursuant to an expansion of the Greater Shopping
24  Center or any portion thereof; **(2)** the cost of any replacements or capital improvements
25  to the Common Areas, except that the cost of repaving the parking areas of the Shopping
26  Center may be included within Common Areas Charges so long as such cost is amortized
27  on a straight-line basis over the useful life thereof under generally accepted accounting
28  principles (or successor accounting standards), and is not incurred (A) prior to the
29  expiration of the fifth (5th) full calendar year of the Term, or (B) more than once during
30  each five (5) full calendar years of the Term; **(3)** the cost of investigating, monitoring or
31  remedying any environmental condition or "Hazardous Substances" or any other
32  "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); **(4)** any debt
33  service (including principal and interest) or payments of any judgments or other liens
34  against Landlord; **(5)** the cost of maintaining, repairing or providing security for interior
35  portions of buildings; **(6)** Taxes or other taxes levied or assessed against Landlord or the
36  Greater Shopping Center; **(7)** the cost of compliance with applicable Legal Requirements
37  (including, without limitation, the cost of curing violations or contesting such Legal
38  Requirements); **(8)** any costs resulting from insurance deductibles or any payments made
39  under any self-insurance policy maintained by Landlord; **(9)** any costs which would have
40  been reimbursed or paid for by insurance proceeds had Landlord maintained the
41  insurance required under Section 10.3 hereof and the amount of any judgment or other
42  charge entered or costs assessed against Landlord in excess of the policy limits of the
43  insurance maintained by Landlord under Section 10.3 hereof); **(10)** those portions of
44  Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in
45  the Shopping Center other than through the payment of such tenant's proportionate share
46  of insurance premiums otherwise includable as part of Common Areas Charges; **(11)**
47  sums paid or owed by Landlord to any tenant in the Shopping Center; **(12)** costs incurred
48  in connection with the negotiation of leases with, or construction of improvements for,
49  any tenant in the Shopping Center (including, without limitation, brokerage commissions
50  and legal fees); **(13)** costs incurred in connection with lawsuits or other legal actions
51  (including, without limitation, arbitrations and mediations) instituted or defended by
52  Landlord; **(14)** sums incurred as late payment fees, penalties or interest; **(15)** ground rent;
53  **(16)** depreciation [except as expressly permitted pursuant to item 23 below]; **(17)** costs
54  disproportionately incurred by or on behalf of any one or more of the tenants in the
55  Shopping Center (including, without limitation, all costs relating to the operation of any

food court or exterior dining area in the Shopping Center); **(18)** electricity costs for
lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section
5.2], other than low-level security lighting; **(19)** Landlord's advertising, entertainment
and promotional costs for the Greater Shopping Center (including, without limitation,
holiday decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying
sculptures, paintings and other objects of art located within or outside the Shopping
Center; **(21)** costs and expenses payable to Landlord or its Affiliate, to the extent that
such costs and expenses exceed competitive costs and expenses for materials and services
by unrelated persons or entities of similar skill and experience; **(22)** repairs resulting from
defects in the original construction of the Greater Shopping Center arising within one (1)
year after the Rent Commencement Date; **(23)** the cost of mechanized equipment for the
maintenance of the Common Areas (but not the straight-line depreciation thereof over its
useful life, as determined in accordance with generally accepted accounting principles (or
successor accounting standards)); **(24)** reserves for anticipated future expenses; **(25)** any
cost or expense relating to the administration and management of the Common Areas
(whether on-site or off-site) including, but not limited to, overhead, management fees,
office salaries and benefits, office rental, office supplies, dues and subscriptions, office
utility charges, telephone charges and automobile expenses; **(26)** costs incurred in
connection with the monitoring, maintenance, inspection, or testing of fire alarm systems;
**(27)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision
of utility service(s) to the Common Areas, to the extent that such costs and expenses
exceed competitive market rates; **(28)** except as specifically provided in Section 7.2
hereof, any costs relating to any pylon signs or other signage identifying tenants of the
Greater Shopping Center; or **(29)** any costs incurred by Landlord to operate, maintain,
insure and repair the Common Areas located within any portion of the Greater Shopping
Center other than the Shopping Center (other than the Shopping Center's share of costs to
maintain the Road Parcel and certain improvements serving the entire Greater Shopping
Center pursuant to the OEA).

