# EXHIBIT A

# LEASE AGREEMENT PART 2

ARTICLE 7
SIGNS

Section 7.1 <u>Tenant's Building Signage</u>. Landlord shall supply and install signage on the front exterior wall of the Premises (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with <u>Exhibits D</u>, <u>D-1</u>, and <u>F</u> hereto, and with the additional provisions of this Lease. Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls (including the rear walls) of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements and the OEA. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2 <u>Pylon/Monument Signage</u>. Landlord shall provide two (2) pylon signs at the locations shown on <u>Exhibit B</u> hereto during the entire Term (**"Tenant's Pylons"**), and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of the Tenant Pylons, in accordance with the provisions of Article 3 and <u>Exhibits D and F</u> hereto. The dimensions and location of Tenant's pylon sign panel(s) shall be as shown on <u>Exhibit F</u>. In addition, if Landlord constructs or makes available to any other tenant or tenants of the Section III Inline Space occupying less square feet than Tenant, and which already have pylon or monument signage that is equivalent to Tenant's pylon signage, any other signage located in the Common Areas, Landlord shall also include on such signage Tenant's identification sign, as shown on <u>Exhibit F</u> hereto, which shall be in such order on the pylon as the size of other occupants on such pylon (*i.e.*, panels for tenants occupying larger square footage will be located above Tenant's panel). Landlord shall maintain Tenant's Pylons (and all other pylons and monuments bearing Tenant's sign panel, if any) and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments bearing Tenant's sign panel(s) without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges; however, neither the cost of individual tenants' signs thereon, nor the cost of the construction of the pylons and monuments, shall be includable in Common Areas Charges.

Section 7.3 <u>Signage: Alteration/Removal/Allocation</u>. Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, <u>provided</u> that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises (provided, however, if Tenant desires to include more than two (2) names on the Tenant's pylon panel, Tenant's pylon panel shall require Landlord's approval). All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements and the OEA.

Section 7.4 <u>Cooperation</u>. Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the

1  placement, installation, and/or replacement by Tenant of any signs on any part of the
2  Premises or on any pylon or monument, to which Tenant may be entitled under this
3  Lease.

4      Section 7.5    Signage and Building Restrictions and Criteria.

5      7.5.1  No exterior identification signs attached to any building of the
6  Shopping Center shall be of the following type: **(i)** flashing, moving or audible signs; **(ii)**
7  signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or
8  exposed transformers, provided that Tenant shall have the right to employ any methods
9  necessary for the installation of internally illuminated self-contained channel letters; or
10  **(iii)** paper or cardboard signs other than professionally prepared interior window signs
11  advertising special sales within the subject premises and other than vinyl panel signs,
12  temporary signs (exclusive of contractor signs), stickers or decals; provided, however, the
13  foregoing shall not prohibit the placement at the entrance of each such premises of (A)
14  small stickers or decals which indicate hours of business, emergency telephone numbers,
15  credit cards accepted, and other similar information, and/or (B) a sticker or decal which
16  contains the phrase "no solicitation" or words of like import.  No billboard signs shall be
17  permitted within the Shopping Center.

18      7.5.2  Subject to Landlord's requirement to maintain certain vegetation in
19  compliance with applicable governmental landscape ordinances, Landlord shall not
20  permit any obstructions (including, without limitation, any trees, bushes or other
21  landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront
22  signs or other exterior wall signs or any pylons, monuments or other freestanding signs.
23  Subject to the rights of tenants under Existing Leases, no premises in the Shopping
24  Center containing less Floor Area than the Floor Area of the Premises shall have:
25  **(i)** building signage possessing more total square footage than the total square footage
26  available for use by Tenant, or a maximum height greater than the maximum height of
27  Tenant's building signage, as measured from the finished floor level to the highest point
28  on such signage, or **(ii)** a building and entrance design element higher, wider, or which
29  projects farther than the height, width, or projection of the building and entrance design
30  element of the Premises.

31                          ARTICLE 8
32              ALTERATIONS AND IMPROVEMENTS

33      Section 8.1    Alterations and Improvements.

34      8.1.1  Tenant shall not perform any structural alterations or structural
35  improvements to the Premises (except to the extent same pertain to Tenant's Work)
36  without the prior approval of Landlord, provided, however, that Tenant's alteration of the
37  exterior of the Premises to conform to Tenant's then-current prototypical elevation shall
38  not require Landlord's consent, provided, however, that the exterior of the Premises shall
39  be reasonably harmonious and aesthetically compatible with the balance of the Shopping
40  Center and the height and perimeter of the exterior of the Premises shall not increase
41  from the perimeter and height of the Premises as originally constructed.  All work
42  performed by Tenant in connection with structural and non-structural alterations or
43  improvements shall be done at Tenant's sole cost and expense, in a good and
44  workmanlike manner and in compliance with all applicable Legal Requirements and the
45  OEA and shall not unreasonably interfere with parking for, access to or visibility or use
46  of the remainder of the Shopping Center.  The provisions of this Section 8.1 shall not
47  apply to Tenant's building signage, which shall be governed by the applicable provisions
48  of Article 7 above.

49      8.1.2  Tenant may, from time to time, at its sole cost and expense, without
50  the prior approval of Landlord, make non-structural alterations and non-structural
51  improvements to the Premises as Tenant deems necessary or desirable, including, but not

1    limited to, electrical systems, heating, ventilation and air conditioning and other
2    mechanical systems, installation of fixtures and equipment, painting, and wall and floor
3    coverings.

4        8.1.3   Subject to Tenant's compliance with the requirements of this Section
5    8.1.3, Tenant shall have the right to subdivide the Premises into two (2) (but no more
6    than two (2)) separate stores, each of which may have its own front entrance and access
7    to the loading docks in the rear of the Premises, as well as separately sub-metered
8    utilities, provided in no event will either subdivided store contain less than eight thousand
9    (8,000) square feet of Floor Area.

10        8.1.4   Tenant shall have the exclusive right to erect and maintain an
11    antenna and a satellite dish, and/or such other equipment as Tenant shall reasonably
12    desire, on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior
13    approval of its plans for the installation of such equipment, (ii) uses a contractor
14    designated or approved by Landlord for all roof penetrations so as not to violate or
15    invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof
16    penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the
17    roof caused by the making of the roof penetrations, including, but not limited to, the
18    repair of the roof penetrations upon the removal of any equipment installed thereon, and
19    (v) erects and maintains such equipment in accordance with applicable Legal
20    Requirements and the OEA.

21        8.1.5   Landlord shall execute and return to Tenant all appropriately
22    completed building department or equivalent applications within ten (10) business days
23    after Tenant's request therefor, and will reasonably cooperate with Tenant in the
24    permitting process.

25        8.1.6   If any violation of any applicable Legal Requirement which is noted
26    against the Greater Shopping Center or the Premises (other than a violation caused by
27    Tenant) prevents Tenant from obtaining a building permit for any alterations or a
28    certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and
29    diligently cause such violation to be removed of record to the extent required to permit
30    Tenant to obtain its building permit or certificate of occupancy, as the case may be.

31        8.1.7   Landlord shall not make any alterations to the Premises (including,
32    without limitation, changing the design, color or materials of the exterior of the Premises)
33    nor shall Landlord construct an additional floor or floors above the Premises. Landlord
34    shall neither make nor permit to be made any alterations to the exterior architectural
35    theme of the remainder of the Shopping Center (as shown on Exhibit D-2 hereto) which
36    would be inconsistent with a comparable shopping center in the state in which the
37    Shopping Center is located (exclusive of other tenants' entrance features) without the
38    prior consent of Tenant.

39        8.1.8   Tenant shall have the exclusive right to erect and maintain on the
40    roof of the Premises, a passive solar array for the production of electricity (the
41    *"System"*), provided that Tenant: (i) obtains Landlord's prior approval of its plans for the
42    installation of the System, (ii) uses a contractor designated or approved by Landlord for
43    all roof penetrations so as not to violate or invalidate any roof warranties maintained by
44    Landlord, (iii) maintains the area where roof penetrations are made while the System is
45    present, (iv) repairs any damage to the roof caused by the making of the roof
46    penetrations, including, but not limited to, the repair of the roof penetrations upon the
47    removal of any component of the System, and (v) erects and maintains the System in
48    accordance with applicable Legal Requirements. The System shall be deemed to be part
49    of Tenant's Property. In the event that Landlord does not approve, or reject with
50    reasonable detail, Tenant's request for approval of the System or Landlord fails to
51    provide contact information for its approved roofing contractor, in each instance within

29

1  thirty (30) days after request therefor from Tenant, then the plans for the System shall be
2  deemed approved and/or Tenant shall have the right to use its own contractor to perform
3  any roof penetrations, as applicable. Landlord acknowledges and agrees that Tenant or
4  its Affiliate or transferee shall be the exclusive owner and operator of the System and
5  Landlord shall have no right, title or interest in such equipment or any component
6  thereof, notwithstanding that any such equipment may be physically mounted or adhered
7  to the Premises. Landlord acknowledges and agrees that, notwithstanding the System's
8  presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and
9  exclusive owner of: (i) the electricity generated by the System, (ii) the environmental
10  attributes of the System, and (iii) any and all credits (including tax credits), rebates,
11  benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever
12  entitled, resulting from the environmental or related attributes of the System. Without the
13  express written consent of Tenant, Landlord shall not make or publish any public
14  statement or notice regarding any environmental incentive relating to the System or any
15  environmental attribute of the System or the energy output from the System.

16          8.1.9  Tenant shall be entitled to receive any and all "Incentives"
17  (hereinafter defined) which Tenant may negotiate with, or derive from governmental,
18  non-governmental, private or public utility, or other entities pertaining to construction
19  and/or remodeling (including without limitation Tenant's Work) of the Premises, hiring
20  of employees, or other business operations of Tenant which would cause an owner or
21  occupant of the Premises to be entitled to an Incentive. As used herein, the term
22  *"Incentive"* shall include, without limitation, any cost reduction, refund, voucher, credit,
23  tax relief, abatement, or other monetary inducement (such as, for examples only, energy
24  efficiency incentives, property tax abatements or grants, sales tax refunds or grants, tax
25  credits, governmental grants, utility rebates or refunds, or any other benefit or amount
26  negotiated by, or otherwise allowed to Tenant). If any such Incentive is required to be
27  paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Incentive in
28  a lump sum, or if that is not permitted, then in the shortest number of installments
29  possible, so as to permit Tenant to recoup the full amount of the Incentive during the
30  Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the
31  Incentive, Landlord shall pay Tenant for such amount, or in the alternative, Tenant shall
32  be entitled to offset the full amount of such Incentive against the next succeeding
33  installment(s) of Rent then payable under the Lease.

34                                    ARTICLE 9
35                                    REPAIRS

36          Section 9.1  Tenant's Repairs. Subject to the provisions of Articles 10 and 11
37  hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in
38  good condition and repair, at its sole cost and expense: (i) the non-structural, interior
39  elements of the Premises (including plate glass, and the electrical, plumbing, mechanical,
40  and/or alarm systems located in, and serving exclusively the Premises); and (ii) the
41  heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the
42  Premises. All repairs and replacements on Tenant's part to be performed hereunder shall
43  be at Tenant's sole cost and expense, and performed in a good and workmanlike manner
44  in accordance with all applicable Legal Requirements.

