# EXHIBIT A

# LEASE AGREEMENT PART 3

<div align="center">Exhibit C</div>

<div align="center">Rent Commencement and Expiration Date Agreement</div>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 201___, by and between NC FAYETTEVILLE SKIBO, LLC, a North Carolina limited liability company (*"Landlord"*) and BED BATH & BEYOND INC., a New York corporation, d/b/a Buy Buy Baby (*"Tenant"*).

<div align="center">**W I T N E S S E T H :**</div>

WHEREAS, Landlord is the owner of a certain shopping center known as _____ (the *"Shopping Center"*), situated in _____, _____;

WHEREAS, by that certain Lease Agreement dated as of _____, 201__ (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____, 201___.

2.    The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the first Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise being ___[insert date]___), and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the second Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise being ___[insert date]___), and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The date of commencement of the third Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise being ___[insert date]___), and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.    The date of commencement of the fourth Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise being ___[insert date]___), and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

1        7.    The date of commencement of the fifth Renewal Period shall be February
2    1, 20___, if Tenant effectively exercises its option in respect thereof (the deadline for
3    such exercise being ___[insert date]___), and if Tenant does so, the Term of the Lease
4    shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the
5    Lease.

6        8.    Capitalized terms used, but not defined, herein shall have the meanings
7    ascribed to them in the Lease.

8        IN WITNESS WHEREOF, the parties hereto have caused this Rent
9    Commencement and Expiration Date Agreement to be executed the date and year first
10   above written.

**LANDLORD:**

NC FAYETTEVILLE SKIBO, LLC
a North Carolina limited liability company

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:
Title:

1

<u>Exhibit D</u>

2

<u>Specifications for Landlord's Work</u>



**Fayetteville, NC**



Exhibit D - Landlord's Work
***New Construction***

02/19/16 **(rev.05/19/16)**

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

## I.    Landlord's Plans & Specifications

A.  Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following :

1.  Tenant's Plans : Site-specific design-development drawings prepared by Tenant which shall include :
    a)  F1 - FIXTURE PLAN
    b)  F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
    c)  F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
    d)  F4 - LIGHTING PLANS AND NOTES
    e)  F5 - HIGH PILE STORAGE PLAN
    f)  Additional F-drawings as may be required to address atypical site-specific conditions

2.  Tenant's Prototype Drawings & Specifications  –  [developed MCG Architecture,Cleveland, OH] which consist of :

    a)  buybuy BABY – PROTOTYPE VERSION 1.2015.A – Drawings (dated 12/21/15)
    b)  buybuy BABY – PROTOTYPE VERSION 1.2015.A – Project Manual (dated 12/21/15)

3.  Lease Exhibits : Landlord's Plans & Specifications shall conform to all provisions of Exhibits B, D, D-1, D-2 and F to this Lease.

B.  Landlord's Plans & Specifications shall also include the following items :

1.  All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

2.  All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

3.  Complete civil engineering documents that describe planned improvements to the Shopping Center.

4.  Geo-technical and Storm-water design reports.

C.  Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements.  Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings & Specifications".  Such Requirements may include (but shall not be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas [incl. protection of openings through fire-rated partitions]; Disability access to mezzanine level [i.e. - ADA lift; limited use/limited application elevator; passenger elevator]; Second egress stair from the mezzanine level; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc..  Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

D.  Hierarchy :

1.  In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern :
    a)  Lease Exhibits B, D [excluding Tenant's Prototype], D-1, D-2 & F
    b)  Tenant's Plans
    c)  Tenant's Prototype Drawings and Specifications
    d)  Landlord's Plans and Specifications

2.  To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised (prior to construction) to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant.

E.  Quality Control Review :

1.  At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete full size set and one (1) complete ½ size set. Tenant may (at Tenant's option) employ a third party consultant to review the submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($2,500 - All payments must be made in US Dollars or the foreign equivalent thereof) related to such third party review.  If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

2.  Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications.  Tenant may (at Tenant's option) employ a third party consultant to review each subsequent submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($1,500 - All payments must be made in US Dollars or the foreign equivalent thereof) related to such third party review.  If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

3. Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant. Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications. Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease. Tenant reserves the right to immediately disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

4. Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

## II.    Site Specifications

A. All parking areas and traffic drives in the Shopping Center shall consist of a **95% compacted sub-grade, 6" compacted granular base, 1 1/2" asphalt base course and 1 ½" asphalt finish surface.** Grading of these areas shall not exceed a slope of 2% unless specifically approved in writing by Tenant. Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited.

B. All truck access drives in the Shopping Center shall consist of a **95% compacted sub-grade, 6" compacted granular base, 1 1/2" asphalt base course and 1 ½" asphalt finish surface.** Grading of these areas are not to exceed a slope of 3% unless specifically approved in writing by Tenant.

C. Tenant's truck ramp, Trash Compactor Pad and Trash Container Pad shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 6" Portland cement concrete surface finish. Tenant's truck ramp shall include #4 re-bars at 18" on center each direction. Tenant's recessed truck ramp shall not exceed slope of 6%.

D. If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

E. The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of Landlord's Plans & Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall also provide low level security lighting and throughout center that shall remain illuminated from dusk to dawn seven days a week **in accordance with the applicable codes and in compliance with the Governing Agencies having Jurisdiction.**

## III.    Building Requirements

The following section both (a) highlights elements of Landlord's Work which are already specified in "Tenant's Prototype Drawings & Specifications" and (b) identifies project-specific·elements of Landlord's Work which are in addition to the scope detailed in "Tenant's Prototype Drawings & Specifications" :

A. Clear Height : All Building Systems shall be designed to allow Tenant to stock merchandise to 16'-6"a.f.f. Various systems shall be designed to conform with the following criteria :
   1. 18'-4" minimum clear height to underside of all structural system components.
   2. 16'-6" minimum clear height to underside of all plumbing & electrical system components [excluding lighting]
   3. 17'-6" minimum clear height to underside of all mechanical system components [i.e. - ductwork]
   4. 19'-0" maximum clear height to underside of all mechanical supply and return ducts
   5. 16'-6" minimum clear height to underside of all fire protection sprinkler piping (main and branch lines)
   6. 1" minimum and 6" maximum from fire sprinkler heads to underside of roof/floor deck above
   7. 22'-0" maximum clear height at the lowest point of the underside of roof/floor deck above (excluding elevator override)
   8. 10'-0"minimum clear height from finished mezzanine floor to underside of roof/floor structure above.

B. Fire Protection : Landlord shall furnish and install both a fire alarm system and a fire sprinkler system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

   1. Landlord shall issue one complete submittal each for : (i) the fire alarm system and (ii) the fire sprinkler system (per Sections 01340, 16300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval. Each initial submittal must be received by Tenant's Consultant no later than (12) weeks prior to projected Delivery Date. Prior to the commencement of Consultant's review, Landlord shall pay a fixed fee ($625 for Fire Alarm + $825 for Fire Sprinkler) directly to Tenant's Consultant. If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant then Landlord shall revise the submittal to address all Consultant comments and resubmit. Prior to the commencement of Consultant's review of any resubmittal, Landlord shall pay a fixed fee ($625 each) directly to Tenant's Consultant. All payments must be made in US Dollars or the foreign equivalent thereof.

   2. Landlord shall be responsible for monitoring the fire alarm system up to 90 days following the Delivery Date.

   3. Fire Alarm system components shall be purchased by the Landlord thru Tenant's National Account vendor :
      **FE Moran**
      **Phone: 217-366-2419**
      **Contact: Susan Hirstein**
      **E-mail: bbb@femoransecurity.com**

   4. The sprinkler system shall be designed to allow merchandise to be stored to 16'-6" AFF or within 24 inches of the underside of the roof deck. The system shall comply with 2007 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity and a limited amount of group A plastics on solid shelves, minimum 4-foot aisles [typical requirement = 0.60 GPM/sf over a 2000 sf area].

   5. The sprinkler system shall NOT utilize a fire pump. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate any required Fire Pump outside of the Premises. Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 8 of 2008 Edition), and shall otherwise maintain the fire pump.

6. Consulting Services : If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials. If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

7. Landlord shall pay a fixed fee ($2,500) plus travel expenses to have Tenant's National Fire Protection Consultant (listed below) conduct a detailed field observation of the sprinkler system and fire alarm to confirm the systems have been installed in compliance with the approved shop drawing submittal.  Such field observation shall occur no later than ten days prior to the established Delivery Date.  Landlord shall pay the fixed fee directly to Tenant's Consultant prior to commencement of the site visit. All payments must be made in US Dollars or the foreign equivalent thereof.

8. Tenant's National Fire Protection Consultant :    Mr. Will Smith / Code Consultants, Inc. (CCI)
                                                    2043 Woodland Pkwy, Ste. 300
                                                    St. Louis, MO  63146-4136
                                                    (314) 991-2633 [ph]
                                                    (314) 991-4614 [fax]
                                                    wills@codeconsultants.com

C. Office Mezzanine Access : Prior to the development of Tenant's Plans, Landlord shall coordinate with the Authority Having Jurisdiction and advise Tenant of all applicable requirements regarding vertical transportation at the office mezzanine.  In the event that vertical transportation equipment is required, Landlord shall provide and install the appropriate vertical transportation equipment in accordance with "Tenant's Prototype Drawings & Specifications".  Vertical transportation equipment installation by the Landlord shall be complete, fully code compliant and inspected and shall allow Tenant to fixture, merchandise and open for business to the public in the Premises.  All equipment shall be operational a minimum of (2) two weeks prior to the Delivery Date to allow for proper "burn-in" in accordance with Tenant's Prototype Specifications Sections 14205 and 14255.  Final locations of all equipment shall be in accordance with Tenant's Plans.

D. Floor System : Landlord shall provide and install a concrete floor slab in accordance with "Tenant's Prototype Drawings & Specifications".  The floor system shall utilize 4,000 psi concrete and maintain a minimum thickness of 4 inches.  The floor system shall be designed to accept a minimum 125 lbs. per square foot of live load.  If rebar or pre-tensioned / post-tensioned steel is required, such reinforcement shall not be placed within the top 2 ½" of the concrete slab. The concrete floor system shall not be below FF40/FL30 and be measured immediately after finishing in accordance with ASTM E1155.

E. Utilities : Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas, water, fire protection water, sanitary sewer and phone services) are separately metered exclusive of all other tenants and occupants in the Shopping Center. Tenant's utility services shall be provided directly by the Utility company (sub-metering is prohibited).

Location of utility lines and equipment serving other Tenants in the Shopping Center shall be prohibited on, under, over, across or within the Premises.  Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date.  Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date.  If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

F. Intumescent Paint : In the event that fire-proofing of exposed structural elements is required, then Landlord shall use intumescent fire resistant coating to achieve the required fire rating. Application shall be neat & clean and in accordance with manufacturer's recommendations.

G. Exit Signs - Any existing Self Luminous Exit Signs containing Tritium Gas shall be removed from the Premises at the Landlord's cost (if applicable).

