EXHIBIT A


LEASE AGREEMENT PART 4

Recording Requested By and
When Recorded Mail to:

Graybill, Lansche & Vinzani, LLC
2721 Devine Street
Columbia, South Carolina 29205
Attention: Wesley M. Graybill

_____
(Space above this line for Recorder's Use)

| STATE OF NORTH CAROLINA | ) | *DECLARATION OF EASEMENTS, COVENANTS* |
|---|---|---|
|  | ) | *AND RESTRICTIONS FOR FREEDOM TOWN CENTER* |
| COUNTY OF CUMBERLAND | ) |  |

### WITNESSETH:

THIS DECLARATION OF EASEMENTS, COVENANTS AND RESTRICTIONS FOR FREEDOM TOWN CENTER ("Declaration") is made as of the _____ day of _____, 2016 (the "Effective Date"), by *NC FAYETTEVILLE SKIBO, LLC*, a North Carolina limited liability company (the "Declarant").

WHEREAS, Declarant is the owner of all that certain piece, parcel or tract of land, together with the improvements thereon, situate, lying and being near the intersection of Cliffdale Road and Skibo Road in the City of Fayetteville, Cumberland County, North Carolina, said master tract containing a total area of approximately 49.061 acres and being subdivided into five (5) separate parcels shown and designated as Lot 1, with an area of approximately _____ acres ("Lot 1"); Lot 2, with an area of approximately _____ acres ("Lot 2"); Lot 3, with an area of approximately _____ acres ("Lot 3"); right of way consisting of _____ with an area of approximately _____ acres (the "Road Parcel"); and an area of approximately _____ acres to be dedicated as railroad right of way (the "Railroad Parcel"), all as shown on a _____ of Freedom Town Center prepared for NC Fayetteville Skibo, LLC by _____ of _____ dated _____, 201__, last revised _____, 201__, and recorded in the Office of the ROD for Cumberland County in _____ (Lot 1, Lot 2, Lot 3 and the Road Parcel are sometimes collectively called the "Property"); and

WHEREAS, Declarant is developing a commercial project on the Property and desires to provide for the preservation of the value of the Property and to assure a uniform and consistent or harmonious development and improvement of the Property; and

WHEREAS, Declarant desires to subject the Property to certain restrictions, and to declare certain nonexclusive easements to benefit the Property as set forth herein; and

WHEREAS, the Shared Pylon Signs, the Road Parcel, the Landscape Island Area(s), the DSG/F&S Outdoor Sales Area, the Homegoods Outside Sales Area, the PetCo Pet Adoption Area, the PetCo Disposal Facility Area, the Five Below Outside Sales Area, the DSG/F&S Expectant Mother Spaces, the BBB Reserved Spaces, the Carter Stroller Spaces, the CPWM Pick Up Area, the Sprouts Temporary Tent Area, the Sprouts Outdoor Sales Area, the Sprouts Special Events Area, the Burke's Outside Sales Area, the BBB Outside Sales Area, the CPWM Outside Sales Area and the Carter/Osh Kosh Outside Sales Area as defined in this Declaration, are all shown and identified on the site plan attached hereto and incorporated herein as *Exhibit A* (the "Site Plan").

1

NOW, THEREFORE, Declarant hereby covenants and declares, on behalf of itself and its successors and assigns, that the Property shall be held, conveyed, acquired and encumbered subject to the following easements and restrictions, all of which shall run with the Property and bind and inure to the benefit of all persons who may now or hereafter occupy or enter upon any portion thereof, subject to the right of Declarant to amend this Declaration as provided herein.

1.   Incorporation of Recitals.  The foregoing Recitals are incorporated and made a part of this Declaration.

2.   Certain Definitions.  For purposes hereof:

   (a)    The term "Common Area" shall mean those portions of the Parcels that are outside of exterior walls of buildings or other structures, from time to time located on the Parcels, and which are either unimproved, or are improved as (without limitation) parking areas, landscaped areas, driveways, roadways, walkways, light standards, curbing, paving, drainage facilities and entrances and exits. Notwithstanding anything to the contrary contained herein, in no event shall any drive-thru lanes located on any Parcel be considered part of the Common Area.  Notwithstanding anything to the contrary contained in this Declaration, the Landscape Island Area(s) shall always be considered part of the Common Area.

   (b)    The term "Landscape Island Area(s)" shall mean that portion of the Road Parcel identified as such on the Site Plan.

   (c)    The term "LFA" shall mean the number of gross square feet of leasable floor area (whether occupied or unoccupied) of the buildings in the Property intended for the exclusive use by any tenant, subtenant, assignee, licensee, concessionaire or other occupant of the Property, thereof including mezzanines or other levels if used for retail sales.  LFA shall be measured from the exterior face of exterior walls and the exterior face of service corridor walls, the line along the front of such premises where it abuts the sidewalk or other Common Area, and the center line of any wall that such premises shares with an adjoining premises

   (d)    The term "Owner" or "Owners" shall mean the owners of the individual Parcels and any and all successors, assigns or grantees of such persons as the owner or owners of fee simple title to all or any portion of the Property, whether by sale, assignment, inheritance, operation of law, trustee's sale, foreclosure, or otherwise, but not including the holder of any lien or encumbrance on such real property.

   (e)    The term "Parcel" or "Parcels" shall mean each separately identified parcel of real property now constituting a part of the real property subjected to this Declaration as described in the Recitals, that is, Lot 1, Lot 2, Lot 3 and the Road Parcel and any future subdivisions thereof.

   (f)    The term "Permittees" shall mean the tenant(s), subtenants or occupant(s) of a Parcel, and the respective employees, agents, contractors, customers, invitees and licensees of (i) the Owner of such Parcel, and/or (ii) such tenant(s), subtenants or occupant(s).

   (g)    The term "Service Drive" shall mean the roadway to be constructed on the Road Parcel and on parts of the Parcels and identified as such on the Site Plan.

3.   Grant of Easements.

   (a)    Access Easements benefiting the Parcels.  Declarant does hereby declare, grant, bargain, sell and convey a non-exclusive permanent, perpetual, irrevocable, transmissible and assignable easements for access, ingress and egress on, over and across all roads, drives and walkways as may exist from time to time on the Parcels for the benefit of the Parcels (the "Access Easement").  Declarant also grants the Owner of Lot 1 the right to construct, maintain, repair and replace the roadway to be located on the Road Parcel.  The Access Easement granted herein shall be used in a manner so as not to unreasonably interfere with the business operations conducted, in any case, on the Parcels.

   (b)    Parking Easement benefiting the Parcels.  Declarant does hereby declare, grant, bargain, sell and convey a non-exclusive, permanent, perpetual, irrevocable, transmissible and assignable easement, for the benefit of the Parcels, for the parking of vehicles on and across those portions of the Parcels improved as parking spaces (the "Parking Easement").  Notwithstanding the immediately preceding sentence, and anything to the contrary contained in this Declaration, (i) there shall be four (4) parking spaces for the exclusive use of expectant mothers (the "DSG/F&S Expectant Mother Spaces") in the location indicated on the Site Plan, (ii) there shall be six (6) parking spaces for the exclusive use of expectant mothers and parents with infants who are customers of Building III-C (the "BBB Reserved Spaces") in the location indicated on the Site Plan, (iii) there shall be four (4) parking spaces for cars carrying baby strollers (the "Carter's Stroller Spaces") in the location indicated on the Site Plan, (iv) there shall be one (1) parking space for the exclusive use of customers of CPWM (the "CPWM Pick Up Area") in the location identified on the Site Plan, (v) there shall be up to eight (8) parking spaces (the "Sprouts Temporary Tent Area") in the location identified on the Site Plan available for up to two weeks for use by Sprouts to accommodate a temporary tent where Sprouts can perform nutrition classes during Sprouts grand

2

opening; (vi) there shall be up to four (4) contiguous parking spaces in front of Building III-H (the "Sprouts Special Events Area") in the location identified on the Site Plan for use by Sprouts for special events (e.g., grand opening, job fair or anniversary celebration) ("Sprouts Special Events"), provided, however, no such Sprouts Special Events shall be permitted which impedes any loading/drop off areas, fire-lines, "no parking" areas, or ingress/egress generally within the Parcels, and provided further that such Sprouts Special Events shall not exceed four (4) consecutive days in duration and shall not occur more than eight (8) times in any calendar year; (vii) Declarant shall have the ability to unilaterally reserve (which reservation shall not be considered an amendment under Section 18 hereof) and render exclusive up to four (4) parking spaces per building on Lot 2, and up to four (4) parking spaces per Building III-J, Building III-K, Building III-M and Building III-O on Lot 3, for uses such as pick up/call ahead spaces; and (viii) Declarant shall have the ability to unilaterally reserve (which reservation shall not be considered an amendment under Section 18 hereof) and render exclusive spaces to be utilized for cart corrals for specific tenants or occupants of the Property.

(c)    *Storm Drainage Easements benefitting the Property.*  Declarant does hereby declare, grant, bargain, sell and convey a non-exclusive permanent, perpetual, irrevocable, transmissible and assignable easement for the benefit of the Property, varying in width, for (i) stormwater drainage and for the installation, operation, maintenance, repair and replacement of stormwater drainage facilities, including, without limitation, any off site filtration and drainage system (including but not limited to detention pond facilities (collectively, the "Drainage System")), and (ii) surface drainage to the extent incidentally required in order for water on the various Parcels on the Property to reach the Drainage System (together, the "Drainage Easement"), under, over, through, across and into the Drainage System facilities located within the Common Area of the Property.  No permanent buildings will be placed in or allowed to encroach upon the Drainage Easement areas, and no change of grade elevation or excavation that materially impacts the use of the Drainage Easement areas shall be made to such areas without the consent of the Owner of the impacted Parcels.

(d)    *Signage Easement benefitting the Parcels.*  Declarant does hereby declare, grant, bargain, sell and convey a non-exclusive permanent, perpetual, irrevocable, transmissible and assignable easement (the "Pylon Sign Easement") for the benefit of Lot 1 and Lot 2 over those portions of Lot 3 identified as "Shared Pylon Sign(s)" on the Site Plan, for the utilization of the Shared Pylon Signs and multiple sign panels (the "Sign Panels") on the Shared Pylon Sign(s).  The Pylon Sign Easement shall include the right of reasonable access over, under, upon and across Lot 3 reasonably necessary to maintain and repair the Shared Pylon Signs and to install, replace, maintain, repair and utilize the Sign Panels.  In exercising its rights to the Pylon Sign Easement, the Owners of Lot 1 and Lot 2 shall access Lot 3 and perform work on the Sign Panels in a commercially reasonable and expeditious manner.

