# EXHIBIT A

# LEASE AGREEMENT

Between

## CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP,

Landlord

and

## BED BATH & BEYOND INC.,

a New York corporation,

Tenant

## GREEN MOUNTAIN PLAZA

Rutland, Vermont

December 16
Dated: ~~November~~__, 2005

\* \* \* \* \* \*

# Table of Contents

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS ...........................................................................1
    Section 1.1    Basic Terms and Definitions .................................................................1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ....................................4
    Section 2.1    Lease of Premises ................................................................................4
    Section 2.2    Term. .....................................................................................................4
    Section 2.3    Delivery Date..........................................................................................5
    Section 2.4    Unseasonable Delivery: Slack Period....................................................6
    Section 2.5    Initial Co-Tenancy Condition. ................................................................6

ARTICLE 3 IMPROVEMENTS ....................................................................................................7
    Section 3.1    Landlord's Work and Tenant's Work......................................................7
    Section 3.2    Plan Approvals. .....................................................................................7
    Section 3.3    Performance of Work. ............................................................................8
    Section 3.4    Measurement; Adjustment of Rent. .....................................................10

ARTICLE 4 FIXED RENT AND TAXES: DETERMINATION AND PAYMENT ..........................11
    Section 4.1    Fixed Rent............................................................................................11
    Section 4.2    Payment of Rent. .................................................................................12
    Section 4.3    Real Estate and Other Taxes. ..............................................................12

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES ................................................13
    Section 5.1    Common Areas: Maintenance. ............................................................13
    Section 5.2    Common Areas: Restrictions................................................................15

ARTICLE 6 UTILITIES ..............................................................................................................18
    Section 6.1    Utility Service ......................................................................................18
    Section 6.2    Interruption ..........................................................................................18

ARTICLE 7 SIGNS....................................................................................................................18
    Section 7.1    Tenant's Building Signage....................................................................18
    Section 7.2    Pylon/Monument Signage. ...................................................................18
    Section 7.3    Signage: Alteration/Removal/Allocation...............................................19
    Section 7.4    Cooperation .........................................................................................19
    Section 7.5    Signage Restrictions and Criteria. .......................................................19

ARTICLE 8 ALTERATIONS AND IMPROVEMENTS .................................................................19
    Section 8.1    Alterations and Improvements..............................................................19

ARTICLE 9 REPAIRS ...............................................................................................................21
    Section 9.1    Tenant's Repairs .................................................................................21
    Section 9.2    Landlord's Repairs ...............................................................................21
    Section 9.3    Legal Compliance Work .......................................................................22

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION .............22
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification. ......22
    Section 10.2    Tenant's Insurance...............................................................................23
    Section 10.3    Landlord's Insurance............................................................................23
    Section 10.4    General Insurance Requirements.........................................................24

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN .........................................24
    Section 11.1    Fire and Other Casualty. .....................................................................24
    Section 11.2    Eminent Domain...................................................................................26
    Section 11.3    Abatement of Rent Charges. ................................................................27

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES ................................27
    Section 12.1    Quiet Enjoyment...................................................................................27
    Section 12.2    Authority................................................................................................27
    Section 12.3    Landlord's Covenants, Warranties and Representations. .....................27
    Section 12.4    Environmental Matters. ........................................................................28
    Section 12.5    Intentionally Omitted.............................................................................30

ARTICLE 13 USES AND RESTRICTIONS ...............................................................................30
    Section 13.1    Permitted and Prohibited Uses.............................................................30

Section 13.2   Tenant's Exclusive in Center. ...................................................................30
Section 13.3   Exclusives Which Tenant Must Honor. ......................................................31

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS ...........................................................32

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING.........................................................32
Section 15.1   Assignment and Subletting.......................................................................32
Section 15.2   Liability of Tenant ....................................................................................33
Section 15.3   Collateral Assignment. .............................................................................33
Section 15.4   Cure Rights of Original Tenant. ................................................................33
Section 15.5   Recognition Agreement ............................................................................34

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION .............................................................34
Section 16.1   Tenant Default...........................................................................................34
Section 16.2   Landlord Default........................................................................................35
Section 16.3   Arbitration.................................................................................................36

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
CERTIFICATE.........................................................................................................37
Section 17.1   Right to Mortgage and Non-Disturbance ..................................................37
Section 17.2   Estoppel Certificate ..................................................................................37
Section 17.3   Existing Mortgages....................................................................................37

ARTICLE 18 NOTICE .................................................................................................................38

ARTICLE 19 TENANT'S PROPERTY .........................................................................................38

ARTICLE 20 END OF TERM ......................................................................................................38
Section 20.1   Surrender of Premises ..............................................................................38
Section 20.2   Hold Over..................................................................................................38

ARTICLE 21 INTENTIONALLY OMITTED ..................................................................................39

ARTICLE 22 ONGOING CO-TENANCY .....................................................................................39

ARTICLE 23 MISCELLANEOUS.................................................................................................39
Section 23.1   Loading Facilities ......................................................................................39
Section 23.2   Liens   .......................................................................................................39
Section 23.3   Broker's Commission .................................................................................39
Section 23.4   Force Majeure...........................................................................................39
Section 23.5   Consents...................................................................................................40
Section 23.6   Costs. .......................................................................................................40
Section 23.7   Attorneys' Fees .........................................................................................40
Section 23.8   Survival of Obligations...............................................................................40
Section 23.9   Non-Waiver. ..............................................................................................40
Section 23.10  Rights Cumulative .....................................................................................40
Section 23.11  Definition of Landlord.................................................................................40
Section 23.12  Successors and Assigns ............................................................................40
Section 23.13  Limitation of Landlord's Liability.................................................................40
Section 23.14  Limitation of Tenant's Liability ...................................................................41
Section 23.15  Joint and Several Liability...........................................................................41
Section 23.16  Severability................................................................................................41
Section 23.17  Grammatical Usages and Construction ......................................................41
Section 23.18  Table of Contents, Line Numbering and Paragraph Headings................41
Section 23.19  Definition of Hereunder, Herein, etc. .........................................................41
Section 23.20  Short Form Lease ......................................................................................41
Section 23.21  Entire Agreement and Modification.............................................................41
Section 23.22  No Joint Venture or Partnership Created by Lease .....................................41
Section 23.23  Tenant's Tradename. ..................................................................................41
Section 23.24  Counterparts..............................................................................................41
Section 23.25  Right to Trial by Jury. .................................................................................42
Section 23.26  Governing Law. .........................................................................................42

********

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevations of the Shopping Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Subtenant Recognition and Attornment Agreement |
| Exhibit I | Delivery Date Notice |
| Exhibit J | Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit K-3 | Treaty Letter with Michaels |
| Exhibit L | Alternate Rent |
| Exhibit M | Prohibited Uses |

1                                  **LEASE AGREEMENT**

*December 16,*

2           THIS LEASE AGREEMENT (**"Lease"**) is entered into as of ~~November __~~, 2005 by and
3    between CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP, a Vermont limited partnership,
4    having an office at c/o Chase Enterprises, 225 Asylum Street, 29th Floor, Hartford, Connecticut
5    06103 (**"Landlord"**), and BED BATH & BEYOND INC., a New York corporation, having an
6    office at 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**).

7                                  **W I T N E S S E T H:**

8                                       **ARTICLE 1**
9                             **BASIC TERMS AND DEFINITIONS**

10          Section 1.1    <u>Basic Terms and Definitions</u>.  The following terms shall have the
11    meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

12                  1.1.1    <u>Additional Rent</u>:  Any monies which Tenant is required to pay to Landlord
13    under the terms and conditions of this Lease, other than Fixed Rent.

14                  1.1.2    <u>Affiliate</u>:  A corporation, partnership, person or other entity which is
15    controlling, controlled by, or under common control with, Landlord or Tenant, as the case may
16    be.  As used herein, "**control**" shall mean the possession, direct or indirect, of the power to
17    direct or cause the direction of the management and policies of a person or entity, whether
18    through the ownership of voting securities or rights, by contract, or otherwise.

19                  1.1.3    <u>Alternate Rent</u>:  As defined in and payable in the manner set forth in
20    <u>Exhibit L</u> attached hereto.

21                  1.1.4    <u>Common Areas</u>:  All areas in the Shopping Center which are, from time to
22    time, available for the joint use and benefit of Tenant and other tenants and occupants of the
23    Shopping Center, and their respective employees, agents, subtenants, concessionaires,
24    licensees, customers and other invitees, including, but not limited to, any and all parking areas,
25    parking spaces, driveways, truck serviceways, passageways, pylon signs, sidewalks, entrances,
26    exits, lighting facilities, courts, landscaped areas, canopied areas, propane farms, storm water
27    drainage systems, retention or detention areas, and common utility lines.

28                  1.1.5    <u>Common Areas Charges</u>:  As defined in Section 5.1 hereof.

29                  1.1.6    <u>Delivery Date</u>: As defined in Section 2.3 hereof.

30                  1.1.7    <u>Effective Date</u>: The date hereof.

31                  1.1.8    <u>Event of Default</u>:  As defined in Section 16.1 hereof.

32                  1.1.9    <u>Excused Periods</u>:  Periods during which Tenant's (or, as the case may
33    be, another tenant's) failure to conduct the operations of its business or any other business:
34    (x) resulted from alterations or renovations being performed in and to the Premises, (y) was
35    caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, or
36    (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

37                  1.1.10  <u>Exhibits</u>.  The exhibits listed in the Table of Contents annexed to this
38    Lease have been agreed to by the parties and attached hereto, it being the intention of the
39    parties that they shall become a binding part of this Lease as if fully set forth herein.

40                  1.1.11  <u>Fixed Rent</u>:  The following amounts for the periods indicated (subject to
41    adjustment pursuant to Section 3.4 hereof):

42                         (a)     For the period commencing on the Rent Commencement Date
43    and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate
44    of Three Hundred Sixty Thousand Dollars ($360,000.00) per year [based on Fifteen and 00/100
45    Dollars ($15.00) per square foot of Floor Area];



(b)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Three Hundred Seventy-Two Thousand Dollars ($372,000.00) per year [based on Fifteen and 50/100 Dollars ($15.50) per square foot of Floor Area];

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Three Hundred Eighty-Four Thousand Dollars ($384,000.00) per year [based on Sixteen and 00/100 Dollars ($16.00) per square foot of Floor Area];

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Three Hundred Ninety-Six Thousand Dollars ($396,000.00) per year [based on Sixteen and 50/100 Dollars ($16.50) per square foot of Floor Area]; and

(e)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Four Hundred Eight Thousand Dollars ($408,000.00) per year [based on Seventeen and 00/100 Dollars ($17.00) per square foot of Floor Area].

1.1.12  <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13  <u>Force Majeure</u>:  As defined in Section 23.4 hereof.

1.1.14  <u>Ground Lessor</u>:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15  Intentionally Omitted.

1.1.16  <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17  <u>Inducement Tenants</u>:  As defined in Subsection 2.3.1 hereof.

1.1.18  <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19  <u>Landlord's Mailing Address</u>:  c/o Chase Enterprises, 225 Asylum Street, 29th Floor, Hartford, Connecticut 06103, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.20  <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21  <u>Lease Interest Rate</u>:  The then effective prime rate as published from time to time in the "Money Rates" section of The Wall Street Journal (or any successor publication thereto) plus two percent (2%).

1.1.22  <u>Legal Requirements</u>:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23  <u>Mortgagee</u>:  Any (i) state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, or (ii) other reputable lender, in each case which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24  Intentionally Omitted.

1.1.25  Intentionally Omitted.

1.1.26 Intentionally Omitted.

1.1.27 <u>Permitted Use</u>:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items and cosmetics, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) and not specifically prohibited by the provisions of Subsection 13.1.1 below (the aforementioned items are hereinafter collectively referred to as the **"Permitted Items"**); and for any other lawful retail use not specifically prohibited by the provisions of Subsection 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises</u>:  Being the area cross-hatched on <u>Exhibit B</u> hereto, which, when constructed, shall have dimensions as shown on <u>Exhibit B</u> and shall contain approximately: (i) twenty-four thousand (24,000) square feet of Floor Area, and (ii) one thousand (1,000) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such mezzanine space or space used for fire pump facilities result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option</u>:  As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>:  Four (4) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>:  Fixed Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date</u>:  As defined in Section 2.2 hereof.

1.1.33 Intentionally Omitted.

1.1.34 <u>Shopping Center</u>:  The shopping center commonly known as Green Mountain Plaza, containing approximately two hundred seven thousand (207,000) square feet of Floor Area, on the property located on Route 7 in Rutland, Vermont, and more particularly described in <u>Exhibit A</u> hereto. Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35 <u>Substantially Completed or Substantial Completion</u>:  The completion of specified work at the Shopping Center (including, without limitation, as applicable,  Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36 <u>Taxes</u>:  As defined in Section 4.3.3 hereof.

1.1.37 <u>Tenant</u>:  As defined in the preamble hereof.

1.1.38 <u>Tenant's Mailing Address</u>:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39 <u>Tenant's Permits</u>:  As defined in Section 2.3.1(b) hereof.

1.1.40 <u>Tenant's Property</u>:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor

systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41 <u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as such fraction may be (x) decreased any time a building (and/or Floor Area) is added to the Shopping Center, or (y) increased, but only to the extent that the aggregate Floor Area of the Shopping Center is reduced due to casualty damage or condemnation of a building in the Shopping Center which damaged or condemned Floor Area cannot be legally restored by Landlord for retail use after the use of diligent efforts by Landlord to do so.  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.  In no event shall Tenant's Pro Rata Share be greater than twelve percent (12%), provided that in the event the aggregate Floor Area of the Shopping Center is reduced due to casualty or condemnation that cannot be legally restored as aforementioned, the foregoing cap on Tenant's Pro Rata Share shall be recalculated to be a ratio, stated as a percentage, the numerator of which is the Floor Area of the Premises less any such Floor Area within the Premises that cannot be legally restored as aforesaid and the denominator of which is 207,000 less any Floor Area within the Shopping Center that cannot be legally restored as aforesaid.

1.1.42 <u>Tenant's Work</u>:  As defined in Section 3.1 hereof.

1.1.43 <u>Term</u>:  A period  (the "***Initial Term***") of approximately fifteen (15) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the fifteenth (15th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the fifteenth (15th) anniversary of the Rent Commencement Date.  As used herein:  (i) "***Term***" shall refer to the Initial Term, as the same may be extended by any Renewal Period timely exercised pursuant to Section 2.2.2 below; and (ii) "***Expiration Date***" shall mean the date on which the Term expires.

# ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    <u>Lease of Premises</u>.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2    <u>Term</u>.

2.2.1    <u>Initial Term</u>.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the sixtieth (60th) day following the Delivery Date (the "***Rent Commencement Date***").  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as <u>Exhibit C</u> specifying the Rent Commencement Date.

2.2.2    <u>Renewal Options</u>.  Provided no Event of Default on the part of Tenant has occurred and is continuing, Tenant shall have the right and option (hereinafter a "***Renewal Option***") to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a "***Renewal Period***", and collectively, the "***Renewal Periods***") upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred forty (240) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    Delivery Date.

2.3.1    Definition.  Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "**Delivery Date**") following the day on which all of the following conditions (the "**Delivery Date Conditions**") shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, "**Tenant's Permits**", which term shall include any fixture permit required for Tenant to install its fixtures in the Premises)), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a temporary certificate of occupancy for the Premises provided that such temporary certificate of occupancy permits the occupancy by Tenant of the Premises for all of the Permitted Uses hereunder, otherwise, a permanent certificate of occupancy shall be required.  If Landlord delivers a temporary certificate of occupancy to satisfy the Delivery Date conditions, then Landlord shall obtain the permanent certificate of occupancy promptly following the Delivery Date.  Landlord shall cooperate with Tenant in obtaining Tenant's Permits;

(c)    The Common Areas, and all of the improvements thereto shown on Exhibit B hereto, shall have been Substantially Completed and be operational and in good order and condition, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed and be operational and in good order and condition; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(e)    Two (2) of Dick's, Staples or Jo-Ann's shall be open for business in the location and Floor Area shown on Exhibit B (such two (2) retailers are referred to herein as the "**Inducement Tenants**"); and

(f)    Landlord shall have delivered to Tenant, in recordable form, a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof).

2.3.2    Delivery Date.

(a)    Landlord shall give Tenant at least sixty (60) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice,

1    Tenant will sustain substantial, additional costs and expenses, including, without limitation,
2    storage costs for fixtures, equipment, and inventory, employee costs during waiting period, and
3    additional advertising and promotional costs, the exact amount of which would be impracticable
4    or extremely difficult to ascertain.  If the Delivery Date does not occur by the date established
5    therefor in the Delivery Date Notice, then, in addition to any other remedies available to Tenant
6    under this Lease, Landlord agrees to pay to Tenant (or, at Landlord's election, to allow to
7    Tenant a credit against the initial installment(s) of Rent hereunder equal to), as liquidated
8    reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant,
9    the sum of: (i) Seventy-Five Thousand Dollars ($75,000), plus (ii) Two Thousand Five Hundred
10   Dollars ($2,500) for each day that the Delivery Date established in the Delivery Date Notice is
11   delayed.  The foregoing liquidated reimbursements represent the parties' good faith agreement
12   as to an agreed upon amount which shall have been incurred by Tenant and which shall
13   otherwise not be susceptible of exact ascertainment.

14           2.3.3   Delivery Date Certification.  Upon the satisfaction of all of the Delivery
15   Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification
16   attached hereto as Exhibit J.

17           2.3.4   No Waiver.  Neither Tenant's acceptance of physical possession of the
18   Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery
19   Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii)
20   relieve Landlord of any obligation under this Lease, unless such condition or obligation is
21   expressly waived in writing by Tenant.

22           Section 2.4    Unseasonable Delivery: Slack Period.  If, for any reason
23   (including, without limitation, Force Majeure), the Delivery Date occurs during the period
24   commencing on November 1 and ending on the February 28 next following (the "**Slack
25   Period**"), then Tenant shall have, in addition to any other remedies, the right to:

26               (a)    accept delivery of physical possession of the Premises; or

27               (b)    defer its acceptance of delivery of physical possession of the
28   Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed
29   to have occurred on the date that Tenant actually accepts physical possession of the Premises
30   (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery
31   Date Conditions); and

32   in either event, if the Rent Commencement Date occurs before the March 1 next following the
33   Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period
34   commencing on the Rent Commencement Date and ending on the last day of the Slack Period,
35   any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for
36   certain pre-opening expenses incurred by Tenant in connection with this Lease.

37           Section 2.5    Initial Co-Tenancy Condition.

38           2.5.1   As used herein, the "**Initial Co-Tenancy Condition**" shall mean that each
39   and every Inducement Tenant shall be open for business in the space for such Inducement
40   Tenants as described in Section 2.3.1(d) above.

41           2.5.2   If, on the Delivery Date, the Initial Co-Tenancy Condition has not been
42   satisfied, Tenant shall have the right, at its sole option, to:

43               (a)    accept delivery of physical possession of the Premises; or

44               (b)    defer its acceptance of delivery of physical possession of the
45   Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is
46   satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall
47   be deemed to have occurred on the date that Tenant actually accepts physical possession of
48   the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of
49   the Delivery Date Conditions); and

50   in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial
51   Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until
52   the Initial Co-Tenancy Condition is satisfied, subject to any other applicable provisions of this
53   Article 2.

## ARTICLE 3
## IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, "**Landlord's Work**"), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as "**Tenant's Work**") which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Intentionally Omitted.

(b)    Intentionally Omitted.

(c)    Prior to the Effective Date, Landlord delivered to Tenant drawings showing the proposed footprint, column layout, interior clean dimensions, location of the interior structural grid (column layout), storefront opening and mezzanine core, and the location and arrangement of the loading facilities, trash compactor pad and trash container pad(s) the "**Certified LOD**"), which was certified by Landlord, approved by Tenant, and which is attached hereto as part of Exhibit B hereto.  Any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements.  Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.

(d)    Prior to the Effective Date, Tenant delivered to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details  (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High Pile Storage Plans (F5) (collectively, "**Tenant's Plans**"), all of which were substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(e)    Prior to the Effective Date, Landlord caused to be prepared and submitted to Tenant, in a single submission, Landlord's preliminary plans and specifications (the "**Preliminary Plans**") for Landlord's Work (which include, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans [including, without limitation, a site lighting plan with photometrics]).

(f)    On or before November 22, 2005, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly cause to be made any revisions necessary to correct such matters and obtain Tenant's approval.

(g)    Within thirty (30) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall cause to be prepared and delivered to Tenant, in a single submission, final plans and specifications (the "**Final Plans and Specifications**"), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(h)    Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, cause to be made any revisions necessary to correct such matters and cause to be submitted to Tenant in a single submission, the revised Final Plans and Specifications, and the process of Tenant responding within fifteen (15) days of receipt of single submissions of revised Final Plans and Specifications and Landlord causing said plans to be revised and resubmitted to Tenant within fifteen (15) days of Tenant's response shall continue until Tenant approves in writing the Final Plans and Specifications.  Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval.  Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the

Final Plans and Specifications, then the terms and provisions of Tenant's Plans, <u>Exhibit B</u>, <u>Exhibit D</u>, <u>Exhibit D-1</u>, and <u>Exhibit F</u> shall govern and prevail.

(i)     All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans, the Final Plans and Specifications, and the measurements required under Subsections 3.4.1 (other than the measurements of the Shopping Center under Subsection 3.4.1, which are not required to be on AutoCAD) and 3.4.2 below shall be made (or accompanied) by the computer files thereof formatted in any version of "AutoCAD" up to AutoCAD 2002 format.

### 3.2.2   <u>Plan Changes</u>.

(a)     Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in <u>Exhibit D</u> hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the "***Changes***"). Within fifteen (15) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change. If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(b)     Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding seven and one-half percent (7.5%) subcontractor profit and seven and one-half percent (7.5%) general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen.

(c)     Landlord shall pay to Tenant the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums not exceeding seven and one-half percent (7.5%) subcontractor profit and seven and one-half percent (7.5%) general contractor profit thereon). At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen. Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d)     If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, and (ii) the commencement of the Slack Period and, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date, shall be extended by the number of days of such net delay; provided, however, that, within ten (10) business days following its receipt of Tenant's notice describing the Changes, Landlord shall have notified Tenant in reasonable detail as to the nature and extent of such delay.

Section 3.3   <u>Performance of Work</u>.

3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new materials specified in the Final Plans and Specifications, and in accordance with all requirements governing the insurance required to be maintained by Landlord hereunder. Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain

Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2   If (a)Landlord has not yet poured foundation footings for the Premises by May 1, 2006, or (b) the Delivery Date shall not have occurred by November 1, 2006 (subject to Force Majeure, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of Force Majeure promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)   terminate this Lease, if Landlord shall fail to cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease; and/or

(ii)   avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)   extend one or more times the dates set forth in clauses (a) and/or (b) and/or (c) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity, provided that if Tenant elects to avail itself of the self-help rights set forth in Section 16.2(a) and subsequently elects to terminate this Lease as a result of Landlord's failure to commence or complete the Landlord's work by the dates set forth above, Tenant may not pursue Landlord after such termination for reimbursement for the costs incurred by Tenant in exercising its self-help rights.

