**Exhibit "1"**

CoPY   1 o 2 2

# LEASE AGREEMENT

Between

## NEWTOWN/BUCKS ASSOCIATES, L.P.,

Landlord

and

## BED BATH & BEYOND INC.,
a New York corporation,

Tenant

Newtown Shopping Center
Newtown, Pennsylvania

Dated:  June 2 , 2000

\* \* \* \* \* \*

## TABLE OF CONTENTS

Page

ARTICLE 1
    BASIC TERMS, EXHIBITS AND DEFINITIONS  . . . . . . . . . . 1
    Section 1.1   Basic Terms, Exhibits, and Definitions  . . 1

ARTICLE 2
    LEASE OF PREMISES; LEASE TERM; DELIVERY DATE  . . . . . . 5
    Section 2.1   Lease of Premises . . . . . . . . . . . . 5
    Section 2.2   Term  . . . . . . . . . . . . . . . . . . 5
    Section 2.3   Delivery Date . . . . . . . . . . . . . . 6
    Section 2.4   Unseasonable Delivery: Blackout Period  . . 9
    Section 2.5   Co-Tenancy Condition  . . . . . . . . . . 10

ARTICLE 3
    IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . 11
    Section 3.1   Landlord's Work . . . . . . . . . . . . . 11
    Section 3.2   Plan Approvals; Tenant's Work . . . . . . 11
    Section 3.3   Performance of Work . . . . . . . . . . . 13
    Section 3.4   Measurement:  Premises and
                  Shopping Center . . . . . . . . . . . . . 15

ARTICLE 4
    FIXED RENT AND TAXES : DETERMINATION AND PAYMENT . . . . 16
    Section 4.1   Fixed Rent  . . . . . . . . . . . . . . . 16
    Section 4.2   Real Estate and Other Taxes . . . . . . . 16

ARTICLE 5
    COMMON AREAS, THEIR USE AND CHARGES  . . . . . . . . . . 18
    Section 5.1   Common Areas: Maintenance . . . . . . . . 18
    Section 5.2   Common Areas: Restrictions  . . . . . . . 22

ARTICLE 6
    UTILITIES  . . . . . . . . . . . . . . . . . . . . . . 25

ARTICLE 7
    SIGNS  . . . . . . . . . . . . . . . . . . . . . . . . 26
    Section 7.1   Tenant's Building Signage . . . . . . . . 26
    Section 7.2   Signage Restrictions and Criteria . . . . 26
    Section 7.3   Pylon/Monument Signage  . . . . . . . . . 27
    Section 7.4   Signage: Alteration/Removal/Allocation  . 27

ARTICLE 8
    ALTERATIONS AND IMPROVEMENTS . . . . . . . . . . . . . . 28
    Section 8.1   Alterations and Improvements  . . . . . . 28

ARTICLE 9
    REPAIRS  . . . . . . . . . . . . . . . . . . . . . . . 29
    Section 9.1   Tenant's Repairs  . . . . . . . . . . . . 29
    Section 9.2   Landlord's Repairs  . . . . . . . . . . . 30
    Section 9.3   Legal Compliance Work . . . . . . . . . . 31

ARTICLE 10
    INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION . . 31
    Section 10.1  Mutual Release, Waiver of Subrogation
                  and Mutual Indemnification  . . . . . . . 31
    Section 10.2  Tenant's Insurance  . . . . . . . . . . . 32
    Section 10.3  Landlord's Insurance  . . . . . . . . . . 33
    Section 10.4  General Insurance Requirements  . . . . . 34

ARTICLE 11
    FIRE AND OTHER CASUALTY; EMINENT DOMAIN  . . . . . . . . 34
    Section 11.1  Fire and Other Casualty . . . . . . . . . 34
    Section 11.2  Eminent Domain  . . . . . . . . . . . . . 36
    Section 11.3  Abatement of Rent Charges . . . . . . . . 38

ARTICLE 12
    COVENANTS, REPRESENTATIONS AND WARRANTIES . . . . . . . 38
      Section 12.1  Quiet Enjoyment. . . . . . . . . . . . . 38
      Section 12.2  Authority. . . . . . . . . . . . . . . 38
      Section 12.3  Landlord's Covenants, Warranties
                   and Representations. . . . . . . . . . 39
      Section 12.4  Environmental Matters. . . . . . . . . 40

ARTICLE 13
    USES AND RESTRICTIONS . . . . . . . . . . . . . . . . . 43
      Section 13.1  Permitted and Prohibited Uses . . . . . 43
      Section 13.2  Tenant's Exclusive in Center . . . . . 45
      Section 13.3  Exclusives Which Tenant Must Honor . . . 47

ARTICLE 14
    CONDUCT OF BUSINESS OPERATIONS . . . . . . . . . . . . 47

ARTICLE 15
    TENANT ASSIGNMENT AND SUBLETTING . . . . . . . . . . . 48
      Section 15.1  Assignment and Subletting . . . . . . . 48
      Section 15.2  Liability of Tenant . . . . . . . . . . 49
      Section 15.3  Collateral Assignment . . . . . . . . . 49
      Section 15.4  Cure Rights of Original Tenant . . . . 49
      Section 15.5  Recognition Agreement . . . . . . . . . 50

ARTICLE 16
    DEFAULT AND DISPUTE RESOLUTION . . . . . . . . . . . . 50
      Section 16.1  Tenant Default . . . . . . . . . . . . 50
      Section 16.2  Landlord Default . . . . . . . . . . . 51
      Section 16.3  Payment under Protest . . . . . . . . . 52
      Section 16.4  Work Performed Under Protest . . . . . 53
      Section 16.5  Arbitration . . . . . . . . . . . . . 53

ARTICLE 17
    RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE
    . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
      Section 17.1  Right to Mortgage and Non-Disturbance . . 53
      Section 17.2  Estoppel Certificate . . . . . . . . . 54

ARTICLE 18
    NOTICE . . . . . . . . . . . . . . . . . . . . . . . . 54

ARTICLE 19
    TENANT'S PROPERTY . . . . . . . . . . . . . . . . . . . 54

ARTICLE 20
    END OF TERM . . . . . . . . . . . . . . . . . . . . . 55
      Section 20.1  Surrender of Premises. . . . . . . . . 55
      Section 20.2  Hold Over. . . . . . . . . . . . . . . 55
      Section 20.3  Landlord's Entry. . . . . . . . . . . 55

ARTICLE 21
    INTENTIONALLY OMITTED . . . . . . . . . . . . . . . . 55

ARTICLE 22
    TENANT'S RIGHT OF TERMINATION . . . . . . . . . . . . 55

ARTICLE 23
    MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . 56
      Section 23.1  Loading Facilities. . . . . . . . . . 56
      Section 23.2  Liens. . . . . . . . . . . . . . . . 56
      Section 23.3  Broker's Commission. . . . . . . . . . 56
      Section 23.4  Force Majeure. . . . . . . . . . . . . 56
      Section 23.5  Consents. . . . . . . . . . . . . . . 56
      Section 23.6  Costs. . . . . . . . . . . . . . . . 57
      Section 23.7  Attorneys' Fees. . . . . . . . . . . . 57
      Section 23.8  Survival of Obligations. . . . . . . . 57
      Section 23.9  Non-Waiver. . . . . . . . . . . . . . 57

| Section 23.10 | Rights Cumulative. . . . . . . . . . . . | 57 |
| Section 23.11 | Definition of Landlord. . . . . . . . | 57 |
| Section 23.12 | Successors and Assigns. . . . . . . . | 57 |
| Section 23.13 | Limitation of Landlord's Liability. . . | 58 |
| Section 23.14 | Limitation of Tenant's Liability. . . . | 58 |
| Section 23.15 | Joint and Several Liability. . . . . . | 58 |
| Section 23.16 | Severability. . . . . . . . . . . . | 58 |
| Section 23.17 | Grammatical Usages and Construction . . . | 58 |
| Section 23.18 | Table of Contents, Line Numbering and Paragraph Headings. . . . . . . . | 58 |
| Section 23.19 | Definition of Hereunder, Herein, etc. . . | 58 |
| Section 23.20 | Short Form Lease. . . . . . . . . . . | 58 |
| Section 23.21 | Entire Agreement and Modification. . . . | 59 |
| Section 23.22 | No Joint Venture or Partnership Created by Lease. . . . . . . . . . . | 59 |
| Section 23.23 | Governing Law. . . . . . . . . . . . | 60 |

## EXHIBITS

| | |
|---|---|
| Exhibit "A" | Legal Description of Shopping Center |
| Exhibit "B" | Site Plan |
| Exhibit "C" | Rent Commencement and Expiration Date Agreement |
| Exhibit "D" | Specifications for Landlord's Work |
| Exhibit "D-1" | Front Elevation and Sidewalk Plan of Premises [including Building Signage] and Front Elevation of Shopping Center |
| Exhibit "E" | Permitted Encumbrances |
| Exhibit "F" | Signage Criteria |
| Exhibit "F-1" | Coming Soon Sign |
| Exhibit "G" | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit "H" | Recognition Agreement |
| Exhibit "I" | Delivery Date Notice |
| Exhibit "J" | Delivery Date Certification |
| Exhibit "K-1" | Existing Exclusives |
| Exhibit "K-2" | Existing Leases |
| Exhibit "L" | Percentage Rent |

## LEASE AGREEMENT

THIS LEASE AGREEMENT (**"Lease"**) is entered into as of June 2, 2000 by and between NEWTOWN/BUCKS ASSOCIATES, L.P., a Pennsylvania limited partnership, having an office at 55 Country Club Drive, Suite 200, Downingtown, Pennsylvania 19335-3062 (**"Landlord"**), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**).

### W I T N E S S E T H:

### ARTICLE 1
### BASIC TERMS, EXHIBITS AND DEFINITIONS

Section 1.1    _Basic Terms, Exhibits, and Definitions_.   The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    _Additional Rent_:   Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    _Affiliate_:   A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, **"control"** shall mean shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    _Alternate Rent_: Payment of Percentage Rent defined in and payable in the manner set forth in _Exhibit L_ attached hereto, but in no event shall the aggregate Percentage Rent payable during the Alternate Rent period exceed seventy-five percent (75%) of the amount of Fixed Rent which otherwise would have been payable during such period.   In the event that Tenant exercises any right under this Lease to pay Alternate Rent in lieu of Fixed Rent, any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

1.1.4    _Common Areas_:  All areas which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas and common utility lines.

1.1.5    _Common Areas Charges_:  As defined in Section 5.1 hereof.

1.1.6    _Delivery Date_: As defined in Section 2.3 hereof.

1.1.7    _Effective Date_: The date hereof.

1.1.8    _Event of Default_:  As defined in Section 16.1 hereof.

1.1.7    Effective Date: The date hereof.

1.1.8    Event of Default: As defined in Section 16.1 hereof.

1.1.9    Excused Periods: Such periods of time during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (w) resulted from alterations or renovations being performed in and to the Premises, (x) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, (y) occurred during the course of diligent good-faith efforts by Tenant to assign Tenant's interest in this Lease or to sublease all or any portion of the Premises, up to ninety (90) consecutive days, or (z) was caused by any act or omission of Landlord.

1.1.10    Exhibits. The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11    Expiration Date: The date on which the Term of this Lease expires, as established in Section 1.1.43 hereof.

1.1.12    Fixed Rent: The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the original Term, at the rate of Four Hundred Twenty-Seven Thousand Five Hundred and 0/100 ($427,500.00) Dollars per year [based on Fourteen and 25/100 ($14.25) Dollars per square foot of Floor Area];

(b)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Four Hundred Ninety-One Thousand Four Hundred and 0/100 ($491,400.00) Dollars per year [based on Sixteen and 38/100 ($16.38) Dollars per square foot of Floor Area];

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Five Hundred Forty Thousand Six Hundred and 0/100 ($540,600.00) Dollars per year [based on Eighteen and 2/100 ($18.02) Dollars per square foot of Floor Area]; and

(d)    In the event Tenant exercises the third Renewal Option, for the four (4) year eleven (11) month Renewal Period, at the rate of Five Hundred Ninety-Four Thousand Six Hundred and 0/100 ($594,600.00) Dollars per year [based on Nineteen and 82/100 ($19.82) Dollars per square foot of Floor Area].

1.1.13    Floor Area: The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than unenclosed loading dock areas and trash compactor areas, exterior mechanical equipment areas, and outdoor seating areas). All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the

Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.14    Force Majeure:  As defined in Section 23.4 hereof.

1.1.15    Ground Lessor: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.16    Intentionally Omitted.

1.1.17    Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

1.1.18    Inducement Tenants:  As defined in Subsection 2.3.1 hereof.

1.1.19    Institutional Mortgagee:  Any commercial bank, federal or state savings and loan association, life insurance company, or pension fund, which is not an Affiliate of Landlord, holding a mortgage on the Shopping Center.

1.1.20    Landlord:  As defined in the preamble and Section 23.11 hereof.

1.1.21    Landlord's Mailing Address: 55 Country Club Drive, Suite 200, Downingtown, Pennsylvania 19335-3062 or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.22    Landlord's Work:  As defined in Section 3.1 hereof.

1.1.23    Lease Interest Rate: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.24    Intentionally Omitted.

1.1.25    Intentionally Omitted.

1.1.26    Percentage Rent:  As defined in Exhibit L hereto.

1.1.27    Permitted Use:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, personal care products and other bathroom appliances and accessories); housewares (including, but not limited to, utensils, kitchen utensils, appliances and "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture; decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile

merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the **"Permitted Items"**); and for any other lawful retail use. Notwithstanding anything to the contrary contained in this Section 1.1.27, the Premises may not be used for any use specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28    <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto having dimensions as shown on the Site Plan and containing approximately Thirty Thousand  (30,000) square feet of Floor Area and approximately one thousand three hundred (1,300) square feet of space on the mezzanine level for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall such non-selling space result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such non-selling space be included in the determination of Tenant's Pro Rata Share.

1.1.29    <u>Renewal Option</u>:  As defined in Section 2.2.2 hereof.

1.1.30    <u>Renewal Period(s)</u>: three successive periods the first two (2) of which shall be for five (5) years each and the third of which shall be for five (5) years minus a period equal to the sum of (X) the number of days between the Delivery Date and the Rent Commencement Date plus (Y) the number of days by which the Initial Term exceeds fifteen (15) calendar years (being a period equal to the number of days from the Rent Commencement Date until the following January 31st), as provided in Section 2.2.2 hereof.

1.1.31    <u>Rent</u>:  Fixed Rent and/or Additional Rent.

1.1.32    <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33    Intentionally Omitted.

1.1.34    <u>Shopping Center</u>:  The shopping center commonly known as Newtown Shopping Center, containing approximately one hundred sixty thousand (160,000) square feet of Floor Area, on the property located at the intersection of Route 413 and Durham Road, Newtown, Pennsylvania, and more particularly described in <u>Exhibit A</u> hereto.

1.1.35    Intentionally Omitted.

1.1.36    <u>Substantially Completed or Substantial Completion</u>:  The completion of specified work at the Shopping Center (including, without limitation, as applicable,  Landlord's Work) to the extent that only so-called "punch list" items of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.37    <u>Taxes</u>:  As defined in Section 4.2 hereof.

1.1.38    <u>Tenant</u>:  As defined in the preamble hereof.

1.1.39    <u>Tenant's Mailing Address</u>:   650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.40    <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41    <u>Tenant's Pro Rata Share</u>: A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than Eighteen and 75/100 (18.75%) percent. Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within ten (10) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.42    <u>Tenant's Work</u>: As defined in Section 3.2 hereof.

1.1.43    <u>Term</u>: A period of approximately fifteen (15) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the fifteenth (15th) anniversary of the Rent Commencement Date (the **"Initial Term"**).   As used herein, **"Term"** shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    <u>Lease of Premises</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2    <u>Term</u>.

2.2.1    <u>Initial Term</u>. Subject to the provisions of this Article 2 and Section 11.1(c) below, the Term of this Lease shall begin on the earlier of (such earlier date being referred to herein as the **"Rent Commencement Date"**): (a) the date (the **"Grand Opening Date"**) which Tenant shall establish in its published advertisement as its grand opening [but not later than

the tenth (10th) day after the date upon which Tenant shall initially open the Premises to the general public for business], or (b) the fiftieth (50th) day following the Delivery Date.  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as _Exhibit C_ specifying the Rent Commencement Date.  Notwithstanding the fact that the Term shall commence on the Rent Commencement Date, all the provisions of this Lease, except for those setting forth the Rent, shall be in full force and effect commencing on the Effective Date.

2.2.2    _Renewal Options_.  Provided that Tenant is not in monetary default hereunder beyond any applicable grace and cure period, Tenant shall have the right and option (hereinafter a **"Renewal Option"**) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods the first two (2) of which shall be for periods of five (5) years each and the third of which shall be for a period of five (5) years minus a period equal to the sum of (X) the number of days between the Delivery Date and the Rent Commencement Date plus (Y) the number of days by which the Initial Term exceeds fifteen (15) calendar years (being a period equal to the number of days from the Rent Commencement Date until the following January 31st) (individually, a **"Renewal Period"**, and collectively, the **"Renewal Periods"**) upon the same terms and conditions as are herein set forth, except that the Fixed Rent during such Renewal Periods shall be as set forth in the definition of "_Fixed Rent_" in Section 1.1.12 above.  Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    _Delivery Date_.

2.3.1    _Definition_.  Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the **"Delivery Date"**) following the day on which all of the following conditions (the **"Delivery Date Conditions"**) shall have occurred _and_ Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)  Actual possession of the Premises shall have been delivered to Tenant free of all leases (other than this Lease) and occupants, and Landlord shall then be the owner of the fee simple estate in the Shopping Center free and clear of any liens and encumbrances, except for those described on _Exhibit E_ hereto);

(b)  Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant) all permits and approvals required from all applicable governmental authorities to enable: (i) Tenant to occupy and use the Premises for the conduct of its business (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business (and not a general retail business)) in the Premises, and (ii) the

Common Areas to be developed, operated and used for the
purposes hereunder contemplated, which permits and
approvals shall include, without limitation, zoning,
building code, curb cut and site plan approvals, all
permits pertaining to pylon and/or monument signage,
Tenant's panel(s) thereon, and Tenant's building
signage (provided that Landlord shall have no
obligation to apply for a variance in respect of
Tenant's building signage), construction, development
and use permits, and a permanent certificate of
occupancy for the Premises (unless a permanent
certificate of occupancy for the Premises cannot be
obtained at that time due to the manner in which such
certificates of occupancy are issued by the applicable
governmental authority, and not due to some aspect of
Landlord's Work required to be completed hereunder as a
condition of the Delivery Date not being completed, in
which event: (1) the delivery of a permanent
certificate of occupancy for the Premises shall not be
a condition to the occurrence of the Delivery Date, (2)
the obtaining of a temporary certificate of occupancy
shall be a condition to the occurrence of the Delivery
Date, and (3) Landlord shall as soon as possible after
the completion of Landlord's Work and Tenant's Work
apply for and diligently proceed to obtain the
permanent certificate of occupancy so that in no event
is Tenant's business interrupted as a result of the
expiration of a temporary certificate of occupancy);

(c)   Landlord's Work shall have been
Substantially Completed, which Substantial Completion
shall be evidenced by a written certification by
Landlord's architect to Tenant, the Premises shall have
been delivered "broom clean", and Landlord shall have
complied fully with the provisions of Section 12.4
(Environmental Matters) below;

(d)   The Common Areas, and all of the
buildings and other improvements depicted on Exhibit B
hereto shall have been Substantially Completed and
operational (provided, however, that (i) the
improvements to be constructed upon the outparcels
labeled "Pad 1", "Pad 2", "Pad 3" and "Pad 4" on
Exhibit B shall not have to be completed as a condition
of the occurrence of the Delivery Date and (ii) except
as required in Section 2.3.1(f) hereof, the interior of
the buildings shown on Exhibit B shall not be required
to be Substantially Completed as a condition to the
occurrence of the Delivery Date); in addition, all
streets, storm drainage, traffic signalization, and
other off-site improvements (including, but not limited
to, all off-site improvements depicted on Exhibit B)
required for the Shopping Center to open for business
and for Tenant to receive a permanent certificate of
occupancy shall be Substantially Completed;

(e)   There shall be no restrictions or other
legal impediments imposed by any public or private
instrument which would prevent: (i) the use of the
Premises for the Permitted Use; (ii) the use of the
parking facilities, access roads, and other Common
Areas in the manner contemplated by this Lease; (iii)
the lawful installation of the signage permitted
pursuant to Article 7 below; or (iv) the performance of
Tenant's Work ;

(f)    Leases or other occupancy agreements
shall have been entered into with the following tenants
(hereinafter collectively referred to as the
*"Inducement Tenants"*) on the following terms, for
occupancy of building sites in the Shopping Center;
such leases shall not be cancelable by any of the
Inducement Tenants, except for failure of Landlord to
complete the Shopping Center, for injury to or loss of
the premises thereby demised because of fire or other
casualty, or for a taking or for other reasons similar
to those for which this Lease is cancelable by Tenant;
and the extent of construction then performed for each
of the respective premises of all Inducement Tenants,
whether by Landlord and/or such Inducement Tenant
itself, shall not be materially less than is reasonably
necessary to reasonably enable Landlord to satisfy the
Co-Tenancy Condition in Section 2.5 hereof;

| Inducement Tenants | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Acme Supermarket | 55,000 | 15 years |
| Staples or national or regional tenant substitute | 20,000 | 15 years |

(g)    Landlord shall have delivered to Tenant
(i) an agreement in the form attached hereto as Exhibit
G executed by each holder of any mortgage or deed of
trust encumbering or affecting the Shopping Center or
any portion thereof, in recordable form, and (ii) an
agreement in the form and content described in clause
(b) of Section 17.1 hereof executed by any existing
Ground Lessor, in recordable form; the provisions of
this subsection (g) shall be in addition to, and not in
limitation of, Sections 12.3 of this Lease.

