UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Kristen Watson, Esquire (No. 270832018)
**BURR & FORMAN LLP**
420 N. 20th Street, 3400
Birmingham, AL  35203
(205) 458-5169
kwatson@burr.com

-and-

James H. Haithcock, III
**BURR & FORMAN LLP**
420 N. 20th Street, 3400
Birmingham, AL  35203
Tel: 205-458-5277
Fax: 205-244-5674

-and-

J. Cory Falgowski
**BURR & FORMAN LLP**
222 Delaware Avenue, Suite 1030
Wilmington, DE  19801
Tel: 302-830-2312
Fax: 302-397-2566

*Counsel for Comenity Capital Bank*

| | |
|---|---|
| In re: | Chapter 11 |
| Bed Bath & Beyond, Inc., *et al.,*[1] | Case No. 23-13359-VFP |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 29, 92, 708, 714** |

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF
COMENITY CAPITAL BANK WITH RESPECT TO DEBTORS' NOTICE OF
<u>SELECTION OF STALKING HORSE BIDDER</u>**

Comenity Capital Bank ("<u>Comenity</u>"), by and through its undersigned counsel, respectfully submits this limited objection and reservation of rights (this "<u>Limited Objection</u>") with respect to the *Debtors' Notice of Selection of Stalking Horse Bidder* [Dkt. No. 708] (the "<u>Sale Notice</u>").[2]  For its Limited Objection, Comenity states as follows:

<u>**Introduction**</u>

Comenity and certain of the above-captioned debtors, along with certain debtor-affiliates (collectively "<u>BBBY</u>"), are parties to the Program Agreement, as defined herein, governing the issuance of co-brand and private label credit cards to certain of BBBY's customers. The Program Agreement grants Comenity numerous rights, including, but not limited to, rights of chargeback and setoff, and usage rights of certain of the Debtors' intellectual property.

After the filing of the Sale Notice, the Debtors filed their *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Dkt. No. 714] notifying counterparties to certain contracts that their respective agreements may be assumed and assigned as part of the Sale Transaction. The Program Agreement was not included on the list of contracts and agreements to potentially be assumed and assigned; however, Comenity files this Objection out of an abundance of caution.

The asset purchase agreement and proposed sale order approving the Sale Transaction subject all executory contracts to a "Designation Deadline," giving the purchaser certain designation rights and the ability to assume or reject executory contracts after the Closing Date of the Sale Transaction.  Comenity objects to its Program Agreement with BBBY being subject to

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Notice.

any "designation rights" period under which the Program Agreement is assumed and assigned or rejected at any date after the Closing Date, and requests language to such effect be included in any order confirming the sale of the Debtors' assets to Overstock.com, Inc., or to any other approved purchaser of the Debtors' assets under the Sale Transaction (the "Purchaser").

On June 13, 2023, the Debtors filed the Sale Notice stating that the Debtors selected Overstock.com, Inc. to act as the Stalking Horse Bidder and that the Debtors intend to sell certain of their corporate assets associated with their Bed Bath & Beyond brand and business segment, including certain intellectual property "free and clear of any interest in such property" pursuant to 11 U.S.C. § 363(f). The Debtors' Harmon and buybuyBaby brands and business segments are not included assets of the Sale Transaction.  However, these Excluded Assets are also part of the Program Agreement. The Debtors cannot assume and assign the Bed Bath & Beyond brand portion of the Program Agreement and reject the remainder. Thus, Comenity objects to the Sale Notice to this extent and requests that the Program Agreement be rejected by the Debtors and that card utility, for both sales and returns of merchandise, be terminated.[3]

Comenity also requests that the Program Agreement be rejected by the Debtors, since BBBY has breached its obligations to Comenity by failing to maintain certain sale volume requirements. The Company's pre-petition defaults under the Program Agreement are historical facts, which are incurable, and thus stand as a total bar to assumption and assignment of the Program Agreement. Further, the Program Agreement cannot be assumed and assigned by the Debtor without violating section 365(c)(1) of the Bankruptcy Code.

Comenity does not object to the Debtors seeking to sell its assets in general. However, the

---

[3]  On or about May 19, 2023, BBBY and Comenity entered into an email agreement pursuant to which usage of all co-brand and private label cards issued under the Program Agreement shall be terminated as of **August 1, 2023**. Through this Limited Objection, Comenity seeks to enforce the agreement reached between the parties.

