# AGREEMENT OF LEASE

Between

# DEVELOPERS DIVERSIFIED REALTY CORPORATION,

LANDLORD,

AND

# BED BATH & BEYOND OF SOLON INC.,

TENANT

DATED: July 15, 1998

PREMISES LOCATED

IN

SOLON, OHIO

COLE01/SYS:\DMS\EMS.DIR\0460024.07
May 14, 1998

## TABLE OF CONTENTS

Page

SECTION 1.    DEFINITIONS AND BASIC TERMS . . . . . . . . . .    1
SECTION 2.    LEASE OF PREMISES . . . . . . . . . . . . . :.    11
SECTION 3.    LEASE TERM . . . . . . . . . . . . . . . . . .    12
SECTION 4.    PAYMENT OF FIXED RENT . . . . . . . . . . . .    12
SECTION 5.    IMPROVEMENTS . . . . . . . . . . . . . . . . .    15
SECTION 6.    REAL ESTATE AND OTHER TAXES . . . . . . . .    27
SECTION 7.    PERMITTED AND PROHIBITED USES . . . . . . .    31
SECTION 8.    UTILITIES . . . . . . . . . . . . . . . . . .    34
SECTION 9.    MUTUAL RELEASE, WAIVER OF SUBROGATION AND
              MUTUAL INDEMNIFICATION . . . . . . . . . . .    34
SECTION 10.   SIGNS . . . . . . . . . . . . . . . . . . . .    36
SECTION 11.   ALTERATIONS AND IMPROVEMENTS . . . . . . . .    39
SECTION 12.   ACCESS TO SHOPPING CENTER . . . . . . . . .    42
SECTION 13.   COMMON AREAS . . . . . . . . . . . . . . . .    42
SECTION 14.   PARKING AREAS AND OTHER COMMON AREAS. . . . .    47
SECTION 15.   TENANT'S INSURANCE . . . . . . . . . . . . .    49
SECTION 16.   LANDLORD'S INSURANCE . . . . . . . . . . . .    50
SECTION 17.   REPAIRS . . . . . . . . . . . . . . . . . . .    53
SECTION 18.   TENANT DEFAULT . . . . . . . . . . . . . . .    56
SECTION 19.   LANDLORD DEFAULT . . . . . . . . . . . . . .    58
SECTION 20.   LANDLORD'S ENTRY . . . . . . . . . . . . . .    59
SECTION 21.   FIRE AND OTHER CASUALTY . . . . . . . . . .    60
SECTION 22.   EMINENT DOMAIN . . . . . . . . . . . . . . .    64
SECTION 23.   EXCLUSIVE IN CENTER . . . . . . . . . . . .    66
SECTION 24.   RIGHT TO MORTGAGE AND NON-DISTURBANCE . . . .    70
SECTION 25.   TENANT ASSIGNMENT AND SUBLETTING . . . . . .    72
SECTION 26.   NOTICE . . . . . . . . . . . . . . . . . . .    77
SECTION 27.   SHORT FORM LEASE . . . . . . . . . . . . . .    78
SECTION 28.   ENTIRE AGREEMENT AND MODIFICATION . . . . . .    78
SECTION 29.   SEVERABILITY . . . . . . . . . . . . . . . .    78
SECTION 30.   GRAMMATICAL USAGES AND CONSTRUCTION . . . . .    79
SECTION 31.   TABLE OF CONTENTS, LINE NUMBERING AND
              PARAGRAPH HEADINGS . . . . . . . . . . . . .    79
SECTION 32.   NO JOINT VENTURE OR PARTNERSHIP CREATED BY
              LEASE . . . . . . . . . . . . . . . . . . .    79
SECTION 33.   BROKER'S COMMISSION . . . . . . . . . . . . .    79
SECTION 34.   RIGHTS CUMULATIVE; DEFINITION OF LANDLORD . .    79
SECTION 35.   NON-WAIVER . . . . . . . . . . . . . . . . .    80
SECTION 36.   LIMITATION OF LANDLORD'S LIABILITY . . . . . .    80
SECTION 37.   SURRENDER OF PREMISES . . . . . . . . . . . .    81
SECTION 38.   SUCCESSORS AND ASSIGNS . . . . . . . . . . .    81
SECTION 39.   FORCE MAJEURE . . . . . . . . . . . . . . . .    81
SECTION 40.   HOLD OVER . . . . . . . . . . . . . . . . . .    82
SECTION 41.   CONSENTS . . . . . . . . . . . . . . . . . .    82
SECTION 42.   DECLARATION OF CONTRACTUAL LIABILITY . . . . .    82
SECTION 43.   QUIET ENJOYMENT . . . . . . . . . . . . . . .    82
SECTION 44.   ESTOPPEL CERTIFICATE . . . . . . . . . . . .    82
SECTION 45.   COSTS . . . . . . . . . . . . . . . . . . . .    83
SECTION 46.   OPTIONS TO EXTEND TERM . . . . . . . . . . .    83
SECTION 47.   GOVERNING LAW . . . . . . . . . . . . . . . .    84
SECTION 48.   ATTORNEYS' FEES . . . . . . . . . . . . . . .    84
SECTION 49.   PAYMENT UNDER PROTEST . . . . . . . . . . . .    84
SECTION 50.   WORK PERFORMED UNDER PROTEST . . . . . . . .    85
SECTION 51.   CONDUCT OF BUSINESS OPERATIONS . . . . . . .    85
SECTION 52.   ABATEMENT OF RENT CHARGES . . . . . . . . .    86
SECTION 53.   WARRANTIES AND REPRESENTATIONS . . . . . . .    87
SECTION 54.   ARBITRATION . . . . . . . . . . . . . . . . .    87
SECTION 55.   LIENS . . . . . . . . . . . . . . . . . . . .    88
SECTION 56.   DEFINITION OF HEREUNDER, HEREIN, ETC. . . . .    89
SECTION 57.   TENANT'S PROPERTY . . . . . . . . . . . . . .    89
SECTION 58.   TENANT'S RIGHT OF FIRST OFFER . . . . . . . .    89
SECTION 59.   LIMITATION OF TENANT'S LIABILITY . . . . . .    90
SECTION 60.   TENANT'S RIGHT OF TERMINATION . . . . . . . .    91
SECTION 61.   SURVIVAL OF OBLIGATIONS . . . . . . . . . . .    92
SECTION 62.   ENVIRONMENTAL MATTERS . . . . . . . . . . . .    92
SECTION 63.   EXECUTION OF THIS LEASE . . . . . . . . . . .    96


EXHIBIT A -   Legal Description of Shopping Center
EXHIBIT B -   Site Plan
EXHIBIT C -   Rent Commencement and Expiration Date Agreement

EXHIBIT D   -   Specifications for Landlord's Work
EXHIBIT D-1      Front Elevation of Premises [including building
                signage] and of Shopping Center
EXHIBIT E   -   Permitted Encumbrances
EXHIBIT F   -   Building Signage
EXHIBIT F-1 -   Monument Signs
EXHIBIT G   -   Subordination,   Non-Disturbance   and   Attornment
                Agreement
EXHIBIT G-1 -   Fee Owner Recognition Agreement
EXHIBIT H   -   Recognition Agreement
EXHIBIT I   -   Delivery Date Notice
EXHIBIT J   -   Delivery Date Certification
EXHIBIT K   -   Percentage Rent
EXHIBIT L   -   Letter Agreement with Borders, Inc.
EXHIBIT M   -   Rules and Regulations
EXHIBIT N   -   Existing Leases
EXHIBIT N-1 -   Existing Exclusives



## LEASE AGREEMENT

THIS LEASE AGREEMENT ("<u>Lease</u>") is entered into as of ~~July~~ *15,* 1998 by and between DEVELOPERS DIVERSIFIED REALTY CORPORATION, an Ohio corporation, having an office at 34555 Chagrin Boulevard, P.O. Box 8022, Chagrin Falls, Ohio 44022 ("<u>Landlord</u>"), and BED BATH & BEYOND OF SOLON INC., an Ohio corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 ("<u>Tenant</u>").

## W I T N E S S E T H:

SECTION 1.    <u>DEFINITIONS AND BASIC TERMS</u>.    The following terms shall have the meanings set forth in this Section 1 except as otherwise expressly provided herein:

<u>Additional Rent</u>: As defined in Section 4(a) of this Lease.

<u>Broker</u>: None.

<u>Column Layout</u>: As defined in Section 5(a) of this Lease.

<u>Commencement Date</u>: The date hereof.

<u>Common Areas</u>:    All areas which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including but not limited to any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and common utility lines.

<u>Common Areas Charges</u>: As defined in Section 13(c) of this Lease.

<u>Compliance Costs</u>: As defined in Section 62(a) of this Lease.

<u>Delivery Date</u>: As defined in Section 5(b) of this Lease.

<u>educational uses</u>: As defined in Section 7(b) of this Lease.

<u>Environmental Laws</u>: As defined in Section 62(a) of this Lease.

<u>Environmental Notice</u>: As defined in Section 62(a) of this Lease.

<u>Event of Default</u>: As defined in Section 18(a) of this Lease.

<u>Exclusive Items</u>: As defined in Section 23(a) of this Lease.

<u>Excused Periods</u>: As defined in Section 51 of this Lease.

<u>Exhibits</u>.  The following Exhibits are annexed hereto and made a part hereof:

EXHIBIT A -     Legal Description of Shopping Center

EXHIBIT B -     Site Plan

EXHIBIT C -     Rent Commencement and Expiration Date Agreement

EXHIBIT D -     Specifications for Landlord's Work

EXHIBIT D-1     Front Elevation of Premises [including building signage] and of Shopping Center

EXHIBIT E -     Permitted Encumbrances

EXHIBIT F -     Building Signage

EXHIBIT F-1 -   Monument Signs

EXHIBIT G -     Subordination, Non-Disturbance and Attornment Agreement

EXHIBIT G-1 -   Fee Owner Recognition Agreement

EXHIBIT H -     Recognition Agreement

EXHIBIT I -     Delivery Date Notice

EXHIBIT J -     Delivery Date Certification

EXHIBIT K -     Percentage Rent

EXHIBIT L -     Letter Agreement with Borders, Inc.

EXHIBIT M -     Rules and Regulations

EXHIBIT N -     Existing Leases

EXHIBIT N-1 -   Existing Exclusives

<u>Expiration Date:</u> The date on which the Term of this Lease expires.

<u>Extended Date</u>: As defined in Section 5(a) of this Lease.

<u>Final Plans and Specifications</u>: As defined in Section 5(a) of this Lease.

<u>Fixed Rent</u>:  The following amounts for the periods indicated:

(i) For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the fifth (5th) anniversary of the Rent Commencement Date, at the rate of Five Hundred Thousand and xx/100 ($500,000.00) Dollars per year [based on Twelve and 50/100 ($12.50) Dollars per square foot of Floor Area];

(ii) For the period commencing on the first February 1 occurring after the fifth (5th) anniversary of the Rent

Commencement Date and ending on the last day of the original Term, at the rate of Five Hundred Twenty Thousand and xx/100 ($520,000.00) Dollars per year [based on Thirteen and xx/100 ($13.00) Dollars per square foot of Floor Area];

(iii)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Five Hundred Fifty Thousand and xx/100 ($550,000.00) Dollars per year [based on Thirteen and 75/100 ($13.75) Dollars per square foot of Floor Area];

(iv) In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Five Hundred Ninety Thousand and xx/100 ($590,000.00) Dollars per year [based on Fourteen and 75/100 ($14.75) Dollars per square foot of Floor Area];

(v)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Six Hundred Twenty Thousand and xx/100 ($620,000.00) Dollars per year [based on Fifteen and 50/100 ($15.50) Dollars per square foot of Floor Area]; and

(vi) In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Six Hundred Fifty Thousand and xx/100 ($650,000.00) Dollars per year [based on Sixteen and 25/100 ($16.25) Dollars per square foot of Floor Area].

Floor Area:    The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas). All measurements pursuant to this paragraph shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

Force Majeure: As defined in Section 39 of this Lease.

Hazardous Substances: As defined in Section 62(a) of this Lease.

Inducement Date: As defined in Section 4(b) of this Lease.

Inducement Opening Period: As defined in Section 4(b) of this Lease.

Inducement Tenants: As defined in Section 5(b) of this Lease.

Institutional Lender: A state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, REIT, a state or federally regulated lender or any other recognized lender.

Insurance Rebate: As defined in Section 16(b) of this Lease.

Landlord: As defined in the introductory paragraph of this Lease (or, as applicable, its successors and assigns pursuant to the further provisions of this Lease).

Landlord's Mailing Address: 34555 Chagrin Boulevard, P.O. Box 8022, Chagrin Falls, Ohio 44022, or such other place and/or to the attention of such other person as Landlord may notify Tenant in writing from time to time.

Landlord's Work: As defined in Section 5(a) of this Lease.

Lease: As defined in the introductory paragraph of this Lease.

Lease Interest Rate: The then effective prime rate as announced from time to time by the Wall Street Journal plus two (2%) percent.

Major Assignee: As defined in Section 25(c) of this Lease.

Major Guarantor: As defined in Section 25(c) of this Lease.

obnoxious or a nuisance: As defined in Section 7(b) of this Lease.

Offered Space: As defined in Section 58 of this Lease.

Offering Notice: As defined in Section 58 of this Lease.

Original Tenant: Bed Bath & Beyond of Solon Inc.

Parent Corporation: Bed Bath & Beyond Inc., a New York corporation.

Paying Agent: BBBY Management Corporation.

Permitted Encumbrances: As defined in Section 5(b) of this Lease.

Permitted Items: As defined within the definition of "Permitted Use" in this Section 1.

Permitted Use: The sale at retail of a variety of linens and domestics (including but not limited to sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including but not limited to towels, shower curtains, bathroom rugs, toilet seats, health and beauty aids [subject to the limitation with respect to vitamins and vitamin supplements set forth in Section 7(c) below]; personal care products and other bathroom accessories); personal care devices (including but not limited to electric razors, shavers, toothbrushes and hair dryers); home furnishings; area rugs; housewares (including but not limited to utensils, kitchen utensils, appliances and "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, kitchen and bathroom appliances, garbage pails, ironing boards and other laundry items, mops and brooms, ready-to-assemble furniture and artificial flowers); wall and floor coverings; furniture; window treatments; decorative accessories; frames and wall art; photo albums; photo storage boxes; closet, shelving and storage items; luggage; books (subject to the Existing Exclusive to Borders, Inc. described in Exhibit N-1 hereto as modified between Tenant and Borders, Inc. pursuant to a letter agreement dated March 13, 1998, a copy of which is attached hereto for informational purposes as Exhibit L); party supplies; cards and stationery; seasonal items; juvenile merchandise (including but not limited to toys, car seats and safety-proofing items); specialty food items [subject to the limitation with respect to meat and fresh produce set forth in Section 7(c) below]; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or any entity affiliated with Tenant (all of the aforementioned items are hereinafter collectively called the "Permitted Items"); and for any other lawful retail use not specifically prohibited by the provisions of Section 7(c) of this Lease. In addition, Tenant shall be permitted to use portions of the Premises for storage and

office uses incidental to the Permitted Use.  Tenant's assignees,

sublessees, licensees and concessionaires shall be permitted to use

the

5A

Premises (or the applicable portion thereof) for the uses permitted in Section 25 hereof.

pornographic use: As defined in Section 7(b) of this Lease.

Premises: Being the area cross-hatched on Exhibit B, containing approximately forty thousand (40,000) square feet of Floor Area and approximately one thousand two hundred (1,200) square feet of non-selling space on the mezzanine level for non-selling office purposes. In no event shall such non-selling space result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such non-selling space be included in the determination of Tenant's Pro Rata Share. At least ninety (90) days prior to the Delivery Date, exact measurements of the Floor Area of the Premises, the square footage of the non-selling space of the Premises and the Floor Area of the Shopping Center (to the extent then completed) shall be made and certified to Tenant by Landlord's licensed architect, surveyor or engineer. The measurements of Landlord's licensed architect, surveyor or engineer shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. In the event Landlord has failed to deliver such certification to Tenant as set forth above and if that failure continues for thirty (30) days after notice of such failure is given to Landlord by Tenant, Tenant shall thereafter have the right to have either or both of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer, and the cost of such measurement(s), in an amount not to exceed Twenty-Five Hundred ($2,500.00) Dollars, shall be credited to Tenant against the first payment of Fixed Rent or Percentage Rent, as provided herein, due hereunder. In the event the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth above, the parties hereto shall promptly execute an amendment to this Lease reducing, as applicable, the Fixed Rent and any other applicable provision of this Lease to conform to the exact measurement. Notwithstanding the provisions of the immediately preceding sentence, the parties hereto agree that (x) with respect to any non-selling office space on the mezzanine level, in the event the measurement of such space indicates a

square footage which is more than fifty (50) square feet less than the size of such space set forth above, then, for each square foot of such space deficiency in excess of fifty (50) square feet, the Floor Area of the Premises shall be deemed to have been reduced by one square foot, and the reduction in the Fixed Rent and any other applicable provision of this Lease (including, without limitation, a proportionate reduction in Tenant's Pro Rata Share shall apply; (y) if the Floor Area of the Premises is determined or deemed to be less than the Floor Area of the Premises set forth above, Tenant shall receive a proportional refund of any Rent previously paid to Landlord pursuant to the terms of this Lease, and (z) if (i) the Floor Area of the Premises is determined to be less than thirty-nine thousand (39,000) square feet, or (ii) the square footage of the non-selling space on the office mezzanine is determined to be less than one thousand (1,000) square feet, then, in any such event, Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all sums (a) paid to Landlord pursuant to the terms of this Lease, and (b) incurred by Tenant in connection with Tenant's Work; provided, however, that Tenant's notice of termination and right to a refund shall be negated if Landlord, within ten (10) days after receipt of Tenant's notice gives notice (the "Enlargement Notice") to Tenant that Landlord will, prior to and as a condition precedent to giving Tenant the Delivery Date Notice (as hereinafter defined), (A) enlarge the Premises and/or mezzanine, as the case may be, so as to conform to the minimum sizes thereof set forth in (i) and (ii) above, and (B) provide Tenant with a re-certification of the measurements of such areas by its licensed architect, surveyor or engineer (which measurements shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer).    In the event the measurement of the Premises shall indicate a Floor Area more than the Floor Area of the Premises set forth above [i.e. forty thousand (40,000) square feet], the Fixed Rent shall not be increased by reason thereof, nor shall such excess Floor Area be utilized in the determination of

Tenant's Pro Rata Share under this Lease.  In addition to the measurements of the Floor Area described above, the Floor Area of the Premises and of the Shopping Center shall be increased or decreased, as the case may be, and in accordance with the provisions contained within the definition of "Floor Area" in this Section 1, as walls which previously constituted outside walls become common walls, and as walls which previously constituted common walls become outside walls. Any dispute between the parties with respect to the Floor Area of the Premises,  the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 54 below.

Prohibited Uses: As defined in Section 7(b) of this Lease.

Recision Notice: As defined in Section 51 of this Lease.

Related Company:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant (as applicable).

Related Land: As defined in Section 7(b) of this Lease.

Release: As defined in Section 62(a) of this Lease.

Renewal Option: As defined in Section 46(a) of this Lease.

Renewal Period(s): As defined in Section 46(a) of this Lease.

Rent: As defined in Section 4(a) of this Lease

Rent Commencement Date:  The first to occur of the following two (2) dates:  (i))the date which Tenant shall establish in its published advertisement as its grand opening [but not later than five (5) days after the date upon which Tenant shall initially open the Premises to the general public for business]; or (ii) the date that is thirty (30) days after the Delivery Date; except, however, if for any reason whatsoever [including, without limitation, Force Majeure], the date established pursuant to (ii) occurs between October 16 and the following March 31 (the "Slack Period"), Tenant shall have the right to delay the Rent Commencement Date without payment of Rent or penalty until the end of the Slack Period. Notwithstanding the foregoing, in the event that the date established pursuant to (ii) above occurs during the Slack Period, or in the event the Delivery Date occurs during the

Case 23-13359-VFP   Doc 954-1   Filed 06/23/23   Entered 06/23/23 20:03:20   Desc
Exhibit A   Page 13 of 162

Slack Period, and Tenant, nevertheless, elects to open the Premises to the general public for business prior to the next following April 1, then, the Rent Commencement Date shall be the date determined in accordance with (i) above but, commencing on such Rent Commencement Date and continuing until the next following April 1, Tenant shall be entitled to a full abatement of Fixed Rent and Tenant shall be liable only for the payment of (A) Tenant's Pro Rata Share of Taxes and Common Areas Charges, and (B) Percentage Rent (defined in and payable in the manner set forth in Exhibit K annexed hereto) but in no event shall the aggregate Percentage Rent payable during such period exceed one-half (½) of the amount which the Fixed Rent would otherwise have been payable with respect to such period.  Landlord and Tenant agree that any abatement of Fixed Rent which inures to the benefit of Tenant in accordance with the provisions of this paragraph shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.  Within ten (10) days after the Rent Commencement Date has been determined, Landlord and Tenant shall execute and deliver to each other a Rent Commencement and Expiration Date Agreement in the form provided in Exhibit C setting forth the Rent Commencement Date, the Expiration Date and the dates of commencement of the Renewal Periods.

Replacement Tenant: As defined in Section 60 of this Lease.

Shopping Center: The shopping center commonly known as Uptown Solon Shopping Center, containing approximately one hundred seventy-nine thousand (179,000) square feet of Floor Area, located on the property on Kruse Drive in Solon, Ohio, and more fully described in Exhibit A.  In the event the legal description of the Shopping Center described in Exhibit A indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord.  Landlord shall not change the name of the Shopping Center without at least ninety (90) days prior notice to Tenant, and Landlord covenants and agrees not to include the name of any tenant (other than Tenant) in the name of the Shopping Center.

COLE01/SYS:\DMS\EMS.DIR\0460024.07
May 14, 1998                                    9

<u>Slack Period</u>: As defined within the definition of "<u>Rent Commencement Date</u>" in this Section 1.

<u>Special Delivery Conditions</u>: As defined in Section 5(b) of this Lease.

<u>Substantially Completed or Substantial Completion</u>: The completion of specified work at the Shopping Center (including without limitation, as applicable, Landlord's Work) to the extent that only so-called "punch list" items of such work shall not be completed.   "Punch list items" with respect to Landlord's Work shall be limited to such minor items of fit and finish which, when considered as a whole, do not materially adversely affect either (y) the performance of Tenant's Work, or (z) Tenant's ability to conduct its normal business operations in the Premises.

<u>Taxes</u>: As defined in Section 6(a) of this Lease.

<u>Tenant</u>: As defined in the introductory paragraph of this Lease (or, as applicable, its successors and assigns pursuant to the further provisions of this Lease).

<u>Tenant's Administrative Costs</u>: As defined in Section 5(b) of this Lease.

<u>Tenant's Mailing Address</u>:   650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time.

<u>Tenant's Plans</u>: As defined in Section 5(a) of this Lease.

<u>Tenant's Pro Rata Share</u>:   A fraction whose numerator is the Floor Area of the Premises (as determined pursuant to the provisions of the definition of "<u>Floor Area</u>" in this Section 1) and whose denominator is the Floor Area of the Shopping Center (as determined pursuant to the provisions of the definition of "<u>Premises</u>" in this Section 1).   Tenant's Pro Rata Share shall be redetermined from time to time when buildings are added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than twenty-four (24%) percent.   A building shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which the building is opened to the public for business, or (ii) at such time as an

assessment for Taxes is made or removed, as the case may be, with respect to such building.  Within ten (10) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center (as determined pursuant to the provisions contained within the definition of "Premises" in this Section 1.

Tenant's Property: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, mill work, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, HVAC and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

Tenant Related Parties: As defined in Section 62(a) of this Lease.

Tenant Releases: As defined in Section 62(a) of this Lease.

Tenant's Specified Costs: As defined in Section 5(b) of this Lease.

Tenant's Work: As defined in Section 5(a) of this Lease.

Term:  An original period of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date.  As used herein, "Term" shall refer to the original Term and any Renewal Period exercised pursuant to Section 46 below, as the context shall require.

**SECTION 2.    LEASE OF PREMISES.**  As of the Commencement Date, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, arising out of any public or private grant or authority, including without limitation the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center, subject to the Permitted Encumbrances.

SECTION 3.    **LEASE TERM.**    Subject to the terms of this Lease, Tenant shall have and hold the Premises for the Term, unless sooner terminated as herein provided.

SECTION 4.    **PAYMENT OF FIXED RENT.**

(a)    Commencing on the Rent Commencement Date and continuing throughout the balance of the Term, Tenant shall pay to Landlord the Fixed Rent, payable in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent for any partial calendar month during the Term shall be prorated.    Fixed Rent shall be paid without deduction or set-off (except as may be otherwise expressly provided herein).    Whenever Tenant is required hereunder to pay any monies to Landlord, other than Fixed Rent, the same shall be deemed to be "Additional Rent".    Landlord shall have the same remedies with respect to the non-payment of Additional Rent as it has for the nonpayment of Fixed Rent pursuant to the terms of this Lease.    The term "Rent" as used herein shall mean Fixed Rent and/or Additional Rent.    All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or to such other address as Landlord may from time to time designate by notice to Tenant.    All Rent shall be paid in lawful money of the United States which shall be legal tender for the payment of all debts and dues, public and private, at the time of payment.    Landlord acknowledges and agrees that for administrative purposes, Tenant has designated the Paying Agent to make all Rent payments due to Landlord under this Lease.    Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights of Tenant to Paying Agent. Landlord shall not have any right to bring any actions against Paying Agent, and Paying Agent shall have no liability to Landlord for any obligation whatsoever (including, without limitation, the obligation to pay Rent).    All payments of Rent received by Landlord from Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

(b)    If on or before the date on which Tenant is "ready to open" (as such phrase is hereinafter defined) the Premises to

the general public for business, (1) Borders, Inc. has not either "opened its premises to the general public for business" (as such phrase is hereinafter defined) or is not ready to open, (2) all of the stores shown on Exhibit B hereto between the Premises and the Borders premises, except the Old Navy premises, are not ready to open, and (3) with respect to the premises leased to Mustard Seed or a Replacement Tenant, (x) Landlord has not completed its required construction work, or (y) Landlord is not actively pursuing such construction work [collectively, (1), (2) and (3) are the "Inducement Conditions"], then Tenant shall have the right, at its sole option, to:

        (i)   elect not to open the Premises to the general public for business, in which event the Rent Commencement Date, notwithstanding any other provision of this Lease except for the conditions precedent to the occurrence of the Delivery Date, shall be the date that is the earlier of (A) thirty (30) days after the date (the "Inducement Date") upon which the Inducement Conditions have been satisfied and Landlord has given Tenant notice thereof (except, however, if the date which is thirty (30) days after the Inducement Date occurs during the Slack Period, Tenant shall have the right to delay its opening for business and the Rent Commencement Date without payment of Rent or penalty until the end of the Slack Period), or (B) the date, after the Inducement Date, which Tenant shall establish as its grand opening in its published advertisements [but not later than five (5) days after the actual date upon which Tenant shall have opened the Premises to the general public for business]; or

        (ii) elect to open the Premises to the general public for business, despite the fact that the Inducement Conditions have not been satisfied, or the fact that the date which is thirty (30) days after the Inducement Date shall occur during the Slack Period, in either of which event set forth in this subsection (ii), notwithstanding any other provision of this Lease except for the conditions precedent to the occurrence of the Delivery Date, the Rent Commencement Date shall be deemed to be the date which Tenant shall establish as its grand opening in its

published advertisement [but not later than five (5) days after the actual date upon which Tenant shall have opened the Premises to the general public for business] and during the period (the "Inducement Opening Period") commencing on the Rent Commencement Date and ending on the later to occur of (x) the end of the Slack Period, or (y) the day immediately following the Inducement Date, Tenant shall be entitled to a full abatement of Fixed Rent and Tenant shall only be liable for the payment of Tenant's Pro Rata Share of Taxes and Common Areas Charges hereunder, and Percentage Rent hereunder but in no event shall the aggregate Percentage Rent payable during the Inducement Opening Period exceed one-half (½) of the amount which the Fixed Rent would otherwise have been with respect to the Inducement Opening Period). Landlord and Tenant agree that any abatement of Fixed Rent which inures to the benefit of Tenant in accordance with the provisions of this Section 4(b) shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

In the event the Inducement Conditions have not been satisfied on or before September 1, 1999, then Tenant may at any time within sixty (60) days thereafter (the "Termination Period") when the Inducement Conditions have not been satisfied (and whether or not Tenant shall have opened for business), upon giving Landlord not less than sixty (60) days' notice, terminate this Lease as of the date specified in said notice, in which event neither party shall have any further liability hereunder except that Landlord shall be obligated to promptly reimburse Tenant for all its costs and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Tenant's Work. Such termination shall be negated if not later than thirty (30) days after Tenant has given notice of termination, the Inducement Conditions are satisfied and Landlord has given Tenant notice thereof. In the event, however, that Tenant does not elect to terminate this Lease as aforesaid, then upon the expiration of the Termination Period the Inducement Opening Period shall terminate and Tenant shall commence the payment of Fixed and Additional Rent hereunder. For the purposes

of this Section 4(b), the phrase "opened its premises to the general public for business" shall mean that the entire premises shall be fully fixtured, staffed and merchandised and open to the public, and the phrase "ready to open" shall mean that all construction and related work required to be performed by or on behalf of Landlord and each applicable tenant shall be Substantially Completed and each such tenant shall have accepted possession and then be actively and continuously engaged in the fixturing of its entire premises.

