# EXHIBIT A

# **NOTEBOOM** LAW LLC

June 7, 2023

Bed Bath & Beyond Inc. Claims Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

      **RE:**    **Proof of Claim | Bankruptcy Case # 23-13359**
               **400 Strander Blvd, Tukwila, WA (Store #371)**

To Whom it May Concern:

      I represent Garfield-Southcenter, LLC ("Landlord") which owns that certain real property commonly known as 400 Strander Blvd, Tukwila, Washington that is leased to Bed Bath & Beyond Inc. ("Tenant") pursuant to that certain Lease Agreement dated June 5, 2000, as amended ("Lease"). I am writing to provide Landlord's proof of claim for pre-petition amounts owed by Tenant in the above referenced bankruptcy.

### **Proof of Claim – Pre-Petition**

Tenant owes the following amounts under the Lease for matters occurring pre-petition:

| | | |
|---|---|---|
| 2022 CAM reconciliation | $10,294.69 | |
| April 2023 Rent | $39,722.22 | |
| April 2023 CAM | $5,592.25 | |
| April 2023 Utilities | $680.95 | |
| Sub Total | $56,290.11 | |
| Interest Accrual (10%) (1 Day) | $15.23 | Lease Sect. 16.1.4 & 1.1.21 ($15.23 per diem) |
| Attorney Fees | $390.00 | Lease Sect. 10.1.3(a) |
| Tenant Repair Obligations | $74,875* | Estimate only. Landlord reserves right to collect the actual costs of repair. |
| **TOTAL:** | **$131,570.53*** | |

On behalf of Landlord, I reserve all claims, rights, remedies, privileges and defenses that Landlord may have and nothing herein is a waiver of the same.  Please let me know if you have any questions or require further information or documentation in support of the claim.

Sincerely,

**NOTEBOOM LAW LLC**

Aaron J. Noteboom

Authorized Agent of Landlord:

**G GROUP, LLC**

Ann Chu, Controller

Ex A    Proof of Claim Form
Ex B    Lease, as amended
Ex C    Notice of Default (Payment Rent)
Ex D    Notice of Default (Repair Obligation)
Ex E    Invoice (Attorney Fees)
Ex F    Email (Statement Balance and Repair Estimate)
Ex G    Utility Bill

## United States Bankruptcy Court, District of New Jersey (Newark)

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | |
|---|---|---|---|
| ☑ Bed Bath & Beyond Inc. (Case No. 23-13359) | ☐ Alamo Bed Bath & Beyond. (Case No. 23-13360) | ☐ BBB Canada LP Inc. (Case No. 23-13361) | ☐ BBB Value Services Inc. (Case No. 23-13362) |
| ☐ BBBY Management Corporation (Case No. 23-13363) | ☐ BBBYCF LLC (Case No. 23-13364) | ☐ BBBYTF LLC (Case No. 23-13365) | ☐ bed 'n bath Stores Inc. (Case No. 23-13396) |
| ☐ Bed Bath & Beyond of Annapolis, Inc. (Case No. 23-13366) | ☐ Bed Bath & Beyond of Arundel Inc. (Case No. 23-13367) | ☐ Bed Bath & Beyond of Baton Rouge Inc. (Case No. 23-13368) | ☐ Bed Bath & Beyond of Birmingham Inc. (Case No. 23-13369) |
| ☐ Bed Bath & Beyond Bridgewater Inc. (Case No. 23-13370) | ☐ Bed Bath & Beyond of California Limited Liability Company (Case No. 23-13371) | ☐ Bed Bath & Beyond of Davenport Inc. (Case No. 23-13372) | ☐ Bed Bath & Beyond of East Hanover Inc. (Case No. 23-13373) |
| ☐ Bed Bath & Beyond of Edgewater Inc. (Case No. 23-13374) | ☐ Bed Bath & Beyond of Falls Church, Inc. (Case No. 23-13375) | ☐ Bed Bath & Beyond of Fashion Center, Inc. (Case No. 23-13376) | ☐ Bed Bath & Beyond of Frederick, Inc. (Case No. 23-13377) |
| ☐ Bed Bath & Beyond of Gaithersburg Inc. (Case No. 23-13378) | ☐ Bed Bath & Beyond of Gallery Place L.L.C. (Case No. 23-13379) | ☐ Bed Bath & Beyond of Knoxville Inc. (Case No. 23-13380) | ☐ Bed Bath & Beyond of Lexington Inc. (Case No. 23-13381) |
| ☐ Bed Bath & Beyond of Lincoln Park Inc. (Case No. 23-13382) | ☐ Bed Bath & Beyond of Louisville Inc. (Case No. 23-13383) | ☐ Bed Bath & Beyond of Mandeville Inc. (Case No. 23-13384) | ☐ Bed, Bath & Beyond of Manhattan, Inc. (Case No. 23-13397) |
| ☐ Bed Bath & Beyond of Opry Inc. (Case No. 23-13385) | ☐ Bed Bath & Beyond of Overland Park Inc. (Case No. 23-13386) | ☐ Bed Bath & Beyond of Palm Desert Inc. (Case No. 23-13387) | ☐ Bed Bath & Beyond of Paradise Valley Inc. (Case No. 23-13388) |
| ☐ Bed Bath & Beyond of Pittsford Inc. (Case No. 23-13389) | ☐ Bed Bath & Beyond of Portland Inc. (Case No. 23-13390) | ☐ Bed Bath & Beyond of Rockford Inc. (Case No. 23-13391) | ☐ Bed Bath & Beyond of Towson Inc. (Case No. 23-13392) |
| ☐ Bed Bath & Beyond of Virginia Beach Inc. (Case No. 23-13393) | ☐ Bed Bath & Beyond of Waldorf Inc. (Case No. 23-13394) | ☐ Bed Bath & Beyond of Woodbridge Inc. (Case No. 23-13395) | ☐ Buy Buy Baby of Rockville, Inc. (Case No. 23-13398) |
| ☐ Buy Buy Baby of Totowa, Inc. (Case No. 23-13399) | ☐ Buy Buy Baby, Inc. (Case No. 23-13400) | ☐ BWAO LLC (Case No. 23-13401) | ☐ Chef C Holdings LLC (Case No. 23-13402) |
| ☐ Decorist, LLC (Case No. 23-13403) | ☐ Deerbrook Bed Bath & Beyond Inc. (Case No. 23-13404) | ☐ Harmon of Brentwood, Inc. (Case No. 23-13405) | ☐ Harmon of Caldwell, Inc. (Case No. 23-13406) |
| ☐ Harmon of Carlstadt, Inc. (Case No. 23-13407) | ☐ Harmon of Franklin, Inc. (Case No. 23-13408) | ☐ Harmon of Greenbrook II, Inc. (Case No. 23-13409) | ☐ Harmon of Hackensack, Inc. (Case No. 23-13410) |
| ☐ Harmon of Hanover, Inc. (Case No. 23-13411) | ☐ Harmon of Hartsdale, Inc. (Case No. 23-13412) | ☐ Harmon of Manalapan, Inc. (Case No. 23-13413) | ☐ Harmon of Massapequa, Inc. (Case No. 23-13414) |
| ☐ Harmon of Melville, Inc. (Case No. 23-13415) | ☐ Harmon of New Rochelle, Inc. (Case No. 23-13416) | ☐ Harmon of Newton, Inc. (Case No. 23-13417) | ☐ Harmon of Old Bridge, Inc. (Case No. 23-13418) |
| ☐ Harmon of Plainview, Inc. (Case No. 23-13419) | ☐ Harmon of Raritan, Inc. (Case No. 23-13420) | ☐ Harmon of Rockaway, Inc. (Case No. 23-13421) | ☐ Harmon of Shrewsbury, Inc. (Case No. 23-13422) |
| ☐ Harmon of Totowa, Inc. (Case No. 23-13423) | ☐ Harmon of Wayne, Inc. (Case No. 23-13424) | ☐ Harmon of Westfield, Inc. (Case No. 23-13425) | ☐ Harmon of Yonkers, Inc. (Case No. 23-13426) |
| ☐ Harmon Stores, Inc. (Case No. 23-13427) | ☐ Liberty Procurement Co. Inc. (Case No. 23-13428) | ☐ Of a Kind, Inc. (Case No. 23-13429) | ☐ One Kings Lane LLC (Case No. 23-13430) |
| ☐ San Antonio bed Bath & Beyond Inc. (Case No. 23-13431) | ☐ Springfield Buy Buy Baby, Inc. (Case No. 23-13432) | | |

Modified Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. | Who is the current creditor? | Garfield-Southcenter, LLC |
| --- | --- | --- |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ |
| --- | --- | --- |

| 3. | Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Garfield-Southcenter, LLC<br>PO Box 529<br>Eugene, OR 97440<br><br><br><br>Contact phone (541) 465-1600<br>Contact email NeillP@giustina.com | **Where should payments to the creditor be sent? (if different)**<br><br>Garfield-Southcenter, LLC<br>PO Box 529<br>Eugene, OR 97440<br><br><br><br>Contact phone (541) 465-1600<br>Contact email NeillP@giustina.com |
| --- | --- | --- | --- |

| 4. | Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known)_____    Filed on _____<br>MM / DD / YYYY |
| --- | --- | --- |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |
| --- | --- | --- |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____  ____  ____  ____

**7. How much is the claim?**

$ ___131,570.53(See attached)___. Does this amount include interest or other charges?

☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

___Lease for real property___

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate (when case was filed)_____%**
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☐ No
☑ Yes. Amount necessary to cure any default as of the date of the petition.  $ ___131,570.53___

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

| | | | Amount entitled to priority |
|---|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No | | |
| | ☐ Yes. *Check one:* | | |
| | ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ | Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ | Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after hat for cases begun on or after the date of adjustment. | | |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | | |
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | | $_____ |

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  **06/07/2023**
                   MM / DD / YYYY

Signature

Name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | **Anu** | | **Chu** |
| | First name | Middle name | Last name |
| Title | **Controller** | | |
| Company | **G Group LLC, authorized agent** | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | **PO Box 529** | | |
| | Number   Street | | |
| | **Eugene** | **OR** | **97440** |
| | City | State | ZIP Code |
| Contact phone | **(541) 465-1600** | Email | **NeillP@giustina.com** |

Modified Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                    12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- Fill in all of the information about the claim as of the date the case was filed.

- Fill in the caption at the top of the form.

- If the claim has been acquired from someone else, then state the identity of the last party who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- Attach any supporting documents to this form. Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- Do not attach original documents because attachments may be destroyed after scanning.

- If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.

- A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth. See Bankruptcy Rule 9037.

- For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian. For example, write *A.B., a minor child (John Doe, parent, 123 Main St., City, State)*. See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at https://restructuring.ra.kroll.com/BBBY.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of Information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

If by first class mail:

Bed Bath & Beyond Inc. Claims Processing Center
c/o Kroll Restructuring Administration LLC
Grand Central Station, PO Box 4850
New York, NY 10163

If by overnight courier or hand delivery:

Bed Bath & Beyond Inc. Claims Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

**Do not file these instructions with your form**

DocuSign Envelope ID: 1DFAE796-A245-4281-97B7-0F3D8CFE8889

## FIFTH AMENDMENT TO LEASE

THIS FIFTH AMENDMENT TO LEASE (the *"Amendment"*) made and entered into as of the 6th day of Nov 11 , 2021, by and between GARFIELD-SOUTHCENTER, LLC, a Washington limited liability company, as successor in interest to Regency Realty Group, Inc. (*"Landlord"*), having an address at 200 International Way, Springfield, Oregon 97477 and BED BATH & BEYOND, INC., a New York corporation (*"Tenant"*), having an address at 650 Liberty Avenue, Union, New Jersey 07083.

## W I T N E S S E T H :

WHEREAS, by that certain Lease Agreement dated as of June 5, 2000 (the *"Original Lease"*) between Regency Realty Group, Inc. (*"Regency"*) and Tenant, Regency leased to Tenant, and Tenant leased from Regency, certain premises in the building located at the northeast corner of the intersection of Strander Boulevard and Andover Park West, in Tukwila, Washington (the *"Shopping Center"*);

WHEREAS, the Original Lease was modified and amended by the following agreements: (i) Letter Agreement dated November 13, 2000 [First Amendment]; (ii) Letter Agreement dated November 28, 2000 [Second Amendment]; (iii) Third Amendment to Lease dated March 21, 2001; (iv) Rent Commencement and Expiration Date Agreement dated February 13, 2001; and (v) Fourth Amendment to Lease dated as of March 31, 2011 (the Original Lease, as so amended, is hereinafter referred to as the *"Lease"*);

WHEREAS, on or about March, 2001, Regency conveyed all of its right, title and interest in and to the Shopping Center, and assigned all of its right, title and interest as Landlord under the Lease to Lakha Southcenter Properties, LLC, who thereafter, on or about January 23, 2004, conveyed all of its right, title and interest in and to the Shopping Center, and assigned all of its right, title and interest as Landlord under the Lease, to Landlord; and

WHEREAS, Landlord and Tenant now desire to amend the Lease as more particularly hereinafter set forth.

NOW THEREFORE, in consideration of the premises, the promises and covenants of the parties hereto, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lease is hereby modified and amended and the parties mutually agree as follows:

1.      Capitalized terms used, but not otherwise defined herein, shall have the meaning(s) ascribed to them in the Lease.

2.      The current Term of the Lease will expire on January 31, 2022. The Term of the Lease is hereby extended for a period of five (5) years, commencing on February 1, 2022, and expiring on January 31, 2027 (the *"Extension Period"*), subject to the Renewal Options set forth below.

3.      Fixed Rent for the Extension Period shall be paid at the rate of Six Hundred Fifty Thousand ($650,000) Dollars per year, payable in equal monthly Installments of Fifty-four Thousand One Hundred Sixty-six and 67/100 ($54,166.67) Dollars. Landlord confirms that the

DocuSign Envelope ID: 1DFAE796-A245-4281-97B7-0F3D8CEE6848

Fixed Rent payable hereunder is a gross rental and that Tenant shall not be obligated to reimburse Landlord for any Taxes, Common Area Charges, insurance costs or other charges with respect to the Shopping Center except as otherwise expressly set forth in the Fourth Amendment, which shall be applicable to the Extension Period and the Renewal Periods.

4. Tenant shall retain its right and option to further extend the Term for the remaining four (4) five-year Renewal Periods, which, if exercised, shall run from February 1, 2027 through and including January 31, 2032 for the first Renewal Period, February 1, 2032 through and including January 31, 2037 for the second Renewal Period, February 1, 2037 through and including January 31, 2042 for the third Renewal Period, and February 1, 2042 through and including January 31, 2047 for the fourth Renewal Period, respectively. The Fixed Rent for the Renewal Periods shall be as set forth in Section 2(C) of the Fourth Amendment to Lease.

5. Provided that Tenant Substantially Completes the "Renovation Work" on or before January 31, 2023, Landlord shall reimburse Tenant for up to Four Hundred Thousand and 00/100 Dollars ($400,000.00) (the *"Tenant Allowance"*) in consideration for Tenant's construction of "Landlord's Special Improvements" (defined below) and to be applied towards costs and expenses of Tenant's construction, remodeling, refixturing, and/or renovation of Tenant's store in the Premises (including, without limitation, any or all of the items listed on Exhibit A hereto annexed, hard and soft costs and expenses, signage, third party and reasonable in-house labor costs incurred in conjunction with Tenant's work, and technology expenses and equipment (e.g., large display monitors, wifi connectivity, etc.) (collectively, the *"Renovation Work"*). All Renovation Work shall be subject to the terms and provisions of the Lease (including, without limitation, Article 8 thereof). Subject to Landlord's receipt of a Tenant-signed Mechanics' Lien Indemnification Agreement in the form hereto annexed as Exhibit B, Landlord shall pay the Tenant Allowance to Tenant as follows: (a) fifty percent (50%) of the Tenant Allowance shall be paid to Tenant within thirty (30) days after Landlord's receipt of Tenant's certification that at least fifty percent (50%) of the Renovation Work has been completed; and (b) the balance of the Tenant Allowance shall be paid to Tenant within thirty (30) days after Landlord's receipt of: (i) Tenant's certification that the Renovation Work has been Substantially Completed, (ii) Tenant's certification, in reasonable detail, of costs and expenses incurred by it for the Renovation Work, including breakdown of expenses by major trades and (iii) final permit inspection approvals. If Tenant has complied with all obligations required by this Section and the Landlord does not pay the Tenant Allowance to Tenant within such thirty (30) day periods, then Tenant shall have the right to offset such unpaid amount against Rent payable by Tenant under the Lease, together with interest at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. The Tenant Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of the Renovation Work (the *"Landlord's Special Improvements"*) (which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease). Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance. Tenant shall be responsible for and herewith agrees to pay all costs of the Renovation Work in excess of the Tenant's Allowance, and the Renovation Work (except for Landlord's Special Improvements), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes.

2

DocuSign Envelope ID: 1DFAE796-A245-4281-97B7-0F3D8CEE4889

6.    Section 1.1.38 (Tenant's Mailing Address) and Article 18 (Notice) of the Lease shall be modified to provide that Tenant's Mailing Address is now as follows:

| | |
|---|---|
| Tenant Mailing Address: | Bed Bath & Beyond Inc. |
| | 650 Liberty Avenue |
| | Union, New Jersey 07083 |
| | Attention:  Vice President – Real Estate |
| | |
| With a separate copy to: | Bed Bath & Beyond Inc. |
| | 650 Liberty Avenue |
| | Union, New Jersey 07083 |
| | Attention:  General Counsel |

7.    Section 1.1.19 (Landlord's Mailing Address) and Article 18 (Notice) of the Lease shall be modified to provide that Landlord's Mailing Address is now as follows:

| | |
|---|---|
| Landlord's Mailing Address: | 200 International Way |
| | Springfield, OR  97477 |
| | (if by hand delivery) |
| | |
| | PO Box 529 |
| | Eugene, OR 97440 |
| | (if by mail) |

8.    Subject to applicable Legal Requirements and other tenants' leases in the Shopping Center as of the mutual execution of this Amendment (each a *"Current Tenant"*), Landlord hereby consents to Tenant: (a) using no more than four (4) parking stalls directly in front of the Premises for curbside pickup for Tenant's customers (*"Curbside Pickup Area"*); and (b) installing signs designating the Curbside Pickup Area (*"Curbside Pickup Signs"*), all at Tenant's expense.  In the event that Tenant's use of the Curbside Pickup Area and/or the installation of the Curbside Pickup Signs violates a Current Tenant's lease and Landlord is advised of such violation by the applicable Current Tenant, then Landlord shall use commercially reasonable efforts to obtain such Current Tenant's consent to same.  In the event Landlord is unable to obtain such consent after using such commercially reasonable efforts, then Tenant shall promptly discontinue its use of the Curbside Pickup Area and/or remove any Curbside Pickup Signs, as applicable.

9.    It is the policy of Tenant (together with its subsidiaries and affiliates, collectively, the *"Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  Landlord shall not, directly or indirectly, solicit or accept from, nor offer, promise or pay any individual or entity (including, but not limited, to any government official) any bribe, kickback or any other improper payment of money or anything else of value.  This includes, but is not limited to, any improper payment in exchange for the Company's execution of this Amendment.  Landlord will also require any subcontractor (of any level) to adhere to the same standards.  In addition, any individual who is employed by or who represents the Company is prohibited from soliciting, accepting, offering, promising or paying any bribe, kickback or any other improper payment of money or anything else of value.  If any such improper actions are observed, Landlord shall inform the Company's Legal Department (Attention: General Counsel) by (i) notice to the address set forth in the Lease, as amended hereby or (ii) by telephoning 908-688-0888.

DocuSign Envelope ID: 1DFAE796-A245-4281-97B7-0F3D8CEE8488

10.     Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment, except for Retail Consulting Services (*"Tenant's Broker"*).  Tenant shall pay any commission due to Tenant's Broker in connection with this Amendment pursuant to a separate written agreement between Tenant and Tenant's Broker.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Tenant's Broker) with respect to this Amendment in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease.  The provisions of this Section shall survive the expiration or earlier termination of the Lease.

11.     Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Amendment to be in full force and effect.  The parties represent and warrant to each other that the person signing on behalf of either Landlord or Tenant, as the case may be, has the authority to do so and for this Amendment to be deemed in full force and effect.

12.     Neither party hereto shall record this Amendment.  Upon the request of either party following the execution and delivery of this Amendment, Landlord and Tenant shall execute an amended/restated short form lease or memorandum for recording, which shall be in form and substance as reasonably acceptable to both parties.  In no event shall the amount of Rent or any other monetary terms hereof be included in any such short form lease or memorandum.  Further, after the expiration or earlier termination of the Lease, Tenant agrees, to execute and deliver a termination of such short form lease or memorandum in recordable form and this obligation shall survive expiration or termination of the Lease.  The party requesting such document shall record any such short form lease or memorandum at its expense.

13.     The terms and conditions of this Amendment shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.  Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect.  In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Amendment, the terms and provisions of this Amendment shall govern and control.

14.     This Amendment may be executed electronically and in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Modification to Lease.  The execution and transmission of an image of any signed document or document signed by DocuSign (or a similar application) will have the same binding effect as an original bearing an original signature.  No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

[signature page follows, remainder of page left blank intentionally]

4

DocuSign Envelope ID: 1DFAE796-A245-4281-97B7-0F3D8CFE8889

IN WITNESS WHEREOF, the parties have executed this Fifth Amendment to Lease as of the day and date first above written.

**LANDLORD:**

GARFIELD-SOUTHCENTER, LLC, a Washington limited liability company

By:
Name: PETER C. SIKORA
Title: MANAGER

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By: John Hartmann
John Hartmann
EVP, Chief Operating Officer

**TENANT:**

STATE OF NEW JERSEY          )
                             ):ss.
COUNTY OF UNION              )

On this 5th day of April, 2021, before me personally came John Hartmann to me known, who being by me duly sworn, did depose and say that he is the EVP and Chief Operating Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

Kathleen Currie

Notary Public
My Commission Expires:

KATHLEEN P. CURRIE
Notary Public
11/2/2023
State of New Jersey
Commission Expires 11/2/2023

5.

DocuSign Envelope ID: 1DFAE796-A245-4281-97B7-0F3D8CFE8869

**LANDLORD:**

STATE OF OREGON, COUNTY OF LANE  )  ss.

    I certify that I know or have satisfactory evidence that Peter C. Sikora, signed this instrument, on oath, and stated that he was authorized to execute the instrument and acknowledged it as the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

    GIVEN under my hand and official seal this 6th day of April _____, 2021.

