# LEASE AGREEMENT

**Between**

**ARROWHEAD PALMS, L.L.C.**
**an Arizona limited liability company,**

**Landlord**

**and**

**BED BATH & BEYOND INC.,**
**a New York corporation,**

**Tenant**

**ARROWHEAD PALMS SHOPPING CENTER**
**SEC 75th Avenue & Bell Road**
**PEORIA, ARIZONA**

**Dated as of:** February 1, 2017

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

**TABLE OF CONTENTS**

                                                                                    Page

ARTICLE 1      BASIC TERMS AND DEFINITIONS ................................................. 1
    Section 1.1      Basic Terms and Definitions ................................................ 1

ARTICLE 2      LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ........... 5
    Section 2.1      Lease of Premises ................................................................. 5
    Section 2.2      Term .......................................................................................... 5
    Section 2.3      Delivery Date ........................................................................ 7
    Section 2.4      Unseasonable Delivery: Slack Period .............................. 7
    Section 2.5      Initial Co-Tenancy Condition ............................................ 7

ARTICLE 3      IMPROVEMENTS ..................................................................... 10
    Section 3.1      Landlord's Work and Tenant's Work ............................. 10
    Section 3.2      Plan Approvals ................................................................. 10
    Section 3.3      Performance of Work ....................................................... 13
    Section 3.4      Measurement; Adjustment of Rent ................................ 15

ARTICLE 4      FIXED RENT & TAXES: DETERMINATION AND PAYMENT  16
    Section 4.1      Fixed Rent .......................................................................... 16
    Section 4.2      Payment of Rent ............................................................... 16
    Section 4.3      Real Estate and Other Taxes .......................................... 16

ARTICLE 5      COMMON AREAS, THEIR USE AND CHARGES ................... 18
    Section 5.1      Common Areas: Maintenance ........................................ 18
    Section 5.2      Common Areas: Restrictions .......................................... 21

ARTICLE 6      UTILITIES ................................................................................. 24
    Section 6.1      Utility Service .................................................................... 24
    Section 6.2      Interruption ........................................................................ 24

ARTICLE 7      SIGNS ....................................................................................... 24
    Section 7.1      Tenant's Building Signage .............................................. 24
    Section 7.2      Pylon/Monument Signage ............................................... 24
    Section 7.3      Signage: Alteration/Removal/Allocation ..................... 25
    Section 7.4      Cooperation ....................................................................... 25
    Section 7.5      Signage Restrictions and Criteria ................................. 25

ARTICLE 8      ALTERATIONS AND IMPROVEMENTS ................................ 26
    Section 8.1      Alterations and Improvements ....................................... 26

ARTICLE 9      REPAIRS ................................................................................... 28
    Section 9.1      Tenant's Repairs ............................................................... 28
    Section 9.2      Landlord's Repairs ........................................................... 28
    Section 9.3      Legal Compliance Work .................................................. 29

ARTICLE 10     INDEMNIFICATION, INSURANCE AND WAIVER OF
               SUBROGATION ....................................................................... 29
    Section 10.1     Mutual Release, Waiver of Subrogation and Mutual Indemnification29
    Section 10.2     Tenant's Insurance ........................................................... 30
    Section 10.3     Landlord's Insurance ........................................................ 30
    Section 10.4     General Insurance Requirements ................................... 31

ARTICLE 11     FIRE AND OTHER CASUALTY; EMINENT DOMAIN ............. 31
    Section 11.1     Fire and Other Casualty .................................................. 31
    Section 11.2     Eminent Domain ............................................................... 33
    Section 11.3     Abatement of Rent Charges ........................................... 35

i

ARTICLE 12        COVENANTS, REPRESENTATIONS AND WARRANTIES ...... 35
Section 12.1      Quiet Enjoyment ...................................................................... 35
Section 12.2      Authority ................................................................................. 35
Section 12.3      Landlord's Covenants, Warranties and Representations ................. 35
Section 12.4      Environmental Matters ............................................................. 36
Section 12.5      OEA......................................................................................... 38

ARTICLE 13        USES AND RESTRICTIONS ...................................... 40
Section 13.1      Permitted and Prohibited Uses .................................................. 40
Section 13.2      Tenant's Exclusive in Center ..................................................... 40
Section 13.3      Exclusives Which Tenant Must Honor ....................................... 42

ARTICLE 14        CONDUCT OF BUSINESS OPERATIONS................................... 42

ARTICLE 15        TENANT ASSIGNMENT AND SUBLETTING............................. 43
Section 15.1      Assignment and Subletting ....................................................... 43
Section 15.2      Liability of Tenant.................................................................... 44
Section 15.3      Collateral Assignment............................................................... 44
Section 15.4      Cure Rights of Original Tenant .................................................. 44
Section 15.5      Recognition Agreement ............................................................. 45

ARTICLE 16        DEFAULT AND DISPUTE RESOLUTION ...................................... 45
Section 16.1      Tenant Default.......................................................................... 45
Section 16.2      Landlord Default ...................................................................... 46
Section 16.3      Arbitration ............................................................................... 47

ARTICLE 17        RIGHT TO MORTGAGE AND NON-DISTURBANCE;
                  ESTOPPEL CERTIFICATE ....................................................... 47
Section 17.1      Right to Mortgage and Non-Disturbance.......................................... 47
Section 17.2      Estoppel Certificate .................................................................. 48
Section 17.3      Existing Mortgages .................................................................. 48

ARTICLE 18        NOTICE ..................................................................... 48

ARTICLE 19        TENANT'S PROPERTY ................................................ 49

ARTICLE 20        END OF TERM ........................................................... 49
Section 20.1      Surrender of Premises ............................................................... 49
Section 20.2      Hold Over ................................................................................ 49

ARTICLE 21        INTENTIONALLY OMITTED...................................................... 50

ARTICLE 22        ONGOING CO-TENANCY ............................................ 50

ARTICLE 23        MISCELLANEOUS...................................................... 50
Section 23.1      Loading Facilities ..................................................................... 50
Section 23.2      Liens ....................................................................................... 50
Section 23.3      Broker's Commission................................................................ 51
Section 23.4      *Force Majeure* ....................................................................... 51
Section 23.5      Consents .................................................................................. 51
Section 23.6      Costs ....................................................................................... 51
Section 23.7      Attorneys' Fees ........................................................................ 51
Section 23.8      Survival of Obligations ............................................................. 51
Section 23.9      Non-Waiver ............................................................................. 52
Section 23.10     Rights Cumulative..................................................................... 52
Section 23.11     Definition of Landlord .............................................................. 52
Section 23.12     Successors and Assigns.............................................................. 52
Section 23.13     Limitation of Landlord's Liability ............................................. 52

Section 23.14    Limitation of Tenant's Liability ....................................................... 52
Section 23.15    Joint and Several Liability ............................................................... 52
Section 23.16    Severability ...................................................................................... 52
Section 23.17    Grammatical Usages and Construction ............................................ 53
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings ......... 53
Section 23.19    Definition of Hereunder, Herein, etc. .............................................. 53
Section 23.20    Short Form Lease ............................................................................ 53
Section 23.21    Entire Agreement and Modification ................................................ 53
Section 23.22    No Joint Venture or Partnership Created by Lease .......................... 53
Section 23.23    Tenant's Tradename ........................................................................ 53
Section 23.24    Timely Billing of Charges. .............................................................. 53
Section 23.25    Counterparts .................................................................................... 53
Section 23.26    Waiver of Trial by Jury ................................................................... 54
Section 23.27    Ethical Conduct Policy ................................................................... 54
Section 23.28    Confidentiality ................................................................................ 54
Section 23.29    Governing Law ................................................................................ 55

## **EXHIBITS**

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives and Use Restrictions |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of ___February___ _1_, 2017 by and between Arrowhead Palms, L.L.C., an Arizona limited liability company, having an office at 1600 Steeles Avenue West, Suite 200, Concord, Ontario Canada L4K 4M2 with a copy to Zell Commercial Real Estate Services, Inc. 5343 N. 16th Street, Suite 290, Phoenix, Arizona, 85016(*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

**W I T N E S S E T H :**

ARTICLE 1
BASIC TERMS AND DEFINITIONS

Section 1.1  <u>Basic Terms and Definitions</u>.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1  <u>Additional Rent</u>:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2  <u>Affiliate</u>:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3  <u>Alternate Rent</u>: 50% of Fixed Rent otherwise payable during the period in which Tenant is entitled to pay Alternate Rent.

1.1.4  <u>Common Areas</u>:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and utility lines serving such common areas and facilities.

1.1.5  <u>Common Areas Charges</u>:  As defined in Section 5.1 hereof.

1.1.6  <u>Delivery Date</u>: As defined in Section 2.3 hereof.

1.1.7  <u>Effective Date</u>: The date hereof.

1.1.8  <u>Event of Default</u>: As defined in Section 16.1 hereof.

1.1.9  <u>Excused Periods</u>:  Periods during which Tenant's (or another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises (or the premises of such other tenant), (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) with respect to Tenant's operations at the Premises only, was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10  <u>Exhibits</u>.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11  <u>Fixed Rent</u>:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of Two Hundred Eighty-Five Thousand Fifty-Two and 50/100 ($285,052.50) Dollars per year [based on thirteen and 50/100 ($13.50) Dollars per square foot of Floor Area in the Retail Space];

(b)    In the event Tenant exercises the first Renewal Option,  for the first five (5) year Renewal Period, at the rate of Three Hundred Six Thousand One Hundred Sixty-Seven and 50/100 ($306,167.50) Dollars per year [based on fourteen and 50/100 ($14.50) Dollars per square foot of Floor Area in the Retail Space];

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Three Hundred Twenty-Seven Thousand Two Hundred Eighty-Two and 50/100 ($327,282.50) Dollars per year [based on fifteen and 50/100 ($15.50) Dollars per square foot of Floor Area in the Retail Space]; and

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Three Hundred Forty-Eight Thousand Three Hundred Ninety-Seven and 50/100 ($348,397.50) Dollars per year [based on sixteen and 50/100 ($16.50) Dollars per square foot of Floor Area in the Retail Space]; and

(e)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Three Hundred Sixty-Nine Thousand Five Hundred Twelve and 50/100 ($369,512.50) Dollars per year [based on seventeen and 50/100 ($17.50) Dollars per square foot of Floor Area in the Retail Space]; and

(f)    In the event Tenant exercises the fifth Renewal Option, for the fifth five (5) year Renewal Period, at the rate of Three Hundred Ninety Thousand Six Hundred Twenty-Seven and 50/100 ($390,627.50) Dollars per year [based on eighteen and 50/100 ($18.50) Dollars per square foot of Floor Area in the Retail Space].

1.1.12    <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area of the Premises or Floor Area of the Shopping Center include areas within the Office Space or the Enclosed Loading Area (as both terms are hereinafter defined in section 1.1.28) as well as any mezzanine, lower floor, second floor, or, except as set forth above, any exterior areas.

1.1.13    <u>*Force Majeure*</u>:  As defined in Section 23.4 hereof.

1.1.14    <u>Ground Lessor</u>: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15    <u>Intentionally Omitted</u>.

1.1.16    <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17    <u>Intentionally Omitted</u>.

1.1.18    <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19    <u>Landlord's Mailing Address</u>: 1600 Steeles Avenue West, Suite 200, Concord, Ontario, Canada, L4K 4M2, with a copy to Zell Commercial Real Estate Services, Inc. 5343 N. 16th Street, Suite 290, Phoenix, Arizona, 85016, or such other

place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof. If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

     1.1.20  <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

     1.1.21  <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

     1.1.22  <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof, including, without limitation, the Americans with Disabilities Act and federal, state, and local governmental interpretations thereof.

     1.1.23  <u>Mortgagee</u>:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

     1.1.24  <u>Intentionally Omitted</u>.

     1.1.25  <u>Intentionally Omitted</u>.

     1.1.26  <u>Intentionally Omitted</u>.

     1.1.27  <u>Permitted Use</u>:  The sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of the following: infant's, juvenile's and children's  furniture, furnishings, beds (including, without limitation, mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, maternity clothing and related items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food or formula for infants, juveniles and children, feeding items, safety items, nursing items, health and beauty care items, food and beverages, drug remedies, diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, pregnancy books, magazines, computer software, audio and video cassettes or tapes, picture frames, portrait studio items and services, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items, hair cutting services, fitness center development and learning services, and any and all other items sold or services (including, without limitation, the operation of Demonstration Areas, defined below) provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.  As used herein, *"Demonstration Areas"* shall mean an area or areas located within the Premises, for the

3

purpose of demonstrating to Tenant's customers and invitees various products (including, without limitation, food and cooking products), which Demonstration Areas shall be at all times be operated in full compliance with all Legal Requirements.

1.1.28  Premises: Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and consisting of (i) approximately twenty-one thousand one hundred fifteen (21,115) square feet of Floor Area for retail use (the "*Retail Space*"), (ii) approximately one thousand (1,000) square feet of ground level space for office purposes (the "*Office Space*") and (iii) the enclosed loading dock space as shown on Exhibit B (the "*Enclosed Loading Area*").  In no event shall the Enclosed Loading Area and/or Office Space (or any space used for fire pump facilities or electrical switch gear) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29  Renewal Option:  As defined in Section 2.2.2 hereof.

1.1.30  Renewal Period(s): Five (5) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31  Rent:  Fixed Rent and/or Additional Rent.

1.1.32  Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.33  Intentionally Omitted.

1.1.34  Shopping Center:  The shopping center commonly known as Arrowhead Palms Shopping Center, containing approximately seventy-eight thousand two hundred twenty-one (78,221) square feet of Floor Area, on the property located at the southeast corner of 75th Avenue and Bell Road in Peoria, Arizona, and more particularly described in Exhibit A hereto.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35  Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable,  Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36  Taxes:  As defined in Section 4.3.3 hereof.

1.1.37  Tenant:  As defined in the preamble hereof.

1.1.38  Tenant's Mailing Address:   650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39  Tenant's Permits:  As defined in Section 2.3.1(b) hereof.

1.1.40  Tenant's Property:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

4

1.1.41   Tenant's Pro Rata Share:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than twenty-nine (29%) percent.  Floor Area shall be deemed added to the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.42   Tenant's Work:  As defined in Section 3.1 hereof.

1.1.43   Term:  A period  (the *"Initial Term"*) of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) *"Expiration Date"* shall mean the date on which the Term expires.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1   Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2   Term.

2.2.1   Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the sixtieth (60th) day following the Delivery Date (such date being referred to herein as the *"Rent Commencement Date"*).  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date, and Landlord shall deliver to Tenant a completed and signed IRS Form W-9 contemporaneously therewith; the delivery of the Form W-9 shall be a condition precedent to the payment of Rent.

2.2.2   Renewal Options.  Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for five (5) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s), provided, however, that the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 270th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options.  If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions

1   of this Lease but without the application of Article 20 hereof.  If Landlord then gives
2   Tenant such notice and Tenant exercises its Renewal Option, then the effective date of
3   such exercise shall be retroactive to the Expiration Date.  Notwithstanding the foregoing,
4   if at the time a Renewal Option is exercised the tenant under this lease is any entity other
5   than the Original Tenant or a tenant resulting from a transaction covered under Section
6   15.1.3 hereof, then as a precondition to the exercise of such Renewal Option, such tenant
7   shall not be in default of the terms of this Lease beyond any applicable notice and cure
8   periods

9       2.2.3 .  Kick-out Right.
10

11          (a)   Provided that the Tenant is Bed Bath & Beyond Inc. or its
12  Affiliate, and the Premises are being operated as a typical buybuy Baby store,  then if
13  Tenant's Gross Sales do not equal or exceed four million dollars ($4,000, 000.00 ) during
14  the one (1) year period commencing on first day of the sixty-sixth (66th) month first
15  occurring after the Rent Commencement Date and continuing through and including the
16  last day of the seventy-seventh (77th) month first occurring after the Rent Commencement
17  Date (the "**Measuring Period**"), Tenant shall have the right, as its sole remedy, to
18  terminate this Lease, so long as: (A) Tenant provides written notice to Landlord (the
19  "*Termination Notice*") on or before the thirtieth (30th) day next following the expiration
20  of the Measuring Period (the "*Termination Option Notice Date*"); (B) this Lease has not
21  been terminated previously pursuant to the provisions of this Lease or pursuant to law;
22  (C) Tenant shall have actively, diligently and  continuously operated in the Premises
23  during the Term as a typical buy buy Baby store, in accordance with the terms of this
24  Lease; and (D) Tenant is not then in default under any of the terms, covenants or
25  conditions of this Lease on Tenant's part to be observed or performed beyond any
26  applicable notice and cure period provided in this Lease.
27

28          (b)   The Termination Notice shall contain a compilation prepared
29  and certified to be correct by an officer of Tenant setting forth the amount of Gross Sales
30  during the Measuring Period (the "*Final Gross Sales Report*").  Time is of the essence
31  with respect to the giving of the Termination Notice, and any notice given after the .
32  Termination Option Notice Date purporting to exercise such option shall be void and of
33  no force or effect.  In the event Tenant shall give the Termination Notice pursuant to the
34  provisions of this Section and shall otherwise comply with the conditions provided in this
35  Section for the exercise of Tenant's right to terminate this Lease, this Lease and the Term
36  shall come to an end and expire on the date that is the last day of the eighty-third (83rd)
37  month first occurring after the Rent Commencement Date (the "*Termination Date*").
38  Upon the Termination Date, this Lease shall expire and come to an end with the same
39  force and effect as if that date were the expiration date originally set forth in this Lease
40  and, except for accrued liabilities and any other matters stated in this Lease to survive the
41  end of the Term, neither party hereto shall have any further liability pursuant to this
42  Lease.  In addition, in connection with such termination, Tenant shall pay to Landlord, as
43  liquidated damages and not as a penalty, the sum of Four Hundred Thirty-Five Thousand
44  and no/100 Dollars ($435,000.00) in reimbursement for a portion of the unamortized
45  capital costs incurred by Landlord.
46

47          (c)   As used herein, the term "*Gross Sales*" shall mean the total
48  amount of all merchandise or services sold and fulfilled from the Premises by Tenant
49  and/or any sublessee, licensee or concessionaire of Tenant and any other person or entity
50  operating in the Premises (for purposes of this Subsection 2.2.3 only, collectively,
51  "Tenant"), whether for cash, credit or otherwise, including redemption of gift certificates
52  and gift cards.  Tenant shall record, at the time of each Gross Sale, all receipts from such
53  sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such
54  electronic or computer device which records sales in a manner which is generally
55  acceptable by industry standards.  The term "Gross Sales" shall exclude: (1) proceeds

6

from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sale price; (2) bona fide transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant and not for the primary purpose of reducing Gross Sales from the Premises, and returns to shippers and manufacturers for credit; (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises regardless of where purchased; (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business; (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received; (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones at no profit to the Tenant; (7) sales to employees of Tenant at discount which shall not exceed two percent (2%) of total Gross Sales, per calendar year or pro rata portion thereof, as applicable; (8) fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, which shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable; (9) proceeds from delivery, gift-wrapping and check cashing charges at no profit to the Tenant; (10) sums and credits received in settlement of claims for loss or damage to merchandise provided the sales for such merchandise was made from the Premises; (11) the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises so long as the coupons are not purchased from the Premises: however, if any such coupon is purchased from the Premises then the value thereof shall be included in Gross Sales at the time of its purchase; (12) close-out or bulk sales of inventory to jobbers or wholesalers; (13) sales of gift certificates and/or gift cards, provided that a Gross Sale shall be recorded at the time of redemption; (14) forfeited deposits; (15) sales of alcoholic beverages; and (16) sales of merchandise where payment is made at the Premises but not fulfilled from the Premises.

