**STARK & STARK**
A Professional Corporation
Joseph H. Lemkin, Esquire
Thomas S. Onder, Esquire
PO Box 5315
Princeton, NJ 08543-5315
(609) 896-9060
*Attorneys for Bell Tower Shops, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND, INC., et al. | Case No. 23-13359 (VFP) |
| Debtors[1] | Judge: Hon. Vincent F. Papalia |

**PRELIMINARY OBJECTION OF BELL TOWER SHOPS, LLC**
**TO POTENTIAL ASSUMPTION AND ASSIGNMENT OF**
**UNEXPIRED LEASE AND RESERVATION OF RIGHTS**

Bell Tower Shops, LLC ("Bell Tower"), by and through its counsel, hereby files

this limited objection to the *Notice to Contract Parties to Potentially Assumed Executory*

*Contracts and Unexpired Leases* [Docket No. 714] ("Notice"), and in support hereof

states as follows:

**Background**

1.      On or about April 24, 2023 ("Petition Date"), each of the above-captioned

debtors ("Debtors") filed voluntary petitions under chapter 11 of title 11 of the United

States Code ("Bankruptcy Code") with this Court.

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

2.      Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On June 13, 2023, the Debtors filed the Notice which states that, "pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the contract or agreement listed on **Exhibit A** to which you are a counterparty, upon approval of the Sale Transaction." Notice, p.2 (emphasis in original).[2] The Notice further provides that any objection to the "proposed Cure Payment", the "proposed assignment to the Successful Bidder", or "the ability of the Successful Bidder to provide adequate assurance of future performance" must be filed no later than June 26, 2023 at 5:00 p.m. (prevailing Eastern Time). *Id.*

4.      Exhibit A to the Notice includes a lease with Bell Tower for the premises located in the Bell Tower Shopping Centre, Fort Myers, Florida ("Premises"), described in the Notice as "Lease Agreement – 13499 South Cleveland Avenue, Ft. Myers, FL" ("Lease"). Exhibit A to the Notice identifies Bell Tower as the counterparty and asserts that the proposed Cure Payment for the Lease is $32,695.88.

5.      In addition, on May 22, 2023, this Court entered the *Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [Docket No. 422] ("Lease Sale Procedures Order"). The Lease Sale Procedures Order approves, among other things, additional sale procedures related to the Debtors' potential "Phase I" and "Phase II" sale of leases, and expressly permits

---

[2] Capitalized terms in the Notice have the meanings set forth in the Court's order approving bidding procedures [Docket No. 92] (the "Bidding Procedures Order").

landlords to submit bids in connection with their leases, including credit bids of their

undisputed cure amounts.

## Preliminary Objection

### a.  Proposed Cure Payment

6.          Debtors set the proposed Cure Payment for Bell Tower at $32,695.88.  Bell

Tower asserts that the correct cure amount for the Lease is **$179,491.46** ("Correct Cure

Amount"), which includes unpaid Rent due under the Lease as of the date of filing this

limited objection.[3]

7.          If the Lease is to be assumed or assumed and assigned, the Debtors or the

assignee should be required to pay Bell Tower the Correct Cure Amount in accordance

with section 365(b) of the Bankruptcy Code, together with any other amounts accruing

under the Lease (including without limitation any fixed rent or percentage rent, and

applicable taxes, common areas charges, and insurance costs) in accordance with the terms

of the Lease between the date of this filing and the date that the Lease is actually assumed

or assumed and assigned.

### b.  Adequate Assurance of Future Performance

8.          Additionally, Bell Tower is entitled to adequate assurance of future

performance by any assignee under section 365(f)(2)(B) of the Bankruptcy Code. As a

shopping center lease, this also requires satisfaction of the provisions of section 365(b)(3).

Section 365(b)(3) specifically requires adequate assurance:

---

[3] A copy of the ledger is attached hereto as **Exhibit A**.

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement related to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

*11 U.S.C. § 365(b)(3).*

9.      Bell Tower objects to the extent any proposed assignment of the Lease fails to comply with any of the foregoing requirements under section 365(b)(3) of the Bankruptcy Code, including without limitation: (i) the "Permitted Use" and "Prohibited Uses" provisions set out in <u>Sections 1.1.27</u> and <u>13.1.1</u> of the Lease[4] and <u>Exhibit M</u>[5] of the Lease, as amended; and (ii) the "Existing Exclusives" granted by Bell Tower to other tenants as set forth in <u>Sections 13.3.1</u> and <u>13.3.2</u> and <u>Exhibit K-1</u>[6] of the Lease.

---

[4] A copy of the Lease, less the voluminous Lease Exhibits, is attached hereto as **Exhibit B**. The Debtors are in possession of each of the Lease Exhibits and such Exhibits are also available upon request.

[5] A copy of Exhibit M of the Lease is attached hereto as **Exhibit C**.

[6] A copy of Exhibit K-1 of the Lease is attached hereto as **Exhibit D**.

10.    Bell Tower reserves all rights to the extent that the use under the Lease will be changed by reason of any proposed assignment, result in a violation of any "Permitted Use" and "Prohibited Uses" provisions under the Lease, and/or result in a violation of "Existing Exclusives" granted by Bell Tower to other tenants on or at the Premises, all as set forth above.

11.    If the Lease is to be assumed or assumed and assigned, the Debtors or applicable assignee should also be required to pay Bell Tower a "deposit or other security for the performance of the [Debtors'] obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant" in accordance with section 365(l) of the Bankruptcy.

## Reservation of Rights

12.    Bell Tower further reserves the right to amend and/or supplement this objection and the Correct Cure Amount. Further, while the Lease Sale Procedures Order is not referenced in the Notice, Bell Tower further reserves all rights with respect thereto. All objections and reservations asserted herein apply with equal force to any proposed sale, assumption or assignment under the Lease Sale Procedures Order, to the extent applicable.

## Conclusion

**WHEREFORE**, Bell Tower respectfully requests that the Court sustain this preliminary objection by conditioning assumption and assignment of the Lease on the payment to Bell Tower of the Correct Cure Amount plus any other amounts accruing under the Lease between the date of this filing and the date that the Lease is actually assumed or

assumed and assigned and grant any other and further relief that the Court may deem appropriate.

Respectfully submitted,

Dated: June 26, 2023

**STARK & STARK**
**A Professional Corporation**

By: */s/ Joseph H. Lemkin*
     Joseph H. Lemkin, Esquire
and

By: */s/ Thomas S. Onder*
Thomas S. Onder, Esquire

P.O. Box 5315
Princeton, NJ 08543
(609) 791-7022 (direct)
(609) 896-9060 (main)
(609) 895-7395 (facsimile)
jlemkin@sstark-stark.com
tonder@stark-stark.com
*Attorneys for Bell Tower Shops, LLC*

### International Lease Ledger

Date: 06/15/2023
Property: z026010
Tenant: t0000571 Bed, Bath & Beyond
From Date: 07/01/2001  To Date: 01/31/2027
Move In Date: 07/01/2001
Unit(S): UBBB
Base Currency: usd

| Trans Date | From | To | Post Month  Description | Net | Tax | Total | Payment | Balance |
|---|---|---|---|---|---|---|---|---|
| **Currency : USD** | | | | | | | | |
| 12/17/2016 | | | 12/2016 CAM AUTOCHRG @T1/31/2016 | 638.99 | 0.00 | 638.99 | 0.00 | 638.99 |
| 12/17/2016 | | | 12/2016 STX Tax for CAM | 72.53 | 0.00 | 72.53 | 0.00 | 711.52 |
| 12/17/2016 | | | 12/2016 PYR 2015 Tax Reconciliation | 88,173.69 | 0.00 | 88,173.69 | 0.00 | 88,885.21 |
| 12/17/2016 | | | 12/2016 STX Tax for PYR | 5,290.42 | 0.00 | 5,290.42 | 0.00 | 94,175.63 |
| 12/17/2016 | | | 12/2016 PYE 2015 CAM Reconciliation | 4,445.97 | 0.00 | 4,445.97 | 0.00 | 98,621.60 |
| 12/17/2016 | | | 12/2016 STX Tax for PYE | 266.76 | 0.00 | 266.76 | 0.00 | 98,888.36 |
| 12/17/2016 | | | 12/2016 RET 2016 Annual RETax | 91,748.97 | 0.00 | 91,748.97 | 0.00 | 190,637.33 |
| 12/17/2016 | | | 12/2016 STX Tax for RET | 5,504.94 | 0.00 | 5,504.94 | 0.00 | 196,142.27 |
| 12/17/2016 | | | 1/2017 BRR AUTOCHRG @T1/31/2017 | 35,684.83 | 0.00 | 35,684.83 | 0.00 | 231,827.10 |
| 12/17/2016 | | | 1/2017 STX Tax for BRR | 2,141.09 | 0.00 | 2,141.09 | 0.00 | 233,968.19 |
| 12/17/2016 | | | 1/2017 CAM AUTOCHRG @T1/31/2017 @R | 4,754.68 | 0.00 | 4,754.68 | 0.00 | 238,722.87 |
| 12/17/2016 | | | 1/2017 STX Tax for CAM | 285.28 | 0.00 | 285.28 | 0.00 | 239,008.15 |
| 12/17/2016 | | | 1/2017 ELE AUTOCHRG @T1/31/2017 @R | 561.94 | 0.00 | 561.94 | 0.00 | 239,570.09 |
| 12/17/2016 | | | 1/2017 STX Tax for ELE | 33.72 | 0.00 | 33.72 | 0.00 | 239,603.81 |
| 12/17/2016 | | | 1/2017 INS AUTOCHRG @T1/31/2017 @R | 1,639.12 | 0.00 | 1,639.12 | 0.00 | 241,242.93 |
| 12/17/2016 | | | 1/2017 STX Tax for INS | 98.35 | 0.00 | 98.35 | 0.00 | 241,341.28 |
| 1/3/2017 | | | 1/2017 chk# 0005172090 Lockbox | 0.00 | 0.00 | 0.00 | 234,831.53 | 6,509.75 |
| 1/19/2017 | 2/1/2017 | 2/28/2017 | 2/2017 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 41,633.83 |
| 1/19/2017 | 2/1/2017 | 2/28/2017 | 2/2017 CAM Common Area Maintenance:Revised by ctrl# 92311 | 4,754.68 | 285.28 | 5,039.96 | 0.00 | 46,673.79 |
| 1/19/2017 | 2/1/2017 | 2/28/2017 | 2/2017 ELE Electricity Reimbursemen | 561.94 | 33.72 | 595.66 | 0.00 | 47,269.45 |
| 1/19/2017 | 2/1/2017 | 2/28/2017 | 2/2017 INS Insurance | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 49,006.92 |
| 1/31/2017 | | | 2/2017 chk# 0005172656 Lockbox | 0.00 | 0.00 | 0.00 | 42,183.55 | 6,823.37 |
| 2/16/2017 | 3/1/2017 | 3/31/2017 | 3/2017 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 41,947.45 |
| 2/16/2017 | 3/1/2017 | 3/31/2017 | 3/2017 CAM Common Area Maintenance:Revised by ctrl# 92312 | 4,754.68 | 285.28 | 5,039.96 | 0.00 | 46,987.41 |
| 2/16/2017 | 3/1/2017 | 3/31/2017 | 3/2017 ELE Electricity Reimbursemen | 561.94 | 33.72 | 595.66 | 0.00 | 47,583.07 |
| 2/16/2017 | 3/1/2017 | 3/31/2017 | 3/2017 INS Insurance | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 49,320.54 |
| 2/27/2017 | | | 3/2017 chk# 0005173287 Lockbox | 0.00 | 0.00 | 0.00 | 42,183.55 | 7,136.99 |
| 3/21/2017 | 1/1/2017 | 1/31/2017 | 3/2017 CAM Common Area Maintenance | 163.14 | 9.79 | 172.93 | 0.00 | 7,309.92 |
| 3/21/2017 | 2/1/2017 | 2/28/2017 | 3/2017 CAM Common Area Maintenance:Revises charge ctrl# 45543 | 163.14 | 9.79 | 172.93 | 0.00 | 7,482.85 |
| 3/21/2017 | 3/1/2017 | 3/31/2017 | 3/2017 CAM Common Area Maintenance:Revises charge ctrl# 64694 | 163.14 | 9.79 | 172.93 | 0.00 | 7,655.78 |
| 3/21/2017 | 4/1/2017 | 4/30/2017 | 4/2017 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 42,779.86 |
| 3/21/2017 | 4/1/2017 | 4/30/2017 | 4/2017 CAM Common Area Maintenance :Write Off by Charge Ctrl# 542326 | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 47,992.75 |
| 3/21/2017 | 4/1/2017 | 4/30/2017 | 4/2017 ELE Electricity Reimbursemen | 561.94 | 33.72 | 595.66 | 0.00 | 48,588.41 |
| 3/21/2017 | 4/1/2017 | 4/30/2017 | 4/2017 INS Insurance | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 50,325.88 |
| 3/21/2017 | 4/1/2017 | 4/30/2017 | 1/2019 WO :Write Off Charge Ctrl#96828Old charges | -0.01 | 0.00 | -0.01 | 0.00 | 50,325.87 |
| 4/3/2017 | | | 4/2017 chk# 0005173883 Lockbox | 0.00 | 0.00 | 0.00 | 42,670.09 | 7,655.78 |
| 4/18/2017 | 5/1/2017 | 5/31/2017 | 5/2017 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 42,779.86 |
| 4/18/2017 | 5/1/2017 | 5/31/2017 | 5/2017 CAM Common Area Maintenance :Write Off by Charge Ctrl# 542327 | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 47,992.75 |
| 4/18/2017 | 5/1/2017 | 5/31/2017 | 5/2017 ELE Electricity Reimbursemen | 561.94 | 33.72 | 595.66 | 0.00 | 48,588.41 |
| 4/18/2017 | 5/1/2017 | 5/31/2017 | 5/2017 INS Insurance | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 50,325.88 |
| 4/18/2017 | 5/1/2017 | 5/31/2017 | 1/2019 WO :Write Off Charge Ctrl#1139400ld charges | -0.01 | 0.00 | -0.01 | 0.00 | 50,325.87 |
| 5/1/2017 | | | 5/2017 chk# 0005174421 Lockbox | 0.00 | 0.00 | 0.00 | 42,670.09 | 7,655.78 |
| 5/18/2017 | | | 5/2017 PYE 2016 CAM Reconciliation | 7,126.29 | 427.58 | 7,553.87 | 0.00 | 15,209.65 |
| 5/18/2017 | | | 5/2017 PY1 2016 INS Reconciliation | -7,435.69 | -446.14 | -7,881.83 | 0.00 | 7,327.82 |
| 5/18/2017 | | | 5/2017 PYE 2016 ELE Reconciliation | -845.92 | -50.76 | -896.68 | 0.00 | 6,431.14 |
| 5/18/2017 | 6/1/2017 | 6/30/2017 | 6/2017 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 41,555.22 |
| 5/18/2017 | 6/1/2017 | 6/30/2017 | 6/2017 CAM Common Area Maintenance :Write Off by Charge Ctrl# 542328 | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 46,768.11 |
| 5/18/2017 | 6/1/2017 | 6/30/2017 | 6/2017 ELE Electricity Reimbursemen | 561.94 | 33.72 | 595.66 | 0.00 | 47,363.77 |
| 5/18/2017 | 6/1/2017 | 6/30/2017 | 6/2017 INS Insurance | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 49,101.24 |
| 5/18/2017 | 6/1/2017 | 6/30/2017 | 1/2019 WO :Write Off Charge Ctrl#1359980ld charges | -0.01 | 0.00 | -0.01 | 0.00 | 49,101.23 |
| 5/30/2017 | | | 6/2017 chk# 0005174980 Lockbox | 0.00 | 0.00 | 0.00 | 42,670.09 | 6,431.14 |
| 6/20/2017 | 7/1/2017 | 7/31/2017 | 7/2017 BRR Base Rent - Retail :Write Off by Charge Ctrl# 542329 | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 41,555.22 |
| 6/20/2017 | 7/1/2017 | 7/31/2017 | 7/2017 CAM Common Area Maintenance | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 46,768.11 |
| 6/20/2017 | 7/1/2017 | 7/31/2017 | 7/2017 ELE Electricity Reimbursemen | 561.94 | 33.72 | 595.66 | 0.00 | 47,363.77 |
| 6/20/2017 | 7/1/2017 | 7/31/2017 | 7/2017 INS Insurance | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 49,101.24 |
| 6/20/2017 | 7/1/2017 | 7/31/2017 | 1/2019 WO :Write Off Charge Ctrl#1571300ld charges | -0.01 | 0.00 | -0.01 | 0.00 | 49,101.23 |
| 7/3/2017 | | | 7/2017 chk# 0005175583 | 0.00 | 0.00 | 0.00 | 42,670.09 | 6,431.14 |
| 7/19/2017 | 8/1/2017 | 8/31/2017 | 8/2017 BRR Base Rent - Retail :Write Off by Charge Ctrl# 542330 | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 41,555.22 |
| 7/19/2017 | 8/1/2017 | 8/31/2017 | 8/2017 CAM Common Area Maintenance | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 46,768.11 |
| 7/19/2017 | 8/1/2017 | 8/31/2017 | 8/2017 ELE Electricity Reimbursemen | 561.94 | 33.72 | 595.66 | 0.00 | 47,363.77 |
| 7/19/2017 | 8/1/2017 | 8/31/2017 | 8/2017 INS Insurance | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 49,101.24 |
| 7/19/2017 | 8/1/2017 | 8/31/2017 | 1/2019 WO :Write Off Charge Ctrl#1759000ld charges | -0.01 | 0.00 | -0.01 | 0.00 | 49,101.23 |

6/15/2023 4:53 PM

### International Lease Ledger

Date: 06/15/2023
Property: z026010
Tenant: t0000571 Bed, Bath & Beyond
From Date: 07/01/2001  To Date: 01/31/2027
Move In Date: 07/01/2001
Unit(S): UBBB
Base Currency: usd

| Trans Date | From | To | Post Month | Description | Net | Tax | Total | Payment | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 7/31/2017 | | | 8/2017 chk# 0005176082 Lockbox | | 0.00 | 0.00 | 0.00 | 42,670.09 | 6,431.14 |
| 8/21/2017 | 9/1/2017 | 9/30/2017 | 9/2017 BRR Base Rent - Retail :Write Off by Charge Ctrl# 542331 | | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 41,555.22 |
| 8/21/2017 | 9/1/2017 | 9/30/2017 | 9/2017 CAM Common Area Maintenance | | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 46,768.11 |
| 8/21/2017 | 9/1/2017 | 9/30/2017 | 9/2017 ELE Electricity Reimbursemen | | 561.94 | 33.72 | 595.66 | 0.00 | 47,363.77 |
| 8/21/2017 | 9/1/2017 | 9/30/2017 | 9/2017 INS Insurance | | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 49,101.24 |
| 8/21/2017 | 9/1/2017 | 9/30/2017 | 1/2019 WO :Write Off Charge Ctrl#196934Old charges | | -0.01 | 0.00 | -0.01 | 0.00 | 49,101.23 |
| 9/5/2017 | | | 9/2017 chk# 0005176634 Lockbox | | 0.00 | 0.00 | 0.00 | 42,670.09 | 6,431.14 |
| 9/19/2017 | 10/1/2017 | 10/31/2017 | 10/2017 BRR Base Rent - Retail | | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 41,555.22 |
| 9/19/2017 | 10/1/2017 | 10/31/2017 | 10/2017 CAM Common Area Maintenance | | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 46,768.11 |
| 9/19/2017 | 10/1/2017 | 10/31/2017 | 10/2017 ELE Electricity Reimbursemen | | 561.94 | 33.72 | 595.66 | 0.00 | 47,363.77 |
| 9/19/2017 | 10/1/2017 | 10/31/2017 | 10/2017 INS Insurance | | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 49,101.24 |
| 10/2/2017 | | | 10/2017 chk# 0005177143 Lockbox | | 0.00 | 0.00 | 0.00 | 15,035.62 | 34,065.62 |
| 10/10/2017 | | | 10/2017 chk# 0005177588 Lockbox | | 0.00 | 0.00 | 0.00 | 7,111.68 | 26,953.94 |
| 10/20/2017 | 11/1/2017 | 11/30/2017 | 11/2017 BRR Base Rent - Retail :Write Off by Charge Ctrl# 542332 | | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 62,078.02 |
| 10/20/2017 | 11/1/2017 | 11/30/2017 | 11/2017 CAM Common Area Maintenance | | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 67,290.91 |
| 10/20/2017 | 11/1/2017 | 11/30/2017 | 11/2017 ELE Electricity Reimbursemen | | 561.94 | 33.72 | 595.66 | 0.00 | 67,886.57 |
| 10/20/2017 | 11/1/2017 | 11/30/2017 | 11/2017 INS Insurance | | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 69,624.04 |
| 10/20/2017 | 11/1/2017 | 11/30/2017 | 1/2019 WO :Write Off Charge Ctrl#236589Old charges | | -0.01 | 0.00 | -0.01 | 0.00 | 69,624.03 |
| 10/31/2017 | | | 11/2017 chk# 0005177660 | | 0.00 | 0.00 | 0.00 | 42,670.09 | 26,953.94 |
| 11/13/2017 | | | 11/2017 TBB Pylon Sign | | 342.98 | 0.00 | 342.98 | 0.00 | 27,296.92 |
| 11/16/2017 | 12/1/2017 | 12/31/2017 | 12/2017 BRR Base Rent - Retail :Write Off by Charge Ctrl# 542333 | | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 62,421.00 |
| 11/16/2017 | 12/1/2017 | 12/31/2017 | 12/2017 CAM Common Area Maintenance | | 4,917.82 | 295.07 | 5,212.89 | 0.00 | 67,633.89 |
| 11/16/2017 | 12/1/2017 | 12/31/2017 | 12/2017 ELE Electricity Reimbursemen | | 561.94 | 33.72 | 595.66 | 0.00 | 68,229.55 |
| 11/16/2017 | 12/1/2017 | 12/31/2017 | 12/2017 INS Insurance | | 1,639.12 | 98.35 | 1,737.47 | 0.00 | 69,967.02 |
| 11/16/2017 | 12/1/2017 | 12/31/2017 | 1/2019 WO :Write Off Charge Ctrl#252936Old charges | | -0.01 | 0.00 | -0.01 | 0.00 | 69,967.01 |
| 12/4/2017 | | | 12/2017 chk# 0005178151 Lockbox | | 0.00 | 0.00 | 0.00 | 42,670.09 | 27,296.92 |
| 12/15/2017 | 1/1/2018 | 1/31/2018 | 1/2018 BRR Base Rent - Retail | | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 62,354.72 |
| 12/15/2017 | 1/1/2018 | 1/31/2018 | 1/2018 CAM Common Area Maintenance | | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 67,817.93 |
| 12/15/2017 | 1/1/2018 | 1/31/2018 | 1/2018 ELE Electricity Reimbursemen:Revised by ctrl# 285547 | | 561.94 | 32.59 | 594.53 | 0.00 | 68,412.46 |
| 12/15/2017 | 1/1/2018 | 1/31/2018 | 1/2018 INS Insurance | | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 69,720.95 |
| 1/2/2018 | | | 1/2018 chk# 0005178633 Lockbox | | 0.00 | 0.00 | 0.00 | 42,589.58 | 27,131.37 |
| 1/19/2018 | 1/1/2018 | 1/31/2018 | 1/2018 ELE Electricity Reimbursemen | | 534.17 | 30.98 | 565.15 | 0.00 | 27,696.52 |
| 1/19/2018 | 1/1/2018 | 1/31/2018 | 1/2018 ELE Rev Electricity Reimb: Revises charge ctrl# 273148 | | -561.94 | -32.59 | -594.53 | 0.00 | 27,101.99 |
| 1/19/2018 | 2/1/2018 | 2/28/2018 | 2/2018 BRR Base Rent - Retail | | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 62,159.79 |
| 1/19/2018 | 2/1/2018 | 2/28/2018 | 2/2018 CAM Common Area Maintenance | | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 67,623.00 |
| 1/19/2018 | 2/1/2018 | 2/28/2018 | 2/2018 ELE Electricity Reimbursemen | | 534.17 | 30.98 | 565.15 | 0.00 | 68,188.15 |
| 1/19/2018 | 2/1/2018 | 2/28/2018 | 2/2018 INS Insurance | | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 69,496.64 |
| 1/30/2018 | | | 2/2018 chk# 0005179087 Lockbox | | 0.00 | 0.00 | 0.00 | 41,044.40 | 28,452.24 |
| 2/16/2018 | 3/1/2018 | 3/31/2018 | 3/2018 BRR Base Rent - Retail | | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 63,510.04 |
| 2/16/2018 | 3/1/2018 | 3/31/2018 | 3/2018 CAM Common Area Maintenance | | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 68,973.25 |
| 2/16/2018 | 3/1/2018 | 3/31/2018 | 3/2018 ELE Electricity Reimbursemen | | 534.17 | 30.98 | 565.15 | 0.00 | 69,538.40 |
| 2/16/2018 | 3/1/2018 | 3/31/2018 | 3/2018 INS Insurance | | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 70,846.89 |
| 3/1/2018 | | | 3/2018 chk# 0005179591 Lockbox | | 0.00 | 0.00 | 0.00 | 42,394.65 | 28,452.24 |
| 3/19/2018 | 4/1/2018 | 4/30/2018 | 4/2018 BRR Base Rent - Retail | | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 63,510.04 |
| 3/19/2018 | 4/1/2018 | 4/30/2018 | 4/2018 CAM Common Area Maintenance | | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 68,973.25 |
| 3/19/2018 | 4/1/2018 | 4/30/2018 | 4/2018 ELE Electricity Reimbursemen | | 534.17 | 30.98 | 565.15 | 0.00 | 69,538.40 |
| 3/19/2018 | 4/1/2018 | 4/30/2018 | 4/2018 INS Insurance | | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 70,846.89 |
| 4/2/2018 | | | 4/2018 chk# 0005180087 Lockbox | | 0.00 | 0.00 | 0.00 | 42,394.65 | 28,452.24 |
| 4/13/2018 | | | 4/2018 PYE 2017 CAM Reconciliation | | 87.31 | 5.06 | 92.37 | 0.00 | 28,544.61 |
| 4/13/2018 | | | 4/2018 PYI 2017 INS Reconciliation | | -4,819.97 | -279.56 | -5,099.53 | 0.00 | 23,445.08 |
| 4/13/2018 | | | 4/2018 PYR 2017 RET Reconciliation | | 90,326.52 | 5,238.94 | 95,565.46 | 0.00 | 119,010.54 |
| 4/13/2018 | | | 4/2018 PYE 2017 ELE Reconciliation | | -1,651.74 | -95.80 | -1,747.54 | 0.00 | 117,263.00 |
| 4/18/2018 | 5/1/2018 | 5/31/2018 | 5/2018 BRR Base Rent - Retail | | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 152,320.80 |
| 4/18/2018 | 5/1/2018 | 5/31/2018 | 5/2018 CAM Common Area Maintenance | | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 157,784.01 |
| 4/18/2018 | 5/1/2018 | 5/31/2018 | 5/2018 ELE Electricity Reimbursemen | | 534.17 | 30.98 | 565.15 | 0.00 | 158,349.16 |
| 4/18/2018 | 5/1/2018 | 5/31/2018 | 5/2018 INS Insurance | | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 159,657.65 |
| 4/30/2018 | | | 5/2018 chk# 0005180560 Lockbox | | 0.00 | 0.00 | 0.00 | 35,576.10 | 124,081.55 |
| 5/18/2018 | 6/1/2018 | 6/30/2018 | 6/2018 BRR Base Rent - Retail | | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 159,139.35 |
| 5/18/2018 | 6/1/2018 | 6/30/2018 | 6/2018 CAM Common Area Maintenance | | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 164,602.56 |
| 5/18/2018 | 6/1/2018 | 6/30/2018 | 6/2018 ELE Electricity Reimbursemen | | 534.17 | 30.98 | 565.15 | 0.00 | 165,167.71 |
| 5/18/2018 | 6/1/2018 | 6/30/2018 | 6/2018 INS Insurance | | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 166,476.20 |
| 6/4/2018 | | | 6/2018 chk# 0005181027 Lockbox | | 0.00 | 0.00 | 0.00 | 42,394.65 | 124,081.55 |
| 6/19/2018 | 7/1/2018 | 7/31/2018 | 7/2018 BRR Base Rent - Retail | | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 159,139.35 |

