**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

IN RE:

| | | |
|---|---|---|
| **BED BATH & BEYOND, Inc., et al** | : | **CHAPTER 11** |
| Debtors | : | |
| | : | **No. 23-13359 (vfp)** |

**LIMITED OBJECTION to CURE AMOUNT**
**and to ASSUMPTION and ASSIGNMENT of LEASE**

Consumer Centre Paramount 1, LLC, Consumer Centre Paramount 2, LLC, Consumer Centre Paramount 4, LLC, Consumer Centre Paramount 5, LLC, Consumer Centre Paramount 6, LLC, and Consumer Centre Paramount 7, LLC (collectively, the **"Landlord"**), by their undersigned counsel, hereby make this limited objection to the "cure amount" stated by the Debtor with respect to the Lease (defined below) and to the assumption and assignment of the Lease, as follows:

1.     The Landlord is the lessor of Buy Buy Baby location #3081, located at 310 Route 36, West Long Branch, NJ 08701 (the **"Location"**).

2.     In its Notice to Contract Parties, dated June 13, 2023 (docket #714), the "cure amount" due under the terms of the Lease is stated as $541.92 (the **"Alleged Cure Amount"**).

3.     The Alleged Cure Amount is incorrect.

4.     The correct cure amount (the **"Correct Cure Amount"**) is $38,583.36, as shown on **Exhibit "A"** hereto.

5.     A copy of the Lease is attached as **Exhibit "B"**.

6.     The Correct Cure Amount consists of $15,046.31 in post-petition charges, and $23,537.05 in pre-petition charges.

7.     The Landlord objects to any assumption or assignment of the Lease unless the total Correct Cure Amount is paid.

8.     The Location is part of a "shopping center" as that term is used in 11 U.S.C. §365.

9.      The Landlord specifically reserves its right to object to any other relief sought by the Debtors in connection with the assumption of the Lease, including, but not limited to, any additional amounts coming due under the Lease after the filing of this Objection, and any assignee's proposed adequate assurance of future performance (including, but not limited to, such adequate assurance pursuant to Sections 365(b) and 365(f) of the Bankruptcy Code), including but not limited to compliance with the "shopping center" provisions of Section 365.

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

**By:**      _/s/ William J. Levant, Esquire_
**William J. Levant, Esquire**
Kaplin Stewart Meloff Reiter & Stein, P.C.
910 Harvest Drive; P.O. Box 3037
Blue Bell, PA 19422
Phone: (610) 941-2474
Facsimile: (610) 684-2020
wlevant@kaplaw.com
Attorneys for Consumer Centre Paramount 1, LLC, Consumer Centre Paramount 2, LLC, Consumer Centre Paramount 4, LLC, Consumer Centre Paramount 5, LLC, Consumer Centre Paramount 6, LLC, and Consumer Centre Paramount 7, LLC

Date: June 24, 2023

**EXHIBIT "A"**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

IN RE:

| | | |
|---|---|---|
| **BED BATH & BEYOND, Inc., et al** | : | **CHAPTER 11** |
| Debtors | : | |
| | : | **No. 23-13359 (vfp)** |

### Exhibit "A" to Objection

| Date | Description | | | Amount |
|---|---|---|---|---|
| 12/01/22 | Estimated CAM Charges (12/2022) | 2,316.11 | | 2,316.11 |
| 12/01/22 | Rent Charges (12/2022) | 20,371.08 | | 22,687.19 |
| 12/01/22 | Estimated Insurance (12/2022) | 1,247.10 | | 23,934.29 |
| 12/23/22 | ach - Dec. rent rec'd fm seller | | 23,934.29 | 0.00 |
| 01/01/23 | Estimated CAM Charges (01/2023) | 2,316.11 | | 2,316.11 |
| 01/01/23 | Rent Charges (01/2023) | 20,371.08 | | 22,687.19 |
| 01/01/23 | Estimated Insurance (01/2023) | 1,247.10 | | 23,934.29 |
| 01/09/23 | Chk# 110397 - :CHECKscan Payment F/S | | 24,058.18 | (123.89) |
| 01/17/23 | To Reverse check amount due to Seller | 581.52 | | 457.63 |
| 01/17/23 | Chk# 111113 - :CHECKscan Payment F/S - UTL-Water/Sewer WS 3rd Qtr 2022 | | 581.52 | (123.89) |
| 01/25/23 | 1Q 2023 RET | 13,089.57 | | 12,965.68 |
| 02/01/23 | Estimated CAM Charges (02/2023) | 2,316.11 | | 15,281.79 |
| 02/01/23 | Rent Charges (02/2023) | 20,371.08 | | 35,652.87 |
| 02/01/23 | Estimated Insurance (02/2023) | 1,247.10 | | 36,899.97 |
| 02/15/23 | Chk# 111862 - :CHECKscan Payment F/S | | 24,058.18 | 12,841.79 |
| 02/27/23 | Chk# 112118 - :CHECKscan Payment F/S | | 13,089.57 | (247.78) |
| 03/01/23 | Estimated CAM Charges (03/2023) | 2,377.65 | | 2,129.87 |
| 03/01/23 | Rent Charges (03/2023) | 20,371.08 | | 22,500.95 |
| 03/01/23 | Estimated Insurance (03/2023) | 1,309.45 | | 23,810.40 |
| 03/15/23 | Chk# 112326 - :CHECKscan Payment F/S | | 24,058.18 | (247.78) |
| 03/30/23 | 1Q 2023 Sewer | 439.20 | | 191.42 |
| 04/01/23 | Estimated CAM Charges (04/2023) | 2,377.65 | | 2,569.07 |
| 04/01/23 | Rent Charges (04/2023) | 20,371.08 | | 22,940.15 |
| 04/01/23 | Estimated Insurance (04/2023) | 1,309.45 | | 24,249.60 |
| 05/01/23 | Estimated CAM Charges (05/2023) | 2,377.65 | | 26,627.25 |
| 05/01/23 | Rent Charges (05/2023) | 20,371.08 | | 46,998.33 |
| 05/01/23 | Estimated Insurance (05/2023) | 1,309.45 | | 48,307.78 |
| 05/08/23 | Chk# 113951 - :CHECKscan Payment - May Rent | | 24,058.18 | 24,249.60 |
| 05/08/23 | Chk# 113377 - :CHECKscan Payment - Post petition 4/23-4/30 April rent | | 6,415.52 | 17,834.08 |
| 05/17/23 | Gas 12/07/22-04/18/23 | 1,706.61 | | 19,540.69 |
| 06/01/23 | Estimated CAM Charges (06/2023) - estcam changed per Escrow Budget Letter 2/15/23 | 2,377.65 | | 21,918.34 |
| 06/01/23 | Estimated Insurance (06/2023) - Ins. Changed per Escrow Budget Letter 2/14/23 | 1,309.45 | | 23,227.79 |
| 06/01/23 | Rent Charges (06/2023) | 20,371.08 | | 43,598.87 |
| 06/01/23 | 2Q 2023 RET | 13,089.57 | | 56,688.44 |
| 06/02/23 | Chk# 114510 - :CHECKscan Payment F/S | | 24,058.18 | 32,630.26 |
| 06/03/23 | 2Q 2023 Sewer (04/01 - 06/30/23) | 439.20 | | 33,069.46 |
| 06/08/23 | Gas Invoice 4/18/23 - 5/16/23 | 218.09 | | 33,287.55 |
| 06/14/23 | 2022 CAM TAX INS Reconciliation | 5,295.81 | | 38,583.36 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 19,042.67 | 1,706.61 | 17,252.56 | 581.52 | 38,583.36 |

Monday, June 26, 2023

EXHIBIT "B"

**After Recording, Return to:**
Buy Buy Baby, Inc.
650 Liberty Avenue
Union, NJ  07083
Attention:  Scott R. Smith, Esquire

_____

(The Above Space for Recorder's Use Only)

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE, made as of ⟨May 25⟩, 2012, by and between BG MONMOUTH LLC, a New Jersey limited liability company, having an office at c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, Attention:  Senior Vice President of Anchor Store Leasing (*"Landlord"*), and BUY BUY BABY, INC., a Delaware corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

### Preliminary Statement

Landlord is the fee owner of certain real property located in the County of Monmouth, State of New Jersey, as more particularly described on Exhibit A hereto annexed, together with improvements constructed or to be constructed thereon (the *"Shopping Center"*).  Landlord and Tenant, as of the date hereof, have entered into a lease (the *"Lease"*) demising a portion of the Shopping Center as more particularly described therein (the *"Premises"*) to Tenant.  In connection therewith, Landlord and Tenant have entered into this Memorandum of Lease to confirm the demise of the Premises and to provide notice to any interested party of such demise and of the terms and provisions of the Lease.

NOW, THEREFORE, the parties state as follows:

1.    All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

2.    The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term of approximately twelve (12) years commencing on the Rent Commencement Date (the

***"Initial Term"***).  Under the terms of the Lease, Tenant has the right to extend the Initial Term for four (4) separate and additional periods of five (5) years each after the expiration of the Initial Term.

3.    This Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

(i)      that, subject to certain exceptions more particularly set forth in the Lease, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) infant and children's (for the purpose of this section (i) infant shall be defined as 0-18 months in age, and children shall be defined as 19-48 months in age) furniture (including, without limitation, cribs and beds (including, without limitation, mattresses and bedding); changing tables; gliders, rockers (including coordinating ottomans); high chairs; lamps; walkers; portable play yards and play pens; car seats and booster seats; cradles; carriages and strollers; toy and clothing chests; indoor infant swings; or any other infant and children's furniture or furnishings similar to the foregoing enumerated items) (collectively, ***"Restricted Furniture"***); (b) layettes, infant and children's apparel, shoes and/or clothing accessories (collectively, ***"Restricted Clothing"***); (c) merchandise and products for use by infants, (including, without limitation, food; formula; indoor and/or outdoor play and recreational equipment (excluding outdoor swing sets and outdoor play sets); safety items; feeding items; nursing items; health, bath and beauty care items; (including bath tubs and seats, bath toys, changing pads, scales and towels) diapers; wipes); and (d) infant and children's toys (except for arts and crafts materials and other hobby activity items [such as, without limitation, crayons, play-dough, model cars, trains and planes] that are typically sold in arts and crafts or hobby stores such as Michaels and Hobby Lobby) and books are (collectively, ***"Restricted Products"***) (which items in clauses (a), (b), (c) and (d) above, either singly or in any combination, are hereinafter referred to as the *"**Exclusive Items**"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within

such tenant's or subtenant's premises.   In addition to the foregoing, Landlord shall not lease, rent or occupy or permit any other tenant or occupant of the Shopping Center to operate a store in which the primary business is retail sale of infant or children's shoes, books, or furniture;

(ii)   the restrictions set forth therein on Landlord's ability to lease certain portions of the Shopping Center for certain uses which are otherwise prohibited by the terms of the Lease;

(iii)   provisions set forth therein regarding Tenant's right to install and maintain signage upon the exterior of the Premises and upon a pylon and/or monument sign located at the Shopping Center;

(iv)   provisions set forth therein regarding Tenant's right to use (and to permit Tenant's customers, employees, agents and contractors to use) certain common areas of the Shopping Center (such as, without limitation, the parking facilities of the Shopping Center); and

(v)   provisions set forth therein regarding certain areas in the Shopping Center in which no improvements are to be constructed, or changes made without the consent of the Tenant.

4.   In addition to those terms hereinabove set forth, the Lease contains numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions.  The Lease and exhibits thereto are hereby incorporated by reference in this Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded.  In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control.

[signature page follows]



J:\BUY BUY BABY\STORES\-West Long Branch, NJ\RIKER_DOCS2-#4227645-v2-Memorandum_of_Lease_-_BBB_West_Long_Branch.DOC

**IN WITNESS WHEREOF**, the parties hereto have executed this Memorandum of Lease as of the day and year first above written.

WITNESS/ATTEST:

**LANDLORD:**

BG MONMOUTH, LLC, a New Jersey limited liability company
By:   JDN Realty Corporation, a ⎯⎯⎯⎯⎯
       corporation
       Its Managing Member

_____
[SEAL] *Lana Berner-Absut*

By: _____
    Name: Bryan P. Zabell
    Title:  Senior Vice President of
          Anchor Store Leasing

**TENANT:**

WITNESS/ATTEST:

BUY BUY BABY, INC.,
a Delaware corporation

_____
Alan M. Freeman
Assistant Secretary

By: _____
Name: *Steven M. Temares*
Title: *Director & Authorized Signatory*

_____

[SEAL]

<u>Acknowledgments</u>

STATE OF *Ohio*        )
                       ) : ss.
COUNTY OF *Cuyahoga*   )

On this 25 day of _May_, 2012, before me personally came Bryan P. Zabell to me known, who being by me duly sworn, did depose and say that he is the Senior Vice President of Anchor Store Leasing Buy Buy Baby, Inc. and the authorized signatory for JDN Realty Corporation, the managing member of BG Monmouth, LLC, the company described in and which executed the above instrument and that he signed his name thereto by order of the members of said limited liability company.

My Commission Expires:

_1-11-2014_

PAULA JONES
Notary Public, State of Ohio
My Commission expires
January 11, 2014

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

On this 26 day of April 2012, before me personally came _Steven H. Timmins_ to me known, who being by me duly sworn, did depose and say that he is the _Director, Authorized Signatory_ of Buy Buy Baby, Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

KATHLEEN C. FERENCHAK
NOTARY PUBLIC OF NEW JERSEY
COMMISSION EXPIRES NOVEMBER 2, 2013

5

KATHLEEN C. FERENCHAK
NOTARY PUBLIC OF NEW JERSEY
COMMISSION EXPIRES NOVEMBER 2, 2013

## EXHIBIT A

### Legal Description of the Shopping Center

ALL THAT CERTAIN LOT, TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN THE TOWNSHIP OF WEST LONG BRANCH, IN THE COUNTY OF MONMOUTH AND STATE OF NEW JERSEY AND BEING LOT 8.01 BLOCK 67 AND LOT 8 .01 BLOCK 105 AS SHOWN ON A MAP ENTITLED "PLAN OF SURVEY FOR RB-S ASSOCIATES, LOT 8, BLOCK 67 BOROUGH OF WEST LONG BRANCH, MONMOUTH COUNTY, NEW JERSEY DATED FEBRUARY 2, 1992. THE SAME BEING PART OF LOT 8, BLOCK 67, SAID LOT AS SHOWN ON SHEET NO. 4 OF THE OFFICIAL TAX MAP OF THE TOWNSHIP OF WEST LONG BRANCH, AND THE SAME BEING PART OF LOT 8, BLOCK 105, SAID LOT AS SHOWN ON SHEET NO. 15 OF THE OFFICIAL TAX MAP OF THE BOROUGH OF EATONTOWN, AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS: TO WIT:

BEGINNING AT AN IRON REBAR WITH SURVEYOR'S CAP SET ALONG THE SOUTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE 36 (1801 R.O.W.) SAID LINE BEING DISTANT 80.00 FEET MEASURED SOUTHWARDLY FROM AND RADIALLY TO THE CENTERLINE THEREOF, SAID REBAR BEING THE POINT OF INTERSECTION OF THE WESTERLY LINE OF LOT 7, BLOCK 67 WITH THE SAID SOUTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE 36. SAID REBAR BEING OPPOSITE STATION 56+55.91 AS SHOWN ON A MAP ENTITLED "NEW JERSEY STATE HIGHWAY DEPARTMENT GENERAL PROPERTY KEY MAP" ROUTE 35-4N CONN. TO WEST LONG BRANCH SECTION I, SHOWING EXISTING RIGHT OF WAY AND PARCELS TO BE TAKEN IN THE BOROUGH OF EATONTOWN AND WEST LONG BRANCH MONMOUTH COUNTY, SCALE 30 FEET TO 1 INCH, MAY 1940 FILED JULY 27, 1944 CASE NO. 73A-24 AND RUNNING; THENCE

1. SOUTH 12 DEGREES 31 MINUTES 55 SECONDS EAST 449.57 FEET ALONG THE WESTERLY LINE OF LOT 7, BLOCK 67 TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

2. SOUTH 12 DEGREES 01 MINUTES 50 SECONDS EAST 647.15 FEET ALONG THE WESTERLY LINE OF LOT 6.01, BLOCK 67 AND BEYOND TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

3. SOUTH 11 DEGREES 29 MINUTES 50 SECONDS EAST 221 .15 FEET ALONG LOT 10, BLOCK 67 AND BEYOND, TO AN IRON REBAR WITH SURVEYORS CAP FOUND IN THE NORTHERLY LINE OF PARKER ROAD (VARIABLE R.O.W.); THENCE

4. SOUTH 71 DEGREES 40 MINUTES 10 SECONDS WEST 690.73 FEET ALONG THE AFORESAID NORTHERLY LINE OF PARKER ROAD, SAID LINE BEING DISTANT 25.00 FEET FROM AND AT RIGHT ANGLES TO THE CENTERLINE THEREOF, TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

5. NORTH 02 DEGREES 27 MINUTES 21 SECONDS EAST 257.77 FEET ALONG THE EASTERLY LINE OF LOT 5, BLOCK 105, TO AN IRON REBAR WITH SURVEYORS CAP FOUND (SAID LINE BEING THE MUNICIPAL BOUNDARY LINE DIVIDING THE

A-1

TOWNSHIP OF WEST LONG BRANCH FROM THE BOROUGH OF EATONTOWN); THENCE

6. SOUTH 70 DEGREES 34 MINUTES 21 SECONDS WEST 117.43 FEET ALONG THE NORTHERLY LINE OF THE AFORESAID LOT 5, BLOCK 105 (STILL ALONG THE AFORESAID MUNICIPAL BOUNDARY LINE) TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

7. NORTH 37 DEGREES 05 MINUTES 23 SECONDS WEST 468.08 FEET ALONG THE EASTERLY LINE OF LOT 6, BLOCK 105 (STILL ALONG THE AFORESAID MUNICIPAL BOUNDARY LINE) TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

8. SOUTH 79 DEGREES 23 MINUTES 10 SECONDS WEST 130.67 FEET ALONG THE NORTHEASTERLY LINE OF AFORESAID LOT 6 BLOCK 105 TO AN IRON REBAR WITH SURVEYORS CAP SET; THENCE

9. NORTH 18 DEGREES 36 MINUTES 50 SECONDS WEST 542.37 FEET ALONG THE NORTHERLY LINE OF THE AFORESAID LOT 6, BLOCK 105 AND BEYOND (STILL ALONG THE AFORESAID MUNICIPAL BOUNDARY LINE) TO AN IRON BAR WITH SURVEYORS CAP SET; THENCE

10. NORTH 76 DEGREES 08 MINUTES 10 SECONDS EAST 300.00 FEET ALONG THE SOUTHERLY LINE OF LOT 8 .01 BLOCK 67 SAID LOT IN THE TOWNSHIP OF WEST LONG BRANCH, TO AN IRON BAR WITH SURVEYORS CAP SET; THENCE

11. NORTH 12 DEGREES 03 MINUTES 35 SECONDS WEST 210.00 FEET ALONG THE EASTERLY LINE OF THE FORESAID LOT 8 .02, BLOCK 67, AND BEING, AND ALONG THE EASTERLY LINE OF LOT 8, BLOCK 105, OF THE BOROUGH OF EATONTOWN TO A POINT IN THE AFORESAID SOUTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE NO. 36; THENCE

12. NORTHEASTERLY ON AN ARC HAVING A RADIUS OF 9,629 .55 FEET AND CURVING TO THE LEFT AN ARC DISTANCE OF 828 .56 FEET ALONG THE AFORESAID SOUTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE 36, TO THE POINT AND PLACE OF BEGINNING.

DESCRIBED IN ACCORDANCE WITH A SURVEY MADE BY JAMES V. DEMURO, P.L.S., DATED APRIL 7, 2004, LAST REVISED APRIL 16, 2004.

4227645v2

# LEASE AGREEMENT

**Between**

**BG MONMOUTH, LLC**

**a New Jersey limited liability company,**

**Landlord**

**and**

**BUY BUY BABY, INC.,**

**a Delaware corporation,**

**Tenant**

**Consumer Centre**
**310 SR 36**
**West Long Branch, New Jersey**

**Dated:** May 25 , **2012**

\* \* \* \* \* \*

## TABLE OF CONTENTS

ARTICLE 1  BASIC TERMS AND DEFINITIONS ................................................................1
Section 1.1  Basic Terms and Definitions ................................................................1

ARTICLE 2  LEASE OF PREMISES; LEASE TERM; DELIVERY DATE..........................5
Section 2.1  Lease of Premises ..............................................................................5
Section 2.2  Term. ..................................................................................................5
Section 2.3  Delivery Date ......................................................................................6
Section 2.4  Unseasonable Delivery: Slack Period ................................................7

ARTICLE 3  IMPROVEMENTS ............................................................................................8
Section 3.1  Landlord's Work and Tenant's Work ..................................................8
Section 3.2  Plan Approvals. ..................................................................................8
Section 3.3  Performance of Work........................................................................10
Section 3.4  Measurement....................................................................................102

ARTICLE 4 FIXED RENT, TAXES AND PERCENTAGE RENT; DETERMINATION AND
PAYMENT ..........................................................................................................................12
Section 4.1  Fixed Rent .......................................................................................12
Section 4.2  Payment of Rent ..............................................................................12
Section 4.3  Real Estate and Other Taxes. ...........................................................12
Section 4.4  Percentage Rent ...............................................................................14

ARTICLE 5  COMMON AREAS, THEIR USE AND CHARGES .......................................16
Section 5.1  Common Areas: Maintenance...........................................................16
Section 5.2  Common Areas: Restrictions. ...........................................................18

ARTICLE 6  UTILITIES........................................................................................................21
Section 6.1  Utility Service ...................................................................................21
Section 6.2  Interruption .......................................................................................21
Section 6.3  Indemnification .................................................................................21

ARTICLE 7  SIGNS ...............................................................................................................21
Section 7.1  Tenant's Building Signage.................................................................21
Section 7.2  Pylon Signage. ..................................................................................22
Section 7.3  Signage: Alteration/Removal/Allocation...........................................22
Section 7.4  Cooperation.......................................................................................22
Section 7.5  Signage Restrictions and Criteria......................................................22

ARTICLE 8  ALTERATIONS AND IMPROVEMENTS.....................................................23
Section 8.1  Alterations and Improvements. .........................................................23

ARTICLE 9  REPAIRS ..........................................................................................................25
Section 9.1  Tenant's Repairs ...............................................................................25
Section 9.2  Landlord's Repairs ............................................................................25
Section 9.3  Legal Compliance Work ....................................................................27

ARTICLE 10  INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION ....27
Section 10.1  Mutual Release, Waiver of Subrogation and Mutual Indemnification...............27
Section 10.2  Tenant's Insurance. .........................................................................28
Section 10.3  Landlord's Insurance. ......................................................................28
Section 10.4  General Insurance Requirements. ....................................................29

ARTICLE 11  FIRE AND OTHER CASUALTY; EMINENT DOMAIN ..................................30
Section 11.1  Fire and Other Casualty. ..................................................................30
Section 11.2  Eminent Domain ..............................................................................32
Section 11.3  Abatement of Rent Charges .............................................................33

ARTICLE 12  COVENANTS, REPRESENTATIONS AND WARRANTIES ...........................33
Section 12.1  Quiet Enjoyment ..............................................................................33
Section 12.2  Authority ..........................................................................................34

i

Section 12.3  Landlord's Covenants, Warranties and Representations .......................................34
Section 12.4  Environmental Matters..................................................................................35
Section 12.5  OEA .............................................................................................................37

ARTICLE 13  USES AND RESTRICTIONS .........................................................................37
Section 13.1  Permitted and Prohibited Uses.......................................................................37
Section 13.2  Tenant's Exclusive in Center.........................................................................37
Section 13.3  Exclusives Which Tenant Must Honor ...........................................................39

ARTICLE 14  CONDUCT OF BUSINESS OPERATIONS ......................................................39
Section 14.1  Tenant's Opening Covenant ..........................................................................39
Section 14.2  Landlord's Recapture Right ..........................................................................39

ARTICLE 15  TENANT ASSIGNMENT AND SUBLETTING..................................................40
Section 15.1  Assignment and Subletting. ..........................................................................40
Section 15.2  Liability of Tenant .......................................................................................40
Section 15.3  Collateral Assignment..................................................................................41
Section 15.4  Cure Rights of Original Tenant......................................................................41
Section 15.5  Recognition Agreement ................................................................................41

ARTICLE 16  DEFAULT AND DISPUTE RESOLUTION .......................................................42
Section 16.1  Tenant Default. ...........................................................................................42
Section 16.2  Landlord Default..........................................................................................43
Section 16.3  Arbitration...................................................................................................43

ARTICLE 17  RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
CERTIFICATE....................................................................................................................44
Section 17.1  Right to Mortgage and Non-Disturbance..........................................................44
Section 17.2  Estoppel Certificate .....................................................................................44
Section 17.3  Existing Mortgages and Ground Leases ...........................................................45

ARTICLE 18  NOTICE ......................................................................................................45

ARTICLE 19  TENANT'S PROPERTY..................................................................................45

ARTICLE 20  END OF TERM .............................................................................................46
Section 20.1  Surrender of Premises ..................................................................................46
Section 20.2  Hold Over....................................................................................................46

ARTICLE 21  INTENTIONALLY OMITTED .........................................................................46

ARTICLE 22  ONGOING CO-TENANCY .............................................................................46

ARTICLE 23  MISCELLANEOUS .......................................................................................46
Section 23.1  Loading Facilities.........................................................................................46
Section 23.2  Liens...........................................................................................................46
Section 23.3  Broker's Commission ...................................................................................47
Section 23.4  Force Majeure .............................................................................................47
Section 23.5  Consents......................................................................................................47
Section 23.6  Costs...........................................................................................................47
Section 23.7  Attorneys' Fees ...........................................................................................47
Section 23.8  Survival of Obligations .................................................................................47
Section 23.9  Non-Waiver.................................................................................................47
Section 23.10  Rights Cumulative ......................................................................................48
Section 23.11  Definition of Landlord .................................................................................48
Section 23.12  Successors and Assigns................................................................................48
Section 23.13  Limitation of Landlord's Liability .................................................................48
Section 23.14  Limitation of Tenant's Liability.....................................................................48
Section 23.15  Joint and Several Liability ............................................................................48
Section 23.16  Severability ...............................................................................................48
Section 23.17  Grammatical Usages and Construction............................................................48
Section 23.18  Table of Contents, Line Numbering and Paragraph Headings ...........................49

Section 23.19  Definition of Hereunder, Herein, etc. ................................................................49
Section 23.20  Short Form Lease ...............................................................................................49
Section 23.21  Entire Agreement and Modification ...................................................................49
Section 23.22  No Joint Venture or Partnership Created by Lease............................................49
Section 23.23  Payment Under Protest ......................................................................................49
Section 23.24  Work Performed Under Protest .........................................................................49
Section 23.25  Tenant's Tradename............................................................................................49
Section 23.26  Counterparts.......................................................................................................49
Section 23.27  Waiver of Trial by Jury......................................................................................49
Section 23.28  Governing Law ..................................................................................................50
Section 23.29  Ethical Conduct Policy  .....................................................................................50
Section 23.30  Supplemental Permits ........................................................................................50

| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Intentionally Omitted |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Guaranty of Lease |

4191724v7

# LEASE AGREEMENT

THIS LEASE AGREEMENT ("*Lease*") is entered into as of _May 25_, 2012 by and between **BG MONMOUTH, LLC**, a New Jersey limited liability company, having an office at c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, Attention: Senior Vice President of Anchor Store Leasing ("*Landlord*"), and **BUY BUY BABY, INC.**, a Delaware corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*").

