# EXHIBIT A

EXECUTED LEASE

# LEASE

by and between

Dadeland Station Associates, Ltd.,
a Florida limited partnership

("Lessor")


and


Bed Bath & Beyond of Dadeland Station Inc.,
a Florida corporation

("Lessee")

for improved real property at

Dadeland Station Center

Miami, Florida

## TABLE OF CONTENTS

ARTICLE                                                          PAGE

1.   FUNDAMENTAL LEASE TERMS . . . . . . . . . . . . . . . .     1

2.   THE PREMISES. . . . . . . . . . . . . . . . . . . . . .     2

3.   TITLE AND QUIET POSSESSION. . . . . . . . . . . . . . .     3

4.   LEASE TERM. . . . . . . . . . . . . . . . . . . . . . .     4

5.   OPTION TO EXTEND. . . . . . . . . . . . . . . . . . . .     5

6.   COMPLETION AND DELIVERY OF THE PREMISES AND SHOPPING
     CENTER. . . . . . . . . . . . . . . . . . . . . . . . .     5

7.   RENT. . . . . . . . . . . . . . . . . . . . . . . . . .    10

8.   CONFORMITY WITH LAW. . . . . . . . . . . . . . . . . . .   14

9.   UTILITIES. . . . . . . . . . . . . . . . . . . . . . . .   14

10.  REPAIR OF THE PREMISES. . . . . . . . . . . . . . . . .    14

11.  ACCESS BY LESSOR. . . . . . . . . . . . . . . . . . . .    16

12.  LESSEE'S FIXTURES AND SIGNS . . . . . . . . . . . . . .    17

13.  ALTERATIONS TO THE PREMISES . . . . . . . . . . . . . .    18

14.  SURRENDER OF THE PREMISES . . . . . . . . . . . . . . .    19

15.  HOLDING OVER . . . . . . . . . . . . . . . . . . . . . .   20

16.  DEFAULT . . . . . . . . . . . . . . . . . . . . . . . .    20

17.  NONWAIVER OF DEFAULT . . . . . . . . . . . . . . . . . .   22

18.  QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . .    22

19.  DAMAGE BY FIRE OR CASUALTY . . . . . . . . . . . . . . .   22

20.  WAIVER OF SUBROGATION . . . . . . . . . . . . . . . . .    24

21.  EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . .   24

22.  INSURANCE . . . . . . . . . . . . . . . . . . . . . . .    26

23.  SUBORDINATION OF LEASE. . . . . . . . . . . . . . . . .    27

24.  TRANSFER OF INTEREST; ASSIGNMENT AND SUBLETTING. . . . .   28

25. REAL ESTATE TAXES . . . . . . . . . . . . . . . . . . . . . 29

26. NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . 30

27. SEVERABILITY OF PROVISIONS . . . . . . . . . . . . . . . . 30

28. MEMORANDUM OF LEASE . . . . . . . . . . . . . . . . . . . . 31

29. PARKING REQUIREMENTS . . . . . . . . . . . . . . . . . . . 31

30. ENTIRE AGREEMENT . . . . . . . . . . . . . . . . . . . . . 32

31. RELATIONSHIP OF THE PARTIES . . . . . . . . . . . . . . . 32

32. RIGHT OF PROTEST . . . . . . . . . . . . . . . . . . . . . 33

33. HEADINGS . . . . . . . . . . . . . . . . . . . . . . . . . 33

34. PARTIES IN INTEREST . . . . . . . . . . . . . . . . . . . 33

35. COUNTERPARTS. . . . . . . . . . . . . . . . . . . . . . . . 33

36. NUMBER AND GENDER . . . . . . . . . . . . . . . . . . . . . 33

37. COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . 33

38. USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

39. HAZARDOUS SUBSTANCES . . . . . . . . . . . . . . . . . . . 39

40. BROKERAGE . . . . . . . . . . . . . . . . . . . . . . . . . 40

41. ATTORNEY'S FEES . . . . . . . . . . . . . . . . . . . . . . 40

42. RADON . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

43. GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . 41

44. ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . 41

45. CONDITIONS PRECEDENT . . . . . . . . . . . . . . . . . . . 41

46. LESSEE FIXTURES . . . . . . . . . . . . . . . . . . . . . . 42

47. EXCULPATION . . . . . . . . . . . . . . . . . . . . . . . . 42

48. RECAPTURE. . . . . . . . . . . . . . . . . . . . . . . . . . 43

49. INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . 43

50. SELF INSURANCE, DEDUCTIBLES . . . . . . . . . . . . . . . 43

51. GRAMMATICAL USES AND CONSTRUCTION . . . . . . . . . . . 44

52. RIGHTS CUMULATIVE . . . . . . . . . . . . . . . . . . . 44

53. NON-WAIVER . . . . . . . . . . . . . . . . . . . . . . . 44

54. FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . 44

55. CONSENTS . . . . . . . . . . . . . . . . . . . . . . . . 45

56. COSTS . . . . . . . . . . . . . . . . . . . . . . . . . 45

57. PAYMENT UNDER PROTEST . . . . . . . . . . . . . . . . . 45

58. WORK UNDER PROTEST . . . . . . . . . . . . . . . . . . . 45

59. ABATEMENT OF RENT CHARGES . . . . . . . . . . . . . . . 46

60. LESSOR'S WARRANTIES AND REPRESENTATIONS . . . . . . . . 46

61. ARBITRATION . . . . . . . . . . . . . . . . . . . . . . 46

62. DEFINITION OF HEREUNDER, HEREIN, ETC. . . . . . . . . . 47

63. LIMITATION OF LESSEE'S LIABILITY . . . . . . . . . . . . 47

64. EASEMENT AND OPERATING AGREEMENT. . . . . . . . . . . . 47

## EXHIBITS

| Exhibit A | LEGAL DESCRIPTION OF SHOPPING CENTER |
| Exhibit B | SITE PLAN (including Transit Drive but excluding area south of Transit Drive) |
| Exhibit C | PERMITTED TITLE EXCEPTIONS |
| Exhibit D | SUPPLEMENTAL AGREEMENT |
| Exhibit E | STANDARD LESSOR'S WORK |
| Exhibit F | INTENTIONALLY OMITTED |
| Exhibit G | SCHEDULE OF PERTINENT GROUND LEASE PROVISIONS |
| Exhibit H | GROUND LEASE NON-DISTURBANCE AGREEMENT FORM |
| Exhibit I | MORTGAGE NON-DISTURBANCE AGREEMENT FORM |

# L E A S E

THIS LEASE is made and entered into as of the $\underline{31^{st}}$ day of October, 1994, by and between DADELAND STATION ASSOCIATES, LTD., a Florida limited partnership having its principal office at 2665 S. Bayshore Drive, Suite 1200, Coconut Grove, Florida 33133 ("Lessor"), and BED BATH & BEYOND OF DADELAND STATION INC., having its principal office at 715 Morris Avenue, Springfield, New Jersey 07081 ("Lessee").

## WITNESSETH:

In consideration of the rents reserved and the covenants and conditions set forth herein, Lessor and Lessee agree as follows:

**1. FUNDAMENTAL LEASE TERMS.** The following terms shall have the meanings set forth in this Article 1 except as otherwise expressly provided herein.

    (a) <u>Parties</u>.

| | |
|---|---|
| Lessor: | Dadeland Station Associates, Ltd. |
| Lessee: | Bed Bath & Beyond of Dadeland Station Inc. |
| Guarantor: | Bed Bath & Beyond Inc. |

    (b) <u>Premises</u> (Article 2).

        Approximately sixty thousand (60,000) square feet at Dadeland Station Center Shopping Center, Miami, Florida.

    (c) <u>Term</u> (Articles 4 and 5).

        Fifteen (15) Lease Years, with four (4) five (5) year renewals.

    (d) <u>Fixed Rent</u> (Article 7).

| Lease Year | Monthly | Annual | Per Sq. Ft. |
|---|---|---|---|
| 1-5 | $ 86,250.00 | $1,035,000.00 | $17.25 |
| 6-10 | $ 94,900.00 | $1,138,800.00 | $18.98 |
| 11-15 | $104,400.00 | $1,252,800.00 | $20.88 |
| Option 1 (16-20) | $114,850.00 | $1,378,220.00 | $22.97 |
| Option 2 (21-25) | $126,350.00 | $1,516,200.00 | $25.27 |
| Option 3 (26-30) | $139,000.00 | $1,668,000.00 | $27.80 |
| Option 4 (31-35) | $152,900.00 | $1,834,800.00 | $30.58 |

    (e) <u>Construction</u> (Article 6).

        Lessor to complete construction on or before June 30, 1996, subject to extension by reason of Force Majeure.

(f) **Addresses** (Article 26).

Lessor:

Dadeland Station Associates, Ltd.
c/o Dadeland Depot, Inc.
Grand Bay Plaza
2665 South Bayshore Drive
Suite 1200
Coconut Grove, FL 33133
Attention:  Jeffrey L. Berkowitz

Lessee:

Bed Bath & Beyond of Dadeland Station Inc.
715 Morris Avenue
Springfield, New Jersey 07081
Attention:  Mr. Warren Eisenberg, with a copy to

Edward M. Schotz, Esq.
c/o Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601-7015

## 2.  THE PREMISES.

(a) Subject to the terms and conditions of this Lease, Lessor leases to Lessee and Lessee leases from Lessor the premises situated in the Dade County, State of Florida, and known and described as follows:

The premises and improvements and appurtenances constructed and to be constructed thereto (the "Premises") located in the Dadeland Station Center Shopping Center [the "Shopping Center", the name of which shall not be changed by Lessor without at least ninety (90) days' prior written notice to Lessee]. The legal description of the Shopping Center is attached hereto as Exhibit A and made a part hereof, and is outlined in black on the site plan of the Shopping Center attached hereto as Exhibit B and made a part hereof, provided, that in the event of any conflict between Exhibit A and Exhibit B, Exhibit B shall control. The Premises will contain approximately sixty thousand (60,000) square feet of third level building area and will be in substantially the area outlined in black on the site plan attached as Exhibit B.

(b)  At least thirty (30) days prior to the Delivery of Possession (as hereinafter defined), exact measurements of the square footage of the Floor Area (as hereinafter defined) of the Premises and of all the buildings (including the building in which the Premises are located) in the Shopping Center shall be made and certified to Lessee by Lessor's licensed architect or engineer, and if the measurement of the Premises shall indicate a Floor Area less than sixty thousand (60,000) square feet, the parties hereto shall execute a supplemental agreement reducing, as applicable, the Fixed Rent and any other applicable provision of this Lease to conform to the exact measurement; provided, however, that if the Floor Area of the Premises is determined to be less than fifty-eight thousand (58,000) square feet, Lessee shall have the right to terminate this Lease upon notice to Lessor given within fifteen (15) days after Lessee's receipt of the final measurement determination. The term "Floor Area" as set forth in this Lease shall mean the actual number of square feet of space contained on each floor within the buildings (including the Premises) in the Shopping Center, as measured from the exterior of outside walls or store front and/or to the centerline of any common walls, including interior loading docks, interior service corridors, freight elevators, stairways and similar interior areas devoted exclusively to a lessee's use, but shall exclude exterior areas and non-selling mezzanine areas which shall be limited to office and storage space associated with a retail store operation; provided, however, that the Floor Area of the Premises shall not include any interior loading docks, interior service corridors, freight elevators, or similar exterior areas. If Lessee shall have made any payments to Lessor prior to the determination of such exact measurements, an appropriate adjustment shall be made by the parties to reflect the accurate figures. Any dispute between the parties with respect to the Floor Area of the Premises shall be determined by arbitration in accordance with the provisions of Article 62 below.

## 3.  TITLE AND QUIET POSSESSION.

(a)  Lessor hereby warrants that it has full right and authority to enter into this Lease in accordance with the terms hereof and that it has good leasehold title to the Shopping Center free and clear of all liens and encumbrances except as stated in Exhibit C attached hereto and made a part hereof (the "Permitted Exceptions").  Lessor further warrants that the Permitted Exceptions will not prevent the operation of Lessee's business as contemplated in this Lease.  Lessee agrees not to violate any of the Permitted Exceptions, anything in this Lease to the contrary notwithstanding.  If so requested by Lessee from time to time during the term of this Lease, Lessor shall furnish Lessee with such evidence of Lessor's title to the Premises as is in Lessor's possession.  Such title may be evidenced by a copy of a commitment or policy of title insurance issued by a recognized title insurance company licensed to do business in the State of Florida, which policy shall contain no exceptions to Lessor's interest in the Premises, which would adversely impact Lessee's ability to conduct

in and from the Premises its normal business activities as contemplated in this Lease.

(b)  Lessee acknowledges being advised that Lessor's interest in the Premises is a leasehold estate pursuant to a Lease (the "Ground Lease") with Dade County (the "Ground Lessor") which Lessor warrants and represents is in full force and effect without any defaults thereunder on the part of either Lessor or the Ground Lessor..  This Lease is subject and subordinate to the Ground Lease, provided that (i) Lessee is given the Ground Lease Non-Disturbance Agreement pursuant to Article 45.(b) below, and (ii) Lessor shall not modify or amend the Ground Lease in any manner which will materially adversely affect the rights and obligations of Lessee hereunder without the prior written consent of Lessee. Set forth on Exhibit G hereto a designation of provisions of the Ground Lease which might materially affect Lessee's rights and privileges hereunder with respect to which Lessee acknowledges being advised and agrees to abide by and not violate, and to take such steps as may be reasonably required of it to cause compliance therewith.

## 4.  LEASE TERM.

(a)  The term of this Lease (the "Lease Term") shall be for a period of fifteen (15) "Lease Years," as that term is hereinafter defined. The term shall commence on the date (the "Commencement Date") which is the earlier of (i) ninety (90) days after Delivery of Possession, as hereinafter defined, and (ii) thirty (30) days after the date Lessee shall establish as its grand opening, but not later than ten (10) days after the date upon which Lessee shall open for business to the public in the Premises; except, however, if the Commencement Date established pursuant to the foregoing occurs between November 1 and the following March 31, Lessee shall have the option of delaying the Commencement Date in which event Rent (as hereinafter defined) shall not be payable until the earlier of (A) the date described in (ii) above, or (B) the next April 1.  The Lease Term shall expire on the last day of the fifteenth (15th) Lease Year, unless sooner terminated or extended as provided herein.

(b)  The term "Lease Year" as used herein shall mean a period of twelve (12) consecutive full calendar months (except for the first Lease Year, which may be longer). The first Lease Year shall commence on the Commencement Date and shall expire at midnight on the second January 31 following the Commencement Date. Succeeding Lease Years shall each commence on the first (1st) day following the end of the preceding Lease Year. After the Commencement Date has been determined and within ten (10) days after request from the other party, each party shall execute and deliver to the other a Supplemental Agreement in the form of Exhibit D annexed hereto and made a part hereof, stipulating the Commencement Date, the date of expiration of the original Lease Term, the dates of the commencement of the Renewal Periods (as hereinafter defined), and

the actual square footage of building area in the Premises as determined pursuant to Article 2.(b) above.

## 5. OPTION TO EXTEND.

Provided Lessee is not in default beyond applicable notice and cure periods at the time of exercise or on the effective date of any hereinafter provided renewal, Lessee is hereby given the right to extend the Lease Term for four (4) additional period(s) of five (5) year(s) per period (each herein called a "Renewal Period"), upon the same terms and conditions as provided in the original Lease Term. Lessee shall exercise the right granted in the foregoing sentence by notifying Lessor in writing of its intention to extend at least one hundred eighty (180) days prior to the date of commencement of each such Renewal Period, and thereupon this Lease shall be so extended without any further document or act. If Lessee fails to notify Lessor of its exercise of any extension option hereunder as hereinabove provided, its option(s) to extend shall nevertheless remain in full force and effect for a period of ten (10) days after Lessee's receipt of subsequent written notice from Lessor setting forth the expiration date of the Lease and advising Lessee that notice of extension has not been received. Unless Lessee's notice of exercise of any applicable aforestated extension option shall be given as provided in this Article 5, Lessee shall be deemed to have waived the right to exercise that extension option and all future extension options shall be null and void.

## 6. COMPLETION AND DELIVERY OF THE PREMISES AND SHOPPING CENTER.

(a) Lessor shall use its best efforts to complete the following work (collectively, "Lessor's Work") on or before June 30, 1996: (i) construct the Shopping Center substantially as shown on the site plan attached hereto as Exhibit B [subject, however, to the provisions of Articles 29.(a) and 37.(e) below] including, without limitation, all parking areas, common areas and access roads located on or serving the Shopping Center including ingress and egress to and from U.S. 1 (South Dixie Highway), subject to governmental approval, and S.W. 70th Avenue; and (ii) construct the Premises as provided in (b) below. If Lessor's Work is not completed and Delivery of Possession (as hereinafter defined) has not occurred on or before June 30, 1996, for any reason whatsoever, subject any to extension by reason of Force Majeure (as hereinafter defined) for a like number of days but not beyond September 1, 1996, Lessee shall have the right to cancel this Lease at any time thereafter by forwarding written notice to Lessor before completion of Lessor's Work. Time is of the essence with respect to the dates contained in this Article 6. By opening the Premises for business, Lessee shall be deemed to have (A) accepted the Premises, and (B) agreed that Lessor's Work has been performed, save and except (1) any so-called "punch lists" of Lessor's Work which requires completion or correction of deficiencies previously given to Lessor, and (2) Lessor's obligation, pursuant to Section 10.(b)(ii) below, to make, at its sole cost and expense, all repairs and

replacements to the Premises during the twelve (12) month period on and after the Commencement Date which are occasioned by defective labor or materials furnished by Lessor as part of Lessor's Work.

(b) Lessor shall provide or cause to be provided all materials, and perform or cause to be performed all work, necessary to deliver the Premises as depicted on the plans and specifications and as described in "Standard Lessor's Work" attached hereto as Exhibit E, and otherwise to deliver possession of the Premises to Lessee in "broom clean" condition. Lessor's Work shall include landscaping, parking area lighting, site drainage, truck docks, concrete curbs and sidewalks, driveways, utilities, a finished and fully improved parking garage, loading areas and other site improvements shown on Exhibit B hereto. All heating, ventilating and air-conditioning equipment servicing the Premises will be new. Lessor hereby warrants and represents that, upon completion of Lessor's Work, the structure, roof, heating, air conditioning, ventilating, lighting, electrical, plumbing, sewer and all other systems and fixtures serving the Premises will be in good condition and working order, and there will be sufficient utilities available (including without limitation, water and electricity, but excluding gas) to heat, illuminate, ventilate, air condition and provide power to the Premises in the quantities or at the capacities reasonably required by Lessee for its use contemplated by this Lease.

(c) Delivery of possession ("Delivery of Possession") shall be deemed to have occurred on the date on which the latest of all of the following shall have occurred: (i) Lessor's Work shall have been Substantially Completed (as hereinafter defined), (ii) Lessor shall have tendered actual possession of the Premises to Lessee free of all leases (other than this Lease) and occupants; (iii) Lessor shall have made the Premises available to Lessee for performance of Lessee's Work (as hereinafter defined), and the installation of Lessee's fixtures and equipment; (iv) Lessor shall endeavor to give Lessee at least sixty (60) days' prior notice of the date of Delivery of Possession, however, failure to give Lessee an accurate notice shall not delay the Delivery of Possession; (v) Lessor shall then be the holder of a valid leasehold estate in the Shopping Center free and clear of any liens and encumbrances, except the Permitted Encumbrances and any matters permitted under Article 3.(a) and 3.(b) above; (vi) any permits, certificates, "sign-offs" and approvals (copies of which shall be delivered to Lessee upon request) required from applicable governmental authorities with respect to Lessor's Work and for the use of the Common Area (as hereinafter defined) shall have been obtained, at Lessor's sole cost and expense, including but not limited to zoning, building code, environmental requirements, site plan approvals, sign permits, construction and development permits, and a certificate of completion (but excluding a certificate of occupancy which Lessor represents can only be obtained by Lessee upon completion of Lessee's Work); (vii) the Common Area, including, without limitation, the pylons, shall have been completed and operational and utilities shall have been connected

to and in the Premises, provided, however, that the parking garage may not then be completed and in full operation, in which event (A) the time reasonably estimated by Lessor's architect (as evidenced by his written statement to Lessee) for the completion and full operation of the parking garage shall not then exceed forty-five (45) days, (B) Lessor shall use its best efforts (including, without limitation, the use of overtime labor) to cause the parking garage to be completed and fully operational prior to the date which Lessee may establish, by notice to Lessor, for the opening of the Premises for business, (C) Lessee shall not be required to open the Premises for business until the parking garage is completed and fully operational, but if Lessee, in its sole discretion, elects to do so, all Rent (as hereinafter defined) payable by it hereunder shall be fully abated until the parking garage is completed and fully operational, and the monies so abated may be retained by Lessee, (D) if the parking garage is not completed and fully operational on the date upon which Lessee is prepared to open the Premises for business, Lessor shall reimburse Lessee for all costs, expenses, damages and liabilities which Lessee may actually incur as a direct result thereof, regardless of whether Lessee may have nevertheless elected to open the Premises for business, and (E) if Lessor fails to reimburse Lessee for any amounts due from Lessor pursuant to (D), Lessee shall have the absolute right to offset such amounts against the Rent first due and payable by Lessee hereunder; (viii) the zoning of the Shopping Center and all other laws, orders and regulations shall then permit the occupancy of the Premises for the Permitted Use (as hereinafter defined) and shall then permit the parking of private automobiles in the Common Area where parking is shown on Exhibit B hereto; (ix) Lessor shall have delivered to Lessee, Mortgage Non-Disturbance Agreements (as hereinafter defined) duly executed by any then holders of any mortgage or deed of trust on the Shopping Center and a Ground Lease Non-Disturbance Agreement (as hereinafter defined) from the Ground Lessor; (x) there are no restrictions or other legal impediments either imposed by law (including applicable zoning and building ordinances) or by any instrument which would prevent: (A) except for Lessee's Work, the use of the Premises for the Permitted Use; (B) the use of the parking facilities, access roads, and other portions of the Common Area in the manner contemplated by this Lease; or (C) the performance of Lessee's Work (as hereinafter defined) in the Premises in the manner contemplated by this Lease; (xi) Lessor shall have delivered to Lessee the certification of Lessor's architect with respect to the measurement of the Premises and of the Shopping Center as provided in Article 2.(b) above; (xii) leases shall have been entered into with at least two (2) of the following tenants (hereinafter collectively called the "Inducement Lessees"), one of which Inducement Lessees must have leased space on the same level as the Premises, on the following terms, [Such leases shall not be cancelable by any of the Inducement Lessees, except for failure of Lessor to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking by eminent domain (as set forth in Article 21 below) or for reasons

similar to those for which this Lease is cancelable by Lessee or Lessor. Except for a default by the lessee thereunder, Lessor covenants not to terminate any such lease without Lessee's consent, unless a lease has been entered into with an alternative lessee (which shall be a nationally or regionally recognized retail chain) for approximately the same floor area and the same minimum term]:

| Inducement Lessees | Minimum Square Foot Gross Floor Area | Minimum Term |
|---|---|---|
| 1. Best Buy | 57,000 | 15 years |
| 2. Target | 100,000 | 15 years |
| 3. Sports Authority | 42,500 | 15 years |

and; (xiii) construction of the premises for all the Inducement Lessees shall have been Substantially Completed, in accordance with the terms of the respective lessee's lease.

