**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered)<br>**Re: Docket No. 25, 76, 729, 982** |

---

[1]  The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby.  The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

**DEBTORS' OBJECTION TO THE MOTION
OF THE AD HOC BONDHOLDER GROUP, PURSUANT TO
11 U.S.C. § 105(A), FED. R. CIV. P. 60(A), AND FED. R. BANKR. P. 4001(C)
AND 9024, FOR (A) AN ORDER VACATING THE INTERIM AND FINAL
ORDERS AUTHORIZING THE DEBTORS TO, AMONG OTHER THINGS,
OBTAIN POSTPETITION FINANCING, AND (B) OTHER RELATED RELIEF**

TO: THE HONORABLE JUDGE VINCENT F. PAPALIA UNITED STATES

BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this objection (the "Objection") to the *Motion of the*

*Ad Hoc Group, Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(a), and Fed. R. Bankr. P.*

*4001(c) and 9024, for (A) an Order Vacating the Interim and Final Orders Authorizing the*

*Debtors To, Among Other Things, Obtain Postpetition Financing, and (B) Other Related Relief*

[Docket No. 982] (the "Motion"):[2]

**Preliminary Statement**

1.    The ad hoc bondholder group (the "Ad Hoc Group," or "Movant") seeks

extraordinary relief that would provide them with yet another bite at the apple on matters already

well settled by this Court.  After sitting on its hands for months, seeking no discovery and filing

no objections,[3] the Ad Hoc Group's Motion should be denied.

---

[2]    Capitalized terms used but not otherwise defined in this Objection shall have the meanings ascribed to them in:
(a) the *Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond
Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 10] (the "First Day
Declaration"); (b) the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A)
Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority
Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay,
(V) Scheduling A Final Hearing, and (VI) Granting Related Relief* [Docket No. 25] (the "DIP Motion");
(c) the Etlin DIP Declaration (as defined in the DIP Motion); (d) the Kurtz Declaration (as defined in the DIP
Motion); (e) the Interim DIP Order and Final DIP Order; and (f) the Motion, as applicable.  A detailed description
of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases is set
forth in greater detail in the First Day Declaration and incorporated by reference herein.

[3]    At the Final DIP Hearing, Movant did request (and was granted by the Court), a limited opportunity to show
cause to extend the Challenge Period.  When asked by the Court to clarify what the Ad Hoc Bondholder Group

2.       The Motion is improper, untimely, and procedurally defective under Federal Rule of Civil Procedure 60(b), 60(c), and section (e) of 364 of the Bankruptcy Code, all as more fully described herein.  But perhaps most alarming is that Movant has largely based its Motion on a "new discovery" that the Debtors' actual cash results in the first week differed from those forecasted.  This is not, however, new evidence.  Projections are just that—projections.  And actual results have been posted publicly for weeks.  This is wholly non-controversial information that would have been readily available to Movant at any time, were Movant to have requested it from the Debtors.

3.       Incredibly, Movant raises due process concerns after forgoing the opportunity to cross-examine the Debtors' witnesses, serve formal discovery, lodge routine informal diligence requests, or file and have heard any objections before entry of the Final DIP Order.  Movant goes so far as to imply that the Debtors' cash forecast was some kind of nefarious undertaking because: *one*, the Debtors' financial performance immediately prior to and following the filing of these cases exceeded expectations; and *two*, like nearly every other debtor in chapter 11 (particularly retailers), natural but unforeseen circumstances (*e.g.*, account opening and disbursement delays) caused actual disbursements and receipts to differ from projections.  To use those facts as the basis for allegations that the Debtors did not need the DIP Facility or, worse, that they secured it for an improper purpose is absolutely incorrect. And, insofar as the Motion questions without any support whatsoever the good faith of the Debtors and their professionals, it is highly irresponsible.

4.       The DIP Facility was sized, sought, and negotiated prepetition, before the Debtors could have known actual postpetition sales results or the result of their sales in the day before the

---

was seeking, counsel to the Ad Hoc Bondholder Group stated:  "[t]o be clear Judge, it's only the [extension of the] challenge period, that's it." *See id* at 42-43: 25-15.

petition date.  The DIP Facility represents a collective package of compromises that benefits the

estate through, among other things, the Reserves, while providing additional benefits to the general

unsecured creditor pool through the DIP Settlement.  The DIP Facility was arranged and negotiated

in good faith and at arms'-length by the Debtors based on the circumstances the Debtors faced at

the time.  Absent the DIP Facility, the Debtors had no avenues available to seek a going-concern

transaction.  The DIP Facility was secured in the face of significant negative historical sales trends,

the cessation of virtually all trade credit extended to the Debtors, and the need to pay payroll, rent,

and other operating expenses after the Petition Date.  Further, the Debtors did not have any

available cash reserves as of the Petition Date because they were operating under total cash

dominion in accordance with the terms of the Prepetition ABL Facility.  Accordingly, the only

source of cash available to the Debtors was the DIP Facility.  Without it, the Debtors would have

been forced to rely on the use of cash collateral as their only liquidity source to sustain themselves

in these cases.  The use of cash collateral itself does not come without costs and would have carried

its own uncertainties.  No responsible and well-advised debtor would file a chapter 11 case hoping

for a completely counterfactual scenario to unfold while not assuring itself of adequate liquidity

through conventional and available debtor-in-possession financing.

