# EXHIBIT "A"

# LEASE AGREEMENT

Between

## AVR PORTCHESTER, LLC
**a Delaware limited liability company,**

Landlord

and

## BED BATH & BEYOND INC.,
**a New York corporation,**

Tenant

## PORT CHESTER SHOPPING CENTER
**421 Boston Post Road**
**Port Chester, New York**

Dated as of:  February _____, 2011

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms.  This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease.  Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

1807454 v8

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1 | BASIC TERMS AND DEFINITIONS | 1 |
| Section 1.1 | Basic Terms and Definitions | 1 |
| ARTICLE 2 | LEASE OF PREMISES; LEASE TERM; DELIVERY DATE | 5 |
| Section 2.1 | Lease of Premises | 5 |
| Section 2.2 | Term | 5 |
| Section 2.3 | Delivery Date | 6 |
| Section 2.4 | Unseasonable Delivery: Slack Period | 7 |
| Section 2.5 | Initial Co-Tenancy Condition | 8 |
| Section 2.6 | Permits Contingency | 8 |
| ARTICLE 3 | IMPROVEMENTS | 9 |
| Section 3.1 | Tenant's Work | 9 |
| Section 3.2 | Plan Approvals | 9 |
| Section 3.3 | Performance of Work | 10 |
| Section 3.4 | Measurement: Premises and Shopping Center | 14 |
| ARTICLE 4 | FIXED RENT AND TAXES: DETERMINATION AND PAYMENT | 14 |
| Section 4.1 | Fixed Rent | 14 |
| Section 4.2 | Payment of Rent | 14 |
| Section 4.3 | Real Estate and Other Taxes | 14 |
| ARTICLE 5 | COMMON AREAS, THEIR USE AND CHARGES | 16 |
| Section 5.1 | Common Areas: Maintenance | 16 |
| Section 5.2 | Common Areas: Restrictions | 18 |
| ARTICLE 6 | UTILITIES | 22 |
| Section 6.1 | Utility Service | 22 |
| Section 6.2 | Interruption | 22 |
| ARTICLE 7 | SIGNS | 22 |
| Section 7.1 | Tenant's Building Signage | 22 |
| Section 7.2 | Pylon Signage | 23 |
| Section 7.3 | Signage: Alteration/Removal/Allocation | 23 |
| Section 7.4 | Cooperation | 23 |
| Section 7.5 | Signage and Building Restrictions and Criteria | 23 |
| ARTICLE 8 | ALTERATIONS AND IMPROVEMENTS | 24 |
| Section 8.1 | Alterations and Improvements | 24 |
| ARTICLE 9 | REPAIRS | 27 |
| Section 9.1 | Tenant's Repairs | 27 |
| Section 9.2 | Landlord's Repairs | 27 |
| Section 9.3 | Legal Compliance Work | 28 |
| ARTICLE 10 | INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION | 29 |

1807454 v8

| | | |
|---|---|---|
| Section 10.1 | Mutual Release, Waiver of Subrogation and Mutual Indemnification | 29 |
| Section 10.2 | Tenant's Insurance | 29 |
| Section 10.3 | Landlord's Insurance | 30 |
| Section 10.4 | General Insurance Requirements | 31 |
| ARTICLE 11 | FIRE AND OTHER CASUALTY; EMINENT DOMAIN | 31 |
| Section 11.1 | Fire and Other Casualty | 31 |
| Section 11.2 | Eminent Domain | 34 |
| Section 11.3 | Abatement of Rent Charges | 36 |
| ARTICLE 12 | COVENANTS, REPRESENTATIONS AND WARRANTIES | 36 |
| Section 12.1 | Quiet Enjoyment | 36 |
| Section 12.2 | Authority | 36 |
| Section 12.3 | Landlord's Covenants, Warranties and Representations | 36 |
| Section 12.4 | Environmental Matters | 38 |
| Section 12.5 | Ground Lease | 40 |
| ARTICLE 13 | USES AND RESTRICTIONS | 41 |
| Section 13.1 | Permitted and Prohibited Uses | 41 |
| Section 13.2 | Tenant's Exclusive in Center | 41 |
| Section 13.3 | Exclusives Which Tenant Must Honor | 43 |
| ARTICLE 14 | CONDUCT OF BUSINESS OPERATIONS | 44 |
| ARTICLE 15 | TENANT ASSIGNMENT AND SUBLETTING | 45 |
| Section 15.1 | Assignment and Subletting | 45 |
| Section 15.2 | Liability of Tenant | 46 |
| Section 15.3 | Collateral Assignment | 46 |
| Section 15.4 | Cure Rights of Original Tenant | 46 |
| Section 15.5 | Recognition Agreement | 47 |
| ARTICLE 16 | DEFAULT AND DISPUTE RESOLUTION | 47 |
| Section 16.1 | Tenant Default | 47 |
| Section 16.2 | Landlord Default | 49 |
| Section 16.3 | Arbitration | 50 |
| ARTICLE 17 | RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE | 50 |
| Section 17.1 | Right to Mortgage and Non-Disturbance | 50 |
| Section 17.2 | Estoppel Certificate | 51 |
| Section 17.3 | Existing Mortgages and Ground Leases | 51 |
| ARTICLE 18 | NOTICE | 51 |
| ARTICLE 19 | TENANT'S PROPERTY | 52 |
| ARTICLE 20 | END OF TERM | 52 |
| Section 20.1 | Surrender of Premises | 52 |
| Section 20.2 | Hold Over | 52 |
| ARTICLE 21 | INTENTIONALLY OMITTED | 53 |

ARTICLE 22    ONGOING CO-TENANCY .................................................................. 53

ARTICLE 23    MISCELLANEOUS ......................................................................... 53

Section 23.1    Loading Facilities ............................................................. 53

Section 23.2    Liens ................................................................................ 53

Section 23.3    No Broker ........................................................................ 53

Section 23.4    Force Majeure .................................................................. 54

Section 23.5    Consents .......................................................................... 54

Section 23.6    Costs ................................................................................ 54

Section 23.7    Attorneys' Fees ............................................................... 54

Section 23.8    Survival of Obligations .................................................. 54

Section 23.9    Non-Waiver ..................................................................... 54

Section 23.10    Rights Cumulative .......................................................... 54

Section 23.11    Definition of Landlord .................................................... 55

Section 23.12    Successors and Assigns ................................................. 55

Section 23.13    Limitation of Landlord's Liability ................................ 55

Section 23.14    Limitation of Tenant's Liability ................................... 55

Section 23.15    Joint and Several Liability ............................................. 55

Section 23.16    Severability ..................................................................... 55

Section 23.17    Grammatical Usages and Construction .......................... 55

Section 23.18    Table of Contents, Line Numbering and Paragraph
Headings .......................................................................... 56

Section 23.19    Definition of Hereunder, Herein, etc. ........................... 56

Section 23.20    Short Form Lease ............................................................ 56

Section 23.21    Entire Agreement and Modification ............................... 56

Section 23.22    No Joint Venture or Partnership Created by Lease ......... 56

Section 23.23    Tenant's Tradename ........................................................ 56

Section 23.24    Counterparts .................................................................... 56

Section 23.25    Waiver of Trial by Jury .................................................. 56

Section 23.26    USA Patriot Act .............................................................. 56

Section 23.27    Authority ......................................................................... 57

Section 23.28    Accord and Satisfaction ................................................. 57

Section 23.29    Right to Show Premises .................................................. 57

Section 23.30    Governing Law ................................................................ 58

## EXHIBITS

| Exhibit A | Legal Description of Shopping Center |
|---|---|
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement ("SNDA") |
| Exhibit G-1 | Form of Fee Owner SNDA |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Intentionally Omitted |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Alternate Rent |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Mechanics' Lien indemnification |

# LEASE AGREEMENT

THIS LEASE AGREEMENT (***"Lease"***) is entered into as of February 17, 2011 by and between AVR PORTCHESTER, LLC, a Delaware limited liability company, having an office at One Executive Blvd., 4th Floor, Yonkers, New York 10701-6818 (***"Landlord"***), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (***"Tenant"***).

## W I T N E S S E T H :

### ARTICLE 1
### BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, ***"control"*** shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  As defined in and payable in the manner set forth in Exhibit L attached hereto.

1.1.4    Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint, non-exclusive use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and common utility lines.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.5A Constant Dollars: "Constant Dollars" means the present value of the dollars to which such phrase refers.  An adjustment shall occur on January 1 of the sixth calendar year following the date of this Lease, and thereafter at five (5) year intervals. Constant Dollars shall be determined by multiplying the dollar amount to be adjusted (without prior adjustment) by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number.  The "Base Index Number" shall be the level of the Index for the month during which this Lease is dated; the "Current Index Number " shall be the level of the Index for the month of September of the year preceding the adjustment year; the "Index" shall be the Consumer Price Index for All Urban Consumers, U.S. City Average, All items published by the Bureau of Labor Statistics of the United States Department of Labor (base year 1982-84=100), or any successor index thereto as hereinafter provided.  If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then Landlord and Tenant shall substitute for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication or recognized authority most closely approximating the result which would have been achieved by the Index.

1.1.5B Critical Area:  The area designated "*Critical Area*" on Exhibit B hereto and including, without limitation (and whether or not identified as part of the Critical Area on Exhibit B), all driveways, passageways and roadways, and entrances and exits, providing access for the Premises to and from Boston Post Road, all as shown in Exhibit B.

1.1.6  Delivery Date: As defined in Section 2.3 hereof.

1.1.7  Effective Date: The date hereof.

1.1.8  Event of Default:  As defined in Section 16.1 hereof.

1.1.9  Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business (not prohibited by this Lease): (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10 Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11 Fixed Rent:  The following agreed-upon amounts for the periods indicated:

(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of Three Hundred Ninety-Three Thousand Seven Hundred Fifty and 00/100 ($393,750.00) Dollars per year;

(b)    In the event Tenant exercises the first Renewal Option,  for the first five (5) year Renewal Period, at the rate of Four Hundred Thirty-Seven Thousand Five Hundred and 00/100 ($437,500.00) Dollars per year;

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Four Hundred Sixty-Two Thousand Five Hundred and 00/100 ($462,500.00) Dollars per year; and

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Four Hundred Eighty-Seven Thousand Five Hundred and 00/100 ($487,500.00) Dollars per year.

1.1.12 Floor Area:  The actual number of square feet of space contained on the ground floor within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13 *Force Majeure*:  As defined in Section 23.4 hereof.

1.1.14 Ground Lessor: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

1807454 v8

1    1.1.16 *Intentionally Omitted.*

2    1.1.17 *Intentionally Omitted.*

3    1.1.18 Landlord:  As defined in the preamble and Section 23.11 hereof.

4    1.1.19 Landlord's Mailing Address:  One Executive Blvd., 4th Floor,
5    Yonkers, New York  10701-6818, or such other place and/or to the attention of such other
6    person as Landlord may notify Tenant from time to time by notice given in accordance
7    with the provisions of Article 18 hereof.  If the "Landlord" consists of more than one
8    person, then notices given to the entity listed in Landlord's Mailing Address will be
9    deemed to have been given automatically to all of the parties which constitute Landlord,
10    and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

11    1.1.20 Landlord's Work:  As described on Exhibit D, if any.

12    1.1.21 Lease Interest Rate: The then effective prime rate as published from
13    time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor
14    publication thereto) plus two (2%) percent.

15    1.1.22 Legal Requirements: All laws, statutes, codes, acts, ordinances,
16    judgments, decrees, authorizations, directions and requirements of, and agreements with,
17    all governmental departments, commissions, boards, courts, authorities, agencies,
18    officials and officers, which now or at any time hereafter may be applicable to the
19    Premises, the Shopping Center, or any part(s) thereof.

20    1.1.23 Mortgagee:  Any individual or legal entity, which is not an Affiliate
21    of Landlord, and which holds a mortgage on all or any portion of the land and/or
22    improvement comprising the Shopping Center.

23    1.1.24 Intentionally Omitted.

24    1.1.25 Intentionally Omitted.

25    1.1.26 Intentionally Omitted.

