1          (b)   paying to Tenant, within thirty (30) days after such notice is
2    given, all of Tenant's costs and expenses incurred in connection with the
3    preparation and review of plans and specifications for, and the then unamortized
4    costs of Tenant's Work (less the Tenant's Allowance to the extent actually paid by
5    Landlord to Tenant) and any alterations or improvements made by Tenant and
6    permitted under this Lease (amortized on a straight-line basis over the Initial
7    Term),

8    whereupon this Lease shall terminate upon the sixtieth (60th) day (the "*Recapture Date*")
9    after the date on which Tenant receives Landlord's termination notice, as if the Recapture
10    Date was originally set forth herein as the expiration date of the Term.  Upon such
11    termination, Landlord and Tenant shall each be released from any and all liabilities
12    thereafter accruing hereunder, except for those obligations which survive the expiration
13    or other termination of this Lease pursuant to the express terms of this Lease.  All Rent
14    payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant
15    shall promptly pay to Landlord any amounts so determined to be due and owing by
16    Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any
17    amounts prepaid by Tenant for periods subsequent to the Recapture Date.

18                ARTICLE 15
19        TENANT ASSIGNMENT AND SUBLETTING

20        Section 15.1  Assignment and Subletting.

21          15.1.1 Tenant shall have the right from time to time, without the consent of
22    Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license
23    all or any portion of the Premises, subject to all of the terms and conditions of this Lease
24    (including, without limitation, Section 13.1).  In the event of an assignment of this Lease
25    hereunder, Tenant shall forward a copy of the relevant assignment document to Landlord
26    within a reasonable time thereafter.  Landlord acknowledges that immediately following
27    execution of this Lease by the parties, Tenant intends to sublease all of the Premises to its
28    Affiliate, Buy Buy Baby Inc. and Landlord shall enter into a Recognition Agreement with
29    respect to the Buy Buy Baby sublease pursuant to the terms of Section 15.5 hereof.

30          15.1.2 Except with respect to any transaction covered under Subsection
31    15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet,
32    in a single transaction, the whole of the Premises, it shall first give notice thereof (the
33    "*Assignment/Subletting Notice*") to Landlord, which notice shall specify the name and
34    address of the proposed assignee or sublessee and the proposed use of the Premises to be
35    made by such assignee or sublessee, together with a statement certified by Tenant of the
36    amount of the then unamortized costs (amortized on a straight-line basis over the Initial
37    Term) of Tenant's Work (less the Tenant's Allowance to the extent actually paid by
38    Landlord to Tenant) and any alterations performed by Tenant to the Premises.  Thereafter,
39    Landlord shall have the option to terminate this Lease, which option shall be exercisable
40    by:

41          (a)   giving notice to Tenant (the "*Termination Notice*") thereof
42    within fifteen (15) days after receipt of an Assignment/Subletting Notice from
43    Tenant, and

44          (b)   paying to Tenant, within thirty (30) days after such notice is
45    given, all of Tenant's costs and expenses incurred in connection with the
46    preparation of plans and specifications for, and the then unamortized costs of
47    Tenant's Work (less the Tenant's Allowance to the extent actually paid by
48    Landlord to Tenant) and any alterations performed by Tenant to the Premises
49    (amortized on a straight-line basis over the Initial Term),

1  in which event this Lease shall automatically terminate on the ninetieth (90th) day (the
2  *"Termination Date"*) after the date on which Tenant receives Landlord's Termination
3  Notice, with the same force and effect as if the Termination Date had been designated as
4  the expiration date of this Lease.  Upon the Termination Date, Landlord and Tenant shall
5  each be released from any and all liabilities thereafter accruing hereunder, except for
6  those obligations which survive the expiration or other termination of this Lease pursuant
7  to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be
8  apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any
9  amounts so determined to be due and owing by Tenant to Landlord, and conversely
10  Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods
11  subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have
12  the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission
13  Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of
14  the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be
15  rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the
16  Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not give the
17  Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be
18  deemed to have waived its termination rights hereunder with respect to such proposed
19  assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire
20  Premises in accordance with its Assignment/Subletting Notice.

21          15.1.3  In addition to, and not in limitation of, Tenant's other rights set forth
22  in this Section 15.1, Tenant shall have the right from time to time, without the consent of
23  Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any
24  portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases
25  all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity
26  which purchases Tenant's interest in the majority of stores owned or operated by Tenant
27  or its Affiliate(s) in the State of New York; (d) in conjunction with any merger,
28  acquisition, consolidation or public offering of stock or other interests involving Tenant
29  or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

30          Section 15.2  Liability of Tenant.  Unless otherwise agreed to in writing by
31  Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce,
32  diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in
33  the event of an assignment by the Tenant originally named herein or its Affiliate
34  (collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or
35  to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all
36  liability of the Original Tenant under this Lease accruing from and after the effective date
37  of such assignment, shall terminate.  For purposes of this Section 15.2, the term *"Major
38  Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity
39  which has, as of the effective date of such assignment, a net worth of at least Two
40  Hundred Fifty Million ($250,000,000) Dollars in Constant Dollars.

41          Section 15.3  Collateral Assignment.  In addition to Tenant's other rights set forth
42  in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to
43  one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or
44  other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute
45  all documentation reasonably requested by Tenant or any such Lender (and reasonably
46  acceptable to Landlord) in connection therewith.  In addition, Tenant shall have the right,
47  without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of
48  Tenant's business operations at the Premises, without such Affiliate having assumed any
49  liability for the performance of Tenant's obligations under this Lease.  As used herein,
50  *"Lender"* shall mean a state or federally regulated: bank, savings and loan association,
51  insurance company, pension fund, credit union, real estate investment trust, or other
52  institutional lender.

Section 15.4 <u>Cure Rights of Original Tenant</u>.

15.4.1 If Tenant assigns Tenant's interest in this Lease in accordance with this Article 15, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), <u>provided</u> that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are personal to the assignee and/or not reasonably susceptible of cure by the Original Tenant (it being agreed that Events of Default curable by the payment of money are susceptible to cure), in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein for the then balance of the Term, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5 <u>Recognition Agreement</u>.  In the event Tenant subleases all of the Premises for a term of at least five (5) years, and provided that the subtenant thereunder is either (1) Buy Buy Baby, Inc. (or another Affiliate of Tenant) or (2) a nationally or regionally recognized retail tenant of a type commonly found in first-class shopping centers located in the State of New York which has a net worth of at least twenty-five million dollars ($25,000,000), then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of <u>Exhibit H</u> hereto, in recordable form.  In the event Tenant subleases any portion of the Premises containing in excess of 10,000 square feet of Floor Area, for a term of at least five (5) years, to a subtenant to whom Landlord is not required to execute and deliver the agreement described in this Section 15.5, then, following Landlord's receipt of notice from Tenant setting forth the name and address of such subtenant, Landlord shall (i) simultaneously with any notice of default thereafter delivered to Tenant under this Lease, deliver a full and complete copy thereof to such subtenant, and (ii) permit such subtenant to cure such default on behalf of Tenant within the same applicable period as allowed Tenant under this Lease.

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

Section 16.1 <u>Tenant Default</u>.

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that, other than pursuant to Subsection 16.1.2(c) hereof, Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and, as its damages by reason of any such breach, the sum of (x) the then present worth, of the excess, if any, of (i) the amount equivalent to the Fixed Rent under this Lease for the balance of the Term (excluding unexercised Renewal Options), over (ii) the then reasonable Fixed Rent value of the Premises for said period, discounted at the then prime rate of the JP Morgan Chase Bank (or, as applicable, its corporate banking successor or such comparable bank mutually acceptable to the parties, so long as such then prime rate is reasonably consistent with that of major institutional lenders located in the New York City metropolitan area), to present net worth, plus (y) the then unamortized portion of the Tenant's Allowance (to the extent actually paid by Landlord to Tenant) (amortized on a straight-line basis over the Initial Term); and Tenant shall promptly surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession (without terminating this Lease), re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the

Premises during said period (after deducting reasonable expenses of any kind incurred by Landlord in connection with such reletting, including reasonable attorney's fees). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the hard and soft cost of repairs; costs of altering the Premises for another tenant's fitout; and all other commercially reasonable expenses of any kind incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default; provided, however, that: (i) Landlord shall have no obligation to treat preferentially the Premises compared to other premises Landlord has available for leasing within the Shopping Center or in other properties owned or managed by Landlord; (ii) Landlord shall not be obligated to expend any efforts or any monies beyond those Landlord would expend in the ordinary course of leasing space within the Shopping Center; (iii) in evaluating a prospective reletting of the Premises, the term, rental, use and the reputation, experience and financial standing of prospective tenants are factors which Landlord may properly consider; (iv) Landlord shall have no obligation to lease the Premises to a tenant whose primary use will be the same as the primary use of an existing tenant in the Shopping Center; and (v) Landlord shall have no obligation to lease less than one-half (1/2) of the Premises. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2 <u>Landlord Default</u>. If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), <u>or</u> (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "***Landlord's Default***"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a) as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b) bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c) offset against fifty percent (50%) of each successive installment of Fixed Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with

1    interest thereon at the Lease Interest Rate from the date of the outlay until paid (it being
2    agreed that (x) Tenant shall, as applicable, be entitled to offset against larger percentages
3    of each successive installment of Fixed Rent if the aforesaid fifty (50%) percent offset is
4    insufficient to reimburse Tenant in full, taking in to account the then remaining number of
5    installments of Fixed Rent due and payable by Tenant hereunder, and (y) the reference in
6    this subsection (c) to "fifty (50%) percent" shall be increased to "one hundred (100%)
7    percent" with respect to offsets pertaining to Tenant's performance of the restoration of
8    the Premises which Landlord is required to perform under Article 11 hereof, or offsets
9    pertaining to Landlord's failure to pay the Tenant Allowance when due); it being
10    understood that if Landlord disputes Tenant's rights to such offset remedy, such dispute
11    shall be submitted to arbitration pursuant to Section 16.3 below, and such offset remedy
12    shall not be exercisable so long as Tenant's rights thereto have been submitted to
13    arbitration by Landlord within thirty (30) days of notice from Tenant of Tenant's election
14    to exercise such offset remedy (provided, further, however, the accrual of interest on the
15    applicable outlay shall not be tolled during the pendency of such arbitration).

16    Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition
17    posing imminent risk of liability or material harm to persons or property or material
18    disruption to the normal conduct of any business operations in the Premises shall exist (it
19    being agreed, without limitation, that any water infiltration into the Premises from within
20    or without the Premises, or mold remediation in connection therewith, shall be deemed to
21    be such a condition), Tenant may, at its election, and without prior notice to Landlord,
22    exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall
23    Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result
24    of a default by, or any other act of, Landlord.

25    Section 16.3  <u>Arbitration</u>.  In any case where this Lease expressly provides for
26    submission of a dispute or matter to arbitration (but not otherwise), the same shall be
27    settled by arbitration in Westchester County, New York, before one arbitrator in
28    accordance with the procedural rules of the American Arbitration Association (or any
29    successor thereto) then in effect.  The decision of the arbitrator shall be final, conclusive
30    and binding on the parties, but the powers of the arbitrator are hereby expressly limited to
31    the determination of factual issues, and the arbitrator shall have no power to reform,
32    supplement or modify this Lease.  The arbitrator shall make only required findings of fact
33    incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a
34    written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and
35    expenses of such arbitration, and each shall separately pay its own attorneys' fees and
36    expenses, unless the arbitrator finds that one of the parties did not act in good faith in
37    connection with the dispute or the conduct of the arbitration proceeding, in which case the
38    arbitrator may award all or part of said costs, expenses and fees to the other party.

