would constitute an event of default under the Sublease by the Subtenant or the Prime Tenant; and (iv) except as provided in the Sublease, there are no offsets or defenses to the payment of rent, additional rent or other sums payable under the Sublease. Subtenant agrees that it will, within thirty (30) days after receipt or refusal of notice from Landlord, deliver to Landlord an estoppel certificate in accordance with the terms of the Sublease.

(b)    Prime Tenant and Landlord represent to Subtenant that the Prime Lease is in full force and effect for a term expiring on August 1, 2077, and that Landlord is the owner in fee of the Shopping Center and the landlord under the Prime Lease.

2.    Prime Tenant represents to Landlord that as of the date hereof the Sublease has not been modified or amended.

3.    Subject to the provisions of this Agreement, Subtenant agrees that the Sublease and all of Subtenant's rights thereunder are subject and subordinate to the Prime Lease as the same may be extended, renewed, modified or replaced, and to all of Landlord's rights thereunder.

4.    Landlord and Prime Tenant hereby acknowledge and agree that, notwithstanding anything to the contrary in the Prime Lease, the provisions of the Sublease shall govern with respect to Subtenant's lease and occupancy of the Demised Premises.

5.    Subtenant shall not pay an installment of rent (or any part thereof) more than thirty (30) days prior to the due date of such installments, except as provided in the Sublease.

6.    Subtenant has not relied upon any representation (either oral or in writing) of Landlord, except as set forth herein, in executing the Sublease or this Agreement and Subtenant shall look only to Prime Tenant to fulfill the terms, covenants and conditions of the Sublease until such time as the Landlord shall succeed to the position of landlord under the Sublease in accordance with Paragraph 8 below.

7.    Prime Tenant and Subtenant agree that, except as expressly provided in the Sublease upon the occurrence of a particular event (e.g. casualty, change in Floor Area (as defined in the Sublease), failure of co-tenancy, etc.), the Sublease will not be terminated, modified or replaced without the prior written consent of the Landlord. Any termination, modification or replacement entered into without Landlord's written consent shall be null and void except for such termination, modification and/or replacement, if any, as may be expressly provided for in the Sublease.

8.    In the event of the expiration or earlier termination of the Prime Lease and/or an eviction of the Prime Tenant, or if Landlord otherwise obtains possession of the Demised Premises, and provided that the Sublease shall have been in full force and effect immediately prior to the aforesaid termination of the Prime Lease and/or eviction of the Prime Tenant and Subtenant shall not then be in default beyond the expiration of any applicable grace period for the cure thereof in (i) the payment of rent or additional rent due under the Sublease or (ii) the performance or observance of any of the other material obligations or conditions of the Sublease, then (a) Landlord shall recognize the Sublease and shall automatically succeed to the position of landlord under the Sublease; (b) the Subtenant shall attorn to and accept the Landlord as landlord under the Sublease and be bound to perform all of the obligations imposed by the Sublease upon the tenant thereunder; and (c) the Sublease shall continue in full force and effect as a direct lease between the Landlord and Subtenant and the Landlord will not disturb the possession of Subtenant or impair any other rights of Subtenant under the Sublease (subject, however, to the provisos set forth in the next sentence). In such event, Landlord, as Landlord under the Sublease, shall be bound by the obligations set forth in the Sublease, provided, however, that the Landlord shall not be bound by those obligations which are not then applicable or pertinent to the remainder of the term of the Sublease nor shall the Landlord be personally liable for any previous act or omission of any prior landlord under the Sublease, provided, further, however, that upon Landlord obtaining possession of the Demised Premises (which for purposes of this Agreement shall mean, the termination of the Prime Lease and/or eviction of the Prime Tenant coupled with Landlord having possession of the Shopping Center subject to then-existing subleases), Landlord shall

