# EXHIBIT "B"

LEASE

BETWEEN

## ML-MJW PORT CHESTER SC OWNER LLC
### (LANDLORD)

AND

## TARGET CORPORATION
### (TENANT)

RECITALS
ARTICLE 1:  DEFINITIONS
ARTICLE 2:  DEMISE AND TERM
ARTICLE 3:  FIXED RENT
ARTICLE 4:  COMMON ELEMENT CHARGES, TAXES, AND OTHER CHARGES
ARTICLE 5:  USE; SIGNAGE
ARTICLE 6:  INITIAL IMPROVEMENTS; ALTERATIONS
ARTICLE 7:  MAINTENANCE
ARTICLE 8:  LEGAL COMPLIANCE
ARTICLE 9:  ASSIGNMENT AND SUBLETTING
ARTICLE 10:  REPRESENTATIONS, WARRANTIES AND COVENANTS
ARTICLE 11:  SURRENDER; HOLDING OVER
ARTICLE 12:  DEFAULT
ARTICLE 13:  INSURANCE AND INDEMNITIES
ARTICLE 14:  CASUALTY
ARTICLE 15:  CONDEMNATION
ARTICLE 16:  MISCELLANEOUS
SCHEDULE AND EXHIBITS

<u>LEASE</u>

This Lease (the "**Lease**") is dated _Jun 15_____, 2020 (the "**Effective Date**") and is by and between ML-MJW PORT CHESTER SC OWNER LLC, a Delaware limited liability company (the "**Landlord**"), and TARGET CORPORATION, a Minnesota corporation (the "**Tenant**").

RECITALS

A.     Landlord holds a ground leasehold estate (the "**Leasehold**") in approximately thirty (30) acres of real property described on the attached <u>Exhibit A</u> (the "**Land**"). There has been constructed on the Land (i) a two level building consisting of approximately 89,781 square feet of Floor Area in the aggregate (the "**Building**"), which amount of Floor Area is fixed and stipulated and shall not be subject to remeasurement except in the event of casualty, redevelopment, or other similar circumstances creating changes such as a material change in the size of the Premises or any of the Adjacent Buildings, (ii) other buildings consisting of approximately 414,431 square feet of Floor Area in the aggregate (the "**Adjacent Buildings**"), (iii) parking fields containing approximately 1,431 parking spaces (the "**Parking Lot**") and (iv) all other improvements and appurtenances, all as shown on the site and floor plans attached hereto as <u>Exhibit B</u> (collectively, the "**Plans**"). The Leasehold, the Building, the Adjacent Buildings, the Parking Lot, and all other improvements and appurtenances constructed on the Land are collectively referred to herein as the "**Property**."

B.     Tenant desires to lease from Landlord the Premises (as more fully defined herein) consisting of approximately 89,781 square feet of Floor Area in the aggregate (composed of approximately 38,432 square feet of Floor Area on the upper level and 51,349 square feet of Floor Area on the lower level), and Landlord desires to lease the Premises to Tenant.

C.     Subject to the terms and conditions of this Lease, Landlord and Tenant have agreed that the Premises must be delivered by Landlord to Tenant on the Delivery Date (as hereinafter defined) in accordance with the Delivery Conditions (as hereinafter defined).

NOW THEREFORE, Landlord and Tenant, for valuable consideration, hereby agree to perform all of the terms, covenants, conditions and agreements herein provided to be kept and performed by Landlord and Tenant, respectively.

**ARTICLE 1 - DEFINITIONS**

Capitalized terms used in this Lease have the meanings specified in **Schedule 1** attached to this Lease (or the meaning specified elsewhere in this Lease), unless the context clearly indicates otherwise.

Case 23-11209-VFP   Doc 1066-4   Filed ...   Entered ... 16:03:09   Desc
Exhibit B - Part 1   Page 3 of 50

**ARTICLE 2 - DEMISE AND TERM**

2.1     <u>Demise</u>.

(A)     Landlord hereby demises and leases the Premises unto Tenant and Tenant hereby takes and accepts the same from Landlord upon the terms and conditions set forth

1

in this Lease, together with all rights, benefits, licenses, appurtenances, and hereditaments attaching, belonging, or pertaining to the Premises or to the Property, including the exclusive right to use the Exclusive Areas and the non-exclusive right to use the Common Elements.

(B)     Notwithstanding any other provision in this Lease, Tenant and its Permittees shall have no obligations for the Property until the Delivery Date unless Tenant or its Permittees enter the Property pursuant to Section 2.7 below, in which case Tenant's obligations under Article 13 shall apply during such entry with respect to Tenant's Work.

2.2     Term; Extensions.

(A)     The initial term of this Lease (the "**Initial Term**") commences on the Effective Date and continues until 11:59 P.M. on the last day of the fifteenth (15th) Lease Year.

(B)     Landlord hereby grants Tenant the right, at Tenant's option, to extend the Initial Term for six (6) consecutive periods of five (5) Lease Years each upon the same terms and conditions applicable during the Initial Term, unless specifically indicated otherwise (each, an "**Extension Term**"). The Initial Term, as may be extended by any Extension Term(s), is referred to herein as the "**Term**".

(C)     Not more than nine (9) months before the expiration of the Initial Term and any Extension Term, Landlord shall give Tenant notice of the expiration date of such Initial Term or Extension Term, as the case may be (each, a "**Reminder Notice**"). If Tenant wishes to extend the Term, Tenant may do so by giving Landlord notice on or before the later of (i) the date that is six (6) months before the expiration of the Initial Term or the then current Extension Term, as the case may be, and (ii) the date that is thirty (30) days after Landlord delivers to Tenant a Reminder Notice for the Initial Term or then current Extension Term, as the case may be. The time extension in clause (ii) set forth in this Section 2.2(C) is the sole consequence of Landlord's failure to provide a Reminder Notice.

2.3     Additional Rights. Subject to the terms and conditions of this Lease, Landlord hereby grants the following rights to Tenant (and to Tenant's Permittees, as appropriate) during the Term:

(A)     A non-exclusive right to use the Common Elements for all purposes for which they are intended in common with others entitled to use the same.

(B)     An exclusive right to use the Exclusive Areas for the ordinary purposes for which they were intended, together with such access to the Exclusive Areas as is reasonably necessary for such purposes.

(C)     A non-exclusive right, subject to Landlord's reasonable approval as to particular location and manner of installation, to install, operate and maintain Utilities exclusively serving the Premises within and through those portions of the Common Elements reasonably necessary therefor, in each case together with such access within the Building as is necessary to accomplish the same.

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 00:00:00   Desc Exhibit B - Part 1   Page 4 of 50

(D)     The right to install, operate, maintain, repair and replace the Tenant's Signs described in Section 5.5 below, together with a license for access over, under, upon, through and across the Property to install, maintain and operate Utilities necessary to provide the Tenant's Signs and accent lights with power to illuminate the same.

(E)     A temporary license for access and passage over and across such portions of the Property, subject to Landlord's reasonable approval as to the particular location and manner of installation, as is reasonably necessary for Tenant to construct, alter and/or maintain improvements and equipment within or serving the Premises.  Tenant may not use such license in a manner that unreasonably interferes with the use and operation of such portions of the Property.

(F)     The right to (i) attach Tenant's Improvements and Tenant's Property to the Building, including the right to penetrate floor and ceilings slabs to the extent reasonably necessary and (ii) install, operate, repair and replace Utilities in the space below the floor slab underneath the Premises.

(G)     A non-exclusive right to access, view, record, and obtain copies from Landlord of security video footage and related documentation that is kept by Landlord in the ordinary course of business if associated with an incident within the Premises, relating to a Permittee of Tenant within the Common Elements, or with respect to a Claim as to which Tenant or its Permittee might reasonably be made a party or held liable.

2.4     <u>Covenant of Quiet Enjoyment</u>.  Subject to the provisions of Article 12 below and of the SNDAs referenced in this Lease, Landlord covenants that Tenant shall peaceably and quietly have, hold and enjoy the Premises and the Exclusive Areas and all other rights, benefits and privileges herein set forth without hindrance or molestation.  Landlord waives any right, title and interest, and any security interest, landlord's lien (whether by statute, common law or otherwise) and right of distress/distraint for rent, if any, Landlord may now or hereafter acquire with respect to Tenant's Property.  Landlord shall from time to time execute such documents as Tenant may reasonably request to acknowledge such waiver.

2.5     <u>Early Termination Rights</u>.  Subject to the terms and conditions of this Lease, the following early termination rights are in addition to any other termination right or provision set forth in this Lease:

(A)     Tenant may, in Tenant's sole discretion, terminate this Lease upon thirty (30) days' notice to Landlord if the Delivery Date has not occurred on or before July 1, 2021 (as such date is extended by Pandemic Delay, the "**Final Delivery Date**"); provided, however, if the Delivery Date has not occurred within sixty (60) days after the Final Delivery Date and Tenant has not exercised its termination right on or before the end of such 60-day period, then Tenant's termination right under this Section 2.5(B) shall be deemed waived by Tenant; provided further however, that if the Delivery Date has not occurred by January 1, 2022, then this Lease shall automatically terminate.

(B)     Tenant may, in Tenant's sole discretion, terminate this Lease upon thirty (30) days' notice to Landlord if Landlord has not supplied an SNDA from every lender,

Case 23-13359-VFP    Doc 1066-4    Filed 06/27/23    Entered 06/27/23    Page 5 of 50
Exhibit B - Part 1    Page 5 of 50

mortgagee and other party holding a monetary lien (regardless of whether against the Landlord's interest or against Fee Owner's interest) with respect to the Property on or before the date that is sixty (60) days following the Effective Date.

(C)     Tenant may, in Tenant's sole discretion, terminate this Lease upon thirty (30) days' notice to Landlord if Landlord has not supplied a recognition and non-disturbance agreement from Fee Owner in the form attached hereto as Exhibit P (the "**Recognition Agreement**") on or before the date that is sixty (60) days following the Effective Date; provided however, that even if waived, Landlord must continue to use due diligence to obtain the Recognition Agreement.

(D)     To deliver the Premises to Tenant, Landlord must first cause the existing tenants of the Premises, Dave's Dollar and Jembro (the "**Premises Tenants**") to vacate the Premises (the "**Premises Vacation**"). Landlord represents and warrants that it has obtained the right either to terminate each such lease or relocate each such tenant on terms consistent with this Lease (the "**Premises Removal Rights**"), and shall provide Tenant with written evidence thereof within thirty (30) days of the Effective Date of this Lease. Tenant may, in Tenant's sole discretion, terminate this Lease upon ten (10) days' notice to Landlord if Landlord has not supplied evidence of the Premises Removal Rights to Tenant within fifteen (15) days of the Effective Date. If Tenant waives the contingencies in (A) and (B) above, then Landlord will promptly exercise both Premises Removal Rights and provide evidence thereof to Tenant.

2.6     Required Delivery Date. The anticipated Delivery Date is May 11, 2021 subject to per diem extensions as a result of: (i) Force Majeure Event, except for delays described in clause (ii); (ii) any delay in obtaining permits and approvals (including the Landlord Approval Items) from Governmental Authorities (including due to the Pandemic or other Force Majeure) so long as such delay in obtaining such permits and approvals is not attributable to Landlord's failure to pursue such matters with due diligence and Landlord complies with the "**Permissible Delay Notice Requirements**" set forth below; or (iii) Tenant Delays [all of clauses (i) through (iii) being collectively "**Permissible Delays**"]. The "**Required Delivery Date**" shall be the anticipated Delivery Date as extended on a per diem basis by any Permissible Delays.

In addition to the right to terminate this Lease under Section 2.5, if the Delivery Conditions have not been satisfied by the Required Delivery Date, then Landlord must pay Tenant (collectively, the "**Late Delivery Charge**"):

(A)     $1,500 for each day after the Required Delivery Date until the Delivery Conditions are met and the Delivery Date occurs, for the first sixty (60) days; and

(B)     $2,000 for each day, upon the sixty-first (61st) day after the Required Delivery Date, until the Delivery Conditions are met and the Delivery Date occurs after the first sixty (60) days.

Landlord acknowledges that (1) Tenant shall incur substantial damages if the Delivery Date does not occur by the Required Delivery Date (including acceleration, storage, and contractor costs), and (2) the Late Delivery Charge is a reasonable estimate of such damages. If Landlord does not

4

pay the Late Delivery Charge within ten (10) days after written demand by Tenant, Tenant may (x) sue to collect such amount, or (y) offset the Late Delivery Charge against any amounts owed Landlord by Tenant. The obligations under this Section 2.6 shall survive any termination of this Lease. In addition, in the event that Tenant opens for business at the Premises to the general public then Late Delivery Charges shall, even if the Delivery Date has not yet occurred, cease accruing as of such date.

If this Lease is terminated before Tenant opens for business at the Premises to the general public, then the maximum Late Delivery Charges for which Landlord is liable shall not exceed a cumulative total of Two Hundred Fifty Thousand Dollars ($250,000.00).

Landlord may only treat a delay in obtaining permits and approvals from Governmental Authorities as a Permissible Delay only so long as Landlord has (aa) used commercially reasonable efforts and due diligence to obtain such permits and approvals, and (bb) advised Tenant of the circumstances supporting such claim by the earlier of (bb-i) fifteen (15) days after knowledge of such delay, or (bb-ii) December 6, 2021. These clauses (aa) and (bb) are the "**Permissible Delay Notice Requirements**".

    2.7    <u>Early Entry</u>.

    (A)    Before the Delivery Date, Tenant and its Permittees may enter the Property on such dates and times as agreed upon by Landlord and Tenant, in their respective reasonable discretion, for the purpose of Tenant and its Permittees performing measurements and testing within the Property.

    (B)    If the Delivery Date has not occurred by the Required Delivery Date, but Landlord's Work is sufficiently completed to allow for all or a portion of Tenant's Work to be commenced, then, in Tenant's sole discretion and provided that the insurance requirements of the Lease have been satisfied, upon at least five (5) days' notice to Landlord, Tenant and its Permittees may enter the Property and begin Tenant's Work. Landlord and Tenant shall coordinate the performance of their respective contractors so as to minimize any interference with the performance of such work by either party. No entry onto the Property and no work by Tenant and its Permittees shall affect any of Landlord's obligations under this Lease, and the Delivery Date shall not occur until Landlord has met the requirements for the Delivery Date to occur.

    2.8    <u>Pandemic Delays</u>.

    (A)    Notwithstanding anything to the contrary in this Lease, to the extent that Tenant is or reasonably expects to experience a Pandemic Delay, then Tenant may elect, in Tenant's sole discretion, to:

    (i)    refuse to accept the delivery of the Premises until the end of the Pandemic Delay Period and delay the Delivery Date (even if the Delivery Conditions are satisfied and the Delivery Date would otherwise occur) by the amount of time of equal to the Pandemic Delay Period, and/or

Case 23-13359-VFP    Doc 1066-4    Filed 06/27/23    Entered 06/27/23 ...    Exhibit B - Part 1    Page 7 of 50

(ii)     have the payment of Rent (including the Rent Commencement Date) delayed by the amount of time equal to the Pandemic Delay Period, but if Tenant opens for business at the Premises to the general public then Rent will commence as of the date thereof.

Tenant is entitled to the benefit of both clauses (i) and (ii) above to the extent applicable.

(B)     Notwithstanding anything to the contrary in this Lease, to the extent that Landlord experiences a Pandemic Delay, then all of Landlord's obligations with respect to the delivery of the Premises (including those pertaining to the Delivery Date, Premises Vacation, Landlord's Work, and the Required Delivery Date) shall be delayed by the amount of time equal to the Pandemic Delay Period, which is a Force Majeure Event.

(C)     The following defined terms are applicable to this Section 2.8:

(i)     **"Contemplated Activities"** are (i) accepting the Premises from Landlord as of the Delivery Date, (ii) occupying the Premises, (iii) performing Tenant's Work, or fixturing and furnishing the Premises, (iv) upon completion of Tenant's Work, obtaining a final certificate of occupancy (or equivalent) for the Premises to open to the public as a retail store including the Initially Intended Use, and/or (v) from operating (including staffing) for the Initially Intended Use within the Premises.

