# EXHIBIT G
## Prohibited Uses

1.    Any use that emits an obnoxious odor, obnoxious noise, or obnoxious sound that can be heard or smelled outside of any Occupant space at the Property.

2.    An operation primarily used as a storage warehouse operation or any assembling operation, or any manufacturing, distilling (except in connection with otherwise permitted activities, such as the brewing of beer), refining, smelting, agricultural, or mining operation.

3.    Any "second hand" store; provided however, this shall not restrict the following: a first-class retail establishment selling antiques, or a retail operation with at least ten (10) locations under the same trade name and that operates substantially as Play-it-Again Sports, Disc Go Round, Once Upon A Child, Plato's Closet, or Clothes Mentor, each as of the Effective Date.

4.    Any operation selling "surplus" or "salvage" goods, or pawn shop.

5.    Any dumping, disposing, incineration or reduction of garbage, but this prohibition does not apply to (i) garbage compactors or other garbage collection areas or facilities located in designated service areas not visible to customers visiting the Premises or (ii) recycling centers that may be required by Governmental Requirements.

6.    Any fire sale, bankruptcy sale (unless pursuant to a court order), or auction house operation.

7.    Any (i) automobile, truck, trailer or recreational vehicle sales, leasing or display operation (provided that this shall not be construed to restrict a car rental dropoff / pickup facility located within the Redevelopment Area and which, in event, whose Permittees may only use parking spaces within the Redevelopment Area), (ii) car wash or (iii) body shop or repair operation.

8.    Any (i) automotive service/repair station, or (ii) facility that both sells and installs any lubricants, tires, batteries, transmissions, brakes or any other similar vehicle accessories, other than as customarily provided by stores operating under the 'Goodyear' trade name and located within the Redevelopment Area; provided however, that in any event, only so long as any garage doors, lifts and related equipment are screened from the view along the path of travel in the Protected Area from Boston Post Road to the Premises.

9.    Any long term residential use, including single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters.

10.    Except within the Redevelopment Area, any hotel, motel, or short term residential use.

11.    Any bowling alley, skating rink, movie theater or live performance theater, or other use primarily of an entertainment nature such as a Dave & Busters, Pinstripes, Lucky Strike, etc.

12.    Any veterinary hospital or animal raising or boarding facility, but pet shops may offer veterinary or boarding services incidental to the operation of a pet shop, provided (i) the boarding of pets as a separate customer service is prohibited; (ii) all kennels, runs and pens must be located

inside the Building; and (iii) the combined incidental veterinary and boarding facilities may not occupy more than fifteen percent (15%) of the Floor Area of the pet shop.

13.     Any mortuary or funeral home.

14.     Any (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications customarily sold by a national bookstore of the type normally located in first-class shopping centers in the State in which the Property is located (such as, for example Books-A-Million, Half Price Books, and Barnes & Noble, as said stores currently operate) shall not be restricted]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto (provided, however, that the sale or rental of such media by a national store of the type normally located in first-class shopping centers in the State in which the Property is located shall not be restricted).

15.     Any establishment that sells or exhibits illicit drugs or related paraphernalia.

16.     Any strip club, restaurant, or other operation whose personnel wear a uniform or attire that a reasonable person would consider to be sexually provocative (e.g., Hooters, Tilted Kilt).

17.     Any bar, tavern, restaurant, or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds forty percent (40%) of the gross revenues of such business.

18.     Any banquet hall, although this shall not restrict special dining or event rooms or halls ancillary within restaurants.

19.     Any health spa, fitness center, or workout facility unless such operation is (i) less than three thousand five hundred (3,500) square feet of Floor Area, or (ii) located at least three hundred (300) feet from the Premises.

20.     Any massage parlor or similar establishment (but the provision of therapeutic massages as part of a first-class health or beauty salon or spa operation or by professional health care providers or licensed massage therapists are permitted).

21.     Any flea market, amusement or video arcade, pool or billiard hall, or dance hall.

22.     Any gambling facility or operation, including:  off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall.  This prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by an Occupant of the Property.

23. Any central laundry, dry cleaning plant, or laundromat, but this restriction (i) is not intended to prevent the operation of an on-site service oriented solely to pickup and delivery of clothing by the ultimate consumer, with no washing or processing facilities upon the Property, as the same may be found in retail shopping centers in the Metropolitan Area, and (ii) shall not apply to a retail drycleaner (a) not exceeding 3,000 square feet of Floor Area, (b) operated by a national operator using a closed-loop system solely using dry cleaning solvents that are biodegradable, non-chlorinated, not hydrocarbons, and not Hazardous Materials, and (c) located at least five hundred (500) feet from the Premises.

24. Any training or educational facility, including: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers, but this prohibition is not applicable to (a) on site employee training by an Occupant incidental to the conduct of its business at the Property, or (b) the Exception Building Location.

25. Any firearms testing or firing range, or the sale or display of any type of firearms or ammunition.

26. Any storing, selling, dispensing, or distributing Marijuana Products by prescription, medical recommendation, or otherwise. "**Marijuana Products**" means any form of cannabis intended for human consumption (via inhalation, ingestion, injection, topical application, or otherwise) that contains psychoactive levels of THC, or similar psychoactive derivatives, chemicals, or substances, whether natural or synthetic. Marijuana Products does not include non-psychoactive cannabis derivatives, such as industrial hemp, cannabidiol (commonly known as CBD) derived from industrial hemp, or other non-psychoactive cannabis derivatives, compounds, or substances, whether for human consumption or other use. The foregoing restriction shall not apply to the sale of Marijuana Products by a licensed pharmacist (in any case, no signage visible from the exterior of the premises may include marijuana or Marijuana Product references) selling a wide variety of pharmaceuticals as part of a reputable national or regional medical pharmacy chain in compliance with all Governmental Requirements, provided no such sales may be made: (i) for recreational use, as opposed to medicinal use; or (ii) to minors.

27. Any unusual fire, explosive or dangerous hazards (including the storage, display or sale of explosives or fireworks other than "sparklers" or other fireworks incidental to a discount department store).

28. A store primarily selling merchandise which is classed as "odd lot, "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World" or "Odd Job"; provided however, that the foregoing shall not prohibit (i) the retailer commonly known as "Christmas Tree Shops", (ii) so called "Dollar Stores", or (iii) operations specifically permitted by Paragraph #3 above.

29. Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance).

30.     Any payroll loan service.

31.     Any tattoo or piercing parlor, although this shall not prohibit ear piercing as an ancillary use.

32.     Any church or other place of religious worship, related religious facility, or religious reading room.

33.     Any swimming pool or hot tub.

34.     Any karate center.

35.     Any auditorium.

36.     Pursuant to the Existing Occupancy Agreement with Buy Buy Baby (the "**Baby Lease**"), any daycare center, children's recreational facility, entertainment facility or activity facility (such as 'Discovery Zone' or 'Chuck E. Cheese's') within two hundred (200) feet of the premises occupied by Buy Buy Baby as depicted on the Plan (the "**Baby Premises**").

37.     Pursuant to the Baby Lease, any establishment selling alcoholic beverages for on or off premises consumption, except (a) sales of alcoholic beverages for on-premises consumption incidental to a restaurant permitted by Paragraph #38 below, or (b) establishments selling alcoholic beverages for off-premises consumption located more than 100 feet from the Baby Premises. (Note: The Premises, as configured as of the Effective Date, is more than 100 feet from the Baby Premises.)

38.     Pursuant to the Baby Lease, any restaurant serving meals located within two hundred (200) feet of the Baby Premises; provided however, that after the expiration (including any existing renewals provided for in the current Baby Lease) or earlier termination of the Baby Lease, the foregoing restriction shall not exceed a distance of one hundred (100) feet of the Baby Premises.

39.     Pursuant to the Existing Occupancy Agreement with ULTA, any restaurant occupying more than 2,500 square feet of Floor Area within the Premises or Exclusive Areas except that this shall not apply so long as such restaurant use is part of or ancillary to another use.

Each of the prohibitions in Items #36, 37 and 38 (each, an "**Existing Noxious Restriction**") are not permitted at the Property during the term of the applicable Existing Occupancy Agreement. Each Existing Noxious Use Restriction is enforceable solely on the basis of the Existing Occupancy Agreement(s) for the sole benefit of each Existing Occupant under such Existing Occupancy Agreement, and only during the term of such Existing Occupancy Agreement (including any existing renewals provided for in such current Existing Lease and as otherwise provided in #38), and are not intended as a benefit to Landlord independent of the rights of Existing Occupants. In furtherance thereof, Landlord hereby releases, solely on behalf of itself, its successors, assigns, and affiliates, any rights Landlord holds relating to the Existing Noxious Use Restrictions to enforce the Existing Noxious Use Restrictions against Tenant, other than Landlord's right to enforce the restrictions to the extent notified, requested or demanded by such Existing Occupant or (as to Existing Occupancy Agreements under which Landlord would be in breach or subject to remedies or detriment without notice, request or demand by the Existing

Case 23-13359-VFP   Doc 1086-7   Filed 06/27/23   Entered 06/27/23 11:02:02   Desc
Exhibit B - Part 4J   Page 4 of 64

Occupant) required by Existing Occupancy Agreements. Each Existing Noxious Use Restriction will automatically expire upon the earlier of the (i) expiration or sooner termination of the applicable Existing Occupancy Agreement, or (ii) date that the Existing Noxious Restriction in such Existing Occupancy Agreement expires or terminates subject to any reinstatement provided in such Existing Occupancy Agreement.

# EXHIBIT H-1
## <u>Exterior Building Signage</u>

# EXHIBIT H1- EXTERIOR BUILDING SIGNAGE

Case 23-13269-VFP   Doc 1086-7   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit B - Part 4   Page 7 of 64



Internally illum. "logo & letter" set
8'-0" tall x 30'-0" wide (~237 sf)
Coordinate center of bullseye with
metal panel joints.

Internally illum. Starbucks sign
behind glazing
2'-0" dia (~4 sf)

new glazing

new metal panel wall with
+/- 2'-0" return

non-illuminated CVS pharmacy
sign on backside of glazing
2'-3" tall x 4'-6" wide (~10 sf)

repaint existing

OP - OPTION#1:
non-illuminated order pickup sign
on backside of glazing
2'-3" tall x 3'-9" wide (~8.5 sf)

8'-10"

8'-10"

7'-4"

1 — UPPER LEVEL ELEVATION
H1.2    1" = 20'-0"

## Port Chester Store
495 Boston Post Road

Port Chester, New York

05 | 20 | 20

# EXHIBIT H1- EXTERIOR BUILDING SIGNAGE



repaint new color

replace existing metal panel with new red metal panel - wrap inside corner over existing exterior stairs

area reserved for other tenants of the property

Internally illum. "logo & letter" set 8'-0" tall x 30'-0" wide (~237 sf) Coordinate center of bullseye with metal panel joints.

Internally illum. CVS Pharmacy sign 3'-8" tall x 8'-0" wide (~30 sf)

STAPLES

WHOLE FOODS

K-CVS

target

OP- OPTION#2: non-illuminated order pickup sign on backside of glazing 1'-6" tall x 2'-6" wide (~4 sf)

new entry

repaint new color

replace existing fence with new

1 LOWER LEVEL ELEVATION
H1.3 1" = 25'-0"

# EXHIBIT H-2

# **Freestanding Signage Exhibit**

# EXHIBIT H2- FREESTANDING SIGNAGE



Case 23-13359-VFP   Doc 1086-7   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit B - Part 4   Page 10 of 64

# EXHIBIT H-3
## Wayfinding Signage Exhibit

# EXHIBIT H3- WAYFINDING SIGNAGE

Legend

○ Building Elevations, See Exhibit H1

◉ Wayfinding Signage provided as part of the Landlord's redevelopment plan.

WS.1

WS.2

WS.3

# EXHIBIT H3 - WAYFINDING SIGNAGE



**general note:**
Landlord provided wayfinding signage shown here indicates preliminary recommendations and intent. All text is preliminary. Final design to be coordinated with Target's requirements. Dimensions will be determined by Port Chester signage code. Landlord will submit maximum allowable size.

4' 6"

lower
level

○⊙

more parking
order pickup
drive up

TENANT
TENANT

WS.3

9'-0"

3'-0"

TENANT

○P◀

more parking
order pickup
& drive up
at lower level

TENANT
TENANT
TENANT

WS.2

6'-0"

3'-0"

TENANT
○ target →
TENANT
TENANT
TENANT
TENANT
TENANT
TENANT

WS.1

6'-0"

Location of order pickup and drive
up t.b.d. This will be either at the
upper level or the lower level, but
not both

1 WAYFINDING SIGN ELEVATIONS
H1.4 3/8" = 1'-0"

**Port Chester Store**
495 Boston Post Road
Port Chester, New York

# EXHIBIT I
## Insurance Requirements

1.1 <u>Landlord's Liability Insurance</u>.  Landlord must, at all times during the Term, maintain or cause to be maintained in full force and effect at least the minimum insurance coverages set forth below:

A.   Commercial General Liability Insurance ("**Landlord's CGL Coverage**") with a combined single limit of liability of Five Million Dollars ($5,000,000) for bodily injury, personal injury, contractual liability, and property damage, arising out of any one occurrence. Tenant must be named as an "additional insured" under Landlord's CGL Coverage.  Landlord's CGL Coverage covering the Property (other than with respect to the Premises) must be primary insurance and not contributory with the insurance maintained by Tenant pursuant to Section 1.2.

