

Genova Burns LLC
110 Allen Rd., Ste. 304
Basking Ridge, NJ 07920
**Tel:** 973.467.2700  **Fax:** 973.467.8126
**Web:** www.genovaburns.com

Gregory S. Kinoian, Esq.
Counsel
Member of the NJ and NY Bars
gkinoian@genovaburns.com
Direct: 973-646-3284

June 27, 2023

**Via CM/ECF**

Honorable Vincent F. Papalia, U.S. Bankruptcy Judge
U.S. Bankruptcy Court, District of New Jersey
50 Walnut Street, Courtroom 3B
Newark, NJ 07012

> **Re:**   **In re Bed Bath & Beyond, Inc., et al., Ch. 11, Case No. 23-13359 (VFP)**
> **REDACTED VERSION OF MOTION FOR RECONSIDERATION**

Dear Judge Papalia:

This firm is co-counsel to the Ad Hoc Bondholder Group. With the consent of Debtors' counsel, enclosed is a redacted version of the Ad Hoc Bondholder Group Motion for Reconsideration in connection with Docket No. 982 filed in the Bed Bath & Beyond, Inc. Chapter 11 cases, Case No. 23—13359 (VFP). A Motion to Seal had been filed with respect to the Motion to Seal as Docket No. 983. An order was entered as Docket No. 1068 scheduling a hearing on the Motion to Seal for this afternoon, June 27, 2023 at 2:30 pm.

The Ad Hoc Bondholder Group rights to challenge the Debtors' designations regarding the redacted portions of the enclosed Motion for Reconsideration as constituting Confidential Information under the terms of that certain Confidentiality Agreement, dated as of May 26, 2023, entered into between Glenn Agre Bergman & Fuentes LLP, lead counsel to the Ad Hoc Bondholder Group, and the Debtors (the "Confidentiality Agreement"), including, but not necessarily limited to, those rights under the terms of the Confidentiality Agreement, are hereby being expressly preserved.

Respectfully submitted,

**GENOVA BURNS LLC**
Co-Counsel to Ad Hoc Bondholder Group

/s/ *Gregory S. Kinoian*
By:_____
Gregory S. Kinoian, Counsel

Enclosure

Daniel M. Stolz, Esq.
Gregory S. Kinoian, Esq.
**GENOVA BURNS, LLC.**
110 Allen Road, Suite 304
Basking Ridge, New Jersey 07920
Phone: (973) 533-0777
Fax: (973) 533-1112

- and -

Andrew K. Glenn (admitted *pro hac vice*)
Kurt A. Mayr (admitted *pro hac vice*)
Shai Schmidt (admitted *pro hac vice*)
Agustina G. Berro (admitted *pro hac vice*)
Naznen Rahman (admitted *pro hac vice*)
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600

*Counsel to the Ad Hoc Bondholder Group*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 23-13359 (VFP) |
| BED BATH & BEYOND INC., *et al.*, | ) |
| | ) (Jointly Administered) |
| Debtors.[1] | ) |
| | ) |

**MOTION OF THE AD HOC BONDHOLDER GROUP, PURSUANT
TO 11 U.S.C. § 105(a), FED. R. CIV. P. 60(b), AND FED. R. BANKR. P. 4001(c)
AND 9024, FOR (A) AN ORDER VACATING THE INTERIM AND FINAL
ORDERS AUTHORIZING THE DEBTORS TO, AMONG OTHER THINGS,
OBTAIN POSTPETITION FINANCING, AND (B) OTHER RELATED RELIEF**

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.  The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

The ad hoc group (the "Ad Hoc Bondholder Group") of certain holders of the 3.479%

Senior Notes due 2024 (the "2024 3.749% Notes"), the 4.915% Senior Notes due 2034 (the "2034

4.915% Notes") and the 5.165% Senior Notes due 2044 (the "2044 5.165% Notes" and, together

with the 2024 3.749% Notes and the 2034 4.915% Notes, the "Senior Unsecured Notes"), each

issued by Bed Bath & Beyond, Inc. on July 17, 2014, files this motion (the "Motion") for

reconsideration of the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition*

*Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative*

*Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay,*

*(V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Interim DIP Order" and

the related motion [Dkt. No. 25], the "DIP Motion") and the *Final Order (I) Authorizing the*

*Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens*

*and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection,*

*(IV) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Dkt. No. 729] (the "Final

DIP Order" and, together with the Interim DIP Order, the "DIP Orders").   In support of this

Motion, the Ad Hoc Bondholder Group incorporates the declaration of Andrew K. Glenn (the

"Glenn Declaration")[2] submitted contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.        Unbeknownst to parties in interest, the draconian outcome of these cases was

decided at the first-day hearing held on April 24, 2023 (the "First Day Hearing") when the Court

approved the interim DIP financing (the "DIP Financing").   As a result, general unsecured

creditors are unlikely to obtain any recovery, and these Chapter 11 cases (the "Chapter 11 Cases"

or "Cases") will be conducted for the sole benefit of the Debtors' ABL and FILO lenders.   By this

---

[2]     Exhibit citations ("Glenn Ex. __") refer to exhibits accompanying the Glenn Declaration.

Motion, the Ad Hoc Bondholder Group asks the Court to reconsider approval of the DIP Motion and then hold an evidentiary hearing with full discovery preceding it.

2.    Approval of interim DIP financing may be granted on an emergency basis solely to ensure that the debtor can continue operating its business—literally to keep the lights on—pending the final hearing when stakeholders can conduct discovery to determine the need for the financing, and the effect of the financing on the debtor's business and creditor recoveries.  *See* Fed. R. Bankr. P. 6003(b).  Here, the Debtors obtained approval to incur the entire $40 million of DIP Financing and a $200 million roll-up (the "Roll-Up") of the prepetition first-in last-out term loan facility (the "FILO Loan" and the lenders thereunder, the "FILO Lenders") at the First Day Hearing.  On less than 24 hours' notice, the Court granted the FILO Lenders a blanket lien on valuable unencumbered assets that materially impaired general unsecured creditors' recovery.

3.    The Court's approval of the DIP Financing was based on the Debtors' proposed budget (the "First Day DIP Budget"), which projected a significant liquidity shortfall in the first week of these Cases, ending on April 29, 2023 ("Week 1").  The First Day DIP Budget showed that the Debtors could not make payroll or pay rent in Week 1 without the DIP Financing.  At the First Day Hearing, the Debtors argued that emergency relief was necessary because they had a $30 million "hole that we need to fill this week."  First Day Hr'g Tr. at 37:15.  The reality, however, was different.

4.    Evidence discovered after the Court approved the Roll-Up demonstrates that the Debtors never needed the DIP Financing.  Just hours before the final DIP hearing on June 14 (the "Final DIP Hearing"), the Debtors filed a 13-week wind-down DIP budget [Dkt. No. 716, Ex. B] (the "Wind-Down DIP Budget"), which shows that the First Day DIP Budget vastly overstated the Debtors' operational disbursements and understated total collections in Week 1 to create a $30

million cash deficiency when, in fact, there was none.  Specifically, the Wind-Down DIP Budget showed that the Debtors recorded (i) operating disbursements of $20 million in Week 1 (versus projected disbursements of $86 million in the First Day DIP Budget) and (ii) total collections of $77 million (versus projected collections of $56 million in the First Day DIP Budget).

