## THIRD AMENDMENT TO LEASE

**THIS THIRD AMENDMENT TO LEASE** (this **"Amendment"**) is made as of the $\overline{30}$ day of December, 2022, by and between **CAPARRA CENTER ASSOCIATES, LLC,** a limited liability company organized under the Laws of the Commonwealth of Puerto Rico, with an address of PO Box 9506, San Juan, Puerto Rico 00908 (**"Landlord"**), and **BED BATH & BEYOND INC.**, a New York corporation, with an address of 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**).

## RECITALS

**A.**     **WHEREAS,** Landlord and Tenant are parties to that certain Lease, dated November 13, 2002 (as amended, the **"Lease"**), pursuant to which Tenant leases from Landlord certain premises (the **"Premises"**) within San Patricio Plaza (the **"Shopping Center"**), Guaynabo, Puerto Rico.

**B.**     **WHEREAS,** Landlord and Tenant wish to amend the Lease to extend the Term of the Lease and amend certain other terms of the Lease.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Landlord and Tenant agree as follows:

1.     **Recitals; Capitalized Terms**. All of the foregoing recitals are true and correct. Unless otherwise defined herein, all capitalized terms used in this Amendment shall have the meanings ascribed to them in the Lease.

2.     **Extended Term.**     Landlord and Tenant hereby agree to extend  the Term of the Lease for a period of five (5) years commencing on February 1, 2026 and expiring on January 31, 2031 (the **"Amended Extension Period"**).

3.     **Rent.** Notwithstanding anything in the Lease to the contrary, Tenant shall pay Fixed Rent for the period commencing on January 1, 2023 and ending on January 31, 2031 at the rate of $810,000 per year (based on $20.00 Dollars per square foot of Floor Area).

4.     **Percentage Rent Breakpoint.**     The parties hereby acknowledge and agree that notwithstanding anything in the Lease to the contrary, the Sales Break Point during the Amended Extension Period (for purposes of Section 4.4 of the Lease) shall be $16,071.429.00.

5.     **Renewal Options.** Tenant shall continue to have two (2) remaining five (5) year options to renew the Lease for the entirety of the Premises as set forth in Section 2.2.2 of the Lease, as amended herein. The dates by which the remaining two (2) Renewal Options must be exercised are August 4, 2030 and August 4, 2035, respectively.  Fixed Rent for the remaining Renewal Periods, if exercised, shall be as follows:

DocuSign Envelope ID: C0B1C295-8B66-4AFA-B4E1-...

| Period | Annual Fixed Rent | Fixed Rent psf |
|---|---|---|
| February 1, 2031 through on January 31, 2036<br><br>(second Renewal Period, if exercised) | $911,250.00 | $22.50 |
| February 1, 2036 through on January 31, 2041<br><br>(third Renewal Period, if exercised) | $982,125.00 | $24.25 |

6.  **Prohibited Uses and Redevelopment.**

Landlord desires to re-develop the parcel identified on the Site Plan attached hereto as Exhibit "B" ("The Square @ San Patricio Plaza" or "The Square") Tenant agrees that the following Prohibited Uses pursuant to Exhibit L of the Lease are hereby deleted in their entirety and replaced with the following:

(8) Any automobile, truck, trailer, boat or recreational vehicle sales, leasing, display or body shop repair operation, except that Landlord shall be permitted to lease to a tenant who engages in the sale of the aforementioned vehicles, and may, from time to time, ~~for promotional purposes only,~~ display in The Square vehicles which are ordinarily and customarily displayed in first class shopping centers for promotional purposes. The foregoing shall not be construed to permit Landlord to lease space in the Shopping Center to any dealership which may in the ordinary course of business maintain a sales floor or stock of inventory for on-site sales. ,

(9) Any bowling alley over five lanes; or skating rink except as part of a temporary promotional skate park outside the Critical Area, except that Landlord shall be permitted to lease to a tenant operating as a bowling alley consistent with bowling alleys ordinarily found in first class shopping centers in the basement level of The Square, or in any other premises in the Shopping Center provided that the same is not located within ~~four~~ two hundred (~~400~~ 200) feet of the Premises;

(16)     Any bar, tavern, or any other establishment selling alcoholic beverages for on or off premises consumption within three hundred lineal feet of the Premises, except as a part of a restaurant otherwise permitted herein, and except for Ocean Lab located in the premises identified on the Site Plan attached hereto as Exhibit C.

(34)     restaurant serving meals for on- or off-premises consumption in that one-half of The Square closest to the Premises, provided that this shall not restrict Landlord's ability to lease to the restaurant tenants identified on the Site Plan attached hereto as Exhibit _ or other restaurants ordinarily and customarily found in first class shopping centers and that the main entrance to any of the restaurant(s) is located at least 150 feet from the main entrance to the Premises. Notwithstanding the foregoing, in the event Landlord permits restaurant tenants to offer a valet service, the same shall in no event infringe upon Tenant's Critical Area, cause or permit to be caused any municipal violation including fire code violations, which are attributable to the Premises or Tenant's occupancy thereof. In the event Tenant receives any such violation, Landlord agrees to indemnify and hold harmless Tenant from the same.

(35)     health spa, exercise facility or any similar type of business in that one-half of The

Square fronting the west elevation of the Shopping Center, except that a day space or beauty spa or exercise facility ordinarily found in first class shopping centers, including but not limited to yoga or Pilates studios, Orange Theory or F45 studios, provided that the same are not located immediately adjacent to the Premises and meet a minimum Sound Transmission Class ("STC") rating of 60 prior to commencement of operations in any such space and Landlord shall ensure the minimum STC rating is maintained for the duration of any exercise facility operations.

Landlord covenants that it shall not violate any existing Exclusive or Prohibited Uses under Section 13 or Exhibit L of the Lease, as have been amended and/or modified, or otherwise violate any of Tenant's rights as set forth under Section 5.2.2, 5.2.3 or any other section of the Lease with regards to Tenant's minimum parking spaces, the No Build Area, or the Critical Area, as the same may be hereby modified and reflected in the Site Plan as depicted in Exhibit B, without the express written consent of Tenant, which Tenant may withhold in its sole discretion. Any breach of the same shall entitle Tenant to pursue all rights and remedies available to it under the Lease, at law or in equity, and shall be further entitled to offset Rent at fifty (50%) percent from any continuing violations as long as any such violation exists without the obligation of first notifying Landlord of the same.

7.    **Curbside Parking –** Subject to any applicable laws, Tenant shall be entitled to (a) use up to eight (8) parking stalls directly in front of the Premises for curbside pickup for Tenant's customers ("Curbside Pickup Area") as depicted on the Site Plan attached hereto as Exhibit B, and (b) install signs designating the Curbside Pickup Area ("Curbside Pickup Signs"). The parties agree the Curbside Pickup Area will be non-exclusive to Tenant and neither party shall be obligated to enforce the use thereof.

8.    **LED Screens.** Tenant consents to Landlord installing LED screens on the portions of the Shopping Center shown on Exhibit A. The aforesaid LED screens shall be as substantially shown on Exhibit A.

9.    **Brokerage.** Landlord and Tenant each represents and warrants to the other that it has not employed or dealt with any broker, agent or finder in carrying on the negotiations relating to this Amendment. Tenant shall indemnify and hold Landlord harmless from and against any claim or claims for brokerage or other commissions relating to this Amendment asserted by any broker, agent or finder engaged by Tenant or with whom Tenant has dealt. Landlord shall indemnify and hold Tenant harmless from and against any claim or claims for brokerage or other commissions relating to this Amendment asserted by any broker, agent or finder engaged by Landlord or with whom Landlord has dealt.

10.    **Ratification.** Except as expressly modified by this Amendment, the Lease shall remain in full force and effect, and as further modified by this Amendment, is expressly ratified and confirmed by the parties hereto. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, subject to the provisions of the Lease regarding assignment and subletting.

11.    **Ethical Policy.** It is the policy of Tenant (together with its subsidiaries and affiliates, collectively, the **"Company"**) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act). Landlord shall not, directly or indirectly, solicit or accept from, nor offer, promise or pay any individual or entity (including, but not limited, to any government official) any bribe, kickback or any other improper payment of money or anything else of value. This includes,

but is not limited to, any improper payment in exchange for the Company's execution of this Amendment. Landlord will also require any subcontractor (of any level) to adhere to the same standards, and will appropriately monitor its subcontractors to ensure such adherence. In addition, any individual who is employed by or who represents the Company is prohibited from soliciting, accepting, offering, promising or paying any bribe, kickback or any other improper payment of money or anything else of value. If any such improper actions are observed, Landlord shall inform the Company's Legal Department (Attention: General Counsel) by (i) notice to the address set forth in the Lease, as amended hereby or (ii) by telephoning 908-688-0888.

12.    **Consents**.  Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Amendment to be in full force and effect or, if any such consent is required, Landlord has obtained same prior to its execution hereof.  Tenant represents and warrants to Landlord that, as of the date hereof, no third-party consents or approvals are required in order for the terms and provisions of this Amendment to be in full force and effect or, if any such consent is required, Tenant has obtained same prior to its execution hereof.  The parties represent and warrant to each other that the person signing on behalf of either Landlord or Tenant, as the case may be, has the authority to do so and for this Amendment to be deemed in full force and effect.

13.    **Electronic Signatures**.   This Amendment may be executed electronically and in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Amendment.  The execution and transmission of an image of any signed document or document signed by DocuSign (or a similar application) will have the same binding effect as an original bearing an original signature.  No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

14.    **Governing Law; Interpretation and Partial Invalidity.** This Amendment shall be governed and construed in accordance with the laws of the Commonwealth of Puerto Rico.  If any term of this Amendment, or the application thereof to any person or circumstances, shall to any extent be invalid or unenforceable, the remainder of this Amendment, or the application of such term to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term of this Amendment shall be valid and enforceable to the fullest extent permitted by law. Paragraph titles are for convenience only and are not to be considered in construing this Amendment. This Amendment contains all of the agreements of the parties with respect to the subject matter hereof, and supersedes all prior dealings between them with respect to such subject matter. No delay or omission on the part of either party to this Amendment in requiring performance by the other party or exercising any right hereunder shall operate as a waiver of any provision hereof or any rights hereunder, and no waiver, omission or delay in requiring performance or exercising any right hereunder on any one occasion shall be construed as a bar to or waiver of such performance or right on any future occasion.

15.    **Counterparts and Authority.** This Amendment may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Landlord and Tenant each warrant to the other that the person executing this Amendment on its behalf has authority to do so, that no third-party consents are

DocuSign Envelope ID: C0B1C295-8B66-4AFA-B4E5-xxxxx

required to enter into this Amendment, and that such execution has fully obligated and bound such party to all terms and provisions of this Amendment.


[Remainder of Page Left Intentionally Blank - Signature Page to Follow]

DocuSign Envelope ID: C0B1C295-8B66-4AFA-B4F3-...

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the day and year first written above.

**LANDLORD:**

**CAPARRA CENTER ASSOCIATES, LLC,**
a Puerto Rico limited liability company

By: _____
Name: Luis Rafael Gonzalez
Title: Vice President of Leasing

**TENANT:**

**BED BATH & BEYOND INC.**
a New York corporation

By: _____
Name: Wade Haddad
Title: SVP, Real Estate and Store Development

DocuSign Envelope ID: C0B1C295-8B66-4AFA-B4E6-...

## Exhibit A

### [LED Location and signs]

**Northwest façade**



**The Square**



DocuSign Envelope ID: C0B1C295-8B66-4AFA-B4E5...

**Exhibit B**

**Site Plan**



DocuSign Envelope ID: C0B1C295-8B66-4AFA-B4E9-CB8DB95F0C11



DocuSign Envelope ID: C0B1C295-8B66-4AFA-B9FD-2DB8E2E2B8F9



# LEASE AGREEMENT

Between

## CAPARRA CENTER ASSOCIATES, SE,

Landlord

and

## BED BATH & BEYOND INC.,

a New York corporation,

Tenant

SAN PATRICIO PLAZA

GUAYNABO

PUERTO RICO

**Dated: November 13, 2002**

* * * * * *



## TABLE OF CONTENTS

ARTICLE 1.
BASIC TERMS AND DEFINITIONS ................................................................................ 1
    Section 1.1 Basic Terms and Definitions ................................................................... 1

ARTICLE 2.
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ........................................ 5
    Section 2.1 Lease of Premises ................................................................................... 5
    Section 2.2 Term. ...................................................................................................... 5
    Section 2.3 Delivery Date. ......................................................................................... 5
    Section 2.4 Unseasonable Delivery: Slack Period ..................................................... 7

ARTICLE 3.
IMPROVEMENTS ........................................................................................................... 7
    Section 3.1 Landlord's Work and Tenant's Work ....................................................... 7
    Section 3.2 Plan Approvals ........................................................................................ 8
    Section 3.3 Performance of Work ............................................................................. 10
    Section 3.4 Measurement; Adjustment of Rent. ...................................................... 13

ARTICLE 4.
FIXED RENT, TAXES & PERCENTAGE RENT: DETERMINATION AND
PAYMENT ...................................................................................................................... 14
    Section 4.1 Fixed Rent ............................................................................................. 14
    Section 4.2 Payment of Rent .................................................................................... 14
    Section 4.3 Real Estate and Other Taxes. ................................................................ 14
    Section 4.4 Percentage Rent. ................................................................................... 17

ARTICLE 5.
COMMON AREAS, THEIR USE AND CHARGES .................................................... 19
    Section 5.1 Common Areas: Maintenance. ............................................................... 19
    Section 5.2 Common Areas: Restrictions. ................................................................ 22

ARTICLE 6.
UTILITIES ...................................................................................................................... 25
    Section 6.1 Utility Service ........................................................................................ 25
    Section 6.2 Interruption ........................................................................................... 25

ARTICLE 7.
SIGNS ............................................................................................................................. 25
    Section 7.1 Tenant's Building Signage ...................................................................... 25
    Section 7.2 Pylon/Monument Signage ...................................................................... 26
    Section 7.3 Signage: Alteration/Removal/Allocation ................................................ 26
    Section 7.4 Cooperation ........................................................................................... 26
    Section 7.5 Signage Restrictions and Criteria. ........................................................ 26

ARTICLE 8.
ALTERATIONS AND IMPROVEMENTS ..................................................................... 27
    Section 8.1 Alterations and Improvements ............................................................... 27

ARTICLE 9.
REPAIRS ......................................................................................................................... 28
    Section 9.1 Tenant's Repairs .................................................................................... 28
    Section 9.2 Landlord's Repairs ................................................................................. 28
    Section 9.3 Legal Compliance Work ........................................................................ 29



i

ARTICLE 10.
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION ............... 29
   Section 10.1  Mutual Release, Waiver of Subrogation and Mutual Indemnification.... 29
   Section 10.2  Tenant's Insurance. ................................................................................. 30
   Section 10.3  Landlord's Insurance. ............................................................................. 30
   Section 10.4  General Insurance Requirements. .......................................................... 32

ARTICLE 11.
FIRE AND OTHER CASUALTY; EMINENT DOMAIN ............................................. 32
   Section 11.1  Fire and Other Casualty. ........................................................................ 32
   Section 11.2  Eminent Domain. .................................................................................... 34
   Section 11.3  Abatement of Rent Charges .................................................................... 35

ARTICLE 12.
COVENANTS, REPRESENTATIONS AND WARRANTIES ...................................... 35
   Section 12.1  Quiet Enjoyment .................................................................................... 35
   Section 12.2  Authority ................................................................................................. 36
   Section 12.3  Landlord's Covenants, Warranties and Representations ......................... 36
   Section 12.4  Environmental Matters. .......................................................................... 37

ARTICLE 13.
USES AND RESTRICTIONS ........................................................................................ 40
   Section 13.1  Permitted and Prohibited Uses. .............................................................. 40
   Section 13.2  Tenant's Exclusive in Center .................................................................. 40
   Section 13.3  Exclusives Which Tenant Must Honor. ................................................... 42

ARTICLE 14.
CONDUCT OF BUSINESS OPERATIONS. .................................................................. 42
   Section 14.1  Obligation to Open and Operate ............................................................. 42
   Section 14.2  Damages for a Closure ........................................................................... 423

ARTICLE 15.
TENANT ASSIGNMENT AND SUBLETTING .............................................................. 44
   Section 15.1  Assignment and Subletting. .................................................................... 44
   Section 15.2  Liability of Tenant .................................................................................. 46
   Section 15.3  Collateral Assignment ............................................................................. 46
   Section 15.4  Cure Rights of Original Tenant. .............................................................. 46
   Section 15.5  Recognition Agreement ........................................................................... 47

ARTICLE 16.
DEFAULT AND DISPUTE RESOLUTION .................................................................... 47
   Section 16.1  Tenant Default. ........................................................................................ 47
   Section 16.2  Landlord Default. ..................................................................................... 48
   Section 16.3  Arbitration ............................................................................................... 49

ARTICLE 17.
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE 50
   Section 17.1  Right to Mortgage and Non-Disturbance ................................................. 50
   Section 17.2  Estoppel Certificate. ................................................................................ 50
   Section 17.3  Existing Mortgages .................................................................................. 50

ARTICLE 18.
NOTICE ........................................................................................................................... 51



ARTICLE 19.
TENANT'S PROPERTY ..................................................................................... 51

ARTICLE 20.
END OF TERM.................................................................................................. 51
   Section 20.1  Surrender of Premises ............................................................ 51
   Section 20.2  Hold Over............................................................................... 51

ARTICLE 21.
INTENTIONALLY OMITTED........................................................................... 52

ARTICLE 22.
ONGOING CO-TENANCY ............................................................................... 52

ARTICLE 23.
MISCELLANEOUS........................................................................................... 52
   Section 23.1  Loading Facilities ................................................................. 52
   Section 23.2  Liens...................................................................................... 52
   Section 23.3  Broker's Commission ........................................................... 52
   Section 23.4  Force Majeure ....................................................................... 53
   Section 23.5  Consents................................................................................ 53
   Section 23.6  Costs...................................................................................... 53
   Section 23.7  Attorneys' Fees..................................................................... 53
   Section 23.8  Survival of Obligations ........................................................ 53
   Section 23.9  Non-Waiver........................................................................... 53
   Section 23.10 Rights Cumulative ................................................................ 53
   Section 23.11 Definition of Landlord .......................................................... 53
   Section 23.12 Successors and Assigns ........................................................ 54
   Section 23.13 Limitation of Landlord's Liability......................................... 54
   Section 23.14 Limitation of Tenant's Liability ............................................ 54
   Section 23.15 Joint and Several Liability .................................................... 54
   Section 23.16 Severability .......................................................................... 54
   Section 23.17 Grammatical Usages and Construction ................................. 54
   Section 23.18 Table of Contents, Line Numbering and Paragraph Headings .............. 54
   Section 23.19 Definition of Hereunder, Herein, etc. .................................... 54
   Section 23.20 Recording Lease ................................................................... 55
   Section 23.21 Entire Agreement and Modification ...................................... 55
   Section 23.22 No Joint Venture or Partnership Created by Lease ................. 55
   Section 23.23 Tenant's Tradename .............................................................. 55
   Section 23.24 Counterparts......................................................................... 55
   Section 23.25 Waiver of Trial by Jury......................................................... 55
   Section 23.26 Governing Law ..................................................................... 55
   Section 23.27 Sale or Transfer of Shopping Center ..................................... 55

ARTICLE 24. RIGHT OF LANDLORD TO ERECT EXPANSION ABOVE THE
PREMISES...................................................................................................... 56



iii

# EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit B-1 | Shopping Center Outline |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises and Sidewalk Plan |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Tenant's Signage |
| Exhibit F-1 | Sign Criteria |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |
| Exhibit M | Form of Mechanics' Lien Indemnification |
| Exhibit N | Form of Acknowledgment of Collateral Assignment of Lease |
| Exhibit O | Plans for Landlord's Proposed Alterations. |



## LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of November *13*, 2002 by and between **CAPARRA CENTER ASSOCIATES, SE**, a Puerto Rico special partnership (Sociedad Especial), having an office at P.O. Box 9506, San Juan, Puerto Rico 00908-0506 (*"Landlord"*), and **BED BATH & BEYOND INC.**, a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

### W I T N E S S E T H:

### ARTICLE 1.
### BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  Payment, in lieu of Fixed Rent, but not Additional Rent, of an amount equal to four (4%) percent of all Gross Sales (as hereinafter defined) for the applicable period for which Alternate Rent is payable hereunder.  Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains.  Such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of *"Gross Sales"* (hereinafter defined in Subsection 4.4.2) achieved during, and the amount of Alternate Rent payable for, such month.

1.1.4    Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, elevators, escalators and common utility lines.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6    Delivery Date: As defined in Section 2.3 hereof.

1.1.7    Effective Date: The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  As used in Article 14 hereof, periods during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (w) occurred on holidays or other days on which the majority of other retail tenants in the Shopping Center are typically closed or are closed pursuant to a Legal Requirement, (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent




1

domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10 <u>Exhibits</u>. The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11 <u>Fixed Rent</u>: The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)     For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the fifth (5th) anniversary of the Rent Commencement Date, at the rate of Eight Hundred Ten Thousand and 00/100 ($810,000.00) Dollars per year [based on Twenty and 00/100 ($20.00) Dollars per square foot of Floor Area];

(b)     For the period commencing on the first February 1 occurring after the fifth (5th) anniversary of the Rent Commencement Date and ending on the last day of the *"Initial Term"* (defined in Subsection 1.1.43 below), at the rate of Eight Hundred Fifty Thousand Five Hundred and 00/100 ($850,500.00) Dollars per year [based on Twenty-One and 00/100 ($21.00) Dollars per square foot of Floor Area];

(c)     In the event Tenant exercises the first Renewal Option, for the first [five (5)] year Renewal Period, at the rate of Nine Hundred Eleven Thousand Two Hundred Fifty and 00/100 ($911,250.00) Dollars per year [based on Twenty-Two and 50/100 ($22.50) Dollars per square foot of Floor Area];

(d)     In the event Tenant exercises the second Renewal Option, for the second [five (5)] year Renewal Period, at the rate of Nine Hundred Eighty-Two Thousand One Hundred Twenty-Five and 00/100 ($982,125.00) Dollars per year [based on Twenty-Four and 25/100 ($24.25) Dollars per square foot of Floor Area]; and

(e)     In the event Tenant exercises the third Renewal Option, for the third [five (5)] year Renewal Period, at the rate of One Million Sixty-Three Thousand One Hundred Twenty-Five and 00/100 ($1,063,125.00) Dollars per year [based on Twenty-Six and 25/100 ($26.25) Dollars per square foot of Floor Area].

1.1.12 <u>Floor Area</u>: The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas). All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls. The Floor Area of the Premises shall include one-half of the floor area of the mezzanine floor (up to a maximum inclusion of six hundred (600) square feet). In no event shall Floor Area within the Premises include any exterior areas, except as set forth above.

1.1.13 <u>Force Majeure</u>:  As defined in Section 23.4 hereof.

1.1.14 <u>Ground Lessor</u>: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 <u>Intentionally Omitted</u>.

1.1.16 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17 <u>Intentionally Omitted</u>.

1.1.18 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

2

1.1.19 <u>Landlord's Mailing Address</u>: Galeria San Patricio, Suite 212, Tabonuco St. B-5, Caparra Hills, Guaynabo, Puerto Rico 00968, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.20 <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21 <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the *"Money Rates"* section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.22 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23 <u>Mortgagee</u>: Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24 <u>Parent Corporation</u>:  As defined in Section 1.1.15 hereof.

1.1.25 <u>Percentage Multiple</u>:  Four (4%) percent.

1.1.26 <u>Percentage Rent</u>:  As defined in Section 4.4 hereof.

1.1.27 <u>Permitted Use</u>: Except as prohibited by the provisions of Section 13.1.1 below, the sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in the majority of the Bed Bath & Beyond stores in Puerto Rico owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and, subject to the prior consent of Landlord, other lawful retail use customarily found in shopping centers of no less quality or character than the Shopping Center as of the date of such use.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.



