**STARK & STARK**
A Professional Corporation
Joseph H. Lemkin, Esquire (JL-2490)
Thomas S. Onder, Esquire (TO-7880)
PO Box 5315
Princeton, NJ 08543-5315
(609) 896-9060
*Attorneys for Richards Clearview, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND, INC., et al. | Case No. 23-13359 (VFP) |
| Debtors[1] | Judge: Hon. Vincent F. Papalia |

**OBJECTION OF RICHARDS CLEARVIEW, LLC**
**TO POTENTIAL ASSUMPTION AND ASSIGNMENT OF**
**UNEXPIRED LEASE AND RESERVATION OF RIGHTS**

Richards Clearview, LLC ("Richards"), by and through its counsel, hereby files

this objection to the (i) *Notice to Contract Parties to Potentially Assumed Executory*

*Contracts and Unexpired Leases* [Docket No. 714] ("Notice") and (ii) *Notice of*

*Amendment of Cure Objection Deadline* ("Amended Notice") [Docket No. 952], and in

support hereof states as follows:

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

**Background**

1.      On or about April 24, 2023 ("Petition Date"), each of the above-captioned

debtors ("Debtors") filed voluntary petitions under chapter 11 of title 11 of the United

States Code ("Bankruptcy Code") with this Court.

2.      Debtors are operating their businesses as debtors-in- possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On June 13, 2023, the Debtors filed the Notice which states that, "pursuant

to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume

and assign to the Successful Bidder the contract or agreement listed on **Exhibit A** to

which you are a counterparty, upon approval of the Sale Transaction." Notice, p.2

(emphasis in original).[2] The Notice further provides that any objection to the "proposed

Cure Payment", the "proposed assignment to the Successful Bidder", or "the ability of

the Successful Bidder to provide adequate assurance of future performance" ("Cure

Objection Deadline") must be filed no later than June 26, 2023 at 5:00 p.m. (prevailing

Eastern Time). *Id*.

4.      Exhibit A to the Notice includes a lease with Richards for the premises

located in the Clearview City Center, Metairie, Louisiana ("Premises"), described in the

Notice as "Lease Agreement – 4410 Veterans Blvd., Metairie, LA" ("Lease"). Exhibit A to

the Notice identifies Richards as the counterparty and asserts that the proposed Cure

Payment for the Lease is $0.

---

[2] Capitalized terms in the Notice have the meanings set forth in the Court's order approving bidding procedures
[Docket No. 92] (the "Bidding Procedures Order").

#4996768v5
4859-2299-5565, v. 2

5.      On June 23, 2023, Debtors filed the Amended Notice which states that "with respect to all executory contracts and unexpired leases listed on the Potentially Assumed Contracts List… the Cure Objection Deadline has been extended to July 5, 2023 at 9:00 a.m. (prevailing Eastern Time)."

6.      In addition, on May 22, 2023, this Court entered the *Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [Docket No. 422] ("Lease Sale Procedures Order"). The Lease Sale Procedures Order approves, among other things, additional sale procedures related to the Debtors' potential "Phase I" and "Phase II" sale of leases, and expressly permits landlords to submit bids in connection with their leases, including credit bids of their undisputed cure amounts.

## Preliminary Objection

### a. Proposed Cure Payment

7.      Debtors set the proposed Cure Payment for Richards at $0.  Richards asserts that the correct cure amount for the Lease, as of the date of filing this limited objection, is $536,237 ("Correct Cure Amount"), which includes (i) HVAC repairs compensable under the Lease in the approximate amount of $29,395,[3] (ii) elevator and escalator repairs compensable under the Lease in the approximate amount of $488,717,[4]

---

[3] A copy of the written estimates for the HVAC repairs is attached hereto as Exhibit A.

[4] A copy of the written estimates for the elevator and escalator repairs is attached hereto as Exhibit B.

#4996768v5
4859-2299-5565, v. 2

and (iii) legal fees incurred relating to the enforcement of the Lease in the approximate amount of $18,125.

8.      If the Lease is to be assumed or assumed and assigned, the Debtors or the assignee should be required to pay Richards the Correct Cure Amount in accordance with section 365(b) of the Bankruptcy Code, together with any other amounts accruing under the Lease (including without limitation any fixed rent or percentage rent, and applicable taxes, common areas charges, and insurance costs) in accordance with the terms of the Lease between the date of this filing and the date that the Lease is actually assumed or assumed and assigned.

### b. Adequate Assurance of Future Performance

9.      In addition, Richards is entitled to adequate assurance of future performance by any assignee under section 365(f)(2)(B) of the Bankruptcy Code. As a shopping center lease, this also requires satisfaction of the provisions of section 365(b)(3). Section 365(b)(3) specifically requires adequate assurance:

> (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

> (B) that any percentage rent due under such lease will not decline substantially;

> (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease,

#4996768v5
4859-2299-5565, v. 2

financing agreement, or master agreement related to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

*11 U.S.C. § 365(b)(3).*

10.    Richards objects to the extent any proposed assignment of the Lease fails to comply with any of the foregoing requirements under section 365(b)(3) of the Bankruptcy Code. This shall include specifically without limitation: (i) the "Permitted Use" and "Prohibited Uses" provisions set out in Sections 1.1.27 and 13.1.1 of the Lease[5] and Exhibit M[6] of the Lease; and (ii) the "Existing Exclusives" granted by Richards to other tenants as set forth in Sections 13.3.1 and 13.3.2 and Exhibit K-1[7] of the Lease.

11.    Until adequate information has been provided on the proposed assignee regarding the intended use of the Lease, Richards cannot even discern whether such an assignee will be attempting to violate any "Prohibited Uses" or "existing Exclusives" as set forth in the Lease.

12.    Section 4 of the Lease provides for percentage rent. Under section 365(b)(3)(B) of the Bankruptcy Code, any assignment must include adequate assurance that "any percentage rent due under such lease will not decline substantially." Once again,

---

[5] A copy of the Lease is attached hereto as Exhibit C. Note that the Lease Exhibits are voluminous and only the Exhibits relevant to this Objection have been included herein. The entirety of the Lease Exhibits are in the possession of Debtors and are also available upon request.

[6] A copy of Exhibit M of the Lease is attached hereto as Exhibit D.

[7] A copy of Exhibit K-1 of the Lease is attached hereto as Exhibit E.

- 5 -

until adequate information has been provided on the proposed assignee, Richards cannot make this determination.

13.    Richards reserves all rights to the extent that the use under the Lease will be changed by reason of any proposed assignment, result in a violation of any "Permitted Use" and "Prohibited Uses" provisions under the Lease, and/or result in a violation of "Existing Exclusives" granted by Richards to other tenants on or at the Premises, all as set forth above.

14.    If the Lease is to be assumed or assumed and assigned, the Debtors or the proposed assignee should also be required to pay Richards a "deposit or other security for the performance of the [Debtors'] obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant" in accordance with section 365(l) of the Bankruptcy.

### Reservation of Rights

15.    Richards further reserves the right to amend and/or supplement this objection and the Correct Cure Amount. Further, while the Lease Sale Procedures Order is not referenced in the Notice, Richards further reserves all rights with respect thereto. All objections and reservations asserted herein apply with equal force to any proposed sale, assumption or assignment under the Lease Sale Procedures Order, to the extent applicable.

### Conclusion

**WHEREFORE**, Richards respectfully requests that the Court sustain this preliminary objection by conditioning assumption and assignment of the Lease on: (1) the payment to Richards of the Correct Cure Amount plus any other amounts accruing under

- 6 -

the Lease between the date of this filing and the date that the Lease is actually assumed or assumed and assigned; and (2) adherence to the provision of adequate assurance of future performance, including without limitation as required by section 365(b)(3) of the Bankruptcy Code, and grant any other and further relief that the Court may deem appropriate.

Respectfully submitted,

Dated: June 30, 2023

**STARK & STARK**
**A Professional Corporation**
By: */s/ Joseph H. Lemkin*
        Joseph H. Lemkin, Esquire
<u>and</u>

By: */s/ Thomas S. Onder*
        Thomas S. Onder, Esquire
P.O. Box 5315
Princeton, NJ 08543
(609) 791-7022 (direct)
(609) 896-9060 (main)
(609) 895-7395 (facsimile)
jlemkin@sstark-stark.com
tonder@stark-stark.com
*Attorneys for Richards Clearview, LLC*

-and-

**CHAFFE McCALL, LLP**
By:   */s/ Fernand L. Laudumiey, IV*
2300 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163-2300
Telephone: (504) 585-7000
Fax: (504) 585-7075
David J. Messina, #18341
messina@chaffe.com
Fernand L. Laudumiey, IV, #24518
(*Pro Hac Vice Application Pending*)
laudumiey@chaffe.com
*Attorneys for Richards Clearview, LLC*

#4996768v1
4859-2299-5565, v. 2

# EXHIBIT A

# Gulf South Mechanical

## ═══ USA, Inc. ═══

### Commercial HVAC Service

6/26/2023
Richards Clearview City Center
Re: Bed Bath & Beyond
HVAC Problems

Unit # 5  Lennox M # LGA210HL2G

Variable Frequency Drive Fault .  Blower will not operate.
Replace VFD in order to determine if other problems exist.
Repair and check cost minimum

| | |
|---|---|
| Labor | $800 |
| VFD (Part) | $1,350 |
| | $2,150 |

Unit # 6  Lennox M # LGA210HL2G

Bad blower motor and 1 bad compressor.
Repair and check cost minimum

| | |
|---|---|
| Labor | $1,600 |
| Motor & Compressor ( Parts) | $5,411 |
| | $7,011 |

Unit # 8  Lennox M # LGA102HS3G

One refrigerant circuit out of refrigerant
Repair and check cost minimum

| | |
|---|---|
| Labor | $800 |
| Refrigerant and Misc. (Parts) | $600.00 |
| | $1,400 |

Unit # 14 Lennox M # LGA102HS3G

Bad VFD and both circuits out of refrigerant.
Repair and check cost minimum.

| | |
|---|---|
| Labor | $2,400 |
| VFD and Refrigerant  (Parts) | $2,550 |
| | $4,950 |

We recommend and additional labor allowance, to identify
any other issues that may exist.                                    $3,200

**Minimum grand total                          $18,711.00**

If you should have any questions, please call Ron @ 504-329-8188.

1020 Old Spanish Trail Suite 6 Slidell, LA 70458  504-329-8188

Exhibit A

# Gulf South Mechanical
## ═══ USA, Inc. ═══
### Commercial HVAC Service

6/26/2023
Richards Collection Properties
Re: 1200 Place
Suites 10 & 12

      Suite 10

          Minor problem was corrected while testing system.

          No charge

      Suite 12

          Estimate to replace 5 ton system.

          Utilizing Arcoair (by Carrier) Model FJMA4X60LODB air handler

          and Model R4A5S60AKAWA condensing unit.

          Adapted to existing ductwork, electrical wiring, and refrigerant piping.

          Total customer cost          $10,684.00

If you should have any questions, please contact Ron @ 504-329-8188.

# EXHIBIT B



# *REPAIR ORDER AGREEMENT*

June 30, 2023

**Purchaser:**
Bed Bath and Beyond
4410 Veterans Blvd
Metairie, La 70006

A-1 Elevator Service hereby proposes to furnish and install the following located at 4410 Veterans Blvd
Metairie, La 70006

The following repairs are necessary due to the neglect, age and obsolescence, and not being tested for over 5 years the following repairs are necessary:

Passenger Elevator Modernization into code compliance **$72,600**

Freight Elevator Modernization into code compliance  **$122,200**

Both Escalators:
- Replace inlet skirt and step switches, annual clean down, replace drive chains, replace comb teeth segments, replace steps as needed that are damaged, and replace handrails   **$198,717**

Both Vermaports:
- Replace brakes, replace newel drive chains, replace all hub rollers, replace track segments, and replace starter contactors **$95,200**

(Price quoted is valid for 60 days and is based on work performed during regular working hours)

Since A-1 Elevator Service is not your current maintenance provider, we cannot guarantee that the above scope of work is all that is needed to put the elevator back into safe operating condition. If determined additional repairs are needed, a separate repair order will be submitted for approval.

Payment Terms:
50% of price quoted is due upon acceptance of this proposal
Remaining balance due upon completion of job.

*1500 Mehle Ave., Arabi, LA  70032*
*Office: 504-278-1876, Fax: 504-278-1864*
*admin@A1elevator.net*

Exhibit B

# TERMS AND CONDITIONS

1. A-1 Elevator Service retains title to any equipment furnished hereunder until final payment is made.  Late or non-payment will result in assessment of interest charged at a rate of 1-1/2% per month or the highest legal rate available, and any attorneys' fees, expenses and costs associated with the collection of said amount.

2. Any changes to the building to meet local or state codes are to be made by purchaser.  Any changes in the work required due to building conditions discovered in the performance of the work will be paid by Purchaser.

