| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>Kristen Watson, Esquire (No. 270832018)<br>**BURR & FORMAN LLP**<br>420 N. 20th Street, 3400<br>Birmingham, AL  35203<br>(205) 458-5169<br>kwatson@burr.com<br><br>-and-<br><br>James H. Haithcock, III<br>**BURR & FORMAN LLP**<br>420 N. 20th Street, 3400<br>Birmingham, AL  35203<br>Tel: 205-458-5277<br>Fax: 205-244-5674<br><br>-and-<br><br>J. Cory Falgowski<br>**BURR & FORMAN LLP**<br>222 Delaware Avenue, Suite 1030<br>Wilmington, DE  19801<br>Tel: 302-830-2312<br>Fax: 302-397-2566<br><br>*Counsel for Comenity Capital Bank* | |
| In re:<br><br>Bed Bath & Beyond, Inc., *et al.,*[1]<br><br>      Debtors. | Chapter 11<br><br>Case No. 23-13359-VFP<br><br>(Jointly Administered)<br><br>**Re: D.I. 29, 92, 771, 1152** |

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

51082766 v3

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF
COMENITY CAPITAL BANK WITH RESPECT TO DEBTORS' NOTICE OF
AMENDMENT OF DATES AND DEADLINES RELATED TO DEBTORS' BIDDING
PROCEDURES AND NOTICE OF FILING OF ASSET PURCHASE AGREEMENT
WITH DREAM ON ME INDUSTRIES, INC. RELATING TO BABY IP ASSETS**

Comenity Capital Bank ("Comenity"), by and through its undersigned counsel, respectfully submits this limited objection and reservation of rights (this "Limited Objection") with respect to the *Debtors' Notice of Amendment of Dates and Deadlines Related to the Debtors' Bidding Procedures* [Dkt. No. 771] (the "Auction Notice") and *Notice of Filing of Asset Purchase Agreement with Dream on Me Industries, Inc. Relating to Baby IP Assets* [Dkt. No. 1152] (the "APA," and together with the Auction Notice, the "Sale Notice").[2] For its Limited Objection, Comenity states as follows:

### Introduction

Comenity and certain of the above-captioned debtors, along with certain debtor-affiliates (collectively "BBBY"), are parties to the Program Agreement, as defined herein, governing the issuance of co-brand and private label credit cards to certain of BBBY's customers. The Program Agreement grants Comenity numerous rights, including, but not limited to, rights of chargeback and setoff, and usage rights of certain of the Debtors' intellectual property.

Through the filing of the Auction Notice, the Debtors announced that they were holding a separate auction to sell certain of their corporate assets associated with their buybuyBABY brand and business segment (the "buybuyBABY Assets") to occur on June 28, 2023. Two days after the auction, the Debtors filed the APA that they entered into with the winning bidder, Dream on Me Industries, Inc. ("Purchaser"). The APA states that the Sale Transaction between the Debtors and

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Notice.

2

51082766 v3

Purchaser does not contemplate assumption or assumption and assignment of any executory contracts. However, Comenity files this Objection out of an abundance of caution.

The Debtors' Bed Bath & Beyond and Harmon brands and business segments are not included assets of the Sale Transaction. However, these excluded assets are part of the Program Agreement. The Debtors cannot assume and assign the buybuyBABY brand portion of the Program Agreement and reject the remainder. Thus, Comenity objects to the Sale Notice to this extent and requests that the Program Agreement be rejected by the Debtors and that card utility, for both sales and returns of merchandise, be terminated.[3]

Comenity also requests that the Program Agreement be rejected by the Debtors, since BBBY has breached its obligations to Comenity by failing to maintain certain sales volume requirements. The Company's pre-petition defaults under the Program Agreement are historical facts, which are incurable, and thus stand as a total bar to assumption and assignment of the Program Agreement. Further, the Program Agreement cannot be assumed and assigned by the Debtor without violating section 365(c)(1) of the Bankruptcy Code.

