**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1**

Faye C. Rasch
Wenokur Riordan PLLC
600 Stewart Street, Suite 1300
Seattle, WA 98101
Phone: (646) 279-9627
Email: faye@wrlawgroup.com

Attorneys for SHI Owner LLC

| | |
|---|---|
| In re: | Case No. 23-13359 (VFP) |
| BED BATH & BEYOND INC., et al. | Chapter 11 |
| Debtors. | (Joint Administration Requested) |

## OBJECTION OF SHI OWNER LLC. TO NOTICE TO
## CONTRACT PARTIES TO POTENTIALLY ASSUMED
## <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

SHI Owner, LLC ("**SHI**"), a wholly owned subsidiary of and successor-in-interest to

Stratford Hall, Inc., by and through its attorneys, Wenokur Riordan PLLC, hereby files its

objection to the cure amount set forth in the Notice to Contract Parties to Potentially Assumed

Executory Contracts and Unexpired Leases (the "Cure Notice') [Doc. No. 714], and

respectfully represent in support thereof as follows:

## <u>BACKGROUND</u>

1.         On April 23, 2023 (the "Petition Date"), the above-captioned debtors

(collectively, the "Debtors") filed voluntary petitions for reorganization pursuant to Chapter 11 of

Title 11 of the United States Code (the "Bankruptcy Code").  Since the Petition Date, the Debtors

have continued to manage their properties and operate their businesses as debtors-in-possession

pursuant to §§1107 and 1108 of the Bankruptcy Code.

2.          SHI Owner LLC, wholly owned subsidiary of and successor-in-interest to

Stratford Hall, Inc., is the owner of certain nonresidential real estate known as Burlington

Crossings Shopping Center located in Burlington, Washington (the "Property").

3.          On June 14, 2010, SHI, as lessor, entered into a lease agreement (the "Lease")

with Bed Bath & Beyond, Inc. ("Bed Bath"), one of the Debtors, as lessee, for retail premises at

the Property.  A copy of the Lease is attached hereto and made a part hereof as **Exhibit "A"**.

4.          The Property is a "shopping center" within the meaning of § 365(b)(3) of the

Bankruptcy Code.

5.          On June 13, 2023, the Debtors filed the Cure Notice in connection with a

potential assumption and assignment of the Lease, among other unexpired nonresidential real

property leases.  As it relates to the Lease (as well as the Sublease), the Cure Notice reflects a

stated cure amount of $0.00.  See, Cure Notice, p. 35 of 46.

6.          While SHI reserves all of its rights with respect to the prospective assumption and

assignment of the Lease, it objects to the stated cure amount applicable to the Lease for the reasons

hereinafter set forth.

## **RELIEF REQUESTED**

7.          The Cure Notice understates the cure amount presently due and owing under the Lease

and is inconsistent with the Debtors' own schedules of assets and liabilities, which reflect an amount due

and owing to SHI as of the Petition Date in the amount of $22,963.00.  In addition, the stated cure amount

is inconsistent with SHI's proof of claim (the "SHI Claim"), a copy of which is attached hereto and made

a part hereof as **Exhibit "B"**, which reflects an amount due under the Lease as of the Petition Date in the

amount of $58,392.27.

8.        The discrepancy between the stated cure amount and the actual amount required to cure defaults under the Lease as of the Petition Date is illustrated in the following chart:

| Landlord | Actual Claim Amount | Stated Cure Amount | Discrepancy |
|---|---|---|---|
| SHI Owner, LLC | $58,392.27 | $0.00 | $58,392.27 |

9.        In order to assume the Lease, the Debtors are required to cure defaults existing under such lease pursuant to § 365(b)(1)(A) of the Bankruptcy Code, which provides in relevant part that "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee … cures, or provides adequate assurance that the trustee will promptly cure, such default…" 11 U.S.C. § 365(b)(1)(A).

10.       In disregarding the amounts due under the Lease, as reflected in the attached SHI Claim, the Debtors have materially understated the amount required to cure defaults under the Lease.

## RESERVATION OF RIGHTS

11.       SHI specifically reserves its rights to object to any other relief sought by the Debtors in connection with the assumption of the Lease, including, without limitation, an assignee's proposed adequate assurance of future performance.

## CONCLUSION

12.       For the foregoing reasons, SHI seeks an order of this Court fixing the Debtors' cure obligations under the Lease in the amount set forth herein (less any payments made by the Debtors on account of such sum prior to the assumption of the Lease plus any additional post-

petition amounts accruing under the Lease through the date thereof) and directing the Debtors

promptly to satisfy such amount following the entry of an order approving the assumption of the

Lease.

WHEREFORE, SHI respectfully requests the entry of an order granting the relief

described herein, together with such other and further relief as is just and proper.

Dated: June 26, 2023

Wenokur Riordan PLLC

By:    /s/  Faye C. Rasch
Faye C. Rasch
600 Stewart St, Suite 1300
Seattle, WA 98101
Telephone:  (646) 279-9627

*Counsel for SHI Owner, LLC*

Case 23-13359-VFP    Doc 1187    Filed 07/05/23    Entered 07/05/23 16:48:54    Desc Main
Document    Page 5 of 145

## CERTIFCATE OF SERVICE

I, Faye C. Rasch, hereby certify that on July 5, 2023 I caused the foregoing to be to be electronically filed with the Court using the CM/ECF System and to be served on all parties requesting service. I further certify that I cased true and correct copy of the foregoing to be served upon the following via electronic mail on July 26, 2023:

**Counsel to the Debtors**
Kirkland & Ellis LLP,
601 Lexington Avenue,
New York, New York 10022
Joshua A.Sussberg, P.C. (joshua.sussberg@kirkland.com)
Emily E. Geier, P.C. (emily.geier@kirkland.com)
Derek I. Hunter (derek.hunter@kirkland.com)
Ross J. Fiedler (ross.fiedler@kirkland.com)

**Co-counsel to the Debtors**
Cole Schotz P.C.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
Michael D. Sirota, Esq. (msirota@coleschotz.com)
Warren A. Usatine, Esq. (wusatine@coleschotz.com)
Felice R. Yudkin, Esq.; (fyudkin@coleschotz.com)

**Counsel to the Prepetition ABL Agent**
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017,
Marshall S. Huebner (marshall.huebner@davispolk.com)
Adam L. Shpeen (adam.shpeen@davispolk.com)
Steven Z. Szanzer (steven.szanzer@davispolk.com)
Michael Pera (michael.pera@davispolk.com)

**Counsel to the DIP Agent**
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
David M. Hillman (DHillman@proskauer.com)
Megan R. Volin (MVolin@proskauer.com)

**United States Trustee**
Office of the United States Trustee for Region 3
District of New Jersey
Raymond Boulevard, Suite 2100
Newark, NJ 07102,
Fran B. Steele (fran.b.steele@usdoj.gov)

**Counsel to the Creditors' Committee**,
**Pachulski Stang Ziehl & Jones LLP**
780 Third Ave., 34th Floor
New York, NY 10017
Robert J. Feinstein, Esq. (rfeinstein@pszjlaw.com)
Bradford J. Sandler, Esq. (bsandler@pszjlaw.com)
Paul J. Labov, Esquire (plabov@pszjlaw.com)
Colin R. Robinson, Esquire (crobinson@pszjlaw.com)

Counsel for the Stalking Horse Bidder
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Scott K. Charles (SKCharles@wlrk.com)
Michael S. Benn (MSBenn@wlrk.com)
Gordon S. Moodie (GSMoodie@wlrk.com)

Dated: July 5, 2023

Wenokur Riordan PLLC

By:    /s/  Faye C. Rasch
          Faye C. Rasch
          600 Stewart St, Suite 1300
          Seattle, WA 98101
          Telephone:  (646) 279-9627

          *Counsel for SHI Owner, LLC*

# EXHIBIT A

**LEASE AGREEMENT**

**Between**

**STRATFORD HALL, INC.,**
**a Delaware corporation**

**Landlord**

**and**

**BED BATH & BEYOND INC.,**
**a New York corporation,**

**Tenant**

**BURLINGTON CROSSINGSSHOPPING CENTER**
**1915 Marketplace Drive**
**Burlington, Washington 98233**

Dated as of: June 14, 2010

## TABLE OF CONTENTS

Page

ARTICLE 1     BASIC TERMS AND DEFINITIONS ............................................. 1
Section 1.1     Basic Terms and Definitions ........................................................ 1

ARTICLE 2     LEASE OF PREMISES; LEASE TERM; DELIVERY DATE .......... 5
Section 2.1     Lease of Premises........................................................................ 5
Section 2.2     Term ............................................................................................ 5
Section 2.3     Delivery Date .............................................................................. 6
Section 2.4     Unseasonable Delivery: Slack Period ......................................... 9
Section 2.5     Initial Co-Tenancy Condition ...................................................... 9
Section 2.6     Permits Contingency ................................................................. 10

ARTICLE 3     IMPROVEMENTS ..................................................................... 11
Section 3.1     Landlord's Work and Tenant's Work ......................................... 11
Section 3.2     Plan Approvals .......................................................................... 11
Section 3.3     Performance of Work ................................................................. 12
Section 3.4     Measurement; Adjustment of Rent ............................................ 15

ARTICLE 4     FIXED RENT, TAXES AND PERCENTAGE RENT:
            DETERMINATION AND PAYMENT ....................................... 15
Section 4.1     Fixed Rent ................................................................................. 15
Section 4.2     Payment of Rent ........................................................................ 15
Section 4.3     Real Estate and Other Taxes ..................................................... 15
Section 4.4     Percentage Rent ........................................................................ 17

ARTICLE 5     COMMON AREAS, THEIR USE AND CHARGES...................... 19
Section 5.1     Common Areas: Maintenance.................................................... 19
Section 5.2     Common Areas: Restrictions ..................................................... 23

ARTICLE 6     UTILITIES ................................................................................ 26
Section 6.1     Utility Service ........................................................................... 26
Section 6.2     Interruption ............................................................................... 26
Section 6.3     Utility Easements ...................................................................... 26

ARTICLE 7     SIGNS ....................................................................................... 26
Section 7.1     Tenant's Building Signage ......................................................... 26
Section 7.2     Pylon/Monument Signage.......................................................... 26
Section 7.3     Signage: Alteration/Removal/Allocation ................................... 27
Section 7.4     Cooperation ............................................................................... 27
Section 7.5     Signage Restrictions and Criteria.............................................. 27

ARTICLE 8     ALTERATIONS AND IMPROVEMENTS ................................... 28
Section 8.1     Alterations and Improvements ................................................... 28

ARTICLE 9     REPAIRS .................................................................................. 30
Section 9.1     Tenant's Repairs ........................................................................ 30
Section 9.2     Landlord's Repairs .................................................................... 30
Section 9.3     Legal Compliance Work ............................................................ 31

ARTICLE 10     INDEMNIFICATION, INSURANCE AND WAIVER OF
            SUBROGATION ........................................................................ 31
Section 10.1     Mutual Release, Waiver of Subrogation and
            Mutual Indemnification.............................................................. 31
Section 10.2     Tenant's Insurance ..................................................................... 32
Section 10.3     Landlord's Insurance.................................................................. 33
Section 10.4     General Insurance Requirements ................................................ 34

i

ARTICLE 11        FIRE AND OTHER CASUALTY; EMINENT DOMAIN ............. 34
   Section 11.1   Fire and Other Casualty ..................................................... 34
   Section 11.2   Eminent Domain ................................................................ 36
   Section 11.3   Abatement of Rent Charges .............................................. 38

ARTICLE 12        COVENANTS, REPRESENTATIONS AND WARRANTIES ...... 38
   Section 12.1   Quiet Enjoyment ............................................................... 38
   Section 12.2   Authority ........................................................................... 38
   Section 12.3   Landlord's Covenants, Warranties and Representations ................ 38
   Section 12.4   Environmental Matters ..................................................... 40
   Section 12.5   OEA .................................................................................. 42

ARTICLE 13        USES AND RESTRICTIONS ............................................... 44
   Section 13.1   Permitted and Prohibited Uses ......................................... 44
   Section 13.2   Tenant's Exclusive in Center ........................................... 44
   Section 13.3   Exclusives Which Tenant Must Honor .............................. 46

ARTICLE 14        CONDUCT OF BUSINESS OPERATIONS .................................... 46

ARTICLE 15        TENANT ASSIGNMENT AND SUBLETTING ............................ 47
   Section 15.1   Assignment and Subletting ............................................... 47
   Section 15.2   Liability of Tenant ............................................................ 47
   Section 15.3   Collateral Assignment ...................................................... 47
   Section 15.4   Cure Rights of Original Tenant ........................................ 47
   Section 15.5   Recognition Agreement .................................................... 48

ARTICLE 16        DEFAULT AND DISPUTE RESOLUTION ................................. 48
   Section 16.1   Tenant Default .................................................................. 48
   Section 16.2   Landlord Default ............................................................... 49
   Section 16.3   Arbitration ........................................................................ 50

ARTICLE 17        RIGHT TO MORTGAGE AND NON-DISTURBANCE;
                  ESTOPPEL CERTIFICATE ................................................... 51
   Section 17.1   Right to Mortgage and Non-Disturbance .......................... 51
   Section 17.2   Estoppel Certificate .......................................................... 51
   Section 17.3   Existing Mortgages .......................................................... 51

ARTICLE 18        NOTICE .............................................................................. 52

ARTICLE 19        TENANT'S PROPERTY ....................................................... 52

ARTICLE 20        END OF TERM ................................................................... 53
   Section 20.1   Surrender of Premises ...................................................... 53
   Section 20.2   Hold Over ......................................................................... 53

ARTICLE 21        TENANT'S RIGHT OF FIRST OFFER ........................................... 53

ARTICLE 22        ONGOING CO-TENANCY ................................................. 54

ARTICLE 23        MISCELLANEOUS .............................................................. 54
   Section 23.1   Loading Facilities ............................................................. 54
   Section 23.2   Liens ................................................................................. 54
   Section 23.3   Broker's Commission ........................................................ 54
   Section 23.4   *Force Majeure* ................................................................ 55
   Section 23.5   Consents ........................................................................... 55
   Section 23.6   Costs ................................................................................. 55
   Section 23.7   Attorneys' Fees ................................................................ 55
   Section 23.8   Survival of Obligations .................................................... 55
   Section 23.9   Non-Waiver ...................................................................... 55

1220165.6

Section 23.10    Rights Cumulative................................................................ 55
Section 23.11    Definition of Landlord ........................................................ 56
Section 23.12    Successors and Assigns........................................................ 56
Section 23.13    Limitation of Landlord's Liability ....................................... 56
Section 23.14    Limitation of Tenant's Liability........................................... 56
Section 23.15    Joint and Several Liability ................................................... 56
Section 23.16    Severability ......................................................................... 56
Section 23.17    Grammatical Usages and Construction................................ 57
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings ......... 57
Section 23.19    Definition of Hereunder, Herein, etc.................................. 57
Section 23.20    Short Form Lease ................................................................ 57
Section 23.21    Entire Agreement and Modification .................................... 57
Section 23.22    No Joint Venture or Partnership Created by Lease............ 57
Section 23.23    Tenant's Tradename............................................................. 57
Section 23.24    Counterparts ....................................................................... 57
Section 23.25    Waiver of Trial by Jury ....................................................... 57
Section 23.26    Governing Law.................................................................... 58

iii

## EXHIBITS

| | |
|---|---|
| Exhibit A-1 | Legal Description of Project |
| Exhibit A-2 | Legal Description of Shopping Center |
| Exhibit A-3 | Legal Description of Tax and Common Areas Parcel |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Intentionally Omitted |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Intentionally Omitted |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Mechanics' Lien indemnification |
| Exhibit O | Form of Declaration of Restrictions Against Related Land |
| Exhibit P | Form of Home Depot Letter |

1220165.6

1                         **LEASE AGREEMENT**

2         THIS LEASE AGREEMENT (*"Lease"*) is entered into as of   June

3 *14*, 2010 by and between STRATFORD HALL, INC., a Delaware corporation, having

4 an office at 6310 San Vincente Boulevard, Suite 250, Los Angeles, California 90048

5 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an

6 office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

7                      **W I T N E S S E T H:**

8                         ARTICLE 1

9              BASIC TERMS AND DEFINITIONS

10        Section 1.1   Basic Terms and Definitions. The following terms shall have the

11 meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

12         1.1.1  Additional Rent: Any monies which Tenant is required to pay to

13 Landlord under the terms and conditions of this Lease, other than Fixed Rent.

14         1.1.2  Affiliate: A corporation, partnership, limited liability company,

15 person or other entity which is controlling, controlled by, or under common control with,

16 Landlord or Tenant, as the case may be. As used herein, *"control"* shall mean the

17 possession, direct or indirect, of the power to direct or cause the direction of the

18 management and policies of a person or entity, whether through the ownership of voting

19 securities or rights, by contract, or otherwise.

20         1.1.3  Alternate Rent: Payment of Percentage Rent (except that for

21 purposes of this paragraph, the Percentage Multiple shall be deemed to be three (3%)

22 percent and the Sales Break Point shall be deemed to be One ($1.00) Dollar), not to

23 exceed sixty six and 67/100 percent (66.67%) of the amount of Fixed Rent which

24 otherwise would have been payable during such period (the *"Cap"*). Alternate Rent shall

25 be payable within thirty (30) days after the end of the calendar month to which it pertains,

26 and shall be payable in lieu of Fixed Rent and Percentage Rent normally payable under

27 Article 4 below. If the Alternate Rent for a calendar month does not exceed the Cap,

28 such payment shall be accompanied by a statement prepared by an officer of Tenant

29 setting forth the amount of "Gross Sales" (hereinafter defined in Subsection 4.4.2)

30 achieved during, and the amount of Alternate Rent payable for, such month.

31         1.1.4  Common Areas: All areas in the Shopping Center which are, from

32 time to time, available for the joint use and benefit of Tenant and other tenants and

33 occupants of the Shopping Center, and their respective employees, agents, subtenants,

34 concessionaires, licensees, customers and other invitees, including, but not limited to, any

35 and all parking areas, parking spaces, driveways, truck serviceways, passageways,

36 sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or

37 detention areas, elevators (if applicable), escalators (if applicable) and common utility

38 lines.

39         1.1.5  Common Areas Charges: As defined in Section 5.1 hereof.

40         1.1.6  Delivery Date: As defined in Section 2.3 hereof.

41         1.1.7  Effective Date: The date hereof.

42         1.1.8  Event of Default: As defined in Section 16.1 hereof.

43         1.1.9  Excused Periods: Periods during which Tenant's failure to conduct

44 the operations of its business or any other business: (x) resulted from alterations or

45 renovations being performed in and to the Premises, (y) was caused by damage or

46 destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused

47 by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10 <u>Exhibits</u>.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11 <u>Fixed Rent</u>:  The following amounts for the periods indicated:

(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.44 below), at the rate of Two Hundred Seventy Eight Thousand Eight Hundred Thirty and 75/100 ($278,830.75) Dollars per year [based on Ten and 25/100 ($10.25) Dollars per square foot of Floor Area in the Premises];

(b)    In the event Tenant exercises the first Renewal Option,  for the first five (5) year Renewal Period, at the rate of Three Hundred Twenty Six Thousand Four Hundred Thirty Six and 00/100 ($326,436.00) Dollars per year [based on Twelve and 00/100 ($12.00) Dollars per square foot of Floor Area in the Premises];

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Three Hundred Fifty Three Thousand Six Hundred Thirty Nine and 00/100 ($353,639.00) Dollars per year [based on Thirteen and 00/100 ($13.00) Dollars per square foot of Floor Area in the Premises];

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Three Hundred Eighty Thousand Eight Hundred Forty Two and 00/100 ($380,842.00) Dollars per year [based on Fourteen and 00/100 ($14.00) Dollars per square foot of Floor Area in the Premises]; and

(e)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Four Hundred Eight Thousand Forty Five and 00/100 ($408,045.00) Dollars per year [based on Fifteen and 00/100 ($15.00) Dollars per square foot of Floor Area in the Premises].

1.1.12 <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building area (including the Premises) in the Shopping Center or the Project (if applicable) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than [exterior] loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, without deduction for columns, stairs, elevators, escalators, shafts or other interior construction which may reduce usable area, but in no event shall Floor Area within the Premises include any loading docks or non-selling or storage space areas within any mezzanine or, except as set forth above, any exterior areas.

1.1.13 <u>*Force Majeure*</u>:  As defined in Section 23.4 hereof.

1.1.14 <u>Ground Lessor</u>: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 Intentionally Omitted.

1.1.16 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17 <u>Inducement Tenants</u>:  As defined in Subsection 2.3.1 hereof.

1.1.18 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19 <u>Landlord's Mailing Address</u>:  6310 San Vincente Boulevard, Suite 250, Los Angeles, California  90048, or such other place and/or to the attention of such

2

other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

1.1.20 <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21 <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.22 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23 <u>Mortgagee</u>:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24 Intentionally Omitted.

1.1.25 <u>Percentage Multiples</u>:  As defined in Section 4.4.1 hereof.

1.1.26 <u>Percentage Rent</u>:  As defined in Section 4.4 hereof.

1.1.27 <u>Permitted Use</u>:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items, cosmetics, and drug remedies, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the ***"Permitted Items"***); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing (i) Twenty Seven Thousand Two Hundred Three (27,203) square feet of Floor Area and (ii) approximately Six Hundred Twenty Five (625) square feet of mezzanine level space for office purposes.  In no event shall such non-selling mezzanine space (or any space used for fire pump facilities) result

in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.28A  Project:  The Shopping Center and the areas designated on Exhibit B attached hereto as the "Kohl's Parcel" and the "Home Depot Parcel", initially containing approximately three hundred seventy six  thousand three hundred forty seven (376,347) square feet of Floor Area, as more particularly described in Exhibit A-1 hereto.

1.1.29  Renewal Option:  As defined in Section 2.2.2 hereof.

1.1.30  Renewal Period(s):  Four (4) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31  Rent:  Fixed Rent and/or Additional Rent.

1.1.32  Rent Commencement Date:  As defined in Section 2.2 hereof.

1.1.33  Sales Break Points:  As defined in Section 4.4.1 hereof.

1.1.34  Shopping Center:  The shopping center commonly known as Burlington Crossings Shopping Center, containing approximately One Hundred Sixty Two Thousand Five Hundred Fifty Seven (162,557) square feet of Floor Area, on the property located at the intersection of Interstate 5, George Hopper Road and South Burlington Boulevard, in Burlington, Washington, and more particularly described in Exhibit A-2 hereto.  Anything contained in this Lease to the contrary notwithstanding, if Landlord or its Affiliate acquires title to or control over, by deed, ground lease or otherwise, the Kohl's Parcel and/or the Home Depot Parcel (or any portion thereof), then such parcel(s) (or such portion thereof) shall be deemed to be included within the Tax and Common Areas Parcel and the Shopping Center for all purposes of this Lease, and Landlord shall comply with its obligations imposed against the Shopping Center by this Lease regarding such parcel(s) (or such applicable portion thereof) including, without limitation, Section 23.20 below.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35  Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36  Tax and Common Areas Parcel:  The parcel of land, and the improvements thereon containing approximately One Hundred Fifteen Thousand Forty One (115,041) square feet of Floor Area, as more particularly described in Exhibit A-3 hereto and as shown on Exhibit B hereto.

1.1.37  Taxes:  As defined in Section 4.3.3 hereof.

1.1.38  Tenant:  As defined in the preamble hereof.

1.1.39  Tenant's Mailing Address:   650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.40  Tenant's Permits:  As defined in Section 2.3.1(b) hereof.

1.1.41  Tenant's Property:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers,

4

furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.42 <u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is the Floor Area of the Premises, and whose denominator is the Floor Area of the Tax and Common Areas Parcel, as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Tax and Common Areas Parcel, but in no event shall Tenant's Pro Rata Share be greater than Twenty-four (24%) percent.  Floor Area shall be deemed added to or removed from the Tax and Common Areas Parcel on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Anything contained in this Subsection 1.1.42 to the contrary notwithstanding, if Landlord or its Affiliate acquires title to or control over, by deed, ground lease or otherwise, the Kohl's Parcel and/or the Home Depot Parcel (as shown on <u>Exhibit B</u> hereto), or any portion thereof, or if Landlord is maintaining the common areas on any part of the Kohl's Parcel and/or the Home Depot Parcel, then the Tenant's Pro Rata Share shall be adjusted to be no greater than a percentage determined by dividing the amount of square feet of Floor Area in the Premises by the total amount of square feet of Floor Area as shown on <u>Exhibit B</u> for (a) the Tax and Common Areas Parcel and (b) such portion of the Kohl's Parcel and/or the Home Depot Parcel that Landlord or its Affiliate acquired title to, obtained control over, or is maintaining.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Tax and Common Areas Parcel including, if applicable, the Home Depot Parcel and/or the Kohl's Parcel if added to the Tax and Common Areas Parcel.

1.1.43 <u>Tenant's Work</u>:  As defined in Section 3.1 hereof.

1.1.44 <u>Term</u>:  A period  (the "***Initial Term***") of approximately Ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) "***Term***" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) "***Expiration Date***" shall mean the date on which the Term expires.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1   <u>Lease of Premises</u>.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with (but subject to the encumbrances described on <u>Exhibit E</u> hereto) any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, or any portion thereof, and, pursuant to the OEA (as defined in Section 12.5 hereof), the Kohl's Parcel and/or the Home Depot Parcel, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center and, pursuant to the OEA, the Kohl's Parcel and the Home Depot Parcel.

Section 2.2   <u>Term</u>.

2.2.1   <u>Initial Term</u>.  Subject to the provisions of this Article 2 (including, but not limited to, section 2.6.2 below), the Term of this Lease shall begin on the one

5

hundred fiftieth (150th) day following the later of the Delivery Date or the "Permit Contingency Date" (hereinafter defined in Section 2.6) (the *"Rent Commencement Date"*). The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as <u>Exhibit C</u> specifying the Rent Commencement Date.

2.2.2 <u>Renewal Options</u>. Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s). In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice (a "*Renewal Reminder Notice*") from Landlord that the Renewal Option in question has not been exercised (Landlord's Renewal Reminder Notice shall not be given prior to the 180th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options. If Landlord fails to give Tenant a Renewal Reminder Notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof. If Landlord then gives Tenant a Renewal Reminder Notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date. If Tenant does not deliver notice exercising its Renewal Option within fifteen (15) days of Landlord's delivery of a Renewal Reminder Notice, the Term shall expire on the earlier of (i) one hundred eighty (180) days after the date of Landlord's delivery of its Renewal Reminder Notice or (ii) such date as shall be selected by Landlord upon no less than sixty (60) days notice to Tenant.

Section 2.3   <u>Delivery Date</u>.

2.3.1 <u>Definition</u>. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred <u>and</u> Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)   Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, broom clean and free of any previous tenant's or occupant's furniture, fixtures, and equipment, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)   Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (<u>exclusive</u> of building permits which may be necessary for the performance of Tenant's Work and any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively *"Tenant's Permits"*)), which permits and approvals shall

6

include, without limitation, zoning and building code approvals, environmental requirements, and a certificate of occupancy for the Premises (unless a certificate of occupancy for the Premises cannot be obtained solely as a result of Tenant's Work not having been commenced or completed, in which event the delivery of a certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date);

(c)    The Common Areas, and all of the improvements thereto shown on <u>Exhibit B</u> hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(e)    Leases or other occupancy agreements shall have been entered into with the following tenants or occupants of the Project (hereinafter collectively referred to as the ***"Inducement Tenants"***) or Suitable Replacement Tenants (as hereinafter defined) on the following terms, for occupancy of the premises designated for them on <u>Exhibit B</u>; such leases or occupancy agreements (other than leases and occupancy agreements for the Kohl's Parcel and the Home Depot Parcel) shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant:

| Inducement Tenants | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Home Depot | 144,900 | N/A |
| Kohl's | 68,890 | N/A |
| Best Buy | 20,051 | N/A |
| Ross | 30,228 | N/A |
| Old Navy | 14,845 | N/A |
| Pet Smart | 22,714 | N/A |

As used herein, the term ***"Suitable Replacement Tenant"*** shall mean a national retail chain store (i) operating, as of the Effective Date or thereafter during the Term, at least twenty five (25) retail stores in the continental United States in similar first-class shopping centers (a) in a manner substantially equivalent to the operations of the store at the Shopping Center and (b) under a single trade name (or substantially similar trade names), and (ii) operating as a single store in at least eighty (80%) percent of the premises leased to the Inducement Tenant such tenant is replacing.

(f)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as <u>Exhibit G</u> executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood

7

and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

(g)    Landlord shall have obtained all approvals, if any, required under the OEA (as defined in Section 12.5) for Landlord's Work and Tenant's Work (as such terms are defined in Section 3.1) and the operation of Tenant's business in the Premises, and delivered copies of such approvals to Tenant.

(h)    Landlord shall have obtained and delivered to Tenant a letter from Home Depot in the form of Exhibit P annexed hereto.

2.3.2  Delivery Date.

(a)    Landlord shall give Tenant at least thirty (30) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the *"Delivery Date Notice"*).  Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.  No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, costs incurred in connection with contractors and subcontractors hired to perform Tenant's Work, the exact amount of which would be impracticable or extremely difficult to ascertain.  If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice, then, subject to extensions by reason of *Force* Majeure, not to exceed sixty (60) days in the aggregate (and provided Landlord shall have given Tenant notice of such event of Force Majeure promptly after its occurrence) occurring after Landlord's delivery to Tenant of the Delivery Date Notice, or by reason of Tenant Delay (as defined below) occurring after Landlord's delivery to Tenant of the Delivery Date Notice, then, as Tenant's sole monetary remedy (other than self-help reimbursement), in addition to any other non-monetary remedies available to Tenant under this Lease, Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of: (i) Ten Thousand Dollars ($10,000), plus (ii) One Thousand Dollars ($1,000) for each day that the Delivery Date established in the Delivery Date Notice is delayed.  The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.  As used herein, the term *"Tenant Delay"* shall mean any delay in Landlord's performance of any construction required to satisfy the Delivery Date Conditions that results solely from: (a) Tenant's failure to comment upon, reject or otherwise timely respond to a request for plan approval within the express time provisions set forth in this Lease; or (b) the interference, in breach of this Lease, by Tenant or Tenant's contractors in the performance by Landlord or Landlord's contractors of any such construction, provided that Landlord delivered to Tenant written notice of such claimed Tenant Delay within five (5) days after such delay has begun.

2.3.3  Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

8

2.3.4  <u>No Waiver</u>.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.  Without limiting the foregoing, if Tenant accepts physical possession of the Premises and obtains a final certificate of occupancy for the Premises prior to the satisfaction of all of the Delivery Date Conditions, then the Rent Commencement Date shall be deemed to have occurred on the one hundred fiftieth (150th) day after the date on which Tenant accepts delivery of physical possession of the Premises; <u>provided</u>, <u>however</u>, that: (i) Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on such Rent Commencement Date and ending on the date all of the Delivery Date Conditions are satisfied as required hereunder; (ii) Landlord shall remain obligated to satisfy all Delivery Date Conditions and shall at all times proceed diligently to effect the foregoing; (iii) to the extent that Tenant is delayed in performing Tenant's Work, merchandising, obtaining a final certificate of occupancy or opening for business in the Premises, due to the failure of Landlord to timely satisfy the Delivery Date Conditions, then the Rent Commencement Date specified above shall be tolled on a day for day basis for each day of such delay or delays; and (iv) subject to Landlord's continuing obligation to satisfy the Delivery Date Conditions, and Tenant's rights and remedies in connection with any default in connection with same, Tenant agrees that Tenant shall not have the right to claim that Landlord's failure to satisfy all of the Delivery Date Conditions before Tenant obtained a final certificate of occupancy for the Premises resulted in a failure of a condition precedent to the effectiveness of this Lease.