(b)    In addition, if any tenant or other occupant of the Shopping
Center (i) maintains the Common Areas in whole or in part, or any facilities therein,
(ii) provides any services the cost of which would otherwise be includable in Common
Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in
the Common Areas Charges, then the costs associated with or attributable to any of the
foregoing shall be excluded from Common Areas Charges, and the denominator used to
determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced
by the Floor Area occupied by such tenant or other occupant.  In applying the provisions
hereof, Landlord shall act equitably, taking into account, for example, the relationship of
the size of the Common Areas maintained by the other tenant or occupant to the size of
its premises.

(c)    Common Areas Charges for any period during the Term
which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    <u>Tenant's Right to Audit</u>.  Tenant shall have the right, within three (3)
years after receiving any CAC Reconciliation Statement (and not more than once
annually) to audit Landlord's books and records to verify Landlord's calculation of
Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof.  Upon
Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup
materials (including, but not limited to, contracts, correspondence and paid invoices)
reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord
shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand
therefor, and if the overcharge exceeds five (5%) percent of Tenant's Pro Rata Share of
Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the
audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall
have the right (in addition to any rights and remedies to which it may be entitled under
this Lease, at law, or in equity) to offset such amount from payments of Rent next

1   becoming due hereunder, together with interest thereon at the Lease Interest Rate from
2   the date such remittance is due until reimbursement or full satisfaction by credit.
3   Landlord shall maintain all books and records pertaining to a calendar year for at least
4   three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such
5   calendar year.  Tenant shall keep the results of any such audit confidential, provided that
6   nothing contained herein shall restrict Tenant from disclosing such information as may be
7   required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide*
8   prospective assignees or subtenants (provided that each of such recipients shall be bound
9   by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by
10   Landlord with respect to an audit by Tenant shall be submitted to arbitration in
11   accordance with the provisions of Section 16.3 below.

12       5.1.5  In no event shall Tenant be required to join, participate in or
13   contribute to any promotional fund, marketing fund or merchants' association.

14       Section 5.2  Common Areas: Restrictions.

15       5.2.1  Continuous Access.  No entrances, exits, approaches and means of
16   ingress and egress to, from, and/or within the Road Parcel, the Shopping Center or the
17   Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or
18   omission of Landlord or any third party during the Term, except: (i) in the event of an
19   emergency or as may be otherwise required by applicable Legal Requirements, in which
20   event Landlord shall use reasonable efforts to give Tenant advance notice of same and to
21   minimize interference to Tenant's normal business operations in the Premises as a result
22   thereof; or (ii) in the event that Landlord is required to temporarily close the Common
23   Areas within the Shopping Center, for the minimum time legally necessary to prevent a
24   dedication thereof or an accrual of any rights in any person or the public generally
25   therein; provided that such closure shall not occur during August (through Labor Day),
26   November or December of any calendar year, and Landlord shall give Tenant at least
27   thirty (30) days' prior notice thereof.