45          Section 9.2  Landlord's Repairs. Subject to the provisions of Articles 10 and 11
46  hereof, Landlord shall perform, as the same shall from time to time be necessary, all
47  repairs and replacements to the following:

48                  (a)  the buildings of the Shopping Center and such other portions
49  of the Greater Shopping Center owned by Landlord as necessary to maintain same in
50  good condition and repair (including, without limitation, repainting the exterior walls of
51  the buildings of the Shopping Center (including, without limitation, the Premises)) as
52  same may be reasonably required from time to time during the Term, and during any time

period when the Section I Shopping Center and/or the Section II Shopping Center (or any portion thereof) is not owned by Landlord, Landlord shall use its commercially reasonable efforts to enforce its rights under the OEA to cause the portions of Section I Shopping Center and/or the Section II Shopping Center (or any portion thereof) not owned by Landlord, as the case may be, to be maintained in good condition and repair;

(b)   the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)   the roof, gutters, flashings, downspouts and scuppers;

(d)   the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises (including, without limitation, any fire pump facilities or electrical switch gear serving the Premises);

(e)   all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)   the non-structural elements of the Premises (including, without limitation, the maintenance, repair and replacement of the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)   any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

31

1       Section 9.3    <u>Legal Compliance Work</u>.  Except as hereinafter expressly provided,
2    Landlord shall be responsible, at its sole cost and expense (and not includable in
3    Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter
4    defined).  Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and
5    expense, for the performance of Legal Compliance Work: (a) pertaining to the interior
6    elements of the Premises which are neither structural nor comprise the major building
7    systems serving the Premises; or (b) required solely as a result of Tenant's specific
8    manner of use of the Premises (*i.e.*, are not of general applicability to tenants and
9    occupants of the Greater Shopping Center); <u>provided</u>, <u>however</u>, that the foregoing shall
10   not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance
11   with all Legal Requirements, and (y) the repairs required in this Lease.  As used herein,
12   "***Legal Compliance Work***" shall mean any obligation, addition, alteration, improvement,
13   or rebuilding, structural or otherwise, to or of the Premises, the Greater Shopping Center,
14   or any part thereof, as applicable, which may be required by reason of any Legal
15   Requirement.

16                   ARTICLE 10
17     INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

18       Section 10.1  <u>Mutual Release, Waiver of Subrogation and Mutual Indemnification</u>.

19       10.1.1 <u>Mutual Waiver of Claims</u>.  Landlord and Tenant, on their own behalf
20   and on behalf of anyone claiming under or through either one by way of subrogation,
21   hereby release and waive all rights of recovery and causes of action against each other
22   and their respective Affiliates from any and all liability for any loss or damage to
23   property or resulting from damage to such property (and, in either case, any resulting loss
24   of business or rental income), whether caused by the negligence or fault of the other
25   party, which is normally insured under Special Form property insurance (so-called "All-
26   Risk") and time element insurance required to be maintained hereunder.  In the event
27   either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be
28   permitted hereunder), then the self-insuring party or the party maintaining the deductible
29   hereby releases the other party from any liability arising from any event which would
30   have been covered had the required insurance been obtained and/or the deductible not
31   been maintained.

32       10.1.2 <u>Waiver of Subrogation</u>.  Landlord and Tenant shall cause each
33   property insurance policy carried by either of them insuring the Premises, the contents
34   thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery
35   by way of subrogation or otherwise against the other party hereto (and all of such other
36   party's Affiliates) in connection with any loss or damage which is covered by such policy
37   or that such policy shall otherwise permit, and shall not be voided by the releases
38   provided above.

39       10.1.3 <u>Mutual Indemnification</u>.

40           (a)  Except as otherwise provided in Subsections 10.1.1 and
41   10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord
42   harmless from and against any and all claims, actions, damages, liability and expense,
43   including reasonable attorneys' fees, (x) in connection with loss of life, personal injury
44   and/or damage to property arising from or out of any occurrence in or upon the Premises,
45   or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant,
46   its agents, contractors, employees, servants, or licensees, <u>except</u> to the extent such claims,
47   actions, damages, liability and expense are caused by the acts or omissions of Landlord,
48   its agents, contractors, licensees, employees, or other tenants and occupants, or for which
49   any of said parties may be statutorily liable.

50           (b)  Except as otherwise provided in Subsections 10.1.1 and
51   10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant

1  harmless from and against any and all claims, actions, damages, liability and expense,
2  including reasonable attorneys' fees, (x) in connection with loss of life, personal injury
3  and/or damage to property arising from or out of any occurrence in or upon any
4  portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or
5  in part by any act or omission of Landlord, its agents, contractors, employees, servants,
6  tenants (other than Tenant), occupants or licensees, except to the extent such claims,
7  actions, damages, liability and expense are caused by the acts or omissions of Tenant, its
8  agents, contractors, licensees or employees, or for which any of said parties may be
9  statutorily liable.

10      Section 10.2  Tenant's Insurance.

11          10.2.1 Tenant's Insurance.  Tenant shall maintain, or cause to be
12  maintained, in full force and effect from and after the Delivery Date, and throughout the
13  Term: (i) commercial general liability insurance protecting and insuring Tenant, naming
14  Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of
15  the Premises by Tenant and the obligations assumed by Tenant under this Lease, and
16  having a combined single limit of liability of not less than Ten Million Dollars
17  ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special
18  Form (so-called "All-Risk") property insurance, on a replacement cost basis, in an
19  amount adequate to cover the full insurable replacement value of all of Tenant's Property.

20          10.2.2 Self-Insurance.  All insurance required to be maintained under this
21  Section 10.2 may be: (i) insured under an individual policy covering this location, or  a
22  blanket policy or policies which includes other liabilities, properties and locations of
23  Tenant or its Affiliates; (ii) self-insured by Tenant via a deductible, a formal plan of self-
24  insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations
25  under this Lease maintains, during the period of such self-insurance, a net worth of at
26  least One Hundred Million Dollars ($100,000,000); or (iii) insured or self-insured by
27  Tenant through a combination of any of the foregoing insurance programs.

28      Section 10.3  Landlord's Insurance.

29          10.3.1 Liability Insurance.  Landlord shall maintain in full force and effect
30  on and after the Effective Date and throughout the Term commercial general liability
31  insurance with regard to the Common Areas within the Shopping Center protecting and
32  insuring Landlord, naming Tenant as an "additional insured-lessee", and having a
33  combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for
34  bodily injury, death and property damage liability.

35          10.3.2 Special Form Property Insurance.  Landlord shall procure and
36  maintain in full force and effect on and after the Effective Date and throughout the Term,
37  Special Form (so-called "All-Risk") property insurance (including loss of rents for a
38  minimum period of one (1) year) and endorsements for coverages for flood, earthquake,
39  windstorm, earth movement [sinkholes], Ordinance or Law coverage, on a replacement
40  cost basis, in an amount adequate to cover the full insurable replacement value of all of
41  the buildings (including the Premises) and other insurable improvements in the Shopping
42  Center; provided, however, in no event shall such insurance cover Tenant's Property.  All
43  policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall
44  provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if
45  none, to Landlord, in either event to be held in trust by such party and disbursed only in
46  accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.
47  The property insurance required to be maintained by Landlord pursuant to this Section
48  shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without
49  Tenant's prior consent.

50          10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall
51  reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums

attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of such insurance premiums from the Rent Commencement Date through the end of the first full calendar year of the Term exceed $.50 per square foot of Floor Area per annum. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4  <u>General Insurance Requirements</u>.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each policy carried by either party shall be written as a primary policy not contributing with, and not in excess of, coverage carried by the other. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Subsections 10.2.1 and 10.3 above.

10.4.2 The liability insurance requirements under Subsections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1  <u>Fire and Other Casualty</u>.

11.1.1 (a)    Except as otherwise provided in this Subsection 11.1.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, and shall not include any of Tenant's Property (all of the foregoing work is hereinafter referred to as the "***Primary Restoration***"). With respect to buildings or improvements within the Greater Shopping Center (other than the Shopping Center) which are damaged by fire or other casualty, Landlord shall promptly either (aa) rebuild and restore or cause to be rebuilt or restored) all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (bb) raze (or cause to be razed) the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly

manner (all of the foregoing work is hereinafter referred to as the "*Secondary Restoration*"). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 10.3 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration (it being agreed that subject to the provisions of this Lease, such proceeds delivered to Landlord's Mortgagee may be disbursed in accordance with such Mortgagee's commercially reasonable disbursement requirements). In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Greater Shopping Center in the manner provided in this Subsection 11.1.1. Notwithstanding anything herein to the contrary, in the event Landlord does not own (and an affiliate of Landlord does not own) any portion of the Greater Shopping Center (other than the Shopping Center), Landlord's Secondary Restoration obligations under this Section 11.1.1(a) on the portion of the Greater Shopping Center (other than the Shopping Center) not owned by Landlord (or Landlord's affiliate) shall be satisfied by Landlord enforcing the restoration obligations under the OEA.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Subsection 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any condition affecting, or damage to, the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any condition affecting, or damage to, the Road Parcel or the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2 In the event that:

(a)    Landlord does not commence the Primary Restoration and/or Secondary Restoration as required pursuant to this Section 11.1 within one hundred eighty (180) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)    the Primary Restoration and/or Secondary Restoration is not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

35

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

        (i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Section 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

        (ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

        (iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

Notwithstanding anything in this Lease to the contrary, in the event Landlord no longer owns any of the other parcels of real property comprising the Greater Shopping Center after a casualty has occurred, Landlord agrees to use commercially reasonable efforts to enforce the provisions of the OEA related to restoration, but shall be under no obligation to pursue any self-help rights related to same unless such parcels are located within the Shopping Center.

        11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

        Section 11.2  Eminent Domain.

        11.2.1 As used in this Section 11.2, "*Taking*" or "*Taken*" shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

        11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further

1    liability on the part of either Landlord or Tenant, except for an adjustment between the
2    parties for the Rent payable by Tenant hereunder.

3        11.2.3 In the event that:

4            (a)   any portion of the Premises shall be Taken so that it is
5    commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to
6    conduct its normal business in the Premises;

7            (b)   as a consequence of any Taking: (i) portions of the Greater
8    Shopping Center shall be divided or separated in any manner that it materially
9    interferes with parking, visibility, or access to the Premises from other portions of
10    the Shopping Center, or (ii) the Shopping Center no longer has all of the entrances
11    from both Skibo Road and Cliffdale Road, and as a result, it is not commercially
12    reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal
13    business in the Premises;

14            (c)   there occurs, in Tenant's reasonable judgment, a denial of
15    adequate access to the Shopping Center at the grade of any street adjoining the
16    Greater Shopping Center or to any easement granted under this Lease, whether or
17    not a Taking shall have occurred;

18            (d)   any portion of the Shopping Center shall be Taken which
19    materially interferes with parking, visibility or access to the Premises, and as a
20    result of such taking it is commercially unreasonable or unfeasible for Tenant, in
21    its reasonable judgment, to conduct its normal business in the Premises;

22            (e)   more than twenty-five (25%) percent of the total Floor Area
23    of all of the buildings in the Shopping Center (other than the Premises) are Taken;
24    or

25            (f)   ten (10%) percent or more of the parking spaces located in the
26    Shopping Center are Taken, or if so many of the parking spaces in the Shopping
27    Center are Taken such that there are fewer than (i) three and one-third (3 1/3)
28    parking spaces for every one thousand (1,000) square feet of Floor Area in the
29    Shopping Center, or (ii) the number of parking spaces required by applicable
30    Legal Requirements (without variance);

31    then, in any of such events, Tenant shall have the right to terminate this Lease by giving
32    at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event,
33    in which event this Lease shall terminate without any further liability on the part of either
34    Landlord or Tenant, except for an adjustment between the parties for the Rent payable by
35    Tenant hereunder and for payment to Tenant for its share of the award for the taking
36    pursuant to Subsection 11.2.5 below.  Upon any partial Taking of the Premises, the Rent
37    shall be equitably reduced or totally abated based upon the extent to which the remaining
38    portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal
39    conduct of business.