H. Security Equipment : Landlord shall provide and install new security equipment (including Electronic Article Surveillance [EAS] and Closed Circuit Television [CCTV]) in accordance with Tenant requirements.  Landlord shall purchase such EAS equipment directly from Tenant's National Account Vendor (WG Security Products, Inc. / Attn: Tim Gates / 704-232-8891 / tgates@wgspl.com)  Landlord shall purchase such CCTV equipment directly from Tenant's National Account Vendor. **Refer to Specifications Section, Vendor contacts 01000 for Vendor supplier for this Product.**

I. Sanitary Survey - Landlord shall perform a videographic, fiber optic camera survey of the existing sanitary drainage system 7-days prior to Delivery (plus a second camera survey within 7 days of the start of construction for all renovation projects).  The survey(s) shall include the entire sanitary line serving the Premises to a minimum of 50-feet outside the building.  Sanitary lines shall be "jetted" prior to starting the survey(s) to remove any existing waste, construction debris or standing clogs.  Camera recording shall indicate the operating camera depth.  Camera recording shall include a verbal narrative by the technician (including technician's name, company name, store number, store address, starting location of survey, and a brief description of any problems, deficiencies or points of interest identified throughout the inspection). Camera recording shall be submitted in DVD format and shall contain only the camera survey for this project.  Camera recording shall be clearly labeled with store number, store address, date of inspection, name of inspector and inspection company.  Camera recording shall be accompanied by a written evaluation report highlighting any problems, deficiencies or points of interest and shall include a schematic diagram of the sanitary line which indicates the size, slope and material of the pipe and all cleanout locations.

J. Vestibule : Landlord shall provide and install a fully enclosed "Vestibule" if indicated on Tenant's Plans in lieu of an open "Vestibule" as detailed on Tenant's prototype documents.  Vestibule shall conform to the following:  Interior vestibule glazing/storefront system shall match exterior glazing/storefront system in height, color and finish, with metal stud and gypsum board walls (including any headers and/or diagonal bracing, etc.) above to deck.  Bottom of vestibule gypsum board ceiling system  shall match top of glazing/storefront system and contain 2'x4' light fixtures (Type D1), ducted HVAC supply and plenum return, as well as chrome recessed sprinkler heads and fire alarm devices as required by code or authority having jurisdiction.

K. **New Roofing System: Landlord shall furnish and install new 60 mil white TPO roofing system. This would include all of the required misc. materials and associated secondary items deemed necessary for the complete installation of the specified roofing system. Acceptable manufacturers would be GAF, Firestone Johns Manville (Tenant's National Account Vendor) or equivalent. In each case the system selected shall meet or exceed Tenant's specified design criteria. System must be installed by a certified roofing contractor designated by the Manufacturer whose product is being used.  The composite roofing system must also be in compliance with applicable, current energy code standards  and in accordance with all Governing Agencies having Jurisdiction.**

L. NA

## IV. Construction Coordination Requirements

A. <u>Schedule</u> : Landlord shall provide Tenant with a critical path construction schedule prior to commencement of Landlord's Work. Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every two weeks until Landlord's Work is complete.

B. <u>Photographs</u> : Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address : **BBB.2000photos@bedbath.com**

C. <u>Vendor Coordination</u> : Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.

D. <u>Certification</u> : Whenever testing, certification, or verification is required in Tenant's Prototype Drawings & Specifications, Landlord shall, at Tenant's request, provide Tenant with copies of tests, certifications, or verifications, and shall otherwise cooperate with Tenant's reasonable informational requests.

## V.    Building and Site Signs

A. <u>Building Signs</u> – Landlord shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only. Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations. Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date. If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease. If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

B. <u>Remote Building Sign(s)</u> – **NA**

C. <u>Pylon/Monument/Directional Signs</u> – Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics). Landlord to furnish, install and remove (at Tenant's request) temporary non stick vinyl graphics as detailed in exhibit F.

D. <u>Temporary Signs</u> – Commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below. Landlord shall also remove the temporary banners on the date designated by the Tenant. Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
    1. Two double sided temporary banners mounted to the Premises bearing the phrase :
        Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
        Banner #2 - "Why Wait ? Shop Online" (side a) and "Now Open" (side b).
    2. Four single-sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
        Banners #1 & #2 - "Coming Soon"
        Banners #3 & #4 - "Now Open"
    3. One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
        "Now Hiring" (side a) and "Now Open" (side b).
    At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.

    Landlord shall secure banners through the following vendor:

        Auna Foote / Corporate Identification Solutions
        5563 North Elston Avenue
        Chicago, IL 60630
        (773) 763-9600 [ph]
        (773) 763-9606 [fax]
        afoote@corporateidsolutions.com
        www.corporateidsolutions.com

E. <u>Shop Drawings</u> : Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval no later than twelve (12) weeks prior to the Delivery Date.

## VI.    Permits and Approvals

A. Landlord shall be obligated to secure <u>all</u> permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises. Such permits may include (but shall not be limited to) the following : Building Permit, Health Permit [for the sale of prepackaged foods], Fixture Permit, Seismic Permit, High Pile Storage Permit [for storage of merchandise above 12'-0-"] and Signage Permits.

    If seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date. Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of the permit application. Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).

        Seizmic Inc.
        Sal Fateen / Genie Fateen / Keri Putnam
        161 Atlantic Street, Pomona, CA 91768
        (909) 869-0689 [ph]

Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.

## VII. Construction Closeout

A. Electronic Format: Within thirty (30) days following the "Substantial Completion" date, Landlord shall be responsible for uploading all required documents to the Digital Reliance Inc. (DRI) website [http//www.closeoutassistant.com]. For additional information or assistance contact DRI at 614-430-5950. Special software is not required. All documents shall be uploaded in pdf format to the DRI website within thirty (30) days following "substantial completion". Landlord shall pay the mandatory $725 service fee to DRI prior to uploading files. All payments must be made in US Dollars or the foreign equivalent thereof. DRI will confirm submittal meets base requirements and shall inform Landlord or Landlord's Contractor if certain documents are missing. DRI will not review items for content. The content will be reviewed by the BBB Construction Manager after posting of all documents is complete. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord or Landlord's Contractor from BBB's Construction Manager. Landlord shall resubmit amended document(s) to DRI until approved by BBB's Construction Manager. Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700.

B. Warranties : Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', Installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord shall forward a written report to Tenant outlining the condition of all warranty items.

C. Late Closeouts : If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D. Itemized Budget : NA

E. Energy Rebate Information : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy rebate programs that are in force by the Authority Having Jurisdiction and/or the utility provider.

1

<u>Exhibit D-1</u>

2

<u>Exterior Elevations of Premises and Sidewalk Plan</u>

3



1                                   Exhibit D-2

2                        Exterior Elevations of the Shopping Center



ARCHITECT OF RECORD:
R. MICHAEL COLEMAN
NORTH CAROLINA REGISTERED ARCHITECT
OWNERS REPRESENTATIVE:
COR3 Design, LLC
550 South Main Street
Suite 320
Greenville, SC 29601
Phone: 864.451.5288
Fax: 864.990.3085
www.cor3design.com
STRUCTURAL
PLUMBING
MECHANICAL
ELECTRICAL
NC FAYETTEVILLE
SKIBO
FAYETTEVILLE, N.C.
PHASE III - SHELL
REALTYLINK
C1 PARTIAL FRONT ELEVATION
F1 PARTIAL FRONT ELEVATION
I1 PARTIAL FRONT ELEVATION
L1 PARTIAL FRONT ELEVATION
N1 OVERALL FRONT ELEVATION
EXTERIOR FINISH LEGEND
buybuy BABY
World Market
10.25.16
EXHIBIT D-2 - ELEVATION
Page 1 of 1
buy buy Baby
Fayetteville, NC
Date: 10/04/16

1        <u>Exhibit E</u>

2        <u>Permitted Encumbrances</u>

3        The documents set forth in this Exhibit E were recorded in the Official Records of
4    the Cumberland County, NC Recorder's Office.

5        1.    Building restriction lines, easements, and any other matters shown on map
6    or plat recorded in Book 52, Page 25.

7        2.    Deed of Easement dated February 8, 1983 in favor of Robert F. Bleecker,
8    recorded March 11, 1983 in Book 2911, Page 455.

9        3.    Deed of Easement dated December 28, 1972 in favor of Montclair Water
10   Company, a North Carolina corporation recorded June 6, 1973 in Book 2391, Page 125.

11       4.    Deed of Easement dated March 11, 1983 in favor of Montclair Water
12   Company, a North Carolina recorded March 14, 1983 in Book 2911, Page 623.

13       5.    Deed of Easement dated August 31, 1983 in favor of Montclair Water
14   Company, a North Carolina corporation recorded September 2, 1983 in Book 2948, Page
15   371.

16       6.    Utility Easement dated  January 4, 1991 in favor of Montclair Water
17   Company, a North Carolina public utility water corporation recorded April 5, 1991 in
18   Book 3658, Page 258.

19       7.    Deed of Easement dated October 14, 1991 in favor of American Television
20   and Communications Corporation d/b/a Fayetteville Cablevision, a Delaware corporation,
21   recorded October 21, 1991 in Book 3717, Page 34.

22       8.    Easement dated August 5, 1985 in favor of the City of Fayetteville recorded
23   August 6, 1985 in Book 3084, Page 761.

24       9.    Utility Easement (Water & Sanitary Sewer PWC) dated February 13, 1996
25   in favor of the City of Fayetteville recorded February 20, 1996 in Book 4445, Page 611.

26       10.   Utility Easement (Water & Sanitary Sewer PWC) dated April 14, 1998 in
27   favor of the City of Fayetteville recorded April 20, 1998 in Book 4846, Page 440.

28       11.   Utility Easement (Water & Sanitary Sewer PWC) dated April 14, 1998 in
29   favor of The City of Fayetteville recorded April 20, 1998 in Book 4846, Page 446.

30       12.   Deed dated June 12, 1997 between John H. Wellons, Jr., Don C. Wellons,
31   Robert P. Wellons, Sylvia W. Craft and John H. Wellons, partners of Leisure Living
32   Company, a North Carolina General Partnership and the Department of Transportation,
33   recorded in Book 4729, Page 177.

34       13.   The OEA.

35       14.   Easement Agreement by and between Manna Church and NC Fayetteville
36   Skibo, LLC, a copy of which is attached hereto, which shall be recorded in connection
37   with Landlord's acquisition of the Greater Shopping Center.

38       Landlord represents and warrants that (i) none of the foregoing will interfere with
39   or prevent Tenant from operating its Premises in accordance with the terms of this Lease,
40   (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any
41   obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing
42   easements or rights of way (a) are located beneath the Premises, or (b) will interfere with
43   Tenant's use and enjoyment of the Premises.