(e)    *Reciprocal General Utility Easements.*

(i)    Declarant does hereby declare, grant, bargain, sell and convey reciprocal and mutual non-exclusive permanent, perpetual, irrevocable, transmissible and assignable easements, varying in width, for the purpose of constructing, utilizing, maintaining, repairing and replacing utility lines for electricity, water, sewer, cable, telephone as well as fire lines and other utilities across, under and over the Parcels for the benefit of the other Parcels (collectively, the "General Utility Easements").  The General Utility Easements will be located in accordance with requirements of the applicable utility service provider in such a manner as not to interfere with the intended development of the Parcels.  No permanent buildings will be placed in or allowed to encroach upon the utility easement areas, and no material change of grade elevation or excavation that impacts the Parcels' use of the utility easement areas shall be made to such areas without the consent of the Owner of the impacted Parcel(s).

(ii)    Any Owner desiring to construct a utility line across another Owner's Parcel (the "Burdened Parcel") shall provide the Owner of the Burdened Parcel a survey of the location of the proposed easement and plans and specifications with regard to the improvements to be constructed on the Burdened Parcel, all of which shall be subject to the written approval of the Owner of the Burdened Parcel, which approval shall not be unreasonably withheld or delayed.  Except as otherwise agreed in writing, any Owner installing such utility lines pursuant to the provisions of this paragraph shall pay all costs and expenses with respect thereto and shall cause all work in connection therewith (including general clean-up and proper surface and/or subsurface restoration) to be completed as quickly as possible and in a manner so as to minimize interference with the use of the Burdened Parcel and in compliance with all applicable laws.  The Owner of the Parcel benefiting from any utility line installed pursuant to this section agrees to defend, protect, indemnify, and hold harmless the Owner of the Burdened Parcel from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorney's fees and costs of suit, arising out of or resulting from the exercise of the right to install, maintain and operate the said utility line.  The Owner of the Parcel benefiting from any utility line installed pursuant to this Section 3(e)(ii) shall be responsible for the repair and maintenance of said line and all costs and expenses related thereto.  No liens shall attach to the Burdened Parcel associated with utility lines installed pursuant to this Section 3(e)(ii).  During the utility installation process, no materials may be stored on the Burdened Parcel.

To have and to hold all and singular the easements and rights conveyed hereby (collectively, the "Easements") for the collective benefit of the Parcels (as applicable) and Declarant, and its successors, assigns and grantees forever, subject to the terms and conditions set forth herein.

4.    <u>As-Built Location; Further Assurances; Dedication to Service Provider</u>.  The Site Plan shows the general location of certain easements set forth in Section 3 above and the portion of the Property affected by the Easements.  Declarant and any subsequent Owners of the Parcels agree to give further assurances by way of executing and providing for recordation such other and further instruments and documents as may be reasonably necessary to confirm the as-built locations of easement areas or matters generally affecting the Easements and to otherwise effectuate and carry out the intents and purposes of this Declaration.  Declarant further reserves the right to specifically grant to the appropriate service providers such easements as are necessary to provide utility service to the Property, including without limitation, water, sewer, electricity, cable and telephone.  Any party obtaining an interest in the Property agrees to execute such documentation as the service provider may reasonably require, including, without limitation, the standard easements and deeds substantially in the form generally used by such service provider, to complete the transfer of the utility facilities for dedication and maintenance by such service provider.

5.    <u>Construction, Maintenance, and Restoration Obligations</u>.

(a)    <u>Construction</u>.

(i)    Declarant shall construct and shall be responsible for all costs associated with the construction of all Common Area improvements on the Parcels, the Service Drive, and the improvements within the Landscape Island Area(s).  Such Common Area improvements shall include all driveways, parking spaces, utility lines, storm water facilities, and signs.  All Owners of any portion of the Property shall comply with all requirements of the governmental regulatory authorities in connection with stormwater retention.  With the exception of any utility line installed across a Burdened Parcel for the benefit of another Parcel Owner, which utility line must be maintained by the Owner of the Parcel benefiting from the utility easement, the Owner of a Parcel shall be responsible for the maintenance, repair, and replacement of the easement improvements located on its Parcel(s) (specifically all roads, drives and walkways, utility and storm drainage facilities).  The Owners of the Parcels shall use only those reasonable measures during construction, maintenance or repair which are least intrusive to and which have the least impact on the condition and operation of the property affected by such construction or repair, including but not limited to, protection of existing improvements, trees, bushes, and other landscaping on the Property from damage or destruction, and maintenance of access to, egress from and parking on the burdened property.  It is understood and agreed that the property affected will be restored as near as practicable to its prior condition after construction of easement improvements and any repairs thereto.  Owners shall use reasonable and diligent efforts to prevent any material interference with the operation of business of tenants, subtenants or licensees on the Parcels when performing any construction, repairs or maintenance within any Parcel.  Owners shall cause all construction on the Property to be performed in compliance with all applicable laws and shall not permit any such construction to: (i) interfere with the use, occupancy or enjoyment of any part of the Property by any occupant thereof, or (ii) cause any portion of the Property to be in violation of any applicable laws.  Upon completion of any construction on the Property, each Owner shall restore any affected accessways, parking areas and other portion of the Common Area to a condition equal to or better than the condition thereof existing prior to the commencement of such construction.  Each Owner performing construction on the Property shall at all times before and during the performance of any such construction maintain all construction areas in a neat and tidy condition.  Each Owner shall place all construction debris in construction dumpsters on a weekly basis, and shall empty (or cause to be emptied) said construction dumpsters as needed.  Construction vehicles and trucks shall not access the construction areas through the parking areas on the Parcels.  If any delivery vehicles or customers' access to improvements on the Property are blocked at any time as a result of construction on the Property, Declarant shall remove such blockage or cause such blockage to be removed.  Once construction has commenced on any Parcel, such construction shall be diligently and continuously pursued to completion.

(b)    <u>Repair and Maintenance Responsibilities</u>.

(i)    <u>General</u>.  Until such time as improvements are constructed on a Parcel, the Owner thereof shall maintain (or cause to be maintained) said Parcel in a clean, neat and sightly condition and shall take such measures as are necessary to control grass, weeds, blowing dust, dirt, litter or debris.

(ii)    <u>Buildings, Improvements and Appurtenances Thereto</u>.  With the exception of the Shared Pylon Sign(s) located on Lot 3, the road within the Road Parcel and the Landscape Island Area(s) within the Road Parcel, which shall be maintained by the Owner of Lot 1, each Owner covenants to keep and maintain, at its sole cost and expense, or to cause to be kept and maintained, the building(s) and improvements located from time to time on its respective Parcel in good order, condition and repair and in compliance with all applicable laws, and in a manner consistent with the highest standards of repair normally demanded in a first-class shopping center.  Once

4

constructed, in the event of any damage to or destruction of a building and/or improvement on the Parcels, the Owner (or it Permittee, if applicable) of such Parcel(s) shall, at its sole cost and expense, with due diligence either raze, repair, restore and rebuild such building and improvement to its condition prior to such damage or destruction (or with such changes as shall not conflict with this Declaration).  Such razing, repair, restoration and/or rebuilding must commence within 180 days after the date of the damage or destruction, and must be completed within one (1) year after the date of damage or destruction.  Nothing contained herein shall be deemed to allow an Owner to avoid a more stringent obligation for repair, restoration and rebuilding contained in a lease or other written agreement between an Owner and such Owner's Permittee.

(iii)    Common Area.  Each Owner of a Parcel covenants at all times during the term hereof to operate and maintain or cause to be operated and maintained at its expense all Common Area located on its Parcel, in good order, condition and repair and in compliance with all applicable laws.  Except as otherwise expressly provided in this Declaration, once constructed, in the event of any damage to or destruction of all or a portion of the Common Area on any Parcel, the Owner of such Parcel shall, at its sole cost and expense, with due diligence repair, restore and rebuild such Common Area to its condition prior to such damage or destruction (or with such changes as shall not conflict with this Declaration).  Each Owner, on behalf of itself and, if applicable, its Permittee reserves the right to alter, modify, reconfigure, relocate and/or remove the Common Areas, or buildings on its Parcel, subject to the condition that such alteration, modification, reconfiguration, relocation and/or removal shall not violate any of the provisions and easements granted in Section 3 hereof.  The foregoing obligations to maintain, repair and keep in repair, the Common Area will, without limiting its generality, include the following:

A.    Maintaining and repairing the surface of the Common Area, including, without limitation, the sidewalks, parking and roadway areas (including resurfacing and restriping) at such grade and levels that the area may be used and enjoyed as contiguous and homogeneous common areas, and maintaining such surface in a level, smooth and evenly-covered condition with the type of surfacing material originally installed or of similar quality, use and durability; and

B.    Removing all papers, debris, snow, ice, filth and refuse and thoroughly sweeping the areas to the extent reasonably necessary to keep the areas in a neat, clean and orderly condition; and

C.    Maintaining signage in good repair and keeping in repair and replacing any necessary appropriate directional signs, striping markers and lines; and operating, keeping in repair and replacing, when necessary, such artificial lighting facilities as will be reasonably required;

D.    Maintaining any perimeter walls and retaining walls in good condition and state of repair;

E.    Maintaining all landscaped areas, making such replacements of shrubs and other landscaping as is necessary, and keeping the areas at all times adequately weeded, fertilized, watered and trimmed; and

F.    Performing any and all such other duties as are necessary to maintain such Common Area in a clean, safe, attractive and orderly condition and in compliance with applicable law.

(iv)    Utilities.  Each Owner shall at all times during the term hereof construct, operate and maintain or cause to be constructed, operated and maintained, in good order, condition and repair, at its sole cost and expense, (A) any utility facilities located on such Owner's Parcel which serve said Parcel, and (B) any utility facilities located on another Parcel which exclusively benefit such Owner's Parcel and which do not benefit the Parcel burdened by the utility facility.

(v)    Road Parcel; Landscape Island Area(s); Shared Pylon Signs.  Declarant intends to dedicate the Road Parcel to the City of Fayetteville (the "City") through the recordation of a dedication deed (the "Dedication Deed").  Until such time that the Road Parcel is transferred (dedicated) to the City, the Road Parcel and all improvements related thereto shall be maintained by the Owner of Lot 1.  During any period of time the Road Parcel is being maintained by the Owner of Lot 1 (prior to or after dedication to the City), the Road Parcel shall be considered part of the Common Area for purposes of this Declaration, and the Common Area Maintenance Contribution (defined herein) shall be used (in part) to maintain, repair and replace the improvements within the Road Parcel, as applicable.  In the event the Road Parcel is dedicated to the City, the Dedication Deed shall include the reservation of an access and maintenance easement over the Landscape Island Area(s) for the benefit of the Lot 1 Owner.  The Landscape

GLV v22 (9/13/16)

Island Area and Shared Pylon Signs shall at all times remain part of the Common Area for purposes of this Declaration, and the Common Area Maintenance Contribution (defined herein) shall be used (in part) to maintain, repair and replace the improvements within the Landscape Island Area, and to maintain, repair and replace the Shared Pylon Signs.