3.3.3   Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a list of the "Punch List Items" (hereinafter defined).  Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through signed by an authorized employee of Tenant.  Landlord shall complete any Punch List Items within twenty (20) days after it receives a copy of said punch list.  If Landlord fails to complete any item on said punch list within said 20-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof within thirty (30) days of receipt by Landlord of paid invoices for such work and releases of mechanic's liens with respect thereto.  If Landlord fails to timely remit to Tenant the amount of such reimbursement, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such reimbursement is due until reimbursement or full satisfaction by credit.  If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when as few as is reasonably possible of Tenant or its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work.  Within forty-five (45) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises.  As used herein, the term "**Punch List Items**" shall mean such minor items of a cosmetic nature which, when considered as a whole, do not materially and adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4   Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall defend, indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5   Intentionally Omitted.

3.3.6   <u>Work Requirements After Delivery Date</u>. Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)   no staging and storage of materials and parking of construction vehicles shall be permitted at any time within the portions of the Shopping Center designated as "Tenant's Protected Area/Non-Staging Area" on <u>Exhibit B</u>;

(b)   Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on <u>Exhibit B</u> hereto; and

(c)   Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use diligent efforts (which diligent efforts shall, with respect to work to be performed in space adjacent to the Premises, include, but not be limited to, the installation of adequate screening materials (i.e., plywood or tarps) to screen the entrance to the Premises from the work and to protect pedestrians entering the Premises from dust, paint and other airborne materials and projectiles) so that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7   <u>Tenant's Trailer</u>.

(a)   Landlord shall, at Landlord's sole cost and expense, at least forty-five (45) days prior to the Delivery Date, either (i) install and have operational a trailer for Tenant's exclusive use in conducting employee interviews and recruiting, in accordance with <u>Exhibit D</u> hereto, in the location shown on <u>Exhibit B</u> hereto, and said trailer shall be removed within twenty (20) days after the Delivery Date; or (ii) prepare and deliver (in fully operational condition) to Tenant possession of an in-line store to be selected by Landlord from one of the locations shown on <u>Exhibit B</u> hereto as "Temporary Interview Space" for Tenant's use in conducting employee interviews and recruiting which store shall have facilities similar to the hiring trailer as noted in <u>Exhibit D</u>, and Tenant shall have the right to use such store until the date that is twenty (20) days following the Delivery Date.

(b)   If, in Landlord's reasonable judgment, the Shopping Center site cannot accommodate said trailer and none of the locations shown on <u>Exhibit B</u> hereto as "Temporary Interview Space" are available for Tenant's use, Landlord may, by written notice to Tenant on or before the sixtieth (60th) day prior to the Delivery Date, elect to not provide said trailer or in-line store for Tenant's use in conducting employee interviews and recruiting, in which event Landlord shall provide, in lieu thereof, at Landlord's sole cost and expense, appropriate guest or meeting room(s) in the Rutland Holiday Inn, or, if the Rutland Holiday Inn is unavailable, in a local hotel selected by Landlord subject to Tenant's reasonable approval, for Tenant's use in conducting employee interviews and recruiting.

Section 3.4   <u>Measurement; Adjustment of Rent</u>.

3.4.1   Measurement of Premises.

(a)   At any time after the foundation of the Premises is poured and before delivering the Delivery Date Notice to Tenant, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Premises, the measurement of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer within ten (10) days of receipt by Tenant of such measurement. Any dispute between the parties with respect to the foregoing measurement shall be resolved by arbitration in accordance with the provisions of Section 16.3 below. If Tenant fails to notify Landlord within such ten (10) day period that Tenant disagrees with Landlord's certification, then Tenant shall be conclusively deemed to have accepted Landlord's measurement.

(b)   If the Floor Area of the Premises as determined pursuant to Subsection 3.4.1(a) is less than ninety-eight percent (98%) of that shown on the Final Plans and Specifications, then Landlord shall have until the date that is sixty (60) days prior to the Delivery Date to correct Landlord's Work so that the Floor Area of the Premises is more than ninety-eight percent (98%) of that shown on the Final Plans and Specifications. At any time after the date that is sixty (60) days prior to the Delivery Date and prior to the Rent Commencement Date, Tenant shall have the right to have the Floor Area of the Premises measured, and certified to

Landlord by, Tenant's licensed architect, surveyor or engineer, and any dispute between the parties with respect to the foregoing measurement shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.  If the Floor Area of the Premises as determined by the immediately preceding sentence is less than ninety-eight percent (98%) of that shown on the Final Plans and Specifications, then, without limiting Tenant's other rights and remedies under this Lease, Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease and all reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work (including, without limitation, plan preparation and review), not to exceed Twenty-Five Thousand Dollars ($25,000).

(c)    If Landlord fails to deliver to Tenant the certification required by Subsection 3.4.1(a) hereof, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer, which measurement shall be conclusive and binding on the parties.  If the Floor Area of the Premises as determined by the measurement described in the immediately preceding sentence is less than ninety-eight percent (98%) of that shown on the Final Plans and Specifications, then, without limiting Tenant's other rights and remedies under this Lease, Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease and all reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work (including, without limitation, plan preparation and review), not to exceed Twenty-Five Thousand Dollars ($25,000).

(d)    In addition, within thirty (30) days of receipt of written request from Tenant, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Shopping Center, the measurement of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.

3.4.2  Measurement of Mezzanine.  Within five (5) days after the substantial completion of the floor system for the office mezzanine and the installation of the floor tracks for the walls enclosing it, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of each of said non-selling space(s), the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If the square footage of the non-selling space on the office mezzanine varies from that shown on the Final Plans and Specifications, then, at Tenant's request, Landlord shall correct such work to conform to the Final Plans and Specifications.

3.4.3  Adjustment of Fixed Rent and Tenant's Pro Rata Share.  If the measurement of the Premises shall indicate a Floor Area more than 120 square feet less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof, neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof.   Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

**ARTICLE 4**
**FIXED RENT AND TAXES: DETERMINATION AND PAYMENT**

Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    Payment of Rent.   All Rent shall be delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the "**Paying Agent**"),  to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1   Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2   (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which relate to the periods occurring during the Term, subject to the provisions of this Section 4.3.  Any Taxes for a real estate fiscal year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3   As used herein, "**Taxes**" shall mean all general, ad valorem real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part or as an addition thereto, due to a future change in the method of taxation. Taxes shall be reduced by any net deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities for the particular fiscal year to which it applies. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon either Landlord or the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); or (5) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, (ii) subject to any special assessments or similar charges, or (iii) are included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes for calendar year 2005 will be approximately One and 17/100 Dollars ($1.17) per square foot of Floor Area in the Premises.

4.3.4   Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with

Tenant, execute any and all documents reasonably required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which common areas of shopping centers of comparable age and quality in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, power washing, insurance, supervision, parking lot paving, striping, crack sealing and sweeping, catch basin cleaning, maintenance of the propane farm serving the Shopping Center, maintenance of the detention/retention ponds serving the Shopping Center, pylon sign repair and maintenance (to the extent includable under Section 7.2), drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

(a)    During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the "**Common Areas Charges**") paid by Landlord to operate, maintain, insure and repair the Common Areas, including the insurance required to be maintained by Landlord under Sections 10.3.1 and 10.3.2 hereof.  Common Areas Charges shall also include (i) annual amounts paid by Landlord to the Marble Valley Regional Transit District (or its successor) (**"MVRTD"**) under written agreement with MVRTD in connection with the public mass transit program operated by MVRTD offering free rides to residents of Rutland, Vermont to the Shopping Center and other business locations (which annual payment Landlord represents is currently $6,000), provided all other future tenants or occupants of the Shopping Center are also required to pay their pro rata share of such payments; (ii) the reasonable, out-of-pocket cost of painting the exterior of the buildings in the Shopping Center (including the Premises) not more than once in any seven (7) year period; and (iii) the reasonable, out-of-pocket cost of repairing and maintaining all utility connections from the exterior of the buildings in the Shopping Center to any public roads directly adjacent to the Shopping Center.  Landlord shall be permitted to include in Common Area Charges (in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas) for each calendar year an administrative fee (the "**Administrative Fee**") equal to five percent (5%) of the Common Areas Charges for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible Common Areas Charge hereunder) and the cost of electricity and other utilities.  Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)    Within ninety (90) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied  (the "**CAC Reconciliation Statement**").  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment of Common Area Charges made by Tenant (if any) during the preceding calendar year.  If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice.  Landlord shall, within ten (10) business days of receipt of Tenant's request, deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment

hereunder, Tenant shall have the right to offset such amount from payments of Tenant's Pro Rata Share of Common Areas Charges next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges with respect to any calendar year during the Term hereof following the Base Year (hereinafter defined) (exclusive of insurance premiums paid by Landlord to insure the Common Areas as required by this Lease and exclusive of increases in the costs of snow removal and utility rate increases for the Common Areas during such calendar year and the cost of repaving the parking areas of the Shopping Center amortized as set forth in clause (2) of Subsection 5.1.3(a) below, which shall not be capped) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges payable by Tenant for the immediately preceding calendar year (exclusive of the costs of snow removal, utility rate increases and insurance rate increases for the Common Areas during such calendar year and the cost of repaving the parking areas of the Shopping Center amortized as set forth in clause (2) of Subsection 5.1.3(a) below).  The term "***Base Year***" as used in this Section 5.1.2(b), shall mean the later of (i) the first full calendar year of the Term, and (ii) calendar year 2007.  Landlord estimates Tenant's Pro Rata Share of Common Areas Charges to be $1.31 per square foot for the first full calendar year of the Term.

5.1.3    Exclusions from Common Areas Charges.

(a)    Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over at least seven (7) years, and is not incurred (A) prior to the expiration of the tenth (10th) full calendar year of the Term, or (B) more than once during each seven (7) full calendar years of the Term after the tenth full calendar year; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation [except as expressly permitted pursuant to item 23 below]; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) [Intentionally Omitted]; (23) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles, which shall be includable); (24) reserves for anticipated future expenses; (25) except for the Administrative Fee provided for in Subsection 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; (26) costs incurred in connection with the monitoring,

maintenance, inspection, or testing of fire alarm systems; or (27) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates.

(b)    In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, except to the extent the cost thereof is reimbursed by Landlord, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges.

(c)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    <u>Tenant's Right to Audit</u>.  Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof.  Upon seven (7) days advance written notice from Tenant, Landlord shall make available to Tenant for inspection at Landlord's offices relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds five percent (5%) of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit (not to exceed $1,500 in Constant Dollars (hereinafter defined)) within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right to offset such amount from payments of Tenant's Pro Rata Share of Common Areas Charges next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or bona fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.  For purposes of this lease, the term **"Constant Dollars"** shall mean the present value of the U.S. dollars to which such phrase refers, as adjusted from time to time.  An adjustment shall occur on the 1st day of June of the second (2nd) full calendar year following the date of this Lease, and each year thereafter.  Constant Dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number.  The **"Base Index Number"** shall be the level of the Index for the year this Lease commences; the **"Current Index Number"** shall be the level of the Index for the year preceding the adjustment year; the **"Index"** shall be the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics of the United States Department of Labor for U.S. City Average, All Items, or any successor index thereto as hereinafter provided.  If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then there shall be substituted for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Index.  Constant Dollar amounts shall be rounded to the nearest million with respect to insurance coverage amounts required hereunder.

5.1.5    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    <u>Common Areas: Restrictions</u>.

5.2.1    <u>Continuous Access</u>.  None of the entrances, exits, approaches and means of ingress and egress to and from the Shopping Center or the Premises within the area designated on <u>Exhibit B</u> hereto as "Tenant's Protected Area" ("**Tenant's Protected Area**") shall be interrupted or disturbed by any act or omission of Landlord during the Term, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof.  Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time

legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2  No Alterations.  Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the portion of the Shopping Center within Tenant's Protected Area or the location, availability, or size of any building or improvement within Tenant's Protected Area as shown on Exhibit B hereto; (ii) materially change the number, location, or layout of parking spaces within Tenant's Protected Area; (iii) construct any structures in the Common Areas of the Shopping Center within Tenant's Protected Area (including, without limitation, any kiosks, booths, signs or similar structures in the Common Areas within Tenant's Protected Area); or (iv) materially change the entrances or exits to and from the Shopping Center within Tenant's Protected Area, or the curb cuts, roadways and sidewalks or other Common Areas within Tenant's Protected Area, from those shown on Exhibit B hereto.  Notwithstanding any provision herein to the contrary, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center within Tenant's Protected Area, including the Premises (other than emergency repairs to utilities and Common Areas within Tenant's Protected Area) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be granted or denied in Tenant's sole and unfettered discretion, reasonably or unreasonably exercised.  Notwithstanding the foregoing with respect to Subsections 5.2.2(i) and (iv), to the extent that Landlord seeks a permit from the State of Vermont under 10 Vermont Statutes Annotated Chapter 151 (**"Act 250"**) in connection with the expansion of the Shopping Center and a condition of such permit is a change in the entrance/exit to the Shopping Center to/from Route 7 located within Tenant's Protected Area, then Tenant's right to consent to such change shall not be unreasonably withheld or delayed.  It shall be deemed reasonable for Tenant to deny its consent of the change in the entrance/exit to the Shopping Center to/from Route 7 located in Tenant's Protected Area if such change would materially and adversely affect access to or from Tenant's Protected Area.

5.2.3  Outparcels.  In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the outparcels (collectively, the "**Outparcels**" and individually, an "**Outparcel**") each designated on Exhibit B hereto as "Outparcel":  (a) no more than one building shall be constructed on any Outparcel; (b) no building shall exceed one story in height; and (c) no building shall exceed a maximum height of twenty-eight feet (28') as measured from the finished floor level to the highest point on such building or structure (inclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae).  For purposes of this Subsection 5.2.3, the Floor Area of any building constructed on an Outparcel shall also be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service).

5.2.4  Parking Area.  During the Term, Landlord shall maintain in the Shopping Center, at a minimum, four (4) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length.  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord knowingly permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees.  Notwithstanding the foregoing, Landlord may designate specific parking spaces within the area shown as "Petco Reserved Parking" on Exhibit B for the use by customers and invitees of Petco.  Tenant shall use reasonable efforts to have its employees park their motor vehicles in the area designated as "Employee Parking" on Exhibit B hereto, provided that the majority of tenants under Existing Leases and all future tenants and occupants of the Shopping Center are similarly obligated and provided further that Landlord shall take all reasonable measures that other tenants and occupants of the Shopping Center who are similarly obligated comply with such obligation.  There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center.  Landlord shall not permit overnight parking in the Shopping Center.

5.2.5  Lighting.  Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday ("**Normal Hours**").  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request (subject to Legal Requirements), provided Tenant

shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6 <u>Repairs</u>. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas within Tenant's Protected Area or in any other portion of the Shopping Center within Tenant's Protected Area shall:

(a) not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b) be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c) be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7 <u>Rules and Regulations</u>. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not materially and adversely affect the normal conduct of any business operations in the Premises, (iii) do not materially and adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8 <u>Miscellaneous</u>.

(a) <u>No Promotional Use</u>. Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales and shall not use or permit the use of all or any portion of the Common Areas within Tenant's Protected Area for promotional purposes. Promotional activities shall be permitted in portions of the Common Areas outside of Tenant's Protected Area provided that such activities not exceed forty-eight (48) hours in the aggregate in any calendar year. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in comparable shopping centers in the State of Vermont, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. In addition, for as long as the Dick's Sporting Goods lease for the premises in the Shopping Center identified as "Dick's" on <u>Exhibit B</u> hereto remains in effect, the tenant under said lease with Dick's Sporting Goods shall be entitled to conduct seasonal and promotional sales and other sales customary to such party's business operations within that specific area designated as "Dick's Promotional Area" on <u>Exhibit B</u> hereto provided that (1) not more than one (1) such event shall be held in any calendar year, (2) any such event shall be held between June 15 and August 1 and shall not exceed fourteen (14) days in duration, (3) no such event shall materially interfere with the normal conduct of Tenant's business in the Premises (4) any expenses incurred by Landlord in connection with such events shall not be included in Common Areas Charges, (5) such events shall not materially interfere with normal vehicular ingress and egress to and from the parking areas or over the drive aisles and shall not materially interfere with normal pedestrian access through the parking lot or over the sidewalks, and (6) such events shall not materially impair the visibility of Tenant's signage. Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas of the Shopping Center except as otherwise may be mandated by applicable Legal Requirements.

(b) <u>Trash Compactor and Containers</u>. Tenant shall be permitted to maintain and operate, at no extra charge, in accordance with applicable Legal Requirements: (i) a trash compactor in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as

"Trash Compactor Pad"; and (ii) a reasonably sufficient number of commercially acceptable trash container(s) in the portion of the Common Areas designated on Exhibit B hereto as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers. Tenant shall not burn garbage or rubbish in or about any portion of the Premises or Shopping Center. Tenant shall take reasonable steps to dissipate offensive odors caused by Tenant's garbage and to control pest and vermin infestation with respect to Tenant's garbage.

## ARTICLE 6
## UTILITIES

Section 6.1   Utility Service.  Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, propane, water, sanitary sewer, alarm and telecommunications, and any deposits required by the utility providers in connection with the payment thereof) consumed in the Premises during the Term.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date.  Landlord shall not knowingly permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.  Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2   Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall as promptly as reasonably possible restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has actual knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

## ARTICLE 7
## SIGNS

Section 7.1   Tenant's Building Signage.

Landlord shall, at Landlord's sole cost, supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease.  Tenant may, in accordance with applicable Legal Requirements and at Tenant's cost, provide and install the temporary Coming Soon/Grand Opening/Now Hiring/Now Open banners for the exterior walls of the Premises as shown in Exhibit F.  After the initial installation of Tenant's building signage, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements (as adjusted by variance).  Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2   Pylon/Monument Signage.  Landlord shall maintain the existing pylon at the location shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor.  Landlord, as part of Landlord's Work, shall refurbish said existing pylon as shown on Exhibt F hereto.  Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylon, in accordance with the provisions of Article 3 and Exhibits D and F hereto.  The location and size of Tenant's pylon sign panel(s) is shown on Exhibit F.  In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other

signage located in the Common Areas, such signage shall also include Tenant's identification sign, as shown on Exhibit F hereto, which shall be of a similar relative size and location as Tenant's pylon sign panel shown on Exhibit F hereto. Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent which consent Tenant shall not unreasonably withhold, condition or delay. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) [but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments] and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.

Section 7.3    Signage: Alteration/Removal/Allocation.  Subject to Legal Requirements, Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same.  Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5    Signage Restrictions and Criteria.

7.5.1    During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises,  temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which  indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.

7.5.2    Except as otherwise permitted in the Existing Lease with Merchants Bank and 99 Restaurant, Landlord shall not permit any obstructions (including, without limitation, any signs, trees, bushes or other landscaping, scaffolding or architectural details) within the Shopping Center to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.  Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(i)), no premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have: (i) building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, or (ii) a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises.

<div align="center">

**ARTICLE 8**
**ALTERATIONS AND IMPROVEMENTS**

</div>

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any exterior alterations, structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior written approval of Landlord, provided, however, that Tenant's alteration of the doors, loading docks and exterior signs of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent.  All work performed by Tenant in

connection with its alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements. Tenant shall provide Landlord with as-built plans for any structural alteration or alteration involving building systems within a reasonable time after completion of such alterations. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3    Tenant shall have the right to subdivide the Premises into not more than two (2) separate stores, each of which shall (a) have its own front entrance, and (b) be separately metered for utilities; provided that, in the event the sublet space (1) is not at least 8,000 square feet of Floor Area, and (2) is not cut front to back, and (3) does not have at least forty feet (40') of frontage, then, at the end of the Term, Tenant shall remove any demising walls separating such sublet space and shall reunite any HVAC and electrical systems to the extent that the same were separated in connection with any such subdivision.

8.1.4    (a)    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the back wall of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, including a certification by an engineer that the installation plans meet at least a 100 mile-per-hour wind load requirement, (ii) maintains the area where wall penetrations are made while Tenant's equipment is present, (iii) repairs any damage to the wall caused by the making of the wall penetrations, including, but not limited to, the repair of the wall penetrations upon the removal of any equipment installed thereon, and (iv) erects and maintains such equipment in accordance with applicable Legal Requirements. Notwithstanding the foregoing, if such antenna and/or satellite dish are unable to function properly due to the location on the back wall of the Premises, Tenant shall have the right to install the antenna and/or satellite dish on the roof of the Premises subject to all of the conditions set forth above in this Subsection 8.1.4, and subject to the further condition that Tenant uses a contractor designated or approved by Landlord for roof penetrations so as not to violate or invalidate any roof warranty maintained by Landlord.

(b)    Tenant acknowledges that two-way microwave antennae or dishes and transmitters associated with the same have the potential to cause interference with transmission and reception of other equipment. As a result, prior to Tenant's installation of any dish (or replacement), Tenant shall provide all information reasonably required by Landlord to confirm that Tenant's proposed equipment will not cause interference with transmission or reception of radio frequency transmissions of other users of such equipment located in the Shopping Center. To the extent Landlord is required to perform an intermodulation study to confirm whether or not Tenant's proposed equipment (and any replacement thereof) will cause such interference, Tenant shall pay for the actual reasonable cost of the study. If the results of the intermodulation study reveal that no such interference will be caused by Tenant's equipment (and any replacement), then Tenant shall be entitled to install such equipment (and any replacement). Following installation of the dish, Landlord agrees that it shall use diligent efforts to prevent interference by other users of such equipment located in the Shopping Center with Tenant's operation of the dish. To the extent that the dish causes interference with other users of such equipment located in the Shopping Center, Tenant shall use diligent efforts to eliminate such interference.

8.1.5    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) business days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6    If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant, or Tenant's agents, contractors or employees, provided that in no event shall Landlord or its agents, contractors or employees be deemed to be agents, contractors or employees of Tenant for the purpose of this Section 8.1.6) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor

shall Landlord construct an additional floor or floors above the Premises.  Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center (as shown on Exhibit D-2 hereto) which would be inconsistent with a comparable shopping center in the State of Vermont (exclusive of other tenants' entrance features) without the prior reasonable consent of Tenant.

## ARTICLE 9
## REPAIRS

Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning ("**HVAC**") units and systems exclusively serving the Premises.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting or causing to be repainted the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation,  repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises;

(f)    the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and Landlord shall assign to Tenant any contractors', manufacturers', vendors', or insurers' warranties or guarantees covering any such non-structural elements to the extent that such warranties or guaranties extend beyond the first (1st) anniversary of the Delivery Date; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges except for the costs referenced in Section 5.1.2(a)(iii)), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises,

Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof).

Section 9.3 <u>Legal Compliance Work</u>. Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (i.e., are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used herein, "**Legal Compliance Work**" shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement. Landlord and Tenant shall each have the right to contest or appeal such party's obligation to perform Legal Compliance Work and, if and to the extent permitted by applicable Legal Requirements, to postpone the performance of such Legal Compliance Work pending the final disposition of such challenge or appeal.

**ARTICLE 10**
**INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION**

Section 10.1 <u>Mutual Release, Waiver of Subrogation and Mutual Indemnification</u>.