2.3.2    Delivery Date Notice.

(a)    Landlord shall give Tenant at least ninety
(90) days prior notice of the Delivery Date, using the form of
Delivery Date Notice attached hereto as Exhibit I.  Landlord
acknowledges that such Delivery Date Notice is essential to the
coordination and timing of Tenant's Work and pre-opening
activities, including, without limitation, the ordering and
delivery of long lead-time fixtures and equipment and inventory.
Landlord's delivery of the Delivery Date Notice shall be a
condition precedent to the Rent Commencement Date.

(b)    Landlord acknowledges that if it shall fail
to satisfy the Delivery Date Conditions set forth in Section
2.3.1(a) through (e) and (g) by the Delivery Date as established
in the Delivery Date Notice, Tenant will sustain substantial,
additional costs and expenses, including, without limitation,
storage costs for fixtures, equipment, and inventory,  and
additional advertising and promotional costs, the exact amount of
which would be impracticable or extremely difficult to ascertain.
Subject to the provisions of subparagraph (c) below, if the
Delivery Date does not occur by the date established therefor in
the Delivery Date Notice, then, in addition to any other remedies
available to Tenant under this Lease, Landlord agrees to allow to

Tenant a credit against the initial installment(s) of Rent hereunder equal to:

    (A)  as liquidated reimbursement to Tenant for all of the aforesaid costs incurred by Tenant, the sum of (i) One Hundred Five Thousand Dollars ($105,000), plus (ii) Four Thousand Five Hundred Dollars ($4,500.00) for each day that the Delivery Date established in the Delivery Date Notice is delayed (other than a delay by reason of an election by Tenant of a right under Section 2.4.1(b) hereof) (**"Tenant's Liquidated Costs"**), and

    (B)  Five Thousand Dollars ($5,000) in reimbursement for costs and expenses (**"Tenant's Administrative Costs"**) incurred by Tenant by reason of additional work performed by Tenant's employees at its corporate offices as a result thereof,

it being acknowledged and agreed by Landlord and Tenant that the liquidated sums referred to in this sentence represent the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

    (c)  Notwithstanding the provisions of subparagraphs (a) and (b) above, Landlord may postpone a Delivery Date from that previously established in a Delivery Date Notice by delivering to Tenant a revised Delivery Date Notice at least seventy-five (75) days prior to the Delivery Date established in the previous Delivery Date Notice, which revised notice shall set forth the date to which the Delivery Date will be postponed. Each time that a revised Delivery Date Notice is timely given hereunder, Tenant's Liquidated Costs, if any, shall only be deemed to accrue after the new Delivery Date established in the revised Delivery Date Notice, but Tenant shall nevertheless be entitled to offset Tenant's Administrative Costs on each such occasion from Rent first becoming due hereunder.  Revised Delivery Date Notices not given prior to the aforesaid 75-day period shall <u>not</u> serve to avoid the accrual of Tenant's Liquidated Costs as provided in subparagraph (b) above.

    2.3.3    <u>Delivery Date Certification</u>.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as <u>Exhibit J</u>.

    2.3.4    <u>No Waiver</u>.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

    Section 2.4    <u>Unseasonable Delivery: Blackout Period</u>.

    2.4.1    If, for any reason (including, without limitation, _Force Majeure_), the Delivery Date occurs during the period commencing on September 30 and ending on the January 31 next following (the **"Slack Period"**), then Tenant shall have, in addition to any other remedies, the right to:

  (a) accept physical possession of the Premises; or

  (b) delay its acceptance of physical possession of the Premises to a date not later than the end of the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the April 1 next following the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the March 31 next following.

  Section 2.5 <u>Co-Tenancy Condition</u>.

  2.5.1 As used herein, the **"Co-Tenancy Condition"** shall mean that all of the Inducement Tenants are "Fixturing and Merchandising" (hereinafter defined), and Landlord shall have given Tenant notice thereof.

  2.5.2 As used herein, the phrase **"Fixturing and Merchandising"** shall mean that each Inducement Tenant shall have accepted possession of its entire premises, such premises shall have been Substantially Completed, and each Inducement Tenant shall then be actively and continuously engaged in the fixturing and merchandising therein.

  2.5.3 If, on the date on which Tenant is ready to commence installing fixtures in, and merchandising, the Premises for business to the general public, the Co-Tenancy Condition has not been satisfied in respect of the Acme Supermarket, Tenant shall have the right, at its sole option, to:

  (a) not open the Premises for business to the general public, in which event, the Rent Commencement Date shall be delayed until the sixtieth (60th) day after the date (the **"Inducement Date"**) on which the Co-Tenancy Condition is satisfied in respect of all of the Inducement Tenants, <u>or</u>, if such 60th day occurs during the Slack Period, then the Rent Commencement Date shall be delayed until the end of the Slack Period, subject, in any event, to any applicable provisions of this Article 2; or

  (b) open the Premises for business to the general public, in which event, subject to any applicable provisions of this Article 2, the Rent Commencement Date shall occur on the Grand Opening Date, and thereafter, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Inducement Date occurs (or, if the Inducement Date occurs during the Slack Period, then until the end of the Slack Period).

  2.5.4 If on the date which is sixty (60) days after Tenant shall have opened to the public for business in the Premises the Co-Tenancy Condition has not been satisfied in respect of Staples, Inc. or its substitute, then thereafter until the Inducement Date occurs (or, if the Inducement Date occurs during the Slack Period, then until the end of the Slack Period) Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent.

  2.5.5 In addition to the provisions of Section 2.5.3 above, if the Co-Tenancy Condition has not been satisfied within one hundred eighty (180) days after Tenant either shall have been ready to commence Fixturing and Merchandising or shall have opened the Premises to the general public for business,

Tenant shall have the right, at any time prior to the satisfaction of the Co-Tenancy Condition, upon giving Landlord at least sixty (60) days' prior notice, to terminate this Lease as of the date specified in said notice.  Landlord may negate such termination by causing the Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which the foregoing termination notice is given.  If this Lease is terminated pursuant to this Subsection 2.5.5, neither party shall have any further liability hereunder, except as set forth in Section 23.3 below.

ARTICLE 3

IMPROVEMENTS

Section 3.1   Landlord's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibits D and D-1 hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, **"Landlord's Work"**), and shall deliver possession of the Premises to Tenant in the condition described therein.

Section 3.2    Plan Approvals; Tenant's Work.

3.2.1    Preparation of Preliminary Plans.

(a)  Within sixty (60) days after the Effective Date, Landlord shall deliver to Tenant the **"Shell Drawings"** (hereinafter defined) which shall be subject to any reasonable modifications indicated by Tenant in Tenant's Plans".  As used herein, the term "**Shell Drawings**" shall include all of the following: (i) a dimensioned building floor plan for the Premises which shall denote egress, ingress, vertical transportation, receiving area (truck access), and compactor locations; (ii) building elevations for all buildings in the Shopping Center; (iii) exterior wall sections of the Premises; (iv) a sidewalk plan showing improvements located within the area from the back of the front curb to the front wall of the Premises and any adjacent premises (including, without limitation, sidewalks, depressed curbing, cart corral locations, and planters); (v) roof plan of the Premises (including, without limitation, roof construction, location of heating, ventilation and air conditioning units, drainage, and penetrations); (vi) dimensioned structural drawing showing interior layout and exterior facade column layout of the Premises (including, without limitation, column sizes for each), and interior clearance heights; and (vii) landscape and grading plans for the Shopping Center (and the then current site plan).

(b)  Within thirty (30) days after Tenant's receipt of the Shell Drawings, Tenant shall deliver to Landlord its fixture plan, reflected ceiling plan and office plan (collectively, **"Tenant's Plans"**), all of which shall conform to the Shell Drawings (as same may be reasonably modified by Tenant, as noted above).

(c)  Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant, in a single submission (which, in Tenant's reasonable opinion, shall be at least 85% complete), Landlord's preliminary plans and specifications (the **"Preliminary Plans"**) for Landlord's Work, which shall include, without limitation, mechanical, electrical, plumbing, structural, architectural and site plans.

(d)  Within thirty (30) days after its receipt of the Preliminary Plans, Tenant shall give Landlord notice of the

respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Shell Drawings (as the same may have been modified by Tenant), Tenant's Plans, and/or Exhibits D and D-1 hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

3.2.2   Preparation of Final Plans and Specifications. Within thirty (30) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the *Final Plans and Specifications*) based upon the approved Preliminary Plans. Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval.  Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of the Shell Drawings, Exhibit D, and Exhibit D-1 hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of the Shell Drawings, Exhibit D, and Exhibit D-1 shall govern and prevail.  Tenant's approval of the Preliminary Plans and the Final Plans and Specifications shall not constitute an opinion or agreement by Tenant that the Premises or the Common Areas are structurally sufficient or that the Preliminary Plans and the Final Plans and Specifications comply with law or other applicable requirements of governmental or quasi-governmental authorities.

After Tenant approves either or both of the Preliminary Plans and Specifications or the Final Plans and Specifications, it shall have the right to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications or the Final Plans and Specifications, in which event:

(a)   Tenant shall pay to Landlord the net reasonable additional cost (together with overhead and profit thereon, not to exceed five percent (5%) of such net reasonable additional cost) of Landlord's Work resulting from such changes, taking into consideration any and all actual reduced and added costs resulting from all such changes (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require) and/or other cost savings that Tenant may provide to Landlord; such payment by Tenant shall be due and payable on or before the later of: (i) the thirtieth (30th) day after the Delivery Date, or (ii) the fifteenth (15th) day after Landlord shall have delivered to Tenant backup information in support of such net reasonable additional cost (including, without limitation, receipted invoices) as Tenant may reasonably require; and

(b)   if, despite Landlord's diligent efforts in performing Landlord's Work, such changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions

resulting from such changes and/or other time savings
that Tenant may provide to Landlord), then the Rent
Commencement Date shall be determined as if such net
delay had not occurred.

Except for Landlord's Work, Tenant shall, at its own cost
and expense, do any and all work (hereinafter referred to as
**"Tenant's Work"**) which Tenant desires to adapt the Premises to
Tenant's use.  Landlord shall perform Landlord's Work in a manner
required by applicable governmental and quasi-governmental
regulations, ordinances and codes so that Tenant will be able to
obtain all required permits and approvals from applicable
governmental and quasi-governmental authorities to enable Tenant
to perform Tenant's Work and to open and conduct its business in
the Premises.  Landlord shall pay all impact fees and related
governmental charges in connection with Landlord's Work and all
other work performed by or on behalf of Landlord in connection
with the Shopping Center.  If such permits and approvals cannot
be obtained because Landlord's Work has not been completed or has
been performed improperly or by reason of any then existing
condition of the Shopping Center, Landlord shall remedy the
situation so as to enable Tenant to obtain such permits and
approvals for Tenant's Work, and the Delivery Date shall be
deemed delayed, for Tenant's benefit only, on a day-for-day basis
for each day of delay occasioned thereby.

Section 3.3    Performance of Work.

3.3.1    Both Landlord's Work and Tenant's Work shall
be performed in a good and workmanlike manner, in compliance with
all applicable law, utilizing only new, first-class materials,
and in accordance with all insurance company requirements.

3.3.2    If: (a)  Landlord's Work has not been
commenced by August 30, 2000, or (b)  the Delivery Date shall not
have occurred by August 30, 2001 (subject to Force Majeure, not
to exceed thirty (30) days), Tenant may thereafter, during such
time as Landlord's Work has not been commenced or the Delivery
Date has not occurred, as the case may be, consider Landlord to
be in default hereunder and, at Tenant's option in its sole
discretion, elect to:

(i)  terminate this Lease, if Landlord shall fail
to fully cure such default within thirty (30) days
after receiving Tenant's notice thereof, in which event
neither party shall have any further liability
hereunder (other than as set forth in Section 23.3
below); and/or

(ii)  avail itself of the remedies set forth in
Section 16.2 below (provided, however, that the cure
period set forth therein shall not be applicable);
and/or

(iii)  extend one or more times the dates set
forth in clauses (a) and/or (b) of this Subsection
3.3.2 to such future dates designated by Tenant in
notice given to Landlord.

The election by Tenant of any one or more of the foregoing
remedies shall not preclude the subsequent election of any
alternative remedy provided in this Section, this Lease, at law,
or in equity.

3.3.3    Landlord's Work Performed After Delivery of

Possession.   Landlord shall complete any "punch list items"
(hereinafter defined) within thirty (30) days after Landlord
receives notice thereof.   If Landlord fails to timely complete
any punch list item, Tenant shall have the right, after a ten(10)
day notice to Landlord and opportunity to cure, to complete the
same using its own contractors, in which event, Landlord shall
reimburse Tenant for the reasonable costs and expenses thereof
upon demand.   Any portion of Landlord's Work which is performed
after Tenant accepts physical possession of the Premises and
which would materially adversely affect Tenant's Work or Tenant's
use of the Premises, shall occur only "after hours", when neither
Tenant nor any of its agents, contractors, employees and servants
are working within the Premises.   Within thirty (30) days
following Substantial Completion of Landlord's Work, Landlord
shall deliver to Tenant a duplicate copy of the "as built" plans
for the building containing the Premises.   As used herein, the
term *punch list items* shall mean such minor items of a cosmetic
nature which, when considered as a whole, do not adversely affect
either the performance of Tenant's Work or Tenant's ability to
conduct its normal business operations in the Premises.

   3.3.4   No other consents or approvals required.
Landlord represents and warrants to Tenant, and Tenant has relied
on such representation and warranty as a material inducement for
Tenant entering into this Lease, that no consents or approvals
(other than those which may be required by governmental
authorities) are necessary or required to be obtained in order
for Landlord to commence and complete Landlord's Work or other
work required to be performed by Tenant hereunder, or for
Tenant to commence and complete Tenant's Work

   3.3.5   Tenant's Right of Entry.   Prior to the
Delivery Date, Tenant may enter upon the Premises for the
purposes of inspecting the work, taking measurements, making
plans, erecting temporary or permanent signs and doing such other
work as may be appropriate or desirable without being deemed
thereby to have taken possession or obligated itself to pay Rent,
provided, however, that Tenant shall not, during the course of
such work, materially interfere with the performance of
Landlord's Work and shall indemnify and hold Landlord harmless
from and against any and all claims or losses arising from
Tenant's entry upon the Premises, except to the extent caused by
Landlord, its agents, employees, or contractors.

   3.3.6 Work Requirements After Delivery Date.   Following
the Delivery Date, any construction by Landlord affecting any
portion of the Shopping Center shall be subject to the following
terms and conditions:

      (a)   all staging and storage of materials and
      parking of construction vehicles for the buildings
      labeled "Staples" and "Pad 1" shall at all times occur
      only within the portions of the Shopping Center
      designated as "Staging" on Exhibit B hereto or within
      such areas as are reasonably agreed between Landlord
      and Tenant, staging for other areas of the Shopping
      Center shall be outside of the Key Area within such
      areas as are reasonably agreed between Landlord and
      Tenant;

      (b)   during the course of any such construction,
      Landlord, at its sole cost and expense, shall construct
      and at all times maintain such safety barricading as
      Tenant may reasonably require, and, as necessary, a
      silt fence around all then "unstabilized areas" of any

such work (*i.e.*, those areas from which silt and sediment deposits could run to any portion of the Premises or any then developed portion of the Shopping Center); and

(c) Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

Section 3.4    <u>Measurement: Premises and Shopping Center</u>. Contemporaneously with the Delivery Date Notice, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Premises, the square footage of the non-selling space of the Premises and the Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver such certification to Tenant and such failure continues for a period of ten (10) days after Landlord's receipt of a notice from Tenant advising Landlord of the particular failure, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer, at Landlord's expense (not to exceed Two Thousand Five Hundred Dollars ($2,500)), which shall be credited to Tenant against Fixed Rent first becoming due hereunder. If the measurement of any non-selling space on the mezzanine level indicates a deficiency of more than fifty (50) square feet less than the square footage for such space(s) as set forth in the Final Plans and Specifications, then the Floor Area of the Premises shall be deemed to be reduced by one square foot for each square foot of such deficiency in excess of fifty (50) square feet, and the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share,) shall be reduced accordingly. Tenant shall give Landlord notice of any reduction in the Floor Area of the Premises pursuant to the immediately preceding sentence within thirty (30) days of Tenant's receipt of the measurement. If (i) the Floor Area of the Premises is determined to be less than twenty-nine thousand five hundred (29,500) square feet, (ii) the square footage of the non-selling space on the office mezzanine is determined to be less than the Floor Area shown therefor on the Final Plans and Specifications, then Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease and all reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work (including, without limitation, plan preparation and review). If the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord. If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof, neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable

provisions of this Lease, made pursuant to the provisions of this Section 3.4. During the Term, the Floor Area of the Premises and of the Shopping Center shall be adjusted, from time to time, as walls which previously constituted outside walls become common walls (and vice versa). Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.5 below.

ARTICLE 4
FIXED RENT AND TAXES : DETERMINATION AND PAYMENT

Section 4.1    <u>Fixed Rent</u>.    Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated. Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein. All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or to such other address as Landlord may from time to time designate, upon at least thirty (30) days' prior notice to Tenant. All Rent shall be paid in lawful money of the United States which shall be legal tender for the payment of all debts and dues, public and private, at the time of payment. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the **"Paying Agent"**), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. Landlord shall have no right to bring any actions against the Paying Agent, and the Paying Agent shall have no liability to Landlord for any obligation whatsoever (including, without limitation, the obligation to pay Rent). All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord. In addition, with respect to any payment of Rent which becomes due and payable by Tenant hereunder but is not paid when due under this Lease, Tenant shall pay to Landlord a late charge equal to three (3%) percent of such unpaid amount (it being agreed, however, that such late charge shall not be payable with respect to the first two (2) times during any twelve-month period during the Term that a payment of Rent is not timely made unless Tenant fails to make the payment within five (5) days following receipt of a "reminder notice" from Landlord that such amount was not received on the due date thereof. All rent payable hereunder shall be apportioned as of the date of termination of the Term.

Section 4.2    <u>Real Estate and Other Taxes</u>.

4.2.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.2.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.2.2    (a) Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.2. Any Taxes for a real

estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof. Only installments becoming due during, or attributable to a real estate fiscal tax year falling partially within the Term (regardless of when paid) shall be included in Taxes for computation of Tenant's Pro Rata Share of Taxes.

(b)   Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.2.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become due in order to earn the early payment discount).

(c)   In the event that Landlord's Institutional Mortgagee shall require Landlord to escrow monthly payments for Taxes, then, so long as such escrow shall be so required and all other tenants (except Acme) and occupants of the Shopping Center are similarly required to make monthly payments to Landlord with respect to Taxes, Tenant shall, in lieu of making payments pursuant to subparagraph (b) above, pay Landlord monthly with each installment of Fixed Rent an amount equal to one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's (or Landlord's Institutional Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within sixty (60) days following the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Pro Rata Share thereof for such year (the **"Tax Reconciliation Statement"**). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) copies of the applicable tax bills, (y) a calculation of Tenant's Pro Rata Share of Taxes, and (z) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Pro Rata Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by Tenant in respect of said fiscal tax year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. If Landlord fails to timely remit to Tenant the amount of any overpayment, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

4.2.3   As used herein, **"Taxes"** shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to

a future change in the method of taxation.  For purposes of
computing Tenant's Pro Rata Share of Taxes, Taxes shall not
include any: (1) income, excise, profits, estate, inheritance,
succession, gift, transfer, franchise, capital, or other tax or
assessment upon Landlord or upon the rentals payable under this
Lease; (2) taxes on rents, gross receipts or revenues of Landlord
from the Premises unless such taxes are assessed in lieu of real
estate taxes or an increase therein and in the jurisdiction such
taxes are typically paid by a tenant or occupant; (3) fine,
penalty, cost or interest for any tax or assessment, or part
thereof, which Landlord or its lender failed to timely pay
(except if same are caused by an Event of Default); (4)
assessment for a public improvement arising from the initial
construction or expansion of the Shopping Center or the Premises
(it being agreed that all assessments imposed during the Term
which are permitted to be included within Taxes hereunder shall,
for the purposes of computing Tenant's Pro Rata Share thereof, be
deemed to have been paid in the maximum number of installments
permitted by the applicable taxing authority); (5) Taxes
resulting directly from an increase in the assessment caused by a
sale or ground lease of all or any portion of the Shopping Center
to an Affiliate of Landlord or more than once every five (5)
years; or (6) fees imposed upon Landlord in connection with
Landlord's development of the Shopping Center (including, without
limitation, trip generation fees).  All Taxes payable by Tenant
pursuant to this Section 4.2 shall be determined as if the
Shopping Center was the only property owned by Landlord.
Landlord represents to Tenant that, as of the Effective Date and,
to the best of Landlord's knowledge, as of the anticipated
Delivery Date, no portion of the Shopping Center is or will be
(i) subject to or the beneficiary of an abatement of Taxes, or
(ii) subject to any special assessments or similar charges.