51032415 v3

Program Agreement grants Comenity limited, non-exclusive, non-transferable revocable licenses to use the trademarks, service marks, and names owned by or licensed to BBBY and designated by BBBY for use by Comenity in connection with the Program Agreement (the "<u>BBBY Marks</u>") which survive any purported "free and clear" sale. Comenity requests the inclusion of language in any sale order recognizing Comenity's continued right to use the BBBY Marks to service the credit card accounts.

Accordingly, Comenity objects to (a) assumption and assignment or rejection as of any time later than the Closing Date of the Sale Transaction; (b) any sale "free and clear" or impairment of Comenity's rights and license to the BBBY Marks as set forth in the Program Agreement; and (c) in the event of rejection, any post-closing acceptance of the private label credit cards for purchases or returns by the Purchaser or any other entity that is not a contract counterparty to the Program Agreement.

<strong><u>Relevant Background</u></strong>

**I.**     **<u>The Program Agreement.</u>**

1.     Comenity and BBBY are parties to that certain Co-Brand Credit Card Program Agreement dated December 22, 2015 (as amended and/or modified from time to time, the "<u>Program Agreement</u>") by and between Comenity and Bed Bath & Beyond Inc.[4]

2.     Pursuant to the Program Agreement, Comenity owns and operates private label and co-brand credit card programs for the benefit of BBBY and its customers. Comenity issues private label and co-brand credit cards (collectively, the "<u>BBBY Cards</u>") to qualified customers (the

---

[4] The Program Agreement is confidential by its terms and contains confidential commercial information and trade secrets that are protected from disclosure pursuant to 11 U.S.C. § 107(b).  Accordingly, a copy of the Program Agreement is not being filed herewith and it is only discussed generally herein.  By discussing the Program Agreement generally in this Limited Objection, Comenity does not waive any of the confidentiality provisions of the Program Agreement and reserves all rights with respect thereto.

4

"Cardholders") and extends credit to such customers to make purchases at BBBY related retailers online or in stores.  Comenity maintains the Cardholders' accounts and owns all payments made by the Cardholders.  After a purchase is made on a BBBY Card, Comenity pays BBBY for such purchase (including the sale price and sales tax), net of certain amounts owed to Comenity pursuant to the Program Agreement.

3.    The Program Agreement grants Comenity certain chargeback and setoff rights, including rights related to returned and/or defective merchandise.  Additionally, Comenity has the right to set off any payments made by the Cardholders on their BBBY Cards in the various BBBY retail stores (the "In-Store Payments") against amounts owed by Comenity to BBBY. The Program Agreement also grants Comenity rights in certain of the Debtors' intellectual property, including, but not limited to, certain trademarks, for purposes of Comenity carrying out its rights and obligations under the Program Agreement (all intellectual property of the Debtors in which Comenity has rights and/or interests is referred to herein as the "Trademarks").

## II.    **The Bankruptcy Cases.**

4.    On April 23, 2023 (the "Petition Date"), the Debtors filed their petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court" or the "Court"), citing liquidity issues exacerbated by the COVID-19 global pandemic and declining in-store sales. *See Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 10] (the "Etlin Declaration").

5.    On June 7, 2023, the Bankruptcy Court entered a final order (the "Store Closing Order") [Dkt. No. 641] approving the Debtors' motion to approve the Consulting Agreements (as

defined in the Store Closing Order and granting the Consultant (*ibid.*) authorization to conduct going-out-of-business sales in hundreds of the Debtors' remaining stores.

6.      On June 13, 2023, the Debtors filed their *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Dkt. No. 714] notifying counterparties to certain contracts that their respective agreements may be assumed and assigned as part of the Sale. The Program Agreement was not included on the list of contracts and agreements to potentially be assumed and assigned.

### III.     The Debtors' Planned 363 Sale Transaction.

7.      On April 23, 2023, the Debtors filed their *Motion for Entry of an Order (I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, (E) Approving the Form APA, and (II)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts, (C) Authorizing the Sale of Assets and (D) Granting Related Relief* [Dkt. No. 29] (the "Bidding Procedures Motion").

8.      On April 25, 2023, the Bankruptcy Court entered an order approving the Bidding Procedures Motion and authorizing the Debtors to sell, among other things, certain of the Debtors' corporate assets and certain other assets associated with their business (the "Bidding Procedures Order").