SECTION 5.    **IMPROVEMENTS**.

(a)(i)    On or before the date which is thirty (30) days after the Commencement Date, Landlord shall prepare and provide Tenant with an accurate plan of the column layout (the "<u>Column Layout</u>") of the Premises [which Column Layout, in the event the Premises is not an existing building, shall be subject to Tenant's reasonable modifications, which modifications shall be indicated by Tenant as part of Tenant's Plans] and within thirty (30) days thereafter, based upon the Column Layout (and Tenant's reasonable modifications thereto, if any), Tenant shall prepare and provide Landlord with its fixture plan, reflected ceiling plan and office plan (collectively, "<u>Tenant's Plans</u>"). Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant Landlord's preliminary plans and specifications for the construction of the Premises. Tenant shall approve such preliminary plans and specifications provided the same conform to the provisions of the Column Layout (as the same may have been modified by Tenant), Tenant's Plans, and <u>Exhibits D</u> and <u>D-1</u> hereto (which provisions, as more fully depicted and described in the Final Plans and Specifications, are hereinafter collectively referred to as "<u>Landlord's Work</u>"). Tenant shall give notice of such approval (or the reasons why such approval cannot be granted) to Landlord within thirty (30) days after receipt of the preliminary plans and specifications (it being understood that Tenant's approval of the preliminary plans and specifications shall not constitute an opinion or agreement by Tenant that the Premises and the Common Areas are structurally sufficient or that the

preliminary plans and specifications are in compliance with law).
In the event Tenant shall not have responded to any submission on
or before the expiration of the said thirty (30) day period, such
submission shall be deemed approved by Tenant unless within fifteen
(15) days after Landlord gives Tenant notice of such failure, which
notice shall state in bold lettering "TENANT HAS FAILED TO RESPOND
TO A SUBMISSION WITHIN THE TIME PERIOD SPECIFIED IN SECTION 5 OF
THE LEASE. IF TENANT FAILS TO RESPOND ON OR PRIOR TO THE FIFTEENTH
DAY AFTER THIS NOTICE, THE SUBMISSION SHALL BE DEEMED APPROVED BY
TENANT". Immediately following receipt of such notice, Landlord
shall promptly commence the preparation of final plans and
specifications (the "Final Plans and Specifications") based upon
Landlord's preliminary plans and specifications and any changes
required by Tenant therein, and Landlord shall complete the Final
Plans and Specifications and provide Tenant with copies thereof
within thirty (30) days after receipt of Tenant's notice. The
Final Plans and Specifications shall not be changed without
Tenant's prior written approval. Unless specifically noted on the
Final Plans and Specifications, to the extent of a conflict between
the terms and provisions of Exhibit D and D-1 hereto, on one hand,
and the terms and provisions of the Final Plans and Specifications,
on the other hand, then the terms and provisions of Exhibits D and
D-1 shall govern and prevail. Tenant shall have the right to make
changes in Tenant's Plans and/or to require Landlord to make
changes in the Final Plans and Specifications, in which event (x)
Tenant shall pay to Landlord the net reasonable additional cost of
Landlord's Work resulting from such changes, taking into
consideration any and all actual reduced and added costs resulting
from all such changes and/or other costs savings that Tenant may
provide to Landlord; such payment by Tenant shall be due and
payable upon the latter to occur of (1) thirty (30) days after the
Delivery Date, or (2) fifteen (15) days after Landlord has
delivered to Tenant backup information in support of such net
reasonable additional cost (including without limitation receipted
invoices) as reasonably required by Tenant, and (y) to the extent
that such changes cause a net delay in the Substantial Completion

of Landlord's Work, despite Landlord having proceeded diligently at all times in connection therewith, then the date to be determined pursuant to subsection (ii) contained within the definition of "Rent Commencement Date" and the Slack Period in Section 1 above shall be determined as if such net delay had not occurred (provided, however, that Landlord shall, within ten (10) days following its receipt of Tenant's notice describing such changes in Tenant's Plans and/or the Final Plans and Specifications, have notified Tenant in reasonable detail as to the nature and extent of the such anticipated net delay in the Substantial Completion of Landlord's Work). Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter called "Tenant's Work") which Tenant desires to adapt the Premises to Tenant's use, which Tenant's Work shall be subject to Landlord's prior written approval to the extent that any structural or exterior (other than signage pursuant to Section 10 below) work is involved therewith.   Landlord shall perform Landlord's Work in a manner required by applicable governmental regulations, ordinances and codes so that Tenant will be able to secure, at its sole cost and expense, any and all required permits and approvals from applicable governmental authorities to enable Tenant to perform Tenant's Work and to open and conduct its business in the Premises; without limiting the foregoing, Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center.  If such permits and approvals cannot be obtained because Landlord's Work has not been completed or has been done improperly or by reason of any condition of the Shopping Center or the building containing the Premises, then it shall be Landlord's obligation to remedy the situation so as to enable Landlord to obtain such permits and approvals for Tenant's Work.

(ii) Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable law, utilizing only new, first class materials, and in accordance with all insurance company requirements.   In the event

that (A) Landlord's Work has not been commenced (which commencement
shall be deemed fulfilled when the footings for the Premises are
poured) by May 6, 1998, (B) Landlord's Work is not diligently and
continuously pursued by Landlord after commencement thereof, (C)
Landlord's Work is not Substantially Completed either (x) on or
before February 1, 1999 (which date is subject to extension only as
a result of Force Majeure), or (y) on or before April 1, 1999
(which date is not subject to extension as a result of Force
Majeure), or (D) the Delivery Date shall not have occurred by April
1, 1999 (which date is not subject to extension as a result of
Force Majeure), Tenant, in any such event, may thereafter, at any
time when Landlord's Work has not been commenced, is not being
diligently pursued or has not been Substantially Completed, or when
the Delivery Date has not occurred, as the case may be, at Tenant's
option, elect (I) upon the expiration of thirty (30) days notice to
Landlord with Landlord having failed to cure fully such default, to
terminate this Lease [in which event neither party shall have any
further liability hereunder (other than as set forth in Section 33
below) except that Landlord shall be obligated to promptly
reimburse Tenant for all its costs and expenses incurred in
connection with this Lease, including, without limitation, the
preparation of plans and specifications for and the costs of
Tenant's Work], and/or (II) if the shell of the Premises has been
constructed, to avail itself of the self-help remedies set forth in
Section 19 below (provided, however, that the cure period set forth
therein shall not be applicable) in order to complete Landlord's
Work, and/or (III) by notice to Landlord, to extend one or more
times the dates set forth in subsections (A), (C) and/or (D) of
this subsection 5(a)(ii) to such future dates designated by Tenant
(with each such future date hereinafter referred to as the
"Extended Date"). In the event Tenant exercises its right to
extend the dates set forth in subsections (A), (C) and/or (D) of
this subsection 5(a)(ii) to the Extended Date, and in the event
Landlord's Work shall not have commenced, or in the event
Landlord's Work is not diligently pursued by Landlord after
commencement thereof, or in the event the Substantial Completion of

Landlord's Work shall not have occurred, or in the event the Delivery Date shall not have occurred, on or prior to the applicable Extended Date, then Tenant, in such event, may thereafter, at any time when Landlord's Work has not been commenced, is not being diligently pursued or has not been Substantially Completed, or when the Delivery Date shall not have occurred, as the case may be, at Tenant's option, elect (1) upon the expiration of thirty (30) days notice to Landlord with Landlord having failed to cure fully such default, to terminate this Lease [in which event neither party shall have any further liability hereunder (other than as set forth in Section 33 below) except that Landlord shall be obligated to promptly reimburse Tenant for all its costs and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Tenant's Work], and/or (2) if the shell of the Premises has been constructed, to avail itself of the self-help remedies set forth in Section 19 below (provided, however, that the cure period set forth therein shall not be applicable) in order to complete Landlord's Work.  In the event Landlord's Work shall not have commenced, or the Substantial Completion of Landlord's Work or the Delivery Date shall not have occurred, on or prior to August 1, 1999, without Tenant having previously terminated this Lease or having availed itself of the self-help remedies described above, then on said date this Lease shall terminate with the same effect as if Tenant had exercised its said right of termination.  If this Lease is terminated pursuant to the provisions of this subsection (ii) and Landlord or any affiliate of Landlord actually (AA) commences to construct the Shopping Center (or a shopping center substantially similar to the Shopping Center) on or before the date which is three (3) years after the effective date of the termination of this Lease, or (BB) Substantially Completes construction of the Shopping Center (or a shopping center substantially similar to the Shopping Center) on or before the date which is three (3) years after the effective date of the termination of this Lease, then Landlord shall be obligated to offer to Tenant, at the time of the commencement of the

construction, or at the time of the Substantial Completion of the Shopping Center or shopping center, as the case may be, the option to lease a portion of the Shopping Center (or a portion of such shopping center) equal in size to forty thousand (40,000) square feet upon all the terms and conditions of this Lease (including without limitation, the amount of Fixed Rent which would otherwise have been paid hereunder); _provided_, _however_, that all dates set forth in the Lease shall be appropriately extended.  In the event Tenant elects, within thirty (30) days after such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon the same terms and provisions of this Lease and Tenant's parent corporation shall execute a guaranty of such lease.  In the event Tenant does not elect, within thirty (30) days after such offer, to exercise such option, Landlord shall be free to lease such premises to any other person or entity, upon terms which are substantially similar to the terms of this Lease [except that, with respect to the Fixed Rent, if such premises are constructed at substantially the same location and pursuant to substantially the same Landlord's Work as provided herein, the lease with such other person or entity shall include Fixed Rent in an amount not less than ninety-five (95%) percent of the Fixed Rent set forth herein].  The provisions of the immediately preceding two (2) sentences shall survive a termination of this Lease pursuant to this subsection (ii).  Landlord covenants and agrees to fully complete any punch list items [which may be submitted to Landlord, from time to time, at any time prior to the date which is forty-five (45) days after the Rent Commencement Date] not later than the date which is thirty (30) days after Landlord receives notification thereof, and in the event Landlord fails to so complete any punch list item within such time period, then Tenant shall have the right to complete the same utilizing its own contractors, in which event the reasonable costs of such completion shall be reimbursed to Tenant by Landlord upon demand, together with interest on the amount due at the Lease Interest Rate, which interest shall accrue on all such sums commencing five (5) days after Tenant shall have so notified Landlord of the amount due.  In the event Landlord does not

reimburse Tenant for all such costs and any interest accrued thereon within ten (10) days after the original demand by Tenant for payment of those costs, Tenant shall have a right of offset against the Rent payable by Tenant for all the costs and interest thereon. Within thirty (30) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises.

(iii)   Landlord represents, warrants and covenants to Tenant, and Tenant has relied upon the foregoing as a material inducement for Tenant entering into this Lease, that (A) other than those which may be required by governmental authorities, no other consents or approvals are necessary or required to be obtained in order for Landlord to commence and complete Landlord's Work or other work required to be performed by Landlord hereunder, and (B) no third party consents are required in order for Landlord to enter into this Lease.

(b)   (i)   Landlord shall give Tenant at least forty-five (45) days prior notice of the Delivery Date, utilizing the Delivery Date Notice annexed hereto as Exhibit I, and if Landlord shall have given Tenant an Enlargement Notice, as a condition precedent to Landlord giving Tenant a Delivery Date Notice, Landlord shall have completed the enlargement of the Premises and/or mezzanine and shall have given Tenant the re-certification of the measurements of such areas, all as required by and pursuant to the relevant provisions set forth in the definition of "Premises" in Section 1 above.   Should Landlord fail to satisfy the conditions to the Delivery Date on any Delivery Date established by Landlord then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to (A) reimburse Tenant for all reasonable costs [not exceeding an aggregate of Four Thousand Three Hundred Thirty-Three ($4,333.00) Dollars per diem] incurred by Tenant (including, without limitation, all temporary storage costs and salary costs for employees with respect to the Premises as a result thereof (the "Tenant's Specified Costs"), and (B) pay to Tenant the additional liquidated sum of Five Thousand ($5,000.00) Dollars in

reimbursement for costs and expenses incurred by Tenant by reason of additional work performed by Tenant's employees at its corporate offices as a result thereof (it being acknowledged and agreed by Landlord and Tenant that the liquidated sum referred to in the immediately foregoing clause (B) represents the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment) (the "Tenant's Administrative Costs"). In no event shall Tenant be obligated to accept as the Delivery Date any date which is prior to the date then established by Landlord as the Delivery Date.

(ii) Landlord agrees that each time, if ever, that Landlord revises the Delivery Date from any date previously established by Landlord, then, in addition to any other remedies available to Tenant under this Lease, Landlord shall pay to Tenant both Tenant's Specified Costs resulting therefrom and Tenant's Administrative Costs (except that Landlord shall not be obligated to pay Tenant's Specified Costs with respect to any revision by Landlord of the Delivery Date which takes place at least thirty (30) days prior to the last Delivery Date previously established by Landlord).

(iii) In the event Landlord shall have failed to pay any monies due to Tenant in accordance with this subsection 5(b) within fifteen (15) days after Tenant has notified Landlord of the amount of such monies (and furnished Landlord with copies of



all applicable bills relating thereto), then Tenant shall have the right to offset such amounts, together with interest thereon at the Lease Interest Rate accruing from and after such fifteenth (15th) day after Tenant's notification, against the installments of Rent next accruing under this Lease.

(iv)  Subject to Landlord's prior delivery to Tenant of the Delivery Date Notice in accordance with the preceding provisions of this subsection 5(b) and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (with such date hereinafter called the "Delivery Date") following the day on which Tenant shall have received from Landlord  the Delivery Date Certification annexed hereto as Exhibit J, which shall constitute Landlord's written certification that all of the following shall have occurred:

(A)  Actual possession of the Premises shall have been delivered to Tenant free of all leases (other than this Lease) and occupants, Landlord shall then be the owner of the fee simple estate in the Shopping Center free and clear of any liens and encumbrances (except the "Permitted Encumbrances" described on Exhibit E);

(B)  Any permits, certificates of occupancy (or its local equivalent if certificates of occupancy are not issued in the applicable jurisdiction), other certificates, "sign-offs" and approvals (copies of which shall have been delivered to Tenant) required from applicable governmental authorities to enable (A) Tenant to occupy the Premises and use the Premises for the conduct of its business, other than those required for Tenant to open and operate its specific business for the sale of Permitted Items hereunder (and not a general retail business) on the Premises, and (B) the Common Areas to be used for their intended purposes, shall have been obtained, at Landlord's sole cost and expense (with copies thereof, upon Tenant's request, to be delivered to Tenant by Landlord), including, but not limited to, zoning, building code, environmental requirements, curb cut and site plan approvals, building signage approvals (but not permits relating to the

esthetic details of Tenant's signs), all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon) permits, certificates of occupancy (unless a certificate of occupancy for the Premises cannot be obtained solely as a result of Tenant's acts or omissions in connection with the performance of Tenant's Work in the Premises, in which event (1) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and (2) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's acts or omissions or Tenant's Work), and construction, development and use permits.

(A)   Kruse Drive shall have been Substantially Completed with curbs, lighting and to such further extent that vehicular traffic may lawfully use the same for entrance to and exit from the Shopping Center without hindrance; at least two (2) of the three (3) entrances to the Shopping Center from Kruse Drive and unimpeded access therefrom to the front entrance and loading docks of the Premises and to the Critical Area shown on Exhibit B hereto shall be available; all construction work (including, without limitation, curbs, paving, striping, lighting and sidewalks) within the Critical Area shall have been completed and operational; the other portions of the Common Areas not then completed and operational shall be in such a state of construction that they can reasonably be completed within thirty (30) days thereafter, except that Landlord shall not be required to install the final layer of pavement or stripe the parking area (no portion of which shall be in the Critical Area) directly in front of the premises designated "Major Retail A" on Exhibit B hereto until those premises are opened to the public for business provided that the unfinished parking area does not adversely affect access to the Premises or the Critical Area and is kept and maintained by Landlord in a safe, sightly and clean condition; construction of all the stores between the Premises and the Borders premises, all as shown on Exhibit B hereto shall have been completed to the extent that such stores are then at least so-called "warm, lighted shells" (as such term is commercially————————————————

defined); and Landlord's Work shall have been Substantially Completed (including, but not limited to, the connection of all utilities to and in the Premises), which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant, those portions of the Common Areas which are not, pursuant to the immediately preceding sentence, required to be completed or Substantially Completed on the Delivery Date, shall be completed (except for the final layer of pavement and the striping in front of "Major Retail A", as aforesaid) within thirty (30) days (which period shall not be extended pursuant to Force Majeure) after the Delivery Date, and in the event Tenant has opened the Premises for business or is ready to open the Premises for business and all such work has not been completed within such period, Tenant (x), despite having opened to the public for business, shall not be liable to Landlord for the payment of Fixed Rent hereunder and shall pay only Percentage Rent and Tenant's Pro Rata Share of Taxes and Common Areas Charges until all such work is completed, and/or (y) Landlord shall be in default hereunder and, if the shell of the Premises has been constructed, Tenant may avail itself of the self-help remedies set forth in Section 19 above to complete the Premises and any unfinished portions of the Critical Area shown on Exhibit B hereto, and/or (z) Tenant shall be entitled to the remedies set forth in Section 5(b)(i) above for the failure of Landlord to have satisfied the Special Delivery Conditions.  In addition, (x) the Premises shall have been delivered in broom clean, secured condition with the roof watertight (and all gutters and downspouts in good working order), all systems and equipment (including, without limitation, the heating, plumbing and electrical systems and the air conditioning and ventilation system) in good working order, and the structural components (including, without limitation, the foundation, exterior walls, structural supports and roof) in good order and repair, and (y) Landlord shall have complied fully with the provisions of Section 62 below.

(D)  The zoning of the Shopping Center and all other laws, orders and regulations shall then permit the occupancy of the Premises for the Permitted Use and shall then permit the

parking of private automobiles in the Common Areas where parking is shown on <u>Exhibit B</u>;

(E)   Except for the Permitted Encumbrances, there shall be no restrictions or other legal impediments either imposed by law (including applicable zoning and building ordinances) or by any instrument which would prevent: (1) the use of the Premises for the Permitted Use; (2) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; (3) the lawful installation of the signage permitted pursuant to Section 10 below; or (4) the performance of Tenant's Work, other than the procurement by Tenant of a building permit, if necessary, for Tenant's Work [subject to Landlord's responsibilities as set forth in Sections 5(a)(i) and 11(g)];

(F)   Landlord shall have delivered to Tenant the certifications with respect to the measurements of the Premises and of the Shopping Center (to the extent then completed) as provided in (and subject to) Section 1 above [see definition of "Premises"];

(G)   Leases have been entered into with the following tenants (herein collectively called the "<u>Inducement Tenants</u>") on the following terms, for occupancy of building sites shown on Exhibit B hereto:

| <u>Inducement Tenants</u> | Minimum Square Foot <u>Gross Floor Area</u> | Minimum <u>Term</u> |
|---|---|---|
| 1. Mustard Seed or a Replacement Tenant | 35,000 | 10 Years |
| 2. Borders | 25,000 | 10 Years |

; and

(H)   Borders shall have accepted possession of its premises and commenced the construction therein required for its opening for business.

(I)   Landlord shall have delivered to Tenant (x) an agreement in the form of <u>Exhibit G</u> hereto executed by each holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof and in form suitable for recording, and (y) an agreement in the

form and content described in clause (b) of Section 24 hereof executed by the landlord under any ground or underlying lease encumbering or affecting all or any part of the Shopping Center and in form suitable for recording. The provisions of this subsection (I) shall be in addition to, and not in limitation of, Section 24 of this Lease.

(c)  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall relieve Landlord of any obligation under this Lease, unless such obligation is expressly waived in writing by Tenant.

(d)  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable (including, without limitation, the installation of Tenant's shelving and fixtures) without being deemed thereby to have taken possession or obligated itself to pay Rent, but Tenant shall not, during the course of such work, cause any interference with Landlord's performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from such work and from Tenant's entry upon the Premises.

(e)  In the event construction of any roads, acceleration lanes, deceleration lanes, entrances, or other roadway improvements, or the widening or relocation of existing streets, is dependent upon Landlord's dedicating any land to a governmental agency or body, Landlord agrees to make such dedication in time to permit construction work to commence without delay.

SECTION 6.    **REAL ESTATE AND OTHER TAXES**.

(a)  Landlord shall pay on or before the due dates thereof all real estate taxes and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), other than personal property taxes levied against tenants (hereinafter collectively called "Taxes"). On and after the Rent Commencement Date, Tenant

shall be obligated each calendar year or partial calendar year for
the payment of Tenant's Pro Rata Share of the Taxes [or, as
provided and defined in subsection (e) below, Service Payments in
lieu of Taxes] which accrue during the Term.  Taxes, as used
herein, shall not include any: (1) income, excise, profits, estate,
inheritance, succession, gift, transfer, franchise, capital, or
other tax or assessment upon Landlord or upon the rentals payable
under this Lease; (2) taxes on rents, gross receipts or revenues of
Landlord from the Premises; (3) fine, penalty, cost or interest for
any tax or assessment, or part thereof, which Landlord (or
Landlord's lender) failed to timely pay (except if same are imposed
by reason of an Event of Default; (4) assessment for a public
improvement arising from the initial construction or expansion of
the Shopping Center or the Premises (it being agreed that all
assessments imposed during the Term which are permitted to be
included within Taxes hereunder shall, for the purposes of
computing Tenant's Pro Rata Share thereof, be deemed to have been
paid in the maximum number of installments permitted by the
applicable taxing authority); (5) Taxes resulting directly from an
increase in the assessment caused by a sale or ground lease of all
or any portion of the Shopping Center more often than once every
five (5) years; (6) Taxes resulting directly from any construction
work performed by or on behalf of a third party at the Shopping
Center which materially exceeds the general construction standard
of the Shopping Center; (7) Taxes on unimproved portions of the
Shopping Center until the same are either improved by improvements
or buildings which become an integral part of the Shopping Center
or by incorporation of such portions into the Common Areas; or (8)
fees imposed upon Landlord in connection with Landlord's
development of the Shopping Center (including, without limitation,
trip generation fees).  Notwithstanding the foregoing, if at any
time during the Term the present method of taxation shall be so
changed that the whole or any part of the Taxes imposed on real
estate and improvements thereon shall be discontinued and in whole
or partial substitution therefor, taxes, assessments, levies,
impositions, or charges shall be levied, assessed and/or imposed

wholly or partially as a capital levy or otherwise on the rents, gross receipts, revenues, or profits received from real estate or the rents, gross receipts, revenues, or profits reserved herein or any part thereof, then such substitute taxes, assessments, levies, impositions, or charges, to the extent so levied, assessed, or imposed, shall be deemed to be Taxes for the purpose of this Lease. All Taxes payable by Tenant pursuant to this Section 6 shall be determined as if the Shopping Center was the only property owned by Landlord.   Landlord represents to Tenant that, as of the date hereof and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, or (ii) subject to any special assessments or similar charges.   .

(b)   For the year in which the Rent Commencement Date occurs and the year in which this Lease expires or sooner terminates, Tenant shall only pay a proportionate share of Taxes, based on a ratio of the Term within the tax year to the full tax year.

(c)   Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and all notices concerning assessments, changes of assessments, tax rates and changes thereto (as well as proof of the payment of Taxes for the previous payment period). Tenant shall reimburse Landlord in the amount required by this Section 6 within thirty (30) days after receipt of such bill. In no event shall Landlord request reimbursement for such Taxes paid earlier than the last day such Taxes could have been paid by Landlord without penalty.   Within thirty (30) days after Tenant's request, Landlord shall provide Tenant with copies of paid bills for Taxes paid by Landlord pursuant to this Section 6.

(d)   If Tenant so requests, Landlord shall contest the amount or validity of any assessed valuation or Taxes.  If Landlord shall fail or refuse, on request of Tenant, to take the necessary steps to contest such Taxes, Tenant shall have the right to contest the Taxes by appropriate proceedings conducted in good faith, in which event Landlord shall cooperate with Tenant, execute any and

all documents required in connection therewith and, if required by any governmental authority having authority, join with Tenant in the prosecution thereof.    If, as a result of any contest, negotiation or appeal, any rebate, refund or reduction of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after all reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest, negotiation or appeal are paid to the party which incurred such expense).    If any contest, negotiation or appeal undertaken by Landlord is unsuccessful and Landlord has incurred any reasonable out-of-pocket costs and expenses to third parties, then those tenants (including Tenant) who requested such contest, negotiation or appeal shall reimburse Landlord for such costs and expenses based upon their respective proportionate Floor Areas.

(e)    Landlord represents to Tenant that (i) certain public improvements benefiting the Shopping Center, including the extension of Kruse Drive and installation of utilities (collectively, the "Public Improvements"), will be constructed by the City of Solon and a portion of the cost to construct the Public Improvements will be financed by tax increment financing bonds ("TIF Bonds") to be issued by the City of Solon (the "City"), (ii) absent the availability of proceeds from the TIF Bonds, neither the public improvements benefiting the Shopping Center nor the Shopping Center would be constructed by the City or Landlord, (iii) the source of the repayment of the TIF Bonds will be service payments ("Service Payments") which will be assessed against the buildings and improvements to be constructed by Landlord in the Shopping Center, and (iv) notwithstanding the provisions of subsection (a), the Service Payments will be assessed in lieu of Taxes and will be equal to the amount of Taxes which would be due and payable if the Shopping Center buildings and improvements were assessed for real estate tax purposes during the period set forth in Resolution No. 1997-256 dated December 8, 1997, adopted by the City of Solon. Landlord warrants and represents that (A) it has executed a Tax Increment Financing Agreement (the "TICA") dated December 23, 1997, with the City relating to the Service Payment, and (B) the TICA is

in full force and effect and has not been modified or amended. Notwithstanding anything to the contrary contained in this Lease: (i) Tenant shall not be obligated to pay or reimburse Landlord for any increase in Service Payments and/or Taxes resulting from a modification, or termination of or amendment to, the TICA; and (ii) Service Payments and/or Taxes shall not include the payments to the Solon City School District set forth in Section 6 of the TICA.