Print Name: Delia C. Stephenson
NOTARY PUBLIC for the State of Oregon
My commission expires: 8.8.22

OFFICIAL STAMP
DELIA C. STEPHENSON
NOTARY PUBLIC-OREGON
COMMISSION NO. 977995
MY COMMISSION EXPIRES AUGUST 08, 2022

6

## EXHIBIT A

| Category | Component | Description | Scope Components |
|---|---|---|---|
| BOPIS | BOPIS | •BOPIS graphics included in total graphics package | Graphics |
| | | •BOPIS cages, where/if necessary, assumed 3 per store | Cages |
| Queue | Queue | •Includes electronics, queueing fixtures, registers/counters, and associated labor costs | Tensator |
| | | | Electronics |
| | | | Counters |
| | | | Back of counter fixtures |
| | | | Installation |
| | | | Remerchandising labor |
| Fixtures | Aisle Fixtures | •Update aisle fixtures ($4 psf based on sq. of racetrack) - Vision for aisle fixtures is yet to be defined. Current costing assumption is based on a new store aisle fixture cost – assumes 100% of replacement | Aisle Fixtures |
| | End-Caps | •Update end-cap fixtures – Roll out Universal Graphics holder 33 x 10 ; already ordered, paid for chain (budget listed separately) | End-caps |
| | Dire Fixtures | •Replacing 75% of fixtures at $15 psf; replacing all maple, cherry fixtures, cookware island/vignettes, metal edge banding, all basic linen, all sign bands, bed box with maple trim, window towers, virtual display window, damaged discolored fixtures, stardust silver gables and wall hardware (ATO) | Replacement fixtures |
| | Labor | •Labor associated with remerchandising aisle fixtures, end caps and sign bands | Remerchandising labor |
| | Rebar | •Rebar for new Top Stock Banners (400 per store) | Fixtures |
| | Lifestyle Beds | •Bedding displays & headboard (average 6 per store) | Fixtures |
| | Décor | •Parsons Table (average 2 per store) | Fixtures |
| | Bath Fixtures | •Shower Curtin Fixture (2) per store | Fixtures  (need labor cost) |
| | Desk | •Mobile JDA Desk | Fixture need install cost |
| | BOPIS Cabinets | •Added new BOPIS cabinets & Desk as per Store #303 | Fixtures  (need labor cost) |
| Graphics | New Graphics Package | •Main Components: Hello and Thanks walls, BOPIS Signing, Queue line graphics, checkout hanging sign, registry room graphics,  hard panels for marquee graphics, blue / green banners, lifestyle banners, aisle wayfinding, mid level navigation kits, low sign navigation kit | Main graphics |
| | | •Optional components: Sleep Shop, Sheets, Bath Marquee Kit, Marquee Hinged Graphics, Specialty Sign Holder Kit, Backdrop Kit | Optional graphics |

A-1

| | | | Labor associated with overseeing graphics installation |
|---|---|---|---|
| Restroom | Repairs | •Bathroom repairs including partition replacements, new counters, sinks, and mirrors for both rooms. No tile replacements included | Bathrooms |
| Project Man | Outsourced Support | •Per store soft cost for store surveys, preparation, etc. | Store surveys |
| | | •Wrap racetrack column slatwall above 7'3" | Construction |
| | | •General contractor costs (20% of construction costs excluding flooring and racetrack)includes barriers | Project management |
| Flooring | Floor | •Concrete floors will be scrubbed and cleaned ($0.05 psf), carpeted floors will be replaced by LVT15 ($8.86 psf) applicable to 2/3 of selling space | Flooring |
| | | •Racetracks will be stripped and cleaned and receive UV installation ($0.11 psf applicable to 1/3 of selling space) | Strip and Wax Racetrack |
| | | | Oversight of UV installation - Labor Cost |
| Electrical Work | Electrical Work | •Disconnecting and reconnecting of electronics, light relocations, additional track and spot lights, and additional circuits for displays | Electrical Work |
| Front Wall | Front Wall | •Installing white brick panel on backwall, denim blue wallpaper behind cash register to receive graphics, and cleaning-up bulkhead; ranges between $7.5K to $37.5K. Assumed at the higher end as current conditions in stores are unknown | Front Wall |
| Auto Doors | Auto Doors | •Entrance doors will either be repaired ($3K) or replaced ($7.5K) | Auto Doors |
| Hallway | Hallway | •Scope will be between the following: Low End - Clean-up, wallpaper, cleaning ceiling tiles, High end – replacing ceiling, replacing water fountains, lights, cleaning floors, wax/repair; Stores that underwent the 15$ refresh will not receive this; ranges between $12K to $30K | Hallway |
| | Exterior Painting | •Paint existing storefront; higher end range is for corner stores | Exterior Painting |
| Exterior | Exterior Sign | •All faded white faces to be replaced, all red faces to be replaced with white, all neon replaced with LEDs •All stores that underwent the refresh have received an exterior sign; only a handful remaining stores will require a new exterior sign | Exterior Sign |
| Breakroom | Breakroom | •Cleaning, replacing counter sink, flooring, ceiling, lights, and furniture | Construction |
| | | | Labor |
| Offices | Offices | •Repairs made as necessary - painting, repairing carpet with VCT (tan VCT to match the CPWM offices), replacing millwork, shelves, and ceiling tiles | Construction |
| | | | Labor |

A-2

| Lighting | Lighting | • Placeholder cost of $0.52 psf – | Lighting |
|---|---|---|---|
| Architectural Permits | Permits | • Obtain architectural permits, cost varies by cost of permit applications | Permits |
| Pylon Panel | Pylon Panel | • Change pylon panels (signage outside of the malls); some stores will not require this upgrade hence range is between $0K-$7.5K | Pylon Panel |
| Loss Prevention | Loss Prevention | • Moving the location of surveillance cameras within the store; cost will range from $14K-$15K, majority of costs are focused on the front end, entrances and exits | Loss Prevention |
| Vestibule Clean Up | Vestibule Clean Up | • For stores with Vestibule: denim blue wallpaper on walls within vestibule (relocate devices on vestibule wall as necessary to avoid wall graphic), replace all flooring in vestibule, replace ceiling tiles (if ceiling) <br> • Applicable to stores that do not have vestibules as well for cleaning entrance area post renovation | Vestibule Clean Up |
| Reflow / Remerch | Reflow / Remerch / Open Up Sightlines | • Change assortment allocation; adjust: space, potentially reduce or reallocate section count and space across departments <br> • Includes Destination Shops (Org + Cleaning + Decor + Kitchen Sections) <br> • Move finger walls & divider walls, lower profiles. There are no construction costs associated with this upgrade component, only labor costs | Reflow / Remerch / Open Up Sightlines + Labor Costs |
| Table Top 2.1 | Table Top 2.1 | • Converting FTG to Tabletop 2.1, includes cost of construction and payroll | Construction |
| | | • Applicable only to stores with FTG, no $ for fixtures | Labor |
| | | • Gondola counter top, Gondola display shelf and wall display shelf | Fixtures |
| Rightsizing HBC | Rightsizing HBC | • HBC Construction Costs | Construction |
| | | • Applicable only to stores with an HBC department | Labor |
| | | • HBC Fixtures (based on transition to lows in #252) | Fixtures |
| Keurig Wall | Keurig Wall | • Remove existing Beverage Hub and Keurig Wall; Install proposed 1 section count Keurig Wall in 2 stores (~$9K/store) – TBD if any additional stores will receive a Keurig Wall (marseille oak wood shelves) | Construction |
| | | | Fixture |
| Sleep Shop | Sleep Shop | • All stores will receive new fixtures | Fixture |
| | | | Labor |
| Registry Room | Registry Room | • Registry room will be walled up and converted into BOPIS overflow space - $9000 to wall up, wallpaper, and install door; all stores that do not have FTG will receive this | Registry Room |

A-3

DocuSign Envelope ID: 1DFAE796-A245-4281-97B7-0F3D8CDE6989

| Enlarge Impact door to receiving | Impact Door | •Main access from receiving to sales floor to be widened to a minimum 5'-0" clear opening to allow pallets to access the floor. A small number of stores (those fire-rated walls) will require investment of $20K; | Impact Door |
|---|---|---|---|
| Stockroom | Stockroom | •Stockroom Fixtures | Fixtures |
| | | •Stockroom Labor | Labor |
| Remodel Tax | Construction | •Construction Remodel T&F (Texas) | T&F |
| Tax and Freight | Tax & Freight | •Freight for fixtures (tax already included) | T&F |

A-4

DocuSign Envelope ID: 1DFAE798-A245-4281-97B7-0F3D8CF3E84B

EXHIBIT B

Form of Mechanics' Lien Indemnification Agreement

THIS MECHANICS' LIEN INDEMNIFICATION is made this _____ day of
_____, 20___, by BED BATH & BEYOND INC., a New York corporation (hereinafter
referred to as *"Tenant"*), for the benefit of GARFIELD-SOUTHCENTER, LLC, a Washington
limited liability company (*"Landlord"*).

WITNESSETH

Landlord and Tenant are parties to that certain Lease Agreement dated as of June 5,
2000, as modified and amended by the following agreements:  (i) Letter Agreement dated
November 13, 2000 [First Amendment]; (ii) Letter Agreement dated November 28, 2000
[Second Amendment]; (iii) Third Amendment to Lease dated March 21, 2001; (iv) Rent
Commencement and Expiration Date Agreement dated February 13, 2001; and (v) Fourth
Amendment to Lease dated as of March 31, 2011 (collectively, the *"Original Lease"*), demising
certain premises (the *"Premises"*) in the building located at the northeast corner of the
intersection of Strander Boulevard and Andover Park West, in Tukwila, Washington (the
*"Shopping Center"*); and

Landlord and Tenant have entered into that certain Fifth Amendment to Lease dated as
of _____, 2021 (the *"Fifth Amendment"*, which, together with the Original Lease, are
hereinafter collectively referred to as the *"Lease"*), regarding the modification, refixturing,
renovation, remodeling and upgrading of the Premises.

NOW, THEREFORE, in consideration of the payment of the "Tenant Allowance" as
defined in the Fifth Amendment and other good and valuable consideration, the receipt of which
is hereby acknowledged, the Tenant agrees as follows:

1.       Tenant hereby indemnifies and agrees to hold Landlord and Landlord's
mortgagee harmless from any loss, payment, claim or expense as the result of mechanics and
materialmen filing liens or otherwise making claims against Landlord's interest in the Premises
and the Shopping Center based upon materials or services provided under contract with
Tenant.  In the event that any mechanic, materialmen or other claimant makes claim against the
Premises or Shopping Center based upon materials or services provided under contract with
Tenant, Tenant shall hold harmless and protect Landlord and Landlord's mortgagee from any
loss, payment, claim or expense related thereto.

2.       Tenant reserves the right to contest in good faith the amount of any claim or lien
assessed against the Premises or the Shopping Center by any of such claimants; provided,
however, should the holder or holders of such claim or lien attempt to enforce their lien by
foreclosure by any other means, Tenant shall bond around, pay or remove such lien by any
manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping
Center.  This indemnity and hold harmless shall not apply to any liens or claims caused by
Landlord or Landlord's agents.

3.       If Landlord or Landlord's mortgagee shall desire to obtain title insurance with
respect to the Premises or the Shopping Center and the title insurer is unwilling to insure title to
the Premises or the Shopping Center without exception for any lien, or right to a lien, for
services, labor or material heretofore or hereafter furnished, imposed by law and not shown by
the public records which may arise from materials or services provided under contract with

B-1

DocuSign Envelope ID: 1DFAE796-A245-4261-97B7-0F3D8CFE88A9

Tenant, then Tenant shall provide such undertakings or security as may be reasonably required by title insurer to provide affirmative title insurance over such exception to title or issue title insurance without such exception.

4.    This Mechanics' Lien Indemnification Agreement shall inure to the benefit of Landlord and Landlord's mortgagee and their respective successors and assigns.

EXECUTED this _____ day of _____, 20___.

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By: _____
        Michael J. Yorio
        Vice President - Construction

B-2

## GARFIELD-SOUTHCENTER, LLC

PO BOX 529
EUGENE, OR  97440
(541) 465-1600

November 1, 2013

Re:   Garfield-Southcenter, LLC ("Landlord")
      Bed Bath & Beyond Inc., dba Store # 371 ("Tenant")
      Leased Premises: 400 Strander Blvd., Tukwila, WA  98188

### NOTICE OF CHANGE OF ADDRESS FOR LANDLORD

Per the notice provisions of your Lease, please be advised that effective December 6, 2013, all notices, correspondence, rent and other payments due under your lease should be sent to the Landlord's new address as follows:

**Mailing Address (No Change):**          **Overnight Delivery (New Address):**
**P.O. Box 529**                          **200 International Way**
**Eugene, OR  97440**                     **Springfield, OR  97477**

Please update your records accordingly and contact us should you have any questions.

cc: P-0150



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bed Bath & Beyond Inc.

650 Liberty Avenue

Union, NJ  07083

Attn: Lease Admin. (#371)

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered    ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7013 1710 0000 5637 5435

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

## FOURTH AMENDMENT TO LEASE

THIS FOURTH AMENDMENT TO LEASE made and entered into as of the __31__ day of __March__, 2011, by and between GARFIELD-SOUTHCENTER, LLC, a Washington limited liability company, as successor in interest to Regency Realty Group, Inc. (*"Landlord"*), having an address at 366 Pearl Street, Eugene, Oregon 97401 and BED BATH & BEYOND, INC., a New York corporation (*"Tenant"*), having an address at 650 Liberty Avenue, Union, New Jersey 07083.

### WITNESSETH:

WHEREAS, by that certain Lease Agreement dated as of June 5, 2000 (the *"Original Lease"*) between Regency Realty Group, Inc. (*"Regency"*) and Tenant, Regency leased to Tenant, and Tenant leased from Regency, certain premises in the building located at the northeast corner of the intersection of Strander Boulevard and Andover Park West, in Tukwila, Washington (the *"Shopping Center"*);

WHEREAS, the Original Lease was modified and amended by the following agreements: (i) Letter Agreement dated November 13, 2000 [First Amendment]; (ii) Letter Agreement dated November 28, 2000 [Second Amendment]; (iii) Third Amendment to Lease dated March 21, 2001; (iv) Rent Commencement and Expiration Date Agreement dated February 13, 2001 (the Original Lease, as so amended, is hereinafter referred to as the *"Lease"*);

WHEREAS, on or about March, 2001, Regency conveyed all of its right, title and interest in and to the Shopping Center, and assigned all of its right, title and interest as Landlord under the Lease to Lakha Southcenter Properties, LLC, who thereafter, on or about January 23, 2004, conveyed all of its right, title and interest in and to the Shopping Center, and assigned all of its right, title and interest as Landlord under the Lease, to Landlord; and

WHEREAS, Landlord and Tenant now desire to amend the Lease as more particularly hereinafter set forth.

NOW THEREFORE, in consideration of the premises, the promises and covenants of the parties hereto, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lease is hereby modified and amended and the parties mutually agree as follows:

1.    Capitalized terms used, but not otherwise defined herein, shall have the meaning(s) ascribed to them in the Lease.

2.    The Lease is hereby amended as follows;

A.    Landlord and Tenant acknowledge that the current Term of the Lease will expire on January 31, 2012. The Term of the Lease is hereby extended for a period of ten (10) years, commencing on February 1, 2012, and expiring on January 31, 2022 (the *"Extended Term"*), subject to the Renewal Options set forth below.

B.    Section 2.2.2 of the Lease is hereby amended by deleting the reference to three (3) five-year Renewal Periods and inserting in lieu thereof a reference to four (4) five-year Renewal Periods, which, if exercised, shall run from February 1, 2022 through and including January 31, 2027 for the first Renewal Period, February 1, 2027 through and including January 31, 2032 for the second Renewal Period, February 1, 2032 through and including January 31, 2037 for the third Renewal Period, and February 1, 2037 through and including January 31, 2042 for the fourth Renewal Period, respectively.

C.    Notwithstanding any provision of the Lease to the contrary, the Fixed Rent for the Extended Term and the Renewal Periods shall be as follows:

(i)

(ii)

P 0170

(iii)

(iv)

(v)

Landlord acknowledges and agrees that, from and after the commencement of the Extended Term, the Fixed Rent payable hereunder is a gross rental and that Tenant shall not be obligated to reimburse Landlord for any Taxes, Common Area Charges, insurance costs or other charges with respect to the Shopping Center except as otherwise expressly set forth in this Fourth Amendment

D.    Notwithstanding the provisions of Section 4.3.2(a) of the Lease to the contrary, during the 2013 calendar year and each calendar year thereafter during the Extended Term (as same may be extended), Tenant shall pay, for each such calendar year, Tenant's Pro Rata Share of the amount (hereinafter referred to as the *"Increased Taxes"*), if any, equal to (x) the Taxes payable with respect to such calendar year, less (y) the Base Year Taxes. Tenant shall not be required to contribute towards any Taxes payable with respect to the Base Tax Year. As used herein: (i) *"Base Tax Year"* shall mean the 2012 calendar year; and (ii) *"Base Year Taxes"* shall mean the Taxes payable with respect to the 2012 calendar year. Landlord shall deliver to Tenant a copy of the assessment(s) pertaining to each calendar year and the Taxes payable with respect to the Base Tax Year promptly following the taxing authority's issuance thereof. Tenant's Pro Rata Share of Increased Taxes shall be payable at the time and in the manner as specified for Tenant's Pro Rata Share of Taxes in the Lease

E.    Notwithstanding the provisions of Section 5.1.2 or Section 10.3.3 of the Lease to the contrary, during the 2013 calendar year and each calendar year thereafter during the Extended Term (as same may be extended), Tenant shall pay, for each such calendar year, Tenant's Pro Rata Share of the amount (hereinafter referred to as the *"Increased Common Areas Charges"*), if any, equal to (x) the Common Areas Charges payable with respect to such calendar year, less (y) "the Base Year Common Areas Charges". Tenant shall not be required to contribute towards any Common Areas Charges payable with respect to the Base CAC Year Tenant shall not be required to contribute towards any Common Areas Charges payable with respect to the Base CAC Year. As used herein: (i) *"Base CAC Year"* shall mean the 2012 calendar year; and (ii) *"Base Year Common Areas Charges"* shall mean the Common Areas Charges payable with respect to the 2012 calendar year. Tenant's Pro Rata Share of Increased Common Areas Charges shall be payable at the time and in the manner as specified for Tenant's Pro Rata Share of Common Areas Charges in the Lease.

4.    Landlord shall pay Tenant the sum of Three Hundred Fifty Thousand Dollars ($350,000) (the *"Tenant Allowance"*) in consideration for the "hard" and "soft" costs associated with "Landlord's Special Improvements" (defined below). Landlord shall pay the Tenant Allowance to Tenant within twenty (20) days after the later to occur of Substantial Completion of the "Work" (hereinafter defined), as certified by Tenant, and Landlord's receipt of all of the following:

(i)    Tenant's certification indicating substantial completion of the Work;

(ii)    at Tenant's discretion, either (x) a lien waiver from Tenant's general contractor (if any), or (y) an agreement regarding mechanics' and materialman's liens in the form attached hereto as Exhibit 1.

If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion thereof within thirty (30) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above, then in addition to the rights and remedies under Section 16 2 of the Lease, Tenant shall have the right to a credit against one hundred percent (100%) of the Rent payable by Tenant, together with interest thereon at a rate equal to the then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus five percent (5%) The Tenant

Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of the portion of the Work for which it is paid (such portion is hereinafter referred to as the *"Landlord's Special Improvements"*), which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Extended Term (as same may be extended).  Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance.  Tenant shall be responsible for and herewith agrees to pay all costs of the Work in excess of the Tenant's Allowance, and the Work (except for Landlord's Special Improvements), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes.  As used herein, the *"Work"* shall mean any and all work in connection with the modification, remerchandising, renovation, remodeling and upgrading of the Premises.

5.      Landlord represents and warrants to Tenant that, as of the date hereof, the Shopping Center is not encumbered by a mortgage or deed of trust, except for the mortgage held by Wells Fargo Bank, N.A., whose consent is appended hereto.

6.      Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Fourth Amendment, except for Rob Andrews at Northwest Retail Partners (the *"Broker"*).  Landlord shall pay the Broker a commission pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Fourth Amendment in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Fourth Amendment.

7.      Except as expressly amended herein, all other terms and conditions of the Lease shall remain unchanged and in full force and effect.  Neither party shall cause or permit this Fourth Amendment to be recorded.

[signature page follows, remainder of page left blank intentionally]



8.    This Fourth Amendment to Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant, their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Fourth Amendment to Lease as of the day and date first above written.

WITNESS/ATTEST:

**LANDLORD:**

GARFIELD-SOUTHCENTER, LLC, a Washington limited liability company

By:
Name: DAN GERBMANS
Title: MANAGING MEMBER

WITNESS/ATTEST:

Scott R. Smith

Alan A. Freeman

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By:
Name: Warren Eisenberg
Title: Co-Chairman

Exhibit 4

Form of Mechanics' Lien Indemnification Agreement

THIS MECHANICS' LIEN INDEMNIFICATION is made this _____ day of
_____, 201__, by BED BATH & BEYOND INC., a New York corporation (hereinafter
referred to as "*Tenant*"), for the benefit of GARFIELD-SOUTHCENTER, LLC, a Washington
limited liability company ("*Landlord*").

WITNESSETH

Landlord and Tenant are parties to that certain Lease dated as of June 5, 2000, as
amended by the following agreements: (i) Letter Agreement dated November 13, 2000 (First
Amendment); (ii) Letter Agreement dated November 28, 2000 (Second Amendment), (iii) Third
Amendment to Lease dated March 21, 2001; (iv) Rent Commencement and Expiration Date
Agreement dated February 13, 2001 (the Original Lease, as so amended, is hereinafter referred
to as the "*Original Lease*"); demising certain premises (the "*Premises*") in the Hunter's
Square Shopping Center, located in Farmington Hills, Michigan (the "*Shopping Center*").

Landlord and Tenant have entered into that certain Fourth Amendment to Lease dated
as of March ___, 2011 (the "*Fourth Amendment*", which, together with the Original Lease, are
hereinafter collectively referred to as the "*Lease*"), regarding the modification, remerchandising,
renovation, remodeling and upgrading of the Premises.

NOW, THEREFORE, in consideration of the payment of the 'Tenant Improvement
Allowance" as defined in the Third Amendment and other good and valuable consideration, the
receipt of which is hereby acknowledged, the Tenant agrees as follows:

1.    Tenant hereby indemnifies and agrees to hold Landlord and Landlord's
mortgagee harmless from any loss, payment, claim or expense as the result of mechanics and
materialmen filing liens or otherwise making claims against Landlord's interest in the Premises
and the Shopping Center based upon materials or services provided under contract with
Tenant. In the event that any mechanic, materialman or other claimant makes claim against the
Premises or Shopping Center based upon materials or services provided under contract with
Tenant, Tenant shall hold harmless and protect Landlord and Landlord's mortgagee from any
loss, payment, claim or expense related thereto.

2.    Tenant reserves the right to contest in good faith the amount of any claim or lien
assessed against the Premises or the Shopping Center by any of such claimants; provided,
however, should the holder or holders of such claim or lien attempt to enforce their lien by
foreclosure by any other means, Tenant shall bond around, pay or remove such lien by any
manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping
Center. This indemnity and hold harmless shall not apply to any liens or claims caused by
Landlord or Landlord's agents.

3.    If Landlord or Landlord's mortgagee shall desire to obtain title insurance with
respect to the Premises or the Shopping Center and the title insurer is unwilling to insure title to
the Premises or the Shopping Center without exception for any lien, or right to a lien, for
services, labor or material heretofore or hereafter furnished, imposed by law and not shown by
the public records which may arise from materials or services provided under contract with
Tenant, then Tenant shall provide such undertakings or security as may be reasonably required
by title insurer to provide affirmative title insurance over such exception to title or issue title
insurance without such exception.

4.    This Mechanics' Lien Indemnification Agreement shall inure to the benefit of
Landlord and Landlord's mortgagees and their respective successors and assigns.

EXECUTED this _____ day of _____, 201__.

TENANT:

BED BATH & BEYOND INC., a New York
corporation

By:       _____
Name:  _____
Title:     _____

CONSENT OF MORTGAGEE

The undersigned hereby consents to and approves the Fourth Amendment to Lease is made as
of _March 21st_, 2011, by and between GARFIELD-SOUTHCENTER, LLC, a Washington
limited liability company, as Landlord, and BED BATH & BEYOND INC., a New York
corporation, as Tenant, to which this Consent is appended.

MORTGAGEE:

WITNESS/ATTEST:                                    WELLS FARGO BANK, N.A .

By:      _Kaig Will_
Name:    _Kaig Hills_
Title:   _Vice President_

Dated: _April 14th_, 2011.

State of OREGON
County of Lane

This instrument was acknowledged before me on April 14, 2011, by Kraig Hills as Vice
President of Wells Fargo Bank, National Association.

Notary Public – State of Oregon

My commission expires: 11-18-2014

OFFICIAL SEAL
MANDY L HOWELL
NOTARY PUBLIC - OREGON
COMMISSION NO. 453847
MY COMMISSION EXPIRES NOVEMBER 18, 2014

## ACKNOWLEDGEMENT

State of Oregon

County of Lane

On _Apr. 6_____, 2011, before me, personally appeared Dan Giustina, personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the Fourth Amendment to Lease in his authorized capacity for Garfield-Southcenter, LLC, and that by his signature on the instrument the person, or entity upon behalf of which the person acted, executed this instrument.

WITNESS my hand and official seal.

_Debbie L Bailor_

My Commission Expires: _9-24-13_

OFFICIAL SEAL
DEBBIE L BAILOR
NOTARY PUBLIC-OREGON
COMMISSION NO. 441620
MY COMMISSION EXPIRES SEPTEMBER 24, 2013

STATE OF NEW JERSEY )

) : ss.

COUNTY OF UNION )

On this 31st day of March, 2011, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

Kathleen C. Ferenchak

Notary Public

My Commission Expires:

KATHLEEN C. FERENCHAK
NOTARY PUBLIC OF NEW JERSEY
COMMISSION EXPIRES NOVEMBER 3, 2013

## THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE ("*Amendment*") is entered into this 21st day of March, 2001 by and between REGENCY REALTY GROUP INC., a Florida corporation, having an office 4000 Kruse Way Place, Building No. 1, Suite 130, Lake Oswego, Oregon 97035 ("*Landlord*"), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease Agreement (the "*Original Lease*") dated as of June 5, 2000 pursuant to which Landlord demised to Tenant certain premises in the Tukwila, Washington (as more particularly defined in the Original Lease, the "*Premises*").