(d)    Landlord shall have the right, upon at least thirty (30) days prior notice to Tenant, to audit Tenant's books and records to verify the accuracy of the Final Gross Sales Report, provided, however, that Landlord's notice to audit the Final Gross Sales Report must be given (if at all) within thirty (30) days of its receipt of same. If Landlord fails to timely notify Tenant that Landlord is exercising its right to audit the Final Gross Sales Report then such report shall be deemed to be correct and conclusively binding upon Landlord. Upon Landlord's timely request to audit, Tenant shall promptly deliver to Landlord copies of relevant backup materials reasonably required by Landlord in furtherance of such audit.    Landlord shall keep all sales reports and the results of any such audit confidential (and if requested by Tenant, shall execute a confidentiality agreement in form reasonably acceptable to Landlord and Tenant provided that nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, or attorneys (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Tenant with respect to an audit by Landlord shall be submitted to arbitration in accordance with the provisions of Section 16.3 below, and the Termination Notice shall be suspended and not operative pending results of the arbitration

Section 2.3    Delivery Date.

2.3.1    Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"**Delivery Date Conditions**"*) shall have occurred and Tenant shall have received from Landlord the

7

Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect or general contractor to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, "*Tenant's Permits*")), which permits and approvals, as applicable, shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work);

(c)    The Common Areas, and all of the improvements thereto shown on Exhibit B hereto shall be in substantially the same condition as of the Effective Date and otherwise in good condition, operational and in compliance with all applicable Legal Requirements, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(e)    Intentionally Omitted; and

(f)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof, if any (it being understood and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor, if any.

2.3.2    Delivery Date.

(a)    Landlord shall give Tenant at least seventy-five (75) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the "*Delivery Date Notice*"). Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during the waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established in the Delivery Date Notice (subject to (i) events of *Force Majeure* first occurring after the giving of the Delivery Date Notice and (ii) net delays in the completion of Landlord's Work caused by the acts or omissions of Tenant first occurring after the giving of the Delivery Date Notice (such delay a "*Tenant Delay*"), provided that Landlord shall have given Tenant notice of such event of Force Majeure or such Tenant Delay within five (5) business days after Landlord first learns of the occurrence thereof), then, in addition to any other remedies available to Tenant under this Lease, Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of: (i) Eighty-Five Thousand Dollars ($85,000), plus (ii) Two Thousand Dollars ($2,000) for each day that the Delivery Date established in the Delivery Date Notice is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3    <u>Delivery Date Certification</u>. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as <u>Exhibit J</u>.

2.3.4    <u>No Waiver</u>. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4    <u>Unseasonable Delivery: Slack Period</u>. If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on September 1 and ending on the March 31 next following (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. In the event that Tenant elects to defer the Delivery Date to the end of the Slack Period pursuant to this Section, the accrual of any per diem liquidated reimbursement under Section 2.3.2(b) above shall be suspended for the period of such deferment.

Section 2.5    <u>Initial Co-Tenancy Condition</u>.

2.5.1    As used herein, the *"Initial Co-Tenancy Condition"* shall mean that at least seventy-five percent (75%) of the total Floor Area of all buildings in the

9

Shopping Center, as set forth in Section 1.1.34 above (excluding the Premises), shall be
open for business by tenants of the type typically found in specialty shopping centers
located in the Phoenix, Arizona metropolitan area similar in quality to the quality of the
Shopping Center existing as of the Effective Date (or, if not already open for business,
then such tenants shall be actively and continuously engaged in the fixturing and
merchandising within their respective premises).  For purposes of this Section 2.5, the
premises shown as "Cost Plus World Market" on the Site Plan attached hereto as Exhibit
B shall be deemed to be open and operating for business (regardless of whether such
Premises is in fact open and operating) for so long as the named Tenant herein (i.e. Bed
Bath & Beyond Inc.) and/or its Affiliate is the "Tenant" under such lease and has not
assigned such lease to a non-Affiliate third party.

2.5.2    Tenant acknowledges that as of the Effective Date, the Initial Co-
Tenancy is satisfied.  If, however, on the Delivery Date, the Initial Co-Tenancy Condition
is not satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the
Premises to a later date (but not later than the date on which the Initial Co-
Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof),
whereupon the Delivery Date shall be deemed to have occurred on the date that
Tenant actually accepts physical possession of the Premises (subject to the other
provisions of this Article 2 and the continuing satisfaction of the Delivery Date
Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the
Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of
Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives
Tenant notice thereof, subject to any other applicable provisions of this Article 2.  In the
case of such deferment, the accrual of any per diem liquidated reimbursement under
Section 2.3.2(b) above shall be suspended for the period of such deferment.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial
Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery
Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at
any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving
Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as
of the date specified in said notice.  Landlord may negate such termination by causing the
Initial Co-Tenancy Condition to be satisfied within ninety (90) days after the date on
which said termination notice is given.  If this Lease is terminated hereunder, neither
party shall have any further liability under this Lease, except: (i) for those obligations
which survive the expiration or other termination of this Lease pursuant to the express
terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its
reasonable third-party costs and expenses incurred in connection with this Lease,
including, without limitation, costs associated with the preparation and review of plans
and specifications, attorney's fees, and the performance of Tenant's Work, not to exceed
Fifty Thousand Dollars ($50,000).

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost
and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and
Exhibit F hereto, and the "Final Landlord's Plans and Specifications" (hereinafter defined
in Section 3.2) (collectively, "*Landlord's Work*"), and shall deliver possession of the
Premises to Tenant in the condition described therein.  Except for Landlord's Work,

10

1    Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as
2    *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

3        Section 3.2    <u>Plan Approvals</u>.

4            3.2.1    <u>Preparation of Plans and Specifications</u>.

5                (a)    Within thirty (30) days after the Effective Date, Landlord
6    shall deliver to Tenant drawings showing the proposed footprint, column layout, and
7    interior clear dimensions of the Premises (the *"Preliminary LOD"*) [Limits of Demised],
8    which shall be subject to any reasonable modifications indicated by Tenant as provided
9    below. The Preliminary LOD shall be substantially consistent with <u>Exhibits B</u>, <u>D</u>, and <u>D-
10   1</u> hereto. Notwithstanding the foregoing to the contrary, Tenant acknowledges that
11   Landlord has delivered the Preliminary LOD to Tenant in compliance with this
12   Subsection 3.2.1(a).

13               (b)    Within thirty (30) days after Tenant's receipt of the
14   Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the *"Revised
15   LOD"*), showing the location of the interior structural grid (column layout), storefront
16   opening, and Enclosed Loading Area and Office Space, the location and arrangement of
17   the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable
18   revisions to the interior clear dimensions. Notwithstanding the foregoing to the
19   contrary, Landlord acknowledges that Tenant has delivered the Revised LOD to Landlord
20   in compliance with this Subsection 3.2.1(b).

21               (c)    Within fifteen (15) days after Landlord's receipt of the
22   Revised LOD, Landlord shall deliver to Tenant a final LOD (as approved by Tenant, the
23   *"Certified LOD"*), certified by Landlord, which shall incorporate all of the elements of
24   the Revised LOD. Within fifteen (15) days after its receipt of such final LOD, Tenant
25   shall notify Landlord of Tenant's approval thereof or the reasons why such approval
26   cannot be granted, and Landlord shall, within fifteen (15) days after receiving such
27   notice, make any revisions necessary to correct such matters and obtain Tenant's
28   approval. Upon Tenant's approval of the Certified LOD, any further changes thereto
29   shall be subject to Tenant's prior written approval (which may be withheld in its sole
30   discretion), provided that, as to changes required to conform to Legal Requirements,
31   Tenant shall have reasonable approval rights within the confines of said Legal
32   Requirements. After Tenant approves the Certified LOD, Landlord shall be responsible
33   for any and all reasonable costs incurred and delays experienced by Tenant in connection
34   with any further changes to the Certified LOD required by Landlord. Notwithstanding
35   the foregoing to the contrary, Tenant acknowledges that Landlord has delivered the
36   Certified LOD to Tenant in compliance with this Subsection 3.2.1(c).

37               (d)    Within thirty (30) days after Tenant's receipt of the Certified
38   LOD, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and
39   Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes
40   (F4); and High-Pile Storage Plan (F5) (collectively, *"Tenant's Plans"*), all of which shall
41   be substantially consistent with the Certified LOD (as same may be reasonably modified
42   by Tenant, as noted above). Notwithstanding the foregoing to the contrary, Landlord
43   acknowledges that Tenant has delivered the Tenant's Plans to Landlord in compliance
44   with this Subsection 3.2.1(d).

45               (e)    Within thirty (30) days after the Effective Date, Landlord
46   shall prepare and deliver to Tenant, in a single submission, *"Landlord's Plans and
47   Specifications"* (as defined in <u>Exhibit D</u> hereto), and each of the plans which collectively
48   constitute Landlord's Plans and Specifications shall be at least 85% complete, in Tenant's
49   reasonable judgment. Landlord's Plans and Specifications shall be substantially
50   consistent with Tenant's Plans, the Certified LOD, and <u>Exhibits B, D, D-1</u>, and <u>F</u> hereto.

11

(f)    Within thirty (30) days after its receipt of Landlord's Plans and Specifications, Tenant shall give Landlord notice of the respects, if any, in which said Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto.

(g)    Within fifteen (15) days after the date on which Landlord receives Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a single submission, revised Landlord's Plans and Specifications, which shall be 100% complete and shall address all of Tenant's comments.

(h)    Within fifteen (15) days after its receipt of the revised Landlord's Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted.

(i)    In the event that the Landlord's re-submittal of Landlord's Plans and Specifications is not approved by the Tenant, then Landlord shall further revise Landlord's Plans and Specifications to address all Tenant comments and re-submit them to Tenant for Tenant's review and approval.  The re-submittal described in the preceding sentence shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice that the previous submittal has not been approved.  The process described in this subparagraph (i) and subparagraph (h) above shall be repeated until Landlord has secured Tenant's approval of Landlord's Plans and Specifications.  Landlord's Plans and Specifications as finally approved by Tenant are referred to herein as the *"Final Landlord's Plans and Specifications"*.

(j)    Upon Tenant's approval of the Final Landlord's Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval.  Unless specifically noted on a separate summary sheet attached to the Final Landlord's Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Landlord's Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(k)    All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Landlord's Plans and Specifications, the Final Landlord's Plans and Specifications, and the measurements required under Section 3.4.1 and 3.4.2 below shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad 2002"* up to *"Autocad 2010"*.

3.2.2    Plan Changes.

(a)    Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in Exhibit D hereto (collectively, the *"Prototype Standards/Specifications"*), and/or to require Landlord to subsequently make changes to Landlord's Plans and Specifications and/or the Final Landlord's Plans and Specifications in accordance therewith (the *"Changes"*).  Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change, which notice shall be accompanied by all back-up supporting the cost increases or delays.  If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(b)    Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not

exceeding 5% subcontractor profit and 5% general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and applicable lien waivers of subcontractors and materialmen, but in no event earlier than the Delivery Date.

(c)    Landlord shall pay to Tenant the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 5% subcontractor profit and 5% general contractor profit thereon). At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices and receipts. Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d)    If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3    Performance of Work.

3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in such a manner so as not to negatively impact Tenant's ability to obtain Tenant's Permits. Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Premises. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2    If: (a) Landlord's Work has not been commenced (i.e. Landlord has obtained all permits and approvals required from all applicable governmental authorities to commence Landlord's Work and Landlord has commenced demolition work at the Premises) by June 1, 2017, or (b) the Delivery Date shall not have occurred by October 1, 2017 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

13

(i)    terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000) and/or

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)    extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord, and as to any extension granted with respect to the clause 3.3.2(b) above, in addition to any other rights and remedies to which Tenant may be entitled, the Rent Commencement Date shall be postponed by two (2) days for each day of the extension granted as to clause 3.3.2(b) above.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3    <u>Landlord's Work Performed After Delivery of Possession</u>.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises at a mutually convenient time to compile a punch list of the "Punch List Items" (hereinafter defined).  Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within fifteen (15) days after it receives a copy of said punch list.  If Landlord fails to complete any item on said punch list within said 15-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand.  If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises.  As used herein, the term ***"Punch List Items"*** shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4    <u>Tenant's Right of Entry</u>.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5    <u>Intentionally Omitted</u>.

3.3.6    <u>Work Requirements After Delivery Date</u>.  Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center

1  affecting any portion of the Shopping Center shall be subject to the following terms and
2  conditions:

3            (a)  staging and storage of materials and parking of construction
4  vehicles shall occur only within the portions of the Shopping Center designated as
5  "Staging" on Exhibit B hereto;

6            (b)  Landlord shall diligently ensure that, from and after Tenant's
7  opening for business to the public, no ingress, egress or passage of any construction,
8  delivery and related vehicles engaged in the performance of such work or other
9  construction activities shall take place except through the entrance/exit drive designated
10  as the "Construction Drive" on Exhibit B hereto; and

11            (c)  Landlord shall maintain the Shopping Center in a clean, safe,
12  and sightly condition, and shall use reasonable efforts to ensure that such construction
13  shall not materially adversely interfere with the normal conduct of any business
14  operations in the Premises.

15      Section 3.4    Measurement; Adjustment of Rent.

16            3.4.1    Measurement of Premises and Shopping Center.  At least sixty
17  (60) days prior to the Delivery Date, Landlord shall deliver to Tenant a certification by
18  Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear
19  dimensions and the Floor Area (with the dimensions on which it is based) of the
20  Premises, and Floor Area of the Shopping Center, the measurements of which shall be
21  subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If Landlord
22  shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any
23  of such measurements made and certified to Landlord by Tenant's licensed architect,
24  surveyor or engineer.  If the interior clear dimensions and/or the Floor Area of the
25  Premises vary from those shown on the Certified LOD (as may be modified by any
26  applicable Changes), then Landlord shall correct such work to conform to the Certified
27  LOD (as may be modified by any applicable Changes).

28            3.4.2    Measurement of Office Space.  Within five (5) days after the
29  substantial completion of the walls enclosing the Office Space, Landlord shall deliver to
30  Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of
31  the square footage of the Office Space, the measurement of which shall be subject to
32  confirmation by Tenant's licensed architect, surveyor or engineer.  If the square footage
33  of the Office Space varies from that shown on the Final Landlord's Plans and
34  Specifications, then, at Tenant's request, Landlord shall correct such work to conform to
35  the Final Landlord's Plans and Specifications.

36            3.4.3    Adjustment of Fixed Rent and Tenant's Pro Rata Share.  Subject to
37  the foregoing provisions of this Section 3.4, if the measurement of the Premises (less the
38  Office Space and Enclosed Loading Area) shall indicate a Floor Area less than twenty-
39  two thousand one hundred fifteen (22,115) square feet, then the Fixed Rent and any other
40  applicable provision of this Lease (including, without limitation, Tenant's Pro Rata
41  Share) shall be reduced to conform to the actual measurement of the Premises (less the
42  Office Space and Enclosed Loading Area), and Tenant shall receive a proportional refund
43  of any Rent theretofore paid to Landlord.  If the measurement of the Premises (less the
44  Office Space and Enclosed Loading Area) shall indicate a Floor Area greater than
45  twenty-two thousand one hundred fifteen (22,115) square feet (as same may be increased
46  due to Changes under Section 3.2 above), then neither Fixed Rent nor Tenant's Pro Rata
47  Share shall be increased by reason thereof by more than fifty (50) square feet of Floor
48  Area.  Landlord and Tenant shall each promptly execute and deliver to the other an
49  amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any
50  other applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute
51  between the parties with respect to the Floor Area of the Premises (including the Office

1 Space and Enclosed Loading Area) or the Floor Area of the Shopping Center shall be
2 resolved by arbitration in accordance with the provisions of Section 16.3 below.

3 ARTICLE 4
4 FIXED RENT & TAXES: DETERMINATION AND PAYMENT

5     Section 4.1   Fixed Rent.  Commencing on the Rent Commencement Date and
6 continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal
7 successive monthly installments, in advance, on the first day of each and every calendar
8 month throughout the Term, except that Fixed Rent payable for any partial calendar
9 month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be
10 paid without deduction or set-off, except to the extent otherwise expressly provided
11 herein.

12     Section 4.2   Payment of Rent.  All Rent shall be mailed or otherwise delivered to
13 Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to
14 Tenant, to such other address as Landlord may from time to time designate.  Landlord
15 acknowledges and agrees that for administrative purposes, Tenant may designate a
16 corporation or other entity to act as a paying agent (the *"Paying Agent"*) to make all Rent
17 payments due to Landlord under this Lease.  Said designation (which may be revoked by
18 Tenant at any time) is not intended as, and shall not constitute, an assignment of any
19 rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily
20 liable for payment of Rent under this Lease.  All payments of Rent received by Landlord
21 from the Paying Agent shall be credited to Tenant as if such payments of Rent had been
22 made by Tenant directly to Landlord.