6/15/2023 4:53 PM

### International Lease Ledger

Date: 06/15/2023
Property: z026010
Tenant: t0000571 Bed, Bath & Beyond
From Date: 07/01/2001  To Date: 01/31/2027
Move In Date: 07/01/2001
Unit(S): UBBB
Base Currency: usd

| Trans Date | From | To | Post Month | Description | Net | Tax | Total | Payment | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 6/19/2018 | 7/1/2018 | 7/31/2018 | 7/2018 | CAM Common Area Maintenance | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 164,602.56 |
| 6/19/2018 | 7/1/2018 | 7/31/2018 | 7/2018 | ELE Electricity Reimbursemen | 534.17 | 30.98 | 565.15 | 0.00 | 165,167.71 |
| 6/19/2018 | 7/1/2018 | 7/31/2018 | 7/2018 | INS Insurance | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 166,476.20 |
| 7/5/2018 | | | 7/2018 | chk# 0005181471 Cash Receipt 07.05.2018 July Rent | 0.00 | 0.00 | 0.00 | 42,394.65 | 124,081.55 |
| 7/30/2018 | | | 8/2018 | chk# 0005181902 Cash Receipt 07.30.2018 Aug Rent | 0.00 | 0.00 | 0.00 | 42,394.65 | 81,686.90 |
| 8/1/2018 | 8/1/2018 | 8/31/2018 | 8/2018 | BRR Base Rent - Retail | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 116,744.70 |
| 8/1/2018 | 8/1/2018 | 8/31/2018 | 8/2018 | CAM Common Area Maintenance | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 122,207.91 |
| 8/1/2018 | 8/1/2018 | 8/31/2018 | 8/2018 | ELE Electricity Reimbursemen | 534.17 | 30.98 | 565.15 | 0.00 | 122,773.06 |
| 8/1/2018 | 8/1/2018 | 8/31/2018 | 8/2018 | INS Insurance | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 124,081.55 |
| 8/17/2018 | 9/1/2018 | 9/30/2018 | 9/2018 | BRR Base Rent - Retail | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 159,139.35 |
| 8/17/2018 | 9/1/2018 | 9/30/2018 | 9/2018 | CAM Common Area Maintenance | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 164,602.56 |
| 8/17/2018 | 9/1/2018 | 9/30/2018 | 9/2018 | ELE Electricity Reimbursemen | 534.17 | 30.98 | 565.15 | 0.00 | 165,167.71 |
| 8/17/2018 | 9/1/2018 | 9/30/2018 | 9/2018 | INS Insurance | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 166,476.20 |
| 9/4/2018 | | | 9/2018 | chk# 0005182356 Cash Receipt 09.04.2018 | 0.00 | 0.00 | 0.00 | 138,023.95 | 28,452.25 |
| 9/25/2018 | 10/1/2018 | 10/31/2018 | 10/2018 | BRR Base Rent - Retail | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 63,510.05 |
| 9/25/2018 | 10/1/2018 | 10/31/2018 | 10/2018 | CAM Common Area Maintenance | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 68,973.26 |
| 9/25/2018 | 10/1/2018 | 10/31/2018 | 10/2018 | ELE Electricity Reimbursemen | 534.17 | 30.98 | 565.15 | 0.00 | 69,538.41 |
| 9/25/2018 | 10/1/2018 | 10/31/2018 | 10/2018 | INS Insurance | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 70,846.90 |
| 10/2/2018 | | | 10/2018 | chk# 0005182778 Cash Receipt 10.02.2018 | 0.00 | 0.00 | 0.00 | 42,394.65 | 28,452.25 |
| 10/19/2018 | 11/1/2018 | 11/30/2018 | 11/2018 | BRR Base Rent - Retail | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 63,510.05 |
| 10/19/2018 | 11/1/2018 | 11/30/2018 | 11/2018 | CAM Common Area Maintenance | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 68,973.26 |
| 10/19/2018 | 11/1/2018 | 11/30/2018 | 11/2018 | ELE Electricity Reimbursemen | 534.17 | 30.98 | 565.15 | 0.00 | 69,538.41 |
| 10/19/2018 | 11/1/2018 | 11/30/2018 | 11/2018 | INS Insurance | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 70,846.90 |
| 10/29/2018 | | | 11/2018 | chk# 0005183191 Cash Receipt 10.29.2018 Nov Rent | 0.00 | 0.00 | 0.00 | 42,394.65 | 28,452.25 |
| 11/6/2018 | | | 11/2018 | chk# 7823876236 Cash Receipt 11.06.2018 | 0.00 | 0.00 | 0.00 | 200.00 | 28,252.25 |
| 11/27/2018 | 12/1/2018 | 12/31/2018 | 12/2018 | BRR Base Rent - Retail | 33,135.92 | 1,921.88 | 35,057.80 | 0.00 | 63,310.05 |
| 11/27/2018 | 12/1/2018 | 12/31/2018 | 12/2018 | CAM Common Area Maintenance | 5,163.71 | 299.50 | 5,463.21 | 0.00 | 68,773.26 |
| 11/27/2018 | 12/1/2018 | 12/31/2018 | 12/2018 | ELE Electricity Reimbursemen | 534.17 | 30.98 | 565.15 | 0.00 | 69,338.41 |
| 11/27/2018 | 12/1/2018 | 12/31/2018 | 12/2018 | INS Insurance | 1,236.76 | 71.73 | 1,308.49 | 0.00 | 70,646.90 |
| 12/3/2018 | | | 12/2018 | chk# 0005183574 Cash Receipt 12.03.2018 Dec Rent | 0.00 | 0.00 | 0.00 | 42,394.65 | 28,252.25 |
| 12/18/2018 | 1/1/2019 | 1/31/2019 | 1/2019 | BRR Base Rent - Retail | 33,135.92 | 1,888.75 | 35,024.67 | 0.00 | 63,276.92 |
| 12/18/2018 | 1/1/2019 | 1/31/2019 | 1/2019 | CAM Common Area Maintenance | 5,429.92 | 309.51 | 5,739.43 | 0.00 | 69,016.35 |
| 12/18/2018 | 1/1/2019 | 1/31/2019 | 1/2019 | ELE Electricity Reimbursemen | 432.20 | 24.64 | 456.84 | 0.00 | 69,473.19 |
| 12/18/2018 | 1/1/2019 | 1/31/2019 | 1/2019 | INS Insurance | 1,322.58 | 75.39 | 1,397.97 | 0.00 | 70,871.16 |
| 12/31/2018 | | | 1/2019 | chk# 0005184008 Cash Receipt 12.31.2018 | 0.00 | 0.00 | 0.00 | 42,394.65 | 28,476.51 |
| 1/18/2019 | 2/1/2019 | 2/28/2019 | 2/2019 | BRR Base Rent - Retail | 33,135.92 | 1,888.75 | 35,024.67 | 0.00 | 63,501.18 |
| 1/18/2019 | 2/1/2019 | 2/28/2019 | 2/2019 | CAM Common Area Maintenance | 5,429.92 | 309.51 | 5,739.43 | 0.00 | 69,240.61 |
| 1/18/2019 | 2/1/2019 | 2/28/2019 | 2/2019 | ELE Electricity Reimbursemen | 432.20 | 24.64 | 456.84 | 0.00 | 69,697.45 |
| 1/18/2019 | 2/1/2019 | 2/28/2019 | 2/2019 | INS Insurance | 1,322.58 | 75.39 | 1,397.97 | 0.00 | 71,095.42 |
| 2/4/2019 | | | 2/2019 | chk# 5184412 - CAM Escrow Credit -$250.06 not on acct. | 0.00 | 0.00 | 0.00 | 42,843.15 | 28,252.27 |
| 2/20/2019 | 3/1/2019 | 3/31/2019 | 3/2019 | BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 63,442.62 |
| 2/20/2019 | 3/1/2019 | 3/31/2019 | 3/2019 | CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 69,209.20 |
| 2/20/2019 | 3/1/2019 | 3/31/2019 | 3/2019 | ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 69,668.20 |
| 2/20/2019 | 3/1/2019 | 3/31/2019 | 3/2019 | INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 71,072.78 |
| 3/5/2019 | | | 3/2019 | chk# 0005184812 Lockbox | 0.00 | 0.00 | 0.00 | 42,618.90 | 28,453.88 |
| 3/21/2019 | 4/1/2019 | 4/30/2019 | 4/2019 | BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 63,644.23 |
| 3/21/2019 | 4/1/2019 | 4/30/2019 | 4/2019 | CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 69,410.81 |
| 3/21/2019 | 4/1/2019 | 4/30/2019 | 4/2019 | ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 69,869.81 |
| 3/21/2019 | 4/1/2019 | 4/30/2019 | 4/2019 | INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 71,274.39 |
| 4/1/2019 | | | 4/2019 | PYE | 90.67 | 5.62 | 96.29 | 0.00 | 28,751.78 |
| 4/1/2019 | | | 4/2019 | chk# 0005185174 Lockbox | 0.00 | 0.00 | 0.00 | 42,618.90 | 28,655.49 |
| 4/10/2019 | | | 4/2019 | PYI | -182.96 | -11.34 | -194.30 | 0.00 | 28,557.48 |
| 4/10/2019 | | | 4/2019 | PYR | 88,682.43 | 5,498.31 | 94,180.74 | 0.00 | 122,738.22 |
| 4/10/2019 | | | 4/2019 | PYE | -912.04 | -56.55 | -968.59 | 0.00 | 121,769.63 |
| 4/24/2019 | 5/1/2019 | 5/31/2019 | 5/2019 | BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 156,959.98 |
| 4/24/2019 | 5/1/2019 | 5/31/2019 | 5/2019 | CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 162,726.56 |
| 4/24/2019 | 5/1/2019 | 5/31/2019 | 5/2019 | ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 163,185.56 |
| 4/24/2019 | 5/1/2019 | 5/31/2019 | 5/2019 | INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 164,590.14 |
| 4/29/2019 | | | 5/2019 | chk# 5185559 (TT having $1,004.33 credit for 2018 cam rec) | 0.00 | 0.00 | 0.00 | 41,614.57 | 122,975.57 |
| 5/17/2019 | 6/1/2019 | 6/30/2019 | 6/2019 | BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 158,165.92 |
| 5/17/2019 | 6/1/2019 | 6/30/2019 | 6/2019 | CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 163,932.50 |
| 5/17/2019 | 6/1/2019 | 6/30/2019 | 6/2019 | ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 164,391.50 |
| 5/17/2019 | 6/1/2019 | 6/30/2019 | 6/2019 | INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 165,796.08 |

6/15/2023 4:53 PM

### International Lease Ledger

Date: 06/15/2023
Property: z026010
Tenant: t0000571 Bed, Bath & Beyond
From Date: 07/01/2001  To Date: 01/31/2027
Move In Date: 07/01/2001
Unit(S): UBBB
Base Currency: usd

| Trans Date | From | To | Post Month  Description | Net | Tax | Total | Payment | Balance |
|---|---|---|---|---|---|---|---|---|
| 5/17/2019 | | | 5/2019 STX 1/19-2/19 STX True UP | 403.18 | 0.00 | 403.18 | 0.00 | 166,199.26 |
| 6/3/2019 | | | 6/2019 chk# 0005185926 Lockbox | 0.00 | 0.00 | 0.00 | 42,618.90 | 123,580.36 |
| 6/20/2019 | 7/1/2019 | 7/31/2019 | 7/2019 BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 158,770.71 |
| 6/20/2019 | 7/1/2019 | 7/31/2019 | 7/2019 CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 164,537.29 |
| 6/20/2019 | 7/1/2019 | 7/31/2019 | 7/2019 ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 164,996.29 |
| 6/20/2019 | 7/1/2019 | 7/31/2019 | 7/2019 INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 166,400.87 |
| 7/1/2019 | | | 7/2019 chk# 0005186274 Lockbox | 0.00 | 0.00 | 0.00 | 42,618.90 | 123,781.97 |
| 7/22/2019 | 8/1/2019 | 8/31/2019 | 8/2019 BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 158,972.32 |
| 7/22/2019 | 8/1/2019 | 8/31/2019 | 8/2019 CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 164,738.90 |
| 7/22/2019 | 8/1/2019 | 8/31/2019 | 8/2019 ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 165,197.90 |
| 7/22/2019 | 8/1/2019 | 8/31/2019 | 8/2019 INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 166,602.48 |
| 8/1/2019 | | | 9/2019 chk# 0005186634 | 0.00 | 0.00 | 0.00 | 42,618.90 | 123,983.58 |
| 8/27/2019 | 9/1/2019 | 9/30/2019 | 9/2019 BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 159,173.93 |
| 8/27/2019 | 9/1/2019 | 9/30/2019 | 9/2019 CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 164,940.51 |
| 8/27/2019 | 9/1/2019 | 9/30/2019 | 9/2019 ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 165,399.51 |
| 8/27/2019 | 9/1/2019 | 9/30/2019 | 9/2019 INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 166,804.09 |
| 9/3/2019 | | | 9/2019 chk# 0005186996 | 0.00 | 0.00 | 0.00 | 136,799.64 | 30,004.45 |
| 9/24/2019 | 10/1/2019 | 10/31/2019 | 10/2019 BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 65,194.80 |
| 9/24/2019 | 10/1/2019 | 10/31/2019 | 10/2019 CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 70,961.38 |
| 9/24/2019 | 10/1/2019 | 10/31/2019 | 10/2019 ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 71,420.38 |
| 9/24/2019 | 10/1/2019 | 10/31/2019 | 10/2019 INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 72,824.96 |
| 9/30/2019 | | | 10/2019 chk# 0005187354 Lockbox | 0.00 | 0.00 | 0.00 | 42,618.90 | 30,206.06 |
| 10/18/2019 | 11/1/2019 | 11/30/2019 | 11/2019 BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 65,396.41 |
| 10/18/2019 | 11/1/2019 | 11/30/2019 | 11/2019 CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 71,162.99 |
| 10/18/2019 | 11/1/2019 | 11/30/2019 | 11/2019 ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 71,621.99 |
| 10/18/2019 | 11/1/2019 | 11/30/2019 | 11/2019 INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 73,026.57 |
| 11/4/2019 | | | 11/2019 chk# 0005188017 Lockbox | 0.00 | 0.00 | 0.00 | 42,618.90 | 30,407.67 |
| 11/26/2019 | 12/1/2019 | 12/31/2019 | 12/2019 BRR Base Rent - Retail | 33,135.92 | 2,054.43 | 35,190.35 | 0.00 | 65,598.02 |
| 11/26/2019 | 12/1/2019 | 12/31/2019 | 12/2019 CAM Common Area Maintenance | 5,429.92 | 336.66 | 5,766.58 | 0.00 | 71,364.60 |
| 11/26/2019 | 12/1/2019 | 12/31/2019 | 12/2019 ELE Electricity Reimbursemen | 432.20 | 26.80 | 459.00 | 0.00 | 71,823.60 |
| 11/26/2019 | 12/1/2019 | 12/31/2019 | 12/2019 INS Insurance | 1,322.58 | 82.00 | 1,404.58 | 0.00 | 73,228.18 |
| 12/2/2019 | | | 12/2019 chk# 0005188404 | 0.00 | 0.00 | 0.00 | 42,618.90 | 30,609.28 |
| 12/23/2019 | 1/1/2020 | 1/31/2020 | 1/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 65,733.36 |
| 12/23/2019 | 1/1/2020 | 1/31/2020 | 1/2020 CAM Common Area Maintenance | 5,429.92 | 325.80 | 5,755.72 | 0.00 | 71,489.08 |
| 12/23/2019 | 1/1/2020 | 1/31/2020 | 1/2020 ELE Electricity Reimbursemen | 432.20 | 25.93 | 458.13 | 0.00 | 71,947.21 |
| 12/23/2019 | 1/1/2020 | 1/31/2020 | 1/2020 INS Insurance | 1,322.58 | 79.35 | 1,401.93 | 0.00 | 73,349.14 |
| 12/30/2019 | | | 1/2020 chk# 0005188795 Lockbox | 0.00 | 0.00 | 0.00 | 42,618.90 | 30,730.24 |
| 1/7/2020 | | | 1/2020 CAM 01/2020 escrow adj | -5,429.92 | -325.80 | -5,755.72 | 0.00 | 24,974.52 |
| 1/7/2020 | | | 1/2020 CAM 01/2020 escrow adj | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 31,018.01 |
| 1/7/2020 | | | 1/2020 ELE 01/2020 escrow adj | -432.20 | -25.93 | -458.13 | 0.00 | 30,559.88 |
| 1/7/2020 | | | 1/2020 ELE 01/2020 escrow adj | 394.71 | 23.68 | 418.39 | 0.00 | 30,978.27 |
| 1/7/2020 | | | 1/2020 RET 01/2020 escrow adj | 7,653.59 | 459.22 | 8,112.81 | 0.00 | 39,091.08 |
| 1/7/2020 | | | 1/2020 INS 01/2020 escrow adj | -1,322.58 | -79.35 | -1,401.93 | 0.00 | 37,689.15 |
| 1/7/2020 | | | 1/2020 INS 01/2020 escrow adj | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 39,352.92 |
| 1/15/2020 | | | 1/2020 TBB Knox Box Fine | 200.00 | 0.00 | 200.00 | 0.00 | 39,552.92 |
| 1/30/2020 | | | 2/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 74,677.00 |
| 1/30/2020 | | | 2/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 80,720.49 |
| 1/30/2020 | | | 2/2020 ELE Electricity Reimbursement | 394.71 | 23.68 | 418.39 | 0.00 | 81,138.88 |
| 1/30/2020 | | | 2/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 82,802.65 |
| 2/3/2020 | | | 2/2020 chk# 0005189127 | 0.00 | 0.00 | 0.00 | 47,509.06 | 35,293.59 |
| 2/10/2020 | | | 2/2020 TBB Fire Pump Replacement | 3,628.50 | 0.00 | 3,628.50 | 0.00 | 38,922.09 |
| 2/28/2020 | 3/1/2020 | 3/31/2020 | 3/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 74,046.17 |
| 2/28/2020 | 3/1/2020 | 3/31/2020 | 3/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 80,089.66 |
| 2/28/2020 | 3/1/2020 | 3/31/2020 | 3/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 80,508.05 |
| 2/28/2020 | 3/1/2020 | 3/31/2020 | 3/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 82,171.82 |
| 3/2/2020 | | | 3/2020 chk# 0005189472 Lockbox | 0.00 | 0.00 | 0.00 | 43,449.73 | 38,722.09 |
| 4/1/2020 | 4/1/2020 | 4/30/2020 | 4/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 73,846.17 |
| 4/1/2020 | 4/1/2020 | 4/30/2020 | 4/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 79,889.66 |
| 4/1/2020 | 4/1/2020 | 4/30/2020 | 4/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 80,308.05 |
| 4/1/2020 | 4/1/2020 | 4/30/2020 | 4/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 81,971.82 |
| 4/2/2020 | | | 4/2020 RET RET bills annually; reverse chgs | -8,112.81 | 0.00 | -8,112.81 | 0.00 | 73,859.01 |
| 4/6/2020 | | | 4/2020 chk# 0005189807 Lockbox | 0.00 | 0.00 | 0.00 | 8,649.95 | 65,209.06 |
| 5/8/2020 | 5/1/2020 | 5/31/2020 | 5/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 100,333.14 |

6/15/2023 4:53 PM

### International Lease Ledger

Date: 06/15/2023
Property: z026010
Tenant: t0000571 Bed, Bath & Beyond
From Date: 07/01/2001  To Date: 01/31/2027
Move In Date: 07/01/2001
Unit(S): UBBB
Base Currency: usd

| Trans Date | From | To | Post Month  Description | Net | Tax | Total | Payment | Balance |
|---|---|---|---|---|---|---|---|---|
| 5/8/2020 | 5/1/2020 | 5/31/2020 | 5/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 106,376.63 |
| 5/8/2020 | 5/1/2020 | 5/31/2020 | 5/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 106,795.02 |
| 5/8/2020 | 5/1/2020 | 5/31/2020 | 5/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 108,458.79 |
| 5/27/2020 | 6/1/2020 | 6/30/2020 | 6/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 143,582.87 |
| 5/27/2020 | 6/1/2020 | 6/30/2020 | 6/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 149,626.36 |
| 5/27/2020 | 6/1/2020 | 6/30/2020 | 6/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 150,044.75 |
| 5/27/2020 | 6/1/2020 | 6/30/2020 | 6/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 151,708.52 |
| 6/22/2020 | | | 7/2020 chk# 0005190158 Lockbox | 0.00 | 0.00 | 0.00 | 121,099.25 | 30,609.27 |
| 6/29/2020 | | | 7/2020 chk# 0005190198 Lockbox | 0.00 | 0.00 | 0.00 | 43,249.73 | -12,640.46 |
| 6/30/2020 | 7/1/2020 | 7/31/2020 | 7/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 22,483.62 |
| 6/30/2020 | 7/1/2020 | 7/31/2020 | 7/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 28,527.11 |
| 6/30/2020 | 7/1/2020 | 7/31/2020 | 7/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 28,945.50 |
| 6/30/2020 | 7/1/2020 | 7/31/2020 | 7/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 30,609.27 |
| 7/27/2020 | 8/1/2020 | 8/31/2020 | 8/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 65,733.35 |
| 7/27/2020 | 8/1/2020 | 8/31/2020 | 8/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 71,776.84 |
| 7/27/2020 | 8/1/2020 | 8/31/2020 | 8/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 72,195.23 |
| 7/27/2020 | 8/1/2020 | 8/31/2020 | 8/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 73,859.00 |
| 8/4/2020 | | | 8/2020 chk# 5190501 Lockbox | 0.00 | 0.00 | 0.00 | 43,249.73 | 30,609.27 |
| 8/13/2020 | | | 8/2020 PYI | 1,030.29 | 61.82 | 1,092.11 | 0.00 | 31,701.38 |
| 8/13/2020 | | | 8/2020 PYR | 79,956.01 | 4,797.36 | 84,753.37 | 0.00 | 116,454.75 |
| 8/13/2020 | | | 8/2020 PYE | -604.70 | -36.28 | -640.98 | 0.00 | 115,813.77 |
| 8/25/2020 | 9/1/2020 | 9/30/2020 | 9/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 150,937.85 |
| 8/25/2020 | 9/1/2020 | 9/30/2020 | 9/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 156,981.34 |
| 8/25/2020 | 9/1/2020 | 9/30/2020 | 9/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 157,399.73 |
| 8/25/2020 | 9/1/2020 | 9/30/2020 | 9/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 159,063.50 |
| 9/3/2020 | | | 9/2020 chk# 5190808 Cash Receipt 9.01.20 | 0.00 | 0.00 | 0.00 | 43,249.73 | 115,813.77 |
| 9/16/2020 | 10/1/2020 | 10/31/2020 | 10/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 150,937.85 |
| 9/16/2020 | 10/1/2020 | 10/31/2020 | 10/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 156,981.34 |
| 9/16/2020 | 10/1/2020 | 10/31/2020 | 10/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 157,399.73 |
| 9/16/2020 | 10/1/2020 | 10/31/2020 | 10/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 159,063.50 |
| 10/2/2020 | | | 10/2020 chk# 5191073 Lockbox | 0.00 | 0.00 | 0.00 | 43,249.73 | 115,813.77 |
| 10/14/2020 | | | 10/2020 chk# 5191255 Lockbox | 0.00 | 0.00 | 0.00 | 85,204.48 | 30,609.29 |
| 10/22/2020 | 11/1/2020 | 11/30/2020 | 11/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 65,733.37 |
| 10/22/2020 | 11/1/2020 | 11/30/2020 | 11/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 71,776.86 |
| 10/22/2020 | 11/1/2020 | 11/30/2020 | 11/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 72,195.25 |
| 10/22/2020 | 11/1/2020 | 11/30/2020 | 11/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 73,859.02 |
| 11/2/2020 | | | 11/2020 chk# 5191313 Lockbox | 0.00 | 0.00 | 0.00 | 43,249.73 | 30,609.29 |
| 11/23/2020 | 12/1/2020 | 12/31/2020 | 12/2020 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 65,733.37 |
| 11/23/2020 | 12/1/2020 | 12/31/2020 | 12/2020 CAM Common Area Maintenance | 5,701.41 | 342.08 | 6,043.49 | 0.00 | 71,776.86 |
| 11/23/2020 | 12/1/2020 | 12/31/2020 | 12/2020 ELE Electricity Reimbursemen | 394.71 | 23.68 | 418.39 | 0.00 | 72,195.25 |
| 11/23/2020 | 12/1/2020 | 12/31/2020 | 12/2020 INS Insurance | 1,569.59 | 94.18 | 1,663.77 | 0.00 | 73,859.02 |
| 12/4/2020 | | | 12/2020 chk# 5191555 lockbox 12.04.20 | 0.00 | 0.00 | 0.00 | 43,249.73 | 30,609.29 |
| 1/5/2021 | 1/1/2021 | 1/31/2021 | 1/2021 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 65,733.37 |
| 1/5/2021 | 1/1/2021 | 1/31/2021 | 1/2021 CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 72,079.05 |
| 1/5/2021 | 1/1/2021 | 1/31/2021 | 1/2021 ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 72,440.70 |
| 1/5/2021 | 1/1/2021 | 1/31/2021 | 1/2021 INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 74,496.96 |
| 1/6/2021 | | | 1/2021 chk# 5191793 Lockbox | 0.00 | 0.00 | 0.00 | 43,249.73 | 31,247.23 |
| 1/26/2021 | 2/1/2021 | 2/28/2021 | 2/2021 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 66,371.31 |
| 1/26/2021 | 2/1/2021 | 2/28/2021 | 2/2021 CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 72,716.99 |
| 1/26/2021 | 2/1/2021 | 2/28/2021 | 2/2021 ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 73,078.64 |
| 1/26/2021 | 2/1/2021 | 2/28/2021 | 2/2021 INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 75,134.90 |
| 2/2/2021 | | | 2/2021 chk# 5192007 | 0.00 | 0.00 | 0.00 | 43,249.73 | 31,885.17 |
| 2/24/2021 | 3/1/2021 | 3/31/2021 | 3/2021 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 67,009.25 |
| 2/24/2021 | 3/1/2021 | 3/31/2021 | 3/2021 CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 73,354.93 |
| 2/24/2021 | 3/1/2021 | 3/31/2021 | 3/2021 ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 73,716.58 |
| 2/24/2021 | 3/1/2021 | 3/31/2021 | 3/2021 INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 75,772.84 |
| 3/2/2021 | | | 3/2021 chk# 5192277 Lockbox | 0.00 | 0.00 | 0.00 | 45,163.55 | 30,609.29 |
| 3/30/2021 | | | 4/2021 chk# 5192472 | 0.00 | 0.00 | 0.00 | 43,887.67 | -13,278.38 |
| 3/31/2021 | 4/1/2021 | 4/30/2021 | 4/2021 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 21,845.70 |
| 3/31/2021 | 4/1/2021 | 4/30/2021 | 4/2021 CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 28,191.38 |
| 3/31/2021 | 4/1/2021 | 4/30/2021 | 4/2021 ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 28,553.03 |
| 3/31/2021 | 4/1/2021 | 4/30/2021 | 4/2021 INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 30,609.29 |
| 4/29/2021 | 5/1/2021 | 5/31/2021 | 5/2021 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 65,733.37 |

6/15/2023 4:53 PM

## International Lease Ledger

Date: 06/15/2023
Property: z026010
Tenant: t0000571 Bed, Bath & Beyond
From Date: 07/01/2001  To Date: 01/31/2027
Move In Date: 07/01/2001
Unit(S): UBBB
Base Currency: usd

| Trans Date | From | To | Post Month | Description | Net | Tax | Total | Payment | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 4/29/2021 | 5/1/2021 | 5/31/2021 | 5/2021 | CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 72,079.05 |
| 4/29/2021 | 5/1/2021 | 5/31/2021 | 5/2021 | ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 72,440.70 |
| 4/29/2021 | 5/1/2021 | 5/31/2021 | 5/2021 | INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 74,496.96 |
| 5/3/2021 | | | 5/2021 | chk# 5192667 05.03.2021 CRS | 0.00 | 0.00 | 0.00 | 43,887.67 | 30,609.29 |
| 5/17/2021 | | | 5/2021 | PYE CAM Billing2020 PY CAM | -343.00 | -20.58 | -363.58 | 0.00 | 30,245.71 |
| 5/17/2021 | | | 5/2021 | PYI INS Billing2020 PY CAM | 1,402.36 | 84.14 | 1,486.50 | 0.00 | 31,732.21 |
| 5/17/2021 | | | 5/2021 | PYR RET Billing2020 PY CAM | 78,218.96 | 4,693.14 | 82,912.10 | 0.00 | 114,644.31 |
| 5/17/2021 | | | 5/2021 | ELE ELE Billing2020 PY CAM | -1,177.95 | -70.68 | -1,248.63 | 0.00 | 113,395.68 |
| 5/24/2021 | 6/1/2021 | 6/30/2021 | 6/2021 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 148,519.76 |
| 5/24/2021 | 6/1/2021 | 6/30/2021 | 6/2021 | CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 154,865.44 |
| 5/24/2021 | 6/1/2021 | 6/30/2021 | 6/2021 | ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 155,227.09 |
| 5/24/2021 | 6/1/2021 | 6/30/2021 | 6/2021 | INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 157,283.35 |
| 6/1/2021 | | | 6/2021 | chk# 5192852 Lockbox | 0.00 | 0.00 | 0.00 | 43,887.67 | 113,395.68 |
| 6/28/2021 | | | 7/2021 | chk# 5193039 Lockbox | 0.00 | 0.00 | 0.00 | 43,887.67 | 69,508.01 |
| 6/28/2021 | 7/1/2021 | 7/31/2021 | 7/2021 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 104,632.09 |
| 6/28/2021 | 7/1/2021 | 7/31/2021 | 7/2021 | CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 110,977.77 |
| 6/28/2021 | 7/1/2021 | 7/31/2021 | 7/2021 | ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 111,339.42 |
| 6/28/2021 | 7/1/2021 | 7/31/2021 | 7/2021 | INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 113,395.68 |
| 7/28/2021 | 8/1/2021 | 8/31/2021 | 8/2021 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 148,519.76 |
| 7/28/2021 | 8/1/2021 | 8/31/2021 | 8/2021 | CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 154,865.44 |
| 7/28/2021 | 8/1/2021 | 8/31/2021 | 8/2021 | ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 155,227.09 |
| 7/28/2021 | 8/1/2021 | 8/31/2021 | 8/2021 | INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 157,283.35 |
| 8/2/2021 | | | 8/2021 | chk# 5193218 Lockbox | 0.00 | 0.00 | 0.00 | 43,887.67 | 113,395.68 |
| 8/25/2021 | 9/1/2021 | 9/30/2021 | 9/2021 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 148,519.76 |
| 8/25/2021 | 9/1/2021 | 9/30/2021 | 9/2021 | CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 154,865.44 |
| 8/25/2021 | 9/1/2021 | 9/30/2021 | 9/2021 | ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 155,227.09 |
| 8/25/2021 | 9/1/2021 | 9/30/2021 | 9/2021 | INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 157,283.35 |
| 9/3/2021 | | | 9/2021 | chk# 5193393 Lockbox | 0.00 | 0.00 | 0.00 | 43,887.67 | 113,395.68 |
| 9/27/2021 | 10/1/2021 | 10/31/2021 | 10/2021 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 148,519.76 |
| 9/27/2021 | 10/1/2021 | 10/31/2021 | 10/2021 | CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 154,865.44 |
| 9/27/2021 | 10/1/2021 | 10/31/2021 | 10/2021 | ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 155,227.09 |
| 9/27/2021 | 10/1/2021 | 10/31/2021 | 10/2021 | INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 157,283.35 |
| 9/30/2021 | | | 10/2021 | chk# 5193571 Lockbox | 0.00 | 0.00 | 0.00 | 43,887.67 | 113,395.68 |
| 10/27/2021 | 11/1/2021 | 11/30/2021 | 11/2021 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 148,519.76 |
| 10/27/2021 | 11/1/2021 | 11/30/2021 | 11/2021 | CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 154,865.44 |
| 10/27/2021 | 11/1/2021 | 11/30/2021 | 11/2021 | ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 155,227.09 |
| 10/27/2021 | 11/1/2021 | 11/30/2021 | 11/2021 | INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 157,283.35 |
| 11/1/2021 | | | 11/2021 | chk# 5193740 Lockbox - 2020 RET Rec Payment | 0.00 | 0.00 | 0.00 | 66,664.22 | 90,619.13 |
| 11/24/2021 | 12/1/2021 | 12/31/2021 | 12/2021 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,743.21 |
| 11/24/2021 | 12/1/2021 | 12/31/2021 | 12/2021 | CAM Common Area Maintenance | 5,986.49 | 359.19 | 6,345.68 | 0.00 | 132,088.89 |
| 11/24/2021 | 12/1/2021 | 12/31/2021 | 12/2021 | ELE Electricity Reimbursemen | 341.18 | 20.47 | 361.65 | 0.00 | 132,450.54 |
| 11/24/2021 | 12/1/2021 | 12/31/2021 | 12/2021 | INS Insurance | 1,939.87 | 116.39 | 2,056.26 | 0.00 | 134,506.80 |
| 12/6/2021 | | | 12/2021 | chk# 5193913 Lockbox | 0.00 | 0.00 | 0.00 | 43,887.67 | 90,619.13 |
| 12/29/2021 | 1/1/2022 | 1/31/2022 | 1/2022 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,743.21 |
| 12/29/2021 | 1/1/2022 | 1/31/2022 | 1/2022 | CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,406.17 |
| 12/29/2021 | 1/1/2022 | 1/31/2022 | 1/2022 | ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,742.75 |
| 12/29/2021 | 1/1/2022 | 1/31/2022 | 1/2022 | INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 134,983.43 |
| 1/3/2022 | | | 1/2022 | chk# 5194081 Lockbox | 0.00 | 0.00 | 0.00 | 43,887.67 | 91,095.76 |
| 1/26/2022 | 2/1/2022 | 2/28/2022 | 2/2022 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 126,219.84 |
| 1/26/2022 | 2/1/2022 | 2/28/2022 | 2/2022 | CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,882.80 |
| 1/26/2022 | 2/1/2022 | 2/28/2022 | 2/2022 | ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 133,219.38 |
| 1/26/2022 | 2/1/2022 | 2/28/2022 | 2/2022 | INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,460.06 |
| 2/4/2022 | | | 2/2022 | chk# 5194248 Lockbox | 0.00 | 0.00 | 0.00 | 43,887.67 | 91,572.39 |
| 2/23/2022 | 3/1/2022 | 3/31/2022 | 3/2022 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 126,696.47 |
| 2/23/2022 | 3/1/2022 | 3/31/2022 | 3/2022 | CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 133,359.43 |
| 2/23/2022 | 3/1/2022 | 3/31/2022 | 3/2022 | ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 133,696.01 |
| 2/23/2022 | 3/1/2022 | 3/31/2022 | 3/2022 | INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,936.69 |
| 2/28/2022 | | | 3/2022 | chk# 5194425 Lockbox | 0.00 | 0.00 | 0.00 | 45,317.56 | 90,619.13 |
| 4/1/2022 | 4/1/2022 | 4/30/2022 | 4/2022 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,743.21 |
| 4/1/2022 | 4/1/2022 | 4/30/2022 | 4/2022 | CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,406.17 |
| 4/1/2022 | 4/1/2022 | 4/30/2022 | 4/2022 | ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,742.75 |
| 4/1/2022 | 4/1/2022 | 4/30/2022 | 4/2022 | INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 134,983.43 |
| 4/4/2022 | | | 4/2022 | PYE 2021 Annual Exp Recon | -12,909.00 | -774.54 | -13,683.54 | 0.00 | 121,299.89 |