## W I T N E S S E T H:

## ARTICLE 1
## BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.    The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent and Percentage Rent.

1.1.2    Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, "*control*" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  Payment of Percentage Rent (except that for purposes of this paragraph, the (i) the Percentage Multiple shall be deemed to equal to four (4%) percent, and (ii) the Sales Break Point shall be deemed to be One ($1.00) Dollar), not to exceed the amount of Fixed Rent which otherwise would have been payable during such period (the "*Cap*"). Notwithstanding anything to the contrary contained in this Lease, if Tenant is entitled to pay Alternate Rent hereunder and Tenant is not open for business to the public in the Premises as a fully stocked, fixtured and staffed retail store, then Alternate Rent shall be equal to fifty-percent (50%) of the then payable Fixed Rent in lieu of the Fixed Rent and Percentage Rent that otherwise would have been payable during such period.  Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains, and shall be payable in lieu of Fixed Rent and Percentage Rent normally payable under Article 4 below.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of "Gross Sales" (hereinafter defined in Subsection 4.4.2) achieved during, and the amount of Alternate Rent payable for, such month.

1.1.4    Common Areas:  All areas of the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and utility lines serving such common areas and facilities.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.5A    Critical Area:  As defined in Subsection 3.3.5. hereof.

1.1.6    Delivery Date:  As defined in Subsection 2.3.1 hereof.

1.1.7    Effective Date:  The date hereof.

1.1.8    Event of Default:  As defined in Subsection 16.1.1 hereof.

1.1.9    Excused Periods:  Such periods of time during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force*

1

*Majeure,* or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

       1.1.10  <u>Exhibits</u>.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

       1.1.11  <u>Fixed Rent</u>:  The following amounts for the periods indicated:

       (a)     For the period commencing on the Rent Commencement Date and ending on the day preceding the sixth (6th) anniversary of the Rent Commencement Date, at the rate of Two Hundred Twenty-Two Thousand Two Hundred Thirty and 00/100 Dollars ($222,230.00) per year based on Ten and 00/100 Dollars ($10.00) per square foot of Floor Area in the Premises;

       (b)     For the period commencing on the sixth (6th) anniversary of the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of Two Hundred Forty-Four Thousand Four Hundred Fifty-Three and 00/100 Dollars ($244,453.00) per year based on Eleven and 00/100 Dollars ($11.00) per square foot of Floor Area in the Premises;

       (c)     In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Two Hundred Sixty-Six Thousand Six Hundred Seventy-Six and 00/100 Dollars ($266,676.00) per year based on Twelve and 00/100 Dollars ($12.00) per square foot of Floor Area in the Premises;

       (d)     In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Two Hundred Eighty-Eight Thousand Eight Hundred Ninety-Nine and 00/100 Dollars ($288,899.00) per year based on Thirteen and 00/100 Dollars ($13.00) per square foot of Floor Area in the Premises;

       (e)     In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Three Hundred Eleven Thousand One Hundred Twenty-Two and 00/100 Dollars ($311,122.00) per year based on Fourteen and 00/100 Dollars ($14.00) per square foot of Floor Area in the Premises; and

       (f)     In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Three Hundred Thirty-Three Thousand Three Hundred Forty-Five and 00/100 Dollars ($333,345.00) per year based on Fifteen and 00/100 Dollars ($15.00) per square foot of Floor Area in the Premises.

       1.1.12  <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building or permanently enclosed structure in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants or occupants other than: (i) exterior loading dock areas, (ii) trash compactor areas and trash container areas, (iii) any separately enclosed space incidentally used by Landlord solely for building utilities, mechanical equipment or equipment used for Common Area maintenance, (iv) any areas of the Shopping Center not within a building or permanently enclosed structure which from time to time may be used for sales, display and/or storage purposes as may be permitted under this Lease, or (v) sidewalk areas used in connection with sidewalk sales as permitted under this Lease.  Landlord and Tenant acknowledge and agree that notwithstanding anything to the contrary herein contained, the square footage of the garden center located adjacent to Unit 26 shall not be included when calculating Floor Area of the Shopping Center so long as such area is operated as a garden center.  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

       1.1.13  <u>*Force Majeure*</u>:  As defined in Section 23.4 hereof.

       1.1.14  <u>Ground Lessor</u>:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center (as defined below).

2

1.1.14A  <u>Guaranty of Lease</u>:  That certain Guaranty of Lease, dated of even date herewith, pursuant to which Bed Bath & Beyond Inc., a New York corporation (the "***Parent Corporation***") guaranteed to Landlord the performance of Tenant's obligations hereunder. The form of the Guaranty of Lease is attached hereto as <u>Exhibit N</u>.

1.1.15  <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1(b) hereof.

1.1.16  <u>Intentionally Omitted</u>.

1.1.17  <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.18  <u>Landlord's Mailing Address</u>:  c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, Attention:  Senior Vice President of Anchor Store Leasing, with a copy at the same location to Attention:  Vice President/General Counsel, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof. If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

1.1.19  <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.20  <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.21  <u>Legal Requirements</u>:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.22  <u>Mortgagee</u>:  Any Institutional Lender (as defined in Section 15.3) which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is a beneficiary under a deed of trust encumbering the Shopping Center.

1.1.23  <u>Parent Corporation</u>.  As defined in Subsection 1.1.14A hereof.

1.1.24  <u>Percentage Multiple</u>:  As defined in Subsection 4.4.1 hereof.

1.1.25  <u>Percentage Rent</u>:  As defined in Subsection 4.4.1 hereof.

1.1.26  <u>Permitted Encumbrances</u>:  The matters described on <u>Exhibit E</u>.

1.1.27  <u>Permitted Use</u>:  Subject to the Permitted Encumbrances, the Prohibited Uses as set forth on <u>Exhibit M</u>, and the Existing Exclusives (as set forth on <u>Exhibit K-1</u>), as then applicable, the sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of the following: infant's, juvenile's and children's furniture, furnishings, beds (including, without limitation, mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, maternity clothing and related items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food or formula for infants, juveniles and children, feeding items, safety items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, pregnancy books, magazines, computer software, audio and video cassettes or tapes, picture frames, portrait studio items and services, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items, hair cutting services, fitness center development and learning services, and any and all other items sold or provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the "***Permitted Items***"); and for any other lawful

3

retail use not specifically prohibited by the provisions of Subsection 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing approximately twenty-two thousand two hundred twenty-three (22,223) square feet of Floor Area, and (ii) one thousand twenty-five (1,025) square feet of mezzanine level space for office and\or non-selling purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such non-selling space or any space used for fire pump facilities result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option</u>: As defined in Subsection 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>: Four (4) successive periods of five (5) years each, as provided in Subsection 2.2.2 hereof.

1.1.31 <u>Rent</u>: Fixed Rent, Percentage Rent, Alternate Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Subsection 2.2.1 hereof.

1.1.33 <u>Sales Break Point</u>: As defined in Section 4.4.1 hereof.

1.1.34 <u>Shopping Center</u>: The shopping center located at 310 SR 36, in West Long Branch, New Jersey, and more particularly described in <u>Exhibit A</u> hereto. The Shopping Center contains approximately two hundred ninety-two thousand nine hundred ninety-nine (292,999) square feet of Floor Area. The preceding numbers are intended as an estimates only and are not a representations by Landlord as to the actual size or any minimum area to be constructed. Landlord shall not change or agree to change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include or agree to include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35 <u>Substantially Completed or Substantial Completion</u>: The completion of specified work in the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36 <u>Taxes</u>: As defined in Subsection 4.3.2 hereof.

1.1.37 <u>Tenant</u>: As defined in the preamble hereof.

1.1.38 <u>Tenant's Mailing Address</u>: Buy Buy Baby, Inc., 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39 <u>Tenant's Permits</u>: As defined in Subsection 2.3.1(b) hereof.

1.1.40 <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41 <u>Tenant's Pro Rata Share</u>: A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event (other than as described in the balance of this paragraph) shall Tenant's Pro Rata Share be greater than ten and 00/100 (10%) percent (***"Tenant's Maximum"***). Floor

4

Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center. Notwithstanding the foregoing, to the extent that any tenant or collection of tenants (other than Tenant) or an owner of any portion of the Shopping Center, pays the real estate taxes, costs of maintaining the Common Areas and/or the insurance premiums relative to such owner('s)(s') or tenant('s)(s') portion(s) (each, a "*Stand-Alone Tenant*"), then: (a) the amounts thereof shall not be included in the Taxes, Common Areas Charges and/or Insurance Charge, as the case may be, for which Tenant is responsible; and (b) the denominator used to determine Tenant's Pro Rata Share of Taxes, Common Areas Charges and/or Insurance Charge, as the case may be, shall be reduced by the Floor Area of the Stand-Alone Tenant and Tenant's Pro Rata Share shall be adjusted accordingly; and (c) Tenant's Pro Rata Share as so adjusted shall be deemed Tenant's Maximum; the foregoing, however, shall be subject to the following terms and conditions: **(A)** with respect to Taxes, such tenant(s) (or, as applicable owner(s)) shall in any event remain responsible for a proportionate share of Taxes allocable to the Common Areas based on the proportion which the Floor Area of its building bears to the total Floor Area of the Shopping Center (which proportionate share of Taxes shall be excluded from Taxes in the manner described in the preceding clause (a) of this Subsection 1.1.41), and **(B)** with respect to Common Areas Charges, such tenant(s) (or, as applicable owner(s)) shall in any event remain responsible for the proportionate share of Common Areas Charges based on the proportion which the Floor Area of its building bears to the total Floor Area of the Shopping Center (which proportionate share of Common Areas Charges shall be excluded from Common Areas Charges in the manner described in the preceding clause (a) of this Subsection 1.1.41), and **(C)** with respect to the Insurance Charge, such tenant(s) (or, as applicable owner(s)) shall in any event remain responsible for the proportionate share of the Insurance Charge based on the proportion which the Floor Area of its building bears to the total Floor Area of the Shopping Center (which proportionate share of the Insurance Charge shall be excluded from the Insurance Charge in the manner described in the preceding clause (a) of this Subsection 1.1.41). Notwithstanding the foregoing, any allocation of Common Areas Charges and/or the Insurance Charge shall at all times remain equitable.

1.1.42  Tenant's Work:  As defined in Section 3.1 hereof.

1.1.43  Term:  A period (the "*Initial Term*") of approximately twelve (12) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the twelfth (12th) anniversary of the Rent Commencement Date. As used herein: (i) "*Term*" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Subsection 2.2.2 below; and (ii) "*Expiration Date*" shall mean the date on which the Term expires.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    Lease of Premises.  Subject to and in accordance with the terms and conditions hereof, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with all other owners, tenants and occupants of the Shopping Center.

Section 2.2    Term.

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term shall begin on the earlier of (such earlier date being referred to herein as the "*Rent Commencement Date*"): (a) the fifth (5th) day after the date Tenant shall initially open the Premises to the general public for business, or (b) the sixtieth (60th) day following the Delivery Date. The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Subsection, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date, and Landlord shall

5

deliver to Tenant a completed and signed IRS Form W-9 prior thereto or contemporaneously therewith; the delivery of the Form W-9 shall be a condition precedent to the payment of Rent.

2.2.2   Renewal Options.  Provided Tenant is not then in default beyond any applicable notice and grace periods, Tenant shall have the right and option (hereinafter a "**Renewal Option**") to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a "**Renewal Period**", and collectively, the "**Renewal Periods**") upon the same terms and conditions as are herein set forth (provided that the Fixed Rent payable for each Renewal Period shall be as set forth in Subsection 1.1.11 above).  Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3     Delivery Date.

2.3.1   Definition.  Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "**Delivery Date**") following the day on which all of the following conditions (the "**Delivery Date Conditions**") shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Subsection 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)     Actual possession of the Premises shall have been delivered to Tenant (i) water-tight, free of Hazardous Substances, in a good, structurally sound condition, and (ii) with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant.

(b)     Subject to the provisions of Subsection 23.30 below, Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any permits (other than permits to be obtained by Landlord pursuant to Exhibit D, which shall remain Landlord's responsibility) or business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, "**Tenant's Permits**")), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and  (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work);

(c)     The Common Areas, and all of the improvements thereto shown on Exhibit B hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed (it being agreed that if on the Delivery Date, the Common Areas and off-site improvements are in substantially the same condition as they existed as of  the Effective Date, then the foregoing condition set forth in this subparagraph (c) shall be deemed satisfied (with the exception of any work required to be performed in the Common Areas as part of Landlord's Work as described on Exhibit D); subject to the provisions of Subsection 23.30 below, Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon signage (and Tenant's panel(s) thereon), construction, and development and use permits;

6

(d)     The representations and warranties of Landlord set forth in subparagraphs (a) through (j) of Section 12.3 below shall then be true and in effect; and

(e)     Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, or such other form as may be agreed upon by the parties, executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(e) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

2.3.2   Delivery Date.

(a)     Landlord shall give Tenant at least forty-five (45) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the "*Delivery Date Notice*"). Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)     Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established by the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur on or before the date established therefor in the Delivery Date Notice, and the delay was not: (i) the result of Force Majeure occurring after the delivery of the Delivery Date Notice; (ii) caused by Tenant, its agents, employees or contractors; or (iii) caused by Changes [as defined in Subsection 3.2.2(a) below] requested by Tenant after the delivery of the Delivery Date Notice, then, as Tenant's sole remedy (along with the remedies contained in Subsection 3.3.2 below and the right to seek injunctive relief) for Landlord's failure to cause the Delivery Date to occur as aforesaid, Tenant may take a credit against the initial installment(s) of Rent hereunder as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, in an amount equal to the sum of: Four Thousand and 00/100 ($4,000.00) for each day that the Delivery Date established in the Delivery Date Notice is delayed ("*Tenant's Liquidated Costs*"), it being acknowledged and agreed by Landlord and Tenant that Tenant's Liquidated Costs represent the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3   Delivery Date Certification. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4   Unseasonable Delivery: Slack Period. If, for any reason (including, without limitation, Force Majeure), but except for net delays proximately caused by Tenant, its agents, employees and/or contractors, including Changes [as defined in Subsection 3.2.2(a) below] after Tenant's submission of the Tenant's Plans to Landlord or after Tenant's approval of the Final Landlord's Plans and Specifications, the Delivery Date occurs during the period commencing on November 1 and ending on the February 1 next following] (the "*Slack Period*"), then Tenant shall have, in addition to any other remedies, the right to:

(a)     accept physical possession of the Premises; or

7

(b)    delay its acceptance of delivery of physical possession of the Premises to a date not later than the end of the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions), except that Tenant shall not be entitled to Tenant's Liquidated Costs for any portion of the Slack Period occurring after the date on which all of the Delivery Date Conditions shall have been satisfied; and

in either event, if the Rent Commencement Date occurs before the end of the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of the Fixed Rent and Percentage Rent for the period commencing on the Rent Commencement Date and ending at the end of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

# ARTICLE 3
# IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto, and the "Final Landlord's Plans and Specifications" (hereinafter defined in Subsection 3.2.1(j)) (collectively, "*Landlord's Work*"), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as "*Tenant's Work*") that Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the "*Preliminary LOD*") [Limits of Demised], which shall be subject to any reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially consistent with Exhibits B, D, and D-1 hereto. The parties acknowledge that Landlord delivered the Preliminary LOD to Tenant prior to the Effective Date.

(b)    Within thirty (30) days after Tenant's receipt of the Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the "*Revised LOD*"), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions. The parties acknowledge that Tenant delivered the Revised LOD to Landlord prior to the Effective Date.

(c)    Within fifteen (15) days after Landlord's receipt of the Revised LOD, Landlord shall deliver to Tenant a final LOD (as approved by Tenant, the "*Certified LOD*"), certified by Landlord, which shall incorporate all of the elements of the Revised LOD. Within fifteen (15) days after its receipt of such final LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements.  After Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.  The parties acknowledge that Landlord has delivered and Tenant has approved the Certified LOD prior to the Effective Date.

(d)    On or before April 2, 2012, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively,

8

***"Tenant's Plans"***), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(e)      Within fifteen (15) days after receipt of Tenant's Plans, Landlord shall prepare and deliver to Tenant, in a single submission, ***"Landlord's Plans and Specifications"*** (as defined in Exhibit D hereto), and each of the plans which collectively constitute Landlord's Plans and Specifications shall be at least 85% complete, in Tenant's reasonable judgment.  Landlord's Plans and Specifications shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(f)      Within ten (10) business days after its receipt of Landlord's Plans and Specifications, Tenant shall give Landlord notice of the respects, if any, in which Landlord's Plans and Specifications fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto.

(g)      Within ten (10) days after the date on which Landlord receives Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a single submission, revised Landlord's Plans and Specifications, which shall be 100% complete and shall address all of Tenant's comments.

(h)      Within fifteen (15) days after its receipt of the revised Landlord's Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted.

(i)      In the event that the Landlord's re-submittal of Landlord's Plans and Specifications is not approved by the Tenant, then Landlord shall further revise Landlord's Plans and Specifications to address all Tenant comments and re-submit them to Tenant for Tenant's review and approval.  The re-submittal described in the preceding sentence shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice that the previous submittal has not been approved.  The process described in this subparagraph (i) and subparagraph (h) above shall be repeated until Landlord has secured Tenant's approval of Landlord's Plans and Specifications.

(j)      In the event that Landlord's Plans and Specifications have not been approved by Tenant on or before May 18, 2012, then on June 1, 2012, Tenant and Landlord's shall meet face-to-face at Tenant's office in Union, New Jersey to address all of Tenant's comments to the Landlord's Plans and Specifications with the goal of achieving a marked-up set of Landlord's Plans and Specifications that are approved by Tenant.  Landlord's Plans and Specifications as finally approved as noted by Tenant are referred to herein as the ***"Final Landlord's Plans and Specifications"***.

(k)      Upon Tenant's approval of the Final Landlord's Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval.  Unless specifically noted on a separate summary sheet attached to the Final Landlord's Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Landlord's Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(l)      All submissions by the parties of the Preliminary LOD, Revised LOD, Certified LOD, the Tenant's Plans, the Landlord's Plans and Specifications, and the Final Landlord's Plans and Specifications, and the measurements required under Subsection 3.4.2 below, shall be made (or accompanied) by the computer files thereof formatted in any version of ***"Autocad 2002"*** up to ***"Autocad 2010"***.

(m)      In the event Tenant fails to give the plans or notices set forth in subsections (c), (d) (f), (h) and (i) of this Subsection 3.2.1 within the time periods set forth in such subsections and within five (5) days after Tenant's receipt of written notice from Landlord advising Tenant of such failure, then the 60-day period set forth in Subsection 2.2.1(b) shall be reduced one (1) day for each day that Tenant delays giving such plans or notice.

9

3.2.2    <u>Plan Changes</u>.

(a)    Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in <u>Exhibit D</u> hereto (collectively, the ***"Prototype Standards/Specifications"***), and/or to require Landlord to subsequently make changes to Landlord's Plans and Specifications and/or the Final Landlord's Plans and Specifications in accordance therewith (each, a "*Change*" and collectively, the "*Changes*"). Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change. If Tenant fails to authorize such Change by written notice to Landlord within five (5) business days after receiving Landlord's notice, then Tenant shall be deemed to have disapproved such Change. Subject to the foregoing provisions of this Subsection 3.2.2(a), Tenant shall be responsible, subject to and in accordance with the terms of this Subsection 3.2.2, for any and all Changes initiated by Tenant whether directly with Landlord or with Landlord's designated architect or general contractor (in lieu of directly with Landlord). Nothing contained in this Subsection 3.2.2(a) shall place responsibility upon Tenant for any Changes generated by Tenant that are required to correct defective, incorrect or incomplete Landlord's Work (or Landlord's Work that does not comply with Legal Requirements).

(b)    Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding five (5%) percent subcontractor profit and five (5%) percent general contractor profit thereon), taking into account any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen. Notwithstanding the foregoing, Landlord shall not be required to effect a Change unless it is evidenced by a written change order signed by an authorized representative of Tenant, which change order shall incorporate the provisions of this subsection (b). Written evidence of approval of a Change will include an original or fax copy of an authorizing signature as well as an email notification from Tenant or Tenant's representative.

(c)    If the Changes occur during the preparation of any of the plans described in Subsection 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such Changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the date set forth in Subsection 3.3.2 below, shall be postponed by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

<u>Section 3.3</u>    <u>Performance of Work</u>.

3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new or like new, first-class materials, and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits. Landlord shall pay all impact fees and related governmental charges in connection with the Shopping Center and the Premises. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

4191724v7

3.3.2   If the Delivery Date shall not have occurred by May 1, 2013 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and delays proximately caused by Tenant, its agents, employees and/or contractors), then Tenant may thereafter, during such time as the Delivery Date has not occurred, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)   terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees and the performance of Tenant's Work), not to exceed Thirty-Five Thousand and 00/100 ($35,000) Dollars; and/or

(ii)   avail itself of the remedies set forth in Section 16.2 below (provided, however, that (x) the cure period set forth therein shall not be applicable, and (y) Tenant seeks a remedy under Sections 16.2(a) or (c) or injunctive relief and/or specific performance but not damages); and/or

(iii)   extend one or more times the date set forth above in this Subsection 3.3.2 to such future date designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Subsection.

3.3.3   Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list or such additional period of time as may reasonably be necessary with respect to any particular Punch List Item that cannot reasonably be completed within such 10-day period, provided Landlord is diligently pursuing completion of such work (but in no event shall such additional time period exceed an additional 20 days).  If Landlord fails to complete any item on said punch list within said period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand and presentation of receipts and invoices for such work. If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work upon demand and presentation of receipts and invoices for such costs and expenses.  As used herein, the term "*Punch List Items*" shall mean such minor items of fit or finish which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4   Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5   Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord (x) affecting any portion of the entrances or exits of the Shopping Center, or in the Critical Area (hereinafter defined), (y) adversely affecting Tenant's use and occupancy of the Premises and/or (z) adversely affecting access to the Premises from the Common Areas, shall be subject to the following terms and conditions:

11

(a)     No staging or storage of materials or parking of construction vehicles shall at any time occur within the portions of the Shopping Center designated as "Critical Area" on Exhibit B hereto (the **"Critical Area"**);

(b)     Landlord shall at all times proceed diligently to ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place in a manner which will interfere (other than de minimis interferences) with vehicular access to the Premises from the roads adjacent to the Shopping Center or otherwise materially interfere with the normal conduct of any business operation in the Premises; and

(c)     Landlord shall maintain or cause to be maintained the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.6   Intentionally Omitted.

Section 3.4   Measurement.

3.4.1   Intentionally Omitted.

3.4.2   Measurement of Storage Area/Mezzanine.  Within five (5) days after the substantial completion of the floor system for the office mezzanine and the installation of the floor tracks for the walls enclosing it, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the square footage of each of said non-selling space(s), the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If the square footage of the non-selling space on the office mezzanine varies from that shown on the Final Landlord's Plans and Specifications, then, at Tenant's request, Landlord shall correct such work to conform to the Final Landlord's Plans and Specifications.

# ARTICLE 4
# FIXED RENT, TAXES AND PERCENTAGE RENT: DETERMINATION AND PAYMENT

Section 4.1   Fixed Rent.   Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without demand, deduction or set off, except to the extent otherwise expressly provided herein.

Section 4.2   Payment of Rent.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant may designate a corporation or other entity to act as a paying agent (the **"Paying Agent"**), to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3   Real Estate and Other Taxes.

4.3.1   Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.2 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.  Tenant shall pay on or before the due dates thereof, all personal property taxes on Tenant's Property.

12

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

(c)    As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation.  Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities.  For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease (except as may be otherwise expressly provided herein); (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State of New Jersey), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease by Landlord of all or any portion of the Shopping Center to an Affiliate of Landlord; other than an increase in Taxes, if any, after the Rent Commencement Date resulting solely from any such sale or lease that is valued at or below the then fair market value of the Shopping Center (as to a sale) or such lease; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).  Landlord estimates (but does not guarantee) that the Tenant's Pro Rata Share of Taxes for the first full calendar year during the Term shall be approximately $3.08 per square foot of Floor Area in the Premises.

4.3.3    At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Taxes is received (other than as a result of any tax appeal of Taxes for a real estate fiscal tax year not within the Term), Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

13

<u>Section 4.4</u>    Percentage Rent.