(d) On or before January 31, 1995, Lessor shall prepare and provide Lessee with an accurate plan of the column layout (the "Column Layout") of the Premises and within thirty (30) days thereafter, based upon the Column Layout, Lessee shall prepare and provide Lessor with its fixture plan, reflected ceiling plan and office plan (collectively, "Lessee's Plans"). Within sixty (60) days after receipt of Lessee's Plans, Lessor shall prepare and submit to Lessee its preliminary plans and specifications for the construction of the Premises. Lessee shall review such preliminary plans and specifications (i) to determine whether they conform to the Column Layout, Lessee's Plans, and to the Specifications for Lessor's Work described in <u>Exhibit E</u> hereto, and (ii) to approve the front elevation of the Premises shown thereon. Lessee shall exert good faith efforts to advise Lessor with respect thereto within less than thirty (30) days after receipt of the preliminary plans and specifications. Lessor shall promptly prepare final plans and specifications based upon its preliminary plans and specifications and any changes required by Lessee therein. Such final plans and specifications shall not be materially changed without Lessee's prior written approval. Except for Lessor's Work, Lessee shall, at its own cost and expense, do any and all work (herein called "Lessee's Work") which Lessee desires to adapt the Premises to a prototypical Bed Bath & Beyond store. Both parties shall do their respective work in a manner required by applicable governmental regulations and codes so that Lessee may secure any and all required permits, approvals and a final certificate of occupancy from applicable governmental authorities to enable Lessee to open and conduct its business in the Premises. If, however, such permits, approvals and/or final certificate of occupancy cannot be obtained by Lessee because Lessor's Work has not been completed or has been done improperly (and not because of the manner in which Lessee shall have done or proposes to do its work), or by reason of any condition of the Shopping Center or the building containing the Premises, then it shall be the responsibility of Lessor to remedy the situation so as to enable it

to obtain such permits and approvals. Both Lessor's Work and Lessee's Work shall be performed in a good and workmanlike manner, utilizing only new, first class materials, and in accordance with all applicable laws, ordinances, codes and insurance company requirements.

(e) Lessee shall commence Lessee's Work within thirty (30) days after the Delivery of Possession.

(f) Lessee agrees to fully fixture, stock and initially open all of the Premises for the business contemplated to be initially operated pursuant to this Lease on the Commencement Date, subject to extension by reason of Force Majeure for a like period.

(g) The terms "Substantially Completed" and "Substantial Completion" shall mean that only so-called "punch list" items of Lessor's Work shall not be completed and that the completion thereof will not interfere, in any material manner, with Lessee's Work or the subsequent operations of Lessee's business in the Premises.

(h) At any time prior to the Delivery of Possession, Lessee shall have the right to enter the Premises for the purposes of measuring the Premises, performing Lessee's Work and installing Lessee's leasehold improvements, fixtures, equipment and merchandise, provided that such operations do not interfere unreasonably with Lessor's completion of the Premises or the Shopping Center or with any then operations at the Shopping Center. Any entry by Lessee for the purpose of measuring the Premises, performing Lessee's Work or of installing its leasehold improvements, fixtures and equipment shall not be deemed acceptance of the Premises by Lessee and shall be at Lessee's sole risk. Prior to any entry by Lessee, Lessee shall furnish to Lessor evidence of the insurance coverage required hereunder of Lessee and, in addition, shall deliver to Lessor satisfactory proof that all workmen of Lessee, or any of Lessee's contractors or subcontractors entering upon the Premises, are covered by workmen's compensation insurance as required by law.

(i) In the event this Lease is terminated pursuant to the provisions of (a) above or pursuant to Article 45 below, Lessor and the successors and assigns of Lessor shall not, directly or indirectly, for a period of three (3) years from the date of such termination of this Lease, lease or permit the occupancy of any portion of the Shopping Center for the principal use of selling the Permitted Items without first giving Lessee and Guarantor (as hereinafter defined) written notice of such intention and the right within thirty (30) days after such notice to reinstate this Lease with appropriate modifications, if necessary, for the size and location of the Premises based upon any revised site plan of the Shopping Center. The provisions of the immediately preceding sentence shall survive any termination of this Lease.

## 7.  **RENT.**

(a)  (i)  <u>Fixed Rent</u>.  Lessee hereby covenants and agrees to pay Lessor as monthly fixed rent ("Fixed Rent") for the Premises commencing on the Commencement Date and thereafter during the Lease Term the sums as set forth in Article 1.(d) above.  Monthly Fixed Rent shall be payable in advance and without demand on the first day of every calendar month during the Lease Term.

(ii) If the Inducement Lessee whose premises is on the same level as the Premises shall not have opened its premises to the general public for business and at least one Major Lessee (as hereinafter defined) on each of the first and second levels are not in the process of completing their lessee improvements to their premises (collectively, the "Opening Conditions") on or before the date on which Lessee is prepared to open to the Premises to the general public for business, then Lessee, notwithstanding any other provision of this Lease, shall not be required to open the Premises for business and the Commencement Date shall be postponed until the Opening Conditions have been fulfilled, but if Lessee elects to open to the public for business at any time before fulfillment of the Opening Conditions, then Lessee shall, notwithstanding any other provision of this Lease, be entitled to a full abatement of Fixed Rent and Lessee shall only be liable for the payment of its proportionate share of Lessee's Operating Costs (as hereinafter defined) and for Percentage Rent (as hereinafter defined) in accordance with (b) below, except that such payments of Percentage Rent shall be made without a Break Point (as hereinafter defined) and shall not exceed, on a cumulative basis, the payments of Fixed Rent which would otherwise have been payable by Lessee for the same periods, from the date that it may elect to open the Premises to the public for business until the date on which the Opening Conditions have been fulfilled, and the monies so abated may be retained by Lessee, it being acknowledged by each of Lessor and Lessee that the actual damages suffered by Lessee would be difficult to ascertain and that the said abatement constitutes liquidated damages and not a penalty.  For the purposes of this paragraph, a "Major Lessee" is a regionally or nationally recognized retail chain store.  In the event the Opening Conditions have not been fulfilled within one hundred eighty (180) days after Lessee shall either have opened for business or shall have been ready to open for business, then Lessee may at any time thereafter when the Opening Conditions have not been fulfilled (and whether or not Lessee shall have opened for business), upon giving Lessor not less than thirty (30) days' notice, terminate this Lease as of the date specified in said notice, in which event neither party shall have any further liability hereunder except that Lessor shall be obligated to promptly reimburse Lessee for all its costs incurred in connection with the preparation of plans and specifications for Lessee's Work.  Lessor may negate such termination if the Opening Conditions are fulfilled not later than thirty (30) days after the date on which Lessee has given the foregoing notice of termination.

(b)  (i)  <u>Percentage Rent</u>.  In addition to the Fixed Rent, Lessee shall pay to Lessor as percentage rent ("Percentage Rent") for each calendar year, a sum equal to the amount, if any, by which three (3%) percent of Gross Sales exceeds the sum of Thirty Million ($30,000,000.00) Dollars (the "Break Point"). Each calendar year shall be considered as an independent accounting period for the purpose of computing the amount of Percentage Rent; the amount of Gross Sales in any calendar year shall not be carried over into any other calendar year.  Lessee shall pay Percentage Rent to Lessor at the address specified for notices to Lessor, on or before the sixtieth (60th) day following the end of each calendar year, and shall concurrently provide the written report described in (iii) below.  The amount of Percentage Rent, if any, payable with respect to a partial calendar year shall be determined by (A) calculating the Gross Sales for the first full twelve (12) month period on and after the Commencement Date (with respect to a partial calendar year which includes such Commencement Date) or for the last full twelve (12) month period prior to the expiration or sooner terminate date of this Lease (with respect to a partial calendar year which includes such expiration or sooner termination date), as the case may be, and (B) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the partial calendar year and the denominator of which is three hundred sixty-five (365).  The Percentage Rent for a partial calendar year, as so determined, shall be paid within sixty (60) days after the end of the applicable twelve (12) month period.

(ii)  The term "Gross Sales" as used herein shall mean the total amount of the actual sales price, whether for cash or on credit or partly for cash and partly on credit, of all sales of merchandise and services and of any and all other receipts of business conducted in or from the Premises including, but not limited to, all gift and merchandise certificates, mail or telephone orders received or filled at or from the Premises, deposits not refunded to purchasers including all sums paid on lay-away sales which are or shall become forfeited to Lessee, orders taken in and from the Premises whether or not filled elsewhere, commissions received on vending machines or coin operated devices, sales by any sublessee, concessionaire or licensee, and the retail value of any goods, services, food or merchandise delivered in lieu of cash.  Gross Sales, however, shall not include (A) amounts of refunds, allowances or discounts made on merchandise claimed to be defective or unsatisfactory; (B) exchanges of merchandise between stores of Lessee where such exchanges are made solely for the operation of Lessee's business and not for the purpose of consummating a sale which has been made at, in, on, or from the Premises (it being understood, however, that if Lessee transfers inventory to another location and then sells the same in bulk, at discount or otherwise, the receipts therefrom shall constitute Gross Sales); (C) returns to shippers and manufacturers for credit; (D) sale of trade fixtures or store operating equipment after use thereof in the conduct of Lessee's business in the Premises; (E)

sums and credits received in settlement of claims for loss or damage to merchandise; (F) the amount of any sales taxes, so-called "luxury" taxes, consumers' excise taxes and other similar taxes now or hereafter imposed upon the sale of merchandise or services and paid by customers; (G) coin telephone receipts; (H) charges for services provided for the convenience of customers of Lessee at no profit to Lessee; (I) receipts from vending machines used by employees; (J) sales to employees at prices less than those available to the public not to exceed one (1%) percent of Gross Sales; (K) fees paid to unaffiliated third party credit card companies on credit card sales; (L) separately stated services, finance and interest charges; and (M) bad debts on Gross Sales. Each sale upon installment or credit shall be regarded as a sale for the full price in the month during which the sale shall be made, irrespective of the time when Lessee shall receive payment from its customer, but lay-away sales shall not be taken into account until they shall become actual sales, except for forfeited lay-away sales as above provided. No deduction shall be allowed for uncollected or uncollectible credit accounts.

(iii) From and after the Commencement Date, Lessee shall maintain and cause its sublessees, concessionaires and licensees, if any, to maintain adequate records, conforming to generally accepted accounting practices, consistently applied, showing all of the Gross Sales at, in, from and upon the Premises. Within sixty (60) days after the end of each calendar year, Lessee shall furnish Lessor a complete written report, in form reasonably acceptable to Lessor, showing in reasonable detail all Gross Sales for the previous calendar year, computed as herein provided. Such annual report shall be signed and certified to be true, correct and complete by Lessee, or if Lessee is an entity, by one of its principal officers or partners. Upon request, Lessee shall exhibit to Lessor at Lessee's principal office, copies of any and all tax returns filed by Lessee.

(iv) The acceptance by Lessor of Percentage Rent payments or sales reports thereon shall be without prejudice and shall in no case constitute a waiver of Lessor's right to examine Lessee's books and records of its Gross Sales and inventories of merchandise. Lessee agrees to prepare and keep on the Premises for a period of not less than two (2) years following the end of each calendar year, adequate records which shall show inventories and receipts of merchandise at the Premises and receipts from all revenue and other transactions on the Premises by Lessee and any other persons conducting business upon the Premises. Lessor or its duly authorized representatives (including, without limitation, auditors on behalf of Dade County to confirm Lessor's income from the Shopping Center pursuant to the Ground Lease) may, from time to time as it shall deem necessary or desirable, inspect Lessee's records at Lessee's principal office provided such inspection is made within two (2) years after an annual statement of Gross Sales is furnished Lessor by Lessee and is limited to the period covered by such statement.

(v) Lessee shall be allowed to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and are made accessible for Lessor's inspection on request, and (B) promptly upon request, printed copies of any such books and records are made available to Lessor's representatives who are engaged in inspecting and/or auditing Lessee's books and records as provided herein.

(vi) Lessor will not disclose the contents of any of Lessee's gross sales reports or any information obtained pursuant to an audit of Lessee's books and records to any party except to any mortgagee or prospective mortgagee of the Shopping Center or to the landlord under any underlying lease or to a bona-fide prospective purchaser of any such leasehold or fee interest in the Shopping Center, or as required in any legal proceeding.

(c) (i) <u>General Provisions</u>. Rent shall be prorated for any partial month at the beginning or end of the Lease Term. Lessee shall pay Rent (as hereinafter defined) to Lessor at the address provided for Lessor in Article 1.(f) above, unless otherwise notified in writing by Lessor. All payments by Lessee under this Lease (all of which shall be deemed Rent for purposes of this Lease) shall be accompanied by payment of any applicable sales tax, regardless of who is liable therefor by statute.

(ii) Without limiting any of Lessor's other remedies, if Lessor has not received any payment of Rent by the tenth (10th) day of any month during the Lease Term, as same may be extended, Lessee shall pay Lessor, together with the next installment of Fixed Rent, (A) interest from the date due until the date paid at the rate of two (2%) percent above the prime rate from time to time announced in the Wall Street Journal or any successor publication (or similar publication reasonably designated by Lessor, if there is no successor) which rate is herein referred to as the "Lease Interest Rate", and (B) a late charge in an amount equal to four (4%) percent of the overdue payment as an administrative fee and not a penalty, but such late charge shall apply only to the second and any subsequent overdue payment during any calendar year.

(iii) Whenever Lessee is required hereunder to pay any monies to Lessor, other than Fixed Rent, the same shall be deemed to be "Additional Rent". Lessor shall have the same remedies with respect to the non-payment of Additional Rent as it has for the nonpayment of Fixed Rent pursuant to the terms of this Lease. The term "Rent" as used herein shall mean Fixed Rent and Additional Rent.

## 8. CONFORMITY WITH LAW.

Lessee will use and occupy the Premises and appurtenances in a careful, safe and proper manner, and shall comply with the lawful requirements of the proper public authorities regarding the conduct of Lessee's business and its use of the Premises. Lessee will not permit the Premises to be used for any unlawful purpose. Lessor hereby warrants that, at time of the Delivery of Possession, and thereafter during the Lease Term, the Premises will be in conformance with all applicable building, health, safety, fire, environmental and zoning codes and other laws, ordinances and regulations of all public authorities having jurisdiction over the Premises, all at Lessor's sole cost and expense, except that any such work which is required due to Lessee's specific use or due to any alterations or improvements made to the Premises by Lessee and would not otherwise be required, shall be made by and at the sole cost and expense of Lessee.

## 9. UTILITIES.

On and after the Delivery of Possession and during the entire Lease Term, Lessee shall pay when due all bills for gas, water, electricity, garbage and refuse disposal [unless Lessor elects to provide same, with the cost to be included in Lessor's Operating Costs (as hereinafter defined)], and other utilities used on the Premises. Lessor, at its sole cost and expense, shall install separate meters for the utilities used in the Premises, but Lessee shall apply for such meters in its name and pay any utility deposits required in connection therewith. Lessor shall have no liability for the interruption of any utility services and no such interruption shall entitle Lessee to an abatement of rent or other remedies against Lessor under this Lease, unless such interruption is caused by the negligence or neglect of Lessor, its employees, agents, contractors or representatives.

## 10. REPAIR OF THE PREMISES. 

(a) Lessee agrees that except as otherwise provided in this Article 10, it will perform all necessary non-structural interior maintenance, repairs and replacements to the Premises, including maintenance, repair, replacement of damaged or broken doors and windows and maintenance, repair and replacement of the heating, ventilating, air-conditioning, plumbing, gas, electrical and similar systems which are located in and service exclusively the Premises. Lessee further agrees that it will keep and maintain the interior of the Premises in a clean and sanitary condition. Lessee shall not be required to make any repairs which are the responsibility of Lessor pursuant to this Article 10 or elsewhere under this Lease.

(b) Lessor shall, at its sole cost and expense, make as the same shall from time to time are necessary, all repairs and replacements to the Premises (i) to the extent, if any, of contractors',

manufacturers', vendors', or insurers' warranties or guarantees, (ii) during the twelve (12) month period on and after the earlier of (A) the date upon which Lessee opens the Premises for business, or (B) the Commencement Date, occasioned by defective labor or materials furnished by Lessor as part of Lessor's Work, and (iii) which are occasioned by any act, omission or negligence of Lessor, its employees, agents or contractors.

(c) Lessor shall make all structural repairs to the Premises, whether interior or exterior, keep the Premises watertight, and shall repair, replace and maintain in good condition the exterior of the Premises including without limitation the roof (including gutters, flashings, downspouts and scuppers), walls, foundations, and utility lines from the point of connection to the Premises to the main line. Lessor shall make all necessary maintenance, repairs and replacements of any plumbing, gas, electrical and other systems and components thereof, and any loading docks, service corridors, freight elevators and similar areas which service more than just the Premises, including the cooling tower and related equipment which furnishes chilled water to the air conditioning systems in the various leased premises (including the Premises). The costs of all of the foregoing, excluding roof and structural repairs, as well as the deductibles, if any, applicable to Lessor's casualty insurance pursuant to Section 22.(b)(v) below, shall be included in Lessor's Operating Costs; provided, however, that any of same that benefit solely some, but not all, occupants of the Shopping Center (such as loading docks, service corridors, freight elevators and similar areas designed to service some portions of, but not all, of the Shopping Center) shall be allocated only amongst the occupants so benefitted.

(d) In performing its obligations under this Article 10, Lessor shall use all reasonable efforts to minimize interference with or disruption of Lessee's normal business operations. If Lessor fails to commence and thereafter diligently complete to Lessee's reasonable satisfaction the repairs required under this Article 10 or elsewhere under this Lease within a reasonable time after written notice from Lessee, Lessee shall have the right to make such repairs on behalf of Lessor and Lessor shall reimburse Lessee for the cost thereof, plus ten (10%) percent of such cost to cover its overhead and administrative costs, and interest on all sums due at the Lease Interest Rate, within ten (10) days of demand. In the event Lessor should fail to reimburse Lessee for the cost of said repairs as provided herein and Lessee obtains a declaratory or other judgment against Lessor from any court of competent jurisdiction for the cost of said repairs, Lessee shall be allowed to offset the full amount, plus the aforestated ten (10%) percent for overhead and administrative costs, and interest as aforesaid against the Rent payable under this Lease.

(e) Anything in this Lease to the contrary notwithstanding, Lessor agrees that in the event of an emergency which necessitates prompt maintenance, repair or replacement of items which are otherwise

required by this Lease to be maintained, repaired or replaced by Lessor, and Lessee is unable to contact Lessor and advise it of such emergency condition, Lessee may at its option proceed forthwith to make such repairs and pay the reasonable cost thereof. Lessor agrees to reimburse Lessee for the reasonable cost of such repairs in the same manner and subject to the same provisions as set forth in (d) above except that interest shall not accrue or shall not commence to accrue until ten (10) days after Lessee makes demand upon Lessor for payment of the costs incurred by Lessee.

(f) If at any time during the term of this Lease or any extension thereof any governmental agency or other authority with jurisdiction over the Premises requires modification or repairs of the Premises which are necessitated by reasons other than Lessee's particular use of the Premises or by any alterations or improvements made to the Premises by Lessee (for which Lessee shall be responsible at its sole cost and expense), all such repairs, alterations, and additions or remodeling shall be at Lessor's sole cost and expense. If Lessor does not make such changes (subject to Lessor's right to contest the need therefor with the governmental agency or authority), then Lessee may either make such repairs after thirty (30) days' written notice of its intent to do so unless Lessor commences to do so within such time (as such time may be extended while any contest is pending, for a like number of days), and Lessor shall reimburse Lessee in the same manner and subject to the same provisions as set forth in (d) above.

(g) All maintenance, repairs and replacements by both Lessor and Lessee shall be performed in a good, workmanlike and lien free manner, and in full compliance with all applicable legal requirements. Any contractor performing work for Lessee in the Premises costing in excess of Fifty Thousand ($50,000.00) Dollars shall carry and maintain, at no cost to Lessor, commercial general liability insurance, including contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection with limits, for each occurrence, of not less than One Million ($1,000,000.00) Dollars, combined single limit, as well as workmen's compensation or similar insurance as required by law.

## 11. ACCESS BY LESSOR.

Lessor shall have access to the Premises during Lessee's business hours upon three (3) days' prior notice for the purpose of examining same, showing same to prospective lenders, prospective purchasers and, during the last one hundred eighty (180) days of the Lease Term (as extended) to prospective tenants, or making any repairs thereto which Lessor is required to make under this Lease or which are necessary for safety or maintenance purposes. In the event of an emergency, Lessor shall not be required to give Lessee such three (3) days' prior notice, but shall use reasonable efforts to notify Lessee and its security company prior to entry. Lessee

acknowledges being advised that access to the Premises may be needed in order to access and install, maintain, repair and replace, support, utility or other facilities that benefit other portions of the Shopping Center and access as aforestated shall be provided for such purposes. In connection with maintenance, repair and replacement of such support, utility and other facilities, Lessor shall not interfere with or disrupt Lessee's normal business operations.

## 12. LESSEE'S FIXTURES AND SIGNS.

(a) Lessee at its sole cost and expense shall have the exclusive right to install and maintain its standard sign on the exterior of the Premises facing the atrium, provided that prior to doing so Lessee obtains any required permits from and complies with all laws and ordinances of any governmental authority with jurisdiction over the Premises. Lessee may also install and maintain in the Premises such signs as its desires and in the ceiling areas and below the finished floor such machinery, equipment, fixtures, pipes, conduits and ventilating ducts as are required or desirable for the business conducted by Lessee therein.

(b) Lessee shall at all times have the right to remove all signs, fixtures, machinery, equipment, appurtenances or other property heretofore or hereafter furnished or installed by Lessee, provided it repairs any damage caused thereby, it being expressly understood and agreed by the parties that said property shall not become part of the Premises but shall at all times be and remain the property of Lessee and as such shall not be subject to any pre-judgment landlord's lien or other creditor's remedy otherwise available to Lessor.

(c) Lessor will use its best efforts to obtain maximum signage for the Shopping Center, including two (2) Shopping Center pylons on Route 1. Lessee shall be entitled to erect and maintain its standard sign face on those pylons as well as on the side of the building wherein the Premises are situate, facing the Dadeland Mall. In addition, Lessor shall use its best efforts to obtain all required governmental approvals for signage on the building facing Snapper Creek Expressway. Signs on the said pylons and on the building may be erected by lessees (including Lessee) occupying at least eighteen thousand (18,000) square feet of Floor Area in the Shopping Center and the size of their respective signs shall, at Lessor's sole option, either (i) be equal, or (ii) be pro-rata based on the relative Floor Areas of such lessees (including Lessee). Preference of position on the pylons (after the Shopping Center identification) for all such signs shall be determined based on the square footage of space demised to each user in the Shopping Center occupying a position on such sign (the larger the square footage, the greater the priority of preference) but Lessee may reserve space below all such signs for up to two (2) additional phases of the Shopping Center. Lessee may place on the interior of the Premises any sign which conform to applicable legal

requirements. Although Lessor shall cause any pylon to be initially constructed as part of its construction obligations related to the Shopping Center, the costs of maintaining, repairing, replacing and lighting same after initial construction shall be included in Lessor's Operating Costs. The cost of Lessee's sign face, and the costs of maintenance, repair and replacement of Lessee's sign face, shall be borne exclusively by Lessee.

(d)    In addition to Lessee's right to install and maintain its sign on the exterior of the Premises pursuant to (a) above, Lessor will endeavor to obtain all necessary governmental approvals for signage on the parking structure comprising a part of the Shopping Center, and in such event, Lessee shall have the right to erect and maintain, its sign thereon with preference of size and position established in the same manner as is set forth above for pylon and free-standing signage.

(e)    The signage rights granted to Lessee pursuant to this Article 12 shall accrue to any assignee of this Lease and to any subtenant of the Premises; provided, however, that no sublessee of less than the whole of the Premises shall have the right to erect and maintain its sign on any pylon or free standing sign pursuant to (c) above.