     5.     The Court should dispose of this Motion immediately, as it manifestly fails to meet

the applicable standards for reconsideration.  Entertaining the Ad Hoc Group's attempts to tear the

DIP Orders to shreds risks undoing the substantial progress the Debtors have achieved to date,[4]

---

[4]    The DIP Lenders have informed the Debtors that they will not consent to the release of liens on the Reserves
provided for in the Final DIP Order to the extent the Motion remains unresolved.  It is therefore crucial to the
Debtors' estates that this Motion be dispensed with expeditiously.  Moreover, while the Motion does not include
a request to extend the Challenge Period as contemplated by this Court's ruling during the Final DIP Hearing, the
Motion instead asks the Court to vacate the Interim DIP Order with the apparent purpose of eliminating the
Challenge Period as a whole.  The Debtors reserve all rights with respect to the release of the Reserves and the
Ad Hoc Group's purported request to eliminate the Challenge Period.

particularly at such a critical juncture in the chapter 11 cases,[5] and it would burden the Debtors' estates with undue costs and distraction.   Vacating or even reconsidering the DIP Orders not only risks a default and termination under the terms of the DIP Credit Agreement, but will deprive the Debtors of the benefit of their bargain when they negotiated the DIP Orders.

**Background**

6.       On April 23, 2023, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* [Docket No. 25] (the "DIP Motion"), requesting the Court enter interim and final orders authorizing the Debtors to obtain postpetition DIP financing, among other relief.  The Debtors filed the First Day Declaration, the Etlin DIP Declaration, and the Kurtz DIP Declaration in further support of the DIP Motion.

7.       On April 24, 2023, the Court held a hearing on the DIP Motion (the "Interim DIP Hearing") and entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* [Docket No. 76] (the "Interim DIP Order").  The Debtors provided additional factual bases at the Interim DIP Hearing to support the relief requested in the DIP Motion, as reflected in the record.  The Ad Hoc Group appeared at

---

[5]    Consistent with the Milestones set forth in the Final DIP Order, the Debtors expect to file a chapter 11 plan and corresponding disclosure statement in the near-term, and seek conditional approval of the disclosure statement to further advance these chapter 11 cases to a successful close.

the Interim DIP Hearing on behalf of certain unsecured bond holders; it did not, however, oppose

entry of the Interim DIP Order.[6]  At the Interim DIP Hearing, Mr. Mayr, as counsel to the Ad Hoc

Group, stated:

> We also did want to -- no objections today on an interim basis . . . but we do want
> -- you know, ***we do reserve rights to the final hearing***. Particular would note that,
> you know, ***we may have issue with a certain incremental collateral or liens on
> avoidance actions going to the DIP***.[7]

8.      On May 5, 2023, the United States Trustee for the District of New Jersey (the "U.S.

Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the

Bankruptcy Code (the "Committee") [Docket No. 218].

9.      On May 31, 2023, an agreement in principle was announced among the DIP

Lenders, the Committee, and the Debtors on the terms and conditions of the Final DIP Order and

certain other case-related issues.

10.     On June 13, 2023, the Debtors filed a revised proposed order approving the DIP

Motion on a final basis [Docket No. 726], containing the wind-down budget discussed at length in

the Motion, at Exhibit B.

11.     On June 14, 2023, this Court held the Final DIP Hearing to consider entry of the

Final DIP Order.  At the Final DIP Hearing, the Ad Hoc Group made clear that the only relief it

sought was an extension of the Challenge Period.[8]  The Court agreed that the Ad Hoc Group would

---

[6]    Tr. H'rg  (Bankr. D.N.J. April 24, 2023) at p.3, 8:16–20 (MR. MAYR: Yeah, sorry. This is -- I can't make it to
the podium obviously, but this is Kurt Mayr from Glenn Agre Bergman & Fuentes. We're appearing today for a
group of unsecured bond holders, a number of investment funds and institutional holders of the unsecured bonds
of the debtor.").

[7]    *Id.* at 68:23–25; 29:1–3 (Mr. Mayr speaking).