26    1.1.27 Permitted Use:  Subject to the Existing Exclusives (as defined in
27    Section 13.3.1) and the Prohibited Uses (as defined in Exhibit M), the sale (including the
28    incidental rental), at retail of infant, juvenile and children's goods and services, including,
29    but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of
30    the following: infant's, juvenile's and children's furniture, furnishings, beds (including,
31    without limitation, mattresses and bedding), changing tables, gliders and rockers
32    (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car
33    seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests,
34    stuffed animals, games and toys, bedding accessories, maternity clothing and related
35    items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes,
36    toys, bottles, food or formula for infants, juveniles and children, feeding items, safety
37    items, nursing items, health and beauty care items, drug remedies, diapers, wipes,
38    bathroom and personal care devices and items, indoor or outdoor play and recreational
39    equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's
40    books, pregnancy books, magazines, computer software, audio and video cassettes or
41    tapes, picture frames, portrait studio items and services, party supplies, invitations,
42    greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other
43    educational and multi-media children's items, hair cutting services, fitness center
44    development and learning services (the aforementioned items are hereinafter collectively
45    referred to as the ***"Permitted Items"***) and any and all other items sold or services
46    provided from time to time in any store owned or operated by Tenant or its Affiliate(s);
47    and for any other lawful retail use not specifically prohibited by the provisions of Article

1807454 v8

3

13 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 Premises: Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and containing (i) an agreed-upon Twenty-Five Thousand (25,000) square feet of Floor Area located on the first floor, and (ii) approximately twelve thousand (12,000) square feet of space on the basement level.  If Tenant elects to build the same, the Premises may also contain approximately one thousand (1,000) square feet of mezzanine level space for non-selling office purposes.

1.1.28A Reimbursable Costs:  As defined in Section 5.1.2.

1.1.29 Renewal Option:  As defined in Section 2.2.2 hereof.

1.1.30 Renewal Period(s): Three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 Rent:  Fixed Rent and/or Additional Rent.

1.1.32 Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.33 Intentionally Omitted.

1.1.34 Shopping Center:  The shopping center containing approximately 408,138 square feet of Floor Area, on the property located at 421 Boston Post Road in Port Chester, New York, and more particularly described in Exhibit A hereto, which Shopping Center is commonly known as Port Chester Shopping Center.  Landlord shall not change the name of the Shopping Center without giving prior notice to Tenant, and Landlord shall not include the name of any tenant in the name of the Shopping Center.

1.1.35 Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work shall not be completed.  As used herein, the term *Punch List Items* shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

1.1.36 Taxes:  As defined in Section 4.3.3 hereof.

1.1.37 Tenant:  As defined in the preamble hereof.

1.1.37A Tenant's Contribution:  As defined in Section 5.1.2.

1.1.37B Tenant's Fixed CAM:  For the period from the Rent Commencement Date through the end of the first full calendar year of the Term, $2.75 per square foot of Floor Area in the Premises per annum, thereafter increasing on each January 1 by two and one-half percent (2.5%) over the amount per square foot paid by Tenant for the previous calendar year.  Tenant's Fixed CAM for the period from the Rent Commencement Date until the end of the calendar year in which the Rent Commencement Date occurs, and for any partial calendar year at the end of the Term, shall be prorated.  Tenant's Fixed CAM shall initially be $68,750 per annum, payable in monthly installments of $5,729.17.

1.1.38 Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Eugene A. Castagna, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1807454 v8

1            1.1.39 Tenant's Permits: As defined in Section 2.3.1(b) hereof.

2            1.1.40 Tenant's Property: All of Tenant's personal property, including,
3 without limitation, phone and alarm systems, satellite antennae, shelving, computers,
4 furniture, cash registers and customer service counters, specialty lighting, track lighting,
5 millwork, conveyor systems, storage racks and signage and any and all other personal
6 property of Tenant which is capable of being removed from the Premises without material
7 damage thereto, but which shall not include electrical systems, heating, ventilation and air
8 conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard
9 lighting and wiring installed within the walls of the Premises.

10            1.1.41 Tenant's Pro Rata Share: A fraction whose numerator is twenty-five
11 thousand (25,000) square feet and whose denominator is the Floor Area of the Shopping
12 Center as may be re-determined any time a building (and/or Floor Area) is added to or
13 removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be
14 greater than eight (8%) percent. Floor Area shall be deemed added to or removed from
15 the Shopping Center on the earlier of (i) the date upon which such Floor Area is
16 Substantially Completed, or (ii) at such time as an assessment for Taxes is made or
17 removed, as the case may be, with respect to such Floor Area. Within thirty (30) days
18 following written request from Tenant, Landlord shall certify to Tenant in writing as to
19 the then Floor Area of the Shopping Center.

20            1.1.42 Tenant's Work: As defined in Section 3.2 hereof.

21            1.1.43 Term: A period (the *"Initial Term"*) of approximately fifteen (15)
22 years beginning on the Rent Commencement Date and expiring at midnight on the last
23 day of January following the fifteenth (15th) anniversary of the Rent Commencement
24 Date, unless the Rent Commencement Date is February 1, in which event the Expiration
25 Date shall be the day before the fifteenth (15th) anniversary of the Rent Commencement
26 Date. As used herein: (i) *"Term"* shall refer to the Initial Term, as the same may be
27 extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii)
28 *"Expiration Date"* shall mean the date on which the Term expires.

29                               ARTICLE 2
30           LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

31         Section 2.1    Lease of Premises. Landlord hereby leases to Tenant, and Tenant
32 hereby leases from Landlord, the Premises together with any and all rights, benefits,
33 privileges and easements, now or hereafter appurtenant to either or both of the Premises
34 and the Shopping Center (which as to the Shopping Center, but not the Premises, shall be
35 non-exclusive and in common with all other tenants and occupants of the Shopping
36 Center, except as otherwise provided in this Lease), arising out of any public or private
37 grant or authority, including, without limitation, the non-exclusive right and easement to
38 use the Common Areas in common with other tenants and occupants of the Shopping
39 Center.

40         Section 2.2    Term.

41           2.2.1    Initial Term. Subject to the provisions of this Article 2, the Term of
42 this Lease shall begin on the earlier of (such earlier date being referred to herein as the
43 *"Rent Commencement Date"*): (a) the tenth (10th) day after the date upon which Tenant
44 shall initially open the Premises to the general public for business, or (b) the one hundred
45 fiftieth (150th) day following the later of the Delivery Date or the **"Permit Contingency**
46 **Date"** (hereinafter defined in Section 2.6); but in no event shall the Rent Commencement
47 Date occur prior to a temporary or permanent certificate of occupancy for the Premises
48 (or the local equivalent) having been obtained. The Term shall expire on the Expiration
49 Date, unless earlier terminated as herein provided. When the Rent Commencement Date

1807454 v8

has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2  Renewal Options.  So long as no Event of Default shall then remain uncured (at the time of the exercise of the applicable Renewal Option and the commencement of the Renewal Period), Tenant shall have the right and option (hereinafter a **"Renewal Option"**) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a **"Renewal Period"**, and collectively, the **"Renewal Periods"**) upon the same terms and conditions as are herein set forth (with the Fixed Rent payable during each Renewal Period being as set forth in Subsection 1.1.11 hereof).  Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s).  In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 270th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options.  If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof.  If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    Delivery Date.

2.3.1  Definition.  Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the **"Delivery Date"**) following the day on which all of the following conditions (the **"Delivery Date Conditions"**) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, broom clean and free of any previous tenant's or occupant's furniture, fixtures, and equipment, in a good, structurally sound condition, with Landlord's Work (if any) Substantially Completed, but the Premises shall otherwise be in "as is" condition as of the Effective Date;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request, to the extent in Landlord's possession) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of (i) building and site work permits which may be necessary for the performance of Tenant's Work (collectively, **"Tenant's Permits"**), (ii) a temporary and/or permanent certificate of occupancy for the Premises (or local equivalent) and (iii) any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business), which permits and approvals shall include, without limitation, zoning and building code approvals, and environmental requirements;

(c)    The representations and warranties of Landlord set forth in subparagraphs (a) through (j) of Section 12.3 below shall then be true and in effect;

(d)    Intentionally Omitted;

(e)   Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G (or in such other form as may be agreed upon by Tenant and the applicable Mortgagee) executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement substantially in the form attached hereto as Exhibit G-1 (or in such other form as may be agreed upon by Tenant and the Ground Lessor) executed by any existing Ground Lessor.

2.3.2   Delivery Date.

(a)   Landlord shall cause the Delivery Date to occur on **March 31, 2011**. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to such date.

(b)   Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in subparagraph (a) above, Tenant will sustain substantial, additional costs and expenses, including, without limitation, costs incurred in connection with contractors and subcontractors hired to perform Tenant's Work, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in subparagraph (a) above, and the Delivery Date continues to not have occurred on or before thirty (30) days after the Delivery Date as established in subparagraph (a) above, then, in addition to any other remedies available to Tenant under this Lease, Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of: (i) Seventy- Five Thousand Dollars ($75,000), plus (ii) Three Thousand Five Hundred Dollars ($3,500) for each day that the Delivery Date established in subparagraph (a) above is delayed; provided, that in no event shall such sum exceed $100,000.00, in the aggregate. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3   Delivery Date Certification. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4   Unseasonable Delivery: Slack Period. If, for any reason (including, without limitation, Force Majeure), the Rent Commencement Date occurs by reason of the effect of Section 2.2.1(b) above during the period commencing on November 1 and ending on the March 1 next following (the *"Slack Period"*), then Tenant shall have the right to defer the Rent Commencement Date until a later date within the Slack Period. Tenant shall not have the right to defer the Rent Commencement Date pursuant to this Section if the Rent Commencement Date occurs by reason of the effect of Section 2.2.1(a) above (i.e., Tenant opening for business in the Premises).

1    Section 2.5    Initial Co-Tenancy Condition.

2    2.5.1  As used herein, the *"Initial Co-Tenancy Condition"* shall mean that
3    at least 200,000 square feet of Floor Area in the Shopping Center (excluding the
4    Premises) shall be open for business to the public or, if not already open for business,
5    then the tenants thereof shall be actively and continuously engaged in the fixturing and
6    merchandising therein.

7    2.5.2  If, on the Delivery Date, the Initial Co-Tenancy Condition has not
8    been satisfied, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent (but, in
9    any event, shall continue to pay all Additional Rent which becomes due and payable
10   hereunder) until the Initial Co-Tenancy Condition is satisfied and the Landlord gives
11   Tenant notice thereof, subject to any other applicable provisions of this Article 2.

12   2.5.3  In addition to the provisions of Section 2.5.2 above, if the Initial Co-
13   Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery
14   Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the one-time
15   right, exercisable at any time prior to the satisfaction of the Initial Co-Tenancy Condition,
16   upon giving Landlord at least sixty (60) days' prior notice, to terminate this Lease as of
17   the date specified in said notice.  Landlord may negate such termination by either (x)
18   causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the
19   date on which said termination notice is given, or (y) delivering notice to Tenant, within
20   thirty (30) days after the date on which said termination notice is given, stating that
21   Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent in accordance with
22   Section 2.5.2 above (in which event, for the remainder of the Term, Tenant shall be
23   entitled to pay Alternate Rent in lieu of Fixed Rent (but, in any event, shall continue to
24   pay all Additional Rent which becomes due and payable hereunder) until the Initial Co-
25   Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to
26   any other applicable provisions of this Article 2).  If this Lease is terminated hereunder,
27   neither party shall have any further liability under this Lease, except: (i) for those
28   obligations which survive the expiration or other termination of this Lease pursuant to the
29   express terms of, and any accrued and unpaid Rent under, this Lease, and (ii) Landlord
30   shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses
31   incurred in connection with this Lease, including, without limitation, costs associated
32   with the preparation and review of plans and specifications, and attorney's fees, not to
33   exceed Seventy-Five Thousand Dollars ($75,000), and the costs incurred in connection
34   with performance of Tenant's Work (less any Tenant Allowance, as hereinafter defined,
35   paid by Landlord to Tenant).  If Tenant does not exercise its right to terminate this Lease
36   pursuant to this Section 2.5.3 within sixty (60) days following the first (1st) anniversary
37   of the Delivery Date, then commencing on the expiration of said 60-day period, Tenant
38   shall be deemed to have waived its right to terminate this Lease pursuant to this Section
39   2.5.3, and Tenant shall have no further right to pay Alternate Rent in lieu of Fixed Rent
40   under Section 2.5.2 above; provided, however, that nothing herein shall be construed to
41   limit Tenant's rights under Article 22 below with respect to an Excess Vacancy (as
42   defined in said Article 22).