39    ARTICLE 17
40    RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

41    Section 17.1  <u>Right to Mortgage and Non-Disturbance</u>.  Landlord reserves the right
42    to subject and subordinate this Lease at all times to the lien of any mortgage or deed of
43    trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any
44    portion of the Shopping Center, as well as to any future ground or underlying leases
45    encumbering or affecting all or any part of the Shopping Center; <u>provided</u>, <u>however</u>, that
46    (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-
47    disturbance and attornment agreement in substantially the form attached as <u>Exhibit G</u>
48    hereto or in such other form as may be reasonably agreed upon by Tenant and such
49    Mortgagee (provided that such other form includes provisions to the effect that (i) no
50    default by Landlord under any such lien shall affect Tenant's rights under this Lease so
51    long as Tenant is not in default of such obligations beyond the applicable notice and grace
52    periods provided herein, (ii) Tenant will not be named as a party in any foreclosure or
53    other proceedings with respect to any such lien, (iii) the holder of any such lien agrees

1   that the insurance proceeds resulting from any fire or other casualty and the proceeds
2   payable from any taking by eminent domain will be made available for restoration of the
3   Premises and the Shopping Center to the extent provided in this Lease, and (iv) Landlord
4   and Tenant shall have the right to execute any amendment to this Lease which is
5   specifically required hereunder and the holder of any such lien shall recognize and be
6   bound thereto), in recordable form, and (b) any Ground Lessor shall execute (and shall
7   obtain the written consent of any holder of any mortgage, deed of trust or any other
8   existing lien encumbering or affecting the Shopping Center or any portion thereof, as
9   applicable) and deliver to Tenant a fee owner recognition agreement substantially in the
10  form attached as Exhibit G-1 hereto or in such other form as may be agreed upon by
11  Tenant and such Ground Lessor, which shall include the following provisions: (i) so long
12  as Tenant is not in default of any obligations beyond the applicable notice and grace
13  periods provided herein, the Ground Lessor will not, in the exercise of any of the rights
14  arising or which may arise out of such lease, disturb or deprive Tenant in or of its
15  possession or its rights to possession of the Premises or of any right or privilege granted
16  to or inuring to the benefit of Tenant under this Lease; (ii) so long as Tenant is not in
17  default of such obligations beyond the applicable notice and grace periods provided
18  herein, in the event of the termination of the ground or underlying lease, Tenant will not
19  be made a party in any removal or eviction action or proceeding, nor shall Tenant be
20  evicted or removed of its possession or its right of possession of the Premises, and this
21  Lease shall continue in full force and effect as a direct lease between the Ground Lessor
22  and Tenant for the remainder of the Term and on the same terms and conditions as
23  contained herein, without the necessity of executing a new lease; and (iii) Landlord and
24  Tenant shall have the right to execute any amendment to this Lease which is specifically
25  required hereunder and the Ground Lessor shall recognize and be bound thereto.

26      Section 17.2 Estoppel Certificate.  Upon written request of Landlord or Tenant,
27  the other party, within thirty (30) days after the date of such request, shall execute and
28  deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide
29  prospective mortgagee, purchaser, assignee, or sublessee of the requesting party, without
30  charge, a written statement:  (1) ratifying this Lease; (2) certifying, to such party's actual
31  knowledge, that this Lease is in full force and effect, if such is the case, and has not been
32  modified, assigned, supplemented or amended, except by such writings as shall be stated;
33  (3) specifying the dates to which Fixed Rent and Additional Rent have been paid;
34  (4) stating whether or not, to such party's actual knowledge, the party requesting the
35  estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent
36  Commencement Date, and (6) stating which options to extend the Lease Term have been
37  exercised, if any.

38      Section 17.3 Existing Mortgages and Ground Leases.  If a mortgage, deed of trust,
39  or other security instrument, or any ground or underlying lease, encumbers the Shopping
40  Center or any part thereof on the Effective Date, then within thirty (30) days after the
41  Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination,
42  non-disturbance and attornment agreement substantially in the form attached hereto as
43  Exhibit G, in recordable form, executed by each and every holder of any mortgage, deed
44  of trust or any other existing lien encumbering or affecting the Shopping Center or any
45  portion thereof, and (y) a fee owner recognition agreement substantially in the form
46  attached hereto as Exhibit G-1, in recordable form, executed by any Ground Lessor (and,
47  as may be required, consented to by the holder of any mortgage, deed of trust or other
48  existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within
49  said 30-day period, Tenant shall have the right by notice given to Landlord at any time
50  prior to the date on which such instrument(s) are delivered, to terminate this Lease, in
51  which event, neither party shall have any further liability hereunder, except: (i) for those
52  obligations which survive the expiration or other termination of this Lease pursuant to the
53  express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse
54  Tenant for all its reasonable, third-party costs and expenses incurred in connection with

1   this Lease, including, without limitation, the preparation and review of plans and
2   specifications, and the performance of Tenant's Work, provided, however, that such
3   reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars
4   ($50,000).

5                                   ARTICLE 18
6                                     NOTICE

7           Subject to the further provisions of this Article 18, whenever it is provided herein
8   that any notice, demand, request, consent, approval or other communication ("*Notice*")
9   shall or may be given to either of the parties by the other, it shall be in writing and, any
10  Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose
11  unless same shall be given by registered or certified mail, postage prepaid, return receipt
12  requested, or by any recognized overnight mail carrier, with proof of delivery slip,
13  addressed to Landlord at Landlord's Mailing Address, with copies of notices to Landlord
14  also given to (i) Joseph Meyers, Esq. at Joseph Meyers & Associates P.C., c/o AVR Realty
15  Company, One Executive Boulevard, Yonkers, New York 10701 and to (ii) DPPC Holdings,
16  L.P. c/o Todd S. Pickard, Esq., Balber Pickard Maldonado & Van Der Tuin, PC, 1370
17  Avenue of the Americas, New York, New York 10019, or to Tenant at Tenant's Mailing
18  Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed
19  Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Margaret F.
20  Black, Esq., c/o Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey
21  07102, or to such other person or other address as may, from time to time, be specified by
22  either party in a written notice to the other party. If Landlord shall consist of more than
23  one person or entity, notices delivered by Tenant to Landlord's Mailing Address shall be
24  deemed to be delivered to, and effective notice to, all such persons or entities comprising
25  Landlord. All notices given in accordance with the provisions of this Section shall be
26  effective upon receipt (or refusal of receipt) at the address of the addressee.
27  Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant
28  (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but
29  not notices of default) and related information pertaining to Tenant's Pro Rata Share of
30  Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices
31  (but not notices of default), statements, bills and related information pertaining to
32  Tenant's Contribution (i.e., Tenant's payment of Tenant's Fixed CAM and Tenant's Pro
33  Rata Share of the Reimbursable Costs as described in Section 5.1 of this Lease).

34                                  ARTICLE 19
35                              TENANT'S PROPERTY

36          All of Tenant's Property, which may be installed or placed in or upon the Premises
37  by Tenant, shall remain the property of Tenant. Tenant may assign, hypothecate,
38  encumber, mortgage or create a security interest in or upon Tenant's Property in the
39  Premises without the consent of Landlord and may remove Tenant's Property at any time
40  during the Term, provided Tenant repairs any damage to the Premises caused by such
41  removal (which repair shall include properly capping electrical equipment in accordance
42  with standard electrical practices and applicable Legal Requirements). Landlord waives
43  any right it may have in Tenant's Property. To the extent Landlord may have a lien on or
44  security interest in the Tenant's Property pursuant to this Lease, by law or otherwise,
45  Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord
46  shall provide to Tenant, within thirty (30) days after Tenant's request therefor, a written
47  waiver in form reasonably satisfactory to Tenant and Landlord, evidencing Landlord's
48  waiver of any rights it has or may have in Tenant's Property.

1
2

<div align="center">

ARTICLE 20

END OF TERM

</div>

3    Section 20.1 <u>Surrender of Premises</u>.  At the expiration of the Term, Tenant will
4    quit and surrender the Premises in good condition and repair (as required under
5    Section 9.1 above), <u>excepting</u>, <u>however</u>, reasonable wear and tear, damage by fire or other
6    casualty, damage by eminent domain, and repairs and replacements to be made by
7    Landlord hereunder.

8    Section 20.2  <u>Hold Over</u>.  If Tenant fails to deliver possession of the Premises to
9    Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable
10   for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an
11   amount (the **"Holdover Rate"**) equal to one hundred fifty (150%) percent of the Fixed
12   Rent payable by Tenant for the month immediately preceding the last day of the Term as
13   well as for all Additional Rent payable by Tenant hereunder.  Provided Landlord and
14   Tenant are, at such time, engaged in good faith negotiations to extend the Term, the
15   Holdover Rate shall be stayed during such good faith negotiations, but in no event for
16   longer than thirty (30) days after the expiration of the term of this Lease.

17
18

<div align="center">

ARTICLE 21

INTENTIONALLY OMITTED

</div>

19
20

<div align="center">

ARTICLE 22

ONGOING CO-TENANCY

</div>

21   If, at any time during the Term, less than 200,000 square feet of Floor Area in the
22   Shopping Center (excluding the Premises) is open for business to the general public in the
23   Shopping Center (such condition being hereinafter referred to as an *"Excess Vacancy"*),
24   then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed
25   Rent (but Tenant shall continue to pay all Additional Rent when due hereunder) during
26   the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a
27   period in excess of three hundred sixty-five (365) continuous days, to elect to terminate
28   this Lease, exercisable by giving Landlord, within sixty (60) days after the expiration of
29   such 365-day period, at least sixty (60) days' prior notice, in which event this Lease shall
30   terminate on the date set forth in Tenant's notice of termination without further liability
31   on the part of either Landlord or Tenant, <u>except</u> for those obligations which survive the
32   expiration or other termination of this Lease pursuant to the express terms of this Lease.
33   If Tenant does not elect to terminate this Lease pursuant to this Article 22, then
34   commencing on the expiration of the aforesaid 60-day period, Tenant shall resume paying
35   full Rent, <u>provided</u>, <u>however</u>, that Tenant shall: (x) again be entitled to exercise its rights
36   under this Article 22 each time the then existing condition of Excess Vacancy worsens by
37   5% or more; and (y) retain all of its original rights under this Article 22 with respect to
38   any future condition(s) of Excess Vacancy.  Notwithstanding the foregoing, the Alternate
39   Rent for any portion of any period of Excess Vacancy during which the Premises are not
40   open for business to the general public shall be fifty percent (50%) of the amount of
41   Fixed Rent which otherwise would have been payable for such portion of any period of
42   Excess Vacancy (but Tenant shall continue to pay all Additional Rent when due
43   hereunder).

44
45

<div align="center">

ARTICLE 23

MISCELLANEOUS

</div>

46   Section 23.1 <u>Loading Facilities</u>.  Subject to applicable Legal Requirements,
47   Tenant shall have the exclusive right to utilize the loading facilities serving the Premises
48   (shown on <u>Exhibit B</u>) on a "24 hour a day", "365 days a year" basis.  Tenant will make
49   commercially reasonable efforts to cause all deliveries to the Premises to be made only at
50   such loading facilities (except during Excused Periods relating to such loading facilities).