perform any maintenance, repair or restoration work to the Demised Premises or the Shopping Center then required, including, but not limited to, such maintenance, repair or restoration work of (but unperformed by) any prior landlord under the Sublease including, without limitation, those arising by reason of casualty, eminent domain takings, law, ordinance, code, regulation, rule, or other similar requirement. In no event, except as otherwise provided in this Agreement, shall Landlord (1) have any liability under the prior sentence except for failure to perform such obligations after Landlord obtains possession of the Demised Premises, (2) be subject to any offsets, defenses or counterclaims which have accrued to Subtenant against such prior landlord, except that Subtenant shall have the rent abatement rights expressly provided for in the Sublease as a result of Prime Tenant's failure to pay the "Tenant Allowance" described in the Sublease and except for claims resulting from defaults by Prime Tenant as to which Landlord received notice and an opportunity to cure pursuant to Section 10 of this Agreement, (3) be bound by any modification, cancellation, termination by mutual agreement between Prime Tenant and Subtenant, or replacement of the Sublease (which is not provided for in the existing Sublease as set forth in Section 7 above) or by any prepayment of more than one month's rent (except as provided in the Sublease) or by any waiver or forbearance on the part of a prior landlord (which is not expressly provided for in the Sublease) that is of monetary value and materially adverse to the interest of the Landlord unless such modification, cancellation, termination, replacement, prepayment, waiver or forbearance shall have been previously approved in writing by Landlord, provided, however, notwithstanding the foregoing, Landlord shall have no right to enforce claims against Subtenant arising from non-monetary immaterial waivers or forbearances given by Prime Tenant with respect to periods that precede the expiration or termination of the Prime Lease, eviction of the Prime Tenant, or Landlord's possession of the Demised Premises, (4) be personally bound by any guaranty of work performed by or for any prior landlord in connection with the construction of Subtenant's improvements at the Demised Premises or any warranty of workmanship or materials or any other personal guaranty of any prior landlord under the Sublease, (5) be liable to Subtenant for the return of any security deposit unless Landlord shall have in fact received such security deposit from the Prime Tenant or the Subtenant or (6) be liable for any construction obligation under the Sublease (other than the obligation to fund, or be subject to rent abatements for, the Tenant Allowance described in the Sublease), provided, however, that nothing contained in this clause (6) shall be deemed (i) to limit, waive or otherwise affect any construction obligation that is required due to maintenance and/or repair, restoration or replacement obligations of the Prime Tenant (or subsequent landlord) under the Sublease, including, without limitation, those arising by reason of casualty, eminent domain takings, law, ordinance, code, regulation, rule, or other similar requirement or (ii) to limit or alter Tenant's rights under the Sublease as a result of Prime Tenant's failure to so perform. In no event, however, shall Landlord have any liability under the foregoing clause (6) except for failure to perform such obligation after Landlord obtains possession of the Demised Premises.

9.      In the event of a termination or surrender of the Prime Lease, Subtenant and Landlord covenant and agree that, upon the request of either party hereto, the other party will execute and deliver such instrument as may be reasonably necessary to confirm the non-disturbance and attornment provisions of this Agreement. Subtenant waives the provision of any statute or rule of law now or hereafter in effect which may give or purport to give Subtenant any right of election to terminate the Sublease or to surrender possession of the Demised Premises by reason of the termination or surrender of the Prime Lease.

10.     Notwithstanding anything in the Sublease to the contrary, Subtenant hereby agrees that Subtenant will notify Landlord in writing of any default(s) under the Sublease by the Prime Tenant and of any other events under the control of the Prime Tenant (whether or not defaults) that would entitle Subtenant to terminate the Sublease or abate the rent payable thereunder, and no notice of termination shall be effective unless (i) the aforesaid notice has been given to Landlord, c/o Todd S. Pickard, Esq., Balber Pickard Maldonado & Van Der Tuin, PC, 1370 Avenue of the Americas, New York, New York 10019 (or such other place hereafter designated from time to time in writing at least thirty (30) days prior to Subtenant's giving such notice) by overnight courier service or by

certified or registered U.S. mail, return receipt requested, and (ii) Landlord has been given an opportunity to cure such default(s) for a period of thirty (30) days following the receipt of such notice; provided, however, if such default(s) cannot reasonably be cured within such thirty-day period and Landlord has commenced the cure of such default(s) within such thirty-day period and is diligently and in good faith pursuing such cure, then the time for Landlord to cure such default shall be extended to include the time reasonably necessary to cure same, but if Tenant is unable to conduct its normal business operations in the Premises as a result of Prime Tenant's default, such extension shall not exceed an additional sixty (60) days.  If Subtenant does not give Landlord notice in writing in the manner set forth above, of any default(s) under the Sublease by the Prime Tenant or any events under the control of the Prime Tenant (whether or not defaults) that would entitle Subtenant to abate the rent payable thereunder or provide Subtenant with any defenses or counterclaims against Prime Tenant, then Subtenant shall not be entitled to seek such rent abatement from, or enforce such defenses or counterclaims against, Landlord until such notice has been given and the applicable opportunity to cure period has elapsed.  It is understood that the provisions of this Section 10 shall not apply to any termination or abatement rights of Subtenant under the Sublease (such as, for example, upon Prime Tenant's failure to pay the Tenant Allowance, the occurrence of a casualty, or failure of co-tenancy), which rights shall be independent of the notice and cure periods set forth herein.  Notwithstanding anything to the contrary, nothing contained herein shall obligate Landlord to perform the obligations of landlord under the Sublease until such time as Landlord shall take possession of the Demised Premises.

11. To the extent that the Sublease shall entitle the Subtenant to receipt of any agreement providing for non-disturbance from the Landlord with respect to the Prime Lease, this Agreement shall constitute compliance therewith.