(ii)     **"Pandemic"** means the infectious disease designated as "2 (SARS-CoV-2)", also commonly referred to as "COVID-19" or simply "the Coronavirus", including any mutation or similar evolution thereof.

(iii)     **"Pandemic Delay"** means (i) Tenant is or reasonably expects to be limited, delayed, or prohibited, directly or indirectly, by the Pandemic from performing any one or more of the Contemplated Activities, or (ii) Landlord is limited, delayed, or prohibited, directly or indirectly, by the Pandemic from satisfying the Delivery Conditions or causing the Delivery Date (including as of the Required Delivery Date) to occur.

(iv)     **"Pandemic Delay Period"** means the total aggregate amount of delay to Landlord or Tenant actually caused by the Pandemic Delay, plus a reasonable time for re-mobilization, whether on one or more occasions.

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 11:03:09   Desc
Exhibit B - Part 1   Page 8 of 50

(D)     For the avoidance of doubt, the provisions set forth above are (i) in addition to the benefit of any provisions a party is entitled to under this Lease to the extent applicable, including the provisions relating to Force Majeure Events, (ii) not limited by the provisions applicable to Force Majeure Events pursuant to any other provision of this Lease, and (iii) available to each party regardless of such party's current knowledge of any actual or potential Pandemic Delay.

## ARTICLE 3 - FIXED RENT

3.1     Fixed Rent; Rent Commencement Date.  Tenant shall pay the following fixed rent to Landlord ("**Fixed Rent**") in advance on or before the first day of each calendar month at the notice address of Landlord provided herein or such other address as Landlord may designate from time to time by notice:

(A)     Commencing on the Rent Commencement Date and continuing for the remainder of the Term, Tenant shall pay the monthly amounts set forth in the Fixed Rent Schedule on the attached Exhibit E.

(B)     The "**Rent Commencement Date**" is the earlier to occur of (i) the first Opening Date that is at least two hundred seventy (270) days after the Delivery Date (provided, however, that this 270-day period shall be reduced day-for-day for any Tenant Delay), or (ii) Tenant's opening for business at the Premises to the general public. Notwithstanding the foregoing in this Section 3.1(B), (x) the Rent Commencement Date shall not occur until the first Opening Date after the date upon which Landlord's Work (including all Punch List items, if any) has been completed in accordance with the Delivery Specifications and, to the extent necessary for Tenant to obtain a final certificate of occupancy or equivalent for the Premises, Landlord has obtained a final certificate of occupancy or equivalent for Landlord's Work, and (y) if Tenant elects, in Tenant's sole and absolute discretion, to open for business with the general public prior to Landlord's having completed Landlord's Work, then until Landlord's Work is completed, Tenant shall pay Fixed Rent equal to (1) seventy percent (70%) of such amounts otherwise payable in accordance with this Lease if such uncompleted Landlord's Work is material, or (2) if such uncompleted Landlord's Work is solely Punch List Items or is not material, then ninety-five percent (95%) of such amounts otherwise payable in accordance with this Lease until Landlord's Work including all Punch List Items have been completed in accordance with the Delivery Specifications.

(C)     Following the Rent Commencement Date, Landlord and Tenant shall execute, acknowledge and exchange duplicate originals of a recordable agreement in the form on the attached Exhibit L confirming the Rent Commencement Date, the expiration date of the Initial Term, and the dates of each Extension Term.

(D)     Tenant has no obligation to pay any sort of percentage rent, nor any obligation to report to any party any sales, income or other figures.

## ARTICLE 4 COMMON ELEMENT CHARGES, TAXES, AND OTHER CHARGES

4.1     Common Element Charges, Common Element Insurance Charges.  Commencing on the Rent Commencement Date, and on the first day of each month thereafter during the Term, Tenant shall pay to Landlord, as additional rent, Tenant's Proportionate Share of (i) the Common Element Charges actually incurred by Landlord, (ii) the Administration Fee, in equal monthly payments, in advance based upon the Budget, all as more specifically set forth in Section 7.3 hereof, including the limitations and the Cap set forth in Section 7.3(A) thereof, and (iii) the Common Element Insurance Charges actually incurred by Landlord, including the limitations and

the Insurance Cap set forth in Section 7.3(A) thereof.

4.2    Taxes.

(A)    Commencing on the Rent Commencement Date, Tenant shall pay (subject to the limitations and the Tax Cap set forth below), as additional rent (but payable to Landlord only as set forth in this Section 4.2(A)), Tenant's Proportionate Share of Taxes (prorated on a daily basis for partial years) to Landlord at least fifteen (15) days before the date on which interest or penalties may be assessed by the taxing authority, but Tenant is not obligated to pay such share any sooner than thirty (30) days after Landlord has given Tenant a demand for payment accompanied by (i) a copy of the tax statement(s) rendered by the Governmental Authority(ies) for which such demand for payment is made, (ii) tax receipts or other reasonable, written evidence that Taxes have been paid for the previous payment period, and (iii) a statement indicating the basis upon which Tenant's Proportionate Share of Taxes were calculated, including a certification as to the aggregate number of square feet Floor Area within the Premises and the Property, and indicating the last date each installment of Taxes may be paid without interest or penalty. Landlord shall pay the Taxes before delinquency.

(B)    Tenant's Proportionate Share of Taxes for the first Lease Year may not exceed Six and 50/100 Dollars ($6.50) per square foot of Floor Area. Thereafter, Tenant's Proportionate Share of Taxes may not increase by more than two and one-half percent (2.5%) from the amounts paid during the last twelve (12) months of the previous Lease Year (the "Tax Cap"). The risk associated with any increase in Taxes above these amounts is assumed by Landlord.

(C)    Landlord may not voluntarily subject the Property nor the Premises to any special assessments, any assessment district applicable to less than the entire area under the authority of the applicable taxing authority, or any other governmental or quasi-governmental financing for the payment of any on or off-site improvements, except at Landlord's sole cost and no such assessment, tax or levy shall be part of Taxes hereunder.

(D)    With respect to Taxes (or any permitted portion thereof) that may, in compliance with Governmental Requirements, be paid over a period of more than one tax year in installments, Landlord must elect to either:

(i) pay such Taxes in installments over the longest period permitted by Governmental Requirements, and Tenant will only be liable for Tenant's Proportionate Share of such installments that are payable during the Term; or

Case 23-13269-VFP Doc 1066-4 Filed 06/27/23 Entered 06/27/23 11:02:09 Desc Exhibit B - Part 1 Page 10 of 50

(ii) pay such Taxes immediately, but in such case Tenant will only be liable for Tenant's Proportionate Share of Taxes as if Landlord had made the election to pay such Taxes in installments as provided in 4.2(D)(i) above.

(E)    If Landlord is delinquent in the payment of Taxes and fails to pay such delinquent Taxes or other sums within thirty (30) days after notice from Tenant, Tenant may pay such Taxes, other sums, interest and penalty, if any, and deduct from Rent the amount so paid, together with interest on such amount at the Default Rate until paid or

8

credited to Tenant.

(F)     If Landlord contests the validity or amount of any taxes and/or assessments covering the Premises, Tenant is entitled to collect, and Landlord must pay to Tenant, if Landlord collects the same, net of Landlord's expenses of obtaining such refunds, or portions thereof, any refunds, or portions thereof, attributable to Taxes previously paid by Tenant.

4.3    <u>Utility Charges</u>.  Except for those utilities that are separately metered or sub-metered to the Premises and as otherwise provided in this Section 4.3, Tenant shall have no responsibility for any costs or charges for the consumption of water, gas, electricity, telecommunications and other utilities serving the Property (the "**Utility Charges**").  All costs and charges for sewer rents and for water charges for fire sprinkler system shall be paid or caused to be paid in a timely manner by Landlord.  Utility charges for Common Elements may be included in Common Element Charges to the extent in accordance with this Lease.  Commencing on the Delivery Date and throughout the Term, Tenant is responsible for all Utility Charges that are separately metered or sub-metered to the Premises (as well as allocated charges, not directly metered, for sewer rents to the extent such charges are based upon Tenant's consumption of water and for water charges for fire sprinkler system based directly upon the system serving the Premises) and shall pay the same directly to each respective utility provider (in the case of a meter) or to Landlord within thirty (30) days following receipt of an invoice therefor (in the case of a sub-meter off of service to Landlord).

4.4    <u>Trash Removal</u>.  After the Delivery Date, Tenant shall dispose of all trash generated from the Premises.  Tenant shall, at its sole cost, remove and dispose of the trash generated from the Premises.

4.5    <u>Books and Records</u>.  Within three (3) years after the later of (i) the date charges set forth in this Article 4 (the "**Charges**") are due and payable, or (ii) the issuance of the Reconciliation (defined in Section 7.3), Tenant may review Landlord's books and records pertaining to any or all of such Charges.  Tenant shall provide Landlord notice at least fifteen (15) days before the designated review date.  The cost of any review is assumed by Tenant, unless Tenant is entitled to a refund in excess of three percent (3%) of the amount calculated by Landlord as Tenant's obligation with respect to the Charge(s), in which case Landlord shall pay the reasonable cost of such review.

## ARTICLE 5– USE; SIGNAGE

5.1    <u>Use of Premises</u>.

(A)     Nothing contained in this Lease imposes upon Tenant, either directly, indirectly, constructively or implicitly, an obligation to construct any Tenant's Improvements, to install fixtures or merchandise in the Premises, to open for business, or to remain open and operating for any period or in accordance with any operating schedule, procedures or methods.

(B)     Subject to Section 5.2, Tenant may use the Premises for any lawful Retail Use not otherwise prohibited or restricted pursuant to this Lease, including the right to

9

adjust and/or change merchandising and service mix to reflect current strategies then being offered in Tenant's other business operations. However, if less than eighty percent (80%) of the Floor Area in the Property (excluding the Premises and Redevelopment Area from the numerator and denominator of this calculation) which is then operating for any use is being operated for Retail Use, then Tenant may use the Premises for any lawful use not otherwise prohibited or restricted pursuant to this Lease.

(C)     Landlord represents and warrants to Tenant that there are no private use restrictions applicable to this Lease (via other tenant leases at the Property or otherwise) other than the Existing Use Restrictions.  Tenant shall not violate the Existing Use Restrictions.  Landlord agrees not to impose any other use restrictions on this Lease during the Term.

(D)     The Existing Use Restrictions are enforceable solely on the basis of the Existing Occupancy Agreement(s) for the sole benefit of each Existing Occupant under such Existing Occupancy Agreement, and only during the term of such Existing Occupancy Agreement (including any existing renewals provided for in such current Existing Lease), and are not intended as a benefit to Landlord independent of the rights of Existing Occupants.  In furtherance thereof, Landlord hereby releases, solely on behalf of itself, its successors, assigns, and affiliates, any rights Landlord holds relating to the Existing Use Restrictions to enforce the Existing Use Restrictions against Tenant, other than Landlord's right to enforce the restrictions to the extent notified, requested or demanded by such Existing Occupant or (as to Existing Occupancy Agreements under which Landlord would be in breach or subject to remedies or detriment without notice, request or demand by the Existing Occupant) required by Existing Occupancy Agreements.  Each Existing Use Restriction will automatically expire upon the earlier of the (i) expiration or sooner termination of the applicable Existing Occupancy Agreement (for the avoidance of doubt, an Existing Occupancy Agreement shall, except as provided with respect to the Whole Foods Existing Restriction below, be deemed expired after all currently existing renewal terms have expired even if new renewal terms are granted by Landlord), (ii) date that the Existing Use Restriction in such Existing Occupancy Agreement expires or terminates (for example, if the Existing Restrictions terminates because the space is not operated as a credit union) subject to any reinstatement provided in such Existing Occupancy Agreement, or (iii) "unconditional and unlimited termination" of such restriction with respect to any other Occupant of the Property.  Notwithstanding the preceding clause (i), the Whole Foods Existing Restriction shall remain in effect if the Whole Foods Occupancy Agreement is extended with Exempt Renewals.  Furthermore, for the avoidance of doubt with respect to clause (i), if an Exempt Renewal is granted for the Whole Foods Occupancy Agreement, and such Exempt Renewal is subsequently exercised, then, with respect to the Whole Foods Occupancy Agreement, clause (i) shall only occur upon the natural expiration of the term of the Exempt Renewal unless such Occupancy is earlier terminated.

For purposes of clause (iii) above, the term "unconditional and unlimited termination" means a termination that (a) imposes no material and substantial conditions on the termination of such restriction (by way of example only and not of limitation, the payment of substantial funds to the Existing Occupant or material alteration of the terms of the Occupancy Agreement in favor of the Existing Occupant, for the release of such restriction

10

to such particular Occupant), and (b) does not substantially limit the release of such restriction to specific parameters (by way of example only and not of limitation, such as a release for the operation of an Italian delicatessen is limited to being operated in connection with an Italian restaurant).

(E)     Provided Landlord has performed all of Landlord's obligations under this Lease, if Tenant does not open the Premises to the general public fixtured and stocked as is typical for a "Target" store (or any variation of a "Target" store then being operated in the United States) for at least one day ("**Open**") before the date that is twelve (12) months after the Rent Commencement Date (the "**Opening Deadline**"), then no later than sixty (60) days after the Opening Deadline, Landlord may, at Landlord's sole option, as Landlord's sole and exclusive right and remedy:  (i) send a notice of lease termination to Tenant (the "**Termination Notice**") and (ii) recover liquidated damages (the "**Liquidated Damages**") from Tenant equal to $1,795,620.00.  If Tenant does not Open within ninety (90) days of Tenant's receipt of the Termination Notice, then (a) this Lease will automatically terminate upon the expiration of such ninety (90) day period (the "**Lease Termination Date**") and neither party will have any obligation to the other by virtue of this Lease with respect to periods of time after the Lease Termination Date except as otherwise specifically provided in this Lease, and (b) Tenant must pay the Liquidated Damages within forty-five (45) days after the Lease Termination Date.  If Tenant does Open, then Landlord will have no termination rights and no right to the Liquidated Damages.

(F)     If, after the first anniversary of the Rent Commencement Date, at any time during the Term, Tenant (i) never opened any business or (ii) opened and "goes dark" and is not operating any business from the Premises for a continuous period of twelve (12) months (which time period will be extended for any retenanting [so long as such assignment has occurred or agreement for subtenancy has been established, and such retenanting is being diligently completed], or for delays due to a Force Majeure Event) ("**Dark Period**") or (iii) notifies Landlord that Tenant intends to permanently cease operating in the Premises and notifies Landlord of the approximate date of the permanent cessation of operations prior thereto (a "**Tenant's Go Dark Notice**"), then Landlord will have a one (1) time right to terminate this Lease, on the following conditions:

(G)     If Landlord desires to terminate this Lease, Landlord must send notice of such election (the "**Go Dark Election Notice**") within ninety (90) days after the earlier to occur of (i) the expiration of the Dark Period or (ii) the issuance of Tenant's Go Dark Notice.

(H)     Upon receipt of the Go Dark Election Notice, Tenant may elect to immediately accept such termination by notice to Landlord delivered thirty (30) days after receipt of Landlord's Go Dark Election Notice.  If Tenant accepts such termination, then this Lease will terminate thirty (30) days after such acceptance by Tenant and neither party will have any further obligations under this Lease.

(I)     If Tenant does not accept in writing the termination election by Landlord due to a Dark Period, then Tenant will have ninety (90) days from the Go Dark Election

Notice to operate a business (the "**New Required Operating Date**") as required above. If Tenant operates a business by the New Required Operating Date, the termination will not be effective. If Tenant does not operate a business by the New Required Operating Date, then this Lease will automatically terminate on the New Required Opening Date, and neither party will have any further obligations under this Lease.