B.   Workers' compensation insurance as required by any applicable law or regulation.

C.   Employer's liability insurance or if not available as part of Landlord's workers' compensation insurance, functionally equivalent "stop gap" coverage, in the amount of $1,000,000 for each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

D.   Automobile liability insurance (including coverage for owned, hired, and non-owned vehicles) with minimum limits of coverage of not less than $1,000,000 combined single limit per accident.

1.2 <u>Tenant's Liability Insurance</u>.  Commencing on the Delivery Date and thereafter throughout the Term, Tenant (as to the Premises) must maintain or cause to be maintained in full force and effect at least the minimum insurance coverages set forth below:

A.   Commercial General Liability Insurance ("**Tenant's CGL Coverage**") with a combined single limit of liability of Five Million Dollars ($5,000,000) for bodily injury, contractual liability, personal injury and property damage, arising out of any one occurrence. Landlord, the Mortgagee, and Landlord's managing agent each must be named as an "additional insured" under Tenant's CGL Coverage.  Tenant's CGL Coverage covering the Premises must be primary insurance and not contributory with the insurance maintained by Landlord, the Mortgagee, and Landlord's managing agent pursuant to Section 1.1.

B.   Workers' compensation insurance as required by any applicable law or regulation.

C.   Employer's liability insurance or if not available as part of Landlord's workers' compensation insurance, functionally equivalent "stop gap" coverage, in the amount of $1,000,000 for each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

D. Automobile liability insurance (including coverage for owned, hired, and non-owned vehicles) with minimum limits of coverage of not less than $1,000,000 combined single limit per accident.

1.3 <u>Contractor's Liability Insurance</u>. Before Landlord or Tenant commences any construction activities within the Property, Landlord or Tenant, as applicable, must obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverages set forth below:

A. Workers' compensation insurance as required by any applicable law or regulation.

B. Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

C. Commercial General Liability insurance covering all operations by or on behalf of the contractor, which must include the following minimum limits of liability and coverages:

(i) Required coverages:

(1) Premises and Operations;
(2) Products and Completed Operations;
(3) Contractual Liability, insuring the indemnity obligations assumed by contractor under the contract documents;
(4) Broad Form Property Damage (including Completed Operations);
(5) Explosion, Collapse and Underground Hazards; and
(6) Personal Injury Liability.

(ii) Minimum limits of liability:

(1) $1,000,000 each occurrence (for bodily injury and property damage)
(2) $1,000,000 for Personal Injury Liability,
(3) $2,000,000 aggregate for Products and Completed Operations (which must be maintained for a three (3) year period following final completion of the work); and
(4) $2,000,000 general aggregate applying separately to the project.

D. Automobile liability insurance (including coverage for owned, hired, and non-owned vehicles) with minimum limits of coverage of not less than $1,000,000 combined single limit per accident. The contractor must require each of its subcontractors to include coverage for automobile contractual liability in each such subcontractor's respective commercial general liability insurance policy.

E.    The contractor must also carry Commercial Umbrella Liability.  If the contractor's Commercial General Liability insurance policy has a per project aggregate, the coverage limit must be not less than $5,000,000; if it does not have a per project aggregate, the coverage limit must be not less than $10,000,000.

1.4    Landlord's "Special Form" Insurance.  Landlord must, at all times during the Term, maintain or cause to be maintained with respect to the Property (including the Common Elements, the Premises and Tenant's Improvements), property insurance against loss or damage to the Property as are included in so-called "special form" coverages (a/k/a "all-risk" coverage) that are at least as broad as those set forth in ISO Form CP 10 30 (and including loss of rents for a minimum of one (1) year and endorsements for coverages for flood, earthquake, windstorm, earth movement or sinkholes, demolition, increased cost of construction and contingent operation of building laws) on a full replacement cost basis, exclusive of the cost of excavations foundations and footings, without any deduction being made for depreciation, or such greater amount as is necessary to prevent Landlord from being treated as a co-insurer.  During construction, such property insurance must be a so-called "builder's risk" insurance policy to the extent that such construction is not covered under Landlord's "special form" insurance.  Costs of loss of rents coverage for any period over eighteen (18) months must be at Landlord's sole cost.

1.5    Tenant's "Special Form" Insurance.  Commencing on the Delivery Date and thereafter throughout the Term, Tenant must provide and cause to be maintained property insurance against loss or damage to Tenant's Property as are customarily included in so called "special form" coverages (a/k/a "all risk" coverage) that are at least as broad as those set forth in ISO Form CP 10 30 (and including endorsements for coverages for flood, earthquake, windstorm, earth movement or sinkholes, demolition, increased cost of construction and contingent operation of building laws) on a full replacement cost basis (excluding the cost of foundations, excavations, and footings), without any deduction being made for depreciation, or such greater amount required to prevent Tenant from being treated as a co-insurer within the terms of the policy or policies in question.  During construction, such property insurance must be a so-called "builder's risk" insurance policy.

1.6    Policy Standards.

A.    All insurance required by this Exhibit I must be written on an occurrence basis and procured from companies rated by Best's Rating Guide not less than A-/VII that are authorized to do business in the state where the Property is located.  All insurance may be provided under (i) an individual policy covering the Property (or portion thereof as applicable), (ii) a combination of primary, excess, and/or umbrella policies, (iii) a blanket policy or policies which includes other liabilities, properties and locations of such party, but if such blanket commercial general liability insurance policy or policies contain a general policy aggregate of less than $20,000,000, then such insuring party must also maintain excess liability coverage necessary to establish a total liability insurance limit of $20,000,000, (iv) a plan of self-insurance, provided any party so self-insuring notifies the other party of its intent to self-insure and upon request must deliver to the other party each calendar year a copy of its annual report that is audited by an independent certified public accountant that discloses that such party (or a guarantor of such party's obligations) has

$250,000,000 of tangible net worth; or (v) combination of any of the foregoing insurance programs. To the extent any deductible or self-insurance retention amount is permitted or allowed as a part of any insurance policy carried by a party in compliance with this Exhibit I, such party shall be deemed to be covering the amount thereof under an informal plan of self-insurance, but in no event may any deductible or self-insurance retention amount exceed $50,000 unless such party complies with the requirements regarding self-insurance pursuant to (iii) above. Each party must furnish to the other party, (x) upon request, a certificate(s), evidence of coverage, or memorandum(s) of insurance, or statement of self-insurance, as the case may be, or the Web address where such insurance information is available, and (y) upon receipt by the receiving party, any notice of cancellation of an insurance policy.

      B.     The insurance required pursuant to Section 1.1 and Section 1.2 must include the following provisions:

         (i)     Must provide that an act or omission of one of the insureds or additional insureds that would void (or otherwise reduce) coverage may not reduce or void the coverage as to the other insureds or additional insureds; and

         (ii)     With respect to each policy of commercial general liability, must provide for contractual liability coverage with respect to the indemnity obligations of Landlord and Tenant, respectively, set forth in this Lease, to the extent within the coverage provisions of such policy.

C.     At the request of either Landlord or Tenant, such request to not be made more than every five (5) years by a party during the Term, the other party must work together with the requesting party and their respective insurance agents to determine if the insurance coverage amounts set forth in this Exhibit I (the "**Lease Coverage Amounts**") are consistent with those coverages being maintained by similar landlords and tenants at projects comparable to the Property and within a radius of thirty (30) miles of the Property (the "**Comparable Coverage Amounts**"). If any Comparable Coverage Amount ever becomes more than a Lease Coverage Amount, then Landlord and Tenant must enter into an amendment to this Lease setting forth the new Lease Coverage Amount in an amount equal to the applicable Comparable Coverage Amount (although the Lease Coverage Amount may never be reduced below the stated amounts in this Lease).

# EXHIBIT J
## Reports

1.      Phase One Environmental Site Assessment, Port Chester Shopping Center, 421 Boston Post Road, Port Chester, NY 10573, completed by ATC on October 18, 2018, ATC Project Number: 301MET0063.

# EXHIBIT K
## Memorandum of Lease

This Instrument Prepared By:
Target Corporation Law Department
1000 Nicollet Mall, TPS-3155
Minneapolis, MN 55403

<u>RECORD and RETURN TO</u>:
Target Corporation Law Department
1000 Nicollet Mall (TPS-3155)
Minneapolis, MN 55403
Attn: Nora McGreevy

-----------------------------------------------------------------------------------------------------------

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is dated _____, 2020 ("**Effective Date**"), by and between ML-MJW PORT CHESTER SC OWNER LLC, a Delaware limited liability company ("**Landlord**") having an address at c/o M & J Wilkow Properties, LLC, 20 South Clark Street, Suite 3000, Chicago, Illinois 60603, and TARGET CORPORATION, a Minnesota corporation ("**Tenant**") having an address at Target Properties, Attn: Real Estate Portfolio Management/[Port Chester, NY][T-3399], 1000 Nicollet Mall, TPN 12H, Minneapolis, Minnesota 55403.

RECITALS:

A.     Landlord holds a ground leasehold estate (the "**Leasehold**") in certain real property located at 421 Boston Post Rd., Port Chester, NY 10573, which is more particularly described on the attached <u>Exhibit A</u> (the "**Land**").

B.     There has been constructed on the Land (i) a two level building consisting of approximately 89,781 square feet of Floor Area in the aggregate (the "**Building**"), which amount of Floor Area is fixed and stipulated and shall not be subject to remeasurement except in the event of casualty, redevelopment, or other similar circumstances creating changes such as a material change in the size of the Premises or any of the Adjacent Buildings, (ii) other buildings consisting of approximately 414,431 square feet of Floor Area in the aggregate (the "**Adjacent Buildings**"), (iii) parking fields containing approximately 1,431 parking spaces (the "**Parking Lot**") and (iv) all other improvements and appurtenances, all as shown on the site and floor plans attached to the Lease.

C.     The Leasehold, Building, Adjacent Buildings, the Parking Lot, and all other improvements and appurtenances constructed on the Land are collectively referred to herein as the "**Property**".

Case 23-13359-VFP   Doc 1086-7   Filed 07/...
Exhibit 8 - Part D...

D.    Pursuant to a Lease between Landlord and Tenant dated as of even date herewith (the "**Lease**"), Tenant has leased from Landlord portions of the Building consisting of approximately 89,781 square feet of Floor Area in the aggregate (composed of approximately 38,432 square feet of Floor Area on the upper level and 51,349 square feet of Floor Area on the lower level), together with such other rights, easements, and appurtenances as more particularly described in the Lease (collectively, the "**Premises**").

## W I T N E S S E T H:

For valuable consideration, and subject to the covenants and agreements set forth herein, Landlord and Tenant hereby agree as follows:

1.    <u>Definitions</u>.  Any capitalized term not otherwise defined herein has the same meaning ascribed to such term in the Lease.

2.    <u>Demise of Premises</u>.  Landlord has demised and leased the Premises unto Tenant and Tenant has accepted the Premises from Landlord upon the terms and conditions set forth in the Lease, together with all rights attaching, belonging, or pertaining to the Premises or to the Property, including (i) the exclusive right to use the Exclusive Areas and (ii) the non-exclusive right to use the Common Elements, all as described in the Lease.

3.    <u>Term</u>.  The initial Term of the Lease commences on the Effective Date and continues until 11:59 P.M. on the last day of the fifteenth (15th) Lease Year.  Tenant may, at its election, extend the Term for six (6) consecutive additional terms of five (5) Lease Years each.

4.    <u>Offset</u>.  Rent and other amounts payable by Tenant are subject to offset and abatement in accordance with, and subject to, the Lease.

5.    <u>Use</u>.  Subject only to the use restrictions set forth in the attached <u>Exhibit B</u> and the terms and conditions of the Lease, Tenant may use the Premises for any lawful Retail Use as well as certain other uses under terms more particularly set forth in the Lease.  Landlord may not impose any use restrictions with respect to the Lease during the Term.  "**Retail Use**" means (i) retail sales of goods, (ii) Retail Office, (iii) restaurants, and (iv) entertainment and fitness facility uses, if and to the extent not prohibited by this Lease.  An operation which would otherwise qualify as a "Retail Use" shall not be excluded from qualifying for such a use solely because such operation also includes other incidental (i.e., less than the five percent (5%) of its Floor Area) services unrelated to the Retail Use.  For avoidance of doubt, storage, office, administrative and other uses supporting retail use are not "unrelated" and constitute Retail Use.  "**Retail Office**" means an office which provides services directly to consumers, including financial institutions, real estate, stock brokerage and title companies, travel and insurance agencies, and medical, dental and legal clinics, massage, salon and hair care.

6.    <u>Use of Property</u>.  The Lease contains specific permitted and restricted uses at the Property, including those in the attached <u>Exhibit B</u> and <u>Exhibit C</u>.

7.    <u>Incorporation</u>.  In addition to those terms set forth above, the Lease contains other

Case 23-13359-VFP    Doc 1086-7    Filed ...    Exhibit 6 - Part G ...

terms, conditions, provisions, covenants, representations, and warranties, all of which affect not only the Premises but also the balance of the Property, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants, and conditions. All of the foregoing are hereby incorporated into this Memorandum of Lease by reference as though fully set forth herein, and both the Lease and this Memorandum of Lease are deemed to constitute a single instrument. Nothing contained herein may be construed to amend, modify, amplify, interpret, or supersede any provision of the Lease.