5.    The wide discrepancy between the First Day DIP Budget and the Wind-Down DIP Budget was known or knowable to the Debtors and the FILO Lenders at the First Day Hearing. Over the weekend preceding the First Day Hearing, the Debtors benefitted from a significant spike in sales and, as a result, had a robust cash balance on the Petition Date far beyond what the First Day DIP Budget contemplated.  The Debtors and the FILO Lenders also certainly knew that the Debtors did not need to disburse $86 million in Week 1. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

6.    The sales reports and cash receipts for the weekend preceding the First Day Hearing, however, were not reflected in the First Day DIP Budget, so parties in interest had no basis to contest the Debtors' apparent need for emergency relief.  Nor did parties in interest have a basis to contest the Debtors' purported need to make $86 million in disbursements in Week 1. Based on the information disclosed in the First Day Budget alone, stakeholders were not prepared to argue that the DIP Motion should be denied and risk what appeared to be a catastrophic outcome for the Debtors and their estates.

7.    Since the Petition Date, the Debtors have (i) enjoyed cash balances far in excess of the $10 million minimum requirement in the First Day DIP Budget, (ii) repaid the $82 million ABL in full, and (iii) projected full repayment of the DIP Financing this week.  The only parties who benefited from the DIP Financing are the ABL Lenders (as defined below), who were repaid

in full by the third week of these Cases, and the FILO Lenders, who cross-collateralized $200 million of their undersecured prepetition FILO Loan with valuable unencumbered assets of the estate.  Had the Court and parties in interest known that the Debtors did not need the DIP Financing, the Court would not (and could not) have approved it, and the Roll-Up would not have occurred.

8.    The official committee of unsecured creditors' (the "Committee") settlement with the FILO Lenders (the "UCC Settlement") reflects the reality that the Committee was handcuffed by the Court's prior approval of the Roll-Up.  With its hands tied, the Committee negotiated a sharing formula on certain litigation claims that offers general unsecured creditors no recovery unless and until the FILO Lenders recover the principal amount of the FILO Loan ($515 million) in full.  The UCC Settlement reflects a compromise only on the FILO Lenders' makewhole claims.

9.    Unfortunately, even with the UCC Settlement, the Roll-Up likely dooms any hope that general unsecured creditors will receive any material recovery.  Current projections indicate that the FILO Lenders will have a deficiency claim █████████████████████████████ ████████████████  The auction of lease designation rights (which were unencumbered collateral before the Roll-Up) will reduce this number in an amount to be determined this week, ██████████████████████████████  Unless the retained litigation (which was also unencumbered collateral before the Roll-Up) recovers ███████████████████████ ████████████████████████████████████████████████████  By contrast, had the Roll-Up not occurred, general unsecured claims—including the FILO Lenders' deficiency claims—████████████████████████████████████████████ ████████████████████████████

10.     Where, as here, there is newly discovered evidence or a material mistake that undermines the predicates for a judgment, that judgment should be vacated under Rule 60(b) of the Federal Rules of Civil Procedure (made applicable by Rule 9060 of the Federal Rules of Bankruptcy Procedure).  That is precisely the case here.  The Debtors' own documents show the DIP Financing was unnecessary because the Debtors had sufficient cash to run the business using only cash collateral.  The Roll-Up is the fruit of this poisonous tree.

11.     The Ad Hoc Bondholder Group recognizes that this is extraordinary relief.  But such relief is required here based on the facts of these Cases and the fundamental right of stakeholders to due process and full disclosure of the relevant facts.  The outcome of a Chapter 11 case cannot be determined based on an interim, first-day motion when parties in interest have no meaningful opportunity to challenge the factual predicates for emergency relief and an estate fiduciary has not been appointed.  That is precisely what happened here.

12.     For all the reasons herein, the Ad Hoc Bondholder Group respectfully requests that the Court reconsider and vacate the DIP Orders.

## JURISDICTION

13.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

14.     The statutory predicates for the relief requested herein are section 105(a) of the Bankruptcy Code, Rule 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), and Rules 4001(c) and 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

15.     On April 23, 2023 (the "Petition Date"), each of the above-captioned debtors (the

"Debtors") in these Chapter 11 Cases filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

16.    On the Petition Date, the Debtors filed the *Declaration of Holly Etlin in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 10] (the "First Day Declaration"). On the Petition Date, the Debtors also filed the DIP Motion.

17.    On April 24, 2023, or the day after the Petition Date, the Debtors held their "first day" hearing in the Chapter 11 Cases for the Court's consideration of, *inter alia*, the relief requested in the DIP Motion.

18.    On May 5, 2023, the United States Trustee for Regions 3 and 9 appointed the Committee.

19.    The Ad Hoc Bondholder Group owns nearly $185 million of the $1.3 billion in Senior Unsecured Notes outstanding. The remaining $1.1 billion is held primarily by retail investors who hold small claims and are unlikely to meaningfully participate in these Chapter 11 Cases. While the indenture trustee for the unsecured noteholders has a seat on the Committee, the Ad Hoc Bondholder Group has voiced its concern that the trustee is not acting in the best interests of the noteholders.

A.    **The Debtors' Prepetition Capital Structure.**

20.    The Debtors had approximately $1.8 billion in total funded debt obligations on the Petition Date, consisting of: (i) a $80.3 million senior secured asset-based revolving credit facility (the "ABL Facility" and the lenders thereunder, the "ABL Lenders"); (ii) a $547.1 million FILO Loan; (ii) $1.03 billion in outstanding Senior Unsecured Notes; and (iii) $61.5 million of aggregate capital lease obligations. *See* First Day Declaration ¶ 64.

21.     The ABL Facility and the FILO Loan (together, the "Prepetition Credit Facilities")

are secured on a first-priority basis (subject to customary exceptions) on substantially all assets

(other than certain real property or equipment located in the United States that is owned by, or

leased to, the Company or any of its subsidiaries exceeding a certain threshold) of Bed Bath &

Beyond and its subsidiaries that are borrowers or guarantors under the Prepetition Credit Facilities.

**B.      The Court Approves the DIP Financing and Roll-Up at the First Day
          Hearing.**

22.     On less than 24 hours' notice,[3] the Court approved the DIP Motion and entered the

Interim DIP Order authorizing the Debtors to obtain senior secured postpetition financing on a

superpriority basis consisting of (i) a new money, single draw term loan facility of $40 million and

(ii) the Roll-Up of the FILO Loan in the amount of $200 million.  The Interim DIP Order granted

the FILO Lenders a blanket lien on all unencumbered assets of the estate.

23.     In support of the DIP Motion, the Debtors filed the *Declaration of Holly Etlin in*

*Support of the Debtors' DIP Motion* [Dkt. No. 37] (the "Etlin DIP Declaration").  The Etlin DIP

Declaration argued that immediate emergency financing is necessary because:

- "The Debtors ***enter these cases in dire financial straits***—the Debtors were in cash dominion, $54 million over-advanced under their prepetition credit facilities, and did not have a clear path to further financing out-of-court." Etlin DIP Declaration ¶ 13 (emphasis added).

- "While the Debtors anticipate cost-savings and proceeds from store closures and inventory sales during the first few weeks of these cases, the Debtors require funding to operate their businesses long enough to effectively capture those proceeds.  Without access to Cash Collateral ***and the proceeds of the DIP Facility, I do not believe the Debtors will be able to avoid an immediate, value-destructive, and disorganized liquidation of their businesses***[.]"  *Id.* ¶ 15 (emphasis added).