1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) forty thousand (40,000) square feet of Floor Area, being two (2) floors of approximately twenty thousand (20,000) square feet of Floor Area each) and (ii) one thousand two hundred (1,200) square feet of mezzanine level space for office purposes, subject to adjustment in

3

accordance with the provisions of Section 3.4 below. In no event shall more than the lesser of one-half (1/2) or six hundred (600) square feet of such mezzanine floor (or any space used for fire pump facilities) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option</u>: As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>: Three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>: Fixed Rent and/or Additional Rent, including, Alternate Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33 <u>Sales Break Point</u>:   As defined in Section 4.4.1 hereof;

1.1.34 <u>Shopping Center</u>: The shopping center commonly known as San Patricio Plaza Shopping Center, containing approximately five hundred one thousand nine hundred twenty-five (501,925) square feet of Floor Area, on the property located at the corner of Tabonuco Street, Marginal Road and San Patricio Avenue, in Guaynabo, Commonwealth of Puerto Rico, and more particularly described in <u>Exhibit A</u> hereto. Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant with a Floor Area less than one hundred thousand (100,000) square feet in the name of the Shopping Center. Landlord hereby represents and warrants to Tenant that the description of the Shopping Center set forth in <u>Exhibit A</u> consists of the whole of the Shopping Center as outlined on <u>Exhibit B-1</u> and contains no other property.

1.1.35 <u>Substantially Completed or Substantial Completion</u>: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only *"Punch List Items"* of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36 <u>Taxes</u>: As defined in Section 4.3.3 hereof.

1.1.37 <u>Tenant</u>: As defined in the preamble hereof.

1.1.38 <u>Tenant's Mailing Address</u>:   650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39 <u>Tenant's Permits</u>: As defined in Section 2.3.1(b) hereof.

1.1.40 <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property or leasehold improvements of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, the Vertical Transportation Items (upon Landlord's payment of the Tenant Allowance in accordance with Section 3.3.8 hereof), elevators, standard lighting and wiring installed within the walls of the Premises.




1.1.41 <u>Tenant's Pro Rata Share</u>: For the purposes of determining Tenant's share of Taxes and insurance premiums, a fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of all buildings in the Shopping Center (which as of the date hereof, after completion of the Premises, is estimated to be 501,925 square feet). The Floor Area of the Shopping Center may be re-determined any

4

time a building (and/or Floor Area) is added to or removed from the Shopping Center. Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.42 <u>Tenant's Work</u>: As defined in Section 3.1 hereof.

1.1.43 <u>Term</u>: A period (the *"Initial Term"*) of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date (the *"Expiration Date"*), unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date. As used herein, *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

## ARTICLE 2.
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    <u>Lease of Premises</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2    <u>Term</u>.

2.2.1    <u>Initial Term</u>. Subject to the provisions of this Article 2, the Term of this Lease shall begin on the earlier of (such earlier date being referred to herein as the *"Rent Commencement Date"*): (a) the tenth (10th) day after the date upon which Tenant shall initially open the Premises to the general public for business, or (b) the forty-fifth (45th) day following the Delivery Date. The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as <u>Exhibit C</u> specifying the Rent Commencement Date.

2.2.2    <u>Renewal Options</u>. Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    <u>Delivery Date</u>.

2.3.1    <u>Definition</u>. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred <u>and</u> Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:




(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with that part of Landlord's Work described as Phase I on <u>Exhibit D</u> and installation of the Vertical Transportation Items Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant. Landlord, at its sole cost and expense, shall have substantially satisfied (i.e. shall have progressed to the point that Landlord will be able to obtain a permanent "permiso de uso" prior to the Rent Commencement Date) the conditions (other than the performance of Tenant's Work) required by all applicable governmental authorities to the extent required to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises and to obtain in due time a permanent "permiso de uso" for the Premises as provided in Section 3.2.1 hereof;

(b)    Landlord shall have obtained or will be in the process (i.e. shall have progressed to the point that Landlord will be able to obtain a permanent "permiso de uso" prior to the Rent Commencement Date) of obtaining (and delivered copies thereof to Tenant, if available, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (<u>exclusive</u> of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, *"Tenant's Permits"*)), which permits and approvals shall include, without limitation, zoning and building code approvals, and environmental requirements, whenever applicable; and

(c)    The Common Areas, and all of the improvements thereto shown on <u>Exhibit B</u> hereto (including, the parking deck and all ramps) are constructed and operational in accordance with Legal Requirements, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) shall be constructed and operational to the extent required for Landlord to obtain in due time a permanent "permiso de uso" for the Premises;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (h) of Section 12.3 below shall then be true and in effect; and



(e)    Landlord shall have delivered to Tenant, a subordination, non-disturbance and attornment agreement in the form attached hereto as <u>Exhibit G</u> (or in such other form which is recordable but which is substantively the same as <u>Exhibit G</u>) executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof, including, any new mortgage entered into to secure the financing for the construction of the Premises.

2.3.2    <u>Delivery Date</u>.

(a)    Landlord shall give Tenant at least ninety (90) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as <u>Exhibit I</u>. Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.



(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice, then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial

6

installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of: (i) Seventy-Five Thousand ($75,000.00) Dollars, plus (ii) One Thousand ($1,000.00) Dollars for each of the first three (3) days that the Delivery Date established in the Delivery Date Notice is delayed, Two Thousand Five Hundred ($2,500.00) Dollars for each of the next three (3) days that the Delivery Date established in the Delivery Date Notice is delayed and Five Thousand ($5,000.00) Dollars for each day thereafter that the Delivery Date established in the Delivery Date Notice is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

(c)     If there is a delay in the Delivery Date due to the fact that Tenant fails to substantially complete the installation of the Vertical Transportation Items within seventy (70) days (subject to Force Majeure) after the date upon which Tenant is obligated to commence such work as set forth in Section 3.3.1 hereof, then Landlord shall give Tenant notice of such delay and the Delivery Date shall be deemed to have occurred, subject to Landlord's compliance with Section 2.3.2(a) hereof, on the date upon which it would otherwise have occurred absent the delay caused by Tenant.

2.3.3    Delivery Date Certification. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4    No Waiver. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4    Unseasonable Delivery; Slack Period. If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on October 29 and ending on the February 15 next following (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to:

(a)     accept delivery of physical possession of the Premises; or

(b)     defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the March 2 (the *"Final Alternate Rent Date"*) next following the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on such Rent Commencement Date and ending on the day prior to the Final Alternate Rent Date; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.




ARTICLE 3.
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work. Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto, and the *"Final Plans and Specifications"* (hereinafter defined in Section 3.2) (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein. Except for Landlord's Work,

7

Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Landlord has delivered to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the *"Preliminary LOD"*) [Limits of Demise], which shall be subject to any reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially consistent with Exhibits B, D, and D-1 hereto.

(b)    Tenant has delivered to Landlord its revisions thereto (the *"Revised LOD"*), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions.

(c)    On October 1, 2002, Landlord delivered to Tenant a final LOD (the *"Certified LOD"*), certified by Landlord, which incorporated all of the elements of the Revised LOD. Within fifteen (15) days after its receipt of the Certified LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements. After Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable third party out-of-pocket costs incurred by Tenant in connection with any further changes to the Certified LOD required by Landlord.

(d)    Within sixteen (16) days after Tenant's receipt of the Certified LOD, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details  (F2); Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4)  (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(e)    Within forty-nine (49) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and specifications (the *"Preliminary Plans"*) for Landlord's Work (which shall include, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans [including, without limitation, a site lighting plan with photometrics]), and each of the plans which collectively constitute the Preliminary Plans shall be at least eighty (80%) percent complete, in Tenant's reasonable judgment. The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(f)    Within twenty (20) days after its receipt of the Preliminary Plans, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.





8

(g)    Within twenty-one (21) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the *"Final Plans and Specifications"*), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(h)    Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within twenty-four (24) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(i)    All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans, and the Final Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in *"Autocad 14"* format.

### 3.2.2    Plan Changes.

(a)    Tenant shall have the right to make changes from the standards and specifications set forth in *"Tenant's Prototype Drawings and Specifications"* and/or the *"Project Manual"*, referred to in Exhibit D hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the *"Changes"*).

(b)    Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding ten (10%) percent subcontractor profit and ten (10%) percent general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen.

(c)    If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, and (ii) the commencement of the Slack Period and, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date, shall be extended by the number of days of such net delay; provided, however, that, within five (5) days following its receipt of Tenant's notice describing the Changes, Landlord shall have notified Tenant in reasonable detail as to the nature and extent of such delay.




Section 3.3   <u>Performance of Work</u>.

3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements. Tenant agrees to order the Vertical Transportation Items so that the same are able to be delivered to the Premises on or around July 15, 2003. Landlord shall give Tenant, no earlier than July 1, 2003, at least fourteen (14) days' prior notice of the date on which Landlord's Work shall have been completed to the point that Tenant is able to install the Vertical Transportation Items; Landlord's notice shall include, if applicable, a copy of any building permit or approval required to allow the installation of the Vertical Transportation Items. Upon receipt of Landlord's notice Tenant shall mobilize a contractor to install such items and shall commence on or around such fourteen (14th) day and thereafter diligently proceed to perform such work. After July 15, 2003 Landlord shall be responsible, at its own cost and expense for the temporary storage of the Vertical Transportation Items until such time as Tenant is able to commence the installation of the same. Upon completion of the installation of the Vertical Transportation Items Tenant shall vacate the Premises for Landlord to complete Landlord's Work. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits, if required. Landlord shall complete all of Phase 2 of Landlord's Work on or before that date which is fourteen (14) days after the Delivery Date. Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby. Upon the completion of Tenant's Work and on or before fourteen (14) days after the Delivery Date and as a condition of the Rent Commencement Date, Landlord shall obtain a permanent permiso de uso for the Premises. If the permanent permiso de uso is not obtained immediately prior to the Rent Commencement Date then the Rent Commencement Date shall be delayed day-for-day for each day after the date specified in Section 2.2.1. that Landlord delays in obtaining the permanent permiso de uso for the Premises.

3.3.2   If: (a) Landlord's Work has not been commenced (i.e., if Landlord has not commenced to drive piles for the Premises) by February 15, 2003, (b) the Delivery Date shall not have occurred by October 29, 2003, subject to Section 2.3.2(a) (and without limiting Section 2.3.2(b) as applicable) (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence, subject to the duration of any delay in the Delivery Date pursuant to 2.3.2(c) above, or (c) all of Phase 2 of Landlord's Work has not been completed by the date required in Section 3.3.1 hereof and as a result thereof Tenant is not able to open and operate its business in its normal manner, Tenant may thereafter consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)   avail itself of the remedies set forth in Section 16.2*(a)-(c)* below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(ii)   extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.




10

Once the right accrues to Tenant, Tenant may exercise the remedies in Section 3.3.2 hereof, until such time as either Landlord's Work has been commenced, the Delivery Date has occurred or Phase 2 of Landlord's Work has been completed to the extent that Tenant is able to open and operate its business in its normal manner, as the case may be, provided, however, that nothing herein shall affect Landlord's obligation to complete the Phase 2 of Landlord's Work.

If the Delivery Date shall not have occurred by October 28, 2004 (subject to Force Majeure, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of Force Majeure promptly after its occurrence), Tenant may thereafter, until such time as the Delivery Date has occurred, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder (other than as set forth in Section 23.8 below), except that Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed Twenty-Five Thousand and 00/100 ($25,000.00) Dollars.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3  <u>Landlord's Work Performed After Delivery of Possession</u>.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the *"Punch List Items"* (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within twenty (20) days after it receives a copy of said punch list, provided that if any particular Punch List Item cannot reasonably be completed within such twenty (20) day period then provided Landlord promptly commences the completion of such Punch List Item after it receives a copy of the punch list then the aforesaid twenty (20) day period with respect to such items shall be extended to that period that is reasonably required to complete the same proceeding diligently. If Landlord fails to complete any item on said punch list within said 20-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises and has opened for business shall occur only "after hours", when the Premises are not open for business. Within sixty (60) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises. As used herein, the term *"Punch List Items"* shall mean such minor items of a cosmetic nature which, when considered as a whole, do not materially adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.



3.3.4  <u>Tenant's Right of Entry</u>.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, installing the Vertical Transportation Items as provided in Section 3.3.1 above, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, <u>provided, however</u>, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses

arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5  <u>Tenant's Leasehold Improvements</u>.  Tenant's Work and all other improvements erected by Tenant with respect to the Premises (excluding the Vertical Transportation Items after Landlord's payment of the Tenant Allowance), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

3.3.6  <u>Work Requirements After Delivery Date</u>.  Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)  No staging and storage of materials and parking of construction vehicles shall occur within the Critical Area, except where such items relate to work occurring in the Premises;

(b)  Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place through the minimum number of entrances which must be opened within the Critical Area as set forth in Section 11.2.3(b) hereof; and

(c)  Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7  <u>Tenant's Hiring Space</u>.  If available, Landlord shall provide Tenant, at no cost to Tenant, with vacant space in the Shopping Center (comprising up to one thousand (1,000) square feet) for Tenant's exclusive use in conducting employee interviews and recruiting.  Such space shall be returned to Landlord at least ten (10) days prior to the Rent Commencement Date.  If no vacant space is available in the Shopping Center, then Tenant shall be entitled to place a trailer in the Common Areas, at Tenant's cost, immediately adjacent to the Premises for such purposes. Landlord shall, at Landlord's cost, furnish temporary electric and telephone service for the aforesaid trailer, provided, however, that Tenant shall pay for all utilities consumed therein.

3.3.8  <u>Tenant Allowance</u>.  Landlord shall pay Tenant the sum of Seven Hundred Thousand and 00/100 ($700,000.00) Dollars (the *"Tenant Allowance"*) to reimburse Tenant for certain of the actual, out-of-pocket costs (hard costs and soft costs) incurred by Tenant in connection with the purchase and installation of one pair of cart conveyors (vermaports), 1 pair of escalators, 1 freight elevator and 1 glass-enclosed passenger elevator (the *"Vertical Transportation Items"*).  Landlord and Tenant hereby acknowledge and agree that the Tenant Allowance shall be in addition to Landlord's Work.  Landlord shall pay the Tenant Allowance to Tenant in one lump sum on the later of (i) the Delivery Date, or (ii) the date on which Tenant shall have substantially completed the installation of the Vertical Transportation Items and delivered to Landlord:



(a)  a copy of a fully-executed standard form of contractor's requisition indicating that installation of the Vertical Transportation Items has been substantially completed; and



(b)    at Tenant's discretion, either (y) a lien waiver from Tenant's general contractor, or (z) an agreement regarding mechanics' and materialman's liens in the form attached hereto as Exhibit M.

If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion thereof within twenty (20) days of the later of the Delivery Date or the date of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to offset against one hundred (100%) percent of the Rent payable by Tenant hereunder, together with interest thereon at the Lease Interest Rate. The Tenant Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of the Vertical Transportation Items (the *"Landlord's Special Improvements"*) (which Landlord's Special Improvements, together with any replacements thereof, when completed to the extent of the Tenant Allowance shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease). Landlord alone shall be entitled to depreciate the Landlord's Special Improvements to the extent of the Tenant Allowance as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance. To the extent that Tenant retains title to any part of the Vertical Transportation Items for tax purposes, Tenant hereby acknowledges that on the termination of this Lease Tenant shall have no right to remove such items from the Premises and Landlord shall have no obligation, on termination, to reimburse Tenant for any part of the cost thereof not depreciated by Tenant.

Section 3.4    Measurement; Adjustment of Rent.

3.4.1    Measurement of Premises and Shopping Center. Immediately after the first layer of block for the exterior walls of the Premises have been laid, exact measurements of the Floor Area of the Premises shall be made and certified to Tenant by Landlord's licensed architect, surveyor or engineer. The measurements of Landlord's licensed architect, surveyor or engineer shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If the measurement of the Floor Area of the Premises (excluding for the purposes of such calculation the one-half of the mezzanine which would otherwise be included in the Floor Area of the Premises) determined as aforesaid, shows that the Floor Area of the Premises is greater or less than forty thousand (40,000) square feet by an amount greater than eight hundred (800) square feet, then Landlord shall take all steps necessary to cure the deviation from the Final Plans and Specifications which resulted in the Floor Area of the Premises (excluding for the purposes of such calculation the one-half of the mezzanine which would otherwise be included in the Floor Area of the Premises) measuring more than forty thousand eight hundred (40,800) square feet of Floor Area or less than thirty-nine thousand two hundred (39,200) square feet of Floor Area, as the case may be. If Landlord has failed to deliver such certification to Tenant as set forth above, Tenant shall have the right to (i) have such measurement made and certified to Landlord by Tenant's licensed architect, surveyor or engineer, and (ii) if the Floor Area of the Premises is greater or less than the thresholds set forth above, require Landlord to correct the deviation. If Landlord refuses to correct the deviation in the Floor Area of the Premises over eight hundred (800) square feet as required herein, then, in addition to any other remedy available to Tenant, Tenant may terminate this Lease upon notice to Landlord within thirty (30) days of Landlord's refusal or failure to correct the deviation as aforesaid and to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease and all reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work (including, without limitation, plan preparation and review), not to exceed Twenty-Five Thousand ($25,000.00) Dollars. Once the deviation has been corrected or if Tenant elects in its sole discretion not to require Landlord to correct any deviation, upon substantial completion of the Premises, Landlord shall cause exact measurements of the Floor Area of the Premises to be made and certified to Tenant by Landlord's licensed





13

architect, surveyor or engineer, which measurement shall be subject to confirmation by Tenant as aforesaid at Tenant's sole cost and expense. The Fixed Rent shall be amended based upon the final measurement of the Premises, after Landlord corrects any deviation required above, or if Tenant elects in its sole discretion not to require Landlord to correct any deviation, to conform to the exact measurement of the Premises and the parties hereto shall promptly execute an amendment to this Lease accordingly, provided that, no such amendment shall be made to increase the Floor Area of the Premises by more than eight hundred (800) square feet.

3.4.2 <u>Measurement of Mezzanine</u>. Within five (5) days after the completion of the walls enclosing the mezzanine, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the mezzanine, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If the square footage of the mezzanine, varies from that shown on the Final Plans and Specifications, then, at Tenant's request, Landlord shall correct such work to substantially conform to the Final Plans and Specifications.

3.4.3 <u>Amendment to Lease</u>. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4. Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

ARTICLE 4.
FIXED RENT, TAXES & PERCENTAGE RENT: DETERMINATION AND
PAYMENT

Section 4.1    <u>Fixed Rent</u>.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    <u>Payment of Rent</u>.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the *"Paying Agent"*),  to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    <u>Real Estate and Other Taxes</u>.



4.3.1  Landlord shall pay on or before the due dates thereof all *"Taxes"* (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.  Landlord shall pay all Taxes on or before the last date for the payment



14

thereof which would entitle Landlord to receive a discount for early payment of the same from the taxing authority.

4.3.2  (a)    Tenant shall pay to Landlord Tenant's share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's share of Taxes. If, by law, Taxes may, at the option of the taxpayer, be paid in installments and still obtain the maximum discount otherwise available (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof. Tenant's share of Taxes shall be calculated as follows:  (1) with respect to the land and exterior Common Area improvements, including the parking deck, Tenant's Pro Rata Share of that proportion of Taxes assessed upon all land area (but Tenant's Pro Rata Share of Taxes shall not include Taxes on buildings or improvements, other than exterior Common Area improvements and the parking deck) within the Shopping Center; and (2) with respect to the building and improvements comprising the Premises, (A) if such building and improvements are separately assessed, then Tenant shall pay, as Tenant's share of real estate taxes on the buildings and improvements within the Shopping Center, the real estate taxes assessed only on the building and improvements comprising the Premises, and (B) if the building and improvements comprising the Premises are not separately assessed, then Tenant shall pay, as Tenant's share of the real estate taxes on the buildings and improvements located within the Shopping Center, Tenant's Pro Rata Share of all Taxes assessed upon all of the buildings and improvements located in the Shopping Center (excluding Taxes on the land, the exterior Common Area improvements and the parking deck only). Landlord hereby represents to Tenant that as of the date hereof the Taxes under subparagraphs (1) and (2) above are estimated not to exceed Two and 14/100 ($2.14) Dollars per square foot of Floor Area of the Premises.

(a)    Tenant acknowledges that Landlord shall pay Taxes for each year in two installments on or before January 31st and July 31st of each year to qualify for the ten (10%) percent early payment discount; accordingly Landlord and Tenant agree that Tenant shall be invoiced for and shall pay Tenant's share of Taxes as follows: (i) Landlord shall send to Tenant, to be received on or before the fifteenth days of December and June of each year, an invoice estimating Tenant's share of Taxes (prior to the date upon which an assessment is available for the Premises such estimated payments shall be based upon the escrow amount set forth below and after such assessment is available each subsequent estimated payment shall be based upon the actual payment made by Landlord for the immediately preceding tax payment period); (ii) Tenant shall on or before the fifteenth days of January and July pay its estimated Tax payment based upon Landlord's estimate; (iii) within a reasonable period of time after Landlord receives an invoice for Taxes for the applicable Tax payment period Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's share of such Taxes and a calculation of any adjustment to be made between Landlord and Tenant as a result of Tenant's estimated payment and Landlord's calculation of the actual amount due, and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto (Landlord's statement shall include a refund of any overpayment by Tenant); and (iv) within thirty (30) days after receipt of Landlord's reconciliation statement Tenant shall pay to Landlord any amount due to Landlord. Whether or not Tenant pays the amounts due under this Section 4.3.2 prior to the last day for qualification of the ten (10%) percent early payment discount, Landlord shall pay the Taxes so as to obtain such discount and provide Tenant the benefit thereof. Notwithstanding anything to the contrary contained herein, Tenant acknowledges that an assessment of the Taxes for the building and




improvements comprising the Premises may not be available for some time and that until an assessment is provided by the taxing authority Landlord shall be entitled to recover from Tenant in equal installments on the dates Taxes would otherwise be payable by Tenant, to be held in escrow an amount equal to One and 07/100 ($1.07) Dollars per square foot of Floor Area of the Premises per annum which shall be held by Landlord towards the Taxes due under Section 4.3.2(a)(2) above. Landlord shall hold such escrow amount in an interest bearing account and all interest thereon shall be included in the escrow and be applied to reduce Tenant's liability for building and improvement Taxes under Section 4.3.2(a)(2) above. On receipt of an assessment of the Taxes for the building and improvements comprising the Premises Landlord shall provide Tenant with a statement of the Taxes due thereon and the amount due from Tenant after deduction of the amount held on escrow and Tenant shall pay such sum within sixty (60) days of receipt of such statement.

(b)    Tenant shall be responsible for property taxes imposed on Tenant's Property (either classified for property tax purposes as personal or immovable (real) property whether or not located at the Premises.

(c)    If at any time during the Term, the methods of taxation prevailing at the Effective Date shall be altered so that in addition to or in lieu of, or as a substitute for the whole or any part of the taxes now levied, assessed or imposed on real estate as such, there shall be levied, assessed or imposed (i) a tax on the rent or (ii) a license fee measured by the rent received or receivable by Landlord from the Shopping Center (including the Premises or any portion thereof), or (iii) a tax or license fee imposed upon Landlord which is otherwise measured by or based in whole or in part upon the economic value of the Shopping Center (including the Premises) or any portion thereof, then any and all alternative impositions shall be included in the composition of Taxes as if the amount of such tax or fee so payable were the tax.which could be due if the Shopping Center was the only property of Landlord subject thereto.

4.3.3   As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) except as specified in Section 4.3.2(d), taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the Commonwealth of Puerto Rico), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority and still obtain the maximum discount otherwise available); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or




16

the beneficiary of an abatement of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).

      4.3.4  At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes for the building and improvements comprising the Premises.  Landlord shall contest the amount or validity of Taxes upon the land comprising the Shopping Center if in Landlord's reasonable judgment an appeal is justified.  If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

      Section 4.4    Percentage Rent.

      4.4.1  Payment.  During and for each full calendar year during the Term, Tenant shall pay annual percentage rent (***"Percentage Rent"***) equal to four (4%) percent (the ***"Percentage Multiple"***) of all ***"Gross Sales"*** (hereinafter defined in Subsection 4.4.2) resulting from business conducted in, on or from the Premises during such calendar year in excess of Fifteen Million ($15,000,000.00) Dollars (the ***"Sales Break Point"***).  The Sales Break Point shall increase by the same percentage increase in Fixed Rent on the same dates on which Fixed Rent increases in accordance with Section 1.1.11 hereof.  Within forty-five (45) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year.  The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation.  Payments of Percentage Rent for any calendar year having less than twelve (12) full months (***"Partial calendar year"***) shall be based upon Tenant's Gross Sales for the twelve (12) month period immediately following the Rent Commencement Date (as to the first Partial calendar year, if any) and for the twelve (12) month period immediately preceding the Expiration Date or the date of earlier termination of this Lease (as to the final Partial calendar year of the Term, if any).  Said payments of Percentage Rent for any Partial calendar year shall be paid by Tenant to Landlord within sixty (60) days following expiration of the applicable twelve (12) month measuring period in an amount equal to (a) the applicable percentages of the amount by which Tenant's Gross Sales for the applicable twelve (12) month period exceeds the amount of the applicable Sales Break Point for the twelve (12) month measuring period, multiplied by (b) a fraction of the numerator of which is the number of calendar days in such Partial calendar year and the denominator of which is 365.