3. No work, service materials or equipment other than as specified hereunder is included or intended.

4. Purchaser retains its normal responsibilities as Owner of the equipment which is subject of this Agreement.

5. A-1 Elevator Service will not be liable for damages of any kind, in excess of the price of this Agreement, nor in any event for special, indirect, consequential or liquidated damages.

6. Any cutting or patching will be the responsibility of other and is not included is work quoted.

7. Neither party shall be responsible for any loss, damage, detention or delay for causes beyond its reasonable control, including strikes, lockouts, labor disputes, or acts of God.  Dates for the performance or completion of the work shall be extended as is reasonably necessary to compensate for the delay.

8. We warrant that the work will comply with the specifications and that there will be no defects in materials or workmanship for one year after the completion of work or acceptance thereof by beneficial use, whichever is earlier.  Our duty under this warranty is to correct nonconformance or defect at our expense within a reasonable time after the receipt of notice. THE EXPRESS WARRANTIES CONTAINED HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PERTICULAR PURPOSE.

9. Purchaser agrees to defend, indemnify and hold A-1 Elevator Service harmless from and against any claims, lawsuits, demands, judgements, damages, costs and expenses arising out of this Agreement except to the extent caused by or resulting from the sole and direct fault of A-1 Elevator Services.

10. It is expressly understood, in consideration of the performance of the service enumerated herein at the price stated, that nothing in this agreement shall be construed to mean that A-1 Elevator Services assumes any liability on account of injury or damage to persons or property, except to the extent directly and solely due to the negligent acts or omissions of A-1 Elevator Services or its employees; and that the Purchaser's responsibility for injury or damage to persons or property while riding on or being in or about the equipment referred to is in no way affected by this Agreement.

<u>Acceptance:</u>

This proposal is hereby accepted in its entirety and shall constitute the entire agreement as contemplated by the owner/purchaser and A-1 Elevator, only after it has been approved by a manager of A-1 Elevator Service LLC.

**Purchaser:**

Signature: _____

Printed Name: _____

Date: _____

**A-1 Elevator Service LLC:**

Signature: _____*Gary Songy*_____

Printed Name: _____ Gary Songy _____

Date: _____ 6/30/2023 _____

**A-1 Elevator Service LLC Approval:**

Signature: _____

Printed Name: _____

Date: _____

# EXHIBIT C

**LEASE AGREEMENT**

Between

**RICHARDS CLEARVIEW, L.L.C.,**

a Louisiana limited liability company,

Landlord

and

**BED BATH & BEYOND INC.,**

a New York corporation,

Tenant

**CLEARVIEW MALL**

**METAIRIE, LOUISIANA**

Dated:  November __, 2001

* * * * * *

H:\Clearview Lease.doc

Exhibit C

**Table of Contents**

**Page**

ARTICLE 1 BASIC TERMS AND DEFINITIONS..........................................................................1
    Section 1.1    Basic Terms and Definitions...................................................................1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ....................................4
    Section 2.1    Lease of Premises. ..................................................................................4
    Section 2.2    Term. .......................................................................................................5
    Section 2.3    Delivery Date. .........................................................................................5
    Section 2.4    Unseasonable Delivery: Slack Period.....................................................6
    Section 2.5    Initial Co-Tenancy Condition. ..................................................................7

ARTICLE 3 IMPROVEMENTS......................................................................................................7
    Section 3.1    Landlord's Work and Tenant's Work........................................................7
    Section 3.2    Plan Approvals........................................................................................8
    Section 3.3    Performance of Work. .............................................................................9
    Section 3.4    Measurement; Adjustment of Rent. .......................................................11

ARTICLE 4 FIXED RENT, TAXES & PERCENTAGE RENT: DETERMINATION AND
PAYMENT..................................................................................................................................12
    Section 4.1    Fixed Rent.............................................................................................12
    Section 4.2    Payment of Rent ...................................................................................12
    Section 4.3    Real Estate and Other Taxes. ..............................................................12
    Section 4.4    Percentage Rent. ..................................................................................13

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES .................................................15
    Section 5.1    Common Areas: Maintenance. ..............................................................15
    Section 5.2    Common Areas: Restrictions. ................................................................17

ARTICLE 6 UTILITIES................................................................................................................19
    Section 6.1    Utility Service ........................................................................................19
    Section 6.2    Interruption ...........................................................................................19

ARTICLE 7 SIGNS ....................................................................................................................20
    Section 7.1    Tenant's Building Signage......................................................................20
    Section 7.2    Pylon/Monument/Directional Signage....................................................20
    Section 7.3    Signage: Alteration/Removal/Allocation.................................................20
    Section 7.4    Cooperation ..........................................................................................20
    Section 7.5    Signage Restrictions and Criteria. ........................................................21

ARTICLE 8 ALTERATIONS AND IMPROVEMENTS .................................................................21
    Section 8.1    Alterations and Improvements. ..............................................................21

ARTICLE 9 REPAIRS.................................................................................................................22
    Section 9.1    Tenant's Repairs ...................................................................................22
    Section 9.2    Landlord's Repairs ................................................................................22
    Section 9.3    Legal Compliance Work ........................................................................23

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION .............23
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification......23
    Section 10.2    Tenant's Insurance. ..............................................................................24
    Section 10.3    Landlord's Insurance. ............................................................................24
    Section 10.4    General Insurance Requirements. .........................................................25

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN .........................................25
    Section 11.1    Fire and Other Casualty........................................................................25
    Section 11.2    Eminent Domain. ...................................................................................26
    Section 11.3    Abatement of Rent Charges ..................................................................28

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES.................................28
    Section 12.1    Quiet Enjoyment....................................................................................28
    Section 12.2    Authority ................................................................................................28
    Section 12.3    Landlord's Covenants, Warranties and Representations ...........28
    Section 12.4    Environmental Matters...........................................................................29

ARTICLE 13 USES AND RESTRICTIONS ...............................................................................30

Section 13.1      Permitted and Prohibited Uses. ....................................................30
Section 13.2      Tenant's Exclusive in Center ......................................................31
Section 13.3      Exclusives Which Tenant Must Honor............................................32

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS ...............................................32
Section 14.1      Covenant to Open ...................................................................32
Section 14.2      Charges Payable by Tenant .......................................................33

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING..............................................33
Section 15.1      Assignment and Subletting. .......................................................33
Section 15.2      Liability of Tenant ...................................................................33
Section 15.3      Collateral Assignment..............................................................33
Section 15.4      Cure Rights of Original Tenant. ..................................................33
Section 15.5      Recognition Agreement .............................................................34

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION.................................................34
Section 16.1      Tenant Default.......................................................................34
Section 16.2      Landlord Default ....................................................................35
Section 16.3      Arbitration ............................................................................35

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
CERTIFICATE.................................................................................................36
Section 17.1      Right to Mortgage and Non-Disturbance......................................36
Section 17.2      Estoppel Certificate................................................................36
Section 17.3      Existing Mortgages .................................................................36

ARTICLE 18 NOTICE ......................................................................................37

ARTICLE 19 TENANT'S PROPERTY ...................................................................37

ARTICLE 20 END OF TERM ..............................................................................37
Section 20.1      Surrender of Premises .............................................................37
Section 20.2      Hold Over ............................................................................37

ARTICLE 21 TENANT'S RIGHT OF FIRST OFFER ...................................................37

ARTICLE 22 ONGOING CO-TENANCY .................................................................38

ARTICLE 23 MISCELLANEOUS...........................................................................38
Section 23.1      Loading Facilities ...................................................................38
Section 23.2      Liens...................................................................................38
Section 23.3      Broker's Commission ...............................................................38
Section 23.4      Force Majeure .......................................................................38
Section 23.5      Consents .............................................................................39
Section 23.6      Costs .................................................................................39
Section 23.7      Attorneys' Fees......................................................................39
Section 23.8      Survival of Obligations.............................................................39
Section 23.9      Non-Waiver ..........................................................................39
Section 23.10     Rights Cumulative ..................................................................39
Section 23.11     Definition of Landlord..............................................................39
Section 23.12     Successors and Assigns...........................................................39
Section 23.13     Limitation of Landlord's Liability .................................................39
Section 23.14     Limitation of Tenant's Liability ....................................................40
Section 23.15     Joint and Several Liability .........................................................40
Section 23.16     Severability ..........................................................................40
Section 23.17     Grammatical Usages and Construction..........................................40
Section 23.18     Table of Contents, Line Numbering and Paragraph Headings ....40
Section 23.19     Definition of Hereunder, Herein, etc. ............................................40
Section 23.20     Short Form Lease...................................................................40
Section 23.21     Entire Agreement and Modification ..............................................40
Section 23.22     No Joint Venture or Partnership Created by Lease ...................40
Section 23.23     Tenant's Tradename................................................................40
Section 23.24     Governing Law ......................................................................40
Section 23.25     Radius Restriction ..................................................................40

********

1  **EXHIBITS**
2
3   Exhibit A          Legal Description of Shopping Center
4   Exhibit B          Site Plan
5   Exhibit C          Rent Commencement and Expiration Date Agreement
6   Exhibit D          Specifications for Landlord's Work
7   Exhibit D-1        Exterior Elevations of the Premises, and Sidewalk Plan
8   Exhibit D-2        Exterior Elevations of the Shopping Center
9   Exhibit E          Permitted Encumbrances
10  Exhibit F          Signage
11  Exhibit G          Subordination, Non-Disturbance and Attornment Agreement
12  Exhibit H          Subtenant Recognition Agreement
13  Exhibit I          Form of Delivery Date Notice
14  Exhibit J          Delivery Date Certification
15  Exhibit K-1        Existing Exclusives
16  Exhibit K-2        Existing Leases
17  Exhibit L          INTENTIONALLY OMITTED
18  Exhibit M          Prohibited Uses
19  Exhibit N          Radius Restriction
20

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of November ___, 2001 by and between RICHARDS CLEARVIEW, L.L.C. a Louisiana limited liability company, having an office at Clearview Shopping Center, 4436 Veterans Boulevard, Metairie, LA 70006 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

**W I T N E S S E T H :**

**ARTICLE 1**
**BASIC TERMS AND DEFINITIONS**

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1   Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2   Affiliate:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3   Alternate Rent:  Payment of three percent (3%) of all Gross Sales (as hereinafter defined in Section 4.4.2), not to exceed the amount of Fixed Rent which otherwise would have been payable during such period (the *"Cap"*).  Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of "Gross Sales" achieved during, and the amount of Alternate Rent payable for, such month.

1.1.4   Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, elevators, escalators and common utility lines.

1.1.5   Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6   Delivery Date: As defined in Section 2.3 hereof.

1.1.7   Effective Date: The date hereof.

1.1.8   Event of Default:  As defined in Section 16.1 hereof.

1.1.9   Excused Periods:  Periods during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10   Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11   Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)   For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the fifteenth (15th) anniversary of the Rent Commencement Date, at the rate of Five Hundred Thousand and 00/100 Dollars ($500,000.00) per year; provided, however, (i) if Percentage Rent is payable by Tenant any time during the

period commencing on the first February 1 occurring after the fifth (5th) anniversary of the Rent Commencement Date and ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date, then Fixed Rent during such period that Percentage Rent is payable shall be paid at the rate of Five Hundred Twenty-Five Thousand and 00/100 Dollars ($525,000.00) per year, and (ii) if Percentage Rent is payable by Tenant any time during the period commencing on the first February 1 occurring after the tenth (10th) anniversary of the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), then Fixed Rent during such period that Percentage Rent is payable shall be paid at the rate of Five Hundred Fifty Thousand and 00/100 Dollars ($550,000.00) per year.  During the period during the Initial Term that Percentage Rent is not payable by Tenant, then the Fixed Rent shall remain at Five Hundred Thousand and 00/100 Dollars ($500,000.00) per year;

(b)     In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Five Hundred Seventy-Five Thousand and 00/100 Dollars ($575,000.00) per year;

(c)     In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Six Hundred Thousand and 00/100 Dollars ($600,000.00) per year;

(d)     In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Six Hundred Twenty-Five Thousand and 00/100 Dollars ($625,000.00) per year; and

(e)     In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Six Hundred Fifty Thousand and 00/100 Dollars ($650,000.00) per year.

1.1.12 <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas and trash compactor areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or except as set forth above, any exterior areas or any Common Areas.

1.1.13 <u>Force Majeure</u>:  As defined in Section 23.4 hereof.

1.1.14 <u>Ground Lessor</u>:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 *Intentionally Omitted.*

1.1.16 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17 <u>Inducement Tenants</u>:  As defined in Subsection 2.3.1 hereof.

1.1.18 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19 <u>Landlord's Mailing Address</u>:  Richards Clearview, L.L.C., 4436 Veterans Boulevard, Metairie, LA  70006, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.20 <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21 <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two percent (2%).

1.1.22 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23 <u>Mortgagee</u>: Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24 <u>Lease Year</u>: The 365 day (or 366 day for leap years) period commencing with the Rent Commencement Date and each 365 day (or 366 day for leap years) period thereafter.