Comenity does not object to the Debtors seeking to sell the buybuyBABY Assets in general. However, the Program Agreement grants Comenity limited, non-exclusive, non-transferable revocable licenses to use the trademarks, service marks, and names owned by or licensed to BBBY and designated by BBBY for use by Comenity in connection with the Program Agreement (the "BBBY Marks") which survive any purported "free and clear" sale. Comenity requests the inclusion of language in any sale order recognizing Comenity's continued right to use

---

[3] On or about May 19, 2023, BBBY and Comenity entered into an email agreement pursuant to which usage of all co-brand and private label cards issued under the Program Agreement shall be terminated as of **August 1, 2023** (the "Email Agreement"). The Email Agreement was incorporated into the Order approving the Debtors' sale of their Bed Bath & Beyond brand assets [Dkt. No. 1117, ¶ 33]. Through this Limited Objection, Comenity seeks to enforce the Email Agreement reached between the parties.

51082766 v3

the BBBY Marks to service the credit card accounts.

Accordingly, Comenity objects to (a) assumption and assignment of the Program Agreement; (b) any sale "free and clear" or impairment of Comenity's rights and license to the BBBY Marks as set forth in the Program Agreement; and (c) in the event of rejection, any post-closing acceptance of the private label credit cards for purchases or returns by the Purchaser or any other entity that is not a contract counterparty to the Program Agreement.

**Relevant Background**

**I.    The Program Agreement.**

1.    Comenity and BBBY are parties to that certain Co-Brand Credit Card Program Agreement dated December 22, 2015 (as amended and/or modified from time to time, the "Program Agreement") by and between Comenity and Bed Bath & Beyond Inc.[4]

2.    Pursuant to the Program Agreement, Comenity owns and operates private label and co-brand credit card programs for the benefit of BBBY, including its buybuyBABY line of products, and its customers. Comenity issues private label and co-brand credit cards (collectively, the "BBBY Cards") to qualified customers (the "Cardholders") and extends credit to such customers to make purchases at BBBY related retailers online or in stores. Comenity maintains the Cardholders' accounts and owns all payments made by the Cardholders. After a purchase is made on a BBBY Card, Comenity pays BBBY for such purchase (including the sale price and sales tax), net of certain amounts owed to Comenity pursuant to the Program Agreement.

---

[4] The Program Agreement is confidential by its terms and contains confidential commercial information and trade secrets that are protected from disclosure pursuant to 11 U.S.C. § 107(b). Accordingly, a copy of the Program Agreement is not being filed herewith and it is only discussed generally herein. By discussing the Program Agreement generally in this Limited Objection, Comenity does not waive any of the confidentiality provisions of the Program Agreement and reserves all rights with respect thereto.

4

51082766 v3

3.  The Program Agreement grants Comenity certain chargeback and setoff rights, including rights related to returned and/or defective merchandise. Additionally, Comenity has the right to set off any payments made by the Cardholders on their BBBY Cards in the various BBBY retail stores (the "In-Store Payments") against amounts owed by Comenity to BBBY. The Program Agreement also grants Comenity rights in certain of the Debtors' intellectual property, including, but not limited to, certain trademarks, for purposes of Comenity carrying out its rights and obligations under the Program Agreement (all intellectual property of the Debtors in which Comenity has rights and/or interests is referred to herein as the "Trademarks").

4.  Specifically, the Program Agreement grants a license to Comenity from BBBY to make use of certain Intellectual Property required for communications made by Comenity to the Cardholders. The Program Agreement includes the grant of licenses providing that BBBY—

> hereby grants to Bank a royalty-free, non-exclusive (except as to branded credit account and card plans per Section 3.5), non-transferable license to use the BBBY Marks (as reviewed and approved by BBBY) solely in satisfaction of its duties, rights and obligations described in this Agreement, including without limitation, using same in any and all promotional materials, Account documentation, advertising, websites, marketing, and solicitations related to the Program, as well as Bank's and its Affiliates' product marketing and promotional materials and literature in written and electronic form, as well as their business client lists. Bank shall use the trademark designations "®" or "™" or such other designation as BBBY may specify or approve in connection with the BBBY Marks on the Credit Cards, Account documentation and promotional materials.

Program Agreement § 2.8(a).

5.  BBBY also agreed that even if the Program Agreement was to be terminated, that the licenses would survive in favor of Comenity "solely in connection with the administration and collection of the balance due on the Accounts." Program Agreement § 2.8 (b).