Section 2.4  <u>Unseasonable Delivery: Slack Period</u>.  If, for any reason (including, without limitation, Force Majeure), the Delivery Date (or the Permit Contingency Date, if later) occurs during the period commencing on July 15 and ending on the November 1 next following (the ***"Slack Period"***), then Tenant shall have, in addition to any other remedies, the right to:

(a)  accept delivery of physical possession of the Premises; or

(b)  defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.  In the event that Tenant elects to defer the Delivery Date pursuant to this Section, (i) the accrual of any per diem liquidated reimbursement under Section 2.3.2(b) above shall be suspended for the period of such deferment, and (ii) if the Delivery Date, but for Tenant's deferral of the Delivery Date, would not be later than the Delivery Date set forth in the Delivery Date Notice, the Ten Thousand Dollars ($10,000) liquidated reimbursement under Section 2.3.2(b) above shall not be due or payable to Tenant.

Section 2.5  <u>Initial Co-Tenancy Condition</u>.

2.5.1  As used herein, the ***"Initial Co-Tenancy Condition"*** shall mean that each and every Inducement Tenant (or a Suitable Replacement Tenant, if applicable) shall have accepted possession of its entire premises, such premises shall have been substantially completed, and each Inducement Tenant shall be open for business to the public.

9

1    2.5.2  If, on the Delivery Date, the Initial Co-Tenancy Condition has not
2  been satisfied, Tenant shall have the right, at its sole option, to:

3                    (a)  accept delivery of physical possession of the Premises; or

4                    (b)  defer its acceptance of delivery of physical possession of the
5          Premises to a later date (but not later than the date on which the Initial Co-
6          Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof),
7          whereupon the Delivery Date shall be deemed to have occurred on the date that
8          Tenant actually accepts physical possession of the Premises (subject to the other
9          provisions of this Article 2 and the continuing satisfaction of the Delivery Date
10         Conditions); and

11  in either event, if the Rent Commencement Date occurs before the satisfaction of the
12  Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of
13  Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives
14  Tenant notice thereof, subject to any other applicable provisions of this Article 2.

15    2.5.3  In addition to the provisions of Section 2.5.2 above, if the Initial Co-
16  Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery
17  Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at
18  any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving
19  Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as
20  of the date specified in said notice. Landlord may negate such termination by causing the
21  Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on
22  which said termination notice is given. If this Lease is terminated hereunder, neither
23  party shall have any further liability under this Lease, except for those obligations which
24  survive the expiration or other termination of this Lease pursuant to the express terms of
25  this Lease.

26    Section 2.6    Permits Contingency.

27    2.6.1  Tenant shall apply for Tenant's Permits within ninety (90) days of
28  the Effective Date and thereafter shall use diligent efforts to obtain all of Tenant's
29  Permits (defined in Section 2.3.1(b) above). Notwithstanding the provisions of this
30  Article 2 to the contrary, if, despite Tenant's diligent efforts, all Tenant's Permits have
31  not been obtained by the first (1st) anniversary of the Effective Date, Tenant shall have
32  the right, upon notice given to Landlord prior to the unconditional grant of all of Tenant's
33  Permits, to: (a) delay its acceptance of physical possession of the Premises to the date on
34  which all of the Tenant's Permits have been obtained, whereupon the Delivery Date shall
35  be deemed to have occurred on such date (subject to the other provisions of this Article 2
36  and the continuing satisfaction of the Delivery Date Conditions); or (b) terminate this
37  Lease. Tenant's exercise of its rights under (a) above shall not preclude the subsequent
38  exercise of its rights under (b) above. The date on which all Tenant's Permits are
39  unconditionally granted is referred to herein as the *"Permit Contingency Date"*.

40    2.6.2  If all of Tenant's Permits have not been obtained within three
41  hundred sixty-five (365) days after the date set forth in the first sentence of Section 2.6.1
42  above for any reason other than Landlord's failure to perform or observe any of its
43  obligations under this Lease, then Landlord shall have the option, upon notice given to
44  Tenant prior to the unconditional grant of all Tenant's Permits, to terminate this Lease,
45  provided, however, that Tenant shall have the right to avoid Landlord's termination by
46  giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination
47  notice, of Tenant's waiver of its rights under Section 2.6.1 above, whereupon Landlord's
48  termination notice shall be rendered null and void. If Tenant shall exercise such right and
49  render Landlord's termination notice null and void, the Permit Contingency Date shall be
50  deemed to be the date Tenant shall deliver its notice exercising such right.

10

1      2.6.3   In the event Tenant or Landlord elects to terminate this Lease
2   pursuant to this Section 2.6, this Lease shall cease and be deemed canceled and
3   terminated as of the date set forth in Tenant's or Landlord's notice of such termination
4   and upon such termination, Tenant and Landlord shall be relieved of any and all further
5   liability hereunder, except for those obligations which survive the expiration or other
6   termination of this Lease pursuant to the express terms of this Lease.

7                                    ARTICLE 3
8                                  IMPROVEMENTS

9      Section 3.1   Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost
10   and expense, perform the work and obligations described on Exhibit D, hereto, and the
11   "Final Landlord's Plans and Specifications" (hereinafter defined in Section 3.2)
12   (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant
13   in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own
14   cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*)
15   which Tenant desires to adapt the Premises to Tenant's use.

16      Section 3.2   Plan Approvals.

17         3.2.1   Preparation of Plans.

18            (a)   Prior to the Effective Date, Landlord delivered to Tenant
19   drawings showing the proposed footprint, column layout, and interior clear dimensions of
20   the Premises (the *"Preliminary LOD"*) [Limits of Demised], which were subject to
21   reasonable modifications indicated by Tenant as provided below. The Preliminary LOD
22   was substantially consistent with Exhibits B, D, and D-1 hereto.

23            (b)   Prior to the Effective Date, Tenant delivered to Landlord its
24   revisions thereto (the *"Revised LOD"*), showing the location of the interior structural grid
25   (column layout), storefront opening, and mezzanine and/or office core, the location and
26   arrangement of the loading facilities, trash compactor pad and trash container pad(s).
27   The Revised LOD does not require Landlord to make structural alterations or
28   improvements to the Premises not included on Exhibit D hereto.

29            (c)   Prior to the Effective Date, (i) Landlord delivered to Tenant a
30   final LOD (the *"Certified LOD"*), certified by Landlord, which incorporated all of the
31   elements of the Revised LOD, and (ii) Tenant approved the Certified LOD.  Any further
32   changes thereto shall be subject to Tenant's prior written approval (which may be
33   withheld in its sole discretion), provided that, as to changes required to conform to Legal
34   Requirements, Tenant shall have reasonable approval rights within the confines of said
35   Legal Requirements.  Landlord shall be responsible for any and all reasonable costs
36   incurred and delays experienced by Tenant in connection with any further changes to the
37   Certified LOD required by Landlord.

38            (d)   Intentionally Omitted.

39            (e)   Intentionally Omitted.

40            (f)   Intentionally Omitted.

41            (g)   On or prior to the Effective Date, Tenant shall deliver to
42   Landlord Tenant's plans (*"Tenant's Plans"*) depicting Tenant's Work.  Landlord shall
43   have fifteen (15) days from its receipt of Tenant's Plans (or revisions thereto, as
44   applicable) to approve or disapprove Tenant's Work depicted thereon, which plans and
45   work shall be approved so long as they: (i) comply with all Legal Requirements, and (ii)
46   are substantially consistent with Exhibits B, D, D-1, and F attached hereto and (iii) do not
47   materially reduce the structural soundness of the building containing the Premises.  If
48   Landlord shall fail to disapprove Tenant's Plans with reasonable specificity within said

11

30-day period, Tenant's Plans shall be deemed approved.  This Lease is subject to and conditioned upon Landlord's approval (or deemed approval) of Tenant's Plans.

        3.2.2  Plan Changes.  Intentionally Omitted.

Section 3.3    Performance of Work.

        3.3.1  Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials.  Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Premises.  If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

        3.3.2  If: the Delivery Date shall not have occurred by September 1, 2010 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

        (i)    terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work), not to exceed Thirty-five Thousand Dollars ($35,000) and/or

        (ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

        (iii)    extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord, and as to any extension granted with respect to the clause 3.3.2(b) above, in addition to any other rights and remedies to which Tenant may be entitled, the Rent Commencement Date shall be postponed by two (2) days for each day of the extension granted as to clause 3.3.2(b) above.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

        3.3.3  Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined).  Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list.  If Landlord fails to

complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand.  If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work.  As used herein, the term ***Punch List Items***" shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5    Tenant's Leasehold Improvements.  Subject to Section 3.3.8 below, Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

3.3.6    Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)    staging and storage of materials and parking of construction vehicles shall occur only within the portions of the Shopping Center designated as "Staging" on Exhibit B hereto;

(b)    Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on Exhibit B hereto; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7    Tenant's Trailer.  Tenant shall have the right, subject to applicable Legal Requirements, to place a trailer on the Common Areas in an area immediately adjacent to the Premises, in the location shown on Exhibit B hereto, during the period commencing on the forty-fifth (45th) day prior to date on which Tenant has scheduled for the commencement of its fixturing in the Premises, until the twentieth (20th) day after said fixturing date (but not later than the date Tenant opens for business in the Premises), for the purpose of conducting employee interviews and recruiting.  Tenant shall install, at Tenant's expense, utility hookups to the trailer in accordance with the specifications set

13

forth in Exhibit D hereto. Notwithstanding anything to the contrary in this Section 3.3.7, in lieu of installing a trailer, Landlord may provide during the time periods specified above temporary vacant space in the Shopping Center for Tenant's exclusive use in conducting employee interviews and recruiting, in accordance with Exhibit D hereto, provided such temporary space has a Floor Area of at least Four Hundred (400) square feet. Such temporary space shall be vacant, finished, in a "broom clean" condition and contain utility services (including HVAC) in accordance with the specifications set forth in Exhibit D hereto, private restrooms, and other services and amenities which would otherwise have been provided in and for such trailer.

3.3.8   Tenant Allowance. Landlord shall pay Tenant the sum of (a) Seven Hundred Forty Eight Thousand Eighty Two and 50/100 Dollars ($748,082.50) in consideration for Tenant's construction of "Landlord's Special Improvements" (defined below), and (b) Ten Thousand and 00/100 Dollars ($10,000.00) in consideration of floor work to be performed on Landlord's behalf, which floor work is described in Exhibit D attached hereto (collectively, the *"Tenant Allowance"*). Landlord and Tenant hereby acknowledge and agree that the Tenant Allowance shall be in addition to Landlord's Work. Landlord shall pay the Tenant Allowance to Tenant within twenty (20) days after the later to occur of Substantial Completion of Tenant's Work in accordance with the Tenant's Plans, as certified by Tenant's architect, and Landlord's receipt of all of the following:

(i)   a copy of a fully executed standard form of contractor's requisition indicating substantial completion of Tenant's Work;

(ii)   at Tenant's discretion, either (y) a lien waiver from Tenant's general contractor , or (z) an agreement regarding mechanics' and materialman's liens in the form attached hereto as Exhibit N; and

(iii)   a temporary or permanent certificate of occupancy (or its local equivalent), unless such certificate is not available for any reason other than Tenant's failure to perform Tenant's Work in compliance with all Legal Requirements.

If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion thereof within twenty (20) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to a credit against one hundred percent (100%) of the Rent payable by Tenant hereunder, together with interest thereon at a rate equal to the then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus five percent (5%). The Tenant Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of Tenant's Work (the *"Landlord's Special Improvements"*) (which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease). It is the parties' intention that Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance. Landlord represents and warrants to Tenant for such purpose that Landlord's Employer Identification Number is 13-5417562, but Tenant acknowledges that Landlord does not represent or warrant that the Internal Revenue Service will agree that the Tenant Allowance is not income to Tenant pursuant to Section 110 of the Internal Revenue Code (Title 26 U.S.C. § 110). Within a reasonable time after substantial completion of Tenant's Work, Landlord and its consultants shall be permitted to enter the Premises at a mutually convenient time scheduled in advance with Tenant to inspect Tenant's Work solely for the purpose of determining and confirming such information as shall be required for Landlord to fulfill its tax reporting obligations in connection with the use of the Tenant Allowance. Tenant, at Landlord's sole cost and expense, shall reasonably

14

cooperate with Landlord to facilitate such entry and inspection. Tenant acknowledges that Landlord and its consultants may need to gain entry to the Premises and perform such inspection on more than one (1) occasion in order to determine the information necessary to satisfy Landlord's tax reporting obligations with respect to the use of the Tenant Allowance. Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the Tenant's Allowance, and Tenant's Work (except for Landlord's Special Improvements), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes.

Section 3.4   Measurement; Adjustment of Rent. Intentionally Omitted.

ARTICLE 4

FIXED RENT, TAXES AND PERCENTAGE RENT: DETERMINATION AND
PAYMENT

Section 4.1   Fixed Rent. Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid in lawful money of the United States without notice or demand and without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2   Payment of Rent. All Rent shall be mailed or otherwise delivered to Stratford Hall, Inc., c/o Burlington Crossings, PO Box 4000, MS 902, Portland, OR 97208 or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the "*Paying Agent*"), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord. With respect to any installment of Rent which becomes due and payable by Tenant hereunder but is not paid within ten (10) days after Tenant's receipt of a reminder notice from Landlord (which notice shall reference this Section 4.2 and shall include on the first page the following text in bold font and capital letters: "FAILURE TO PAY THE PAST DUE RENT STATED IN THIS NOTICE WITHIN TEN (10) DAYS OF YOUR RECEIPT OF THIS NOTICE MAY RESULT IN THE IMPOSITION OF A LATE CHARGE OF THREE (3%) PERCENT OF SUCH PAST DUE RENT"), Tenant shall pay to Landlord a late charge equal to three (3%) percent of such unpaid amount.

Section 4.3   Real Estate and Other Taxes.

4.3.1   Landlord shall pay on or before the delinquency dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2   (a)   Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as

15

the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by
law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not
interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option
so as to maximize the number of installments, and Landlord shall pay the same as they
come due and before any fine, penalty, interest or cost may be added thereto for
nonpayment thereof.

(b)      Landlord shall submit to Tenant a copy of the bill for Taxes
issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of
such Taxes and proof of the payment of Taxes for the previous payment period, as well
as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant
shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days
after receipt of such bill (but in no event earlier than the thirtieth (30th) day prior to the
date on which such Taxes would become delinquent).

(c)      Notwithstanding anything herein to the contrary, in no event
shall the amount to be paid by Tenant pursuant to Section 4.3.2(a) during any applicable
period of the Term exceed the amount which Tenant would pay if (i) Taxes were equal to
the amount of all general, *ad valorem* real estate taxes, and assessments for betterments
and improvements, levied or assessed by any lawful authority on the entire Shopping
Center, as determined in accordance with the provisions of Section 4.3.3, and (ii) the
denominator used for determining Tenant's Pro Rata Share was the Floor Area of the
entire Shopping Center.

4.3.3   As used herein, *"Taxes"* shall mean (i) all general, *ad valorem* real
estate taxes, and assessments for betterments and improvements that are levied or
assessed by any lawful authority on the Tax and Common Areas Parcel (general or
special), including any substitution therefor, in whole or in part, due to a future change in
the method of taxation and (ii) subject to the provisions of this Section below, all actual,
reasonable, out-of-pocket costs and expenses paid or incurred by Landlord to contest the
amount of any such real estate taxes and/or assessments. Taxes shall be reduced by any
deferral, abatement, or other tax-lowering adjustment received by Landlord from the
taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes
shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift,
transfer, franchise, capital, or other tax or assessment upon Landlord, or upon the rentals
payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are
customarily paid by retail tenants in the state in which the Shopping Center is located),
gross receipts or revenues of Landlord from the Premises (unless such tax on Landlord's
gross receipts or revenues shall be in lieu of, and not in addition to, general, *ad valorem*
real estate taxes and all commercial property owners in the taxing district of the Project
are required to pay such tax); (3) fine, penalty, cost or interest for any tax or assessment,
or part thereof, which Landlord or its lender failed to timely pay (except if same are
caused by an Event of Default); (4) assessment for a public improvement arising from the
initial construction or expansion of the Shopping Center, the Tax and Common Areas
Parcel or the Premises (it being agreed that all assessments imposed during the Term
which are permitted to be included within Taxes hereunder shall, for the purposes of
computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the
maximum number of installments permitted by the applicable taxing authority); (5) Taxes
resulting directly from an increase in the assessment caused by a sale or ground lease of
all or any portion of the Shopping Center or the Tax and Common Areas Parcel to an
Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon
Landlord in connection with Landlord's development of the Shopping Center and/or the
Tax and Common Areas Parcel (including, without limitation, trip generation fees). All
Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Tax
and Common Areas Parcel was the only property owned by Landlord. Landlord
represents to Tenant that, as of the Effective Date and, to the best of Landlord's
knowledge, as of the anticipated Delivery Date, no portion of the Tax and Common

16

Areas Parcel is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, other than a Local Improvement District assessment expiring in October of 2011, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes (inclusive of the above-mentioned Local Improvement District assessment) for the first full calendar year after the Tax and Common Areas Parcel has been completed and fully-assessed will be approximately $2.08 per square foot of Floor Area in the Premises. Notwithstanding anything in this Lease to the contrary, if, other than at Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes and such contest shall be unsuccessful, Tenant shall not be required to pay more than One Thousand and 00/100 ($1,000.0) Dollars in the aggregate on account of the costs and expenses of such contest.

4.3.4    At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Notwithstanding the foregoing, if Tenant is the sole occupant of the tax lot on which the Premises is located, then Tenant shall have the right to contest the assessed valuation or Taxes without first requesting that Landlord do so.

Section 4.4    Percentage Rent.

4.4.1    Payment. During and for each full calendar year during the Initial Term, Tenant shall pay annual percentage rent ("*Percentage Rent*") equal to the aggregate of (i) four percent (4%) of "Gross Sales" (hereinafter defined in Subsection 4.4.2) resulting from business conducted in, on or from the Premises during such calendar year in excess $6,000,000 up to (and including) $9,000,000; and (ii) two percent (2%) of Gross Sales resulting from business conducted in, on or from the Premises during such calendar year in excess of $9,000,000 up to (and including) $14,000,000 (the aforesaid percentages of 4% and 2%, respectively hereinafter referred to as "*Percentage Multiples*" and the aforesaid amounts of $6,000,000, $9,000,000 and $14,000,000 respectively hereinafter referred to as the "*Sales Break Points*"). For purposes of illustration, if Gross Sales in a calendar year during the Initial Term are $15,000,000, then Tenant would owe Landlord Percentage Rent equal to $220,000 ($9,000,000 minus $6,000,000 =$3,000,000 multiplied by 4% = $120,000 and $14,000,000 minus $9,000,000 =$5,000,000 multiplied by 2% = $100,000). Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year, provided, however, that Tenant shall not be required to provide such compilation if the amount of Gross Sales for such calendar year is less than ninety percent (90%) of the lowest applicable Sales Break Point. The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Notwithstanding the foregoing, no Percentage Rent shall be payable with respect to the period commencing on the Rent Commencement Date and ending on the December 31 next following the Rent Commencement Date, and Gross Sales generated during any period when Alternate Rent is payable under this Lease shall be excluded from the determination of Gross Sales for purposes of computing Percentage Rent hereunder. Notwithstanding anything herein to the contrary, in no event shall Percentage Rent be due or payable with respect to any

17

Gross Sales in any calendar year during the Term which are in excess of Fourteen Million and 00/100 ($14,000,000.00) Dollars.

4.4.2   Definition of Gross Sales.  As used herein, the term **"Gross Sales"** shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant (subject, however, to Section 4.4.6) and any other person or entity operating in the Premises (for purposes of this Subsection 4.4.2, and Subsections 4.4.3, 4.4.4 and 4.4.5, only, collectively, **"Tenant"**), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards.  Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term **"Gross Sales"** shall exclude: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, **(2)** *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, **(6)** receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(8)** fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates and/or gift cards, and **(15)** forfeited deposits.

4.4.3   Books and Records.  Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles (or successor accounting standards) and practices consistently applied and shall be retained by Tenant for at least two (2) years following the end of the calendar year to which they refer.

4.4.4   Landlord's Right to Audit.  Landlord and/or Landlord's auditor shall have the right, upon at least thirty (30) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales.  If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency.  If such deficiency is in excess of three (3%) percent of the Gross Sales

18

reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

4.4.5  Confidentiality. Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its parents, affiliates, accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

4.4.6  Licensees. If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the *"Licensees"*) permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the product obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the unlicensed portion) of the Premises. The provisions of this Subsection 4.4.6 shall not apply to more than 4,000 square feet of Floor Area, in the aggregate, in the Premises at any one time. If more than 4,000 square feet of the Floor Area of the Premises is licensed to Licensees at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

4.4.7  Intentionally Omitted.

4.4.8  Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease.

ARTICLE 5

COMMON AREAS, THEIR USE AND CHARGES

Section 5.1   Common Areas: Maintenance.

5.1.1  Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2  Tenant's Pro Rata Share of Common Areas Charges.

(a)   During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) paid by Landlord to operate, maintain, insure and repair the Common Areas

19

located on the Tax and Common Areas Parcel, which shall include the reasonable premiums for insurance required to be maintained by Landlord under Section 10.3 below, it being understood that, as of the Rent Commencement Date (unless Landlord shall have theretofore acquired the Kohl's Parcel and/or the Home Depot Parcel, in which event, as provided in Section 1.1.34 hereof, such parcel(s) shall be deemed as part of the Tax and Common Areas Parcel): (i) neither of the common areas of either the Kohl's Parcel or the Home Depot Parcel shall be deemed a part of the Common Areas, (ii) the Common Areas shall be solely as shown on <u>Exhibit B</u> hereto with respect to the Shopping Center, and (iii) the maintenance costs for the common areas of either the Kohl's Parcel, the Home Depot Parcel or any other areas of the Project not included in the Tax and Common Areas Parcel shall not be included in Common Area Charges.  Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.  Notwithstanding anything herein to the contrary, in no event shall the Common Areas Charges exceed that amount which is equal to the product of the reasonable costs paid by Landlord to operate, maintain, insure and repair the Common Areas located in the Shopping Center (as such costs shall be reduced in accordance with Section 5.1.3 below) multiplied by a fraction, the numerator of which is the Floor Area of the Tax and Common Areas Parcel and the denominator of which is the Floor Area of the Shopping Center.

(b)    Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles (or successor accounting standards) consistently applied (the *"CAC Reconciliation Statement"*).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges.  Any overpayment made by Tenant during the preceding calendar year will be credited in full against the succeeding installments of Rent due to be paid by Tenant until such credit shall be exhausted.  If the Term shall expire or be terminated prior to the exhaustion of any such credit, Landlord shall, subject to Section 16.1, pay the unused portion of such credit to Tenant within thirty (30) days of the expiration or sooner termination of the Term.  If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges from the Rent Commencement Date through the last day of the month in which the first anniversary of the Rent Commencement Date occurs exceed $1.83 per square foot of Floor Area per annum, and with respect to any other calendar year thereafter (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the increased cost of snow removal, insurance rate increases, and utility rate increases during such calendar year).

(c)    Notwithstanding anything herein to the contrary, in no event shall the amount of the Common Areas Charges to be paid by Tenant pursuant to Section 5.1.2(a) above during any applicable period of the Term exceed the amount which Tenant

20

1   would pay if (i) the Common Areas Charges were equal to the reasonable costs, subject
2   to the exclusions set forth in Section 5.1.3 below, paid by Landlord to operate, maintain,
3   insure and repair the Common Areas located in the entire Shopping Center, and (ii) the
4   denominator used for determining Tenant's Pro Rata Share was the Floor Area of the
5   entire Shopping Center.

6          5.1.3   <u>Exclusions from Common Areas Charges</u>.

7                  (a)   Common Areas Charges shall not include: **(1)** the capital cost
8   of any additions to the Common Areas pursuant to an expansion of the Shopping Center;
9   **(2)** the cost of any replacements or capital improvements to the Common Areas, except
10  that the cost of repaving the parking areas of the Shopping Center may be included within
11  Common Areas Charges so long as such cost is amortized on a straight-line basis over the
12  useful life thereof under generally accepted accounting principles (or successor
13  accounting standards), and is not incurred (A) prior to the expiration of the fifth (5th) full
14  calendar year of the Term, or (B) more than once during each five (5) full calendar years
15  of the Term; **(3)** the cost of investigating, monitoring or remedying any environmental
16  condition or "Hazardous Substances" or any other "Compliance Costs" (both as
17  hereinafter defined in Subsection 12.4.1); **(4)** any debt service (including principal and
18  interest) or payments of any judgments or other liens against Landlord; **(5)** the cost of
19  maintaining, repairing or providing security for interior portions of buildings; **(6)** Taxes
20  or other taxes levied or assessed against Landlord or the Shopping Center; **(7)** the cost of
21  compliance with applicable Legal Requirements (including, without limitation, the cost
22  of curing violations or contesting such Legal Requirements), except that Common Areas
23  Charges shall include the cost of compliance with laws affecting only the Common Areas
24  provided that same shall (A) apply only to laws enacted after the Delivery Date, (B) not
25  be necessitated by the acts or omissions of Landlord or any other tenant or any of their
26  respective agents, subtenants, occupants, contractors or employees, (C) benefit the
27  majority of all tenants of the part of the Shopping Center then being operated,
28  maintained, repaired or replaced by Landlord, (D) if a capital cost, be amortized on a
29  straight-line basis over the useful life thereof under generally accepted accounting
30  practices, and (E) be similarly imposed on all other tenants of that part of the Shopping
31  Center then being operated, maintained, repaired or replaced by Landlord; **(8)** any costs
32  resulting from insurance deductibles or any payments made under any self-insurance
33  policy maintained by Landlord; **(9)** any costs which would have been reimbursed or paid
34  for by insurance proceeds had Landlord maintained the insurance required under Section
35  10.3 hereof and the amount of any judgment or other charge entered or costs assessed
36  against Landlord in excess of the policy limits of the insurance maintained by Landlord
37  under Section 10.3 hereof); **(10)** those portions of Landlord's insurance premiums which
38  are reimbursed to Landlord by any other tenant in the Shopping Center other than through
39  the payment of such tenant's proportionate share of insurance premiums otherwise
40  includable as part of Common Areas Charges; **(11)** sums paid or owed by Landlord to
41  any tenant in the Shopping Center; **(12)** costs incurred in connection with the negotiation
42  of leases with, or construction of improvements for, any tenant in the Shopping Center
43  (including, without limitation, brokerage commissions and legal fees); **(13)** costs incurred
44  in connection with lawsuits or other legal actions (including, without limitation,
45  arbitrations and mediations) instituted or defended by Landlord; **(14)** sums incurred as
46  late payment fees, penalties or interest; **(15)** ground rent; **(16)** depreciation [except as
47  expressly permitted pursuant to item 23 below]; **(17)** costs disproportionately incurred by
48  or on behalf of any one or more of the tenants in the Shopping Center (including, without
49  limitation, all costs relating to the operation of any food court or exterior dining area in
50  the Shopping Center); **(18)** electricity costs for lighting Common Areas later than the
51  "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security
52  lighting, as reasonably estimated by Landlord; **(19)** Landlord's advertising, entertainment
53  and promotional costs for the Shopping Center (including, without limitation, holiday
54  decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying sculptures,
55  paintings and other objects of art located within or outside the Shopping Center;

21

**(21)** costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(22)** repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; **(23)** the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles [or successor accounting standards]); **(24)** reserves for anticipated future expenses; **(25)** any cost or expense relating to the administration and management of the Common Areas or any other areas of the Project (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; **(26)** costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; **(27)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; **(28)** except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs or other signage identifying tenants of the Project; **(29)** any portion of the cost of insurance which Landlord is required to maintain under this Lease, which is attributable to any betterments or improvements contained within any other tenant's premises within the Shopping Center; and **(30)** any costs and expenses incurred by Landlord in connection with the OEA. Notwithstanding the foregoing (including, without limitation, the preceding clause (30)), Landlord and Tenant acknowledge that the Common Area Charges shall not include any costs with respect to the Project (to the exclusion of the Shopping Center), it being understood that if Landlord acquires the Kohl's Parcel and/or the Home Depot Parcel, or if Landlord is maintaining the common areas on any part of the Kohl's Parcel and/or the Home Depot Parcel, then the maintenance costs of such parcel(s) shall be included in Common Areas Charges subject to the provisions of Section 1.1.41 hereof, and the exclusions set forth in this Section 5.1.3(a) as though such parcel(s) shall be deemed a part of the Tax and Common Areas Parcel.

(b)    In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into account, for example, the relationship of the size of the Common Areas maintained by the other tenant or occupant to the size of its premises.

(c)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    <u>Tenant's Right to Audit</u>. Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall

have the right (in addition to any rights and remedies to which it may be entitled under
this Lease, at law, or in equity) to offset such amount from payments of Rent next
becoming due hereunder, together with interest thereon at the Lease Interest Rate from
the date such remittance is due until reimbursement or full satisfaction by credit.
Landlord shall maintain all books and records pertaining to a calendar year for at least
three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such
calendar year. Tenant shall keep the results of any such audit confidential, provided that
nothing contained herein shall restrict Tenant from disclosing such information as may be
required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide*
prospective assignees or subtenants (provided that each of such recipients shall be bound
by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by
Landlord with respect to an audit by Tenant shall be submitted to arbitration in
accordance with the provisions of Section 16.3 below.

5.1.5  In no event shall Tenant be required to join, participate in or
contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2   Common Areas: Restrictions.

5.2.1  Continuous Access.  No entrances, exits, approaches and means of
ingress and egress to, from, and/or within the Shopping Center or the Premises as shown
on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord
during the Term, except: (i) in the event of an emergency or as may be otherwise required
by applicable Legal Requirements, in which event Landlord shall use reasonable efforts
to give Tenant advance notice of same and to minimize interference to Tenant's normal
business operations in the Premises as a result thereof; or (ii) in the event that Landlord is
required to temporarily close the Common Areas, for the minimum time legally
necessary to prevent a dedication thereof or an accrual of any rights in any person or the
public generally therein; provided that such closure shall not occur during August,
November or December of any calendar year, and Landlord shall give Tenant at least
thirty (30) days' prior notice thereof.

5.2.2  No Alterations.  Landlord shall not, without obtaining Tenant's prior
written consent in each instance, which consent may be withheld in its sole discretion:
**(i)** alter the area of the building in which the Premises and the other premises in-line with
the Premises is located (i.e., the areas of the stores currently occupied by the Premises,
Petsmart, Ross, Old Navy and Best Buy as shown on Exhibit "B" hereto) or the location,
availability, or size of any Common Area improvement located within the area
designated as "Critical Area" on Exhibit B hereto (the "***Critical Area***") from that shown
on Exhibit B hereto; **(ii)** construct or permit to be constructed any structures in the
Critical Area of the Shopping Center (including, without limitation, any buildings,
kiosks, booths, signs or similar structures in the Critical Area), other than as shown on
Exhibit B hereto; or **(iii)** materially change the entrances or exits to and from the
Shopping Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of
the Common Areas, or the number, location or layout of parking spaces located within
the Critical Area from those shown on Exhibit B hereto.  Landlord shall neither perform
nor permit to be performed, any construction, repairs, replacements or maintenance to
any portion of the Shopping Center, including the Premises (other than emergency repairs
to utilities and Common Areas) during the months of August, November and December
of any year, without the prior consent of Tenant, which consent may be withheld in
Tenant's sole discretion.