28       5.2.2  No Alterations.  Landlord shall not, without obtaining Tenant's prior
29   written consent in each instance, which consent may be withheld in its sole discretion:
30   (i) alter (except in de minimis ways) the area of the Shopping Center or the location,
31   availability, or size of any Common Area improvement located within the Critical Area,
32   from that shown on Exhibit B hereto; (ii) construct or permit to be constructed any
33   structures within the Critical Area (including, without limitation, any buildings, kiosks,
34   booths, signs or similar structures within the Critical Area), other than as shown on
35   Exhibit B hereto; or (iii) materially change the entrances or exits to and from the Road
36   Parcel, the Shopping Center, or the curb cuts, roadways, drive aisles, sidewalks or other
37   elements of the Common Areas within the Critical Area or the Road Parcel, or the
38   number, location or layout of parking spaces, located within the Critical Area from those
39   shown on Exhibit B hereto.  Except in the event of an emergency, and except for minor
40   repairs necessary to maintain the free flow of vehicular traffic, Landlord shall neither
41   perform nor permit to be performed, any construction, repairs, replacements or
42   maintenance to any portion of the Road Parcel or the Critical Area (other than emergency
43   repairs to utilities and Common Areas) during the months of August (through Labor Day),
44   November or December of any year, without the prior consent of Tenant, which consent
45   may be withheld in Tenant's sole discretion.  Tenant hereby acknowledges that Landlord
46   intends to dedicate the Road Parcel to the City of Fayetteville.  In the event such
47   dedication takes place, any restrictions or requirements in this Lease related to the Road
48   Parcel, including but not limited to the restrictions prohibiting repairs, replacements or
49   maintenance of the Road Parcel during the months of August (through Labor Day),
50   November or December of any year, shall no longer be applicable.

51       5.2.3  Outparcels.  In addition to the provisions of Subsection 5.2.2 above,
52   during the Term, the following restrictions shall encumber and bind the outparcels

1  (collectively, the "***Outparcels***" and individually, an "***Outparcel***") designated on <u>Exhibit</u>
2  <u>B</u> hereto as "Building III-K", "Building III-L", and "Building III-M":  (a) the entrances to
3  Building III-L and Building III-M shall not face the Premises, but shall be located on the
4  side of said buildings that is opposite to the center drive aisle or the side of said buildings
5  facing the Road Parcel, (b) no building shall exceed one story in height; (c) no building
6  shall exceed a maximum height of twenty-four feet (24') as measured from the finished
7  floor level to the highest point on such building or structure (inclusive of the height of all
8  types of projections or architectural treatments or embellishments thereon, such as, but
9  without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and
10  antennae), provided, however, that architectural elements on no more than two (2) sides
11  of the subject building may be higher than twenty-four (24) feet (but less than twenty-
12  eight (28) feet) so long as the architectural elements on a building which are higher than
13  twenty-four (24) feet in height do not exceed twenty percent (20%) of the total aggregate
14  footage (measured in lineal feet) of the perimeter of the building in question; and (d) the
15  Floor Area of any building constructed on an Outparcel shall not exceed the Floor Area
16  established therefor on <u>Exhibit B</u> hereto.  For purposes of this Subsection 5.2.3, the Floor
17  Area of any building constructed on an Outparcel shall also be deemed to include outdoor
18  balconies, patios or other outdoor areas utilized for retail sales or food or beverage
19  service (exclusive of drive through or walk-up take-out food or beverage service).

20           5.2.4  <u>Parking Area; Customer Pick Up Area</u>.  During the Term, Landlord
21  shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of
22  parking spaces required by applicable Legal Requirements, without variance, or (ii) the
23  number of ground-level parking spaces shown on <u>Exhibit B</u> hereto, with each such space
24  being at least nine (9) feet in width and eighteen (18) feet in length.  Parking spaces shall
25  at all times be clearly marked by painting, striping or otherwise.  Landlord shall maintain
26  in the location identified on <u>Exhibit B</u> as the "Expectant Mother Parking Area", a
27  minimum of six (6) parking spaces reserved for the exclusive use of expectant mothers
28  and/or parents with infants who are customers of Tenant (the "***Expectant Mother***
29  ***Parking Spaces***").  The Expectant Mother Parking Spaces shall be prominently marked
30  and/or signed as reserved for expectant mothers and/or parents with infants who are
31  customers of Tenant.  Except for the Expectant Mother Parking Spaces, the "Cost Plus
32  Reserved Spaces" shown on <u>Exhibit B</u>, the "Carter's Stroller Spaces" shown on <u>Exhibit</u>
33  <u>B</u>, the "Sprouts Special Events Area" shown on <u>Exhibit B</u>, the "Sprouts Temporary Tent
34  Area" shown on <u>Exhibit B</u>, the "PetCo Disposal Facility Area" shown on <u>Exhibit B</u>, and
35  up to sixteen (16) total "pick up" spaces adjacent to Building III-K, Building III-L,
36  Building III-M and/or Building III-O, Landlord shall not designate specific parking
37  spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord
38  permit any person or entity to use the parking areas other than Tenant, the other tenants
39  and occupants of the Greater Shopping Center, and their employees, agents, subtenants,
40  concessionaires, licensees, customers, and invitees.  Landlord shall use commercially
41  reasonable and diligent efforts to enforce the foregoing restrictions.  There shall be no
42  charge whatsoever levied for the use of any parking areas within the Greater Shopping
43  Center.  Landlord shall not permit overnight parking in the Shopping Center.