40            11.2.4 If this Lease is not terminated pursuant to this Section 11.2,
41    Landlord, at its sole cost and expense, within a reasonable period of time after such
42    Taking, shall repair and restore the area not so Taken to tenantable condition, similar in
43    physical appearance to the condition of the area immediately prior to the Taking,
44    pursuant to plans and specifications approved by Tenant (which repair and restoration
45    shall, as applicable, include all Tenant's Work and all other leasehold improvements
46    performed by Tenant; provided, however, that Landlord shall not be obligated to repair or
47    restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking
48    shall be made available to and used by Landlord for any rebuilding or restoration which it
49    is required to perform hereunder.  During the period of such repairs and restoration, all

Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below.  Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3 Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1 Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2 Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Greater Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3 Landlord's Covenants. Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a) As of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Greater Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b) In the event the legal description of the Shopping Center described in Exhibit A-1 hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c) No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

38

(d)    Except with respect to any Existing Exclusives as set forth on Exhibit K-1, Tenant's use of the Premises for sale of "Permitted Items" (defined in Subsection 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Greater Shopping Center;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have, access to and from Skibo Road and Cliffdale Road, and the Road Parcel as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Greater Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Greater Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)    There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use, subject to the Existing Exclusives set forth on Exhibit K-1; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)    As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof;

(i)    As of the Effective Date there is no "Related Land" (defined in Subsection 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(j)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Greater Shopping Center (the "*Existing Leases*"); and

(k)    Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease.  Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance.  If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

1    Section 12.4 Environmental Matters.

2    12.4.1 Definitions.

3    (a)    As used herein, the term *"Environmental Laws"* shall mean
4    any and all Legal Requirements concerning the protection of the environment, human
5    health or safety.

6    (b)    As used herein, the term *"Hazardous Substances"* shall mean
7    each and every element, compound, material, mixture, substance, waste, hazardous
8    substance, hazardous waste, hazardous material, toxic substance, pollutant or
9    contaminant either as those terms are defined in any of the Environmental Laws or the
10    presence of which may cause liability at common law, including, without limitation,
11    asbestos and/or asbestos-containing products, whether or not currently friable.

12    (c)    As used herein, the term *"Environmental Notice"* shall mean
13    a summons, citation, directive, order, claim, notice, litigation, investigation, judgment,
14    legal pleading, letter or other communication, written or oral, actual or threatened, from
15    the United States Environmental Protection Agency or other federal, state or local
16    governmental agency or authority, or any other private individual or entity concerning (i)
17    any Hazardous Substances at, on, in, under or emanating from the Premises, the Greater
18    Shopping Center or any contiguous property; (ii) any violation or potential violation of
19    Environmental Laws at the Premises, the Greater Shopping Center or any contiguous
20    property; or (iii) any underground storage tanks on the Premises or the Greater Shopping
21    Center.

22    (d)    As used herein, the term *"Releasing"* or *"Release"* shall
23    mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise
24    introducing any substance into the environment or into any building or other
25    improvements in violation of Environmental Laws.

26    (e)    As used herein, the term *"Compliance Costs"* shall mean any
27    and all costs incurred by a party in complying with applicable Environmental Laws,
28    including, without limitation, consultant's and engineer's fees; laboratory costs;
29    contractor's and subcontractor's fees; application and filing fees; costs of investigation,
30    monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings
31    or other improvements; equipment costs; disposal fees; costs of operation and
32    maintenance of equipment; legal fees; other governmental fees or costs; interest at the
33    Lease Interest Rate from the date of expenditure until paid in full; and other similar or
34    related costs.

35    (f)    As used herein, the term *"Tenant Related Parties"* shall
36    mean Tenant's agents, servants, employees, contractors or licensees.

37    12.4.2 Compliance with Environmental Laws.  Tenant shall comply with all
38    applicable requirements of Environmental Laws governing its use of, and operations at,
39    the Greater Shopping Center and the Premises.  Landlord shall comply with all applicable
40    requirements of Environmental Laws relating to the Greater Shopping Center and the
41    Premises, except to the extent such requirements arise from Tenant's operations thereon.

42    12.4.3 Responsibility for Releases of Hazardous Substances.
43    Notwithstanding any other provision of this Lease, Tenant shall only be liable for any
44    Release of Hazardous Substances at, on, in, under or emanating from the Premises or
45    Greater Shopping Center which were introduced by Tenant or Tenant Related Parties
46    (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs
47    required to address Tenant Releases.  As between Landlord and Tenant, Landlord shall be
48    liable (subject to the limitations contained in Section 12.4.7 hereof) for any Hazardous
49    Substances at, on, in, under or emanating from the Premises or Greater Shopping Center,

40

1    including, without limitation, any Compliance Costs attributable to such Hazardous
2    Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in
3    the event of an emergency or if compelled by applicable governmental authority, any
4    work performed by Landlord relating to Hazardous Substances shall be performed by
5    Landlord at any time other than during the months of August (through Labor Day),
6    November or December, and shall be undertaken in such a manner so as to (i) not
7    adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect
8    on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not
9    otherwise materially interfere with the normal conduct of any business operations in the
10    Premises.  If the presence of Hazardous Substances, or Landlord's remediative work
11    relative thereto, interferes with Tenant's normal business operations in the Premises, then
12    Tenant shall be entitled to an equitable abatement of Rent for so long as such condition
13    persists.

14          12.4.4 <u>Standards</u>.  Except as expressly provided herein, the parties agree
15    that any investigation or remediation of Hazardous Substances, or cure of a violation of
16    Environmental Laws, required to be conducted at the Premises or Greater Shopping
17    Center shall be no more stringent than necessary to meet the minimum standards of
18    Environmental Laws applicable to properties used in the manner the Greater Shopping
19    Center is being used.

20          12.4.5 <u>Landlord's Representations and Warranties</u>.  Landlord represents
21    and warrants that: (i) Landlord has received no Environmental Notices concerning the
22    Greater Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no
23    knowledge of, and has received no notice of, any violation, or potential or alleged
24    violation, of any Legal Requirement, including, without limitation, Environmental Laws,
25    affecting the Greater Shopping Center, the Premises or any contiguous properties,
26    regardless of whether same has been cured; and (iii) except as set forth in the (x) Phase I
27    Environmental Site Assessment for Leisure Living Estates property intersection of  Skibo
28    Road and Cliffdale Road, Fayetteville, Cumberland County, North Carolina, prepared
29    for: NC Fayetteville Skibo, LLC, dated March 1, 2015, and (y) Phase II Environmental
30    Site Assessment Report for Leisure Living Estates property intersection of  Skibo Road
31    and Cliffdale Road, Fayetteville, Cumberland County, North Carolina, prepared for: NC
32    Fayetteville Skibo, LLC, dated November 19, 2015, to the best of Landlord's knowledge:
33    (A) no Hazardous Substances are located at, on, in, under or emanating from the Greater
34    Shopping Center, the Premises or any contiguous properties; and (B) no underground
35    storage tank exists at the Greater Shopping Center or the Premises.  The foregoing
36    representations and warranties shall in no way serve to vitiate Landlord's obligations
37    under this Article 12.

38          12.4.6 <u>Documents</u>.  Each party shall immediately notify the other party of
39    the notifying party's receipt of an Environmental Notice.

40          12.4.7 <u>Indemnity</u>.  Each party to this Lease shall indemnify, defend and
41    hold the other party, and its agents, servants, shareholders, directors, officers, partners,
42    members and employees harmless from any and all claims, losses, expenses, costs,
43    lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and
44    liabilities of any nature whatsoever, including, without limitation, reasonable attorneys'
45    fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs,
46    arising from (i) the indemnifying party's breach of any of its representations, warranties,
47    covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for
48    which the indemnifying party is liable under this Section 12.4; or (iii) violations of
49    Environmental Laws for which the indemnifying party is liable under this Section 12.4.
50    Notwithstanding the foregoing provisions of this Subsection 12.4.7, Landlord's
51    agreement to indemnify, defend and hold Tenant harmless shall not apply with respect to
52    Hazardous Substances (i) which are introduced to the Greater Shopping Center or the
53    Premises after the Delivery Date by any party other than Landlord or any party related to

1    Landlord or any contractor, employee, agent or representative of Landlord, and (ii) for
2    which Landlord is not otherwise responsible under applicable Legal Requirements,
3    subject to the following conditions: (A) Landlord shall otherwise comply with its duties
4    and obligations under this Section 12.4, (B) upon request by Tenant, Landlord shall at its
5    expense commence such actions or proceedings on Tenant's behalf against the party who
6    shall have introduced (or be legally responsible for the introduction of) such Hazardous
7    Substances to the Greater Shopping Center or the Premises and thereafter diligently
8    pursue same, and (C) should the introduction of such Hazardous Substances as aforesaid
9    materially interfere with the normal conduct of Tenant's business in the Premises, its use
10   and enjoyment of the Common Areas or its other rights and benefits under this Lease,
11   then Tenant shall be entitled to an equitable abatement of Rent and, in the event such
12   material interference continues for a period of one hundred eighty (180) days after
13   discovery of such Hazardous Substances and Landlord is unable (or elects not) to
14   remediate (or cause the remediation of) such Hazardous Substances as required by law
15   within such period of one hundred eighty (180) days, then Tenant shall be entitled to
16   terminate this Lease at any time prior to the completion of such remediation upon thirty
17   (30) days prior notice to Landlord.

18       12.4.8 Survival.  The obligations of the parties under this Section 12.4 shall
19   survive the renewal, expiration, breach or earlier termination of this Lease.

20       12.4.9 Conflict.  In the event of any conflict between the provisions of this
21   Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4
22   shall control.

23   Section 12.5  OEA.

24       12.5.1 As used in this Lease, the term *"OEA"* shall mean that certain
25   Declaration of Easements, Covenants and Restrictions for Freedom Town Center, a form
26   of which is attached hereto as Exhibit N.  Any changes to the OEA that could diminish
27   the rights or increase the obligations of Tenant thereunder or under this Lease, or could
28   adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's
29   business therein, shall be subject to Tenant's prior written consent, which consent may be
30   withheld in its sole and absolute discretion.

31       12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the
32   OEA has not been modified, amended or terminated; (ii) the OEA is currently in full
33   force and effect; (iii) to its actual knowledge as of the date hereof, no default under the
34   OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA
35   is, and shall remain, superior in lien to all mortgages and related liens affecting the
36   Greater Shopping Center and all other land which is encumbered by the OEA.  Landlord
37   and Tenant each acknowledge that this Lease is made and shall continue to be subject and
38   subordinate to the OEA, subject to the provisions of this Section 12.5.  Tenant shall
39   comply with the terms and conditions of the OEA to the extent same affects the Premises
40   (it being agreed that Tenant shall not be obligated to expend any sums in connection with
41   such compliance).