44                                          E-1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15  Recording Requested By and
16  When Recorded Mail to:
17
18  Graybill, Lansche & Vinzani, LLC
19  2721 Devine Street
20  Columbia, South Carolina 29205
21  Attention:  Wesley M. Graybill
22                                        (Space above this line for Recorder's Use)
23
24  STATE OF NORTH CAROLINA          )
25                                   )          *EASEMENT AGREEMENT*
26  COUNTY OF CUMBERLAND             )
27
28
29          THIS  EASEMENT  AGREEMENT  (the  "Agreement")  is  made  as  of  the  _____  day  of
30  _____, 2016 by and between *MANNA CHURCH*, a North Carolina non-profit corporation
31  (the  "Church")  and  *NC  FAYETTEVILLE  SKIBO,  LLC*,  a  South  Carolina  limited  liability
32  company ("Fayetteville Skibo").
33
34                                      RECITALS
35
36          *WHEREAS,* the Church owns certain property along Cliffdale Road in Cumberland County,
37  North Carolina (the "Church Property") being more particularly described on Exhibit "A" attached hereto
38  and incorporated herein by reference and identified on Exhibit "C" attached hereto and incorporated
39  herein by reference (the "Site Plan"); and
40
41          *WHEREAS,* Fayetteville Skibo owns that certain property along Cliffdale Road in Cumberland
42  County, North Carolina (the "Skibo Property") being more particularly described on Exhibit "B" attached
43  hereto and incorporated herein by reference and identified on the Site Plan; and
44          *WHEREAS,* Fayetteville Skibo intends to commercially develop the Skibo Property; and
45
46          *WHEREAS,* Fayetteville Skibo desires to install a curb cut and related improvements to tie the
47  existing driveway on the Church Property to the improved driveway on the Skibo Property (collectively,
48  the "Curb Cut") along the boundary between the Church Property and the Skibo Property in the location
49  identified on the Site Plan; and
50
51          *WHEREAS,* Fayetteville Skibo has agreed to extend water lines for its development of the Skibo
52  Property onto the Church Property in the location identified on the Site Plan to permit the Church
53  Property to tie into said lines; and
54
55          *WHEREAS,* the Church desires to grant Fayetteville Skibo temporary easements to construct the
56  Curb Cut and extend the water lines onto the Church Property; and
57
58          *WHEREAS,* Fayetteville Skibo desires to grant the Church a sewer easement to connect sewer
59  lines from the Church Property into the sewer line located on the Skibo Property as more particularly set
60  forth herein; and
61
62          *WHEREAS,* Fayetteville Skibo desires to grant the Church an access easement over the internal
63  driveways located on the Skibo Property as more fully set forth herein; and
64
65          *WHEREAS,* the Church desires to grant Fayetteville Skibo an access easement over the internal
66  driveways located on the Church Property as more fully set forth herein; and
67

AGREEMENTS

*NOW, THEREFORE,* in consideration of the easements granted herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Church and Fayetteville Skibo agree as follows:

1.    Incorporation of Recitals.  The foregoing Recitals are incorporated and made a part of this Agreement.

2.    Grant of Access Easement Benefitting the Church Property.  Subject to the terms and conditions of this Agreement, Fayetteville Skibo does hereby grant, bargain, sell, convey and deliver unto the Church, its successors and assigns, for the benefit of the Church Property, a non-exclusive, perpetual, permanent, transmissible and assignable easement for ingress, egress and access for vehicular and pedestrian traffic over the internal driveways (the "Skibo Driveways") constructed on the Skibo Property, as the same are identified and shown on the Site Plan or may be constructed from time to time (hereinafter, the "Church Access Easement") which shall run with the land and be appurtenant thereto. Notwithstanding the foregoing, nothing herein shall prevent Fayetteville Skibo from modifying or reconfiguring the location of the Skibo Driveways located on the Skibo Property from time to time; provided, however, that the Church's connection to the Skibo Driveways in the location of the Curb Cut shall not be materially adversely affected.  The Church Access Easement granted herein shall be used in a manner so as not to unreasonably interfere with the business operations conducted on the Skibo Property.

3.    Grant of Access Easement Benefitting the Skibo Property.  Subject to the terms and conditions of this Agreement, the Church does hereby grant, bargain, sell, convey and deliver unto Fayetteville Skibo, its successors and assigns, for the benefit of the Skibo Property, a non-exclusive, perpetual, permanent, transmissible and assignable easement for ingress, egress and access for vehicular and pedestrian traffic over the internal driveways (the "Church Driveways") constructed on the Church Property, as the same are identified and shown on the Site Plan or may be constructed from time to time (hereinafter, the "Skibo Access Easement") which shall run with the land and be appurtenant thereto.  The Skibo Access Easement shall include the right to connect a driveway on the Skibo Property to the Church Driveways in the location of the Curb Cut. Notwithstanding the foregoing, nothing herein shall prevent the Church from modifying or reconfiguring the location of the Church Driveways located on the Church Property from time to time; provided, however, that Fayetteville Skibo's connection to the Church Driveways in the location of the Curb Cut shall not be materially adversely affected.  The Skibo Access Easement granted herein shall be used in a manner so as not to unreasonably interfere with the business operations conducted on the Church Property.

4.    Grant of Temporary Construction Easement Benefitting the Skibo Property.  Subject to the terms and conditions of this Agreement, the Church does hereby declare, grant, bargain, sell and convey to Fayetteville Skibo, for the benefit of the Skibo Property, a temporary, non-exclusive, irrevocable, and assignable easement over the Easement Area (as defined below) to construct the Curb Cut and connect the Church Driveway and to extend water lines from the Skibo Property onto the Church Property in the location shown on the Site Plan within the Easement Area and to make all other improvements associated therewith (the "Temporary Construction Easement").  The "Easement Area" shall consist of that portion of the Church Property identified and labeled on the Site Plan attached hereto and incorporated herein by this reference.  This Temporary Construction Easement shall terminate upon the earlier of the (i) installation of the Curb Cut, the extension of the Church Driveway through the Curb Cut to the Skibo Property and installation of the water lines within the Easement Area or (ii) one (1) year from the date of this Agreement.

5.    Grant of Sewer Easement Benefitting the Church Property.  Subject to the terms and conditions of this Agreement, Fayetteville Skibo does hereby declare, grant, bargain, sell and convey to the Church, for the benefit of the Church Property, a permanent, non-exclusive, irrevocable, and assignable sanitary sewer easement to connect sanitary sewer lines from the Church Property to the sanitary sewer line located on the Skibo Property near the boundary with the Church Property (the "Sanitary Sewer Easement").  The Sanitary Sewer Easement shall include a temporary construction easement for and during the time necessary for the Church to connect the sanitary sewer lines on the Church Property to the sanitary sewer lines on the Skibo Property.  The exact location of the connection of the sanitary sewer line from the Church Property to the sanitary sewer line on the Skibo Property shall be approved by Fayetteville Skibo, which approval shall not be unreasonably withheld, and at such time as the connection is made, the Sanitary Sewer Easement shall be limited to ten feet (10') on either side of the line, as installed.  The Church's use of the Sanitary Sewer Easement shall not cause any disruption or interruption in sanitary sewer service to the Skibo Property.  The connection of sanitary sewer lines from the Church Property to the existing sanitary sewer line on the Skibo Property shall be at the sole cost of the Church and the Church shall be solely responsible for maintenance, repair and replacement of any improvements installed within the Sanitary Sewer Easement area.  In addition, the Church shall be responsible for obtaining any governmental approvals or third party easements or agreements related to

E-3

tying into said sanitary sewer lines.  Fayetteville Skibo makes no representation or warranty whatsoever to the Church related to the Church's ability to obtain such governmental approvals or third party easements.

6.    Grant of Right to Tie In to Water Lines.  Subject to the terms and conditions of this Agreement and to the extent necessary, Fayetteville Skibo does hereby grant to the Church the right to tie in to the water lines once extended onto the Church Property; provided, however, the Church shall be responsible for obtaining any governmental approvals related to tying into said water lines.  Fayetteville Skibo makes no representation or warranty whatsoever to the Church related to the Church's ability to obtain such governmental approvals.

6.    Construction / Maintenance.

a.    Curb Cut.  The Skibo Property owner shall be solely responsible for the construction, repair and maintenance and all costs related to the paving and curbing of the Curb Cut and extending and connecting the Church Driveway to the Skibo Driveway at the Curb Cut.

b.    Driveways.  Except as provided for herein, each owner shall be solely responsible for the construction, repair and maintenance and all costs related to the Driveways located on its property, at its sole cost and expense.

c.    Water Lines.  The Skibo Property owner shall be solely responsible for the extension of the water lines onto the Church Property and all costs related to such installation; provided, however, the Church Property owner shall be solely responsible for tying into said lines and the maintenance and repair of any portion of the water lines installed by the Skibo Property owner located on the Church Property and all costs related thereto until such time as the same are dedicated or otherwise transferred to the appropriate governmental body or private utility company, as the case may be.

7.    Legal Effect.  The easements contained in this Agreement shall run with the parcels affected hereby and shall bind the parties and their successors and assigns and every person now or hereafter acquiring an interest in or lien upon the property affected hereby.  The rights of easement declared hereby: (a) shall be an estate prior to any subsequent lien, deed, estate or encumbrance whatsoever; (b) except as noted herein, shall be perpetual and shall run with the land, be binding upon, and inure to the benefit of the parties hereto, their respective successors and assigns and all existing and future mortgagees having an interest in any properties described herein; provided, however, that the rights of any mortgagee having an interest in either all or part of the aforesaid properties shall cease and terminate at such time as the respective mortgage or mortgages of said mortgagee are satisfied and discharged of record, unless such mortgagee shall become successor in title to owner of such parcel by reason of foreclosure or voluntary conveyance of such owner's interest to such mortgagee; (c) are, as of the execution date hereof, appurtenant to the Church Property and the Skibo Property; and (d) are made in contemplation of commercial use, and are of commercial character.  It is the parties' express intent that the easements granted herein shall not, at any time, merge by operation of law into the owner's title or interest in any parcel, but that said easements shall remain separate and distinct rights and estates in land, unless the owner(s) of all affected parcels specifically evidence their intent by mutual agreement in writing to extinguish the same.  It is further expressly provided that the acquisition hereafter by any other party (including, without limitation, a present or future mortgagee of any parcel or any portion thereof) of an ownership interest (in fee, leasehold, or otherwise) shall not operate, by merger or otherwise, to extinguish, diminish, impair, or otherwise affect any easement granted herein, which said easements shall remain separate and distinct estates in land.

8.    Limitations.  There are no other easements granted hereby other than as expressly stated.

9.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.  In addition, this Agreement may contain more than one counterpart of the signature page(s), all of which signature page(s) may be attached to one copy of this Agreement to constitute the entire executed Agreement.

10.    Captions, Gender and Number.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.  Whenever the context so requires, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

11.    Waiver.  Any consent to or waiver of any provision hereof shall not be deemed or construed to be a consent to or waiver of any other provision of this Agreement.  Failure on the part of either party to complain of any act or failure to act of the other party, irrespective of the duration of such failure, shall not constitute a wavier or modification of rights hereunder.  No waiver or modification

E-4

hereunder shall be effective unless the same is in writing and signed by the party against whom it is sought.

12.    Severability. If any provision of this Agreement shall, in whole or in part, prove to be invalid for any reason, such invalidity shall affect only the portion of such provision which shall be invalid, and in all other respects this Agreement shall stand as if such invalid provision, or other invalid portion thereof, had not been a part hereof. The parties agree that this Agreement shall be enforced to the fullest extent permitted by law. Accordingly, if, in any judicial proceeding, a court shall determine that any provision is invalid or unenforceable as written, the parties' consent to an interpretation by the court that will provide enforcement to the maximum extent permitted by law.

13.    Entire Agreement; Amendment. This Agreement is the sole and entire agreement and understanding of the parties with respect to the matters contemplated herein. All prior agreements, representations or understandings regarding the easements and obligations described herein, whether written or oral, shall be merged herein and shall not be construed to change, amend, alter, repeal or invalidate this Agreement. The parties hereto agree that the provisions of this Agreement may be modified or amended, in whole or in part, or terminated, only by the written consent of all record owners of the Church Property and the Skibo Property, and if reasonably required by any such party, evidenced by a document that has been fully executed and acknowledged by all such record owners and recorded in the official records of the Register of Deeds of Cumberland County, North Carolina.

14.    Governing Law and Jurisdiction. This Agreement has been executed and delivered in the State of North Carolina, and its validity, interpretation, performance and enforcement, and all matters relating thereto, shall be governed by and construed and interpreted in accordance with the laws of the State of North Carolina.