(vi)   Common Detention Pond. Lot 1 contains the common detention pond for the Property, and shall at all times remain part of the Common Area for purposes of this Declaration. The Owner of Lot 1 shall maintain the common detention pond, and the Common Area Maintenance Contribution (defined herein) shall be used (in part) to maintain, repair and replace the common detention pond on Lot 1.

(vii)   Self-Help. In the event an Owner does not maintain the Common Area on its Parcel to the reasonable satisfaction of another Owner (the "Complaining Owner"), the Complaining Owner shall provide the defaulting Owner with written notice indicating the maintenance deficiencies. Except in the case of an emergency, in which event no prior notice shall be required (but the Complaining Owner shall give notice as soon as practicable thereafter) and the Complaining Owner may commence with repair and maintenance activity immediately and be reimbursed as set forth below, the defaulting Owner shall have a reasonable amount of time from receipt of the notice to remedy the matters noted therein. In the event the defaulting Owner fails to remedy the matters noted in the notice within a reasonable amount of time after receipt of the notice (but in no event later than thirty (30) days, unless such remedy cannot reasonably be completed within 30 days, in which case the defaulting Owner shall have such time as is reasonably necessary provided that the defaulting Owner shall commence the remedy within such 30 day period, and thereafter diligently prosecute to completion), the Complaining Owner may take all reasonable actions to maintain the Common Areas and may submit an invoice to the defaulting Owner for the prompt payment of all expenses incurred (but in no event later than thirty (30) day after submission).

(c)   Maintenance Contribution. The Owners of Lot 2 and Lot 3 (each a "Contributing Parcel" and collectively, the "Contributing Parcels") shall contribute (or cause to be contributed) the following sums per year (the "Common Area Maintenance Contribution") to the Owner of Lot 1 to offset the costs of the maintenance, repair and replacement of the Road Parcel (as provided in Section 5(b)(v) hereof), the Landscape Island Area(s), the Shared Pylons Signs and the common detention pond (as provided in Section 5(b)(vi): Lot 2: $4,000 and Lot 3: $11,000. The Common Area Maintenance Contribution shall commence on the date the first (or only) certificate of occupancy (or its equivalent) is issued for a building constructed on each Contributing Parcel. The Owners of each of the Contributing Parcels shall provide a copy of the certificates of occupancy issued for each building on its particular Contributing Parcel within fifteen (15) days of the receipt thereof. Such Common Area Maintenance Contribution shall increase by 10% on the fifth (5th) anniversary of the first January 15 occurring after this Declaration is recorded (the "Initial Increase Date") and on every fifth (5th) anniversary of the Initial Increase Date thereafter. The Common Area Maintenance Contribution shall be due and payable in advance on or before January 15th of each calendar year. The obligation to pay the Common Area Maintenance Contribution, together with interest, costs, and reasonable attorneys' fees, shall be the personal obligation of the then Owner of each of the Contributing Parcels. In addition, any unpaid portion of the Common Area Maintenance Contribution, together with interest, costs, and reasonable attorneys' fees, shall continue to be secured by a lien upon the Contributing Parcels owned by the Owners that have failed to make such payment, which lien may be foreclosed. Any assessment not paid within thirty (30) days after the due date shall bear interest from the due date at the lesser of (i) the rate of fourteen (14%) per cent per year or (ii) the maximum rate of interest allowed under the laws of the State of North Carolina. The Owner of Lot 1 (or its designee) may bring an action at law against the Owner of any Contributing Parcel or foreclose the assessment lien against any Contributing Parcel, or pursue any other remedy for collection allowed by law and/or equity. Interest, costs and reasonable attorneys' fees of such action or foreclosure shall be added to the amount of the outstanding Common Area Maintenance Contribution. Sale or transfer of any Contributing Parcel shall not affect any assessment lien. A sale pursuant to the judicial foreclosure of a first priority mortgage may (per applicable law) extinguish a lien for assessment; however such sale or transfer shall not relieve any Contributing Parcel from liability for any assessments thereafter becoming due or from the lien of the assessment.

(d)   Railroad Crossing Contribution. Declarant has entered into an agreement with Aberdeen & Rockfish Railroad (the "Railroad") related to the crossing of the Railroad property at the intersection of the Road Parcel and Cliffdale Road (the "Crossing Agreement"). The Crossing Agreement requires certain annual fees be paid to the Railroad for use of the crossing and maintenance and repair of the same. The Owner of Lot 2 shall be responsible for the payment of all annual fees payable to the Railroad pursuant to the Crossing Agreement. The Owner of Lot 1 shall contribute (or cause to be contributed) (the "Lot 1 Railroad Contribution") to the Owner of Lot 2 a share of the annual fees under the Crossing Agreement equal to thirty-five percent (35%) of the total of the fees paid by Lot 2 to the Railroad pursuant to the Crossing Agreement, which Lot 1 Railroad Contribution shall be allocated among the outbuildings (excluding the inline space) located on Lot 1, based on a fraction the numerator of which shall be the square footage of the contributing space in the outbuilding on Lot 1 and the denominator of

GLV v22 (9/13/16)

which shall be the total square footage of the outbuildings (excluding the inline space) located on Lot 1. The Owner of Lot 3 shall contribute (or cause to be contributed) (the "<u>Lot 3 Railroad Contribution</u>") to the Owner of Lot 2 a share of the annual fees under the Crossing Agreement equal to fifteen percent (15%) of the total of the fees paid by Lot 2 to the Railroad pursuant to the Crossing Agreement, which Lot 3 Railroad Contribution shall be allocated among the outbuildings (excluding the inline space) located on Lot 3, based on a fraction the numerator of which shall be the square footage of the contributing space in the outbuilding on Lot 3 and the denominator of which shall be the total square footage of the outbuildings (excluding the inline space) located on Lot 3. The initial outbuildings on Lot 1 for calculating the Railroad Contribution are Buildings I-F and I-G and the initial outbuildings on Lot 3 for calculating the Railroad Contribution are Buildings III-K, III-L, III-M and III-O.

6.    <u>Restrictions</u>.

(a)    <u>Use</u>. Declarant has leased portions of the Property to various tenants (collectively, the "<u>Tenants</u>") pursuant to the terms and conditions of the leases more fully described on *Exhibit B* (collectively, the "<u>Leases</u>"). Declarant does hereby declare that the Property shall be held, transferred, sold, conveyed, mortgaged, given, donated, leased, occupied, possessed, and used subject to the conditions and restrictions more fully described on *Exhibit C* (the "<u>Use Restrictions</u>").

(b)    <u>Height; Number of Stories</u>. Building I-F, Building I-G, Building III-K, Building III-L, Building III-M, and Building III-O, all as shown on the Site Plan, shall be subject to the following building height restrictions: twenty-four (24) feet; provided, however, that architectural elements on no more than two (2) sides of the subject building may be higher than twenty-four (24) feet (but less than twenty-eight (28) feet) so long as the architectural elements on a building which are higher than twenty-four (24) feet in height do not exceed twenty percent (20%) of the total aggregate footage (measured in lineal feet) of the perimeter of the building in question. No buildings on Lot 1, Lot 2, or Lot 3 shall be more than one story high. In addition the entrances to Building III-L and Building III-M shall not face the Section III In-line Space, but shall be located on the side of said buildings that is opposite to the center drive aisle or the side of said buildings facing the Road Parcel.

(c)    <u>Service Drive</u>. The Service Drive may not be blocked or impeded. Declarant, hereby reserves for the benefit of the Owner of Lot 1, and its successors and assigns, the right to relocate, modify, or reconfigure the Service Drive, without the consent of the other Parcel Owners, so long as a commercially reasonable convenient avenue of access is provided from the Parcels to Cliffdale Road and Skibo Road. The Dedication Deed shall contain the restrictions and reservations contained in this Section 6(c).

(d)    <u>Tenant Specific Restrictions</u>.

    (i)    <u>Cellular Towers</u>. No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Property; provided, however, this restriction shall not apply to Hobby Lobby under the Hobby Lobby Lease, Homegoods under the Homegoods Lease and DSG under the DSG/F&S Lease if such leases do not otherwise prohibit transmission and/or reception towers for wireless telephone or internet communications.

    (ii)    <u>Overnight Parking on Lot 3</u>. There shall be no overnight parking of vehicles on Lot 3.

(e)    <u>Required Parking Ratio</u>. Each of the Parcels shall at all times contain the requisite number of parking spaces required by municipal code.

(f)    <u>View and Safety</u>. Declarant shall not erect or permit a building, kiosk, any sign (including, without limitation, the parking by occupants of the Property of vehicles bearing signage identifying such occupants), or other object in any part of the Common Area within the Property, or which would obstruct in any way the view of Building I-A, Building I-B, Building I-C, and Building I-D from the Property or adjoining roads, except as shown on the Site Plan. Furthermore, Declarant shall not: (i) permit the conduct of any business, or the operation of any carnival or other entertainment within the Common Area within the Property; (ii) allow any occupant to use its premises in any manner that would create an unsafe condition; (iii) charge for the parking of automobiles within the Common Area within the Property.

(g)    <u>Signage</u>. Declarant shall not permit any permanent or temporary signage (i.e., "reader boards," billboards, "lollipop" signs, mobile marquee, vehicles bearing signage identifying occupants of the Property, etc.) in the Common Area within the Property. Notwithstanding the immediately preceding sentence, signs associated with the opening of business such as temporary "Opening Soon" signs shall not be prohibited as long as such signs are associated with a grand opening and are utilized for no more than sixty (60) days.

(h)    <u>No Construction Period</u>. After the initial construction of the improvements on the Parcels is complete, no exterior construction work shall occur on the Parcels during the period of November 1

7

through December 31 of any year.

7.    Subdivision of the Parcels:  Declarant hereby reserves the right to further subdivide Lot 2 into multiple parcels without the consent of any other Parcel owner.  In the event Lot 2 is subdivided, the easements granted herein shall benefit and burden each subdivided parcel.  In the event Lot 2 is subdivided, Declarant hereby reserves the right to designate the Owner of one of the subdivided parcels of Lot 2 as the Owner responsible for the payment of all annual fees payable to the Railroad pursuant to the Crossing Agreement and owed the Lot 1 Railroad Contribution and the Lot 3 Railroad Contribution pursuant to Section 5(d) above.