10.1.1 <u>Mutual Waiver of Claims</u>. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "all-risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 <u>Waiver of Subrogation</u>. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 <u>Mutual Indemnification</u>.

(a) Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors or employees, or for which any of said parties may be statutorily liable.

(b) Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Common Areas, or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees or servants, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors or employees, or for which any of said parties may be statutorily liable.

Section 10.2   Tenant's Insurance.

10.2.1 Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord and Landlord's first Mortgagee as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations of Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.  Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 Self-Insurance.  All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000) in constant 2005 U.S. Dollars; or (iv) a combination of any of the foregoing insurance programs.  To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3   Landlord's Insurance.

10.3.1 Liability Insurance.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas (which may include areas within buildings leased to occupants of the Shopping Center) protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 Special Form Property Insurance.  Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement, demolition, increased cost of construction and contingent operation of building laws coverages,  on a replacement cost basis, in an amount adequate to cover the full replacement cost of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property.  All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding Two Hundred Fifty Thousand Dollars ($250,000) without Tenant's prior consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the commercially reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant, net of Tenant's

1  Pro Rata Share of Landlord's reasonable, out-of-pocket expense of obtaining such dividend,
2  credit, rebate or return.  Tenant's Pro Rata Share of any insurance premium for any period
3  during the Term which constitutes less than a full calendar year shall be equitably prorated.  The
4  provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this
5  Lease.

6  Section 10.4   General Insurance Requirements.

7  10.4.1 All insurance required to be maintained by the parties under this Lease
8  shall be maintained with insurance companies qualified to do business in the state in which the
9  Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating
10  Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent
11  efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of
12  premium] prior notice to the other party of cancellation or non-renewal of any policy required
13  hereunder.  Each party shall provide to the other duly executed certificates evidencing the
14  insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

15  10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above
16  shall be reviewed by Landlord and Tenant every three (3) years for the purpose of mutually
17  increasing (in consultation with their respective insurance advisors) the minimum limits of such
18  insurance to limits which shall be reasonable and customary for similar facilities of like size and
19  operation in accordance with generally accepted insurance industry standards.  The
20  replacement value of the buildings and other insurable improvements constituting the Shopping
21  Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

22  **ARTICLE 11**
23  **FIRE AND OTHER CASUALTY; EMINENT DOMAIN**

24  Section 11.1   Fire and Other Casualty.

25  11.1.1  (a)  Except as otherwise provided in this Section 11.1.1, if all or a
26  portion of the Premises, the Common Areas or other buildings, including all improvements
27  thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall
28  promptly rebuild and restore (i) the Premises and the Common Areas to the condition existing
29  immediately prior to such fire or other casualty (which restoration shall include all Tenant's Work
30  and all other leasehold improvements performed by Tenant), and (ii) all of the Floor Area within
31  the buildings shown on Exhibit B hereto between and including Dick's and Jo-Ann's to
32  substantially the condition in which same existed immediately prior to such fire or other casualty
33  so that same shall be occupied or ready for occupancy following reconstruction (all of the
34  foregoing work is hereinafter referred to as the *"Primary Restoration"*).  With respect to
35  buildings or improvements within the Shopping Center which are damaged by fire or other
36  casualty but which are not required to be restored by Landlord as part of the Primary
37  Restoration, Landlord shall promptly either (x) rebuild and restore all or portions of the same to
38  substantially the condition in which they existed immediately prior to such fire or other casualty,
39  or (y) raze the remaining portions of such buildings or improvements not rebuilt, remove all
40  debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly
41  manner (all of the foregoing work is hereinafter referred to as the *"Secondary Restoration"*).
42  The proceeds of the policies required to be obtained and maintained by Landlord pursuant to
43  Section 10.3 hereof shall, to the extent necessary, be used for performance of the Primary
44  Restoration and the Secondary Restoration (it being agreed that subject to the provisions of this
45  Lease, such proceeds delivered to Landlord's Mortgagee may be disbursed in accordance with
46  such Mortgagee's commercially reasonable disbursement requirements); in the event such
47  insurance proceeds are insufficient to complete such work, Landlord shall provide the balance
48  of the amount necessary to rebuild or restore the Shopping Center in the manner provided in
49  this Section 11.1.1.

50  (b)  Notwithstanding the foregoing, if any portion of the Premises are
51  so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to
52  the Premises in the course of, and as part of, such rebuilding or restoration work.  If the net cost
53  and expense of such rebuilding or restoration work is increased solely as a result of such
54  changes (taking into consideration any and all actual reduced and additional costs resulting
55  from such changes and/or other cost savings arising therefrom), then Tenant shall pay to
56  Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and
57  payable within thirty (30) days after Landlord has delivered to Tenant backup information
58  evidencing such increase (including, without limitation, receipted invoices) as may be
59  reasonably required by Tenant (but in no event earlier than the occurrence of the date on which

possession of the restored areas of the Premises are delivered to Tenant); provided that if such net increase exceeds $25,000, Tenant shall reimburse Landlord for such net increase as the work is performed within thirty (30) days of receipt of written request for payment from Landlord accompanied by paid invoices indicating the amount of such net increase incurred by Landlord through the date of such request for payment, provided that Landlord shall not submit a payment request to Tenant more than one (1) time in any thirty (30) day period. To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed as a direct result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)     If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business (provided that Tenant shall pay Rent on any portion of the Premises Tenant actually uses in the conduct of its business during such period, provided that storage of damaged inventory and equipment shall not constitute use by Tenant of the Premises).

11.1.2 In the event that:

(a)     Landlord does not commence the Primary Restoration Work and/or Secondary Restoration Work as required pursuant to this Section 11.1 within one hundred eighty (180) days after the date of such destruction for any reason (including Force Majeure), or thereafter fails to diligently pursue the completion of such repair and restoration work; or

(b)     the Primary Restoration Work and Secondary Restoration Work are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of Force Majeure, not to exceed sixty (60) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)     after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, the Primary Restoration Work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within thirty (30) days after Tenant's delivery to Landlord of paid invoices therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2,  that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)     seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)     terminate this Lease by thirty (30) days' notice to Landlord.

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2  Eminent Domain.

11.2.1 As used in this Section 11.2, "*Taking*" or "*Taken*" shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)    (i) more than 15% of the Premises shall be Taken, or (ii) the portion of the Premises including the loading dock or front door is taken and cannot be relocated to a new location reasonably acceptable to Tenant;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has entrances from U.S. Route 7 and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)    there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred, unless such access can be restored or relocated to a new area not more than 50 feet away from the existing access within a reasonable period of time not to exceed thirty (30) days;

(d)    any portion of the Shopping Center shall be Taken which materially interferes with parking or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)    more than thirty-three and one-third percent (33.33%) of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken;

(f)    five percent (5%) or more of the parking spaces located in Tenant's Protected Area are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than four parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center; or

(g)    Tenant does not elect to terminate the Lease due to the occurrence of any of the events set forth in clauses (a) through (f) of this Section 11.2.3. but Landlord fails to commence restoration within six (6) months of the effective date of such Taking for any reason (including Force Majeure events);

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business (provided that Tenant shall pay Rent on any portion of the Premises Tenant actually uses in the conduct of its business).

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of receipt of the condemnation award, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord with respect to the Premises for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform

hereunder.  During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business (provided that Tenant shall pay Rent on any portion of the Premises that Tenant actually uses in the conduct of its business).  Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5  In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements paid for by Tenant, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6  Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3  Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and Tenant is lawfully able to occupy the Premises.

## ARTICLE 12
## COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1  Quiet Enjoyment.  Provided no Event of Default has occurred and is continuing, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2  Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation to lease, or otherwise create any interest in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3  Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)  As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)  [Intentionally Omitted];

(c)  No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)  Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)  The Shopping Center now has, and, on the Delivery Date, shall have, access to U.S. Route 7 for the purpose of vehicular traffic;

(f)  This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or to Landlord's knowledge affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)     There are no restrictions or other legal impediments imposed by any public or private instrument which prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)     As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof;

(i)     As of the Effective Date there is no "Related Land" (defined in 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence as of the Delivery Date or thereafter during the Term, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(j)     Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the "**Existing Leases**"); and

(k)     If requested by Tenant, Landlord shall appear at any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease, and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding. If all or substantially all of the tenants in the Shopping Center would benefit from opposition to such proposed variance, then the cost of such contest shall be borne by Landlord and included in Common Area Charges; otherwise, Landlord and Tenant shall share such costs equally.

Section 12.4    Environmental Matters.

12.4.1    Definitions.

(a)     As used herein, the term "**Environmental Laws**" shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety with respect to Hazardous Substances.

(b)     As used herein, the term "**Hazardous Substances**" shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)     As used herein, the term "**Environmental Notice**" shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other written communication from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property in violation or potential violation of Environmental Laws; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)     As used herein, the term "**Releasing**" or "**Release**" shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)     As used herein, the term "**Compliance Costs**" shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including,

without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)      As used herein, the term "**Tenant Related Parties**" shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 <u>Compliance with Environmental Laws</u>. Tenant shall comply, and shall cause Tenant's Related Parties to comply, with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply, and shall cause the other tenants and occupants of the Shopping Center to comply, with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter "**Tenant Releases**"), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties which has not been remediated in accordance with Environmental Laws; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, which has not been cured in accordance with applicable Legal Requirements; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties in violation of Environmental Laws; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5   Intentionally Omitted

**ARTICLE 13
USES AND RESTRICTIONS**

Section 13.1   <u>Permitted and Prohibited Uses</u>.

13.1.1 <u>Tenant's Permitted Use</u>.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 <u>Prohibited Uses</u>.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a shopping center comparable to other comparable shopping centers in the State of Vermont.  Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or any land (the "***Related Land***") contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned or controlled by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center or the Related Land existing as of the Effective Date) for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall not apply to any business existing on any Related Land owned or controlled by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the time it became Landlord hereunder, already owned or controlled such Related Land (excluding, however, the Landlord originally named herein and its Affiliates).  Said contiguous or adjacent land shall constitute Related Land hereunder only during periods when it is owned or leased by Landlord or its Affiliate(s).

Section 13.2   <u>Tenant's Exclusive in Center</u>.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land (defined in Subsection 13.1.2 above) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware, soaps and cleaners); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the "***Exclusive Items***").  Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.]  Existing tenants of the Shopping Center and any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord and any such tenant requires Landlord's consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items and Landlord has the right to consent in its sole discretion or otherwise has the right to so condition its consent under such existing leases; or (ii) Landlord permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.  Such contiguous or adjacent land shall constitute Related Land hereunder only during periods when it is owned or leased by Landlord or its Affiliate(s).  In

1    addition, the Existing Lease with Michaels shall be subject to the restrictions contained in this
2    Section 13.2.1 subject to the terms of the letter attached hereto as Exhibit K-3.

3        13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to
4    one full-line national or regional: (i) department store [for example, Wal-Mart, Macy's, or Target],
5    (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home
6    improvement center [for example, Home Depot or Lowe's], commonly located in first-class
7    shopping centers in the state in which the Shopping Center is located, occupying at least 75,000
8    square feet of Floor Area within the Shopping Center, as such stores are currently operated (as
9    of the Effective Date).

10        13.2.3  The exclusive rights granted to Tenant with respect to any respective
11    category listed in Subsection 13.2.1 above shall be conditioned upon Tenant using portions of
12    the Premises for the sale, rental or distribution of items contained in such category (other than
13    during "Excused Periods" [defined in Section 1.1.9 above] and during other periods of time not
14    exceeding twelve (12) consecutive months) and such exclusive rights shall, following notice
15    from Landlord to Tenant, terminate and be of no further force or effect with respect to any
16    "category" of merchandise (i.e. any one of the categories listed respectively as (a)-(f) in the
17    foregoing Section 13.2.1) within which no items are sold, rented or distributed within the
18    Premises for said period of twelve (12) consecutive months, provided that any exclusive use
19    which Tenant honors must be subject to the same restrictions (i.e. that the beneficiary of the
20    exclusive will lose the exclusive, as it relates to a category of exclusive items, as applicable, if
21    the beneficiary does not use its premises for the exclusive use for the sale of the categories of
22    exclusive items in question).  The exclusive rights granted to Tenant in this Section 13.2 shall
23    inure to the benefit of any assignee of Tenant's interest in this Lease.

24        13.2.4  (a)    Upon breach of the aforesaid covenant and agreement by
25    Landlord (which breach shall not include a situation in which the lease between Landlord and
26    any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from
27    violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition,
28    such tenant violates such exclusive rights, unless Landlord fails to comply with any of the
29    provisions of Subsection (b) below), the Rent payable hereunder shall be reduced by fifty
30    percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies
31    given to it at law and in equity, including, without limitation, the right to obtain injunctive relief,
32    and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord
33    or any other violator for damages.

34            (b)    If any person or entity other than Landlord shall violate any of the
35    exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to
36    violate any of said provisions, Landlord shall promptly commence appropriate legal
37    proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If
38    Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously
39    prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal
40    proceedings (including, without limitation, an action for injunctive relief) in its own name, at
41    Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be
42    exercised under applicable Legal Requirements, to conduct and prosecute such legal
43    proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with
44    Tenant with respect to such prosecution (including, without limitation, by executing any
45    documentation or authorization reasonably required by Tenant in connection with such
46    prosecution and by appearing at any hearing or trial with respect to such prosecution).  If, any
47    such proceeding against an existing tenant of the Shopping Center, such tenant counter claims
48    against Landlord and/or Tenant that the rights granted to Tenant under this Section 13.2 violate
49    anti-trust laws, Tenant shall indemnify and defend Landlord against any damages or liabilities
50    incurred by Landlord as a result of such claim.

51        Section 13.3    Exclusives Which Tenant Must Honor.

52        13.3.1  Tenant shall honor the exclusives granted by Landlord to certain other
53    tenants in the Shopping Center pursuant to the terms of leases which have been executed prior
54    to the Effective Date (hereinafter, "**Existing Exclusives**") [a true and complete listing and
55    description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not
56    sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the
57    Premises to be occupied or used in violation of any such Existing Exclusive.  Landlord
58    represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1
59    hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend
60    and hold Tenant harmless from and against all loss, cost, liability or expense (including, without
61    limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any
62    person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, Tenant shall

be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises. As of the date of this Lease, Tenant has entered into such a separate agreement with Michaels, a copy of which is attached hereto as Exhibit K-3.

13.3.2  Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

## ARTICLE 14
## CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day.  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the two hundred fortieth (240th) day after the date on which said 365-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the "**Recapture Date**") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1  Assignment and Subletting.

15.1.1  Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease. Notwithstanding the foregoing, Tenant will not sublease the Premises to a subtenant whose primary use violates an Existing Exclusive.

15.1.2  Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or to sublet all or substantially all of the Premises, it shall first give notice thereof (the "**Transfer Notice**") to Landlord, which notice shall specify the name and address of the proposed transferee and the proposed use of the Premises to be made by such transferee.  Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice to Tenant (the "**Termination Notice**") thereof within thirty (30) days after receipt of an Transfer Notice from Tenant, in which event this Lease shall automatically terminate on the ninetieth (90th) day (the "**Termination Date**") after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease.  Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to

Landlord (the "**Rescission Notice**"), within ten (10) days after receiving the Termination Notice, of its rescission of the Transfer Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Transfer Notice.  If Landlord does not give the Termination Notice within the aforesaid 30-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire, or substantially all of the, Premises in accordance with its Transfer Notice.

15.1.3  In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises:  (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates;  (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the State of Vermont, and/or (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s).

Section 15.2    Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the "**Original Tenant**") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term "**Major Assignee**" or "**Major Guarantor**", as the case may be, shall mean a person or entity which has, as of the day after the effective date of such assignment, a net worth of at least One Hundred Fifty Million Dollars ($150,000,000) in constant U.S. Dollars.  Tenant shall provide Landlord with certified financial statements of any Major Assignee or Major Guarantor.

Section 15.3    Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used in this Section 15.3., "**Lender**" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4    Cure Rights of Original Tenant.

15.4.1  If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant in accordance with Article 18, and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  If this Lease is terminated because of:  (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord ("**New Lease**"), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise) with respect to such cured Event of Default.  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such

New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5   Recognition Agreement.  In the event Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form, provided that (a) such sublet space shall (i) be cut front to back, have its own front entrance and direct access to the loading area, (ii) have a minimum of eight thousand (8,000) square feet of Floor Area, (iii) have a minimum of forty feet (40') of store frontage and (iv) be separately sub-metered for utilities; (b) in the event this Lease terminates, the fixed rent and additional rent payable under such recognized sublease shall be, for the then remainder of the term of the Sublease, an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under this Lease, prorated on the basis of the ratio which the Floor Area of the subleased premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under such sublease); (c) the use(s) permitted under such sublease are permitted under this Lease and, so long as the Shopping Center remains a first class regional retail center, are otherwise reasonably consistent with uses in a first class regional retail center; (d) to the extent there are any variations between this Lease and any such sublease, the terms of this Lease shall control to the extent that the subtenant under the sublease shall have no greater rights or lesser obligations on a pro-rata basis under the sublease than the Tenant under this Lease; (e) the subtenant at the time of the sublease shall have a net worth equal to (or whose sublease is guaranteed by a person or entity having a net worth equal to) fifty (50) times annual fixed rent and additional rent payable on the sublease space as if the rent per square foot of such space were at the same rate as payable under this Lease; and (f) such subtenant shall not be an existing tenant of the Shopping Center at the time the sublease is executed nor a tenant with whom Landlord is then negotiating for space within the Shopping Center.

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1   Tenant Default.

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent; or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion); or (iii) Tenant shall voluntarily make an assignment for the benefit of creditors, file or consent in writing to a petition in any court (whether pursuant to any state statute or federal bankruptcy statute) in any bankruptcy, reorganization or insolvency proceeding or make an application in any proceeding for, or consent in writing to, the appointment of a trustee or receiver for Tenant or for all or substantially all of its assets; or (iv) if any petition shall be filed against Tenant in any state or federal court in bankruptcy, reorganization or insolvency proceedings to which Tenant has not consented in writing, and said proceedings shall not be dismissed, discontinued or vacated within ninety (90) days; or (v) if in any proceeding, pursuant to the application of any person other than Tenant to which Tenant does not consent in writing, a receiver or trustee shall be appointed for Tenant or for all or substantially all of Tenant's property and such appointment is not set aside within ninety (90) days after such appointment; such circumstance shall constitute an "***Event of Default***".

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a) to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b) without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date incurred until payment; and/or

(c) upon not less than five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d) upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring one or more actions to collect amounts due from Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees and expenses.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use all commercially reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

16.1.6 No delay or omission by Landlord in exercising a right or remedy shall exhaust or impair its exercise or constitute a waiver of, or acquiescence to, a continuing Event of Default. No waiver of an Event of Default shall extend to or affect any other Event of Default or impair any right or remedy with respect to any other Event of Default. No action or inaction by Landlord shall constitute a waiver of any Event of Default (absent a written waiver of such event of default by Landlord).

16.1.7 Tenant expressly waives (to the extent legally permissible), for itself and all persons claiming by, through or under Tenant, any right of redemption currently available to Tenant under the laws of the State of Vermont.

Section 16.2    Landlord Default

16.2.1 If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion); or (ii) materially breach any warranty or representation under this Lease (provided that if such

breach of a warranty or representation is susceptible of being cured, Landlord shall have a reasonable period of time (not to exceed thirty (30) days) to cure such breach before such breach becomes a Landlord's Default) (either of (i) or (ii) above being hereinafter referred to as a "**Landlord's Default**"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)     as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)     offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)     may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, Tenant may, at its election, and with such notice as is reasonably practicable under the circumstances (which notice may be oral), exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord. Any election by Tenant to offset amounts owed to Tenant by Landlord shall be at Tenant's sole election and shall not preclude Tenant from commencing and pursuing an action against Landlord for funds remaining unpaid or uncredited in the event the Term expires prior to Tenant receiving full credit by offset or otherwise.

16.2.2 Notwithstanding the foregoing, in each case in this Lease where Tenant has a right of offset under this Lease, including, but not limited to, Section 16.2.1 (c) above, Tenant may offset against forty percent (40%) of each successive installment of Fixed Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably and actually expended by Tenant performing such repairs or work, including costs and attorneys' fees, together with interest thereon at the Lease Interest Rate (it being agreed that (x) Tenant shall, as applicable, be entitled to offset against larger percentages of each successive installment of Fixed Rent if the aforesaid forty percent (40%) offset is insufficient to reimburse Tenant in full, taking into account the then remaining number of installments of Fixed Rent due and payable by Tenant hereunder, and (y) the reference in this paragraph to forty percent (40%) shall be increased to one hundred percent (100%) with respect to offsets pertaining to Tenant's performance of Landlord's Work and Tenant's performance of the restoration pursuant to Article 11 hereof (subject, as applicable, to Tenants actual receipt of insurance proceeds which would otherwise be payable to Landlord or Landlord's mortgagee, in the manner described in said Article 11)).

Section 16.3   <u>Arbitration</u>. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Rutland, Vermont, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The arbitrator shall be a commercial real estate attorney actively engaged in the practice of law in the state of Vermont for at least the five (5) years preceding the arbitration. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or

1    the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of
2    said costs, expenses and fees to the other party.  Judgment upon the arbitration award may be
3    entered in any court having jurisdiction.

4                                                **ARTICLE 17**
5              **RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE**

6              Section 17.1    Right to Mortgage and Non-Disturbance.  Landlord reserves the right to
7    subject and subordinate this Lease at all times to any mortgage or deed of trust for the benefit of
8    any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as
9    well as to any future ground or underlying leases encumbering or affecting all or any part of the
10   Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to
11   Tenant a recordable subordination, non-disturbance and attornment agreement in substantially
12   the form attached as Exhibit G hereto, provided that if such Mortgagee is not the type of
13   Mortgagee described in subparagraph (i) of Subsection 1.1.23, such agreement shall be in the
14   form of Exhibit G hereto without modification, and (b) any Ground Lessor shall execute (and
15   shall obtain the written consent of any holder of any mortgage, deed of trust or any other
16   existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable)
17   and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to
18   Tenant and such Ground Lessor, which shall include the following provisions: (i) as long as no
19   Event of Default has occurred and is continuing, the Ground Lessor will not, in the exercise of
20   any of the rights arising or which may arise out of such lease, disturb or deprive Tenant  in or of
21   its possession or its rights to possession of the Premises or of any right or privilege granted to
22   or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the
23   ground or underlying lease, Tenant will not be made a party in any removal or eviction action or
24   proceeding (unless required by applicable laws), nor shall Tenant be evicted or removed of its
25   possession or its right of possession of the Premises, and this Lease shall continue in full force
26   and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the
27   Term and on the same terms and conditions as contained herein, without the necessity of
28   executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any
29   amendment to this Lease which is specifically required hereunder and the Ground Lessor shall
30   recognize and be bound thereto.