     4.2.4    At Tenant's reasonable request, Landlord
shall contest the amount or validity of any assessed valuation or
Taxes, failing which, Tenant shall have the right to contest the
assessed valuation or Taxes by appropriate proceedings conducted
in good faith, whereupon Landlord shall cooperate with Tenant,
execute any and all documents required in connection therewith
and, if required by any governmental authority having
jurisdiction, join with Tenant in the prosecution thereof.  If,
as a result of any contest or otherwise, any rebate or refund of
Taxes is received, Tenant shall be entitled to Tenant's Pro Rata
Share thereof (after reasonable and customary expenses incurred
by Landlord and/or Tenant in connection with such contest are
paid to the party which incurred such expense).  For the purposes
of this Article 4, "Taxes" shall include the reasonable out-of-
pocket costs incurred by Landlord in respect of any contesting of
Taxes, provided that any such costs over and above the cost of
valuers and other experts in respect of such contest, shall only
be included to the extent of the reduction in Taxes achieved.

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

     5.1.1    Maintenance of Common Areas.  Landlord shall
operate, maintain, repair and replace the Common Areas as
required by this Lease and otherwise to the standard by which
Common Areas of first-class shopping centers in the State of
Pennsylvania are operated, maintained, repaired and replaced,
including, without limitation, snow, ice, rubbish and debris
removal, landscaping (including, without limitation, the trimming
and pruning of trees to avoid interference with the use or

visibility of canopies or signs on the exterior of the Premises),
adequate lighting, insurance, supervision, use, parking lot
paving and striping, drainage, security (as reasonably required),
and control of all Common Areas, and Landlord shall comply with
all laws, ordinances, orders, rules and regulations applicable
thereto.

5.1.2    Tenant's Pro Rata Share of Common Areas
Charges.

(a)    During the Term, Tenant shall pay to Landlord
Tenant's Pro Rata Share of the reasonable costs (hereinafter
referred to as the **"Common Areas Charges"**) incurred by Landlord
to operate, maintain, insure and repair the Common Areas.
Landlord shall be permitted to include in Common Area Charges for
each calendar year an administrative fee (the "*Administrative
Fee*") equal to five percent (5%) of the Common Areas Charges for
the calendar year in question, but excluding from the computation
of such Fee the cost of any replacement or improvement of a
capital nature.  Tenant's Pro Rata Share of Common Areas Charges
shall be paid in equal monthly installments on the first day of
each calendar month, in advance, during each calendar year based
on Landlord's reasonable budget. Landlord's budget for the first
full calendar year during the Term shall be in an amount equal to
$1.10 per square foot of Floor Area.  Thereafter, except as
provided in the next sentence, Landlord's budget for any calendar
year shall not exceed one hundred five percent (105%) of the
Common Areas Charges for the immediately preceding calendar year
(exclusive of snow removal, electricity and insurance premiums),
and Landlord shall provide Tenant, upon Tenant's request, with
reasonable backup documentation and applicable evidence of prior
bills and payments.  Tenant hereby acknowledges that the
aforesaid five (5) percent cap in increases in Common Areas
Charges in any calendar year is cumulative so that if the Common
Areas Charges exceed the Common Areas Charges for the immediately
preceding calendar year by less than five (5) percent then
Landlord shall be entitled to carry forward to future calendar
years the positive difference between (i) five (5%) percent minus
(ii) the actual increase (the "Credit"), so that in any future
calendar year where the increase in Common Areas Charges over
those for the immediately preceding calendar year is greater than
five (5%) percent Landlord shall be able to use for that
particular calendar year only any Credit so carried over from a
previous year(s) to increase the five (5) percent cap by the
amount of the available Credit up to the actual Common Areas
Charges for such year.

(b)    Within sixty (60) days after the end of each
calendar year, Landlord shall provide to Tenant a statement, in
detail reasonably satisfactory to Tenant, of Common Areas Charges
for such year, which statement shall be prepared in accordance
with generally accepted accounting principles consistently
applied (the **"CAC Reconciliation Statement"**). The CAC
Reconciliation Statement shall be certified by Landlord as being
accurate and shall be accompanied by a calculation of Tenant's
Pro Rata Share of Common Areas Charges, and payment to Tenant in
the amount of any overpayment made by Tenant during the preceding
calendar year.  If Tenant's Pro Rata Share of the Common Areas
Charges for a calendar year shall exceed the aggregate monthly
installments paid by Tenant during said calendar year, Tenant
shall pay to Landlord the deficiency within thirty (30) days
after receipt of such notice.  Upon Tenant's request, Landlord
shall promptly deliver to Tenant copies of relevant backup
materials (including, but not limited to, contracts,
correspondence and paid invoices) reasonably required by Tenant.

If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Except as is provided in the next sentence, in no event shall the Tenant's Pro Rata Share of the Common Areas Charges with respect to any calendar year (exclusive of snow removal, electricity and insurance premiums) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of the Common Areas Charges for the immediately preceding calendar year (exclusive of snow removal, electricity and insurance premiums). Tenant hereby acknowledges that the aforesaid five (5%) percent cap in increases in Common Areas Charges in any calendar year is cumulative so that if the Common Areas Charges exceed the Common Areas Charges for the immediately preceding calendar year by less than five (5%) percent then Landlord shall be entitled to carry forward to future calendar years the Credit, so that in any future calendar year where the increase in Common Areas Charges over those for the immediately preceding calendar year is greater than five (5%) percent Landlord shall be able to use for that particular calendar year only any Credit so carried over from a previous year(s) to increase the five (5%) percent cap by the amount of the available Credit up to the actual Common Areas Charges for such year.

     5.1.3    <u>Exclusions from Common Areas Charges</u>.

     (a)   Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2)  the cost of any replacements or capital improvements to the Common Areas (for example, the cost of repaving the parking areas as opposed to patching); (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with laws (including, without limitation, the cost of curing violations or contesting such laws or violations); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation; (17) costs disproportionately incurred by or on

behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the Normal Hours [hereinafter defined in Subsection 5.2.5], (other than low-level security lighting); (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or to an Affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses, except for the Administrative Fee provided for in Subsection 5.1.2(a) above; (26) costs incurred in connection with the monitoring, maintenance, inspection or testing of Fire Alarm Systems, or (27) costs incurred in respect of the sports field shown upon Exhibit B and labeled "Sports Field" thereon.

(b)   In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges and the denominator used in the calculation of Tenant's Pro Rata Share for such costs shall be adjusted accordingly.

(c)   Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

(d)   The cost of repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises), as provided in Section 9.2 hereof, shall be includable in Common Areas Charges only with respect to repainting performed after the fifth (5th) anniversary of the Rent Commencement Date, and not more frequently than once every five (5) years thereafter.

5.1.4    _Tenant's Right to Audit_.  For any preceding two (2) years, Tenant shall have the right to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share thereof.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the overcharge exceeds four (4%) percent of Tenant's Pro Rata

Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable out-of-pocket expenses not to exceed $2,000.00)of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by law, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.5 below and pending resolution of such dispute, Tenant shall continue to pay Common Areas Charges at the previously estimated rate.

5.1.5    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1    Continuous Access.  The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads and other Common Areas are designated on the Site Plan.  No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term.  Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2    No Alterations. Landlord shall not: (i) alter the location, availability or size of any building or improvement within that part of the Common Areas labeled "Key Area" on Exhibit B (the "Key Area"); (ii) change the number, location, or layout of parking spaces within the Key Area; (iii) construct additional structures or buildings within the Key Area (including without limitation any kiosks, booths, signs or similar structures); (iv) materially change the roadways and sidewalks or other Common Areas within the Key Area; or (v) materially decrease or obstruct the entrances to and from the Shopping Center; without obtaining Tenant's prior written consent in each instance, which consent may be withheld by Tenant in its sole discretion without the application of Section 23.5 below.  In the event Tenant consents to any such work, it shall be performed by Landlord at any time other than during the months of August, November and December except in an emergency, and shall be undertaken in such a manner so as to (A) not materially adversely affect ingress to or egress from the Shopping Center, (B) have no material adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (C) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises.  Landlord shall not designate specific parking spaces within the Key Area for use by any tenant or other occupant of the Shopping Center.  Except within the areas shown labeled on Exhibit B as "Permissible Building Areas", Landlord

shall not make any changes to the Common Areas of the Shopping
Center outside of the Key Area without Tenant's prior written
consent which Tenant hereby agrees not to unreasonably withhold.

5.2.3 Outparcels.  In addition to the provisions of
Subsection 5.2.2 above, during the Term, the following
restrictions shall encumber and bind the outparcels
(collectively, the "Outparcels" and individually, an "Outparcel")
designated on Exhibit B hereto as "Pad #1," and "Pad #2": (a) no
more than one building shall be constructed on any Outparcel; (b)
no building shall exceed one story in height; (c) no building
shall exceed a maximum height of twenty-eight feet (28') as
measured from the finished floor level to the highest point on
such building or structure (inclusive of the height of all types
of projections or architectural treatments or embellishments
thereon, such as, but without limitation, HVAC equipment,
parapets, mansards, signs and antennae, but excluding any
flagpole); (d) the Floor Area of any building constructed on Pad
#1 shall not exceed ten thousand (10,000) square feet of Floor
Area and for any building constructed on Pad #2 shall not exceed
six thousand (6,000) square feet of Floor Area; (e) each building
shall comply with all governmental rules, regulations, ordinances
and laws; and (f) all such rules, regulations, ordinances or laws
relative to parking requirements for each Outparcel operation
shall be complied with by providing the requisite number of
parking spaces, without reduction in such number by virtue of the
granting of a variance or special exception.  The above
notwithstanding, in no case will Landlord be required to maintain
a ratio greater than five (5) stalls per thousand square feet of
Floor Area, unless required to do so by Township approvals, in
which case the Township requirement shall prevail.  For purposes
of determining the building area under this Subsection 5.2.3, the
Floor Area of any building constructed on an Outparcel shall also
be deemed to include outdoor balconies, patios or other outdoor
areas utilized for retail sales or food or beverage service
(exclusive of drive through or walk-up take-out food or beverage
service).

5.2.4    Parking Area.  During the Term, Landlord
shall maintain in the Shopping Center, at a minimum, the greater
of (i) the number of parking spaces required by law, without
variance, or (ii) five (5) ground-level parking spaces for every
one thousand (1,000) square feet of Floor Area in the Shopping
Center, with each such space being at least nine (9) feet in
width and eighteen (18) feet in length.  Parking spaces shall at
all times be clearly marked by painting, striping or otherwise.
Except for "Pad #3" and "Pad #4", Landlord shall not designate
specific parking spaces for use by any tenant or other occupant
of the Shopping Center. Tenant shall use reasonable efforts to
have its employees park their motor vehicles in an area away from
the entrances to the various businesses being operated in the
Shopping Center and Landlord shall take all reasonable measures
to have other tenants and occupants of the Shopping Center do the
same.  If employee parking becomes a problem (i.e., a substantial
number of employees of occupants of the Shopping Center park on a
recurring basis immediately in front of a tenant's or occupant's
premises) and such problem is not eliminated in other ways, then
Landlord may reasonably allocate areas in the Shopping Center for
employee parking and in such event Landlord shall cause the
employees of all other tenants within the Shopping Center to
cause their employees to park in the areas reasonably designated
by Landlord and Tenant shall cause its employees to parking their
vehicles only in the areas reasonably designated by Landlord.
There shall be no charge whatsoever levied for the use of any
parking areas within the Shopping Center.

5.2.5    _Lighting_.  Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week at all times during normal retail shopping center hours, and, one (1) hour thereafter,  which shall include, but not be limited to, until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*).  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, _provided_ Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (_excluding_, however, those tenants and occupants who separately control and pay for their own Common Area lighting).  In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6    _Repairs_.  During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)  not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable law;

(b)  be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances);

(c)  be performed in accordance with the requirements of Section 3.3.7 above and in such a manner so as not to: (i) adversely affect ingress to or egress from the Shopping Center, (ii) adversely affect the visibility of the Premises or any signs which contain Tenant's name, and (iii) otherwise materially interfere with the normal conduct of Tenant's business in the Premises.

5.2.7    _Rules and Regulations_.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the operations of Tenant's, or its sublessee's, business(es) on the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8    _No Promotional Use_.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes; provided, however, that (i) the foregoing shall not be deemed to prohibit Landlord from installing a trailer to the extent required in Landlord's Work, in the location shown on _Exhibit B_ hereto; (ii) Tenant shall have the right, subject to applicable law, to place a trailer on the

Common Areas in an area immediately adjacent to the Premises for the purpose of conducting employee interviews and recruiting, which trailer shall be removed within ten (10) days after the Delivery Date; (iii) each occupant of the Shopping Center may conduct periodic sidewalk sales on the sidewalk immediately adjacent to the premises in the Shopping Center occupied by them (b) retail sales may be conducted on the sidewalk in front of a tenant's store only provided that (1) such sales shall be conducted at all times in a manner consistent with first-class shopping centers; (2) Landlord shall proceed with reasonable diligence to ensure that such sales by other tenants do not interfere with or disrupt Tenant's normal business operations, pedestrian access, the visibility of the Premises or any signage thereon or Tenant's use of the Common Areas under this Lease, and (3) the sidewalk sales of each such tenant shall not occur more than four (4) times each calendar year (and each such sale shall not exceed ten (10) days in duration), provided, however, the restrictions with respect to sidewalk sales set forth in the foregoing Section shall not apply to Acme; and (iv) Acme may use that part of the Common Areas labeled "Acme Outside Sales Area" on Exhibit B for outside sales.

     5.2.9    Trash Compactor.  Tenant shall be permitted to maintain and operate, at no extra charge, its trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor".

     5.2.10    Shopping Carts.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.  Tenant shall have the right to provide for the use of its customers a cart coral in the location in the Common Areas shown on Exhibit B for the placement by Tenant's customers of carts for collection by Tenant's employees, provided, however, all shopping carts for be stored inside of the Premises.

## ARTICLE 6
### UTILITIES

     Section 6.1.    From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, and sanitary sewer) consumed in the Premises by Tenant.  If Tenant exercises a right of entry prior to the Delivery Date pursuant to Section 3.3.5 hereof then Tenant shall be responsible for the cost of any utilities consumed by Tenant on the Premises.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord, unless: (i) the quality of the service(s) provided is at least equal to the quality of the same service(s) provided by the public utility corporation or governmental authority providing such utilities in the area in which the Shopping Center is located; and (ii) the cost of such service(s) shall not exceed the lesser of: (x) the cost of the same service if Tenant had obtained such service directly from the applicable public utility company, or (y) the cost to Landlord for such service.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date.  Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by other tenants of the Shopping Center.

Section 6.2.    Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be abated during the period of disruption.

ARTICLE 7
SIGNS

Section 7.1    <u>Tenant's Building Signage</u>.

Subject to compliance with applicable law, Tenant shall have the exclusive right, at its sole cost and expense,  to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), flags and signs (including, without limitation, under-canopy (e.g., blade) signs) of such size, design and color as Tenant, from time to time, may desire, subject only to compliance with the applicable provisions of <u>Exhibit F</u> hereto,  provided that the foregoing shall not limit Landlord's obligation to supply and install signage as part of Landlord's Work in accordance with <u>Exhibits D</u> and <u>D-1</u> hereto, and with the additional provisions of this Lease.  Landlord, in accordance with its obligation to supply and install signage as part of Landlord's Work in accordance with <u>Exhibits</u> D and <u>D-1</u> hereto and with the additional provisions of this Lease, shall at its sole cost and expense: (i) install and maintain on the storefront of the Premises a temporary banner announcing "Coming Soon" at such time, and for such duration prior to the Rent Commencement Date, as Tenant shall desire, and (ii) install and maintain, during the period commencing on the Effective Date and ending on the day prior to the Rent Commencement Date, a temporary sign near the site of the main entrance to the Shopping Center which states "Bed Bath & Beyond Coming Soon".  Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    <u>Signage Restrictions and Criteria</u>.

7.2.1    The signage rights of all other tenants in the Shopping Center shall be subject to the provisions of <u>Exhibit F</u> hereto and Landlord shall enforce the provisions of <u>Exhibit F</u> against all tenants of the Shopping Center in a non-discriminatory manner).

7.2.2    Except for the landscape plan described in <u>Exhibit D</u>, Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.  Except as may be otherwise permitted under leases or occupancy agreements existing as of the Effective Date, Landlord shall not permit any tenant or occupant in the Shopping Center whose premises contain less Floor Area than the Premises to erect or maintain building signage having: (a) an "area of the sign" (as defined by applicable codes) larger than the "area of the sign" permitted to be

utilized by Tenant, or (b) the top of any other tenant's sign field be higher than the top of Tenant's sign field allocated to Tenant.  Except for the premises labeled "Acme" on Exhibit B (the "Acme Premises"), in no event shall the height of any sign (or any sign letters) or logo which is utilized by any other tenant or occupant in the Shopping Center extend beyond the sign band shown on the front elevation of the Shopping Center attached hereto as Exhibit D-1.

Section 7.3   Pylon/Monument Signage. Landlord and Tenant hereby agree that it is Landlord's intention to apply for and use all diligent efforts to obtain a variance for the installation of pylon and/or monument signage in the Shopping Center.  On receipt of any such variance Landlord shall provide Tenant with a copy of the same, including information as to the location, size and layout of the pylons and/or monuments in respect of which Landlord has been able to obtain a variance and the proposed location of Tenant's sign panel thereon. If the variance authorizes the installation of individual identification panels on such pylon and/or monument then, to the extent authorized by such permits and approvals, Tenant shall be entitled to place a sign panel thereon in the second position thereon beneath the panel for Acme, equal in size to one-quarter of the total permitted square footage of all panels on such pylon or monument. If Landlord obtains permits and approvals for any pylon(s), then Landlord shall construct the same in accordance with a layout plan reasonably approved by Tenant.  In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas or on any "Related Land" (defined in Subsection 13.1.2 below) or otherwise, such signage shall also include Tenant's identification sign (having colors as selected by Tenant), which shall be at least as large as the largest sign made available to the signs of such other tenant or tenants.  Landlord shall maintain all pylons and monuments in good order and repair, and allow Tenant access to maintain, repair and replace its signs thereon, at Tenant's cost and expense.  Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent. The cost of maintenance of all pylons and monuments (but not individual tenants' signs thereon or the cost of the construction of the pylons and monuments), and of the cost of any electricity used to illuminate them, shall be included in Common Areas Charges.  The foregoing provisions of this Section 7.3 are subject to the right of Acme Supermarkets to erect two (2) monument signs in the Shopping Center, provided that Landlord hereby covenants that (i) such monument signs shall not be positioned so as to interfere with Tenant's use and enjoyment of the Premises in accordance with this Lease, or materially interfere with the visibility of the Premises; and (ii) if the location of the Acme Supermarkets monuments interferes with any other Shopping Center pylon or monument, then Landlord shall change the location of the Shopping Center pylon or monument so that the same is clearly visible.

Section 7.4   Signage: Alteration/Removal/Allocation. Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same.  Landlord, upon request, shall execute any consents or applications which may be required by law to permit the placement or installation of any signs by Tenant on any part of the Premises or on any pylon or

monument.  Upon the expiration or earlier termination of the
Lease, Tenant shall remove its signs and patch up any holes on
the fascia or other exterior walls of the Premises or on any
pylon or monument caused by the prior installation or the removal
of such signs.  The signage rights granted to Tenant pursuant to
this Article 7 shall, at Tenant's option, be allocated to or
between Tenant and/or any subtenant(s) of all or any portion of
the Premises.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1        Tenant shall not perform any structural
alterations or structural improvements to the Premises or make
any alterations to the exterior architectural theme of the
Premises, to the extent that such architectural theme is not
consistent throughout the Shopping Center, without the prior
approval of Landlord.  All work performed in connection with
structural and non-structural alterations or improvements
proposed by Tenant shall be done at Tenant's sole cost and
expense, in a good and workmanlike manner and in compliance with
all applicable governmental requirements.  The provisions of this
Section 8.1 shall not apply to Tenant's building signage, which
shall be governed by the applicable provisions of Article 7
above.

8.1.2        Tenant may, from time to time, at its sole
cost and expense, without the prior approval of Landlord, make
non-structural alterations and non-structural improvements to the
Premises as Tenant deems necessary or desirable, including, but
not limited to, electrical systems, heating, ventilation and air
conditioning and other mechanical systems, installation of
fixtures and equipment, painting, and wall and floor coverings,
provided that the structural integrity or economic value of the
Premises shall not be adversely affected thereby.

8.1.3        Tenant shall have the right, at Tenant's
expense, to subdivide the Premises into two (2) or more separate
stores, each of which may have its own front entrance and access
to the loading docks in the rear of the Premises, as well as
separately sub-metered utilities.  Tenant shall provide to
Landlord plans for any subdivision work at least fifteen (15)
days prior to the commencement of such work, for Landlord's
informational purposes only.

8.1.4        Tenant shall have the right to erect and
maintain an antenna and a satellite dish on the roof of the
Premises, provided that Tenant: (i) obtains Landlord's prior
approval of its plans for the installation of such equipment,
(ii) uses a contractor designated or approved by Landlord for all
roof penetrations, (iii) maintains the area where roof
penetrations are made while Tenant's equipment is present, and
(iv) repairs any damage to the roof caused by the making of the
roof penetrations, including, but not limited to, the repair of
the roof penetrations upon the removal of any equipment installed
thereon.