9.      On June 13, 2023, the Debtors filed the Sale Notice stating that the Debtors have selected Overstock.com, Inc. to act as the Stalking Horse Bidder and that only the Debtors' Bed Bath & Beyond brand assets are proposed to be sold to the Stalking Horse Bidder.

6

51032415 v3

10.     Under the proposed asset purchase agreement by and between the Debtors and the

Purchaser (the "APA"), attached as Exhibit A to the Sale Notice, the Purchaser will acquire, in

part—

> [A]ll of the following: (i) patents, inventions, invention disclosures, industrial
> designs and utility models; (ii) trademarks, service marks, logos, trade dress,
> trade names, corporate names, and other indicia of commercial source or origin,
> and goodwill associated with any of the foregoing ("Trademarks"); (iii)
> copyrights and all works of authorship, whether copyrightable or not, including
> any Software and rights therein; (iv) Internet domain names, URLs, internet
> protocol addresses, Social Media Accounts, websites, and all the content
> provided on the foregoing (collectively, "Internet Properties"); (v) trade secrets,
> industrial secret rights, and know-how, data, databases and confidential or
> proprietary information, including customer lists, supplier lists, processes,
> protocols, specifications, drawings, schematics, analyses, plans, techniques,
> technical plans and other forms of technology (whether or not embodied in any
> tangible form, and including all tangible embodiments of the foregoing, such
> as notebooks, samples, studies and summaries); (vi) rights in or associated with
> any of the foregoing, and all other intellectual property rights and proprietary
> rights, in each case, arising in any jurisdiction of the world; and (vii) any
> registrations of and pending applications to register any of the foregoing clauses
> (i) through (vi), together with all renewals, reissuances, continuations,
> continuations-inpart, divisionals, revisions, extensions, and reexaminations
> thereof.

APA §§ 1.1, 2.1 (the "Intellectual Property").

11.     Additionally, the APA subjects all executory contracts to a designation deadline of

the earlier of (a) the date that is forty-five (45) days following the Closing and (b) the date on

which the Bankruptcy Court enters an Order confirming the Debtors' plan of reorganization or

liquidation, by which the Purchaser must decide whether to assume and assign or reject the

contracts.    APA § 2.7(a) (the "Designation Deadline"). Such Designation Deadline is also

incorporated into the proposed order approving the Sale, which is attached as Exhibit B to the Sale

Notice (the "Sale Order").

12.     No provision was made in the APA for the license granted to Comenity by BBBY

under the Program Agreement to make use of certain intellectual property required for

51032415 v3

communications made by Comenity to the Cardholders. The Program Agreement includes the

grant of licenses providing that BBBY—

> hereby grants to Bank a royalty-free, non-exclusive (except as to branded credit
> account and card plans per Section 3.5), non-transferable license to use the BBBY
> Marks (as reviewed and approved by BBBY) solely in satisfaction of its duties,
> rights and obligations described in this Agreement, including without limitation,
> using same in any and all promotional materials, Account documentation,
> advertising, websites, marketing, and solicitations related to the Program, as well
> as Bank's and its Affiliates' product marketing and promotional materials and
> literature in written and electronic form, as well as their business client lists. Bank
> shall use the trademark designations "®" or "™" or such other designation as
> BBBY may specify or approve in connection with the BBBY Marks on the Credit
> Cards, Account documentation and promotional materials.

Program Agreement § 2.8(a).

Additionally, BBBY has agreed that even if the Program Agreement was to be terminated,

that the licenses would survive in favor of Comenity "solely in connection with the administration

and collection of the balance due on the Accounts." Program Agreement § 2.8 (b).

## LIMITED OBJECTION

I.    **The Program Agreement Cannot be Assumed and Assigned Due to the Debtors'
      Incurable Material Defaults, the Usage of Intellectual Property, and the Division
      of Assets.**

1.    **The Debtors have Committed Incurable Defaults under the Program
      Agreement.**

Pursuant to 11 U.S.C. § 365(b)(1)(A), a debtor-in-possession must cure, or provide

adequate assurance of the prompt cure of any default, in order to assume an executory contract.