**SECTION 7.**    <u>**PERMITTED AND PROHIBITED USES**</u>.

(a)   The Premises may be used and occupied for the Permitted Use.

(b)   (i)   Landlord covenants and agrees that the Shopping Center shall be constructed, leased, operated, maintained and managed as a first class shopping center and that no premises (and no portion of any premises) in the Shopping Center or on any land (hereinafter the "<u>Related Land</u>") contiguous or adjacent to the Shopping Center (which shall include land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned now or at any time in the future by Landlord or any affiliated entity (referring to the actual Landlord from time to time, without regard to land owned by any prior landlords, and excluding from the operation hereof any business existing at the time any future landlord becomes Landlord hereunder) shall be used or occupied for any of the following (except that the underlined uses shall be applicable only to the Shopping Center and not to the Related Land): unlawful use; pornographic use; "second-hand" or "surplus" store; <u>laundry or dry cleaners</u>; pawn shop; daycare center; veterinary office; living quarters; hotel/motel; manufacturing; bowling alley; off-track betting parlor or other gambling establishment; funeral parlor; skating rink; nightclub, discotheque or dance hall; so-called "head shop"; catering or banquet hall; <u>children's entertainment or activity facility</u>, unless incidental to a permitted use but not closer than two hundred (200) feet from any portion of the Premises or as otherwise shown on <u>Exhibit B</u> hereto; video rental or viewing unless by a nationally recognized tenant such as Blockbuster or Hollywood Video or incidental to a permitted use but in either case

not closer than two hundred (200) feet from any portion of the Premises or as otherwise shown on <u>Exhibit B</u> hereto; meeting hall; auction hall; place of religious worship; sporting event; karate center; auditorium; warehouse; theater, except on Related Land if parking spaces are provided for any such theater equal to the greater of one (1) space for each theater seat or as required by governmental regulation; automobile repair shop, or any business servicing motor vehicles, including without limitation any <u>quick lube oil change service, tire center or gasoline or service station</u>; supermarket, except where shown on <u>Exhibit B</u> hereto or on Related Land; <u>restaurant serving meals for on or off premises consumption</u>, except where shown on <u>Exhibit B</u> hereto or otherwise not closer than two hundred (200) feet from any portion of the Premises, but in no event shall the aggregate Floor Area of all restaurants in the Shopping Center exceed eleven thousand (11,000) square feet, and except that so-called "coffee bars and cafés" shall be permitted incidental to a permitted retail use; <u>beauty parlor and nail salon</u>, except in the Shopping Center where shown on <u>Exhibit B</u> hereto or more than two hundred (200) feet from any portion of the Premises; billiard parlor; sales office or showroom for automobiles or other vehicles; <u>an establishment serving alcoholic beverages for off premises consumption or for on premises consumption unless incidental to a permitted restaurant use, but in no event shall a so-called "bar" or separate area be permitted for the sale of such beverages</u>; massage parlor; office (excluding office space used in connection with and ancillary to a permitted retail use hereunder); health spa, exercise facility or similar type business; car wash; a so-called "flea market"; carnival, amusement park or circus; video/pinball arcade or game room; customer viewing, entertainment or educational uses, unless incidental to a permitted use but not closer than two hundred (200) feet from any portion of the Premises or as otherwise shown on <u>Exhibit B</u> hereto; any use generally deemed to be obnoxious or a nuisance; medical offices; or any other non-retail uses (herein collectively called the "<u>Prohibited Uses</u>"). For the purposes of this subsection (b), an "incidental" use shall not be conducted in

more than five hundred (500) square feet of Floor Area (including allocable storage and aisle space).

(ii) As used herein (A) the term "pornographic use" shall include without limitation a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto, (B) the term "educational uses" shall include without limitation a beauty school, barber school, reading room, place of instruction, or any other activity, facility, school or program catering primarily to students or trainees as opposed to shoppers, and (C) the term "obnoxious or a nuisance" shall include without limitation a use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

(c) Tenant covenants and agrees not to use the Premises for any Existing Exclusive, to the extent then applicable, or (ii) any of the Prohibited Uses other than for a supermarket or a grocery store (provided that no supermarket or grocery store is then a tenant and operating its business in the Shopping Center) or for a restaurant. Tenant acknowledges that Landlord is negotiating with Mustard Seed to lease and operate the Premises so designated on Exhibit B hereto as a grocery store, and if such lease is executed and delivered within twenty-four (24) months after the Rent Commencement Date, Tenant agrees that it will not, during the

term of such lease, use the Premises (i) as a grocery store or supermarket, (ii) for the sale of meat or fresh produce, or (iii) for the display and sale of vitamins or vitamin supplements in more than two hundred fifty (250) square feet of Floor Area, unless such tenant does not use its premises as a grocery store or supermarket for a period of time exceeding twelve (12) months (other than during Excused Periods).

SECTION 8.    **UTILITIES**.

(a) From the Delivery Date and continuing throughout the Term, Tenant shall be responsible for paying, and as necessary shall contract for, in its own name, directly with the utility company servicing the Premises, the cost and expense of all utility services rendered or furnished to the Premises, including heat, air conditioning, water, gas, electricity and telephone. Landlord, at its cost and expense, will provide separate utility meters for the Premises (and pay all connection and hook-up fees) and no space other than the Premises shall be connected thereto. Landlord and Tenant acknowledge and agree that Tenant's entry upon the Premises prior to the Delivery Date is not a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by other tenants of the Shopping Center.

(b) Notwithstanding anything to the contrary in this Lease, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises due to the disruption of such utility service, Fixed Rent shall be abated during the period of disruption.

SECTION 9.    <u>MUTUAL RELEASE, WAIVER OF SUBROGATION AND
MUTUAL INDEMNIFICATION</u>.

(a)  Landlord and Tenant, on their own behalf and on
behalf of anyone claiming under or through either one by way of
subrogation, hereby release and waive all rights of recovery and
causes of action against each other and their respective Related



34A

COLE01/SYS:\DMS\EMS.DIR\0460024.07
May 14, 1998

Companies from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property and time element insurance required to be maintained hereunder or any other insurance policy now or hereafter issued covering the Premises or the contents thereof or the Shopping Center.

(b) Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises or the contents thereof or the Shopping Center to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Related Companies) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided for in this Section 9. If any additional charge or increase in premium is made by the insurer because of this waiver of subrogation, then the party in whose favor the waiver was obtained shall pay such additional charge or increase in premium upon receipt of written notice. Failure to pay the increase in premium will void the release and waiver benefitting such party but shall not affect the benefit of the corresponding release and waiver in favor of the other party.

(c) In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had (i) the required insurance been obtained and/or (ii) the deductible not been maintained.

(d) (i) Except as otherwise provided in the foregoing subsections (a) and (b) of this Section 9, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless (except for loss or damage (x) resulting from the acts or omissions of *Landlord*, its agents, contractors, licensees, tenants [other than

Tenant], occupants or employees, or (y) for which any of the respective parties listed in the foregoing clause (x) may be statutorily liable) from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees.

(ii) Except as otherwise provided in the foregoing subsections (a) and (b) of this Section 9, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless (except for loss or damage resulting from the acts or omissions of Tenant, its agents, contractors, licensees or employees) from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon those portions of the Shopping Center not included within the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees.

**SECTION 10.    <u>SIGNS</u>.**

(a)    Tenant may erect and maintain in the interior of the Premises any signs it may desire other than signs affixed to a window for which Landlord's prior written approval must be obtained and other than small signs affixed to a window or exterior door to provide general information (i.e., store hours, identification of acceptable credit cards, etc.). Tenant shall also, at its own cost and expense, have the exclusive right to erect and maintain signs on the storefront and rear wall of the Premises (and, as applicable, on the side walls of any entrance design element) and, if consistent with any other of Tenant's stores, banners, awnings, flags and signs (including without limitation under-canopy (e.g. blade) signs) and replacement banners, awnings, flags and signs (including without limitation under-canopy signs) (including

temporary banners placed on the storefront of the Premises announcing "Sneak Preview," "Grand Opening" and/or "Now Hiring") of such size, design and color as Tenant, from time to time, may desire, subject to compliance with any applicable provisions of Exhibit F and with all applicable governmental requirements. Landlord covenants and agrees that (i) no sign or logo utilized by any other tenant in the Shopping Center shall include the words "bed", "bedroom", "bath" (except for Bath & Body Works as long as it is a tenant in the Shopping Center), "bathroom", "sheets", "towels" or "housewares", and (ii) no obstructions in the Shopping Center (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) shall obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs. Tenant shall be entitled, at Tenant's sole cost and expense, to (A) install and maintain on the storefront of the Premises a temporary banner announcing "Coming Soon" at such time, and for such duration prior to the Rent Commencement Date, as Tenant shall request, and (B) install and maintain, during the period commencing on the Commencement Date and ending on the day prior to the Rent Commencement Date, a temporary sign as Tenant may provide near the site of the future main entrance to the Shopping Center which states "Bed Bath & Beyond Coming Soon," provided that such sign is permitted by law and does not materially interfere with Landlord's construction of the Shopping Center. During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each

such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.

(b)   Landlord shall during the entire Term, provide monuments at the locations shown on <u>Exhibit B</u>.  If governmental regulations permit identification signs to be placed thereon, Tenant shall have the right, at its sole cost and expense, to erect and maintain its identification sign, as shown on <u>Exhibit F-1</u>, on both sides of such monuments above the signs of all other tenants of the Shopping Center whose premises then contain less Floor Area than the Premises and no other signs thereon shall have letters which are larger than the letters on Tenant's sign.  In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas or on any Related Land or otherwise, such signage shall also include Tenant's identification sign, as shown on <u>Exhibit F-1</u>, which shall also be higher than the signs of any other tenant of the Shopping Center whose premises then contain less Floor Area than the Premises and shall have letters thereon at least as large as the letters on any other sign made available to such other tenant or tenants.  Tenant agrees to pay, as Additional Rent hereunder, its Pro Rata Share of Landlord's actual third party cost of constructing any monument(s) on which Tenant's sign is erected pursuant to this subsection (c) as well as the full cost of Tenant's panel thereon.   After completion of the subject monument(s), payment of Tenant's Pro Rata Share shall be made to Landlord within thirty (30) days after the later of (i) the Delivery Date, or (ii) the delivery to Tenant of a computation of the amount due from Tenant and copies of all paid bills from third parties upon which such computation is based.

(c)   Tenant shall have the right, at its own cost and expense, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises as well as on any monument provided that the area of the new sign is Tenant's *then* prototypical sign, is no larger than the area of the sign

which it replaces and that the method of construction and attachment is substantially the same; Landlord, upon request, shall execute any consents or applications which may be required by law to permit the placement or installation of any signs by Tenant on any part of the Premises or on any monument. Upon Tenant's cessation of business in the Premises, it shall remove its signs and patch up any holes on the fascia or other exterior walls of the Premises or on any monument caused by the prior installation or the removal of such signs.

(d)  Landlord shall (A) at all times maintain all monuments in good order and repair (and at all times allow Tenant reasonable access to maintain, repair and replace its signs thereon, at Tenant's cost and expense), and (B) not change or alter the location, structure, height or general appearance of the monuments without obtaining Tenant's prior consent.  The cost of maintenance of all monuments (but not individual tenants' signs) and of the cost of any electricity used to illuminate them, shall be included in Common Areas Charges.

(e)  The signage rights granted to Tenant pursuant to this Section 10 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.

(f)  In the event Landlord or any tenant or other occupant of the Shopping Center, or anyone acting on their behalf, shall apply for any sign variance for premises in the Shopping Center, Landlord shall promptly give Tenant notice thereof, which notice shall fully describe (to the best of Landlord's knowledge) the details of the variance application and (if available to Landlord) shall include a copy of any drawing or plan to which the application may apply.

SECTION 11.    **ALTERATIONS AND IMPROVEMENTS**.

(a)  Tenant shall not make any structural alterations or structural improvements to the Premises without the prior approval of Landlord.  All work done in connection with structural and non-structural alterations or improvements shall be done at Tenant's

sole cost and expense, in a good and workmanlike manner and in compliance with all applicable governmental requirements.

(b)    Tenant may, from time to time, at its own cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises, as Tenant deems necessary or desirable, including but not limited to electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings, provided that the structural integrity of the Premises shall not be adversely affected thereby.

(c)    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided (i) Tenant's plans for the installation of such equipment are previously approved by Landlord, (ii) Tenant utilizes a contractor designated or approved by Landlord for all roof penetrations, (iii) Tenant maintains the area where roof penetrations are made while Tenant's equipment is present, and (iv) Tenant assumes full responsibility for any breach of Landlord's roof guaranty or warranty caused directly by Tenant's installation and Tenant repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon.

(d)    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises. Landlord shall not refurbish, renovate and/or paint the exterior of other portions of the Shopping Center unless Landlord also refurbishes, renovates and/or paints the exterior of the Premises, which refurbishment, renovation and/or painting shall (i) be performed at Landlord's sole cost and expense, and (ii) with respect to the Premises, be subject to Tenant's reasonable prior approval.    Landlord shall not make nor permit to be made any alterations to the exterior "architectural theme" of the remainder

of the Shopping Center (exclusive of tenants', other than Tenant's, storefronts) without the prior consent of Tenant.

(e)   Tenant shall have the right to subdivide the Premises into not more than two (2) separate stores, each of which (i) shall contain not less than fifteen thousand (15,000) square feet of Floor Area and with front footage of not less than seventy-five (75) lineal feet, (ii) may have its own front entrance and access to the loading docks in the rear of the Premises, (iii) may have separately sub-metered utilities, and (iv) shall be used and occupied only by Tenant or a subtenant permitted hereunder.

(f)   Upon the request of Tenant, Landlord shall fully, promptly and diligently cooperate with Tenant and its architects and designers in obtaining any permits, approvals and certificates required to be obtained by Tenant in connection with any alteration or improvement described in this Section 11, and shall execute all applications, documents and other instruments reasonably required for such purpose, provided that Landlord shall not be obligated to incur any costs or expenses, including, without limitation, attorneys' fees and disbursements, or suffer any liability in connection therewith.  Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within fifteen (15) days after Tenant's request therefor.

(g)   If any violation of any applicable legal requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cure the same and cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be. Likewise, if Tenant is solely responsible for creating a violation of any applicable legal requirement which is noted against the Shopping Center or the Premises which prevents Landlord or any other tenant in the Shopping Center from obtaining a building permit for any alteration or a certificate of occupancy, then, upon

request by Landlord, Tenant shall promptly and diligently cure the same and cause such violation to be removed of record to the extent required to permit Landlord or such other tenant to obtain its building permit or certificate of occupancy, as the case may be.

(h) All alterations and improvements made by Tenant shall become the property of Landlord, and shall be surrendered to Landlord, upon the expiration or sooner termination of this Lease; provided, however, that this provision shall not apply to Tenant's Property, and Tenant shall have no obligation to remove alterations or improvements.

SECTION 12.   **ACCESS TO SHOPPING CENTER**.   All entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B shall not be interrupted or disturbed by any act or omission of Landlord during the Term except that, when required for repairs or in the event of an emergency, one (1) of the three (3) entrances may be temporarily closed but Landlord shall use best efforts and act diligently to effect a reopening of the closed entrance. Tenant shall have the exclusive right to utilize the loading facilities at the Premises on a "24 hour a day", "365 days a year" basis.

SECTION 13.   **COMMON AREAS**.

(a) Landlord hereby undertakes and assumes all duties and responsibilities in regard to maintenance (including, without limitation, snow, ice, rubbish and debris removal), repair, replacement, operation, landscaping (including without limitation the trimming and pruning of trees in the Common Areas to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security and control of all Common Areas and shall comply with all laws, ordinances, orders, rules and regulations applicable thereto.

(b) Tenant shall comply with the rules and regulations of the Shopping Center described on Exhibit M hereto and such other rules and regulations as may be established from time to time by Landlord, within thirty (30) days after Landlord notifies Tenant of the establishment of the same, provided that all such rules and

regulations (including those on <u>Exhibit M</u>) (i) are reasonable, (ii) do not adversely affect the operations of Tenant's business on the Premises, and (iii) do not adversely affect any of Tenant's rights under this Lease. All rules and regulations shall be uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

(c) On and after the Rent Commencement Date, Tenant shall pay Tenant's Pro Rata Share of the reasonable costs (hereinafter called the "<u>Common Areas Charges</u>") paid by Landlord to operate, maintain, insure and repair the Common Areas only. Tenant's Pro Rata Share of Common Areas Charges shall be paid in monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget, and (ii) Landlord agrees to supply Tenant, upon Tenant's request, with reasonable backup documentation and applicable evidence of prior bills and payments, provided that Landlord shall only be required to provide such backup documentation and evidence once per calendar year. Within 60 days following the end of each calendar year, Landlord shall submit to Tenant a computation of Tenant's Pro Rata Share for the prior calendar year (which computation shall, as applicable, be accompanied by an updated accurate site plan which shall show any change in the total Floor Area of the Shopping Center from that which previously existed), together with a reasonably detailed statement certified by Landlord and containing actual costs and the calculation of Tenant's Pro Rata Share, and thereafter Landlord shall furnish Tenant with copies of such bills and other documentation as Tenant may reasonably request. If Tenant's Pro Rata Share of Common Areas Charges shall be more than the aggregate monthly installments paid by Tenant during the prior year, Tenant shall pay to Landlord the difference within sixty (60) days after receipt of such notice. If, however, the aggregate monthly installments paid by Tenant for the prior year exceeds the actual amount due from Tenant for such period, such excess shall be refunded by Landlord to Tenant

simultaneously with submission of the detailed statement setting forth Tenant's Pro Rata Share or applied to Tenant's next installment(s) of Common Areas Charges to the extent of the remaining Term.  Tenant's Pro Rata Share of Common Areas Charges shall not include: (i) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (ii) the cost of any replacements (which shall be of substantially the same quality as the original installments) or capital improvements to the Common Areas (for example, the cost of repaving the parking areas as opposed to patching), but not the straight-line depreciation of the capital costs of replacements over their useful life, as determined in accordance with generally accepted accounting principles; (iii) the cost of investigating, monitoring or remedying any environmental condition or hazardous substances or wastes, except that with respect to spills of hazardous substances or wastes in the Common Areas by third parties (other than Landlord, Tenant or any other tenant or occupant in the Shopping Center), the reasonable costs of clean-up which are not covered by the insurance required to be maintained by Landlord pursuant to Section 16 hereof, or not otherwise insured by Landlord, and which are not recoverable from the party who caused the spill, may be included in Common Areas Charges but Tenant's Pro Rata Share thereof shall not exceed Five Thousand ($5,000.00) Dollars; (iv) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (v) the cost of maintaining, repairing or providing security for interior portions of buildings; (vi) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (vii) the cost of compliance with laws (including, without limitation, the cost of curing violations or contesting such laws or violations), except that Common Areas Charges shall include the cost of compliance with laws affecting only the Common Areas provided that same shall (A) apply only to laws enacted after the Rent Commencement Date, (B) not be necessitated by the acts or omissions of Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or employees, (C) benefit all tenants of the Shopping

Center equally, (D) be amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, and (E) be similarly imposed on all other tenants of the Shopping Center; (viii) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (ix) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 16 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 16 hereof (including, without limitation, liability insurance); (x) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise included as part of Common Areas Charges; (xi) any costs of refinancing any debt encumbering the Shopping Center; (xii) sums paid or owed by Landlord to any tenant in the Shopping Center; (xiii) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (xiv) costs incurred in connection with a sale, ground leasing or sale-leaseback of all or any part of the Shopping Center; (xv) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (xvi) sums incurred as late payment fees, penalties or interest; (xvii) ground rent; (xviii) depreciation; (xix) (intentionally deleted); (xx) electricity costs for lighting Common Areas later than one (1) hour after the regular closing time of the Shopping Center (other than low level security lighting); (xxi) Landlord's advertising, entertainment and promotional costs for the Shopping Center; (xxii) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center other than landscaping; (xxiii) costs and expenses payable to Landlord or to an affiliate of Landlord to

the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (xxiv) repairs resulting from defects in the original construction of the Shopping Center arising within three (3) years after the Rent Commencement Date; (xxv) the cost of mechanized equipment (but not the straight line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); and (xxvi) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including but not limited to overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses, except that in lieu of such costs and expenses, Landlord may include in Common Areas Charges an administrative and management fee equal to five (5%) percent of the aggregate of all other Common Areas Charges except Taxes, insurance premiums, utilities and amortization.  In addition, if any tenant or other occupant of the Shopping Center maintains the Common Areas in whole or in part, or any facilities therein, or furnishes any services which would otherwise be included in Common Areas Charges, or pays directly for costs which would otherwise be included in the Common Areas Charges,  its costs thereof shall be excluded in determining Tenant's obligation hereunder to the extent of the maintenance or services furnished by or costs incurred by said tenant or other occupant. Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably pro rated.

(d)   Tenant shall have the right to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share.   Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the error exceeds three (3%) percent

of Tenant's Pro Rata Share of Common Areas Charges, Tenant shall also have the right to immediate reimbursement from Landlord for the reasonable expenses of the audit.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by law, or to its accountants, attorneys or bona-fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 54 below.

(e)  In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

(f)  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(g)  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes, except for outdoor café seating where shown on <u>Exhibit B</u> hereto, for occasional sidewalk sales which do <u>not</u> materially disrupt pedestrian access to the Premises, and for occasional sales in the Outdoor Promotion Areas shown on <u>Exhibit B</u> hereto. Notwithstanding the foregoing, provided the same is permitted by applicable law and the location is reasonably approved by Landlord, Tenant shall have the right to place a trailer on the Common Areas in an area immediately adjacent to the Premises for the purpose of conducting employee interviews and recruiting, which trailer shall be removed not later than the date which is ten (10) days after the Delivery Date.

SECTION 14.   <u>**PARKING AREAS AND OTHER COMMON AREAS**</u>.

(a)  The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads and other Common Areas are designated on <u>Exhibit B</u>.  Landlord shall not: (i) materially

alter the area of the Shopping Center or the location, availability or size of any building or improvement shown on <u>Exhibit B</u>; (ii) change the number, location, or layout of parking spaces within the Critical Area shown on <u>Exhibit B</u>; (iii) construct additional structures or buildings in the Shopping Center (including without limitation any kiosks, booths, signs or similar structures in the Common Areas); or (iv) change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks or other Common Areas unless required by law, without obtaining Tenant's prior written consent in each instance, which consent may be withheld by Tenant in its sole discretion without the application of Section 41 below. In the event Tenant consents to any such work in the Critical Area shown on <u>Exhibit B</u> hereto or in any other portion of the Common Areas which would adversely affect access to or visibility of the Premises, it shall be performed by Landlord at any time other than during the months of August, November and December, unless due to an emergency, and shall be undertaken in such a manner so as to (A) not unreasonably adversely affect ingress to or egress from the Shopping Center, (B) have no unreasonable, adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (C) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises. Landlord shall not designate specific parking spaces for use by any tenant or other occupant of the Shopping Center except adjacent to the Mustard Seed premises as shown on Exhibit B hereto. Landlord further warrants and represents that the Shopping Center will, except as provided in Section 22(d) below, at all times during the Term, contain the greater of (I) the number of parking spaces required by law, or (II) at least five (5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space not less than nine (9) feet wide and eighteen (18) feet deep.

     (b)   Parking spaces shall at all times be reasonably, clearly marked by painting, striping or otherwise.

     (c)   The Common Areas shall be fully lighted by Landlord on each day that business shall be conducted by Tenant in the

Shopping Center from dusk until one (1) hour after the close of business in the Premises and Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

(d) Tenant shall use reasonable efforts to have its employees park their motor vehicles in any area designated for employee parking by Landlord, provided that (i) Landlord shall take all reasonable measures to have other tenants and occupants of the Shopping Center do the same, and (ii) no employee parking shall be designated in all or any portion of the Critical Area shown on Exhibit B hereto.

(e) There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center (other than costs incurred in maintaining Common Areas, as provided in Section 13 above).

(f) In the event any construction or repair which is permitted under the terms of this Lease is undertaken in  the Common Areas or in any other portion of the Shopping Center during such time as the Premises shall be open for business to the public, all such construction shall be commenced following not less than five (5) days notice to Tenant (or without such notice in case of emergency, i.e., posing imminent material harm to persons or property), and shall be conducted in a manner which will not materially interfere with the normal operation of Tenant's business in the Premises, including access to and visibility of the Premises from the parking lots, roads and highways abutting the Shopping Center.

SECTION 15.    **TENANT'S INSURANCE**.

(a) Tenant, at its own cost and expense, shall procure and maintain in full force and effect on and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" with regard to the Premises, and having a combined single limit of liability of not less than Five Million ($5,000,000.00) Dollars for bodily injury, death and property damage liability; and (ii) standard "All-Risk" insurance, on a

replacement cost basis, in an amount adequate to cover the full insurable replacement value of all fixtures, equipment and other items of personal property of Tenant located on or within the Premises.  Tenant shall proceed diligently to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] notice of cancellation.

(b)  Duly executed certificates evidencing the insurance coverage described in Section 15(a)(i) above shall be delivered to Landlord prior to the Delivery Date.

(c)  Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any affiliate of Tenant owns or leases.

(d)  The property insurance required to be maintained by Tenant pursuant to this Section shall not have deductibles exceeding One Hundred Thousand ($100,000.00) Dollars without Landlord's prior consent.

(e)  All insurance required of Tenant under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).

(f)  Except with respect to the liability insurance described in Section (a)(i) above, Tenant shall be permitted to self-insure the risks which would otherwise have been covered under the other insurance policies required to be maintained by Tenant pursuant to the provisions of this Section 15 on the condition that either Tenant or any guarantor of Tenant's obligations under this Lease maintains, on a non-aggregated basis, during the period of such self-insurance, a net worth of at least One Hundred Million ($100,000,000.00) Dollars.

SECTION 16.   **LANDLORD'S INSURANCE**.

(a)  Landlord shall procure and maintain in full force and effect on and after the Commencement Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured", and having a combined single limit of

liability of not less than Ten Million ($10,000,000.00) Dollars for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and provided further that in all other respects, any such policy or policies shall comply with the provisions of this Section 16.

      (b)  Landlord shall procure and maintain in full force and effect on and after the Commencement Date and throughout the Term standard "All-Risk" insurance (including, at Landlord's option, loss of rents for a minimum period of one (1) year) and endorsements, to the extent obtainable at commercially reasonable rates, for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant. All policies required to be obtained and maintained by Landlord pursuant to this Section 16 shall provide that any loss shall be made payable to Landlord's institutional fee mortgagee, or if none, to Landlord; all proceeds of such policies shall be disbursed by such party in accordance with the provisions of, and for the purposes set forth in, Section 21 hereof. Tenant agrees to reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be obtained and maintained by Landlord pursuant to this Section 16 as part of Common Areas Charges. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping

Center, to the extent such rates are included as part of Common Areas Charges, Tenant's Pro Rata Share of said reasonable insurance premiums attributable thereto shall be appropriately reduced so Tenant does not contribute to such additional costs. To the extent that Landlord may receive a dividend, credit, rebate or other return of a premium (collectively, "Insurance Rebate") for which Tenant has paid a share of the insurance premium, Tenant shall be entitled to receive Tenant's Pro Rata Share of the Insurance Rebate. For the calendar years in which this Lease commences and terminates, the provisions of this paragraph shall apply and Tenant's liability for Tenant's Pro Rata Share of any insurance premium for such year shall be subject to a pro rata adjustment based on the number of days of said years during which the Term is in effect. The provisions of this subsection 16(b) shall survive the expiration or sooner termination of this Lease.