WHEREAS, Landlord and Tenant amended the Original Lease pursuant to two Letter Agreements, dated November 13, 2000, and November 28, 2000 (the Original Lease, as amended by the Letter Agreements, hereinafter referred to as the "*Lease*").

WHEREAS, in accordance with Section 3.4 of the Lease, Landlord and Tenant desire to confirm the Floor Area of the Premises.

NOW THEREFORE, in consideration the mutual covenants herein set forth, and other good and valuable consideration, the parties hereby agree as follows:

1.      For all purposes under the Lease, the Floor Area of the Premises shall be deemed to be forty-five thousand six hundred and thirty-three (45,633) square feet.

2.      Section 1.1.11 of the Lease is hereby deleted and there is substituted in lieu thereof the following:

"Fixed Rent: The following amounts for the periods indicated:

For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date, at the rate of Six Hundred Eighty-Four Thousand Four Hundred Ninety-Five and 00/100 ($684,495.00) Dollars per year [based on fifteen and 00/100 ($15.00) Dollars per square foot of Floor Area];

In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Seven Hundred Fifty-Two Thousand Nine Hundred Forty-Four and 50/100 ($752,944.50) Dollars per year [based on Sixteen and 50/100 ($16.50) Dollars per square foot of Floor Area];

In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Eight Hundred Twenty-Eight Thousand Two Hundred Thirty-Eight and 95/100 ($828,238.95/100) Dollars per year [based on Eighteen and 15/100 ($18.15) Dollars per square foot of Floor Area]; and

In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Nine Hundred Ten Thousand Eight Hundred Thirty-Four and 68/100 ($910,834.68) Dollars per year [based on Nineteen and 96/100 ($19.96) Dollars per square foot of Floor Area]

1.      Except as otherwise set forth herein, the Lease remains in full force and effect and the parties hereby ratify same. This Amendment shall be binding upon the parties and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first above written.

LANDLORD:

REGENCY REALTY GROUP INC.
a Florida corporation

Witness:

By: _____
Name _____
Title: _____

TENANT:

BED BATH & BEYOND INC., a New York corporation

Witness:

By: _____
Name: _____
Title: _____

2

Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT made as of the ___ day of February, 2001 by and between REGENCY REALTY GROUP, ("*Landlord*") and BED BATH & BEYOND INC ("*Tenant*").

### WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as the "*Shopping Center*" situated in _____, W.V.

WHEREAS, by that certain lease dated June 5, 2000 (the "*Lease*"), Landlord leased a certain the "*Premises*") of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.1 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.   The Rent Commencement Date occurred on February 2, 2001.

2.   The Initial Term of the Lease shall expire on January 31, 2012, unless Tenant exercises its option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.   The date of commencement of the first Renewal Period shall be February 1, 2012, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2017, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.   The date of commencement of the second Renewal Period shall be February 1, 2017 if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2022, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.   The date of commencement of the third Renewal Period shall be February 1, 2022, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2027, unless the Lease terminates earlier as provided in the Lease.

6.   Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

### LANDLORD:

REGENCY REALTY GROUP, INC.

By: _____
Name: _____
Title: _____

### TENANT:

BED BATH & BEYOND INC.

By: _____
       Warren Eisenberg
       Co-Chief Executive Officer

# Regency Realty Corporation

December 27, 2000

VIA: FEDERAL EXPRESS

Elizabeth Stoner
Regency Realty
1601 114th Ave. S.E., Suite 135
Bellevue, WA 98004

Re:   Bed Bath & Beyond
      Tukwila, Washington
      Lease Amendments Dated
      November 13, 2000 (Trash Compactor) &
      November 28, 2000 (Rent Commencement)

Dear Elizabeth:

Enclosed are the following original Letter Agreements which amend certain provisions of the Bed Bath
& Beyond Lease dated June 5, 2000.

1. Letter Agreement Dated November 13, 2000
   This Letter Agreement modifies certain provisions of the Lease relating to the trash compactor.
   Originally, Bed Bath & Beyond was to have a dedicated trash compactor for their use only. This
   agreement allows the trash compactor to be used by all three tenants and billed back through CAM.
   We will take care of paying for the trash compactor. You just need to coordinate with Monty and the
   tenants regarding the installation, use and billing for the ongoing service.

2. Letter Agreement Dated November 28, 2000
   This letter Agreement was necessary to resolve two issues. The first is the remedial structural work.
   Monty and I will take care of this one. The second is the rent commencement date. As noted in
   paragraph 4 of the Letter Agreement, the rent commencement is the earlier of "Grand Opening" or
   February 1, 2001. Please make sure Bed Bath & Beyond is billed in January so that we receive
   payment by February 1, 2001.

These two Letter Agreements are really Lease Amendments and should be treated as such. Please make
sure a copy of each Letter Agreement is forwarded to Lease Administration to be filed with the Lease.

Thank you for your help and please call me if you have any questions.

Sincerely,

H. Craig Ramey
Senior Vice President



Beyond any store of its kind.

Corporate Office
650 Liberty Avenue
Union, NJ 07083
908/688-0888

November 28, 2000

*Via Airborne Express*

Regency Realty Group, Inc.
4000 Kruse Way Place
Building One, Suite 130
Lake Oswego, Oregon 97035
Attention: Mr. H. Craig Ramey

      Re:    Agreement of Lease (as amended to date, the "*Lease*"), dated June
              5, 2000, between Regency Realty Group Inc. ("*Landlord*") and Bed
              Bath & Beyond Inc. ("*Tenant*") demising premises ("*Premises*") in
              Tukwila, Washington

Dear Mr. Ramey:

      During the performance of Tenant's Work at the Premises, Tenant ascertained that the
Premises required certain remedial structural work to the exterior walls. Attached hereto is a
report (the "*Engineers Report*") issued by KPFF Engineers, dated November 1, 2000,
documenting the aforesaid condition. Page one of Exhibit D to the Lease states that, as part of
Landlord's Work, Landlord shall deliver the Premises in a structurally sound condition.
Accordingly, Landlord and Tenant hereby agree that:

1.     Tenant shall perform the remedial work to the Premises described in the Engineer☐s
       Report (the"*Remedial Work*") (it being acknowledged that Tenant's obligation will not
       extend, or be deemed to include, any work that may be necessary to other portions of the
       Building outside of the Premises);

2.     Landlord shall reimburse Tenant for all costs and expenses incurred by Tenant in the
       performance of the Remedial Work provided, however, that such amount shall not exceed
       the sum of $16,763.00 (the "*Structural Reimbursement*"). The foregoing is in addition to
       the other reimbursements and payments due Tenant under the Lease.

RECEIVED NOV 2 9 2000

Regency Realty Corporation
November 28, 2000
Page 2

3.    Landlord shall pay the Structural Reimbursement to Tenant within twenty (20) days after
Landlord's receipt of notification from Tenant that the Remedial Work is Substantially
Complete. If Landlord fails to timely pay the Structural Reimbursement as aforesaid,
Tenant shall be entitled to offset said amount against Rent, together with interest at the
Lease Interest Rate.

4.    The Remedial Work, when completed, shall be the property of Landlord, subject to use
by Tenant of same during the Term. Landlord alone shall be entitled to depreciate the
Remedial Work as an asset for tax purposes, and Tenant shall not recognize income with
respect to the amount of the Structural Reimbursement.

In addition, Landlord and Tenant agree that Section 2.2.1 of the Lease is deleted in its
entirety, and the following is added in lieu thereof:

"Subject to the provisions of this Article 2, the Term of this Lease shall begin on
the earlier to occur of (such earlier date being referred to herein as the "Rent
Commencement Date"): (a) February 2, 2001, and (b) the date (the "Grand
Opening Date") which Tenant shall establish in its published advertisement as its
grand opening [but not later that the tenth (10th) day after the date upon which
Tenant shall initially open the Premises to the general public for business]. The
Term shall expire on the Expiration Date, unless terminated as herein provided.
When the Rent Commencement Date has been determined, as provided in this
Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the
other, a written statement in the form attached to the Lease as Exhibit C
specifying the Rent Commencement Date."

Except as specifically set forth herein, all terms and conditions of the Lease shall remain
in full force and effect. All capitalized terms used herein but not defined shall have the meaning
ascribed to them in the Lease. Kindly acknowledge your agreement to the foregoing by signing
below and returning a copy to the undersigned no later than December 6, 2000.

Sincerely,
Bed Bath & Beyond Inc.

Seth Geldzahler
Real Estate Director

[signatures continued on next page]

Regency Realty Corporation
November 28, 2000
Page 3

ACKNOWLEDGED AND AGREED TO
THIS 4ᵗʰ DAY OF _December_, 2000

REGENCY REALTY GROUP, INC.

By: _H. Cry Rg_
Name: _H. Craig Ramey_
Title: _Sn Vice President_



# BED BATH &
# BEYOND

Beyond any store of its kind.®

Corporate Office
650 Liberty Avenue
Union, NJ 07083
908/688-0888

RECEIVED NOV 2 0 2000

November 13, 2000

Regency Realty Group, Inc.
400 Kruse Way Place
Building One, Suite 130
Lake Oswego, Oregon 97035
Attention: Mr. H. Craig Ramey

      Re:    Agreement of Lease ("*Lease*"), dated June 5, 2000, between Regency
            Realty Group Inc. ("*Landlord*") and Bed Bath & Beyond Inc. ("*Tenant*")
            demising premises ("*Premises*") in Tukwila, Washington

Dear Mr. Ramey:

As you know, the Lease currently provides for Tenant's installation of a trash compactor in the location depicted on Exhibit B to the Lease. The trash compactor is for the exclusive use of Tenant. This letter will memorialize the agreement between Landlord and Tenant that, among other things, the trash compactor will be shared by Tenant and two other tenants in the Building, Guitar Centers and Oakmill Furniture (the latter two being hereinafter, the "*Co-Tenants*"), on the terms and conditions hereinafter set forth:

1.     Tenant shall, at Landlord's sole cost and expense, purchase and install the trash compactor in accordance with the Final Plans and Specifications. No later than twenty days after Landlord's receipt of notification from Tenant that the installation of the trash compactor is Substantially Complete and operational, Landlord shall pay to Tenant an amount (the "*Compactor Reimbursement*") equal to the costs incurred by Tenant for such purchase and installation. If Landlord fails to timely pay the Compactor Reimbursement to Tenant as aforesaid, Tenant shall be entitled to offset said amount against Rent, together with interest at the Lease Interest Rate.

2.     As part of Landlord's obligations for the Common Areas described in Section 5.1.1 of the Lease, Landlord shall cause the trash compactor to be operated (emptied) and maintained at all times in good working order. The costs for such operation and maintenance (which shall include furnishment of the compactor bin) may be included in Common Area Charges, subject however to Paragraph 3 below.

Regency Realty Corporation
November 13, 2000
Page 2

3.      The Co-Tenants are currently Oakmill Furniture and Guitar Centers. If either of the Co-Tenants are replaced by other tenants for any reason, and such new tenant's use of the trash compactor causes an increase to the costs for the operation and maintenance thereof, then such increased costs shall be borne entirely by the responsible tenant. In no event shall food or other perishables (other than nominal amounts) be placed in the trash compactor.

4.      Page 3a of the Lease is hereby deleted. During the Term, the Common Compactor Area shall be available for the nonexclusive use of Tenant and the Co-Tenants. The Common Compactor Area shall be used only for access to the trash compactor.

5.      Section 5.2.7(b) of the Lease is deleted.

Except as specifically set forth herein, all terms and conditions of the Lease shall remain in full force and effect. All capitalized terms used herein but not defined shall have the meaning ascribed to them in the Lease. Kindly acknowledge your agreement to the foregoing by signing below and returning a copy to the undersigned no later than November 17, 2000.

Sincerely,
Bed Bath & Beyond Inc.

Seth Geldzahler
Real Estate Director

ACKNOWLEDGED AND AGREED TO
THIS _21_ DAY OF NOVEMBER, 2000

REGENCY REALTY GROUP, INC.

By: _____
Name: _H. CRAIG Rawley_
Title: _Sr. Vice President_

11/01/00   WED 15:45 FAX 314 VII 002   602 285 1010 → CASCO CORP   Page 2
Received: 11/1/00 12:16;   602 285 1010;   Nov-1-00 1:15;   Page 2/2
Sent By: KPFF Consulting Engineers;   602 285 1010;   Nov-1-00 1:15;

 **Consulting Engineers**

November 1, 2000

Mr. Dan Kirchner
CASCO Corporation
10877 Watson Road
St. Louis, Missouri 63127

Re:   Bed Bad & Beyond, Tukwila, WA.
      KPFF Project # 100082

Mr. Kirchner,

Michel Puhlmann P.E., S.E. from our firm visited the above-mentioned building on
October 16, 2000 after wall finishes had been removed from the walls. He observed
concrete panels stopped short of the roof all the way along the south wall (with the
exception of two panels at the west end).
Continuity of wall elements is required at roof level to resist and transfer lateral loads.
Following steps are proposed to remedy the situation.

- Connect existing concrete panels to existing roof with a 6" cmu infill between
  grids C & D, D& E, H & J, J & K and K & L.

- Connect existing concrete panels and new cmu infills to existing columns at grids
  C & D, D& E, H & J, J & K and K & L.

In light of the actual condition at the south wall we wonder about the continuity of the
panels at the west wall (which were not accessible at the time of our visit). Therefore, we
would require information to confirm that the west wall panels are continuous from floor
to roof.

If you have any questions please call me.

Sincerely,

Rocio Garcia, P.E., S.E.
Project Engineer.

2800 North Central Avenue, Suite 1010  Phoenix, AZ 85004-1008  (602) 264-1010  Fax (602) 285-1010

Phoenix  Seattle  Portland  San Francisco  Irvine  Los Angeles  San Diego

# LEASE AGREEMENT

Between

## REGENCY REALTY GROUP, INC.,

Landlord

and

## BED BATH & BEYOND INC.,
a New York corporation,

Tenant

Northwest Corner of Andover Park West & Strander Boulevard
Tukwila, Washington

Dated: June 5, 2000

* * * * * *

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

* * * * * *

11868-00033/785407.9

## TABLE OF CONTENTS

Page

**ARTICLE 1**
BASIC TERMS AND DEFINITIONS ................................ 1
Section 1.1    Basic Terms and Definitions ....................... 1

**ARTICLE 2**
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ................ 4
Section 2.1    Lease of Premises ............................... 4
Section 2.2    Term .......................................... 4
Section 2.3    Delivery Date .................................. 4
Section 2.4    Late Delivery .................................. 5

**ARTICLE 3**
IMPROVEMENTS .............................................. 6
Section 3.1    Landlord's Work and Tenant's Work ................ 6
Section 3.2    Plan Approvals ................................. 6
Section 3.3    Performance of Work ............................ 7
Section 3.4    Measurement: Premises and Shopping Center ....... 9

**ARTICLE 4**
FIXED RENT, TAXES; DETERMINATION AND PAYMENT ............... 9
Section 4.1    Fixed Rent ..................................... 9
Section 4.2    Payment of Rent ................................ 9
Section 4.3    Real Estate and Other Taxes .................... 10

**ARTICLE 5**
COMMON AREAS, THEIR USE AND CHARGES ...................... 11
Section 5.1    Common Areas: Maintenance ...................... 11
Section 5.2    Common Areas: Restrictions ..................... 13

**ARTICLE 6**
UTILITIES ................................................ 15
Section 6.1    Utility Service ................................ 15
Section 6.2    Interruption ................................... 15

**ARTICLE 7**
SIGNS .................................................... 15
Section 7.1    Tenant's Building Signage ...................... 15
Section 7.2    Signage Restrictions and Criteria .............. 16
Section 7.3    Pylon/Monument Signage ......................... 16
Section 7.4    Signage: Alteration/Removal/Allocation .......... 16
Section 7.5    Cooperation .................................... 17

**ARTICLE 8**
ALTERATIONS AND IMPROVEMENTS .............................. 17
Section 8.1    Alterations and Improvements ................... 17

**ARTICLE 9**
REPAIRS .................................................. 19
Section 9.1    Tenant's Repairs ............................... 19
Section 9.2    Landlord's Repairs ............................. 19
Section 9.3    Legal Compliance Work .......................... 20

**ARTICLE 10**
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION ....... 20
Section 10.1   Mutual Release, Waiver of Subrogation and Mutual Indemnification .. 20
Section 10.2   Tenant's Insurance ............................. 21
Section 10.3   Landlord's Insurance ........................... 21
Section 10.4   General Insurance Requirements ................. 22

**ARTICLE 11**
FIRE AND OTHER CASUALTY; EMINENT DOMAIN ................... 22
Section 11.1   Fire and Other Casualty ........................ 22
Section 11.2   Eminent Domain ................................ 24
Section 11.3   Abatement of Rent Charges ...................... 25

ARTICLE 12
    COVENANTS, REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . . . 26
    Section 12.1  Quiet Enjoyment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Section 12.2  Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Section 12.3  Landlord's Covenants, Warranties and Representations. . . . . . . . . . 26
    Section 12.4  Environmental Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Section 12.5  Goltsmith Termination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 12.6  Purchase and Sale Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE 13
    USES AND RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Section 13.1  Permitted and Prohibited Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Section 13.2  Tenant's Exclusive in Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Section 13.3  Exclusives Which Tenant Must Honor . . . . . . . . . . . . . . . . . . . . . . . . 31

ARTICLE 14
    CONDUCT OF BUSINESS OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARTICLE 15
    TENANT ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 15.1  Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 15.2  Liability of Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    Section 15.3  Collateral Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    Section 15.4  Cure Rights of Original Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    Section 15.5  Recognition Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ARTICLE 16
    DEFAULT AND DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Section 16.1  Tenant Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Section 16.2  Landlord Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Section 16.3  Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ARTICLE 17
    RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE . . 35
    Section 17.1  Right to Mortgage and Non-Disturbance . . . . . . . . . . . . . . . . . . . . 35
    Section 17.2  Estoppel Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 18
    NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 19
    TENANT'S PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 20
    END OF TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Section 20.1  Surrender of Premises. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Section 20.2  Hold Over. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Section 20.3  Landlord's Entry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 21
    TENANT'S RIGHT OF FIRST OFFER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARTICLE 22
    [Intentionally Omitted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARTICLE 23
    MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    Section 23.1  Loading Facilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    Section 23.2  Liens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    Section 23.3  Broker's Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.4  Force Majeure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.5  Consents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.6  Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.7  Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.8  Survival of Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.9  Non-Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.10  Rights Cumulative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.11  Definition of Landlord. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Section 23.12  Successors and Assigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Section 23.13  Limitation of Landlord's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
Section 23.14  Limitation of Tenant's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
Section 23.15  Joint and Several Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
Section 23.16  Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
Section 23.17  Grammatical Usages and Construction . . . . . . . . . . . . . . . . . . . . . . . .  39
Section 23.18  Table of Contents, Line Numbering and Paragraph Headings. . . . . . .  39
Section 23.19  Definition of Hereunder, Herein, etc. . . . . . . . . . . . . . . . . . . . . . . . . . .  39
Section 23.20  Short Form Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
Section 23.21  Entire Agreement and Modification. . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
Section 23.22  No Joint Venture or Partnership Created by Lease. . . . . . . . . . . . . . .  40
Section 23.23  Governing Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

11858-00033/13540/.9

iii

## EXHIBITS

| Exhibit "A"   | Legal Description of Shopping Center |
|---------------|--------------------------------------|
| Exhibit "B"   | Site Plan |
| Exhibit "C"   | Rent Commencement and Expiration Date Agreement |
| Exhibit "D"   | Specifications for Landlord's Work |
| Exhibit "D-1" | Specifications for Tenant's Work |
| Exhibit "D-2" | Exterior Elevations |
| Exhibit "D-3" | List of Prototypical Drawings and Specifications |
| Exhibit "E"   | Permitted Encumbrances |
| Exhibit "F"   | Signage |
| Exhibit "G"   | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit "H"   | Subtenant Recognition Agreement |
| Exhibit "I"   | Form of Delivery Date Notice |
| Exhibit "J"   | Delivery Date Certification |
| Exhibit "K-1" | Existing Exclusives |
| Exhibit "K-2" | Existing Leases |
| Exhibit "L"   | Prohibited Uses |

11853-00093/785407.9                        iv

## LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of _____June 5_____ , 2000 by and between REGENCY REALTY GROUP, INC., a Florida corporation, having an office at 4000 Kruse Way Place, Building No. 1, Suite 130, Lake Oswego, Oregon 97035 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

### WITNESSETH:

### ARTICLE 1
### BASIC TERMS AND DEFINITIONS

Section 1.1   Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1   Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2   Affiliate:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3   [Intentionally omitted].

1.1.4   Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, elevators, escalators and common utility lines.

1.1.5   Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6   Delivery Date:  As defined in Section 2.3 hereof.

1.1.7   Effective Date:  The date hereof.

1.1.8   Event of Default:  As defined in Section 16.1 hereof.

1.1.9   Excused Periods:  Such periods of time during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business; (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or Landlord's employees, agents, or contractors.

1.1.10   Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11   Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)   For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date, at the rate of Six Hundred Seventy-Five Thousand and 00/100 ($675,000.00) Dollars per year [based on Fifteen and 00/100 ($15.00) Dollars per square foot of Floor Area];

(b)   In the event Tenant exercises the first Renewal Option,  for the first five (5) year Renewal Period, at the rate of Seven Hundred Forty-Two Thousand Five Hundred and 00/100 ($742,500) Dollars per year [based on Sixteen and 50/100 ($16.50) Dollars per square foot of Floor Area];   $16.50 × 45,633 sf = $742745.38

*[handwritten:]* opt 1 - per month, $62,745.38

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Eight Hundred Sixteen Thousand Seven Hundred Fifty and 00/100 ($816,750.00) Dollars per year [based on Eighteen and 15/100 ($18.15) Dollars per square foot of Floor Area]; and

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Eight Hundred Ninety-Eight Thousand Two Hundred and 00/100 ($898,200.00) Dollars per year [based on Nineteen and 96/100 ($19.96) Dollars per square foot of Floor Area].

1.1.12  *Floor Area*:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas and trash and trash compactor areas and/or cart storage areas). All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13  *Force Majeure*:  As defined in Section 23.4 hereof.

1.1.14  *Ground Lessor*: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15  [Intentionally omitted]

1.1.16  *Hazardous Substances*:  As defined in Subsection 12.4.1 hereof.

1.1.17  [Intentionally omitted]

1.1.18  *Landlord*:  As defined in the preamble and Section 23.11 hereof.

1.1.19  *Landlord's Mailing Address*: 4000 Kruse Way Place, Building No. 1, Suite 130, Lake Oswego, Oregon 97035 or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  Rent payments are to be made to:

c/o Regency Centers, L.P.
P.O. Box 84432
Seattle, WA 98124-5732

1.1.20  *Landlord's Work*:  As defined in Section 3.1 hereof.

1.1.21  *Lease Interest Rate*: The lesser of ten percent (10%) per annum and the then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent per annum.

1.1.22  *Legal Requirements*: All laws, statutes, codes, acts, ordinances, judgements, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23  *Mortgagee*:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord (unless the mortgage held by such Affiliate Mortgagee is held by an Affiliate in the business of mortgage financing and such loan made by such Affiliate is on arms-length terms), and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24  *Offset*:  Unless specified to the contrary and except with respect to Tenant's recoupment of Landlord's Reimbursement Amount, Tenant's Reimbursable Building Costs and amounts reimbursed under Article 11, any offset or monetary deductions permitted under this Lease to be made by Tenant shall be limited to the sum of thirty percent (30%) of Fixed Rent as such amounts shall become due and payable from time to time (provided, however, that Tenant shall, as applicable, be entitled to offset against larger percentages of each successive installment of Rent if the aforesaid thirty (30%) percent offset is insufficient to reimburse Tenant in full, taking into account the then remaining number of installments of Fixed

Rent due and payable by Tenant hereunder) and Tenant shall before exercising any such right of Offset provide Landlord with thirty (30) days' notice of Tenant's intention to do so.