23     Section 4.3   Real Estate and Other Taxes.

24     4.3.1   Landlord shall pay on or before the due dates thereof all "Taxes"
25 (defined in Subsection 4.3.3 below) other than personal property taxes levied against
26 tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be
27 maintained entirely within tax parcels and lots that exclude any property not a part of the
28 Shopping Center.

29     4.3.2   (a)   Tenant shall pay to Landlord Tenant's Pro Rata Share of the
30 Taxes which accrue during the Term, subject to the provisions of this Section 4.3.  Any
31 Taxes for a real estate fiscal tax year, only a part of which is included within the Term,
32 shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the
33 Rent Commencement Date or the date on which the Term expires or earlier terminates, as
34 the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by
35 law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not
36 interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option
37 so as to maximize the number of installments, and Landlord shall pay the same as they
38 come due and before any fine, penalty, interest or cost may be added thereto for
39 nonpayment thereof.

40     (b)   Landlord shall submit to Tenant a copy of the bill for Taxes
41 issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of
42 such Taxes and proof of the payment of Taxes for the previous payment period, as well
43 as copies of all notices concerning assessments, tax rates, and changes thereto.  Tenant
44 shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days
45 after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the
46 date on which such Taxes would become delinquent).

47     (c)   In the event that Landlord's Mortgagee shall require Landlord
48 to escrow monthly payments for Taxes, then, so long as such escrow shall be so required
49 and all other tenants and occupants of the Shopping Center are similarly required to make
50 monthly payments to Landlord with respect to Taxes, Tenant shall, in lieu of making

16

payments pursuant to subparagraph (b) above, pay Landlord monthly with each installment of Fixed Rent an amount equal to one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's (or Landlord's Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within thirty (30) days following the issuance by the taxing authority of the bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Pro Rata Share thereof for such year (the "Tax Reconciliation Statement"). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) copies of the applicable tax bills, (y) a calculation of Tenant's Pro Rata Share of Taxes, and (z) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Pro Rata Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by Tenant in respect of said fiscal tax year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. If Landlord fails to timely remit to Tenant the amount of any overpayment, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit

(d)    Notwithstanding anything to the contrary contained herein, to the extent privilege taxes on rentals are customarily paid by retail tenants in the State of Arizona (and are, in fact, paid by all tenants of the Shopping Center), Tenant shall pay each month, together with Fixed Rent, the governmental imposed privilege (rental) tax on the Rent due hereunder, which rental tax is imposed in the amount of two and three-tenths percent (2.3%) of rentals as of the Effective Date and is subject to change if the applicable law shall be changed.

4.3.3    As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments and levies for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement,

17

1 exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar
2 charges, or (iii) included in any special improvement district(s) which would result in
3 higher sales taxes or other similar impositions than would exist in the absence of such
4 district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full
5 calendar year after the Shopping Center has been completed and fully-assessed will be
6 approximately $1.90 per square foot of Floor Area in the Premises (the parties hereto
7 acknowledging that such amount is Landlord's good faith estimate of the Taxes expected
8 for such time period).

9        4.3.4    At the request of tenants or other occupants (including Tenant)
10 collectively occupying sixty-five percent (65%) or more of the Floor Area of the
11 Shopping Center (the "*Tax Appeal Threshold*"), Landlord shall contest the amount of
12 any assessed valuation used in determining Taxes. Should Landlord fail to do so or if the
13 Tax Appeal Threshold is met and Tenant shall reasonably determine to pursue any such
14 contest, Tenant shall have the right to contest such assessed valuation or the validity or
15 amount of Taxes by appropriate proceedings conducted in good faith, whereupon
16 Landlord shall cooperate with Tenant, execute any and all documents required in
17 connection therewith and, if required by any governmental authority having jurisdiction,
18 join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise,
19 any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata
20 Share thereof (after deducting reasonable and customary expenses). Notwithstanding the
21 foregoing, if Tenant is the sole occupant of the tax lot on which the Premises is located,
22 then Tenant shall have the right to contest the assessed valuation or Taxes without first
23 requesting that Landlord do so.

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

26    Section 5.1    Common Areas: Maintenance.

27        5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain,
28 repair and replace the Common Areas as required by this Lease and otherwise to the
29 standard by which Common Areas of specialty shopping centers located in the Phoenix,
30 Arizona metropolitan area similar in quality to the quality of the Shopping Center
31 existing as of the Effective Date are operated, maintained, repaired and replaced,
32 including, without limitation, snow, ice, rubbish and debris removal (including
33 installation and maintenance of sidewalk refuse containers), landscaping (including,
34 without limitation, the trimming and pruning of trees to avoid interference with the use or
35 visibility of canopies or signs on the exterior of the Premises), adequate lighting,
36 insurance, supervision, use, parking lot paving, seal coating and striping, drainage,
37 security (as reasonably required), and control of all Common Areas, and Landlord shall
38 comply with all applicable Legal Requirements.

39        5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

40        (a)    During the Term, Tenant shall pay to Landlord Tenant's Pro
41 Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas
42 Charges"*) paid by Landlord to operate, maintain, insure and repair the Common Areas,
43 which shall include the reasonable premiums for insurance required to be maintained by
44 Landlord under Section 10.3 below. Landlord shall be permitted to include in Common
45 Area Charges (in lieu of any cost(s) or expense(s) relating to the administration and
46 management of the Common Areas) for each calendar year an administrative fee (the
47 *"Administrative Fee"*) equal to ten percent (10%) of the Common Areas Charges for the
48 calendar year in question, but excluding from the computation of such Administrative
49 Fee the cost of any replacement or improvement of a capital nature (if such capital item is
50 a permissible Common Areas Charge hereunder), the cost of electricity and other utilities,
51 and the cost of insurance which Landlord is required to maintain under this Lease

Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

 (b) Within ninety (90) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles (or successor accounting standards) consistently applied (the *"CAC Reconciliation Statement"*). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges from the Rent Commencement Date through the end of the first full calendar year of the Term exceed $2.75 per square foot of Floor Area per annum, and with respect to any other calendar year thereafter (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases during such calendar year).

 5.1.3 <u>Exclusions from Common Areas Charges.</u>

 (a) Common Areas Charges shall not include: **(1)** the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; **(2)** the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles (or successor accounting standards), and is not incurred (A) prior to the expiration of the fifth (5th) full calendar year of the Term, or (B) more than once during each five (5) full calendar years of the Term; **(3)** the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); **(4)** any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; **(5)** the cost of maintaining, repairing or providing security for interior portions of buildings; **(6)** Taxes or other taxes levied or assessed against Landlord or the Shopping Center; **(7)** the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); **(8)** any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; **(9)** any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); **(10)** those portions of Landlord's insurance premiums which are reimbursed to

Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; **(11)** sums paid or owed by Landlord to any tenant in the Shopping Center; **(12)** costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); **(13)** costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; **(14)** sums incurred as late payment fees, penalties or interest; **(15)** ground rent; **(16)** depreciation [except as expressly permitted pursuant to item 23 below]; **(17)** costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court or exterior dining area in the Shopping Center); **(18)** electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; **(19)** Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; **(21)** costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(22)** repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; **(23)** the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles (or successor accounting standards)); **(24)** reserves for anticipated future expenses; **(25)** except for the Administrative Fee provided for in Subsection 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; **(26)** costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; **(27)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; or **(28)** except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs or other signage identifying tenants of the Shopping Center.

(b)    In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into account, for example, the relationship of the size of the Common Areas maintained by the other tenant or occupant to the size of its premises.

(c)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    <u>Tenant's Right to Audit</u>.  Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup

materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

      5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2  <u>Common Areas: Restrictions</u>.

      5.2.1   <u>Continuous Access</u>.  No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on <u>Exhibit B</u> hereto shall be interrupted or disturbed by any act or omission of Landlord or any third party during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; <u>provided</u> that such closure shall not occur during August (through Labor Day), November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

      5.2.2   <u>No Alterations</u>.  Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion (unless such changes are required by Legal Requirements, in which case Tenant's consent shall not be required but prior written notice and a reasonable opportunity to work with the applicable governmental authority regarding the nature, scope and timing of such changes shall be given to the Tenant): (i) alter the area of the Shopping Center or the location, availability, or size of any Common Area improvement located within the area designated as "Critical Area" on <u>Exhibit B</u> hereto (the "***Critical Area***"); (ii) construct or permit to be constructed any structures in the Critical Area (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on <u>Exhibit B</u> hereto; or (iii) materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Critical Area, or the number, location or layout of parking spaces,  from those shown on <u>Exhibit B</u> hereto.  Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August (through Labor Day), November and December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.

5.2.3   Outbuildings. In addition to the provisions of Subsection 5.2.2 above, and subject to the rights of tenants under Existing Leases (as defined in Section 12.3(j) hereof), during the Term, Landlord shall not increase the area and/or height (inclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae) of the buildings designated on Exhibit B hereto as "Rubios" and the building(s) containing Suites 1 - Suite 7 as shown on Exhibit B hereto (collectively, the "*Outbuildings*") without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

5.2.4   Parking Area. During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) the number of parking spaces shown on the Site Plan attached hereto as Exhibit B, with each such space being at least nine (9) feet in width and eighteen (18) feet in length. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Subject to the rights of tenants under any Existing Leases (defined in Section 12.3(j) hereof), Landlord shall not designate specific parking spaces for use by tenants (including Tenant except as expressly provided for herein) or occupants of the Shopping Center. Landlord shall use commercially reasonable efforts (which shall include towing of vehicles) to prohibit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. Notwithstanding the foregoing, Landlord shall maintain in the location identified on Exhibit B as the "Expectant Mother Parking Area", a minimum of six (6) parking spaces reserved for the exclusive use of expectant mothers and/or parents with infants who are customers of Tenant (the "*Expectant Mother Parking Spaces*"). The Expectant Mother Parking Spaces shall be prominently marked and/or signed as reserved for expectant mothers and/or parents with infants (the costs of the initial installation of such signage to be paid for by Landlord; any replacement signage thereafter shall, at the request of Tenant, be installed by Landlord at Tenant's reasonable cost). There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center, except to the extent overnight parking is allowed by the terms of any Existing Leases (defined in Section 12.3(j) hereof), except that Tenant shall be entitled to park overnight in the parking lot located in front of the Premises one box truck that is used exclusively for delivery of merchandise purchased by Tenant's customers.

5.2.5   Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday ("*Normal Hours*"). Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6   Repairs. During the Term, any construction or repair (as opposed to routine maintenance work that does not materially interfere with Tenant's use of the Premises) by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

22

(a)    not be performed during the months of August (through Labor Day), November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)    with respect to the Critical Area, be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)    be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7    Rules and Regulations.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8    Miscellaneous.

(a)    No Promotional Use.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in specialty shopping centers located in the Phoenix, Arizona metropolitan area similar in quality to the quality of the Shopping Center existing as of the Effective Date, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.  Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)    Trash Compactor and Containers.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad".  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)    Shopping Carts.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)    Cellular Towers.  No ground mounted transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.

(e)    Temporary Storage Containers.  Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on Exhibit B hereto during the Term, subject to applicable Legal Requirements.

23

ARTICLE 6

UTILITIES

Section 6.1  Utility Service. From and after the Delivery Date, and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to such date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2  Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Fixed Rent shall be equitably abated during the period of disruption.

ARTICLE 7

SIGNS

Section 7.1  Tenant's Building Signage. Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease. Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are of professional quality and design.

Section 7.2  Pylon/Monument Signage. Landlord shall provide pylons and monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylons and monuments, in accordance with the provisions of Article 3 and Exhibits D and F hereto. The dimensions of Tenant's pylon sign panel(s) shall be at least as large as those of other occupants of the Shopping Center, and shall be located above the signs of all other tenants of the Shopping Center. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center whose premises contain less Floor Area than the Premises space on any other signage located in the Common Areas, Landlord shall also include on such signage Tenant's identification sign, as shown on Exhibit F hereto, which shall be higher than and at least as large as the largest sign made available to such other tenant or tenants.

24

Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges; however, neither the cost of individual tenants' signs thereon, nor the cost of the construction of the pylons and monuments, shall be includable in Common Areas Charges. If the top position on the pylon sign, as shown on Exhibit F, is occupied by another tenant's sign panel, then upon the expiration or earlier termination of such other tenant's lease, Tenant shall have the right to relocate its pylon sign panel to the top position on the pylon sign, at Tenant's sole expense.

Section 7.3   Signage: Alteration/Removal/Allocation. Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same. Upon the expiration or earlier termination of this Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4   Cooperation. Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5   Signage and Building Restrictions and Criteria.

7.5.1   Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(j)), during the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import. No billboard signs shall be permitted within the Shopping Center.

7.5.2   Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs. Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(j)), no premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have: (i) building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such

25

1  signage, or (ii) a building and entrance design element higher, wider, or which projects
2  farther than the height, width, or projection of the building and entrance design element
3  of the Premises.

4                                    ARTICLE 8
5                        ALTERATIONS AND IMPROVEMENTS

6       Section 8.1   Alterations and Improvements.

7           8.1.1   Tenant shall not perform any structural alterations or structural
8  improvements to the Premises (except to the extent same pertain to Tenant's Work)
9  without the prior approval of Landlord, provided, however, that Tenant's alteration of the
10 exterior of the Premises to conform to Tenant's then-current prototypical elevation shall
11 not require Landlord's consent.  All work performed by Tenant in connection with
12 structural and non-structural alterations or improvements shall be done at Tenant's sole
13 cost and expense, in a good and workmanlike manner and in compliance with all
14 applicable Legal Requirements.  The provisions of this Section 8.1 shall not apply to
15 Tenant's building signage, which shall be governed by the applicable provisions of
16 Article 7 above.

17          8.1.2   Tenant may, from time to time, at its sole cost and expense,
18 without the prior approval of Landlord, make non-structural alterations and non-structural
19 improvements to the Premises as Tenant deems necessary or desirable, including, but not
20 limited to, electrical systems, heating, ventilation and air conditioning and other
21 mechanical systems, installation of fixtures and equipment, painting, and wall and floor
22 coverings.

23          8.1.3   Tenant shall have the right to subdivide the Premises into two (2)
24 or more separate stores, each of which may have its own front entrance and access to the
25 loading docks in the rear of the Premises, as well as separately sub-metered utilities.

26          8.1.4   Tenant shall have the exclusive right to erect and maintain an
27 antenna and a satellite dish, and/or such other equipment as Tenant shall reasonably
28 desire, on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior
29 approval of its plans for the installation of such equipment, (ii) uses a contractor
30 designated or approved by Landlord for all roof penetrations so as not to violate or
31 invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof
32 penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the
33 roof caused by the making of the roof penetrations, including, but not limited to, the
34 repair of the roof penetrations upon the removal of any equipment installed thereon, and
35 (v) erects and maintains such equipment in accordance with applicable Legal
36 Requirements.

37          8.1.5   Landlord shall execute and return to Tenant all appropriately
38 completed building department or equivalent applications within ten (10) days after
39 Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting
40 process.

41          8.1.6   If any violation of any applicable Legal Requirement which is
42 noted against the Shopping Center or the Premises (other than a violation caused by
43 Tenant) prevents Tenant from obtaining a building permit for any alterations or a
44 certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and
45 diligently cause such violation to be removed of record to the extent required to permit
46 Tenant to obtain its building permit or certificate of occupancy, as the case may be.

47          8.1.7   Landlord shall not make any alterations to the Premises (including,
48 without limitation, changing the design, color or materials of the exterior of the Premises)
49 nor shall Landlord construct an additional floor or floors above the Premises.  Landlord

26

1    shall neither make nor permit to be made any alterations to the exterior architectural
2    theme (i.e. the exterior façade) of the remainder of the Shopping Center which would be
3    inconsistent with a specialty shopping center located in the Phoenix, Arizona
4    metropolitan area similar in quality to the quality of the Shopping Center existing as of
5    the Effective Date (exclusive of other tenants' entrance features) without the prior
6    consent of Tenant.

7            8.1.8    Tenant shall have the exclusive right to erect and maintain on the
8    roof of the Premises, a passive solar array for the production of electricity (the
9    *"System"*), provided that Tenant: (i) obtains Landlord's prior approval of its plans for the
10    installation of the System, (ii) uses a contractor designated or approved by Landlord for
11    all roof penetrations so as not to violate or invalidate any roof warranties maintained by
12    Landlord, (iii) maintains the area where roof penetrations are made while the System is
13    present, (iv) repairs any damage to the roof caused by the making of the roof
14    penetrations, including, but not limited to, the repair of the roof penetrations upon the
15    removal of any component of the System, and (v) erects and maintains the System in
16    accordance with applicable Legal Requirements. The System shall be deemed to be part
17    of Tenant's Property. In the event that Landlord does not approve, or reject with
18    reasonable detail, Tenant's request for approval of the System or Landlord fails to
19    provide contact information for its approved roofing contractor, in each instance within
20    thirty (30) days after request therefor from Tenant, then the plans for the System shall be
21    deemed approved and/or Tenant shall have the right to use its own contractor to perform
22    any roof penetrations, as applicable. Landlord acknowledges and agrees that Tenant or
23    its Affiliate or transferee shall be the exclusive owner and operator of the System and
24    Landlord shall have no right, title or interest in such equipment or any component
25    thereof, notwithstanding that any such equipment may be physically mounted or adhered
26    to the Premises. Landlord acknowledges and agrees that, notwithstanding the System's
27    presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and
28    exclusive owner of: (i) the electricity generated by the System, (ii) the environmental
29    attributes of the System, and (iii) any and all credits (including tax credits), rebates,
30    benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever
31    entitled, resulting from the environmental or related attributes of the System. Without the
32    express written consent of Tenant, Landlord shall not make or publish any public
33    statement or notice regarding any environmental incentive relating to the System or any
34    environmental attribute of the System or the energy output from the System.