## International Lease Ledger

Date: 06/15/2023
Property: z026010
Tenant: t0000571 Bed, Bath & Beyond
From Date: 07/01/2001  To Date: 01/31/2027
Move In Date: 07/01/2001
Unit(S): UBBB
Base Currency: usd

| Trans Date | From | To | Post Month  Description | Net | Tax | Total | Payment | Balance |
|---|---|---|---|---|---|---|---|---|
| 4/4/2022 | | | 4/2022 PYI 2021 Annual Exp Recon | -308.71 | -18.52 | -327.23 | 0.00 | 120,972.66 |
| 4/4/2022 | | | 4/2022 PYE 2021 Annual Exp Recon - ELE | -567.91 | -34.07 | -601.98 | 0.00 | 120,370.68 |
| 4/4/2022 | | | 4/2022 PYR 2021 Annual Exp Recon | 75,665.04 | 4,539.90 | 80,204.94 | 0.00 | 200,575.62 |
| 4/4/2022 | 5/1/2022 | 5/31/2022 | 4/2022 chk# 101077 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 156,211.32 |
| 4/20/2022 | 5/1/2022 | 5/31/2022 | 5/2022 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 191,335.40 |
| 4/20/2022 | 5/1/2022 | 5/31/2022 | 5/2022 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 197,998.36 |
| 4/20/2022 | 5/1/2022 | 5/31/2022 | 5/2022 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 198,334.94 |
| 4/20/2022 | 5/1/2022 | 5/31/2022 | 5/2022 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 200,575.62 |
| 5/4/2022 | | | 5/2022 chk# 102215 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 156,211.32 |
| 6/6/2022 | | | 6/2022 chk# 103181 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 111,847.02 |
| 6/7/2022 | 6/1/2022 | 6/30/2022 | 6/2022 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 146,971.10 |
| 6/7/2022 | 6/1/2022 | 6/30/2022 | 6/2022 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 153,634.06 |
| 6/7/2022 | 6/1/2022 | 6/30/2022 | 6/2022 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 153,970.64 |
| 6/7/2022 | 6/1/2022 | 6/30/2022 | 6/2022 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 156,211.32 |
| 6/21/2022 | | | 7/2022 chk# 103502 Lockbox | 0.00 | 0.00 | 0.00 | 65,492.71 | 90,718.61 |
| 6/30/2022 | 7/1/2022 | 7/31/2022 | 7/2022 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,842.69 |
| 6/30/2022 | 7/1/2022 | 7/31/2022 | 7/2022 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,505.65 |
| 6/30/2022 | 7/1/2022 | 7/31/2022 | 7/2022 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,842.23 |
| 6/30/2022 | 7/1/2022 | 7/31/2022 | 7/2022 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,082.91 |
| 7/5/2022 | | | 7/2022 chk# 104431 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 90,718.61 |
| 7/29/2022 | 8/1/2022 | 8/31/2022 | 8/2022 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,842.69 |
| 7/29/2022 | 8/1/2022 | 8/31/2022 | 8/2022 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,505.65 |
| 7/29/2022 | 8/1/2022 | 8/31/2022 | 8/2022 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,842.23 |
| 7/29/2022 | 8/1/2022 | 8/31/2022 | 8/2022 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,082.91 |
| 8/2/2022 | | | 8/2022 chk# 105487 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 90,718.61 |
| 9/6/2022 | | | 9/2022 chk# 106568 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 46,354.31 |
| 9/7/2022 | 9/1/2022 | 9/30/2022 | 9/2022 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 81,478.39 |
| 9/7/2022 | 9/1/2022 | 9/30/2022 | 9/2022 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 88,141.35 |
| 9/7/2022 | 9/1/2022 | 9/30/2022 | 9/2022 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 88,477.93 |
| 9/7/2022 | 9/1/2022 | 9/30/2022 | 9/2022 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 90,718.61 |
| 9/30/2022 | 10/1/2022 | 10/31/2022 | 10/2022 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,842.69 |
| 9/30/2022 | 10/1/2022 | 10/31/2022 | 10/2022 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,505.65 |
| 9/30/2022 | 10/1/2022 | 10/31/2022 | 10/2022 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,842.23 |
| 9/30/2022 | 10/1/2022 | 10/31/2022 | 10/2022 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,082.91 |
| 10/3/2022 | | | 10/2022 chk# 107071 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 90,718.61 |
| 10/31/2022 | | | 11/2022 chk# 108169 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 46,354.31 |
| 11/10/2022 | 11/1/2022 | 11/30/2022 | 11/2022 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 81,478.39 |
| 11/10/2022 | 11/1/2022 | 11/30/2022 | 11/2022 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 88,141.35 |
| 11/10/2022 | 11/1/2022 | 11/30/2022 | 11/2022 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 88,477.93 |
| 11/10/2022 | 11/1/2022 | 11/30/2022 | 11/2022 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 90,718.61 |
| 12/5/2022 | | | 12/2022 chk# 109046 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 46,354.31 |
| 12/12/2022 | 12/1/2022 | 12/31/2022 | 12/2022 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 81,478.39 |
| 12/12/2022 | 12/1/2022 | 12/31/2022 | 12/2022 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 88,141.35 |
| 12/12/2022 | 12/1/2022 | 12/31/2022 | 12/2022 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 88,477.93 |
| 12/12/2022 | 12/1/2022 | 12/31/2022 | 12/2022 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 90,718.61 |
| 12/27/2022 | 1/1/2023 | 1/31/2023 | 1/2023 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,842.69 |
| 12/27/2022 | 1/1/2023 | 1/31/2023 | 1/2023 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,505.65 |
| 12/27/2022 | 1/1/2023 | 1/31/2023 | 1/2023 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,842.23 |
| 12/27/2022 | 1/1/2023 | 1/31/2023 | 1/2023 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,082.91 |
| 1/3/2023 | | | 1/2023 chk# 110249 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 90,718.61 |
| 1/30/2023 | 2/1/2023 | 2/28/2023 | 2/2023 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,842.69 |
| 1/30/2023 | 2/1/2023 | 2/28/2023 | 2/2023 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,505.65 |
| 1/30/2023 | 2/1/2023 | 2/28/2023 | 2/2023 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,842.23 |
| 1/30/2023 | 2/1/2023 | 2/28/2023 | 2/2023 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,082.91 |
| 2/14/2023 | | | 2/2023 chk# 111717 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 90,718.61 |
| 2/17/2023 | 3/1/2023 | 3/31/2023 | 3/2023 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,842.69 |
| 2/17/2023 | 3/1/2023 | 3/31/2023 | 3/2023 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,505.65 |
| 2/17/2023 | 3/1/2023 | 3/31/2023 | 3/2023 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,842.23 |
| 2/17/2023 | 3/1/2023 | 3/31/2023 | 3/2023 INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,082.91 |
| 3/14/2023 | | | 3/2023 chk# 112310 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 90,718.61 |
| 3/23/2023 | 4/1/2023 | 4/30/2023 | 4/2023 BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 125,842.69 |
| 3/23/2023 | 4/1/2023 | 4/30/2023 | 4/2023 CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 132,505.65 |
| 3/23/2023 | 4/1/2023 | 4/30/2023 | 4/2023 ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 132,842.23 |

6/15/2023 4:53 PM

### International Lease Ledger

Date: 06/15/2023
Property: z026010
Tenant: t0000571 Bed, Bath & Beyond
From Date: 07/01/2001  To Date: 01/31/2027
Move In Date: 07/01/2001
Unit(S): UBBB
Base Currency: usd

| Trans Date | From | To | Post Month | Description | Net | Tax | Total | Payment | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 3/23/2023 | 4/1/2023 | 4/30/2023 | 4/2023 | INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 135,082.91 |
| 3/31/2023 | | | 4/2023 | PYE 2022 Annual Exp Recon | -13,553.88 | -813.23 | -14,367.11 | 0.00 | 120,715.80 |
| 3/31/2023 | | | 4/2023 | PYI 2022 Annual Exp Recon | -524.25 | -31.46 | -555.71 | 0.00 | 120,160.09 |
| 3/31/2023 | | | 4/2023 | PYR 2022 Annual Exp Recon | 52,902.80 | 3,174.17 | 56,076.97 | 0.00 | 176,237.06 |
| 3/31/2023 | | | 4/2023 | PYE 2022 Annual Exp Recon - ELE | 388.81 | 23.33 | 412.14 | 0.00 | 176,649.20 |
| 4/18/2023 | 5/1/2023 | 5/31/2023 | 5/2023 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 211,773.28 |
| 4/18/2023 | 5/1/2023 | 5/31/2023 | 5/2023 | CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 218,436.24 |
| 4/18/2023 | 5/1/2023 | 5/31/2023 | 5/2023 | ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 218,772.82 |
| 4/18/2023 | 5/1/2023 | 5/31/2023 | 5/2023 | INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 221,013.50 |
| 4/25/2023 | | | 5/2023 | chk# 113193 NSFed by ctrl# 732050 NSF | 0.00 | 0.00 | 0.00 | 44,364.30 | 176,649.20 |
| 4/28/2023 | | | 5/2023 | chk# 113193 NSF receipt Ctrl# 731941 NSF | 0.00 | 0.00 | 0.00 | -44,364.30 | 221,013.50 |
| 5/8/2023 | | | 5/2023 | chk# 113845 Lockbox | 0.00 | 0.00 | 0.00 | 44,364.30 | 176,649.20 |
| 5/16/2023 | | | 5/2023 | chk# 114406 Lockbox | 0.00 | 0.00 | 0.00 | 11,668.42 | 164,980.78 |
| 6/5/2023 | | | 6/2023 | chk# 114406 Lockbox | 0.00 | 0.00 | 0.00 | 29,853.62 | 135,127.16 |
| 6/15/2023 | 6/1/2023 | 6/30/2023 | 6/2023 | BRR Base Rent - Retail | 33,135.92 | 1,988.16 | 35,124.08 | 0.00 | 170,251.24 |
| 6/15/2023 | 6/1/2023 | 6/30/2023 | 6/2023 | CAM Common Area Maintenance | 6,285.81 | 377.15 | 6,662.96 | 0.00 | 176,914.20 |
| 6/15/2023 | 6/1/2023 | 6/30/2023 | 6/2023 | ELE Electricity Reimbursemen | 317.53 | 19.05 | 336.58 | 0.00 | 177,250.78 |
| 6/15/2023 | 6/1/2023 | 6/30/2023 | 6/2023 | INS Insurance | 2,113.85 | 126.83 | 2,240.68 | 0.00 | 179,491.46 |
| **Total : USD** | | | | | **3,822,973.57** | **214,720.87** | **4,037,694.44** | **3,858,202.98** | |

**EXHIBIT B**

**LEASE AGREEMENT**

Between

**BELL TOWER PROPERTIES LIMITED PARTNERSHIP,**

Landlord

and

**BED BATH & BEYOND INC.,**
a New York corporation,

Tenant

**The Bell Tower Shops**
**Fort Myers, Florida**

Dated: May 25, 2000

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be
deemed an offer to enter into any transaction or to enter into
any relationship, whether on the terms contained herein or on any
other terms. This Lease shall not be binding nor shall either
party have any obligations or liabilities or any rights with
respect thereto, or with respect to the premises, unless and
until both parties have executed and delivered this Lease. Until
such execution and delivery of this Lease, either party may
terminate all negotiation and discussion of the subject matter
hereof, without causes and for any reason, without recourse or
liability.

\* \* \* \* \* \*

#2060B-1.WPD
May 1, 2000

## TABLE OF CONTENTS

Page

ARTICLE 1
  BASIC TERMS AND DEFINITIONS  . . . . . . . . . . . . . . 1
  Section 1.1    Basic Terms and Definitions . . . . . . . 1

ARTICLE 2
  LEASE OF PREMISES; LEASE TERM; DELIVERY DATE . . . . . . 6
  Section 2.1    Lease of Premises . . . . . . . . . . . 6
  Section 2.2    Term . . . . . . . . . . . . . . . . . 6
  Section 2.3    Delivery Date . . . . . . . . . . . . . 7
  Section 2.4    Unseasonable Delivery: Initial Slack Period
                 . . . . . . . . . . . . . . . . . . . . 10

        ARTICLE 3
        IMPROVEMENTS

            Section 3.1    Landlord's Work and Tenant's Work
                 . . . . . . . . . . . . . . . . . . . . 11
  Section 3.2    Plan Approvals . . . . . . . . . . . . 11
  Section 3.3    Performance of Work . . . . . . . . . . 13
  Section 3.4    Measurement:  Premises and Shopping Center
                 . . . . . . . . . . . . . . . . . . . . 15

ARTICLE 4
  FIXED RENT AND TAXES : DETERMINATION AND PAYMENT . . . . 16
  Section 4.1    Fixed Rent . . . . . . . . . . . . . . 16
  Section 4.2    Payment of Rent . . . . . . . . . . . . 16
  Section 4.3    Real Estate and Other Taxes . . . . . . 17

ARTICLE 5
  COMMON AREAS, THEIR USE AND CHARGES  . . . . . . . . . . 19
  Section 5.1    Common Areas: Maintenance . . . . . . . 19
  Section 5.2    Common Areas: Restrictions . . . . . . 22

ARTICLE 6
  UTILITIES  . . . . . . . . . . . . . . . . . . . . . . . 25

ARTICLE 7
  SIGNS  . . . . . . . . . . . . . . . . . . . . . . . . . 26
  Section 7.1    Tenant's Building Signage . . . . . . . 26
  Section 7.2    Signage Restrictions and Criteria . . . 26
  Section 7.3    Pylon/Monument Signage  . . . . . . . . 26
  Section 7.4    Signage: Alteration/Removal/Allocation . 27
  Section 7.5    Cooperation . . . . . . . . . . . . . . 27

ARTICLE 8
  ALTERATIONS AND IMPROVEMENTS . . . . . . . . . . . . . . 27
  Section 8.1    Alterations and Improvements . . . . . 27

ARTICLE 9
  REPAIRS  . . . . . . . . . . . . . . . . . . . . . . . . 29
  Section 9.1    Tenant's Repairs  . . . . . . . . . . . 29
  Section 9.2    Landlord's Repairs  . . . . . . . . . . 29
  Section 9.3    Legal Compliance Work . . . . . . . . . 30

ARTICLE 10
  INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION . . 30
  Section 10.1   Mutual Release, Waiver of Subrogation and
                 Mutual Indemnification . . . . . . . . . 30
  Section 10.2   Tenant's Insurance . . . . . . . . . . 31
  Section 10.3   Landlord's Insurance . . . . . . . . . 32
  Section 10.4   General Insurance Requirements . . . . . 33

#20608-1.WPD
May 1, 2000

ARTICLE 11
    FIRE AND OTHER CASUALTY; EMINENT DOMAIN . . . . . . . . 34
    Section 11.1    Fire and Other Casualty . . . . . . . . . 34
    Section 11.2    Eminent Domain . . . . . . . . . . . 36
    Section 11.3    Abatement of Rent Charges . . . . . . . 37

ARTICLE 12
    COVENANTS, REPRESENTATIONS AND WARRANTIES . . . . . . 37
    Section 12.1    Quiet Enjoyment. . . . . . . . . . . 37
    Section 12.2    Authority. . . . . . . . . . . . . 37
    Section 12.3    Landlord's  Covenants,  Warranties  and
        Representations. . . . . . . . . . . . . 38
    Section 12.4    Environmental Matters. . . . . . . . . 39

ARTICLE 13
    USES AND RESTRICTIONS . . . . . . . . . . . . . . 41
    Section 13.1    Permitted and Prohibited Uses . . . . . . 41
    Section 13.2    Tenant's Exclusive in Center . . . . . . 42
    Section 13.3    Exclusives Which Tenant Must Honor . . . 44

ARTICLE 14
    CONDUCT OF BUSINESS OPERATIONS . . . . . . . . . . . 44

ARTICLE 15
    TENANT ASSIGNMENT AND SUBLETTING . . . . . . . . . . 45
    Section 15.1    Assignment and Subletting . . . . . . . 45
    Section 15.2    Liability of Tenant . . . . . . . . . 46
    Section 15.3    Collateral Assignment . . . . . . . . 47
    Section 15.4    Cure Rights of Original Tenant . . . . . 47
    Section 15.5    Recognition Agreement . . . . . . . . 48

    ARTICLE 16
    DEFAULT AND DISPUTE RESOLUTION . . . . . . . . . . . 48
    Section 16.1    Tenant Default . . . . . . . . . . . 48
    Section 16.2    Landlord Default . . . . . . . . . . 49
    Section 16.3       . . . . . . . . . . . . . . 51
    Arbitration . . . . . . . . . . . . . . . . . 51

ARTICLE 17
    RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE
    . . . . . . . . . . . . . . . . . . . . . . 51
    Section 17.1    Right to Mortgage and Non-Disturbance . . . 51
    Section 17.2    Estoppel Certificate . . . . . . . . . 52
    Section 17.3    Existing Mortgages . . . . . . . . . . 52

ARTICLE 18
    NOTICE . . . . . . . . . . . . . . . . . . . 52

ARTICLE 19
    TENANT'S PROPERTY . . . . . . . . . . . . . . . 53

ARTICLE 20
    END OF TERM . . . . . . . . . . . . . . . . . 53
    Section 20.1    Surrender of Premises. . . . . . . . . 53
    Section 20.2    Hold Over. . . . . . . . . . . . . 53

ARTICLE 21
    INTENTIONALLY OMITTED . . . . . . . . . . . . . . 54

ARTICLE 22
    CONTINUING CO-TENANCY . . . . . . . . . . . . . . 54

ARTICLE 23
    MISCELLANEOUS . . . . . . . . . . . . . . . . 54
    Section 23.1    Loading Facilities. . . . . . . . . . 54
    Section 23.2    Liens. . . . . . . . . . . . . . . 54
    Section 23.3    Broker's Commission. . . . . . . . . . 55

Section 23.4    Force Majeure.  . . . . . . . . . . . .  55
Section 23.5    Consents.  . . . . . . . . . . . . . .  55
Section 23.6    Costs.  . . . . . . . . . . . . . . .  55
Section 23.7    Attorneys' Fees.  . . . . . . . . . .  55
Section 23.8    Survival of Obligations.  . . . . . . .  56
Section 23.9    Non-Waiver.  . . . . . . . . . . . . .  56
Section 23.10   Rights Cumulative.  . . . . . . . . . .  56
Section 23.11   Definition of Landlord.  . . . . . . . .  56
Section 23.12   Successors and Assigns.  . . . . . . . .  56
Section 23.13   Limitation of Landlord's Liability.  . . .  56
Section 23.14   Limitation of Tenant's Liability.  . . . .  56
Section 23.15   Joint and Several Liability.  . . . . . .  57
Section 23.16   Severability.  . . . . . . . . . . . .  57
Section 23.17   Grammatical Usages and Construction . . .  57
Section 23.18   Table of Contents, Line Numbering and Paragraph
         Headings.  . . . . . . . . . . . . . . . .  57
Section 23.19   Definition of Hereunder, Herein, etc..  .  57
Section 23.20   Short Form Lease.  . . . . . . . . . .  57
Section 23.21   Entire Agreement and Modification.  . . .  57
Section 23.22   No Joint Venture or Partnership Created by
         Lease.  . . . . . . . . . . . . . . . . . .  58
Section 23.23   Governing Law.  . . . . . . . . . . . .  58

## EXHIBITS

| | |
|---|---|
| Exhibit "A" | Legal Description of Shopping Center |
| Exhibit "B" | Site Plan |
| Exhibit "C" | Rent Commencement and Expiration Date Agreement |
| Exhibit "D" | Specifications for Landlord's Work |
| Exhibit "D-1" | Exterior Elevations of the Premises and Shopping Center, and Sidewalk Plan |
| Exhibit "E" | Permitted Encumbrances |
| Exhibit "F" | Signage |
| Exhibit "G" | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit "H" | Subtenant Recognition Agreement |
| Exhibit "I" | Delivery Date Notice |
| Exhibit "J" | Delivery Date Certification |
| Exhibit "K-1" | Existing Exclusives |
| Exhibit "K-2" | Existing Leases |
| Exhibit "L" | Percentage Rent |
| Exhibit "M" | Prohibited Uses |
| Exhibit "N" | Tenant Design and Construction Handbook |

<u>**LEASE AGREEMENT**</u>

THIS LEASE AGREEMENT (**"Lease"**) is entered into as of _____ May _____ 25, 2000 by and between BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership, having an office at 7 West Seventh Street, Cincinnati, Ohio 45202 (**"Landlord"**), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**).

**W I T N E S S E T H:**

ARTICLE 1
BASIC TERMS AND DEFINITIONS

Section 1.1    <u>Basic Terms and Definitions</u>.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    <u>Additional Rent</u>:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    <u>Affiliate</u>: A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, **"control"** shall mean shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    <u>Alternate Rent</u>: Payment of Percentage Rent defined in and payable in the manner set forth in <u>Exhibit L</u> attached hereto, but in no event shall the aggregate Percentage Rent payable during the Alternate Rent period exceed the amount of Fixed Rent which otherwise would have been payable during such period.

1.1.4    <u>Common Areas</u>:  All areas in the Shopping Center which are, from time to time, available for the joint use and/or benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas and common utility lines.

1.1.5    <u>Common Areas Charges</u>:  As defined in Section 5.1 hereof.

1.1.6    <u>Delivery Date</u>: As defined in Section 2.3 hereof.

1.1.7    <u>Effective Date</u>: The date hereof.

1.1.8    <u>Event of Default</u>:  As defined in Section 16.1 hereof.

1.1.9    <u>Excused Periods</u>:  Such periods of time during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business:

#20608-1.WPD
May 1, 2000

(x) resulted from alterations or renovations being performed in and to the Premises, not to exceed one (1) year, (y) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

        1.1.10    <u>Exhibits</u>.    The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

        1.1.11    <u>Fixed Rent</u>:    The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

        (a)    For the period commencing on the Rent Commencement Date and, if the Rent Commencement Date occurs during the period from January 31 through July 31 of any year, then ending on the first January 31 occurring after the fourth (4th) anniversary of the Rent Commencement Date, or if the Rent Commencement Date occurs during the period from August 1 through January 30 of any year, then ending on the first January 31 occurring after the fifth (5th) anniversary of the Rent Commencement Date, at the rate of Three Hundred Sixty-Seven Thousand Forty-Four and No/100 ($367,044.00) Dollars per year [based on Twelve and No/100 ($12.00) Dollars per square foot of Floor Area];

        (b)    For the period commencing on the February 1 immediately following the end of the period described in 1.1.11(a), and ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date, at the rate of Three Hundred Ninety-Seven Thousand Six Hundred Thirty-One and No/100 ($397,631.00) Dollars per year [based on Thirteen and No/100 ($13.00) Dollars per square foot of Floor Area];

        (c)    For the period commencing on the February 1 immediately following the end of the period described in 1.1.11(b) and ending on the last day of the "Initial Term" (defined in Subsection 1.1.42 below), at the rate of Four Hundred Twenty-Eight Thousand Two Hundred Eighteen and No/100 ($428,218.00) Dollars per year [based on Fourteen and No/100 ($14.00) Dollars per square foot of Floor Area];

        (d)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Four Hundred Seventy-One Thousand Thirty-One and 80/100 ($471,039.80) Dollars per year [based on Fifteen and 40/100 ($15.40) Dollars per square foot of Floor Area];

        (e)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Five Hundred Eighteen Thousand One Hundred Forty-Three and 78/100 ($518,143.78) Dollars per year [based on Sixteen and 94/100 ($16.94) Dollars per square foot of Floor Area]; and

        (f)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Five Hundred Sixty-Nine Thousand Eight Hundred Thirty-Five and 81/100 ($569,835.81) Dollars per year [based on Eighteen and 63/100 ($18.63) Dollars per square foot of Floor Area].

        1.1.12    <u>Floor Area</u>:    The actual number of square feet of space contained on all floors within any building area in the

#20608-1.WPD
May 1, 2000                                    2

Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, exclusive parking areas expressly permitted under this Lease, and restaurant patio areas for which no cleaning, repair, maintenance or other costs are included in Common Areas Charges).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13    <u>Force Majeure</u>:  As defined in Section 23.4 hereof.

1.1.14    <u>Ground Lessor</u>: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15    Intentionally Omitted.

1.1.16    <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17    Intentionally Omitted

1.1.18    <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19    <u>Landlord's Mailing Address</u>: c/o Madison Marquette Realty Services, Suite 1600, 7 West Seventh Street, Cincinnati, Ohio 45202, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.20    <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21    <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.22    <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgements, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23    <u>Mortgagee</u>:  Any state or federally regulated: bank, savings and loan association, insurance company, life insurance company, pension fund, credit union, real estate investment trust, or other institutional or bona fide lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is a beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24    <u>Slack Period</u>: The period commencing on August 1 and ending on the March 31 next following.

1.1.25    Intentionally Omitted.

1.1.26    <u>Percentage Rent</u>:  As defined in <u>Exhibit L</u>

hereto.

1.1.27   Permitted Use:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, personal care products and other bathroom appliances and accessories); housewares (including, but not limited to, utensils, kitchen utensils, appliances and "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums, photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the **"Permitted Items"**); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28   Premises: Being the area cross-hatched on Exhibit B hereto having dimensions as shown on Exhibit B and containing approximately Thirty Thousand Five Hundred Eighty-Seven (30,587) square feet of Floor Area, approximately six thousand six hundred (6,600) square feet of non-selling space on the second level for non-selling storage purposes (the "Second Level Storage Area") and approximately nine hundred eighty (980) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall such non-selling space be used for retail display or sales area, nor shall such non-selling area result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such non-selling space be included in the determination of Tenant's Pro Rata Share.  Notwithstanding anything in this Lease to the contrary, if Landlord does not obtain governmental approval for the Second Level Storage Area despite its commercially reasonable and diligent efforts to obtain the same within the time set forth for obtaining Landlord's Approvals (as hereinafter defined)  hereunder, then Landlord shall not be required to provide the Second Level Storage Area, no amounts due by Tenant under this Lease shall be reduced, and this Lease shall remain in full force and effect as if no reference to the Second Level Storage Area had ever been contained herein.

1.1.29   Renewal Option:  As defined in Section 2.2.2 hereof.

1.1.30   Renewal Period(s): three successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31   Rent:  Fixed Rent and/or Additional Rent.

1.1.32   Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.33    Intentionally Omitted.

1.1.34    Shopping Center:  The shopping center commonly known as The Bell Tower Shops, containing approximately three hundred forty-three thousand four hundred fifteen (343,415) square feet of Floor Area, on the property located at U.S. Route 41, Big Pine Way and Daniels Parkway, Fort Myers, Florida, and more particularly described in Exhibit A hereto.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35    Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable,  Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36    Taxes:  As defined in Section 4.3.3 hereof.

1.1.37    Tenant:  As defined in the preamble hereof.

1.1.38    Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39    Tenant's Property:  All of Tenant's personal property, including, without limitation, phone and (to the extent installed by or on behalf of Tenant) alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.40    Tenant's Pro Rata Share:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than eleven and one-half (11.5%) percent, except that, as to the calculation of Taxes, Tenant's Pro Rata Share may be larger than such amount if due to exclusion of portions of the Shopping Center which are separately assessed and paid.  Floor Area shall be deemed added to or removed from the Shopping Center, for the purposes of inclusion in area prorations,(i) for all prorations other than Taxes, the date upon which such Floor Area (including tenant finishing and fixturing thereof) is Substantially Completed, or (ii) for the proration of Taxes, at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.41    Tenant's Work:  As defined in Section 3.1 hereof.

1.1.42    Term:  A period (the **"Initial Term"**) of fifteen (15) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the

fifteenth (15th) anniversary of the Rent Commencement Date (the "*Expiration Date*"). As used herein, **"Term"** shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1   Lease of Premises. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2   Term.