4.4.1    <u>Payment</u>. During and for each full calendar year during the Term, Tenant shall pay annual percentage rent (***"Percentage Rent"***) equal to three (3%) percent (the "***Percentage Multiple***") of all "Gross Sales" (hereinafter defined in Subsection 4.4.2) resulting from business conducted in, on or from the Premises during such calendar year in excess of Six Million Dollars ($6,000,000.00) and less than or equal to Ten Million Dollars ($10,000,000.00) (the Six Million Dollar ($6,000,000.00) and Ten Million Dollars ($10,000,000.00) break points are each referred to as the "***Sales Break Point***" as the context requires) (i.e., no more than One Hundred Twenty Thousand and 00/100th Dollars ($120,000) shall be payable in Percentage Rent in any calendar year). Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year <u>provided, however</u>, that Tenant shall not be required to provide such compilation if the amount of Gross Sales for such calendar year is less than ninety percent (90%) of the Sales Break Point. The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Notwithstanding the foregoing, no Percentage Rent shall be payable with respect to the period commencing on the Rent Commencement Date and ending on the December 31 next following the Rent Commencement Date. Gross Sales generated during any period when Alternate Rent is payable under this Lease shall be excluded from the determination of Gross Sales for purposes of computing Percentage Rent hereunder in the manner described below. If the Term shall end other than at the end of a calendar year, Percentage Rent for such final partial calendar year shall be calculated for the 365 day period ending at the end of the Term, and then such amount shall be multiplied by a fraction having as a numerator the number of days from, but excluding, the last day of the immediately preceding calendar year to the end of the Term and having as a denominator the number "365". The product is the Percentage Rent for such final partial calendar year, which Tenant shall pay to Landlord within ninety (90) days after the end of the Term. If Alternate Rent is payable with respect to only a portion of a calendar year, Percentage Rent for such partial calendar year shall be calculated: (a) for the 365 day period(s) ending at the beginning of the Alternate Rent period; and (b) for the 365 day period(s) ending at the end of the calendar year in which the Alternate Rent period ends; and then (I) the amount set forth in clause (a) shall be multiplied by a fraction having as a numerator the number of days from, but excluding, the last day of the immediately preceding calendar year to the beginning of the Alternate Rent period and having as a denominator the number "365", plus (II) the amount set forth in clause (b) shall be multiplied by a fraction having as a numerator the number of days from, but excluding, the last day of the Alternate Rent period to the last day of the calendar year in which such Alternate Rent period ends and having as a denominator the number "365". The sum of the products calculated in clauses (I) and (II) above is the Percentage Rent for such partial calendar year, which Tenant shall pay to Landlord within sixty (60) days after the close of such partial calendar year.

4.4.2    <u>Definition of Gross Sales</u>. As used herein, the term "***Gross Sales***" shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant (subject, however, to Subsection 4.4.6) and any other person or entity operating in the Premises (for purposes of this Subsection 4.4.2 only, collectively, "***Tenant***"), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards (regardless of where or how such gift certificates and gift cards were purchased). Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term "***Gross Sales***" shall <u>exclude</u>: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, **(2)** *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, **(6)** receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at discount (which, for the purposes of determining

14

Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(8)** fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates and/or gift cards, and **(15)** forfeited deposits.

   4.4.3 <u>Books and Records</u>. Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be allowed to maintain its books and records in a computerized form; <u>provided</u>, <u>however</u>, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for at least two (2) years following the end of the calendar year to which they refer.

   4.4.4 <u>Landlord's Right to Audit</u>. Landlord and/or Landlord's auditor shall have the right, upon at least thirty (30) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales.  If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency.  If such deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit.  Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

   4.4.5 <u>Confidentiality</u>. Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, <u>provided</u>, <u>however</u>, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

   4.4.6 <u>Licensees</u>. If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the "***Licensees***") permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the product obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the unlicensed portion) of the Premises.  The provisions of this Subsection 4.4.6 shall not apply to more than 4,000 square feet of Floor Area, in the aggregate, in the Premises at any one time.  If more than 4,000 square feet of the Floor Area of the Premises is licensed to Licensees at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

   4.4.7 <u>Intentionally Omitted</u>.

   4.4.8 Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease.

4191724v7

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace, or cause to be operated, maintained, repaired and/or replaced, the Common Areas as required by this Lease and otherwise to the standard by which common areas of first-class shopping centers in the West Long Branch, New Jersey metropolitan area are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

(a)    During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) incurred by Landlord to operate, maintain, and repair the Common Areas; provided, however, that during the first full calendar year of the Term, Tenant's Pro Rata Share of Common Areas Charges shall not exceed One and 57/100 Dollars ($1.57) per square foot of Floor Area in the Premises, which amount includes the Administrative Fee described below.  Landlord shall be permitted to include in Common Areas Charges (in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas) for each calendar year an administrative fee (the "*Administrative Fee*") equal to five (5%) percent of the Common Areas Charges for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible Common Areas Charge hereunder), the cost of electricity and other utilities, and the cost of snow and ice removal.  Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget; provided, however, that Landlord's budget, starting with the second full calendar year, shall not exceed one hundred five (105%) percent of the Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the costs of snow and ice removal, costs of security and utility rate increases). Landlord shall provide Tenant, upon Tenant's request, with reasonable backup documentation and applicable evidence of prior bills and payments.

(b)    Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the *"CAC Reconciliation Statement"*).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year.  If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  In addition, Tenant reserves all of its rights and remedies to which it may be entitled under this Lease, at law, or in equity in the event Landlord fails to timely remit to Tenant any such overpayment prior to the expiration or sooner termination of this Lease.  Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges with respect to the first full calendar year of the Term exceed

16

One and 57/100 Dollars ($1.57) per square foot of Floor Area (as set forth in clause (a) above), and with respect to any other calendar year thereafter (exclusive of the cost of snow and ice removal, security costs, and utility rate increases) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the costs of snow and ice removal, costs of security and utility rate increases during such calendar year)(the *"CAM Cap"*).

5.1.3   Exclusions from Common Areas Charges.

(a)   Common Areas Charges shall not include: **(1)** the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; **(2)** the cost of any replacements or capital improvements to the Shopping Center, (for example, the cost of repaving the parking areas as opposed to patching), except that the capital costs of replacement and/or improvements to the Common Areas may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over their useful life, as determined in accordance with generally accepted accounting principles, provided that such replacements and/or improvements are of substantially the same quality as the original installations; **(3)** the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1), except that with respect to spills of Hazardous Substances in the Common Areas by third parties (other than Landlord, Tenant or any other tenant or occupant in the Shopping Center), the reasonable costs of clean-up which are not covered by the insurance required to be maintained by Landlord pursuant to Section 10.3 hereof, or not otherwise insured by Landlord, and which are not recoverable from the party who caused the spill, may be included in Common Areas Charges, but Tenant's Pro Rata Share thereof shall not exceed Five Thousand and 00/100 ($5,000.00) Dollars in any calendar year (and such cost shall also be subject to the CAM Cap); **(4)** any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; **(5)** the cost of maintaining, repairing or providing security for interior portions of buildings; **(6)** Taxes or other taxes levied or assessed against Landlord or the Shopping Center; **(7)** the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements except that Common Areas Charges shall include the cost of compliance with laws affecting only the Common Areas provided that same shall (A) apply only to laws enacted after the Rent Commencement Date, (B) not be necessitated by the acts or omissions of Landlord or any other tenant or occupant or any of their respective agents, subtenants, occupants, contractors or employees, (C) benefit all tenants and occupants in the Shopping Center equally, (D) be amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, if they are deemed to be capital expenditures according to generally accepted accounting principles(and such costs shall also be subject to the CAM Cap), and (E) be similarly imposed on all other tenants and occupants in the Shopping Center; **(8)** any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; **(9)** any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); **(10)** intentionally omitted; **(11)** sums paid or owed by Landlord to any tenant or occupant in the Shopping Center; **(12)** costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant or occupant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); **(13)** costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; **(14)** sums incurred as late payment fees, penalties or interest; **(15)** ground rent; **(16)** depreciation; **(17)** costs disproportionately incurred by or on behalf of any one or more of the tenants or occupants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court on the Shopping Center); **(18)** electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; **(19)** Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; **(21)** costs and expenses payable to Landlord or to an Affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(22)** repairs resulting from defects in the original construction of

17

buildings and improvements on the Shopping Center arising within one (1) year after the Rent Commencement Date; **(23)** the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); **(24)** reserves for anticipated future expenses; **(25)** except for the Administrative Fee provided for in Subsection 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; and **(26)** costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems.

(b)      In addition, if any tenant(s) or other occupant(s) of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of the relevant costs only shall be reduced by the Floor Area of the tenant(s) or other occupant(s) which directly paid these costs.

(c)      Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4   <u>Tenant's Right to Audit</u>.  Tenant shall have the right (not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share thereof for a period of three (3) calendar years after the year in which Landlord's calculations are received by Tenant.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right to offset such amount from payments of Fixed Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

<u>Section 5.2</u>      <u>Common Areas: Restrictions</u>.

5.2.1   <u>Continuous Access</u>.  No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center or the Premises as shown on <u>Exhibit B</u> hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term in such a manner as to unreasonably interfere with ingress and egress to the Shopping Center or the Premises. Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; <u>provided</u> that such closure shall not occur during August (through Labor Day), November or December of any calendar year.

5.2.2   <u>No Alterations</u>.  Landlord shall not, without obtaining Tenant's prior written consent in each instance:  (i) alter the area of the Shopping Center or the location, availability, or size of any Common Area improvement located within the Critical Area,

18

(ii) materially change the number, location, or layout of parking spaces in the Critical Area, (iii) construct any structures or buildings (including, without limitation, any kiosks, booths, signs or similar structures) within the Critical Area, or (iv) materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks within the Critical Area or other Common Area, from those shown on Exhibit B hereto. Tenant's consent with respect to (ii), (iii) and (iv) above may be withheld in its sole and absolute discretion, notwithstanding anything otherwise contained in Section 23.5 hereof. In the event Tenant consents to any such work, except for emergencies, it shall not be performed during August (through Labor Day), November and December of any year, and shall be undertaken in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises or Tenant's rights under this Lease.

5.2.3    Intentionally Omitted.

5.2.4    Parking Area.    Except as specifically permitted by Subsection 5.2.2 hereof, during the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, or (ii) four (4) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space in the Critical Area being at least nine (9) feet in width and eighteen (18) feet in length (or such smaller dimensions as may exist on the date of this Lease). Landlord shall not reduce the number of parking spaces in the Critical Area from the number of parking spaces shown on Exhibit B, unless required by Legal Requirements and, subject to the provisions of Subsection 23.30 below, shall permit certain parking spaces to be designated for expectant mothers as shown on Exhibit B unless prohibited by any of the Existing Leases and a tenant for whom the prohibition, if any, benefits requests that such prohibition be enforced. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces within the Critical Area for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the owners of the Shopping Center (or portions thereof), other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees and any persons entitled to use such parking areas as provided by the Permitted Encumbrances. Tenant shall use reasonable efforts to have its employees park their motor vehicles in any area reasonably designated by Landlord as "Employee Parking" (provided such area is not in the Critical Area, but is in reasonable proximity to the Premises); and Landlord shall take all reasonable measures to have the employees of other tenants and occupants of the Shopping Center park outside the Critical Area. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Subject to the rights of tenants under Existing Leases, Landlord shall not permit overnight parking in the Shopping Center, except that Tenant shall be entitled to park overnight in the parking lot located in front of the Premises one box truck that is used exclusively for delivery of merchandise purchased by Tenant's customers.

5.2.5    Lighting.    Throughout the Term, Landlord shall cause the Common Areas to be fully lighted and open to the customers of the Shopping Center seven (7) days a week at all times during normal retail shopping center hours, which shall include until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall also cause the Common Areas to be lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours.

5.2.6    Repairs.    During the Term, any construction or repair by Landlord of the Premises, or in the Critical Area, permitted or required under this Lease shall:

(a)    not be performed during the months of October, November, December or January of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)    be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

19

(c)    be performed in accordance with the requirements of Subsection 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7  Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all of Landlord's tenants in the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8  Miscellaneous.

(a)    No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, but subject to applicable Legal Requirements, the Permitted Encumbrances and any restrictions set forth in the lease between Landlord and PetSmart (the *"PetSmart Lease"*), tenants of the Shopping Center (including Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales in front of their respective stores only, provided that Landlord shall use commercially reasonable efforts to require that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or the business operations of other tenants in their respective premises nor materially impair the visibility of Tenant's (or other tenants') signage. Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements. Landlord and Tenant agree that notwithstanding anything contained in the PetSmart Lease to the contrary, if Tenant elects to display seasonal merchandise on the sidewalk in front of the Premises in accordance with the provisions of this Section 5.2.8(a), (i) Landlord shall permit Tenant to conduct such sidewalk sale unless PetSmart has notified Landlord in writing that such sidewalk sale constitutes a breach by Landlord under the PetSmart Lease, and (ii) Tenant shall indemnify Landlord as provided in Section 10.1.3(a).

(b)    Trash Compactor and Containers. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "*Trash Compactor Pad*"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "*Trash Container Pad*". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)    Shopping Carts. Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto, subject to applicable Legal Requirements and the provisions of Subsection 23.30 below. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)    Cellular Towers. No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center except in the rear of the Shopping Center; provided such towers shall not be located behind the building of which the Premises is a part or in the Critical Area and shall be clear of all truck access ways and loading areas; provided however the foregoing shall not restrict either (i) a concealed cell phone antenna erected upon or as part of a pylon sign structure so long as the same is visually and structurally integrated into the pylon sign structure so as not to be distinguishable therefrom, (ii) antenna located on the roof of any building, or (iii) any existing transmission and/or reception tower or antenna.

(e)    Temporary Storage Container. Tenant shall be permitted to maintain a temporary storage container or trailer in the location designated on Exhibit B hereto during the Term, subject to applicable Legal Requirements and Permitted Encumbrances. Tenant

20

acknowledges and agrees that the temporary storage container or trailer shall not interfere with ingress or egress to the Shopping Center.

## ARTICLE 6
## UTILITIES

Section 6.1    Utility Service.    From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.   Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord, unless: (i) the quality of the service(s) provided is at least equal to the quality of the same service(s) provided by the public utility corporation or governmental authority providing such utilities in the area in which the Shopping Center is located; and (ii) the cost of such services(s) shall not exceed the cost of the same service if Tenant had obtained such service directly from the applicable public utility company, and (iii) Landlord shall pay the costs of reconnection. Landlord shall provide separate utility meters or sub-meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).   Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date.   Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider access to, and use of, those telecommunications conduits in the Shopping Center that are controlled by Landlord for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2    Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to no fault on the part of Tenant, its employees, agents or contractors, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If such disrupted utilities are not restored within twenty-four (24) hours after Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption, but if a disruption in water service to the Premises continues for a period of three (3) months, Tenant shall, at any time thereafter when the disruption continues, have the right to terminate this Lease upon thirty (30) days' prior notice to Landlord, in which event neither party shall have any further liability under this Lease, except as set forth in Section 23.8 below or as otherwise expressly set forth in this Lease.  The time periods set forth in this Section 6.2 shall not be subject to Force Majeure.

Section 6.3    Indemnification.  Except as otherwise provided in Subsections 10.1.1 and 10.1.2 below, Landlord covenants to defend, indemnify and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, arising from or out of any utility disruption described in Section 6.2 above not caused by the fault of Tenant, its employees, agents or contractors, but in no event shall Landlord be liable to Tenant for consequential and/or punitive damages.

## ARTICLE 7
## SIGNS

Section 7.1    Tenant's Building Signage.  Subject to compliance with applicable Legal Requirements, Tenant shall have the exclusive right, in connection with Tenant's Work, at its sole cost and expense, to supply and install the signage in accordance with Exhibits D, D-1, and F hereto.  Thereafter during the Term, subject to compliance with Legal Requirements, Tenant shall have the exclusive right, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy (*e.g.*, blade) signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire.  Subject to compliance with applicable Legal Requirements, Tenant shall also be entitled, at Tenant's sole cost and expense, to install and maintain, during the period commencing on the Effective Date and ending on the day prior to the Rent Commencement Date, a temporary sign on the storefront of the Premises and such other walls of

21

the Premises selected by Tenant which states "buybuy BABY Coming Soon" (which sign is more particularly shown in <u>Exhibit F</u> hereto). Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared. Landlord acknowledges and agrees that, in the event, during the Term of this Lease, any tenant of the Shopping Center is permitted to seek a waiver or variance from the Legal Requirements applicable to the size of its storefront signage, Tenant shall have the right, at Tenant's cost and expense, to seek a waiver/variance to permit the installation of similar sized storefront signage at the Premises and Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

<u>Section 7.2</u>     <u>Pylon Signage</u>.

7.2.1    Landlord shall provide pylons at the locations shown on <u>Exhibit B</u> hereto during the entire Term, and obtain all permits and approvals therefor. Tenant, as part of Tenant's Work, shall obtain all governmental approvals and permits for Tenant's sign panel(s). Tenant shall have the right, at its sole cost and expense, to erect and maintain its identification sign on the pylon sign(s), as shown on <u>Exhibit F</u> hereto (and having colors as shown on <u>Exhibit F</u> hereto). The dimensions of Tenant's pylon sign panel(s) on such pylon sign(s) shall be no smaller than as set forth on <u>Exhibit F</u>, and shall be located in the position set forth on <u>Exhibit F</u> on such pylon sign(s). Landlord shall maintain all pylons bearing Tenant's sign panels. Tenant shall, at Tenant's cost and expense, maintain Tenant's signs thereon, in good order and repair, and Landlord shall allow Tenant access to maintain and replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons without obtaining Tenant's prior consent. The cost of maintaining all pylons bearing Tenant's sign panel(s) [but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons] and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.

<u>Section 7.3</u>     <u>Signage: Alteration/Removal/Allocation</u>. Subject to Tenant's compliance with applicable Legal Requirements, Tenant shall have the right, from time to time, without Landlord's approval (except as may be required under the next sentence), to change its signs on the storefront and exterior of the Premises, as well as on any pylon, <u>provided</u> that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same. Notwithstanding the foregoing, if Tenant does not operate at least twenty-five (25) other stores, then Landlord shall have the right to approve changes to any signage permitted by Section 7.2 or located on the Premises that is visible from the exterior of the Premises, such approval not to be unreasonably withheld, conditioned or delayed. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon, and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises; provided that in no event shall Tenant place or permit the placement of more than one (1) separate identification panel on each side of a single pylon signage structure. All signage installed by Landlord or permitted to be installed by any tenant (including Tenant) in the Shopping Center shall comply with applicable Legal Requirements.

<u>Section 7.4</u>     <u>Cooperation</u>. Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon, to which Tenant may be entitled under this Lease.

<u>Section 7.5</u>     <u>Signage Restrictions and Criteria</u>.

7.5.1    Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(j)), during the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that (y) the foregoing restriction shall only apply to any building within five hundred (500) linear feet of the Premises and (z) any tenant or occupant of the Shopping Center shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject

22

premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import. No billboard signs shall be permitted within the Shopping Center.

7.5.2   Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons or other freestanding signs. Except as otherwise permitted under Existing Leases, no premises in the Shopping Center containing less frontage than the frontage of the Premises shall have: (i) building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, or (ii) a building and entrance design element higher, wider, or which projects farther than the height, width or projection of the building and entrance design element of the Premises. Notwithstanding the foregoing, in the event that subsequent to the initial construction of the Premises, the height of the design elements of the Premises, are reduced as part of an alteration or reconstruction approved by Tenant, and such alteration or reconstruction results in another premises in the Shopping Center being in violation of this Section, Landlord shall not be required to alter the design elements of such other premises to bring same into conformity with this provision.

## ARTICLE 8
## ALTERATIONS AND IMPROVEMENTS

Section 8.1     Alterations and Improvements.

8.1.1   Tenant shall not perform any structural or exterior (except for signage as permitted herein), alterations or structural or exterior improvements to the Premises without the prior written approval of Landlord. All work performed by Tenant in connection with structural and nonstructural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all Legal Requirements. The provisions of this Subsection 8.1.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2   Tenant may, in accordance with Subsection 8.1.1 hereof, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3   Tenant shall have the right to subdivide the Premises into two (2) separate stores, each of which (i) shall contain not less than ten thousand (10,000) square feet of Floor Area, and (ii) may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities; provided, however, that on or before the Expiration Date, Tenant shall, upon Landlord's request, (a) remove and restore any alterations to the storefront and mechanical systems, (b) remove any demising walls constructed in connection with any such subdivision, (c) perform such other work as may be necessary to restore the Premises to a condition which will accommodate a single tenant therein. In the event Landlord requests Tenant to perform any such removal and/or restoration work, Tenant shall also repair any damage to the Premises caused by such removal and restoration.

8.1.4   Subject to all Legal Requirements, Tenant shall have the exclusive right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.

23

8.1.5   Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises. Landlord shall neither make nor permit to be made (except to the extent another tenant or occupant is otherwise permitted under an Existing Lease) any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

8.1.8   Except as specifically provided herein, Tenant shall have the exclusive right to erect and maintain on the roof of the Premises, a passive solar array for the production of electricity (the "*System*"), provided that Tenant: (i) obtains Landlord's prior approval of its plans and specifications for the System and the location thereof on the roof, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while the System is present, (iv) repairs any damage to the roof (including any necessary replacement of the roof) caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any component of the System, (v) erects and maintains the System in accordance with applicable Legal Requirements; (vi) the installed System is not visible to customers in the Shopping Center; and (vii) uses the System solely for supplementing Tenant's own energy needs in the Premises and not for the resale of energy to third parties. The System shall be deemed to be part of Tenant's Property   Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator of the System and Landlord shall have no right, title or interest in such equipment or any component thereof, notwithstanding that any such equipment may be physically mounted or adhered to the Premises.   Landlord acknowledges and agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the environmental attributes of the System, and (iii) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever entitled, resulting from the environmental or related attributes of the System. Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System. Landlord and Tenant acknowledge that the provisions set forth in this Section 8.1.8 are deal specific to this particular Premises. Notwithstanding anything contained herein to the contrary, Tenant agrees that Landlord shall have the right to right to erect and maintain within a ten (10') foot wide portion of the roof running along the wall of the Premises adjacent to PetSmart, as such area is more particularly shown on Exhibit B (**"*Landlord's Solar Panel Area*"**) a passive solar array for the production of electricity. Landlord and Tenant shall reasonably cooperate with each other in the event either party elects to exercise its rights hereunder to install solar panels on the roof of the Premises.

8.1.9   Landlord and Tenant agree that in the event that Tenant shall perform or cause to be performed any alterations or improvements (including without limitation Tenant's Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the benefit of such Energy Rebate. As used herein, an **"*Energy Rebate*"** shall be deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax credits, governmental grants, utility rebates or refunds) given by a governmental, non-governmental, private or public utility, or other entity as a result of efforts to conserve energy or other utilities or cause property or processes to be more environmentally friendly. If any such

24

Energy Rebate is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate received by or credited directly to Landlord against the next succeeding installment(s) of Rent then payable under the Lease.

<div align="center">

**ARTICLE 9**
**REPAIRS**

</div>

Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) except as otherwise provided in Section 9.2 below, the non-structural, interior elements of the Premises (including plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls and the electrical, plumbing, mechanical, and/or alarm systems located in, and serving exclusively the Premises); (ii) except as otherwise provided herein and in Section 9.2 below, the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises and (iii) any damage to the Premises or the Shopping Center caused by the negligence of Tenant, its employees, agents or contractors.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, or cause to be performed, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, sprinkler system, footings, foundation, exterior walls (including, without limitation,  repainting the exterior, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers of the Premises and other premises in the Shopping Center that may adversely affect the Premises;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises;

(f)    the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the later of: (A) the expiration of any contractors', manufacturers', vendors', or insurers' warranties or guarantees; or (B) the first (1st) anniversary of the Delivery Date;

(g)    the existing methane gas monitoring system located under the slab of, and/or within, the Premises, together with the monitoring box associated with same located within the Premises (the ***"Methane Gas Monitoring System"***); and

<div align="center">25</div>

(h)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges, except for periodic painting of the exterior of the Premises, not more often than once every five (5) years, and except as hereinafter provided with respect to the Methane Gas Monitoring System), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within thirty (30) days after Tenant's demand therefor, Tenant shall have the right to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit. In addition, and notwithstanding the provisions of Section 16.2 hereof, if (i) Landlord has failed to make necessary repairs to the exterior of the Premises, the walkways and landscaped areas immediately in front of the Premises, or (ii) such areas are not maintained in an attractive and first-class manner, and with respect to any of the foregoing, such failure is not remedied within ten (10) business days after notice from Tenant, Tenant shall have the right to perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord. If Landlord fails to reimburse the documented reasonable expenses incurred by Tenant within thirty (30) days after delivering to Landlord paid invoices for such costs, Tenant shall have the right to offset such unpaid amounts against the Rent payable by Tenant hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit. Landlord or its designee may enter upon the Premises during regular business hours, following at minimum 48 hours prior notice to Tenant, (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances) to inspect the Methane Gas Monitoring System. In exercising any such rights of entry, Landlord shall use commercially reasonable efforts not to unreasonably interfere with or disrupt the normal operation of Tenant's business. Tenant shall have the right, in its sole discretion, to designate a representative to accompany Landlord, or any third parties, while they are on the Premises. If Landlord is required to make any repairs or replacements to the Methane Gas Monitoring System (the *"Monitoring System Work"*), all such work shall; (i) occur only upon at least ten (10) business days prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances), (ii) not be performed during the months of August (through Labor Day), November or December of any calendar year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements, (iii) occur only after the regular hours (except in an emergency or unless otherwise required by the nature of the work to be performed) of operation of Tenant and any other occupant of the Premises (or any portion thereof), and (iv) to the extent reasonably practicable, be performed in such a manner so as not to unreasonably interfere with the normal conduct of any business operations in the Premises (except in an emergency or unless otherwise required by the nature of the work to be performed). In addition, (i) Landlord shall repair any damage to the Premises caused by the Monitoring System Work and reimburse Tenant for the actual, reasonable, documented costs and expenses that Tenant is required to incur in connection with the Monitoring System Work, including, without limitation, employee overtime costs, security expenses, and costs associated the moving and storage of any Tenant's Property that must be relocated during the performance of the Monitoring System Work, and (ii) if the performance of the Monitoring System Work or the presence of methane gas in the Premises requires Tenant in its commercially reasonable judgment to cease operating at the Premises or otherwise materially and adversely interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable

26

abatement of Rent for so long as such condition persists, provided that if such condition continues for a period in excess of six (6) consecutive months, Tenant shall have the right to terminate this Lease upon thirty (30) days written notice to Landlord. For purposes of this Section 9.2, "emergency" shall include any circumstance where the health or safety of persons or the protection of property requires a response, as determined in Landlord's reasonable discretion.