## 13.    **ALTERATIONS TO THE PREMISES.**

(a)    At any time after delivery of the Premises to Lessee, Lessee at its own cost and expense and without Lessor's consent may make non-structural changes, alterations, additions and improvements to the interior of the Premises. Lessee shall first obtain Lessor's consent (which consent shall not be unreasonably withheld or delayed) before making any changes to the structure of the building itself or any other structural changes, alterations, additions or improvements.        Lessee    shall    submit    to    Lessor    completed architectural, electrical and mechanical plans and specifications (the "Plans and Specifications") covering all structural work which Lessee proposes to do in the Premises.        The    Plans    and Specifications shall be prepared in such detail as Lessor may reasonably require, and Lessee shall not be permitted to commence any such structural work until Lessor has approved the structural Plans and Specifications in writing.    In addition to approving the Plans and Specifications, Lessor shall have the right to approve any contractor working on Lessee's behalf in the Shopping Center with respect to structural work.    Lessor agrees to act with promptness with respect to approval of the Plans and Specifications and Lessee's contractor, and in the event Lessor does not give its written response (which shall specify in detail its reasons for any disapproval) within fifteen (15) days after receipt of the Plans and Specifications and/or name of Lessee's proposed contractor, then Lessor shall be deemed to have approved the same.    Any changes in the Plans and Specifications must be similarly approved by the Lessor.    If so requested by Lessee, Lessor shall cooperate in securing necessary permits and other government authorizations for

Lessee's changes and alterations, at no cost to Lessor. Lessee has no right to cause any liens, including mechanics', materialmen's or laborers' liens, to be created against Lessor's interest in the Premises; any such liens are hereby prohibited. Notwithstanding the foregoing, if any liens are filed by reason of the acts or omissions of Lessee or those claiming by, through or under Lessee, Lessee shall cause them to be transferred to security or discharged of record within thirty (30) days after notice thereof from Lessor to Lessee.

(b) Lessee shall, under no circumstances, whether by act or omission, do anything within the Premises that would adversely affect the structural integrity of the Shopping Center or the utility or other common facilities that run through the Premises (within columns, the ceiling or floor) and service other parts of the Shopping Center.

(c) Lessee shall be permitted to install, at its sole cost and expense, one (1) roof or wall mounted satellite dish and one (1) roof or wall antenna provided (i) Lessee utilizes an experienced contractor for such installation and maintenance, (ii) Lessor has the right to reasonably approve and supervise such contractor's work, including the location of the satellite dish and antenna, and the manner in which each is affixed to the roof (or wall) of the building, (iii) Lessee does not at any time during the Term of this Lease or any renewal thereof engage in any act including penetration of the roof, which will affect the structural integrity of the roof or the building of which the Premises are a part, (iv) such installation is accomplished in accordance with all applicable codes, ordinances and laws, (v) Lessee shall indemnify and hold Lessor harmless with respect to any liability, damage or claim arising out of the installation, maintenance, removal and use of the antenna and satellite dish, and (vi) any such installation does not invalidate any or all warranties which Landlord may have with respect to the roof, building or Shopping Center.

(d) Lessor shall not make any material alterations to the exterior of the Premises, without Lessee's prior approval.

(e) Lessee, at its sole cost and expense, shall have the right to subdivide the Premises into not more than two (2) separate stores, provided that each such store shall contain no less than ten thousand (10,000) square feet of Floor Area.

## 14. SURRENDER OF THE PREMISES.

Lessee will deliver and surrender possession of the Premises to Lessor upon the expiration of this Lease or its earlier termination, in condition and repair equal to the condition and repair thereof at the time of Delivery of Possession, loss by fire, ordinary wear and tear and decay, casualty, neglect or fault or default of Lessor, and taking by eminent domain excepted.

## 15. HOLDING OVER.

If Lessee continues its occupancy of the Premises after the expiration of the Lease Term (or any earlier termination provided or permitted by this Lease) either with or without the consent of Lessor, such tenancy shall be month-to-month only, and not year-to-year or based on any other interval of time. Such continued occupancy shall not defeat Lessor's right to possession of the Premises, and the month-to-month tenancy provided for herein may be canceled at the end of any calendar month upon not less than fifteen (15) days' prior written notice from Lessor to Lessee. Except for provisions relating to Lease Term and Fixed Rent, which shall be at the rate of one hundred fifty (150%) percent of the Fixed Rent payable immediately prior to the commencement of such month-to-month tenancy, all covenants, provisions, obligations and conditions of this Lease shall remain in full force and effect during such month-to-month tenancy.

## 16. DEFAULT.

(a) <u>Lessee Default</u>. In the event that any of the following (hereinafter referred to as an "Event of Default") shall occur:

(i) Lessee shall at any time be in default of the payment of Rent under this Lease, and Lessee shall fail to remedy such default within ten (10) days after receipt of written notice of such default from Lessor; or

(ii) Lessee shall at any time be in default of the performance of any of its obligations under this Lease other than payment of Rent, and Lessee shall fail to remedy such default within thirty (30) days [or twenty (20) days if such default would create a default on Lessor's part under the Ground Lease] after receipt of written notice of such default from Lessor, provided, however, that Lessee shall not be deemed in default if such default cannot be cured within such thirty (30) or twenty (20) day period, as the case may be, and Lessee commences curing such default within such thirty (30) or twenty (20) day period, as the case may be, and thereafter diligently pursues such cure; or

(iii) if the interest of Lessee in the Premises shall be sold under execution or similar legal process, other than bankruptcy or receivership;

then upon the occurrence of such Event of Default and the termination of the applicable notice period hereinabove provided without cure, Lessor may, subject to applicable law, without further notice or demand enter into the Premises and take full and absolute possession thereof, without such reentry causing a forfeiture of the Rent to be paid or the covenants to be performed by Lessee hereunder for the full Lease Term, and upon such reentry Lessor may lease or sublease the Premises for such rent as Lessor may reasonably obtain, crediting Lessee with the rent so obtained

after deducting the costs Lessor reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Lessor in its sole discretion may terminate this Lease and reenter and take full and absolute possession of the Premises without further notice on a date selected by Lessor, releasing Lessee from further obligation hereunder and free from any further right or claim by Lessee. Lessor hereby waives any pre-judgment statutory or other liens in Lessee's property. Lessor shall use reasonable efforts to mitigate damages, but this shall not preclude Lessor from attempting to lease other vacant space at the Shopping Center before attempting to lease the Premises.

(b) <u>Re-Entry by Lessor</u>. Upon re-entry without termination of the Lease, Lessor may relet the Premises or any part thereof for a term(s) less than, equal to or greater than the remaining Lease Term and all rentals and other sums received by Lessor from such re-letting shall be applied: first, to the payment of any indebtedness other than Rent due hereunder from Lessee to Lessor; second, to the payment of any reasonable and necessary costs and expenses of such re-letting, including reasonable brokerage and attorneys' fees and the costs of any alteration and repairs necessary to re-let the Premises; third, to the payment of Rent due and unpaid hereunder; and the residue, if any, shall be held by Lessor and applied in payment of future Rent as the same may become due and payable hereunder. If such rentals and other sums received from such re-letting during any month be less than that to be paid during that month by Lessee hereunder, Lessee shall pay such deficiency to Lessor; if such rentals and other sums shall be more, Lessee shall receive a credit against prospective liability for the excess, but in no event shall Lessee be entitled to any cash payment as a result of any such excess. Notwithstanding any such re-letting without termination, Lessor may at any time elect to terminate this Lease for such previous breach. Lessor shall have the right to accelerate the Fixed Rent due for the remainder of the Lease Term and sue for the full amount thereof, provided that it may only obtain execution and payment on a monthly basis for monies then due without considering the acceleration.

(c) <u>Lessor Default</u>. If Lessor fails to make any repairs or do any work required of Lessor by the provisions of this Lease, or if Lessor shall at any time be in default in the observance or performance of any of the other covenants and agreements required to be performed and observed by Lessor hereunder, and any such failure continues for a period of thirty (30) days after written notice thereof is given by Lessee to Lessor, or, if such failure requires more than thirty (30) days to cure in the exercise of due diligence, unless Lessor commences to cure same within said thirty (30) day period and thereafter diligently prosecutes the same to completion, Lessee (i) may, if the failure materially interferes with the normal conduct of Lessee's business in the Premises, after obtaining a final judgment or arbitration award, abate all payments of Rent hereunder until the failure has been cured and Lessee is able to conduct its normal business in the Premises, but without

waiving its rights to damages for Lessor's failure to perform; and/or (ii) may, but shall not be obligated to, make such repairs or perform such work in accordance with the provisions of this Lease all on behalf of and at the expense of Lessor; and/or (iii) may bring suit for the collection of any amounts for which Lessor is in default, or for the performance of any other covenant or agreement devolving upon Lessor, without terminating this Lease; and (iv) seek reimbursement from Lessor for such sums and in the same manner and subject to the same provisions as set forth in Article 10.(d) above.

(d) <u>Remedies Cumulative</u>. The foregoing remedies available to Lessor and Lessee shall be cumulative and in addition to, and not in lieu of, all other rights and remedies available at law, in equity or under this Lease.

## 17. **NONWAIVER OF DEFAULT.**

No acquiescence by either party in any breach of covenant or default by the other party hereunder shall operate as a waiver of the acquiescing party's rights with respect to any other breach or default, whether of the same or any other covenant or condition.

## 18. **QUIET ENJOYMENT.**

Lessor covenants and agrees that if Lessee shall perform all covenants and agreements herein stipulated to be performed on Lessee's part, then at all times during the Lease Term Lessee shall have the peaceable and quiet enjoyment and possession of the Premises, without any manner of hindrance from Lessor or any other person or entity, subject to the terms of this Lease.

Lessor hereby represents and warrants that its execution of this Lease, compliance with the terms hereof and occupation of the Premises by Lessee will not conflict with, cause a breach of or constitute a default under the terms of any agreement or instrument to which Lessor is a party, including, without limitation, the Ground Lease.

A breach of this Article by Lessor shall entitle Lessee to all available equitable relief as well as any and all remedies at law, and Lessor shall indemnify Lessee from and against all damages, expenses and costs arising out of or resulting therefrom.

## 19. **DAMAGE BY FIRE OR CASUALTY.**

(a) If the Premises or any other portion (including the Common Area) of the Shopping Center is destroyed or damaged by any cause, then Lessor shall promptly rebuild and restore the Premises to the condition that existed immediately prior to the damage or destruction, and the Shopping Center to a complete and useable facility (but not necessarily containing the same square footage or facilities as before, subject to the provisions of Article 29

below), all within a reasonable period of time after the occurrence of such destruction or damage, and, promptly thereafter, Lessee shall fully fixture and stock and initially reopen all of the Premises for business. Lessor shall exercise good faith and due diligence to settle its insurance loss and pursue rebuilding and restoration. If Lessee is unable to conduct its normal business operations in a portion of the Premises due to any destruction or damage to the Premises or Common Area but can nevertheless in Lessee's sole but reasonable opinion continue to engage in its normal business operations in part of the Premises, the Rent under this Lease shall proportionately abate corresponding to the time during which, and to the area of the Premises of which, Lessee shall be deprived (provided no use is made by Lessee of such space of which Lessee is deprived) due to such destruction or damage or the making of such repairs and restoration to the Premises or the Common Area. No Rent shall be payable during any period that Lessee in its sole but reasonable opinion is unable to engage in its normal business operation in the entire Premises (and in fact does not engage in such business, or any other business, at the Premises).

(b) If the Premises or Shopping Center is substantially damaged or destroyed during the last three years of the Lease Term, Lessor or Lessee shall have the option to terminate this Lease by giving the other written notice thereof within sixty (60) days following such damage or destruction, in which event this Lease shall terminate effective as of the date of such damage or destruction; provided, however, that Lessee may rescind Lessor's notice of termination if and to the extent it has an unexercised renewal option and in fact exercises same within thirty (30) days of receipt of Lessor's notice of termination.

(c) Notwithstanding any other provision of this Article 19, if Lessor does not commence the repair and restoration work to the Premises and the Common Area as required pursuant to (a) above within one hundred eighty (180) days after the date of destruction, or if the required repairs and restorations to the Premises are not completed by Lessor within a period of twelve (12) months [which period shall be subject to extension for Force Majeure not exceeding an additional six (6) months] after the date of such damage or destruction, Lessee shall have the right, at its sole discretion and option, to: (i) seek to obtain specific performance of Lessor's repair and restoration obligations pursuant to the laws of the State of Florida; or (ii) terminate this Lease by thirty (30) days' written notice to Lessor.

(d) If this Lease is terminated for any reason pursuant to this Article, Lessor shall promptly refund to Lessee any Fixed Rent paid in advance and any unearned Additional Rent.

## 20. **WAIVER OF SUBROGATION.**

Notwithstanding any other provision contained in this Lease to the contrary, Lessee hereby waives any right it may have against Lessor, Lessor's mortgagee or any of the other parties in interest from time to time on account of any loss or damage occasioned to Lessee, its property, the Premises or its contents arising from any risk generally covered (including deductibles) by the "all risk" insurance required to be maintained by Lessee hereunder, whether or not such a policy shall be in force, and Lessor hereby waives any rights it may have against Lessee on account of any loss or damage occasioned to Lessor, its property or to the Shopping Center arising from any risk generally covered (including deductibles) by the "all risk" insurance required to be maintained by Lessor hereunder, whether or not such a policy shall be in force. The parties hereto also, on behalf of their respective insurance companies insuring the property of either Lessor or Lessee against any such loss, waive any right of subrogation that such insurance company(ies) may have against the other or shall secure the consent of insurers to waived rights of recovery, as the case may be.

## 21. **EMINENT DOMAIN.**

(a) If possession of the entire Premises are at any time after execution of this Lease is taken (whether by proceedings or by deed in lieu thereof, whenever such term is used) by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any Rent paid in advance and any unearned Additional Rent shall be refunded to Lessee by Lessor on such date.

(b) Lessee shall have the right to terminate this Lease and to receive from Lessor an appropriate refund of Rent paid in advance and unearned Additional Rent if, as a result of eminent domain proceeding or other governmental or quasi public action, (i) it is commercially unreasonable or unfeasible for Lessee, in its sole but reasonable judgment, to continue its normal business operations in the Premises; or (ii) (A) portions of the Shopping Center shall be divided or separated in any manner that materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (B) the Shopping Center no longer has any entrance from U.S. Highway No. 1 (South Dixie Highway) and from S.W. 70th Avenue, and as a result, in either case, it is not commercially reasonable or feasible for Lessee, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iii) any portion of the Shopping Center shall be so taken that materially interferes with parking, visibility or access to the Premises and as a result of such taking it is commercially unreasonable or unfeasible for Lessee, in its sole but reasonable judgment, to continue its business in the Premises; or (iv) more than twenty-five (25%) percent of the building areas in the Shopping Center (other than the Premises) are taken; then, within sixty (60) days of any such event, Lessee shall have the right to

terminate this Lease by giving sixty (60) days' written notice to Lessor, in which event this Lease shall so terminate without further liability on the part of either Lessor or Lessee, except for an adjustment between the parties for the Rent payable by Lessee hereunder. Subsequent to any partial taking of the Premises, the Rent shall be justly reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Lessee's sole judgment, be utilized for its normal conduct of business. Should Lessee not so terminate this Lease after any partial taking, then Rent and Additional Rent shall be reduced for the remainder of the Lease Term thereafter in proportion to the area of the Premises taken, and Lessor shall promptly repair and restore the Premises and the Common Areas as nearly as possible to their prior condition and, promptly thereafter, Lessee shall fully fixture and stock and initially reopen all of Premises for business. Notwithstanding the provisions of this paragraph, Lessee shall not be entitled to terminate this Lease but shall be entitled to a full abatement of Rent in the event a taking is for a period of less than thirty (30) days.

(c) Notwithstanding (b) above, if so many of the parking spaces within the Shopping Center are so taken such that there are less than four and one-quarter (4.25) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, then Lessee, in either such case, shall have the right to terminate this Lease in the same manner and with the same effect as set forth in (b) above unless Lessor, within a reasonable period of time after the taking provides additional parking adjacent to or as an addition to the parking garage which satisfies the said minimum ratio and is reasonably satisfactory to Lessee. Any dispute between the parties relating to this paragraph (c) shall be submitted to and determined by arbitration pursuant to Article 61 below.

(d)ᐟ Lessee shall be entitled to claim an award for the unamortized balance of Lessee's cost of any leasehold improvements made by it to the Premises and for the value of its leasehold interest, provided same are separately awarded and do not diminish Lessor's award for the value of its leasehold interest in and its improvements to the Shopping Center. In addition, Lessee shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses.

(e) Any dispute between the parties with respect to this Article 21 shall be determined by arbitration in accordance with the provisions of this Lease other than the awards payable under Article 21.(d), which shall be adjudicated by the court having jurisdiction over the condemnation proceedings.

## 22. INSURANCE.

(a) (i) <u>Lessee's Insurance</u>. Lessee shall obtain and keep in force at Lessee's expense during the Lease Term, (A) commercial general liability insurance with a combined single limit of not less than One Million ($1,000,000.00) Dollars for each occurrence, (B) standard "all risk" insurance written at replacement cost value, covering all of Lessee's personal property in the Premises (including, without limitation, decorations, inventory, trade fixtures, floor coverings, furniture and any other property removable by Lessee under the provisions of this Lease), and (C) worker's compensation or similar insurance as required by law. The insurance required of Lessee under this paragraph (i) or elsewhere in this Lease shall be issued by an insurance company or companies authorized to do business in the State of Florida and acceptable to the Ground Lessor pursuant to the provisions of the Ground Lease. A certificate evidencing such coverage and copies of the policies shall be delivered to Lessor, Ground Lessor and any mortgagees of either upon request. The Lessor, Ground Lessor and Lessor's mortgage shall be named as an additional insureds on the Lessee's liability insurance policy provided that Lessor, for such purpose, gives Lessee notice of the names and addresses of Ground Lessor and Lessor's mortgagee.

(ii) Lessee shall require that its insurers endeavor to provide thirty (30) days [ten (10) days in the event of non-payment of premiums] notice to Lessor, Ground Lessor and any mortgagees of either before cancellation, modification or non-renewal.

(iii) Lessee may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any affiliate of Lessee owns or leases.

(iv) The property insurance required to be maintained by Lessee pursuant to (i) above shall not have deductibles exceeding One Hundred Thousand ($100,000.00) Dollars without Lessor's prior consent.

(b) (i) <u>Lessor's Insurance</u>. On or before the Delivery of Possession, Lessor shall procure and shall maintain in full force and effect thereafter during the Lease Term, (A) commercial general liability insurance insuring Lessor, covering the Common Areas, with a limit of liability of not less than Five Million ($5,000,000.00) Dollars combined single limit for personal injury and property damage liability, and (B) standard "all risk" insurance [with endorsements covering flood, windstorm and earth movement (including sink holes)] on a replacement cost basis (or, in the case of flood insurance, for the maximum amount then available but not more than the replacement cost) covering all of the insurable portions of the buildings (including the Premises) and improvements thereto in the Shopping Center in an amount equal in value to the full replacement value of said buildings and

improvements. Lessee shall be named as an additional insured on Lessor's liability insurance policy.

(ii) Lessor shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties. Upon request, Lessor shall provide Lessee with a certificate or other evidence of the insurance described in (i) above.

(iii) Lessor shall provide Lessee with a certificate or other evidence of the insurance described in (i) above, and shall require that its insurers endeavor to provide thirty (30) days [ten (10) days in the event of non-payment of premiums] notice to Lessee before cancellation, modification or non-renewal.

(iv) Lessor may carry higher limits of coverage and may also carry any other insurance required to be carried by it under the Ground Lease or customarily required for similar properties in the vicinity of the Shopping Center, including rent loss insurance. Lessee shall pay its proportionate share of Lessor's cost of all such insurance, which shall be included in Lessor's Operating Costs and shall be calculated and paid in the manner described in Article 37 below. Within thirty (30) days of receipt by Lessee of a billing invoice, Lessee shall reimburse Lessor for its proportionate share of any prepaid insurance in effect on the Commencement Date.

(v) The property insurance required to be maintained by Lessor pursuant to Section 22.(b)(i)(B) above may have a deductible not exceeding Two Hundred Thousand ($200,000.00) Dollars with respect to flood, windstorm and other required coverages, but only if Lessor, after using its best efforts, is unable to obtain such coverages at a reasonable cost without such a deductible.

## 23. SUBORDINATION OF LEASE.

(a) At the option of Lessor, this Lease shall be superior or subordinate to the lien of any mortgage or deed of trust (collectively "mortgage") upon the Premises or any property of which the Premises form a part; provided that such subordination is made upon the condition that (i) in the event of foreclosure or other action taken under the mortgage, this Lease and the rights of Lessee hereunder shall not be disturbed but shall continue in full force and effect so long as Lessee shall not have committed an Event of Default hereunder and attorns to such mortgagee, (ii) such mortgage shall permit insurance proceeds to be used for any restoration and repair required by the provisions of this Lease as set forth in Article 19, (iii) Lessee shall not be named as a party in any foreclosure or other proceedings with respect to the mortgage unless otherwise required by law, and (iv) the holder of the mortgage shall execute with Lessee a non-disturbance and attornment agreement which shall incorporate (i) through (iii). The form of non-disturbance and attornment agreement shall be

_Bed, Bath + Beyond_

reasonably acceptable to Lessee and Lessee agrees to be a party to such non-disturbance and attornment agreement. Lessee approves the form of non-disturbance and attornment agreement attached hereto as __Exhibit I__ and agrees to execute such agreement in substantially the same form thereof. The word "mortgage," as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof.

(b) Lessee acknowledges being advised that purchase money financing presently encumbers the Shopping Center, which will be satisfied in conjunction with the commencement of construction of the initial improvements on the Shopping Center. Accordingly, a non-disturbance and attornment agreement pursuant to (a) above from the holder of such purchase money financing shall not be required prior to the Delivery of Possession. Lessor represents to Lessee that there is no other financing presently encumbering the Shopping Center.

## 24. TRANSFER OF INTEREST; ASSIGNMENT AND SUBLETTING.

(a) Lessor may at any time transfer its interest in this Lease and underlying leasehold, but no transfer or sale of Lessor's interest hereunder shall be binding upon Lessee until Lessee has received a true, correct and complete copy of the original instrument assigning Lessor's interest in this Lease or a certified and conformed copy of any deed or assignment conveying Lessor's interest in the Premises. Any such instrument shall evidence the fact that the assignee or transferee thereunder has assumed all of Lessor's obligations under this Lease and acquired sufficient title to the Premises to enable it to perform such obligations.

(b) Without transferring its interest in the Shopping Center, Lessor may assign its interest in this Lease or the income derived therefrom and, in the event Lessor furnishes Lessee notice of any such assignment, Lessee agrees to abide by Lessor's instructions contained in such assignment, including paying the party designated therein in accordance with the terms thereof. Nothing contained in this Lease shall be deemed a limitation on Lessor's right to trans-fer, assign or encumber its interest this Lease or the Shopping Center.

(c) Lessee shall have the right at any time to assign this Lease or sublet all or any part of the Premises, provided Lessee and Guarantor (as hereinafter defined) shall remain liable for the full performance of all terms, covenants and conditions of this Lease and, further provided, that any assignee shall agree to be bound by all the terms and provisions hereof. Lessee shall also have the right from time to time, without the consent of Lessor, to concession or license a portion or portions of the Premises, but not the whole of the Premises. No such licensing or concessioning shall release Lessee from any of its obligations hereunder.

## 25. REAL ESTATE TAXES.

(a) Lessee shall pay its proportionate share of all real estate taxes and all installments of assessment (collectively, the "Taxes") payable with respect to the Premises and the Shopping Center and assessed for the period during the Lease Term. Such payment shall be proportionately adjusted during the first and the last Lease Year of the Lease Term. Lessee's proportionate share shall be equal to a fraction, the numerator of which is the Floor Area of the Premises and the denominator of which is the Floor Area of all leasable space in all buildings of the Shopping Center (and any other buildings included within the tax parcel). Such payment shall be made monthly, in advance at the same time as payment of Fixed Rent are required hereunder, so that Lessor will have sufficient funds to pay Taxes at least thirty (30) days before they are payable with maximum discount, based on the amount of Taxes payable during the preceding year (except during the first Lease Year, during which the amount shall be as reasonably determined by Lessor) and Lessor shall annually reconcile the actual amount of Taxes with the estimated payments paid [such annual reconciliation shall be made within sixty (60) days after the current Lease Year's tax figures become available, i.e., on a time frame different from the time frame for reconciling Landlord's Operating Costs], and the parties shall pay any excess or deficiency, all in the same manner as set forth in Article 37 below. Lessor shall furnish Lessee with proof of payment of Taxes within thirty (30) days after written request therefor.