[8]    When asked by the Court to clarify what the Ad Hoc Group was seeking, counsel to the Ad Hoc Group stated:
"[t]o be clear Judge, it's only the [extension of the] challenge period, that's it." *See id* at 42-43: 25-15.

have the ability to seek an extension of the Challenge Period by filing a request with the Court by

June 25, 2023, and such agreement was read into the record and approved by the Court in the Final

DIP Order. *See* Final DIP Order ¶ 43.

12.    On June 15, 2023, this Court entered the *Final Order (I) Authorizing the Debtors
to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and
Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying
the Automatic Stay, and (V) Granting Related Relief* [Docket No. 729].

13.    On June 25, 2023, the Ad Hoc Group file the Motion, seeking to, among other

things, reconsider the DIP Orders.  The Motion does ***not*** include a request to extend the Challenge

Period.

## Objection

**I.    The Debtors' Need for DIP Financing Remains Clear and Facts and Circumstances
Related to Good-Faith Financial Projections and Actual Operating Results Do Not
Warrant Reconsideration of the DIP Orders.**

14.    Even if the Court were to bypass the important procedural reasons for denying the

Motion, the substantive points raised in the Motion would not warrant the requested relief.

The Ad Hoc Group points to apparent "known or knowable" discrepancies between the DIP

Budgets filed as attachments to the Interim DIP Order (the "Initial Budget") and Final DIP Order,

respectively, as evidence that "there was no need for the DIP Facility."  Motion ¶ 42.  However,

these so-called "discrepancies" between the Debtors' projected performance and their actual

performance, were nothing more than the result of natural yet unforeseen consequences of the

Debtors' transition into chapter 11.

| $M | | Week ending 4/29/23 | | |
| --- | --- | --- | --- | --- |
| | | Forecast | Actual | Variance |
| Go Forward Collections | $ | 10 | 56 | 46 |
| Store liquidation sales | | 43 | 8 | (35) |
| Sales Tax / Other Receipts | | 3 | 13 | 9 |
| **Total Collections** | | **56** | **77** | **21** |
| | | | | |
| Merchandise Vendor Payments | $ | - | $ - | $ - |
| Payroll, Taxes & Medical | | (42) | (17) | 25 |
| Rent | | (26) | (1) | 25 |
| Non Merch Vendor Expense | | (14) | (1) | 12 |
| Sales Tax | | - | - | - |
| SG&A Other | | - | - | - |
| Hilco Payments | | (4) | - | 4 |
| **Total Operating Disbursements** | | **(86)** | **(20)** | **66** |
| | | | | |
| **Total Operating Cash Flow** | | **(30)** | **57** | **87** |

15.     As set forth in the foregoing chart, certain of the Debtors' actual collections—specifically those in the "Go Forward Collections" line-item—exceeded the projections in the Initial Budget.  This line-item captured retail sales conducted before the commencement of store liquidations began.  The positive variance from the Initial Budget (reflected as #**1** in the Variance column) appears to have resulted from a rush of customers seeking to utilize their gift cards or store coupons in a timely manner after they learned that the Debtors would soon be filing for chapter 11 protection.  In fact, nearly double the number of gift cards were redeemed in the initial week of the chapter 11 cases than the Debtors projected.  This led to a significant sales bump relative to the Debtors' projections.  In addition, because liquidation sales at the Debtors' retail locations did not begin until late in the week of April 23, there was a significant negative variance in the "Store Liquidation Sales" line-item (reflected as #**2** in the Variance column).  The net

increase of $11 million between these two line-items (less than a 20% variance) reflects the actual increase in sales compared to the projections in the Initial Budget.

16.     The Ad Hoc Group implies that the Debtors not only should have known about the increase in sales, but that the Debtors should have relied on this knowledge to forego entry into the DIP Facility.  But at the time of the First Day Hearing, the Debtors had not received even preliminary reports detailing these cash receipts.  While the Debtors had indicators that gross sales exceeded the Debtors' forecasts, the Debtors had no way to discern whether the uptick in gross sales resulted from redemptions of coupons or gift cards, which result in lower actual cash receipts. Accordingly, the Debtors could not have possibly known that their cash position was better than expected.  They certainly could not have shirked their fiduciary responsibilities and relied on a baseless assumption to forego entry into the DIP Facility, particularly when the cost of being wrong was running out of cash in the first days of these chapter 11 cases.

17.     Similarly, certain of the Debtors' operating disbursements were lower than projected in the Initial Budget.  As discussed in the DIP Motion, the Interim DIP Order authorized the creation of the Reserves, including $21 million in agreed-upon funding to satisfy WARN and PTO obligations (captured in the "Payroll, Taxes, and Medical" line-item).  In the Initial Budget, these and other funds (including those budgeted in the "Rent" line-item) were projected to be disbursed during the first week of the cases.  However, because the Debtors' cash management bank was primarily focused on reopening and unfreezing payroll accounts rather than opening disbursement accounts, the Debtors were unable to source bank accounts for disbursement of such funds during the first week of the case.  The Debtors therefore did not disburse the full quantum of funds associated with the "Payroll, Taxes, and Medical," and "Rent" line-items until the following week, leading to a negative variance (reflected as **#3** and **#4** in the Variance column).