43   Section 2.6    Permits Contingency.

44.  2.6.1  Tenant shall use diligent efforts to obtain all of Tenant's Permits
45   (defined in Section 2.3.1(b) above) on or before **June 1, 2011** (the *"Outside Permit
46   Date"*).  Tenant shall submit its initial application for the applicable Tenant's Permits on
47   or before **March 1, 2011**, subject to Tenant's receipt by such date of local Review Board
48   approval, which Tenant agrees to make application for on or before **February 1, 2011**.
49   Notwithstanding the provisions of this Article 2 to the contrary, if, despite Tenant's
50   diligent efforts, all Tenant's Permits have not been obtained by the Outside Permit Date,
51   then either Tenant or Landlord shall have the right, exercised by notice given to the other
52   prior to the unconditional grant of all of Tenant's Permits, to terminate this Lease;

provided, however, that, in the event that Landlord exercises its termination right under
this Subsection 2.6.1, Tenant shall have the right to avoid Landlord's termination by
giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination
notice, of Tenant's waiver of its rights under this Subsection 2.6.1, whereupon Landlord's
termination notice shall be rendered null and void. The date on which all Tenant's
Permits are unconditionally granted is referred to herein as the "*Permit Contingency
Date*". Tenant shall provide any reasonable information requested by the applicable
municipal authority with respect to the application for Tenant's Permits promptly
following its receipt of request therefor, and shall provide Landlord with copies of such
application and such information so requested and submitted.

2.6.2  In the event Tenant or Landlord elects to terminate this Lease
pursuant to this Section 2.6, this Lease shall cease and be deemed canceled and
terminated as of the date set forth in Tenant's or Landlord's notice of such termination
and upon such termination, Tenant and Landlord shall be relieved of any and all further
liability hereunder, except for those obligations which survive the expiration or other
termination of this Lease pursuant to the express terms of this Lease.

## ARTICLE 3
## IMPROVEMENTS

Section 3.1  Tenant's Work. Following the later of the Delivery Date or the
Permit Contingency Date, Tenant shall, at its sole cost and expense, commence and
pursue to completion the construction at the Premises of a typical Buy Buy Baby store,
inclusive of any and all work which Tenant desires to adapt the Premises to Tenant's use,
including without limitation the performance by Tenant of certain site work ("*Site
Work*") outside the Premises, as more particularly described on Exhibit D (i.e., the
widening of the sidewalk in front of the Premises and related work required by the
applicable governmental authorities) (collectively, "**Tenant's Work**"); and Tenant shall
use diligent efforts to Substantially Complete Tenant's Work within six (6) months
following the later of the Delivery Date or the Permit Contingency Date, and subject to
Section 3.3.1 below, will use diligent efforts to obtain a temporary or permanent
certificate of occupancy (or its local equivalent), unless such certificate is not available
for any reason other than Tenant's failure to perform Tenant's Work in compliance with
all Legal Requirements.

Section 3.2  Plan Approvals.

3.2.1  Preparation of Plans.

(a)  Prior to the Effective Date, Landlord has delivered to Tenant
drawings showing the existing footprint, column layout, and interior clear dimensions of
the Premises (the "*Preliminary LOD*") [Limits of Demised]. Landlord represents and
warrants, to the best of its actual knowledge, that the Preliminary LOD is true and correct
and accurately depicts the building in which the Premises are located, and Landlord
acknowledges that Tenant is relying on the accuracy of the Preliminary LOD.

(b)  Prior to the Effective Date, Tenant has delivered to Landlord,
and Landlord has approved, the revisions to the Preliminary LOD which Tenant intends
to make as part of Tenant's Work (the "*Revised LOD*"), including, without limitation, the
location of the interior structural grid (column layout), storefront opening, and mezzanine
and/or office core, the location and arrangement of the loading facilities, trash compactor
pad, and trash container pad(s), and any revisions to the interior clear dimensions. Tenant
has also delivered to Landlord Tenant's prototype drawings dated April 29, 2010 and
entitled Buy Buy Baby Prototype Drawings 2010.B (the "*Prototype Drawings*") which
shall be used to produce Tenant's Plans (as defined below) based on the Revised LOD.

1    (c)    Simultaneously with its applications for Tenant's Permits,
2  Tenant shall deliver to Landlord, for Landlord's information only, Tenant's plans
3  (*"Tenant's Plans"*) depicting Tenant's Work, including Tenant's elevation, modifications
4  to the loading facilities in the rear of the Premises and any Site Work.  Landlord shall
5  have no approval rights with respect to Tenant's Plans or the work contemplated thereby
6  so long as they: (i) comply with all Legal Requirements, (ii) are substantially consistent
7  with Exhibits B, D-1, and F attached hereto and with the Revised LOD and Prototype
8  Drawings, and (iii) do not materially reduce the structural soundness of the building
9  containing the Premises.

10    3.2.2  Plan Changes.  Tenant shall have the right to make changes to the
11  Tenant's Plans delivered to Landlord pursuant to Subsection 3.2.1(c) above, without
12  obtaining Landlord's consent, provided that the changes to Tenant's Plans do not result in
13  exterior or structural work which materially deviates from the Tenant's Plans so delivered
14  to Landlord and are otherwise in compliance with Section 3.2.1(c) hereof.

15    Section 3.3   Performance of Work.

16    3.3.1  Tenant's Work shall be performed in a good and workmanlike
17  manner, in compliance with all applicable Legal Requirements, utilizing only new, first-
18  class materials.  Landlord shall pay any and all impact fees and related governmental
19  charges in connection with the Shopping Center and the Premises.  If Tenant's Permits
20  and/or a temporary or permanent certificate of occupancy cannot be obtained (or Tenant
21  cannot otherwise open the Premises for business) by reason of any then existing condition
22  of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to
23  obtain Tenant's Permits, and/or a temporary or permanent certificate of occupancy (or to
24  enable Tenant to otherwise open the Premises for business), as the case may be, and (in
25  addition to any rights and remedies to which Tenant may be entitled to under this Lease,
26  at law, or in equity) the Rent Commencement Date shall be deemed delayed on a day-for-
27  day basis for each day of delay in obtaining Tenant's Permits or such certificate of
28  occupancy (or Tenant being unable to otherwise open for business) by reason of such
29  existing condition.  Tenant shall use reasonable efforts to ensure that its performance of
30  Tenant's Work shall not interfere with the normal conduct of any business operations of
31  another tenant or occupant of the Shopping Center.

32    3.3.2  If the Delivery Date shall not have occurred by one hundred fifty
33  (150) days after the Effective Date (subject to (a) *Force Majeure*, not to exceed sixty (60)
34  days in the aggregate, and (b) delays due to the actions of Tenant or Tenant's agents,
35  employees or contractors in violation of Section 3.3.4 hereof, and provided that Landlord
36  shall have given Tenant notice of such event of *Force* Majeure or Tenant delay, as the
37  case may be, promptly after its occurrence), Tenant may thereafter, during such time as
38  the Delivery Date has not occurred, consider Landlord to be in default hereunder and, at
39  Tenant's option in its sole discretion (and as Tenant's sole and exclusive remedies), elect
40  to:

41    (i)    terminate this Lease, if Landlord shall fail to fully cure
42  such default within thirty (30) days after receiving Tenant's notice thereof, in
43  which event neither party shall have any further liability hereunder, except: (i) for
44  those obligations which survive the expiration or other termination of this Lease
45  pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to
46  promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof,
47  for all its reasonable third-party costs and expenses incurred in connection with
48  this Lease (including, without limitation, costs associated with the preparation and
49  review of plans and specifications, attorney's fees, and the performance of
50  Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000) and/or

1807454 v8

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable), and provided, further, however, Tenant shall have no right to sue for monetary damages by reason of such default (except if Landlord fails to reimburse Tenant in the event Tenant performs self-help); and/or

(iii)    extend one or more times (but not for an aggregate period of more than 90 days) the date set forth in this Subsection 3.3.2 to such future date designated by Tenant in notice given to Landlord, and as to any extension granted with respect to such date, in addition to any other rights and remedies to which Tenant may be entitled, the Rent Commencement Date shall be postponed by two (2) days for each day of the extension granted as to such date.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3    Intentionally Omitted.

3.3.4    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5    Tenant's Leasehold Improvements.  Subject to Section 3.3.8 below, Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes; provided that any improvements erected by Tenant which are in the nature of a fixture attached to real property shall, when made, become the property of Landlord.

3.3.6    Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)    staging and storage of materials and parking of construction vehicles shall occur only within portions of the Shopping Center which are located entirely outside of the Critical Area;

(b)    Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall not materially adversely interfere with the normal conduct of any business operation in the Premises; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

1807454 v8

11

1         3.3.7   Tenant's Trailer. Tenant shall have the right, subject to applicable
2 Legal Requirements, to place a trailer in an area immediately behind the Premises, in the
3 location shown on Exhibit B hereto, during the period commencing on the forty-fifth
4 (45th) day prior to date on which Tenant has scheduled for the commencement of its
5 fixturing in the Premises, until the twentieth (20th) day after said fixturing date (but not
6 later than the date Tenant opens for business in the Premises), for the purpose of
7 conducting employee interviews and recruiting.

8         3.3.8   Tenant Allowance and Fire Pump Allowance. Landlord shall pay to
9 Tenant, in consideration for Tenant's construction of "Landlord's Special Improvements"
10 (defined below) the sum of (1) One Million Dollars ($1,000,000.00) (the "Tenant
11 Allowance") and (2) fifty percent (50%) of the actual costs incurred by Tenant to
12 purchase, install and construct the fire pump and related facilities described on Exhibit D
13 hereto, provided that Landlord's share of such costs shall not exceed $250,000.00 (the
14 "Fire Pump Allowance"). The Tenant Allowance and Fire Pump Allowance shall be
15 paid to Tenant as follows:

16         (a)   Five Hundred Thousand Dollars ($500,000.00) plus 50% of
17 the Fire Pump Allowance shall be paid to Tenant within twenty (20) days after Landlord's
18 receipt or the occurrence, as the case may be, of all of the following:

19         (i)   completion of at least fifty percent (50%) of Tenant's
20 Work, as certified to Landlord by Tenant and Tenant's architect;

21         (ii)   receipt of a copy of a fully-executed standard form of
22 contractor's requisition indicating that at least fifty percent (50%) of Tenant's Work has
23 been completed;

24         (iii)   at Tenant's discretion, either (y) a lien waiver from
25 Tenant's general contractor to the extent of sums which have then become due to it, or (z)
26 an agreement regarding mechanics' and materialman's liens in the form attached hereto
27 as Exhibit N; and

28         (iv)   a certification by Tenant as to the actual costs incurred
29 with respect to the fire pump and related facilities described on Exhibit D and the amount
30 of the Fire Pump Allowance as of the date of such certification.

31         (b)   The balance of the Tenant Allowance and the Fire Pump
32 Allowance shall be paid to Tenant within twenty (20) days after the later to occur of
33 Substantial Completion of Tenant's Work in accordance with the Tenant's Plans, as
34 certified to Landlord by Tenant's architect, and Landlord's receipt of all of the following:

35         (i)   a copy of a fully executed standard form of
36 contractor's requisition indicating substantial completion of Tenant's Work; .

37         (ii)   at Tenant's discretion, either (y) a lien waiver from
38 Tenant's general contractor, or (z) an agreement regarding mechanics' and materialman's
39 liens in the form attached hereto as Exhibit N;

40         (iii)   a temporary or permanent certificate of occupancy (or
41 its local equivalent), unless such certificate is not available for any reason other than
42 Tenant's failure to perform Tenant's Work in compliance with all Legal Requirements.
43 Tenant agrees that if a temporary certificate of occupancy is issued, Tenant shall make
44 reasonable efforts to obtain a permanent certificate of occupancy within a reasonable
45 period of time thereafter, subject to Landlord's compliance with Section 3.3.1 hereof with
46 respect thereto; and

(iv)    a certification by Tenant as to the actual costs incurred with respect to the fire pump and related facilities described on Exhibit D and the amount of the Fire Pump Allowance as of the date of such certification.

Simultaneously with the execution of this Lease, Landlord has deposited into escrow with Equitable Abstract Co., Inc. (the "*Escrow Agent*") pursuant to a certain Escrow Agreement of even date herewith (the "*Escrow Agreement*") the sum of $1,250,000 (the "*Escrow Funds*") to secure the payment of the Tenant Allowance and the Fire Pump Allowance. The Escrow Agreement provides for the Escrow Funds (or the applicable portion thereof) to be delivered to Tenant within five (5) days after the delivery to Escrow Agent of written statements signed by Landlord and Tenant directing Escrow Agent to do so.