1807454 v8

1     Section 23.2 <u>Liens</u>. Within thirty (30) days after notice of the filing thereof,
2 Tenant shall discharge (either by payment or by filing of the necessary bond, or
3 otherwise) any lien against the Premises and/or Landlord's interest therein, which may
4 arise out of any payment due for, or purported to be due for, any labor, services,
5 materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon
6 or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof,
7 Landlord shall discharge (either by payment or by filing of the necessary bond, or
8 otherwise) any lien against the Premises and/or Landlord's interest therein, which may
9 arise out of any payment due for, or purported to be due for, any labor, services,
10 materials, supplies or equipment alleged to have been furnished to or for Landlord in,
11 upon or about the Premises.

12     Section 23.3 <u>No Broker</u>. Landlord and Tenant each warrant and represent to the
13 other that they did not deal with any real estate broker in connection with the negotiation,
14 execution and delivery of this Lease. Each party agrees to indemnify, defend, and save
15 the other harmless from and against any and all liabilities, costs, causes of action,
16 damages and expenses, including, without limitation, attorneys' fees, with respect to or
17 arising out of any claims made by any real estate broker, agent or finder with respect to
18 this Lease in breach of the foregoing representation. The provisions of this Section shall
19 survive the expiration or earlier termination of this Lease.

20     Section 23.4 <u>*Force Majeure*</u>. Except as otherwise expressly set forth herein, in
21 the event either party hereto shall be delayed or hindered in, or prevented from, the
22 performance of any act required hereunder by reason of strikes, failure of power, riots,
23 insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of
24 unusual severity), or other reasons of an extraordinary nature which are beyond the
25 reasonable control of the party, and which could not have been avoided through the
26 exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"),
27 then the performance of any such act shall be excused for a period equal to the period of
28 the delay. Notwithstanding the foregoing provisions, the following shall not constitute
29 Force Majeure: (i) the financial inability of a party to perform its obligations under this
30 Lease; or (ii) delays occurring in the course of complying with applicable Legal
31 Requirements that could have been avoided through the exercise of due diligence by a
32 party hereto. A party wishing to invoke this Section shall give the other party notice of
33 that intention within twenty (20) days of the commencement of any event of *Force*
34 *Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this
35 Lease which will be delayed as a result, and the period of such extension, if known, or if
36 not known, a reasonable estimate thereof.

37     Section 23.5 <u>Consents</u>. Except as may be otherwise expressly set forth in this
38 Lease, whenever under this Lease provision is made for either party's securing the
39 consent or approval of the other party, (i) such consent or approval shall be in writing and
40 shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters
41 contained herein, both parties shall have an implied obligation of reasonableness.

42     Section 23.6 <u>Costs</u>. Whenever this Lease requires the performance of an act by a
43 party, such party shall perform the act at its own cost and expense, unless expressly
44 provided to the contrary.

45     Section 23.7 <u>Attorneys' Fees</u>. In any action or proceeding hereunder (whether to
46 enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall
47 be entitled to recover from the other party the prevailing party's reasonable costs and
48 expenses in such action or proceeding, including reasonable attorneys' fees, costs and
49 expenses. Except as otherwise set forth herein, if either party is sued by a third party as a
50 result of a violation of a covenant or warranty herein contained by the other party hereto,
51 then the party who has violated the covenant or warranty shall be responsible for the

1    reasonable costs and expenses in such action or proceeding against the non-violating
2    party, including reasonable attorneys' fees, costs and expenses.

3            Section 23.8  Survival of Obligations.  The obligation to pay any sums due to
4    either party from the other that by the terms herein would not be payable, or are incapable
5    of calculation, until after the expiration or sooner termination of this Lease shall survive
6    and remain a continuing obligation until paid.  All indemnity obligations under this Lease
7    shall survive the expiration or earlier termination of this Lease.

8            Section 23.9  Non-Waiver.  The failure of Landlord or Tenant to insist upon the
9    strict performance of, or to enforce, any provision, covenant or condition herein shall not
10   be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to
11   enforce the same covenant or condition on the occasion of any subsequent breach or
12   default; nor shall the failure of either party to exercise any option in this Lease upon any
13   occasion arising therefor be deemed or construed to be a waiver of the right to exercise
14   that same kind of option upon any subsequent occasion.

15           Section 23.10   Rights Cumulative.  Unless expressly provided to the contrary in
16   this Lease, each and every one of the rights, remedies and benefits provided by this Lease
17   shall be cumulative and shall not be exclusive of any other such rights, remedies and
18   benefits allowed by applicable Legal Requirements.

19           Section 23.11   Definition of Landlord.  The term *"Landlord"* shall mean only the
20   person or entity which, from time to time, shall then own the Shopping Center, and in the
21   event of the transfer by such owner of its interest in the Shopping Center, such owner
22   shall (except to the extent of (1) claims made by Tenant against Landlord which arose
23   prior to the effective date of the transfer of such ownership interest, and/or (2) judgments
24   obtained by Tenant against Landlord, on or prior to the effective date of the transfer of
25   such ownership interest) thereupon be released and discharged from all covenants and
26   obligations of Landlord thereafter accruing, but such covenants and obligations shall be
27   binding during the Term upon each new owner for the duration of such owner's
28   ownership.

29           Section 23.12   Successors and Assigns.  The provisions of this Lease shall be
30   binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31   executors, administrators, successors and assigns.

32           Section 23.13   Limitation of Landlord's Liability.  Except with respect to
33   insurance proceeds or condemnation awards received by Landlord which are required by
34   the terms of this Lease to be applied to the repair or restoration of the Premises or the
35   Shopping Center, and with respect to Landlord's obligation to pay the Tenant Allowance
36   when due hereunder, Tenant shall, on and after the Delivery Date, look only to Landlord's
37   estate and property in the Shopping Center (or the proceeds from the sale of all or any
38   portion thereof) and net income derived from the Shopping Center for the satisfaction of
39   Tenant's remedies for the collection of a judgment (or other judicial process) requiring
40   the payment of money by Landlord hereunder and no other property or assets of Landlord,
41   its officers, directors, stockholders, members or partners shall be subject to levy,
42   execution or other enforcement procedure for the satisfaction of Tenant's remedies under
43   or with respect to this Lease.  Except with respect to the limitation on personal liability
44   hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or
45   construed to limit Tenant's rights and remedies pursuant to this Lease or which may be
46   available at law or in equity.

47           Section 23.14   Limitation of Tenant's Liability.  Landlord, its successors and
48   assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for
49   the satisfaction of any claim arising from or under this Lease and shall not seek to impose
50   personal liability on any shareholder, officer, director, member or employee of Tenant or

1807454 v8

1   any of its Affiliates.  Except with respect to the limitation on personal liability
2   hereinabove set forth, the provisions of this Section 23.14 shall not be deemed or
3   construed to limit Landlord's rights and remedies pursuant to this Lease.

4        Section 23.15   Joint and Several Liability.  If either party consists of more than
5   one person, then the persons constituting such party shall be jointly and severally liable
6   hereunder.

7        Section 23.16   Severability.  If any term, covenant, condition or provision of this
8   Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the
9   remainder of the provisions hereof shall remain in full force and effect and shall in no
10  way be affected, impaired, or invalidated thereby.

11       Section 23.17   Grammatical Usages and Construction.  In construing this Lease,
12  feminine or neuter pronouns shall be substituted for those masculine in form and vice
13  versa, and plural terms shall be substituted for singular and singular for plural in any
14  place in which the context so requires.  This Lease shall be construed without regard to:
15  (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition
16  or deletion of text made during the negotiation of this Lease.  Moreover, each and every
17  provision of this Lease shall be construed as though all parties hereto participated equally
18  in the drafting thereof.  As a result of the foregoing, any rule or construction that a
19  document is to be construed against the drafting party shall not be applicable hereto.

20       Section 23.18   Table of Contents, Line Numbering and Paragraph Headings.  The
21  table of contents and line numbering, if any, and section headings are inserted only for
22  convenience and in no way define, limit or describe the scope or intent of this Lease, nor
23  in any way affect this Lease.

24       Section 23.19   Definition of Hereunder, Herein, etc..  Unless the context clearly
25  indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and
26  words of similar import refer to this Lease and all the Exhibits attached hereto as a whole
27  and not to any particular section, subsection, or paragraph hereof.

28       Section 23.20   Short Form Lease.  Upon the request of either party following the
29  execution and delivery of this Lease, Landlord and Tenant shall execute a short form
30  lease or memorandum for recording, which shall be in form and substance as either party
31  shall reasonably request.  In no event shall the amount of Fixed Rent reserved hereunder
32  be included in any such short form lease or memorandum.

33       Section 23.21   Entire Agreement and Modification.  This Lease constitutes the
34  entire agreement of the parties hereto, and all prior agreements between the parties,
35  whether written or oral, are merged herein and, except as may be specifically set forth
36  herein, shall be of no force and effect.  This Lease cannot be changed, modified or
37  discharged orally, but only by an agreement in writing, signed by the party against whom
38  enforcement of the change, modification or discharge is sought.

39       Section 23.22   No Joint Venture or Partnership Created by Lease.  Nothing
40  contained herein shall be deemed or construed as creating the relationship of principal
41  and agent or of partnership or of joint venture between the parties hereto.

42       Section 23.23   Tenant's Tradename.  Landlord shall not make use of Tenant's
43  tradename [i.e., "buy buy Baby"®] in any advertising or marketing material, including,
44  without limitation, on any internet website, without obtaining Tenant's prior written
45  approval, which may be withheld in Tenant's sole and absolute discretion.

46       Section 23.24   Counterparts.  This instrument may be executed in several
47  counterparts, each of which shall be deemed an original.  The signatures to this

1807454 v8

1    instrument may be executed and notarized on separate pages, and when attached to this
2    instrument, shall constitute one complete document.

3        Section 23.25    Waiver of Trial by Jury.  Landlord and Tenant shall and they
4    hereby do each waive trial by jury in any action, proceeding or counterclaim brought by
5    either of the parties hereto, at law or in equity, against the other on any matters
6    whatsoever arising out of or in any way connected with this Lease, the relationship of
7    Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of
8    injury or damage with respect thereto.

9        Section 23.26    USA Patriot Act.  Landlord and Tenant each hereby represent and
10   warrant to the other that:

11           (a)    the Office of Foreign Assets Control of the United States
12   Department of the Treasury (**"OFAC"**) has not listed such party or, to the best of such
13   party's knowledge, any of such party's Affiliates, on its list of Specially Designated
14   Nationals and Blocked Persons; and

15           (b)    it is not knowingly acting, directly or indirectly, for or on
16   behalf of any person, group, entity or nation named by any Executive Order, the United
17   States Treasury Department, or United States Office of Homeland Security as a terrorist,
18   Specially Designated National and Blocked Person, or other banned or blocked person,
19   entity, nation or pursuant to any law, order, rule or regulation that is enforced or
20   administered by the OFAC.

21       Section 23.27    Authority.  Landlord and Tenant represent and warrant that each
22   has full right, power and authority to execute and deliver this Lease, and that the
23   execution, delivery and performance of this Lease by Landlord and Tenant has been duly
24   authorized and approved by Landlord and Tenant's Board of Directors or other applicable
25   governing body of Tenant.