12. Anything herein or in the Sublease to the contrary notwithstanding, in the event that Landlord shall succeed to the landlord's interest in the Sublease, Landlord shall have no obligation, nor incur any liability, beyond Landlord's then existing estate or interest, if any, in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center, and Subtenant shall look exclusively to such interest, if any, of Landlord in the Shopping Center for the payment and discharge of any obligations imposed upon the Landlord hereunder or under the Sublease, and the Landlord is hereby released or relieved of any other liability hereunder or under the Sublease with respect to any other property.  Subtenant agrees that, with respect to any money judgment which may be obtained or secured by Subtenant against the Landlord, Subtenant shall look solely to the estate or interest owned by the Landlord in the Shopping Center, and the Subtenant shall not collect or attempt to collect any such judgment out of any other assets of the Landlord.

13. To the extent that the Prime Lease requires the consent of the Landlord to the Sublease, this Agreement shall constitute such consent.

14. This Agreement shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of the parties hereto and, except as otherwise provided in this Agreement, shall inure to the benefit of Landlord, Prime Tenant and Subtenant, and cannot be changed or terminated orally, but only by an instrument in writing executed by the party to be charged.

15. Landlord acknowledges that, simultaneously with the execution of the Sublease, Landlord sub-subleased the entire Demised Premises to its affiliate, Buy Buy Baby, Inc. (Buy Buy Baby, Inc. and any successors or assigns, the "Sub-Subtenant") pursuant to a certain sub-sublease (the "Sub-Sublease"), and Landlord hereby consents to such Sub-Sublease.  Nothing herein, however, shall be deemed to constitute Landlord's recognition of the Sub-Sublease, and notwithstanding any of the terms or provisions of the Sublease, Sub-Sublease, or this Agreement, upon any termination of the Sublease, the Sub-Sublease shall also automatically terminate and be of no further force and effect, there shall be no attornment by the Sub-Subtenant to Landlord, and Landlord shall have no obligation whatsoever not to disturb the possession of Sub-Subtenant but shall be entitled to all

rights and remedies at law and in equity, including, but not limited to, the right to reenter and possess the Demised Premises, subject to the terms of the Prime Lease.


[The Remainder of this Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

DPPC HOLDINGS L.P.

By:    DPPC (GP) LLC, its general partner

      By:    _____
            Todd S. Pickard, Manager

AVR PORTCHESTER LLC

By:    _____
      Jeffrey H. Gansberg, Authorized Signatory

BED BATH & BEYOND INC.

By:    _____

STATE OF NEW YORK           )
                                    ) ss.:
COUNTY OF NEW YORK    )

On the ____ day of _____ in the year _____ before me, the undersigned, personally appeared TODD S. PICKARD, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK           )
                                    ) ss.:
COUNTY OF WESTCHESTER    )

On the ____ day of _____ in the year _____ before me, the undersigned, personally appeared JEFFREY H. GANSBERG, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW JERSEY    )
                                ) ss.:
COUNTY OF UNION         )

On the ____ day of _____ in the year _____ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

1807454 v8

Exhibit H

Form of Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200___, by and between _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ ("**_Landlord_**"); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("**_Tenant_**"); and _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ ("**_Subtenant_**").

R E C I T A L S :

A.    Landlord and Tenant have entered into a certain Lease Agreement (the "**_Lease_**") dated as of _____ __, 2011, a short form of which has been recorded in _____, which demises certain premises (the "**_Premises_**") located in Port Chester Shopping Center, Port Chester, New York, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.    Section 15.5 of the Lease provides that, subject to the satisfaction of the requirements set forth therein, in the event Tenant subleases all of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.    Pursuant to a Sublease dated as of _____ (the "**_Sublease_**"), Tenant has subleased all of the Premises to Subtenant (the "**_Subleased Premises_**").

D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(a)    that it is the owner of leasehold title to the Premises,

(b)    that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(c)    that the term of the Lease expires on _____, but is subject to [four] renewal periods of five years each and

(d)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.    Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.  Subtenant hereby acknowledges and agrees that, subject to the provisions of this Agreement, the Sublease is subject and subordinate to the Lease.

3.    Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation (or grant such consent or approval) in accordance with the terms and conditions of the Lease.

4.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period. If the Subtenant is an Affiliate (as defined in the Lease) of Tenant at the time of Tenant's default, the foregoing non-disturbance agreement by Landlord shall be applicable only if Subtenant cures all defaults by Tenant.

5.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, then, provided that at the time of such surrender, termination or expiration, Subtenant is not an Affiliate of Tenant, then Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that (x) the terms of the Sublease shall not increase the obligations or reduce the rights of Landlord from those set forth in the Lease, (y) Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (1) the Fixed Rent and additional rent then payable under the Lease or (2) the fixed rent and additional rent then payable under the Sublease, and (z) the term (inclusive of all renewal terms) of such Sublease shall not continue beyond the then expiration date of the Lease (inclusive of all then exercised renewal periods thereunder).