5.2     Use of Property.

(A)     Subject to uses permitted under Existing Occupancy Agreements (although Landlord must enforce, as and to the extent contemplated by mechanisms for enforcement in Section 5.2(B) below including with respect to the Prohibited Uses), each Existing Occupancy Agreement to effectuate the provisions of this Section 5.2(A)), the Property may only be used for Retail Use and for Business Office and hotel use, and no use is permitted at the Property that is inconsistent with the operation of a first-class retail mixed-use development, provided however, that (I) any Business Office use must be located at least two hundred (200) feet from the Premises, and (II) at least seventy percent (70%) of the Property (excluding the Premises and Redevelopment Area from the numerator and denominator of this calculation) which is then operating for any use must remain Retail Use. No portion of the Property may be used in a manner that (i) constitutes a public or private nuisance or (ii) otherwise interferes with the safety or peaceful possession of Occupants and/or their Permittees. Tenant shall not use the Premises, and Landlord shall not allow any other Occupant to use its premises, in a manner that may compromise the structural integrity of the Property or require any changes in the design and/or structural capacities of the Premises. Without limiting the generality of the foregoing, but subject to uses permitted under Existing Occupancy Agreements, the uses listed on the attached Exhibit G (the "**Prohibited Uses**") are not permitted at the Property during the Term, subject to the terms of such exhibit.

(B)     Subject to uses permitted under the Existing Occupancy Agreements (as more specifically provided below), the following uses (the "**Tenant Exclusives**") are prohibited upon all portions of the Property except for the Premises:

(1)     Any sale of pharmaceutical drugs requiring the services of a licensed pharmacist; provided however, that this clause shall not prohibit the operation of a pharmacy integrated within the Permitted Supermarket so long as such operation (i) is operated under the same trade name as the Permitted Supermarket, (ii) does not have an exterior entrance separate from the entrance to the Permitted Supermarket, and (iii) does not have a drive-up facility.

(2)     Any sale of food and/or non-alcoholic beverages for off-premises consumption, except that the foregoing prohibition shall not apply to: (i) restaurant operations (including food or beverage service operations such as coffee shops, smoothie shops, ice cream parlors, yogurt shops, food halls, doughnut shops, bakeries, carryout pizza, etc.); or (ii) stores having no more than the lesser of (a) 500 square feet of Floor Area, or (b) 10% of its Floor Area, devoted to the display for sale of such products. One-half of the aisle space adjacent to any display of such products shall also be included in calculating Floor Area for purposes of

12

this Section 5.2(B)(2). In addition, the operation of one (1) Permitted Supermarket within the Property is permitted.

(3)     Any General Merchandise Use.

(4)     Any store, department, service, or operation within the Property that identifies, in any manner that is visible from the exterior of any building, any retailer that operates a General Merchandise Use anywhere in the United States (via its name or symbol or any derivative thereof).

(5)     Any beauty specialty store or beauty-retail concept store such as those operated on the Effective Date under the trade name ULTA or Sephora of more than 3,000 square feet. For avoidance of doubt, the operation of a beauty parlor/hair care salon is not prohibited so long as such activity is the primary use of such operation

(6)     No restaurant on the upper level shall be located within seventy five (75) feet to the west of the west wall of the Premises or within one hundred fifty (150) feet to the north of the north elevation of the Premises.

The Tenant Exclusives shall not apply to any Existing Occupant and its Existing Occupancy Agreement, except as provided in this Section 5.2(B). Notwithstanding that the Tenant Exclusives may not currently be enforceable with respect to an Existing Occupancy Agreement, Landlord must enforce each Existing Occupancy Agreement to effectuate the Tenant Exclusives to the extent the Existing Occupancy Agreement allows. By way of example only, Landlord must not permit or agree to (i) an expansion of a Pre-Existing Premises that allows for a use that violates the Tenant Exclusives if Landlord has the right to withhold such permission or agreement, (ii) a change of a permitted use by any such tenant or its successors or assigns to a use that violates the Tenant Exclusives if Landlord has the right to withhold such permission or agreement, or (iii) an assignment or sublease of an Existing Lease to an assignee or subtenant who is permitted to use such premises for a use that violates the Tenant Exclusives if Landlord has the right to withhold such permission or agreement); provided however, that notwithstanding the foregoing clause (i) Landlord may allow an expansion of the Pre-Existing Premises so long as the Tenant Exclusive Requirements are imposed in such Occupancy Agreement in connection with any such expansion (a "**Permitted Expansion**").

In addition, Landlord may not extend an Existing Occupancy Agreement (beyond those existing renewals provided for in such Existing Occupancy Agreement) unless the Tenant Exclusive Requirements are imposed in such Occupancy Agreement in connection with such renewal. Any renewal made in accordance with the Tenant Exclusive Requirements is an "**Exempt Renewal**". Notwithstanding the foregoing, a renewal of the Existing Occupancy Agreement with Kohl's shall be an Exempt Renewal if the premises occupied by Kohl's has been or shall be reduced (within twelve months of the grant of such renewal) to a size of 60,000 square feet or less of Floor Area, so long as clause (a) of the definition of the Tenant Exclusive Requirements is satisfied, even if clause (b) thereof is not satisfied.

For purposes of this Lease:

"**Existing Occupancy Agreement**" means each of the leases (including amendments thereto prior to the Effective Date) with an Occupant listed on the attached <u>Exhibit M</u> existing as of the Effective Date providing for the possession of space in the Property, as the same may, subject to Landlord's obligations to enforce the Tenant Exclusives as set forth above, be amended from time to time. An Existing Occupancy Agreement includes, subject to Landlord's obligations to enforce the Tenant Exclusives as set forth above, a new or amended and restated lease with a Pre-Existing Occupant on substantially the same non-economic terms concerning permitted use as the previously existing lease between such parties.

"**Existing Occupant**" means any Occupant leasing space in the Property who is a party to an Occupancy Agreement that is dated and entered into prior to the Effective Date, including, subject to Landlord's obligations to enforce the Tenant Exclusives as set forth above, a direct or indirect assignee or subtenant of such a party.

"**Existing Premises**" means the premises, as of the Effective Date, subject to an Existing Occupancy Agreement.

"**Existing Use Restrictions**" means the use restrictions set forth on the attached <u>Exhibit M</u>.

"**Tenant Exclusive Requirements**" means that (a) the permitted use clause (as set forth on the attached <u>Exhibit N</u>) for such Existing Occupancy Agreement is not modified in manner that would broaden the use rights to allow for any use conflicting with Tenant's Exclusives, and (b) the Existing Occupancy Agreement provides that if there is a change in the primary use being operated (from that existing as of the Effective Date) in the Pre-Existing Premises, then such agreement shall, upon the Tenant Exclusive Date, immediately be subject to the Tenant Exclusives.

"**Tenant Exclusive Date**" is the earlier of (x) the date any area subject to a Permitted Expansion is first used for the intended purpose of such expansion (e.g. opening for business to the pubic in the expansion areas of such Occupant's premises if such area is being used to conduct business with the public), or (y) the first day of the term of such Existing Occupancy Agreement beyond all currently existing renewal option periods (i.e. the first day such Existing Occupant is benefitting from the additional renewal(s)).

"**Whole Foods Occupancy Agreement**" means the Existing Occupancy Agreement with Whole Foods.

Case 23-13359-VFP  Doc 1066-4  Filed 06/27/23  Entered 06/27/23 11:02:06  Desc
Exhibit B - Part 1  Page 16 of 50

"**Whole Foods Restriction**" means the use restriction contained in the Whole Foods Lease entitled "X. Whole Foods", as set forth on attached <u>Exhibit M</u>.

5.3     <u>Common Elements and Exclusive Areas</u>.

(A)     Landlord shall, to the extent not already completed, construct the Common Elements and the Exclusive Areas as shown on the Plans. Thereafter, Landlord may not make or permit any changes (whether temporary or permanent in nature) to (1) the

14

Protected Area, (2) the Exclusive Areas, or (3) the Common Elements outside the Protected Area if such changes would have a materially adverse effect on the Common Elements within the Protected Area (including the use thereof), except in each case, with Tenant's affirmative written consent (with the provisions of Section 16.10 below regarding deemed approval being inapplicable). Tenant's consent may be granted or withheld in:

(x) Tenant's sole and absolute discretion as to (1) and (2) above, except that

(aa) Tenant's consent shall not be unreasonably withheld as to matters mandated by Governmental Requirements [and are not otherwise the result of approvals and/or permits sought by Landlord from Governmental Authorities] which do not have a material adverse effect on Tenant's use of the Exclusive Areas),

(bb) Tenant's consent shall not be required with respect to immaterial changes to any of the items in clause (iii) of the definition of Protected Area; and

(cc) Landlord may, but solely to the extent depicted on that portion of the Plans labeled as "Site Renovation Concept", reconfigure the Protected Area so as to reduce the number of parking spaces (which, as of the Effective Date, is 606 spaces) to no fewer than 565 spaces, and may modify traffic flow and drive lane locations in a manner reasonably providing for comparable or more convenient traffic flow and traffic access to the Protected Area and the Premises;

and,

(y) in Tenant's reasonable discretion as to (3) above;

provided however, that Tenant's consent shall not be unreasonably withheld as to matters mandated by Governmental Requirements put into effect after the Effective Date [and are not otherwise the result of approvals and/or permits sought by Landlord from Governmental Authorities] which do not have a material adverse effect on business operations within the Premises or Tenant's rights under this Lease.

Tenant and its Permittees (as appropriate) may use the Common Elements and Exclusive Areas without any charge. No barrier that would prevent or unreasonably obstruct ingress or egress between the Premises and the Parking Lot, sidewalks, street and public transportation facilities adjacent thereto, or the circulation of pedestrian and/or vehicular traffic as contemplated on the Plans, may be erected or is permitted within or across the Common Elements or the Exclusive Areas. Without limiting the balance of this Section 5.3(A), (I) the heights of buildings or other improvements (including architectural features, etc.) in the "Height Restriction Area" shown on the Plans shall not be increased above the heights currently existing as of the Effective Date (except to the extent not enforceable against Existing Occupants during the term of the respective Existing Occupancy Agreements), and (II) there may not be any increase in Floor Area of any building improvements located in the Property outside of the Premises which causes the parking requirements set forth below to be violated. Landlord reserves the right to reduce the number of Parking Spaces so long as (i) Governmental Requirements(s) are met, (ii) there is no reduction in the number of parking spaces located in the Protected Area, (iii) a parking

15

ratio consistent with the size and operations of the Property is maintained, and (iv) no portion of the Parking Lot (including that portion outside of the Protected Area) is ever used for any building(s) or other structure(s), except for the Redevelopment Area (shown on the Plans) where this restriction shall not apply.

(B)

(1)     Landlord shall not permit the use or occupancy of the Common Elements by Persons engaged in civic, public, or political activities, except:

(a) such activities shall be permitted to the extent (if any) required by Governmental Requirements, and

(b) outside of the Protected Area.

Landlord and Tenant acknowledge that Subparagraph (B)(1)(a) might not be enforceable against Existing Occupants during the term of the respective Existing Occupancy Agreements, but in any case, Landlord must enforce with respect to any Existing Occupant to effectuate the provisions of this provision, to the extent the respective Existing Occupancy Agreement allows.

(2)     In addition, Landlord shall not permit the use or occupancy of the Protected Area for Persons engaged in charitable activities and, with respect to the balance of the Property, no charitable activities may be permitted if such charitable activities have a material and adverse effect on the Premises, the Exclusive Areas, the Protected Area or Tenant's business operations.

(C)     Except to the extent the Premises is not open for business to the public, Landlord must keep the Parking Lot and the balance of the exterior Common Elements, illuminated, operating and accessible, as applicable, and open to the public each day from 7 a.m. until at least midnight local time (collectively, the "**Normal Hours**"). Tenant may be open for business at hours other than the Normal Hours, and Tenant may, at any time, require Landlord to keep such Common Elements open, illuminated and operating, if Tenant notifies Landlord of such request not less than fifteen (15) days in advance. Tenant shall pay to Landlord, within thirty (30) days after demand therefor, the reasonable costs for such additional operation (including electrical power, bulbs and labor), but, if other Occupants are also open such additional time, or some portion thereof, then Tenant shall pay only a proportionate share of such costs based upon the Floor Areas of all Occupants remaining open during such extended hours. Any such request for additional Common Elements operations may be changed, withdrawn or terminated at any time by notice from Tenant.

(D)     Notwithstanding any provisions to the contrary contained herein, Tenant has unrestricted and full use of and access to (i) the Premises, (ii) the Exclusive Areas, (iii) the loading, receiving and storage areas that are part of Common Elements, and (iv) such portions of the Common Elements (including the Parking Lot) that are reasonably necessary to access all areas comprising the Premises and the Exclusive Areas twenty-four (24) hours a day, seven (7) days a week, every day of the year, subject to Governmental Requirements.

(E)     Except as shown on the Plans, no merchandise, equipment or services, including kiosks, vending machines, promotional devices and similar items, may be displayed, offered for sale or lease or stored within the Common Elements; provided however, that Tenant and its Permittees may conduct occasional merchandise sales, offer services and advertise their business operations in the sidewalks directly in front of the Premises. Landlord and Tenant acknowledge that this might not be enforceable against Existing Occupants during the term of the respective Existing Occupancy Agreements, but in any case, Landlord must enforce with respect to any Existing Occupant to effectuate the provisions of this provision, to the extent the respective Existing Occupancy Agreement allows. In addition, no restaurant seating is permitted within the Common Elements except on sidewalks directly in front of such Occupant (a "**Seating Area**"), and, in any event, only so long as such Occupant complies, at such Occupant's sole cost and expense, with all of the following requirements:  (i) each Occupant shall maintain all furniture in such Occupant's Seating Area in a first-class condition; (ii) each Occupant shall keep such Occupant's Seating Area clean, free of trash and debris and in good order, including cleaning such Occupant's Seating Area at least once a day; (iii) each Occupant's use of such Occupant's Seating Area shall be subject to all Governmental Requirements; (iv) no Occupant shall be permitted to erect any signage within such Occupant's Seating Area (other than typical signage such as on umbrellas, seats, tables, and table-top setups); and (v) no Occupant shall be entitled to unreasonably interfere with pedestrian passage along sidewalks.

(F)     Subject to Landlord's reasonable approval (which shall not be applicable to prototypical design aspects of items approved by Landlord, such as the specific color), Tenant may, at its cost, install, maintain and replace, from time to time, signage and other branding (including installation of branding elements such as bollards, painting of surface with Tenant's prototypical colors and designs) on the sidewalks directly adjacent to the Premises.

(G)     Subject to Landlord's reasonable approval as to the specific manner of installation, Tenant may, at its cost, install and maintain (i) branded cart corrals within the Parking Lot (occupying no more total parking spaces than the amount shown on the Plans), (ii) an electronic shopping cart containment system within the Protected Area, and (iii) cart storage on the sidewalks directly adjacent to the Premises. All equipment so installed shall be maintained in a neat and safe condition.