8. <u>Counterparts</u>. This Memorandum of Lease may be executed in any number of counterparts, each of which, when executed and delivered will be deemed an original, and such counterparts together constitute one and the same instrument.

9. <u>Conflict</u>. If there is any conflict between the terms and conditions of the Lease and this Memorandum of Lease, the terms and conditions of the Lease control. This Memorandum of Lease does not amend the Lease, and is merely an abbreviated form for the purpose of record notice of selected provisions.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease as of the date first above written.

**Landlord:**

ML-MJW PORT CHESTER SC OWNER LLC,
a limited liability company

By ML-MJW Port Chester SC Venture LLC,
a Delaware limited liability company,
its sole member

By M & J PC Investors LLC,
A Delaware limited liability company,
its managing member

By M&J PC Manager, Inc.,
a Delaware corporation
its manager

By: _____
      Marc R. Wilkow, President

Date: _____

**Tenant:**

TARGET CORPORATION,
a Minnesota corporation

By: _____
Name: _____
Title: _____
Date: _____

STATE OF _____
COUNTY OF _____

      The foregoing was acknowledged before me this _____ day of _____, _____, by _____, the _____ of _____, a _____ corporation, as general partner of _____, a _____, who is personally known to me, or who produced _____ as identification.

                      Notary Public, State of _____
                      Name: _____
                      My Commission Expires:_____
                      Notary Seal:


STATE OF MINNESOTA
COUNTY OF HENNEPIN


      On this _____ day of _____, 20___, before me, the undersigned officer, personally appeared _____, the _____ of Target Corporation, known to me to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained as his free act and deed and the free act of Target Corporation.


                      _____
                      Notary Public
                      My Commission Expires:

Exhibit A
Legal Description

ALL that certain plot, piece or parcel of land, situate, lying and being in the Village of Portchester, Town of Rye, and partly in the City Rye, County of Westchester and State of New York, enclosed by the following boundary lines:

BEGINNING at the point of intersection of the northeasterly line of Charles Street (not traveled or improved) with the southeasterly line of Boston Post Road as monumented per County filed map no. 12210 and 12211;

THENCE RUNNING the following three courses along the aforementioned southerly line of Boston Post Road;

North 24 degrees 05 minutes east, 116.47 feet;

North 33 degrees 18 minutes east, 99.30 feet;

North 58 degrees 02 minutes, east 97.30 feet to the southeasterly line of Boston Post Road as widened and monumented per County Clerk filed map no. 23912;

THENCE along said southeasterly line of Boston Post Road per map no. 23912, north 56 degrees 26 minutes 27 seconds east 153.29 feet;

North 47 degrees 11 minutes 43 seconds east 154.70 feet;

North 40 degrees 47 minutes 04 seconds east, 123.07 feet and north 31 degrees 46 minutes 24 seconds east, 119.88 feet (deed)(120.34 feet, survey) to a point;

THENCE south 52 degrees 10 minutes 30 seconds east a distance of 164.46 feet to a point;

THENCE north 38 degrees 03 minutes 30 seconds east, a distance of 220.81 feet to a point;

THENCE south 55 degrees 56 minutes 10 seconds, east a distance of 161.00 feet to a point;

THENCE north 39 degrees 28 minutes east, a distance of 611.40 feet to a point;

THENCE north 47 degrees 47 minutes west a distance of 149.80 feet to a point on the southerly line of Boston Post Road;

THENCE along the said southerly line of Boston Post Road, north 83 degrees 00 minutes 20 seconds east, 130.98 feet;

THENCE south 47 degrees 47 minutes east, a distance of 160.06 feet to a point;

THENCE south 39 degrees 28 minutes west a distance of 350.00 feet to a point;

THENCE south 50 degrees 28 minutes east a distance of 440.31 feet to a point;

THENCE south 32 degrees 08 minutes 08 seconds, west a distance of 1377.04 feet to a point;

THENCE south 41 degrees 00 minutes 10 seconds west a distance of 195.91 feet to a point;

THENCE south 41 degrees 09 minutes west a distance of 27.76 feet to a point;

THENCE north 10 degrees 39 minutes west a distance of 105.26 feet (deed)(North 11 degrees 13 minutes 00 seconds west 106.65 feet, survey) to a point;

THENCE north 24 degrees 43 minutes 49 seconds east, a distance of 28.11 feet to a point;

THENCE in a northwesterly direction along the arc of a radius of 478.87 feet bearing to the left, a distance of 148.62 feet (deed)(148.61 feet, survey) to a point;

THENCE north 50 degrees 34 minutes west a distance of 844.96 feet (deed)(858.70 feet, survey) to the point and place of BEGINNING.

# EXHIBIT B

## Prohibited Uses (including Premises)

The Property may only be used for Retail Use and for Business Office and hotel use, and no use is permitted at the Property that is inconsistent with the operation of a first-class retail mixed-use development, provided however, that (I) any Business Office use must be located at least two hundred (200) feet from the Premises, and (II) at least seventy percent (70%) of the Property (excluding the Premises and Redevelopment Area from the numerator and denominator of this calculation) which is then operating for any use must remain Retail Use. "**Business Office**" means an office which does not provide services directly to consumers. Without limiting the generality of the foregoing, but subject to uses permitted under Existing Occupancy Agreements, the following uses are not permitted at the Property during the Term:

1. Any use that emits an obnoxious odor, obnoxious noise, or obnoxious sound that can be heard or smelled outside of any Occupant space at the Property.

2. An operation primarily used as a storage warehouse operation or any assembling operation, or any manufacturing, distilling (except in connection with otherwise permitted activities, such as the brewing of beer), refining, smelting, agricultural, or mining operation.

3. Any "second hand" store; provided however, this shall not restrict the following: a first-class retail establishment selling antiques, or a retail operation with at least ten (10) locations under the same trade name and that operates substantially as Play-it-Again Sports, Disc Go Round, Once Upon A Child, Plato's Closet, or Clothes Mentor, each as of the Effective Date.

4. Any operation selling "surplus" or "salvage" goods, or pawn shop.

5. Any dumping, disposing, incineration or reduction of garbage, but this prohibition does not apply to (i) garbage compactors or other garbage collection areas or facilities located in designated service areas not visible to customers visiting the Premises or (ii) recycling centers that may be required by Governmental Requirements.

6. Any fire sale, bankruptcy sale (unless pursuant to a court order), or auction house operation.

7. Any (i) automobile, truck, trailer or recreational vehicle sales, leasing or display operation (provided that this shall not be construed to restrict a car rental dropoff / pickup facility located within the Redevelopment Area and which, in event, whose Permittees may only use parking spaces within the Redevelopment Area), (ii) car wash or (iii) body shop or repair operation.

8. Any (i) automotive service/repair station, or (ii) facility that both sells and installs any lubricants, tires, batteries, transmissions, brakes or any other similar vehicle accessories,

other than as customarily provided by stores operating under the 'Goodyear' trade name and located within the Redevelopment Area; provided however, that in any event, only so long as any garage doors, lifts and related equipment are screened from the view along the path of travel in the Protected Area from Boston Post Road to the Premises.

9. Any long term residential use, including single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters.

10. Except within the Redevelopment Area, any hotel, motel, or short term residential use.

11. Any bowling alley, skating rink, movie theater or live performance theater, or other use primarily of an entertainment nature such as a Dave & Busters, Pinstripes, Lucky Strike, etc.

12. Any veterinary hospital or animal raising or boarding facility, but pet shops may offer veterinary or boarding services incidental to the operation of a pet shop, provided (i) the boarding of pets as a separate customer service is prohibited; (ii) all kennels, runs and pens must be located inside the Building; and (iii) the combined incidental veterinary and boarding facilities may not occupy more than fifteen percent (15%) of the Floor Area of the pet shop.

13. Any mortuary or funeral home.

14. Any (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications customarily sold by a national bookstore of the type normally located in first-class shopping centers in the State in which the Property is located (such as, for example Books-A-Million, Half Price Books, and Barnes & Noble, as said stores currently operate) shall not be restricted]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto (provided, however, that the sale or rental of such media by a national store of the type normally located in first-class shopping centers in the State in which the Property is located shall not be restricted).

15. Any establishment that sells or exhibits illicit drugs or related paraphernalia.

16. Any strip club, restaurant, or other operation whose personnel wear a uniform or attire that a reasonable person would consider to be sexually provocative (e.g., Hooters, Tilted Kilt).

17. Any bar, tavern, restaurant, or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on premises consumption exceeds forty percent (40%) of the gross revenues of such business.

18. Any banquet hall, although this shall not restrict special dining or event rooms or halls ancillary within restaurants.

19. Any health spa, fitness center, or workout facility unless such operation is (i) less than three thousand five hundred (3,500) square feet of Floor Area, or (ii) located at least three hundred (300) feet from the Premises.

20. Any massage parlor or similar establishment (but the provision of therapeutic massages as part of a first-class health or beauty salon or spa operation or by professional health care providers or licensed massage therapists are permitted).

21. Any flea market, amusement or video arcade, pool or billiard hall, or dance hall.

22. Any gambling facility or operation, including: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. This prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by an Occupant of the Property.

23. Any central laundry, dry cleaning plant, or laundromat, but this restriction (i) is not intended to prevent the operation of an on site service oriented solely to pickup and delivery of clothing by the ultimate consumer, with no washing or processing facilities upon the Property, as the same may be found in retail shopping centers in the Metropolitan Area, and (ii) shall not apply to a retail drycleaner (a) not exceeding 3,000 square feet of Floor Area, (b) operated by a national operator using a closed-loop system solely using dry cleaning solvents that are biodegradable, non-chlorinated, not hydrocarbons, and not Hazardous Materials, and (c) located at least five hundred (500) feet from the Premises.

24. Any training or educational facility, including: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers, but this prohibition is not applicable to (a) on site employee training by an Occupant incidental to the conduct of its business at the Property, or (b) the Exception Building Location.

25. Any firearms testing or firing range, or the sale or display of any type of firearms or ammunition.

26. Any storing, selling, dispensing, or distributing Marijuana Products by prescription, medical recommendation, or otherwise. "Marijuana Products" means any form of cannabis intended for human consumption (via inhalation, ingestion, injection, topical

application, or otherwise) that contains psychoactive levels of THC, or similar psychoactive derivatives, chemicals, or substances, whether natural or synthetic. Marijuana Products does not include non-psychoactive cannabis derivatives, such as industrial hemp, cannabidiol (commonly known as CBD) derived from industrial hemp, or other non-psychoactive cannabis derivatives, compounds, or substances, whether for human consumption or other use. The foregoing restriction shall not apply to the sale of Marijuana Products by a licensed pharmacist (in any case, no signage visible from the exterior of the premises may include marijuana or Marijuana Product references) selling a wide variety of pharmaceuticals as part of a reputable national or regional medical pharmacy chain in compliance with all Governmental Requirements, provided no such sales may be made: (i) for recreational use, as opposed to medicinal use; or (ii) to minors.

27. Any unusual fire, explosive or dangerous hazards (including the storage, display or sale of explosives or fireworks other than "sparklers" or other fireworks incidental to a discount department store).

28. A store primarily selling merchandise which is classed as "odd lot, "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World" or "Odd Job"; provided however, that the foregoing shall not prohibit (i) the retailer commonly known as "Christmas Tree Shops", (ii) so called "Dollar Stores", or (iii) operations specifically permitted by Paragraph #3 above.

29. Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance).

30. Any payroll loan service.

31. Any tattoo or piercing parlor, although this shall not prohibit ear piercing as an ancillary use.

32. Any church or other place of religious worship, related religious facility, or religious reading room.

33. Any swimming pool or hot tub.

34. Any karate center.

35. Any auditorium.

36. Except as otherwise provided in the Lease, any daycare center, children's recreational facility, entertainment facility or activity facility (such as 'Discovery Zone' or 'Chuck E. Cheese's') within two hundred (200) feet of the premises occupied by Buy Buy Baby.

37. Except as otherwise provided in the Lease, any establishment selling alcoholic beverages for on or off premises consumption, except (a) sales of alcoholic beverages for on-premises consumption incidental to a restaurant permitted by Paragraph #38 below, or (b) establishments selling alcoholic beverages for off-premises consumption located more than 100 feet from the Baby Premises. (Note: The Premises, as configured as of the Effective Date, is more than 100 feet from the Baby Premises.)

38. Except as otherwise provided in the Lease, any restaurant serving meals located within two hundred (200) feet of the Baby Premises; provided however, that after the expiration (including any existing renewals provided for in the current Baby Lease) or earlier termination of the Baby Lease, the foregoing restriction shall not exceed a distance of one hundred (100) feet of the Baby Premises.

39. Except as otherwise provided in the Lease, any restaurant occupying more than 2,500 square feet of Floor Area within the Premises or Exclusive Areas except that this shall not apply so long as such restaurant use is part of or ancillary to another use.