---

[3]     The DIP Motion was filed on April 23, 2023 at 4:00 p.m. (ET) and the proposed Interim DIP Order, which disclosed the Roll-Up, was not filed until April 23, 2023 at 8:20 p.m. (ET).  The hearing on the matter was held on April 24, 2023 at 2:00 p.m.

- "[T]he Debtors require *immediate* access to liquidity.  The proposed DIP Facility provides just that."  *Id*. (emphasis added).

24.    The Etlin DIP Declaration explained that $40 million DIP Facility amount was "derived from a cash-flow projection that AlixPartners developed from an analysis of the Debtors' projected receipts and disbursements."  *Id*. ¶ 17 (emphasis added).  At the First Day Hearing, Debtors' counsel relied on the First Day DIP Budget prepared by AlixPartners to argue that immediate relief was necessary to bridge a $30 million liquidity shortfall in Week 1.  *See* First Day Hr'g Tr. at 37:15–17.  There was no disclosure in the first day pleadings nor at the First Day Hearing of the Debtors' actual cash balance at that time. [4]

25.    Below is the First Day DIP Budget showing a $30 million deficiency without the DIP Facility:

**First Day DIP Budget**

Filed on the Petition Date at Dkt. No. 41

| Forecast Week #  $M | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Fiscal Month | May-23 | May-23 | May-23 | May-23 | May-23 |
| Week Ending | 29-Apr | 6-May | 13-May | 20-May | 27-May |
| Go Forward Collections | $  10 | – | – | – | – |
| Release of restricted cash | – | – | – | – | – |
| Store liquidation sales | 43 | 75 | 87 | 83 | 75 |
| Sales Tax / Other Receipts | 3 | 15 | 12 | 12 | 11 |
| **Total Collections** | 56 | 90 | 99 | 95 | 86 |
| Merchandise Vendor Payments | – | – | – | – | – |
| Payroll, Taxes & Medical | (42) | (2) | (19) | (2) | (17) |
| Rent | (26) | – | – | – | – |
| Non Merch Vendor Expense | (14) | (25) | (15) | (15) | (15) |
| Sales Tax | – | – | – | – | – |
| Hilco payments | (4) | (12) | (5) | (5) | (5) |
| **Total Operating Disbursements** | (86) | (39) | (39) | (21) | (36) |
| **Total Operating Cash Flow** | (30) | 51 | 61 | 74 | 50 |
| Equity Proceeds | – | – | – | – | – |
| DIP Interest | – | – | – | – | – |
| FILO paydown | – | – | – | – | – |
| ABL Interest | – | (1) | – | – | (0) |
| FILO Interest | – | (4) | – | – | – |
| Unsec. Notes Interest | – | – | – | – | – |
| **Net Cash Flow Before Rx items** | (30) | 46 | 61 | 74 | 50 |
| Professional fees | ($4) | – | – | – | – |
| DIP flows | 40 | – | – | – | (8) |
| Other Rx flows | – | – | (30) | (3) | (0) |
| Supplemental items | (1) | (1) | (1) | (1) | (1) |
| **Net Cash Flow** | 4 | 45 | 30 | 70 | 42 |
| **Ending Cash** | 10 | 10 | 10 | 10 | 10 |
| ABL Balance | (82) | (36) | (7) | – | – |
| LC Balance | (103) | (103) | (103) | (41) | – |

---

[4]    The Debtors also informed the Court at the hearing that while "the roll-up does need to occur upon entry of this interim order" "very little harm comes from it, simply because there are not really significant unencumbered assets[.]"  *Id*. at 35:17-23.  That statement stands in stark contrast with the FILO Lenders' assertion that they would not have funded the DIP Financing without the Roll-Up.

## C.    The Truth Emerges Just Hours Before The Final DIP Hearing.

26.    Just hours before the Final DIP Hearing, the Debtors filed the Wind-Down DIP Budget showing a dramatically better cash position in Week 1 than disclosed in the First Day DIP Budget.  The key drivers of the actual results for Week 1 were (i) better than forecasted cash generated over the weekend preceding the First Day Hearing and (ii) drastically lower disbursements ($86 million versus $20 million).  The Wind-Down DIP Budget shows that the Debtors did not need the DIP Financing.  If the DIP Financing proceeds were subtracted from the Debtors' actual results, the Debtors would still have excess cash to run their business and pay the ABL in full by the third week of these Cases.

### Wind Down DIP Budget
Filed on June 13, 2023 at Dkt. No. 716

| Week #                                $M | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Month | May-23 | May-23 | May-23 | May-23 | May-23 | Jun-23 | Jun-23 | Jun-23 | Jun-23 | Jul-23 | Jul-23 | Jul-23 | Jul-23 | 13 weeks |
| Week Ending | 29-Apr | 6-May | 13-May | 20-May | 27-May | 3-Jun | 10-Jun | 17-Jun | 24-Jun | 1-Jul | 8-Jul | 15-Jul | 22-Jul | |
| Go Forward Collections | $  56 | - | - | - | - | - | - | - | - | - | - | - | - | $  56 |
| Release of restricted cash | - | - | - | - | 2 | - | - | - | - | - | - | - | - | 2 |
| Store liquidation sales | 8 | 92 | 66 | 39 | 35 | 32 | 33 | 46 | 60 | 61 | 57 | 54 | 50 | 636 |
| Augment collections | - | - | 2 | 4 | 7 | 12 | 18 | 21 | 21 | 21 | 21 | 16 | | 143 |
| Sales Tax / Other Receipts | 13 | 6 | 5 | 2 | 5 | 5 | 4 | 5 | 9 | 9 | 9 | 31 | 20 | 123 |
| **Total Collections** | **77** | **98** | **71** | **43** | **47** | **44** | **48** | **70** | **91** | **91** | **87** | **106** | **86** | **960** |
| Payroll, Taxes & Medical | (17) | (26) | (16) | (3) | (15) | (2) | (16) | (3) | (16) | (3) | (14) | (2) | (13) | (145) |
| Rent | (1) | (23) | (1) | (0) | - | (24) | - | - | - | (18) | - | - | - | (68) |
| Non Merch Vendor Expense | (1) | (5) | (2) | (3) | (6) | (5) | (11) | (8) | (8) | (9) | (8) | (3) | (3) | (71) |
| Sales Tax | - | (2) | - | (0) | (2) | (0) | (5) | (13) | - | (0) | (2) | (13) | | (37) |
| Hilco payments | - | (4) | - | (4) | - | (5) | (8) | (15) | (18) | (25) | (25) | (25) | (25) | (153) |
| **Total Operating Disbursements** | **(20)** | **(60)** | **(18)** | **(10)** | **(21)** | **(38)** | **(35)** | **(31)** | **(54)** | **(54)** | **(47)** | **(32)** | **(54)** | **(474)** |
| **Total Operating Cash Flow** | **57** | **38** | **53** | **33** | **26** | **6** | **14** | **39** | **36** | **37** | **40** | **75** | **32** | **486** |
| DIP Interest | - | - | - | - | - | - | (0) | - | (0) | - | - | - | - | (1) |
| FILO paydown, ex FF&E / lease | - | - | - | - | - | - | - | - | (33) | (28) | (37) | (16) | - | (114) |
| FILO paydown - FF&E / lease | - | - | - | - | - | - | - | - | - | (1) | (1) | (23) | (13) | (38) |
| ABL Interest | - | - | (1) | - | - | (2) | - | - | - | - | - | - | - | (3) |
| FILO Interest | - | - | - | - | (4) | - | - | - | (5) | - | - | - | - | (13) |
| **Net Cash Flow Before Rx items** | **57** | **34** | **52** | **33** | **26** | **0** | **13** | **39** | **3** | **3** | **2** | **36** | **19** | **317** |
| Professional fees | - | ($4) | ($3) | ($2) | ($2) | ($2) | ($2) | ($1) | ($1) | ($3) | ($1) | ($1) | ($1) | ($26) |
| DIP flows | 40 | - | - | - | - | - | (10) | (26) | - | - | - | - | - | (0) |
| Other Rx flows | (7) | (6) | (10) | (0) | (9) | (1) | (2) | (9) | (1) | - | - | - | - | (45) |
| Supplemental items | - | (2) | (3) | (1) | - | - | (1) | (1) | (1) | (1) | (1) | (1) | (5) | (15) |
| **Net Cash Flow** | **89** | **22** | **36** | **29** | **14** | **(6)** | **(2)** | **2** | **1** | **(1)** | **(0)** | **34** | **13** | **231** |
| Beginning Cash | $  8 | $  93 | $  69 | $  34 | $  36 | $  34 | $  24 | $  10 | $  12 | $  11 | $  11 | $  11 | $  45 | 8 |
| +/- Net Cash Flow | 89 | 22 | 36 | 29 | 14 | (6) | (2) | 2 | 1 | (1) | (0) | 34 | 13 | 231 |
| +/- ABL Draw / (Repayment) | - | (3) | (50) | (28) | - | - | - | - | - | - | - | - | - | (80) |
| +/- LC draws / cash collateralization | (1) | 4 | (43) | (28) | (16) | (4) | (12) | - | - | - | - | - | - | (100) |
| **Ending Cash** | **$  93** | **$  69** | **$  34** | **36** | **34** | **24** | **10** | **11** | **12** | **11** | **11** | **45** | **58** | **58** |