      4.4.2  Definition of Gross Sales.  As used herein, the term ***"Gross Sales"*** shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant (subject, however, to Section 4.4.6) and any other person or entity operating in the Premises (for purposes of this Subsection 4.4.2 only, collectively, ***"Tenant"***), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards.  Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term ***"Gross Sales"*** shall exclude: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, **(2)** *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how




17

purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, **(5)** receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, **(6)** sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two (2%) percent of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(7)** fees paid to independent third party credit card, charge card, and debit card companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, as applicable, in excess of one and one-half (1.5%) percent, **(8)** proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two (2%) percent of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(9)** sums and credits received in settlement of claims for loss or damage to merchandise, **(10)** separately stated service, finance and interest charges, **(11)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(12)** close-out or bulk sales of inventory to jobbers or wholesalers, and **(13)** sales of gift certificates and/or gift cards until redeemed at the Premises.

4.4.3   <u>Books and Records</u>. Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; <u>provided, however</u>, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for at least two (2) years following the end of the calendar year to which they refer.

4.4.4   <u>Landlord's Right to Audit</u>. Landlord and/or Landlord's auditor shall have the right, upon at least ten (10) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency. If such deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

4.4.5   <u>Confidentiality</u>. Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, <u>provided, however</u>, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).



4.4.6   <u>Licensees</u>. If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the ***"Licensees"***) permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the greater of (A) the product obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the



unlicensed portion) of the Premises or (B) an amount equal to the license fee and other payments received by Tenant from such Licensee less a pro rata portion of the Rent attributable to such licensed portion. The provisions of this Subsection 4.4.6 shall not apply to more than 4,000 square feet of Floor Area, in the aggregate, in the Premises at any one time. If more than 4,000 square feet of the Floor Area of the Premises is licensed to Licensees at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which in the aggregate shall not exceed four thousand (4,000) square feet of Floor Area that will be entitled to the benefit of this Subsection 4.4.6.

        4.4.7  <u>Adjustment for Assignees and Sublessees</u>. In the event an assignee of this Lease or any sublessee of all or any portion of the Floor Area of the Premises does not use the Premises (or, as applicable, the subleased portion thereof) as a store specializing primarily in the sale of linens and domestics, bathroom items, housewares, frames and wall art, window treatments and/or closet, shelving and storage items, then the Percentage Multiple and the Sales Break Point shall be amended, with respect to the Premises (or, as applicable, the subleased portion thereof), to such other percentage (the *"Adjusted Percentage Multiple"*) and such other break point (the *"Adjusted Break Point"*) as shall, as of the effective date of such assignment or sublease, be then generally applicable to such use of the Premises (or, as applicable, the subleased portion thereof) by normal and accepted business standards applicable to such use, taking into consideration (i) the location of the Shopping Center, and (ii) the nature of the Shopping Center (*e.g.*, strip center, mall, power center, etc.); it being agreed that with respect to any sublease covering less than all of the Floor Area of the Premises, the following shall apply: (1) the Sales Break Point relating to any portion of the Premises so subleased shall be the quotient of (aa) the annual base subrent payable by each sublessee under the terms of its sublease on account of the calendar year for which Percentage Rent is being determined, divided by (bb) the Adjusted Percentage Multiple applicable to such sublessee, and (2) the Sales Break Point relating to the non-subleased portions of the Premises shall be determined by dividing the product of (x) the Fixed Rent for the calendar year for which Percentage Rent is being determined per square foot of the Premises, and (y) the Floor Area of such retained portion of the Premises, by the Percentage Multiple. Notwithstanding the foregoing, in no event shall the Percentage Rent payable by Tenant after the adjustment referred to herein be less than the average Percentage Rent payable by Tenant for the three calendar years immediately preceding such adjustment.

        4.4.8  Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease.

ARTICLE 5.
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1   <u>Common Areas: Maintenance</u>.



        5.1.1  <u>Maintenance of Common Areas</u>. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, <u>including, without limitation</u>, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.



19

### 5.1.2  Tenant's share of Common Areas Charges.

(a)    During the Term, Tenant shall pay to Landlord a contribution towards the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) paid by Landlord to operate, maintain and repair the Common Areas.  Tenant's share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget  (with respect to which budget Landlord agrees to supply Tenant, within thirty (30) days of Tenant's prior written request, with reasonable backup documentation and applicable evidence of prior bills and payments one (1) time in any calendar year).

(b)    For the purposes hereof the phrase *"Increase"* shall mean the percentage increase, if any, in Common Areas Charges for a particular fiscal year for Landlord over the Common Areas Charges for the immediately preceding fiscal year. On and after the Rent Commencement Date, Tenant shall pay as Tenant's share of Common Areas Charges the following:

(i)    For the period commencing on the Rent Commencement Date and ending on December 31, 2004, the sum of One ($1.00) Dollar per square foot of Floor Area of the Premises per annum;

(ii)    For each calendar year, or part thereof, during the Term, after the 2004 calendar year, an amount equal to (A) One ($1.00) Dollar plus (B) One ($1.00) Dollar multiplied by the Increase for the prior fiscal year over the immediately preceding fiscal year.  For example, Landlord's fiscal year for Common Areas Charges commences June 1 and expires on the following May 31, therefore Tenant's share of Common Areas Charges for the year commencing January 1, 2005 shall equal (A) One ($1.00) Dollar plus (B) One ($1.00) Dollar multiplied by the percentage increase in Common Areas Charges for Landlord's fiscal year ending May 31, 2004 over those for the Landlord's fiscal year ending May 31, 2003.

Amounts due hereunder shall be pro-rated for any period less than a full year.

(c)    Within one hundred twenty (120) days after the end of each fiscal year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the *"CAC Reconciliation Statement"*).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's share of Common Areas Charges.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.

### 5.1.3  Exclusions from Common Areas Charges.

(a)    Common Areas Charges shall not include: (1)  the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2)  the cost of any replacements or capital improvements to the Common Areas, except if Landlord incurs a capital expenditure relating to a replacement to the Common Areas not required as a result of the act or omission of Landlord, after the first year after the Rent Commencement Date, the same may be amortized in accordance with generally accepted accounting principles (*"GAAP"*), at the time such expenditures are incurred, over the useful life of the item so amortized, and only the amortized portion applicable to each year shall be included in Common Areas Charges and then only to the extent the capital expenditure is for a replacement similar in nature and quality to the improvement replaced; (3) the cost of investigating, monitoring or remedying any environmental condition or *"Hazardous Substances"* or any other *"Compliance Costs"* (both as




20

hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of other tenant's premises; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord in excess of One Hundred Thousand ($100,000.00) Dollars; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) sums paid or owed by Landlord to any tenant in the Shopping Center; (11) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (12) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (13) sums incurred as late payment fees, penalties or interest; (14) ground rent; (15) depreciation [except as expressly permitted pursuant to item 21 below]; (16) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (17) electricity costs for lighting Common Areas later than the *"Normal Hours"* [hereinafter defined in Section 5.2], other than security lighting which is reasonable and normal in the circumstances; (18) Landlord's advertising, entertainment and promotional costs for the Shopping Center; (19) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (20) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses unreasonably exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (21) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (22) reserves for anticipated future expenses; (23) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses, provided however that Landlord may include in Common Areas Charges an administration fee equal to fifteen (15%) percent of Common Areas Charges, excluding taxes and insurance premiums; (24) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems for other tenants' premises; (25) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses unreasonably exceed competitive market rates; or (26) any costs associated with a valet parking system

(b)    In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges.

(c)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4   Tenant's Right to Audit. Tenant shall have the right, within two (2) years after receiving any CAC Reconciliation Statement (and not more than once





annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within forty-five (45) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor. Landlord shall maintain all books and records pertaining to a calendar year for at least two (2) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2   Common Areas: Restrictions.

5.2.1   Continuous Access. No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center or the Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof. Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during November or December of any calendar year.

5.2.2   No Alterations. The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads and other Common Areas are designated on Exhibit B. Subject to Article 24 hereof, Landlord shall not: (i) alter the location, availability or size of any improvement within the *"Critical Area"* or *"No Build Area"* as shown on Exhibit B; (ii) change the number, location, or layout of parking spaces within the Critical Area shown on Exhibit B; (iii) construct any improvements (except as shown on Exhibit B), structures or buildings within the Critical Area or No Build Area (including without limitation any kiosks, booths (except as shown on Exhibit B), signs or similar structures); (iv) change the roadways and sidewalks or other Common Areas within the Critical Area shown on Exhibit B or (v) materially and adversely change the curbcuts, entrances and/or exits and access to and from the Shopping Center or the access drives from such entrances to and from the Critical Area; without obtaining Tenant's prior written consent in each instance, which consent may be withheld by Tenant in its sole discretion. In addition to the foregoing, Landlord shall not, without obtaining Tenant's prior consent, make any other alterations to the Common Areas outside of the Critical Area or No Build Area in a manner which materially and adversely affects parking, access to or, the visibility of the Premises from the Common Areas or adjacent public streets. Notwithstanding any provision herein to the contrary, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements, or maintenance to any portion of the Shopping Center (except in the case of an emergency) during the months of November




22

and December and all such work shall be undertaken in such a manner so as to (A) not materially adversely affect ingress to or egress from the Shopping Center, (B) have no material adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (C) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises.

5.2.3   Parking Area. (a)   During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) a number of parking spaces equal to the number shown on Exhibit B minus two hundred fifty (250) parking spaces. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not permit any parking areas within the Critical Area to be used to park valet cars and shall remove any and all obstructions to ingress and egress to the Premises, including but not limited to access to the front door of the Premises. Landlord shall not designate specific parking spaces in the Critical Area for use by other tenants or occupants of the Shopping Center. Landlord shall designated an are within the Shopping Center for "*Employee Parking*", which area shall be located outside of the Critical Area but shall be reasonably designated having regard to the location of the Premises. Tenant shall use reasonable efforts to have its employees park their motor vehicles in an area reasonably designated for "*Employee Parking*" and Landlord shall take all reasonable measures to have other tenants and occupants of the Shopping Center do the same. Landlord shall not permit overnight parking in the Shopping Center. Landlord further covenants that it shall at all times proceed diligently to prevent the employees of any non-retail office premises in the Shopping Center, existing on the date hereof or permitted pursuant to Exhibit L, from parking in the "*Special Parking Field*" as shown labeled on Exhibit B.

(a)   Except in connection with charges to customers using the valet parking services, there shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Notwithstanding the foregoing, in order to discourage non-customer and employee parking in the Shopping Center parking areas during business hours, Landlord shall have the right to require that all vehicles shall be charged for parking in the parking areas on a per vehicle or time related basis at fees or rates established therefor, and on terms and conditions as may be set and changed upon at least thirty (30) days' prior notice to Tenant from Landlord, from time to time. Tenant's employees shall not be required to pay any such charges so long as they are using the "*Employee Parking*" area designated by Landlord (it being agreed that Landlord shall at all times make such "*Employee Parking*" available). Notwithstanding the foregoing, Tenant shall have the right, at no charge to Tenant, to validate parking tickets (produced by the operator of the Shopping Center parking areas), which validation shall provide for at least two (2) hours of free parking for Tenant's customers. Landlord's standard parking rates and permitted validation for Tenant's customers, invitees and employees shall be consistent with the rules and regulations issued by the Puerto Rico Department of Consumer Affairs for similar parking usage and availability and shall be consistent with those rates typically charged by other urban shopping centers in the San Juan geographical area.

(b)   Tenant acknowledges that a valet parking service may be provided by Landlord only if (i) such valet parking service is in compliance with all Legal Requirements issued by the Puerto Rico Department of Consumer Affairs; (ii) there shall be no discrimination between retail and restaurant patrons of the Shopping Center relative to the usage of and charges for the valet service; (iii) the valet parking service operator shall run the valet parking service in a professional manner with a sufficient number of employees to return vehicles in a timely manner; (iv) the valet parking service operator shall not park vehicles in the Critical Area; (v) the valet parking service operator shall maintain so-called "*garage keeper's liability insurance*", workers' compensation, and other insurance with respect to the operation of such valet parking




23

service against such risk and in such amounts as may be reasonably required from time to time by Landlord; and (vi) such valet parking service shall be operated in a manner so that the efficient ingress and egress of vehicles is not blocked or impeded. In no event shall the valet parking area or any portion thereof (other than the drop off and pickup areas), be located within the Critical Area.

5.2.4   Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.5   Repairs. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Critical Area shall:

(a)   not be performed during the months of November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)   be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)   be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.6   Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not materially adversely affect the normal conduct of any business operations in the Premises, (iii) do not materially adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.7   Miscellaneous.



(a)   No Promotional Use. Landlord shall not use or permit the use of the Critical Area, or any portion of the Common Areas which would have a material impact on the parking in the Critical Area, for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.



24

(b)   <u>Trash Compactor & Containers</u>. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as *"Trash Compactor Pad"*; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on <u>Exhibit B</u> hereto as *"Trash Container Pad"*. Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)   <u>Shopping Carts</u>. Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on <u>Exhibits B</u> and <u>D-1</u> hereto. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

## ARTICLE 6.
## UTILITIES

Section 6.1   <u>Utility Service</u>. From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord. Landlord shall at its sole cost and expense provide and install an electric meter bank exclusively serving the Premises, provide and install, or cause the installation of all meters and pay all connection and hook-up fees (it being agreed that Tenant shall be responsible for opening the account and providing the account deposit or bond with the utility company). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose, it being agreed that any connection cost (including the cost of any meter) pertaining to such telecommunications service shall be paid by Landlord, and that any fee for the use of the telecommunications service shall be paid by Tenant.

Section 6.2   <u>Interruption</u>. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption in excess of forty-eight (48) hours.

## ARTICLE 7.
## SIGNS

Section 7.1   <u>Tenant's Building Signage</u>. Tenant shall supply and install signage (and obtain all permits and approvals therefor) as part of Tenant's Work in accordance with <u>Exhibits D</u>, <u>D-1</u>, and <u>F</u> hereto, and with the additional provisions of this Lease. Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element of the Premises, if any, signs (including, without limitation, under-canopy or blade signs), banners (including



25

temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements and Landlord's Sign Criteria attached hereto as <u>Exhibit F-1</u> (the *"Sign Criteria"*). Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared. Landlord shall, at Landlord's cost, list Tenant and its successors and subtenants on any directional signs and directories located in the mall portion of the Shopping Center.

Section 7.2   <u>Pylon/Monument Signage</u>. If Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any pylon, monument or other signage located in the Common Areas, such signage shall also include Tenant's identification sign, which shall be of a size and location which bears the same relationship in position and size as the Premises bears to the size of the premises of other tenants having panels on such pylon, monument or other signage. Landlord shall maintain such signs, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense (such replacement to be consistent with the Sign Criteria. The cost of constructing and maintaining all such pylons, monuments or other signs bearing Tenant's sign panel(s) [but <u>not</u> the cost of individual tenants' signs thereon] and the cost of any electricity used to illuminate them, shall be paid by all tenants having a panel thereon in proportion to the area of each tenant's panel on such pylon, monument or other signage.

Section 7.3   <u>Signage: Alteration/Removal/Allocation</u>. Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any other signage under Section 7.2 (subject, however, to the terms of Section 7.2), <u>provided</u> that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises as well as on any other signage under Section 7.2 (subject, however, to the terms of Section 7.2), and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements and Landlord's signage criteria attached hereto as <u>Exhibit F-1</u>.

Section 7.4   <u>Cooperation</u>. Landlord, upon request, shall execute any consents or approvals which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or other signage to which Tenant may be entitled under this Lease.

Section 7.5   <u>Signage Restrictions and Criteria</u>.

7.5.1   During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: **(i)** flashing, moving or audible signs, unless consistent with first class shopping centers; **(ii)** signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally self-contained channel letters; or **(iii)** paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, <u>provided</u>, <u>however</u>, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.




26

7.5.2   Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.  Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(i) and except for the Shopping Center signage existing as of the Effective Date, no premises having an elevation on the west elevation fascia of the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have building signage possessing more total square footage than the total square footage available for use by Tenant.

## ARTICLE 8.
## ALTERATIONS AND IMPROVEMENTS

Section 8.1   <u>Alterations and Improvements</u>.

8.1.1   Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord.  All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2   Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make interior non-structural alterations and interior non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3   Subject to Article 15 hereof, Tenant shall have the right to subdivide the Premises into two (2) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4   Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.



8.1.5   Landlord shall execute and return to Tenant with reasonable promptness all appropriately completed governmental applications after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.



27

8.1.7   Except as provided in Article 24, Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Without limiting Landlord's rights under Article 24 hereof, Landlord shall neither make nor permit to be made any material alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in Puerto Rico (exclusive of other tenants' entrance features) without the prior consent of Tenant.

ARTICLE 9.
REPAIRS

Section 9.1   Tenant's Repairs.  Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the ventilation and air conditioning ("HVAC") units exclusively serving the Premises.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements and consistent with that of other tenants in first class shopping centers.

Section 9.2   Landlord's Repairs.  Subject to the provisions of Article 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)   the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)   the structural elements of the Premises, which shall be deemed to include, without limitation: the roof joists; columns; footings; foundation; exterior walls (including, without limitation, repainting) (but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls); floor slab (but not the floor covering, unless the same is damaged as a result of a floor defect or settling); and the structural elements of any building of which the Premises may be a part;

(c)   the roof, gutters, flashings, downspouts and scuppers;

(d)   the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)   all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)   the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees, which warranties or guarantees Landlord may assign to Tenant, if the same may be enforceable by Tenant; and



28

(g)     any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Whenever possible, Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).

Section 9.3    Legal Compliance Work.  Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all *"Legal Compliance Work"* (hereinafter defined).  Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required from Landlord in this Lease.  As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

### ARTICLE 10.
### INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1  Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1 Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as *"All-Risk"*) and time element insurance required to be maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.



10.1.2 Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.



29

### 10.1.3 Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2    Tenant's Insurance.

10.2.1 Tenant's Insurance. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million ($10,000,000.00) Dollars for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 Self-Insurance. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least One Hundred Fifty Million ($150,000,000.00) Dollars; or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand ($250,000.00) Dollars unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3    Landlord's Insurance.




30

10.3.1 <u>Liability Insurance</u>. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Two Million ($2,000,000.00) in the aggregate, and One Million ($1,000,000.00) Dollars per occurrence, for bodily injury, death and property damage liability, with an umbrella policy providing such coverage with a limit of at least Ten Million ($10,000,000.00) Dollars. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 <u>Special Form Property Insurance</u>.

(a)    Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "*All-Risk*") property insurance and endorsements for coverages for flood, earthquake, windstorm, earth movement, demolition, increased cost of construction and contingent operation of building laws coverages, on a stated insurable value basis, in a minimum amount, for all of the buildings (excluding the Premises) and other insurable improvements in the Shopping Center, of Twenty Six Million Three Hundred One Thousand ($26,301,000.00) Dollars at eighty (80%) percent co-insurance and Sixteen Million Four Hundred Thirty-Eight Thousand One Hundred Seventy-Five ($16,438,175.00) Dollars for windstorm at fifty (50%) percent co-insurance and Eighteen Million Two Hundred Thirty-Eight Thousand ($18,238,000.00) Dollars for earthquake at fifty (50%) percent co-insurance, without limiting the obligations of Landlord under Article 11 hereof.

(b)    Landlord shall procure and maintain in full force and effect on and after the Delivery Date and throughout the Term, property insurance for the Premises and endorsement for flood, earthquake, windstorm, earth movement, demolition, increased cost of construction and contingent operation of building laws coverage, on a stated value of no less than Three Million Seven Hundred Thousand ($3,700,000.00) Dollars at eighty (80%) percent co-insurance of the value of the Premises, Two Million Five Hundred Fifty Thousand ($2,550,000.00) Dollars for earthquake at fifty (50%) percent co-insurance and Two Million Three Hundred Thousand ($2,300,000.00) for windstorm at fifty (50%) percent co-insurance (without limiting the obligations of Landlord under Article 11 hereof). In no event shall such insurance policy cover Tenant's Property.

(c)    The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding the higher of One Hundred Thousand ($100,000.00) Dollars or the equivalent of two (2%) percent of stated value for windstorm or the equivalent of five (5%) percent of stated value for earthquake, without Tenant's prior consent, which will not be unreasonably withheld. All policies required to be maintained by Landlord pursuant to this Section shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, with Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in Section 11.1 hereof. Landlord shall submit to Tenant a copy of the insurance premiums invoice for the property insurance for the Premises and coverages.



10.3.3 <u>Tenant's Pro Rata Share of Insurance Premiums</u>. Tenant shall reimburse Landlord for (a) the premiums for the insurance maintained by Landlord under Section 10.3.2(b) hereof, and (b) Tenant's Pro Rata Share of the insurance premiums (i)



attributable to the policies required to be maintained by Landlord for the Shopping Center pursuant to this Section 10.3.1; (ii) loss of rent for a minimum period of six (6) months and a maximum period of twelve (12) months; (iii) Garage Keepers Liability policy in the amount of One Million ($1,000,000.00) Dollars; (iv) Federal Flood Insurance in the amount of Two Hundred Sixty-Six Million ($266,000.00) Dollars for buildings; (v) Boiler and Machinery Insurance coverage; (vi) Inland Marine Insurance in an amount of at least Four Hundred Thousand ($400,000.00) Dollars; and (vii) other reasonable insurance coverages regularly contracted by prudent shopping centers of a class similar to the Shopping Center. Tenant shall pay its share of insurance premiums as set forth herein within thirty (30) days after notification of Tenant's receipt of any itemized invoice therefore. If the rate for any insurance Landlord is required to carry under this Subsection are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from the insurance premium for which Tenant is liable to pay a share. If the rate for any insurance Landlord is required to carry hereunder is increased as a result of the use or other activity of Tenant, the amount of such increase shall be paid by Tenant. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been insurance premiums paid by Tenant, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4   <u>General Insurance Requirements</u>.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the Commonwealth of Puerto Rico, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11.
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1   <u>Fire and Other Casualty</u>.



11.1.1 (a)      Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all other leasehold improvements performed by or for Tenant, which belong to Landlord, but shall not include any of Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent



32

necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1. In no event whatsoever shall Tenant's share of Taxes or Common Areas Charges be increased as a result of a casualty in the Shopping Center.

(a)     Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make reasonable changes to the Premises (but not to the building footprint or the size of the Premises) in the course of, and as part of, such rebuilding or restoration work. Such changes shall be consistent with a first class shopping center and, with respect to the structural and major building systems shall be subject to Landlord's prior approval. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable in progress payments within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but if the amount of such net increase is less than One Hundred Thousand ($100,000.00) Dollars then in no event shall Tenant be obligated to make such payment earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(b)     If any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may be utilized for its normal conduct of business.

11.1.2 In the event that:

(a)     Landlord does not commence the repair and restoration work to the Premises and the Common Areas within the Critical Area pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed ninety (90) days in the aggregate); or

(b)     the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed sixty (60) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:



(i)     after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or

33

any portion thereof) on Landlord's behalf and at the sole cost of Landlord (except for Tenant Changes above, the net cost of which shall be borne by Tenant), which cost Landlord shall pay to Tenant during the course of such repairs within thirty (30) days after Tenant's delivery to Landlord of an invoice therefor; or

(ii)   seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the Commonwealth of Puerto Rico; or

(iii)   terminate this Lease by sixty (60) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect mutually designated by Landlord and Tenant, the required repairs and restorations to the Premises, the Common Areas within the Critical Area or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the then current Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2   Eminent Domain.

11.2.1 As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)   any material portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant to conduct its normal business in the Premises;

(b)   as a consequence of any Taking the Shopping Center no longer has two entrances within the Critical Area from Marginal Road as shown on Exhibit B and at least one of the three entrances from Tabonuco Street and Gonzalez Giusti Avenue as Shown on Exhibit B;

(c)   an amount of Floor Area of all of the buildings in the Shopping Center (other than the Premises) is Taken such that Landlord is not able to satisfy the on-going co-tenancy requirements under Article 22 hereof; or

(d)   ten (10%) percent or more of the parking spaces located in the *"Shopping Center"* are Taken, or more than fifty (50) parking spaces in the Critical Area



are Taken, and in either event Landlord does not provide substitute parking as hereinafter provided;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may be utilized for its normal conduct of business. In the event of a Taking involving the parking areas, Landlord shall have the right to nullify Tenant's termination of this Lease by sending a notice to Tenant agreeing to provide substitute parking spaces, which shall be located so as to be a reasonable substitute for the parking spaces taken, and such termination shall be suspended for so long as Landlord commences and diligently proceeds to obtain permits for and to provide or construct within the Shopping Center the substitute parking spaces. If Landlord is unable to provide such substitute parking within one hundred eighty (180) days, or within one year in respect of a new parking deck structure, after such Taking then Tenant's termination shall be reinstated and be in full force and effect. Such one hundred eighty (180) day and one (1) year periods shall be extended by the time that it is reasonably necessary to complete work on the basis that Landlord promptly commences and diligently proceeds to complete the same.