1.1.25 <u>Percentage Multiple</u>: Six percent (6%).

1.1.26 <u>Percentage Rent</u>: As defined in Section 4.4 hereof.

1.1.27 <u>Permitted Use</u>: The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services typically provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the ***"Permitted Items"***); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) Fifty Thousand Five Hundred Eighty (50,580) square feet of Floor Area, but in no event less than Fifty Thousand (50,000) square feet of Floor Area, on two floors approximately [23,450 square feet of first floor area, having approximate dimensions of 186 feet wide and 130.5 feet deep with a minimum clear height of 18 feet plus a second floor sales area containing approximately 27,130 square feet with a minimum clear height of 18 feet], and (ii) one thousand (1,000) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall such mezzanine space result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option</u>: As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>: four (4) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>:  Fixed Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33 <u>Sales Break Point</u>:    As defined in Section 4.4.1 hereof.

1.1.34 <u>Shopping Center</u>:  The shopping center commonly known as the Clearview Mall, containing approximately Five Hundred Fifty-Eight Thousand (558,000) square feet of Floor Area, on the property located at the corner of Veterans Boulevard and Clearview Parkway in Metairie, Louisiana, and more particularly described in <u>Exhibit A</u> hereto.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35 <u>Substantially Completed or Substantial Completion</u>:  The completion of specified work at the Shopping Center (including, without limitation, as applicable,  Landlord's

Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36 <u>Taxes</u>: As defined in Section 4.3.3 hereof.

1.1.37 <u>Tenant</u>: As defined in the preamble hereof.

1.1.38 <u>Tenant's Mailing Address</u>: 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39 <u>Tenant's Permits</u>: As defined in Section 2.3.1(b) hereof.

1.1.40 <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, escalators, standard lighting and wiring installed within the walls of the Premises.

1.1.41 <u>Tenant's Pro Rata Share</u>: A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than eleven percent (11%). Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.42 <u>Tenant's Work</u>: As defined in Section 3.1 hereof.

1.1.43 <u>Term</u>: A period (the *"Initial Term"*) of approximately fifteen (15) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the fifteenth (15th) anniversary of the Rent Commencement Date (the *"Expiration Date"*). As used herein, *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    <u>Lease of Premises</u>.

2.1.1    <u>Lease of Premises</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

2.1.2    <u>Resolutory Conditions</u>. Landlord and Tenant agree that this Lease shall be conditioned upon satisfaction of the following conditions and should any of such conditions not be satisfied in the relevant time frame set forth below, then Landlord shall have the right to terminate this Lease by sending a written termination notice to Tenant no later than five (5) business days after the first occurrence of any of the conditions not being satisfied:

(a)    Within thirty (30) days after the Effective Date, Tenant shall deliver the Tenant's Plans to Landlord and within sixty (60) days after the Effective Date Landlord shall prepare the Preliminary Plans such that such Preliminary Plans are either not less than eighty-five percent (85%) complete or so complete as to allow Landlord to apply for the permits specified in clause (c) below.

(b)    The execution by Landlord of a construction contract with a responsible contractor at a cost which is deemed reasonable by Landlord, in its good faith and commercially reasonable judgment, within sixty (60) days after the Effective Date.

(c)    The Landlord shall obtain a demolition permit within ninety (90) days after the Effective Date and a building permit for Landlord's Work within one-hundred twenty (120) days after the Effective Date.  This condition shall be deemed waived by Landlord if Landlord fails to apply for the demolition permit or the building permit in a timely and expeditious manner.

(d)    Relocation agreements in a commercially reasonable form from Singer Sewing Center, Gulf States Research, Regis Hair Salon and Walden Books shall be obtained by the Landlord within sixty (60) days of the Effective Date.

Landlord and Tenant agree that they will each exercise their best efforts, and take whatever action as is required of them, in order to satisfy the conditions set forth in clauses (a), (b), (c) and (d) above.  In the event that any of the conditions are not satisfied within the time periods set forth above and, such failure and/or delay in satisfying such conditions was due in whole or in part to the Landlord's failure to perform its obligations in accordance with this Lease, or was due to the occurrence of a Force Majeure, then, Landlord shall not have the right to terminate this Lease and the time period within which to satisfy any of such conditions shall be extended day per day for each day of the delay caused by Landlord's failure and/or the occurrence of the Force Majeure.  The provisions of this Section 2.1.2 shall not be deemed to modify or alter the provisions of Section 3.2.

Section 2.2    <u>Term</u>.

2.2.1    <u>Initial Term</u>.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the sixtieth (60th) day following the Delivery Date (the **"Rent Commencement Date"**).  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as <u>Exhibit C</u> specifying the Rent Commencement Date.

2.2.2    <u>Renewal Options</u>.  Tenant shall have the right and option (hereinafter a **"Renewal Option"**) to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a **"Renewal Period"**, and collectively, the **"Renewal Periods"**) upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    <u>Delivery Date</u>.

2.3.1    <u>Definition</u>.  Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the **"Delivery Date"**) following the day on which all of the following conditions (the **"Delivery Date Conditions"**) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals, if any, required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, **"Tenant's Permits"**)), which permits and approvals shall include, without limitation, a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent

certificate of occupancy promptly following the correction or completion of Tenant's Work);
provided, however, if Tenant is required by the Legal Requirements to obtain the temporary or
permanent certificate of occupancy, then Landlord shall perform and complete all work
necessary so that Tenant is able to obtain such temporary or permanent certificate of
occupancy after Tenant's Work is substantially complete.

(c)    Intentionally Omitted.

(d)    The representations and warranties of Landlord set forth in
subparagraphs (a) through (h) of Section 12.3 below shall then be true and in effect;

(e)    Leases or other occupancy agreements shall have been entered
into with Palace Theater and Target for a minimum term of ten (10) years (hereinafter
collectively referred to as the *"Inducement Tenants"*) for occupancy of the premises
designated for them on Exhibit B and Sears shall be open to the public and operating its store at
the location shown on Exhibit B; and

(f)    Landlord shall have delivered to Tenant, in recordable form: (i) a
subordination, non-disturbance and attornment agreement in the form attached hereto as
Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting
the Shopping Center or any portion thereof, and (ii) a fee owner recognition agreement in the
form and content described in clause (b) of Section 17.1 hereof executed by any existing
Ground Lessor.

2.3.2    Delivery Date.

(a)    Landlord shall give Tenant at least one hundred and twenty (120)
days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as
Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the
Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no
event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the
Delivery Date Notice.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the
Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice,
Tenant will sustain substantial, additional costs and expenses, including, without limitation,
storage costs for fixtures, equipment, and inventory, employee costs during waiting period, and
additional advertising and promotional costs, the exact amount of which would be impracticable
or extremely difficult to ascertain. If the Delivery Date does not occur by the date established
therefor in the Delivery Date Notice, then, in addition to any other remedies available to Tenant
under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of
Rent hereunder equal to any and all reasonable costs, expenses, liabilities and damages
incurred, directly or indirectly, by Tenant (and which Tenant continues to incur for each day that
the Delivery Date established by the Delivery Date Notice is delayed) (*"Damages"*) in
connection with or resulting from such delay.

2.3.3    Delivery Date Certification. Upon the satisfaction of all of the Delivery
Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification
attached hereto as Exhibit J.

2.3.4    No Waiver. If Tenant accepts physical possession of the Premises, it
shall be deemed to have waived the then unsatisfied Delivery Date Conditions; provided,
however, Tenant may prevent such waiver and Landlord shall remain obligated to satisfy such
conditions if Tenant, within five (5) business days of its acceptance of the physical possession
of the Premises sends written notice to Landlord setting forth those Delivery Date Conditions the
satisfaction of which Tenant is not waiving.

Section 2.4    Unseasonable Delivery; Slack Period. If, for any reason (including,
without limitation, Force Majeure), the Delivery Date occurs during the period commencing on
October 1 and ending on the March 31 next following (the "*Slack Period*"), then Tenant shall
accept delivery of physical possession of the Premises (subject to the other provisions of this
Article 2 and the continuing satisfaction of the Delivery Date Conditions), and shall be entitled to
pay only Fixed Rent, and not Percentage Rent pursuant to Section 4.4, for the period
commencing on the Rent Commencement Date and ending on the March 31 next following.
After the Slack Period, Tenant shall be obligated to pay Fixed Rent and Percentage Rent
pursuant to Section 4.4.

Section 2.5    Initial Co-Tenancy Condition.

2.5.1    As used herein, the **"Initial Co-Tenancy Condition"** shall mean that one (1) of the Inducement Tenants shall have accepted possession of its entire premises, such premises shall have been substantially completed, and such Inducement Tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising therein and Sears shall have been operating and open for business at its location adjacent to the Shopping Center as shown on Exhibit B.

2.5.2    If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Co-Tenancy Condition, upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice.  Landlord may negate such termination by causing the Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given.  If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) as set forth in Section 23.3 below, and (ii) Landlord shall promptly pay and reimburse Tenant for all of its Damages reasonably incurred in connection with this Lease, including, without limitation, all reasonable third-party costs and expenses associated with the preparation and review of plans and specifications, and the performance of Tenant's Work, not to exceed Fifty Thousand Dollars ($50,000).

**ARTICLE 3**
**IMPROVEMENTS**

Section 3.1    Landlord's Work and Tenant's Work.

3.1.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, **"Landlord's Work"**), and shall deliver possession of the Premises to Tenant in the condition described therein. Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as **"Tenant's Work"**) which Tenant desires to adapt the Premises to Tenant's use.

3.1.2    Tenant Reimbursement.  Tenant shall reimburse Landlord the sum of Two Million Dollars ($2,000,000.00) as Tenant's contribution toward the costs actually incurred by Landlord in performing the Landlord's Work, such amount to be paid within thirty (30) days after Tenant's receipt or the occurrence, as the case may be, of the following:

(a)    a copy of the temporary or permanent certificate of occupancy for the Premises;

(b)    substantial completion of the Landlord's Work and Tenant's Work (in accordance with the Final Plans and Specifications) as certified by Landlord's architect;

1                  (c)      a copy of a fully executed standard form of contractor's requisition
2 indicating final completion of Landlord's Work and Tenant's Work, subject to punchlist items;
3 and

4                  (d)      final lien waivers evidencing that all contractors have been paid
5 and that no liens have been filed.

6       Section 3.2    Plan Approvals.

7            3.2.1    Preparation of Plans and Specifications.

8                  (a)      Prior to the Effective Date, Landlord delivered to Tenant drawings
9 showing the proposed footprint, column layout, and interior clear dimensions of the Premises
10 (the **"Preliminary LOD"**) [Limits of Demised], which were subject to any reasonable
11 modifications indicated by Tenant as provided below. The Preliminary LOD had to be
12 substantially consistent with Exhibits B, D, and D-1 hereto.

13                  (b)      Prior to the Effective Date, Tenant delivered to Landlord its
14 revisions thereto (the **"Revised LOD"**), showing the location of the interior structural grid
15 (column layout), storefront opening, and mezzanine and/or office core, the location and
16 arrangement of the loading facilities and trash compactor pad, and any reasonable revisions to
17 the interior clear dimensions.

18                  (c)      Prior to the Effective Date, Landlord and Tenant agreed to a
19 certain LOD as shown on Exhibit B (the **"Certified LOD"**) certified by Landlord, which
20 incorporated all of the elements of the Revised LOD.  Any further changes thereto shall be
21 subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided
22 that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable
23 approval rights within the confines of said Legal Requirements.  After Tenant approves the
24 Certified LOD, Landlord shall be responsible for any and all reasonable costs incurred and
25 delays experienced by Tenant in connection with any further changes to the Certified LOD
26 required by Landlord. Notwithstanding the foregoing, Landlord and Tenant acknowledge that
27 following performance by Landlord of that portion of Landlord's Work constituting demolition, the
28 parties shall proceed diligently to develop the final LOD (the **"Final Certified LOD"**), certified by
29 Landlord, which will incorporate all of the elements of the Certified LOD referred to in this
30 Section 3.2.1(c), whereupon all references in this Lease to "Certified LOD" shall  instead refer to
31 the Final Certified LOD.

32                  (d)      Within thirty (30) days after the Effective Date, Landlord shall
33 deliver to Tenant its demolition and foundation plans (the **"Demolition/Foundation Plans"**),
34 which shall be reasonably consistent with the Certified LOD.  Within five (5) days following its
35 receipt of the Demolition/Foundation Plans, Tenant shall give Landlord notice of the respects, if
36 any, in which the Demolition/Foundation Plans fail to meet Tenant's reasonable approval, and
37 Landlord shall promptly make any revisions necessary to correct such matters and obtain
38 Tenant's approval.

39                  (e)      Within thirty (30) days after the Effective Date, Tenant shall deliver
40 to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details  (F2); Power/Specialty
41 Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4)  (collectively, **"Tenant's
42 Plans"**), all of which shall be substantially consistent with the Certified LOD (as same may be
43 reasonably modified by Tenant, as noted above).