**II.   The Bankruptcy Cases.**

6.  On April 23, 2023 (the "Petition Date"), the Debtors filed their petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United

States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court" or the "Court"), citing liquidity issues exacerbated by the COVID-19 global pandemic and declining in-store sales. *See Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 10] (the "Etlin Declaration").

7. On June 7, 2023, the Bankruptcy Court entered a final order (the "Store Closing Order") [Dkt. No. 641] approving the Debtors' motion to approve the Consulting Agreements (as defined in the Store Closing Order and granting the Consultant (*ibid.*) authorization to conduct going-out-of-business sales in hundreds of the Debtors' remaining stores.

### III. The Debtors' Planned 363 Sale Transaction.

8. On April 23, 2023, the Debtors filed their *Motion for Entry of an Order (I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, (E) Approving the Form APA, and (II)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts, (C) Authorizing the Sale of Assets and (D) Granting Related Relief* [Dkt. No. 29] (the "Bidding Procedures Motion").

9. On April 25, 2023, the Bankruptcy Court entered an order approving the Bidding Procedures Motion and authorizing the Debtors to sell, among other things, certain of the Debtors' corporate assets and certain other assets associated with their business [Dkt. No. 92] (the "Bidding Procedures Order").

10. On June 19, 2023, the Debtors filed the Auction Notice stating that the Debtors had scheduled a separate Auction for the buybuyBABY Assets to occur on June 28, 2023 at 10 a.m.

11. On June 30, 2023, the Debtors filed the APA that they entered into with Purchaser.

6

51082766 v3

12. Under the terms of the APA, Purchaser will acquire, in part—

[A]ll of the following: (i) patents, inventions, invention disclosures, industrial designs and utility models; (ii) trademarks, service marks, logos, trade dress, trade names, corporate names, and other indicia of commercial source or origin, and goodwill associated with any of the foregoing ("Trademarks"); (iii) copyrights and all works of authorship, whether copyrightable or not, including any Software and rights therein; (iv) Internet domain names, URLs, internet protocol addresses, Social Media Accounts, websites, and all the content provided on the foregoing (collectively, "Internet Properties"); (v) trade secrets, industrial secret rights, and know-how, data, databases and confidential or proprietary information, including customer lists, supplier lists, processes, protocols, specifications, drawings, schematics, analyses, plans, techniques, technical plans and other forms of technology (whether or not embodied in any tangible form, and including all tangible embodiments of the foregoing, such as notebooks, samples, studies and summaries); (vi) rights in or associated with any of the foregoing, and all other intellectual property rights and proprietary rights, in each case, arising in any jurisdiction of the world; and (vii) any registrations of and pending applications to register any of the foregoing clauses (i) through (vi), together with all renewals, reissuances, continuations, continuations-inpart, divisionals, revisions, extensions, and reexaminations thereof.

APA §§ 1.1, 2.1 (the "Intellectual Property").

13. No provision was made in the APA for the license granted to Comenity by BBBY under the Program Agreement to make use of certain intellectual property required for communications made by Comenity to the Cardholders.

## LIMITED OBJECTION

I. **The Program Agreement Cannot be Assumed and Assigned Due to the Debtors' Incurable Material Defaults, the Usage of Intellectual Property, and the Division of Assets.**

   1. **The Debtors have Committed Incurable Defaults under the Program Agreement.**

Pursuant to 11 U.S.C. § 365(b)(1)(A), a debtor-in-possession must cure, or provide adequate assurance of the prompt cure of any default, in order to assume an executory contract. However, as most courts have held, material nonmonetary defaults must also be cured, and if such defaults are incurable—as is the case with past events that cannot be changed—they preclude the

7

debtor-in-possession from assuming an executory contract. *See In re Vitanza*, Case No. 98-19611DWS, 1998 Bankr. LEXIS 1497, at *82-84 (Bankr. E.D. Pa. Nov. 13, 1998); *In re New Breed Realty Enters.*, 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002); *In re Lee West Enterprises, Inc.*, 179 B.R. 204, 208 (Bankr. C.D. Cal. 1995). In the instant case, the Debtors' defaults, both occurring before and after the Petition Date, are incurable material defaults that preclude assumption.