5.2.3  Outparcels.  In addition to the provisions of Subsection 5.2.2 above,
during the Term, the following restrictions shall encumber and bind the outparcels
(collectively, the "***Outparcels***" and individually, an "***Outparcel***") designated on Exhibit
B hereto as "Outparcel 1," "Outparcel 2," and "Outparcel 3": (a) no more than one
building shall be constructed on any Outparcel; (b) no building shall exceed one story in
height; (c) no building shall exceed a maximum height of twenty-two feet (22') as

23

1   measured from the finished floor level to the highest point on such building or structure
2   (inclusive of the height of all types of projections or architectural treatments or
3   embellishments thereon, such as, but without limitation, HVAC equipment, parapets,
4   mansards, signs, satellite dishes, and antennae); (d) the Floor Area of any building
5   constructed on an Outparcel shall not exceed the Floor Area established therefor on
6   Exhibit B hereto; and (e) all Legal Requirements relative to parking requirements for
7   each Outparcel operation shall be complied with by providing the requisite number of
8   parking spaces solely within the boundaries of such Outparcel, without reduction in such
9   number by virtue of the granting of a variance or special exception. For purposes of this
10  Subsection 5.2.3, the Floor Area of any building constructed on an Outparcel shall also
11  be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail
12  sales or food or beverage service (exclusive of drive through or walk-up take-out food or
13  beverage service).

14          5.2.4   Parking Area. During the Term, Landlord shall maintain in the
15  Shopping Center, at a minimum, the greater of (i) the number of parking spaces required
16  by applicable Legal Requirements, without variance, or (ii) four (4) ground-level parking
17  spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center,
18  with each such space being at least nine (9) feet in width and eighteen (18) feet in length.
19  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.
20  Landlord shall not designate specific parking spaces for use by other tenants or occupants
21  of the Shopping Center, nor shall Landlord permit any person or entity to use the parking
22  areas other than Tenant, the other tenants and occupants of the Shopping Center, and their
23  respective employees, agents, subtenants, concessionaires, licensees, customers, and
24  invitees. There shall be no charge whatsoever levied for the use of any parking areas
25  within the Shopping Center. Landlord shall not permit overnight parking in the Shopping
26  Center.

27          5.2.5   Lighting. Throughout the Term, Landlord shall keep the Common
28  Areas fully lighted and open to the customers of the Shopping Center seven (7) days a
29  week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on
30  Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common
31  Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant
32  shall pay for a share of the reasonable cost of said requested lighting, which share shall
33  be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall
34  be the number of square feet of Floor Area within the Premises and the denominator of
35  which shall be the aggregate number of square feet of Floor Area of all premises within
36  the Shopping Center (including the Premises) open later than Normal Hours (excluding,
37  however, those tenants and occupants who separately control and pay for their own
38  Common Area lighting). In addition to the foregoing, Landlord shall provide for low
39  level security lighting from one (1) hour after the close of business in the Premises until
40  dawn.

41          5.2.6   Repairs. During the Term, any construction or repair by Landlord
42  permitted or required under this Lease and undertaken in the Critical Area shall:

43                  (a)   not be performed during the months of August, November, or
44  December of any year, except in the event of an emergency or as may be otherwise
45  required by applicable Legal Requirements;

46                  (b)   be commenced only upon at least five (5) days' prior notice to
47  Tenant (except in an emergency, in which event Landlord shall only be required to give
48  such notice as is reasonable under the circumstances); and

49                  (c)   be performed in accordance with the requirements of Section
50  3.3.6 above, if applicable, and in such a manner so as not to materially interfere with the
51  normal conduct of any business operations in the Premises.

24

5.2.7 <u>Rules and Regulations</u>. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8 <u>Miscellaneous</u>.

(a) <u>No Promotional Use</u>. Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b) <u>Trash Compactor and Containers</u>. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c) <u>Shopping Carts</u>. Subject to applicable Legal Requirements, Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on <u>Exhibits B</u> and <u>D-1</u> hereto. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d) <u>Cellular Towers</u>. No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center outside of the Cell Tower area shown on <u>Exhibit B</u> attached, other than (i) transmission and/or reception devices that are integrated into an element of the Common Areas (e.g., a lightpole) and/or (ii) satellite dishes or antennas located on the roofs of buildings within the Shopping Center, provided that such satellite dishes or antennas are screened from view in a manner that is attractive and consistent with the architectural theme of the Shopping Center. No such transmission and/or reception towers or devices will be permitted unless they comply with all applicable Legal Requirements and will not adversely affect the proper functioning of Tenant's satellite and other wireless communications equipment.

(e) <u>Temporary Storage Containers</u>. Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on <u>Exhibit B</u> hereto during the Term, subject to applicable Legal Requirements.

1220165.6

ARTICLE 6

UTILITIES

Section 6.1    Utility Service. From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.  Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2    Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

ARTICLE 7

SIGNS

Section 7.1    Tenant's Building Signage. Subject to compliance with applicable Legal Requirements, Tenant shall have the exclusive right, in connection with Tenant's Work, and thereafter during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy (e.g., blade) signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire.  Tenant shall also be entitled, at Tenant's sole cost and expense, to install and maintain, during the period commencing on the Effective Date and ending on the day prior to the Rent Commencement Date, a temporary sign near the site of the main entrance to the Shopping Center which states "Bed Bath & Beyond Coming Soon" (which sign is more particularly shown in Exhibit F hereto).  Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided same are professionally prepared.

Section 7.2    Pylon/Monument Signage. Landlord shall provide pylons and monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor.  Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylons and monuments, in accordance with the provisions of Article 3 and Exhibits D and F hereto.  If Landlord constructs or makes available to any other tenant or tenants in the Project any other signage located in the Common Areas, Landlord shall also include on such signage Tenant's identification sign, as shown on Exhibit F hereto, which, subject to the existing rights of tenants under the Existing Leases (as hereinafter defined in Section 12.3(j)),.shall be higher than and at least as large as the largest sign made available to such other tenant or tenants.  Landlord shall maintain all

26

pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow
Tenant access to replace its signs thereon, at Tenant's cost and expense.  Landlord shall
not change or alter the location, structure, height or general appearance of the pylons or
monuments without obtaining Tenant's prior consent.  The cost of maintaining all pylons
and monuments bearing Tenant's sign panel(s) [but not the cost of individual tenants'
signs thereon or the cost of the construction of the pylons and monuments] and the cost of
any electricity used to illuminate them, shall be includable in Common Areas Charges.  If
the top position on the pylon sign, as shown on Exhibit F, is occupied by another tenant's
sign panel, then, subject to the existing rights of tenants under the Existing Leases, upon
the expiration or earlier termination of such other tenant's lease, Tenant shall have the
right to relocate its pylon sign panel to the top position on the pylon sign, at Tenant's sole
expense.

Section 7.3    Signage: Alteration/Removal/Allocation.  Tenant shall have the
right, from time to time, without Landlord's approval, to change its signs on the
storefront and exterior of the Premises, as well as on any pylon or monument, provided
that the area of the new sign is no larger than the area of the sign which it replaces and
that the method of construction and attachment is substantially the same.  Upon the
expiration or earlier termination of the Lease, Tenant shall remove its signs from the
fascia or other exterior walls of the Premises and from any pylon or monument, and shall
repair any damage occasioned thereby.  The signage rights granted to Tenant pursuant to
this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any
subtenant(s) of all or any portion of the Premises.  All signage installed by Landlord and
Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents or
applications which may be required by applicable Legal Requirements to permit the
placement, installation, and/or replacement by Tenant of any signs on any part of the
Premises or on any pylon or monument, to which Tenant may be entitled under this
Lease.

Section 7.5    Signage and Building Restrictions and Criteria.

7.5.1    During the Term, no exterior identification signs attached to any
building of the Shopping Center shall be of the following type: **(i)** flashing, moving or
audible signs; **(ii)** signs employing exposed raceways, exposed neon tubes, exposed
ballast boxes, or exposed transformers, provided that Tenant shall have the right to
employ any methods necessary for the installation of internally illuminated self-contained
channel letters; or **(iii)** paper or cardboard signs other than professionally prepared
interior window signs advertising special sales within the subject premises,  temporary
signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing
shall not prohibit the placement at the entrance of each such premises of (A) small
stickers or decals which  indicate hours of business, emergency telephone numbers, credit
cards accepted, and other similar information, and/or (B) a sticker or decal which
contains the phrase "no solicitation" or words of like import.  No billboard signs shall be
permitted within the Shopping Center.

7.5.2    Landlord shall not permit any obstructions (including, without
limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to
obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons,
monuments or other freestanding signs.  Except as otherwise permitted under Existing
Leases (hereinafter defined in Section 12.3(j)), no premises in the Shopping Center
containing less Floor Area than the Floor Area of the Premises shall have: **(i)** building
signage possessing more total square footage than the total square footage available for
use by Tenant, or a maximum height greater than the maximum height of Tenant's
building signage, as measured from the finished floor level to the highest point on such
signage, or **(ii)** a building and entrance design element higher, wider, or which projects

27

1  farther than the height, width, or projection of the building and entrance design element
2  of the Premises.

3                              ARTICLE 8
4                    ALTERATIONS AND IMPROVEMENTS

5        Section 8.1    Alterations and Improvements.

6              8.1.1   Tenant shall not perform any structural alterations or structural
7  improvements to the Premises (except to the extent same pertain to Tenant's Work)
8  without the prior approval of Landlord, provided, however, that the alteration of the
9  exterior of the Premises by Tenant, or any of its subtenants or assignees, to conform to
10  Tenant's (or such subtenant's or assignee's, as applicable) then-current prototypical
11  elevation shall not require Landlord's consent unless Tenant (or such subtenant or
12  assignee, as applicable) shall not be a national or regional retailer operating a minimum
13  of fifteen (15) stores under a single trade name (or substantially similar trade names).  All
14  work performed by Tenant in connection with structural and non-structural alterations or
15  improvements shall be done at Tenant's sole cost and expense, in a good and
16  workmanlike manner and in compliance with all applicable Legal Requirements.  No
17  work performed by Tenant shall result in the imposition of any liens on the Premises or
18  any other areas of the Shopping Center.  If any lien shall be filed as a result of any such
19  work performed by Tenant, Tenant shall cause such lien to be discharged in accordance
20  with the provisions of Section 23.2.  Subject to Section 10.1.1 and Section 10.1.2 below,
21  Tenant shall indemnify Landlord against personal injury and property damage claims
22  resulting from Tenant's performance of any work in or about the Premises as set forth in
23  Section 10.1.3(a) below.  The provisions of this Section 8.1 shall not apply to Tenant's
24  building signage, which shall be governed by the applicable provisions of Article 7
25  above.

26              8.1.2   Tenant may, from time to time, at its sole cost and expense, without
27  the prior approval of Landlord, make non-structural alterations and non-structural
28  improvements to the Premises as Tenant deems necessary or desirable, including, but not
29  limited to, electrical systems, heating, ventilation and air conditioning and other
30  mechanical systems, installation of fixtures and equipment, painting, and wall and floor
31  coverings.

32              8.1.3   Tenant shall have the right to subdivide the Premises into two (2)
33  separate stores, each of which may have its own front entrance and access to the loading
34  docks in the rear of the Premises, as well as separately sub-metered utilities.

35              8.1.4   Tenant shall have the right to erect and maintain an antenna and a
36  satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's
37  prior approval of its plans for the installation of such equipment, (ii) uses a contractor
38  designated or approved by Landlord for all roof penetrations so as not to violate or
39  invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof
40  penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the
41  roof caused by the making of the roof penetrations, including, but not limited to, the
42  repair of the roof penetrations upon the removal of any equipment installed thereon, and
43  (v) erects and maintains such equipment in accordance with applicable Legal
44  Requirements.  Tenant shall indemnify Landlord against direct loss or damage resulting
45  from a loss of Landlord's roof warranty caused by Tenant making any roof penetrations
46  in connection with the installation of any such antenna or satellite dish by contractors
47  other than the contractor(s) designated or approved by Landlord for performing roof
48  penetrations.

49              8.1.5   Landlord shall execute and return to Tenant all appropriately
50  completed building department or equivalent applications within ten (10) days after

                                  28

1220165.6

1    Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting
2    process.

3          8.1.6   If any violation of any applicable Legal Requirement which is noted
4    against the Shopping Center or the Premises (other than a violation caused by Tenant)
5    prevents Tenant from obtaining a building permit for any alterations or a certificate of
6    occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause
7    such violation to be removed of record to the extent required to permit Tenant to obtain
8    its building permit or certificate of occupancy, as the case may be.

9          8.1.7   Landlord shall not make any alterations to the Premises (including,
10   without limitation, changing the design, color or materials of the exterior of the Premises)
11   nor shall Landlord construct an additional floor or floors above the Premises.  Landlord
12   shall neither make nor permit to be made any alterations to the exterior architectural
13   theme of the remainder of the Shopping Center which would be inconsistent with a first-
14   class shopping center in the state in which the Shopping Center is located (exclusive of
15   other tenants' entrance features) without the prior consent of Tenant.

16         8.1.8   Tenant shall have the right to erect and maintain on the roof of the
17   Premises, a passive solar array for the production of electricity (the *"System"*), provided
18   that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the
19   System, (ii) uses a contractor designated or approved by Landlord for all roof
20   penetrations so as not to violate or invalidate any roof warranties maintained by
21   Landlord, (iii) maintains the area where roof penetrations are made while the System is
22   present, (iv) repairs any damage to the roof caused by the making of the roof
23   penetrations, including, but not limited to, the repair of the roof penetrations upon the
24   removal of any component of the System, and (v) erects and maintains the System in
25   accordance with applicable Legal Requirements.  The System shall be deemed to be part
26   of Tenant's Property   Landlord acknowledges and agrees that Tenant or its Affiliate or
27   transferee shall be the exclusive owner and operator of the System and Landlord shall
28   have no right, title or interest in such equipment or any component thereof,
29   notwithstanding that any such equipment may be physically mounted or adhered to the
30   Premises.  Landlord acknowledges and agrees that, notwithstanding the System's
31   presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and
32   exclusive owner of: (i) the electricity generated by the System, (ii) the environmental
33   attributes of the System, and (iii) any and all credits (including tax credits), rebates,
34   benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever
35   entitled, resulting from the environmental or related attributes of the System.  Without the
36   express written consent of Tenant, Landlord shall not make or publish any public
37   statement or notice regarding any environmental incentive relating to the System or any
38   environmental attribute of the System or the energy output from the System.  Tenant shall
39   indemnify Landlord against direct loss or damage resulting from a loss of Landlord's roof
40   warranty caused by Tenant making roof penetrations in connection with the installation
41   of any such System by contractors other than the contractor(s) designated or approved by
42   Landlord for performing roof penetrations.

43         8.1.9   Landlord and Tenant agree that in the event that Tenant shall
44   perform or cause to be performed any alterations or improvements (including without
45   limitation Tenant's Work) to, or within, the Premises which would cause an owner or
46   occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then
47   Tenant shall be solely entitled to the benefit of such Energy Rebate. As used herein, an
48   "Energy Rebate" shall be deemed to be any rebate, refund, voucher, credit, tax relief,
49   abatement, or other monetary inducement (such as, for examples only, energy efficiency
50   incentives, property tax abatements, sales tax refunds, tax credits, governmental grants,
51   utility rebates or refunds) given by a governmental, non-governmental, private or public
52   utility, or other entity as a result of efforts to conserve energy or other utilities or cause
53   property or processes to be more environmentally friendly. If any such Energy Rebate is

29

1220165.6

required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate against the next succeeding installment(s) of Rent then payable under the Lease.

ARTICLE 9

REPAIRS

Section 9.1   Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, and serving exclusively the Premises); (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises; and (iii) the improvements which constitute Tenant's Work.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2   Landlord's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation,  repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    the non-structural elements of the Premises (including, without limitation, the maintenance, repair and replacement of the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

30

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof).  In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3   Legal Compliance Work.  Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined).  Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease.  As used herein, "***Legal Compliance Work***" shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1  Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1  Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (so-called "All-Risk") and time element insurance required to be maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2  Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates)  in connection with any loss or damage which is covered by such

31

policy or that such policy shall otherwise permit, and shall not be voided by the releases
provided above.

10.1.3 <u>Mutual Indemnification</u>.

(a)   Except as otherwise provided in Subsections 10.1.1 and
10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord
harmless from and against any and all claims, actions, damages, liability and expense,
including reasonable attorneys' fees, (x) in connection with loss of life, personal injury
and/or damage to property arising from or out of any occurrence in or upon the Premises,
or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant,
its agents, contractors, employees, servants, or licensees, <u>except</u> to the extent such claims,
actions, damages, liability and expense are caused by the acts or omissions of Landlord,
its agents, contractors, licensees, employees, or other tenants and occupants, or for which
any of said parties may be statutorily liable.  The foregoing indemnity is specifically and
expressly intended to constitute a waiver of Tenant's immunity under Washington's
Industrial Insurance Act, RCW Title 51, to the extent necessary to provide Landlord with
an indemnity from claims made by Tenant and its employees, to the extent provided
herein.  Tenant shall promptly notify Landlord of casualties or accidents occurring in or
about the Premises.   LANDLORD AND TENANT ACKNOWLEDGE THAT THE
INDEMNIFICATION PROVISIONS OF THIS SECTION 10.1.3 WERE
SPECIFICALLY NEGOTIATED AND AGREED UPON BY THEM.

(b)   Except as otherwise provided in Subsections 10.1.1 and
10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant
harmless from and against any and all claims, actions, damages, liability and expense,
including reasonable attorneys' fees, (x) in connection with loss of life, personal injury
and/or damage to property arising from or out of any occurrence in or upon any
portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or
in part by any act or omission of Landlord, its agents, contractors, employees, servants,
tenants (other than Tenant), occupants or licensees, <u>except</u> to the extent such claims,
actions, damages, liability and expense are caused by the acts or omissions of Tenant, its
agents, contractors, licensees or employees, or for which any of said parties may be
statutorily liable.  The foregoing indemnity is specifically and expressly intended to
constitute a waiver of Landlord's immunity under Washington's Industrial Insurance Act,
RCW Title 51, to the extent necessary to provide Tenant with an indemnity from claims
made by Landlord and its employees, to the extent provided herein.  LANDLORD AND
TENANT ACKNOWLEDGE THAT THE INDEMNIFICATION PROVISIONS OF
THIS SECTION 10.1.3 WERE SPECIFICALLY NEGOTIATED AND AGREED
UPON BY THEM.

(c)   In compliance with RCW 4.24.115 as in effect on the date of
this Lease, all provisions of this Lease pursuant to which Landlord or Tenant (the
"*Indemnitor*") agrees to indemnify the other (the "*Indemnitee*") against liability for
damages arising out of bodily injury to Persons or damage to property relative to the
construction, alteration, repair, addition to, subtraction from, improvement to, or
maintenance of, any building, road, or other structure, project, development, or
improvement attached to real estate, including the Premises, (i) shall not apply to
damages caused by or resulting from the sole negligence of the Indemnite, its agents or
employees, and (ii) to the extent caused by or resulting from the concurrent negligence of
(a) the Indemnitee or the Indemnitee's agents, employees or contractors, and (b) the
Indemnitor or the Indemnitor's agents, employees or contractors, shall apply only to the
extent of the negligence of the Indemnitor and its agents, employees and contractors.

Section 10.2  <u>Tenant's Insurance</u>.

10.2.1 <u>Tenant's Insurance</u>.  Tenant, at its own cost and expense, shall
maintain in full force and effect from and after the Delivery Date and throughout the

32

1220165.6

Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (so-called "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property and Tenant's Work.

10.2.2 Self-Insurance. All insurance required to be maintained under this Section 10.2 may be: (i) insured under an individual policy covering this location, or a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (ii) ) self-insured by Tenant via a deductible, a formal a plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iii) insured or self-insured by Tenant through a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3  Landlord's Insurance.

10.3.1 Liability Insurance. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as an "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 Special Form Property Insurance. Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (so-called "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], Law or Ordinance coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Work or Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges, it being agreed however that (i) for purposes of including such insurance costs in the Common Areas Charges, said "insurance

33

premiums" shall not be deemed to include premiums to the extent same are attributable to any betterments or improvements contained within any other tenant's premises within the Shopping Center, and (ii) the insurance premiums included in the Common Areas Charges shall be equal to the product of the total insurance premiums for the Shopping Center multiplied by a fraction, the numerator of which is the Floor Area of the Tax and Common Areas Parcel and the denominator of which is the Floor Area of the Shopping Center. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from the insurance costs included within the Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of the amount resulting from multiplying such dividend, credit, rebate by a fraction, the numerator of which is the Floor Area of the Tax and Common Areas Parcel and the denominator of which is the Floor Area of the Shopping Center. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4 <u>General Insurance Requirements</u>.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11

FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1 <u>Fire and Other Casualty</u>.

11.1.1 (a)    Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall not include any of Tenant's Work or any other leasehold improvements performed by Tenant, and shall not include any of Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1. Landlord shall give Tenant at least sixty (60) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

34

       (b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work.  If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

       (c)    If, in Tenant's reasonable judgment, any condition affecting, or damage to, the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any condition affecting, or damage to, the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

       11.1.2 In the event that:

       (a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within one hundred eighty (180) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

       (b)    the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

       (i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to

35

Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)     seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)     terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2  Eminent Domain.

11.2.1 As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)     any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)     as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Project no longer has all of the entrances from both South Burlington Boulevard and Market Place Drive as are shown on Exhibit B hereto, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)     there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

36

1    (d) any portion of the Shopping Center shall be Taken which
2 materially interferes with parking, visibility or access to the Premises, and as a
3 result of such taking it is commercially unreasonable or unfeasible for Tenant, in
4 its reasonable judgment, to conduct its normal business in the Premises;

5    (e) more than twenty-five (25%) percent of the total Floor Area
6 of all of the buildings in the Shopping Center (other than the Premises) are Taken;
7 or

8    (f) five (5%) percent or more of the parking spaces located in the
9 Shopping Center are Taken, or if so many of the parking spaces in the Shopping
10 Center are Taken such that there are fewer than (i) four and one-half (4.5) parking
11 spaces for every one thousand (1,000) square feet of Floor Area in the Shopping
12 Center, or (ii) the number of parking spaces required by applicable Legal
13 Requirements;

14 then, in any of such events, Tenant shall have the right to terminate this Lease by giving
15 at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event,
16 in which event this Lease shall terminate without any further liability on the part of either
17 Landlord or Tenant, except for an adjustment between the parties for the Rent payable by
18 Tenant hereunder and for payment to Tenant for its share of the award for the taking
19 pursuant to Subsection 11.2.5 below.  Upon any partial Taking of the Premises, the Rent
20 shall be equitably reduced or totally abated based upon the extent to which the remaining
21 portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal
22 conduct of business.

23   11.2.4 If this Lease is not terminated pursuant to this Section 11.2,
24 Landlord, at its sole cost and expense, within a reasonable period of time after such
25 Taking, shall repair and restore the area not so Taken to tenantable condition, similar in
26 physical appearance to the condition of the area immediately prior to the Taking,
27 pursuant to plans and specifications approved by Tenant (which repair and restoration
28 shall, as applicable, include all Tenant's Work and all other leasehold improvements
29 performed by Tenant; provided, however, that Landlord shall not be obligated to repair or
30 restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking
31 shall be made available to and used by Landlord for any rebuilding or restoration which it
32 is required to perform hereunder.  During the period of such repairs and restoration, all
33 Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment,
34 be used by Tenant for the normal conduct of its business.  Such abatement shall terminate
35 in accordance with the terms of Section 11.3 below.  Landlord shall give Tenant at least
36 sixty (60) days' prior notice of the date on which the restoration work to the Premises
37 will be Substantially Completed.

38   11.2.5 In the event of a Taking resulting in a termination of this Lease
39 under this Article 11.2, the parties hereto, and each of their respective mortgagees, agree
40 to cooperate in applying for and in prosecuting any claim for such Taking and further
41 agree that, subject to Tenant's right, if any, to maintain a separate action to recover the
42 fair market value of its leasehold interest in the Premises,  the aggregate net award, after
43 deducting the reasonable expenses of Landlord, Tenant, and any fee or Leasehold
44 Mortgagee, excluding attorneys' fees, incurred in connection therewith, shall be paid and
45 distributed as follows, and in the following order of priority:

46    (a) The amount of the award which is equal to the aggregate amount of
47 unamortized costs of Landlord's Work, Tenant's Work (including the Landlord's Special
48 Improvements funded by the Tenant Allowance) and any alterations performed by
49 Tenant, shall be split by Tenant and Landlord in proportion to the amount of such
50 unamortized costs paid by Tenant and Landlord.  By way of example only, if (1) the
51 unamortized cost of Landlord's Work were Fifty Thousand and 00/100 ($50,000.00)
52 Dollars, (2) the unamortized costs of Tenant's Work were Two Hundred Fifty Thousand

37

and 00/100 ($250,000.00) Dollars, of which amount Ten Thousand and 00/100 ($10,000.00) Dollars were attributable to the unamortized costs of Landlord's Special Improvements funded by the Tenant Allowance, and (3) the unamortized costs of Tenant's alterations were Fifty Thousand and 00/100 ($50,000.00) Dollars, then the first Three Hundred Thousand and 00/100 ($300,000.00) Dollars of the award would be split between Landlord and Tenant, with Landlord receiving Sixty Thousand and 00/100 ($60,000.00) Dollars of the award and Tenant receiving Two Hundred Forty Thousand and 00/100 ($240,000.00) Dollars of the award. For purposes hereof, the Term shall be determined as if the Lease had been renewed by Tenant for all of the renewal periods.

(b)    Landlord next shall be entitled to an amount equal to the value, on the date of the Taking, of the land taken, as if vacant and unimproved and available for its best or most economic use, giving effect to the existence of this Lease.

(c)    If Tenant shall be unable under applicable law to maintain a separate action for the value of Tenant's leasehold interest in the Premises, Tenant shall next be entitled to that portion of the award equal to the fair market value of Tenant's leasehold interest in the Premises under this Lease. If Tenant shall be able to maintain such a separate action, no portion of the joint award for the Premises shall be attributable to the value of Tenant's leasehold interest therein, and Landlord shall be entitled to receive the balance of the award as set forth in clause (d) below.

(d)    Landlord shall be entitled to the balance of the award.

11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3 <u>Abatement of Rent Charges</u>. Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is one hundred fifty (150) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1 <u>Quiet Enjoyment</u>. Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2 <u>Authority</u>. Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3 <u>Landlord's Covenants, Warranties and Representations</u>. To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping

38

Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)    In the event the legal description of the Shopping Center described in Exhibit A-2 hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)    Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Project now has, and, on the Delivery Date, shall have, access to and from South Burlington Boulevard and Market Place Drive, as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)    There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work (provided any permit or other authorization to proceed with Tenant's Work shall have been obtained by Tenant);

(h)    As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof. With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Legal Requirements.

(i)    As of the Effective Date there is no "Related Land" (defined in Section 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(j)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the "*Existing Leases*"); and

(k)    Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any

39

1   proposed zoning, building code, signage, or related variance affecting the Shopping
2   Center or any adjoining or adjacent property, which, if granted, could adversely affect
3   (beyond to a mere de minimis extent) Tenant's use or occupancy of the Premises, the
4   conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease.
5   Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest
6   such proposed variance.  If Landlord fails so to appear and contest such proposed
7   variance after receiving five (5) days' notice from Tenant (or such shorter notice as may
8   be practicable under the circumstances), then Tenant shall be entitled (but shall not be
9   obligated to), in its own name and/or in the name of Landlord, to appear in such
10  proceeding, in which event Landlord shall fully cooperate with Tenant, provide such
11  information, and execute any documents or other instruments as Tenant may reasonably
12  request in connection with any such proceeding.

13       Section 12.4  Environmental Matters.

14            12.4.1 Definitions.

15                 (a)   As used herein, the term *"Environmental Laws"* shall mean
16  any and all Legal Requirements concerning the protection of the environment, human
17  health or safety.

18                 (b)   As used herein, the term *"Hazardous Substances"* shall mean
19  each and every element, compound, material, mixture, substance, waste, hazardous
20  substance, hazardous waste, hazardous material, toxic substance, pollutant or
21  contaminant either as those terms are defined in any of the Environmental Laws or the
22  presence of which may cause liability at common law, including, without limitation,
23  asbestos and/or asbestos-containing products, whether or not currently friable.

24                 (c)   As used herein, the term *"Environmental Notice"* shall mean
25  a summons, citation, directive, order, claim, notice, litigation, investigation, judgment,
26  legal pleading, letter or other communication, written or oral, actual or threatened, from
27  the United States Environmental Protection Agency or other federal, state or local
28  governmental agency or authority, or any other private individual or entity concerning (i)
29  any Hazardous Substances at, on, in, under or emanating from the Premises, the
30  Shopping Center or any contiguous property; (ii) any violation or potential violation of
31  Environmental Laws at the Premises, the Shopping Center or any contiguous property; or
32  (iii) any underground storage tanks on the Premises or the Shopping Center.

33                 (d)   As used herein, the term *"Releasing"* or *"Release"* shall
34  mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise
35  introducing any substance into the environment or into any building or other
36  improvements in violation of Environmental Laws.

37                 (e)   As used herein, the term *"Compliance Costs"* shall mean any
38  and all costs incurred by a party in complying with applicable Environmental Laws,
39  including, without limitation, consultant's and engineer's fees; laboratory costs;
40  contractor's and subcontractor's fees; application and filing fees; costs of investigation,
41  monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings
42  or other improvements; equipment costs; disposal fees; costs of operation and
43  maintenance of equipment; legal fees; other governmental fees or costs; interest at the
44  Lease Interest Rate from the date of expenditure until paid in full; and other similar or
45  related costs.

46                 (f)   As used herein, the term *"Tenant Related Parties"* shall
47  mean Tenant's agents, servants, employees, contractors or licensees.

48            12.4.2 Compliance with Environmental Laws.  Tenant shall not use the
49  Premises or the Shopping Center, or any portion thereof, for the generation, storage,

manufacture or use of Hazardous Substances other than those used in normal commercial retail applications or sold at retail to consumers. Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter ***"Tenant Releases"***), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Notwithstanding anything to the contrary in this Lease, if any Hazardous Substances are found in or on the Premises (including, without limitation, in the roof system thereof) or the Shopping Center which pre-date the Delivery Date, then Landlord shall promptly remove the same in compliance with all applicable laws at Landlord's sole cost and expense, and, to the extent such work delays Tenant's Work, then the Rent Commencement Date and the date on which Tenant is required to open for business under Article 14 hereof shall be delayed on a day for day basis for each day of such delay, and Landlord shall reimburse Tenant for any and all reasonable costs incurred by Tenant in connection with such delay. Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises. If the presence of Hazardous Substances, or Landlord's remediative work relative thereto, interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that, except as set forth in that certain environmental site assessment report dated March 4, 2005, entitled Phase 1 Environmental Site Assessment/George Hooper Road Property, Burlington, WA, prepared by Materials Testing & Consulting, Inc., and that certain environmental site assessment report dated July 19, 2001, entitled Phase 1 Environmental Site Assessment/George Hooper Road Property, Burlington, WA, prepared by Materials Testing & Consulting, Inc., full, complete and correct copies of which Landlord delivered to Tenant prior to the Effective Date: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises. The

41

foregoing representations and warranties shall in no way serve to vitiate Landlord's
obligations under this Article 12.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of
the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and
hold the other party, and its agents, servants, shareholders, directors, officers, partners,
members and employees harmless from any and all claims, losses, expenses, costs,
lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and
liabilities of any nature whatsoever, including, without limitation, reasonable attorneys'
fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs,
arising from (i) the indemnifying party's breach of any of its representations, warranties,
covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for
which the indemnifying party is liable under this Section 12.4; or (iii) violations of
Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall
survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this
Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4
shall control.

Section 12.5 <u>OEA</u>.