44           5.2.5  <u>Lighting</u>.  Throughout the Term, Landlord shall keep the Road
45  Parcel and the Common Areas within the Shopping Center fully lighted and open to the
46  customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m.
47  Monday through Saturday and until 7:00 p.m. on Sunday ("***Normal Hours***").  Upon
48  request of Tenant, Landlord shall keep the Common Areas within the Shopping Center
49  lighted for as long after Normal Hours as Tenant shall request, <u>provided</u> Tenant shall pay
50  for a share of the reasonable cost of said requested lighting, which share shall be equal to
51  the product of (x) such cost, and (y) a fraction, the numerator of which shall be the
52  number of square feet of Floor Area within the Premises and the denominator of which
53  shall be the aggregate number of square feet of Floor Area of all premises within the
54  Shopping Center (including the Premises) open later than Normal Hours (<u>excluding</u>,
55  however, those tenants and occupants who separately control and pay for their own

24

1   Common Area lighting). In addition to the foregoing, Landlord shall provide for low
2   level security lighting from one (1) hour after the close of business in the Premises until
3   dawn.

4             5.2.6  Repairs. During the Term, any construction or repair by Landlord
5   permitted or required under this Lease and undertaken in the Road Parcel, the Common
6   Areas within the Shopping Center or in any other portion of the Shopping Center shall:

7             (a)   not be performed during the months of August (through Labor
8   Day), November or December of any year, except in the event of an emergency, except
9   for minor repairs necessary to maintain the flow of vehicular traffic, or except as may be
10  otherwise required by applicable Legal Requirements;

11           (b)   be commenced only upon at least five (5) days' prior notice to
12  Tenant (except in an emergency, in which event Landlord shall only be required to give
13  such notice as is reasonable under the circumstances); and

14           (c)   be performed in accordance with the requirements of
15  Subsection 3.3.6 above and in such a manner so as not to materially interfere with the
16  normal conduct of any business operations in the Premises.

17          5.2.7  Rules and Regulations. Tenant shall comply with the rules and
18  regulations of the Shopping Center as established from time to time by Landlord, within
19  sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable,
20  (ii) do not adversely affect the normal conduct of any business operations in the
21  Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are
22  uniformly enforced against all tenants of the Shopping Center and without prejudice
23  against Tenant. In the event of any conflict between the provisions of this Lease and any
24  rules or regulations, the provisions of this Lease shall prevail and govern.

25          5.2.8  Miscellaneous.