42       12.5.3 Landlord shall, during the Term: (i) perform and observe all of the
43   terms, covenants, provisions and conditions of the OEA on Landlord's part to be
44   performed and observed; (ii) defend, indemnify and hold harmless Tenant from and
45   against any and all claims, demands, causes of action, suits, damages, liabilities, and
46   expenses of any nature arising out of or in connection with the enforcement of, or a
47   claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA;
48   and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations
49   of the OEA.

50       12.5.4 Whenever, pursuant to the OEA, the consent or approval of
51   Landlord shall be required by or requested, and such consent or approval could diminish

the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5 Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7 In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA.  Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA  or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8 As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

Section 12.6   Purchase and Sale Contract.

12.6.1 Landlord represents and warrants to Tenant that, as of the Effective Date:  (a) it is the vendee under that certain Agreement for Sale of Property dated October 31, 2014 by and between Leisure Living DGW, LLC, Leisure Living JHW, LLC, Leisure Living RPW, LLC and Leisure Living SWC, LLC, collectively, as seller, and RealtyLink Investment, LLC [to be assigned to Landlord], as purchaser, with respect to the Greater Shopping Center (the "***Contract***"); (b) the Contract is in full force and effect; (c) it has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contract; and (d) the Greater Shopping Center consists of approximately 49.10 acres, and currently constitutes all of the property to be purchased under the Contract.  Landlord shall proceed diligently and in good faith to acquire fee title to the Greater Shopping Center under the Contract.

12.6.2 In the event that Landlord and Tenant have executed a short form or memorandum of this Lease for recording pursuant to Section 23.20 below prior to Landlord's closing of title to the Greater Shopping Center, Landlord shall cause such short form or memorandum to be duly recorded promptly after the deed of conveyance to Landlord, at Landlord's expense, and prior to the recording of any mortgage as which mortgage a subordination, non-disturbance and attornment agreement (or its equivalent)

has not been executed and delivered by and between Tenant and such mortgagee. Within five (5) days after the closing of title to the Greater Shopping Center pursuant to the Contract, Landlord shall give Tenant notice thereof.

12.6.3 (a)    In the event that Landlord has not acquired fee title to the entire Greater Shopping Center in full accordance with the terms and conditions of this Lease within one hundred eighty (180) days after the Effective Date, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Tenant so terminate this Lease, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third party costs and expenses incurred by Tenant in connection with this Lease (and the provisions of Section 23.13 below shall not apply), including, without limitation, the preparation of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under the Contract, such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000). If Landlord's failure to acquire such fee title is attributable to Landlord's default or breach under the Contract, the provisions of Section 23.13 hereof shall not apply.

(b)    In the event that Landlord has not acquired fee title to the entire Greater Shopping Center in full accordance with the terms and conditions of this Lease within one hundred eighty (180) days after the Effective Date, which failure by Landlord is not attributable to Landlord's default or breach under the Contract, then Landlord may at its election, upon notice to Tenant, given at any time after said date (and in any event prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Landlord terminate this Lease as aforesaid, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third-party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under the Contract, such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000), and the provisions of Section 23.13 hereof shall not apply.

12.6.4 If this Lease is terminated pursuant to Subsection 12.6.3 above, and Landlord or its Affiliate acquires title to the Greater Shopping Center within two (2) years after the date on which the Lease termination becomes effective hereunder, then Landlord shall offer to Tenant, at the time of Landlord's (or its Affiliate's) acquisition of title to the Greater Shopping Center, the option to lease the Premises upon the terms and conditions of this Lease; provided, however, that all dates set forth in this Lease shall be appropriately extended. In the event Tenant elects, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord shall be free to lease the Premises to any other person or entity, upon economic terms which are not materially more favorable to the tenant than those contained in this Lease. The provisions of this Subsection 12.6.4 shall survive the termination of this Lease.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1 Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed) or the

44

1  "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then
2  applicable.

3  13.1.2 Prohibited Uses. Landlord shall construct, lease, operate, maintain
4  and manage the Greater Shopping Center (or cause the Greater Shopping Center to be
5  constructed, leased, operated, maintained and managed) in a manner equivalent to other
6  comparable shopping centers in the state in which the Greater Shopping Center is located.
7  Subject to the rights of tenants under Existing Leases, Landlord shall not lease, rent or
8  occupy or permit to be occupied any portion of the Greater Shopping Center or any
9  "Related Land" (hereinafter defined) for any of the "Prohibited Uses" that pertain to the
10  Greater Shopping Center or the Related Land, as the case may be (as set forth in Exhibit
11  M hereto annexed), provided, however, that as to any future Related Land, the foregoing
12  restriction shall not apply to the extent that any Prohibited Uses are otherwise permitted
13  under leases entered into prior to the date on which such land becomes Related Land. As
14  used in this Lease, the term *"Related Land"* shall mean any land contiguous or adjacent
15  to the Greater Shopping Center (including, without limitation, any land that would be
16  contiguous or adjacent to the Greater Shopping Center but for any intervening road,
17  street, alley or highway) owned or controlled by Landlord or its Affiliate(s).

18  Section 13.2 Tenant's Exclusive in Center. To induce Tenant to execute this
19  Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord
20  covenants and agrees as follows.

21  13.2.1 Landlord shall not lease, rent or occupy or permit any other
22  premises in the Greater Shopping Center or on any Related Land to be occupied, whether
23  by a tenant, sublessee, assignee, licensee or other occupant or itself, for: (a) the sale of
24  infant, juvenile and children's furniture and equipment (collectively, *"Restricted*
25  *Furniture"*); (b) the operation of a business whose primary business is the sale of
26  clothing, layettes, apparel, shoes and/or accessories for infants, juveniles and children 0-4
27  years in age, and maternity clothing; and (c) the operation of a business whose primary
28  business is the sale of merchandise, products and services targeted for use by or for
29  infants, juveniles and children 0-4 years in age (including, without limitation, infant,
30  juvenile and children's: toys, books, food, formula, indoor and/or outdoor play and
31  recreational equipment, audio and video cassettes or equipment, safety items, feeding
32  items, nursing items, health and beauty care items, drug remedies, diapers, wipes,
33  bathroom items (including, without limitation, personal care devices and other bathroom
34  appliances, accessories and toiletries)) (which items in clauses (a), (b) and (c) above, either
35  singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*).
36  Notwithstanding the foregoing, any tenant or subtenant in the Greater Shopping Center or
37  the Related Land shall have the right to utilize its respective premises for the sale of the
38  Restricted Furniture within an aggregate area (which shall include an allocable portion of
39  the aisle space adjacent to such sales area) not to exceed the lesser of (A) five percent
40  (5%) of the Floor Area of such tenant's or subtenant's premises, or (B) one thousand
41  (1,000) square feet of Floor Area within such tenant's or subtenant's premises, except
42  that (x) Dick's Sporting Goods/Field & Stream ("DSG") (or the successors, assigns
43  and/or subtenants of DSG operating under the initial lease of Building I-A and I-B) shall
44  have the right to utilize Building I-A and I-B, for the sale of the Restricted Furniture
45  within an aggregate area (which shall include an allocable portion of the aisle space
46  adjacent to such sales area) not to exceed the lesser of (A) ten percent (10%) of the Floor
47  Area of Building I-A and Building I-B, or (B) two thousand five hundred (2,500) square
48  feet of Floor Area of Building I-A and Building I-B, and (y) Homegoods (and its
49  successors and assigns) operating under the initial lease of Building I-C shall have the
50  right to utilize Building I-C, for the sale of the Restricted Furniture within an aggregate
51  area (which shall include an allocable portion of the aisle space adjacent to such sales
52  area) not to exceed the lesser of (A) ten percent (10%) of the Floor Area of Building I-C,
53  or (B) two thousand five hundred (2,500) square feet of Floor Area of Building I-C. As
54  to any future Related Land, the foregoing restrictions shall not apply to the extent that

45

1    any Exclusive Items are otherwise permitted under leases entered into prior to the date on
2    which such land became Related Land.

3              13.2.2 (a) The restrictions set forth in Subsection 13.2.1 above shall not
4    apply to: (i) department stores [for example, Wal-Mart, Macy's, or Target], (ii) discount
5    clubs [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home
6    improvement centers [for example, Home Depot or Lowe's], commonly located in first-
7    class shopping centers in the state in which the Shopping Center is located, each
8    occupying at least 60,000 square feet of Floor Area within the Greater Shopping Center,
9    as such stores are currently operated (as of the Effective Date). In addition, the
10   restrictions set forth in Subsection 13.2.1 above shall not apply to (i) any premises
11   containing less than 3,500 square feet of Floor Area, (ii) Bed Bath & Beyond, (iii) any
12   store in the Greater Shopping Center occupied and operated by Tenant or any of its
13   Affiliates, and (iv) Hobby Lobby (or to the successors, assigns and/or subtenants of
14   Hobby Lobby operating under the initial lease of Building I-D).

15              (b)    The restrictions set forth in Subsection 13.2.1(b) and (c)
16   above shall not apply to Carter's or OshKosh in Building III-A, as those brands currently
17   operate their stores (as of the Effective Date) or any modifications to their product lines,
18   provided such new product lines (i) are commonly sold in other Carter's or OshKosh
19   stores, as applicable, and (ii) are Carter's or OshKosh's own label, including any future
20   change in Carter's trade name so long as it contains the word "Carter's" and any future
21   change in OshKosh's trade name so long as it contains the word "OshKosh".
22

23              13.2.3 The exclusive rights granted to Tenant in Subsection 13.2.1 above
24   shall be conditioned upon Tenant being open and operating within the Premises as a
25   typical Buy Buy Baby store (or similar trade name) (other than prior to the date Tenant
26   initially opens its store for business to the public, or during "Excused Periods" [defined in
27   Section 1.1.9 above] and for periods of time not exceeding six (6) consecutive months).
28   Notwithstanding anything in this Subsection 13.2.3, Tenant's exclusive shall only apply
29   to Dick's Sporting Goods/Field & Stream in the event Tenant opens for business to the
30   public in the Shopping Center within 180 days after the Delivery Date. The exclusive
31   rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of
32   Tenant's interest in this Lease and to any sublessee of at least fifteen thousand square feet
33   of Floor Area within the Premises for the sale of the Exclusive Items.

34              13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by
35   Landlord (which breach shall not include a situation in which the lease between Landlord
36   and any tenant in the Greater Shopping Center or in the Related Land prohibits the tenant
37   therein from violating the exclusive rights granted to Tenant in this Section 13.2 and
38   despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails
39   to comply with any of the provisions of subparagraph (b) below), the Rent payable
40   hereunder shall be reduced by fifty percent (50%) for so long as such violation shall
41   continue, and Tenant shall have all remedies given to it at law and in equity, including,
42   without limitation, the right to obtain injunctive relief, and/or to terminate this Lease,
43   and/or to commence and prosecute an action against Landlord or any other violator for
44   damages.