15.    No Adverse Presumption. It is acknowledged that this Agreement arose as the result of arms-length negotiations between the parties and that this Agreement, although manually prepared by representatives of Fayetteville Skibo, was prepared with the advice, consent, recommendation and review of the Church's representatives, and is the product of input by all parties. As a result, any ambiguity or uncertainty is not to be construed against the party whose counsel prepared this Agreement on the grounds that such party's representatives drafted this Agreement.

16.    Notices. Notices or other communication hereunder shall be in writing and shall be sent certified or registered mail, return receipt requested, or by other national overnight courier company, or personal delivery. Notice shall be deemed given upon receipt or refusal to accept delivery. Each party may change from time to time their respective address for notice hereunder by like notice to the other party. The notice addresses of the parties are as follows:

|  |  |
|---|---|
| Fayetteville Skibo: | NC Fayetteville Skibo, LLC |
|  | 550 S. Main Street |
|  | Suite 300 |
|  | Greenville, SC 29601 |
|  | Attention: Maude B. Davis |
|  | Telephone: (864) 263-5422 |
|  | Facsimile: (864) 232-0160 |
|  | Email: mdavis@realtylinkdev.com |
|  |  |
| With a copy to: | Wesley M. Graybill, Esquire |
|  | Graybill, Lansche & Vinzani, LLC |
|  | 2721 Devine Street |
|  | Columbia, South Carolina 29205 |
|  | Facsimile Number: (803) 404-5701 |
|  |  |
| Church: | Manna Church |
|  | 5117 Cliffdale Road |
|  | Fayetteville, NC 28314 |
|  | Attention:_____ |
|  | Facsimile Number: _____ |

17.    As-Built Location/Further Assurances/Amendment to Agreement. The parties hereto acknowledge that the easement areas as reflected on the Site Plan are approximate in location and size and may need to have minor adjustments made to reflect as-built conditions after construction is complete. Each party agrees to give further assurances to the other by way of executing and providing for recordation an amendment to this Agreement to confirm the as-built locations and sizes of the easement areas described in this Agreement after all improvements have been constructed. The approximate

locations and sizes of the easement areas as reflected on the Site Plan shall not render any of the easements granted in this Agreement unenforceable.

18.    <u>Mutual Indemnification</u>.  Fayetteville Skibo and the Church shall indemnify, defend and hold harmless each other and their respective successors and assigns and lenders and tenants from and against all liabilities, damages, expenses, causes of action, suits, judgments or claims, whether actual or threatened, (including, without limitation, reasonable attorney's fees and court costs) arising directly or indirectly from the other (offending) party's use of the easements created herein or such party's agents, employees, contractors, tenants, licensees or invitees; including, but not limited to, personal injury, death, or damage to pavement or improvements located on the respective properties.

[Signature Pages Follow]

*SIGNATURE PAGE FOR*
*EASEMENT AGREEMENT*

IN WITNESS WHEREOF, the undersigned has executed this Easement Agreement under seal effective as of the date set forth above.

*NC FAYETTEVILLE SKIBO, LLC*

By:_____
Philip J. Wilson, Manager

STATE OF SOUTH CAROLINA    )
                           )
COUNTY OF GREENVILLE       )

I, _____, a Notary Public of the County and State aforesaid, certify that Philip J. Wilson personally came before me this day and acknowledged that he is Manager of **NC Fayetteville Skibo, LLC**, a South Carolina limited liability company, and that by authority duly given and as an act of the company, has signed the foregoing instrument in its name and on its behalf as its act and deed.

WITNESS my hand and notarial seal, this _____ day of_____, 2016.

[Notarial Seal]

_____
Notary Public
Printed Name _____
My Commission Expires: _____

E-7

*SIGNATURE PAGE FOR*
*EASEMENT AGREEMENT*

IN WITNESS WHEREOF, the undersigned has executed this Easement Agreement under seal effective as of the date set forth above.

*MANNA CHURCH*

By:_____[SEAL]
Name:_____
Title: _____

STATE OF_____    )
                                              )
COUNTY OF _____    )

Before me, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that _____, personally known to me, whose name is subscribed to the within instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument of writing as such officer, as his free and voluntary act, for the uses and purposes therein set forth.

WITNESS my hand and notarial seal, this _____ day of_____, 2016.

[Notarial Seal]

_____
Notary Public
Printed Name _____
My Commission Expires: _____

**LENDER CONSENT PAGE TO EASEMENT AGREEMENT**

Branch Banking and Trust Company("Lender") holds a lien on the Parcel 2 by virtue of the following, all recorded in the official land records of Cumberland County:  (i) North Carolina Deed of Trust and Security Agreement dated June 30, 2010 and recorded in Book 8426, Page 37 and (ii) Agreement not to Transfer, Encumber, Assign or Pledge Assets dated June 10, 2004 and recorded in Book 6558, Page 233.  Lender, for itself and its successors and assigns, evidences its consent to the terms and provisions of this Agreement and to evidence its agreement that its lien shall be subordinate to the easement(s) granted herein and that any foreclosure of the lien of Lender affecting all or any part of the Parcel 2, whether such lien presently exists or is created in the future, or any conveyance in lieu of such foreclosure, shall not extinguish, terminate, cut-off, alter or otherwise affect the easements, which shall continue unabated, in full force and effect.

**BRANCH BANKING AND TRUST COMPANY**

By:  _____

Name:  _____

Title:  _____

STATE OF _____ )

                         )

COUNTY OF _____ )

I, _____, a Notary Public of the County and State aforesaid, certify that _____ personally came before me this day and acknowledged that s/he is _____ of BRANCH BANKING AND TRUST COMPANY and that by authority duly given and as an act of the company, has signed the foregoing instrument in its name and on its behalf as its act and deed.

WITNESS my hand and notarial seal, this _____ day of_____, 2016.

[Notarial Seal]

_____

Notary Public

Printed Name _____

My Commission Expires: _____

*EXHIBIT A*

CHURCH PROPERTY

Being all of Lot 2 as shown on plat entitled "PROPERTY OF BEREAN BAPTIST CHURCH" recorded in Plat Book 110, Page 137, of the Cumberland County, NC, Registry.

LESS AND EXCEPT:

The following described area of land lies on the southern side Cliffdale Road and the northern portion of lot 1 as shown in Plat Book 133, Page 82, in the Cross Creek Township and being a portion of land in the deed duly recorded in Deed Book 6397, Page 28 of the Cumberland County, North Carolina Registry, and is more fully described as follows:

**Commencing** at an existing 1" iron rod on the eastern line of the Leisure Living parcel as recorded in Deed Book 9532, Page 603 of the Cumberland County Registry; thence **N75°39'25"W 10.99** feet to the **Point of Beginning;** thence **N75°39'25"W 52.02** feet to a point in the southern right-of-way margin of Cliffdale Road; thence with said right-of-way margin **N87°13'04"E 92.98** feet to a point; thence **N86°45'06"E 249.38** feet to a point; thence with a curve as it curves to the right having a **radius of 717.50** feet and an **arc distance of 5.36** feet, chord bearing and distance of **N86°37'07"E 5.36** feet to a point; thence leaving said right-of-way margin and running with a new right-of-way line the following three calls: **S02°47'02"E 1.86** feet to a point; thence with a non-tangent curve as it curves to the left having a **radius of 813.84** feet and an **arc distance of 45.93** feet, chord bearing and distance of **S85°35'58"W 45.92** feet to a point; thence **S83°58'58"W 252.50** feet to the **Point of Beginning,** containing 2,720 square feet (0.062 acres), more or less.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

*EXHIBIT B*

SKIBO PROPERTY

All that certain piece, parcel or tract of land, together with the improvements thereon, situate, lying and being near the intersection of Cliffdale Road and Skibo Road in the City of Fayetteville, Cumberland County, North Carolina, designated as Lot 1, with an area of approximately _____ acres ("Lot 1"); Lot 2, with an area of approximately _____ acres ("Lot 2"); Lot 3, with an area of approximately _____ acres ("Lot 3"); right of way consisting of _____ with an area of approximately _____ acres (the "Road Parcel"); all as shown on a _____ of Freedom Town Center prepared for NC Fayetteville Skibo, LLC by _____ of _____ dated _____, 201__, last revised _____, 201__, and recorded in the Office of the ROD for Cumberland County in Book_____, Page_____.

1
2
3

**EXHIBIT C**

SITE PLAN



4

1

<u>Exhibit F</u>

2

<u>Signage</u>

3    •





**GENERAL SPECIFICATIONS**

(1) Set internally lighted letters constructed of aluminum (.090 backs, .063 returns 6" deep). Returns & back (interiors) finished in semi-gloss white acrylic enamel. Letters to have ¼" "weep" holes at the bottom of each letter.

Letter faces of .177 Cyro Acrylite: #SG-605-0 Blue for "BABY" & #SG-278-0 Red for "buy buy".

Letters that are 42" or larger will have fabricated aluminum retainers (1/2" face-1" side). Color to match returns. There will be no adhesive used to face material to aluminum retainers.

Internal illumination of letters by GE Tetra PowerMax LED modules: GEMXRD-1 Red for "buy buy" & GEMXBL-1 Blue for BABY. Modules are mechanically attached at 12 c/c (min). Power supplies (GEPS12-60U-NA) located within each letter. All wiring UL approved.

Letters installed w/ non-corrosive fasteners. Specific fasteners & methods to be determined.

**NOTES**

- All LED's at any one location MUST have the same BIN#'s
- All weep holes to have interior covers.
- Individual disconnect switch on EACH letter mounted so that toggle moves horizontally

Various Locations

Proposed Channel Letters | 7'-6" x 15'-0"

atlas SIGN INDUSTRIES

CORPORATE HEADQUARTERS

NORTHEAST DIVISION

www.atlassignindustries.us

This design / engineering is to remain Atlas Sign Industries exclusive property until approved and accepted thru purchase by client named on drawing. No part of design and or specifications may be duplicated without written authorization of Atlas Sign Industries.

© Copyright 2013

| | |
|---|---|
| S.O. No. | |
| Drawing No. | BABY-CL-ST-90 |
| Date | 12\|9\|2013 |
| Path Buy Buy Baby\|Various Locations | |
| PM | M. Cox |
| Drawn By | C. Barbato |
| Sign Size | 7'-6" x 15'-0" |
| Revision 1 | 03\|05\|2014 By DR |
| Revision 2 | 04\|15\|2014 By DR |
| Revision 3 | |
| Revision 4 | |
| Revision 5 | |
| Revision 6 | |

buybuy BABY

UNDERWRITERS LABORATORIES INC.