8.    Review and Approval of Plans.  No exterior improvements, additions or alterations shall be commenced or erected on any building on the Property which are in excess of $50,000 (which $50,000 shall be increased by an amount equal to fifteen percent (15%) every five (5) years commencing with the 5th anniversary of the Effective Date), until the plans and specifications showing the nature, kind, shape, height, materials and location of the same shall have been submitted to Declarant for written approval, which approval shall not be unreasonably withheld or delayed.  In the event Declarant fails to approve or disapprove such plans and specifications within thirty (30) days after the same have been submitted in writing, approval by Declarant shall be deemed granted.  Plans and specifications shall be in such form and shall contain such information as may be reasonably required by Declarant including, without being limited to: (i) a site plan showing the location of all proposed and existing improvements including building setbacks, open space, driveways, walkways and parking spaces including the number thereof; (ii) a floor plan; (iii) exterior elevations of all proposed improvements and alterations to existing improvements, as such improvements will appear after all backfilling and landscaping are completed; (iv) specifications of materials, color scheme, lighting schemes and other details affecting the exterior appearance of all proposed improvements and alterations to existing improvements; (v) plans for grading; and (vi) plans for landscaping (to be submitted not less than sixty (60) days before anticipated completion of the building improvements).  Declarant shall not be responsible or liable in any way for any defects in any plans or specifications approved by Declarant, nor for any structural defects in any work done according to such plans and specifications approved by Declarant.  Further, Declarant shall not be liable in any way to anyone submitting plans or specifications for approval under this provision, or to any Owner of property affected by this Declaration, by reason of mistake in judgment or negligence arising out of or in connection with the approval or disapproval or failure to approve or disapprove any such plans or specifications.

9.    Signage Criteria.  All signage within the Property shall comply with applicable signage ordinances and the following requirements (collectively referred to as the "Signage Criteria"):

   A. All monument signage shall be subject to the prior written approval of Declarant, which approval shall not be unreasonably withheld or delayed.
   B. Any monument signage shall be controlled by this Signage Criteria.
   C. All signage must conform to all applicable codes and/or ordinances having jurisdiction over the Property.
   D. Each Owner of a Parcel is solely responsible for any permits and/or fees required associated with its building signage.
   E. No exterior identification signs attached to the exterior façade of any building on the Property shall be flashing, moving or audible signs, or signs employing exposed neon tubes, exposed ballast boxes or exposed transformers.

10.    Insurance.  The Owners hereby covenant to maintain or cause to be maintained commercial general liability insurance on the Property owned by each Owner including contractual liability coverage in the minimum amounts of Two Million and No/100 Dollars ($2,000,000.00) per occurrence, with an annual aggregate limit of Two Million and No/100 Dollars ($2,000,000.00) for personal or bodily injury and damage to property, which requirements may be satisfied with an aggregate of both primary and excess (or umbrella) liability insurance.

The Owners at their sole cost and expense shall keep or cause to be kept insured for the mutual benefit of the Owners, all improvements now or hereafter located on or appurtenant to each Owners' respective portion of the Property, against loss or damage by fire and such other risks as are now or hereafter included in extended coverage endorsements, including vandalism, explosion and malicious mischief coverages for improvements of comparable size and quality.  The amount of such insurance coverage shall be in commercially reasonable amounts with commercially reasonable deductibles sufficient to provide for replacement of all improvements, without deduction for depreciation.

The Owners shall name each other as additional insureds on all policies described in this Section 10.  All policies described in this Section 10 shall contain full waiver of subrogation.  In the event an Owner fails to provide any of the insurance coverages required by this Section 10, the other Owners have the right, but not the obligation, to provide any coverage that is not provided.  In the event a required coverage is not provided and is then provided by another Owner, the Owner(s) providing the coverage shall have the right to invoice the non-providing Owner for reimbursement of the cost of the premium.  Said invoice shall be paid within thirty (30) days of receipt.

Notwithstanding anything to the contrary contained in this Section 10, it is acknowledged that the above

GLV v22 (9/13/16)

insurance requirements may be satisfied by a tenant of an Owner and that said tenant may elect to self-insure in order to satisfy the above requirements provided said tenant has a minimum net worth of $50,000,000. Notwithstanding anything to the contrary in this Declaration, this Section 10 shall not apply to the Road Parcel once the Road Parcel is dedicated to the City.

11.    <u>Legal Effect</u>.  The Easements and restrictions set forth herein (the "<u>Restrictions</u>") shall run with the Property and shall bind Declarant, its successors and assigns, and every other person now or hereafter acquiring an interest in or lien upon the Property, or any portion thereof.  The rights of Easements declared hereby: (i) shall be an estate prior to any lien, deed, estate or encumbrance whatsoever; (ii) shall be perpetual and shall run with the land, be binding upon, and inure to the benefit of the parties hereto, their heirs, successors, assigns, grantees and tenants; (iii) shall be, and are, appurtenant to, and essentially necessary for the enjoyment and use of the Property; and (iv) are made in contemplation of commercial use, and are of commercial character.  It is Declarant's express intent that the Easements shall not, at any time, merge by operation of law into an Owner's title or interest in any Parcel, but that the Easements shall remain separate and distinct rights and estates in land, unless the Owner(s) of all affected parcels specifically evidence their intent by mutual agreement in writing to extinguish any such Easement.  It is further expressly provided that the acquisition hereafter by any other party (including, without limitation, a present or future mortgagee of any Parcel or any portion thereof) of an ownership interest (in fee, leasehold, or otherwise) shall not operate, by merger or otherwise, to extinguish, diminish, impair, or otherwise affect any Easement granted herein, which Easements shall remain separate and distinct and estates in land.

12.    <u>Enforcement</u>.  This Declaration shall be enforceable by Declarant and its successors and assigns owning the Property (or a portion thereof, as the case may be), by any tenants on the Property (or a portion thereof, as the case may be) pursuant to the terms of any applicable leases, by any proceeding at law or in equity against any person or persons, Owner or lessee of the Property or any portion thereof violating or attempting to violate or circumvent this Declaration either to restrain a violation or to recover damages.  The failure by any party to enforce this Declaration contained herein for any period of time shall in no event be deemed a waiver of the right of any of the foregoing to enforce the same, nor shall any failure by any party to enforce the Restrictions contained herein for any period of time work to stop any of the foregoing from enforcing the same.  This provision does not exclude other remedies available at law or equity, including monetary damages.  In any such actions, the prevailing party shall be entitled to reasonable attorneys' fees and costs of the action.  In the event of any failure by the Owner of a Parcel to perform, fulfill or observe any covenant, condition, obligation or agreement herein to be performed, fulfilled or observed by it, continuing for thirty (30) days, or immediately in situations involving potential danger to the health or safety of persons in, or about or substantial deterioration of the Property or any portion thereof or improvements located thereon, in each case after written notice specifying such, the Owner of another Parcel, which is a part of the Property, may, at such Owner's election, cure such failure or breach for and on behalf of the defaulting Owner, and any amount which such Parcel Owner shall expend for such purpose, or which shall otherwise be due by any Owner to such Parcel Owner, shall be paid to such Parcel Owner on demand, upon delivery of its invoice, together with interest thereon at the lower of (i) the rate of 14% per annum, or (ii) the maximum rate permissible from time to time under applicable law, from the date of expenditure or the date when same shall have become due to the date of payment thereof to such Parcel Owner in full.

13.    <u>Captions, Gender and Number</u>.  Captions contained in this Declaration are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Declaration or the intent of any provision hereof.  Whenever the context so requires, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

14.    <u>Waiver</u>.  Any consent to or waiver of any provision hereof in any one instance shall not be deemed or construed to be a consent to or waiver of such provision in any other instance (unless specifically stated) nor a consent to or waiver of any other provision of this Declaration.  Failure on the part of any Owner to complain of any act or failure to act of any other Owner, irrespective of the duration of such failure, shall not constitute a wavier or modification of rights hereunder.  No waiver or modification hereunder shall be effective unless the same is in writing and signed by the Owner against whom it is sought.

15.    <u>Binding Effect</u>.  Except as otherwise provided herein, all provisions of this Declaration shall be binding upon, inure to the benefit of and be enforceable by and against Declarant and its successors, assigns and grantees.

16.    <u>Severability</u>.  If any covenant, restriction, or provision contained in this Declaration is to any extent declared by a court of competent jurisdiction to be invalid or unenforceable, the remaining covenants, restrictions, and provisions contained herein (or the application of such covenants, restrictions, and provisions to persons or circumstances other than those in respect of which the determination of invalidity or unenforceability was made) will not be affected thereby and each covenant, restriction, and provision contained in this Declaration will be valid and enforceable to the fullest extent permitted by law.

17.    <u>Governing Law</u>.  This Declaration shall be governed by the laws of the State of North Carolina.

GLV v22 (9/13/16)

18.    <u>Term; Amendment</u>. This Declaration and the covenants and restrictions set forth herein shall run with and bind all land within the Property, as applicable, for an initial term of twenty-five (25) years from the date this Declaration is filed for record in the real property records of Cumberland County, North Carolina. At the end of the initial term, this Declaration shall be automatically renewed without any action by the parties hereto or their respective successors or assigns for successive terms of twenty (20) years. Any such amendment, supplement or termination will be effective at such time as an instrument reflecting such amendment, supplement or termination, signed by Declarant, or its successors and assigns, and by such mortgagees is filed for record in the real property records of Cumberland County, North Carolina. This Declaration may be amended by, and only by, a written agreement signed by the Owners of Lot 1, Lot 2 and Lot 3, and shall be effective only when recorded in Cumberland County, North Carolina; provided, however, that no such amendment shall impose any materially greater obligation on, or materially impair any right of an Owner or its Parcel without the consent of such Owner. The Owner(s) of the Property shall not unreasonably withhold or delay consent to any amendment of this Declaration requested by the Owners of Lot 1, Lot 2 and Lot 3.

19.    <u>Notice</u>. All notices, demands and requests required or permitted to be given under this Declaration (collectively the "<u>Notices</u>") must be in writing and must be delivered personally or by nationally recognized overnight courier or sent by United States certified mail, return receipt requested, postage prepaid and addressed to the parties at their respective addresses set forth below, or to any address established by a Parcel Owner pursuant to this Section 19, and the same shall be effective upon receipt or refusal. The initial addresses of the parties shall be:

To Declarant:              NC FAYETTEVILLE SKIBO, LLC
                           550 S. Main Street, Suite 300
                           Greenville, SC 29601
                           Attn: Legal Department

With a copy to:            Graybill, Lansche & Vinzani, LLC
                           2721 Devine Street
                           Columbia, SC 29205
                           Attn: Wesley M. Graybill, Esq.