31             Section 17.2    Estoppel Certificate.  Upon written request of Landlord or Tenant, the
32   other party, within twenty (20) days of the date of such request, shall execute and deliver to and
33   only for the benefit of the requesting party or any Mortgagee, bona fide prospective purchaser,
34   assignee, or sublessee of the requesting party, without charge, a written statement:  (1) ratifying
35   this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and
36   effect, if such is the case, and has not been modified, assigned, supplemented or amended,
37   except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and
38   Additional Rent have been paid; (4) stating whether or not, to Tenant's actual, knowledge,
39   Landlord is in default and, if so, stating the nature of such default, (5) stating the Rent
40   Commencement Date; (6) stating which options to extend the Lease Term have been exercised,
41   if any; and (7) such other factual information relating to this Lease as is reasonably requested.
42   Each request for a written statement pursuant to this Section 17.2 made within twelve (12)
43   months of an earlier request for such a written statement shall be accompanied by a payment,
44   from the requesting party to the other party, in the amount of Five Hundred Dollars ($500)
45   (increased by Fifty Dollars ($50) on each date that the Fixed Rent increases pursuant to
46   Subsection 1.1.11 hereof).

47             Section 17.3    Existing Mortgages.  If a mortgage, deed of trust, or other security
48   instrument encumbers the Shopping Center or any part thereof on the Effective Date, then
49   within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable
50   form:  (x) a subordination, non-disturbance and attornment agreement substantially in the form
51   attached hereto as Exhibit G, in recordable form, executed by each and every holder of any
52   mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center
53   or any portion thereof, and (y) a fee owner recognition agreement in the form and content
54   described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground
55   Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or
56   other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within
57   said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to
58   the date on which such instrument(s) are delivered, to terminate this Lease, in which event,
59   neither party shall have any further liability hereunder except for those obligations that survive
60   the expiration or other termination of this Lease pursuant to the express terms of this Lease.
61   Tenant acknowledges that Landlord has entered into an assignment of its leases and rents with
62   respect to the Shopping Center to First Vermont Bank and Trust Company, now known as T.D.

1    Banknorth, N.A. (**"Bank"**), dated March 15, 1999, which assignment was given by Landlord to
2    Bank as security for a loan.  Tenant hereby consents to the assignment of this Lease to Bank
3    and acknowledges that, under the assignment of leases and rents, Landlord is entitled to collect
4    all rents under the Lease unless Bank notifies Tenant, in writing, that rents are payable to Bank.
5    If Tenant receives such a written notice from Bank to pay all rents directly to Bank, Tenant shall
6    pay all rents directly to Bank until Tenant receives different direction from Bank or a court of
7    competent jurisdiction.  This provision shall terminate and be of no force and effect from and
8    after the repayment in full of Landlord's loan with Bank, Landlord agreeing to provide evidence
9    of the discharge of such loan to Tenant.  Landlord hereby agrees that any payments made by
10   Tenant to Bank as provided herein shall be deemed in satisfaction of Tenant's obligations under
11   the Lease as if the same had been paid to Landlord directly, and Tenant shall never be deemed
12   to be in default by reason of making any payments to Bank rather than Landlord pursuant to this
13   paragraph and/or any subordination, non-disturbance and attornment agreement entered into
14   between Bank and Tenant.

15                                        **ARTICLE 18**
16                                          **NOTICE**

17   Subject to the further provisions of this Article 18, whenever it is provided herein that any notice,
18   demand, request, consent, approval or other communication ("**Notice**") shall or may be given to
19   either of the parties by the other, it shall be in writing and, any Legal Requirement to the
20   contrary notwithstanding, shall not be effective for any purpose unless same shall be given by
21   any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at
22   Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to
23   Tenant also given to:  Allan N. Rauch, Esquire, c/o Bed Bath & Beyond Inc., 650 Liberty
24   Avenue, Union, New Jersey 07083, and Bart I. Mellits, Esquire, Ballard Spahr Andrews &
25   Ingersoll, LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103-7599 , or to
26   such other person or other address as may, from time to time, be specified by either party in a
27   written notice to the other party.  All notices given in accordance with the provisions of this
28   Section shall be effective upon receipt or refusal of receipt, at the address of the addressee or
29   upon attempted delivery at the last address of the addressee of which the party giving notice
30   has notice if the addressee no longer is resident at such address.  Notwithstanding the
31   foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease
32   Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and
33   related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3
34   of this Lease, and (B) all budgetary information, notices (but not notices of default), statements,
35   bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges
36   as described in Section 5.1 of this Lease.

37                                        **ARTICLE 19**
38                                   **TENANT'S PROPERTY**

39          All of Tenant's Property which may be installed or placed in or upon the Premises by
40   Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber,
41   mortgage or create a security interest in or upon Tenant's Property in the Premises without the
42   consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord
43   waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or
44   security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord
45   hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to
46   Tenant, within twenty (20) days after Tenant's request therefor, a written waiver in form
47   reasonably satisfactory to Landlord and Tenant evidencing Landlord's waiver of any rights it has
48   or may have in Tenant's Property.

49                                        **ARTICLE 20**
50                                       **END OF TERM**

51          Section 20.1   Surrender of Premises.  At the expiration of the Term, Tenant will quit and
52   surrender the Premises broom clean and in good working condition and repair, excepting,
53   however, reasonable wear and tear, damage by fire or other casualty, damage by eminent
54   domain, and repairs and replacements to be made by Landlord hereunder.

55          Section 20.2   Hold Over.  If Tenant fails to deliver possession of the Premises to
56   Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for

Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty percent (150%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
## INTENTIONALLY OMITTED

## ARTICLE 22
## ONGOING CO-TENANCY

If, at any time during the Term, there are not at least two (2) Qualifying Retailers (hereinafter defined) (excluding Tenant) open for business each in at least 20,000 square feet of Floor Area in the Shopping Center (such condition being hereinafter referred to as an "*Excess Vacancy*"), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  The term *"Qualifying Retailers"* as used in this Article 22 shall mean retailers operating at least ten (10) stores in the northeastern United States.  If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy described in clause (b) above worsens; and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

## ARTICLE 23
## MISCELLANEOUS

Section 23.1   Loading Facilities.  Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day," "365 days a year" basis.

Section 23.2   Liens.  Within twenty (20) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within twenty (20) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3   Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Atlantic Retail Properties (the "*Broker*").  Landlord shall pay the Broker a commission  pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4   Force Majeure.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, terrorism, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity),

or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as "**Force Majeure**"), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of Force Majeure.

Section 23.5    Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6    Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7    Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8    Survival of Obligations. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9    Non-Waiver. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10    Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11    Definition of Landlord. The term "**Landlord**" shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12    Successors and Assigns. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13    Limitation of Landlord's Liability. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Common Areas, Tenant shall look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy,

execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 <u>Limitation of Tenant's Liability</u>. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc</u>. Unless the context clearly indicates to the contrary, the words "***herein***," "***hereof***," "***hereunder***," "***hereafter***," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 <u>Short Form Lease</u>. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request. In no event shall the amount of Rent reserved hereunder be included in any such short form lease or memorandum. In addition, if there shall be Related Land in existence as of the Delivery Date or thereafter during the Term, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land.

Section 23.21 <u>Entire Agreement and Modification</u>. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 <u>No Joint Venture or Partnership Created by Lease</u>. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 <u>Tenant's Tradename</u>. Landlord shall not make use of Tenant's tradename [i.e., "Bed Bath & Beyond"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion, provided that Landlord may use Tenant's then-current logo to designate the Premises on site plans.

Section 23.24 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 <u>Waiver of Trial by Jury</u>. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26 <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

*{Remainder of page intentionally blank.}*

1        IN WITNESS WHEREOF, the parties have executed this instrument under seal the day
2   and year first-above written.

3

**LANDLORD:**

WITNESS:                              CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP

                                      By:    Chase Green Mountain, Inc.
                                             a Vermont corporation, its general partner

                                             By: _____
[SEAL]                                       Name: _Cheryl A. Chase_____
                                             Title: _Exec. Vice President_____

**TENANT:**

WITNESS:                              BED BATH & BEYOND INC., a New York corporation

                                      By: _____
                                             Warren Eisenberg
                                             Co-Chairman
[SEAL]

## INDEX OF EXHIBITS

Exhibit A -    Legal Description of Shopping Center

Exhibit B -    Site Plan

Exhibit C -    Rent Commencement and Expiration Date Agreement

Exhibit D -    Specifications for Landlord's Work

Exhibit D-1    Exterior Elevations of the Premises, and Sidewalk Plan

Exhibit D-2    Exterior Elevations of the Shopping Center

Exhibit E -    Permitted Encumbrances

Exhibit F -    Signage

Exhibit G -    Form of Subordination, Non-Disturbance and Attornment Agreement

Exhibit H -    Form of Subtenant Recognition and Attornment Agreement

Exhibit I -    Form of Delivery Date Notice

Exhibit J -    Form of Delivery Date Certification

Exhibit K-1    Existing Exclusives

Exhibit K-2    Existing Leases

Exhibit K-3    Treaty Letter with Michaels

Exhibit L    Alternate Rent

Exhibit M    Prohibited Uses

**EXHIBIT A**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

Beginning at a point on the westerly side of Holiday Drive, also known as Route 7 Frontage Road, so-called, and on the northerly side of Farrell Road, so-called, which point marks the southeasterly corner of the within described lands and premises;

THENCE from said point of beginning and in and along the northerly side of Farrell Road, so-called, the following six (6) courses:

1. North 83° 14' 03" West a distance of 236.77 feet to a ¾" iron pin;
2. North 83° 14' 03" West a distance of 49.28 feet to a ¾" iron pin;
3. North 83° 03' 12" West a distance of 235.76 feet to an ¾ iron pin;
4. Along a curve, heading westerly and northerly, with a radius of 470.02 feet with a length of 124.87 feet to an iron pin;
5. North 67° 49' 53" West a distance of 213.25 feet to a ¾" iron pin;
6. Along a curve, heading westerly and northerly, with a radius of 189.89 feet with a length of 75.42 feet to an iron pin marking the southeast corner of lands now or formerly belonging to Farrell Realty Partners and the southwest corner of the within described lands and premises;

THENCE along the easterly side of lands now or formerly belonging to Farrell Realty Partners and in and along the westerly line of the within described lands and premises the following four (4) courses:

1. North 06° 55' 56" East a distance of 62.84 feet to a 1" iron pin;
2. North 06° 44' 54" East a distance of 126.23 feet to an iron pin;
3. North 06° 44' 54" East a distance of 227.88 feet to an iron pin;
4. North 06° 44' 10" East a distance of 488.73 feet to a ¾" iron pin set in the southerly line of lands now or formerly belonging to Randbury Commercial Condominium and the northwest corner of the within described lands and premises;

THENCE South 83° 12' 05" East a distance of 849.99 feet in and along the southerly line of lands of said Randbury Commercial Condominium and lands now or formerly belonging to Kinney Motors, Ltd. to a 1" iron pipe marking a northeast corner of the within described lands and premises and the northwest corner of lands now or formerly belonging to Barbara and Paul Hood;

THENCE South 06° 45' 11" West a distance of 224.98 feet in and along the westerly line of lands of said Hood to a 1 ¼" iron pin marking the southwest corner of lands of said Hood;

THENCE South 83° 15' 00" East a distance of 170.67 feet in and along the southerly line of lands of said Hood to a ¾" iron pin;

THENCE South 83° 15' 00" East a distance of 2.61 feet in and along the southerly line of lands of said Hood to an iron pin set in the westerly line of U.S. Route 7 and marking the southeast corner of lands of said Hood and a northeast corner of the within described lands and premises;

THENCE South 10° 34' 33" West a distance of 20.28 feet in and along the westerly side of U.S. Route 7 and the easterly line of the within described lands and premises to a concrete highway bound;

THENCE South 07° 24' 52" West a distance of 197.44 feet in and along the westerly side of U.S. Route 7 and the easterly line of the within described lands and premises to an iron pin;

THENCE South 17° 30' 19" West a distance of 81.60 feet in and along the easterly line of the within described lands and premises to an iron pin;

THENCE South 04° 20' 10" West a distance of 142.20 feet in and along the easterly line of the within described lands and premises to a ¾" iron pin marking a southeast corner of the within described lands and premises;

THENCE North 83° 15' 06" West a distance of 98.00 feet in and along a southerly line of the within described lands and premises and the northerly line of lands and premises of the Town of Rutland containing the northern terminus of Holiday Drive, also known as Route 7 Frontage Road, so-called, to an in-corner of the within described lands and premises;

THENCE South 06° 05' 37" West a distance of 175.01 feet in and along lands of said Town of Rutland and the easterly line of the within described lands and premises to a concrete highway bound;

THENCE South 06° 45' 00" West a distance of 2.24 feet in and along lands of said Town of Rutland and the easterly line of the within described lands and premises to a 1" iron pin;

THENCE South 06° 45' 57" West a distance of 148.27 feet in and along lands of said Town of Rutland and the easterly line of the within described lands and premises to a concrete highway bound;

THENCE South 01° 13' 28" East a distance of 23.07 feet in and along lands of said Town of Rutland and the easterly line of the within described lands and premises to the point and place of beginning.

The premises described hereby are the same as those depicted on a survey entitled "Survey of Lands Standing in the Name of Chase Green Mountain Limited Partnership, U.S. Route 7, Rutland Town, Vermont", dated 06/30/05 and prepared by Spencer Engineering, Inc., Drawing No. C05-11A.

1                                    **EXHIBIT B**

2                                    **SITE PLAN**

**EXHIBIT C**

**RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT**

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 200___, by and between CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

**W I T N E S S E T H :**

WHEREAS, Landlord is the owner of a certain shopping center known as Green Mountain Plaza (the *"Shopping Center"*), situated in Rutland, Vermont and

WHEREAS, by that certain lease dated _____, 2002 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant; and

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____, 200___.

2.    The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.    The date of commencement of the **fourth Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

1        IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement
2  and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

WITNESS:                     CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP

By:    Chase Green Mountain, Inc.
        a Vermont corporation, its general partner

_____

                  By:   _____
[SEAL]               Name: _____
                  Title:  _____

**TENANT:**

WITNESS:                     BED BATH & BEYOND INC., a New York corporation

By:   _____

_____

                     Warren Eisenberg
                     Co-Chairman

[SEAL]

1                                                **EXHIBIT D**

2                                **SPECIFICATIONS FOR LANDLORD'S WORK**

*Rutland, VT*

### Exhibit D - Standard Landlord's Work

11/11/05

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of the Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

#### Landlord's Final Plans and Specifications

Landlord shall provide one (1) complete full size set, one (1) complete ½ size set and one (1) copy of electronic file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.    Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5).  Tenant's Plans are project-specific design-development documents.  In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail.  Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.    Tenant's Prototype Drawings and Specifications entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2005, dated 03-01-05 developed by Casco Architects, comprise the following drawings and specifications:

All site specific plans and specifications developed by Landlord and submitted to Tenant for review and approval must be in the same Format as Tenant's Prototypical Plans and Specifications as outlined within Item C. below of this Exhibit unless otherwise authorized in writing by Tenant.

Tenant shall not be obligated to review nor approve improperly formatted Landlord's Plans and/or specifications, nor shall said submission be deemed to be in compliance with Section 3.2 "Plan Approvals" of the Lease, unless said Format is complied with.

Tenant reserves the right to immediately disapprove and return improperly formatted plans to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the plans and/or specifications to Tenant for re-review and approval.

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | Prototype Version 1.2005 | 03/01/05 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2005 | 03/01/05 |
| A1.1 | Site Details | Prototype Version 1.2005 | 03/01/05 |
| A1.2 | Demolition Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.1 | Store Fixture/Egress Path  Plan & Notes | Prototype Version 1.2005 | 03/01/05 |
| A2.2 | Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.3 | Floor Finish Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2005 | 03/01/05 |
| A2.5 | Roof Plan Details & Notes | Prototype Version 1.2005 | 03/01/05 |
| A3.1 | Finish Schedule, Storefront Types & Vestibule Elevations | Prototype Version 1.2005 | 03/01/05 |
| A3.2 | Door Hardware, Door Schedule & Door Types | Prototype Version 1.2005 | 03/01/05 |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/Distribution Schedule | Prototype Version 1.2005 | 03/01/05 |
| A4.1 | Exterior Elevations | Prototype Version 1.2005 | 03/01/05 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.5 | Interior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.6 | *Alternate* Scissor Lift Plan, Section, Specification & Notes | Prototype Version 1.2005 | 03/01/05 |
| A6.1 | Exterior Details | Prototype Version 1.2005 | 03/01/05 |
| A6.2 | Interior & Exterior Details | Prototype Version 1.2005 | 03/01/05 |
| A6.3 | Slatwall Details at Storefront | Prototype Version 1.2005 | 03/01/05 |
| A7.1 | Large Scale Plans & Partition Types | Prototype Version 1.2005 | 03/01/05 |
| A7.2 | Large Scale Plans & Partition Types | Prototype Version 1.2005 | 03/01/05 |
| A7.2a | *Alternate* Large Scale Plans & Partition Types (38k SF | Prototype Version 1.2005 | 03/01/05 |

1

| | Building) | | |
|---|---|---|---|
| A8.1 | Interior Details | Prototype Version 1.2005 | 03/01/05 |
| A8.2 | Interior Details | Prototype Version 1.2005 | 03/01/05 |
| A8.3 | Customer Service Desk | Prototype Version 1.2005 | 03/01/05 |
| A8.4 | Register Bays | Prototype Version 1.2005 | 03/01/05 |
| A8.5 | Remote Service Desks | Prototype Version 1.2005 | 03/01/05 |
| A9.1 | Interior Elevations | Prototype Version 1.2005 | 03/01/05 |
| A9.1a | *Alternate* Interior Elevations (38K SF Building) | Prototype Version 1.2005 | 03/01/05 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | Prototype Version 1.2005 | 03/01/05 |
| A9.4a | *Alternate* FTG Fixture Plan & Vendor Responsibility Schedule (Corner) | Prototype Version 1.2005 | 03/01/05 |
| A9.4b | *Alternate* FTG Fixture Plan & Vendor Responsibility Schedule (Freestanding w/o Bulkhead) | Prototype Version 1.2005 | 03/01/05 |
| A9.5 | FTG Plans, Wall Sections & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.5a | *Alternate* FTG Plans, Wall Sections & Details (Corner) | Prototype Version 1.2005 | 03/01/05 |
| A.9.6 | *Alternate* Awning Details | Prototype Version 1.2005 | 03/01/05 |
| A9.7 | *Alternate* Awning Details | Prototype Version 1.2005 | 03/01/05 |
| A9.8 | *Alternate* Wall Sections at Awning | Prototype Version 1.2005 | 03/01/05 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2005 | 03/01/05 |
| S1.1 | Structural General Information & Typical Details | Prototype Version 1.2005 | 03/01/05 |
| S2.1 | Foundation Plan | Prototype Version 1.2005 | 03/01/05 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2005 | 03/01/05 |
| S3.1 | Foundation Details | Prototype Version 1.2005 | 03/01/05 |
| S3.2 | Roof Framing Details | Prototype Version 1.2005 | 03/01/05 |
| P1.1 | Plumbing Riser Diagrams and Fixture Schedule | Prototype Version 1.2005 | 03/01/05 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.0a | Base System Fire Alarm Plans, Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.1a | Base System Misc. Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2a | Base System Fire Alarm Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| FA1.0b | *Alternate* Fire Alarm Plans w/Occupant Notification Alarm | Prototype Version 1.2005 | 03/01/05 |
| FA1.1b | *Alternate* Fire Plans w/Occupant Notification Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2b | *Alternate* Fire Alarm Plans w/Occupant Notification Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| FA1.0c | *Alternate* Fire Alarm Plans w/Smoke Detection | Prototype Version 1.2005 | 03/01/05 |
| FA1.1c | *Alternate* Fire Alarm Plans w/Smoke Detection Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2c | *Alternate* Fire Alarm Plans w/Smoke Detection Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| M1.1 | Mechanical General Information | Prototype Version 1.2005 | 03/01/05 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2005 | 03/01/05 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2005 | 03/01/05 |
| E2.1 | Power Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.2 | Lighting Layout Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.3 | Lighting Circuiting Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.4 | Specialty Lighting Plans & Diagrams | Prototype Version 1.2005 | 03/01/05 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2005 | 03/01/05 |
| E3.3 | Electrical Details | Prototype Version 1.2005 | 03/01/05 |
| E4.1 | Electrical Schedules | Prototype Version 1.2005 | 03/01/05 |
| E4.2 | Electrical Diagrams | Prototype Version 1.2005 | 03/01/05 |
| E4.3 | Electrical Schedules | Prototype Version 1.2005 | 03/01/05 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2005 | 03/01/05 |
| E4.4a | *Alternate* Novar Wiring Details for RTU's Other Than Lennox | Prototype Version 1.2005 | 03/01/05 |
| E4.5 | ETM Details for Lennox RTU's | Prototype Version 1.2005 | 03/01/05 |

| | | | |
|---|---|---|---|
| E4.5a | *Alternate* ETM Wiring Details For Non-Lennox RTU's | Prototype Version 1.2005 | 03/01/05 |
| E5.1 | FTG Power, Lighting & Specialty Lighting | Prototype Version 1.2005 | 03/01/05 |
| E5.1a | *Alternate* FTG Power, Lighting Specialty Lighting (Corner) | Prototype Version 1.2005 | 03/01/05 |
| E5.1b | *Alternate* FTG Power, Lighting, Specialty Lighting (Freestanding w/o Bulkhead) | Prototype Version 1.2005 | 03/01/05 |
| E6.1 | *Bid Alternate:* Modular Wiring (Data Only) Plans & Details | Prototype Version 1.2005 | 03/01/05 |

Project Manual for Bed Bath & Beyond, dated March 01, 2005.

D.    Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements.  Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications:

1.    All architectural elevations and construction details for the pylon sign located in the Shopping Center.

2.    Civil engineering documents that indicate proposed grades and site utilities adjacent to tenant's premises.

### Site Specifications

A.    All parking areas and traffic drives in the Shopping Center shall consist of existing to remain and new asphalt surfaces, constructed in compliance with governmental and geotechnical requirements.  Grading of paved areas in front of premises shall not exceed a maximum slope of 3%.  Utilization of any portion of the parking field for above ground storm water retention/detention is not acceptable to Tenant.

B.    All truck access drives in the Shopping Center shall consist of existing to remain and new asphalt surfaces, constructed in compliance with governmental and geotechnical requirements.

C.    All truck ramps and dumpster pads shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 6" Portland cement concrete surface finish.  All truck ramps shall consist of #4 re-bars, 18" o/c. each direction, as referenced on drawing S2.1, dated 9/26/05, prepared by Hibbard & Rosa, Architects.  Recessed truck ramps shall not exceed slope of 5%.

If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

D.    The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be as per requirements of governing authorities.  Landlord has provided photometric site plan 1 of 3, dated 3/11/05, prepared by Lane Associates indicating these levels.  Landlord has included illumination from building-mounted wall packs when calculating the required foot-candle level.  Landlord shall provide low level security lighting per requirements of governing authorities that shall remain illuminated from dusk to dawn seven days a week.  If any other tenant obtains higher light levels in the parking field in front of their premises, than the landlord shall be obligated to increase levels in the parking field in front of tenant's premises, subject to governmental authorities.

### Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.    Clear Height - Building systems (plumbing & electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f.  All plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures.  Mechanical shall be designed at a minimum of 17'-6" a.f.f. to bottom of duct.  Maximum bottom of supply and return duct height shall not exceed 19'-0" a.f.f. Fire protection sprinkler piping (main and branch lines) shall be located at least 16'-6" a.f.f., sprinkler heads shall be located within 1" minimum and 6" maximum from the roof/floor deck. Bottom of all structural elements shall be located at least 18'-4" a.f.f. (with the following exceptions: underside of joists on column line 6 shall be 17'-10" a.f.f. rising ¼" per ft. toward front of store; underside of joists along column line 7- rear wall of receiving area- shall be 18'-1 1/2".)

B.    Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law.  Landlord shall be responsible for monitoring the fire alarm system up to 30 days after the Delivery Date.

LL shall issue complete fire alarm system submittal consisting of site specific drawings and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date.  The combined fixed cost to LL for fire alarm and fire protection review indicated in paragraph F below, is $550.00. Tenant is responsible for any additional expenses.

Mr. Will Smith
Code Consultants, INC.

3

Work:          (314) 991-2633
Fax:           (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

C.   1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4". Structural system shall be rated to accept 125 lb. per square foot of live load. If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab.

D.   Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads. System shall comply with NFPA 231-C and or NFPA13, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required.

E.   Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall be allowed to locate Fire Pump at location inside of Premises indicated on Exhibit B. Beyond the warranty period, Tenant shall maintain Fire Pump for the full term of the Lease without any cost to Landlord. Tenant shall, without any cost to Landlord and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.   LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date. The combined fixed cost to LL for fire protection and fire alarm review is indicated in paragraph B above. Tenant is responsible for any additional expenses

If required, LL may use consultants of his choice to assist with obtaining fire protection and high pile storage permits. If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then Tenant shall directly pay consultant for all time and materials.

G.   If fire-proofing of structural elements is required by governmental authorities, then Landlord shall use intumescent fire resistive coating, or comparable system approved by governmental authorities. All edges of application shall be neat, clean and straight. All edges of material to be parallel to structural element being treated.

H.   If elevator or lift is required by governmental authorities, Landlord shall complete and make operational all vertical transportation equipment (passenger and freight elevators, escalators, cart conveyors, etc.) a minimum of (2) two weeks in advance of Delivery. Landlord shall continuously operate such equipment in accordance with manufacturers recommendations during this (2) week period in order to allow equipment to properly "Burn-In" in order to identify and repair any potential mechanical deficiencies that may exist with the equipment prior to Delivery.

I.   Office Mezzanine- Landlord shall provide a ¾" APA rated Sturd-I-Floor subfloor on steel joists capable of bearing 80# live load. See drawing for requirements at store safe.

### Construction Coordination Requirements

A.   Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every four weeks thereafter until Landlord's Work is completed

B.   Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a bi-weekly (twice monthly) basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at BBB.2000photos@bedbath.com

### Building and Site Signs

A.   Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Size of signage to be as per governmental authorities. Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord required to execute purchase order with Tenant's specified vendor within 10 weeks prior to Delivery Date. If Landlord fails to execute purchase order within this time frame, then at Tenant's option, Tenant may execute purchase order with Tenant's specified vendor and deduct all costs from rent, (or , at Tenant's option , receive a credit against "Changes" under the lease). If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute purchase order.

B.   Not applicable

C.   Pylon/Monument/Directional Signs -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).

4

D.      Temporary Signs – if allowed by the governmental authorities, commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Tenant shall obtain approvals for, furnish, install and maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign near the site of the main entrance to the Shopping Center, bearing the phrase "Bed Bath & Beyond Coming Soon". Tenant shall secure banners. If Landlord has obtained approvals from governmental authorities for and installed other tenant's temporary signs, than Landlord shall be obligated to obtain approvals for and install Tenant's.

E.      Landlord shall have sign vendors provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval at least (12) weeks prior to delivery date.

## Permits and Approvals

A.      <u>Landlord is to assist tenant in securing (at tenant's cost) all permits required to allow Tenant to fixture, merchandise, and open for business to the public in the Premises</u>.

B.      Sprinkler system design shall allow Tenant to obtain and secure "high pile storage" permit, if required by governmental authorities.

## Construction Closeout

A.      Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Tenant's representative shall accompany Landlord's representative for a site walk-thru.

B.      If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraph A within the prescribed sixty (60) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within twenty (20) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

1

**EXHIBIT D-1**

2

**EXTERIOR ELEVATIONS OF PREMISES AND SIDEWALK PLAN**

3





EXHIBIT D-1
RUTLAND VT.
ELEVATION & SIDEWALK PLAN
FRONT ELEVATION
SIDEWALK PLAN
BED BATH & BEYOND
TILE-2, CHARCOAL COLOR NERO PORCELAIN / POLISHED 12"X12" (18" MIN. AROUND SIGN)
EIFS-3 STO-'COASTAL MIRAGE'
CMU-SP.2 SPLIT FACE BLOCK TO MATCH STO-'COASTAL MIRAGE'
EIFS-1 TYP. AT PIERS MATCH JANDRIS 540
6'-6"x26' BUILDING SIGN WHITE FACES, WHITE RETURNS
EIFS-2 STO: PLATEAU
ANODIZED ALUMINUM STOREFRONT
TENANT PROTOTYPE LIGHT SCONCE
TILE-1, CHARCOAL COLOR NERO PORCELAIN POLISHED 8"x8"
CMU-SP.2
MET. HOOD
EYEBOLTS FOR (2) TEMPORARY BANNERS - 5'X20' & 4X20'
EIFS-4 (ATTRIDEALS) STO-'GRAY FLANNEL'
EIFS-1 TO MATCH JANDRIS 540
BRICK-1 JANDRIS-540
109'-6" CL. INTERIOR DIMENSION
24'-9"
CART CORRAL
TRASH RECEPTACLE
CURB RAMP
38'-0" (M.O.)
34'-8"
31'-8"
25'-4"
18'-0"
0'-0"
EQ.
6'-8"
4'-8"
7'-4"
2'-8"

PROPOSED FRONT ELEVATION

PROPOSED FRONT ELEVATION

PROPOSED FRONT ELEVATION

PROPOSED PARTIAL FLOOR PLAN BED BATH & BEYOND AND DICK'S

SUPER STOP & SHOP

BEYOND

DICK'S

PROPOSED ELEVATIONS

HRA

A-1

ADDITIONS AND RENOVATIONS TO
GREEN MOUNTAIN PLAZA
U.S. ROUTE 7
RUTLAND, VT.

EXHIBIT D-2
SHOPPING CENTER
ELEVATION
RUTLAND, VT.

1                                                **EXHIBIT D-2**

2                            **<ins>EXTERIOR ELEVATIONS OF THE SHOPPING CENTER</ins>**

**EXHIBIT E**

**PERMITTED ENCUMBRANCES**

1. Mortgage from Chase Green Mountain Limited Partnership to T.D. BankNorth, N.A., successor in interest to First Vermont Bank and Trust Company dated March 16, 1995 and recorded in Book 82, page 376 of the Rutland Town Land Records, **subject to the provisions of Section 17.3 of the Lease.**

2. Assignment of Leases and Rents from Chase Green Mountain Limited Partnership to T.D. BankNorth, N.A., successor in interest to First Vermont Bank and Trust Company dated, March 16, 1995 and recorded in Book 82, page 387 of the Rutland Town Records, **subject to the provisions of Section 17.3 of the Lease.**

3. Sewer easement granted to Town of Rutland by Easement Deed dated January 8, 1990 and recorded in Book 61, page 76 of the Rutland Town Land Records.

4. Sewer easement granted to Town of Rutland by instrument dated October 17, 1988 and recorded in Book 55, page 526 of the Rutland Town Land Records.

5. Perpetual easements for municipal sewer lines granted to Town of Rutland by instrument dated October 17, 1988 and recorded in Book 55, page 529 of the Rutland Town Land Records.

6. Utility rights and easements granted to Central Vermont Public Services Corporation and New England Telephone and Telegraph Company by instruments dated and recorded in the Rutland Town Land Records as follows:

    a.  Dated August 3, 1994 and recorded in Book 81, page 43;
    b.  Dated May 23, 1985 and record in Book 43, page 491;
    c.  Dated June 28, 1978 and recorded in Book 27, Page 118;
    d.  Dated January 14, 1966 in Book 17, Page 603;
    e.  Dated May 1, 1952 and recorded in Book 11, Page 551;
    f.  Dated June 19, 1948 and recorded in Book 10, Page 592;
    g.  Dated September 23, 1965 and recorded in Book 16, Page 302;
    h.  Dated January 14, 1964 and recorded in Book 15, Page 337; and
    i.  Dated January 9, 1963 and recorded in Book 15, Page 29

7. Drainage and slope easements taken by the State of Vermont in Condemnation proceedings in Project No. Rutland U 019-3(12), dated December 15, 1976 and recorded at Book 24, Page 53 of the Rutland Town Land Records.

8. Slope easements taken by the State of Vermont in Condemnation proceedings in Project No. Clarend-Rutland AP 019-3(8) dated September 15, 1966 and recorded at Book 17 Page 119 of the Rutland Town Land Records.

9. Easement Deed from Chase Green Mountain Limited Partnership to E. Paul Hood and Barbara Hood dated July 5, 1995 and recorded in Book 83, Page 500 of the Rutland Town Land Records.

10. Conditions and reservations set forth in the Mutual Confirmation and Waiver between E. Paul Hood and Barbara S. Hood and Chase Green Mountain Limited Partnership dated July 5 and July 7, 1995 and recorded in Book 83, Page 492 and Book 83, Page 496 all of the Rutland Town Land Records.

11. 1R0678, dated September 10, 1990, recorded at Book 63, page 32 of Rutland Town Land Records, for construction and use of a 79,600 square foot addition to and renovation of existing Green Mountain Shopping Plaza on 18.2 acres west side of Route 7.

12. 1R0678-1, dated December 14, 1992, recorded at Book 72 page 352 of Rutland Town Land Records, to allow a retail tenant (Rite Aid) to have sign on the building facia which exceeds 30 inches in height.

13. 1R0678-2, dated May 11, 1993, recorded at Book 74 page 392 of Rutland Town Land Records, for extension of construction completion date on 39,000 square foot extension to October 15, 1994; the extension of construction completion of free standing stores on grass pads to October 15, 1994.

14.    1R0678-3, dated May 5, 1994, recorded at Book 79 page 442 of Rutland Town Land Records, for the construction of a 6,360 square foot (200 seat) restaurant.

15.    1R0678-4, dated May 19, 1994, recorded in Book 80, page 80 of Rutland Town Land Records, to extend construction date on 39,000 square foot easterly extension of Shopping Plaza to October 15, 1994; to extend construction completion deadline on Red Lobster restaurant building and second free standing building on grass from October 15, 1994 to October 15, 1995.

16.    1R0678-5, dated April 6, 1995, recorded at Book 82, page 503 of Rutland Town Land Records, for final exterior design of "Staples" addition, and addition of second left hand turn lane for traffic exiting the mall.

17.    1R0678-6, dated September 21, 1995, recorded at Book 84 page 381 of Rutland Town Land Records, for construction of a branch bank with five drive-thru lanes.

18.    1R0678-3A, dated January 28, 2003, recorded at Book 120 page 301 of Rutland Town Land Records, to allow raising of the 99 Restaurant sign from seven to thirteen feet.

19.    Rights and easements set forth in the deed from E. Paul Hood and Barbara S. Hood to Chase Green Mountain Limited Partnership dated July 7, 1995, and recorded at Book 83, page 487 of the Rutland Town Land Records.

20.    Sewer line easement granted by E. Paul Hood and Barbara S. Hood to the Town of Rutland dated September 20, 1989, recorded at Book 59 page 319 of the Rutland Town Land Records.

21.    Utility easement for the benefit of Central Vermont Public Service Corporation and/or New England Telephone and Telegraph Company dated April 30, 1991, recorded at Book 65 page 177 of the Rutland Town Land Records.

22.    DE-1-1798 dated August 2, 1994, recorded at Book 83 page 473 of the Rutland Town Land Records, for 2.5 acre parcel, portion of 29/274. (convey to Chase – 2.3 acre 83/487).

23.    DE-1-1799 dated August 2, 1994, recorded at Book 83 page 475 of the Rutland Town Land Records, for .72 acre parcel, portion of 29/274 (conveyed to Chase - .92 acre 134/439)

24.    Town of Rutland Subdivision Permit No. RT-110, dated October 25, 1990 as modified by Permit No. RT-149 dated March 20, 1995.

25.    Provisions of Lease between Chase Green Mountain Limited Partnership and Staples, Inc. dated February 23, 1995 and recorded in Book 82, Page 407 of the Rutland Town Land Records. **The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.**

26.    Provisions of Lease between Chase Green Mountain Limited Partnership and Vermont Federal Bank, FSB dated June 4, 1995 and recorded in Book 83, Page 219 of the Rutland Town Land Records. Lease was subsequently assigned to Merchant's Bank. **The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.**

**Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease; (ii) none of the foregoing will conflict with any right granted Tenant under this Lease; (iii) none of the foregoing will impose on Tenant any Obligation(s) in excess of those set forth in this Lease; (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises or from performing Tenant's Work; and (v) none of the foregoing will restrict or prevent Landlord from complying with its obligations under this Lease, including, but not limited to, Landlord's obligation to perform Landlord's Work.**

1

## EXHIBIT F

2

## **<u>TENANT'S SIGNAGE</u>**

3

4



THE INFORMATION CONTAINED IN THIS DRAWING IS THE SOLE PROPERTY OF COLLINS SIGNS. ANY REPRODUCTION IN PART OR WHOLE WITHOUT THE WRITTEN PERMISSION OF COLLINS SIGNS IS PROHIBITED.

| ECR | REV | REVISIONS | DATE | BY |
|-----|-----|-----------|------|-----|

26'-0"

3'-1 13/16"

6'-6"

2'-5 15/16"

**BED BATH &**

**BEYOND**

TUBESUPPORT W/PAD ON Z-BRACKET
.090 ALUM. BACK(s)-STAPLED
CONDUIT, CONN. AND STRAIN RELIEF
DISCONNECT SWITCH
STD. TRANSFORMER (60MA IN COLD WEATHER) (SEE ELECTRICAL SPECS)
.063 ALUM. RETURNS (SEE SPECS)
1" JEWELITE (SEE COLORS)
LEXAN FACE(s) (SEE COLORS)
15MM NEON 3" O.C. – TURNBACK W/ELECTRO-BITS BOOTS (SEE COLORS)
EQUIPMENT GROUND REQ'D
3/8" THREADED ROD OR LAG BOLT-AS REQ'D.
SILICONE BEAD AROUND INTERIOR SEAM
1/4"ø WEEP HOLES

WHIPS 12 FT.

**TYPICAL SELF-CONTAINED DETAIL**
SCALE: NTS

COLORS:
FACES:
(FACE COLOR TO BE DETERMINED BY LOCATION)
■ 3/16" 7328 WHITE PCB    □ 3/16" 2793 RED PCB
RETURNS:
OUTSIDE:
▨ WHITE    □ #313 DARK BRONZE    □•□ BLACK
INSIDE:
▨ PAINT WHITE
RETAINER:
1" TRIMCAP (COLOR TO MATCH RETURNS)

NOTES:
MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE TRIM AND FACE TO THE SIGN BODY. THE MAXIMUM SPACING SHALL NOT EXCEED 1'-6" AND NO FEWER THAN (4) FOUR SCREWS ARE TO BE USED PER FACE. SHELLAC IS TO BE APPLIED TO EACH COPPER WIRE TIE TO PREVENT LOOSENING OF THE WIRE TIE.
ALL SIGNAGE WILL BE U.L. LISTED AND CARRY U.L. LABELS.
**EQUIPMENT GROUND REQUIRED.
ACTUAL # OF CIRCUITS TO BE DETERMINED BY A LICENSED ELECTRICAL CONTRATOR.

ELECTRICAL SPECS:
□ RED NEON / 30mA TRANSFORMER(S)
AMPS: 32.65
# OF 20 AMP CIRCUITS (RECOMMENDED): 3
VOLTS: 120

□ WHITE NEON / 30mA TRANSFORMER(S)
AMPS: 35.5
# OF 20 AMP CIRCUITS (RECOMMENDED): 3
VOLTS: 120

▨ WHITE NEON / 60mA TRANSFORMER(S)
AMPS: 64.25
# OF 20 AMP CIRCUITS (RECOMMENDED): 5
VOLTS: 120

1 of 3

EXHIBIT F, RUTLAND, VT. BUILDING SIGN

**COLLINS SIGNS**
4255 MANOR FOLD RD
DOTHAN, AL 36302
PHONE: (334) 983-8005
FAX: (334) 982-1378

| | | |
|---|---|---|
| CUSTOMER | BED BATH & BEYOND | |
| CODE | PAGE LAYOUT PRESENTATION | |
| ITEM DESCRIPTION | 6'-6" X 26'-0" STACKED LAYOUT SELF-CONT. CHLL | |
| DRAWING APPROVED BY | | |
| PROGRAM APPROVED BY | LOCATION VARIOUS | DRAWN BY CUPPLES |
| PROTOTYPE BY | SCALE 1:32 | ENGINEER JOHNSON | ACCOUNT REPRESENTATIVE MURAKAMI |
| 1st RUN BY | SHEET 1 | BOXED SQ FT 169 | ITEM NUMBER |
| PRODUCTION BY | WIND LOAD (MPH) | EST WEIGHT (LBS) | BED12401 | REV - |

ITEM NUMBER: BED12401



PAINT EXISTING CORNICE.
COLOR: STO #10606 -
PLATEAU

EXISTING SIGN

**Green Mountain Plaza**

PAINT EXISTING MATERIAL.
COLOR: STO #10607 -
COASTAL MIRAGE

PAINT EXISTING FRAME.
COLOR: STO #10606 -
PLATEAU

WHITE LOGO - 1'-4" X 4'-0" APPROX
(1 TO 3 RATIO)

2" WHITE BORDER

PANEL SIZE: APPROX. 2'-3" X 4'-9"
LOGO TO FIT WITHIN CHARCOAL
BACKGROUND, 2" FROM EDGE OF BACKGR'D.

PAINT EXISTING SIGN PANEL
COLOR: STO #10607 - COASTAL MIRA

PAINT EXISTING FRAME.
COLOR: STO #10606 - PLATEAU

PAINT EXISTING MATERIAL.
COLOR: GRAY

WRAP EXISTING PIERS
WITH CULTURED BRICK.
COLOR: JANDRIS #250A
ALL EXPOSED SIDES

NOTE: ALL TENANT SIGNS PER
TENANT'S SPECIFICATION

NOTES:

1. TENANT'S GRAPHICS ON EACH FACE OF PYLON, FACE CLOSEST TO PARKING FIELD

2. BBBY PANEL- CHARCOAL VINYL BACKGROUND (MATCH PANTONE PROCESS BLACK 'C') ON WHITE ACRYLIC, WHITE LOGO. LOGO PROPORTION, 1 VERTICAL / 3 HORIZONTAL.

3. LANDLORD IS RESPONSIBLE FOR FURNISHING AND INSTALLING TENANT'S GRAPHICS, PYLON/MONUMENT STRUCTURE AND REQUIRED ELECTRICAL SERVICE.

4. FABRICATION OF GRAPHICS SHALL NOT PROCEED UNTIL BBBY PROVIDES E-FILE OF LOGO AND BBBY APPROVES INSTALLERS DESIGN.

5. DIMENSIONS INDICATED ARE APPROXIMATE AND NEED TO BE VERIFIED.

EXHIBIT F
2 OF 3
PYLON SIGNAGE
RUTLAND, VT.



**GRAND OPENING**

*(SIDE 1)*

4' x 20'
(VERSION 1)

**BED BATH & BEYOND**
**HIRING HOTLINE 1-877-JOBS-BBB**
**COMING SOON!**

*(SIDE 2)*

4'-0"

— 20'-0" —

TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

— 20'-0" —

**NOW HIRING**

*(SIDE 1)*

4' x 20'
(VERSION 2)

**NOW OPEN**

*(SIDE 2)*

TEMPORARY SIGN (BUILDING OR BBB HIRING TRAILER)



SILKSCREENED TYVEK
SHEET GRAPHIC (FURN. BY
BBB) SECURE TO 3/4"
CD-EXT PLYWD. W/ 1x2 PR.
TR. BATTENS ON REVERSE
SIDE, TYP. FOR 2 SIDES

PLAN VIEW
NOT TO SCALE

SIGN
SIDE

BACK OF
PLYWOOD

PREVAILING
WIND

45°

FIN. GR.

TEMPORARY CONSTRUCTION SIGN
AS SPEC'D (GI300)

COMPACTED CRUSHED STONE
AND CONC FTG.)

TEMPORARY SITE SIGNAGE

**why wait? shop online @**
**www.bedbathandbeyond.com**

— 20'-0" —

5'-0"

5' x 20'

TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT-D-1 FOR LOCATION ON BUILDING)

*(VERSION 1)*

**BED BATH &**
**BEYOND**
**NOW OPEN**

4'-8"

— 8'-8" —

*(VERSION 2)*

**BED BATH &**
**BEYOND**
**COMING SOON!**
**FOR HIRING INFORMATION CALL**
**877-JOBS-BBB**

4' x 8' - TYVEK
(2 banners of a single
version per box)

TEMPORARY SITE SIGNAGE

VINYL COLORS

PMS 187 RED

BLACK

(IF ALLOWED BY
GOVERNING AUTHORITIES)

3 OF 3
EXHIBIT F
RUTLAND, VT
TEMPORARY SIGNAGE

**EXHIBIT G**

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200___, by and between _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____(the **"Mortgagee"**) and Bed Bath & Beyond [of _____] Inc., a _____ corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the **"Tenant"**).

W I T N E S S E T H:

WHEREAS, Mortgagee is the holder of a mortgage (the **"Mortgage"**) covering a parcel of land owned by _____, a _____ [corporation], [limited] [general] [partnership] (the **"Landlord"**) together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the **"Shopping Center"** and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____(the **"Lease"**), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the **"Premises"**); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

_____

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and**]**

_____

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.**]**

_____

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.   Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)  Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)  The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)  All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.   If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)  Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)  Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)   liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)   subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)   subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)   bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)   bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that

the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)  Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.  Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.  Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.  Any notices of communications given under this Agreement shall be in writing and shall be given by any recognized overnight delivery service with proof of delivery slip, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and _____, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.  This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.  This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10. This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if the memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

1        IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination,
2   Non-Disturbance and Attornment Agreement as of the day and year first above written.

<div align="center"><strong><u>MORTGAGEE</u>:</strong></div>

ATTEST:

_____

[Corporate Seal]

_____    By:_____
(Assistant) Secretary    Name:_____
    Title:_____

**<u>TENANT</u>:**

ATTEST:    BED BATH & BEYOND INC.

[Corporate Seal]

_____    By:_____
(Assistant) Secretary        Warren Eisenberg
        Co-Chairman

**MORTGAGEE**

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )


On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.