8.1.5        Upon the request of Tenant, Landlord shall
fully, promptly and diligently cooperate with Tenant and its
architects and designers in obtaining any permits, approvals and
certificates required to be obtained by Tenant in connection with
any alteration or improvement described in this Article 8, and

shall execute all applications, documents and other instruments reasonably required for such purpose, provided that Landlord shall not be obligated to incur any costs or expenses, including, without limitation, attorneys' fees and disbursements, or suffer any liability in connection therewith.  Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within twenty (20) days after Tenant's request therefor.

8.1.6     If any violation of any applicable legal requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7     Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord shall not refurbish, renovate and/or paint (or repaint) the exterior of other portions of the Shopping Center so as to create a difference in appearance between such premises and the Premises, unless Landlord also refurbishes, renovates and/or paints (or repaints) the exterior of the Premises, which refurbishment, renovation and/or painting shall (i) be performed at Landlord's sole cost and expense, and (ii) with respect to the Premises, be subject to Tenant's prior approval.  Landlord shall neither make nor permit to be made any alterations to the exterior "architectural theme" of the remainder of the Shopping Center (exclusive of other tenants' entrance features) without the prior consent of Tenant.

8.1.8     Upon the expiration or sooner termination of this Lease, all alterations and improvements made by Tenant to the Premises, with Landlord's approval,  shall become the property of, and shall be surrendered to, Landlord, and Tenant shall have no obligation to remove alterations or improvements; provided, however, that this provision shall not apply to Tenant's Property.  Landlord reserves the right to require Tenant to restore the Premises to the condition that the same were in prior to any unapproved alteration, subject to normal wear and tear.

ARTICLE 9
REPAIRS

Section 9.1     Tenant's Repairs.  Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical and/or fire alarm systems located in, or serving, exclusively the Premises);  (ii) the heating, ventilation and air conditioning ("HVAC") units exclusively serving the Premises .  Landlord hereby grants Tenant license to enter upon the roof, the exterior of the Premises, and/or the Common Areas to perform work with respect to the HVAC units in a commercially reasonable manner.  In the event Tenant replaces the HVAC units exclusively serving the Premises within two (2) years of the expiration or earlier termination of the Term, then, provided that Tenant provides Landlord with documentation of the cost of said replacement prior to performing

work and provides Landlord with the opportunity to perform such
work at a lower cost and provided Tenant is not in default
hereunder beyond any applicable grace and cure period, Landlord
shall pay to Tenant, upon Tenant's surrender of possession of the
Premises to Landlord, the then unamortized cost of such HVAC
units (utilizing the estimated useful life of the HVAC units as
established by the Internal Revenue Code of the United States);
the provisions of this sentence shall survive the expiration or
earlier termination of this Lease.  All repairs and replacements
on Tenant's part to be performed hereunder shall be at Tenant's
sole cost and expense, and performed in a good and workmanlike
manner in accordance with all applicable legal requirements.

        Section 9.2   Landlord's Repairs.  Subject to the
provisions of Article 11 hereof, Landlord shall perform, as the
same shall from time to time be necessary, all repairs and
replacements to the following:

                (a)   the buildings of the Shopping Center as
necessary to maintain same in good condition and repair
(including, without limitation, repainting the exterior walls of
the buildings of the Shopping Center (including, without
limitation, the Premises)) as same may be reasonably required
from time to time during the Term;

                (b)   the structural elements of the Premises,
which shall be deemed to include, without limitation, the roof
joists, foundation, exterior walls (including, without
limitation,  repainting, but excluding plate glass, storefront
windows, doors, door closure devices, window and door frames,
molding, locks and hardware, and painting or other treatment of
interior walls), floor (but not the floor covering, unless the
same is damaged as a result of a floor defect or settling), and
the structural elements of any building of which the Premises may
be a part;

                (c)   the roof, gutters, flashings, downspouts and
scuppers;

                (d)   the electric, gas, water, sanitary sewer, and
other public utility lines serving the Premises, to the point of
connection to the Premises;

                (e)   all utility lines and ducts in or passing
through the Premises which do not exclusively serve the Premises;

                (f)   the non-structural elements of the Premises
(including, without limitation, the HVAC units and the
electrical, plumbing, mechanical and/or fire alarm systems
located in or serving the Premises) until the later of: (A) the
expiration of any contractors', manufacturers', vendors', or
insurers' warranties or guarantees, or (B) the first (1st)
anniversary of the Delivery Date ; and

                (g)   any damage to the Premises or the Shopping
Center which is occasioned by (A) the act or omission of
Landlord, its employees, agents or contractors, or (B) any breach
by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed
hereunder shall be at Landlord's sole cost and expense (and not
includable in Common Areas Charges), performed in a good and
workmanlike manner in accordance with all applicable legal
requirements, in accordance with the requirements of Section
3.3.7 above, and without material interference with or disruption

to the normal business operations of Tenant or any subtenant, concessionaire or licensee of Tenant. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal operation of Tenant's business in, the Premises (except in the case of an emergency posing imminent material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's sole but reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal business operations of Tenant or any subtenant, concessionaire or licensee of Tenant, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof). In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have a right to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    Legal Compliance Work. Subject to Section 9.2 above, Tenant shall be responsible, at its sole cost and expense, for the performance of all "Legal Compliance Work" (hereinafter defined) required: (a) solely due to Tenant's specific use of the Premises (i.e., is not of general applicability to tenants and occupants of the Shopping Center), (b) with respect to interior elements of the Premises which are not structural (as noted in Section 9.2 above), or (c) which are required as a direct result of Tenant's application for a building permit or other approval for work to be performed by Tenant on the Premises, provided, however, that the foregoing shall not serve to relieve Landlord of its obligations to perform Landlord's Work in accordance with all legal requirements and to perform the repairs required under Section 9.2 above. Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges) for performing all other Legal Compliance Work. As used herein, **"Legal Compliance Work"** shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any law, rule, regulation or order promulgated by competent governmental authority and in effect on the date of this Lease or hereafter imposed. Notwithstanding the foregoing, if it is determined that the Landlord's Work does not comply with The Americans with Disabilities Act, Landlord shall bear all costs of effecting such compliance, whether or not the same is required as a result of Tenant's specific use of the Premises.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1    Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property and time

element insurance required to be maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2    Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided for in Section 10.1.1 above. If any additional charge or increase in premium is required by an insurer because of this waiver of subrogation, then the party for whose benefit the waiver was obtained shall pay such additional charge or increase in premium within ten (10) days after it receives written notice thereof, failing which, the release and waiver benefitting such party shall be of no further force or effect unless and until said beneficiary pays such charge or increase.

10.1.3    Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2    Tenant's Insurance.

10.2.1    Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising

out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) standard "All-Risk" property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of  all fixtures, equipment and other items of personal property of Tenant located on or within the Premises.  Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

    10.2.2    <u>Self-Insurance</u>.  All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iv) a combination of any of the foregoing insurance programs.  To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; <u>provided</u>, however, that in no event shall any deductible exceed One Hundred Thousand Dollars ($100,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

    Section 10.3    <u>Landlord's Insurance</u>.

    10.3.1    <u>Liability Insurance</u>.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as  "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

    10.3.2    <u>"All-Risk" Property Insurance</u>.  Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term standard "All-Risk" property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages,  on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center ; <u>provided</u>, <u>however</u>, in no event shall such insurance cover  Tenant's Property.  All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Institutional Mortgagee, or if none,

to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3    Tenant's Pro Rata Share of Insurance Premiums.  Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Subsection 10.3 as part of Common Areas Charges.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4    General Insurance Requirements.

10.4.1    All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

10.4.2    The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.


ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1    Fire and Other Casualty.

11.1.1    (a)  Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other

casualty, which restoration shall  include all Tenant's Work and
all other leasehold improvements performed by Tenant, and shall
not include any of Tenant's Property.  The proceeds of the
policies required to be obtained and maintained by Landlord
pursuant to Subsection 10.3.2 hereof shall, to the extent
necessary, be used for the performance of such rebuilding and
restoration work.  In the event such insurance proceeds are
insufficient to complete such work, Landlord shall provide the
balance of the amount necessary to rebuild or restore the
Shopping Center in the manner provided in this Section 11.1.

(b)  Notwithstanding the foregoing, if any portion
of the Premises are so damaged or destroyed, Tenant shall have
the right to require Landlord to make changes to the Premises in
the course of, and as part of, such rebuilding or restoration
work.  If the net cost and expense of such rebuilding or
restoration work is increased solely as a result of such changes
(taking into consideration any and all actual reduced and
additional costs resulting from such changes and/or other cost
savings arising therefrom), then Tenant shall pay to Landlord, as
Additional Rent, the amount of such net increase, which amount
shall be due and payable within thirty (30) days after Landlord
has delivered to Tenant backup information evidencing such
increase (including, without limitation, receipted invoices) as
may be reasonably required by Tenant (but in no event earlier
than the occurrence of the Delivery Date).

(c)  If, in Tenant's sole but reasonable judgment,
any damage to the Premises renders all or any portion of the
Premises unusable for the conduct of Tenant's business or, in the
case of damage to the Shopping Center, materially interferes with
the normal conduct of Tenant's business in the Premises, the Rent
shall be equitably reduced or totally abated based upon the
extent to which the remaining portion of the Premises may, in
Tenant's sole but reasonable judgment, be utilized for its normal
conduct of business.  Such abatement shall continue until
terminated in accordance with the provisions of Section 11.3
below.  If such fire or other casualty occurs after the Delivery
Date but before the Rent Commencement Date, then, notwithstanding
any other provision of this Lease (but subject, however, to the
provisions of Sections 2.3, 2.4 and 2.5 above), the Rent
Commencement Date shall be deemed delayed by one day for each day
which elapses between the occurrence of such fire or other
casualty and the date upon which the damaged or destroyed area(s)
are fully rebuilt and restored.

11.1.2   In the event that:

(a)  Subject to any delays caused by Tenant
pursuant to Section 11.1.1(b) hereof, Landlord does not
commence the repair and restoration work to the
Premises, the Common Areas, or other buildings in the
Shopping Center as required pursuant to this Section
11.1 within ninety (90) days after the date of such
destruction, or thereafter fails to diligently pursue
the completion of such repair and restoration work
(subject to such period as may be reasonably necessary
for the adjustment of insurance proceeds, not to exceed
thirty (30) days in the aggregate); or

(b)  the required repairs and restorations to
the Premises, the Common Areas, or other buildings in
the Shopping Center are not Substantially Completed by
Landlord in accordance with the provisions of this
Subsection 11.1 within one (1) year after the date of

destruction (which period may be extended by up to ninety (90) days by reason of Force Majeure, provided that Landlord gives Tenant notice of its claim of Force Majeure within five (5) days after the occurrence of the event of Force Majeure),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord, perform or complete, as the case may be, the required repairs and restoration work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that Tenant shall have the right to claim such progress payments during the course of such repairs from all insurance proceeds paid or payable to Landlord or Landlord's Institutional Mortgagee pursuant to Subsection 10.3 hereof); or

(ii) seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii) terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the reasonable opinion of an independent licensed architect designated by Tenant, the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof, provided that Tenant provides said notice prior to Landlord's commencement of reconstruction and not later than thirty (30) days after the date of destruction.

11.1.3    If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2    Eminent Domain.

11.2.1    As used in this Section 11.2, **"Taking"** or **"Taken"** shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord

and those having the authority to exercise such right.

11.2.2    If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for obligations occurring prior to the date of the taking by Tenant hereunder.

11.2.3    In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has entrances from Durham Road, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises;

(c)    there occurs, in Tenant's sole but reasonable judgement, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)    any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises;

(e)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken;

(f)    so many of the parking spaces in the Shopping Center are taken that the parking ratio in the Shopping Center is less than 5:1 and no substitutes are provided to restore the ratio to 5:1, or if so many of the parking spaces in the Key Area are Taken such that there are fewer than (i) four and one-half (4.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the premises fronting the Key Area; or

(g)    a Taking occurs which results in a prohibition of use of the Demised Premises for retail purposes;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant

hereunder and for payment to Tenant for its share of the award
for the taking pursuant to Subsection 11.2.5 below.  Upon any
partial Taking of the Premises, the Rent shall be equitably
reduced or totally abated based upon the extent to which the
remaining portion of the Premises may, in Tenant's sole but
reasonable judgment, be utilized for its normal conduct of
business.

        11.2.4    If this Lease is not terminated pursuant to
this Section 11.2, Landlord, at its sole cost and expense, within
a reasonable period of time after such Taking, shall repair and
restore the area not so Taken to tenantable condition, similar in
physical appearance to the condition of the area immediately
prior to the Taking, pursuant to plans and specifications
approved by Tenant (which repair and restoration to the Premises
shall include all Tenant's Work and all other leasehold
improvements performed by Tenant; provided, however, that
Landlord shall not be obligated to repair or restore Tenant's
Property).  During the period of such repairs and restoration,
all Rent shall abate to the extent that the Premises may not, in
Tenant's sole but reasonable judgment, be used by Tenant for the
normal conduct of its business.  Such abatement shall terminate
in accordance with the terms of Section 11.3 below.

        11.2.5    In connection with any Taking or partial
Taking of the Premises, Tenant shall be entitled to claim an
award for loss of business, leasehold improvements, fixtures and
equipment and removal and reinstallation costs; provided,
however, that no award shall be payable to Tenant which reduces
the award payable to Landlord for its fee interest in the
Premises.

        11.2.6    Any dispute between the parties with respect
to this Section 11.2 shall be resolved by arbitration in
accordance with the provisions of Section 16.5 below.

    Section 11.3    Abatement of Rent Charges.  Notwithstanding
any other provisions of this Lease, if the Fixed Rent and
Additional Rent payable by Tenant hereunder shall be abated
pursuant to Sections 11.1 or 11.2 above, such abatement shall
terminate upon the first to occur of: (a) the date on which
Tenant shall reopen the Premises to the public for business and
shall be able to engage in the normal conduct of such business;
or (b) the expiration of the period which is  sixty (60) days
after Landlord shall have completed such repairs and restoration
work as Landlord is obligated to perform hereunder and the
interference with the operation of business in the Premises has
ceased.


                        ARTICLE 12
            COVENANTS, REPRESENTATIONS AND WARRANTIES

    Section 12.1    Quiet Enjoyment.  Tenant shall peaceably and
quietly have, hold, occupy and enjoy the Premises for the Term,
without hindrance from Landlord or any party claiming by,
through, or under Landlord.

    Section 12.2    Authority.  Tenant and Landlord each warrant
and represent that the person(s) signing this Lease on their
behalf has authority to enter into this Lease and to bind Tenant
and Landlord, respectively, to the terms, covenants and
conditions contained herein.  The submission of this Lease to
each party hereto shall be for examination and negotiation
purposes only, and does not and shall not constitute a

reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3   Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)  As of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)  In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)  No third party consents are required in order for Landlord to enter into this Lease, or to allow Landlord to perform Landlord's Work (other than governmental permits and approvals);

(d)  Tenant's use of the Premises for sale of Permitted Items (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)  The Shopping Center on the Delivery Date shall have access to Durham Road for the purpose of vehicular traffic;

(f)  Except as required by law, Landlord shall (i) not reveal to anyone the economic or other business terms of this Lease (including, without limitation, the amount of Rent set forth herein), and (ii) use all commercially reasonable efforts to cause any broker retained by Landlord in connection with this Lease to abide by the confidentiality requirement described in (i) above, provided, however, that Landlord shall be permitted to disclose such information to its accountants, attorneys, agents or other consultants, any *bona fide* prospective purchasers of the Shopping Center, or any current or prospective Institutional Mortgagees or "Ground Lessors" (defined in Subsection 1.1.15 above) of all or any portion of Landlord's interest in the Shopping Center;

(g)  This Lease does not violate the provisions of any instrument heretofore executed and binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(h)  Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center;

(i)  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center;

(j)   Landlord shall use its best good faith efforts to forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease.  Landlord hereby authorizes Tenant to appear at such proceeding to contest the proposed zoning, building code, signage, or related variance.  Landlord, at Tenant's sole cost and expense, shall cooperate with Tenant in Tenant's appearance in such proceeding and to contest such proposed variance.  Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding; and

(k)   Upon the date of closing any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, Landlord shall deliver to Tenant (x) an agreement in the form attached hereto as Exhibit G, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof and in form suitable for recording, and (y) an agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid), in recordable form.  Should Landlord fail to so deliver such instrument(s) in the aforesaid manner, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below).  The provisions of this Section **12.3(k)** shall be in addition to, and not in limitation of, Article 17 of this Lease.

Section 12.4   Environmental Matters.

12.4.1   Definitions.

(a)   As used herein, the term **"Environmental Laws"** shall mean any and all federal, state, county, municipal or other governmental statutes, laws, ordinances, rules, regulations and legally enforceable policies concerning the protection of the environment, human health or safety.

(b)   As used herein, the term **"Hazardous Substances"** shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law.

(c)   As used herein, the term **"Environmental Notice"** shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning

(i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)   As used herein, the term **"Releasing"** or **"Release"** shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)   As used herein, the term **"Compliance Costs"** shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation: consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)   As used herein, the term **"Tenant Related Parties"** shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2   <u>Compliance with Environmental Laws</u>.  Tenant shall comply with all  applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3   <u>Responsibility for Releases of Hazardous Substances</u>.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter **"Tenant Releases"**), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises.

12.4.4   <u>Standards</u>.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum

standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5    Landlord's Representations and Warranties. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any governmental law, rule, statute, ordinance or regulation, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6    Documents. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7    Indemnity. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Environmental Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8    Survival. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9    Conflict. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5    Purchase and Sale Contract.

12.5.1    Landlord represents and warrants to Tenant that: (a) it is the vendee under that certain Purchase and Sale Agreement dated January 6, 1999 by and between Burton Lifson, Rita Lifson, Kalman Lifson and Marilyn Lifson, as seller, and Landlord, as purchaser, with respect to part of the Shopping Center (the "Contract"); (b) the Contract is in full force and effect; and (c) it has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contract.

12.5.2    Landlord shall proceed diligently and in good faith to acquire fee title to all of the Shopping Center in the manner required under this Lease.

12.5.3    (a)    In the event that Landlord has not acquired fee title to the entire Shopping Center in full

accordance with the terms and conditions of this Lease on or before August 1, 2000, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease.

(b)    In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease on or before August 1, 2000, which failure by Landlord is not attributable to Landlord's default or breach under this Lease, then Landlord may at its election, upon notice to Tenant, given at any time after said date (and in any event prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease.

12.5.4        If this Lease is terminated pursuant to Subsection 12.5.3 above, and Landlord or its Affiliate acquires title to the Shopping Center within two (2) years after the date on which the Lease termination becomes effective hereunder, then at the time of Landlord's (or its Affiliate's) acquisition of title to the Shopping Center, Tenant shall have a right of first refusal to lease the Premises upon the terms and conditions on which Landlord proposes to lease the Premises to any other party; provided, however, that all dates set forth in this Lease shall be appropriately extended.  In the event Tenant elects to exercise such right of first refusal, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease, subject to any change in the economic terms as aforesaid. In the event Tenant does not elect to exercise such right of first refusal within thirty (30) days after its receipt of a notice from Landlord advising Tenant of Landlord's subsequent acquisition of the Shopping Center, Landlord shall be free to lease the Premises to any other person or entity, upon economic terms which are not materially more favorable to the tenant than those contained in this Lease. The provisions of this Subsection 12.5.4 shall survive the termination of this Lease.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1    Permitted and Prohibited Uses.

13.1.1    Tenant's Permitted Use.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the Premises for any of the "Prohibited Uses" (hereinafter defined in Subsection 13.1.3(a)) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2    Prohibited Uses.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located.  Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any land (the *"Related Land"*) contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date) for any of the "Prohibited Uses" (defined in Subsection 13.1.3 below), provided, however,

that the foregoing provisions of this Subsection 13.1.2 shall not
apply to any business existing on any Related Land owned by a
person or entity which: (i) was previously, but is no longer, the
Landlord hereunder, or (ii) at the time it became Landlord
hereunder, already owned such Related Land (excluding, however,
the Landlord originally named herein and its Affiliates).