However, as most courts have held, material nonmonetary defaults must also be cured, and if such

defaults are incurable—as is the case with past events that cannot be changed—they preclude the

debtor-in-possession from assuming an executory contract. *See In re Vitanza*, Case No. 98-

19611DWS, 1998 Bankr. LEXIS 1497, at *82-84 (Bankr. E.D. Pa. Nov. 13, 1998); *In re New

Breed Realty Enters.*, 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002); *In re Lee West Enterprises, Inc.*,

8

179 B.R. 204, 208 (Bankr. C.D. Cal. 1995). In the instant case, the Debtors' defaults, both occurring before and after the Petition Date, are incurable material defaults that preclude assumption.

Facilitating a credit card program requires incredible coordination, infrastructure, and supervision, together with massive outlays of financial and human resources. Given this, such a program requires certain returns in order to justify the expense of its operation.  In acknowledgement of this economic reality, the parties agreed and the Plan Agreement provides that an event of default warranting immediate termination would occur:

> If at any time BBBY's total Net Sales volume decreases by more than thirty percent (30%) as compared to the prior twelve (12) month period.

Program Agreement § 7.2(e) (the "Sales Volume Provision"). Per the Etlin Declaration, in early 2019, the Debtors reported their seventh consecutive quarter of declining store sales and profits had plunged 48% year-over-year. *See* Etlin Declaration ¶ 21.

By the plain meaning of 11 U.S.C. § 365(b)(1)(A), an executory contract in which the debtor committed an incurable default may not be assumed.  Additionally, case law confirms that an incurable non-monetary default acts as a bar to assumption when such default is material or caused substantial economic detriment.  *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990).

As discussed by the court in *In re New Breed Enterprises, Inc.*—

> [T]he Third Circuit articulated a standard which may be applied to determine whether the existence of an incurable non-monetary default precludes assumption of an executory contract or unexpired lease. [In *Joshua Slocum*], the court noted with approval the concept that "the [bankruptcy] court does retain some discretion in determining that lease provisions . . . may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets." *Joshua Slocum*, 922 F.2d at 1092 (*citing In re Mr. Grocer, Inc.*, 77 B.R. 349, 354 (Bankr. D.N.H.1987)). **The Third Circuit found in *Joshua Slocum* that a provision in a shopping center lease,**

> **allowing for the termination of the lease if certain minimum sales figure were
> not realized, was "material in the sense that it goes to the very essence of the
> contract, i.e., the bargained for exchange," and that it was "also reflective of
> the economic terms of the lease agreement governing occupancy."** *Joshua
> Slocum*, 922 F.2d at 1092.

278 B.R. at 321-22 (emphasis added).

The Debtors' triggering of the Sales Volume Provision is a "historical fact" and constitutes an incurable default that precludes assumption and assignment under Section 365 of the Bankruptcy Code. *See id.* In *New Breed*, the court held that where a debtor filed bankruptcy and failed to close the sale by the date specified in the contract, that this failure "constitutes a non-monetary default which cannot be cured because it is a historical fact." The same conclusion is compelled in this case, as the Debtors have already failed to meet the Sales Volume Provision by confirming their drastically declining sales. Moreover, the Debtors are going out of business— shuttering all their store locations and selling their intellectual property. Thus, there exists no possibility that the Debtors could even belatedly satisfy or cure its obligations to Comenity.

In agreeing to the Sales Volume Provision, the parties to the Program Agreement understood that certain metrics needed to be maintained in order for the program to be economically viable. The Sales Volume Requirement was an essential and material term of the Program Agreement, as it "goes to the very essence of the contract, *i.e.*, the bargained for exchange." *Joshua Slocum,* 922 F.2d at 1092. Comenity agreed to administer the credit card program for a company with hundreds of stores conducting a high volume of business throughout the entire country—it did not agree to administer the program for a significantly smaller volume business, and permitting assumption, notwithstanding the Debtors' breach of the Sales Volume Provision, would result in "substantial economic detriment" which is inconsistent with the requirements of Section 365 of the Bankruptcy Code. Bankruptcy does not allow the Debtors to rewrite the Program Agreement or override material incurable defaults. Given the substantial

economic detriment Comenity would suffer from potentially not being able to enforce the defaults

and terminate the Program Agreement immediately, it is evident that these defaults are material

and preclude assumption of the Program Agreement.