(c) The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand ($100,000.00) Dollars without Tenant's prior consent.

(d) All insurance required of Landlord under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Landlord shall proceed diligently to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] notice of cancellation. Upon written request, Landlord shall provide Tenant with duly executed certificates of all insurance described in this Section 16.

(e) The liability insurance requirements under the foregoing Section 15 and this Section 16 shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted

insurance industry standards.  If the parties are unable to mutually agree upon such new limits within thirty (30) days of a written demand by one party upon the other, the determination of an independent insurance advisor selected by the parties' insurance advisors shall be binding upon the parties.

**SECTION 17.   REPAIRS.**

(a)  Except as set forth in subsection 17(b) below, Tenant shall keep the non-structural interior of the Premises, including the plate glass, in good condition and repair, except for ordinary wear and tear, damage by fire or other casualty or eminent domain and any work done by Landlord. With respect to HVAC units serving the Premises exclusively but located on the roof of the Premises, Tenant shall, except as set forth in subsection 17(b) below, be responsible for the repair of same, provided that Landlord shall at all times provide Tenant with access necessary in order for Tenant to perform such work in a commercially reasonable manner (including without limitation by granting or arranging such easements or licenses for the benefit of Tenant as may be necessary). Notwithstanding the foregoing, Tenant shall have no responsibility for the repair of any portions of the electrical, plumbing, mechanical and/or other utility systems serving the Premises which are located outside thereof, nor for any portions of such systems running through, in, under or across the Premises but not exclusively serving the same.

(b)  In addition to Landlord's obligations with respect to punch list items described in Section 5(a)(i) above, Landlord shall perform, at its own cost and expense (and not includable in Common Areas Charges), as the same shall from time to time be necessary, all repairs and replacements to (i) the HVAC units and the electrical, plumbing and/or mechanical systems serving the Premises but located outside thereof (provided that subject to the further provisions of this Section 17(b); (ii) the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing and/or mechanical systems located in or servicing the Premises) (A) to the extent of any contractors', manufacturers', vendors', or insurers' warranties or

guarantees, including without limitation such warranties described in Exhibit D hereof, (B) during the period terminating on the date which is one (1) year after the Delivery Date, (C) which are occasioned by the act or omission of Landlord, its employees, agents or contractors, or (D) which are occasioned by any breach by Landlord of any provision of this Lease; (iii) the structural elements of the Premises and the remainder of the Shopping Center, including without limitation the roof joists, foundation, exterior walls (except plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering unless the same are damaged as a result of a floor defect or settling), and structural portions of any building of which the Premises may be a part; (iv) the roof, gutters, flashings, downspouts and scuppers; (v) the sewer, gas, wiring and public utility connections outside the Premises; and (vi) all utility lines and ducts in or passing through the Premises that serve other tenants and occupants in the Shopping Center or that are located outside the Premises but that serve the Premises.  The phrase "located outside thereof" shall, for the purposes of clause (i) above, not include those portions of the HVAC units located on the roof of the Premises and serving the Premises exclusively), and any portions thereof running through, in, under or across the Premises but not exclusively serving the same.

(c)  Any structural addition, alteration, improvement, or rebuilding to or of the Premises or any part thereof and the installation of any fire or safety equipment, device or other installation in the Premises or any part thereof, which may be required by reason of any law, rule, regulation or order promulgated by competent governmental authority and in effect on the date of this Lease or which is hereafter enacted and is not required solely due to Tenant's specific use of the Premises, and not required solely as a result of any alterations made to the Premises by Tenant, shall be made by and at the cost and expense of Landlord, except that any such work which is required solely due to Tenant's specific use and would not otherwise be required, shall be

made by and at the cost and expense of Tenant.  After the Delivery
Date Tenant shall comply with any law, rule, regulation or order
promulgated by competent governmental authority pertaining to all
interior non-structural portions of the Premises which are not
otherwise the obligation of Landlord pursuant to this
subsection(c).  As used in this Lease, the term "<u>Tenant's specific
use</u>" shall not refer to general retail use.  If it is determined
that the Landlord's Work, performed in accordance with all
presently existing laws and regulations and the present
interpretations thereof, does not comply with The Americans with
Disabilities Act, Landlord shall bear all costs of effecting such
compliance, whether or not the same is required as a result of
Tenant's specific use of the Premises.

(d)   (Intentionally deleted)

(e)   Landlord shall have access to the Premises during
Tenant's business hours upon at least five (5) days prior notice
(or without such notice in case of emergency, i.e., posing
imminent material harm to persons or property) for inspection and
to make any repairs or replacements required of it to be made;
<u>provided</u>, <u>however</u>, that Landlord's employees, agents and
contractors shall identify themselves to the store manager upon
entering the Premises.  Landlord shall reimburse Tenant promptly
upon demand for the reasonable cost and expense of Tenant incurred
in connection with the moving of any merchandise and trade fixtures
required to enable Landlord to make such repairs or replacements,
unless such repair is solely caused by the negligence of Tenant,
its agents, employees and/or contractors.

(f)   Notwithstanding any obligation of Tenant pursuant to
(a) above, the repair and replacement (but not normal maintenance)
of the HVAC units exclusively servicing the Premises shall be
Landlord's responsibility during the period terminating on the date
which is one (1) year after the Rent Commencement Date and
thereafter, provided any such repair or replacement is not required
as a result of Landlord's negligence or intentional acts, shall be
Tenant's sole responsibility throughout the remainder of the Term
subject to the guarantees to be provided by Landlord pursuant to

Exhibit D; provided, however, that in the event Tenant replaces the HVAC units exclusively serving the Premises during the three (3) year period ending on the expiration or earlier termination of this Lease, then (provided such replacement is not required as a result of Tenant's negligence or intentional acts) Landlord shall pay to Tenant, upon Tenant's delivery of possession of the Premises to Landlord, the then unamortized cost of such HVAC units (which unamortized cost shall be determined utilizing the estimated useful life of the HVAC units as provided by the Internal Revenue Code of the United States). The provisions of this Section 17(f) shall survive the expiration or earlier termination of this Lease.

(g) Any repairs or replacement performed by Landlord shall not materially interfere with the normal conduct of Tenant's business in the Premises, and no materials or tools of any kind used in connection with such repairs shall be stored in the Premises or in any portion of the Critical Area shown on Exhibit B hereto unless required for emergency or safety purposes or during repairs or replacements to the Critical Area, except where reasonably designated by Tenant. To the extent that any repairs or replacements required of Landlord pursuant to this Section 17 may materially interfere with the normal conduct of Tenant's business in the Premises if performed during Tenant's regular business hours, Landlord shall perform the same solely during the times that Tenant is not open for business.

**SECTION 18.    TENANT DEFAULT.**

(a)    If (i) Tenant shall default in the payment of any Rent provided for herein for a period of ten (10) days after its receipt of written notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) default should be made in any of the other covenants of this Lease on Tenant's part to be performed, and Tenant does not cure such default on or before the thirtieth (30th) day after its receipt of written notice thereof from Landlord specifying the nature of such default (or, if such default described in this subsection (ii) shall be of a nature that same cannot reasonably be cured on or before such thirtieth (30th) day and Tenant does not commence to cure such default on or

before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an "Event of Default".

(b) Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity, including the following:

(i) to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(ii) upon at least five (5) days' notice to Tenant (and Tenant's continued failure to cure such Event of Default), to terminate this Lease, or to terminate Tenant's right of possession, reenter the Premises and take possession thereof.  If Landlord shall so elect to terminate this Lease, all rights and obligations of Landlord shall cease and terminate, except that Landlord shall have and retain full right to sue for and collect all such unpaid Rent and all damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord and upon any failure by Tenant in so doing, Landlord shall have the right to recover possession by summary proceedings.  If Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which have accrued to the date of repossession, as well as all Rent which becomes due and payable pursuant to the terms of this Lease when and as required to be paid by Tenant to Landlord during the remainder of the Term (with no acceleration), diminished by any net sums, if any, thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant to Landlord as provided herein may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until the expiration of the Term.

(c) Upon an Event of Default, Tenant shall also be liable for and shall pay to Landlord, in addition to any sum

provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises, the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

(d)  Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period.

(e)  Landlord agrees to use reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default, provided that Landlord shall not be required to give any preference to the leasing of the Premises in lieu of other then available space in the Shopping Center.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

(f)  In the event Tenant fails on two (2) occasions during any calendar year to pay any Rent within ten (10) days after the date provided herein for such payment, then with respect to any subsequent payments of Rent during that same calendar year which are not made on the due dates thereof, Tenant shall pay Landlord, as Additional Rent hereunder, a late charge of four (4%) percent of the amount thereof as well as interest at the Lease Interest Rate computed from the due date to the date actually paid.

SECTION 19.  **LANDLORD DEFAULT.**  If Landlord fails to make any repairs or do any work required of Landlord by the provisions of this Lease, or if Landlord shall at any time be in default in the observance or performance of any of the other covenants and agreements required to be performed and observed by Landlord hereunder, and any such failure or default continues for a period of thirty (30) days after written notice thereof is given by Tenant to Landlord, or, if such failure or default requires more than thirty (30) days to cure in the exercise of due diligence, unless

Landlord commences to cure same within said thirty (30) day period and thereafter diligently prosecutes the same to completion, then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity (a) may, if the failure or default materially interferes with the normal conduct of Tenant's business in the Premises and Tenant, as a result thereof, closes the Premises for business to the public, terminate this Lease, but in such case without waiving its rights to damages for Landlord's failure to perform; and/or (b) may, but shall not be obligated to, make such repairs or perform such work in accordance with the provisions of this Lease all on behalf of and at the reasonable expense of Landlord; and/or (c) may bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or (d) may offset against the Fixed Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing such repairs or work, including reasonable costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate. Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (i.e., posing imminent material harm to persons or property or material disruption to the normal operation of Tenant's business) shall exist, Tenant may at its election and with prior written notice to Landlord, exercise its rights in accordance with the foregoing subsections (b), (c) and (d) of this Section 19. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord. To the extent that Tenant, pursuant to the provisions of this Section 19, avails itself of the remedy of self help and it is subsequently determined that Landlord was not in default hereunder, Tenant agrees to indemnify and hold Landlord harmless from and against all costs and expenses (including reasonable attorneys' fees but excluding damages) resulting from or occurring by reason of Tenant exercising such right of self help.

**SECTION 20.**    **LANDLORD'S ENTRY.**    Tenant shall permit Landlord to enter upon the Premises during Tenant's business hours, upon at least three (3) days prior notice to Tenant, to exhibit same to prospective bona-fide purchasers and mortgagees of the Shopping Center, and during the last six (6) months of the Term, to exhibit same to prospective bona-fide tenants; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises.

**SECTION 21.**    **FIRE AND OTHER CASUALTY.**

(a)    Except as otherwise provided in this Section 21, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty (which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, provided that in no event shall Landlord be obligated to repair or replace any of Tenant's Property). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 16(b) hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work; in the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 21. Notwithstanding the foregoing, Landlord agrees that if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work (it being agreed that to the extent that the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount by which the net cost and expense of such rebuilding or restoration work was thereby

increased, which amount shall be due and payable within fifteen (15) days after Landlord has delivered to Tenant backup information in support of such increase in the net cost and expense of such rebuilding or restoration work (including without limitation receipted invoices) as reasonably required by Tenant.   If, in Tenant's sole but reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business, or in the case of damage to the Shopping Center, materially interferes with the normal conduct of Tenant's business in the Premises, a just proportion [based upon the portion(s), if any, of the Premises which Tenant, in its sole but reasonable judgment, determines is not useable for the normal operation of its business, and Tenant in fact does not use such portion(s)] of Rent payable hereunder shall be abated, and such abatement shall terminate in accordance with the terms of Section 52 below.   In addition, if such fire or other casualty occurs during the period commencing on the Delivery Date and ending one day prior to the Rent Commencement Date, then, notwithstanding any other provision of this Lease (but subject to the Slack Period provisions set forth in the definition of "Rent Commencement Date" in Section 1 above), the Rent Commencement Date shall be deemed delayed one day for each day which elapses between the occurrence of such fire or other casualty and the date upon which the damaged or destroyed area(s) are fully rebuilt and restored.

    (b)   If (i) Landlord does not commence the repair and restoration work to the Premises, the Common Areas or other buildings in the Shopping Center as required pursuant to this Section 21 within one hundred eighty (180) days (which period shall not be subject to extension for delays caused by Force Majeure) after the date of such destruction or thereafter fails to diligently pursue the completion of such repair and restoration work, (ii) the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot, in the opinion of an independent licensed architect designated by Landlord and reasonably acceptable to Tenant, be completed by Landlord in accordance with all provisions of this Section 21

within a period of eighteen (18) months (which period shall not be subject to extension for delays caused by Force Majeure) after the date of destruction, or (iii) the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center are not actually Substantially Completed by Landlord in accordance with all provisions of this Section 21 within a period of eighteen (18) months (which period shall not be subject to extension for delays caused by Force Majeure) after the date of destruction, then, in any of such events, Tenant shall have the right, at its sole discretion and option, to: (A) with respect to (i) or (iii) above, after giving thirty (30) days prior notice to Landlord, perform or complete, as the case may be, the required repairs and restoration work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days of Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Section 21(b), that at Tenant's election all insurance proceeds payable (or, as applicable, paid) to Landlord or Landlord's mortgagee pursuant to Section 16(b) hereof shall be paid (or, applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or (B) with respect to (i) or (iii) above, seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or (C) with respect to (i), (ii) or (iii) above, terminate this Lease by thirty (30) days notice to Landlord. The exercise of the rights granted to Tenant herein shall be in furtherance of and not in limitation of any other rights Tenant may have pursuant to this Lease or in law or equity.

(c) If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof,

either Landlord or Tenant shall have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Section 46 below, if available, within ten (10) days after receipt of the termination notice from Landlord.

(d)    Notwithstanding any other provision of this Section 21, in the event that the Premises and other buildings in the Shopping Center are substantially destroyed by fire or other casualty to the extent that Landlord elects not to rebuild and restore the same, then Landlord shall have the right to terminate this Lease as of the date of such damage or destruction by giving notice thereof to Tenant within sixty (60) days following such damage or destruction; provided, however, that no such notice of termination shall be effective unless it is accompanied by a certification from Landlord that all other leases in the Shopping Center have also been terminated, and provided further that if Landlord or any affiliate of Landlord actually (AA) commences the reconstruction or restoration of the Shopping Center (or a shopping center substantially similar to the Shopping Center) on or before the date which is three (3) years after the effective date of the termination of this Lease, or (BB) Substantially Completes the reconstruction or restoration of the Shopping Center (or a shopping center substantially similar to the Shopping Center) on or before the date which is three (3) years after the effective date of the termination of this Lease, then Landlord shall be obligated to offer to Tenant, at the time of the commencement of the reconstruction or restoration, or at the time of the Substantial Completion of the reconstruction or restoration of the Shopping Center or shopping center, as the case may be, the option to lease a portion of the Shopping Center (or a portion of such shopping center) equal in size to forty thousand (40,000) square feet upon all the terms and conditions of this Lease (including without limitation, the amount of Fixed Rent which would otherwise have been paid hereunder); provided, however, that (i) all dates set

forth in the Lease shall be appropriately extended, and (ii) at the time of Substantial Completion of the reconstruction or restoration of the Premises, the remaining Term of this Lease is at least five (5) years, which Tenant may achieve by exercising an available Renewal Option pursuant to Section 46 below.  In the event Tenant elects, within thirty (30) days after such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon the same terms and provisions of this Lease and Tenant's parent corporation shall execute a guaranty of such lease limited to the remainder of the original Term hereof.  In the event Tenant does not elect, within thirty (30) days after such offer, to exercise such option, Landlord shall be free to lease such premises to any other person or entity, upon terms which are substantially similar to the terms of this Lease [except that, with respect to the Fixed Rent, if the premises are rebuilt and restored to substantially the same condition and location as existed immediately prior to the destruction, the lease with such other person or entity shall include Fixed Rent in an amount not less than ninety-five (95%) percent of the Fixed Rent set forth herein].  The provisions of the immediately preceding two (2) sentences shall survive the expiration or earlier termination of this Lease pursuant to this subsection (d).

SECTION 22.    **EMINENT DOMAIN.**

(a)    If all of the Premises shall be taken under the power of eminent domain, this Lease shall terminate as of the effective date of such taking without further liability on the part of either Landlord or Tenant except for an adjustment between the parties for the Rent payable by Tenant hereunder.  If:  (i) any portion of the Premises shall be taken under the power of eminent domain so that it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (ii) whether or not a taking occurs, (A) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (B) the Shopping Center no longer has the two

(2) most westerly entrances from Kruse Drive where shown on Exhibit B hereto, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iii) any portion of the Shopping Center shall be so taken that materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iv) more than twenty-five (25%) percent of the buildings in the Shopping Center (other than the Premises) are taken; then, within sixty (60) days of any such event, Tenant or Landlord [only with respect to an event described in (iv) above and then subject to all of the provisions set forth in Section (d) above] shall have the right to terminate this Lease by giving sixty (60) days notice to the other party, in which event this Lease shall so terminate without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to (c) below.   Subsequent to any partial taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's sole but reasonable judgment, be utilized for its normal conduct of business.

(b)   If Tenant shall not have the right to cancel this Lease or, having such right, elects not to exercise the same, Landlord shall, within a reasonable period of time, repair and restore the damaged area to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the taking, pursuant to plans and specifications approved by Tenant, which repair and restoration to the Premises shall include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to (i) repair or restore Tenant's Property, or (ii) expend for the repair and restoration of the Premises more than Five Hundred Thousand ($500,000.00) Dollars in excess of the condemnation award

payable to Landlord for the taking, and in the event the cost of repair and restoration exceeds such amount Landlord may terminate this Lease unless Tenant agrees in writing, within thirty (30) days after Landlord's notice of termination, to provide the additional funds for the repair and restoration of the Premises (which funding shall be paid, as Additional Rent hereunder, to Landlord within fifteen (15) days after the redelivery of possession to Tenant after Substantial Completion of the repairs and restoration). During the period of said repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's sole but reasonable judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 52 below.

(c)   In connection with any taking or partial taking of the Premises, Tenant shall be entitled to claim an award against the condemning authority only and not against Landlord for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; <u>provided</u>, <u>however</u>, that no award shall be payable to Tenant which reduces the award payable to Landlord or the lessor under the Ground Lease for their respective leasehold and fee interests in the Shopping Center.

(d)   Notwithstanding the foregoing, if five (5%) percent or more of the parking spaces within the Critical Area shown on <u>Exhibit B</u> shall be taken under the power of eminent domain, or if so many of the parking spaces within the Shopping Center are so taken such that there are less than either (i) the number of parking spaces required by law, or (ii) four and one-half (4.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, then Tenant shall have the right to terminate this Lease in the same manner and with the same effect as set forth in subsection (a) above.

(e)   Any dispute between the parties with respect to this Section 22 shall be resolved by arbitration in accordance with the provisions of Section 54 below.

**SECTION 23.**    **EXCLUSIVE IN CENTER.**    To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 23, Landlord covenants and agrees that:

(a)    Subject only to the fully executed and delivered leases in effect on the date hereof with tenants listed on Exhibit N hereto (to which the provisions of this Section 23(a) shall not apply except as specifically stated herein), Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center (or in any Related Land) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of items: (a) linens and domestics; (b) bathroom items; (c) housewares; (d) frames and wall art; (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the "Exclusive Items"). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center shall have the right to utilize up to an aggregate of five (5%) percent of the Floor Area of their respective premises (including an allocable portion of the aisle space adjacent to such selling space) for the sale, rental or distribution of the Exclusive Items; provided, and on the condition that, the aggregate Floor Area utilized by all such tenants and subtenants in the Shopping Center, at any one time, shall not exceed five thousand (5,000) square feet of Floor Area. Despite the foregoing reference to "fully executed and delivered leases in effect on the date hereof," Landlord hereby agrees that current tenants of the Shopping Center (and current or future assignees or sublessees of such current tenants) shall nevertheless be subject to the restrictions contained in this Section 23(a) in the event that the lease between Landlord and any such tenant requires Landlord's consent to any assignment or sublet or requires Landlord's consent in order to permit a change in the use or an expansion of the applicable premises so as to allow for the sale, rental or distribution of the Exclusive Items. Notwithstanding the foregoing inclusion of any Related Land, Tenant's exclusive shall

not apply to (i) full-line department stores, each containing at least seventy thousand (70,000) square feet of Floor Area such as Kohl's, (ii) discount department stores and home improvement stores in which the Exclusive Items may be sold on an incidental basis, or (iii) the Related Land Small Stores (as hereinafter defined). The term "Related Land Small Stores" shall mean retail stores located on Related Land which do not contain a Floor Area in excess of three thousand (3,000) square feet each, provided, and on the condition that, there are no more than two (2) such Related Land Small Stores selling Exclusive Items on other than an incidental basis at any one time, and the aggregate Floor Area utilized by the Related Land Small Stores for the sale of the Exclusive Items does not exceed three thousand (3,000) square feet each.

(b)    The exclusive rights granted to Tenant with respect to any respective category listed in the foregoing subsection (a) of this Section 23 shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during Excused Periods and for periods of time not exceeding twelve (12) consecutive months). The exclusive rights granted to Tenant in this Section 23 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least fifteen thousand (15,000) square feet of the Premises; and

(c)    (i)    Upon a breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which Landlord has included in the lease between Landlord and any tenant in the Shopping Center or in the Related Land a provision which effectuates the exclusive rights granted to Tenant in this Section 23(a) and, despite such inclusion, such tenant has violated the exclusive rights granted to Tenant in this Section 23(a)), and provided that Landlord has not within thirty (30) days after notice of the violation either fully cured the same or given Tenant notice that it disputes the alleged violation, the Fixed Rent payable hereunder shall be reduced by fifty (50%) percent for so long as such violation shall be continuing and Tenant shall have

all the remedies available to it pursuant to Section 19 above.  If
Landlord gives timely notice, as aforesaid, that it disputes the



68A

COLD01/SYS:\DMS\EMS.DIR\0460024.07
May 14, 1998

alleged violation, Tenant shall not then be entitled to the Fixed Rent reduction or other remedies set forth in Section 19, but the dispute shall be promptly submitted to arbitration pursuant to Section 54 below.  In the event that Tenant's claim of a violation is upheld by the arbitrator, Tenant shall be entitled to (A) the Fixed Rent reduction of fifty (50%) percent and availability of its other remedies pursuant to Section 19, (B) a retroactive credit for fifty (50%) percent of the Fixed Rent paid by Tenant from the date of its original notice of violation to Landlord (together with interest thereon at the Lease Interest Rate), which credit shall be applied against the next payments of Rent due to Landlord hereunder, and (C) a prompt reimbursement from Landlord for all its reasonable attorneys' fees and expenses involved with the arbitration.  On the other hand, if Tenant's claim of a violation is not upheld by the arbitrator, Tenant shall promptly reimburse Landlord for all its reasonable attorneys' fees and expenses involved with the arbitration.

(ii) If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails within thirty (30) days after demand by Tenant to commence such proceedings, or shall fail thereafter to vigorously prosecute the same, Tenant shall have the right (A) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief)in its own name, or (B) in the event the right set forth in (A) above is not permitted to be exercised under applicable law, to conduct and prosecute such legal proceedings in the name of Landlord, and Landlord agrees to cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).  In the event Tenant's claim in any such legal proceedings that there was a

violation of its exclusive rights hereunder is upheld by judgment, order or otherwise, Landlord shall promptly upon demand reimburse Tenant for all its reasonable attorneys' fees and expenses involved with such proceedings; provided, however, that if Landlord conducts and prosecutes the proceeding and despite its best efforts and due diligence therein, Tenant's claim that there was a violation of its exclusive rights hereunder is not upheld by a final judgment or order, Tenant shall promptly upon demand reimburse Landlord for all its reasonable attorneys' fees and expenses involved with the proceedings.

(d)    Landlord and Tenant acknowledge that the exclusive provisions set forth in this Section 23 have been included herein at the sole request of Tenant, and in the event such provisions shall be construed to be or shall be declared to be invalid or unenforceable by the decision of any court or any governmental agency having jurisdiction over such matters or by the enactment of any law, ordinance or regulation, or in the event such provisions shall be construed or shall be declared to be in violation of any law, rule or regulation, including but not limited to any anti-trust laws, rules or regulations, Tenant agrees to indemnify, defend, protect and hold Landlord harmless from and against any and all claims, demands, damages, costs or liabilities, including reasonable attorneys' fees and court costs, arising from Landlord's grant of the exclusive provisions herein; provided, however, that Tenant may, at any time, elect in its sole discretion and without Landlord's approval, to voluntarily terminate Tenant's said exclusive as it may affect any one or more parties, which termination shall be evidenced by a notice thereof to Landlord.

SECTION 24.    **RIGHT TO MORTGAGE AND NON-DISTURBANCE**.

(a)    Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any mortgage or deed of trust now or hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each holder of any mortgage or deed of trust which encumbers the Shopping Center as of

the date hereof shall execute and deliver to Tenant an agreement in the form of Exhibit G hereto, in recordable form, (b) the landlord under the Ground Lease and the landlord under any future ground or underlying lease affecting all or any part of the Shopping Center shall execute and deliver to Tenant a Fee Owner Recognition Agreement in the form attached hereto as Exhibit G-1, and (c) each holder of a future mortgage or deed of trust encumbering or affecting any part of the Shopping Center shall execute and deliver to Tenant a Subordination, Non-Disturbance and Attornment Agreement in a form reasonably satisfactory to Tenant but which shall, in any event, include the following provisions:  (i) no default by Landlord under any such lien shall affect Tenant's rights under this Lease so long as Tenant performs the obligations imposed upon it hereunder and is not in default of such obligations beyond the applicable notice and grace periods provided herein; (ii) Tenant will not be named as a party in any foreclosure or other proceedings with respect to any such lien unless and except to the extent required by law or required to fully protect said mortgagee's interests, it being agreed that no such naming or joinder shall adversely affect Tenant's rights under the Lease; (iii) the holder of any such lien agrees that insurance proceeds will be made available for restoration pursuant to Sections 21 and 22 above; and (iv) Landlord and Tenant shall have the right, without prior approval of the holder of the future mortgage or deed of trust but with prior written notice to such mortgagee, to execute any amendment to this Lease which is specifically required hereunder or which does not either materially decrease any of Tenant's obligations hereunder, or materially increase any of Landlord's obligations hereunder, or materially impair said mortgagee's interests or materially increase mortgagee's obligations hereunder.

(b)  If the holder of any mortgage or deed of trust encumbering or affecting all or any part of the Shopping Center shall so elect by notice to Tenant or by the recording of a unilateral declaration of subordination, this Lease and Tenant's rights hereunder shall be superior and prior in right to the lien

of which such holder has the benefit, with the same force and effect as if this Lease had been executed, delivered and recorded prior to the execution, delivery and recording of such mortgage or deed of trust.