      1.1.25  [Intentionally omitted]

      1.1.26  [Intentionally omitted]

      1.1.27  Permitted Use: Subject to Sections 13.1.1 and 13.3.1 hereof, the sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, personal care products and other bathroom appliances and accessories); housewares (including, but not limited to, utensils, kitchen utensils, appliances and "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services (provided that any café located within the Premises shall not exceed 500 square feet of Floor Area and shall have no exterior sign nor separate entrance); any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use consistent with the quality and character of the Shopping Center and not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

      1.1.28  Premises: Being the area hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and containing approximately forty-five thousand (45,000) square feet of Floor Area, approximately one thousand one hundred (1,100) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such non-selling mezzanine space result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such non-selling mezzanine space be included in the determination of Tenant's Pro Rata Share.  [See page 3a]

      1.1.29  Renewal Option:  As defined in Section 2.2.2 hereof.

      1.1.30  Renewal Period(s): Three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

      1.1.31  Rent: Fixed Rent and/or Additional Rent.

      1.1.32  Rent Commencement Date: As defined in Section 2.2 hereof.

      1.1.33  [Intentionally omitted]

      1.1.34  Shopping Center:  The shopping center comprised of a building (sometimes hereinafter referred to as the *"Building"*), containing approximately eighty-three thousand (83,000) square feet of Floor Area, on the property located at the northwest corner of Andover Park West and Strander Boulevard, Tukwila, Washington and more particularly described in Exhibit A hereto. Landlord shall not name or thereafter change the name of the Building without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Building.

      1.1.35  Substantially Completed or Substantial Completion: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

      1.1.36  Taxes:  As defined in Section 4.3.3 hereof.

      1.1.37  Tenant:  As defined in the preamble hereof.

      1.1.38  Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083. Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

### Insert to Section 1.1.28

With respect to those Common Areas currently designated as "Common
Compactor Area" on Exhibit B hereto, Landlord shall have the right on the
Delivery Date to include same within the Premises, in which event  (a) no portion
thereof shall be deemed "Common Areas" under this Lease, and (b) same shall
instead be included within the "Premises" for all purposes under this Lease.
Should such area currently designated as "Common Compactor Area" on Exhibit
B hereto not be so included within the Premises on the Delivery Date as
aforesaid, then Tenant shall at all times have non-exclusive use thereof in order
to have direct access to its exclusive trash compactor as shown on Exhibit B
hereto.

1.1.39 Tenant's Property: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.40 Tenant's Pro Rata Share: A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than sixty (60%) percent (except proportionately to the extent the Floor Area of the Premises is enlarged). Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.41 Tenant's Work: As defined in Section 3.1 hereof.

1.1.42 Term: A period  (the *"Initial Term"*) of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date (the *"Expiration Date"*).  As used herein, *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and license to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2    Term.

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the earlier of (such earlier date being referred to herein as the *"Rent Commencement Date"*): (a) the date (the *"Grand Opening Date"*) which Tenant shall establish in its published advertisement as its grand opening (but not later than the tenth (10th) day after the date upon which Tenant shall initially open the Premises to the general public for business), or (b) the one hundred twentieth (120th) day following the Delivery Date, provided, however, that such 120-day period shall be reduced one day for each day after the Requisite Permit Application Date (as defined in Section 2.3.1(e)) that Tenant is delayed in filing a complete application for the building permits for Tenant's Work. The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2    Renewal Options.  Provided that Tenant is not in monetary default hereunder beyond any applicable grace period for the cure thereof at the time notice of renewal is required hereunder or at the commencement of the Renewal Period, Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth except for the amount of Fixed Rent which shall be as set forth in the definition of "Fixed Rent" in Section 1.1.11 hereof. Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s). If the Term is not extended for any particular Renewal Period, then Tenant's option for such Renewal Period and any successive Renewal Periods shall lapse and shall thereafter not be exercisable by Tenant.

Section 2.3    Delivery Data.

2.3.1    Definition. Landlord shall be deemed to have delivered possession of the Premises at 8:00 a.m. on the date (the "**Delivery Date**") set forth in the Delivery Date Notice delivered in accordance with Section 2.3.2, by which all of the following conditions (the "**Delivery Date Conditions**") shall have occurred and as to which Landlord has certified in the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that the conditions set forth in Subsections (a), (c) and (d) below shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant broom clean (and, with respect to the space currently occupied by Golfsmith [the "**Golfsmith Space**"] pursuant to the existing lease with such tenant [the "**Golfsmith Lease**"], free of any fixtures, machinery, equipment, and/or inventory), vacant and free of all leases (other than this Lease), including the lease currently affecting the Golfsmith Space, and with Landlord's Work Substantially Completed; Landlord hereby certifies that as of the date hereof, the Premises, except for the Golfsmith Space, are in such condition; and

(b)    Intentionally Omitted;

(c)    The representations and warranties of Landlord set forth in subparagraphs (a) through (h) of Section 12.3 below shall then be true and in effect, all of which shall be deemed repeated as of the Delivery Date;

(d)    If any mortgage or deed of trust or ground lease encumbers the Shopping Center or any portion thereof, Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof, and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor; Notwithstanding the foregoing, Landlord represents and warrants that, as of the date Landlord acquires fee title to the Shopping Center, there shall be no such mortgages or deeds of trust nor any Ground Lessor and covenants that none shall exist on the Delivery Date;

(e)    All required building permits necessary for Tenant's Work (defined in Article 3 herein) have been issued (or are ready to be issued, subject only to Tenant's payment of fees for such issuance) (the "**Permit Condition**"). Tenant shall file a complete application for all such building permits not later than June 22, 2000 (the "**Requisite Permit Application Date**").

2.3.2    Delivery Date. Landlord shall give Tenant written notice concerning satisfaction of those three conditions to the Delivery Date set forth in Subsections (a), (c) and (d) of Section 2.3.1 hereof, using the form of Delivery Date Notice attached hereto as Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date, unless Tenant opens for business. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

2.3.3    Delivery Date Certification. Tenant shall notify Landlord that the Permit Condition has been satisfied within five (5) business days after issuance of all required building permits necessary for Tenant's Work. Upon satisfaction of all of the Delivery Date Conditions, Landlord shall thereafter deliver to Tenant a Delivery Date Certification in the form annexed hereto as Exhibit J. Landlord's delivery of the Delivery Date Certification shall be a condition precedent to the Rent Commencement Date.

2.3.4    No Waiver. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4    Late Delivery. If, for any reason (including, without limitation, *Force Majeure*), the Delivery Date has not occurred by August 15th in any year, Tenant shall have the option to elect not to take possession of the Premises during the period of August 16th through the next succeeding December 1st (the "**Non-Possession Period**") in which case the Delivery Date (provided the Delivery Date Conditions and the other provisions of this Article 2 have been satisfied) shall occur on the date Tenant accepts possession of the Premises but not later than the end of the Non-Possession Period, and the Rent Commencement Date shall be postponed

Ex B Page 44 of 115

accordingly. Notwithstanding the foregoing, if Tenant fails to file a complete application for all building permits necessary for Tenant's Work on or prior to the Requisite Permit Application Date, the August 15th date set forth above for the commencement of the Non-Possession Period shall be delayed one day for each day after the Requisite Permit Application Date that Tenant is delayed in so filing the building permits for Tenant's Work.

## ARTICLE 3
## IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibits D hereto (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein. Except for Landlord's Work, Tenant shall do any and all work, including, without limitation, Tenant's Building Work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use. All of Tenant's Work shall be performed by Tenant at its sole cost and expense, except as set forth in Sections 3.2.3 and 3.2.4.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Tenant's Plans. Landlord has delivered to Tenant those "as built" plans in its possession or control with respect to the portion of the building in which the Premises are located (i.e. comprised of the former Future Shop location and part of the Golfsmith Space)].

(b)    On or before June 22, 2000, Tenant shall deliver to Landlord Tenant's plans (*"Tenant's Plans"*) depicting Tenant's Work. Landlord acknowledges that Tenant's Plans will be submitted to Landlord at the same time such Tenant's Plans are submitted by Tenant to the City of Tukwila for building permits. Landlord shall have fifteen (15) days from its receipt of Tenant's Plans (or revisions thereto, as applicable) to approve or disapprove Tenant's Work depicted thereon, which plans and work shall be approved so long as they: (i) comply with all Legal Requirements, and (ii) do not reduce the structural soundness of the building containing the Premises. Notwithstanding the foregoing, if Tenant's Plans affect any structural elements, Building exterior, locations of entrances or exits or major building systems, such aspects of Tenant's Plans shall be subject to Landlord's approval. Landlord shall have no approval rights with respect to any other aspects of Tenant's Plans, provided Tenant's Plans are consistent with Tenant's prototype plans described on Exhibit D-3 annexed hereto, except for changes required as a result of the configuration of the Premises. If Landlord shall fail to disapprove Tenant's Plans with reasonable specificity within said 15-day period, Tenant's Plans shall be deemed approved. This Lease is subject to and conditioned upon Landlord's approval (or deemed approval) of Tenant's Plans. Upon Landlord's approval (or deemed approval) of Tenant's Plans, such plans shall be referred to as *"Final Plans and Specifications"*.

(c)    Tenant shall have the right to make changes to the Final Plans and Specifications, provided that any such changes which constitute structural changes to the building in which the Premises are a part, or which modify the exterior of the Premises from that exterior as shown on the Final Plans and Specifications, shall be subject to the approval of Landlord. Landlord shall review and respond to such structural and/or exterior modifications within seven (7) days after the day Tenant delivers such modifications to Landlord. Landlord's failure to timely respond to such proposed modifications shall be deemed Landlord's approval thereof. The Final Plans and Specifications and any subsequent changes to the Final Plans and Specifications shall comply with Legal Requirements.

3.2.2    Building Permits. Within ten (10) days after Landlord and Tenant have approved Tenant's Final Plans and Specifications as aforesaid, Tenant shall file any necessary amendments to Tenant's application for all required building and signage permits necessary for the construction of Tenant's Work and to thereafter use good faith and diligent efforts to obtain all such permits. The cost of the pursuit of such permits shall be borne by Tenant; but Landlord will provide its cooperation in connection therewith and, if necessary, shall join in such applications, and execute such other documents, as Tenant may reasonably request for such purposes. If, despite Tenant's good faith and diligent efforts, Tenant is unable or for any reason fails to obtain all necessary permits for the construction of Tenant's Work on or prior to October 20, 2000, Tenant may terminate this Lease by giving written notice thereof to Landlord, which notice of termination shall be effective thirty (30) days after the giving of such notice, but which notice of termination shall be ineffective if, within said 30-day period, all necessary permits for the construction of Tenant's Work are, in fact, obtained. During the aforesaid 30-day period, Landlord shall have the right, but not the obligation, in cooperation with Tenant, to use whatever efforts Landlord deems advisable or desirable in order to assist Tenant in the pursuit of all such necessary permits. Furthermore, if for any reason Tenant is unable or fails to obtain all

Ex B Page 45 of 115

necessary permits for the construction of Tenant's Work on or prior to December 19, 2000.
Landlord may terminate this Lease by giving written notice thereof to Tenant, which notice of
termination shall be effective sixty (60) days after the giving of such notice, but which notice of
termination shall be ineffective if, within said 60-day period, all necessary permits for the
construction of Tenant's Work are, in fact, obtained.  Upon obtaining all required permits for the
performance of Tenant's Work, Tenant, at its expense (subject to the provisions of Section
3.2.3, 3.2.4 and Exhibit D-1 hereof), shall commence the performance of Tenant's Work and
shall use all reasonable and diligent efforts to cause the same to be completed in substantial
accordance with the approved Tenant's Final Plans and Specifications.

3.2.3  Landlord's Reimbursement Amount.

Landlord covenants and agrees to reimburse Tenant an amount equal to Eight Hundred
Thousand ($800,000) Dollars ("*Landlord's Reimbursement Amount*") as an offset (and not an
inducement) for Tenant's construction, on behalf of Landlord, of certain improvements (the
"*Landlord's Special Improvements*") (which Landlord's Special Improvements, when
completed shall be the property of Landlord, subject to use by Tenant of same during the Term
of, and in accordance with, this Lease).  Landlord alone shall be entitled to depreciate the
Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize
income with respect to the amount of the Landlord's Reimbursement Amount.  Tenant shall be
responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the
Landlord's Reimbursement Amount, and Tenant's Work (except for Landlord's Special
Improvements) shall be and remain the property of Tenant throughout the Term, and Tenant
alone shall be entitled to the benefits of ownership thereof, including, without limitation,
depreciation of same as an asset for tax purposes.  Landlord shall pay to Tenant $400,000 of
Landlord's Reimbursement Amount after Tenant's Substantial Completion of Landlord's Special
Improvements and upon the issuance and delivery to Landlord of a copy of the certificate of
occupancy (whether permanent or temporary) for the Premises, and thereafter Landlord shall
pay Tenant the balance of Landlord's Reimbursement Amount within ten (10) days after the
later of Tenant's opening for business and Tenant's payment of the first month's Fixed Rent due
under this Lease.  As soon as reasonably practical after Tenant has opened for business, but in
no event more than sixty (60) days after the Rent Commencement Date, Tenant shall deliver to
Landlord (i) its architect's written certification that Tenant's Work has been substantially
completed, and (ii) a final general contractor's affidavit stating that all subcontractors, suppliers,
materialmen and laborers who have furnished labor or materials to the Premises at Tenant's
request have been paid the agreed price or reasonable value of the labor, services and/or
materials furnished in the performance of Tenant's Work and (iii) unless otherwise bonded, final
lien waivers from all of its contractors, subcontractors and materialmen, except that no lien
waivers shall be required if the amount of the work performed or materials supplied is less than
$25,000.00.  As soon as reasonably possible thereafter, but in no event more than two (2)
months after Tenant has opened for business, Tenant shall deliver a complete set of as-built
plans and specifications for Tenant's Work, including Landlord's Special Improvements.  If
Landlord fails to pay the Landlord's Reimbursement Amount (or any portion thereof) when due,
then Tenant may, in addition to all other remedies available at law or in equity, proceed with
construction and in such event Tenant shall have the right to recoup the portion of the
Landlord's Reimbursement Amount due and owing by deducting same from Fixed Rent and
Additional Rent (together with interest thereon at the Lease Interest Rate). The parties agree
that the within right to recoup any unpaid installment of Landlord's Reimbursement Amount is a
recoupment and not an Offset.

3.2.4  Landlord's Reimbursement for Tenant's Building Work.  In addition to
Landlord's Reimbursement Amount, Landlord shall reimburse Tenant fifty (50%) percent of
Tenant's certified and documented cost (which 50% of such costs are referred to herein as
"*Tenant's Reimbursable Building Costs*") of completing the portion of Tenant's Work
described as "*Tenant's Building Work*" in Exhibit D-1. The Tenant's Reimbursable Building
Costs shall be payable to Tenant in two equal installments concurrently with each payment of
Landlord's Reimbursement Amount [and Tenant shall be liable for the balance of such costs of
Tenant's Building Work]. Landlord and Tenant shall reasonably approve the plans to be
prepared by Tenant for the Tenant's Building Work. Tenant's Building Work shall be deemed to
be part of Landlord's Special Improvements for all purposes of Section 3.2.3 above, except with
respect to the reimbursement amount governed by this Section 3.2.4.  If Landlord fails to pay
Tenant's Reimbursable Building Costs (or any portion thereof) when due, then Tenant may, in
addition to all other remedies available at law or in equity, proceed with construction and in
such event Tenant shall have the right to recoup the portion of the Tenant's Reimbursable
Building Costs due and owing by deducting same from Fixed Rent and Additional Rent
(together with interest thereon at the Lease Interest Rate). The parties agree that the within
right to recoup any unpaid installment of Tenant's Reimbursable Building Costs is a recoupment
and not an Offset.

Section 3.3  Performance of Work.

3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain all required permits and approvals from applicable governmental and quasi-governmental authorities to enable Tenant to perform Tenant's Work and to open and conduct its business in the Premises. Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with Landlord's current refurbishment of the Shopping Center. If such permits and approvals cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain such permits and approvals for Tenant's Work, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2   Subject to the provisions of Section 12.6 and Section 3.2.2 hereof, if: the Delivery Date shall not have occurred by December 31, 2000 because the conditions set forth in clauses (a), (c) or (d) of Section 2.3.1 have not occurred (subject to *Force Majeure*, not to exceed thirty (30) days), Tenant may thereafter, during such time as the Delivery Date has not occurred, at Tenant's option and in its sole discretion, elect to:

(i)   terminate this Lease, if Landlord shall fail to fully cure such matters within sixty (60) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to promptly reimburse Tenant for fifty percent (50%) of the costs associated with the preparation and review of plans and specifications, not to exceed Thirty-Five Thousand Dollars ($35,000); and/or

(ii)   avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)   extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section or this Lease.

3.3.3   Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to in order to verify that Landlord's Work has been completed.

3.3.4   Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable and, in respect of any work proposed by Tenant prior to the Delivery Date, as shall have been approved by Landlord in advance, without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims, losses, costs, expenses, actions, causes of action, demands, and fees, including, without limitation, attorneys' and other professional fees, arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors. Tenant's entry onto the Premises shall be in accordance with all terms and conditions of this Lease, including, without limitation, with respect to insurance and indemnity, other than the obligation to pay Fixed Rent and Tenant's Pro Rata Share of Common Areas Charges and Taxes.

3.3.5   Tenant's Leasehold Improvements.  Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, all to the extent performed at Tenant's expense and without reimbursement for the costs thereof by Landlord, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.  Upon the expiration of the Term, all of such improvements remaining at the Premises shall automatically, without further action by Landlord or Tenant, become the property of Landlord.

3.3.6   Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

8

(a)    all staging and storage of materials and parking of construction vehicles shall at all times occur only within the portions of the Shopping Center designated as "Staging" on  Exhibit B  hereto or such other area reasonably approved by Landlord and Tenant;

(b)    Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on  Exhibit B  hereto; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7  Tenant's Trailer   Tenant shall have the right, subject to applicable Legal Requirements, to place a trailer on the Common Areas in an area immediately adjacent to the Premises, in the location shown on  Exhibit B  hereto, for the purpose of conducting employee interviews and recruiting, which trailer shall be removed prior to the Rent Commencement Date.

Section 3.4    Measurement; Premises and Shopping Center.  At least thirty (30) days prior to the Delivery Date, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Premises and the Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer.  If (I) the Floor Area of the Premises is determined to be less than forty three thousand (43,000) square feet, then Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease and all reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work (including, without limitation, plan preparation and review), not to exceed Fifty Thousand Dollars ($50,000).  If the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof, neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof, except to the extent such excess Floor Area does not exceed two percent (2%) of the Floor Area set forth in Subsection 1.1.28 above.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to the provisions of this Section 3.4.  Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

ARTICLE 4
FIXED RENT, TAXES; DETERMINATION AND PAYMENT

Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated.  Fixed Rent shall be paid without deduction, notice or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    Payment of Rent.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address for rent payments set forth above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the *"Paying Agent"*),  to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under

this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3   Real Estate and Other Taxes.

4.3.1   Landlord shall pay on or before the delinquency dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2   (a)   Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Tenant's Pro Rata Share of the Taxes shall be determined, and shall be payable at such times, as if Landlord had exercised such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof (except for such interest as may accrue on the unpaid balance because of the installments, which interest shall be included within such Taxes). Landlord estimates that Tenant's Pro Rata Share of Taxes during the first twelve month's of the term of this Lease shall be approximately $1.38 per square foot per year of Floor Area occupied by the Premises.

(b)   Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

(c)   Tenant shall pay all personal property taxes assessed on Tenant's personal property on the Premises. If Landlord has paid any such tax in the first instance, as required by the applicable taxing authority, Tenant shall reimburse Landlord upon Tenant's receipt of paid invoices for such taxes, provided Landlord shall use reasonable efforts to give Tenant notice of any such tax prior to paying same.

4.3.3   As used herein, *"Taxes"* shall mean all general and special, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center and taxes on rents (to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), including without limitation, school taxes, local improvement district assessments and other similar state, county or local assessments and charges, including any substitution therefor, in whole or in part, due to a future change in the method of taxation. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord; (2) taxes on gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); or (5) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date, to Landlord's actual knowledge, no portion of the Shopping Center is or is scheduled or planned to be (i) subject to or the beneficiary of an abatement of Taxes, or (ii) subject to any special assessments or similar charges.

4.3.4   At Tenant's request, Landlord shall determine in good faith whether to contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if reasonably required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any

Ex B Page 49 of 115

contest or otherwise, any rebate or refund of Taxes is received. Tenant shall be entitled to Tenant's Pro Rata Share thereof to the extent same pertain to Taxes previously paid by Tenant (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). If any such contest of Taxes is initiated by Landlord at the request of Tenant, Tenant and all other tenants requesting that Landlord initiate such contest shall pay in advance their respective pro rata share of all costs and expenses of conducting such contest as such costs and expenses are incurred and in such event such tenant shall receive their pro rata share of any reduction or refund of real estate taxes thereupon realized. In connection with any such appeal, protest or refund claim, Tenant covenants and agrees that it shall continue to pay the currently assessed Taxes for the Premises at the then assessed rate. Failure of Tenant to pay Taxes will be a default under this Lease notwithstanding any pending appeal, protest or refund claim.

## ARTICLE 5
## COMMON AREAS. THEIR USE AND CHARGES

### Section 5.1    Common Areas: Maintenance

5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

(a)    During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the "*Common Areas Charges*") incurred by Landlord to operate, maintain, insure and repair the Common Areas, including, without limitation (subject to item (2) of Section 5.1.3 hereof), the cost of landscaping, sweeping, lighting, repaving, resurfacing, repairing, replacing, painting, lighting, removing trash, cleaning (including graffiti removal), security services and other similar items with respect to the Common Areas; the cost of any insurance required to be obtained by Landlord pursuant to this Lease, the cost of twelve (12) months rental interruption insurance and any other insurance now or hereafter typically maintained by owners of shopping centers hereafter maintained by Landlord in the particular area which is similar to the Shopping Center; the cost of water, electricity, gas and any other utilities used in connection with the Common Areas. Landlord shall be permitted to include in Common Areas Charges for each calendar year an administrative fee (the "*Administrative Fee*") equal to ten percent (10%) of the Common Areas Charges for the calendar year in question, but excluding from the computation of such Fee the cost of any replacement or improvement of a capital nature, the cost of electricity and other utilities and insurance premiums. If any costs includable within the definition of Common Areas Charges herein are disproportionately incurred by or on behalf of any one or more of the tenants of the Shopping Center (such as for example costs relating to the operation of a food court) then Landlord may in Landlord's reasonable discretion allocate such costs other than on a pro rata basis against the particular tenant(s), including Tenant, for whom such costs are incurred. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget. Landlord's budget for the first full twelve (12) calendar months of during the Term shall be in an amount equal to $1.37 per square foot per year of Floor Area occupied by the Premises. Thereafter, Landlord's budget for any calendar year shall not exceed one hundred five percent (105%) of the actual Common Areas Charges for the immediately preceding calendar year (exclusive of the costs of snow removal, insurance and utility service for the Common Areas during each such prior calendar year), and Landlord shall make available to Tenant, upon Tenant's request, with reasonable backup documentation and applicable evidence of prior bills and payments.

(b)    Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the "*CAC Reconciliation Statement*"). The CAC Reconciliation Statement shall be certified by Landlord or Landlord's manager, as agent for Landlord, as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in

the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly make available to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of the actual Common Areas Charges with respect to the first twelve (12) months of the Term exceed $1.37 per square foot per year of Floor Area occupied by the Premises, and with respect to any other calendar year thereafter (exclusive of the costs of snow removal, insurance, utility service and extraordinary non-recurring capital expenses for the Common Areas during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of the Common Areas Charges for the immediately preceding calendar year (exclusive of the costs of snow removal, insurance, utility service and extraordinary non-recurring capital expenses for the Common Areas during such calendar year).

### 5.1.3  Exclusions from Common Areas Charges.

(a)   Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any replacements or capital improvements to the Common Areas (except if Landlord incurs a capital expenditure relating to a replacement to the Common Areas not required as a result of the negligence or willful misconduct of Landlord, after the first three (3) years after the Rent Commencement Date, the same may be amortized in accordance with generally accepted accounting principles ("GAAP"), at the time such expenditures are incurred, over the useful life of the item so amortized, and only the amortized portion applicable to each year shall be included in Common Areas Charges for such year and then only to the extent the capital expenditure is for a replacement similar in nature and quality to the improvement replaced; provided, however, that any repaving of the parking areas may not be included to the extent incurred more often than once every five (5) years during the Term); (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center (which amounts are covered in Article 4 hereof); (7) the cost of compliance with Legal Requirements (including, without limitation, the cost of curing violations or contesting such laws or violations), except that Common Areas Charges shall include the cost of compliance with laws affecting only the Common Areas provided that same shall (A) apply only to laws enacted after the Rent Commencement Date, (B) not be necessitated by the acts or omissions of Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or employees, (C) benefit all tenants of the Shopping Center, (D) be amortized on a straight-line basis over the useful life thereof under generally accepted accounting practices, and (E) be similarly imposed on all other tenants of the Shopping Center the cost of compliance with applicable Legal Requirements; (8) any costs resulting from insurance deductibles in excess of Fifty Thousand Dollars ($50,000.00) per annum (as same may be increased during the term by commercially reasonable amounts) or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center other than for the performance of services or repairs which would otherwise be includable in Common Areas Charges if performed by Landlord; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest (except to the extent caused by Tenant); (15) ground rent; (16) subject to item (23) below of this Section 5.1.3, depreciation; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center) unless such costs are incurred on behalf of Tenant; (18) electricity costs for lighting Common Areas

later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting to the extent provided in Landlord's reasonable judgment; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or to an Affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses, except for the Administrative Fee; or (26) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems, provided that Tenant monitors, maintains, inspects and tests the fire alarm system exclusively serving the Premises.