35            8.1.9    Tenant shall be entitled to receive any and all *"Incentives"*
36    (hereinafter defined) which Tenant may negotiate with, or derive from governmental,
37    non-governmental, private or public utility, or other entities pertaining to construction
38    and/or remodeling (including without limitation Tenant's Work) of the Premises, hiring
39    of employees, or other business operations of Tenant which would cause an owner or
40    occupant of the Premises to be entitled to an Incentive. As used herein, the term
41    *"Incentive"* shall include, without limitation, any cost reduction, refund, voucher, credit,
42    tax relief, abatement, or other monetary inducement (such as, for examples only, energy
43    efficiency incentives, property tax abatements or grants, sales tax refunds or grants, tax
44    credits, governmental grants, utility rebates or refunds, or any other benefit or amount
45    negotiated by, or otherwise allowed to Tenant (and shall not include such benefit or
46    amounts allowed to Landlord). If any such Incentive is required to be paid or credited
47    directly to Landlord, then: (i) Landlord shall elect to take the Incentive in a lump sum, or
48    if that is not permitted, then in the shortest number of installments possible, so as to
49    permit Tenant to recoup the full amount of the Incentive during the Term of this Lease,
50    and (ii) within thirty (30) days after Landlord's receipt of the Incentive, Landlord shall
51    pay Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the
52    full amount of such Incentive against the next succeeding installment(s) of Rent then
53    payable under the Lease.

54

ARTICLE 9

REPAIRS

Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, and serving exclusively the Premises); (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises and (iii) the System (if any) and any other rooftop equipment installed by Tenant.  Subject to the provisions of Articles 10 and 11 hereof, Tenant shall be responsible for the reasonable cost of repairing any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Tenant, its employees, agents or contractors, or (B) any breach by Tenant of any provision of this Lease.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises (including, without limitation, any fire pump facilities or electrical switch gear serving the Premises);

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    the non-structural elements of the Premises (including, without limitation, the maintenance, repair and replacement of the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges),

28

1     performed in a good and workmanlike manner in accordance with all applicable Legal
2     Requirements, and without material interference with or disruption to the normal conduct
3     of any business operations in the Premises.  Landlord shall give Tenant at least five (5)
4     days' prior notice of any proposed repairs or replacements to the Premises, or any
5     proposed repairs or replacements which would materially affect the normal conduct of
6     any business operations in the Premises (except in the case of an emergency posing
7     imminent risk of material harm to persons or property, in which event Landlord shall
8     only be required to give such notice as is reasonable under the circumstances).  If, in
9     Tenant's reasonable judgment, Landlord's repairs would materially interfere with or
10    disrupt the normal conduct of any business operations in the Premises, Landlord shall
11    perform such repairs only after the regular hours of operation of Tenant and any other
12    occupant of the Premises (or any portion thereof).

13        Section 9.3  Legal Compliance Work.  Except as hereinafter expressly provided,
14    Landlord shall be responsible, at its sole cost and expense (and not includable in
15    Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter
16    defined).  Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and
17    expense, for the performance of Legal Compliance Work: (a) pertaining to the interior
18    elements of the Premises which are neither structural nor comprise the major building
19    systems serving the Premises; or (b) required solely as a result of Tenant's specific
20    manner of use of the Premises (*i.e.*, are not of general applicability to tenants and
21    occupants of the Shopping Center); provided, however, that the foregoing shall not
22    relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with
23    all Legal Requirements, and (y) the repairs required in this Lease.  As used herein, ***Legal***
24    ***Compliance Work"*** shall mean any obligation, addition, alteration, improvement, or
25    rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part
26    thereof, as applicable, which may be required by reason of any Legal Requirement.

27                          ARTICLE 10
28    INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

29        Section 10.1 Mutual Release, Waiver of Subrogation and Mutual Indemnification.

30        10.1.1  Mutual Waiver of Claims.  Landlord and Tenant, on their own
31    behalf and on behalf of anyone claiming under or through either one by way of
32    subrogation, hereby release and waive all rights of recovery and causes of action against
33    each other and their respective Affiliates from any and all liability for any loss or damage
34    to property or resulting from damage to such property (and, in either case, any resulting
35    loss of business or rental income), whether caused by the negligence or fault of the other
36    party, which is normally insured under Special Form property insurance (so-called "All-
37    Risk") and time element insurance required to be maintained hereunder.  In the event
38    either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be
39    permitted hereunder), then the self-insuring party or the party maintaining the deductible
40    hereby releases the other party from any liability arising from any event which would
41    have been covered had the required insurance been obtained and/or the deductible not
42    been maintained.

43        10.1.2  Waiver of Subrogation.  Landlord and Tenant shall cause each
44    property insurance policy carried by either of them insuring the Premises, the contents
45    thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery
46    by way of subrogation or otherwise against the other party hereto (and all of such other
47    party's Affiliates) in connection with any loss or damage which is covered by such policy
48    or that such policy shall otherwise permit, and shall not be voided by the releases
49    provided above.

10.1.3   Mutual Indemnification.

(a)   Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)   Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2   Tenant's Insurance.

10.2.1   Tenant's Insurance.   Tenant shall maintain or cause to be maintained in full force and effect from and after the Delivery Date, and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (so-called "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.

10.2.2   Self-Insurance.   All insurance required to be maintained under this Section 10.2 may be: (i) insured under an individual policy covering this location, or a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (ii) self-insured by Tenant via a deductible, a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iii) insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.

Section 10.3   Landlord's Insurance.

10.3.1   Liability Insurance.   Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as an "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.

10.3.2   Special Form Property Insurance.   Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (so-called "All-Risk") property insurance (including loss of rents for a

30

minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], Ordinance or Law coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee (if any), or if none, to Landlord (in either event, such proceeds shall be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof). The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3   Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4  General Insurance Requirements.

10.4.1   All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each policy carried by either party shall be written as a primary policy not contributing with, and not in excess of, coverage carried by the other. Within a reasonable time after request therefor, each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2   The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

## ARTICLE 11
### FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1  Fire and Other Casualty.

11.1.1   (a)   Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord

31

shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements, and shall not include any of Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1. Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any condition affecting, or damage to, the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any condition affecting, or damage to, the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2    In the event that:

(a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within one hundred twenty (120) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)    the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

32

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3    If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2    Eminent Domain.

11.2.1    As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2    If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3    In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with

33

parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has all of the entrances from both Bell Road and 75th Avenue and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)    there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)    any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)    five (5%) percent or more of the parking spaces located in the Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four and one-half (4.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.  Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4    If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder.  During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below.  Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5    In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements paid for by it, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

34

11.2.6   Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3  Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12

COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1  Quiet Enjoyment.  So long as Tenant is not in default hereunder beyond any applicable notice and cure periods, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2  Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3  Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)   As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)   In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)   No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)   Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)   The Shopping Center now has, and, on the Delivery Date, shall have, access to and from Bell Road and 75th Avenue as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)   This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the

35

Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)    There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)    As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof. With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Legal Requirements.

(i)    As of the Effective Date there is no "Related Land" (defined in Section 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(j)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the *"Existing Leases"*); and

(k)    Landlord shall use reasonable efforts to promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant, as its sole remedy for such failure by Landlord, shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4  Environmental Matters.

12.4.1  Definitions.

(a)    As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous

substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)    As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2    Compliance with Environmental Laws.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3    Responsibility for Releases of Hazardous Substances. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August (through Labor Day), November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.  If the presence of Hazardous Substances, or Landlord's remediative work relative thereto,

37

interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

12.4.4   Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5   Landlord's Representations and Warranties.  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.  The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6   Documents.  Each party shall provide reasonably prompt notice to the other party of the notifying party's receipt of an Environmental Notice.

12.4.7   Indemnity.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8   Survival.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9   Conflict.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5  OEA.

12.5.1   As used in this Lease, the term *"OEA"* shall mean that certain Declaration of Easements, Covenants and Restrictions dated May 18, 1998 and recorded in the Maricopa County, State of Arizona County Recorder's Office (the *"Clerk's Office"*) as Instrument No. 98-0411572 as amended by that certain First Amendment to Declaration of Easements, Covenants and Restrictions dated February 2, 2000 and recorded with the Clerk's Office as Instrument No. 00-0144804.

12.5.2   Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the

38

Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 12.5. Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance).

12.5.3    Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

12.5.4    Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5    Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6    Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7    In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA  or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8    As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

12.5.9    Landlord shall obtain any third-party approvals required under the OEA for the performance of Landlord's Work (including, without limitation, Tenant's

1    elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work,
2    and the operation of Tenant's business in the Premises.

3                                    ARTICLE 13
4                               USES AND RESTRICTIONS

5        Section 13.1  Permitted and Prohibited Uses.

6            13.1.1  Tenant's Permitted Use.  The Premises may be used and occupied
7    for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the
8    Premises for any of the "Prohibited Uses" (defined in Exhibit L hereto annexed) or the
9    "Existing Exclusives and Use Restrictions" (hereinafter defined in Subsection 13.3.1), to
10   the extent then applicable.

11           13.1.2  Prohibited Uses.  Landlord shall construct, lease, operate, maintain
12   and manage the Shopping Center in a manner consistent with other specialty shopping
13   centers located in the Phoenix, Arizona metropolitan area similar in quality to the quality
14   of the Shopping Center existing as of the Effective Date.  Except and to the extent
15   otherwise permitted under any Existing Leases (as defined in Section 12.3(j) hereof),
16   Landlord shall not lease, rent or occupy or permit to be occupied any portion of the
17   Shopping Center or any "Related Land" (hereinafter defined) for any of the "Prohibited
18   Uses" that pertain to the Shopping Center or the Related Land, as the case may be (as set
19   forth in Exhibit L hereto annexed), provided, however, that as to any future Related Land,
20   the foregoing restriction shall not apply to the extent that any Prohibited Uses are
21   otherwise permitted under leases entered into prior to the date on which such land
22   becomes Related Land.  As used in this Lease, the term *"Related Land"* shall mean any
23   land contiguous or adjacent to the Shopping Center (including, without limitation, any
24   land that would be contiguous or adjacent to the Shopping Center but for any intervening
25   road, street, alley or highway) owned or controlled by Landlord or its Affiliate(s).

26       Section 13.2  Tenant's Exclusive in Center.  To induce Tenant to execute this
27   Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord
28   covenants and agrees as follows.

29           13.2.1  Subject to the rights of tenants under Existing Leases (as defined
30   in Section 12.3(j) hereof), Landlord shall not lease, rent or occupy or permit any other
31   premises in the Shopping Center or on any Related Land to be occupied, whether by a
32   tenant, sublessee, assignee, licensee or other occupant or itself, for the storage, sale,
33   rental or distribution, at retail or at wholesale, either singly or in any combination, of
34   items contained in any of the following respective categories of merchandise: (a) infant,
35   juvenile and children's furniture and equipment (including, without limitation, infant,
36   juvenile and children's: cribs, beds, mattresses, bedding, changing tables, gliders,
37   rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, play
38   pens, car seats, booster seats, cradles, carriages, strollers, toy and clothing chests, swings,
39   or any other furniture or equipment similar to the foregoing enumerated items)
40   (collectively, *"Restricted Furniture"*); (b) clothing, layettes, apparel, shoes and/or
41   accessories for infants, juveniles and children 0-4 years in age; and maternity clothing
42   (collectively, *"Restricted Clothing"*); and (c) merchandise, products and services
43   targeted for use by or for infants, juveniles and children 0-4 years in age (including,
44   without limitation, infant, juvenile and children's: toys, books, food, formula, indoor
45   and/or outdoor play and recreational equipment, audio and video cassettes or equipment,
46   safety items, feeding items, nursing items, health and beauty care items, drug remedies,
47   diapers, wipes, bathroom items (including, without limitation, personal care devices and
48   other bathroom appliances, accessories and toiletries)) (collectively, *"Restricted
49   Products"*) (which items in clauses (a), (b) and (c) above, either singly or in any
50   combination, are hereinafter referred to as the *"Exclusive Items"*).  Notwithstanding the
51   foregoing, any tenant or subtenant in the Shopping Center or any Related Land shall have

                                        40

the right to utilize its respective premises for the storage, sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such storage, sales, rental and/or distribution area) not to exceed the lesser of (A) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (B) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises; provided, however, in no event shall any tenant or subtenant have the right to sell more than one thousand (1,000) square feet of Floor Area within such tenant's or subtenant's premises for the sale of Restricted Furniture. As to any future Related Land, the foregoing restrictions shall not apply to the extent that any Exclusive Items are otherwise permitted under leases entered into prior to the date on which such land became Related Land. Existing tenants of the Shopping Center and any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the storage, sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

13.2.2    The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national: (i) department store [for example, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in specialty shopping centers located in the Phoenix, Arizona metropolitan area similar in quality to the quality of the Shopping Center existing as of the Effective Date, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date). The restrictions set forth in Subsection 13.2.1 above shall not apply to any store in the Shopping Center occupied and operated by Tenant or any of its Affiliates.

13.2.3    The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4    (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in any Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization

41

1   reasonably required by Tenant in connection with such prosecution and by appearing at
2   any hearing or trial with respect to such prosecution).

3       Section 13.3  Exclusives Which Tenant Must Honor.

4       13.3.1  Tenant shall honor certain exclusives granted by Landlord to
5   certain other tenants in the Shopping Center pursuant to the terms of leases which have
6   been executed prior to the Effective Date (hereinafter, **"*Existing Exclusives and Use*
7   *Restrictions"*) [a true and complete listing and description of such Existing Exclusives
8   and Use Restrictions being attached hereto as Exhibit K-1], and shall not sublease,
9   occupy or use all or any portion of the Premises, or permit all or any portion of the
10   Premises to be occupied or used in violation of any such Existing Exclusive (except as
11   may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no
12   Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit
13   K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant
14   harmless from and against all loss, cost, liability or expense (including, without
15   limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any
16   person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing,
17   Tenant shall be entitled to enter into a separate agreement with any tenant or other
18   occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies
19   the corresponding Existing Exclusive with regard to the Premises.

20       13.3.2  Except as expressly set forth in this Section 13.3, Tenant shall not
21   be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping
22   Center or in any other property owned by Landlord or Landlord's Affiliate.

23                 ARTICLE 14
24          CONDUCT OF BUSINESS OPERATIONS

25       Subject to the other provisions of this Lease (including, without limitation,
26   Articles 2 and 3 and Section 12.4.3 hereof) Tenant shall initially open its store for
27   business to the public in the Premises for at least one (1) day, not later than the one
28   hundred eightieth (180th) day after the Delivery Date (which date shall, as applicable, be
29   extended by reason of (A) damage or destruction, eminent domain proceedings or
30   actions, or *Force Majeure*, or (B) the acts or omissions of Landlord). Other than as
31   expressly set forth in the preceding sentence, Tenant shall have no obligation to open or
32   operate any business in the Premises, and shall have the right, at any time, to cease to
33   conduct any business operations in the Premises, and Tenant shall incur no liability to
34   Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of
35   Tenant's obligations under this Lease shall continue unless this Lease is terminated
36   pursuant, *inter alia,* to the further provisions of this Article 14 or any other provision of
37   this Lease [other than by reason of an Event of Default]). In the event that Tenant does
38   not operate or cause to be operated any retail business in the Premises (other than prior to
39   the Rent Commencement Date or during Excused Periods) for more than three hundred
40   sixty-five (365) consecutive days, Landlord shall have the option to terminate this Lease,
41   which option shall be exercisable by giving notice thereof to Tenant by not later than the
42   ninetieth (90th) day after the date on which said 365-day period expires, whereupon this
43   Lease shall terminate upon the sixtieth (60th) day (the **"*Recapture Date"*) after the date
44   on which Tenant receives Landlord's termination notice, as if the Recapture Date was
45   originally set forth herein as the expiration date of the Term. Upon such termination,
46   Landlord and Tenant shall each be released from any and all liabilities thereafter accruing
47   hereunder, except for those obligations which survive the expiration or other termination
48   of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant
49   hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to
50   Landlord any amounts so determined to be due and owing by Tenant to Landlord, and
51   conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant
52   for periods subsequent to the Recapture Date.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1 Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease. Notwithstanding anything to the contrary contained herein, Landlord hereby acknowledges that Tenant intends to sublet the entire Premises to Buy Buy Baby, Inc. (the *"BBB Sublet"*) and Landlord hereby consents to such subletting without the need for any further action on the part of Tenant.

15.1.2 Except with respect to the BBB Sublet and any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises. Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)    giving notice to Tenant (the *"Termination Notice"*) thereof within fifteen (15) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)    paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice. If Landlord terminates the Lease hereunder, then, for a period of one (1) year after the Termination Date, Landlord shall not lease, rent or occupy or permit the Premises or any portion

thereof to be occupied as a store which operates primarily as a baby store; the foregoing shall survive the termination of this Lease.

15.1.3 In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the Phoenix, Arizona metropolitan area; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2 <u>Liability of Tenant</u>. Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; <u>provided, however</u>, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate. For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million ($100,000,000) Dollars.

Section 15.3 <u>Collateral Assignment</u>. In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4 <u>Cure Rights of Original Tenant</u>.

15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, <u>then</u> Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), <u>provided</u> that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are personal to the assignee and/or not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not

44

be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5 <u>Recognition Agreement</u>. In the event Tenant subleases all or any portion of the Premises to an Affiliate, or for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of <u>Exhibit H</u> hereto, in recordable form. Landlord agrees to execute and deliver such agreement, upon Tenant's request, in connection with the BBB Sublet (defined in Section 15.1 above).

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1 <u>Tenant Default</u>.

16.1.1   If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an ***"Event of Default"***.

16.1.2   Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)   to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)   without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

45

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach as provided in Section 16.1.3 below, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3    Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4    Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5    Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2 <u>Landlord Default</u>. If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), <u>or</u> (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default")*, then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, provided Tenant's notice to Landlord advises Landlord of Tenant's intention to exercise its remedy of self help, make such repairs or perform such work in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

46

(c)  offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)  terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and  (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed, without limitation, that any water infiltration into the Premises from within or without the Premises, or mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3  Arbitration.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Phoenix, Arizona before one arbitrator in accordance with the procedural rules of the American Arbitration Association (or any successor thereto) then in effect.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1  Right to Mortgage and Non-Disturbance.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or

47

deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2 Estoppel Certificate. Upon written notice given by Landlord or Tenant in accordance with Article 18 hereof, the other party, within thirty (30) days after receiving such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any. Each request for a written statement pursuant to this Section 17.2 made within twelve (12) months of an earlier request for such a written statement shall be accompanied by a payment, from the requesting party to the other party, in the amount of Five Hundred ($500) Dollars (increased by One Hundred ($100 Dollars on each date that the Fixed Rent increases pursuant to Section 1.1.11 hereof).

Section 17.3 Existing Mortgages and Ground Leases. If a mortgage, deed of trust, or other security instrument, or any ground or underlying lease, encumbers the Shopping Center or any part thereof on the Effective Date, then within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid). Should Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000).