2.2.1   Initial Term. Subject to the provisions of this Article 2, the Term of this Lease shall begin on the earlier of (such earlier date being referred to herein as the **"Rent Commencement Date"**): (a) the date (the **"Grand Opening Date"**) which Tenant shall establish in its published advertisement as its grand opening [but not later than the tenth (10th) day after the date upon which Tenant shall initially open the Premises to the general public for business], or (b) the thirtieth (30th) day following the Delivery Date. The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2   Renewal Options. Tenant shall have the right and option (hereinafter a **"Renewal Option"**) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a **"Renewal Period"**, and collectively, the **"Renewal Periods"**) upon the same terms and conditions as are herein set forth. Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s). In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, it is agreed that Landlord may not terminate this Lease, and the Term of this Lease shall not expire, until and unless Landlord notifies Tenant in writing (which notice is hereinafter referred to as the "Remind Notice") and indicates that the Renewal Option to extend or to further extend, as the case may be, has not been exercised (which Remind Notice shall not be sent prior to the date which is three hundred (300) days before the beginning of the Renewal Period to which it relates). Tenant's Renewal Option, in each instance, shall continue for a period of fifteen (15) days after receipt of such Remind Notice from Landlord; but if Tenant either (i) does not send written notice of the exercise of such Renewal Option to Landlord within said fifteen (15) day period or (ii) sends written notice to Landlord declining the exercise of such Renewal Option, then Tenant's Renewal Option to extend shall thereafter terminate. Notwithstanding any other provision of this Lease, in the event the Remind Notice is received by Tenant later than the date which is ninety (90) days before the beginning of the Renewal Period to which it relates, and in the event Tenant either (i) does not send written notice of the exercise of such Renewal Option to Landlord within fifteen (15) days after receipt of the Remind Notice, or (ii) sends written

notice to Landlord declining the exercise of such Renewal Option,
then Landlord shall deliver an election notice (the "Election
Notice") to Tenant, within ten (10) days after the earlier of (I)
the date which is fifteen (15) days after Tenant's receipt of the
Remind Notice, or (II) the date upon which Landlord shall have
received the notice described in (ii) above, pursuant to which
Landlord, at Landlord's sole option, shall elect to either (y)
allow the Term of the Lease to expire by its terms upon the date
which is ninety (90) days after Tenant's receipt of the Election
Notice, or (z) extend the Term (or, if applicable, the then
current Renewal Period), upon all of the terms (including,
without limitation, the Fixed Rent payable during the then
current Term (or, if applicable, the then current Renewal
Period)) for up to ninety (90) days after Tenant's receipt of the
Remind Notice.  In the event Landlord does not deliver the
Election Notice within the time period set forth above, then
Landlord shall be deemed to have delivered the Election Notice on
the earlier to occur of the dates described in (I) and (II)
above, and shall be deemed to have elected the option described
in subsection (y) above.  If Landlord fails to give Tenant such
Remind Notice prior to the expiration of the original Term or of
any extended Term, as the case may be, and if Tenant shall remain
in possession of the Premises after the expiration of the then
current Term, then Tenant shall remain in possession as a tenant
from month to month, subject to the provisions of this Lease
insofar as the same may be made applicable to a Tenant from month
to month, but without the application of Section 20.2.  If
Landlord then gives Tenant Remind Notice and Tenant exercises its
Renewal Option, then the effective date of such exercise shall be
retroactive to the expiration date of the original Term or of the
previously extended Term, whichever is appropriate.


Section 2.3    Delivery Date.

    2.3.1    Definition.  Subject to Landlord's delivery
to Tenant of the Delivery Date Notice in accordance with the
provisions of Subsection 2.3.2 below and Landlord's timely
compliance therewith, Landlord shall be deemed to have delivered
possession of the Premises to Tenant at 8:00 a.m. on the date
(the "Delivery Date") following the day on which all of the
following conditions (the "Delivery Date Conditions") shall have
occurred and Tenant shall have received from Landlord the
Delivery Date Certification in accordance with the provisions of
Section 2.3.3 below, which shall constitute Landlord's written
certification that all of the following shall have occurred:

        (a)  Actual possession of the Premises shall
    have been delivered to Tenant with Landlord's Work
    Substantially Completed, which Substantial Completion
    shall be evidenced by a written certification by
    Landlord's architect to Tenant, and Landlord, at its
    sole cost and expense, shall have obtained (and
    delivered copies thereof to Tenant, upon request) all
    permits and approvals required from all applicable
    governmental authorities to enable Tenant to construct
    Tenant's Work and occupy the Premises for the conduct
    of a general retail business in the Premises (exclusive
    of any business licenses which Tenant may be required
    to obtain in order to open and operate its specific
    business [and not a general retail business]) which
    permits and approvals shall include, without
    limitation, to the extent required, zoning and building
    code approvals, environmental requirements, and a
    permanent certificate of occupancy for the Premises
    (unless a permanent certificate of occupancy for the
    Premises cannot be obtained solely as a result of the
    failure to complete Tenant's Work in the manner

required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work provided that completion of Tenant's Work entitles Landlord to obtain the same); and

(b)   The Common Areas, and all of the improvements thereto as shown on Exhibit B hereto shall have been Substantially Completed and operational (except for the landscaping in the Common Areas, which shall have been Substantially Completed to the extent necessary for issuance of a temporary certificate of occupancy for the Premises), and all off-site improvements, if any, (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) any permits and approvals required from applicable governmental authorities to enable the Common Areas and such improvements to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, to the extent applicable, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon) and construction permits;

(c)   The representations and warranties of Landlord set forth in subparagraphs (a) through (h) of Section 12.3 below shall then be true and in effect; and

(d)   Landlord shall have delivered to Tenant in recordable form (i) a subordination, non-disturbance and attornment agreement in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof, and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

2.3.2   Delivery Date.

(a)   Landlord shall give Tenant at least ninety (90) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I.  Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

(b)   Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice and such failure is not due to a casualty, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory,  and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain.

1   If the Delivery Date does not occur by the date established
2   therefor in the Delivery Date Notice, then, in addition to any
3   other remedies available to Tenant under this Lease (provided,
4   however, that Tenant will not exercise the remedies set forth in
5   Section 16.2 prior to April 1, 2001), Landlord agrees to allow to
6   Tenant a credit against the initial installment(s) of Rent
7   hereunder equal to as liquidated reimbursement to Tenant (and not
8   as a penalty) for all of the aforesaid costs incurred by Tenant,
9   the sum of: (i) Seventy Five  Thousand ($75,000) Dollars, plus
10  (ii) Four Thousand ($4,000) Dollars for each day that the
11  Delivery Date established in the Delivery Date Notice is delayed;
12  provided, however, Tenant furnishes Landlord with at least two
13  (2) days prior notice to imposing the per diem liquidated
14  reimbursement.  The foregoing liquidated reimbursements represent
15  the parties' good faith agreement as to an agreed upon amount
16  which shall have been incurred by Tenant and which shall
17  otherwise not be susceptible of exact ascertainment.
18  Notwithstanding the foregoing provisions, Landlord may postpone a
19  Delivery Date from that previously established in a Delivery Date
20  Notice by delivery to Tenant of a revised Delivery Date Notice at
21  least sixty (60) days prior to the Delivery Date established in
22  the previous Delivery Date Notice, which revised notice shall set
23  forth the date to which the Delivery Date will be postponed (not
24  to exceed thirty (30) days in the aggregate).  If the revised
25  Delivery Date Notice is timely given hereunder, the liquidated
26  reimbursements shall only be deemed to accrue after the new
27  Delivery Date established in the revised Delivery Date Notice.
28  Revised Delivery Date notices not given prior to the aforesaid
29  sixty (60) days period shall <u>not</u> serve to avoid the accrual of
30  liquidated reimbursements as provided herein. If a revised
31  Delivery Date Notice is given, then as a condition to its
32  effectiveness, such notice shall be accompanied by a check to the
33  order of Tenant in the amount of $5,000.00 as reimbursement for
34  costs and expenses incurred by Tenant by reason of additional
35  work performed by Tenant's employees at its corporate offices as
36  a result thereof.  Notwithstanding any provision of this Lease to
37  the contrary, in no event shall the Delivery Date be deemed to
38  occur prior to the Delivery Date established in the Delivery Date
39  Notice.
40
41        2.3.3   <u>Delivery Date Certification</u>.  Upon the
42  satisfaction of all of the Delivery Date Conditions, Landlord
43  shall so certify to Tenant, using the form of Delivery Date
44  Certification attached hereto as <u>Exhibit J</u>.
45
46        2.3.4   <u>No Waiver</u>.  Neither Tenant's acceptance of
47  physical possession of the Premises nor Tenant's opening of the
48  Premises for business to the public prior to the Delivery Date
49  shall: (i) be deemed a waiver by Tenant of any of the Delivery
50  Date Conditions, or (ii) relieve Landlord of any obligation under
51  this Lease, unless such condition or obligation is expressly
52  waived in writing by Tenant.
53
54        2.3.5   <u>Second Level Storage Area</u>.
55  If Landlord constructs the Second Level Storage Area in the
56  Premises as part of Landlord's Work, then on the later to occur
57  of: (a) the Delivery Date; or (b) thirty (30) days after Landlord
58  provides Tenant with notice (accompanied by reasonably
59  satisfactory evidence thereof) of the actual cost of designing
60  and constructing the Second Level Storage Area, including the
61  cost of any vertical transportation installed by Landlord, Tenant
62  shall reimburse to Landlord the reasonable amounts incurred by
63  Landlord for designing and constructing such Second Level Storage
64  Area.
65
66        2.3.6   <u>Landlord's Approvals</u>.  Landlord shall use
67  commercially reasonable and diligent efforts to obtain site plan
68  approval and any other approvals or permits required for

construction of the Premises (the "Landlord's Approvals"), the final configuration of which being as shown on Exhibit B. Landlord agrees to use its diligent efforts to prepare those plans and specifications which are necessary in order to file an application for Landlord's Approvals and to promptly submit an application for Landlord's Approvals. Landlord shall use its commercially reasonable efforts to obtain Landlord's Approvals on or before March 31, 2001 (the "Outside Date"). If Landlord does not obtain Landlord's Approvals by the Outside Date, then Tenant shall have the right, at its option to either: (i) terminate this Lease, or (ii) seek to obtain Landlord's Approvals, all at the expense of Landlord. If, Tenant elects to seek Landlord's Approvals, then (a) Tenant shall use commercially reasonable efforts to obtain the Landlord's Approval; and (b) the Outside Date shall be extended to March 31, 2002 (the "Extended Outside Date"). If, Tenant does not terminate this Lease, or elect to seek Landlord's Approvals as aforesaid, within ten (10) business days after expiration of the Outside Date, Landlord shall have the right to terminate this Lease, by notice to Tenant. If Tenant does not obtain Landlord's Approvals on or before the Extended Outside Date, then either Landlord or Tenant, may by notice to the other, terminate this Lease.

Section 2.4    Unseasonable Delivery: Initial Slack Period.

If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on November 4 and ending on the March 31 next following (the "*Initial Slack Period*"), then Tenant shall have, in addition to any other remedies, the right to:

(a)   accept physical possession of the Premises; or

(b)   delay its acceptance of physical possession of the Premises to a date not later than the end of the Initial Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions), in which event the initial Seventy-five Thousand ($75,000.00) Dollar payment set forth in Section 2.3.2(b)(i) shall be due and the per diem payments set forth in Section 2.3.2(b)(ii) shall be due and owing to the extent that the Delivery Date does not occur prior to April 1, provided that, if the Delivery Date occurs during the Initial Slack Period because Landlord elected a 30-day postponement in compliance with Section 2.3.2(b), the $75,000 payment shall not be due if the Delivery Date occurs within the period of such permitted postponement; and

in either event, if the Rent Commencement Date occurs before the April 1 next following the Initial Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the March 31 next following; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

ARTICLE 3
IMPROVEMENTS

Section 3.1    <u>Landlord's Work and Tenant's Work</u>.   Landlord shall, at its sole cost and expense, perform the work and obligations described on <u>Exhibits D</u>, <u>D-1 and F</u> hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, **"Landlord's Work"**), and shall deliver possession of the Premises to Tenant in the condition described therein.   Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as **"Tenant's Work"**) which is required in order for Tenant to meet its obligations under Article 14 or which Tenant otherwise desires to adapt the Premises to Tenant's use.

Section 3.2    <u>Plan Approvals</u>.

3.2.1    <u>Preparation of Plans and Specifications</u>.

(a)  Landlord has delivered to Tenant the **"Shell Drawings"** (hereinafter defined).  As used herein, the term **"Shell Drawings"** shall include all of the following: (i) a dimensioned building floor plan for the Premises which shall denote egress, ingress, vertical transportation, receiving area (truck access), and compactor locations; (ii) building elevations for the Premises; (iii) exterior wall sections of the Premises; (iv) a sidewalk plan showing improvements located within the area from the back of the front curb to the front wall of the Premises (including, without limitation, sidewalks, depressed curbing, cart corral locations, and planters, if any); (v) roof plan of the Premises (including, without limitation, roof construction, location of heating, ventilation and air conditioning units, drainage, and penetrations); (vi) dimensioned structural drawing showing interior layout and exterior facade column layout of the Premises (including, without limitation, column sizes for each), and interior clearance heights; and (vii) landscape and grading plans for the Shopping Center (and the then current site plan).  The Shell Drawings shall be substantially consistent with Exhibits B, D, and D-1 hereto.

(b)  On or before April 24, 2000, Tenant shall deliver to Landlord its fixture plan, reflected ceiling plan and office plan (collectively, **"Tenant's Plans"**), all of which shall be substantially consistent with the Shell Drawings.

(c)  On or before May 22, 2000, Landlord shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and specifications (the **"Preliminary Plans"**) for Landlord's Work, (which shall include, without limitation, mechanical, electrical, plumbing, structural, architectural and site plans), and each of the plans which collectively constitute the Preliminary Plans shall be at least 85% complete, in Tenant's reasonable judgment.  The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Shell Drawings, and Exhibits D, D-1, and F hereto.

(d)  On or before June 12, 2000, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Shell Drawings, Tenant's Plans, and/or <u>Exhibits D</u>, <u>D-1 and F</u> hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

(e)  On or before July 10, 2000, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the **"Final Plans and Specifications"**)

1   which shall be substantially consistent with the Preliminary
2   Plans, as approved by Tenant.
3
4           (f)    On or before July 25, 2000, Tenant shall
5   notify Landlord of Tenant's approval thereof or the reasons why
6   Tenant's approval is not granted, and Landlord shall within
7   fifteen (15) days after receiving such notice, make any revisions
8   necessary to correct such matters and obtain Tenant's approval.
9   Upon Tenant's approval of the Final Plans and Specifications, any
10  further changes thereto shall be subject to Tenant's prior
11  written approval.  Unless specifically noted on a separate
12  summary sheet attached to the Final Plans and Specifications, to
13  the extent of a conflict between the terms and provisions of
14  Tenant's Plans, Exhibit D, Exhibit D-1, and/or Exhibit F hereto,
15  and the terms and provisions of the Final Plans and
16  Specifications, then the terms and provisions of Tenant's Plans,
17  Exhibit D, Exhibit D-1 and Exhibit F shall govern and prevail
18  taking into consideration local construction practices and
19  applicable building codes.
20
21          (g) All submissions by the parties of the Shell
22  Drawings, Tenant's Plans, the Preliminary Plans, and the Final
23  Plans and Specifications shall be made (or accompanied) by the
24  computer files thereof formatted in "Autocad 14" format.
25
26      3.2.2   Plan Changes.
27
28          (a)   After Tenant approves either or both of the
29  Preliminary Plans and Specifications or the Final Plans and
30  Specifications, it shall have the right to require Landlord to
31  subsequently make changes to either or both thereof (the
32  "Changes").
33
34          (b)   Tenant shall pay to Landlord the net reasonable
35  additional third-party costs of Landlord's Work resulting
36  directly and solely from the aggregate Changes (exclusive of any
37  charges for overhead and profit, other than sums not exceeding 5%
38  subcontractor profit and 5% general contractor profit thereon),
39  taking into account any and all actual costs and savings
40  resulting from all Changes, in the aggregate (including, without
41  limitation, reasonable costs approved by Tenant in advance
42  associated with any acceleration of the work schedule which
43  Tenant, at its sole option, may require).  Such payment shall be
44  due and payable within thirty (30) days  after Tenant's receipt
45  of backup information reasonably supporting all such costs,
46  including, without limitation, invoices, receipts and lien
47  waivers of subcontractors and materialmen.
48
49          (c) Landlord shall pay to Tenant the net reasonable
50  cost savings resulting from the aggregate Changes, taking into
51  consideration all reasonable additional third-party costs of
52  Landlord's Work directly and solely resulting from the Changes
53  (exclusive of any charges for overhead and profit, other than
54  sums not exceeding 5% subcontractor profit and 5% general
55  contractor profit thereon).  At Tenant's request, Landlord shall
56  deliver to Tenant backup information reasonably supporting all
57  such additional costs, including, without limitation, invoices,
58  receipts, and lien waivers of subcontractors and materialmen.
59  Such payment shall be due and payable within thirty (30) days
60  after the Delivery Date.
61
62          (d)   If, despite Landlord's diligent efforts in
63  performing Landlord's Work, the Changes cause a net delay in the
64  Substantial Completion of Landlord's Work (taking into
65  consideration any time reductions resulting from such changes),
66  then the Delivery Date established pursuant to Section 2.3.2
67  hereof shall be extended by the number of days of the delay and
68  the November 4th date for commencement of the Initial Slack Period

shall be reduced by the number of days of the delay, provided, however that, within five (5) days following its receipt of Tenant's notice describing the Changes, Landlord shall have notified Tenant in reasonable detail as to the nature and extent of such delay.

Section 3.3     Performance of Work.

3.3.1     Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements.  Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain all required permits and approvals from applicable governmental and quasi-governmental authorities to enable Tenant to perform Tenant's Work as of the Delivery Date and to open and conduct its business in the Premises in accordance with the terms of this Lease.  Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center. If such permits and approvals cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain such permits and approvals for Tenant's Work, and the Delivery Date shall be deemed delayed if it has not occurred, or the Rent Commencement Date shall be deemed delayed if the Delivery Date has occurred, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2     If: (a)  Landlord's Work has not been commenced by November 1, 2000, or (b)  the Delivery Date shall not have occurred by April 1, 2001 (subject to Force Majeure, not to exceed thirty (30) days, or such reasonably longer period if the failure is caused by the occurrence of a casualty), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)  terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to promptly reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000); and/or

(ii)  avail itself of the remedies set forth in Section 16.2 (a), (b) or (c) below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)  extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section.

3.3.3     Landlord's Work Performed After Delivery of

Possession. On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within fifteen (15) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said 15-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the affected area of the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work. Within thirty (30) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises. As used herein, the term **"Punch List Items"** shall mean such minor items within the scope of Landlord's Work of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4    Tenant's Right of Entry. Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5 Work Requirements After Delivery Date. Following the Delivery Date, any construction by Landlord affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)  no staging and storage of materials and parking of construction vehicles shall occur in the No Build Area designated on Exhibit B hereto;

(b)  Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place in the Critical Access areas except as necessary in order to perform repairs permitted under this Lease to the Critical Access areas; and

(c)  Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition as is commercially reasonably consistent with the operation of first class shopping centers, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

#20608-1.WPD
May 1, 2000                            14

3.3.6   <u>Tenant's Trailer</u>.  Tenant may provide a trailer for Tenant's exclusive use in conducting employee interviews and recruiting, in the location shown on <u>Exhibit B</u> hereto and Landlord shall furnish all temporary utilities required for such trailer use, in accordance with Exhibit D hereto. Said trailer shall be removed within ten (10) days after the Delivery Date.  On and after the Delivery Date and throughout the Term of this Lease, Tenant shall perform its staging within the Premises.

Section 3.4   <u>Measurement: Premises and Shopping Center</u>. At least sixty (60) days prior to the Delivery Date, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Premises, the square footage of the non-selling space of the Premises and (based upon existing plans) the Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer.  If (i) the Floor Area of the Premises is determined to be less than thirty thousand eighty-two (30,082) square feet, or(ii) the square footage of the non-selling space on the office mezzanine is determined to be less than ninety-five (95%) percent of the Floor Area shown therefor on the Final Plans and Specifications, then Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease and all reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work (including, without limitation, plan preparation and review), not to exceed Fifty Thousand Dollars ($50,000).  If the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof, neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to the provisions of this Section 3.4.  Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

ARTICLE 4

FIXED RENT AND TAXES : DETERMINATION AND PAYMENT

Section 4.1   <u>Fixed Rent</u>.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2   <u>Payment of Rent</u>.  All Rent shall be mailed or

otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the **"Paying Agent"**),  to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    <u>Real Estate and Other Taxes</u>.

4.3.1      Provided that Tenant meets its payment obligations under this Lease, Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2      (a)  Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3.  Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  Subject to 4.3.2 (c) below, if, by law, any Taxes may, at the option of the taxpayer, be paid in installments (without accrual of interest), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)  Notwithstanding the provisions of Section 4.3.2 (a)above, for so long as (x) the tax lot of which the Premises are a part shall at any time consist of less than the entire Shopping Center (such tax lot being hereinafter referred to as the "Tax Lot"), and (y) the square foot area allocation of Common Areas located within the Tax Lot (as compared to the total Floor Area of buildings located within the Tax Lot) is not materially greater than the allocation of Common Areas for the remainder of the Shopping Center (or, in the alternative, Tenant shall not contribute towards Taxes affecting the Common Areas in a square foot allocation which is materially greater than that contributed by the other tenants of  Shopping Center), then the following shall apply: (A) "Taxes" shall be all real estate taxes and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Tax Lot (general or special), other than personal property taxes levied against tenants (and subject to the exclusions from "Taxes" as hereinabove described); (B) "Tenant's Pro Rata Share" shall be a fraction whose numerator is the Floor Area of the Premises [as determined pursuant to subsection 1.1.28] and whose denominator is the annual average Floor Area of the buildings located within the Tax Lot [as determined in a manner consistent with subsection 1.1.28], it being agreed that all references in Section 1.1.34 hereof to "Shopping Center"  shall, for the purposes of this Section 4.3, instead be deemed to refer to the Tax Lot; and (C) all other provisions of this Lease, including without limitation, the other provisions of this Section 4.3, shall remain in full force and effect and unchanged by this

Section 4.3.2 (b).

(c)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent) except that, if Landlord actually pays regular annual real estate taxes in a lump sum payment in order to obtain a reduction of the amount Taxes and Tenant receives the benefit of Tenant's Pro Rata Share of such reduction, then fifteen (15) days prior to the required date for such lump sum payment.

4.3.3    As used herein, **_Taxes_** shall mean all general, _ad valorem_ real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation.  For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord; (2) taxes on rents (except for the Florida sales tax), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same result from an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) if the State of Florida changes the current method of real estate taxation Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, or (ii) subject to any special assessments or similar charges other than the trash assessment which was in the amount of approximately Fourteen Thousand ($14,000.00) Dollars for the year prior to the Effective Date, as more particularly described on Exhibit E.

4.3.4    At Tenant's request accompanied by the request of other tenants which (together with Tenant) occupy at least fifty (50%) percent of the Floor Area of the Shopping Center, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or

otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    <u>Common Areas: Maintenance</u>.

5.1.1    <u>Maintenance of Common Areas</u>.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the State of Florida are operated, maintained, repaired and replaced, including, <u>without limitation</u>, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid significant interference with the use or visibility of canopies or signs on the exterior of the Premises other than to the extent generally existing as of the Rent Commencement Date), adequate lighting, insurance as required under this Lease, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements (subject to any variances, grandfathering rights or other exemptions to which Landlord is or may from time to time be entitled).

5.1.2    <u>Tenant's Pro Rata Share of Common Areas Charges</u>.

(a)    During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the ***"Common Areas Charges"***) incurred by Landlord to operate, maintain, insure and repair the Common Areas. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.  Landlord's budget for purposes of calculating Tenant's Pro Rata Share for the first full calendar year during the Term shall be in an amount equal to One and 65/100 ($1.65) Dollar per square foot of Floor Area.  Thereafter, Landlord's budget for purposes of calculating Tenant's Pro Rata Share for any calendar year shall not exceed one hundred five percent (105%) of the actual Common Areas Charges for the immediately preceding calendar year (exclusive of the costs of snow removal, insurance premiums, and utility service for the Common Areas during such prior calendar year), and Landlord shall provide Tenant, upon Tenant's request, with reasonable backup documentation and applicable evidence of prior bills and payments.

(b)    Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with reasonable accounting principles utilized in the shopping center industry consistently applied (the ***"CAC Reconciliation Statement"***).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to

Landlord the deficiency within thirty (30) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant in order to verify Landlord's calculation of Common Areas Charges.  If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of the Common Areas Charges with respect to the first full calendar year of the Term exceed One and 65/100 ($1.65) Dollar per square foot of Floor Area in the Premises, and with respect to any calendar year thereafter (exclusive of the costs of snow removal and utility service for the Common Areas during such calendar year which shall be adjusted based upon actual cost) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of the actual Common Areas Charges for the immediately preceding calendar year (exclusive of the costs of snow removal and utility service for the Common Areas during such calendar year, which shall be adjusted based upon actual cost).

     5.1.3    <u>Exclusions from Common Areas Charges</u>.

     (a)  Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2)  the cost of any replacements or capital improvements to the Common Areas (for example, the cost of repaving the parking areas as opposed to patching); (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings (other than restroom facilities which are part of Common Areas); (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); <u>provided</u>, <u>however</u>, that the cost of compliance with laws shall be permitted to be included as Common Areas Charges to the extent of the reasonable annual amortization of such cost based on the useful life of the improvements required to comply with such laws (it being understood and agreed that such costs shall not be included in Common Areas Charges on any basis to the extent the same relates to either (A) compliance with laws which are required due to the act or omission of Landlord or any other tenant or other occupant of the Shopping Center, or (B) compliance with laws which were in effect prior to the Delivery Date); (8) any costs in excess of a cost to Tenant of up to five thousand ($5,000.00) dollars per calendar year resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance or deductible required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the

Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation; (17) costs materially disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or to an Affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; or (26) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems.

        (b)  In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges.  Landlord reserves the right to allow occupants who own, or tenants who lease portions of the Shopping Center to pay directly to the provider of such services either (1) its pro rata share, or (2) its separately metered share of expenses which would otherwise be considered Common Areas Charges hereunder (said parties being hereinafter called "Direct Payors" and such payments being hereinafter called "Direct Payments").  In the event there are Direct Payors who make Direct Payments, Tenant's Pro Rata Share of Common Areas Charges for those expense items in the same category as those covered by such Direct Payments (i.e. sweeping, striping, etc.) but for which Tenant makes no Direct Payments shall, subject to the provisions of Section 1.1.40, be computed by multiplying: (i) a fraction, the numerator of which shall be the Floor Area in the Premises, and the denominator of which shall be the annual average number of square feet of Floor Area within the Shopping Center (excluding from the denominator the annual average number of square feet of Floor Area of the Direct Payors making the Direct Payments in the same category), by (ii) a sum equal to the total cost incurred by Landlord for such Common Areas Charges in the particular category less the portion paid, if any, directly by Direct Payors.  Landlord shall calculate Tenant's Pro Rata Share for each separate category of expenses for which Direct

Payments are made and deliver a statement with supporting documentation to Tenant.

(c)  Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    Tenant's Right to Audit.  Tenant shall have the right (not more than once annually) to audit Landlord's books and records at the location within the continental United States in which such are maintained by Landlord to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share thereof for the three (3) year period commencing upon delivery of the CAC Reconciliation Statement; provided, however, if, after request of Tenant within such three (3) year period, Landlord fails to promptly deliver to Tenant all relevant backup information for the calendar year in question to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share, then Tenant may give Landlord notice of such failure. Upon the giving of such notice as aforesaid, Tenant shall continue to have the right to commence an audit of Landlord's books and records prior to or, to the extent of Landlord's delay, subsequent to such three (3) year period for the enforcement of its rights under this Lease.  Upon Tenant's request, Landlord shall, at Tenant's expense, promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1    Continuous Access.  No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center designated "Critical Access" as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term.  Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2    No Alterations.  Landlord shall not, without obtaining Tenant's prior written consent in each instance, except

to the extent, if any, permitted under Section 11, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location, availability, or size of any building or improvement in the "No Build Area" shown on Exhibit B hereto; (ii) materially change the number, location, or layout of parking spaces shown on Exhibit B hereto in the "No Build Area"; (iii) construct any structures or buildings in the Shopping Center (including, without limitation, any kiosks, booths, signs or similar structures in the Common Areas) other than in the locations shown on Exhibit B hereto; or (iv) materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks or other Common Areas, from those designated "Critical Access" on Exhibit B hereto.  In the event Tenant consents to any such work, it shall not be performed during August, November and December of any year, and Landlord shall use commercially reasonable efforts to undertake such work in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises or Tenant's rights under this Lease.

5.2.3    _Intentionally Omitted._

5.2.4    _Parking Area._  During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) four and one-half (4.5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, as shown on Exhibit B (unless a Taking occurs, in which event Section 11.2.3 shall govern).  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord after the Effective Date (such arrangements existing as of the date of this Lease being listed on the Site Plan) permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and invitees and other than up to four (4) spaces for any single restaurant use and other than any spaces which Landlord may designate for valet parking use, provided that in no event may such spaces be located in the No Build Area.  Tenant shall use reasonable efforts to have its employees park their motor vehicles in the area designated as "Employee Parking" on  Exhibit B hereto, if any, and Landlord shall take commercially reasonable measures to have other tenants and occupants of the Shopping Center do the same.  There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center, unless in connection with a voluntary non-mandatory valet program.

5.2.5    _Lighting._  Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week at all times during normal retail shopping center hours, which shall include until 2:00 a.m. Monday through Saturday and until 7:00 p.m. on Sunday (**_"Normal Hours"_**).  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, underlined provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours and to the extent substantially operating until the hours contained in Tenant's request (_excluding_, however, those tenants and occupants who separately control and pay for their own Common Area lighting).

In addition to the foregoing, Landlord shall provide for low level security lighting from the time at which full lighting is discontinued in accordance with this paragraph until dawn.

5.2.6    Repairs.  During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)  if within the No Build Area and/or the Critical Access area, not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)  if within the No Build Area and/or the Critical Access area, be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)  be performed in accordance with the requirements of Section 3.3.5 above and Landlord shall use commercially reasonable efforts (without the necessity of overtime or off-hours work) to perform such work in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7    Rules and Regulations.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within thirty (30) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are reasonably uniformly enforced against all tenants of the Shopping Center (excluding department stores, provided that Tenant will only be bound to the extent that such department stores are bound) and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8    Miscellaneous.

(a)  No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes; provided, however, that (1) occasional promotional events may be conducted in the "Center Court" designated on Exhibit "B" provided that such events do not occur within one hundred (100) linear feet from any portion of the Premises nor in the No Build Area; and (2) retail sales may be conducted outside of the No Build Area on the sidewalk in front of a tenant's store (including, the Premises, notwithstanding that such area is in the No Build Area) only if (a) such sales shall be conducted at all times in a manner consistent with first-class shopping centers in the Ft. Myers Metropolitan Area; (b) Landlord shall proceed with reasonable diligence to ensure that such sales by other tenants do not interfere with or disrupt Tenant's normal business operations, pedestrian access, the visibility of the Premises or any signage thereon or Tenant's use of the Common Areas under this Lease, and (c) the sidewalk sales of each such tenant shall not occur more than four (4) times each calendar year (and each such sale shall not exceed ten (10) days in duration).

(b)  Trash Compactor.  Tenant shall, at Tenant's sole cost, be permitted to maintain and operate, at no extra charge from Landlord, its trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor".