Section 9.3    Legal Compliance Work. Subject to Section 9.2 above, Tenant shall be responsible, at its sole cost and expense, for the performance of all "Legal Compliance Work" (hereinafter defined) required: (a) solely due to Tenant's specific manner of use of the Premises (i.e., is not of general applicability to tenants and occupants of the Shopping Center), (b) with respect to interior elements of the Premises which are not structural, or (c) as the result of alterations performed by the Tenant on the Premises, provided, however, that the foregoing shall not relieve Landlord of its obligations to perform Landlord's Work in accordance with all Legal Requirements and to perform the repairs, as required in this Lease. Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges) for performing all other Legal Compliance Work. As used herein, "*Legal Compliance Work*" shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1 Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to their respective property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which loss is actually insured by the party suffering the loss or is normally insured under Special Form property and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and any Mortgagee and Ground Lessor and hold Landlord and any Mortgagee and Ground Lessor harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of such indemnitee, its agents, contractors, licensees, employees, or other tenants and occupants of the Shopping Center, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center

27

(excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or other tenants or other occupants of the Shopping Center, or for which any of said parties may be statutorily liable.

Section 10.2    Tenant's Insurance.

10.2.1    Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (a) commercial general liability insurance protecting and insuring Tenant, naming Landlord and any Mortgagee and Ground Lessor of which Tenant has been given notice of, if any, as "additional insureds" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million and 00/100 ($10,000,000.00) Dollars for personal injury bodily injury, death and property damage liability; and (b) standard Special Form  property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.  Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.  The liability insurance described in clause (a) of this Subsection 10.2.1 or in Subsection 10.2.2 below shall state that such liability insurance is primary over and shall not contribute with any insurance carried by Landlord.

10.2.2    Self-Insurance.  All insurance required to be maintained under this Section 10.2 may be: (i) insured under an individual policy covering this location, or a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (ii) self-insured by Tenant via a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a tangible net worth of at least Fifty Million Dollars ($50,000,000); or (iii) insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.  In no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant or any guarantor of Tenant's obligations under this Lease maintains a tangible net worth of at least Fifty Million Dollars ($50,000,000).  To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance.

Section 10.3    Landlord's Insurance.

10.3.1    Liability Insurance.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2    Special Form Property Insurance.  Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, standard "Special Form" property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], Ordinance of Law coverage on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings owned by Landlord (including the Premises) and other insurable improvements owned by Landlord in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property.  All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none (or if such Mortgagee permits),

28

to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Subsection shall not have any deductibles exceeding Two Hundred Fifty Thousand and 00/100 ($250,000.00) Dollars without Tenant's prior consent.

10.3.3 <u>Tenant's Pro Rata Share of Insurance Premiums</u>.   (a) Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 (the "*Insurance Charge*"); provided, however, those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums shall not be included in the Insurance Charge. For the first full calendar year of the Term, Tenant's Insurance Charge shall not exceed Forty-Nine Cents ($.49) per square foot of Floor Area in the Premises. With respect to each calendar year of the Term thereafter, in no event shall Tenant's Insurance Charge exceed one hundred five percent (105%) of the Tenant's Insurance Charge paid by Tenant for the immediately preceding calendar year. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from the Insurance Charge. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in the Insurance Charge Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease. The provision of this Subsection also shall be subject to that certain Agreement between DDR Corp. and Bed Bath and Beyond Inc. dated January 1, 2010 re: Global Agreement Pertaining to Insurance Charges and all renewals, amendments, modifications, replacements and extensions thereof (collectively the "*Global Agreement*"). Notwithstanding anything to the contrary herein contained, the Global Agreement shall not bind any subsequent owner of the Shopping Center (other than an Affiliate of Landlord).

(b) Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Insurance Charge and Tenant's Pro Rata Share thereof for such year (the "*Insurance Reconciliation Statement*"). The Insurance Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) documentation supporting the applicable Insurance Charge, (y) a calculation of Tenant's Pro Rata Share of Insurance Charge, and (z) payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Insurance Charge for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

Section 10.4   <u>General Insurance Requirements</u>.

10.4.1 At least ninety (90%) of the aggregate insurance limits (taking into considering all primary and excess policies) of all insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the State of New Jersey, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Subsection 10.2.1 and Section 10.3 above.

29

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements owned by Landlord and constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

## ARTICLE 11
## FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1    Fire and Other Casualty.

11.1.1 (a)    Except as otherwise provided in this Subsection 11.1.1, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly (x) rebuild and restore the Premises and the Common Areas to the condition existing immediately prior to such fire or other casualty (which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, and shall not include any of Tenant's Property), and (y) rebuild and restore at least two hundred thousand (200,000) square feet of additional Floor Area (exclusive of the Premises) to substantially the condition in which same existed immediately prior to such fire or other casualty so that same shall be occupied or ready for occupancy following reconstruction (all of the foregoing work is hereinafter referred to as the "*Primary Restoration*"). With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (aa) rebuild and restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (bb) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner (all of the foregoing work is hereinafter referred to as the "*Secondary Restoration*"). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Subsection 11.1.1. Landlord shall give Tenant at least forty five (45) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Subsection 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

4191724v7

11.1.2  In the event that:

(a)     Landlord does not commence or cause to be commenced the repair and restoration work to the Premises or the Common Areas or other buildings in the Shopping Center as required pursuant to this Section 11.1 within one hundred eighty (180) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (which period may be extended by up to thirty (30) days by reason of the adjustment of insurance proceeds and Force Majeure, not to exceed thirty (30) days in the aggregate); or

(b)     the required repairs and restorations to the Premises or the Common Areas or other buildings in the Shopping Center are not Substantially Completed by Landlord or third parties, as the case may be, in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by up to ninety (90) days by reason of *Force Majeure*, provided that Landlord gives Tenant notice of its claim of Force Majeure within five (5) business days after the occurrence of the event of Force Majeure),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)     after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder; or

(ii)     seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the State of New Jersey; or

(iii)     terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas in the Shopping Center or other buildings in the Shopping Center cannot be completed in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3  If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

11.1.4  Notwithstanding any other provision of this Article 11, in the event that the Premises and all other buildings in the Shopping Center are substantially destroyed by fire or other casualty and that Landlord elects not to rebuild and restore the same, then Landlord, acting in good faith, shall have the right to terminate this Lease as of the date of such damage or destruction by giving notice thereof to Tenant within sixty (60) days following such damage or destruction; provided, however, that no such notice of termination shall be effective unless it is accompanied by a certification from Landlord that all other leases in the Shopping Center have also been terminated, and provided further that if Landlord or any Affiliate of Landlord actually (AA) commences the reconstruction or restoration of a retail shopping center in the Shopping Center on or before the date which is three (3) years after the effective date of the termination of this Lease, or (BB) Substantially Completes the reconstruction or restoration of the improvements in the Shopping Center (or a shopping center substantially similar to the Shopping Center) on or before the date which is three (3) years after the effective date of the termination of this Lease, then Landlord shall be obligated to offer to Tenant, at the time of the commencement

31

of the reconstruction or restoration, or at the time of the Substantial Completion of the reconstruction or restoration of the improvements in the Shopping Center, the option to lease a portion of the Shopping Center (or a portion of such shopping center) equal in size to twenty-two thousand two hundred twenty-three (22,223) square feet upon all the terms and conditions of this Lease (including without limitation, the amount of Rent which would otherwise have been paid hereunder); provided, however, that: (i) all dates set forth in the Lease shall be appropriately extended; and (ii) at the time of Substantial Completion of the reconstruction or restoration of the Premises, the remaining Term is at least five (5) years, which, notwithstanding the casualty or Landlord's termination of this Lease as aforesaid, Tenant may achieve by exercising an available Renewal Option pursuant to Subsection 2.2.2. In the event Tenant elects, within thirty (30) days after such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after such offer, to exercise such option, Landlord shall be free to lease such premises to any other person or entity, upon terms which are substantially similar to the terms of this Lease [except that, with respect to the Fixed Rent, if the premises are rebuilt and restored to substantially the same condition and location as existed immediately prior to the destruction and the proposed lease with such other person or entity shall include Fixed Rent in an amount less than ninety-five (95%) percent of the annual Fixed Rent that Tenant was paying when the Lease was terminated, then Landlord shall re-offer the space to Tenant by giving Tenant a second opportunity to exercise its next available Renewal Option, it being agreed that if Tenant does not exercise its next available Renewal Option within ten (10) days after the space is re-offered to Tenant, then Tenant shall be deemed to have relinquished all further rights to such space]. The provisions of the immediately preceding two (2) sentences shall survive the expiration or earlier termination of this Lease pursuant to this Subsection 11.1.4.

Section 11.2    Eminent Domain.

11.2.1  As used in this Section 11.2, "*Taking*" or "***Taken***" shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3  In the event that:

(a)  any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)  as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has all of the "*Critical Entrances*" identified as such on Exhibit B, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)  there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)  any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)  more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)    ten (10%) percent or more of the parking spaces located in the Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four (4.0) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant or Landlord [but Landlord may only do so with respect to an event described in (e) above and only if Landlord's termination is accompanied by a certification from Landlord that Landlord has notified all other tenants in the Shopping Center that their leases are being terminated, which leases have terminated or will terminate within one hundred twenty (120) days from the date of Landlord's certification] shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to the other party within ninety (90) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.  In the event this Lease is not terminated by either party upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant; provided, however, that Landlord shall not be obligated to (i) repair or restore Tenant's Property or Tenant's Work, or (ii) expend for the repair and restoration of the Premises more than Five Hundred Thousand and 00/100 ($500,000.00) Dollars (in constant dollars) in excess of the condemnation award payable to Landlord for the taking, and in the event the cost of repair and restoration exceeds such amount Landlord may terminate this Lease unless Tenant agrees in writing, within thirty (30) days after Landlord's notice of termination, to provide the additional funds for the repair and restoration of the Premises (which funding shall be paid, as Additional Rent hereunder, to Landlord within fifteen (15) days after the redelivery of possession to Tenant after Substantial Completion of the repairs and restoration).  During the period of said repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's sole but reasonable judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5  In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, Tenant's Work, Tenant's Property and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.  Notwithstanding anything contained in this Subsection 11.2.5 to the contrary, no award shall be payable to Tenant with respect to Landlord's Work.

11.2.6  Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3    Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent  and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the public for business and shall be able to engage in the normal conduct of such business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

## ARTICLE 12
## COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1    Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

33

Section 12.2   Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3   Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)     As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto and the Existing Leases described on Exhibit K-2 hereto;

(b)     In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that as of the Effective Date there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)     No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work that have not been obtained by Landlord prior to the Effective Date (excluding, as of the Effective Date, governmental permits and approvals);

(d)     Except with respect to any Existing Exclusives as set forth on Exhibit K-1, Permitted Encumbrances and the Prohibited Uses set forth herein, Tenant's use of the Premises for sale of "Permitted Items" (defined in Subsection 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)     The Shopping Center now has, and, on the Delivery Date, shall have, access to and from SR 36, as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)     This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)     To Landlord's actual knowledge, without investigation, and subject to the Permitted Encumbrances, there are no restrictions or other legal impediments imposed by any private instrument which would prevent: (i) the use of the Premises for the Permitted Use (subject to the Existing Exclusives set forth on Exhibit K-1 and the Prohibited Uses set forth on Exhibit M); (ii) the use of the parking facilities, access roads, and other Common Areas in the Shopping Center in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)     To Landlord's actual knowledge, without investigation and except as otherwise set forth in this Lease, as of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof.  With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Legal Requirements;

34

(i)      Intentionally Omitted;

(j)      Set forth on Exhibit K-2 is the identity of the only fully executed and delivered leases (excluding this lease) in effect on the Effective Date with respect to the Shopping Center (the "**Existing Leases**"), which Existing Leases, as of the Effective Date, have not been modified or amended.  Any reference to the Existing Leases shall also include any existing or future subleases, licenses or occupancy agreements entered into by the tenant identified in the Existing Leases and such tenant's subtenant(s), licensee(s) or concessionaire(s) even though such subleases, licenses or occupancy agreements are not identified on Exhibit K-2; and

(k)      Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease.  Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4   Environmental Matters.

12.4.1  Definitions.

(a)      As used herein, the term "**Environmental Laws**" shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)      As used herein, the term "**Hazardous Substances**" shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable, polychlorinated biphenyls, oil, petroleum and petroleum products.

(c)      As used herein, the term "**Environmental Notice**" shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)      As used herein, the term "**Releasing**" or "**Release**" shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)      As used herein, the term "**Compliance Costs**" shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees;

other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)     As used herein, the term "***Tenant Related Parties***" shall mean Tenant's agents, servants, employees, contractors or licensees.

(g)     As used herein, the term "***Landlord Related Parties***" shall mean Landlord's Affiliates, agents, servants, employees or contractors or licensees.

12.4.2 <u>Compliance with Environmental Laws</u>.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or the Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter "***Tenant Releases***"), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or the Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency or Legal Requirements, any work performed by Landlord or Tenant relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August (through Labor Day), November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of any tenant's premises (including the Premises) or any tenant signs (including Tenant's signs), and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Shopping Center.

12.4.4 <u>Standards</u>.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or the Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>.  Except as disclosed by that certain Phase I Environmental Assessment prepared by BCM Engineers Inc. as Project No. 05-7802-39, dated October 21, 1992, Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no actual knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to Landlord's actual knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6 <u>Documents</u>.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; but in no event shall the indemnifying party be responsible under this Subsection 12.4.7 for Releases made by unrelated third parties; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

36

12.4.8 <u>Survival</u>.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

<u>Section 12.5</u>    <u>OEA</u>.  Landlord represents and warrants that as of the date of this Lease, there is no OEA, REA or similar declaration in effect with respect to the Shopping Center.

## ARTICLE 13
## USES AND RESTRICTIONS

<u>Section 13.1</u>    <u>Permitted and Prohibited Uses</u>.

13.1.1 <u>Tenant's Permitted Use</u>.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above); provided, however, Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed) or in violation of the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable, or the Permitted Encumbrances as set forth in <u>Exhibit E</u> hereto.

13.1.2 <u>Prohibited Uses</u>.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the West Long Branch, New Jersey metropolitan area.  Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center (except to the extent otherwise permitted under any Existing Leases) for any of the "Prohibited Uses" that pertain to the Shopping Center (as set forth in <u>Exhibit M</u> hereto annexed).

<u>Section 13.2</u>    <u>Tenant's Exclusive in Center</u>.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1  Subject only to the Existing Leases [defined in Section 12.3(j) above], to which the provisions of this Section 13.2 shall not apply except as specifically stated herein, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) infant and children's (for the purpose of this Section 13.2 infant shall be defined as 0-18 months in age, and children shall be defined as 19-48 months in age) furniture (including, without limitation, cribs and beds (including, without limitation, mattresses and bedding); changing tables; gliders, rockers (including coordinating ottomans); high chairs; lamps; walkers; portable play yards and play pens; car seats and booster seats; cradles; carriages and strollers; toy and clothing chests; indoor infant swings; or any other infant and children's furniture or furnishings similar to the foregoing enumerated items) (collectively, ***"Restricted Furniture"***); (b) layettes, infant and children's apparel, shoes and/or clothing accessories (collectively, ***"Restricted Clothing"***); (c) merchandise and products for use by infants, (including, without limitation, food; formula; indoor and/or outdoor play and recreational equipment (excluding outdoor swing sets and outdoor play sets); safety items; feeding items; nursing items; health, bath and beauty care items; (including bath tubs and seats, bath toys, changing pads, scales and towels) diapers; wipes); and (d) infant and children's toys (except for arts and crafts materials and other hobby activity items [such as, without limitation, crayons, play-dough, model cars, trains and planes] that are typically sold in arts and crafts or hobby stores such as Michaels and Hobby Lobby) and books are (collectively, ***"Restricted Products"***) (which items in clauses (a), (b), (c) and (d) above, either singly or in any combination, are hereinafter referred to as the ***"Exclusive Items"***).  Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises.  In addition to the foregoing, Landlord shall not lease, rent or occupy or permit any other tenant or occupant of the Shopping Center to operate a store in which the primary business is retail sale of infant or children's shoes, books, or furniture.

37

Existing tenants of the Shopping Center (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to: (i) full-line national or regional department stores [for example, Wal-Mart, Macy's, Kohl's or Target], (ii) national or regional discount department stores [for example, T.J. Maxx, Marshall's or Stein Mart, as such stores are currently operated] (iii) discount clubs [for example, Costco, BJ's Wholesale Club, Sam's Club], or (iv) home improvement centers [for example, Home Depot or Lowe's] commonly located in first-class shopping centers in the state in which the Shopping Center is located, each discount club and/or home improvement center occupying at least Eighty Thousand (80,000) square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).  In addition to the foregoing, nothing contained herein shall prohibit Landlord from leasing or renting any other premises in the Shopping Center to: (i) shoe stores (provided the primary business shall not be the retail sale of infant or children's shoes), (ii) furniture stores (provided the primary business shall not be the retail sale of infant or children's furniture, such as, by way of example, Thomasville, Raymour & Flannigan, Seaman's or Ethan Allen), (iii) mattress stores, (iv) book stores (provided the primary business shall not be the retail sale of infant or children's books, such as, by way of example, Borders or Barnes & Noble), (v) children's clothing stores normally found in first class shopping centers similar to the Shopping Center selling its merchandise under a private label, such as, by way of example, Gap Kids, Baby Gap, or Gymboree [but not Carter's or Oshkosh]; (vi) supermarkets or grocery stores otherwise permitted under this Lease, (vii) drug stores (e.g. CVS, Walgreens, Rite Aid, etc.), or (viii) cosmetic stores and/or a beauty and hair salons (e.g. ULTA, Sephora, etc.).  Further, nothing contained herein shall prohibit Landlord from leasing or renting any other premises to an upscale children's consignment store, or a children's store whose primary business is the sale of gently used merchandise, by way of example, Once Upon a Child, or similar type of tenant found in a first class shopping center.

13.2.3  The exclusive rights granted to Tenant pursuant to this Section 13.2, shall (a) be conditioned upon Tenant using portions of the Premises for the Exclusive Items (other than during Excused Periods and for periods of time not exceeding six (6) consecutive months), and (b) inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least ten thousand (10,000) square feet of the Premises.

13.2.4  (a)     Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord or its Affiliate and any tenant in the Shopping Center prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Fixed Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)     If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails, within thirty (30) days after demand by Tenant, to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

38

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, "***Existing Exclusives***") [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises. Tenant shall indemnify, defend and hold Landlord harmless from all loss, cost and/or expense incurred by Landlord relating to any separate agreement entered into by Tenant with the other tenant.

13.3.2 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center or in any other property owned by Landlord or Landlord's Affiliate.

# ARTICLE 14
# CONDUCT OF BUSINESS OPERATIONS

Section 14.1    Tenant's Opening Covenant.  Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 hereof) Tenant shall initially open its store for business to the public in the Premises as a fully stocked, staffed and fixtured Buy Buy Baby store for at least one (1) day, not later than the sixtieth (60th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).

Section 14.2    Landlord's Recapture Right.  In the event that Tenant (or any assignee of this Lease or sublessee of the Premises) does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease and recapture the Premises, which option shall be exercisable by giving notice thereof to Tenant at any time after the date on which said 180-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the "***Recapture Date***") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations that survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any Rent and other amounts determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1 Assignment and Subletting.  Tenant shall have the right, subject only to Subsection 15.1.2 below, from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease and provided that the use of the Premises by any such assignee, sublessee, concessionaire or licensee is for a retail use consistent with a first-class shopping center in the West Long Branch, New Jersey metropolitan area.

15.1.2 Recapture.  Except as set forth in Subsection 15.1.3 and Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet all or more than fifty (50%) percent of the Premises, it shall first give notice thereof (hereinafter called the "**Assignment/Subletting Notice**") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, and such financial information with respect to such assignee or sublessee as may have been furnished to Tenant.   Within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, Landlord may elect by notice (hereinafter called the "**Termination Notice**") in writing to Tenant to terminate this Lease and recapture the Premises, in which event this Lease shall automatically terminate on the ninetieth (90th) day (hereinafter called the "**Termination Date**") following Tenant's receipt of the Termination Notice with the same force and effect as if said Termination Date had been designated as the expiration date of this Lease and Landlord and Tenant shall upon such Termination Date be released from any and all liabilities thereafter accruing hereunder except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall, within fifteen (15) days following demand by Landlord, pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding any Termination Notice given to Tenant by Landlord within the aforesaid 30-day period, Tenant shall have the right within ten (10) days thereafter to give Landlord notice (hereinafter called the "**Rescission Notice**") of its rescission of the Assignment/Subletting Notice and upon the receipt of the Rescission Notice the Termination Notice previously given by Landlord shall be deemed null and void and Tenant shall not assign this Lease or sublet the Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not exercise its right of termination within the aforesaid 30-day period, Landlord shall conclusively be deemed to have waived its rights pursuant to this Subsection 15.1.2 with respect to the transaction described in the Assignment/Subletting Notice (but not as to a different transaction, it being agreed that Landlord shall retain all of its rights with respect to any transaction other than the one described in the Assignment/Subletting Notice) and Tenant may assign this Lease or sublet the Premises pursuant to its Assignment/Subletting Notice, provided that in no event shall such assignment or subletting relieve the assignor or sublessor of its primary liability to Landlord under this Lease.

15.1.3 In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates;  (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the State of New Jersey; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); provided, however, that (i) in the case of (c) above, the tangible net worth of any such assignee or any then guarantor of this Lease shall not be worth less than Fifty Million ($50,000,000.00) Dollars, and (ii) the assignor shall not be relieved of its primary liability to Landlord under this Lease, as such liability may then exist.

Section 15.2    Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the "**Original Tenant**") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant and any guarantor of the

40

Original Tenant's obligations under this Lease accruing from and after the effective date of such assignment shall terminate. For purposes of this Section 15.2, the term "*Major Assignee*" or "*Major Guarantor*", as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a tangible net worth of at least One Hundred Million ($100,000,000) Dollars.

Section 15.3   Collateral Assignment. In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Institutional Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Institutional Lender in connection therewith in a form reasonably acceptable to Landlord. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, "*Institutional Lender*" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate mortgage investment conduit,  or real estate investment trust.

Section 15.4   Cure Rights of Original Tenant.

15.4.1  If Tenant assigns Tenant's interest in this Lease and provided Tenant has not been released of its liability as set forth herein, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  Provided Tenant has not been released of its liability as set forth herein, if this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirement affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord ("*New Lease*"), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5   Recognition Agreement. In the event Tenant subleases all of the Premises for a term of at least five (5) years to a single sublessee having a tangible net worth of at least Fifteen Million and 00/100 ($15,000,000.00) Dollars, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and such subtenant in the form of Exhibit H hereto, in recordable form. Said agreement shall provide, among other things, that the sublease shall continue in full force and effect as a direct lease between Landlord and subtenant provided that in such event subtenant shall, for the then remainder of the term of the sublease, pay rent in an amount equal to the

greater of (x) the Rent then payable under this Lease, or (y) the rent then payable under the sublease.

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1    Tenant Default.

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Section 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

42

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid. Notwithstanding the foregoing, in the event Landlord has given Tenant notice of a monetary default more often than two (2) times in any one calendar year, interest shall accrue at the Lease Interest Rate on any monetary sums due to Landlord thereafter during that same calendar year which is not paid on the due date thereof.

16.1.5 Landlord shall use all commercially reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default, provided that Landlord shall not be required to give any preference to the leasing of the Premises in lieu of other then available space in the Shopping Center. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2    Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Tenant specifying the nature of such default (or if such default shall be a nature that same cannot reasonably be cured within thirty (30) days, and Landlord does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "*Landlord's Default*"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)    offset against Fixed Rent  payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)    upon five (5) days' notice to Landlord, may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided and on condition that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises; (2) Landlord's Default is not capable of being cured or being rendered irrelevant by any actions of Tenant despite commercially reasonable efforts on the part of Tenant; and (3) Tenant shall have delivered notice of Landlord's Default to any Mortgagee of Landlord (provided Landlord shall have previously notified Tenant of the name and address of such Mortgagee), and such Mortgagee has not cured Landlord's Default within thirty (30) days following its receipt of such notice (or, if Landlord's Default requires more than thirty (30) days to cure in the exercise of due diligence, such Mortgagee has not commenced to cure same within said 30-day period and thereafter diligently prosecuted the same to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (i.e., posing imminent material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3    Arbitration.    In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in West Long Branch, New Jersey, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues,

4191724v7

and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17
## RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1   Right to Mortgage and Non-Disturbance. Landlord reserves the right to subject and subordinate this Lease at all times to any mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, it being agreed, however, that Tenant shall not unreasonably withhold its consent to another form of subordination, non-disturbance and attornment agreement, in recordable form; provided, however, that such other form shall in any event provide that (i) no default by Landlord under any such lien shall affect Tenant's rights under this Lease so long as Tenant is not then in default of such obligations beyond the applicable notice and grace periods provided herein, (ii) Tenant will not be named as a party in any foreclosure or other proceedings with respect to any such lien, unless specifically required to be so named by applicable law, provided Tenant's rights under this Lease are not diminished nor its obligations hereunder increased, (iii) the holder of any such lien shall agree that the insurance proceeds resulting from any fire or other casualty and the proceeds payable from the any taking by eminent domain of the Shopping Center will be made available for restoration of the Premises and Shopping Center to the extent provided in this Lease, and (iv) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required herein and the holder of any such lien shall recognize and be bound thereto, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; provided Tenant is not then in default of any of its obligations hereunder beyond any applicable notice or grace periods; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, except to the extent required by Legal Requirements to fully protect said mortgagee's interests, provided Tenant's rights under this Lease are not diminished nor its obligations increased hereunder, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease, provided Tenant is not then in default of any of its obligations hereunder beyond any applicable notice or grace periods; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2   Estoppel Certificate. Upon written request of Landlord or Tenant, the other party, within thirty (30) days after the date of receipt of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent, Percentage Rent, Additional Rent, and Alternate Rent, if any, have been paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

44

4191724v7

Section 17.3    Existing Mortgages and Ground Leases.  If a mortgage, deed of trust, or other security instrument, or any ground or underlying lease, encumbers the Shopping Center or any part thereof on the Effective Date, then within sixty (60) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, or such other form as may be agreed upon by the parties, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within said 60-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000).