(b) Notwithstanding anything to the contrary contained herein, the definition of Taxes shall not include, and Lessee shall have no obligation to pay, any special assessments levied, pending or assessed prior to the Commencement Date or which relate to public improvements performed or to which Lessor is obligated prior to the Commencement Date. Lessor shall have the exclusive right to contest or seek a reduction in Taxes. In the event occupants of the Shopping Center whose premises exceed an aggregate of 50,000 square feet request Lessor to contest or seek a reduction in Taxes, Lessor agrees to do so but, otherwise, the decision shall be made by Lessor in its reasonable discretion. In the event of any action to abate or reduce Taxes, any rebates, refunds or abatements of Taxes, less reasonable out-of-pocket costs paid to independent third parties to obtain the same, shall be refunded to Lessee on a pro-rata basis to the extent previously paid by Lessee within thirty (30) days of receipt by or credit to Lessor.

(c) Lessee shall at all times be solely responsible for and shall pay before delinquency all municipal, county, state or federal taxes assessed or levied specifically and solely against its leasehold interest hereunder or any personal property of any kind owned, installed or used by Lessee.

(d) If at any time during the Lease Term, a tax or excise on rents or other tax, however described, is levied or assessed against

Lessor on account of or measured by, in whole or in part, the Fixed Rent expressly reserved hereunder (excluding any income, excise, corporate franchise, corporate, estate, inheritance, succession, gift, capital stock, corporate loan, corporate bonus, transfer or profits tax of Lessor) as a substitute, in whole or in part, for Taxes assessed or imposed on buildings and Taxes, if any, assessed or imposed on the land comprising the Shopping Center to the extent that Lessor is legally required to pay Taxes on such land pursuant to the Ground Lease, such tax or excise on rents or other tax shall be included as a part of the Taxes covered hereby but only to the extent of the amount thereof which is lawfully assessed or imposed as a direct result of Lessor's ownership of this Lease or of the rentals accruing under this Lease. If any real property tax or assessment levied against the land, buildings or improvements covered hereby or the rents reserved therefrom shall be evidenced by improvement or other bonds or in other form which may be paid in installments, Lessor shall, if permitted, elect such installment payment plan and only the amount paid in any Lease Year shall be included in Taxes for that Lease Year for purposes of this Article 25.

(e) Taxes, as used herein, shall not include, any: (i) any fine, penalty, cost or interest for any tax or assessment, or part thereof, which Lessor failed to timely pay (except if same are imposed by reason of Lessee's default hereunder); (ii) any assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; and (iii) any fees, permits or other imposition which relate to any approvals or construction of additions to the Shopping Center other than taxes and assessments on completed buildings and improvements whose leasable Floor Area is then included in the denominator referred to in (a) above.

## 26. NOTICES.

Any notice or consent required to be given by or on behalf of either party to the other shall be in writing and given by mailing such notice or consent by registered or certified mail, return receipt requested, or by overnight courier addressed to the other party as indicated in Article 1.(f) hereof, or at such other address as may be specified from time to time in writing by either party. Any notice or consent given hereunder by either party shall be deemed effective when mailed or dispatched as aforesaid, but the time period in which to respond to any notice or consent shall commence to run on the date on which such notice or consent is actually received by the addressee. Refusal to accept delivery or inability to deliver due to an unnoticed change of address shall be deemed receipt thereof.

## 27. SEVERABILITY OF PROVISIONS.

In any term or provision of this Lease, or the application thereof to any person or circumstance, shall to any extent be determined to

be invalid or unenforceable by a court of competent jurisdiction, then the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

## 28. MEMORANDUM OF LEASE.

Neither party may record this Lease. However, upon the request of either party hereto, the other party shall join in the execution of a Memorandum or so-called "Short Form" of this Lease for the purposes of recordation. Said Memorandum or Short Form of this Lease shall describe the parties, the Premises, the Lease Term and any special provisions hereof, and shall incorporate this Lease by reference. Any fees required to be paid in order to record such Memorandum or Short Form of this Lease shall be paid by the party which initiated its preparation. No such Memorandum or Short Form shall be recorded prior to the time the conditions set forth in Article 45 are satisfied or waived by the applicable party or parties. Upon termination of this Lease, Lessee shall, within ten (10) days of request, execute a termination of lease in recordable form.

## 29. PARKING REQUIREMENTS.

(a) The locations and size of the buildings (including the parking garage) in the Shopping Center, and the layout of the parking and service areas and access and service roads are designated on Exhibit B. All those portions of the Shopping Center not designated as buildings, future building or service areas on Exhibit B, are herein referred to as Common Area, for the use of all tenants, their customers, business invitees and employees. No improvements, including kiosks, shall be constructed in the parking garage except as may be shown on Exhibit B. Lessor shall not (i) except as may be otherwise expressly provided herein, reduce the number, location or lay-out of parking spaces, or (ii) change the entrances or exits to and from the Shopping Center. Lessor shall, however, have the right to (A) construct additional improvements above the buildings (including the parking garage) shown on Exhibit B hereto, provided that it provides and maintains at least four and one-half (4.5) parking spaces for every one thousand (1,000) square feet of additional leasable area constructed by Lessor and further provided that such construction shall not materially interfere with the normal operation of Lessee's business in the Premises or impair access to the Premises. Any additional building areas constructed by Lessor for office purposes shall not only have their own parking areas with spaces as aforesaid, but shall be designed, constructed and operated in a manner which will, in effect discourage the use of the parking provided for Lessee and the other retail lessees from being used by the office lessees.

(b) Lessor further agrees and warrants that the Shopping Center will contain at least four and one-half (4.5) parking spaces for

every one thousand (1,000) square feet of leasable space in the Shopping Center. If Lessor fails to maintain such minimum parking area provided herein [except in the case of a taking of parking spaces by eminent domain], Lessee shall have the remedies of specific performance and/or injunctive relief. Such rights are in addition to all other remedies available to it in law or at equity.

(c) The parking areas of the Shopping Center shall be lighted by Lessor on each day that business shall be conducted by Lessee in the Shopping Center from dusk until one (1) hour after the later of the closing of the Shopping Center or the closing of Lessee's business in the Premises.

(d) Lessee shall use reasonable efforts to have its employees park their motor vehicles in the area(s) reasonably designated by Lessor in the parking garage and Lessor shall take all reasonable measures to have other lessees of the Shopping Center do the same.

(e) In the event any construction is undertaken in the parking areas of the Shopping Center during such time as the Premises shall be open for business to the public, all such construction shall be conducted in a manner which will not materially interfere with the normal operations of Lessee's business in the Premises, but to the extent that any repairs or replacements to the parking garage are required Lessor will use its best efforts to minimize inconvenience and not to materially interfere with the normal operations of Lessee's business in the Premises.

## 30. ENTIRE AGREEMENT.

This instrument shall merge all undertakings between the parties hereto with respect to the Premises and upon execution by both parties shall constitute the entire lease agreement, unless thereafter modified by both parties in writing. Upon execution of this Lease by Lessor, Lessee shall have ten (10) days to accept the terms hereof and to execute this Lease, during which time Lessors execution shall constitute an irrevocable offer.

## 31. RELATIONSHIP OF THE PARTIES.

Nothing contained in this Lease shall be deemed or construed by the parties hereto or by a third party to create the relationship of principal and agent or of partnership or of joint venture of any association whatsoever between Lessor and Lessee, it being expressly understood and agreed that neither the method or computation of rent nor any other provision contained herein, nor any act or acts of the parties hereto, shall be deemed to create any relationship between Lessor and Lessee other than the relationship of landlord and tenant.

## 32. RIGHT OF PROTEST.

Lessee may contest any mechanics' or other liens imposed against the Premises, provided Lessee believes in good faith that such liens are not proper, and further provided that Lessee complies with the obligations of Article 13 respecting same.

## 33. HEADINGS.

The headings of the Articles of this Lease are for convenience of reference only and do not form a part hereof, and they shall not be interpreted or construed to modify, limit, or amplify the intent of such Articles.

## 34. PARTIES IN INTEREST.

Subject to the provisions of this Lease relating to assignment, subleasing and other transfers of the parties' interests, this Lease shall inure to the benefit of and be binding upon the successors in interest and assigns of the parties hereto.

## 35. COUNTERPARTS.

This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

## 36. NUMBER AND GENDER.

Words in the singular, plural, masculine, feminine and neuter as used herein shall have the meanings and be construed as required by the context in which they are used herein.

## 37. COMMON AREAS.

(a)  Lessor will maintain in good order, condition and repair all parking areas, streets, sidewalks, canopies, roadways, shelters, ramps, landscaped areas, surface drainage facilities, and elevators and escalators, if any, used solely to connect a portion of the Common Area to another portion thereof (excluding any elevators or escalators which may be used exclusively for the Premises or for any other leased space), and all other areas used in common by lessees of the Shopping Center (the "Common Area"), and Lessor hereby grants to Lessee, its agents, employees and invitees, the nonexclusive right to use the Common Area in common with other lessees of the Shopping Center and with any other persons lawfully permitted to use the same in accordance with the EOA (as defined in Article 64 below) and the Ground Lease.  In each Lease Year Lessee shall pay Lessor, as Additional Rent, its proportionate share of Lessor's Operating Costs (as hereinafter defined).  Lessee's proportionate share of Lessor's Operating Costs will be computed by multiplying Lessor's Operating Costs by a fraction, the numerator of which shall be the Floor Area of the Premises and the

denominator of which shall be the total Floor Area of all leasable square feet of all buildings in the Shopping Center (excluding any (i) garden center areas, outside sales areas and outdoor dining areas not exclusively used by any one lessee, (ii) Common Area, and (iii) areas used for kiosks).

(b) As used herein, the term "Lessor's Operating Costs" shall mean actual expenses reasonably incurred and paid by Lessor for operating the Shopping Center and maintaining, repairing and replacing the Common Area and other portions of the Shopping Center not demised or available for demise for the exclusive use of lessees, including the buildings containing the Premises and space demised to other occupants of the Shopping Center and the components thereof, but excluding maintenance, repairs and replacements to (i) roof, (ii) structure, and (iii) any portions thereof demised or available for demise to lessees and the components which are the maintenance obligation of lessees pursuant to their leases, in the manner required of Lessor hereunder including, without limitation, (A) operating, managing, maintaining, repairing, replacing, lighting, signing, cleaning, painting, striping, policing and providing security (at Lessor's sole discretion) and parking control personnel for the Common Area (including cost of uniforms, equipment, salaries, payroll taxes, worker's compensation insurance and fringe benefits); (B) security systems and services (at Lessor's sole discretion); (C) utilities for the Common Area; (D) gardening and landscaping; (E) exterior maintenance; (F) repairs of all kinds to the Common Area; (G) patching, black topping, lining and painting of the parking areas; (H) at Lessor's option, garbage and refuse disposal (but only if the service and cost is comparable to that of third party contractors); (I) general resurfacing of parking areas and driveways; (J) maintenance of all water retention and discharging piping, culverts, fountains, pumps, lift stations, catch basins and similar areas and facilities, whether or not on or off the Shopping Center; (K) sign maintenance; (L) personnel (including payroll taxes, worker's compensation insurance and fringe benefits) to implement such services and to direct parking but only to the extent such personnel actually perform services on-site and do not include any management or administrative personnel; (M) painting the exterior of the buildings in the Shopping Center including the parking garage; and (N) administrative and management fees and overhead collectively equal to ten (10%) percent of Lessor's Operating Costs excluding Taxes, insurance premiums and utilities. The following shall be excluded from Lessor's Operating Costs: depreciation; principal; interest and other charges on debt; the cost of capital expenditures and/or improvements (as defined by generally accepted accounting principles), but the amortized cost thereof over their useful life shall be included; costs to remove hazardous or toxic substances except as otherwise provided herein; all costs, including, without limitation, attorneys' fees, real estate commissions and construction costs associated with the leasing of building areas in the Shopping Center; costs of constructing the buildings and improvements (including the parking

garage) in the Shopping Center and any expansions thereof; costs incurred to correct any deficiencies in Lessor's construction of the Common Areas; and any costs incurred in connection with improvements to any lessee's premises (including the Premises).

(c) The portion of Lessor's Operating Costs to be paid by Lessee hereunder shall be due and payable monthly in advance on the first day of each month, together with Fixed Rent, in an amount determined based on a reasonable budget to be prepared by Lessor and delivered to Lessee at least annually, with an annual reconciliation between actual expenses and estimated payments to be furnished to Lessee within sixty (60) days after the end of each calendar year. Lessor shall refund to Lessee any excess payment at the time it furnishes the annual reconciliation and Lessee shall pay to Lessor any additional sums owed within thirty (30) days of receipt of the annual reconciliation. Lessor shall make available to Lessee for Lessee's inspection, upon Lessee's request, Lessor's records relating to Lessor's Operating Costs. Such records shall be made available at Lessor's office during normal business hours and Lessor need only make such records available one time per year and need only retain records pertaining to a given year for a period of two years after furnishing the annual reconciliation for such year to Lessee.

(d) The Common Areas shall be under the exclusive control of Lessor and Lessor may, from time to time, promulgate reasonable and non-discriminatory rules and regulations pertaining to the use and operation of such common areas (including those pertaining to sanitation, handling of trash and debris, loading and unloading of trucks and other vehicles, and safety and security against fire, theft, vandalism, personal injury and other hazards), which rules and regulations Lessee agrees to abide by and not violate provided that they are not arbitrary and are enforced uniformly against all tenants of the Shopping Center. Lessor shall have the sole right to install public telephones in the Common Area and all income derived therefrom shall belong to Lessor. Lessee shall not solicit business or distribute handbills or similar matter in the Common Area. Except for its antenna, satellite dish and signs, Lessee shall not install anything on the roof or exterior of the buildings comprising a part of the Shopping Center or cause any protrusions to be made in the roof or between floors of the building housing the Premises.

(e) Although it is Lessor's intention to initially open and operate the parking garage in the Shopping Center without levying any charge for the use thereof, Lessor reserves the right at any time thereafter to implement a system for controlled access to the parking structure, which system may entail gated entry. Any such system shall be implemented in a manner such that Lessee's employees, customers and agents shall be entitled to access the Shopping Center and park in the parking structure within the Shopping Center at no cost to them or to Lessee if the appropriate validation system provided by Lessor is utilized. Lessor may limit

employee parking to specified areas of the parking structure, may impose time limits for parking validation to discourage long-term parking in the parking structure, and may limit access to the parking structure between midnight and 9:30 A.M. to those who can establish a reasonable Shopping Center purpose so as to discourage mass transit patrons from utilizing the parking structure for long-term parking. Any controlled access system established by Lessor shall (i) be reasonable, (ii) apply uniformly to all lessees (including Lessee) in the Shopping Center without discrimination, (iii) not materially interfere with the normal conduct of Lessee's business in the Premises, and (iv) be designed and operated in a manner which is customary in shopping centers in the Miami, Florida metropolitan area which are similar to the Shopping Center.

(f) Lessor may, at any time and from time to time, add adjacent lands owned or controlled by it to the Shopping Center, provided that all provisions of this Lease relating to the Shopping Center shall apply thereto, including without limitation the minimum parking ratios set forth in (a) and (b) above and the Lessee's exclusive use restriction set forth in Article 38.(c) below, and further provided that if any Taxes (as hereinabove defined) are lawfully imposed on such land, Lessee shall not be responsible for any portion thereof unless and only to the extent that such land is actually being used as part of the Shopping Center for parking, building(s) and other improvements and the leasable Floor Area of such buildings and improvements is then included in the denominator referred to in (a) above.

(g) Lessee acknowledges that (i) the Premises do not include the areas below the finished floor and the exterior surface areas of the building wherein the Premises are situate, (ii) Lessor shall have an easement through the three (3) foot area below the slab of the ceiling in the Premises, and (iii) Lessor shall have vertical easements for chases along columns and demising walls in the Premises, all of which areas and easements may be utilized by Lessor for such purposes as it may reasonably require in connection with the construction, operation, maintenance, repair and replacement of facilities serving other portions of the building wherein the Premises are situate; provided, however, that (A) such use shall not adversely affect utility or other services to the Premises that run through such areas, (B) the preliminary and final plans and specifications to be prepaid by Lessor pursuant to Article 6.(d) above shall show the location of all its required chases, which locations shall not be changed after Lessee's approval of the final plans and specifications without Lessee's prior approval; (C) the chases shall not individually exceed twelve (12) inches by twenty-four (24) inches, (D) such uses do not interfere with the signs which Lessee is permitted to erect on or in the Premises pursuant to Section 12 above, (E) such uses do not materially interfere with the Lessee's rights hereunder or the normal operations of Lessee's business in the Premises; and provided further, that on and after the Delivery of Possession, Lessor (F) shall not perform any work respecting such areas and

easements, except for emergencies, during the months of November and December, (G) shall promptly repair any damage to the Premises caused by its work or installations, (H) shall not store materials in the Premises, and (I) shall indemnify, defend and hold Lessee harmless with respect to any liabilities, damages, suits, actions or other proceedings relating to Lessor's use of such areas and easements.

(h) It is acknowledged by Lessor that Lessee provides shopping carts for the use of its customers and that carts are often abandoned by such customers in the Common Areas. Lessee will use reasonable efforts to periodically and diligently remove its carts from the Common Areas, Lessee shall not be liable to Lessor for any claims, damages or causes of action for damages brought on account of injury to any person or persons or property, or loss of life, arising in any manner whatsoever from the use or abandonment of shopping carts in the Common Areas, it being the intention of the parties that the liability insurance to be procured and maintained by Lessor pursuant to Article 22.(b)(i) above will protect both Lessor and Lessee with respect to any such claims, damages or causes of action.

## 38. USE.

(a) Lessor warrants, covenants and agrees that it shall operate the Shopping Center as a first-class retail shopping center, and based thereon, Lessee warrants, covenants and agrees that it will operate the Premises as a first-class retail establishment (but this shall not imply an obligation of continuous operation).

(b) Lessee will use the Premises solely for retail purposes. Neither the Premises nor any other portion of the Shopping Center shall be leased, occupied or used by Lessee or Lessor for any of the following purposes: (i) amusement or game room or similar establishment, including without limitation the use of pinball machines, electronic games or similar apparatus; (ii) sale of tires, batteries or automobile accessories; (iii) paint shop or garage (whether for body or mechanical repair), or for the dispensing of petroleum products; (iv) carwash or similar facility; (v) funeral home; (vi) laundromat or dry cleaning operation; (vii) bingo, games of chance, billiard room or pool parlor; (viii) bowling alley; (ix) car, boat, truck or motorcycle sales or repair; (x) crematoriums; (xi) self-service storage facility; (xii) skating rink; (xiii) blaster tag or other game arena; (xiv) nightclub or discotheque, with or without the service of alcoholic beverages (xv) head shop, massage parlor, adult book store or any other store involved in the sale, distribution, lease or exhibition of pornographic materials, or any other business restricted by law to "adults" only; or (xvi) conducting an auction, fire sale or liquidation sale. Lessor shall have the right to utilize future expansion areas of the Shopping Center for uses described in (vii), (viii) and (xiv), provided that Lessor shall provide direct access for such uses to the existing parking in the adjacent Dade County

parking garage and further provided that Lessor will use best efforts to discourage parking for those uses in the parking available for the Premises. The Premises shall be operated in a manner so that no sound or odor originating from the Premises shall be heard or smelled outside of the Premises.

(c) Lessee shall initially use the Premises for the sale of a variety of linens and domestics (including but not limited to sheets, bedspreads, comforters, pillows and pillow covers); bathroom items (including but not limited to towels, shower curtains, toilet seats and other bathroom accessories); home furnishings; housewares (including but not limited to utensils, cookware, bakeware, dishes and china, glassware, kitchen and bathroom appliances); wall and floor coverings; furniture; window treatments; decorative accessories; closet and storage items; luggage; books; party supplies; shelving systems; juvenile merchandise (including but not limited to toys, car seats and safety-proofing items); food and beverage services; and any and all other items sold or services provided from time to time in any Bed Bath & Beyond store, (all such items are herein collectively called the "Permitted Items"), and thereafter for any lawful use which (A) does not conflict with the principal use of any other lessee then occupying and operating (except during an Excused Closing, as defined below) its business in at least eighteen thousand (18,000) square feet of Floor Area in the Shopping Center and if so then Lessee may engage in such use in the Premises only on an incidental basis, and (B) will not increase the parking requirement allocable to the Premises. So long as the Demised Premises are used for the said initial use and during such periods as Lessee is not operating its business in the Premises due to (i) Force Majeure, (ii) fire or other casualty, (iii) a taking by eminent domain, or (iv) reasonable periods required by Lessee for alterations or improvements to the Premises [each of which (i) through (iv) is hereinafter referred to as an "Excused Closing"], Lessor covenants and agrees that it will not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied for the sale of bed, bath, linens and houseware items (collectively, the "BBB Items"). Nothing contained herein shall be construed to prohibit Lessor from leasing any portion of the Shopping Center to any of the following retail users, even if the same sell similar or the same merchandise as Lessee: (v) department store(s); or (vi) general discounter(s) (e.g. Target, Walmart, Kmart); or (vii) catalog showrooms (e.g. Luria's, Service Merchandise); or (viii) transit convenience retail store(s) of one thousand five hundred (1,500) square feet or less any or all of whom may sell the BBB Items on an incidental basis; or (ix) electronic store (e.g., Best Buy); or (x) sporting goods store (e.g., Sports Authority).

(d) Upon a breach by Lessor of its covenants and agreement set forth in (c) above, Lessee shall have all remedies given to it at law and in equity, including the right to injunctive relief and damages. If any person or entity other than Lessor shall violate Lessee's aforesaid exclusive use Lessor shall promptly commence

legal proceedings and vigorously prosecute the same, to enjoin and prohibit any such violation. If Lessor fails to commence such proceedings, or shall fail thereafter to vigorously prosecute the same, Lessee shall have the right to conduct and prosecute such legal proceedings in its own name, and at the expense of Lessor if a court determines there was a breach of said covenant.

(e) Notwithstanding the exclusive uses set forth in the other Leases, Lessee shall have (i) the absolute right to sell apparel and apparel accessories, and (ii) the right to sell any of the other items included within such exclusives on an incidental basis.

## 39. **HAZARDOUS SUBSTANCES.**

(a) Lessor hereby warrants and represents that: (i) to Lessor's knowledge, the Premises has never been used by current or previous owners or occupants to generate, transport, treat, store, manufacture, emit, dispose of, refine or handle any dangerous, toxic or hazardous pollutants, chemicals, wastes or substances in violation of applicable law, (ii) to Lessor's knowledge, the Premises does not contain any underground storage tanks or any asbestos, polychlorinated biphenyls (PCBs) or other toxic materials, pollutants, hazardous substances or hazardous wastes; and (iii) Lessor has not received a summons, citation, directive, letter or other written communication, from any state agency or the U.S. Government concerning the Premises or any intentional or unintentional action or omission on Lessor's part as a result of the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of toxic or hazardous pollutants, chemicals, wastes or substances into waters or onto lands of the state in which the Premises is located, or into water outside the jurisdiction of the state in which the Premises is located, and to Lessor's knowledge the Premises is not subject to any "super fund" type liens or claims by governmental regulatory agencies or other third parties arising from the release or threatened release of toxic or hazardous pollutants, chemicals, wastes or substances in, on or about the Premises. Should any representation or warranty contained herein prove to be false, it shall constitute an event of default hereunder and shall entitle Lessee to exercise all remedies available to it hereunder, at law or in equity.

(b) Lessor shall indemnify, defend and hold Lessee harmless from and against any and all loss, cost, liability, damage or expense (including without limitation attorney's fees, investigation and court costs) which Lessee may incur, sustain or suffer or which may be asserted against Lessee by reason of any violation of any representation or warranty made by Lessor in this Article; any liability Lessee may incur for cleanup or response costs, fines or penalties resulting from a release or a threatened release of any materials defined in the foregoing paragraph unless caused by the acts or omissions of Lessee or those claiming under Lessee; and any personal injury, death, property damage or damage to the

environment unless caused by the acts or omissions of Lessee or those claiming under Lessee.