Rather, the Debtors segregated such funds in the Debtors' records, but had not yet transferred such funds to an actual segregated account.  In addition, the projected disbursement for "Hilco Payments" related to a billing that was delayed until the second week of the cases, resulting in a negative variance (reflected as **#5** in the Variance column).  These circumstances simply could not have been known to the Debtors at the time of filing.

18.    As set forth in the Etlin DIP Declaration, the Debtors initiated these chapter 11 cases in dire financial straits and on the brink of a value-destructive liquidation.  The Debtors had spent the months prior to the filing in cash dominion under the Prepetition Credit Facility, effectively cutting the Debtors off from access to cash.  The Ad Hoc Group's assertion that the Debtors should have relied on facts that, in reality, they could not have known at the time of the First Day Hearing and launch into chapter 11 without access to a DIP Facility, flies in the face of logic and the requirements of the Bankruptcy Code.  The performance of the Debtors' business in the weeks leading up to the Petition Date provided little reason for the Debtors to expect a stable and smooth transition into chapter 11.  It would have been unjustifiably risky (and indeed, impossible under the circumstances) for the Debtors to proceed into chapter 11 without access to DIP financing in reliance on then-unknown assumptions.

**II.    The Motion Is Untimely Under Rule 60(c) of the Federal Rules of Civil Procedure.**

19.    To the extent this Court determines that Rule 60(b) applies to the Interim DIP Order, the Court should deny the relief requested in the Motion as untimely under Rule 60(c).

20.    "Federal Rule of Civil Procedure 60(c)(1) requires that a motion for reconsideration be 'made within a reasonable time.' What constitutes a 'reasonable time' depends on the 'circumstances of each case,'" *see Leja v. Schmidt Mfg., Inc.*, 743 F. Supp. 2d 444, 456 (D.N.J. 2010) (*citing Delzona Corp. v. Sacks*, 265 F.2d 157, 159 (3d Cir. 1957)), and "includes factors such as finality, reason for delay, the practical ability for the litigant to learn of the ground relied

upon earlier, and potential prejudice to other parties." *In re Diet Drugs Prod. Liab. Litig.*, 383 F. App'x 242, 246 (3d Cir. 2010) (citing *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir. 1986)).

21.    The Motion sets forth various arguments premised on the Debtors' cash levels as of the First Day Hearing and additional information related to the Debtors' financial projections, actual operating results, and operational disbursements.  The information referenced in the Motion is not, however, new; the projections were available at the First Day Hearing, and the Debtors have regularly collected and reported to various parties their actual operational results upon request. Movant had multiple opportunities to seek this information from the Debtors.  It could have asked the Debtors' witnesses questions regarding the sworn testimony in support of the DIP Motion and the other operational "first day" motions, either at the First Day Hearing or at the Final DIP Hearing.  It could have served discovery.  Or more simply, it could have requested that information from the Debtors' informally.  Movant did none of these things, and its delay in receiving this information is entirely of its own doing.

22.    Bringing forward the issues in the Motion now, rather than at any moment prior, prejudices the Debtors and their estates.  The Debtors negotiated a holistic DIP financing package with the DIP Lenders, securing $40 million of new money financing and, at the same time, securing $36 million for the Reserves.  The Reserves are critical in that they provide funding for any chapter 11 administrative and priority claims, certain WARN Costs, and the costs and expenses of administering the winddown of the Debtors.  The deal embodied in the DIP Facility was further advanced by the discussions and ultimate settlement with the Committee—whose members include the trustee on the unsecured bonds held by the Ad Hoc Group.  Vacating or even reconsidering the DIP Orders at this time risks upending the holistic deal reached between the DIP

Lenders, the Committee, and the Debtors, which would result in substantial and irreparable harm

to the Debtors' estates. *See Coltec Indus. v. Hobgood*, 280 F.3d 262, 276 (3d Cir. 2002) (finding

prejudice where party would lose the benefit of the bargain it made, and affirming denial of Rule

60(b) motion).