If Landlord fails to direct Escrow Agent in writing to release the Tenant Allowance and/or Fire Pump Allowance or applicable portion thereof within fifteen (15) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to a credit against one hundred percent (100%) of the Fixed Rent (but not the Additional Rent) payable by Tenant hereunder, together with interest thereon at a rate equal to the then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus four percent (4%). The Tenant Allowance and Fire Pump Allowance are an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of Tenant's Work (the "*Landlord's Special Improvements*") (which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease). Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance and/or Fire Pump Allowance. Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the Tenant's Allowance and Fire Pump Allowance, together with any replacements thereof, and Tenant's Work (except for Landlord's Special Improvements) shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes. Within fifteen (15) days after Tenant's receipt of payment in full of the Tenant Allowance and the Fire Pump Allowance, Tenant shall direct Escrow Agent to release any and all remaining Escrow Funds to Landlord.

3.3.9    Tenant's Staging Area. Subject to applicable Legal Requirements, Tenant intends to utilize a staging area for its construction vehicles, equipment and materials in the location marked "*Staging Area*" shown on Exhibit B hereto during the period commencing on the Delivery Date and ending on the date (the "*Staging Area Removal Date*") which is the twentieth (20th) day after Tenant commences its fixturing in the Premises (but not later than the date Tenant opens for business in the Premises). All such construction vehicles, equipment and materials shall be located within such Staging Area. Tenant shall properly secure the Staging Area. Tenant shall be responsible for all damage or loss resulting from the use of such Staging Area by Tenant and its contractors and shall cause the Staging Area to be used in a manner that will not impede the use of the Common Areas or the access of other tenants and occupants of the Shopping Center (and/or their customers, contractors, employees, agents and/or delivery vehicles) to their premises. Within five (5) days after the Staging Area Removal Date, Tenant shall remove all construction vehicles, equipment and materials from the Staging Area, and return the Staging Area to substantially the condition that existed prior to Tenant's use of such Common Area as Staging Area.

1807454 v8

13

1    Section 3.4    Measurement: Premises and Shopping Center.

2    3.4.1  Landlord and Tenant agree that the Floor Area of the Premises shall
3    be deemed to be Twenty-Five Thousand (25,000) square feet as of the Effective Date,
4    notwithstanding its actual measurement upon completion of Tenant's Work to the
5    contrary.  Landlord hereby represents and warrants that, as of the Effective Date, the
6    Floor Area of the Shopping Center (inclusive of the Premises) is 408,138 square feet.

7    ARTICLE 4
8    FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

9    Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and
10    continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal
11    successive monthly installments, in advance, on the first day of each and every calendar
12    month throughout the Term, except that Fixed Rent payable for any partial calendar
13    month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be
14    paid without deduction or set-off, except to the extent otherwise expressly provided
15    herein.

16    Section 4.2    Payment of Rent.  All Rent shall be mailed or otherwise delivered to
17    Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to
18    Tenant, to such other address as Landlord may from time to time designate.  Landlord
19    acknowledges and agrees that for administrative purposes, Tenant may designate a
20    corporation or other entity to act as paying agent (the *"Paying Agent"*), to make all Rent
21    payments due to Landlord under this Lease.  Said designation (which may be revoked by
22    Tenant at any time) is not intended as, and shall not constitute, an assignment of any
23    rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily
24    liable for payment of Rent under this Lease.  All payments of Rent received by Landlord
25    from the Paying Agent shall be credited to Tenant as if such payments of Rent had been
26    made by Tenant directly to Landlord.

27    Section 4.3    Real Estate and Other Taxes.

28    4.3.1  Landlord shall pay (or will cause its Mortgagee to pay) on or before
29    the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal
30    property taxes levied against tenants.  Throughout the Term, Landlord shall cause the
31    Shopping Center to be maintained entirely within tax parcels and lots that exclude any
32    property not a part of the Shopping Center.

33    4.3.2  (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the
34    Taxes which accrue during the Term, subject to the provisions of this Section 4.3.  Any
35    Taxes for a real estate fiscal tax year, only a part of which is included within the Term,
36    shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the
37    Rent Commencement Date or the date on which the Term expires or earlier terminates, as
38    the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  Subject
39    to compliance with the terms of any mortgage or deed of trust encumbering the Shopping
40    Center on the Effective Date, if, by law, any Taxes may, at the option of the taxpayer, be
41    paid in installments (whether or not interest shall accrue on the unpaid balance thereof),
42    Landlord shall exercise such option so as to maximize the number of installments, and
43    Landlord shall pay the same as they come due and before any fine, penalty, interest, a loss
44    of discount or cost may be added thereto for nonpayment thereof.

45    (b)    Landlord shall submit to Tenant a copy of the bill for Taxes
46    issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of
47    such Taxes and (no more than once annually) proof of the payment of Taxes for the
48    previous calendar year, as well as copies of all notices concerning assessments, tax rates,
49    and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection

1807454 v8

14

4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

        (c)   In the event that Landlord's Mortgagee shall require Landlord to escrow monthly payments for Taxes, then, so long as such escrow shall be so required and tenants and occupants (excluding Tenant) occupying no less than 70% of the Floor Area of the Shopping Center, in the aggregate, are similarly required to make monthly payments to Landlord with respect to Taxes, Tenant shall, in lieu of making payments pursuant to subparagraph (b) above, pay Landlord monthly with each installment of Fixed Rent an amount equal to one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's (or Landlord's Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within thirty (30) days following the issuance by all applicable taxing authorities of the bills covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Pro Rata Share thereof for such year (the ***"Tax Reconciliation Statement"***). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) copies of the applicable tax bills, (y) a calculation of Tenant's Pro Rata Share of Taxes, and (z) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Pro Rata Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by Tenant in respect of said fiscal tax year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. If Landlord fails to timely remit to Tenant the amount of any overpayment, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

        4.3.3  As used herein, ***"Taxes"*** shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease (unless the present method of taxation is changed so that such franchise or capital tax or assessment, or tax or assessment on rentals, is imposed or levied as a total or partial substitute for other Taxes); (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord; or (6) fees imposed upon Landlord in connection with Landlord's future or further development of the Shopping Center after the Effective Date (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date

and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full calendar year of this Lease will be approximately $5.08 per square foot of Floor Area in the Premises.

4.3.4    Landlord shall have the sole right to contest any valuation of the Shopping Center or Taxes. If Landlord shall elect not to contest the amount or validity of any assessed valuation or Taxes, then Tenant shall have the right, at its own cost and expense, to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant (at no out-of-pocket cost or expense to Landlord, other than de minimis expenses), execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. Notwithstanding the foregoing, if tax certiorari counsel selected by Landlord recommends against the filing of proceedings contesting the amount or validity of any assessed valuation or Taxes and Tenant is notified of same prior to Tenant commencing the applicable proceeding, then (unless tenants of the Shopping Center (including Tenant), leasing fifty percent (50%) or more of the aggregate Floor Area of the Shopping Center, desire such contest) Tenant shall not file such proceedings. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received (of which Tenant has paid Tenant's Pro Rata Share), Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Notwithstanding the foregoing, if Tenant is the sole occupant of the tax lot on which the Premises is located, then Tenant shall have the right to contest the assessed valuation or Taxes without first requesting that Landlord do so. If, as a direct result of a contest undertaking by Tenant under this Section 4.3.4 Taxes are increased, Tenant shall pay the entire amount of such increase in Taxes (in the same manner that Tenant pays Tenant's Pro Rata Share of Taxes under Subsection 4.3.2(b) above).

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers Westchester County, New York are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, liability and casualty insurance, supervision, use, parking lot paving and striping, pylon and monument signs, drainage, utility conduits and pipes (including electrical) serving the Common Areas, irrigation system, security (as reasonably required) and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    Tenant's Contribution Towards Common Areas Charges.

(a)    During the Term, as Tenant's contribution (***"Tenant's Contribution"***) towards the costs (hereinafter referred to as the ***"Common Areas Charges"***) paid by Landlord to operate, maintain, insure, repair and replace the Common

Areas, as provided in Section 5.1.1, Tenant shall pay (i) Tenant's Fixed CAM, (ii) Tenant's Pro Rata Share of snow and ice removal costs for the Shopping Center (which Landlord reasonably estimates to be approximately $.24 per square foot of Floor Area in the Premises for the first full calendar year of the Term), and (iii) Tenant's Pro Rata Share of the reasonable premiums for insurance required to be maintained by Landlord under Section 10.3 below (the costs described in clauses (ii) and (iii) are herein collectively called the *"Reimbursable Costs"*). No administrative and/or management fees shall be permitted to be included in or added to Tenant's Contribution. Tenant's Contribution shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget for the Reimbursable Costs.

(b)    Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Reimbursable Costs for such year, which statement shall be prepared in accordance with generally accepted accounting principles (or successor accounting standards) consistently applied (the *"CAC Reconciliation Statement"*). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of the Reimbursable Costs, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Reimbursable Costs for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount against fifty percent (50%) of each successive installment of Fixed Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit (it being agreed that Tenant shall be entitled to offset against larger percentages of each successive installment of Fixed Rent if the aforesaid fifty percent (50%) offset is insufficient to reimburse Tenant in full, taking into account the then remaining number of installments of Fixed Rent payable by Tenant hereunder).

5.1.3  Exclusions from Reimbursable Costs.

(a)    The Reimbursable Costs shall not include **(1)** any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; **(2)** those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; **(3)** sums paid or owed by Landlord to any tenant in the Shopping Center; **(4)** sums incurred as late payment fees, penalties or interest; **(5)** costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(6)** the cost of mechanized equipment for snow and ice removal (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles (or successor accounting standards)); **(7)** reserves for anticipated future expenses; and **(8)** any cost or expense relating to administration and/or management.

(b)    In addition, if any tenant or other occupant of the Shopping Center (i) performs snow and ice removal for the Common Areas adjoining its premises or provides the insurance required to be maintained pursuant to Section 10.3 below for its

1807454 v8

17

1 premises and/or such Common Areas, the cost of which would otherwise be includable in
2 the Reimbursable Costs, and/or (ii) pays directly for costs which would otherwise be
3 included in the Reimbursable Costs, then the costs associated with or attributable to any
4 of the foregoing shall be excluded from the Reimbursable Costs, and the denominator
5 used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be
6 reduced by the Floor Area occupied by such tenant or other occupant. In applying the
7 provisions hereof, Landlord shall act equitably, taking into account, for example, the
8 relationship of the size of the Common Areas maintained by the other tenant or occupant
9 to the size of its premises.

10             (c)    Tenant's Contribution and the Reimbursable Costs for any
11 period during the Term which constitutes less than a full calendar year shall be equitably
12 prorated.

13             5.1.4   Tenant's Right to Audit. Tenant shall have the right, within three (3)
14 years after receiving any CAC Reconciliation Statement (and not more than once
15 annually) to audit Landlord's books and records to verify Landlord's calculation of the
16 Reimbursable Costs for the applicable calendar year as reflected therein and Tenant's Pro
17 Rata Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant
18 copies of relevant backup materials (including, but not limited to, contracts,
19 correspondence and paid invoices) reasonably required by Tenant. In the event of an
20 error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty
21 (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%)
22 percent of Tenant's Pro Rata Share of the Reimbursable Costs, Landlord shall pay to
23 Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand
24 therefor, failing which, Tenant shall have the right (in addition to any rights and remedies
25 to which it may be entitled under this Lease) to offset such amount from payments of
26 Rent next becoming due hereunder, together with interest thereon at the Lease Interest
27 Rate from the date such remittance is due until reimbursement or full satisfaction by
28 credit. Landlord shall maintain all books and records pertaining to a calendar year for at
29 least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such
30 calendar year. Tenant shall keep the results of any such audit confidential, provided that
31 nothing contained herein shall restrict Tenant from disclosing such information as may be
32 required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide*
33 prospective assignees or subtenants (provided that each of such recipients shall be bound
34 by the same non-disclosure provisions as are imposed upon Tenant). Tenant shall not
35 employ an auditor to conduct an audit who is paid on a contingency basis, Tenant shall
36 require in its contract with its auditor that the auditor keep the results of any such audit
37 confidential and agrees to make reasonable efforts to cause the auditor to comply with
38 such obligation [it being agreed that should such auditor violate such obligation, Tenant
39 shall, at Landlord's request, assign to Landlord its right to enforce such obligation against
40 the auditor, provided such assignment is legally permissible]. Any dispute by Landlord
41 with respect to an audit by Tenant shall be submitted to arbitration in accordance with the
42 provisions of Section 16.3 below.

43             5.1.5  In no event shall Tenant be required to join, participate in or
44 contribute to any promotional fund, marketing fund or merchants' association.