26       Section 23.28    Accord and Satisfaction.  No payment by Tenant or receipt by
27   Landlord of a lesser amount than the Fixed Rent and Additional Rent payable hereunder
28   shall be deemed to be other than a payment on account of the earliest stipulated Fixed
29   Rent and Additional Rent, nor shall any endorsement or statement on any check or any
30   letter accompanying any check or payment for Fixed Rent or Additional Rent be deemed
31   an accord and satisfaction, and Landlord may accept such check or payment without
32   prejudice to Landlord's right to recover the balance of such Fixed Rent and Additional
33   Rent or pursue any other remedy provided herein or by law.

34       Section 23.29    Right to Show Premises.  Landlord may show the Premises to
35   prospective purchasers and mortgagees, and, during the nine (9) months prior to the
36   termination of this Lease, to prospective tenants, in any such events, during business
37   hours and on reasonable advance notice to Tenant; provided, however, Landlord shall not
38   have the right hereunder to show the Premises to a prospective tenant during the Initial
39   Term or any Renewal Period, unless and until Tenant has no further rights to exercise any
40   Renewal Option with respect thereto pursuant to Section 2.2.2 above.  Landlord agrees
41   that in connection with exercising its rights under this Section, it and its agents shall
42   proceed in a manner necessary to avoid disrupting the normal business operations being
43   conducted at the Premises, and shall not advise any employee in the Premises of the
44   nature of the inspection.

45                              [Signature page follows]

Section 23.30  <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

AVR PORTCHESTER, LLC, a
Delaware limited liability company

[SEAL]

By: _____
Name: _____
Title: _____

**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New
York corporation

By: _____
Name: Alan M. Freeman
Title:  Assistant Secretary

By: _____
Name:  Warren Eisenberg
Title: Co-Chairman

[SEAL]

1

## INDEX OF EXHIBITS

| | | |
|---|---|---|
| 2 | Exhibit A | Legal Description of Shopping Center |
| 3 | Exhibit B | Site Plan |
| 4 | Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| 5 | Exhibit D | Landlord's Work |
| 6 | Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| 7 | Exhibit E | Permitted Encumbrances |
| 8 | Exhibit F | Signage |
| 9 | Exhibit G | Form of Subordination, Non-Disturbance and Attornment |
| 10 | | Agreement |
| 11 | Exhibit G-1 | Form of Fee Owner SNDA |
| 12 | Exhibit H | Form of Subtenant Recognition Agreement |
| 13 | Exhibit I | Intentionally Omitted |
| 14 | Exhibit J | Form of Delivery Date Certification |
| 15 | Exhibit K-1 | Existing Exclusives |
| 16 | Exhibit K-2 | Existing Leases |
| 17 | Exhibit L | Alternate Rent |
| 18 | Exhibit M | Prohibited Uses |
| 19 | Exhibit N | Form of Mechanics' Lien indemnification |

20

1                                    Exhibit A

2                          Legal Description of Shopping Center

ALL that certain plot, piece or parcel of land, lying and being partly in the Village of
Port Chester, Town of Rye, and partly in the City of Rye, County of Westchester and
State of New York, enclosed by the following boundary lines:

BEGINNING at the point of intersection of the northeasterly line of Charles Street (not
traveled or improved) with the southeasterly line of Boston Post Road, as monumented
per County filed map No. 12210 and 12211;

THENCE running the following three courses along the beforementioned southerly line
of Boston Post Road;

North 24 degrees 05' East 116.47 feet;

North 33 degrees 18' East 99.30 feet;

North 58 degrees 02' East 97.30 feet to the southeasterly line of Boston Post Road as
widened and monumented per County Clerk filed map no. 23912;

THENCE along said southeasterly line of Boston Post Road per Map No. 23912, North
56 degrees 26' 27" East 153.29 feet;

North 47 degrees 11' 43" East 154.70 feet;

North 40 degrees 47' 04" East 123.07 feet and North 31 degrees 46' 24" East 119.88
feet to a point;

THENCE South 52 degrees 10' 30" East a distance of 164.46 feet to a point;

THENCE North 38 degrees 03' 30" East a distance of 220.81 feet to a point;

THENCE South 55 degrees 56' 10" East a distance of 161.00 feet to a point;

THENCE North 39 degrees 28' East a distance of 611.40 feet to a point;

THENCE North 47 degrees 47' West a distance of 149.80 feet to a point on the
southerly line of Boston Post Road;

THENCE along the said southerly line of Boston Post Road North 83 degrees 00' 20"

3    _____

## S C H E D U L E   A  (continued)

East 130.98 feet;

THENCE South 47 degrees 47' East a distance of 160.06 feet to a point;

THENCE South 39 degrees 28' West a distance of 350.00 feet to a point;

THENCE South 50 degrees 28' East a distance of 440.31 feet per deed (440.13 feet as measured) to a point;

THENCE South 32 degrees 08' West a distance of 1377.04 feet to a point;

THENCE South 41 degrees 00' 10" West a distance of 195.91 feet to a point;

THENCE South 41 degrees 09' West a distance of 27.76 feet to a point; .

THENCE North 10 degrees 39' West a distance of 105.26 feet per map (North 11 degrees 00' 10" West a distance of 104.53 feet as measured) to a point;

THENCE North 24 degrees 43' 49" East a distance of 28.11 feet to a point;

THENCE in a northwesterly direction, along the arc of a radius of 478.87 feet bearing to the left, a distance of 148.62 feet per map (149.77 feet as measured) to a point;

THENCE North 50 degrees 34' West a distance of 844.96 feet to the point and place of BEGINNING.

1

2    BEING ALSO KNOWN AS Section 139.20 in Block 1 Lot 2 and Section 142.53 in Block 1 Lot 1 on the
3    Tax Maps.

4

Exhibit B

Site Plan

1

2

B

1807454 v3



TRAFFIC SIGNAL
PYLON SIGN (CONTAINS TENANT GRAPHICS)
BOSTON POST ROAD
TENANTS TEMPORARY SITE SIGN
A & P PARCEL (PART OF SHOPPING CENTER)
PARCEL 'B' EXISTING RETAIL
PARCEL 'A' BANK OF AMERICA
PARCEL 'C' PARTY CITY
CROSS WESTCHESTER EXPRESSWAY (287)
(STAPLES & TRIPODI'S AT LOWER LEVEL)
EXISTING RETAIL SHOPS
SAVIN BUILDING - EXISTING 3-STORY RETAIL- PETSMART @ IST FL MODELLS @ 2ND FL
TO BOSTON POST ROAD
NOTES
1. SITE LAYOUT SHALL ADEQUATELY ACCOMODATE A 55' TRAILER FROM TENANT'S SITE ENTRANCE TO TENANT'S LOADING DOCK TO TENANT'S SITE EXIT. AT THE TIME OF THE SIGNING OF THE LEASE, TRUCK ACCESS IS AS DESCRIBED ABOVE, AND IS ADEQUATE.
2. CONSTRUCTION STAGING AREA FOR OTHER CO-TENANTS SHALL NOT BE WITHIN TENANT'S PARKING FIELD, DIRECTLY IN FRONT OF TENANT'S PREMISES, OR BLOCK ACCESS TO TENANT'S LOADING DOCK.
3. EXIT DOORS TO BE COORDINATED WITH TENANT'S PLANS.
4. TENANT WILL BE ALLOWED TO EXTEND CROSSWALK ACROSS ACCESS DRIVE AS SHOWN. TENANT WILL BE ALLOWED TO PROVIDE FLEXIBLE PEDESTRIAN SIGN SYSTEM IN CENTER OF CROSSWALK (MFGR: SETON IDENTIFICATION STYLE NO. 89536) WORDING: 'STOP FOR PEDESTRIANS IN CROSSWALK'. TENANT TO PROVIDE PAINTED 'STOP' ON PAVING, EACH SIDE OF CROSSWALK. SIGNAGE IS CONTINGENT UPON CITY APPROVAL.
5. TENANT WILL BE ALLOWED RESERVED PARKING SPACES FOR EXPECTANT MOTHERS. LOCATIONS ARE IDENTIFIED ON THIS EXHIBIT AS EM. SPACES WILL BE IDENTIFIED WITH FLEXIBILE SIGN AT EACH SPACE, AS PER LEASE AND AS INDICATED ON EXHIBIT F, 5 OF 5.
PARKING LOT CART CORRALS
EXISTING EM SPACES
STAGING AREA
SEE NOTE 5
REMOVE PORTION OF EXIST. SIDEWALK
NEW SIDEWALK EXTENSION
EXIST. CONC. PLAZA
FLEA MARKET ENTRY
EXISTING BUS STOP TO BE REMOVED
A. I. FRIEDMAN
(EMPIRE STATE FLEA MARKET AT LOWER LEVEL)
JOYCE LESLIE
EXISTING RETAIL-VACANT
PREMISES
EXISTING KOHLS
HOME GOODS
MANDEES
JEMBROS
LOCATION OF TENANT'S REMOTE SIGN
PROPOSED ENCLOSURE AT EXISTING LOADING DOCK
TEMP STORAGE CONTAINER
TRASH COMPACTOR PAD
TENANT'S TRAILER
LOADING FACILITIES
STAGING AREA
SEE ENLARGED SITE PLAN
TRASH CONTAINER PAD
PREMISES HAS UPPER LEVEL (LEVEL WITH FRONT PARKING FIELD) AND LOWER LEVEL (LEVEL WITH REAR ACCESS DRIVE)
NORTH
LEGEND
TENANT'S PREMISES
CRITICAL AREA
A & P PARCEL
STAGING AREA (FOR TENANT USE)
AREA CONTAINING LOWER LEVEL TENANTS BELOW MAIN LEVEL
JB 2/11/11
EXHIBIT B, 1 of 2
SITE PLAN
PORT CHESTER, NY
buybuyBaby



UPPER LEVEL PLAN

LOWER LEVEL PLAN

EXHIBIT B, 2 OF 2
PART SITE PLANS
**buy buy BABY**
PORT CHESTER, NY

<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 200___, by and between AVR PORTCHESTER, LLC (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

# W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Port Chester Shopping Center (the *"Shopping Center"*), situated in Port Chester, New York;

WHEREAS, by that certain Lease Agreement dated as of _____, 2009 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____, 200___.

2.    The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

1

2        IN WITNESS WHEREOF, the parties hereto have caused this Rent
3  Commencement and Expiration Date Agreement to be executed the date and year first
4  above written.

**LANDLORD:**

AVR PORTCHESTER, LLC, a Delaware
limited liability company


By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation


By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

C

Exhibit D

Landlord's Work

D



*Port Chester, NY- buybuyBaby*

**Exhibit D - Standard Landlord's Obligations (As-Is Delivery)**

**2-11-11**

[All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease. To the extent not inconsistent with the terms of this Exhibit D, the terms of the lease regarding Landlord's work shall be deemed to supplement the provisions of the Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturer's' specifications.]

1.    Landlord agrees to perform any and all work necessary to delivery possession of the Premises to Tenant in the following condition (*"Landlord's Work"*):

2.    Landlord shall deliver to Tenant (1) hard copy set of as-built drawings of the Premises. Tenant acknowledges receipt from Landlord of the as-built drawings on 10/27/10.

3.    Landlord shall deliver premises to tenant as is, except that Landlord is responsible for the construction of a new demising wall between the Premises and the adjacent space to the south, as indicated on Exhibit B. The Premises shall be properly demised from other tenant's premises. Landlord shall insure that the demising walls and partitions meet or exceed all applicable fire codes and insurance regulations. The Tenant is responsible for the demolition of partitions, floor finishes, etc, within the Premises.