6.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "*Notice*") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Margaret F. Black, Esq., c/o Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

1    8.    No modification, amendment, waiver or release of any provision of this
2 Agreement or of any right, obligation, claim or cause of action arising hereunder shall be
3 valid or binding for any purpose whatsoever unless in writing and duly executed by the
4 party against whom the same is sought to be asserted.

5                    [Signature Page Follows]

H

9.      This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

_____

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

1    **[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

2    _____

3

4    STATE OF NEW JERSEY        )
5                             ) : ss.
6    COUNTY OF UNION            )

7        On this ___ day of _____, 200__, before me personally came Warren
8    Eisenberg to me known, who being by me duly sworn, did depose and say that he is the
9    Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which
10   executed the above instrument and that he signed his name thereto by order of the Board
11   of Directors of said corporation.

12

13                                        _____
                                          Notary Public
14   My Commission Expires:

15

16

17   _____

18

H

Exhibit I

Intentionally Omitted

1

2

3

1

1                     <u>Exhibit J</u>

2                <u>Form of Delivery Date Certification</u>

3                [Letterhead of Landlord]

4                     _____, 20__

5 [via Federal Express or other
6 recognized overnight delivery
7 service per Article 18 of the foregoing
8 lease]

9 Bed Bath & Beyond Inc.
10 650 Liberty Avenue
11 Union, NJ 07083
12 Attn: Warren Eisenberg

13 Re:    Lease Agreement dated as of _____, 20__ (the "*Lease*"), between AVR
14         Portchester, LLC, as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as
15         tenant ("*Tenant*"), with respect to certain retail premises (the "*Premises*") located
16         in Port Chester Shopping Center, Port Chester, New York

17 Gentlemen:

18      In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
19 hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
20 Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
21 Date (as such term is defined in the Lease) will be deemed to be _____, 20__ .
22 This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
23 of the Lease.

24                     AVR PORTCHESTER, LLC
25
26
27                     By: _____
28                        Name:
29                        Title:
30
31 cc:    Margaret F. Black, Esq.
32         Allan N. Rauch, Esq.

1                          Exhibit K-1

2                        Existing Exclusives

3                    PORT CHESTER EXCLUSIVES

4

5     1. **Clino Pizza** – Landlord agrees that it will not rent any other space within the
6        Shopping Center to any other tenant whose principal business if the operation of a
7        pizza and Italian restaurant.  The foregoing restriction shall not apply to any store
8        now or hereafter leased, to a department store, or drug store, supermarket, Sear's
9        or Montgomery Ward hardline store, catalog order store, stamp redemption center,
10       theatre, tire or rubber store similar to Firestone, Goodyear or Goodrich, Gasoline
11       Service Station, or the successors or assigns of any of the above.

12

13    2. **Modell's** – Landlord shall not lease any space in the Shopping Center, to anyone
14       whose principal permitted use is for the sale of Sporting Goods, Athletic Apparel
15       (such as team licensed clothing and headwear (i.e. baseball caps) and branded
16       athletic apparel such as Nike, Addidas, Reebok, etc., used for athletic purposes)
17       and/or Athletic Footwear.  Tenant's Exclusive Use shall not apply to any existing
18       or future department stores (such as Macy's), discount department stores (such as
19       Target, WalMart, Kohl's, Kmart, or similar type operation), junior department
20       stores (such as Marshalls, TJ Maxx), or other stores selling clothing or equipment
21       for outdoor activities, (such as EMS, Work N Gear). Tenant's Exclusive Use shall
22       also not be applicable to specialty stores, (such as Best Buy, Circuit City, Toy's R
23       Us) provided such specialty store is operating in a manner substantiality similar to
24       the manner of operation in the majority of the stores such specialty store operates
25       in the northeastern United States. However, Landlord agrees not to lease any other
26       premises in the Shopping Center to a specialty store such as Dick's Sporting
27       Goods. Notwithstanding anything contained herein to the contrary, I the event that
28       any such specialty store shall assign its lease or sublet its premises, it may assign
29       its lease or sublet its premises to a user that sells merchandise covered by Tenant's
30       Exclusive Use, provided the area used for the sale or display of the merchandise
31       covered by Tenant's Exclusive Use, is not more than 20% of the specialty store's
32       premises square footage, and provided further that such area does not constitute
33       separately demised store with its own entrance and signage. It is understood and
34       agreed that the occupants of the premises currently operated by tenants, and
35       licensees, whose occupancy in the shopping or leases precede the date of this
36       Lease and their successors and assigns, (collectively a "Prior Tenant") shall ,
37       notwithstanding anything contained in this Lease to the contrary, not be subject to
38       Tenant's Exclusive Use. This Section 4.03A will not be applicable to any tenant in
39       the Shopping Center using the lesser of 20% or 2,000 square feet of its premises,
40       in the aggregate for the sale of Sporting Goods, Athletic Apparel and /or Athletic
41       Footwear, provided that no one category of each of (i) Sporting Goods, (ii)
42       Athletic Apparel, and (iii) Athletic Footwear shall exceed 1,000 square feet.