5.4     Building Signs.

(A)     Landlord must not permit any Signs to be placed or projected on, or interact with, the exterior of the Building, except for (x) Informational Signs, (y) Tenant's Signs as described in Section 5.5 below, and (z) Identification Signs for Occupants of the Property that are located or displayed within the specific areas designated on the attached Exhibit H-1 (the "**Exterior Building Signage Exhibit**"). Landlord must not place or project, or permit to be placed or projected, any Sign that identifies or benefits any business that is not an Occupant of the Property. Neither the name of any building, nor any Signs visible from the exterior of any building or the Property, nor any business or trade conducted on the Property may (i) contain words, text, or images, including any name of any Occupant, that

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23
Exhibit 4 - Part 1   Page 19 of 50

is or could reasonably be construed to be offensive, obscene, derogatory, or disparaging, or that suggests advocacy for a policy or political position or party, (ii) mention or infringe on Tenant's trade name(s) or trade mark(s) except for Tenant's Signs or by agreement or permission between the signage beneficiary and Tenant, (iii) be inconsistent with the operation of a first-class retail business, and/or (iv) reference any General Merchandise Use. Landlord and Tenant acknowledge that the foregoing clauses (i), (iii) and (iv) might not be enforceable against Existing Occupants during the term of the respective Existing Occupancy Agreements, but in any case, Landlord must enforce with respect to any Existing Occupant to effectuate the provisions of this provision, to the extent the respective Existing Occupancy Agreement allows. Landlord and Tenant shall cooperate in connection with the placement of Informational Signs; provided however, that (a) Landlord shall install wayfinding signage identifying Tenant and other Occupants in the locations depicted on Exhibit H-3 (the "**Wayfinding Signage Exhibit**") in a design reasonably acceptable to both parties with the depictions on the Wayfinding Signage Exhibit serving as an example of such signage and (b) the Wayfinding Signage Exhibit design may be adjusted in a non-material manner as necessary to comply with Existing Occupancy Agreements to the extent notified, requested or demanded by such Existing Occupant or (as to Existing Occupancy Agreements under which Landlord would be in breach or subject to remedies or detriment without notice, request or demand by the Existing Occupant).

(B)     No Sign on the exterior of any building or exterior-directed in the storefront display of any building may be (i) painted on the surface of such building unless consistent with the standard prototype signage of an Occupant which is a Qualified Chain and such signage is used in other similar first class retail developments; (ii) flashing, moving or audible; (iii) made utilizing exposed (a) neon tubes, (b) ballast boxes, (c) transformers, or (d) raceways, (iv) placed, displayed, or projected in a manner that obstructs the visibility of, or in any way interacts with, any other Signs, or (v) made of paper or cardboard, or be temporary in nature, or be a sticker or decal, but (1) the foregoing does not prohibit the placement at the entrance of each Occupant's space of a small sticker or decal indicating business hours, accepted credit cards and other similar information, nor does it prohibit the temporary display of leasing information or identification of contractors working on a construction job within the Property, and (2) clauses (iii)(a), (iii)(b) and (iii)(c) shall not apply to the "**Exception Building Location**" shown on the Plans. Landlord and Tenant acknowledge that this Paragraph (B) might not be enforceable against Existing Occupants during the term of the respective Existing Occupancy Agreements, but in any case, Landlord must enforce with respect to any Existing Occupant to effectuate the provisions of this provision, to the extent the respective Existing Occupancy Agreement allows. A "Qualified Chain" means a retail company or franchise operation (including restaurants and banks) occupying 3,000 square feet or more of Floor Area having a national or regional presence, operating or franchising the same retail business under the same tradename in at least seventy-five (75) business locations serving the public in the United States.

5.5     Tenant's Signs.

(A)     Subject to Section 5.4, Tenant may, at Tenant's cost, install, display, project, maintain, repair, replace, and remove (i) Identification Signs on the exterior of the Building in the location(s) and with dimensions not greater than those shown for Tenant's

18

Signs on the Exterior Building Signage Exhibit, but otherwise of such design, content, and colors as Tenant may determine, (ii) Identification Signs on the freestanding (including pylon) signage within the Common Elements in the location(s) and with dimensions not greater than those shown for Tenant's Signs and background on Exhibit H-2 (the "**Freestanding Signage Exhibit**") but otherwise of such design, content, and colors as Tenant may determine, (iii) Signs, of such design, content, and colors as Tenant may determine, for Tenant's order pick up operations, as permitted by this Lease, and (iv) augmented, virtual, or mixed reality Signs, of such design, content, and nature as Tenant may determine, for Tenant's operations, that are within the Tenant Storefront Area and otherwise comply with this Lease ((i)-(iv) are referred to collectively as the "**Tenant's Signs**"). Tenant shall install, maintain, repair, and replace Tenant's identification panel(s) on such Sign(s) at Tenant's cost.

(B) Landlord specifically authorizes Tenant to submit for approval to Governmental Authorities as may be necessary to obtain all necessary approvals as well as variances, special use permits or other such specialized permissions as may be necessary to allow the signage program otherwise allowed by this Lease and desired by Tenant; provided however, no such variances, special use permits or other such specialized permissions as may be necessary to allow the signage program otherwise allowed by this Lease and desired by Tenant shall create any material condition or obligation on either the Property or Landlord that extends beyond Tenant's leasehold interest in the Premises without Landlord's prior written consent. Landlord shall join in the application for all permits and approvals if necessary to prosecute such applications properly and/or execute all documents reasonably necessary to obtain licenses and permits from applicable Governmental Authorities.

(C) If Landlord constructs or makes available to any other Occupant(s) any multi-tenant Sign (above and beyond the signage depicted on the Freestanding Signage Exhibit) that is placed or projected upon or adjacent to the Property, then (subject to those rights of Existing Tenants existing as of the Effective Date set forth on Exhibit Q attached hereto), the topmost space on such Sign will be reserved for the identification of Tenant, the size of the area reserved for Tenant's identification shall be determined by the relative Floor Area of all the retail tenants of the Property (including Tenant) who are identified on such Sign. Landlord shall at all times maintain the multi-tenant Sign structure(s) (but not the identification panels located thereon) in good order and repair as part of its Common Element maintenance obligations hereunder. If Tenant elects not to be identified on such Sign or thereafter elects in writing to release its right to be identified on such Sign, Tenant shall have no further rights, duties, or responsibilities with respect to such Sign, unless and until Tenant delivers notice to Landlord of Tenant's election to be identified on such Sign(s) and, if space is available on the Sign(s), Landlord shall promptly allow Tenant to be identified on such Sign (which includes the right to install an identification panel on the physical Sign(s)), or if no space is available on the Sign(s), Tenant shall be entitled to the next available open space on the Sign(s) and Landlord shall promptly provide Tenant notice of the next available open space on the Sign(s).

Case 23-13359-VFP   Doc 1086-4   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit 8 - Part 1   Page 21 of 50

## ARTICLE 6 - INITIAL IMPROVEMENTS;
## ALTERATIONS

19

6.1    Initial Improvements.  The initial improvements to the Property and the Premises shall be undertaken by Landlord in accordance with the Delivery Specifications and the Plans. Landlord hereby consents to all of Tenant's Work, subject to the provisions of this Lease concerning approval of Tenant's Work.

6.2    Alterations.

(A)    Tenant may, from time to time, make such structural or non-structural alterations, additions, restorations, changes, replacements and installations in or to the Premises and/or the Exclusive Areas as Tenant deems necessary or desirable (individually and collectively "**Alterations**"); but Landlord's prior approval is required for any Alterations that (i) adversely affect the Common Systems or the structural integrity of the Building, (ii) any changes to the structural footprint or structural height of (a) the Building or (b) the structural elements (if any) in the Exclusive Areas, or (iii) reduce the Floor Area of the Premises, which approval may not be unreasonably withheld, conditioned or delayed so long as Tenant has mitigated any adverse impact from such Alteration to Landlord's reasonable satisfaction.  Tenant shall deliver to Landlord copies of all legally required permits and approvals and contractors' insurance certificates meeting the requirements of this Lease before commencing construction of any Alterations for which Landlord's consent is required.

(B)    For any Alteration(s) that require Landlord's prior approval as provided in Section 6.2(A) above, Landlord's response shall be given within ten (10) business days of Landlord's receipt of Tenant's initial request for approval of such Alteration(s) accompanied by reasonably sufficient and complete information in order for Landlord to evaluate Tenant's request.  If Landlord's response is not given within such ten (10) business day period, Landlord will be deemed to have given its approval.  However, if Landlord timely disapproves Tenant's initial request for approval of Alteration(s), and thereafter, Tenant is re-submitting a request for Landlord's approval of Alteration(s) after accommodating or addressing Landlord's timely disapproval, then Landlord's response shall be given within five (5) business days of Landlord's receipt of such re-submitted request.  If Landlord's response is not given within such five (5) business day period, then Tenant shall send a second written notice to Landlord and, upon Landlord's failure to provide Landlord's Transfer Response within three (3) business days of receipt of Tenant's second written notice, Landlord will be deemed to have given its approval.

(C)    Landlord hereby grants Tenant the right to file and prosecute applications and petitions for building permits and/or other governmental approvals required or deemed necessary by Tenant in connection with any Alterations; provided, however, Landlord's approval shall be required in connection with any material restrictions on uses of the Property required by Governmental Authorities which extend for periods after expiration or termination· of this Lease, or to any fees, additional taxes or assessments against the Premises which extend for periods after expiration or termination of this Lease.  Alterations shall be completed with reasonable diligence in a good and workmanlike manner in compliance with applicable Governmental Requirements.

6.3    Allowance.  As an inducement for Tenant to consummate this Lease, Landlord shall

Case 23-13359-VFP  Doc 1066-4  Filed 06/27/23  Entered 06/27/23
Exhibit 8 - Part 1  Page 22 of 50

pay to Tenant a cash allowance (the "**Allowance**") in the amount of Two Million Eight Hundred Forty-Two Thousand Three Hundred Three Hundred Thirty-Five and 00/100 Dollars ($2,842,335.00). The Allowance may be used by or at the direction of Tenant as an allowance for costs relating to this Lease and the Initially Intended Use, including costs of planning, developing, constructing and installing the Tenant's Improvements and Tenant's Property. Landlord must disburse the entire Allowance to Tenant within thirty (30) days after the Delivery Date. Landlord shall provide reasonably satisfactory evidence to Target for Landlord's actual out-of-pocket costs (including contractor fees) for performance of <u>Exhibit C</u>, Part 3.3. If and to the extent that such cost is less than $300,000.00, the Allowance shall be increased by the amount of such savings.

6.4    <u>Landlord's Cooperation</u>. At Tenant's request, Landlord shall execute, or join in (if necessary), any applications, submissions and other documents that may be reasonably required to obtain Tenant's building permit and all other licenses, permits, approvals and authorizations that Tenant requires for the construction of Tenant's Work and any Alterations (as approved by Landlord, if applicable), and for the operation of Tenant's business at the Premises, so long as not creating any material condition or obligation on either the Property or Landlord that extends beyond Tenant's leasehold interest in the Premises. If a utility provider requires an easement, license or other limited access right as a condition to providing utility services required by Tenant, Landlord shall promptly execute such reasonable documentation as is necessary to satisfy this requirement and/or authorize Tenant to execute such documentation, as applicable, and Tenant shall reimburse Landlord for any reasonable out of pocket actual costs incurred by Landlord in reviewing and confirming such documentation. Without limiting the generality of the foregoing, Landlord must promptly file for all necessary approvals, if any, for (i) reverse vending machines serving the Premises in the location depicted on the Plans, (ii) use of cart corrals within the Parking Lot as permitted by this Lease, (iii) use of that portion of the Property designated for Order Pick Up, and (iv) the Wayfinding Signage (collectively, the "**Landlord Approval Items**"). If Landlord notified Tenant at any time by December 31, 2020 that, despite Landlord's commercially reasonable efforts and due diligence to obtain approval from applicable Governmental Authorities, Landlord has not received such approval, then, within thirty (30) days thereafter, Tenant may elect to waive the requirement for approval of the Landlord Approval Items by notice to Landlord, and, if Tenant does not provide such notice, then this Lease shall terminate as of the end of the 30-day period.

6.5    <u>Liens</u>. If any mechanic's lien or other lien related to the construction, repair, replacement or improvement of all or any portion of the Property is filed against the Property, or any portion thereof, as a result of services performed by or for, or materials furnished for the use of, either Tenant (and anyone claiming by, through or under Tenant) or Landlord (and anyone claiming by, through or under Landlord other than Tenant), the party requesting the work or services or materials ("**Lien Creating Party**") shall cause such lien to be released and discharged of record, either by paying the indebtedness that gave rise to such lien or by posting bond or other security as may be required by law to obtain such release and discharge, within thirty (30) days after receipt of notice of such filing. Nothing herein prevents the Lien Creating Party from contesting the validity of the lien in any manner it chooses so long as such contest is pursued with reasonable diligence.

6.6    <u>Construction Criteria</u>. Any construction, alterations, repairs or other work ("**Work**") within the Property shall be performed by Landlord and Tenant (and their respective

Permittees) in accordance with the following criteria:

(A)     The performance of such Work shall not unreasonably interfere with construction work being performed on any other part of the Property.

(B)     The performance of such Work shall be conducted in a manner that minimizes interference with the access, use and occupancy of the Premises, the Exclusive Areas, other premises within the Property and the Common Elements.

(C)     Any Work upon the Property shall be (i) performed in a good, safe, workman-like manner in accordance with all applicable Governmental Requirements, and (ii) prosecuted diligently to completion.

(D)     Any property damage caused in connection with the Work shall be promptly repaired by the Person performing the Work.

(E)     The Person performing the Work shall take such safety measures as may be reasonably required to protect the Permittees of the Property and the property of each from injury or damage.

(F)     The Person performing the Work shall secure all permits and licenses necessary for such Work and submit a copy of such permits and licenses to Landlord or Tenant, as applicable, upon request.

(G)     The Work shall be performed in such manner as not to create labor disharmony, picketing, boycotts, strikes or hand billing at or about the Property.

## ARTICLE 7- MAINTENANCE

7.1     Tenant's Obligations.  Except as provided in Section 7.2 below, Tenant shall at no cost to Landlord (i) keep and maintain the Premises (including Tenant's Improvements and the storefront glass and doors of the Premises), Tenant's Property within the Exclusive Areas, and Tenant's Systems, in a neat, clean, orderly and sanitary condition and in good condition and repair, and shall use commercially reasonable efforts to keep the Premises reasonably free of vermin, rodents, insects and other pests, including retaining a licensed professional exterminating company, if necessary and (ii) make any repairs, replacements, alterations and betterments required due to the acts or omissions of Tenant or its licensees, concessionaires, agents, employees or contractors.  Notwithstanding the foregoing, any maintenance, repair, or replacement of the Tenant's Systems (including HVAC system exclusively serving the Premises and of the refrigeration system exclusively serving the Premises) that is desired by Tenant must be performed by Tenant and for clarity, Tenant shall only be required to maintain, repair, or replace any Tenant System in accordance with Tenant's customary business practices and may remove or discontinue use of any of Tenant's Systems in Tenant's discretion.

7.2     Landlord's Obligations.

(A)     Landlord shall, at no cost to Tenant (except to the extent payable as part of the Common Element Charges), make all repairs, replacements, alterations and

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit 4 - Part 1a Page 24 of 60

betterments, whether foreseen or unforeseen, ordinary or extraordinary, to all portions of the Property (other than specified in Section 7.1 as Tenant's responsibility) necessary to keep the Property in a neat, clean, orderly and sanitary condition and in good condition and repair, whether structural or non-structural, including (other than specified in Section 7.1 as Tenant's responsibility) (i) improvements to the Land, (ii) all structural components of the Building, the roof, windows (except the storefront glass and doors of the Premises) and exterior walls, and all other work necessary to prevent water intrusion, water damage and mold from entering the Premises, (iii) the Common Elements, (iv) the Exclusive Areas (except for Tenant's Property located therein), (v) all repairs, replacements and modifications required as a result of any defects in labor, workmanship, materials, or equipment employed, supplied or installed by Landlord, and (vi) all repairs, replacements and modifications required as a result of the acts or omissions of Landlord or its employees, agents, tenants (other than Tenant) and contractors, or required as a result of any breach by Landlord of any provision of this Lease.

(B)     Landlord shall maintain, repair, replace and operate the Common Elements in accordance with standards of maintenance comparable in other similar first class retail developments in the Metropolitan Area and shall insure the Common Elements in accordance with this Lease. The Common Elements shall at all times be operated and maintained in compliance with all applicable Governmental Requirements and in a neat, clean, orderly and sanitary condition, and Landlord shall use commercially reasonable efforts to keep the Common Elements in good condition and repair and reasonably free of vermin, rodents, insects and other pests, including retaining a licensed professional exterminating company, if necessary. Without limiting the generality of the foregoing, such obligations include all of the following:

    (1)     <u>Drive and Parking Areas</u>. Maintaining, repairing, and replacing all paved surfaces and curbs in a smooth and evenly covered condition, including (i) replacement of base, skin patch, resurfacing and, when necessary to restripe the Parking Lot, resealing, (ii) restriping parking lots and drive lanes at least every two (2) years but in any event as necessary to clearly identify parking space designations, traffic direction designations, fire lanes, loading zones, no parking areas and pedestrian cross-walks, and (iii) removal of ice, and when there is an accumulation of two (2) inches or more on surface, snow.