# EXHIBIT C

## Prohibited Uses (except Premises)

Subject to uses permitted under the Existing Occupancy Agreements to the extent more particularly set forth in the Lease, the following uses are prohibited upon all portions of the Property except the Premises:

1. Any sale of pharmaceutical drugs requiring the services of a licensed pharmacist; provided however, that this clause shall not prohibit the operation of a pharmacy integrated within the Permitted Supermarket so long as such operation (i) is operated under the same trade name as the Permitted Supermarket, (ii) does not have an exterior entrance separate from the entrance to the Permitted Supermarket, and (iii) does not have a drive-up facility.

2. Any sale of food and/or non-alcoholic beverages for off-premises consumption, except that the foregoing prohibition shall not apply to: (i) restaurant operations (including food or beverage service operations such as coffee shops, smoothie shops, ice cream parlors, yogurt shops, food halls, doughnut shops, bakeries, carryout pizza, etc.); or (ii) stores having no more than the lesser of (a) 500 square feet of Floor Area, or (b) 10% of its Floor Area, devoted to the display for sale of such products. One-half of the aisle space adjacent to any display of such products shall also be included in calculating Floor Area for purposes of this Section 2. In addition, the operation of one (1) Permitted Supermarket within the Property is permitted.

3. Any General Merchandise Use. "**General Merchandise Use**" means any store, department, service, or operation that collectively or individually "trades in" a broad variety of merchandise in multiple categories, including all of the following categories: (i) apparel and accessories, (ii) baby products, (iii) consumer electronics, (iv) toys, (v) health and beauty products, (vi) household cleaning products, and (vii) automotive supplies. For the avoidance of doubt, any operation that does not "trade in" a broad variety of goods in all of the categories set forth in clause (i) through (vii) above is not a General Merchandise Use and therefore the foregoing prohibition would not apply to such an operation. "**Trades in or trade in**" means offers for sale, delivery, or return (whether through in-store sales, Online Fulfillment, or any combination thereof).

4. Any store, department, service, or operation within the Property that identifies, in any manner that is visible from the exterior of any building, any retailer that operates a General Merchandise Use anywhere in the United States (via its name or symbol or any derivative thereof).

5. Any beauty specialty store or beauty-retail concept store such as those operated on the Effective Date under the trade name ULTA or Sephora of more than 3,000 square feet. For avoidance of doubt, the operation of a beauty parlor/hair care salon is not prohibited so long as such activity is the primary use of such operation

6. No restaurant on the upper level of the Property shall be located within seventy five (75) feet to the west of the west wall of the Premises or within one hundred fifty (150) feet to the north of the north elevation of the Premises.

# EXHIBIT L

## Rent Commencement Date Confirmation Form

<u>This Instrument Prepared By</u>:
Name: _____
Title:   Director Real Estate Counsel
Target Corporation
1000 Nicollet Mall, TPS-3155
Minneapolis, MN 55403

<u>RECORD and RETURN TO</u>:
Target Corporation Law Department
1000 Nicollet Mall (TPS-3155)
Minneapolis, MN 55403
Attn: _____

-------------------------------------------------------------------------------------------------------------------

### MEMORANDUM OF RENT COMMENCEMENT DATE

This MEMORANDUM OF RENT COMMENCEMENT DATE (this "**Memorandum**") is dated
_____, 201___, by and between _____, a _____
("**Landlord**"), and TARGET CORPORATION, a Minnesota corporation ("**Tenant**").

### RECITALS

A.      Landlord and Tenant are parties to that certain Lease dated _____, 201___
("**Lease**") of which a Memorandum of Lease dated _____, 201___ was filed and
recorded _____, as Document #_____ in _____
County, _____, regarding certain real property more particularly described in
the Lease.

B.      The Lease provides that, upon the determination of certain dates, Landlord and
Tenant shall enter into an agreement setting forth the same, and such dates have been
determined.

NOW THEREFORE, Landlord and Tenant agree as follows:

1.   Capitalized terms not otherwise defined in this Memorandum have the meanings

Case 23-13359-VFP   Doc 1086-7   Filed... Exhibit B - Part 4...

ascribed in the Lease.

2.  The Rent Commencement Date is _____, 20__.

3.  The expiration of the Initial Term of the Lease is January 31, 20__.

4.  The expiration of each Extension Term of the Premises is as follows:

First Extension Term        January 31, 20____
Second Extension Term       January 31, 20____
Third Extension Term        January 31, 20____
Fourth Extension Term       January 31, 20____


*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum as of the day and year first above set forth.

TENANT:

TARGET CORPORATION

By: _____

Name: _____

Title: _____

STATE OF MINNESOTA

COUNTY OF HENNEPIN

The foregoing instrument was acknowledged before me on _____, 201__, by _____ the _____ of Target Corporation, a Minnesota corporation, on behalf of the corporation, who is personally known to me.

_____

Notary Public

_____

Printed Name of Notary Public

My Commission expires:_____

LANDLORD:

_____

By: _____
Name: _____
Title: _____

Date: _____


STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me on _____, 201__, by _____, the _____ of _____, a _____, who is personally known to me.

_____
Notary Public

_____
Printed Name of Notary Public


My Commission expires:_____

# EXHIBIT M
## Existing Use Restrictions

I. **BUY BUY BABY**.

The operation of a store for the primary use of the sale, rental or distribution, at retail or at wholesale, of a mix of items contained in the following categories of merchandise: (a) infant and children's furniture (including, without limitation, cribs and beds (including, without limitation, mattresses and bedding); changing tables, gliders, rockers (including coordinating ottomans); high chairs; lamps; walkers; play yards and play pens; car seats and booster seats; cradles; carriages and strollers; toy and clothing chests; swings; or any other children's furniture or children's furnishings similar to the foregoing enumerated items) (collectively, "Restricted Furniture"); (b) layettes, apparel, shoes and/or accessories for infants and children 0-4 years in age (collectively, "Restricted Clothing") and (c) merchandise and products for use by infants and children 0-4 years in age (including, without limitation, toys; books; food; formula; indoor and/or outdoor play and recreational equipment; audio and video cassettes or equipment; safety items; feeding items; nursing items; diapers; wipes; bathroom items (including, without limitation, personal care devices and other bathroom appliances, accessories and toiletries) (collectively, "Restricted Products') (which items in clauses (a), (b) and (c) above, either singly or in any combination, are hereinafter referred to as the "Exclusive Items"), is prohibited. Such prohibitions shall not apply to (a) a full-line national or regional: department store such as Target; or a discount club such as Costco; or home improvement center such as Home Depot, each occupying at least 60,000 square feet of Floor Area; or (b) a full-line junior and or discount department store such as TJ Maxx; or (c) Pottery Barn, Home Goods, Ross Stores, Pier One, Crate & Barrel, Old Navy, Gap, H & M or A.J. Wright; or (d) stores whose primary use is the sale of books, groceries, sporting goods, electronics, arts & crafts, shoes, health and beauty aids or to drug stores, provided that the tenancies described in (b), (c) and (d) shall be prohibited from assigning or subleasing for a primary use that involves the sale, rental or distribution of the Restricted Products. (Section 13.2)

II. **CLINO'S PIZZA**.

The operation of Pizza and Italian Restaurant (which is a restaurant serving pizza, and/or meals and/or sandwiches which are customarily recognized as 'Italian' in origin on manner of preparation) is prohibited. Such restriction shall not apply to a department store, or branch thereof, Junior Department store, Variety Store, Discount Store, Drug Store or Supermarket (which terms are not defined in the Clino's Pizza lease). (Section 53)

## III.  **HOMEGOODS.**

No store shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of furnishings for the home including the following categories of items:  linens and domestics, window treatments, floor coverings, bathroom items, bedding, furniture (excluding children's furniture), wall decor, housewares, table top goods, glassware, flatware, cookware, kitchen utensils, giftware and/or closet, shelving and storage items and home accessories (all of the foregoing hereinafter referred to as a "Competing Use" and the merchandise referred to therein as the "Protected Merchandise").  The computation of such floor area shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves., cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Protected Merchandise.  The foregoing restriction shall not apply to:  (a) a full-line national or regional:  (i) department store containing not less than fifty thousand (50,000) square feet of floor area (for example, Wal-Mart, Macy's, Kohl's or Target), (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], (iii) arts and crafts store, or (iv) home improvement center [for example, Home Depot or Lowe's], (b) a Restoration Hardware; (c) a Pottery Barn; (d) a Crate & Barrel; (e) a William Sonoma, (f) a Buy, Buy Baby, (g) any store selling primarily mattresses, and (h) one(1) store selling primarily furniture.  In addition, if the Demised Premises shall be closed for business to customers for any period of one hundred eighty (180) consecutive days or more, other than as the result of a cause or event referred to in Articles X or XI or Section 18.3 hereof, then the provisions of this Paragraph 4(B) shall be of no further force or effect, provided, that if the Demised Premises re-open for business the provisions of this Paragraph 4(B) shall be revived, subject to any leases entered into by Landlord while the provisions of this Paragraph 4(B) were not in force and effect.


## IV.  **MASELLI'S** (R&S Foods).

Principal business which is the operation of a store as an Italian Delicatessen (which term is not defined in the Maselli's / R&S Foods lease) is prohibited.  Such restriction shall not apply to a department store, or branch thereof, Junior Department store, Variety store (which terms are not defined in the Maselli's / R&S Foods lease), discount store, drug store, or supermarket.  (Section 53)

## V.  **MODELL'S.**

The operation of a store who principal use is for the sale of Sporting Goods (which term is not defined in the Modell's lease), Athletic Apparel (such as team licensed clothing and headwear (such as baseball caps) and branded athletic apparel such as Nike, Adidas, Reebok, etc., used for

athletic purposes) and/or Athletic Footwear, is prohibited. Such restriction shall not apply to department stores (such as Macy's), discount department stores (such as Target, WalMart, Kohl's, Kmart, or a similar type operation), junior department stores, (such as Marshalls, TJ Maxx), or other stores selling clothing or equipment for outdoor activities (Such as EMS, Work N Gear). The restriction shall also not be applicable to specialty stores (such as Best Buy, Circuit City, Toys 'R Us) provided such specialty store is operating in a manner substantially similar to the manner of operation in the majority of the stores such specialty store operates in the northeastern United States. Landlord shall not to lease to a specialty store such as Dick's Sporting Goods. Notwithstanding anything contained herein to the contrary, in the event that any such specialty store shall assign its lease or sublet its premises, it may assign its lease or sublet its premises to a user that sells merchandise covered by Tenant's Exclusive Use, provided the area used for the sale or display of the merchandise covered by Tenant's Exclusive Use, is not more than 20% of the specialty store's premises square footage, and provided further that such area does not constitute a separately demised store with its own entrance and signage. The foregoing exclusive use restriction shall not be applicable to any tenant in the Shopping Center using the lesser of 20% or 2,000 square feet of its premises, in the aggregate for the sale of Sporting Goods, Athletic Apparel and/or Athletic Footwear, provided that no one category of each of (i) Sporting Goods, (ii) Athletic Apparel, and (iii) Athletic Footwear shall exceed 1,000 square feet. (Section 4.03)


VII. **NEW YORK GOLF**.

The operation of a store for the principal use of the sale of golf equipment. The foregoing restriction shall not be deemed to prevent leasing to a sporting goods store, so long as the principal use of such sporting good store shall not be for the sale of golf equipment. (Section 58)


VII. **PARTY CITY**.

No store may use more than 3,000 square feet of rentable space in its leased premises for the sale of party goods. The foregoing restriction shall not apply to: (i) a department store which leases in excess of 50,000 square feet of rentable space in the Shopping Center, or (ii) a home improvement center, junior department store, discount department store, supermarket, catalog store or flea market, any of which leases in excess of 30,000 square feet of rentable space in the Shopping Center, or (iii) any tenant or licensee or occupant of a flea market which flea market occupies in excess of 30,000 square feet of space in the Shopping Center or (iv) any assignees or subtenants of the foregoing. The restriction shall not apply to Landlord during (a) the last year of the initial term and/or the First Renewal Term, as the case may be, if Tenant has not exercised its option to extend the term of this Lease in accordance with Section 56 hereof, and (b) last year of

Case 23-13359-VFP   Doc 1066-7   Filed ... 
Exhibit 6: Part ...

the term of this Lease if Tenant has exercised both extension options provided for in Section 56 hereof. (Section 57)

## VIII. **ULTA**.

No other store may use its premises for Tenant's Protected Uses. The foregoing restriction shall not apply to uses associated with (a) any retail tenant in excess of twenty two thousand (22,000) square feet, (b) one (1) beauty parlor/hair care salon of no more than 2,000 square feet, or (c) incidental sales (less than 500 square feet total of such tenant's premises is used to sell any of the products that comprise Tenant's Protected Uses). The term "Tenant's Protected Uses" shall mean (i) the retail sale of cosmetics, fragrances, health and beauty products, hair care products and accessories; personal care appliances; skin care products, and body care-products; and (ii) the operation of a full service beauty salon. The term "full service beauty salon" for purposes of this Section shall be defined as the offering of any of or a combination of the following services: hair care [including, without limitation, cutting, styling, hair treatments, highlighting, tinting, coloring, texturizing, smoothing and hair extensions); facials; esthetician services; skin care services (skin treatments for face and body); beauty treatments/services; hair removal (including, without limitation, waxing, threading and tweezing for face and body); and eye lash extension services. Nail services and therapeutic massage are not included as Tenant's Protected Uses. (Section 5.4)

## IX. **US ALLIANCE**.

No other space in the Shopping Center may be used as a credit union business. (Section 7)

## X. **WHOLE FOODS**.

The operation of a store: (a) devoting more than ten percent (10%) of its rentable area to sale of the following or (b) creating any separate entrance or separate signage to promote sale of the following: (i) produce, meat, poultry, seafood, dairy, cheese, cereals, grains, fruits and vegetables, frozen foods, grocery products, bulk foods, gourmet foods or bakery goods, is prohibited. In addition, the operation of any vitamin shop in excess of 4,500 square feet of rentable area is prohibited.