> **D.    The Debtors Settle with the Committee and the Court Approves the
> DIP Financing on a Final Basis.**

27.    At the Final DIP Hearing, Debtors' counsel announced that it had reached a global

settlement with the FILO Lenders and the Committee (the "UCC Settlement"), the terms of which

were incorporated into the Final DIP Order [Dkt. No. 729].  Debtors' counsel described the UCC

Settlement as "essentially a marshalling agreement" whereby "the DIP lenders and the pre-petition

secured lenders have agreed to look first to the DIP collateral and the pre-petition collateral as a

source of recovery other than certain proceeds of certain specified claims and causes of action[.]"

Final DIP Hr'g Tr. at 10:10–16.

28.    Under the terms of the UCC Settlement, the FILO Lenders and the Debtors' estates

will share collateral proceeds pursuant to a waterfall defined by certain distribution thresholds.  At

a high level, the first threshold requires that (i) the Prepetition ABL Lenders be paid in full and

(ii) that the FILO Lenders recover $515 million in cash in respect of their principal plus interest

and fees on account of the DIP and FILO obligations (collectively, the "Initial Sharing

Threshold").  *See* Final DIP Order ¶ 60(b).

29.    Next, and only after the Initial Sharing Threshold is met, all proceeds of DIP

Collateral and Prepetition Collateral[5] would be distributed to the FILO Lenders, including the

proceeds of certain litigation claims subject to specific distribution allocations to these parties and,

presumably, general unsecured creditors.  *See id.* ¶ 60(c).  Pursuant to these distribution

allocations: (i) the FILO Lenders and DIP Secured Parties would receive 100% of the proceeds of

all Prepetition Collateral and DIP Collateral, 80% of the Shipping and Price Gouging Claim

Proceeds, 60% of the Specified Estate Claim Proceeds, and 50% of the Other Liability Claim

---

[5]    The Interim DIP order defines "Prepetition Collateral" as the "Specified Collateral" and the "ABL Assets," each
as defined in the Prepetition Credit Agreement and "whether then owned or existing or thereafter acquired or
arising."  *See* Interim DIP Order ¶ G.(iii).

Proceeds and the Interchange Litigation Proceeds; and (ii) the Debtors' estates would receive the remainder of each of the foregoing proceeds and 100% of the Preference Action Proceeds. *Id.* These distributions would continue until (i) the FILO Lenders recover $550 million in cash plus interest and fees on account of their DIP and FILO claims, and (ii) the Debtors' estates recover $25 million (collectively, the "Second Sharing Threshold"). *See id.* ¶ 60(d). Finally, and after the Second Sharing Threshold is met, all proceeds of all Prepetition Collateral and DIP Collateral would again be distributed to the FILO Lenders, including the proceeds of certain litigation claims, subject to distribution allocations to these parties and the Debtors' estates. *See id.* Specifically: (i) the FILO Lenders and DIP Secured Parties would receive: 80% of the proceeds of all Prepetition Collateral and DIP Collateral; 65% of the Shipping and Price Gouging Claim Proceeds; and 50% of the Specified Estate Claim Proceeds, the Other Liability Claim Proceeds and the Interchange Litigation Proceeds; and (ii) the Debtors' estates would receive the remainder of each of the foregoing proceeds and 100% of the Preference Action Proceeds. *Id.*

30.    At the Final DIP Hearing, counsel to the Committee explained on the record that the Committee's decision to enter into the UCC Settlement was a product of "try[ing] to basically dig ourselves out of a hole where . . . all the [Debtors'] assets were liened on the first day[.]" Final DIP Hr'g Tr. at 35:8–13.   The Roll-Up, counsel explained, was "controversial from the Committee's perspective because the roll-up . . . took a prepetition debt claim of $200 million that only had recourse to certain designated items of collateral, made it a post-petition super priority claim but more importantly, granted a blanket lien on all the unencumbered assets for the benefit of the secured lender[.]" *Id.* at 32:24–33:10.  Counsel further illuminated that the DIP Facility was approved prior to the appointment of the Committee, and "when the lenders were granted a lien

[on all unencumbered assets] on the first day, [the Committee] had two choices which was either

to litigate that or to settle it." *Id.* at 33:24–34:1.

31.    The Debtors' ongoing liquidation has crystalized the FILO Lenders' deficiency

claims.  Based on current estimates—which should be confirmed by the time this Motion is

heard— ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Based on

current projections, ██████████████████████████████████████████

█████████████████████████████ If a litigation trust hires lawyers on contingency and

expenses are netted out, ██████████████████████████████████████████

████████████████████████████ Thus, in the absence of a "home run" outcome

with the litigation, these cases will have been run for the sole benefit of the ABL and FILO

Lenders.

## **RELIEF REQUESTED**

32.    Pursuant to Section 105(a) of the Bankruptcy Code, Federal Rule 60(b), and

Bankruptcy Rules 4001(c) and 9024, the Ad Hoc Bondholder Group respectfully requests that the

Court reconsider and vacate the DIP Orders.

## **ARGUMENT**

33.    Bankruptcy Rule 4001(c)(2) provides that a court may authorize a debtor to obtain

credit on an interim basis "only to the extent necessary to avoid ***immediate and irreparable*** harm

to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(c)(2) (emphasis added).  Similarly,

Bankruptcy Rule 6003 provides that:

> Except to the extent that relief is necessary to avoid immediate and irreparable
> harm, the court shall not, within 21 days after the filing of the petition, issue an
> order granting the following:
> . . .