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant which would otherwise belong to Landlord; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, an equitable proportion of the Rent shall abate to the extent that, due to the nature and extent of the Taking, the Premises may not reasonably be used by Tenant for the normal conduct of its business, provided that Tenant hereby acknowledges that for the purposes of this Section 11.2.4 a reduction in Gross Sales in itself shall not mean that the Premises can not be used for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.



11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3  Abatement of Rent Charges. Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is twenty-one (21) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated



to perform hereunder and the interference with the operation of business in the Premises has ceased.

## ARTICLE 12.
## COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1  Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2  Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3  Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)  As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)  · In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots within the Critical Area which are not owned by Landlord;

(c)  No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)  Except as shown on Exhibit K-1, Tenant's use of the Premises for sale of *"Permitted Items"* (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)  The Shopping Center now has, and, on the Delivery Date, shall have, access to Tabonuco Street, Gonzalez Giusti Avenue, Marginal Street and San Patricio Avenue for the purpose of vehicular traffic;



(f)  This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)  Except as provided in Exhibit E, there shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

36

(h)     Attached hereto as <u>Exhibit K-2</u> is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the *"Existing Leases"*); and

(i)     Landlord shall use all reasonable efforts promptly forward to Tenant any notice or other communication actually received by Landlord from any owner of property within five hundred (500) feet of the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease.  Tenant shall have the right to appear in such proceeding and to contest the same.  If Tenant has no standing to appear in its own name, then Landlord shall appear in such proceeding, at Tenant's reasonable cost and expense, and shall contest such proposed variance.  If reasonably requested by Tenant Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4  <u>Environmental Matters</u>.

12.4.1  <u>Definitions</u>.

(a)     As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or welfare.

(b)     As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant as those terms are defined in any of the Environmental Laws.

(c)     As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency (*"EPA"*), the Puerto Rico Environmental Quality Board (*"EQB"*) or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)     As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any Hazardous Substance in violation of Environmental Laws.



(e)     As used herein, the term *"Compliance Costs"* shall mean any and all reasonable costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the



37

Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)     As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, suppliers, employees, contractors or licensees.

12.4.2 <u>Compliance with Environmental Laws</u>. Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. In line with and not in limitation of the above, Tenant shall: (i) not manufacture, generate, store or dispose of (except in compliance with Environmental Laws) any Hazardous Substances in the Shopping Center, including the Premises; (ii) not place in the sewerage system any Hazardous Substances or substances which may require special treatment or may cause damage to the sewerage system; (iii) provide Landlord with written notice, upon Tenant's obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Substances at the Shopping Center, including the Premises, which may reach air, land or water, by Tenant or any Tenant Related Parties, or upon Tenant's receipt of any Environmental Notice to such effect from *"EPA"*, *"EQB"*, or any other federal, state or local governmental agency or authority. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>. Notwithstanding any other provision of this Lease, Tenant shall be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Shopping Center, which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Shopping Center, which were either existing as of the date hereof or caused by Landlord (or its agents, servants, employees, contractors, or licensees, *"Landlord Related Parties"*), including, without limitation, any Compliance Costs attributable to such Hazardous Substances. Except in the event of an emergency or as may be required by applicable Legal Requirements, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of November and December, and shall be undertaken in such a manner so as to (i) not materially adversely affect ingress to or egress from the Premises, (ii) have no material adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises. In the event of a Release of Hazardous Substances into to the Shopping Center after the Delivery Date by a third party other than Tenant, or Tenant Related Parties, or Landlord, or Landlord Related Parties, then (i) in the absence of enforcement action by the EPA, EQB, or other federal, state or local governmental agency or authority, upon request by Tenant, Landlord shall commence an action or proceeding against the party who shall be legally responsible for the Release of such Hazardous Substances to the Shopping Center for the remediation thereof and thereafter diligently pursue same, and (ii) should the Release of such Hazardous Substances as aforesaid materially interfere with the normal conduct of Tenant's business in the Premises, its use and enjoyment of the Critical Areas or its other material rights and benefits under this Lease, then Tenant shall be entitled to an equitable abatement of Rent and, in the event such material interference continues for a period of two hundred seventy (270) days after discovery of such Hazardous Materials and in the absence of enforcement action by the EPA, EQB, or other federal, state or local governmental agency or authority Landlord elects not to remediate, is unable to cause it to be remediated or is unable to remediate such Hazardous Substances, as required by law, within such period of two hundred seventy (270) days after discovery of such Hazardous Substances, then Tenant shall be entitled to terminate this Lease at any time thereafter




and prior to the completion of such remediation upon thirty (30) days prior notice to Landlord.

12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used unless required or ordered by the EPA, EQB, or any other federal, state or governmental authority.

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants concerning the Shopping Center and other properties that it owns, that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any adjoining properties; (ii) with the exception of the property located at San Patricio Avenue, No. 2, Guaynabo, Puerto Rico, occupied by Standard Oil Company (Puerto Rico) (the *"Esso Property"*), there are currently no monitoring wells or venting systems currently located on the Shopping Center to monitor or treat Releases of Hazardous Substances present in or under the Shopping Center as of the Effective Date; (iii) Landlord, with the exception of the Esso Property, has no knowledge of, and has received no notice of, any existing violation, or potential or alleged violation, of any Environmental Laws, affecting the Shopping Center, the Premises or any adjoining properties, regardless of whether same has been cured; and (iv) to the best of Landlord's knowledge: (A) with the exception of the Esso Property, no Release of Hazardous Substances has occurred at, on, in, or under the Shopping Center, the Premises or any adjoining properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) a Release of Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4. Without limiting the generality of the preceding sentence of this Section 12.4.7, Landlord hereby (x) grants to Tenant the right to test for the presence of Hazardous Substances beneath the Premises and beneath the premises currently occupied by the drycleaner, within fourteen (14) days following vacation of such premises by the drycleaner, and (ii) agrees to indemnify, defend and hold Tenant, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity) and Compliance Costs, arising from any Release of Hazardous Substances, both prior to and after the Effective Date, from a drycleaner in the Shopping Center. In the event Tenant conducts any testing for Hazardous Substances as aforesaid, Tenant shall coordinate with Landlord to avoid interruption of the Shopping Center operations, on or about the Premises, as well as any delay to the performance of Landlord's Work. Tenant shall be responsible for obtaining any permits required by applicable laws and regulations. In the event any testing to be conducted by Tenant entails the taking of subsurface soil or water samples, through the use of drilling




39

equipment other than hand augers, Landlord and Tenant shall enter into a separate agreement, reasonably acceptable to each, specifying the applicable terms and conditions under which such drilling may be conducted. Tenant shall provide Landlord with copies of all testing results and, in the case of soil and water samples, will grant Landlord the opportunity, at Landlord's discretion, to obtain split samples.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

ARTICLE 13.
USES AND RESTRICTIONS

Section 13.1    <u>Permitted and Prohibited Uses</u>.

13.1.1 <u>Tenant's Permitted Use</u>. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the *"Prohibited Uses"* (defined in <u>Exhibit L</u> hereto annexed) or the *"Existing Exclusives"* (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 <u>Prohibited Uses</u>. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the Commonwealth of Puerto Rico. Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date) for any of the *"Prohibited Uses"* (defined in <u>Exhibit L</u> hereto annexed).

Section 13.2    <u>Tenant's Exclusive in Center</u>. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 (a) Subject only to the Existing Leases (and any renewals or extensions thereof, and any expansion of any premises occupied by the tenants under the Existing Leases, up to a maximum expansion of each particular such premises to no more than twenty (20%) percent of such tenant's premises (up to a maximum of eight thousand (8,000) square feet of Floor Area) {it being agreed that any such expansion over such amount shall subject all of such tenant's premises to this Section 13.2.1}) as to which the provisions of this Section 13.2 shall not apply except as specifically stated herein, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, primarily for the sale, rental or distribution (either as to any single category below or in any combination of such categories), of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items; (c) housewares (meaning for the purposes of this Section 13.2 kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); (d) frames and wall art (provided that fine art and custom framing shall not be included); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, Landlord may lease space in the Shopping Center to Pier 1 Imports, Mikasa, Sears, JC Penney, Febus, Burdines, Casa Linda, Capri, Galeria Labrador, Grabados Modernos, Crate & Barrel, Pottery Barn,




40

Restoration Hardware, Williams & Sonoma, and The Gap for operation of a Gap store, Banana Republic, Gap Kids or Old Navy store (hereinafter referred to as *"Excluded Tenants"*). Notwithstanding the foregoing, the aforesaid restriction shall not apply to any premises within the Shopping Center comprising less than two thousand (2,000) square feet of Floor Area. Moreover the exception granted under this Section to tenants under Existing Leases (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord and any such tenant requires Landlord's consent to any assignment or subletting or to a change in the use of the corresponding premises to permit the sale, rental or distribution of the Exclusive Items, other than those presently being sold, and Landlord may withhold its consent under the lease in question and under applicable law (i.e., under applicable law, Landlord shall be deemed reasonable in withholding its consent to such change in use due to the fact that such change would violate Tenant's exclusive); or (ii) Landlord permits or agrees to an expansion of the applicable premises to an area of over eight thousand square feet of Floor Area primarily for the sale, rental, or distribution of the Exclusive Items. Notwithstanding anything to the contrary set forth above, (i) the foregoing exclusive shall not apply to a typical Walgreens (as such concept is understood as of the date hereof) within the Shopping Center, even if Walgreens expands or relocates, and (ii) the tenant known as "Capri" currently occupying approximately twenty thousand (20,000) square feet of Floor Area within the Shopping Center may expand such premises by thirteen thousand (13,000) square feet of Floor Area, provided that the total percentage of Floor Area within the expanded Capri premises used for the display of any particular category of the Exclusive Items shall not exceed the total percentage of Floor Area in the existing Capri premises used for the display of such category of the Exclusive Items.

(a)    Landlord shall not, and shall cause its Affiliates not, to lease, rent or occupy or permit any premises on the Esso Property to be occupied (whether by a tenant, sublessee, assignee, licensee or other occupant or itself) by any of Tenant's Direct Competitors. For the purposes hereof the term *"Tenant's Direct Competitors"* is intended to apply to, by way of example, those businesses currently operating under the trade names of Reading China, HomePlace, Linens & Things, Linen Locker, Linen Barn, and/or other retailers with a mix of merchandise similar to that of Tenant. This restriction shall only apply to Landlord and its Affiliates and shall not apply to a transferee of Landlord's, or Landlord's Affiliate in the Esso Property.

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department store [for example, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).

13.2.3  The exclusive rights granted to Tenant as to any particular category set forth in Section 13.2.1 above shall be conditioned upon either (i) Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category, or (ii) Tenant's permitted assignee or a subtenant of the whole of the Premises using the Premises primarily for the sale, rental or distribution of items contained in categories (a) through (f) above in a business carrying a mix of merchandise similar to that of Bed Bath & Beyond and then only as to those categories that are carried on a regular basis, (other than during *"Excused Periods"* [defined in Section 1.1.9 above] and for periods of time not exceeding six (6) consecutive months).

13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by Landlord under Sections 13.2.1 through 13.2.3 above (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or




41

in the Esso Building prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder corresponding to such period shall abate and in lieu thereof Tenant shall pay Alternate Rent for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(a)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3  Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. If Tenant breaches any of the Existing Exclusives then in addition to any other remedies available to Landlord under this Lease, at law or in equity, Tenant shall pay to Landlord for the duration of such violation, as liquidated damages and not as a penalty, additional Fixed Rent equal to fifty (50%) percent of the Fixed Rent which would otherwise be payable during such period.

13.3.2 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

## ARTICLE 14.
### CONDUCT OF BUSINESS OPERATIONS

Section 14.1  Obligation to Open and Operate. Subject to the other provisions of this Lease (including, without limitation, Articles 2 & 3 hereof) Tenant shall initially open its store for business to the public in the Premises as a typical Bed Bath & Beyond store, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or



42

destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord). After so opening (the date of Tenant's opening for business being hereinafter called the *"Opening Date"*) Tenant shall continuously operate therein for a period of one (1) year (the *"Required Operating Period"*). After the end of the Required Operating Period, Tenant shall have no obligation to operate any business in the Premises, and shall have the right, at any time after the Required Operating Period, to cease to conduct any business operations in the Premises, and, except as hereinafter set forth in Section 14.2, Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that, after the Required Operating Period, Tenant intends to cease to conduct any business operations in the Premises, other than during any Excused Periods, Tenant shall reasonably endeavor to give Landlord as much advanced notice thereof as is reasonable in the circumstances. In the event that Tenant does not operate or cause to be operated any retail business in the Premises for either (i) ten (10) consecutive days, or (ii) a total aggregate period of thirty (30) days out of any three hundred sixty-five (365) consecutive days (the *"Grace Period"*) (other than prior to the Delivery Date or during Excused Periods), Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant at any time after the expiration of the Grace Period granted to Tenant, other than during the Excused Periods, whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Landlord's right to terminate this Lease as a result of a particular closure by Tenant shall end upon the date that Tenant, or an assignee or subtenant permitted under Article 15 hereof, re-commences the operation of a retail use which is permitted under this Lease and prior to such re-commencement of business, Tenant shall have the right to suspend Landlord's right of termination of this Lease, but only if Landlord has not already given Tenant a termination notice, by giving Landlord notice that Tenant, or its permitted assignee or subtenant, intend to re-open for business, immediately thereafter and Tenant, or its permitted assignee or subtenant, commences re-fixturing the Premises and in fact so re-opens for business within sixty (60) days after the date of Landlord's receipt of Tenant's re-opening notice. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.8 below. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

Section 14.2 <u>Damages for a Closure</u>.    Notwithstanding that Landlord and Tenant have agreed that Tenant shall have no obligation to operate a business in the Premises after the Required Operating Period, Tenant acknowledges that Landlord shall suffer certain losses and damages if Tenant no longer operates a Bed Bath & Beyond store in the Premises (such ceasing to operate a Bed Bath & Beyond store in the Premises being hereinafter referred to as a *"Closure"*). Accordingly, Landlord and Tenant hereby agree that if Tenant, or its permitted assignee or subtenant or licensee, ceases to operate a Bed Bath & Beyond store in at least seventy (70%) percent of the Floor Area of the Premises, other than for the Excused Periods, at any time prior to the seventh (7th) anniversary of the Opening Date that Tenant shall pay to Landlord, as Landlord's sole remedy for damages for such Closure, Landlord's Damages (as hereinafter defined). For the purposes hereof, the phrase *"Landlord's Damages"* shall mean the following amounts in the following circumstances: (A) in the event of a Closure after the Required Operating Period but on or before the third anniversary of the Opening Date, if the Gross Sales are more than Two Hundred Fifty ($250.00) Dollars per square foot of Floor Area of the





43

Premises per annum for the immediately preceding twelve months immediately preceding the Closure, Tenant shall pay to Landlord an amount equal to one hundred (100%) percent of the Fixed Rent which would otherwise be payable for the next one year after the date of the Closure; (B) in the event of a Closure after the third (3rd) but before the fifth (5th) anniversary of the Opening Date, if the Gross Sales are more than Three Hundred ($300.00) Dollars per square foot of Floor Area of the Premises per annum for the immediately preceding twelve (12) months before such Closure, Tenant shall pay to Landlord an amount equal to seventy-five (75%) percent of the Fixed Rent which would otherwise be payable for the next one year after the date of the Closure; and (C) in the event of a Closure after the fifth but on or before the seventh (7th) anniversary of the Opening Date, if the Gross Sales are more than Three Hundred Twenty-Five ($325.00) Dollars per square foot of Floor Area of the Premises per annum for the immediately preceding twelve (12) months before such Closure, Tenant shall pay to Landlord an amount equal to fifty (50%) percent of the Fixed Rent which would otherwise be payable for the next one year after the date of the Closure. Landlord's Damages shall: (i) only be payable on the first occasion during the Term that Tenant, or its permitted assignee or subtenant, ceases to operate a Bed Bath & Beyond store in the Premises; (ii) only be payable in the circumstances set forth in this Section 14.2; (iii) be payable in addition to all of Tenant's other obligations under this Lease; (iv) shall be payable notwithstanding that Tenant, or an assignee or subtenant permitted under Article 15 hereof, in fact opens at the time of or after the date of the Closure another business in the Premises which is for a use permitted herein; and (v) shall be paid in equal monthly installments for the next one year after the date of the Closure. Except as hereinabove set forth, Tenant shall have no obligation to pay Landlord any damages as a result of Tenant, or any permitted assignee or subtenant, ceasing to operate in the Premises. In the event of a Closure prior to the seventh (7th) anniversary of the Opening Date, Tenant shall provide to Landlord a written certification of the Gross Sales for the twelve (12) months immediately preceding the date of the Closure and Landlord shall have the right to audit such statement in the manner set forth in 4.4.4 hereof.

## ARTICLE 15.
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1 <u>Assignment and Subletting</u>.

15.1.1 Tenant shall have the right from time to time, with the prior consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet all or any portion of the Premises, subject to all of the terms and conditions of this Lease. If Tenant proposes to assign this Lease or sublet, all or any part of the Premises, other than pursuant to Sections 15.1.3 or 15.3 hereof, it shall first give notice thereof to Landlord which notice shall be deemed to be an application to Landlord for its consent thereto (the "**Assignment/Subletting Notice**"), and which notice shall specify: the name, address, net worth and previous business experience of the proposed assignee or sublessee; in the case of a sublease of part of the Premises, a description of that part of the Premises being sublet; the proposed use of the Premises to be made by such assignee or sublessee and such other information as shall be reasonably necessary to enable Landlord to consider Tenant's application for consent and whether or not such assignment or sublease satisfies the conditions wherein Landlord's consent may not be withheld as set forth below. Landlord shall respond to Tenant's application for consent within thirty (30) days after its receipt of the Assignment/Subletting Notice and if Landlord refuses its consent Landlord's response shall set forth the reasons for such refusal. Landlord's consent shall be deemed to have been given if Landlord fails to respond to such application within thirty (30) days after Landlord's receipt of the Assignment/Subletting Notice provided that such notice contains in bold language on the face thereof a warning of the consequences of Landlord's failure to respond. Landlord acknowledges that its right of consent is subject to Section 23.5 hereof and further that such consent shall not be withheld if:




44

(a)  the proposed assignee or sublessee is a national retailer (with at least fifty (50) stores in the United States) or a regional retailer (with at least five stores in Puerto Rico) and in either event has a good reputation and past experience in operating the kind of business proposed to be operated in the Premises and has operated such business of the size and scope so contemplated;

(b)  the proposed assignee or sublessee proposes to use the Premises for a lawful retail use customarily found in shopping centers of no less quality or character than the Shopping Center as of the date of the Assignment/Subletting Notice and which will not violate any of the Prohibited Uses or the Existing Exclusives;

(c)  Tenant is not then in default in its performance of any of the terms or provisions of this Lease beyond any applicable notice and grace period provided herein for the curing of such default;

(d)  such assignee has agreed to assume all of Tenant's obligations under this Lease from and after the date of the proposed assignment, or, if applicable, the proposed sublease reflects that it is subject to the terms and conditions of this Lease, provided that such assumption shall not affect the liability of Tenant under this Lease;

(e)  the proposed assignee or sublessee is a party of reasonable financial worth and financial stability, in light of the responsibilities under this Lease or the proposed sublease and able to provide reasonable assurance of its ability to perform its obligations under the proposed sublease or under this Lease; and

(f)  the proposed assignee's or sublessee's use would not violate any then existing primary use exclusive granted to a tenant operating in the Shopping Center.

15.1.2 Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, if Tenant sends to Landlord an Assignment/Subletting Notice in respect of an assignment of this Lease or a subletting of all, but not part, of the Premises, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice to Tenant (the *"Termination Notice"*) thereof within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant in which event this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease.  Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Sections 14.2 and 23.8 below.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not give the Termination Notice within the aforesaid 30-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, but Landlord shall retain it consent right in respect thereof as set forth in Section 15.1.1 above.

15.1.3 In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to (i) license or concession a portion of the Premises for the operation of a business which is an incidental business to a Bed Bath & Beyond store and which is




integrated into the Bed Bath & Beyond store with no separate entrance or signage, and (ii) to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant that operates a Bed Bath & Beyond store (or another retail use compatible with a first class shopping center and with the nature and character of the Shopping Center and which is not duplicative of the principal use of another tenant or occupant of the Shopping Center at such time); (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates and which continues to operate a typical Bed Bath & Beyond store in the Premises; (c) to any entity which purchases Tenant's interest in all stores owned or operated by Tenant or its Affiliate(s) in the Commonwealth of Puerto Rico and which continues to operate a typical Bed Bath & Beyond store in the Premises; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2  Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder.

Section 15.3  Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more *"Lenders"* (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all reasonable documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant that operates a Bed Bath and Beyond store (or another retail use compatible with a first class shopping center and with the nature and character of the Shopping Center and which is not duplicative of the principal use of another tenant or occupant of the Shopping Center at such time) a license to operate all of Tenant's business permitted operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease, provided that Tenant shall remain liable under this Lease as set forth in Section 15.2 hereof.  As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4  Cure Rights of Original Tenant.

15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid,



46

Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

   Section 15.5  <u>Recognition Agreement</u>.  In the event Tenant subleases all, but not part of the Premises and such sublease is permitted in this Article 15, Landlord, upon Tenant's request and provided that at such time Tenant is not in default under this Lease beyond any applicable notice and cure period, shall execute, acknowledge and deliver to the subtenant an instrument in the form annexed hereto as <u>Exhibit H</u> but only if such sublease satisfies the following conditions:

         (a)   the sublease obligates the subtenant to pay at least the same Fixed Rent and Additional Rent as is payable under this Lease or the subtenant would on the implementation of any such Recognition Agreement be obligated to pay Landlord at least the same Fixed Rent and Additional Rent as is payable under this Lease;

         (b)   the sublease is for a use which is consistent with the nature and character of a first class Shopping Center;

         (c)   the sublease is on terms and conditions which are no more onerous, or would be on implementation of the Recognition Agreement no more onerous, to the sublessor thereunder than those pertaining to Landlord under this Lease; and

         (d)   the subtenant on the implementation of the Recognition Agreement attorns to Landlord and assumes all of the obligations of Tenant under this Lease, and as a result thereof, the subtenant shall substitute for Tenant as tenant under this Lease and immediately cure any existing curable default of Tenant hereunder and the sublease shall thereon be deemed to have been terminated; provided further that (except as set forth in Section 13.2.3 hereof) Sections 13.2, 15.3, 15.4 and 15.5 of the Lease shall be inapplicable to the subtenant as the new Tenant under this Lease.

Upon the request of Tenant following the execution and delivery of such Recognition Agreement, Landlord and Tenant shall re-execute the same in the form of a public instrument (deed) before a Puerto Rican Notary Public reasonably designated by Tenant, which instrument Tenant may, at its sole cost, cause to be recorded in the corresponding Section of the Registry of the Property of Puerto Rico and upon the termination of the applicable sublease, cancelled at Tenant's or subtenant's cost.



## ARTICLE 16.
## DEFAULT AND DISPUTE RESOLUTION

   Section 16.1  <u>Tenant Default</u>.

      16.1.1  If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of

47

notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.



16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

48

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2  Landlord Default. If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "*Landlord's Default*"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)     as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)     offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid, provided, however, that said offset shall in no event exceed thirty (30%) percent of each of the next succeeding monthly installments of Rent (except that if Tenant shall be unable to recoup the amounts owing to Tenant by offsetting the foregoing thirty (30%) percent of Rent during the remainder of the Term, the thirty (30%) percent limitation shall be increased to an amount each month required to enable Tenant to recover such amount monthly, amortized over the remaining months of the Term); and/or

(d)     may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).



Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3  Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in San Juan, Puerto Rico, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the



49

determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17.
## RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1  Right to Mortgage and Non-Disturbance.  Landlord reserves the right to subject and subordinate this Lease at all times to any mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, provided that the form attached hereto as Exhibit G shall be modified, or substituted by another form which is substantively the same, so as to be in recordable form in the Commonwealth of Puerto Rico, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2  Estoppel Certificate.  Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to Tenant's actual, knowledge, Landlord is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.