44                  (f)      Within thirty (30) days after receipt of Tenant's Plans, Landlord
45 shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and
46 specifications (the **"Preliminary Plans"**) for Landlord's Work [which shall include, without
47 limitation, mechanical (including, without limitation, one (1)  "hospital style" passenger elevator,
48 one (1) freight elevator, two (2) passenger escalators and two (2) cart "Vermaport" escalators],
49 electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans
50 [including, without limitation, a site lighting plan with photometrics]), and each of the plans which
51 collectively constitute the Preliminary Plans shall be at least eighty-five percent (85%) complete,
52 in Tenant's reasonable judgment.  The Preliminary Plans shall be substantially consistent with
53 Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

54                  (g)      Within fifteen (15) days after its receipt of the Preliminary Plans,
55 Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to
56 meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans,
57 and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly make any revisions
58 necessary to correct such matters and obtain Tenant's approval.

(h)     Within thirty (30) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the **"Final Plans and Specifications"**), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(i)     Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(j)     All submissions by the parties of the Tenant's Plans, the Preliminary Plans, and the Final Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in *"AutoCAD 14"* format.

3.2.2   Plan Changes

(a)     Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in Exhibit D hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the **"Changes"**).

(b)     Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding five percent (5%) subcontractor profit and five percent (5%) general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate. Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen.

(c)     Landlord shall pay to Tenant the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums not exceeding five percent (5%) subcontractor profit and five percent (5%) general contractor profit thereon). At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen. Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d)     If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, and (ii) the commencement of the Slack Period and, for purposes of calculating Tenant's Damages under Subsection 2.3.2(b) above, the Delivery Date, shall be extended by the number of days of such net delay; provided, however, that, within five (5) days following its receipt of Tenant's notice describing the Changes, Landlord shall have notified Tenant in reasonable detail as to the nature and extent of such delay.

Section 3.3   Performance of Work.

3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's

Permits. Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2  If: (a) Landlord's Work has not been commenced within six (6) months after the Effective Date, or (b) the Delivery Date shall not have occurred by March 31, 2003 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)     terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), <u>except</u> that Landlord shall be obligated to promptly pay and reimburse Tenant for all of Tenant's Damages, including, without limitation, reasonable third-party costs and expenses incurred in connection with this Lease, with the preparation and review of plans and specifications, and with the performance of Tenant's Work; and/or

(ii)    avail itself of the remedies set forth in Section 16.2 below (<u>provided</u>, <u>however</u>, that the cure period set forth therein shall not be applicable); and/or

(iii)   extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3  <u>Landlord's Work Performed After Delivery of Possession</u>. On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work. Within thirty (30) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises. As used herein, the term *"Punch List Items"* shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4  <u>Tenant's Right of Entry</u>. Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, <u>provided</u>, <u>however</u>, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5  *Intentionally Omitted.*

3.3.6  <u>Work Requirements After Delivery Date</u>. Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)    all staging and storage of materials and parking of construction vehicles shall at all times occur only within the portions of the Shopping Center designated as "Staging" on <u>Exhibit B</u> hereto;

(b)    Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place in the "No Build Area" shown on <u>Exhibit B</u> hereto; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

Section 3.4    <u>Measurement; Adjustment of Rent</u>.

3.4.1    <u>Measurement of Premises and Shopping Center</u>. Within five (5) days after the completion of the exterior walls and the demising walls of the Premises (and at least sixty (60) days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Premises and of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer. If the Floor Area of the Premises is determined to be less than Fifty Thousand (50,000) square feet, then, without limiting Tenant's other rights and remedies under this Lease, it shall have the right (a) to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination, (b) to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease, and (c) to be paid and reimbursed by Landlord for all of Tenant's Damages including, without limitation, reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work, and plan preparation and review.

3.4.2    <u>Measurement of Mezzanine</u>. Within five (5) days after the completion of the walls enclosing the office mezzanine, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of said mezzanine, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If the square footage of the office mezzanine varies by more or less than five percent (5%) from that shown on the Final Plans and Specifications, then, at Tenant's request, Landlord shall correct such work to substantially conform to the Final Plans and Specifications. It shall be an immediate Landlord's Default under this Lease if Landlord fails to commence to correct such work within thirty (30) days of its receipt of Tenant's request to do so or fails to complete such corrections within sixty (60) days of its receipt of Tenant's request to do so.

3.4.3    <u>Adjustment of Fixed Rent and Tenant's Pro Rata Share</u>. Subject to the provisions contained in Section 3.4.1, if the measurement of the Premises shall indicate a Floor Area greater or less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent shall not be adjusted; however, any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be increased or reduced, as the case may be, to conform to the actual measurement, and Tenant shall receive a proportional refund of any Additional Rent theretofore paid to Landlord or make a proportional payment of Additional Rent theretofore owed to Landlord. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4. Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

3.4.4    Notwithstanding the foregoing, if the deviation in the measurement of the Leased Premises is less than one percent (1%), then no adjustments shall be made to any provisions of this Lease, provided that the Floor Area of the Premises shall be no less than fifty thousand (50,000) square feet. Tenant shall notify Landlord of any deviation in the measurement of the Leased Premises within five (5) business days after the Delivery Date.

**ARTICLE 4**
**FIXED RENT, TAXES & PERCENTAGE RENT: DETERMINATION AND PAYMENT**

Section 4.1   <u>Fixed Rent</u>. Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated. Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2   <u>Payment of Rent</u>. All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the *"Paying Agent"*), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3   <u>Real Estate and Other Taxes</u>.

4.3.1   Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2   In addition to the sum set forth in Section 4.4.9 below, Tenant shall pay to Landlord Tenant's Pro Rata Share of the increase in Taxes imposed during the second full calendar year over those Taxes imposed during the first full calendar year, subject to the provisions of this Section 4.3, and Tenant shall pay Tenant's Pro Rata Share of the increase in Taxes which accrue during each subsequent full calendar year over the immediately preceding full calendar year. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

4.3.3   Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of the increase in such Taxes, if any, and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.4   As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or

1    any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5)
2    years; or (6) fees imposed upon Landlord in connection with Landlord's development of the
3    Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by
4    Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only
5    property owned by Landlord.  Landlord represents to Tenant that, as of the Effective Date and,
6    to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the
7    Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, (ii)
8    subject to any special assessments or similar charges, or (iii) included in any special
9    improvement district(s) which would result in higher sales taxes or other similar impositions than
10   would exist in the absence of such district(s).

11            4.3.5   At Tenant's request, Landlord shall contest the amount or validity of any
12   assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed
13   valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord
14   shall cooperate with any reasonable effort of Tenant, execute any and all documents reasonably
15   required in connection therewith and, if required by any governmental authority having
16   jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or
17   otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro
18   Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or
19   Tenant in connection with such contest are paid to the party which incurred such expense).

20        Section 4.4   Percentage Rent.

21            4.4.1   Payment.  During and for each full calendar year during the Term, Tenant
22   shall pay annual percentage rent (*"Percentage Rent"*) equal to six percent (6%) (the
23   *"Percentage Multiple"*) of all "Gross Sales" (hereinafter defined in Subsection 4.4.2) resulting
24   from business conducted in, on or from the Premises during such calendar year in excess of the
25   following amounts (each a *"Sales Break Point"*) for the periods indicated:

| TIME PERIOD | SALES BREAK POINT |
|---|---|
| Rent Commencement Date to end of first full calendar year of the Initial Term. | No Percentage Rent payable |
| First day of the second full calendar year of the Initial Term, through the end of the Initial Term. | $11,500,000.00 Sales Break Point; provided that the Percentage Rent payable shall not exceed $500,000 per year |
| First and Second Renewal Periods | $12,250,000.00 Sales Break Point; provided that the Percentage Rent payable shall not exceed $540,000 per year |
| Third and Fourth Renewal Periods | $13,000,000.00 Sales Break Point; provided that the Percentage Rent payable shall not exceed $575,000 per year |

26

27   Within sixty (60) days after the close of each calendar year for which Percentage Rent is
28   payable, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting
29   forth the amount of Gross Sales during the preceding calendar year and showing the amount of
30   Percentage Rent, if any, required to be paid by Tenant for such calendar year.  The full amount
31   of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said
32   compilation.  Notwithstanding the foregoing, no Percentage Rent shall be payable with respect
33   to the period commencing on the Rent Commencement Date and ending on the December 31
34   next following the Rent Commencement Date.

35            4.4.2   Definition of Gross Sales.  As used herein, the term *"Gross Sales"* shall
36   mean the total amount of all sales of merchandise or services arising out of or payable on
37   account of all the business conducted in, on or from the Premises by or on account of Tenant
38   and any sublessee, licensee or concessionaire of Tenant (subject, however, to Section 4.4.6)
39   and any other person or entity operating in the Premises, whether for cash, credit or otherwise,
40   including redemption of gift certificates or gift cards, orders for merchandise taken from and
41   filled at or from the Premises, and deposits not refunded to customers.  A sale shall be deemed
42   to have been consummated for purposes of this Lease, and the entire amount of the sales price
43   shall be included in Gross Sales, at such time as (A)  the transaction is initially reflected in the
44   books or records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any
45   other person or entity operating its business in the Premises, (B) Tenant or any other person or

entity operating its business in the Premises receives all or any portion of the sales price, or (C) the applicable goods or services are delivered to the customer, whichever of (A), (B) or (C) first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time. Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term *"Gross Sales"* shall <u>exclude</u>: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises, (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), (8) fees paid to independent third party credit card and debit card companies in connection with sales charged to or debited from customers' credit cards or debit cards, as applicable, (9) proceeds from delivery, wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, (14) sales of gift certificates and/or gift cards, and (15) sales filled from, but not taken at, the Premises.

4.4.3  <u>Books and Records</u>. Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; <u>provided</u>, <u>however</u>, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for at least two (2) years following the end of the calendar year to which they refer.

4.4.4  <u>Landlord's Right to Audit</u>. Landlord and/or Landlord's auditor shall have the right, upon at least ten (10) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency. If such deficiency is in excess of three percent (3%) of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

4.4.5  <u>Confidentiality</u>. Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, <u>provided</u>, <u>however</u>, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

4.4.6  <u>Licensees</u>. If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the *"Licensees"*) permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the product obtained by multiplying (i) the Floor Area of such

licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder
(*i.e.*, the unlicensed portion) of the Premises. The provisions of this Subsection 4.4.6 shall not
apply to more than 4,000 square feet of Floor Area, in the aggregate, in the Premises at any
one time. If more than 4,000 square feet of the Floor Area of the Premises is licensed to
Licensees at any one time, then Tenant shall have the right to designate, from time to time,
those portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

4.4.7    Intentionally omitted.

4.4.8    Intentionally omitted.

4.4.9    Tenant's Tax, Common Areas Charges and Insurance Contribution.
Tenant shall pay to Landlord an annual contribution ("**Tenant's Contribution**") for Taxes,
Common Areas Charges and Landlord's Insurance Costs in the amount of $200,000.00,
payable in equal monthly installments of $16,666,67 during the Term of this Lease at the same
time and in the same manner as Fixed Rent.

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain, repair
and replace the Common Areas as required by this Lease and otherwise to the standard to
which Common Areas of first-class shopping centers in the Greater New Orleans metropolitan
area are operated, maintained, repaired and replaced, including, without limitation, rubbish and
debris removal (including installation and maintenance of sidewalk refuse containers),
landscaping (including, without limitation, the trimming and pruning of trees to avoid interference
with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting,
insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably
required), and control of all Common Areas, and Landlord shall comply with all applicable Legal
Requirements.

5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

(a)    Commencing with the second full calendar year and each
subsequent full calendar year during the Term, in addition to the amount set forth in Section 4.5,
Tenant shall pay to Landlord Tenant's Pro Rata Share of the increases in the reasonable costs
(hereinafter referred to as the *"Common Areas Charges"*) paid by Landlord to operate,
maintain, insure and repair the Common Areas over those Common Areas Charges applicable
to the immediately preceding calendar year. Landlord shall be permitted to include in Common
Area Charges for each calendar year (i) the cost of maintaining, repairing or providing security
for interior portions of the buildings (the "**Security Costs**"), not to exceed five percent (5%) of
the Common Area Charges for the calendar year in question, (ii) costs incurred in connection
with the monitoring, maintenance, inspection or testing of fire alarm systems (the "**Alarm
Costs**"), not to exceed five percent (5%) of the Common Area Charges for the calendar year in
question, and (iii) an administrative fee (the *"Administrative Fee"*) equal to five percent (5%) of
the Common Areas Charges for the calendar year in question, but excluding from the
computation of such Administrative Fee the cost of any replacement or improvement of a capital
nature (if such capital item is a permissible Common Areas Charge hereunder), the cost of
electricity and other utilities and "Landlord's Insurance Costs" (defined in Section 10.3.3 below).
Tenant's Pro Rata Share of the increase in Common Charges shall be payable within
thirty (30) days after Tenant receives the CAC Reconciliation Statement in accordance with
Section 5.1.2(b) below. Notwithstanding any provision hereof to the contrary, in no event shall
the Tenant's Pro Rata Share of the increase in Common Areas Charges (exclusive of the costs
of utility service for the Common Areas during such calendar year) for the second full calendar
year and each subsequent full calendar year exceed one hundred five percent (105%) of the
Tenant's Pro Rata Share of the increase in Common Areas Charges for the immediately
preceding calendar year (exclusive of the costs of utility service for the Common Areas during
such calendar year). Notwithstanding the foregoing, with respect to the Security Costs and the
Alarm Costs, Landlord may only include such charges in the Common Areas Charges if every
tenant at the Shopping Center is obligated to pay for such items pursuant to the terms of its
respective lease.