Facilitating a credit card program requires incredible coordination, infrastructure, and supervision, together with massive outlays of financial and human resources. Given this, such a program requires certain returns in order to justify the expense of its operation. In acknowledgement of this economic reality, the parties agreed and the Program Agreement provides that an event of default warranting immediate termination would occur:

> If at any time BBBY's total Net Sales volume decreases by more than thirty percent (30%) as compared to the prior twelve (12) month period.

Program Agreement § 7.2(e) (the "<u>Sales Volume Provision</u>"). Per the Etlin Declaration, in early 2019, the Debtors reported their seventh consecutive quarter of declining store sales and profits had plunged 48% year-over-year. *See* Etlin Declaration ¶ 21.

By the plain meaning of 11 U.S.C. § 365(b)(1)(A), an executory contract in which the debtor committed an incurable default may not be assumed. Additionally, case law confirms that an incurable non-monetary default acts as a bar to assumption when such default is material or caused substantial economic detriment. *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990).

As discussed by the court in *In re New Breed Enterprises, Inc.*—

> [T]he Third Circuit articulated a standard which may be applied to determine whether the existence of an incurable non-monetary default precludes assumption of an executory contract or unexpired lease. [In *Joshua Slocum*], the court noted with approval the concept that "the [bankruptcy] court does retain some discretion

8

> in determining that lease provisions . . . may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets." *Joshua Slocum,* 922 F.2d at 1092 (*citing In re Mr. Grocer, Inc.,* 77 B.R. 349, 354 (Bankr. D.N.H.1987)). **The Third Circuit found in *Joshua Slocum* that a provision in a shopping center lease, allowing for the termination of the lease if certain minimum sales figure were not realized, was "material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange," and that it was "also reflective of the economic terms of the lease agreement governing occupancy."** *Joshua Slocum,* 922 F.2d at 1092.

278 B.R. at 321-22 (emphasis added).

The Debtors' triggering of the Sales Volume Provision is a "historical fact" and constitutes an incurable default that precludes assumption and assignment under Section 365 of the Bankruptcy Code. *See id*. In *New Breed*, the court held that where a debtor filed bankruptcy and failed to close the sale by the date specified in the contract, that this failure "constitutes a non-monetary default which cannot be cured because it is a historical fact." The same conclusion is compelled in this case, as the Debtors have already failed to meet the Sales Volume Provision by confirming their drastically declining sales. Moreover, the Debtors are going out of business—shuttering all their store locations and selling their intellectual property. Thus, there exists no possibility that the Debtors could belatedly satisfy or cure its obligations to Comenity.

In agreeing to the Sales Volume Provision, the parties to the Program Agreement understood that certain metrics needed to be maintained in order for the program to be economically viable. The Sales Volume Requirement was an essential and material term of the Program Agreement, as it "goes to the very essence of the contract, *i.e.*, the bargained for exchange." *Joshua Slocum,* 922 F.2d at 1092. Comenity agreed to administer the credit card program for a company with hundreds of stores conducting a high volume of business throughout the entire country—it did not agree to administer the program for a significantly smaller volume business, and permitting assumption, notwithstanding the Debtors' breach of the Sales Volume

9

Provision, would result in "substantial economic detriment" which is inconsistent with the requirements of Section 365 of the Bankruptcy Code. Bankruptcy does not allow the Debtors to rewrite the Program Agreement or override material incurable defaults. Given the substantial economic detriment Comenity would suffer from potentially not being able to enforce the defaults and terminate the Program Agreement immediately, it is evident that these defaults are material and preclude assumption of the Program Agreement.

    **2. As Proposed, the APA Would Affect an Assignment of Comenity's Intellectual Property in Violation of Section 365(c)(1) of the Bankruptcy Code.**

In Section 2.8(c) of the Program Agreement, Comenity grants the Debtors a non-exclusive, non-transferable, revocable right to use Comenity's trademarks, service marks, or names owned by or licensed (and capable of being sublicensed) to Comenity and designated by Comenity for use by the Debtors in connection with the Program Agreement ("Comenity's Marks"). However, the Debtors may not sublicense any of its rights to Comenity's Marks without Comenity's prior written approval, let alone assign them. However, if the Debtors are permitted to assume the Program Agreement, these restrictions would be violated, as Purchaser is buying all Intellectual Property in which the Debtors have any right or interest. *See* APA §§ 1.1, 2.1.