12.5.1 As used in this Lease, the term *"OEA"* shall mean that certain
Restriction Agreement and Grant of Easements, by and between Newman Development
Group of Burlington, LLC, a Washington limited liability company, and Home Depot
U.S.A., Inc., a Delaware corporation, dated as of February 13, 2004 and recorded on
April 8, 2004 in the Office of the Skagit County Auditor, State of Washington (the
*"Clerk's Office"*) under Instrument No. 200404080093, as amended by that certain First
Amendment to Restriction Agreement and Grant of Easements, by and between Newman
Development Group of Burlington, LLC, a Washington limited liability company, and
HD Development of Maryland, Inc., a Maryland corporation, successor to Home Depot
U.S.A., Inc., a Delaware corporation, dated as of March 8, 2006, and recorded on March
15, 2006 in the Clerk's Office under Instrument No. 200603150121, as further amended
by that certain Second Amendment to Restriction Agreement and Grant of Easements, by
and between Newman Development Group of Burlington, LLC, a Washington limited
liability company, HD Development of Maryland, Inc., a Maryland corporation and
Stratford Hall, Inc., a New York corporation, dated as of June 26, 2006, and recorded on
July 6, 2006 in the Clerk's Office under Instrument No. 200607060008.

12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the
OEA has not been modified, amended or terminated; (ii) the OEA is currently in full
force and effect; (iii) to its actual knowledge as of the date hereof, no default under the
OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA
is, and shall remain, superior in lien to all mortgages and related liens affecting the
Shopping Center and all other land which is encumbered by the OEA. Landlord and
Tenant each acknowledge that this Lease is made and shall continue to be subject and
subordinate to the OEA, subject to the provisions of this Section 12.5. Tenant shall
comply with the terms and conditions of the OEA to the extent same affects the Premises
(it being agreed that Tenant shall not be obligated to expend any sums in connection with
such compliance).

12.5.3 Landlord shall, during the Term: (i) perform and observe all of the
terms, covenants, provisions and conditions of the OEA on Landlord's part to be
performed and observed; (ii) defend, indemnify and hold harmless Tenant from and

42

against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

12.5.4 Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5 Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7 In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8 As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

12.5.9 Landlord shall obtain any third-party approvals, if any, required under Section 2 of the OEA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's business in the Premises.

12.5.10      Landlord hereby warrants, covenants and represents to Tenant that Landlord shall not assign its rights as a "Consenting Owner" under the OEA separate and apart from its interest as Landlord under this Lease. Landlord further warrants, covenants and represents to Tenant that any assignment of its rights as a Consenting Owner under the OEA shall be set forth in a written instrument.

43

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1  <u>Permitted and Prohibited Uses</u>.

      13.1.1 <u>Tenant's Permitted Use</u>. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

      13.1.2 <u>Prohibited Uses</u>. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center or any "Related Land" (hereinafter defined) for any of the "Prohibited Uses" that pertain to the Shopping Center or the Related Land, as the case may be (as set forth in <u>Exhibit M</u> hereto annexed), <u>provided</u>, <u>however</u>, that the foregoing restriction shall not apply (i) as to any future Related Land, to the extent that any Prohibited Uses are otherwise permitted under leases entered into prior to the date on which such land becomes Related Land, and (ii) as to the Kohl's Parcel and/or the Home Depot Parcel, to the extent that any Prohibited Uses are otherwise permitted under any lease for space within such parcel(s) existing on the date that Landlord may acquire such parcel(s). As used in this Lease, the term ***"Related Land"*** shall mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled by Landlord or its Affiliate(s). Landlord shall execute and record, or cause to be executed and recorded, a Declaration of Restrictions substantially in the form attached hereto as <u>Exhibit O</u>, against any land which shall become Related Land during the Term.

     Section 13.2  <u>Tenant's Exclusive in Center</u>. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

      13.2.1  Subject to the existing rights of tenants under the Existing Leases, Landlord shall not lease, rent or occupy or permit any other premises in the Project (except, with respect to Kohl's Parcel and/or the Home Depot Parcel, to the extent otherwise permitted under any lease for space within such parcel(s) existing on the date that Landlord may acquire such parcel(s)) or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the ***"Exclusive Items"***). Notwithstanding the foregoing, any tenant or subtenant in the Project or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed, (1) if such tenant or subtenant occupies less than five thousand (5,000) square feet of Floor Area, the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises and (2) if such tenant or subtenant occupies five thousand (5,000) square feet of Floor Area or more, the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such

44

tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet, and a tenant occupying premises containing a total of four thousand (4,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed four hundred (400) square feet.] As to any future Related Land, the foregoing restrictions shall not apply to the extent that any Exclusive Items are otherwise permitted under leases entered into prior to the date on which such land became Related Land. Existing tenants of the Shopping Center (which shall be deemed to include the existing tenant(s) of the Kohl's Parcel and/or the Home Depot Parcel on the date that Landlord may acquire such parcel(s)) and any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department store [for example, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).

13.2.3 The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty (50%) percent of the Floor Area of the Premises.

13.2.4 (a)     Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(a)     If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization

45

reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3 Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Project or in any other property owned by Landlord or Landlord's Affiliate.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Notwithstanding any other provisions of this Lease, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)   giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, and

(b)   paying to Tenant, within thirty (30) days after such notice is given, any unpaid portion of the Tenant Allowance to the extent Tenant has satisfied all conditions for payment as set forth in Section 3.3.8 (*"Tenant's Lease Costs"*),

whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant

46

shall promptly pay to Landlord any amounts so determined to be due and owing by
Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any
amounts prepaid by Tenant for periods subsequent to the Recapture Date.
Notwithstanding anything in this Lease to the contrary, Landlord shall not be obligated to
reimburse Tenant for Tenant's Lease Costs if the Lease shall be terminated by Landlord
pursuant to this Article 14 after Tenant shall have initially opened the Premises for
business to the public.

ARTICLE 15

TENANT ASSIGNMENT AND SUBLETTING

Section 15.1 <u>Assignment and Subletting</u>.

15.1.1 Tenant shall have the right from time to time, without the consent of
Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license
all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

Section 15.2 <u>Liability of Tenant</u>.  Unless otherwise agreed to in writing by
Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce,
diminish, or otherwise affect the liability of Tenant hereunder; <u>provided, however</u>, that in
the event of an assignment by the Tenant originally named herein or its Affiliate
(collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or
to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all
liability of the Original Tenant under this Lease accruing from and after the effective date
of such assignment, shall terminate.  For purposes of this Section 15.2, the term *"Major
Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity
which has, as of the effective date of such assignment, a net worth of at least One
Hundred Fifty Million ($150,000,000) Dollars.

Section 15.3 <u>Collateral Assignment</u>.  In addition to Tenant's other rights set forth
in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to
one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or
other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute
all documentation reasonably requested by Tenant or any such Lender in connection
therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant
to an Affiliate of Tenant a license to operate all of Tenant's business operations at the
Premises, without such Affiliate having assumed any liability for the performance of
Tenant's obligations under this Lease.  As used herein, *"Lender"* shall mean a state or
federally regulated: bank, savings and loan association, insurance company, pension
fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4 <u>Cure Rights of Original Tenant</u>.

15.4.1 If Tenant assigns Tenant's interest in this Lease, then unless the
continuing liability of Tenant shall have been terminated pursuant to Section 15.2 or by
the agreement of the parties, Landlord, when giving notice to said assignee or any future
assignee in respect of any default, shall also give a copy of such notice to the Original
Tenant, and no notice of default shall be effective until a copy thereof is so given to
Original Tenant.  Original Tenant shall have the same period after receipt of such notice
to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of
such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or
on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal
Requirement of any State or of the United States, or any other Legal Requirements
affecting creditors' rights, <u>then</u> Landlord shall promptly give to Original Tenant notice
thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord
within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter

47

1   into a new lease of the Premises with Landlord (*"New Lease"*), provided that the
2   Original Tenant shall have remedied all Events of Default of the assignee hereunder,
3   unless such Events of Default are not reasonably susceptible of cure by the Original
4   Tenant, in which event the Original Tenant shall not be obligated to cure such Events of
5   Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the
6   Original Tenant's curing of any such Event of Default of the assignee as aforesaid,
7   Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee
8   (whether arising as a result of bankruptcy court proceedings or otherwise). The term of
9   said New Lease shall begin on the date of termination of this Lease and shall continue for
10  the remainder of the Term (including any Renewal Periods). Such New Lease shall
11  otherwise contain the same terms and conditions as those set forth herein, except for
12  requirements which are no longer applicable or have already been performed. It is the
13  intention of the parties hereto that such New Lease shall have the same priority relative to
14  other rights or interests in or to the Premises as this Lease. The provisions of this
15  Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full
16  force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate
17  and independent contract between Landlord and the Original Tenant. From the date on
18  which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise
19  of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and
20  enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

21      Section 15.5  Recognition Agreement. In the event Tenant subleases all or any
22  portion of the Premises containing Ten Thousand (10,000) square feet or more of Floor
23  Area, for a term of at least five (5) years, then, notwithstanding any other provisions of
24  this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement
25  among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in
26  recordable form. In the event Tenant subleases any portion of the Premises to a subtenant
27  to whom Landlord is not required to execute and deliver the agreement described in this
28  Section 15.5, then, following Landlord's receipt of notice from Tenant setting forth the
29  name and address of such subtenant, Landlord shall (i) simultaneously with any notice of
30  default thereafter delivered to Tenant under this Lease, deliver a full and complete copy
31  thereof to such subtenant, and (ii) permit such subtenant to cure such default on behalf of
32  Tenant within the same applicable cure period as allowed Tenant under the Lease.

33                              ARTICLE 16
34                  DEFAULT AND DISPUTE RESOLUTION

35      Section 16.1  Tenant Default.

36      16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10)
37  days after its receipt of notice thereof from Landlord specifying the amount and details of
38  the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on
39  Tenant's part to be performed or observed within thirty (30) days after its receipt of
40  notice thereof from Landlord specifying the nature of such default (or, if such default
41  shall be of a nature that same cannot reasonably be cured within thirty (30) days and
42  Tenant does not commence to cure such default on or before such thirtieth (30th) day and
43  thereafter diligently prosecute said cure to completion), such circumstance shall
44  constitute an *"Event of Default"*.

45      16.1.2 Upon an Event of Default, Landlord shall have all remedies given to
46  it at law or in equity (except that Landlord hereby expressly waives any rights to
47  accelerate any element of the Rent, and any right of distraint, which may be granted to it
48  by law), including the following:

49                  (a)  to bring suit for the collection of such unpaid Rent or for the
50  performance of such other covenant of this Lease on Tenant's part to be performed;
51  and/or

48

1220165.6

(b)   without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)   upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach as provided in Section 16.1.3 below, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)   upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given (including any amounts offset by Tenant against Rent to the extent Landlord shall dispute the amounts offset and such dispute shall be determined in Landlord's favor) shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2  Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as

49

a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)   as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)   bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)   Tenant may offset against fifty (50%) percent of each successive installment of Fixed Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably and actually expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate; provided, however, that (x) Tenant shall, as applicable, be entitled to offset against larger percentages of each successive installment of Fixed Rent if the aforesaid fifty (50%) percent offset is insufficient to reimburse Tenant in full, taking into account the then remaining number of installments of Fixed Rent due and payable by Tenant hereunder, and (y) the reference in this subsection to fifty (50%) percent shall be increased to one hundred (100%) percent with respect to offsets pertaining to Tenant's performance of Landlord's Work, Tenant's performance of restoration work pursuant to Section 11.1.2 (subject, as applicable, to Tenant's actual receipt of insurance proceeds which would otherwise be payable to Landlord or Landlord's mortgagee, in the manner described in said Section 11.1.2), Tenant's performance of restoration work pursuant to Section 11.2 and Landlord's failure to pay liquidated damages due pursuant to Section 2.2.3; and/or

(d)   terminate this Lease, without waiving its rights to damages for Landlord's Default, <u>provided</u> that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed, without limitation, that any water infiltration into the Premises from within or without the Premises, or mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3 <u>Arbitration</u>. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Seattle, Washington, before one arbitrator in accordance with the procedural rules of the American Arbitration Association (or any successor thereto) then in effect. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and

50

1220165.6

1   expenses of such arbitration, and each shall separately pay its own attorneys' fees and
2   expenses, unless the arbitrator finds that one of the parties did not act in good faith in
3   connection with the dispute or the conduct of the arbitration proceeding, in which case
4   the arbitrator may award all or part of said costs, expenses and fees to the other party.

5                                    ARTICLE 17
6        RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

7          Section 17.1 Right to Mortgage and Non-Disturbance. Landlord reserves the
8   right to subject and subordinate this Lease at all times to the lien of any first mortgage or
9   deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or
10  any portion of the Shopping Center, as well as to any future ground or underlying leases
11  encumbering or affecting all or any part of the Shopping Center; provided, however, that
12  (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-
13  disturbance and attornment agreement in substantially the form attached as Exhibit G
14  hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the
15  written consent of any holder of any mortgage, deed of trust or any other existing lien
16  encumbering or affecting the Shopping Center or any portion thereof, as applicable) and
17  deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to
18  Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in
19  the exercise of any of the rights arising or which may arise out of such lease, disturb or
20  deprive Tenant in or of its possession or its rights to possession of the Premises or of any
21  right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the
22  event of the termination of the ground or underlying lease, provided no Event of Default
23  shall have occurred and be then continuing, Tenant will not be made a party in any
24  removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its
25  possession or its right of possession of the Premises, and this Lease shall continue in full
26  force and effect as a direct lease between the Ground Lessor and Tenant for the
27  remainder of the Term and on the same terms and conditions as contained herein, without
28  the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right
29  to execute any amendment to this Lease which is specifically required hereunder and the
30  Ground Lessor shall recognize and be bound thereto.

31         Section 17.2 Estoppel Certificate. Upon written request of Landlord or Tenant,
32  the other party, within thirty (30) days after the date of receipt of such request, shall
33  execute and deliver to and only for the benefit of the requesting party or any Mortgagee,
34  bona fide prospective purchaser, assignee, or sublessee of the requesting party, without
35  charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual
36  knowledge, that this Lease is in full force and effect, if such is the case, and has not been
37  modified, assigned, supplemented or amended, except by such writings as shall be stated;
38  (3) specifying the dates to which Fixed Rent and Additional Rent have been paid;
39  (4) stating whether or not, to such party's actual knowledge, the party requesting the
40  estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent
41  Commencement Date, and (6) stating which options to extend the Lease Term have been
42  exercised, if any. Each request for a written statement pursuant to this Section 17.2 made
43  within twelve (12) months of an earlier request for such a written statement shall be
44  accompanied by a payment, from the requesting party to the other party, in the amount of
45  One Thousand ($1000) Dollars (increased by Two Hundred ($200 Dollars on each date
46  that the Fixed Rent increases pursuant to Section 1.1.11 hereof).

47         Section 17.3 Existing Mortgages and Ground Leases. If a mortgage, deed of
48  trust, or other security instrument, or any ground or underlying lease, encumbers the
49  Shopping Center or any part thereof on the Effective Date, then within thirty (30) days
50  after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a
51  subordination, non-disturbance and attornment agreement substantially in the form
52  attached hereto as Exhibit G, in recordable form, executed by each and every holder of
53  any mortgage, deed of trust or any other existing lien encumbering or affecting the

51

1 Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the
2 form and content described in clause (b) of Section 17.1 hereof, in recordable form,
3 executed by any Ground Lessor (and, as may be required, consented to by the holder of
4 any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to
5 so deliver such instrument(s) within said 30-day period, Tenant shall have the right by
6 notice given to Landlord at any time prior to the date on which such instrument(s) are
7 delivered, to terminate this Lease, in which event, neither party shall have any further
8 liability hereunder, except: (i) for those obligations which survive the expiration or other
9 termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord
10 shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs
11 and expenses incurred in connection with this Lease, including, without limitation, the
12 preparation and review of plans and specifications, and the performance of Tenant's
13 Work, provided, however, that such reimbursement by Landlord shall not exceed the
14 aggregate sum of Seventy-five Thousand Dollars ($75,000).

15                                        ARTICLE 18
16                                          NOTICE

17        Subject to the further provisions of this Article 18, whenever it is provided herein
18 that any notice, demand, request, consent, approval or other communication (*"Notice"*)
19 shall or may be given to either of the parties by the other, it shall be in writing and, any
20 Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose
21 unless same shall be given by registered or certified mail, postage prepaid, return receipt
22 requested, or by any recognized overnight mail carrier, with proof of delivery slip,
23 addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing
24 Address, with copies of notices to Landlord also given to Grubb & Ellis Management
25 Services, Inc., 1120 NW Couch, Suite 350 Portland, OR  97209, Attn: Property Manager,
26 and with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath
27 & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Wolff & Samson
28 P.C., One Boland Drive, West Orange, New Jersey 07052, Attn:  Mitchell S. Berkey,
29 Esq. (by separate notice), or to such other person or other address as may, from time to
30 time, be specified by either party in a written notice to the other party.  If Landlord shall
31 consist of more than one person or entity, notices delivered by Tenant to Landlord's
32 Mailing Address shall be deemed to be delivered to, and effective notice to, all such
33 persons or entities comprising Landlord.  All notices given in accordance with the
34 provisions of this Section shall be effective upon receipt (or refusal of receipt) at the
35 address of the addressee.  Notwithstanding the foregoing, Landlord shall instead send the
36 following items to Tenant (Attention: Lease Administration) at Tenant's Mailing
37 Address: (A) all bills, notices (but not notices of default) and related information
38 pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease,
39 and (B) all budgetary information, notices (but not notices of default), statements, bills
40 and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges
41 as described in Section 5.1 of this Lease.

42                                        ARTICLE 19
43                                   TENANT'S PROPERTY

44        All of Tenant's Property  which may be installed or placed in or upon the Premises
45 by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate,
46 encumber, mortgage or create a security interest in or upon Tenant's Property in the
47 Premises without the consent of Landlord and may remove Tenant's Property at any time
48 during the Term provided Tenant repairs any damage to the Premises caused thereby.
49 Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may
50 have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law
51 or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security
52 interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request

                                           52

1   therefor, a written waiver in form reasonably satisfactory to Tenant evidencing
2   Landlord's waiver of any rights it has or may have in Tenant's Property.

3                              ARTICLE 20
4                              END OF TERM

5       Section 20.1  Surrender of Premises.  At the expiration of the Term, Tenant will
6   quit and surrender the Premises in good condition and repair, excepting, however,
7   reasonable wear and tear, damage by fire or other casualty, damage by eminent domain,
8   and repairs and replacements to be made by Landlord hereunder.

9       Section 20.2  Hold Over.  If Tenant fails to deliver possession of the Premises to
10  Landlord at the end of the Term, and unless Landlord and Tenant are, at such time,
11  engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at
12  sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a
13  prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the
14  amount thereof payable by Tenant for the month immediately preceding the last day of
15  the Term, as well as for all Additional Rent payable by Tenant hereunder; provided,
16  however, that the Fixed Rent due during any period Tenant shall remain in occupancy of
17  the Premises after the third (3rd) full calendar month following the end of the Term shall
18  be in the monthly amount (or, if applicable, on a prorated daily basis) equal to two
19  hundred (200%) percent of the amount thereof payable by Tenant for the month
20  immediately preceding the last day of the Term.

21                             ARTICLE 21
22                        TENANT'S RIGHT OF FIRST OFFER

23      Provided an uncured Event of Default does not then exist under this Lease, Tenant
24  shall have continuing rights of first offer to lease additional space in the Shopping Center
25  which is contiguous to the Premises and which may become available on and after the
26  date of this Lease.  At such time that Landlord has knowledge that such space ("*Offered*
27  *Space*") is or will become available, Landlord will give Tenant notice (the "*Offering*
28  *Notice*") of the terms and conditions Landlord would be willing to accept with respect to
29  the Offered Space (including, without limitation, the proposed rent, additional rent, scope
30  of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall
31  have fifteen (15) business days within which to respond to Landlord's offer.  In the event
32  Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such
33  election by giving notice to Landlord during such fifteen (15) business day period and
34  Landlord and Tenant shall thereupon enter into an amendment to this Lease for the
35  leasing of the Offered Space, which amendment shall (a) contain the terms and conditions
36  set forth in the Offering Notice, (b) provide that the term thereunder shall expire or
37  sooner terminate contemporaneously with the expiration or sooner termination of the
38  Term hereof (subject to extension in accordance with Section 2.2.2 above), and (c)
39  contain such other terms and provisions as either Landlord or Tenant may reasonably
40  require in order to effectuate the incorporation of the Offered Space into the Premises and
41  to otherwise effectuate the intent of this Article 21.  Should Tenant decline Landlord's
42  offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to
43  have waived any prospective rights of first offer to the Offered Space (but Tenant shall
44  not lose any prospective rights of first offer with respect to any space (including, without
45  limitation, the Offered Space) which may in the future become vacant and available), and
46  Landlord may lease the Offered Space to any other party upon substantially the same
47  terms and conditions as that offered to Tenant, provided that such lease is executed
48  within six (6) months after Tenant has declined (or has been deemed to have waived)
49  Landlord's offer with respect to the Offered Space.  As used herein, the phrase
50  "*substantially the same terms and conditions as that offered to Tenant*" shall mean
51  terms not materially different and/or a rent of not more than five (5%) percent below the
52  rent requested by Landlord of Tenant.  Any dispute between the parties with respect to
53  this Article 21 (including, without limitation, any dispute as to the provisions of the

                                    53

1   amendment described in this Article 21) shall be resolved by arbitration in accordance
2   with the provisions of Section 16.3 above.

3                                    ARTICLE 22
4                               ONGOING CO-TENANCY

5          If, at any time during the Term, either (i) two (2) or more of the Inducement
6   Tenants or Suitable Replacement Tenants, as applicable, or (ii) more than thirty percent
7   (30%) of the total Floor Area of all buildings in the Shopping Center, as set forth in
8   Section 1.1.34 above (excluding the Premises), ceases to be used for the operation of
9   retail business by national or regional tenants of the type typically found in first-class
10  regional shopping centers located in the Burlington, Washington metropolitan area (such
11  condition being hereinafter referred to as an *"Excess Vacancy"*), then (i) if the Excess
12  Vacancy continues for a period in excess of one hundred eighty (180) continuous days,
13  Tenant shall have the right to pay Alternate Rent in lieu of Fixed Rent during the period
14  of such Excess Vacancy, and (ii) if the Excess Vacancy continues for a period in excess
15  of seven hundred thirty (730) continuous days, to terminate this Lease, exercisable by
16  giving Landlord, within one hundred twenty (120) days after the expiration of such 730-
17  day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate
18  on the date set forth in Tenant's notice of termination without further liability on the part
19  of either Landlord or Tenant, except: (A) for those obligations which survive the
20  expiration or other termination of this Lease pursuant to the express terms of this Lease,
21  and (B) Landlord, promptly after receiving a statement from Tenant showing the costs
22  and expenses of Tenant's Work and any alterations made by Tenant, shall reimburse
23  Tenant for the unamortized portion of such costs and expenses based upon the unexpired
24  portion of the Term.  If Tenant does not terminate this Lease pursuant to this Article 22,
25  then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume
26  paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its
27  rights under this Article 22 each time the then existing condition of Excess Vacancy
28  worsens by more than five percent (5%); and (y) retain all of its original rights under this
29  Article 22 with respect to any future condition(s) of Excess Vacancy.

30                                   ARTICLE 23
31                                 MISCELLANEOUS

32         Section 23.1  Loading Facilities.  Tenant shall have the exclusive right to utilize
33  the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day",
34  "365 days a year" basis.

35         Section 23.2  Liens.  Within thirty (30) days after notice of the filing thereof,
36  Tenant shall discharge (either by payment or by filing of the necessary bond, or
37  otherwise) any lien against the Premises and/or Landlord's interest therein, which may
38  arise out of any payment due for, or purported to be due for, any labor, services,
39  materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon
40  or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof,
41  Landlord shall discharge (either by payment or by filing of the necessary bond, or
42  otherwise) any lien against the Premises and/or Landlord's interest therein, which may
43  arise out of any payment due for, or purported to be due for, any labor, services,
44  materials, supplies or equipment alleged to have been furnished to or for Landlord in,
45  upon or about the Premises.

46         Section 23.3  Broker's Commission.  Landlord and Tenant each warrant and
47  represent to the other that they did not deal with any real estate broker in connection with
48  the negotiation, execution and delivery of this Lease, except for Northwest Retail
49  Partners (the *"Broker"*).  Landlord shall pay the Broker a commission pursuant to a
50  separate agreement.  Each party agrees to indemnify, defend, and save the other harmless
51  from and against any and all liabilities, costs, causes of action, damages and expenses,
52  including, without limitation, attorneys' fees, with respect to or arising out of any claims

                                        54

1    made by any real estate broker (other than the Broker), agent or finder with respect to this
2    Lease in breach of the foregoing representation.  The provisions of this Section shall
3    survive the expiration or earlier termination of this Lease.

4         Section 23.4 *Force Majeure*.  Except as otherwise expressly set forth herein, in
5    the event either party hereto shall be delayed or hindered in, or prevented from, the
6    performance of any act required hereunder by reason of strikes, failure of power, riots,
7    insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of
8    unusual severity), or other reasons of an extraordinary nature which are beyond the
9    reasonable control of the party, and which could not have been avoided through the
10   exercise of due diligence by a party (collectively referred to herein as *"Force Majeure"*),
11   then the performance of any such act shall be excused for a period equal to the period of
12   the delay.  Notwithstanding the foregoing provisions, the following shall not constitute
13   Force Majeure: (i) the financial inability of a party to perform its obligations under this
14   Lease; or (ii) delays occurring in the course of complying with applicable Legal
15   Requirements that could have been avoided through the exercise of due diligence by a
16   party hereto.  A party wishing to invoke this Section shall give the other party notice of
17   that intention within ten (10) days of the commencement of any event of *Force Majeure*
18   and shall, at that time, specify the reasons therefor, the specific provision of this Lease
19   which will be delayed as a result, and the period of such extension, if known, or if not
20   known, a reasonable estimate thereof.

21        Section 23.5 Consents.  Except as may be otherwise expressly set forth in this
22   Lease, whenever under this Lease provision is made for either party's securing the
23   consent or approval of the other party, (i) such consent or approval shall be in writing and
24   shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters
25   contained herein, both parties shall have an implied obligation of reasonableness.

26        Section 23.6 Costs.  Whenever this Lease requires the performance of an act by a
27   party, such party shall perform the act at its own cost and expense, unless expressly
28   provided to the contrary.

29        Section 23.7 Attorneys' Fees.  In any action or proceeding hereunder (whether to
30   enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall
31   be entitled to recover from the other party the prevailing party's reasonable costs and
32   expenses in such action or proceeding, including reasonable attorneys' fees, costs and
33   expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a
34   result of a violation of a covenant or warranty herein contained by the other party hereto,
35   then the party who has violated the covenant or warranty shall be responsible for the
36   reasonable costs and expenses in such action or proceeding against the non-violating
37   party, including reasonable attorneys' fees, costs and expenses.

38        Section 23.8 Survival of Obligations.  The obligation to pay any sums due to
39   either party from the other that by the terms herein would not be payable, or are incapable
40   of calculation, until after the expiration or sooner termination of this Lease shall survive
41   and remain a continuing obligation until paid.  All indemnity obligations under this Lease
42   shall survive the expiration or earlier termination of this Lease.

43        Section 23.9 Non-Waiver.  The failure of Landlord or Tenant to insist upon the
44   strict performance of, or to enforce, any provision, covenant or condition herein shall not
45   be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to
46   enforce the same covenant or condition on the occasion of any subsequent breach or
47   default; nor shall the failure of either party to exercise any option in this Lease upon any
48   occasion arising therefor be deemed or construed to be a waiver of the right to exercise
49   that same kind of option upon any subsequent occasion.

50        Section 23.10 Rights Cumulative.  Unless expressly provided to the contrary in
51   this Lease, each and every one of the rights, remedies and benefits provided by this Lease

55

1   shall be cumulative and shall not be exclusive of any other such rights, remedies and
2   benefits allowed by applicable Legal Requirements.

3       Section 23.11  <u>Definition of Landlord</u>.  The term *"Landlord"* shall mean only the
4   person or entity which, from time to time, shall then own the Shopping Center, and in the
5   event of the transfer by such owner of its interest in the Shopping Center, such owner
6   shall (<u>except</u> to the extent of (1) claims made by Tenant against Landlord which arose
7   prior to the effective date of the transfer of such ownership interest, and/or (2) judgments
8   obtained by Tenant against Landlord, on or prior to the effective date of the transfer of
9   such ownership interest) thereupon be released and discharged from all covenants and
10  obligations of Landlord thereafter accruing, but such covenants and obligations shall be
11  binding during the Term upon each new owner for the duration of such owner's
12  ownership.

13      Section 23.12  <u>Successors and Assigns</u>.  The provisions of this Lease shall be
14  binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
15  executors, administrators, successors and assigns.

16      Section 23.13  <u>Limitation of Landlord's Liability</u>.  Except with respect to any
17  unpaid portion (if any) of the Tenant Allowance, Tenant shall, on and after the Delivery
18  Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds
19  from the sale of all or any portion thereof) and net income derived from the Shopping
20  Center (such estate, property, proceeds and income, *"Landlord's Estate"*) for the
21  satisfaction of Tenant's remedies for the collection of a judgment (or other judicial
22  process) requiring the payment of money by Landlord hereunder and no other property or
23  assets of Landlord, its officers, directors, stockholders, members or partners shall be
24  subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's
25  remedies under or with respect to this Lease.  Notwithstanding anything in this Lease to
26  the contrary, if Landlord shall deliver notice to Tenant that Landlord has paid the final
27  installment of the Tenant Allowance (which notice shall reference this Section 23.13 and
28  advise Tenant that should Tenant desire to contest Landlord's claim that it has paid the
29  final installment of the Tenant Allowance, Tenant must deliver notice of such contest
30  within thirty (30) days), and Tenant shall fail to deliver notice contesting that Landlord
31  has so paid such final installment within thirty (30) days of Tenant's receipt of
32  Landlord's notice, then if Tenant thereafter shall desire to contest that Landlord has in
33  fact paid the last installment of the Tenant Allowance, Tenant shall look only to
34  Landlord's Estate for the payment of any unpaid portion of the Tenant Allowance and no
35  other property or assets of Landlord, its officers, directors, stockholders, members or
36  partners shall be subject to levy, execution or other enforcement procedure for recovery
37  of any unpaid portion of the Tenant Allowance.  Except with respect to the limitation on
38  personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be
39  deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or
40  which may be available at law or in equity.

41      Section 23.14  <u>Limitation of Tenant's Liability</u>.  Landlord, its successors and
42  assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns,
43  for the satisfaction of any claim arising from or under this Lease and shall not seek to
44  impose personal liability on any shareholder, officer, director, member or employee of
45  Tenant or any of its Affiliates.

46      Section 23.15  <u>Joint and Several Liability</u>.  If either party consists of more than
47  one person, then the persons constituting such party shall be jointly and severally liable
48  hereunder.

49      Section 23.16  <u>Severability</u>.  If any term, covenant, condition or provision of this
50  Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable,
51  the remainder of the provisions hereof shall remain in full force and effect and shall in no
52  way be affected, impaired, or invalidated thereby.

1         Section 23.17  <u>Grammatical Usages and Construction</u>.  In construing this Lease,
2    feminine or neuter pronouns shall be substituted for those masculine in form and vice
3    versa, and plural terms shall be substituted for singular and singular for plural in any
4    place in which the context so requires.  This Lease shall be construed without regard to:
5    (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition
6    or deletion of text made during the negotiation of this Lease.  Moreover, each and every
7    provision of this Lease shall be construed as though all parties hereto participated equally
8    in the drafting thereof.  As a result of the foregoing, any rule or construction that a
9    document is to be construed against the drafting party shall not be applicable hereto.