26          (a)   No Promotional Use. Except as permitted pursuant to the
27  OEA, Landlord shall not use or permit the use of all or any portion of the Common Areas
28  within the Shopping Center for retail sales or for promotional purposes.
29  Notwithstanding the foregoing provision, (i) tenants of the Shopping Center (including
30  Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales
31  in front of their respective stores only, provided that such sales shall: (A) be conducted in
32  a manner consistent with sidewalk sales in comparable shopping centers in the state in
33  which the Shopping Center is located, (B) not materially interfere with normal pedestrian
34  access over the sidewalks, and (C) not materially interfere with the normal business
35  operations of Tenant in the Premises or materially impair the visibility of Tenant's
36  signage and (ii) Sprouts, as the tenant of Building III-H as shown on Exhibit B, shall be
37  permitted to use the Sprouts Temporary Tent Area as shown on Exhibit B for up to two
38  weeks upon opening for business in Building III-H to accommodate a temporary tent
39  where Sprouts can perform nutrition classes during Sprouts grand opening and (iii)
40  Sprouts, as the tenant of Building III-H as shown on Exhibit B, shall be permitted to use
41  the Sprouts Special Events Area as shown on Exhibit B for special events (e.g., grand
42  opening, job fair or anniversary celebration) ("Sprouts Special Events"); provided,
43  however, no such Sprouts Special Events shall be permitted which impedes any
44  loading/drop off areas, fire-lanes, "no parking" areas, or ingress/egress generally within
45  the Shopping Center, and provided further that such Sprouts Special Events shall not
46  exceed four (4) consecutive days in duration and shall occur no more than eight (8) times
47  in any calendar year. Landlord shall not permit any solicitation, distribution of handbills,
48  picketing, or other public demonstration in the Common Areas, except as otherwise may
49  be mandated by applicable Legal Requirements.

25

1                   (b)   Trash Compactor and Containers. Tenant shall be permitted
2 to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the
3 Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a
4 trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto
5 as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash
6 compactor and containers neat and clean and repair any damage caused by use and
7 storage of such compactor and containers.

8                   (c)   Shopping Carts. Tenant shall be permitted to store its
9 shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1
10 hereto. With respect to shopping carts provided by Tenant for the use of its customers,
11 Tenant will use reasonable efforts to periodically remove same from the Common Areas.
12 No more than two (2) parking spaces may be utilized for Tenant cart corrals.

13                   (d)   Cellular Towers. No transmission and/or reception towers for
14 wireless telephone or internet communications shall be permitted within the Shopping
15 Center.

16                   (e)   Temporary Storage Containers. Tenant shall be permitted to
17 maintain temporary storage containers or trailers in the locations designated on Exhibit B
18 hereto during the Term, subject to applicable Legal Requirements. Tenant acknowledges
19 and agrees that the temporary storage container or trailer shall (i) not interfere with
20 ingress or egress to the Shopping Center or deliveries to other tenants in the Shopping
21 Center, and (ii) be limited to two (2) times during each calendar year during the Term and
22 for a duration not to exceed six (6) weeks during each such period.

23                                 ARTICLE 6
24                                 UTILITIES

25         Section 6.1   Utility Service. From and after the Delivery Date, and continuing
26 thereafter through the end of the Term, Tenant shall be solely responsible for and shall
27 pay the cost of utilities services (including, without limitation, electricity, gas, water,
28 sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.
29 Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or
30 from any utility provider designated by Landlord. Landlord shall provide separate utility
31 meters exclusively serving the Premises, at its sole cost and expense (including, without
32 limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to
33 the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay
34 the costs of all utility charges incurred in the Premises prior to such date. Landlord shall
35 not permit the capacity of utility lines available for use at the Premises to be reduced or
36 overloaded by any other persons or entities. Landlord shall permit Tenant and its
37 telecommunications provider full and free access to, and use of, available
38 telecommunications conduits in the Shopping Center for the provision of
39 telecommunications service to the Premises, subject to such reasonable requirements as
40 Landlord may impose.

41         Section 6.2   Interruption. Notwithstanding any provision of this Lease to the
42 contrary, in the event utilities serving the Premises are disrupted due to the acts or
43 omissions of Landlord, its agents, contractors, servants or employees, Landlord shall
44 promptly restore the affected utilities at Landlord's sole cost and expense. If the
45 disrupted utilities are not restored within twenty-four (24) hours after the Landlord has
46 knowledge of the disruption, and Tenant is unable to conduct its normal business in the
47 Premises as a result thereof, Rent shall be equitably abated during the period of
48 disruption.

26