45              (b)    If any person or entity other than Landlord shall violate any
46   of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it
47   intends to violate any of said provisions, Landlord shall promptly commence appropriate
48   legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such
49   violation. If Landlord fails to promptly commence such proceedings, or shall fail
50   thereafter to diligently prosecute the same, then Tenant shall have the right (i) to conduct
51   and prosecute such legal proceedings (including, without limitation, an action for
52   injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set
53   forth in (i) above is not permitted to be exercised under applicable Legal Requirements,

1   to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's
2   expense, and Landlord shall cooperate with Tenant with respect to such prosecution
3   (including, without limitation, by executing any documentation or authorization
4   reasonably required by Tenant in connection with such prosecution and by appearing at
5   any hearing or trial with respect to such prosecution).

6       Section 13.3  Exclusives Which Tenant Must Honor.

7        13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain
8   other tenants in the Greater Shopping Center pursuant to the terms of leases which have
9   been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and
10  complete listing and description of such Existing Exclusives being attached hereto as
11  Exhibit K-1, and shall not sublease, occupy or use all or any portion of the Premises, or
12  permit all or any portion of the Premises to be occupied or used in violation of any such
13  Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord
14  represents and warrants that no Existing Exclusive(s) exist other than those listed on
15  Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to
16  indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or
17  expense (including, without limitation, reasonable legal fees) incurred by Tenant by
18  reason of the enforcement by any person or entity of such unlisted Existing Exclusive.
19  Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement
20  with any tenant or other occupant for whose benefit the Existing Exclusive is granted
21  which nullifies or modifies the corresponding Existing Exclusive with regard to the
22  Premises.

23       13.3.2 Except as expressly set forth in this Section 13.3, Tenant shall not be
24  obligated to honor any exclusive granted by Landlord to any tenant in the Greater
25  Shopping Center or in any other property owned by Landlord or Landlord's Affiliate.

26              ARTICLE 14
27         CONDUCT OF BUSINESS OPERATIONS

28      Subject to the other provisions of this Lease (including, without limitation,
29  Articles 2 and 3 and Subsection 12.4.3  hereof) Tenant shall initially open its store for
30  business to the public in the Premises for at least one (1) day, not later than the one
31  hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as
32  applicable, be extended by reason of (A) damage or destruction, eminent domain
33  proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord).
34  Other than as expressly set forth in the preceding sentence, Tenant shall have no
35  obligation to open or operate any business in the Premises, and shall have the right, at any
36  time, to cease to conduct any business operations in the Premises, and Tenant shall incur
37  no liability to Landlord or its Mortgagee by reason thereof (it being understood and
38  agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is
39  terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other
40  provision of this Lease [other than by reason of an Event of Default]).  In the event that
41  Tenant does not operate or cause to be operated any retail business in the Premises (other
42  than prior to the Rent Commencement Date or during Excused Periods) for more than
43  one hundred eighty (180) consecutive days, Landlord shall have the option to terminate
44  this Lease, which option shall be exercisable by giving notice thereof to Tenant by not
45  later than the ninetieth (90th) day after the date on which said 180-day period expires,
46  whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*)
47  after the date on which Tenant receives Landlord's termination notice, as if the Recapture
48  Date was originally set forth herein as the expiration date of the Term.  Upon such
49  termination, Landlord and Tenant shall each be released from any and all liabilities
50  thereafter accruing hereunder, except for those obligations which survive the expiration
51  or other termination of this Lease pursuant to the express terms of this Lease.  All Rent
52  payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant

1  shall promptly pay to Landlord any amounts so determined to be due and owing by
2  Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any
3  amounts prepaid by Tenant for periods subsequent to the Recapture Date.

4                                    ARTICLE 15
5                        TENANT ASSIGNMENT AND SUBLETTING

6            Section 15.1 Assignment and Subletting.

7            15.1.1 Tenant shall have the right from time to time, without the consent of
8  Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license
9  all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

10           15.1.2 Except with respect to any transaction covered under Subsection
11  15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet,
12  in a single transaction, the whole of the Premises, it shall first give notice thereof (the
13  "*Assignment/Subletting Notice*") to Landlord, which notice shall specify the name and
14  address of the proposed assignee or sublessee and the proposed use of the Premises to be
15  made by such assignee or sublessee, together with a statement certified by Tenant of the
16  amount of the then unamortized costs (amortized on a straight-line basis over the Initial
17  Term) of any alterations performed by Tenant to the Premises. Thereafter, Landlord shall
18  have the option to terminate this Lease, which option shall be exercisable by:

19           (a)  giving notice to Tenant (the "*Termination Notice*") thereof
20  within fifteen (15) days after receipt of an Assignment/Subletting Notice from
21  Tenant, and

22           (b)  paying to Tenant, within thirty (30) days after such notice is
23  given, all of Tenant's costs and expenses incurred in connection with the
24  preparation of plans and specifications for, and the then unamortized costs
25  (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and
26  any alterations performed by Tenant to the Premises,

27  in which event this Lease shall automatically terminate on the ninetieth (90th) day (the
28  "*Termination Date*") after the date on which Tenant receives Landlord's Termination
29  Notice, with the same force and effect as if the Termination Date had been designated as
30  the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall
31  each be released from any and all liabilities thereafter accruing hereunder, except for
32  those obligations which survive the expiration or other termination of this Lease pursuant
33  to the express terms of this Lease. All Rent payable by Tenant hereunder shall be
34  apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any
35  amounts so determined to be due and owing by Tenant to Landlord, and conversely
36  Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods
37  subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have
38  the right to avoid Landlord's termination by giving notice to Landlord (the "*Rescission
39  Notice*"), within ten (10) days after receiving the Termination Notice, of its rescission of
40  the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be
41  rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the
42  Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the
43  Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be
44  deemed to have waived its termination rights hereunder with respect to such proposed
45  assignment or subletting transaction, and Tenant may assign this Lease or sublet the
46  entire Premises in accordance with its Assignment/Subletting Notice. If Landlord
47  terminates the Lease hereunder, then, for a period of two (2) years after the Termination
48  Date, Landlord shall not lease, rent or occupy or permit the Premises or any portion
49  thereof to be occupied as a store which operates primarily as a baby store; the foregoing
50  shall survive the termination of this Lease.

48

15.1.3 In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the Fayetteville, NC metropolitan area; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2 <u>Liability of Tenant</u>.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; <u>provided</u>, <u>however</u>, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million ($100,000,000) Dollars.

Section 15.3 <u>Collateral Assignment</u>.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4 <u>Cure Rights of Original Tenant</u>.

15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, <u>then</u> Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), <u>provided</u> that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are personal to the assignee (Tenant acknowledging that a monetary default shall not be deemed as personal to the assignee) and/or not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of

Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5  Recognition Agreement.  In the event Tenant subleases all or any portion of the Premises to an Affiliate, or for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.  Landlord acknowledges that following the Effective Date, Tenant intends to sublease the Premises to Buy Buy Baby, and Landlord shall, in connection with such sublease, execute and deliver a recognition agreement in accordance with the provisions of this Section 15.5.

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1  Tenant Default.

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)  to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)  without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

1          (c)   upon at least five (5) days' notice to Tenant, to terminate this
2 Lease, whereupon Landlord shall have and retain full right to sue for and collect all
3 unpaid Rent which shall have accrued up to the date of termination and any damages to
4 Landlord by reason of any such breach as provided in Subsection 16.1.3 below, and
5 Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord
6 shall have the right to initiate summary proceedings to recover possession; and/or

7          (d)   upon at least five (5) days' notice to Tenant to terminate
8 Tenant's right of possession, re-enter the Premises and take possession thereof by lawful
9 means. If Landlord shall so elect to repossess the Premises without terminating the
10 Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to
11 Landlord pursuant to the terms of this Lease which shall have accrued up to the date of
12 repossession, as well as all Rent as and when same shall become due and payable
13 pursuant to the terms of this Lease during the remainder of the Term, diminished by any
14 net sums thereafter received by Landlord through reletting the Premises during said
15 period (after deducting reasonable expenses incurred by Landlord in connection with
16 such reletting. In no event shall Tenant be entitled to any excess of any rent obtained by
17 such reletting over and above the Rent herein reserved. Landlord may bring actions to
18 collect amounts due by Tenant under this Lease, from time to time, prior to the expiration
19 of the Term.

20          16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to
21 Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by
22 Landlord in connection with reletting the whole or any part of the Premises for the
23 remainder of the then unexpired Term (excluding any then unexercised Renewal
24 Periods), the costs of removing and storing Tenant's or other occupant's property; the
25 cost of repairs; and all other commercially reasonable expenses incurred by Landlord in
26 enforcing or defending Landlord's rights and/or remedies, including reasonable
27 attorneys' fees.

28          16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure
29 said Event of Default and any Rent payments not paid after notice thereof is given shall
30 bear interest at the Lease Interest Rate from and after the expiration of any applicable
31 grace period until paid.

32          16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any
33 portion thereof to mitigate Landlord's damages to which Landlord would otherwise be
34 entitled to as a result of an Event of Default. In no event shall Tenant be liable to
35 Landlord for any consequential damages suffered by Landlord as a result of an Event of
36 Default by, or any other act of, Tenant.

37      Section 16.2 <u>Landlord Default</u>. If Landlord shall: (i) fail to perform or observe
38 any of the covenants of this Lease on Landlord's part to be performed or observed within
39 thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably
40 be cured within thirty (30) days, if Landlord shall fail to promptly commence and
41 diligently prosecute said cure to completion), <u>or</u> (ii) materially breach any warranty or
42 representation under this Lease (either of (i) or (ii) above being hereinafter referred to as
43 a "***Landlord's Default***"), then Tenant, in addition to such other rights and remedies as
44 may be available under this Lease, or at law or in equity, may, in its sole discretion:

45          (a)   as applicable, perform such obligation(s) of Landlord in
46 accordance with the provisions of this Lease on behalf of, and at the expense of Landlord;
47 and/or

48          (b)   bring suit for the collection of any amounts for which
49 Landlord is in default, seek injunctive relief, or seek specific performance for any other
50 covenant or agreement of Landlord, without terminating this Lease; and/or

51

1                       (c)    offset against the Rent payable by Tenant hereunder for
2   amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by
3   Tenant performing Landlord's obligations hereunder, including costs and reasonable
4   attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of
5   the outlay until paid; and/or

6                       (d)    terminate this Lease, without waiving its rights to damages
7   for Landlord's Default, provided that: (1) Landlord's Default materially interferes with
8   the normal conduct of any business operations in the Premises, (2) Landlord's Default is
9   not reasonably capable of being cured by Tenant, and  (3) Tenant gives notice of
10   Landlord's Default to any Mortgagee of whom Landlord shall have previously given
11   Tenant notice (including its address), and such Mortgagee shall not have cured
12   Landlord's Default within thirty (30) days after such notice is given (or, if such default
13   cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly
14   commence and diligently prosecute said cure to completion).