Approved by:

Date:

☐ APPROVED AS SHOWN
☐ APPROVED AS NOTED
☐ CORRECT & RESUBMIT

10·25·16

bb BABY
FAYETTEVILLE, NC
EXHIBIT F (1 OF 4)

Tetra® LED Systems

MATERIAL ESTIMATE

Drwg #: 036243- 11

| CUSTOMER INFORMATION | | *** SPECIAL INSTRUCTIONS |
|---|---|---|
| REF. | buybuyBABY 7' - 6" x 15' | |
| | | ESTIMATE FOR ONE SIDE OF SIGN ONLY |

1) THE GRAPHICS BELOW ARE FOR REFERENCE ONLY and should not be used for commercial quotation or bid without validation. The material estimates for Tetra® LED Systems are based upon our engineering standards and information provided pertaining to font, letter height, can depth, face material, and any special instructions provided by the customer. Missing information will cause delays in delivery of estimate as well as effect product selection, quantities, application, and illumination.
2) LED MODULE PLACEMENT AND QUANTITY IS AN APPROXIMATION ONLY. The sign manufacturer must verify module placement and quantity to ensure even illumination.
3) Final material quantities for estimation purposes and construction are the responsibility of the sign OEM
4) All signs should be tested as complete units (including correct Tetra® power supply) before installation for acceptable color, illumination, intensity, & functionality.
5) For detailed information and instructions refer to the applicable Tetra® product found under Signage at: [illegible]

| Can Depth | Power Supply Location | Illumination | Total Amps (Primary) | Total Watts (System) | Total Area | Energy Usage |
|---|---|---|---|---|---|---|
| 6" | SELF-CONTAINED | FACE / BACKLIT | 6.5 Amps | 181.13 Watts | 56.60 Sq Ft | 3.20 Watts/Sq.Ft |

| | | | |
|---|---|---|---|
| Tetra® MAX Red | | GEMXRD-1 | |
| Tetra® MAX Blue | | GEMXBL-1 | |
| MATERIAL LIST | | | |
| LED Module | GEMXRD-1 | 132 Mod | 66 Ft |
| | GEMXBL-1 | 175 Mod | 86 Ft |
| Power Supply | GEPS12-60U-NA | | 10 Ea |
| Supply Wire | 9409 | | 70 Ft |
| Choose one wire connector | 182180001 | | 50 Ea |
| | 181500041 | | 60 Ea |
| End Caps | 181000041 | | 70 Ea |

MATERIAL BREAKDOWN

| GEMXRD-1 | Modules | P/S |
|---|---|---|
| B | 210 | 1 |
| U | 200 | 1 |
| Y | 210 | 1 |
| B | 220 | 1 |
| U | 200 | 1 |
| Y | 210 | 1 |

| GEMXBL-1 | Modules | P/S |
|---|---|---|
| B | 480 | 1 |
| A | 420 | 1 |
| B | 480 | 1 |
| Y | 370 | 1 |

Tetra® LED Systems Lighting Solutions EAST CLEVELAND, OH 44112

TECH SUPPORT: 888-694-3533 / 216-266-2891
EMAIL: [illegible]
E-FAX: 216-359-0075

| Drawn By | KJD |
|---|---|
| Checked By | KJD |
| Date | 11/30/11 |

Drwg #: 036243 - 11 PAGE 1 OF 1 Rev A

atlas SIGN INDUSTRIES

CORPORATE HEADQUARTERS
1077 West Blue Heron Blvd., Riviera Beach, FLA 33404
Phone: (561)863-6659 / (800)772-7932 Fax: (561)863-4294

NORTHEAST DIVISION
707 Commerce Dr., Concord, NC 28025
Phone: (704)788-3733 / (800)772-7932 Fax: (704)788-3843

www.atlassignindustries.us

This design / engineering is to remain Atlas Sign Industries exclusive property until approved and accepted thru purchase by client named on drawing. No part of design and or specifications may be duplicated without written authorization of Atlas Sign Industries.
© Copyright 2013

| | |
|---|---|
| S.D. No. | |
| Drawing No. | BABY-CL-ST-90 LED |
| Date | 12\|9\|2013 |
| Path | Buy Buy Baby\|Various Locations |
| PM | M. Cox |
| Drawn By | C. Barbato |
| Scale | No Scale |
| Revision 1 | 04\|15\|14 By DR |
| Revision 2 | |
| Revision 3 | |
| Revision 4 | |
| Revision 5 | |
| Revision 6 | |

buybuy BABY

UNDERWRITERS LABORATORIES INC.

Approved by:

Date:

- APPROVED AS SHOWN
- APPROVED AS NOTED
- CORRECT & RESUBMIT

Various Locations

7'-6" x 15'-0" | LED Layout By GE

bb BABY
FAYETTEVILLE, NC
EXHIBIT F (2 OF 4)



PROPOSED TENANT VINYL | 1/2" = 1'-0"

**SCOPE OF WORK:**
1. Manufacture vinyl graphics and coming soon clings.
2. Apply to existing multi-tenant pylon sign faces as shown.

**SQUARE FOOTAGE:**
Proposed | 3.0'H x 10.0'L = 30.0 SF

**DESCRIPTION | LOGO:**
Exterior surface applied vinyl graphics on existing white substrate.

**COLOR SCHEDULE | LOGO:**
"buy buy" Copy = 3M 3630-33 Translucent Red Vinyl
"BABY" Copy = 3M 3630-137 Translucent European Blue Vinyl

**DESCRIPTION | CLING:**
3M Controltac Removable Vinyl with digitally printed graphics.
Coming Soon cling to be removed prior to store opening.

**COLOR SCHEDULE | CLING:**
Cling = Match 3M 33 Red Low Tack Vinyl
Text = White

*Note * - Total of (4) tenant panels for two existing D/F freestanding signs

PROPOSED PYLON ELEVATION | 3/16" = 1'-0"

NOTE: 2 PYLONS REQUIRED SAME LAYOUT

2000 Skibo Rd. Fayetteville, NC

Proposed Pylon Vinyl | Exhibit F ( _ of _ )

CORPORATE HEADQUARTERS

NORTHEAST DIVISION

www.atlassignindustries.us

This design / engineering is to remain Atlas Sign Industries exclusive property until approved and accepted thru purchase by client named on drawing. No part of design and or specifications may be duplicated without written authorization of Atlas Sign Industries.

© Copyright 2016

| | |
|---|---|
| S.O. No. | 71025 |
| Sheet No. | 1 |
| Date | 8/17/2016 |
| Path | buybuy BABY\|NC\|Fayetteville |
| PM | J. Kistle |
| Drawn By | C. Barbato |
| Scale | As Shown |
| Revision 1 | 8/18/16 By TG |
| Revision 2 | |
| Revision 3 | |
| Revision 4 | |
| Revision 5 | |
| Revision 6 | |

buybuy BABY

UNDERWRITERS LABORATORIES INC.

Approved by:

Date:

APPROVED AS SHOWN
APPROVED AS NOTED
CORRECT & RESUBMIT

bb BABY
FAYETTEVILLE NC
EXHIBIT F (3 OF 4)



1    Exhibit G

2    Form of Subordination, Non-Disturbance and Attornment Agreement

3    THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
4    AGREEMENT, made as of the _____ day of _____, 201__, by and between
5    _____, a _____ [corporation] [limited] [general]
6    [partnership] [national banking association], having an office at
7    _____ (the "**Mortgagee**") and BED BATH
8    & BEYOND INC., a New York corporation, d/b/a Buy Buy Baby, having an office at
9    650 Liberty Avenue, Union, New Jersey 07083 (the "**Tenant**").

10    W I T N E S S E T H :

11    WHEREAS, Mortgagee is the holder of a mortgage (the "**Mortgage**"), covering a
12    parcel of land owned by _____, a _____ [corporation],
13    [limited] [general] [partnership] (the "**Landlord**") together with the improvements [to
14    be] erected thereon (said parcel of land and improvements thereon being hereinafter
15    referred to as the "**Shopping Center**" and being more particularly described on Exhibit A
16    attached hereto and made a part hereof); and

17    WHEREAS, by a certain Lease Agreement heretofore entered into between
18    Landlord and Tenant dated as of _____ (as amended and/or modified, the
19    "**Lease**"), Landlord leased to Tenant a portion of the Shopping Center, as more
20    particularly described in the Lease (the "**Premises**"); and

21    WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
22    which is hereby acknowledged; and

23    **[For mortgages existing as of the date Lease is executed:** WHEREAS, as an
24    inducement to Tenant to enter into the Lease, **[Subsection 2.3.1/Section 17.3]** thereof
25    provides that the Lease is conditioned upon Landlord obtaining this Agreement from
26    Mortgagee; and

27    WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
28    the non-disturbance of Tenant by the holder of the Mortgage; and]

29    **[For mortgages occurring after the Lease is executed:** WHEREAS, Section
30    17.1 of the Lease provides that the Lease shall become subject and subordinate to a
31    mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and
32    when a non-disturbance agreement is entered into with respect to such mortgage; and

33    WHEREAS, the parties hereto desire to effect the subordination of the Lease to
34    the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

35    NOW, THEREFORE, in consideration of the premises and of the mutual
36    covenants and agreements herein contained, the parties hereto, intending to be legally
37    bound hereby, agree as follows:

38    1.    Mortgagee hereby consents to and approves the Lease and the term thereof,
39    including the options to extend the term as set forth in the Lease, and covenants and
40    agrees that the exercise by Tenant of any of the rights, remedies and options therein
41    contained shall not constitute a default under the Mortgage.

42    2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made
43    and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and
44    to all modifications and extensions thereof (and such subordination shall not lessen or
45    diminish Tenant's rights under the Lease), subject, however, to the provisions of this
46    Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the

applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent (unless Mortgagee's consent is not required under the terms of the Mortgage); notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease. It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  (i) General Counsel, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Cathleen H. Giuliana, Esq., Riker, Danzig, Scherer, Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown, New Jersey 07962-1981, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing

1  executed by the party against whom enforcement of such modification, change, waiver or
2  cancellation is sought.

3      10.    This Agreement and the covenants herein contained are intended to run
4  with and bind all lands affected thereby.

5      **[to add if our memorandum of lease has been recorded prior to the subject**
6  **mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE
7  UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE
8  BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO
9  SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID
10  MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

11      IN WITNESS WHEREOF, the parties hereto have duly executed this
12  Subordination, Non-Disturbance and Attornment Agreement as of the day and year first
13  above written.

<div align="right">

**MORTGAGEE:**

</div>

ATTEST:                          _____

By:_____       By:_____
Name:_____       Name:_____
Title:  (Assistant) Secretary        Title:    (Vice) President

[SEAL]

<div align="right">

**TENANT:**

</div>

ATTEST:                          BED BATH & BEYOND INC., a New
                                 York corporation

By:_____       By:_____
Name:_____       Name:
Title:  (Assistant) Secretary        Title:

[SEAL]

14

1          **[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

2                              _____

3      STATE OF NEW JERSEY            )
4                                     ) : ss.
5      COUNTY OF UNION                )

6          On this ___ day of _____, 201__, before me personally came Warren Eisenberg
7      to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of
8      Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument
9      and that he signed his name thereto by order of the Board of Directors of said corporation.

10                                              _____
11                                              Notary Public
12     My Commission Expires:
13
14
15     _____

16
17
18
19
20                              _____

1       Exhibit H

2       Form of Recognition Agreement

3       THIS RECOGNITION AGREEMENT, made as of the _____ day of _____,
4       201__, by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability
5       company, having an address at 550 South Main Street, Suite 300, Greenville, SC 29601
6       ("*Landlord*"); Bed Bath & Beyond Inc., a New York corporation, having an address at
7       650 Liberty Avenue, Union, NJ 07083 ("*Tenant*"); and _____,
8       a [_____] [corporation] [limited] [general] [partnership], having an
9       address at _____ ("*Subtenant*").

10      R E C I T A L S:

11      A.      Landlord and Tenant have entered into a certain Lease Agreement (the
12      "*Lease*") dated as of _____ __, 201__, a short form of which has been recorded
13      in _____, which demises certain premises (the "*Premises*") located in the
14      _____ Shopping Center, Fayetteville, North Carolina, which Shopping
15      Center is more particularly described on Exhibit A annexed hereto and made a part
16      hereof.