Upon at least ten (10) days prior written notice, each party shall have the right to change its address to any other address within the United States of America. All Owners shall provide Declarant with current notice addresses. Declarant shall provide such addresses to any Owner upon request by said Owner.

20.    <u>Notice of Sale or Transfer of Title; Establishment of Notice Address</u>. Any Parcel Owner desiring to sell or otherwise transfer title to its Parcel shall, within ten (10) days after a sale or transfer, provide the Declarant written notice of the name and address of the purchaser or transferee, the date of such transfer of title, and such other information as the Declarant may reasonably require. The transferor shall continue to be jointly and severally responsible with the transferee for all obligations of the new Parcel Owner, including the Common Area Maintenance Contribution, if applicable, until the date upon which such notice is received by the Declarant, notwithstanding the transfer of title. Any transferee of a Parcel may, at its option, file a notice in the Cumberland County ROD's office establishing the notice address of said Parcel, which notice must also be mailed to the Declarant contemporaneously with such filing. At such time as the named Declarant hereunder (NC Fayetteville Skibo, LLC) no longer holds title to all the Property, then at such time the "Declarant" shall be deemed to be the Owner of Lot 1.

21.    <u>INTENTIONALLY DELETED</u>.

22.    <u>Miscellaneous</u>.

(a)    <u>Consents</u>. Wherever in this Declaration the consent or approval of an Owner and/or Permittee is required, unless otherwise expressly provided herein, such consent or approval shall not be unreasonably withheld, conditioned, or delayed. Any request for consent or approval shall (a) be in writing; (b) specify the section hereof which requires that such notice be given or that such consent or approval be obtained; and (c) be accompanied by such background data as is reasonably necessary to make an informed decision thereon. The consent of an Owner under this Declaration, to be effective, must be given, denied or conditioned expressly and in writing. In the event a requesting Owner's or Permittee's request is not approved, denied or conditioned in writing within twenty (20) days of the consenting Owner's or Permittee's receipt, then such consent shall be deemed to have been automatically given and no further action on the part of the requesting Owner or Permittee shall be required under this Declaration or otherwise. A notice of such twenty (20) day period for response shall be conspicuously noted at the top of any request.

(b)    <u>Covenants to Run with Land</u>. It is intended that each of the easements, covenants, conditions, restrictions, rights and obligations set forth herein shall run with the land and create equitable servitudes in favor of the real property benefited thereby, shall bind every person having any fee, leasehold or other interest therein and shall inure to the benefit of the respective parties and their successors, assigns, heirs and personal representatives.

GLV v22 (9/13/16)

(c)    Grantee's Acceptance.  The grantee of any Parcel or any portion thereof, by acceptance of a deed conveying title thereto, whether from an original party or from a subsequent Owner of such Parcel, shall accept such deed subject to each and all of the easements, covenants, conditions, restrictions and obligation contained herein.  By such acceptance, any such grantee shall for himself and his successors, assigns, heirs and personal representatives, covenant, consent and agree to and with the other party, to keep, observe, comply with, and perform the obligations and agreements set forth herein with respect to the property so acquired by such grantee.

(d)    Time of Essence.  Time is of the essence of this Declaration.

(e)    Estoppel Certificates.  Each Owner, within thirty (30) days of its receipt of a written request from another Owner, shall from time to time provide the requesting Owner, a certificate binding upon such Owner stating: (a) to the best of such Owner's knowledge, whether any party to this Declaration is in default or violation of this Declaration and if so identifying such default or violation; and (b) that this Declaration is in full force and effect and identifying any amendments to the Declaration as of the date of such certificate.

(f)    Declarant Cessation of Rights.  In the event the named Declarant hereunder (NC Fayetteville Skibo, LLC) no longer holds fee simple title to all the Property, any exercisable rights of Declarant not otherwise designated within this Declaration, shall automatically terminate without the need for any further action by Declarant, and all record holding Owners of Parcel(s) or their respective Permittee(s). Notwithstanding the foregoing, the rights of the named Declarant hereunder (NC Fayetteville Skibo, LLC) shall automatically transfer to and vest in the Owner of Lot 1 at such time as the Declarant no longer owns all the Property.

(g)    Applicability of Declaration to Railroad Parcel.  The Railroad Parcel is not subject to this Declaration.

(h)    Protected Areas, Sidewalk Sales and other Off-Premises Sales or Activity by Occupants.

(i)    Declarant covenants and agrees that the occupant of Building I-C shall be permitted to display and/or sell merchandise at retail or to conduct other promotional activities associated with Building I-C in the sidewalk area directly in front of Building I-C (and identified on the Site Plan as the "HomeGoods Outside Sales Area") provided that such display of merchandise or promotional activities shall not:  (i) unreasonably interfere with pedestrian traffic upon the sidewalk area or with vehicular traffic or parking in the Common Area, or (ii) occur more than two (2) times per calendar year.

(ii)    Declarant covenants and agrees that the occupant of Building I-C shall be permitted to install cart corrals in that portion of the Common Area directly in front of Building I-C.

(iii)    Declarant hereby covenants and agrees that the occupants of Building I-A and Building I-B shall have the right to use the sidewalks in front of Building I-A and Building I-B, and the "DSG/F&S Outdoor Sales Area" (and identified on the Site Plan) for the sale of merchandise. Declarant shall cause the occupant of Building I-A and Building I-B to maintain such area during the period of such use; keep, protect and insure any merchandise or other personal property located therein during such period; keep such area in a clean and attractive condition; and return same to the condition which existed prior thereto upon the conclusion of such use.

(iv)    Declarant covenants and agrees that the occupant of Building III-F shall be permitted to utilize the sidewalk immediately in front of Building III-F (and identified on the Site Plan as the "PetCo Pet Adoption Area") in connection with its prototypical periodic adoption events  provided that such events shall not:  (i) unreasonably interfere with pedestrian traffic upon the sidewalk area or with vehicular traffic in the Common Areas or (ii) be conducted outside of Building III-F on more than two (2) occasions per calendar month nor exceed three (3) days total per calendar month; provided, however, the foregoing limitation shall not be applicable to activities conducted within Building III-F.

(v)    Declarant covenants and agrees that the occupant of Building III-F shall be permitted to utilize the area in the Common Area in front of Building III-F (and identified on the Site Plan as the "PetCo Disposal Facility Area") for the installation of a pet waste clean up station; provided, however, the occupant of Building III-F shall maintain the pet waste clean up station in the Petco Disposal Facility Area in good condition and repair and shall cause same to be regularly emptied and the contents thereof disposed in accordance with all applicable laws, codes and ordinances

(vi)    Declarant covenants and agrees that the occupant of Building III-B shall be permitted to utilize the area in the Common Area in front of Building III-B (and identified on the Site Plan as the "Five Below Outside Sales Area") for the display of the occupant of Building III-B's merchandise provided that (i) such display shall not unreasonably interfere with pedestrian traffic upon the

*11*

sidewalk area or with vehicular traffic or parking in the Common Areas, and (ii) no merchandise shall be left or kept on the sidewalk area during non-business hours. In addition, the occupant of Building III-B shall have the one time right to use the Five Below Outside Sales Area to stage grand opening events such as vendor giveaways, contests, promotional sales (such as a 5 cent hot dog cart, or popcorn cart), local radio appearances and remote broadcasts; provided in all instances, (i) such events shall not materially interfere with ingress and egress to or visibility of the other premises including pedestrian traffic upon the sidewalk area and vehicular traffic or parking in the Common Areas, and (ii) no grand opening event shall exceed three (3) days.

(vii)    Declarant covenants and agrees that the occupant of Building III-D shall be permitted to display and/or sell merchandise at retail or to conduct other promotional activities associated with Building III-D in the sidewalk area directly in front of Building III-D (and identified on the Site Plan as the "BBB Outside Sales Area") provided that such display of merchandise or promotional activities shall not materially interfere with pedestrian traffic upon the sidewalk area or with vehicular traffic or parking in the Common Area.

(viii)    Declarant covenants and agrees that the occupant of Building III-C shall be permitted to display or sell merchandise at retail or to conduct other promotional activities associated with Building III-C in the sidewalk area directly in front of Building III-C (and identified on the Site Plan as the "CPWM Outside Sales Area") provided that such display of merchandise or promotional activities shall not materially interfere with pedestrian traffic upon the sidewalk area or with vehicular traffic or parking in the Common Area.

(ix)    Declarant covenants and agrees that the occupant of Building III-H shall be permitted to (i) place outdoor displays of items which are for sale within Building III-H, (ii) conduct outdoor sales of grocery store products, (iii) hold outdoor seasonal events, and (iv) install outdoor tables and chairs for the use of the occupant of Building III-H's customers (all of such activities are collectively referred to as "Sprouts Outdoor Sales"), provided, however, such Sprouts Outdoor Sales are located within or on the sidewalks directly in front of the Premises (the "Sprouts Outdoor Sales Area"), and provided that an adequate and clear walkway is maintained for pedestrian traffic on the sidewalk. The occupant of Building III-H may utilize the Sprouts Outdoor Sales Area for Sprouts Special Events, subject to the same requirements imposed upon the Sprouts Special Events Area related to Sprouts Special Events.

(x) Declarant covenants and agrees that the occupant of Building III-G shall be permitted to conduct sidewalk sales upon the sidewalk located immediately adjacent to Building III-G, in front of Building III-G (and identified on the Site Plan as the "Burke's Outside Sales Area"), provided that such sidewalk sales shall not unreasonably interfere with pedestrian traffic upon the sidewalk area or with vehicular traffic in the Common Areas.

(xi) Declarant covenants and agrees that the occupant of Building III-A shall be permitted to display and/or sell merchandise at retail or to conduct other promotional activities associated with Building III-A in the sidewalk area directly in front of Building III-A (and identified on the Site Plan as the "Carter's/OshKosh Outside Sales Area") provided that such display of merchandise or promotional activities shall not unreasonably interfere with pedestrian traffic upon the sidewalk area or with vehicular traffic or parking in the Common Areas.

*[Signatures Appear on the Following Page]*

GLV v22 (9/13/16)

SIGNATURE PAGE OF DECLARATION OF EASEMENTS, COVENANTS AND RESTRICTIONS FOR
FREEDOM TOWN CENTER

Declarant has caused these presents to be executed this _____ day of _____, 2016.

NC FAYETTEVILLE SKIBO, LLC

By:_____
                Philip J. Wilson, Manager

STATE OF SOUTH CAROLINA      )
                                  )
COUNTY OF GREENVILLE        )

     I, _____, a Notary Public of the County and State aforesaid, certify that Philip J. Wilson personally came before me this day and acknowledged that he is Manager of **NC Fayetteville Skibo, LLC**, a North Carolina limited liability company, and that by authority duly given and as an act of the company, has signed the foregoing instrument in its name and on its behalf as its act and deed.