_____

My Commission Expires:


_____

**EXHIBIT H**

**RECOGNITION AND ATTORNMENT AGREEMENT**

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200__, by and between CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP, a Vermont limited partnership, having an office at c/o Chase Enterprises, 225 Asylum Street, 29th Floor, Hartford, Connecticut 06103 ("**Landlord**"); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("**Tenant**"); and _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ ("**Subtenant**").

## R E C I T A L S:

A.     Landlord and Tenant have entered into a certain Lease Agreement (the "**Lease**") dated as of _____ __, 200__, a short form of which has been recorded in _____, which demises certain premises (the "**Premises**") located in the _____ Shopping Center, **[City]**, **[State]**, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.     Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years and satisfies the other requirements set forth in Section 15.5 of the Lease, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.     Pursuant to a Sublease dated as of _____ complying with the requirements of Section 15.5 of the Lease (the "**Sublease**"), Tenant has subleased **[a portion of]** the Premises to Subtenant (the "**Subleased Premises**").

D.     The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

(a)     Landlord warrants and represents as follows:

(1) that it is the fee owner of the Premises,

(2) that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(3) that the term of the Lease expires on _____, but is subject to four renewal periods of five years each and

(4) that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease except as follows:

_____

(b)     Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

(c)     Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

1                      (d)     Landlord shall not, in the exercise of any of the rights arising or
2   which may arise out of the Lease or of any instrument modifying or amending the same or
3   entered into in substitution or replacement thereof (whether as a result of Tenant's default or
4   otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the
5   Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant
6   under the Sublease, provided that Subtenant is not in default under the Sublease beyond the
7   expiration of any applicable notice and cure period.

8                      (e)     In the event of the termination of the Lease by reentry, notice,
9   conditional limitation, surrender, summary proceeding or other action or proceeding, or
10  otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates
11  provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if
12  immediately prior to such surrender, termination or expiration the Sublease shall be in full force
13  and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding
14  nor shall Subtenant be evicted or removed of its possession or its right of possession of the
15  Subleased Premises be disturbed or in any way interfered with, and Subtenant shall attorn to
16  Landlord under the terms and conditions of the Sublease, which shall continue in full force and
17  effect as a direct lease between Landlord and Subtenant (provided, that in such event,
18  Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and
19  additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then
20  payable under the Lease, prorated on the basis of the ratio which the Floor Area of the
21  Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional
22  rent then payable under the Sublease).

23                    (f)     Landlord hereby waives and relinquishes any and all rights or
24  remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have
25  against the property, goods or chattels of Subtenant in or on the Subleased Premises.

26  Any notices, consents, approvals, submissions, demands or other communications (hereinafter
27  collectively referred to as "**Notice**") given under this Agreement shall be in writing. Unless
28  otherwise required by law or governmental regulation, Notices shall be deemed given if sent by
29  registered or certified mail, return receipt requested, or by any recognized overnight mail carrier,
30  with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as
31  hereinabove set forth or such other address or persons as Landlord may designate by Notice to
32  the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with
33  duplicate copies to  Allan N. Rauch, Esquire, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue,
34  Union, New Jersey 07083, and Bart I. Mellits, Esquire, Ballard Spahr Andrews & Ingersoll, LLP,
35  1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103-7599, or such other address
36  or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant,
37  at the address of Subtenant as hereinabove set forth or such other address or persons as
38  Subtenant may designate by Notice to the other parties hereto.  During the period of any postal
39  strike or other interference with the mails, personal delivery shall be substitute for registered or
40  certified mail.  All Notices shall become effective only on the receipt or rejection of same by the
41  proper parties.

42                    (g)     No modification, amendment, waiver or release of any provision of
43  this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be
44  valid or binding for any purpose whatsoever unless in writing and duly executed by the party
45  against whom the same is sought to be asserted.

46                    (h)     This Agreement shall be binding on and shall inure to the benefit
47  of the parties hereto and their respective heirs, legal representatives, successors, assigns and
48  sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

WITNESS:                                LANDLORD:

                                        _____

_____       By:_____
                                        Name:_____
                                        Title:_____

[SEAL]                                                    `

                                        TENANT:

                                        BED BATH & BEYOND INC., a New York
                                        corporation

_____       By:_____
Alan M. Freeman                              Warren Eisenberg
(Assistant) Secretary                        Co-Chairman

[SEAL]
                                        SUBTENANT:

                                        _____

_____       By:_____
                                        Name:_____
                                        Title:_____

[SEAL]

**[INSERT APPROPRIATE JURATS FOR LANDLORD AND SUBTENANT]**

### [JURAT FOR PARENT:]

| | |
|---|---|
| STATE OF NEW JERSEY | ) |
| | ) : ss. |
| COUNTY OF UNION | ) |

On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of BED BATH & BEYOND INC., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____

Notary Public

My Commission Expires:

_____

**Exhibit I**

**DELIVERY DATE NOTICE**


[Letterhead of Landlord]




_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 200__ (the "***Lease***"), between Chase Green
Mountain Limited Partnership, as landlord ("***Landlord***"), and Bed Bath & Beyond Inc., as
tenant ("***Tenant***"), with respect to certain retail premises (the "***Premises***") located in the
Green Mountain Plaza, Rutland, Vermont

Gentlemen:

In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____,
200__.  This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of
the Lease.

Yours very truly,

**LANDLORD:**

WITNESS:                                CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP

                                                By:    Chase Green Mountain, Inc.
                                                        a Vermont corporation, its general partner

_____                 By:    _____
                                                Name: _____
[SEAL]                                          Title:    _____


**TENANT:**

WITNESS:                                BED BATH & BEYOND INC., a New York corporation


                                                By:    _____
_____                         Warren Eisenberg
                                                        Co-Chairman

[SEAL]

cc:    [Allan N. Rauch, Esq.]

**EXHIBIT J**

**DELIVERY DATE CERTIFICATION**

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:   Agreement of Lease, dated _____, 200__ (the "**Lease**"), between Chase Green
      Mountain Limited Partnership, as landlord ("**Landlord**"), and Bed Bath & Beyond Inc., as
      tenant ("**Tenant**"), with respect to certain retail premises (the "**Premises**") located in the
      Green Mountain Plaza, Rutland, Vermont

Gentlemen:

        In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term
is defined in the Lease) will be deemed to be _____, 200__ [INSERT THE DATE
WHICH IS TWO DAYS AFTER THE DATE OF THIS LETTER].  This notice shall constitute the
Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

                                Yours very truly,

                                **LANDLORD:**

WITNESS:                        CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP

                                By:   Chase Green Mountain, Inc.
                                      a Vermont corporation, its general partner

_____          By:   _____
                                      Name: _____
[SEAL]                                Title: _____

                                **TENANT:**

WITNESS:                        BED BATH & BEYOND INC., a New York corporation

                                By:   _____
_____          Warren Eisenberg
                                      Co-Chairman

[SEAL]

cc:   [Allan N. Rauch, Esq.]

**EXHIBIT K-1**

**EXISTING EXCLUSIVES**

See attached exclusives for:

1.    Jo-Ann's

2.    Record Town

3.    Staples

4.    Weight Watchers

5.    Yankee One Dollar Store

6.    Stop & Shop

7.    Michael's

8.    99 Restaurant

9.    Petco

10.    Dick's

<u>Section 15.11</u>    <u>Tenant's Exclusive</u>.

Landlord acknowledges that Tenant has requested that Landlord grant it an exclusive in the Shopping Center for the operation of a weight loss clinic. Provided Tenant is not in Default under this Lease and is open for business for the operation of a weight loss clinic, then, Landlord agrees that it will not lease any space in the Shopping Center for Center for the operation of a weight loss clinic. This exclusive shall not apply to any current leases for space in the Shopping Center. If Landlord violates the provisions of this section, Tenant's remedy shall be limited to reducing Minimum Rent to fifty (50%) percent of the stated Minimum Rent plus all Additional Rent during the period of Landlord's violation.

As an inducement for Landlord's granting of this exclusive, Tenant agrees to defend, indemnify, and hold Landlord harmless from any and all liability, loss, cost or expense arising out of the granting of this exclusive, including any damages under the Sherman Antitrust Act, and any other federal, state or local act or regulation governing unfair trade practices.

In order to indicate their agreement with the foregoing, Landlord has caused this Lease to be executed  and Tenant has caused this Lease to be executed and attested to by its duly authorized officers.

WITNESS:                        LANDLORD:

_____          CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP

_____          By:  Chase Green Mountain, Inc., Its General Partner


                               By_____
                                  Cheryl A. Chase, Executive Vice President


                               TENANT:
                               **THE W W GROUP EAST, L.L.C**
_____          ~~WW WEIGHT LOSS~~, DBA WEIGHT WATCHERS

_____          By_____
                                  David M. Mark, Executive Vice President and Secretary–Treasurer

(m)  "Permitted Use" shall mean the sale of fabrics of all kinds , yard goods, linens, curtains, upholstery material, towels, draperies (both custom made and ready made), drapery hardware, patterns, knitting supplies, needlepoint, macrame, arts and crafts, cards, gift items (e.g., nutcrackers), foam products, yarns and all types of sewing notions, house decorating products and accessories, house-making and do-it-yourself products and accessories, seasonal merchandise, sewing machines, sewing machine furniture, vacuum cleaners, fabric care items (e.g., an "ultrapress"), and products, accessories and services related to all of the foregoing and other items and service customarily offered for sale by fabric store;

(n)  "Protected Use" shall mean the sale of fabrics of all kinds (but not carpets, rugs or clothes), yard goods, linens, curtains, upholstery material, draperies (both custom made and ready made), patterns, knitting supplies, needlepoint, macrame, yarns and all types of sewing notions, related do-it-yourself products and accessories, sewing machines, sewing machine furniture, products, accessories and services related to all of the foregoing, and other items and service customarily offered for sale by a fabric store.

## MARKET CONDITION

SECTION 14.  In the event that any portion of the Shopping Center, or any additions thereto, other than the Premises and other than any store currently operating in the Shopping Center pursuant to an existing lease with the Landlord, are used or occupied for the Protected Use or if any sales area therein is designated for the Protected Use (either of the foregoing being referred to as a "Market Condition"), Tenant shall have the right and option either to (i) pay as substitute rent only an amount equal to five percent (5%) of Tenant's Gross Sales of all goods and services except Hardline Items and four percent (4%) of Tenant's Gross Sales of Hardline Items, in lieu of the Fixed Minimum Rent and Percentage Rent required to be paid hereunder (hereinafter referred to as "Substitute Rent"), or (ii) terminate this Lease by giving written notice to Landlord, in which event all further obligations hereunder shall terminate; provided, however, that the foregoing provision shall not apply (x) to any store having more than thirty thousand (30,000) square feet of sales area in which the Protected Use accounts for no more than five percent (5%) of its Gross Leasable Area during any period of thirty (30) days or more or (y) to any store having a sales area of fewer than thirty thousand (30,000) square feet of sales area in which the Protected Use accounts for no more than ten percent (10%) of its Gross Leasable Area during any period of thirty (30) days or more.  If Tenant elects the option in (i) above, it shall be without prejudice to a future election of the option set forth in (ii) above.  Substitute Rent shall be paid in monthly installments within thirty (30) days after the end of each month for which Substitute Rent is computed.  The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns.

The foregoing restrictions are subject to that certain agreement dated October 7, 2005 by and between Jo-Ann Stores, Inc. and Bed Bath & Beyond Inc., a copy of which is attached hereto.

**Jo-Ann Stores, Inc.**
**5555 Darrow Road**
**Hudson, Ohio  44236**

**Bed Bath & Beyond Inc.**
**650 Liberty Avenue**
**Union, New Jersey  07083**

October 7, 2005

Re:    Green Mountain Plaza Shopping Plaza, Rutland, VT (the *"Shopping Center"*)

Ladies and Gentlemen:

Jo-Ann Stores, Inc., an Ohio corporation (*"Jo-Ann"*), and Bed Bath & Beyond Inc., a New York corporation (*"BBB"*), are or are to become co-tenants in the Shopping Center.  This letter, when executed by both parties, will confirm the agreement between Jo-Ann and BBB regarding covenants contained in their existing or prospective leases which restrict the types of use and sales activities which may be conducted in the Shopping Center (*"Exclusives"*).  BBB and Jo-Ann agree as follows.

1.    As hereinafter used, the following terms shall have the following meanings.

(a)    *"Affiliate"* shall mean a person or entity which controls, is controlled by, or is under common control with, Jo-Ann or BBB, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

(b)    *"BBB"* shall mean Bed Bath & Beyond Inc., a New York corporation, its Affiliates, and any non-Affiliated assignee(s) and sublessee(s) of Bed Bath & Beyond Inc. engaged in substantially the same use as Bed Bath & Beyond Inc. (such as, for example, *"Linens N' Things"* and *"Homegoods"*).

(c)    Intentionally omitted

(d)    *"BBB Lease"* shall mean the Lease existing or to be entered into between BBB and the Landlord for premises at the Shopping Center.

(e)    *"BBB Premises"* shall mean premises at the Shopping Center which are demised to BBB.

(f)    *"Excused Periods"* shall mean periods during which: (a) material alterations or renovations are being performed in and to a party's Premises for a period not in excess of 365 days, (b) a party's Premises are being restored with reasonable efforts following damage, destruction, or taking in eminent domain, or (c) an event of *force majeure* prevents the operation of business within a Party's Premises.

J:\FORMS\EXCLUSVE\Jo-Ann\Rutland, VT (2).wpd

Jo-Ann Stores, Inc.
Bed Bath & Beyond Inc.
Rutland, Vermont
October 7, 2005
Page 2

      (g)    *"Jo-Ann"* shall mean Jo-Ann Stores, Inc., an Ohio corporation, its Affiliates, and any non-Affiliated assignee(s) and sublessee(s) of Jo-Ann Stores, Inc. engaged in substantially the same use as Jo-Ann Stores, Inc.

      (h)    *"Jo-Ann's Exclusive Items"* shall mean, either singly or in any combination, items contained in any of the following respective categories of merchandise: bolted and/or unfinished fabrics of any kind, yard goods, unassembled upholstery materials, patterns, knitting supplies, needlepoint, macrame, artificial flowers and accessories, arts and crafts materials and supplies, finished crafts, picture frames, framing (both ready made and custom made), yarns and all types of notions, sewing machines, sewing machine furniture, and fabric care items, products, accessories and services related to all of the foregoing.

      (i)    *"Jo-Ann Lease"* shall mean the Lease existing or to be entered into between Jo-Ann and the Landlord for premises at the Shopping Center.

      (j)    *"Jo-Ann Premises"* shall mean premises at the Shopping Center which are demised to Jo-Ann.

      2.    Notwithstanding any exclusive use restrictions contained in the Jo-Ann Lease, the parties agree that the following provisions shall apply in lieu thereof.

      A.    Except as expressly provided in subparagraphs B and C below, neither BBB nor its assignees or sublessees shall use the BBB Premises for the sale, rental or distribution of the Jo-Ann's Exclusive Items.

      B.    Notwithstanding the provisions of subparagraph A above, BBB shall be permitted to use the BBB Premises for the sale, rental and/or distribution of: artificial flowers and accessories, picture frames, ready-made framing, and fabric care items, products, and accessories (except for sewing machines).

      C.    In addition to the provisions of subparagraph B above, BBB and its successors and assigns shall be permitted to use the BBB Premises for the sale, rental and/or distribution of the other Jo-Ann's Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) ten percent (10%) of the Floor Area of the BBB Premises, or (y) three thousand (3,000) square feet of Floor Area.

      D.    The restrictions with respect to any particular category of merchandise listed among Jo-Ann's Exclusive Items shall expire in the event that the Jo-Ann Premises ceases to be used for the sale, rental or distribution of items contained in such category for in excess of six (6) consecutive months (except for Excused Periods).

J:\FORMS\EXCLUSVE\Jo-Ann\Rutland, VT (2).wpd

Jo-Ann Stores, Inc.
Bed Bath & Beyond Inc.
Rutland, Vermont
October 7, 2005
Page 3

     3.    This letter agreement shall be binding upon, and shall inure to the benefit of Jo-Ann and BBB, and their respective assignees and subtenants, to the extent herein set forth.

     4.    It shall be a condition precedent to the agreements herein set forth that BBB shall have entered into a lease or occupancy agreement for the BBB Premises on or before the first anniversary of the date hereof; upon the satisfaction of such condition precedent, the provisions of this agreement shall continue in force for so long as the BBB Lease and the Jo-Ann Lease (and any renewals, extensions or replacements thereof) remain in full force and effect.

     Please sign both of the enclosed counterparts of this letter agreement and return to the undersigned one fully executed counterpart of this letter agreement to confirm your acceptance of and agreement to the foregoing.  Thank you for your time and cooperation.

Very truly yours,

BED BATH & BEYOND INC.,
  a New York corporation

By: _____
Name: _Seth Gehlzahler_____
Title: _Vice President – Real Estate____

AGREED TO AND ACCEPTED THIS
____1____ day of ~~October~~, 2005
     NOVEMBER
JO-ANN STORES, INC.,
  an Ohio corporation

By: _____
Name: _____
Title: _____
        Jeffrey N. Fink
      Vice President, Real Estate

J:\FORMS\EXCLUSVE\Jo-Ann\Rutland, VT (2).wpd

YANKEE ONE DOLLAR

### Section 15.11   Tenant's Exclusive.

Landlord acknowledges that Tenant has requested that Landlord grant it
an exclusive in the Shopping Center for the use permitted Tenant pursuant
to Section 7.1(a).  Provided Tenant is not in default under this Lease and
is open for business for the uses permitted pursuant to Section 7.1(a),
Landlord hereby agrees that it will not lease any space in the Shopping
Center for the use permitted Tenant pursuant to Section 7.1(a).  This
exclusive shall not apply to the leases under which Grand Union, Rite Aid,
Vermont Federal, Red Lobster, Jo-Ann Fabrics, Staples, Radio Shack,
Strawberries, or Ames Department Stores occupy space in the Shopping
Center, nor to the incidental sale of such items in any other store in the
Shopping Center so long as the area used for such incidental sales does not
exceed the lesser of five (5%) percent of the space demised to such tenant,

or 300 square feet of the space demised to such tenant.  Thus, as an example, if any of the above-named tenant leases expire or are terminated, Landlord agrees not to lease the space formerly occupied by such tenant for the use permitted pursuant to Section 7.1(a) herein. As an inducement for Landlord's granting of this exclusive, Tenant agrees to defend, indemnify and hold Landlord harmless from any and all liability, loss, cost or expense arising out of the granting of this exclusive, including treble damages under the Sherman Antitrust Act, and any other federal, state or local act or regulation governing unfair trade practices.

In order to indicate their agreement with the foregoing, Landlord has caused this lease to be executed  and Tenant has caused this lease to be executed and attested to by its duly authorized officers.

WITNESS:                          LANDLORD:

_____ _α Brodsky_             CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP

_____          By:  Chase Green Mountain, Inc., Its
                                      General Partner


                                 By _Cheryl A. Chase_____
                                    Cheryl A. Chase
                                    Executive Vice President


_____          TENANT:

_____          YANKEE ONE DOLLAR STORES, INC.


                                 By _Keith R. Flick_  _President_
                                    Its

                                 _Keith R. Flick_    _President_

<u>Article 7   Use and Operation.</u>

<u>Section 7.1     Use.</u>

(a)  Tenant shall use the Demised Premises for the retail sale of items sold in so-called "Dollar Stores" for prices up to Five ($5.00) Dollars, and for no other purpose.

(b)  None of the following activities shall be deemed incidental to the uses permitted by this lease and Tenant shall not:

(i)          sell, give away, purvey, display, or serve food, food products, baked products, liquor, beer or alcoholic beverages at the Demised Premises or use the Demised Premises for the sale of any item sold at supermarkets, including, but not limited to:

(a)  food supermarket or grocery store (whether or not self-service) or grocery department;

(b)  meat market or department;

(c)  produce market or department;

(d)  milk store or department;

(e)  bakery or department; and

(f)  delicatessen or department.

(ii)          (1)  the restriction contained in part (i) shall not apply to restaurants, luncheonettes, "Dunkin' Donuts"-type establishments, takeout food establishments, fast food establishments or similar enterprises.

(2)  (aa) Department stores, variety stores (which shall be deemed to include dollar stores), drug stores and health and beauty aid stores may sell food (other than the foods described in sub-subparts (bb)) of any kind as long as the combined floor area from which all these products are sold does not exceed ten (10%) percent of the store's total floor area.

(bb) Except as provided in sub-subpart (cc), the following foods may not be sold in department stores, variety stores (which

shall be deemed to include dollar stores), drug stores and health and beauty aid stores:

(xx) fresh, frozen or smoked food products, meat, fish or poultry, including delicatessen and appetizing-style meat, fish and poultry; fruit or vegetables; bread, cake or cookies baked on the premises; or "Supermarket Dairy Products."

(yy) "Supermarket Dairy Products" are fresh milk, cream or yogurt; fresh butter and cheese; ice cream, ice milk, sherbet or other frozen desserts served in half-gallon or larger containers that are not cylindrical.

(cc) Department stores, variety stores (which shall be deemed to include dollar stores), drug stores and health and beauty aid stores may sell gift baskets containing the food described in (x) and (y) of sub-subpart (bb).

(iii)       except as permitted in Section 7.1(a) herein, conduct a discount department store, self-service department store selling merchandise at so-called discount prices, specialty store or department store selling merchandise at a discount or less than conventional prices or off-quality merchandise, junior department store or variety store;

(iv)       except as permitted in Section 7.1(a) herein, sell fish, aquarium related products and other pets and related pet supplies or hand made wooden gifts;

(v)       use the Demised Premises for the purpose of conducting the retail sale of prescription drugs, or sell health and beauty such as a Rite Aid drug store type outlet from greater than fifty (50) square feet of space;

(vi)       display or sell electronic components and computers including related items and equipment and other merchandise commonly sold in Radio Shack affiliated stores from greater than fifty (50) square feet of space;

(vii)       use the Demised Premises for industrial purposes; warehouse purposes; except as permitted in Section 7.1(a) herein, a toy or combination toy and furniture store; except as permitted in Section 7.1(a) herein, for the sale of cards and gifts; establishment selling or exhibiting pornographic materials; a massage parlor; a body or fender shop; a funeral parlor; a bowling alley; a billiard parlor or pool hall; an automobile showroom; an automobile service center; an amusement gallery; an off-track betting parlor; a theater of any type; a roller rink; a skating rink; an ice skating rink; a dance hall, movie theatre, discotheque, or any other business providing a place of recreation for its customers; an establishment providing live music or pre-recorded entertainment of any type except background music incidental to a restaurant; office space; except as permitted in Section 7.1(a) herein, a department store selling general merchandise; catalog store; or pizza parlor or takeout pizza store;

(viii)       sell, display, or offer for sale automobile tires and automobile batteries; or except as permitted in Section 7.1(a) herein, automobile parts or accessories;

(ix)       sell records, audiotapes, compact discs or audio-visual components or accessories

(xi)      a bank, savings and loan office, or bank-related activity;

(xii)      sale of office equipment (including computers), office furniture, office supplies, or office services then offered by Staples from greater than fifty (50) square feet;

(xiii)      except as permitted in Section 7.1(a) herein, sale of menswear, women's clothing, or children's clothing;

(xiv)      in any manner expand its use of the Demised Premises to a use not embraced within the use permitted in this Section.