13.1.3   Definitions.

(a)  As used herein, the term *Prohibited Uses*
shall mean any of the following uses: unlawful use; "pornographic
use" (hereinafter defined); "second-hand" or "surplus" store;
laundry or dry cleaners with on-site dry cleaning; pawn shop;
daycare center [except as may be located in the premises labeled
Phase I on Exhibit B ("Phase I")]; veterinary office (except as
may be located in Phase I); living quarters; hotel/motel;
manufacturing; bowling alley; off-track betting parlor or other
gambling establishment; bingo hall; funeral parlor; skating rink;
nightclub, discotheque or dance hall; so-called "head shop";
catering or banquet hall (but not excluding private banquet rooms
in a public restaurant permitted herein); children's
entertainment or activity facility except in Phase I; meeting
hall; auction hall; place of religious worship; sporting event
except for the sports field shown upon Exhibit B and labeled
"Sports Field" thereon; karate center except in Phase I;
auditorium; warehouse (except for the use of the Acme Expansion
Space); theater; automobile repair shop, or any business
servicing motor vehicles in any respect, including, without
limitation, any quick lube oil change service, tire center or
gasoline or service station or facility (except as may be located
in the premises labeled Pad #4 on Exhibit B); supermarket, except
as is shown labeled "Acme" on Exhibit B; restaurant serving meals
for on or off premises consumption (except (i) that a "coffee
bar" shall be permitted to be located within the Premises and in
the Premises labeled "Coffee Beanery" on Exhibit B, (ii) as may
be located in Phase I, Pad #1, Pad #2, Pad #3 and Pad #4 and
(iii) as an incidental use within the Premises labeled Staples on
Exhibit B); beauty parlor except in Phase I; nail salon except in
Phase I; billiard parlor or pool hall; sales office or showroom
for automobiles, boats, or other vehicles; an establishment
serving alcoholic beverages for on or off premises consumption
(except as part of the operation of a family style restaurant
permitted hereunder and except that a liquor store comprising no
more than four thousand (4,000) square feet shall be permitted in
Phase I; massage parlor; office (excluding office space used in
connection with and ancillary to a permitted retail use
hereunder); health spa, exercise facility or similar type
business except in Phase I; car wash except in Pad #4; a so-
called "flea market"; carnival, amusement park or circus;
video/pinball arcade or game room, except as may be incidental to
another use permitted hereunder; entertainment or educational
uses; any use generally deemed to be "obnoxious or a nuisance"
(hereinafter defined); medical clinics or offices (except that
offices typically found in a first class shopping center shall be
permitted in Pads 1 (up to a maximum of four thousand five
hundred (4,500) square feet of Floor Area) and 4 and in up to
five thousand (5,000) square feet of Floor Area on Phase I); or
any other non-retail uses.

(b)  As used herein, the term *pornographic use*
shall include, without limitation, a store displaying for sale or
exhibition books, magazines or other publications containing any
combination of photographs, drawings or sketches of a sexual
nature, which are not primarily scientific or educational, or a
store offering for exhibition, sale or rental video cassettes or

other medium capable of projecting, transmitting or reproducing,
independently or in conjunction with another device, machine or
equipment, an image or series of images, the content of which has
been rated or advertised generally as NC-17 or "X" or unrated by
the Motion Picture Rating Association, or any successor thereto.
The above notwithstanding, nothing herein shall prohibit the
rental of NC-7 or X rated or unrated videos if they are not
displayed in public or if display is limited to a separate room
to which only adults are permitted.

(c)  As used herein, the term **_educational uses_**
shall include, without limitation, a beauty school, barber
school, reading room, place of instruction, or any other
activity, facility, school or program catering primarily to
students or trainees as opposed to shoppers.

(d)  As used herein, the term **_obnoxious or a
nuisance_**" shall include, without limitation, a use which emits or
results in strong, unusual or offensive odors, fumes, dust or
vapors, is a public or private nuisance, emits noise or sounds
which are objectionable due to intermittence, beat, frequency,
shrillness or loudness, creates a hazardous condition, or is
used, in whole or in part, as or for warehousing or the dumping
or disposing of garbage or refuse.

Section 13.2    Tenant's Exclusive in Center.  To induce
Tenant to execute this Lease, and subject to all of the terms and
provisions of this Section 13.2, Landlord covenants and agrees as
follows.

13.2.1    Except as may be permitted in the lease to
Acme, Landlord will not lease, rent or occupy or permit any other
premises in the Shopping Center or on any Related Land (defined
in Subsection 13.1.2 above) to be occupied, whether by a tenant,
sublessee, assignee, licensee or other occupant or itself, for
the sale, rental or distribution, either singly or in any
combination, of items contained in any of the following
respective categories of merchandise: (a) linens and domestics;
(b) bathroom items; (c) housewares; (d) frames and wall art
(except custom framing); (e) window treatments; and/or (f)
closet, shelving and storage items (which items, either singly or
in any combination, are hereinafter referred to as the **_"Exclusive
Items"_**).  Notwithstanding the foregoing, (i) any tenant or
subtenant in the Shopping Center or the Related Land shall have
the right to utilize its respective premises for the sale, rental
and/or distribution of Exclusive Items within an aggregate area
(which shall include an allocable portion of the aisle space
adjacent to such sales, rental and/or distribution area) not to
exceed the lesser of (x) five percent (5%) of the Floor Area of
such tenant's or subtenant's premises, or (y) two thousand
(2,000) square feet of Floor Area within such tenant's or
subtenant's premises [For example only, a tenant occupying
premises containing a total of five thousand (5,000) square feet
of Floor Area could sell Exclusive Items (either singly or in any
combination) so long as the aggregate area within its entire
demised premises in which any and all Exclusive Items are sold
shall not exceed two hundred fifty (250) square feet]; (ii) the
foregoing exclusive shall not apply to the premises demised to
Acme so long as such premises are controlled by Acme, but the
foregoing exclusive shall apply to such premises if they again
come under the control of Landlord; (iii) the foregoing exclusive
shall not prohibit the operation within the Shopping Center of a
full-line hardware store, a "Staples" or a "Corners"; and (iv)
the foregoing exclusive shall not prohibit the operation within
the Shopping Center of a custom framing store (with incidental

non-custom framing) comprising a Floor Area of up to four thousand (4,000) square feet.  Notwithstanding the foregoing reference to "fully executed and delivered leases in effect on the Effective Date", current tenants of the Shopping Center (and current or future assignees or sublessees of such current tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord and any such tenant requires Landlord's consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items."

13.2.2    The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional department store commonly located in first-class shopping centers in the state in which the Shopping Center is located and occupying at least 100,000 square feet of Floor Area within the Shopping Center, such as, by way of example, Wal-Mart, Macy's, or Target, as currently operated (as of the Effective Date).

13.2.3    The exclusive rights granted to Tenant with respect to any respective category listed in Subsection 13.2.1 above shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during "Excused Periods" [defined in Section 1.1.9 above] and for periods of time not exceeding six (6) consecutive months).  The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least fifteen thousand (15,000) square feet of the Premises.

13.2.4    (a)  Upon breach of the aforesaid covenant and agreement by Landlord which continues beyond a period of thirty (30) days after notice thereof from Tenant (which breach shall not include a situation in which Landlord has included in the lease between Landlord and any tenant in the Shopping Center or in the Related Land a provision which effectuates the exclusive rights granted to Tenant in this Section 13.2 and, despite such inclusion, such tenant has violated said exclusive right unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord for damages.

(b)  If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then, in addition to the remedy provided in subparagraph (a) above, Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable law, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord

shall cooperate with Tenant with respect to such prosecution
(including, without limitation, by executing any documentation or
authorization reasonably required by Tenant in connection with
such prosecution and by appearing at any hearing or trial with
respect to such prosecution).

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by
Landlord to certain other tenants in its initial lease-up of the
Shopping Center (hereinafter, *"Existing Exclusives"*) [a true and
complete listing and description of such Existing Exclusives
being attached hereto as Exhibit K-1], and shall not sublease,
occupy or use all or any portion of the Premises, or permit all
or any portion of the Premises to be occupied or used in
violation of any such Existing Exclusive (except as may be
specifically set forth on Exhibit K-1). Landlord represents and
warrants that no Existing Exclusive(s) exist other than those
listed on Exhibit K-1 hereto and that Exhibit K-1 is true
accurate and complete, and covenants to indemnify, defend and
hold Tenant harmless from and against all loss, cost, liability
or expense (including, without limitation, reasonable legal fees)
incurred by Tenant by reason of the enforcement by any person or
entity of such unlisted Existing Exclusive. Tenant's honoring of
any Existing Exclusive shall be conditioned upon the use, by the
tenant or occupant for whose benefit the Existing Exclusive is
granted, of its premises in the Shopping Center for the sale,
rental or distribution of the item or items covered by its
Existing Exclusive (other than during Excused Periods and for
periods of time not to exceed six (6) consecutive months).
Notwithstanding the foregoing, Tenant shall be entitled to enter
into a separate agreement with any tenant or other occupant for
whose benefit the existing Exclusive is granted which nullifies
or modifies the corresponding Existing Exclusive with regard to
the Premises, provided that Landlord is furnished with a copy of
said agreement. Tenant covenants to indemnify, defend and hold
Landlord harmless from and against all loss, cost, liability or
expense (including, without limitation, reasonable legal fees)
incurred by Landlord by reason of the breach by Tenant of an
exclusive by which Tenant is bound in accordance with the terms
hereof.

13.3.2    Except as expressly set forth in this Section
13.3, Tenant shall not be obligated to honor any exclusive
granted by Landlord to any tenant in the Shopping Center.


ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including,
without limitation, Section 3 hereof) Tenant shall initially open
its store for business to the public in the Premises for at least
one (1) day, not later than one hundred eighty (180) days after
the Rent Commencement Date (which date shall, as applicable, be
extended by reason of (A) damage or destruction, eminent domain
proceedings or actions, or Force Majeure, or (B) the acts or
omissions of Landlord). Other than as expressly set forth in the
preceding sentence, Tenant shall have no obligation to open or
operate any business in the Premises, and shall have the right,
at any time, to cease to conduct any business operations in the
Premises, and Tenant shall incur no liability to Landlord or its
mortgagee by reason thereof (it being understood and agreed that
all of Tenant's obligations under this Lease shall continue
unless this Lease is terminated pursuant, *inter alia*, to the

further provisions of this Article 14 or any other provision of this Lease [other than Section 16.1 below]).  In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

> (a)  giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, and

> (b)  paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations or improvements made by Tenant and permitted under this Lease,

whereupon this Lease shall terminate upon the sixtieth (60th) day (the "*Recapture Date*") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by: (i) giving notice to Landlord within ten (10) days after it receives Landlord's termination notice, of Tenant's intention to open or cause to be opened the Premises for the operations of its business or any other business, and (ii) in fact so opening or causing to be opened the Premises for the operations of its business or any other business within sixty (60) days after Tenant's notice is given (which 60-day period shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord), in which event the termination notice previously given by Landlord shall be deemed null and void.  Landlord may request written confirmation and reasonable evidence of the amount referred to in subparagraph (b) above at any time that Tenant has ceased operating within the Premises so as to give Landlord a right of recapture under this Section and Tenant shall provide such information to Landlord within thirty (30) days of its request. For each day after such thirty (30) day period that Tenant delays in providing Landlord with such information, the 90-day period referred to in subparagraph (a) above shall be extended by one (1) day.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1    Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms

and conditions of this Lease.

Section 15.2    Liability of Tenant.  Unless otherwise agreed
to in writing by Landlord, no assignment, subletting, licensing
or concessioning by Tenant shall reduce, diminish, or otherwise
affect the liability of Tenant hereunder; provided, however, that
in the event of an assignment of Tenant's interest in this Lease
to a Major Assignee or in the event of an assignment of Tenant's
interest in this Lease to a tenant whose obligations under this
Lease are guaranteed by a Major Guarantor, all liability of
Tenant hereunder, accruing from and after the effective date of
such assignment, shall terminate, provided that Tenant has
furnished Landlord with an assumption agreement executed by Major
Assignee assuming all future obligations under this Lease.  For
purposes of this Section 15.2, the term *"Major Assignee"* or
*"Major Guarantor"*, as the case may be, shall mean a person or
entity which has, as of the effective date of such assignment, a
net worth of at least Fifty Million ($50,000,000.00) Dollars.

Section 15.3    Collateral Assignment.  In addition to
Tenant's other rights set forth in this Article 15, a collateral
assignment of Tenant's interest in this Lease by Tenant to one or
more "Institutional Lenders" (hereinafter defined), as collateral
security for an indebtedness or other obligation of Tenant or its
Affiliates shall be permitted and Landlord shall execute all
documentation reasonably requested by Tenant or any such
Institutional Lender in connection therewith.  In addition,
Tenant shall have the right, without Landlord's consent, to grant
to an Affiliate of Tenant a license to operate all of Tenant's
business operations at the Premises, without such Affiliate
having assumed any liability for the performance of Tenant's
obligations under this Lease.  As used herein, *"Institutional
Lender"* shall mean a state or federally regulated bank, savings
and loan association, insurance company, pension fund, credit
union, real estate investment trust, a state or federally
regulated lender or any other recognized lender.

Section 15.4    Cure Rights of Original Tenant.

15.4.1    If Tenant assigns Tenant's interest in this
Lease, then Landlord, when giving notice to said assignee or any
future assignee in respect of any default, shall also give a copy
of such notice to the Tenant originally named herein (the
*"Original Tenant"*), and no notice of default shall be effective
until a copy thereof is so given to Original Tenant.  Original
Tenant shall have the same period after receipt of such notice to
cure such default as is given to Tenant therefor under this
Lease.

15.4.2    If this Lease is terminated because of: (a)
an Event of Default of such assignee, or (b) the rejection,
disaffirmation, or other termination of this Lease by or on
behalf of the assignee pursuant to any proceeding in bankruptcy
under any law, rule or regulation of any State or of the United
States, or any other law affecting creditors' rights, then
Landlord shall promptly give to Original Tenant notice thereof,
and Original Tenant shall have the right, exercisable by notice
given to Landlord within thirty (30) days after receipt by
Original Tenant of Landlord's notice, to enter into a new lease
of the Premises with Landlord (*"New Lease"*), provided that the
Original Tenant shall have remedied all Events of Default of the
assignee hereunder, unless such Events of Default are not
reasonably susceptible of cure by the Original Tenant, in which
event the Original Tenant shall not be obligated to cure such
Events of Default as a condition to the exercise of its rights

under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5   <u>Recognition Agreement</u>.  In the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of <u>Exhibit H</u> hereto, in recordable form.

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

Section 16.1   <u>Tenant Default</u>.

16.1.1    If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an ***"Event of Default"***.

16.1.2    Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)  to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)  without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall

comply with the applicable provisions of Sections 9.2 and 20.3 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, or to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to terminate this Lease, Landlord shall have and retain full right to sue for and collect all such unpaid Rent and all damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession.  If Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which have accrued to the date of repossession, as well as all Rent which becomes due and payable pursuant to the terms of this Lease when and as required to be paid by Tenant to Landlord during the remainder of the Term (with no acceleration), diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3    Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4    Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5    Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2    Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Tenant specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Landlord does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (ii) materially breach any

warranty or representation under this Lease (either of (i) or
(ii) above being hereinafter referred to as a *"Landlord's
Default"*), then Tenant, in addition to such other rights and
remedies as may be available under this Lease, or at law or in
equity, may, in its sole discretion:

(a)  as applicable, make such repairs or perform
such work in accordance with the provisions of this
Lease on behalf of, and at the expense of Landlord;
and/or

(b)  bring suit for the collection of any amounts
for which Landlord is in default, seek injunctive
relief, or seek specific performance for any other
covenant or agreement of Landlord, without terminating
this Lease; and/or

(c)  offset against the Rent payable by Tenant
hereunder for amounts owed by Landlord to Tenant and/or
for the amounts reasonably expended by Tenant
performing Landlord's obligations hereunder, including
costs and reasonable attorneys' fees, together with
interest thereon at the Lease Interest Rate from the
date of the outlay until paid; and/or

(d)  may terminate this Lease, without waiving its
rights to damages for Landlord's Default, provided and on
condition that (1) Landlord's Default materially interferes
with the normal conduct of Tenant's business in the
Premises, (2) Landlord's Default is not capable of being
cured or being rendered irrelevant by any actions of Tenant
despite commercially reasonable efforts on the part of
Tenant, and (3) Tenant shall have delivered notice of
Landlord's Default to any mortgagee of Landlord (provided
Landlord shall have previously notified Tenant of the name
and address of such mortgagee), and such mortgagee has not
cured Landlord's Default within thirty (30) days following
its receipt of such notice (or, if Landlord's Default
requires more than thirty (30) days to cure in the exercise
of due diligence, such mortgagee has not commenced to cure
same within said thirty (30) day period and thereafter
diligently prosecuted the same to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable
judgment, an emergency (*i.e.*, posing  imminent material harm to
persons or property or material disruption to the normal
operation of Tenant's business) shall exist, Tenant may, at its
election, and without prior notice to Landlord, exercise any or
all of the remedies set forth in (a), (b) and (c) above.  In no
event shall Landlord be liable to Tenant for any consequential
damages suffered by Tenant as a result of a default by, or any
other act of, Landlord.

Section 16.3   Payment under Protest.  If, at any time, a
dispute shall arise as to any amount to be paid by one party to
the other party under the provisions hereof, the party against
whom the obligation to pay the money is asserted shall have the
right to make payment "under protest", which payment shall not be
regarded as voluntary payment, and there shall survive the right
on the part of such party to institute suit for recovery of such
sum.  If it shall be adjudged that there was no legal obligation
on the part of such party to pay such sum or any part thereof,
such party shall be entitled to recover from the other party such
sum or so much thereof as it was not legally required to pay
under the provisions of this Lease, together with interest

thereon at the Lease Interest Rate.

Section 16.4    Work Performed Under Protest.  If at any time
a dispute shall arise between the parties hereto as to any work
to be performed by either of them under the provisions hereof,
the party against whom the obligation to perform the work is
asserted may perform such work and pay the cost thereof "under
protest", performance of such work in no event to be regarded as
a voluntary performance, and there shall survive the right on the
part of such party to institute suit for recovery of the cost of
such work.  If it shall be adjudged that there was no legal
obligation on the part of such party to perform such work or any
part thereof, such party shall be entitled to recover from the
other party the cost of such work or the cost of so much thereof
as such party was not legally required to perform under the
provisions of this Lease, together with interest thereon at the
Lease Interest Rate.

Section 16.5    Arbitration.  In any case where this Lease
expressly provides for submission of a dispute or matter to
arbitration (but not otherwise), the same shall be settled by
arbitration in Newtown, Pennsylvania, before one arbitrator in
accordance with the procedural rules then obtaining of the
American Arbitration Association or any successor thereto.  The
decision of the arbitrator shall be final, conclusive and binding
on the parties, but the powers of the arbitrator are hereby
expressly limited to the determination of factual issues, and the
arbitrator shall have no power to reform, supplement or modify
this Lease.  The arbitrator shall make only required findings of
fact incident to an arbitrable dispute, which findings shall be
set forth in reasonable detail in a written decision by the
arbitrator.  Landlord and Tenant shall share equally in the cost
and expenses of such arbitration, and each shall separately pay
its own attorneys' fees and expenses, unless the arbitrator finds
that one of the parties did not act in good faith in connection
with the dispute or the conduct of the arbitration proceeding, in
which case the arbitrator may award all or part of said costs,
expenses and fees to the other party.


ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1    Right to Mortgage and Non-Disturbance.
Landlord reserves the right to subject and subordinate this Lease
at all times to any first mortgage or deed of trust for the
benefit of any Institutional Mortgagee now or hereafter
encumbering or affecting all or any portion of the Shopping
Center, as well as to any future ground or underlying leases
encumbering or affecting all or any part of the Shopping Center;
provided, however, that (a) each Institutional Mortgagee shall
first execute and deliver to Tenant an agreement substantially in
the form attached as Exhibit G hereto, in recordable form, and
(b) any Ground Lessor shall execute and deliver to Tenant a fee
owner recognition agreement in a form reasonably satisfactory to
Tenant (and, as may be required, consented to by any
Institutional Mortgagee), which shall include the following
provisions: (i) the Ground Lessor will not, in the exercise of
any of the rights arising or which may arise out of such lease,
disturb or deprive Tenant  in or of its possession or its rights
to possession of the Premises or of any right or privilege
granted to or inuring to the benefit of Tenant under this Lease;
(ii) in the event of the termination of the ground or underlying
lease, Tenant will not be made a party in any removal or eviction
action or proceeding, nor shall Tenant be evicted or removed of

its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2    <u>Estoppel Certificate</u>.  Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Institutional Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) certifying, to such party's actual knowledge, that all conditions and agreements under this Lease to be satisfied and performed have been satisfied and performed, except as shall be stated; and (4) reciting the amount of advance Rent, if any, paid by Tenant and the date to which Rent has been paid.

ARTICLE 18
NOTICE

Subject to the further provisions of this Article XVIII, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any law or statute to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by <u>registered</u> or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.  Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.2 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

ARTICLE 19
TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or

create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.  Upon the expiration or earlier termination of this Lease, Tenant shall have the right (but not the obligation, except as otherwise expressly provided herein) to remove from the Premises all or any part of Tenant's Property.

## ARTICLE 20
### END OF TERM

Section 20.1   Surrender of Premises.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent, domain, and repairs and replacements to be made by Landlord hereunder, and further, subject to the provisions of Subsection 8.1.8 above.

Section 20.2   Hold Over.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

Section 20.3   Landlord's Entry.  Tenant shall permit Landlord to enter upon the Premises during Tenant's business hours, upon at least twenty-four (24) hours prior notice to Tenant, to exhibit same to prospective bona fide purchasers and Institutional Mortgagees of the Shopping Center, and during the last six (6) months of the Term, to exhibit same to prospective bona fide tenants; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises.

## ARTICLE 21
### INTENTIONALLY OMITTED

## ARTICLE 22
### TENANT'S RIGHT OF TERMINATION

If, at any time during the Term at least seventy-five percent (75%) of the premises occupied by Acme, plus an additional fifteen thousand (15,000) square feet of Floor Area within the Shopping Center (excluding the Premises) ceases to be used for the operation of retail business by national or regional tenants of the type typically found in first-class regional shopping centers located in the Newtown area;] for a period of one hundred eighty (180) consecutive days (such condition being hereinafter referred to as an "Excess Vacancy") then in such event Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a total period in

excess of three hundred sixty-five (365) continuous days, to
terminate this Lease upon at least ninety (90) days prior notice
given to Landlord, in which event this Lease shall terminate on
the date set forth in Tenant's notice of termination without
further liability on the part of either Landlord or Tenant,
except: as set forth in Section 23.3 below.