> **2.  As Proposed, the APA Would Affect an Assignment of Comenity's Intellectual Property in Violation of Section 365(c)(1) of the Bankruptcy Code.**

In Section 2.8(c) of the Program Agreement, Comenity grants the Debtors a non-exclusive,

non-transferable, revocable right to use Comenity's trademarks, service marks, or names owned

by or licensed (and capable of being sublicensed) to Comenity and designated by Comenity for

use by the Debtors in connection with the Program Agreement ("Comenity's Marks"). However,

the Debtors may not sublicense any of its rights to Comenity's Marks without Comenity's prior

written approval, let alone assign them. However, if the Debtors are permitted to assume the

Program Agreement, these restrictions would be violated, as the Purchaser is buying all Intellectual

Property in which the Debtors have any right or interest. *See* APA §§ 1.1, 2.1.

Section 365(c)(1)(A) of the Bankruptcy Code states that a debtor cannot assign an

executory contract where "applicable law excuses a party, other than the debtor, to such contract .

. . from accepting performance from or rendering performance to an entity other than the debtor[.]"

*See also Cinicola v. Scharlfenberger*, 248 F.3d 110, 121 (3d Cir. 2001) ("Section 365(c) places

constraints on the assignment rights created under § 365(1) and prohibits the assumption or

assignment of an executory contract if applicable nonbankruptcy law would excuse the other party

'from accepting performance from or rendering performance to' someone other than the debtor.").

Courts in this District have consistently found that a debtor cannot assign a contract under

which intellectual property is licensed on a non-exclusive basis without the licensor's consent. *See*

*In re Valley Media, Inc.*, 279 B.R. 105, 135-36 (Bankr. D. Del. 2002) (non-exclusive intellectual

property license may not be assigned without consent of licensor); *see also In re Golden Books*

*Family Entertainment, Inc.*, 269 B.R. 300, 308–310 (Bankr. D. Del. 2001) (sustaining licensor's objection and finding that non-exclusive intellectual property licenses are non-assignable under Bankruptcy Code section 365(c)); *In re Access Beyond Technologies, Inc.*, 237 B.R. 32 (Bankr. D. Del. 1999) (debtor could not assign intellectual property license without licensor's consent).

Under relatively similar circumstances a court determined that a franchise agreement could not be assumed by the debtor pursuant to Section 365(c)(1), because that agreement contained a non-exclusive trademark license, like Comenity's Marks, that could not be assumed under the Lanham Act without the licensor's consent. *In re Wellington Vision, Inc.*, 364 B.R. 129 (S.D. Fla. 2007); *see also In re N.C.P. Marketing Group, Inc., et al.*, 337 B.R. 230, 237 (D. Nev. 2005) ("trademarks are personal and non-assignable without the consent of the licensor.").

A decision to assume or reject an executory contract is "an all or nothing proposition." *Schlumberger Resource Management Serv., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.)*, 327 F.2d 242, 249 (3d Cir. 2003). Thus, if a debtor assumes a contract, it must do so with all the benefits, as well as the burdens. *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 183 (Bankr. E.D. Pa. 2010) (holding that the debtor "must either assume the whole contract, cum onere, or reject the entire contract, shedding obligations as well as benefits"). The assumption and assignment of an executory contract does not give the debtor or the assignee the ability or the right to modify the terms of the agreement being assumed and assigned. *See e.g. Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001); *see also In re Federal-Mogul Global, Inc.*, Case No. 05-2423, 2007 U.S. App. LEXIS 6120, at *9 (3d Cir. Mar. 15, 2007) (explaining that the debtor is not able to modify obligations in contract assumed and assigned pursuant to Section 365 of the Bankruptcy Code).

Comenity has invested a great deal in establishing a nationwide corporate identity. Comenity has a clear right to protect its substantial investment in and use of its intellectual property. Comenity should not be forced to allow the Purchaser, with which it has no business relationship, the untrammeled right to exploit its intellectual property. Under applicable law, Comenity cannot be compelled to accept performance from an entity with whom it does not wish to do business. *See e.g., In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 310 (Bankr. D. Del. 2001) (finding that licensor intended to "exercise a considerable degree [of] control over [intellectual property] licenses as a matter of business policy"); *In re N.C.P. Marketing Group, Inc.*, et al., 337 B.R. 230, 236 (D. Nev. 2005) (holding that intellectual property owner has an interest in the assignability of such property "so that it can maintain the goodwill, quality and value of its products[.]").