(c)    If any person shall succeed to all or part of Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease or otherwise, and if so requested or required by such successor in interest, Tenant shall attorn to such successor in interest and shall execute such agreement in confirmation of such attornment as such successor in interest shall reasonably request. The provisions of this subsection (c) shall be included in any Subordination, Non-Disturbance and Attornment Agreement described in subsection (a) above.

SECTION 25.    **TENANT ASSIGNMENT AND SUBLETTING.**

(a)    Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises for retail sales and services provided that (i) the prospective use of the Premises by the assignee, sublessee, concessionaire or licensee is a Permitted Use hereunder, (ii) the prospective assignee or sublessee of all or fifty (50%) percent or more of the Premises is a recognized national or regional retailer [provided, however, that this limitation shall not apply if at such time a majority of the tenants occupying more than ten thousand (10,000) square feet of Floor Area in the Shopping Center are not recognized national or regional retailers], (iii) an assignment of this Lease or a subletting of all or more than fifty (50%) percent of the Premises is subject to the provisions of subsection (b) below, and (iv) Tenant and any assignee of this Lease or sublessee of all or fifty (50%) percent or more of the Premises shall execute and deliver to Landlord a fully executed counterpart of the written assignment of this Lease or of the sublease within twenty (20) days after the effective date thereof.    The provisions of this subsection (a) shall not apply to any assignment or sublease pursuant to subsections (c) and (f) below.

(b)  Except as set forth in subsections (c) or (f) below, in the event Tenant proposes to assign this Lease or sublet all or more than fifty (50%) percent of the Premises, it shall first give notice thereof (hereinafter called the "Assignment/Subletting Notice") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, and such financial information with respect to such assignee or sublessee as may have been furnished to Tenant.  Within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, Landlord may elect by notice (hereinafter called the "Termination Notice") in writing to Tenant to terminate this Lease and recapture the Premises, in which event this Lease shall automatically terminate on the ninetieth (90th) day (hereinafter called the "Termination Date") following Tenant's receipt of the Termination Notice with the same force and effect as if said Termination Date had been designated as the expiration date of this Lease and Landlord and Tenant shall upon such Termination Date be released from any and all liabilities thereafter accruing hereunder except as set forth in Section 33 below.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall, within fifteen (15) days following demand by Landlord, pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding any Termination Notice given to Tenant by Landlord within the aforesaid thirty (30) day period, Tenant shall have the right within ten (10) days thereafter to give Landlord notice (hereinafter called the "Recision Notice") of its recision of the Assignment/Subletting Notice and upon the receipt of the Recision Notice the Termination Notice previously given by Landlord shall be deemed null and void and Tenant shall not assign this Lease or sublet the Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not exercise its right of termination within the aforesaid thirty (30) day period, Landlord shall conclusively be deemed to have consented to the

proposed assignment or subletting, as the case may be, and Tenant may assign this Lease or sublet the Premises pursuant to its Assignment/Subletting Notice, provided that in no event shall such assignment or subletting relieve Tenant or Parent Corporation of their respective primary liability to Landlord under this Lease and Guaranty of this Lease.

(c)   In addition to and not in limitation of Tenant's other rights set forth in this Section 25, Tenant shall have the right from time to time, without the consent of Landlord, to:  (i) assign Tenant's interest in this Lease and/or to sublet all or any portion of the Premises to any corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Tenant; (ii) assign Tenant's interest in this Lease to any entity which purchases all or substantially all of the assets of Tenant, of Tenant's parent company or of any affiliate of Tenant or of Tenant's parent company; (iii) assign Tenant's interest in this Lease to any entity which purchases Tenant's interest in the Premises; and/or (iv) assign Tenant's interest in this Lease in conjunction with any merger, consolidation or public offering of stock or other interests involving Tenant or any corporation, partnership or other entity which is controlling, controlled by, or under common control with, Tenant; provided, however, that (A) in the case of (iii) above, the net worth of any such successor in interest or any then guarantor of this Lease shall not be worth less than One Hundred Million ($100,000,000.00) Dollars, and (B) neither Tenant nor the Parent Corporation (as hereinafter defined) shall be relieved of their primary liability to Landlord under this Lease, as such liability may then exist.

(d)   Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment of Tenant's interest in this Lease to a Major Assignee or in the event of an assignment of Tenant's interest in this Lease to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of Tenant hereunder, from and after the

effective date of such assignment, shall terminate and all liability of any guarantor of this Lease, from and after the effective date of such assignment, shall terminate. For purposes of this Section 25(d), the term "<u>Major Assignee</u>" or "<u>Major Guarantor</u>", as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million ($100,000,000.00) Dollars.

(e) All assignees, sublessees, licensees and concessionaires shall be permitted to use the Premises (or the applicable portion thereof) for any retail purpose not specifically prohibited by the provisions of Section 7(c) of this Lease. Landlord hereby acknowledges that any sublessee of all or any portion of the Premises shall, subject to Tenant's prior written approval, be entitled to all of the rights and benefits available to Tenant pursuant to the terms of this Lease.

(f) In addition to Tenant's other rights set forth in this Section 25, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more Institutional Lenders, as collateral security for an indebtedness or other obligation of Tenant, the Parent Corporation (as hereinafter defined)] or any affiliated entity shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Institutional Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to Bed Bath & Beyond Inc. (herein called the "Parent Corporation") or to any entity which is controlling, controlled by or under common control with, Parent Corporation, a license to operate all of Tenant's business operations at the Premises, without the Parent Corporation or such other entity having assumed any liability for the performance of Tenant's obligations under this Lease other than Parent Corporation's liability under its Guaranty annexed hereto.

(g) If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the original Tenant named herein (hereinafter referred to as "<u>Original Tenant</u>"), and no notice of default shall be effective

until a copy thereof is so given to Original Tenant. Original
Tenant shall have the same period after receipt of such notice to
cure such default as is given to Tenant therefor under this Lease.
If this Lease terminates because of an Event of Default of such
assignee, Landlord shall promptly give to Original Tenant notice
thereof; and Original Tenant shall have the option, exercisable by
the giving of notice by Original Tenant to Landlord within ten (10)
days after receipt by Original Tenant of Landlord's notice, to cure
any such Event of Default (but only if such Event of Default is of
a monetary nature or is otherwise reasonably susceptible of cure by
Original Tenant, and, if such is not the case, Original Tenant
shall not be obligated to cure such Event of Default as a condition
to the exercise by Original Tenant of Original Tenant's rights set
forth in this subsection (g)) and become Tenant under a new lease
for the remainder of the Term of this Lease (including any Renewal
Periods) upon all of the terms and conditions as then remain under
this Lease, and such new lease shall commence on the date of
termination of this Lease, except that if Landlord delivers to
Original Tenant, together with Landlord's notice, a release as to
all future liability under this Lease, Original Tenant shall not
have the foregoing option. In the event this Lease is terminated
as a result of a bankruptcy filing by said assignee or any future
assignee which results in such assignee's rejection of tenant's
leasehold interest in this Lease, then, upon Tenant's curing of
such assignee's Event of Default as set forth above and provided
Landlord has no other claims against the assignee, Landlord shall
assign to Tenant all of Landlord's rights against such assignee
(whether arising as a result of bankruptcy court proceedings or
otherwise).

(h) In the event Tenant subleases all or a portion of
the Premises for a term of at least five (5) years, then,
notwithstanding any other provisions of this Lease, Landlord shall,
upon Tenant's request, execute and deliver an agreement among
Landlord, Tenant and each such subtenant in the form of Exhibit H
hereto, in recordable form, provided that (i) Landlord shall not be
bound by any payment by such subtenant under the sublease made more

than thirty (30) days in advance; (ii) subtenant shall not be in default under the sublease beyond applicable notice and cure periods provided therein for the curing of such default; (iii) Landlord shall not be liable for the payment of any security deposit not paid to Landlord; (iv) Landlord shall not be bound to any provision of the sublease which creates rights or remedies in the subtenant which are greater than the rights of Tenant under this Lease; (v) Landlord shall not be bound by any provision in the sublease which creates obligations upon the Landlord thereunder which are greater than Landlord's obligations under this Lease; (vi) the subtenant, at the time Landlord is requested to execute and deliver the agreement, has a net worth of at least Fifteen Million ($15,000,000.00) Dollars; and (vii) at least fifty (50%) percent of the Premises is subleased.

(i)    In connection with any assignment of this Lease or subletting of all or substantially all of the Premises consented to or deemed consented to by Landlord, Landlord shall be entitled to receive, as Additional Rent under this Lease, fifty (50%) percent as of the A/S Profit (as such term is hereinafter defined) which shall be paid, in the case of an assignment, upon the effective date of such assignment, and in the case of a sublease, monthly during the term of such sublease. For purposes of this subsection (i), the "A/S Profit" shall mean (i) with respect to any assignment, the excess, if any, of any payment received by Tenant from the assignee in consideration for such assignment over any costs reasonably incurred by Tenant in connection with such assignment (including, without limitation, brokers' fees, required tenant improvement work and advertisements), and (ii) with respect to a sublease, the excess, if any, of any subrents received by Tenant from such sublessee over the Rent payable by Tenant to Landlord, and any costs (which shall be amortized over the term of the sublease) reasonably incurred by Tenant in connection with such sublease (including, without limitation, brokers' fees, required tenant improvements work and advertisements).

SECTION 26.    NOTICE.    Whenever a notice or request    is required or permitted in this Lease, it shall mean a written notice

(i) sent by certified mail, return receipt requested, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address with copies to (A) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (B) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602-0800, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party; or (ii) a written notice delivered to the addresses stated above by Federal Express or other recognized overnight delivery service with charges prepaid and which obtains a receipt for any such delivery.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

SECTION 27.    **SHORT FORM LEASE.**  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request and shall refer to such provisions of this Lease which may survive the expiration or sooner termination hereof.   In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

SECTION 28.    **ENTIRE AGREEMENT AND MODIFICATION.**  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

SECTION 29.    **SEVERABILITY.**  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

**SECTION 30.**   <u>**GRAMMATICAL USAGES AND CONSTRUCTION**</u>.   In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.   This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.   Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.   As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

**SECTION 31.**   <u>**TABLE OF CONTENTS, LINE NUMBERING AND PARAGRAPH HEADINGS**</u>.   The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

**SECTION 32.**   <u>**NO JOINT VENTURE OR PARTNERSHIP CREATED BY LEASE**</u>.   Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

**SECTION 33.**   <u>**BROKER'S COMMISSION**</u>.   Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease.   Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Lease in breach of the foregoing representation.   The provisions of this Section 33 shall survive the expiration or earlier termination of this Lease.

**SECTION 34.**   <u>**RIGHTS CUMULATIVE; DEFINITION OF LANDLORD**</u>. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other

such rights, remedies and benefits allowed by law. The term "Landlord" shall mean only the owner, for the time being, of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (a) claims made by Tenant against Landlord at any time with respect to periods of time which occurred prior to the effective date of the transfer of such ownership interest, and/or (b) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

SECTION 35.    NON-WAIVER. The failure of Landlord or Tenant to enforce against the other any provision, covenant or condition herein, by reason of either of them committing any breach of or default under this Lease shall not be deemed a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach of default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

SECTION 36.    LIMITATION    OF    LANDLORD'S    LIABILITY. Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that if, on and after the Delivery Date and except with respect to insurance proceeds or condemnation awards received by Landlord which are required, by the terms of this Lease, to be applied to the repair or restoration of the Premises or the Shopping Center, Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy

thereon against the right, title and interest of Landlord in the Shopping Center, as the same may then be encumbered, and neither Landlord nor any of its officers or shareholders shall be liable for any deficiency, except to the extent of any net proceeds (after the payment of any mortgages) received by Landlord from a sale or refinancing of the Shopping Center after an initial claim by Tenant which resulted in a money judgment against Landlord.  It is understood that in no event shall Tenant have any right to levy execution against any property of Landlord other than its interest in the Shopping Center, except as hereinbefore expressly provided. In the event of the sale or other transfer of Landlord's right, title and interest in the Premises or the Shopping Center, Landlord shall be released from all liability and obligations under this Lease except to the extent of any then liability to Tenant as otherwise set forth in this Section 36.

SECTION 37.  **SURRENDER OF PREMISES.**  At the expiration of the Term, Tenant will quit and surrender the Premises in as good a state and condition as received, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder excepted.

SECTION 38.  **SUCCESSORS AND ASSIGNS.**  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

SECTION 39.  **FORCE MAJEURE.**  Except as may be otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder (except for the payment of a monetary sum to be paid by either party to the other party) by reason of strikes, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reasons of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease (all of such reasons or causes are herein collectively called "Force Majeure"), then the performance of any such act shall be excused for the period of the delay and the

period of the performance of any such act shall be extended for a period equivalent to the period of such delay.

SECTION 40. **HOLD OVER**. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for Rent on a monthly basis (or, if applicable, on a pro rated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term.

SECTION 41. **CONSENTS**. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 42. **DECLARATION OF CONTRACTUAL LIABILITY**. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

SECTION 43. **QUIET ENJOYMENT**. Provided an uncured Event of Default does not then exist under this Lease, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

SECTION 44. **ESTOPPEL CERTIFICATE**. Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party, without charge, a written statement: (a) ratifying this Lease; (b) certifying, to the best of such party's knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (c) certifying, to the best of such party's knowledge, that all conditions and agreements under this Lease to be satisfied and performed have been satisfied and performed, except as shall be

stated; (d) reciting the amount of advance Rent, if any, paid by Tenant and the date to which Rent has been paid; and (e) certifying to such other matters as the requesting party may reasonably require.

    **SECTION 45.**   <u>**COSTS.**</u>   Whenever this Lease requires the performance of an act by either party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

    **SECTION 46.**   <u>**OPTIONS TO EXTEND TERM.**</u>

    (a)   Tenant shall have the right and option (hereinafter a "<u>Renewal Option</u>") to extend the original Term from the date upon which it would otherwise expire for four (4) separate renewal periods of five (5) years each (each such period being herein called a "<u>Renewal Period</u>" and collectively, "<u>Renewal Periods</u>") upon the same terms and conditions as are herein set forth, except that the Fixed Rent during such Renewal Periods shall be as set forth in the definition of "<u>Fixed Rent</u>" in Section 1 above.   If Tenant elects to exercise one or more of said Renewal Options, it shall do so by giving notice of such election to Landlord at any time during the Term (including any Renewal Period) on or before the date which is two hundred seventy (270) days before the beginning of the Renewal Period or Renewal Periods for which the Term hereof is to be extended by the exercise of such Renewal Option or Renewal Options.

    (b)   In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, it is agreed that Landlord may not terminate this Lease, and the Term of this Lease shall not expire, until and unless Landlord notifies Tenant in writing and indicates that the Renewal Option to extend or to further extend, as the case may be, has not been exercised (which notification shall not be sent prior to the date which is one hundred eighty (180) days before the beginning of the Renewal Period to which it relates).   Tenant's Renewal Option, in each instance, shall continue for a period of fifteen (15) days after receipt of such notice from Landlord; but if Tenant does not send written notice of the exercise of such

Renewal Option to Landlord within said fifteen (15) day period, Tenant's Renewal Option shall thereafter terminate. If Landlord fails to give Tenant such notice prior to the expiration of the original Term or of any extended Term, as the case may be, and if Tenant shall remain in possession of the Premises after the expiration of the then current Term, then Tenant shall remain in possession as a tenant from month to month, subject to the provisions of this Lease insofar as the same may be made applicable to a tenant from month to month, but without the application of Section 40 above. If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the expiration date of the original Term or of the previously extended Term, whichever is appropriate.

SECTION 47.    **GOVERNING LAW.** This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

SECTION 48.    **ATTORNEYS' FEES.** In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 49.    **PAYMENT UNDER PROTEST.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall make payment but may do so "under protest", which payment shall not be regarded as voluntary payment, and there shall survive the right on

the part of such party to institute suit for recovery of such sum.
If it shall be adjudged that there was no legal obligation on the
part of such party to pay such sum or any part thereof, such party
shall be entitled to recovery from the other party such sum or so
much thereof as it was not legally required to pay under the
provisions of this Lease, together with interest thereon at the
Lease Interest Rate.

SECTION 50.   **WORK PERFORMED UNDER PROTEST.**   If at any time
a dispute shall arise between the parties hereto as to any work to
be performed by either of them under the provisions hereof, the
party against whom the obligation to perform the work is asserted
shall perform such work and pay the cost thereof but may do so
"under protest", performance of such work in no event to be
regarded as a voluntary performance, and there shall survive the
right on the part of such party to institute suit for recovery of
the cost of such work.   If it shall be adjudged that there was no
legal obligation on the part of such party to perform such work or
any part thereof, such party shall be entitled to recover from the
other party the cost of such work or the cost of so much thereof as
such party was not legally required to perform under the provisions
of this Lease, together with interest thereon at the Lease Interest
Rate.

SECTION 51.   **CONDUCT OF BUSINESS OPERATIONS.**   Tenant shall
have the obligation to initially open for business to the public
within thirty (30) days after the Rent Commencement Date (subject
to extensions for delays caused by Force Majeure) but,
notwithstanding any other provisions of this Lease, it shall not
thereafter be obligated to remain open or operate its business or
any other business in the Premises and shall have the right, at any
time after such initial opening, to fail or refuse to conduct the
operations of its business or any other business in the Premises,
and Tenant shall not thereby incur any liability to Landlord by
reason thereof [it being understood and agreed that all of Tenant's
obligations under this Lease shall continue unless this Lease is
terminated pursuant, _inter alia_, to the further provisions of this
Section 51 or any other Sections of this Lease (other than Section

18)].   In the event such failure or refusal to conduct business continues (other than prior to the Delivery Date or during Excused Periods), for a period of time in excess of six (6) months, Landlord shall have the option, to be exercised by notice to Tenant given at any time upon ninety (90) days notice, given at any time after such six (6) month period when Tenant has not reopened the Premises for business, to cancel and terminate this Lease, in which event this Lease shall terminate upon the date which is sixty (60) days after the date on which Tenant receives Landlord's termination notice, as if such date was originally set forth herein as the expiration date of the Term and Landlord and Tenant shall upon such termination be released from any and all liabilities thereafter accruing hereunder.   As used in this Lease, the term "Excused Periods" shall mean such periods of time during which Tenant's failure or refusal to conduct the operations of its business or any other business (w) resulted from alterations or renovations being performed in and to the Premises, provided Tenant is diligently pursuing completion of such alterations or renovations, (x) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (y) was caused by any act or omission of Landlord (with all of the periods referred to in subsections (w), (x) or (y) above hereinafter collectively referred to as "Excused Periods").

SECTION 52.   **ABATEMENT OF RENT CHARGES**.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 21 or 22 above, such abatement shall terminate upon the first to occur of:   (a) the date on which Tenant shall reopen the Premises to the public for business and shall be able to engage in the normal conduct of such business; or (b) the expiration of the period which is forty-five (45) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

**SECTION 53.   WARRANTIES AND REPRESENTATIONS.**   To induce Tenant to execute this Lease, and in consideration thereof, Landlord warrants and represents to Tenant as follows:

(a)   As of the date hereof, Landlord is the fee owner of the entire Shopping Center free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except the Permitted Encumbrances described on Exhibit E;

(b)   Subject only to the obligations of Tenant under the letter agreement with Borders, Inc. set forth in Exhibit L hereto, Tenant's use of the Premises for sale of Permitted Items will not violate any exclusive provision or prohibited use restriction granted to any tenant or tenants in the Shopping Center;

(c)   The Shopping Center shall, on the Delivery Date, have two (2) of the three (3) accesses to Kruse Drive for the purpose of vehicular traffic as shown on Exhibit B hereto and within thirty (30) days thereafter all three (3) accesses shall be operational;

(d)   This Lease does not violate the provisions of any instrument heretofore executed and binding on Landlord and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant in the Shopping Center, except as set forth in Exhibit L hereto;

(e)   That Landlord and each person executing this Lease on behalf of Landlord (or in any representative capacity) have full right and lawful authority to execute this Lease; and

(f)   Landlord acknowledges that Tenant has relied on each of the foregoing warranties and representations in executing this Lease, that each of the same is material and that each of said warranties and representations are true as of the date hereof, will (to the extent within the control of the Landlord) be true as of the Delivery Date, and will (to the extent within the control of the Landlord) remain true throughout the Term.

**SECTION 54.   ARBITRATION.**

(a)   In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Cleveland,

Ohio, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto; provided, however, that in the event of a dispute involving an amount in excess of Fifty Thousand ($50,000.00) Dollars, except with respect to Tenant's right of offset pursuant to Sections 5(a)(ii), 19 and 21(b), either party hereto may elect to litigate (instead of arbitrate) such dispute, which election shall be made, if at all, by notice to the other party within fifteen (15) days after either (i) the occurrence of the dispute, or (ii) notice of the intended arbitration from the other party, whichever first occurs.    The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.    The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.

(b)    Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party unless otherwise specifically provided in this Lease.

**SECTION 55.**    **LIENS.**    Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or  purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises

and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

SECTION 56.    **DEFINITION OF HEREUNDER, HEREIN, ETC.**    Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section or paragraph hereof.

SECTION 57.    **TENANT'S PROPERTY**.

(a)    All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.    Landlord waives any right it may have in Tenant's Property.    Tenant may assign, lien, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.    Upon the request of Tenant, Landlord agrees to provide Tenant, within ten (10) days of such request, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

(b)    To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives and agrees not to assert such lien or security interest.

(c)    Upon the expiration or earlier termination of this Lease, Tenant shall have the right (but not the obligation, except as otherwise specifically provided herein) to remove from the Premises all or any part of Tenant's Property.

SECTION 58.    **TENANT'S RIGHT OF FIRST OFFER.**    Provided an uncured Event of Default does not then exist under this Lease, Landlord will use its best efforts to provide Tenant with continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease.    At such time that Landlord has knowledge that such space ("Offered Space") is or

will become available, Landlord will give Tenant notice (the "Offering Notice") of the commercially reasonable terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer. In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall contain (i) the terms and conditions set forth in the Offering Notice, (ii) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 46), and (iii) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Section 58. Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed prior to the date which is six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space.

**SECTION 59.    LIMITATION OF TENANT'S LIABILITY**. Landlord acknowledges that Tenant is now and shall remain a so-called "shell corporation" and has not now and will not at any time in the future have any assets or retain any earnings, and that the operations of Tenant's business may be conducted by the Parent Corporation in

accordance with the provisions of Section 25(e) above, which may also own all or a part of the fixtures, equipment and inventory in the Premises.    In no event shall Landlord or any other entity acting on behalf or in place of Landlord, including without limitation, any mortgagee of the Premises or any successor or assignee of Landlord, seek to pierce the corporate veil of Tenant in an attempt to hold the Parent Corporation liable for Tenant's obligations under this Lease, and Landlord agrees that it, and any other entity, including without limitation, any mortgagee of the Premises and the successors and assigns of Landlord shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant, the Parent Corporation or any of their respective affiliates, subsidiaries or related companies, or of their respective successors and assigns, except that Parent Corporation shall be liable to Landlord solely during the Guaranty Period defined in and pursuant to its Guaranty of this Lease.

**SECTION 60.    TENANT'S RIGHT OF TERMINATION.** If, at any time during the Term of this Lease (a) less than fifty (50%) percent of the total Floor Area of all buildings in the Shopping Center (excluding the Premises) is open and being operated for retail purposes by so-called "small tenants" (as hereinafter defined), and (b) either one of the Inducement Tenants (or a Replacement Tenant) is not open and operating for retail purposes, then in such event Tenant shall have the right (x) to discontinue the payment of Fixed Rent hereunder and, in lieu thereof, pay only Percentage Rent (pursuant to Exhibit K hereto) and Tenant's Pro Rata Share of Taxes and Common Areas Charges hereunder, provided Tenant shall have given Landlord notice ("Tenant's Notice") of Tenant's intention to exercise any such right and Landlord shall not have remedied the situation giving rise to Tenant's right within six (6) months [or, within nine (9) months if the situation giving rise to Tenant's right results from a fire or other casualty to premises (other than the Premises) on the Shopping Center provided that Landlord, during

such nine (9) month period is proceeding diligently to rebuild and restore the damaged areas] following Tenant's Notice, and (y) to terminate this Lease if Landlord has not remedied the situation within twelve (12) months following Tenant's Notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant except that Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of Tenant's Work, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired portion of the Term. For the purposes of this Lease, the term "small tenant" shall mean any tenant of the Shopping Center other than Mustard Seed, Borders, Inc., Tenant or a Replacement Tenant. For the purposes of this Lease, a "Replacement Tenant" shall mean a tenant replacing an Inducement Tenant provided that it is a nationally or regionally recognized tenant of the type typically found in first class shopping centers in the Cleveland, Ohio area, appealing to the same type of metropolitan customers that is attracted by the Inducement Tenant which it is replacing.

SECTION 61.   **SURVIVAL OF OBLIGATIONS**.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.   All indemnity obligations under this Lease shall survive the expiration or sooner termination of this Lease.

SECTION 62.   **ENVIRONMENTAL MATTERS**.

(a)  Definitions.

(i)  "Environmental Laws" means any and all federal, state, county, municipal or other governmental statutes, laws, ordinances, rules, regulations and legally enforceable policies concerning the protection of the environment, human health or safety.

(ii) "Hazardous Substances" means each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance,

pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law.

(iii)   "Environmental Notice" means a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other written communication, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (A) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property which affects the Premises or Shopping Center; (B) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property which affects the Premises or Shopping Center; or (C) any underground storage tanks on the Premises or the Shopping Center.

(iv) "Releasing" or "Release" means releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements.

(v)   "Compliance Costs" means consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(vi) "Tenant Related Parties" means Tenant's agents, servants, employees, contractors or licensees.

(b)   Compliance with Environmental Laws. Tenant shall comply with all the requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.   Landlord shall comply with all the requirements of Environmental Laws relating to the Shopping Center and the

Premises, except to the extent such requirements arise from Tenant's operations thereon.

(c) <u>Responsibility for Releases of Hazardous Substances</u>. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter <u>"Tenant Releases"</u>), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall only be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. The aforesaid two (2) sentences are subject to the exception set forth in Section 13(c)(iii) above. Except in the event of an emergency and except where required by law, any work performed by Landlord relating to Hazardous Materials shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (A) not adversely affect ingress to or egress from the Shopping Center, (B) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (C) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises.

(d) <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

(e) <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that:

(i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties;

(ii) To the best of Landlord's knowledge, it has received no notice of, any violation, or potential or alleged violation, of any governmental law, rule, statute, ordinance or regulation, including without limitation Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and

(iii)    To the best of Landlord's knowledge and subject to the Phase I Environmental Site Assessment Report dated April 28, 1997, a copy of which Tenant acknowledges receipt:    (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

(f)    Documents.    Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

(g)    Indemnity.    Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Environmental Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 62; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 62; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 62.

(h)    Survival.    The obligations of the parties under this Section 62 shall survive the renewal, expiration, breach or earlier termination of this Lease.

(i)    Conflict.    In the event of any conflict between the provisions of this Section 62 and any other provision of this Lease, the provisions of this Section 62 shall control.

SECTION 63.   **EXECUTION OF THIS LEASE.**   Tenant and Landlord each warrant and represent that the parties signing this Lease on behalf of each has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each of Landlord and Tenant shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed by Tenant and Landlord.

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the day and year first above written.