(b)    In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges.

(c)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

The cost of repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises), as provided in Section 9.2 hereof, shall be includable in Common Areas Charges only with respect to repainting performed after the fifth (5th) anniversary of the Delivery Date, and not more frequently than once every five (5) years thereafter, except as otherwise necessary to remove graffiti or comply with Landlord's obligations pursuant to Section 9.2 hereof.

5.1.4    Tenant's Right to Audit.  Tenant shall have the right (not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share thereof.  Upon Tenant's request, Landlord shall promptly make available to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the overcharge exceeds four (4%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right to Offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or bona fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 18.3 below.

5.1.5    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1    Continuous Access.  Except as may be required by governmental authorities or temporarily in the event of an emergency, no entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term. Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2 No Alterations. Except as may be required by governmental authorities, Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location, availability, or size of any building or improvement shown on Exhibit B hereto, except to a de minimis extent; (ii) change the number, location, or layout of parking spaces shown on Exhibit B hereto, except to a de minimis extent; (iii) construct any structures or buildings in any portion of the Common Areas of the Shopping Center (including, without limitation, any kiosks, booths, signs or similar structures in the Common Areas) other than within the Permissible Building Area indicated on Exhibit B hereto (the "Permissible Building Area"); or (iv) materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks or other Common Areas, from those shown on Exhibit B hereto. In the event Tenant consents to any such work, it shall not be performed during August, November and December of any year, and shall be undertaken in such a manner so as to minimize interference with the normal conduct of any business operations in the Premises or Tenant's rights under this Lease.

5.2.3 Parking Area. During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) two and six-tenths (2.6) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center.

5.2.4 Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week at all times during normal retail shopping center hours, which shall include until at least 11:00 p.m. Monday through Saturday and until at least 7:00 p.m. on Sunday ("Normal Hours"). If Landlord is not lighting the Common Areas longer than the Normal Hours (which Landlord is entitled to do), then upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting in the Common Areas from one (1) hour after the close of business in the Premises until dawn.

5.2.5 Repairs. After the date Tenant opens for business in the Premises, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center other than leasable Floor Area (excluding minor repairs) shall:

(a) not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b) be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c) be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as to minimize interfere with the normal conduct of any business operations in the Premises.

5.2.6 Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease (except to a de minimis extent), and (iv) are uniformly enforced against all tenants of the Shopping Center similarly situated and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.7 Miscellaneous.

(a)     No Promotional Use.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes.

(b)     Trash Compactor.  Tenant shall be permitted to maintain and operate, at Tenant's expense but at no extra charge, its trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor".

(c)     Shopping Carts.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and/or D-1 and D-2 hereto. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas. Without limiting the foregoing, Tenant shall use reasonable efforts not to suffer or permit shopping carts to be left or stored in areas which interfere with pedestrian or other traffic or with ingress and/or egress to the Premises or the premises of other tenants.

## ARTICLE 6
## UTILITIES

Section 6.1     Utility Service.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord unless: (i) the quality of the service(s) provided is at least equal to the quality of the same service(s) provided by the public utility corporation or governmental authority providing such utilities in the area in which the Shopping Center is located; (ii) the cost of such service(s) shall not exceed the lesser of: (x) the cost of the same service if Tenant had obtained such service directly from a utility service provider, either on a single-store or multi-store basis, or (y) the cost to Landlord for such service; and (iii) Landlord shall pay the costs of reconnection. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees paid for the installation of utilities as part of the build-out of the Shopping Center and the installation of pipes, wires and other media for the delivery of utilities to and from the Shopping Center and the Premises as required by Landlord's Work, if any, other than deposits and fees typically paid by the users of the utility solely to activate the service). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other tenants of the Shopping Center.

Section 6.2     Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If such disrupted utilities are not restored within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption if and to the extent Tenant is unable to and does not conduct business from the Premises as a result thereof.

## ARTICLE 7
## SIGNS

Section 7.1     Tenant's Building Signage.

Tenant shall supply and install signage (and obtain all permits and approvals therefor) as part of Tenant's Work which such signage shall be in accordance with Exhibit F hereto, and with the additional provisions of this Lease. Subject to compliance with Legal Requirements, Landlord agrees that Tenant's storefront sign shall be at least ten (10') feet by forty (40') feet. Subject to compliance with applicable Legal Requirements, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy (e.g., blade) signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant announcing "Sneak Preview," "Grand Opening" and/or "Now Hiring" ), awnings, and flags of such size, design and color as Tenant, from time to time, may desire. Subject to compliance with applicable Legal Requirements, Tenant shall also be entitled, at Tenant's sole cost and expense, to: (i) install and maintain on the storefront of the Premises a temporary banner announcing "Coming Soon" at such time, and for such duration

15


in Exhibit F hereto). Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided same are professionally prepared.

Section 7.2    Signage Restrictions and Criteria.

7.2.1   During the Term and except to the extent not prohibited under leases existing as of the Effective Date, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant, and other tenants, shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs and exclusive of temporary signs comparable to those Tenant is permitted hereunder), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.

7.2.2   Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs. Except as may be otherwise existing or as may be permitted under existing leases or occupancy agreements existing as of the Effective Date, Landlord shall not permit any tenant or occupant in the Shopping Center whose premises contain less Floor Area than the Floor Area of the Premises, to erect or maintain building signage having: (a) greater total square footage than the maximum total square footage available for use by Tenant, or (b) a maximum height greater than the maximum available height of Tenant's building signage, as measured from the finished floor level to the highest point available for such signage, nor shall the height or width of the building and entrance design element of such tenant(s) or occupant(s) (including, without limitation, the height and width of any sign which is utilized by such other tenant or occupant) exceed the maximum available for Tenant's building and entrance design element (subject, however, to increases in the maximum size and/or height of building signage pursuant to Legal Requirements after Tenant's installation of its sign, to the extent such change enables a future tenant to install a sign larger than or higher than Tenant's existing sign, but provided that such installation by such other tenant does not diminish Tenant's rights to enlarge its sign pursuant to such new Legal Requirements).

Section 7.3    Pylon/Monument Signage.   Landlord shall during the entire Term, provide a pylon structure at the location shown on Exhibit B hereto. Tenant shall have the right, at its sole cost and expense, to erect and maintain its identification sign, substantially as shown on Exhibit F hereto, with such colors and otherwise as designed by Tenant, subject to Landlord's approval, on both sides of and in the top position on such pylon structure where Golfsmith listed its signs, and no other signs thereon shall be larger than Tenant's maximum allowable sign thereon. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas or otherwise, such signage shall also include Tenant's identification sign, as shown on Exhibit F hereto, which shall be higher and at least as large as the largest sign made available to such other tenant or tenants. Landlord shall maintain all pylons and monuments, if any, in good order and repair, and allow Tenant access to maintain and replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent. The cost of maintenance of all pylons and monuments (but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments), and of the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges. [See page 16a]

Section 7.4    Signage: Alteration/Removal/Allocation.   Subject to compliance with applicable Legal Requirements, Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any permitted subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.5    Cooperation.   Landlord, upon request, shall execute any consents or applications which may be reasonably required by applicable Legal Requirements or prior to the

Insert to Section 7.3

Notwithstanding the foregoing provisions of this Section 7.3, so long as the applicable governmental authority having jurisdiction does not allow Tenant to maintain pylon signage by reason of Tenant's having exterior elevation signage on two (2) sides of the building containing the Premises, then Tenant shall not be entitled to maintain pylon signage hereunder.

subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.5   Cooperation. Landlord, upon request, shall execute any consents or applications which may be reasonably required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

## ARTICLE 8
## ALTERATIONS AND IMPROVEMENTS

Section 8.1   Alterations and Improvements.

8.1.1   Tenant shall not perform any roof, structural alterations or structural improvements (including any changes to the entrance locations) to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord. All work performed in connection with roof, structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above. Tenant shall not make any improvements which would materially affect the exterior of the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld provided that such improvements (i) do not conflict with the then design and style of the Shopping Center, and (ii) are reasonably consistent with Tenant's exterior improvements in other shopping centers comparable to the Shopping Center. No alteration made by Tenant hereunder shall diminish the value of the Premises, increase the maximum height of the Building, change the building footprint, or divide the Premises into more than three (3) separate tenant spaces. If Landlord's consent is required under this Article 8, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. After completing any structural alterations to the Premises, Tenant shall deliver the plans and specifications, if any, pursuant to which the alteration was made.

8.1.2   Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural interior alterations and non-structural interior improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings, provided that the structural integrity or roof of the Premises shall not be materially adversely affected thereby.

8.1.3   After the date Tenant initially opens for business in the entire Premises, Tenant shall have the right to subdivide the Premises into up to, but not more than, three (3) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4   Tenant shall have the right to erect and maintain an antenna and a satellite dish (together with related equipment, **"Satellite Equipment"**) not to exceed five (5) feet in diameter on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, and (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon. In connection with the Satellite Equipment, the following shall apply:

(a)   Tenant shall submit to Landlord for approval an installation plan with respect to the Satellite Equipment, which shall be subject to Landlord's prior approval including without limitation as to location and method of attachment. Tenant acknowledges and agrees that, as part of Tenant's Work, Landlord may require Tenant to erect a visual barrier to limit or eliminate the visibility of the Satellite Equipment. Tenant's installation, operation, maintenance, repair and use of the Satellite Equipment shall be in accordance with all applicable governmental requirements, including, without limitation, those of the City of Tukwila, the Federal Aviation Administration and the Federal Communications Commission.

(b)   During the Term, Tenant's authorized engineers or persons under Tenant's direct supervision shall have the right of ingress and egress to the roof of the Premises for the purpose of installation, operation, maintenance and removal of the Satellite Equipment, provided Tenant obtains Landlord's prior approval of the nature thereof and the scope of

services and/or work performed on the roof.  Tenant shall notify Landlord prior to accessing the roof and/or the Satellite Equipment, and Landlord shall have the right to appoint a representative to accompany Tenant.  Tenant shall be solely responsible, both as to performance and payment of costs, for the use of the roof for the foregoing purposes; any such use shall be at Tenant's sole risk, and Tenant shall be responsible for any damage to the roof, the roof membrane, any other equipment located thereon or otherwise to the Premises resulting from Tenant's use of the same for the foregoing purposes or otherwise.  Tenant's obligations pursuant to the Lease with respect to the Premises, including without limitation with respect to insurance and indemnity, shall apply with equal force to Tenant's use of the roof and the Satellite Equipment.

(c)    Tenant will not interfere in any way with radio or other equipment which Landlord or any other user may have on any roof in the Shopping Center at the time Tenant's Satellite Equipment is installed.  In the event that Tenant causes interference, including Objectionable interference (as defined below), to the radio or other equipment on a roof of the Shopping Center of any other person in place before Tenant's equipment was installed on the roof of the Premises, Tenant will take all reasonable steps necessary to remove said interference.  If said interference cannot be removed within a reasonable period of time, Tenant's equipment will be shut down until such interference can be corrected or it will be removed.

(d)    Upon the expiration of this Lease or any extension of the Term hereof, Tenant will remove all of the Satellite Equipment and repair any damage to the roof, the roof membrane and the building of which the Premises are a part caused by such removal of the Satellite Equipment and shall return the same to the condition it was in prior to installation of the Satellite Equipment.

(e)    As used herein, *"Objectionable Interference"* shall be defined as (i) any material impairment of the functioning of any person's equipment that is located at the site and/or (ii) degradation, obstruction, or repeated interruption of a radio broadcast or receive signal which continues for a period longer than one hour, when such signal emanates from or is to be received by equipment that is located at the site.

8.1.5    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within twenty (20) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6    If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prior to the commencement of an alteration prevents Tenant from obtaining a building permit for any such alteration or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7    Except to the extent required by Legal Requirements, Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises without Tenant's prior consent.  Landlord shall neither make nor permit to be made any alterations to the exterior "architectural theme" of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

8.1.8    Landlord reserves and shall at any and all times have the right, provided that the business of Tenant shall not be interfered with unreasonably, upon reasonable prior notice, to enter the Premises at reasonable times to inspect the same to determine whether Tenant is complying with its obligations hereunder; to supply any service to be provided by Landlord to Tenant hereunder; to post notices of non-liability or non-responsibility as reasonably required and provided Landlord uses reasonable efforts to give prior notice to Tenant of such posting; and to repair the Premises and any portion of the Shopping Center, without abatement of rent, and may for that purpose erect scaffolding and other necessary structures that are reasonably required by the character of the work to be performed by Landlord.  Any entry to the Premises or portions thereof obtained by Landlord by any of said means, or otherwise, shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an eviction, actual or constructive, of Tenant from the Premises, or any portion thereof.

8.1.9    Tenant shall indemnify, defend and keep Landlord free and harmless from and against all liability, loss, damage, cost, attorneys' fees and any other expense incurred on account of claims by any person performing work or furnishing materials or supplies for Tenant or any person claiming under Tenant.  Landlord shall have the right at all times to post

Ex 8 Page 58 of 115

on the Premises any notices permitted or required by law as reasonably required and provided Landlord uses reasonable efforts to give prior notice to Tenant of such posting, or that Landlord shall deem proper, for the protection of Landlord, the Premises and the Shopping Center, and any other party having an interest therein, from mechanics' and materialmen's liens, and Tenant shall give to Landlord written notice of the commencement of any construction in or on the Premises at least thirty (30) business days prior thereto. Prior to the commencement of any such construction, Landlord shall be furnished certificates of insurance, naming Landlord as an additional insured, evidencing that each contractor performing work has insurance required hereunder, including but not limited to general liability insurance of not less than Two Million Dollars ($2,000,000.00) and worker's compensation insurance in the statutorily required amount.

8.1.10   Upon the expiration or sooner termination of this Lease, all alterations and improvements made by Tenant shall become the property of, and shall be surrendered to, Landlord, and Tenant shall have no obligation to remove alterations or improvements; provided, however, that this provision shall not apply to Tenant's Property. Any Tenant's Property remaining within the Premises after Tenant has vacated the Premises shall be deemed abandoned and Landlord may dispose of the same without liability to Tenant.

ARTICLE 9
REPAIRS

Section 9.1   Tenant's Repairs.   Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, storefront, windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls, floor coverings, and the electrical, plumbing, mechanical, and/or alarm systems, sprinkler systems, located in, or serving exclusively the Premises); (ii) the heating, ventilation and air conditioning ("HVAC") units exclusively serving the Premises; and (iii) the improvements which constitute Tenant's Work. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2   Landlord's Repairs.   Subject to the provisions of Article 11 hereof (and subject to any reimbursement obligations to the extent provided under Section 5.1), Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)   the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)   the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)   the roof, gutters, flashings, downspouts and scuppers;

(d)   the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)   all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises;

(f)   intentionally omitted;

(g)   any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges except as otherwise set forth in Section 5.1), performed in a good and workerlike manner in accordance
Ex B Page 59 of 115

19

with all applicable Legal Requirements, and to the extent possible, without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within twenty (20) days after Tenant's demand therefor, Tenant shall have a right to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    Legal Compliance Work.  Subject to Section 9.2 above, Tenant shall be responsible, at its sole cost and expense, for the performance of all "Legal Compliance Work" (hereinafter defined) required: (a) solely due to Tenant's specific manner of use of the Premises (i.e., is not of general applicability to tenants and occupants of the Shopping Center), or (b) with respect to items Tenant is required to maintain pursuant to Section 9.1 above or (c) with respect to items that would not be required but for Tenant's alterations or improvements to the Premises, provided, however, that the foregoing shall not relieve Landlord of Landlord's obligations to perform Landlord's Work in accordance with all Legal Requirements and to perform the repairs required under Section 9.2 of this Lease. Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges except as provided in Section 5.1 hereof) for performing all other Legal Compliance Work. As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.


ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1    Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other  from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2    Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3    Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, subtenants, concessionaires, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsection 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises and any other leased premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2    Tenant's Insurance.

10.2.1 Tenant's Insurance. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" and Landlord's mortgagees of which Tenant has been given notice of, if any, as an "additional insured" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; (ii) standard "All-Risk" property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property, (iii) a policy in commercially reasonable form of hired and nonowned automobile liability insurance with limits of at least $1,000,000; and (iv) to the extent required by law, workers' compensation insurance covering its employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible. During the performance of Tenant's Work or other substantial construction work, Tenant shall maintain a builder's risk policy (or endorsement) with Landlord as an additional insured, for Tenant's Work, on a full replacement cost basis. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (a) such insurance shall be primary insurance and not contributing with any insurance maintained by Landlord, and the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (b) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 Self-Insurance. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Seventy-Five Million Dollars ($75,000,000), and Tenant shall provide Landlord with evidence of such net worth and such other related information reasonably requested by Landlord; or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed One Hundred Thousand Dollars ($100,000) (as same may be increased during the term by commercially reasonable amounts), unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above. In the event that Tenant elects to so self-insure, upon the occurrence of a casualty or of any damage or destruction or claim for which insurance proceeds would have been available pursuant to the insurance required to be maintained under the Lease but for Tenant's election to so self-insure, Tenant shall use Tenant's own funds to replace the insurance proceeds which would have been available but for Tenant's election to so self-insure. In no event shall Tenant's decision not to carry such insurance as permitted pursuant to the foregoing sentence diminish Tenant's obligations (other than the obligation to carry such insurance) or Landlord's rights pursuant to this Lease.

Section 10.3    Landlord's Insurance.

10.3.1 Liability Insurance. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 "All-Risk" Property Insurance. Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term standard "All-Risk" property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake (to the extent Landlord, in its sole business judgment, requires or if maintained by prudent owners of comparable buildings), windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center (including, without limitation, Landlord's Work); provided, however, in no event shall such insurance cover Tenant's Work or Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000)(as same may be increased during the term by commercially reasonable amounts), without Tenant's prior consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Subsection 10.3 as part of Common Areas Charges. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center and such increase is attributable by the insurance company to such cause, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges paid by Tenant, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4    General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above prior to the Rent Commencement Date and thereafter at least ten (10) days prior to the expiration of such insurance policies..

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

## ARTICLE 11
## FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1    Fire and Other Casualty.

11.1.1 (a)    Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall not include any of Tenant's Property or any other items required to be insured by Tenant hereunder. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. Subject to Section 11.1.4, in the event such insurance proceeds are insufficient to complete such work,

Ex B Page 62 of 115

Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.

(b)   Notwithstanding the foregoing, but subject to Legal Requirements and any Landlord approvals required pursuant to Section 8.1, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work.  If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the Delivery Date).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)   If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.  Such abatement shall continue until terminated in accordance with the provisions of Section 11.3 below.  If such fire or other casualty occurs after the Delivery Date but before the Rent Commencement Date, then, notwithstanding any other provision of this Lease (but subject, however, to the provisions of Sections 2.3, 2.4 and 2.5 above), the Rent Commencement Date shall be deemed delayed by one day for each day which elapses between the occurrence of such fire or other casualty and the date upon which the damaged or destroyed area(s) are fully rebuilt and restored.

11.1.2  In the event that:

(a)   Subject to the availability of insurance proceeds and obtaining permits therefor, each of which Landlord hereby undertakes to diligently pursue, Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed sixty (60) days in the aggregate); or

(b)   the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Subsection 11.1 within one (1) year after the date of destruction (which period may be extended by up to ninety (90) days by reason of Force Majeure, provided that Landlord gives Tenant notice of its claim of Force Majeure within ten (10) days after the occurrence of the event of Force Majeure),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)   after giving thirty (30) days' prior notice to Landlord and Landlord's Mortgagee, if any (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within twenty (20) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that all Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)   seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)   terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3  If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

11.1.4  Notwithstanding any other provision of this Article, in the event of a fire or other casualty which damages or destroys all or a portion of the Premises, the buildings in the Shopping Center and/or the Common Areas, which fire or other casualty is not insurable or for which Landlord is not required, pursuant to Article 10 above to provide coverage (and has not so provided such coverage), then Landlord's responsibility for the repair and restoration of such damage or destruction shall be limited to an expenditure of Two Hundred Thousand and 00/100 Dollars ($200,000.00) in addition to any insurance proceeds which may have been paid to or on behalf of Landlord (collectively, the *"Uninsured Obligation"*). In the event the Uninsured Obligation is not sufficient to rebuild and restore the Premises, the other buildings and/or the other portions of the Common Areas, as the case may be, then Landlord shall have no obligation to rebuild and restore the same (but may, in any event, elect to do so) provided that Landlord gives notice to Tenant within forty-five (45) days after Landlord's insurer declines coverage of Landlord's elections not to perform such restoration, which notice shall include an independent architect's certification as to the estimated cost of the repair and restoration work to the Premises and Common Areas (the *"Restoration Cost"*). Tenant shall have the right, but not the obligation, exercisable within thirty (30) days after receipt of Landlord's notice, to give Landlord notice of Tenant's intention to provide the funds (the *"Remaining Funds"*) for the repair and restoration of the Premises and the Common Areas, which Remaining Funds shall not exceed the Restoration Cost less the Uninsured Obligation. In the event Tenant elects to provide the Remaining Funds, then Landlord shall diligently prosecute the completion of such rebuilding and restoration as otherwise provided and subject to the provisions of this Article, and the Remaining Funds shall be paid to Landlord within the same period of time as is specified in Section 11.1.1(b) above for the payment of net costs and expenses resulting from Tenant changes. In the event Tenant does not elect to provide the Remaining Funds for such rebuilding and restoration, then Tenant or Landlord shall have the right to terminate this Lease as of the end of the thirty (30) day period described above, and in such event neither party shall have any liability to the other hereunder (except as expressly provided for herein).

Section 11.2  Eminent Domain.

11.2.1  As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3  In the event that:

(a)   any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)   as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the

Shopping Center, or (ii) the Shopping Center no longer has entrances from both Andover Park West and Strander Boulevard, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)   there occurs, in Tenant's reasonable judgement, a denial of adequate access to the Shopping Center from Strander Boulevard, whether or not a Taking shall have occurred and Landlord shall have failed to relocate such entrance in a location reasonably acceptable to Tenant;

(d)   any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)   intentionally omitted; or

(f)   if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) two and one-half (2.5) parking spaces for every one thousand (1,000) square feet of Floor Area remaining in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event. In the event of a termination of this Lease by Tenant, then this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for their respective obligations pursuant to Section 10 and an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant to the extent that the same are included in the award received by Landlord; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property). During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises and Tenant shall not be entitled to any award for Tenant's leasehold bonus value.

11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3   Abatement of Rent Charges.   Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is one hundred twenty (120) days after Landlord shall have Substantially Completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

## ARTICLE 12
## COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1    Quiet Enjoyment. Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2    Authority. Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3    Landlord's Covenants, Warranties and Representations. To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Delivery Date, Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto and such additional future encumbrances as to which Tenant shall have been notified by Landlord and Tenant shall have approved;

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding governmental permits and approvals);

(d)    Subject to the termination of the existing Golfsmith Lease, Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have, access to Andover Park West and Strander Boulevard for the purpose of vehicular traffic;

(f)    Except as contemplated under Section 12.6 hereof with respect to satisfaction of certain conditions precedent to Landlord's obligations hereunder and subject to Landlord's termination of the existing Golfsmith Lease, this Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)    Subject to the building permit requirements, there shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work (and any permit or other authorization to proceed with Tenant's Work shall have been obtained by Tenant);

(h)    As of the Effective Date, other than any Legal Requirements, there are no sign ordinances, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit E hereof;

(i)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases which will be in effect on the Delivery Date with respect to the Shopping Center (the "Existing Leases"), Landlord and Tenant acknowledging that the Golfsmith Lease is in effect on the Effective Date; and

(j)    Landlord shall use reasonable efforts to forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or

Ex B Page 66 of 115

11858-00033/785407.9                          26

adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, would be likely to materially adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Tenant shall be entitled (but shall not be obligated). in its own name, to appear in such proceeding.