ARTICLE 18

NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any

48

1    Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose
2    unless same shall be given by registered or certified mail, postage prepaid, return receipt
3    requested, or by any recognized overnight mail carrier, with proof of delivery slip,
4    addressed to Landlord at Landlord's Mailing Address, with a copy also given to: Zell
5    Commercial Real Estate Services, Inc. 5343 N. 16th Street, Suite 290, Phoenix, Arizona,
6    85016 or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also
7    given to: (i) General Counsel, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union,
8    New Jersey 07083, and (ii) Thomas J. Phillips, Esq., Brown Rudnick LLP, One Financial
9    Center, Boston, Massachusetts 02111, or to such other person or other address as may,
10   from time to time, be specified by either party in a written notice to the other party.  If
11   Landlord shall consist of more than one person or entity, notices delivered by Tenant to
12   Landlord's Mailing Address shall be deemed to be delivered to, and effective notice to,
13   all such persons or entities comprising Landlord.  All notices given in accordance with
14   the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the
15   address of the addressee, provided, however, that if a deadline for the giving of any
16   notice under this Lease occurs on Saturday, Sunday, or a legal holiday, then such
17   deadline shall be extended to the next business day thereafter occurring.  Notwithstanding
18   the foregoing, Landlord shall instead send the following items to Tenant (Attention:
19   Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices
20   of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as
21   described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not
22   notices of default), statements, bills and related information pertaining to Tenant's Pro
23   Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

24                 ARTICLE 19
25             TENANT'S PROPERTY

26       All of Tenant's Property which may be installed or placed in or upon the Premises
27   by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate,
28   encumber, mortgage or create a security interest in or upon Tenant's Property in the
29   Premises without the consent of Landlord and may remove Tenant's Property at any time
30   during the Term.  Landlord waives any right it may have in Tenant's Property.  To the
31   extent Landlord may have a lien on or security interest in the Tenant's Property pursuant
32   to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such
33   lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after
34   Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant
35   evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

36                 ARTICLE 20
37             END OF TERM

38       Section 20.1 Surrender of Premises.  At the expiration of the Term, Tenant will
39   quit and surrender the Premises in good condition and repair, excepting, however,
40   reasonable wear and tear, damage by fire or other casualty, damage by eminent domain,
41   and repairs and replacements to be made by Landlord hereunder.

42       Section 20.2 Hold Over.  If Tenant fails to deliver possession of the Premises to
43   Landlord at the end of the Term, and unless Landlord and Tenant are, at such time,
44   engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at
45   sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a
46   prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the
47   amount thereof payable by Tenant for the month immediately preceding the last day of
48   the Term as well as for all Additional Rent payable by Tenant hereunder.

ARTICLE 21
INTENTIONALLY OMITTED

ARTICLE 22
ONGOING CO-TENANCY

If, at any time during the Term, less than seventy percent (70%) of the total Floor Area of all buildings in the Shopping Center, as set forth in Section 1.1.34 above (excluding the Premises), is open for business (subject to other tenants not being open for business during Excused Periods) by tenants of the type typically found in specialty shopping centers located in the Phoenix, Arizona metropolitan area similar in quality to the quality of the Shopping Center existing as of the Effective Date (such condition being hereinafter referred to as an *"Excess Vacancy"*), then in such event, Tenant shall have the right to pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy. For purposes of this Article 22, the premises shown as "Cost Plus World Market" on the Site Plan attached hereto as Exhibit B shall be deemed to be open and operating for business (regardless of whether such premises is in fact open and operating) for so long as the named Tenant herein (i.e. Bed Bath & Beyond Inc.) and/or its Affiliate is the "Tenant" under such lease and has not assigned such lease to a non-Affiliate third party. In addition, if Tenant pays Alternate Rent hereunder for a period in excess of three hundred sixty-five (365) continuous days, then Tenant shall have the right, within sixty (60) days after the expiration of such 365-day period, to terminate this Lease, exercisable by giving Landlord at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. If Tenant does not timely terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 60-day period, Tenant shall (a) resume paying full Rent and (b) pay to Landlord within thirty (30) days an amount equal to the difference between Alternate Rent and the full Rent for such 60 day period (i.e. Tenant shall only be entitled to Alternate Rent for a period not to exceed 365 days) , provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the condition of Excess Vacancy existing as of the close of such 365 day period worsens by more than five percent (5%); and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy. Tenant acknowledges that as of the Effective Date there is no Excess Vacancy at the Shopping Center.

ARTICLE 23
MISCELLANEOUS

Section 23.1 Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2 Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3 Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Zell Commercial Real Estate Services and Phoenix Commercial Advisors (collectively, the "**Broker**"). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4 _Force Majeure_. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for a period equal to the period of the delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease (except for delays resulting from cyber-attacks, power failures, or other events of Force Majeure affecting the availability of funds); or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto. A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of _Force Majeure_ and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5 Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6 Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7 Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8 Survival of Obligations. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

51

Section 23.9 Non-Waiver. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11 Definition of Landlord. The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 Successors and Assigns. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 Limitation of Landlord's Liability. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 Joint and Several Liability. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 Severability. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

52

Section 23.17 <u>Grammatical Usages and Construction</u>.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u>.  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 <u>Short Form Lease</u>.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum, which shall be in recordable form, and such form and substance as either party shall reasonably request; Landlord and Tenant shall cooperate in the recordation thereof.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 <u>Entire Agreement and Modification</u>.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 <u>No Joint Venture or Partnership Created by Lease</u>.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 <u>Tenant's Tradename</u>.  Except as a nominative fair use (e.g., to show the location of the Premises in the Shopping Center or to indicate that Tenant is a tenant in the Shopping Center), Landlord shall not make use of Tenant's tradename [*i.e.*, *"buybuy BABY"*®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24 <u>Timely Billing of Charges</u>.  Notwithstanding any provision of this Lease to the contrary, any Additional Rent for which Tenant is to be billed or charged by Landlord shall be billed or charged within two (2) years after the close of the calendar year (or fiscal tax year, in the case of Taxes) for which the amount is incurred by Landlord, failing which, Landlord shall be deemed to have waived its right to payment of such Additional Rent.

Section 23.25 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

53

Section 23.26 <u>Waiver of Trial by Jury</u>.  Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.27 <u>Ethical Conduct Policy</u>.  It is the policy of Tenant and its subsidiaries and affiliates (collectively, the "**Company**") to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  Landlord shall not solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services.  This includes, but is not limited to, any improper payment in exchange for the Company's execution of this Lease.  Landlord will also require any subcontractor (of any level) to adhere to the same standards, and will appropriately monitor its subcontractors to ensure such adherence.  In addition, any individual who is employed by or who represents the Company is prohibited from soliciting, accepting, offering, promising or paying any bribe, kickback or any other improper payment of money, products or services.  If any such improper actions are observed, please contact our Legal Department (Attention: General Counsel) at the address set forth in Article 18 hereof and/or by telephone at 908-688-0888, so that the incident may be fully investigated.

Section 23.28 <u>Confidentiality</u>.  Landlord shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the economic or other business terms of this Lease (including, without limitation, the Term and the Rent), except as required by Legal Requirements; or for disclosure to Landlord's accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center, provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord.

[Signature page follows]

54

Section 23.29 <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

ARROWHEAD PALMS, L.L.C., an
Arizona limited liability company

By:  Global Arizona Properties LLC, a
Delaware limited liability company, its
manager

[SEAL]

By:  Global Connecticut Properties Inc., a
Delaware Corporation, its manager

By: _____
Name: _RONALD J. ROTH_
Title: _GENERAL MANAGER_

**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New
York corporation

By: _____
Name: _____
Name:  Alan M. Freeman
Title:  Assistant Secretary

Name:  Steven H. Temares
Title:    Chief Executive Officer

[SEAL]

55

1

**<u>INDEX OF EXHIBITS</u>**

| | | |
|---|---|---|
| 2 | Exhibit A | Legal Description of Shopping Center |
| 3 | Exhibit B | Site Plan |
| 4 | Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| 5 | Exhibit D | Specifications for Landlord's Work |
| 6 | Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| 7 | Exhibit E | Permitted Encumbrances |
| 8 | Exhibit F | Signage |
| 9 | Exhibit G | Form of Subordination, Non-Disturbance and Attornment |
| 10 | | Agreement |
| 11 | Exhibit H | Form of Subtenant Recognition Agreement |
| 12 | Exhibit I | Form of Delivery Date Notice |
| 13 | Exhibit J | Form of Delivery Date Certification |
| 14 | Exhibit K-1 | Existing Exclusives and Use Restrictions |
| 15 | Exhibit K-2 | Existing Leases |
| 16 | Exhibit L | Prohibited Uses |

17

18

1

<u>Exhibit A</u>

2

<u>Legal Description of Shopping Center</u>

3

Real property in the County of Maricopa, State of Arizona, described as follows:

Parcel 1:

Lot 4 and Tract A, ARROWHEAD PALMS, according to Book 490 of Maps, Page 21, records of Maricopa County, Arizona.

PARCEL NO. 2:

A reciprocal easement for ingress and egress over and across the shared access roads and for certain additional rights, as shown and granted in Instrument No. 98-0411572 and re-recorded in Instrument No. 98-0839645, records of Maricopa County, Arizona.

4

5

A-1

1                                <u>Exhibit B</u>

2                                <u>Site Plan</u>

B-1

**EXHIBIT B**



BUY BUY BABY - EXHIBIT B (1 of 2)



BUY BUY BABY - EXHIBIT B (2 of 2)
7325 WEST BELL ROAD
PEORIA, ARIZONA
DATE: 1-26-17

1          <u>Exhibit C</u>

2          <u>Rent Commencement and Expiration Date Agreement</u>

3          THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT,
4     made as of the ____ day of _____, 201___, by and between ARROWHEAD
5     PALMS, L.L.C. (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

6                    **W I T N E S S E T H :**

7          WHEREAS, Landlord is the owner of a certain shopping center known as
8     Arrowhead Palms Shopping Center (the *"Shopping Center"*), situated in Peoria, Arizona,

9          WHEREAS, by that certain Lease Agreement dated as of _____, 2017
10    (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to
11    Tenant;

12         WHEREAS, Tenant is in possession of the Premises and the Term of the Lease
13    has commenced; and

14         WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter
15    into an agreement setting forth certain information in respect of the Premises and the
16    Lease.

17         NOW, THEREFORE, Landlord and Tenant agree as follows:

18         1.    The Rent Commencement Date occurred on _____,
19    201___.

20         2.    The Initial Term of the Lease shall expire on January 31, 20___, unless
21    Tenant exercises any option to extend the Term of the Lease or unless the Lease
22    terminates earlier as provided in the Lease.

23         3.    The date of commencement of the first Renewal Period shall be February 1,
24    20___, if Tenant effectively exercises its option in respect thereof (the deadline for such
25    exercise being ___[insert date]___), and if Tenant does so, the Term of the Lease shall
26    expire on January 31, 20___, unless Tenant exercises any option to further extend the
27    Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

28         4.    The date of commencement of the second Renewal Period shall be
29    February 1, 20___, if Tenant effectively exercises its option in respect thereof (the
30    deadline for such exercise being ___[insert date]___), and if Tenant does so, the Term of
31    the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further
32    extend the Term of the Lease or unless the Lease terminates earlier as provided in the
33    Lease.

34         5.    The date of commencement of the third Renewal Period shall be February
35    1, 20___, if Tenant effectively exercises its option in respect thereof (the deadline for
36    such exercise being ___[insert date]___), and if Tenant does so, the Term of the Lease
37    shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the
38    Lease.

39         6.    The date of commencement of the fourth Renewal Period shall be February
40    1, 20___, if Tenant effectively exercises its option in respect thereof (the deadline for
41    such exercise being ___[insert date]___), and if Tenant does so, the Term of the Lease
42    shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the
43    Lease.

44         7.    The date of commencement of the fifth Renewal Period shall be February
45    1, 20___, if Tenant effectively exercises its option in respect thereof (the deadline for

1    such exercise being    [insert date]   ), and if Tenant does so, the Term of the Lease
2    shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the
3    Lease.

4          8.    Capitalized terms used, but not defined, herein shall have the meanings
5    ascribed to them in the Lease.

6          IN WITNESS WHEREOF, the parties hereto have caused this Rent
7    Commencement and Expiration Date Agreement to be executed the date and year first
8    above written.

**LANDLORD:**

ARROWHEAD PALMS, L.L.C., an
Arizona limited liability company

By:  Global Arizona Properties LLC, a
Delaware limited liability company, its
manager

By:  Global Connecticut Properties Inc., a
Delaware Corporation, its manager

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:  Seth Geldzahler
Title:    Vice President – Real Estate

1                               Exhibit D

2                        Specifications for Landlord's Work

**PEORIA, ARIZONA**

**Exhibit D - Landlord's Work**

**Renovation**

**buybuy BABY**

01-12-2017

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

## I.  Landlord's Plans & Specifications

A.  Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following:

    1.  Tenant's Plans: Site-specific design-development drawings prepared by Tenant which shall include:
        a)  F1 - FIXTURE PLAN/BANNER LOCATION
        b)  F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
        c)  F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
        d)  F4 - LIGHTING PLANS AND NOTES
        e)  F5 - HIGH PILE STORAGE PLAN
        f)  Additional F-drawings as may be required to address atypical site-specific conditions

    2.  Tenant's Prototype Drawings & Specifications [developed MCG Architecture, Cleveland, OH] which consist of :

        a)  buybuy BABY – PROTOTYPE VERSION 1.2015.A – Drawings (dated 12/21/15)
        b)  buybuy BABY – PROTOTYPE VERSION 1.2015.A – Project Manual (dated 12/21/15)

    3.  Lease Exhibits: Landlord's Plans & Specifications shall conform to all provisions of Exhibits B, D, D-1, D-2 and F to this Lease.

B.  Landlord's Plans & Specifications shall also include the following items :

    1.  All available architectural elevations and panel locations details for all pylon, monument and directional signs located throughout the Shopping Center.

    2.  Available architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center that are being remodeled, redeveloped or changed as part of any new work.

    3.  Available civil engineering documents for the Shopping Center.

    4.  Available geo-technical and storm water design reports.

C.  Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements. Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings & Specifications". Such Requirements may include (but shall not be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas [incl. protection of openings through fire-rated partitions]; Disability access to mezzanine level [i.e. - ADA lift; limited use/limited application elevator; passenger elevator]; Second egress stair from the mezzanine level; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc.. Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

D.  Hierarchy :

    1.  In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern :
        a)  Lease Exhibits B, D [excluding Tenant's Prototype], D-1, D-2 & F
        b)  Tenant's Plans
        c)  Tenant's Prototype Drawings and Specifications
        d)  Landlord's Plans and Specifications

    2.  To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised (prior to construction) to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant.

E.  Quality Control Review :

    1.  At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete full size set and one (1) complete ½ size set. Tenant may (at Tenant's option) employ a third party consultant to review the submittal, in which event, prior to the commencement thereof, . If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

    2.  Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications. Tenant may (at Tenant's option) employ a third party consultant to review each subsequent submittal, in which event, prior to the commencement thereof. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

3. Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant. Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications. Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease. Tenant reserves the right to disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

4. Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

F. Landlord's Plans and Specifications shall indicate all existing items which are to remain (i.e. – HVAC equipment, ductwork, doors, electrical equipment, etc.) and are (in Tenants reasonable judgment) required to (i) properly convey the complete design intent for the building, (ii) allow Tenant to confirm all required functions and accessories are provided, and (iii) to ensure coordination of existing items with new equipment and installations. Omission of such items from the Landlord's Plans and Specifications shall be grounds for Tenant to reject the submittal and return without review.

## II. Site Specifications

A. All parking areas and traffic drives in the Shopping Center are existing and to remain. . The condition of these parking areas and traffic drives at the time of Delivery shall be consistent with the standards of a comparable specialty Shopping Center having regard for the size age and location thereof in the state of AZ. Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited.

B. All truck access drives in the Shopping Centerare existing and shall remain . All new truck access drives shall consist of a minimum 12" of compacted sub-base (95% compacted), 6" asphalt base, and 3" asphalt surface finish or match existing conditions. The condition of these truck access drives at the time of Delivery shall be consistent with  the standards of a comparable  Shopping Center having regard for the size, age and location thereof in the state of AZ.  Grading of the existing areas does not exceed a slope of 3%.

C. Tenant's, Trash Container Pads is existing, and shown on lease Exhibit B. The new enclosed truck dock, ramp and compactor to be constructed per Tenant's prototype and specs as shown on exhibit D, D1  and B.The condition of these items at the time of Delivery shall be consistent with  the standards of a comparable Shopping Center having regard for the size, age and location thereof in the state of AZ.  Landlord represents that Tenant's recessed truck ramp will not exceed a slope of 6%.  In the event that the existing truck dock height is greater or less than 44-inches, Landlord shall consult directly with Tenant's National Account Vendor to generate recommended solutions for Tenant's review and approval (at Tenant's sole discretion).

D. The lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) is existing and shall be a minimum of two (2) foot-candles, measured 30" above grade. Landlord has provided a photometric plan Exhibit DZ attached dated 12/8/2016 which confirms the existing lighting levels throughout the Shopping Center are adequate. Landlord shall ensure all lighting fixtures in the Critical area ( as shown on exhibit B) are in proper working order on or prior to delivery date. Landlord shall provide low level security lighting (min. 1 foot-candle) throughout the Shopping Center that shall remain illuminated from dusk to dawn seven days a week.

E. Landlord shall provide a new curb ramp and painted crosswalk directly in front of the Premises aligned with the center of the entry/exit doors.  Such curb ramp shall be a minimum of 14'-0" wide and shall have a maximum slope of 1:12.

F. Landlord shall patch (as required), reseal and re-stripe the existing parking lot in at least Tenant's critical area.

## III. Building Requirements

The following section (a) highlights elements of Landlords Work which are already outlined in "Tenant's Prototype Drawings & Specifications" ; (b) identifies project-specific elements of Landlord's Work which are in addition to the scope detailed in "Tenant's Prototype Drawings & Specifications" and (c) describes items that may remain as-is if determined by Tenant (at Tenant's sole discretion) to be in good working order as well as in good condition and appearance.