(c)  Shopping Carts.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and/or D-1 hereto.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

ARTICLE 6
UTILITIES

Section 6.1.  Utility Service.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord, unless: (i) the quality of the service(s) provided is at least equal to the quality of the same service(s) provided by the public utility corporation or governmental authority providing such utilities in the area in which the Shopping Center is located; and (ii) the cost of such services(s) shall not exceed the lesser of (x) the cost of the same service if Tenant had obtained such service directly from the applicable public utility company, or (y) the cost to Landlord for such service.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date.  Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.

Section 6.2.  Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

ARTICLE 7
SIGNS

Section 7.1  Tenant's Building Signage.

Tenant shall supply and Landlord shall install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease.  Subject to compliance with applicable Legal Requirements, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-

#20608-1.WPD
May 1, 2000                                  24

canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to Section 7.2.1.  Tenant may erect and maintain in the interior of the Premises and not visible from the exterior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2      Signage Restrictions and Criteria.

7.2.1      During the Term, exterior identification signs at the Shopping Center shall be in accordance with the Tenant Design and Construction Handbook annexed hereto as Exhibit "N"; provided, however, that if Tenant is Bed Bath & Beyond, Inc. or any Affiliate thereof, Tenant shall have the right to affix its prototypical signage if such signage complies with applicable laws.

7.2.2      Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details other than to the extent generally existing as of the Rent Commencement Date) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.

Section 7.3      Pylon/Monument Signage.  Landlord shall during the entire Term, provide pylons and monuments at the locations shown on Exhibit B hereto. Without limiting Landlord's obligation to supply and install signage as part of Landlord's Work in accordance with Exhibits D and Exhibit D-1 hereto, and with the additional provisions of this Lease, Tenant shall have the right and obligation following the Substantial Completion of Landlord's Work, at its sole cost and expense, to erect and maintain its identification sign, as shown on Exhibit F hereto (and having colors as shown on Exhibit F hereto), on all sides of such pylons and monuments in the location indicated on Exhibit F and no other signs thereon shall be larger than Tenant's.  In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other pylon or monument signage located in the Common Areas (other than the two pylon signs on which Tenant does not have a panel as shown on Exhibit F), such signage shall also include Tenant's identification sign, as shown on Exhibit F hereto, which shall be higher and at least as large as the largest sign made available to such other tenant or tenants except only with respect to tenants of the Shopping Center which then occupy a Floor Area which is larger than that of the Premises.  Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense.  Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments on which Tenant's panel appears so as to diminish Tenant's signage rights or visibility with respect to same, nor otherwise modify such signs in a manner inconsistent with a first-class shopping center, without obtaining Tenant's prior consent.  The cost of maintenance of all pylons and monuments (but not the cost of individual tenants' signs thereon, which shall be maintained by and at the cost of Tenant, or the cost of the construction of the pylons and monuments), and of the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.

Section 7.4      Signage: Alteration/Removal/Allocation.
Subject to Section 7.2.1, Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon

or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same. By the date of expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.5    <u>Cooperation</u>. Landlord, upon request, shall execute any reasonable consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    <u>Alterations and Improvements</u>.

8.1.1    Tenant shall not perform any structural or exterior alterations or structural improvements to the Premises without the prior approval of Landlord. All work performed in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above. Tenant shall obtain all governmental approvals required for all work described under this Article 8. All alterations shall be performed at Tenant's sole cost and expense, in a good and workmanlike manner in accordance with all applicable Legal Requirements.

8.1.2    Tenant may, from time to time, at its sole cost and expense upon at least five (5) days notice to Landlord but, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings. Notwithstanding the immediately preceding sentence any exterior non-structural alterations shall be subject to Landlord's prior written consent, which Landlord hereby agrees not to unreasonably withhold, provided that Landlord's consent shall not be required in respect of any exterior alteration which is prototypical for Bed Bath & Beyond Inc., or any Affiliate thereof, or for any national retailer (meaning a retailer operating at least fifty (50) stores nationwide) or regional retailer (meaning a retailer operating at least twenty (20) stores in the geographical regional of the Shopping Center) occupying the Premises or any part thereof.

8.1.3    Tenant shall have the right to subdivide the Premises into two (2) (but not more than two) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the

Premises, provided that Tenant: (i) obtains Landlord's prior
approval of its plans and location for the installation of such
equipment; (ii) uses a contractor designated or approved by
Landlord for all roof penetrations so as not to violate or
invalidate any roof warranties maintained by Landlord, (iii)
maintains the area where roof penetrations are made while
Tenant's equipment is present; (iv) repairs any damage to the
roof caused by the making of the roof penetrations, including,
but not limited to, the repair of the roof penetrations upon the
removal of any equipment installed thereon, and (v) places such
equipment to the extent reasonably possible so as not to be
visible from the Common Areas open to the public, including, if
reasonably necessary, appropriate screening.

8.1.5    Landlord shall execute and return to Tenant
all appropriately completed building department or equivalent
applications within ten (10) days after Tenant's request
therefor, and will reasonably cooperate with Tenant in the
permitting process.

8.1.6    If any violation of any applicable Legal
Requirement which is noted against the Shopping Center or the
Premises (other than a violation caused by Tenant or resulting
from Tenant's Work) prevents Tenant from obtaining a building
permit for any alterations or a certificate of occupancy, then,
upon request by Tenant, Landlord shall promptly and diligently
cause such violation to be removed of record to the extent
required to permit Tenant to obtain its building permit or
certificate of occupancy, as the case may be.

8.1.7    Landlord shall not make any alterations to
the Premises (including, without limitation, changing the design,
color or materials of the exterior of the Premises) nor shall
Landlord construct an additional floor or floors above the
Premises.

ARTICLE 9
REPAIRS

Section 9.1    _Tenant's Repairs_.  Subject to the provisions
of Article 11 hereof, and except as otherwise provided in Section
9.2 below, Tenant shall maintain in good condition and repair, at
its sole cost and expense: (i) the non-structural, interior
elements of the Premises (including plate glass, storefront
windows, doors, door closure devices, window and door frames,
molding, locks and hardware, and painting and other treatment of
interior walls and the electrical, plumbing, mechanical and/or
fire alarm systems located in, or serving, exclusively the
Premises); and (ii) the heating, ventilation and air conditioning
(**"HVAC"**) units exclusively serving the Premises including
maintenance of a commercially reasonable maintenance program
therefor.  All repairs and replacements on Tenant's part to be
performed hereunder shall be at Tenant's sole cost and expense,
and performed in a good and workmanlike manner in accordance with
all applicable Legal Requirements.  All of Tenant's repairs shall
be at Tenant's sole cost and expense, performed in a good and
workmanlike manner in accordance with all applicable Legal
Requirements.

Section 9.2    _Landlord's Repairs_.  Subject to the
provisions of Article 11 hereof, Landlord shall perform, as the
same shall from time to time be necessary, all repairs and
replacements to the following:

(a)  the buildings of the Shopping Center as
necessary to maintain same in good condition and repair
[including, without limitation, repainting the exterior walls of
the buildings of the Shopping Center (including, without

limitation, the Premises)] as same may be reasonably required from time to time during the Term;

       (b)  the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, sprinkler system, footings, foundation, exterior walls (including, without limitation,  repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

       (c)  the roof, gutters, flashings, downspouts and scuppers;

       (d)  to the extent not maintained by any applicable utility company the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

       (e)  all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

       (f)  the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical and/or fire alarm systems located in or serving the Premises) until the later of: (A) the expiration of any contractors', manufacturers', vendors', or insurers' warranties or guarantees, or (B) the first (1st) anniversary of the Delivery Date; and

       (g)  Subject to Section 11, any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in the Premises (except in the case of an emergency posing imminent material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses.  In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have a right to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    <u>Legal Compliance Work</u>.  Subject to Section 9.2 above, Tenant shall be responsible, at its sole cost and expense, for the performance of all "Legal Compliance Work" (hereinafter defined) required: (a) solely due to Tenant's specific manner of use of the Premises (*i.e.*, is not of general applicability to tenants and occupants of the Shopping Center), or (b) with respect to interior elements of the Premises which are not structural, provided, however, that the foregoing shall not relieve Landlord of its obligations to perform Landlord's Work in accordance with all Legal Requirements and to perform the repairs, as required in this Lease.  Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges) for performing all other Legal Compliance Work.  As used herein, ***"Legal Compliance Work"*** shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    <u>Mutual Release, Waiver of Subrogation and Mutual Indemnification</u>.

10.1.1    <u>Mutual Waiver of Claims</u>.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property and time element insurance required to be maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2    <u>Waiver of Subrogation</u>.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3    <u>Mutual Indemnification</u>.

(a)  Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) to the extent occasioned by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)   Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) to the extent occasioned by any act or omission of Landlord, its agents, contractors, employees, or servants, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2   Tenant's Insurance.

10.2.1   Tenant's Insurance.   Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) standard "All-Risk" property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.  Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2   Self-Insurance.   All Insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iv) a combination of any of the foregoing programs.  To the extent that any deductible is permitted or allowed as part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed One Hundred Thousand Dollars ($100,000.00) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3   Landlord's Insurance.

10.3.1   Liability Insurance.   Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent

to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2   "All-Risk" Property Insurance.  Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term standard "All-Risk" property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages,  on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center ; provided, however, in no event shall such insurance cover  Tenant's Property.  All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have any deductibles exceeding One Hundred Thousand Dollars ($100,000.00) without Tenant's prior consent; provided, however, that in connection with a review of the liability insurance requirements pursuant to Section 10.4.2 hereof, the deductible may be increased to such reasonable and customary deductibles maintained for similar facilities of like size and operation.

10.3.3   Tenant's Pro Rata Share of Insurance Premiums.  Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Subsection 10.3 as part of Common Areas Charges.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4   General Insurance Requirements.

10.4.1   All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

10.4.2   The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant from time to time as reasonably requested by either party for the purpose of mutually

#20608-2.NPD
May 1, 2000

increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1   <u>Fire and Other Casualty</u>.

11.1.1    (a)  Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall  include all Tenant's Work and all other leasehold improvements performed by Tenant, and shall not include any of Tenant's Property.  The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.

(b)  Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make reasonable changes to the Premises in the course of, and as part of, such rebuilding or restoration work, provided that such changes do not affect the footprint of the Premises or add an additional Floor (whether above grade or below grade) to the Premises.  If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the Delivery Date).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)  If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2    In the event that:

(a)  Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within one hundred fifty (150) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)  the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Subsection 11.1 within one (1) year after the date of destruction (which period may be extended by up to one hundred fifty (150) days by reason of Force Majeure, provided that Landlord gives Tenant notice of its claim of Force Majeure within five (5) days after the occurrence of the event of Force Majeure and Landlord is acting with all due diligence to Substantially Complete such construction during such period),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)  after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on the Premises, No Build Area and Critical Access areas on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii) seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, and Landlord fails to refute such opinion by provision of binding contracts (with economic terms deleted) for such restoration within such time

period within thirty (30) days after Landlord's receipt of such notice, Tenant may, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof, provided that such notice, to be effective, must be given within thirty (30) days after the end of the 30-day period during which Landlord was permitted to provide such refutation.

11.1.3   If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2   Eminent Domain.

11.2.1   As used in this Section 11.2, **"Taking"** or **"Taken"** shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2   If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3   In the event that:

(a)   any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)   as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or on grade access to the Premises from the portions of the Shopping Center designated as Critical Access on Exhibit B, or (ii) the Shopping Center no longer has entrances from both Daniels Road and U.S. 41, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)   more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(d)   five (5%) percent or more of the parking spaces located in the No Build Area in the Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four (4.0) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to

terminate this Lease by giving at least sixty (60) days' prior
notice to Landlord within sixty (60) days of any such event, in
which event this Lease shall terminate without any further
liability on the part of either Landlord or Tenant, except for an
adjustment between the parties for the Rent payable by Tenant
hereunder and for payment to Tenant for its share of the award
for the taking pursuant to Subsection 11.2.5 below.  Upon any
partial Taking of the Premises, the Rent shall be equitably
reduced or totally abated based upon the extent to which the
remaining portion of the Premises may, in Tenant's reasonable
judgment, be utilized for its normal conduct of business.

11.2.4    If this Lease is not terminated pursuant to
this Section 11.2, Landlord, at its sole cost and expense, within
a reasonable period of time after such Taking, shall repair and
restore the area not so Taken to tenantable condition, similar in
physical appearance to the condition of the area immediately
prior to the Taking, pursuant to plans and specifications
approved by Tenant (which repair and restoration shall, as
applicable include all Tenant's Work and all other leasehold
improvements performed by Tenant; provided, however, that
Landlord shall not be obligated to repair or restore Tenant's
Property).  During the period of such repairs and restoration,
all Rent shall abate to the extent that the Premises may not, in
Tenant's reasonable judgment, be used by Tenant for the normal
conduct of its business.  Such abatement shall terminate in
accordance with the terms of Section 11.3 below.

11.2.5    In connection with any Taking or partial
Taking of the Premises, Tenant shall be entitled to claim an
award for loss of business, unamortized leasehold improvements
performed at Tenant's expense, fixtures and equipment and removal
and reinstallation costs; provided, however, that no award shall
be payable to Tenant which reduces the award payable to Landlord
for its fee interest in the Premises.

11.2.6    Any dispute between the parties with respect
to this Section 11.2 shall be resolved by arbitration in
accordance with the provisions of Section 16.3 below.

Section 11.3  Abatement of Rent Charges.  Notwithstanding
any other provisions of this Lease, if the Fixed Rent and
Additional Rent payable by Tenant hereunder shall be abated
pursuant to Sections 11.1 or 11.2 above, such abatement shall
terminate upon the first to occur of: (a) the date on which
Tenant shall reopen the Premises to the public for business and
shall be able to engage in the normal conduct of such business;
or (b) the expiration of the period which is thirty (30) days
after Landlord shall have completed such repairs and restoration
work as Landlord is obligated to perform hereunder and the
interference with the operation of business in the Premises has
ceased.


ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1  Quiet Enjoyment.  Tenant shall peaceably and
quietly have, hold, occupy and enjoy the Premises for the Term,
without hindrance from Landlord or any party claiming by,
through, or under Landlord.

Section 12.2  Authority.  Tenant and Landlord each warrant
and represent that the person(s) signing this Lease on their
behalf has authority to enter into this Lease and to bind Tenant
and Landlord, respectively, to the terms, covenants and
conditions contained herein.  The submission of this Lease to
each party hereto shall be for examination and negotiation

purposes only, and does not and shall not constitute a
reservation of or an obligation of Tenant to lease, or otherwise
create any interest of Tenant in, the Premises or any other
premises situated in the Shopping Center unless and until the
Lease is fully executed and delivered by Tenant and Landlord.

    Section 12.3   Landlord's Covenants, Warranties and
Representations.  To induce Tenant to execute this Lease, and in
consideration thereof, Landlord covenants, warrants and
represents to Tenant as follows:

        (a)  As of the Effective Date, Landlord has, and
as of the Delivery Date Landlord shall have, good and marketable
fee simple title to the entire Shopping Center, free and clear of
all easements, restrictions, liens, encumbrances, leases and the
like, except for the encumbrances described on Exhibit E hereto;

        (b)  In the event the legal description of the
Shopping Center described in Exhibit A hereto indicates that the
Shopping Center is composed of more than one parcel or lot,
Landlord represents that there exist no strips or gores between
such parcels or lots which are not owned by Landlord;

        (c)  No third party consents or approvals are
required in order for Landlord to enter into this Lease, or for
the performance of Landlord's Work and Tenant's Work (excluding,
as of the Effective Date, governmental permits and approvals);

        (d)  Tenant's use of the Premises for sale of
Permitted Items (defined in Section 1.1.27 above) will not
violate any exclusive provision or prohibited use restriction
granted to any other tenant or occupant in the Shopping Center;

        (e)  The Shopping Center now has, and, on the
Delivery Date, shall have, access to Daniels Road and U.S. 41 for
the purpose of vehicular traffic;

        (f)  This Lease does not violate the provisions of
any instrument heretofore executed and/or binding on Landlord, or
affecting or encumbering the Shopping Center, or the Premises,
and no rights granted by Landlord to Tenant under the terms of
this Lease conflict with any rights granted by Landlord to any
other tenant or occupant in the Shopping Center;

        (g)  There shall be no restrictions or other legal
impediments imposed by any public or private instrument which
would prevent: (i) the use of the Premises for the Permitted Use
as it exists as of the Effective Date; (ii) the use of the
parking facilities, access roads, and other Common Areas in the
manner contemplated by this Lease; or (iii) other than applicable
governmental laws, the performance of Tenant's Work;

        (h)  As of the Effective Date, there are no sign
ordinances, restrictive covenants, uniform sign plans or other
signage restrictions which would prevent the Premises from having
the signage (including, without limitation, the square foot area
and size of letters) as depicted on Exhibit F hereof.

        (i)  Attached hereto as Exhibit K-2 is a complete
list of all fully executed and delivered leases in effect on the
Effective Date with respect to the Shopping Center (the "Existing
Leases"), which Tenant shall maintain as confidential except as
may be necessary to enforce its rights under this Lease; and

        (j)  Landlord shall promptly forward to Tenant any
notice received by Landlord from any owner of property adjoining
or adjacent to the Shopping Center or from any municipal or other
governmental authority, in connection with any hearing or other

#20608-1.WPD
May 1, 2000                        36

1   administrative proceeding relating to any proposed zoning,
2   building code, signage, or related variance affecting the
3   Shopping Center, which, if granted, could adversely affect
4   Tenant's right to use or occupy the Premises, the conduct of
5   Tenant's business therein, or Tenant's rights and benefits under
6   this Lease.  If the granting of such variance would cause
7   Landlord to be in violation of this Lease, Landlord, at its sole
8   cost and expense, shall appear in such proceeding and shall
9   contest such proposed variance.  If Landlord is required to so
10  appear and fails so to appear and contest such proposed variance
11  after receiving five (5) days' notice from Tenant (or such
12  shorter notice as may be practicable under the circumstances),
13  then Tenant shall be entitled (but shall not be obligated to), in
14  its own name and/or in the name of Landlord, appear in such
15  proceeding, in which event Landlord shall fully cooperate with
16  Tenant, provide such information, and execute any documents or
17  other instruments as Tenant may reasonably request in connection
18  with any such proceeding.
19
20      Section 12.4   Environmental Matters.
21
22          12.4.1   Definitions.
23
24              (a)  As used herein, the term **"Environmental Laws"**
25  shall mean any and all Legal Requirements concerning the
26  protection of the environment, or human health or safety as
27  related to Hazardous Substances.
28
29              (b)  As used herein, the term **"Hazardous
30  Substances"** shall mean each and every element, compound,
31  material, mixture, substance, waste, hazardous substance,
32  hazardous waste, hazardous material, toxic substance, pollutant
33  or contaminant either as those terms are defined in any of the
34  Environmental Laws or the presence of which may cause
35  environmentally related liability at common law.
36
37              (c)  As used herein, the term **"Environmental
38  Notice"** shall mean a summons, citation, directive, order, claim,
39  notice, litigation, investigation, judgment, legal pleading,
40  letter or other communication, written or oral, actual or
41  threatened, from the United States Environmental Protection
42  Agency or other federal, state or local governmental agency or
43  authority, or any other private individual or entity concerning
44  (i) any Hazardous Substances at, on, in, under or emanating from
45  the Premises, the Shopping Center or any contiguous property;
46  (ii) any violation or potential violation of Environmental Laws
47  at the Premises, the Shopping Center or any contiguous property;
48  or (iii) any underground storage tanks on the Premises or the
49  Shopping Center.
50
51              (d)  As used herein, the term **"Releasing"** or
52  **"Release"** shall mean releasing, spilling, leaking, discharging,
53  disposing or dumping or otherwise introducing any substance into
54  the environment or into any building or other improvements in
55  violation of Environmental Laws.
56
57              (e)  As used herein, the term **"Compliance Costs"**
58  shall mean any and all costs incurred by a party in complying
59  with applicable Environmental Laws, including, without
60  limitation: consultant's and engineer's fees; laboratory costs;
61  contractor's and subcontractor's fees; application and filing
62  fees; costs of investigation, monitoring or cleanup of soil or
63  other substrate, surface water, groundwater, or buildings or
64  other improvements; equipment costs; disposal fees; costs of
65  operation and maintenance of equipment; legal fees; other
66  governmental fees or costs; interest at the Lease Interest Rate
67  from the date of expenditure until paid in full; and other

similar or related costs.

(f)  As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees, or those claiming by or under Tenant and the agents, servants, employees, contractors or licensees thereof.

12.4.2  <u>Compliance with Environmental Laws</u>.  Tenant shall comply with all  applicable requirements of Environmental Laws governing its use and occupancy of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises to the extent of any potential liability of Tenant or interference with Tenant's rights under this Lease, except to the extent such requirements arise from the occupancy, use or operations thereon by Tenant or Tenant Related Parties.

12.4.3  <u>Responsibility for Releases of Hazardous Substances</u>.  Notwithstanding any other provision of this Lease, Tenant shall only be responsible for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be responsible for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances and materially interfering with Tenant's use and occupancy of, or operations at, the Shopping Center and the Premises shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to use commercially reasonable efforts to (i) not materially adversely affect ingress to or egress from the Shopping Center, (ii) have no material adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4  <u>Standards</u>.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used, as reasonably determined by arbitration pursuant to Section 16.3.

12.4.5  <u>Landlord's Representations and Warranties</u>.  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises, except for four underground storage tanks used to store propane.

12.4.6  _Documents_.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7  _Indemnity_.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Environmental Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8  _Survival_.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9  _Conflict_.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1  _Permitted and Prohibited Uses_.

13.1.1  _Tenant's Permitted Use_.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in _Exhibit M_ hereto) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable under this Lease.

13.1.2  _Prohibited Uses_.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located.  Landlord shall not lease, rent or occupy, and shall use commercially reasonable and diligent efforts (including, without limitation, litigation) not to permit any portion of the Shopping Center, to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date) for any of the "Prohibited Uses" (defined in _Exhibit M_ hereto annexed).

Section 13.2  _Tenant's Exclusive in Center_.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1  Subject only to the Existing Leases as to which the provisions of this Section 13.2 shall not apply except as specifically stated herein, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items; (c) housewares such as utensils, kitchen utensils, appliances and gadgets, cleaning appliances and supplies, cookware, bakeware, dishes and china

(excluding fine china) glassware, garbage pails, ironing boards and other laundry items, mops and brooms and artificial flowers (the foregoing is not intended to include candles, ready to assemble furniture or candle holders); (d) frames and wall art; (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the **"Exclusive Items"**).

Notwithstanding the foregoing, Landlord may, from time to time, designate up to thirty thousand (30,000) square feet of Floor Area (the "Excluded Space") in which the Exclusive Items may be sold provided that no individual premises may utilize more than fifteen thousand (15,000) square feet of Floor Area in the aggregate for the sale, rental or distribution of the Exclusive Items, and provided further that such Excluded Space is not utilized by any of Tenant's Direct Competitors (as hereinafter defined).  Further, any tenant or subtenant in the Shopping Center which leases a Floor Area of greater than three thousand (3,000) square feet, shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five (5%) percent of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises.  Any tenant or subtenant in the Shopping Center which leases a Floor Area of three thousand (3,000) square feet or less, shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lessor of: (1) ten (10%) percent of the Floor Area of such tenant's or subtenant's premises; or (2) three hundred (300) square feet of Floor Area.  In addition to the preceding exclusion from Landlord's obligations hereunder, Landlord shall be permitted to lease space in the Shopping Center to Pottery Barn for the sale, rental or distribution of Exclusive Items on the condition that the aggregate space used by Pottery Barn shall not exceed fifteen thousand (15,000) square feet of Floor Area. For the purposes hereof the term "Tenant's Direct Competitors" is intended to apply to, by way of example, those businesses currently operating under the tradenames of HomePlace, Linens & Things, LinenLocker, Linen Barn, Lechters and/or other retailers with a mix of merchandise similar to that of Tenant.

Notwithstanding the exception of Existing Leases from this Subsection 13.2.1, existing tenants of the Shopping Center (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord and any such tenant requires Landlord's consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items, and Landlord is entitled to withhold its consent to such assignment or subletting under the terms and conditions of such lease; or (ii) Landlord permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items."

13.2.2    The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional department store commonly located in first-class shopping centers in the state in which the Shopping Center is located and occupying at least forty thousand (40,000) square feet of Floor Area within the Shopping Center, such as, by way of example, Jacobsen's, Saks, Wal-Mart, Macy's, or Target, as such department stores are currently operated (as of the Effective Date), but this Section 13.2.2 shall not be construed so as to permit one of Tenant's Direct Competitors.

13.2.3    The exclusive rights granted to Tenant with respect to any respective category listed in Subsection 13.2.1 above shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during "Excused Periods [defined in Section 1.1.9 above] and for periods of time not exceeding six (6) consecutive months). In the event Tenant fails to use the Premises, or any portion thereof, for the sale, rental or distribution of any such items for a period in excess of six (6) months, exclusive of any Excused Periods, then Tenant's exclusive rights granted herein with respect to such item(s) shall terminate. The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least twenty-five thousand (25,000) square feet of the Premises.

13.2.4    (a) Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which Landlord has included in the lease between Landlord and any tenant in the Shopping Center a provision which effectuates the exclusive rights granted to Tenant in this Section 13.2 and, despite such inclusion, such tenant has violated said exclusive right unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or following an additional thirty (30) days notice of termination to Landlord if Landlord fails to so comply within such thirty (30) day period, to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b) If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). Landlord shall have no further liability and Tenant shall not be entitled to any further abatement hereunder if, despite Landlord's diligent efforts to enforce this Section 13.2, a court of competent jurisdiction holds the provisions of this Section 13.2 to be unenforceable. Any appeal from such decision shall be at Tenant's election, to be prosecuted by Tenant at its sole cost.

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1    Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, **_Existing Exclusives_**) [a true and complete listing and description of such Existing Exclusives

being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2   Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Section 5 hereof) Tenant shall initially open its store for business as a prototypical Bed Bath & Beyond to the public in the Premises for at least one (1) day, not later than the ninetieth (90th) day after the Delivery Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence,  Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event that Tenant does not operate or cause to be operated any retail business permitted under this Lease in at least ten thousand (10,000) square feet of Floor Area in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 180-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the **"Recapture Date"**) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1   Assignment and Subletting.

15.1.1   Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.  Tenant shall provide reasonable advance notice of any assignment other than to an Affiliate and shall provide notice to Landlord upon assignment to an Affiliate and furnish Landlord with a copy of any applicable assumption agreement.

15.1.2   Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, the whole of the Premises or more than fifty (50%) percent of the Premises, it shall first give notice thereof (the **"Assignment/Subletting Notice"**) to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises up to a maximum of Three Hundred Thousand ($300,000.00) Dollars plus the cost of the Second Level Storage Area.  Thereafter, Landlord shall have the option, subject to Section 15.5 (and any recognition agreement then in effect), to terminate this Lease, which option shall be exercisable by:

(a)   giving notice to Tenant (the **"Termination Notice"**) thereof within fifteen (15) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)   paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection the preparation of plans and specifications for, subject to the limitation set forth above, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the **"Termination Date"**) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease.  Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the **"Rescission Notice"**), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not give the Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed to have waived its

termination rights hereunder with respect to such particular proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice.

15.1.3    In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises:  (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates;  (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the State of Florida; and/or (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s).

Section 15.2    Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively the "Original Tenant") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease, accruing from and after the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million ($100,000,000.00) Dollars.

Section 15.3    Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Institutional Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Institutional Lender in connection therewith, such documentation shall not impair Landlord's remedies under this Lease.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease (although such Affiliate shall be subject to all rights of Landlord to recover possession of the Premises and/or terminate this Lease).  As used herein, *"Lender"* shall mean a state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4    Cure Rights of Original Tenant.

15.4.1    If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant if Original Tenant remains liable for Tenant's obligations under this Lease, and no notice of default shall be effective until a copy thereof is so given to Original Tenant if so required.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease, such periods to run concurrently and not consecutively.

15.4.2    If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirement affecting creditors' rights, <u>then</u> Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (**"New Lease"**), <u>provided</u> that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5    <u>Recognition Agreement</u>.  In the event Tenant subleases all of the Premises for a term of at least five (5) years, and this Lease has not been terminated under Section 15.1.2, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of <u>Exhibit H</u> hereto, in recordable form.

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

Section 16.1    <u>Tenant Default</u>.

16.1.1    If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an **"Event of Default"**.

16.1.2    Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any

element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)   to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)   without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)   upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and or

(d)   upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable costs and expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3   Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; reasonable costs of refitting the Premises for substitute tenant(s) with the unamortized amount on which such calculation is based not to exceed Fifteen ($15.00) Dollars per square foot regardless of whether Landlord's actual cost exceeds such amount, and provided that, as to any substitute term ending after the Expiration Date of this Lease as it existed as of the Event of Default, Tenant shall only be liable for the portion of such costs attributable to the period prior to such Expiration Date, amortized on a straight-line basis without interest, and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4   Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not

paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5    Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  Landlord may, from time to time, have other premises in the Shopping Center available for lease, and Landlord shall not be required to show preference for the Premises compared with any such other area.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2    Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Tenant specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Landlord does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a **"Landlord's Default"**), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)  as applicable, perform such any repair or maintenance obligations of Landlord which are necessary for use and operation of the Premises and the No Build Area in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)  bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)  may offset against forty (40%) percent of each successive installment of Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid (it being agreed that Tenant shall, as applicable, be entitled to offset against larger percentages of each successive installment of Rent if the aforesaid forty (40%) percent offset is insufficient to reimburse Tenant in full, taking into account the then remaining number of installments of Rent due and payable by Tenant hereunder); and/or

(d)  may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided and on condition that (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not capable of being cured or being rendered irrelevant by any actions of Tenant despite commercially reasonable efforts on the part of Tenant, and (3) Tenant shall have delivered notice of Landlord's Default to any Mortgagee of Landlord (provided Landlord shall have previously notified Tenant of the name

and address of such Mortgagee), and such Mortgagee has not cured Landlord's Default within thirty (30) days following its receipt of such notice (or, if Landlord's Default requires more than thirty (30) days to cure in the exercise of due diligence, such Mortgagee has not commenced to cure same within said thirty (30) day period and thereafter diligently prosecuted the same to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (i.e., posing imminent material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises) shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3  <u>Arbitration</u>.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Fort Myers, Florida, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.  Notwithstanding anything in this Lease to the contrary, this Section 16.3 shall not apply to any action by Landlord seeking the remedy of recovery of possession of the Premises under forcible entry and detainer or comparable action (including determination of Tenant's Rent obligations to the extent necessary in order for Landlord to enforce its remedy of recovery of possession).


ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1  <u>Right to Mortgage and Non-Disturbance</u>. Landlord reserves the right to subject and subordinate this Lease at all times to any mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; <u>provided</u>, <u>however</u>, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as <u>Exhibit G</u> hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant  in or of its possession or its rights to possession of

the Premises or of any right or privilege granted to or inuring
to the benefit of Tenant under this Lease other than to the
extent such right is available to Landlord; (ii) in the event of
the termination of the ground or underlying lease, Tenant will
not be made a party in any removal or eviction action or
proceeding, nor shall Tenant be evicted or removed of its
possession or its right of possession of the Premises other than
to the extent such right is available to Landlord, and this Lease
shall continue in full force and effect as a direct lease between
the Ground Lessor and Tenant for the remainder of the Term and on
the same terms and conditions as contained herein, without the
necessity of executing a new lease; and (iii) Landlord and Tenant
shall have the right to execute any amendment to this Lease which
is specifically required hereunder, if any, and the Ground Lessor
shall recognize and be bound thereto.