## ARTICLE 18
## NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication ("*Notice*") shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address with copies of notices to Landlord also given to (i) Senior Vice President of Anchor Store Leasing, c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, and (ii) General Counsel, c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Cathleen H. Giuliana, Esq., c/o Riker, Danzig, Scherer, Hyland & Perretti, LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown, New Jersey 07962-1981, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.  Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of (i) Taxes as described in Section 4.3 of this Lease, (ii) Common Areas Charges as described in Section 5.1 of this Lease, and (iii) Insurance Charge as described in Subsection 10.3.3. of this Lease.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within twenty (20) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant and Landlord evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

45

## ARTICLE 20
## END OF TERM

Section 20.1   Surrender of Premises.   At the expiration or sooner termination of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements required to be made by Landlord hereunder.

Section 20.2   Hold Over.   If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
## INTENTIONALLY OMITTED

## ARTICLE 22
## ONGOING CO-TENANCY

If, at any time during the Term, there are not at least two (2) of the following named merchants or their replacements (which replacements must be Qualified Replacement Tenants (hereinafter defined): Home Depot, Staples, PetSmart and The Sports Authority, open and operating retail business in the Shopping Center (such condition being hereinafter referred to as an "*Excess Vacancy*"), then in such event, Tenant shall have the right to pay Alternate Rent, in lieu of the Fixed Rent and Percentage Rent, during the period of such Excess Vacancy (but in no event for more than three hundred sixty-five (365) days) in lieu of the Fixed Rent normally payable under Article 4.  If Tenant pays Alternate Rent hereunder for a period in excess of three hundred sixty-five (365) continuous days, then Tenant shall have the right to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least one hundred twenty (120) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 365-day period, Tenant shall resume paying full Rent; provided, however, that Tenant shall retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy. As used herein "*Qualified Replacement Tenants*" shall mean national or regional merchants of the type typically found in first-class regional shopping centers located in the West Long Branch, New Jersey metropolitan area that will occupy individually or collectively (i) with respect to Home Depot, at least seventy-nine thousand eight hundred (79,800) square feet of Floor Area; and (ii) with respect to Staples, PetSmart and The Sports Authority, at least seventy-five percent (75%) of such merchant's Floor Area as shown on Exhibit B.

## ARTICLE 23
## MISCELLANEOUS

Section 23.1   Loading Facilities.   Subject to Legal Requirements and any applicable restrictions in the Permitted Encumbrances, Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2   Liens.   Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's or Tenant's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's or

46

Tenant's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3   Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4   Force Majeure.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, inability to procure materials, failure of power, restrictive Legal Requirements, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of a like nature which are beyond the reasonable control of the party from whom performance is required, or any of its contractors or other representatives (including, without limitation, a delay caused by the other party, or any of its contractors or other representatives (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay.  Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of Force Majeure. A party wishing to invoke this Section shall give the other party notice of that intention within fifteen (15) business days of the commencement of any event of *Force Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5   Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6   Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7   Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8   Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9   Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 <u>Rights Cumulative</u>.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11 <u>Definition of Landlord</u>.  The term "***Landlord***" shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (<u>except</u> to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 <u>Successors and Assigns</u>.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 <u>Limitation of Landlord's Liability</u>.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (subject only to bona fide mortgage encumbrances to which this Lease is subject pursuant to Sections 17.1 or 17.3 above), or the proceeds from the sale of all or any portion thereof, and net income derived from the Shopping Center after payment of bona fide mortgage encumbrances to which this Lease is subject pursuant to Sections 17.1 or 17.3 above, for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 <u>Limitation of Tenant's Liability</u>.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, and any guarantor of Tenant's obligations under this Lease for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant, or any of its Affiliates, successors, and/or assigns.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.14 shall not be deemed or construed to limit Landlord's rights and remedies against Tenant, its successors and assigns, pursuant to this Lease or which may be available at law or in equity against Tenant, its successors and assigns.

Section 23.15 <u>Joint and Several Liability</u>.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

48

Section 23.18  Table of Contents, Line Numbering and Paragraph Headings. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19  Definition of Hereunder, Herein, etc.. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20  Short Form Lease.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum, which shall be in recordable form, and such form and substance as either party shall reasonably request; Landlord and Tenant shall cooperate in the recordation thereof.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21  Entire Agreement and Modification.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  No Joint Venture or Partnership Created by Lease.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23  Payment Under Protest.  If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall make payment but may do so "under protest", which payment shall not be regarded as voluntary payment, and there shall survive the right on the part of such party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of such party to pay such sum or any part thereof, such party shall be entitled to recovery from the other party such sum or so much thereof as it was not legally required to pay under the provisions of this Lease, together with interest thereon at the Lease Interest Rate.

Section 23.24  Work Performed Under Protest.  If at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them with respect to the Premises under the provisions hereof, the party against whom the obligation to perform the work to the Premises is asserted shall perform such work to the Premises and pay the cost thereof but may do so "under protest", performance of such work to the Premises in no event to be regarded as a voluntary performance, and there shall survive the right on the part of such party to institute suit for recovery of the cost of such work to the Premises.  If it shall be adjudged that there was no legal obligation on the part of such party to perform such work to the Premises or any part thereof, such party shall be entitled to recover from the other party the cost of such work to the Premises or the cost of so much thereof as such party was not legally required to perform under the provisions of this Lease, together with interest thereon at the Lease Interest Rate.

Section 23.25  Tenant's Tradename.  Landlord shall not make use of Tenant's tradename [i.e., "buybuy BABY"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.26  Counterparts. This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.27  Waiver of Trial by Jury.  LANDLORD AND TENANT HEREBY MUTUALLY WAIVE ANY AND ALL RIGHTS WHICH EITHER MAY HAVE TO

4191724v7

REQUEST A JURY TRIAL IN ANY PROCEEDING BETWEEN THEM AT LAW OR IN EQUITY.

Section 23.28 Governing Law.   This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

Section 23.29 Ethical Conduct Policy.      It is the policy of Buy Buy Baby, Inc. (as used in this Section 23.29, the *"Company"*) and its subsidiaries and affiliates to conduct all its business transactions in accordance with the highest ethical standards: No individual who is employed by or who represents the Company is permitted to solicit, accept or pay any bribe, kickback or any other improper payment of money, products or services in exchange for (i) the Company's execution of this Lease, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.  If any such improper actions are observed, please contact our Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

Section 23.30 Supplemental Permits.  Landlord and Tenant acknowledge that the submission of plans to the appropriate governmental authorities for the installation of the cart corrals and signs designating the parking spaces for expectant mothers as each are more particularly shown on Exhibit B, could result in a delay of the issuance of permits for the construction of the remainder of Landlord's Work.  Accordingly, Landlord and Tenant agree that the initial submission of construction documents and site plan to the applicable governmental authorities for the permits for the construction of Landlord's Work, shall not include the cart corrals or the expectant mother parking spaces.  Landlord agrees that within ten (10) days following the issuance of a building permit for Landlord's Work, Landlord shall submit a revised site plan to the applicable governmental authorities and thereafter shall diligently pursue and use commercially reasonable efforts to obtain all permits and approvals (the *"Supplemental Permits"*) required from said governmental authorities to permit the installation of the cart corrals and signage designating the expectant mother parking spaces in accordance with Exhibit B and Exhibit D (the *"Deferred Work"*).  Landlord agrees that promptly following receipt of the Supplemental Permits Landlord shall commence and diligently complete the Deferred Work.  Landlord further agrees that Landlord shall give Tenant notice on or before the date that is two weeks prior to the Delivery Date as established by the Delivery Date Notice, whether or not Landlord will have obtained the Supplemental Permits prior to the Delivery Date.  Tenant agrees that if despite Landlord's diligent efforts, the Landlord is unable to obtain the Supplemental Permits, the completion of the Deferred Work shall not constitute a Delivery Date Condition.  Tenant further agrees that in the event the applicable governmental authorities deny Landlord's application for the Supplemental Permits, despite Landlord's diligent pursuit thereof, Landlord shall be relieved of its obligations to obtain the Supplemental Permits and to complete the Deferred Work.

[Signature page follows]

4191724v7

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

**BG MONMOUTH, LLC**
a New Jersey limited liability company
By JDN Realty Corporation, a
corporation
Its Managing Member

[SEAL] *Lara Benham Abusdt*

By:

Name:  Bryan P. Zabell
Title:   Senior Vice President of Anchor
           Store Leasing

**TENANT:**

ATTEST:

**BUY BUY BABY, INC.**
A Delaware corporation

By:

Name:  Alan M. Freeman
Title:   Assistant Secretary

Name:  Steven H. Temares
Title:   Director and Authorized Signatory

51

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Intentionally Omitted |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Guaranty of Lease |

4191724v7

Exhibit A
Legal Description of Shopping Center

ALL THAT CERTAIN LOT, TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN THE TOWNSHIP OF WEST LONG BRANCH, IN THE COUNTY OF MONMOUTH AND STATE OF NEW JERSEY AND BEING LOT 8.01 BLOCK 67 AND LOT 8 .01 BLOCK 105 AS SHOWN ON A MAP ENTITLED "PLAN OF SURVEY FOR RB-S ASSOCIATES, LOT 8, BLOCK 67 BOROUGH OF WEST LONG BRANCH, MONMOUTH COUNTY, NEW JERSEY DATED FEBRUARY 2, 1992. THE SAME BEING PART OF LOT 8, BLOCK 67, SAID LOT AS SHOWN ON SHEET NO. 4 OF THE OFFICIAL TAX MAP OF THE TOWNSHIP OF WEST LONG BRANCH, AND THE SAME BEING PART OF LOT 8, BLOCK 105, SAID LOT AS SHOWN ON SHEET NO. 15 OF THE OFFICIAL TAX MAP OF THE BOROUGH OF EATONTOWN, AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS: TO WIT:

BEGINNING AT AN IRON REBAR WITH SURVEYOR'S CAP SET ALONG THE SOUTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE 36 (1801 R.O.W.) SAID LINE BEING DISTANT 80.00 FEET MEASURED SOUTHWARDLY FROM AND RADIALLY TO THE CENTERLINE THEREOF, SAID REBAR BEING THE POINT OF INTERSECTION OF THE WESTERLY LINE OF LOT 7, BLOCK 67 WITH THE SAID SOUTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE 36. SAID REBAR BEING OPPOSITE STATION 56+55.91 AS SHOWN ON A MAP ENTITLED "NEW JERSEY STATE HIGHWAY DEPARTMENT GENERAL PROPERTY KEY MAP" ROUTE 35-4N CONN. TO WEST LONG BRANCH SECTION I, SHOWING EXISTING RIGHT OF WAY AND PARCELS TO BE TAKEN IN THE BOROUGH OF EATONTOWN AND WEST LONG BRANCH MONMOUTH COUNTY, SCALE 30 FEET TO 1 INCH, MAY 1940 FILED JULY 27, 1944 CASE NO. 73A-24 AND RUNNING; THENCE

1. SOUTH 12 DEGREES 31 MINUTES 55 SECONDS EAST 449.57 FEET ALONG THE WESTERLY LINE OF LOT 7, BLOCK 67 TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

2. SOUTH 12 DEGREES 01 MINUTES 50 SECONDS EAST 647.15 FEET ALONG THE WESTERLY LINE OF LOT 6.01, BLOCK 67 AND BEYOND TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

3. SOUTH 11 DEGREES 29 MINUTES 50 SECONDS EAST 221 .15 FEET ALONG LOT 10, BLOCK 67 AND BEYOND, TO AN IRON REBAR WITH SURVEYORS CAP FOUND IN THE NORTHERLY LINE OF PARKER ROAD (VARIABLE R.O.W.); THENCE

4. SOUTH 71 DEGREES 40 MINUTES 10 SECONDS WEST 690.73 FEET ALONG THE AFORESAID NORTHERLY LINE OF PARKER ROAD, SAID LINE BEING DISTANT 25.00 FEET FROM AND AT RIGHT ANGLES TO THE CENTERLINE THEREOF, TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

5. NORTH 02 DEGREES 27 MINUTES 21 SECONDS EAST 257.77 FEET ALONG THE EASTERLY LINE OF LOT 5, BLOCK 105, TO AN IRON REBAR WITH SURVEYORS CAP FOUND (SAID LINE BEING THE MUNICIPAL BOUNDARY LINE DIVIDING THE TOWNSHIP OF WEST LONG BRANCH FROM THE BOROUGH OF EATONTOWN); THENCE

6. SOUTH 70 DEGREES 34 MINUTES 21 SECONDS WEST 117.43 FEET ALONG THE NORTHERLY LINE OF THE AFORESAID LOT 5, BLOCK 105 (STILL ALONG THE SOFRESAID MUNICIPAL BOUNDARY LINE) TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

7. NORTH 37 DEGREES 05 MINUTES 23 SECONDS WEST 468.08 FEET ALONG THE EASTERLY LINE OF LOT 6, BLOCK 105 (STILL ALONG THE AFORESAID MUNICIPAL BOUNDARY LINE) TO AN IRON REBAR WITH SURVEYORS CAP FOUND; THENCE

A-1

8. SOUTH 79 DEGREES 23 MINUTES 10 SECONDS WEST 130.67 FEET ALONG THE NORTHEASTERLY LINE OF AFORESAID LOT 6 BLOCK 105 TO AN IRON REBAR WITH SURVEYORS CAP SET; THENCE

9. NORTH 18 DEGREES 36 MINUTES 50 SECONDS WEST 542.37 FEET ALONG THE NORTHERLY LINE OF THE AFORESAID LOT 6, BLOCK 105 AND BEYOND (STILL ALONG THE AFORESAID MUNICIPAL BOUNDARY LINE) TO AN IRON BAR WITH SURVEYORS CAP SET; THENCE

10. NORTH 76 DEGREES 08 MINUTES 10 SECONDS EAST 300.00 FEET ALONG THE SOUTHERLY LINE OF LOT 8 .01 BLOCK 67 SAID LOT IN THE TOWNSHIP OF WEST LONG BRANCH, TO AN IRON BAR WITH SURVEYORS CAP SET; THENCE

11. NORTH 12 DEGREES 03 MINUTES 35 SECONDS WEST 210.00 FEET ALONG THE EASTERLY LINE OF THE FORESAID LOT 8 .02, BLOCK 67, AND BEYING, AND ALONG THE EASTERLY LINE OF LOT 8, BLOCK 105, OF THE BOROUGH OF EATONTOWN TO A POINT IN THE AFORESAID SOUTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE NO. 36; THENCE

12. NORTHEASTERLY ON AN ARC HAVING A RADIUS OF 9,629 .55 FEET AND CURVING TO THE LEFT AN ARC DISTANCE OF 828 .56 FEET ALONG THE AFORESAID SOUTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE 36, TO THE POINT AND PLACE OF BEGINNING.

DESCRIBED IN ACCORDANCE WITH A SURVEY MADE BY JAMES V. DEMURO, P.L.S., DATED APRIL 7, 2004, LAST REVISED APRIL 16, 2004.

A-2

Exhibit B
Site Plan

B-1



## FLOOR PLAN

THE ABOVE FLOOR PLAN REPRESENTS TENANT'S CRITICAL DIMENSIONS

# EXHIBIT 'B'

## SHEET 2 OF 2

## SITE PLAN

W. LONG BRANCH, NJ

<u>Exhibit C</u>
<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 201__, by and between BG MONMOUTH, LLC, a New Jersey limited liability company ("***Landlord***") and BUY BUY BABY, INC., a Delaware corporation ("***Tenant***").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Consumer Centre (the "***Shopping Center***"), situated in West Long Branch, New Jersey;

WHEREAS, by that certain lease dated _____ __, 2012 (the "***Lease***"), Landlord leased a portion (the "***Premises***") of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2.1 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

A.      The Rent Commencement Date occurred on _____, 201__.

B.      The Initial Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

C.      The date of commencement of the first Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease. Tenant shall exercise the first Renewal Period on or before _____, 20__.

D.      The date of commencement of the second Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.  Tenant shall exercise the second Renewal Period on or before _____, 20__.

E.      The date of commencement of the third Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.  Tenant shall exercise the third Renewal Period on or before _____, 20__.

F.      The date of commencement of the fourth Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease. Tenant shall exercise the fourth Renewal Period on or before _____, 20__.

G.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

C-1

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

|  |  |
|---|---|
| | **LANDLORD:**<br><br>**BG MONMOUTH, LLC**<br>a New Jersey limited liability company<br>By JDN Realty Corporation, a _____ corporation<br>Its Managing Member<br><br><br>By:_____<br>Name:<br>Title: |
| | **TENANT:**<br><br>BUY BUY BABY, INC.,<br>a Delaware corporation<br><br><br>By:_____<br>Name:  Steven H. Temares<br>Title:   Director and Authorized Signatory |

C-2

Exhibit D
Specifications for Landlord's Work

### *W. Long Branch, NJ*
### Exhibit D - Landlord's Work



04-12-2012

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

## I. Landlord's Plans & Specifications

A.   Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following :

    1.   <u>Tenant's Plans</u> : Site-specific design-development drawings prepared by Tenant which shall include :
        a)   F1 - FIXTURE PLAN
        b)   F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
        c)   F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
        d)   F4 - LIGHTING PLANS AND NOTES
        e)   F5 - HIGH PILE STORAGE PLAN
        f)   Additional F-drawings as may be required to address atypical site-specific conditions

    2.   <u>Tenant's Prototype Drawings & Specifications</u>  –  [developed by MCG Architecture, Cleveland, OH] which consist of :

        a)   **Buy Buy Baby – PROTOTYPE VERSION 2011.A – Drawings (dated 04/21/11)**

| | | | |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | P1.1 | Plumbing Riser Diagrams and Fixture Schedule |
| A0.2 | Generic Site Requirements Plan | P2.1 | Plumbing Floor Plan |
| A1.1 | Site Details | P3.1 | Plumbing Enlarged Plans & Details |
| A1.2 | Demolition Plan | | |
| A2.1 | Store Fixture/Egress Path Plan & Notes | FP1.0 | Fire Sprinkler Plans & Details |
| A2.2 | Floor Plan | FP1.1 | Fire Sprinkler Notes and Details |
| A2.3 | Floor Finish Plans | | |
| A2.4 | Reflected Ceiling Plans & Notes | FA1.0a | Fire Alarm Plans & Notes Base System |
| A2.5 | Roof Plan, Details & Notes | FA1.0b | (Alternate) Fire Alarm Plans & Notes – |
| A3.1 | Finish Schedule, Storefront Types & | | Occupant Notification |
| | Vestibule Elevations | FA1.0c | (Alternate) Fire Alarm Plans & Notes - |
| A3.2 | Door Hardware, Door Schedules & Door Types | | Full Smoke Detection |
| A3.3 | bbBaby National Account Vendors & Specified | FA1.1a | Fire Alarm Details - Base System |
| | Manufactures w/ Distribution Schedule | FA.1.1b | (Alternate) Fire Alarm Details – |
| A4.1 | Exterior Elevations | | Occupant Notification |
| A5.1 | Building Sections, Interior Wall Sections | FA1.1c | (Alternate) Fire Alarm Details – |
| A5.2 | Exterior Wall Sections | | Full Smoke Detection |
| A5.3 | Exterior Wall Sections | FA1.2a | Fire Alarm Device Lists & Calcs - Base System |
| A5.4 | Exterior Wall Sections | FA1.2b | (Alternate) Fire Alarm Device Lists & Calcs - |
| A5.5 | Interior / Exterior Wall Sections | | Occupant Notification |
| A5.6 | (Alternate) Scissor Lift Plan, Section, | FA1.2c | (Alternate) Fire Alarm Device Lists & Calcs - |
| | Specification & Notes | | Full Smoke Detection |
| A6.1 | Exterior Details | | |
| A6.2 | Interior Details | M1.1 | Mechanical General Information |
| A6.3 | Slatwall Details | M2.1 | Mechanical Floor Plan |
| A7.1 | Large Scale Plans | M3.1 | Mechanical Enlarged Plans & Details |
| A7.2 | Large Scale Plans & Partition Types | M4.1 | Mechanical Schedules |
| A8.1 | Interior Details | | |
| A8.2 | Interior Details | E1.1 | Electrical General Information & Schedules |
| A8.3 | Customer Service Desk | E2.1 | Power Plan |
| A8.4 | Register Bays, Gift Registry Desk & Remote | E2.2 | Lighting Layout Plan |
| | Service Desks | E2.3 | Lighting Circuiting Plan |
| A8.5 | Furniture Department Desk | E2.4 | Specialty Lighting Plans & Diagrams |
| A9.1 | Interior Elevations | E2.5 | Specialty Lighting Elevations |
| A9.2 | Interior Elevations (Gift Registry & Waiting) | E3.1 | Electrical Large Scale Plans & Details |
| A9.5a | (Alternate) – Vertical Core Sections | E3.1a | Cash Room Elevations |
| A9.5b | (Alternate) – Vertical Core Plans Elevations & Details | E3.2 | Lighting Sequencing |
| A9.6a | Portrait Studio Partition, Finish, Reflected Ceiling | E3.3 | Electrical Details |
| | Plans and Details | E4.1 | Electrical Schedules |
| A9.6b | Portrait Studio Elevations & Finish Schedule | E4.2 | Electrical Diagrams |
| A9.6c | Portrait Studio Fixture Details | E4.3 | Power Wall Details, Security Details, Sign & Lighting |
| | | | Control Schedules |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | E4.4 | Novar Wiring Details |
| | | E4.4a | (Alternate) Novar Wiring Details for |
| S1.1 | Structural General Notes & Typical Details | | Non-Lennox RTU's |
| S2.1 | Foundation Plan | E4.5 | ETM Wiring Details for Lennox RTU's |
| S2.2 | Roof Framing Plan | E4.5a | (Alternate) ETM Wiring Dtls for Non-Lennox RTU's |
| S3.1 | Foundation Details | E6.1 | Portrait Studio Power Plan |
| S3.2 | Roof Framing Details | E6.2 | Portrait Studio Lighting & Telephone / Network Plan |

        b)   **Buy Buy Baby – PROTOTYPE VERSION 2011.A – Project Manual (dated 04/21/11)**

    3.   <u>Lease Exhibits</u> : Landlord's Plans & Specifications shall conform to all provisions of Exhibits B, D, D-1, D-2 and F to this Lease.

JB 4/24/12

---

    

A.   Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements. Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings & Specifications". Such Requirements may include (but shall be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas [incl. protection of openings through fire-rated partitions]; Disability access to mezzanine level [i.e. - ADA lift; limited use/limited application elevator; passenger elevator]; Second egress stair from the mezzanine level; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc.. Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

B.   Hierarchy :

1.   In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern :
   a.   Lease Exhibits B, D [excluding Tenant's Prototype], D-1, D-2 & F
   b.   Tenant's Plans
   c.   Tenant's Prototype Drawings and Specifications
   d.   Landlord's Plans and Specifications

2.   To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised (prior to construction) to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant.

C.   Quality Control Review :

1.   At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete ½ size set of construction documents and (1) set of specifications. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

2.   Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

3.   Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant. Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications. Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease. Tenant reserves the right to immediately disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

4.   Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

## II. Site Specifications

A.   All parking areas and traffic drives in the Shopping Center are existing and shall remain as-is. The condition of these parking areas and traffic lanes shall be consistent with that of a first class Shopping Center in the state of New Jersey. Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited.

B.   All truck access drives in the Shopping Center are existing and shall remain as-is. The condition of these truck access drives at the time of Delivery shall be consistent with that of a first class Shopping Center in the state of New Jersey. Landlord represents that it shall maintain the existing grading and any future site grading shall not create slopes in excess of 3%.

C.   Tenant's truck ramp and Trash Container Pad are existing and shall remain as-is. A new Trash Compactor pad shall be installed as shown on Exhibit B and D-1. The condition of these items at the time of Delivery shall be consistent with that of a first class Shopping Center in the state of New Jersey. The Landlord represents that it shall maintain the existing grading and any future site grading shall not create slopes in excess of 6%.

D.   The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) is existing and shall remain as-is. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of Landlord's Plans & Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall also provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week. (Site lighting shall be consistent with that of a first class Shopping Center in the state of New Jersey).

E.   Landlord shall provide four (4) "Expectant Mother Parking" spaces as shown on Exhibit B, subject to existing Tenants' lease-provided protected areas and the approval of the local authorities which Landlord shall use all commercially reasonable efforts to obtain.

## III. Building Requirements

The following section both (a) highlights elements of Landlord's Work which are already specified in "Tenant's Prototype Drawings & Specifications" and (b) identifies project-specific elements of Landlord's Work which are in addition to the scope detailed in "Tenant's Prototype Drawings & Specifications" :

A.   Clear Height : All Building Systems shall be designed to allow Tenant to stock merchandise to 15'-0" a.f.f. Various systems shall be designed to conform to the following criteria:
1.   Clear height to underside of all structural system components are existing to remain.
2.   16'-6" minimum clear height to underside of all plumbing & electrical system components [excluding lighting]
3.   16'-0" minimum clear height to underside of all mechanical system components [i.e. - ductwork]
4.   16'-0" maximum clear height to underside of all mechanical supply and return ducts

5. 16'-6" minimum clear height to underside of all fire protection sprinkler piping (main and branch lines)
6. 1" minimum and 6" maximum from fire sprinkler heads to underside of roof/floor deck above
7. Existing clear height at the lowest point of the underside of roof/floor deck above (excluding elevator override) to remain.