(c) Lessee will not use, generate, place, store, release or otherwise dispose of any hazardous or toxic substances or materials in the Premises or Shopping Center, except in strict accordance with all environmental laws, and it will indemnify, defend and hold Lessor harmless from and against any and all loss, cost, liability, damage and expense (including, without limitation, attorneys' fees, investigation and court costs which Lessor may incur, sustain or suffer or which may be asserted against Lessor by reason of any violation or breach by Lessee of its obligations under this Article; any liability Lessor may incur for cleanup or response costs, fines or penalties resulting from a release or a threatened release of any hazardous or toxic substances or materials by Lessee or anyone claiming under Lessee; and any personal injury, death, property damage or damage to the environment arising under this article as a result of the acts or omissions of Lessee or those claiming under Lessee.

## 40. BROKERAGE.

Each party represents to the other that it has dealt with no brokers in connection with this transaction other than Florida Shopping Center Group, who shall be paid by Lessor pursuant to separate agreement. Each party indemnifies, defends and holds harmless the other from and against all claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees at all tribunal levels) arising from the assertion of any claim for brokerage commissions or finder's fees in respect of this Lease if same arises as a result of the act of the indemnifying party.

## 41. ATTORNEY'S FEES.

In the event Lessee or Lessor defaults in the performance of any of the terms, covenants, agreements or conditions contained in this Lease and the other party places in the hands of an attorney the enforcement of all or any part of this Lease, the defaulting party agrees to pay on demand the other party's reasonable attorneys' fees at all tribunal levels for the services of the attorney, whether suit is actually filed or not.

## 42. RADON.

In accordance with Section 404.056, Florida Statutes, Lessor hereby notifies Lessee as follows: Radon is a naturally occurring radio-active gas that, when it has accumulated in a building in suf-ficient quantities, may present health risks to persons who are exposed to it over time; levels of radon that exceed federal and state guidelines have been found in buildings in Florida; and addi-tional information regarding radon and radon testing may be ob-tained from the applicable county public health unit.

## 43. GOVERNING LAW.

This Lease shall be construed and governed by the laws of the State of Florida.

## 44. ESTOPPEL CERTIFICATE.

Upon request of either party, the other shall, within fifteen (15) days of request, execute and deliver to the requesting party, without charge, a written statement certifying that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended except as specified, certifying that all conditions and agreements under this Lease to be satisfied and performed have been satisfied and performed, except as stated, certifying that the other party is not in default or stating the defaults claimed with specificity, setting forth the date through which rent has been paid and setting forth such other truthful information as may reasonably be requested.

## 45. CONDITIONS PRECEDENT.

The following are conditions precedent to the obligations of the parties specified (and may be waived by such parties in their discretion):

(a) It is a condition precedent to Lessor's and Lessee's obligations under this Lease that platting shall have occurred and all development approvals shall have been obtained so that building permits for construction of the Shopping Center can be obtained and construction commenced without delay on the time frame contemplated by Lessor. If this condition has not been satisfied by June 1, 1995, Lessor or Lessee may terminate this Lease at any time thereafter and prior to satisfaction of this condition. Lessor agrees to use reasonable efforts to attempt to satisfy this condition prior to the date specified above.

(b) It is a condition to Lessee's obligations under this Lease that Lessee and the Ground Lessor shall have entered into a non-disturbance and attornment agreement reasonably acceptable to Lessee. Lessee agrees that the form of non-disturbance and attornment agreement attached hereto as Exhibit H is acceptable to Lessee. Lessee acknowledges being advised that the Ground Lessor is a governmental authority and the content of the non-disturbance and attornment agreement with Ground Lessor, and its reasonableness, shall be viewed in this context. Lessee agrees to be a party to such non-disturbance and attornment agreement. In the event such non-disturbance and attornment agreement is not received from the Ground Lessor by January 31, 1995, Lessee may terminate this Lease at any time within thirty (30) days thereafter (but prior to the receipt of such agreement) by notice to Lessor.

(c) Lessee acknowledges being advised that changes in the configuration of the Premises and the Shopping Center may be

required in order to obtain all governmental approvals and permits required for the construction of the Shopping Center. If any such changes alter the configuration of the Premises, or cause the number of parking spaces or access to the Premises to substantially deviate from that which is shown on Exhibit B, or otherwise increase any of Lessee's obligations or decrease any of Lessee's rights hereunder, Lessee shall have the right, as its sole and exclusive remedy, to terminate this Lease by giving Lessor notice within fifteen (15) days after Lessee's receipt of Lessor's notice of such changes, in which event there shall be no further liability on the part of either party hereto except as set forth in Article 6.(i) above.

(d) It is a condition precedent to Lessor's obligations under this Lease that it shall have arranged construction financing for the Shopping Center, acceptable to it in its sole discretion, by April 1, 1995.

If any of the foregoing conditions are not satisfied or waived by the applicable party or parties, this Lease shall be terminated and of no further force or effect, without liability hereunder on the part of either party, and each party shall be relieved of its obligation hereunder except for items which by their nature are contemplated to survive termination and except for the provisions of Article 6.(i) above.

**46. LESSEE FIXTURES.**

(a) All fixtures, equipment and property of any nature which may be installed or placed in or upon the Premises by Lessee shall remain the property of Lessee. Lessor waives any right it may have in said fixtures, equipment and property. Lessee may assign, lien, encumber, mortgage or create a security interest in or upon its equipment, fixtures or other property in the Premises without the consent of Lessor and may remove said equipment, fixtures and other property at any time during the Term. Upon the request of Lessee, Lessor agrees to provide Lessee, within ten (10) days of such request, a written waiver in form reasonably satisfactory to Lessee evidencing Lessor's waiver of any rights it has or may have in Lessee's fixtures, equipment and other property.

(b) To the extent Lessor may have a lien on or security interest in the fixtures, equipment and personal property of Lessee pursuant to this Lease, by law or otherwise, Lessor hereby waives and agrees not to assert such lien or security interest.

**47. EXCULPATION.** On and after the Delivery of Possession and except as otherwise provided herein, Lessee shall look solely to Lessor's interest in the Shopping Center in connection with any monetary claims pertaining to this Lease, and no deficiency judgment shall be sought or obtained against Lessor or any of its partners in connection therewith. Upon transfer of the Shopping Center, the transferor shall be relieved of all liabilities

thereafter accruing under or in connection with this Lease and Lessee will look solely to the transferee for the performance of the Lessee's obligations thereafter accruing hereunder. The provisions of this Article shall not relieve Lessor of any liability which it may have to Lessee pursuant to Article 6.(c)(vii) above, except for transferee liability.

**48. RECAPTURE.**

If the Premises shall remain closed for business for more than ninety (90) consecutive days, Lessor shall have the right, exercisable at any time while the Premises shall remain closed for business, to terminate this Lease by written notice to Lessee. For purposes of this Article, Lessee shall be deemed to be closed for business in the Premises if any portion of the Premises repeatedly is not open for business between the hours of 10:00 a.m. through 7:00 p.m., Monday through Saturday, and noon through 5:00 p.m. on Sundays, subject nonetheless to Lessee not being deemed closed in the event of an Excused Closing. Such termination shall be effective sixty (60) days after the date Lessor furnishes Lessee notice of such termination; provided, however, that Lessee shall have the right to nullify such termination by giving Lessor notice, within thirty (30) days after receipt of Lessor's notice of termination, that all of the Premises will be reopened within thirty (30) days thereafter and by causing all of the Premises to be so reopened.

**49. INDEMNIFICATION**

Lessor and Lessee agree to indemnify, defend and hold each other harmless from and against any and all claims, damages or causes of action for damages brought on account of injury to any person or persons or property, or loss of life, arising, in the case of Lessor, out of the negligence of Lessor or Lessor's employees, agents or contractors in the use, operation or maintenance of the Shopping Center (including the Common Areas) and, in the case of Lessee, the negligence of Lessee's employees, agents or contractors in the use, operation or maintenance of the Premises, respectively.

**50. SELF INSURANCE, DEDUCTIBLES**

In the event either Lessor or Lessee is a self-insurer or maintains a deductible (as either may be permitted hereunder and which is permitted pursuant to the Ground Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had (i) the required insurance been obtained or (ii) the deductible not been maintained.

## 51. GRAMMATICAL USES AND CONSTRUCTION

In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

## 52. RIGHTS CUMULATIVE

Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by law.

## 53. NON-WAIVER

The failure of Lessor or Lessee to enforce against the other any provision, covenant or condition herein, by reason of either of them committing any breach of or default under this Lease shall not be deemed a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach of default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

## 54. FORCE MAJEURE

Except as may be otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder (except for the payment of a monetary sum to be paid by either party) by reason of strikes, inability to procure materials, failure of power, governmental laws, requirements or regulations, riots, insurrection, war or other reasons not the fault of the party delayed in performing work or doing acts required under the terms of this Lease (all of such reasons or causes are herein collectively called "Force Majeure"), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a

period equivalent to the period of such delay. Any time either party is experiencing delay under this provision, such party will endeavor to give notice to the other party detailing the nature of the delay and giving an estimate as to how long the delay is expected to be but the failure to give such notice shall not abrogate the right to a Force Majeure delay pursuant to this Article.

## 55. CONSENTS

Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and in all matters contained herein, both parties shall have an implied obligation of reasonableness.

## 56. COSTS

Whenever this Lease requires the performance of an act by either party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

## 57. PAYMENT UNDER PROTEST

If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", which payment shall not be regarded as voluntary payment, and there shall survive the right on the part of such party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of such party to pay such sum or any part thereof, such party shall be entitled to recovery from the other party such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

## 58. WORK UNDER PROTEST

If at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest", performance of such work in no event to be regarded as a voluntary performance, and there shall survive the right on the part of such party to institute suit for recovery of the cost of such work. If it shall be adjudged that there was no legal

obligation on the part of such party to perform such work or any part thereof, such party shall be entitled to recover from the other party the cost of such work or the cost of so much thereof as such party was not legally required to perform under the provisions of this Lease.

## 59. **ABATEMENT OF RENT CHARGES**

Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Lessee hereunder shall be abated pursuant to Articles 19 and 21 above, such abatement shall terminate upon the first to occur of: (a) the date on which Lessee shall reopen the Premises to the public for business; or (b) the expiration of the period which is ninety (90) days after Lessor shall have completed such repairs and restoration work as Lessor is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

## 60. **LESSOR'S WARRANTIES AND REPRESENTATIONS**

To induce Lessee to execute this Lease, and in consideration thereof, Lessor warrants and represents to Lessee as follows:

(a) Lessee's use of the Premises for sale of Permitted Items will not violate any exclusive provision granted to another tenant in the Shopping Center;

(b) This Lease does not violate the provisions of any instrument heretofore executed and binding on Lessor, and the execution of this Lease has been duly and validly authorized on behalf of Lessor.

## 61. **ARBITRATION.**

(a) In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Miami, Florida before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.

(b)   Lessor and Lessee shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## 62.   DEFINITION OF HEREUNDER, HEREIN, ETC.

Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section or paragraph hereof.

## 63.   LIMITATION OF LESSEE'S LIABILITY.

Lessor acknowledges that Lessee is now and will probably remain a so-called "shell corporation" and has not now and will not at any time in the future have any assets or retain any earnings, and that the operations of Lessee's business may be conducted by BED BATH & BEYOND INC. (herein called the "Guarantor"), or one of its subsidiaries, which may also own all or a part of the fixtures, equipment and inventory in the Premises.  In no event shall Lessor seek to pierce the corporate veil of Lessee in an attempt to hold Guarantor liable based upon the provisions of the previous sentence of this Article, and Lessor agrees that it and its successors and assigns shall look solely to the assets, if any, of Lessee and its successors and assigns, and to the assets of Guarantor pursuant to its Guaranty of this Lease and its subsidiary and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Lessee, Guarantor or any of their respective affiliates, subsidiaries or related companies, or of their respective successors and assigns.

## 64.   EASEMENT AND OPERATING AGREEMENT.

(a)   Lessee acknowledges that it has received and reviewed an Easement and Operating Agreement dated April 19, 1994, by and between Green Dadeland Station, Inc. and Lessor (the "EOA").  The lien of the EOA is set forth as a Permitted Encumbrance in Exhibit C hereto.

(b)   Lessor warrants and represents that the EOA (i) is in full force and effect, (ii) has not been amended, (iii) does not conflict with any material provision of this Lease, and (iv) will not be amended or modified by Lessor in any manner which will

materially adversely affect the rights and obligations of Lessee hereunder without the prior written consent of Lessee.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date first above written.

Two Witness for each:

LESSOR:

DADELAND STATION ASSOCIATES, LTD., a Florida limited partnership by DADELAND DEPOT, INC., a Florida corporation, its general partner

By: _____
JEFFREY L. BERKOWITZ, President

LESSEE:

BED BATH & BEYOND OF DADELAND STATION INC.

By: _____
WARREN EISENBERG, PRESIDENT

GLORIA ESTEVEZ

## EXHIBIT A

## Legal Description of Shopping Center

See Attached

# EXHIBIT B

## Site Plan

### (Premies)



FLOOR PLAN-RETAIL LEVEL 3
scale 1:60'

BED BATH & BEYOND
60,000 S.F. ±

THE SPORTS AUTHORITY
46,620 S.F. ±

SERVICE TERRACE

# EXHIBIT B

## Site Plan

### (Shopping Center)



## EXHIBIT C

### Permitted Encumbrances

1.  Covenants, conditions and restrictions, including easements and lien rights, set forth in Easement and Operating Agreement recorded in Official Records Book 16454, Page 2505, of the Public Records of Dade County, Florida.

2.  Covenants, conditions, restrictions, easements, terms and provisions set forth in the Lease with Dade County, a Memorandum of which is recorded in Official Records Book 16454, Page 2465, as supplemented by Assignment recorded in Official Records Book 16454, Page 2477, both of the Public Records of Dade County, Florida, including the easement rights set forth in Exhibit "C" attached to said Memorandum of Lease.

## EXHIBIT D

## SUPPLEMENTAL AGREEMENT

THIS AGREEMENT, made as of this ___ day of _____ 199_, by and between DADELAND STATION ASSOCIATES, LTD., (hereinafter called "Landlord") and BED BATH & BEYOND OF DADELAND STATION INC. (hereinafter called "Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord is the developer of a certain Shopping Center situated in Miami, Florida; and

WHEREAS, by that certain lease dated October ___, 1994 (herein called the "Lease"), Landlord leased a portion (the "Premises") of the Shopping Center to Tenant; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Article 4 of the Lease Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The Commencement Date (as such term is defined in the Lease) was _____, 199_.

2. The term of the Lease shall expire on January 31, 201_, unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the first Renewal Period (as such term is defined in the Lease) shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4. The date of commencement of the second Renewal Period (as such term is defined in the Lease) shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

5. The date of commencement of the third Renewal Period (as such term is defined in the Lease) shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if

Tenant does so, the term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6. The date of commencement of the fourth Renewal Period (as such term is defined in the Lease) shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7. The agreed Floor Area (as defined in the Lease) of the Premises, as of the Commencement Date, is _____.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the date and year first above written.

DADELAND STATION ASSOCIATES, LTD.
By: Dadeland Depot, Inc.

By: _____
    Name: Jeffrey L. Berkowitz
    Title: President

BED BATH & BEYOND OF DADELAND STATION INC.

By: _____
Name:    Warren Eisenberg
Title:    President



Corporate Office
715 Morris Avenue
Springfield, NJ 07081
201/379-1520

Buying Office
340 Wall Whitman Road
Huntington Station, NY 11746
516/424-1070

**EXHIBIT E**

## STANDARD LESSOR'S WORK
### (revision 8/10/94)

All references to "Landlord" and "Tenant" herein shall mean "Lessor" and "Lessee" respectively.

1.      **Plans** - Landlord to provide for the Tenant's use six (6) complete sets of all required architectural and engineering drawings to complete the Landlord's work. In addition, the Landlord is to include the Tenant's fixture plan.

2.      **Flooring** - Combination carpet/wood floor to cover all sales area, layout per Tenant's floorplan. Type of carpet and wood per spec below, substitution only with Tenant's approval.

a) "Snap-T" or like molding to be installed wherever carpet meets wood flooring. Color of molding to match carpet. Cove base in White-White to be installed on all exposed walls of selling floor and office.

b) Steps to mezzanine office to have rubber stair treads.

c) Stockroom floor to be sealed concrete.

d) Lunchroom floor to be vinyl composition tile, spec below. Size and location of lunchroom per Tenant's drawings.

e) Vestibule flooring, spec below.

f) Bathroom flooring, full ceramic tile floors and walls.

**Specifications:**
        Carpet - **mfg.**: J& J Industries; style: Custom Certificate 992-282-0-B.
        Wood - **mfg.**: Hartco; style: Patterns Plus 5000 series; color: Curry; size: 36" lengths to be installed on a 45-degree angle, or equal.
        Adhesive- Hartco #40.
        Vinyl - **mfg.**: Armstrong; style: Imperial Texture; color: 51904 Sterling

        Vestibule flooring: Interface Walk Off tile; color: charcoal

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.      page 1

**3.** <u>Stockroom/Sales Area Partition Wall</u>- Provide local code approved wall between sales area and stockroom and include up to two (2) high impact self closing double action swing doors with window to fit within 48" opening, color: gray.

**4.** <u>Insulation</u>- Provide a R-19 factor insulation between exterior roof membrane and decking.

**5.** <u>Ceiling</u>- Underside of roof shall be open and exposed, painted with two coats of white paint (see #7 below).

**6.** <u>Ceiling Clearance</u>- 20' minimum clearance between slab and all structure and sprinkler heads. Sprinkler system should be designed to allow fixturing and storage to be within 18" of heads.

**7.** <u>Painting</u>- Paint specs for ceiling - two coats Benjamin Moore M5301 Latex Dry Fog Flat. In addition to ceiling, and including all pipes, ductwork, steel and decking, all interior walls and columns are to be primed and painted two coats Benjamin Moore Regal Aquaglo White #333-01.

**8.** <u>Exposed Columns</u>- To be "boxed out" with white low pressure laminate (melamine) 3" O.C. slatwall up to 14', at corners install 1/4 round molding painted white per #7 above.

**9.** <u>Lighting</u>- Fixtures to be provided as a combination of the following, per Tenant's layout. All offices, cash room, conference rooms, bathrooms and lunchroom to have occupancy sensors to control lighting (see #22-25 below).

<u>General Store Lighting</u>
- 4' and 8' fluorescent strip fixtures, to accommodate 2 high-output cool-white, energy efficient lamps (F96T12HO/CW/SS or similar), energy saving electronic high-output ballast, with reflector that has a 10% aperture option and pendant mounted at a height of 15'6" above finished floor to bottom of reflector. Fluorescent lighting to be mounted on unistrut mounted to ceiling structure to enable Tenant to adjust spacing between rows of lighting as necessary.

<u>Specialty Lighting</u>
- Up to 500 ft. Juno single circuit Trackmaster lighting track, 200 Juno style V689 track light fixtures with 75PAR30 lamps. (40) SS-125-120V EB-81 with (1) FO25/41k octron lamp TL7, (60) SS225-120v EB81 with (2) FO25/35k octron lamp TL7, 100 PLI branch circuit connectors, and up to (100) Indy 701T-50 fluorescent wall-wash fixtures with General Electric 50W Biax 4100K lamps, to be distributed throughout the store per Tenant's final layout.

Tenant reserves the right to supply all or part of specialty lighting package, described

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.

above, and be reimbursed for the costs provided that it is the most economical solution for Landlord to meet its construction requirements.

10. **Exit/Emergency Lights**- Per code as needed per Tenant's fixture plan. Emergency lights integrated into Tenant's fluorescent lighting plan.

11. **Outlets**- Standard duplex wall outlets provided per Tenant's plan. Outlets and outlet covers to be white. Provide up to 20 trenched flush-to-floor outlets with covers per Tenant's plan. In addition, two 110/220 receptacles on dedicated circuits provided for both telephone and alarm equipment to be located per Tenant's plan.

All register bays and Cash Room, and Customer Service area to include 2 quad receptacles (Hubbell 1G5362) or equivalent. Island-type service desks to have 1 quad receptacle. For additional information see "Addendum A," also see #12 below.

12. **Phone/Electric Conduits**- To Cash Room (designated on floor plan) provides 2" conduit with drawstring from local telephone company demarcation point. To register bays provide Walker duct complete with drawstrings. To island-type service desks provide dual-chamber power poles isolating phone from electric service, painted white per #7 above. Power poles must be extended to underside of deck. To Cash Room from "Employee Entrance" door, provide 1" conduit with drawstring for controls and power for electric door strike (see #17 below).

*under slab*

13. **P.O.S/Computer Conduit**- Standard duplex wall outlets provided per Tenants plan, to "Cash Room" (designated on floor plan). Also see #12 above.

14. **Sign Conduit**- Conduit to be installed from panel box to outdoor sign location(s). Also, include necessary circuiting and wiring to location per Tenant's plan, along with photocell(s) (for sign "On") and standard timer(s) (for sign "Off").

15. **Vestibule**- Interior or exterior vestibule to consist of glass in anodized metal frames, and automatic doors (see #17 below). Flooring in vestibule to be tenant specified walk-off tiles (see #2 above). All wall surfaces to be paneled in Marlite. Bumper molding to be provided on all walls including glass at tenant specified height. Bumper molding to consist of aluminum channel with rubber or vinyl insert.

16. **Pay Phone**- Landlord to arrange for and provide a pay phone within Tenant's store front area.

17. **Automatic Doors**- All sets to be Stanley's Dura Glide 2000 complete package- (1) each largest Bi-Part (7'pkg), (2) each-4' single slide. Door should have a lock set compatible with the Best core. Landlord to provide an electric strike on one door, designated by Tenant as the "Employee Entrance" door.

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.     page 3

18.    **Cart Corral**- Landlord to provide a cart corral for up to 100 shopping carts ~~within and alongside~~ the store front area. *near*

19.    **Loading Dock**- Trenched ramp ~~truck bed at store level~~ *at* /loading dock to be provided with bumpers and 4' x 4' dock leveler. *and*

20.    **Waste Removal**- Provide suitable pad ~~and opening with door for chute and~~ standard compactor. In addition, provide additional and/or special sprinkler protection in the area in front of the chute opening to satisfy local codes.

*adjacent to Tenant's grade level loading area*

21.    **Receiving Area**- Office layout as per Tenant's plans approximately 120 sq ft. to include painted walls and vinyl floor also, (2) electrically operated 8' wide roll-up doors. ~~Provide Remove any trash compactor(s) for receiving area. Also provide suitable water the material trash cardboard compacting~~. Provide conduit from the man door to the "Cash Room" for Tenant installed doorbell/intercom system.

22.    **Mezzanine Office**- Elevated mezzanine office to be built above the entire vestibule, customer service, bridal/gift registry room, code required bathrooms, stairs and lift, minimum size 1500 sq. ft. to be constructed per Tenant's specifications. Included should be up to four private offices as well as a general work area. All walls to be sound insulated. "Cash Room" door to have automatic closure and peep hole. All offices to have Best Lock Corp door hardware and general office area and Cash Room to have built-in counters per Tenant's floorplan. Lighting in all private rooms must have RAB LOS1000 occupancy sensors (see #9 above), RAB Electric Manufacturing, 170 Ludlow Ave., Northvale, NJ. 07847, 201/784-8600.

23.    **Lunch Room**- Layout as per Tenant's plan, to include painted walls, vinyl floor (see #2 above), cabinets, counters and sink. There should be 4 duplex outlets installed for: refrigerator, microwave oven and vending machine(s) located per Tenant's specifications. Lunch Room lighting to be operated by RAB LOS1000 occupancy sensor (see #22 above for address).

24.    **Lockers**- Provide up to four (4) sets of box lockers, Republic model #753893, 18 lockers per set, 6 high x 3 wide, box size: 12" x 15", grey, with number plates, model #700405; with built-in Combination Locks, model #1654RH, include 2 master keys.

25.    **Bathrooms**- As per code (proportioned to size of store) with power-Flush (tankless type) toilets. Each rest room to include a wall mounted infant changing table (JBJ Industries Koala Bear Care or approved equivalent) and a C-fold towel dispenser with an in-wall mounted stainless steel trash receptacle and soap dispenser. Bathroom entrance to have "Men" and "Women" graphic braille signs on door or at entrance, and accessible route signs if necessary. Floor and walls to be full ceramic tiled. Bathroom lighting to be operated by RAB LOS2400 occupancy sensor (see #22 above for address).