**III.    Rule 60(b) of the Federal Rules of Civil Procedure Does Not Apply to the Interim DIP Order; If It Does, Movant Fails to Meet the Requisite Standards Under Rule 60(b) for Reconsideration of the DIP Orders.**

23.    Under the plain text of Rule 60(b), relief as to the Interim DIP Order is unavailable

to the Movant.  Rule 60(b) provides that "a court may relieve a party . . . from a final judgment,

order, or proceeding" for a number of reasons. Fed R. Civ. P. 60(b) (emphasis added).  Here,

the Interim DIP Order is, by definition and title, not a final order.  Therefore, the relief available

in Rule 60(b) simply does not cover an appeal related to the Interim DIP Order, and as such the

Motion should be denied with respect to the Interim DIP Order.  *See Kham & Nate's Shoes No. 2.,

Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir. 1990) ("Rule 60(b) . . . applies only

to final decisions."); *In re Island View Crossing II, L.P.*, 604 B.R. 181, 193 n.6 (Bankr. E.D. Pa.

2019).

24.    To the extent that Rule 60(b) does apply to the DIP Orders, the Motion should be

denied as Movant fails to carry the heavy burdens imposed by Rule 60(b).  Motions for

reconsideration under Rule 60(b) of the Federal Rules of Civil Procedure, as incorporated by

Bankruptcy Rule 9024, provides, *inter alia*, that "the court may relieve a party . . . from a final  . .

. order . . .  for the following reasons:   (1) mistake, inadvertence, surprise or excusable

neglect; . . . (2) newly discovered evidence that . . . could not have been discovered in time to

move for a new trial under Rule 59(b); . . . [or] (6) any other reason that justifies relief." Fed. R.

Civ. P. 60(b).  "Importantly, the movant in a Rule 60(b) motion carries a heavy burden, as Rule

60(b) motions are viewed as extraordinary relief which should be granted only where extraordinary

justifying circumstances are present." *Kiburz v. Sec'y, U.S. Dep't of Navy*, 446 F. App'x 434, 436 (3d Cir. 2011) (internal citations, quotation marks omitted). To succeed on the motion to reconsider, the Movant "must rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." *Leja v. Schmidt Mfg., Inc.*, 743 F. Supp. 2d 444, 456 (D.N.J. 2010) (internal citations, quotation marks omitted); *see also North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir. 1995).

25.     ***First***, Movant shows no intervening change in controlling law since entry of the Interim DIP Order on April 24, 2023.

26.     ***Second***, Movant asserts that the relief granted by the DIP Orders was improper because, with the clarity of hindsight, such relief: (a) was unnecessary to avoid immediate and irreparable harm (with respect to the Interim DIP Order); (b) prejudiced unsecured creditors by granting new liens and administrative expense claims to the DIP Lenders on account of a makewhole provision that violates New York state law; and (c) was granted in violation of the due process rights of unsecured creditors. While Movant is substantively wrong on each of (a)–(c) above, the Court need not address the substance as Movant failed to raise these with respect to either the Interim or Final DIP Orders. While Movant attempts to support the above arguments with evidence from the days leading up to the Petition Date and the weeks after the Interim DIP Order was entered, Movant fails to introduce any "newly discovered" evidence. The "newly discovered" evidence requirement means that "a motion for reconsideration may not be premised on legal theories that could have been adjudicated or evidence which was available but not presented prior to the earlier ruling . . . " . . . ." *Leja v. Schmidt Mfg., Inc.*, 743 F. Supp. 2d 444, 456 (D.N.J. 2010) (emphasis added). Movant's purported "newly discovered" evidence, either

was available and filed with the Court in connection with the DIP Motion prior to the Final DIP

Hearing[9] or did not exist yet, to the extent Movant points to the actual postpetition operating results

of the Debtors.  Furthermore, any information could have been elicited by the Ad Hoc Group in

the two months following its arrival on the scene of these cases at the First Day Hearing—through

cross-examination, formal discovery, or informal information requests.  The Ad Hoc Group, in its

judgment, declined to do so.

27.    ***Third***, the relief granted by the Court in the Interim DIP Order and the Final DIP

Order was supported by a robust evidentiary record, which provided sufficient factual basis for the

Court's approval of such orders.  A party's disagreement with a court's decision, alone, is

insufficient to establish "clear error."  *Leja v. Schmidt Mfg., Inc.*, 743 F. Supp. 2d 444, 456 (D.N.J.

2010).  Rather, to show clear error, a movant bears the substantial burden of demonstrating that

"the holdings on which it bases its request were without support in the record."  *Leja v. Schmidt*

*Mfg., Inc.*, 743 F. Supp. 2d 444, 456 (D.N.J. 2010) (*citing United States v. Grape*, 549 F.3d 591,

603–04 (3d Cir. 2008)).  The evidentiary record included the First Day Declaration, the Etlin DIP

Declaration, and the Kurtz DIP Declaration, and was further supplemented by argument at the First

Day Hearing and Final DIP Hearing.  This robust record showed the need for postpetition financing

and the immediate and irreparable harm that would befall the Debtors absent granting the relief

requested in the DIP Motion.  Movant fails to show that any of the relief granted in either of the

DIP Orders was without ***any*** evidentiary basis.