45       Section 5.2   Common Areas: Restrictions.

46             5.2.1   Continuous Access. No entrances, exits, approaches and means of
47 ingress and egress to, from, and/or within the Shopping Center or the Premises as shown
48 on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord
49 during the Term, except in the event of an emergency or as may be otherwise required by
50 applicable Legal Requirements, or on a temporary basis in order to make ordinary repairs
51 or perform Common Areas maintenance, in any of which events Landlord shall use
52 reasonable efforts to give Tenant advance notice of same and to minimize interference to

1   Tenant's normal business operations in the Premises as a result thereof.  Notwithstanding
2   the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice to
3   Tenant, to temporarily close the Common Areas, for the minimum time legally necessary
4   to prevent a dedication thereof or an accrual of any rights in any person or the public
5   generally therein; provided that such closure shall not occur during August, November or
6   December of any calendar year.

7       5.2.2  No Alterations.  Landlord shall not, without obtaining Tenant's prior
8   written consent in each instance, which consent may be withheld in its sole discretion:
9   (i) alter the area of the Shopping Center or the location, availability, or size of any
10  Common Area improvement located within the Critical Area, from that shown on
11  Exhibit B hereto (except as may be required by Legal Requirements or a Taking, as
12  hereinafter defined); (ii) construct or permit to be constructed any structures in the
13  Critical Area (including, without limitation, any buildings, kiosks, booths, signs or similar
14  structures in the Critical Area), other than as shown on Exhibit B hereto; or (iii)
15  materially change the entrances or exits to and from the Shopping Center, or the curb
16  cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas, or the
17  number, location or layout of parking spaces, located within the Critical Area from those
18  shown on Exhibit B hereto.  Landlord shall neither perform nor permit to be performed,
19  any construction, repairs or replacements to any portion of the Shopping Center (except
20  in the event of an emergency, as may be required by Legal Requirements or leases, or in
21  order to fit out a new tenant) during the months of August, November and December of
22  any year, without the prior consent of Tenant, which consent may be withheld in Tenant's
23  sole discretion; provided, however, in no event shall Landlord maintain or permit to be
24  maintained any staging and storage of materials and/or parking of construction vehicles in
25  the Common Areas in the front part of the Shopping Center in connection with the fit out
26  of a new tenant during the period from November 15 through December 31 of any year.

27      5.2.3  Outparcels.  In addition to the provisions of Subsection 5.2.2 above,
28  during the Term, the following restrictions shall encumber and bind the outparcels
29  (collectively, the "*Outparcels*" and individually, an "*Outparcel*") designated on Exhibit B
30  hereto as "Parcel A," "Parcel B," and "Parcel C": (a) no more than one building shall be
31  constructed on any Outparcel; (b) no building shall exceed one story in height; (c) no
32  building shall exceed the greater of (i) thirty (30) feet in height or (ii) the current height of
33  the existing building on such Outparcel (inclusive of the height of all types of projections
34  or architectural treatments or embellishments thereon, such as, but without limitation,
35  HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae); (d) the Floor
36  Area of any building constructed on an Outparcel shall not exceed 115% of the Floor
37  Area of the existing building on such Outparcel, as shown on Exhibit B hereto; and (e)
38  the parking requirements for the Shopping Center set forth in Section 5.2.4 below shall
39  continue to be complied with.  For purposes of this Subsection 5.2.3, the Floor Area of
40  any building constructed on an Outparcel shall also be deemed to include outdoor
41  balconies, patios or other outdoor areas utilized for retail sales or food or beverage service
42  (exclusive of drive through or walk-up take-out food or beverage service).

43      5.2.4  Parking Area.  During the Term, Landlord shall maintain in the
44  Shopping Center, at a minimum, the greater of (i) the number of parking spaces required
45  by applicable Legal Requirements, without variance, or (ii) four (4) ground-level parking
46  spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center,
47  with each such space being at least nine (9) feet in width and eighteen (18) feet in length.
48  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.
49  Except as expressly permitted in this Section 5.2.4 below, Landlord shall not designate
50  specific parking spaces for use by other tenants or occupants of the Shopping Center, nor
51  shall Landlord authorize any person or entity to use the parking areas other than Tenant,
52  the other tenants and occupants of the Shopping Center, and their respective employees,
53  agents, subtenants, concessionaires, licensees, customers, and invitees (and Landlord shall

1807454 v8

make reasonable and diligent efforts to cause such unauthorized persons and entities to cease their use of the parking areas). There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center, except that Tenant shall be entitled to park overnight, adjacent to Tenant's loading dock in the rear of the Premises, one box truck that is used exclusively for delivery of merchandise purchased by Tenant's customers. Notwithstanding the foregoing to the contrary, four (4) parking spaces shall be permitted to be designated by Tenant for use by expectant mothers and/or parents with infants who are customers of the Shopping Center (the *"Expectant Mother Parking Spaces"*) in the location identified on Exhibit B as the "Expectant Mother Parking Area". The Expectant Mother Parking Spaces shall be prominently marked and/or signed as intended for use by expectant mothers and/or parents with infants who are customers of the Shopping Center. Tenant's signs for the Expectant Mother Parking Spaces are included in Exhibit F and Tenant shall be permitted to install such signs, at its expense. Landlord shall have the right to designate up to three (3) parking spaces in the Shopping Center, in the aggregate, for the exclusive or restrictive use of customers of a particular store provided that each such parking space is located immediately in front of such tenant's store and more than 300 feet from the Premises. Landlord shall use commercially reasonable and diligent efforts to enforce the foregoing restrictions.

      5.2.5 Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 10:00 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn. Notwithstanding anything in this Subsection 5.2.5 to the contrary, Landlord may elect to keep the Common Areas lighted after Normal Hours, and the costs of said lighting shall be deemed included in Tenant's Fixed CAM (and not charged to Tenant under this Subsection).

      5.2.6 Repairs. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

      (a) to the extent performed or staged within the Common Areas, not be performed during the months of August, November, or December of any year, except in the event of an emergency, as may be required by Legal Requirements or leases, or in order to fit out a new tenant; provided, however, in no event shall Landlord maintain or permit to be maintained any staging and storage of materials and/or parking of construction vehicles in the Common Areas in the front part of the Shopping Center in connection with the fit out of a new tenant during the period from November 15 through December 31 of any year;

      (b) to the extent performed or staged within the Common Areas, be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)  be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7  Rules and Regulations.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect (other than to a de minimis extent) the normal conduct of any business operations in the Premises, (iii) do not adversely affect any (other than to a de minimis extent) of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8  Miscellaneous.

(a)  No Promotional Use.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, Tenant shall be permitted to (and Landlord may, in its discretion, permit other tenants of the Shopping Center to) display seasonal merchandise and conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.  Landlord shall not authorize any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas (and Landlord shall make reasonable and diligent efforts to cause any person or entity performing any of such activities to cease same), except as otherwise may be mandated or permitted by applicable Legal Requirements.

(b)  Trash Compactor and Containers.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad".  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.  Tenant, at its sole cost and expense, shall arrange for carting of its own trash.

(c)  Shopping Carts.  Tenant shall be permitted (and required) to store its shopping carts either in the Premises or in such exterior cart corrals as may be reflected on Exhibit B.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable and diligent efforts, in good faith, consistent with good shopping center practices, to remove same from the Common Areas during each business day.

(d)  Cellular Towers.  No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.  It is hereby acknowledged and agreed that this Subsection (d) is not intended to prohibit tenants of the Shopping Center from erecting and maintaining antennae and Satellite Dishes on the roofs of their respective premises for use in connection with their business activities at the Shopping Center; provided, however, that the erection and maintenance of such antennae and Satellite Dishes by other tenants (i) is in compliance with the applicable terms of this Lease, and (ii) does not diminish or adversely affect Tenant's rights under Section 8.1.4 hereof.

1807454 v8

21

        (e)    Temporary Storage Containers. Tenant shall be permitted to
utilize the loading facilities serving the Premises (shown on Exhibit B) for seasonal
storage purposes, subject to applicable Legal Requirements. Tenant shall be permitted to
maintain temporary storage containers or trailers in the locations designated on Exhibit B
hereto during the Term, subject to applicable Legal Requirements.

ARTICLE 6<br>UTILITIES

        Section 6.1    Utility Service. From and after the Delivery Date and continuing
thereafter through the end of the Term, Tenant shall be solely responsible for and shall
pay the cost of utilities services (including, without limitation, electricity, gas, water,
sanitary sewer, alarm and telecommunications) consumed on or in the Premises by
Tenant. Tenant shall not be obligated to purchase utility service(s) directly from
Landlord, or from any utility provider designated by Landlord. Landlord shall provide
separate utility meters exclusively serving the Premises, at its sole cost and expense
(including, without limitation, all connection and hook-up fees). Tenant's entry upon the
Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's
obligation to pay the costs of all utility charges incurred in the Premises prior to the
Delivery Date, provided that Tenant shall pay all costs for utilities consumed by Tenant in
Tenant's performing work in the Premises prior to the Delivery Date. Landlord shall not
permit the capacity of utility lines available for use at the Premises to be reduced or
overloaded by any other persons or entities. Landlord shall permit Tenant and its
telecommunications provider full and free access to, and use of, available
telecommunications conduits in the Shopping Center for the provision of
telecommunications service to the Premises, subject to such reasonable requirements as
Landlord may impose.

        Section 6.2    Interruption. Notwithstanding any provision of this Lease to the
contrary, in the event utilities serving the Premises are disrupted due to the negligence or
willful acts of Landlord, its agents, contractors, servants or employees, Landlord shall
promptly restore the affected utilities at Landlord's sole cost and expense. If the
disrupted utilities are not restored within forty-eight (48) hours after the Landlord has
knowledge of the disruption, and Tenant is unable to conduct its normal business in the
Premises as a result thereof, Rent shall be equitably abated during the period of
disruption, from and after the expiration of such 48-hour period.

ARTICLE 7<br>SIGNS

        Section 7.1    Tenant's Building Signage. Subject to compliance with applicable
Legal Requirements, Tenant shall have the exclusive right, in connection with Tenant's
Work, and thereafter during the Term, at its sole cost and expense, to erect, maintain, and
replace on the storefront and exterior walls of the Premises, and on the side walls of any
entrance design element, if any, signs (including, without limitation, under-canopy (e.g.,
blade) signs), banners (including, professionally prepared, temporary banners placed on
the storefront of the Premises and such other walls of the Premises as selected by Tenant),
awnings, and flags of such size, design and color as Tenant, from time to time, may
desire. Subject to compliance with applicable Legal Requirements, Tenant shall also
have the non-exclusive right to erect, maintain and replace a sign of such design and color
as Tenant may desire on the shopping center wall facing Interstate 287 ("**Remote Sign**").
Tenant's Remote Sign shall be next to (and similar in size to) the Al Friedman sign
currently existing as of the Effective Date. Subject to obtaining all approvals for same
required by applicable Legal Requirements, Tenant shall also be entitled, at Tenant's sole
cost and expense, to install and maintain, during the period commencing on the Effective
Date and ending on the day prior to the Rent Commencement Date, a professionally
prepared, temporary sign near the site of the main entrance to the Shopping Center which

1    states "buy buy Baby Coming Soon" (which sign is more particularly shown in <u>Exhibit F</u>
2    hereto). Tenant may erect and maintain in the interior of the Premises any signs it may
3    desire, provided same are professionally prepared.

4    Section 7.2    <u>Pylon Signage</u>. Landlord shall continue to provide the pylon at the
5    location shown on <u>Exhibit B</u> hereto during the entire Term ("**<u>Pylon</u>**"), and Landlord
6    represents that it has obtained all permits and approvals therefor. Tenant shall have the
7    right, at its sole cost and expense, to erect and maintain Tenant's identification sign panel,
8    as shown on <u>Exhibit F</u> hereto (and having colors as shown on <u>Exhibit F</u> hereto), on all
9    sides of the Pylon in the position shown on <u>Exhibit F</u> hereto (with the dimensions and
10   position of Tenant's sign panel(s), and the sign panels of the other tenants located on such
11   Pylon, as shown on <u>Exhibit F</u> hereto). In addition, if Landlord constructs or makes
12   available any other signage located in the Common Areas identifying more than one
13   occupant of the Shopping Center, Landlord shall also include on such signage Tenant's
14   identification sign. Landlord shall maintain all pylons and monuments (but not Tenant's
15   signs thereon), in good order and repair, and allow Tenant access to maintain and/or
16   replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter
17   the location, structure, height or general appearance of the pylons or monuments bearing
18   Tenant's sign panel(s) without obtaining Tenant's prior consent. The cost of maintaining
19   all pylons and monuments bearing Tenant's sign panel(s) [but <u>not</u> the cost of individual
20   tenants' signs thereon or the cost of the construction of the pylons and monuments] and
21   the cost of any electricity used to illuminate them, shall be includable in Common Areas
22   Charges.