If there is duct work present that would obstruct/hinder the construction of the new demising walls/partitions then the Landlord, as part of Landlord's work, shall remove it as required to install said demising wall and secure any and all remaining sections to the roof structure above. Tenant assumes no responsibility regarding the functionality nor building code compliance for the system within the adjacent tenant's space.

If there are any sprinkler laterals, branch lines, drops, heads, hangers, etc., present that would obstruct/hinder the construction of the new demising walls/partitions or cause to extend into the Tenant's Premises then the Landlord, as part of Landlord's work, shall remove it as required to install said demising wall and to cap all remaining piping and secure them to the roof structure above. Tenant assumes no responsibility regarding the functionality nor building code compliance for the system within the adjacent tenant's space after the re-demise work is completed.

If there are any conduits, wires, light fixtures, junction boxes, contactors, etc., present that would obstruct/hinder the construction of the new demising walls/partitions then the Landlord, as part of Landlord's work, shall remove said obstructions so demising walls/partitions can be constructed. Tenant assumes no responsibility regarding the functionality nor building code compliance for this scope of work within the adjacent tenant's space after the re-demise work is completed. Landlord, at Landlord's cost, shall be required to provide and install any and all electrical service(s) as well as any and all related equipment, wires, etc. required for the vacant portion of building.

After the re-demise work is completed the Landlord shall be solely responsible for the gas service / meter, telephone service and water service / meter that serves the remaining portion of the vacant premises.

4.    Landlord will deliver the existing functioning fire suppression system with existing water density, in its current 'as is' condition. Landlord shall allow Tenant to further modify the sprinkler system in accordance with applicable laws in order to accommodate tenant's specific storage requirements. Tenant shall install a new fire pump, which shall be placed in the existing lower level utility room on a new concrete pad, for Tenant's sole use. The sprinkler system as adapted by Tenant shall be designed to comply with NFPA 13 2002 Edition (high pile solid shelf storage) for classes I-IV commodities. See the lease for how the fire pump and associated construction costs shall be shared between Landlord and Tenant.

5.    The Premises shall be delivered to Tenant by Landlord in a neat and clean condition, free of all tenants and occupants, and free of all store fixtures and the like of prior occupants.

6.    The Premises shall be delivered to Tenant by Landlord in broom clean, secured condition with the roof watertight (and all gutters, downspouts, roof drains in working order), and the structural components (including, without limitation, the foundation, exterior walls, structural supports and roof) in working order.

7.    All existing electric, water (fire and domestic), and sanitary utilities in the premises and serving only the Tenant's Premises shall be in working order and active. The telephone line entering premises shall be in proper working order, with Tenant required to activate line by contacting the utility. Capacity of water, sanitary, and gas and phone shall be as existed on the date of Tenant's inspection. The Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date. Tenant shall be responsible for the utility connection and

~7707561.doc

. . . . . . . . . . . . . . . . . . . . 1

1

deposit charges. If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

8.  The Landlord is to provide a single 800 amps, 277/480 volt, 3 phase service to the main (upper) level, at location as shown on Exhibit B. The Landlord is to provide tenant electric meter in the fenced area behind Kohl's premises.

9.  The Landlord shall maintain existing 400 amp electric service (entering premises on lower level) for Tenant's use during construction as temporary power until the 800 amp service set forth in paragraph 8 above is operational. After Tenant has connected to new service, Tenant shall remove existing feeder and panels, to be coordinated with Landlord so that Landlord can reuse existing feeders and panel outside of Tenant's space.

10. The Landlord shall remove the existing Kohl's panels and electrical service from the rear wall of the lower level. Tenant intends to utilize this portion of wall for the new compactor door.

11. Landlord shall allow Tenant to remove existing RTU's and replace with new units and curbs, along with associated ductwork, grilles, diffusers, accessories, related controls, etc. (at Tenant's cost and discretion). Where existing RTU's are to be removed with no replacement RTU, Tenant will keep the existing curb and provide a weathertight metal cap. Tenant agrees to accept equipment in their current 'as is' condition. Tenant shall coordinate with and hire Landlord's roof contractor in order to complete Tenant's roof work, so as not to void the roof warranty. Existing steel dunnage for existing elevated RTU shall remain.

10. The Premises shall be free from asbestos material and other Hazardous Substances.

11. Subject to the conditions set forth in this exhibit, the Premises shall be delivered to Tenant in substantially the same condition and state of repair as existed on the date of Tenant's inspection thereof on 10/11/10.

12. Bottom of structural elements are existing, and shall remain as is.

13. All work performed in the Premises, whether performed by Landlord or Tenant, shall be done in a good and first class workmanlike manner; in accordance with all applicable laws, ordinances, codes and insurance requirements. Landlord agrees to fully cooperate with Tenant and to assist Tenant (including without limitation performing any work outside of the Premises required by governmental authority), all at Tenant's sole cost and expense, in obtaining all required building permits for Tenant's Work, and in obtaining an unconditional permanent certificate of occupancy, or the local equivalent thereof.

14. Tenant shall have the right to construct a freight lift from the lower level to the main (upper) level of the Premises

15. Tenant shall have the right to construct a roof hatch with ladder. This needs to be coordinated with roofing manufacturer to avoid the voiding of the roof warranty.

16. Except as otherwise provided in this Lease and the exhibits thereto, Landlord shall deliver the Premises to Tenant in its present "As Is" physical condition. The foregoing reference to the Premises being delivered in "As Is" condition shall not relieve Landlord of any maintenance or repair obligations with respect to the Premises otherwise specifically set forth in this Lease as the responsibility of Landlord.

17. Tenant shall have the right to furnish and install one building sign on the front face of the building, and one at remote wall location, overlooking I-287, subject to final approval by all applicable governmental authorities. Tenant shall have the right to furnish and install all temporary signs in accordance with the Lease and as further detailed in Exhibit F and D-1, as permitted by all applicable governmental authorities.

18. Tenant shall have the right to widen the sidewalk in front of premises, as shown on Exhibit B. **The Landlord has obtained approval from the governing authorities for the relocation of the bus stop currently in front of premises. See attached bus stop approval e-mail.** Tenant shall be responsible for all work related to the relocation of bus stop, including curbing and parking field alterations and site plan amendment (if needed).

19. Site lighting is to remain as is. Landlord is to clean lenses and replace burned out lamps within Tenant's parking field.

20. Tenant shall modify rear loading dock as needed for Tenant's operating purposes. Tenant shall be allowed to construct a metal framed EIFS enclosure over the existing open-air concrete loading dock. This will include new overhead door, canopy and edge of dock lift. Tenant shall also construct a new compactor pad, along with new opening cut in rear building wall.

21. Tenant shall be allowed to designate 'Expectant Mother Parking' spaces as shown on Exhibit B. Tenant will be responsible for graphic signage at the parking spaces (and maintenance of same)..

22. Tenant shall be allowed to modify the front, side and rear elevations as indicated on Exhibit D-1.

From: Stiller, Richard <rls1@westchestergov.com>
To: Campagnolo, Joseph
Cc: Ziegler, Andrew <azz1@westchestergov.com>; Swee, Michael <mas9@westchestergov.com>
Sent: Tue Jan 18 16:56:29 2011
Subject: Relocation of Bus Stop Kohls Portchester Shopping Center

Pursuant to our telcon and the exchange of e-mails from various sources, I offer the following comments pertaining to the proposed relocation of the bus stop at the Port Chester Shopping:

·   The current bus stop is served by Bee-Line Route #76.

·   The #76 operates six days a week and 7 days a week from May till September.

·   The bus headway is approximately every 60 minutes.

·   The bus model used on the route is a 2005 Orion V that is 30' in length and 96" wide.  The spare bus for the route is of the same dimensions.

As part of renovations to the building immediately south of Kohls to accommodate a new "Buy Buy Baby," it is proposed that the bus stop be relocated immediately south of the sidewalk bump-out.

WCDPW&T have no objections to this proposal.  However, careful consideration should be given to the proposed location in that it will obstruct access and the visual sight to the plaza area adjacent to the new store.  Further, the construction of the relocated bus stop should conform with the "Westchester County Bus Stop Guidelines."

Please contact me if you have any further questions.

Richard L. Stiller

Director of Surface Transportation

Westchester County Department of Public Works and Transportation

100 East First Street

Mount Vernon, New York  10550

TEL: (914) 813-7776

FAX: (914) 813-7766

E-MAIL: rls1@westchestergov.com <mailto:rls1@westchestergov.com>

1

<u>Exhibit D-1</u>

2

<u>Exterior Elevations of Premises and Sidewalk Plan</u>

3

1807454 v8



MATERIAL LEGEND
PROPOSED SIDE ELEVATION 2
PROPOSED FRONT ELEVATION 1
PROPOSED REAR ELEVATION 3
buybuy BABY
EQ.
EYEBOLTS FOR (2) BANNERS EACH SIDE OF CENTRAL CANOPY
110'-4 1/4" CL. INTERIOR DIM.
SIDE PLAZA
26'-4" MASONRY OPENING
NEW CART CORRAL
NEW PROPOSED CANOPY ABOVE
PORTION OF NEW CONC. SIDEWALK EXTENSION
NEW ENTRY DOORS
NEW CURB RAMP
NEW FRONT FACADE OVER EXISTING BUILDING WALL. SEE ELEVATION SHEET.
NEW ELEV
16'-0"
7'-0"
27'-10 5/8"
27'-11 7/8"
27'-11 7/8"
27'-1 1/8"
5'-9 3/8"
20'-0"
SIDEWALK PLAN
EXHIBIT D-1
SIDEWALK PLAN & ELEVATIONS
buybuyBABY - PORT CHESTER, NY
2/11/14

<u>Exhibit E</u>

<u>Permitted Encumbrances</u>

Title to the Shopping Center is subject to the attached Exceptions in the Certification and Report dated October 2, 2010 issued by Equitable Abstract Co (the "Title Report").

Landlord represents and warrants that (i) none of the foregoing Exceptions will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

The inclusion of the memoranda of leases listed in the Title Report within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

References in the Exceptions in the Title Report to Mortgages and the documents comprising the Ground Lease shall be deemed subject to the provisions of Section 17.3 and Subsection 2.3.1(e) of the Lease.

*Attachment to
Exhibit E*

## EQUITABLE ABSTRACT CO., INC.

Proposed Insured:

Title No. EA-1685A

Effective Date:    October 2, 2010

Proposed Insured:

Amount of Insurance    Fee
                       Mortgage

**THIS COMPANY CERTIFIES** that a good and marketable title to premises described in Schedule A, subject to the liens, encumbrances and other matters, if any, set forth in this certificate may be conveyed and/or mortgaged by:

AS TO FEE TITLE:

DPPC HOLDINGS, L.P., who acquired title by deed from
Handels-En Productiemaatschappij DeSchouw, B.V.
dated June 3, 2003 and recorded May 19, 2004
in Control No. 440930437.

AS TO LEASEHOLD:

AVR PORTCHESTER, LLC,
by Assignment of Lease from Allan V. Rose
dated May 1, 2005 and recorded
January 30,207 in Control No. 470040783.