43

44    3. **R&S Foods, Inc**. – Landlord agrees that it will not rent any other space within the
45       Shopping center to any other tenant whose principal business is the operation of an
46       Italian delicatessen.  The foregoing restriction shall not apply to any store now or
47       hereafter leased, to a department store, or branch thereof, Junior Department store,
48       Variety store, discount store, drug store, supermarket, Sear's or Montgomery Ward
49       hardline store, catalog order store, stamp redemption center, theater, tire or rubber
50       store similar to Firestone, Goodyear or Goodrich, Gasoline Service Station, or the
51       successors or assigns of any of the above described tenants.

52

4. **Trans World Entertainment Corp.** – Landlord agrees that during the Term Landlord shall not grant to any tenant in the Shopping Center other than to an Excluded Entity the right to use no more than the lesser of (i) 20% of such store's rentable floor space and (ii) 400 square feet of rentable space in such tenant's store, for the display, sale and/or rental of prerecorded music and/or video tapes. The term "Excluded Entity" shall mean (i) Waldbaum's, Caldor and/or Pergaments and/or any successor, assignee or subtenant of any of such tenants, (ii) any occupant of any space in the Shopping Center now occupied by Waldbaums, Caldor and/or Pergaments and/or any successor, assignee or subtenant of any such tenants and/or (iii) (a) any tenant that is presently a tenant in the Shopping Center other than Waldbaums, Caldor and/or Pergaments and/or (b) any successor, assignee or subtenant of such tenant. Landlord agrees that any existing lease or other existing agreement with an Excluded Entity shall not be amended or modified in a manner as would expand an Excluded Entity's right to display, sell and/or rent such items unless Landlord is required to do so pursuant to its existing lease or other existing agreement with the Excluded entity. This provision shall not apply to Landlord during (i) the last 6 months of the last year of the initial Term if Tenant has not exercised its option to extend the initial term (ii) the last 6 months of the last year of the first extension period if Tenant has not exercised its option to extend the term for the second extension period and (iii) the last 6 months of the last year of the term if Tenant has exercised both extension options.

5. **A&P / Waldbaum's** – Landlord shall not lease any other store in the Shopping Center as (i) supermarket, (ii) for the principal purpose of the sale of fresh fruits and vegetables; and (iii) for the principal purpose of the sale of fresh or frozen meat but shall not apply to any store having a floor area of less than 3,000 s.f.

6. **Port Chester NY Golf Center, Inc.** – Landlord shall not enter into a lease with another tenant in the Shopping Center, which lease permits such tenant to use the premises predominantly for the retail sale of golfing equipment. The foregoing restriction shall not apply to any leases or renewals or replacements thereof affecting premises (a) currently occupied by Caldor, Pergament or Waldbaums or (b) to any space in the Shopping Center leased to a department store.

7. **Party City** – Landlord shall not grant any tenant other than an Excluded Entity the right to use more than 3,000 square feet of rentable space in the leased premises for the sale of party goods. The term Excluded Entity shall mean any Tenant that is (i) presently a tenant in the Shopping Center, (ii) a department store which leases in excess of 50,000 square feet of rentable space in the Shopping Center , (iii) a home improvement center, junior department store, discount department store, supermarket, catalog store or flea market, any of which leases in excess of 30,000 square feet of rentable space in the Shopping Center or (iv) any tenant or licensee or occupant of a flea market which flea market occupies in excess of 30,000 square feet of space in the Shopping Center or (v) any assignees or subtenants of the foregoing including, any subtenant of Caldors.

8. **Petsmart, Inc.** – As used in the Lease, the term "Tenant's Primary Business" shall mean, subject to compliance with the laws of any governing agency having jurisdiction and obtaining any necessary permits, the retail sale of (i) pets (including, but not limited to, fish, birds, reptiles, dogs, cats and other small animals), (ii) pet food, pet accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, such as grooming, pet day care, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment such as wild bird feeders, baths and feed, and (v) educational products and services related to any of the foregoing, and office and

storage uses incidental to the foregoing. From and after the date hereof and continuing throughout the Term of the Lease, Tenant shall have the exclusive right in the Shopping Center to conduct any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of this Section 2. All other tenants or other occupants of any portion of the Shopping Center, and any other real property which is located directly adjacent to the Shopping Center and which is owned and/or controlled by Landlord or by an entity which is owned and/or controlled by Landlord or an affiliate thereof, other than (x) existing tenancies as of the date of this Lease, their successors, replacements or assigns, or (y) tenants or future tenants in the Shopping Center occupying at least 45,000 square feet of Gross Floor Area, shall be prohibited from engaging in any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of this Section 2; provided, however, that the sale of the items listed in clauses (i), (ii) and (iii) of this Section 2 shall be permitted on an incidental basis (as defined herein). For purposes of this Section 2, the term "incidental" shall mean that the use occupies the lesser of (a) 1,000 square feet of Gross Floor Area, or (b) five percent (5%) of Gross Floor Area in the subject premises.