    (2)     <u>Unimproved Common Elements</u>. Unimproved areas must be mowed and kept litter-free.

    (3)     <u>Debris and Refuse</u>. Periodically removing papers, debris, filth, and refuse, including vacuuming and broom-sweeping of paved areas at least 3 days per week, but in any event to the extent necessary to keep the Common Element in a first class, clean, and orderly condition. All sweeping must be at appropriate intervals during such times as do not interfere with the conduct of business or use of the Common Elements.

    (4)     <u>Directional Signs and Markers</u>. Maintaining, cleaning, and replacing any appropriate directional, stop, or handicapped parking signs or

Case 23-13389-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc Exhibit 4 - Part 1   Page 25 of 50

markers.

(5) <u>Lighting</u>. Maintaining, cleaning, and replacing Common Element lighting facilities, including light standards, wires, conduits, lamps, ballasts, and lenses, time clocks and circuit breakers, illuminating the Common Elements pursuant to Section 5.3.

(6) <u>Landscaping</u>. Maintaining and replacing all landscape plantings, trees, and shrubs in an attractive, live, and thriving condition, trimmed and weed-free; maintaining and replacing landscape planters, including those adjacent to buildings; providing water for landscape irrigation through a properly maintained system, including performing any seasonal (start up and/or winterization) maintenance thereto, and any modifications to such system to satisfy governmental water allocation or emergency requirements.

(7) <u>Obstructions</u>. Keeping the Common Elements free from any obstructions, including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provisions of this Lease.

(8) <u>Sidewalks</u>. Maintaining, cleaning, repairing, and replacing sidewalks, including those adjacent to buildings regardless of the installing party. Sidewalks must be: (i) steam-cleaned at least quarterly and pressure washed periodically in the interim, but in any event to the extent necessary to keep the surface in a first class and clean condition, (ii) swept at appropriate intervals during such time as does not interfere with the conduct of business or use of the sidewalks, and (iii) cleared of ice, and, when there is an accumulation of 2 inches or more on surface, snow.

(9) <u>Security Measures</u>. Providing security measures, including personnel, for the Common Elements, if reasonably required.

(C) At least thirty (30) days before making any planned repair, replacement, alteration, betterment, or modification described in Subsections (A) or (B) of this Section 7.2 that involves the Premises, the Protected Area, Exclusive Areas or any Tenant's Systems, Landlord shall deliver to Tenant copies of the plans therefor; provided however, that the foregoing shall not apply to (a) typical ongoing maintenance or repairs outside of the Premises which has no adverse impact on the use of the foregoing and whose purpose shall be to keep such items in good working order and condition consistent with existing design or (b) any repair, replacement, alteration, betterment, or modification required as a result of an Emergency so long as Landlord provides such plans as soon as is practicable under the circumstances (which may after the fact so long as notice is given as soon as practicable thereafter). During the months of October, November, December or January, no such work may occur (i) within the Premises, Exclusive Areas, or the Common Elements, (ii) outside any exterior wall of the Premises, or (iii) that affects Tenant's Systems, but there shall be no delay in the performance of regular maintenance required by Section 7.2(B) above or any repair, replacement, alteration, betterment, or modification required as a result of an Emergency. If there is a repair, replacement, alteration,

betterment, or modification required of Landlord hereunder within the Premises or the performance of which shall affect the Premises, Tenant's Systems or the business operation therefrom, Landlord shall give Tenant's on-site manager at least thirty (30) days' prior notice of same (including telephonic or electronic notice), except in the case of an Emergency, in which case Landlord shall provide to Tenant such prior notice as is reasonable under the circumstances. All repairs, replacements, alterations, betterments, and modifications shall be done in a manner intended to minimize, to the extent reasonably practicable, interference with Tenant's business operations.

7.3     Common Element Charges; Common Element Insurance Charges; Administration Fee.

(A)     Landlord shall expend only such Common Element Charges as are reasonably necessary for performance of obligations imposed on Landlord pursuant to Section 7.2, including maintaining the Common Elements in accordance with standards of maintenance comparable in other similar first class retail developments in the Metropolitan Area. Common Element Charges for the first Lease Year shall be capped at 2.5% over the actual Common Element Charges for calendar year 2020, and Landlord estimates such amounts for 2020 to be $2.60 per square foot of Floor Area. Thereafter Landlord may not include in Common Element Charges (nor charge Tenant for) increases to Controllable Charges of more than two and one-half percent (2.5%) of Controllable Charges from the previous calendar year (the "**Cap**") (and with respect to the partial calendar year at the beginning of the Term, such amount will be prorated based upon a fraction, the numerator of which is the number of days in such partial calendar year falling within the Term, and the denominator of which is 365). The risk associated with any increase above the foregoing amounts is assumed by Landlord. "**Controllable Charges**" means all Common Element Charges except for (i) utility charges resulting from rate increases, or (ii) snow removal. For example, if Controllable Charges have increased in a particular calendar year by 5%, then those costs would be capped at 2.5%, but any snow removal increases would not be capped, and would be payable as otherwise provided in this Lease. Landlord may not include in Common Element Insurance Charges (nor charge Tenant for) Common Element Insurance Charges for the first calendar year at the beginning of the Term (prorated based upon a fraction, the numerator of which is the number of days in such partial calendar year falling within the Term, and the denominator of which is 365) that is more than two and one-half percent (2.5%) of Landlord's actual Common Element Insurance costs for 2020, and Landlord estimates such amounts for 2020 to be $0.40 per square foot of Floor Area, which estimate includes all of the coverages contemplated by the definition of Common Element Insurance Charges for the 2020 year. Thereafter Landlord may not include in Common Element Insurance Charges (nor charge Tenant for) increases to Common Element Insurance Charges of more than two and one-half percent (2.5%) of Common Element Insurance Charges from the previous calendar year (the "**Insurance Cap**").

(B)     Not later than ninety (90) days before the Rent Commencement Date, Landlord shall provide Tenant an estimated budget for the balance of the current calendar year containing the information required by this Section 7.3. Beginning on the Rent Commencement Date, Tenant shall pay, Tenant's Proportionate Share of (i) Common

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit B - Part 1   Page 27 of 50

Element Charges, (ii) Common Element Insurance Charges, and (iii) the Administration Fee (defined below). Landlord may hire companies affiliated with it to perform the maintenance and operation of the Common Elements, but only if the rates charged by such affiliates are competitive with those of other companies furnishing similar services in the Metropolitan Area.

(C)     Notwithstanding anything to the contrary, Common Element Charges do not include the following:

(1)     Any late charges or fees; any cost, fee, fine, penalty or similar charge arising out of or resulting from any violation by Landlord or anyone else (other than Tenant or its contractors, agents or employees) relating to the Property;

(2)     Any costs for promotional or marketing activities, including costs of materials, equipment, banners, decorations or lighting, or the cost of set up, take down, clean up, maintenance, repair or storing any of the foregoing (and, further, seasonal and holiday Common Element Charges for the entirety of the Property shall not exceed $30,000 in any calendar year);

(3)     Any costs associated with trash and/or garbage removal from an Occupant's premises or a trash compactor or receptacle (i) exclusive to any Occupant, or (ii) from any (x) hotel portion of the Property, or (y) Business Office portion of the Property;

(4)     Any costs resulting from or arising out of the repair or replacement of items to the extent actually covered by warranties or guaranties, but such costs may be included in Common Element Charges if a good faith and commercially diligent effort by Landlord to collect any amounts due under such warranties and guaranties has been unsuccessful;

(5)     Any costs of operating, maintaining or repairing any portions of the Property (i) exclusive to any Occupant or (ii) from any (x) hotel portion of the Property, or (y) Business Office portion of the Property;

(6)     Taxes;

(7)     Insurance costs or premiums;

(8)     Landlord's profit, administrative and overhead costs including: office space, equipment and utilities; legal fees and/or costs; accounting and administrative service; premiums relating to bonding over mechanic's liens; and costs relating to hiring, training, screening, drug testing and/or background checks of personnel;

(9)     Any fee or charge, other than the Administration Fee, as hereinafter defined, relating to the management and/or supervision of the operation of the Common Elements, or any part thereof;

(10)     Entertainment, transportation, meals and lodging of anyone;

(11)     Any costs, fees expenses and/or adjustments related to any Common Element Charges submitted more than three (3) years after the date incurred by Landlord;

(12)     The cost of any capital improvements to the Property, including any capital replacements;

(13)     Interest or payments on any financing, loans or indebtedness;

(14)     Any costs of installing, operating, maintaining or repairing any sign structures that Tenant's identification panel is not on;

(15)     All repairs, replacements and modifications required as a result of any defects in labor, workmanship, materials, or equipment employed, supplied, or installed by Landlord; or

(16)     All repairs, replacements and modifications required as a result of the acts or omissions of Landlord or its employees, agents, tenants (other than Tenant), and contractors, or required as a result of any breach by Landlord of any provision of this Lease.

For clarity, if any of the foregoing exclusions are part of assessments or payments due under any agreements relating to the Property (for example, condominium assessments under a condominium declaration), Tenant need not pay such portion of any assessments or payments, and that portion shall be Landlord's sole responsibility.

(D)     In lieu of Landlord's profit, administrative charges, all indirect and/or other direct costs, and overhead expenses, Landlord may charge an amount ("**Administration Fee**") computed by multiplying Common Element Charges (exclusive of utility charges and the portion of single purpose expenditures that exceed $50,000 in Constant Dollars), by three percent (3%). If any of Landlord's personnel at the Property perform services, functions or tasks in addition to duties directly related to the operation and maintenance of the Common Elements required of Landlord pursuant to this Lease, then the cost of such personnel shall be equitably allocated according to time spent performing such duties. The cost of work performed by Landlord's personnel and/or affiliates that is includable in Common Element Charges shall be charged at such individual's normal (no mark-up or overhead) hourly basis, including benefits, but the total rate charged for such individual shall not exceed the rate charged for such work by competitive companies furnishing similar work in the Metropolitan Area. For purposes of this Lease, a "single purpose expenditure" means an expenditure for a single project, occurrence, or event (for example, seal-coating the entire parking lot), and does not mean the aggregate cost of all expenditures under a single category or categories of Common Element Charges (for example, all regular sweeping of the parking lot).

(E)     Landlord shall, at least ninety (90) days before the beginning of each calendar year during the Term, submit to Tenant a good faith estimated budget ("**Budget**")

Case 23-13359-VFP   Doc 1086-4   Filed 06/27/23   Entered 06/27/23 11:54
Exhibit 6 - Part 1   Page 29 of 50

for Common Element Charges, Taxes (unless paid directly by Tenant) and the Administration Fee for the ensuing calendar year. The Budget shall be in a form and content reasonably acceptable to Tenant and shall identify separate cost estimates for such categories of costs as Tenant may reasonably require (including separate line items for each type of insurance maintained by Landlord), plus the Administration Fee, any rental fees or purchase price of equipment and supplies used in maintaining, operating or repairing the Common Elements, credit for any depreciation or trade-in allowance applicable to items purchased for Common Element purposes and maintenance of physical Sign structure(s) pursuant to this Lease. If Landlord fails to provide the Budget, then, as the sole consequence, Tenant's Common Element Charges for the calendar year to which such Budget applies shall accrue but shall not be payable until Landlord has provided the Budget for such calendar year.

(F)    If an item of maintenance is to be accomplished in phases over a period of calendar years during the Term, then the Budget shall separately identify the cost attributable to the applicable calendar year (including the portion of the Common Element affected) and shall note the anticipated cost and timing (indicating the portion of the Common Element affected) of such phased work during succeeding calendar years.

(G)    Landlord shall use its diligent, good faith efforts to operate, maintain, repair and replace the Common Elements in accordance with the Budget.

(H)    Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide Tenant with a statement certified by an authorized Person, together with reasonable supporting documentation (including invoices where available), setting forth the actual Common Element Charges, Common Element Insurance Charges and Taxes paid by Landlord, the Administration Fee, and Tenant's Proportionate Share of the Common Element Charges, Common Element Insurance Charges and Taxes (such statement and supporting data are collectively called the "**Reconciliation**"). The Reconciliation shall separately identify cost categories specified in the Budget and shall be in a form reasonably acceptable to Tenant. If the amount paid with respect to the Premises for such calendar year has exceeded Tenant's Proportionate Share of actual Common Element Charges, Common Element Insurance Charges and Taxes, Landlord shall refund the excess to Tenant at the time the Reconciliation is delivered or credit such excess against future monthly installments of Rent, or if the amount paid with respect to the Premises for such calendar year is less than Tenant's Proportionate Share of actual Common Element Charges or Taxes, Tenant shall pay the balance of Tenant's Proportionate Share of actual Common Element Charges, Common Element Insurance Charges or Taxes to Landlord within thirty (30) days after receipt of such Reconciliation, less any amounts disputed in writing, but the thirty (30) day period only establishes the period for payment and is not to be construed as an acceptance of the Reconciliation. If Landlord does not refund amounts shown by the Reconciliation to be owed to Tenant, then Tenant may offset the refund owed against Rent due for any future period.

## ARTICLE 8 - LEGAL COMPLIANCE

8.1    <u>Tenant's Responsibilities</u>.  Subject to such contest as Tenant may elect, Tenant

Case 23-13369-VFP  Doc 1066-4  Filed 06/27/23  Entered 06/27/23 11:02:09  Desc
Exhibit 6 - Part 1  Page 30 of 50

shall, at no cost to Landlord, comply with Governmental Requirements (including any ADA requirements) now or hereafter in force applicable to those portions of the Property that Tenant is required to maintain under Section 7.1. However, Tenant is not required to make changes to the Property to comply with Governmental Requirements to the extent those changes are necessary for retail uses generally (as opposed to Tenant's particular use of the Premises).

8.2     Landlord's Responsibilities.  Subject to such contest as Landlord may elect, Landlord shall, throughout the Term, at its sole cost, comply with Governmental Requirements applicable to the Premises and/or Property, including alterations necessary in connection with ADA requirements, structural enhancements, and fire protection measures, to the extent Tenant is not required to comply therewith pursuant to Section 8.1.

8.3     Contest.  Any contest of Governmental Requirements undertaken by either Landlord or Tenant shall (i) be undertaken at such contesting party's cost, (ii) not impose any criminal or civil liability on either party, (iii) be prosecuted with reasonable diligence and in good faith, and (iv) not result in a lien or encumbrance on, or a forfeiture of Landlord's interest or Tenant's interest in the Property.

8.4     Hazardous Substances.

(A)     Tenant shall not use, or permit the use of, Hazardous Substances on, about, under or in the Premises, except in the ordinary course of its usual operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws.

(B)     Landlord shall not use, or permit the use of, Hazardous Substances on, about, under or in the Property, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws.

## ARTICLE 9 - ASSIGNMENT AND SUBLETTING

9.1     Assignment and Subletting.

(A)     Tenant may assign or sublet the Premises, or any portion thereof, without Landlord's consent; provided however, that as part of any assignment or subleasing Tenant may not, without Landlord's consent, break up and separately demise the (i) upper floor of the Premises into more than two (2) separate spaces with separate exterior entrances, or (ii) the lower floor of the Premise into more than three (3) separate spaces with separate exterior entrances.  In addition, with respect to the upper floor, one of the separately demised spaces must be at least 33,000 square feet.  In addition, Tenant may sublease or license departments or concessions giving any number of other persons, firms or corporations the right to sell goods, wares, and merchandise, or perform services in the Premises as a part of the overall business operation in the Premises, and the same is not considered a subletting hereunder (and therefore not subject to the limits set forth in clauses (i) and (ii) above), provided that no department or concession shall have a separate exterior entrance to outside of the Premises solely serving such department or concession.