# EXHIBIT N
## Existing Permitted Use Clauses

**Club Pilates**
The operation of a first-class Club Pilates fitness studio which includes, without limitation, Pilates (both group class and individual), barre, reformer, spring board, TRX and the sale of related apparel, equipment and retail products and no other purpose.

**Modell's**
The Premises shall be used solely for the retail sale of sporting goods, equipment, accessories, and men's, women's and children's athletic, active, recreational and leisure wear, apparel, and footwear (the "Primary Use"), and items incidental to the foregoing, and other goods typically sold at any Modell's Sporting Goods, and any other retail use provided the same does not violate another exclusive in the S/C or is not the same primary use as another tenant in the S/C and for no other purpose.  As long as the NY Golf Store or its successor is in operation as such, T's sale of golf equipment will be limited to an area of no more than 5% of the SF of the Premises (the "Restricted Area").  In addition, the golf items to be sold in the Restricted Area shall be limited to golf bags, golf balls, on course accessories, (i.e., tees, ball markers, divot tools, training aids, travel covers and carts) and a limited section of golf clubs.

**Route 1 Dry Cleaners**
T agrees that, notwithstanding any other provision of the Lease, it will conduct its business in the entire Premises as a typical dry-cleaning operation, including hand laundry (but not coin operated laundry machines) and clothing alterations (subject, however, to all of the terms, covenants and conditions of the Lease) and in such consistent manner therewith as will achieve the maximum value therefor.

**Staples**
For the retail sale of office furniture and office supplies and equipment and for the sale at retail of the following products: packaged coffee, packaged tea, sugar, sweeteners (such as Sweet & Low, etc.), non-dairy creamers, bottled and canned soft drinks and snack items such as potato chips, pretzels and candy: provided, however, that all of the above listed products shall be sold from an area aggregating no more than 40 linear feet and/or from the areas at which the T's cash registers are located and for no other purpose.

**Old Navy**
Any lawful retail purpose

**Tripodis**
Tenant covenants and agrees that it shall use the Premises for the operation of a retail store for the sale to the general public of home and electronic appliances and accessories thereto, stereos, televisions, and video equipment and for no other purpose.

Case 23-13359-VFP   Doc 1086-7   Filed 06/27/23   Entered 06/27/23 11:02:09   Desc
Exhibit 8 - Part 4   Page 40 of 64

**F45 Portchester**
Tenant covenants and agrees that it shall use the Premises for the following use and no other purpose: operation of an F45 fitness studio, including the fitness services currently being offered in a majority of F45 fitness locations under the F45 name and trademark.

**Jembro / Dave's Dollar**
Tenant covenants and agrees that it shall use the Premises as a retail variety store and/or as a "dollar store".  The term "dollar store" for purposes of this clause means a retail store offering for sale a wide

range of goods at low prices of one dollar or less. Tenant may offer for sale: (i) any food and/or non-alcoholic beverages for off-premises consumption in no more than the lesser of 500 square feet or 10% of its floor space; (ii) any automobile supplies in an area within the Premises that is less than 500 square feet of the floor area in the Premises; and (iii) any cosmetics, fragrances, health and beauty products, hair care products and accessories, personal care appliances, skin care products, and body care-products, in an area within the Premises that is less than 500 square feet of the floor area in the Premises.

**Kohl's**

The Premises may be used by Tenant or any assignee or subtenant without LL's consent as (A) a Kohl's Department Store, (B) as any other type of department store (including a so-called "discount" department store) for in excess of 80,000 SF of the leased premises (e.g., Wal-Mart, Target, Sam's, Costco, Home Depot, etc.), or (C) any other lawful retail purpose, other than the following (collectively, "Tenant Prohibited Uses"):

(a)     As a supermarket (which is defined as a retail store that derives a majority of its revenue from the sale of fresh, frozen, canned, packaged and/or processed foods, fruits, vegetables, meats and other combustibles to customers for off-premises consumption) or if a principal use is the sale of canned or packaged foods, sale of fresh fruits and vegetables and/or the sale of fresh or frozen meats;

(b)     For any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any building within the Shopping Center;

(c)     For any operation primarily used as (1) a single storage warehouse operation of more than 5,000 square feet of Floor Area in the aggregate (other than a "warehouse club" with a business model similar to Sam's or Costco) or (2) any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation;

(d)     As a 'second hand' store or 'surplus' store, thrift shop or other business principally engaged in the sale of used merchandise;

(e)     As a mobile home park, trailer court, labor camp, junkyard or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction or maintenance);

(f)     For any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any building in the Shopping Center);

(g)     For any central laundry, central dry cleaning plant or laundromat (except that this provision shall not prohibit nominal supportive facilities for on site service oriented to pickup and delivery by the ultimate consumer as the same may be found in first class shopping centers);

(h)     As a service station or automobile, truck, trailer or recreational vehicles sales, leasing, display, body shop or repair operation;

(i)     As a bowling alley or skating rink;

(j)     As a movie theater, night club or live performance theater;

(k)     For living quarters, sleeping apartments or lodging rooms;

(l)     As a veterinary hospital or animal raising facility (except that this prohibition shall not prohibit pet shops or pet supply superstores and veterinary services which are incidental thereto);

(m)     As a mortuary, funeral home or crematory;

(n)     As an adult book store, adult video store, adult movie theater or other establishment selling, renting or exhibiting pornographic materials or drug related paraphernalia (except that this provision shall not prohibit the operation of a bookstore or video store which carries a broad inventory of books or videos and other materials directed towards the interest of the general public as opposed to a specific segment thereof);

(o)     As a bar, tavern, restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on premises consumption exceeds 30 percent of the gross revenues of such business;

(p)     As a health spa, fitness center or athletic facility in excess of 5,000 square feet;

(q)     As a flea market, amusement or video arcade, pool or billiard hall, car wash, tattoo parlor or dance hall (except that this provision shall not prohibit a restaurant from including three or fewer video games as an incidental use to its operations);

(r)     As a school, day-care center, training or educational facility, including, but not limited to, beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers (except that this provision shall not prohibit on site employee training by an occupant incidental to the conduct of its business at the Shopping Center);

(s)     As a church or related religious facility or religious reading room;

(t)     As a massage parlor (except that this provision shall not prohibit massages in connection with a beauty salon, health club or athletic facility);

(u)     As a casino or other gambling facility or operation, off track or sports betting parlors, table games such as black jack or poker, slot machines, video gambling machines and similar devices, and bingo halls (except that this provision shall not prohibit government sponsored gambling activities or charitable gambling activities if such activities are incidental to the business operation being conducted by an occupant);

(v)     For traveling carnivals, fairs, auctions, shows, kiosks, booths for the sale of fireworks and sales by transient merchants using vehicles or booths;

(w)     As a restaurant (other than a restaurant within, and not exceeding ten percent (10%) of the Floor Area of, the Kohl's Store Space and which does not have a separate entrance); or

(x)     As an oil development operations, oil refining, quarrying, mining, mineral or gas extraction or similar operations of any kind or the installation and use of any improvements for such purposes (including derricks, wells, tanks, tunnels or shafts), either on the surface or any nearer than 500 feet from the surface.

**Buy Buy Baby**

Subject to the Existing Exclusives (as defined in Section 13.3.1) and the Prohibited Uses (as defined in Exhibit M), the sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to, a variety (in T's sole discretion as to the mix and proportions) of the following: infant's, juvenile's and children's furniture, furnishings, beds (including, without limitation, mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, maternity clothing and

related items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food or formula for infants, juveniles and children, feeding items, safety items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, pregnancy books, magazines, computer software, audio and video cassettes or tapes, picture frames, portrait studio items and services, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items, hair cutting services, fitness center development and learning services (the aforementioned items are hereinafter collectively referred to as the "Permitted Items") and any and all other items sold or services provided from time to time in any store owned or operated by T or its Affiliate(s); and for any other lawful retail use not specifically prohibited by the provisions of Article 13 below. In addition, T shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

### Carvel
Tenant covenants and agrees that it shall use the Premises as a typical "Carvel" ice cream store offering products typically sold in Carvel stores, including freshly-made hand-dipped and soft serve ice cream, take home novelty treats, premium ice cream cakes, bulk chocolate by the pound and for no other use or purpose.

### DSW
For the sale of dress, casual and athletic footwear for men and women, hosiery, accessories and related apparel (including but not limited to handbags, hats and gloves), provided that, after T initially opens for business as a DSW Designer Shoe Warehouse, Tenant may change its trade name or the Permitted Use to any other lawful retail purpose, provided, however, the use must be a retail use consistent in quality and nature to a first class S/C, subject only to Sections 13.2 (Exclusives) and 13.3 (Prohibited Uses) and Exclusives then in effect for the primary use of tenants leasing more than 19,000 SF of GLA in the S/C.

### Pier 1
Tenant may use the Premises for the purposes of the display and retail sale of merchandise as is commonly sold in the majority of Pier 1 Imports stores in the State of New York, as such stores evolve from time to time, and for no other purpose except uses that are incidental and reasonably necessary to the operation of a Pier 1 Imports store.

### Pizza Past N Things
Tenant covenants and agrees that it shall use the Premises solely for the retail sale of pizza, Italian sandwiches, soft drinks and cooked Italian food, and for no other purpose.

### Sally Beauty
Tenant covenants and agrees that it shall use the Premises solely for the sale of beauty supplies, related accessories and gifts and other items sold in Sally Beauty stores from time to time, including without limitation the sale of human or synthetic hair, wigs and/or hair extensions and for no other purpose without LL's consent.

### Tyson Jewels
Tenant covenants and agrees that it shall use the Premises solely for the sale of jewelry and related accessories and for no other purpose.

### ULTA
The Premises may be used for any of the following uses (collectively, the "Permitted Use"): (a) the operation of T's Protected Uses and the sale of related goods and services, (b) for office and storage uses

incidental thereto, and (c) any lawful retail purpose not prohibited by the restrictions on use set forth in Exhibit E attached to the Lease. "T's Protected Uses" shall mean (i) the retail sale of cosmetics, fragrances, health and beauty products, hair care products and accessories; personal care appliances; skin care products, and body care products; and (ii) the operation of a full service beauty salon. The term "full service beauty salon" for purposes of this Section shall be defined as the offering of any of or a combination of the following services: hair care (including, without limitation, cutting, styling, hair treatments, highlighting, tinting, coloring, texturizing, smoothing and hair extensions); facials; esthetician services; skin care services (skin treatments for face and body); beauty treatments/services; hair removal (including, without limitation, waxing, threading and tweezing for face and body); and eye lash extension services. Nail services and therapeutic massage are not included as T's Protected Uses.

## Angel Tips
Tenant covenants and agrees that it shall use the Premises solely for the sale of an Angel Tips nail care, skin care (facials, waxing, tanning), salon and related spa services and for no other purpose.

## Bank of America
A commercial bank for the providing therein of such services as are permitted by law to be provided by commercial banks, and for no other purpose.

## Bev Max
Tenant covenants and agrees that it shall use the Premises solely for the sale of liquor and related items for off premises consumption and for no other purpose.

## Whole Foods
The Demised Premises shall be used only for the purpose of the operation of a grocery store and/or supermarket under the trade name Whole Foods Market (or such other trade name used by Tenant in a majority of its other stores) (the "Permitted Use"). The Permitted Use may include, without limitation, (A) the sale of products, foods, merchandise, services and items generally sold in supermarkets or grocery stores including, without limitation, produce, meat, poultry, seafood, dairy, cereals, grains, fruits and vegetables, frozen foods, grocery products, household items, bulk foods, gourmet foods, bakery goods, prepared foods, alcoholic beverages (including wine, beer and package (i.e., "hard") liquor products and including for on or off premises consumption), vitamins, body care products, cosmetics, health care items, beauty aids, plants, flowers, books, magazines, bed sheets, towels and other household linens, clothing, medicinal herbs, naturopathic and homeopathic remedies, nutritional supplements, smoothies and/or fresh fruit drinks, and any other product, food, merchandise, services, or item sold in other supermarkets or grocery stores operated by Whole Foods Market, Inc. or by entities owned or controlled by Whole Foods Market, Inc., (B) the operation of an in store bakery, cafe and/or a delicatessen style or sit down style restaurant, including the cooking required therefore, coffee bar and juice bar (Tenant may have such number of seats for Tenant's customers as Tenant deems necessary or desirable), (C) providing services ancillary or complementary to the foregoing including, without limitation, a branch bank, cooking demonstrations and cooking classes, and providing massages, pedicures and other spa type services, and (D) the sale of any other products, foods, merchandise, and items and/or the provision of any other services that Tenant may from time to time deem to be desirable, including those that may arise from future innovations to or changes in Tenant's business. Amended to add the following additional uses as ancillary to the operation of a grocery store, food market, and/or supermarket: (a) sale of electronics, memberships, subscriptions, and warranties, (b) storage of Tenant's and/or a Tenant Affiliate's (as defined below) products, foods, merchandise, and other items, (c) installing Tenant's and/or a Tenant Affiliate's lockers for customer pick up of items purchased from Tenant and/or a Tenant Affiliate and (d) offering delivery and  customer pick up.  Notwithstanding anything herein to the contrary, no more than five thousand (5,000) square feet of Rentable Area at the Demised Premises shall be used for Tenant Affiliate's storage and Tenant Affiliate's lockers.  A "Tenant Affiliate" means Tenant's parent company,

any subsidiary of Tenant, and any entity which controls, is controlled by, or is under common control with Tenant.