(b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, *including a motion to pay all or part of a claim that arose before the filing of the petition*, but not a motion under Rule 4001.

Fed. R. Bankr. P. 6003(b) (emphasis added).

34.     As demonstrated below, based on the evidence that has since been unearthed, there was no emergency warranting the relief requested in the Interim DIP Order.

**A.     Statutory Basis for Granting the Requested Relief.**

35.     Pursuant to Rule 60 of the Federal Rules of Civil Procedure, made applicable here by Bankruptcy Rule 9024, the Ad Hoc Bondholder Group seeks the entry of an order vacating the DIP Orders. *See G.W. Palmer & Co. v. Dye (In re Tanimura Distrib., Inc.)*, No. CC-10-1220-KIPAD, 2011 WL 3299933, at *6 (B.A.P. 9th Cir. Mar. 11, 2011) ("As courts of equity, bankruptcy courts have broad discretion under Rule 9024 to reconsider, vacate, or modify past orders.  [Rule 9024] does not restrict the bankruptcy court's power to reconsider any of its previous orders when equity so requires.") (internal citations omitted).

36.     Rule 60 provides that "the court may relieve a party . . . from [an] order . . . for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . . . (2) newly discovered evidence that . . . could not have been discovered in time to move for a new trial under Rule 59(b); . . . (6) any other reason that justifies relief."  Fed. R. Civ. P. 60.  Alternately, a court may reconsider relief granted in its orders, including any interim orders, pursuant to 11 U.S.C. § 105(a).  *See, e.g., In re G-I Holdings, Inc.*, 472 B.R. 263, 279–80 (Bankr. D.N.J. 2012) ("At the outset, the Court acknowledges it has independent, discretionary authority to review, amend, correct, or clarify its own Opinion and other orders under its inherent equitable power."); *Utica Leaseco, LLC v. GMI Land Co., LLC*, No. 11-CV-0565, 2011 WL 2458065, at *5 (W.D. Pa. June 16, 2011) ("Bankruptcy courts generally have 'independent authority' to reconsider their own orders pursuant to Section 105."); *see also Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l*

*Fibercom, Inc.*), 503 F.3d 933, 945 (9th Cir.2007) ("Aside from Rule 60(b)(6), the bankruptcy

court also had the discretionary power to reconsider its order."); *Rodriguez v. EMC Mortg. Corp.*

*(In re Rodriguez)*, No. 00-50657, at *2 (5th Cir. Mar. 15, 2001) (per curiam) ("[T]he bankruptcy

court had jurisdiction to interpret its own order, thereby giving it the power to entertain the motion

for clarification").

37.     An interim order entered by a bankruptcy court may be reconsidered under Rule

60(b) where, as here, the order resolves and seriously affects substantive rights and finally

determines the discrete issue to which it is addressed.  *See In re Frontier Props., Inc.*, 979 F.2d

1358, 1363 (9th Cir.1992).  Here, the Interim DIP Order substantially prejudiced the rights of

unsecured creditors by permitting the FILO Lenders to roll up $200 million of their undersecured

prepetition debt and cross-collateralize that debt with unencumbered assets of the estate.

38.     As this Court has explained, cross-collateralization is permitted (if at all) only if the

debtor can demonstrate that, absent the proposed financing, (i) the "business would not survive"

and (ii) the proposed financing is "in the best interests of the creditor body as a whole."  *In re S B*

*Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 367 (Bankr. D.N.J. 2020) (citing *In re Vanguard*

*Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)).  As demonstrated herein, the Debtors

did not need the DIP Facility.  Instead, the DIP Facility was a vehicle for the FILO Lenders to

improve their position at the expense of general unsecured creditors who will likely recover

***nothing*** in these Chapter 11 Cases if the DIP Orders stand.

39.     This Court has the authority to provide the relief requested.   The Ad Hoc

Bondholder Group submits that the protections afforded to financing orders pursuant to Section

364(e) of the Bankruptcy Code do not apply to this Motion for Reconsideration because that

provision only applies (in certain instances) to *appeals*, while the Ad Hoc Bondholder Group is

instead asking this Court to reconsider its entry of those orders. *See Matter of Ellingsen MacLean Oil Co., Inc.*, 65 B.R. 358, 360 n.2 (W.D. Mich. 1986), *aff'd sub nom.*, *In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599 (6th Cir. 1987) ("[U]pon reconsideration the party extending credit cannot rely upon the protection of section 364(e), as the court then reviewing the case is the original tribunal and not an appeals court.") (citing *In re Monarch Circuit Indus.*, 41 B.R. 859, 862 (Bankr. E.D. Pa. 1984)).

## B.      The Debtors Did Not Need the DIP Facility.

40.      At the First Day Hearing, the Court asked the Debtors to explain why they needed the $40 million DIP Facility to be approved "today."  First Day Hr'g Tr. at 36:16.  In response, counsel for the Debtors directed the Court to the First Day DIP Budget and explained that there was a $30 million "hole that we need to fill this week" (*id.* at 37:15) to "pay payroll benefits of $42 million" (*id.* at 37:17) as well as "May rent" and "a portion of April stub rent."  *Id.* at 37:21– 22.  The Court entered the Interim DIP Order on an emergency basis relying on the Debtors' representation that they needed the DIP Facility "right now" (*id.* at 37:16) to bridge the "deficit of $30 million" (*id.* at 38:2–3) in Week 1.

41.      In reality, the "need" to fill a $30 million hole in Week 1 was wrong by a wide margin.  The truth emerged hours before the Final DIP Hearing when the Debtors filed their Wind-Down DIP Budget.  The Wind-Down DIP Budget showed that the Debtors recorded operating disbursements of $20 million in Week 1 (versus projected disbursements of $86 million) and total collections of $77 million (versus projected collections of $56 million).

### First Day DIP Budget
Filed on the Petition Date at Dkt. No. 41

| Forecast Week # | $M | 1 | 2 | 3 | 4 | 5 |
| Fiscal Month | | May-23 | May-23 | May-23 | May-23 | May-23 |
| Week Ending | | 29-Apr | 6-May | 13-May | 20-May | 27-May |
|---|---|---|---|---|---|---|
| Go Forward Collections | $ | 10 | - | - | - | - |
| Release of restricted cash | | - | - | - | - | - |
| Store liquidation sales | | 43 | 75 | 87 | 83 | 75 |
| Sales Tax / Other Receipts | | 3 | 15 | 12 | 12 | 11 |
| **Total Collections** | | 56 | 90 | 99 | 95 | 86 |
| Merchandise Vendor Payments | | - | - | - | - | - |
| Payroll, Taxes & Medical | | (42) | (2) | (19) | (2) | (17) |
| Rent | | (26) | - | - | - | - |
| Non Merch Vendor Expense | | (14) | (25) | (15) | (15) | (15) |
| Sales Tax | | - | - | - | - | - |
| Hilco payments | | (4) | (12) | (5) | (5) | (5) |
| **Total Operating Disbursements** | | (86) | (39) | (39) | (21) | (36) |
| **Total Operating Cash Flow** | | (30) | 51 | 61 | 74 | 50 |
| Equity Proceeds | | - | - | - | - | - |
| DIP Interest | | - | - | - | - | - |
| FILO paydown | | - | - | - | - | - |
| ABL Interest | | - | (1) | - | - | (0) |
| FILO Interest | | - | (4) | - | - | - |
| Unsec. Notes Interest | | - | - | - | - | - |
| **Net Cash Flow Before Rx items** | | (30) | 46 | 61 | 74 | 50 |
| Professional fees | | ($4) | - | - | - | - |
| DIP flows | | 40 | - | - | - | (8) |
| Other Rx flows | | - | - | (30) | (3) | - |
| Supplemental items | | (1) | (1) | (1) | (1) | (1) |
| **Net Cash Flow** | | 4 | 45 | 30 | 70 | 42 |
| **Ending Cash** | | 10 | 10 | 10 | 10 | 10 |
| ABL Balance | | (82) | (36) | (7) | - | - |
| LC Balance | | (103) | (103) | (103) | (41) | - |