Section 17.3  Existing Mortgages.  If a mortgage, deed of trust, or other security instrument encumbers the Shopping Center or any part thereof on the Effective Date, then within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, provided that the form attached hereto as Exhibit G shall be modified, or substituted by another form which is substantively the same, so as to be in recordable form in the Commonwealth of Puerto



Rico, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid). Should Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder (other than as set forth in Section 23.8 below), except that Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Twenty-Five Thousand and 00/100 ($25,000.00) Dollars. Tenant hereby agrees on the date hereof to execute an acknowledgement in the form attached hereto as Exhibit N.

ARTICLE 18.
NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

ARTICLE 19.
TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord, except on its interest in the Vertical Transportation Items, and may remove Tenant's Property at any time during the Term. Landlord waives any statutory lien it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any statutory lien it has or may have in Tenant's Property.



51

## ARTICLE 20.
## END OF TERM

Section 20.1 Surrender of Premises. At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2 Hold Over. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21.
## INTENTIONALLY OMITTED

## ARTICLE 22.
## ONGOING CO-TENANCY

The On-Going Co-Tenancy Condition shall mean that seventy-five (75%) percent of the Floor Area of the Shopping Center (excluding the existing KMart premises and the Premises) is open for the operation of retail business by national or regional tenants of the type typically found in first-class regional shopping centers located in the Puerto Rico. If, at any time during the Term the On-Going Co-Tenancy Condition is not satisfied (such condition being hereinafter referred to as an *"Excess Vacancy"*), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (A) as set forth in Section 23.8 below, and (B) Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of any alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired portion of the Term. If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens by more than five (5%) percent; and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

## ARTICLE 23.
## MISCELLANEOUS

Section 23.1 Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2 Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.



52

Section 23.3 Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4 Force Majeure. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of *Force Majeure*.

Section 23.5 Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6 Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary. ·

Section 23.7 Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8 Survival of Obligations. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.



Section 23.9 Non-Waiver. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

53

Section 23.11 _Definition of Landlord_. The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) final judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 _Successors and Assigns_. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 _Limitation of Landlord's Liability_. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, and except for the payment of the Tenant Allowance, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability with respect to Landlord hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 _Limitation of Tenant's Liability_. Landlord, its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim against Tenant arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates, successors, and/or assigns (unless such Affiliates, successors or assigns become the *"Tenant"* hereunder pursuant to Article 15 hereof).

Section 23.15 _Joint and Several Liability_. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 _Severability_. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.



Section 23.17 _Grammatical Usages and Construction_. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 _Table of Contents, Line Numbering and Paragraph Headings_. The table of contents and line numbering, if any, and section headings are inserted only for

convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 Definition of Hereunder, Herein, etc.. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 Recording Lease. Upon the request of Tenant following the execution and delivery of this Lease (or at any time thereafter during the Term), Landlord and Tenant shall re-execute this Lease in the form of a public instrument (deed) before a Puerto Rican Notary Public designated by Tenant, which instrument Tenant shall, at its sole cost, cause to be recorded in the corresponding Section of the Registry of the Property of Puerto Rico. If this Lease is recorded in the Registry of Property of Puerto Rico, at the expiration or earlier termination of the Term, Tenant shall pay to Landlord the notarial fee and all documentary stamps and recording fees associated with the cancellation of record of this Lease and deliver appropriate executed documentation to remove this Lease of record. Tenant's obligations under this Section shall survive the termination of this Lease.

Section 23.21 Entire Agreement and Modification. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 No Joint Venture or Partnership Created by Lease. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 Tenant's Tradename. Landlord shall not make use of Tenant's tradename [i.e., "Bed Bath & Beyond"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24 Counterparts. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 Waiver of Trial by Jury. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26 Governing Law. This Lease shall be governed by, construed, and enforced in accordance with the laws of the Commonwealth of Puerto Rico.

Section 23.27 Sale or Transfer of Shopping Center. Landlord hereby agrees should it sell or otherwise transfer (or have sold or otherwise transferred) its ownership interest in the Shopping Center or any portion thereof [the foregoing to include without limitation any applicable change in "control" (as defined in Section 1.1.2 hereof)], then, so long as this Lease is still in effect, such sale or transfer shall be conditioned upon the purchaser or other transferee simultaneously recognizing the existence of this Lease and assuming, in writing, all of the then existing terms and conditions hereof. Landlord shall notify Tenant of such transfer or sale simultaneously with the occurrence thereof. For the purposes of this Section 23.27, a sale or transfer shall not pertain to a mortgagee's foreclosure of the Shopping Center, which shall be governed by Article 17.



55

ARTICLE 24.
RIGHT OF LANDLORD TO ERECT EXPANSION ABOVE THE PREMISES

Section 24.1  Notwithstanding anything contrary in this Lease, the parties acknowledge that Landlord is contemplating erecting one additional level of building(s) above the Premises, as well as an additional three (3) level extension of the west end of the Shopping Center on the Critical Area and No Build Area, including a ten level parking deck adjacent to the front of the Premises as shown on Exhibit O (collectively referred to as the "Expansion"). Attached hereto as Exhibit O is a diagram of the possible Expansion, it being recognized that the actual Expansion may differ slightly from that shown on Exhibit O. The parties desire to establish rights and limitations in connection with construction of the Expansion, including enumerating obligations of Landlord in addition to Landlord's obligations otherwise set forth in this Lease.

Section 24.2  Landlord hereby retains all air rights above the top boundaries of the Premises, including above the level of the flat roof of the Premises ("Flat Roof Surface") solely for the purpose of construction of one additional level on the Flat Roof Surface.

Section 24.3  If Landlord intends to erect the Expansion, or perform any work on the Flat Roof Surface in connection with the Expansion, modify the parapet walls above the level of the roof of the Premises in connection with the Expansion or alter any parking areas and/or ramps in the Critical Area in connection with the Expansion (the aforesaid occurrences being individually or collectively referred to as "Alterations"), Landlord shall deliver to Tenant one hundred-twenty (120) days prior notice of its intent with respect to same, together with preliminary plans and specifications showing in reasonable detail, the nature of the proposed Alterations; provided, however, that no such notice shall be given prior to the date which is one hundred twenty (120) days preceding the tenth (10th) anniversary of the Rent Commencement Date and Landlord shall have no right to make any Alterations prior to such tenth (10th) anniversary. Tenant shall have the right, within thirty (30) days after receipt of the plans and specifications for the Alterations, to approve or disapprove the plans and specifications for such Alterations. If Tenant disapproves of the plans and specifications, Tenant shall indicate its reasons for such disapproval. No such disapproval may be based on a general objection to the Expansion, but rather must be based only on (i) Tenant's ability to conduct the normal operation of its business in the Premises due to the fact that the completed (as opposed to during the construction thereof) Alterations will have a material impact on Tenant's ability to do business, or (ii) specific construction details that will materially restrict Tenant's ability to conduct the normal operation of its business within the Premises. Notwithstanding the foregoing, Landlord shall not have the right to add columns or new supports to the Premises, or perform any Alterations which would affect the interior of the Premises or necessitate a change to the layout of the Premises.

Section 24.4  If Tenant approves of the plans and specifications for the Alterations, then the following restrictions shall apply to Landlord's construction of such Alterations:



      (a)    Landlord shall maintain, repair, and replace at its sole cost and expense, (and not includable in Common Areas Charges) the affected roof membrane of the Premises, the affected drainage system for the Premises (including affected roof drains, leaders and down spouts), and any affected utility conduits or components intended to serve the Premises;



      (b)    Landlord shall at all times keep watertight the roof, walls and all other parts of the Premises in connection with the Alterations;




    (c) Landlord shall, at its sole cost and expense, relocate Tenant's electrical systems, ventilation and air conditioning systems, and other mechanical systems, if necessary, at relocation points reasonably acceptable to Tenant;

    (d) Landlord shall use commercially diligent efforts to insure continuous operation of the HVAC and other mechanical systems in the Premises and to minimize disruption to parking areas and shall make no permanent changes to same (except as otherwise reflected on Exhibit M) without Tenant's prior written approval as aforesaid;

    (e) The completed Alterations shall not increase or decrease the Floor Area of the Premises or adversely alter the means of ingress and egress of the Shopping Center;

    (f) No portions of Landlord's staging areas shall be located within any area which unreasonably impedes access to the Shopping Center or the Premises or otherwise unreasonably interferes with the operation of Tenant's business;

    (g) Landlord shall not remove, alter or otherwise conceal Tenant's signage; provided however, that Tenant acknowledges that certain portions of the Expansion may require the obstruction or reduction of the top of Tenant's signage on the west exterior wall of the Premises. In such event, during the remainder of the Term, Landlord agrees to erect, at its sole cost and expense, Tenant's standard signage, acceptable to Tenant, on the far west portion of the parking deck;

    (h) Landlord shall promptly repair, at its sole cost and expense, any damage to the Premises caused by Landlord's construction of the Alterations, and any damage to the Premises caused by the act or omission of Landlord, its employees, agents, or contractors; and

    (i) Landlord shall be liable for all loss, damage, or injury to persons or property resulting therefrom and shall indemnify and hold Tenant, its successors, assigns and subtenants harmless from all claims, losses, costs, expenses and liabilities, including reasonable attorney's fees and disbursements, arising therefrom.

    (j) In consideration of any disruptions that Tenant is likely to encounter during construction of the Alterations, immediately upon commencement of construction of the Alterations, including but not limited to any pre-construction activities which materially adversely impact Tenant's operations or business, Tenant shall be entitled to pay Alternate Rent, in lieu of Fixed Rent. Payment of Alternate Rent shall terminate upon the date on which the disruption ceases and Tenant shall be able to engage in the normal conduct of such business.

**[signature page follows]**

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

LANDLORD:

WITNESS:

**CAPARRA CENTER ASSOCIATES, SE**, a Puerto Rico special partnership (Sociedad Especial)

By: _____
Roberto González
Executive Vice President

[SEAL]

TENANT

WITNESS:

**BED BATH & BEYOND INC.**, a New York corporation

By: _____
Leopoldo J. Cabassa Sauri
Attorney-in-Fact

[SEAL]

58

Affidavit Number 244 (Copy)

Acknowledged and subscribed before me by Roberto González Vizcarrondo in his capacity as Executive Vice President of Caparra Center Associates, S.E., of legal age, single, business executive and resident of San Juan, Puerto Rico and Leopoldo J. Cabassa Saurí in his capacity as Attorney in Fact of Bed Bath & Beyond, Inc., of legal age, married, attorney and resident of Guaynabo, Puerto Rico, both personally known to me.

In San Juan, Puerto Rico this 13th day of November, 2002.

**NOTARY PUBLIC**

58a

## INDEX OF EXHIBITS

Exhibit A      Legal Description of Shopping Center

Exhibit B      Site Plan

Exhibit B-1    Shopping Center Outline

Exhibit C      Rent Commencement and Expiration Date Agreement

Exhibit D      Specifications for Landlord's Work

Exhibit D-1    Exterior Elevations of the Premises and Sidewalk Plan

Exhibit E      Permitted Encumbrances

Exhibit F      Tenant's Signage

Exhibit F-1    Sign Criteria

Exhibit G      Form of Subordination, Non-Disturbance and Attornment
               Agreement

Exhibit H      Form of Subtenant Recognition Agreement

Exhibit I      Form of Delivery Date Notice

Exhibit J      Form of Delivery Date Certification

Exhibit K-1    Existing Exclusives

Exhibit K-2    Existing Leases

Exhibit L      Prohibited Uses

Exhibit N      Form of Acknowledgement of Collateral Assignment of
               Lease

Exhibit O      Plans for Landlord's Proposed Alterations.



## Exhibit A

### Legal Description of Shopping Center

The Shopping Center and the parking areas serving the same are located in three (3) parcels, which descriptions are as follows:

1.    MAIN PARCEL NORTH PARCEL (MAIN STRUCTURE)

"URBAN: Lt site in Pueblo Viejo, Municipality of Guaynabo, with a surface area of 47,646.1879 square meters. Its boundaries are:  on the North, with Franklin D. Roosevelt Avenue; on the East, with San Patricio Avenue and land property of San Patricio Shopping Center, Inc., nowadays, Caparra Center Associates, S.E.; on the South, with land property of San Patricio Shopping Center, Inc., nowadays Caparra Center Associates, S.E. and public street, nowadays named Ortegón Street; on the West, with lot property of González Giusti Brothers, nowadays, Caparra Realty Associates, S.E."

Recorded at page 120 of volume 587 of Guaynabo, property number 24,401, Registry of Property of Guaynabo.

2.    SOUTH PARCEL (PARKING BUILDING)

"URBAN: Lot of land denominated parcel number four (4) in the plan approved in case number sixty-two dash seven hundred twenty-five (62-725) Lot, report sixty-three dash L one thousand five hundred (63-L1500) of an irregular form, located at Pueblo Viejo Ward in the Municipality of Guaynabo, with a surface area of EIGHTEEN THOUSAND SIX HUNDRED THIRTY-ONE square meters and ONE THOUSAND TWO HUNDRED FIFTY-ONE TEN THOUSANDS of another (18,631.1251) equivalent to four cuerdas and SEVEN THOUSAND THREE HUNDRED THIRTY TEN THOUSANDS of another (4.7330), with boundaries to the NORTH and WEST, with a portion of the main parcel to be dedicated to public street; on the EAST with Las Caobas Development and Banco Popular de Puerto Rico; and on the SOUTH with the main parcel."

Recorded at page 29overleaf (⟦vuelto⟧) of volume 625 of Guaynabo, property number 12,002 of the Registry of Property of Guaynabo.

3.    PARCEL WEST TO THE MAINSTRUCTURE

"URBAN: Lot of land located at Pueblo Viejo Ward in the Municipality of Guaynabo, with a surface area of FIVE POINT THREE THOUSAND THREE HUNDRED FIFTY-TWO (5.3352) cuerdas, equivalent to TWENTY THOUSAND NINE HUNDRED EIGHTY-FIVE POINT ZERO EIGHT (20,985.08) square meters, and with boundaries along the NORTHEAST, in TWO HUNDRED FOUR POINT TWO HUNDRED EIGHTY-TWO (204.282) meters with land property of San Patricio Shopping Center; along the SOUTH in EIGHTY-TWO POINT FIVE HUNDRED SEVENTY-FIVE (82.575) meters with the main parcel (future Road No. 5 of Caparra Hills Development, nowadays Tabonuco Street and Lot A9); along the EAST and WEST in FORTY ONE POINT FOUR HUNDRED SIXTY EIGHT (41.468) and ONE HUNDRED THIRTY FIVE POINT THREE HUNDRED FOUR (135.304), respectively, with the parcels of Caparra Hills Development and; along the NORTHWEST with TWO HUNDRED FORTY-TWO POINT EIGHT HUNDRED FORTY-




A-1

SEVEN (242.847) meters of the new right of passway of Intersection number 66 of Franklin Delano Roosevelt Avenue and State Road Number 2."

Recorded at page 195 of volume 169 of Guaynabo, property number 12,006 of the Registry of Property of Guaynabo.



# Exhibit B

## Site Plan



B-1-1







Architectu

Interior Desi

Graphic Desi

Retail & Store Planni



December 18, 2003

**Bed Bath & Beyond
San Patricio Plaza
Guaynabo, PR**

**Area Verification**

As required by the lease we have verified the measurements of the store and have
the following results.

- Area of 2nd Level................................................................21,336 sf.
- Area for Ground Level..................................................... 18,831 sf.
- Area for Mezzanine...................................................... 1,000 sf.

- Total Area for Ground & Second Level............................... 40,167 sf.
- Plus Mezzanine.............................................................. 500 sf.

- Total Store Area.............................................................40,667 sf.
(Refer to attached drawings ground & second floor for reference)

Certified Correct

Edelberto Carrerá, AIA





21,336 S.F,



18,831 S.F,

Exhibit B-1

Shopping Center Outline



B-1-1



Exhibit 8-1

E:/PROYECTOS 2001/10.02RRR SP PHASE III/A/2

577

## Exhibit C

## Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the 4th day of February , 2002, by and between CAPARRA CENTER ASSOCIATES, S.E. *("Landlord")* and BED BATH & BEYOND INC. *("Tenant").*

## WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as San Patricio Plaza (the *"Shopping Center"),* situated in Guaynabo, Puerto Rico;

WHEREAS, by that certain lease dated November 13, 2002 (the *"Lease"),* Landlord leased a portion (the *"Premises")* of the Shopping Center to Tenant:

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease had commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW THEREFORE, Landlord and Tenant agree as follows:

1. The Rent Commencement date occurred on November 14, 2003.

2. The Initial Term of the Lease shall expire on January 31, 2014, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease..

3. The date of commencement of the **first Renewal Period** shall be February 1, 2014, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2019, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4. The date of commencement of the **second Renewal Period** shall be February 1, 2019, if Tenant effectively exercises its option in respect therof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2024, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5. The date of commencement of the **third Renewal Period** shall be February 1, 2024, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2029, unless the Lease terminates earlier as provided in the Lease.

C-1

6. Capitalized terms used, but not defined herein, shall have the meanings ascribed to them in the Lease

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year firs above written.

LANDLORD:

**CAPARRA CENTER ASSOCIATES, S.E.**

By: _____
Roberto González
Executive Vice President


TENANT:

**BED BATH & BEYOND INC.**

By: _____
Warren Eisenberg
Co-Chief Executive Officer


EXHIBIT C BBB

C-2

# San Patricio, Puerto Rico

## Exhibit D - Standard Landlord's Work – Phase 1

10/16/02

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the
Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of
the Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and
agreed that all materials and supplies shall be installed in strict accordance with all manufacturers'
specifications.]

### Landlord's Final Plans and Specifications

Landlord shall provide three (3) complete full size sets, three (3) complete ½ size sets and one (1) copy of electronic
file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use.
Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.    Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND
      DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS
      AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5).  Tenant's Plans are project-specific design-
      development documents.  In the event of a conflict between Tenant's Plans and "Tenant's Prototype
      Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail.  Tenant's Plans
      shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.    Tenant's Prototype Drawings and Specifications entitled "Bed Bath & Beyond Prototype Drawings and
      Specifications – version 1.2002, dated 4-01-02 developed by Ignarri-Lummis Architects, comprise the
      following drawings and specifications:

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---|---|---|---|
| A0.1 | Code Data, Project Data, Responsibility Schedule | Prototype Version 1.2002 | 04/01/02 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2002 | 04/01/02 |
| A1.1 | Site Details | Prototype Version 1.2002 | 04/01/02 |
| A1.2 | Demolition Plan | Prototype Version 1.2002 | 04/01/02 |
| A2.1 | Store Fixture Plan & Notes | Prototype Version 1.2002 | 04/01/02 |
| A2.2 | Floor Plan & Partition Types | Prototype Version 1.2002 | 04/01/02 |
| A2.3 | Floor Finish Plan, Transition Strip Details & Interior Finishes Legend | Prototype Version 1.2002 | 04/01/02 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2002 | 04/01/02 |
| A2.5 | Roof Plan & Notes | Prototype Version 1.2002 | 04/01/02 |
| A3.1 | Door & Finish Schedules, Door & Storefront Types, Vestibule Elevations | Prototype Version 1.2002 | 04/01/02 |
| A3.2 | Finish Hardware Schedule | Prototype Version 1.2002 | 04/01/02 |
| A3.3 | BBB National Account Vendors & Distribution Schedule | Prototype Version 1.2002 | 04/01/02 |
| A3.4 | BBB Specified Manufacturers & Distribution Schedule | Prototype Version 1.2002 | 04/01/02 |
| A4.1 | Exterior Elevations | Prototype Version 1.2002 | 04/01/02 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A6.1 | Exterior Details | Prototype Version 1.2002 | 04/01/02 |
| A7.1 | Large Scale Plans | Prototype Version 1.2002 | 04/01/02 |
| A7.2 | Large Scale Plans | Prototype Version 1.2002 | 04/01/02 |
| A8.1 | Interior Details | Prototype Version 1.2002 | 04/01/02 |
| A8.2 | Interior Details | Prototype Version 1.2002 | 04/01/02 |
| A8.3 | Customer Service Desk *(1 of 4 optional sheets)* | Prototype Version 1.2002 | 04/01/02 |
| A8.4 | Register Bays  *(1 of 2 optional sheets)* | Prototype Version 1.2002 | 04/01/02 |
| A8.5 | Remote Service Desks | Prototype Version 1.2002 | 04/01/02 |
| A9.1 | Interior Elevations | Prototype Version 1.2002 | 04/01/02 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2002 | 04/01/02 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2002 | 04/01/02 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf | Prototype Version 1.2002 | 04/01/02 |





1

| | Details | | |
|---|---|---|---|
| CH-1 | Fine China – Floor / Framing / Ceiling Plans & Schedules | Prototype Version 1.2002 | 04/01/02 |
| CH-2 | Fine China – Wall Sections & Details | Prototype Version 1.2002 | 04/01/02 |
| CH-3 | Fine China – Electrical Plans, Details & Notes | Prototype Version 1.2002 | 04/01/02 |
| S1.1 | Structural General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| S2.1 | Foundation Plan | Prototype Version 1.2002 | 04/01/02 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2002 | 04/01/02 |
| S3.1 | Structural Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| S3.2 | Typical Structural Details | Prototype Version 1.2002 | 04/01/02 |
| PME1.1 | Plumbing, Mechanical & Electrical General Information | Prototype Version 1.2002 | 04/01/02 |
| P1.1 | Plumbing General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| P1.2 | Plumbing Riser Diagrams | Prototype Version 1.2002 | 04/01/02 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2002 | 04/01/02 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2002 | 04/01/02 |
| M1.1 | Mechanical General Information | Prototype Version 1.2002 | 04/01/02 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2002 | 04/01/02 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2002 | 04/01/02 |
| M4.2 | ETM Wiring Details for Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |
| M4.2a | *Alternate* ETM Wiring Details for non-Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| E2.1 | Power Plan | Prototype Version 1.2002 | 04/01/02 |
| E2.2 | Lighting Plan | Prototype Version 1.2002 | 04/01/02 |
| E2.3 | Specialty Lighting Plan | Prototype Version 1.2002 | 04/01/02 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2002 | 04/01/02 |
| E3.3 | Specialty Lighting Power Diagrams | Prototype Version 1.2002 | 04/01/02 |
| E3.4 | Electrical Details | Prototype Version 1.2002 | 04/01/02 |
| E4.1 | Electrical Schedules | Prototype Version 1.2002 | 04/01/02 |
| E4.2 | Electrical Riser Diagrams | Prototype Version 1.2002 | 04/01/02 |
| E4.3 | Electrical Schedules | Prototype Version 1.2002 | 04/01/02 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2002 | 04/01/02 |
| E4.4a | *Alternate* Novar Wiring Details for non-Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |

Project Manual for Bed Bath & Beyond, dated April 1, 2002.

D.    Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements. Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications:

1.    All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center. No existing pylon, monument, or directional signs exist, in the event that new signs are built Tenant will be included on same per the lease.

2.    All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

3.    Complete civil engineering documents that describe planned improvements to the Shopping Center, including geo-technical and stormwater design reports and tie in the existing system(s).



2

## Site Specifications

A.    All parking areas and traffic drives in the Shopping Center have been engineered and are existing. The water retention/detention system is complete and engineered to meet applicable codes.

B.    All truck access drives in the Shopping Center have been engineered and are existing.

C.    All existing truck loading dock ramps and compactor/dumpster pads are concrete, have been engineered and shall not exceed slope of 5%. All new truck ramps and compactor/dumpster pads shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 5" Portland cement concrete surface finish. All new truck ramps shall consist of #4 re-bars, 18" o/c. each direction. New truck ramps shall not exceed slope of 5%.

If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

D.    The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be at least two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of the Final Plans and Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

## Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.    Clear Height - Building systems (mechanical, plumbing, electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. All mechanical, plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures. Fire protection sprinkler piping shall be located at least 16'-6" a.f.f., sprinkler heads shall be located at least 19'-0" a.f.f. Bottom of all structural elements shall be located at least 17'-6" a.f.f.

B.    Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law. Landlord shall be responsible for monitoring the fire alarm system up to (and including) the Delivery Date. Landlord shall be obligated to contract directly with "ADT" to provide required FA system. Fire alarm shall be tied into and monitored by Tenant's and Landlord's monitoring services.

C.    1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4". Structural system shall be rated to accept 125 lb. per square foot of live load. If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2" of the concrete slab.

D.    Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads. System shall comply with NFPA 231-C and or NFPA 13, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required (or as required by ESFR system). If Landlord chooses to install an ESFR sprinkler system, all ESFR (NFPA 13) codes and obstruction clearance(s) must be met by Landlord.