(b)    Within sixty (60) days after the end of each calendar year, commencing with the second full calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the **"CAC Reconciliation Statement"**). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of the increased Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.

5.1.3   <u>Exclusions from Common Areas Charges</u>.

(a)    Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, and is not incurred (A) prior to the expiration of the fifth (5th) full calendar year of the Term, or (B) more than once during each five (5) full calendar years of the Term; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) except for the Security Costs, the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) in ground rent; (16) depreciation [except as expressly permitted pursuant to item 23 below]; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25) except for the Administrative Fee provided for in Section 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; (26) except for the Alarm Costs, costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; or (27) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates.

(b)    In addition, if any tenant or other occupant of the Shopping Center other than Tenant (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges.

(c)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4  Tenant's Right to Audit.  Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share of the increases thereof.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the overcharge exceeds three percent (3%) of Tenant's Pro Rata Share of the increase in Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or bona fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

Section 5.2    Common Areas; Restrictions.

5.2.1  Continuous Access.  No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center or the Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof.  Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2  No Alterations.  Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location, availability, or size of any building or improvement located in the No Build Area; (ii) materially change the number, location, or layout of parking spaces located in the No Build Area; (provided, however, Tenant will not unreasonably withhold its consent if Landlord desires to reconfigure the layout of parking spaces in the No Build Area if (A) such reconfiguration is materially the same as the layout of parking spaces for the parking field in front of the Target premises at the Shopping Center, (B) the parking spaces are perpendicular to the Premises, (C) the reconfiguration is completed before the Delivery Date and (D) the parking space ratio is not reduced); (iii) construct any structures in the Common Areas located in the No Build Area (including, without limitation, any kiosks, booths, signs or similar structures in the Common Areas), other than as shown on Exhibit B hereto, or (iv) materially change the entrances or exits to and from the No Build Area, or the curb cuts, roadways and sidewalks or other Common Areas located in the No Build Area from those shown on Exhibit B hereto.  Notwithstanding any provision herein to the contrary, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the North side of the Shopping Center, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be granted or denied in Tenant's sole and unfettered discretion, reasonably or unreasonably exercised.

5.2.3  *Intentionally Omitted.*

5.2.4  <u>Parking Area</u>. During the Term, Landlord shall maintain in the Shopping Center, at a minimum, 4.75 parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, and Landlord shall maintain in the No Build Area, at a minimum, five (5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center.

5.2.5  <u>Lighting</u>. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, <u>provided</u> Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (<u>excluding</u>, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6  <u>Repairs</u>. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the North side of the Shopping Center shall:

(a)     not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)     be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)     be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7  <u>Rules and Regulations</u>. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8  <u>Miscellaneous</u>.

(a)     <u>No Promotional Use</u>. Landlord shall not use or permit the use of all or any portion of the exterior portions of the Common Areas (including, without limitation, the parking area), for retail sales or any part of the Common Areas located in the No Build Area, for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.

                (b)    <u>Trash Compactor</u>. Tenant shall be permitted to maintain and operate, at no extra charge, a trash compactor in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Compactor Pad".

                (c)    <u>Shopping Carts</u>. Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on <u>Exhibits B and D-1</u> hereto. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

                (d)    <u>Kiosks, etc.</u>   Landlord shall not permit kiosks, booths, pushcarts or any other promotional or sales areas to be located within twenty-five (25) feet of Tenant's entrance into the Mall area of the Shopping Center as shown on <u>Exhibit B</u>; provided, however, the Cingular kiosk shall be permitted to be not less than twenty-three and one-half (23½) feet of Tenant's entrance into the Mall. If Cingular ceases to do business at its kiosk or otherwise is no longer operating at the kiosk, then this exception to the twenty-five foot limitation shall terminate.

## ARTICLE 6
## UTILITIES

    Section 6.1   <u>Utility Service</u>. From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees) and Tenant shall provide, directly to the public utility, the deposit required by the public utility for electric service to the Premises. Promptly upon Landlord's request, Tenant shall cooperate with Landlord's application with the public utility for the meters or, if specifically required by the public utility, Tenant shall, with Landlord's cooperation, directly submit such application to the public utility. Upon the expiration or earlier termination of this Lease, Tenant shall be entitled to a return of its portion of the deposit with interest as provided by the public utility. Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

    Section 6.2   <u>Interruption</u>. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

1
2

**ARTICLE 7**
**SIGNS**

3    Section 7.1    Tenant's Building Signage.  Landlord shall supply and install signage (and
4    obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits
5    D, D-1, and F hereto, and with the additional provisions of this Lease.  Thereafter, Tenant shall
6    have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and
7    replace on the storefront and exterior walls of the Premises, at or above Tenant's interior
8    entrance into the Mall and on the side walls of any entrance design element, if any, signs
9    (including, without limitation, under-canopy or blade signs), banners (including temporary
10   banners placed on the storefront of the Premises and such other walls of the Premises as
11   selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to
12   time, may desire, subject to Landlord's approval and compliance with applicable Legal
13   Requirements.  Tenant may erect and maintain in the interior of the Premises any signs it may
14   desire, provided that same are professionally prepared.

15   Section 7.2    Pylon/Monument/Directional Signage.  Landlord shall provide the pylon at
16   the location shown on Exhibit B hereto during the entire Term, and obtain all permits and
17   approvals therefor.  Landlord, as part of Landlord's Work, shall obtain all governmental
18   approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of
19   such pylon in accordance with the provisions of Article 3 and Exhibits D and F hereto.  Except
20   for the Inducement Tenants and Sears, the dimensions of Tenant's pylon sign panel(s) shall be
21   at least as large as those of other occupants of the Shopping Center, and shall be located
22   above the signs of all other tenants of the Shopping Center.  Also, Tenant shall have the right to
23   have its name on all directional signs existing at the Shopping Center as of the Effective Date
24   having more than one(1) tenant's name.  Landlord shall maintain all pylons, monuments and
25   directional signs, and Tenant's signs thereon, in good order and repair, and allow Tenant
26   access to replace its signs thereon, at Tenant's cost and expense.  Landlord shall not change or
27   alter the location, structure, height or general appearance of the pylons, monuments or
28   directional signs without obtaining Tenant's prior consent.  The cost of maintaining all pylons
29   and monuments bearing Tenant's sign panel(s) [but not the cost of individual tenants' signs
30   thereon or the cost of the construction of the pylons and monuments] and the cost of any
31   electricity used to illuminate them, shall be includable in Common Areas Charges.  Tenant shall
32   pay for, or shall reimburse Landlord for Landlord's reasonable third-party costs for the
33   fabrication and installation of Tenant's sign panel on the pylon sign the Shopping Center.  Also,
34   Tenant shall reimburse Landlord for Landlord's reasonable third-party costs for the construction
35   and installation of the new pylon sign shown on Exhibit B (the "*Pylon Costs*") within thirty (30)
36   days of receipt of a bill therefor, along with reasonable evidence of the costs actually incurred
37   and paid by Landlord, an amount equal to the product of (x) the Pylon Costs and (y) a fraction,
38   the numerator of which is the square footage of Tenant's sign on the pylon and the denominator
39   of which is the total square footage of all signs on the pylon, such amount in no event to exceed
40   $8,000.  In addition, Tenant shall have the right to place a sign (in the maximum size and
41   dimensions allowed by the applicable Legal Requirements) on the side of the parking deck at
42   the Shopping Center that faces Interstate Highway 10 (the "Parking Deck Sign") provided
43   Tenant obtains all permits and approvals to do so.  Landlord shall fully cooperate with Tenant, at
44   Tenant's cost, in Tenant's efforts to obtain such permits and approvals, which cooperation shall
45   include, without limitation, submitting and prosecuting applications for such permits and
46   approvals.  In the event Tenant obtains such permits and approvals Tenant shall be permitted to
47   install such sign in conformity with such permits and approvals and in a good and workmanlike
48   manner.  Landlord makes no warranty that the Parking Deck Sign will be unobstructed by any
49   new improvements.

50   Section 7.3    Signage; Alteration/Removal/Allocation.  Tenant shall have the right, from
51   time to time, without Landlord's approval, to change its signs on the storefront and exterior of
52   the Premises, as well as on any pylon or monument, provided that the area of the new sign is
53   no larger than the area of the sign which it replaces and that the method of construction and
54   attachment is substantially the same.  Upon the expiration or earlier termination of the Lease,
55   Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from
56   any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights
57   granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between
58   Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by
59   Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

60   Section 7.4    Cooperation.  Landlord, upon request, shall execute any reasonable
61   consents or applications which may be required by applicable Legal Requirements to permit the
62   placement, installation, and/or replacement by Tenant of any signs on any part of the Premises
63   or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5    Signage Restrictions and Criteria.

7.5.1    Except for the Palace Theater, during the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises,  temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.

7.5.2    Except for landscaping required to be installed under applicable Legal Requirements, Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs or Tenant's Parking Deck Sign, if any, permitted under this Lease; provided, however, (A) Tenant shall have the right to contest, on its own or on Landlord's behalf, the municipality's landscape requirements if such requirements obscure Tenant's storefront or signage, which right shall include the right to relocate landscaping at Tenant's cost and expense and (B) if Tenant's Parking Deck Sign is obscured by a new parking garage (that does not include a hotel or office component but which may include a retail component), then Tenant, with Landlord's consent, shall have a right to relocate its Parking Deck Sign to such new garage, at Tenant's sole cost.  Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(i)), no premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have: (i) building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, or (ii) a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises.

**ARTICLE 8**
**ALTERATIONS AND IMPROVEMENTS**

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent.  All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3    In connection with a sublet or assignment permitted pursuant to this Lease, Tenant shall have the right to subdivide the Premises into two (2) or more separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.  Notwithstanding the right to subdivide the Premises granted herein, relocation of vermiports, escalators and elevators shall be prohibited without the prior approval of Landlord.

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof

warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.

8.1.5   Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within twenty (20) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center (as shown on Exhibit D-2 hereto) which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

**ARTICLE 9**
**REPAIRS**

Section 9.1   Tenant's Repairs.  Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning (*"HVAC"*) units exclusively serving the Premises.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2   Landlord's Repairs.  Subject to the provisions of Article 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)      the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)      the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)      the roof, gutters, flashings, downspouts and scuppers;

(d)      the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)      all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)      the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are

1  covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees;
2  and

3                    (g)      any damage to the Premises or the Shopping Center which is
4  occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or
5  (B) any breach by Landlord of any provision of this Lease.

6  All repairs and replacements on Landlord's part to be performed hereunder shall be at
7  Landlord's sole cost and expense (and not includable in Common Areas Charges unless
8  expressly provided to be included in Common Areas Charges pursuant to Section 5.1.1),
9  performed in a good and workmanlike manner in accordance with all applicable Legal
10 Requirements, and without material interference with or disruption to the normal conduct of any
11 business operations in the Premises.  Landlord shall give Tenant at least five (5) days' prior
12 notice of any repairs or replacements to, or which would otherwise affect the normal conduct of
13 any business operations in, the Premises (except in the case of an emergency posing imminent
14 risk of material harm to persons or property, in which event Landlord shall only be required to
15 give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable
16 judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any
17 business operations in the Premises, Landlord shall perform such repairs only after the regular
18 hours of operation of Tenant and any other occupant of the Premises (or any portion thereof),
19 and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant
20 in connection with such "after hours" repairs, including, without limitation, utilities charges and
21 security expenses.  In the event Landlord does not reimburse Tenant for any amounts payable
22 to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the
23 right (in addition to any rights and remedies to which it may be entitled under this Lease, at law,
24 or in equity) to offset such amounts against Rent, together with interest thereon at the Lease
25 Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

26         Section 9.3    Legal Compliance Work.  Except as hereinafter expressly provided,
27 Landlord shall be responsible, at its sole cost and expense (and not includable in Common
28 Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined).
29 Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the
30 performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises
31 which are neither structural nor comprise the major building systems serving the Premises; or
32 (b) are required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are
33 not of general applicability to tenants and occupants of the Shopping Center); provided,
34 however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's
35 Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease.  As
36 used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration,
37 improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center,
38 or any part thereof, as applicable, which may be required by reason of any Legal Requirement.