Section 365(c)(1)(A) of the Bankruptcy Code states that a debtor cannot assign an executory contract where "applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor[.]" *See also Cinicola v. Scharlfenberger*, 248 F.3d 110, 121 (3d Cir. 2001) ("Section 365(c) places constraints on the assignment rights created under § 365(1) and prohibits the assumption or assignment of an executory contract if applicable nonbankruptcy law would excuse the other party 'from accepting performance from or rendering performance to' someone other than the debtor.").

Courts in this District have consistently found that a debtor cannot assign a contract under which intellectual property is licensed on a non-exclusive basis without the licensor's consent. *See In re Valley Media, Inc.*, 279 B.R. 105, 135-36 (Bankr. D. Del. 2002) (non-exclusive intellectual property license may not be assigned without consent of licensor); *see also In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 308–310 (Bankr. D. Del. 2001) (sustaining licensor's objection and finding that non-exclusive intellectual property licenses are non-assignable under Bankruptcy Code section 365(c)); *In re Access Beyond Technologies, Inc.*, 237 B.R. 32 (Bankr. D. Del. 1999) (debtor could not assign intellectual property license without licensor's consent).

Comenity has invested a great deal in establishing a nationwide corporate identity. Comenity has a clear right to protect its substantial investment in and use of its intellectual property. Comenity should not be forced to allow Purchaser, with which it has no business relationship, the right to use its intellectual property. Under applicable law, Comenity cannot be compelled to accept performance from an entity with whom it does not wish to do business. *See e.g., In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 310 (Bankr. D. Del. 2001) (finding that licensor intended to "exercise a considerable degree [of] control over [intellectual property] licenses as a matter of business policy"); *In re N.C.P. Marketing Group, Inc.*, et al., 337 B.R. 230, 236 (D. Nev. 2005) (holding that intellectual property owner has an interest in the assignability of such property "so that it can maintain the goodwill, quality and value of its products[.]").

In sum, the Debtors cannot use the provisions of the Bankruptcy Code to defeat or impair Comenity's rights to its intellectual property. Accordingly, since the APA would grant Purchaser access to those rights—without Comenity's consent—the Program Agreement must be rejected.

51082766 v3

3. **The Program Agreement Cannot be Partially Assumed and Partially Rejected as Part of the Division of Assets of the Sale Transaction.**

Under the terms of the APA, Purchaser will only be buying the buybuyBABY Assets while the Debtors' Bed Bath & Beyond and Harmon brand assets will be excluded. However, the Program Agreement covers all of the Debtors' brands and it must be assumed and assigned or rejected in its entirety. The Debtors cannot assume and assign just the part of the Program Agreement that includes the buybuyBABY brand and assume or reject the remainder that includes Bed Bath & Beyond and Harmon as part of a separate transaction.

A decision to assume or reject an executory contract is "an all or nothing proposition." *Schlumberger Resource Management Serv., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.)*, 327 F.2d 242, 249 (3d Cir. 2003). Thus, if a debtor assumes a contract, it must do so with all the benefits, as well as the burdens. *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 183 (Bankr. E.D. Pa. 2010) (holding that the debtor "must either assume the whole contract, cum onere, or reject the entire contract, shedding obligations as well as benefits"). The assumption and assignment of an executory contract does not give the debtor or the assignee the ability or the right to modify the terms of the agreement being assumed and assigned. *See e.g. Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001); *see also In re Federal-Mogul Global, Inc.*, Case No. 05-2423, 2007 U.S. App. LEXIS 6120, at *9 (3d Cir. Mar. 15, 2007) (explaining that the debtor is not able to modify obligations in contract assumed and assigned pursuant to Section 365 of the Bankruptcy Code).

Accordingly, since any potential asset purchase agreement is only for the buybuyBABY Assets and the Program Agreement covers all brands, the Program Agreement cannot be assumed and should be rejected. Additionally, the same will hold true should motions be filed in the future regarding any other brands of the Debtors.