10        Section 23.18  <u>Table of Contents, Line Numbering and Paragraph Headings</u>.  The
11   table of contents and line numbering, if any, and section headings are inserted only for
12   convenience and in no way define, limit or describe the scope or intent of this Lease, nor
13   in any way affect this Lease.

14        Section 23.19  <u>Definition of Hereunder, Herein, etc.</u>.  Unless the context clearly
15   indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and
16   words of similar import refer to this Lease and all the Exhibits attached hereto as a whole
17   and not to any particular section, subsection, or paragraph hereof.

18        Section 23.20  <u>Short Form Lease</u>.  Upon the request of either party following the
19   execution and delivery of this Lease, Landlord and Tenant shall execute a short form
20   lease or memorandum for recording, which shall be in form and substance as either party
21   shall reasonably request.  If Landlord or its Affiliate acquires title to or control over, by
22   deed, ground lease or otherwise, the Kohl's Parcel and/or the Home Depot Parcel (or any
23   portion thereof), then Landlord shall record a memorandum or short form of this Lease
24   against such parcel(s) (or such applicable portion thereof) in form and substance as either
25   party shall reasonably request, and which shall refer to such provisions of this Lease
26   which may survive the expiration or sooner termination thereof.  In no event shall the
27   amount of Fixed Rent reserved hereunder be included in any such short form lease or
28   memorandum.

29        Section 23.21  <u>Entire Agreement and Modification</u>.  This Lease constitutes the
30   entire agreement of the parties hereto, and all prior agreements between the parties,
31   whether written or oral, are merged herein and, except as may be specifically set forth
32   herein, shall be of no force and effect.  This Lease cannot be changed, modified or
33   discharged orally, but only by an agreement in writing, signed by the party against whom
34   enforcement of the change, modification or discharge is sought.

35        Section 23.22  <u>No Joint Venture or Partnership Created by Lease</u>.  Nothing
36   contained herein shall be deemed or construed as creating the relationship of principal
37   and agent or of partnership or of joint venture between the parties hereto.

38        Section 23.23  <u>Tenant's Tradename</u>.  Landlord shall not make use of Tenant's
39   tradename [*i.e.*, "*Bed Bath & Beyond*"®] in any advertising or marketing material,
40   including, without limitation, on any internet website, without obtaining Tenant's prior
41   written approval, which may be withheld in Tenant's sole and absolute discretion.

42        Section 23.24  <u>Counterparts</u>. This instrument may be executed in several
43   counterparts, each of which shall be deemed an original.  The signatures to this
44   instrument may be executed and notarized on separate pages, and when attached to this
45   instrument, shall constitute one complete document.

46        Section 23.25  <u>Waiver of Trial by Jury</u>.  Landlord and Tenant hereby mutually
47   waive any and all rights which either may have to request a jury trial in any proceeding
48   between them at law or in equity.

49                        [Signature page follows]

1         Section 23.26 <u>Governing Law</u>. This Lease shall be governed by, construed, and
2 enforced in accordance with the laws of the State in which the Premises are located.

3         IN WITNESS WHEREOF, the parties have executed this instrument under seal
4 the day and year first-above written.

**LANDLORD:**

WITNESS:                           STATFORD HALL, INC.,
                                a Delaware corporation

[SEAL]                        By:_____
                       Name:   FRANK   LEE
                       Title:   VP

**TENANT:**

ATTEST:                       BED BATH & BEYOND INC.,
                              a New York corporation

                       By:_____
_____    Name:   Warren Eisenberg
Name: Alan M. Freeman           Title:   Co-Chairman
Title:  Assistant Secretary

[SEAL]

5

6 <u>Landlord's Acknowledgement:</u>

7 State of California             )
8
9 County of *Los Angeles*     )
10
11     On *06·02–10*    before me, *Linda D. Sheldon*
12 (here insert name and title of the officer), personally appeared _____
13 *Frank Lee* _____, who proved to me on the basis of satisfactory evidence
14 to be the person(s) whose name(s) is/are subscribed to the within instrument and
15 acknowledged to me that he/she/they executed the same in his/her/their authorized
16 capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
17 entity upon behalf of which the person(s) acted, executed the instrument.

18
19     I certify under PENALTY OF PERJURY under the laws of the State of
20 California that the foregoing paragraph is true and correct.

21
22 WITNESS my hand and official seal.
23
24
25
26 Signature *Linda D. Sheldon* (Seal)
27
28

                                        LINDA D. SHELDON
                                        COMM. # 1694276
                                        NOTARY PUBLIC-CALIFORNIA
                                        KERN COUNTY
                                        MY COMM. EXP. SEPT. 17, 2010

58

1       Section 23.26 <u>Governing Law</u>. This Lease shall be governed by, construed, and
2 enforced in accordance with the laws of the State in which the Premises are located.

3       IN WITNESS WHEREOF, the parties have executed this instrument under seal
4 the day and year first-above written.

**LANDLORD:**

WITNESS:

STATFORD HALL, INC.,
a Delaware corporation

_____

[SEAL]

By:_____
Name:_____
Title:_____

**TENANT:**

ATTEST:

BED BATH & BEYOND INC.,
a New York corporation

_____
Name: Alan M. Freeman
Title: Assistant Secretary

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

[SEAL]

5

6 <u>Landlord's Acknowledgement</u>:

7 State of California          )
8
9 County of _____    )
10
11      On _____ before me, _____
12 (here insert name and title of the officer), personally appeared
13 _____, who proved to me on the basis of satisfactory evidence
14 to be the person(s) whose name(s) is/are subscribed to the within instrument and
15 acknowledged to me that he/she/they executed the same in his/her/their authorized
16 capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
17 entity upon behalf of which the person(s) acted, executed the instrument.
18
19      I certify under PENALTY OF PERJURY under the laws of the State of
20 California that the foregoing paragraph is true and correct.
21
22 WITNESS my hand and official seal.
23
24
25
26 Signature _____ (Seal)
27
28

58

1220165.6

1  <u>Tenant's Acknowledgement:</u>
2  STATE OF NEW JERSEY          )
3                               ) : ss.
4  COUNTY OF UNION              )

5       On this 28th day of _May_, 2010, before me personally came Warren
6  Eisenberg to me known, who being by me duly sworn, did depose and say that he is the
7  Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which
8  executed the above instrument and that he signed his name thereto by order of the Board
9  of Directors of said corporation.

10                                    _Angela M Leary_
11                                    Notary Public

12  My Commission Expires:                  ANGELA M. LEARY
13                                   Notary Public, State of New Jersey
14                                   My Commission Expires July 9, 2012
15  _July 9, 2012_

59

1220165.6

1                      **<u>INDEX OF EXHIBITS</u>**

2    Exhibit A-1 -        Legal Description of Project

3    Exhibit A-2 -        Legal Description of Shopping Center

4    Exhibit A-3 -        Legal Description of Tax and Common Areas Parcel

5    Exhibit B -          Site Plan

6    Exhibit C -          Form of Rent Commencement and Expiration Date Agreement

7    Exhibit D -          Specifications for Landlord's Work

8    Exhibit D-1         Exterior Elevations of the Premises, and Sidewalk Plan

9    Exhibit D-2         Intentionally Omitted

10   Exhibit E -          Permitted Encumbrances

11   Exhibit F -          Signage

12   Exhibit G -          Form of Subordination, Non-Disturbance and Attornment

13                            Agreement

14   Exhibit H -          Form of Subtenant Recognition Agreement

15   Exhibit I -           Form of Delivery Date Notice

16   Exhibit J -           Form of Delivery Date Certification

17   Exhibit K-1         Existing Exclusives

18   Exhibit K-2         Existing Leases

19   Exhibit L            Intentionally Omitted

20   Exhibit M           Prohibited Uses

21   Exhibit N           Form of Mechanics' Lien Indemnification

22   Exhibit O           Form of Declaration of Restrictions Against Related Land

23   Exhibit P           Form of Home Depot Letter

24

1220165.6

<u>Exhibit A-1</u>

<u>Legal Description of Project</u>

Lots 1-11, inclusive, and lots 13-15, inclusive, City of Burlington Binding Site Plan No. Burl-01-04, entitled Newman Development of Burlington, LLC, Retail/Commercial Center, approved March 8, 2004 and recorded March 15, 2004 under Skagit County Auditor's File No. 200403150156, being a portion of Government Lot 8 and the Southeast 1/4 of the Northeast 1/4, Section 7, Township 34 North, Range 4 East, W.M.

Subject to and together with easements, reservations, restrictions, covenants, liens, leases, court causes and other instruments of record.

Situate in the City of Burlington, County of Skagit, State of Washington.

1220165.6

1          <u>Exhibit A-2</u>

2          <u>Legal Description of Shopping Center</u>

3

4     Lots 2 - 9, inclusive, and Lots 13 and 14, inclusive, City of Burlington Binding Site Plan
5     No. Burl-01-04, entitled Newman Development of Burlington, LLC, Retail/Commercial
6     Center, approved June 12, 2006 and recorded June 27, 2006, under Skagit County
7     Auditor's File No. 200606270207, being a revision of that certain instrument approved
8     March 8, 2004 and recorded March 15, 2004, under Auditor's File No. 200403150156,
9     and being a portion of Government Lot 8 and the Southeast 1/4 of the Northeast 1/4,
10    Section 7, Township 34 North, Range 4 East, W.M.
11
12    TOGETHER WITH an easement for ingress, egress and utilities as described in that
13    instrument recorded on February 11, 2004, under Auditor's File No. 200402110099,
14    records of Skagit County, Washington.
15
16    ALSO TOGETHER WITH an easement for ingress, egress and utilities as described in
17    that instrument recorded on March 15, 2004 under Auditor's File No. 200403150158 and
18    re-recorded April 8, 2004, under Auditors File No. 200404080093, records of Skagit
19    County, Washington.
20
21    Situate in the County of Skagit, State of Washington.

A-2

1

<u>Exhibit A-3</u>

<u>Legal Description of Tax and Common Areas Parcel</u>

Lots 2 - 6, inclusive, City of Burlington Binding Site Plan No. Burl-01-04, entitled
Newman Development of Burlington, LLC, Retail/Commercial Center, approved June
12, 2006 and recorded June 27, 2006, under Skagit County Auditor's File No.
200606270207, being a revision of that certain instrument approved March 8, 2004 and
recorded March 15, 2004, under Auditor's File No. 200403150156, and being a portion of
Government Lot 8 and the Southeast 1/4 of the Northeast 1/4, Section 7, Township 34
North, Range 4 East, W.M.

TOGETHER WITH an easement for ingress, egress and utilities as described in that
instrument recorded on February 11, 2004, under Auditor's File No. 200402110099,
records of Skagit County, Washington.

ALSO TOGETHER WITH an easement for ingress, egress and utilities as described in
that instrument recorded on March 15, 2004 under Auditor's File No. 200403150158 and
re-recorded April 8, 2004, under Auditors File No. 200404080093, records of Skagit
County, Washington.

Situate in the County of Skagit, State of Washington.

1

## Exhibit B

2

## Site Plan

1220165.6



## FLOOR PLAN / LOD
N.T.S.

NOTE:
1) CONSTRUCTION STAGING AREA FOR LANDLORD AND OTHER CO-TENANT'S SHALL NOT BE DIRECTLY IN FRONT OF TENANT'S PREMISES OR BLOCK ACCESS TO TENANT'S LOADING DOCK.
2) TENANT TO HAVE THE RIGHT TO RELOCATE CART CORRALS ON THE SIDEWALK IN FRONT OF PREMISES AND IN THE PARKING FIELD.
3) EXIT DOOR LOCATIONS TO BE COORDINATED WITH TENANT'S PLANS.
4) SITE PLAN LAYOUT TO ADEQUATELY ACCOMMODATE TURNING RADIUS FOR A WB-67 TRACTOR AND TRAILER, FROM POINT OF ENTRY TO TENANT'S LOADING DOCK AND THEN FOR EXITING SHOPPING CENTER.

EXHIBIT B (1 of 2)

SITE PLAN
BED BATH & BEYOND
BURLINGTON CROSSING
BURLINGTON, WA
DATE: 05/26/10



### SITE PLAN LEGEND

| | |
|---|---|
| PREMISES | |
| CRITICAL AREA | |
| SHOPPING CENTER | |
| CONSTRUCTION DRIVE | |
| STAGING | |
| HOME DEPOT PARCEL | |
| KOHL'S PARCEL | |
| CELLULAR TOWER AREA | |

SITE PLAN
N.T.S.



CENTER
PYLON
SIGN

W.S.D.O.T R.O.W

W.S.D.O.T R.O.W

W.S.D.O.T R.O.W

HOME DEPOT
F.F.ELEV.=32.2

GARDEN
CENTER

MARKET PLACE DR.
SOUTH (PUBLIC ROW)

ASHLEY'S
FINE
FURNITURE

KOHL'S
68,890 sf

Plot not
part of site

Plot not
part of site

Plot not
part of site

JANE BRYANT

FAMOUS
FOOTWEAR

CENTER
MONUMENT
SIGN

PUBLIC
ROADWAY

TO COSTCO

CENTER
MONUMENT
SIGN

S. BURLINGTON BLVD.

CENTER
MONUMENT
SIGN

EXHIBIT B (2 OF 2)
BED BATH & BEYOND
BURLINGTON CROSSING
BURLINGTON, WA
DATE: 5/26/10

# THE PROPERTY CAM & TAX PARCEL
### Burlington, WA - MARCH 10, 2010

▨ BUILDING DENOMINATOR

▨ CAM & TAX PARCEL

<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 200___, by and between STRATFORD HALL, INC. (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

# W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Burlington Crossings Shopping Center (the *"Shopping Center"*), situated in Burlington, Washington;

WHEREAS, by that certain Lease Agreement dated as of _____ __, 2010 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 201__.

2.      The **Initial Term** of the Lease shall expire on January 31, 202_, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the **first Renewal Period** shall be February 1, 202_, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 202_, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the **second Renewal Period** shall be February 1, 202_, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 203_, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the **third Renewal Period** shall be February 1, 203_, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 203_, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

6.      The date of commencement of the **fourth Renewal Period** shall be February 1, 203_, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 204_, unless the Lease terminates earlier as provided in the Lease.

7.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

C-1

1   IN WITNESS WHEREOF, the parties hereto have caused this Rent
2 Commencement and Expiration Date Agreement to be executed the date and year first
3 above written.

**LANDLORD:**

STRATFORD HALL, INC.,
a Delaware corporation

By:_____

Name:_____

Title:_____

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By:_____

Name:  Warren Eisenberg

Title:   Co-Chairman

C-2

1                              <u>Exhibit D</u>

2                      <u>Specifications for Landlord's Work</u>



**BURLINGTON, WA**

## Exhibit D

Landlord's Obligations (As-Is Delivery) and Tenant's Optional Work

### 05/27/2010

[All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturer's' specifications.]

### Section A – Landlord's Obligations

Landlord agrees to fully perform (at its sole cost) all of the work ("Landlord's Work") set forth below:

1. Schedule : Landlord's Work shall be substantially complete within 15 days following Lease Execution.

2. As-Is : Except as otherwise provided in this Lease and the Exhibits thereto, Landlord shall deliver the Premises to Tenant in its present "As Is" physical condition. The foregoing reference to the Premises being delivered in "As Is" condition shall not relieve Landlord of any maintenance or repair obligations with respect to the Premises otherwise specifically set forth in this Lease as the responsibility of Landlord. Subject to the above, the Premises shall be delivered to Tenant in substantially the same condition and state of repair as existed on the date of Tenant's inspection thereof on 02/19/2010 aside from required landlord work to remove fixtures,broom clean condition, and as outlined in item #5 below..

3. Demised : Landlord represents that the Premises is fully demised/separated from all other spaces in the Shopping Center in accordance with all applicable codes and insurance regulations.

4. Clean : The Premises shall be delivered to Tenant by Landlord in a neat and broom clean condition, free of all prior tenants and occupants, and free of all store fixtures and the like from prior occupants.

5. Flooring: Landlord to be diligent in not damaging the floor when removing existing store fixtures per item 4 above. Landlord is responsible at landlord cost to remove existing sales flooring in a professional manner. Landlord is responsible at Landlord cost to mechanically remove the existing adhesive once the sales flooring has been removed. Tenant to apply required flooring products and applications per Tenant's Specification Section 07190 CONCRETE SLAB TESTING & TREATMENT, provided to Landlord on 05/26/2010.

6. Watertight: The Premises shall be delivered to Tenant by Landlord in a secured condition with the roof watertight (and all gutters, downspouts, roof drains in good working order), all systems and equipment (including, without limitation, the heating, plumbing, electrical systems, and air conditioning/ventilation systems) in good working order, and the structural components (including, without limitation, the foundation, exterior walls, structural supports and roof) in good order and repair.

7. Utilities: Landlord shall be responsible to ensure that all utilities serving the Premises are separately metered and independent from all other Tenants/Spaces in the Shopping Center. Landlord shall be responsible to ensure that any utility lines which serve other Tenants/Spaces in the Shopping Center do NOT pass through or under the Premises.

8. Utilities : All existing electric, gas, water (fire and domestic), sanitary and phone utilities shall independently serve the Premises and shall be in good working order with capacities as defined below:

   a) *Electric* : ex- (3) 3" conduits w/ pull strings capable of supplying 4 #300MCM (480/277V, 3 Phase Electric Service) to Tenant's 800amp MDP.
   b) *Telephone* : existing (1) 4" conduit with pull cord.

    c) *Gas* : 2575 CFH @ 7" WC, Minimum Gas Line, refer to Exhibit B for location.

    d) *Domestic Water* : existing 2-inch incoming domestic water service, refer to Exhibit B for location.

    e) *Fire Suppression* – Min. (1) 8" Fire Suppression Water Service Line providing a density of .49/2000. The sprinkler system shall be designed to comply with NFPA 231-C (high pile storage) for Class IV Commodity.

    f) *Sanitary* – existing 4-inch Sanitary Waste Line, refer to Exhibit B for location.

9. Haz-Mat : The Premises shall be delivered to Tenant by Landlord free from asbestos containing material and all other Hazardous Substances.

10. Quality : All work performed in the Premises by Landlord shall be done in a good and first class workmanlike manner; in accordance with all applicable laws, ordinances, codes and insurance requirements.

11. Cooperation : Landlord agrees to fully cooperate with Tenant and to assist Tenant (including without limitation performing any work outside of the Premises required by governmental authority) in obtaining all required building permits for Tenant's Work, and in obtaining an unconditional permanent certificate of occupancy, or the local equivalent thereof.

12. Lighting: The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) is existing and shall be in proper working order consistent with a first class Shopping Center inWashington. Landlord shall provide low level security lighting throughout the center that shall remain illuminated from dusk to dawn seven days a week. Landlord shall repair or replace any damaged or non-functioning site lighting fixtures prior to Delivery and maintain throughout the Term.

13. Signage: Pylon/Monument/Directional Signs – Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F. Conduit to be installed continuously from Landlord's panel to pylon/ monument/ directional signs location(s). Landlord responsible for furnishing and installing all pylon/ monument/ directional signs. Landlord shall provide complete shop drawings of all Landlord furnished signs to Tenant.

## Section B – Landlord's Obligations Sitework

1. Condition - At the time of Delivery, Landlord shall ensure that all existing construction (including but not limited to : parking areas, traffic drives, truck access drives, sidewalks, painted striping, site lighting and site drainage) are in good repair consistent with a first class Shopping Center inWashington.

2. Lighting - The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) is existing and Landlord shall repair same as required to ensure all lighting is in proper working order consistent with a first class Shopping Center inWashington. Landlord shall provide low level security lighting (approximately one foot-candle) throughout the Shopping Center that shall remain illuminated from dusk to dawn seven days a week.

3. Schedule – Landlord shall coordinate any necessary sitework repairs with Tenant to meet Tenant's scheduled completion date.

## Section C– Tenant's Optional Work

Landlord shall allow Tenant to perform the work set forth below; provided, however, all such work performed by Tenant in the Common Areas shall be: (i) subject to applicable governmental laws, rules and regulations; (ii) completed expeditiously upon commencement of work; and (iii) performed in such a manner as to minimize any impact on shopping center operations.

1. Structure : Tenant shall have the right to modify the existing structure as required by Tenant.

2. Mechanical : Landlord shall allow Tenant to re-use and/or remove and dispose of existing RTU's (at Tenant's discretion) solely serving the Premises including all associated ductwork, grilles, diffusers, accessories, controls, etc.

3. Crosswalk : Landlord shall allow Tenant (at Tenant's option) to provide painted ADA crosswalk striping with flexible pedestrian "warning" sign at the drive aisle located directly in front of the Premises as shown on Exhibit B (site plan). In the event that it is reasonably determined by the Tenant that vehicular traffic through the main drive aisle directly in front of the main entrance to the Premises presents a danger to pedestrians, then, subject to governmental laws, rules and regulations, Tenant shall have the right to install "traffic calming measures" to protect pedestrians crossing the drive aisle. Final

traffic calming measures shall be mutually agreed upon by both Landlord and Tenant and may include speed bumps, striping, warning signs, etc.

4.  <u>Cart Corrals</u> : Tenant shall have the right (at Tenant's option) to install one parking lot cart corral in accordance with Tenant's prototypical specifications.  Any such cart corrals shall be subject to governmental approval.

5.  <u>Elevator/ Lift</u> : Tenant shall have the right (at Tenant's option) to install an Elevator / lift for Tenant's exclusive use in the location and in accordance with Tenant's Plans.  Such elevator / lift shall be subject to governmental approval.

6.  <u>Graphic Artwork</u> : Tenant shall have the right (at Tenant's option) to apply graphic artwork directly to the storefront glass located along the perimeter of the Premises.  Such artwork shall be subject to governmental approval.

7.  <u>Building Signage</u> : Tenant shall furnish and install all building signs (subject to governmental approval) shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor.

8.  <u>Temporary Signs</u> : Commencing on the Effective Date (subject to governmental approval), and continuing thereafter through the Rent Commencement Date, Tenant shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below.  Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
    a) Two double sided temporary banners mounted to the Premises bearing the phrase :
        (1) Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
        (2) Banner #2 - "Why Wait ? Shop Online" (side a) and "Now Open" (side b).
    b) Two double sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
        (1) Banners #1 & #2 – "Coming Soon" (side a) and "Now Open" (side b).
    c) One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
        (1) "Now Hiring" (side a) and "Now Open" (side b)
    At Tenant's discretion, Tenant may relocate Tenant's temporary signage should the signage visibility become obstructed.

9.  <u>High Pile</u> : Landlord acknowledges and approves Tenant's intent to store merchandise above 12'-0".  Such merchandise storage height shall be subject only to governmental approval.

10. <u>Elevation</u>: Tenant shall have the right to modify and paint the exterior canopy as shown on exhibit D-1.

1                              <u>Exhibit D-1</u>

2                    <u>Exterior Elevations of Premises and Sidewalk Plan</u>

D-1-1



**68'-4"**

**134'-0"**

FRONT EXTERIOR ELEVATION
SCALE:NTS

SIDE EXTERIOR ELEVATION
SCALE:NTS

**EXTERIOR FINISH LEGEND:**

EIFS-1  EXISTING DRYVIT TO REMAIN AND BE PAINTED TO MATCH COLOR #449 "BUCKSKIN" SANDBLAST FINISH

EIFS-2  EXISTING DRYVIT TO REMAIN AND BE PAINTED TO MATCH COLOR #111 "PRAIRIE CLAY" SANDBLAST FINISH OR A SIMILAR DARKER TAN COLOR.

EIFS-4  BLACK EIFS PER BBBY SPECS. (07240)

EIFS-5  EXISTING BLACK EIFS TO REMAIN – PATCH REPAIR AS REQUIRED – REPAINT TO LIKE NEW CONDITION.

PARTIAL FLOOR PLAN
SCALE:NTS

**139'-1 3/8" CLEAR INTERIOR DIMENSION**

**140'-0" LEASE DIMENSION**

EXISTING SIDEWALK

EXISTING EXIT DOOR

LINE OF SOFFIT ABOVE

TENANT TRASH

EXISTING ZERO CURB TO REMAIN

EXISTING CMU TO REMAIN

EXISTING CMU TO REMAIN

EXISTING DRYVIT TO REMAIN PAINT PER EIFS-2

EXISTING ALUMINUM STOREFRONT SYSTEM

BED BATH & BEYOND PROTOTYPICAL LIGHT FIXTURE, CENTER IN PILASTER

(2) 12' X 10' TEMPORARY BANNERS LOCATION. LOCATE EYEBOLTS ACCORDINGLY PER PROTOTYPE DETAILS

EXISTING BLACK EIFS TO REMAIN

ALUM. COPING, PRE-FINISHED - EXISTING

NEW NERO TILE 12"X12" PER BBBY SPECS. TENANT WILL HAVE THE OPTION AT TENANT'S DISCRETION TO USE BLACK EIFS IN THE TILE FIELD.

UNDER CANOPY SIGN FINAL SIZE AND LOCATION TO BE DETERMINED, SIMILAR TO ROSS SIGN.

# EXHIBIT D-1
# 1 OF 2
**BURLINGTON CROSSING**
**BURLINGTON, WA**
DATE: 05/27/10



**01** SHOPPING CENTER ELEVATION
SCALE: NTS

AREA AROUND SIGN
TO BE PAINTED BLACK

7'-0"X28'-0" BED BATH & BEYOND SIGN STACKED INDIVIDUALLY ILLUMINATED
WHITE LED LETTERS W/ WHITE FACE AND WHITE RETURNS ON BLACK PAINTED
BACKGROUND

EXISTING WALLPACK RELAMP AND CLEAN AS
REQUIRED

NEW METAL HOODS PER SPEC (10300)
PAINT TO MATCH COLOR.

AL-CO-E   ALUM. COPING, PRE-FINISHED – EXISTING

EXISTING DOCK SEAL UPDATE PER
VENDOR SURVEY.

EXISTING COMPACTOR TO REMAIN.
REPAIRS TO BE MADE PER VENDOR
SURVEY

BED BATH &
BEYOND

EXISTING TRASH AREA TO
REMAIN.

CMU-E
EXISTING CMU

CLEAN AND RELAMP EXISTING WALL SCONCES

EXISTING MANDOOR

EXISTING DOCK LEVELER,
BOTTOM PAD AND BUMPER

EXISTING CONC. WALL

**02** REAR ELEVATION
SCALE: NTS

**04** DOCK ELEVATION (REAR)
SCALE: NTS

EXISTING COMPACTOR DOOR
LOCATION

EXISTING DOCK AREA TO
REMAIN

EXISTING DOOR

116'-8 1/4"

116'-9 3/4"

140'-9 7/8" LEASE DIMENSION

24'-0"

22'-4"

C    C-1    C2    C3    D

**03** REAR PARTIAL SIDEWALK PLAN
SCALE: NTS

# EXHIBIT D-1
# 2 OF 2
**BURLINGTON CROSSING**
**BURLINGTON, WA**
**DATE: 05/10/10**

1

## Exhibit D-2

2

Intentionally Omitted

3

4

D-2-1

1   Exhibit E

2   Permitted Encumbrances

3

4        1.  Restriction Agreement and Grant of Easements, dated February 13, 2004,
5   by and between Newman Development Group of Burlington, LLC, a Washington limited
6   liability company, and Home Depot U.S.A., Inc., a Delaware corporation, recorded April
7   8, 2004 in the office of the Skagit County Auditor under Auditor's No. 2004094080093,
8   as amended by First Amendment to Restriction Agreement and Grant of Easements,
9   dated March 8, 2008, by and between Newman Development Group of Burlington, LLC,
10  a Washington limited liability company, and HD Development Group of Maryland, Inc.,
11  a Maryland corporation (successor to Home Depot U.S.A., Inc., a Delaware corporation),
12  recorded March 15, 2006 in the office of the Skagit County Auditor under Auditor's Nos.
13  200603150120 and 200603150121, as further amended by Second Amendment to
14  Restriction Agreement and Grant of Easements, dated June 26, 2006, by and between
15  Newman Development Group of Burlington, LLC, a Washington limited liability
16  company, HD Development of Maryland, Inc., a Maryland corporation (successor to
17  Home Depot U.S.A., Inc., a Delaware corporation) and Stratford Hall, Inc., a New York
18  corporation, recorded July 6, 2006 in the office of the Skagit County Auditor under
19  Auditor's No. 200607060008.

20       2.  Property Covenant Agreement, dated April 18, 2006, by and between
21  Newman Development Group of Burlington, LLC, a Washington limited liability
22  company, and Stratford Hall, Inc., a New York corporation, recorded April 19, 2008 in
23  the office of the Skagit County Auditor under Auditor's No. 200604190076.

24       3.  Drainage District Assessment Payment Agreement, dated as of July 24,
25  2005, by and between Newman Development Group of Burlington, LLC, a Washington
26  limited liability company, and Home Depot U.S.A., Inc., a Delaware corporation,
27  recorded September 16, 2005 in the office of the Skagit County Auditor under Auditor's
28  No. 200509160178.

29       4.  Subject to the provisions of Subsection 2.3.(f) of the Lease, Deed of Trust,
30  Assignment of Rents and Fixture Filing, dated April 18, 2006, by and between Stratford
31  Hall, Inc., a New York corporation, as grantor, and Pacific Northwest Title Insurance
32  Company, as trustee for Wachovia Bank, National Association, the beneficiary, recorded
33  April 19, 2006 in the office of the Skagit County Auditor under Auditor's No.
34  200604190074, as assigned by Assignment of Deed of Trust, Security Agreement and
35  Fixture Filing, dated August 15, 2006, by and between Wachovia Bank, National
36  Association, as assignor, and Wells Fargo Bank, N.A., as trustee and assignee, recorded
37  August 20, 2007 in the office of the Skagit County Auditor under Auditor's No.
38  200708200143, as further assigned by Assignment of Deed of Trust, Security Agreement
39  and Fixture Filing and Assignment of Leases and Rents, dated as of March 31, 2009,
40  between Wells Fargo Bank, as trustee and assignor, to Bank of America, N.A., as trustee,
41  recorded July 16, 2009 in the office of the Skagit County Auditor under Auditor's No.
42  200907160107.

43       5.  Subject to the provisions of Subsection 2.3.(f) of the Lease, Assignment of
44  Leases and Rents, dated April 18, 2006, by and between Stratford Hall, Inc., a New York
45  corporation, as assignor, and Wachovia Bank, National Association, as assignee,
46  recorded April 19, 2006 in the office of the Skagit County Auditor under Auditor's No.
47  2006041900754, as assigned by Assignment of Leases and Rents, dated August 15, 2006,
48  by and between Wachovia Bank, National Association, as assignor, and Wells Fageo
49  Bank, N.A., as trustee and assignee, recorded August 20, 2007 in the office of the Skagit
50  County Auditor under Auditor's No. 200708200144, as further assigned by Assignment
51  of Deed of Trust, Security Agreement and Fixture Filing and Assignment of Leases and
52  Rents, dated as of March 31, 2009, between Wells Fargo Bank, as trustee and assignor, to

E-1

Bank of America, N.A., as trustee, recorded July 16, 2009 in the office of the Skagit County Auditor under Auditor's No. 200907160107.

6. Subject to the provisions of Subsection 2.3.(f) of the Lease, financing statement filed May 3, 2006 in the office of the Skagit County Auditor under Auditor's No. 200605030093, perfecting a security interest held by Wachovia Bank, National Association, in property owned by Stratford Hall, Inc., as assigned to Wells Fargo Bank, N.A. by UCC Financing Statement Amendment recorded November 20, 2006 in the office of the Skagit County Auditor under Auditor's No. 200611200058, as further assigned to Bank of America, N.A., as trustee, by UCC Financing Statement Amendment recorded July 16, 2009 in the office of the Skagit County Auditor under Auditor's No. 200907160108.