15        Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition
16   posing imminent risk of liability or material harm to persons or property or material
17   disruption to the normal conduct of any business operations in the Premises shall exist (it
18   being agreed, without limitation, that any water infiltration into the Premises from within
19   or without the Premises, or mold remediation in connection therewith, shall be deemed to
20   be such a condition), Tenant may, at its election, and without prior notice to Landlord,
21   exercise any or all of the remedies set forth in (a), (b) and (c) above, provided, however,
22   Tenant shall not undertake any mold remediation, unless Landlord fails to commence to
23   cure (and thereafter diligently prosecute) such condition within ten (10) days of receipt of
24   notice thereof.  In no event shall Landlord be liable to Tenant for any consequential
25   damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

26        Section 16.3  Arbitration.  In any case where this Lease expressly provides for
27   submission of a dispute or matter to arbitration (but not otherwise), the same shall be
28   settled by arbitration in Fayetteville, North Carolina, before one arbitrator in accordance
29   with the procedural rules of the American Arbitration Association (or any successor
30   thereto) then in effect.  The decision of the arbitrator shall be final, conclusive and
31   binding on the parties, but the powers of the arbitrator are hereby expressly limited to the
32   determination of factual issues, and the arbitrator shall have no power to reform,
33   supplement or modify this Lease.  The arbitrator shall make only required findings of fact
34   incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a
35   written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and
36   expenses of such arbitration, and each shall separately pay its own attorneys' fees and
37   expenses, unless the arbitrator finds that one of the parties did not act in good faith in
38   connection with the dispute or the conduct of the arbitration proceeding, in which case
39   the arbitrator may award all or part of said costs, expenses and fees to the other party.

40                            ARTICLE 17
41   RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

42        Section 17.1  Right to Mortgage and Non-Disturbance.  Landlord reserves the
43   right to subject and subordinate this Lease at all times to the lien of any first mortgage or
44   deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or
45   any portion of the Shopping Center, as well as to any future ground or underlying leases
46   encumbering or affecting all or any part of the Shopping Center; provided, however, that
47   (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-
48   disturbance and attornment agreement in substantially the form attached as Exhibit G
49   hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the
50   written consent of any holder of any mortgage, deed of trust or any other existing lien
51   encumbering or affecting the Shopping Center or any portion thereof, as applicable) and
52   deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to

1    Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in
2    the exercise of any of the rights arising or which may arise out of such lease, disturb or
3    deprive Tenant in or of its possession or its rights to possession of the Premises or of any
4    right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the
5    event of the termination of the ground or underlying lease, Tenant will not be made a
6    party in any removal or eviction action or proceeding, nor shall Tenant be evicted or
7    removed of its possession or its right of possession of the Premises, and this Lease shall
8    continue in full force and effect as a direct lease between the Ground Lessor and Tenant
9    for the remainder of the Term and on the same terms and conditions as contained herein,
10   without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have
11   the right to execute any amendment to this Lease which is specifically required hereunder
12   and the Ground Lessor shall recognize and be bound thereto.

13        Section 17.2  Estoppel Certificate.  Upon written notice given by Landlord or
14   Tenant in accordance with Article 18 hereof, the other party, within thirty (30) days after
15   receiving such request, shall execute and deliver to and only for the benefit of the
16   requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or
17   sublessee of the requesting party, without charge, a written statement:  (1) ratifying this
18   Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and
19   effect, if such is the case, and has not been modified, assigned, supplemented or
20   amended, except by such writings as shall be stated; (3) specifying the dates to which
21   Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such
22   party's actual knowledge, the party requesting the estoppel is in default and, if so, stating
23   the nature of such default, (5) stating the Rent Commencement Date, and (6) stating
24   which options to extend the Lease Term have been exercised, if any.  Each request for a
25   written statement pursuant to this Section 17.2 made within twelve (12) months of an
26   earlier request for such a written statement shall be accompanied by a payment, from the
27   requesting party to the other party, in the amount of One Thousand Dollars ($1,000)
28   (increased by Two Hundred Dollars ($200) on each date that the Fixed Rent increases
29   pursuant to Subsection 1.1.11 hereof).

30        Section 17.3  Existing Mortgages and Ground Leases.  If a mortgage, deed of
31   trust, or other security instrument, or any ground or underlying lease, encumbers the
32   Shopping Center or any part thereof on the Effective Date, then within thirty (30) days
33   after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a
34   subordination, non-disturbance and attornment agreement substantially in the form
35   attached hereto as Exhibit G, in recordable form, executed by each and every holder of
36   any mortgage, deed of trust or any other existing lien encumbering or affecting the
37   Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the
38   form and content described in clause (b) of Section 17.1 hereof, in recordable form,
39   executed by any Ground Lessor (and, as may be required, consented to by the holder of
40   any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to
41   so deliver such instrument(s) within said 30-day period, Tenant shall have the right by
42   notice given to Landlord at any time prior to the date on which such instrument(s) are
43   delivered, to terminate this Lease, in which event, neither party shall have any further
44   liability hereunder, except: (i) for those obligations which survive the expiration or other
45   termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord
46   shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs
47   and expenses incurred in connection with this Lease, including, without limitation, the
48   preparation and review of plans and specifications, and the performance of Tenant's
49   Work, provided, however, that such reimbursement by Landlord shall not exceed the
50   aggregate sum of Fifty Thousand Dollars ($50,000).  Landlord represents and warrants
51   that there are no mortgages, deeds of trust or other security instruments, or any ground or
52   underlying lease, encumbering the Shopping Center as of the Effective Date.

ARTICLE 18

NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) General Counsel, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Cathleen H. Giuliana, Esq., c/o Riker, Danzig, Scherer, Hyland & Perretti, LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown, New Jersey 07962-1981, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. If Landlord shall consist of more than one person or entity, notices delivered by Tenant to Landlord's Mailing Address shall be deemed to be delivered to, and effective notice to, all such persons or entities comprising Landlord. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee, provided, however, that if a deadline for the giving of any notice under this Lease occurs on Saturday, Sunday, or a legal holiday, then such deadline shall be extended to the next business day thereafter occurring. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

ARTICLE 19

TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

ARTICLE 20

END OF TERM

Section 20.1 Surrender of Premises. At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2 Hold Over. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the

1    amount thereof payable by Tenant for the month immediately preceding the last day of
2    the Term as well as for all Additional Rent payable by Tenant hereunder.

3                                    ARTICLE 21
4                          TENANT'S RIGHT OF FIRST OFFER

5    Provided an uncured Event of Default does not then exist under this Lease, Tenant
6    shall have continuing rights of first offer to lease additional space in the Shopping Center
7    which is contiguous to the Premises and which may become available on and after the
8    date of this Lease.  At such time that Landlord has knowledge that such space (*"Offered
9    Space"*) is or will become available, Landlord will give Tenant notice (the *"Offering
10   Notice"*) of the terms and conditions Landlord would be willing to accept with respect to
11   the Offered Space (including, without limitation, the proposed rent, additional rent, scope
12   of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall
13   have thirty (30) days within which to respond to Landlord's offer.  In the event Tenant
14   elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by
15   giving notice to Landlord during such thirty (30) day period and Landlord and Tenant
16   shall thereupon enter into an amendment to this Lease for the leasing of the Offered
17   Space, which amendment shall (a) contain the terms and conditions set forth in the
18   Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate
19   contemporaneously with the expiration or sooner termination of the Term hereof (subject
20   to extension in accordance with Subsection 2.2.2 above), and (c) contain such other terms
21   and provisions as either Landlord or Tenant may reasonably require in order to effectuate
22   the incorporation of the Offered Space into the Premises and to otherwise effectuate the
23   intent of this Article 21.  Should Tenant decline Landlord's offer or fail to respond
24   thereto, then Tenant shall have been deemed to have waived its right of first offer to the
25   Offered Space in that instance (but Tenant shall not lose any prospective rights of first
26   offer with respect to any space (including, without limitation, the Offered Space) which
27   may in the future become vacant and available), and Landlord may lease the Offered
28   Space to any other party upon substantially the same terms and conditions as those
29   offered to Tenant, provided that such lease is executed within six (6) months after Tenant
30   has declined (or failed to respond to) Landlord's offer with respect to the Offered Space.
31   As used herein, the phrase *"substantially the same terms and conditions as that offered
32   to Tenant"* shall mean terms not materially different and/or a rent of not more than five
33   (5%) percent below the rent requested by Landlord or Tenant.  Any dispute between the
34   parties with respect to this Article 21 (including, without limitation, any dispute as to the
35   provisions of the amendment described in this Article 21) shall be resolved by arbitration
36   in accordance with the provisions of Section 16.3 above.

37                                    ARTICLE 22
38                          ONGOING CO-TENANCY

39   If, at any time during the Term, at least (i) four (4) of the Named Inducement
40   Tenants are not open to the public for the operation of retail business, or (ii) at least sixty-
41   five (65%) percent of Floor Area of the Greater Shopping Center, as set forth in
42   Subsection 1.1.13A above (excluding the Premises), ceases to be used for the operation
43   of retail business by national tenants or regional tenants of the type typically found in
44   first-class regional shopping centers located in the Fayetteville, NC metropolitan area
45   (such condition being hereinafter referred to as an *"Excess Vacancy"*), then in such
46   event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent and
47   Percentage Rent during the period of such Excess Vacancy, and/or (ii) if Tenant pays
48   Alternate Rent hereunder for a period in excess of three hundred sixty-five (365)
49   continuous days, to terminate this Lease, exercisable by giving Landlord, within one
50   hundred twenty (120) days after the expiration of such 365-day period, at least sixty (60)
51   days' prior notice, in which event this Lease shall terminate on the date set forth in
52   Tenant's notice of termination without further liability on the part of either Landlord or
53   Tenant, except: (A) for those obligations which survive the expiration or other

termination of this Lease pursuant to the express terms of this Lease, and (B) Landlord,
promptly after receiving a statement from Tenant showing the costs and expenses of any
alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such
costs and expenses based upon the unexpired portion of the Term.  If Tenant does not
terminate this Lease pursuant to this Article 22, then commencing on the expiration of the
aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that
Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the
then existing condition of Excess Vacancy in clause (ii) worsens by more than five
percent (5%); and (y) retain all of its original rights under this Article 22 with respect to
any future condition(s) of Excess Vacancy.

### ARTICLE 23
### MISCELLANEOUS

Section 23.1  Loading Facilities.  Tenant shall have the exclusive right to utilize
the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day",
"365 days a year" basis.

Section 23.2  Liens.  Within thirty (30) days after notice of the filing thereof,
Tenant shall discharge (either by payment or by filing of the necessary bond, or
otherwise) any lien against the Premises and/or Landlord's interest therein, which may
arise out of any payment due for, or  purported to be due for, any labor, services,
materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon
or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof,
Landlord shall discharge (either by payment or by filing of the necessary bond, or
otherwise) any lien against the Premises and/or Landlord's interest therein, which may
arise out of any payment due for, or purported to be due for, any labor, services,
materials, supplies or equipment alleged to have been furnished to or for Landlord in,
upon or about the Premises.

Section 23.3  Broker's Commission.  Landlord and Tenant each warrant and
represent to the other that they did not deal with any real estate broker in connection with
the negotiation, execution and delivery of this Lease, except for The Shopping Center
Group, LLC (the "*Broker*").  Landlord shall pay the Broker a commission pursuant to a
separate agreement.  Each party agrees to indemnify, defend, and save the other harmless
from and against any and all liabilities, costs, causes of action, damages and expenses,
including, without limitation, attorneys' fees, with respect to or arising out of any claims
made by any real estate broker (other than the Broker), agent or finder with respect to this
Lease in breach of the foregoing representation.  The provisions of this Section shall
survive the expiration or earlier termination of this Lease.