17      B.      Section 15.5 of the Lease provides that in the event Tenant subleases all or
18      a portion of the Premises for a term of at least five (5) years, Landlord shall, upon
19      Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant
20      and each such subtenant in the form attached to the Lease, in recordable form.

21      C.      Pursuant to a Sublease dated as of _____ (the "*Sublease*"),
22      Tenant has subleased [a portion of] the Premises to Subtenant (the "*Subleased
23      Premises*").

24      D.      The parties hereto desire to effectuate the provisions of Section 15.5 of the
25      Lease with respect to the Sublease and the Subleased Premises.

26      NOW, THEREFORE, in consideration of the mutual covenants and agreements
27      herein contained, the parties hereto, intending to be legally bound hereby, agree as
28      follows:

29      1.      Landlord warrants and represents as follows:

30              (a)      that it is the fee owner of the Premises,

31              (b)      that the Lease is unmodified (except as may be otherwise set forth in
32      Exhibit B annexed hereto, if any) and is in full force and effect,

33              (c)      that the term of the Lease expires on _____, but is subject
34      to [five] renewal periods of [five] years each and

35              (d)      that Tenant is not in default under the Lease nor has any event
36      occurred which would after notice to Tenant and the passage of time become a default of
37      Tenant under the Lease.

38      2.      Landlord hereby acknowledges receipt of a copy of, and consents to and
39      approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees
40      that the exercise by Subtenant of any of its rights, remedies and options contained therein
41      shall not constitute a default under the Lease.

42      3.      Landlord agrees that whenever it has an obligation with respect to the
43      Premises, or its consent or approval is required for any action of Tenant under the Lease,
44      then, to the extent such obligation, consent or approval relates to the Subleased Premises
45      or Subtenant's use and occupation thereof, it will perform such obligation in accordance

1  with the terms and conditions of the Lease, and, subject to the applicable terms of the
2  Lease, will not unreasonably withhold or unduly delay such consent or approval.

3      4.      Landlord shall not, in the exercise of any of the rights arising or which may
4  arise out of the Lease or of any instrument modifying or amending the same or entered
5  into in substitution or replacement thereof (whether as a result of Tenant's default or
6  otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession
7  of the Subleased Premises or of any right or privilege granted to or inuring to the benefit
8  of Subtenant under the Sublease, provided that Subtenant is not in default under the
9  Sublease beyond the expiration of any applicable notice and cure period.

10     5.      In the event of the termination of the Lease by reentry, notice, conditional
11 limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or,
12 if the Lease shall terminate or expire for any reason before any of the dates provided in
13 the Sublease for the termination of the initial or renewal terms of the Sublease and if
14 immediately prior to such surrender, termination or expiration the Sublease shall be in
15 full force and effect, Subtenant shall not be made a party in any removal or eviction
16 action or proceeding nor shall Subtenant be evicted or removed of its possession or its
17 right of possession of the Subleased Premises be disturbed or in any way interfered with,
18 and the Sublease shall continue in full force and effect as a direct lease between Landlord
19 and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the
20 term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater
21 of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the
22 basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area
23 of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

24     6.      Landlord hereby waives and relinquishes any and all rights or remedies
25 against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against
26 the property, goods or chattels of Subtenant in or on the Subleased Premises.

27     7.      Any notices, consents, approvals, submissions, demands or other
28 communications (hereinafter collectively referred to as "*Notice*") given under this
29 Agreement shall be in writing.  Unless otherwise required by law or governmental
30 regulation, Notices shall be deemed given if sent by registered or certified mail, return
31 receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip,
32 postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or
33 such other address or persons as Landlord may designate by Notice to the other parties
34 hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate
35 copies to  (i) General Counsel, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union,
36 New Jersey 07083, and (ii) Cathleen H. Giuliana, Esq., Riker, Danzig, Scherer, Hyland &
37 Perretti LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown,
38 New Jersey 07962-1981, or such other address or persons as Tenant may designate by
39 Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as
40 hereinabove set forth or such other address or persons as Subtenant may designate by
41 Notice to the other parties hereto.  During the period of any postal strike or other
42 interference with the mails, personal delivery shall be substitute for registered or certified
43 mail.  All Notices shall become effective only on the receipt or rejection of same by the
44 proper parties.

45     8.      No modification, amendment, waiver or release of any provision of this
46 Agreement or of any right, obligation, claim or cause of action arising hereunder shall be
47 valid or binding for any purpose whatsoever unless in writing and duly executed by the
48 party against whom the same is sought to be asserted.

49                      [Signature Page Follows]
50

H-2

1        9.     This Agreement shall be binding on and shall inure to the benefit of the
2 parties hereto and their respective heirs, legal representatives, successors, assigns and
3 sublessees.

4        IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to
5 be executed under seal the date first above written.

**LANDLORD:**

NC FAYETTEVILLE SKIBO, LLC,
a North Carolina limited liability company

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:
Title:

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

6

1      **[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

2      _____

3      STATE OF NEW JERSEY          )
4                                   ) : ss.
5      COUNTY OF UNION              )

6              On this ___ day of _____, 201__, before me personally came Warren Eisenberg
7      to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of
8      Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument
9      and that he signed his name thereto by order of the Board of Directors of said corporation.

10
11                                          _____
12     My Commission Expires:                      Notary Public
13
14
15     _____

Exhibit I

Form of Delivery Date Notice

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: General Counsel

Re:    Lease Agreement dated as of _____, 201__ (the "*Lease*"), between FC
       Fayetteville Skibo, LLC, a North Carolina limited liability company, as landlord
       ("*Landlord*"), and Bed Bath & Beyond Inc., d/b/a Buy Buy Baby, as tenant
       ("*Tenant*"), with respect to certain retail premises (the "*Premises*") located in the
       _____ Shopping Center, Fayetteville, North Carolina.

Gentlemen:

       In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 201__.  This notice shall constitute the Delivery Date Notice referred to
in Subsection 2.3.2 of the Lease.

                                 NC FAYETTEVILLE SKIBO, LLC
                                 a North Carolina limited liability
                                 company


                                 By:_____
                                 _____, (Vice) President
cc:    Cathleen H. Giuliana, Esq.
       General Counsel

I-1

Exhibit J

Form of Delivery Date Certification

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: General Counsel

Re:    Lease Agreement dated as of _____, 201__ (the "*Lease*"), between NC
       Fayetteville Skibo, LLC, a North Carolina limited liability company, as landlord
       ("*Landlord*"), and Bed Bath & Beyond Inc., a New York corporation, d/b/a Buy
       Buy Baby, as tenant ("*Tenant*"), with respect to certain retail premises (the
       "*Premises*") located in the _____ Shopping Center, Fayetteville,
       North Carolina

Gentlemen:

       In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
Date (as such term is defined in the Lease) will be deemed to be _____, 201__ .
This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
of the Lease.

                                        NC FAYETTEVILLE SKIBO, LLC
                                        a North Carolina limited liability
                                        company


                                        By:_____
                                        _____, (Vice) President
cc:    Cathleen H. Giuliana, Esq.

J-1

1          Exhibit K-1

2          Existing Exclusives

3

4    1.      Dick's Sporting Goods/Field & Stream Exclusive: During the term of the Dick's
5    Sporting Goods/Field & Stream Lease of Buildings I-A and I-B, except in the buildings
6    labeled as Buildings I-A and I-B on Exhibit B, no portion of the Greater Shopping Center
7    shall be used for the sale, rental and/or distribution, either singly or in any combination
8    of: (i) hunting, camping, fishing (including, but not limited to, fly fishing), hiking and/or
9    outdoor products, equipment, gear and/or accessories; (ii) hunting, camping, fishing,
10   hiking, outdoor, climbing, cycling, skiing/snowboarding, paddling and/or rugged
11   footwear; (iii) hunting, fishing and/or camping services, lessons and/or training; (iv)
12   hunting and/or fishing electronics products; (v) work boots (including, but not limited to,
13   soft toe and/or safety toe work boots, logger boots, mine boots, wellington boots and
14   athletic boots); (vi) boats, boat accessories and/or boating products, equipment, gear
15   and/or accessories; (vii) firearms, ammunition, knives and/or archery products,
16   equipment, gear and/or accessories; (viii) recreational vehicles, off-road vehicles, utility
17   terrain vehicles and/or all-terrain vehicles; (ix) sporting goods and/or sporting equipment
18   (including, but not limited to, golf equipment and accessories); (x) athletic footwear;
19   and/or (xi) health, fitness and/or exercise equipment ("Precluded Use Activity(ies)").
20

21   Notwithstanding the foregoing Precluded Use Activity(ies) set forth above, the retail sale
22   and/or distribution of sporting goods and/or sporting equipment in the lesser of (i) ten
23   percent (10%) in the aggregate of a building's gross leasable area (which shall include an
24   allocable portion of the aisle space adjacent to such sales floor area of such use) or (ii)
25   two thousand five hundred (2,500) square feet in the aggregate of the building's gross
26   leasable area (which shall include an allocable portion of the aisle space adjacent to such
27   sales floor area of such use), shall not be a violation of the Precluded Use Activities.
28   Furthermore, the following shall be permitted in the Greater Shopping Center and shall
29   not be a violation of the Precluded Use Activities (i) one (1) national brand shoe store for
30   the retail sale of men's and women's fashion footwear (such as Off Broadway Shoes or
31   DSW, as such national brand shoe stores currently operate as of the date of this Lease),
32   provided that such national brand shoe store shall not occupy more than twenty thousand
33   (20,000) square feet of gross leasable area; shall be permitted in the Greater Shopping
34   Center, (ii) Boot Barn, so long as Boot Barn is operating in a manner consistent with
35   substantially all other Boot Barn stores as of the date of the DSG Lease, provided that
36   Boot Barn shall not occupy more than eleven thousand (11,000) square feet of gross
37   leasable area; (iii) HomeGoods, so long as HomeGoods is operating in a manner
38   consistent with substantially all other HomeGoods stores as of the date of the DSG Lease;
39   (iv) Marshalls, so long as Marshalls is operating in a manner consistent with substantially
40   all other Marshalls stores as of the date of the DSG Lease; (v) TJ Maxx, so long as TJ
41   Maxx is operating in a manner consistent with substantially all other TJ Maxx stores as of
42   the date of the DSG Lease; and (vi) Burkes Outlet, so long as Burkes Outlet is operating
43   in a manner consistent with substantially all other Burkes Outlet stores as of the date of
44   the DSG Lease.
45

46   2.      Hobby Lobby Exclusive: During the term of the Hobby Lobby Lease of Building
47   I-D, except in the building labeled as Building I-D on Exhibit B, no other premises in the
48   Greater Shopping Center shall not be used for the sale of art supplies, craft supplies,
49   fabrics, photo frames, frames, framed art, wall art, and wall decor (the "HL Exclusive").
50   Incidental sales by other tenants of items included in the HL Exclusive in amounts not to
51   exceed the lesser of: (i) one thousand (1,000) square feet of such tenant's gross sales area,
52   measured from the center aisle; or (ii) ten percent (10%) of such tenant's gross sales area,
53   measured from the center aisle, shall not be deemed to violate the HL Exclusive.
54   Additionally, incidental sales by Dick's Sporting Goods and/or Field & Stream (or any
55   successor trade name utilized by the majority of stores previously operating under the
56   Dick's Sporting Goods or Field & Stream trade name, as the case may be) of items
57   included in the HL Exclusive in amounts not to exceed the lesser of: (i) one thousand five