     WITNESS my hand and notarial seal, this _____ day of_____, 2016.

     [Notarial Seal]

                             _____
                             Notary Public
                             Printed Name _____
                             My Commission Expires: _____

GLV v22 (9/13/16)

*EXHIBIT A*

SITE PLAN

14

GLV v22 (9/13/16)

### EXHIBIT B

Leases

1. Lease Agreement by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Homegoods, Inc., a Delaware corporation ("Homegoods"), dated March 15, 2016 (the "Homegoods Lease").

2. Lease Agreement by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Hobby Lobby Stores, Inc., an Oklahoma corporation ("Hobby Lobby"), dated February 11, 2016 (the "Hobby Lobby Lease").

3. Lease by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Dick's Sporting Goods, Inc., a Delaware corporation ("DSG"), dated January 20, 2016 (the "DSG/F&S Lease").

4. Lease Agreement by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Five Below, Inc., a Pennsylvania corporation, dated _____ (the "Five Below Lease").

5. Lease Agreement by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and DSW Shoe Warehouse, Inc., a Missouri corporation, dated _____ (the "DSW Lease").

6. Lease by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Petco Animal Supplies Stores, Inc., a Delaware corporation, dated _____ (the "Petco Lease").

7. Lease by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Carter's Retail, Inc., a Delaware corporation, dated _____ (the "Carter's Lease").

8. Lease by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Carter's Retail, Inc., a Delaware corporation, dated _____ (the "Oshkosh Lease").

9. Lease by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Bed Bath & Beyond, Inc., a _____ corporation, dated _____ (the "buybuy Baby Lease").

10. Lease by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Bed Bath & Beyond, Inc., a _____ corporation, dated _____ (the "World Market Lease").

11. Lease by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and Burke's Outlet Stores, LLC, a Texas limited liability company, dated _____ (the "Burke's Lease").

12. Lease by and between NC Fayetteville Skibo, LLC, a North Carolina limited liability company, as Landlord, and SFM, LLC, a Delaware limited liability company, dated _____ (the "Sprouts Lease").

### EXHIBIT C

Use Restrictions

**PROHIBITED USES:**

Except as provided for herein, no part of the Property shall be used for any of the following:

(a)     for any non-retail purposes (restaurants, repairs, alterations, storage and offices incidental to retailing, and banks and small loan offices, shall be deemed retail). Notwithstanding the foregoing, non-retail purposes consistent with a first-class regional shopping center (such as, by way of example only, Aspen Dental) shall be permitted in twenty percent (20%) of the total, cumulative, LFA of the following buildings within the Property: Building I-F, Building I-G, Building III-K, Building III-L, Building III-M and Building III-O, provided that in no event shall any individual non-retail use exceed four thousand (4,000) square feet. Declarant acknowledges that a Business Office shall not be permitted. As used herein, the term "Business Office" shall mean an office which does not provide services directly to consumers;

GLV v22 (9/13/16)

(b)    for any entertainment purposes such as a bowling alley, skating rink, bar, night club, discotheque, amusement gallery, cinema, poolroom, health club, massage parlor, sporting event, sports or game facility or off-track betting club; but not to prohibit: (i) an upscale bowling alley within that area depicted as Building I-A on the Site Plan, (ii) a cinema within that area depicted as Building I-A on the Site Plan ; (iii) a first-class, first-run cinema within Lot 2, (iv) a prototypical Massage Envy and/or Spa La La so long as (x) such establishment is located at least 300 linear feet away from Building I-D and is not located within Buildings III-A, III-B, III-C, III-D, III-E, III-F, III-G or III-H (collectively, the "Section III Inline Space") or Building III-L, and no more than one such use shall be located on Lot 3, (v) a health club within that area depicted as Building I-A on the Site Plan; or (v) a first-class health club, gym or exercise studio within those areas of the Property labeled "Lot 2" and "Lot 3" on the Site Plan so long as such health club, gym or exercise studio occupies no more than (x) 5,000 square feet if located on Lot 2, or (y) 3,000 square feet if located on Lot 3, and is not located in the Section III Inline Space or Building III-L;

(c)    for any establishment which sells or displays used merchandise or second hand goods, except that first-class stores with a combination of new and used goods (such as GameStop and Cartridge World) shall be permitted, provided that the aggregate LFA of such stores shall not exceed four thousand (4,000) square feet;

(d)    for any establishment which sells or displays pornographic materials;

(e)    for a restaurant or establishment selling food prepared on premises for consumption on or off premises located within Lot 1 or within the Section III Inline Space, Building III-L, Building III-M or Building III-O; except that (i) one (1) restaurant containing up to three thousand (3,000) square feet of LFA shall be permitted in each of Building I-F and Building I-G, (ii) a quick service restaurant containing up to two thousand five hundred (2,500) square feet of LFA shall be permitted in Building III-L, (iii) a restaurant containing up to four thousand (4,000) square feet of LFA shall be permitted in Building III-M, (iv) a restaurant containing up to two thousand five hundred (2,500) square feet of LFA shall be permitted in Building III-O and (v) up to four (4) tables for seating up to sixteen (16) persons may be maintained inside Building III-H. In the event Building I-F or Building I-G contains more than three thousand (3,000) square feet of LFA, then any such restaurant shall be located within the northernmost portion of such building. In the event Building III-L contains a restaurant, then any such restaurant shall be located within the southernmost portion of such building. In the event Building III-M contains a restaurant, then any such restaurant shall be located in the southernmost portion of such building. In the event Building III-O contains a restaurant, then any such restaurant shall be located in the northernmost portion of such building.

(f)    store selling liquor, beer, or wine, without the consent of Hobby Lobby, which consent may be granted or withheld in Hobby Lobby's sole discretion, but not to prohibit: (i) the incidental sales of alcohol by a grocery store, or (ii) the sale of alcohol by a restaurant so long as the annual gross sales receipts of such items are less than forty percent (40%) of the total annual gross sales of such restaurant, which sales permitted by (i) and (ii) above shall not require the consent of Hobby Lobby;

(g)    bowling alley, billiard parlor, arcade, or other place of amusement or recreation, but not to prohibit an upscale bowling alley within that area depicted as Building I-A on the Site Plan;

(h)    second-hand store whose principal business is selling used or donated merchandise (except that stores with a combination of new and used goods (such as Play it Again Sports, GameStop and Cartridge World) shall be permitted);

(i)    pawn shop;

(j)    head shop, electronic cigarette shop, or store selling marijuana, but not to prohibit an electronic cigarette shop within those areas of the Property labeled "Lot 2" on the Site Plan;

(k)    payday loan or check cashing provider;

(l)    child care center;

(m)    funeral home or mortuary;

(n)    school, church, or other place of worship;

(o)    flea market;

(p)    tattoo parlor or body piercing establishment;

(q)    theater, but not to prohibit a theater within that area depicted as Building I-A on the Site Plan or a first-class, first-run theater on Lot 2;

(r)    adult video store and adult book store;

(s)    adult entertainment club;

GLV v22 (9/13/16)

(t)     night club;

(u)     health club, gym, exercise studio, spa, or massage parlor, but not to prohibit: (a) a prototypical Massage Envy or Spa La La so long as such establishment is located at least 300 linear feet away from Building I-D and is not located in the Section III Inline Space or Building III-L and no more than one such use shall be located in Lot 3; (b) a health club, gym or exercise studio within that area depicted as Building I-A on the Site Plan; or (c) a first-class health club, gym or exercise studio within those areas of the Property labeled "Lot 2" and "Lot 3" on the Site Plan so long as such health club, gym or exercise studio occupies no more than (x) 5,000 square feet if located on Lot 2, or (y) 3,000 square feet if located on Lot 3, and is not located in the Section III Inline Space or Building III-L;

(v)     place of betting, gambling, bingo, or other gaming;

(w)     self-service laundry facility;

(x)     on-site dry cleaner;

(y)     hotel, motel, or other place of residence;

(z)     car wash, auto body shop, auto rental business, or junk yard;

(aa)    animal facility, but not to prohibit a national pet supply store such as Petco or PetSmart, but in no case shall such pet supply store have a "dog run" or other similar outside pen for animals;

(bb)    manufacturing operation;

(cc)    a government owned or operated healthcare clinic;

(dd)    abortion clinic, including Planned Parenthood;

(ee)    anything constituting a public or private nuisance;

(ff)    except as specifically permitted in items (b) and (u) above, any of the following uses in the Section III Inline Space, Building III-K and Building III-L: (i) an Entertainment or Educational Facility, as defined below, but not to prohibit a nail salon in Building III-K or Building III-L so long as such nail salon occupies no more than 2,000 square feet of LFA; (ii) military recruitment center; or (iii) a store selling liquor, beer, or wine; but not to prohibit the retail sale of liquor, beer or wine primarily for off-premises consumption (including conducting on-premises sampling and tasting); "**Entertainment Facility**" means a facility primarily for entertainment or recreation, including, without limitation, gym, yoga studio, health spa or exercise studio, auditorium, meeting hall or other place of public assembly, dance hall or night club, massage parlor, health club, game parlor, video arcade (which shall be defined as any store containing more than five (5) electronic games), "laser tag," "bounce house" or "virtual reality" operation; "**Educational Facility**" means a facility primarily for training or education, including, without limitation, a beauty school, nail salon, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees as opposed to customers;

(gg)    any of the following uses in Lot 3: (i) any automobile, truck, trailer or R.V. sales or leasing, or (ii) telemarketing or call center; or (iii) any catering or banquet hall; (iv) any carnival, amusement park or circus; or (v) karate center; (vi) gun shop, except that this provision shall not prohibit a national or regional sporting goods store, of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as Dick's Sporting Goods or Field and Stream), from selling guns as an incidental part of such store's business; (vii) supermarket/grocery store in any building on Lot 3 other than in Building III-H (i.e., a supermarket/grocery store is permitted to operate in Building III-H);

(hh)    during the term of the Five Below Lease, for a pet store located immediately adjacent to Building III-B;

(ii)    during the term of the World Market Lease, any use, the presence of which may jeopardize the validity of the right to sell alcohol from Building III-C (*e.g.*, in some jurisdictions, educational facilities, medical facilities, churches, and schools);

(jj)    any of the following uses: (1) any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse; (2) any operation primarily used as a storage facility and any assembling, distilling, refining, smelting, agricultural, or mining operation; (3) any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance); (4) any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building); and

GLV v22 (9/13/16)

(kk) any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event; (ix) a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged," such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailers commonly known as "Christmas Tree Shops" and "And That" shall be deemed not to violate the foregoing restriction, nor shall discount retailers such as, for example, those commonly known as "TJ Maxx", "Marshalls", "Ross", "Burkes", "DSW Shoe Warehouse", "Carter's", "OshKosh" and "Five Below" be deemed to violate the foregoing restriction. This covenant shall not apply to the tenants under the Lot 1 Anchor Leases (as defined herein).