Landlord.  Prior to the commencement of any work, Tenant shall deliver
duplicate originals of certificates of all insurance policies to Landlord.

<div align="center">Article 7   Use and Operation</div>

Section 7.1   Use.

(a)  Tenant shall use the Demised Premises for the sale of records,
pre-recorded music tapes, pre-recorded music cassettes, pre-recorded music
compact disks, pre-recorded music mini compact discs, pre-recorded music
videos, pre-recorded music CD-ROM's, pre-recorded music video tapes,
pre-recorded music laser disks, pre-recorded music digital video discs
(DVD's), pre-recorded music digital compact cassettes, pre-recorded music
CD-i's, posters, music care accessories, blank tapes, sheet music,
entertainment tickets, and entertainment-related clothing, headphones,
music books, or any future format or SKU in which music or music videos may
be sold ("Tenant's Core Products"), and the incidental sale of phonographs,
compact disc, laser disc and cassette players, and all other items commonly
sold in a Strawberries/Waxie Maxie's store, and for no other purpose.

counterparts to Lease are executed by both parties and delivered to both
parties.

Section 15.10   Exclusive.

Landlord acknowledges that Tenant has requested the right to sell
Tenant's Core Products on an exclusive basis in the Shopping Center.
Subject to the rights previously granted to other tenants of the Shopping
Center, and so long as the Demised Premises are used for the retail sale of
Tenant's Core Products, Landlord agrees not to lease any space in the
Shopping Center to any tenant for the sale or rental of Tenant's Core
Products.  Landlord shall not enter into any agreement or consent to the
assignment of any lease that currently provides for the sale of Tenant's
Core Products with any other tenant or occupant for such purpose, subject
only to rights granted any such tenants under leases in existence as of the
date of this Lease.  As a condition to the granting of this exclusive,
Tenant hereby agrees to defend, indemnify and hold Landlord harmless from
any claims which may arise out of the granting of these exclusive rights,
including any claim of violation of antitrust laws, federal trade
commission regulations and any damages which may be assessed against
Landlord thereunder.

STAPLES

**Section 5.2. *Exclusive, Prohibited and Restricted Uses.*** Landlord covenants that, other than the Premises:

**Section 5.2.1. *Exclusive Use.*** No part of the Center shall be used for the sale of office equipment (including computers), office furniture or office supplies, or the provision of any office services then provided by Tenant, nor shall any property within one mile of the Center owned by Landlord or an entity under common control with Landlord be used for an office supply superstore; and

**Section 5.2.2. *Prohibited Uses.*** No part of the Center shall be used for any of the following: (i) tanning, health, exercise or racquet club or spa, gymnasium, bowling alley,

**Section 5.3. *Covenants in General.*** The covenants set forth in Section 5.2 shall run with the land comprising the Center. In the event of a breach of any such covenants, Tenant shall be entitled to injunctive relief and any other appropriate remedy. Notwithstanding the foregoing, Section 5.2 shall not prohibit any tenant existing on the date of this Lease (or such tenant's assigns or subtenants) from using space occupied by it for its present permitted use, nor prohibit any future tenant from selling office equipment, office furniture or office supplies or providing office services incidental to such tenant's primary business in no more than ten percent of such tenant's selling space; provided, however, if Tenant shall cease to operate the Premises for the purposes set forth in the first sentence of Section 5.1, future tenants may sell office equipment, office furniture or office supplies or provide office services if incidental to such tenant's primary business, but the limitation of no more than ten percent of such tenant's selling space shall not apply.

Section 16.13    From and after the date of this Lease and throughout the Term, and for so long as Tenant is not in default beyond any applicable cure or grace period and the Demised Premises are being operated as a restaurant, Landlord will not enter into any lease for space within five (5) miles of the Demised Premises that would permit such space to be used for a casual dining restaurant with a full liquor license that directly competes with Tenant. By way of example, the following restaurants, as currently operated, would be considered to be in direct competition with Tenant: TGI Fridays, Applebee's, Chili's, Ground Round, Houlihans, Outback Steak House, Lone Star Steak House, Bugaboo Creek, Longhorn Steak House, Joe's American Bar & Grill, O'Charlie's, Hops, Pizzeria Uno, Chicago Bar & Grill, Olive Garden, Bertucci's, Hometown Buffet, and Dave & Busters. Landlord may enter into any lease with a casual dining restaurant or without the service of alcoholic beverages. Casual dining restaurants without the service of alcoholic beverages include restaurants such as Friendly's Restaurant, Shoney's Restaurant, Denny's Restaurant, Bob Evans, Cracker Barrel, International House of Pancakes, and any Brinker International Restaurant. As consideration for the exclusive granted to Tenant hereunder and as an inducement to Landlord to grant such exclusive, Tenant agrees to defend, indemnify, hold Landlord harmless from any claim that such exclusive violates any state, federal, or local antitrust act, including the Sherman Antitrust Act, including attorneys' fees, costs, and any damages that may arise thereunder.

Section 9.2(a). Restrictions on other Premises. Except as specifically provided to the contrary below, the other premises in the Shopping Center shall only be used for lawful retail purposes.

Section 9.2(b). During such time as any part of the demised premises shall be used or occupied for the conduct of a food supermarket business, or for a combination food/drug store/general merchandise business, or for a so-called "Super Store", or for the sale of food products for off-premises consumption, Landlord shall not lease, use or permit to be used any other portion of or premises in the Shopping Center or Landlord's Adjacent Land for the conduct of a food supermarket business, or for the sale of any food products for off-premises consumption (whether by humans or animal, except as provided in Section 9.2(b) below), except that Landlord may permit the sale of food items and the conduct of businesses principally engaged in food sales, as follows:

Section 9.2(b)(i)  snack bars in variety stores, junior department stores and department stores may sell take-out orders, ready for immediate consumption, of soups, sandwiches, hot and cold beverages and individual servings of items which are also being sold (on the same premises) for on-premises consumption, but not frozen foods; and

Section 9.2(b)(ii)  an ice cream store business of the kind now operated under the name "Ben and Jerry's" or "Friendly" or "Baskin Robbins" or "TCBY" or any similar ice cream or frozen yogurt store chain, may be operated in the Shopping Center and may sell frozen yogurt, ice cream and ice cream products for off-premises consumption; and

Section 9.2(b)(iii)  a candy store business may be operated in the Shopping Center and may sell bulk and packaged candies, nuts and dried fruit for off-premises consumption; and

Section 9.2(b)(iv)  a package liquor store business may be operated in the Shopping Center and may sell alcoholic beverages for off-premises consumption only, and, as an ancillary part of its business, may sell cocktail ingredients, such as syrups and carbonated beverages, and cocktail snacks, such as pretzels, potato chips and nuts, for off-premises consumption only (provided, however, that a package liquor store business shall not be operated in the Shopping Center if such operation precludes Tenant from obtaining a license to sell beer or beer and wine in the demised premises); and

Section 9.2(b)(v)  a variety store, a junior department store, department store business or full service sporting goods store may sell food items for off-premises consumption, provided, however, that not more than a total of 2,500 square feet of selling space, or (if less) a total of 5% of the total floor area of the premises used for such business, shall be used for the sale (including display) and storage of food items; and

Section 9.2(b)(vi)  a pet shop may devote not more than 200 square feet of selling space for the sale and display of pet foods, except that in the event the existing lease listed on Exhibit E hereto to Petco Animal Supplies, Inc. permits the sale and display of pet foods from more than 200 square feet of selling space, then the sale and display of pet food by Petco pursuant to and in accordance with such lease or any extension thereof or replacement lease with Petco or other pet store tenant shall be permitted, except that there shall not be permitted a pet store within the area shown on Exhibit A as the Dick's Sporting Goods space; and

Section 9.2(b)(vii)  a store business containing in excess of 10,000 square feet of sales area may sell food items for off-premises consumption, provided, however, that not more than a total of 2,500 square feet of selling space, or (if less) a total of 5% of the total floor area of the premises used for such business, shall be used for the sale (including display) and storage of food items and provided further that such sales shall not include any Completely Prohibited Food (defined below); and

{JROB1712.DOC / 10}                    24

Section 9.2(b)(viii)  a store business where the primary use is not one of the uses described in 9.2(b) above may engage in incidental sales of food items for off premises consumption, provided, however, that not more than a total of 100 square feet of selling space shall be used for the sale (including display) and storage of food items, and provided further that such sales shall not include any Completely Prohibited Food (defined below).

Section 9.2(c).  During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for a drug store, or for a pharmacy, or for the sale of health and beauty aids, Landlord shall not lease, use, or permit to be used any other portion of or other premises in the Shopping Center or that portion of Landlord's Adjacent Land located within one (1) mile of the perimeter of the Shopping Center for:

Section 9.2(c)(i)  the conduct of a drug store, or for a pharmacy, or for health and beauty aid business; or

Section 9.2(c)(ii)  the sale, display or advertising of drugs, medicines (except that "patent" and "proprietary" medicines which may, by law, be sold in stores which do not contain a prescription department and which do not employ a registered pharmacist on the premises may be sold in premises in the Shopping Center or Landlord's Adjacent Land which contain not less than 20,000 square feet of floor area and which are used for the business of a department store, junior department store or variety store (if otherwise permitted), but the total amount of floor area devoted to the sale, storage and display of such "patent" and "proprietary" medicines by any one such business conducted in the Shopping Center or Landlord's Adjacent Land shall not exceed 2,500 square feet; or

Section 9.2(c)(iii)  the conduct of the business consisting principally of the sale of perfumes, cosmetics, vitamins, "patent" or "proprietary" medicines (described above) or "sundries" of the types commonly sold in drug stores, or of any combination of the foregoing, whether operated on a discount or limited price or regular price basis, and whether on a self-service or service basis; or

Section 9.2(c)(iv)  Intentionally Omitted.

The foregoing provisions of Section 9.2(c) through 9.2(c)(iii) shall not preclude the operation of one (1) "Sally Beauty Company" retail store, provided that such premises shall be used only (a) for the sale at wholesale of professional beauty supplies marketed under a private label used by Sally 's Beauty Company, Inc., or a "professional use only" label (b) for the sale at retail to the general public of professional sized beauty supplies sold under a private or "professional use only" label used by Sally's Beauty Company, Inc., and (c) for the sale at retail of full priced, brand name beauty supplies, provided that not more than 10% of the inventory shall be such full priced, brand name beauty supplies; and any lease of the Sally Beauty Supply premises shall not allow the sale of any other health and beauty aid products (reference herein to a "Sally Beauty Company retail store" shall be deemed to include a comparable type of business a store business of the type now operated by Sally Beauty). Additionally, (i) in the event that a pharmacy is not operating from within the demised premises, then there shall be permitted a drug store with a pharmacy and such store may also sell health and beauty aids, and (ii) a hair salon, weight watchers, nail salon and/or a fitness center, to the extent permitted under this Article IX, may engage in incidental sales of health and beauty aids, provided, however, that not more than a total of 10 square feet of selling space shall be used for the sale (including display) and storage of such items.

Section 9.2(d).  Intentionally Omitted.

Section 9.2(e).  During such time as Tenant or anyone claiming under Tenant shall use or occupy any portion of the demised premises for the sale of flowers, plants or other horticultural products, Landlord shall not lease, use, or permit to be used any other portion of or other premises in the Shopping Center for the sale of flowers, plants or other horticultural products, except that a business of the kind operated as of the date of this Amended and Restated Lease by Frank's Nursery & Crafts shall be permitted within the areas identified as "9.2(e) Space" on Exhibit A hereto, provided, however, that the sale of fresh cut flowers shall not be permitted.

Section 9.2(f). Intentionally Omitted.

Section 9.2(g). Intentionally Omitted.

Section 9.2(h). In order to insure that the parking areas of the Shopping Center shall not be overburdened and to preserve the character of the Shopping Center as an active center of retail trade offering a variety of goods and services capable of attracting the widest possible spectrum of shoppers, Landlord agrees that during such time as more than fifty percent (50%) of the floor area of the demised premises is used or occupied for the conduct of a "retail business", so-called, no other part of or other premises in the Shopping Center shall be used for any one or more of the following:

Section 9.2(h)(i)  for the conduct of a business operation which regularly or with significant frequency sells merchandise of the types or qualities now commonly known as "odd lot", "close out", "clearance", "discontinued", "cancellation", "second", "factory reject", "sample", "floor model", "demonstrator", "obsolescent", "over-stock", "distressed", "bankruptcy", "fire sale" or "damaged" except (i) that the business currently being operated by Yankee One Dollar pursuant to its existing lease with Landlord shall be permitted for so long as such lease (or any replacement lease) remains in force and effect, provided the Yankee One Dollar space shall not exceed 3,800 square feet, and (ii) that the foregoing shall not preclude Landlord from leasing space in the Shopping Center for use as an "all for a dollar" type of business of the kinds operated, as of the date of this Amended and Restated Lease, under the names " Dollar General" or "Dollar Tree" (the "Dollar Store Business"), or from leasing space in the Shopping Center for an "over-stock" type of business, such as the type operated, as of the date of this Amended and Restated Lease, by Ocean State Job Lot (the "Overstock Business"), subject to the following conditions:

a)  the Dollar Store Business and the Overstock Business shall be operated only as a single integrated general merchandise store selling a variety of goods to the general public; and

b)  no more than an aggregate total of the lesser of (i) five percent (5%) of the square feet of selling space of the premises comprising the Dollar Store Business (the "Dollar Store Business Premises ") and the Overstock Business (the "Overstock Business Premises"), or (ii) 2,000 square feet of the floor area of the Dollar Store Business Premises and the Overstock Business Premises will be used for the sale and display of food items for off-premises consumption (exclusive of sales area used for the sale of pre-packaged candy and nuts), provided, however, that in no event will any portion of the Dollar Store Business Premises and/or the Overstock Business Premises be used for the sale of "Completely Prohibited Food" which for the purposes hereof shall mean each and all of the following: perishables (including, without limitation, milk and/or other dairy products), fruit, vegetables, and/or other produce, baked goods or bakery items (other than pre-packaged baked goods and items baked off-premises for on-premises consumption), meat, poultry, fish and delicatessen items, and all prepared and unprepared frozen foods; and

c)  no more than a total of one hundred (100) square feet of total sales area in the Dollar Store Business Premises and the Overstock Business Premises shall be used for the sale of dog and cat food; and

d)  no portion of the Dollar Store Business Premises and the Overstock Business Premises will be used as a pharmacy, a health and beauty aids store, and/or a drug store, provided, however, that an aggregate of not more than the lesser of (i) a total of five percent (5%), in the aggregate, of the square feet of selling space of the Dollar Store Business Premises and the Overstock Business Premises, or (ii) 500 square feet of the floor area of the Dollar Store Business Premises and the Overstock Business Premises may be devoted to the sale and display of so-called "patent" and/or "proprietary" medicines, perfume, vitamins, health and beauty care products, and sundries; or

Section 9.2(h)(ii)  for any purpose or business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors, or

Section 9.2(h)(iii)  for any purpose other than the conduct of a "retail business", so-called, which term shall mean and include mail-order catalog store operations of the Sears Roebuck and Montgomery Ward type, banks, finance company businesses, service and self-service dry cleaning and laundry businesses, shoe repair shops, barber shops, beauty shops, dance studios, health salons, and real estate brokerage, stock brokerage and insurance brokerage businesses, tax preparation store of the kind operated as of the date of this Amended and Restated Lease by H&R Block, as well as ordinary retail businesses selling merchandise, except that one (1) so-called "walk-up medical facility" and one (i) dental center, eye care center or hearing aid center shall be permitted, no closer to the demised premises than one hundred (100) feet from the demising wall of the demised premises; or

Section 9.2(h)(iv)  for the operation of a motel or tourist court; or

Section 9.2(h)(v)  for a restaurant business or alcoholic beverage business ("bar") of any kind, including, without limitation (A) a "car-hop" or "carry-out" restaurant business whose customers consume food items sold for off-premises consumption while such customers are occupying vehicles parked on the Common Facilities of the Shopping Center, and (B) a banquet hall business which serves its guests on a special, catered basis as distinguished from a restaurant business open to the public at large on a random basis, and (C) a restaurant-bar business which serves alcoholic beverages for on-premises consumption to customers who do not consume the beverages in question as a part of their meals, except that (i) there shall be permitted two (2) restaurants, provided that any such restaurant located within one hundred fifty (150) feet from the demising wall of the demised premises shall not exceed 2,000 square feet, and (ii) restaurants shall be permitted on Outparcels 1, 2 and 3 as shown on Exhibit A; or

Section 9.2(h)(vi)  for any "amusement operation," so-called, which term shall mean and include any activity consisting wholly or in substantial part of the furnishing of entertainment or amusement facilities, whether or not as a business or as a part or aspect of a business (including, without limitation, off-track betting parlors, movie theaters, "penny arcades," so-called; amusement games or devices (electronic or otherwise); "discos," so-called; so called "strip shows" and live entertainment of any kind), or for a massage parlor, so-called or the business of the sale of so-called "adult" material such as, without limitation, magazines, books, movies and photographs; or

Section 9.2(h)(vii)  for any automobile or truck sales, storage, service, fueling, washing, or repair operation, except that (i) one (1) business of the kind now operated under the name "Pep Boys" or a similar operation may be operated in the Shopping Center, and (ii) one (1) automobile fueling facility shall be permitted on the outparcels identified on Exhibit A hereto, provided that in the event Landlord desires to permit such automobile fueling facility Tenant shall have a right of first refusal with respect to such proposed use; or

Section 9.2(h)(viii)  for any business using outdoor space in its regular operations, such as lumber yards, boat sales yards and the like (except that a business of the kind operated as of the date of this Amended and Restated Lease by Frank's Nursery & Crafts or Home Depot shall be permitted within the areas identified as "9.2(e) Space" on Exhibit A hereto, provided, however, that the sale of fresh cut flowers shall not be permitted); or

Section 9.2(h)(ix)  for any storage operations except storage operations which are a part of the conduct of a retail business in the Shopping Center.

Section 9.2(i).  For the purposes of this Article (i) the "floor area" of any premises (including the demised premises) shall include the ground coverage of any "garden shop" or "outdoor selling area" (whether or not enclosed or covered) which is or may be used in the conduct of business by the occupant of such premises, and (ii) "selling space" shall be measured to the interior faces of adjoining walls and to the exterior lines of adjoining aisles.

Exclusive:      Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the shopping center or any property contiguous to the shopping center (including, without limitation, any property that would be contiguous or adjacent to the shopping center but for any intervening road, street, alley or highway) owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, to any "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, wedding or party goods (except apparel), scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing classes on any of the foregoing or any combination of the foregoing categories, or any store similar to Tenant in operation or merchandising.

**The foregoing restrictions are subject to that certain agreement dated May 3, 2005 by and between Michaels Stores, Inc. and Bed Bath & Beyond Inc., a copy of which is attached to this Lease as <u>Exhibit K-3</u>.**

MICHAELS STORES EXCLUSIVES 11-05-04

**PETCO**

10.    (a) NON-COMPETITION

Landlord covenants and agrees that during the term of this Lease, subject to the rights of tenants under leases existing as of the date hereof and as shown on *Exhibit "H",* Exclusive Use Provisions, attached hereto and made a part hereof, Tenant shall have the exclusive right to sell pet food, pet supplies, live animals, pet grooming, pet training, and veterinary services in the Shopping Center, except for incidental sales. Incidental sales shall mean the sale or display for sale of such items or services not as the primary use of the competing tenant and taking up no more than five hundred (500) square feet of floor area. This covenant shall run with the land on which the Shopping Center is located so long as the Tenant has not Gone Dark, as defined in Paragraph 37 below and the Premises are used primarily for the Pet Related Uses, but shall not apply to a supermarket, a department store, or discount department store operating in more than thirty thousand (30,000) square feet of floor area. Landlord agrees not to sell to, lease to, nor approve any sublease or assignment of lease, or change in use, unless prevented by the terms of any lease then currently in force and effect, for any tenant, sub-tenant, assignee or user using its premises for any such Pet Related Uses in violation of the above covenant when the Premises are being operated primarily for such Pet Related Uses.

## DICK'S SPORTING GOODS

<u>1.5</u>    <u>Competition Rent Reduction.</u>

(a)    Landlord warrants and agrees that, during the term of this Lease, it has not and will not, nor will any entity under common control with Landlord, enter into any lease, license agreement or other similar agreement  nor permit any premises in the Shopping Center (other than the Demised Premises) or any land adjacent to or contiguous (but for roadways or access ways) to the Shopping Center which is owned or otherwise controlled by Landlord or a parent, subsidiary or affiliate of Landlord (collectively, the "**Restricted Property**"), or otherwise transfer or permit a possessory interest in the Restricted Property to an Occupant to be used for the sale, rental and/or distribution, either singly or in any combination of (i) health, fitness and/or exercise equipment; (ii) sporting goods; (iii) sporting equipment; and/or (iv) athletic footwear, ("**Precluded Use Activity(ies)**").

(b)    Notwithstanding the foregoing Precluded Use Activity(ies) set forth in Subsection (a) above, the following uses shall be permitted by an Occupant of the Restricted Property:

(i)    the retail sale and/or distribution of sporting goods and/or sporting equipment in the lesser of (A) five percent (5%) in the aggregate of any such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (B) two thousand (2,000) square feet in the aggregate of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use); and

(ii)    the retail sale and/or distribution of athletic footwear in the lesser of (A) five percent (5%) of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (B) one thousand five hundred (1,500) square feet of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use).

**EXHIBIT K-2**

**EXISTING LEASES**

1. Staples

2. Jo-Ann Stores, Inc.

3. Merchants Bank

4. Citifinancial, Inc.

5. RadioShack Corporation

6. Weight Watchers North American, Inc.

7. Yankee One Dollar Stores, Inc.

8. Dick's Sporting Goods, Inc.

9. Record Town, Inc.

10. The Stop & Shop Supermarket Company, LLC

11. Michael's Stores

12. Petco

13. 99 Restaurant

1
2
3
4

**EXHIBIT K-3**

**TREATY LETTER WITH MICHAELS**



May 3, 2005

Bed Bath & Beyond
650 Liberty Avenue
Union, New Jersey 07083

Re:   Modifications of Exclusive Use Provisions as to Michaels Stores, Inc., a Delaware corporation (*"Michaels"*) and Bed Bath & Beyond Inc., a New York corporation (*"BBB"*): Green Mountain Shopping Center, Rutland Town, Vermont (the *"Shopping Center"*)

Ladies and Gentlemen:

Michaels and BBB are or are to become co-tenants in the Shopping Center. This letter, when executed by both parties, will confirm the agreement between Michaels and BBB regarding covenants contained in their existing or prospective leases, and/or other recorded instruments, which restrict the types of use and sales activities which may be conducted in the Shopping Center (*"Exclusives"*). In lieu of any Exclusives set forth in their existing or prospective leases for space at the Shopping Center, and/or other recorded instruments, BBB and Michaels agree as follows.