## ARTICLE 23
## MISCELLANEOUS

Section 23.1   Loading Facilities.   Tenant shall have the
exclusive right to utilize the loading facilities serving the
Premises on a "24 hour a day", "365 days a year" basis.

Section 23.2   Liens.   Within thirty (30) days after notice
of the filing thereof, Tenant shall discharge (either by payment
or by filing of the necessary bond, or otherwise) any lien
against the Premises and/or Landlord's interest therein, which
may arise out of any payment due for, or  purported to be due
for, any labor, services, materials, supplies or equipment
alleged to have been furnished to or for Tenant in, upon or about
the Premises.  Similarly, within thirty (30) days after notice of
the filing thereof, Landlord shall discharge (either by payment
or by filing of the necessary bond, or otherwise) any lien
against the Premises and/or Landlord's interest therein, which
may arise out of any payment due for, or purported to be due for,
any labor, services, materials, supplies or equipment alleged to
have been furnished to or for Landlord in, upon or about the
Premises.

Section 23.3   Broker's Commission.   Landlord and Tenant
each warrant and represent to the other that they did not deal
with any real estate broker in connection with the negotiation,
execution and delivery of this Lease, except for RIPCO Realty
Corporation (the **"Broker"**).  Landlord shall pay the Broker a
commission  pursuant to a separate agreement.  Each party agrees
to indemnify, defend, and save the other harmless from and
against any and all liabilities, costs, causes of action, damages
and expenses, including, without limitation, attorneys' fees,
with respect to or arising out of any claims made by any real
estate broker (other than the Broker), agent or finder with
respect to this Lease in breach of the foregoing representation.
The provisions of this Section shall survive the expiration or
earlier termination of this Lease.

Section 23.4   Force Majeure.   Except as otherwise expressly
set forth herein, in the event either party hereto shall be
delayed or hindered in, or prevented from, the performance of any
act required hereunder by reason of strikes, inability to procure
materials, failure of power, restrictive governmental laws or
regulations, riots, insurrection, war or other reasons of a like
nature which are beyond the reasonable control of the party
(collectively referred to herein as **"Force Majeure"**), then the
performance of any such act shall be excused for the period of
the delay and the period of the performance of any such act shall
be extended for a period equivalent to the period of such delay.
Notwithstanding the foregoing provisions, the financial inability
of a party to perform its obligations under this Lease shall not
constitute an event of Force Majeure.

Section 23.5   Consents.   Except as may be otherwise
expressly set forth in this Lease, whenever under this Lease
provision is made for either party's securing the consent or
approval of the other party, (i) such consent or approval shall
be in writing and shall not be unreasonably withheld, delayed or

conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6    Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7    Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8    Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9    Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10    Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by law.

Section 23.11    Definition of Landlord.  The term **"Landlord"** shall mean only the owner, for the time being, of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of 23.11.1 claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or 23.11.2 judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12    Successors and Assigns.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13  Limitation of Landlord's Liability.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds thereof) and income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14  Limitation of Tenant's Liability.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15  Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16  Severability.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17  Grammatical Usages and Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18  Table of Contents, Line Numbering and Paragraph Headings.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19  Definition of Hereunder, Herein, etc..  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20  Short Form Lease.  Upon the request of either party following the execution and delivery of this Lease,

but not prior to Landlord's purchase of the Shopping Center, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request and shall refer to such provisions of this Lease which may survive the expiration or sooner termination hereof.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21  <u>Entire Agreement and Modification</u>.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  <u>No Joint Venture or Partnership Created by Lease</u>.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23  <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

**[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties have executed this
instrument under seal the day and year first-above written.

**LANDLORD:**

ATTEST:
WITNESS:

NEWTOWN/BUCKS ASSOCIATES, L.P.
By: JRL PROPERTIES, INC., its
    General Partner

_____
SECRETARY

By: _____
    Jack R. Loew
    President

[SEAL]

**TENANT:**

WITNESS:

BED BATH & BEYOND INC., a New York
corporation

Marisol Baez
MARISOL BAEZ

By: _____ AMF
    Warren Eisenberg
    Co-Chief Executive Officer

[SEAL]

INDEX OF EXHIBITS

Exhibit "A"     Legal Description of Shopping Center
Exhibit "B"     Site Plan
Exhibit "C"     Rent Commencement and Expiration Date Agreement
Exhibit "D"     Specifications for Landlord's Work
Exhibit "D-1"   Front Elevation and Sidewalk Plan of Premises
                [including Building Signage] and Front Elevation
                of Shopping Center
Exhibit "E"     Permitted Encumbrances
Exhibit "F"     Signage Criteria
Exhibit "F-1"   Coming Soon Sign
Exhibit "G"     Subordination, Non-Disturbance and Attornment
                Agreement
Exhibit "H"     Recognition Agreement
Exhibit "I"     Delivery Date Notice
Exhibit "J"     Delivery Date Certification
Exhibit "K-1"   Existing Exclusives
Exhibit "K-2"   Existing Leases
Exhibit "L"     Percentage Rent

Exhibit A

Legal Description

PARCEL 1

ALL THAT CERTAIN tract of land, situate in the Township of
Newtown, County of Bucks, Commonwealth of Pennsylvania as shown
on a Plan of Heights of Newtown dated 7/19/1976 and last revised
8/11/1980 prepared by Tri-State Engineers and Land Surveyors,
Inc., 801 West Street Road, Feasterville, Pennsylvania, bounded
and described as follows:

BEGINNING at a point a corner on the Northeasterly side of LR
1141 (varying width) said point being the Southeasterly point of
curve on the Easterly radius corner at the intersection of the
said LR 1141 and LR 152 Spur A (varying width); thence from the
said point of beginning and along the Easterly side of the said
LR 152 Spur A by a curve to the right in a Northerly direction
having a radius of 142.00 feet the arc distance of 170.32 feet to
a point of tangency on the Southeasterly side of the said LR 152
Spur A; thence along the Southeasterly side thereof the four
following courses and distances viz: (1) North 36 degrees 20
minutes 40 seconds East 307.15 feet to a point a corner; (2)
North 47 degrees 39 minutes 10 seconds East 101.98 feet to a
point a corner; (3) North 36 degrees 20 minutes 40 seconds East
8.46 feet to a point of curve; and (4) by a curve to the right in
a Northeasterly direction having a radius of 1537.02 feet the arc
distance of 224.18 feet to a point a corner of lands of Raymond
W. Goodnoe; thence along said lands South 02 degrees 04 minutes
35 seconds East 301.41 feet to a point a corner; thence
continuing along said lands South 49 degrees 22 minutes 20
seconds East 194.70 feet to a point a corner of lands of the
Council Rock Joint School Board; thence along said lands South 04
degrees 34 minutes 00 seconds West 731.51 feet to a point a
corner; thence continuing along said lands North 53 degrees 30
minutes 40 seconds West 19.84 feet to a point a corner on the
Northeasterly side of Old Swamp Road (33 feet wide) thence along
the Northeasterly side thereof by a curve to the left in a
Northwesterly direction having a radius of 195.55 feet the arc
distance of 80.91 feet to a point of tangency; thence continuing
along the Northeasterly side thereof North 53 degrees 30 minutes
40 seconds West 348.07 feet to a point a corner on the
Northeasterly side of LR 1141 aforesaid; thence along the
Northeasterly side thereof by a curve to the left in a
Northwesterly direction having a radius of 1737.02 feet the arc
distance of 173.74 feet to a point; thence continuing along the
Northeasterly side thereof North 32 degrees 22 minutes 42 seconds
West 105.59 feet to the point and place of beginning.

BEING PARCEL NUMBER 29-3-12-1

PARCEL 2

ALL THAT CERTAIN lot or piece of ground, situate in Newtown
Township, Bucks County, Pennsylvania, described according to a
survey and topography plan made for Gigliotti Corporation made by
Pickering, Corts and Summerson, Inc., dated 7/15/1987, revised
8/4/1987 as follows: to wit:

BEGINNING at a point on the Southeasterly legal right of way line
of S.R. 413, said point being a corner of lands now or late of
Newtown Village Partnership; thence extending from said beginning

point and along lands now or late of Newtown Village Partnership
measured South 02 degrees 45 minutes 55 seconds West the distance
of 939.30 feet to a point in line of lands now or late of Council
Rock School District; thence along said lands measured North 88
degrees 18 minutes West the distance of 1,150.71 feet to a point;
thence extending North 49 degrees 23 minutes 19 seconds West the
distance of 194.68 feet to a point; thence extending North 02
degrees 04 minutes 25 seconds West the distance of 301.98 feet to
a point on the Southeasterly side of S.R. 413; thence extending
along SR 413 on a curve bearing to the right in a Northeasterly
direction having a radius of 1,537.02 feet the arc distance of
1,028.06 feet to a point; thence extending North 73 degrees 46
minutes 32 seconds East the distance of 145.28 feet to a point of
curve; thence extending on a curve to the right having a radius
of 1,567.02 feet the arc distance of 112.89 feet to a point;
thence extending South 87 degrees 34 minutes 03 seconds East the
distance of 195.99 feet to the first mentioned point and place of
beginning.

BEING PARCEL NUMBER 29-3-24

PREMISES "A"

BEING the same premises which Burton S. Lifson and Rita N.
Lifson, his wife and Kalman B. Lifson and Marilyn Lifson, his
wife by Deed dated January 10, 1995 and recorded in Bucks County
in Land Record Book 1019 page 1251 conveyed unto Burton S. Lifson
and Rita N. Lifson, his wife and Kalman B. Lifson and Marilyn
Lifson, his wife, in fee.

PREMISES "B"

BEING the same premises which American Stores Properties, Inc., a
Delaware Corporation by Deed dated January 22, 1999 and recorded
in Bucks County in Land Record Book 1772 page 1979 conveyed unto
Newtown/Bucks Associates, L.P., a Pennsylvania Limited
Partnership, in fee.

Exhibit B

Site Plan

B-1



<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 2000, by and between NEWTOWN/BUCKS ASSOCIATES, L.P. (**"Landlord"**) and BED BATH & BEYOND INC. (**"Tenant"**).

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Newtown Shopping Center (the **"Shopping Center"**), situated in_____, Newtown, Pennsylvania;

WHEREAS, by that certain lease dated _____ __ , 199____ (the **"Lease"**), Landlord leased a portion (the **"Premises"**) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____, 2000.

2.    The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent
Commencement and Expiration Date Agreement to be executed the
date and year first above written.

**LANDLORD:**

NEWTOWN/BUCKS ASSOCIATES, L.P.

By: _____
Name: _____
Title: _____

**TENANT:**

BED BATH & BEYOND INC.

By: _____
                    Warren Eisenberg
                    Co-Chief Executive
Officer

Exhibit D

Specifications for Landlord's Work

D-1

# BED BATH & BEYOND

### Beyond any store of its kind."

*Newtown, PA*

### Exhibit D - Standard Landlord's Work
12/07/99

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of the <u>Exhibit D</u>, to the extent not inconsistent with the terms of this <u>Exhibit D</u>. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

#### Landlord's Final Plans and Specifications

Landlord shall provide three (3) complete sets of the Final Plans and Specifications for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.    Tenant's Plans:

| | |
|---|---|
| F1 | FIXTURE PLAN |
| F2 | FLOOR FINISH PLAN |
| F3 | POWER PLAN |
| F4 | LIGHTING PLAN |

Tenant's Plans are project-specific design-development documents. In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail. Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.    <u>Tenant's Prototype Drawings and Specifications</u> entitled "Bed Bath & Beyond Prototype Drawings and Specifications - revision 0.99 dated 11/02/98, comprise the following drawings and specifications:

**CIVIL/SIGNAGE:**

| | |
|---|---|
| C1.0 | SITE PLAN & DETAILS |
| C1.1 | BUILDING SIGNAGE & TEMPORARY SIGNAGE DETAILS |

**ARCHITECTURAL:**

| | |
|---|---|
| A.0 | COVER SHEET |
| A1.0 | FLOOR PLAN |
| A1.1 | FIXTURE PLAN |
| A1.2 | FINISH PLAN |
| A2.0 | ENLARGED OFFICE/TOILET PLANS & DETAILS |
| A2.1 | ENLARGED VESTIBULE PLAN & DETAILS |
| A2.2 | ENLARGED LOADING AREA PLAN & DETAILS |
| A2.3 | MISCELLANEOUS DETAILS |
| A3.0 | ROOF PLAN & DETAILS |
| A4.0 | BUILDING ELEVATIONS |
| A4.1 | BUILDING SECTIONS & MEZZANINE DETAILS |
| A5.0 | WALL SECTIONS |
| A5.1 | WALL SECTIONS |
| A5.2 | MISCELLANEOUS DETAILS |
| A5.3 | MISCELLANEOUS SECTIONS & DETAILS |
| A5.4 | MISCELLANEOUS DETAILS |
| A5.5 | WOOD WORKING DETAILS |
| A.6 | SCHEDULES |

**STRUCTURAL:**

| | |
|---|---|
| S1.0 | STRUCTURAL NOTES |
| S2.0 | STRUCTURAL DETAILS |
| S3.0 | FOUNDATION PLAN |
| S4.0 | ROOF FRAMING PLAN |



**MECHANICAL:**

M1           MAIN FLOOR MECHANICAL PLAN
M2           ENLARGED PLANS, SCHEDULES & DETAILS

**PLUMBING:**

P1           PLUMBING PLAN
P2           ENLARGED TOILETS, SCHEDULES & DETAILS

**ELECTRICAL:**

E1.0       POWER PLAN
E1.1       ELECTRICAL RACK MOUNTED EQUIPMENT PLAN
E.2        LIGHTING PLAN
E3.0       DETAILS & ELEVATIONS
E4.0       SCHEDULES & RISER DIAGRAMS

**FIRE PROTECTION:**

FP1       BUILDING SECTION & MISCELLANEOUS NOTES
FP2       AUTOMATIC SPRINKLER PLAN

**SPECIFICATIONS:**

Project Manual for Bed Bath & Beyond, Project Manual/Construction Criteria dated 10/27/98

C.       Tenant's Design Change Bulletin  041999-1 dated April 19, 1999.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications:

A.       All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

B.       All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

C.       Complete civil engineering documents which describe planned improvements to the Shopping Center, including geo-technical and stormwater design reports.

Landlord shall deliver to Tenant's construction project manager, two (2) hard-copy sets of as-built drawings of the Premises, together with one (1) electronic copy CD-ROM (*"Auto Cad" Rel. 14* Format) with all close-out books and warranty information, as specified within Tenant's Prototype Drawings and Specifications within thirty (30) days after the Completion Date.  As used herein, the *"Substantial Completion Date"* shall be the date on which Landlord's Work is Substantially Completed.

### Site Specifications

A.       All parking areas, traffic drives, and truck access drives shall be constructed per the Landlord's plans for the Shopping Center as approved by Newtown Township.  The plans, prepared and engineered by Showalter & Associates, include the following sheets:

| Sheet No. | Plan Description | Revision Date |
|---|---|---|
| 1 | Site Layout | 3/08/00 |
| 2 | Site Layout | 3/08/00 |
| 3 | Existing Features Plan | 3/08/00 |
| 4 | Existing Features Plan | 3/08/00 |
| 5 | Grading Plan | 3/08/00 |
| 5a | Future Reserve Parking Plan | 3/08/00 |
| 6 | Grading Plan | 3/08/00 |
| 7 | Utility Plan | 3/08/00 |
| 8 | Utility Plan | 3/08/00 |
| 11 | Erosion Control Plan | 3/08/00 |
| 12 | Erosion Control Plan | 3/08/00 |
| 13 | Drainage Area Plan | 3/08/00 |
| 14 | Drainage Area Plan | 3/08/00 |
| 15 | Utility Profiles | 3/08/00 |
| 16 | Utility Profiles | 3/08/00 |
| 17 | Utility Profiles | 3/08/00 |
| 18 | Construction Details | 9/28/99 |
| 19 | Construction Details | 9/28/99 |

B.     All truck ramps and dumpster pads shall consist of 12" compacted sub-grade (95% compacted), 4" compacted granular base and 5" Portland cement concrete surface finish. All truck ramps shall consist of #3 re-bars, 18" o/c. each direction. Recessed truck ramps shall not exceed slope of 5%.

C.     The sidewalk in front of the Premises shall have at least one ADA curb, the location and width of which shall be as shown on Exhibit D-1 to the Lease (Exterior Elevations of Premises and Shopping Center, and Sidewalk Plan).

D.     Landlord shall install cart corrals as shown in the Final Plans and Specifications and Exhibit D-1 hereof.

E.     The lighting level throughout the Shopping Center shall match that shown on Landlord's Plans for the Shopping Center as approved by Newtown Township. The plans include sheet 9 of 19 and sheet 10 of 19 as prepared and engineered by Showalter & Associates, and dated 5/1/98. As well as sheet 1 of 1 dated 3/31/00 as prepared and engineered by WLS Lighting Systems.

## Building Requirements

The following describes certain project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.     Stockroom/Sales Area Partition - If required by local code, provide a code-compliant partition between sales area and stockroom. All openings through the partition shall be properly protected.

B.     Clear Height - Building systems (structural, mechanical, plumbing, electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. All structural, mechanical, plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures. Fire protection sprinkler piping shall be located at least 16'-6" a.f.f., sprinkler heads shall be located at least 18'-0" a.f.f.

C.     Sprinkler System - The sprinkler system for the Premises shall be designed to allow fixturing and storage to be within 18" of sprinkler heads. System shall comply with NFPA 231-C, (high rack storage) for class IV commodity. Typically, .486 GPM over 2000 sf will be required. System shall be designed without hose stations and/or in-rack sprinkler system.

D.     Disability Access - If required by applicable Legal Requirements, an ADA lift, limited use/limited application elevator, or elevator to the mezzanine area shall be provided. Mechanized barrier-free access to mezzanine area shall be provided in accordance with all Legal Requirements. Landlord is responsible to secure and complete installation of phone lines in accordance with all applicable Legal Requirements and Tenant's specifications. All equipment required under this Paragraph D shall be installed at least ten (10) days prior to the Substantial Completion Date.

E.     Mezzanine Office - The mezzanine plan (# of restroom fixtures, # of exits stairs, size of elevator, etc.) as shown on Tenant's Plans reflects Tenant's requirements. Landlord shall modify said mezzanine plan if necessary to comply with all applicable Legal Requirements. If the modified plan varies from Tenant's Plans, then Landlord shall review the modified plan with Tenant prior to formally submitting the Preliminary Plans to Tenant. The mezzanine office shall be completed at least ten (10) days prior to the Substantial Completion Date.

F.     Fire Extinguishers - Landlord shall furnish and install all fire extinguishers in accordance with applicable Legal Requirements, and shall be responsible for locating all fire extinguishers in coordination with the final location of Tenant's fixtures.

G.     Fixtures - Landlord shall unload and install all Tenant-furnished cash-wraps and remote department service desks as shown on Tenant's Plans. Landlord shall furnish and install all built-in counters, cabinets, and the customer service desk as shown on Tenant's Plans. The furnishing and installation of all remaining sales/non-sales fixtures shall be Tenant's responsibility.

H.     Specialty Lighting - Landlord shall give Tenant at least two (2) weeks notice of the date of commencement of the scheduled electrical "rough-in" associated with all specialty lighting shown on the Final Plans and Specifications. Tenant reserves the right to modify the actual location of the specialty lighting system up to one (1) week prior to the commencement of scheduled rough-in. Scheduled rough-in date shall be six (6) weeks prior to the Substantial Completion Date. Tenant shall not be responsible for the cost of any work completed by Landlord prior to the scheduled rough-in date which may not be in accordance with Tenant's specialty lighting requirements.

I.     Itemized Budget - At Tenant's request, Landlord shall provide Tenant with its itemized "budget" and "final cost" upon completion of Landlord's Work within thirty (30) days after the Substantial Completion Date.

J.     Warranties - Landlord shall provide Tenant with a list of contractors' and subcontractors' contacts and addresses, and a guarantee, including parts and labor, for a period of at least one (1) year after the Rent Commencement Date. Landlord shall deliver all warranties of equipment, service manuals, and as-built drawings to Tenant's construction project manager within thirty (30) days after the Substantial Completion Date. Landlord shall cause its contractor(s) to instruct Tenant's representative in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a

manner which will not void or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period the Landlord must forward a written report to Tenant on the condition of all warranty items.

K.      Landlord shall deliver the Premises to Tenant "broom clean", ready for Tenant's fixtures and merchandise.

A.      Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law. Landlord shall be responsible for monitoring the fire alarm system up to (and including) the Deilvery Date.

M.      Hiring Trailer - Tenant to provide hiring trailer. Landlord to provide electric utilities and phone service to trailer.

### Construction Coordination Requirements

A.      Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed

B.      Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant's construction project manager at such e-mail address as Tenant may designate.

### Building and Site Signs

A.      Building Signs -- Landlord shall furnish and install up to six (6) circuits per building sign(s) shown on Exhibits D-1 and F to this Lease, and is responsible to verify actual number of circuits required with Tenant's sign manufacturer. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord to provide all necessary blocking and access. Tenant shall supply and install all building signs shown on Exhibits D-1. Landlord shall provide final electrical connection to building signs.