In sum, the Debtors cannot use the provisions of the Bankruptcy Code to defeat or impair Comenity's rights to its intellectual property. Accordingly, since the APA would grant the Purchaser access to those rights—without Comenity's consent—the Program Agreement must be rejected.

### 3. The Program Agreement Cannot be Partially Assumed and Partially Rejected as Part of the Division of Assets of the Sale Transaction.

Under the terms of the APA, the Purchaser will only be buying the Debtors' assets related to the Bed Bath & Beyond Brand while the Harmon and buybuyBaby brand assets will be excluded. However, the Program Agreement covers all of the Debtors' brands and it must be assumed and assigned or rejected in its entirety. The Debtors cannot assume and assign just the part of the Program Agreement that includes the Bed Bath & Beyond brand and assume or reject the remainder that includes the Harmon and buybuyBaby as part of a separate transaction. *See Schlumberger* 327 F.3d at 249 (holding that election to reject or assume an executory contract "is

an all-or-nothing proposition—either the whole contract is assumed or the entire contract is rejected"); *In re Philadelphia Newspapers, LLC*, 424 B.R. at 183 (holding that the debtor "must either assume the whole contract, cum onere, or reject the entire contract, shedding obligations as well as benefits").

Accordingly, since the APA is only for the Debtors' assets related to the Bed Bath & Beyond brand and the Program Agreement covers all brands, the Program Agreement cannot be assumed and should be rejected. Additionally, the same will hold true should motions be filed in the future regarding the other brands of the Debtors.

## II.    Even Assuming, *Arguendo*, that the Program Agreement Could be Assumed, It Must be Assumed and Assigned, or Rejected, in Its Entirety Effective as of the Closing.

In order to sell a debtor's assets outside the ordinary course of business, the debtor must provide notice of such sale. Additionally, to preserve the interested parties' rights, "[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 265 (3d Cir. 2000) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950)). As the "Designation Rights Period" and the related provisions are absent from the Bidding Procedures Motion, and the counterparties to executory contracts and unexpired leases have not had the opportunity to object and be heard on these provisions, the Purchaser may not impose any Designation Rights Period on any counterparty to an executory contract or unexpired lease. *See* Bidding Procedures Motion ¶¶ 19, 21; Bidding Procedures Order ¶ 19.

The APA sets the Designation Deadline as the earlier of (a) the date that is forty-five (45) days following the Closing and (b) the date on which the Bankruptcy Court enters an Order confirming the Debtors' plan of reorganization or liquidation, by which the Purchaser must decide

14

whether to assume and assign or reject the contracts.  APA § 2.7(a). Comenity objects to any Designation Deadline because, under such Designation Deadline, there is no guarantee that the Program Agreement will be conclusively assumed and assigned or rejected effective as of the Closing.

Due to the nature of the Program Agreement and BBBY's obligations thereunder, the Program Agreement must be assumed and assigned or rejected contemporaneously with the Sale Transaction's Closing.  If it is not, the Program Agreement will be rendered impracticable and Comenity would be significantly prejudiced due to BBBY's inability to perform under the Program Agreement. As further explained herein, Comenity maintains that the Program Agreement must ultimately be rejected by the Debtors.

Additionally, if the Program Event is not assumed and assigned or rejected by the Closing, Comenity would be prohibited from seeking redress from the Purchaser, given Comenity's lack of privity with the entity that will ultimately own and operate the businesses to which the Program Agreement relates. Due to a lack of contractual privity with the Purchaser (*i.e.*, the entity operating the business and engaging in sales transactions with Comenity Cardholders to which the Program Agreement relates), Comenity would be unable to enforce material terms of the Program Agreement during any post-Closing designation rights period, including its rights of recoupment and setoff with respect to daily Cardholder sales transactions.

Moreover, in addition to being grounds for termination of the Program Agreement, Comenity no longer being in privity with the entity in possession of the assets that form the basis of the Program Agreement would create a host of legal and regulatory issues.  For example, Comenity operates in a highly regulated space, and must make legally binding representations to

51032415 v3

regulatory bodies and to consumers regarding, among other things, Comenity's ability to honor any guarantees made to Cardholders with respect to their transactions.

Accordingly, Comenity objects to the Sale Transaction to the extent the Debtors seek to assume and assign or reject the Program Agreement after the Closing Date.  In conjunction with this objection, Comenity requests that the Sale Order be modified to reflect that: the Program Agreement must be assumed and assigned or rejected, in its entirety, upon the Closing of the Sale Transaction.