WITNESS:

DEVELOPERS DIVERSIFIED REALTY CORPORATION, an Ohio corporation (Landlord)

By: _____
Name: _____Richard J. Kaplan_____
Title: ___Executive Vice President___

WITNESS:

BED BATH & BEYOND OF SOLON INC., an Ohio corporation (Tenant)

By: _____
Name: _Steven H. Temares_
Title: Vice President and Assistant
       Secretary

LANDLORD:

STATE OF OHIO

SS:

COUNTY OF CUYAHOGA

BEFORE ME, a Notary Public in and for said County and State, personally appeared Richard E. Kaplan, Executive Vice President of Developers Diversified Realty Corporation, the corporation which executed the foregoing instrument for, and on behalf of said corporation being duly authorized by its Board of Directors that the same is his free act and deed as such officer and is the free act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Moreland Hills, Ohio this 15th day of _July_____, 1998.

_Mark E. Florak_____
Notary Public

MARK E. FLORAK, Attorney At Law
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

EXHIBIT A

Legal Description of Shopping Center

Situated in the City of Solon, County of Cuyahoga and State of
Ohio and known as being part of Original Solon Township Lot No. 4
and Lot No. 5, Tract No. 2 and being part of a parcel of land now
owned by Arthur Road Development Company and further bounded and
described as follows:

Beginning at a 1" iron pin in a monument box at the centerline
intersection of S.O.M. Center Road (86 feet wide) also known as
State Route 91 and Solon Road (60 feet wide) an 1" iron pin found
in a monument box N 00° 04' 45.3" E, 468.89 feet along the
centerline of S.O.M. Center Road therefrom, thence along the
centerline of S.O.M. Center Road N 00° 04' 45.3" E, 277.92 feet
to a point; thence N 89° 56' 58.6" N, 1211.13 feet to a 5/8" Re-
bar w/cap set at the Principal Place of beginning said point of
Beginning being on the Northerly line of land now or formerly
owned by Nancy Farinnacci, Volume 93-19527, Page 1 in Cuyahoga
County Records;

(1)   Thence along said Farinnacci land N 89° 56' 58.6" W, 85.99
feet to a 1-1/4" I. pipe found;

(2)   thence continuing  S 00° 22' 56.6" W, 71.45 feet to a 5/8"
Re-bar found;

(3)   Thence along the former W. & L.E. Railway right of way now
owned by the City of Solon, 370.45 feet along the arc of a curve
which bears left and has a radius of 705.30 feet and a chord of
366.21 feet which bears S 88° 01' 47.1" W;

(4)   Thence continuing along said right of way 204.71 feet along
the arc of a curve which bears left and has a radius of 651.62
feet and a chord of 203.87 feet which bears S 63° 58' 58" W;

(5)   Thence continuing along said right of way 144.68 feet along
the arc of a curve which bears left and has a radius of 863.84
feet and a chord of 144.51 feet which bears S 50° 11' 05" W, to a
5/8" Re-bar found;

(6)   Thence N 01° 12' 56.6" E, 205.51 feet to a 5/8" Re-bar found
at the Northeasterly corner of land conveyed to Robert & Helen
Poletek on Deed 83-104, Page 817;

(7)   Thence along said Poletek land S 89° 54' 25.5" W, 337.44
feet to a 5/8" Re-bar in concrete found at the Northeasterly
corner of land conveyed to P. Laughlin on Deed Volume 12738, Page
75;

(8)   Thence along said Loughlin land N 88° 11' 21.4" W, 129.42
feet to a 5/8" re-bar in concrete found 0.15" W;

(9)   Thence S 08° 49' 31.6" W, 252.53 feet to the Northerly right
of way of Bainbridge Road (80 feet wide);

(10) Thence along said right of way 78.03 feet along the arc of a
curve which bears right and has a radius of 676.78 feet and a
chord of 77.99 feet, which bears N 33° 08' 18" W;

(11) Thence N 29° 50' 04.5" W, 73.32 feet continuing along said
right of way;

(12) Thence continuing along said right of way 154.25 feet along
the arc of a curve which bears left, and has a radius of 756.78
feet and a chord of 153.97 feet which bears N 35° 40' 23" W to a
1" I. Pipe FD., at the Southeasterly corner of land conveyed to
Richard & Bridget Hines on Deed Volume 96-603, Page 42;

(13) Thence along said Hines land N 34° 24′ 15" W, 251.29 feet to a 7/8" I. Pipe found;

(14) Thence N 07° 46′ 19.5" E, 497.95 feet to the Southerly right of way of Route 422;

(15) Thence along said right of way 508.62 feet along the arc of a curve which bears left and has a radius of 2411.82 feet and a chord of 507.68 feet which bears S 81° 52′ 26.0" E, to a 5/8" re-bar found;

(16) Thence S 85° 40′ 40.7" E, 413.45 feet continuing along said right of way to a 5/8" re-bar found;

(17) Thence N 82° 55′ 54.5" E, 207.13 feet continuing along said right of way to a 5/8" re-bar found;

(18) Thence N 87° 05′ 04.8" E, 87.47 feet continuing along said right of way to a 5/8" re-bar w/cap set;

(19) Thence S 00° 03′ 01" W, 579.77 feet to the Principal Place of Beginning.



COLEOI/SYS:\DMS\EMS.DIR\0460024.07
May 14, 1998

EXHIBIT B
Site Plan

### REVISIONS

| | | |
|---|---|---|
| 7.20.21 | DELETED B BOXE ONE EATING | AB |
| 7.14.21 | SCALE REVISED | AB |

### TENANT INDEX

| | | |
|---|---|---|
| A | GOURMET MARKET | 35,150 SF |
| B | BED BATH & BEYOND | 40,000 SF |
| C | TALBOTS OUTLET | 12,000 SF |
| D | NEWMAN OUTFITTERS | 10,000 SF |
| E | PIER ONE IMPORTS | 9,000 SF |
| F | BORDERS BOOKS | 25,000 SF |
| 1 | BATH & BODY WORKS | 3,500 SF |
| 2 | GAP | 7,000 SF |
| 3 | PLAYMATERS | 3,000 SF |
| 4 | JORDON TODD CLOTHIERS | 2,050 SF |
| 5 | CARLTON CARDS | 3,300 SF |
| 6 | SHUHO JAPAN | 5,000 SF |
| 7 | OLD NAVY | 15,000 SF |
| 8 | OMO PALMERI SALON | 1,390 SF |
| 9 | PLYMOUTH CANDLE | 1,390 SF |
| 10 | CORKYS BBQ | 3,500 SF |
| 11 | AVAILABLE | 2,000 SF |

PARCEL A-1
18.728 AC  S. R.  422

PARCEL A-2
6.973 AC

Exclusive Parking

MAJOR
RETAIL A
35,150 SF
"Mustard Seed"

MAJOR
RETAIL B
40,000 SF

MAJOR
RETAIL C
13,000 SF
"Talbots"

98

Outdoor
Promotion
Areas

Critical
Area

Monument
Sign

MAJOR
RETAIL D
10,000 SF

MAJOR
RETAIL E
9,000 SF

156

BORDERS
25,000
SF

PARC
7.145

612

KRUSE  DRIVE



### Developers Diversified Realty Corporation

34555 Chagrin Boulevard
Moreland Hills, Ohio 44022
Phone  440 . 347 . 4700
Fax  440 . 347 . 1118

Uptown Solon
Conceptual Site Plan
Kruse Drive
Solon, Ohio

| | |
|---|---|
| Drawn By: | jms |
| File Name: | Uptp |

LP

## EXHIBIT C

## Rent Commencement and Expiration Date Agreement

THIS AGREEMENT, made as of this _____ day of _____, 199__, by and between DEVELOPERS DIVERSIFIED REALTY CORPORATION (hereinafter called "Landlord") and BED BATH & BEYOND OF SOLON INC. (hereinafter called "Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as _____ (the "Shopping Center"), situated in Solon, Ohio;

WHEREAS, by that certain lease dated _____, 199__ (herein called the "Lease"), Landlord leased a portion (the "Premises") of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 1(j) of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.   The Rent Commencement Date was _____, 199__.

2.   The Term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.   The date of commencement of the first Renewal Period shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.   The date of commencement of the second Renewal Period shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.   The date of commencement of the third Renewal Period shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20__, unless the Lease terminates earlier as provided in the Lease.

6.   The date of commencement of the fourth Renewal Period shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20__, unless the Lease terminates earlier as provided in the Lease.

7.   Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed the date and year first above written.

DEVELOPERS DIVERSIFIED REALTY
CORPORATION


By:_____
Name:_____
Title:_____


BED BATH & BEYOND OF
SOLON INC.


By:_____
Name:  Warren Eisenberg
Title: President

## EXHIBIT D

## Specifications for Landlord's Work

EXHIBIT D-1

Front Elevation of Premises [including building signage] and of Shopping Center



Reflected Clg./Canopy Plan
1/16" = 1'-0"

**AWNING COLOR SCHEDULE**

Ⓐ  AWNING COLOR 'JOCKEY RED' AS MANUFACTURED BY 'SUNBRELLA AWNING CO.'

Ⓑ  AWNING COLOR 'AQUAMARINE' AS MANUFACTURED BY 'SUNBRELLA AWNING CO.'

Ⓒ  AWNING COLOR A WIDE STRIPE PATTERN OF COLORS 'JOCKEY RED' AND 'AQUAMARINE' AS MANUFACTURED BY 'SUNBRELLA AWNING CO.'

BED BATH & BEYOND

Front Elevation

STOREFRONT ENTRANCE SYSTEM PART OF INTERIOR PACKAGE. PROVIDE 37'-0"w X 14'-8"h MASONRY OPNG. ONLY

THIS DETAIL SUBJECT TO CHANGE

T.O. MASONRY EL. 24'-4"
CORNICE EL. 24'-0"
4" REVEAL EL. 18'-8"
4" REVEAL EL. 18'-4"
4" REVEAL EL. 10'-0"
PRECAST BASE EL. 8'-8"
FINISH FLOOR EL. 0'-0"



## Floor Plan
1/16" = 1'-0"

Tenant's sign is to be included on the rear wall of the Premises
pursuant to the provisions of Section 10(a) of the Lease to which
this Exhibit D-1, page 2 of 2 is attached

REAR ELEVATION BED BATH & BEYOND
SCALE: 1/16" = 1'-0"

Apr. 24. 1998    1:51PM    WDA CLEVELAND    No. 7212    P. 4/4



CONTINUOUS CONCEALED
HINGE ALONG TOP EDGE

1" CHAMFERED EDGE

PROVIDE 'V' GROOVE REVEAL
● ±4'-0" O.C. SPACED EQUALLY
AS APPROVED BY ARCHITECT

INDIVIDUAL INTERNALLY ILLUMINATED
RED PLEXIGLASS FACED LETTERS
COLOR: PLEXIGLAS RED 2415
MOUNTED DIRECTLY TO PLACARD
FONTS BY TENANTS AS APPROVED
BY THE CITY

PREFABRICATED ALUMINUM
CABINET WITH TEXTURED
PAINT - FINISH AND
COLOR TO MATCH SW 2073
'SANDBAR' AS APPROVED BY
ARCHITECT

CONCEALED ALUMINUM CLIPS
TO SECURE BOTTOM OF
CABINET TO BRICK - QUANTITY
AS REQUIRED

48" HIGH LETTERS MAX.

4'-0"
6'-0"

EQUAL

R1'-0"

1"

1'-6" MINIMUM

3"

PLACARD WIDTH BASED ON SIGNAGE DIMENSION

## SIGNAGE DETAIL @ MAJOR TENANTS

SCALE: 3/4" = 1'-0"
FOR REFERENCE ONLY

NOTE:    1. CONCEAL TRANSFORMERS WITHIN CANOPY CONSTRUCTION

2. ALL ATTACHMENTS TO BUILDING FACE SHALL BE MADE AT A
MORTAR JOINT, NOT THROUGH THE BRICK

3. ALL PREFABRICATED ALUMINUM CABINET PLACARDS TO BE
MANUFACTURED BY CICOGNA SIGN CO. AT TENANT'S EXPENSE

## EXHIBIT E

## Permitted Encumbrances

1.  Lot Split Plat for Arthur Road Development Company in Volume 284 of Maps, Page 2 and a 20 foot Sanitary Sewer Easement affecting the Westerly part of the Shopping Center.

2.  Plat of Harper-Miles Road Dedication Plat recorded in Volume 130 of Maps, Page 99.

3.  Sanitary Sewer Easement by and between Cloyd S. Steininger and Dorothy Steininger (husband and wife) and the City of Solon filed for record October 23, 1962, recorded in Volume 10638, page 435.

4.  Deed from Ernest W. Farr and Zetta W. Farr, husband wife to William Aiken, filed for record October 16, 1914 in Volume 1567, page 616.

5.  Electric Transmission Line Right of Way of Wm. Aiken, to R.S. Graves filed for record August 18, 1919 in Volume 2219, page 46.

6.  Sanitary Sewer Easement by and between Cloyd S. Steininger and Dorothy Steininger (husband and wife) and the City of Solon filed for record March 18, 1964, recorded in Volume 11118, page 259.

EXHIBIT F

Building Signage

(SEE EXHIBIT D-1 AND PROVISIONS OF SECTION 10 OF LEASE)

EXHIBIT F-1

## Monument Signs



## EXHIBIT G

## Subordination, Non-Disturbance and Attornment Agreement

THIS AGREEMENT, made as of the _____ day of _____ _____, 19____, between _____ _____, a [_____] [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ _____ (hereinafter called "Mortgagee") and Bed Bath & Beyond of Solon Inc. a [_____] corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (hereinafter called "Tenant").

## WITNESSETH

WHEREAS, Mortgagee is the holder of a mortgage (hereinafter called the "Mortgage") covering a parcel of land owned by Developers Diversified Realty Corporation, an Ohio corporation (hereinafter called "Landlord") together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter called the "Shopping Center" and being more particularly described on Exhibit A annexed hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (hereinafter called the "Lease"), Landlord leased to Tenant a portion of the Shopping Center, to wit, the premises designated the "Premises" on Exhibit B annexed hereto and made a part hereof, together with the building or portion thereof located thereon (said premises and the improvements thereon being hereinafter called the "Premises"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

WHEREAS, as an inducement to Tenant to enter into the Lease, Subsection 5(b) thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and

WHEREAS, Section 24 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof, subject, however, to the provisions of this Agreement.

3.   Tenant certifies that the Lease is presently in full force and effect and unmodified and Tenant as of this date has no knowledge of any charge, lien or claim of offset under the Lease.

4.   Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)   Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)   The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby;

(c)   All insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease; and

5.   If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)   Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)   Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not (i) be liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord; (ii) be subject to any offsets or defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which either (x) pertains to the prior landlord's failure to perform repairs or

replacements as required under the Lease, or (y) continues from
and after the date upon which the new owner succeeds to the
interest of such prior landlord (it being further agreed that
offsets under the Lease that were deducted by Tenant prior to the
date upon which the new owner succeeds to the interest of such
prior landlord shall not be subject to challenge); (iii) be bound
by any fixed rent which Tenant might have paid for more than one
month in advance of its due date under the Lease to any prior
landlord (including Landlord); or (iv) be bound by any amendment
or modification of the Lease made without its consent;
notwithstanding the foregoing, Mortgagee acknowledges that the
Lease specifically provides for amendments thereof upon the
occurrence of certain events described in the Lease (such as, for
example, an amendment to the Lease confirming the measurement of
the Premises), and, by its execution below, Mortgagee agrees to
recognize such amendments as part of the Lease, and Mortgagee
further agrees that such new owner shall also be bound by such
amendment(s) to the Lease, without any consent on the part of
Mortgagee or such new owner.

(c)   Tenant's obligations hereunder shall be effective
only so long as Mortgagee is bound to Mortgagee's obligations
hereunder.

6.   Tenant will notify Mortgagee of any default by Landlord
under the Lease which would entitle Tenant to terminate the Lease
or abate the rent payable thereunder and agrees that
notwithstanding any provision of the Lease, no notice of
termination thereof nor any abatement shall be effective unless
Mortgagee has received the aforesaid notice and has failed to
cure the subject default within the same time period allowed
Landlord under the Lease. It is understood that the abatement
provisions of this paragraph relate to abatements by reason of
Landlord's default and do not apply to provisions of the Lease
whereby Tenant has the automatic right to abate rentals such as,
for example, abatement upon casualty or condemnation.

7.   Neither the Mortgage nor any other security instrument
executed in connection therewith shall encumber or be construed
as subjecting in any manner to the lien thereof, any trade
fixtures, signs or other personal property at any time furnished
or installed by or for Tenant or its subtenants or licensees on
the aforementioned property regardless of the manner or mode of
attachment thereof.

8.   Any notices of communications given under this
Agreement shall be in writing and shall be given by registered or
certified mail, return receipt requested, postage prepaid, (a) if
to Mortgagee, at the address of Mortgagee as hereinabove set
forth or at such other address or persons as Mortgagee may
designate by notice in the manner herein set forth, or (b) if to
Tenant, at the address of Tenant as hereinabove set forth, with
duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond
Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Edward M.
Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A.,
Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New
Jersey 07602-0800, or such other address or persons as Tenant may
designate by notice in the manner herein set forth. All notices
given in accordance with the provisions of this Section shall be
effective upon receipt (or refusal of receipt) at the address of
the addressee.

9.   This Agreement shall bind and inure to the benefit of
and be binding upon and enforceable by the parties hereto and
their respective successors and assigns.

10.   This Agreement contains the entire agreement between
the parties and cannot be changed, modified, waived or canceled
except by an agreement in writing executed by the party against
whom enforcement of such modification, change, waiver or
cancellation is sought.

11.   This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

Attest:                                    [MORTGAGEE]


By:_____      By:_____
         Secretary                         Vice President

[Corporate Seal]


Attest:                                    BED BATH & BEYOND OF
                                           SOLON INC.


By:_____      By:_____
         Secretary

[Corporate Seal]                              (Tenant)

EXHIBIT G-1

Fee Owner Recognition Agreement

THIS AGREEMENT, made as of the _____ day _____,
1998, by and between _____, a
[_____] [corporation] [limited] [general] [partnership],
having an address at _____
_____ ("Landlord"); Bed Bath &
Beyond [of _____] Inc., a [_____] corporation,
having an address at 650 Liberty Avenue, Union, New Jersey 07083
("Tenant"); and _____, a [_____]
[corporation] [limited] [general] [partnership], having an
address at _____
("Subtenant").

R E C I T A L S

A.   Landlord and Tenant have entered into a certain lease
(the "Lease") dated as of _____, 199__, a short form of
which has been recorded in _____, which
demises certain premises (the "Premises") located in the _____
_____ Shopping Center, [City], [State], which
Shopping Center is more particularly described on Exhibit A
annexed hereto and made a part hereof.

B.   Pursuant to an instrument dated as of _____
(the "Sublease") Tenant has subleased [a portion of] the Premises
to Subtenant, which [portion] is designated as "Subleased
Premises" on Exhibit B annexed hereto and made a part hereof (the
"Subleased Premises").

NOW, THEREFORE, it is agreed as follows:

1.   Landlord warrants and represents as follows:

(i)   that it is the fee owner of the Premises,
(ii)  that the Lease is unmodified (except as may
be otherwise set forth in Exhibit B annexed hereto, if any) and
is in full force and effect,
(iii) that the term of the Lease expires on
_____, but is subject to ~~(three)~~ four renewal periods of
[five] years each and
(iv)  that Tenant is not in default under the Lease
nor has any event occurred which would after notice to Tenant and
the passage of time become a default of Tenant under the Lease.

2.   Landlord hereby acknowledges receipt of a copy of, and
consents to and approves, the Sublease and all of the terms,
covenants and provisions thereof, and agrees that the exercise by
Subtenant of any of its rights, remedies and options contained
therein shall not constitute a default under the Lease.

3.   Landlord agrees that whenever it has an obligation with
respect to the Premises, or its consent or approval is required
for any action of Tenant under the Lease, then, to the extent
such obligation, consent or approval relates to the Subleased
Premises or Subtenant's use and occupation thereof, it will
perform such obligation in accordance with the terms and
conditions of the Lease, and, subject to the applicable terms of
the Lease, will not unreasonably withhold or unduly delay such
consent or approval.

4.   Landlord shall not, in the exercise of any of the
rights arising or which may arise out of the Lease or of any
instrument modifying or amending the same or entered into in
substitution or replacement thereof (whether as a result of
Tenant's default or otherwise), disturb or deprive Subtenant in
or of its possession or its rights to possession of the Subleased
Premises or of any right or privilege granted to or inuring to
the benefit of Subtenant under the Sublease, provided that

Subtenant is not in default under the Sublease beyond the
expiration of any applicable notice and cure period.

5.    In the event of the termination of the Lease by
reentry, notice, conditional limitation, surrender, summary
proceeding or other action or proceeding, or otherwise, or, if
the Lease shall terminate or expire for any reason before any of
the dates provided in the Sublease for the termination of the
initial or renewal terms of the Sublease and if immediately prior
to such surrender, termination or expiration the Sublease shall
be in full force and effect, Subtenant shall not be made a party
in any removal or eviction action or proceeding nor shall
Subtenant be evicted or removed of its possession or its right of
possession of the Subleased Premises be disturbed or in any way
interfered with, and the Sublease shall continue in full force
and effect as a direct lease between Landlord and Subtenant
(provided that in such event Subtenant shall, for the then
remainder of the term of the Sublease, pay fixed rent and
additional rent  in an amount equal to the greater of (x) the
fixed rent and additional rent then payable under the Lease, or
(y) the fixed rent and additional rent then payable under the
Sublease except that Subtenant's payment of percentage rent shall
in any event continue to be governed by the applicable provisions
of the Sublease).

6.    Landlord hereby waives and relinquishes any and all
rights or remedies against Subtenant, pursuant to any lien,
statutory or otherwise, that it may have against the property,
goods or chattels of Subtenant in or on the Subleased premises.

7.    Any notices, consents, approvals, submissions, demands
or other communications (hereinafter collectively referred to as
"Notice") given under this Agreement shall be in writing.  Unless
otherwise required by law or governmental regulation, Notices
shall be deemed given if sent by registered or certified mail,
return receipt requested, postage prepaid (a) to Landlord, at the
address of Landlord as hereinabove set forth or such other
address or persons as Landlord may designate by Notice to the
other parties hereto, (b) to Tenant, at the address of Tenant as
hereinabove set forth, with duplicate copies to  Allan N. Rauch,
Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New
Jersey 07083, and  Edward M. Schotz, Esq., c/o Cole, Schotz,
Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main
Street, P.O. Box 800, Hackensack, New Jersey 07602-0800, or such
other address or persons as Tenant may designate by Notice to the
other parties hereto, and (c) to Subtenant, at the address of
Subtenant as hereinabove set forth or such other address or
persons as Subtenant may designate by Notice to the other parties
hereto.  During the period of any postal strike or other
interference with the mails, personal delivery shall be
substitute for registered or certified mail.  All Notices shall
become effective only on the receipt or rejection of same by the
proper parties.

8.    No modification, amendment, waiver or release of any
provision of this Agreement or of any right, obligation, claim or
cause of action arising hereunder shall be valid or binding for
any purpose whatsoever unless in writing and duly executed by the
party against whom the same is sought to be asserted.

9.    This Agreement shall be binding on and shall inure to
the benefit of the parties hereto and their respective heirs,
legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed under seal the date first above written.

LANDLORD

By: _____

TENANT

BED BATH & BEYOND [OF _____ ]

By: _____

SUBTENANT

By: _____

EXHIBIT H

Recognition Agreement

        THIS AGREEMENT, made as of the _____ day _____,
1998, by and between DEVELOPERS DIVERSIFIED REALTY CORPORATION,
an Ohio corporation, having an address at 34555 Chagrin
Boulevard, P.O. Box 8022, Chagrin Falls, Ohio 44022 ("Landlord");
Bed Bath & Beyond of Solon Inc., an Ohio corporation, having an
address at 650 Liberty Avenue, Union, New Jersey 07083
("Tenant"); and _____, a [_____]
[corporation] [limited] [general] [partnership], having an
address at _____
("Subtenant").

R E C I T A L S

        A.  Landlord and Tenant have entered into a certain lease
(the "Lease") dated as of _____, 199__, a short form of
which has been recorded in _____, which
demises certain premises (the "Premises") located in the _____
_____ Shopping Center, [City], [State], which
Shopping Center is more particularly described on Exhibit A
annexed hereto and made a part hereof.

        B.  Pursuant to an instrument dated as of _____
(the "Sublease") Tenant has subleased [a portion of] the Premises
to Subtenant, which [portion] is designated as "Subleased
Premises" on Exhibit B annexed hereto and made a part hereof (the
"Subleased Premises").

        NOW, THEREFORE, it is agreed as follows:

        1.  Landlord warrants and represents to the best of its
knowledge as follows:

                (i)  that it is the fee owner of the Shopping
Center (including the Premises),
                (ii) that the Lease is unmodified (except as may
be otherwise set forth in Exhibit B annexed hereto, if any) and
is in full force and effect,
                (iii) that the term of the Lease expires on
_____, but is subject to [three] renewal periods of
[five] years each and ‑four‑
                (iv) that Tenant is not in default under the Lease
nor has any event occurred which would after notice to Tenant and
the passage of time become a default of Tenant under the Lease.

        2.  Landlord hereby acknowledges receipt of a copy of, and
consents to and approves, the Sublease and all of the terms,
covenants and provisions thereof, and agrees that the exercise by
Subtenant of any of its rights, remedies and options contained
therein shall not constitute a default under the Lease.

        3.  Landlord agrees that whenever it has an obligation with
respect to the Premises, or its consent or approval is required
for any action of Tenant under the Lease, then, to the extent
such obligation, consent or approval relates to the Subleased
Premises or Subtenant's use and occupation thereof, it will
perform such obligation in accordance with the terms and
conditions of the Lease, and, subject to the applicable terms of
the Lease, will not unreasonably withhold or unduly delay such
consent or approval.

        4.  Landlord shall not, in the exercise of any of the
rights arising or which may arise out of the Lease or of any
instrument modifying or amending the same or entered into in
substitution or replacement thereof (whether as a result of
Tenant's default or otherwise), disturb or deprive Subtenant in
or of its possession or its rights to possession of the Subleased

Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided that in such event Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the fixed rent and additional rent then payable under the Lease, or (y) the fixed rent and additional rent then payable under the Sublease except that Subtenant's payment of percentage rent shall in any event continue to be governed by the applicable provisions of the Sublease).

6.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased premises.

7.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602-0800, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

9.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed under seal the date first above written.

LANDLORD:

DEVELOPERS DIVERSIFIED
REALTY CORPORATION


By:_____


TENANT:

BED BATH & BEYOND OF SOLON INC.


By:_____


SUBTENANT:


_____


By:_____

Exhibit I

DELIVERY DATE NOTICE

[Letterhead of Landlord]

_____, 199__

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
Bed Bath & Beyond of Solon Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

                              Re:  Agreement of Lease, dated
                                   _____, 199__ (the
                                   "Lease"), between Developers
                                   Diversified Realty
                                   Corporation, as landlord
                                   ("Landlord"), and Bed Bath &
                                   Beyond of Solon Inc., as
                                   tenant ("Tenant"), with
                                   respect to certain retail
                                   premises (the "Premises")
                                   located in the Uptown Solon
                                   Shopping Center, Solon, Ohio

Gentlemen:

     In accordance with the provisions of Section 5(b) of the
Lease, Landlord hereby informs Tenant that the Delivery Date
shall take place on _____, 199__.  This notice shall
constitute the Delivery Date Notice referred to in Section 5(b)
of the Lease.