Section 12.4   Environmental Matters.

12.4.1 Definitions.

(a)     As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)     As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law.

(c)     As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)     As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)     As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)     As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors, sublessees, concessionaires or licensees.

12.4.2 Compliance with Environmental Laws. Tenant shall comply with all applicable requirements of Environmental Laws governing Tenant and Tenant Related Parties' use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant and Tenant Related Parties' operations thereon.

12.4.3 Responsibility for Releases of Hazardous Substances. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases. As between Landlord and Tenant, Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except in the event of an emergency or as may be required under Environmental Laws, any work performed by Landlord or Tenant relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially

interfere with the normal conduct of any business operations in the Premises or, in the case of Tenant, the business of other occupants of the Shopping Center.

12.4.4  Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5  Landlord's Representations and Warranties.  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge and except as may be disclosed in that certain Asbestos Survey and that certain Phase I Environmental Site Assessment, both prepared by Environmental Partners, Inc. dated April 20, 2000 (collectively, the "Environmental Report"), copies of which have been delivered to and reviewed by Tenant; (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties in excess of levels permitted by Environmental Laws; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6  Documents.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7  Indemnity.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, constituent partners, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Environmental Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8  Survival.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9  Conflict.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5  Golfsmith Termination.

12.5.1  Tenant acknowledges that a portion of the Premises is currently leased to Golfsmith under the Golfsmith Lease.  Landlord represents that it has commenced lease termination negotiations with Golfsmith and, accordingly, the effectiveness of this Lease is necessarily conditioned upon Landlord and Golfsmith entering into a lease termination agreement (the "Golfsmith Termination Agreement") in form satisfactory to Landlord, in Landlord's sole but reasonable discretion, whereby the Golfsmith Lease is terminated and Golfsmith surrenders possession of its premises.  Notwithstanding the foregoing, Landlord covenants to proceed diligently and in good faith to enter into the Golfsmith Termination Agreement.  Within five (5) days after full execution and delivery of the Golfsmith Termination Agreement, Landlord shall give Tenant notice thereof.

12.5.2  (a)    In the event that Landlord has not obtained a fully executed Golfsmith Termination Agreement in accordance with the terms and conditions of this Lease on or prior to December 31, 2000, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to obtaining the Golfsmith Termination Agreement as aforesaid), elect to terminate this Lease.  Should Tenant terminate this Lease as aforesaid, Landlord shall be obligated to promptly reimburse Tenant for fifty percent (50%) of the costs of the preparation of plans and specifications, such reimbursement by Landlord shall not exceed the aggregate sum of Thirty-Five Thousand Dollars ($35,000).

(b)    In the event that Landlord has not obtained a fully executed Golfsmith Termination Agreement in accordance with the terms and conditions of this Lease on or prior to December 31, 2000, despite Landlord's compliance with the provisions of this Section 12.5, then, Landlord may at its election, upon notice to Tenant, given at any time after

said date (and in any event prior to obtaining the Golfsmith Termination Agreement as aforesaid), elect to terminate this Lease. Should Landlord terminate this Lease as aforesaid, Landlord shall be obligated to promptly reimburse Tenant for fifty percent (50%) of the costs of the preparation and review of plans and specifications, such reimbursement by Landlord shall not exceed the aggregate sum of Thirty-Five Thousand Dollars ($35,000).

Section 12.6   Purchase and Sale Contract.

12.6.1 Landlord represents and warrants to Tenant that, as of the Effective Date: (a) it is the vendee under that certain Purchase and Sale Agreement dated March 27, 2000 by and between American Legend Cooperative, as seller, and Landlord, as purchaser, with respect to the Shopping Center (the "Contract"); (b) the Contract is in full force and effect; (c) it has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contract; and (d) the Shopping Center consists of approximately 4.5 acres, and currently constitutes all of the property to be purchased under the Contract. Landlord anticipates that the closing date shall be on or about June 1, 2000.

12.6.2 In the event that Landlord and Tenant have executed a short form or memorandum of this Lease for recording pursuant to Section 23.20 below prior to Landlord's closing of title to the Shopping Center or obtaining a fully executed Golfsmith Termination Agreement, Landlord shall cause such short form or memorandum to be duly recorded promptly after the deed of conveyance to Landlord and the execution of the Golfsmith Termination Agreement, at Landlord's expense. Within five (5) days after the closing of title to the Shopping Center pursuant to the Contract, Landlord shall give Tenant notice thereof.

12.6.3 (a)   In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease on or prior to December 31, 2000, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Tenant terminate this Lease as aforesaid, Landlord shall be obligated to promptly reimburse Tenant for fifty percent (50%) of the costs of the preparation of plans and specifications, such reimbursement by Landlord shall not exceed the aggregate sum of Thirty-Five Thousand Dollars ($35,000).

(b)   In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease on or prior to December 31, 2000, then, Landlord may at its election, upon notice to Tenant, given at any time after said date (and in any event prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Landlord terminate this Lease as aforesaid, Landlord shall be obligated to promptly reimburse Tenant for fifty percent (50%) of the costs of the preparation and review of plans and specifications, such reimbursement by Landlord shall not exceed the aggregate sum of Thirty-Five Thousand Dollars ($35,000).

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1   Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use.   The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 Prohibited Uses.   Landlord shall construct, lease, operate, maintain and manage the Shopping Center in a manner comparable to other similar shopping centers in the state in the vicinity in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date) for any of the "Prohibited Uses" (defined in Exhibit M hereto).

Section 13.2   Tenant's Exclusive in Center.   To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Subject only to the "Existing Leases" (defined in Section 12.3 above), as to which the provisions of this Section 13.2 shall not apply except as specifically stated herein, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to

Ex B Page 69 of 115

be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items; (c) housewares; (d) frames and wall art; (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*).  Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area within such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.]  Notwithstanding the exception of Existing Leases from this Subsection 13.2.1, existing tenants of the Shopping Center (and current or future assignees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that the lease between Landlord and any such tenant requires Landlord's consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items.

13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional department store commonly located in first-class shopping centers in the state in which the Shopping Center is located and occupying at least 100,000 square feet of Floor Area within the Shopping Center, such as, by way of example, Wal-Mart, Macy's, or Target, as such department stores are currently operated (as of the Effective Date).

13.2.3  The exclusive rights granted to Tenant with respect to any respective category listed in Subsection 13.2.1 above shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during "Excused Periods" [defined in Section 1.1.9 above] and for periods of time not exceeding six (6) consecutive months).  The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least twenty-five thousand (25,000) square feet of the Premises.

13.2.4  (a)       Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which Landlord has included in the lease between Landlord and any tenant in the Shopping Center a provision which effectuates the exclusive rights granted to Tenant in this Section 13.2 and, despite such inclusion, such tenant has violated said exclusive right unless Landlord fails to comply with any of the provisions of subparagraph (b) below) and Landlord's failure to cure the same within sixty (60) days after notice from Tenant, the Fixed Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.  In the event said violation continues for more than one year, Tenant shall have the right, in addition to all remedies given to it at law and in equity, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such one year period, upon at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination (which date shall not be more than ninety (90) days after delivery of the termination notice) without further liability on the part of either Landlord or Tenant, except for those provisions which expressly survive the termination of this Lease.  Subject to Tenant's right to terminate this Lease as aforesaid, commencing as of the expiration of the aforesaid one year period, Tenant shall resume paying full Rent without regard to the foregoing provisions of this Section 13.2.4(a), provided, however, that Tenant shall retain all of its rights and other remedies under this Section with respect to such violation and shall retain all of its rights and remedies under this Section with respect to any future violation of Tenant's exclusive thereafter occurring under this Section 13.2.4(a).

(b)       If any person or entity other than Landlord (and tenants under "Existing Leases" to the extent provided under Section 13.2.1 above) shall violate any of the exclusive provisions herein set forth in this Section 13.2, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly after Landlord has actual notice thereof from Tenant or otherwise, commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal

Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3   Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, "Existing Exclusives") a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1, and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

## ARTICLE 14
## CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Article 3 hereof) Tenant shall initially open its store for business to the public in the Premises as a Bed Bath & Beyond store, fully stocked, staffed and fixturized, for at least one (1) day, not later than ninety (90) days after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Article 14 or any other provision of this Lease (other than by reason of an Event of Default)). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by paying to Tenant, within sixty (60) days after such notice is given, all of Tenant's costs and expenses incurred in connection the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations or improvements made by Tenant and permitted under this Lease, whereupon this Lease shall terminate upon the sixtieth (60th) day (the "Recapture Date") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1   Assignment and Subletting.

15.1.1 Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or, subject to Section 8.1.2 hereof with respect to the maximum number of stores into which the Premises may be demised, any portion of the Premises, subject to all of the terms and conditions of this Lease. Tenant shall give Landlord at least thirty (30) days prior notice of any assignment, subletting, concession or license; provided, however, that failure to do so shall not affect the effectiveness thereof.

Section 15.2 Liability of Tenant. Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder.

Section 15.3 Collateral Assignment. In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4 Cure Rights of Original Tenant.

15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5 Recognition Agreement. In the event Tenant subleases any portion of the Premises containing more than 20,000 square feet of Floor Area to a national or regional retail tenant possessing a net worth of at least Ten Million Dollars ($10,000,000) for a term of at least five (5) years and satisfying the conditions set forth below in this Section 15.5, then notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver a non-disturbance agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form. The conditions applicable to any subtenant entitled to receive a non-disturbance agreement as aforesaid are as follows:

(a)     the sublease is for all of the Premises or the Premises and any remaining premises are commercially reasonable in size and configuration with adequate frontage and access to the loading dock;

(b)     the sublease obligates the subtenant to pay at least the same fixed annual rent and additional rent on a per square foot basis as is payable under this Lease or the subtenant would on the implementation of any such non-disturbance agreement be obligated to pay Landlord at least the same fixed annual rent and additional rent on a per square foot basis as is payable under this Lease;

(c)    if the sublease is not for all of the Premises, the sublease is for premises which are contiguous to either side exterior wall of the Premises;

(d)    the sublease is on terms and conditions which are no more onerous to the sublessor thereunder than those pertaining to Landlord under this Lease or the subtenant would on the implementation of any such non-disturbance agreement be obligated to Landlord under terms and conditions which are no more onerous to the Landlord than those pertaining to Landlord under this Lease;

(e)    upon the implementation of any such non-disturbance agreement the subtenant attorns to Landlord upon the terms and conditions set forth in the sublease;

(f)    the term of the sublease, inclusive of renewal options, shall not exceed the Term, inclusive, of renewal options;

(g)    if pursuant to the terms of the aforesaid non-disturbance agreement, Landlord and any subtenant become bound to each other as landlord and tenant on the terms set forth in the Sublease, then (A) Landlord shall not be liable to subtenant for any prior default of the sublessor under the sublease, (B) Landlord shall not be bound by the payment of any advance rent and (C) Landlord shall not be bound by any amendment of the sublease not received by Landlord or which does not meet the standards set forth in this Section 15.5.


# ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1    Tenant Default.

16.1.1    If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2    Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by

Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default; provided, however, in no event shall Landlord be required to lease the Premises prior to any then vacant space in the Shopping Center. In connection with Landlord's mitigation of Landlord's damages, Landlord agrees to take the following steps: (1) Landlord will engage at least one (1) commercial real estate broker with respect to leasing the Premises, (2) Landlord will notify its internal leasing staff in writing of the availability of the Premises, and (3) Landlord will post a "For Lease" sign in the window of the Premises, but Landlord shall have no obligation to relet the Premises, or any portion thereof, unless the lease terms, tenant, and use and purpose are reasonably satisfactory to Landlord. Landlord agrees to follow similar steps to relet the Premises as Landlord takes to lease other premises within the Shopping Center. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2   Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Tenant specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Landlord does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease and, with respect to breaches which are capable of being cured, failure to cure the same within thirty (30) days after notice thereof is given to Landlord (either of (i) or (ii) above being hereinafter referred to as a **"Landlord's Default"**), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)   as applicable, following an additional ten (10) days' written notice to Landlord stating Tenant's intention to cure such default on behalf of Landlord and Landlord's failure to cure within such ten (10) day period, or if such default is not reasonably capable of being cured within such period, Landlord's failure to have commenced the cure within such ten (10) day period or, having commenced to cure within such ten (10) day period, Landlord's failure to diligently proceed to cure such default, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord, provided that notwithstanding anything to the contrary that may be contained in this Section 16.2 no prior notice from Tenant to Landlord shall be required in the event of an emergency; and/or

(b)   bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)   Offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)   may, after a second five (5) day notice advising Landlord of Tenant's intention to terminate this Lease and Landlord's continued failure to remedy Landlord's default before the expiration of such five (5) day period or such longer period as is required to cure the default if Landlord promptly commences and diligently proceeds to

Ex B Page 74 of 115

complete such cure (all of which shall be subject to arbitration in accordance with Section 16.5 hereof), terminate this Lease, without waiving its rights to damages for Landlord's Default, provided and on condition that (1) Landlord's Default materially interferes with the normal conduct of any permitted business operations in the Premises, (2) Landlord's Default is not capable of being cured or being rendered irrelevant by any actions of Tenant despite commercially reasonable efforts on the part of Tenant, and (3) Tenant shall have delivered notice of Landlord's Default to any Mortgagee of Landlord (provided Landlord shall have previously notified Tenant of the name and address of such Mortgagee), and such Mortgagee has not cured Landlord's Default within thirty (30) days following its receipt of such notice (or, if Landlord's Default requires more than thirty (30) days to cure in the exercise of due diligence, such Mortgagee has not commenced to cure same within said thirty (30) day period and thereafter diligently prosecuted the same to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (i.e., posing imminent material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises) shall exist, Tenant may, at its election, and without prior notice to Landlord except to the extent reasonable under the circumstances, exercise any or all of the remedies set forth in (a) and (b) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3 Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Seattle, Washington, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party. Tenant's right to arbitrate certain matters under this Lease shall in no event affect Tenant's obligations to pay Fixed Rent without deduction, notice or set-off, except as otherwise expressly provided herein.

## ARTICLE 17
### RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1 Right to Mortgage and Non-Disturbance. Landlord reserves the right to subject and subordinate this Lease at all times to any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee and Tenant shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto with such changes thereto as Tenant may reasonably approve, or such other form as is reasonably approved by Tenant, in recordable form, and (b) any Ground Lessor and Tenant shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease so long as Tenant is not in default under the terms of this Lease beyond any applicable cure period; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2 Estoppel Certificate. Upon written request of Landlord or Tenant, the other party, within twenty (20) days of the date of such request, shall execute and deliver to and

only for the benefit of the requesting party or any Mortgagee, bona fide prospective purchaser, assignee, or sublessee of the requesting party, without charge, a certified written statement to which a true, correct and complete copy of the Lease, as amended, shall be attached: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease, as attached, is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to Tenant's actual, knowledge, Landlord is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, (6) stating which options to extend the Lease Term have been exercised, if any, and (7) such other matters as may be reasonably requested.

### ARTICLE 18
### NOTICE

Subject to the further provisions of this Article XVIII, whenever it is provided herein that any notice, demand, request, consent, approval or other communication ("Notice") shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Jeffrey H. Kaplan, Esq., c/o Robinson Silverman Pearce Aronsohn & Berman, LLP, 1290 Avenue of the Americas, New York, New York 10104, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 6.1 of this Lease.

### ARTICLE 19
### TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within twenty (20) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

### ARTICLE 20
### END OF TERM

Section 20.1   Surrender of Premises.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2   Hold Over.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

Section 20.3   Landlord's Entry.  Tenant shall permit Landlord to enter up Premises during Tenant's business hours, upon reasonable prior notice to Tenant

same to prospective *bona fide* purchasers and lenders of the Shopping Center, and during the last six (6) months of the Term, to exhibit same to prospective *bona fide* tenants; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager or other person in charge upon entering the Premises for such purposes. Landlord and Landlord's employees shall be entitled to enter upon the portions of the Premises open to Tenant's customers at any time during Tenant's normal business hours provided doing so does not interfere with the conduct of Tenant's business at the Premises.

## ARTICLE 21
## TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease and the initial Tenant named herein is in occupancy of the entire Premises, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease (excluding the initial leasing of the remainder of the Goldsmith Center to any other Tenant hereunder). At such time that Landlord has knowledge that such space (" *Offered Space*") is or will become available, Landlord will give Tenant notice (the " *Offering Notice*") of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have fifteen (15) days within which to respond to Landlord's offer with respect to the entire Offered Space (but Tenant shall not have any right to lease only a portion of the Offered Space). In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such fifteen (15) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall contain the terms and conditions set forth in the Offering Notice, provide that the term thereunder shall expire contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21. Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon such terms and conditions as are satisfactory to Landlord, in Landlord's sole discretion, provided that such lease is executed within twelve (12) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space. Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above.

## ARTICLE 22
[Intentionally Omitted]

## ARTICLE 23
## MISCELLANEOUS

Section 23.1   Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2   Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises to the extent such lien may have any adverse affect on Tenant, Tenant's operations therein or performance of alterations thereto.

Section 23.3 Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Northwest Retail Partners, Ltd. (the **"Broker"**). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, reasonable attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4 _Force Majeure_. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, inability to procure materials, failure of power, restrictive Legal Requirements, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as **"Force Majeure"**), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of Force Majeure.

Section 23.5 Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6 Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary or except as otherwise provided by law.

Section 23.7 Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8 Survival of Obligations. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9 Non-Waiver. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11 Definition of Landlord. The term **"Landlord"** shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 Successors and Assigns. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 Limitation of Landlord's Liability. Except with respect to (i) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center and (ii) the payment to Tenant of the Landlord's Reimbursement Amount, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center (for the period which is six (6) months prior to the entry of a judgment and thereafter) for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity. Tenant further hereby waives any and all right to assert any claim against or obtain any damages from, for any reason whatsoever, the directors, officers, employees and constituent partners of Landlord, including all injuries, damages or losses to Tenant's property, real and personal, whether known, unknown, foreseen, unforeseen, patent or latent, which Tenant may have against Landlord or Landlord's directors, officers or partners. Tenant understands and acknowledges the significance and consequence of such specific waiver.

Section 23.14 Limitation of Tenant's Liability.

Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15 Joint and Several Liability. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 Severability. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 Grammatical Usages and Construction. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 Table of Contents, Line Numbering and Paragraph Headings. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 Definition of Hereunder, Herein, etc.. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 Short Form Lease. Upon the request of either party following the execution and delivery of this Lease, but subject to Landlord's acquisition of the Shopping Center, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request and shall refer to such provisions of this Lease which may survive the expiration or sooner termination hereof. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 Entire Agreement and Modification. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no

Ex B Page 79 of 115

force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 No Joint Venture or Partnership Created by Lease.   Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

**[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]**

Section 23.23 <u>Governing Law</u>. This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:                                            REGENCY REALTY GROUP, INC., a Florida
                                                    corporation

*Kim A. Magruder*                        By:    _____
                                                    H. Craig Ramey
                                                    Vice President

[SEAL]


**TENANT:**

WITNESS:                                            BED BATH & BEYOND  INC.,, a New York
                                                    corporation

*Alan M. J___*                           By:    _____    AmF
ALAN FRELMAN                                        Warren Eisenberg
                                                    Co-Chief Executive Officer

[SEAL]


STATE OF NEW JERSEY    )
                                         ) : ss.
COUNTY OF UNION        )

On this 22 day of ___MAY___, 200⊙, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                         *Marisol Baez*
                                         _____
                                         Notary Public

My Commission Expires;                   **MARISOL BAEZ**
                                         **NOTARY PUBLIC OF NEW JERSEY**
                                         **Commission Expires 1/13/2005**

STATE OF OREGON        )
                                         ) : ss.
COUNTY OF WASHINGTON   )

On this 5th day of ___June___, 2000, before me personally came H. Craig Ramey, to me known, who being by me duly sworn, did depose and say that he is the Vice President of Regency Realty Group, Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                         *Kim A. Magruder*
                                         _____
                                         Notary Public

My Commission Expires:  1-25-01



## INDEX OF EXHIBITS

Exhibit A -    Legal Description of Shopping Center

Exhibit B -    Site Plan

Exhibit C -    Rent Commencement and Expiration Date Agreement

Exhibit D -    Specifications for Landlord's Work

Exhibit D-1    Tenant's Work

Exhibit D-2    Elevation Drawings

Exhibit D-3    List of Prototypical Drawings and Specifications

Exhibit E -    Permitted Encumbrances

Exhibit F -    Signage

Exhibit G -    Form of Subordination, Non-Disturbance and Attornment Agreement

Exhibit H -    Form of Subtenant Recognition Agreement

Exhibit I -    Form of Delivery Date Notice

Exhibit J -    Form of Delivery Date Certification

Exhibit K-1    Existing Exclusives

Exhibit K-2    Existing Leases

Exhibit L    Prohibited Uses

1
2
3
4
5
6
7
8

### Exhibit A

### Legal Description of Shopping Center

That portion of Tract 7 of Andover Industrial Park No. 2, according to Plat recorded in Volume
71 of Plats at pages 68 and 69 records of King County, Washington, lying southerly of a line
drawn parallel with the south line of Baker Boulevard and 469 feet southerly thereof when
measured perpendicularly.

1856-00033/7654C7.9

1
2
3
4
5  Depict:
6
7  1. Premises (cross-hatch) with dimensions
8  2. Cart Corrals
9  3. Staging Area
10  4. Pylon
11  5. Trash Compactor
12  6. Construction Drive
13  7. Recruitment Trailer
14  8. Parking Spaces
15  9. Permissible Building Area
16  10. Loading Facilities

**Exhibit B**

**Site Plan**

11858-00033/785407.9

<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 200____, by and between _____ (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

## WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as_____ _____ (the *"Shopping Center"*), situated in _____, _____;

WHEREAS, by that certain lease dated _____, 200_ (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 200____.

2.      The Initial Term of the Lease shall expire on January 31, 20____, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the **first Renewal Period** shall be February 1, 20____, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20____, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the **second Renewal Period** shall be February 1, 20____, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20____, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the **third Renewal Period** shall be February 1, 20____, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20____, unless the Lease terminates earlier as provided in the Lease.

6.     Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

<u>LANDLORD:</u>

REGENCY REALTY GROUP, INC.

By:    _____
Name:   _____
Title:    _____

<u>TENANT:</u>

BED BATH & BEYOND INC.

By:    _____
              Warren Eisenberg
              Co-Chief Executive Officer

1
2
3
4
5
6

Exhibit D

Specifications for Landlord's Work

**BEYOND**

*Beyond any store of its kind.*

EXHIBIT D
Specifications for Landlord's Work(¶ 3.1)

[All terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease. To the extent not inconsistent with the terms of this Exhibit D, the terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of the Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturer's specifications.]

1. Landlord agrees to fully perform (at its sole cost) all of the work *("Landlord's Work")* set forth below:

2. Premises shall be delivered in a structurally sound condition, free of building, health or other municipal violations. With respect to the roof, Landlord shall transfer (allow) to Tenant during the term the benefit of any then existing roof warranty. The Landlord shall deliver the Premises "broom clean", having removed and disposed of all existing furnishings, fixtures and in such condition that the roof is watertight.

3. The Premises shall be free from asbestos contained materials and other Hazardous Substances.

4. Except as otherwise provided in this Lease and the Exhibits thereto, Landlord shall deliver the Premises to the Tenant in its present "As Is" physical condition. The foregoing reference to the Premises being delivered in "As Is" condition shall not relieve the Landlord of any maintenance or repair obligations with respect to the Premises otherwise specifically set forth in this Lease as the responsibility of the Landlord.

5. The Landlord will assist the Tenant with regard to the utilities as follows:

   A. Electric-Present electrical service is 800 amps, 480/277volts, 3 phase 4 wire. A 500 KVA transformer (pad mounted) is on site (NW corner of the building) and serving the Golfsmith and proposed Bed Bath & Beyond space. The transformer currently utilized by the Landlord will be made available, at no cost to the Tenant. Tenant shall be entitled, in the event that it becomes necessary, to install and modify, as required, electrical equipment, as it becomes necessary, within the Landlord's premises, to be located in the vicinity of the Landlord's direct meter (and shall during the term have reasonable access thereto). Should the Tenant need to interrupt electrical service within the Landlord's premises, it shall do so during Landlord's "after hours".

   B. Sanitary Sewer-Tenant shall connect new sanitary sewer line(4") to existing sewer line located below the existing concrete slab, within the premises. Landlord represents, that to the best of its knowledge, that the existing sanitary sewer line is in good working order, free of blockages and obstructions.