A. Demolition : Landlord shall remove all existing obsolete miscellaneous items and equipment in their entirety throughout the Premises including (but not limited to) partitions, doors, frames, soffits, studs, furring, insulation, suspended ceiling systems, plumbing fixtures, mechanical equipment, electrical equipment, roof mounted equipment, devices, etc. unless specifically approved by Tenant in writing that such items may remain.  Landlord shall repair and patch all surfaces which are to remain and coordinate all demolition work with new construction.

B. Clear Height: All Building Systems shall be designed to allow Tenant to stock merchandise to 16'-6"a.f.f. Various systems shall be designed to conform with the following criteria :
   1. 18'-4" minimum clear height to underside of all structural system components.
   2. 16'-6" minimum clear height to underside of all plumbing & electrical system components [excluding lighting]
   3. 17'-6" minimum clear height to underside of all mechanical system components [i.e. - ductwork]
   4. 19'-0" maximum clear height to underside of all mechanical supply and return ducts
   5. 16'-6" minimum clear height to underside of all fire protection sprinkler piping (main and branch lines)
   6. 1" minimum and 6" maximum from fire sprinkler heads to underside of roof/floor deck above
   7. 22'-0" maximum clear height at the lowest point of the underside of roof/floor deck above.

Landlord's architect to provide a coordination plan by 01/05/2017 showing; high pile area, lighting, duct work, diffusers, sprinkler and any other items what will affect light locations, for the use of coordinating any light locations that cannot be located at prototypical 15'-6" clear height to bottom of light. Tenant to determine light heights/locations based on this accurate coordination plan.

C. Utilities: Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas water, fire protection water, sanitary sewer & phone services) are properly sized in accordance with Tenant's Prototype and separately metered exclusive of all other tenants and occupants in the Shopping Center. Tenant's utility services shall be provided directly by the Utility company (sub-metering is prohibited).  If meter is located remote from the Premises, then Landlord shall install a shut-off control within the Premises at a mutually agreeable location.  Location of utility lines and equipment serving other Tenants in the Shopping Center shall be prohibited on, under, over, across or within the Premises unless they are existing at

the time of Lease execution. To the extent that such existing utilities conflict with Tenant's ability to properly merchandise the store (i.e. – clear heights), Landlord shall relocate such utilities to a mutually agreed upon location. Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date. Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date. If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

D.  <u>Office Mezzanine Access</u> : Not Applicable.

E.  <u>Fire Protection</u>: Landlord shall furnish and install both a fire alarm  (FA) system and a fire sprinkler (FS) system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

    1.  Landlord shall issue one complete submittal each for: (a) the fire alarm system and (b) the fire sprinkler system (per Sections 01340, 15300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval.  Each initial submittal must be received by Tenant's Consultant no later than (12) weeks prior to projected Delivery Date.  Prior to the commencement of Consultant's review, Landlord shall pay a fixed fee (**$625 USD** for Fire Alarm + **$625 USD** for Fire Sprinkler) directly to Tenant's Consultant.  If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant then Landlord shall revise the submittal to address all Consultant comments and resubmit.  Prior to the commencement of Consultant's review of any resubmittal, Landlord shall pay a fixed fee ($625 USD each) directly to Tenant's Consultant. Landlord shall be responsible for monitoring the fire alarm system up to 45 days following the Delivery Date.

        Landlord shall purchase all Fire Alarm equipment and devices thru Tenant's National Account Vendor :
        **FE Moran**
        **Phone: 217-366-2419**
        **Contact: Susan Hirstein**
        **E-mail: bbb@femoransecurity.com**

    2.  The sprinkler system shall be designed per the following criteria in order to prevent a fire pump from being required.
        a.  The system design would be in accordance with FM Global design criteria versus NFPA 13.  This will require that an Alternate Means and Methods Request (AMMR) letter be submitted to the city to allow this system versus an NFPA 13 system design.  This should not be an issue, but there is a possibility that they will not accept this request.

        b.  The system design will provide a possible avenue to eliminate smoke and heat vents in the building, but this will also require an AMMR.  This should not be an issue either, but there is a possibility that they will not accept this request.

        c.  The system design requires that the top of storage be a minimum distance of 36" below the sprinkler deflectors.  This will reduce the available storage heights in the building to the approximate heights indicated in red on the attached pdf.

    If the above requirements fail to meet the city or any other requirements then landlord shall comply with Tenant's prototypical specs and requirements for the sprinkler design. The prototype spec. and requirements are that the system shall comply with 2007 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity and a limited amount of Group A plastics on solid shelves, minimum 4-foot aisles [typical requirement = 0.60 GPM/sf over a 2000 sf area].  The sprinkler system shall be separate, stand alone and dedicated to Tenant's premise. Canopy FP system shall be installed in accordance with Tenant's Prototype criteria
The sprinkler system shall NOT utilize a fire pump. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate any required Fire Pump outside of the Premises. Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 8 of 2008 Edition), and shall otherwise maintain the fire pump.

    3.  Due to the FM Global design criteria more stringent coordination is required to meet the requirements. Landlord shall coordinate the below requirements in order to accommodate Tenant's light configuration. Landlord to work with Tenant to ensure that lights are per our requirements and sprinkler heads are adjusted as required to meet those requirements.

    Per FM Global Data Sheet 2-0, items and lights that will need to be coordinated with the sprinklers are as follows.

    <u>Isolated Obstructions (affecting only 1 sprinkler):</u>
    a.  Up to and including 4 in. wide.
        The top of the obstruction must be below the sprinkler deflectors and it is not considered an obstruction.
    b.  Greater than 4 in. up to and including 12 in. wide.
        -The top of the obstruction must be below the sprinkler deflectors and a minimum horizontal distance of 12 in. from the leading edge to the sprinklers above.
        -The bottom of the obstruction must be at least 18 in. above the top of storage.
    c.  Greater than 12 in. up to and including 24 in. wide.
        -The top of the obstruction must be below the sprinkler deflectors and a minimum horizontal distance of 12 in. from the leading edge to the sprinklers above.
        -The bottom of the obstruction must be at least 36 in. above the top of storage.
    d.  Greater than 24 in. wide.
        -The top of the obstruction must be below the sprinkler deflectors and a sprinkler must be provided below the obstruction.
        -The sprinkler deflectors below the obstruction must be at least 36 in. above the top of storage.

    <u>Continuous Obstructions (affecting 2 or more adjacent sprinklers):</u>
    a.  Up to and including 4 in. wide.
        -The top of the obstruction must be below the sprinkler deflectors and it is not considered an obstructions.
    b.  Greater than 4 in. up to and including 12 in. wide.

---

-The top of the obstruction must be below the sprinkler deflectors and a minimum horizontal distance of 12 in. from the leading edge to the sprinklers above.
-The bottom of the obstruction must be at least 18 in. above the top of storage..

    c.  Greater than 12 in. up to and including 24 in. wide.
-The top of the obstruction must be below the sprinkler deflectors and a minimum horizontal distance of 24 in, from the leading edge to the sprinklers above.
- The bottom of the obstruction must be at least 36 in. above the top of storage.

    d.  Greater than 24 in. wide
- The top of the obstruction must be below the sprinkler deflectors and sprinklers must be provided below the obstruction.
- The sprinkler deflectors below the obstruction must be at least 36 in. above the top of storage.

4.    Consulting Services : If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials. If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

5.    Landlord shall pay a fixed fee ($2,500 USD) plus travel expenses to have Tenant's National Fire Protection Consultant (listed below) conduct a detailed field observation of the sprinkler system and fire alarm to confirm the systems have been installed in compliance with the approved shop drawing submittal.  Such field observation shall occur no later than ten days prior to the established Delivery Date.  Landlord shall pay the fixed fee directly to Tenant's Consultant prior to commencement of the site visit.

6.    Tenant's National Fire Protection Consultant :    Mr. Will Smith / Code Consultants, Inc. (CCI)
    2043 Woodland Pkwy, Ste. 300
    St. Louis, MO   63146-4136
    (314) 991-2633 [ph]
    (314) 991-4614 [fax]
    wills@codeconsultants.com

F.   Sanitary Survey - Landlord shall perform two videographic, fiber optic camera surveys of the existing sanitary drainage system (one within 7 days of the start of construction + one 7 days prior to Delivery).  The survey shall include the entire sanitary line serving the Premises to a minimum of 50 feet outside the building.  Sanitary lines shall be "jetted" prior to starting the survey to remove any existing waste, construction debris or standing clogs.  Camera recording shall include the operating camera depth. Camera recording shall include a verbal narrative by the technician (including technician's name, company name, store number, store address, starting location of survey, and a brief description of any problems, deficiencies or points of interest identified throughout the inspection).  Camera recording shall be submitted in DVD format and shall contain only the camera survey for this project.  Camera recording shall be clearly labeled with store number, store address, date of inspection, name of inspector and inspection company.  Camera recording shall be accompanied by a written evaluation report highlighting any problems, deficiencies or points of interest and shall include a schematic diagram of the sanitary line which indicates the size, slope and material of the pipe and all cleanout locations.  Landlord shall repair the sanitary sewer line as required to ensure proper function (i.e. – no standing water/waste).

G.   Mechanical Equipment : Landlord shall furnish and install all new HVAC equipment (RTU's, Air Curtain, Unit Heater, etc.) in accordance with Tenant's Prototype Drawings and Specifications.  Landlord shall furnish and install new ductwork in accordance with Tenant's Prototypical Drawings and Specifications.  Landlord shall Test & Balance all mechanical equipment in accordance with Tenant's Prototypical Drawings and Specifications.

H.   Electrical System : The electrical service shall be a minimum 800 amp / 480/277v / 3 phase / 4 wire service.  Re-use of existing electrical system components within the Premises shall be prohibited.  Power Wall Assembly shall be in the location shown on Tenant's Plans.

I.   Roof :Landlord at Landlord cost and expense to perform any and all maintenance and/or repairs as outlined in the following roof report, *Arrowhead Palms Roof evaluation and Proposal, dated 7/6/2016* completed by *Gorman Roofing Services, INC, Phoenix, AZ*.  Landlord shall perform all necessary roof repairs within the limits of BBBY's demised premises per the terms of the lease.  Landlord shall provide new roof access hatch and ladder in accordance with Tenant's Prototypical criteria.  Landlord shall install maintenance pads on the roof around all mechanical equipment and roof hatch consistent with Tenant's Prototype requirements.

J.   Floor Slab :  Landlord shall provide Ardex SD-T with Diamond Quest (Ardex Version) over existing floor slab in all areas designated as CC-1 on Tenant's Plans..  Slab prep / floor prep shall be in accordance with Tenant's Prototype Drawings and Specifications.  Any areas of new concrete shall utilize 4,000 psi concrete, maintain a minimum thickness of 4 inches, and shall cure for a minimum 28-days prior to Delivery.  The entire floor system (existing and new) shall be designed to accept a minimum 125 lbs. per square foot of live load.  If rebar or pre-tensioned / post-tensioned steel is required, such reinforcement shall not be placed within the top 2 ½" of the concrete slab.  Landlord shall core the existing floor slab and provide certification from a licensed structural engineer that the slab will support the minimum live load requirements plus the anticipated loads from an Office Mezzanine.  Landlord shall confirm the existing concrete floor system is flat and level and shall not be below FF40/FL30 and be measured in accordance with ASTM E1155

K.   Autoslider : Landlord shall provide new autoslider doors in accordance with Tenant's Prototypical criteria.

L.   Storefront : Landlord shall provide new storefront system in accordance with Tenant's Prototype criteria and as depicted on lease exhibit D1.  Storefront shall be modified per Tenant's and Landlord's agreed upon revisions to incorporate existing storefront structure.

M.   Vestibule  : Landlord shall provide and install a fully enclosed "Vestibule" if indicated on Tenant's Plans in lieu of an open "Vestibule" as detailed on Tenant's prototype documents.  Vestibule shall conform to the following:  Interior vestibule glazing/storefront system shall match exterior glazing/storefront system in height, color and finish, with metal stud and gypsum board walls (including any headers and/or diagonal bracing, etc) above to deck.  Bottom of vestibule gypsum board ceiling system  shall match top of glazing/storefront system and contain 2'x4' light fixtures (Type D1), ducted HVAC supply and plenum return, as well as chrome recessed sprinkler heads and fire alarm devices as required by code or authority having jurisdiction.

N.  Loading Dock : Landlord shall provide new equipment in accordance with Tenant's Prototypical criteria as part of the newly constructed dock and enclosure shown on lease exhibit B and D1. Landlord at landlords' cost and expense to build out the dock and enclosure consistent per the Lease Exhibits B and D1 and consistent with the Buy Buy Baby prototype details so that the dock is sufficient for constant truck activity while minimizing damage to the dock area over time. The dock is to be conditioned per Tenant's prototype requirements.

O.  Exterior Finishes : Landlord shall modify the building exterior as required to be in accordance with Exhibit D-1 elevations. In the event that any existing exterior finishes are designated to remain, then Landlord shall refurbish such existing finishes to "like new" condition (i.e. – clean, paint, etc.). Landlord shall power wash the entire exterior façade and sidewalk a minimum of two weeks prior to the Delivery Date. Landlord shall provide adequate access and ventilation for all concealed spaces (i.e. – above entry canopy soffit) in accordance with Tenant's Prototype.

P.  Intumescent Paint : In the event that fire-proofing of exposed structural elements is required, then Landlord shall use intumescent fire resistant coating to achieve the required fire rating. Application shall be neat & clean and in accordance with manufacturer's recommendations.

Q.  Temporary Banners : Landlord shall provide eyehooks on the building facade for temporary banners as detailed on Tenant's prototype. Locations to be determined in the field by Tenant.

R.  Exit Signs : Landlord (at Landlord's cost) shall remove any existing Self Luminous Exit Signs containing Tritium Gas.

S.  Security Equipment : Landlord shall provide and install new security equipment (including Electronic Article Surveillance [EAS] and Closed Circuit Television [CCTV]) in accordance with Tenant requirements.  Landlord shall purchase such EAS equipment directly from Tenant's National Account Vendor (WG Security Products, Inc. / Attn: Tim Gates / 704-232-8891 / tgates@waspl.com)  Landlord shall purchase such CCTV equipment directly from Tenant's National Account Vendor (Sensormatic / Attn: Doug Thomas / 804-739-8144 / douglasthomas@adt.com).

T.  Restrooms : Landlord shall provide restrooms in the location(s) depicted on Tenant's Plans.  All existing restroom fixtures and associated fittings (including counters, sinks, faucets, toilets, urinals, floor drains, clean out covers, access plates, toilet partitions, HVAC diffusers & grilles, etc.) shall be removed and replaced with new items in accordance with Tenant's Prototypical criteria.  All existing restroom finishes shall be removed and replaced with new finishes in accordance with Tenant's Prototypical criteria.  Landlord shall provide all new restroom accessories (soap dispenser, toilet tissue dispenser, toilet seat cover dispenser, electric hand dryers, sanitary napkin vendor, sanitary napkin disposal, coat hook and bumper, etc.) in accordance with Tenant's Prototype Documents.

U.  Existing Rooms/Spaces : All existing demised rooms/spaces which have been retained in Tenant's Plans shall be repaired to "like new" condition and shall receive new finishes in accordance with Tenant's Prototypical criteria.

V.  Slatwall :In the event that there is existing slatwall, drywall or other sheathing in those areas designated on Tenant's Plans to receive slatwall, Landlord shall remove such sheathing to allow for the proper anchoring of the sub-structure and fastening of the new slatwall in accordance with Tenant's Prototype Drawings and Specifications.

W.  Landlord shall provide "Expectant Mother Parking" spaces as shown on Exhibit B.

X.  Landlord not required to provide Tenant's Hiring Trailer as called out in Tenant's specs.

## III.  Construction Coordination Requirements

A.  Schedule: Landlord shall provide Tenant with a critical path construction schedule prior to commencement of Landlord's Work.  Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every two weeks until Landlord's Work is complete.

B.  Photographs: Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work.  All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address : BBB.2000photos@bedbath.com

C.  Vendor Coordination: Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.

D.  Certification: Whenever testing, certification, or verification is required in Tenant's Prototype Drawings & Specifications, Landlord shall, at Tenant's request, provide Tenant with copies of tests, certifications, or verifications, and shall otherwise cooperate with Tenant's reasonable informational requests.

## IV.  Building and Site Signs

At a minimum, all signage rights granted to previous tenant shall be granted to Tenant. Building signs and pylon/monument signs shall be provided by Landlord in accordance with Tenants prototype details and specifications.

A.  Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only.  Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations.  Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date.  If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease.  If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

B.  Remote Building Sign(s) – Not Applicable

---

C. Pylon/Monument Signs -- All pylon /monument structures shown on Exhibit F are existing. Landlord to confirm the following are complete including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics.   Landlord to furnish, install all new sign panels as shown on Exhibit F. Landlord to furnish, install and remove (at Tenant's request) temporary non-stick vinyl graphics as detailed in Exhibit F.

D. Temporary Signs — Commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below.  Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
　　1.　Two double-sided temporary banners mounted to the Premises bearing the phrase :
　　　　a)　Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
　　　　b)　Banner #2 - "Why Wait? Shop Online" (side a) and "Now Open" (side b).
　　2.　Four single-sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
　　　　a)　Banners #1 & #2 - "Coming Soon"
　　　　b)　Banners #3 & #4 - "Now Open"
　　3.　One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
　　　　a)　"Now Hiring" (side a) and "Now Open" (side b).
　　4.　At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.

　　5.　Landlord shall secure banners through the following vendor:
　　　　Auna Foote / Corporate Identification Solutions
　　　　5563 North Elston Avenue
　　　　Chicago, IL 60630
　　　　(773) 763-9600 [ph]
　　　　(773) 763-9606 [fax]
　　　　afoote@corporateidsolutions.com
　　　　www.corporateidsolutions.com

E. Shop Drawings: Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval no later than twelve (12) weeks prior to the Delivery Date.

## V.  Permits and Approvals

A. Landlord shall be obligated to secure all permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises.  Such permits may include (but shall not be limited to) the following: Building Permit, Health Permit [for the sale of prepackaged foods], Fixture Permit, Seismic Permit, High Pile Storage Permit [for storage of merchandise above 12'-0"] and Signage Permits.