Section 17.2    <u>Estoppel Certificate</u>.  Upon written request
of Landlord or Tenant, the other party, within thirty (30) days
of the date of such request, shall execute and deliver to and
only for the benefit of the requesting party or any Mortgagee,
*bona fide* prospective purchaser, assignee, or sublessee of the
requesting party, without charge, a written statement: (1)
ratifying this Lease; (2) certifying, to such party's actual
knowledge, that this Lease is in full force and effect, if such
is the case, and has not been modified, assigned, supplemented or
amended, except by such writings as shall be stated;
(3)specifying the dates to which Fixed Rent and Additional Rent
have been paid; (4) stating whether or not, to Tenant's actual
knowledge, Landlord is in default and, if so, stating the nature
of such default, (5) stating the Rent Commencement Date, and (6)
stating which options to extend the Lease Term have been
exercised, if any.

Section 17.3    <u>Existing Mortgages</u>.  Within thirty (30) days
after the Effective Date, Landlord shall deliver to Tenant, in
recordable form: (x) a subordination, non-disturbance and
attornment agreement substantially in the form attached hereto as
<u>Exhibit G</u>, executed by each and every holder of any mortgage,
deed of trust or any other existing lien encumbering or affecting
the Shopping Center or any portion thereof, and (y) a fee owner
recognition agreement in the form and content described in clause
(b) of Section 17.1 hereof executed by any Ground Lessor (and, as
may be required, consented to by the holder of any mortgage, deed
of trust or other existing lien as aforesaid).  Should Landlord
fail to so deliver such instrument(s) within said 30-day period,
Tenant shall have the right by notice given to Landlord at any
time prior to the date on which such instrument(s) are delivered,
to terminate this Lease, in which event, neither party shall have
any further liability hereunder (other than as set forth in
Section 23.3 below), except that Landlord shall be obligated to
promptly reimburse Tenant for all its reasonable, third-party
costs and expenses incurred in connection with this Lease,
<u>including</u>, without limitation, the preparation and review of
plans and specifications, and the performance of Tenant's Work,
provided, however, that such reimbursement by Landlord shall not
exceed the aggregate sum of Fifty Thousand Dollars ($50,000),
plus reasonable legal fees.

ARTICLE 18
NOTICE

Subject to the further provisions of this Article XVIII,
whenever it is provided herein that any notice, demand, request,
consent, approval or other communication (*"Notice"*) shall or may
be given to either of the parties by the other, it shall be in
writing and, any Legal Requirement to the contrary
notwithstanding, shall not be effective for any purpose unless
same shall be given by registered or certified mail, postage

prepaid, return receipt requested, or delivery thereof has been refused, or by any recognized overnight mail carrier, with proof of delivery slip or refusal thereof, addressed to Landlord at Landlord's Mailing Address, with copies of notices to Landlord also given to Huprich & Krasnove, LLP, Suite 1620, 7 West Seventh Street, Cincinnati, Ohio 45202, Attn: David Huprich, Esq., or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term, although no such transaction shall bind Landlord or affect its rights under this Lease unless Landlord and the security holder enter into an agreement with respect thereto upon terms and conditions reasonably acceptable to Landlord which do not impair Landlord's remedies under this Lease, and which will provide for advance notice to the security holder of the prospective exercise of any remedy potentially requiring removal of the affected Tenant's Property. Landlord waives any right it may have in Tenant's Property, although such waiver shall not be deemed to impair Landlord's right to remove Tenant's Property in the exercise of remedies available under this Lease in accordance with the foregoing agreement. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant and Landlord evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## ARTICLE 20
## END OF TERM

Section 20.1    _Surrender of Premises_. At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, _excepting_, _however_, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2    _Hold Over_. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term,

Tenant shall be a tenant at sufferance and shall be liable for
Fixed Rent on a monthly basis (or, if applicable, on a prorated
daily basis) in an amount equal to one hundred fifty (150%)
percent of the amount thereof payable by Tenant for the month
immediately preceding the last day of the Term as well as for all
Additional Rent payable by Tenant hereunder.


ARTICLE 21
INTENTIONALLY OMITTED




ARTICLE 22
CONTINUING CO-TENANCY

If, at any time during the Term of this Lease, more than
fifty-five percent (55%) of the total Floor Area of all buildings
in the Shopping Center (excluding the Premises) ceases to be used
for the operation of retail business by national or regional
tenants (such condition being hereinafter referred to as an
**"Excess Vacancy"**), then in such event, Tenant shall have the
right to: (i) pay Alternate Rent in lieu of Fixed Rent during the
period of such Excess Vacancy (with Fixed Rent recommencing upon
cure of such Excess Vacancy),and/or (ii) if the Excess Vacancy
continues for a period in excess of five hundred forty (540)
continuous days, to terminate this Lease exercisable by giving
Landlord, within one hundred twenty (120) days after the
expiration of such 540-day period, at least sixty (60) days'
prior notice, in which event, unless as of the date of Tenant's
notice, Landlord has executed leases which will cure the Excess
Vacancy Condition and provides reasonable evidence thereof to
Tenant within fourteen (14) days after Tenant's notice of
termination, and such Excess Vacancy condition is actually cured
within such 180-day period, this Lease shall terminate on the
date set forth in Tenant's notice of termination without further
liability on the part of either Landlord or Tenant, except as set
forth in Section 23.3 below.  If Tenant does not terminate this
Lease pursuant to this Article 22, then commencing on the
expiration of the aforesaid 120-day period, Tenant shall resume
paying full Rent without regard to the foregoing provisions of
this Article 22, <u>provided</u>, <u>however</u>, that Tenant shall retain all
of its rights under this Article 22 with respect to any future
condition of Excess Vacancy thereafter occurring.


ARTICLE 23
MISCELLANEOUS

Section 23.1    <u>Loading Facilities</u>.  Tenant shall have the
exclusive right to utilize the loading facilities serving the
Premises (shown on Exhibit B).  Landlord shall not prevent
Tenant's operation of such facilities on a "24 hour a day", "365
days a year" basis, although Tenant is solely responsible for any
governmental approvals and compliance with all Legal Requirements
in connection with Tenant's operation.

Section 23.2    <u>Liens</u>.  Within thirty (30) days after notice
of the filing thereof, Tenant shall discharge (either by payment
or by filing of the necessary bond, or otherwise) any lien
against the Premises and/or Landlord's interest therein, which
may arise out of any payment due for, or  purported to be due
for, any labor, services, materials, supplies or equipment
alleged to have been furnished to or for Tenant or a Tenant
Related Party in, upon or about the Premises.  Similarly, within
thirty (30) days after notice of the filing thereof, Landlord
shall discharge (either by payment or by filing of the necessary
bond, or otherwise) any lien against the Premises and/or
Landlord's interest therein, which may arise out of any payment
due for, or purported to be due for, any labor, services,

materials, supplies or equipment alleged to have been furnished to or for Landlord or a Landlord Related Party in, upon or about the Premises.

Section 23.3    Broker's Commission.   Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Florida Shopping Center Group (the **"Broker"**).  Landlord shall pay the Broker a commission  pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4    Force Majeure.   Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, inability to procure materials, failure of power, restrictive Legal Requirements, riots, insurrection, war, earthquake, hurricane or tornado(or comparable weather conditions of unusual severity) or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as **"Force Majeure"**), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay.  Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of Force Majeure.

Section 23.5    Consents.   Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6    Costs.   Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7    Attorneys' Fees.   In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8    Survival of Obligations.   The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the

expiration or earlier termination of this Lease.

Section 23.9    _Non-Waiver_.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10    _Rights Cumulative_.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11    _Definition of Landlord_.  The term **"Landlord"** shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (_except_ to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12    _Successors and Assigns_.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13    _Limitation of Landlord's Liability_.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale occurring thereafter of all or any portion thereof) and net income derived thereafter from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14    _Limitation of Tenant's Liability_. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates. Such limitation shall not limit the extent to which any party is subject to Landlord's right to possession and/or termination remedies under this Lease.

Section 23.15    _Joint and Several Liability_.  If either party

consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16  <u>Severability</u>.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17  <u>Grammatical Usages and Construction</u>.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18  <u>Table of Contents, Line Numbering and Paragraph Headings</u>.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19  <u>Definition of Hereunder, Herein, etc.</u>.  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20  <u>Short Form Lease</u>.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request and shall refer to such provisions of this Lease which may survive the expiration or sooner termination hereof.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.  All costs of recording any such memorandum shall be borne by the party electing to perform such recordation.

Section 23.21  <u>Entire Agreement and Modification</u>.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  <u>No Joint Venture or Partnership Created by Lease</u>.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23  <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

WITNESS:

*Tracy A. Huyls*

[SEAL]


**LANDLORD:**

BELL TOWER PROPERTIES LIMITED
PARTNERSHIP
By MRP Bell Tower, Inc., a Del. corp.
general Partner

By: _____
Name: _____
Title: _____
        C. LOUIS MITSCH
        VICE PRESIDENT


ATTEST:

*Alan M Freed*
Ass't Sec
Officer
[SEAL]


**TENANT:**

BED BATH & BEYOND INC., a
New York corporation

By: _____    AMF
        Warren Eisenberg
        Co-Chief Executive

# FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT (*"First Amendment"*) is entered into as of November 15th, 2000 by and between BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership, having an office at 7 West Seventh Street, Cincinnati, Ohio 45202 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

Landlord and Tenant are parties to a certain Lease Agreement dated as of May 25, 2000, and, in consideration of the terms and conditions of this First Amendment and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, desire to amend the Lease Agreement as set forth below. The Lease Agreement, as modified by this First Amendment, is the "Lease". Capitalized terms used in this First Amendment and not defined herein have the meanings provided in the Lease. Page and line numbers listed below are for convenience only, and only the beginning line number of the referenced passage is provided.

A.      Section 1.1.28 (page 4, line 33) is amended and restated in its entirety, as follows: "Premises:  Being the area cross-hatched on Exhibit 1-B hereto having dimensions as shown on Exhibit 1-B and containing approximately thirty thousand five hundred eighty-seven (30,587) square feet of Floor Area and approximately nine hundred eighty (980) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  Non-selling mezzanine space shall not be included in the determination of Tenant's Fixed Rent, Additional Rent or Pro Rata Share.  The Premises shall not include a Second Level Storage Area."

B.      In Section 2.3.2(b) (page 9, line 5), April 1, 2001 is changed to October 1, 2001, as the earliest date on which Tenant may exercise remedies set forth in Section 16.2.

C.      Section 2.3.5 (page 9, line 54), captioned "Second Level Storage Area", is deleted.  In Section 15.1.2, the following phrase at the end of the first sentence is deleted: "plus the cost of the Second Level Storage Area".

D.      In Section 2.3.6 (page 10, lines 8 and 15), the Outside Date for Landlord to obtain Landlord's Approvals is changed from March 31, 2001 to September 1, 2001, and the Extended Outside Date by which Tenant may obtain Landlord's Approvals is changed from March 31, 2002 to September 1, 2002.

E.      In Section 3.2.1 (page 11), items (a) (Shell Drawings), (b) (Tenant's Plans), (c) (Preliminary Plans), (d) (Tenant's comments to the Preliminary Plans), (e) Landlord's delivery of Final Plans and Specifications, and (f) Tenant's response to Landlord's Final Plans and Specifications, all have occurred.  Tenant shall have fifteen (15) days from receipt of the revised Final Plans and Specifications (which Landlord anticipates to occur on or around December 7, 2000) to respond to Landlord's revision(s) of the Final Plans and Specifications, and Landlord shall, if necessary, revise same in the manner provided in Section 3.2.1 of the Lease.  Attached

Exhibits 1-B and 1-D1 replace the corresponding exhibits which were attached to the original Lease, as further provided in item H below in this First Amendment.

F.     In Section 3.3.2(a) (page 13, line 33), the date regarding commencement of Landlord's Work is changed from November 1, 2000 to January 1, 2001.  In Section 3.3.2(b) (page 13, line 34), the date regarding the Delivery Date is changed from April 1, 2001 to October 1, 2001.

G.     Tenant agrees to pay fifty percent (50%) of Landlord's reasonable third-party out-of-pocket expenditure for certain design work incurred from August 10, 2000.  Tenant shall make such payment within fourteen (14) days after the later to occur of (i) Tenant's approval of the Final Plans and Specifications and (ii) Tenant's receipt of a paid invoice and any other documentation reasonably requested by Tenant showing the amount paid by Landlord for such design work in detail reasonably satisfactory to Tenant.  The maximum amount payable by Tenant for such design work shall be equal to the sum of fifteen thousand dollars ($15,000).  This obligation is incremental to Tenant's obligation to reimburse Landlord in the amount of eighteen thousand five hundred twenty-two dollars ($18,522) for the previously performed design of the Second Level Storage Area, which Tenant shall pay to Landlord at the same time.

H.     In the index of exhibits appearing at the end of the table of contents (page iv) and at the end of the Lease (page 56) and in all references to such exhibits throughout the Lease:

     i.     Exhibit B is changed to Exhibit 1-B, and
            Exhibit D1 is changed to Exhibit 1-D1.

I.     In the Prohibited Uses definition in Exhibit M (page L-3, line 37), the text shown in italics and boldface is deleted:  "more than fifteen thousand (15,000) square feet (exclusive of outside patio areas) of restaurants serving meals for on or off premises consumption within two hundred (200) linear feet from the perimeter of the Premises provided that no such use will be permitted within *forty-five (45) linear feet (or, with respect to outside patio areas, within* thirty-two (32) linear feet) from the perimeter of the Premises (except that a 'coffee bar' shall be permitted to be located within the Premises)".  Landlord anticipates enclosure of the nearby patio area currently under lease to TGI Friday and shown on Exhibit 1-B, in which event such area shall be included as Shopping Center Floor Area and Tenant's Pro Rata Share shall be recalculated accordingly.

J.     The Lease is hereby ratified and confirmed and acknowledged to be in full force and effect, as modified by this First Amendment.  Tenant and Landlord each warrant and represent that the person(s) signing this First  Amendment on their behalf has authority to enter into this First Amendment and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  This First Amendment may be executed and delivered in multiple counterparts, each of which shall be effective as an original First Amendment.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

BELL  TOWER  PROPERTIES  LIMITED
PARTNERSHIP, a Delaware limited partnership

By:    MRP  Bell  Tower,  Inc.,  a  Delaware
corporation, general partner

By:
Name:    C. LOUIS MITSCH
Title:    VICE PRESIDENT

**TENANT:**

WITNESS:

BED BATH & BEYOND INC., a

By:
Name: Steven Temares
Title: President & Chief Op. Officer

Guaranty Federal Bank, F.S.B., as holder of a mortgage encumbering the Shopping Center dated September 30, 1996, as amended and recorded at Book 2749, page 1680 of the Official Records of Lee County, Florida, hereby consents to the foregoing amendment.

GUARANTY FEDERAL BANK, F.S.B.,, a
federal savings bank

By:
Name:    Scott Allen
Title:    Vice President

STATE OF TEXAS        §
COUTNY OF HARRIS   §


    The foregoing instrument was acknowledged before me this 30th day of November 2000, by R. Scott Allen, Vice President of Guaranty Federal Bank, F.S.B., a federal savings bank, on behalf of the association who is personally known to me or who has produced his driver's license as identification, and did take an oath.


Printed Name: _Anne Holik_____
Notary Public: _____
Commission Expires: _8-26-02_____
Serial Number: _____

ANNE HOLIK
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-26-2002

INSTR # 4901333

OR BK 03269 PG 1322

Prepared by and when Recorded Return to:

RECORDED 06/19/00 02:05 PM
CHARLIE GREEN CLERK OF COURT
LEE COUNTY
RECORDING FEE    55.50
DEPUTY CLERK B Thompson

Sharon Reider Babb, Esq.
Cole, Schotz, Meisel, Forman & Leonard, PC
Court Plaza North
25 Main Street
Hackensack, New Jersey 07602

_____

(The Above for Recorder's Use Only)

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT,
made as of the _ . . . _ day of May, 2000, by and between GUARANTY FEDERAL BANK,
F.S.B., a Federal Savings Bank, having an office at 8333 Douglas Avenue, Dallas, Texas 75225
(the "Lender") and Bed Bath & Beyond Inc., a New York corporation, having an office at 650
Liberty Avenue, Union, New Jersey 07083 (the "Tenant").

WITNESSETH:

WHEREAS, Lender is the holder of a mortgage dated September 30, 1996, as amended
and recorded at Book 2749, page 1680 in the Official Records of Lee County, Florida
(hereinafter called the "Mortgage") covering a parcel of land owned by BELL TOWER
PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership (hereinafter called
"Landlord") together with the improvements [to be] erected thereon (said parcel of land and
improvements thereon being.hereinafter referred to as the "Shopping Center" and being more
particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant
dated as of May 25, 2000 (the "Lease"), Landlord leased to Tenant a portion of the Shopping
Center, to wit, the premises designated the "Premises" on Exhibit B annexed hereto and made
a part hereof, together with the building or portion thereof located thereon (said premises and
the improvements thereon being hereinafter referred to as the "Premises"); and

WHEREAS, a copy of the Lease has been delivered to Lender, the receipt of which is
hereby acknowledged; and

WHEREAS, as an inducement to Tenant to enter into the Lease, Landlord has agreed to
obtain this Agreement from Lender; and

WHEREAS, the parties desire to effect the subordination of the Lease to the Mortgage
and to provide for the non-disturbance of Tenant by the holder of the Mortgage.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and
agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as
follows:

1.    Lender hereby consents to and approves the Lease and the term thereof,
including the options to extend the term as set forth in the Lease, and covenants and agrees

C:\WINDOWS\TEMP\189L202.WPD
April 3, 2000                                   1

that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Tenant covenants and agrees with Lender that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof, subject, however, to the provisions of this Agreement.

3.    Tenant certifies that the Lease is presently in full force and effect and unmodified and Tenant, as of this date, has no knowledge of any charge, lien or claim of offset under the Lease.

4.    Lender agrees that so long as the Lease shall be in full force and effect:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center and received by the Lender, shall be applied and paid in the manner set forth in the Lease.

5.    If Lender or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same

remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)      personally liable for any breach of the Lease by or any other act or omission of any prior landlord (including Landlord) except for any right to offset Tenant may have under the Lease, provided notice has been given to Lender as required herein;

(ii)      liable for the construction of any improvements required of Landlord under the Lease in the event such new owner acquires title to the Shopping Center prior to full completion and acceptance by Tenant of improvements required under the Lease; provided, however, such lack of liability on the part of such new owner pursuant to this subparagraph shall not affect Tenant's rights of self-help and offset or termination described in the Lease in the event of such failure to complete such improvements as long as Tenant has provided all applicable notices as required under the Lease and this Agreement. Notwithstanding the foregoing, it is expressly agreed that for purposes of this Section 5(b)(ii) only, the term "new owner" shall mean Lender, any affiliate of Lender or any successor or assign of Lender, but not any unrelated third party purchaser at foreclosure;

(iii)      bound by any rent or additional rent which Tenant might have paid for more than one month in advance to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(iv)      bound by any amendment or modification of the Lease made without its consent which would (x) reduce fixed annual rent, or (y) reduce any other monetary obligation of Tenant under the Lease or (z) increase the obligations of Landlord under the Lease.

Nothing in this Paragraph 5(b) shall be deemed a waiver of such new owner's obligation to cure any breach by or any other act or omission of any prior landlord (including Landlord) that continues during the period in which such new owner has possession or control of the Premises.

Notwithstanding the foregoing, Lender acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Lender agrees to recognize such amendments as part of the Lease, and Lender further agrees that such new owner shall also be bound by such amendments to the Lease, without any consent on the part of Lender or such new owner.

(c)      Tenant's obligations hereunder shall be effective only so long as Lender is bound to Lender's obligations hereunder.

(d)      The person or entity to whom Tenant attorns shall, unless or otherwise provided in this Paragraph 5, be liable to Tenant under the Lease only for matters arising during

C:\WINDOWS\TEMP\189L202.WPD
April 3, 2000                                        3

such person's or entity's period of ownership, and such liability shall terminate with respect to obligations arising after that date upon the transfer by such person or entity of its interest in the Lease and the Premises.

6. Tenant agrees to provide Lender, and the successor and assigns of Lender of which Tenant has received notice, with notice of any default by Landlord which would give rise to the right of Tenant to terminate of offset more than one month's rent due Landlord under the Lease (it being understood that a right of offset expressly set forth in the Lease shall not be affected by the aforesaid notice requirement), and thereafter, the opportunity to cure such default by Landlord within thirty (30) days following such notice. In addition, as to any non-monetary default by Landlord, the nature of which cannot be cured within said thirty (30) day period, provided only that Lender undertakes to Tenant by notice to Tenant within said thirty (30) days to exercise reasonable efforts to cure such default, Lender's cure period for such non-monetary default shall continue for such additional time as Lender may reasonably require to cure the default with reasonable diligence and continuity, not to exceed, however, ninety (90) days from the date of Lender's receipt of Tenant's notice of default on the part of Landlord. Lender shall have no obligation to cure or liability for not curing any default of Landlord, except (i) to the extent that Lender agrees or undertakes in writing, or (ii) if such default continues into the period during which Lender or such new owner has possession or control of the Premises. Notwithstanding the foregoing, Tenant can cure and offset as to emergencies by giving such notice and cure period to Lender as is reasonable under the circumstances.

7. Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

8. Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Lender, at the address of Lender as hereinabove set forth or at such other address or persons as Lender may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07601, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. During the period of any postal strike or other interference with the mail, personal delivery shall be substituted for registered or certified mail. No default notice given by Tenant under the Lease shall be effective as against Lender unless a duplicate copy thereof has been given to Lender.

After notice is given to Tenant by Lender pursuant to the Mortgage that the rental due under the Lease should be paid to Lender, Tenant shall pay to Lender, or in accordance with the directions of Lender, all rentals and other monies due and to become due to Landlord under the Lease, and Landlord hereby expressly authorizes Tenant to make such payments to Lender and hereby releases and discharges Tenant of and from any liability to landlord on account of any such payments, and any such payments shall continue until first to occur or (i)

the receipt by Tenant of a subsequent notice from Lender directing Tenant to make rental payments to a party other than Lender; (ii) the appointment of a receiver, in which event Tenant shall thereafter make payments of rents as may be directed by such receiver, or (iii) the issuance of a court order directing Tenant to make rental payments in a manner not consistent with Lender's prior notice.

9.     This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors and assigns.

10.     This Agreement may be executed in counterparts, each of which, when exchanged, shall be deemed an original.

11.     This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

12.     This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.



IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**Lender:**
GUARANTY FEDERAL BANK, F.S.B.,
a Federal Savings Bank

ATTEST:

(Assistant) Secretary

By: _____
Name: _____
Title: _____

**TENANT:**
BED BATH & BEYOND INC.
a New York corporation

ATTEST:

_____
(Assistant) Secretary

By: _____
          Warren Eisenberg
          Co-Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination,
Non-Disturbance and Attornment Agreement as of the day and year first above written.

ATTEST:

Lender:
GUARANTY FEDERAL BANK, F.S.B.,
a Federal Savings Bank

_____
(Assistant) Secretary

By:     _____
Name:   _____
Title:  _____

ATTEST:

TENANT:
BED BATH & BEYOND INC.
a New York corporation

_____
(Assistant) Secretary

By:     _____
            Steven H. Temares
            President - Chief Operating Officer

STATE OF TEXAS          )

COUNTY OF TRAVIS        )

On this 1st day of June, 2000, before me personally appeared Scott Allen to me know, who being by me duly sworn, did dispose and say that he is the Vice President of Guaranty Federal Bank, F.S.B., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

ANNE HOLIK
NOTARY PUBLIC
State of Texas
Comm. Exp. 06-26-2002

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

On this ___ day of _____, 2000, before me personally came Warren Eisenberg to me know, who being by me duly sworn, did depose and say that he is the C-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

C:\WINDOWS\TEMP\185L202.WPD
April 3, 2000

7

STATE OF TEXAS          )

COUNTY OF TRAVIS     )

    On this ___ day of _____, 2000, before me personally appeared _____
to me known, who being by me duly sworn, did dispose and say that he is the Vice President of
Guaranty Federal Bank, F.S.B., the corporation described in and which executed the above
instrument and that he signed his name thereto by order of the Board of Directors of said
corporation.

 

_____
               Notary Public

My Commission Expires:

_____


STATE OF NEW JERSEY     )
                   ) : ss.
COUNTY OF UNION          )

    On this 5th day of June, 2000, before me personally came Steven H. Temares to me
known, who being by me duly sworn, did depose and say that he is the President - Chief
Operating Officer of Bed Bath & Beyond Inc., the corporation described in and which executed
the above instrument and that he signed his name thereto by order of the Board of Directors of
said corporation.

 

_____
               Notary Public
My Commission Expires:               ARLENE WAGNER
                                   NOTARY PUBLIC OF NEW JERSEY
_____    My Commission Expires May 19, 2005

## EXHIBIT A

### Legal Description of the Shopping Center

A tract or parcel of land lying in the west half (W–1/2) of the northwest quarter (NW–1/4) of Section 24, Township 45 South, Range 24 East, Lee County, Florida which tract or parcel is described as follows:

From the concrete monument marking the intersection of the north line of said section with the easterly line of Tamiami Trail (State Road No. 45) (68 feet from the centerline) run S 01° 12' 46" E along said easterly line for 591.96 feet to the centerline of Big Pine Way S.E. and the Point of Beginning of the herein described parcel.

From said Point of Beginning continue S 01° 12' 46" E along said easterly line for 49.50 feet to the south line of said Big Pine Way S.E.; thence run N 89° 10' 00" E along said south line for 173.17 feet; thence run S 45° 50' 00" E for 21.21 feet; thence run S 00° 50' 00" E for 450.31 feet to a point of curvature; thence run southwesterly along the arc of a curve to the right of radius 90.00 feet (delta 25° 00' 00") (chord 33.96 feet) (chord bearing S 11° 40' 00" W) for 39.27 feet to a point of tangency; thence run S 24° 10' 00" W for 126.84 feet to a point of curvature; thence run southwesterly along the arc of a curve to the left of radius 157.89 feet (delta 25° 22' 46") (chord 69.37) (chord bearing S 11° 28' 37" W) for 69.94 feet to a point of tangency; thence run S 01° 12' 46" E for 147.33 feet; thence run S 88° 47' 14" W for 106.80 feet to said easterly line of Tamiami Trail; thence run S 01° 12' 46" E along said easterly line for 1041.30 feet to an intersection with the northerly right–of–way line (120 feet from the centerline) of Daniels Parkway; thence run N 89° 11' 50" E along said north right–of–way line for 1078.45 feet to the east line of Bell Tower Drive (a 75 foot roadway easement) thence run N 01° 12' 32" W along said east line for 445.26 feet; thence run N 89° 11' 50" E for 177.61 feet to an intersection with the east line of said west half (W–1/2) of the northwest quarter (NW–1/4); thence run N 01° 12' 32" W along said east line for 1060.12 feet to the southeast corner of lands described in deed recorded in Official Record Book 1815 at page 142, Lee County Records; thence run S 89° 11' 50" W along the south line of said lands for 453.76 feet to an intersection with the easterly line of said Bell Tower Drive; thence run N 40° 40' 00" W along said easterly line for 121.64 feet to a point of curvature; thence run northwesterly and northerly along the arc of a

J:\STORES\255\1891202.WPD
April 3, 2000

*Page 1 of 2*

curve to the right of radius 257.50 feet (delta 39° 50' 00") (chord 175.44 feet) (chord bearing N 20° 45' 00" W) for 179.02 feet to a point of tangency; thence run N 00° 50' 00" W for 123.51 feet to the northwest corner of said lands; thence run N 89° 10' 00" E along the north line of said lands for 588.93 feet to the northeast corner of said lands; thence run N 01° 12' 32" W for 37.50 feet to the centerline of said Big Pine Way S.E.; thence run S 89° 10' 00" W along said centerline for 1256.19 feet to the Point of Beginning.

Together with the following Roadway Easement appurtenant to the aforedescribed real estate property:

Roadway Easement created by those certain Easement Agreements recorded in Official Records Book 1555, at Page 1146, and Official Records Book 2720, at Page 1747, of the Public Records of Lee County, Florida.

EXHIBIT A
Page 2 of 2

**Prepared by and when Recorded Return to:**

Sharon Reider Babb, Esq.
Cole, Schotz, Meisel, Forman & Leonard, PC
Court Plaza North
25 Main Street
Hackensack, New Jersey 07602

---

**(The Above for Recorder's Use Only)**

<u>Subordination, Non-Disturbance and Attornment Agreement</u>

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _ . . . . day of May, 2000, by and between GUARANTY FEDERAL BANK, F.S.B., a Federal Savings Bank, having an office at 8333 Douglas Avenue, Dallas, Texas 75225 (the **"Lender"**) and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the **"Tenant"**).

W I T N E S S E T H :

WHEREAS, Lender is the holder of a mortgage dated September 30, 1996, as amended and recorded at Book 2749, page 1680 in the Official Records of Lee County, Florida (hereinafter called the **"Mortgage"**) covering a parcel of land owned by BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership (hereinafter called **"Landlord"**) together with the improvements **[to be]** erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the **"Shopping Center"** and being more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of May 25, 2000 (the **"Lease"**), Landlord leased to Tenant a portion of the Shopping Center, to wit, the premises designated the "Premises" on <u>Exhibit B</u> annexed hereto and made a part hereof, together with the building or portion thereof located thereon (said premises and the improvements thereon being hereinafter referred to as the **"Premises"**); and

WHEREAS, a copy of the Lease has been delivered to Lender, the receipt of which is hereby acknowledged; and

WHEREAS, as an inducement to Tenant to enter into the Lease, Landlord has agreed to obtain this Agreement from Lender; and

WHEREAS, the parties desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by the holder of the Mortgage.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Lender hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees

that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Lender that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof, subject, however, to the provisions of this Agreement.

3.      Tenant certifies that the Lease is presently in full force and effect and unmodified and Tenant, as of this date, has no knowledge of any charge, lien or claim of offset under the Lease.

4.      Lender agrees that so long as the Lease shall be in full force and effect:

(a)      Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)      The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)      All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center and received by the Lender, shall be applied and paid in the manner set forth in the Lease.