B. **Fire Protection**: Landlord shall furnish and install both a fire alarm system and a fire sprinkler system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

1. Landlord shall issue one complete submittal each for : (i) the fire alarm system and (ii) the fire sprinkler system (per Sections 01340, 15300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval. Each initial submittal must be received by Tenant's Consultant no later than (12) weeks prior to projected Delivery Date. Prior to the commencement of Consultant's review, Landlord shall pay a fixed fee ($625 for Fire Alarm + $625 for Fire Sprinkler) directly to Tenant's Consultant. If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant then Landlord shall revise the submittal to address all Consultant comments and resubmit. Prior to the commencement of Consultant's review of any resubmittal, Landlord shall pay a fixed fee ($625 each) directly to Tenant's Consultant. All payments must be made in US Dollars or the foreign equivalent thereof.

2. Landlord shall be responsible for monitoring the fire alarm system up to 30 days following the Delivery Date.

3. Fire Alarm system components shall be purchased by the Landlord thru Tenant's National Account vendor :
   **FE Moran**
   33341 Kelly Road
   Fraser, MI 48026
   855-FE-MORAN (855-336-6726)
   contact: BBB/Baby/CTS Coordinator
   e-mail: bbb@femoranalarm.com

4. The sprinkler system shall be designed to allow merchandise to be stored to 15'-0" AFF or within 24 inches of the underside of the roof deck. The system shall comply with 2007 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity and a limited amount of group A plastics on solid shelves, minimum 4-foot aisles [typical requirement = 0.50 GPM/ sf over a 2000 sf area].

5. The sprinkler system shall NOT utilize a fire pump. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate any required Fire Pump outside of the Premises. Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 8 of 2008 Edition), and shall otherwise maintain the fire pump.

6. Consulting Services : If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials. If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

7. Tenant's National Fire Protection Consultant:    Mr. Will Smith / Code Consultants, Inc.  (CCI)
                                                     2043 Woodland Pkwy, Ste. 300
                                                     St. Louis, MO  63146-4136
                                                     (314) 991-2633 [ph]
                                                     (314) 991-4614 [fax]
                                                     wills@codeconsultants.com

C. **Office Mezzanine Access**: Prior to the development of Tenant's Plans, Landlord shall coordinate with the Authority Having Jurisdiction and advise Tenant of all applicable requirements regarding vertical transportation at the office mezzanine. In the event that vertical transportation equipment is required, Landlord shall provide and install the appropriate vertical transportation equipment in accordance with "Tenant's Prototype Drawings & Specifications". Vertical transportation equipment installation by the Landlord shall be **complete**, fully code compliant and inspected and shall allow Tenant to fixture, merchandise and open for business to the public in the Premises. All equipment shall be operational a minimum of (2) two weeks prior to the Delivery Date to allow for proper "burn-in" in accordance with Tenant's Prototype Specifications Sections 14205 and 14255. Final locations of all equipment shall be in accordance with Tenant's Plans.

D. **Floor System** : The concrete slab is existing and shall remain.

E. **Utilities** : Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas, water, fire protection water, sanitary sewer & phone services) are separately metered exclusive of all other tenants and occupants in the Shopping Center. Tenant's utility services shall be provided directly by the Utility company (sub-metering is prohibited except for domestic water). Location of utility lines and equipment serving other Tenants in the Shopping Center shall be prohibited on, under, over, across or within the Premises. Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date. Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date. If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

F. **Intumescent Paint**: In the event that fire-proofing of exposed structural elements is required, then Landlord shall use intumescent fire resistant coating to achieve the required fire rating. Application shall be neat & clean and in accordance with manufacturer's recommendations.

G. **Exit Signs** - Any existing Self Luminous Exit Signs containing Tritium Gas shall be removed from the Premises at the Landlord's cost (if applicable).

H. **Security Equipment**: Landlord shall provide and install new security equipment (including Electronic Article Surveillance [EAS] and Closed Circuit Television [CCTV]) in accordance with Tenant requirements. Landlord shall purchase such equipment directly from Tenant's National Account Vendor (Sensormatic / Attn: Doug Thomas / 804-739-8144 / douglasthomas@adt.com).

I.   Storefront Entry and Vestibule: Landlord shall furnish and install Tenant's prototypical auto slider doors at the location of the existing storefront entry.  Landlord shall replace the existing interior vestibule as required accommodate the entrance/exit door location/configuration shown on the Tenants Plans.

## IV. Construction Coordination Requirements

A.   Schedule: Landlord shall provide Tenant with a critical path construction schedule prior to commencement of Landlord's Work. Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every two weeks until Landlord's Work is complete.

Photographs : Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work.  All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address : **BBB.2000photos@bedbath.com**

Vendor Coordination: Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.  To the extent that Tenant's national account vendors fail to meet reasonable delivery schedules or are delinquent in performing other aspects of their responsibilities, Landlord will look to Tenant for assistance in mitigating these problems.  Tenant's on-site vendors shall employ organized union labor so as not to interfere with or disrupt the Landlord's construction activities and/or schedules.  Tenant will be responsible, without penalty to Landlord, for any delays caused due to the use of non-union on-site labor forces.

D.   Certification: Whenever testing, certification, or verification is required in Tenant's Prototype Drawings & Specifications, Landlord shall, at Tenant's request, provide Tenant with copies of tests, certifications, or verifications, and shall otherwise cooperate with Tenant's reasonable informational requests.

## V. Building and Site Signs

A.   Building Signs -- Tenant shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only.  Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations.

B.   Remote Building Sign(s) – NA

C.   Pylon/Monument/Directional Signs -- Tenant shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).

D.   Temporary Signs -- Commencing on the Effective Date and subject to approval of local authorities, and continuing thereafter through the Rent Commencement Date, Tenant shall furnish and Landlord install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below. Landlord shall also remove the temporary banners on the date designated by the Tenant. Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications:
   1.   Two double sided temporary banners mounted to the Premises bearing the phrase:
         Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
         Banner #2 - "Why Wait ? Shop Online" (side a) and "Now Open" (side b).
   2.   Four single-sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
         Banners #1 & #2 – "Coming Soon"
         Banners #3 & #4 - "Now Open"
   3.   One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
         "Now Hiring" (side a) and "Now Open" (side b).
   At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.

Tenant shall secure banners through the following vendor:

         Auna Foote / Corporate Identification Solutions
         5563 North Elston Avenue
         Chicago, IL 60630
         (773) 763-9600 [ph]
         (773) 763-9606 [fax]
         afoote@corporateidsolutions.com
         www.corporateidsolutions.com

## VI. Permits and Approvals

A.   Landlord shall be obligated to secure all permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises.  Such permits may include (but shall not be limited to) the following: Building Permit, [Seismic Permit and High Pile Storage Permit [for storage of merchandise above 12'-0-"].

If seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date.  Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of the permit application.  Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).
         Seizmic Inc.
         Sal Fateen / Genie Fateen / Keri Putnam
         161 Atlantic Street, Pomona, CA 91768
         (909) 869-0989 [ph]

Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.  Tenant's fixture

contractor shall employee organized labor forces so as not to disrupt or interfere with the Landlord's contractor and/or schedule.

# VII. Construction Closeout

A. <u>Electronic Format</u> : Within thirty (30) days following the "Substantial Completion" date, Landlord shall be responsible for uploading all required documents to the Digital Reliance Inc. (DRI) website [http//www.closeoutassistant.com]. For additional information or assistance contact DRI at 614-430-5950. Special software is not required. All documents shall be uploaded in pdf format to the DRI website within thirty (30) days following "substantial completion". Landlord shall pay the mandatory $675 service fee to DRI prior to uploading files. All payments must be made in US Dollars or the foreign equivalent thereof. DRI will confirm submittal meets base requirements and shall inform Landlord or Landlord's Contractor if certain documents are missing. DRI will not review items for content. The content will be reviewed by the BBB Construction Manager after posting of all documents is complete. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord or Landlord's Contractor from BBB's Construction Manager. Landlord shall resubmit amended document(s) to DRI until approved by BBB's Construction Manager. Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700

B. <u>Warranties</u> : Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord shall forward a written report to Tenant outlining the condition of all warranty items. Contingent upon tenant's written request.

C. <u>Late Closeouts</u> : If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed forty five 45day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D. <u>Itemized Budget</u> : Landlord shall provide Tenant with its itemized "budget" and "final cost" for all of Landlord's Work within thirty (30) days following the Substantial Completion Date.

E. <u>Energy Rebate Information</u> : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy rebate programs that are in force by the Authority Having Jurisdiction and/or the utility provider.

Exhibit D-1

Exterior Elevations of Premises

4191724v7



**FRONT ELEVATION**

**SIDEWALK PLAN**

**EXHIBIT D-1**

EXTERIOR ELEVATIONS OF THE PREMISES, AND SIDE WALK PLAN

W. LONG BRANCH, NJ

GENERAL NOTES:

1. ENTRY MAY SHOW BASED ON TENANT'S FINAL FIXTURE PLAN.

2. FENESTRATION INDICATED IS SCHEMATIC AND IS SUBJECT TO TENANT'S PLANS

3. FINAL EXTERIOR COLOR SCHEME SHALL BE BASED ON TENANT'S PROTOTYPE

4. LANDLORD WILL REPAINT THE AREAS OF THE STORE FRONT WHICH ARE PAINTED TO MATCH THE EXISTING COLORS

**buybuyBABY**

Exhibit E
Permitted Encumbrances

1. Mortgage, Assignment of Leases Rents, and Contracts and Security Agreement dated as of June 15, 1993, from RB-3 Associates, David Feuerstein and Stephen B. Goodman, collectively, Mortgagor, in favor of Allstate Life Insurance Company, Mortgagee, to secure the principal amount of $21,400,000.00 recorded on June 17, 1993, in Mortgage Book 5357, Page 708, which Mortgage, Assignment of Leases, Rents and Contracts and Security Agreement was assigned to BG Monmouth, LLC pursuant to that certain Assignment and Assumption Agreement dated May 21, 2004, by RB-3 Associates, David Feuerstein and Ronald Benderson, Randall Benderson and David H. Baldauf, as Trustees under a Trust Agreement dated October 14, 1985, known as The Benderson 85-1 Trust, assignor, BG Monmouth, LLC, assignee, and Allstate Life insurance Company, Lender, recorded on June 15, 2004, in Book 8371, Page 9423 and re-recorded on June 15, 2004, in Book 8371, Page 9505, and was assigned by Allstate Life Insurance Company to Aviva Life and Annuity Company pursuant to that certain Assignment of Mortgage and Assignment of Leases dated November 17, 2009 recorded on December 14, 2009, in Book 8811, Page 2424.

Assignment of Leases and Rents dated as of June 15, 1993, by and between RB-3 Associates, David Feuerstein and Stephen B. Goodman, collectively, assignor, and Allstate Life Insurance Company, assignee, recorded on June 17, 1993, in Mortgage Book 5357, Page 747, which Assignment of Leases and Rents was assigned BG Monmouth, LLC pursuant to that certain Assignment and Assumption Agreement dated May 21, 2004, by RB-3 Associates, David Feuerstein and Ronald Benderson, Randall Benderson and David H. Baldauf, as Trustees under a Trust Agreement dated October 14, 1985, known as The Benderson 85-1 Trust, assignor, BG Monmouth, LLC, assignee, and Allstate Life insurance Company, Lender, recorded on June 15, 2004, in Book 8371, Page 9423 and re-recorded on June 15, 2004, in Book 8371, Page 9505, and was by Allstate Life Insurance Company to Aviva Life and Annuity Company pursuant to that certain Assignment of Mortgage and Assignment of Leases dated November 17, 2009 recorded on December 14, 2009, in Book 8811, Page 2424.

UCC-1 Financing Statement between BG Monmouth, Debtor, and Allstate Life Insurance Company, Secured Party, and filed on June 15, 2004, as Instrument Number 2004130302, and continued on February 20, 2009, as Instrument Number 20090165451, and assigned to Aviva Life and Annuity Company on December 14, 2009, as Instrument Number 2009138448.

The loan documents set forth in this item #1 are subject to the provisions of Section 17.3 or Subsection 2.3.1(f) of the Lease.


2. RIGHT OF WAY TO JERSEY CENTRAL POWER AND LIGHT COMPANY AND NEW JERSEY BELL TELEPHONE COMPANY AS SET FORTH IN DEED BOOK 5174 PAGE 401; DEED BOOK 5174 PAGE 405; DEED BOOK 5174 PAGE 410

AS SHOWN ON THE SURVEY PREPARED BY JAMES V. DEMURO, P.L.S., DATED APRIL 7, 2004, LAST REVISED APRIL 16, 2004.

3. NON-EXCLUSIVE EASEMENT AND RIGHT OF WAY TO NEW JERSEY NATURAL GAS COMPANY AS SET FORTH IN DEED BOOK 5163 PAGE 174

AS SHOWN ON THE SURVEY PREPARED BY JAMES V. DEMURO, P.L.S., DATED APRIL 7, 2004, LAST REVISED APRIL 16, 2004

4. TERMS AND CONDITIONS OF LEASE AS EVIDENCED BY THE FILING OF A MEMORANDUM THEREOF BETWEEN RB-3 ASSOCIATES, A NEW YORK GENERAL PARTNERSHIP AND LOEHMANNS' INC., AS SET FORTH IN DEED BOOK 5099 PAGE 790

E-1

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT TO FIRST FIDELITY AGREEMENT AS SET FORTH IN MORTGAGE BOOK 5133 PAGE 923

The inclusion of the foregoing memorandum of lease and Subordination, Non-Disturbance and Attornment Agreement within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

5. TERMS AND CONDITIONS OF LEASE AS EVIDENCED BY THE FILING OF A MEMORANDUM THEREOF BETWEEN RB-3 ASSOCIATES, A NEW YORK GENERAL PARTNERSHIP AS TO AN UNDIVIDED 75% INTEREST, AND STEPHEN B. GOODMAN AS TO AN UNDIVIDED 10% INTEREST, AND DAVID FEUERSTEIN AS TO AN UNDIVIDED 15% INTEREST AND THE SPORTS AUTHORITY, INC., AS SET FORTH IN DEED BOOK 5160 PAGE 715

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT TO FIRST FIDELITY AS SET FORTH IN MORTGAGE BOOK 5189 PAGE 145

The inclusion of the foregoing memorandum of lease and Subordination, Non-Disturbance and Attornment Agreement within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

6. TERMS AND CONDITIONS OF LEASE AS EVIDENCED BY THE FILING OF A MEMORANDUM THEREOF BETWEEN RB-3 ASSOCIATES, A NEW YORK GENERAL PARTNERSHIP AS TO AN UNDIVIDED 75% INTEREST, AND STEPHEN B. GOODMAN AS TO AN UNDIVIDED 10% INTEREST, AND DAVID FEUERSTEIN AS TO AN UNDIVIDED 15% INTEREST AND THE HOME DEPOT INC. AS SET FORTH IN DEED BOOK 5146 PAGE 495

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT TO FIRST FIDELITY AS SET FORTH IN MORTGAGE BOOK 5133 PAGE 967

MODIFIED BY MODIFICATION AGREEMENT AS SET FORTH IN DEED BOOK 5146 PAGE 503; DEED BOOK 5202 PAGE 731

The inclusion of the foregoing memorandum of lease and Subordination, Non-Disturbance and Attornment Agreement within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

7. TERMS AND CONDITIONS OF LEASE AS EVIDENCED BY THE FILING OF A MEMORANDUM THEREOF BETWEEN RB-3 ASSOCIATES, A NEW YORK GENERAL PARTNERSHIP AS TO AN UNDIVIDED 75% INTEREST, AND STEPHEN B. GOODMAN AS TO AN UNDIVIDED 10% INTEREST, AND DAVID FEUERSTEIN AS TO AN UNDIVIDED 15% INTEREST AND BURGER KING CORPORATION AS SET FORTH IN DEED BOOK 5223 PAGE 525 AND MORTGAGE BOOK 5349 PAGE 412

AS TO LOT 8.01 BLOCK 105

The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

8. TERMS AND CONDITIONS OF SHORT FORM OF LEASE BETWEEN RB-3 ASSOCIATES, A NEW YORK GENERAL PARTNERSHIP AS TO AN UNDIVIDED 75% INTEREST, AND STEPHEN B. GOODMAN AS TO AN UNDIVIDED 10% INTEREST, AND DAVID FEUERSTEIN AS TO AN UNDIVIDED 15% INTEREST AND DRUG

EMPORIUM, INC., DATED AUGUST 24, 1993, RECORDED DECEMBER 7, 1993 IN DEED
BOOK 5270 PAGE 380 AND MORTGAGE BOOK 5493 PAGE 165

The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is
for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or
increase any of Tenant's obligations, under this Lease.

9. TERMS AND CONDITIONS OF COMMENCEMENT OF LEASE BETWEEN RB-3
ASSOCIATES, A NEW YORK GENERAL PARTNERSHIP AS TO AN UNDIVIDED 75%
INTEREST, AND STEPHEN B. GOODMAN AS TO AN UNDIVIDED 10% INTEREST,
AND 6AVID FEUERSTEIN AS TO AN UNDIVIDED 15% INTEREST AND BURGER KING
CORPORATION AS SET FORTH IN DEED BOOK 5272 PAGE 429

AS TO LOT 8.01 BLOCK 105

The inclusion of the foregoing commencement of lease agreement within these "Permitted
Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of
Tenant's rights, or increase any of Tenant's obligations, under this Lease.

10. MEMORANDUM OF LEASE BY AND BETWEEN RB-3 ASSOCIATES, DAVID
FEUERSTEIN AND STEPHEN B. GOODMAN (LANDLORD) AND STAPLES, INC.
(TENANT) AS EVIDENCED BY THE FILING OF A MEMORANDUM THEREOF IN DEED
BOOK IN BOOK 5113 PAGE 587.

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT TO FIRST
FIDELITY AS SET FORTH IN MORTGAGE BOOK 5133 PAGE 936.

FIRST AMENDMENT TO MEMORANDUM OF LEASE AS SET FORTH IN DEED BOOK
5985 PAGE 22.

The inclusion of the foregoing memorandum of lease and Subordination, Non-Disturbance and
Attornment Agreement within these "Permitted Encumbrances" is for informational purposes
only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's
obligations, under this Lease.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent
Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with
any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of
those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are
located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the
Premises.

E-3

<u>Exhibit F</u>

<u>Signage</u>

F-1



SIGN AREA
BOXED AREA = 207 sq ft.
INDIVIDUAL LETTER AREA = 90 sq ft.

- 'buy buy' LETTERS = RED ACRYLIC FACES w/ "RED MAX" G.E. LUMINATION L.E.D. SYSTEM
- 'BABY' LETTERS = BLUE ACRYLIC FACES w/ "BLUE MAX" G.E. LUMINATION L.E.D. SYSTEM
- ALL LETTERS TO HAVE WHITE RETURNS AND WHITE TRIM CAP RETAINER
- POWER REQUIREMENTS = TWO (2) 120V / 20A CIRCUITS
- POWER TO J-BOX AND FINAL ELECTRICAL CONNECTION BY G.'s ELECTRICIAN
- G.C. TO COORDINATE MOUNTING REQUIREMENTS WITH SIGN MANUFACTURER AND INSTALLER

EXHIBIT F
BUILDING SIGN
W. LONG
BRANCH, NJ
SHEET 1 of 4

**"BABY" LETTER SECTION w/ SELF CONTAINED TRANSFORMERS**

**"buy buy" LETTER SECTION w/ SELF CONTAINED TRANSFORMERS**

2" SPACE FROM VISUAL OPENING TO START OF LOGO.

1. TENANT IS RESPONSIBLE FOR FURNISHING AND INSTALLING TENANT'S GRAPHICS

2. LANDLORD IS RESPONSIBLE FOR PYLON / MONUMENT STRUCTURE AND REQUIRED ELECTRICAL SERVICE.

3. TENANT LOGO ON EACH FACE OF ONE PYLON. TOTAL OF TWO PANELS.

4. buy buy BABY PANEL – WHITE ACRYLIC BACKGROUND
   buy buy IS RED VINYL (3M#3630G3)
   BABY IS BLUE VINYL (3M#3630137)
   LOGO PROPORTION IS 1 TO 6.82. LOGO TO BE PLACED 2" MINIMUM FROM EDGE OF RAISED PANEL. FINAL LOGO SIZE CAN BE ADJUSTED SLIGHTLY FOR FIELD CONDITIONS, BUT MUST BE APPROVED BY TENANT.

buybuy BABY

EXHIBIT F
PYLON SIGN
W. LONG BRANCH, NJ
SHEET 2 of 4





buybuy BABY
EXHIBIT  F
EXPECTANT MOTHER PARKING SIGN
W LONG BRANCH, NJ
SHEET  3 of  4
(TENANT'S PARKING FIELD)



LOCATION SHOWN ON EXHIBIT B.

TEMPORARY SITE SIGNAGE

TEMPORARY SITE BANNERS

COLORS:

RED = Pantone 186C
BLUE = Pantone 281C
GRAY = Pantone 30% Black

BANNER STYLE

CORNER STYLE

NOTE:
- VINYL TO BE RED (PMS 187 OR EQUIVALENT) BACKGROUND WITH WHITE LETTERS IN A SIMILIAR FONT AS SHOWN.
- TENANT'S SPECIFIED VENDOR TO PROVIDE, INSTALL AND REMOVE AS REQUIRED BY bbBABY.
- TENANT TO APPROVE THE STYLE ( BANNER, CORNER, ETC) AND LANDLORD PROVIDED RENDERING FOR EACH PANEL LOCATED ON PYLON, MONUMENT OR OTHER SIGN PANEL STRUCTURE.
- TENANT TO DETERMINE PHRASE (COMING SOON, NOW OPEN, ETC) ON TEMPORARY VINYL
- VINYL TO BE 3M NON STICK VINYL OR EQUIVALENT. NO LASTING RESIDUE OR MARKS AFTER THE VINYL IS REMOVED.

TEMPORARY NON STICK VINYL GRAPHIC

ALL TEMPORARY SIGNAGE IS SUBJECT TO LOCAL SIGN ORDINANCES.

12'-0" x 10'-0" DOUBLE SIDED BANNER

**TEMPORARY SIGN**
(TENANT'S HIRING TRAILER)
SAME SPECS AS TEMP BUILDING SIGN

12'-0" x 10'-0" DOUBLE SIDED BANNER

SIDE A

SIDE B

TYPICAL SPECIFICATIONS FOR ALL DOUBLE SIDED BANNERS:
DOUBLE-SIDED
300 DPI DIGITALLY PRINTED GRAPHICS
PRINTED ON 15oz WHITE BLOCKOUT BANNER MATERIAL
HEMS & GROMMETS IN THE CORNERS AND EVERY 18"

**TEMPORARY BUILDING SIGN**
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

12'-0" x 10'-0" DOUBLE SIDED BANNER

SIDE A

SIDE B

**TEMPORARY BUILDING SIGN**
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)
SAME SPECS AS TEMP BUILDING SIGN

buybuy BABY

EXHIBIT F
TEMPORARY SIGNAGE
W LONG BRANCH, NJ
SHEET 4 of 4

Exhibit G
Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 201__, by and between _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ (the "*Mortgagee*") and BUY BUY BABY, INC., a Delaware corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the "*Tenant*").

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*") covering a parcel of land owned by BG MONMOUTH, LLC, a New Jersey limited liability company (the "*Landlord*") together with the improvements erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the "*Shopping Center*" and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the "*Lease*"), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the "*Premises*"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Subsection 2.3.1(e)/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(1) Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

G-1

(2) The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(3) All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.      If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(1) Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(2) Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)      liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)     subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)     bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part

G-2

of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(3) Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.     Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.     Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.     Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Cathleen H. Giuliana, Esq., Riker, Danzig, Scherer, Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown, New Jersey 07962-1981, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.     This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.     This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.     This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

G-3

4191724v7

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

| ATTEST: | **MORTGAGEE:** |
|---|---|
| By:_____ <br> Name:_____ <br> Title:          (Assistant)        Secretary <br><br> [SEAL] | _____ <br><br> By:_____ <br> Name:_____ <br> Title:   (Vice) President |
| ATTEST: <br><br> By:_____ <br> Name:_____ <br> Title:  (Assistant) Secretary <br><br> [SEAL] | **TENANT:** <br><br> BUY BUY BABY, INC., <br> a Delaware corporation <br><br> By:_____ <br> Name:  Steven H. Temares <br> Title:    Director and Authorized Signatory |

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

_____

STATE OF NEW JERSEY          )
                                             ) : ss.
COUNTY OF UNION               )

On this ___ day of _____, 201__, before me personally came Steven H. Temares to me known, who being by me duly sworn, did depose and say that he is the Director and Authorized Signatory of Buy Buy Baby, Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:


_____

G-4

Exhibit H
Subtenant Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 201__, by and between BG MONMOUTH, LLC, a New Jersey limited liability company, having an address at c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, Attention: Senior Vice President of Anchor Store Leasing ("*Landlord*"); BUY BUY BABY, INC., a Delaware corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*"); and _____, a [_____] **[corporation]      [limited]      [general]      [partnership]**, having an address at _____ ("*Subtenant*").

R E C I T A L S:

1.      Landlord and Tenant have entered into a certain lease (the "*Lease*") dated as of _____ __, 201__, a short form of which has been recorded in Mercer County, which demises certain premises (the "*Premises*") located in the Consumer Centre, West Long Branch, New Jersey, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

2.      Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

3.      Pursuant to a Sublease dated as of _____ (the "*Sublease*"), Tenant has subleased [a portion of] the Premises to Subtenant (the "*Subleased Premises*").

4.      The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

(1) Landlord warrants and represents as follows:

(i)      that it is the fee owner of the Premises,

(ii)      that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(iii)      that the term of the Lease expires on _____, but is subject to four renewal periods of five years each and

(iv)      that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

(2) Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

(3) Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

(4) Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises

H-1

or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

(5) In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent  and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

(6) Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

(7) Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth, with a duplicate copy to General Counsel, c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, Cathleen H. Giuliana, Esq., Riker, Danzig, Scherer, Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown, New Jersey 07962-1981, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

(8) No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

H-2

(9) This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

<u>**LANDLORD:**</u>

**BG MONMOUTH, LLC**
a New Jersey limited liability company
By JDN Realty Corporation, a _____ corporation
Its Managing Member


By:_____
Name:
Title:

<u>**TENANT:**</u>

BUY BUY BABY, INC.,
a Delaware corporation


By:_____
Name:  Steven H. Temares
Title:    Director and Authorized Signatory

<u>**SUBTENANT:**</u>

_____


By:_____
Name:_____
Title:_____

H-3

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

STATE OF NEW JERSEY        )
                                      ) : ss.
COUNTY OF UNION            )

On this ___ day of _____, 201__, before me personally came Steven H. Temares, to me known, who being by me duly sworn, did depose and say that he is the Director and Authorized Signatory of Buy Buy Baby, Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.