26.    **Mechanical System**- See Addendum "B."

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.        **page 4**

**27.** **Refrigerated Water Fountain-** With filter located per Tenant's floorplan.

**28.** **Fire Exits and Rear Door-** All to be equipped with local audible alarm "Detex" locking panic bar systems that will accept the Best core. Detex Exit Control Lock model# ECL-230C

**29.** **Fire Extinguisher-** Landlord to provide all fire extinguishers as required per local code.

**30.** **Fire Protection/Sprinkler-** Landlord shall provide a sprinkler and fire alarm system, which will provide the necessary sprinkler heads and fire alarm for the premises, as required by local authorities. Sprinkler system should be designed in accordance with NFPA 231C to allow for high pile storage, fixturing and storage to be within 18 " of heads. In addition, if required, provide a smoke purge and pressurization system or any other similar code required system. Landlord is responsible for the monitoring of the system, (includes securing phone lines.)

**31.** **Disability Access-** Provide wheelchair lift to mezzanine area per Federal guidelines.

**32.** **Utility Services-** See Addendum "C"

**33.** **Itemized Budget-** At Tenant's request, Landlord shall provide its itemized budget for Landlord's Work.

**34.** **Site-** Storefront sidewalk to have a minimum of one ADA curb cut within 6 ft. of any entrance door that conforms with barrier.

**35.** **Site Lighting-** minimum lighting level should be 2 footcandles, measured 30" above adjacent ground including entire parking and service areas.

**36.** **Store Front-** Per Tenant's layout, provide up to 80 ft. wide store front glass to 10'0" high above bulkhead or other approved base. Low emissivity glass must be used if there is no canopy or overhang.

**37.** **Warranties-** Landlord shall provide a list of contractors' and subcontractors' contacts and addresses, and a guarantee, including parts and labor for a one (1) year period after the commencement date. Send all warranties of equipment, service manuals and As-built drawings to Tenant's corporate office within thirty (30) days of completion.

**38.** **Access to Other Level(s)-** Landlord will provide to either basement or second level storage facilities a sufficient conveyor system (as reasonably accepted by Tenant) and stairs as required by code.

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.        page 5

**39. Delivery-** Sixty (60) day advance written notice of delivery. All reasonable costs incurred by Tenant resulting from any delay in the noticed delivery date shall be paid by Landlord.

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.     page 6

## ADDENDUM "A"

### Items Provided By General Contractor

1.  Contractor to provide a 4' x 8' x 3/4" plywood backboard for the local telephone company for their demarcation (coordinate with local telephone company), and all other necessary structures and/or accesses (e.g. conduits) for local telephone company use to bring phone trunks to the Tenant's space, if not already provided. This requirement must be met at least one (1) month prior to Tenant occupancy and must be coordinated with the local tele company.

2.  A second plywood backboard, supported by unistrut, 8'H x 7'W x 3/4", in the Cash Room for a wiring wallfield, mounted 3" above the finished ceiling. The plywood must be painted fire-retardant white prior to the installation of any Contractor or telephone company wiring equipment. This requirement must be met at least ten (10) days prior to Tenant occupancy.

    There should be approximately 3" of clearance between the plywood and the sheetrock wall. The receptacles must be flush with the front of the plywood.

3.  Cash room must be secured- finished walls, ceiling, lockable doors and all outlets working and all outlets working at least ten (10) days prior to Tenant occupancy.

4.  Four (4) shelves in Cash Room. Approximately 6' W x 15" D. Please refer to Cash Room drawing for the placement of the shelves.

### Items Provided By Electrical Contractor

1.  AC CIRCUITS

All POS equipment must be on AC circuits dedicated to POS equipment only. Electrician must use 1 circuit for every 2 terminals so that if 1 circuit is lost the remainder of the system will function. POS equipment must be on a separate panel. It MUST NOT be on a panel that supplies power to electric motors, machines, or any inductively coupled load. All outlets must be surge suppressed by a main surge suppressor attached to the panel.

2.  AC RECEPTACLES

All POS terminals, peripherals, or equipment they communicate with MUST be plugged into insulated/isolated ground outlets. Use Hubbell IG5362 Duplex receptacles beneath each POS

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.      page 7

terminal. Every bay with 2 POS terminals will have 2 duplex receptacles. In addition, each bay must have 2 duplex outlets on a separate circuit and panel for non-POS equipment power.

3.    GROUNDING

All insulated/isolated ground wiring for Hubbel IG5362 outlets must be run in conduit and grounded to the panel. DO NOT ground to the electrical conduit.

## ADDENDUM "B"

### MECHANICAL

Provide air conditioning and heating systems capable of maintaining space cooling and heating temperature of 78°F.Db, 65°F.Wb summer and ~~●°F.Db winter~~
65°

The system shall have the capacity to handle space exterior skin load, outside air ventilation load, plus an internal heat load of 4.5 watts/sq. ft. (Total load approximately 300-350 sq. ft./ton).

~~The system shall have an economizer cycle to provide free cooling in winter months.~~

The system shall operate at minimum efficiency as described in local or state energy codes.

The system shall be fully automatic with programmable start/stop and night setback. Thermostats should be Honeywell T7400, with remote sensors located for optimum efficiency. All thermostats to be located centrally in the Cash Office room on the mezzanine level.

The system shall be zoned for interior and exterior exposures.

Provide a filter change using pleated filters 3 days prior to store opening.

Landlord to assign all applicable warranties to Tenant. To include 10 year extended warranty on compressor-parts and labor.

Provision shall be made for exhaust systems to the outdoors as follows:

1. Toilet exhaust
2. Smoking room exhaust
3. Pantry exhaust

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.

## ADDENDUM "C"

<u>PLUMBING</u>

Provide the following to premises in agreed location-

1. 3 1/2" valved and metered water service

2. 4" plugged sanitary line

3. 1230 F 1" capped hot water line with associated reciprocation system

4. ~~4" valved metered natural gas service capable of providing a minimum of 2000 cfh at 8"~~
   ~~gas pressure~~

<u>ELECTRICAL</u>

Provide electrical service feeder, main service switch and separate utility metering sized to handle a 4.5 watts per square foot load for lighting and miscellaneous power and a 1750 watts per ton load for air conditioning to the premise in agreed location.

Provide 20% useable spare capacity above the Landlords electrical engineers calculations, within each panel no more than 80% of breakers may be used.

All utility service metering to be set up for the best possible rate. Consult Tenant.

© Bed Bath & Beyond Inc. and its subsidiaries, 1994.

# ADDENDUM "D"

## I. LANDLORD'S WORK

The following work is to be done by Landlord at Landlord's expense (unless otherwise noted).

A. Parking Structure, Common Area, and Roads: Multi-level, open air parking structure with stairs, elevators, and illumination. Hard surfaced, drained, lighted and landscaped common areas; access roads having directional signs and such traffic controls as may be necessary; service areas; walkways and common areas to building entrances.

B. Buildings: A complex of multi-level retail store buildings facing an opened-canopied entry area substantially as identified on Exhibit "A" (Site Plan) with exterior design and materials as determined by Landlord's Architect.

    1. Frame: A structural frame of steel and/or concrete, foundations and roof deck designed to carry the following allowable live loads per square foot:

    a. First Floor (on grade) -   150 p.s.f.

    b. Second/Third Floors -   120 p.s.f.

    c. Roof -   30 p.s.f.

    2. Roof: a single-ply membrane roofing on insulated steel or concrete deck with a minimum "R" rating of 19.

C. Common Areas:

    1. Public Areas: Open and lighted canopied entry areas, escalators and passenger elevators.

    2. Service Areas: Lighted and sprinklered service and exit corridors, stairs, ramps, freight elevators, project equipment storage areas, janitor closets, project offices, security office, maintenance and cleaning equipment rooms, meter and valve rooms, utility distribution rooms and all other areas and facilities used in the common area maintenance and operation of The Project (as defined in the Lease).

D. Central cooling tower with associated pumps and piping "Environmental System" for Tenant cooling, subject to reimbursement as follows:

    1. The Tenant cost for the Environmental Systems shall be equal to the cost of the Environmental System multiplied by a fraction, the numerator of which shall be the gross leasable area of the Premises and the denominator of which shall be the gross leasable area of The Project, excluding those areas not serviced by the Environmental System.

    2. From and after the date Tenant connects to the Environmental Systems, Tenant shall pay to Landlord an amount that shall include Tenant's share of all costs and expenses incurred by Landlord in connection with the Environmental Systems, including, but not limited, to the costs and charges for operation, administration, electricity, water, repairs, replacement and maintenance.

    3. The annual amount (the "Annual ES Charge") will not include costs incurred by Tenant for maintenance or operation of equipment installed in Tenant's space.

    4. The base Annual ES Charge will be determined by a unit rate per square foot of floor area of Tenant's Premises and shall be paid by Tenant to Landlord.

E. Service Doors: Service and exit doors in Landlord's service corridors to stairs or through exterior walls shall be a rated hollow metal door(s) as required by code and installed by Landlord.

F. Exit and service corridors, equipment and storage rooms and similar service areas to be lighted and sprinklered with concrete floors and fire-rated walls.

G. Building facade and storefront materials as designed by Landlord's Architect will be provided to Tenant for approval, which shall not be unreasonably withheld, to secure a design which will assure clarity of materials and treatment.

H. Utilities:

    1. Sanitary sewer

    2. Valved one and one-half inch (1 1/2") domestic cold water.

    3. Plumbing vent

    4. Fire protection sprinkler system

    5. Valved supply and return condenser water system.

6. Air-conditioning drain

7. Toilet exhaust duct

8. Outside air duct

9. Electrical metering cabinets to be provided by Landlord, at Landlord's expense, within central electrical distribution room. Meter cabinets shall include meter socket and main disconnect means (277/480V, 3PH, 4 wire, 60HZ), plus Tenant electrical work as defined in Landlord's Work Letter attached to Lease as Exhibit "E."

10. Electrical conduit from central electrical distribution room to Tenant's Premises.

11. Central telephone distribution boards with conduit system from central area to Tenant's Premises, plus Tenant telephone requirements defined in Exhibit "E" to the lease.

I. Interior of Premises:

1. Demising Partitions:

a. Landlord will erect metal stud framing for one-hour, fire-resistant partitions separating the Premises from adjacent premises. Such stud framing shall extend from the floor slab of the Premises to the underside of the floor or roof structure above.

b. Landlord will erect metal stud framing and one layer of 5/8" Firecode C gypsum wallboard on corridor side of one-hour fire-resistant partitions separating the Premises from adjacent service/exit corridors to the underside of the floor or roof structure above.

2. Exterior Walls:

Insulated (Min. R-3) reinforced block wall with stucco finish on exterior face.

3. Floors

a. Upper levels: Four (4") inch concrete slab on precast concrete joist. Total depth of system is to be determined by Landlord's Architect.

1. In all upper level rest rooms, kitchen, food preparation, dishwashing and similar areas, Landlord shall furnish and install, at Landlord's sole expense, a waterproof membrane on Landlord-furnished floor slab beneath finished floor material. Perimeter edges of membrane shall extend vertically a minimum of four (4") inches. Landlord shall provide floor drains with deep-seal traps within all such areas and raised thresholds at all floor transition points.

4. Ceilings: Exposed underside of floor deck and/or roof deck above with concrete and/or steel framing. Minimum clear height below all framing shall be twenty feet (20'-0").

5. Service Door Sign: Landlord shall provide and install for each Tenant a store identification sign. Tenant shall reimburse Landlord for all costs paid by Landlord for said sign.

## II. TENANT'S WORK

A. General:

1. Tenant, at its sole cost and expense, shall perform all work required to complete the Premises to a finished condition ready for the conduct of business therein.

2. All of the work performed for the purpose of complying with the Lease to which this Exhibit is attached and made a part hereof, shall be deemed to be improvements made to the Premises by Tenant.

3. Tenant's work shall conform to procedures and schedules as set forth by Landlord and shall include, without limitation, the following:

a. Store Design Drawings, Construction Drawings and Specifications.

b. Construction work in accordance with Landlord's requirements.

B. Criteria: The criteria and/or specifications as set forth herein represent minimum standards for the design, construction and finish of the Premises by Tenant.

1. Jurisdiction and Codes: The Project is being developed in and under the jurisdiction of Dade County, Florida. All design and construction work shall comply with all applicable statutes, ordinances, regulations, laws and codes; including, without limiting the foregoing, the South Florida Building Code latest Edition, National Electric Code, A. D. A., Requirements of Landlord's Fire Insurance Underwriter; the requirements pertaining to services and utilities furnished by Miami Dade Water & Sewer Authority Department, Local Gas Company, Florida Power and Light Company, Southern Bell Telephone Company; and the regulations of the Dade County Health Department.

2. Permits and Approvals: Prior to the commencement of construction, building and other permits shall be obtained by Tenant and posted in a prominent place within the Premises. Landlord's written approval shall be obtained by Tenant, prior to the undertaking of any construction work which deviates from Tenant's Working Drawings and Specifications as approved by Landlord, or the undertaking of any other work not explicitly shown on said Working Drawings and Specifications. Landlord's approval of the foregoing shall not constitute the assumption of any responsibility by Landlord, Landlord's Representative or Landlord's Architect for the accuracy or sufficiency thereof, and Tenant shall be solely responsible therefor.

responsibility by Landlord, Landlord's Representative or Landlord's Architect for the accuracy or sufficiency thereof, and Tenant shall be solely responsible therefor.

3. Design Loads: The structural system has been designed to carry the following live loads, and loading imposed by any Tenant's Work, on a temporary or permanent basis, shall not exceed the following allowable live load:

    a. On-grade slab:        150 lbs. per sq. ft.

    b. Second and third floor:    120 lbs. per sq. ft.

4. Standard Project Details: As issued by Landlord's Architect and as they pertain to Tenant's Work, shall govern with respect to such Work. Such details shall be incorporated into the Working Drawings and Specifications for the Premises. Landlord's Architect will furnish to Tenant drawings showing suggested Tenant storefront signs and typical Tenant storefront.

5. Materials: Only new, first-class materials shall be used in the construction of the Premises.

6. Space Layout: A Space Layout of the Premises will be furnish to Tenant's Architect by Landlord's Tenant Coordinator, when so authorized by Landlord the same shall indicate, by floor plan, the dimensions of the Premises, column locations and sizes, doors, if existing, interior grades, underground and overhead utility lines and sprinkler source. A section drawing indicating height clearances and any special conditions affecting Tenant's construction, as well as the Standard Project Details, will similarly be furnished to Tenant's Architect.

7. Field Conditions: Tenant shall verify conditions pertaining to the Premises from time to time, prior to commencement of fixturing of the Premises. Tenant shall coordinate Tenant's Work with the work of Landlord and others, as well as with existing conditions occurring above or below the Premises.

8. Non-Interference with Other Work: Tenant shall perform all of its work under this Exhibit "B" in such a manner so as not to interfere with, impede, or delay Landlord's Work or the work of other tenants.

DS:BBB
18-27-94

## EXHIBIT F

## INTENTIONALLY OMITTED

## SCHEDULE OF PERTINENT GROUND LEASE PROVISIONS

The Ground Lease, with respect to which Tenant is taking its interest subject to, contains the following pertinent provisions, all of which Tenant agrees to abide by and not violate, as applicable (for purposes of the following paragraphs, Lease shall mean the Ground Lease, Landlord shall mean the Ground Lessor and Tenant shall means the Ground Lessee):

1.    Section 4.06 of the Lease provides that Tenant shall use its best efforts to include a provision in each leasehold mortgage which vests Landlord with all right, title and interest in the construction plans and specifications for the improvements financed thereby, should an event of default occur and the affected leasehold mortgagee does not elect to construct and complete the improvements so financed.

2.    Section 11.01 of the Lease permits modifications, construction, replacements or repair in the nature of "tenant work", as such term is customarily used, and normal and periodic maintenance, operation and repair without Landlord's approval. Other modifications, remodeling, expansion, rebuilding, alterations and reconstruction are subject to both the approval of Landlord and the conditions contained in the Lease and all instruments of conveyance, assignment, transfer or encumbrance that create rights with respect to any portion of the Leased Premises arising by, through or under Tenant (each an "Instrument") shall be deemed to include such provision, and the transferee of each Instrument shall be bound by such provision.

3.    The provisions of Sections 13.01, 13.02 and 13.03 of the Lease regarding "Use of Premises" are as set forth below and each Instrument shall be deemed to include such provisions, and the transferee of each Instrument shall be bound by such provisions:

Section 13.01   Use of Demised Premises by Tenant.

(a)   The Demised Premises shall not be used for the following:

(i)   any unlawful or illegal business, use or purpose, or for any business, use or purpose which is immoral, disreputable, extra-hazardous, or constitutes a nuisance of any kind (public or private); or

(ii)  any purpose which violates the certificates of occupancy (or other similar approvals of applicable governmental authorities).

(b) <u>No Discrimination</u>. No covenant, agreement, lease, Sublease, Space Lease, Leasehold Mortgage, Subleasehold Mortgage, conveyance or other instrument shall be effected or executed by Tenant, or any of its successors or assigns, whereby the Demised Premises or any portion thereof is restricted by Tenant, or any successor in interest, upon the basis of race, color, religion, sex or national origin in the sale, lease, use or occupancy thereof. Tenant shall comply with all applicable state and local laws, in effect from time to time, prohibiting discrimination or segregation by reason of race, color, religion, sex, or national origin in the sale, lease or occupancy of the Demised Premises.

(c) Except as otherwise specified, Tenant may use the Demised Premises for any lawful purpose or use authorized by this Lease and allowed under the Ordinance establishing the zoning for the Demised Premises (provided Tenant otherwise complies with the terms and conditions hereof). Tenant shall not knowingly suffer any act to be done or any condition to exist in or on the Demised Premises or any part thereof or any article to be brought thereon, which may be dangerous, unless safeguarded as required by law, or which may make void or voidable any insurance then in force with respect thereto.

Section 13.02  <u>Dangerous Liquids and Materials</u>.

Tenant shall not permit any vehicle to carry flammable or combustible liquids into or onto the Demised Premises within 50 feet of the Station structure, busways, or the transit guideway dripline during or following completion of construction and shall prohibit the storage of any flammable or combustible liquid or dangerous or explosive materials in or on the Demised Premises within 50 feet of the Station structure, busways, or the transit guideway dripline, provided that this restriction shall not apply to prevent the entry and parking of motor vehicles carrying flammable or combustible liquids solely for the purpose of their own propulsion. Tenant shall not allow the manufacture of any such flammable or combustible liquids or hazardous or dangerous materials in or on the Demised Premises.

Section 13.03  <u>Tenant's Duty and Landlord's Right of Enforcement Against Tenant and Successor and Assignee</u>.

Notwithstanding any other provision of this Lease, Tenant shall have an affirmative duty to assure that the actions prohibited by Section 13.01 and 13.02 do not occur and to take immediate steps to terminate same, including bringing suit in Circuit Court but not taking or defending any appeal. In the event Tenant does not immediately terminate a prohibited action, Landlord or Dade County may seek appropriate injunctive relief against the party or parties actually engaged in the prohibited action in the Circuit Court of Dade County without being required to prove or establish that Landlord or Dade County do not have an adequate remedy at law. The provisions of this section shall be deemed automatically included in all Subleases, Leasehold Mortgages, Subleasehold Mortgages and Space Leases, and any other conveyances, transfers and assignments under this Lease, and any Transferee who accepts such Sublease, Leasehold Mortgage, Subleasehold Mortgage, Space Lease or any other conveyance, transfer or assignment hereunder shall be deemed by such acceptance to adopt, ratify, confirm and consent to the provisions of Sections 13.01, 13.02 and 13.03 and to Landlord's and Dade County's rights to obtain the injunctive relief specified therein.

4. The provisions of Article 14 of the Lease regarding "Entry on Premises by Landlord" are as set forth below and each Instrument shall be deemed to include such provisions, and the transferee of each Instrument shall be bound by such provisions:

Section 14.01 <u>Inspection by Landlord of Demised Premises</u>.

Landlord and its authorized representatives, upon reasonable notice and in the presence of a representative of Tenant, shall have the right to enter the Demised Premises at reasonable times during normal business hours for the purpose of inspecting the same to insure itself of compliance with the provisions of this Lease.

Section 14.02 <u>Limitations on Inspection</u>.

Landlord, in its exercise of the right of entry granted to it in Section 14.01 herein, shall

(a) whenever reasonably practical, avoid entering bona fide "security areas" of the Demised Premises;

(b) not exercise its rights of entry with unreasonable frequency; and

(c) shall not unreasonably disturb the conduct by Tenant, Sublessees and Space Lessees of their business activities.

5. Section 17.02 of the Lease provides that any mortgage encumbering the Leased Premises shall be expressly subject to the terms, covenants and conditions of the Lease and shall at all times be inferior and subject to the prior right, title and interest of Landlord as security for the performance of the terms and conditions of the Lease; each Instrument shall be deemed to include such provision, and the transferee of each Instrument shall be bound by such provision.

6. Section 17.10 of the Lease provides that there shall be no subordination of Landlord's fee simple interest in the Land to the lien of any financing obtained by Tenant or those claiming by, through or under Tenant, and no lender providing such financing may impose any lien upon the Landlord's fee simple interest in the Land; each Instrument shall be deemed to include such provision, and the transferee of each Instrument shall be bound by such provision.

7. Section 23.06 of the Lease provides that, whenever the consent or approval of Landlord is required under the Lease, such consent or approval shall be made by the County Manager or his designee on behalf of the Landlord.

8. The provisions of Article 25 of the Lease regarding "Equal Opportunity" are as set forth below and each Instrument shall be deemed to include such provisions, and the transferee of each Instrument shall be bound by such provisions:

Tenant will not discriminate against any employee or applicant for employment because of race, religion, color, sex, age, ancestry, disability, marital status, handicap, place of birth, or national origin. The Tenant shall take affirmative action to ensure that applicants are employed and that employees are treated during their employment, without regard to their race, religion, color, sex, age, ancestry, disability, marital status, handicap, place of birth or national origin. Such actions shall include, but not be limited to, the following: employment; upgrading; transfer or demotion; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation and selection for training, including apprenticeship. Tenant agrees to post in conspicuous places, available to employees and applicants for

employment notices to be provided by Dade County setting forth the provisions of this Equal Opportunity clause. Tenant will comply with all of the following statutes, rules, regulations and orders to the extent that these are made applicable by virtue of the grant to Landlord under the Urban Mass Transportation Act of a Section 3 capital grant for Metrorail: (i) all regulations of the U.S. Department of Transportation; (ii) all applicable provisions of the Civil Rights Act of 1964; (iii) Executive Order 11246 of September 24, 1964 as amended by Executive Order 11375; (iv) Executive Order 11625 of October 13, 1971; (v) the Age Discrimination Employment Act effective June 12, 1968; (vi) the rules, regulations and orders of the Secretary of Labor; (vii) Florida Statute 112.042; and (viii) Articles 3 and 4 of Chapter 11A of the Code of Metropolitan Dade County.

## GROUND LEASE NON-DISTURBANCE AGREEMENT

THIS AGREEMENT, made as of the _____ day of _____, 1994, by and between DADE COUNTY, a political subdivision of the State of Florida, whose address is County Manager, Suite 2910, Stephen P. Clark Center, 111 Northwest 1st Street, 29th Floor, Miami, Florida 33128 ("Ground Lessor") and BED BATH & BEYOND OF DADELAND STATION INC., a Florida corporation having its principal office at 715 Morris Avenue, Springfield, New Jersey 07081 ("Lessee").

A.    Ground Lessor is lessor under that certain lease (the "Ground Lease") with Green Dadeland Station, Ltd., as lessee, dated April 19, 1994, which demises certain real property located in Miami, Florida (the "Property") together with certain easement rights (the "Easements") set forth in Exhibit "C" to the Ground Lease.    A short form of the Ground Lease (the "Memorandum of Lease") was recorded in Book 16454 at Page 2465 of the Official Records of Dade County, Florida.