28.    ***Fourth***, not only does Movant fail to show "manifest injustice," but granting the

relief requested in the Motion would be highly prejudicial to the Debtors, their estates, and their

---

[9]    See Docket No. 726, filed on June 13, 2023, at <u>Exhibit B</u>.

stakeholders.  A showing of "manifest injustice" requires "that there exist a fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with public policy."  *See In re Bunting Bearings Corp.*, 321 B.R. 420, 423 (N.D. Ohio 2004).  The Motion fails under any equitable consideration as reconsidering the Interim DIP Order (entered over 60 days ago) will (a) increase the administrative costs of these Chapter 11 Cases; (b) delay the Debtors' ability to solicit and confirm any proposed chapter 11 plan; and (c) be prejudicial to the Debtors, Prepetition ABL Lenders, Prepetition FILO Lenders, the Committee, and other parties-in-interest who have been relying on the findings in the DIP Orders to progress these Chapter 11 Cases.  Further, by vacating the DIP Orders, the Debtors will lose the benefit of their bargain under the DIP Order, including risking the Reserves and providing an additional hurdle to a confirmable chapter 11 plan.

29.    Movant could have challenged the Interim DIP Order or Final DIP Order on the exact grounds argued in the Motion based on readily available information.  Allowing Movant to do so now is prejudicial, inequitable, and untimely.

**IV.    Section 364(e) of the Bankruptcy Code Precludes Granting the Relief Requested in the Motion.**

30.    Even if the Movant were entitled to the relief sought in the Motion (it is not), the Motion should be denied as an improper attempt to end-run around the protections afforded to the DIP Lenders under the Bankruptcy Code.  Section 364(e) of the Bankruptcy Code provides:

> [t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.[10]

---

[10]    11 U.S.C. § 364(e).

31.    Section 364(e) provides lenders with "protections to overcome people's natural reluctance to deal with a bankrupt firm . . . by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction." *Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 561 (quoting *In re EDC Holding Corp.*, 676 F.2d 945, 947 (7th Cir. 1982)); *see Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1488 (9th Cir. 1987) ("Section 364 was designed to provide a debtor a means to obtain credit after filing bankruptcy.").

32.    The Third Circuit has been unequivocal that, where funds are fully disbursed under a postpetition lending facility, relief under section 364(e) may not be granted. *Swedeland*, 16 F.3d at 563; *see Krebs Chrysler-Plymouth, Inc. v. Valley Motors*, 141 F.3d 490, 499 (3d Cir. 1998) (observing that the *Swedeland* court held that "[r]egarding a fully disbursed loan, however, the appeal was moot because the district court could not fashion any effective relief that would not violate section 364(e)" (citing *Swedeland*, 16 F.3d at 562–63)).  The *Swedeland* court held that "the bankruptcy court could not on remand enjoin [the debtor] from using the proceeds of the [DIP] loan nor could it order [the debtor] to return the proceeds, as they were gone." *Swedeland*, 16 F.3d at 563.  Moreover, the Third Circuit declined to void an interest reserve, which it held would "impair the security for which [the DIP lender] bargained and thus would be inconsistent with the protection afforded it by section 364(e)." *Id.*  Accordingly, even though the lender "would obtain effective relief by the voiding of the reserve, in view of section 364(e) it cannot be done." *Id.*

33.     Here, the Ad Hoc Group did not petition the court for a stay of the Interim DIP

Order or the Final DIP Order.  Good faith is supported by the robust evidentiary record reflected

not only in the DIP Orders[11] but also in the declarations filed in support thereof.[12]

34.     The DIP Facility has been fully disbursed and the funds subsequently used in

accordance with the DIP Orders.  The Court's reconsideration, modification, or vacation of the

DIP Orders at this stage cannot force the Debtors to return funds spent in furtherance of these

Chapter 11 Cases nor impair the DIP Lender's security afforded by the Reserves without running

afoul of section 364(e) and Third Circuit precedent.

35.     The relief sought in the Motion is precisely the sort of *post hoc* attack that

section 364(e) was designed to prevent and granting the relief sought therein would be contrary to

the well-established policy underlying section 364(e).  In the sole paragraph allotted to this

dispositive statute in the Motion, the Movant all but admits that the Motion is predicated on a

technicality—the language of section 364(e) only mentions appeals, not motions for

reconsideration.  Motion ¶ 39.  This argument has been soundly rejected in other courts presented

with this question.  *See Fleetwood*, 427 B.R. at 859 (noting and rejecting movant's argument "that

the safe harbor of § 364(e) is applicable only to appeals" by its language); *Kham's & Nate's Shoes*,

908 F.2d at 1355 ("[A]lthough § 364(e) does not apply by its own terms, its principle applies

through the law of the case.  A judge lacks the power to undo the priority granted by a financing

order without first finding that the creditor acted in bad faith.").