23   Section 7.3    <u>Signage: Alteration/Removal/Allocation</u>. Tenant shall have the
24   right, from time to time, without Landlord's approval, to change its signs on the storefront
25   and exterior of the Premises, as well as on any pylon or monument upon which Tenant
26   may maintain its sign pursuant to Section 7.2 above, <u>provided</u> that the area of the new
27   sign is no larger than the area of the sign which it replaces and that the method of
28   construction and attachment is substantially the same. Upon the expiration or earlier
29   termination of the Lease, Tenant shall remove its signs from the fascia or other exterior
30   walls of the Premises and from any pylon or monument, and shall repair any damage
31   occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall,
32   at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any
33   portion of the Premises. All signage installed by Landlord and Tenant hereunder shall
34   comply with applicable Legal Requirements.

35   Section 7.4    <u>Cooperation</u>. Landlord, upon request (but at no out-of-pocket cost to
36   Landlord, other than de minimis costs), shall execute any variances, consents or
37   applications which may be required by applicable Legal Requirements to permit the
38   placement, installation, and/or replacement by Tenant of the Remote Sign or any signs on
39   any part of the Premises or on any pylon or monument, to which Tenant may be entitled
40   under this Lease.

41   Section 7.5    <u>Signage and Building Restrictions and Criteria</u>.

42   7.5.1    During the Term, no exterior identification signs attached to any
43   building of the Shopping Center shall be of the following type: (**i**) flashing, moving or
44   audible signs; (**ii**) signs employing exposed neon tubes, exposed ballast boxes, or exposed
45   transformers, provided that Tenant shall have the right to employ any methods necessary
46   for the installation of internally illuminated self-contained channel letters; or (**iii**) paper or
47   cardboard signs other than professionally prepared interior window signs advertising
48   special sales within the subject premises, temporary signs (exclusive of contractor signs),
49   stickers or decals, <u>provided, however</u>, the foregoing shall not prohibit the placement at the
50   entrance of each such premises of (A) small stickers or decals which indicate hours of
51   business, emergency telephone numbers, credit cards accepted, and other similar
52   information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or

1    words of like import.  Notwithstanding the foregoing to the contrary, existing tenants of
2    the Shopping Center (to the extent such tenants are not required to comply with the terms
3    of this Section 7.5.1 under their respective Existing Leases) shall not be required to
4    comply with the terms of this Section 7.5.1; provided, however, existing tenants shall
5    nevertheless be subject to compliance with the restrictions contained in this Section 7.5.1
6    in the event that Landlord has the absolute right of consent under the applicable lease
7    (and not simply "reasonable" or conditional consent) in order for such existing tenant to
8    maintain building signage in violation of this Section 7.5.1.  No billboard signs shall be
9    permitted within the Shopping Center.

10          7.5.2  Landlord shall not permit any obstructions (including, without
11    limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to
12    obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons,
13    monuments or other freestanding signs.

14                ARTICLE 8
15        ALTERATIONS AND IMPROVEMENTS

16    Section 8.1    Alterations and Improvements.

17          8.1.1  Tenant shall not perform any structural alterations or structural
18    improvements to the Premises (except to the extent same pertain to Tenant's Work)
19    without the prior approval of Landlord, provided, however, that Tenant's alteration of the
20    exterior of the Premises to conform to Tenant's then-current prototypical elevation shall
21    not require Landlord's consent.  All work performed by Tenant in connection with
22    structural and non-structural alterations or improvements shall be done at Tenant's sole
23    cost and expense, in a good and workmanlike manner and in compliance with all
24    applicable Legal Requirements.  Any alterations or improvements made to the exterior of
25    the Premises, whether structural or non-structural, (i) must be architecturally harmonious
26    with the Shopping Center, and (ii) must be reasonably consistent with the practices of
27    similar shopping centers located in Westchester County, New York.  The provisions of
28    this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by
29    the applicable provisions of Article 7 above.

30          8.1.2  Tenant may, from time to time, at its sole cost and expense, without
31    the prior approval of Landlord, make non-structural alterations and non-structural
32    improvements to the Premises as Tenant deems necessary or desirable, including, but not
33    limited to, electrical systems, heating, ventilation and air conditioning and other
34    mechanical systems, installation of fixtures and equipment, painting, and wall and floor
35    coverings.

36          8.1.3  Tenant shall have the right to subdivide the Premises into no more
37    than two (2) separate stores, each of which may have its own front entrance and access to
38    the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

39          8.1.4  Provided Tenant obtains and keeps in full force and effect all
40    municipal and governmental approvals required under applicable Legal Requirements for
41    the installation and operation of such communication equipment, Tenant may, without
42    payment of any charge therefor, install or cause to be installed an antenna, Satellite Dish
43    and related equipment (collectively, the "*Satellite Dish*") at such location on the roof above
44    the Premises as shall be reasonably selected by Tenant, provided that such location shall not
45    (x) undermine or prejudice the structural integrity of the building or any portion therefor, (y)
46    adversely affect any roof warranty (or, in lieu thereof, Tenant shall use a contractor
47    approved by Landlord so as to not violate any such roof warranty), or (z) be visible from
48    any point at street level, subject to the following:

(a)    The combined weight of the Satellite Dish, supporting pedestal and all appurtenances thereto shall not (i) exceed the structural load and integrity of the roof due to weight/wind loading or (ii) be visible from any exterior ground level line of sight.

(b)    Tenant shall be responsible, at its sole cost and expense, for obtaining, securing and maintaining all applicable governmental and quasi-governmental permits, licenses, authorizations and approvals required under applicable Legal Requirements in order to install, maintain, use and operate the Satellite Dish. Prior to installing any Satellite Dish, Tenant shall prepare plans indicating the type of Satellite Dish to be installed, the location and the method of installation and removal, and shall deliver same to Landlord (the "*Satellite Dish Plans*"). If such Satellite Dish Plans provide for roof penetrations, then such Satellite Dish Plans and Tenant's contractor shall be subject to Landlord's approval. Tenant shall not penetrate the roof or exterior walls of the Premises, except in accordance with the Satellite Dish Plans. Once Tenant has installed any Satellite Dish, it may not relocate same without again complying with this provision.

(c)    Tenant shall be responsible for all costs associated with the installation of the Satellite Dish and for the maintenance of the Satellite Dish and all appurtenances thereto.

(d)    Tenant shall use commercially reasonable efforts to ensure that the erection and use of the Satellite Dish and the appurtenances thereto do not materially interfere with the existing telecommunication dishes and equipment located or to be located in the Shopping Center, or the use and enjoyment of their premises by other tenants and occupants of the Shopping Center.

(e)    The Satellite Dish shall be used solely and exclusively by Tenant (and not for the benefit of any third party) for the transmission and reception of signals or other similar types of communication between and among the various divisions, departments and subsidiaries of Tenant, In no event shall the Satellite Dish be used for general broadcasting or any similar or related broadcasting use.

(f)    Tenant hereby agrees to indemnify and hold Landlord harmless from all loss, liability, cost and expense (including, without limitation, reasonable legal fees) which Landlord may sustain or incur by reason of the installation, operation, presence, maintenance, moving and removal of the Satellite Dish (and any replacement thereof), except as a result of the negligence or willful misconduct of Landlord or Landlord's agents, employees or contractors.

8.1.5    Landlord shall, at no out-of-pocket expense to Landlord (other than de minimis expenses), execute and return to Tenant all appropriately completed building department or equivalent applications (which are factually accurate) within fifteen (15) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6    If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant, or with respect to which Tenant is responsible for under this Lease) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises. Landlord

1807454 v8

25

1   shall neither make nor permit to be made any alterations to the exterior architectural
2   theme of the remainder of the Shopping Center which would be inconsistent with similar
3   shopping centers in Westchester County, New York (exclusive of other tenants' entrance
4   features) without the prior consent of Tenant.

5        8.1.8 Provided Tenant obtains and keeps in full force and effect all
6   municipal and governmental approvals required under applicable Legal Requirements for
7   the installation and operation of such solar array equipment, Tenant may, without payment
8   of any charge therefor, erect and maintain on the roof of the Premises, a passive solar
9   array for the production of electricity (the *"System"*), at such location on the roof above
10   the Premises as may be selected by Tenant, subject to the reasonable approval of Landlord,
11   provided that such location shall not (x) undermine or prejudice the structural integrity of
12   the building or any portion therefor, (y) adversely affect any roof warranty (or, in lieu
13   thereof, Tenant shall use a contractor approved by Landlord so as to not violate any such
14   roof warranty), or (z) be visible from any point at street level, subject to the following:

15        (a)   The combined weight of the System, supporting pedestal and
16   all appurtenances thereto shall not (i) exceed the structural load and integrity of the roof
17   due to weight/wind loading or (ii) be visible from any exterior ground level line of sight.

18        (b)   Tenant shall be responsible, at its sole cost and expense, for
19   obtaining, securing and maintaining all applicable governmental and quasi-governmental
20   permits, licenses, authorizations and approvals required under applicable Legal
21   Requirements in order to install, maintain, use and operate the System. Prior to installing
22   any System, Tenant shall prepare plans indicating the type of System to be installed, the
23   location and the method of installation and removal, and shall deliver same to Landlord
24   (the *"System Plans"*). If such System Plans provide for roof penetrations, then such
25   System Plans and Tenant's contractor shall be subject to Landlord's approval. Tenant shall
26   not penetrate the roof or exterior walls of the Premises, except in accordance with the
27   System Plans. Once Tenant has installed any System, it may not relocate same without
28   again complying with this provision.

29        (c)   Tenant shall be responsible for all costs associated with the
30   installation of the System and for the maintenance of the System and all appurtenances
31   thereto. Tenant shall repair any damage caused by the installation, operation,
32   maintenance and repair of the System.

33        (d)   Tenant shall use commercially reasonable efforts to ensure
34   that the erection and use of the System and the appurtenances thereto do not materially
35   interfere with the use and enjoyment of their premises by other tenants and occupants of
36   the Shopping Center.

37        (e)   Tenant hereby agrees to indemnify and hold Landlord
38   harmless from all loss, liability, cost and expense (including, without limitation,
39   reasonable legal fees) which Landlord may sustain or incur by reason of the installation,
40   operation, presence, maintenance, moving and removal of the System (and any
41   replacement thereof), except as a result of the negligence or willful misconduct of
42   Landlord or Landlord's agents, employees or contractors.

43        (f)   The System shall be deemed to be part of Tenant's Property.
44   Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the
45   exclusive owner and operator of the System and Landlord shall have no right, title or
46   interest in such equipment or any component thereof, notwithstanding that any such
47   equipment may be physically mounted or adhered to the Premises. Landlord
48   acknowledges and agrees that, notwithstanding the System's presence as a fixture on the
49   Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (i) the
50   electricity generated by the System, (ii) the environmental attributes of the System, and

1807454 v8

(iii) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever entitled, resulting from the environmental or related attributes of the System. Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System.

(g)  If any solar panels or other portions of the System need to be moved in order to permit Landlord to perform its obligations under Sections 9.2 and 9.3 hereof with respect to the roof of the Premises, Tenant shall cause such panels or portions of the System to be temporarily moved at no cost or expense to Landlord.  In addition, Tenant shall pay any additional costs incurred by Landlord in performing its obligations under Sections 9.2 and 9.3 hereof as a result of the presence of solar panels or other portions of the System upon the roof of the Premises.

8.1.9  Landlord and Tenant agree that in the event that Tenant shall perform or cause to be performed any alterations or improvements (including without limitation Tenant's Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the benefit of such Energy Rebate. As used herein, an ***"Energy Rebate"*** shall be deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, sales tax refunds, tax credits, governmental grants, utility rebates or refunds), but excluding therefrom rebates, refunds or credits against Taxes, given by a governmental, non-governmental, private or public utility, or other entity as a result of efforts to conserve energy or other utilities or cause property or processes to be more environmentally friendly. If any such Energy Rebate is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate against the next succeeding installment(s) of Rent then payable under the Lease.