AS TO THE SUBLEASE:

ALLAN V. ROSE D/B/A PORTCAL CO.
by Memo of Sub Lease from The Caldor
Corporation dated February 25, 1994 and recorded
May 3, 1994 in Liber 10844 pg. 53;

FOR ANY TITLE CLEARANCE QUESTIONS ON THIS REPORT, PLEASE CALL:
See Premises information on next page

Joseph P. Galella, Esq.    (914) 788-9401

1

E
NYF

1
2

## EQUITABLE ABSTRACT CO., INC.

3

Title No. EA-1685A

7a)  Restrictive Covenants and Reservations of Easements in Liber 5231 cp 468;

7b)  Easement in Control No. 411630168;

7c)  Easement Agreement in Liber 7018 cp 434 as modified by Liber 7086 cp 242 and re-recorded in Liber 7096 cp 554;

7d)  Drainage Easement in Liber 7157 cp 143;

7e)  Easement Agreement in Liber 6002 cp 63 as modified by Liber 7007 cp 128;

4

- continued on next page -

E
N<sub>Y</sub>F

**EQUITABLE ABSTRACT CO., INC.**

Title No. EA-1685A

S C H E D U L E  B  (continued)

<u>DISPOSITION</u>

8. Memorandum of Management Agreement between Handels-en-Productiemaatschappij De Schouw B.V. and AVR Hotel Management, Ltd. dated 1-3-89 and recorded 1-10-89 in Liber 9418 pg. 39;

9. Assignment and Assumption of Lease dated 3-31-81 between Korvettes, Inc. (Assignor) and Admor Distributors, Inc. (Assignee) recorded 4-6-81 in Liber 7692 pg. 98;

10. Assignment of Lease and Assumption Agreement dated 3-31-81 between Admor Distributors, Inc. (Assignor) and Caldor, Inc. (Assignee) recorded 11-5-81 in Liber 7735 pg. 280;

11. Assignment and Assumption of Lease Agreement dated 4-2-90 between Caldor, Inc. (Assignor) and The Caldor Corporation (Assignee) recorded 6-7-90 in Liber 9822 pg. 311;

12. Assumption Agreement by Handels-en Productiemaatschappij De Schouw, B.V. dated 7-10-78 and recorded 4-18-79 in Liber 8034 pg. 726;

13. Terms, Conditions, Provisions and Agreements contained in that certain Lease dated 7-10-78 between Handels-en Productiemaatschappij De Schouw, B.V. Landlord, and Allan V. Rose, d/b/a AVR Realty Company, Tenant (the "Operating Lease") a Memorandum of which was dated 7-10-78 and recorded 7-11-78 in Liber 7482 pg. 464 and which Lease was amended by (a) Agreement and Amendment to Lease dated 4-4-79; (b) Agreement and Second Amendment to Lease dated as of 1980; (c) Second Lease Amendment dated as of 8-1-81 (d) Letter Agreement dated 12-21-81 (e) Letter Agreement dated 2-26-82 and (f) Memorandum of Agreement dated 4-2-86;

14. Terms, Conditions, Provisions and Agreements contained in an unrecorded Lease dated 7-28-81 between Caldor, Inc. (Landlord) and Rocorp, Inc. (Tenant) and unrecorded Sublease dated 7-28-81 between Rocorp., Inc. (Landlord) and Consumers Distributing Company Limited (Tenant) as assigned by Assignment dated 2-25-94 between Rocorp., Inc. (Assignor) and Allan V. Rose, d/b/a Portcal Co., Assignee, recorded 11-18-94 in Liber 11015 pg. 275;

1

- continued on next page -

E
NyF

EQUITABLE ABSTRACT CO., INC.

Title No. EA-1685A

S C H E D U L E   B   (continued)

**DISPOSITION**

15.  Memorandum of Lease between Arlen Operating Company (Landlord) and E.J. Korvette, Inc. (Tenant) dated 10-30-64 and recorded 12-21-64 in Liber 6469 pg. 184;

16.  Lease Amendment Agreement dated 7-14-64 between Arlen Operating Company (Landlord) and E.J. Korvette, Inc. (Tenant);

17.  Second Amendment of Lease between Dorwood Realty Corporation (Landlord) and E.J. Korvette, Inc. (Tenant) dated 11-2-64 and recorded 12-21-64 in Liber 6469 pg. 216;

18.  Third Amendment of Lease dated 1-3-96 between Arlen Operating Company (Landlord) and E.J. Korvette, Inc. (Tenant) - Memorandum recorded 5-6-66 in Liber 6610 pg. 470;

19.  Subordination, Non-Disturbance and Attornment Agreement between Handels-En Productiemaatschapij De Schouw, B.V. (Landlord), Lest Company and Allan V. Rose, d/b/a AVR Realty Company (Prime Tenant) and Waldbaum, Inc. (Sub Tenant) dated 1-30-89 and recorded 8-4-89 in Liber 9594 pg. 151 (affects Fee and Lease Interest only);

20.  Memorandum of Lease between Allan V. Rose, d/b/a AVR Realty Company (Lessor) and Big M, Inc. (Lessee) dated 7-8-91 and recorded 2-27-92 in Liber 10231 pg. 223 as Tenant only with no right of first refusal or option to purchase;

21.  Subordination, Non-Disturbance and Attornment Agreement between Handels-En Productiemaatschapij De Schouw, B.V. (Landlord) Lest Company and Allan V. Rose, d/b/a AVR Realty Company (Prime Tenant) and Big M, Inc. dated 10-11-91 and recorded 2-27-92 in Liber 10231 pg. 291 (affects Fee and Lease Interest only);

22.  Subordination Agreement between Emigrant Savings Bank and Empire State Flea Market, Inc. dated 8-21-86 and recorded 9-16-86 in Liber 10267 pg. 57;

23.  Subordination Agreement between Emigrant Savings Bank and Tripodis Electronics Corporation dated 8-21-86 and recorded 9-23-86 in Liber 10293 pg. 71;

- continued on next page -

1

EQUITABLE ABSTRACT CO., INC.

Title No. EA-1685A

S C H E D U L E   B   (continued)

DISPOSITION

24.    Subordination Agreement between Emigrant Savings Bank and Tripodis Electronics Corporation dated 8-21-86 and recorded 9-23-86 in Liber 10293 pg. 94;

25.    Subordination and Non-Disturbance Agreement between Emigrant Savings Bank and National Westminster Bank, USA dated 2-19-88 and recorded 7-14-88 in Liber 12411 pg. 1;

26.    Subordination, Non-Disturbance and Attornment Agreement between Emigrant Savings Bank and Allan V. Rose, d/b/a Lest Company dated 8-21-86 and recorded 9-16-86 in Liber 10269 pg. 74;

27.    Memorandum of Lease between Allan V. Rose d/b/a AVR Realty Company (Landlord) and Staples, Inc. (Tenant) dated 2-6-87 and recorded 8-2-87 in Liber 8933 pg. 391 as Tenant Only with no right of first refusal or option to purchase;

28.    Memorandum of Amendment and Restatement of Lease between Lest Company and Allan V. Rose (Landlord) and Waldbaum, Inc. (Tenant) dated 11-20-87 and recorded 12-4-87 in Liber 9049 pg. 12 as Tenant only with no right of first refusal or option to purchase;

29.    Terms, Conditions, Provisions and Agreement contained in unrecorded Sublease dated 3-23-68 between Spartan Industries, Inc. Sublandlord, and Pueblo Supermarkets of New York, Inc. (Tenant). The Tenant's position was assigned by Mesne Assignments to Waldbaum, Inc. ("Waldbaum Lease");

30.    Subordination, Non-Disturbance and Attornment Agreement amongst DPPC Holdings, L.P. (Landlord), AVR Portchester, LLC (Prime Tenant) and Kohl's Department Stores, Inc. (Subtenant) dated 1-10-07 and recorded 4-25-07 in Control No. 471020087 (affects fee and lease interests only);

31.    Memorandum of 2005 Amendment to Lease between AVR Portchester, LLC to Kohl's Department Stores, Inc. dated March 7, 2007 and recorded April 25, 2007 in Control No. 471020052;

- continued on next page -

1

EQUITABLE ABSTRACT CO., INC.

Title No. EA-1685A

S C H E D U L E   B  (continued)

DISPOSITION

32.  Subordination, Non-Disturbance Agreement between Wachovia Bank, National Association (lender), DPPC Holdings LP (Landlord) and AVR Portchester LLC (Tenant) dated May 23, 2007 and recorded July 10, 2007 in Control No. 471780250;

33.  Subordination, Non-Disturbance Agreement between Wachovia Bank National Association and Kohl's Department Stores, Inc. dated May 23, 2005 and recorded July 10, 2007 in Control No. 471780245;

34.  Subordination, Recognition, Non-Disturbance Agreement between Wachovia Bank National Association and Waldbaum, Inc. dated May 23, 2007 and recorded July 10, 2007 in Control No. 471780224;

35.  Memorandum of 2006 Amendment to Lease between AVR Portchester, LLC to Kohl's Department Stores, Inc. dated 3-7-07 and recorded 4-25-07 in Control No. 471020032;

36.  Assignment of Leases and Rents between DPPC Holdings LP to Wachovia Bank dated 5-23-07 and recorded 7-10-07 in Control No. 471780211;

37.  Assignment of Leases and Rents between Wachovia Bank National Association and Wells Fargo Bank, N.A., Trustee dated 8-9-07 and recorded 9-24-08 in Control No. 482590268;

38.  Second Assignment of Leases and Rents between Wells Fargo Bank, N.A., Trustee and Bank of America, N.A., Trustee dated 3-31-09 and recorded 12-24-09 in Control No. 493370666;

39.  Memorandum of Lease between AVR Portchester LLC and A.I. Friedman, L.P. dated 3-27-09 and recorded 1-28-10 in Control No. 500123412;

1

E

NyF

1
2

FEE MORTGAGES                    FEE MORTGAGES

1.  Mortgage dated December 20, 1965 made by Berkport Realty Corporation in favor of
    Teachers Insurance and Annuity Association of America in the principal amount of
    $1,200,000.00 and recorded December 28, 1965 in Liber 6927 at mp 62.

2.  Mortgage dated July 29, 1966 made by Berkport Realty Corporation in favor of Teachers
    Insurance and Annuity Association of America in the principal amount of $650,000.00
    and recorded August 12, 1966 in Liber 7012 at mp 299.

    Consolidation Agreement dated July 29, 1966 between Teachers Insurance and Annuity
    Association of America and Berkport Realty Corporation and recorded August 12, 1966
    in Liber 7012 at Page 317.  Consolidates Mortgages 1 and 2 to form a single lien in the
    amount of $1,950,000.00.

3.  Mortgage dated December 14, 1966 made by Berkport Realty Corporation in favor of
    Teachers Insurance and Annuity Association of America in the principal amount of
    $700,000.00 and recorded December 16, 1966 in Liber 7052 at mp 29.

    Consolidation Agreement dated December 14, 1966 between Teachers Insurance and
    Annuity Association of America and Berkport Realty Corporation and recorded
    December 16, 1966 in Liber 7052 at Page 47.  Consolidates Mortgages 1, 2 and 3 to form
    a single lien in the amount of $2,538,252.30.

4.  Mortgage dated April 24, 1967 made by Berkport Realty Corporation in favor of
    Teachers Insurance and Annuity Association of America in the principal amount of
    $500,000.00 and recorded April 24, 1967 in Liber 7073 at mp 375.