9. **A.I. Friedman** – Landlord covenants and agrees that throughout the Lease Term and any extensions thereof, Landlord shall not lease, license, or grant any other right to use or occupy, any portion of the Shopping Center to any person or entity if more then ten (10%) percent thereof is used for the retail sale of arts and crafts supplies or framing, floral or stationery (the term "stationery" applying only to retail stores such as Kate's Paperie that are devoted primarily or exclusively to the sale of stationery and not to "card shops"); provided, however, that nothing herein contained shall apply to (i) any tenant (or other person in possession) of premises in the Shopping Center pursuant to a lease existing as of the date hereof or any renewals extensions thereof, (ii) Bed Bath & Beyond, Home Goods, or similar types of operations, and/or (iii) any tenant (or other person in possession) of premises in the Shopping Center exceeding 45,000 rental square feet, including but not limited to space currently occupied by Kohl's or Waldbaum's; provided further, however, that the landlord shall not itself lease, license, or grant any other right to use or occupy, any premises in the Shopping Center, regardless of square footage, to a person or entity whose primary use is retail sale of arts and crafts supplies, such as Michael's (although Tenant acknowledges that any tenants under leases existing as of the date hereof or any renewals or extensions thereof may not be so restricted in terms of their ability to assign and/or sublet for such use).

10. **HomeGoods** - Landlord agrees that, from the date hereof until expiration of the term of this lease, no other premises in the Shopping Center shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of furnishings for the home including the following categories of items:  linens and domestics, window treatments, floor coverings, bathroom items, bedding, furniture (excluding children's furniture), wall décor, housewares, table top goods, glassware, flatware, cookware, kitchen utensils, giftware and/or closet, shelving and storage items and home accessories (all of the foregoing hereinafter referred to as a "Competing Use" and the merchandise referred to therein as the "Protected Merchandise"). The computation of such floor area shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Protected Merchandise.  The restrictions set forth in this paragraph with respect to Protected Merchandise shall not apply to:  (a) any existing tenants at the Shopping Center as of the date of this lease that is set forth on Schedule M hereto, (b) a full-line national or regional: (i) department store containing not less than fifty thousand (50,000) square feet of floor area (for

example, Wal-Mart, Macy's, Kohl's or Target), (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], (iii) arts and crafts store, or (iv) home improvement center [for example, Home Depot or Lowe's],   (b) a Restoration Hardware; (c) a Pottery Barn; (d) a Crate & Barrel; (e) a William Sonoma, (f) a Buy, Buy Baby, (g) any store selling primarily mattresses, and (h) one (1) store selling primarily furniture.  In addition, if the Demised Premises shall be closed for business to customers for any period of one hundred eighty (180) consecutive days or more, other than as the result of a cause or event referred to in Articles X or XI or Section 18.3 hereof, then the provisions of this Paragraph 4(B) shall be of no further force or effect, provided, that if the Demised Premises re-open for business the provisions of this Paragraph 4(B) shall be revived, subject to any leases entered into by Landlord while the provisions of this Paragraph were not in force and effect.