(B)     Except as part of a Corporate Transaction, if Tenant proposes to assign this

29

Lease or sublet all of the Premises, Tenant must send notice thereof to Landlord ("**Tenant's Notice**"). Within ninety (90) days of Landlord's receipt of Tenant's Notice, Landlord may, by notice to Tenant ("**Landlord's Response**"), elect to recapture the Premises by terminating this Lease ("**Landlord's Transfer Response**"). If Landlord fails to timely deliver Landlord's Transfer Response, then Tenant shall send a second written notice to Landlord and, upon Landlord's failure to provide Landlord's Transfer Response within five (5) days of receipt of Tenant's second written notice, such failure shall be deemed a waiver of Landlord's right to terminate this Lease pursuant to this Section 9.1(B) for any transaction occurring within twenty-four (24) months thereafter. If Landlord elects to recapture the Premises by terminating this Lease such termination will be effective sixty (60) days after issuance of Landlord's Response.

(C)     Except as provided hereafter, no assignment shall relieve Tenant of its liability for the full performance of this Lease, but if the assignee (or a guarantor of such assignee's obligations) has a tangible net worth of at least $500,000,000, then the assigning Tenant and all prior assignors shall be unconditionally released of liability which first accrues from and after the effective date of assignment.

9.2     <u>Landlord's Right to Assign</u>.  Landlord may transfer Landlord's rights under this Lease so long as Landlord's successor assumes in writing all of Landlord's obligations under this Lease and evidence of such assumption is delivered to Tenant, and after the effective date of such a transfer and notice to Tenant in accordance with this Lease, Tenant may look solely to Landlord's successor in interest for performance of Landlord's obligations thereafter accruing.  Tenant shall be under no obligation to pay Rent or provide notice to such successor until thirty (30) days after Tenant has been notified of such transfer.

**ARTICLE 10- REPRESENTATIONS, WARRANTIES AND COVENANTS**

10.1     <u>Landlord's Representations, Warranties and Covenants</u>.     Landlord hereby represents, warrants and covenants that:

(A)     Landlord holds a valid leasehold estate in the Property free and clear of all restrictions, covenants, easements, liens, encumbrances and any other exceptions except as shown on the attached <u>Exhibit O</u> (the "**Permitted Exceptions**"); provided however, none of the Permitted Exceptions interfere with Tenant's rights under this Lease.  In addition, the Premises and Exclusive Areas are free and clear of other tenancies, occupancies or other rights of possession.  Tenant may obtain at Tenant's cost a leasehold policy of title insurance (the "**Title Policy**") insuring Tenant's leasehold estate in the Premises, and Landlord shall cooperate in connection with establishing such Title Policy by providing whatever documents are reasonably required for issuance of the Title Policy.

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 ...
Exhibit B - Part 1   Page 32 of 50

(B)     Landlord has full right and authority to enter into this Lease, perform Landlord's obligations under this Lease and grant Tenant the rights under this Lease.

(C)     The Premises and the Initially Intended Use (and, to the best of Landlord's knowledge, the balance of the Property) are not in violation of any local governmental rule, zoning, ordinance, regulation or building code, nor is there a pending or threatened

investigation regarding a possible violation of any of the foregoing, nor are there any pending or proposed changes to any law, zoning or other by-law ordinance, code, rule or regulation that are likely to materially adversely affect the Property or the Premises nor the permitted uses under this Lease.

(D)     Landlord has not received any notice, nor is it aware of any pending action to take by condemnation all or any portion of the Property, nor has Landlord agreed or committed to dedicate any part of the Property.

(E)     The Premises and the Parking Lot have free and full access to and from all adjoining streets, roads and highways as shown on the Plans, and there is no pending or threatened action that would limit or impair such access.

(F)     To Landlord's knowledge, there is neither litigation nor other proceedings pending or threatened relating to the uses permitted or rights granted under this Lease.

(G)     The individuals signing this Lease and all other documents executed or to be executed pursuant hereto on behalf of Landlord are duly authorized to sign the same on Landlord's behalf and to bind Landlord thereto, and this Lease is binding upon and enforceable against Landlord in accordance with its terms, and the transaction contemplated hereby shall not result in a breach of, or constitute a default or permit acceleration and maturity under any indenture, mortgage, deed of trust, loan agreement or other agreement to which Landlord or the Property (or any portion thereof) are subject or by which Landlord or the Property (or any portion thereof) is bound.

(H)     Landlord has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Landlord's creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Landlord's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Landlord's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(I)     Landlord is not a "foreign person" as contemplated by Section 1445 of the Internal Revenue Code. Neither Landlord nor any affiliate of Landlord is a person or entity with whom U.S. persons or entities are restricted or prohibited from doing business under any laws, orders, statutes, regulations or other governmental action relating to terrorism or money laundering (including Executive Order No. 13224 effective September 24, 2001, and regulations of the Office of Foreign Asset Control of the Department of the Treasury) ("**Blocked Persons**"), and, to Landlord's knowledge, neither Landlord nor any affiliate of Landlord engages in any dealings or transactions with any Blocked Person or is otherwise associated with a Blocked Person.

(J)     Subject to the terms and conditions of this Lease, Landlord shall deliver the Premises to Tenant on or before the Required Delivery Date with all of the Delivery Conditions satisfied.

(K)     Landlord must supply an SNDA from every lender, mortgagee and other party holding a similar monetary lien with respect to the Property on or before the sixtieth (60th) day after the Effective Date.

(L)     Landlord must supply a Recognition Agreement from Fee Owner on or before the sixtieth (60th) day after the Effective Date.

(M)     With respect to Hazardous Substances:

(1)     Except as disclosed in the environmental reports listed on the attached Exhibit J, if any (the "**Reports**"), to the best of Landlord's knowledge, there are no Hazardous Substance in, on, or under the Property or the Premises.

(2)     Except as disclosed in the Reports, there is no, nor, to the best of Landlord's knowledge, has there ever been any investigation, administrative proceeding, litigation, regulatory hearing or other action proposed, threatened or pending, relating to the Property and/or alleging non-compliance with or the violation of any Environmental Law(s).

(3)     Landlord has disclosed to Tenant all assessments, studies, sampling results, evaluations, reports and investigations commissioned by Landlord or within Landlord's possession or control relating to the environmental condition of the Property and has delivered true and correct copies thereof to Tenant.

(4)     On the Delivery Date, Landlord must, at Landlord's sole cost, have removed any and all known Hazardous Substances from the Premises and Exclusive Areas, and from Common Elements to the extent (i) in violation of Governmental Requirements, and/or (ii) sufficient to allow Tenant to develop and operate the Premises and Exclusives Areas without any interference and/or increase in cost attributable to the environmental condition of the Property. In addition, if any Hazardous Substances are discovered after the Delivery Date which existed prior to the Delivery Date, Landlord shall continue to be responsible for promptly complying with clauses (i) and (ii) above and completing such removal with all due diligence.

In addition, Landlord further covenants that Landlord may not take, authorize or consent to, directly or indirectly, any action during the Term that has or will have the potential to render Landlord's representations, warranties and covenants in this Lease inaccurate.

**10.1(A-1)     Landlord's Representations, Warranties and Covenants (Ground Lease).** Landlord hereby represents, warrants and covenants that:

(A)     True Copy. Landlord has delivered to Tenant, a true, accurate and complete copy of the Ground Lease, together with all exhibits annexed thereto and amendments and agreements appurtenant thereto.

32

(B)  **Effectiveness**.  The Ground Lease is valid, binding and in full force and effect.

(C)  **Notice of Default**.  There are no defaults or events of default under, or events which with due notice or lapse of time, or both, would constitute defaults or events of default under the Ground Lease by Fee Owner or Landlord.

(D)  **Landlord's Right of Possession**.  Landlord has the right to possess the Property during the Term (including all Extension Terms).

(E)  **Performance**.  Landlord shall pay when due all rents and other payments which are and that become payable under the Ground Lease and to timely carry out and perform all other terms, covenants, provisions and conditions of Ground Lease on Landlord's (as tenant under the Ground Lease) part to be performed.

(F)  **Consistent**.  The terms and provisions of this Lease are consistent with the terms and provisions of the Ground Lease.

(G)  **Notices**.  Landlord shall, immediately upon receipt, forward to Tenant a copy of any and all notices and/or demands received by Landlord from Fee Owner.

(H)  **Governing Provisions**.  As between Landlord and Tenant, wherever the terms, covenants, provisions, conditions and restrictions of this Lease are in conflict with the terms, covenants, provisions, conditions and restrictions of the Ground Lease, the terms, covenants, provisions, conditions and restrictions of this Lease will govern and control.

(I)  **Consent**.  To the extent required under the Ground Lease, Landlord has obtained the consent of Fee Owner to this Lease.

(J)  **Bankruptcy of Fee Owner**.  So long as this Lease is in effect, Landlord covenants that Landlord may not, as the "lessee" under §365(h)(1) of the Bankruptcy Code insofar as the Ground Leased Land is concerned, elect to treat the Ground Lease as terminated under Section 365(h)(1)(A) of the Bankruptcy Code.

10.2  **Tenant's Representations**.  Tenant hereby represents, warrants and covenants that:

(A)  Tenant has full right and authority to enter into this Lease and perform Tenant's obligations under this Lease.

(B)  The individuals signing this Lease and all other documents executed or to be executed pursuant hereto on behalf of Tenant are duly authorized to sign the same on Tenant's behalf and to bind Tenant thereto, this Lease is binding upon and enforceable against Tenant in accordance with its terms, and the transaction contemplated hereby shall not result in a breach of, or constitute a default or permit acceleration and maturity under any indenture, mortgage, deed of trust, loan agreement or other agreement to which Tenant is subject or by which Tenant is bound.

33

(C)     Tenant has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Tenant's creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Tenant's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Tenant's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(D)     Tenant is not a "foreign person" as contemplated by Section 1445 of the Internal Revenue Code. Neither Tenant nor any of its affiliates is a Blocked Person, and, to the best of Tenant's knowledge, neither Tenant nor any of its affiliates engages in any dealings or transactions with any Blocked Person or is otherwise associated with a Blocked Person.

(E)     Tenant shall execute and deliver the SNDAs contemplated under this Lease within thirty (30) days after request therefor.

In addition, Tenant further covenants that Tenant may neither take nor allow any action during the Term that has or will have the potential to render Tenant's representations and warranties inaccurate or otherwise adversely affect Landlord's rights in connection therewith.

10.3     Reliance.  The foregoing representations and warranties of Landlord and Tenant set forth in this Article 10 are express representations and warranties on which the other party may rely on regardless of any investigation or inquiry made by, or any knowledge of, the relying party.

## ARTICLE 11 – SURRENDER; HOLDING OVER

11.1     Surrender.  Upon the expiration or termination of this Lease, Tenant shall surrender possession of the Premises and Tenant's Improvements and remove all of Tenant's Property in the Premises.  Tenant's Improvements that remain upon the Property after surrender shall automatically become the property of Landlord.

11.2     Holding Over.  If Tenant holds the Premises after the expiration of the Term, such holding over will be deemed to have created a tenancy from month to month terminable on thirty (30) days' notice by either party to the other, at a monthly rental equal to 125% of the Fixed Rent payable during the last year of the Term for the first thirty (30) days and thereafter 150% of the Fixed Rent payable during the last year of the Term.

## ARTICLE 12 - DEFAULT

Case 23-13359-VFP  Doc 1066-4  Filed 06/27/23  Entered 06/27/23 11:03:09  Desc
Exhibit 8 - Part 1  Page 36 of 50

12.1     Tenant's Default.  Tenant is in **"Default"** under this Lease if (i) Tenant does not pay the Rent or other sum payable by Tenant pursuant to this Lease within ten (10) days following Tenant's receipt of notice from Landlord stating that (x) such payment was not made on or before its due date, or (y) Tenant has not complied with Sections 6.5, 10.2.E or 16.2 by the date required therein, or (ii) Tenant has not performed any of the other covenants, terms, conditions or provisions of this Lease within thirty (30) days after Tenant's receipt of notice specifying such failure, but, with respect to those failures that cannot with due diligence be cured within the thirty (30) day period, Tenant shall not be in Default if Tenant commences to cure such failure within such thirty

(30) day period and thereafter continues the curing of such failure with all due diligence until such cure is effected.

12.2 <u>Landlord's Remedies</u>. If Tenant is in Default, Landlord may, during the continuance of such Default, institute from time to time an action or actions (i) to recover damages (exclusive of consequential or special damages) plus interest at the Default Rate from the date due until payment in full by Tenant, (ii) for injunctive and/or other equitable relief, or (iii) subject to this Section, to terminate this Lease and recover possession of the Premises by appropriate judicial action. Notwithstanding any provisions of this Lease or applicable law, Landlord may not terminate this Lease nor recover possession of the Premises (and Tenant's rights under this Lease may not be limited) unless (x) the Default is a monetary Default or if non-monetary is a material Default, (y) Landlord has obtained the right to terminate this Lease and recover possession of the Premises through appropriate judicial action, and (z) Tenant has been given ten (10) more days to commence to cure the material Default after such court determination against Tenant. Landlord may immediately terminate this Lease and recover possession of the Premises if Tenant does not pay or otherwise commence to cure the material Default within such ten (10) day period. If Tenant does pay or otherwise commence to cure the material Default within such ten (10) days period, Landlord may not terminate this Lease or recover possession of the Premises, but for clarity, Tenant shall be responsible to Landlord for any damages and attorneys' fees as and to the extent otherwise provided in this Lease.

12.3 <u>Damages on Termination</u>. If Landlord recovers possession and this Lease is terminated, Landlord may recover from Tenant all actual, direct damages incurred by Landlord by reason of such Default before the date this Lease is terminated, including the reasonable cost of recovering possession of the Premises, reasonable cost of reletting, renovation and alteration of the Premises necessary for reletting and reasonable attorneys' fees, plus interest at the Default Rate from the date Landlord advances payment thereof until payment in full by Tenant. Notwithstanding the immediately preceding sentence, Landlord shall not be entitled to recover (i) consequential, speculative or special damages or (ii) any Rent applicable to any period after the termination of this Lease or Landlord's recovery of possession of the Premises, but Landlord may recover from Tenant the balance of the Rent payable by Tenant for the remainder of the Term, minus the fair market rental value (including all amounts that would be payable by a replacement Occupant of the Premises for such period), each discounted to present value.

12.4 <u>Landlord's Default and Tenant's Remedies</u>.

(A) In addition to all other rights and remedies of Tenant under this Lease and at law or equity after notice and cure period provided in this Lease (or, no cure period is provided in this Lease, then within thirty days after notice thereof from Tenant; although no notice or cure period shall be required with respect to Landlord's failure to comply with Section 16.2 by the date required therein), in the event of any breach or default by Landlord under this Lease affecting the Premises, the Exclusive Areas or the Protected Area, and such breach or default by Landlord continues for such period of thirty (30) days after notice thereof from Tenant (or if such default is not susceptible of being cured within the thirty (30) day period, such additional time as may be reasonably necessary to cure such default, provided Landlord commences such cure within thirty (30) days and thereafter diligently pursues such cure to completion), Tenant may (but shall not be obligated to) cure such

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit B - Part 1   Page 37 of 50

breach on behalf of Landlord and, no later than thirty (30) days following demand by Tenant, Landlord shall pay to Tenant the actual out-of-pocket costs of such cure, plus interest at the Default Rate from the date Tenant advances payment thereof until payment in full by Landlord.