**Elite Furniture**

Tenant covenants and agrees that it shall use the Premises as a typical furniture store for the sale of new furniture including bedding, sofas, tables, lamps, and other home furnishings of that nature and for no other use or purpose.

**GameStop**

Tenant covenants and agrees that it shall use the Premises for the purpose of the sale of new and pre-owned video games; virtual reality/video game related hardware, accessories, content and add-ons, other devices upon which video games are commonly played; entertainment related books, magazines, and other periodicals; related supplies and services; peripherals; related gift items (including, but not limited to action figures, toys, trading cards, and other items which have a "tie-in" to other items sold in the Premises); plus other items customarily sold by entertainment software/video stores including DVD's, any other similar and related items to the above and technological evolutions thereof, other movie formats, games and items incidental thereto and for no other use. Notwithstanding the foregoing, T shall be permitted to: (i) sell, purchase, and display tablets or the technological evolutions thereof upon which games may be purchased or played, provided same shall not exceed more than 5% of the sales floor area of the Premises, (ii) use 15% of the Premises for clerical and office purposes and for the storage of merchandise which T intends to offer for sale from the Premises, and (iii) transfer merchandise to other stores operated by T or its affiliates in order to consummate sales made at such other stores.

**HomeGoods**

Retail store

**Maselli's**

As a delicatessen for the off and on premises consumption, of food and non-alcoholic beverages and for no other purpose.

**Party City**

As a franchisee of Party City corporation for the retail sale of party goods and related supplies, and incidental thereto for the retail sale of costumes, paper goods, balloons, snacks, soda, candy, greeting cards, rental of party furniture/equipment, and retail sale of trim a tree and for no other purpose.

**US Alliance**

Tenant covenants and agrees that it shall use the Premises to operate a US Alliance Federal Credit Union branch office and for no other purpose, except those incidental to providing the products and services that its members are offered; provided that same does not involve the sale of merchandise of any sort.

**Verizon**

Tenant covenants and agrees to use and occupy the Premises for selling, leasing, installing, servicing, maintaining and repairing personal, wireless, cellular and mobile telecommunications systems, equipment, service and related products, accessories, peripherals, parts, and services, including long distance service and wireless imagery, consumer and business electronics and for no other purpose. Notwithstanding the foregoing, T's use of the Premises shall also include, specifically, the Permitted Use described as follows: the furnishing of wireless and/or wireline communications services (including, without limitation, voice, data, paging, text messaging, television, video, fiber optic cable and internet access) and the sale and servicing of wireless and/or wireline communications equipment and related accessories, and any services and items which are a technological evolution of any of the foregoing services, equipment and/or accessories. T and T's affiliate Verizon Services Corp. or its parent or affiliate

shall have the right, but not the obligation, to sell, lease and otherwise market the wireline products and services of T's affiliate Verizon Services Corp. or its parent or affiliate in the Premises.

## Vision World

Tenant covenants and agrees that it shall use the Premises for the sale of eye glasses and eye glass frames, eye examinations performed by a licensed physician, dispensing of eye glasses and prescriptions and for no other use or purpose.

## Vitamin Shoppe

Tenant covenants and agrees that it shall use the Premises predominantly for the sale at retail of vitamins, mineral supplements, nutrition products (including sports nutrition products), herbs, cosmetics and other health, dietary and beauty-related items (but not as a health and beauty aids store), and, at T's option, and subject to certain limitations, such items as are sold from time to time in T's other same-format stores in the New York metropolitan area (the "Metropolitan Area"), or through any catalog or website operations conducted by T, and for no other purpose, provided that T's sale of cosmetic and beauty-related items will be limited to an area no larger than 10% of the SF of the Premises and shall only be products that are "natural" or "naturally" oriented or derived "naturally" (the "Permitted Use").

# EXHIBIT O
## Permitted Exceptions

1.     Covenants and Restrictions in deed made by The New York, New Haven and Hartford Railroad Company to Messina & Briante, Inc. dated 6/5/1953 recorded 7/14/1953 in Liber 5231 Cp 468.

2.     Right of Way Agreement made by and between First National Stores Inc. and Brimes, Inc. dated 3/31/1960 and recorded 4/11/1960 in Liber 6002 Cp 63, as amended by Agreement made by and between EJK Realty New York Corp. and Messina & Briante, Inc. dated 2/22/1971 and recorded 8/18/1971 in Liber 7007 Cp 128.

3.     Grant of Easement made by Richard Joyce Smith and William J. Kirk as Co-Trustees of the property of the New York, New Haven and Hartford Railroad Company to Arlen of Port Chester, Inc. dated 12/21/1966 and recorded 1/4/1967 in Liber 6680 Cp 477.

4.     Covenants and Restrictions, easements and reservations in deed made by Messina & Briante, Inc. to C. Philip Palermo and Ann M. Palermo dated 10/7/1971 recorded 10/12/1971 in Liber 7018 Cp 434.

5.     Agreement made by and between C. Philip Palermo and Ann M. Palermo and E.J.K. Realty New York Corp. dated 9/15/1972 and recorded 10/11/1972 in Liber 7086 Cp 242, as correct by Agreement made by and between C. Philip Palermo and Ann M. Palermo and E.J.K. Realty New York Corp. dated 9/15/1972 and recorded 12/5/1972 in Liber 7096 Cp 554.

6.     Drainage Easement made by E.J.K. Realty New York Corp. and the People of the State of New York dated 8/23/1972 and recorded 10/2/1973 in Liber 7157 Cp 143.

7.     Drainage Easement made by and between the People of the State of New York, acting by and through the New York State Thruway Authority and E.J.K. Realty New York Corp. dated 8/17/1973 and recorded 10/2/1973 in Liber 7157 Cp 153.

8.     Declaration of Restrictions made by Arlen Operating Company and Dorwood Realty Corporation dated as of 11/2/1964 and recorded 12/21/1964 in Liber 6469 Cp 177, as Agreed to by Agreement made by Handels-En Productiemaatschappij De Schouw, B.V. dated 7/10/1978 and recorded 10/2/1978 in Liber 7504 Cp 607.

9.     Easement for Utilities made by and between Handels-En Productiemaatschappij De Schouw, B.V., Alan V. Rose d/b/a AVR Realty Co. and Port Chester Project II, LLC dated 1/8/2001 and recorded 6/21/2001 in Document Control # 411630168.

10.     Assignment of Interest in Store Leases made by E.J.K. Realty New York Corp. to Handels-En Productiemaatschappij De Schouw, B.V. dated 7/10/1978 and recorded 7/11/1978 in Liber 52 of Assignments, Page 503. With regard to same:

    A. Assumption Agreement made by Handels-En Productiemaatschappij De Schouw, B.V. dated as of 7/10/1978 and recorded 4/18/1979 in Liber 8034 Cp 726.

11.     Terms, covenants, conditions and agreements contained in a lease dated 4/17/1964 made by and between Arlen Operating Company, Lessor, and E. J. Korvette, Inc., Lessee, a memorandum of which dated as of 10/30/1964 was recorded on 12/21/1964 in Liber 6469 Cp 184. With regard to

same:

A. Collateral Assignment of Lessor's interest in Lease made by Dorwood Realty Corporation to The Chase Manhattan Bank dated as of 11/3/1964 recorded 12/21/1964 in Liber 6469 Cp 199.

B. Second Amendment of Lease made by and between Dorwood Realty Corporation and E. J. Korvette, Inc., dated as of 11/2/1964 and recorded 12/21/1964 in Liber 6469 Cp 216.

C. Memorandum of Third Amendment of Lease made by and between Arlen Operating Company and E. J. Korvette, Inc. dated as of 1/3/1966 and recorded 5/6/1966 in Liber 6610 Cp 470.

D. Assignment and Assumption of Lease made by Korvettes, Inc. as successor in interest to E. J. Korvettes, Inc. to Admor Distributors, Inc. dated 3/31/1981 and recorded 4/6/1981 in Liber 7692 Cp 98.

E. Assignment of Lease and Assumption Agreement made by Admor Distributors, Inc. to Caldor, Inc. dated 3/31/1981 and recorded 11/5/1981 in Liber 7735 Cp 280.

F. Assignment of Lease and Assumption Agreement made by Admor Distributors, Inc. to TSEL, Inc. dated 7/28/1981 and recorded 1/14/1982 in Liber 7747 Cp 19.

G. Subordination, Nondisturbance and Attornment Agreement made by and between Emigrant Savings Bank and Allan V. Rose d/b/a Lest Co. dated 8/21/1986 recorded 9/16/1986 in Liber 10269 Cp 74.

H. Subordination, Nondisturbance and Attornment Agreement made by and between Caldor, Inc. and First Trust National Association, as Trustee dated as of 5/24/1990 recorded 6/7/1990 in Liber 13954 Cp 311.

I. Assignment and Assumption of Lease Agreement made by Caldor, Inc. to The Caldor Corporation dated as of 4/2/1990 and recorded 6/7/1990 in Liber 9822 Cp 311.

J. Assignment and Assumption Agreement made by The Caldor Corporation to Kohl's Department Stores, Inc. dated as of 3/1/1999 and recorded 9/8/1999 in Liber 12365 Cp 200.

K. Memorandum of 2006 Amendment to Lease made by and between AVR Portchester, LLC and Kohl's Department Stores, Inc. dated as of 3/7/2007 and recorded 4/25/2007 in Document Control #471020032.

L. Subordination, Nondisturbance and Attornment Agreement made by and between Genworth Life and Annuity Insurance company, successor by merger to First Colony Life Insurance Company, DPPC Holdings L.P. and Kohl's Department Stores, Inc. dated as of 3/9/2007 recorded 4/27/2007 in Document Control # 470940312.

M. Subordination, Nondisturbance and Attornment Agreement made by and between Park National Bank, AVR Portchester LLC and Kohl's Department Stores, Inc. dated as of 1/16/2007 recorded 4/25/2007 in Document Control # 471020049.

N. Subordination, Nondisturbance and Attornment Agreement made by and between DPPC Holdings, L.P., AVR Portchester LLC and Kohl's Department Stores, Inc. dated as of 1/10/2007

recorded 4/25/2007 in Document Control # 471020087.

O. Subordination, Nondisturbance and Attornment Agreement made by and between Wachovia Bank, National Association and Kohl's Department Stores, Inc. dated as of 5/23/2005 recorded 7/10/2007 in Document Control # 471780245.

P. Assignment and Assumption of Lease made by Kohl's Department Stores, Inc. to Kohl's Illinois, Inc. dated as of 6/27/2007 and recorded 8/25/2009 in Document Control # 491980343.

12.    Terms, covenants, conditions and agreements contained in a lease dated 7/10/1978 made by and between Handels-En Productiemaatschappij De Schouw, B.V., Lessor, and Allan V. Rose, d/b/a AVR Realty Company, Lessee, a memorandum of which dated 7/10/1978 was recorded on 7/11/1978 in Liber 7482 Cp 464. With regard to same:

A. Subordination Agreement made by Allan V. Rose, d/b/a AVR Realty Company to Emigrant Savings Bank dated 8/21/1986 and recorded 9/16/1986 in Liber 10269 Cp 51.

B. Subordination, Nondisturbance and Attornment Agreement made by and between Emigrant Savings Bank and Allan V. Rose d/b/a AVR Realty Co. dated as of 9/13/1996 recorded 9/19/1996 in Liber 22032 Cp 123.

C. Subordination, Nondisturbance and Attornment Agreement made by and between Emigrant Savings Bank and Allan V. Rose d/b/a AVR Realty Co. dated as of 11/16/1999 recorded 4/24/2000 in Document Control # 400890759.

D. Assignment of Leasehold Interest made by Allan V. Rose to AVR Portchester, LLC dated as of 5/1/2005 and recorded 1/30/2007 in Document Control # 470040783.

E. Subordination, Nondisturbance and Attornment Agreement made by and between Wachovia Bank, National Association, DPPC Holdings L.P. and AVR Portchester LLC dated as of 5/23/2007 recorded 7/10/2007 in Document Control # 471780250.

13.    Terms, covenants, conditions and agreements contained in a lease dated 2/6/1987 made by and between Allan V. Rose D/B/A AVR Realty Company, Lessor, and Staples, Inc., Lessee, a memorandum of which dated 2/6/1987 was recorded on 8/21/1987 in Liber 8933 Cp 319. With regard to same:

A. Subordination, Nondisturbance and Attornment Agreement made by and between Emigrant Savings Bank and Staples, Inc. dated 5/29/1987 recorded 7/10/1987 in Liber 11377 Cp 186.