### Wind Down DIP Budget
Filed on June 13, 2023 at Dkt. No. 716

| Week # | $M | 1 | 2 | 3 | 4 | 5 |
| Fiscal Month | | May-23 | May-23 | May-23 | May-23 | May-23 |
| Week Ending | | 29-Apr | 6-May | 13-May | 20-May | 27-May |
|---|---|---|---|---|---|---|
| Go Forward Collections | $ | 56 | - | - | - | - |
| Release of restricted cash | | - | - | - | - | 2 |
| Store liquidation sales | | 8 | 92 | 66 | 39 | 35 |
| Augment collections | | - | - | - | 2 | 4 |
| Sales Tax / Other Receipts | | 13 | 6 | 5 | 2 | 5 |
| **Total Collections** | | 77 | 98 | 71 | 43 | 47 |
| Payroll, Taxes & Medical | | (17) | (26) | (16) | (3) | (15) |
| Rent | | (1) | (23) | (1) | (0) | - |
| Non Merch Vendor Expense | | (1) | (5) | (2) | (3) | (6) |
| Sales Tax | | - | (2) | - | - | (0) |
| Hilco payments | | - | (4) | - | (4) | - |
| **Total Operating Disbursements** | | (20) | (60) | (18) | (10) | (21) |
| **Total Operating Cash Flow** | | 57 | 38 | 53 | 33 | 26 |
| DIP Interest | | - | - | - | - | - |
| FILO paydown, ex FF&E / lease | | - | - | - | - | - |
| FILO paydown - FF&E / lease | | - | - | - | - | - |
| ABL Interest | | - | - | (1) | - | - |
| FILO Interest | | - | (4) | - | - | - |
| **Net Cash Flow Before Rx items** | | 57 | 34 | 52 | 33 | 26 |
| Professional fees | | - | ($4) | ($3) | ($2) | ($2) |
| DIP flows | | 40 | - | - | (0) | (1) |
| Other Rx flows | | (7) | (6) | (10) | (0) | (9) |
| Supplemental items | | - | (2) | (3) | (1) | - |
| **Net Cash Flow** | | 89 | 22 | 36 | 29 | 14 |
| **Beginning Cash** | $ | 8 | $ 93 | $ 69 | $ 34 | $ 36 |
| +/- Net Cash Flow | | 89 | 22 | 36 | 29 | 14 |
| +/- ABL Draw / (Repayment) | | (3) | (50) | (28) | - | - |
| +/- LC draws / cash collateralization | | (1) | 4 | (43) | (28) | (16) |
| **Ending Cash** | $ | 93 | $ 69 | $ 34 | 36 | 34 |

42.     The wide discrepancy between the projected and actual numbers was known or knowable to the Debtors and the FILO Lenders at the First Day hearing. ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████ With those minor adjustments alone—which the Debtors and the FILO Lenders surely knew were possible when they filed the First Day DIP Budget with the Court—there was no need for the DIP Facility. Indeed, even if actual collections had come in at $56 million as projected in the First Day DIP Budget, the Debtors would have ended Week 1 with total operating cash flow of $36 million—significantly higher than the $10 million minimum cash balance reflected in the First DIP Budget for each of the first five weeks of these Chapter 11 Cases.

43.    In any event, the Debtors and the FILO Lenders also knew at the First Day Hearing that Week 1 collections would be materially higher than projected. ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ By the time the Debtors appeared in Court to request emergency relief, they knew or should have known that the First Day DIP Budget was stale and the DIP Facility was unnecessary.

44.    The Debtors justified their need for emergency relief at the First Day Hearing with a stale and inaccurate First DIP Budget and without disclosure of their actual cash position. The differences between the critical numbers in the First Day DIP Budget submitted to the Court and the actual numbers in the Wind-Down DIP Budget, coupled with the timing of such material changes (just hours before the Final DIP Hearing) justify vacating the DIP Orders and unwinding the cross-collateralization of the FILO Lenders' undersecured prepetition debt. *See In re Cisneros*, 994 F.2d 1462, 1467 (9th Cir. 1993) ("The order of discharge was entered by the bankruptcy court under a misapprehension as to the facts of the case. Had the court been appraised of the actual facts, it would never have entered the order. In our view, this is precisely the sort of 'mistake' or 'inadvertence' that Rule 60(b) was intended to reach.").

### C.    The Interim DIP Order Unduly Prejudices the Rights of Unsecured Creditors.

45.    The Interim DIP Order unduly prejudiced unsecured creditors by granting the FILO Lenders an administrative priority claim and a blanket lien on unencumbered assets of the estate to secure $200 million of their prepetition debt. Cross-collateralization "is an extremely controversial form of Chapter 11 financing" that should be used "only as a last resort." *In re*

*Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1493 (11th Cir. 1992) (citing *In re Vanguard Diversified, Inc.*, 31 B.R. at 366). As this Court has explained, to obtain postpetition financing that cross-collateralizes prepetition debt, the debtor must demonstrate (i) that its business operations would fail absent the proposed financing and (ii) that the proposed financing is "in the best interests of the creditor body as a whole." *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. at 367; *see also In re Saybrook Mfg. Co., Inc.*, 963 F.2d at 1493 (same); *In re Vanguard Diversified, Inc.*, 31 B.R. at 366 (same).

46. Here, evidence disclosed after the Court approved the Interim DIP Order (but known or knowable to the Debtors and the FILO Lenders before the Court approved such order) shows that the DIP Facility was unnecessary. Had the Court known all the facts, the Ad Hoc Noteholder Group believes that it would not (and could not) have found that the Debtors' business operations would fail absent the DIP Facility or that the Interim DIP Order—which obliterated the recoveries of unsecured creditors—was in the best interests of the creditor body as a whole. *See Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985) ("The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence."); *see also Stanziale v. Nachtomi*, No. CIV.A.-01-403-KAJ, 2004 WL 1812705, at *2-3 (D. Del. Aug. 6, 2004) (explaining that a court may grant a motion for reconsideration "if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension.").

47. Likewise, the Roll-Up was unnecessary. A roll-up is particularly inappropriate where, as here, the debtors are liquidating. The Debtors and their estates should not pay a premium to the FILO Lenders – here, a $200 million roll-up – when these proceedings are conducted for

their benefit.  Ultimately, that premium is, in fact, a penalty paid by the general unsecured creditors.