E.    Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate Fire Pump outside of Premises. Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant. Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.    LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to CCI for their review and approval no later than (16) weeks prior to projected delivery date



| | |
|---|---|
| Mr. Will Smith<br>Code Consultants, INC.<br>Work:           (314) 991-2633<br>Fax:            (314) 991-4614<br>1804 Borman Circle Drive<br>St. Louis, Missouri 63146-4136 | |

3

G.    If fire-proofing of structural elements is required, then Landlord shall use a solid white spray on cementitious-based product. All edges of fire proofing application shall be neat, clean and straight. All edges of material to be parallel to structural element being treated.

H.    Landlord to provide and install a (2) 500 gallon re-circulating water tanks (tied in Novar system) to supplement the domestic water system including but not limited to toilets, drinking fountains, lavatories & janitor sink(but excluding the fire protection system.) Landlord shall also provide an approved pump system to allow regular operation of Tenant's plumbing fixtures. All meters and taps for the above referenced water tanks shall be tied into Tenant's meters.

I.    Landlord shall provide and install a generator to support all store operations and life safety items including but not limited to HVAC, plumbing systems (and pump system), lighting, cash registers, office package and mezzanine, service desk(s), fire alarm, etc. Generator shall enable Tenant to operate its premises in a normal operational manner and is assumed as being 500 KW. The fuel tanks for the generator shall provide 12 hours of continuous service before requiring re-fueling (generator and fuel tanks shall be tied into Novar).

J.    Landlord shall supply and install concealed roll down hurricane shutters at all exterior first floor glazed areas of Tenant's premises and Lexan/Metal panel system at all second floor glazed areas of Tenant's premises. Landlord's mall personnel shall supply, store and install panels as required for inclement weather.

K.    All mechanical equipment coils shall be provided with coastal corrosion (coating) protection.

L.    Landlord to provide and install a raised floor and pump (@ restroom sanitary system) to enable water closet tie ins to existing drain locations (if required).

M.    Landlord shall provide and install decorative bollards @ mall entrance from Tenant's Premises (if required).

N.    Landlord shall provide a "Lennox", or alternate manufacturer as solely specified by Tenant, mechanical HVAC split system equipped with Novar shall be utilized in lieu of the RTUs shown on the prototype drawings. (only if prototypical RTU's cannot be provided due to site conditions).

O.    Landlord shall coordinate building overhang clearances with compactor manufacturer and provide any necessary equipment required to pick-up/drop off container (i.e. rails) or Landlord shall provide a "Autoquip", or alternate manufacturer as solely specified by Tenant, scissor lift (84"x120" platform) located within the premises (receiving area) in lieu of the dock leveler shown on the prototype drawings. (only if prototypical dock leveler cannot be provided due to site conditions with Tenant's approval.)

P.    Tenant will supply the following items (to be installed by Landlord as part of Landlord's Work): customer service desk, remote service desks, cashwraps, hiring trailer, cart corrals, mecho shades and lockers.

Q.    Tenant shall supply and install the following vertical transportation items: 1 pair of cart conveyors (vermaports), 1 pair escalators, 1 freight elevator and 1 glass-enclosed passenger elevator. Landlord to perform all work (including finishes) necessary to accommodate installation of the vertical transportation by Tenant, including, but not limited to, providing all power, pits, floor openings, structural support(s), shafts (glass at passenger elevator), enclosures and finishes., Additionally Landlord shall coordinate and provide adequate access to bring vertical transportation equipment into the premises.

**[In the event that the Premises includes a second level or basement, then the following four (4) paragraphs shall apply:]**

A.    Clear Height - Building systems (structural, mechanical, plumbing, electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. These criteria shall apply to space located below and within a second level, as well as space located within a basement level. All structural, mechanical, plumbing and electrical elements shall be located at least 16'-6" a.f.f. except for Tenant's light fixtures. Fire protection sprinkler piping shall be located at least 16'-6" a.f.f., and sprinkler heads shall be located at least 19'-0" a.f.f.

B.    Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads. System shall comply with NFPA 231-C, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required. ). If Landlord chooses to install an ESFR sprinkler system, all ESFR (NFPA 13) codes and obstruction clearance(s) must be met by Landlord.

C.    Second Level Structure- Landlord shall provide a minimum 3000 psi concrete floor slab having a minimum thickness of 4". If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2" of the concrete slab. Structural system shall be rated to accept 125 lb. per square foot of live load.





4

## Construction Coordination Requirements

A.    Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed

B.    Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at **BBB.2000photos@bedbath.com**

## Building and Site Signs

A.    Building Signs – Tenant shall furnish and  install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to provide plywood (or equal) blocking and verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord to provide power and make final electrical connections.

B.    Temporary Signs – Subject to legal requirements, commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Tenant shall install and Landlord shall maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign near the site of the [future] main entrance to the Shopping Center, bearing the phrase "Bed Bath & Beyond Coming Soon". At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed.

## Permits and Approvals

A.    <u>Landlord to secure all permits required allowing Tenant to fixture, merchandise (including without limitation permits for  it's for prepackaged foods), and open for business to the public in the Premises.</u>

B.    Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

## Construction Closeout

A.    Landlord shall deliver to Tenant's Construction Project Manager two (2) hard-copy sets of as-built drawings of the Premises, one (1) electronic copy CD-ROM (*"Auto Cad" Rel. 14* Format) of As-built along with all close-out books and warranty information, as specified within Tenant's Prototype Drawings and Specifications (refer to Section 01700 for complete list of closeout documents) within thirty (30) days after the "Substantial Completion Date".

B.    Warranties - Landlord shall provide Tenant with a list of contractors' and subcontractors' contacts and addresses, and a guarantee, including parts and labor, for a period of at least one (1) year after the Rent Commencement Date. Landlord shall deliver all warranties of equipment, service manuals, and as-built drawings to Tenant's construction project manager within thirty (30) days after the "Substantial Completion Date". Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant.

C.    If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraphs A and B within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D.    Itemized Budget - Landlord shall provide Tenant with its itemized "budget" and "final cost" within thirty (30) days after the Substantial Completion Date.



Exhibit D-1

Exterior Elevations of Premises and Sidewalk Plan



D-1-1

Exhibit D

Specifications for Landlord's Work



D-1

## San Patricio, Puerto Rico

### Exhibit D - Standard Landlord's Work – Phase 2
10/16/02

1. Sign Installation – Sign installation shall commence on Delivery Date, All Landlord work to enable sign install by Tenant, including but not limited to tile finish, power to sign area, and access shall be completed as Phase 1 work.
2. Exterior Finishes – Excluding items referenced in item #1 above.
3. Canopy Finishes – LL shall maintain safe 24/7 access for use of Tenant's Main Entry after Delivery Date.  See item #1 above.
4. Sidewalk Finishes – LL shall maintain safe 24/7 access for use of Tenant's Main Entry after Delivery Date.
5. Exterior Landscaping.
6. Exterior Lighting.
7. Punch List Items as deemed and defined in the lease.
8. A/C Balancing
9. Final Electrical Calibration.
10. Final Testing & Calibration of Fire Alarm & Control.
11. City Inspector Final Review & Endorsements (Health Department & Fire Marshall).
12. Final Equipment Calibration/Testing.
13. Final Use Permit or equivalent.

Note: After Delivery Date, Landlord shall not use lifts within Tenant's premises.



**Exhibit D -- Standard Landlord's Work – Phase 1**

**Darrot (vermaport)' Vertical Transportation Work**

## Construction Site Notes, and Work by Others

1. The ~~Owner~~ *Tenant* shall communicate to Darrott the make and type of Shopping Cart they intend to use on the VERMAPORT prior to manufacturing.

2. In the event that VERMAPORTs are to be installed adjacent to escalators, the ~~Owner~~ *Tenant* shall communicate to Darrott the make and type of Escalator they intend to use prior to manufacturing.

3. Architectural drawings and Escalator drawings shall be submitted to Darrott for review and coordination prior to manufacturing.

   In the event that VERMAPORTs are being installed in an existing building and/or adjacent to existing escalator(s), as-built drawings of the existing building / escalator(s) shall be submitted to Darrott.

4. Finished floor heights shall be within +/- 1/4" of those indicated on the Architectural drawings.

   In the event that VERMAPORTs are being installed in an existing building, the existing floor height shall be field verified by ~~Owner~~ and confirmed in writing to Darrott prior to manufacturing. *Landlord*

5. Permits, local taxes and levies are the responsibility of the ~~Owner~~. *Landlord. Tenant.*

6. Installation and maintenance of VERMAPORTs are the responsibility of the ~~Owner~~ *Tenant*, unless special arrangements have been made with Darrott.

7. Darrott recommends that ~~Owners~~ *Tenant* use their preferred Escalator Company to install and maintain VERMAPORTs.

8. ~~Owner~~ *Landlord* / Architect to provide in the final layout for sufficient free floor space at landings to facilitate safe and efficient traffic flow of shoppers with carts.

9. ~~Owner~~ *Tenant* or their designated representative(s) shall review VERMAPORT shop drawings and provide marked-up or approved copies within the requested timeframe.

10. ~~Owner~~ *Landlord* shall provide proper floor openings, wellways, support recesses, and pits in accordance with the VERMAPORT shop drawings. ~~Owner~~ *Landlord* shall be responsible for any required temporary or permanent railings, barriers, or partitions relating to the wellways or relating to the VERMAPORTs.

11. ~~Owner~~ *Landlord* shall provide adequate structural bearing supports on top and bottom landings in accordance with the VERMAPORT shop drawings. ~~Owner~~ *Landlord* shall also provide adequate structural bearing support for intermediate truss support(s) if required.

12. ~~Owner~~ *Landlord* shall provide 3-phase power supply to top landing area in accordance with the VERMAPORT shop drawings and specification. Power connection shall be made through a suitable fused disconnect switch meeting all local requirements.

13. ~~Owner~~ *Landlord* shall provide a 120VAC duplex receptacle located in the VERMAPORT drive compartment.

14. ~~Owner~~ *Landlord* shall provide suitable outer truss cladding to exposed surfaces of the VERMAPORT, unless special arrangements have been made with Darrott. Cladding material not to exceed 10lb/ft².

15. ~~Owner~~ *Landlord* to provide clear, uninterrupted and level access to VERMAPORT location to facilitate installation.

Please contact DARROTT at +1-973-639-0300 if you have any questions regarding these points.

© 2002 Darrott                                                     Rev. B (10/21/2002)





11/4/02

6

This Proposal is made subject to the following conditions

Quotations are subject to change after 60 days.

A mutually agreeable form of contract (fully executed before a manufacturing date can be established in our factory) which includes the following provisions:

Our indemnity obligation will be limited to the extent of our negligence.

We will warrant our work hereunder for one year from completion or acceptance for beneficial use, whichever is earlier. Such express warranty will be in lieu of all other warranties, express or implied, including any warranties of merchantability or fitness for a particular purpose, and our sole obligation under the warranty will be to correct any nonconformance within a reasonable time following notice.

We will not be liable in any event for direct damages in excess of the amount of our Subcontract, whether in contract or in tort, nor in any event for special, indirect, consequential or liquidated damages of default or delay.

The purchaser agrees to accept in satisfaction of insurance requirements for the project a standard Schindler Certificate of Insurance with "per occurrence" limits not to exceed $2 million. Schindler will not name additional insureds.

Partial waivers of lien for payments received by Schindler will be issued on a mutually agreeable form if the Purchaser so requests in writing. Schindler shall issue a full waiver of lien on a mutually agreeable form after the receipt of all monies to which it is entitled under this Agreement if the Purchaser so requests in writing.

Agreeable terms of payment shall be established in accordance with an agreed upon payment schedule as follows: 15% of the above sum upon presentation of initial invoice; 95% progress payments based upon work in place and materials delivered and stored on or off site; balance within 30 days of completion of work hereunder. Payment of 95% is a condition precedent to equipment turnover.

Work shall be performed by Schindler during regular working hours on regular working days, and overtime by Schindler will be compensated at Schindler's standard rates.

We shall not be liable for any loss, damage, detention or delay, due to any cause beyond our reasonable control or caused by fires, floods, labor troubles, strikes, lockouts, civil or military authorities or government regulations or restrictions or, in any event, for consequential damages. Dates for the performance or completion of work shall be extended to the extent of such delays.

In the case of delay in construction, you agree to pay for off-site storage of equipment and additional handling should on-site storage not be available. Our price assumes one mobilization.

If an inground borehole is required to accommodate the jack unit, our bid shall be based on the assumption that the hole is drilled in normal uncontaminated soil, sand or gravel, using a truck mounted drilling rig. Adequate access will be provided for this rig. Should latent or concealed conditions be encountered in the performance of the work below the surface of the ground or should concealed or unknown conditions in an existing structure be at variance with conditions indicated by the contract documents, or differ materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this contract be encountered, we will be compensated for all additional costs for labor and material to overcome such obstacles. The additional costs shall be the difference between our estimate for the bid and our actual cost incurred and shall be billed at our standard billing rate. The time to complete the installation shall be extended to include the additional time required to overcome these obstacles while drilling the hole.

Satisfactory reference as to credit must be furnished including bank and bonding company references.

You agree to pay, as an addition to the price stated herein, the amount of any tax, or increase of any tax, based upon the sale, use, ownership or possession of equipment imposed by any law enacted after the date of this proposal, or imposed upon you by any existing law.

Any proprietary material, information or data contained in any component or feature of this equipment remains the property of Schindler Elevator Corporation. This includes but is not limited to tools, devices, manuals, software, source codes, access codes, objects and passwords.

Our proposal does not include any provision for Prevailing Wages (Davis Bacon or State or Local jurisdiction). You must immediately notify Schindler Elevator Corporation if such provisions apply to this project.

## Preparatory Work

You agree to furnish the following in compliance with all local and state regulations in sufficient time in order not to delay the installation:

## Schindler Vertical Transportation Work

It is understood that the hoistways are to be prepared and properly enclosed, wiring is to be brought to our controller and other conditions, met, as noted in this proposal.

Sufficient data within thirty days after entering into the contract, including guarantee of the hoistway or wellway sizes and current characteristics to permit manufacture of all parts of the equipment.

A legal hoistway or wellway plumb from top to bottom within a variation of one inch per one hundred feet, and provided with sufficient clearance at the top and bottom of the shaft for proper installation of machinery, inside edge of door sill supports shall be parallel, level and plumb from the center line of the hoistway, with allowable variation of one quarter inch.

Suitable machine room of adequate size for the equipment, including proper ventilation, concrete floors or metal gratings and concrete foundations.

A pit of adequate depth provided with the necessary drains and waterproofing.

Adequate supports to carry the load of all equipment, including loads imposed by machine beams or overhead sheave beams, rail brackets, buffers, etc., as shown on our drawings.

Suitable connections from the power mains to our controller, plus necessary cutouts, line switches, lightning arresters, etc., as required to meet your local requirements.

Electric power of the same characteristics as the permanent supply for construction, testing and adjusting. Outlets at the center of hoistway for lighting the car.

Access doors to machine room and pit. Ladders to machine room, pit and buffers; also necessary guards, except cable guards and counterweight guards in the pit, all as required by applicable codes.

All cutting, patching and chasing of walls, beams, masonry, plastering work and painting, together with all repairs made necessary by such work.

Protection to hoistway or wellway during time equipment is being installed.

## Escalator Skirt Deflector Devices (Brushes):

The ANSI A17 Code ("Code"), which establishes elevator and escalator safety requirements, is in the process of being modified. Addenda A17.1d-2000 to ASME A17.1-1996 was published in November 2000. A new ASME A17.1-2000 Code Edition is expected to be published in early 2001 and a new revision of the ASME A17.3 for existing units is expected to be published in late 2001. All of these code changes incorporate new rules that address loaded gap and the potential for step to skirt entrapments. Although these Code revisions will be adopted by different states at various times, they will apply to both new and all installed escalators. Schindler Elevator Corporation strongly recommends the application of escalator skirt deflector devices, commonly referred to as "brushes", as the most effective method of complying with these new requirements. Furthermore, we encourage you to provide this information to your customer so he may make an informed decision regarding this important code change. In those states where these Code revisions are not yet effective, Schindler will work with the customer and local code authorities to help obtain any necessary variance.

For nominal 32-inch escalators (step width = 24"), installation of the brushes could create interference with strollers that passengers may improperly bring onto the escalators. We encourage customers to deploy a physical barrier (post, planter, etc.) spaced closer than 24 inches to discourage passage of strollers onto the escalator. These should be placed at the entry of the escalator, along with clear signage that forbids strollers and provides directions to elevators.

## Temporary Use

Should the service of the elevator(s) be required before final completion, you agree to pay for any labor and material required for us to arrange the elevator(s) for temporary service and agree to sign our temporary acceptance form and be bound by the terms and conditions thereof and pay all costs of the power and operation and leave the elevator equipment clean and in the same condition in which it was at the time it was placed in service.

Furthermore, you agree that the completion schedule of each elevator used by you before final acceptance shall be extended by the amount of time necessary (no less than the period of temporary usage), to complete the installation and make final adjustments during regular working hours. During said period of extension, you agree to allow us the uninterrupted use of the car.

You agree that you shall be responsible for any liability or damages arising from the temporary use and operation of the elevator.

Schindler O

7

**Exhibit D -- Standard Landlord's Work – Phase 1**
**Schindler Vertical Transportation Work**

**10/16/02**

(A)  "Ready" is defined to include the following work by other trades for the hydraulic elevators.

OR

"Ready" is defined to include work by others as shown in the plans and specifications, along with the following additional work by other trades for the hydraulic elevator(s).

(1)  Hoistway plumb – bracket supports and clear hoistway(s) (complying with OSHA) plumb from top-to-bottom with variations not to exceed 1-inch.

(2)  Power for construction (220 volt, single phase, for welders and hoists) and sufficient power to run elevators(s) at the same time (480 volts, 3 phase, 60 cycles). Machine room complying with code with disconnect switch(es) and power feeder(s) (brought to the elevator controller) to suit Schindler standard equipment.

(3)  Sump pump or drain in each elevator pit (cannot be connected directly to sewer).

(4)  If applicable, Schindler recommends that sound deadening material be provided between layers of sheet rock in all walls around machine rooms.

(5)  Sill support angles and channel frames for the freight elevator.

(6)  If steel framed hoistway with floor heights > 15'0", structural support at 8'0" to 15'0" (maximum) above finished floor level for Schindler entrance strut angles.

(7)  Grouting (immediately in sequence after Schindler installs entrances).

(8)  Barricades (per OSHA requirements).

(9)  Toe guards (per OSHA requirements).

(10)  Hoist beam(s).

(11)  Shaft wall installed on three (3) sides.

(12)  Uninterrupted use of hoistways(s) and machine room(s).

(13)  Dried-in hoistway(s) and machine room(s).

(14)  Machine room temperature between 55° and 90° F.

(15)  Location of holes(s) and removal of hole spoils after Schindler completes drilling.

(16)  If applicable, for remote machine rooms provide clear access above ceiling or furnish accessible trench in floor for "oil line and wiring duct" from machine room to elevator hoistway.

(17)  If applicable, divider beams between adjacent cars at all floor levels and in the overhead area.

(18)  If applicable, intermediate bracket supports between floor(s) as may be required.

(19)  The following work must be completed before elevator(s) are placed into automatic operation. (Prior to State Inspection):

- If applicable, field upfitting of interior cab walls.
- Finish cab flooring
- If applicable, smoke detectors with signals to elevator controllers(s).
- If applicable, emergency power generator and automatic transfer switch with capacity to run 1 elevator(s) at the same time.
- Bevel all hoistway(s) projections exceeding two inches (2").
- Pit ladder(s).
- Telephone instrument in cab(s). Phone must comply with ADA and be able to receive incoming calls per ASME A17.1, Rule 211.1.
- Seal all penetrations through 2-hour (or greater) rated walls with Code approved material.
- Per the 1993 National Electrical Code, cab light circuits, all receptacles installed in machine room, machinery space and pits must have Ground Fault Circuit Interrupter Protection (GFCI).
- Drywall liner behind all hall lanterns.
- Seal all penetrations through 2-hour rated walls with Code approval material.

(20)  If applicable, for Vertical Bi-Parting freight entrances, provide channel frames and sills at all openings along with separate disconnect switch and feeder to door control panel.

Schindler ☉

### Schindler Vertical Transportation Work
#### 10/16/02

B. Escalator wellway "Ready" is defined to include the following completed preparatory work by other trades:

OR

"Ready" is defined to include work by others as shown in the plans and specifications, along with the following additional work by other trades for the escalator(s).

(1) Properly framed openings in the floors, necessary supports for the truss per the manufacturer's drawings and information, the necessary enclosures, wellway railings, baffles and barricades around the wellway as required. Hoisting of trusses into place, using building roof supports by others, is necessary.
Landlord
~~Owner~~ should consider providing a drain or sump pump in lower wellway (pit) floor to prevent accumulation of water in the lower wellway.

When concrete supports are provided, coordinate with the escalator contractor, the location and installation of steel member required for truss attachment prior to the pouring of the concrete supports.

(2) Covering for the exterior of the escalator from the edges of the decks including covering for the truss and soffit. The materials used will be fire resistant as required by ANSI code and will weigh not more than ten (10) pounds per square foot.

(3) Arrangement for proper ventilation of the machine compartment and controller space.

(4) Finished flooring and its base over the escalator contractor's floor support.

(5) Permanent electric service, as hereafter specified, to the controller in the machine compartment, and wiring for lighting.

(6) Power feeders to the controller of each escalator.

(7) Temporary three phase power as required for construction testing and adjusting, of the same characteristics as the permanent power supply.

(8) Provide a light and single phase, 60-cycle lighting circuit run to combination receptacle and convenience outlets to be located at the top and bottom of the escalator.

(9) Any electric circuits and outlets for special use as required.

(10) Paint and finish all material other than that described in this specification.

(11) Per the 1993 National Electrical Code, all receptacles installed in machine rooms, machinery spaces and pits must have Ground Fault Circuit Interrupter Protection (GFIC).



Schindler Q

9









Exhibit E

Permitted Encumbrances

## I.   **EASEMENTS**

1.   Easement in favor of Autoridad de Energía Eléctrica. (Electrical Energy Authority)

   **[THIS EASEMENT ENCUMBERS PARCEL NO. 24,401]**

2.   Easement in favor of Autoridad de Acueductos y Alcantarillados de Puerto Rico, constituted pursuant to deed number 60 and 61 of August 18, 1972, executed before notary public Yolanda Pomales Alvarez.

   **[THIS EASEMENT ENCUMBER PARCEL NOS. 12,002 AND 24,401]**

3.   Easement to relocate Margarita Creek, constituted pursuant to deed No. 19, of November 29, 1963, executed before Notary Public Luis Dubón Jr.

   **[THIS EASEMENT ENCUMBER PARCELS NOS. 12,002 AND 24,401]**

4.   Parking Easement, constituted over **Parcel No. 12,002**, as dominant parcel for the benefit of **Parcel No. 24,401** as dominant parcel, as evidenced in deed number 31 of June 30, 1977, executed before Notary Public Jacobo Ortiz Murias.

5.   Parking Easement and restrictive covenants constituted over Parcel No. **12,006**, as evidenced in deed number 48, executed on September 27, 1993, before notary public Francisco González Nieto.

## II.   **MORTGAGES**

   Each reference to a mortgage, deed of trust, or other security instrument or lien in this Exhibit E are made subject to the provisions of Section 17.3 or Subsection 2.3.1(f) of the Lease.

1.   First Mortgage to secure two (2) promissory notes, the first, a promissory note in the principal amount of $22,605,000.00 and the second, a promissory note in the amount of $18,040,000.00 for a total aggregate amount of $40,645,000.00, as evidenced in deed number 149, executed on December 21, 1993, before notary public Luis E López Correa and deed number 2, executed on May 31, 1995,  before Notary Javier D. Ferrer Fernández.

   **[THIS MORTGAGE ENCUMBERS PARCELS NO. 12,002, 12,006 and 24,401]**




2.   Mortgage to guarantee three (3) promissory notes, the first in the principal amount of $1,300,000.00, the second in the principal amount of $800,000.00 and the third in the   principal amount of $2,663,298.52 for a total aggregate amount of $4,763,298.52, as evidenced in various deeds and

E-1

deed no. 15, executed on June 30, 1977, before Notary José Garrido Monge.

**[THIS MORTGAGE ENCUMBERS PARCEL NO. 24,401]**

III. **LEASES**

1. Ground Lease and edification right (□air rights□) in favor of TWENTY FIRST CENTURY REALTY OF CAPARRA, S.E. for the construction of a 6,335 square feet building, as evidenced in deed number 3, executed on April 17, 1999, before Notary Luisa M Vega Gutiérrez, as amended by deed number 37 of October 8,1999, executed before Notary Noel González Abella.