39                              **ARTICLE 10**
40         **INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION**

41         Section 10.1   Mutual Release, Waiver of Subrogation and Mutual Indemnification.

42                 10.1.1  Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and
43 on behalf of anyone claiming under or through either one by way of subrogation, hereby release
44 and waive all rights of recovery and causes of action against each other from any and all liability
45 for any loss or damage to property or resulting from damage to such property (and, in either
46 case, any resulting loss of business or rental income), whether caused by the negligence or
47 fault of the other party, which is normally insured under "All-Risk" property and time element
48 insurance required to be maintained hereunder.  In the event either Landlord or Tenant is a self-
49 insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring
50 party or the party maintaining the deductible hereby releases the other party from any liability
51 arising from any event which would have been covered had the required insurance been
52 obtained and/or the deductible not been maintained.

53                 10.1.2  Waiver of Subrogation.  Landlord and Tenant shall cause each property
54 insurance policy carried by either of them insuring the Premises, the contents thereof, or the
55 Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation
56 or otherwise against the other party hereto in connection with any loss or damage which is
57 covered by such policy or that such policy shall otherwise permit, and shall not be voided by the
58 releases provided above.

#### 10.1.3 Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

### Section 10.2    Tenant's Insurance.

10.2.1 <u>Tenant's Insurance</u>.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) standard "All-Risk" property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 <u>Self-Insurance</u>.  All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iv) a combination of any of the foregoing insurance programs.  To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; <u>provided,</u> however, that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

### Section 10.3    Landlord's Insurance.

10.3.1 <u>Liability Insurance</u>.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 <u>"All-Risk" Property Insurance</u>.  Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term standard "All-Risk"

property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3  Tenant's Pro Rata Share of Insurance Premiums. In addition to the sum set forth in Section 4.4.9 above, Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the increases in costs for the second full calendar year and each subsequent full calendar year over the immediately preceding full calendar year of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 (**"Landlord's Insurance Costs"**). If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of the increase in the Landlord's Insurance Costs for the second full calendar year and each subsequent full calendar year exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of the increase in Landlord's Insurance Costs for the immediately preceding calendar year. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4   General Insurance Requirements.

10.4.1  All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

10.4.2  The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

## ARTICLE 11
## FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1   Fire and Other Casualty.

11.1.1  (a)      Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include any of Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.

   (b) If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

   11.1.2 In the event that:

   (a) Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

   (b) the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

   (i) after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2,  that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

   (ii) seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

   (iii) terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

   11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

   Section 11.2 Eminent Domain.

   11.2.1 As used in this Section 11.2, **_"Taking"_** or **_"Taken"_** shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

1        11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the
2 date of vesting of title or transfer of possession, whichever is earlier, without further liability on
3 the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent
4 payable by Tenant hereunder.

5        11.2.3 In the event that:

6            (a)    any portion of the Premises shall be Taken so that it is
7 commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its
8 normal business in the Premises;

9            (b)    as a consequence of any Taking: (i) portions of the Shopping
10 Center shall be divided or separated in any manner that it materially interferes with parking,
11 visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the
12 Shopping Center no longer has entrances from Veterans Boulevard, and as a result, it is not
13 commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its
14 normal business in the Premises;

15            (c)    there occurs, in Tenant's reasonable judgment, a denial of
16 adequate access to the Shopping Center at the grade of any street adjoining the Shopping
17 Center or to any easement granted under this Lease, whether or not a Taking shall have
18 occurred;

19            (d)    any portion of the Shopping Center shall be Taken which
20 materially interferes with parking, visibility or access to the Premises, and as a result of such
21 taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to
22 conduct its normal business in the Premises;

23            (e)    more than twenty-five percent (25%) of the total Floor Area of all
24 of the buildings in the Shopping Center (other than the Premises) are Taken; or

25            (f)    five percent (5%) or more of the parking spaces located in the
26 Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are
27 Taken such that there are fewer than (i) four and one-half (4.5) parking spaces for every one
28 thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking
29 spaces required by applicable Legal Requirements;

30 then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least
31 sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event
32 this Lease shall terminate without any further liability on the part of either Landlord or Tenant,
33 except for an adjustment between the parties for the Rent payable by Tenant hereunder and for
34 payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.
35 Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated
36 based upon the extent to which the remaining portion of the Premises may, in Tenant's
37 reasonable judgment, be utilized for its normal conduct of business.

38        11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at
39 its sole cost and expense, within a reasonable period of time after such Taking, shall repair and
40 restore the area not so Taken to tenantable condition, similar in physical appearance to the
41 condition of the area immediately prior to the Taking, pursuant to plans and specifications
42 approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work
43 and all other leasehold improvements performed by Tenant; provided, however, that Landlord
44 shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded
45 to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or
46 restoration which it is required to perform hereunder. During the period of such repairs and
47 restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable
48 judgment, be used by Tenant for the normal conduct of its business. Such abatement shall
49 terminate in accordance with the terms of Section 11.3 below.

50        11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant
51 shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and
52 equipment and removal and reinstallation costs; provided, however, that no award shall be
53 payable to Tenant which reduces the award payable to Landlord for its fee interest in the
54 Premises.

55        11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be
56 resolved by arbitration in accordance with the provisions of Section 16.3 below.

11.2.7  The parties recognize that the expropriation described in item 10 of Exhibit E shall not constitute a Taking and shall not give rise to any claims by Tenant under this Article 11.

Section 11.3  Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

**ARTICLE 12**
**COVENANTS, REPRESENTATIONS AND WARRANTIES**

Section 12.1  Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2  Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3  Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals) which have not already been obtained;

(d)    Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have, access to Veterans Boulevard for the purpose of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)    There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)    As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises

from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof.

(i)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the *"Existing Leases"*); and

(j)    Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4    Environmental Matters.

12.4.1    Definitions.

(a)    As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)    As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2    Compliance with Environmental Laws.    Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.    Landlord shall comply with all applicable requirements of

Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter **"Tenant Releases"**), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Environmental Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

**ARTICLE 13**
**USES AND RESTRICTIONS**

Section 13.1   <u>Permitted and Prohibited Uses</u>.

13.1.1 <u>Tenant's Permitted Use</u>. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 <u>Prohibited Uses</u>. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or any land (the *"Related Land"*) contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned or controlled by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center or the Related Land existing as of the Effective Date) for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed), <u>provided</u>, <u>however</u>, that the foregoing provisions of this Subsection 13.1.2 shall not apply to any business existing on any Related Land owned or controlled by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the time it became Landlord hereunder, already owned or controlled such Related Land (excluding, however, the Landlord originally named herein and its Affiliates).

Section 13.2  <u>Tenant's Exclusive in Center</u>.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Except for the Existing Leases, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land (defined in Subsection 13.1.2 above) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*).  Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the <u>aggregate</u> area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.]  Existing tenants of the Shopping Center (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord and any such tenant requires Landlord's consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department store [for example, Wal-Mart, Sears, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).

13.2.3 The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least [twenty-five thousand (25,000)] square feet of the Premises.

13.2.4 (a)   Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, **"Existing Exclusives"**) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true and accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

## ARTICLE 14
## CONDUCT OF BUSINESS OPERATIONS

Section 14.1    Covenant to Open: Subject to the other provisions of this Lease (including, without limitation, Article 3 hereof), not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord), Tenant shall initially open its store for business to the public in the Premises and remain open to the public for at least two (2) years. Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time after the second year of operation, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). After the second year of operation, if Tenant does not operate or cause to be operated any retail business in the Premises (other than during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 180-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the **"Recapture Date"**) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

Section 14.2  <u>Charges Payable by Tenant</u>.  In the event Tenant elects to cease conducting its business in the Premises as set forth above, then in lieu of all charges due under this Lease, Tenant shall pay to Landlord, until the Lease expires or is sooner terminated, Fixed Rent, Tenant's Contribution, Tenant's Pro Rata Share of the increases of Taxes, Common Areas Charges and Landlord's Insurance Costs in accordance with the terms of this Lease, and, in lieu of Percentage Rent as set forth herein, an annual amount equal to the average annual amount paid by Tenant for Percentage Rent for the immediately preceding two (2) calendar years.

**ARTICLE 15**
**TENANT ASSIGNMENT AND SUBLETTING**

Section 15.1  <u>Assignment and Subletting</u>.

15.1.1  Tenant shall have the right, from time to time, with the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises.

15.1.2  Intentionally Omitted.

15.1.3  In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises:  (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the States of Alabama, Louisiana and Mississippi; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); (e) as may be required by any Legal Requirement; and/or (f) to a transferee that has a net worth at the time of such assignment or sublet of $25,000,000.00 or more.

Section 15.2  <u>Liability of Tenant</u>.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least Fifty Million Dollars ($50,000,000).

Section 15.3  <u>Collateral Assignment</u>.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4  <u>Cure Rights of Original Tenant</u>.

15.4.1  If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, <u>then</u>

1   Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have
2   the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original
3   Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New
4   Lease"*), _provided_ that the Original Tenant shall have remedied all Events of Default of the
5   assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by
6   the Original Tenant, in which event the Original Tenant shall not be obligated to cure such
7   Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon
8   the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord
9   shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result
10  of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the
11  date of termination of this Lease and shall continue for the remainder of the Term (including any
12  Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as
13  those set forth herein, except for requirements which are no longer applicable or have already
14  been performed.  It is the intention of the parties hereto that such New Lease shall have the
15  same priority relative to other rights or interests in or to the Premises as this Lease.  The
16  provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall
17  continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a
18  separate and independent contract between Landlord and the Original Tenant.  From the date
19  on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its
20  right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment
21  of the Premises and all appurtenances thereto, as contemplated in this Lease.

22          Section 15.5  Recognition Agreement.  In the event Tenant subleases all or any portion
23  of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of
24  this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among
25  Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

26                              **ARTICLE 16**
27                  **DEFAULT AND DISPUTE RESOLUTION**

28          Section 16.1  Tenant Default.

29              16.1.1  If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days
30  after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid
31  Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be
32  performed or observed within thirty (30) days after its receipt of notice thereof from Landlord
33  specifying the nature of such default (or, if such default shall be of a nature that same cannot
34  reasonably be cured within thirty (30) days and Tenant does not commence to cure such default
35  on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to
36  completion), such circumstance shall constitute an *"Event of Default"*.

37              16.1.2  Upon an Event of Default, Landlord shall have all remedies given to it at
38  law or in equity, including the following:

39                  (a)      to bring suit for the collection of such unpaid Rent or for the
40  performance of such other covenant of this Lease on Tenant's part to be performed; and/or

41                  (b)      without waiving any non-monetary default, may (but shall not be
42  obligated to) perform any covenant which is capable of being remedied by the performance of
43  affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that
44  should Landlord require access to the Premises in order to perform such covenant as aforesaid,
45  Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event,
46  Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount
47  thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of
48  expense until payment; and/or

49                  (c)      upon at least five (5) days' notice to Tenant, to terminate this
50  Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent
51  which shall have accrued up to the date of termination and any damages to Landlord by reason
52  of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing
53  which, Landlord shall have the right to initiate summary proceedings to recover possession;
54  and/or

55                  (d)      upon at least five (5) days' notice to Tenant, to terminate Tenant's
56  right of possession, re-enter the Premises and take possession thereof by lawful means.  If
57  Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant

shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2   Landlord Default. If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a **"Landlord's Default"**), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)     as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)     offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)     may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3   Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by

1 arbitration in New Orleans, Louisiana, before one arbitrator in accordance with the procedural
2 rules then obtaining of the American Arbitration Association or any successor thereto. The
3 decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of
4 the arbitrator are hereby expressly limited to the determination of factual issues, and the
5 arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall
6 make only required findings of fact incident to an arbitrable dispute, which findings shall be set
7 forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share
8 equally in the cost and expenses of such arbitration, and each shall separately pay its own
9 attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in
10 good faith in connection with the dispute or the conduct of the arbitration proceeding, in which
11 case the arbitrator may award all or part of said costs, expenses and fees to the other party.

12 **ARTICLE 17**
13 **RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE**

14 Section 17.1 <u>Right to Mortgage and Non-Disturbance</u>. Landlord reserves the right to
15 subject and subordinate this Lease at all times to any first mortgage or deed of trust for the
16 benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping
17 Center, as well as to any future ground or underlying leases encumbering or affecting all or any
18 part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and
19 deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially
20 the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall
21 execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any
22 other existing lien encumbering or affecting the Shopping Center or any portion thereof, as
23 applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably
24 satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will
25 not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or
26 deprive Tenant in or of its possession or its rights to possession of the Premises or of any right
27 or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the
28 termination of the ground or underlying lease, Tenant will not be made a party in any removal or
29 eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its
30 right of possession of the Premises, and this Lease shall continue in full force and effect as a
31 direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the
32 same terms and conditions as contained herein, without the necessity of executing a new lease;
33 and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease
34 which is specifically required hereunder and the Ground Lessor shall recognize and be bound
35 thereto.