## II. Comenity's Rights and License to the Trademarks Should not be Impaired Following the Sale of the buybuyBABY Assets.

Comenity objects to the Sale Notice to the extent that it seeks to sell the Debtors' intellectual property and trademarks free and clear of Comenity's rights and license to the BBBY Marks. If the Court enters an order approving a potential sale, it is possible that the purchaser would acquire with the Debtors' assets a yet-to-be-identified portion of the Debtors' Intellectual Property.

Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." Section 361 of the Bankruptcy Code provides that bankruptcy court with broad discretion in granting adequate protection.

The Program Agreement grants Comenity a limited, non-exclusive, non-transferable revocable license to use the BBBY Marks. *See* Program Agreement § 2.8(a). The APA provides that the Acquired Assets, including all Intellectual Property, are being sold free and clear of all liens, claims, interests, and other encumbrances. *See* APA § 2.1. The APA makes no provision for adequate protection to be provided to Comenity as is required in order for the BBBY Marks, a subset of the Debtors' Intellectual Property, to be transferred and sold free and clear of Comenity's rights and license. Comenity requires the BBBY Marks to continue the servicing and billing of the Cardholders long after the Sale Transaction closes, and post-termination of the Program Agreement per Comenity's post-termination rights under the Program Agreement. Accordingly, Comenity objects to the sale of the Intellectual Property free and clear of Comenity's license without adequate protection of Comenity's interests. Any sale order approving the Sale Transaction should clarify that the Intellectual Property may not be sold free and clear of

13

Comenity's interests unless adequate protection is provided to Comenity.  Comenity also requests that this Court adequately protect Comenity by requiring that the Intellectual Property remain subject to Comenity's interests.  *See, e.g.*, *In re Dynamic Tooling Sys. Inc.*, 349 B.R. 847, 856 (Bankr. D. Kan. 2006).

Additionally, the U.S. Supreme Court has held that a debtor's rejection of a licensing agreement does not deprive the licensee of its rights under the agreement. *Mission Prod. Holdings, Inc. v. Tempnology, LLC, n/k/a Old Cold, LLC*, 139 S. Ct. 1652 (2019).  Because the Debtors cannot impair Comenity's license to the BBBY Marks through rejection of the Program Agreement, the Debtors also should not be able to impair Comenity's license to the BBBY Marks through a free and clear section 363 sale based on the same reasoning set forth by the U.S. Supreme Court in *Tempnology*.

Further, it would be inequitable to require Comenity to finance the Debtors' sales and store liquidations through the BBBY Cards during the pendency of this bankruptcy case but not allow it to use the BBBY Marks to the full extent authorized by the Program Agreement in order to collect the amounts owed.  *See* Program Agreement § 2.8 (b).

Finally, consumer protection laws require issuers of credit and collectors of debt to identify the origin of their debts to consumers. *See, e.g.*, 15 U.S.C. § 1692(g).  Use of the BBBY Marks is required for compliance with such laws.

Accordingly, any sale order should clarify that Comenity's license to use the BBBY Marks is not affected in any way by the sale of the Debtors' assets.  Comenity requests that any order confirming the Sale Transaction provide that Comenity's right to use the Debtors' trademarks, service marks, and/or other rights pertaining to the Debtors' names as set forth in the Program Agreement shall not be affected, modified, waived, primed, subordinated, or impaired in any way

by any sale of the Debtors' assets, including, but not limited to, the Debtors' Intellectual Property, and any such sale shall not be made free and clear of Comenity's interest in the assets pursuant to the Program Agreement.

### III. The BBBY Cards should not be Used by the Purchaser Following the Closing of the Sale Transaction.

Comenity objects to any BBBY Card usage by the purchaser following the closing of the Sale Transaction—limiting the cards to only sales channels owned by the contract counterparties. As of the Sale Transaction closing (or shortly thereafter), the Debtors' merchandise and sales channels will no longer exist or will no longer belong to the Debtors. The private label cards are authorized for purchases of the Debtors' merchandise solely through the Debtors' sales channels. Therefore, card usage will not be available for the purchaser's customers or through any sales channels owned or maintained by the purchaser.