7. Covenant Not to Compete, dated August 29, 2006, executed by Stratford Hall, Inc., a New York corporation, in favor of McDonald's USA, LLC, a Delaware limited liability company, recorded September 13, 2006 in the office of the Skagit County Auditor under Auditor's No. 200609130114.

8. Agreement for Non-Liability, dated April 26, 2007, between and among Public Utility District No. 1 of Skagit County, Stratford Hall, Inc., a New York corporation, and McDonald's USA, LLC, a Delaware limited liability company, recorded recorded February 7, 2008 in the office of the Skagit County Auditor under Auditor's No. 200802070054.

9. Easement, dated April 13, 1927, by and between S.A. Halland and Mary A. Halland, as grantor, and The Pacific Telephone and Telegraph Company, as grantee, recorded May 13, 1927 in Volume 143 of Deeds, Page 266, of the office of the Skagit County Auditor, under Auditor's No. 203678.

10. Condemnation of Access to State Highway No. 1, and of light, view and air, by Decree of the State of Washington, entered July 26, 1960 and April 26, 1973 in the Skagit County Superior Court, Cause No. 25580 and Cause No. 33369, as confirmed by Deed, dated May 20, 1954, by Thomas Wiley and Jane Wiley to the State of Washington, recorded July 16, 1954 in Volume 263, Page 753, in the office of the Skagit County Auditor, under Auditor's No. 504049, by Deed dated August 19, 1954, by Alex Sandell and Beatty Sandell to the State of Washington, recorded October 19, 1954 in Volume 266, Page 101, in the office of the Skagit County Auditor, under Auditor's No. 508076, and Deed October 26, 1972, by Puget Sound Power and Light Company to the State of Washington, recorded December 4, 1972, in Volume 102, Page 535, in the office of the Skagit County Auditor, under Auditor's No. 777710.

11. Site Plan No. 01-04, recorded March 15, 2004 and June 27, 2006 in the office of the Skagit County Auditor under Auditor's No.s 200403150156 and 200606270207.

12. Notice of Covenant Running With the Land, executed March 15, 2004, between and among Newman Development Group of Burlington, LLC, a Washington limited liability company, S/G Properties, LP and Sakuma Commercial, LLC, recorded March 15, 2004 in the office of the Skagit County Auditor under Auditor's No. 200403150162.

13. Slope and Road Improvement Easement, dated July 14, 2000, by and between Bouslog Investments, L.L.C and JBK Investments, L.L.C, as grantors, and the City of Burlington, a municipal corporation, as grantee, recorded September 26, 2004 in the office of the Skagit County Auditor under Auditor's No. 2009260064.

14. Following matters disclosed on that certain Survey, dated March 23, 2006 (certified as of March 9, 2006), prepared by Pacific Survey & Engineering Inc., Job. No. 200602T:

E-2

1220165.6

1        A)    Common building walls are not consistent with platted lot
2    lines for Lots 2, 3, 4, 5, 6 of said binding site plan. The resulting
3    encroachments measure up to 64.5' on to the adjacent lots.

4        B)    Locations of various utility facilities and their appurtenances
5    as delineated, including but not limited to storm drains, underground
6    sanitary sewer, underground water liens, underground electrical power,
7    underground communication, underground gas line, their associated
8    facilities and appurtenances.

9        C)    City setbacks are delineated on the exterior 10 feet of all lots
10   in said premises.

11       D)    Location of building foundation of lot 14 within 2.6 feet of
12   the south line of the Market Place Dr. right of way.

13       E)    Location of curbing within the right of way for Market Place
14   Drive

15   15. Memorandum of Lease, dated May 3, 2004, by and between Newman
16   Development Group of Burlington, LLC, a Washington limited liability company, as
17   lessor, and Petsmart, Inc., a Delaware corporation, as lessee, recorded June 2, 2004 in the
18   office of the Skagit County Auditor under Auditor's No. 200406020074. The inclusion
19   of the foregoing memorandum of lease within these "Permitted Encumbrances" is for
20   informational purposes only, and shall not be deemed to diminish any of Tenant's rights,
21   or increase any of Tenant's obligations, under this Lease.

22   16. Memorandum of Lease, dated July 30, 2004, by and between Newman
23   Development Group of Burlington, LLC, a Washington limited liability company, as
24   lessor, and Ross Stores, Inc., a Delaware corporation, as lessee, recorded August 16, 2004
25   in the office of the Skagit County Auditor under Auditor's No. 200408160080. The
26   inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances"
27   is for informational purposes only, and shall not be deemed to diminish any of Tenant's
28   rights, or increase any of Tenant's obligations, under this Lease.

29   17. Memorandum of Lease, dated May 3, 2004, by and between Newman
30   Development Group of Burlington, LLC, a Washington limited liability company, as
31   lessor, and Old Navy, LLC a Delaware limited liability company, as lessee, recorded
32   September 13, 2005 in the office of the Skagit County Auditor under Auditor's No.
33   200509130149. The inclusion of the foregoing memorandum of lease within these
34   "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to
35   diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

36   18. Memorandum of Lease, dated January 27, 2006, by and between Newman
37   Development Group of Burlington, LLC, a Washington limited liability company, as
38   lessor, and GMRI, Inc., a Florida corporation, as lessee, recorded January 30, 2006 in the
39   office of the Skagit County Auditor under Auditor's No. 200601300263. The inclusion
40   of the foregoing memorandum of lease within these "Permitted Encumbrances" is for
41   informational purposes only, and shall not be deemed to diminish any of Tenant's rights,
42   or increase any of Tenant's obligations, under this Lease.

43   19. Memorandum of Lease, dated August 2, 2006, by and between Stratford
44   Hall, Inc., a New York corporation, as lessor, and McDonald's USA, LLC, a Delaware
45   limited liability company, as lessee, recorded September 13, 2006 in the office of the
46   Skagit County Auditor under Auditor's No. 200609130113, as modified by Supplement
47   to Lease dated March 2, 2007, by and between Stratford Hall, Inc., a New York
48   corporation, and McDonald's USA, LLC, a Delaware limited liability company, recorded
49   April 2, 2007, in the office of the Skagit County Auditor under Auditor's No.
50   200704020203. The inclusion of the foregoing memorandum of lease within these

E-3

1   "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to
2   diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

3       20. Memorandum of Lease, dated February 25, 2009, by and between Stratford
4   Hall, Inc., a New York corporation, as lessor, and Best Buy Stores, L.P., a Virginia
5   limited partnership, as lessee, recorded March 25, 2009 in the office of the Skagit County
6   Auditor under Auditor's No. 200903250114. The inclusion of the foregoing
7   memorandum of lease within these "Permitted Encumbrances" is for informational
8   purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase
9   any of Tenant's obligations, under this Lease.

10      21. Subordination, Non-Disturbance and Attornment Agreement, dated April
11   18, 2006, between and among Wachovia Bank, National Association, Stratford Hall, Inc.,
12   a New York corporation and PetsMart, Inc. a Delaware corporation, recorded May 17,
13   2006 in the office of the Skagit County Auditor under Auditor's No. 200605170005.

14      22. Subordination, Non-Disturbance and Attornment Agreement, dated April
15   18, 2006, between and among Wachovia Bank, National Association, Ross Dress for
16   Less, Inc., a Virginia corporation and Stratford Hall, Inc., a New York corporation,
17   recorded May 17, 2006 in the office of the Skagit County Auditor under Auditor's No.
18   200605170004.

19      23. Subordination, Non-Disturbance and Attornment Agreement, dated April
20   18, 2006, between and among Wachovia Bank, National Association, Old Navy, LLC, a
21   Delaware limited liability company and Stratford Hall, Inc., a New York corporation,
22   recorded May 17, 2006 in the office of the Skagit County Auditor under Auditor's No.
23   200605170006.

24      24. Subordination, Non-Disturbance and Attornment Agreement, dated
25   September 19, 2006, by and between Wells Fargo Bank, N.A., as trustee, and
26   McDonald's USA, LLC, a Delaware limited liability company, recorded September 26,
27   2006 in the office of the Skagit County Auditor under Auditor's No. 200609260119.

28      Landlord represents and warrants that (i) none of the foregoing will interfere with
29   or prevent Tenant from operating its Premises in accordance with the terms of this Lease,
30   (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any
31   obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing
32   easements or rights of way (a) are located beneath the Premises, or (b) will interfere with
33   Tenant's use and enjoyment of the Premises.

34

1220165.6

1                                  <u>Exhibit F</u>

2                                  <u>Signage</u>

3        •

F-1

1220165.6



34'-0"

4'-1 3/16"

8'-6"

3'-3"

ELEVATION

### MATERIALS

| POWER WHITE | GEWHPTS2 | GECLPS5 | GECLPS6 | GECLSC2 | GECLSW1 | GECLEC1 | N/A | N/A |
|---|---|---|---|---|---|---|---|---|
| WHITE | | SELF-CONTAINED POWER SUPPLIES | | SPLICE CONNCTR | SUPPLY WIRE | END CAP | LT. GUIDE CONNCTR | LIGHT GUIDE |
| 129" | Ft In | Bank # | Bank # | Qty | Ft | Qty | Qty | Ft |
| B | 32 0 | #1B1-4 | #1B1 | 10 | 40 | 20 | | |
| E | 30 0 | #2B1-4 | #19B1 | 10 | 40 | 20 | | |
| D | 30 0 | #3B1-4 | #20B1 | 10 | 40 | 20 | | |
| B | 32 0 | #4B1-4 | #21B1 | 10 | 40 | 20 | | |
| A | 31 0 | #5B1-4 | #22B1 | 10 | 40 | 20 | | |
| T | 19 0 | #6B1-3 | | 6 | 24 | 12 | | |
| H | 32 0 | #7B1-4 | #23B1 | 10 | 40 | 20 | | |
| & | 37 0 | #8B1-4 | #24B1;#25B1 | 12 | 48 | 24 | | |
| B | 35 0 | #9B1-4 | #26B1 | 10 | 40 | 20 | | |
| E | 34 0 | #10B1-4 | #27B1 | 10 | 40 | 20 | | |
| Y | 30 0 | #11B1-4 | #28B1 | 10 | 40 | 20 | | |
| O | 28 0 | #12B1-4 | | 8 | 32 | 16 | | |
| | 18 0 | #13B1-3 | | 6 | 24 | 12 | | |
| N | 28 0 | #14B1-4 | | 8 | 32 | 16 | | |
| | 22 0 | #15B1-4 | | 8 | 32 | 16 | | |
| D | 28 0 | #16B1-4 | | 8 | 32 | 16 | | |
| | 28 0 | #17B1-4 | | 8 | 32 | 16 | | |
| | 9 0 | | #29B1 | 2 | 8 | 4 | | |

FACE

GENERAL NOTE:
   MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE FACE TO THE LETTER RETURN.
   THE MAXIMUM SPACING SHALL NOT EXCEED 18" AND NO FEWER THAN FOUR SCREWS ARE TO BE USED PER FACE.

COLOR NOTES:
RETURN: 6"x.063 WHITE
TRIM: TO MATCH RETURN
   LTRS UNDER 42" USE 1" WHITE JEWELITE
   LTRS 42" AND ABOVE USE L MOLD PAINTED WHITE
FACE: 2447 WHITE SG 410 LEXAN
LED: WHITE GELCORE TYPE–GEWHPTS2
INSIDE OF CAN TO BE PAINTED
   SEMI GLOSS WHITE

IF NON–STANDARD PRODUCT CHECK APPROPRIATE BOX BELOW
   ☐ – RED FACE
   ☐ – BLACK RETURNS
   ☐ – DARK BRONZE RETURNS

ELEVATION

ELECTRICAL NOTE–Actual # of circuits to be determined by a Licensed Electrical Contractor.
TOTAL AMPS– 31.50A
# OF CKTS– 2  20 AMP(RECOMMENDED)
VOLTS– 120
ALL SIGNAGE WILL BE (U.L.) LISTED, (U.L.) 2161 COMPLIANT AND CARRY (U.L) LABELS.



ON   OFF

*NOTE:
INSTALL TOGGLE SWITCH TO OPERATE (ON/OFF) IN THE HORIZONTAL POSITION.

1 SWITCH PER LETTER



.063 ALUM. RETURN
1" JEWELITE FACE
TOGGLE SWITCH
.090 ALUM. BACK STAPLED
POWER SUPPLY
½" CARFLEX CONDUIT x 15' CARFLEX WHIP
EQUIPMENT GROUND
LED. GELCORE 2/ft. TETRA (WHITE)
GELCORE SPLICE CONNECTOR
⅜" NON–CORROSIVE LAG BOLTS OR THREADED ROD AS REQ'D.
1/4" WEEP HOLE w/LIGHT BAFFLE BEAD AROUND INTERIOR SEAM

CROSS SECTION MOUNTING DETAIL
SCALE: NTS

GELCORE LED LAYOUT



# EXHIBIT F (1 OF 5)
BED BATH & BEYOND
BURLINGTON CROSSING
BURLINGTON, WV
DATE:04/08/10



LED CHANNEL LETTERS

28'-0"

3'-5"

7'-0"

2'-8 3/8"

## BED BATH &
## BEYOND

ELEVATION

GENERAL NOTE:
MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE FACE TO THE LETTER RETURN.
THE MAXIMUM SPACING SHALL NOT EXCEED 18" AND NO FEWER THAN FOUR SCREWS ARE TO BE USED PER FACE.

COLOR NOTES:
RETURN: 6"x.063 BLACK
TRIM: TO MATCH RETURN
LTRS UNDER 42" USE 1" WHITE JEWELITE
LTRS 42" AND ABOVE USE L MOLD
PAINTED WHITE
FACE: 2447 WHITE SG 410 LEXAN
LED: WHITE GELCORE TYPE-GEWHPTS2
INSIDE OF CAN TO BE PAINTED
SEMI GLOSS WHITE

IF NON-STANDARD PRODUCT
CHECK APPROPRIATE BOX BELOW
☐ – RED FACE
☐ – BLACK RETURNS
☐ – DARK BRONZE RETURNS

.063 ALUM. RETURN
1" JEWELITE FACE
.090 ALUM. BACK
TOGGLE SWITCH
POWER SUPPLY
1/2" CARFLEX CONDUIT x 15' CARFLEX WHIP
EQUIPMENT GROUND
LED, GELCORE
2/ft. TETRA, (WHITE)
GELCORE SPLICE CONNECTOR
NON-CORROSIVE LAG BOLTS OR THREADED ROD AS REQ'D.
1/4" WEEP HOLE w/LIGHT BAFFLE BEAD AROUND INTERIOR SEAM
STAPLED

CROSS SECTION MOUNTING DETAIL
SCALE: NTS

## MOUNTING SECTION

ELECTRICAL NOTE–Actual # of circuits to be determined by a Licensed Electrical Contractor.
TOTAL AMPS– 8.5A
# OF CKTS– 3  20 AMP(RECOMMENDED)
VOLTS– 120
ALL SIGNAGE WILL BE (U.L.) LISTED, (U.L.) 2161 COMPLIANT AND CARRY (U.L) LABELS.
OR CANADIAN EQUIVALENT

*NOTE:
INSTALL TOGGLE SWITCH TO OPERATE (ON/OFF) IN THE HORIZONTAL POSITION.

| 1 SWITCH PER LETTER |

## EXTERIOR CHANNEL LETTER  SIGNS

NOTES:
■ TENANT SHALL HAVE APPROVAL RIGHTS FOR ALL DESIGN AND SHOP DRAWINGS FOR TENANT'S SIGNAGE PRIOR TO MANUFACTURE.
■ ALL TENANT'S SIGNAGE SHALL BE COMPLETED USING TENANT'S STANDARD FONTS, LOGO AND COLORS AND WILL BE SUBJECT TO TENANT'S REVIEW AND APPROVAL PRIOR TO MANUFACTURE.
■ TENANT RESERVES THE RIGHT TO CHANGE DESIGN, SIZE AND MATERIAL PRIOR TO MANUFACTURE.

AREA BEHIND SIGN PAINTED BLACK

LED CHANNEL LETTERS

32'-0"

134'-0"

**BED BATH &
BEYOND**

## REAR BUILDING SIGN ELEVATION

## EXHIBIT F (2 OF 5)
REAR EXTERIOR SIGNS
BURLINGTON COMMONS
BURLINGTON, WA
DATE:04/07/10



— SEE PANEL DETAIL
THIS SHEET

PYLON SIGN #1
(REFER TO EXHIBIT B FOR LOCATION)
SCALE: NTS



12'-7 15/16"
11'-4"
EQ
EQ
2'-8"
1'-0"

LEXAN PYLON PANEL WITH
WHITE BED BATH & BEYOND
LOGO WITH BLACK BACKGROUND.
SIGN COMPANY TO STRETCH
LOGO FOR BEST FIT IN PANEL.

2" PERIMETER
ACCENT BORDER
(COLOR WHITE)

BED BATH & BEYOND PYLON PANEL
LOCATED ON PYLON #1
SCALE: NTS

- PANEL BOTH SIDES OF PYLON
- FINAL VISIBLE OPENING TO BE CONFIRMED
AND   LOGO ADJUSTED AS REQUIRED AND
APPROVED  BY BBBY.

EXHIBIT F (3 OF 5)
BED BATH & BEYOND
BURLINGTON CROSSING
BURLINGTON, WA
DATE: 04/05/10



COLOR NOTE:
CABINET— ROUTED .125 ALUM. PAINTED SEMI—GLOSS BLACK
COPY— PUSH—THRU ¾" THK CLEAR ACRYLIC w/ 3630—20
    TRANSLUCENT WHITE VINYL APPLIED 1st SURFACE
1" BORDER STRIPE— 3630—20 WHITE VINYL
CONNECTION PLATE—PAINTED SEMI—GLOSS BLACK

ELECTRICAL NOTE—Actual # of circuits to be
determined by a Licensed Electrical Contractor.
TOTAL AMPS—1.6
# OF CKTS— 2— 20 AMP(RECOMMENDED)
VOLTS— 120
ALL SIGNAGE WILL BE (U.L.) LISTED, (U.L.) 2161
COMPLIANT AND CARRY (U.L) LABELS.
OR CANADIAN EQUIVALENT

## BLADE SIGN

UNDER CANOPY SIGN FINAL SIZE
AND LOCATION TO BE
DETERMINED, SIMILIAR TO ROSS
SIGN.



## UNDER CANOPY BLADE SIGN



CEILING METHOD

## BLADE SIGN HANGING METHODS

NOTES:
■ TENANT SHALL HAVE APPROVAL RIGHTS FOR ALL DESIGN AND SHOP
  DRAWINGS FOR TENANT'S SIGNAGE PRIOR TO MANUFACTURE.
■ ALL TENANT'S SIGNAGE SHALL BE COMPLETED USING TENANT'S
  STANDARD FONTS, LOGO AND COLORS AND WILL BE SUBJECT TO
  TENANT'S REVIEW AND APPROVAL PRIOR TO MANUFACTURE.
■ TENANT RESERVES THE RIGHT TO CHANGE DESIGN, SIZE AND MATERIAL
  PRIOR TO MANUFACTURE.
■ TENANT SHALL HAVE OPTION AT TENANT'S DISCRETION TO INSTALL
  ILLUMINATED BLADE SIGN OR NON ILLUMINATED SIGN.

## EXHIBIT F (4 OF 5)
SMALL BLADE SIGNS
BURLINGTON CROSSING
BURLINGTON, WA
DATE:05/15/10





**TEMPORARY BUILDING BANNERS**

(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)



VINYL COLORS

PMS 187 RED
BLACK



**TEMPORARY BANNERS (BUILDING OR BBB HIRING TRAILER)**



LOCATION SHOWN ON EXHIBIT B.

**TEMPORARY SITE SIGNAGE**

**TEMPORARY SITE BANNERS**



BANNER STYLE

CORNER STYLE

NOTE:

o VINYL TO BE RED (PMS 187 OR EQUIVALENT) BACKGROUND WITH WHITE LETTERS IN A SIMILIAR FONT AS SHOWN.
o TENANT'S SPECIFIED VENDOR TO PROVIDE, INSTALL AND REMOVE AS REQUIRED BY BBBY.
o TENANT TO APPROVE THE STYLE ( BANNER, CORNER, ETC) AND LANDLORD PROVIDED RENDERING FOR EACH
PANEL LOCATED ON PYLON, MONUMENT OR OTHER SIGN PANEL STRUCTURE.
o TENANT TO DETERMINE PHRASE (COMING SOON, NOW OPEN, ETC) ON TEMPORARY VINYL.
o VINYL TO BE 3M NON STICK VINYL OR EQUIVALENT. NO LASTING RESIDUE OR MARKS AFTER THE VINYL IS
REMOVED.

**TEMPORARY NON STICK VINYL GRAPHIC**

# EXHIBIT F (5OF 5)
# BED BATH & BEYOND
### BURLINGTON CROSSING
### BURLINGTON, WA
### DATE: 04/09/10

1    <u>Exhibit G</u>

2    <u>Form of Subordination, Non-Disturbance and Attornment Agreement</u>

3    THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
4    AGREEMENT, made as of the _____ day of _____, 200___, by and between
5    _____, a _____ **[corporation] [limited] [general]**
6    **[partnership] [national banking association]**, having an office at
7    _____ (the "*Mortgagee*") and Bed Bath &
8    Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union,
9    New Jersey 07083 (the "*Tenant*").

10    W I T N E S S E T H :

11    WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*") covering a
12    parcel of land owned by Stratford Hall, Inc., a Delaware corporation (the "*Landlord*")
13    together with the improvements erected thereon (said parcel of land and improvements
14    thereon being hereinafter referred to as the "*Shopping Center*" and being more
15    particularly described on <u>Exhibit A</u> attached hereto and made a part hereof); and

16    WHEREAS, by a certain Lease Agreement heretofore entered into between
17    Landlord and Tenant dated as of _____, 2010 (the "*Lease*"), Landlord leased
18    to Tenant a portion of the Shopping Center, as more particularly described in the Lease
19    (the "*Premises*"); and

20    WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
21    which is hereby acknowledged; and

22    **[For mortgages existing as of the date Lease is executed:** WHEREAS, as an
23    inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof
24    provides that the Lease is conditioned upon Landlord obtaining this Agreement from
25    Mortgagee; and

26    WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
27    the non-disturbance of Tenant by the holder of the Mortgage; and]

28    **[For mortgages occurring after the Lease is executed:** WHEREAS, Section
29    17.1 of the Lease provides that the Lease shall become subject and subordinate to a
30    mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and
31    when a non-disturbance agreement is entered into with respect to such mortgage; and

32    WHEREAS, the parties hereto desire to effect the subordination of the Lease to
33    the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

34    NOW, THEREFORE, in consideration of the premises and of the mutual
35    covenants and agreements herein contained, the parties hereto, intending to be legally
36    bound hereby, agree as follows:

37    1.    Mortgagee hereby consents to and approves the Lease and the term thereof,
38    including the options to extend the term as set forth in the Lease, and covenants and
39    agrees that the exercise by Tenant of any of the rights, remedies and options therein
40    contained shall not constitute a default under the Mortgage.

41    2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made
42    and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and
43    to all modifications and extensions thereof (and such subordination shall not lessen or
44    diminish Tenant's rights under the Lease), subject, however, to the provisions of this
45    Agreement.

G-1

1        3.      Mortgagee agrees that so long as the Lease shall be in full force and effect,
2  and so long as Tenant shall not be in default under the Lease beyond any applicable
3  notice and grace period:

4        (a)     Tenant shall not be named or joined as a party or otherwise in any
5  suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights
6  under the Mortgage or the bond or note or other obligation secured thereby;

7        (b)    The possession by Tenant of the Premises and Tenant's rights
8  thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term
9  thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought
10  upon the Mortgage or the bond or note or other obligation secured thereby, or for the
11  foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by
12  any judicial sale or execution or other sale of the Premises or the Shopping Center, or any
13  deed given in lieu of foreclosure, or by the exercise of any other rights given to any
14  holder of the Mortgage or other documents as a matter of law, or (ii) any default under
15  the Mortgage or the bond or note or other obligation secured thereby; and

16       (c)    All condemnation awards and insurance proceeds paid or payable
17  with respect to the Premises or any other part of the Shopping Center shall be applied and
18  paid in the manner set forth in the Lease.

19        4.      If Mortgagee or any future holder of the Mortgage shall become the owner
20  of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the
21  Shopping Center shall be sold as a result of any action or proceeding to foreclose the
22  Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall
23  continue in full force and effect, without necessity for executing any new lease, as a
24  direct lease between Tenant and the then owner of the Shopping Center, as "landlord",
25  upon all of the same terms, covenants and provisions contained in the Lease, and in such
26  event:

27       (a)    Tenant shall be bound to such new owner under all of the terms,
28  covenants and provisions of the Lease for the remainder of the term thereof (including the
29  Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term)
30  and Tenant hereby agrees to attorn to such new owner and to recognize such new owner
31  as "landlord" under the Lease; and

32       (b)    Such new owner shall be bound to Tenant under all of the terms,
33  covenants and provisions of the Lease for the remainder of the term thereof (including the
34  Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term)
35  which such new owner hereby agrees to assume and perform and Tenant shall, from and
36  after the date such new owner succeeds to the interest of "landlord" under the Lease, have
37  the same remedies against such new owner for the breach of any covenant contained in
38  the Lease that Tenant might have had under the Lease against Landlord if such new
39  owner had not succeeded to the interest of "landlord"; provided, however, that such new
40  owner shall not be:

41          (i)    liable for any act or omission of any prior landlord (including
42  Landlord) unless such act or omission continues from and after the date upon which the
43  new owner succeeds to the interest of such prior landlord;

44         (ii)    subject to any defenses which Tenant may have against any
45  prior landlord (including Landlord) unless resulting from any default or breach by such
46  prior landlord which continues from and after the date upon which the new owner
47  succeeds to the interest of such prior landlord;

48         (iii)   subject to any offsets which Tenant may have against any
49  prior landlord, except to the extent such offsets are expressly provided under the Lease
50  and Mortgagee has received notice thereof and the opportunity to cure within the

G-2

applicable time periods set forth in the Lease (it being further agreed that offsets under
the Lease that were deducted by Tenant prior to the date upon which the new owner
succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant
might have paid for more than one month in advance of its due date under the Lease to
any prior landlord (including Landlord), unless such additional rent is paid in accordance
with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made
without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the
Lease specifically provides for amendments thereof upon the occurrence of certain events
described in the Lease (such as, for example, an amendment to the Lease confirming the
measurement of the Premises), and, by its execution below, Mortgagee agrees to
recognize such amendments as part of the Lease, and Mortgagee further agrees that such
new owner shall also be bound by such amendment(s) to the Lease, without any consent
on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as
Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease
which would entitle Tenant to terminate the Lease or abate the rent payable thereunder
and agrees that notwithstanding any provision of the Lease, no notice of termination
thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid
notice and has failed to cure the subject default within the same time period allowed
Landlord under the Lease. It is understood that the abatement provisions of this Section
relate to abatements by reason of Landlord's default and do not apply to provisions of the
Lease whereby Tenant has the automatic right to abate rentals such as, for example,
abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in
connection therewith shall encumber or be construed as subjecting in any manner to the
lien thereof, any trade fixtures, signs or other personal property at any time furnished or
installed by or for Tenant or its subtenants or licensees on the aforementioned property
regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in
writing and shall be given by registered or certified mail, return receipt requested, or by
any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if
to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other
address or persons as Mortgagee may designate by notice in the manner herein set forth,
or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies
to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New
Jersey 07083, and Wolff & Samson P.C., One Boland Drive, West Orange, New Jersey
07052, Attn: Mitchell S. Berkey, Esq. (by separate notice), or such other address or
persons as Tenant may designate by notice in the manner herein set forth. All notices
given in accordance with the provisions of this Section shall be effective upon receipt (or
refusal of receipt) at the address of the addressee.

8.    This Agreement shall bind and inure to the benefit of and be binding upon
and enforceable by the parties hereto and their respective successors, assigns, and
sublessees.

9.    This Agreement contains the entire agreement between the parties and
cannot be changed, modified, waived or canceled except by an agreement in writing
executed by the party against whom enforcement of such modification, change, waiver or
cancellation is sought.

G-3

10.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if our memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:                                    _____

By:_____      By:_____
Name:_____      Name:_____
Title: (Assistant) Secretary            Title:   (Vice) President

[SEAL]

**TENANT:**

ATTEST:                                    BED BATH & BEYOND INC.,
                                                   a New York corporation

By:_____      By:_____
Name: Alan M. Freeman               Name:  Warren Eisenberg
Title: (Assistant) Secretary            Title:   Co-Chairman

[SEAL]

G-4

1220165.6

1      **[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

2      _____

3      STATE OF NEW JERSEY        )
4                                 ) : ss.
5      COUNTY OF UNION            )

6          On this ___ day of _____, 20__, before me personally came Warren
7      Eisenberg to me known, who being by me duly sworn, did depose and say that he is the
8      Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which
9      executed the above instrument and that he signed his name thereto by order of the Board
10     of Directors of said corporation.

11                                          _____
12                                          Notary Public
13     My Commission Expires:
14
15
16     _____

G-5

1        <u>Exhibit H</u>

2        <u>Form of Recognition Agreement</u>

3        THIS RECOGNITION AGREEMENT, made as of the _____ day of _____,
4        200__, by and between Stratford Hall, Inc., a Delaware corporation, having an address at
5        6310 San Vincente Boulevard, Suite 250, Los Angeles, California 90048 ("***Landlord***");
6        Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty
7        Avenue, Union, New Jersey 07083 ("***Tenant***"); and _____,
8        a [_____] [corporation] [limited] [general] [partnership], having an
9        address at _____ ("***Subtenant***").

10        <u>R E C I T A L S</u>:

11        A.        Landlord and Tenant have entered into a certain Lease Agreement (the
12        "***Lease***") dated as of _____, 2010, a short form of which has been recorded
13        in the Official Records of Skagit County, which demises certain premises (the
14        "***Premises***") located in the Burlington County Shopping Center, Burlington, Washington,
15        which Shopping Center is more particularly described on <u>Exhibit A</u> annexed hereto and
16        made a part hereof.

17        B.        Section 15.5 of the Lease provides that in the event Tenant subleases all or
18        a portion of the Premises for a term of at least five (5) years, Landlord shall, upon
19        Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant
20        and each such subtenant in the form attached to the Lease, in recordable form.

21        C.        Pursuant to a Sublease dated as of _____ (the "***Sublease***"),
22        Tenant has subleased **[a portion of]** the Premises to Subtenant (the "***Subleased***
23        ***Premises***").

24        D.        The parties hereto desire to effectuate the provisions of Section 15.5 of the
25        Lease with respect to the Sublease and the Subleased Premises.

26        NOW, THEREFORE, in consideration of the mutual covenants and agreements
27        herein contained, the parties hereto, intending to be legally bound hereby, agree as
28        follows:

29        1.        Landlord warrants and represents as follows:

30        (a)        that it is the fee owner of the Premises,

31        (b)        that the Lease is unmodified (except as may be otherwise set forth in
32        <u>Exhibit B</u> annexed hereto, if any) and is in full force and effect,

33        (c)        that the term of the Lease expires on _____, but is subject
34        to [four] renewal periods of five years each and

35        (d)        that Tenant is not in default under the Lease nor has any event
36        occurred which would after notice to Tenant and the passage of time become a default of
37        Tenant under the Lease.

38        2.        Landlord hereby acknowledges receipt of a copy of, and consents to and
39        approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees
40        that the exercise by Subtenant of any of its rights, remedies and options contained therein
41        shall not constitute a default under the Lease.

42        3.        Landlord agrees that whenever it has an obligation with respect to the
43        Premises, or its consent or approval is required for any action of Tenant under the Lease,
44        then, to the extent such obligation, consent or approval relates to the Subleased Premises
45        or Subtenant's use and occupation thereof, it will perform such obligation in accordance

H-1

1  with the terms and conditions of the Lease, and, subject to the applicable terms of the
2  Lease, will not unreasonably withhold or unduly delay such consent or approval.