Section 23.4  *Force Majeure*.  Except as otherwise expressly set forth herein, in
the event either party hereto shall be delayed or hindered in, or prevented from, the
performance of any act required hereunder by reason of strikes, failure of power, riots,
insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of
unusual severity), or other reasons of an extraordinary nature which are beyond the
reasonable control of the party, and which could not have been avoided through the
exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"),
then the performance of any such act shall be excused for a period equal to the period of
the delay.  Notwithstanding the foregoing provisions, the following shall not constitute
Force Majeure: (i) the financial inability of a party to perform its obligations under this
Lease (except for delays resulting from cyber-attacks, power failures, or other events of
*Force Majeure* affecting the availability of funds); or (ii) delays occurring in the course
of complying with applicable Legal Requirements that could have been avoided through
the exercise of due diligence by a party hereto.  A party wishing to invoke this Section
shall give the other party notice of that intention within ten (10) days of the
commencement of any event of *Force Majeure* and shall, at that time, specify the reasons

1  therefor, the specific provision of this Lease which will be delayed as a result, and the
2  period of such extension, if known, or if not known, a reasonable estimate thereof.

3      Section 23.5  Consents. Except as may be otherwise expressly set forth in this
4  Lease, whenever under this Lease provision is made for either party's securing the
5  consent or approval of the other party, (i) such consent or approval shall be in writing and
6  shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters
7  contained herein, both parties shall have an implied obligation of reasonableness.

8      Section 23.6  Costs. Whenever this Lease requires the performance of an act by a
9  party, such party shall perform the act at its own cost and expense, unless expressly
10  provided to the contrary.

11      Section 23.7  Attorneys' Fees. In any action or proceeding hereunder (whether to
12  enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall
13  be entitled to recover from the other party the prevailing party's reasonable costs and
14  expenses in such action or proceeding, including reasonable attorneys' fees, costs and
15  expenses. Except as otherwise set forth herein, if either party is sued by a third party as a
16  result of a violation of a covenant or warranty herein contained by the other party hereto,
17  then the party who has violated the covenant or warranty shall be responsible for the
18  reasonable costs and expenses in such action or proceeding against the non-violating
19  party, including reasonable attorneys' fees, costs and expenses.

20      Section 23.8  Survival of Obligations. The obligation to pay any sums due to
21  either party from the other that by the terms herein would not be payable, or are incapable
22  of calculation, until after the expiration or sooner termination of this Lease shall survive
23  and remain a continuing obligation until paid. All indemnity obligations under this Lease
24  shall survive the expiration or earlier termination of this Lease.

25      Section 23.9  Non-Waiver. The failure of Landlord or Tenant to insist upon the
26  strict performance of, or to enforce, any provision, covenant or condition herein shall not
27  be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to
28  enforce the same covenant or condition on the occasion of any subsequent breach or
29  default; nor shall the failure of either party to exercise any option in this Lease upon any
30  occasion arising therefor be deemed or construed to be a waiver of the right to exercise
31  that same kind of option upon any subsequent occasion.

32      Section 23.10 Rights Cumulative. Unless expressly provided to the contrary in this
33  Lease, each and every one of the rights, remedies and benefits provided by this Lease
34  shall be cumulative and shall not be exclusive of any other such rights, remedies and
35  benefits allowed by applicable Legal Requirements.

36      Section 23.11 Definition of Landlord. The term *"Landlord"* shall mean only the
37  person or entity which, from time to time, shall then own the Shopping Center, and in the
38  event of the transfer by such owner of its interest in the Shopping Center, such owner
39  shall (except to the extent of (1) claims made by Tenant against Landlord which arose
40  prior to the effective date of the transfer of such ownership interest, and/or (2) judgments
41  obtained by Tenant against Landlord, on or prior to the effective date of the transfer of
42  such ownership interest) thereupon be released and discharged from all covenants and
43  obligations of Landlord thereafter accruing, but such covenants and obligations shall be
44  binding during the Term upon each new owner for the duration of such owner's
45  ownership. Subject to the terms of this Section 23.11, Tenant acknowledges that
46  Landlord has the right to transfer all or any portion of its interest in the Shopping Center,
47  the Premises and/or in this Lease. Without limiting the generality of the foregoing, it is
48  acknowledged and agreed that the liability of Landlord under this Lease is limited to its
49  actual period of ownership of title to the Shopping Center, subject to any provisions that
50  expressly survive, but only to matters relative to the period of ownership.

57

Section 23.12 <u>Successors and Assigns</u>. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 <u>Limitation of Landlord's Liability</u>. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Greater Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Greater Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Greater Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 <u>Limitation of Tenant's Liability</u>. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u>. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, Section, or paragraph hereof.

Section 23.20 <u>Short Form Lease</u>. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum, which shall be in recordable form, and such form and substance as either party shall reasonably request; Landlord and Tenant shall cooperate in the

1    recordation thereof.  In no event shall the amount of Fixed Rent reserved hereunder be
2    included in any such short form lease or memorandum.

3        Section 23.21 Entire Agreement and Modification.  This Lease constitutes the
4    entire agreement of the parties hereto, and all prior agreements between the parties,
5    whether written or oral, are merged herein and, except as may be specifically set forth
6    herein, shall be of no force and effect.  This Lease cannot be changed, modified or
7    discharged orally, but only by an agreement in writing, signed by the party against whom
8    enforcement of the change, modification or discharge is sought.

9        Section 23.22 No Joint Venture or Partnership Created by Lease.  Nothing
10   contained herein shall be deemed or construed as creating the relationship of principal
11   and agent or of partnership or of joint venture between the parties hereto.

12       Section 23.23 Tenant's Tradename.  Except as a nominative fair use (e.g., to show
13   the location of the Premises in the Greater Shopping Center or to indicate that Tenant is a
14   tenant in the Greater Shopping Center), Landlord shall not make use of any of Tenant's
15   tradename [*i.e.*, "*buybuy BABY*"®] in any advertising or marketing material, including,
16   without limitation, on any internet website, without obtaining Tenant's prior written
17   approval, which may be withheld in Tenant's sole and absolute discretion.

18       Section 23.24 Counterparts. This instrument may be executed in several
19   counterparts, each of which shall be deemed an original.  The signatures to this
20   instrument may be executed and notarized on separate pages, and when attached to this
21   instrument, shall constitute one complete document.

22       Section 23.25 Waiver of Trial by Jury.  Landlord and Tenant hereby mutually
23   waive any and all rights which either may have to request a jury trial in any proceeding
24   between them at law or in equity.

25       Section 23.26 Timely Billing of Charges.  Notwithstanding any provision of this
26   Lease to the contrary, any Additional Rent for which Tenant is to be billed or charged by
27   Landlord shall be billed or charged within ninety (90) days after the close of the calendar
28   year (or fiscal tax year, in the case of Taxes) for which the amount is incurred by
29   Landlord, failing which, Landlord shall be deemed to have waived its right to payment of
30   such Additional Rent.

31       Section 23.27 Ethical Conduct Policy.  It is the policy of Tenant and its
32   subsidiaries and Affiliates (collectively, *"the Company"*) to conduct all its business
33   transactions in accordance with the highest ethical standards and all applicable laws
34   (including, but not limited to, the U.S. Foreign Corrupt Practices Act).  No individual
35   employed by or representing the Company, and no individual or entity contracting with
36   the Company or otherwise performing services on behalf of the Company, is permitted to
37   solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment
38   of money, products or services.  This includes, but is not limited to, any improper
39   payment in exchange for (i) the Company's execution of this Lease, (ii) any action taken
40   by such individual on behalf of the Company, or (iii) any action taken by a third party.
41   Any individual or entity having a business relationship with the Company shall require
42   any subcontractor (of any level) to adhere to the same standards and are expected to
43   appropriately monitor their subcontractors to ensure such adherence.  If any such
44   improper actions are observed, please contact the Tenant's Legal Department (Attention:
45   General Counsel) at the address set forth in Article 18 hereof and/or by telephone at 908-688-
46   0888 so that the incident may be fully investigated.

47       Section 23.28 Confidentiality.  Landlord shall not reveal to anyone, or otherwise
48   make or publish any public statement or notice regarding the economic or other business
49   terms of this Lease (including, without limitation, the Term and the Rent), except as
50   required by Legal Requirements; or for disclosure to Landlord's accountants, attorneys,

1    bona fide prospective purchasers, or current or prospective Mortgagees or underlying
2    lessors of all or any portion of Landlord's interest in the Greater Shopping Center,
3    provided that each of such recipients shall be bound to the same non-disclosure
4    provisions as are imposed upon Landlord.

5                                    [Signature page follows]
6

1       Section 23.29<u>Governing Law</u>.  This Lease shall be governed by, construed, and
2  enforced in accordance with the laws of the State in which the Premises are located.

3       IN WITNESS WHEREOF, the parties have executed this instrument under seal
4  the day and year first-above written.

**LANDLORD:**

WITNESS:                             NC FAYETTEVILLE SKIBO, LLC,
                                     a North Carolina limited liability company

[SEAL]                            By:
                                Name:  Philip J. Wilson
                                Title:  Manager

**TENANT:**

ATTEST:                            BED BATH & BEYOND INC., a New
                                   York corporation

Name: Alan M. Freeman        By:
Title: Assistant Secretary      Name: Steven H. Temares
                                Title:   Chief Executive Officer

[SEAL]

1

### INDEX OF EXHIBITS

2   Exhibit A        Legal Description of Greater Shopping Center
3   Exhibit A-1      Legal Description of Shopping Center
4   Exhibit B        Site Plan
5   Exhibit C        Form of Rent Commencement and Expiration Date Agreement
6   Exhibit D        Specifications for Landlord's Work
7   Exhibit D-1      Exterior Elevations of the Premises, and Sidewalk Plan
8   Exhibit D-2      Exterior Elevations of the Shopping Center
9   Exhibit E        Permitted Encumbrances
10  Exhibit F        Signage
11  Exhibit G        Form of Subordination, Non-Disturbance and Attornment
12                   Agreement
13  Exhibit H        Form of Subtenant Recognition Agreement
14  Exhibit I        Form of Delivery Date Notice
15  Exhibit J -      Form of Delivery Date Certification
16  Exhibit K-1      Existing Exclusives
17  Exhibit K-2      Existing Leases
18  Exhibit L        Intentionally Omitted
19  Exhibit M        Prohibited Uses
20  Exhibit N        Form of OEA