1    hundred (1,500) square feet of its gross sales area, measured from the center aisle; or (ii)
2    ten percent (10%) of its gross sales area, measured from the center aisle, shall not be
3    deemed to violate the HL Exclusive.  The provisions of this paragraph shall not apply to
4    HomeGoods (and its successors and assigns) operating in Building I C on Exhibit B,
5    provided that the Homegoods exclusive shall not apply to Hobby Lobby (and its
6    successors and assigns) operating in Building I-D on <u>Exhibit B</u>.  The applicability of the
7    foregoing restriction with respect to the tenant under Bed Bath & Beyond Lease d/b/a
8    Cost Plus World Market of Building III-C is subject to that certain letter agreement dated
9    October 18, 2016 by and between Bed Bath & Beyond Inc. and Hobby Lobby, Inc.
10
11    3.    PetCo Exclusive:  During the term of the PetCo Lease of Building III-F, except in
12    the building labeled Building III-F on <u>Exhibit B</u>, no portion of the Greater Shopping
13    Center shall not be used for the retail sale of pets (including but not limited to fish, birds,
14    reptiles and small animals), pet grooming, veterinary, boarding, animal adoptions,
15    training, day care and other pet services, pet food, pet accessories and other pet related
16    products except for incidental sales (meaning the sale or display for sale of such items or
17    services, not as the primary use of the competing tenant and taking up no more than five
18    hundred (500) square feet of such tenant's floor area). This covenant shall not apply to
19    those tenants with leases in force and effect as of the date of the PetCo Lease to the extent
20    said leases have use clauses which otherwise permit said tenants to violate this covenant.
21    In addition, this covenant shall not apply to the tenants under the Lot 1 Anchor Leases
22    and the Sprouts Lease of Building III-H as shown on <u>Exhibit B</u>, their respective
23    successors, assigns or sub-tenants.
24
25    4.    Homegoods:  During the term of and pursuant to the terms and conditions of the
26    HomeGoods Lease of Building I-C, except in the building labeled as Building I-C on the
27    Site Plan, no other premises in the Greater Shopping Center shall contain more than
28    fifteen thousand (15,000) square feet of floor area therein used or occupied for, or
29    devoted to, the sale or display of furnishings for the home including the following
30    categories of items:  linens and domestics, window treatments, floor coverings, bathroom
31    items, bedding, furniture, wall décor, housewares, table top goods, glassware, flatware,
32    cookware, kitchen utensils, giftware and/or closet, shelving and storage items and home
33    accessories (the "Homegoods Protected Merchandise").  The computation of such floor
34    area shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces
35    adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures
36    or equipment containing or used for the sale or display of the Homegoods Protected
37    Merchandise.  The provisions of this paragraph shall not apply to Hobby Lobby (and its
38    successors and assigns) operating in Building I D as shown on the Site Plan, provided
39    that the Hobby Lobby exclusive shall not apply to HomeGoods (and its successors and
40    assigns) operating in Building I-C on the Site Plan.  In addition, the provisions of this
41    paragraph shall not apply to Cost Plus World Market (and its successors and assigns)
42    operating in Building III-C on the Site Plan, provided that the Cost Plus World Market
43    exclusive shall not apply to HomeGoods (and its successors and assigns) operating in
44    Building I-C on the Site Plan.
45
46    5.    Five Below:  During the term of and pursuant to the terms and conditions of the
47    Five Below Lease of Building III-B, except in the building labeled Building III-B on the
48    Site Plan, no portion of the Greater Shopping Center shall be used principally for the sale
49    of teen and pre-teen oriented merchandise at a price point of $10 and less (the "Five
50    Below Exclusive Items").  For purposes hereof, a store shall be deemed to be operating
51    for such purpose if it uses more than the lesser of (i) fifteen percent (15%) of the sales
52    space within its premises, or (ii) seven hundred fifty (750) square feet of space therefor
53    for the sale of the Five Below Exclusive Items.  The provisions of this paragraph shall not
54    be construed to prohibit any existing tenant situated within the Greater Shopping Center
55    as of the date of the Five Below Lease which has, as of the date of the Five Below Lease,
56    the right to handle and sell such items, from handling and selling those certain items, but
57    only to the extent permitted in such tenants' lease.  The provisions of this paragraph shall
58    also not apply to a retailer of one (1) principal category of merchandise that devotes at

1    least 75% of its sales floor area to the sale of one (1) principal category of merchandise
2    such as an electronics store, book store, toy store, clothing store, video rental store, health
3    and beauty aids store, convenience store.  In addition, this covenant shall not apply to the
4    initial tenants of the Greater Shopping Center operating as "Homegoods", "DSW" and
5    "Petco", any space in the Greater Shopping Center containing more than eighteen
6    thousand square feet (18,000) or to a "dollar store", such as, but not limited to, Family
7    Dollar, Dollar Tree or Dollar General as such stores operate as of the Effective Date.  For
8    avoidance of doubt, this covenant does not apply to the tenants under the Dick's Sporting
9    Goods/Field & Stream Lease of Building I-A and I-B as shown on Exhibit B, the
10   HomeGoods Lease of Building I-C as shown on the Site Plan and the Hobby Lobby
11   Lease of Building I-D as shown on Exhibit B (collectively, the "Lot 1 Anchor Leases"),
12   their respective successors, assigns or sub-tenants, as the Lot 1 Anchor Lease were
13   executed prior to the Five Below Lease and do not prohibit the handling and selling of the
14   Five Below Exclusive Items.
15
16   6.    Cost Plus World Market: During the term of and pursuant to the terms and
17   conditions of the Bed Bath & Beyond Lease d/b/a Cost Plus World Market of Building
18   III-C, except in the building labeled Building III-C on the Site Plan, no portion of the
19   Greater Shopping Center shall be used for the display and/or sale of gourmet foods; beer,
20   wine and spirits for off-premises consumption; and/or domestic or imported home décor
21   products (which items, either singly or in any combination, are hereinafter referred to as
22   the "Exclusive Items").  This exclusive shall not apply to: (1) department stores [for
23   example, Wal-Mart, Macy's, or Target], (ii) discount clubs [for example, Costco, BJ's
24   Wholesale Club, or Sam's Club], or (iii) home improvement centers [for example, Home
25   Depot or Lowe's], commonly located in first-class shopping centers in the state in which
26   the Greater Shopping Center is located, each occupying at least 60,000 square feet of
27   floor area within the Greater Shopping Center, as such stores are currently operated (as of
28   the Effective Date); (2) premises containing less than 3,500 square feet; (3) any store in
29   the Greater Shopping Center occupied and operated by Bed Bath & Beyond or any of its
30   affiliates (4) national or regional art & craft superstores such as Jo-Ann Fabrics,
31   Michael's, A.C. Moore and Hobby Lobby (or to the successors, assigns and/or subtenants
32   of Hobby Lobby operating under the initial lease of Building I-D); (5) one store of 3,000
33   square feet or less selling custom frames and (6) national or regional grocery stores or
34   supermarkets as such terms are commonly used in the industry [such as (without
35   limitation): Kroger, Tops, Publix, Whole Foods, Sprouts, Trader Joe's and Fresh
36   Market.]; (7) national or regional drug stores (e.g. CVS, Walgreen's, Rite Aid, etc.] and
37   (8) Homegoods (and successors and assigns) operating in Building I-C on the Site Plan,
38   provided that the tenant under the Bed Bath & Beyond Lease and Cost Plus, Inc. (and
39   their successors and assigns) operating in Building III-C on the Site Plan are not subject
40   to any exclusive rights granted to Homegoods.  Furthermore, any tenant or subtenant in
41   the Greater Shopping Center shall have the right to utilize its respective premises for the
42   sale, rental and/or distribution of Exclusive Items (other than beer, wine and spirits for
43   off-premises consumption, which shall not be permitted) within an aggregate area (which
44   shall include an allocable portion of the aisle space adjacent to such storage, sales, rental
45   and/or distribution area) not to exceed the lesser of (a) two thousand five hundred (2,500)
46   square feet of Floor Area within such tenant's or subtenant's premises, or (b) ten percent
47   (10%) of such tenant's Floor Area.
48
49   7.    Carter's/OshKosh:  During the term of and pursuant to the terms and conditions
50   of the Carter's Lease and the OshKosh Lease of Building III-A, except in the building
51   labeled Building III-A on the Site Plan, after the date of the Carter's Lease and the
52   OshKosh Lease, Declarant shall not lease space (or consent to a change of use when
53   Declarant has the right to deny such consent to existing tenants) to another tenant or
54   occupant whose primary use is or may be the operation of a retail store in which infants',
55   toddlers' and/or children's clothing is displayed in at least one-third of the display area
56   (including all adjacent aisle space) (the "Carter's Restricted Use"), if either before
57   entering into such transaction or a result thereof, more than three percent (3%) of the total
58   leasable area in the Greater Shopping Center is operated by tenants or occupants

1  (including Carter's) whose primary use is the Carter's Restricted Use; provided, however,
2  the foregoing three percent (3%) limitation shall not apply to any tenants in the Greater
3  Shopping Center occupying more than fifteen thousand (15,000) square feet of gross
4  leasable area or the initial tenants of Building I-A, Building I-B, Building I-C and
5  Building I-D, their respective successors, assigns or sub-tenants (and the leasable area of
6  such tenants shall be excluded in the denominator when calculating the three percent
7  (3%) limitation).
8
9  8.    Sprouts:    During the term of and pursuant to the terms and conditions of the
10  Sprouts Lease of Building III-H, Sprouts shall have the exclusive right in the Greater
11  Shopping Center to conduct the operation and sale, either singly or in any combination,
12  of any of the following activities or merchandise:  (i) the operation of a grocery store,
13  meat or seafood market or produce market, or the sale of any such items; (ii) the sale of
14  vitamins and supplements, ethnic foods, natural or health food, pet food, or packaged ice
15  cream; (iii) the sale of natural cosmetics, natural health or beauty products; (iv) the sale
16  of packaged beer and wine for off-premises consumption; (v) the operation of a full
17  service bakery; and (vi) the operation of an over-the-counter delicatessen offering sliced
18  or butchered meats and cheeses for off-premises consumption (all of which are included
19  in and referred to as the "Sprouts Exclusive"), and all other Greater Shopping Center
20  tenants or occupants are prohibited from engaging in Spouts Exclusive  except on an
21  Incidental Basis (defined below), provided that there shall be no exception for the sale of
22  fresh meat, seafood and produce.  "Incidental Basis" means for the purposes of this
23  paragraph the area dedicated to the sale of such items occupies the lesser of: (a) 250
24  square feet of Gross Floor Area; or (b) 3% of the sales area of the subject premises;
25  provided not more than 2 linear feet of retail selling space shall be dedicated to the
26  display and sale of any one category of ancillary products.  Sprouts Exclusive shall not
27  apply to any tenant under any lease executed prior to the Sprouts Lease whose lease does
28  not prohibit the use of its premises for the portion of Sprouts Exclusive at issue; provided
29  that to the extent Declarant has the right to consent to a change in use, or assignment,
30  Declarant agrees to withhold such consent if the resulting use would violate the Sprouts
31  Exclusive. The Sprouts Exclusive shall not restrict the following specific uses:  (i) a
32  coffee shop, sandwich shop or restaurant which primarily serves food for on-premises
33  consumption, such as Starbucks, Panera Bread, Jimmy John Sandwiches, Einstein's
34  Bagels, or Subway; (ii) an ice cream, smoothie or frozen yogurt shop; (iii) a pick up or
35  delivery outlet (such as a pizza delivery shop or Chinese carry-out) which occupies not
36  more than 2,000 square feet of gross floor area each; (iv) a cosmetic store such as ULTA,
37  Sally's Beauty or similar beauty supply type store, day spa or a salon such as Aveda
38  Salon; or (v) a full service pharmacy or drug store such as CVS or Walgreens.  In
39  addition, the Sprouts Exclusive shall not apply to the following Greater Shopping Center
40  anchor tenants (or their successors, assigns or subtenants) during the term of Declarant's
41  leases with said anchor tenant:  DSG; Field & Stream; HomeGoods; Hobby Lobby;
42  DSW; Petco; buy buy Baby, World Market; Burkes; Carter's; Oshkosh; and Five Below.
43
44
45

1          <u>Exhibit K-2</u>

2          <u>Existing Leases</u>

3

4    1. Dick's Sporting Goods, Inc. ("DSG")

5    2. Hobby Lobby Stores, Inc.