*EXCLUSIVES*:

1.  DSG:  During the term of  and pursuant to the terms and conditions of the DSG Lease of Buildings I-A and I-B, except in the buildings labeled as Buildings I-A and I-B on the Site Plan, no portion of the Property shall be used for the sale, rental and/or distribution, either singly or in any combination of: (i) hunting, camping, fishing (including, but not limited to, fly fishing), hiking and/or outdoor products, equipment, gear and/or accessories; (ii) hunting, camping, fishing, hiking, outdoor, climbing, cycling, skiing/snowboarding, paddling and/or rugged footwear; (iii) hunting, fishing and/or camping services, lessons and/or training; (iv) hunting and/or fishing electronics products; (v) work boots (including, but not limited to, soft toe and/or safety toe work boots, logger boots, mine boots, wellington boots and athletic boots); (vi) boats, boat accessories and/or boating products, equipment, gear and/or accessories; (vii) firearms, ammunition, knives and/or archery products, equipment, gear and/or accessories; (viii) recreational vehicles, off-road vehicles, utility terrain vehicles and/or all-terrain vehicles; (ix) sporting goods and/or sporting equipment (including, but not limited to, golf equipment and accessories); (x) athletic footwear; and/or (xi) health, fitness and/or exercise equipment ("Precluded Use Activity(ies)").

    Notwithstanding the foregoing Precluded Use Activity(ies) set forth above, the retail sale and/or distribution of sporting goods and/or sporting equipment in the lesser of (i) ten percent (10%) in the aggregate of a building's gross leasable area (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (ii) two thousand five hundred (2,500) square feet in the aggregate of the building's gross leasable area (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use), shall not be a violation of the Precluded Use Activities. Furthermore, the following shall be permitted in the Property and shall not be a violation of the Precluded Use Activities (i) one (1) national brand shoe store for the retail sale of men's and women's fashion footwear (such as Off Broadway Shoes or DSW, as such national brand shoe stores currently operate as of the date of this Lease), provided that such national brand shoe store shall not occupy more than twenty thousand (20,000) square feet of gross leasable area; shall be permitted in the Property, (ii) Boot Barn, so long as Boot Barn is operating in a manner consistent with substantially all other Boot Barn stores as of the date of the DSG Lease, provided that Boot Barn shall not occupy more than eleven thousand (11,000) square feet of gross leasable area; (iii) HomeGoods, so long as HomeGoods is operating in a manner consistent with substantially all other HomeGoods stores as of the date of the DSG Lease; (iv) Marshalls, so long as Marshalls is operating in a manner consistent with substantially all other Marshalls stores as of the date of the DSG Lease; (v) TJ Maxx, so long as TJ Maxx is operating in a manner consistent with substantially all other TJ Maxx stores as of the date of the DSG Lease; and (vi) Burkes Outlet, so long as Burkes Outlet is operating in a manner consistent with substantially all other Burkes Outlet stores as of the date of the DSG Lease.

2.  Homegoods:  During the term of and pursuant to the terms and conditions of the HomeGoods Lease of Building I-C, except in the building labeled as Building I-C on the Site Plan, no other premises in the Property shall contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of furnishings for the home including the following categories of items:  linens and domestics, window treatments, floor coverings, bathroom items, bedding, furniture, wall décor, housewares, table top goods, glassware, flatware, cookware, kitchen utensils, giftware and/or closet, shelving and storage items and home accessories (the "Homegoods Protected Merchandise").  The computation of such floor area shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Homegoods Protected Merchandise.  The provisions of this paragraph shall not apply to Hobby Lobby (and its successors and assigns) operating in Building I-D as shown on the Site Plan, provided that the Hobby Lobby exclusive shall not apply to HomeGoods (and its successors and assigns) operating in Building I-C on the Site Plan. In addition, the provisions of this paragraph shall not apply to Cost Plus World Market (and its successors and assigns) operating in Building III-C on the Site Plan, provided that the Cost Plus World Market exclusive shall not apply to HomeGoods (and its successors and assigns) operating in Building I-C on the Site Plan.

3.  Hobby Lobby:  During the term of and pursuant to the terms and conditions of the Hobby Lobby Lease of Building I-D, except in the building labeled as Building I-D on the Site Plan, no portion of the Property

GLV v22 (9/13/16)

shall be used for the sale of art supplies, craft supplies, fabrics, photo frames, frames, framed art, wall art, and wall decor (the "HL Exclusive"). Incidental sales by other tenants of items included in the HL Exclusive in amounts not to exceed the lesser of: (i) one thousand (1,000) square feet of such tenant's gross sales area, measured from the center aisle; or (ii) ten percent (10%) of such tenant's gross sales area, measured from the center aisle, shall not be deemed to violate the HL Exclusive. Additionally, incidental sales by DSG (or any successor trade name utilized by the majority of stores previously operating under the DSG trade name, as the case may be) of items included in the HL Exclusive in amounts not to exceed the lesser of: (i) one thousand five hundred (1,500) square feet of its gross sales area, measured from the center aisle; or (ii) ten percent (10%) of its gross sales area, measured from the center aisle, shall not be deemed to violate the HL Exclusive. The provisions of this paragraph shall not apply to HomeGoods (and its successors and assigns) operating in Building I-C on the Site Plan, provided that the Homegoods exclusive shall not apply to Hobby Lobby (and its successors and assigns) operating in Building I-D on the Site Plan. The applicability of the foregoing restriction with respect to the tenant under the World Market Lease is subject to that certain letter agreement dated October 18, 2016 by and between Bed Bath & Beyond Inc. and Hobby Lobby, Inc.

4.   Five Below:  During the term of and pursuant to the terms and conditions of the Five Below Lease of Building III-B, except in the building labeled Building III-B on the Site Plan, no portion of the Property shall be used principally for the sale of teen and pre-teen oriented merchandise at a price point of $10 and less (the "Five Below Exclusive Items"). For purposes hereof, a store shall be deemed to be operating for such purpose if it uses more than the lesser of (i) fifteen percent (15%) of the sales space within its premises, or (ii) seven hundred fifty (750) square feet of space therefor for the sale of the Five Below Exclusive Items.  The provisions of this paragraph shall not be construed to prohibit any existing tenant situated within the Property as of the date of the Five Below Lease which has, as of the date of the Five Below Lease, the right to handle and sell such items, from handling and selling those certain items, but only to the extent permitted in such tenants' lease.  The provisions of this paragraph shall also not apply to a retailer of one (1) principal category of merchandise that devotes at least 75% of its sales floor area to the sale of one (1) principal category of merchandise such as an electronics store, book store, toy store, clothing store, video rental store, health and beauty aids store, convenience store.  In addition, this covenant shall not apply to the initial tenants of the Property operating as "Homegoods", "DSW" and "Petco", any space in the Property containing more than eighteen thousand square feet (18,000) or to a "dollar store", such as, but not limited to, Family Dollar, Dollar Tree or Dollar General as such stores operate as of the Effective Date.  For avoidance of doubt, this covenant does not apply to the tenants under the DSG Lease of Building I-A and I-B as shown on the Site Plan, the HomeGoods Lease of Building I-C as shown on the Site Plan and the Hobby Lobby Lease of Building I-D as shown on the Site Plan (collectively, the "Lot 1 Anchor Leases"), their respective successors, assigns or sub-tenants,  as the Lot 1 Anchor Lease were executed prior to the Five Below Lease and do not prohibit the handling and selling of the Five Below Exclusive Items.

5.   World Market: During the term of and pursuant to the terms and conditions of the World Market Lease of Building III-C, except in the building labeled Building III-C on the Site Plan, no portion of the Property shall be used for the display and/or sale of domestic or imported home décor goods, gourmet foods, and beer and wine for off-premises consumption (the "exclusive use items").  This exclusive shall not apply to: (1) department stores [for example, Wal-Mart, Macy's, or Target], (ii) discount clubs [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement centers [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Property is located, each occupying at least 60,000 square feet of LFA within the Property, as such stores are currently operated; (2) premises of less than 3,500 square feet; (3) any store in the Property occupied and operated by Bed Bath & Beyond or any of its affiliates (4) national or regional art & craft superstores such as Jo-Ann Fabrics, Michael's, A.C. Moore and Hobby Lobby (or to the successors, assigns and/or subtenants of Hobby Lobby operating under the initial lease of Building I-D); (5) one store of 3,000 square feet or less selling custom frames and (6) national or regional grocery stores or supermarkets as such terms are commonly used in the industry [such as (without limitation): Kroger, Tops, Publix, Whole Foods, Sprouts, Trader Joe's and Fresh Market.]; (7) national or regional drug stores (e.g. CVS, Walgreen's, Rite Aid, etc.] and (8) Homegoods (and successors and assigns) operating in Building I-C on the Site Plan, provided that the tenant under the World Market Lease and Cost Plus, Inc. (and their successors and assigns) operating in Building III-C on the Site Plan are not subject to any exclusive rights granted to Homegoods.  Furthermore, the incidental sale of home décor goods and/or pre-packaged gourmet foods by any other tenant or occupant of the Property shall be permitted in the lesser of (a) two thousand five hundred (2,500) square feet of such tenant's LFA, or (b) ten percent (10%) of such tenant's LFA.