1.    As used herein, the following terms shall have the following meanings.

(a)    *"Affiliate"* shall mean a person or entity which controls, is controlled by, or is under common control with, Michaels or BBB, as the case may be. As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

(b)    *"BBB Exclusive"* shall mean either: (1) the covenant(s) set forth in the BBB Lease (or other instrument encumbering the Shopping Center) which restrict the types of use and sales activities which may be conducted in the Shopping Center, or (2) the covenants set forth in Exhibit A attached hereto, whichever is less restrictive.

(c)    *"BBB Lease"* shall mean the Lease existing or to be entered into between BBB and the Landlord for premises at the Shopping Center.

(d)    *"BBB Premises"* shall mean the premises at the Shopping Center which are demised to BBB.

N:\RealEstate\HH\Requests\Bed Bath & Beyond\Rutlandltr.wpd

---

**8000 BENT BRANCH DRIVE  •  IRVING, TEXAS 75063**
**972•409•1300**

Bed, Bath & Beyond
May 3, 2005
Page 2

(e)    **"Excused Periods"** shall mean periods during which: (a) material alterations or renovations are being performed in and to a party's Premises for a period not in excess of 365 days, (b) a party's Premises are being restored with reasonable efforts following damage, destruction, or taking in eminent domain, or (c) an event of *force majeure* prevents the operation of business within a Party's Premises.

(f)    **"Michaels Exclusive"** shall mean either: (1) the covenant(s) set forth in the Michaels Lease (or other instrument encumbering the Shopping Center) which restrict the types of use and sales activities which may be conducted in the Shopping Center, or (2) the covenants set forth in <u>Exhibit B</u> attached hereto, whichever is less restrictive.

(g)    **"Michaels Lease"** shall mean the Lease existing or to be entered into between Michaels and the Landlord for premises at the Shopping Center.

(h)    **"Michaels Premises"** shall mean the premises at the Shopping Center which are demised to Michaels.

2.    The Michaels Exclusive shall not apply to the operations in all or a portion of the BBB Premises of a store operating primarily as home furnishings store or a store selling primarily the exclusive items listed in the BBB Exclusive (singly or in any combination).  A store shall be deemed to be operating primarily as a home furnishing store or a store selling primarily the Exclusive Items listed in the BBB Exclusive (singly or in any combination) so long as it devotes fifty percent (50%) or more of the square footage within such store for the sale of the Exclusive Items listed in the BBB Exclusive (singly or in any combination).

3.    The BBB Exclusive shall not apply to the operations in all or a portion of the Michaels Premises of a store operating primarily as an arts & crafts store or a store selling primarily the exclusive items listed in the Michaels Exclusive, singly or in any combination.  A store shall be deemed to be operating primarily as an arts & crafts store or a store selling primarily the Exclusive Items listed in the Michaels Exclusive (singly or in any combination) so long as it devotes fifty percent (50%) or more of the square footage within such store for the sale of the Exclusive Items listed in the Michaels Exclusive (singly or in any combination).

4.    The exclusive rights with respect to any particular category listed in the Michaels Exclusive shall terminate as to such category in the event that the Michaels Premises ceases to be used for the sale, rental or distribution of items contained in such category for in excess of nine (9) consecutive months (except for Excused Periods); provided, however, that the Michaels Exclusive shall be reinstated with respect to such category if the sale, rental or distribution of items contained in such category is resumed in the Michaels Premises, unless the sale, rental or distribution of items contained in such category has been commenced from the BBB Premises during the period in which the Michaels Exclusive had lapsed as to such category.  Notwithstanding the foregoing, the Michaels Exclusive shall lapse in its entirety with respect to a non-Affiliated assignee of the Michaels Lease or a non-Affiliated sublessee of all or a portion of the Michaels Premises, if that assignee or sublessee fails to use at least fifty percent (50%) of the square footage that it occupies within the Michaels Premises for the sale, rental or distribution of the

Bed, Bath & Beyond
May 3, 2005
Page 3

Michaels Exclusive Items noted in <u>Exhibit B</u>, singly or in any combination, for in excess of nine (9) consecutive months, except for Excused Periods.

5.      The exclusive rights with respect to any particular category listed in the BBB Exclusive shall terminate as to such category in the event that the BBB Premises ceases to be used for the sale, rental or distribution of items contained in such category for in excess of nine (9) consecutive months (except for Excused Periods); <u>provided</u>, <u>however</u>, that the BBB Exclusive shall be reinstated with respect to such category if the sale, rental or distribution of items contained in such category is resumed in the BBB Premises, unless the sale, rental or distribution of items contained in such category has been commenced from the Michaels Premises during the period in which the BBB Exclusive had lapsed as to such category.  Notwithstanding the foregoing, the BBB Exclusive shall lapse in its entirety with respect to a non-Affiliated assignee of the BBB Lease or a non-Affiliated sublessee of all or a portion of the BBB Premises, if that assignee or sublessee fails to use at least fifty percent (50%) of the square footage that it occupies within the BBB Premises for the sale, rental or distribution of the BBB Exclusive Items noted in <u>Exhibit A</u>, singly or in any combination, for in excess of nine (9) consecutive months, except for Excused Periods.

6.      For purposes of this agreement, all references herein to "square footage" and/or "floor area" of a particular premises shall be deemed to include an allocable portion of the (i) aisle space adjacent to such selling space or floor area and (ii) storage space in such premises.

7.      This letter agreement shall be binding upon, and shall inure to the benefit of Michaels and BBB, and their respective Affiliates, successors, assignees and subtenants.

8.      It shall be a condition precedent to the agreements herein set forth that BBB and Michaels shall have entered into a lease or occupancy agreement for its Premises in the Shopping Center on or before the first anniversary of the date hereof; upon the satisfaction of such condition precedent, the provisions of this agreement shall continue in force for so long as the BBB Lease and the Michaels Lease (and any renewals, extensions or replacements thereof) remain in full force and effect.

9.      The Landlord in the Michaels Lease and the BBB Lease shall be entitled to rely on the terms and conditions set forth in this agreement only as between Michaels and BBB (and their respective assignees and sublessees in the Shopping Center).

[Signature page follows]

N:\RealEstate\HH\Requests\Bed Bath & Beyond\RevStdLtr5.wpd

Bed, Bath & Beyond
May 3, 2005
Page 4

Please sign both of the enclosed counterparts of this letter agreement and return to the undersigned one fully executed counterpart of this letter agreement to confirm your acceptance of and agreement to the foregoing. Thank you for your time and cooperation.

Very truly yours,

MICHAELS STORES, INC.

By: _____
Douglas B. Sullivan
Executive Vice President - Development

AGREED TO AND ACCEPTED THIS
_10ᵗʰ_ day of _____May_____, 2005.

BED BATH & BEYOND INC.

By: _____
Name: _Seth Geldzahler_
Title: _Vice President - Real Estate_

N:\RealEstate\HH\Requests\Bed Bath & Beyond\RevStdLtr5.wpd

Bed, Bath & Beyond
May 3, 2005
Page 5

## EXHIBIT A

### Form of BBB Exclusive

Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center or on any "Related Land" (hereinafter defined) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items; (c) housewares; (d) frames and wall art; (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of: (AA) Exclusive Items (except housewares) within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) one thousand five hundred (1,500) square feet of Floor Area within such tenant's or subtenant's premises and (BB) housewares within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of: (xx) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (yy) two thousand five hundred (2,500) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell the Exclusive Items referred to in (AA) above (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.] As used herein, the term *"Related Land"* shall mean land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned by Landlord or its Affiliate(s).

N:\RealEstate\HH\Requests\Bed Bath & Beyond\RevStdLtr5.wpd

Bed, Bath & Beyond
May 3, 2005
Page 6

## EXHIBIT B

### Form of Michaels Exclusive

Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center or any property contiguous to the Shopping Center owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord (the *"Related Land"*), to (i) any store selling arts and crafts, art supplies, craft supplies, store selling picture frames or picture framing services, framed art, store selling artificial flowers and/or plants, artificial floral and/or plant arrangements, wedding or party goods (except apparel), or (ii) any store selling scrapbooking/memory book supplies, accessories and/or decorations or other papercrafting (e.g., making greeting cards, gift bags, tags and other related or similar items) supplies, accessories and/or decorations, or providing classes on any of the foregoing or any combination of the foregoing categories  (collectively, the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of: (AA) Exclusive Items (other than picture framing services, which shall not be permitted in any event and other than party goods) within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) one thousand five hundred (1,500) square feet of Floor Area within such tenant's or subtenant's premises and (BB) party goods within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of: (xx) five percent (5%) of the Floor Area of such tenant's or subtenant's premises or (yy) two thousand five hundred (2,500) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell the Exclusive Items referred to in (AA) above (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.]

N:\RealEstate\HH\Requests\Bed Bath & Beyond\RevStdLtr5.wpd

# EXHIBIT L

## ALTERNATE RENT

1.    During the applicable period(s) described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay as "***Alternate Rent***" an amount equal to three percent (3%) of all "***Gross Sales***" (hereinafter defined) resulting from business conducted in, on or from the Premises, not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period (the "***Cap***").

2.    As used herein, the term "***Gross Sales***" shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises (for purposes of this Section 2 only, collectively, "***Tenant***"), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards (regardless of where or how such gift certificates and gift cards were purchased).  Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term "***Gross Sales***" shall exclude: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) bona fide transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (8) fees up to 4% paid to independent third party credit card, charge card, and debit card companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, as applicable, provided that fees in excess of 4% will be included in Gross Sales, (9) proceeds from delivery, gift-wrapping and check cashing charges [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, and (14) sales of gift certificates or gift cards.

3.    Alternate Rent shall be payable within fifteen (15) days after the end of the calendar month to which it pertains.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement certified as being true and correct by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Alternate Rent payable for, such month.  In the event of an error in Landlord's favor, Tenant shall pay such underpayment to Landlord within 30 days after Landlord's demand therefor, and if the underpayment exceeds 5% of the amount due for such month, Tenant shall pay to Landlord the reasonable expenses of the audit within 30 days after Landlord's demand therefor.

4.    Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be permitted to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for not less than three (3) years following the end of the calendar year to which they refer.

5.    Provided that the Alternate Rent payable for a calendar month does not exceed the Cap, Landlord and/or its auditor shall have the right, upon at least ten (10) days prior notice

1     to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in
2     the Premises for such calendar month.

3           6.       Landlord shall not disclose to any third party Tenant's Gross Sales or the amount
4     of Alternate Rent paid or payable by Tenant, provided, however, that (A) such information was
5     not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing
6     contained herein shall restrict Landlord from disclosing such information as may be required by
7     law, or to its accountants, attorneys, bona fide prospective purchasers, or current or prospective
8     Mortgagees or Ground Lessor(s) of all or any portion of Landlord's interest in the Shopping
9     Center (provided that each of such recipients shall be bound to the same non-disclosure
10    provisions as are imposed upon Landlord).

**EXHIBIT M**

**PROHIBITED USES**

As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:

(1)     Any use which emits or results in offensive odors, dust or vapors, or strong or offensive fumes, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

(2)     Any operation primarily used as a self-storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any "second hand" store or "surplus" store (other than a nationally or regionally recognized surplus retailer with at least five (5) operating stores);

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)     Any (i) fire sale, (ii) bankruptcy sale (unless pursuant to a court order), (iii) auction house operation, or (iv) fictitious going-out-of-business sale or lost-our-lease sale or similarly advertised event except by tenants under Existing Leases which do not prohibit such activities;

(7)     Any central laundry, dry cleaning plant or laundromat (except that (i) a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises and (ii) a laundromat consisting of not more than 2,000 square feet of Floor Area shall be permitted as long as it is located more than 280 feet from the Premises);

(8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)     Any bowling alley or skating rink;

(10)     Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use;

(11)     Any living quarters, sleeping apartments, or lodging rooms;

(12)     Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted in number 31 below);

(13)     Any mortuary or funeral home;

(14)     Any "Pornographic Use", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto; the parties hereto acknowledge and agree the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State of Vermont (such as, for example, Borders and Barnes & Noble, as said stores currently operate) and the rental and sale of movies and video games by a national or regional movie rental store of the type normally located in first class shopping centers in the State of Vermont (such as, for example, Blockbuster) shall not be deemed a "pornographic use" hereunder; or massage parlor;

M-1

(15)     Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)     Any bar, tavern, or other establishment selling alcoholic beverages for on-premises consumption (except as an ancillary use in a restaurant permitted in item (35) below);

(17)     Any catering or banquet hall;

(18)     Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall (except that one (1) amusement or video arcade not to exceed 5,000 square feet of Floor Area and located more than 280 feet from the Premises shall be permitted and one (1) pool or billiard hall not to exceed 20,000 feet of Floor Area and located more than 180 feet from the Premises shall be permitted);

(19)     Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers (except that one (1) reading room not to exceed 1,500 square feet of Floor Area and located more than 280 feet away from the Premises shall be permitted and one (1) nationally recognized weight-loss center (Weight Watchers, for example) located more than 280 feet from the Premises shall be permitted); provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)     Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)     Any unlawful use;

(22)     Any pawn shop, gun shop (except as an ancillary use within a full service sporting goods store), or tattoo parlor;

(23)     Any church or other place of religious worship;

(24)     Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility (except that a car wash and a nationally franchised quick lube oil change operation are each permitted on an Outparcel);

(25)     Any carnival, amusement park or circus;

(26)     Any medical clinics or medical offices (except as permitted in number 28 below);

(27)     Supermarkets are not Prohibited Uses provided that any supermarket located adjacent to the Premises (i) to the north of the Premises shall have a "right hand" entry, and (ii) to the south of the Premises shall have a "left hand" entry;

(28)     Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in shopping centers containing Bed Bath and Beyond stores and otherwise similar to the Shopping Center on the date of this Lease in Vermont (for example, financial services, real estate brokerage, insurance agency, banking, travel agency, doctor, dentist, hearing aid, optometrist), provided that not more than 2,500 square feet of Floor Area of such uses are located within 280 feet away from the Premises, and not more than twelve thousand (12,000) square feet of Floor Area in the in-line store portion of the Shopping Center, in the aggregate, shall be devoted to such uses and provided further not more than twelve thousand (12,000) square feet of Floor Area in the Outparcels, in the aggregate, shall be devoted to such uses;

(29)     hotel/motel;

(30)     daycare center;

1        (31)    veterinary office, except as may be incidental to a full-line pet and pet
2    supply store operating in at least 11,000 square feet of Floor Area (such as Petco or
3    Petsmart); such occupant shall use reasonable efforts to prevent its customers from
4    allowing their pets to urinate or defecate in the Common Areas and will promptly remove
5    any "dog dirt" from the Common Areas;

6        (32)    children's entertainment or activity facility (such as "Discovery Zone", or
7    "Chuck E. Cheese's") (except that one (1) such facility not to exceed 20,000 square feet
8    of Floor Area and located more than 180 feet from the Premises shall be permitted);

9        (33)    karate center (except that one (1) karate center not to exceed 2,500
10    square feet of Floor Area and located more than 280 feet from the Premises shall be
11    permitted);

12        (34)    movie theater;

13        (35)    restaurant serving meals for on- or off-premises consumption (except that
14    restaurants not exceeding 8,000 square feet of Floor Area and located more than 280
15    feet from the Premises shall be permitted);

16        (36)    beauty parlor or nail salon (except that beauty parlors or nail salons not
17    exceeding 2,500 square feet of Floor Area shall be permitted); or

18        (37)    health spa, exercise facility or similar type business (except that one (1)
19    health spa, exercise facility or similar type business to be located more than 280 feet
20    from the Premises shall be permitted).

21        (38)    during the Initial Term, a store primarily selling merchandise which is
22    classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second,"
23    "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock,"
24    "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's
25    Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job";
26    the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate
27    the foregoing restriction. After the Initial Term, one store of the type described in this
28    clause (38) shall be permitted in the Shopping Center provided such store is not
29    adjacent to the Premises.

30

DocuSign Envelope ID: 7A2CDEC9-02D5-41BB-AD56-3EE55DD6EDEF

## FIRST LEASE MODIFICATION

THIS FIRST LEASE MODIFICATION (*"Modification"*), dated as of the 21st day of December , 2020 (*"Modification Date"*) by and between CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP, a Vermont limited partnership (*"Landlord"*), having an office c/o Chase Enterprises, Goodwin Square, 225 Asylum Street, 29th Floor, Hartford, Connecticut 06103-1538 and BED BATH & BEYOND INC., a New York corporation (*"Tenant"*), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated as of December 16, 2005 (as amended and/or modified thereafter, the *"Lease"*), with respect to premises (*"Premises"*) located at the Green Mountain Plaza in Rutland, Vermont (*"Shopping Center"*); and

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Modification and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Modification by this reference.  Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to the Lease that are set forth in Schedule A attached hereto and made a part hereof shall govern and control from and after the Modification Date.

3.      It is the policy of Tenant and its subsidiaries and affiliates (collectively, *"the Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services.  This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Modification, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.  If any such improper actions are observed, contact our Legal Department (Attention: General Counsel) at Tenant's notification address and/or by telephone at 908-688-0888, so that the incident may be fully investigated.

4.      Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this

DocuSign Envelope ID: 7A2CDEC9-02D5-41BB-AD56-3EE55DD6EDEF

Modification, except for Retail Consulting Services (***"Tenant's Broker"***). Tenant shall pay any commission due to Tenant's Broker in connection with this Modification pursuant to a separate written agreement between Tenant and Tenant's Broker. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Tenant's Broker) with respect to this Modification in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. The provisions of this Section shall survive the expiration or earlier termination of the Lease.

5.     Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Modification to be in full force and effect or, if any such consent is required, Landlord has obtained same prior to its execution hereof. Each party represents and warrants to the other that the person signing on its behalf has the power and authority to do so, that once executed and delivered this Modification shall be binding and enforceable against each party and this Modification will be deemed to be in full force and effect.

6.     Upon the request of either party following the execution and delivery of this Modification, Landlord and Tenant shall execute an amended/restated short form lease or memorandum for recording, which shall be in form and substance as reasonably acceptable to both parties. In no event shall the amount of Rent or any other monetary terms hereof be included in any such short form lease or memorandum. Further, after the expiration or earlier termination of the Lease, Tenant agrees, upon Landlord's request, to execute and deliver a termination of such short form lease or memorandum in recordable form and this obligation shall survive expiration or termination of the Lease. Tenant shall record any such short form lease or memorandum at Tenant's expense.

7.     The terms and conditions of this Modification shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective successors and assigns. Except as specifically amended by this Modification, the Lease is unmodified, is hereby ratified by the parties hereto and shall be and remain in full force and effect. In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Modification, the terms and provisions of this Modification shall govern and control.

8.     This Modification may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Modification. The execution and transmission of an image of any signed document or document signed by DocuSign (or a similar application) (***"Electronic Signature"***) will have the same binding effect as an original bearing an original signature. No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document. Each party intends to be bound by its Electronic Signature on this Modification, is aware that the other party is relying on its Electronic Signature, and waives any defenses to the enforcement of this Modification based upon the form of signature.

DocuSign Envelope ID: 7A2CDEC9-02D5-41BB-AD56-3EE55DD6EDEF

IN WITNESS WHEREOF, the parties hereto have executed this Modification as of the day and year first above written.

**LANDLORD:**

CHASE GREEN MOUNTAIN LIMITED PARTNERSHIP, a Vermont limited partnership

By: Chase Rutland, Inc., its General Partner

By: _____
Name: Cheryl A. Chase
Title: Executive Vice President

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By: _____
Name:   John Hartmann
Title:    EVP, Chief Operating Officer

DocuSign Envelope ID: 7A2CDEC9-02D5-41BB-AD56-3EE55DD6EDEF

## SCHEDULE A

The Lease is hereby amended to reflect that:

1. The Initial Term is hereby extended for the period commencing on February 1, 2022 and ending on January 31, 2027 (the *"Extended Initial Term"*).

2. During the period commencing on January 1, 2021 and ending of January 31, 2027, Tenant shall pay Fixed Rent at the rate of $264,000 per year, payable in the manner set forth in Section 4.1 of the Lease.

3. Tenant shall continue to have the right to extend the Term (beyond the Extended Initial Term) for four (4) Renewal Options of five (5) years each, subject to the terms and conditions contained in the Lease, including, without limitation, Section 2.2.2 of the Lease. Fixed Rent payable during each Renewal Period shall be as specified in Section 1.1.11(b), (c), (d), and (e) of the Lease.

4. For each full lease year (i.e. February 1st to the next occurring January 31st) occurring during the period commencing on February 1, 2021 and ending on January 31, 2027, Tenant shall pay annual percentage rent (*"Percentage Rent"*) equal to eight (8%) percent of all "Gross Sales" (as defined in Exhibit L of the Lease and as amended as more particularly described below) resulting from business conducted in, on or from the Premises during such lease year in excess of Four Million and 00/100 Dollars ($4,000,000.00). By April 4th of each year occurring during the period commencing on April 4, 2022 and ending on April 4, 2027, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant and certified by such officer to be true and correct setting forth the amount of Gross Sales during the preceding lease year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such lease year. The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Tenant shall maintain books and records, and Landlord shall keep same confidential, as set forth in Exhibit L of the Lease with respect to the Gross Sales reports and payment of Percentage Rent. Any dispute by Landlord with respect to Percentage Rent or Tenant's Gross Sales reports shall be submitted to arbitration in accordance with the provisions of Section 16.3 of the Lease.

5. In addition to the exclusions set forth in Exhibit L of the Lease, "Gross Sales" shall also exclude: (i) sales of merchandise fulfilled from the Premises but where payment is not made at the Premises (e.g., online or at another store); and (ii) sales of merchandise where payment is made at the Premises but not fulfilled from the Premises.

6. Notwithstanding anything in this Modification or the Lease to the contrary, Fixed Rent for the month of May 2020, which totals $30,000 (*"Deferred Rent"*) shall be deferred and paid in twelve (12) consecutive equal monthly installments of Two Thousand Five Hundred Dollars ($2,500.00) on the first of every month during the period beginning on February 1, 2021 and ending on January 31, 2022 (the *"Repayment Period"*). Tenant will receive credit for any Deferred Rent paid prior to the execution of this Modification. In addition, Tenant shall pay all

DocuSign Envelope ID: 7A2CDEC9-02D5-41BB-AD56-3EE55DD6EDEF

other Rent outstanding as of the Modification Date (excluding the Deferred Rent) (***"Outstanding Rent"***), which totals $29,377.14, within fifteen (15) days after Tenant's receipt of a fully executed copy of this Modification. Provided Tenant pays the Outstanding Rent by the date required pursuant to this Modification, all late fees/interest charges/attorney fees incurred, charged, or assessed prior to the full execution of this Modification are waived. Landlord hereby confirms that upon Landlord's receipt of the Outstanding Rent, no monetary default by Tenant shall exist under the Lease. The Deferred Rent and Outstanding Rent shall not accrue any late fees or interest so long as they are paid in accordance with this paragraph 6 and the Deferred Rent may be paid in full at any time.

7.   If Tenant fails to timely pay Landlord the Outstanding Rent or Deferred Rent, then Landlord shall have the right, in Landlord's sole and absolute discretion, upon written notice to Tenant, to declare the Outstanding Rent and all outstanding Deferred Rent to be immediately due and payable (if any), whereupon Tenant shall immediately pay Landlord any then outstanding Deferred Rent and Outstanding Rent.