B.      Monument -- Landlord shall furnish and install all monument signs complete (including, without limitation, sign structure, any required electrical service, sign panels). Tenant to supply and install graphics for Tenant's panel. Landlord shall use best efforts to obtain Tenant's name to appear on monument sign. Monument sign is to be subject to governmental approval. Landlord shall provide final electrical connection to building signs.

D.      Temporary Signs -- commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall install and maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign near the site of the **[future]** main entrance to the Shopping Center, bearing the phrase"Bed Bath & Beyond Coming Soon". At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed. All temporary signage is subject to governmental approval.

E.      Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's prior approval.

### Mechanical System

A.      **Landlord's proposed design shall not be in conflict with "Building Requirements", Item B., Clear Heights.**

Landlord shall install the following system as detailed on Tenant's Prototype Drawings and Specifications: Tenant has a national account agreement with Lennox Industries. All inquires should be addressed to the national account administrator at (800) 367-6285. Units shall be manufactured by Lennox. No other manufacturer will be accepted. The Premises shall be provided with a new, fully-distributed, insulated, balance-ducted and individually-controlled refrigerated air-conditioning and heating system sufficient to maintain an interior temperature of 74 F @ 50% RH in the cooling mode, and 68 F for heating on a design day for the specific geographical area in which the Shopping Center is located. These conditions shall be in accordance with design criteria established by ASHRAE for a dry goods retail space in the area in which the Shopping Center is located. HVAC ductwork, diffusers, plenums, or return locations shall not conflict with Tenant's Plans. Units shall be electric-cooling/gas heating per Tenant's requirements, and have the capacity to handle space exterior skinload, outside air ventilation load, plus an internal heat load of 4.5 watts/sq.ft. Design shall be no less than one ton of conditioned air per 350 sq.ft. of gross usable area. All units to be of the highest efficiency available and have an EER of no less than 11.0 and a IPLV of no less than 11.5. All accessories, such as economizers, exhaust dampers, smoke detectors, disconnect switches, power

exhaust, and 115V GFI outlets shall be factory-installed and tested. A manufacturer-provided "Equipment Operational Check" (EOC) shall be performed on all units after start up. Thermostats shall consist of Honeywell T7300 programmable type with remote sensors. Thermostats are to be located in the cashroom for control, programmed and locked out prior to store opening; remote temperature sensors located as required for optimum efficiency and in areas that do not interfere with Tenant's fixtures. Landlord shall submit mechanical drawings and unit specifications to Tenant for review and approval. Landlord to provide a filter change using pleated filters three (3) days prior to store opening. Landlord shall cause the entire system to be balanced, have the air balance certified in writing, and deliver to Tenant a copy of such written certification. Landlord shall provide a ten (10)-year extended warranty on compressor-parts and labor. Manufacturer will provide a one-year warranty on all parts, a five-year warranty on all compressors, and a ten-year warranty on all heat exchangers, less labor.

Settings:

       Occupied Cooling: 74 degrees - 7:30 A.M., Mon. through Sat.; 8:00 A.M., Sun
       Unoccupied Cooling: 84 degrees - 10:00 P.M., Mon. through Sat.; 6:00 P.M., Sun
       Occupied Heating: 68 degrees - 7:30 A.M., Mon. through Sat.; 8:00 A.M., Sun
       Unoccupied Heating: 58 degrees - 10:00 P.M., Mon. through Sat.; 6:00 P.M., Sun

B.     Smoke Evacuation System (if required by Legal Requirements) - Landlord must provide complete and operating smoke purge/ evacuation/exhaust system (whichever is required by applicable Legal Requirements) for the Premises. Landlord shall provide Tenant with 24-hour access to these systems.

**Permits and Approvals**

A.     <u>Landlord to secure all permits required to allow Tenant to fixture, merchandise, and open for business to the public in the Premises.</u>  If required in accordance with applicable Legal Requirements, Landlord shall provide necessary "Seismic" calculations and details in order to secure fixture permit.

B.     Sprinkler system design shall allow Landlord to obtain "high pile storage" permit.

C.     Landlord shall deliver the Premises to Tenant free of asbestos material and other Hazardous Substances.

## Exhibit D-1

Front Elevation and Sidewalk Plan of Premises [including Building
Signage] and Front Elevation of Shopping Center





Exhibit E

Permitted Encumbrances

1.    Real Estate Taxes not yet due and payable.

2.    Right of Way Agreement in favor of Sun Pipe Line Company, dated March 9, 1956, in Deed Book 660, page 356 and Book 1340, page 209.

3.    Right of Way Agreement between Mabel W. Goodnoe and John C. Goodnoe, as grantors, and Philadelphia Electric Company and Bell Telephone Company of Pennsylvania, as grantees, dated July 28, 1938, in Deed Book 673, page 11.

4.    Right of Way Agreement between Mabel W. Goodnoe and John C. Goodnoe, as grantors, and Philadelphia Electric Company and Bell Telephone Company of Pennsylvania, as grantees, dated July 28, 1938, in Deed Book 673, page 12.

5.    Right of Way Agreement between Mabel W. Goodnoe and John C. Goodnoe, as grantors, and Philadelphia Electric Company, as grantee, dated December 7, 1939, in Deed Book 686, page 107.

6.    Right of Way Agreement between Mabel W. Goodnoe and John C. Goodnoe, as grantors, and Philadelphia Electric Company, as grantee, dated August 12, 1943, in Deed Book 722, page 522.

7.    Notice of Condemnation dated August 24, 1973, in Deed Book 2099, page 209 Stipulation to Amend Declaration of Taking in Deed Book 2213, page 478.

8.    Right of Way Agreement between Mr. and Mrs. George Mess, as grantors, and Philadelphia Suburban Gas and Electric Company, as grantee, dated October 17, 1924, in Deed Book 511, page 16.

9.    Right of Way Agreement between Mr. and Mrs. George Gore, as grantors, and the Philadelphia Electric Company, as grantee, dated December 6, 1939, in Deed Book 686, page 108.

10.    Rights granted pursuant to that certain Indenture between Abe Eckert, as grantor, the Philadelphia Electric Company, as grantee, dated April 14, 1976, in Deed Book 2196, page 347.

11.    Rights granted pursuant to that certain Indenture between Heights of Newton Associates, as grantor, and Philadelphia, as grantee, dated July 15, 1977, in Deed Book 2251, page 609.

12.    Rights granted pursuant to that certain Agreement between Mary Elizabeth Benedict and Walter E. Benedict, as grantors, and Philadelphia Electric Company, as grantee, dated November 3, 1967, in Deed Book 1883, page 540.

13.    Rights granted pursuant to that certain Agreement between Heights of Newton Associates, as grantor, and The Bell Telephone Company of Pennsylvania, as grantee, dated June 8, 1977, in Deed Book 2241, page 482

14.    Rights granted pursuant to that certain Agreement between Heights of Newton Associates, as grantor, and The Bell Telephone Company of Pennsylvania, as grantee, dated June 8, 1977, in Deed Book 2241, page 479.

15.   Rights granted pursuant to that certain Indenture between J. Joyce Judge, Edith G. Feeney and Robert S. Feeney, as grantors, and Philadelphia Electric Company and The Bell Telephone Company of Pennsylvania, as grantees, dated November 5, 1951, in Deed Book 1018, page 432.

16.   Deed of Easement between Abe Eckert and Hope D. Eckert, as grantors, and ATP, Inc. and F.P.A. Corporation, as grantees, dated August 22, 1975, in Deed Book 2819, page 470.

17.   Deed of Easement between Abe Eckert and Hope D. Eckert, as grantors, and ATP, Inc., as grantee, dated August 22, 1975, in Deed Book 2819, page 455.

18.   Right of Way Agreement between Jennie I Gore, as grantor, and Transcontinental Gas Pipe Line Corporation, as grantee, dated May 12, 1950, in Deed Book 948, page 64, and Supplemental Right of Way Agreement between Mary Elizabeth Benedict and Walter E. Benedict, as grantors, and Transcontinental Gas Pipe Line, as grantee, dated May 12, 1950, in Deed Book 1803, page 664.

19.   Cross-Easement Agreement and Maintenance Agreement between Newtonbucks Associates, L.P., as grantor, and Montgomery Group Realty, as grantee, to be executed and recorded; subject however, to Tenant's final approval of the final execution form of such Cross-Easement and Maintenance Agreement and all exhibits thereto.

Exhibit F

Signage Criteria

F-2-1

NEWTOWN SHOPPING CENTER

BED, BATH & BEYOND

SIGNAGE SPECIFICATIONS

1.    Landlord shall provide one (1) exterior signage band, finished with Bed, Bath & Beyond prototype porcelain tile (12" x 12" Crossville Ceramics #A890 Charcoal High Gloss) on the Tenant's storefront, as shown in the Lease Exhibits.

Landlord approves the signage as depicted on Exhibit D-1.  Total length of the sign shall not exceed the lesser of 75% of the width of the store, or the Township regulations.  The height of the sign shall not exceed the lesser of dimensions shown on Exhibit D-1 or the Township regulations.  The sign shall be centered in the signage band as shown on Exhibit D-1.

2.    The sign shall be comprised of individual channel letters with a depth of 8¾ inches, individually mounted.  Letters shall be internally illuminated and shall be faced with translucent plexiglass or equal material.  The letters shall be constructed with white metal sides.  Sign company names or stamps shall be concealed from view.

3.    Sign content shall include store name/or type of store only.

4.    No exposed floodlight illumination, neon tubing, exposed lamps or signs of flashing, blinking, flickering, moving or animated types are permitted.

5.    Signs for promotional displays and/or kiosks, will, in every instance, require the written approval of Landlord.

6.    Paper signs, stickers, banners or flags on the outside of glass storefront shall be prohibited, without the written approval of the Landlord.  All signage on the inside of the glass storefront shall be professionally lettered.

7.    Tenant shall comply with the requirements of all applicable codes, and/or local ordinances and obtain local government approval as required by code.  Tenant shall be responsible for procurement and payment of all required sign permits and fees as well as the cost of the signage and its installation.

8.    All electrical installations shall be U.L. approved and shall be the responsibility of the Tenant or Tenant's sign contractor.  All power connections shall be made at the junction box provided by Landlord.

9.    All signage shall be connected to Tenant's timer control circuitry.

10.   Upon termination of Tenant's Lease, Tenant shall be responsible for the removal of all signage and repair of any damage to the signage band.

6/1/00

$JB$
$6 \cdot 1 \cdot 00$



SIDE 1

SIDE 2

TEMPORARY SIGN (BUILDING / OR BBBY
HIRING TRAILER)



SIDE 1

SIDE 2

TEMPORARY BUILDING SIGN
REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING



ELEVATION - TEMPORARY SITE SIGNAGE
NTS



PLAN VIEW - TEMPORARY SITE SIGN
NTS



NEWTOWN, PA
EXHIBIT F-1
TEMPORARY SIGNS
TYPICAL ELEVATION AND
ENGINEERING DETAILS

JS
6-1-00

· ALL TEMPORARY
SIGNAGE SUBJECT
TO GOVERNMENTAL
APPROVAL.

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 2000, by and between _____, a _____ **[corporation] [limited] [general] [partnership] [national banking association]**, having an office at _____ _____ (the *"Mortgagee"*) and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant"*).

W I T N E S S E T H:

WHEREAS, Mortgagee is the holder of a mortgage (hereinafter called the *"Mortgage"*) covering a parcel of land owned by Newtown/Bucks Associates L.P., a Pennsylvania limited partnership (hereinafter called *"Landlord"*) together with the improvements **[to be]** erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the *"Shopping Center"* and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion of the Shopping Center, to wit, the premises designated the "Premises" on Exhibit B annexed hereto and made a part hereof, together with the building or portion thereof located thereon (said premises and the improvements thereon being hereinafter referred to as the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

_____

**[For New Leases:** WHEREAS, as an inducement to Tenant to enter into the Lease, Section 2.3.1 thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

_____

**[For Existing Leases:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

_____

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties

hereto, intending to be legally bound hereby, agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

5.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the

remainder of the term thereof (including the Renewal Periods, if
Tenant elects or has elected to exercise its options to extend
the term) which such new owner hereby agrees to assume and
perform and Tenant shall, from and after the date such new owner
succeeds to the interest of "landlord" under the Lease, have the
same remedies against such new owner for the breach of any
covenant contained in the Lease that Tenant might have had under
the Lease against Landlord if such new owner had not succeeded to
the interest of "landlord"; provided, however, that such new
owner shall not be:

    (i)    liable for any act or omission of any prior
landlord (including Landlord) unless such act or
omission continues from and after the date upon which
the new owner succeeds to the interest of such prior
landlord;

    (ii)    subject to any defenses which Tenant may
have against any prior landlord (including Landlord)
unless resulting from any default or breach by such
prior landlord which continues from and after the date
upon which the new owner succeeds to the interest of
such prior landlord;

    (iii)    subject to any offsets which Tenant may
have against any prior landlord, except to the extent
such offsets are expressly provided under the Lease and
Mortgagee has received notice thereof and the
opportunity to cure within the applicable time periods
set forth in the Lease (it being further agreed that
offsets under the Lease that were deducted by Tenant
prior to the date upon which the new owner succeeds to
the interest of such prior landlord shall not be
subject to challenge);

    (iv) bound by any fixed rent which Tenant might
have paid for more than one month in advance of its due
date under the Lease to any prior landlord (including
Landlord), unless such additional rent is paid in
accordance with the applicable provisions of the Lease;
or

    (v)    bound by any amendment or modification of the
Lease made without its consent; notwithstanding the
foregoing, Mortgagee acknowledges that the Lease
specifically provides for amendments thereof upon the
occurrence of certain events described in the Lease
(such as, for example, an amendment to the Lease
confirming the measurement of the Premises), and, by
its execution below, Mortgagee agrees to recognize such
amendments as part of the Lease, and Mortgagee further
agrees that such new owner shall also be bound by such
amendment(s) to the Lease, without any consent on the
part of Mortgagee or such new owner.

    (c)    Tenant's obligations hereunder shall be effective
only so long as Mortgagee is bound to Mortgagee's obligations
hereunder.

    6.    Tenant will notify Mortgagee of any default by Landlord
under the Lease which would entitle Tenant to terminate the Lease
or abate the rent payable thereunder and agrees that
notwithstanding any provision of the Lease, no notice of
termination thereof nor any abatement shall be effective unless
Mortgagee has received the aforesaid notice and has failed to

cure the subject default within the same time period allowed
Landlord under the Lease.  It is understood that the abatement
provisions of this paragraph relate to abatements by reason of
Landlord's default and do not apply to provisions of the Lease
whereby Tenant has the automatic right to abate rentals such as,
for example, abatement upon casualty or condemnation.

7.    Neither the Mortgage nor any other security instrument
executed in connection therewith shall encumber or be construed
as subjecting in any manner to the lien thereof, any trade
fixtures, signs or other personal property at any time furnished
or installed by or for Tenant or its subtenants or licensees on
the aforementioned property regardless of the manner or mode of
attachment thereof.

8.    Any notices of communications given under this
Agreement shall be in writing and shall be given by registered or
certified mail, return receipt requested, postage prepaid, (a) if
to Mortgagee, at the address of Mortgagee as hereinabove set
forth or at such other address or persons as Mortgagee may
designate by notice in the manner herein set forth, or (b) if to
Tenant, at the address of Tenant as hereinabove set forth, with
duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond
Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Edward M.
Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A.,
Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New
Jersey 07601, or such other address or persons as Tenant may
designate by notice in the manner herein set forth.  All notices
given in accordance with the provisions of this Section shall be
effective upon receipt (or refusal of receipt) at the address of
the addressee.

9.    This Agreement shall bind and inure to the benefit of
and be binding upon and enforceable by the parties hereto and
their respective successors and assigns.

10.   This Agreement contains the entire agreement between
the parties and cannot be changed, modified, waived or canceled
except by an agreement in writing executed by the party against
whom enforcement of such modification, change, waiver or
cancellation is sought.

11.   This Agreement and the covenants herein contained are
intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:
[Corporate Seal]

_____      By: _____
(Assistant) Secretary                    Name:_____
                                                     Title:_____


**TENANT:**

ATTEST:                           BED BATH & BEYOND INC.

[Corporate Seal]

_____  By: _____
(Assistant) Secretary                        Warren Eisenberg
                                                     Co-Chief Executive Officer

[INSERT APPROPRIATE JURAT FOR MORTGAGEE]

_____

STATE OF NEW JERSEY )
                    ) : ss.
COUNTY OF UNION     )

    On this ____ day of _____, 2000, before me personally
came Warren Eisenberg to me know, who being by me duly sworn, did
depose and say that he is the Co-Chief Executive Officer of Bed
Bath & Beyond Inc., the corporation described in and which
executed the above instrument and that he signed his name thereto
by order of the Board of Directors of said corporation.


_____          _____
                                            Notary Public
My Commission Expires:

_____

Exhibit H

Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of
_____, 2000, by and between NEWTOWN/BUCKS
ASSOCIATES, L.P., a Pennsylvania limited partnership, having an
address at _____ (**"Landlord"**); BED BATH & BEYOND
INC., a New York corporation, having an address at 650 Liberty
Avenue, Union, New Jersey 07083 (**"Tenant"**); and
_____, a [_____] **[corporation]
[limited] [general] [partnership]**, having an address at _____
_____
_____ (**"Subtenant"**).

R E C I T A L S:

    A.    Landlord and Tenant have entered into a certain lease
(the **"Lease"**) dated as of
_____ _____, 2000, a short form of which
has been recorded in _____, which demises
certain premises (the **"Premises"**) located in the Newtown Shopping
Center, Newtown, Pennsylvania, which Shopping Center is more
particularly described on Exhibit A annexed hereto and made a
part hereof.

    B.    Section 15.4 of the Lease provides that in the event
Tenant subleases all or a portion of the Premises for a term of
at least five (5) years, Landlord shall, upon Tenant's request,
execute and deliver a Recognition Agreement among Landlord,
Tenant and each such subtenant in the form attached to the Lease,
in recordable form.

    C.    Pursuant to a Sublease dated as of _____
_____ (the **"Sublease"**), Tenant has subleased **[a portion of]** the
Premises to Subtenant, which **[portion]** is designated as
"Subleased Premises" on Exhibit B annexed hereto and made a part
hereof (the **"Subleased Premises"**).

    D.    The parties hereto desire to effectuate the provisions
of Section 15.4 of the Lease with respect to the Sublease and the
Subleased Premises.

    NOW, THEREFORE, in consideration of the mutual covenants and
agreements herein contained, the parties hereto, intending to be
legally bound hereby, agree as follows:

        1.    Landlord warrants and represents as follows:

            (i)   that it is the fee owner of the Premises,

            (ii) that the Lease is unmodified (except as
        may be otherwise set forth in Exhibit B annexed hereto,
        if any) and is in full force and effect,

            (iii)     that the term of the Lease expires
        on _____, but is subject to [three]
        renewal periods of [five] years each and

            (iv) that Tenant is not in default under the
        Lease nor has any event occurred which would after
        notice to Tenant and the passage of time become a
        default of Tenant under the Lease.

2.    Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.    Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided that in such event Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent  in an amount equal to the greater of (x) the fixed rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

6.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to

Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty
Avenue, Union, New Jersey 07083, and  Edward M. Schotz, Esq., c/o
Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North,
25 Main Street, P.O. Box 800, Hackensack, New Jersey 07601, or
such other address or persons as Tenant may designate by Notice
to the other parties hereto, and (c) to Subtenant, at the address
of Subtenant as hereinabove set forth or such other address or
persons as Subtenant may designate by Notice to the other parties
hereto.  During the period of any postal strike or other
interference with the mails, personal delivery shall be
substitute for registered or certified mail.  All Notices shall
become effective only on the receipt or rejection of same by the
proper parties.

    8.    No modification, amendment, waiver or release of
any provision of this Agreement or of any right, obligation,
claim or cause of action arising hereunder shall be valid or
binding for any purpose whatsoever unless in writing and duly
executed by the party against whom the same is sought to be
asserted.

    9.    This Agreement shall be binding on and shall inure
to the benefit of the parties hereto and their respective heirs,
legal representatives, successors, assigns and sublessees.

    IN WITNESS WHEREOF, the parties have caused this Recognition
Agreement to be executed under seal the date first above written.

**LANDLORD:**

NEWTOWN/BUCKS ASSOCIATES, L.P.

By: _____
Name: _____
Title: _____

**TENANT:**

BED BATH & BEYOND INC.

By: _____
    Warren Eisenberg
    Co-Chief Executive Officer

**SUBTENANT:**

_____

By: _____
Name: _____
Title: _____

STATE OF NEW JERSEY )
                     ) : ss.
COUNTY OF UNION     )

     On this ____ day of _____, 2000, before me personally came Warren Eisenberg to me know, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.


                                    _____
                                      Notary Public

My Commission Expires:

_____

Exhibit I

DELIVERY DATE NOTICE

[Letterhead of Landlord]

_____, ____

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:  Agreement of Lease, dated _____, 2000 (the "Lease"),
     between Newtown/Bucks Associates, L.P., as landlord
     ("Landlord"), and Bed Bath & Beyond Inc., as tenant
     ("Tenant"), with respect to certain retail premises (the
     "Premises") located in the Newtown Shopping Center, Newtown,
     Pennsylvania.

Gentlemen:

     In accordance with the provisions of Subsection 2.3.2 of the
Lease, the Landlord hereby informs the Tenant that the Delivery
Date shall take place at 8:00 A.M. on _____, 199__.  This
notice shall constitute the Delivery Date Notice referred to in
Subsection 2.3.2 of the Lease.