### III.    Comenity's Rights and License to the Trademarks Should not be Impaired Following the Sale of the Debtors' Assets.

Comenity objects to the Sale Notice to the extent that it seeks to sell the Debtors' intellectual property and trademarks free and clear of Comenity's rights and license to the BBBY Marks.  If the Court enters an order giving effect to the APA, the Purchaser would acquire the Debtors' assets, including a yet-to-be-identified portion of the Debtors' Intellectual Property, which includes, but is not limited to, trademarks, service marks, logos, and other indicia of commercial source. *See* APA §§ 1.1, 2.1.

Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  Section 361 of the Bankruptcy Code provides that bankruptcy court with broad discretion in granting adequate protection.

The Program Agreement grants Comenity a limited, non-exclusive, non-transferable revocable license to use the BBBY Marks. *See* Program Agreement § 2.8(a).  The APA provides that the Acquired Assets, including all Intellectual Property, are being sold free and clear of all liens, claims, interests, and other encumbrances. *See* APA § 2.1. The APA makes no provision for

16

adequate protection to be provided to Comenity as is required in order for the BBBY Marks, a subset of the Debtors' Intellectual Property, to be transferred and sold free and clear of Comenity's rights and license.  Comenity requires the BBBY Marks to continue the servicing and billing of the Cardholders long after the Sale Transaction closes, and post-termination of the Program Agreement per Comenity's post-termination rights under the Program Agreement.  Accordingly, Comenity objects to the sale of the Intellectual Property free and clear of Comenity's license without adequate protection of Comenity's interests.  Any sale order approving the Sale Transaction should clarify that the Intellectual Property may not be sold free and clear of Comenity's interests unless adequate protection is provided to Comenity.  Comenity also requests that this Court adequately protect Comenity by requiring that the Intellectual Property remain subject to Comenity's interests.  *See, e.g.*, *In re Dynamic Tooling Sys. Inc.*, 349 B.R. 847, 856 (Bankr. D. Kan. 2006).

Additionally, the U.S. Supreme Court has held that a debtor's rejection of a licensing agreement does not deprive the licensee of its rights under the agreement. *Mission Prod. Holdings, Inc. v. Tempnology, LLC, n/k/a Old Cold, LLC*, 139 S. Ct. 1652 (2019).  Because the Debtors cannot impair Comenity's license to the BBBY Marks through rejection of the Program Agreement, the Debtors also should not be able to impair Comenity's license to the BBBY Marks through a free and clear section 363 sale based on the same reasoning set forth by the U.S. Supreme Court in *Tempnology*.

Further, it would be inequitable to require Comenity to finance the Debtors' sales and store liquidations through the BBBY Cards during the pendency of this bankruptcy case but not allow it to use the BBBY Marks to the full extent authorized by the Program Agreement in order to collect the amounts owed.  *See* Program Agreement § 2.8 (b).

Finally, consumer protection laws require issuers of credit and collectors of debt to identify the origin of their debts to consumers. *See, e.g.*, 15 U.S.C. § 1692(g). Use of the BBBY Marks is required for compliance with such laws.

Accordingly, any sale order should clarify that Comenity's license to use the BBBY Marks is not affected in any way by the sale of the Debtors' assets. Comenity requests that any order confirming the Sale Transaction provide that Comenity's right to use the Debtors' trademarks, service marks, and/or other rights pertaining to the Debtors' names as set forth in the Program Agreement shall not be affected, modified, waived, primed, subordinated, or impaired in any way by any sale of the Debtors' assets, including, but not limited to, the Debtors' Intellectual Property, and any such sale shall not be made free and clear of Comenity's interest in the assets pursuant to the Program Agreement.

## IV.   The BBBY Cards should not be Used by the Purchaser Following the Closing of the Sale Transaction.

Comenity objects to any BBBY Card usage by the Purchaser following the closing of the Sale Transaction—limiting the cards to only sales channels owned by the contract counterparties. As of the Sale Transaction closing (or shortly thereafter), the Debtors' merchandise and sales channels will no longer exist or will no longer belong to the Debtors. The private label cards are authorized for purchases of the Debtors' merchandise solely through the Debtors' sales channels. Therefore, card usage will not be available for the Purchaser's customers or through any sales channels owned or maintained by the Purchaser.