                         DEVELOPERS DIVERSIFIED REALTY
                         CORPORATION


                         By:_____
                                        , (Vice) President


cc:  Edward M. Schotz, Esq.
     Allan N. Rauch, Esq.

Exhibit J

DELIVERY DATE CERTIFICATION

[Letterhead of Landlord]

_____, 199___

[via Federal Express or other
recognized overnight delivery
service per section 26 of the foregoing
lease]

Bed Bath & Beyond of Solon Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

> Re:  Agreement of Lease, dated
> _____, 199___ (the
> "Lease"), between Developers
> Diversified Realty
> Corporation, as landlord
> ("Landlord"), and Bed Bath &
> Beyond of Solon Inc., as
> tenant ("Tenant"), with
> respect to certain retail
> premises (the "Premises")
> located in the Uptown Solon
> Shopping Center, Solon, Ohio

Gentlemen:

In accordance with the provisions of Section 5(b) of the
Lease, Landlord hereby certifies to Tenant that, as of the date
of this certification, all of the conditions described in
subsections (i) - [(x)] of Section 5(b) [and in Sections ___, ___
and ___] of the Lease have been satisfied, and that, as a result,
the Delivery Date (as such term is defined in the Lease) will be
deemed to be _____, 199___ [INSERT THE DATE WHICH IS TWO
DAYS AFTER THE DATE OF THIS LETTER].  This notice shall
constitute the Delivery Date Certification referred to in Section
5(b) of the Lease.

                    DEVELOPERS DIVERSIFIED REALTY
                    CORPORATION

                    By:_____
                                                   '
(Vice) President

cc:  Edward M. Schotz, Esq.
     Allan N. Rauch, Esq.

## EXHIBIT K

### Percentage Rent

1.     During the applicable period provided in Section 1(j) of the Lease, Tenant shall pay percentage rent ("<u>Percentage Rent</u>") equal to three (3%) percent of all Gross Sales (as hereinafter defined) resulting from business conducted in, on or from the Premises.  "<u>Gross Sales</u>" means the total amount of the actual sales price of all sales of merchandise or services arising out of or payable on account of all the business conducted in, on or from the Premises by or on account of Tenant and any subtenant, licensee or concessionaire of Tenant and any other person or entity operating in the Premises, whether for cash, credit or otherwise, including all orders for merchandise taken from or filled at or from the Premises and all deposits not refunded to customers.  A <u>sale</u> shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (A) the transaction is initially reflected in the books or records of Tenant, or any subtenant, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (B) Tenant or any other person or entity operating its business in the Premises receives all or any portion of the sales price, or (C) the applicable goods or services are delivered to the customer, whichever of (A), (B) or (C)  first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time.  Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term "<u>Gross Sales</u>" shall exclude (A) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (B) bona fide transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any affiliates of Tenant, and returns to shippers and manufacturers for credit, (C) refunds or credits given to customers for merchandise purchased at the Premises and returned or exchanged, (D) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (E) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (F) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (G) sales to employees of Tenant at discount, (H) fees paid to independent third party credit card companies in connection with sales charged to customers' credit cards, (I) proceeds from delivery, wrapping and check cashing charges, (J) sums and credits received in settlement of claims for loss or damage to merchandise, (K) separately stated service, finance and interest charges, (L) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise from the Premises, and (M) close out or bulk sales of inventory to jobbers or wholesalers.

2.     Tenant shall keep upon the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (A) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office

for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.   Such books and records shall be kept in accordance with generally accepted accounting principles and practices and shall be retained by Tenant for not less than one (1) year following the end of the calendar year to which they have reference. Within thirty (30) days after the close of each month during which the Percentage Rent is payable hereunder, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent required to be paid by Tenant for such month.   The full amount of any Percentage Rent shall be paid to Landlord simultaneously with the furnishing of said compilation. Landlord and/or Landlord's auditor shall have the right, upon at least ten (10) days prior notice to Tenant to inspect and/or audit the records of Tenant and any and all other persons and entities operating in the Premises relating to Gross Sales.

    3.    Landlord agrees that it shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law or to its accountants, attorneys, bona-fide prospective purchasers, or current or prospective mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

## EXHIBIT L

### Letter Agreement with Borders, Inc

Exhibit L

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083

Borders, Inc.
311 Maynard Street
Ann Arbor, Michigan 48104

March 13, 1998

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083

Re:    Bed Bath & Beyond – Borders Books & Music

Ladies and Gentlemen:

Borders, Inc. or its corporate parent, affiliate or subsidiary (hereinafter, "Borders") and Bed Bath & Beyond of Solon Inc. or its corporate parent, affiliate or subsidiary (hereinafter, "Bed Bath & Beyond"), are or may become co-tenants in the shopping center known as Uptown Solon located in Solon, Ohio (the "Shopping Center"). Notwithstanding any other provision of their respective leases, Borders and Bed Bath & Beyond agree as follows:

(1)    (a)    With respect to the "Borders Exclusive" (a copy of such "Borders Exclusive" is set forth in the attached Exhibit A), as between Borders and Bed Bath & Beyond, Borders will permit an exception to the Borders Exclusive for the benefit of Bed Bath & Beyond and its corporate successor for up to 1,500 square feet (including an allocable portion of the aisle space adjacent to such space) for the items listed in "(i)" "(ii)" and "(iii)" of the Borders Exclusive, so long as such items are sold from time to time in a typical Bed Bath & Beyond store. With respect to assignees or subtenants of the Bed Bath & Beyond premises (other than its corporate successor, so long as the use of its premises as primarily a home furnishings store does not change), the Borders Exclusive will apply, with the exception that the 100 square feet surface display area exception described in the Borders Exclusive shall be increased to 250 square feet of surface display area for assignees and for subtenants occupying at least 10,000 square feet of floor area in the Bed Bath & Beyond premises. The parties also agree that for the purposes of this agreement only, the following shall apply: (i) the reference in the Borders Exclusive to "videotapes" shall instead read "prerecorded videotapes"; and (ii) with respect to that portion of the Borders Exclusive pertaining to "prerecorded videotapes" and "music products" (as set forth in the attached Exhibit A), same shall no longer apply if the Borders ceases using (x) at least 1,000 square feet of the selling space within the Borders premises (including an allocable portion of the aisle space adjacent to such selling space) (the "Borders Selling Space") for the

sale of prerecorded videotapes, or (y) at least 1,000 square feet of the Borders Selling Space for the sale of prerecorded music products.

(b)    Bed Bath & Beyond further agrees that not more than an aggregate of 500 square feet of the Bed Bath & Beyond premises (including an allocable portion of the aisle space adjacent thereto) may at any time be used as a cafe or coffee bar (whether the same is operated by Bed Bath & Beyond, an outside company, a licensee or a sublessee).

(2)    With respect to the "Bed Bath & Beyond Exclusive" ( a copy of such "Bed Bath & Beyond Exclusive" is set forth in the attached Exhibit B), as between Borders and Bed Bath & Beyond, Bed Bath & Beyond will permit an exception to the Bed Bath & Beyond Exclusive for the benefit of Borders and its corporate successor which would permit the sale of the items which would otherwise be subject to the Bed Bath & Beyond Exclusive utilizing up to an aggregate of the lesser of (i) two thousand square feet of floor area, or (ii) five percent (5%) of the floor area of the Borders premises (including, in either case, an allocable portion of the aisle space adjacent to such selling space), so long as, in either case, such items are sold from time to time in a typical Borders store. With respect to assignees or subtenants of the Borders premises (other than its corporate successor, so long as the use of its premises as primarily a book store does not change), the Bed Bath & Beyond Exclusive will apply; provided, however, that Bed Bath & Beyond will permit an exception to the Bed Bath & Beyond Exclusive for the benefit of such assignee or subtenant which would permit the sale of the items which would otherwise be subject to the Bed Bath & Beyond Exclusive utilizing (a) not more than 100 square feet of surface display area for subtenants occupying less than 10,000 square feet of floor area in the Borders premises, and (b) not more than 250 square feet of surface display area for assignees and for subtenants occupying at least 10,000 square feet of floor area in the Borders premises.

(3)    The foregoing provisions of this agreement with respect to both parties, and their continued effectiveness as between the parties, are subject to the condition that such exclusive rights, following notice from the restricted party, shall terminate and be of no further force or effect with respect to the restricted party's premises if the benefiting party (or, as applicable, an assignee or subtenant of such benefiting party) uses less than 40% of the selling portion of such party's premises (in the aggregate and including an allocable portion of the selling space adjacent to such portion of such party's premises) for the sale of the protected or exclusive items for a period of nine (9) consecutive months (subject to "Excused Periods"). The term "Excused Periods" shall mean periods during which (a) material alterations or renovations are being performed in and to the premises for a period not in excess of 365 days, (b) the premises are being restored with reasonable efforts following damage, destruction, or taking in eminent domain, or (c) an event of force majeure prevents the operation of business within the premises. It is understood and agreed that, in the event of a sublease of a portion

of the applicable premises, the 40% test described above will be applied with reference to that portion of the total premises then retained by the benefiting party.

(4)    For purposes of this agreement, the term "surface display area" shall mean the surface of a shelf or other surface devoted to display. For example, a shelf which is eight (8) inches deep and twenty (20) feet long would contain approximately thirteen and thirty-three one hundredths (13.33) square feet of surface display area. Notwithstanding the foregoing, all shelves nine (9) feet or higher from the floor shall not be included in the calculation of aggregate surface display area and shall be excluded from the limitations set forth herein.

By their countersignatures below, Borders and Bed Bath & Beyond each confirm that the foregoing agreement is accepted by both parties.

BORDERS, INC.

By: _____
Name: Richard L. Flanagan
Title: President
Date: March 30, 1998

BED BATH & BEYOND INC.

By: _____
Name: Warren Eisenberg
Title: Co-Chief Executive Officer
Date: March ___, 1998

03/31/98  TUE 11:18 FAX                    BINC DEVELOPMENT                      005
   03/10/98   TUE 10:23 FAX

**Exhibit A**
**Borders Exclusive**

**Solon, OH**

(b)    <u>Tenant's Exclusive Use</u>. Landlord will not, during the term of this Lease, permit any other tenant in the Shopping Center (including, without limitation, any subtenant, licensee, concessionaire or occupant of any portion of the Shopping Center) to engage in the sale of (i) books, (ii) videotapes and/or (iii) music products (i.e., pre-recorded music media such as CD's, tapes, and records (but not musical instruments)), in any current format, and in any future format of such items unless the subject matter of such items is directly related and ancillary to the primary use of such other tenant's premises (e.g., a computer store which sells books dealing with computer products) and not more than 100 square feet of surface display area is devoted to the retail display of such related items. This provision shall not prohibit or restrict the rental of videotapes or the sale or rental of video games. In addition, a store primarily renting video tapes shall be permitted to sell video tapes on up to one thousand (1,000) square feet of floor area.

## Exhibit B

**Bed Bath & Beyond Exclusive:** Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center ... to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of items: (a) linens and domestics; (b) bathroom items; (c) housewares; (d) frames and wall art; (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the "Exclusive Items"). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center shall have the right to utilize up to an aggregate of five (5%) percent of the Floor Area of their respective premises (including an allocable portion of the aisle space adjacent to such selling space) for the sale, rental or distribution of the Exclusive Items; provided, and on the condition that, the aggregate Floor Area utilized by all such tenants and subtenants in the Shopping Center, at any one time, shall not exceed five thousand (5,000) square feet.

## EXHIBIT M

## Rules and Regulations

No tenant shall:

(1)   do, or permit to be done, anything in or about its premises, nor bring or keep anything therein, which will in any way unreasonably increase the existing rate of, or otherwise affect any fire or other insurance policy upon the Shopping Center or its premises, or cause a cancellation of any insurance policy covering its premises or any part thereof or any of its contents;

(2)   do anything which may unreasonably obstruct or interfere with the rights of other tenants, owners, or occupants of the Shopping Center (and tenants shall take all reasonable action to prevent odors, emissions, fumes, liquids, other substances or excessive noise from escaping or extending beyond their premises);

(3)   use or allow its premises to be used for any unlawful purpose;

(4)   produce or cause to be produced, excessive waste in or upon its premises, and shall refrain from using or permitting the use of its premises or any portion thereof as living quarters, sleeping quarters, or lodging.

## EXHIBIT N

## Existing Leases

1. Borders

2. Pier I

# Developers
# Diversified
Realty Corporation

September 16, 1998

**Via: Federal Express**

Mr. Seth Geldzahler
Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, New Jersey 07083

RE: Lease dated July 15, 1998 ("Lease") between Developers Diversified Realty Corporation, an Ohio corporation ("Landlord") and Bed Bath & Beyond of Solon, Inc. ("Tenant"), wherein Landlord leased to Tenant certain premises of Uptown Solon Shopping Center in Solon, Ohio ("Premises"). Upon execution and return, this correspondence shall constitute a First Amendment to Lease regarding Tenant's continued occpancy of the Premises under the following terms and conditions:

     1. Section 1 entitled <u>DEFINITIONS AND BASIC TERMS,</u> is hereby amended by deleting the date of "October 16" and substituting the date of "October 23" as the same is referenced in the definition of <u>Rent Commencement Date</u>.

     2. Tenant acknowledges that the September 15, 1998 Delivery Date set forth in Landlord's Notice of Delivery dated August 1, 1998 is hereby amended to provide that the new Delivery Date shall be on or before September 22, 1998. Upon execution of this First Amendment to Lease, Tenant acknowledges that (a) the Landlord shall not be liable for any penalties set forth in the Lease regarding the modification of the Delivery Date and (b) the Landlord has complied with the requirements of Section 5(b)(i) of the Lease regarding the forty-five (45) day advance written notice requirement of the Delivery Date, provided as to both (a) and (b), that Landlord timely delivers possession as set forth herein.

     3. Tenant hereby agrees that the reference in Section 7(c) of the Lease to "two hundred and fifty (250) square feet of Floor Area" is hereby amended to read "one (1), four (4) foot section during the first five (5) lease year's of the Mustard Seed Lease and thereafter, four (4), four (4) foot sections during the remainder of the Mustard Seed Lease."

If you are in agreement with the foregoing terms and conditions, please sign and date this letter in the spaces provided below and return this letter to me within thirty (30) days from the date hereof. I have enclosed a second copy of this letter for your records. If the agreement is not executed and returned by Tenant within the seven (30) day period, this proposal shall be deemed null and void.

If you have any questions, please contact me at (440) 893-1821.  Thank you.

Very truly yours,

Mark E. Florak
Legal Counsel

The foregoing terms and hereby approved and accepted this ___ day of September _____, 1998.

Bed Bath & Beyond of Solon, Inc.

By: _____ АМГ
      Warren Eisenberg    (Print Name)

Its: _President_____


Bed Bath & Beyond, Inc. (Guarantor)

By: _____ АМГ
      Warren Eisenberg    (Print Name)

Its: _Co-Chief Executive Officer_____


cc: Randy Ruttenberg
     Greg Barrow

**Developers
Diversified
Realty Corporation**

October 13, 1998

Mr. Seth Geldzahler
Director of Real Estate
Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, New Jersey 07083

RE: Lease Agreement dated July 15, 1998, as amended pursuant to a letter agreement dated
September 16, 1998 (the "Lease"), between Developers Diversified Realty Corporation
("Landlord") and Bed Bath & Beyond of Solon, Inc. ("Tenant") for certain premises located in
the Uptown Solon Shopping Center, Solon, Ohio ("Premises").

Dear Seth:

This letter agreement shall acknowledge the Landlord and Tenant's desire to modify the Lease in
accordance with the terms and conditions stated herein. Therefore, in consideration of the
mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, Landlord and Tenant agrees as follows:

1.      As of the date of this letter agreement (the "Effective Date"), the second sentence of
Section 7(c) of the Lease is hereby amended to read in its entirety as follows:

"Tenant acknowledges that Landlord is negotiating with Mustard Seed to lease and operate the
premises so designated on Exhibit B hereby as a grocery store and/or natural or health food store,
and if such lease is executed and delivered within twenty-four (24) months after the Rent
Commencement Date, Tenant agrees that it will not, during the term of the Mustard Seed lease:

        (A)      use the Premises or any portion thereof (i) as a grocery store, supermarket or
bakery, or (ii) for the sale of fresh or frozen: meats, poultry, produce, fish, fruits or vegetables
(provided that the foregoing shall not prevent Tenant from selling dried fruit products); or

        (B)      use more than the lesser of (x) five percent (5%) of the Floor Area of the Premises
or (y) one thousand (1,000) square feet of Floor Area, in the aggregate, for the sale of any other
food products or dietary supplements (hereinafter defined), it being further agreed that in no
event shall Tenant use more than one (1) four (4) linear foot section within the Premises for the
sale of dietary supplements. For purposes of this Lease, the term "dietary supplements" shall
have the same meaning as currently defined in 21 USCA-321(ff) (Supp. 1998), a copy of which
is attached hereto as Exhibit O.


"*The Heritage* "
34555 Chagrin Boulevard, P.O. Box 8022, Chagrin Falls, Ohio 44022-8022
Direct Tel: (440) 247-4700  Fax: (440) 247-1118
www.ddrc.com

All of the restrictions set forth in the foregoing subsections (A) and (B) shall be of no further force and effect whatsoever if the Mustard Seed tenant does not use its premises as a grocery store and/or supermarket or as a natural or health food store for a period of time exceeding Three Hundred and Sixty-five (365) days (other than during Excused Periods)."

2.      As of the Effective Date, there shall be added to the Lease a new "Exhibit O" in the form attached to this letter agreement.

3.      Except as specifically amended hereby, the Lease is ratified and confirmed in its entirety and remains in full force and effect.

If you are in agreement with the foregoing terms and conditions, please sign and date this letter in the spaces provided below and return this letter to me. I have enclosed a second copy of this letter for your records.

If you have any questions, please contact me at (440) 893-1821. Thank you.

Very truly yours,

Mark E. Florak
Legal Counsel

The foregoing terms are hereby approved and accepted this 1 9th day of October, 1998.

TENANT:

Bed Bath & Beyond of Solon, Inc.

By: _____ AMF
Name: ____ Warren Eisenberg ____
Title: ____ President ____

GUARANTOR

Bed Bath & Beyond, Inc.

By: _____ AMF
Name: ____ Warren Eisenberg ____
Title: ____ Co-Chief Executive Officer ____

EXHIBIT O

SEC. 3. DEFINITIONS.

(a) DEFINITION OF CERTAIN FOODS AS DIETARY SUPPLEMENTS.—
Section 201 (21 U.S.C. 321) is amended by adding at the end
the following:

"(ff) The term 'dietary supplement'—

"(1) means a product (other than tobacco) intended to
supplement the diet that bears or contains one or more of
the following dietary ingredients:

"(A) a vitamin;

"(B) a mineral;

"(C) an herb or other botanical;

"(D) an amino acid;

"(E) a dietary substance for use by man to supplement
the diet by increasing the total dietary intake; or

"(F) a concentrate, metabolite, constituent, extract, or
combination of any ingredient described in clause (A), (B),
(C), (D), or (E);

"(2) means a product that—

"(A)(i) is intended for ingestion in a form described
in section 411(c)(1)(B)(i); or

"(ii) complies with section 411(c)(1)(B)(ii);

"(B) is not represented for use as a conventional food
or as a sole item of a meal or the diet; and

"(C) is labeled as a dietary supplement; and

"(3) does—

"(A) include an article that is approved as a new drug
under section 505, certified as an antibiotic under section
507, or licensed as a biologic under section 351 of the
Public Health Service Act (42 U.S.C. 262) and was, prior
to such approval, certification, or license, marketed as a
dietary supplement or as a food unless the Secretary has
issued a regulation, after notice and comment, finding that
the article, when used as or in a dietary supplement under
the conditions of use and dosages set forth in the labeling
for such dietary supplement, is unlawful under section
402(f); and

"(B) not include—

"(i) an article that is approved as a new drug
under section 505, certified as an antibiotic under sec-
tion 507, or licensed as a biologic under section 351
of the Public Health Service Act (42 U.S.C. 262), or

"(ii) an article authorized for investigation as a
new drug, antibiotic, or biological for which substantial
clinical investigations have been instituted and for
which the existence of such investigations has been
made public,

which was not before such approval, certification, licensing,
or authorization marketed as a dietary supplement or as a
food unless the Secretary, in the Secretary's discretion, has
issued a regulation, after notice and comment, finding that
the article would be lawful under this Act.

Except for purposes of section 201(g), a dietary supplement shall
be deemed to be a food within the meaning of this Act.".

(b) EXCLUSION FROM DEFINITION OF FOOD ADDITIVE.—Section
201(s) (21 U.S.C. 321(s)) is amended—

(1) by striking "or" at the end of subparagraph (4);

108 STAT. 4327

DEVELOPERS
DIVERSIFIED
REALTY·

VIA CERTIFIED MAIL        91 7108 2133 3932 6468 0365

January 18, 2009

Bed Bath and Beyond of Solon Inc.
650 Liberty Avenue
Union, NJ  07083
ATTN:  Warren Eisenberg

RE:     Lease dated July 15, 1998 ("Lease"), between GS II Uptown Solon LLC ("Landlord"),
        and Bed Bath and Beyond of Solon Inc. ("Tenant"); Unit No. 123; Uptown Solon in
        Solon, OH ("Premises").

Dear Mr. Eisenberg:

This correspondence will acknowledge Landlord's receipt of Tenant's notice dated July 29, 2008,,
exercising Tenant's option to renew the term of the Lease.

The new term will commence February 1, 2009, and expire January 31, 2014 ("Renewal Term").
During the Renewal Term, Minimum Rent will be paid at the rate of $550,000.00 per annum,
payable in advance in equal monthly installments of $45,833.33.

All other terms and conditions of the Lease will remain in full force and effect.  Tenant shall have
three (3) remaining options to renew the lease for an additional five (5) year periods upon the
terms and conditions provided in the Lease.

Please contact Jill Ross at the number below within ten (10) days following receipt of this letter if
you are not in agreement with the terms set forth above.

Very truly yours,

Christen Ferenz
Paralegal – Northern Region

cc: Jill Ross
    Steven Dorsky

**BED BATH & BEYOND OF SOLON INC.**
**650 LIBERTY AVENUE**
**UNION, NEW JERSEY 07083**





July 29, 2008

<u>**VIA FEDERAL EXPRESS**</u>

GS II Uptown Solon LLC
c/o Developers Diversified Realty Corp.
3300 Enterprise Parkway
P.O. Box 228042
Beachwood, Ohio 44122

    Re:    Lease dated July 15, 1998 (as amended, the "Lease") between
             GS II Uptown Solon LLC, as successor-in-interest to Developers
             Diversified Realty Corp., and Bed Bath & Beyond of Solon Inc.
             ("Tenant") for premises located in Upton Solon Shopping Center,
             Solon, OH [#204]

Dear Sir/Madam:

       Capitalized terms used, but not otherwise defined herein, shall have the meaning(s) ascribed to them in the Lease.

       In accordance with Section 46 of the Lease, Tenant hereby exercises its first Renewal Option. Accordingly, the first Renewal Period shall commence on February 1, 2009 and shall expire on January 31, 2014.

       Please be reminded that Section 59 of the Lease provides in part that "Tenant is now and shall remain a so-called "shell corporation" and has not now and will not at any time in the future have any assets or retain any earnings....In no event shall Landlord or any other entity acting on behalf or in place of Landlord....seek to pierce the corporate veil of Tenant..."

       Except as herein expressly modified, the Lease shall continue in full force and effect.

                             Very truly yours,

                    By:
                             Seth Geldzahler
                             Vice President – Real Estate

Cc:    Alan Freeman, Esq.
       Jeff Cohen
       Steve Austin

## ASSIGNMENT AND AMENDMENT TO LEASE AGREEMENT

THIS ASSIGNMENT AND AMENDMENT TO LEASE AGREEMENT (this "Amendment") is made and entered into as of the _2nd_ day of _July_, 2013, by and among GS II UPTOWN SOLON LLC, a Delaware limited liability company ("Landlord"), as successor in interest to Developers Diversified Realty Corporation, BED BATH & BEYOND OF SOLON INC., an Ohio corporation ("Tenant"), and BED BATH & BEYOND INC., a New York corporation ("Assignee").

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated as of July 15, 1998, as amended by that certain Rent Commencement and Expiration Date Agreement dated as of December 30, 1998 (collectively, the "Lease"), Tenant leased certain premises, containing approximately 40,000 square feet of Floor Area (the "Premises") in the Uptown Solon Shopping Center, located in Solon, Ohio (the "Shopping Center"); and

WHEREAS, the Lease is subject to the terms of the certain letter agreement by and between DDR Corp. and Tenant dated as of January 1, 2010, acknowledging the global agreement pertaining to insurance charges; and

WHEREAS, Tenant desires to assign and Assignee desires to assume the Lease subject to the terms and conditions herein mentioned; and

WHEREAS, the parties desire to modify and amend the Lease, as hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants and agreements, contained herein, and for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby mutually agree as follows:

1.     Capitalized terms used, but not defined herein, shall have the meanings ascribed to them in the Lease.  The recitals hereinabove set forth are incorporated herein by this reference.

2.     Tenant hereby sells and assigns the Lease to Assignee, effective for and during the remainder of the term mentioned in such Lease, as amended hereby, subject to the covenants and conditions therein mentioned, together with all right, title and interest of Tenant in the Premises.

3.     Assignee hereby agrees to assume the Lease, as amended hereby, including, without limitation, as may have heretofore arisen or accrued under the Lease, for the balance of the term thereof, and to pay the rent and additional rent, and to faithfully perform all of the covenants, stipulations and agreements contained therein and to stand fully liable to Landlord upon said Lease including, without limitation, liability for any and all obligations of Tenant under the Lease regardless of the date(s) any such obligation(s) may have arisen. Tenant agrees that Landlord and Assignee may change, modify or amend the Lease in any way, and that further assignments may be made without notice to or consent of Tenant.

4.     Landlord hereby consents to the assignment of the Lease by Tenant to Assignee, but upon the express condition that neither such consent nor the collection of rent from Assignee shall be deemed a waiver or relinquishment for the future of any covenants restricting assignment or subletting under the Lease (including, without limitation, under Section 25 of the Lease).  Nothing herein contained shall be construed as a waiver of any rights or remedies which Landlord may have under the Lease against Assignee.  All rights and remedies of Landlord enumerated herein or in the Lease shall be cumulative, and none shall exclude any other remedies allowed at law or in equity.

5.    Upon the full execution and delivery of this Amendment, Tenant shall be released from any and all liability accruing under the Lease, it being agreed that the Assignee hereby assumes all of liabilities of Tenant which may have have arisen under the Lease prior to the full execution and delivery of this Amendment.