   C. Gas-Existing 1.5" gas line extends to the tenant space from the meter (located at the NW corner of the building) to the roof and then to the existing RTU's. In the event that it becomes necessary, Tenant shall have the right, at its sole expense, to modify the existing gas line to accommodate new RTU's.

   D. Domestic Water-Existing 2" water service extends to the tenant space. The water meter is located directly in front of the building in the landscape area between Strander Blvd. and the parking lot. In the event that it becomes necessary, Tenant shall have the right, at its sole expense, to modify and reconfigure the existing 2" water service.

   E. Fire Suppression Water Service-Existing 8" fire sprinkler main is servicing the premises. The 8" water riser enters the building in the SE corner of the premises. A tamper control valve extends through the front wall and is chained and locked. A double detector check valve is located in the vault located in the front parking lot landscape buffer. Landlord represents, that to the best of its knowledge, the existing Fire Suppression design meets code, (NFPA 231-C) and high pile storage requirements(up to 25' AFF for Class C commodities). If existing system is inadequate for tenant space, tenant shall have the right to install new or modify the existing system as required. Landlord will allow tenant to modify such system and associated common areas as required.

   F. Telephone Service-Existing service extends to the tenant space. Conduit, plywood mounting board, AC Power and grounding is presently installed and located south of the dock door. Tenant shall have the right to modify and reconfigure, at its sole expense, the existing service.

6. All existing equipment (HVAC, lighting, etc.) located within the tenants space or on the roof thereof shall be for the exclusive use of the Tenant. Tenant may also, at its sole election, dispose of the same.

7. In connection with the Tenant's work performed within the Landlord's premises, Tenant shall repair any damage to Landlord's premises caused by Tenant's negligent acts, subject to the applicable insurance and related provisions of the Lease.

JB
5-23-00

1
2
3
4
5
6
7

Exhibit D-1

Specifications for Tenant's Work



Beyond any store of its kind.

**EXHIBIT D-1**

**Specifications for Tenant's Work (¶ 3.1)**

1. Tenant to perform related improvements to existing exterior and interior of building, per plans and specifications, to be submitted. Finishes and specific design elements will be consistent to those contained in the Prototypical Drawings and Specification.

2. Tenant's "Scope of Work" to consist of, but not limited to, the following construction elements.
   a) Demolition-Removal of walls, existing storefront, mezzanine, floor anchors, finishes, etc.
   b) Limited Site Work-installation of egress ramps, repairs to parking lot due to construction of two(2) new storefront entry's.
   c) Concrete-Patch, infill, repair to floors.
   d) Masonry-Infill two 10'x14' doors with CMU.
   e) Steel-Prototypical modification, two(2) new storefront opening, railings & misc.
   f) Carpentry-Rough and finish. New Dryvit to enclose existing storefront entry and necessary modification for two(2) new storefront entry's.
   g) Roofing-make necessary minor repairs to existing roof.
   h) Doors & Glazing-Two(2) new storefront entry, vestibule and security gate. New doors per plans.
   i) Finishes-Per prototype.
   j) Specialties-Scissor lift, dock leveler, toilet accessories.
   k) Equipment-per plans.
   l) Furnishings & Fixtures-per plans.
   m) Mechanical(Plumbing/Sprinkler/HVAC) Per plans.
   n) Electrical-Light fixtures, wiring, New Building I.D. Sign and Pylon Sign, per plans.

**"Tenant's Building Work" (¶ 3.2.4)**

1. Tenant shall construct, on behalf of the Landlord, the demising partition, in accordance with governmental requirements, to separate the Premises from the balance of the building in the existing Golfsmith store. Tenant shall be responsible for modification of existing sprinkler system and HVAC system due to installation of demising partition. Such demising wall to be located so that the Floor Area of the Premises will not vary from the square footage set forth on the Final Plans and Specifications by more than one(1%) percent.

2. Tenant shall remove, disconnect, separate and terminate, if required, the utility services to the extent necessary, including HVAC, plumbing, electrical, gas, telephone systems, sprinkler and fire alarm systems serving the portion of the Golfsmith space which conflict with the new construction of the Tenant's space.

3. The aforementioned "Tenant's Building Work" is limited to cutting back any utilities, existing furnishings and fixtures to within five (5') feet of the demising partition, to allow for the installation of the demising partition. Tenant is not responsible to complete any patching & repair, or additional modifications located within the former Golfsmith store.

1
2
3
4

Exhibit D-2

Exterior Elevation Drawings

1
2
3
4
5

Exhibit D-3

List of Prototypical Drawings and Specifications



**EXHIBIT D-3**

**List of Prototypical Drawings and Specifications (¶ 3.2)**

**I.    List of Construction Drawings**

Construction Drawings prepared by Ignarri-Lummis Architects and Planners, P.A., entitled "Tenant Improvement for a New Bed Bath & Beyond Store", Prototype Version: 1.99; Architect's Commission Number 4970, dated 01/03/00, as follows:

| Drawing # | Drawing Title |
|-----------|---------------|
| A0.1 | CODE DATA, PROJECT |
| C-1 | SITE PLAN |
| C-2 | SITE DEMOLITION PLAN |
| C-3 | SITE GRADING PLAN |
| C-4 | CIVIL DETAILS |
| C-5 | CIVIL DETAILS |
| | |
| A1.1 | SITE DETAILS |
| A1.2 | DEMOLITION PLAN |
| A2.1 | STORE FIXTURE PLAN |
| A2.2 | FLOOR PLAN & PARTITION TYPES |
| A2.3 | FLOOR FINISH PLAN |
| A2.4 | REFLECTED CEILING PLAN |
| A2.5 | ROOF PLAN |
| A3.1 | DOOR & FINISHES SCHEDULES |
| A4.1 | EXTERIOR ELEVATIONS |
| A5.1 | BUILDING SECTIONS |
| A5.2 | EXTERIOR WALL SECTIONS |
| A5.3 | EXTERIOR WALL SECTIONS |
| A5.4 | EXTERIOR WALL SECTIONS |
| A6.1 | EXTERIOR DETAILS |
| A7.1 | LARGE SCALE PLANS |
| A7.2 | LARGE SCALE PLANS |
| A8.1 | INTERIOR DETAILS |
| A8.2 | INTERIOR DETAILS |
| A8.3 | CUSTOMER SERVICE DESK |
| A9.1 | INTERIOR ELEVATIONS |
| | |
| S1.1 | STRUCTURAL INFO & SCHEDULES |
| S2.1 | FOUNDATION PLAN |
| S2.2 | ROOF FRAMING PLAN |
| S3.1 | STRUCTURAL DETAILS |
| S3.2 | STRUCTURAL WALL SECTIONS |
| | |
| PME1.1 | PLUMBING MECHANICAL & ELECTRICAL INFO. |
| P1.1 | PLUMBING GENERAL INFO. |
| P1.2 | PLUMBING RISER DIAGRAM |
| P2.1 | PLUMBING FLOOR PLAN |
| P3.1 | PLUMBING ENLARGED PLAN |
| | |
| FP1.0 | FIRE SPRINKLER PLAN |
| FP2.0 | MERCHANDISING PLAN |
| | |
| M1.1 | MECHANICAL GENERAL INFO. |
| M2.1 | MECHANICAL FLOOR PLAN |
| M3.1 | MECHANICAL PLAN & DETAILS |
| M4.1 | MECHANICAL SCHEDULE & DETAILS |
| | |
| E1.1 | ELECTRICAL GENERAL INFO. |
| E2.1 | POWER PLAN |
| E2.2 | LIGHTING PLAN |
| E2.3 | SPECIALTY LIGHTING PLAN |
| E3.1 | ELECTRICAL PLANS & DETAILS |
| E3.2 | LIGHTING SEQUENCING |
| E3.3 | LIGHTING POWER DIAGRAMS |
| E3.4 | ELECTRICAL DETAILS |
| E4.1 | ELECTRICAL SCHEDULES |
| E4.2 | ELECTRICAL RISER DIAGRAMS |

JB
5-25-00



## EXHIBIT D-3 (Continued.)

II. Construction Specifications
Construction Specifications prepared by Ignarri-Lummis Architects and Planners, P.A., entitled, "Tenant
Improvement for a New Bed Bath & Beyond Store, Project Manual", Architect's Commission Number,
dated, January 3, 2000.



1
2
3
4
5
6
7
8
9
10
11
12
13

Exhibit E

Permitted Encumbrances

1. EASEMENT, INCLUDING TERMS AND PROVISIONS CONTAINED THEREIN:
   RECORDED:              JUNE 13, 1924
   RECORDING NO.:         1881542
   IN FAVOR OF:           THE PACIFIC TELEPHONE AND TELEGRAPH
                          COMPANY
   FOR:                   POLE LINES
   AFFECTS:               THE LEGAL DESCRIPTION CONTAINED IN SAID
                          EASEMENT IS NOT SUFFICIENT TO DETERMINE
                          ITS EXACT LOCATION WITHIN SAID PREMISES

2. EASEMENT, INCLUDING TERMS AND PROVISIONS CONTAINED THEREIN:
   RECORDED:              NOVEMBER 14, 1994
   RECORDING NO.:         9411141145
   IN FAVOR OF:           PUGET SOUND POWER AND LIGHT
                          COMPANY, A WASHINGTON CORPORATION
   FOR:                   ELECTRIC TRANSMISSION AND/OR
                          DISTRIBUTION SYSTEM
   AFFECTS:               AS LOCATED WITHIN THE WEST 140 FEET OF
                          SAID PREMISES AS HEREIN DESCRIBED

3. EASEMENT, INCLUDING TERMS AND PROVISIONS CONTAINED THEREIN:
   RECORDED:              NOVEMBER 30, 1995
   RECORDING NO.:         9511300415
   IN FAVOR OF:           THE CITY OF TUKWILA
   FOR:                   INGRESS AND EGRESS AND FOR THE PURPOSE
                          OF LAYING, MAINTAINING, AND INSTALLING
   CATCH                  BASIN, MANHOLE, STORM PIPE, CURB, SIDWALK
                          AND PAVEMENT
   AFFECTS:               WESTERLY AND SOUTHERLY PORTION OF SAID
                          PREMISES

4. EASEMENT, INCLUDING TERMS AND PROVISIONS CONTAINED THEREIN:
   RECORDED:              SEPTEMBER 13, 1999
   RECORDING NO.:         19990913000593
   IN FAVOR OF:           AMERICAN LEGEND COOPERATIVE FORMERLY
                          SEATTLE FUR EXCHANGE AND FIDELITY
                          NORTHWEST ASSOCIATES LLC
   FOR:                   INGRESS AND EGRESS
   AFFECTS:               EASTERLY PORTION OF SAID PREMISES AS
                          HEREIN DESCRIBED

5. COVENANTS, CONDITIONS, RESTRICTIONS AND/OR EASEMENTS; BUT DELETING ANY COVENANT, CONDITION OR RESTRICTION INDICATING A PREFERENCE, LIMITATION OR DISCRIMINATION BASED ON RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILY STATUS, OR NATIONAL ORIGIN TO THE EXTENT SUCH COVENANTS, CONDITIONS OR RESTRICTIONS VIOLATE 42 USC 3604(C):
RECORDED:                FEBRUARY 28, 1981
RECORDING NUMBER(S):     5256443

AMENDMENT(S) AND/OR MODIFICATION(S) OF SAID COVENANTS:
RECORDED:                SEPTEMBER 22, 1981, SEPTEMBER 22, 1982, FEBRUARY 10, 1987, MAY 24, 1987 AND MARCH 20, 1987
RECORDING NUMBER(S):     5332848, 5500900, 6138154, 6138170, 6180358 AND 8703200329

6. RESTRICTIONS, CONDITIONS, DEDICATIONS, NOTES, EASEMENTS AND PROVISIONS CONTAINED AND/OR DELINEATED ON THE FACE OF THE PLAT RECORDED IN VOLUME 71 OF PLATS AT PAGE(S) 88 AND 89 IN KING COUNTY, WASHINGTON.

7. UNRECORDED LEASE AND THE TERMS AND CONDITIONS THEREOF.
LESSOR:                  SEATTLE FUR EXCHANGE, INC.
LESSEE:                  MUSICIAN'S FRIEND, INC.
DATED:                   NOT DISCLOSED
TERM:                    NOT DISCLOSED
DISCLOSED BY INSTRUMENT RECORDED UNDER RECORDING NO.: 9903111434

THE INCLUSION OF THE FOREGOING MEMORANDUM OF LEASE WITHIN THESE "PERMITTED ENCUMBRANCES" IS FOR INFORMATIONAL PURPOSES ONLY, AND SHALL NOT BE DEEMED TO DIMINISH ANY OF TENANT'S RIGHTS, OR INCREASE ANY OF TENANT'S OBLIGATIONS, UNDER THIS LEASE.

8. RIGHTS OF PARTIES IN POSSESSION OF SAID LAND BY REASON OF THE LEASES SET FORTH IN EXHIBIT K-2

NOTE: THE INCLUSION OF THE FOREGOING "RIGHTS OF TENANTS IN POSSESSION OF THE SHOPPING CENTER" WITHIN THESE "PERMITTED ENCUMBRANCES" IS FOR INFORMATIONAL PURPOSES ONLY AND SHALL NOT BE DEEMED TO LESSEN OR DIMINISH ANY OF THE TENANT'S RIGHTS OR BENEFITS (OR ANY OF THE LANDLORD'S DUTIES OR OBLIGATIONS) OR INCREASE TENANT'S DUTIES AND OBLIGATIONS UNDER THIS LEASE.

1
2
3
4
5
6
7
8
9

Exhibit F

Tenant's Signage

# BED BATH & BEYOND

*Beyond any store of its kind*

**EXHIBIT F (1 of 3)**
**Pylon/Monument Sign (¶ 7.3)**



Existing Pylon/Monument Sign

Proposed Pylon/Monument Sign

**NOTE:** The sole purpose of this Exhibit is to depict the proper
Location and orientation of the existing pylon sign.
It is not intended to depict artistic and graphic representation.

Bed Bath & Beyond panel to replace existing
Golfsmith store panel in size and shape.





**EXHIBIT F** (3 of 4)
TEMPORARY SIGNS
TYPICAL ELEVATION AND
ENGINEERING DETAILS



Colors:
- Face: 7328 white.
- Returns: white, #313 Duranodic bronze or black.
- Can Interior: white
- Trimcap: white, #313 Duranodic bronze or black Jewelite.
- Neon: white.

Materials:
- Faces: 3/16" polycarbonate.
- Returns: .050 aluminum.
- Trimcap: 1" Jewelite.
- Backs: .090 aluminum.
- Neon: 15 mm white.

Electrical:
- 30 mm Transformers
  - (7) 15,000 3.0 amps each
  - (8) 12,000 3.0 amps each
  - (3) 9,000 2.5 amps each
- 61.8 total amps
- (5) 20 amp circuit recommended.
- 120 volts.

- 60 mA Transformers
  - (3) 9,000 3.85 amps each
  - (7) 12,000 6.55 amps each
  - (7) 15,000 6.6 amps each
- 116.7 total amps
- (9) 20 amp circuit recommended.
- 120 volts.



**BUILDING LETTERS**
10'-0" Stacked Layout
White
Internally Illuminated

Boxed Square Feet: 400 SF Total
Individual Letters: 223.50 SF Total

Per Line: Line 1 = 190 SF Total
         Line 2 = 150 SF Total



whips BR

Disconnect switch to be mounted on exterior of sign spandrel & painted to match sign spandrel

8 3/4"

.063 alum returns
1" "L" molding
Lexan face
tube supports
15mm neon 3" OC
turnbacks
30mA transformer 60mA in cold conditions
equipment ground
.090 alum backs - stapled interior - white
3/8" lag bolts or threaded rods (depending on wall construction)
1/4" weep holes
silicone bead around interior seam

1/2" carflex
1/2" steelflex connector

Minimum #8 sheet metal screws are to be used for securing the trim and face to the sign body. The maximum space shall not exceed 18 inches  and no fewer than 4 screws are to be used per face. Shellac is to be applied to each copper wire tie to prevent loosening of the wire tie. All signage to have individual disconnect switches. All signage is to U.L. listed and carry U.L. tables. Equipment ground required.

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200___, by and between _____ a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____, _____ _____ ... (the *"Mortgagee"*) and Bed Bath & Beyond [of _____] Inc., a _____ corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant"*).

WITNESSETH:

WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage"*) covering a parcel of land owned by _____, a _____ ... [corporation], [limited] [general] [partnership] (the *"Landlord"*) together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the *"Shopping Center"* and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

_____

[For mortgages existing as of the date Lease is executed: WHEREAS, as an inducement to Tenant to enter into the Lease, [Section 2.3.1/Section 17.3] thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

_____

[For mortgages occurring after the Lease is executed: WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

_____

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease.

2.    Tenant covenants and agrees with Mortgagee that the Lease and the leasehold estate created thereby, hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the

Mortgage or the bond or note or other obligation secured thereby unless such joinder is necessary pursuant to law to foreclose the Mortgage and then only for such purpose and not for the purpose of terminating the Lease and such naming or joining shall not otherwise be in derogation of the rights or remedies of Tenant set forth in this Agreement or in the Lease;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease said attornment to be effective and self-operative immediately upon Mortgagee succeeding to the interest of Landlord, without the execution of any further instruments on the part of any of the parties hereto. The respective rights and obligations of Tenant and Mortgagee upon such attornment, to the extent of the remaining balance of the term of the Lease and any such extensions and renewals, shall be and are the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein. Without limiting the generality of the foregoing, Tenant agrees to pay all rent and additional rent under the Lease directly to Mortgagee upon receipt of written notice from Mortgagee that Mortgagee has succeeded to the interest of Landlord under the Lease without Tenant being required to determine whether Landlord is in default under the loan secured by the Mortgage or any document or agreement related thereto; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume (except for the assumption of certain obligations or liabilities which are hereinafter expressly set forth and excepted) and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any default, act or omission of any prior landlord (including Landlord) except to the extent such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord however, such new owner shall in accordance with the terms and conditions of the Lease upon becoming substitute landlord thereunder, cure any such existing or continuing defaults of any landlord (including Landlord) and be liable to Tenant for actual damages (and not prospective, special or punitive damages) arising out of any such existing or continuing defaults of any landlord (including Landlord) accruing from and after the date Mortgagee becomes substitute landlord under the Lease;

(ii)    subject to any offsets, claims or defenses which Tenant may have against any prior landlord (including Landlord) except to the extent resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord

(subject to and except as otherwise set forth in subparagraph 4(b)(i) hereinabove and to the extent as otherwise provided for in the Lease);

(iii)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease;

(iv)     bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)     bound by any amendment or modification of the Lease made without its written consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)     Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.     No notice by Tenant to Landlord under the Lease shall be binding on Mortgagee unless a copy thereof is sent to Mortgagee. Tenant agrees to send to Mortgagee a copy of any notice relating to a breach of or a default under the Lease at the same time any such notice is sent to Landlord; provided, however, Tenant's failure to provide such notice to Mortgagee shall not be deemed to impose any liability on Tenant, provided that the time period for Mortgagee to cure a default of Landlord pursuant to this Agreement shall not commence until such notice is given as provided herein. Tenant agrees that if any such notice relates to the breach of or default under the Lease by Landlord, then Mortgagee at Mortgagee's sole option and without any obligation to do so, may cure any such breach or default within the applicable cure period, as provided in the Lease, but measured from the date that Tenant delivers a copy of such notice to Lender. It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, subject to the terms and conditions of the Lease, abatement upon casualty or condemnation.

6.     Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees at such party's expense on the aforementioned property regardless of the manner or mode of attachment thereof.

7.     Any notices, demands or communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and _____, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding anything to the contrary, neither party may designate an address for delivery of Notices unless same shall include a (i) street address, (ii) building name and/or number, (iii) city, (iv) state and (v) zip code.

8.     This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.     This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.     This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

11.   Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written,

**MORTGAGEE:**

ATTEST:

[Corporate Seal]

_____          By: _____
(Assistant) Secretary              Name: _____
                                   Title: _____

**TENANT:**

ATTEST:          BED BATH & BEYOND INC.

[Corporate Seal]

_____          By: _____
(Assistant) Secretary                  Warren Eisenberg
                                       Co-Chief Executive Officer

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

_____

STATE OF NEW JERSEY   }
                      ) : ss.
COUNTY OF UNION       }

On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
                                   Notary Public

My Commission Expires:

_____

Exhibit H

Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200_, by and between _____, a [_____] [corporation] [limited] [general] [partnership], having an address at ___ _____ _____ ("*Landlord*"); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*"); and _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ _____ ("*Subtenant*").

R E C I T A L S :

A.    Landlord and Tenant have entered into a certain lease (the "*Lease*") dated as of _____ ___, 200___, a short form of which has been recorded in _____ _____, which demises certain premises (the "*Premises*") located in the ____ _____ Shopping Center, Tukwila, Washington, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.    Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.    Pursuant to a Sublease dated as of _____ _____ (the "*Sublease*"), Tenant has subleased [a portion of] the Premises to Subtenant (the "*Subleased Premises*").

D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(i)    that it is the fee owner of the Premises.

(ii)    that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect.

(iii)    that the term of the Lease expires on _____ , but is subject to [three] renewal periods of [five] years each and

(iv)    that, to Landlord's actual knowledge, Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.    Landlord hereby acknowledges receipt of a copy of, and, subject to the terms and provisions of this Agreement, consents to  the Sublease and all of the terms, covenants and provisions thereof which are not more favorable to Subtenant than those applicable to Tenant under the Lease, and agrees, subject to the terms and provisions of this Agreement, that the exercise by Subtenant of any of its rights, remedies and options contained therein, which are not more favorable to Subtenant than those applicable to Tenant under the Lease, shall not constitute a default under the Lease.

3.    Landlord agrees that whenever it has an obligation with respect to the Premises, then, to the extent such obligation relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease.

4.    So long as the Sublease is in full force and effect and Subtenant is not in default thereunder beyond all applicable notice, grace and cure periods, Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease.

5.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease). Notwithstanding the foregoing prohibition against naming Subtenant as a party as aforesaid, Landlord shall have the right to name Subtenant in any such removal or eviction action or proceeding against Tenant under the Lease if such naming is necessary by law to terminate the Lease and in such event such naming of Subtenant shall be only for such purpose and shall not be for the purpose of terminating the Sublease or in any manner for the purpose of evicting or removing Subtenant of Subtenant's possession or disturbing or interfering with Subtenant's right of possession to the Premises.

6.    (a)    If the Lease terminates (i) because Tenant has exercised an option to terminate the Lease, (ii) by operation of law, or (iii) by mutual agreement between Landlord and Tenant, Subtenant may elect to continue the Sublease in full force and effect notwithstanding such termination of the Lease, as provided in this Paragraph 6.

(b)    On such election by Subtenant, the Sublease shall continue as a direct lease between Landlord and Subtenant for the remainder of the term of the Sublease without the necessity of executing a new Sublease, on the same terms and conditions as are in effect under the Sublease immediately preceding the termination of the Lease.

7.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

8.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and _____, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties. Notwithstanding anything herein to the contrary, neither party may designate an address for delivery of Notices unless same shall include a (i) street address, (ii) building name and/or number, (iii) city, (iv) state and (v) zip code.

9.    This Agreement contains the entire agreement between the parties and no modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

10.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

11.    This Agreement will be governed by and construed in accordance with the laws of the State of Washington.

12.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

13.     Unless expressly agreed to in writing by Landlord, the expiration of the term of the Sublease shall not occur later than one (1) day earlier than the expiration of the "Term" (as such term is defined in Section 1.1.42 of the Lease).

14.     Landlord shall not be bound by any payment made by Subtenant to Tenant under the Sublease which is made prior to the date on which the Sublease becomes a direct lease between Landlord and Subtenant, nor be liable for the return of any security deposit not actually transferred to Landlord.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

LANDLORD:

_____

By: _____
Name: _____
Title: _____

TENANT:

BED BATH & BEYOND INC.