B. If seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date.  Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of the permit application. Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).
　　　　Seizmic Inc.
　　　　Sal Fateen / Genie Fateen / Keri Putnam
　　　　161 Atlantic Street, Pomona, CA 91768
　　　　(909) 869-0989 [ph]

C. Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.

## VI.  Construction Closeout

A. Electronic Format : Within thirty (30) days following the "Substantial Completion" date, Landlord shall be responsible for uploading all required documents (01700) to the Digital Reliance Inc. (DRI) website [http//www.closeoutassistant.com].  For additional information or assistance contact DRI at 614-430-5950.  Special software is not required.  All documents shall be uploaded in pdf.   DRI will confirm submittal meets base requirements and shall inform Landlord or Landlord's Contractor if certain documents are missing.  DRI will not review items for content.  The content will be reviewed by the BBB Construction Manager after posting of all documents is complete.  Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord or Landlord's Contractor from BBB's Construction Manager.  Landlord shall resubmit amended document(s) to DRI until approved by BBB's Construction Manager.  Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700.

B. Warranties: Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work.  All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant.   Only aspects of Landlord's Work being installed as part of the Lease.

C. Late Closeouts : If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed forty-five(45) day period, then Tenant may provide Landlord with notice of such failure.  If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D. Itemized Budget: Not Applicable.

E. Energy Rebate Information : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy rebate programs that are in force by the Authority Having Jurisdiction and/or the utility provider.

---

**EXHIBIT DZ**



buybuy baby
Photometric Layout
West Bell Road
Peoria, AZ
Date:12/8/2016

1

2

3

<u>Exhibit D-1</u>

<u>Exterior Elevations of Premises and Sidewalk Plan</u>



**EXHIBIT D-1**



BUY BUY BABY - EXHIBIT D-1 (1 of 3)
7325 WEST BELL ROAD
PEORIA, ARIZONA
DATE: 12-12-16



BUY BUY BABY - EXHIBIT D-1 (2 of 3)
7325 WEST BELL ROAD
PEORIA, ARIZONA
DATE: 12-12-16

1-23-17



BUY BUY BABY - EXHIBIT D-1 (3 of 3)
7325 WEST BELL ROAD
PEORIA, ARIZONA
DATE: 12-12-16

1

<u>Exhibit E</u>

2

<u>Permitted Encumbrances</u>

1.    Intentionally omitted.

2.    Intentionally omitted.

3.    Reservations or Exceptions in Patents, or in Acts authorizing the issuance thereof.

4.    The liabilities and obligations imposed upon said land by reason of: (a) inclusion thereof within the boundaries of the Salt River Project Agricultural Improvement and Power District; (b) membership of the owner thereof in the Salt River Valley Water Users' Association, an Arizona corporation and (c) the terms of any Water Right Application made under the reclamation laws of the United States for the purpose of obtaining water rights for said land.

5.    Water rights, claims or title to water, whether or not shown by the public records.

6.    Any charge upon said land by reason of its inclusion in Salt River Valley Water Users' Association.  (All assessments due and payable are paid.)

7.    Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of Arrowhead Palms, as recorded in Plat Book 490, Page(s) 21, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

8.    Declaration of Covenants, Conditions, Restrictions and Easements, recorded in 1998-0411572 of Official Records and re-recorded as 1998-0839645 and thereafter an Assignment of Declarant's Rights recorded as 99-0377150 of Official Records; and thereafter the First Amendment to Declaration of Easements, Covenants and Restrictions recorded February 29, 2000 as 00-0144804 of Official Records. , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

9.    An easement for electric lines and facilities and incidental purposes in the document recorded June 06, 1995 as 95-0323224 of Official Records.

10.    An easement for underground utilities and appurtenant facilities and incidental purposes in the document recorded June 06, 1999 as 1999-0544831 of Official Records.

3

4
5
6
7
8
9

       Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

<u>Exhibit F</u>

<u>Signage</u>



EXHIBIT F



EXHIBIT F (1 OF 5)
BUYBUY BABY
WEST BELL ROAD
PEORIA, AZ
DATE:12/05/2016



**buybuyBABY**

INTERNALLY ILLUMINATED
MONUMENT PANEL. SIGN COMPANY TO
CONFIRM VISIBLE OPENING (TYPICAL
BOTH SIDES).
RED AND BLUE LETTERS ON A WHITE
BACKGROUND, STRUCTURE, POWER,
PANEL & GRAPHICS BY LANDLORD,
bbBABY LOGO

buybuyBABY PYLON PANEL
LOCATED ON MONUMENT SIGN
SCALE: NTS

- PANEL BOTH SIDES OF PYLON.
- FINAL VISIBLE OPENING TO BE CONFIRMED
  AND LOGO ADJUSTED AS REQUIRED AND
  APPROVED BY bbBABY.
- PYLON STRUCTURE AND ELECTRICAL IS
  EXISTING

**WEST PYLON SIGN - 75TH AVE.**

PYLON SIGN #2.
(REFER TO EXHIBIT B FOR LOCATION)
SCALE: NTS

BUYBUYBABY PANEL
POSITION. SEE PANEL
DETAIL THIS SHEET

EXHIBIT F (2 OF 5)
buybuyBABY
WEST BELL ROAD
PEORIA, AZ
DATE: 12/05/2016



**buybuyBABY PYLON PANEL**
LOCATED ON MONUMENT SIGN
SCALE: NTS

- PANEL BOTH SIDES OF PYLON
- FINAL VISIBLE OPENING TO BE CONFIRMED
AND LOGO ADJUSTED AS REQUIRED AND
APPROVED BY bbBABY.
- PYLON STRUCTURE AND ELECTRICAL IS
EXISTING

NORTH PYLON SIGN - BELL RD.

PYLON SIGN #1
(REFER TO EXHIBIT B FOR LOCATION)
SCALE: NTS

BUYBUYBABY PANEL
POSITION. SEE PANEL
DETAIL THIS SHEET

EXHIBIT F (3 OF 5)
buybuyBABY
WEST BELL ROAD
PEORIA, AZ
DATE: 12/05/2016





EXHIBIT F (5 OF 5)
buy buy BABY
WEST BELL ROAD
PEORIA, AZ
DATE: 12/05/16

1          Exhibit G

2          Form of Subordination, Non-Disturbance and Attornment Agreement

3          THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
4    AGREEMENT, made as of the _____ day of _____, 201__, by and between
5    _____, a _____ [corporation] [limited] [general]
6    [partnership] [national banking association], having an office at
7    _____ (the "*Mortgagee*") and Bed Bath &
8    Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union,
9    New Jersey 07083 (the "*Tenant*").

10          W I T N E S S E T H :

11          WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*"), covering a
12    parcel of land owned by _____, a _____ [corporation],
13    [limited] [general] [partnership] (the "*Landlord*") together with the improvements [to
14    be] erected thereon (said parcel of land and improvements thereon being hereinafter
15    referred to as the "*Shopping Center*" and being more particularly described on Exhibit A
16    attached hereto and made a part hereof); and

17          WHEREAS, by a certain Lease Agreement heretofore entered into between
18    Landlord and Tenant dated as of _____ (as amended and/or modified, the
19    "*Lease*"), Landlord leased to Tenant a portion of the Shopping Center, as more
20    particularly described in the Lease (the "*Premises*"); and

21          WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
22    which is hereby acknowledged; and

23          [For mortgages existing as of the date Lease is executed:  WHEREAS, as an
24    inducement to Tenant to enter into the Lease, [Section 2.3.1/Section 17.3] thereof
25    provides that the Lease is conditioned upon Landlord obtaining this Agreement from
26    Mortgagee; and

27          WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
28    the non-disturbance of Tenant by the holder of the Mortgage; and]

29          [For mortgages occurring after the Lease is executed:  WHEREAS, Section
30    17.1 of the Lease provides that the Lease shall become subject and subordinate to a
31    mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and
32    when a non-disturbance agreement is entered into with respect to such mortgage; and

33          WHEREAS, the parties hereto desire to effect the subordination of the Lease to
34    the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

35          NOW, THEREFORE, in consideration of the premises and of the mutual
36    covenants and agreements herein contained, the parties hereto, intending to be legally
37    bound hereby, agree as follows:

38          1.    Mortgagee hereby consents to and approves the Lease and the term thereof,
39    including the options to extend the term as set forth in the Lease, and covenants and
40    agrees that the exercise by Tenant of any of the rights, remedies and options therein
41    contained shall not constitute a default under the Mortgage.

42          2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made
43    and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and
44    to all modifications and extensions thereof (and such subordination shall not lessen or
45    diminish Tenant's rights under the Lease), subject, however, to the provisions of this
46    Agreement.

G-1

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the

applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent (unless Mortgagee's consent is not required under the terms of the Mortgage); notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease. It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  General Counsel, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Thomas J. Phillips, Esq., Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111 or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if our memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:                                    _____

By:_____              By:_____
Name:_____          Name:_____
Title: (Assistant) Secretary          Title:   (Vice) President

[SEAL]


**TENANT:**

ATTEST:                                    BED BATH & BEYOND INC., a New York corporation

By:_____              By:_____
Name: Alan M. Freeman          Name:  Warren Eisenberg
Title: (Assistant) Secretary          Title:   Co-Chairman

[SEAL]

[INSERT APPROPRIATE JURAT FOR MORTGAGEE]

_____

STATE OF NEW JERSEY          )
                             ) : ss.
COUNTY OF UNION              )

    On this ___ day of _____, 201__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                      _____
                                        Notary Public

My Commission Expires:

_____

<u>Exhibit H</u>

<u>Form of Recognition Agreement</u>

THIS RECOGNITION AGREEMENT, made as of the __1st__ day of February___, 2017_, by and between _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ (**"Landlord"**); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**); and _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ (**"Subtenant"**).

<u>R E C I T A L S</u>:

A.    Landlord and Tenant have entered into a certain Lease Agreement (the **"Lease"**) dated as of __February    1__, 2017_, a short form of which has been recorded in _____, which demises certain premises (the **"Premises"**) located in the Arrowhead Palms Shopping Center in Peoria, Arizona, which Shopping Center is more particularly described on <u>Exhibit A</u> annexed hereto and made a part hereof.

B.    Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.    Pursuant to a Sublease dated as of February 1, 2017   (the **"Sublease"**), Tenant has subleased **[a portion of]** the Premises to Subtenant (the **"Subleased Premises"**).

D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(a)    that it is the fee owner of the Premises,

(b)    that the Lease is unmodified (except as may be otherwise set forth in <u>Exhibit B</u> annexed hereto, if any) and is in full force and effect,

(c)    that the term of the Lease expires on _____, but is subject to [five] renewal periods of [five] years each and

(d)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.    Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.    Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance

with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

6.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "*Notice*") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to General Counsel, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Thomas J. Phillips, Esq., Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111 or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.    No modification, amendment, waiver or release of any provision of this Agreement or any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

1     9.    This Agreement shall be binding on and shall inure to the benefit of the
2  parties hereto and their respective heirs, legal representatives, successors, assigns and
3  sublessees.

4      IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to
5  be executed under seal the date first above written.

**LANDLORD:**

ARROWHEAD PALMS, L.L.C., an
Arizona limited liability company

By:  Global Arizona Properties LLC, a
Delaware limited liability company, its
manager

By:  Global Connecticut Properties Inc., a
Delaware Corporation, its manager

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

6

H-3

[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]

_____

STATE OF NEW JERSEY          )
                             ) : ss.
COUNTY OF UNION              )

      On this ____ day of _____, 201__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                        _____
                        Notary Public

My Commission Expires:


_____

H-4

<u>Exhibit I</u>

<u>Form of Delivery Date Notice</u>

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Lease Agreement dated as of _____, 2017 (the "*Lease*"), between Arrowhead
       Palms, LLC, as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as tenant
       ("*Tenant*"), with respect to certain retail premises (the "*Premises*") located in the
       Arrowhead Palms Shopping Center, Peoria, Arizona.

Gentlemen:

       In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 201__.  This notice shall constitute the Delivery Date Notice referred to
in Subsection 2.3.2 of the Lease.

                          ARROWHEAD PALMS, L.L.C.,
                          an Arizona limited liability company

                          By:_____

cc:    [Thomas J. Phillips, Esq.]
       [General Counsel]

I-1

**Exhibit J**

**Form of Delivery Date Certification**

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Lease Agreement dated as of _____, 2017 (the "*Lease*"), between Arrowhead
Palms, LLC, as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as tenant
("*Tenant*"), with respect to certain retail premises (the "*Premises*") located in the
Arrowhead Palms Shopping Center, Peoria, Arizona.

Gentlemen:

In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
Date (as such term is defined in the Lease) will be deemed to be _____, 201__ .
This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
of the Lease.

ARROWHEAD PALMS, L.L.C.,
an Arizona limited liability company

By:_____

cc:    [Thomas J. Phillips, Esq.]
       [General Counsel]

J-1

Exhibit K-1

Existing Exclusives and Use Restrictions

Exclusives Arrowhead Palms

**U Break I Fix** – Provided Tenant has not been placed in default of its obligations under the Lese after the date of Lease, Landlord agrees not to enter into a lease with any other in-line tenant within the Shopping Center whose primary business is derived from the repair of cellular phones, iPhones, and other smart phones. This exclusive shall not have any effect on existing leases in effect in the Shopping Center, any freestanding pad buildings, any spaces which contain 10,000 square feet or more, or any parcels in the Shopping Center not owned by Landlord. For the purpose of the Lease, "Primary business" shall be defined as a line of business wherein the annual gross sales generated from that line of business exceeds ten (10%) percent of that business' annual gross sales

**Rubio's** – So long as the originally named Tenant or a Permitted Transferee is continuously and without interruption conducting business operations within the Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, then except for (i) any real property within the Shopping Center not owned by Landlord as of the date of this Lease or under contract for sale by Landlord as of the date of this Lease, (ii) any premises identified on the Site Plan as "Major Tenant", (iii) the owner and/or occupant of any pad located within the Shopping Center that has entered into a lease with Landlord prior to the Commencement Date, Landlord shall not lease, rent, occupy or permit to be occupied or used any other premises within the Shopping Center, whose primary use is selling Mexican style food.

**Lifeway** – Landlord shall not during the Lease Term lease or rent any other premises in the Shopping Center owned by Landlord primarily for the retail sale of Christian products, including, but not limited to, Christian Books, Christian bibles, Christian music, Christian Gifts, Christian cards, Christian children's products, church supplies and church curriculum ("Exclusive Items"); provided that the foregoing restriction shall not prohibit the incidental sales of Exclusive Items by other tenants or occupants of the Shopping Center in the ordinary course of the business of any such tenant or occupant. (That is, a tenant selling in the ordinary course of its permitted operations a full line of books, music, gifts, cards or children's products shall have the right to sell, as an incidental part of its typical mix of products, Christian books, Christian bibles, Christian music, Christian gifts, Christian cards or Christian children's products, provided that in no event shall sales of such Christian item comprise the primary use of any such tenant or occupant of the Shopping Center.) As used "incidental" shall mean that sales of Exclusive Items shall (x) be made from n not more than twenty-five percent (25%) of the Floor Area of the applicable premises and/or (y) not comprise more than twenty-five percent (25%) of the gross sales made from the applicable premises.

**Hand and Stone** – Provided Tenant has not been placed in default of its obligations under the Lease, after the date of the Lease, Landlord agrees not to enter into a lease with any tenant within the portions of the Shopping Center whose primary business is the operation of a business offering therapeutic massages. This exclusive shall not have any effect on existing leases in effect in the Shopping Center as of the of this Lease, any freestanding pad buildings, any spaces which contain 10,000 square feet or more, or any parcels in the Shopping Center not owned by Landlord. Tenant acknowledges that Landlord has advised Tenant that as of the date of the Lease, the areas marked as Pad 1, Pad 2 and Pad 5 are not owned by Landlord and thus are not subject to this Exclusive. For the purpose of this Lease, primary business shall be defined as a line of business which comprises more than fifteen (15%) percent of its annual gross sales from therapeutic massage revenue.