5.      If Lender or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)      Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)      Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same

remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

    (i)    personally liable for any breach of the Lease by or any other act or omission of any prior landlord (including Landlord) except for any right to offset Tenant may have under the Lease, provided notice has been given to Lender as required herein;

    (ii)    liable for the construction of any improvements required of Landlord under the Lease in the event such new owner acquires title to the Shopping Center prior to full completion and acceptance by Tenant of improvements required under the Lease; provided, however, such lack of liability on the part of such new owner pursuant to this subparagraph shall not affect Tenant's rights of self-help and offset or termination described in the Lease in the event of such failure to complete such improvements as long as Tenant has provided all applicable notices as required under the Lease and this Agreement. Notwithstanding the foregoing, it is expressly agreed that for purposes of this Section 5(b)(ii) only, the term "new owner" shall mean Lender, any affiliate of Lender or any successor or assign of Lender, but not any unrelated third party purchaser at foreclosure;

    (iii)    bound by any rent or additional rent which Tenant might have paid for more than one month in advance to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

    (iv)    bound by any amendment or modification of the Lease made without its consent which would (x) reduce fixed annual rent, or (y) reduce any other monetary obligation of Tenant under the Lease or (z) increase the obligations of Landlord under the Lease.

Nothing in this Paragraph 5(b) shall be deemed a waiver of such new owner's obligation to cure any breach by or any other act or omission of any prior landlord (including Landlord) that continues during the period in which such new owner has possession or control of the Premises.

Notwithstanding the foregoing, Lender acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises) and, by its execution below, Lender agrees to recognize such amendments as part of the Lease, and Lender further agrees that such new owner shall also be bound by such amendments to the Lease, without any consent on the part of Lender or such new owner.

    (c)    Tenant's obligations hereunder shall be effective only so long as Lender is bound to Lender's obligations hereunder.

    (d)    The person or entity to whom Tenant attorns shall, unless or otherwise provided in this Paragraph 5, be liable to Tenant under the Lease only for matters arising during

such person's or entity's period of ownership, and such liability shall terminate with respect to obligations arising after that date upon the transfer by such person or entity of its interest in the Lease and the Premises.

6.      Tenant agrees to provide Lender, and the successor and assigns of Lender of which Tenant has received notice, with notice of any default by Landlord which would give rise to the right of Tenant to terminate of offset more than one month's rent due Landlord under the Lease (it being understood that a right of offset expressly set forth in the Lease shall not be affected by the aforesaid notice requirement), and thereafter, the opportunity to cure such default by Landlord within thirty (30) days following such notice. In addition, as to any non-monetary default by Landlord, the nature of which cannot be cured within said thirty (30) day period, provided only that Lender undertakes to Tenant by notice to Tenant within said thirty (30) days to exercise reasonable efforts to cure such default, Lender's cure period for such non-monetary default shall continue for such additional time as Lender may reasonably require to cure the default with reasonable diligence and continuity, not to exceed, however, ninety (90) days from the date of Lender's receipt of Tenant's notice of default on the part of Landlord. Lender shall have no obligation to cure or liability for not curing any default of Landlord, except (i) to the extent that Lender agrees or undertakes in writing, or (ii) if such default continues into the period during which Lender or such new owner has possession or control of the Premises. Notwithstanding the foregoing, Tenant can cure and offset as to emergencies by giving such notice and cure period to Lender as is reasonable under the circumstances.

7.      Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

8.      Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Lender, at the address of Lender as hereinabove set forth or at such other address or persons as Lender may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07601, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. During the period of any postal strike or other interference with the mail, personal delivery shall be substituted for registered or certified mail. No default notice given by Tenant under the Lease shall be effective as against Lender unless a duplicate copy thereof has been given to Lender.

After notice is given to Tenant by Lender pursuant to the Mortgage that the rental due under the Lease should be paid to Lender, Tenant shall pay to Lender, or in accordance with the directions of Lender, all rentals and other monies due and to become due to Landlord under the Lease, and Landlord hereby expressly authorizes Tenant to make such payments to Lender and hereby releases and discharges Tenant of and from any liability to landlord on account of any such payments, and any such payments shall continue until first to occur or (i)

the receipt by Tenant of a subsequent notice from Lender directing Tenant to make rental payments to a party other than Lender; (ii) the appointment of a receiver, in which event Tenant shall thereafter make payments of rents as may be directed by such receiver, or (iii) the issuance of a court order directing Tenant to make rental payments in a manner not consistent with Lender's prior notice.

9.     This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors and assigns.

10.     This Agreement may be executed in counterparts, each of which, when exchanged, shall be deemed an original.

11.     This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

12.     This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

ATTEST:

Lender:
GUARANTY FEDERAL BANK, F.S.B.,
    a Federal Savings Bank

_Cindy Hanley_
(Assistant) Secretary

By: _Scott Allen_
Name: _Scott Allen_
Title: _Vice President_

ATTEST:

TENANT:
BED BATH & BEYOND INC.
    a New York corporation

_____
(Assistant) Secretary

By: _____
    Warren Eisenberg
    Co-Chief Executive Officer

9.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors and assigns.

10.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

11.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

ATTEST:

<u>Lender:</u>
GUARANTY FEDERAL BANK, F.S.B.,
    a Federal Savings Bank

_____
(Assistant) Secretary

By:    _____
Name:  _____
Title: _____

ATTEST:

<u>TENANT:</u>
BED BATH & BEYOND INC.
    a New York corporation

_____
(Assistant) Secretary

By:    _____  AME
        Warren Eisenberg
        Co-Chief Executive Officer

A:\SNDA.WPD
April 3, 2000

STATE OF TEXAS            )

COUNTY OF TRAVIS         )

    On this 1st day of June, 2000, before me personally appeared Scott Allen to me know, who being by me duly sworn, did dispose and say that he is the Vice President of Guaranty Federal Bank, F.S.B., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____9-26-02_____

ANNE HOLIK
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-26-2002

STATE OF NEW JERSEY      )
                         ) : ss.
COUNTY OF UNION          )

    On this ___ day of _____, 2000, before me personally came Warren Eisenberg to me know, who being by me duly sworn, did depose and say that he is the C-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

STATE OF TEXAS            )

COUNTY OF TRAVIS         )

On this ___ day of _____, 2000, before me personally appeared _____
to me know, who being by me duly sworn, did dispose and say that he is the Vice President of
Guaranty Federal Bank, F.S.B., the corporation described in and which executed the above
instrument and that he signed his name thereto by order of the Board of Directors of said
corporation.

_____
Notary Public

My Commission Expires:

_____

STATE OF NEW JERSEY     )
                        ) : ss.
COUNTY OF UNION         )

On this 12 day of __MAY__, 2000, before me personally came Warren Eisenberg
to me know, who being by me duly sworn, did dispose and say that he is the C-Chief Executive
Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above
instrument and that he signed his name thereto by order of the Board of Directors of said
corporation.

_____
Notary Public

My Commission Expires:

___MARISOL BAEZ_____
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 1/13/2005

A:\SNDA.WPD
April 3, 2000

Exhibit A

Legal Description of Shopping Center

DESCRIPTION
PARCEL IN THE W-1/2 OF THE NW-1/4
SECTION 24, T. 45 S., R. 24 E.
LEE COUNTY, FLORIDA

A tract or parcel of land lying in the west half (W-1/2) of the northwest quarter (NW-1/4) of Section 24, Township 45 South, Range 24 East, Lee County, Florida which tract or parcel is described as follows:

From the concrete monument marking the intersection of the north line of said section with the easterly line of Tamiami Trail (State Road No. 45) (68 feet from the centerline) run S 01° 12' 46" E along said easterly line for 591.96 feet to the centerline of Big Pine Way S.E. and the Point of Beginning of the herein described parcel.

From said Point of Beginning continue S 01° 12' 46" E along said easterly line for 49.50 feet to the south line of said Big Pine Way S.E.; thence run N 89° 10' 00" E along said south line for 173.17 feet; thence run S 45° 50' 00" E for 21.21 feet; thence run S 00° 50' 00" E for 450.31 feet to a point of curvature; thence run southwesterly along the arc of a curve to the right of radius 90.00 feet (delta 25° 00' 00") (chord 38.96 feet) (chord bearing S 11° 40' 00" W) for 39.27 feet to a point of tangency; thence run S 24° 10' 00" W for 126.84 feet to a point of curvature; thence run southwesterly along the arc of a curve to the left of radius 157.89 feet (delta 25° 22' 46") (chord 69.37) (chord bearing S 11° 28' 37" W) for 69.94 feet to a point of tangency; thence run S 01° 12' 46" E for 147.33 feet; thence run S 88° 47' 14" W for 106.80 feet to said easterly line of Tamiami Trail; thence run S 01° 12' 46" E along said easterly line for 1041.30 feet to an intersection with the northerly right-of-way line (120 feet from the centerline) of Daniels Parkway; thence run N 89° 11' 50" E along said north right-of-way line for 1078.45 feet to the east line of Bell Tower Drive (a 75 foot roadway easement) thence run N 01° 12' 32" W along said east line for 445.26 feet; thence run N 89° 11' 50" E for 177.61 feet to an intersection with the east line of said west half (W-1/2) of the northwest quarter (NW-1/4); thence run N 01° 12' 32" W along said east line for 1060.72 feet to the southeast corner of lands described in deed recorded in Official Record Book 1815 at page 142, Lee County Records; thence run S 89° 11' 50" W along the

A-1

Exhibit A

(Cont)

south line of said lands for 453.76 feet to an intersection with the easterly line of said Bell Tower Drive; thence run N 40° 40' 00" W along said easterly line for 121.64 feet to a point of curvature; thence run northwesterly and northerly along the arc of a curve to the right of radius 257.50 feet (delta 39° 50' 00") (chord 175.44 feet) (chord bearing N 20° 45' 00" W) for 179.02 feet to a point of tangency; thence run N 00° 50' 00" W for 123.51 feet to the northwest corner of said lands; thence run N 89° 10' 00" E along the north line of said lands for 588.93 feet to the northeast corner of said lands; thence run N 01° 12' 32" W for 37.50 feet to the centerline of said Big Pine Way S.E.; thence run S 89° 10' 00" W along said centerline for 1256.19 feet to the Point of Beginning.

Together with the following Roadway Easement appurtenant to the aforedescribed real estate property:

Roadway Easement created by those certain Easement Agreements recorded in Official Records Book 1555, at Page 1146, and Official Records Book 2720, at Page 1747, of the Public Records of Lee County, Florida.

A-2

OR BK 03269 PG 1333

SAKS 5IA AVENUE

JACOBSONS

TAMIAMI TRAIL (U.S.41)

BELL TOWER DRIVE

DANIELS PARKWAY

EXHIBIT "B" Site Plan

BED BATH & BEYOND

Burt Hill /Pollock Krieg Architects, Inc.

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE ("*Amendment*"), dated as of the 22ⁿᵈ day of December , 2014 by and between BELL TOWER SHOPS, LLC, a Delaware limited liability company ("*Landlord*"), having an office c/o Madison Marquette Realty Services, 2001 Pennsylvania Avenue NW, 19ᵗʰ Floor, Washington, D.C. 20006 and BED BATH & BEYOND INC., a New York corporation ("*Tenant*"), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

## W I T N E S S E T H :

WHEREAS, Landlord, as successor-in-interest to Bell Tower Properties Limited Partnership, and Tenant are parties to that certain Lease Agreement dated as of May 25, 2000 ("*Original Lease*"), with respect to premises ("*Premises*") consisting of 30,587 square feet of Floor Area in the shopping center known as The Bell Tower Shops, located in Fort Myers, Florida ("*Shopping Center*"); and

WHEREAS, the Original Lease was amended or supplemented by First Amendment to Lease Agreement dated as of November 15, 2000, Rent Commencement and Expiration Date Agreement dated as of August 14, 2001 ("*RCEDA*"), and notice letters regarding Landlord's address, one of which is undated and the other dated August 21, 2009 (collectively, as amended, the "*Lease*"); and

WHEREAS, the Initial Term of the Lease currently is scheduled to expire on January 31, 2017; and

WHEREAS, Landlord acknowledges that Tenant would not have extended the Term at the current rental rate set forth in the Lease for the first Renewal Period; and

WHEREAS, Landlord and Tenant desire to, among other things, extend the Term of the Lease and adjust the Fixed Rent, on the terms and conditions hereinafter set forth; and

WHEREAS, Landlord and Tenant desire to further amend the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Amendment and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Amendment by this reference.  Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Anything contained in the Lease to the contrary notwithstanding, Landlord and Tenant hereby agree that the Initial Term of the Lease shall be extended for ten (10) years and shall now expire on January 31, 2027.  Accordingly, Section 1.1.42 (Term) of the Original Lease is hereby deleted in its entirety and the following language shall be substituted in lieu thereof:

> "A period (the "*Initial Term*") of approximately twenty-five (25) years beginning on the Rent Commencement Date (*i.e.*, July 8, 2001) and ending at 11:59 P.M. on January 31, 2027 (the "*Expiration Date*").  As used herein, "*Term*" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below."

Tenant is leasing the Premises during the extension of the Initial Term (*i.e.*, February 1, 2017 through January 31, 2027) in its "as-is" condition and Landlord shall not be obligated to make any alterations, decorations, additions or improvements in connection therewith, but the foregoing shall not affect any of Landlord's ongoing repair and maintenance obligations as provided in the Lease.

BBBY #285
2518763.v3

3.      Landlord and Tenant agree that the second and third Renewal Options set forth in Section 2.2.2 (Renewal Options) of the Original Lease shall remain in full force and effect and subject to the Fixed Rent set forth in Section 1.1.11 of the Original Lease, as modified by this Amendment.  Accordingly, the parties agree that Sections 4 and 5 of the RCEDA are no longer applicable, and the dates of the second and third Renewal Periods, if exercised in accordance with the Lease, shall be as set forth in this Section 3.  Further, subject to the provisions of Section 2.2.2 of the Original Lease, the parties agree that the dates by which the second and third Renewal Options must be exercised are as follows:

| Renewal Period | Renewal Period Dates | Option Exercise Date |
|---|---|---|
| Second Renewal Period | February 1, 2027 – January 31, 2032 | May 7, 2026 |
| Third Renewal Period | February 1, 2032 – January 31, 2037 | May 7, 2031 |

4.      The definition of Fixed Rent set forth in Section 1.1.11 (Fixed Rent) of the Original Lease is hereby deleted in its entirety and the following language shall be substituted in lieu thereof:

"The following amounts for the periods indicated:

(a)      For the period commencing on the Rent Commencement Date (*i.e.*, July 8, 2001) and ending on the first January 31 occurring after the fourth (4th) anniversary of the Rent Commencement Date (i.e., January 31, 2006), at the rate of Three Hundred Sixty-Seven Thousand, Forty-Four and 00/100 Dollars ($367,044.00) per year [based on Twelve and 00/100 Dollars ($12.00) per square foot of Floor Area in the Premises];

(b)      For the period commencing on the first February 1 occurring after the fourth (4th) anniversary of the Rent Commencement Date (*i.e.*, February 1, 2006) and ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date (*i.e.*, January 31, 2012), at the rate of Three Hundred Ninety-Seven Thousand, Six Hundred Thirty-One and 00/100 Dollars ($397,631.00) per year [based on Thirteen and 00/100 Dollars ($13.00) per square foot of Floor Area in the Premises];

(c)      For the period commencing on the first February 1 occurring after the tenth (10th) anniversary of the Rent Commencement Date (*i.e.*, February 1, 2012) and ending on the first January 31 occurring after the fifteenth (15th) anniversary of the Rent Commencement Date (*i.e.*, January 31, 2017), at the rate of Four Hundred Twenty-Eight Thousand, Two Hundred Eighteen and 00/100 Dollars ($428,218.00) per year [based on Fourteen and 00/100 Dollars ($14.00) per square foot of Floor Area in the Premises];

(d)      For the period commencing on the first February 1 occurring after the fifteenth (15th) anniversary of the Rent Commencement Date (*i.e.*, February 1, 2017) and ending on the last day of the Initial Term (*i.e.*, January 31, 2027), at the rate of Three Hundred Ninety-Seven Thousand, Six Hundred Thirty-One and 00/100 Dollars ($397,631.00) per year [based on Thirteen and 00/100 Dollars ($13.00) per square foot of Floor Area in the Premises];

(e)      In the event Tenant exercises the second Renewal Option (*i.e.*, from February 1, 2027 through January 31, 2032), for the first five (5) year Renewal Period, at the rate of Four Hundred Twenty-Eight Thousand, Two Hundred Eighteen and 00/100 Dollars ($428,218.00) per year [based on Fourteen and 00/100 Dollars ($14.00) per square foot of Floor Area in the Premises];

2

(f)     In the event Tenant exercises the third Renewal Option (*i.e.*, from February 1, 2032 through January 31, 2037), for the second five (5) year Renewal Period, at the rate of Four Hundred Fifty-Eight Thousand, Eight Hundred Five and 00/100 Dollars ($458,805.00) per year [based on Fifteen and 00/100 Dollars ($15.00) per square foot of Floor Area in the Premises];

5.     Intentionally Omitted.

6.     Intentionally Omitted.

7.     Intentionally Omitted.

8.     The following Sections 8.1.8 and 8.1.9 shall be deemed added to Article 8 (Alterations and Improvements) of the Original Lease:

"8.1.8   Tenant shall have the exclusive right to erect and maintain on the roof of the Premises, a passive solar array for the production of electricity (the *"System"*), provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the System, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while the System is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any component of the System, (v) places the System to the extent reasonably possible so as not to be visible from the Common Areas open to the public, including, if reasonably necessary, appropriate screening; and (vi) erects and maintains the System in accordance with applicable Legal Requirements and the then-current Tenant Design and Construction Handbook.  The System shall be deemed to be part of Tenant's Property.  Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator of the System and Landlord shall have no right, title or interest in such equipment or any component thereof, notwithstanding that any such equipment may be physically mounted or adhered to the Premises.  In the event that Landlord is required under this Lease to repair and/or replace the roof or any portion thereof and Landlord determines that the System interferes with Landlord's ability to repair and/or replace the roof or any portion thereof, Tenant shall pay the entire cost of removal of the System so that Landlord may make such repairs and/or replacement. Provided the System may be removed without permanently damaging the roof or any building system, and upon such removal, the roof can be returned to the condition existing prior to the installation of the  System (or otherwise in a condition acceptable to Landlord in the exercise of its reasonable discretion), Tenant shall have the right to remove the System at the expiration or earlier termination of the Lease, provided Tenant repairs any and all damage caused by such removal and returns the roof to the condition existing prior to the installation of the System (subject to reasonable wear and tear), at Tenant's sole cost and expense.  In the event the System cannot be removed in a manner that would permit Tenant to return the roof to the condition existing prior to the installation of the System (subject to reasonable wear and tear), then Tenant shall not remove the System, and instead shall execute such documents as reasonably may be necessary to convey ownership of the System to Landlord at the expiration or earlier termination of this Lease. Notwithstanding the foregoing, Landlord, at its option, may require Tenant to remove the System at the expiration or earlier termination of the Lease, with Tenant repairing any and all damage caused by such removal and returning the roof to the condition existing prior to the installation of the System (subject to reasonable wear and tear), at Tenant's sole cost and expense.

Landlord acknowledges and agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the

BBBY #285
#34246881_v3

sole and exclusive owner of: (a) the electricity generated by the System, (b) the environmental attributes of the System, and (c) any and all Incentives (as hereinafter defined) resulting from the environmental or related attributes of the System. Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System.

8.1.9   Tenant shall be entitled to receive any and all "*Incentives*" (hereinafter defined) which Tenant may negotiate with, or derive from governmental, non-governmental, private or public utility, or other entities pertaining to construction and/or remodeling (including without limitation Tenant's Work) of the Premises, hiring of employees, or other business operations of Tenant within the Premises which would cause an owner or occupant of the Premises to be entitled to an Incentive. For purposes of this Section 8.1.9, the phrase "within the Premises" shall include the installation of the System on the roof above the Premises. As used herein, the term "*Incentive*" shall include, without limitation, any cost reduction, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, sales tax refunds or grants, tax credits, governmental grants, utility rebates or refunds, or any other benefit or amount negotiated by, or otherwise allowed to Tenant). If any such Incentive to which Tenant is entitled hereunder is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Incentive in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Incentive during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Incentive, Landlord shall pay Tenant such amount."

9.      Section 1.1.19 of the Original Lease is hereby deleted in its entirety and the following language substituted in lieu thereof:

"Bell Tower Shops, LLC, c/o Madison Marquette, 2001 Pennsylvania Avenue NW, 10th Floor, Washington, DC 20006, Attn: Chief Financial Officer, or such other place and or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof. Notwithstanding the foregoing, all Rent payments shall be delivered to Bell Tower Shops, LLC-026010, P.O. Box 310300, Des Moines, IA 50331-0300."

10.     Article 18 of the Lease shall be modified as follows:

(a) in lieu of David Huprich, Esq., copies of notices to Landlord shall be sent to (i) Bell Tower Shops, LLC, c/o Madison Marquette, Director of Legal Services and Risk Management, 2001 Pennsylvania Avenue, NW, Suite 1000, Washington DC, 20006, Attn: Laurie Dombroff; and (ii) Bell Tower Shops LLC, c/o Principal Real Estate Investors, 711 High Street, Des Moines, IA 50392-1370, Attn: G-022-500.

(b) in lieu of Edward Schotz, Esq., copies of notices to Tenant shall be sent to Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102, Attn: Karen Levine, Esq.

11.     Tenant shall have no option to further extend the Term of the Lease beyond the third Renewal Period (which would end on January 31, 2037).

12.     Each of Landlord and Tenant certifies that (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person", or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets

BBBY #285
#34246881_v3

Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation. Notwithstanding anything to the contrary contained herein, Landlord recognizes that Tenant's parent company is a publicly traded company with multiple shareholders, many of whose identities are unknown to it.

13.    It is the policy of Tenant and its subsidiaries and affiliates (collectively, "the *Company*") to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act). No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services. This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Amendment, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.

14.    Upon the request of either party following the execution and delivery of this Amendment, Landlord and Tenant shall execute an amended/restated short form lease or memorandum for recording, which shall be in form and substance as reasonably acceptable to both parties. In no event shall the amount of Rent or any other monetary terms hereof be included in any such short form lease or memorandum. Further, after the expiration or earlier termination of the Lease, Tenant agrees, upon Landlord's request, to execute and deliver a termination of such short form lease or memorandum in recordable form and this obligation shall survive expiration or termination of the Lease. Tenant shall record any such short form lease or memorandum at Tenant's expense.

15.    Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment, other than Madison Marquette. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Amendment in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. Landlord shall be solely responsible for any commission due Madison Marquette, pursuant to a separate agreement between Landlord and Madison Marquette. The provisions of this Section shall survive the expiration or earlier termination of the Lease

16.    Landlord represents and warrants to Tenant that, as of the date hereof (i) the Shopping Center is not encumbered by any mortgage or deed of trust, and (ii) no third-party consents or approvals are required in order for the terms and provisions of this Amendment to be in full force and effect.

17.    The terms and conditions of this Amendment shall be binding upon, and inure to the benefit of, Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns. Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect. In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Amendment, the terms and provisions of this Amendment shall govern and control.

18.    This Amendment may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Amendment to Lease.

[Signature Page to Follow]

5

BBBY #285
#34246881_v3

IN WITNESS WHEREOF, the parties hereto have executed this Amendment to Lease as of the day and year first above written.

**LANDLORD:**

BELL TOWER SHOPS, LLC,
a Delaware limited liability company

By:  Madison Realty Partnership LLC,
     a Delaware limited liability company, manager

    By:  Madison Realty Corporation,
       a Delaware corporation, manager

      By: _____
      Name: _____ Jay Cosk _____
      Title: _____ Authorized Agent _____

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Name:  Steven H. Temares
Title:  Chief Executive Officer

BBBY #285
2518763 v3

**Prepared by and after Recording, Return to**:
Scott Smith, Esq.
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083

(The Above Space for Recorder's Use Only)

## AMENDMENT TO MEMORANDUM OF LEASE

   **THIS AMENDMENT TO MEMORANDUM OF LEASE**, made as of
*December 22* , 2014, by and between **BELL TOWER SHOPS, LLC**, a Delaware limited
liability company ("*Landlord*"), having an office c/o Madison Marquette Realty Services, 2001
Pennsylvania Avenue NW, 19th Floor, Washington, D.C. 20006, and **BED BATH & BEYOND
INC.**, a New York corporation ("*Tenant*"), having an office at 650 Liberty Avenue, Union, New
Jersey 07083.

   1.  Landlord and Tenant are parties to a lease dated May 25, 2000 (the "*Original
Lease*"), pursuant to which Landlord leased to Tenant a portion (the "*Premises*") of that certain
shopping center (the "*Shopping Center*") commonly known as The Bell Tower Shops, located in
Fort Myers, Florida, which Shopping Center is more particularly described on Exhibit A attached
hereto and made a part hereof.  A Memorandum of Lease dated as of May 25, 2000 (*"MOL"*)
evidencing the Original Lease was recorded on June 21, 2000 in the Office of the Clerk of the
Lee County, Florida as Instrument #4903471, in Book 03270, Page 1333.  Prior to the date
hereof Landlord and Tenant entered into a First Amendment to Lease Agreement, and
simultaneously herewith Landlord and Tenant are entering into a Second Amendment to Lease
(*"Second Amendment"*) (the Original Lease, as previously amended, and the Second
Amendment shall be collectively referred to herein as the "*Lease*").  The Second Amendment
has extended the Term of the Lease through January 31, 2027.  In connection therewith, the
parties have entered into this Amendment to Memorandum of Lease to reflect the new Term of
the Lease.

   2.  Under the terms of the Second Amendment, Tenant has extended the Term of the
Lease through January 31, 2027.  The Term of the Lease may be further extended for two (2)
additional periods (each, a "*Renewal Period*") of five (5) years each after the expiration of the
Term, as extended pursuant to the Second Amendment.  Each Renewal Period shall be subject to
all the terms and conditions of the Lease (as amended) as if the Term, as extended pursuant to
the Second Amendment, originally included each such Renewal Period.

   3.  Except as expressly amended herein, all other terms and conditions of the MOL
shall remain in full force and effect and are hereby ratified and confirmed by the parties hereto.

   4.  This Amendment to Memorandum of Lease shall be binding upon the parties
hereto, their respective successors and assigns.

5.      This Amendment to Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, and is not intended, and shall not be construed, to define, limit or modify the Lease. The Lease contains numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions.  The Lease and exhibits thereto are hereby incorporated by reference in this Amendment to Memorandum of Lease and the parties hereby ratify and confirm the Lease.  In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control.

6.      Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

[Remainder of Page Left Intentionally Blank]



**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment to Memorandum of Lease as of the day and year first above written.

| WITNESS: | **LANDLORD:** |
|---|---|
| | BELL TOWER SHOPS, LLC, a Delaware limited liability company |
| | By: Madison Realty Partnership LLC, a Delaware limited liability company, manager |
| _(signature)_ | By: Madison Realty Corporation, a Delaware corporation, manager |
| [SEAL] | By: _(signature)_ <br> Name: _Jay Lask_ <br> Title: _Authorized Agent_ |

DISTRICT OF COLUMBIA                    )
                                                            ) SS

The foregoing instrument was acknowledged before me this _22nd_ day of _December_, 2014, by _Jay Lask_, the _Authorized Agent_ of Madison Realty Corporation, a Delaware corporation, which is the manager of Madison Realty Partnership LLC, a Delaware limited liability company, which is the manager of Bell Tower Shops, LLC, a Delaware limited liability company, on behalf of the limited liability company, as Landlord.

_(signature)_
Notary Public

My Commission Expires:

NISHA BHATT
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires October 14, 2019

2518788 v3

3



| WITNESS: | TENANT: |
|---|---|
| | BED BATH & BEYOND INC., a New York corporation |
| _Scott R. Smith_ | By: _____ |
| | Name: Steven H. Temares |
| | Title: Chief Executive Officer |
| [SEAL] | |

STATE OF NEW JERSEY )
                      ) ss.:
COUNTY OF UNION      )

On this _18_ day of November, 2014, before me personally came Steven Temares to me known, who being by me duly sworn, did depose and say that he is Chief Executive Officer of BED BATH & BEYOND INC., the New York corporation described in and which executed the above instrument; and that he signed his name thereto by order of the Board of Directors of BED BATH & BEYOND INC.

_____
Notary Public

My Commission Expires:

KATHLEEN CURRIE
ID # 17737
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires Nov. 2, 2018

EXHIBIT A

LEGAL DESCRIPTION OF SHOPPING CENTER
DESCRIPTION
PARCEL IN THE W–1/2 OF THE NW–1/4
SECTION 24, T. 45 S., R. 24 E.
LEE COUNTY, FLORIDA

A tract or parcel of land lying in the west half (W–1/2) of the northwest quarter (NW–1/4) of Section 24, Township 45 South, Range 24 East, Lee County, Florida which tract or parcel is described as follows:

From the concrete monument marking the intersection of the north line of said section with the easterly line of Tamiami Trail (State Road No. 45) (68 feet from the centerline) run S 01° 12' 46" E along said easterly line for 591.96 feet to the centerline of Big Pine Way S.E. and the Point of Beginning of the herein described parcel.

From said Point · of Beginning continue S 01° 12' 46" E along said easterly line for 49.50 feet to the south line of said Big Pine Way S.E.; thence run N 89° 10' 00" E along said south line for 173.17 feet; thence run S 45° 50' 00" E for 21.21 feet; thence run S 00° 50' 00" E for 450.31 feet to a point of curvature; thence run southwesterly along the arc of a curve to the right of radius 90.00 feet (delta 25° 00' 00") (chord 38.96 feet) (chord bearing S 11° 40' 00" W) for 39.27 feet to a point of tangency; thence run S 24° 10' 00" W for 126.84 feet to a point of curvature; thence run southwesterly along the arc of a curve to the left of radius 157.89 feet (delta 25° 22' 46") (chord 69.37) (chord bearing S 11° 28' 37" W) for 69.94 feet to a point of tangency; thence run S 01° 12' 46" E for 147.33 feet; thence run S 88° 47' 14" W for 106.80 feet to said easterly line of Tamiami Trail; thence run S 01° 12' 46" E along· said easterly line for 1041.30 feet to an intersection with the northerly right-of-way line (120 feet from the centerline) of Daniels Parkway; thence run N 89° 11' 50" E along said north right-of-way line for 1078.45 feet to the east line of Bell Tower Drive (a 75 foot roadway easement) thence run N 01° 12' 32" W along said east line for 445.26 feet; thence run N 89° 11' 50" E for 177.61 feet to an intersection with the east line of said west half · (W–1/2) of the northwest quarter (NW–1/4); thence run N 01° 12' 32" W along said east line for 1060.72 feet to the southeast corner of lands described in deed recorded in Official Record Book 1815 at page 142, Lee County Records; thence run S 89° 11' 50" W along the

(Cont)

south line of said lands for 453.76 feet to an intersection with the easterly line of said Bell Tower Drive; thence run N 40° 40' 00" W along said easterly line for 121.64 feet to a point of curvature; thence run northwesterly and northerly along the arc of a curve to the right of radius 257.50 feet (delta 39° 50' 00") (chord 175.44 feet) (chord bearing N 20° 45' 00' W) for 179.02 feet to a point of tangency; thence run N 00° 50' 00" W for 123.51 feet to the northwest corner of said lands; thence run N 89° 10' 00" E along the north line of said lands for 588.93 feet to the northeast corner of said lands; thence run N 01° 12' 32" W for 37.50 feet to the centerline of said Big Pine Way S.E.; thence run S 89° 10' 00" W along said centerline for 1256.19 feet to the Point of Beginning.