                                            _____
                                            Notary Public
My Commission Expires:


_____

H-4

<u>Exhibit I</u>
<u>Form of Delivery Date Notice</u>

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Buy Buy Baby, Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attention:  Warren Eisenberg

Re:     Lease Agreement dated as of _____, 201__ (the "*Lease*"), between BG Monmouth,
        LLC, as landlord ("*Landlord*"), and Buy Buy Baby, Inc., as tenant ("*Tenant*"), with
        respect to certain retail premises (the "*Premises*") located in the Consumer Centre, West
        Long Branch, New Jersey.

Gentlemen:

        In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____,
201__.  This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of
the Lease.

                                **BG MONMOUTH, LLC**
                                a New Jersey limited liability company
                                By JDN Realty Corporation, a _____
                                corporation
                                Its Managing Member


                                By:_____
                                Name:
                                Title:

cc:     Cathleen H. Giuliana, Esq.
        Allan N. Rauch, Esq.

I-1

<u>Exhibit J</u>
<u>Delivery Date Certification</u>
[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Buy Buy Baby, Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attn:  Warren Eisenberg

Re:     Lease Agreement dated as of _____, 201__ (the "*Lease*"), between BG Monmouth,
        LLC, as landlord ("*Landlord*"), and Buy Buy Baby, Inc., as tenant ("*Tenant*"), with
        respect to certain retail premises (the "*Premises*") located in the Consumer Centre, West
        Long Branch, New Jersey.

Gentlemen:

        In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term is
defined in the Lease) will be deemed to be _____, 201__ .  This notice shall constitute
the Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

                        **BG MONMOUTH, LLC**
                        a New Jersey limited liability company
                        By JDN Realty Corporation, a _____
                        corporation
                        Its Managing Member


                        By:_____
                        Name:
                        Title:

cc:     Cathleen H. Giuliana, Esq.
        Allan N. Rauch, Esq.

J-1

4191724v7

Exhibit K-1
Existing Exclusives

1. Intentionally Omitted.

**2. AAA Mid-Atlantic**

Provided the Lessee has not been in default hereunder and Lessee is operating the Demised Premises pursuant to Paragraph 2, Lessor agrees not to lease any space in the Shopping Center to any other tenant whose primary purpose is the operation of a travel agency. The foregoing shall not be applicable to any lease in effect prior to the date of this Lease.

**3. Chuck E. Cheese's**

Provided the Lessee is not in default hereunder beyond any applicable notice and cure period and Lessee is operating the Demised Premises pursuant to Paragraph 2, Lessor agrees not to lease, use, or sell, permit others to use, or permit any tenant or occupant to use any space in the Shopping Center for (i) any business whose primary purpose is an arcade or gameroom or (ii) a business primarily providing physical play activities for children (including, but not limited to, Jeepers!, Peter Piper, Pistol Petels, Club Disney, Bullwinkle's or similar concept) or (iii) a business whose primary purpose is the use of children's games (including but not limited to electronic, computer controlled redemption and pinball games), (iv) a restaurant or other business primarily serving pizza, or (v) any business which uses more than four (4) kiddie rides. The foregoing shall not be applicable to any Lease in effect prior to the Effective Date of this Lease.

**4. Coconuts**

Provided the Lessee is not in monetary or other material default hereunder beyond any applicable cure period and Lessee is operating the Demised Premises pursuant to Paragraph 2, Lessor agrees not to lease any space in the shopping center of which the Demised Premises forms a part to any other tenant whose primary purpose is the operation of a prerecorded music store or to any tenant whose primary purpose is the sale of prerecorded videos of movies. In the event Lessor leases space in the shopping center to a major electronics store, such as Silo, Best Buy, The Wiz or Highland Superstores, then such major electronics store shall not utilize more than 10% of its selling floor area for the display and sale of records, prerecorded music tapes or prerecorded music compact discs or prerecorded videos. The foregoing shall not be applicable to any Lease in effect prior to the date of this Lease.

**5. Dollar Tree**

Provided the Lessee has not been in default hereunder and Lessee is operating the Demised Premises pursuant to Paragraph 2, Lessor agrees not to lease any space in the Shopping Center to any other tenant who, as its primary business, sells a full line of general merchandise at one price, said price being under $5.00. The foregoing shall not be applicable to any Lease in effect prior to the date of this Lease, nor to any tenant who sells apparel as its main use.

**6. Five Below**

Provided that Tenant is in possession of the Premises and while Tenant is operating its business therein without default beyond any applicable notice and cure period, Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is as a variety retail store selling products at a

price equal to or less than Ten Dollars ($10.00) (the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business devoting more than forty percent (40 %) of its sales floor area to the operation of a variety retail store selling products at a price equal to or less than Ten Dollars ($10.00). Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units occupied by tenants whose gross leaseable area is 25,000 square feet or more, tenants such as Big Lots, Goodwill or Salvation Army, any tenant operating as a dollar store, the occupant of any outparcel adjacent to the Shopping Center (but only to the extent that Landlord does not have the right to control the use of the space), any existing Shopping Center tenant whose lease, as of the date of this Lease, permits the subject premises to be used in violation of the Exclusive Use, or any of their successors or assigns.

K-1-1

7. **Home Depot**

Tenant currently specializes in the sale of lumber, hardware items, plumbing supplies, electrical supplies, paint, wallpaper, floor coverings, cabinets, siding, ceiling fans, gardening supplies, nursery products, unfinished furniture and pool supplies, and, during the year-end holiday season, the sale of Christmas trees. Landlord hereby warrants and represents to Tenant that Landlord has not leased and will not lease any space in the Shopping Center to any party whose principal business is, singularly or in the aggregate, the sale of any of the foregoing items so long as the principal use of the Premises is that of a Home Improvement Center. ... The foregoing to the contrary notwithstanding the use of premises not in excess of 2,000 square feet of gross leasable area per store to an aggregate of 11,000 square feet for the principal purpose of selling (a) paint; (b) wallpaper; (c) ceiling fans (d) pool supplies (e) floor coverings or (f) Christmas trees shall not be deemed to be a violation of the foregoing exclusive. ... In no event shall the foregoing be deemed to prohibit the sale of unfinished furniture by a full line furniture store. The foregoing shall not be applicable to any existing leases affecting the Shopping Center nor shall it apply to any supermarket, furniture, discount or department store or wholesale warehouse club whose primary purpose is not a home improvement store.

8. **Nail X-P**

Provided that Tenant is in possession of the Premises and operating its business therein without default and Tenant has not defaulted under any of the terms and conditions contained in this Lease more than twice during the Term of this Lease, Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is the operation of a nail salon providing manicure and pedicure services (the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business devoting more than fifty percent (50%) of its sales floor area to the operation of a nail salon providing manicure and pedicure services. Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units containing ten thousand (10,000) square feet or more of gross leasable area, the occupant of any outparcel adjacent to the Shopping Center, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns or replacements.

9. **Payless Shoe Source**

To the extent that Landlord may lawfully do so, Landlord covenants and agrees that it will not directly or indirectly, lease or rent any additional property within the Development for principal use as a retail self-service family shoe store; nor will Landlord, directly or indirectly, permit any

tenant or occupant of such property to lease or rent, in any manner, directly or indirectly, any part thereof to a person, firm or corporation for such use.

10. **PetSmart**

As partial consideration for the execution of this lease by Lessee, Lessor agrees not to lease any space in the shopping center, including out-parcels, pads, or future phases or additions to the shopping center, to any other Lessee whose primary purpose is the sale of pet food, pet supplies, or pets, with the exception of a supermarket. The foregoing shall not apply to existing lease with Sports Authority, Staples, or Home Depot.

11. **Sizes Unlimited**

Provided Lessee has not been in default hereunder and is operating the Demised Premises pursuant to Paragraph 2, Lessor shall not allow any space at the shopping center to be occupied by any tenant whose primary purpose is the sale of women's large size apparel. The foregoing shall not be applicable to any Lease in effect prior to the date of this lease.

12. **Staples**

Landlord covenants that, other than the Premises, (a) no part of the Center nor any property within one mile of the Center owned by Landlord or by an entity under common control with Landlord, shall be used for the sale of office equipment (including computers and peripherals), office furniture or office supplies (including computer software), or the provision of any office services then provided by Tenant. ... Such covenants shall run with the land comprising the Center. ... Notwithstanding the foregoing, this Section shall not prohibit Home Depot USA, Inc., Loehman's, Inc., The Sports Authority, Inc., B. Dalton Bookseller, Inc. or Drug Emporium, Inc. from using its space for any lawful retail use as currently permitted by its lease nor prohibit any future tenant from selling office equipment (including computers and peripherals), office furniture or office supplies (including computer software) or providing office services incidental to such tenant's primary business in no more than five percent of such tenant's selling space or 625 square feet of selling space, whichever is greater.

K-1-2

**13. Verizon Wireless**

Provided that Lessee shall not be in default of under this Lease, Landlord shall not, during the term of this Lease or any Renewal term, lease any portion of the Shopping Center to another Lessee whose primary business is the retail sale of wireless telecommunications or paging devices or services.

**14. Villa Pizza**

Provided the Lessee has not been in default hereunder and Lessee is operating the Demised Premises pursuant to Paragraph 2, Lessor agrees not to lease any space in the Consumer Centre to any other tenant whose primary purpose is a pizza and sub shop.

K-1-3

<u>Exhibit K-2</u>
<u>Existing Leases</u>

1. Coconuts
2. Payless Shoe Source
3. Sally Beauty Supply
4. Sizes Unlimited
5. Radio Shack
6. AAA Mid-Atlantic
7. Verizon Wireless
8. KS Fitness Center
9. Nail Pro
10. GameStop
11. Café Villa Pizza
12. Great Clips
13. Five Below
14. Dollar Tree
15. Chuck E. Cheese's
16. Sports Authority
17. PetsMart
18. Staples
19. Home Depot
20. Hibachi Grill and Supreme Buffet

Exhibit K-2-1

Exhibit L
Intentionally Omitted

L-1

Exhibit M
Prohibited Uses

As used in this Lease, the term **"*Prohibited Uses*"** shall mean any of the following uses:

## A.   As to the Shopping Center, any of the following uses:

(1)     Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)     Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any "second hand" store, "surplus" store (it being agreed that this restriction shall not prevent the operation of a Play it Again Sports, Once Upon A Child, Plato's Closet or similar tenant typically found in a first class shopping center);

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)     Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)     Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as the on-site premises is not located within a 200 foot radius of the Premises);

(8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, or display (other than in connection with a full-line sporting goods store such as, by way of example only, Dick's Sporting Goods, Sports Authority or Gart Bros.; provided, however, that any such sales, leasing and display shall be limited to the interior of the sporting goods store's premises, other than temporary promotional sales and displays in designated portions of the Common Area, subject to the restrictions set forth in the Lease with respect to Tenant's Critical Area) or body shop repair operation;

(9)     Any bowling alley or skating rink (except that a high-end national or regional bowling alley, such as Lucky Strike or Corner Alley, shall be permitted, so long as the front door of its on-site premises is located more than 300 linear feet away from the front door of the Premises);

(10)     Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use (except as permitted in Item 34 below);

(11)     Any living quarters, sleeping apartments, or lodging rooms;

(12)     Any veterinary hospital or animal raising or boarding facilities, except: (i) as may be incidental to a permitted full-line pet and pet supply store operating in at least 10,000 square feet of Floor Area and located at least 200 linear feet away from the Premises, and (ii) a veterinary hospital that is incidental to a permitted full-line pet and pet supply store operating in Unit 23 (the premises currently occupied by PetSmart, as shown on Exhibit B) shall be permitted; such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises**;**

(13)     Any mortuary or funeral home;

M-1

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for Massage Envy (or similar stores) as such stores are currently operated as of the Effective Date and therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on-premises consumption or any convenience store whose primary business is the sale of alcohol for off-premises consumption, except that the following shall not be prohibited by this Item (16):  (i) the sale of alcohol for on-premises consumption or off-premises consumption as an incidental part of a restaurant otherwise permitted herein, (ii) a wine bar, provided any such wine bar is located in the spaces shown as Units 1 through Unit 20, or Unit 26 on Exhibit B (the *"Permitted Use Area"*), and (iii) grocery stores, pharmacies and drug stores, upscale package goods stores (such as BevMo!®, or Total Wine & More®), department stores, discount department stores, membership clubs and specialty retailers such as Cost Plus World Market and Kitchen & Company;

(17)    Any catering or banquet hall (it being agreed that this restriction shall not prevent an otherwise permitted occupant from offering off-site catering services, provided such catering service is incidental to the occupant's primary use);

(18)    Any flea market, amusement or video arcade (except as permitted in Item (32)), pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to (i) on-site employee training by an occupant incidental to the conduct of its business at the Shopping Center, (ii) small educational enhancement centers catering to students such as SCORE, Kumon and Sylvan Learning Center, and (iii) a Regency Beauty School (or a beauty school operating similarly to the way a typical Regency Beauty School operates on the Effective Date), provided any such beauty school shall not exceed seven thousand (7,000) square of Floor Area and that the front door of its premises is located more than 300 linear feet away from the front door of the Premises;

(20)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to (i) governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the occupant, or (ii) an internet café located at least 300 linear feet away from the front door of the Premises;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, tattoo parlor, or gun shop (provided, however, the foregoing shall not prohibit gun sales by a full-line sporting goods store, department store, discount department store, general merchandise retailer or membership club);

(23)    Any church or other place of religious worship;

(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility, unless operated as an ancillary part of the business of a department store, discount department store or membership club, such as, without limitation, Sears, Wal-Mart, Sam's Club, etc., or other retailer occupying at least Sixty Thousand (60,000) square feet of Floor Area.  It is also agreed that the foregoing restriction shall not prohibit or restrict the operation of a automobile parts retailer such as Pep Boys, Auto Zone, O'Reilly's, etc, located at least 300 linear feet away from the Premises;

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics or medical offices; except that, subject to the floor area limitation set forth in this Item (26), the following may be located in the Shopping Center: (a) dental offices; (b) eyeglass stores (e.g. Lenscrafters); (c) day spas that may provide such services as tooth whitening, laser hair removal, and skin treatments, and (d) family-oriented medical clinics or medical offices (collectively, *"Medical Uses"*), provided that (i) no Medical Uses shall be adjacent to the Premises, (ii) not more than 3,000 square feet of Floor Area of any such Medical Use shall be located within 200 linear feet of  the front door of the Premises, and (iii) not more than 10,000 square feet of Floor Area of the Shopping Center shall be devoted to Medical Uses.  Notwithstanding the foregoing, a family-oriented medical clinic shall be permitted to be located within (and ancillary to) (i) a drugstore or pharmacy, (ii) a full-line national or regional department store, (iii) a supermarket or grocery store, or (iv) other retailer occupying at least Forty Thousand (40,000) square feet of Floor Area, provided such drugstore, department store, supermarket or other retailer containing said family-oriented medical clinic shall not be located contiguous to the Premises if the family-oriented medical clinic contained therein is greater than 2,500 square feet of Floor Area, and notwithstanding anything contained herein to the contrary, such ancillary, family-oriented medical clinic shall not be subject to or included in the calculation of the floor area limitation set forth in this Item (26);

(27)    Any (i) full-line supermarket, unless the front door of such supermarket is located at least three hundred (300) feet away from the front door of the Premises, or (ii) specialty or upscale grocer such as Whole Foods, Trader Joe's, Fresh Market or Earth Fare, unless the front door of such use is located at least two hundred (200) feet away from the front door of the Premises.

(28)    Except as otherwise permitted under this Exhibit M, office use, other than: (a) office space used in connection with and ancillary to a permitted retail use hereunder; and (b) retail offices providing services commonly found in similar first-class shopping centers in the West Long Branch, New Jersey metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that the front door of such uses are located at least two hundred (200) feet away from the front door of the Premises, and not more than fifteen thousand (15,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to all such office uses set forth in the foregoing clause (b), and no single user shall exceed seven thousand (7,000) square feet of Floor Area;

(29)    hotel/motel;

(30)    daycare center, except that a day care center not exceeding five thousand (5,000) square feet of Floor Area in the aggregate shall be permitted provided the front door thereof is at least 300 linear feet from the front door of the Premises;

(31)    Intentionally omitted.

(32)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's") unless located in the Permitted Use Area;

M-3

(33)   karate center; provided any such use that is less than three thousand (3,000) square feet of Floor Area shall be permitted provided the front door thereof is located at least 300 lineal feet away from the front door of the Premises;

(34)   movie theater, unless the front door of such use is located at least three hundred (300) feet away from the front door of the Premises;

(35)   any restaurant serving meals for on- or off-premises consumption, unless the front door of such use is located at least 300 lineal feet away from the front door of the Premises (provided, however, the foregoing shall not prohibit a quick service restaurant that is 3,000 square feet or less in Unit 24 as shown on Exhibit B, or a restaurant in Unit 20 as shown on Exhibit B), and not more than forty thousand (40,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to all such restaurant uses;

(36)   beauty parlor or nail salon, unless the front door thereof is located at least three hundred (300) feet away from the front door of the Premises, provided, that the foregoing shall not prohibit an ULTA Salon;

(37)   health spa, exercise facility or similar type business, unless the front door thereof is located at least 300 lineal feet from the front door of the Premises, provided however the foregoing restriction shall not apply to a "Curves"/"Snap Fitness"/"Contours" type concept that is 3,000 square feet  or less so long as such use is located in the Permitted Use Area; or

(38)   a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", "Ollie's Bargain Outlet", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction. It is further agreed that this restriction shall not prevent (i) the operation of a Play it Again Sports, Once Upon A Child, Plato's Closet, or similar tenant typically found in a first class shopping center, as further provided in Item (3) above, or (ii) the operation of an outlet store by a national or regional department store, such as a Sears Outlet, in all or a portion of Unit 26 as shown on Exhibit B.

M-4

## B.    Prohibited Uses in Existing Leases:

### 1.   Home Depot

Landlord shall not, during the term of this Lease and during any extensions thereof, grant any exclusives affecting the Premises to any Tenant occupying less than 5,000 square feet other than to an ethnic restaurant without Tenant's consent.

Landlord hereby agrees that it will not lease any space or permit the use of any space within 450 feet of the exterior walls of the Premises building for use as a bowling alley, theatre showing either film, television or the like or live entertainment, health club, bar, social encounter restaurant such as TGI Friday's, Bennigan's and Chili's restaurant in excess of 2,500 square feet which serves beer, wine or alcoholic beverages; cafeteria except within the area designated "Permitted Cafeteria" on Exhibit "A" or game or amusement room. No portion of the Shopping Center as shown on the Site Plan shall be used as an adult bookstore, flea market, school or training center or for non-retail uses or non-retail services.

### 2.   Payless Shoe Source

Landlord agrees and covenants that during the term of this Lease or any extensions thereof, Landlord shall not lease, directly or indirectly, any portion of the Development within fifty (50) feet of the Demised Premises to other tenants for the purpose of sale of food or beverage whether for consumption on or off the premises, amusement arcade, adult book store or movie theater. The food and beverage restriction shall not apply to a supermarket, grocery store, drug store or department store; nor shall this Section 5.03 be operative if the Development is or is a part of a retail development containing more than 200,000 square feet of gross leasable floor area.

### 3.   PetSmart

Lessor shall not lease space within 200 feet of Lessee's entrance for the purpose of a movie theater, cinema, flea market, bowling alley, bar or lounge or bingo parlor, health club, massage parlor or bar-restaurant such as Fridays.

**4. Sports Authority**

The shopping center to be constructed by Landlord may be used for any lawful commercial retail purpose; provided however, that no portion thereof within five hundred feet (500) of the demised premises shall be occupied or used directly or indirectly for a bar, tavern, pub, billiard room or health club, in addition, Landlord shall ensure that no portion of the Shopping Center shall be occupied or used, directly or indirectly, for a bowling alley, arcade, game room, skating rink, massage parlor, adult book store, ballroom, dance hall, discotheque, beauty school, barber

college, theatre, offices (other than a fall service bank office, savings and loan association office, or other consumer services normally found in shopping centers, or credit union), place of instruction, reading room or any operation catering primarily to students or trainees rather than to customers. All business operated in said shopping center shall be operated on a full-time basis during at least normal business hours Monday through Saturday; no business shall be operated on a part-time basis (i.e., for only a portion of the week or month). The foregoing shall not require the continuous use or occupation of any portion of said shopping center but is only intended to prohibit businesses in said shopping center which operate on a part-time basis for only a portion of the week or month, such as a discount store operation which is open only as it has stock available to sell.

No building, structure or business shall be constructed or operated in said shopping center which shall be inconsistent with the operation of a family-type, retail shopping center and any building, structure or business shall be attractive, both in its physical characteristics and in appeal, to customers and retail trade.

No use of said shopping center shall interfere with the use of the common areas or impede the free flow of pedestrian or vehicular traffic thereon.

**5. Staples**

Landlord covenants that, other than the Premises, ... (b) no part of the Center shall be used for any of the following: (i) tanning, health, exercise or racquet club or spa, gymnasium, bowling alley, skating rink or other sports or recreational facility (unless located east of the space marked "Barnes and Noble" on Exhibit A); (ii) school, library or house of worship; (iii) movie theater, gallery, auditorium or meeting hall; (iv) massage parlor, adult bookstore, a so-called "head" shop, off-track betting; (v) car wash, automobile repair work or automotive service, automobile body shop, automobile, boat, trailer or truck leasing or sales, laundromat; (vi) amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video game room, pool hall, arcade or other amusement center; (vii) restaurant (unless more than 75 feet from the Premises), tavern or bar, hotel or motor inn; (viii) any manufacturing, warehouse or office use (except incidental to a retail operation); (ix) funeral parlor, animal raising or storage, pawn shop, flea market or swap meet, junk yard; (x) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction or garbage or refuse, other than in enclosed receptacles intended for such purposes; or (xi) any use which constitutes a public or private nuisance. Such covenants shall run with the land comprising the Center. ... Notwithstanding the foregoing, this Section shall not prohibit Home Depot USA, Inc., Loehman's, Inc., The Sports Authority, Inc., B. Dalton Bookseller, Inc. or Drug Emporium, Inc. from using its space for any lawful retail use as currently permitted by its lease nor prohibit any future tenant from selling office equipment (including computers and peripherals), office furniture or office supplies (including computer software) or providing office services incidental to such tenant's primary business in no more than five percent of such tenant's selling space or 625 square feet of selling space, whichever is greater.

M-6

Home Depot
Exhibit A



M-7

Staples
Exhibit A



Exhibit A

M-8

Exhibit N

Form of Guaranty of Lease

**GUARANTY OF LEASE**

**THIS GUARANTY** (the *"Guaranty"*) is made and entered into this ___ day of _____, 2012 by **BED BATH & BEYOND INC.**, a New York corporation, with an address at 650 Liberty Avenue, Union, New Jersey 07083 (*"Guarantor"*), in favor of **BG MONMOUTH, LLC**, a New Jersey limited liability company, having an office at c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, Attention: Senior Vice President of Anchor Store Leasing (*"Landlord"*).

R E C I T A L S

**WHEREAS**, Landlord, as landlord, and BUY BUY BABY, INC., a Delaware corporation (*"Tenant"*), as tenant, have entered into (or are about to enter into) a certain lease of even date herewith for certain store premises in the Consumer Centre, located at 310 SR 36, in West Long Branch, New Jersey (the *"Lease"*);

**WHEREAS**, in order to induce Landlord to enter into the Lease, Landlord has required that Guarantor execute and deliver this Guaranty; and

**WHEREAS**, Tenant is a wholly owned subsidiary of Guarantor, and, accordingly, will recognize a benefit from Landlord entering into the Lease with Tenant.

**NOW, THEREFORE**, in consideration of the Recitals set forth above and in consideration of Landlord executing and performing its obligations under the Lease and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      All capitalized terms which are not expressly defined in this Guaranty shall have the same meanings herein as are ascribed to such terms in the Lease.

2.      Guarantor does hereby unconditionally and absolutely guarantee to Landlord the full, prompt and complete (a) payment by Tenant of the Fixed Rent, Additional Rent and all other sums payable by Tenant under the Lease (the *"Monetary Lease Obligation(s)"*), whether upon default or otherwise, and (b) performance by Tenant of all other obligations on the part of Tenant to be performed under the Lease, except as otherwise expressly provided in this Guaranty (the *"Non-Monetary Lease Obligation(s)"*; the Monetary Lease Obligations and Non-Monetary Lease Obligations are collectively referred to as the *"Lease Obligations")*). If for any reason any Monetary Lease Obligation is not paid, or any Non-Monetary Lease Obligation is not performed, by Tenant, after the expiration of any applicable notice and cure period, then Guarantor will promptly, after demand, pay such Monetary Lease Obligation or perform such Non-Monetary Lease Obligation for the benefit of the person entitled thereto pursuant to the provisions of the Lease as if such Lease Obligation constituted the direct and primary obligation of the Guarantor, provided that Guarantor's obligations under this Guaranty, to the extent not expressly waived under this Guaranty, shall be subject to any defense, right of set-off or claim which Tenant may have against Landlord under the Lease. Anything contained in this Guaranty to the contrary notwithstanding, (i) if the Non-Monetary Lease Obligation is not of the nature that it can be promptly performed, then Guarantor shall not be in default under this Guaranty as long as Guarantor promptly commences such performance and thereafter diligently prosecutes such performance to completion, and (ii) if the Non-Monetary Lease Obligation arises as the result of a default by the "tenant" under the Lease and such tenant is not an Affiliate of Guarantor at the time of such default, then Guarantor shall not be obligated to perform (and shall have no liability for not performing) any Non-Monetary Lease Obligation that is not reasonably susceptible of being performed by Guarantor.