B.    Green Dadeland Station, Ltd. ("Dadeland") assigned a part of its lessee's interest under the Ground Lease to Dadeland Station Associates, Ltd. ("Lessor") pursuant to that certain Assignment (the "Assignment") dated April 19, 1994, which portion is more particularly described on Exhibit A attached hereto and made a part hereof, together with the Easements (the "Premises").    The Assignment was recorded in Book 16454 at Page 2477 of the Official Records of Dade County, Florida.

C.    Pursuant to a Lease dated as of October ____, 1994, by and between Lessor and Lessee (the "Sublease"), Lessor leased to Lessee a portion of the Premises, which portion is designated as the "Demised Premises" on Exhibit B annexed hereto and made a part hereof.

NOW, THEREFORE, it is agreed as follows:

1.    Ground Lessor states as follows:

(i)    that it is the ground lessor of the Premises,

(ii)    that the Ground Lease is unmodified and is in full force and effect, and

(iii) that the term of the Ground Lease expires on December 31, 2084, and

(iv) that to the best of Ground Lessor's knowledge, Lessor is not in default under the Ground Lease nor has any event occurred which would after notice and the passage of time become a default of Lessor under the Ground Lease.

2. For so long as Lessee is not in default of any of its obligations under the Sublease beyond any applicable notice and cure periods, Ground Lessor shall not, in the exercise of any of the rights arising or which may arise out of the Ground Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof, disturb or deprive Lessee in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Lessee under the Sublease.

3. In the event of the termination of the Ground Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Ground Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect and Lessee shall not be in default of any of its obligations under the Sublease beyond any applicable notice and cure periods, Lessee shall not be made a party in any removal or eviction action or proceeding nor shall Lessee be evicted or removed of its possession or its right of possession or be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease from Ground Lessor to Lessee.

4. If the Ground Lease terminates for any reason including without limitation (i) by operation of law or (ii) by mutual agreement between Ground Lessor and Lessor and for so long as Lessee is not in default of any of its obligations under the Sublease beyond any applicable notice and cure periods, Lessee may elect to continue the Sublease in full force and effect notwithstanding such termination of the Ground Lease. On such election by Lessee, the Sublease shall continue as a direct lease between Ground Lessor and Lessee for the remainder of the term of the Sublease, without the necessity of executing a new sublease, and on the same terms and conditions as are in effect under the Sublease immediately preceding the termination of the Ground Lease, and Lessee shall attorn to Ground Lessor.

5.  Any notices, consents, approval, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Ground Lessor, at the address of Ground Lessor as hereinabove set forth or such other address as Ground Lessor may designate by notice to the other parties hereto, (b) to Lessee, then in duplicate under separate cover, one copy to the attention of the President of Lessee at the address of Lessee set forth above, and one copy to Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., P.O. Box 800, 25 Main Street, Hackensack, New Jersey 07602-0800 or such other addresses or persons as Lessee may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, delivery by recognized overnight courier shall be substituted for registered or certified mail. All Notices shall be deemed served or given on the date mailed; provided, however, that if mailed outside the State of Florida, such notice shall be deemed served or given at the expiration of four (4) days after the date mailed.

6.  No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

7.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed under seal the date first above written.

ATTEST:  Harvey Ruvin, Clerk

DADE COUNTY, a political subdivision of the State of Florida

_____

Deputy Clerk

By:_____

County Manager

ATTEST:

BED BATH & BEYOND OF DADELAND STATION INC.

_____

Secretary

By:_____

Warren Eisenberg, President

STATE OF FLORIDA          )
                          ) SS.:
COUNTY OF DADE            )


        The foregoing instrument was acknowledged before me this _____
day of _____, 1994, by _____, the County
Manager of Dade County, a political subdivision of the State of
Florida, in the capacity aforestated; such person is personally
known to me.


                              Sign Name:_____
                              Print Name:_____
                                              Notary Public
My Commission Expires         Serial No. (none if blank):_____

[NOTARIAL SEAL]




STATE OF NEW JERSEY      )
                         ) SS.:
COUNTY OF                )


        The foregoing instrument was acknowledged before me this _____
day of _____, 1994, by Warren Eisenberg, the President of
Bed Bath & Beyond of Dadeland Station Inc., a Florida corporation,
in the capacity aforestated; such person is personally known to me.


                              Sign Name:_____
                              Print Name:_____
                                              Notary Public
My Commission Expires         Serial No. (none if blank):_____

[NOTARIAL SEAL]

**EXHIBIT I**

## SUBORDINATION, NON-DISTURBANCE AND
## ATTORNMENT AGREEMENT

**AGREEMENT** made as of the _____ day of _____, 19 , by and between _____, a _____ [corporation/partnership] ("Lender") having an office at _____, and Bed Bath & Beyond of Dadeland Station Inc., a Florida corporation ("Tenant") having an office at 715 Morris Avenue, Springfield, New Jersey 07081.

### RECITALS

A.    Dadeland Station Associates Ltd., a Florida limited partnership ("Lessor") is lessor, and Tenant is lessee under that certain Lease dated October __, 1994 (the "Lease"), for approximately sixty thousand (60,000) square feet of space (the "Premises") constructed or to be constructed on real property located in Dade County, Florida, as more particularly described on Exhibit A attached hereto.

B.    Article 23 of the Lease provides that, at Lessor's option, the Lease shall become subject to the lien of any mortgage or deed of trust granted by Lessor if and when a non-disturbance agreement is entered into with respect to any such mortgage or deed of trust.

C.    Lender has made or has agreed to make a loan to Lessor secured in whole or in part by a mortgage or deed of trust on Lessor's leasehold interest in the Premises which includes an assignment of Lessor's interest in the Lease (the "Leasehold Mortgage").

D.    A copy of the Lease has been delivered to Lender, the receipt of which is hereby acknowledged.

E.    Tenant and Lender desire to confirm their understanding with respect to the Lease and the Leasehold Mortgage.

NOW, THEREFORE, in consideration of the mutual agreements contained in this Agreement, and other valuable consideration, the parties agree as follows:

1.    The recitals hereinabove are incorporated herein by reference as if fully set forth.

2.    Tenant's interest in the Lease, including but not limited to, any option in favor of Tenant to extend or renew the Lease, is hereby subordinated to the Leasehold Mortgage and to

any consolidations, extensions, modifications or renewals thereof.

3. So long as Tenant is not in default beyond any applicable cure period, Lender agrees that the rights of Tenant under the Lease will remain in full force and effect, and Tenant's possession of the Premises under the Lease will remain undisturbed by Lender during the term of the Lease, and any renewal or extension thereof, in accordance with the Lease terms.

4. After Tenant's receipt of notice from Lender (i) that Lender has received a conveyance of Lessor's interest in the Lease or (ii) Lender has otherwise obtained the right to the Lease or possession of the Premises, Tenant will be considered to have attorned to and recognized Lender, its successors or assigns, as its substitute Lessor under the Lease, and Tenant's possession of the Premises will not be disturbed as provided herein. This Agreement will be considered self-operative, and no separate agreements will be required to effectuate the attornment and recognition. The attornment and recognition of a substitute Lessor will be upon all of the terms set forth in the Lease. Lender shall not name Tenant, nor join Tenant as a party defendant or otherwise, in any suit, action or proceeding for the foreclosure of the Leasehold Mortgage or to enforce any rights under the Leasehold Mortgage unless otherwise required by law.

5. If Lender or any other person or entity becomes Lessor under the Lease ("New Lessor") as a result of a foreclosure or other action under the Leasehold Mortgage, Tenant will have no claim against the New Lessor resulting from, and the New Lessor will not be liable for, any act, omission and/or breach of the Lease by any prior Lessor under the Lease occurring prior to (a) if the New Lessor acquires the Premises through foreclosure, the date of expiration of all periods of redemption having occurred, or the date said New Lessor takes possession of the Premises, which ever shall occur first, or (b) if the New Lessor acquires the Premises through an assignment in lieu of foreclosure, the date of such acquisition; provided, however, that the rights of the New Lessor in and to the Premises and in, to and under the Lease will be subject to any right of set-off in favor of Tenant expressly and specifically provided for in the Lease. Further, Lender shall not be bound by any prepayment of rent or amendment of the Lease made in violation of Paragraphs 7 and 8 below, or any security deposit other than any security deposit actually delivered to it.

6. All condemnation awards and insurance proceeds paid or payable with respect to the Premises shall be applied and paid in the manner set forth in the Lease. Lender hereby acknowledges and agrees that all fixtures and equipment whether owned by Tenant or any subtenant or leased by Tenant from a lessor/owner (hereinafter called the "Equipment Lessor") installed in or on the Premises, regardless of the manner or mode of attachment,

shall be and remain the property of Tenant or any such Equipment Lessor and may be removed by Tenant or any such Equipment Lessor at any time while the Lease remains in effect. In no event (including a default under the Lease or Leasehold Mortgage) shall Lender have any liens, rights or claims in Tenant's or Equipment Lessor's fixtures and equipment, whether or not all or any part thereof shall be deemed fixtures; and Lender expressly waives all rights of levy, distraint, or execution with respect to said fixtures and equipment except as aforestated. Lender agrees to execute and deliver to Tenant and Equipment Lessor, within ten (10) days after request therefor, any document required by Tenant or Equipment Lessor in order to evidence the foregoing.

7. Tenant shall not prepay any rent under the Lease for more than one (1) month in advance, except with the written consent of Lender.

8. The Lease may not be amended, modified or altered, except through exercise of any rights, options or elections contained therein, without the written consent of the Lender.

9. Tenant agrees to give Lender a copy of any notice of default served upon Lessor in the manner and at the address set forth herein for any notice hereunder. If Lessor fails to cure such default within the time provided in the Lease, Lender shall have the right, but not the obligation, to cure such default on behalf of the Lessor within fifteen (15) calendar days after the time provided for in the Lease or within a reasonable period if such default cannot be cured within that time and Lender is proceeding with due diligence to cure such default. In such event, Tenant shall not terminate the Lease while such remedies are being diligently pursued by Lender.

10. This Agreement may not be amended, modified or altered in any manner other than by a written agreement signed by all the parties hereto.

11. This Agreement will be binding upon and will inure to the benefit of the parties to this Agreement and their respective heirs, executors, administrators, personal representatives, successors and assigns.

12. All notices required or permitted to be given under this Agreement will be in writing and will be considered given or served when sent by either (i) Certified U.S. Mail, Return Receipt Requested, or (ii) overnight courier service, addressed as follows:

              If to Lender:    _____
                               _____
                               _____
                               _____

If to Tenant: Bed Bath & Beyond of
Dadeland Station Inc.
715 Morris Avenue
Springfield, New Jersey 07081

Any party may change its address for such notices from time to time by serving written notice of the change upon the other parties as above provided.

13. This Agreement may be executed in multiple counterparts, all of which shall be deemed originals and with the same effect as if all parties had signed the same document. All such counterparts shall be construed together and shall constitute one instrument.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

TENANT

BED BATH & BEYOND
OF DADELAND STATION INC.

By: _____
Name: _____
Title: _____

LENDER

By: _____
Name: _____
Title: _____

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT** is entered into between DADELAND STATION ASSOCIATES, LTD. ("Lessor") and BED BATH & BEYOND OF DADELAND STATION INC. ("Lessee") as of the _23rd_ day of September, 1995.

**WHEREAS**, Lessor and Lessee are parties to a Lease dated October 31, 1994 (the "Lease") pertaining to space at Dadeland Station Center (the "Shopping Center"); and

**WHEREAS**, the parties desire to amend the Lease as herein provided;

**NOW, THEREFORE**, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lessor and Lessee agree as follows:

1.  The "June 30, 1996" date set forth in paragraph 1(e) of the Lease is hereby changed to "September 15, 1996".

2.  On the second line of Section 6(a) of the Lease, the "June 30, 1996" date is hereby changed to "September 15, 1996". On the 12th line of that Section, the words "June 30, 1996" are hereby changed to "September 15, 1996".

3.  Notwithstanding anything to the contrary in the Lease, Lessee hereby acknowledges and agrees that it shall not be entitled to exercise its right to terminate the Lease for Lessor's failure to complete the Lessor's Work (as defined in the Lease) by September 15, 1996, so long as construction of the Shopping Center is ongoing, and the Lessor is diligently and in good faith pursuing completion of such Lessor's Work, but not later than May 15, 1997 (without regard to Force Majeure).

4.  Provided Delivery of Possession, as defined in the Lease, occurs by September 15, 1996 (without regard to Force Majeure), Lessee agrees to accept possession, promptly thereafter to commence fixturing and stocking of the Premises, and to commence the payment of Rent pursuant to the provisions of Section 4(a) of the Lease.

5.  The third line of Section 38(c) of the Lease is hereby rewritten to read as follows: "sheets, bedspreads, comforters,

placemats, tablecloths, dish towels, oven mittens, aprons, pillows and pillow covers;".

6. The following is added to the end of the sixth line of Section 38(c) of the Lease: "kitchen utensils, appliances and 'gadgets', cleaning appliances and supplies,".

7. On the ninth line of Section 38(c) of the Lease, the word ", shelving" is added after the word "closet".

8. On the twelfth line of Section 38(c) of the Lease, before the word "food", the following is added: "specialty food items;".

9. In Section 4(a) of the Lease, the following is added before the last sentence thereof: "If the Commencement Date is not the first day of February, then the Lease Term shall be deemed extended until the last day of January following the fifteen (15th) anniversary of the Commencement Date. If the Lease Term is so extended (the "Extended Term"), the monthly Fixed Rent payable during such Extended Period shall be the Fixed Rent set forth herein for the next unexercised Renewal Period, if any, but if there is no unexercised Renewal Period, then the monthly Fixed Rent for the Extended Period shall be an amount equal to one hundred ten (110%) percent of the Fixed Rent payable for the month immediately preceding the Extended Term".

10. The seventh line of Section 4(b) of the Lease is hereby modified to read as follows: "the end of the preceding Lease Year, except that the last Lease Year shall be subject to extension, as set forth above, if the Commencement Date is not the first day of February. After the Commencement Date,".

11. A new Section 7(b)(vii) is added to page 13 of the Lease as follows: "Notwithstanding any provisions of this Section 7(b), (A) in the event the Commencement Date is not January 1, the amount of Percentage Rent, if any, payable with respect to the partial calendar year commencing upon the Commencement Date (such partial calendar year hereinafter referred to as the "Partial First Year") shall be determined by calculating the Gross Sales for the twelve (12) month period beginning with the Commencement Date, and multiplying the

Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the Partial First Year and the denominator of which is three hundred sixty-five (365), (B) in the event this Lease expires in accordance with the terms hereof, then the amount of Percentage Rent, if any, payable (1) with respect to the three (3) months of the Lease Term immediately preceding such expiration [with such three (3) month period hereinafter referred to as the "End Months"], shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the End Months and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by twenty-five (25%) percent, and (2) with respect to the ten (10) months of the Term immediately preceding the End Months, shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the End Months, and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by eighty-three and 33/100 (83.33%) percent, and (C) in the event this Lease does not expire in accordance with the terms hereof, but instead terminates for any reason in the middle of a calendar year, then the amount of Percentage Rent, if any, payable with respect to the partial calendar year commencing upon the final January 1 to occur during the Term and ending on the expiration date of this Lease (such partial calendar year hereinafter referred to as the "Partial Last Year") shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the termination date of this Lease, and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the Partial Last Year and the denominator of which is three hundred sixty-five (365).

12. Except as and to the extent modified herein, the Lease shall remain in full force and effect according to its terms and is hereby ratified.

**IN WITNESS WHEREOF**, the undersigned have caused this instrument to be executed as of the day and date first above written.

LESSOR:

Signed sealed and delivered in the presence of:

DADELAND STATION ASSOCIATES, LTD., a Florida limited partnership, by Dadeland Depot, Inc., a Florida Corporation, its general partner

Sign Name: _____
Print Name: YASMIN HAMALUDIN

By: _____
    Jeffrey L. Berkowitz
    President

Sign Name: _____
Print Name: _____
(As to Lessor)

[Corporate Seal]

LESSEE:

BED BATH & BEYOND OF DADELAND STATION INC., a Florida corporation

Sign Name: _____
Print Name: Steven H. Temares

By: _____
    Warren Eisenberg
    President

Sign Name: _____
Print Name: Amanda Chodor
(As to Lessee)

[Corporate Seal]

The undersigned Guarantor of the Lease joins in this Amendment for the purpose of approving thereof.

LESSEE:

BED BATH & BEYOND INC., a New York corporation

Sign Name: _____
Print Name: Steven H. Temares

By: _____
    Warren Eisenberg

Sign Name: _____
Print Name: Amanda Chodor

[Corporate Seal]

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT** is entered into between DADELAND STATION ASSOCIATES, LTD. ("Lessor") and BED BATH & BEYOND OF DADELAND STATION INC. ("Lessee") as of the _23rd_ day of September, 1995.

**WHEREAS**, Lessor and Lessee are parties to a Lease dated October 31, 1994 (the "Lease") pertaining to space at Dadeland Station Center (the "Shopping Center"); and

**WHEREAS**, the parties desire to amend the Lease as herein provided;

**NOW, THEREFORE**, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lessor and Lessee agree as follows:

1.  The "June 30, 1996" date set forth in paragraph 1(e) of the Lease is hereby changed to "September 15, 1996".

2.  On the second line of Section 6(a) of the Lease, the "June 30, 1996" date is hereby changed to "September 15, 1996". On the 12th line of that Section, the words "June 30, 1996" are hereby changed to "September 15, 1996".

3.  Notwithstanding anything to the contrary in the Lease, Lessee hereby acknowledges and agrees that it shall not be entitled to exercise its right to terminate the Lease for Lessor's failure to complete the Lessor's Work (as defined in the Lease) by September 15, 1996, so long as construction of the Shopping Center is ongoing, and the Lessor is diligently and in good faith pursuing completion of such Lessor's Work, but not later than May 15, 1997 (without regard to Force Majeure).

4.  Provided Delivery of Possession, as defined in the Lease, occurs by September 15, 1996 (without regard to Force Majeure), Lessee agrees to accept possession, promptly thereafter to commence fixturing and stocking of the Premises, and to commence the payment of Rent pursuant to the provisions of Section 4(a) of the Lease.

5.  The third line of Section 38(c) of the Lease is hereby rewritten to read as follows: "sheets, bedspreads, comforters,

placemats, tablecloths, dish towels, oven mittens, aprons, pillows and pillow covers;".

6. The following is added to the end of the sixth line of Section 38(c) of the Lease: "kitchen utensils, appliances and 'gadgets', cleaning appliances and supplies,".

7. On the ninth line of Section 38(c) of the Lease, the word ", shelving" is added after the word "closet".

8. On the twelfth line of Section 38(c) of the Lease, before the word "food", the following is added: "specialty food items;".

9. In Section 4(a) of the Lease, the following is added before the last sentence thereof: "If the Commencement Date is not the first day of February, then the Lease Term shall be deemed extended until the last day of January following the fifteen (15th) anniversary of the Commencement Date. If the Lease Term is so extended (the "Extended Term"), the monthly Fixed Rent payable during such Extended Period shall be the Fixed Rent set forth herein for the next unexercised Renewal Period, if any, but if there is no unexercised Renewal Period, then the monthly Fixed Rent for the Extended Period shall be an amount equal to one hundred ten (110%) percent of the Fixed Rent payable for the month immediately preceding the Extended Term".

10. The seventh line of Section 4(b) of the Lease is hereby modified to read as follows: "the end of the preceding Lease Year, except that the last Lease Year shall be subject to extension, as set forth above, if the Commencement Date is not the first day of February. After the Commencement Date,".

11. A new Section 7(b)(vii) is added to page 13 of the Lease as follows: "Notwithstanding any provisions of this Section 7(b), (A) in the event the Commencement Date is not January 1, the amount of Percentage Rent, if any, payable with respect to the partial calendar year commencing upon the Commencement Date (such partial calendar year hereinafter referred to as the "Partial First Year") shall be determined by calculating the Gross Sales for the twelve (12) month period beginning with the Commencement Date, and multiplying the

Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the Partial First Year and the denominator of which is three hundred sixty-five (365), (B) in the event this Lease expires in accordance with the terms hereof, then the amount of Percentage Rent, if any, payable (1) with respect to the three (3) months of the Lease Term immediately preceding such expiration [with such three (3) month period hereinafter referred to as the "End Months"], shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the End Months and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by twenty-five (25%) percent, and (2) with respect to the ten (10) months of the Term immediately preceding the End Months, shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the End Months, and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by eighty-three and 33/100 (83.33%) percent, and (C) in the event this Lease does not expire in accordance with the terms hereof, but instead terminates for any reason in the middle of a calendar year, then the amount of Percentage Rent, if any, payable with respect to the partial calendar year commencing upon the final January 1 to occur during the Term and ending on the expiration date of this Lease (such partial calendar year hereinafter referred to as the "Partial Last Year") shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the termination date of this Lease, and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the Partial Last Year and the denominator of which is three hundred sixty-five (365).

12. Except as and to the extent modified herein, the Lease shall remain in full force and effect according to its terms and is hereby ratified.

**IN WITNESS WHEREOF**, the undersigned have caused this instrument to be executed as of the day and date first above written.

LESSOR:

Signed sealed and delivered in the presence of:

DADELAND STATION ASSOCIATES, LTD., a Florida limited partnership, by Dadeland Depot, Inc., a Florida Corporation, its general partner

Sign Name: _Hamaludin_
Print Name: YASMIN HAMALUDIN

By: _____
    Jeffrey Berkowitz
    President

Sign Name: _____
Print Name: PATRICIA A. CHIRELLES
(As to Lessor)

[Corporate Seal]

LESSEE:

BED BATH & BEYOND OF DADELAND STATION INC., a Florida corporation

Sign Name: _____
Print Name: Steven H. Temares

By: _____
    Warren Eisenberg
    President

Sign Name: _____
Print Name: Amanda Chodor
(As to Lessee)

[Corporate Seal]

The undersigned Guarantor of the Lease joins in this Amendment for the purpose of approving thereof.

LESSEE:

BED BATH & BEYOND INC., a New York corporation

Sign Name: _____
Print Name: Steven H. Temares

By: _____
    Warren Eisenberg

Sign Name: _____
Print Name: Amanda Chodor

[Corporate Seal]

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT** is entered into between DADELAND STATION ASSOCIATES, LTD. ("Lessor") and BED BATH & BEYOND OF DADELAND STATION INC. ("Lessee") as of the _23rd_ day of September, 1995.

**WHEREAS**, Lessor and Lessee are parties to a Lease dated October 31, 1994 (the "Lease") pertaining to space at Dadeland Station Center (the "Shopping Center"); and

**WHEREAS**, the parties desire to amend the Lease as herein provided;

**NOW, THEREFORE**, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lessor and Lessee agree as follows:

1.    The "June 30, 1996" date set forth in paragraph 1(e) of the Lease is hereby changed to "September 15, 1996".

2.    On the second line of Section 6(a) of the Lease, the "June 30, 1996" date is hereby changed to "September 15, 1996". On the 12th line of that Section, the words "June 30, 1996" are hereby changed to "September 15, 1996".

3.    Notwithstanding anything to the contrary in the Lease, Lessee hereby acknowledges and agrees that it shall not be entitled to exercise its right to terminate the Lease for Lessor's failure to complete the Lessor's Work (as defined in the Lease) by September 15, 1996, so long as construction of the Shopping Center is ongoing, and the Lessor is diligently and in good faith pursuing completion of such Lessor's Work, but not later than May 15, 1997 (without regard to Force Majeure).

4.    Provided Delivery of Possession, as defined in the Lease, occurs by September 15, 1996 (without regard to Force Majeure), Lessee agrees to accept possession, promptly thereafter to commence fixturing and stocking of the Premises, and to commence the payment of Rent pursuant to the provisions of Section 4(a) of the Lease.

5.    The third line of Section 38(c) of the Lease is hereby rewritten to read as follows: "sheets, bedspreads, comforters,

placemats, tablecloths, dish towels, oven mittens, aprons, pillows and pillow covers;".

6. The following is added to the end of the sixth line of Section 38(c) of the Lease: "kitchen utensils, appliances and 'gadgets', cleaning appliances and supplies,".