---

[11]    See DIP Orders §§ N(iii); 35.

[12]    See Kurtz DIP Declaration ¶¶ 2, 33.

36.    The very DIP Orders the Movant challenges further undercut the Movant's

arguments.  Each of the DIP Orders expressly provides that "in accordance with section 364(e) of

the Bankruptcy Code, in the event any or all of the provisions of th[e DIP Orders] are hereafter

modified, amended or vacated by a subsequent order of this Bankruptcy Court or any other court,

the DIP Secured Parties and Prepetition Secured Parties are entitled to the protections provided in

section 364(e) of the Bankruptcy Code."  Interim DIP Order ¶ 35; Final DIP Order ¶ 35 (emphasis

added).  Accordingly, "[a]ny such modification, amendment or vacatur shall not affect the validity

and enforceability of any advances previously made or made hereunder, or lien, claim (including

the DIP Roll-Up Obligations) or priority authorized or created hereby."  Interim DIP Order ¶ 35;

Final DIP Order ¶ 35.

37.    "[T]he incorporation of the language of § 364(e) into [an] interim order has the

effect of making that protection part of the relief ordered by the court such that it applies pre-

appeal."  *Fleetwood*, 427 B.R. at 859.  Thus, "a lender is entitled as a matter of law to rely on a

bankruptcy court's financing orders, unless shown to act in bad faith."  *Fleetwood*, 427 B.R. at

860 (citing *Adams Apple*, 829 F.2d at 1488).

38.    The Movant did not challenge the DIP Lender's good faith during either of the

hearings on the DIP Orders, nor in the Motion.  The Motion may be denied on this fact alone.   A

lender's ability to rely on language in orders authorizing postpetition DIP financing, especially in

the absence of even allegations of bad faith, is critical to the availability of DIP financing in

chapter 11.  Accordingly, the Motion should be denied.

## V.    The Ad Hoc Group Flagrantly Violated its Confidentiality Obligations to the Debtors, Despite Repeated Warnings Causing Substantial Harm

39.    The Motion violates the Confidentiality Agreement entered into on May 26, 2023

between Bed Bath & Beyond, Inc. and Glenn Agre Bergman & Fuentes ("GABF," and the

agreement, the "Confidentiality Agreement").    The Debtors and GABF entered into the Confidentiality Agreement to govern the treatment of confidentiality information provided by the Debtors to GABF.  Pursuant to that Confidentiality Agreement, GABF agreed "not to disclose or cause to be disclosed (through commission or omission), in any manner whatsoever, directly or indirectly, in whole or in part, such Confidential Information, except as is expressly permitted by this Agreement." *See* Confidentiality Agreement § 2.  Further, GABF agreed that information would be received from the Debtors on a professionals'-eyes-only-basis.

40.    In light of previous concerns regarding GABF's potential violation of the Confidentiality Agreement and in anticipation of the filing of this Motion, the Debtors delivered a letter to GABF on June 25, 2023.  In the letter, the Debtors warned GABF:

> [t]o the extent that you seek to make use of any Confidential Information you were provided under the terms of the Confidentiality Agreement in any filing with the Court, [the Debtors] expect that [GABF] will comply with [GABF's] obligations under the Confidentiality Agreement and take all necessary steps to prevent the disclosure of any Confidential Information [that GABF] received.  Failure to do so would cause substantial harm to the Debtors' estate and its stakeholders at a crucial point in the Debtors' cases, and the Debtors will pursue all available remedies in response to such a breach.

41.    Notwithstanding this clear warning, the Ad Hoc Group, represented by GABF, filed the declaration in support of the Motion and certain others aspects of the Motion, unsealed, disclosing Confidential Information, including information reflecting potential recoveries from ongoing auctions and asset sales.  This unwarranted and unlawful disclosure resulted in the estate's incurrence of additional administrative costs, prejudices the Debtors' restructuring efforts, and causes substantial harm to the Debtors, their estates, and their stakeholders.  The Motion should be denied, and the Debtors reserve the right to pursue all additional available remedies in response to GABF's breach of the Confidentiality Agreement.

## Conclusion

42.    For the reasons stated above, Movant fails to meet the remarkably heavy burden

necessary for the extraordinary relief Movant requests.  Movant had ample time, opportunity, and

evidence to make all the arguments supporting the request for reconsideration.  Under the facts

and circumstances of these Chapter 11 Cases, Movant's request is improper, untimely and

prejudicial.  Accordingly, the Motion should be denied.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, in substantially the forms submitted herewith, denying the Motion, with prejudice, and granting such other relief as is just and proper under the circumstances.