## ARTICLE 9
## REPAIRS

Section 9.1   <u>Tenant's Repairs</u>. Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair (and replace, to the extent necessary to maintain in such condition), at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, the storefront windows, and the electrical, plumbing, mechanical, and/or alarm and sprinkler systems located in, and serving exclusively the Premises as well as the fire pump and related facilities being constructed and installed pursuant to <u>Exhibit D</u> to this Lease); (ii) the heating, ventilation and air conditioning (***"HVAC"***) units (including any ductwork, electric or mechanical attachments) exclusively serving the Premises; and (iii) any item of repair the necessity for which repair is occasioned by the negligence, recklessness or willful misconduct of Tenant, its agents, servants, contractors or employees.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.  Tenant and Landlord acknowledge and agrees that the fire pump and related facilities being constructed and installed pursuant to <u>Exhibit D</u> to this Lease will be located in the utility room adjacent to the Premises but such room shall not be deemed to be a part of the Premises nor shall it be deemed to imply that Landlord shall be responsible for the

maintenance and repair of such fire pump and related facilities, which shall remain the sole obligation of Tenant as provided above.

Notwithstanding the foregoing, in the event Landlord desires to use the utility room for any purpose or to make any alterations to such room, Landlord shall obtain Tenant's prior written consent to such use or work, which consent shall be given provided that the proposed use or work by Landlord will not adversely affect Tenant's sprinkler, mechanical or electrical equipment therein or Tenant's ability to access same.

Section 9.2   Landlord's Repairs.   Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)   the exterior of all buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)   the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)   the roof, gutters, flashings, downspouts and scuppers;

(d)   the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)   all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)   any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense, performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof).

Section 9.3   Legal Compliance Work.   Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense, for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work

(including, without limitation, all applicable ADA requirements): (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform the repairs required in this Lease.  As used herein, ***"Legal Compliance Work"*** shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

ARTICLE 10

INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1 Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1 Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (so-called "All-Risk") and time element insurance required to be maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or otherwise related to its business being conducted therein, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s)

1807454 v8

29

of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2  Tenant's Insurance.

10.2.1 Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" (and naming Landlord's managing agent and Mortgagee as additional insureds, promptly following Landlord's notice of Landlord's managing agent and/or Mortgagee, respectively, and request to name such party(ies) as an additional insured(s)) for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease (including, without limitation, Tenant's contractual liability under Subsection 10.3.1(a) hereof), and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.

10.2.2 Self-Insurance.  All insurance required to be maintained under this Section 10.2 may be: (i) insured under an individual policy covering this location, or a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (ii) self-insured by Tenant via a deductible, a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least One Hundred Million Dollars ($100,000,000); or (iii) insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.

Section 10.3  Landlord's Insurance.

10.3.1 Liability Insurance.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as an "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 Special Form Property Insurance.  Landlord shall procure and maintain (or cause to be procured and maintained) in full force and effect on and after the Effective Date and throughout the Term, Special Form (so-called "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm and earth movement [sinkholes] (to the extent such endorsements are customarily maintained in connection with insuring first-class shopping centers in Westchester County, New York), and demolition, increased cost of construction and contingent operations of building laws coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center, excluding the footings and foundations; provided, however, in no event shall such insurance cover Tenant's Property.  All policies required

to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3 <u>Tenant's Pro Rata Share of Insurance Premiums</u>.  As part of the Reimbursable Costs payable by Tenant pursuant to Section 5.1.2, Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3, which Landlord reasonably estimates to be $.24 per square foot of Floor Area in the Premises for the first full calendar year of the Term.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Reimbursable Costs, it being understood, however, that if the rates for such insurance are increased solely as a result of Tenant's specific manner of use of the Premises (i.e., are not generally applicable to the tenants and occupants of the Shopping Center), Tenant shall reimburse Landlord for the amount of such increase.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Reimbursable Costs, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4  <u>General Insurance Requirements</u>.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days [twenty (20) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder; and, in the case of Landlord, to Landlord's Mortgage of which Tenant has been given reasonable prior notice requesting that such notices be delivered to it.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to minimum limits which shall be reasonable and customary for similar facilities of like size and operation in Westchester County, New York, in accordance with generally accepted insurance industry standards.  The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

1807454 v8

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1 Fire and Other Casualty.

11.1.1 (a)    Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to substantially the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, and shall not include any of Tenant's Property.  The net proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.  Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.  Within ninety (90) days following such Substantial Completion of the Premises (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord), Tenant (or its subtenant, if applicable) shall open its store for business in the Premises for at least one (1) day.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work.  If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized (or is actually utilized) for its normal conduct of business.

11.1.2 In the event that:

(a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for

the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)    the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within the later of (1) fifteen (15) months after the date of destruction or (2) the Estimated Restoration Period (as hereinafter defined), if applicable (which period may be extended by reason of an event of *Force Majeure*, not to exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), diligently perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within twenty (20) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof with respect to the Premises shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by sixty (60) days' notice to Landlord, unless the applicable noncompliance by Landlord with Subsection 11.1.2 is cured within thirty (30) days after Landlord's receipt of such notice (e.g., the relevant restoration and repair is not commenced with diligence under Subsection 11.1.2(a) or is not completed pursuant to Subsection 11.1.2(b), as the case may be).

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within fifteen (15) months after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof. In the event Tenant does not exercise such right to terminate this Lease, the time period in which such architect retained by Tenant estimates such repairs and restorations can be completed is referred to herein as the "*Estimated Restoration Period*".

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by

Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

11.1.4 Notwithstanding the terms of this Section 11.1 to the contrary, if all or substantially all of the Premises are destroyed by a type of casualty not covered (exclusive of deductibles) by the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof (as opposed to a casualty which is (i) intended to be covered by the policies described in Subsection 10.3.2 hereof but which, in fact, are not covered by the policies actually obtained by Landlord, or (ii) covered by such policies, but with respect to which the insurer refuses to pay the proceeds thereof), Landlord shall have the right to terminate this Lease as of the date of such damage or destruction by giving notice of such election within ninety (90) days following such damage or destruction, provided that such notice shall include an independent architect's certification as to the estimated cost of the repair and restoration work to the Premises (the "***Restoration Cost***"). Tenant shall have the right, but not the obligation, exercisable within sixty (60) days after receipt of Landlord's notice, to give Landlord notice of its intention to provide the funds (the "***Restoration Funds***") for the repair and restoration of the Premises. If Tenant shall elect to provide the Restoration Funds, then such termination election by Landlord shall be null and void and this Lease shall continue in full force and effect, and Landlord shall promptly commence and diligently complete such rebuilding and restoration as otherwise provided and subject to the provisions of this Article, and the Restoration Funds shall be paid to Landlord within the same period of time as specified in Section 11.1.1(b) for the payment of net costs and expenses resulting from Tenant changes (provided, however, Tenant shall not be required to pay sums in excess of the Restoration Funds toward the costs of such repair and restoration, other than sums which may become due under Section 11.1.1(b), and Landlord shall be responsible for all costs and expenses incurred in connection therewith in excess of the Restoration Funds). Notwithstanding the foregoing, if (A) this Lease shall be terminated pursuant to this Section 11.1.4, (B) at the time of such termination there is no less than five (5) years remaining in the Term of the Lease (including any unexercised Renewal Options), and (C) Landlord or any of Landlord's Affiliates shall commence the reconstruction of the Premises (or premises substantially similar to the Premises) on or before the date that is two (2) years after the date of such casualty, Landlord shall be obligated to offer to Tenant, at the time of the commencement of such construction, the option to lease such premises equal in size to not less than 24,750 square feet of Floor Area nor more than 25,250 square feet of Floor Area, on all the same terms and conditions of this Lease in effect at the time of such termination, except that the amount of Fixed Rent per square foot of Floor Area shall be the then fair market value rental rate for the remaining Term of the Lease (and any unexercised Renewal Options). If the Tenant shall elect, within thirty (30) days after such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease on substantially the same terms and provisions of this Lease (provided that Tenant, upon the execution of such new lease, shall be deemed to have exercised the then immediately ensuing Renewal Option if less than five (5) years would otherwise be remaining in the Term, exclusive of all unexercised Renewal Options). If Tenant shall fail to elect, within such thirty 30-day period, to exercise such option, Landlord shall be free to lease such premises to any other person, on any terms and provisions acceptable to Landlord. The provisions of this Section 11.1.4 shall survive the expiration or earlier termination of this Lease and run with and bind the land comprising the Shopping Center.

Section 11.2  Eminent Domain.

11.2.1 As used in this Section 11.2, "***Taking***" or "***Taken***" shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and

those having the authority to exercise such right. A Taking or Taken, as used herein, shall include, without limitation, the termination of the easement over any of the roadways expressly identified as being part of the Critical Area on <u>Exhibit B</u> hereto, or the denial or revocation of the use of all or any portion thereof, whether by any lawful power or authority, pursuant to the easement or otherwise.

11.2.2 If all or substantially all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has the main entrance adjacent to the A&P parcel from Boston Post Road as shown on <u>Exhibit B</u>, and as a result of any of the foregoing, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)    any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(d)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(e)    ten (10%) percent or more of the parking spaces located in the Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) three and one-half (3.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; <u>provided, however,</u> that Landlord shall not be obligated to repair or restore

1807454 v8

Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below. Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements (made or paid for by Tenant in excess of the Tenant Allowance paid by Landlord or any work performed and paid by Landlord, if any), fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3 Abatement of Rent Charges. Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is ninety (90) days after Landlord shall have Substantially Completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1 Quiet Enjoyment. Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2 Authority. Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3 Landlord's Covenants, Warranties and Representations. To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable leasehold title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto (and this Lease is subject to the rights of the parties benefitting from the encumbrances described on said Exhibit E);

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more

than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    Other than the consent of the existing Mortgagee (which consent will be obtained by Landlord pursuant to the subordination, non-disturbance and attornment agreement obtained under Section 17.3 below), no third party consents or approvals are required in order for Landlord to enter into this Lease, for the performance of Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals) and/or for Tenant's elevations and signage (as shown on Exhibit D-1 and Exhibit F hereto);

(d)    Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have direct access to and from Boston Post Road for the passage of vehicular traffic via the two (2) entrances/exits shown on Exhibit B;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)    To the best of Landlord's knowledge, and except for the Prohibited Uses (as hereinafter defined) and the Existing Exclusives (as hereinafter defined), there shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work (provided any permit or other authorization to proceed with Tenant's Work shall have been obtained by Tenant);

(h)    As of the Effective Date, to Landlord's knowledge without independent inquiry or investigation, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the building and pylon signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof provided that no representation by Landlord is made as to the sign ordinances governing the Remote Sign. With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Legal Requirements;

(i)    The Common Areas, and all of the improvements thereto shown on Exhibit B hereto are operational and in the condition required under Section 5.1.1 hereof; and Landlord has obtained (and shall deliver copies thereof to Tenant, upon request, to the extent in Landlord's possession) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be operated and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon);

(j)    intentionally omitted;

1807454 v8

37

1          (k)    Attached hereto as Exhibit K-2 is a complete list of all tenants
2  under fully executed and delivered leases in effect on the Effective Date with respect to the
3  Shopping Center (the "*Existing Leases*"); and

4          (l)    Landlord shall promptly forward to Tenant any notice or other
5  communication received by Landlord from any owner of property adjoining or adjacent to
6  the Shopping Center or from any municipal or other governmental authority, in
7  connection with any hearing or other administrative proceeding relating to any proposed
8  zoning, building code, signage, or related variance affecting the Shopping Center or any
9  adjoining or adjacent property, which, if granted, could materially adversely affect
10  Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or
11  Tenant's rights and benefits under this Lease. Tenant, at its own cost and expense, shall
12  be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord,
13  to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant,
14  provide such information, and execute any documents or other instruments as Tenant may
15  reasonably request in connection with any such proceeding.

16     Section 12.4 Environmental Matters.

17       12.4.1 Definitions.

18          (a)    As used herein, the term "*Environmental Laws*" shall mean
19  any and all Legal Requirements concerning the protection of the environment, human
20  health or safety.

21          (b)    As used herein, the term "*Hazardous Substances*" shall mean
22  each and every element, compound, material, mixture, substance, waste, hazardous
23  substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant
24  either as those terms are defined in any of the Environmental Laws or the presence of
25  which may cause liability at common law, including, without limitation, asbestos and/or
26  asbestos-containing products, whether or not currently friable.