    Consolidation Agreement dated April 24, 1967 between Teachers Insurance and Annuity
    Association of America and Berkport Realty Corporation and recorded April 25, 1967 in
    Liber 7073 at Page 346.  Consolidates Mortgages 1, 2, 3 and 4 to form a single lien in the
    amount of $3,022,885.37

5.  Mortgage dated June 14, 1967 made by Berkport Realty Corporation in favor of Teachers
    Insurance and Annuity Association of America in the principal balance of $1,550,000.00
    and recorded June 16, 1967 in Liber 7083 at mp 772.

    Consolidation Agreement dated June 14, 1967 between Teachers Insurance and Annuity
    Association of America and Berkport Realty Corporation and recorded June 16, 1967 in

    Liber 7084 at Page 1. Consolidates Mortgages 1, 2 ,3, 4 and 5 to form a single lien in the
    amount of $4,557,203.59

    Mortgages 1, 2, 3, 4 and 5 as consolidated were assigned by Teachers Insurance and
    Annuity Association of America to Emigrant Savings Bank by Assignment dated August
    20, 1986 and recorded 9-16-86 in Liber 10267 at Page 52.

6.  Mortgage dated August 21, 1986 made by Handels-en Productiemaatschappij De
    Schouw, B.V. in favor of Emigrant Savings Bank in the principal amount of
    $7,691,950.03 and recorded September 16, 1986 in Liber 10269 at mp 153.

    Consolidation Agreement dated August 21, 1986 between Emigrant Savings Bank and
    Handels-en Productiemaatschappij de Schouw, B.V. and recorded September 16, 1986 in
    Liber 10269 at Page 109.  Consolidates Mortgages 1, 2, 3, 4, 5 and 6 to form a single lien
    in the amount of $9,150,000.00.

3

Continued

E
NyF

7.  Mortgage dated May 29, 1987 made by Handels-en Productiemaatschappij de Schouw, B.V. in favor of Emigrant Savings Bank in the principal amount of $989,482.94 and recorded 7-10-87 in Liber 11378 at mp 1.

extended and modified by Consolidation Agreement dated May 29, 1987 between Emigrant Savings Bank and Handels-en Productiemaatschappij de Schouw, B.V. and recorded July 10, 1987 in Liber 11381 at page 24. Consolidates Mortgages 1, 2, 3, 4, 5, 6 and 7 to form a single lien in the amount of $10,100,000.00.

Mortgages 1, 2, 3, 4, 5, 6 and 7 as consolidated were further modified by Agreement dated September 1, 1991 between Emigrant Savings Bank and Handels-en Productiemaatschappij de Schouw, B.V. and recorded February 26, 1992 in Liber 15279 at Page 119.

Mortgages 1, 2, 3, 4, 5, 6 and 7 were further modified by Agreement dated September 1, 1996 between Emigrant Savings Bank and Handels-en Productiemaatschappij de Schouw, B.V. and recorded September 18, 1996 in Liber 22024 at Page 91.

8.  Mortgage dated November 11, 1999 made by Handels-en Productiemaatschappij de Schouw, B.V. in favor of Emigrant Savings Bank in the principal amount of $10,000,000.00 and recorded April 24, 2000 as Control Number 400890567.

Consolidation Agreement November 16, 1999 between Emigrant Savings Bank and Handels-en Productiemaatschappij de Schouw, B.V. and recorded April 24, 2000 as Control Number 400890589 Consolidates Mortgages 1, 2, 3, 4, 5, 6, 7 and 8 to form a single lien in the amount of $18,769,081.22.

Mortgages 1, 2, 3, 4, 5, 6, 7, and 8 were assigned by Emigrant Savings Bank to Genworth Life and Annuity Insurance Company (f/k/a First Colony Life Insurance Company) by Assignment of Mortgages dated May 30, 2003 and recorded May 19, 2004 as Control Number 440930676.

9   Gap Mortgage dated June 3, 2003 made by DPPC Holdings L.P. in favor of Genworth Life and Annuity Insurance Company (f/k/a First Colony Life Insurance Company) in the amount of $1,007,017.47 and recorded May 19, 2004 as Control Number 440930683.

Amended, Restated and Consolidated Mortgage, Assignment of Rents and Leases, Security Agreement dated June 3, 2003 between DPPC Holdings L.P. and Genworth Life and Annuity Insurance Company (f/k/a First Colony Life Insurance Company)and recorded May 19, 2004 as Control Number 440930698. Consolidates Mortgages 1, 2, 3, 4, 5, 6, 7, 8 and 9 to form a single lien of $19,000,000.00

Assignment of Mortgage from Genworth Life and Annuity Insurance Company (formerly known as First Colony Life Insurance Company) to Wachovia Bank, National Association, recorded in the Office of the Westchester County Clerk, Division of Land Records on July 10, 2007 in Control No. 471780091.

Mortgage Spreader and Assumption Agreement between Park National Bank and AVR Portchester LLC (Leasehold Mortgagor), DPPC Holdings LP (Fee Mortgagor) dated May 23, 2007 and recorded July 10, 2007 in Control No. 471780139 (Fee & Leasehold Mortgaged properties spread to one another)

1

10. Gap Mortgage dated May 23, 2007 in the amount of $43,529,377.96 and recorded in the Office of the Westchester County Clerk on July 10, 2007 between DPPC Holdings LP and Wachovia Bank in Control No. 471780190.

Amended, Restated and Consolidated Mortgage and Security Agreement dated May 23, 2007 between DPPC Holdings LP and Wachovia Bank and recorded in the Office of the Westchester County Clerk on July 10, 2007 forming a single lien in the amount of $70,000,000.00 and interest in Control No. 471780198.

Assignment of Amended, Restated and Consolidated Mortgage and Security Agreement between Wachovia Bank, National Association, Assignor, and Wells Fargo Bank, N.A. as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates Series 2007-C32, Assignee dated July 21, 2008 and recorded January 8, 2009 in Control No. 483610507 (assigns all mortgages);

1

Continued
Pg. 3 of 5.

E
NyF

## LEASEHOLD MORTGAGES

1. Leasehold Mortgage dated February 25, 1994 made by Allan V. Rose d/b/a AVR Realty Co. in favor of Chemical Bank in the principal amount of $5,090,000.00 and recorded November 18, 1994 in Liber 19131 at mp 33.

2. Subleasehold Mortgage dated November 18, 1994 made by Allan V. Rose d/b/a Portcal Co. in favor of Chemical Bank in the principal amount of $5,090,000.00 and recorded November 18, 1994 in Liber 20108 at mp 49.

   Leasehold Mortgages 1 and 2 were assigned by The Chase Manhattan Bank, f/k/a Chemical Bank to Emigrant Savings Bank by Assignment of Mortgage dated September 27, 1999 and recorded October 27, 1999 in Liber 26284 at page 248.

3. Leasehold Mortgage dated September 29, 1999 made by Allan V. Rose d/b/a AVR Realty Company in favor of Emigrant Savings Bank in the principal amount of $5,712,056.84 and recorded October 27, 1999 in Liber 26284 at mp 252.

   Mortgage Consolidation, Modification and Extension Agreement dated September 29, 1999 between Allan V. Rose d/b/a AVR Realty Company and Emigrant Savings Bank and recorded on October 27, 1999 in Liber 26284 at page 260. Consolidates Leasehold Mortgages 1, 2 and 3 to form a single lien of $9,900,000.00.

   Leasehold Mortgages 1, 2, and 3 as consolidated were assigned by an Assignment of Mortgage from Emigrant Savings Bank to Emigrant Commercial Mortgage Corporation dated December 22, 2004 and recorded on April 4, 2005 as Control Number 450330209, and by Assignment of Mortgage dated April 11, 2005 as Control Number 450630450.

   Leasehold Mortgages 1, 2, and 3 as consolidated and assigned were further assigned by an Assignment of Mortgage from Emigrant Commercial Mortgage Corporation to Regency Savings Bank, FSB dated December 22, 2004 and recorded on April 4, 2005 as

4. Control Number 450330230 and by Assignment of Mortgage dated December 22, 2004, which assignment was recorded on April 11, 2005 as Control Number 450630460.

A. GAP Mortgage (Fee) made by DPPC Holdings L.P. for the benefit of Wachovia Bank, National Association dated as of May 23, 2005 and recorded in Control No. 471780190 in the principal amount of $43,529,377.96.

B. Amended, Restated and Consolidated Mortgage and Security Agreement made by DPPC Holdings, P.P. for the benefit of Wachovia Bank, National Association dated as of May 23, 2007 and recorded in the Office of the Westchester County Clerk on July 10, 2007 in Control No. 471780198, in the aggregate amount of $70,000,000.00 and interest;

   Mortgage Spreader and Assumption Agreement between National Bank and AVR Portchester LLC (Leasehold Mortgagor), DPPC Holdings LP (Fee Mortgagor) dated May 23, 2007 and recorded July 10, 2007 in Control No. 471780139; (Fee & Leasehold mortgaged properties spread to one another) Assignment of Mortgage from Park National Bank, Successor by merger to Regency Savings Bank, FSB dated May 14, 2007 and recorded July 10, 2007 to Wachovia Bank National Association in Control No. 471780129. Assigns Mortgages in Liber 19131 mp 33, Liber 20108 mp 49 and Liber 26284 mp 252;

Continued.

Pg. 4 of 5.

1

E
NYF

LEASEHOLD MORTGAGES - Continued

Partial Release of Leasehold Property between Wachovia Bank, National Association and AVR Portchester LLC and DPPC Holdings L.P. recorded in the Office of the Westchester County Clerk, Division of Land Records on July 10, 2007 in Control No. 471780174;

Assignment of Amended, Restated and Consolidated Mortgage and Security Agreement between Wachovia Bank, National Association, Assignor, and Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates Series 2007-C32, Assignee, dated July 21, 2008 and recorded January 8, 2009 in Control No. 483610507 (assigns all mortgages);

1

Pg. 5 of 5.

E
NYF

EQUITABLE ABSTRACT CO., INC.

Title No. EA-1685A

FOR INFORMATION ONLY:

Survey made by Gabriel E. Senor, P.C., Engineer & Surveyor, dated August 27, 1999 and last updated March 28, 2007 and revised May 14, 2007 shows no variations and/or encroachments except the following:

1. Variation between fence and southesterly line;

2. Drainage easement on premises on portion of southeasterly and portion of southwesterly and portion of northwesterly lines of title. Title Company excepts rights of others;

3. Variation between chain link fence and portion of southerly line. Said fence extends within said line by an unmeasured distance. Title Company excepts possible rights of others to that portion of premises to the south of said fence;

4. Fence extends within and outside of southwesterly line;

5. Wires extend onto Boston Post Road;

6. Concrete curbs and access drives extend onto Boston Post Road;

7. Concrete retaining wall on portion of northwesterly line;

8. Concrete curb extends onto premises to the northwest;

9. Chain link fences within and outside of northwesterly lines;

10. Access drive extends onto premises to the northwest onto lands now or formerly of Arnold. Title Company excepts the rights of others and does not insure access over same;

11. Easement granted to Brimes, Inc. on northerly portion of premises. Title Company excepts the rights of others over and to same;

12. Access drives extend onto the aforesaid easement from Boston Post Road, Wendy's Restaurant and premises to the northeast;

13. Parking spaces on premises now or formerly of Wendy's Restaurant, encroach onto subject premises. Title Company does not insure said encroachment and excepts the rights of others over and to same.