1  Exhibit K-2
2  Existing Leases

3  Store Name (legal tenant name)

4  Angel Tip Nails (Sook Ja of NY Inc.)

5  Jembro(Jembro Stores of Portchester)

6  Mandees(Big M Inc.)

7  Party City(R & R Party City Inc.  )

8  Kohl's(Kohl's Illinois Inc)

9  HomeGoods (HomeGoods Inc.)

10  Vitamin Shoppe (Vitamin Shoppe Industries Inc.  )

11  Pizza Pasta & Things (Clino Pizza & Restaurant Inc.)

12  Route 1 Dry Cleaners Inc. (US 1 Dry Cleaners Inc.)

13  Wine Easy Corp (Liquor Land, Inc.)

14  Empire State Flea Market (Empire State Flea Market, Inc)

15  Joyce Leslie (Joyce Leslie, Inc.)

16  Casual Male (Casual Male Retail Store, LLC)

17  Dress Barn (Dress Barn, Inc. )

18  Nandos Beauty Salon (Nandos Beauty Salon, Ltd)

19  Bank of America (Bank of America, N.A.)

20  Jones NY (Jones Retail Corp)

21  A I Friedman(A.I. Friedman L.P.)

22  Vision World (Vision World)

23  Carvel (Bing Kwan)

24  R& S Foods(R& S Foods Inc. )

25  Coconuts (Record Town Inc.)

26  Tyson & Co. Jewelers (Tyson & Co. Jewelers LLC.)

27  Staples (Staples Inc.)

28  A&P (The Great Atlantic & Pacific Tea Co.)

29  Verizon Wireless (New York SMSA  Limited Partnership)

30  Petsmart(Petsmart Inc.)

31  Modells (Modells's NY II, INC.)

32  Portchester NY Golf Center (Porchester NY Golf Center Inc.)

1807454 v8

1    Leapin Lizards (Rodgers Realty and Recreation Inc.)

1                                          Exhibit L

2                                        Alternate Rent

3          1.        During the applicable period(s) described within Section 2.5 and/or Article
4    22 of the Lease, Tenant shall pay as *"**Alternate Rent**"* an amount equal to three (3%)
5    percent of all "Gross Sales" (hereinafter defined) resulting from business conducted in, on
6    or from the Premises, not to exceed the amount of Fixed Rent which otherwise would
7    have been payable during such period (the *"**Cap**"*).

8          2.        As used herein, the term *"**Gross Sales**"* shall mean the total amount of all
9    sales of merchandise or services completed at the Premises by Tenant or any sublessee,
10   licensee or concessionaire of Tenant and any other person or entity operating in the
11   Premises (for purposes of this Paragraph 2 only, collectively, *"**Tenant**"*), whether for
12   cash, credit or otherwise, including redemption of gift certificates and gift cards
13   (regardless of where or how such gift certificates and gift cards were purchased).  Tenant
14   shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, .
15   credit or otherwise, in a cash register or cash registers, or in such electronic or computer
16   device which records sales in a manner which is generally acceptable by industry
17   standards.  The term *"Gross Sales"* shall exclude: **(1)** proceeds from any sales tax, gross
18   receipts tax or similar tax, by whatever name called, which are separately stated and are in
19   addition to the sales price, **(2)** *bona fide* transfers or exchanges of merchandise from the
20   Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and
21   returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers
22   for merchandise returned or exchanged at the Premises (regardless of where or how
23   purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of
24   Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when
25   written off the books of Tenant, provided that any collections made on account of such
26   bad debts shall be included in Gross Sales when received, **(6)** receipts from vending
27   machines installed solely for the use of Tenant's employees and receipts from pay
28   telephones, **(7)** sales to employees of Tenant at discount [which, for the purposes of
29   determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales
30   per calendar year or pro rata portion thereof, as applicable], **(8)** fees paid to independent
31   third party credit card, charge card, and debit card companies in connection with sales
32   charged to or debited from customers' credit cards, charge cards, or debit cards, as
33   applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges [which,
34   for the purposes of determining Alternate Rent hereunder, shall not exceed two percent
35   (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], **(10)**
36   sums and credits received in settlement of claims for loss or damage to merchandise, **(11)**
37   separately stated service, finance and interest charges, **(12)** the dollar value of coupons
38   utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or
39   bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates or gift
40   cards, and **(15)** forfeited deposits.

41         3.        Alternate Rent shall be payable within thirty (30) days after the end of the
42   calendar month to which it pertains.  If the Alternate Rent for a calendar month does not
43   exceed the Cap, such payment shall be accompanied by a statement prepared by an officer
44   of Tenant setting forth the amount of Gross Sales achieved during, and the amount of
45   Alternate Rent payable for, such month.

46         4.        Tenant shall maintain at the Premises or at its principal office, complete
47   books and records reflecting all elements of Gross Sales.  Tenant shall be permitted to
48   maintain its books and records in a computerized form; provided, however, that (A) such
49   computerized books and records provide the same level of information as the books and
50   records described above and are retained for the full record retention period provided for
51   herein, and (B) promptly upon request, printed copies of any such books and records shall
52   be made available at Tenant's principal office for inspection by Landlord's

1     representatives who are engaged in inspecting and/or auditing Tenant's books and records
2     as provided herein.  Such books and records shall be kept in accordance with generally
3     accepted accounting principles (or successor accounting standards) and practices
4     consistently applied and shall be retained by Tenant for not less than one (1) year
5     following the end of the calendar year to which they refer.

6         5.      Provided that the Alternate Rent payable for a calendar month does not
7     exceed the Cap, Landlord and/or its auditor shall have the right, upon at least thirty (30)
8     days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to
9     Gross Sales achieved in the Premises for such calendar month.