(B)    Notwithstanding anything contained in this Lease to the contrary, in the event of an Emergency (i) affecting the Premises, the Exclusive Areas or the Protected Area, or (ii) that interferes with Tenant's business operations, as reasonably determined by Tenant based on circumstances known at the time, the correction of which is Landlord's responsibility, Tenant may immediately notify Landlord orally or by other reasonable means, and upon the failure of Landlord to immediately correct the Emergency situation, Tenant may (but without obligation) correct the same and receive reimbursement of the actual out-of-pocket costs of such cure therefor pursuant to the terms set forth in Section 12.4(A), but the failure of Landlord to immediately correct the Emergency situation shall not be considered a default under this Lease.

(C)    If Landlord fails, no later than thirty (30) days following demand by Tenant, to pay any sums due Tenant under this Lease, Tenant, at its option, may offset against Rent due hereunder or to become due hereunder such sums until the amount owed, plus interest accrued at the Default Rate, is recovered.

(D)    Tenant's rights under this Section 12.4 to cure Landlord's default shall not be deemed to (i) render Tenant liable to Landlord or any third party for any election not to do so, (ii) relieve Landlord from any performance obligation hereunder, or (iii) relieve Landlord from any indemnity obligation herein. No Work performed by Tenant pursuant to this Section 12.4 shall release Landlord from any maintenance, repair and replacement obligations.

(E)    Notwithstanding anything contained in this Lease to the contrary, neither Landlord nor Tenant shall be entitled to recover consequential, speculative or special damages.

12.5    <u>Delay; Waiver</u>.  No delay or omission by either party to exercise any right or power accruing upon any noncompliance or default by the other party with respect to any of the terms of this Lease shall impair the exercise of any such right or power or otherwise be construed to be a waiver thereof, except as otherwise herein expressly provided.  A waiver by either of the parties hereto of any of the covenants, conditions or agreements hereof to be performed by the other shall not be construed to be a waiver of any subsequent breach thereof or of any other covenant, condition or agreement herein contained.  To be effective a waiver must be signed by the party against whom the waiver is to be enforced.

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit 6 - Part 1   Page 38 of 50

12.6    <u>Other Remedies, Mitigation</u>.  Without intending to limit any other remedies provided hereunder, if either party fails to perform any of the covenants, conditions, requirements or obligations attributable to it under this Lease, then, except as expressly provided to the contrary in this Lease, the other party may seek any and all remedies to which it may be entitled at law or in equity, including injunctive relief or an order to compel performance.  Landlord and Tenant

agree to use commercially reasonable efforts to mitigate any damages suffered as a result of a Default or Landlord's breach or default of this Lease, as applicable.

12.7   Limitation of Liability.   Tenant shall, subject to exceptions for fraud, misapplication of deposited funds, or distributions made to avoid payment of an obligation, look solely to Landlord's interest in the Property for the satisfaction of any judgment or decree requiring the payment of money by Landlord, based upon any default under this Lease; provided further, that notwithstanding anything to the contrary, (a) Landlord's personal liability will never be expanded or increased due to any bona fide mortgage, and (b) nothing shall limit Tenant's setoff rights under this Lease. Subject to exceptions for fraud, misapplication of deposited funds, or distributions made to avoid payment of an obligation, no other property or asset of any Landlord affiliate or manager, or any mortgagee, or any other person or entity (excepting only Landlord) is subject to levy, execution, or other enforcement procedure for the satisfaction of any judgment or decree requiring the payment of money by Landlord, based upon any default under this Lease.

## ARTICLE 13 - INSURANCE AND INDEMNITIES

13.1   Insurance Requirements.   Landlord and Tenant shall each maintain the insurance coverages set forth on the attached Exhibit I.

13.2   Release and Waiver of Subrogation.   Notwithstanding any provision to the contrary in this Lease, each party (the "**Releasing Party**") hereby releases and waives for itself, and each Person claiming by, through or under it, the other party (the "**Released Party**") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Property, which loss or damage is of the type covered by (i) the property insurance required to be maintained under this Lease irrespective of the amount of such insurance required or actually carried, including any deductible or self-insurance reserve or (ii) insurance that is actually maintained by the Releasing Party.

13.3   Indemnification by Tenant.   Except as otherwise specifically provided in Section 13.2, from and after the Delivery Date, Tenant must defend, protect, indemnify and hold Landlord, its officers, directors, shareholders, principals, employees, partners, members, and owners, as well as Landlord's managing agent, the Mortgagee and Fee Owner (each, a "**Landlord Indemnitee**"), harmless from and against all Claims (i) asserted, imposed, suffered or incurred, directly or indirectly, in connection with or arising out of loss of life, personal injury and/or damage to property arising from or out of any occurrence in or about the Premises, and the Exclusive Areas maintained by Tenant (if any), or (ii) asserted, imposed, suffered or incurred, directly or indirectly, in connection with or arising out of any breach by Tenant of the covenants, representations, or warranties contained in this Lease. In event Tenant exercises its rights of under Section 2.7 above
Case 23-13359-VFP   Doc 1086-4   Filed 06/27/23   Entered 06/27/23 11:02:06   Desc
Exhibit 6 - Part 1   Page 39 of 50
then during Tenant's entry onto the Property in connection with the exercise of its rights under Section 2.7 above, Tenant shall also defend, protect, indemnify and hold Landlord Indemnitee harmless from and against all Claims asserted, imposed, suffered or incurred, directly or indirectly, in connection with or arising out of loss of life, personal injury and/or damage to property arising from or out of any of Tenant's Work. With respect to the matters set forth in Section 13.3(i), until a court of competent jurisdiction holds that a Landlord Indemnitee is negligent, a claim of negligence against Landlord will not limit Tenant's duties under this Section, and Tenant must defend, indemnify, and hold harmless that Landlord Indemnitee against claims of negligence

against that Landlord Indemnitee. Upon a holding of negligence against a Landlord Indemnitee, Landlord will be responsible for the Claim as determined by the court and must also reimburse Tenant in proportion to the negligent Landlord Indemnitee's fault, for reasonable costs incurred by Tenant in defending such claim of negligence against that Landlord Indemnitee. This Section 13.3 will survive the termination of this Lease.

13.4   <u>Indemnification by Landlord</u>.   Except as otherwise specifically provided in Section 13.2, Landlord must defend, protect, indemnify and hold Tenant, its officers, directors, shareholders, principals, employees, partners, members, and owners (each, a "**Tenant Indemnitee**") harmless from and against all Claims (i) asserted, imposed, suffered or incurred, directly or indirectly, in connection with or arising out of the performance, or failure to perform, by Landlord of its duties or obligations under this Lease with respect to the maintenance and operation of the Property, (ii) asserted, imposed, suffered or incurred, directly or indirectly, in connection with or arising out of loss of life, personal injury and/or damage to property arising from or out of any occurrence in or about the Common Elements and other portions of the Property not included within the Premises, and the Exclusive Areas maintained by Tenant (if any), or (iii) asserted, imposed, suffered or incurred, directly or indirectly, in connection with or arising out of any breach by Landlord of the covenants, representations or warranties contained in this Lease, whether known to or discovered by Tenant before, on or after the Effective Date. With respect to the matters set forth in Section 13.4(i) or 13.4(ii), until a court of competent jurisdiction holds that a Tenant Indemnitee is negligent, a claim of negligence against Tenant will not limit Landlord's duties under this Section, and Landlord must defend, indemnify, and hold harmless that Tenant Indemnitee against claims of negligence against that Tenant Indemnitee. Upon a holding of negligence against a Tenant Indemnitee, Tenant will be responsible for the Claim as determined by the court and must also reimburse Landlord in proportion to the negligent Tenant Indemnitee's fault, for reasonable costs incurred by Landlord in defending such claim of negligence against that Tenant Indemnitee. This Section 13.4 will survive the termination of this Lease.

## ARTICLE 14- CASUALTY

14.1   <u>Right to Terminate</u>.

(A)    If a Substantial Portion of the Building, Premises and/or Common Elements is damaged, destroyed or rendered untenantable by fire, flood, or other casualty, Tenant may terminate this Lease by giving notice of such election to Landlord within thirty (30) days after the casualty, and the termination shall be effective the last day of the second (2nd) calendar month immediately following the month in which such notice was given. "**Substantial Portion**" means (i) damage or destruction to the Building, Premises and/or Common Elements that cannot be fully repaired and restored within twelve (12) months after the date of such fire, flood, or other casualty or (ii) fifty percent (50%) or more of the Floor Area or of the replacement cost of the Building, Premises and/or Common Elements.

(B)    If a Substantial Portion of the Building and/or the Premises is damaged, destroyed or rendered untenantable by fire, flood, or other casualty during the last two (2) years of the then existing Term, Landlord may terminate this Lease by giving notice of such election to Tenant within thirty (30) days after such casualty; if (i) as a result of such

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit B - Part 1   Page 40 of 50

fire, flood, or other casualty, it is physically impossible or economically impracticable to restore the Building for its use immediately preceding the fire, flood, or other casualty within twelve (12) months after the date of such fire, flood, or other casualty, and (ii) the leases (or other agreements for occupancy) of all other Occupants of the "**Co-Termination Area**" of the Property (as shown on the Plans) that are similarly affected by such fire, flood, casualty or damage are terminated. If such notice is given, this Lease will terminate as of the last day of the second (2nd) calendar month immediately following the month in which such notice was given. Notwithstanding the foregoing, Landlord's election to terminate this Lease pursuant to this Section 14.1 will become void if, (x) at such time, there exists at least one (1) remaining Extension Term, and (y) within sixty (60) days after receipt of Landlord's notice of termination, Tenant exercises an option to extend the Term for the Extension Term next following the fire, flood, casualty, or damage.

(C)     If, following any Landlord termination of this Lease as permitted in Section 14.1(B) above during the last five (5) years of the then existing Term, Landlord (in Landlord's sole and absolute discretion) elects to rebuild the Building (or the portion thereof affected by the casualty) within three (3) years after the casualty, then Landlord shall provide notice to Tenant and offer to lease the Premises to Tenant on the same terms and conditions as set forth in this Lease (the "**Rebuilding Offer**"). In the event Tenant desires to accept the Rebuilding Offer, Tenant shall make the election by notice to Landlord within one hundred twenty (120) days after Tenant's receipt of the Rebuilding Offer. This Section 14.1(C) shall survive the expiration or termination of this Lease. In the event Tenant desires to accept the Rebuilding Offer, Tenant shall make the election by notice to Landlord within one hundred twenty (120) days after Tenant's receipt of the Rebuilding Offer. This Section 14.1(C) shall survive the expiration or termination of this Lease. In the event Tenant desires to accept the Rebuilding Offer, Tenant shall make the election by notice to Landlord within one hundred twenty (120) days after Tenant's receipt of the Rebuilding Offer. Notwithstanding the foregoing, if Tenant has not been either (i) operating from the Premises, or (ii) diligently performing renovations to permit a retail business to operate from the Premises, for a period of one (1) year or more immediately preceding the date of the fire or other casualty, then Landlord need not make the Rebuilding Offer.

14.2     <u>Restoration</u>.

(A)     If the whole of, or any portion of, the Property (including the Premises, Exclusive Areas, Tenant's Systems, Building, Adjacent Buildings, and/or Common Elements) is damaged or destroyed by fire, flood, or other casualty, and this Lease is not terminated pursuant to the provisions of Section 14.1, Landlord shall (i) promptly take such action(s) as may be required under Governmental Requirements with respect to any damage, (ii) remove the debris resulting from such casualty and construct a safe and sightly barrier to the damaged areas(s), and (iii) within ninety (90) days after such damage or destruction, commence and thereafter proceed with due diligence to repair, restore and/or rebuild the Building (including the Premises), at least 200,000 square feet of Floor Area of Adjacent Buildings, and Tenant's Improvements (but excluding Tenant's Property), the Exclusive Areas, Tenant's Systems and the Common Elements within the Protected Area to substantially the condition and character that existed on the Rent Commencement Date,

Case 23-13359-VFP   Doc 1086-4   Filed 06/27/23   Entered 06/27/23 11:02... Exhibit 8 - Part 1   Page 41 of 50

and such other portions of the Property as necessary for the issuance of a certificate of occupancy for the Premises and/or to put the Property in a safe and sightly condition (the "**Restoration Work**"). Tenant is responsible at its sole cost for any necessary restoration of Tenant's Property.

(B)     Landlord shall complete the Restoration Work as soon as reasonably possible, but in no event later than twelve (12) months after the date of the casualty if commercially practicable. If Tenant reasonably determines that (i) Landlord most likely cannot complete, (ii) Landlord has not completed, the Restoration Work within twelve (12) months (regardless of whether commercially practicable), or (iii) Tenant will be unable to obtain all necessary approvals to operate within the Premises as permitted under this Lease, Tenant may, upon not less than ten (10) days' notice to Landlord, terminate this Lease; provided however, Tenant must exercise such termination right with respect to clauses (i) and (iii) on or before the day that is 120 days following Landlord's notice to Tenant (with reasonable supporting documentation) that Landlord has received all necessary approvals to perform the Restoration Work. If Landlord has not commenced the Restoration Work within the applicable time periods set forth above, or after commencing fails to diligently proceed therewith to completion, Tenant may, if Landlord fails to cure such condition within thirty (30) days after notice to Landlord, elect to (x) terminate this Lease upon not less than thirty (30) days' notice which notice must be given prior to Landlord commencing the Restoration Work or completing the Restoration Work, as applicable, (y) perform, on Landlord's behalf, all or any portion of the Restoration Work, in which event Landlord's insurance proceeds must (subject only to any existing rights by Landlord's mortgagee) be paid to Tenant in accordance with Section 14.3 and, in addition, Landlord shall, no later than thirty (30) days following demand by Tenant, reimburse Tenant for any actual costs incurred by Tenant in performing the Restoration Work that have not been previously reimbursed to Tenant, plus interest at the Default Rate (failing which reimbursement Tenant may set off the sum against Rent otherwise due and payable hereunder), or (z) seek specific enforcement and performance of Landlord's obligations to complete the Restoration Work.

(C)     Landlord shall submit a copy of the plans and specifications for the Restoration Work to Tenant. Tenant may, subject to the requirements and limitations set forth in Article 6 hereof, require Landlord to make Alterations to the Premises in the course of, and as part of, the Restoration Work. If the net cost of the Restoration Work (including costs and damages resulting from delays caused thereby) is increased after taking into consideration all such Alterations, Tenant shall pay to Landlord the amount by which (i) the net cost of the Restoration Work was thereby increased and (ii) Landlord has been damaged by any delays caused solely by such Alterations (the "**Increased Costs**"). Tenant shall pay the Increased Costs to Landlord in installments, not more frequently than monthly within thirty (30) days following receipt of satisfactory lien waivers for such work and, for the last such payment, a certification from Landlord's architect that the Restoration Work has been substantially completed.

14.3     <u>Proceeds of Insurance</u>.  Insurance proceeds shall be advanced in a normal and customary manner to the party performing the Restoration Work or portion thereof, for such purposes as the work progresses, and upon completion of the Restoration Work, the remaining

Case 23-13359-VFP   Doc 1066-4   Filed 06/27/23   Entered 06/27/23 11:02
Exhibit 6 - Part 1   Page 42 of 50

balance, if any, shall be paid to Landlord. Notwithstanding anything contained herein to the contrary, if this Lease is terminated pursuant to Section 14.1, Tenant is entitled to that portion of the proceeds from Landlord's insurance equal to the unamortized Book Value of Tenant's Improvements.

14.4    _Abatement of Rent_. If all or any part of the Premises is damaged or destroyed by fire, flood, or other casualty, then Rent for the period from the date of such damage or destruction until the date of termination of this Lease pursuant to the provisions of this Article 14, if this Lease is so terminated, or if not, until substantial completion of the Restoration Work, shall be reduced by multiplying the Rent by a fraction, the numerator of which is the Floor Area of the Premises remaining tenantable (in Tenant's reasonable opinion) during performance of the Restoration Work, and the denominator of which is the Floor Area of the Premises immediately preceding the fire, flood, or other casualty. If the Premises, Tenant's Improvements, Tenant's Systems, Exclusive Areas and/or the Common Elements suffer damage or are destroyed and Tenant, in Tenant's good faith business judgment, determines that it is not practical to remain open to the public for business during performance of the Restoration Work and Tenant closes, Rent shall abate in full until the earliest of (i) one hundred eighty (180) days after the Restoration Work having been substantially completed and the Premises having been delivered to Tenant in the condition required as of the Delivery Date, (ii) Tenant's opening of the Premises to the public for business, or (iii) the date of termination of this Lease.