Case 23-13359-VFP   Doc 1066-7   Filed 12/30/23   Entered 12/30/23   Desc
Exhibit G   Page 49 of 64
14.    Terms, covenants, conditions and agreements contained in a sublease dated 7/8/1991 made by and between Allan V. Rose d/b/a AVR Realty Company, Lessor, and Big M, Inc., Lessee, a memorandum of which dated 7/8/1991 was recorded on 2/27/1992 in Liber 10231 Cp 223. With regard to same:

A. Subordination, Nondisturbance and Attornment Agreement made by and between Handels-En Productiemaatschappij De Schouw, B.V., Lest Co., Allan V. Rose d/b/a AVR Realty Company and Big M, Inc. dated 10/11/1991 recorded 2/27/1992 in Liber 10231 Cp 291.

15. Terms, covenants, conditions and agreements contained in a lease dated 11/30/2006 made by and between AVR Portchester, LLC, Lessor, and Petsmart, Inc., Lessee, a memorandum of which dated as of 12/4/2006 was recorded on 12/20/2007 in Document Control # 473510318.

16. Terms, covenants, conditions and agreements contained in a lease dated as of 1/4/2011 made by and between AVR Portchester LLC, Lessor, and Homegoods, Inc., Lessee, a memorandum of which dated 1/4/2011 was recorded on 4/19/2011 in Document Control # 510253346. With regard to same:

    A. Subordination, Nondisturbance and Attornment Agreement made by and between Wells Fargo Bank, National Association, Successor by Merger to Wachovia Bank, National Association, as Master Servicer on behalf of Bank of America, N.A. as successor in interest to Wells Fargo Bank, N.A. as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, commercial Mortgage Pass-Through Certificates, Series 2007-C32 and Homegoods, Inc.. dated as of 1/4/2011 recorded 4/19/2011 in Document Control # 510383117.

    B. Subordination, Nondisturbance and Attornment Agreement made by and between DPPC Holdings L.P., AVR Portchester LLC and Homegoods, Inc.. dated as of 1/25/2011 recorded 4/19/2011 in Document Control # 511043074.

17. Terms, covenants, conditions and agreements contained in a lease dated as of 2/17/2011 made by and between AVR Portchester LLC, Lessor, and Bed, Bath & Beyond Inc., Lessee, a memorandum of which dated as of 2/17/2011 was recorded on 4/22/2011 in Document Control # 510803352. With regard to same:

    A. Subtenant Recognition Agreement made by and between AVR Portchester LLC, Bed, Bath & Beyond Inc., and Buy Buy Baby Inc. dated as of 2/28/2011 and recorded 4/22/2011 in Document Control # 510833371.

    B. Subordination, Nondisturbance and Attornment Agreement made by and between Bank of America, N.A, as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-C32 and Bed, Bath & Beyond Inc.. dated as of 2/21/2011 recorded 4/22/2011 in Document Control # 510833382.

    C. Subordination, Nondisturbance and Attornment Agreement made by and between DPPC Holdings L.P., AVR Portchester LLC and Bed, Bath & Beyond Inc. dated as of 2/18/2011 recorded 4/22/2011 in Document Control # 510833385.

18. Terms, covenants, conditions and agreements contained in a lease dated 4/13/2012 made by and between AVR Portchester LLC, Lessor, and Ulta Salon, Cosmetics and Fragrance, Inc., Lessee, a memorandum of which dated 4/13/2012 was recorded on 11/7/2012 in Document Control # 521183554. With regard to same:

    A. Subordination, Nondisturbance and Attornment Agreement made by and between Ulta Salon, Cosmetics and Fragrance, Inc. and Bank of America, N.A, as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-C32. dated as of 4/13/2012 recorded 11/7/2012 in Document Control # 521663233.

B. Subordination, Nondisturbance and Attornment Agreement made by and between DPPC Holdings L.P., AVR Portchester LLC and Ulta Salon, Cosmetics and Fragrance, Inc. dated as of 4/13/2012 recorded 11/7/2012 in Document Control # 521663554.

19. Terms, covenants, conditions and agreements contained in a lease dated 6/29/2012 made by and between AVR Portchester, LLC, Lessor, and Pier 1 Imports (U.S.), Inc., Lessee, a memorandum of which dated 6/29/2012 was recorded on 7/27/2012 in Document Control # 521803525. With regard to same:

A. Subordination, Nondisturbance and Attornment Agreement made by and between DPPC Holdings L.P., AVR Portchester LLC and Pier 1 Imports (US), Inc. dated as of 6/29/2012 recorded 7/27/2012 in Document Control # 521923256.

20. Terms, covenants, conditions and agreements contained in a lease dated 2/2/2012 made by and between AVR Port Chester, LLC, Lessor, and Whole Foods Market Group, Lessee, a memorandum of which dated effective 2/2/2013 was recorded on 6/14/2013 in Document Control # 530433381. With regard to same:

A. Subordination, Nondisturbance and Attornment Agreement made by and between Whole Foods Market Group, Inc. and U.S. Bank, National Association, as Trustee, successor in interest to Bank of America, N.A. as Trustee, successor in interest to Wells Fargo Bank, N.A. as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-C32 dated as of 7/17/2012 recorded 10/31/2012 in Document Control # 522293247.

B. Subordination, Nondisturbance and Attornment Agreement made by and between DPPC Holdings L.P., AVR Portchester LLC and Whole Foods Market Group, Inc. dated as of 7/17/2012 recorded 10/31/2012 in Document Control # 522893518.

21. Terms, covenants, conditions and agreements contained in a sublease dated 8/12/1986 made by and between Alan V. Rose d/b/a AVR Realty Company, Lessor, and Rock Bottom Stores, Inc., Lessee, (not recorded). With regard to same:

A. Subordination, Nondisturbance and Attornment Agreement made by and between Handels-En Productiemaatschappij De Schouw, B.V., Alan V. Rose d/b/a AVR Realty Company and Rock Bottom Stores, Inc. dated 7/26/1988 recorded 8/5/1988 in Liber 9269 Mp 111.

B. Subordination, Nondisturbance and Attornment Agreement made by and between Emigrant Savings Bank and Empire State Flea Market, Inc. dated 8/21/1986 recorded 9/16/1986 in Liber 10269 Cp 28.

22. Terms, covenants, conditions and agreements contained in a lease dated 10/30/1998 made by and between AVR Realty Co., Lessor, and Empire State Flea Market, Inc., Lessee, (not recorded). With regard to same:

A. Subordination, Nondisturbance and Attornment Agreement made by and between Emigrant Savings Bank and Empire State Flea Market, Inc. dated 8/21/1986 recorded 9/16/1986 in Liber 10267 Cp 57.

23. Terms, covenants, conditions and agreements contained in a lease dated 7/12/1976 made by and between Arlen Management Corp., Lessor, and The Greater New York Savings Bank, (not recorded). With regard to same:

A. Subordination, Nondisturbance and Attornment Agreement made by and between Emigrant Savings Bank and The Greater New York Savings Bank dated 8/21/1986 recorded 9/23/1986 in Liber 10293 Cp 46.

24. Terms, covenants, conditions and agreements contained in a lease dated 1/12/1977 made by and between AVR Realty Corp., Lessor, and Tripodi's Electronics Corp., Lessee, (not recorded). With regard to same:

A. Subordination Agreement made by and between Emigrant Savings Bank and Tripodi's Electronics Corp. dated 8/21/1986 recorded 9/23/1986 in Liber 10293 Cp 71.

B. Subordination Agreement made by and between Emigrant Savings Bank and Tripodi's Electronics Corp. dated 8/21/1986 recorded 9/23/1986 in Liber 10293 Cp 94.

25. Terms, covenants, conditions and agreements contained in a lease dated 3/16/1971 made by and between AVR Realty Co., Lessor, and Edras Liquors, Inc., Lessee, (not recorded). With regard to same:

A. Subordination Agreement made by and between Emigrant Savings Bank and Edras Liquors, Inc. dated 8/21/1986 recorded 9/23/1986 in Liber 10293 Cp 117.

26. Terms, covenants, conditions and agreements contained in a lease dated 7/2/1976 made by and between AVR Realty Co., Lessor, and Shahpoor's Ladies Inc., Lessee, (not recorded). With regard to same:

A. Subordination Agreement made by and between Emigrant Savings Bank and Shahpoor's Ladies Inc., dated 8/21/1986 recorded 9/23/1986 in Liber 10294 Cp 251.

27. Terms, covenants, conditions and agreements contained in a lease dated 5/15/1964 made by and between Arlen Operating Company, Lessor, and The People's National Corporation, (not recorded). With regard to same:

A. Amendment of Lease dated 1/27/1965 (not recorded).

B. Assignment of Lease By Lincoln First Bank, N.A., successor in interest by consolidation to the National Bank of Westchester to The Chase Manhattan Bank dated 8/1/1984 (not recorded).

C. Subordination, Nondisturbance and Attornment Agreement made by and between The Chase Manhattan Bank and Emigrant Savings Bank dated 5/29/1987 recorded 7/10/1987 in Liber 11377 Cp 207.

28. Terms, covenants, conditions and agreements contained in a lease dated 10/21/1987 made by and between Allan V. Rose, Lessor, and National Westminster Bank, USA, Lessee, (not recorded). With regard to same:

A. Subordination, Nondisturbance and Attornment Agreement made by and between Emigrant Savings Bank and National Westminster Bank, U.S.A. dated 2/19/1988 recorded 7/14/1988 in Liber 12411 Cp 1.

29. Terms, covenants, conditions and agreements contained in an Amended and Restated Ground Lease dated as of 6/9/2015, made by and between DPPC Holdings L.P., Lessor, and AVR Portchester LLC, Lessee, a memorandum of which Containing Purchase Options dated as of 6/9/2015 was recorded on 6/18/2015 in Document Control # 551533255 (see post). With regard to same:

A. Subordination, Non-Disturbance and Attornment Agreement made by and between AVR Portchester LLC, New York Life Insurance Company and DPPC Holdings L.P., dated as of 6/9/2015 and recorded 6/18/2015 in Document Control # 551663755.

B. Assignment and Assumption of Ground Lessee's Interest in Amended and Restated Ground Lease made by AVR Portchester LLC to ML-MJW Port Chester SC Owner LLC dated as of 2/8/2019 and recorded 3/26/2019 in Document Control # 590783354.

30. Terms, covenants, conditions and agreements contained in a sublease dated as of 7/24/2013, made by and among DPPC Holdings, L.P. Landlord, AVR Portchester LLC, Lessor, and DSW Shoe Warehouse, Inc., Lessee, (not recorded). With regard to same:

A. Subordination, Non-Disturbance and Attornment Agreement made by and among DPPC Holdings, L.P., AVR Portchester LLC and DSW Shoe Warehouse, Inc., dated as of 7/24/2013 and recorded 12/3/2014 in Document Control # 540843040.

B. Subordination, Non-Disturbance and Attornment Agreement made by and between DSW Shoe Warehouse, Inc. and U.S. Bank National Association, as successor in interest to Wells Fargo Bank N.A. as Trustee for the Registered Holders of Wachovia Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Securities, Series 2007-C32 dated as of 7/24/2013 and recorded 11/6/2014 in Document Control # 543093377.

31. Terms, covenants, conditions and agreements contained in a sublease dated as of 4/9/2018, made by and between AVR Portchester, LLC, Lessor, and Old Navy, LLC, Lessee, a memorandum of which dated as of 4/9/2018 was recorded on 5/2/2018 in Document Control # 580713576. With regard to same:

A. Space Tenant Non-Disturbance and Attornment Agreement made by and among Old Navy, LLC, AVR Portchester LLC and DPPC Holdings L.P., dated as of 4/9/2018 and recorded 5/2/2018 in Document Control # 581033224.

B. Subordination, Non-Disturbance and Attornment Agreement made by and among New York Life Insurance Company, Old Navy, LLC and AVR Portchester LLC dated as of 4/9/2018 and recorded 5/2/2018 in Document Control # 581033450.

32.  Assignment of Lessor's Interest in Lease made by Berkport Realty Corp. to Teachers Insurance and Annuity Association of America dated 12/20/1965 and recorded 12/28/1965 in Liber 6575 Cp 374.

33.  Assignment of Lessor's Interest in Lease made by Berkport Realty Corp. to Teachers Insurance and Annuity Association of America dated 7/29/1966 and recorded 8/12/1966 in Liber 6640 Cp 324.

34.  Consolidated, Amended and Restated Fee and Leasehold Mortgage, Assignment of Leases and Rents and Security Agreement made by and among DPPC Holdings L.P., AVR Portchester LLC – and New York Life Insurance Company in the amount of $120,000,000.00 dated 6/9/2015 recorded 6/1 8/2015 as Control No. 551663720; as modified by the terms of a Note, Mortgage and Other Loan Documents Assumption and Modification Agreement made by and among AVR Portchester LLC, ML-MJW Port Chester SC Owner LLC, DPPC Holdings L.P. and New York Life Insurance Company, dated February 8 , 2019, recorded March 26, 2019, as Control No. 590793034.