48.    The cross-collateralization of the FILO Lenders' prepetition debt dramatically reduced unsecured creditors' recoveries.  The charts below compare unsecured creditors' recovery before and after the Roll-Up with illustrative FILO Lenders' deficiency claims of $147 million to $347 million and assuming lease designation and litigation recoveries of $50 million to $250 million.  The analysis (i) assumes a $1.5 billion general unsecured claims pool pre-FILO Lenders' deficiency claim and (ii) includes the FILO Lenders' makewhole claim.

| Unsecured Recovery Prior to Roll-Up ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| FILO Deficiency Claim | Pre-Petition Collateral | Prepetition Unencumbered Value | | | | |
| | | $50 | $100 | $150 | $200 | $250 |
| $347 | $200 | 2.7% | 5.4% | 8.1% | 10.8% | 13.5% |
| $297 | $250 | 2.8% | 5.6% | 8.3% | 11.1% | 13.9% |
| $247 | $300 | 2.9% | 5.7% | 8.6% | 11.4% | 14.3% |
| $197 | $350 | 2.9% | 5.9% | 8.8% | 11.8% | 14.7% |
| $147 | $400 | 3.0% | 6.1% | 9.1% | 12.1% | 15.2% |

| Unsecured Recovery Post Roll-Up With UCC Settlement ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| FILO Deficiency Claim | Pre-Petition Collateral | Prepetition Unencumbered Value[3] | | | | |
| | | $50 | $100 | $150 | $200 | $250 |
| $347 | $200 | - | - | - | - | 0.6% |
| $297 | $250 | - | - | - | - | 0.6% |
| $247 | $300 | - | - | - | - | 1.4% |
| $197 | $350 | - | - | - | 1.1% | 3.1% |
| $147 | $400 | - | - | 1.1% | 2.8% | 4.8% |

49.    Under the terms of the proposed settlement between the Committee and the FILO Lenders, (i) the prepetition ABL obligations must be paid in full and (ii) the DIP lenders and the FILO Lenders must indefeasibly recover $515 million in cash in respect of principal plus interest and fees on account of the DIP obligations and prepetition FILO secured obligations.  At the Final DIP Hearing, counsel for the Committee explained that the UCC Settlement offers only a modest recovery for general unsecured creditors because the Committee was hamstrung in its negotiation

with the FILO Lenders due to the $200 million roll-up granted at the First Day Hearing.  In the

Committee's view, prior to the Petition Date, there were "very valuable causes of action out there

that didn't belong to the [FILO Lenders]" (Final DIP Hr'g Tr. at 33:22–24), but the roll-up "granted

a blanket lien on all unencumbered assets for the benefit of the [FILO Lenders]" that "should have

been made available to pay general unsecured creditors and the estate." *Id.* at 33:3–8.  Below is a

side-by-side illustrative analysis of the unsecured creditors' recovery with and without the

Committee Settlement, which shows how Committee Settlement provides only minimal value to

unsecured creditors.  The analysis assumes a 50/50 split for prepetition unencumbered value once

the DIP and FILO Lenders recover $515 million.

| Unsecured Recovery Post Roll-Up Without UCC Settlement ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| FILO Deficiency Claim | Pre-Petition Collateral | Prepetition Unencumbered Value | | | | |
| | | $50 | $100 | $150 | $200 | $250 |
| $347 | $200 | - | - | - | - | 0.6% |
| $297 | $250 | - | - | - | - | 0.6% |
| $247 | $300 | - | - | - | - | 0.6% |
| $197 | $350 | - | - | - | - | 0.9% |
| $147 | $400 | - | - | - | 0.9% | 4.2% |

| Unsecured Recovery Post Roll-Up With UCC Settlement ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| FILO Deficiency Claim | Pre-Petition Collateral | Prepetition Unencumbered Value[3] | | | | |
| | | $50 | $100 | $150 | $200 | $250 |
| $347 | $200 | - | - | - | - | 0.6% |
| $297 | $250 | - | - | - | - | 0.6% |
| $247 | $300 | - | - | - | - | 1.4% |
| $197 | $350 | - | - | - | 1.1% | 3.1% |
| $147 | $400 | - | - | 1.1% | 2.8% | 4.8% |

50.  ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Thus, the noteholders' only hope for a meaningful recovery in these Chapter 11 Cases is obtaining

a judgment vacating the DIP Orders and unwinding the improper cross-collateralization of the FILO Lenders' prepetition debt.

> **D.** **The Interim DIP Order Allowed The Lenders To Receive Makewhole Claims That Violate New York Law.**

51.    The Interim DIP Order has further prejudiced the rights of unsecured creditors by granting the FILO Lenders new liens and administrative expense claims in respect of makewhole claims that should be disallowed as a matter of law.  *First*, New York law (which governs the Credit Agreement) mandates that a liquidated damages provision be enforced only if it does not constitute a penalty.  *See JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 379 (N.Y. 2005).  Therefore, a make-whole amount will be sustained only if (1) the make-whole calculation bears a reasonable proportion to the probable loss and (2) the amount of actual loss is incapable or difficult of precise estimation.  *Id.* at 380 (quoting *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (N.Y. 1977)).  Here, the Credit Agreement[6] provides that the FILO Applicable Premium shall be owed following ████████████████████████████████ ████████████████████████████[7] The Debtors agreed to add an aggregate $71 million in purported FILO Applicable Premiums to the principal amount of the Prepetition FILO Term Loan following alleged events of defaults *even though the loan was reinstated and the FILO Lenders retained all of the economic benefits thereunder.*[8]  The makewhole amount here therefore does not bear a "reasonable proportion to the probable loss" for the simple reason that *there was no loss.*

---

[6]    References to the "Credit Agreement" refer to that certain Amended and Restated Credit Agreement dated as of August 9, 2021, as subsequently amended.

[7]    *See* First Amendment to Amended and Restated Credit Agreement and Waiver, dated as of August 31, 2022, Annex A at 37, 48.

[8]    ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

52.     *Second*, the makewhole premiums that were added to the principal of the loan include an additional impermissible punitive component.  Thus, the Credit Agreement provides that ███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[9]  The $54 million Make-Whole Amount, which was added to the principal in *February 2023*, apparently included the additional 2% "default" interest as if it continued to accrue through *February 2024*.[10]  Similarly, the $17 million Make-Whole Amount, which was added to the principal in *April 2023*, apparently included the additional 2% "default" interest as if it continued to accrue through *August 2024*.[11]  Adding a 2% "default" interest per annum for eighteen months following the funding date even where—as allegedly happened here—the loan is accelerated, reinstated and the Make-Whole Amount was added to the principal *a year or more before that 18-month anniversary*, does not bear a reasonable proportion to any probable loss.  There is no reason—other than the desire to punish the breaching party—to add default interest when the loan has been reinstated and the applicable fees have been added to the outstanding principal.

53.     *Third*, on April 21, 2023, pursuant to the sixth amendment to the Credit Agreement, the Debtors agreed to add $17 million to the outstanding FILO principal on account of a purported FILO Applicable Premium that had allegedly become due under the Credit Agreement following an event of default.[12]  Pursuant to the Credit Agreement, however, the FILO Applicable Premium

---

[9]     *See* First Amendment to Amended and Restated Credit Agreement and Waiver, dated as of August 31, 2022, Annex A at 48-49 (definition of "Make-Whole Amount").

[10]    *See id.* at 5 (definition of "First Amendment Funding Date").

[11]    *See* Second Amendment to Amended and Restated Credit Agreement and Waiver, dated as of February 7, 2023 at 3 (definition of "Second Amendment Effective Date").