   **[THIS LEASE ENCUMBERS PARCEL NO. 12,002]**

2. Lease Agreement entered into by and between Caparra Center Associates, S.E., as Lessor and Twenty First Century Realty of Caparra, S.E., as evidenced in deed number 38, executed on June 1, 1988, before Notary Public Luisa M. Vega Gutiérrez and deed number 2, executed on April 17, 1991, before Notary Francisco González Nieto.

   **[THIS LEASE ENCUMBERS PARCEL NO. 12,002]**

3. Leasehold Mortgage constituted over the Lease Agreement referred to in paragraph two (2) the edification built pursuant to said Lease Agreement, as evidenced in deed number 5, executed on April 17, 1991, before Notary Paul René Cortés Rexach.

   **[THIS LEASEHOLD MORTGAGE ENCUMBERS PARCEL NO. 12,002]**

4. Lease Agreement, entered into Kinney Shoe Corp., as Lessor and Caparra Center Associates, S.E., as Lessee, as evidenced in deed number 8, executed on March 18, 1995, before Notary Miguel E Miranda Gutiérrez.

   **[THIS LEASE ENCUMBERS PARCEL NO. 12,002, 12,006 and 24,401]**

5. Lease Agreement entered into by and between Golden Arch Development Corporation, as Lessee (and assignee of Premium Cream Corporation), as evidenced in deed number 149, executed on December 9, 1999, before Notary Raúl J. Vilá Sellés, as amended by deeds number 150 and 203 of December 9, 1999 , and December 22, 1999, respectively, of said notary public.

   **[THIS LEASE ENCUMBERS PARCEL NO. 12,002]**

6. Lease Agreement entered into by and between Caparra Center Associates, S.E. as Lessor, and Caribbean Restaurants, Inc., as Lessee, as evidenced in deed number 9, executed on February 24, 1995, before Notary Alberto Cayetano Rodríguez.

   **[THIS LEASE ENCUMBERS PARCEL NO. 12006]**




E-2

7. Lease Agreement entered into by and between Caparra Center Associates, S.E. as Lessor, and Walgreens San Patricio, Inc., as Lessee, as evidenced in deed of protocolization of lease number 81, executed on July 9, 1980, before Notary Estela I. Vallés, as amended by deed number 64, executed on December 15, 1993, before Notary Hernán Cestero Rodríquez.

**[THIS LEASE ENCUMBERS PARCEL NO. 24,401]**

8. Lease Agreement entered into by and between Caparra Center Associates, S.E. ,as Lessor, and Caribbean Restaurants, Inc., as Lessee, as evidenced in deed number 10, executed on February 24, 1995, before Notary Alberto Cayetano Rodríguez.

**[THIS LEASE ENCUMBERS PARCEL NO. 24,401]**

9. Leasehold Mortgage constituted pursuant to deed number 24, executed on October 8,1996, before Notary Leopoldo J. Cabassa Saurí

**[THIS LEASEHOLD MORTGAGE ENCUMBERS PARCEL NO. 24,401]**

10. Leasehold Mortgage constituted pursuant to deed number 25, executed on October 8,1996, before Notary Leopoldo J. Cabassa Saurí

**[THIS LEASEHOLD MORTGAGE ENCUMBERS PARCEL NO. 24,401]**

The inclusion of the foregoing memoranda of leases within these ⬭Permitted Encumbrances⬭ is for informational purposes only, and shall not be deemed to diminish any of Tenant⬭s rights, or increase any of Tenant⬭s obligations, under this Lease.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.



E-3

## Exhibit F

### Tenant's Signage



F-1



SAN PATRICIO, PR
EXHIBIT F
FRONT BLDG. SIGN
(1 OF 9)

TUBE SUPPORT W/PAD ON Z-BRACKET
.090 ALUM. BACK(s)-STAPLED
CONDUIT, CONN. AND STRAIN RELIEF
DISCONNECT SWITCH
STD. TRANSFORMER (60MA IN COLD WEATHER) (SEE ELECTRICAL SPECS)
.063 ALUM. RETURNS (SEE COLORS)
1" JEWELITE (SEE COLORS)
LEXAN FACE(s) (SEE COLORS)
15MM NEON 3" O.C. - TURNBACK
W/ELECTRO-BITS BOOTS (SEE COLORS)
EQUIPMENT GROUND REQ'D
3/8" THREADED ROD OR LAG BOLT-AS REQ'D.
1/4"Ø WEEP HOLES
SILICONE BEAD AROUND INTERIOR SEAM

TYPICAL SELF-CONTAINED DETAIL
SCALE: NTS

ELECTRICAL SPECS:
☐ RED NEON / 30mA TRANSFORMER(S)
AMPS: 35.65
# OF 20 AMP CIRCUITS (RECOMMENDED): 3
VOLTS: 120

■ WHITE NEON / 30mA TRANSFORMER(S)
AMPS: 37.5
# OF 20 AMP CIRCUITS (RECOMMENDED): 3
VOLTS: 120

☐ WHITE NEON / 60mA TRANSFORMER(S)
AMPS: 66.4
# OF 20 AMP CIRCUITS (RECOMMENDED): 5
VOLTS: 120

28'-0"

3'-4¾"
7'-0"
2'-8¼"

COLORS:
FACES:
(FACE COLOR TO BE DETERMINED BY LOCATION)
☐ 3/16" 7328 WHITE PCB   ☐ 3/16" 2793 RED PCB
RETURNS:
OUTSIDE:
☐ #313 DARK BRONZE   ☐ BLACK
INSIDE:
☐ WHITE
■ PAINT WHITE
RETAINER:
1" TRIMCAP (COLOR TO MATCH RETURNS)

NOTES:
MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR
SECURING THE TRIM AND FACE TO THE SIGN BODY. THE
MAXIMUM SPACING SHALL NOT EXCEED 1'-6" AND NO
FEWER THAN (4) FOUR SCREWS ARE TO BE USED PER
FACE. SHELLAC IS TO BE APPLIED TO EACH COPPER WIRE
TIE TO PREVENT LOOSENING OF THE WIRE TIE.
ALL SIGNAGE WILL BE U.L. LISTED AND CARRY U.L. LABELS.
**EQUIPMENT GROUND REQUIRED.
ACTUAL # OF CIRCUITS TO BE DETERMINED BY A LICENSED
ELECTRICAL CONTRATOR.

THE INFORMATION CONTAINED IN THIS DRAWING IS THE SOLE PROPERTY
OF COLLINS SIGNS. ANY REPRODUCTION IN PART OR WHOLE WITHOUT
THE WRITTEN PERMISSION OF COLLINS SIGNS IS PROHIBITED.

COLLINS SIGNS

CUSTOMER
BED BATH & BEYOND
PAGE NAME
PRESENTATION
ITEM DESCRIPTION
7'-0" X 28'-0" STACKED LAYOUT SELF-CONT. CHNL

ITEM NUMBER
BED12601

BED12601





# BED BATH & BEYOND

SAN PATRICIO, PR

EXHIBIT F

(3 OF 9)

EXTERIOR CANOPY SIGN *
INTERIOR MALL SIGN **

COLORS:
FACES:
(FACE COLOR TO BE DETERMINED BY LOCATION)
RETURNS:
☐ 3/16" 7328 WHITE PCB   ☐ 3/16" 2793 RED PCB
OUTSIDE:
■ #313 DARK BRONZE   ☐ BLACK
INSIDE:
☐ WHITE   ■ PAINT WHITE
RETAINER:
1" JEWELITE (COLOR TO MATCH RETURNS)

NOTES:
MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR
SECURING THE TRIM AND FACE TO THE SIGN BODY. THE
MAXIMUM SPACING SHALL NOT EXCEED 1'-6" AND NO
FEWER THAN (4) FOUR SCREWS ARE TO BE USED PER
FACE. SHELLAC IS TO BE APPLIED TO EACH COPPER WIRE
TIE TO PREVENT LOOSENING OF THE WIRE TIE.
ALL SIGNAGE WILL BE U.L. LISTED AND CARRY U.L. LABELS.
**EQUIPMENT GROUND REQUIRED.
ACTUAL # OF CIRCUITS TO BE DETERMINED BY A LICENSED
ELECTRICAL CONTRATOR.

ELECTRICAL SPECS:
☐ RED NEON / 30mA TRANSFORMER(S)
AMPS: 15.35
# OF 20 AMP CIRCUITS (RECOMMENDED): 1
VOLTS: 120
■ WHITE NEON / 30mA TRANSFORMER(S)
AMPS: 17.36
# OF 20 AMP CIRCUITS (RECOMMENDED): 2
VOLTS: 120
☐ WHITE NEON / 60mA TRANSFORMER(S)
AMPS: 33.01
# OF 20 AMP CIRCUITS (RECOMMENDED): 3
VOLTS: 120

.063 ALUM RETURN
INTERIOR WHITE
EXTERIOR (SEE COLORS)
1" JEWELITE (SEE COLORS)
TUBESUPPORT W/PAD
ON Z-BRACKET (AS REQ'D)
LEXAN FACE(s) (SEE COLORS)
.090 ALUM BACK(s) - STAPLED
15MM NEON 3" O.C. (SEE COLORS)
ELECTRICAL CONDUIT, STEELFLEX
CONNECTOR AND STRAIN RELIEF
TURNBACK NEON
W/ELECTRO-BITS BOOTS
EQUIPMENT GROUND REQ'D
DISCONNECT SWITCH
STANDARD TRANSFORMER
60MA IN COLD WEATHER
(SEE ELECTRICAL SPECS)
1/4"⌀ THREADED ROD OR
LAG BOLT - AS REQ'D
1/4" WEEP HOLE

12'-0"
WHIPS

SILICONE BEAD AROUND
INTERIOR SEAM

LETTER MOUNT CROSS SECTION
SCALE: NTS

COLLINS SIGNS

CUSTOMER
BED BATH & BEYOND
PRESENTATION

ITEM DESCRIPTION
2'-0" LINEAR LETTERS
SELF - CONTAINED

DRAWING
BED14201



# BED BATH & BEYOND

## COMING SOON

8'8"

4'8"

■ 3M Tomato Red Vinyl

■ 3M Black Vinyl

Indicates 40"x 80" visible opening.

CUSTOMER ACCEPTANCE:

DATE: 2/15/01

Bed Bath & Beyond Spanish vinyl banners:
-Black and 3M Tomato Red two color graphics.
-Single face decoration on 13oz. Vinyl.
-No Finishing
-Quantity (2)
-Unit Cost = $ 270.00 x 2 = $ 540.00

### CORPORATE IDENTIFICATION SOLUTIONS

| CUSTOMER BED BATH & BEYOND | SIZE 4'8" x 8'8" | DATE 02/14/01 |
| LOCATION VARIOUS | COLORS PMS Red 187 Black | SCALE 1"=1'0" |



**BED BATH & BEYOND**

**PRONTA APERTURA**

8' 8"

4' 8"

■ 3M Tomato Red Vinyl

■ 3M Black Vinyl

Indicates 4'0" x 8'0" visible opening.

*Bed Bath & Beyond Spanish vinyl banners:*
- Black and 3M Tomato Red two color graphics.
- Single face decoration on 13oz. Vinyl.
- No Finishing
- Quantity (2)
- Unit Cost = $270.00 x 2 = $540.00

CUSTOMER ACCEPTANCE:

X _____

SAN PATRICIO EXHIBIT F (9 OF 9)

DATE: 2/15/09

| CUSTOMER | SIZE | DATE |
|---|---|---|
| BED BATH & BEYOND | 4' 8" x 8' 8" | 02/14/01 |
| LOCATION | COLORS | SCALE |
| VARIOUS | PMS Red 187 / Black | 1" = 1'0" |

**CORPORATE IDENTIFICATION SOLUTIONS**



Bed Bath & Beyond Spanish Vinyl Banner:
- Qty (1)
- 18 oz. white opaque blockout substrate.
- 3M Tomato red, and 3M black (2) color vinyl graphics.
- Double face decoration.
- 1" hem along edges. Grommets every 4'.
- (4) Windslits in the banner.
- Unit Cost = $ 1070.00 × 2 = $ 2,140.00

| CUSTOMER | SIZE | DATE | | | |
|---|---|---|---|---|---|
| Bed Bath & Beyond | 6' x 30' | 02/14/01 | | | |
| LOCATION | COLORS | SCALE | | | |
| VARIOUS | (SEE NOTE) | NO SCALE | | | |

CORPORATE
IDENTIFICATION
SOLUTIONS

CUSTOMER ACCEPTANCE:

DATE:  2/15/01



**ABIERTO AHORA**

**EMPLEAMOS AHORA**

3M Tomato Red Vinyl

Side A

Side B

4'-0"

20'-0"

40"

_Bed Bath & Beyond Spanish Vinyl Banner:_
- Qty (1)
- 18 oz. white opaque blockout substrate.
- Red (PMS# 187 C) one color graphics.
- Double face decoration.
- 1" hem along edges. Grommets every 4'.
- (4) Windslits in the banner.
- Unit Cost = $750.00 x 2 = $1,500.00

OK

CORPORATE
IDENTIFICATION

CUSTOMER ACCEPTANCE:

X

DATE: 2/15/11

| CUSTOMER BED BATH & BEYOND | | |
|---|---|---|
| LOCATION | | |
| SIZE AS SHOWN | DATE 0206/01 | |
| COLORS | SCALE | |



# GRAND OPENING

SIDE 1

6'-0"

30'-0"

# BED BATH & BEYOND

# COMING SOON!

SIDE 2

*Bed Bath & Beyond Spanish Vinyl Banner*

- Qty (1)
- 18 oz. white opaque blockout substrate.
- 3M Tomato red, and 3M black (2) color vinyl graphics.
- Double face decoration.
- 1" hem along edges. Grommets every 4'.
- (4) Windslits in the banner.
- Unit Cost = $ 1070.00  x  2 =  $2,140.00 .

| CUSTOMER | SIZE | DATE |
|---|---|---|
| Bed Bath & Beyond | 6' x 30' | 02/14/01 |
| LOCATION: | COLORS | SCALE |
| VARIOUS | (SEE NOTE) | NO SCALE |

CORPORATE IDENTIFICATION SOLUTIONS

CUSTOMER ACCEPTANCE:

SAN PATRICIO EXHIBIT E (6 OF 9)

DATE: 2/15/01

# SIGN DESIGN CRITERIA 

SIGNAGE CRITERIA HAS BEEN FORMULATED WITH THE INTENT OF GUARANTEEING A QUALITY "GRAPHIC DESIGN" IN THE BEST INTEREST OF ALL TENANTS.

RECOMMENDED SIGN TYPES ARE AS FOLLOWS:

A. Reverse (back lit) illuminated individual letters.

B. Neon exposed.

C. Routed metal with plastic facing internally illuminated letters.

D. Signage using fibre optics.

E. Back lit routed letters at flush fascia.


SIGN TYPES NOT ALLOWED ARE AS FOLLOWS:

A. Sign boxes.

B. Signs with visible fasteners or unfinished edges.

C. Non lit signs, blinking, molded plastic signs.

D. Exterior signs unless specifically allowed by the Landlord.

E. Illuminated panels with mounted letters.

SAN PATRICIO  EXHIBIT F-1  (1 OF 2)

# SIGN DESIGN CRITERIA



### GENERAL NOTES

Only Tenant Trade name as noted in the lease is allowed.  No other image such as Logos, products or services may be part of the store sign unless approved in writing by landlord.

Signs shall be scaled as an integral part of the storefront design.

~~All tenant signs are subject to Landlord approval.  Tenant sign contractor is required to submit sign shop drawings for approval~~.

Exposed neon level of brightness is subject to Landlord approval.

~~Signs may be a total maximum of 18" in height.  Nonetheless signage must be proportional to the storefront design and the store width. The Landlord may request a smaller sized sign~~.

All electrical signs shall be UL labeled and comply with national and local electrical codes.

No exposed conduits are allowed.

Angle clips are not allowed in the case of signs detached from background panel.  Only threaded rods and anchor bolts are allowed.

Only one sign is allowed per tenant Mall facade.

All illuminated signs must be lit during Mall operations hours, as per the lease agreement.





Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
AGREEMENT, made as of the __13__ day of December, 2002, by and between **Banco
Santander Puerto Rico**, a bank operating under the laws of the Commonwealth of Puerto
Rico, having an office at 207 Ponce de León Avenue, Hato Rey (San Juan), Puerto Rico, as
Trustee for the holders of AFICA bonds issued on December 21, 1993 and May 31, 1995,
by Caparra Center Associates, S.E., a limited partnership that owns the shopping center
known as San Patricio Plaza, (the *"Mortgagee"*) and Bed Bath & Beyond Inc., a **New York**
corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the
*"Tenant"*).

WITNESSETH:

WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage"*) covering a
parcel of land owned by Caparra Center Associates, S.E., a limited partnership organized
under the laws of the Commonwealth of Puerto Rico (the *"Landlord"*) together with the
improvements to be erected thereon (said parcel of land and improvements thereon being
hereinafter referred to as the *"Shopping Center"* and being more particularly described on
Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant
dated as of November 13, 2002 (the *"Lease"*), Landlord leased to Tenant a portion of the
Shopping Center, as more particularly described in the Lease (the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
which is hereby acknowledged; and

———————————

WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section
2.3.1/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining
this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
the non-disturbance of Tenant by the holder of the Mortgage; and

———————————

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the
Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.

———————————

NOW, THEREFORE, in consideration of the premises and of the mutual covenants
and agreements herein contained, the parties hereto, intending to be legally bound hereby,
agree as follows:

1. Mortgagee hereby consents to and approves the Lease and the term thereof,
including the options to extend the term as set forth in the Lease, and covenants and agrees
that the exercise by Tenant of any of the rights, remedies and options therein contained shall
not constitute a default under the Mortgage.

2. Tenant covenants and agrees with Mortgagee that the Lease hereby is made
and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and
to all modifications, extensions, substitutions and reconstitutions thereof (and such

subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3. Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a) Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b) The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c) Subject to and to the extent permitted by the Mortgage and other related security documents of the AFICA bonds, all condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4. If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a) Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b) Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i) liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)       subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)       subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)       bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)       bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)       Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.       Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease. It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.       Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.       Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A.,

-3-

Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07601, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.   This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.   This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.   This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

ATTEST:

[Corporate Seal]

_____
(Assistant) Secretary

MORTGAGEE:
BANCO SANTANDER PUERTO RICO

By: _____
Print Name: _____
Print Title: _____

TENANT:

ATTEST:

[Corporate Seal]

_____
(Assistant) Secretary
Alan M. Freeman

BED BATH & BEYOND INC.

By: _____
Warren Eisenberg
Co-Chief Executive Officer

AFFIDAVIT NO.   282

Acknowledged to and subscribed before me by José Gabriel Díaz , of legal age, married, executive , and a resident of San Juan , Puerto Rico, as representative of Banco Santander Puerto Rico, personally known to me in San Juan, Puerto Rico, this 30th day of January , 2003.

Notary Public

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

STATE OF NEW JERSEY)
                                   ) : ss.
COUNTY OF UNION        )

On this 18th day of _February_ , 2003, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_Angela M Leary_
Notary Public

My Commission Expires:

Angela M Leary
Notary Public of New Jersey
My Commission Expires July 9, 2007

_July 9, 2007_

### Exhibit H

### Form of Subtenant Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 2002, by and between CAPARRA CENTER ASSOCIATES, SE, a Puerto Rico special partnership, having an address at P.O. Box 9506, San Juan, Puerto Rico 00908-0506 (*"Landlord"*); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*); and _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ (*"Subtenant"*).

## R E C I T A L S :

A.    Landlord and Tenant have entered into a certain lease (the *"Lease"*) dated as of November__, 2002, of which has been recorded in the Registry of Property of Puerto Rico, which demises certain premises (the *"Premises"*) located in the San Patricio Plaza Shopping Center, Guaynabo, Puerto Rico, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.    Section 15.5 of the Lease provides that in the event Tenant subleases all of the Premises, which sublease satisfies certain other conditions set forth therein, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease.

C.    Pursuant to a Sublease dated as of _____ (the *"Sublease"*), Tenant has subleased the Premises to Subtenant (the *"Subleased Premises"*).

D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises, subject to the occurrence of the conditions related in paragraph No. 4 below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(i)    that it is the fee owner of the Premises,

(ii)    that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(iii)    that the Initial Term of the Lease expires on _____, but is subject to three renewal periods of five years each and

(iv)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.    Landlord hereby acknowledges receipt of a copy of, and consents to the Sublease and all of the terms, covenants and provisions thereof, subject to the provisions of Section 15.5 of the Lease and any other applicable provisions of the Lease.

3.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or



H-1

otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

4.     In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease (which in any event shall not exceed those provided in the Lease) for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, so long as Subtenant attorns to Landlord as Tenant under the Lease and assumes and adopts the Lease as its own in substitution for the Sublease, all in accordance with the terms and conditions of Section 15.5 of the Lease, then Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Premises or be disturbed or in any way interfered with, and the Lease shall continue in full force and effect as a direct lease between Landlord and Subtenant, as tenant under the Lease (provided, that in such event, Subtenant shall, for the then remainder of the term of the Lease that it will assume in substitution of the Sublease, pay Fixed Rent and Additional Rent in an amount equal to the greater of (x) the Fixed Rent and Additional Rent then payable under the Lease, or (y) the fixed rent and additional rent then payable under the Sublease).

5.     Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07601, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

6.     No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

7.     This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.



H-2

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

LANDLORD:

**CAPARRA CENTER ASSOCIATES, SE**

By:_____
    Print Name:_____
    Print Title:_____

TENANT:

**BED BATH & BEYOND INC.**
By:_____
        Warren Eisenberg
        Co-Chief Executive Officer

SUBTENANT:

_____
By:_____
    Print Name:_____
    Print Title:_____



H-3

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

**[JURAT FOR PARENT:]**

STATE OF NEW JERSEY    )
                                ) : ss.
COUNTY OF UNION        )

       On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond INC., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                                _____
                                              Notary Public

My Commission Expires:

_____



H-4

<u>Exhibit I</u>

<u>Form of Delivery Date Notice</u>

# Caparra Center Associates, SE

**P.O. BOX 9506 * SAN JUAN, PR 00908-9506 * TEL. (787) 792-5328 * FAX (787) 782-9555**

July 17, 2003

*Exhibit I*

Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attn: Warren Eisenberg

**Re: Agreement of Lease, dated November 13, 2002 (the "Lease"), between Caparra Center Associates, S.E., as landlord ("Landlord"), and Bed Bath & Beyond, Inc., as tenant ("Tenant"), with respect to certain retail premises (the "Premises") located in the San Patricio Plaza Shopping Center, Guaynabo, Commonwealth of Puerto Rico.**

Gentlemen:

In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby informs the Tenant that the Delivery Date shall take place at 8:00 a.m. on October 20, 2003. This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of the Lease.

CAPARRA CENTER ASSOCIATES, S.E.

By: _____
Humberto R. Charneco, President

sml

c Edward M. Schotz, Esq.
Allan N. Rauch, Esq.
David Cameron
Edelberto Carrerá
Roberto Bustillo





# Caparra Center Associates, SE

P.O. BOX 9506 * SAN JUAN, PR 00908-9506 * TEL. (787) 792-5328 * FAX (787) 782-9555

October 16, 2003

Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, New Jersey  07083
Attn:  Warren Eisenberg

**Re: Agreement of Lease, dated November 13, 2002 (the "Lease"), between
Caparra Center Associates, S.E., as landlord ("Landlord"), and Bed Bath &
Beyond, Inc., as tenant ("Tenant"), with respect to certain retail premises
(the "Premises") located in the San Patricio Plaza Shopping Center,
Guaynabo, Commonwealth of Puerto Rico.**

Gentlemen:

In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
Conditions (as defined in the Lease) have been satisfied, and that, as a result, the
Delivery Date (as such term is defined in the Lease) will be deemed to be
October 20, 2003.  This notice shall constitute the Delivery Date Certification referred to
in Subsection 2.3.3 of the Lease.

CAPARRA CENTER ASSOCIATES, S.E.