36 Section 17.2 <u>Estoppel Certificate</u>. Upon written request of Landlord or Tenant, the
37 other party, within thirty (30) days of the date of such request, shall execute and deliver to and
38 only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser,
39 assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying
40 this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and
41 effect, if such is the case, and has not been modified, assigned, supplemented or amended,
42 except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and
43 Additional Rent have been paid; (4) stating whether or not, to Tenant's actual, knowledge,
44 Landlord is in default and, if so, stating the nature of such default, (5) stating the Rent
45 Commencement Date, and (6) stating which options to extend the Lease Term have been
46 exercised, if any.

47 Section 17.3 <u>Existing Mortgages</u>. If a mortgage, deed of trust, or other security
48 instrument encumbers the Shopping Center or any part thereof on the Effective Date, then
49 within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable
50 form: (x) a subordination, non-disturbance and attornment agreement substantially in the form
51 attached hereto as Exhibit G, executed by each and every holder of any mortgage, deed of trust
52 or any other existing lien encumbering or affecting the Shopping Center or any portion thereof,
53 and (y) a fee owner recognition agreement in the form and content described in clause (b) of
54 Section 17.1 hereof executed by any Ground Lessor (and, as may be required, consented to by
55 the holder of any mortgage, deed of trust or other existing lien as aforesaid). Should Landlord
56 fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the right by
57 notice given to Landlord at any time prior to the date on which such instrument(s) are delivered,
58 to terminate this Lease, in which event, neither party shall have any further liability hereunder
59 (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to
60 promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in
61 connection with this Lease, including, without limitation, the preparation and review of plans and
62 specifications, and the performance of Tenant's Work, provided, however, that such

1   reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars
2   ($50,000).

3                  **ARTICLE 18**
4                   **NOTICE**

5       Subject to the further provisions of this Article 18, whenever it is provided herein that any
6   notice, demand, request, consent, approval or other communication (**"Notice"**) shall or may be
7   given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the
8   contrary notwithstanding, shall not be effective for any purpose unless same shall be given by
9   registered or certified mail, postage prepaid, return receipt requested, or by any recognized
10  overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing
11  Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given
12  to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New
13  Jersey 07083, and (ii) Bart I. Mellits, Esq., Ballard Spahr Andrews & Ingersoll, LLP, One Mellon
14  Bank Center, 1735 Market Street, 51st Floor, Philadelphia, PA  19103, or to such other person
15  or other address as may, from time to time, be specified by either party in a written notice to the
16  other party.  All notices given in accordance with the provisions of this Section shall be effective
17  upon receipt (or refusal of receipt) at the address of the addressee.  Notwithstanding the
18  foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease
19  Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and
20  related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3
21  of this Lease, and (B) all budgetary information, notices (but not notices of default), statements,
22  bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges
23  as described in Section 5.1 of this Lease.

24                  **ARTICLE 19**
25             **TENANT'S PROPERTY**

26       All of Tenant's Property which may be installed or placed in or upon the Premises by
27  Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber,
28  mortgage or create a security interest in or upon Tenant's Property in the Premises without the
29  consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord
30  waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or
31  security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord
32  hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to
33  Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably
34  satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's
35  Property.

36                  **ARTICLE 20**
37              **END OF TERM**

38       Section 20.1  <u>Surrender of Premises</u>.  At the expiration of the Term, Tenant will quit and
39  surrender the Premises in good condition and repair, excepting, however, reasonable wear and
40  tear, damage by fire or other casualty, damage by eminent domain, and repairs and
41  replacements to be made by Landlord hereunder.

42       Section 20.2  <u>Hold Over</u>.  If Tenant fails to deliver possession of the Premises to
43  Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in
44  good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be
45  liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an
46  amount equal to one hundred fifty percent (150%) of the amount thereof payable by Tenant for
47  the month immediately preceding the last day of the Term as well as for all Additional Rent
48  payable by Tenant hereunder.

49                  **ARTICLE 21**
50        **TENANT'S RIGHT OF FIRST OFFER**

51       Intentionally Omitted.

**ARTICLE 22**
**ONGOING CO-TENANCY**

If, at any time during the Term, there are fewer than two (2) national or regional tenants of the type typically found in first-class regional shopping centers located in the greater New Orleans metropolitan area, each open for business to the public at the Shopping Center and each occupying not less than fifty thousand (50,000) square feet of Floor Area at the Shopping Center, or if within twenty-four (24) months of the date of execution of this Lease more than thirty-five percent (35%) of the total Floor Area of all buildings in the Shopping Center (excluding the Premises and the third (3rd) and fourth (4th) floors of the Target premises) is not then, or at any time thereafter ceases to be, used for the operation of retail business by national or regional tenants of the type typically found in first-class regional shopping centers located in the greater New Orleans metropolitan area (any of such conditions being hereinafter referred to as an *"Excess Vacancy"*), then in any of such events, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of eighteen months, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such eighteen-month period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: as set forth in Section 23.3 below.  If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens by more than five percent (5%) or any other Inducement Tenant ceases operations in the Shopping Center, and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

**ARTICLE 23**
**MISCELLANEOUS**

Section 23.1  Loading Facilities.  Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2  Liens.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3  Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Latter & Blum, Inc. (as representative of Tenant) and Stirling Properties, Inc. (as representative of Landlord) (the *"Brokers"*).  Landlord shall pay the Brokers a commission  pursuant to a separate agreement, which commission said Brokers shall share equally.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Brokers), agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4  Force Majeure.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay.  Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of *Force Majeure*.

Section 23.5  <u>Consents</u>. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6  <u>Costs</u>. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7  <u>Attorneys' Fees</u>. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8  <u>Survival of Obligations</u>. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9  <u>Non-Waiver</u>. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 <u>Rights Cumulative</u>. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11 <u>Definition of Landlord</u>. The term **"Landlord"** shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (<u>except</u> to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 <u>Successors and Assigns</u>. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 <u>Limitation of Landlord's Liability</u>. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15 Joint and Several Liability. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 Severability. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 Grammatical Usages and Construction. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 Table of Contents, Line Numbering and Paragraph Headings. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 Definition of Hereunder, Herein, etc. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 Short Form Lease. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 Entire Agreement and Modification. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 No Joint Venture or Partnership Created by Lease. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 Tenant's Tradename. Landlord shall not make use of Tenant's tradename [i.e., "Bed Bath & Beyond"] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24 Governing Law. This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

Section 23.25 Radius Restriction. Tenant agrees so long as Tenant is open and operating its business in the Premises, that Tenant (or any Affiliate of Tenant) for a period of five (5) years from the Rent Commencement Date, will not, within the area depicted on Exhibit N attached hereto and made a part hereof, either directly or indirectly own or operate a business like or substantially similar to the business conducted at the Premises. This Section 23.25 shall not apply: (i) to the continued conduct of any business being operated, as of the date of this Lease, by Tenant or any Affiliate of Tenant; (ii) to any stores hereinafter acquired by Tenant or any Affiliate of Tenant as a result of merger and consolidation or the acquisition of all or substantially all of the assets of another retail chain; (iii) to any business being operated, as of the effective date of any assignment of this Lease or sublease of all or any portion of this Lease, by any permitted assignee or permitted sublessee of Tenant; or (iv) to any business being

1   operated under a trade name which is different from the trade name under which Tenant is
2   operating its business in the Premises.

1    IN WITNESS WHEREOF, the parties have executed this instrument under seal the day
2  and year first-above written.

3

WITNESS:

[SEAL]

WITNESS:

Alan M. Freeman

[SEAL]

LANDLORD:

RICHARDS CLEARVIEW, L.L.C.

By:
Name:
Title:

TENANT:

BED BATH & BEYOND INC., a New York
corporation

By:
Warren Eisenberg
Co-Chief Executive Officer

4

WITNESS:

[SEAL]

WITNESS:

[SEAL]

LANDLORD:

RICHARDS CLEARVIEW, L.L.C.

By:
Name: William G Richards
Title:    Manager

LANDLORD:

RICHARDS CLEARVIEW, L.L.C.

By: Ellenor R Clay
Name: ELLENOR R CLAY
Title: Manager

1                                    INDEX OF EXHIBITS

2      Exhibit A -    Legal Description of Shopping Center

3      Exhibit B -    Site Plan

4      Exhibit C -    Rent Commencement and Expiration Date Agreement

5      Exhibit D -    Specifications for Landlord's Work

6      Exhibit D-1    Exterior Elevations of the Premises, and Sidewalk Plan

7      Exhibit D-2    Exterior Elevations of the Shopping Center

8      Exhibit E -    Permitted Encumbrances

9      Exhibit F -    Signage

10     Exhibit G -    Form of Subordination, Non-Disturbance and Attornment Agreement

11     Exhibit H -    Form of Subtenant Recognition Agreement

12     Exhibit I -    Form of Delivery Date Notice

13     Exhibit J -    Form of Delivery Date Certification

14     Exhibit K-1    Existing Exclusives

15     Exhibit K-2    Existing Leases

16     Exhibit L      INTENTIONALLY OMITTED

17     Exhibit M      Prohibited Uses

18     Exhibit N      Radius Restriction

1                              **EXHIBIT A**

2                  <u>**LEGAL DESCRIPTION OF SHOPPING CENTER**</u>

3

4    A CERTAIN PIECE OR PARCEL OF LAND DESCRIBED AS PLOT Y-1-A, PONTCHARTRAIN
5    GARDENS, SECTION "A", LOCATED IN SECTION 44, T12S-R10E, SOUTHEAST LAND
6    DISTRICT, PARISH OF JEFFERSON, STATE OF LOUISIANA, MORE PARTICULARLY
7    DESCRIBED AS FOLLOWS:

8    COMMENCING AT THE INTERSECTION OF THE EASTERLY RIGHT OF WAY LINE OF
9    CLEARVIEW PARKWAY AND THE SOUTHERLY RIGHT OF WAY LINE OF VETERANS
10   MEMORIAL BOULEVARD, SAID POINT BEING AN "X" FOUND IN CONCRETE, ALSO BEING
11   THE POINT OF BEGINNING;