After the Sale Transaction closes, the Program Agreement will be dormant and of no force and effect to provide credit card financing for the purchaser's customers as to any existing merchandise and inventory no longer owned by the Debtors. Out of an abundance of caution, Comenity objects to any circumstance in which the purchaser attempts to accept BBBY Cards online or on any other platform it intends to use the Debtors' Intellectual Property to generate sales in the future. The contracts governing the issuance and use of the BBBY Cards only provide for usage by the contract counterparty. If the purchaser is not assuming the Program Agreement, which does not seem possible given the foregoing, the purchaser will not have any rights to use the BBBY Cards. To do otherwise would unilaterally and unfairly modify the Program Agreement without Comenity's consent and without creating contractual privity with the purchaser. Comenity's rights would be prejudiced because the purchaser would receive the benefit of the Program Agreement without assuming its burdens. *See, e.g.*, *Richmond Leasing Co. v. Capital*

15

*Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Applicable law does not permit the Debtors or the purchaser to re-write the Program Agreement during the Sale Transaction. *See, e.g., Medtronic/AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001).

Accordingly, Comenity respectfully requests that any order confirming the Sale Transaction clarify that, if the Program Agreement has not been assumed and assigned as of closing, the BBBY Cards will no longer be accepted by the purchaser.

### RESERVATION OF RIGHTS

Comenity reserves all rights to raise additional objections to any orders related to any proposed sale order, any related matters, and any amendments or revisions thereto, or to any attempt to have the Program Agreement assigned at a later date. Comenity further reserves all rights it has under the Program Agreement, the orders related to any proposed sale order and applicable law, including, but not limited to, its rights to seek adequate protection and/or relief from the automatic stay.

### CONCLUSION

**WHEREFORE,** Comenity respectfully requests that this Court enter an Order:

a. Sustaining this Limited Objection;

b. Modifying any order approving the sale of the Debtors' buybuyBABY Assets to the purchaser to provide that:

   i. Unless otherwise agreed to by Comenity and the Debtors in a separate written agreement, the private label and co-brand credit cards offered by Comenity to qualifying customers of the Debtors pursuant to that certain Co-Brand Credit Card Program Agreement dated December 22, 2015 (as amended and/or modified from time to time, the "Program Agreement") shall cease utility, including being accepted for the purchase or return of any merchandise or inventory, on August 1, 2023 at 3:00 a.m. (prevailing eastern time);

   ii. Notwithstanding any provision of a sale order or the APA to the contrary, Comenity shall be permitted to continue the use of the Debtors' trademarks and service marks as provided under the existing Program Agreement and as necessary to administer

      the credit card accounts (including, but not limited to collections) until such time as all the accounts are fully processed, collected and closed;

   iii. That the Program Agreement will not be assumed, or assumed and assigned, as part of any order approving the sale of the buybuyBABY Assets or approval of the APA. Unless otherwise agreed in writing by Comenity and the Debtors, the parties agree that the Program Agreement will be rejected as of August 1, 2023;

   iv. All of Comenity's rights, remedies, claims, defenses, and other relief arising from or related to the Program Agreement (including, but not limited to, those set forth above) are expressly preserved and reserved; and

c. Granting such other, further, and different relief as this Court deems just and proper.

Dated: July 5, 2023

                                          Respectfully submitted,

                                          /s/ *Kristen P. Watson*
                                          Kristen P. Watson (NJ Bar No. 270832018)
                                          BURR & FORMAN LLP
                                          420 N. 20th Street, 3400
                                          Birmingham, AL  35203
                                          Telephone: 205-458-5169
                                          Facsimile: 205-244-5674
                                          Email:  kwatson@burr.com

                                                -and-

                                          James H. Haithcock, III
                                          BURR & FORMAN LLP
                                          420 N. 20th Street, 3400
                                          Birmingham, AL  35203
                                          Tel: 205-458-5277
                                          Fax: 205-244-5674
                                          Email:  jhaithcock@burr.com

                                                -and-

                                          J. Cory Falgowski
                                          BURR & FORMAN LLP
                                          222 Delaware Avenue, Suite 1030
                                          Wilmington, DE 19801
                                          Telephone: 302-830-2312
                                          Facsimile:  302-397-2566
                                          Email:  jfalgowski@burr.com

                                          *Counsel to Comenity Bank*