3      4.     Landlord shall not, in the exercise of any of the rights arising or which may
4  arise out of the Lease or of any instrument modifying or amending the same or entered
5  into in substitution or replacement thereof (whether as a result of Tenant's default or
6  otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession
7  of the Subleased Premises or of any right or privilege granted to or inuring to the benefit
8  of Subtenant under the Sublease, provided that Subtenant is not in default under the
9  Sublease beyond the expiration of any applicable notice and cure period.

10     5.     In the event of the termination of the Lease by reentry, notice, conditional
11  limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or,
12  if the Lease shall terminate or expire for any reason before any of the dates provided in
13  the Sublease for the termination of the initial or renewal terms of the Sublease and if
14  immediately prior to such surrender, termination or expiration the Sublease shall be in
15  full force and effect, Subtenant shall not be made a party in any removal or eviction
16  action or proceeding nor shall Subtenant be evicted or removed of its possession or its
17  right of possession of the Subleased Premises be disturbed or in any way interfered with,
18  and the Sublease shall continue in full force and effect as a direct lease between Landlord
19  and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the
20  term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater
21  of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the
22  basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area
23  of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

24     6.     Landlord hereby waives and relinquishes any and all rights or remedies
25  against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against
26  the property, goods or chattels of Subtenant in or on the Subleased Premises.

27     7.     Any notices, consents, approvals, submissions, demands or other
28  communications (hereinafter collectively referred to as "*Notice*") given under this
29  Agreement shall be in writing. Unless otherwise required by law or governmental
30  regulation, Notices shall be deemed given if sent by registered or certified mail, return
31  receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip,
32  postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or
33  such other address or persons as Landlord may designate by Notice to the other parties
34  hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate
35  copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue,
36  Union, New Jersey 07083, and Wolff & Samson P.C. One Boland Drive, West Orange,
37  New Jersey 07052, Attn: Mitchell S. Berkey, Esq. (by separate notice), or such other
38  address or persons as Tenant may designate by Notice to the other parties hereto, and (c)
39  to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or
40  persons as Subtenant may designate by Notice to the other parties hereto. During the
41  period of any postal strike or other interference with the mails, personal delivery shall be
42  substitute for registered or certified mail. All Notices shall become effective only on the
43  receipt or rejection of same by the proper parties.

44     8.     No modification, amendment, waiver or release of any provision of this
45  Agreement or of any right, obligation, claim or cause of action arising hereunder shall be
46  valid or binding for any purpose whatsoever unless in writing and duly executed by the
47  party against whom the same is sought to be asserted.

48                          [Signature Page Follows]

H-2

1    9.    This Agreement shall be binding on and shall inure to the benefit of the
2  parties hereto and their respective heirs, legal representatives, successors, assigns and
3  sublessees.

4    IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to
5  be executed under seal the date first above written.

**LANDLORD:**

STRATFORD HALL, INC.,
a Delaware corporation

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

H-3

1    **[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

2             _____

3    STATE OF NEW JERSEY     )

4                               ) : ss.

5    COUNTY OF UNION        )

6        On this \_\_\_ day of _____, 200\_\_, before me personally came Warren

7    Eisenberg to me known, who being by me duly sworn, did depose and say that he is the

8    Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which

9    executed the above instrument and that he signed his name thereto by order of the Board

10   of Directors of said corporation.

11

12                              Notary Public

13   My Commission Expires:

14

15

16   _____

17

H-4

1          <u>Exhibit I</u>

2          <u>Form of Delivery Date Notice</u>

3          [Letterhead of Landlord]

4                                              _____, 200__

5     [via Federal Express or other
6     recognized overnight delivery
7     service per Article 18 of the foregoing
8     lease]

9     Bed Bath & Beyond Inc.
10    650 Liberty Avenue
11    Union, NJ 07083
12    Attn: Warren Eisenberg

13    Re:   Lease Agreement dated as of _____, 2010 (the "***Lease***"), between Stratford
14          Hall, Inc., as landlord ("***Landlord***"), and Bed Bath & Beyond Inc., as tenant
15          ("***Tenant***"), with respect to certain retail premises (the "***Premises***") located in the
16          Burlington Crossings Shopping Center, Burlington, Washington

17    Gentlemen:

18          In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
19    hereby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
20    _____, 20__.  This notice shall constitute the Delivery Date Notice referred to in
21    Subsection 2.3.2 of the Lease.

22                                  STRATFORD HALL, INC.
23
24
25                                  By:_____
26                                      _____, (Vice) President
27    cc:   [_____, Esq.]
28          Allan N. Rauch, Esq.

I-1

1       <u>Exhibit J</u>

2       <u>Form of Delivery Date Certification</u>

3       [Letterhead of Landlord]

4       _____, 200__

5       [via Federal Express or other
6       recognized overnight delivery
7       service per Article 18 of the foregoing
8       lease]

9       Bed Bath & Beyond Inc.
10      650 Liberty Avenue
11      Union, NJ 07083
12      Attn: Warren Eisenberg

13      Re:     Lease Agreement dated as of _____, 2010 (the "**Lease**"), between Stratford
14              Hall, Inc., as landlord ("**Landlord**"), and Bed Bath & Beyond Inc., as tenant
15              ("**Tenant**"), with respect to certain retail premises (the "**Premises**") located in the
16              Burlington Crossings Shopping Center, Burlington, Washington

17      Gentlemen:

18              In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
19      hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
20      Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
21      Date (as such term is defined in the Lease) will be deemed to be _____, 20__ .
22      This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
23      of the Lease.

24                                      STRATFORD HALL, INC.
25
26
27                                      By:_____
28                                          _____, (Vice) President
29      cc:     [_____, Esq.]
30              Allan N. Rauch, Esq.

J-1

1
2
3
4

Exhibit K-1

Existing Exclusives

Home Depot

### Home Depot Inc.

Home Improvement Store Restrictions:  So long as Home Depot operates a home improvement store on the Home Depot parcel, no portion of the Shopping Center other than the Home Depot Parcel shall be used for a home improvement center or any business which sells, displays, leases, rents, distributes or otherwise provides services with respect to the following items or materials, singly or in any combination: lumber, hardware items, tools, plumbing supplies and fixtures, electrical supplies and fixtures, pain, wallpaper and other wallcoverings, cabinets, siding, ceiling fans, window treatments (including draperies, curtains and blinds), kitchen or bathrooms or components thereof (including tubs, sinks, faucets, cabinets, showers, vanities, countertops and related hardware, but not accessories), windows, hard and soft flooring (including tile, wood flooring, rugs and carpeting), lawn and garden equipment and vehicles, gardening and garden nursery supplies, natural plants, outdoor cooking equipment and accessories, Christmas trees, indoor and outdoor lighting systems and light fixtures, cabinets and

5

unfinished furniture, kitchen and household appliances, commonly know as white good, closet organizing systems, dedicated department for interior design services, or other products generally sold in a retail home improvement center, except for the incidental sale of such items.  An "incidental sale of such items" is one in which there is no more than the greater of (i) 5% of the total floor area of such business, or (ii) 2,000 sf of sales and/or display area, relating to such items individually or in the aggregate.

6

**HOME DEPOT**          Restriction Agreement and
                              Grant of Easements ("RAGE") between Home Depot U.S.A., In
**5.2,**                      and Newman Development Group of Burlington, LLC

(b)    No portion of the Shopping Center shall be used for any of the following purposes: gun range; the sales of guns as a primary use; car wash facility or gasoline station (except if part of a national chain, an indemnity in form acceptable to Consenting Owners is provided to the Consenting Owners and it otherwise conforms to this Agreement); army/navy surplus store; an animal kennel (except if incidental to a pet store); a flea market or a business selling so-called "second hand" goods (the term "second hand" shall mean stores which sell goods primarily as a service to the public rather than to a retail customer for a profit); cemetery; mortuary; any establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials; a so-called "head shop"; off-track betting parlor; junk yard; recycling facility or stockyard; motor vehicle or boat dealership, repair shop (including lubrication and/or service center) that stores vehicles outdoors overnight, except for regional and national tenants so long as no vehicles are stored outside, body and fender shop, or motor vehicle or boat storage facility (neither the foregoing restriction nor anything else in this Agreement to the contrary shall preclude the Owner of the Home Depot Parcel's sale or rental of delivery vehicles and trailers to its customers as part of its home improvement business); a mini-storage or self-storage facility; a laundromat or on-site dry-cleaning facility (but this shall not be deemed to prohibit nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer so long as located on Outparcels only); a bar, tavern or cocktail lounge (except as incidental to a Restaurant); a discotheque, dance hall, comedy club, night club or adult entertainment facility; billiard or pool hall; massage parlor, game parlor or video arcade (which shall be defined as any store containing more than seven (7) electronic games, which parlor or arcade is not incidental to a Restaurant or other use permitted under this Agreement); a beauty school, barber college; a reading room, place of instruction or any other operation catering primarily to students or trainees and not to customers (but shall specifically not prohibit a school which is incidental to a primary retail purpose); office usage other than incidental in connection with non-prohibited uses; industrial, residential or manufacturing uses, school (except training and "how to") or house of worship.

(d)    Without the prior written consent of the Consenting Owners, the following shall not be allowed to operate in the Shopping Center or Common Area, except as otherwise

7

K-1-1

**EXHIBIT D**
**PROHIBITED USES**

<u>HOME DEPOT</u>   ...(continues)

permitted in this Agreement: traveling carnivals, fairs, auctions, shows, kiosks, booths for the sale of fireworks, sales by transient merchants utilizing vehicles or booths and other promotions of any nature. Except as otherwise permitted in this Agreement, in the event that unauthorized Persons, including without limitation tenants or invitees of tenants occupying Buildings now or at any future time located in the Shopping Center, utilize the parking area for other than temporary parking by customers while shopping in the Shopping Center, then (i) in the case of such use occurring on Developer's Parcel or the Outparcels, Developer shall at its sole expense, upon written request by Home Depot, take whatever action as shall be necessary to prevent said unauthorized use, and (ii) in the case of such use upon Home Depot's Parcel, Home Depot shall, at its sole expense, upon written request by Developer, take whatever action as shall be necessary to prevent said unauthorized use.

(e)      No portion of the Shopping Center shall be used for a business or use which creates strong, unusual or offensive odors (normal Restaurant odors shall not be considered offensive), fumes, dust or vapors; emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness; creates unusual fire, explosive or other hazards, or materially increases the rate of insurance for any other Parcel, Owner or Occupant; provided however, the operation of a typical Home Depot home improvement store as generally operated by Home Depot in other locations on the date of this Agreement shall not be deemed to be in violation of this Section 5.2(e).

(f)      No oil development operations, oil refining, quarrying or mining operations of any kind shall be permitted upon or in any portion of the Parcels, nor shall oil wells, tanks, tunnels, or mineral excavation or shafts be permitted upon the surface of any portion of the Parcels, or within five hundred (500) feet below the surface of any of the Parcels. No derrick or other structure designed for use in boring for water, oil, natural gas or other minerals shall be erected, maintained or permitted on any portion of the Shopping Center.

(g)      No portion of the Common Area shall be used for the sale, storage or display of merchandise or food; provided, however, that (i) the display of delivery vehicles for sale and/or rental to its customers as part of the Owner of the Home Depot Parcel's home improvement business shall be permitted, and (ii) the seasonal sale of merchandise by the Owner or Occupant of the Parcel shall be permitted from the parking lot located on that Owner's Parcel.

(h)      For purposes of this Agreement, all Service Areas shall be the sole exclusive property of the Owners of the Buildings associated with such areas and each Owner shall have the exclusive right to use such areas for whatever purpose such Owner deems appropriate, including, without limitation, the sale and display of merchandise.

1

K-1-2

**EXHIBIT D**
**PROHIBITED USES**

### HOME DEPOT _____ (continues)

(i) For purposes of this Agreement, Persons who are not Owners or Occupants engaging in the following activities in any portion of the Shopping Center will not be considered to be Permittees under this Agreement: (i) exhibiting any placard, sign, or notice that does not advertise an existing business in the Shopping Center; (ii) distributing any circular, handbill, placard, or booklet promoting an existing business in the Shopping Center, except in the immediate vicinity of the entrance way to any Building; (iii) soliciting memberships or contributions for an existing business in the Shopping Center, except in the immediate vicinity of the entranceway to any Building (and solicitation of charitable contributions, sale of Girls Scout cookies, and similar activities shall also be permitted so long as in the immediate vicinity of the entranceway to any Building; (iv) parading, picketing, or demonstrating; and (v) failing to follow regulations relating to the use of the Shopping Center.

(j) This Agreement is not intended to, and does not, create or impose any obligation on a Party to operate, continuously operate, or cause to be operated a business or any particular business in the Shopping Center or on any Parcel.

1

### EXHIBIT "G"

### Description of Related Businesses, Uses and Services

A home improvement center or any business which sells, displays, leases, rents, distributes or otherwise provides services with respect to the following items or materials, singly or in any combination: lumber, hardware items, tools, plumbing supplies and fixtures, electrical supplies and fixtures, paint, wallpaper and other wallcoverings, cabinets, siding, ceiling fans, window treatments (including draperies, curtains and blinds), kitchen or bathrooms or components thereof (including tubs, sinks, faucets, cabinets, showers, vanities, countertops and related hardware, but not accessories), windows, hard and soft flooring (including tile, wood flooring, rugs and carpeting), siding, ceiling fans, lawn and garden equipment and vehicles, gardening and garden nursery supplies, natural plants, outdoor cooking equipment and accessories, Christmas trees, indoor and outdoor lighting systems and light fixtures, cabinets and unfinished and finished furniture, kitchen and household appliances, commonly known as white goods, closet organizing systems, dedicated department for interior design services, or other products generally sold in a retail home improvement center, except for the incidental sale of such items. An "incidental sale of such items" is one in which there is no more than the greater of (i) five percent (5%) of the total floor area of such business, or (ii) 2,000 square feet of sales and/or display area, relating to such items individually or in the aggregate. Notwithstanding the foregoing, the operation of a TJ Maxx, Home Goods, Linens & Things, Ross Dress For Less, Kohl's, Sam's Club, Costco, Bed Bath & Beyond, Best Buy, Circuit City, Fry's, Leslie's Pool Supply, and other Spa/Pool companies, Joann's Fabrics, Target, Wal-Mart, Rite Aid or Supermax, in their current operating format in Washington State or other areas shall not be deemed to be a violation of the foregoing restrictions.

2
3

K-1-3

EXHIBIT H-3

HOME DEPOT WAIVER



3800 W. Chapman Ave • Orange, CA 92868
(714) 940-3500

February __13__, 2004

Newman Development Group of Burlington, LLC
2255 Van Ness Avenue, Suite 102
San Francisco, California 94109
Attention: George Akel

Re:   Burlington, Washington - Purchase Agreement ("PSA") and Restriction Agreement and
Grant of Easements ("RAGE") between Home Depot U.S.A., Inc. ("Buyer") and
Newman Development Group of Burlington, LLC ("Seller")

Dear George:

This letter shall serve as the agreement between Buyer and Seller as follows:

- The provisions of Section 6, Condition 3 of the PSA are hereby satisfied.

- The provisions of Section 6, Condition 6 and Condition 11(h) and also of Section 10 of the
PSA that condition Closing on receipt of the Corps' Conditional Letter of Map Revision
("CLOMR") is hereby waived; provided that Seller is still required to acquire the CLOMR in
accordance with Sections 3.1 and 3.3 of the Development Agreement between Buyer and
Seller ("Development Agreement").

- The provisions of Section 6, Condition 8 and Condition 11(d) and also of Section 10 of the
PSA that condition Closing on receipt of traffic related Approvals (i.e., the Washington
Department of Transportation permit, "DOT Permit") are hereby waived; provided that Seller
is still required to acquire the DOT Permit in accordance with Sections 3.1 and 3.3 of the
Development Agreement.

- Notwithstanding Section 1 of the PSA, the Purchase Price is

- Pursuant to Section 6, Condition 1 of the PSA, Buyer and Seller approve the attached list of
Permitted Exceptions, attached as Exhibit "A".

- Notwithstanding Section 5.1 of the RAGE, Buyer and Seller agree that the retailers
designated on the list attached as Exhibit "B" will be permitted to operate in the Shopping
Center in their current operating format.

- The parties have acknowledged that at the time of the closing of the Home Depot Parcel,
Seller will not own Parcels A, B, C, D, and Developer's Parcel, although Developer intends
to acquire Parcels A, B, C, D and Developer's Parcel. The parties have agreed that at the
time Developer acquires Parcels A, B, C, D and Developer's Parcel, the RAGE shall be

Burlington Crossings Shopping Center
Burlington, WA                                                    1
Store No. 873
6061.614/290290.1

1

K-1-4

1220165.6

## HOME DEPOT WAIVER

*Page – 2*
*Letter to Mr. George Akel*
*February 13, 2004*

time Developer acquires Parcels A, B, C, D and Developer's Parcel, the RAGE shall be recorded after the deed to Developer and before any deed of trust, mortgage, lien, other deeds or encumbrances. Developer shall give Home Depot prior notice of its acquisition of Parcels A, B, C, D and Developer's Parcel and shall obtain for Home Depot an endorsement to its Title Policy to include these parcels as part of the property burdened by the RAGE. The parties further acknowledge that at the time of the closing of the Home Depot Parcel, Seller will not own the Whitmarsh Road connector between Whitmarsh Road and the southern boundary of Parcel E (the "Whitmarsh Road Connector"). However, Seller intends to endeavor to acquire such property or the right to construct or cause to be constructed and construct the Whitmarsh Road Connector in accordance with the Development Agreement between the parties.

For purposes of this letter, the capitalized terms used in this letter and not herein defined have the meanings ascribed to them in the PSA and RAGE, as applicable.

Very truly yours,

HOME DEPOT U.S.A., INC.,
a Delaware corporation

By: ERIKA M. STRAWN
Name: Corporate Counsel
Its:

cc:     Lawrence C. Anderson, Esq.
Jane Rakay Nelson

**Acknowledged and Agreed:**

NEWMAN DEVELOPMENT GROUP OF BURLINGTON, LLC

By: _George Akel_     Date: 2/17/04
Name: George Akel
Its: Member

---

## HOME DEPOT WAIVER

### EXHIBIT "A"

#### PERMITTED EXCEPTIONS
Burlington, Washington

1.  Real property taxes (prorated to close of escrow), a lien not yet due and payable.

2.  Special Assessment levied by the Port of Skagit County (LID #97-1) prorated at close of escrow, subject to proper segregation by the levy authority; or, if segregation is not available, subject to agreement between Seller and Buyer as to the appropriate calculation for amounts due in connection with Buyer's parcel.

3.  Easement in favor of Port of Skagit County dated July 7, 1998, recorded July 21, 1998 at Auditor's File No. 9807210077 for storm drainage purposes.

4.  Relinquishment of right of access to State Highway and of light, view and air, under terms of deed to the State of Washington recorded July 16, 1954 at Auditor's File No. 504049.

K-1-5

1220165.6

## HOME DEPOT WAIVER

### EXHIBIT "B"

### PERMITTED TENANTS

1. Barnes & Noble
2. Books A Million
3. Border's Books
4. Dick's Sporting Goods
5. Gart Sports
6. REI
7. SportMart
8. Sports Authority
9. Bed, Bath & Beyond
10. Linens -N- Things
11. Best Buy
12. Circuit City
13. Petco
14. Petsmart
15. Kids R' Us
16. Kohl's
17. Marshall's
18. Mervyn's
19. Goody's
20. Ross
21. Steinmart
22. TJ Maxx
23. TJ Maxx & More
24. Home Goods
25. Nordstrom Rack
26. Michael's Crafts
27. Joanne's Fabric
28. Toys R' Us
29. Zany Brainy
30. Cost Plus
31. Crate & Barrel
32. Pier One
33. Pottery Barn
34. Restoration Hardware
35. Old Navy
36. Gap
37. Banana Republic
38. William Sonoma
39. DSW
40. Famous Footwear

41. Fry's Electronics
42. Macy's
43. Staples
44. Office Max
45. Office Depot
46. JC Penney
47. Any Mountain
48. Big 5 Sporting Goods
49. Target
50. Wal-Mart
51. Sam's Club
52. Costco
53. Good Guys
54. Comp USA
55. Walgreen's
56. Rite Aid
57. Long's Drugs
58. Ethan Allen
59. Container Store
60. Leslie's Pool Supplies and other spa/pool supply companies

Burlington Crossings Shopping Center
Burlington, WA
Store No. 873
6061.614/290280.1

4

1
2
3
4 *Tenant's obligation to be subject to the foregoing exclusive is subject to Landlord's*
5 *obligation to obtain a letter from Home Depot, as described in Section 2.3.1(h) and*
6 *Exhibit P of the Lease.*
7
8
9
10
11
12
13
14
15
16

K-1-6

1220165.6

1
2
3
4    Best Buy
5

## 30.    EXCLUSIVITY AND USE.

Tenant shall initially use and Landlord represents, warrants and covenants to and with Tenant that Tenant may lawfully use the Premises for sales, rental, service and warehousing (and if applicable, installation in motor vehicles) of the product categories listed below, other products typically sold in the majority of Tenant's stores, and except for the rights of any Shopping Center tenants with leases fully executed prior to the date hereof, Landlord shall not permit any person or entity other than Tenant in space leased directly or indirectly from Landlord the Shopping Center, to sell, rent, service and/or warehouse (and, if applicable, install in motor vehicles) the following product categories: electronic equipment or appliances (including, without limitation, televisions, stereos, and video recorders); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); personal computers and peripherals, computer software; car radios, stereos, tape decks or phones; entertainment software, including compact discs, music videos and prerecorded tapes; telephones, telecopy, facsimile and photocopy machines; photographic cameras or equipment; office equipment, supplies or furniture; any substitutes for or items which are a technological evolution of the foregoing items; or any other related items carried in a majority of Tenant's stores, without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion. The sale of any one or all of the foregoing product categories by another tenant or occupant of the Shopping Center shall be excluded from the foregoing restriction provided that such tenant or occupant restricts the sales area dedicated to the sale of one or all of the foregoing product categories to less than 1,500 square feet within such tenant's premises or occupant occupies more than 90,000 square feet in the Shopping Center or such tenant is an anchor tenant that owns its own parcel. In addition to the foregoing, Tenant shall have the right to (a) sell gourmet and other food items in support of and incidental to the foregoing product categories, and (b) sell books, magazines, sporting equipment and toys. In addition, Landlord shall not lease, or permit the use by any tenant or subtenant of Landlord of any property adjacent to the Shopping Center for use as a consumer electronics store such as Fry's, Good Guys or Circuit City. "Landlord", for purposes of this Article, shall be defined to include Landlord, and (i) if Landlord is a corporation, its principal shareholders; or (ii) if Landlord is a partnership, its partners and any principal shareholders or partners of any partner which is a corporation or shareholder; or (iii) if Landlord is a trust, the beneficiaries of any such trust, including the principal shareholders or partners of any beneficiary which is a corporation or trust, all of whom shall execute an agreement to be bound to this Article.

Notwithstanding the foregoing, Landlord shall have the right to lease or sell space within the Shopping Center for use as an office supply store including but not limited to Staples, Office Max or Office Depot so long as such business shall not be located within two hundred fifty (250) feet of the Premises.

6
7
8
9    *The foregoing existing exclusive is subject to that certain letter dated February 23,*
10   *2010 between Best Buy Stores, L.P. and Tenant, a copy of which is attached hereto.*
11

1



**BED BATH &
BEYOND**
Beyond any store of its kind:

**Corporate Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888

February 23, 2010

Best Buy Stores, L.P.
7601 Penn Avenue South
Richfield, Minnesota 55423

Re:    Burlington Crossings Shopping Center, Burlington, Washington
(the *"Shopping Center"*)

Ladies/Gentlemen:

Bed Bath & Beyond Inc., a New York corporation (*"BBB"*), is negotiating or has executed a lease (the *"BBB Lease"*) for retail premises (the *"BBB Premises"*) in the Shopping Center. Best Buy Stores, L.P., a Delaware limited partnership (*"Best Buy"*) has executed a lease (the *"Best Buy Lease"*) for retail premises (the *"Best Buy Premises"*) in the Shopping Center. Our signatures below shall constitute our agreement to all of the following terms and conditions.

1.    Notwithstanding any provisions of the Best Buy Lease to the contrary, BBB, and its assignees and sublessees of all or any portion of the BBB Premises, shall be subject to the Best Buy exclusive use restrictions (the *"Best Buy Exclusive"*) set forth in the Best Buy Lease (a copy of which is annexed hereto as Exhibit A, except that the Best Buy Exclusive shall not apply to the business operations in the BBB Premises by BBB and/or its "Affiliates" (hereinafter defined) so long as they are operating a store selling primarily home furnishings and/or linens and domestics.

2.    *"Affiliates"* for purposes of this letter agreement shall mean and include: (a) a parent, subsidiary or an entity or association which controls or is controlled by or is under common control with Tenant; (b) an entity or association which purchases all or substantially all of the assets or ownership interests of BBB; or (c) an entity or association that purchases the majority of BBB's retail stores in the State in which the Shopping Center is located.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

2

K-1-8

Best Buy Stores, L.P.
Burlington Crossings Shopping Center, Burlington, Washington
February 23, 2010
Page 2

Please sign and return the enclosed copy of this agreement to the undersigned, to
indicate your agreement to all of the foregoing provisions.  Thank you.

Very truly yours,

BED BATH & BEYOND INC.,
a New York corporation

By:

Seth Geldzahler
Vice President - Real Estate

ACKNOWLEDGED AND AGREED:

BEST BUY STORES, L.P., a Delaware limited partnership

By:    BBC Property Co., a Minnesota corporation
Its General Partner

By:
Name:  Patrick R. Mabe
Title:  V. P

K-1-9

Best Buy Stores, L.P.
Burlington Crossings Shopping Center, Burlington, Washington
February 23, 2010
Page 3

<u>Exhibit A</u>

<u>Best Buy Exclusive</u>

**<u>Best Buy</u>**
Tenant shall initially use and Landlord represents, warrants and covenants to and with Tenant that Tenant may lawfully use the Premises for sales, rental, service and warehousing (and, if applicable, installation in motor vehicles) of the product categories listed below, other products typically sold in the majority of Tenant's stores, and except for the rights of any Shopping Center tenants with leases fully executed prior to the date hereof, Landlord shall not permit any person or entity other than Tenant is space leased directly or indirectly from Landlord the Shopping Center, to sell, rent, service and/or warehousing (and, if applicable, installation in motor vehicles) the following product categories: electronic equipment or appliances (including, without limitation, televisions, stereos, and video recorders); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); personal computers and peripherals, computer software; car radios, stereos, tape decks or phones; entertainment software, including compact discs, music videos and prerecorded tapes; telephones, telecopy, facsimile and photocopy machines; photographic cameras or equipment; office equipment, supplies or furniture; any substitutes for or items which are a technological evolution of the foregoing items; or any other related items carried in a majority of Tenant's stores, without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion. The sale of any one or all of the foregoing product categories by another tenant or occupant of the Shopping Center shall be excluded from the foregoing restriction provided that such tenant occupant restricts the sales area dedicated to the sale of one or all of the foregoing product categories to less than 1,500 sf within such tenant's premises or occupant occupies more than 90,000 sf in the Shopping Center or such tenant is an anchor tenant that owns its own parcel. In addition to the foregoing, Tenant shall have the right to (a) sell gourmet and other food items in support of and incidental to the foregoing product categories, and (b) sell books, magazines, sporting equipment and toys. In addition, Landlord shall not lease, or permit the use by any tenant or subtenant of Landlord of any property adjacent to the Shopping Center for use as a consumer electronics store such as Fry's, Good Guys or Circuit City. "Landlord", for purposes of this Article, shall be defined to include Landlord, and (i) if Landlord is a corporation, its principal shareholders; or (ii) if Landlord is a partnership, its partners and any principal shareholders or partners of any partner which is a corporation or shareholder; or (iii) if Landlord is a trust, the beneficiaries of any such trust, including the principal shareholders or partners or any beneficiary which is a corporation or trust, all of whom shall execute an agreement to be bound to this Article.

Notwithstanding the foregoing, Landlord shall have the right to lease or sell space within the Shopping Center for use as an office supply store including but not limited to Staples,

Office Max or Office Depot so long as such business shall not be located within 250 ft of the Premises.

1
2

1220165.6

1  <u>Old Navy</u>
2

**12.4  Tenant's Exclusive Use Rights**

(A)    Provided that Tenant is in compliance with the requirements of Section 12.3 above, except for the Premises, Landlord shall not lease or permit any space within the Shopping Center to be used for the sale, rental or display of (i) infants', babies', or children's apparel in more than fifteen percent (15%) of any tenant's (or other occupant's) premises, or (ii) any apparel whatsoever in more than fifteen percent (15%) of any premises consisting of 10,000 square feet of GLA or greater (collectively, "Tenant's Exclusive"). If any tenant or occupant of the Shopping Center violates Tenant's Exclusive, then, during the period of such violation and in lieu of all Rent, Tenant shall pay a substitute rent amount equal to fifty percent (50%) of the then-applicable Minimum Rent, and Tenant shall have all remedies available at law or in equity, including injunctive relief. Landlord shall indemnify, defend and hold Tenant harmless from and against any and all Indemnified Costs relating to any violation of Tenant's Exclusive.

(B)    A use that would otherwise be deemed violative of Tenant's Exclusive shall not be considered a violation of the same only if and for so long as it is being conducted by (i) the tenants operating under the following tradenames at their premises at the Shopping Center (a) Home Depot, Ross Dress For Less, Bed Bath & Beyond, PetsMart, Linens N' Things, Best Buy, Kohl's, TJ Maxx, Marshalls, Toys R' Us, Babies R' Us, and (b) one of either Borders or Barnes & Noble, or (ii) any tenant at the Shopping Center whose premises consists of 2,000 square feet of GLA or less.

3
4  <u>Petsmart</u>
5

2.    **Tenant's Exclusive Rights.**  As used in the Lease, the term "<u>Tenant's Primary Business</u>" shall mean the retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) food, accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, such as grooming, boarding, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment, and (v) educational products and services related to any of the foregoing, and office and storage uses incidental to the foregoing.  During the Term of the Lease (unless this Lease has been terminated as a result of Tenant's default hereunder), Tenant shall have the exclusive right in the Shopping Center to conduct any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of this Section 2.  All other tenants or other occupants of any portion of the Shopping Center, except Home Depot and any tenant occupying in excess of 80,000 square feet of Gross Floor Area, and

6

any other real property which is located within a radius of one (1) mile from the Shopping Center and which is owned and/or controlled by Landlord or by an entity which is owned and/or controlled by Landlord or an affiliate thereof, other than existing retail operations which are open and operating as of the date of this Lease, shall be prohibited from engaging in any portion of such Primary Business described in clauses (i), (ii) and (iii) of this Section 2, except on a basis which is incidental to an otherwise permitted use.  For purposes of this Section 2, the term "incidental" shall mean that the use occupies no more than ten percent (10%) of the sales area in the subject premises.  Notwithstanding the foregoing, the provisions of this Section 2 shall apply to Best Buy only to the extent that they may be enforced under the terms of the lease between Landlord and Best Buy.

7
8

K-1-11

1   <u>Ross Dress For Less</u>
2

**<u>Ross Dress For Less</u>**
Tenant's intended use of the store is as a full line department store including, at its option, the sale of soft goods merchandise, including men's, women's and children's apparel, shoes, accessories, such as jewelry and cosmetics, health and beauty aids and sundries, domestics and linens, housewares, art, pictures, posters, frames, artificial floral, office supplies, sporting goods, furniture and lamps, window and floor coverings, electronics, videos, books, toys, party goods, pet supplies, luggage and packaged foods, and such other items as are sold in Tenant's similarly merchandised stores.