21

1                                          Exhibit A

2                        Legal Description of Greater Shopping Center

3
4    **Parcel One**:
5
6    Beginning at a point in the southern right-of-way margin of the A. & R. Railroad, said point of beginning
7    being the northwest corner of the Sanford Milling co. property and runs thence along the western line of
8    the Sanford Milling co. property South 04 degrees 18 minutes West, 283.70 feet to a point; thence along
9    the southern line of the Sanford Milling Co. property South 82 degrees 26 minutes East, 30.0 feet to a
10   point; thence South 05 degrees 45 minutes East, 802.29 feet to a point; thence South 33 degrees 14
11   minutes West, 165.78 feet to a point; thence South 82 degrees 58 minutes West 200.0 feet to a point;
12   thence South 66 degrees 27 minutes West, 698.71 feet to a point; thence along the northeastern lines of
13   Chestnut Hills, Clark and Jackson North 47 degrees 35 minutes West, 1475.95 feet to the eastern right-of-
14   way margin of N.C. Highway 59; thence along the eastern right-of-way margin of N.C. Highway No. 59
15   North 26 degrees 48 minutes East, 111.19 feet to its point of intersection with the southern right-of-way
16   margin of the A. & R. Railroad; thence along the southern right-of-way margin of the A. & R. Railroad
17   North 66 degrees 16 minutes East, 811.34 feet to the p.c. of a curve (the radius of which is 1530.72 feet);
18   thence as it curves to the right, an arc distance of 707.82 feet to the p.t. of said curve; thence continuing
19   along the said right-of-way margin South 87 degrees 14 minutes East, 448.39 feet to the beginning
20   containing 47.55 acres.
21
22   **Parcel Two**:
23
24   Beginning at an iron pipe, said pipe being located South 47 degrees 35 minutes East, 261.45 feet from a
25   concrete monument which is the northernmost corner of Chestnut Hills Subdivision as recorded in Plat
26   Book 33, Page 40, Cumberland County Registry, and proceeding thence with the southern and eastern
27   lines of a 47.55 acre tract conveyed from E.H. Evans to Barrett Land and Development Company, North
28   66 degrees 31 minutes East 699.84 feet; thence North 82 degrees 57 minutes East 200.05 feet; thence
29   North 33 degrees 12 minutes East 165.74 feet; thence North 05 degrees 47 minutes West 802.42 feet to an
30   iron pipe lying in the southern boundary of the Sanford Milling Company property, said point also being
31   a corner in the aforementioned conveyance; thence with said boundary South 82 degrees 30 minutes East
32   64.00 feet to a point; thence proceeding with the various courses of a ditch, South 12 degrees 46 minutes
33   West 92.19 feet; thence South 11 degrees 32 minutes East 50.01 feet; thence South 102.00 feet; thence
34   South 22 degrees 15 minutes East 118.85 feet; thence South 09 degrees 28 minutes East, 48.66 feet;
35   thence South 15 degrees 21 minutes West 105.77 feet; thence South 17 degrees 01 minutes East 102.49
36   feet; thence South 03 degrees 18 minutes West 52.09 feet; thence South 11 degrees 19 minutes East 50.99
37   feet; thence South 07 degrees 58 minutes West 50.49 feet; thence South 09 degrees 15 minutes East 43.57
38   feet; thence South 26 degrees 47 minutes West 119.85 feet; thence South 43 degrees 02 minutes West
39   82.07 feet; thence South 83 degrees 07 minutes West 208.50 feet; thence South 64 degrees 16 minutes
40   West 92.14 feet; thence South 58 degrees 03 minutes West 100.17 feet; thence South 76 degrees 30
41   minutes West 51.42 feet; thence South 84 degrees 30 minutes West 52.24 feet; thence South 62 degrees
42   14 minutes West 150.30 feet; thence South 72 degrees 49 minutes West 101.53 feet; thence South 62
43   degrees 56 minutes West 50.54 feet to an iron pipe; thence leaving said ditch South 82 degrees 46
44   minutes West 104.31 feet to the point of beginning and containing 1.597 acres, more or less.
45
46   Save and Except any portion of the property described in Deed and Deed of Easement recorded in Book
47   2391, Page 125; and in Deed recorded in Book 4729, Page 177.
48
49   Also, Save and Except the following property being conveyed to the Aberdeen & Rockfish Railroad
50   Company in connection with Landlord's acquisition of the Greater Shopping Center:
51
52   BEGINNING AT A NEW REBAR SET IN THE SOUTHERN RIGHT-OF-WAY MARGIN OF THE
53   ABERDEEN AND ROCKFISH RAILROAD RECORDED IN DEED BOOK 170 PAGE 102 OF THE
54   CUMBERLAND COUNTY REGISTRY, THENCE FROM SAID REBAR ALONG THE EXISTING
55   RIGHT-OF-WAY MARGIN FOR THE FOLLOWING CALLS: N60°43'04"E 75.49 FEET TO A
56   POINT; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1530.72 FEET AND
57   AN ARC DISTANCE OF 707.82 FEET, CHORD BEARING AND DISTANCE OF N73°57'54"E 701.53
58   FEET TO A POINT; THENCE N87°13'04"E 357.36 FEET TO A POINT; THENCE LEAVING THE
59   AFOREMENTIONED RIGHT-OF-WAY MARGIN S75°39'25"E 52.02 FEET TO A POINT; THENCE
60   WITH A NEW LINE DEFINING THE FUTURE RIGHT-OF-WAY MARGIN S83°58'58"W 612.70
61   FEET TO A POINT; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1397.41
62   FEET AND AN ARC DISTANCE OF 568.41 FEET, CHORD BEARING AND DISTANCE OF
63   S72°19'48"W 564.50 FEET TO A POINT; THENCE N29°16'56"W 0.47 FEET TO THE POINT OF
64   BEGINNING, CONTAINING 0.64 ACRES (27,697 SF) MORE OR LESS.
65

Exhibit A-1

Legal Description of Shopping Center

BEGINNING AT A NEW REBAR SET IN THE SOUTHERN RIGHT-OF-WAY MARGIN OF THE
ABERDEEN AND ROCKFISH RAILROAD RECORDED IN DEED BOOK 170 PAGE 102 OF THE
CUMBERLAND COUNTY REGISTRY, THENCE FROM SAID REBAR WITH A NEW LINE
DEFINING THE FUTURE RIGHT-OF-WAY MARGIN S29°16'56"E 0.47 FEET TO A POINT;
THENCE WITH A NON TANGENT CURVE AS IT CURVES TO THE RIGHT HAVING A RADIUS
OF 1397.41 FEET AND AN ARC DISTANCE OF 568.41 FEET, CHORD BEARING AND DISTANCE
OF N72°19'48"E 564.50 FEET TO A POINT; THENCE N83°58'58"E 67.15 FEET TO A POINT IN
THE FUTURE WESTERN RIGHT-OF-WAY MARGIN OF FREEDOM PARKWAY DRIVE;
THENCE ALONG SAID RIGHT-OF-WAY MARGIN THE FOLLOWING THIRTY-FOUR CALLS:
S07°41'05"E 17.81 FEET TO A POINT; THENCE WITH A CURVE AS IT CURVES TO THE LEFT
HAVING A RADIUS OF 440.00 FEET AND AN ARC DISTANCE OF 29.92 FEET, CHORD
BEARING AND DISTANCE OF S09°37'58"E 29.91 FEET TO A POINT; S31°55'07"W 15.11 FEET
TO A POINT; THENCE WITH A NON TANGENT CURVE AS IT CURVES TO THE LEFT HAVING
A RADIUS OF 450.54 FEET AND AN ARC DISTANCE OF 68.33 FEET, CHORD BEARING AND
DISTANCE OF S17°19'11"E 68.26 FEET TO A POINT; S59°15'11"E 15.06 FEET TO A POINT;
S16°03'17"E 87.90 FEET TO A POINT; S22°17'19"E 64.07 FEET TO A POINT; S26°48'12"W 38.98
FEET TO A POINT; S11°17'56"E 42.00 FEET TO A POINT; S53°51'24"E 45.11 FEET TO A POINT;
THENCE WITH A NON TANGENT CURVE AS IT CURVES TO THE RIGHT HAVING A RADIUS
OF 210.00 FEET AND AN ARC DISTANCE OF 211.98 FEET, CHORD BEARING AND DISTANCE
OF S34°46'59"W 203.10 FEET TO A POINT; S63°42'05"W 83.46 FEET TO A POINT; S70°04'01"W
99.21 FEET TO A POINT; S63°42'05"W 100.58 FEET TO A POINT; N71°21'07"W 34.62 FEET TO A
POINT; S63°35'42"W 69.00 FEET TO A POINT; S26°24'18"E 10.78 FEET TO A POINT; S18°38'53"W
34.68 FEET TO A POINT; S63°42'05"W 189.51 FEET TO A POINT; THENCE WITH A CURVE AS
IT CURVES TO THE RIGHT HAVING A RADIUS OF 293.00 FEET AND AN ARC DISTANCE OF
83.11 FEET, CHORD BEARING AND DISTANCE OF S71°49'38"W 82.83 FEET TO A POINT;
THENCE WITH A COMPOUND CURVE AS IT CURVES TO THE RIGHT HAVING A RADIUS OF
285.35 FEET AND AN ARC DISTANCE OF 86.99 FEET, CHORD BEARING AND DISTANCE OF
N84°14'15"W 86.65 FEET TO A POINT; THENCE WITH A COMPOUND CURVE AS IT CURVES
TO THE RIGHT HAVING A RADIUS OF 282.00 FEET AND AN ARC DISTANCE OF 85.33 FEET,
CHORD BEARING AND DISTANCE OF N74°10'53"W 85.01 FEET TO A POINT; N18°19'37"W
37.94 FEET TO A POINT; N58°08'59"W 63.47 FEET TO A POINT; S80°14'06"W 42.48 FEET TO A
POINT; N50°16'30"W 69.60 FEET TO A POINT; THENCE WITH A CURVE AS IT CURVES TO
THE LEFT HAVING A RADIUS OF 432.50 FEET AND AN ARC DISTANCE OF 162.65 FEET,
CHORD BEARING AND DISTANCE OF N61°02'56"W 161.69 FEET TO A POINT; THENCE WITH
A NON TANGENT CURVE AS IT CURVES TO THE LEFT HAVING A RADIUS OF 104.50 FEET
AND AN ARC DISTANCE OF 21.29 FEET, CHORD BEARING AND DISTANCE OF N44°00'36"E
21.25 FEET TO A POINT; N38°10'23"E 23.96 FEET TO A POINT; N51°49'37"W 43.00 FEET TO A
POINT; S38°10'23"W 3.06 FEET TO A POINT; THENCE WITH A CURVE AS IT CURVES TO THE
RIGHT HAVING A RADIUS OF 91.50 FEET AND AN ARC DISTANCE OF 107.34 FEET, CHORD
BEARING AND DISTANCE OF S71°46'50"W 101.29 FEET TO A POINT; N74°36'43"W 22.13 FEET
TO A POINT; N33°18'49"W 19.64 FEET TO A POINT ON THE EASTERN RIGHT-OF-WAY
MARGIN OF SKIBO ROAD; THENCE WITH SAID RIGHT-OF-WAY MARGIN N05°27'44"W 42.21
FEET TO IT'S POINT OF INTERSECTION WITH THE SOUTHERN RIGHT-OF-WAY MARGIN OF
THE ABERDEEN AND ROCKFISH RAILROAD RECORDED IN DEED BOOK 170 PAGE 102 OF
THE CUMBERLAND COUNTY REGISTRY; THENCE N60°43'04"E 710.36 FEET TO THE POINT
OF BEGINNING, CONTAINING 14.28 ACRES (522,094 SF) MORE OR LESS.

1
2

Exhibit B
Site Plan



* The Road Parcel is included as part of the Critical Area.





**PLAN LEGEND**

Sprouts Temporary Tent Area

Sprouts Special Events Area

Shopping Center In-Line Space

Petco Disposal Facility Area

**EXHIBIT B - SITE PLAN**
Page 3 of 4
buybuy Baby
Fayetteville, NC
Date: 10/21/16

FREEDOM TOWN CENTER

DETAILED SITE PLAN

NC FAYETTEVILLE SKIBO, LLC



EXHIBIT B - SITE PLAN
Page 4 of 4
buy buy Baby
Fayetteville, NC
Date: 10/21/16