6    3. HomeGoods, Inc.

7    4. PetCo Animal Supplies Stores, Inc.

8    5. DSW Shoe Warehouse, Inc.

9    6. Five Below, Inc.

10   7. SFM, LLC ("Sprouts").

1                               <u>Exhibit L</u>

2                          <u>Intentionally Omitted</u>

1       Exhibit M

2       Prohibited Uses

3    Except as provided for herein, no part of the Greater Shopping Center or Shopping
4    Center, as noted below, including the Premises, shall be used for any of the following
5    (the "*Prohibited Uses*"):

6

7            (a)    for any non-retail purposes (restaurants, repairs, alterations, storage and
8    offices incidental to retailing, and banks and small loan offices, shall be deemed retail).
9    Notwithstanding the foregoing, non-retail purposes consistent with a first-class regional
10   shopping center (such as, by way of example only, Aspen Dental) shall be permitted in
11   twenty percent (20%) of the total, cumulative, LFA of the following buildings within the
12   Greater Shopping Center:  Building I-F, Building I-G, Building III-K, Building III-L,
13   Building III-M, and Building III-O, provided that in no event shall any individual non-
14   retail use exceed four thousand (4,000) square feet.  A Business Office shall not be
15   permitted.  As used herein, the term "Business Office" shall mean an office which does
16   not provide services directly to consumers;

17           (b)    for any entertainment purposes such as a bowling alley, skating rink, bar,
18   night club, discotheque, amusement gallery, cinema, poolroom, health club, massage
19   parlor, sporting event, sports or game facility or off-track betting club;  but not to
20   prohibit: (i) an upscale bowling alley within that area depicted as Building I-A on the Site
21   Plan, (ii) a cinema within that area depicted as Building I-A on the Site Plan ; (iii) a first-
22   class, first-run cinema within Section II, (iv) a prototypical Massage Envy and/or Spa La
23   La so long as (x) such establishment is located at least 300 linear feet away from Building
24   I-D and is not located within Buildings III-A, III-B, III-C, III-D, III-E, III-F, III-G or III-
25   H (collectively, the "Section III Inline Space") or Building III-L, and (y) no more than
26   one such use shall be located in Section III, (v) a health club within that area depicted as
27   Building I-A on the Site Plan; or (vi) a first-class health club, gym or exercise studio
28   within those areas of the Greater Shopping Center labeled "Section II" and "Section III"
29   on the Site Plan so long as such health club, gym or exercise studio occupies no more
30   than (x) 5,000 square feet if located on Section II, or (y) 3,000 square feet if located on
31   Section III, and is not located in the Section III Inline Space or Building III-L;

32           (c)    for any establishment which sells or displays used merchandise or second
33   hand goods, except that first-class stores with a combination of new and used goods (such
34   as GameStop and Cartridge World) shall be permitted, provided that the aggregate floor
35   area of such stores shall not exceed four thousand (4,000) square feet;

36           (d)    for any establishment which sells or displays pornographic materials;

37           (e)    for a restaurant or establishment selling food prepared on premises for
38   consumption on or off premises located within Section I on the Site Plan or within the
39   Section III Inline Space, Building III-L, Building III-M or Building III-O; except that (i)
40   one (1) restaurant containing up to three thousand (3,000) square feet of LFA shall be
41   permitted in each of Building I-F and Building I-G and (ii) one (1) quick service
42   restaurant containing up to two thousand five hundred (2,500) square feet of LFA shall be
43   permitted in Building III-L, (iii) a restaurant containing up to four thousand (4,000)
44   square feet of LFA shall be permitted in Building III-M, (iv) a restaurant containing up to
45   two thousand five hundred (2,500) square feet of LFA shall be permitted in Building III-
46   O and (v) up to four (4) tables for seating up to sixteen (16) persons may be maintained
47   inside Building III-H.  In the event Building I-F or Building I-G contains more than three
48   thousand (3,000) square feet of LFA, then any such restaurant shall be located within the
49   northernmost portion of such building.  In the event Building III-L contains a restaurant,
50   then any such restaurant shall be located within the southernmost portion of such
51   building.  In the event Building III-M contains a restaurant, then any such restaurant shall
52   be located within the southernmost portion of such building.  In the event Building III-O

contains a restaurant, then any such restaurant shall be located within the northernmost portion of such building;

(f)    store selling liquor, beer, or wine, without the consent of Hobby Lobby Stores, Inc. ("Hobby Lobby"), which consent may be granted or withheld in Hobby Lobby's sole discretion, but not to prohibit: (i) the incidental sales of alcohol by a grocery store, or (ii) the sale of alcohol by a restaurant so long as the annual gross sales receipts of such items are less than forty percent (40%) of the total annual gross sales of such restaurant, which sales permitted by (i) and (ii) above shall not require the consent of Hobby Lobby;

(g)    bowling alley, billiard parlor, arcade, or other place of amusement or recreation, but not to prohibit an upscale bowling alley within that area depicted as Building I-A on the Site Plan;

(h)    second-hand store whose principal business is selling used or donated merchandise (except that stores with a combination of new and used goods (such as Play it Again Sports, GameStop and Cartridge World) shall be permitted);

(i)    pawn shop;

(j)    head shop, electronic cigarette shop, or store selling marijuana, but not to prohibit an electronic cigarette shop within those areas of the Greater Shopping Center labeled "Section II" on the Site Plan;

(k)    payday loan or check cashing provider;

(l)    child care center;

(m)    funeral home or mortuary;

(n)    school, church, or other place of worship;

(o)    flea market;

(p)    tattoo parlor or body piercing establishment;

(q)    theater, but not to prohibit a theater within that area depicted as Building I-A on the Site Plan or a first-class, first-run theater in Section II;

(r)    adult video store and adult book store;

(s)    adult entertainment club;

(t)    night club;

(u)    health club, gym, exercise studio, spa, or massage parlor, but not to prohibit: (a) a prototypical Massage Envy or Spa La La so long as such establishment is located at least 300 linear feet away from Building I-D and is not located in the Section III Inline Space or Building III-L and no more than one such use shall be located in Section III; (b) a health club, gym or exercise studio within that area depicted as Building I-A on the Site Plan; or (c) a first-class health club, gym or exercise studio within those areas of the Greater Shopping Center labeled "Section II" and "Section III" on the Site Plan so long as such health club, gym or exercise studio occupies no more than (x) 5,000 square feet if located on Section II, or (y) 3,000 square feet if located on Section III, and is not located in the Section III Inline Space or Building III-L;

(v)  place of betting, gambling, bingo, or other gaming;

(w)  self-service laundry facility;

(x)  on-site dry cleaner;

(y)  hotel, motel, or other place of residence;

(z)  car wash, auto body shop, auto rental business, or junk yard;

(aa)  animal facility, but not to prohibit a national pet supply store such as Petco or PetSmart, but in no case shall such pet supply store have a "dog run" or other similar outside pen for animals;

(bb)  manufacturing operation;

(cc)  a government owned or operated healthcare clinic;

(dd)  abortion clinic, including Planned Parenthood

(ee)  anything constituting a public or private nuisance;

(ff)  except as specifically permitted in items (b) and (u) above, any of the following uses in the Section III Inline Space, Building III-K and Building III-L:  (i) an Entertainment or Educational Facility, as defined below, but not to prohibit a nail salon in Building III-K or Building III-L so long as such nail salon occupies no more than 2,000 square feet of Floor Area; (ii) military recruitment center; or (iii) a store selling liquor, beer, or wine; but not to prohibit the retail sale of liquor, beer or wine primarily for off-premises consumption (including conducting on-premises sampling and tasting); "**Entertainment Facility**" means a facility primarily for entertainment or recreation, including, without limitation, gym, yoga studio, health spa or exercise studio, auditorium, meeting hall or other place of public assembly, dance hall or night club, massage parlor, health club, game parlor, video arcade (which shall be defined as any store containing more than five (5) electronic games), "laser tag," "bounce house" or "virtual reality" operation, "**Educational Facility**" means a facility primarily for training or education, including, without limitation, a beauty school, nail salon, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees as opposed to customers;

(gg)  any of the following uses in the Shopping Center/Section III:
    (i)  any automobile, truck, trailer or R.V. sales or leasing,
    (ii)  telemarketing or call center; or
    (iii)  any catering or banquet hall;
    (iv)  any carnival, amusement park or circus;
    (v)  karate center;
    (vi)  gun shop, except that this provision shall not prohibit a national or regional sporting goods store, of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as Dick's Sporting Goods or Field and Stream), from selling guns as an incidental part of such store's business,
    (vii)  supermarket/grocery store other than in Building III-H (i.e., a supermarket/grocery store is permitted to operate in Building III-H);

(hh)  during the term of the Five Below lease, for a pet store located immediately adjacent to Building III-B;

1         (ii) any use, the presence of which may jeopardize the validity of the right to sell
2   alcohol from the Premises (*e.g.*, in some jurisdictions, educational facilities, medical
3   facilities, churches, and schools);

4         (jj)   any of the following uses:  (1) any use which emits or results in strong,
5   unusual or offensive odors, fumes, dust or vapors, emits noise or sounds which are
6   objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a
7   hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping
8   or disposing of garbage or refuse; (2) any operation primarily used as a storage facility
9   and any assembling, distilling, refining, smelting, agricultural, or mining operation; (3)
10  any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this
11  provision shall not prohibit the temporary use of construction trailers during periods of
12  construction, reconstruction, or maintenance); (4) any dumping, disposing, incineration,
13  or reduction of garbage (exclusive of trash compactors or trash containers located near
14  the rear of any building); and

15        (kk) any fire sale, bankruptcy sale (unless pursuant to a court order), auction house
16  operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised
17  event; a store primarily selling merchandise which is classed as "odd lot," "close out,"
18  "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor
19  model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire
20  sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's
21  Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailers commonly
22  known as "Christmas Tree Shops" and "And That" shall be deemed not to violate the
23  foregoing restriction, nor shall discount retailers such as, for example, those commonly
24  known as "TJ Maxx", "Marshalls", "Ross", "Burkes", "DSW", "Carter's", "OshKosh"
25  and "Five Below" be deemed to violate the foregoing restriction.  This covenant shall not
26  apply to the tenants under the Lot 1 Anchor Leases.

27

28
29

1

<u>Exhibit N</u>

2
3                                Form of OEA
4
5