6.   Buy Buy Baby:  During the term of and pursuant to the terms and conditions of the buybuy Baby Lease of Building III-D, except in the building labeled Building III-D on the Site Plan, no portion of the Property shall be used for (a) the sale of infant, juvenile and children's furniture and equipment (collectively, "Restricted Furniture"); (b) the operation of a business whose primary business is the sale of clothing, layettes, apparel, shoes and/or accessories for infants, juveniles and children 0-4 years in age and maternity clothing; and (c) the operation of a business whose primary business is the sale of merchandise, products and services targeted for use by or for infants, juveniles and children 0-4 years in age (including,

*19*

without limitation, infant, juvenile and children's: toys, books, food, formula, indoor and/or outdoor play and recreational equipment, audio and video cassettes or equipment, safety items, feeding items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom items (including, without limitation, personal care devices and other bathroom appliances, accessories and toiletries) (which items in clauses (a), (b) and (c) above , either singly or in any combination, are hereinafter referred to as the "BBB Exclusive Items"). This exclusive shall not apply to: (1) (i) department stores [for example, Wal-Mart, Macy's, or Target], (ii) discount clubs [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement centers [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Property is located, each occupying at least 60,000 square feet of LFA within the Property, as such stores are currently operated (as of the date of the buybuy Baby Lease); (2) premises containing less than 3,500 square feet; (3) Bed Bath & Beyond or any of its affiliates; (4) Hobby Lobby (or to the successors, assigns and/or subtenants of Hobby Lobby operating under the initial lease of Building I-D). Sections (b) and (c) of the BBB Exclusive shall not apply to Carter's or OshKosh operating under the Carter's Lease and the OshKosh Lease of Building III-A, as those brands currently operate their stores (as of the Effective Date) or any modifications to their product lines provided such new product lines (i) are commonly sold in other Carter's or OshKosh stores, as applicable, and (ii) are Carter's or OshKosh's own label, including any future change in Carter's trade name so long as it contains the word "Carter's" and any future change in OshKosh's trade name so long as it contains the word "OshKosh" . Furthermore, the incidental sale of Restricted Furniture by any other tenant or occupant of the Property shall be permitted in an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales area) not to exceed the lesser of (a) one thousand (1,000) square feet of such tenant's floor area, or (b) five percent (5%) of such tenant's floor area, except that the incidental sale of Restricted Furniture by DSG (its successors, assigns and/or subtenants) under the DSG Lease of Building I-A and Building I-B and Homegoods (and successors and assigns) operating in Building I-C on the Site Plan shall be permitted in an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales area) not to exceed the lesser of (a) two thousand five hundred (2,500) square feet of Building I-A and Building I-B, or (b) ten percent (10%) of Building I-A and Building I-B.

7.  Petco:  During the term of and pursuant to the terms and conditions of the PetCo Lease of Building III-F, except in the building labeled Building III-F on the Site Plan, no portion of the Property shall be used for the retail sale of pets (including but not limited to fish, birds, reptiles and small animals), pet grooming, veterinary, boarding, animal adoptions, training, day care and other pet services, pet food, pet accessories and other pet related products except for incidental sales (meaning the sale or display for sale of such items or services, not as the primary use of the competing tenant and taking up no more than five hundred (500) square feet of such tenant's LFA).  This covenant shall not apply to those tenants with leases in force and effect as of the date of the PetCo Lease to the extent said leases have use clauses which otherwise permit said tenants to violate this covenant.  In addition, this covenant shall not apply to the tenants under the Lot 1 Anchor Leases and the Sprouts Lease of Building III-H as shown on the Site Plan, their respective successors, assigns or sub-tenants.

8.  Carter's/OshKosh:  During the term of and pursuant to the terms and conditions of the Carter's Lease and the OshKosh Lease of Building III-A, except in the building labeled Building III-A on the Site Plan, after the date of the Carter's Lease and the OshKosh Lease, Declarant shall not lease space (or consent to a change of use when Declarant has the right to deny such consent to existing tenants) to another tenant or occupant whose primary use is or may be the operation of a retail store in which infants', toddlers' and/or children's clothing is displayed in at least one-third of the display area (including all adjacent aisle space) (the "Carter's Restricted Use"), if either before entering into such transaction or a result thereof, more than three percent (3%) of the total leasable area in the Property is operated by tenants or occupants (including Carter's) whose primary use is the Carter's Restricted Use; provided, however, the foregoing three percent (3%) limitation shall not apply to any tenants in the Property occupying more than fifteen thousand (15,000) square feet of gross leasable area or the tenants under the Lot 1 Anchor Leases, their respective successors, assigns or sub-tenants (and the leasable area of such tenants shall be excluded in the denominator when calculating the three percent (3%) limitation).

9.  Sprouts:   During the term of and pursuant to the terms and conditions of the Sprouts Lease of Building III-H, Sprouts shall have the exclusive right in the Property to conduct the operation and sale, either singly or in any combination, of any of the following activities or merchandise:  (i) the operation of a grocery store, meat or seafood market or produce market, or the sale of any such items; (ii) the sale of vitamins and supplements, ethnic foods, natural or health food, pet food, or packaged ice cream; (iii) the sale of natural cosmetics, natural health or beauty products; (iv) the sale of packaged beer and wine for off-premises consumption; (v) the operation of a full service bakery; and (vi) the operation of an over-the-counter delicatessen offering sliced or butchered meats and cheeses for off-premises consumption (all of which are included in and referred to as the "Sprouts Exclusive"), and all other Property tenants or occupants are prohibited from engaging in Sprouts Exclusive  except on an Incidental Basis (defined below), provided that there shall be no exception for the sale of fresh meat, seafood and produce. "Incidental Basis" means for the purposes of this paragraph the area dedicated to the sale of such items occupies the lesser of: (a) 250 square feet of LFA; or (b) 3% of the sales area of the subject premises; provided not more than 2 linear feet of retail selling space shall be dedicated to the display and sale of any

GLV v22 (9/13/16)

one category of ancillary products. Sprouts Exclusive shall not apply to any tenant under any lease executed prior to the Sprouts Lease whose lease does not prohibit the use of its premises for the portion of Sprouts Exclusive at issue; provided that to the extent Declarant has the right to consent to a change in use, or assignment, Declarant agrees to withhold such consent if the resulting use would violate the Sprouts Exclusive. The Sprouts Exclusive shall not restrict the following specific uses: (i) a coffee shop, sandwich shop or restaurant which primarily serves food for on-premises consumption, such as Starbucks, Panera Bread, Jimmy John Sandwiches, Einstein's Bagels, or Subway; (ii) an ice cream, smoothie or frozen yogurt shop; (iii) a pick up or delivery outlet (such as a pizza delivery shop or Chinese carry-out) which occupies not more than 2,000 square feet of LFA each; (iv) a cosmetic store such as ULTA, Sally's Beauty or similar beauty supply type store, day spa or a salon such as Aveda Salon; or (v) a full service pharmacy or drug store such as CVS or Walgreens. In addition, the Sprouts Exclusive shall not apply to the following Property anchor tenants (or their successors, assigns or subtenants) during the term of Declarant's leases with said anchor tenant: DSG; Field & Stream; HomeGoods; Hobby Lobby; DSW; Petco; buy buy Baby, World Market; Burkes; Carter's; Oshkosh; and Five Below.

GLV v22 (9/13/16)

DocuSign Envelope ID: 9FD8D72B-581F-40D1-9885-52CB74DAF208

## LEASE MODIFICATION

THIS LEASE MODIFICATION (*"Modification"*), dated as of the $27$ day of *October*, 2020 (*"Modification Date"*) by and between NC FAYETTEVILLE SKIBO, LLC, a North Carolina limited liability company (*"Landlord"*), having an office at 201 Riverplace, Suite 400, Greenville, South Carolina 29601 and BED BATH & BEYOND INC., a New York corporation (*"Tenant"*), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated as of October 31, 2016 (as amended and/or modified thereafter, the *"Lease"*), with respect to premises (*"Premises"*) located in the Freedom Town Center in Fayetteville, North Carolina (*"Shopping Center"*) and being used for the operation of a buybuy Baby store; and

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Modification and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    The recitals hereinabove set forth are incorporated into this Modification by this reference.  Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.    Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to the Rent that are outlined in Schedule A hereto shall govern and control from and after the Modification Date.

3.    Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to certain other terms and provisions of the Lease to the extent outlined in Schedule B hereto shall govern and control from and after the Modification Date.

4.    It is the policy of Tenant and its subsidiaries and affiliates (collectively, *"the Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services.  This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Modification, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.  If any such improper actions are observed, contact our Legal Department (Attention: General Counsel) at Tenant's notification address and/or by telephone at 908-688-0888, so that

DocuSign Envelope ID: 9FD8D72B-581F-40D1-9885-52CB74DAF208

the incident may be fully investigated.

5.        Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Modification, except for Retail Consulting Services (*"Tenant's Broker"*). Tenant shall pay any commission due to Tenant's Broker in connection with this Modification pursuant to a separate written agreement between Tenant and Tenant's Broker. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Tenant's Broker) with respect to this Modification in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. The provisions of this Section shall survive the expiration or earlier termination of the Lease.

6.        Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Modification to be in full force and effect or, if any such consent is required, Landlord has obtained same prior to its execution hereof. The parties represent and warrant to each other that the person signing on behalf of either Landlord or Tenant, as the case may be, has the authority to do so and for this Modification to be deemed in full force and effect.

7.        The terms and conditions of this Modification shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns. Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect. In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Modification, the terms and provisions of this Modification shall govern and control.

8.        This Modification may be executed electronically and in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Modification to Lease. The execution and transmission of an image of any signed document or document signed by DocuSign (or a similar application) will have the same binding effect as an original bearing an original signature. No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

[Signature Page to Follow]

DocuSign Envelope ID: 9FD8D72B-581F-40D1-9885-52CB74DAF208

IN WITNESS WHEREOF, the parties hereto have executed this Modification to Lease as of the day and year first above written.

### LANDLORD:

NC FAYETTEVILLE SKIBO, LLC,
a North Carolina limited liability company

By: _____
Name: Philip J. Wilson
Title: Manager

### TENANT:

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Name: John Hartmann
Title: EVP, Chief Operating Officer

DocuSign Envelope ID: 9FD8D72B-581F-40D1-9885-52CB74DAF208

## SCHEDULE A

The Lease is hereby amended to reflect that Tenant is entitled to a Rent abatement in the amount of Twenty Thousand and 00/100 Dollars ($20,000) (the *"Abatement Amount"*).  The Abatement Amount shall be offset against Rent payable under the Lease after Tenant's receipt of a fully executed copy of this Modification (and the next succeeding installment(s) of Rent payable thereunder) until full satisfaction by credit.

DocuSign Envelope ID: 9FD8D72B-581F-40D1-9885-52CB74DAF208

## **SCHEDULE B**

The Lease is hereby amended to reflect the following:

1.        Landlord hereby confirms that Tenant shall have the right to use the Expectant Mother Parking Spaces for curbside pickup for Tenant's customers and may install signs designating the Expectant Mother Parking Spaces for such curbside pickup use.

2.        Tenant hereby consents to the operation of a Nothing Bundt Cakes, as same is currently known to operate, in the premises shown and identified as Space "III-O-1" on the site plan attached hereto and made a part hereof as Schedule C, provided such business is operated in a manner consistent with first-class shopping centers in the State of North Carolina and in compliance with other provisions of the Lease. The site plan attached hereto is solely for the purpose of identifying the location of the Nothing Bundt Cakes and shall not be deemed Tenant's consent to any other matter thereon.

3.        Landlord hereby confirms that all late fees/interest charges/attorney fees as a result of COVID-related lease issues incurred, charged, or assessed prior to the full execution of this Modification are waived and there is no monetary default by Tenant under the Lease.

DocuSign Envelope ID: 9FD8D72B-581F-40D1-9885-52CB74DAF208

## SCHEDULE C

### Site plan