     In accordance with the provisions of Section 3.4 of the
Lease, attached hereto please find the certification to you by
our licensed **[architect] [surveyor] [engineer]** of the Floor Area
of the Premises, the square footage of the non-selling space of
the Premises, and the Floor Area of the Shopping Center.

                         NEWTOWN/BUCKS ASSOCIATES, L.P.


                         By:_____
                                      , (Vice) President


cc:  [Edward M. Schotz, Esq.]
     [Allan N. Rauch, Esq.]

Exhibit J

DELIVERY DATE CERTIFICATION

[Letterhead of Landlord]

_____, 2000

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:  Agreement of Lease, dated _____, 2000 (the "Lease"),
     between Newtown/Bucks Associates, L.P., as landlord
     ("Landlord"), and Bed Bath & Beyond Inc., as tenant
     ("Tenant"), with respect to certain retail premises (the
     "Premises") located in the Newtown Shopping Center, Newtown,
     Pennsylvania

Gentlemen:

     In accordance with the provisions of Subsection 2.3.3 of the
Lease, Landlord hereby certifies to Tenant that, as of the date
of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result,
the Delivery Date (as such term is defined in the Lease) will be
deemed to be _____, 199__ [INSERT THE DATE WHICH IS TWO
DAYS AFTER THE DATE OF THIS LETTER].  This notice shall
constitute the Delivery Date Certification referred to in
Subsection 2.3.3 of the Lease.

                              Newtown/Bucks Associates, L.P.


                              By:_____
                                                            ,
(Vice) President


cc:  [Edward M. Schotz, Esq.]
     [Allan N. Rauch, Esq.]

Exhibit K-1

Existing Exclusives

Page 1 of 7

K-1-1

EXHIBIT K-1

Case 23-13359-VFP    Doc 926-1    Filed 06/23/23    Entered 06/23/23 15:30:04    Desc
NEWTOWN SHOPPING CTR    Exhibit 1    Page 100 of 108

## RESTRICTIVE COVENANTS

The types of uses permitted in the Shopping Center shall be of a retail and/or commercial nature found in first class shopping centers of a similar size in the metropolitan marketing area in which the Shopping Center is located. No premises (nor any part thereof) in the Shopping Center other than the Premises shall be (i) used or occupied as a pet superstore (defined as a pet store in excess of 3,000 square feet), retail supermarket, drug store or combination thereof, nor (ii) used for the sale of any of the following: (1) fish or meat; (2) produce; (3) baked goods; (4) floral items; (5) any combination of food items sufficient to be commonly known as a convenience food store or department; (6) take-out home meal replacement items (i.e., as sold by Boston Market type operations); and (7) items requiring dispensation by or through a pharmacy or requiring dispensation by or through a registered or licensed pharmacist; provided that baked goods and/or floral items may be sold by other tenants of the Shopping Center at such time as Tenant confirms in writing to Landlord, Tenant's intention to permanently discontinue sales of such items from the Premises. No premises (nor any part thereof) in the Shopping Center other than the Premises shall be given the exclusive right to provide banking and/or other financial services (including, but not limited to, installation of automatic teller machines), such that the provision of any such services in the Premises is precluded.

Notwithstanding the provisions of subsection 23(ii) above, one (1) premises within the Shopping Center (which, for purposes hereof, shall not include the Premises) may be occupied as a bagel shop (i.e., Manhattan Bagel, Einstein Bagel, etc.), provided, however, that (i) the shop shall limit its sales exclusively to bagels and related food items, and under no circumstances shall be a full service bakery, and (ii) the total square footage of such bagel shop shall not exceed two thousand (2,000) square feet. Furthermore, the provisions of subsection 23(ii)(6) above alone shall not be deemed to preclude the use of any premises in the Shopping Center as a traditional restaurant, fast food outlet or pizza or sandwich shop (i.e., Pizza Hut or Subway), provided, however, that such uses shall remain subject to the limitations set forth below.

In addition, none of the following uses shall be conducted in the Shopping Center: (a) offices (except as an incidental use to a permitted retail or commercial business or as located on "Pad 1," "Pad 2," "Pad 3" or "Pad 4"); (b) funeral homes; (c) any production, manufacturing, industrial, or storage use of any kind or nature, except for storage and/or production of products incidental to the retail sale thereof from the Shopping Center; (d) entertainment or recreational facilities ("entertainment or recreational facilities" includes, but are not limited to, a bowling alley, skating rink, electronic or mechanical games arcade [except as an incidental use to a retail or commercial business, in which case such use shall be restricted to less than five percent (5%) of the floor area occupied by such business], theater [other than a single movie theater, provided such movie theater is located in the specific location shown on the Site Plan and contains no more than seventy-seven thousand (77,000) square feet of space], billiard room or pool hall, health spa or studio or fitness center, massage parlor, discotheque, dance hall, banquet hall, night club, bar or tavern [except as incidental to a primary restaurant use], "head shop", pornographic or "adult" store, racquetball court or gymnasium, or other place of public amusement); (e) training or educational facilities ("training or educational facilities" includes, but are not limited to, a beauty school, child care facility, barber college, library, reading room, church, school, place of instruction, or any other operation catering primarily to students or trainees rather than to customers); (f) restaurants in excess of two thousand (2,000) square feet (except on the Premises or as located on "Pad 1," "Pad 2," "Pad 3" or "Pad 4"); (g) car washes, gasoline or service stations, or the displaying, repairing, renting, leasing, or sale of any motor vehicle, boat or trailer; (h) dry cleaner with on-premises cleaning; (i) any use which creates a nuisance or materially increases noise or the emission of dust, odor, smoke, gases, or materially increases fire, explosion or radioactive hazards in the Shopping Center; (j) any business with drive-up or drive-through lanes (except as located on "Pad 1," "Pad 2," "Pad 3" or "Pad 4"); (k) second-hand or thrift stores, or flea markets; and (l) any use involving Hazardous Material, except as may be customary in first class neighborhood shopping centers in the metropolitan area where the Shopping Center is located. It is the Parties' intent that the parking and other common facilities shall not be burdened by either large scale or protracted use by persons other than customers or occupants of the Shopping Center. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to store, use, sell and/or provide any item or service on or from the Premises, and engage in any activity on the Premises, which Tenant or any affiliate of Tenant customarily stores, uses, sells, provides or engages in at any of their other locations.

*Page 2 of 7*

STAPLES
NEWTOWN SHOPPING CENTER

*Section 5.2. Exclusive, Prohibited and Restricted Uses.* Subject to Section 5.3 hereof, Landlord covenants that, other than the Premises:

*Section 5.2.1. Exclusive Use.* No part of the Center nor any property within one mile of the Center owned by Landlord or by an entity under common control with Landlord shall be used for the sale or leasing of equipment (including computers), furniture or supplies for business or office (including home office) use, or the provision of business or office services (including copying, printing, packing, shipping and business equipment repair services) (collectively, the "Exclusive Goods and Services"); and

*Section 5.2.2. Prohibited Uses.* No part of the Center shall be used for any of the following: (i) tanning, health, exercise or racquet club or spa, gymnasium, bowling alley, skating rink or other sports or recreational facility; (ii) school, library, reading room, or house of worship; (iii) movie theatre, gallery, auditorium, meeting hall, hotel or motor inn, or any residential use; (iv) massage parlor, adult bookstore, a so-called "head" shop, off track betting, gambling, gaming or check cashing facility; (v) car wash, automobile repair work or automotive service, automobile body shop, automobile, boat, trailer or truck leasing or sales, or laundromat; (vi) tavern, bar (unless operated incidental to, in conjunction with, and under the same name as, a restaurant permitted hereunder), amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video game (unless incidental to an otherwise permitted use and so long as the number of video game machines does not exceed 5 in any one location), virtual reality or laser tag room or facility, pool hall, arcade, indoor children's recreational facility or other amusement center; (vii) any manufacturing, warehouse or office use (except incidental to a retail operation); (viii) funeral parlor, animal raising or storage (except incidental to a full-line retail pet supply operation), pawn shop, flea market or swap meet, junk yard; (ix) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; or (x) any use which constitutes a public or private nuisance or produces objectionable noise or vibration; and

*Section 5.2.3. Restricted Uses.* No part of the Center within 300 feet of the Premises shall be used for a restaurant (except that Bed, Bath and Beyond may operate a snack bar/coffee bar so long as there is no separate customer entrance from the Common Facilities to same) or any other use which would place an undue burden on parking.

*Section 5.3. Covenants in General.* The covenants set forth in Section 5.2 shall run with the land comprising the Center for the Term of this Lease. In the event of a breach of any such covenants, Landlord and/or Tenant shall be entitled to injunctive relief and any other appropriate remedy. Notwithstanding the foregoing, Section 5.2 shall not prohibit any tenant under a lease existing on the date of this Lease from using space occupied by it for any use permitted under such tenant's lease as of the date hereof, nor prohibit the replacement of a tenant existing as of the date hereof with a tenant located in the same space and operating the same use as operated as of the date hereof, nor prohibit any future tenant from selling, leasing or providing the Exclusive Goods and Services incidental to such tenant's primary business in no more than an aggregate of 5% of such tenant's sales floor area.

Page 3 of 7

DESIGN FOR VISION
NEWTOWN SHOPPING CENTER

2.    Use: The Premises are leased to Tenant solely for use by it for sales at retail of eyeglasses and contact lenses and items and professional services related thereto under the trade name DESIGN FOR VISION___, and for no other purpose.    Throughout the Term as such may be extended, Tenant, at its sole cost and expense, shall comply with all laws, ordinances, notices, orders, rules, regulations, deed restrictions and requirements relating to the Premises, or to the use or manner of use of the Premises, or to the operation of Tenant's business and Tenant shall further comply with all regulations of federal, state and municipal governments and all departments, commissions, boards and officers thereof and of the National Fire Protective Association or any other body now or hereafter constituted exercising similar functions.

Provided Tenant is not in default of any of its obligations hereunder, the Landlord shall not, during the Term (as hereafter defined), enter into any leases covering other premises in the Shopping Center which permit said other premises to be used for the same purpose as Tenant intends to use these Premises as described in this Section 2. The foregoing notwithstanding, the Premises initially occupied by Acme, Bed, Bath & Beyond and Staples (or Office Max) shall not be subject to this restriction.

DRY CLEANER
NEWTOWN SHOPPING CENTER

2.    Use: The Premises are leased to Tenant solely for use by it as a shirt laundry and drop- off dry cleaning store with no on-Premises dry cleaning under the trade name Payless Cleaners, and for no other purpose. Throughout the Term as such may be extended, Tenant, at its sole cost and expense, shall comply with all laws, ordinances, notices, orders, rules, regulations, deed restrictions and requirements relating to the Premises, or to the use or manner of use of the Premises, or to the operation of Tenant's business and Tenant shall further comply with all regulations of federal, state and municipal governments and all departments, commissions, boards and officers thereof and of the National Fire Protective Association or any other body now or hereafter constituted exercising similar functions.

Provided Tenant is not in default of any of its obligations hereunder, the Landlord shall not, during the Term (as hereinafter defined), enter into any leases covering other premises at the Shopping Center which permit said other premises to be used for the same purpose as Tenant intends to use these Premises as described in this Section 2. The foregoing notwithstanding, Tenant acknowledges and agrees that the anchor tenants (to include the Premises occupied initially by Acme, Bed, Bath & Beyond, and Staples) shall not be subject to this exclusive use provision.

Page 4 of 7

HAIR CUTTERY

NEWTOWN SHOPPING CENTER

2.  Use:

(a)  The Premises are leased to Tenant solely for use by it as a hair salon for men, women, and children, the sale of related retail items, and for incidental purposes related thereto under the trade name Hair Cuttery, and for no other purpose. Throughout the Term as such may be extended, Tenant, at its sole cost and expense, shall comply with all laws, ordinances, notices, orders, rules, regulations, deed restrictions (of which Landlord has made Tenant aware) and requirements relating to the Premises, or to the use or manner of use of the Premises, or to the operation of Tenant's business and Tenant shall further comply with all regulations of federal, state and municipal governments and all departments, commissions, boards and officers thereof and of the National Fire Protective Association or any other body now or hereafter constituted exercising similar functions.

(b)  As a material part of the consideration inducing Tenant to execute this Lease, Landlord, to the extent that Landlord may lawfully do so, covenants and agrees that it will not directly or indirectly lease or rent any additional property within the Shopping Center for a hair salon or hair cutting use; nor will Landlord, directly or indirectly, permit any tenant or occupant of such property to lease or rent, in any manner, directly or indirectly, any part thereof to a person, firm or corporation for such use. The parties agree that should a violation or breach of this covenant occur at any time during the term of this Lease, the Tenant's actual damages resulting therefrom will be extremely difficult or impractical to ascertain.

COFFEE BEANERY

NEWTOWN SHOPPING CENTER

2.  Use:  The Premises are leased to Tenant solely for use by it for the retail sale of bulk coffee, packaged tea and related items including coffee, tea, coffee and tea beverages, and related promotional items; specialty pastries, muffins, and baked goods; bagels and bread stuffs; sandwiches, salads, and soups; premium desserts; juice, sparkling water and other non-alcoholic beverages; and coffee confections, all for in-store and carry-out consumption consistent with the menu attached hereto as Exhibit "F-1"; specialty gift baskets, coffee and tea-related equipment, supplies and functional and decorative kitchen accessories under the trade name The Coffee Beanery, and for no other purpose. Tenant's permitted use shall not include a full service bakery. Throughout the Term as such may be extended, Tenant, at its sole cost and expense, shall comply with all laws, ordinances, notices, orders, rules, regulations, deed restrictions and requirements relating to the Premises, or to the use or manner of use of the Premises, or to the operation of Tenant's business and Tenant shall further comply with all regulations of federal, state and municipal governments and all departments, commissions, boards and officers thereof and of the National Fire Protective Association or any other body now or hereafter constituted exercising similar functions.

Provided Tenant is not in default of any of its obligations hereunder, the Landlord shall not, during the Term (as hereafter defined), enter into any leases covering other premises at the Shopping Center which permit said other premises to be used for the same primary purpose as Tenant intends to use these Premises as described in this Section 2. The foregoing notwithstanding, Landlord and Tenant agree that the premises initially leased to Acme, Staples, Bed, Bath & Beyond, Perkins Family Restaurant and Appleby's (the "Excluded Premises") shall not be subject to this restriction.

Page 5 of 7

HOLLYWOOD VIDEO

NEWTOWN SHOPPING CENTER - PAD #4

5.4    **Exclusivity.** Landlord covenants and agrees that during the term of the Lease, including any Option Periods, Tenant, so long as Tenant is not in default under any significant term or condition of this Lease, shall have the exclusive right in the Shopping Center to sell, rent, trade, license and/or distribute pre-recorded video cassettes, tapes, and disks, entertainment software, and video merchandise, including the sale, rental and/or trading of any substitutes for, or items which are a technological evolution of, any of the foregoing items; provided, however, nothing herein shall prevent Landlord from leasing space in the Shopping Center to tenants whose primary business is the sale of books including the sale and/or rental of audio and video books. The foregoing exclusive shall not apply to Acme Markets, Bed Bath and Beyond, and Staples to the extent their existing leases allow such usage or to their assignees or subtenants (provided that any such assignment or subletting does not require Landlord's prior consent to change the use from that which such tenants operated). The foregoing exclusive shall not apply to sales of the above referenced items from a full service bookstore (such as Barnes and Nobel or Borders) or Coconuts, provided that the tenant in question's lease must be fully executed prior to Lease Commencement Date and only to the extent that such existing lease specifically allow such usage or to their assignees or subtenants (provided that any such assignment or subletting does not require Landlord's prior consent to change the use from that which the tenants operated. Nothing contained herein shall limit or restrict any tenant, existing or future, from selling blank or unrecorded video cassettes or selling instructional and promotional video cassettes.

PIZZA
SHOP

NEWTOWN SHOPPING CENTER

AND PIZZA

2.    Use: The Premises are leased to Tenant solely for use by it as an Italian restaurant SHOP under the trade name Imperial Restaurant, and for no other purpose. Throughout the Term as such may be extended, Tenant, at its sole cost and expense, shall comply with all laws, ordinances, notices, orders, rules, regulations, deed restrictions and requirements relating to the Premises, or to the use or manner of use of the Premises, or to the operation of Tenant's business and Tenant shall further comply with all regulations of federal, state and municipal governments and all departments, commissions, boards and officers thereof and of the National Fire Protective Association or any other body now or hereafter constituted exercising similar functions.

Provided Tenant is not in default of any of its obligations hereunder, the Landlord shall not, during the Term (as hereafter defined), enter into any leases covering other premises at the Shopping Center which permit said other premises to be used for the same purpose as Tenant intends to use these Premises as described in this Section 2. The premises occupied by Acme, Staples and Bed, Bath & Beyond shall not be subject to this restriction.

COMMERCE
BANK

NEWTOWN SHOPPING CENTER - PAD # 3

8.2    Competing Use - During the term of this Lease, provided TENANT is not in default,

LANDLORD agrees not to lease or sell any portion of the project, of which the leased premises is a part,

to a commercial bank, savings bank, savings and loan or credit union.

Page 6 of 7

ARTICLE XXXIV.  EXCLUSIVE USE.

(A)   Provided Tenant shall (i) use the Demised Premises for
the Initial Use, and (ii) not be in monetary or other material
default under this Lease beyond the expiration of the applicable
grace period provided for curing such default (together, the
"Conditions Precedent"), Landlord covenants and agrees that it will
not lease or permit the occupancy of any premises located in the
Shopping Center (other than the Demised Premises) for the operation
of a casual dining restaurant substantially similar to an
Applebee's Neighborhood Grill & Bar (the "Restricted Use"),
specifically including, but not limited to, such similar concepts
as "Bennigans", "TGI Fridays", "Chili's", "Ruby Tuesday's", and
"O'Charlie's"; PROVIDED, HOWEVER, that the Restricted Use shall in
no event be construed to apply to other "theme" restaurants, such
as seafood ("Red Lobster" and "Northern Lights"), steakhouses
("Outback" and "Lone Star") or Italian ("Olive Garden").

Exhibit K-2

Existing Leases

Acme
Beautyland
Hair Cuttery
Design for Vision
Blue Ribbon Cleaners
Pizza Restaurant
The Coffee Beanery
Staples
Appleby's Neighborhood Bar and Grill
Commerce Bank
Hollywood Video

Exhibit L

Percentage Rent

1.    During the applicable period described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay percentage rent (*"Percentage Rent"*) equal to five (5%) percent of all Gross Sales (as hereinafter defined) resulting from business conducted in, on or from the Premises.  As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services arising out of or payable on account of all the business conducted in, on or from the Premises by or on account of Tenant and any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises, whether for cash, credit or otherwise, including all orders for merchandise taken from or filled at or from the Premises and all deposits not refunded to customers.  A sale shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (A)  the transaction is initially reflected in the books or records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (B) Tenant or any other person or entity operating its business in the Premises receives all or any portion of the sales price, or (C) the applicable goods or services are delivered to the customer, whichever of (1), (2) or (3) first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time.  Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term *"Gross Sales"* shall exclude (i) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (ii) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (iii) refunds or credits  given to customers for merchandise purchased at the Premises and returned or exchanged, (iv) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (v)  to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (vi) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (vii) sales to employees of Tenant at discount, (viii) fees paid to independent third party credit card companies in connection with sales charged to customers' credit cards, (ix) proceeds from delivery, wrapping and check cashing charges, (x) sums and credits received in settlement of claims for loss or damage to merchandise, (xi)  separately stated service, finance and interest charges, (xii) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise from the Premises, (xiii) close out or bulk sales of inventory to jobbers or wholesalers, and (xiv) sales of gift certificates.

2.    Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all

elements of Gross Sales.  Tenant shall be permitted to maintain
its books and records in a computerized form; provided, however,
that (A) such computerized books and records provide the same
level of information as the books and records described above and
are retained for the full record retention period provided for
herein, and (B) promptly upon request, printed copies of any such
books and records shall be made available at Tenant's principal
office for inspection by Landlord's representatives who are
engaged in inspecting and/or auditing Tenant's books and records
as provided herein.  Such books and records shall be kept in
accordance with generally accepted accounting principles and
practices consistently applied and shall be retained by Tenant
for not less than one (1) year following the end of the calendar
year to which they refer.  Within thirty (30) days after the
close of each calendar month during which Percentage Rent is
payable hereunder, Tenant shall deliver to Landlord a statement
prepared by an officer of Tenant setting forth the amount of
Gross Sales achieved during, and the amount of Percentage Rent
payable for, the preceding calendar month, together with payment
of such Percentage Rent.  Landlord and/or its auditor shall have
the right, upon at least ten (10) days prior notice to Tenant, to
inspect and/or audit Tenant's records relating solely to Gross
Sales achieved in the Premises.

3.    Landlord shall not disclose to any third party Tenant's
Gross Sales or the amount of Percentage Rent paid or payable by
Tenant, provided, however, that (A) such information was not
previously disclosed by Tenant to such third party or to the
public generally, and (B) nothing contained herein shall restrict
Landlord from disclosing such information as may be required by
law, or to its accountants, attorneys, bona-fide prospective
purchasers, or current or prospective Institutional Mortgagees or
Ground Lessor(s) of all or any portion of Landlord's interest in
the Shopping Center (provided that each of such recipients shall
be bound to the same non-disclosure provisions as are imposed
upon Landlord).