After the Sale Transaction closes, the Program Agreement will be dormant and of no force and effect to provide credit card financing for the Purchaser's customers as to any existing merchandise and inventory no longer owned by the Debtors. Out of an abundance of caution, Comenity objects to any circumstance in which the Purchaser attempts to accept BBBY Cards

online or on any other platform it intends to use the Debtors' Intellectual Property to generate sales in the future. The contracts governing the issuance and use of the BBBY Cards only provide for usage by the contract counterparty. If the Purchaser is not assuming the Program Agreement, which does not seem possible given the foregoing, the Purchaser will not have any rights to use the BBBY Cards. To do otherwise would unilaterally and unfairly modify the Program Agreement without Comenity's consent and without creating contractual privity with the Purchaser. Comenity's rights would be prejudiced because the Purchaser would receive the benefit of the Program Agreement without assuming its burdens. *See, e.g.*, *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Applicable law does not permit the Debtors or the Purchaser to re-write the Program Agreement during the Sale Transaction. *See, e.g.*, *Medtronic/AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001).

Accordingly, Comenity respectfully requests that any order confirming the Sale Transaction clarify that, if the Program Agreement has not been assumed and assigned as of the Closing, the BBBY Cards will no longer be accepted by the Purchaser.

## **RESERVATION OF RIGHTS**

Comenity reserves all rights to raise additional objections to any orders related to any proposed sale order, any related matters, and any amendments or revisions thereto, or to any attempt to have the Program Agreement assigned at a later date. Comenity further reserves all rights it has under the Program Agreement, the orders related to any proposed sale order and applicable law, including, but not limited to, its rights to seek adequate protection and/or relief from the automatic stay.

19

51032415 v3

## CONCLUSION

**WHEREFORE,** Comenity respectfully requests that this Court enter an Order:

a.  Sustaining this Limited Objection;

b.  Modifying any order approving the sale of the Debtors' assets to the Purchaser to provide that:

   i.  Unless otherwise agreed to by Comenity and the Debtors in a separate written agreement, the private label and co-brand credit cards offered by Comenity to qualifying customers of the Debtors pursuant to that certain Co-Brand Credit Card Program Agreement dated December 22, 2015 (as amended and/or modified from time to time, the "Program Agreement") shall cease utility, including being accepted for the purchase or return of any merchandise or inventory, on August 1, 2023 at 3:00 a.m. (prevailing eastern time);

   ii.  Notwithstanding any provision of the Sale Order or the APA to the contrary, Comenity shall be permitted to continue the use of the Debtors' trademarks and service marks as provided under the existing Program Agreement and as necessary to administer the credit card accounts (including, but not limited to collections) until such time as all the accounts are fully processed, collected and closed;

   iii.  That the Program Agreement will not be assumed, or assumed and assigned, as part of any order approving the sale of the Debtors' assets or approval of the APA, nor will the Program Agreement be placed in any designation rights category or otherwise classified where it could be assumed and assigned at a later date. Unless otherwise agreed in writing by Comenity and the Debtors, the parties agree that the Program Agreement will be rejected as of August 1, 2023.

   iv.  All of Comenity's rights, remedies, claims, defenses, and other relief arising from or related to the Program Agreement (including, but not limited to, those set forth above) are expressly preserved and reserved; and

c.  Granting such other, further, and different relief as this Court deems just and proper.

Dated:  June 23, 2023

Respectfully submitted,

 /s/ *Kristen P. Watson*
Kristen P. Watson (NJ Bar No. 270832018)
BURR & FORMAN LLP
420 N. 20th Street, 3400
Birmingham, AL  35203
Telephone: 205-458-5169
Facsimile: 205-244-5674
Email:  kwatson@burr.com

51032415 v3

-and-

James H. Haithcock, III
BURR & FORMAN LLP
420 N. 20th Street, 3400
Birmingham, AL  35203
Tel: 205-458-5277
Fax: 205-244-5674
Email:  jhaithcock@burr.com

-and-

J. Cory Falgowski
BURR & FORMAN LLP
222 Delaware Avenue, Suite 1030
Wilmington, DE 19801
Telephone: 302-830-2312
Facsimile:  302-397-2566
Email:  jfalgowski@burr.com

*Counsel to Comenity Bank*

51032415 v3