6.    Notwithstanding anything herein contained to the contrary, Landlord and Assignee hereby agree to the following amendments to the Lease. As used in this Paragraph 6, "Tenant" shall be deemed to refer to Assignee.

a.    The term of the Lease shall be extended for a period of ten (10) years commencing February 1, 2014, and terminating at midnight January 31, 2024 (the "Extension Term").

b.    Commencing as of the first day of the Extension Term, Tenant agrees to pay to Landlord as Fixed Rent for the Premises, without any deduction or setoff, the sums set forth on Schedule A attached hereto and made a part hereof.

c.    Provided Tenant is not then in default beyond any applicable notice and grace periods, Tenant shall have the right and option (hereinafter a "Renewal Option") to extend the Extension Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a "Renewal Period", and collectively, the "Renewal Periods") upon the same terms and conditions as are herein set forth (provided that the Fixed Rent payable for each Renewal Period shall be as set forth on Schedule A attached hereto and made a part hereof). Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s).

d.    On or before June 30, 2015, Tenant, at Tenant's sole cost, shall complete such work as is necessary to fully remodel the Premises to be consistent with Tenant's latest prototype store ("Tenant's Work"); provided that Tenant shall not undertake any structural alterations or additions. All Tenant's Work performed by Tenant shall be in accordance with the terms and conditions of the Lease, and shall be based upon plans and specifications submitted by Tenant and approved in writing by Landlord prior to the commencement of Tenant's Work. Tenant shall perform Tenant's Work in accordance with applicable laws and building codes and ordinances and in a good and workmanlike manner, using only licensed contractors, and shall fully and completely indemnify Landlord, its managing agent, and Landlord's lender against any mechanic's lien or other liens or claims in connection therewith.

e.    Landlord shall pay One Million Three Hundred Thousand and 00/100 Dollars ($1,300,000.00) toward the actual costs incurred by Tenant to complete Tenant's Work (including hard and soft costs and expenses but not the cost of furniture, fixtures, equipment or inventory) (the "Tenant's Allowance"). Tenant hereby represents and warrants that Tenant will incur at least One Million Three Hundred Thousand and 00/100 Dollars ($1,300,000.00) in actual costs to complete Tenant's Work for hard and soft costs and expenses, but excluding the cost of furniture, fixtures, equipment or inventory. Landlord shall pay the Tenant's Allowance to Tenant within thirty (30) days after Landlord's receipt, or the occurrence, as the case may be, of all of the following:

(a) Tenant shall have substantially completed Tenant's Work in accordance with plans and specifications approved by Landlord and the terms of the Lease;

(b) A certificate from an officer of Tenant indicating that Tenant's Work has been substantially completed that Tenant has spent at least $1,300,000.00 on such work; and

2

(c) At Tenant's discretion, either (y) lien waivers from the applicable contractor, or (z) an agreement regarding mechanics' and materialman's liens in the form attached hereto as <u>Exhibit A.</u>

If Landlord fails to provide Tenant with the Tenant's Allowance within thirty (30) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above, then in addition to the rights and remedies under Section 19 of the Lease, Tenant shall have the right, following Tenant's delivery of a second notice to Landlord requesting such payment and Landlord's failure to make such payment within ten (10) days following Landlord's receipt or rejection of such second notice, to a credit against the Fixed Rent payable by Tenant hereunder, together with interest thereon at the Lease Interest Rate. Upon Landlord's request, Tenant shall deliver to Landlord evidence of actual costs incurred (e.g., invoices, paid bills, or requisitions) by Tenant for Tenant's Work; provided, however, such delivery shall not be a condition to payment of the Tenant's Allowance hereunder.

      f.      Section 1 of the Lease is hereby amended by inserting the following at the end of the definition of "<u>Permitted Use</u>":

"Subject to applicable legal requirements and those exclusive and prohibited uses on the Shopping Center existing as of the Effective Date of that certain Assignment and Amendment of Lease Agreement by and between Landlord and Tenant (the "<u>Amendment Effective Date</u>"), Landlord agrees that Tenant may sell alcoholic beverages for off-premises consumption on an incidental basis as part of Tenant's Permitted Use. Landlord further agrees that the operation of a Cost Plus, World Market as such stores are typically operated as of the Amendment Effective Date shall not be a violation of the incidental use limitation of the sale of alcoholic beverages for off-premises consumption. Tenant agrees to provide Landlord with a copy of the liquor license issued by the State of Ohio prior to the sale of any alcoholic beverages from the Premises, and to keep said license in full force and effect and to comply with all rules and regulations issued by the State of Ohio and any local authority regarding the sale of liquor from the Premises."

      g.      Section 1 of the Lease is hereby further amended by deleting the definition of "<u>Tenant's Pro Rata Share</u>" in its entirety and the following shall be inserted in lieu thereof:

"<u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event (other than as described in the balance of this paragraph) shall Tenant's Pro Rata Share be greater than twenty-four percent (24%) ("<u>Tenant's Maximum</u>"). Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center. Notwithstanding the foregoing, to the extent that any tenant or collection of tenants (other than Tenant) or an owner of any portion of the Shopping Center, pays the real estate taxes, costs of maintaining the Common Areas and/or the insurance premiums relative to such owner('s)(s') or tenant('s)(s') portion(s) (each, a "<u>Stand-Alone Tenant</u>"), then: (a) the amounts

3

thereof shall not be included in the Taxes, Common Area Charges and/or Insurance Charge, as the case may be, for which Tenant is responsible; and (b) the denominator used to determine Tenant's Pro Rata Share of Taxes, Common Area Charges and/or Insurance Charge, as the case may be, shall be reduced by the Floor Area of the Stand-Alone Tenant and Tenant's Pro Rata Share shall be adjusted accordingly; and (c) Tenant's Pro Rata Share as so adjusted shall be deemed Tenant's Maximum; the foregoing, however, shall be subject to the following terms and conditions:  (A) with respect to Taxes and/or Common Area Charges, such tenant(s) (or, as applicable owner(s)) shall in any event remain responsible for a proportionate share of Taxes and/or Common Area Charges allocable to the Common Areas based on the proportion which the Floor Area of its building bears to the total Floor Area of the Shopping Center (which proportionate share of Taxes and/or Common Area Charges shall be excluded from Taxes and/or Common Area Charges in the manner described in the preceding clause (a) of this definition), and (B) with respect to the Insurance Charge, such tenant(s) (or, as applicable owner(s)) shall in any event remain responsible for the proportionate share of the Insurance Charge based on the proportion which the Floor Area of its building bears to the total Floor Area of the Shopping Center (which proportionate share of the Insurance Charge shall be excluded from the Insurance Charge in the manner described in the preceding clause (a) of this definition).  Notwithstanding the foregoing, any allocation of the Insurance Charge shall at all times remain equitable."

     h.     [Intentionally omitted]

     i.     Subsection 7(b)(i) of the Lease is hereby amended by deleting the following parenthetical reference in the definition of "Related Land": "(which shall include land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway)", and inserting the following in lieu thereof: " which contiguous or adjacent land is incorporated into and made a part of the Shopping Center".

     i.     Subsection 7(b)(i) of the Lease is hereby further amended by adding the following at the end thereof:  "For purposes of determining whether land is "Related Land" under this Lease, land shall not be deemed "controlled" by Landlord or any affiliated entity unless Landlord or such affiliated entity has the unilateral authority to enter into leases and to make the decision as to whether to lease to a particular occupant without the necessity of obtaining the consent or approval of any other person or entity (which shall not be deemed to include the consent or approval of any holder of a mortgage or deed of trust)."

     k.     The following subsection shall hereby be added to Section 7(b) of the Lease as new subsection (iii) thereof:

     "(iii)     Notwithstanding anything to the contrary set forth in this Section 7(b), the following provisions shall supplement the Prohibited Uses listed in Section 7(b)(i): (A) the restriction on "second-hand" or "surplus" stores shall not prevent the operation of a Play it Again Sports, Once Upon A Child, Plato's Closet or similar tenant typically found in a first class shopping center; (B) the restriction on veterinary offices shall not prevent the operation of a veterinary office as may be incidental to a permitted full-line pet and pet supply store; provided, however, such store shall be located at least one hundred feet (100') away from the Premises and shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises; (C) the

restriction on an establishment serving alcoholic beverages shall not prevent the sale, subject to applicable legal requirements, of alcoholic beverages for on- or off-premises consumption: (i) as an incidental part of a restaurant otherwise permitted herein (notwithstanding that such restaurant may include a separate "bar" area), (ii) a wine bar in a national or regional chain bookstore not having its own separate entrance or signage, (iii) as part of a grocery store, pharmacy or upscale package goods store (such as BevMo!®, or Total Wine & More®) otherwise permitted herein, and (iv) a wine bar for on-site consumption provided that such use is located at least one hundred twenty-five feet (125') away from the Premises; (D) no restriction shall prohibit the operation of a Massage Envy (or similar store) as such store is currently operated; (E) the restriction on exercise facilities shall not prevent the operation of (i) a "Curves"/"Snap Fitness"/"Contours" type concept operator provided that such use is located at least one hundred feet (100') away from the Premises, or (ii) a health club or gym operating in the premises operated by Mustard Seed, provided such use does not exceed 37,100 square feet of Floor Area and the main entrance thereof is located in. the westernmost half of that space; and (F) the five hundred (500) square foot limitation on children's entertainment or activity facilities as an incidental use shall not apply to a health club or gym operating in the premises operated by Mustard Seed.  Additionally, Tenant acknowledges that prior to and as of the Amendment Effective Date Petco is a tenant of the Shopping Center prior to and as of the Amendment Commencement Date and hereby consents to Petco's operation in within the Shopping Center as a typical Petco full-line pet supply store offering veterinary services as an incidental use."

I.      The following subsections shall hereby be added to Section 11 of the Lease as new subsections (i) and (j) thereof:

"(i)      Tenant shall have the right to erect and maintain on the roof of the Premises, a passive solar array for the production of electricity (the "System"), provided that Tenant: (i) obtains Landlord's prior approval of its plans and specifications for the System and the location thereof on the roof, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while the System is present, (iv) repairs any damage to the roof (including any necessary replacement of the roof) caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any component of the System, (v) erects and maintains the System in accordance with applicable Legal Requirements; (vi) the installed System is not visible to customers in the Shopping Center; and (vii) uses the System solely for supplementing Tenant's own energy needs in the Premises and not for the resale of energy to third parties.  The System shall be deemed to be part of Tenant's Property   Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator of the System and Landlord shall have no right, title or interest in such equipment or any component thereof, notwithstanding that any such equipment may be physically mounted or adhered to the Premises. Landlord acknowledges and agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the environmental attributes of the System, and (iii) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements

5

of any kind, howsoever entitled, resulting from the environmental or related attributes of the System.  Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System.

(j)    Landlord and Tenant agree that in the event that Tenant shall perform or cause to be performed any alterations or improvements (including without limitation Tenant's Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the benefit of such Energy Rebate. As used herein, an "Energy Rebate" shall be deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax credits, governmental grants, utility rebates or refunds) given by a governmental, non-governmental, private or public utility, or other entity as a result of efforts to conserve energy or other utilities or cause property or processes to be more environmentally friendly. If any such Energy Rebate is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate received by or credited directly to Landlord against the next succeeding installment(s) of Rent then payable under the Lease."

m.    Commencing on January 1, 2014 and continuing thereafter through the end of the Term, in lieu of paying Tenant's Pro Rata Share of Common Areas Charges pursuant to Subsections 13(c) and 13(d) of the Lease, Tenant shall pay "Tenant's Fixed CAM Contribution" (hereinafter defined).  Tenant's Fixed CAM Contribution for the period commencing on January 1, 2014, through December 31, 2014, shall be an amount equal to One and 20/100 Dollar ($1.20) multiplied by the square footage of Floor Area in the Premises ("Tenant's Fixed CAM Contribution").  In the following calendar year, commencing January 1, 2015, Tenant's Fixed CAM Contribution shall be the product of Tenant's Fixed CAM Contribution payable for the prior calendar year, multiplied by 1.03. Tenant's Fixed CAM Contribution for the next calendar year, commencing January 1, 2016, and each calendar year thereafter during the Term (including extensions, if any) shall be Tenant's Fixed CAM Contribution payable for the immediately preceding calendar year multiplied by 1.03.  Tenant's Fixed CAM Contribution shall be paid in equal monthly installments in advance on the first (1st) day of each and every calendar month without demand therefor and without any setoff or deduction except as expressly provided in this Lease.

Tenant's Fixed CAM Contribution for the first and last years hereunder shall, if necessary, be prorated based on a three hundred sixty-five (365) day year and apportioned between Landlord and Tenant to coincide with the expiration or earlier termination of this Lease.

Other than Tenant's Fixed CAM Contribution and other than those specific items of Rent specifically set forth elsewhere in this Lease, Tenant shall have no obligation to reimburse or pay any amounts to Landlord for any costs or expenses

relating to, or incurred for, the operation, management, equipping, lighting, insuring, repairing, cleaning, maintenance or replacement of the Common Areas or the Premises or for any other expenses relating to the Shopping Center including, by way of example, impact fees and regulating fees and the like.

n.       Subsection 15(d) of the Lease is hereby amended by deleting the reference to "One Hundred Thousand ($100,000) Dollars" and inserting "Two Hundred Fifty Thousand Dollars ($250,000)" in lieu thereof.

o.       Subsection 16(b) of the Lease is hereby amended by deleting the end of the subsection commencing with "Tenant agrees to reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums..." and continuing through the end of the subsection.

p.       Subsection 16(c) of the Lease is hereby amended by deleting the reference to "One Hundred Thousand ($100,000) Dollars" and inserting "Two Hundred Fifty Thousand Dollars ($250,000)" in lieu thereof.

q.       The following subsections shall hereby be added to Section 16 of the Lease as new subsections (f) thereof:

"(f)       Tenant's Pro Rata Share of Insurance Premiums.  (a) Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 16 (the "Insurance Charge"); provided, however, those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums shall not be included in the Insurance Charge.  Landlord estimates (but does not guarantee) that, Tenant's Insurance Charge for the partial calendar year of the Extension Term commencing February 1, 2014, and expiring December 31, 2014, shall be approximately Zero and 26/100 Dollars ($.26) per square foot of Floor Area in the Premises (on a per annum basis). With respect to each calendar year of the Term thereafter, in no event shall Tenant's Insurance Charge exceed one hundred five percent (105%) of the Tenant's Insurance Charge paid by Tenant for the immediately preceding calendar year.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from the Insurance Charge.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in the Insurance Charge Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection (f) shall survive the expiration or earlier termination of this Lease.  The provision of this Subsection also shall be subject to that certain Agreement between DDR Corp. and Bed Bath and Beyond Inc. dated as of January 1, 2010 re: Global Agreement Pertaining to Insurance Charges and all renewals, amendments, modifications, replacements and extensions thereof (collectively, the "Global Agreement").   Notwithstanding anything to the contrary herein contained, the Global Agreement shall not bind any subsequent owner of the Shopping Center (other than an Affiliate of Landlord).

(b)  Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Insurance Charge and Tenant's Pro Rata Share thereof for such year (the "Insurance Reconciliation Statement").  The Insurance Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) documentation supporting the applicable Insurance Charge, (y) a calculation of Tenant's Pro Rata Share of Insurance Charge, and (z) payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Insurance Charge for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit."

r.    Subsection 16(d) of the Lease is hereby amended by deleting the word "All" at the beginning of the first sentence thereof and inserting "At least ninety percent (90%) of the" in lieu thereof.

s.    Subsection 23(a) of the Lease is hereby amended by deleting the end of the subsection commencing with "Notwithstanding the foregoing inclusion of any Related Land…" and continuing through the end of the subsection and the following shall be inserted in lieu thereof":

"The restrictions set forth in this Subsection (a) shall not apply to: (i) full-line national or regional department stores [for example, Wal-Mart, Macy's, Kohl's or Target] each occupying at least Sixty Thousand (60,000) square feet of Floor Area within the Shopping Center or Related Land, as such stores are currently operated (as of the Effective Date), (ii) discount clubs [for example, Costco, BJ's Wholesale Club, or Sam's Club], or home improvement centers [for example, Home Depot or Lowe's] commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least Sixty Thousand (60,000) square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date); (iii) premises containing less than three thousand five hundred (3,500) square feet of Floor Area; (iv) Cost Plus World Market; (v) Pier One; (vi) art and craft superstores (for example, Jo-Ann Fabrics, Michaels, AC Moore and Hobby Lobby); (vii) one (1) tenant that may utilize not more than three thousand (3,000) square feet of Floor Area for the sale of custom frames; (viii) supermarkets or grocery stores as such terms are commonly used in the industry [such as, without limitation, Kroger, Tops, Publix, Von's, Whole Foods, Trader Joe's and Fresh Market]; and (ix) a drug store, such as by way of example CVS, Walgreens or Rite Aid."

t.    Section 58 of the Lease is hereby deleted in its entirety.

u.    Section 60 of the Lease is hereby amended by deleting a portion of the first (1st) sentence thereof commencing with "except that Landlord, promptly after receiving a statement from Tenant" and continuing through the end of the sentence.

v.    Section 60 of the Lease is hereby further amended by deleting the last sentence thereof and inserting the following in lieu thereof:

"For purposes of this Lease, "Replacement Tenant" shall mean one (1) or more national or regional merchant of the type typically found in first-class regional shopping centers located in the Cleveland, Ohio metropolitan area that operates at least fifteen (15) other stores under the same tradename as that utilized in the Shopping Center in the Midwestern part of the United States operating in at least eighty percent (80%) of the Inducement Tenant's Floor Area.   Notwithstanding anything to the contrary contained herein, in the event Tenant shall fail to exercise its right to terminate as set forth in (y) above within thirty (30) days following the expiration of the twelve (12) month period following Tenant's Notice, Tenant shall be deemed to have waived its right to terminate this Lease unless a subsequent breach of the terms of this Section 60 shall occur, and Tenant shall resume the payment of Fixed Rent required to be paid under the terms of this Lease"

w.    Throughout the Lease, where references are made to Tenant's obligation to pay Tenant's Pro Rata Share of Taxes and/or Common Area Charges, such references shall be deemed to also include Tenant's Pro Rata Share of Insurance Charge.

x.    The notice address of Landlord set forth in the Lease is hereby amended. All notices to Landlord shall be sent to the following address:

> 3300 Enterprise Parkway
> Beachwood, Ohio 44122
> Attention: Executive Vice President-Leasing;

with copies to DDR Corp. at the following address:

> 3300 Enterprise Parkway
> Beachwood, Ohio 44122
> Attention: General Counsel

7.    Landlord, Tenant, and Assignee each warrant and represent to the others that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Amendment in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Amendment.

8.    In the event that any provision or section of this Amendment is rendered invalid by the decision of any court or by the enactment of any law, ordinance or regulation, such provision or section shall be deemed to have never been included herein, and the balance of this Amendment shall continue in full force and effect in accordance with its terms.

9.    Landlord represents and warrants to Tenant and Assignee that, as of the date hereof, the Shopping Center is not encumbered by a mortgage or deed of trust.

10.    Except as expressly amended herein, all terms, covenants, and conditions of the Lease shall remain unmodified and in full force and effect.

11.    The Lease, as modified by this Amendment, and all the covenants, provisions and conditions herein and therein contained shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns, respectively, of the parties hereto, provided, however, that no assignment by, from, through or under Tenant or Assignee in violation of the provisions hereof shall vest in the assigns any right, title or interest whatsoever.

12.    This Amendment may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart.

[signature page follows]



IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Amendment to Lease Agreement the day and year first above written.

**LANDLORD:**

GS II UPTOWN SOLON LLC
 a Delaware limited liability company

By:     DDR 2008 Portfolio LLC
        Its Sole Member

        By: _____
        Name: Bryan P. Zabell
        Title:   Senior Vice President of Anchor Store Leasing

**TENANT:**

BED BATH & BEYOND OF SOLON, INC.
 an Ohio corporation

By:     _____
Name:   Warren Eisenberg
Title:   President

**ASSIGNEE:**

BED BATH & BEYOND INC.
 a New York corporation

By:     _____
Name:   Warren Eisenberg
Title:   Co-Chairman

11

## SCHEDULE A

### Fixed Rent Schedule

| Years | $ PSF | $ Monthly | $ Annum |
|---|---|---|---|
| 1 – 10 | $8.35 | $27,833.33 | $334,000.00 |
| (First Renewal Period)<br>11 – 15 | $9.35 | $31,166.67 | $374,000.00 |
| (Second Renewal Period)<br>16 – 20 | $10.35 | $34,500.00 | $414,000.00 |
| (Third Renewal Period)<br>21 – 25 | $11.35 | $37,833.33 | $454,000.00 |

## EXHIBIT A

### Mechanics' Lien Indemnification Agreement

THIS MECHANICS' LIEN INDEMNIFICATION is made this _____ day of _____, 201_, by BED BATH & BEYOND INC., a New York corporation (hereinafter referred to as *"Tenant"*), for the benefit of GS II UPTOWN SOLON LLC, a Delaware limited liability company (*"Landlord"*).

### WITNESSETH

Landlord and Tenant are parties to that certain Lease Agreement dated July 15, 1998 (the *"Lease"*), with respect to certain retail premises (*"Premises"*) located at Uptown Solon, Solon, Ohio (the "*Shopping Center*").

Tenant has made certain leasehold improvements to the Premises and Landlord is obligated to pay Tenant the Tenant Allowance pursuant to the Assignment and Amendment to Lease.

NOW, THEREFORE, in consideration of the payment of the Tenant Allowance (or portion thereof, as may be applicable) as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, Tenant agrees as follows:

1.      Tenant hereby indemnifies and agrees to defend and hold Landlord harmless from any loss, payment, claim, action, damage, liability or expense, including reasonable attorneys' fees, as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's or Tenant's interest in the Premises and/or the Shopping Center based upon materials or services provided to Tenant. In the event that any mechanic, materialman or other claimant makes claim against Landlord's or Tenant's interest in the Premises and/or the Shopping Center based upon materials or services provided to Tenant, Tenant shall defend, hold harmless and protect Landlord from any loss, payment, claim, action, damage, liability or expense, including reasonable attorneys' fees, related thereto.

2.      If such a lien is filed, then Tenant shall, within thirty (30) days (fifteen (15) days if the Shopping Center is then in the process of being financed or under contract for sale) after Landlord has delivered notice of the filing thereof to Tenant (or such earlier time period as may be necessary to prevent the forfeiture of the Premises, Shopping Center or any interest of Landlord or Tenant therein or the imposition of a civil or criminal fine with respect thereto, either: (1) pay the amount of the lien and cause the lien to be released of record; or (2) diligently contest such lien and deliver to Landlord a bond or other security reasonably satisfactory to Landlord. If Tenant fails to timely take either such action, then Landlord may pay the lien claim, and any amounts so paid, including expenses and interest, shall be paid by Tenant to Landlord within thirty (30) days after Landlord has invoiced Tenant therefor. This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

EXECUTED as of the date written above.

BED BATH & BEYOND INC., a New York corporation


By: _____
     Jim Brendle
     Vice President – Construction & Store Dev.

13



VIA UPS


September 23, 2014


Bed Bath and Beyond, Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attn:    Seth Geldzahler
         Vice President – Real Estate


RE:    That certain lease dated July 15, 1998 (as amended, the "Lease") between GS II Uptown Solon
       LLC, an Ohio limited liability company ("Landlord") and Bed Bath and Beyond, Inc., a New York
       corporation ("Tenant"), successor-in-interest Bed Bath and Beyond of Solon, Inc.; Unit No. 123
       (the "Premises") of Uptown Solon in Solon, Ohio (the "Shopping Center").


Dear Mr. Geldzahler:

This letter agreement is intended to reflect Landlord and Tenant's agreement regarding Tenant's right to
install a shopping cart corral in the Common Areas at the Shopping Center. Capitalized terms used, but
not otherwise defined herein, shall have the meaning(s) ascribed to them in the Lease.

Notwithstanding anything to the contrary in the Lease, but subject to (i) all local codes and ordinances, (ii)
any reciprocal easement agreement(s) affecting the Shopping Center, and (iii) any existing leases as of
the date hereof that may prohibit the use of the Common Areas, Tenant shall have the right, at Tenant's
sole cost and expense, to locate a shopping cart corral (the "Cart Corral") in the area marked on Exhibit
A, attached hereto and made a part hereof, provided that Tenant agrees to indemnify, defend, save, and
hold Landlord harmless from and against any and all claims or demands by third parties for damages to
persons or property as a result of Tenant's installation and/or operation of the Cart Corral. Landlord and
Tenant acknowledge that the area upon which the Cart Corral will be located is considered "Common
Area" which all tenants in the Shopping Center are permitted to utilize. Therefore, in the event that any
other tenant or occupant of the Shopping Center notifies Landlord that the installation and/or operation of
the Cart Corral violates that tenant or occupant's existing lease or reciprocal easement agreement,
respectively, then Tenant shall, within ten (10) days after receipt of written notice from Landlord, terminate
its use of the Cart Corral, remove the Cart Corral, and repair any damage caused as a result of Tenant's
use of the Cart Corral, all at Tenant's sole cost and expense. In the event that Tenant fails to remove the
Cart Corral within the ten (10) day time period, or fails to comply with any other condition or requirement
provided herein, Landlord shall have the right to remove the Cart Corral, and either store or dispose of the
Cart Corral, all at Tenant's cost and expense. In the event Landlord removes the Cart Corral, Tenant shall
reimburse Landlord upon demand for any costs incurred in the removal or storage of the Cart Corral,
including a sum equal to fifteen percent (15%) of such cost to reimburse Landlord its administration
overhead, and said reimbursement shall be deemed additional rent under this Lease. In any event,
Tenant shall keep the Cart Corral in good condition and repair and shall keep the area surrounding the
Cart Corral free and clear of all trash, refuse and debris at all times. Landlord shall have the right to
relocate the Cart Corral within the Shopping Center at any time during the Lease Term and shall have no
liability to Tenant if Tenant is unable to utilize the Cart Corral for any reason.

Except as hereinabove set forth, all other terms and conditions of the Lease shall remain in full force and
effect.



Upon mutual execution of this agreement, the agreement shall be binding on Landlord and Tenant.

Very truly yours,

Bryan P. Zabell
Senior Vice President of Leasing

Agreed to and accepted this _____ day of _____, 2014.

**BED BATH AND BEYOND, INC.**
a New York corporation

By: _____
    SETH GELDZAHLER (Print Name)
    VICE PRESIDENT - REAL ESTATE

Think **Retail.** Create**Value.**

ddr
listed **NYSE**®

3300 Enterprise Parkway • Beachwood • Ohio • 44122
p. 216.755.5500 • f. 216.755.1500 • www.ddr.com

EXHIBIT A



REVISION: 8/4/2014

UPTOWN SOLON
6025 Kruse Dr
SOLON, OH 44139

Latitude: 41.3932, Longitude: -81.4445

ddr

3300 Enterprise Parkway, Beachwood, OH 44122
Fax 216.765.1500 Phone 216.765.6500

KRUSE DR

US RTE 422

RETENTION POND

RETENTION POND

100
MUSTARD SEED
MARKET & CAFE
37,046 SF

110
111
113
114
115
117
119
120

123
BED BATH & BEYOND
40,000 SF

135
OLD NAVY
17,000 SF

141A

141
DRESS BARN
8,000 SF

146
148

152
153
PARTY CITY
12,385 SF

156
PIER 1 IMPORTS
9,987 SF

159
PETCO

160
ULTA BEAUTY
11,345 SF

DISCLAIMER
THIS DRAWING IS FOR GENERAL INFORMATION PURPOSES
ONLY. ANY AND ALL FEATURES, MATTERS CONTAINED HEREIN
INFORMATION DEPICTED HEREIN OR CONTAINED HEREIN
ARE FOR ILLUSTRATIVE MARKETING PURPOSES ONLY, ARE
SUBJECT TO MODIFICATION WITHOUT NOTICE, ARE NOT
INTENDED TO BE RELIED UPON BY ANY PARTY AND ARE NOT
INTENDED TO CONSTITUTE ANY REPRESENTATION OR
WARRANTIES AS TO OWNERSHIP OF THE REAL PROPERTY
DEPICTED HEREIN, THE SIZE AND NATURE OF ANY
IMPROVEMENTS TO BE CONSTRUCTED OR THAT ANY
IMPROVEMENTS WILL BE CONSTRUCTED, OR THE IDENTITY
OR NATURE OF ANY OCCUPANTS THEREOF.