By: _____
        Warren Eisenberg
        Co-Chief Executive Officer

SUBTENANT:

_____

By: _____
Name: _____
Title: _____

[INSERT APPROPRIATE JURATS FOR LANDLORD AND SUBTENANT]

⌡

_____

STATE OF NEW JERSEY   )
                      ) : ss.
COUNTY OF UNION       )

On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
                                    Notary Public

My Commission Expires:

_____

H-4                    Ex B Page 110 of 115

Exhibit I      ا

DELIVERY DATE NOTICE

[Letterhead of Landlord]

_____, 200__

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Agreement of Lease, dated _____, 2000 (the "Lease"), between Regency Realty
        Group, Inc., as landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant ("Tenant"),
        with respect to certain retail premises (the "Premises") located in Tukwila, Washington

Gentlemen:

        In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date Conditions set forth in Subsections (a), (c) and (d) of
Section 2.3.1 of the Lease have been satisfied and that [INSERT WHICHEVER OF THE TWO
FOLLOWING ALTERNATIVE PROVISIONS IS APPLICABLE] [subject to satisfaction of the
Permit Condition (defined in Section 2.3.1 of the Lease), the Delivery Date shall be satisfied on
the date that the Permit Condition is satisfied] or [Tenant has notified Landlord that the Permit
Condition (defined in Section 2.3.1 of the Lease) has been satisfied; accordingly, the Delivery
Date shall be _____, 200_ (insert date which is two days after the date of this letter)].

        This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of
the Lease.

                                        REGENCY REALTY GROUP, INC.

                                        By:_____
                                                            , (Vice) President

cc:     Allan N. Rauch, Esq.

Exhibit J

DELIVERY DATE CERTIFICATION

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 2000 (the "Lease"), between Regency Realty
       Group, Inc., as landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant ("Tenant"),
       with respect to certain retail premises (the "Premises") located in Tukwila, Washington

Gentlemen:

       In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result and in accordance with the
Delivery Date Notice previously delivered to Tenant, the Delivery Date (as such term is defined
in the Lease) is deemed to be _____, 200__. This notice shall constitute the Delivery
Date Certification referred to in Subsection 2.3.3 of the Lease.

                                        REGENCY REALTY GROUP, INC.


                                        By: _____
                                                    , (Vice) President


cc:    Allan N. Rauch, Esq.

1
2
3
4
5
6
7
8

Exhibit K-1

Existing Exclusives

None

1
2
3
4
5
6
7
8
9
10
11
12
13
14

## Exhibit K-2

### Existing Leases

Lease between The Seattle Fur Exchange, Inc., a Washington corporation, and Musician's Friend Trust, a business trust dated as of July 16, 1997 (the "Music Store Lease"). The lessee's interest under such lease has been assigned to Guitar Center, Inc., by an Assignment and Assumption of Lease dated as of June 28, 1999.

Exhibit L

Prohibited Uses

(a)    As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses: unlawful use; "pornographic use" (hereinafter defined); "second-hand" or "surplus" store; laundry or dry cleaners; pawn shop; daycare center; veterinary office (except as may be incidental to a full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area located at least 150 feet away from the perimeter of the Premises); living quarters; hotel/motel; manufacturing; bowling alley; off-track betting parlor or other gambling establishment; bingo hall; funeral parlor; skating rink; nightclub, discotheque or dance hall; so-called "head shop"; catering or banquet hall; children's entertainment or activity facility; meeting hall; auction hall; place of religious worship; sporting event; karate center; auditorium; warehouse, theater; automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility; supermarket; restaurant serving meals for on or off premises consumption (except that a "coffee bar" shall be permitted to be located within the Premises); beauty parlor; nail salon; billiard parlor or pool hall; sales office or showroom for automobiles, boats, or other vehicles; an establishment selling alcoholic beverages for on or off premises consumption; massage parlor; office (excluding office space used in connection with and ancillary to a permitted retail use hereunder); health spa, exercise facility or similar type business; car wash; a so-called "flea market"; carnival, amusement park or circus; video/pinball arcade or game room; entertainment or educational uses; any use generally deemed to be "obnoxious or a nuisance" (hereinafter defined); medical clinics or offices; or any other non-retail uses.

(b)    As used above, the term *"pornographic use"* shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto. The parties hereto acknowledge and agree the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder.

(c)    As used above, the term *"educational uses"* shall include, without limitation, a beauty school, barber school, reading room, place of instruction, or any other activity, facility, school or program catering primarily to students or trainees as opposed to shoppers.

(d)    As used above, the term *"obnoxious or a nuisance"* shall include, without limitation, a use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

## GARFIELD-SOUTHCENTER, LLC

P.O. BOX 529
EUGENE, OREGON  97440
(541) 465-1600
(541) 485-2050  FAX

April 10, 2023

Bed Bath & Beyond Inc.                                    *VIA FEDEX*
Attn: Vice President - Real Estate
650 Liberty Avenue
Union, NJ  07083

Re:    Garfield-Southcenter, LLC - Bed Bath & Beyond Inc. (Store #371)
       Premises:  400 Strander Blvd., Tukwila, Washington
       **NOTICE OF INTENT TO DEFAULT**

Greetings:

As you know, your Lease requires you to pay rent, common area maintenance costs, and other charges when due.  As of the date of this letter, you have failed to make these required payments and currently owe $72,087.16 for past due rent and CAM Reconciliation.  Please see the enclosed Statement of Account for your reference.

Based upon this non-payment, and pursuant to Section 16.1 of your Lease, you are hereby notified that unless the Landlord receives the entire balance due as set forth above within ten (10) days of the date you receive this letter, such non-payment shall constitute an Event of Default, and the Landlord may enact any and all remedies provided in the Lease and at law.

This letter requires your immediate attention.  If you have any questions, please feel free to contact me.

Sincerely,

Neill Plant
CFO

cl
Enclosure
cc:    Bed Bath & Beyond, General Counsel *(Via FedEx)*
       leasepayable@bedbath.com
       P-0150

**GARFIELD-SOUTHCENTER, LLC**
PO BOX 529
EUGENE, OR 97440
(541) 465-1600

**STATEMENT of ACCOUNT**

BED BATH & BEYOND #371
ATTN REAL ESTATE ACCOUNTING
650 LIBERTY AVE
UNION, NJ 07083

STATEMENT DATE:    4/10/2023

CUSTOMER NUMBER:    BB&B

| Date | Reference | Description | Charge | Credit | Balance |
|------|-----------|-------------|--------|--------|---------|
| 2/8/2023 | 0000830-IN | 2022 Cam Reconciliation | 10,294.69 | | 10,294.69 |
| 4/1/2023 | 0000836-IN | RENT | 61,792.47 | | 61,792.47 |

| | | | | Total: | 72,087.16 |
|---|---|---|---|---|---|
| Current | 30 Days | 60 Days | 90 Days | 120 Days | Balance Due |
| 61,792.47 | 0.00 | 10,294.69 | 0.00 | 0.00 | 72,087.16 |

Payment is expected within 30 days of invoice
date. Please remit all past due amounts today.

# GARFIELD-SOUTHCENTER, LLC

P.O. BOX 529
EUGENE, OREGON  97440
(541) 465-1600
(541) 485-2050  FAX

March 28, 2023

**Via Certified Mail, Postage Prepaid, Return Receipt Requested**

| | | |
|---|---|---|
| Joe Dusellier | Bed Bath & Beyond Inc. | Bed Bath & Beyond Inc. |
| Director, Corporate Security & | 650 Liberty Avenue | 650 Liberty Avenue |
| Supply Chain Loss Prevention | Union, New Jersey 07083 | Union, New Jersey 07083 |
| Bed Bath & Beyond Inc. | Attention: Vice President – | Attention: General Counsel |
| 650 Liberty Avenue | Real Estate | |
| Union, NJ  07083 | | |

Re:    **NOTICE OF LEASE DEFAULT – FIRE ALARM PANEL**
        Garfield-Southcenter, LLC - Bed Bath & Beyond Inc. (Store #371)
        Premises:  400 Strander Blvd., Tukwila, Washington

Dear Mr. Dusellier:

Thank you for your time on March 23 wherein we discussed the issue of the non-functioning fire alarm system at your store in Tukwila.  We are pleased that you have received bids for the repair.

The proper functioning of the fire panel is your responsibility under the lease.  As you know, this issue dates back to October 2022.  Unfortunately, we are out of time, and this matter must be promptly remedied.  If the fire alarm panel is not satisfactorily repaired or replaced within forty (40) days of the date of this letter, we will institute default proceedings in accordance with the lease and applicable laws.

By this letter, the Landlord hereby reasserts all its rights under the lease, specifically the default provisions contained therein.

If you have any questions, please feel free to contact me.  Please keep me updated as to the progress of your repairs.

Sincerely,

Neill Plant
CFO

cl
cc:    P-0150



**Invoice 654**

375 W 4th Ave Ste 204
Eugene, OR 97401
(541) 513-2298
aaron@noteboomlaw.com

**BILL TO**
Bed Bath and Beyond
PO Box 529
Eugene, OR 97440

| DATE | PLEASE PAY | DUE DATE |
|------|------------|----------|
| 04/12/2023 | $0.00 | 05/12/2023 |

**PROJECT/MATTER**
Bed Bath and Beyond

| DATE | DESCRIPTION | QTY | RATE | AMOUNT |
|------|-------------|-----|------|--------|
| 03/20/2023 | Review lease materials and emails from client. | 0:18 | 325.00 | 97.50 |
| 03/22/2023 | Telephone conference with Neill re current lease default. | 0:12 | 325.00 | 65.00 |
| 03/27/2023 | Review draft letter to tenant from Neill. Review lease provisions for tenant repair responsibilities and notice/default provisions; Revise letter and email Neill re same. | 0:42 | 325.00 | 227.50 |

| | | |
|---|---|---|
| | PAYMENT | 390.00 |
| | **TOTAL DUE** | **$0.00** |

THANK YOU.

**Aaron Noteboom**

| | |
|---|---|
| **From:** | Neill Plant <NeillP@giustina.com> |
| **Sent:** | Thursday, May 4, 2023 2:20 PM |
| **To:** | Aaron Noteboom |
| **Subject:** | GSC - BBBY |
| **Attachments:** | Scope Of Work FA22-1211.pdf |

Aaron,

This is a breakdown of the current account balance.

| | |
|---|---|
| 2022 CAM Rec | 10,294.69 |
| April Rent | 39,722.22 |
| April CAM | 5,592.25 |
| | 55,609.16 |

The attached Scope of work shows the needed repairs are estimated to be $74,875.

Neill

1

**SFS**

**SMITH FIRE SYSTEMS**

1106 54th Avenue East · Tacoma, Washington 98424        Phone 253-926-1880 · Fax 253-896-1216

February 3, 2023

Garfield Southcenter
230 Andover Park W
Tukwila, WA 98188

ATTN: Anthony Johnson

**RE: Fire Alarm Panel replacement**

Estimate #: FA22-1211

Smith Fire Systems will provide and replace the fire alarm control panels and migrate the building to one system **for $74,875.**

**Price includes the following:**
1) Design, permits, materials, fabrication, and installation.
2) Demo existing systems and unneeded wiring.
3) Supply and install one (1) new Siemens fire alarm control panel.
4) Supply and replace one (1) Siemens annunciator with new Siemens annunciator.
5) Supply and replace six (6) photoelectric smoke detectors.
6) Supply and replace nineteen (19) addressable duct detectors.
7) Supply and replace fourteen (14) manual pull stations.
8) Supply and replace two (2) addressable relays for fire door operations.
9) Supply and replace addressable modules servicing fire sprinkler equipment.
10) Supply and install one (1) AES radio for system communications to central monitoring station. This includes one (1) year of monitoring.
11) Supply and install extra notification as needed to bring building up to code.
12) Program and pretest system.
13) Final acceptance test with Puget Sound Regional Fire Authority.

**Clarifications and assumptions:**
1) Based upon NFPA #70 (2020 Edition) and NFPA #72 (2019 Edition) and the approval of Puget Sound Regional Fire Prevention Bureau.
2) This proposal is good for 30 days from the date of this proposal.
3) All work is to be performed during normal business hours, Monday – Friday, 7:00am to 3:00pm. With the exception of the 230 suite, this work above ceiling needs to be performed after hours.
4) This proposal is based on free and unhindered access throughout the facility including access to all ground space beneath our devices and wiring routes.
5) Daily Turn On and Turn Offs of existing fire alarm system is not included in our offer.
6) Any stoppages in work/phasing or acceleration of the project to include additional trips or additional manpower will be at additional costs.
7) Installation/Design time frame will begin when a signed copy of this proposal is returned to Smith Fire Systems, materials cannot be purchased until this time.

**Exclusions:**

1) Washington State Sales Tax.
2) Clean-up fees or shared dumpster costs. SFS will provide timely clean-up and removal of debris generated by our work.
3) Patching or painting of any kind.
4) Removal and reinstallation of ceiling grid.
5) Drilling and coring.
6) Fire Barrier Penetrations.
7) Roof Penetrations.
8) Elevator shunt controls. (monitoring only)
9) Phone Lines.
10) Installation of underground raceway.
11) HVAC duct detectors and design.
12) Fire Smoke dampers
13) Any fire watch that may be required.
14) Fire doors.
15) Additional devices required by AHJ.

Thank you for the opportunity to submit our proposal. Please contact me if you have any questions.

Sincerely,

*Kyle Swann*

Kyle Swann | Project Manager | Nicet III
Smith Fire Systems
1106 54th Ave East | Tacoma, WA. 98424
T 253 248 2014 | F 253 255-4088
Email: kswann@smithfire.com
Web: http://www.smithfire.com/

**SMITH FIRE SYSTEMS** (hereinafter called "SFS") will furnish and install a Fire Alarm or Security System described fully in SFS Scope of Work, hereinafter called "Scope of Work" in accordance with the terms and conditions set forth herein. Buyer acknowledges that the Scope of Work and the following terms and conditions have been read, the Buyer intends to be bound thereby, and that Buyer has retained a copy of this contract as signed.

**1. INSPECTION AND ACCEPTANCE**

The inspection shall be conducted solely to determine if SFS has performed its obligations as specified hereunder. Requirements not included in the specification but required by the inspection organization shall be treated as additions to and not within the scope of this contract. The issuance of an acceptance or approval inspection report as to the work specified herein shall be conclusive evidence of full performance by SFS of its obligations hereunder. Any notices of deficiencies shall be promptly submitted to SFS by Buyer.

**2. BUYER'S OBLIGATIONS IN ADDITION TO THOSE SPECIFIED**

a) The Buyer warrants that the structure of the property in which installation is to be made is sufficient to support the installation and fire protection system specified herein.

b) Until SFS receives full payment hereunder, the Buyer agrees to insure the premises and the materials to be used in this contract and located in and around the  premises against loss or damage by fire, other casualty, or theft, in a sum which will at all times exceed the unpaid balance of this contract and the reasonable value of the said materials. Buyer agrees to assume the full risk of damage to the premises and to the improvements, fixtures, equipment and all personal property located thereon, resulting from any of the perils insured against in the Standard Fire and Extended Coverage Insurance Policy, regardless of cause or origin, and regardless of whether or not the loss or damage is insured; and if insured, whether in full or in part. *Buyer shall furnish proof of insurance to SFS.*

**3. DELAYS**

SFS will not be liable for any damages, direct, incidental or consequential, or delays arising directly or indirectly from causes not within the direct control of SFS including but not limited to:  work stoppages, discontinuance of work, casualties, fires, acts of the elements, labor difficulties, acts of governments or shortages of materials or labor.

**4. ALL MODIFICATIONS TO BE WRITTEN**

This contract constitutes the entire agreement between the parties and may not be modified, amended or rescinded except by written instrument signed by both Buyer or its agents and an Officer of SFS.

**5. SECURITY AGREEMENT**

a) This contract is the subject of a security agreement between the Buyer and SFS.  All materials and equipment described herein are also included and shall hereinafter be called "apparatus."

b) The Buyer agrees to pay SFS for the apparatus in accordance with the terms of clauses 6 and 7 hereof.

c) The title to and ownership of the apparatus herein contracted for, shall remain with SFS until the entire purchase price herein agreed to be paid shall be actually paid in cash by the Buyer.

d) The apparatus will not be sold, transferred or disposed of or be subjected to any unpaid charge, including taxes, or to any subsequent interest of a third person created or suffered by Buyer voluntarily or involuntarily, unless Seller consents in advance in writing to such charge, transfer, disposition or security interest.

e) In case of failure or refusal on the part of the Buyer to make the payments, or any of them, when due under this contract, then, and in any such events, the whole of the unpaid portion of the purchase money, however secured, and whenever payable, shall thereby at the option of SFS become immediately due and payable.

f) In case of any default on the part of the Buyer, SFS shall have the right to enter upon the premises upon which the specified apparatus is installed, and, by its agents, representatives and employees take possession of and remove all or part of the same, and the Buyer shall afford every facility therefore.

g) If the specified apparatus shall be taken by SFS under this contract, by reason of the default by the Buyer, then and in any such case, the Buyer shall pay SFS all expenses, including reasonable legal fees, incurred by SFS under this contract and in retaking and selling the apparatus specified herein, and for all damages to SFS arising from wear and tear of the apparatus, but this shall not be construed to preclude SFS from pursuing any legal remedy for the recovery of any other sum which may be due it, under the terms of this agreement.

h) The Buyer agrees to cooperate with SFS and execute a financing statement, or any other form or agreement required to perfect, record, and file SFS' security interest.

**6. TERMS OF PAYMENT**

On the fifth day of each month, Buyer shall pay SFS for One Hundred Percent (100%) of the amount chargeable to Buyer for labor and materials furnished in the preceding month, based upon the percentage of completion of the installation determined by SFS.  The balance of the unpaid amount of the contract including extras and other price adjustments shall be due and payable within thirty (30) days after the installation is physically completed in accordance with the specifications attached hereto. Interest at the rate of 1.5% per month, shall be applied to the unpaid balance when thirty (30) days past due.

**7. WARRANTIES**

The equipment and supplies specified in this contract are warranted to be free from defects in workmanship and materials for one year from installation.  No other express warranty is given and no affirmation of SFS by words or actions, shall constitute a warranty.

THIS WARRANTY IS EXPRESSLY IN LIEU OF ANY OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

**ESTIMATE: FA22-1211, $74,875**

BY SIGNING THIS PROPOSAL BUYER AGREES TO THE TERMS AND CONDITIONS AS NOTED ON PAGE 3

BY: _____ DATE: _____

# *City of Tukwila*

Allan Ekberg, Mayor

*Finance Department – Vicky Carlsen, Director*

May 31, 2023

Garfield Socenter
C/O G Group LLC
PO Box 529
Eugene, OR 97440-0529

Re: Bed Bath & Beyond Bankruptcy – 400 Strander Blvd, Tukwila, WA 98188

To Whomever It May Concern:

The City of Tukwila has received notification of Bed Bath & Beyond's bankruptcy petition under Chapter 11 filed on April 23, 2023, case #23-13359 in the District of New Jersey of the US Bankruptcy Court. The City of Tukwila provides water and sewer utility service to Bed Bath & Beyond in which Garfield Socenter is the landlord. Bed Bath & Beyond has a water/sewer account (08-0245-0000) with the City. The City transferred $680.95 from account 08-0245-0000 to bankruptcy account 08-0245-0001. This amount reflects pre-petition services up to April 23, 2023. In the State of WA, the owner of the property is ultimately responsible for the water/sewer charges. Consequently, the pre-petition utility charges of $680.95 is being sent to your company for payment and is now due.

Feel free to contact me if you have any questions.

Sincerely,

Richard Takechi
Fiscal Coordinator
City of Tukwila
6200 Southcenter Blvd
Tukwila, WA 98188
206-433-1870 (O)
206-433-1833 (F)
richard.takechi@tukwilawa.gov

Enclosure

# Water and/or Sewer



| 08-0245-0001 | | | | |
|---|---|---|---|---|
| 400 STRANDER BLVD | | 05/31/2023 | 6/10/2023 | 680.95 |

*City of Tukwila*

**Remit To :** 6200 Southcenter Blvd.
Tukwila, WA 98188
(206) 433-1835

**PAY ONLINE AT: https://securepay.tukwilawa.gov**

☐ Check here and complete
back of stub for changes

**GARFIELD SOCENTER**
**c/o: G GROUP LLC**
**PO BOX 529**
**EUGENE, OR 97440-0529**

| Mastercard ☐ Visa ☐ | Amount: $ |
|---|---|
| Card Number: | CVV# |
| Signature: | Exp Date: |

Return this stub with your payment
Please detach and return top portion with your remittance.



| | GARFIELD SOCENTER | | | | | |
|---|---|---|---|---|---|---|
| | 400 STRANDER BLVD  TUKWILA, WA  98188 | | | | | |
| 08-0245-0001 | 05/31/2023 | 6/10/2023 | 0.00 | 0.00 | 680.95 | 680.95 |

**Account #:** 08-0245-0001     **Service Location: 400 STRANDER BLVD**

| | | | |
|---|---|---|---|
| 05/31/2023 | **Billing** | | 680.95 |
| | Sewage Treatment - ST C/I and Multi Fam | 152.10 | |
| | Sewer - Commercial/Industrial Sewer | 166.43 | |
| | Water - Water 1.5 Inch | 362.42 | |

| **Due Date: 6/10/2023** | **Amount Due:** | 680.95 |
|---|---|---|

**Billing Period:**

| Meter # | Prev Date | Prev Read 1 | Prev Read 2 | Curr Date | Curr Read 1 | Curr Read 2 | Totals Cons |
|---|---|---|---|---|---|---|---|
| | | 0 | 0 | | 0 | 0 | |

| Consumption Comparison | This Period | Same period last year | Change |
|---|---|---|---|
| Consumption | 0 | 0 | 0 |

The amount billed includes a tax of 10% calculated on the gross revenue of the water & sewer utility, if applicable.
2021 ANNUAL WATER QUALITY REPORT is available at www.tukwilawa.gov/waterqualityreport  this report contains important information about the source & quality of your drinking water. Call 206-431-2169 if you would like a paper copy of the report.
"Please notify the City if you believe the water consumption is unusual."
City Hall is open to the public Monday, Wednesday & Thursday from 8:30 a.m. to 4:00 p.m.
CITY FACILITIES CLOSED JUNE 19, 2023 & JULY 4, 2023

Please check the box that applies below:

☐ Billing Name or Mailing address change only

☐ Change of tenant

☐ Change of ownership, please indicate below. For final charges call (206) 433-1849.

NAME _____

ADDRESS _____

CITY _____ STATE _____ ZIP _____

PHONE _____ EFFECTIVE DATE or CLOSING DATE _____

Property owners are responsible for the Water/Sewer and related charges at their property. Changes in ownership, mailing address, or tenant changes must be submitted in writing. You may also fax the information to City Hall at (206) 433-1833 or email utility@tukwilawa.gov. Please include your ACCOUNT # on all change requests.

Please do not turn the water meter on/off yourself; if the meter is damaged in any way while doing so you may incur the expense of repair.

If you wish to stop service or obtain information regarding your bill or service, please call between the hours of 8:30 a.m. and 5:00 p.m. Monday-Wednesday and Fridays, and Thursdays between 10:30 a.m. and 5:00 p.m. at 206-433-1849. The City can turn off water meters once it receives written notification. There will be a fee to restore service.

To report a WATER EMERGENCY Monday-Friday 6:00 a.m. to 4:30 p.m. please call 206-433-1863. At any other time please call 911.

## PAYING ONLINE:
Go to www.tukwilawa.gov. Follow link to Online Utility payments. Follow steps to setup user account using a current bill as reference. If you are experiencing difficulties setting up a user account or cannot locate link please direct inquiries to 206-433-1849.

## PAYING BY MAIL:
**Make checks payable to City of Tukwila.** Be sure to enclose the upper portion of the bill to ensure proper credit to your account. Your canceled check is your receipt. PLEASE DO NOT TAPE OR STAPLE ANYTHING TO THE BILL OR THE RETURN ENVELOPE. For your own protection do not send cash by mail.

## PAYING IN PERSON:
Bring payment stub and payment to Tukwila City Hall, 6200 Southcenter Blvd., Tukwila. For your added convenience there is an after hours lock box located inside the Police Dept. lobby behind City Hall. This box is checked daily during business hours.

## TERMS OF PAYMENT:
All charges are due on or before the 10th of the month following the bill date. Late charges apply to accounts 30 days past due. If charges remain unpaid for three months a shut-off notice will be posted at the service location and additional late charges will be added to the account. To restore water service PAYMENT IN FULL OF ALL PAST AND CURRENT CHARGES must be receipted by the Finance Dept. by 3:30 p.m. Monday-Friday to have service restored.

**FINANCE OFFICE HOURS:** Monday through Wednesday and Friday, 8:30 a.m. to 5:00 p.m.; Thursday 10:30 a.m. to 5:00 p.m.

**WATER DEPT HOURS of OPERATION:** Monday through Friday 6:00 a.m. to 4:30 p.m.