**Coffee Bean** - Landlord covenants and agrees that during the Term (as the same may be extended as permitted herein), so long as Tenant is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises (except for closures due to Force Majeure, damage, destruction, permitted remodeling or a breach of this Lease by Landlord that materially and adversely affects Tenant's ability to operate in the Premises in substantial compliance with "The Coffee Bean & Tea Leaf management standards), and provided that there is not in existence an Event of Default, , then, except for any existing leases in effect as of the Date of this Lease, Tenant shall have the exclusive right within portions of the Shopping Center owned by Landlord to sell, for on and off-premises consumption, gourmet coffee, tea and espresso-based drinks (except as otherwise provided below). Landlord further covenants and agrees that Landlord will not permit any other tenant of. the portions of the Shopping Center owned by Landlord, will not execute any new lease or amend any existing lease in the portions of the Shopping Center owned by Landlord to allow the sale of whole bean coffee, loose leaf tea or espresso based drinks or Tenant's

1  trademarked "Tea Blended" frozen beverages as a primary or secondary use, excepting incidental sales of non-branded brewed
2  coffee and non-branded brewed tea espresso based drinks by a Full Service Restaurant (as defined below), Food Service Tenant
3  (as defined below), Ice Cream Store (as defined below) or Juice Drink Store, (as defined below) in the
4  Shopping Center.
5  The term "incidental", as used with respect to sales of coffee or espresso based drinks, is defined to mean less than ten percent
6  (10%) of a tenant's gross calendar year sales. The term "Full Service Restaurant" as used in this Article 6C is defined to mean
7  dinner houses and all food service facilities, other than fast food, coffee shop, and takeout, with seating capacity for forty (40)
8  persons or more and not competing directly with the Permitted Use of the Premises. The term 'Food Service Tenant" as used in
9  this Article 6C is defined to mean any tenant, other than Tenant, in the Shopping Center operating a food service facility for fast
10  food and/or takeout with seating capacity of under forty (40) persons. •
11  (iv) The term 'Ice Cream Store" as used in this Article 6C is defined to mean any tenant in the Shopping Center whose use is the
12  sale of ice cream products; e.g., Carvel Ice Cream, Baskin-Robbins and Haagen-Dazs. The term "Juice Drink Store " as used in
13  this Article 6C is defined to mean any tenant in the Shopping Center whose use is the sale of "smoothie juices" and/or juice-based
14  blended beverages; e.g., Jamba Juice and Robeks.
15  (v) The term "non-branded" as used in this Article 6C is defined to mean a brand name that is not derived from or related to the
16  name of any coffee, tea or related drink and/or refreshment that is served or sold to the public through specialty outlets or
17  retailers. By way of example, Starbucks, Tully's Seattle's Best, Diedrich's and similar brands are considered "branded" and
18  Folgers, Maxwell House or similar brands are considered "non-branded"
19
20  Clothes Mentor - Provided Tenant has not been placed in default of its obligations under the Lease,
21  after the date of the Lease, Landlord agrees not to enter into a lease with any tenant within the
22  portions of the Shopping Center owned by Landlord wherein the primary business is the operation of
23  a business of buying and selling gently used women's clothing and accessories. This exclusive shall
24  not have any effect on existing leases in effect in the Shopping Center as of the date of the Lease, any
25  freestanding pad buildings, any spaces which contain 10,000 square feet or more, or any parcels in the
26  Shopping Center not owned by Landlord. Tenant acknowledges that Landlord has advised Tenant
27  that as of the date of the Lease, the areas marked as PAD 1, PAD 2 and PAD 5 are not owned by
28  Landlord and thus are not subject to this Exclusive. For the purpose of this Exclusive, primary business
29  shall be defined as a line of business which comprises more than fifteen (15%) percent of its annual
30  gross sales from the sale of gently used women's clothing and accessories.
31
32
33  Bikram Yoga - Provided Tenant has not been placed in default of its obligations under the Lease, after
34  the date of the Lease, Landlord agrees not to enter into a lease with any in-line tenant within the Shopping
35  Center whose primary business is the operation of a yoga studio. This exclusive shall not have any effect
36  on existing leases in effect in the Shopping Center, any freestanding pad buildings, any spaces which
37  contain 10,000 square feet or more, or any parcels in the Shopping Center not owned by Landlord. Tenant
38  acknowledges that Landlord has advised Tenant that as of the date of the Lease, the areas marked as PAD
39  1, PAD 2 and PAD 5 are not owned by Landlord and thus are not subject to this Exclusive.
40

2.13  Restrictions for Benefit of Pad 2. For so long as that certain Lease
Agreement dated September 30, 1998 (the "Lease"), entered into between Truststar,
L.L.C. an Arizona limited liability company as Landlord, and Beauty Brands, Inc.,
A Missouri corporation, as Tenant, remains in effect and the Tenant is not in default
thereunder (beyond the expiration of any applicable cure period, if any), and for so
long as the Tenant under the Lease is operating a business on the demised premises
a as "Beauty Brands Salon, Spa & Superstore" which is open for business on a
regular and continual basis, no portion of the Commercial Center other than Pad 2
may be utilized by any Occupant whose primary use is: (i) the sale and/or wholesale
distribution of salon-quality beauty supplies and related products, including, but not
limited to, shampoos, conditioners, holding sprays/gels, cosmetics, skin care
supplies, bath and body products, personal fragrances and perfumes, and/or (ii) a full-
service hair salon (as commonly referred to in Maricopa County, Arizona) having an
Actual Gross Floor Area greater than 2,501 square feet; provided, however, that the
foregoing restriction expressly shall not prohibit discount hair salons (such as,
without limitation, those operated under the name of "Great Clips" and " No
Appointments"). The foregoing also shall not prohibit an Occupant whose business
is the sale of general household goods and/or the provision of general household
services.

41
42

2.6    Prohibited Operations.  The following activities, uses or purposes shall be prohibited in the Commercial Center, unless specifically permitted by Developer in its sole and absolute discretion:

2.6.1    Food Purveyors – Any business with a "drive-through" must be first approved in writing by Developer, in its sole and absolute discretion.  There shall be no restaurant having an Actual Gross Floor Area greater than 2,000 square feet unless approved in writing by Developer, in its sole and absolute discretion.

2.6.2    Theaters – No theater of any kind (including, without limitation, motion picture theaters and facilities for the presentation of "live" performances or concerts) shall be permitted within the Commercial Center.

2.6.3    Offices – No office or professional use with an Actual Gross Floor Area greater than 3,000 square feet (except those incidental to other permitted uses) of any kind.

2.6.4    Health Spas, Gymnasiums and Exercise Studios–No health spa, gymnasium, game court or dance, aerobic or exercise studio of any kind shall be permitted in any part of the Commercial Center.

2.6.5    Place of Recreation – No billiard room, pool hall, athletic facility, game or video arcade, bowling alley, skating rink, dance hall, discotheque, or other place of public amusement, and no training or education facility (including, without limitation, a beauty school, barber college, reading room or other operation or activity designed primarily for students or trainees rather than customers) shall be permitted in any part of the Commercial Center.

2.6.6    Bars – No bar, tavern or cocktail lounge or other establishment chiefly devoted to on-premise consumption of alcoholic beverages shall be permitted in any part of the Commercial Center.  This shall not prohibit a bar or cocktail lounge as an incidental portion of a food service establishment.

2.6.7    Other – No massage parlor, "adult" book store, "adult" business of any type, reading rooms, libraries, schools of any nature, church or funeral parlor or any business using a loudspeaker in the Common Area shall be permitted in any part of the Commercial Center.  The Person maintaining each portion of the Common Area shall do so in accordance with the requirements of Section 5.1, but each Occupant or Owner operating a restaurant and associated "outdoor" eating area, if any, that is permitted under this Section 2.6 shall, at its own cost and expense, take all necessary measures to keep and shall keep the Common Area and "outdoor" eating area, if any, clean and free of all debris and rubbish caused by such use, and no part of the cost therefor shall be included in Common Area Maintenance Costs.  All leases to any Occupants operating restaurants, that may or may not include "outdoor" eating areas, shall include appropriate provisions consistent with and implementing the foregoing conditions.

1

<u>Exhibit K-2</u>

2

<u>Existing Leases</u>

3

4

| |
|---|
| <u>BIKRAM YOGA</u> |
| <u>CLOTHES MENTOR</u> |
| <u>COFFEE BEAN & TEA LEAF</u> |
| <u>COST PLUS #116</u> |
| <u>THE GREEK WRAP</u> |
| <u>HAND AND STONE MASSAGE SPA</u> |
| <u>JAMBA JUICE</u> |
| <u>THE JOINT</u> |
| <u>LIFEWAY CHRISTIAN RESOURCES</u> |
| <u>LOVEKIM NAILS & SPA</u> |
| <u>NEW BALANCE</u> |
| <u>PANDA EXPRESS STORE #488</u> |
| <u>RUBIO'S BAJA GRILL #73</u> |
| <u>SOCCER POST</u> |
| <u>U BREAK I FIX</u> |

5

6

7

8

K-2-1

<u>Exhibit L</u>

<u>Prohibited Uses</u>

As used in this Lease, the term ***"Prohibited Uses"*** shall mean any of the following uses:

A.    As to the <u>Shopping Center</u> (including the Premises), any of the following uses:

(1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)    Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)    Any "second hand" store, "surplus" store except that first class second hand or consignment shops commonly found in specialty shopping centers located in the Phoenix, Arizona metropolitan area similar in quality to the quality of the Shopping Center existing as of the Effective Date (such as Tuesday Morning, Once Upon a Child or Play It Again Sports) shall be permitted provided such use is not located adjacent to the Premises and not more than 5,000 square feet of Floor Area in the Shopping Center (in the aggregate) is devoted to such use;

(4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)    Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaners may be located within any of the Outbuildings (defined in Section 5.2.3 hereof));

(8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)    Any bowling alley or skating rink;

(10)    Any live performance theater, auditorium, meeting hall, sporting event, or other similar entertainment use, provided that the foregoing shall not prevent (i) performances by dance studios or martial arts studios otherwise allowed hereunder or similar types of "in house" events presented by similar tenants within their respective premises from time to time as an incidental part of such tenant's operations or (ii)Tenant from having events within the Premises for its customers, which shall include without limitation product demonstrations, instruction sessions and promotional events; each such event shall at all times (i) be consistent with the operation of a specialty shopping center located in the Phoenix, Arizona metropolitan area similar in quality to the quality of the Shopping Center existing as of the Effective Date, and (ii) comply with all applicable Legal Requirements;

(11)    Any living quarters, sleeping apartments, or lodging rooms;

M-1

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in specialty shopping centers located in the Phoenix, Arizona metropolitan area similar in quality to the quality of the Shopping Center existing as of the Effective Date (such as, for example, Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in specialty shopping centers located in the Phoenix, Arizona metropolitan area similar in quality to the quality of the Shopping Center existing as of the Effective Date shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit L];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, provided, however, (i) a restaurant otherwise allowed hereunder may sell alcohol for on-premises consumption as an incidental part of its business and (ii) Tenant and any of its Affiliates occupying and operating stores in the Shopping Center shall be permitted to sell, on an incidental basis, alcoholic beverages for on- and/or off-premises consumption (including, without limitation, conducting on-premises sampling and tastings), subject to applicable Legal Requirements;

(17)    Any catering or banquet hall provided, however,  a restaurant otherwise allowed hereunder may provide catering services as an incidental part of its business

(18)    Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall (except that arcade / billiard style games may be allowed as an incidental use to a restaurant otherwise permitted hereunder);

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms (except as incidental to a coffee shop or similar use otherwise allowed hereunder), places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to customer instruction sessions referred to Clause (10) above or Clause (37) below or on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities (such as lottery ticket sales), or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

1       (21)   Any unlawful use;

2       (22)   Any pawn shop, check-cashing store, gun shop (except as may be a
3  department within a nationally recognized sporting goods store operation, such as
4  "Dicks" as such store is generally operated as of the Effective Date ), or tattoo parlor;

5       (23)   Any church or other place of religious worship;

6       (24)   Any car wash, automobile repair shop, or any business servicing motor
7  vehicles in any respect, including, without limitation, any quick lube oil change service,
8  tire center or gasoline or service station or facility

9       (25)   Any carnival, amusement park or circus;

10      (26)   Any medical clinics (except medical offices may be allowed pursuant to
11  Item 28, below);

12      (27)   Any supermarket, except that an upscale, boutique-type food store of the
13  type normally operated in the Phoenix, Arizona metropolitan area (such as, by way of
14  example, Whole Foods, Sprouts, Fresh Market, and Trader Joe's) provided, that such
15  store shall not occupy more than 28,000 square feet of Floor Area and shall be located in
16  the premises adjacent to and west of the premises designated as "Cost Plus World
17  Market" on <u>Exhibit B</u> hereto (such premises the "*Western End Cap*"); provided that if
18  the Western End Cap is less than 28,000 square feet, immediately adjacent space in the
19  space labelled as "Cost Plus World Market" on <u>Exhibit B</u> may be used as a supermarket
20  hereunder in order to meet the 28,000 square foot limit (except that an upscale, boutique-
21  type food store shall be permitted to be located within the Premises);

22      (28)   Any office use, other than: (x) office space used in connection with and
23  ancillary to a permitted retail use hereunder; and (y) retail and medical offices providing
24  services commonly found in specialty shopping centers located in the Phoenix, Arizona
25  metropolitan area similar in quality to the quality of the Shopping Center existing as of
26  the Effective Date and first class medical offices (for example, financial services, real
27  estate brokerage, insurance agency, banking, travel agency, medical, dental or
28  ophthalmological services offices), <u>provided</u> that such uses are located in the Western
29  End Cap only;

30      (29)   Any hotel/motel;

31      (30)   Any daycare center;

32      (31)   Any veterinary office, except as may be incidental to a permitted full-line
33  pet and pet supply store operating in at least 10,000 square feet of Floor Area and located
34  in the Western End Cap and at least 80 feet from the premises shown as "Cost Plus" on
35  Exhibit B hereto  (except that a full-line pet and pet supply store shall be permitted to be
36  located within the Premises); such occupant shall use reasonable efforts to prevent its
37  customers from allowing their pets to urinate or defecate in the Common Areas and will
38  promptly remove any "dog dirt" from in front of the Premises; no pet or pet supply store
39  shall be located within 100 feet of the Premises;

40      (32)   Any children's entertainment or activity facility (such as "Discovery Zone",
41  or "Chuck E. Cheese's");

42      (33)   intentionally omitted;

43      (34)   Any movie theater;

44      (35)   Any restaurant serving meals for on- or off-premises consumption,
45  provided, however, that Tenant shall be permitted to operate a café within the Premises,

1    subject to Tenant's full compliance with applicable Legal Requirements and Landlord
2    may replace any existing restaurant with another restaurant;

3         (36)    Any beauty parlor or nail salon except Landlord may locate such uses in the
4    Western End Cap;

5         (37)    Any karate center, dance studio, yoga studio, health spa, exercise facility or
6    similar type business except Landlord may locate such uses in the Western End Cap; or

7         (38)    Any store primarily selling merchandise which is classed as "odd lot,"
8    "close out," "clearance," "discontinued," "cancellation," "second," "factory reject,"
9    "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed,"
10    "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain
11    Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the
12    retailer commonly known as "Christmas Tree Shops" and "And That" shall be deemed
13    not to violate the foregoing restriction.

14         Notwithstanding anything to the contrary contained herein, the foregoing
15    Prohibited Uses shall not be deemed to prevent Landlord from replacing a tenant existing
16    as of the Effective Date with a different tenant that conducts a like-kind use as the tenant
17    being replaced, provided such use is conducted solely within the premises of the tenant
18    being replaced. For example, Landlord may replace an existing restaurant tenant with
19    another restaurant tenant operating within the same premises).

20    B.      As to any Related Land, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22,
21    and 25 above.

22
23
24    62680358 v3

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE ( *First Amendment* ) is made and entered into as of the 19ᵀᴴ day of SEPTEMBER, 2017, by and between ARROWHEAD PALMS, L.L.C., an Arizona limited liability company ( *Landlord* ) and BED BATH & BEYOND INC., a New York corporation ( *Tenant"*).

### RECITALS:

WHEREAS, Landlord and Tenant are parties to a Lease Agreement dated February 1, 2017 ( *Lease* ), with respect to certain premises located in the Arrowhead Palms Shopping Center in Peoria, Arizona (the *"Premises"*), which Premises are more particularly described in the Lease;

WHEREAS, the Premises is being operated by Buy Buy Baby, Inc. *("Subtenant")* pursuant to a Sublease between Tenant and Subtenant dated as of February 1, 2017; and

WHEREAS, Landlord and Tenant desire to commemorate and adjust the square footage of the Premises pursuant to Sections 1.1.28 and 3.4.3 of the Lease.

### AGREEMENT:

NOW THEREFORE, in consideration of the mutual covenants contained herein and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, Landlord and Tenant hereby agree as follows:

1.    The recitals hereinabove set forth are incorporated into this First Amendment by this reference. Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.    Subsection 1.1.28 of the Lease shall be deleted and amended in its entirety to read as follows:

"Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and consisting of (i) twenty-one thousand four hundred sixteen (21,416) square feet of Floor Area for retail use (the *Retail Space*"), (ii) seven hundred forty-two (742) square feet of ground level space for office purposes (the *"Office Space"*) and (iii) five hundred twenty-two (522) square feet for the enclosed loading dock space as shown on Exhibit B (the *"Enclosed Loading Area"*). In no event shall the Enclosed Loading Area and/or Office Space (or any space used for fire pump facilities or electrical switch gear) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share. Notwithstanding anything contained in this Subsection 1.1.28 to the contrary and pursuant to Section 3.4.3 of the Lease, for purposes of calculating Fixed Rent, Additional Rent and Tenant's Pro Rata Share, the Premises shall be deemed to consist of twenty-one thousand three hundred fifteen (21,315) square feet of Floor Area."

3.    Subsection 1.1.11 shall be deleted and amended in its entirety to read as follows:

" 1.1.11 Fixed Rent: The following amounts for the periods indicated:

(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of Two Hundred Eighty-Seven Thousand Seven Hundred Fifty-Two and 50/100 Dollars ($287,752.50) per year [based on thirteen and 50/100 Dollars ($13.50) per square foot of Floor Area in the Retail Space];

(b)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Three Hundred Nine Thousand Sixty-Seven and

50/100 Dollars ($309,067.50) per year [based on fourteen and 50/100 Dollars ($14.50) per square foot of Floor Area in the Retail Space];

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Three Hundred Thirty Thousand Three Hundred Eighty-Two and 50/100 Dollars ($330,382.50) per year [based on fifteen and 50/100 Dollars ($15.50) per square foot of Floor Area in the Retail Space]; and

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Three Hundred Fifty-One Thousand Six Hundred Ninety-Seven and 50/100 Dollars ($351,697.50) per year [based on sixteen and 50/100 Dollars ($16.50) per square foot of Floor Area in the Retail Space]; and

(e)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Three Hundred Seventy-Three Thousand Twelve and 50/100 Dollars ($373,012.50) per year [based on seventeen and 50/100 Dollars ($17.50) per square foot of Floor Area in the Retail Space]; and

(f)    In the event Tenant exercises the fifth Renewal Option, for the fifth five (5) year Renewal Period, at the rate of Three Hundred Ninety-Four Thousand Three Hundred Twenty-Seven and 50/100 Dollars ($394,327.50) per year [based on eighteen and 50/100 Dollars ($18.50) per square foot of Floor Area in the Retail Space]."

4.    The parties agree that, as of the date hereof and subject to Subsections 1.1.34 and 1.1.41, the Shopping Center consists of seventy-six thousand eight hundred forty-nine (76,849) square feet of Floor Area, and Tenant's Pro Rata Share is deemed to be twenty-seven and 74/100 percent (27.74%).

5.    Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this First Amendment to be in full force and effect.

6.    The terms and conditions of this First Amendment shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns. Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect. In the event of any conflict or inconsistency between the terms and provisions of the Lease and this First Amendment, the terms and provisions of this First Amendment shall govern and control.

7.    This First Amendment may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one First Amendment to Lease.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have duly executed this First Amendment to Lease Agreement as of the date and year first written above.

**LANDLORD:**

WITNESS:

ARROWHEAD PALMS, L.L.C.,
an Arizona limited liability company

By:    Global Arizona Properties LLC, a
Delaware limited liability company, its
manager

By:    Global Connecticut Properties Inc., a
Delaware Corporation, its manager

By:    _____
Name:    RONALD J. ROTH
Title:    GENERAL MANAGER.

**TENANT:**

WITNESS:

BED BATH & BEYOND INC.,
a New York corporation

By:    _____
Steven H. Temares
Chief Executive Officer