Together with the following Roadway Easement appurtenant to the aforedescribed real estate property:

Roadway Easement created by those certain Easement Agreements recorded in Official Records Book 1555, at Page 1146, and Official Records Book 2720, at Page 1747, of the Public Records of Lee County, Florida.

## THIRD AMENDMENT TO LEASE AGREEMENT

THIS THIRD AMENDMENT TO LEASE AGREEMENT (this "Amendment") is made and entered effective as of this _11_ day of _January_, 201_5_, by and between BELL TOWER SHOPS, LLC, a Delaware limited liability company, successor-in-interest to Bell Tower Properties Limited Partnership, a Delaware limited partnership ("Landlord"), and BED BATH & BEYOND INC., a New York corporation ("Tenant").

### RECITALS

A.      Landlord and Tenant are party to that certain Lease Agreement dated as of May 25, 2000, as amended by that certain First Amendment to Lease Agreement dated as of November 15, 2000 and by that certain Second Amendment to Lease dated as of December 22, 2014 (collectively, the "Lease"), with respect to approximately 30,587 square feet of Floor Space and 980 square feet of mezzanine level space (the "Premises") located in the shopping center currently known as the Bell Tower Shopping Center located in Fort Myers, Florida, as more particularly described in the Lease.

B.      The parties desire to amend the Lease upon the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the terms and conditions of this Amendment, the receipt and sufficiency of which are hereby acknowledged, the Lease is hereby amended as follows:

1.      Capitalization. Unless otherwise defined herein, words capitalized in this Amendment shall have the meanings given them in the Lease.

2.      Consent to D&B. Tenant acknowledges that Landlord is involved in negotiations to enter into a lease of certain space more particularly depicted on Exhibit A attached hereto and incorporated herein ("D&B Premises") to Dave and Buster's of Florida, Inc. or its affiliate (collectively, "D&B"). Tenant acknowledges and agrees that D&B intends to use the D&B Premises for an entertainment-recreation amusement-restaurant-bar complex substantially similar to the majority of other Dave & Buster's facilities in the country providing goods and services, which goods and services may primarily include, but not be limited to, the provision, sale, rental and use for pecuniary consideration, virtual reality games, video games, arcade games/amusement games, rides and amusements, billiards, golf simulation, play-for-fun blackjack and other amusements, food, beverages (alcoholic and non-alcoholic), branded apparel, party and catering facilities and play areas (some of which games, rides, etc. may provide for the opportunity to win prizes and/or other benefits, e.g., additional free games, by direct reward or through any other method, either directly or via a process of redemption) (collectively, the "D&B Use"). Additionally, the D&B Use may include use of the D&B Premises for the operation of a restaurant, a related bar, private banquet rooms and an amusement/entertainment complex. The D&B Use shall not be deemed a violation of Tenant's use restrictions as set forth in the Lease, including, but not limited to, the restrictions in Exhibit M of the Lease. Further, Tenant hereby consents to D&B's use of the D&B Premises for the D&B Use.

3.      Tenant Inducement Payment. In consideration of, and as an inducement for, Tenant's agreement to the terms in paragraph 2 of this Amendment above, Landlord and Tenant hereby agree that, provided that Landlord and D&B have fully executed a lease or other occupancy

agreement (the "D&B Lease") for the D&B Premises and provided the Lease is still in full force and effect, Landlord shall pay to Tenant Two Hundred Seventy-Seven Thousand Eight Hundred Eighty and 80/100 Dollars ($277,880.80) ("Tenant Inducement Payment") on or before the later of (i) January 15, 2018, and (ii) the date that is fifteen (15) days after the date the D&B Lease has been fully executed by Landlord and D&B. Landlord shall give notice to Tenant within fifteen (15) days after the date on which the D&B Lease is fully executed by Landlord and D&B. Nothing herein shall obligate Landlord to execute the D&B Lease on any terms which are not acceptable to Landlord, in its sole discretion, and in no event is the Tenant Inducement Payment due if Landlord and D&B do not execute the D&B Lease. In the event that Landlord and D&B do not execute the D&B Lease, this Amendment shall be null and void. In the event that Landlord fails to timely pay the Tenant Inducement Payment as required by the terms of this paragraph, Tenant shall be permitted to offset the Tenant Inducement Payment against Rent thereafter coming due under the Lease.

4.   Notice.  For purposes of providing notice in accordance with Section 18 of the Lease, Landlord's mailing address as set forth in Section 1.1.19 of the Lease shall be updated as follows:

      Madison Marquette: Madison Marquette
      Bell Tower Shops, LLC
      670 Water Street, SW
      Washington, DC 20024
      Attn: Chief Financial Officer

      with copies of notices to:

      Madison Marquette
      Bell Tower Shops, LLC
      Director of Legal Services and Risk Management
      670 Water Street, SW
      Washington, DC 20024
      Attn: Laurie Dombroff

      Bell Tower Shops, LLC
      c/o Principal Real Estate Investors
      711 High Street
      Des Moines, IA 50392-1370
      Attn:  G-022-500

      (for Rent payments):

      Bell Tower Shops, LLC-026010
      P.O. Box 310300
      Des Moines, IA
      50331-0300

5.    Conflict.  Except as specifically amended herein, the parties acknowledge and agree that all other terms and conditions of the Lease shall remain in full force and effect as

written throughout the term of the Lease, and the Lease is ratified in all respects. In the event of a conflict between the provisions of this Amendment and the provisions of the Lease, the provisions of this Amendment shall control.

6. <u>Binding Agreement</u>.  The parties agree that there are no other agreements, conditions or representations between the parties, that all prior negotiations and understandings between the parties shall be deemed to have been merged into this Amendment, and that this Amendment shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.  If any term or provision of this Amendment, the deletion of which would not adversely affect the receipt of any material benefit by either party hereunder, shall be held invalid or unenforceable to any extent, the remainder of this Amendment shall not be affected thereby and each term and provision of this Amendment shall be valid and enforceable to the fullest extent permitted by law.

7. <u>Bribery and Corruption</u>.  Landlord and Tenant each respectively agree that (i) it does not support bribery and corruption, and (ii) it will comply with laws regarding bribery and corruption as such laws may apply to the conduct of its business.

8. <u>Counterparts</u>.  This Amendment may by executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9. <u>Applicable Law</u>.  This Amendment shall be governed, construed and enforced in accordance with the law of the State of Florida.

[The remainder of page is intentionally blank.]



IN WITNESS WHEREOF, the parties have set their hands to this Third Amendment to Lease Agreement as of the date set forth below.

**WITNESSES:**                                          **TENANT:**

Witness: _____                    BED BATH & BEYOND INC., a New York
Name: _Kathleen P. Currie_                      corporation

Witness: _____                    By: _____
Name: _Scott R. Smith_                            Name: _Seth Geldzahler_
                                                              Its: _Vice President - Real Estate_

[Landlord's signature on following page]

**WITNESSES:**

Witness: _____ III
Name: _____

Witness: _____
Name: _____

**LANDLORD:**

BELL TOWER SHOPS, LLC,
a Delaware limited liability company

By:    Madison Realty Partnership, LLC,
       a Delaware limited liability company,
       its managing member

       By:    Madison Realty Corporation,
              a Delaware corporation,
              its manager

              By: _____
              Name: John Elliott
              Its: Vice President

Exhibit A
D&B Premises



Exhibit M

Prohibited Uses

(a)  As used in this Lease, the term *Prohibited Uses* shall
mean any of the following uses: unlawful use; "pornographic use"
(hereinafter defined); "second-hand" or "surplus" store; laundry
or dry cleaners within four hundred (400) linear feet from the
perimeter of the Premises (but in no event with on-premises dry-
cleaning); pawn shop; daycare center within two hundred (200)
linear feet from the perimeter of the Premises; veterinary office
(except as may be incidental to a full-line pet and pet supply
store operating in at least 15,000 square feet of Floor Area
located at least 150 feet away from the perimeter of the
Premises); living quarters; hotel/motel (except that the
foregoing shall not apply to a hotel or motel within that portion
of the Shopping Center which is closest to U.S. 41 so long as
same is located at least six hundred (600) feet away from the
from the perimeter of the Premises); manufacturing; bowling
alley; off-track betting parlor or other gambling establishment;
bingo hall; funeral parlor; skating rink; nightclub, discotheque
or dance hall; so-called "head shop"; catering or banquet hall
(except that catering shall be allowed as an incidental use to a
permitted restaurant hereunder); children's entertainment or
activity facility within two hundred (200) linear feet from the
perimeter of the Premises; meeting hall; auction hall; place of
religious worship; sporting event; karate center within four
hundred (400) linear feet from the perimeter of the Premises;
auditorium; warehouse; theater except in the location designated
"Theater" on Exhibit B; automobile repair shop, or any business
servicing motor vehicles in any respect, including, without
limitation, any quick lube oil change service, tire center or
gasoline or service station or facility; supermarket within two
hundred (200) linear feet from the perimeter of the Premises
(except for an upscale gourmet grocer such as Whole Foods or Wild
Oats); more than fifteen thousand (15,000) square feet exclusive
of outside patio areas)of restaurants serving meals for on or off
premises consumption within two hundred (200) linear feet from
the perimeter of the Premises provided that no such use will be
permitted within forty-five (45) linear feet (or, with respect to
outside patio areas, within thirty-two (32) linear feet) from the
perimeter of the Premises(except that a "coffee bar" shall be
permitted to be located within the Premises); beauty parlor
within two hundred(200) linear feet from the perimeter of the
Premises; nail salon within two hundred(200) linear feet from the
perimeter of the Premises; billiard parlor or pool hall; sales
office or showroom for automobiles, boats, or other vehicles; an
establishment selling alcoholic beverages for on or off premises
consumption (except as an incidental use to a permitted
restaurant use); massage parlor; office (excluding (x)office
space used in connection with and ancillary to a permitted retail
use hereunder and service offices typically found in shopping
centers, such as banks, travel agencies and real estate
brokerages, provided that (i) such offices shall not be located
within two hundred (200) linear feet from the perimeter of the
Premises, and (ii) the aggregate square footage for such use
shall not exceed ten thousand (10,000) square feet, and (y) the
management office of the Shopping Center); health spa, exercise
facility or similar type business within four hundred (400)
linear feet from the perimeter of the Premises (except that the
foregoing shall not prohibit the operation of one (1) typical
"day spa," occupying not more than five thousand (5,000) square
feet of Floor Area, to be located within said four hundred (400)

linear feet from the perimeter of the Premises); car wash; a so-
called "flea market"; carnival, amusement park or circus;
video/pinball arcade or game room; entertainment or educational
uses; any use generally deemed to be "obnoxious or a nuisance"
(hereinafter defined); medical clinics or offices; the
distribution of leaflets, booklets or similar handouts in the
Common Areas; or any other non-retail uses.

(b)  As used above, the term **pornographic use** shall
include, without limitation, a store displaying for sale or
exhibition books, magazines or other publications containing any
combination of photographs, drawings or sketches of a sexual
nature, which are not primarily scientific or educational, or a
store offering for exhibition, sale or rental video cassettes or
other medium capable of projecting, transmitting or reproducing,
independently or in conjunction with another device, machine or
equipment, an image or series of images, the content of which has
been rated or advertised generally as NC-17 or "X" or unrated by
the Motion Picture Rating Association, or any successor thereto.
The parties hereto acknowledge and agree the sale of books,
magazines and other publications by a national or regional
bookstore or video rental store of the type normally located in
first-class shopping centers in the State in which the Shopping
Center is located (such as, for example, Borders, Barnes & Noble
and Blockbuster, as said stores currently operate) shall not be
deemed a "pornographic use" hereunder.

(c)  As used above, the term **educational uses** shall
include, without limitation, a beauty school, barber school,
reading room, place of instruction, or any other activity,
facility, school or program catering primarily to students or
trainees as opposed to shoppers (education ancillary to retail
sales, such as computer training, as an incidental part of a
computer retail store, shall be permitted).

(d)  As used above, the term **obnoxious or a nuisance** shall
include, without limitation, a use which emits or results in
strong, unusual or offensive odors (other than restaurant odors
usual and customary in a first-class shopping center, fumes, dust
or vapors, is a public or private nuisance, emits noise or sounds
which are objectionable due to intermittence, beat, frequency,
shrillness or loudness, creates a hazardous condition, or is
used, in whole or in part, as or for warehousing or the dumping
or disposing of garbage or refuse.

**EXHIBIT D**

1
2
3          Exhibit K-1
4
5       Existing Exclusives

Exhibit K-1

Existing Exclusives

**SHOPPING CENTER LEASE**

This Shopping Center Lease ("Lease") is entered into as of this 4 day of DECEMBER, 1998, by and between the Landlord and the Tenant hereinafter named.

ARTICLE I. INTRODUCTORY PROVISIONS.

Section 1.1    Fundamental Lease Provisions.

(a)    Landlord:  BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership

(b)    Landlord's Address:  Seven West Seventh Street, Suite 1600, Cincinnati, Ohio 45202

(c)    Tenant:  THE JOHNNY ROCKETS GROUP, INC., a Delaware corporation

(d)    Tenant's Mailing Address:  15635 Alton Parkway, Suite 350, Irvine, California 92618

(e)    Tenant's Trade Name:  Johnny Rockets

(j)    Permitted Use:  Tenant shall use the Premises solely for the purpose of conducting therein a "Johnny Rockets" restaurant with menu items similar to those served in a majority of all other "Johnny Rockets" restaurants within the United States, and for no other business or purpose whatsoever.

Notwithstanding anything contained in this Lease to the contrary, except as set forth below, during the Term of this Lease, Landlord shall not use, occupy, or permit the use or occupancy of any space in the Shopping Center for the operation of a business primarily selling hamburgers [that is, more than thirty-three percent (33%) of such tenant's or occupant's gross food sales (exclusive of beverages) are generated from the sale of hamburgers] ("Landlord Leasing Prohibition"); however, Landlord's Leasing Prohibition shall not apply (i) to Major Stores at the Shopping Center, (ii) to tenants who signed leases for space in the Shopping Center which predate the date of this Lease, or (iii) if Tenant is in default of any material provision of this Lease beyond any applicable cure period.  In the event Landlord's Leasing Prohibition violates any applicable law, ordinance, rule or regulation of any governmental or quasi-governmental entity having jurisdiction, then Tenant shall indemnify and hold Landlord harmless for all damages, claims, judgments, actions, costs and expenses (including attorney's fees) incurred by Landlord.

K-1-1

Exhibit K-1

(cont.)



Lease") is entered into as of this 28th day of April ,
Landlord and the Tenant hereinafter named.

## ARTICLE I. INTRODUCTORY PROVISIONS.

Section 1.1    Fundamental Lease Provisions.

(a)    Landlord:  BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware
limited partnership

(b)    Landlord's Address: Seven West Seventh Street, Suite 1600, Cincinnati, Ohio 45202

(c)    Tenant:  CLOCKWORKS, INC., a Florida corporation

(d)    Tenant's Mailing Address:  13499 U.S. 41 S.E., Suite 235, Ft. Myers, Florida 33907

(e)    Tenant's Trade Name:  Clockworks

(j)    Permitted Use:  Tenant shall use the Premises solely for the purpose of conducting
therein the business of the sale, at retail, of antique clocks, new clocks, watches, silver,
and estate jewelry, and, on an incidental basis ancillary to the foregoing, the service and
repair of the aforementioned items, and for no other business or purpose whatsoever.
Notwithstanding anything contained in this Lease to the contrary, during the Term of this
Lease, so long as Tenant is not in default of any term, covenant or condition hereof
beyond any applicable cure period, then Landlord shall not lease space in the Shopping
Center to another tenant who derives more than twenty-five percent (25%) of its Gross
Sales (on a calendar year basis) from the sale and repair of antique clocks manufactured
in Europe ("Landlord's Leasing Prohibition").  Landlord's Leasing Prohibition shall not
apply to Major Stores and to tenants whose leases predate the date of this Lease
(regardless of whether those pre-dated leases are subsequently amended or assigned).

## Exhibit K-1

### (cont.)

This Shopping Center Lease ("Lease") is entered into as of this 15th day of April, 1999, by and between the Landlord and the Tenant hereinafter named.

### ARTICLE I. INTRODUCTORY PROVISIONS.

Section 1.1    Fundamental Lease Provisions.

(a)    Landlord:  BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership

(b)    Landlord's Address: Seven West Seventh Street, Suite 1600, Cincinnati, Ohio 45202

(c)    Tenant: TRAPPINGS TRAVELWARE, INC., a Florida corporation

(d)    Tenant's Mailing Address: 33 Swallow Hill Road, Carnegie, Pennsylvania 15106

(e)    Tenant's Trade Name:  Trappings

(j)    **Permitted Use:**  Tenant shall use the Premises solely for the purpose of conducting therein the business of the sale at retail of briefcases, luggage, purses and related gifts and travel accessories, and travelwear, and such other items as are carried in a majority of other "Trappings" stores and for no other business or purpose whatsoever. Notwithstanding anything contained in this Lease to the contrary, during the Term of this Lease, Landlord shall not enter into a direct lease for space in the Shopping Center with a tenant whose primary permitted use (as set forth in such lease) is the sale, at retail, of luggage ("Landlord's Leasing Prohibition"); however, Landlord's Leasing Prohibition shall not apply (i) to the Major Stores at the Shopping Center, (ii) to tenants who signed leases for space in the Shopping Center that predate the date of this Lease (including any subsequent amendment thereto or assignment of sublet thereof), (iii) if Tenant is in default of any material provision of this Lease beyond any applicable cure period, or (iv) in the event of any assignment of this Lease or sublet of all or any part of the Premises by Tenant (unless pursuant to Article XVII, Landlord's consent is not required for such assignment or sublet to be valid). In the event Landlord's Leasing Prohibition violates any applicable law, rule or regulation of any governmental or quasi-governmental entity having jurisdiction, then Tenant shall indemnify and hold Landlord harmless for all damages, claims, judgments, actions, costs and expenses (including reasonable attorneys fees) incurred by Landlord.

Exhibit K-1

(cont.)

This Shopping Center Lease ("Lease") is entered into as of this ___4___ day of ___SEPT___.
1998, by and between the Landlord and the Tenant hereinafter named.

### ARTICLE 1. INTRODUCTORY PROVISIONS.

Section 1.1      Fundamental Lease Provisions.

(a)    Landlord:  BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware
limited partnership

(b)    Landlord's Address: Seven West Seventh Street, Suite 1600, Cincinnati, Ohio 45202

(c)    Tenant: JO-ICE LA-CREAM, INC., a Florida corporation

(d)    Tenant's Mailing Address:  1267 South Beneva Road, Sarasota, Florida 34232

(e)    Tenant's Trade Name: Big Oláf Creamery

(j)    Permitted Use:  Tenant shall use the Premises solely for the purpose of conducting
therein the business of the sale at retail of scoop ice cream, ice cream bars, frozen
yogurt, ice cream cakes, individual servings of fountain drinks, bottled water, coffee
(except that the sale of coffee, either whole bean or as a beverage shall not exceed
twenty-five (25%) of Tenant's Gross Sales from the Premises in any Lease Year), tea,
and other related beverages, and as an incidental use, Tenant may display and sell hand-
stitched quilts in not more than ten percent (10%) of the sales area of the Premises, and
for no other business or purpose whatsoever.  Notwithstanding anything contained in this
Lease to the contrary, Landlord shall not enter into a direct lease for space in the
Shopping Center with a tenant whose primary permitted use (as set forth in such lease)
is the sale at retail of scooped ice cream or yogurt served in cups or cones ("Landlord's
Leasing Prohibition"); however, Landlord's Leasing Prohibition shall not apply (i) to
Major Stores at the Shopping Center, (ii) to tenants who signed leases for space in the
Shopping Center that predate the date of this Lease (regardless of any subsequent
amendments, so long as those amendments do not alter such tenant's permitted use so as

1

C:\BELLTOW\BIGOLAF\BIGOLAF1.LSE
August 3, 1998:037033.044

of this Lease beyond any applicable cure period, (iv) in the event of any assignment of
this Lease or sublet of all or part of the Premises by Tenant, or (v) to other restaurants
and cafes that may operate in the Shopping Center from time to time that serve scooped
ice cream or yogurt in cups or cones as part of their dessert menu.  In the event
Landlord's Leasing Prohibition violates any applicable law, rule or regulation of any
governmental or quasi-governmental entity having jurisdiction, then Tenant shall
indemnify and hold Landlord harmless for all damages, claims, judgments, actions, costs
and expenses (including reasonable attorneys fees) incurred by Landlord.

' K-1-4

Exhibit K-1

(cont.)

## ARTICLE I.  INTRODUCTORY PROVISIONS.

Section 1.1    Fundamental Lease Provisions.

(a)    Landlord:  BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership

(b)    Landlord's Address:  Seven West Seventh Street, Suite 1600, Cincinnati, Ohio 45202

(c)    Tenant:  VITAMIN WORLD, INC., a Delaware corporation

(d)    Tenant's Mailing Address:  105 Orville Drive, Bohemia, New York 11716-2599

(e)    Tenant's Trade Name:  Vitamin World

(j)    Permitted Use:  Tenant shall use the Premises solely for the purpose of conducting therein the business of the sale, at retail, of vitamins, herbs, nutritional supplements, sports nutrition, health and beauty aids, health-oriented packaged food products, health-oriented literature, and related items incidental thereto, and for no other business or purpose whatsoever.  Notwithstanding anything contained in this Lease to the contrary, during the Term of this Lease, Landlord shall not enter into a direct lease for space in the Shopping Center, nor consent to such a lease in an instance in which its consent may be withheld, with a tenant whose "Primary Use" (as set forth in such lease) is the sale at retail of vitamins and/or nutritional supplements ("Landlord's Leasing Prohibition"); however, Landlord's Leasing Prohibition shall not apply (i) to Major Stores at the Shopping Center, (ii) to tenants who signed leases for space in the Shopping Center that predate the date of this Lease (including, without limitation, all amendments thereto and assignments and sublets thereof) unless Landlord may withhold its consent under such leases, (iii) if Tenant is in default of any provision of this Lease beyond any applicable cure period, or (iv) in the event of any assignment of this Lease or sublet of all or part of the Premises where Landlord's consent is required and is either not sought by Tenant or refused by Landlord.  "Primary Use" shall be deemed to mean more than ten percent (10%) of a stores' sales area.  In the event Landlord's Leasing Prohibition violates any applicable law, rule or regulation of any governmental or quasi-governmental entity having jurisdiction, the Tenant shall indemnify and hold Landlord harmless for all damages, claims, judgments, actions, costs and expenses (including reasonable attorneys' fees) incurred by Landlord, provided that Landlord will provide prompt notice to Tenant of any claim that Landlord's Leasing Prohibition constitutes such a violation and Tenant may waive its rights to the extent elected by Tenant concerning Landlord's Leasing Prohibition if Tenant desires to attempt to mitigate any potential liability concerning any such violation.  Should Landlord violate Landlord's Leasing Prohibition during the Term of this Lease, then Tenant shall have the right at its option to pay, in lieu of its monthly installment of Minimum Guaranteed Rental, the sum of six percent (6%) of Tenant's Gross Sales from the Premises ("Substitute Rental") (Substitute Rental and Tenant's accompanying Gross Sales statements shall be submitted to Landlord at the time and in the manner set forth herein for the payment by Tenant to Landlord of Percentage Rental) and if Landlord does not cure such violation within the twelve (12) month period immediately following the date the competing store opens for business in the Shopping Center, Tenant may terminate this Lease upon written notice to Landlord which notice shall be delivered, if at all, within sixty (60) days following expiration of such 12-month period. *Should Tenant fail to terminate this Lease in the time and manner aforesaid, Tenant's right to terminate hereunder shall be null and void and of no further force or effect.  If Tenant elects to pay Substitute Rental, as of the date Landlord is no longer violating Landlord's Leasing Prohibition, Tenant shall resume paying Minimum Guaranteed Rental (plus Percentage Rental and Additional Rent) in the amounts and in the manner set forth in this Lease.  During any period of time in which Tenant is entitled to pay Substitute Rental, Tenant shall remain fully obligated to pay Additional Rent to Landlord, as set forth herein. *In no event shall the Substitute Rental exceed the Minimum Guaranteed Rental and Percentage Rental otherwise payable

*and Percentage Rent*

K-1-5

<u>Exhibit K-1</u>

(cont.)



CENTER LEASE

Shopping Center Lease ("Lease") is entered into as of this _18th_ day of _June_, 1996, by and between the Landlord and the Tenant hereinafter named.

## ARTICLE I. INTRODUCTORY PROVISIONS.

Section 1.1    Fundamental Lease Provisions.

(a)    Landlord:  Bell Tower Properties Limited Partnership, a Delaware limited partnership

(b)    Landlord's Address: Sixteenth Floor, Seven West Seventh Street, Cincinnati, Ohio 45202

(c)    Tenant:  Anna's Boutique, Inc., a Florida corporation

(d)    Tenant's Mailing Address:  13499 U.S. 41 S.E., Suite F-618, Ft. Myers, Florida 33907

(e)    Tenant's Trade Name:  Anna's Boutique

(j)    Permitted Use:  Tenant shall use the Premises solely for the purpose of conducting therein the business of the retail sale of women's apparel which is "Moroccan" in design and appearance, and incidental thereto, accessories, including without limitation belts, hats, shoes, jewelry and bags, and for no other business or purpose whatsoever. Notwithstanding anything contained in this Lease to the contrary, during the Term of this Lease, provided that Tenant is not in default beyond any applicable cure period, Landlord shall not lease space in the Shopping Center to another tenant whose primary permitted use is the sale at retail of clothing that can be labeled as "Moroccan", such that it is of the cotton/rayon fiber that is manufactured in Morocco.

Exhibit K-1

(cont.)

SHOPPING CENTER LEASE

This Shopping Center Lease ("Lease") is entered into as of this 5th day of August, 1996, by and between the Landlord and the Tenant hereinafter named.

## ARTICLE I. INTRODUCTORY PROVISIONS.

Section 1.1    Fundamental Lease Provisions.

(a)    Landlord:  BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership

(b)    Landlord's Address: Sixteenth Floor, Seven West Seventh Street, Cincinnati, Ohio 45202

(c)    Tenant:  SWIM 'N SPORT RETAIL, INC., a Florida corporation

(d)    Tenant's Mailing Address: 2396 N.W. 96th Avenue, Miami, Florida  33172

(e)    Tenant's Trade Name:  Swim 'N Sport

(j)    Permitted Use:  Tenant shall use the Premises solely for the purpose of conducting therein the primary display and sale at retail of women's, junior's, men's and children's swimwear and related accessories, including without limitation, sandals, goggles, bathing caps, suntan lotion and sunglasses, and incidental thereto, women's activewear and sportswear apparel.  Notwithstanding anything contained in this Lease to the contrary, provided Tenant is not in default beyond any applicable cure period, with the exception of Speedo and Major Stores (as defined in Section 6.3 of this Lease), after the date of this Lease Landlord shall not lease premises in the Shopping Center to another tenant whose inventory of women's, junior's, men's and children's swimwear at the premises exceeds twenty percent (20%) of such tenant's total inventory.

Exhibit K-1

(cont.)

SHOPPING CENTER LEASE

This Shopping Center Lease ("Lease") is entered into as of this 5th day of November, 1996, by and between the Landlord and the Tenant hereinafter named.

ARTICLE I. INTRODUCTORY PROVISIONS.

Section 1.1    Fundamental Lease Provisions.

(a)    Landlord:  BELL TOWER PROPERTIES LIMITED PARTNERSHIP, a Delaware limited partnership

(b)    Landlord's Address: Seven West Seventh Street, Suite 1600, Cincinnati, Ohio 45202

(c)    Tenant:  HUE HUE TENANGO OF FLORIDA, LLC, a Florida limited liability company

(d)    Tenant's Mailing Address:  15821 Fairchild Drive, Tampa, Florida  33647

(e)    Tenant's Trade Name:  Joffrey's Coffee Co.

(j)    Permitted Use:  Tenant shall use the Premises solely for the purpose of conducting therein the business of the retail sale (including carry-out and delivery) of primarily coffee, whole bean or as a beverage, espresso and tea beverages and any other non-alcoholic beverages, and incidental to the sale thereto, bagels, muffins, cakes, pies, cookies and other dessert items, sandwiches, soups, salads, substantially as evidenced by Tenant's menu attached hereto as Exhibit E and incorporated herein by reference, and for no other business or purpose whatsoever. Notwithstanding anything contained in this Lease to the contrary, provided (i) that Tenant is not in default beyond any applicable cure period, (ii) that during each year of the Term of this Lease (each year being measured from September 1 to the next August 31) Tenant has Gross Sales in excess of fifty percent (50%) of the Applicable Annual Breakpoint, and (iii) that Tenant continually operates its business in the Premises in a first-class manner, then after the date of this Lease, Landlord shall not lease premises in the Shopping Center to another tenant, with the exception of Major Stores (as defined in Section 6.3 of this Lease), who derives more than twenty-five percent (25%) of its gross sales in a calendar year from the sale of coffee, either whole bean or as a beverage of any kind.   Further, notwithstanding anything contained herein to the contrary, the prohibition against Landlord leasing premises in the Shopping Center to another tenant whose primary permitted use is the sale of coffee, either whole bean or as a beverage, is personal to Tenant and shall not inure to the benefit to any successor or assign of Tenant, with the specific exception that said prohibition on the part of Landlord shall inure to the benefit of (i) a parent, subsidiary or affiliated entity of Tenant, provided such entity has a net worth at least equal to that of Tenant as of the date of this Lease, and (ii) a purchaser of (A) one hundred percent (100%) of Tenant's stock or substantially all of Tenant's assets, and (B) one hundred percent (100%) of the stock or substantially all of the assets of any other entity operating under the "Joffrey's" tradename in which John Doster or Ken Maloy have the right to vote at least fifty percent (50%) of the total combined voting power of all classes of stock, units and/or ownership interests, however represented.

Exhibit K-1

(cont.)

(j)   **Permitted Use:**  Tenant shall use the Premises solely for the purpose of conducting therein the business of the display and sale at retail of fine art, posters, kites, wind socks, art stationary, art clothing, art furnishings, other art/decorative objects and custom framing, and for no other business or purpose whatsoever.  Notwithstanding anything contained in this Lease to the contrary, provided that Tenant is not in default under this Lease beyond any applicable cure period, after the date of this Lease and except for Major Stores, Landlord shall not lease premises in the Shopping Center to a tenant whose gross sales of custom picture framing services in any Lease Year are reasonably expected to be in excess of fifteen percent (15%) of such tenant's total Gross Sales.

PORTFOLIO