N-1

3.     The obligations, covenants, agreements and duties of Guarantor under this Guaranty shall in no way be waived, released, discharged, affected or impaired by reason of the happening from time to time of any of the following, without notice to or the further consent of Guarantor:

(a)     the extension, in whole or in part, of the time for payment by Tenant or Guarantor of any sums owing or payable under the Lease or this Guaranty, or the acceptance of additional collateral or security from Tenant or Guarantor; or

(b)     any assignment of the Tenant's interest under the Lease or subletting of the Premises or any part thereof, or other transfer of the Tenant's interest in the Lease, with or without Landlord's consent; provided, however, that the obligations of Guarantor under this Guaranty shall automatically terminate and be null and void upon an assignment of Tenant's interest under the Lease to a Major Assignee or to a tenant whose obligations under the Lease are guaranteed by a Major Guarantor]; or

(c)     the modification or amendment (whether material or otherwise) of any of the obligations of Tenant under the Lease, or the renewal or extension of the Lease Term; provided, however, that Guarantor shall have no liability with respect to any modification or amendment of the Lease entered into by Landlord and any entity that succeeds to Tenant's interest in the Lease (unless such successor entity is an Affiliate of Guarantor) made without Guarantor's written consent, which consent may be withheld for any or no reason; or

(d)     any failure, omission or delay on the part of Landlord to enforce, assert or exercise any right, power or remedy conferred on or available to Landlord in or by the Lease or this Guaranty, or any action on the part of Landlord granting indulgence or extension in any form whatsoever; or

(e)     the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the assets, marshaling of assets and liabilities, receivership, conservatorship, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, merger, arrangement, composition or readjustment of, winding up, or other similar proceeding affecting Tenant or Guarantor or any of their assets; or

(f)     the release of Tenant or any other party from the performance or observance of any of the agreements, covenants, terms or conditions contained in the Lease or other instrument, as applicable, by operation of law, or the release of any collateral or security held for the performance of Tenant's obligations; provided, however, a complete release by Landlord of all of Tenant's obligations under the Lease as a result of a termination of the Lease (other than a termination due to the occurrence of an Event of Default or a rejection of the Lease by the Tenant in bankruptcy) shall constitute a complete release of Guarantor's obligations under this Guaranty; or

(g)     any defect, invalidity or unenforceability of the Lease or any provision thereof; or

(h)     the transfer by Guarantor of any or all of the capital stock of Tenant or other change in the relationship between Tenant and Guarantor; or

(i)     any repossession, re-entry or re-letting of the Premises by Landlord.

4.     (A)     If the Lease is either (a) terminated because of an Event of Default by an "Unrelated Tenant" (as defined in (C) below), or (b) terminated, rejected, or disaffirmed by an Unrelated Tenant pursuant to any Legal Requirements affecting creditors' rights, Landlord shall promptly give Guarantor notice thereof (any of the events described in (a) or (b) above are hereinafter referred to as a "Termination"). Subject to subsection (D) below, within fifteen (15) days after the later of (x) Guarantor's receipt of such notice, or (y) the deadline by which the Original Tenant may elect to enter into a "New Lease" pursuant to Section 15.4.2 of the Lease, Guarantor shall have the right (but not the obligation), to either (i) enter into a new lease of the Premises with Landlord ("*New Lease*"), or (ii) take over and assume all of the rights and obligations of Tenant under the Lease. If Guarantor elects to enter into a New Lease, then the term of said New Lease shall be deemed to have begun on the date of the Termination, and shall

N-2

continue for the remainder of the Term (including any Renewal Periods), and contain the same terms and conditions as those set forth in the Lease. If Guarantor elects to take over and assume the Lease, then, without the necessity of entering into any further agreements or instruments, the Lease shall be deemed to be reinstated, if applicable, and Guarantor shall be deemed, as of the date of the Termination, to have taken over and assumed all of the rights and obligations of the Tenant under the Lease as if Guarantor was originally named Tenant under the Lease, except that Guarantor, as Tenant under the Lease, shall not be required to cure an Event of Default which was personal to the prior Unrelated Tenant and is not susceptible of being performed by Guarantor.

(B)     Notwithstanding anything to the contrary contained in subsection 4(A) above, Landlord shall have the right to declare Guarantor's exercise of Guarantor's rights null and void by notifying Guarantor, within thirty (30) days after Guarantor has elected to enter into a New Lease or take over the rights and obligations of Tenant under the Lease, that Landlord is releasing Guarantor from all of Guarantor's obligations under this Guaranty. If Landlord so elects within such thirty (30) day period, then Guarantor's obligations under this Guaranty shall automatically terminate and be null and void as to all Lease Obligations accruing from and after the date of the Termination.

(C)     The term *"Unrelated Tenant"* shall mean a "tenant" under the Lease which is not an Affiliate of Guarantor at the time of the termination of the Lease.

(D)     The parties hereto acknowledge that Section 15.4.2 of the Lease contains a right of the Original Tenant that is similar to the right granted to Guarantor set forth in this Section 4. If a Termination occurs and the Original Tenant becomes entitled to exercise its right to enter into a "New Lease" or assume the tenant's obligations pursuant to Section 15.4.2 of the Lease in connection with the Termination, then Guarantor shall have the rights set forth in the Section 4 only if and after the Original Tenant fails to elect to enter into a "New Lease" or assume the tenant's obligations in accordance with Section 15.4.2 of the Lease. As used in this section, "Lease" shall be deemed to include any New Lease entered into by the Original Tenant.

5.     Guarantor hereby waives: (a) presentment, demand, protest and notice of the foregoing, (b) notice of acceptance of this Guaranty, notice of any obligations or liabilities contracted or incurred by Tenant, and notice of Tenant's default under the Lease, (c) the right to a jury trial in any action under this Guaranty or relating to this Guaranty, and (d) the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defenses of prior payment or prior performance.

6.     This Guaranty is a continuing guaranty of payment and performance of the Lease Obligations only, and not of collection. The liabilities and obligations of Guarantor hereunder are primary and enforceable either before, simultaneously or after proceeding against Tenant or against any collateral or security available to Landlord. Guarantor hereby waives any and all legal requirements that Landlord institute any action or proceeding at law or in equity against Tenant or anyone else, or exhaust its remedies against Tenant or anyone else, with respect to the Lease, or with respect to any other security held by Landlord, as a condition precedent to bringing any action or actions in the first instance against Guarantor upon this Guaranty.

7.     In the event suit or action be brought upon and in connection with the enforcement of this Guaranty, the prevailing party shall be entitled to receive reasonable attorneys' fees and all court costs incurred in connection with such suit or action. In no event shall Landlord be entitled to assert, prove or collect either consequential damages or punitive damages in any action arising under this Guaranty.

8.     This Guaranty shall be binding upon the respective successors and assigns of Guarantor and Landlord and shall inure to the benefit of Guarantor, Landlord and their respective successors and assigns. In no event shall Landlord or Guarantor seek to impose any liability under this Guaranty on any shareholder, officer, director or employee of Guarantor or Landlord, as the case may be.

9.     This Guaranty shall be construed in accordance with the laws of the State of New Jersey. Guarantor hereby submits to the jurisdiction of all state and federal courts located in the County and State in which the Premises are located in connection with any claim or action

N-3

relating to this Guaranty and Guarantor hereby waives any right to assert that such court(s) constitute an inconvenient forum.

10.    Except as set forth herein, this Guaranty may not be modified, amended, discharged or terminated except by a written agreement duly executed by Guarantor and Landlord.

11.    Guarantor represents and warrants that Guarantor is a corporation duly organized, legally existing and in good standing under the laws of the State in which it is incorporated, and that the execution of this Guaranty has been authorized by appropriate action of its Board of Directors.

12.    Subject to the further provisions of this Section 12, whenever it is provided herein that any notice or demand (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, Attention: Senior Vice President of Anchor Store Leasing, or addressed to Guarantor at 650 Liberty Avenue, Union, New Jersey 07083, Attention: Allan N. Rauch, Esq., with a copy of Notice to Guarantor also given to Cathleen H. Giuliana, Esq., c/o Riker, Danzig, Scherer, Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Landlord's counsel may give notices on Landlord's behalf.

13.    In the event any one or more of the provisions contained in this Guaranty shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Guaranty, but this Guaranty shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

14.    The execution and delivery of the Lease by Landlord shall be deemed conclusively to be an acceptance of and agreement to all of the provisions of this Guaranty by Landlord.

15.    Notwithstanding anything to the contrary contained in this Guaranty, this Guaranty shall automatically terminate and Guarantor shall have no further liability hereunder with respect to covenants to be fulfilled from and after the date of the event described in clauses (a), (b) or (c) below:

(a) if Tenant is "spun off" to become a public or private entity with a tangible net worth of at least Fifty Million Dollars ($50,000,000) (Constant Dollars) (as hereinafter defined);

(b) if Tenant or Guarantor commences public reporting of separate financial statements or reports of Tenant and such financial statements show that Tenant has a tangible net worth of at least Fifty Million Dollars ($50,000,000) (Constant Dollars); or

(c) if (i) Tenant or all or substantially all of Tenant's assets (including the Lease) are sold to a third party not affiliated with Guarantor, (ii) such third party has a tangible net worth of at least Fifty Million Dollars ($50,000,000) (Constant Dollars), and (iii) such third party delivers to Landlord a substitute guaranty on terms and conditions reasonably acceptable to Landlord.

Notwithstanding the foregoing, Guarantor shall continue to be liable hereunder for those covenants as to which payment and/or performance was due prior to the date of the event described in clauses (a), (b) or (c) above and which are in default on the date of the event described in clauses (a), (b) or (c) above. "Constant Dollars" means the equivalent purchasing power at any time of the value of One Dollar ($1.00) in 2012. Constant Dollars of any amount shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the CPI (as hereinafter defined) for the twelve (12) months last published prior to the date of such determination, and the denominator of which is the CPI for 2012. "CPI means the

N-4

Consumer Price Index for All Urban Consumers (CPI-U-Northeast Region) of the United States Department of Labor's Bureau of Labor Statistics (1982-84 = 100).

16.     The rights and remedies given to Landlord by this Guaranty shall be deemed to be cumulative and no one of such rights and remedies shall be exclusive at law or in equity of the rights and remedies which Landlord might otherwise have by virtue of a default under this Guaranty, and the exercise of one such right or remedy by Landlord shall not impair Landlord's standing to exercise any other rights or remedies hereunder.

[Balance of Page Left Intentionally Blank]

N-5

Executed the date first above written.


**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New York
Corporation

_____       By:_____
Name: Alan M. Freeman                    Name:  Steven H. Temares
Title:  Assistant Secretary              Title:   Co-Chairman

[SEAL]


Error! Unknown document property name.91724Error! Unknown document property name.Error! Unknown document property name.

N-6

## <u>GUARANTY OF LEASE</u>

**THIS GUARANTY** (the *"Guaranty"*) is made and entered into this ___ day of _____, 2012 by **BED BATH & BEYOND INC.**, a New York corporation, with an address at 650 Liberty Avenue, Union, New Jersey 07083 (*"Guarantor"*), in favor of **BG MONMOUTH, LLC**, a New Jersey limited liability company, having an office at c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, Attention: Senior Vice President of Anchor Store Leasing (*"Landlord"*).

## R E C I T A L S

**WHEREAS**, Landlord, as landlord, and BUY BUY BABY, INC., a Delaware corporation (*"Tenant"*), as tenant, have entered into (or are about to enter into) a certain lease of even date herewith for certain store premises in the Consumer Centre, located at 310 SR 36, in West Long Branch, New Jersey (the *"Lease"*);

**WHEREAS**, in order to induce Landlord to enter into the Lease, Landlord has required that Guarantor execute and deliver this Guaranty; and

**WHEREAS**, Tenant is a wholly owned subsidiary of Guarantor, and, accordingly, will recognize a benefit from Landlord entering into the Lease with Tenant.

**NOW, THEREFORE,** in consideration of the Recitals set forth above and in consideration of Landlord executing and performing its obligations under the Lease and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      All capitalized terms which are not expressly defined in this Guaranty shall have the same meanings herein as are ascribed to such terms in the Lease.

2.      Guarantor does hereby unconditionally and absolutely guarantee to Landlord the full, prompt and complete (a) payment by Tenant of the Fixed Rent, Additional Rent and all other sums payable by Tenant under the Lease (the *"Monetary Lease Obligation(s)"*), whether upon default or otherwise, and (b) performance by Tenant of all other obligations on the part of Tenant to be performed under the Lease, except as otherwise expressly provided in this Guaranty (the *"Non-Monetary Lease Obligation(s)";* the Monetary Lease Obligations and Non-Monetary Lease Obligations are collectively referred to as the *"Lease Obligations")*). If for any reason any Monetary Lease Obligation is not paid, or any Non-Monetary Lease Obligation is not performed, by Tenant, after the expiration of any applicable notice and cure period, then Guarantor will promptly, after demand, pay such Monetary Lease Obligation or perform such Non-Monetary Lease Obligation for the benefit of the person entitled thereto pursuant to the provisions of the Lease as if such Lease Obligation constituted the direct and primary obligation of the Guarantor, provided that Guarantor's obligations under this Guaranty, to the extent not expressly waived under this Guaranty, shall be subject to any defense, right of set-off or claim which Tenant may have against Landlord under the Lease. Anything contained in this Guaranty to the contrary notwithstanding, (i) if the Non-Monetary Lease Obligation is not of the nature that it can be promptly performed, then Guarantor shall not be in default under this Guaranty as long as Guarantor promptly commences such performance and thereafter diligently prosecutes

such performance to completion, and (ii) if the Non-Monetary Lease Obligation arises as the result of a default by the "tenant" under the Lease and such tenant is not an Affiliate of Guarantor at the time of such default, then Guarantor shall not be obligated to perform (and shall have no liability for not performing) any Non-Monetary Lease Obligation that is not reasonably susceptible of being performed by Guarantor.

3.      The obligations, covenants, agreements and duties of Guarantor under this Guaranty shall in no way be waived, released, discharged, affected or impaired by reason of the happening from time to time of any of the following, without notice to or the further consent of Guarantor:

(a)      the extension, in whole or in part, of the time for payment by Tenant or Guarantor of any sums owing or payable under the Lease or this Guaranty, or the acceptance of additional collateral or security from Tenant or Guarantor; or

(b)      any assignment of the Tenant's interest under the Lease or subletting of the Premises or any part thereof, or other transfer of the Tenant's interest in the Lease, with or without Landlord's consent; provided, however, that the obligations of Guarantor under this Guaranty shall automatically terminate and be null and void upon an assignment of Tenant's interest under the Lease to a Major Assignee or to a tenant whose obligations under the Lease are guaranteed by a Major Guarantor]; or

(c)      the modification or amendment (whether material or otherwise) of any of the obligations of Tenant under the Lease, or the renewal or extension of the Lease Term; provided, however, that Guarantor shall have no liability with respect to any modification or amendment of the Lease entered into by Landlord and any entity that succeeds to Tenant's interest in the Lease (unless such successor entity is an Affiliate of Guarantor) made without Guarantor's written consent, which consent may be withheld for any or no reason; or

(d)      any failure, omission or delay on the part of Landlord to enforce, assert or exercise any right, power or remedy conferred on or available to Landlord in or by the Lease or this Guaranty, or any action on the part of Landlord granting indulgence or extension in any form whatsoever; or

(e)      the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the assets, marshaling of assets and liabilities, receivership, conservatorship, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, merger, arrangement, composition or readjustment of, winding up, or other similar proceeding affecting Tenant or Guarantor or any of their assets; or

(f)      the release of Tenant or any other party from the performance or observance of any of the agreements, covenants, terms or conditions contained in the Lease or other instrument, as applicable, by operation of law, or the release of any collateral or security held for the performance of Tenant's obligations; provided, however, a complete release by Landlord of all of Tenant's obligations under the Lease as a result of a termination of the Lease (other than a termination due to the occurrence of

an Event of Default or a rejection of the Lease by the Tenant in bankruptcy) shall constitute a complete release of Guarantor's obligations under this Guaranty; or

(g)    any defect, invalidity or unenforceability of the Lease or any provision thereof; or

(h)    the transfer by Guarantor of any or all of the capital stock of Tenant or other change in the relationship between Tenant and Guarantor; or

(i)    any repossession, re-entry or re-letting of the Premises by Landlord.

4.    (A)    If the Lease is either (a) terminated because of an Event of Default by an "Unrelated Tenant" (as defined in (C) below), or (b) terminated, rejected, or disaffirmed by an Unrelated Tenant pursuant to any Legal Requirements affecting creditors' rights, Landlord shall promptly give Guarantor notice thereof (any of the events described in (a) or (b) above are hereinafter referred to as a "Termination").  Subject to subsection (D) below, within fifteen (15) days after the later of (x) Guarantor's receipt of such notice, or (y) the deadline by which the Original Tenant may elect to enter into a "New Lease" pursuant to Section 15.4.2 of the Lease, Guarantor shall have the right (but not the obligation), to either (i) enter into a new lease of the Premises with Landlord ("*New Lease*"), or (ii) take over and assume all of the rights and obligations of Tenant under the Lease.  If Guarantor elects to enter into a New Lease, then the term of said New Lease shall be deemed to have begun on the date of the Termination, and shall continue for the remainder of the Term (including any Renewal Periods), and contain the same terms and conditions as those set forth in the Lease.  If Guarantor elects to take over and assume the Lease, then, without the necessity of entering into any further agreements or instruments, the Lease shall be deemed to be reinstated, if applicable, and Guarantor shall be deemed, as of the date of the Termination, to have taken over and assumed all of the rights and obligations of the Tenant under the Lease as if Guarantor was originally named Tenant under the Lease, except that Guarantor, as Tenant under the Lease, shall not be required to cure an Event of Default which was personal to the prior Unrelated Tenant and is not susceptible of being performed by Guarantor.

(B)    Notwithstanding anything to the contrary contained in subsection 4(A) above, Landlord shall have the right to declare Guarantor's exercise of Guarantor's rights null and void by notifying Guarantor, within thirty (30) days after Guarantor has elected to enter into a New Lease or take over the rights and obligations of Tenant under the Lease, that Landlord is releasing Guarantor from all of Guarantor's obligations under this Guaranty.  If Landlord so elects within such thirty (30) day period, then Guarantor's obligations under this Guaranty shall automatically terminate and be null and void as to all Lease Obligations accruing from and after the date of the Termination.

(C)    The term *"Unrelated Tenant"* shall mean a "tenant" under the Lease which is not an Affiliate of Guarantor at the time of the termination of the Lease.

(D)    The parties hereto acknowledge that Section 15.4.2 of the Lease contains a right of the Original Tenant that is similar to the right granted to Guarantor set forth in this Section 4. If a Termination occurs and the Original Tenant becomes entitled to exercise its right

J:\BUY BUY BABY\STORES\-West Long Branch, NJ\RIKER_DOCS2-#4228182-v1-BBB_Lease_Guaranty_west_Long_Branch.DOC

to enter into a "New Lease" or assume the tenant's obligations pursuant to Section 15.4.2 of the Lease in connection with the Termination, then Guarantor shall have the rights set forth in the Section 4 only if and after the Original Tenant fails to elect to enter into a "New Lease" or assume the tenant's obligations in accordance with Section 15.4.2 of the Lease. As used in this section, "Lease" shall be deemed to include any New Lease entered into by the Original Tenant.

5.      Guarantor hereby waives: (a) presentment, demand, protest and notice of the foregoing, (b) notice of acceptance of this Guaranty, notice of any obligations or liabilities contracted or incurred by Tenant, and notice of Tenant's default under the Lease, (c) the right to a jury trial in any action under this Guaranty or relating to this Guaranty, and (d) the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defenses of prior payment or prior performance.

6.      This Guaranty is a continuing guaranty of payment and performance of the Lease Obligations only, and not of collection.  The liabilities and obligations of Guarantor hereunder are primary and enforceable either before, simultaneously or after proceeding against Tenant or against any collateral or security available to Landlord.  Guarantor hereby waives any and all legal requirements that Landlord institute any action or proceeding at law or in equity against Tenant or anyone else, or exhaust its remedies against Tenant or anyone else, with respect to the Lease, or with respect to any other security held by Landlord, as a condition precedent to bringing any action or actions in the first instance against Guarantor upon this Guaranty.

7.      In the event suit or action be brought upon and in connection with the enforcement of this Guaranty, the prevailing party shall be entitled to receive reasonable attorneys' fees and all court costs incurred in connection with such suit or action.  In no event shall Landlord be entitled to assert, prove or collect either consequential damages or punitive damages in any action arising under this Guaranty.

8.      This Guaranty shall be binding upon the respective successors and assigns of Guarantor and Landlord and shall inure to the benefit of Guarantor, Landlord and their respective successors and assigns.  In no event shall Landlord or Guarantor seek to impose any liability under this Guaranty on any shareholder, officer, director or employee of Guarantor or Landlord, as the case may be.

9.      This Guaranty shall be construed in accordance with the laws of the State of New Jersey.  Guarantor hereby submits to the jurisdiction of all state and federal courts located in the County and State in which the Premises are located in connection with any claim or action relating to this Guaranty and Guarantor hereby waives any right to assert that such court(s) constitute an inconvenient forum.

10.     Except as set forth herein, this Guaranty may not be modified, amended, discharged or terminated except by a written agreement duly executed by Guarantor and Landlord.

11.     Guarantor represents and warrants that Guarantor is a corporation duly organized, legally existing and in good standing under the laws of the State in which it is incorporated, and

that the execution of this Guaranty has been authorized by appropriate action of its Board of Directors.

12.    Subject to the further provisions of this Section 12, whenever it is provided herein that any notice or demand (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at c/o DDR Corp., 3300 Enterprise Parkway, Beachwood, Ohio 44122, Attention: Senior Vice President of Anchor Store Leasing, or addressed to Guarantor at 650 Liberty Avenue, Union, New Jersey 07083, Attention: Allan N. Rauch, Esq., with a copy of Notice to Guarantor also given to Cathleen H. Giuliana, Esq., c/o Riker, Danzig, Scherer, Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ  07962, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.  Landlord's counsel may give notices on Landlord's behalf.

13.    In the event any one or more of the provisions contained in this Guaranty shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Guaranty, but this Guaranty shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

14.    The execution and delivery of the Lease by Landlord shall be deemed conclusively to be an acceptance of and agreement to all of the provisions of this Guaranty by Landlord.

15.    Notwithstanding anything to the contrary contained in this Guaranty, this Guaranty shall automatically terminate and Guarantor shall have no further liability hereunder with respect to covenants to be fulfilled from and after the date of the event described in clauses (a), (b) or (c) below:

(a)  if Tenant is "spun off" to become a public or private entity with a tangible net worth of at least Fifty Million Dollars ($50,000,000) (Constant Dollars) (as hereinafter defined);

(b)  if Tenant or Guarantor commences public reporting of separate financial statements or reports of Tenant and such financial statements show that Tenant has a tangible net worth of at least Fifty Million Dollars ($50,000,000) (Constant Dollars); or

(c)  if (i) Tenant or all or substantially all of Tenant's assets (including the Lease) are sold to a third party not affiliated with Guarantor, (ii) such third party has a tangible net worth of at least Fifty Million Dollars ($50,000,000) (Constant Dollars), and (iii) such third party delivers to Landlord a substitute guaranty on terms and conditions reasonably acceptable to Landlord.

Notwithstanding the foregoing, Guarantor shall continue to be liable hereunder for those covenants as to which payment and/or performance was due prior to the date of the event

described in clauses (a), (b) or (c) above and which are in default on the date of the event described in clauses (a), (b) or (c) above. "Constant Dollars" means the equivalent purchasing power at any time of the value of One Dollar ($1.00) in 2012. Constant Dollars of any amount shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the CPI (as hereinafter defined) for the twelve (12) months last published prior to the date of such determination, and the denominator of which is the CPI for 2012. "CPI means the Consumer Price Index for All Urban Consumers (CPI-U-Northeast Region) of the United States Department of Labor's Bureau of Labor Statistics (1982-84 = 100).

16.    The rights and remedies given to Landlord by this Guaranty shall be deemed to be cumulative and no one of such rights and remedies shall be exclusive at law or in equity of the rights and remedies which Landlord might otherwise have by virtue of a default under this Guaranty, and the exercise of one such right or remedy by Landlord shall not impair Landlord's standing to exercise any other rights or remedies hereunder.

[Balance of Page Left Intentionally Blank]



Executed the date first above written.

**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New York
Corporation

Name: Alan M. Freeman

By: _____

Title:  Assistant Secretary

Name:  Steven H. Temares

Title:   Co-Chairman

[SEAL]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

IN RE:

| | | |
|---|---|---|
| **BED BATH & BEYOND, Inc., et al** | : | **CHAPTER 11** |
| Debtors | : | |
| | : | **No.  23-13359 (vfp)** |

**CERTIFICATION of SERVICE**

I, William J. Levant, Esq. do hereby certify that on June 24, 2023, I (or the ECF system)

caused a true and correct copy of the foregoing objection to be sent to each of the following

persons, by email:

(1) Counsel to the Debtors:
joshua.sussberg@kirkland.com, emily.geier@kirkland.com,  derek.hunter@kirkland.com,
ross.fiedler@kirkland.com

(2) Co-counsel to the Debtors:
wusatine@coleschotz.com, fyudkin@coleschotz.com, msirota@coleschotz.com

(3) Counsel to the pre-petition ABL agent:
marshall.huebner@davispolk.com, adam.shpeen@davispolk.com,
steven.szanzer@davispolk.com, michael.pera@davispolk.com

(4) counsel to the DIP Agent:
DHillman@proskauer.com, MVolin@proskauer.com

(5) Office of the United States Trustee:
Fran.B.Steele@usdoj.gov

(6) Counsel to the Creditors' Committee:
rfeinstein@pszjlaw.com, bsandler@pszjlaw.com, plabov@pszjlaw.com,
crobinson@pszjlaw.com

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

**By:**     _/s/ William J. Levant, Esquire_
**William J. Levant, Esquire**
Kaplin Stewart Meloff Reiter & Stein, P.C.
910 Harvest Drive; P.O. Box 3037
Blue Bell, PA 19422
Phone: (610) 941-2474 / Facsimile: (610) 684-2020
wlevant@kaplaw.com
Attorneys for Landlord