7. On the ninth line of Section 38(c) of the Lease, the word ", shelving" is added after the word "closet".

8. On the twelfth line of Section 38(c) of the Lease, before the word "food", the following is added: "specialty food items;".

9. In Section 4(a) of the Lease, the following is added before the last sentence thereof: "If the Commencement Date is not the first day of February, then the Lease Term shall be deemed extended until the last day of January following the fifteen (15th) anniversary of the Commencement Date. If the Lease Term is so extended (the "Extended Term"), the monthly Fixed Rent payable during such Extended Period shall be the Fixed Rent set forth herein for the next unexercised Renewal Period, if any, but if there is no unexercised Renewal Period, then the monthly Fixed Rent for the Extended Period shall be an amount equal to one hundred ten (110%) percent of the Fixed Rent payable for the month immediately preceding the Extended Term".

10. The seventh line of Section 4(b) of the Lease is hereby modified to read as follows: "the end of the preceding Lease Year, except that the last Lease Year shall be subject to extension, as set forth above, if the Commencement Date is not the first day of February. After the Commencement Date,".

11. A new Section 7(b)(vii) is added to page 13 of the Lease as follows: "Notwithstanding any provisions of this Section 7(b), (A) in the event the Commencement Date is not January 1, the amount of Percentage Rent, if any, payable with respect to the partial calendar year commencing upon the Commencement Date (such partial calendar year hereinafter referred to as the "Partial First Year") shall be determined by calculating the Gross Sales for the twelve (12) month period beginning with the Commencement Date, and multiplying the

Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the Partial First Year and the denominator of which is three hundred sixty-five (365), (B) in the event this Lease expires in accordance with the terms hereof, then the amount of Percentage Rent, if any, payable (1) with respect to the three (3) months of the Lease Term immediately preceding such expiration [with such three (3) month period hereinafter referred to as the "End Months"], shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the End Months and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by twenty-five (25%) percent, and (2) with respect to the ten (10) months of the Term immediately preceding the End Months, shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the End Months, and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by eighty-three and 33/100 (83.33%) percent, and (C) in the event this Lease does not expire in accordance with the terms hereof, but instead terminates for any reason in the middle of a calendar year, then the amount of Percentage Rent, if any, payable with respect to the partial calendar year commencing upon the final January 1 to occur during the Term and ending on the expiration date of this Lease (such partial calendar year hereinafter referred to as the "Partial Last Year") shall be determined by calculating the Gross Sales for the twelve (12) month period prior to the termination date of this Lease, and multiplying the Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the Partial Last Year and the denominator of which is three hundred sixty-five (365).

12. Except as and to the extent modified herein, the Lease shall remain in full force and effect according to its terms and is hereby ratified.

**IN WITNESS WHEREOF**, the undersigned have caused this instrument to be executed as of the day and date first above written.

LESSOR:

Signed sealed and delivered in the presence of:

DADELAND STATION ASSOCIATES, LTD., a Florida limited partnership, by Dadeland Depot, Inc., a Florida Corporation, its general partner

Sign Name: _____
Print Name: YASMIN HAMALODIN

By: _____

Jeffrey W. Berkowitz
President

Sign Name: _____
Print Name: PATRICIA F. COMMELLS
(As to Lessor)

[Corporate Seal]

LESSEE:

BED BATH & BEYOND OF DADELAND STATION INC., a Florida corporation

Sign Name: _____
Print Name: Steven H. Temares

By: _____

Warren Eisenberg
President

Sign Name: _____
Print Name: Amanda Chodor
(As to Lessee)

[Corporate Seal]

The undersigned Guarantor of the Lease joins in this Amendment for the purpose of approving thereof.

LESSEE:

BED BATH & BEYOND INC., a New York corporation

Sign Name: _____
Print Name: Steven H. Temares

By: _____

Warren Eisenberg

Sign Name: _____
Print Name: Amanda Chodor

[Corporate Seal]

STATE OF NEW JERSEY )
                   : ss.:
COUNTY OF          )

    The foregoing instrument was acknowledged before me this
_____ day of _____, 19__, by _____,
to me personally known, who, being by me duly sworn did say that
s/he is the _____ of BED BATH & BEYOND OF DADELAND
STATION INC., a Florida corporation, in the capacity aforesaid.


                                    _____
                                         Notary Public


STATE OF FLORIDA   )
                   : ss:
COUNTY OF DADE     )

    The foregoing instrument was acknowledged before me this
_____ day of _____, 19__, by _____,
to me personally known, who, being by me duly sworn did say that
s/he is the _____ of _____, a
_____ [corporation/partnership] in the capacity
aforesaid.


                                    _____
                                         Notary public

## ASSIGNMENT AND ASSUMPTION AGREEMENT
## AND RELEASE

KNOW ALL MEN BY THESE PRESENTS that BED BATH & BEYOND OF DADELAND STATION, INC., a Florida corporation, having its principal place of business at 650 Liberty Avenue, Union, New Jersey 07083 (*"Assignor"*), for and in consideration of the sum of ONE DOLLAR ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby sells, assigns, transfers and conveys to BED BATH & BEYOND INC., a New York corporation, having its principal place of business at 650 Liberty Avenue, Union, New Jersey 07083 (*"Assignee"*) all of Assignor's right, title, interest and estate in and to that certain Lease Agreement dated October 31, 1994 (as amended), by and between DADELAND ASSOCIATES, LTD, a Florida limited partnership, as Lessor, and Assignor, as Lessee, demising certain premises in the Dadeland Station Shopping Center, located in Miami, Florida, as more particularly described therein, together with any and all amendments or modifications thereof, and ancillary documents thereto (collectively, the *"Lease"*).    *STATION*

ASSIGNEE hereby accepts the foregoing assignment and assumes, agrees to be bound by, observe and perform all of the terms, covenants, conditions and obligations to be observed and performed by the Assignor under the Lease, including, without limitation, as may have heretofore arisen or accrued under the Lease.

By its signature below, Landlord hereby consents to the foregoing assignment and assumption, and, in consideration for the assumption by the Assignee of all of the obligations under the Lease on the Assignor's part to be performed or observed, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord, for itself, its successors and assigns and all persons and concerns claiming by, through and under it, hereby remises, releases and forever discharges: (i) the Assignor from any and all obligations and liabilities that the Assignor may have arising out of the Lease; and (ii) the Assignee, but only in its capacity as Guarantor under that certain Guaranty dated October 31, 1994 guaranteeing Assignor's obligations under the Lease, from any and all obligations and liabilities that the Assignee may have arising out of said Guaranty.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement and Release to be executed as of the latest date below.

WITNESS/ATTEST:

**ASSIGNOR:**

BED BATH & BEYOND OF DADELAND STATION, INC.

By: _____
Name: Steven H. Temares
Title: Vice President
Date: 6/13/02

**ASSIGNEE:**

BED BATH & BEYOND INC.

By: _____
Name: Steven H. Temares
Title: President & Chief Operating Officer
Date: 6/14/03

ARNOLD A. BROWN

**LANDLORD:**

DADELAND STATION ASSOCIATES, LTD.
by Dadeland Properties Inc., its gp.
By: _____
Name: Jeffrey L. Berkowitz
Title: Pres.
Date: 1/22/02

## SECOND LEASE MODIFICATION

THIS SECOND LEASE MODIFICATION ("**Modification**"), dated as of the __28th__ day of __May_____, 2021 ("**Modification Date**") by and between DADELAND STATION ASSOCIATES, LTD., a Florida limited partnership ("**Lessor**"), having an office at 2665 S. Bayshore Drive, #1200, Miami, Florida 33133 and BED BATH & BEYOND INC., a New York corporation ("**Lessee**"), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

### W I T N E S S E T H :

WHEREAS, Lessor and Lessee, as successor-in-interest to Bed Bath & Beyond of Dadeland Station Inc., are parties to that certain Lease dated as of October 31, 1994 (as amended and/or modified thereafter, the "**Lease**"), with respect to premises ("**Premises**") located at the Dadeland Station Center in Miami, Florida ("**Shopping Center**"); and

WHEREAS, Lessor and Lessee desire to modify the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Modification and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Modification by this reference.  Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Notwithstanding anything contained in the Lease to the contrary, Lessor and Lessee hereby agree that the modifications to the Lease that are outlined in Schedule A hereto shall govern and control from and after the Modification Date.

3.      Lessor hereby represents that there is no monetary default by Lessee under the Lease as of the Modification Date.

4.      It is the policy of Lessee (together with its subsidiaries and affiliates, collectively, the "**Company**") to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  Lessor shall not, directly or indirectly, solicit or accept from, nor offer, promise or pay any individual or entity (including, but not limited, to any government official) any bribe, kickback or any other improper payment of money or anything else of value.  This includes, but is not limited to, any improper payment in exchange for the Company's execution of this Modification. In addition, any individual who is employed by or who represents the Company is prohibited from soliciting, accepting, offering, promising or paying any bribe, kickback or any other improper payment of money or anything else of value.  If any such improper actions are observed, Lessor shall inform the Company's Legal Department (Attention: General Counsel) by (i) notice to the address set forth in the Lease, as amended hereby or (ii) by telephoning 908-688-0888.

DocuSign Envelope ID: 996ED7FF-66B4-4F93-8D9A-575419728853

5.      Lessor and Lessee each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Modification, except for Retail Consulting Services (***"Lessee's Broker"***).  Lessee shall pay any commission due to Lessee's Broker in connection with this Modification pursuant to a separate written agreement between Lessee and Lessee's Broker.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Lessee's Broker) with respect to this Modification in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease.  The provisions of this Section shall survive the expiration or earlier termination of the Lease.

6.      Lessor represents and warrants to Lessee that, as of the date hereof that (ii) no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Modification to be in full force and effect against Lessor except for the consent of New York Life Insurance Company, Lessor's lender, whose consent is attached hereto; (ii) no consent or approval is required from Ground Lessor in order for the terms and provisions of this Modification to be in full force and effect; and (iii) the term of the Ground Lease, as amended, expires on December 31, 2084.  The parties represent and warrant to each other that the person signing on behalf of either Lessor or Lessee, as the case may be, has the authority to do so and for this Modification to be deemed in full force and effect.

7.      Upon the request of either party following the execution and delivery of this Modification, Lessor and Lessee shall execute an amended/restated short form lease or memorandum for recording, which shall be in form and substance as reasonably acceptable to both parties.  In no event shall the amount of Rent or any other monetary terms hereof be included in any such short form lease or memorandum.  Further, after the expiration or earlier termination of the Lease, Lessee agrees, upon Lessor's request, to execute and deliver a termination of such short form lease or memorandum in recordable form and this obligation shall survive expiration or termination of the Lease.  The party requesting such document shall record any such short form lease or memorandum at its expense.

8.      The terms and conditions of this Modification shall be binding upon, and inure to the benefit of Lessor and Lessee and their respective heirs, executors, administrators, successors and assigns.  Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect.  In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Modification, the terms and provisions of this Modification shall govern and control.

9.      This Modification may be executed electronically and in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Modification to Lease.  The execution and transmission of an image of any signed document or document signed by DocuSign (or a similar application) will have the

DocuSign Envelope ID: 996ED7FF-6CB4-4F93-8D9A-57519728553

same binding effect as an original bearing an original signature.  No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Second Lease Modification as of the day and year first above written.

**LESSOR:**

DADELAND STATION ASSOCIATES. LTD.
a Florida limited partnership

By: Dadeland Depot, Inc., its general partner

By: _____

Name:  Michael Berkowitz
Title:   Vice President

**LESSEE:**

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Name:  John Hartmann
Title:   EVP, Chief Operating Officer

**From:** Bethany Nadel <Bethany.Nadel@bedbath.com>
**Date:** Friday, May 28, 2021 at 11:56 AM
**To:** Michael Berkowitz <mberkowitz@berkowitzdev.com>
**Cc:** Arnold Brown <abrown@bilzin.com>
**Subject:** RE: NY Life Consent- Dadeland Station, Bed Bath Amendment.

**CAUTION:** This email originated from outside of the organization. Do not click any hyperlinks, respond or open any attached files unless you have validated that the message is legitimate.

Sorry for the delay Michael and Arnold.  The consent is fine.

Thanks and have a great weekend.

---

**From:** Michael Berkowitz <mberkowitz@berkowitzdev.com>
**Sent:** Friday, May 28, 2021 11:40 AM
**To:** Bethany Nadel <Bethany.Nadel@bedbath.com>
**Cc:** Arnold A. Brown <abrown@bilzin.com>
**Subject:** RE: NY Life Consent- Dadeland Station, Bed Bath Amendment.
**Importance:** High

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Bethany,

Good morning. Any update on the email below? I'd really like to sign the document today as I will be traveling next week.

Regards,

Michael Berkowitz
President
Berkowitz Development Group, Inc.
2665 S Bayshore Dr #1200
Miami, FL 33133
305 854 2800
fax: 305 859 8300
www.berkowitzdevelopment.com

The information contained in this electronic message is privileged and/or confidential and is intended only for the use of the individual or entity named above.  If you are not the intended recipient, or if you are responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of the communication is not authorized, allowed or intended by the sender. If you have received this communication in error, please immediately notify us by telephone at the above number and forward the original message to the sender above.  Thank you.

**From:** Arnold A. Brown <abrown@bilzin.com>
**Sent:** Thursday, May 27, 2021 3:03 PM
**To:** Bethany.Nadel@bedbath.com
**Cc:** Michael Berkowitz <mberkowitz@berkowitzdev.com>
**Subject:** FW: NY Life Consent- Dadeland Station, Bed Bath Amendment.

**CAUTION:** This email originated from outside of the organization. Do not click any hyperlinks, respond or open any attached files unless you have validated that the message is legitimate.

Hi Bethany.  Attached is NY Life Consent.  Before Landlord attaches it to the BBB signed 2d Amendment and signs/returns the fully signed 2d Amendment, we want to make sure this works for BBB.  We believe it should.  As we previously indicated, most institutional lenders, including this one, prefer just signing off by e-mail.  Please confirm ok.  Thanks.

Arnold A. Brown, Esq.
Bilzin Sumberg
2665 South Bayshore Drive
Suite 1200
Coconut Grove, FL 33133
Cell:  305-903-2200
e-mail: abrown@bilzin.com

---

On May 27, 2021, at 1:56 PM, Killough, Abby L. <Abby_L_Killough@nylim.com> wrote:

**CAUTION:** This email originated from outside of the organization. Do not click any hyperlinks, respond or open any attached files unless you have validated that the message is legitimate.

Hi Michael,

NYL has no objection to the BBB Second Amendment Lease, please provide the fully executed version once it becomes available.

Thank you,

Abby Killough
Senior Associate • Loan Management
**REAL ESTATE INVESTORS**
51 Madison Avenue, New York, NY 10010
✉ Abby_L_Killough@nylim.com
☎Work (212) 576 8109 ☎Cell (732) 546 6210



**CAUTION:** Please be aware of the increase in cybercrime and fraud. Bilzin Sumberg personnel will not ordinarily provide wire transfer or other payment instructions by email relating to the payment of Bilzin Sumberg invoices or advance fee deposits. Although payment instructions may be provided by email in connection with client matters such as closings, please contact us to obtain verbal verification prior to initiating any payments.

DocuSign Envelope ID: 9B6ED7FF-6CB4-4F93-8D9A-575449728553

## CONSENT OF LENDER

     The undersigned hereby confirms that it is the sole mortgagee or beneficiary of a mortgage or deed of trust encumbering the real property located in the Dadeland Station Center in Miami, Florida; and as such beneficiary, New York Life Insurance Company, hereby consents and agrees to the attached Second Lease Modification.

NEW YORK LIFE INSURANCE COMPANY

Date: _____

By: _____
Name: _____
Title: _____
Address: _____
            _____
            _____

## SCHEDULE A

The Lease is hereby amended to reflect that:

1.      The current Lease Term is hereby extended for the period commencing on February 1, 2022 and ending on January 31, 2032 (the **"Extension Term"**).  Notwithstanding anything in the Lease to the contrary, Lessee shall have the right and option to further extend the Lease Term (beyond the Extension Term) for the third Renewal Period as set forth in Section 5 of the Lease, as amended herein (it being understood that the first and second renewal options have been exercised and the final and fourth option to renew the Lease pursuant to Section 5 of the Lease is hereby deemed null and void and of no further force and effect), except that such Renewal Period, if exercised, will be exercised on no less than 365 days' notice to Lessor (and not 180 days specified in said Section 5 of the Lease) and will occur during the period from February 1, 2032 through January 31, 2037.

2.      During the Extension Term and the third Renewal Period, if exercised, Fixed Rent shall be paid as follows:

| Period | Per Square Foot | Annual Fixed Rent |
|---|---|---|
| February 1, 2022 - January 31, 2027 | $27.80 psf | $1,668,000 per annum |
| February 1, 2027 – January 31, 2032 | $29.90 psf | $1,794,000 per annum |
| Third Renewal Period, if exercised (i.e., February 1, 2032 - January 31, 2037) | $32.89 psf | $1,973,400 per annum |

3.      Section 7(b)(ii) of the Lease shall be modified to add as additional exclusions from the definition of "Gross Sales" thereunder the following: (A) sales of merchandise fulfilled from the Premises but where payment is not made at the Premises (e.g., online or at another store); and (B) sales of merchandise where payment is made at the Premises but not fulfilled from the Premises.

4.      Lessor shall reimburse Lessee the sum of Three Hundred Thousand and 00/100 Dollars ($300,000.00) (**"Lessee Allowance"**) in consideration for Lessee's construction of "Lessor's Special Improvements" (defined below) and to be applied towards costs and expenses of Lessee's construction, refixturing and/or renovation of Lessee's store in the Premises (including, without limitation, hard and soft costs and expenses, signage, third party and reasonable in-house labor costs incurred in conjunction with Lessee's work, and technology expenses and equipment [e.g., large display monitors, wifi connectivity, etc.]) (collectively, the **"Renovation Work"**).  All Renovation Work shall be subject to the terms and provisions of the Lease (including, without limitation, Section 13 thereof).  Lessor shall reimburse the Lessee Allowance to Lessee as follows: (i) within ten (10) days after Lessee's receipt of a fully executed

copy of this Modification, Lessor shall pay Lessee the sum of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) and (ii) Lessor shall pay Lessee the remaining One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) within thirty (30) days after Lessor's receipt of the following from Lessee: (i) a lien waiver from Lessee's general contractor; (iii) invoices evidencing that the Renovation Work cost not less than Three Hundred Thousand and 00/100 Dollars ($300,000.00) (it being understood that Lessee shall only be required to deliver to Lessor Renovation Work invoices in the aggregate amount of Three Hundred Thousand and 00/100 Dollars ($300,000.00) and Lessee shall not be required to deliver to Lessor invoices for all of the Renovation Work); (iii) Certification from Lessee that the Renovation Work has been substantially completed; and (iv) a Mechanics' Lien Indemnification Agreement in the form attached hereto as Exhibit A. If Lessor does not pay any portion of the Lessee Allowance to Lessee by the required date, then Lessee shall have the right to offset such unpaid amount against Rent payable by Lessee under the Lease, together with interest at the Lease Interest Rate (defined hereafter) from the date such remittance is due until reimbursement or full satisfaction by credit. The Lessee Allowance is an offset (and not an inducement) for Lessee's construction, on behalf of Lessor, of the Renovation Work (the **"Lessor's Special Improvements"**) (which Lessor's Special Improvements, together with any replacements thereof, when completed shall be the property of Lessor, subject to use by Lessee of same during the Lease Term of, and in accordance with, the Lease, as herein amended). Lessor alone shall be entitled to depreciate the Lessor's Special Improvements as an asset for tax purposes, and Lessee shall not recognize income with respect to the Lessee Allowance. Lessee shall be responsible for and herewith agrees to pay all costs of the Renovation Work in excess of the Lessee's Allowance, and the Renovation Work (except for Lessor's Special Improvements), together with any replacements thereof, shall be and remain the property of Lessee throughout the Lease Term, and Lessee alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes. As used herein, the term "Lease Interest Rate" shall mean the then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

5.    Subject to applicable legal requirements, Lessor hereby consents to Lessee: (a) using the six (6) parking stalls on level 5 of the parking structure serving the Shopping Center in the area marked with red Xs on Exhibit B (**"Curbside Pickup Area"**) for curbside pickup for Lessee's customers; and (b) installing signs designating the Curbside Pickup Area, which signs shall be substantially in the form depicted on Exhibit C. Notwithstanding the foregoing, Lessee shall not be permitted to tow, boot or otherwise exercise enforcement action against anyone who parks in the parking stalls dedicated for use of the Curbside Pickup Area, and Lessor shall not be required to do so. Further, if any tenant (or any successor, assignee or subtenant of such tenant) leasing premises in the Shopping Center under a lease that is in effect as of the Modification Date (**"Current Tenant"**) objects to the Curbside Pickup Area pursuant to a right to do so that is contained in its lease, or the a governmental entity of Miami-Dade County (**"County"**) objects to the Curbside Pickup Area pursuant to a right it has to do so by law, Lessor shall promptly notify Lessee thereof and Lessee shall, within thirty (30) days after the date of the Current Tenant's or County's complaint, either get the Current Tenant or County (as applicable) to withdraw the complaint in writing or cease the Curbside Pickup Area and restore those portions of the Shopping Center that were changed to accommodate the Curbside Pickup Area to their condition as of the date Lessee commences use of the Curbside Pickup Area as contemplated in this

DocuSign Envelope ID: 996ED7FF-6CB4-4F93-8D9A-57516728553

Section 5.  Lessee acknowledges being advised that the foregoing is included in an abundance of caution to avoid Lessor having to review and evaluate every Current Tenant's lease and inquire of the County to avoid defaulting under any Current Tenant leases with Lessor and/or with the County and in order to avoid the potential need to go to the County and each other Current Tenant's for a sign-off on the Curbside Pickup Area, which would be time consuming and expensive.  Nothing herein shall be deemed a waiver of the parties indemnification obligations set forth in Section 49 of the Lease.

6.    Lessee has suggested to Lessor the conceptual possibility of additional directory signage in the Shopping Center.  Lessor agrees to meet with Lessee's personnel to discuss this topic, although the decision to allow any additional directory signage shall be in Lessor's sole discretion.  Any such additional directory signage shall be fabricated, installed, maintained, repaired and, when necessary, replaced, at Lessee's sole cost.

## Exhibit A

## Form of Mechanics' Lien Indemnification Agreement

THIS MECHANICS' LIEN INDEMNIFICATION is made this _____ day of _____, 202_, by BED BATH & BEYOND INC., a New York corporation (hereinafter referred to as *"Lessee"*), for the benefit of _____, a _____ (*"Lessor"*).

## WITNESSETH

Lessor and Lessee have entered into a Lease dated _____ (as amended, the *"Lease"*), whereby Lessor has leased to Lessee a portion of the real property located in Dadeland Station Center in Miami, Florida (the *"Shopping Center"*) and, in connection with that certain Second Lease Modification dated as of _____, 202__ (*"Amendment"*), Lessee has renovated its store premises within such real property (the *"Premises"*).

NOW, THEREFORE, in consideration of the payment of the Lessee Allowance as defined in the Amendment and other good and valuable consideration, the receipt of which is hereby acknowledged, the Lessee agrees as follows:

1.      Lessee hereby indemnifies and agrees to hold Lessor harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Lessor's interest in the Premises and the Shopping Center based upon materials or services provided under contract with Lessee.  In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Lessee, Lessee shall hold harmless and protect Lessor from any loss, payment, claim or expense related thereto.

2.      Lessee reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure by any other means, Lessee shall bond around, pay or remove such lien by any manner reasonably necessary to protect Lessor's interest in the Premises and the Shopping Center.  This indemnity and hold harmless shall not apply to any liens or claims caused by Lessor or Lessor's agents.

EXECUTED as of the date written above.

BED BATH & BEYOND INC.,
a New York corporation


By: _____
            Michael Yorio
            Vice President – Construction

## Exhibit B



DocuSign Envelope ID: 996ED7FF-6CB4-4E93-8D9A-575410728853

### Exhibit C