Dated: June 27, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:    joshua.sussberg@kirkland.com
          emily.geier@kirkland.com
          derek.hunter@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

**ORDER DENYING THE
MOTION OF THE AD HOC BONDHOLDER
GROUP, PURSUANT TO 11 U.S.C. § 105(A),
FED. R. CIV. P. 60(A), AND FED. R. BANKR. P. 4001(C) AND
9024, FOR (A) AN ORDER VACATING THE INTERIM AND FINAL
ORDERS AUTHORIZING THE DEBTORS TO, AMONG OTHER THINGS,
<u>OBTAIN POSTPETITION FINANCING, AND (B) OTHER RELATED RELIEF</u>**

The relief set forth on the following page, numbered three (3), is **ORDERED**.

KE 97993192

(Page | 3)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER DENYING THE MOTION OF THE AD HOC BONDHOLDER GROUP, PURSUANT TO 11 U.S.C. § 105(a), FED. R. CIV. P. 60(b), AND FED. R, BANKR. P. 4001(c)  AND 9024, FOR (A) AN ORDER VACATING THE INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO, AMONG OTHER THINGS, OBTAIN POSTPETITION FINANCING, AND (B) OTHER RELATED RELIEF |

Upon the *Motion of the Ad Hoc Group, Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(a), and Fed. R. Bankr. P. 4001(c) and 9024, for (A) an Order Vacating the Interim and Final Orders Authorizing the Debtors To, Among Other Things, Obtain Postpetition Financing, and (B) Other Related Relief* [Docket No. 982] (the "Motion")[1] filed on June 26, 2023, by the Ad Hoc Bondholder Group for entry of an order as set forth in the Motion, all interested parties having been duly served, the Court having considered all of the papers submitted, along with any arguments of counsel, and for good cause shown; it is **hereby**

**ORDERED THAT** the Motion is **DENIED** with prejudice.

The Debtors shall cause this order to be served on the United States Trustee, and all parties who entered an appearance on this matter.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**<u>Exhibit B</u>**

**Letter Dated June 25, 2023 to Glenn Agre Bergman & Fuentes**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Casey McGushin
To Call Writer Directly:
+1 312 862 3397
casey.mcgushin@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

June 25, 2023

**Via E-mail**

Andrew K. Glenn
Glenn Agre Bergman & Fuentes
1185 Avenue of the Americas
22nd Floor
New York, NY 10036
aglenn@glennagre.com

Re:     *In re Bed Bath & Beyond Inc., et al*., Case No. 23-13359, (Bankr. D.N.J.)

Dear Andrew:

I write on behalf of the Debtors in the above-captioned action.  We understand that you may intend to file a motion with the Bankruptcy Court today seeking certain relief from or modification to the Court's *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, (Dkt. No. 726, the "Final DIP Order").  The Final DIP Order allowed your clients until June 25, 2023 to file a request seeking to extend the Challenge Period.  (*Id.* at ¶ 43.)

In order to facilitate diligence for you and your clients, the Debtors and their advisors provided certain information and documents to you on a professionals'-eyes-only basis.  All of this information was shared pursuant to the Confidentiality Agreement dated May 26, 2023 between Bed Bath & Beyond, Inc., and Glenn Agre Bergman & Fuentes (the "Confidentiality Agreement").  You signed the Confidentiality Agreement on behalf of your firm.

We write to ensure that the terms of the Confidentiality Agreement are honored in connection with any filing you make with the Bankruptcy Court.  Under the Confidentiality Agreement, the term "Confidential Information" encapsulates "all documents, information (whether oral, written, or electronic), interpretations, and other material about the Company furnished hereunder by or on behalf of the Company or the Company Representatives to [Glenn Agre Bergman & Fuentes]," and further includes "any facts with respect to the chapter 11 cases (potential or otherwise)." (Confidentiality Agreement at § 3(a).)  With respect to such Confidential

Austin   Bay Area   Beijing   Boston   Brussels   Dallas   Hong Kong   Houston   London   Los Angeles   Miami   Munich   New York   Paris   Salt Lake City   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

Andrew K. Glenn
June 25, 2023
Page 2

Information, you agreed "not to disclose or cause to be disclosed (through commission or omission), in any manner whatsoever, directly or indirectly, in whole or in part, such Confidential Information, except as is expressly permitted by this Agreement." (Confidentiality Agreement at § 2.)

To the extent that you seek to make use of any Confidential Information you were provided under the terms of the Confidentiality Agreement in any filing with the Court, we expect that you will comply with your obligations under the Confidentiality Agreement and take all necessary steps to prevent the disclosure of any Confidential Information you received. Failure to do so would cause substantial harm to the Debtors' estate and its stakeholders at a crucial point in the Debtors' cases, and the Debtors will pursue all available remedies in response to such a breach.

All rights are reserved.

Sincerely,

Casey McGushin