27          (c)    As used herein, the term "*Environmental Notice*" shall mean
28  a summons, citation, directive, order, claim, notice, litigation, investigation, judgment,
29  legal pleading, letter or other communication, written or oral, actual or threatened, from
30  the United States Environmental Protection Agency or other federal, state or local
31  governmental agency or authority, or any other private individual or entity concerning (i)
32  any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping
33  Center or any contiguous property; (ii) any violation or potential violation of
34  Environmental Laws at the Premises, the Shopping Center or any contiguous property; or
35  (iii) any underground storage tanks on the Premises or the Shopping Center.

36          (d)    As used herein, the term "*Releasing*" or "*Release*" shall
37  mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise
38  introducing any substance into the environment or into any building or other
39  improvements in violation of Environmental Laws.

40          (e)    As used herein, the term "*Compliance Costs*" shall mean any
41  and all costs incurred by a party in complying with applicable Environmental Laws,
42  including, without limitation, consultant's and engineer's fees; laboratory costs;
43  contractor's and subcontractor's fees; application and filing fees; costs of investigation,
44  monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings
45  or other improvements; equipment costs; disposal fees; costs of operation and
46  maintenance of equipment; legal fees; other governmental fees or costs; interest at the
47  Lease Interest Rate from the date of expenditure until paid in full; and other similar or
48  related costs.

1           (f)   As used herein, the term *Tenant Related Parties* shall mean
2   Tenant's agents, servants, employees, contractors, licensees, subtenants or other parties in
3   possession of all or part of the Premises pursuant to this Lease.

4           12.4.2 <u>Compliance with Environmental Laws</u>.  Tenant shall comply with all
5   applicable requirements of Environmental Laws governing its use of, and operations at,
6   the Shopping Center and the Premises.  Landlord shall comply with all applicable
7   requirements of Environmental Laws relating to the Shopping Center and the Premises,
8   except to the extent such requirements arise from Tenant's operations thereon.

9           12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>.

10           (a)   Notwithstanding any other provision of this Lease, Tenant
11   shall only be liable for any Release of Hazardous Substances at, on, in, under or
12   emanating from the Premises or Shopping Center which were caused by Tenant or Tenant
13   Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any
14   Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any
15   Hazardous Substances at, on, in, under or emanating from the Premises or Shopping
16   Center, including, without limitation, any Compliance Costs attributable to such
17   Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.
18   Notwithstanding anything to the contrary in this Lease, if any Hazardous Substances are
19   found in or on the Premises (including, without limitation, in the roof system thereof) or
20   the Shopping Center which pre-date the Delivery Date, then Landlord shall promptly
21   remove the same in compliance with all applicable laws at Landlord's sole cost and
22   expense, and, to the extent such work delays Tenant's Work, then the Rent
23   Commencement Date and the date on which Tenant is required to open for business under
24   Article 14 hereof shall be delayed on a day for day basis for each day of such delay, and
25   Landlord shall reimburse Tenant for any and all reasonable costs incurred by Tenant in
26   connection with such delay.  Except in the event of an emergency or as may be required
27   by any Legal Requirement, any work performed by Landlord relating to Hazardous
28   Substances shall be performed by Landlord at any time other than during the months of
29   August, November and December, and shall be undertaken in such a manner so as to (i)
30   not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse
31   effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii)
32   not otherwise materially interfere with the normal conduct of Tenant's business
33   operations in the Premises.  If the presence of Hazardous Substances, or Landlord's
34   remediative work relative thereto, interferes with Tenant's normal business operations in
35   the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long
36   as such condition persists.

37           (b)   Notwithstanding the foregoing provisions of this Section
38   12.4.3, Landlord shall not be liable with respect to Hazardous Substances which are
39   introduced to the Premises or the Shopping Center after the Delivery Date by any party
40   other than Landlord or any party related to Landlord or any contractor, employee, agent or
41   representative of Landlord, so long as: (i) upon request by Tenant, Landlord shall at its
42   expense commence actions or proceedings against the party who shall have introduced (or
43   be legally responsible for the introduction of) such Hazardous Substances to the Premises
44   and thereafter diligently pursue same; and (ii) should the introduction of such Hazardous
45   Substances as aforesaid materially interfere with the normal conduct of Tenant's business
46   in the Premises, or its other rights and benefits under this Lease, then Tenant shall be
47   entitled to an equitable abatement of Rent; and (iii), in the event such material
48   interference continues for a period of one hundred eighty (180) days after Landlord being
49   notified (or otherwise obtaining knowledge) of such Hazardous Substances and Landlord
50   is unable or fails to remediate (or cause the remediation of) such Hazardous Substances as
51   required by Environmental Laws within such period of one hundred eighty (180) days,
52   then Tenant shall be entitled to terminate this Lease within sixty (60) days of the
53   expiration of such 180-day period, but prior to the completion of such remediation, upon

1807454 v8

thirty (30) days prior notice to Landlord.  If Tenant does not terminate this Lease pursuant to this Subsection 12.4.3(b), then commencing on the expiration of the aforesaid 60-day period, Tenant shall resume paying full Rent; provided, however, that Tenant shall have all of its rights hereunder in the event of the exacerbation of such Hazardous Substances or with respect to any future introduction of Hazardous Substances.

12.4.4 <u>Standards</u>.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>.  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.  The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6 <u>Documents</u>.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5 <u>Ground Lease</u>.

12.5.1 As used in this Lease, the term "**Ground Lease**" shall mean that certain Ground Lease described on <u>Exhibit E</u>.

12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the Ground Lease has not been modified, amended or terminated; (ii) the Ground Lease is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the Ground Lease exists beyond any applicable notice and cure period; and (iv) the Ground Lease is, and shall remain, superior to all mortgages and related liens affecting the Shopping Center.  Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the Ground Lease, subject to the provisions of this Section 12.5.  Tenant shall not violate the Ground Lease.

Notwithstanding the foregoing, the parties acknowledge and agree that (i) Landlord shall be solely responsible for all payments to Ground Lessor required under the Ground Lease, and (ii) the agreement described in Sections 2.3.1(e) and 17.3 between Tenant and Ground Lessor may also govern with respect to certain conflicting provisions between this Lease and the Ground Lease, to the extent provided therein.

12.5.3 Intentionally Omitted.

12.5.4 Whenever, pursuant to the Ground Lease, the consent or approval of Landlord shall be required or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5 Landlord shall, immediately upon receipt, forward to Tenant a copy of any and all notices and/or demands received by Landlord under or pursuant to the Ground Lease, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not amend or modify the Ground Lease if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the Ground Lease.

12.5.7 Intentionally Omitted.

12.5.8 As between Landlord and Tenant, in the event of any conflict between the Ground Lease and this Lease, this Lease shall in all respects control; provided, however, nothing in this sentence shall waive, negate, or diminish the terms of the Ground Lease or otherwise alter the fact that this Lease is subject and subordinate to the Ground Lease. Without limiting the generality of the foregoing, if the Lease contains restrictions which are more burdensome on Landlord than the Ground Lease (such as by way of example only, if this Lease prohibits flea markets but the Ground Lease does not), then Landlord shall be bound by the more restrictive provisions of this Lease. Further, if this Lease contains greater rights on the part of Tenant than granted under the Ground Lease (such as, by way of example only, if Tenant is permitted to make future exterior alterations without Landlord's consent but the Ground Lease requires the consent of the Ground Lessor), then, notwithstanding that Tenant shall not be permitted to exercise such rights without obtaining the approval of the Ground Lessor under the Ground Lease (which Tenant shall have the right to request and obtain, at its sole cost and expense), Landlord, by virtue of granting Tenant such right under the Lease, shall be deemed to have consented to same.

12.5.9 As a Delivery Date Condition pursuant to Section 2.3.1(e), Landlord shall obtain any Ground Lessor's approval required under the Ground Lease for the performance of Landlord's Work, Tenant's Plans (including, without limitation, Tenant's elevations and signage as shown on Exhibit D-1 and Exhibit F), Tenant's Work and the operation of Tenant's business in the Premises.

ARTICLE 13

USES AND RESTRICTIONS

Section 13.1 Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 Prohibited Uses. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Subject to the Existing Leases, Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center for any of the "Prohibited Uses" (as set forth in Exhibit M hereto annexed).

Section 13.2 Tenant's Exclusive in Center. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Subject only to the rights of tenants (and their current or future assignees and sublessees) under the Existing Leases (as to which the provisions of this Section 13.2 shall not apply except as specifically stated herein), and subject to the enforceability of the restrictions under this Subsection 13.2.1 under applicable Legal Requirements, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for a primary use for the sale, rental or distribution, at retail or at wholesale, of a mix of items contained in the following categories of merchandise: (a) infant and children's furniture (including, without limitation, cribs and beds (including, without limitation, mattresses and bedding); changing tables, gliders, rockers (including coordinating ottomans); high chairs; lamps; walkers; play yards and play pens; car seats and booster seats; cradles; carriages and strollers; toy and clothing chests; swings; or any other children's furniture or children's furnishings similar to the foregoing enumerated items) (collectively, *"Restricted Furniture"*); (b) layettes, apparel, shoes and/or accessories for infants and children 0-4 years in age (collectively, *"Restricted Clothing"*) and (c) merchandise and products for use by infants and children 0-4 years in age (including, without limitation, toys; books; food; formula; indoor and/or outdoor play and recreational equipment; audio and video cassettes or equipment; safety items; feeding items; nursing items; diapers; wipes; bathroom items (including, without limitation, personal care devices and other bathroom appliances, accessories and toiletries)) (collectively, *"Restricted Products"*) (which items in clauses (a), (b) and (c) above, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Existing tenants of the Shopping Center (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) in its sole discretion to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate has the right to consent in its sole discretion, but instead permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items. The restrictions set forth in this Section 13.2 shall be null and void with respect to any category of Exclusive Items in the event Tenant, after the initial opening of the Premises to the public for business (or, if earlier, the date which is one (1) year after the date upon which the Premises was required to be so open under this Lease), has ceased to sell, rent and distribute such category of Exclusive Items at the Premises for a continuous period of

1807454 v8

nine (9) months (other than during Excused Periods); provided, however, that such restrictions with respect to such category of Exclusive Items shall not be null and void unless (x) Landlord has notified Tenant that Landlord intends to render such restrictions null and void by notice delivered to Tenant at any time after the end of such nine (9) month period (which notice shall set forth which category of Exclusive Items such restrictions are intended by Landlord to be null and void), and (y) Tenant fails to resume the sale, rental or distribution of such category of Exclusive Items at the Premises within sixty (60) days following the delivery of such notice to Tenant.

13.2.2 The restrictions set forth in Subsection 13.2.1 above (with respect to any specific category of Exclusive Items) shall not apply to: (a) a full-line national or regional: (i) department store [for example, Kohl's, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 60,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date); (b) a full-line junior and/or discount department store [for example, Marshall's or TJ Maxx], as such store is currently operated (as of the Effective Date); (c) a Pottery Barn (but not Pottery Barn Kids), Home Goods, Ross Stores, Pier One, Crate & Barrel, Old Navy, Gap, H&M or A.J. Wright, as such stores are currently operated (as of the Effective Date); or (d) stores whose primary use is the sale of books, groceries, sporting goods, electronics, arts & crafts, shoes or health and beauty aids/drug stores provided that the tenants of the stores described in clauses (b), (c) and (d) shall be prohibited from assigning their respective leases or subleasing their respective stores for a primary use for the sale, rental or distribution, at retail or at wholesale, of a mix of the Exclusive Items.

13.2.3 The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Fixed Rent payable hereunder shall be reduced by fifty percent (50%) (but Tenant shall continue to pay all Additional Rent when due under this Lease) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages. If a violation hereunder ceases, or if Tenant does not exercise its right to terminate this Lease within one (1) year of Tenant's obtaining knowledge of such violation, then Tenant shall resume payment of its full Rent and Tenant shall have no further right to terminate this Lease as a result of such violation (provided that Tenant shall not be deemed to have waived any of its rights and/or remedies hereunder with respect to any future violation of this Section 13.2).

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's reasonable expense, or (b) in the event

1807454 v8

43

the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's reasonable expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution); but in no event shall Tenant be entitled to any reduction in Rent, or have the right to terminate this Lease, pursuant to this Subsection (b).

Section 13.3  Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises, so long as Tenant gives notice thereof to Landlord promptly following the execution and delivery of such agreement.

13.3.2 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center or in any other property owned by Landlord or Landlord's Affiliate.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 and Section 12.4.3 hereof), Tenant shall initially open its store for business to the public in the Premises, as a typically staffed and stocked Buy Buy Baby store, for at least one (1) day, not later than one hundred fiftieth (150th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than two hundred forty (240) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)  giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 240-day period expires, and