14. Fences within northerly line and extends onto adjoining premises.

- continued on next page -

1

E
NyF

Exhibit F

Signage

1

2

3

F



**"BUY BUY" LETTER SECTION w/ SELF CONTAINED TRANSFORMERS**



**"BABY" LETTER SECTION w/ SELF CONTAINED TRANSFORMERS**



SIGN AREA

BOXED AREA = 200 sq.ft.
INDIVIDUAL LETTER AREA = 98.4 sq.ft.

- *TOP ROW OF LETTERS = RED ACRYLIC FACES w/ "RED MAX" G.E. LUMINATION L.E.D. SYSTEM*
- *BOTTOM ROW OF LETTERS = BLUE ACRYLIC FACES w/ "BLUE MAX" G.E. LUMINATION L.E.D. SYSTEM*
- *ALL LETTERS TO HAVE WHITE RETURNS AND WHITE TRIM CAP RETAINER*
- *POWER REQUIREMENTS = TWO (2) 120V / 20A CIRCUITS (MAX.)*
- *POWER TO J-BOX AND FINAL ELECTRICAL CONNECTION BY G.C.'s ELECTRICIAN*
- *G.C. TO COORDINATE MOUNTING REQUIREMENTS WITH SIGN MANUFACTURER AND INSTALLER*

EXHIBIT F, 1 OF 5
buybuy BABY
PORT CHESTER, NY
BUILDING SIGN

JB
2/11/19





12'-0" x 10'-0" DOUBLE SIDED BANNER

SIDE A

SIDE B

SPECIFICATIONS:
DOUBLE-SIDED
300 DPI DIGITALLY PRINTED GRAPHICS
PRINTED ON 15oz WHITE BLOCKOUT BANNER MATERIAL
HEMS & GROMMETS IN THE CORNERS AND EVERY 18"

COLORS:
RED = Pantone 186C
BLUE = Pantone 281C
GRAY = Pantone 30% Black

## TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

12'-0" x 10'-0" DOUBLE SIDED BANNER

SPECIFICATIONS:
DOUBLE-SIDED
300 DPI DIGITALLY PRINTED GRAPHICS
PRINTED ON 15oz WHITE BLOCKOUT BANNER MATERIAL
HEMS & GROMMETS IN THE CORNERS AND EVERY 18"

COLORS:
RED = Pantone 186C
BLUE = Pantone 281C
GRAY = Pantone 30% Black

## TEMPORARY SIGN
(TENANT'S HIRING TRAILER)

4'-0" x 8'-0" / TYVEK
(2 BANNERS OF A SINGLE VERSION PER BOX)

PLAN VIEW

## TEMPORARY SITE SIGN
(REFER TO EXHIBIT B FOR LOCATION)

12'-0" x 10'-0" DOUBLE SIDED BANNER

SIDE A

SIDE B

SPECIFICATIONS:
DOUBLE-SIDED
300 DPI DIGITALLY PRINTED GRAPHICS
PRINTED ON 15oz WHITE BLOCKOUT BANNER MATERIAL
HEMS & GROMMETS IN THE CORNERS AND EVERY 18"

COLORS:
RED = Pantone 186C
BLUE = Pantone 281C
GRAY = Pantone 30% Black

## TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

NOTE:

1. VINYL SASH SHALL BE WHITE LETTERS ON A RED (PMS 187) BACKGROUND. FONT TO BE SIMILAR TO THAT SHOWN.

2. SIGN VENDOR TO PROVIDE & INSTALL SASH WHEN SIGN PANEL IS INSTALLED. SIGN VENDOR TO REMOVE SASH IMMEDIATELY PRIOR TO STORE OPENING.

3. TENANT SHALL DETERMINE (BASED ON VENDOR SUBMITTED RENDERINGS) THE FINAL SIZE AND SASH STYLE (CORNER OR BANNER) WHICH WILL BE IMPLEMENTED FOR EACH SIGN PANEL (PYLON, MONUMENT, ETC.).

4. TENANT SHALL DETERMINE WHICH PHRASE ("COMING SOON", "NOW OPEN", ETC) WILL BE REQUIRED ON EACH TEMPORARY VINYL SASH.

5. VINYL SASH SHALL BE 3M NON-STICK VINYL (OR EQUIVALENT) AND SHALL LEAVE NO LASTING RESIDUE OR MARKS AFTER THE VINYL IS REMOVED.

## TEMPORARY SASH
(AT PYLON / MONUMENT PANELS)

# EXHIBIT 'F' (4 OF 5)
## BUY BUY BABY
PORT CHESTER, NY

1                                    Exhibit G

2              Form of Subordination, Non-Disturbance and Attornment Agreement

3              THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
4       AGREEMENT, made as of the _____ day of _____, 200__, by and between
5       _____, a _____ [corporation] [limited] [general]
6       [partnership] [national banking association], having an office at
7       _____ (the "*Mortgagee*") and Bed Bath &
8       Beyond Inc., a _____ corporation, having an office at 650 Liberty Avenue,
9       Union, New Jersey 07083 (the "*Tenant*").

10                            W I T N E S S E T H :

11             WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*") covering a
12      parcel of land owned by _____, a _____ [corporation],
13      [limited] [general] [partnership] (the "*Landlord*") together with the improvements
14      erected thereon (said parcel of land and improvements thereon being hereinafter referred
15      to as the "*Shopping Center*" and being more particularly described on Exhibit A attached
16      hereto and made a part hereof); and

17             WHEREAS, by a certain Lease Agreement heretofore entered into between
18      Landlord and Tenant dated as of _____ (the "*Lease*"), Landlord leased to
19      Tenant a portion of the Shopping Center, as more particularly described in the Lease (the
20      "*Premises*"); and

21             WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
22      which is hereby acknowledged; and

23             **[For mortgages existing as of the date Lease is executed:** WHEREAS, as an
24      inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof
25      provides that the Lease is conditioned upon Landlord obtaining this Agreement from
26      Mortgagee; and

27             WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
28      the non-disturbance of Tenant by the holder of the Mortgage; and]

29             **[For mortgages occurring after the Lease is executed:** WHEREAS, Section
30      17.1 of the Lease provides that the Lease shall become subject and subordinate to a
31      mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and
32      when a non-disturbance agreement is entered into with respect to such mortgage; and

33             WHEREAS, the parties hereto desire to effect the subordination of the Lease to the
34      Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

35             NOW, THEREFORE, in consideration of the premises and of the mutual
36      covenants and agreements herein contained, the parties hereto, intending to be legally
37      bound hereby, agree as follows:

38             1.      Mortgagee hereby consents to and approves the Lease and the term thereof,
39      including the options to extend the term as set forth in the Lease, and covenants and
40      agrees that the exercise by Tenant of any of the rights, remedies and options therein
41      contained shall not constitute a default under the Mortgage.

42             2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made
43      and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and
44      to all modifications and extensions thereof (and such subordination shall not lessen or

1807454 v8

                                         G

diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

           (iii)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

           (iv)     bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

           (v)     bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

           (c)     Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

     5.     Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

     6.     Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

     7.     Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Margaret F. Black, Esq., c/o Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey  07102, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

     8.     This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

1    9.    This Agreement contains the entire agreement between the parties and
2  cannot be changed, modified, waived or canceled except by an agreement in writing
3  executed by the party against whom enforcement of such modification, change, waiver or
4  cancellation is sought.

5    10.    This Agreement and the covenants herein contained are intended to run
6  with and bind all lands affected thereby.

7    **[to add if our memorandum of lease has been recorded prior to the subject
8  mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE
9  UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE
10  BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO
11  SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID
12  MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

13    IN WITNESS WHEREOF, the parties hereto have duly executed this
14  Subordination, Non-Disturbance and Attornment Agreement as of the day and year first
15  above written.

**MORTGAGEE:**

ATTEST:

By:_____    By:_____
Name:_____    Name:_____
Title: (Assistant) Secretary    Title: (Vice) President

[SEAL]

**TENANT:**

ATTEST:    BED BATH & BEYOND INC., a New
York corporation

By:_____    By:_____
Name: Alan M. Freeman    Name: Warren Eisenberg
Title: (Assistant) Secretary    Title: Co-Chairman

[SEAL]

1807454 v8    G

1    [INSERT APPROPRIATE JURAT FOR MORTGAGEE]

2    _____

3

4    STATE OF NEW JERSEY            )
5                                   ) : ss.
6    COUNTY OF UNION                )

7        On this ___ day of _____, 200__, before me personally came Warren
8    Eisenberg to me known, who being by me duly sworn, did depose and say that he is the
9    Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which
10   executed the above instrument and that he signed his name thereto by order of the Board
11   of Directors of said corporation.

12                                            _____
13                                            Notary Public
14   My Commission Expires:
15
16
17   _____

1807454 v8

G

<u>Exhibit G-1</u>

After Recording, Return to:
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ  07083
Attention:  Kathleen Currie

_____

(The Above Space for Recorder's Use Only)

## FEE OWNER
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**
(the "*Agreement*") made as of the  day of _____, 2011, by and among DPPC
HOLDINGS, L.P., a New York Limited Partnership having an office c/o Depa Holding B.V.,
Koningsweg 7, 6816 TA Arnhem, The Netherlands (the "<u>Landlord</u>"), AVR PORTCHESTER
LLC, a New York Limited Liability Company, having an office at One Executive Boulevard,
Yonkers, New York 10701 (the "<u>Prime Tenant</u>") and BED BATH & BEYOND INC., a New
York corporation having offices at 650 Liberty Avenue, Union, New Jersey 07083 (the
"<u>Subtenant</u>").

## R E C I T A L S :

**WHEREAS**, Landlord is the owner in fee of a certain shopping center at Boston Post
Road, Port Chester, Westchester County, New York, as more fully described in Exhibit "A"
annexed hereto and made a part hereof (the "<u>Shopping Center</u>"); and

**WHEREAS**, the Prime Tenant is the operating tenant of the Shopping Center pursuant to
a certain lease dated July 10, 1978, as amended (the "<u>Prime Lease</u>") as described in that certain
Memorandum of Lease dated July 10, 1978 and recorded on July 11, 1978 in Liber 7482 pg 464
in the Official Records of the County of Westchester; and

**WHEREAS**, the Prime Tenant, as landlord, and the Subtenant, as tenant, have entered
into, subject to the delivery of this Agreement by the Landlord to the Subtenant, a lease dated as
of even date (the "<u>Sublease</u>"), as described in that certain Memorandum of Lease dated as of
_____ and recorded on _____ as Control No.
_____ in the Official Records of the County of Westchester, pursuant to which the
Prime Tenant sublets to the Subtenant a portion of the Shopping Center (the "<u>Demised
Premises</u>") as more fully described in the Sublease; and

**WHEREAS**, Subtenant desires to be assured of continued occupancy of the Demised
Premises under the terms of the Sublease and is willing to enter into this Agreement to assure
itself of such occupancy.

**NOW, THEREFORE**, Landlord, Prime Tenant and Subtenant agree as follows:

1.      (a)      Subtenant represents to Landlord and Prime Tenant that as of the date hereof and
        subject to the delivery of this Agreement by the Landlord to the Subtenant, (i) the
        Sublease has not been modified or amended; (ii) the Sublease is in full force and effect;
        (iii) to the best of Subtenant's actual knowledge, neither Subtenant nor Prime Tenant is in
        default under any of the terms, covenants or provisions of the Sublease and  Subtenant
        knows of no event which, but for the passage of time or the giving of notice or both,

1807454 v8