10        6.      Landlord shall not disclose to any third party Tenant's Gross Sales or the
11    amount of Alternate Rent paid or payable by Tenant, provided, however, that (A) such
12    information was not previously disclosed by Tenant to such third party or to the public
13    generally, and (B) nothing contained herein shall restrict Landlord from disclosing such
14    information as may be required by law, or to its accountants, attorneys, *bona fide*
15    prospective purchasers, or current or prospective Mortgagees or Ground Lessor(s) of all
16    or any portion of Landlord's interest in the Shopping Center (provided that each of such
17    recipients shall be bound to the same non-disclosure provisions as are imposed upon
18    Landlord).

<u>Exhibit M</u>

<u>Prohibited Uses</u>

As used in this Lease, the term *"**Prohibited Uses**"* shall mean any of the following uses:

(1)     Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)     Any operation primarily used for any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation and any storage facility, except for storage facilities in the area designed as the *"**Lower Level**"* of the Shopping Center as set forth on <u>Exhibit B</u> to this Lease;

(3)     Any "second hand" store, "surplus" store, except in the Lower Level of the Shopping Center.

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)     Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)     Any central laundry, central dry cleaning plant or laundromat except that this provision shall not prohibit laundromats on the Lower Level of the Shopping Center nor shall this provision prohibit dry cleaners in the Shopping Center that perform all dry cleaning outside the Shopping Center and are located more than 150 feet from the Premises;

(8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)     Any bowling alley or skating rink;

(10)    Any movie theater, night club or live performance theater, except for a movie theater in the area labeled *"**A&P Parcel**"* on <u>Exhibit B</u> to this Lease;

(11)    Any living quarters, sleeping apartments or lodging rooms except on the A&P Parcel;

(12)    Any veterinary hospital or animal raising facility or boarding facilities except that this prohibition shall not prohibit pet shops or pet supply stores from having veterinary services and boarding facilities which are incidental thereto so long as such shops or stores are located at least 100 feet from the Premises;

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines

M

and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, except, subject to item 33 below, sales of alcoholic beverages for on-site consumption incidental to a restaurant and except establishments selling alcoholic beverages for off-site consumption located more than 100 feet from the Premises;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall except that a flea market shall continue to be able to be operated on the Lower Level of the Shopping Center either in its current location or in other Lower Level space;

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable (i) to the A&P Parcel, (ii) in the building labeled "Savin Building" on Exhibit B to this Lease, or (iii) to on-site employee training by an occupant of the Shopping Center incidental to the conduct of its business at the Shopping Center;

(20)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by an occupant of the Shopping Center;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)    Any carnival, amusement park or circus;

M

(26)    Any medical clinics or medical offices, except medical offices in the Savin Building or on the A&P Parcel shall be permitted;

(27)    Any office use, other than: (w) offices located on the A&P Parcel, (x) office space used in connection with and ancillary to a use not prohibited hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in Westchester County, New York (for example, financial services, real estate brokerage, insurance agency, banking, or travel agency), provided that the office uses described in (y) do not exceed twenty thousand (20,000) square feet of Floor Area, in the aggregate;

(28)    hotel/motel;

(29)    daycare center;

(30)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's"), except that such use may be permitted in any premises located at least 200 feet from the Premises;

(31)    karate center, except that such use may be permitted in any premises located at least 200 feet from the Premises;

(32)    movie theater, except on the A&P Parcel;

(33)    restaurant serving meals except those located at least 200 feet away from the Premises;

(34)    beauty parlor or nail salon, except for a beauty parlor or nail salon located at least 100 feet from the Premises;

(35)    health spa, exercise facility or similar type business, except for a nationally or regionally recognized health spa, exercise facility or similar business located either on the Lower Level of the Shopping Center or otherwise at least 200 feet from the Premises; or

(36)    a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job" except on the Lower Level; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction and so called "Dollar Stores" shall be deemed not to violate the foregoing restriction.

M

Exhibit N

Form of Mechanics' Lien Indemnification Agreement

THIS MECHANICS' LIEN INDEMNIFICATION is made this _____ day of _____, 20__, by BED BATH & BEYOND INC., a New York corporation (hereinafter referred to as *"Tenant"*), for the benefit of AVR PORTCHESTER, LLC, a Delaware limited liability company ("***Landlord***").

WITNESSETH

Landlord and Tenant have entered into a Lease (the *"Lease"*) dated _____, 20__, whereby Landlord has leased to Tenant a portion of the real property located in the Port Chester Shopping Center (the *"Shopping Center"*) and Tenant has constructed on such real property a store premises (the *"Premises"*).

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the Tenant agrees as follows:

1.    Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center based upon materials or services provided under contract with Tenant.  In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

2.    Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center.  This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

EXECUTED this _____ day of _____, 20___.

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By:       _____
Name:   _____
Title:    _____