## ARTICLE 15- CONDEMNATION

15.1    _Total Taking_. If the entire Premises, or so much of the Property or Premises as to make the Premises unusable by Tenant, is taken by condemnation or by a sale in lieu of condemnation ("**Condemnation**"), then this Lease shall terminate on the date that possession to the Premises is taken. Upon termination, the possessory interests of Landlord and Tenant shall become interests in any award for damages as set forth in Section 15.3.

15.2    _Partial Taking_. If part of the Property or Premises is taken by Condemnation (or is to be taken by Condemnation and notice of such Condemnation has been received by Landlord or Tenant):

(A)    Tenant may terminate this Lease upon thirty (30) days' notice to Landlord following the earlier of (i) Tenant's determination that the Premises cannot be restored to an economically viable condition for Tenant's use, or (ii) Landlord has notified Tenant in writing that, based on the extent of funds available to Landlord from the award paid for the Condemnation, Landlord cannot reasonably restore the Premises to a Tenantable Condition.

Case 23-13359-VFP  Doc 1066-4  Filed 06/27/23  Entered 06/27/23 11:02:09  Desc
Exhibit B - Part 1  Page 43 of 50

(B)    Upon a partial taking that does not result in a termination of this Lease:

(1)    Rent shall be equitably adjusted to reflect the (i) reduced amount of Tenant's useable area in the Premises, and (ii) reduced utility of the Premises, Exclusive Areas, or Common Elements;

(2)    Landlord must restore the Premises to a Tenantable Condition; and

(3)     Landlord must restore the balance of the Property, but only to the extent of funds available to Landlord from the award paid for the taking.

15.3    _Damages_. Upon a total or partial taking, Landlord and Tenant shall each have an interest in the Condemnation award equivalent to their interest in the Premises and under this Lease before the taking (including Tenant's sole right to any award related to Tenant's Improvements as offset by the any unamortized value of the Allowance received by Tenant which offset amount shall be included in Landlord's award, Tenant's Property, and moving and relocation expenses or assistance, but to the extent there is any award for the value of Tenant's leasehold estate or leasehold advantage ("**Leasehold Award**"), the Leasehold Award will be split evenly between Landlord and Tenant. For the avoidance of doubt the foregoing provision regarding the Leasehold Award does not apply to any award related to Tenant's Improvements, Tenant's Property, and moving and relocation expenses or assistance. Landlord and Tenant may each participate in any Condemnation proceeding with counsel of its own choosing.

## ARTICLE 16 - MISCELLANEOUS

16.1    _Notice_. All notices, demands and requests (individually or collectively, a "**notice**") required or permitted to be given under this Lease shall be in writing, sent prepaid, by nationally recognized overnight courier or by United States certified mail, return receipt requested, postage prepaid, and shall be deemed to have been given as of the date such notice is (i) delivered to the party intended, (ii) delivered to the then designated address of the party intended, or (iii) rejected at the then designated address of the party intended. The initial addresses of Landlord and Tenant are:

To Landlord:       c/o M & J Wilkow Properties, LLC
                   20 South Clark Street
                   Suite 3000
                   Chicago, Illinois 60603
                   Attention: Marc R. Wilkow, President

To Tenant:         Target Corporation
                   Target Properties
                   Attn: Real Estate Portfolio Management/[Port Chester, NY, T3399]
                   1000 Nicollet Mall, TPN 12H
                   Minneapolis, MN 55403

Upon at least ten (10) days' prior notice given in accordance with this Article, each party may change its address to any other address within the United States of America.

Case 23-13399-VFP  Doc 1066-4  Filed 06/27/23  Entered 06/27/23 11:02:09  Desc
Exhibit 4 - Part 1  Page 44 of 50

16.2    _Estoppel Certificate_. Landlord or Tenant must, at any time and from time to time, within thirty (30) days after request therefor (which request by such party may not be more frequent than three (3) times during any calendar year), from the other party execute and deliver to the other party and/or its designee(s) (which may include, when requested by Landlord, the Mortgagee and Fee Owner), an estoppel certificate stating (i) whether, to the requested party's knowledge, this Lease is in full force and effect, (ii) whether this Lease has been assigned, modified or amended in any way by the requested party and if so, then stating the nature thereof in reasonable detail, (iii) whether Rent and other charges have been paid more than thirty (30) days in advance, except

to the extent required under the Lease, and (iv) whether there are, to the requested party's knowledge, any uncured defaults on the part of the requesting party hereunder, and if so, specifying such defaults. The issuance (or deemed issuance pursuant to this Section) of the certificate shall act to estop the issuer from asserting a claim or defense against any bona fide prospective purchaser, subtenant, assignee, or encumbrancer of all or any portion of the Premises or the real property of which the Premises are a part to the extent that such claim or defense is based upon facts contrary to the facts contained in the certificate, and such bona fide purchaser, subtenant, assignee, or encumbrancer has acted in reasonable reliance upon such certificate without knowledge of facts to the contrary. The issuance of a certificate shall not waive any right of the issuer to (a) challenge acts committed by the other party for which approval by the issuer of the certificate was required but not sought or obtained or (b) unpaid allowances or audit, offset, or adjustment rights in the Lease (collectively, the "**Estoppel Limitations**"). Subject to the Estoppel Limitations, the requested party's failure to deliver such certificate within such time shall estop the requested party from claiming that (i) this Lease is not in full force and effect, (ii) this Lease has been assigned, modified or amended in any way by the requested party except as may be represented by the requesting party, (iii) Rent has been paid more than thirty (30) days in advance, except to the extent required under the Lease, and (iv) there are uncured defaults in the requesting party's performance.

16.3    Expense of Enforcement. If any dispute arises in connection with the interpretation or enforcement of this Lease or any default hereunder, or if Landlord or Tenant is required to appear in any legal proceeding with regard to this Lease, the prevailing party in any such dispute may recover from the non-prevailing party all reasonable attorneys' fees, costs, disbursements and other expenses actually incurred.

16.4    Entire Agreement. This Lease (including its exhibits) contains all agreements of the parties with respect to the use and rental of the Premises and supersedes all previous written or oral understandings, agreements, contracts, correspondence and documentation with respect thereto. Any oral representations or modifications concerning this Lease are of no force or effect. Landlord and Tenant may consider, approve or disapprove any proposed amendment to this Lease in their respective sole and absolute discretion without regard to reasonableness or timeliness. This Lease may not be amended or modified except by an agreement in writing signed by the parties or their respective successors in interest. This Lease is binding upon, inures to the benefit of, and is enforceable by Landlord and Tenant, and their respective successors and permitted assigns. No third-party beneficiary rights are created by this Lease.

16.5    Headings. The Article headings contained in this Lease are for purposes of reference only and shall not limit or define the meaning of any of the terms or provisions hereof.

Case 23-13359-VFP  Doc 1066-4  Filed 06/27/23  Entered 06/27/23 11:02:09  Desc
Exhibit 4- Part 1  Page 45 of 50

16.6    Governing Law. This Lease is governed by and construed in accordance with the laws of the State or Commonwealth in which the Property is located.

16.7    Costs. Whenever, in this Lease, anything is to be done or performed by Tenant or Landlord, unless otherwise expressly provided to the contrary, it shall be done or performed at the sole cost of Tenant or Landlord, as the case may be.

16.8    Force Majeure/Unavoidable Delay.  Whenever performance is required of any party hereunder, such party shall use all due diligence to perform and take all necessary measures in good faith to perform, but if completion of performance is delayed at any time by reason of acts of God, war, terrorist acts, civil commotion, riots, strikes, picketing, or other labor disputes, or damage to work in progress by reason of fire, flood, pandemics (including, the Pandemic), or other casualty or causes beyond the reasonable control of a party (other than financial reasons unavailability of labor or materials, or default by a contractor) (each, a "**Force Majeure Event**"), then the time for performance as herein specified shall be appropriately extended by the time of the delay actually caused.  For the avoidance of doubt, notwithstanding the fact that the Pandemic is known by the parties, Landlord and Tenant acknowledge that the Pandemic is deemed to be a Force Majeure Event because the duration of the disruptions caused by the Pandemic, and the impact thereof (including, without limitation, with respect to the availability of labor and materials), is currently unforeseeable and unavoidable. If the Required Delivery Date or Final Delivery Date is to be extended by a Force Majeure Event, Landlord must advise Tenant of the circumstances supporting such claim within fifteen (15) days after the event.  The provisions of this Section 16.8 will not operate to excuse any party from the prompt payment of any monies required by this Lease.

16.9    Brokers.  Tenant and Landlord represent and warrant to each other that neither has had any dealings or discussions with any broker or agent (licensed or otherwise) in connection with this Lease other than Jeff Howard at Ripco and Ken Stern and Jessica Curtis at CBRE (the "**Broker**").  Landlord is solely responsible for any fees, commissions or other payments due Broker in connection with this Lease.

16.10    Approvals; Time Period.  Except as otherwise specifically provided in this Lease, in connection with approvals and consents hereunder, nothing contained in this Lease limits the right of a party to exercise its business judgment, or act in a subjective manner, or the right to act in its sole discretion or sole judgment, whether "objectively" reasonable under the circumstances, and any such decision shall not be deemed inconsistent with any covenant of good faith and fair dealing otherwise implied by law to be part of this Lease.  Unless provision is made for a specific time period, each response to a request for an approval or consent required to be considered pursuant to this Lease shall be given by the party to whom directed within thirty (30) days of receipt.  If a response is not given within the required time period, the requested party is deemed (except as otherwise provided in this Lease) to have given its approval if the original notice stated in capitalized letters that failure to respond within the applicable time period shall be deemed an approval.

16.11    Memorandum of Lease.  Landlord and Tenant have executed and delivered to each other a memorandum of this Lease for recording in the form on the attached Exhibit K (the "**Memorandum of Lease**").  Tenant may, at its sole cost, record the Memorandum of Lease in the appropriate public records in and for the county in which the Premises are located.  This Lease may not be recorded unless both Landlord and Tenant have consented thereto in their absolute discretion.

16.12    Counterparts.  This Lease and its amendments may be signed in counterparts, each of which is deemed an original and all of which when taken together shall constitute one instrument.

16.13   Interpretation.   If any part of this Lease is adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect or impair any other provision.  In making an interpretation of the meaning of any provision of this Lease, no inference is to be made based upon changes made to drafts of this Lease during the negotiations between the parties hereto and their respective counsel before the Effective Date.

16.14   Dates.   If the final date of any period of time set forth herein (e.g., a period "within thirty (30) days", but not a specific date such as "January 31") occurs on a Saturday, Sunday, or legal holiday, then the expiration of that period of time shall be postponed to the next day that is not a Saturday, Sunday, or legal holiday.

16.15   Terminology.   Whenever required by the context of this Lease, (i) the singular includes the plural, and vice versa, and the masculine includes the feminine and neuter genders, and vice versa and (ii) use of the words "including", "such as", or words of similar import, when following any general term, statement or matter shall not be construed to limit such statement, term or matter to specific items, whether or not language of non-limitation, such as "without limitation", or "but not limited to", are used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest scope of such statement, term or matter.  The words "and/or" mean each of the items listed whether together, in partial combination or alone.

16.16   Non-Disclosure.   Except for such news or information that has previously been publicly disclosed by Tenant, Landlord and its contractors, agents or employees shall not issue any press release, public statement or announcement or other similar public disclosure regarding this Lease or Tenant's business operations without prior written consent from Tenant.

16.17   Time of the Essence.   Time is of the essence in this Lease.

[signatures on following page]

IN WITNESS WHEREOF, the parties hereto have executed these presents effective as of the Effective Date.

**Landlord:**

ML-MJW PORT CHESTER SC OWNER LLC,
a limited liability company

By ML-MJW Port Chester SC Venture LLC,
a Delaware limited liability company,
its sole member

By M & J PC Investors LLC,
A Delaware limited liability company,
its managing member

By M&J PC Manager, Inc.,
a Delaware corporation
its manager

By: _____
        Marc R. Wilkow, President

Date: _____

**Tenant:**

TARGET CORPORATION,
a Minnesota corporation

By: _____

Name: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the parties hereto have executed these presents effective as of the Effective Date.

**Landlord:**                                                    **Tenant:**

ML-MJW PORT CHESTER SC OWNER LLC,          TARGET CORPORATION,
a limited liability company                               a Minnesota corporation

By ML-MJW Port Chester SC Venture LLC,          By: _____
a Delaware limited liability company,
its sole member                                               Name: _____
                                                                    Michael J. Seaman
By M & J PC Investors LLC,                               Sr. Director Real Estate
A Delaware limited liability company,               Title: _____
its managing member                                          Target Corporation

By M&J PC Manager, Inc.,                                 Date: 5/20/2020
a Delaware corporation
its manager

By: _____
        Marc R. Wilkow, President

Date: _____

# SCHEDULE 1
## Definitions

"**Book Value**" means the value of an asset (such as Tenant's Improvements) on Tenant's accounting records, using straight line depreciation and other sound accounting practices consistently applied by Tenant.

"**Business Office**" means an office which does not provide services directly to consumers.

"**Claim**" means all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses, damages, judgments, penalties, fines and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of defense and of suit.

"**Common Element(s)**" means the following portions of the Property to the extent they are intended or available for the common use and benefit of Tenant and any other Occupant (i) the Common Systems, (ii) utility rooms, but not such areas as are located within the Premises or within other Occupant's premises, (iii) the utility shafts, (iv) the exterior walls of the Building (excluding windows) and the roof of the Building, (v) entrances and exits providing ingress and egress to and from the Building except to the extent any entrance or exit exclusively provides access to a tenant's premises, (vi) common loading, receiving and storage areas, (vii) the foundations, columns, girders, beams, supports, and other structural members of the Building, (viii) the stairs, stairways, stairwells, and all related equipment, (ix) sidewalks, passageways, pedestrian plazas, walkways and paths, (x) the Parking Lot, (xi) access drives and entrances providing ingress and egress to and from the Property and the Building, (xii) interior and exterior lighting located within areas otherwise defined as Common Elements, (xiii) Informational Signs, (xiv) exterior landscaping, and (xv) all other improvements, equipment and facilities the common use of which is necessary or convenient now or in the future for the existence, maintenance, repair and replacement, as well as the safe operation, of the Property and the Building. Landlord may not restrict Tenant's access or use of any of the Common Elements except as may be expressly provided in this Lease. Any of the foregoing that exclusively serves only one (1) Occupant is not a Common Element.

"**Common Element Charges**" means those costs that are reasonably necessary for the repair, cleaning, operation and maintenance of the Common Elements.

"**Common Element Insurance Charges**" means those insurance costs that are reasonably incurred for insurance of the Common Elements to the extent required under this Lease and other insurance as is customarily maintained (and on comparable terms. e.g., with respect to limits, deductibles/self-insured retentions, etc.) by institutional owners of similar shopping centers. In no event may any Common Element Insurance Charges be submitted more than three (3) years after the date incurred by Landlord.

"**Common Systems**" means systems serving the Common Elements or serving Tenant and any other Occupant of the Property, including (i) utility lines, services and facilities, (ii) any refrigeration, heating, ventilating and air conditioning system (including outside air ventilation systems, smoke exhaust systems and toilet exhaust systems), (iii) any emergency generator, panel and system for the Building, (iv) the life safety systems of the Building, (v) the sprinkler system of the Building, (vi) conduits and chases between the main switching equipment and closet up to the distribution panel or switching equipment within and exclusively serving the premises of an