# EXHIBIT P

## RNDA

This Instrument Prepared By:
Target Corporation Law Department
1000 Nicollet Mall, TPS-3155
Minneapolis, MN 55403

RECORD and RETURN TO:
Target Corporation Law Department
1000 Nicollet Mall (TPS-3155)
Minneapolis, MN 55403
Attn: Nora McGreevy

-------------------------------------------------------------------------------------------------------------

## SPACE TENANT NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS ATTORNMENT, RECOGNITION AND NONDISTURBANCE AGREEMENT (this "Agreement"), made as of _____, 2020, among TARGET CORPORATION, a Minnesota corporation (the "Tenant"), ML-MJW PORT CHESTER SC OWNER LLC, a Delaware limited liability company (the "Landlord"), and DPPC HOLDINGS L.P., a New York limited partnership (the "Owner").

### WITNESSETH:

WHEREAS, by Amended and Restated Ground Lease dated as of June 9, 2015 (as amended and assigned, the "Prime Lease"), Owner leased to Landlord certain buildings comprising Port Chester Shopping Center (the "Leased Premises") located in Westchester County, New York, and more particularly described in the Prime Lease and in the attached Exhibit A.

WHEREAS, Landlord has sublet a portion (the "Premises") of the Leased Premises to Tenant for an initial term of fifteen (15) years, with six (6) extension terms of five (5) years each, under a lease (the "Lease") dated as of _____, 2020. The Premises are more particularly described in the Lease.

WHEREAS, the parties wish to provide for the continuation of the Lease for its full term notwithstanding any termination of the Prime Lease, upon and subject to the terms and conditions stated in this Agreement.

NOW, THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable consideration by each party in hand paid to the other, the receipt and sufficiency of which are acknowledged, and in consideration of their mutual promises, Owner, Landlord and Tenant agree as follows:

1

1.     Attornment.  Tenant agrees, from and after an Attornment Event (as defined in subparagraph (a) below), to attorn to the Owner, and Owner agrees to accept such attornment, under all of the terms, conditions, and covenants of the Lease, but subject to the limitations and provisions stated in the following subparagraphs:

(a)     The term "Attornment Event," as used in this Agreement, is defined as the expiration or termination of the Prime Lease for any reason, including the first to occur, during the term of the Lease (including any extension or renewal), of any of the following events:

(i)     the Prime Lease is terminated for any reason (including without limitation a termination due to the default of Landlord), unless the Lease, by its express terms, terminates at the same time due to the occurrence of a condemnation or casualty loss;

(ii)     the Owner, pursuant to the provisions of the Prime Lease, terminates the right of Landlord to possession under the Prime Lease due to a default of Landlord under the Prime Lease; or

(iii)     the expiration of the term of the Prime Lease prior to the expiration of the term of the Lease.

(b)     From and after the occurrence of an Attornment Event, the respective rights and obligations of the Tenant and the Owner will be as provided in the Lease, which is incorporated in this Agreement by reference, and the Lease shall continue in full force and effect as a direct lease between the Owner and the Tenant, with the same force and effect as if the Owner, as landlord, and the Tenant, as tenant, had entered into a lease at the time of occurrence of the Attornment Event, upon the identical terms and conditions as contained in the Lease, for a term equal to the then unexpired term of the Lease, and including all rights to extend the term of the Lease for any extension periods provided for in the Lease subsequent to the then current term of the Lease (it being agreed that, at the request of Owner, Tenant will enter into a new lease, directly with Owner, on the terms and conditions set forth in this Paragraph 1(b), except that

(i)     the Owner will not be liable for nonpayment or nonperformance by the Landlord of the Lease obligations arising prior to the Attornment Event, or for damages resulting from Landlord's act or omission which occurred or arose prior to the Owner succeeding to the position of Landlord under the Lease and Tenant having attorned to the Owner (whether or not the same shall be continuing defaults after such succession and attornment).  Notwithstanding anything to the contrary in the Lease or this Agreement, so long as Tenant has provided Owner notice of such default and the opportunity to exercise Owner's right to cure as provided for in Paragraph 4 of this Agreement, Tenant may (A) offset amounts owed by Landlord to Tenant for any default by Landlord (such as, for example, a failure to repair) that occurred prior to the occurrence of the Attornment Event against all rent and other amounts coming due under the Lease until Tenant has recovered the full amount of such amount, and/or (B) remedy any default by Landlord (such as, for example, a failure to repair) that occurred prior to, and continues unremedied after, the occurrence of the Attornment Event and offset the reasonable costs of curing the same

Case 23-13359-VFP   Doc 1066-7   Filed ...   Exhibit 6 ...

against all rent and other amounts coming due under the Lease until Tenant has recovered the full amount of such costs.

(ii)     The Owner will not be bound by any rent paid in advance by Tenant to Landlord for more than one (1) month in advance of the date due under the Lease.

(iii)     The Owner will not be liable for any security deposit paid by Tenant to Landlord, except to the extent such security deposit has been actually received by or credited to the account of the Owner; and

(iv)     The Tenant will be under no obligation to pay any rent or render any performance to the Owner until it has received notice (in the manner provided in Paragraph 6 of this Agreement) of the occurrence of the Attornment Event from the Owner;

2.     The Owner will be liable for all obligations of the Landlord under the Lease that first accrue or arise from and after occurrence of such succession and attornment, subject to the exceptions stated in subparagraph 1(b) above.

3.     <u>Recognition and Non-Disturbance</u>.  The Owner agrees that so long as the Tenant is not in default under the Lease beyond any applicable notice and/or cure period:

(a)     the Tenant's possession of the Premises and its rights and privileges under the Lease (including, without limitation, the right to have casualty insurance and condemnation proceeds applied to the restoration of the Premises as provided in the Lease) will continue in full force and effect and Tenant's occupancy of the Premises will not be disturbed; and

(b)     Tenant will not be named as a party to any eviction proceedings or proceedings to establish Landlord's default under the Prime Lease or recover possession of the Leased Premises, unless Tenant's joinder is required by law and then only for such purpose and not for the purpose of terminating the Lease or impairing Tenant's rights under the Lease.

4.     <u>Right to Cure Landlord Defaults</u>.  Tenant will give Owner duplicate notice of any claimed default on the part of Landlord, in the manner provided in Paragraph 6 of this Agreement, at the address set forth in this Agreement, and will permit Owner to cure any default by Landlord under the Lease during any period when the Landlord would be entitled to do so, and for (i) ten (10) days after such period with respect to any default which can be cured by the payment of money, and (ii) with respect to any default, for thirty (30) days after such period, and for such reasonable additional time, not to exceed thirty (30) days, as may be required to effect a cure, if Owner, acting diligently, cannot effect the cure within the first thirty (30) day period, but promptly commences to cure the default and notifies Tenant in writing that it has commenced such cure within such period, and proceeds diligently to effect such cure.  It is expressly agreed that the cure period given Owner shall run concurrently, and not sequentially.

5.     <u>No Modification of Prime Lease</u>.  Nothing in this Agreement modifies or alters the respective rights and obligations of Owner and Landlord as between themselves under the Prime Lease, or waives any rights of either of them against the other under the Prime Lease.

Case 23-13359-VFP   Doc 1086-7   Filed ...
Exhibit 6   Part...

3

6.       <u>Notices</u>. All notices required or permitted by the terms of this Agreement shall be deemed given only when sent by electronic email transmission, and followed by certified mail, return receipt requested or a reputable national overnight courier, or, with verification of delivery, when received by telegram, cable, telex, commercial courier or any other generally accepted means of business communication, to a party at the address set forth below for each party. Any notice sent by electronic email transmission shall not be effective until sent by the alternative method within the specified time period. A party may change the address to which notices must be sent by giving notice to the other parties in accordance with this Paragraph. The initial notice address for each party is as follows:

If to Landlord:

c/o M & J Wilkow Properties, LLC
20 South Clark Street
Suite 3000
Chicago, Illinois 60603
Attention: Marc R. Wilkow, President

If to Owner:

c/o Winstead PC
2728 N. Harwood Street
Suite 500
Dallas, Texas 75201
Attn: John Nolan
Email: jnolan@winstead.com
Tom Helfand
Email: thelfand@winstead.com

With a copy to:

Depa Holding B.V. Koningsweg 7
Arnhem 6816 TA
The Netherlands
Attn: Neile Coe
Email: dhcoejr@gmail.com

If to Tenant:

Target Corporation
Target Properties
Attn: Real Estate Portfolio Management /
[Port Chester, NY, T3399]
1000 Nicollet Mall, TPN 12H
Minneapolis, MN 55403

7.     <u>Landlord Representation</u>. Landlord represents to Owner that a true and complete copy of the Lease has been delivered to Owner, and such Lease constitutes the sole agreement with respect to the Premises between Landlord and Tenant.

8. <u>Estoppels</u>. At Owner's written request from time to time, Tenant shall deliver to Owner an estoppel certificate on the same terms and conditions as are set forth in the Lease for Tenant's delivery of estoppel certificates to Landlord.

9. <u>Non-Recourse</u>. In any action to enforce this Agreement any money damages awarded against Owner shall be recoverable exclusively out of Owner's equity in the Leased Premises, and no member, officer, director, partner, shareholder, agent, or employee or other asset of Owner shall be subject to levy or execution in respect of any such monetary damages.

10. <u>Interpretation and Effect</u>. This Agreement:

    (a) shall remain in effect at all times during the term of the Lease or any extension or renewal of the Lease, notwithstanding any default under, or termination of, the Prime Lease;

    (b) is to be governed, enforced, and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in New York (without reference to choice of laws principles thereof);

    (c) binds the parties and their successors and assigns, and the covenants contained in this Agreement shall be covenants running with the land and bind the respective successors in title to the Leased Premises, the leasehold estate in the Leased Premises created by the Prime Lease, and the leasehold estate in the Premises created by the Lease;

    (d) may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument; and

    (e) may not be modified except by a writing executed by the parties.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as a sealed instrument by their dully authorized officers, all as of the date first stated above.

Tenant:

**TARGET CORPORATION,**
a Minnesota corporation

By: _____
Name: _____
Title: _____


Owner:

**DPPC HOLDINGS L.P.**, a New York limited partnership

By: _____
Name: _____
Title: _____


Landlord:

**ML-MJW PORT CHESTER SC OWNER LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

State of _____ )

) ss:

County of _____ )

On the ____ day of _____ in the year 20__ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

State of _____ )

) ss:

County of _____ )

On the _____ day of _____ in the year 20__ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

State of _____ )

) ss:

County of _____ )

On the _____ day of _____ in the year 20__ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

Exhibit A
Legal Description

ALL that certain plot, piece or parcel of land, situate, lying and being in the Village of Portchester, Town of Rye, and partly in the City Rye, County of Westchester and State of New York, enclosed by the following boundary lines:

BEGINNING at the point of intersection of the northeasterly line of Charles Street (not traveled or improved) with the southeasterly line of Boston Post Road as monumented per County filed map no. 12210 and 12211;

THENCE RUNNING the following three courses along the aforementioned southerly line of Boston Post Road;

North 24 degrees 05 minutes east, 116.47 feet;

North 33 degrees 18 minutes east, 99.30 feet;

North 58 degrees 02 minutes, east 97.30 feet to the southeasterly line of Boston Post Road as widened and monumented per County Clerk filed map no. 23912;

THENCE along said southeasterly line of Boston Post Road per map no. 23912, north 56 degrees 26 minutes 27 seconds east 153.29 feet;

North 47 degrees 11 minutes 43 seconds east 154.70 feet;

North 40 degrees 47 minutes 04 seconds east, 123.07 feet and north 31 degrees 46 minutes 24 seconds east, 119.88 feet (deed)(120.34 feet, survey) to a point;

THENCE south 52 degrees 10 minutes 30 seconds east a distance of 164.46 feet to a point;

THENCE north 38 degrees 03 minutes 30 seconds east, a distance of 220.81 feet to a point;

THENCE south 55 degrees 56 minutes 10 seconds, east a distance of 161.00 feet to a point;

THENCE north 39 degrees 28 minutes east, a distance of 611.40 feet to a point;

THENCE north 47 degrees 47 minutes west a distance of 149.80 feet to a point on the southerly line of Boston Post Road;

THENCE along the said southerly line of Boston Post Road, north 83 degrees 00 minutes 20 seconds east, 130.98 feet;

THENCE south 47 degrees 47 minutes east, a distance of 160.06 feet to a point;

THENCE south 39 degrees 28 minutes west a distance of 350.00 feet to a point;

THENCE south 50 degrees 28 minutes east a distance of 440.31 feet to a point;

THENCE south 32 degrees 08 minutes 08 seconds, west a distance of 1377.04 feet to a point;

THENCE south 41 degrees 00 minutes 10 seconds west a distance of 195.91 feet to a point;

THENCE south 41 degrees 09 minutes west a distance of 27.76 feet to a point;

THENCE north 10 degrees 39 minutes west a distance of 105.26 feet (deed)(North 11 degrees 13 minutes 00 seconds west 106.65 feet, survey) to a point;

THENCE north 24 degrees 43 minutes 49 seconds east, a distance of 28.11 feet to a point;

THENCE in a northwesterly direction along the arc of a radius of 478.87 feet bearing to the left, a distance of 148.62 feet (deed)(148.61 feet, survey) to a point;

THENCE north 50 degrees 34 minutes west a distance of 844.96 feet (deed)(858.70 feet, survey) to the point and place of BEGINNING.

# EXHIBIT Q
## Pre-Existing Signage Rights

Kohl's:  Tenant retaining the same, or a greater size, sign panel(s) and the same positioning on the replacement pylon sign