[12]    *See* Sixth Amendment to Amended and Restated Credit Agreement, Consent and Waiver, dated as of April 21,

is only owed upon ████████████████████████████████████████████████████

████████████████[13]  Here, the loan apparently was not accelerated in connection with this

purported event of default.  As such, the $17 million alleged FILO Applicable Premium did not

become due and should not have been added to the principal.  The $71 million in FILO Applicable

Premiums that were added to the principal amount of the FILO loans should be disallowed for all

of the foregoing reasons.

### E.    Unsecured Creditors Were Denied Due Process.

54.    Section 364(d)(1) of the Bankruptcy Code prohibits debtors from obtaining credit

secured by a "senior or equal lien on property of the estate that is subject to a lien" without "notice

and a hearing."  11 U.S.C. § 364(d)(1).  The phrase "after notice and a hearing" is a defined term

in the Bankruptcy Code [11 U.S.C. § 102(1)]; and it has been construed as follows:

> In determining what constitutes "appropriate" notice under § 102(1), I am guided
> by "fundamental notions of procedural due process."  *Western Auto Supply Co. v.
> Savage Arms, Inc. (In re Savage Indus., Inc.),* 43 F.3d 714, 721 (1st Cir.1994).  As
> the Supreme Court held, due process requires notice that is "reasonably calculated,
> under all the circumstances, to apprise interested parties of the pendency of the
> action and afford them an opportunity to present their objections."  *Mullane v.
> Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

*In re Lomas Fin. Corp.*, 212 B.R. 46, 54 (Bankr. D. Del. 1997) (motion for reconsideration granted

based on denial of procedural due process to creditor).  Moreover, Bankruptcy Rule 4001(c)(2)

sets a high standard for approval of financing on less than 14 days' notice by requiring that any

interim financing be "necessary to avoid *immediate and irreparable harm to the estate.*"  Fed. R.

Bankr. P. 4001(c)(2) (emphasis added).  Thus, "Bankruptcy Rule 4001(c)(2) attempts to find a

balance that will accommodate both financial necessity and concerns for due process."  *In re The*

---

2023 § 1(d)(iv).

[13]    *See* Fifth Amendment to Amended and Restated Credit Agreement and Waiver, dated as of April 6, 2023, Annex
A at 31 (emphasis added).

*Colad Grp., Inc.*, 324 B.R. 208, 217 (Bankr. W.D.N.Y. 2005).  Although debtors may enter into

agreements that are "building block[s]" for or "necessary step[s]" toward plans, debtors may not

circumvent the requirements of Section 1129 of the Bankruptcy Code by entering into an

agreement that "has the practical effect of dictating the terms of a prospective Chapter 11 plan."

*In re Nortel Networks, Inc.,* 522 B.R. 491, 508 (Bankr. D. Del. 2014).  An agreement that dictates

the terms of any future plan is an impermissible *sub rosa* plan.  *Id.*  In particular, a "bankruptcy

court cannot, under the guise of section 364, approve financing arrangements that amount to a plan

of reorganization but evade confirmation requirements."  *In re Def. Drug Stores, Inc.*, 145 B.R.

312, 317 (B.A.P. 9th Cir. 1992).

55.    Here, less than 24 hours before the First Day Hearing, the Debtors filed thousands

of pages of first day pleadings, including hundreds of pages relating to the DIP Motion.  At the

same time, the Debtors failed to disclose their actual cash position and assured the Court that the

Roll-Up would cause no harm.  This lack of notice and disclosure rendered it impossible for any

party-in-interest, except the Debtors and the FILO Lenders, to sufficiently evaluate the DIP Motion

and discern the true factual justification, if any, of a $40 million DIP Facility and a $200 million

Roll-Up.  As a result, the Ad Hoc Bondholder Group did not receive sufficient notice to satisfy

due process under Section 364(d)(1) or Bankruptcy Rule 4001(c)(2).  *See In re Ctr. Wholesale,*

*Inc.*, 759 F.2d 1440, 1450–51 (9th Cir. 1985) (holding that cash collateral order was void where

one-day notice violated the requirements of the due process clause because the notice was

insufficient to permit the creditor to adequately prepare for the impending hearing in which the

cash collateral order was approved); *In re Q-C Cirs. Corp.*, 231 B.R. 506, 511–13 (E.D.N.Y. 1999)

(holding that the statutory and due process rights of a creditor with a senior interest in certain cash

collateral of the debtor were violated where the creditor received notice and an opportunity to be heard with respect to only some, but not all, of the "consent orders").

56.    Despite this lack of notice and disclosure, during the First Day Hearing, the Court entered an order approving a financing arrangement with a roll-up that provided recoveries to secured creditors while materially impairing the recoveries of general unsecured creditors.  The Final DIP Order and UCC Settlement provide broad releases to the FILO Lenders, which the Ad Hoc Bondholder Group believes should be withheld until the prepetition conduct of the FILO Lenders has been fully investigated.  The DIP Orders and the UCC Settlement are, in effect, an impermissible *sub rosa* plan.  *See In re The Colad Grp., Inc.*, 324 B.R. at 213–14 (noting that first day orders "are not a device to change the procedural and substantive rights that the Bankruptcy Code and Rules have established.  In particular, [they] should provide no substitute for the procedural and substantive protections of the plan confirmation process.").  Since there was insufficient notice, the Debtors were not authorized to obtain DIP Financing under Section 364, and Section 364(e) does not apply to this Motion.  *See In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1493 (11th Cir. 1992) ("By its own terms, section 364(e) is only applicable if the challenged lien or priority was authorized under section 364.").

## **NOTICE**

57.    Notice of this Motion will be made to the following parties and/or their respective counsel, as applicable: (i) the Debtors; (ii) the office of the United States Trustee for the District of New Jersey; (iii) the Committee; (iv) the agents under the Debtors prepetition secured facilities and counsel thereto; (v) the DIP Agent counsel thereto; (vi) Davis Polk & Wardwell, LLP, and Greenberg Traurig, LLP, in their capacity as counsel to the Prepetition ABL Agent; (vii) the indenture trustee to the Debtors' Senior Unsecured Notes; (viii) the United States Attorney's

Office for the District of New Jersey; (ix) the Internal Revenue Service; (x) the U.S. Securities and

Exchange Commission; (xi) the attorneys general in the states where the Debtors conduct their

business operations; (xii) the monitor in the CCAA proceeding and counsel thereto; (xiii) the

Debtors' Canadian Counsel; and (xiv) any party that has requested notice pursuant to Bankruptcy

Rule 2002.  The Ad Hoc Bondholder Group submits that, in light of the nature of the relief

requested, no other or further notice need be given.

## **CONCLUSION**

WHEREFORE, the Ad Hoc Bondholder Group respectfully requests the entry of an order

(i) reconsidering and vacating the DIP Orders and (ii) granting the Ad Hoc Bondholder Group

such other and further relief as the Court believes is just and proper.

[*Signatures on Next Page*]

Dated: June 25, 2023

/s/ Daniel M. Stolz
Daniel M. Stolz, Esq.
Gregory S. Kinoian, Esq.
**GENOVA BURNS**
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Fax: (973) 533-1112
Email: DStolz@genovaburns.com

- and -

Andrew K. Glenn
Kurt A. Mayr
Shai Schmidt
Agustina Berro
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com (admitted *pro hac vice*)
        kmayr@glennagre.com (admitted *pro hac vice*)
        sschmidt@glennagre.com (admitted *pro hac vice*)
        aberro@glennagre.com (admitted *pro hac vice*)
        nrahman@glennagre.com (admitted *pro hac vice*)

*Counsel to the Ad Hoc Bondholder Group*