By: _____
Roberto González, Executive Vice President

sml

c Edward M. Schotz, Esq.
  Allan N. Rauch, Esq.
  David Cameron
  Edelberto Carrerá
  Roberto Bustillo

J-1



Exhibit K-1

Existing Exclusives



EXHIBIT K-1
EXISTING EXCLUSIVES

KMART

**Landlord's Covenant**

18. Landlord covenants, represents and warrants that, within the confines of the area of the Commercial Development described in Exhibit "A" and upon any other premises within the "restricted radius" of the land described in said Exhibit "A" now or in the future owned or controlled, directly or indirectly, by Landlord, Landlord's principal stockholders, directors or officers, or their assignees or vendees, no premises (other than Tenant's store unit) shall be leased, rented, used or occupied for the operation or conduct of a "variety store" or "junior department store" or "cut-rate store" or "discount store". This covenant shall run with the land commencing with the date of execution of this lease and shall continue until such date as shall be the last day of the lease term or extension or renewal thereof; provided, however, this covenant shall cease and determine and be of no further force or effect in the event that either (a) subsequent to the commencement of the lease term, said store unit shall cease to be used for the operation of a cut-rate store or discount store or any store managed by Tenant for a period of six (6) consecutive months, excluding temporary interruptions of said operation because of causes beyond Tenant's control, or (b) said date of occupancy described in Article 10 hereof shall not occur prior to such date as shall be seven (7) years from the date of the execution of this lease. The terms "variety store" and "junior department store", as used herein, shall be any store similar to the type operated by Tenant under the name and style of "S. S. Kresge" and shall include, by manner of illustration and not by manner of limitation, stores operated by F. W. Woolworth Co., Neisner Brothers, Inc., W. T. Grant Company, J. J. Newberry Co., G. C. Murphy Company, S. H. Kress & Co., Rose's 5-10-25¢ Stores, Scott Stores, Butler Bros., Sprouse-Reitz Co., Inc., Heated Stores Co. and McCrory-McLellan-Green Stores Corporation. The terms "cut-rate store" and "discount store", as used herein, shall include, by manner of illustration and not by manner of limitation, stores operated under any of the following names: Arlan's Department Store, Atlantic Mills, Atlas Shoppers World Bargain City (U.S.A.), Clark's, Family Fair, Fashion Fair, J. M. Fields, Giant Tiger, Grant Store, Grant Department Store, Grandway Stores, G.M.S. Stores, Jubilee City, King's Department Stores, Mason's, Maxam's, Miracle Mart, Shopper's City, Shopper's Fair, Shoppers World Stores, and Spartan Discount Department Stores, or any store of similar operation, regardless of the size thereof. The term "restricted radius", as used herein, shall be a radius of thirty-five hundred (3500) feet with respect to a "variety store" or "junior department store", and a radius of ten (10) miles with respect to a "cut-rate store" or "discount store". (Continued as Article 18-A in Rider)

**LANDLORD'S COVENANT (Cont'd)**

ARTICLE 18-A - It is understood and agreed between the Landlord and Tenant that the following projects in which certain principals of the Landlord corporation have an interest shall be specifically excluded from the restricted radius: (i) the land in College Park planned to be used as a small shopping center which borders on the "restricted radius", (ii) the Borinquen Tower development located within the "restricted radius" after the first 5 years of the herein lease term.

It is further understood and agreed between the Landlord and Tenant with respect to Article 18, that in no event are the provisions

**LANDLORD'S COVENANT (Cont'd)**

therein to be deemed to prohibit (and the same is hereby expressly permitted) the leasing of space within the commercial development described in Exhibit "A" in a location shown on Exhibit "B" as "Department Store" to anyone of the following department stores: (i) New York Department Store, (ii) International Department Store, (iii) Belk-Lindsey Department Store, (iv) Gonzalez Padin, or (v) Velasco; EXCEPT THAT in no event is such other department store ever on the ground floor and 4000 square feet in the basement to have more than 28,000 square feet of gross area/in its said store without the prior written consent of the Tenant.

1 of 4

# WALGREENS

8. **Exclusives and Restrictions:** A. Landlord covenants and agrees that, during the continuance of this lease, no other portion of the entire property shown on said attached plan will be used for the operation of a drug store or a so-called prescription pharmacy or for any other purpose requiring a qualified pharmacist. This provision shall also apply to any additional property which Landlord, directly or indirectly, may now or hereafter own or control, and which may be adjacent to said Shopping Center, or which may be added to or used in conjunction therewith. The provisions of this Article shall not be applicable to the operation of a prescription department or the services of a qualified pharmacist in connection with the business referred to in subsection (2) of Section A of Article 7 and also shall not be applicable if the leased premises are sublet in their entirety for other than a drug store.

B. Tenant shall not display for sale or sell Christmas trees on the leased premises.

7. **Other Occupancies:** A. It is expressly understood and agreed that the installation in said Shopping Center of — —

(1) A Pueblo super food market with a floor area of at least 17,275 square feet and located as shown on attached Exhibit B;

(2) An S. S. Kresge Co. "K-Mart" department store with floor area of at least 50,000 square feet and located as shown on attached Exhibit B;

(3) An Edison Brothers Stores, Inc. or a Melville Shoe Co. "Thom McAn" shoe store with a floor area of at least 8,000 square feet and located as shown on attached Exhibit B, are each primary inducements to Tenant in entering into this lease and agreeing upon the rentals herein reserved. Therefore, it is a further express condition of this lease that Landlord shall furnish and deliver to Tenant, at or before the time for the giving of the notice of possession provided for in Article 3, evidence reasonably satisfactory to Tenant, that leases, each for a term of at least ten years firm, and commencing in accordance with the terms thereof, have been consummated for the installation and operation of all of the businesses above described, in the respective stated locations; but if Landlord fails to furnish and deliver such evidence to Tenant within the time above specified, Tenant shall have the right and option, at Tenant's election, to cancel and terminate this lease.

PUEBLO

### Section 9. Other Food Stores. Landlord agrees
that it will not enter into a lease for any other por-
tion of the Shopping Center for use:

    (i)    as a supermarket;

    (ii)   as a grocery store; or

    (iii)  for any other operation the principal
          business of which is the sale of food
          to be consumed off the premises, ex-
          cept for any one or more of the fol-
          lowing:

    (a)   ice cream shops;

    (b)   so-called nature or health food shops;

    (c)   one bakery, so long as the sales area
          thereof shall not exceed 1,200 square feet.

## CASTLE BOOKS

**1.28    LIMITED EXCLUSIVITY:** *Landlord agrees that at all times while this Lease is in force, and Tenant is operating continuously the Leased Premises as set forth in SECTION 1.15, it shall not enter into any other lease, license agreement or other contract or arrangement of any kind whatsoever (other than with Tenant) with respect to any part of the area recognized as Phase Two (2) of Landlord's Master Plan for the Shopping Center, which permits the operation of a general book store, exempting existing tenants at the Shopping Center. Description of Phase Two (2) is attached hereto as Exhibit H.*

## PAYLESS

**1.26    LANDLORD'S OBLIGATION NOT TO LEASE:** *Landlord hereby warrants that it will not, directly or indirectly, enter into a lease agreement for the operation of a self-service shoe store, such as "FAYVA" or "PIC N' PAY" shoe store, for example, during Phase I or Phase of Landlord's current Master Plan development, which has been provided and explained to Tenant.*

## PRECIOSA

**1.28    OTHER CONDITIONS:**

*1   Landlord agrees that it will not enter into another Lease Agreement for a perfume and cosmetic shop through Phase I and Phase II of Landlord's current Master Plan which includes an additional 150,000 square feet of Gross Leasable Area nor will allow any existing tenants of the Shopping Center to change the use of their leases exclusively to a perfume and cosmetic shop through said phases of Landlord's Master Plan.*





4 of 4

Exhibit K-2

Existing Leases



K-2-1

## Exhibit K-2
## Existing Leases

Abreu & Iglesias CPA
Actualite
Agencia Bithorn
Agencia Hipica
Amado Salón de Belleza I
Amado Salón de Belleza II
America On Line
Arrivederci
AT&T Wireless
Autoridad de Acueductos
Bag Bazaar
Baked Potato
Bambi
Banco Popular de PR
Banco Santander de PR
Barberia San Patricio
Beauty Factory
Big Time
Bostonian
Burger King 185
Burger King 8840
Calzado Pimpolin
Candy Box
Capri
Cardonne
Caribbean Cinemas
Casa de los Tapes
Casa Linda
Castle Books
Casual Street
Champs
Charell Boutique
Chili's Grill & Bar
Cingular Wireless E7
Cingular Wireless K7
Click
Clubman
Cooperativa A/C Caparra
Cooperativa de Seguros Multiples
Cosmetic Café
Credenciales/Resume
David's Cookies
Dr. C.Rodriguez Arrillaga
Electronics Boutique
Envolturas & Llaves
Epiko
Epiko Kids
Equis
Esquire Dry Cleaners
Esso
Exentrix
Eye Center
Femenina
Flamer's Grill
Flower Pavillion
Foot Action
Frivola
Galería Labrador
Gordon's Jewelry
Grabados Modernos
Infinito
International Safe Deposit

Island Finance
Italics
Jeans World
Joyería Caché
Kazual
Kentucky Fried Chicken
Kiosko Centro
Kitty Land
Kmart
Kress
Kress Kids
Kress X
La Batida
La Defensa
La Estrella
La Gran Discoteca
La Muñequita
La Parrilla Argentina
La Providencia
Local's Only
Longhorn Steakhouse
Magali Febles Salon
Marianne & Marianne Plus
Marisqueria Atlantica
Martorell Brothers, Inc.
Me Salve
Metro Comics
MoviStar
Mr. Pretzels
Music Authority
Nadja M
Nous Boutique
Nuova Moda
Ofi-Arte
Oriental Star
Park Avenue Café
Payless Shoe Source
Pearle Vision Center
Piercing Pagoda
Pollo Tropical
Ponderosa
Preciosa
Pueblo International
Puerto Rico Telephone Co.
Raul Hernandez
Reggio Pizza
Renovaciones Licencias
R-G Premier Bank
Romano's Macaroni Grill
Salon de Oro Bared
San Patricio Realty
Savvy Kids
Shampoo Store
Speedo
Sporto
Sprint Store Express
Spy Gallery
Starbucks Café
Stop N' Play
Super Pet Center
Sweet Ann Cakes
Taco Bell

Teatrocentro
Tivoliny
Travisa de PR
Ultra
Valija Gitana
Verizon Wireless
Vertigo
Vivamas Health Foods
Vous Boutique
Walgreens
Wendy's




Exhibit L

Prohibited Uses

As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:

As to the <u>Shopping Center</u>, any of the following uses:

(1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

(2)    Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)    Any "second hand" store, "surplus" store;

(4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation (except in conjunction with a true going out of business sale, for no longer than 2 days), fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)    Except for the existing tenant listed on Exhibit K-2 [as such tenant may be renewed, substituted or relocated and expanded (with the same closed loop cleaning system)], any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)    Any bowling alley over five lanes; or skating rink except as part of a temporary promotional skate park outside the Critical Area;

(10)    Any live performance theater, auditorium or meeting hall; or sporting event or other entertainment use except as part of a temporary promotional activity outside the Critical Area;

(11)    Any living quarters, sleeping apartments, or lodging rooms;

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual



L-1

nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto; the parties hereto acknowledge and agree the sale of books, magazines and other publications by a local bookstore such as "Castle Books" or a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder; or massage parlor except in conjunction with a day spa otherwise permitted herein;

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption within three hundred lineal feet of the Premises, except as part of a restaurant otherwise permitted herein;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade (except further than 300 lineal feet from the Premises and except for the existing arcade on the second floor of the Shopping Center or in a family entertainment center located in a future expansion of the Shopping Center on the third level or "Phase 3B" as shown on Exhibit O), pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor, except for the existing off-track betting store located in the parking deck; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship, except a small community chapel comprising no more than eight hundred (800) square feet which shall not be immediately adjacent to the Premises;



(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility, except for the gasoline station in the Esso Building as shown on Exhibit B;



(25)    Any carnival, amusement park or circus, except for temporary (less than 7 days) promotional activities outside of the Critical Area;

(26)    Any medical clinics, or medical offices, provided that this shall not prohibit doctor's or dental offices typically found in a first class shopping center or a medical laboratory open to the public comprising no more than 4,000 square feet of Floor Area in the aggregate, which are located at least 300 feet from the Premises;

(27)    Any supermarket in that one-half of the existing KMart premises closest to the Premises;

(28)    Any non-retail offices [except financial institutions, travel agencies, offices providing other services typically found in similar retail shopping centers in Puerto Rico, and except office space used in connection with and ancillary to a permitted retail use hereunder]. Notwithstanding the foregoing, non-retail offices shall be permitted so long as such non-retail offices are located on the lower mall level of the Shopping Center, do not aggregate more than 15,000 square feet of Floor Area, and Landlord at all times proceeds diligently to prevent the employees of such non-retail offices from parking in the "Special Parking Field" as shown labeled on Exhibit B.

(29)    hotel/motel;

(30)    daycare center within 100 lineal feet of the Premises;

(31)    veterinary office, except as may be incidental to a full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area; such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from the Common Areas;

(32)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's") within 300 lineal feet of the Premises;

(33)    movie theaters, except for the theaters existing on the date hereof and those programmed for Phase 3(b) of the Shopping Center;

(34)    restaurant serving meals for on- or off-premises consumption in that one-half of the existing KMart premises closest to the Premises, provided that this shall not restrict the café currently part of the operating K-Mart store; or

(35)    health spa, exercise facility or similar type business in that one-half of the existing Kmart premises fronting the west elevation of the Shopping Center, except that a day spa or beauty spa shall not be restricted.



L-3

## MECHANICS' LIEN INDEMNIFICATION

THIS MECHANICS' LIEN INDEMNIFICATION is made this 9th day of December, 2003, by BED BATH & BEYOND INC., a New York corporation ("Tenant"), for the benefit of CAPARRA CENTER ASSOCIATES, SE, a Puerto Rico corporation ("*Landlord*").

### WITNESSETH

Landlord and Tenant have entered into a Lease (the *"Lease"*) dated November 13, 2002, whereby Landlord has leased to Tenant certain premises (the *"Premises"*) located in San Patricio Plaza, in Guaynabo, Puerto Rico (the *"Shopping Center"*), and Tenant has constructed in the Premises certain improvements (the *"Vertical Transport Items"*).

NOW, THEREFORE, in consideration of the payment of the Tenant Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, Tenant hereby agrees as follows:

1.     Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center based upon materials or services provided under contract with Tenant. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

2.     Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

EXECUTED as of the day and year first above written.

TENANT:
**BED BATH & BEYOND INC.**

By: _____
Jim Brendle
Vice President - Construction

M

# BED BATH &
# BEYOND

Beyond any store of its kind.®

**Corporate Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888



December 9, 2003

*Via Airborne Express*

Caparra Center Associates, SE
Galeria San Patricio, Suite 212
Tabonuco St. B-5
Caparra Hills, Guaynabo
Puerto Rico 00968

Re:   Lease Agreement, dated November 13, 2002 between Caparra Center Associates
SE ("Landlord") and Bed bath & Beyond Inc. ("Tenant") regarding premises in
San Patricio Plaza, Guaynabo, Puerto Rico

Dear Landlord:

Reference is made to Section 3.3.8 of the Lease. Please let this serve as Tenant's request
for Landlord's payment of the $700,000.00 Tenant Allowance. Please be advised that the
installation of the Vertical Transport Items at the Premises is substantially complete, and Tenant
is open for business to the public. Per Section 3.3.8 of the Lease, I enclose for your reference the
following:

(i)     Contractor's requisition (final invoice) from Darrott, Inc. with respect to the
purchase of the vermaport equipment. Costs incurred by Tenant were
$439,967.00; and

(ii)    Contractor's requisition (final invoice) from Schindler Corporation with
respect to the purchase and installation of the escalators and the freight and
passenger elevators, and the installation of the vermaport. Costs incurred by
Tenant were $420,500.00; and

(iii)   Indemnification by Tenant regarding mechanics' liens.

Kindly forward payment to the attention of the undersigned. Be reminded that payment
of the $700,000.00 Tenant Allowance is due by December 31, 2003 (i.e. within 20 days from the



Caparra Center Associates, SE
December 9, 2003
Page 2

date hereof).  Please be further reminded that if payment is not received by that date, Tenant is permitted to offset the Allowance from Rent, together with interest at the Lease Interest Rate.

Thank you for your attention to this matter. Do not hesitate to call if you have any questions.

Sincerely,

Sarah W. Gregory
Counsel

Encl.
cc:    Michael Yorio
       Dave Cameron
       Seth Geldzahler

CAPARRA CENTER ASSOCIATES, S.E.                                                                                      131 014129

| Date | Reference | Gross | Discount | Net |
|------|-----------|-------|----------|-----|
| 12/11/2003 | REIMBURSE PURCHAE & INSTALLATION OF 1 PAI | $700,000.00 | $0.00 | $700,000.00 |

| Check Number | 34720 | Payee ID | BEDBATHBEY | $700,000.00 | | $700,000.00 |
|------|------|------|------|------|------|------|
| Check Date | 12/12/2003 | Payee Name | BED BATH & BEYOND | Stub 1 of 1 | Check Total: | $700,000.00 |

**THIS DOCUMENT IS ALTERATION PROTECTED AND REFLECTS FLUORESCENT FIBERS UNDER UV LIGHT**

**CAPARRA CENTER ASSOCIATES, S.E.**
PO BOX 9506 . SAN JUAN PR 00908-9506
TEL (787) 792-5328 FAX (787) 782-9555

BANCO POPULAR PR
SAN PATRICIO PLAZA BRANCH                    101-201/215

| Check Date | Check Number | Amount |
|------------|--------------|--------|
| 12/12/2003 | 34720 | ***$700,000.00*** |

PAY      Exactly Seven Hundred  Thousand Dollars And No Cents

TO THE   BED BATH & BEYOND
ORDER    CORPORATE OFFICE
OF       650 LIBERTY AVENUE
         UNION, NJ  007083

VOID AFTER 180 DAYS

⑈000 34720⑈ ⑈02150 2011⑈ 131⑈014129⑈

DARROTT

Airport Industrial Center, 810 Frelinghuysen Ave, Newark, NJ 07114 USA
Phone 973-639-0300  www.darrott.com  Fax 973-639-1088

## *****INVOICE*****

Invoice No.  030821                     Invoice Date:  08/21/03

Purchaser:  Bed Bath & Beyond        **Purchase Order Number: 00019135**

Bill To:  Bed Bath & Beyond #990
          650 Liberty Avenue
          Union, N.J. 07083

Purchaser Contact: Dave Cameron                    9/8/03

Product Description:    Vermaport Shopping Cart Conveyor

Project Name:  Bed Bath & Beyond San Patricio, Puerto Rico

Quantity Ordered: 2

Purchase Price:                    $439,967.00

Payments Received:                 $351,973.50

Bed Bath & Beyond
Amount: $87,993.50
CB#: _____  CB$: _____
Account Code: 01-120-601-577
TL Code: _____
Print Name: Jim Brendle
Signature: _____ 9/18/03

## Invoice Amount:  ***** $87,993.50 *****

Payment Terms:  Net 30 days   (1.5% interest per month on unpaid balances)

Please make check payable to:  Darrott Inc.

Comments:  Balance of purchase price due upon Buyer's receipt of
equipment at store location.

Schindler Corporation of Puerto Rico
P.O. Box 364005
San Juan, PR 00936-4005

Service: (787) 641-8181 / (800) 225-3123
New Sales: (787) 625-0595
Service Sales: (787) 625-0594 / 625-0589
Modernization Sales: (787) 625-0589
Service: Collection: (787) 625-0593
         Credit: (787) 625-0567
Construction: Collection/Credit: (787) 625-0581
Fax: (787) 641-8195

Internet: http://www.us.schindler.com

November 26, 2003

Bed, Bath & Beyond
650 Liberty Avenue
Union, N.J. 07083
Attention: Danni Ly Steiner

Good morning Danni:

Attached is our invoice PA 6281 for $49,687 balance of the contract.

Appreciate your prompt payment.

Thank for your help.

Aby Pastors Vargas,
Administrative Assistant

**Schindler** Ⓢ

I S O
9001:2000
CERTIFIED

# Company Name

Schindler Corp. of P.R.
P.O. Box 364005
San Juan, P.R. 00936-4005

Phone Number
787-641-8181

# INVOICE

**Schindler ♕**

SOLD TO:

Bed, Bath & Beyond
Attn: Danni Ly Steiner
650 Liberty Avenue
Union, N.J. 07083

INVOICE NUMBE PA 6281
INVOICE DAT Nov.25,2003
OUR ORDER NUMBER
YOUR ORDER NUMBER
TERMS
SHIPPED VIA
F.O.B.
BILLIND ID   5000086658

Bed, Bath and Beyond
Installation of elevators, escalator and Vermaport
at Bed, Bath and Beyond, San Patricio, P.R.

Elevator Freight GO A6454
Elevator Passenger GO A6455
Escalators GO A6452
Vermaport GO A6453

100% Elevators, Escalators and Vermaport installed.
    See attached detail.

49,687.00

49,687.00

Questions concerning this invoice?
Call:      ABY PASTORS VARGAS
            (787)641-8191

MAKE ALL CHECKS PAYABLE TO:
Schindler corp. of P.R.
P.O. Box 364005
San Juan, P.R. 00936-4005

Schindler Q

Nov.  25, 2003

Bed, Bath & Beyond
San Patricio, P.R.

Total Contract Price

| | |
|---|---|
| Passenger Elevator | $97,440.00 |
| Freight Elevator | $87,360.00 |
| Escalators | $205,500.00 |
| Vermaport (installation) | $30,200.00 |
| Total Contract Price | $420,500.00 |
| Less;Previously invoiced and paid | $370,813.00 |
| This Application: | $49,687.00 |

I S O
9001:2000
CERTIFIED

**Exhibit N**
Acknowledgement of Collateral Assignment of Lease

*N*

Acknowledgement of Collateral Assignment of Lease

Reference is made to that certain lease dated as of November 13, 2002 between Caparra Center Associates, SE, as landlord, and Bed Bath & Beyond Inc., as tenant, affecting certain premises within the shopping center known as San Patricio Plaza, on the property located at the corner of Tabonuco Street, Marginal Road and San Patricio Avenue in Guaynabo, Commonwealth of Puerto.

You are hereby notified that as part of the transaction whereby Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority (hereinafter the "Authority") issued its Industrial Revenue Bonds, Series 1993 (San Patricio Plaza Project) and Series 1995 (San Patricio Plaza Project - Phase II), and in accordance with the terms and provisions of an "Amended and Restated Collateral Assignment of Lessor's Interest in Leases", there was assigned and transferred, as collateral security, to Banco Popular de Puerto Rico and Banco Santander Puerto Rico, Trustee, as Assignee of the Authority (hereinafter called the "Trustee"), the interest of the Lessor in and to the abovementioned lease and to all the income, rents and proceeds generated and to be generated by said lease (hereinafter referred to as the "Lease").

Notwithstanding the foregoing, you are further notified that all rental and other payments under the Lease shall be paid to the Lessor in accordance with the terms thereof unless and until you are otherwise notified in writing by the Trustee or the Bank or any other person to whom such persons may transfer and assign their rights under said Amended and Restated Collateral Assignment of Lessor's Interest in Leases. You are hereby authorized and instructed to make all payments directly to the Trustee or the Bank or to such other person, as

*N*

directed in such notice, upon such notice.

TENANT:                            BED BATH & BEYOND, INC.

TENANT'S TRADE NAME:               BED BATH & BEYOND

SIGNATURE:                                                              *AMF*

                                   WARREN EISENBERG
TITLE:                             CO-CHIEF EXECUTIVE OFFICER

DATE:                              November     , 2002





**NET LEASE**
**SUMMARY ALL FLOORS**

| | RETAIL | SERVICES |
|---|---|---|
| GROUND | 58,160 | 14,540 |
| 2nd. FLOOR | 79,800 | - |
| 3rd. FLOOR | 39,785 | 43,500 |
| 4th. (roof) FLOOR | - | 55,000 |
| SUB TOTAL | 177,743 | 113,040 |

TOTAL THIRD FASE LEASE AREA
RETAIL + SERVICES 290,783 SF.

EXHIBIT O
(1 OF 3)

SAN PATRICIO
PHASE III

CARRERA

A-1

MAYO-2001

ASSUME % SERVICES 20% 14,540 SERVICES
58,160 RETAIL

CORRIDOR, STAIR AND COMMUN. AREA 40,811 sf
TOTAL CONST. AREA 113,511 SF
72,700 S.F. LEASABLE
PARKING DECK
ground level 209

GROUND LEVEL
LEASE AREA 72, 700 SF

E:/PROYECTOS 2001/10.02RRR SP PHASE III/ A-1



EXHIBIT O
(2 OF 3)

79,800 RETAIL
CORRIDOR, STAIR AND COMMUN. AREA 33,692SF
TOTAL CONST. AREA 113,492SF

PARKING
second level 96

NEW STRUCTURE

SECOND LEVEL
LEASE AREA 79,800 SF