12   THENCE PROCEED ALONG THE SOUTHERLY RIGHT OF WAY LINE OF VETERANS
13   MEMORIAL BOULEVARD, SOUTH 86 DEGREES 25 MINUTES 19 SECONDS EAST A
14   DISTANCE OF 884.96 FEET TO A "X" SET IN CONCRETE; THENCE LEAVING SAID RIGHT
15   OF WAY LINE, PROCEED SOUTH 03 DEGREES 34 MINUTES 41 SECONDS WEST A
16   DISTANCE OF 350.00 FEET TO A POINT AND CORNER; THENCE PROCEED SOUTH 86
17   DEGREES 25 MINUTES 19 SECONDS EAST A DISTANCE OF 50.00 FEET TO A POINT AND
18   CORNER; THENCE PROCEED SOUTH 03 DEGREES 34 MINUTES 41 SECONDS WEST A
19   DISTANCE OF 565.07 FEET TO A 60d NAIL SET IN ASPHALT; THENCE PROCEED SOUTH
20   86 DEGREES 25 MINUTES 19 SECONDS EAST A DISTANCE OF 261.11 FEET TO A PK
21   NAIL FOUND IN ASPHALT; THENCE PROCEED SOUTH 10 DEGREES 20 MINUTES 02
22   SECONDS EAST A DISTANCE OF 362.02 FEET TO A NAIL FOUND IN ASPHALT ON THE
23   NORTHERLY RIGHT OF WAY LINE OF TRENTON STREET; THENCE PROCEED ALONG
24   SAID RIGHT OF WAY LINE, NORTH 86 DEGREES 20 MINUTES 48 SECONDS WEST A
25   DISTANCE OF 44.97 FEET TO A POINT 0.51 FEET EAST OF A FOUND 1/2 INCH IRON
26   PIPE; THENCE LEAVING SAID RIGHT OF WAY LINE PROCEED NORTH 09 DEGREES 52
27   MINUTES 48 SECONDS WEST A DISTANCE OF 154.70 FEET TO A PK NAIL SET IN
28   ASPHALT; THENCE PROCEED NORTH 86 DEGREES 20 MINUTES 48 SECONDS WEST A
29   DISTANCE OF 100.00 FEET TO A POINT 0.60 FEET EAST OF A FOUND 1/2 INCH IRON
30   PIPE; THENCE PROCEED SOUTH 09 DEGREES 52 MINUTES 48 SECONDS EAST A
31   DISTANCE OF 154.70 FEET TO A POINT 0.42 FEET EAST OF A FOUND 1/2 INCH IRON
32   PIPE ON THE NORTHERLY RIGHT OF WAY LINE OF TRENTON STREET; THENCE
33   PROCEED ALONG SAID RIGHT OF WAY LINE, NORTH 86 DEGREES 22 MINUTES 06
34   SECONDS WEST A DISTANCE OF 342.21 FEET TO AN "X" FOUND IN CONCRETE;
35   THENCE LEAVING SAID RIGHT OF WAY LINE, PROCEED NORTH 60 DEGREES 35
36   MINUTES 45 SECONDS WEST A DISTANCE OF 283.20 FEET TO A "X" FOUND IN
37   ASPHALT; THENCE PROCEED NORTH 54 DEGREES 24 MINUTES 58 SECONDS WEST A
38   DISTANCE OF 50.77 FEET TO A POINT 0.59 FEET WEST OF A FOUND 1/2 INCH IRON
39   ROD; THENCE PROCEED SOUTH 86 DEGREES 22 MINUTES 06 SECONDS EAST A
40   DISTANCE OF 45.41 FEET TO A HOLE PUNCHED IN ASPHALT; THENCE
41   PROCEED NORTH 11 DEGREES 08 MINUTES 06 SECONDS WEST A DISTANCE OF
42   155.12 FEET TO A POINT 0.54 FEET SOUTH OF AN "X" FOUND IN ASPHALT; THENCE
43   PROCEED NORTH 03 DEGREES 39 MINUTES 12 SECONDS EAST A DISTANCE OF 50.15
44   FEET TO A POINT 0.45 FEET SOUTH OF AN "X" FOUND IN CONCRETE; THENCE
45   PROCEED NORTH 86 DEGREES 20 MINUTES 48 SECONDS WEST A DISTANCE OF
46   113.06 FEET TO A FOUND 1/2 INCH IRON PIPE; THENCE PROCEED NORTH 11 DEGREES
47   07 MINUTES 55 SECONDS WEST A DISTANCE OF 155.14 FEET TO A NAIL FOUND IN
48   ASPHALT; THENCE PROCEED NORTH 86 DEGREES 20 MINUTES 48 SECONDS WEST A
49   DISTANCE OF 50.00 FEET TO A PK NAIL SET IN ASPHALT; THENCE PROCEED SOUTH 11
50   DEGREES 07 MINUTES 55 SECONDS EAST A DISTANCE OF 44.45 FEET TO A PK NAIL
51   SET IN ASPHALT; THENCE PROCEED NORTH 86 DEGREES 20 MINUTES 48 SECONDS
52   WEST A DISTANCE OF 46.39 FEET TO A POINT 0.46 FEET WEST OF A FOUND 1/2 INCH
53   IRON ROD; THENCE PROCEED NORTH 11 DEGREES 04 MINUTES 34 SECONDS WEST A
54   DISTANCE OF 327.97 FEET TO A FOUND 1/2 INCH IRON PIPE; THENCE PROCEED 61.55
55   FEET ALONG THE ARC OF A NON-TANGENT CURVE TO THE LEFT HAVING A RADIUS OF
56   57.50 FEET, A DELTA ANGLE OF 61 DEGREES 19 MINUTES 39 SECONDS, A CHORD
57   BEARING OF NORTH 41 DEGREES 46 MINUTES 35 SECONDS WEST, AND A CHORD
58   DISTANCE OF 58.65 FEET, TO A FOUND 1/2 INCH IRON PIPE; THENCE PROCEED NORTH
59   44 DEGREES 22 MINUTES 19 SECONDS WEST A DISTANCE OF 26.69 FEET TO A "X"
60   FOUND IN CONCRETE; THENCE PROCEED NORTH 17 DEGREES 31 MINUTES 07
61   SECONDS WEST A DISTANCE OF 74.20 FEET TO A "X" FOUND IN CONCRETE; THENCE
62   PROCEED SOUTH 78 DEGREES 50 MINUTES 54 SECONDS WEST A DISTANCE OF 2.16
63   FEET TO A FOUND 1/2 INCH IRON ROD; THENCE PROCEED ALONG SAID EASTERLY

1  RIGHT OF WAY LINE, NORTH 11 DEGREES 12 MINUTES 31 SECONDS WEST A
2  DISTANCE OF 365.15 FEET TO A FOUND 1/2 INCH IRON ROD; THENCE CONTINUE
3  NORTH 03 DEGREES 46 MINUTES 54 SECONDS EAST A DISTANCE OF 10.06 FEET BACK
4  TO THE POINT OF BEGINNING.

1                                  **EXHIBIT B**

2                                  **<u>SITE PLAN</u>**

# EXHIBIT D

# EXHIBIT M

## PROHIBITED USES

As used in this Lease, the term **"Prohibited Uses"** shall mean any of the following uses:

**A.**  **As to the Shopping Center, any of the following uses:**

　　　　(1)　　Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

　　　　(2)　　Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

　　　　(3)　　Any "second hand" store, "surplus" store;

　　　　(4)　　Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

　　　　(5)　　Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any building);

　　　　(6)　　Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

　　　　(7)　　Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

　　　　(8)　　Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

　　　　(9)　　Any bowling alley or skating rink, but not including Dave & Buster's or materially similar users that occupy the third (3rd) or fourth (4th) floor of the Target premises or an existing out parcel on the South side of the Mall facing Interstate Highway 10 (the "Out Parcel"), or the first (1st) floor of the area marked "Restaurant/Retail" on Exhibit B;

　　　　(10)　　Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use, but not including Dave & Buster's or materially similar users that occupy the third (3rd) floor or fourth (4th) floor of the Target premises, the Out Parcel, or the first (1st) floor of the area marked "Restaurant/Retail" on Exhibit B;

　　　　(11)　　Any living quarters, sleeping apartments, or lodging rooms;

　　　　(12)　　Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

　　　　(13)　　Any mortuary or funeral home;

　　　　(14)　　Any "Pornographic Use", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto; the parties hereto acknowledge and agree the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder; or massage parlor;

M-1

Exhibit D

(15)  Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)  Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, but not including Dave & Buster's or materially similar users that occupy the third (3rd) floor or fourth (4th) floor of the Target premises or the Out Parcel or a bar or tavern having a Floor Area of not more than 8,000 square feet and located on the first floor of the area marked "Restaurant/Retail" on Exhibit B;

(17)  Any catering or banquet hall;

(18)  Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall, but not including Dave & Buster's or materially similar users that occupy the third (3rd) floor of the Target premises or the Out Parcel and the Palace Theater as located as of the Effective Date;

(19)  Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)  Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices, except in restaurants as permitted by Legal Requirements; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)  Any unlawful use;

(22)  Any pawn shop, gun shop, or tattoo parlor;

(23)  Any church or other place of religious worship;

(24)  Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)  Any carnival, amusement park or circus;

(26)  Any medical clinics or medical offices within 100 feet of the Premises, but not including Cohen Eye Care as located as of the Effective Date;

(27)  Any supermarket, except that an upscale, boutique-type food store of the normally operated in the greater New Orleans metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided that such store shall not occupy more than 35,000 square feet of Floor Area, and shall be located at least 150 feet away from the Premises;

(28)  Any office use, other than: (x)(i) office space used in connection with and ancillary to a permitted retail use hereunder; and (ii) retail offices providing services commonly found in similar first-class shopping centers in the greater New Orleans metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency) provided that such uses set forth in (ii) above are located at least 100 feet away from the Premises, and not more than five thousand (5,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses, and (y) office space located in the Out Parcel, the 3rd or 4th floors of the Target premises as located as of the Effective Date, or adjacent to the parking garage on the South side of the Shopping Center along Interstate Highway 10.

(29)  hotel/motel, but not including such use located on the Out Parcel or the 3rd or 4th floor of the Target premises as located as of the Effective Date;

(30)  daycare center unless in connection with the Palace Theater and not within 100 feet of the Premises;

(31)    veterinary office, except as may be incidental to a full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area; such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from the Common Areas;

(32)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)    karate center;

(34)    movie theater, other than the Palace Theater as located as of the Effective Date;

(35)    health spa (but not including a so-called "day spa" consistent with a first-class shopping center), exercise facility or similar type business, but not including any such facility located on the 3rd or 4th floors of the Target premises as located on the Effective Date.

**B.    As to <u>Related Land</u>, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22, and 25 above.**

# EXHIBIT E

BED, BATH & BEYOND

1        **EXHIBIT K-1**

2        <u>**EXISTING EXCLUSIVES**</u>

3

4

5

6

7

8

9

10       7)    <u>Target</u> – see attached excerpt.

11       8)    <u>Clearview Theatres, L.L.C.</u> – see attached excerpt.

12

13

H:\Clearview Lease.doc                    K-1-1

Exhibit E

to the following:   all federal, state, county, municipal, local and other statutes, ~s, ordinances and regulations which relate to or deal with human health or the ~nvironment, all as may be amended from time to time.

(D)      Landlord shall have the right to lease Kiosks or Vending carts to third parties, to be located within the enclosed Common Areas, provided they do not unreasonably obscure the visibility of the entrance to the Premises.  In no event shall Landlord have the right to place any merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items within the Target Parking Area.

(E)      The following use and occupancy restrictions shall be applicable to the Landlord and other tenants of the shopping center:

(i)    No drug store or pharmacy and no store of any size selling or offering for sale any pharmaceutical products requiring the services of a licensed pharmacist shall be permitted as long as Target at commencement of lease is operating a pharmaceutical department in the premises.  Should Target cease operating a pharmaceutical department on  premises or not operate a pharmaceutical department at the inception of its operation,  this restriction shall be null and void.

(F)    The names "Target", "Greatland", "Super Target" or any variation using the name "Target" shall not be used to identify the Shopping Center.  The Shopping Center shall be called  "Clearview Mall",  unless changed at the sole discretion of Landlord.

(G)    Except to the extent required by law, no Permittee shall be charged for the right to use the Common Area; provided, however, for the purpose of this provision, a tax assessment or other form of charge applicable to parking spaces or parking lots may be deemed by the Approving Parties an imposition required by law.

(H)      Tenant agrees that the third and fourth floors of the Building,  above the premises may be developed by Landlord for retail offices, business offices or hotel space and the floor space thereof shall not be included in determining the percentage

DHC: 40846 v1

28 _ *TARGET EXCLUSIVE* —

*Clearview*

(c)    Notwithstanding anything to the contrary in this Section 21 contained, in the event Landlord shall offer a comparable Parking Area to replace the condemned parking spaces taken under the power of eminent domain, and in the event Tenant shall approve such replacement parking area so offered by Landlord, the Lease shall remain in effect.

22.    **Exclusive.**  To the extent that the Landlord is not prohibited by any existing or future law, regulation, statute or court decision, Landlord hereby covenants and agrees with Tenant (and this covenant and agreement constitutes a material part of the consideration for the execution of this lease by Tenant) that so long as this Lease is in effect, Landlord, its successors, assigns, representatives or heirs, will not lease, or permit to be leased, or rent or occupy, or permit to be occupied, any premises in the Shopping Center to be used or occupied for the purpose of operating a movie theatre, an arcade or game room.  Should Landlord default under this Section 22(a) of the Lease, Tenant shall have the right to recover damages in an action at law, or injunctive relief in equity, or both.

23.    **Attorneys' Fees.**  In case either party hereto commences any litigation against the other involving this lease or any provisions thereof or any rights thereunder, the nonprevailing party to such litigation shall pay to the prevailing party the reasonable attorneys fees incurred by the prevailing party in such litigation.

24.    **Default of Landlord.**  Failure of Landlord to comply with any term, condition, provision, agreement or undertaking contained in this Lease shall constitute a default by Landlord hereunder.

(a)    Landlord and Tenant agree that in the event Landlord defaults in any obligation requiring the payment of money only, Tenant shall give Landlord written notice of such default by certified or registered mail, and Landlord shall have ten (10) days from the date of receipt of such written notice within which to correct the same.  If Landlord fails to correct such default within said ten (10) day period Tenant may, at its option may either (i) after giving Landlord one additional ten (10) day written notice of its intention to terminate this Lease, terminate same, if such default be not corrected within said ten (10) day period, (ii) bring suit for the collection of any amounts for which Landlord may be in default, without terminating this Lease; or (iii) Tenant may set off Rent against any claim against Landlord.  Tenant may also exercise all remedies otherwise provided in this Lease and otherwise available in law or equity under the laws of the State of Louisiana.

(b)    Landlord and Tenant agree that in the event of any default by Landlord in the performance of any covenant or agreement contained in this Lease (other than the payment of money), Tenant shall give Landlord written notice of such default by certified or registered mail.  If at the expiration of twenty (20) days from receipt by Landlord of said written notice, such default continues to exist, or in case of a default which with due diligence cannot be cured within twenty (20) days and Landlord is not proceeding with due diligence to cure and correct the same, Tenant shall then give Landlord a second notice in writing by certified mail or registered mail,

*non monetary default*

*—CLEARVIEW THEATRES EXCLUSIVE*