Without the prior written consent of Tenant, which consent may be withheld in the absolute and sole discretion of tenant, no tenant or occupant of Landlord's Parcel (other than Tenant) may (a) use its premises for the Off Price Sale (as hereinafter defined) of merchandise, or (b) use in excess of ten thousand (10,000) square feet or more of its space for the Off Price Sale of those items listed in Section 15.1 above.  For purposes of this Section 15.3, "Off Price Sale" shall mean the retail sale of merchandise on an every day basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price including permanent "clearance" or other discounted sales (as of the Effective Date, examples of Off Price Sale retailers include such retailers as TJ Maxx, Marshall's, Nordstrom Rack, Goody's, Factory 2 U, Burlington Coat, Steinmart and Filene's Basement.)

3
4
5   <u>Lane Bryant</u>
6

12.17   <u>Other Women's Wear Stores</u>:

Upon the commencement of operation in the Shopping Center (as same may be expanded) of any retail store selling large size (14 and up or its equivalent) women's clothing and/or apparel, (i) Rent and all Other Charges due hereunder shall abate and Tenant shall pay, in lieu thereof, a sum equal to four (4%) percent of Gross Sales as defined in Section 4.3 on a Sales Base of Zero Dollars, in arrears, and (ii) Tenant shall have the right at any time thereafter to terminate this Lease upon thirty (30) days prior written notice to Landlord. Tenant's rights set forth herein shall be effective the date of the commencement of operation in the Shopping Center of the store or stores described above and shall continue until the earlier of the termination of this Lease or such time as the store or stores described above shall cease to operate at the Shopping Center. Upon such termination neither party hereto shall have any further obligations hereunder. The foregoing rights shall also apply to the remerchandising of any existing store in the Shopping Center.

If a tenant sells clothing or apparel as described above in violation of the provisions of such tenant's lease (a "Rogue Tenant"), Tenant shall not exercise its rights hereunder until the expiration of one hundred eighty (180) days from the date such Rogue Tenant commenced the sale of such clothing and/or apparel, provided that Landlord diligently pursues efforts to prevent such Rogue Tenant from selling such clothing and/or apparel in violation of its lease. Should Landlord fail to diligently pursue such efforts, Tenant may immediately commence to exercise its rights hereunder.

The provisions of this Section 12.17 shall not apply to (u) Home Depot, (v) Old Navy, (w) Ross, (x) Linens N Things, (y) Best Buy, or (z) Petsmart, or any successor or assign to Old Navy, Ross, Linens N Things, Best Buy, or Petsmart operating under the current Old Navy, Ross, Linens N Things, Best Buy or Petsmart lease, as applicable, as such respective lease exists on the date of execution hereof, provided however that if Landlord's consent would be required in order for such successor or assign to operate a store as described above, Landlord shall not consent thereto and the provisions of the first two paragraphs of this Section 12.17 shall apply. The provisions of this Section 12.17 shall not apply to any tenant operating a single store under one name which is in excess of 15,000 square feet of contiguous space.

7
8

K-1-12

1220165.6

1  Sally Beauty
2

### 6.04 – Competition

Provided Tenant is open operating the Premises under the Permitted Tradename and for the Permitted Use, except for the anchor tenants and existing leases, Landlord agrees that during the Term and any Renewal Term, Landlord shall not enter into a lease with any tenant who has, as its primary purpose, the sale of beauty supplies. Incidental sales (less than fifteen percent (15%) of total sales volume of such other tenant) by another tenant will not be in violation of these provisions. In addition, except for the anchor tenants and existing leases, Landlord will not enter into a lease with any tenant is such tenant sells hair extensions, wigs or human or synthetic hair. Notwithstanding anything herein to the contrary, if a tenant, without Landlord's knowledge or in violation of its lease or any Landlord direction, violates this provision, and Tenant provides notice to Landlord of such violation for so long as Landlord takes appropriate action to eliminate the violation, Landlord will not be in breach of this provision.

3
4
5  Shellan Jewelers
6

### Shellan Jewelers

No other space in the building of which the Premises is a part, to be primarily used for the marketing or sale of jewelry, watches or products directly related thereto; provided, however, that this provision shall not be applicable to Lane Bryant.

7
8
9  Famous Footwear
10

11. **EXCLUSIVE:** Landlord and Tenant agree that it is to the mutual benefit of both parties and the Shopping Center as a whole to establish and maintain a mixture of retail stores with a balanced and diversified selection of merchandise, goods and services within the Shopping Center. Landlord covenants, warrants, and agrees that it has not and shall not, throughout the term hereof, lease space in this Shopping Center to another tenant that devotes more than twenty percent (20%) of its sales floor area to the sale of shoes, nor shall Landlord permit any tenant to use more than twenty percent (20%) of its sales floor area for the sale of shoes ("Exclusive Use"). This exclusive shall not apply to those stores with (1) Best Buy, Old Navy, Linens N Things, Ross, PetsMart, the occupant of the premises currently owned by Home Depot (as indicated on Exhibit "A" hereto), and their successors and assigns (however, if the premises which any of the above occupy reverts back to Landlord (i.e. the lease expires or is terminated and Landlord has the

opportunity to re-lease or sell such premises) this exclusive shall apply to the premises going forward), (2) any current lease executed prior to the date of this Lease provided that such tenant has the right to operate for the Exclusive Use without Landlord's consent or otherwise modifying or amending their lease, and their successors and assigns not needing Landlord consent or approval, provided, however, that the current leases executed prior to the date of this Lease shall consist of and be limited to those identified on Exhibit "F" hereto, (3) any non-branded shoe stores (such as Payless) which is 3,200 square feet or smaller or (4) any tenant of 20,000 square feet or more provided that they don't devote more than twenty-five percent (25%) of their sales floor area to the sale of shoes. In the event Landlord violates the provisions of this paragraph, Tenant may elect to: (a) terminate this Lease upon ninety (90) days notice to Landlord unless Landlord cures said default within the first sixty (60) days of said ninety (90) day period or prior to said notice to terminate or (b) pay an amount equal to fifty percent (50%) of monthly Minimum Rent, in lieu of Minimum Rent, Common Area Costs, Real Estate Taxes and Insurance Payments ("In Lieu Rent"), from the date that the provisions herein are violated until the date that the violation is ended or this Lease is terminated, whichever occurs first. Tenant shall be permitted to initially elect to pay In Lieu Rent pursuant to subsection (b) above and may still at any time thereafter elect to terminate this Lease pursuant to subsection (a) above. Notwithstanding the foregoing, in the event that another tenant is violating this exclusive use provision and if and so long as Landlord is proceeding reasonably and with due diligence to promptly stop such violation, including but not limited to bring legal action, all of Tenant's remedies pursuant to this Section 11 shall be held in abeyance.

11
12
13  Nail Masters
14

### Nail Masters

Landlord shall not sell, lease, let, use or permit to be used, any property located in Building H in the shopping Center, now or at any time during the initial Term of this Lease or any renewal thereof to an entity which has as its primary purpose the business of a full service nail salon. Tenant shall not have an exclusive for hair.

15

K-1-13

1

K-1-14

1  <u>Sleep Master</u>
2

    **Notwithstanding anything to the contrary contained in this Lease, so long as Tenant is open and operating under the Permitted Tradename and for the Permitted Use, Landlord covenants and agrees not to permit use of any other space in the building of which the Premises is a part to be primarily used for the marketing or sale of mattresses.**

3
4  <u>Olive Garden/GMRI, Inc.</u>
5

35.   <u>RESTRICTIVE COVENANT</u>. The following covenants shall be binding upon the CENTER, will run with land and may be recorded as necessary to provide notice to others.

    A.   <u>Italian Restaurant Restriction</u>. During the TERM of this LEASE, as long as TENANT is operating at the PREMISES as an Italian restaurant, no portion of the CENTER will be used as a restaurant that features Italian food. "Features" means that those food items comprise more than 20% of the menu offerings; provided, however, that a restaurant of less than 2,500 square feet which has as its primary use a pizza restaurant, shall not be in violation of the restriction herein. By way of example, and not as a limitation, examples of existing Italian restaurants include Macaroni Grill, Carrabba's Italian Grill and Johnny Carino's; examples of restaurants that are not Italian restaurants are Chili's, Applebee's, Ruby Tuesday, Red Robin and TGI Friday's. For the purpose of this provision, a restaurant will still be considered to be "operating" even if temporarily closed due to casualty, condemnation, remodeling, reconstruction or force majeure. This restriction will not be applicable to the sale of unprepared foods intended for off-premises consumption.

6
7
8  <u>McDonald's USA, LLC</u>
9

    THEREFORE, Landlord covenants and agrees:

    That no property (other than the Premises) now or hereafter owned, leased or controlled, directly or indirectly, by Landlord, or, if Landlord is a corporation, any subsidiary of Landlord, adjacent or contiguous to the Premises or within the shopping center as legally described on Exhibit B (whether or not such other property is subsequently voluntarily conveyed by Landlord) shall, during the term of the Lease and any extensions of it, be leased, used or occupied as any of the following restaurants operating under the listed trade names, or operating under any successor trade names:

| | | |
|---|---|---|
| Arby's | Hardee's | Sonic |
| Burger King | In and Out Burgers | Wendy's |
| Carl's Jr. | Jack-in-the-Box | White Castle |
| Whataburger | Kentucky Fried Chicken (KFC) | Burgermaster |
| Chick-Fil-A | Fat Burger | Burgerville USA |

    Notwithstanding anything contained herein to the contrary, the covenant set forth above shall not apply to the current tenants of Landlord in the shopping center listed on Exhibit C attached hereto for the period of time during which such tenants' respective leases with Landlord remain in effect.

10
11

K-1-15

1  Burlington Crossings Prohibited Uses:
2

## Burlington Crossings
## Prohibited Uses/Restrictions/Exclusive Rights

**PROHIBITED USES:**

1. Bookstore or other establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials; so called "head shop" or any adult book shop or adult movie house
2. Off-track betting parlor
3. Pawn shop
4. A gun range or any business in which the sale of guns is the primary purpose
5. A dry cleaning business, Laundromat or coin operated laundry
6. Any manufacturing facility
7. Business selling so-called "second-hand" goods; used clothing or thrift store or liquidation outlet
8. Recycling facility or stockyard
9. Motor vehicle or boat dealership and/or storage facility
10. Body and fender shop; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks
11. A mini storage or self-storage facility, it being understood however that incidental storage in connection with non-prohibited uses shall be permitted
12. Use as a training or educational facility
13. Any public or private nuisance
14. Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness
15. Any obnoxious odor
16. Any excessive quantity of dust, dirt, or fly ash; provided however, this prohibition shall not preclude the sale of soils, fertilizers, or other garden materials or building materials in containers in incident to the operation of a home improvement or general merchandise store
17. Any fire, explosion or other damaging or dangerous hazard, including the storage, display or sale of explosives or fireworks
18. Any distillation, refining, smelting, agriculture or mining operations
19. Any mobile home or trailer court, labor camp, junk yard, stock yard or animal raising; notwithstanding the foregoing, pet shops shall be permitted within the Shopping Center
20. Any drilling for and/or removal of subsurface substances
21. Any dumping of garbage or refuse, other than in enclosed receptacles intended for such purpose
22. Any cemetery, veterinary hospital, mortuary, funeral parlor or similar establishment
23. Any car washing establishment
24. Other than as incidental to another permitted use, any entertainment, recreation or amusement use, whether directed to children or adults. Such prohibited uses shall include, without limitation, any one or more of the following: skating rink, bowling alley, teenage discotheque, discotheque, dance hall, night club, video

3

game parlor, pool room, massage parlor, off-track betting facility, casino, card club, bingo parlor, facility containing gaming equipment, planned play environment, arcade games, amusement gallery, rides, video or redemption games, play for fun casino games, rodeo simulations, other sport simulations (excluding golf or other simulations incidental to a sporting goods or golf equipment store) and carnival activities
25. Health spas, health clubs, gyms, exercise studios, dance studios, yoga or martial arts schools or similar facilities
26. Theaters, playhouses, cinemas or movie theaters
27. Any fire sale, flea market, bankruptcy sale (unless pursuant to a court order) or auction operation
28. Any automobile, truck, trailer, or recreational vehicle sales, leasing or display which is not entirely conducted inside of a Building
29. Any restaurant, cocktail lounge, bar or tavern or sale of alcoholic beverages, whether packaged, except in conjunction with a restaurant permitted hereunder
30. Any school, training, educational or day care facility, including, but not limited to: beauty schools, barber colleges, nursery schools, diet centers, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business
31. Any church, synagogue, mosque or other place of worship
32. Any hotel, motel or other lodging facility
33. Any apartment, home or other residential use
34. Any office use other than (i) an office incidental to a retail operation conducted on such Parcel and (ii) a service office catering to the public such as (A) a real estate office, (B) a travel agency, (C) a dental, chiropractic or other medical outpatient office (but not a family planning clinic), or (D) a bank or similar lending office

4
5

K-1-16

**Exhibit K-2**

**Existing Leases**

1.    Lease dated as of November 15, 2004 with Best Buy Stores LP, tenant.

2.    Lease dated as of March 25, 2005 with Famous Footwear, tenant.

3.    Lease dated as of March 31, 2005 with Gamestop, Inc, tenant.

4.    Lease dated as of November 10, 2005 with GMRI, Inc. d/b/a Olive Garden, tenant.

5.    Lease dated as of May 24, 2006 with Lane Bryant, LLC, tenant.

6.    Lease dated as of October 14, 2006 with Mary1Fred LLC d/b/a Shellan Jewelers, tenant.

7.    Lease dated as of January 22, 2007 with McDonald's USA, LLC, tenant.

8.    Lease dated as of March 26, 2005 with Nam M. Vo d/b/a Nail Masters, tenant.

9.    Lease dated as of February 9, 2005 with Old Navy, LLC, tenant.

10.    Lease dated as of January 27, 2005 with PetSmart, Inc., tenant.

11.    Lease dated as of April 10, 2005 with Ross Stores, Inc., tenant.

12.    Lease dated as of July 1, 2006 with Sally's Beauty Company, Inc., tenant.

13.    Lease dated as of May 24, 2006 with See's Candies, tenant.

14.    Lease dated as of January 15, 2007 with Sleep Master, Inc., tenant.

15.    Lease dated as of July 1, 2007 with The Blvd. Hair Studio, tenant.

K-2-1

1

## Exhibit L

2

3                        Intentionally Omitted

4

L-1

1                                    Exhibit M

2                                    Prohibited Uses

3       As used in this Lease, the term *"**Prohibited Uses**"* shall mean any of the following uses:

4       A.      As to the Shopping Center, any of the following uses:

5               (1)     Any use which emits or results in strong, unusual or offensive odors,
6       fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are
7       objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a
8       hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping
9       or disposing of garbage or refuse;

10              (2)     Any operation primarily used as a storage facility and any assembling,
11      manufacturing, distilling, refining, smelting, agricultural, or mining operation;

12              (3)     Any "second hand" store, "surplus" store;

13              (4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard
14      (except that this provision shall not prohibit the temporary use of construction trailers
15      during periods of construction, reconstruction, or maintenance);

16              (5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of
17      trash compactors or trash containers located near the rear of any building);

18              (6)     Any fire sale, bankruptcy sale (unless pursuant to a court order), auction
19      house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly
20      advertised event;

21              (7)     Any central laundry, dry cleaning plant, or laundromat (except that a dry
22      cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so
23      long as its on-site premises are located more than 150 feet away from the Premises);

24              (8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing,
25      display or body shop repair operation;

26              (9)     Any bowling alley or skating rink;

27              (10)    Any live performance theater, auditorium, meeting hall, sporting event, or
28      other entertainment use;

29              (11)    Any living quarters, sleeping apartments, or lodging rooms;

30              (12)    Any veterinary hospital or animal raising or boarding facilities (except to
31      the extent permitted below);

32              (13)    Any mortuary or funeral home;

33              (14)    Any "Pornographic Use", which shall include, without limitation: (x) a
34      store displaying for sale or exhibition books, magazines or other publications containing
35      any combination of photographs, drawings or sketches of a sexual nature, which are not
36      primarily scientific or educational [provided, however, that the sale of books, magazines
37      and other publications by a national bookstore of the type normally located in first-class
38      shopping centers in the State in which the Shopping Center is located (such as, for
39      example, Borders and Barnes & Noble, as said stores currently operate) shall not be
40      deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or
41      rental video cassettes or other medium capable of projecting, transmitting or reproducing,
42      independently or in conjunction with another device, machine or equipment, an image or
43      series of images, the content of which has been rated or advertised generally as NC-17 or

                                          M-1

"X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M];

(15)   Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)   Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption;

(17)   Any catering or banquet hall;

(18)   Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

(19)   Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)   Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)   Any unlawful use;

(22)   Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

(23)   Any church or other place of religious worship;

(24)   Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)   Any carnival, amusement park or circus;

(26)   Any medical clinics or medical offices;

(27)   Any supermarket, except that an upscale, boutique-type food store of the type normally operated in the Burlington, Washington metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall not occupy more than 27,000 square feet of Floor Area, and shall be located at least 200 feet away from the Premises (except that an upscale, boutique-type food store shall be permitted to be located within the Premises);

(28)   Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Burlington, Washington metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that (i) such uses are not located in the building in which the Premises and the other premises in-line with the Premises is located

M-2

(i.e., the areas of the stores currently occupied by the Premises, Petsmart, Ross, Old Navy and Best Buy as shown on Exhibit "B" to the Lease), and (ii) not more than ten thousand (10,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

(29)   hotel/motel;

(30)   daycare center;

(31)   veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and located at least 100 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises; no pet or pet supply store shall be located within 100 feet of the Premises;

(32)   children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)   karate center;

(34)   movie theater;

(35)   restaurant serving meals for on- or off-premises consumption;

(36)   beauty parlor or nail salon;

(37)   health spa, exercise facility or similar type business. ; or

(38)   a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction.

B.   As to Related Land, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22, and 25 above.

M-3

1                                    <u>Exhibit N</u>

2                    <u>Form of Mechanics' Lien Indemnification Agreement</u>

3            THIS MECHANICS' LIEN INDEMNIFICATION is made this _____ day of
4    _____, 201_, by BED BATH & BEYOND INC., a New York corporation
5    (hereinafter referred to as *"Tenant"*), for the benefit of between STRATFORD HALL,
6    INC., a Delaware corporation ("Landlord").

7                                    <u>WITNESSETH</u>

8            Landlord and Tenant have entered into a Lease (the *"Lease"*) dated _____,
9    2010, whereby Landlord has leased to Tenant a portion of the real property located in
10   Burlington Crossings Shopping Center, located in Burlington, Washington (the
11   *"Shopping Center"*) and Tenant has constructed on such real property a store premises
12   (the *"Premises"*).

13           NOW, THEREFORE, in consideration of the payment of the Tenant Allowance as
14   defined in the Lease and other good and valuable consideration, the receipt of which is
15   hereby acknowledged, the Tenant agrees as follows:

16           1.      Tenant hereby indemnifies and agrees to hold Landlord harmless from any
17   loss, payment, claim or expense as the result of mechanics and materialmen filing liens or
18   otherwise making claims against Landlord's interest in the Premises and the Shopping
19   Center based upon materials or services provided under contract with Tenant.  In the
20   event that any mechanic, materialman or other claimant makes claim against the Premises
21   or Shopping Center based upon materials or services provided under contract with
22   Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim
23   or expense related thereto.

24           2.      Tenant reserves the right to contest in good faith the amount of any claim or
25   lien assessed against the Premises or the Shopping Center by any of such claimants;
26   provided, however, should the holder or holders of such claim or lien attempt to enforce
27   their lien by foreclosure by any other means, Tenant shall bond around, pay or remove
28   such lien by any manner reasonably necessary to protect Landlord's interest in the
29   Premises and the Shopping Center.  This indemnity and hold harmless shall not apply to
30   any liens or claims caused by Landlord or Landlord's agents.

31           EXECUTED this _____ day of _____, 2010.


                              **TENANT:**

                              BED BATH & BEYOND INC.,
                              a New York corporation


                              By:      _____
                              Name:    _____
                              Title:   _____

32

                                       N-1

<u>Exhibit O</u>

<u>Form of Declaration of Restrictions Against Related Land</u>

RECORDING REQUESTED BY AND WHEN RECORDED MAIL TO:

**[NOTE:  THIS FORM IS SET UP TO APPLY TO RELATED LAND OWNED BY
LANDLORD OR ITS AFFILIATE.]**

_____

(Space Above Line For Recorder's Use Only)


**DECLARATION OF RESTRICTIONS**

      This Declaration of Restrictions (***"Declaration"***) is made as of the _____ day of _____ 200__ by **[LANDLORD OR LANDLORD'S AFFILIATE, AS APPLICABLE]**, a _____, having an address c/o _____ (***"Declarant"***) for the benefit of BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey  07083 (***"Tenant"***).

      WHEREAS, the Declarant is the owner of that certain real property located in the County of Skegit, State of Washington, as more particularly described on <u>Exhibit A</u> annexed hereto (the "***Related Land***").

      WHEREAS, **[the Declarant// or Name of Landlord, as applicable], a _____, having an address c/o _____ ("*Landlord*")]** is **[also]** the owner of certain real property located in the County of Skegit, State of Washington, commonly referred to as the Burlington Crossings Shopping Center as more particularly described on <u>Exhibit B</u> annexed hereto (the "*Shopping Center*").

      WHEREAS, **[Declarant or Landlord]** and Tenant, as of the date hereof, have entered into a lease (the "*Lease*") demising a portion of the Shopping Center as more particularly described in the Lease (the "*Premises*") to Tenant.

      **[Add if Declarant is an Affiliate of Landlord:  WHEREAS, Declarant controls, is controlled by, or is under common control with, Landlord, and therefore will derive a direct or indirect financial benefit from the Lease (as used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise).]**

      WHEREAS, Tenant is not willing to enter into the Lease unless the Related Land is restricted in accordance with this Declaration and the imposition of the terms of this Declaration on the Related Land is a material inducement to Tenant in connection with the Lease.

      WHEREAS, the Declarant is willing to restrict the Related Land as set forth in this Declaration and by executing this Declaration does so restrict it for the benefit of Tenant and its successors and assigns.

DECLARATION

      NOW, THEREFORE, in consideration of One Dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties state as follows:

      1.    All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

O-1

2.    The Related Land shall be subject to the restrictions as set forth herein which are declared and agreed to be for the benefit of Tenant and its successors and assigns and which restrictions shall run with the Related Land and be binding upon the successors and assigns of the Declarant, and subject to the terms of leases for premises on the Related Land existing on the date hereof, all tenants, licensees and other occupants and users of the Related Land, and any other party claiming by, through or under the Declarant.

3.    For so long as the Lease (as same may be amended, modified, extended or renewed from time to time) shall remain in effect, and subject to the terms of leases for premises on the Related Land existing on the date hereof, the Declarant shall not lease, rent or occupy or permit any portion of the Related Land to be occupied for any of the "Prohibited Uses" (defined in Exhibit C annexed hereto and made a part hereof).

4.    For so long as the Lease (as same may be amended, modified, extended or renewed from time to time) shall remain in effect, and subject to the terms of leases existing on the date hereof, the Declarant shall not lease, rent or occupy or permit any other premises in the Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items.

5.    In the event of a breach of the restrictions set forth in this Declaration, Tenant and its successors and assigns may prosecute any appropriate proceedings at law or in equity. They may, in any such proceeding, obtain injunctive or other equitable relief to enforce this Declaration or restrain violations of this Declaration; recover damages on account of such violation; secure, by way of specific performance or otherwise, the performance of this Declaration; and/or obtain any other remedy provided for at law or in equity.

6.    The Declarant represents and warrants to Tenant that it is duly authorized to execute this Declaration and that this Declaration is superior to all mortgages, deeds of trust and other security instruments encumbering or otherwise affecting the Related Land, and no joinder by or consent or approval of any other party is necessary to fully bind the Declarant and the interests in the Related Land held by the Declarant to the terms of this Declaration.

IN WITNESS WHEREOF, the undersigned has executed this Declaration as of the date hereinabove provided.

**DECLARANT:**

Witness/Attest:                                    [                                    ]
                                                   a _____

_____           By:_____
                                   Name:_____
                                   Title:_____

O-2

1220165.6

## ACKNOWLEDGMENT

State of California                )

County of _____        )

     On _____ before me, _____ _____
(here insert name and title of the officer), personally appeared
_____, who proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted, executed the instrument.

     I certify under PENALTY OF PERJURY under the laws of the State of
California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

O-3

1
2                                    <u>Exhibit A</u>
3
4                            <u>Legal Description of Related Land</u>
5

## Exhibit B

### Legal Description of Shopping Center

Lots 2 - 9, inclusive, and Lots 13 and 14, inclusive, City of Burlington Binding Site Plan No. Burl-01-04, entitled Newman Development of Burlington, LLC, Retail/Commercial Center, approved June 12, 2006 and recorded June 27, 2006, under Skagit County Auditor's File No. 200606270207, being a revision of that certain instrument approved March 8, 2004 and recorded March 15, 2004, under Auditor's File No. 200403150156, and being a portion of Government Lot 8 and the Southeast 1/4 of the Northeast 1/4, Section 7, Township 34 North, Range 4 East, W.M.

TOGETHER WITH an easement for ingress, egress and utilities as described in that instrument recorded on February 11, 2004, under Auditor's File No. 200402110099, records of Skagit County, Washington.

ALSO TOGETHER WITH an easement for ingress, egress and utilities as described in that instrument recorded on March 15, 2004 under Auditor's File No. 200403150158 and re-recorded April 8, 2004, under Auditors File No. 200404080093, records of Skagit County, Washington.

Situate in the County of Skagit, State of Washington.

1220165.6

Exhibit C

Prohibited Uses

As used in this Agreement, the term *Prohibited Uses* shall mean any of the following uses:

(1)     Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)     Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(4)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(5)     Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M];

(6)     Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(7)     Any unlawful use;

(8)     Any pawn shop, check-cashing store, gun shop, or tattoo parlor;and

(9)     Any carnival, amusement park or circus.

O-6

Exhibit P

Form of Home Depot Letter



**Corporate Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888
908/688-8385 Fax

May __, 2010

**VIA DHL EXPRESS**
Home Depot U.S.A., Inc.
3800 West Chapman Avenue
Orange, CA 922868
Attention: Corporate Counsel – Real Estate

      Re:    Burlington Crossings Shopping Center, Marketplace Drive and George
              Hopper Road, Burlington, Washington (the *"Shopping Center"*)

Ladies and Gentlemen:

      Bed Bath & Beyond Inc. (together with its corporate successors, affiliates or
subsidiaries, hereinafter referred to as *"BBB"*) is currently negotiating with Stratford
Hall, Inc. (the *"Landlord"*) to lease space in the Shopping Center.  In connection
therewith, Landlord has provided us with the exclusive provision contained in Section 5.2
of the Restriction Agreement and Grant of Easements by and between Newman
Development Group of Burlington, LLC, Landlord's predecessor-in-interest, and Home
Depot, U.S.A., Inc., a Delaware corporation (*"Home Depot"*) recorded April 8, 2004 as
Document No. 2004 04080093 in the records of Skagit County, Washington (the
*"RAGE"*), a copy of which exclusive provision is attached hereto as Exhibit A.  In order
to accommodate BBB, and notwithstanding the terms contained in the RAGE, Home
Depot hereby consents to BBB's operation in the Shopping Center as a typical Bed Bath
& Beyond store.  Home Depot makes no representation as to whether or not consent from
any other party is required with respect to the terms and conditions of this letter
agreement.

      Kindly indicate your agreement to the foregoing by signing this letter in the space
provided below and returning it to the undersigned.

                      Very truly yours,

                      Seth Geldzahler
                      Vice President – Real Estate

Attachment

#1100770 v2

AGREED:

This waiver granted is personal to BBB and its corporate successors, affiliates or subsidiaries and is applicable only to the Shopping Center, and may not be construed to bind Home Depot with respect to any other property or location. This letter may be relied upon only by Landlord and its successors and assigns as an owner in the Shopping Center and as landlord under the proposed lease to BBB, and by BBB and its corporate successors, affiliates or subsidiaries as tenant under the proposed lease from Landlord. The waiver granted by this letter is not transferable and does not inure to the benefit of any successor, assign or sublessee of BBB (other than to BBB's corporate successors, affiliates or subsidiaries).

HOME DEPOT U.S.A., INC.,
A Delaware corporation


By: _____
Name: _____
Title: _____

1

2

3

# EXHIBIT A

4

### Home Depot Inc.

Home Improvement Store Restrictions:  So long as Home Depot operates a home improvement store on the Home Depot parcel, no portion of the Shopping Center other than the Home Depot Parcel shall be used for a home improvement center or any business which sells, displays, leases, rents, distributes or otherwise provides services with respect to the following items or materials, singly or in any combination: lumber, hardware items, tools, plumbing supplies and fixtures, electrical supplies and fixtures, pain, wallpaper and other wallcoverings, cabinets, siding, ceiling fans, window treatments (including draperies, curtains and blinds), kitchen or bathrooms or components thereof (including tubs, sinks, faucets, cabinets, showers, vanities, countertops and related hardware, but not accessories), windows, hard and soft flooring (including tile, wood flooring, rugs and carpeting), lawn and garden equipment and vehicles, gardening and garden nursery supplies, natural plants, outdoor cooking equipment and accessories, Christmas trees, indoor and outdoor lighting systems and light fixtures, cabinets and

unfinished furniture, kitchen and household appliances, commonly know as white good, closet organizing systems, dedicated department for interior design services, or other products generally sold in a retail home improvement center, except for the incidental sale of such items.  An "incidental sale of such items" is one in which there is no more than the greater of (i) 5% of the total floor area of such business, or (ii) 2,000 sf of sales and/or display area, relating to such items individually or in the aggregate.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

P-1

# EXHIBIT B

**Fill in this information to identify the case:**

Debtor 1    Bed Bath & Beyond, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   District of New Jersey

Case number   23-13359 (VFP)

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. Who is the current creditor? | SHI Owner LLC |
| --- | --- |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor   Stratford Hall, Inc. |

| 2. Has this claim been acquired from someone else? | ☑ No |
| --- | --- |
| | ☐ Yes.  From whom? _____ |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Faye C. Rasch | JSH Properties |
| Name | Name |
| 600 Stewart St, Suite 1300 | 7325 166th Ave NE, Suite F260 |
| Number      Street | Number      Street |
| Seattle, WA 98101 | Redmond, WA 98052 |
| City            State          ZIP Code | City            State          ZIP Code |
| Contact phone (646) 279-9627 | Contact phone (425) 869-2640 |
| Contact email faye@wrlawgroup.com | Contact email RodS@jshproperties.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

| 4. Does this claim amend one already filed? | ☑ No |
| --- | --- |
| | ☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____ |
| | MM  /  DD  / YYYY |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
| --- | --- |
| | ☐ Yes.  Who made the earlier filing? _____ |

Official Form 410                                    **Proof of Claim**                                    page 1

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

| | |
|---|---|
| 7. **How much is the claim?** | $_____ 58,392.68 . **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges  required by Bankruptcy Rule 3001(c)(2)(A). |

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Lease _____

9. **Is all or part of the claim secured?**

☑ No
☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____
**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☐ No<br>☑ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ 58,392.68 |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:* | |
|---|---|---|
| | | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    06/26/2023
                    MM / DD / YYYY

/s/ Faye C. Rasch
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Faye C. Rasch | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Attorney | | |
| Company | Wenokur Riordan, PLLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 600 Stewart St, Suite 1300 | | |
| | Number        Street | | |
| | Seattle, WA 98101 | | |
| | City | State   ZIP Code | |
| Contact phone | (646) 279-9627 | Email  faye@wrlawgroup.com | |