UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                      .      Case No. 23-13359-VFP
                            .
BED BATH & BEYOND, INC., .      M.L.K. Federal Building
et al.,                     .      50 Walnut Street, 3rd Floor
                            .      Newark, NJ 07102
            Debtors.        .
                            .      June 27, 2023
. . . . . . . . . . . . .   .      2:42 p.m.

        TRANSCRIPT OF DEBTORS MOTIONS [18,29,644,724,773]
             BEFORE HONORABLE VINCENT F. PAPALIA
             UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis LLP
                            By:  EMILY E. GEIER, ESQ.
                                 ROSS J. FIEDLER, ESQ.
                                 MICHAEL SLOMAN, ESQ.
                            601 Lexington Avenue
                            New York, NY 10022

For the U.S. Trustee:       Office of the United States Trustee
                            By:  FRAN B. STEELE, ESQ.
                            One Newark Center
                            1085 Raymond Boulevard, Suite 2100
                            Newark, NJ  07102




Audio Operator:             Mariela Primo

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For Sixth Street          Proskauer Rose
Specialty Lending, Inc.:  By:  DAVID M. HILLMAN, ESQ.
                          11 Times Square
                          New York, NY 10036

Ad Hoc Committee and      Glenn Agre Bergman & Fuentes
Bond Holders:             By:  ANDREW K. GLENN, ESQ.
                          1185 Avenue of the Americas
                          22nd Floor
                          New York, NY  10036

                          GREGORY S. KINOIAN, ESQ.
                          8-15 Elaine Terrace
                          Fair Lawn, NJ  07410

ZOOM APPEARANCES:

For Oracle America,       Doshi Legal Group
Inc:                      By:  AMISH DOSHI, ESQ.
                          1979 Marcus Avenue
                          Suite #210E
                          Lake Success, NY  11042

For the Committee of      Pachulski Stang Ziehl & Jones
Unsecured Creditors:      By:  ROBERT J. FEINSTEIN, ESQ.
                          780 Third Avenue, 34th Floor
                          New York, NY  10017

For Agua Mansa:           Allen Matkins Leck Gamble &
                            Mallory, LLP
                          By:  IVAN MARK GOLD, ESQ.
                          3 Embarcadero Center
                          12th Floor
                          San Francisco, CA  94111

- - -

# I N D E X

| **EXHIBIT** | **ID**. | **EVD**. |
|---|---|---|
| Mr. Tempke's Declaration | 44 | 45 |
| Mr. Roberts' Declaration | 51 | 51 |

4

1          THE COURT:  Okay, good afternoon.  It is Tuesday,

2   January 27, 2023.  This is the United States Bankruptcy Court

3   for the District of New Jersey and we are here on the court's

4   calendar in the Bed Bath & Beyond matter.  There was an agenda

5   and then I think recently filed was the notice of amended

6   agenda of matters.

7          MS. GEIER:  That's correct, Your Honor.  Good

8   afternoon, Your Honor.  Emily Geier, Kirkland & Ellis, on

9   behalf of the debtors.  We did file an updated agenda just

10  reflecting a couple of additional filings.  I think the further

11  advised order for the sale order was placed on file, so just

12  wanted to make sure that Your Honor had all the documents

13  reflected there.

14         THE COURT:  Okay.  So are you going to be presenting,

15  Ms. Geier, and going through the agenda or do you have any

16  matters to report before we get started?

17         MS. GEIER:  Yes, Your Honor.  I would love to give

18  just a brief update on sort of some of the progress that we've

19  been making in the efforts over the past even just a few days

20  since seeing Your Honor and maybe make a couple of initial

21  comments about one of the more interesting pleadings for today.

22         So yesterday, we had a very successful lease auction,

23  exceeded expectations in terms of the value achieved.  Probably

24  hundreds of APAs flying around at this point.  Today we'll see

25  the household name of Bed, Bath & Beyond preserved.

1          THE COURT:  Oh.

2          MS. GEIER:  With a buyer, Overstock.com, well-known

3  and reputable company that we know that the -- that the name

4  will be in very good hands and we'll be able to see this name

5  going forward in the future.

6          There will be several other of these transactions

7  here, but -- presented today, but tomorrow there's yet another

8  auction.  We'll be hearing from the Baby assets, so buybuy

9  Baby.  There'll be potentially a sequential auction where we

10  look at different sets of those assets and how they may

11  ultimately come together.  So we'll have a further update at

12  the next hearing, Your Honor.

13          But just wanted to highlight these points to say that

14  the company management advisors have been working at breakneck

15  speed to generate value and recovery for the statements

16  creditors and we're focused on getting a plan on file that's

17  listed and confirmed before the shotgun clock runs out in a

18  couple months.

19          THE COURT:  Well, that is great news and I'm very

20  pleased to hear that.  And I'm gratified, is the right word,

21  and that the name is being preserved is further gratification.

22          MS. GEIER:  Yes, we are absolutely thrilled as well,

23  Your Honor.

24          THE COURT:  That's very good news.

25  Congratulations --

1          MS. GEIER:  Thank you very much.

2          THE COURT:  -- on getting that done.

3          MS. GEIER:  I've successfully taken away all the

4    exciting news that my colleague was going to share, so please

5    react very surprised when he comes up.

6          THE COURT:  That's between you and --

7          MS. GEIER:  So additionally, at the last hearing, of

8    course, the parties presented a consensual substantially

9    uncontested final DIP order reflecting a settlement that

10   potentially shares recoveries with all creditors and really

11   puts us on a path to being the most efficient as we can in

12   reaching finality and closure in these cases.

13          In a particularly difficult case, such as this one,

14   Your Honor, I think my partner, Josh Sussberg, said it the

15   first day, unprecedented in his career on the insurmountable

16   difficulties that we faced.

17          It's not the consensus is the best path forward.

18   It's that consensus is the only path forward that we have.

19   Without it, the train falls off the tracks rather quickly.  And

20   we say that only to note that there have been recent

21   developments in the motion to reconsider filed at docket number

22   982.  I believe there's further advisements that actually

23   unseals the majority of that motion.

24          The debtors filed a response at docket number 1081,

25   but understandably, this has all been happening in the past 24

1 hours so we wouldn't expect Your Honor to have read a motion

2 that we filed -- or an objection that we filed just earlier

3 today.

4        Just a couple of quick notes so that you know where

5 the debtor's position sits on this.  The debtor will never

6 begrudge a party for protecting its own interests seeking the

7 rights that it needs to, to protect those clients.  But here,

8 we are quite confident that this is against the interests of

9 all creditors, including their clients in terms of the weights

10 of the precious resources that are being utilized even now,

11 that would be utilized to continue further going down this

12 road, the 30 million dollars in funds that the debtors worked

13 so hard to negotiate at the outset of these cases for the

14 protection of those administrative and party claimants and that

15 settlement for the sharing of proceeds.

16        So from our perspective, Your Honor, we cannot have

17 this cloud hanging over our heads for very long.  We'll defer

18 to the wisdom of this court as to how we proceed to resolve it.

19 We just want to note that we believe that the Ad Hoc Group has

20 had its opportunity to be heard, to object, to seek discovery.

21 They've had an opportunity granted by Your Honor to seek an

22 extension of the challenge period under the DIP order, which

23 they chose not to pursue.  Counsel successfully preserved that

24 right and stipulated on the record that it was the only right

25 that was preserved.

1          These issues alone make this motion improper,

2    untimely, procedurally defective.  I won't rehash the papers on

3    Rule 60(c), Section 364(e).  Surprised to say that this cake

4    cannot be unbaked two months into the case.  There's just no

5    excuses or justifications for such post-hoc relief and no new

6    evidence giving rise to a basis under 60(b) has been shown.

7          The Ad Hoc Group points to week one actual cash

8    results as demonstrating new evidence.  The debtors don't have

9    a crystal ball.  Ms. Etlin, our CRO [*sic*], she's the best in

10   the business, but even she does not have a crystal ball.  All

11   they had to do was ask for those projections week two and we

12   could have been here week three discussing about whether there

13   was something to be done or what -- you know, what the reasons

14   were there.

15         So that said, the debtors wanted to file papers today

16   specially and most importantly to make the record clear on

17   exactly why, how and for what reason those numbers differed

18   from projections to actuals.  We all take for granted that

19   there's a lot of unpredictability here as we transition through

20   the filing of a case.

21         The upshot of that very detailed variance report that

22   we shared with Your Honor is that while the cash went

23   positive -- and that's theoretically a good thing -- it is

24   largely the result of banking issues that caused late payments

25   to creditors and delayed opening of the separate reserve

1   accounts that we were supposed to have open much more quickly.

2          So the positive side of a slight uptick in sales,

3   that's not a basis upon which to rely to move forward on

4   contested cash collateral, you know, seeking to hope for the

5   best and get cash just to eke out one more day in the cases.

6   Moreover, the necessity of the DIP remains undeniable today as

7   it did then.

8          For all of those same reasons, the DIP preserved the

9   path to the going concern.  It preserves the path to payment of

10  administrative claims, which reaches finality in Chapter 11

11  plan confirmation.  These prospects would be gone without this

12  DIP approved on the first day and to ensure the debtors had

13  necessary funds to operate the business.  That immediate and

14  irreparable harm standard, Your Honor, we are well aware of and

15  we would not have sought a DIP financing order from Your Honor

16  on the first day had we not absolutely felt it necessary.

17         Was the roll-up our favorite feature of that DIP? No.

18  Of course not, Your Honor, but that was the hand that we were

19  dealt and we were fortunate to get a lot of great concessions

20  from the DIP lenders in that regard and the Committee finished

21  the job getting additional concessions through the final DIP

22  order.

23         So, Your Honor, we stand here just to simply say that

24  the motion that was filed contains a series of mistakes and

25  mischaracterizations that don't merit the estate resources

1  spent.  There was an unfortunate, whether inadvertent, not

2  interested in the motives as -- right now as to why

3  confidential information was publicly shared on the docket, but

4  that was harmful to the debtors.  It is something that could

5  threaten the value of the estate's.  We are in the middle of

6  asset monetization.  That is absolutely not helped by that kind

7  of disclosure.

8          But we just wanted to make your position -- our

9  position clear and we'll defer to Your Honor in terms of the

10  best ways to proceed from here.

11          THE COURT:  Well, I mean, I was thinking we were

12  going to deal with that last because it might be the longest,

13  but if you want to deal with it now, we can deal with it now.

14  I had -- I had a thought or two, but I was interested in what

15  the parties' thoughts were because -- and I need to say this

16  preliminarily is that I had trial yesterday all day from 9:30

17  till after 5:00.  And I also just received that motion and, you

18  know, wasn't expecting to receive that motion and I reflected

19  that in the order shortening time.

20          But I did not read the entire motion.  I didn't read

21  the motion at all.  I read the application to shorten time and

22  the order shortening time because that is all the time I had

23  yesterday in the trial.  And I saw that it was a motion for

24  reconsideration, but it was based on what happened here on

25  June 14th where I said they could ask for an extension of the

challenge period by requesting it by a letter on June 25th.

And I assume -- since it referred to that specifically, I guess

I assumed that that was somewhere in the papers that were being

submitted, but I made a wrong assumption because it wasn't

there.  It was -- there was no request to extend the challenge

period which, as I recall, was what the Ad Hoc Bond Holders

Committee said was the only thing they were asking for in that

order.

And that's why I did what I did because I think -- I

looked at -- actually, I looked at the order that was presented

and it said "vacate the DIP orders" and I said, wow, this is

completely beyond what anyone was contemplating on June 14th.

And not saying that parties, like you said, can't file motions

that they believed were appropriate.  I'm not saying that at

all.  It's just it caught me by -- it caught me by surprise.

And I said, boy, you can't file that kind of motion on two

days' notice and expect people to deal with it.

But then I got the reply from the lenders and the

debtor and then I read the motion and I -- and I saw that it

was actually to vacate the orders.  The was the relief that

was -- the DIP orders.  That was a relief that was being

sought.  So I made a bit of a mistake on the order shortening

time in the sense as developed by the facts because if the

parties -- I thought it was too much to ask in that short of a

time period and whatnot.  Not at all what was contemplated to

12

1 happen in that short period and that was kind of my visceral

2 reaction.

3          But now having read the papers and, more importantly,

4 that, you know, you started it off that way and the lenders --

5 lender objected, Sixth Street objected immediately, the debtor

6 filed something this morning, that's who I was concerned about,

7 and the Creditors' Committee, of course, and the Creditors'

8 Committee hasn't submitted anything.  And if you guys are

9 prepared to proceed on the shortened -- extremely shortened

10 time period requested by the bond holders, then that's

11 something we've got to think about and figure out how to deal

12 with that.  That's my initial -- that's my initial reaction.

13          I know that a lot of these things were done on the

14 fly and -- not on the fly, but were done quickly.  Correct

15 myself.  Were done very quickly and, you know, maybe like I

16 didn't see any -- there was a -- I guess there was one

17 certification that I saw, but I'm also very extremely concerned

18 about the progress of the case and I don't want to hold things

19 up, so I'm willing to do this really quickly, but I just need

20 to know what the parties think about it, what record I need to

21 do it on.

22          I will tell you what my initial thought was without

23 even asking you.  My initial thought was there's a lot of facts

24 that I saw in here and I'm sure each party thinks they can back

25 up those facts as best they can, but I'm willing to completely

13

1   adjust my schedule and get it done, have a hearing.  The -- you

2   know, the debtor's response had a lot of facts in it and you

3   have a lot of experts and maybe one or two of those people can

4   come up and say, this is why we did this, this is -- we

5   couldn't have predicted this; we didn't know whatever was going

6   on.  And the bond holders can put their facts in and I'll get

7   you a quick decision.  I'll get you one before the end of this

8   week.  That's my goal and that way we can continue.  That was

9   what I thought.

10          Unless parties think that -- unless parties think it

11  can be done or should be done more quickly, I don't know how

12  much more quickly it can be done than that, to be honest, but

13  if there's -- somebody has a better idea I'm willing to listen

14  to it, but this is too important of an issue and too -- you

15  can't have the kind of overhang that we're talking about for

16  any extended period of time.  So I want to get it done quickly.

17  I want to decide quickly.  Some people are going to think I'm

18  right, some are going to think I'm wrong, but I want to get it

19  done quickly.

20          MS. GEIER:  Think you're right.

21          THE COURT:  I guess Mr. Hillman was rising.  I don't

22  know who was rising first, Mr. Feinstein, Mister --

23          MR. KINOIAN:  Well, Your Honor --

24          THE COURT:  I don't really care.

25          MR. KINOIAN:  It is our motion, so I was kind of

1  taken aback --

2          THE COURT:  I'm sorry, I thought you were -- you're

3  Mr. Kinoian.

4          MR. KINOIAN:  Yes, Your Honor.

5          THE COURT:  Yeah, yeah.

6          MR. KINOIAN:  I was kind of taken aback just --

7          THE COURT:  I had you mistaken for Mr. Hillman.

8          MR. KINOIAN:  You know, started on our motion when it

9  was our motion, so --

10          THE COURT:  Yeah.

11          MR. KINOIAN:  To specifically address these concerns

12  that Your Honor has just raised -- and I hope you don't mind if

13  I'm not going to ask counsel to cede the podium, I'll just

14  state it from here -- is that our application for shortening

15  time, which specifically did reference Your Honor's -- the

16  June 14th hearing when Your Honor directed us to submit

17  something requesting an extension of the challenge deadline,

18  that was the purpose of that paragraph two in our -- the

19  application for shortening time, docket 984.

20          THE COURT:  But you didn't ask for it.

21          MR. KINOIAN:  That's what it was intended for, Your

22  Honor.

23          THE COURT:  Yeah.  I just don't -- I'm -- like I

24  said, I don't hide stuff.  That doesn't -- that was just really

25  surprising to me.  I was -- I didn't understand it.  I just

1 didn't understand it, but --

2      MR. KINOIAN:  So we accompany --

3      THE COURT:  But here we are.

4      MR. KINOIAN:  So, Your Honor, when they talk about

5 prejudice with the overhang, it was certainly contemplated

6 under the terms of the final cash collateral order -- I'm

7 sorry, the final DIP financing order and, as discussed during

8 the June 14th hearing, was that the challenge deadline could on

9 an outside date get extended to July 4th.

10      So what we would contemplate, Your Honor, is that we

11 could have a hearing on the motion to dismiss before the week

12 is out.  We could ask Your Honor's ruling before the week is

13 out and --

14      THE COURT:  There's a motion to dismiss also?

15      MR. KINOIAN:  Excuse me?

16      THE COURT:  There's a motion to dismiss also -- the

17 motion for reconsideration, right?  That's -- yeah.

18      MR. KINOIAN:  Yeah.  We -- we could have a

19 preliminary hearing before the week is out.  We would like to

20 request discovery on these issues because they're -- you know,

21 we -- not to get too caught up in the facts of the case, Your

22 Honor, but the fact of the matter is the Ad Hoc Bond Holder

23 Group had requested this information on day two and was not --

24 on day two of the case and was not provided the information.

25 We solicited a request for a confidentiality agreement back

1  then, was not provided with that.  It wasn't until I think it

2  was, you know, May 26th that we finally entered into the non --

3  the confidentiality agreement that currently exists between the

4  parties.

5          So it wasn't until the discovery that Your Honor

6  essentially directed the parties to produce to us after the

7  June 14th hearing that we then learned about the information

8  that is now the basis of our motion for reconsideration.

9          So, Your Honor, you know, for them to say, well,

10  they've known about this forever, you know, they've had an

11  opportunity to be in the case, the fact of the matter is, Your

12  Honor, we'll be -- we would be able to produce emails that show

13  that we have been requesting information and had been ignored.

14  Not only were we requesting information from the debtor, but we

15  were requesting information from the Committee and we were not

16  being provided that information.  And we are a party in

17  interest and then all of a sudden, you know, a day before the

18  June 14th hearing these parties announce that there's this

19  global settlement and it doesn't involve the largest unsecured

20  creditor in the case.  So -- creditor group, I should say, in

21  the case and that's where we are.

22          So we should be entitled to discovery on this and if

23  the parties feel that they're prejudiced by, you know, some

24  overhang on this case, well, you know, that's just a matter of

25  them not having been candid with the court back at the time of

1  the -- of the interim order being entered and not being candid

2  with the parties at the time that they announced this

3  settlement --

4          MS. GEIER:  Your Honor --

5          MR. KINOIAN:  -- that was brought to the --

6          THE COURT:  Well --

7          MR. KINOIAN:  -- Court's attention on June 14th.

8          THE COURT:  Mr. Kinoian, that's the kind of thing

9  that I was talking about is that, you know, if you think they

10 were not being candid, you have -- you said that.  You said it

11 now, you said it in the papers, and, you know, that's one of

12 the -- I'm not doing any preliminary hearings.  I'm getting

13 this done.  I'm getting this done.  There's no reason for any

14 preliminary hearings.  What does that mean?

15         MS. GEIER:  Yeah --

16         MR. KINOIAN:  Your Honor, we should be entitled -- we

17 should be --

18         THE COURT:  What does a preliminary hearing mean?

19         MR. KINOIAN:  -- entitled to --

20         MS. GEIER:  And, Your Honor, if --

21         MR. KINOIAN:  They're disputing the facts.  We should

22 be entitled to discovery on these facts, Your Honor.

23         THE COURT:  Okay.

24         MS. GEIER:  We can very clearly share our emails, of

25 course, that show the first reach-out weeks after the first day

1  hearing.

2          THE COURT:  Okay.

3          MS. GEIER:  We can share all of that.

4          THE COURT:  Well, that's what I'm saying.

5          MS. GEIER:  And that's fine.  And there -- the

6  indenture trustee is a member of the Committee, who agreed to

7  this settlement and we all know those facts.

8          THE COURT:  That's what I'm saying.

9          MS. GEIER:  Those facts we -- we can happily address,

10 but we all know, Your Honor, that if a debtor or any other

11 party isn't being candid with an entity, they can, of course,

12 always seek formal discovery.  I disagree with the comments

13 that were just made by counsel, but we know that there's

14 another path, so just claim impossibility as to what the --

15 what the DIP need was as reflected in week two, I think we are

16 just beyond the bounds of reasonable inquiry.

17          Your Honor, I think we're prepared to do what we need

18 to put on the record that we can today to dispense with this

19 hearing.  We believe that it can actually be decided on legal

20 argument, probably as a threshold matter.  I believe -- I think

21 that was reflected in the papers, including the DIP lender's

22 papers that, you know, they were hoping to address these

23 threshold issues first.  But, Your Honor, we do have our chief

24 restructuring officer in the room that can respond to the items

25 that were in our filed papers.  There's no need to extend this

1  longer than absolutely necessary.

2          THE COURT:  Um-hum.  Well --

3          MR. KINOIAN:  Your Honor, may my co-counsel be heard?

4          MR. GLENN:  Your Honor, Andrew Glenn for the record

5  on behalf of the Bond Holders Committee.

6          Your Honor, we heard about the DIP budget the day

7  before the interim DIP hearing.  We heard about the wind-down

8  budget that disclosed the results that formed the basis of the

9  motion to vacate the day before the final DIP hearing.

10         Now we're being told Your Honor should decide our

11  60(b) motion on one day's notice when Your Honor hasn't even

12  had a chance to review the papers.

13         THE COURT:  No, I have.

14         MR. GLENN:  Okay.  Thank you.

15         THE COURT:  I have.  I said I didn't review them

16  before the --

17         MR. GLENN:  Okay.  Fair enough.

18         THE COURT:  I didn't review --

19         MS. GEIER:  And --

20         THE COURT:  -- the entire motion before I signed the

21  order shortening time, but now I have reviewed all the papers.

22         MR. GLENN:  Fair enough.  Thank you.

23         And so our point is this.  If we're going to do this,

24  let's do it fairly and let's do it correctly.  Let's have that

25  evidentiary hearing.  It's not appropriate to bring a witness

1  in court without giving us the opportunity to conduct discovery

2  and that's all we're asking for here.  We haven't even had the

3  chance to have formal discovery.

4          My declaration that I submitted, thank you very much

5  to the debtor, was they made Ms. Etlin, who I know, available

6  for informal interviews.  This wasn't a formal discovery

7  process.  This is the game-changing moment in this case, Judge.

8  We don't think our recovery is going to be anything meaningful

9  in this case because of what happened on the first day.  I

10  would love to be wrong.  I would love to be wrong, but that's

11  where we are today.

12          So I would like for one time in this Chapter 11 case

13  to have actual due process, discovery and evidentiary hearing

14  before the Court.  If they're right and they prove it to me,

15  you won't even see me, but I should have that right.

16          MS. GEIER:  Your Honor, we would be happy to share

17  within the provisions of the Rules that provide for how

18  discovery is sought.  In 2004 examinations, it's very clear.

19  We've had them served on us in each case.  There's no lack of

20  due process.  He's been at every hearing since the first day.

21          THE COURT:  The due process is based on the

22  circumstances and so I'll consider all the circumstances.

23          MS. GEIER:  Fair.

24          MR. HILLMAN:  Good afternoon, Your Honor.

25          THE COURT:  Good afternoon.

1           MR. HILLMAN:  David Hillman for the record, Sixth

2   Street Specialty Lending as prepetition agent and DIP agent.

3           We were as surprised as you were.  We moved fast to

4   get you papers.  It is absolutely critical that we have a path

5   forward expeditiously and I heard you loud and clear and I am

6   very appreciative that you will address this with due speed.

7           I have a proposal that I think makes sense.

8           THE COURT:  I'm willing to listen.

9           MR. HILLMAN:  I believe that there are several

10  threshold issues that don't require you to make findings of

11  fact that could be determined as a matter of law as to whether

12  or not this reconsideration motion could ever be approved.  I

13  do not believe that there are any facts that could be developed

14  to support that motion, so I would like the opportunity.  And I

15  don't think that that will take every long to make the

16  threshold argument.  Some of them are in the text of Rule

17  60(b).

18          For instance, I'll just point one out.  Rule 60(b)

19  says that you can seek reconsideration of a final order, as you

20  know.  You may have seen paragraph 36 of the reconsideration

21  motion where interestingly it deletes the word "final" and does

22  an ellipses with the word "an order."  The text of Congress's

23  statute is clear of Rule 60(b).  Only final order.  So right

24  there they ask you to vacate the interim order.  The statute

25  they cite doesn't give them a basis.  Those are the types of

1  legal issues -- and there are several.  We've outlined them in

2  our letter.

3       You're dealing here with -- and I don't want to be

4  overly dramatic, but this is systemic risk.  Right.  This is a

5  cloud here to allow a party 63 days after the interim order was

6  entered, after the DIP lenders have advanced 40 million of new

7  funding, 54 million on the eve of bankruptcy, agreed to allow

8  36 million of cash to fund reserves to have the rug pulled out

9  from under them.

10      I know you know this, but every hearing is the press

11 is here.  I mean, *The Wall Street Journal*, the reorg researches

12 of the world, the bankruptcy blogs.  The capital markets need

13 to know that this can't happen.  So this would wreck havoc on

14 Dip lending.

15      So having it done swiftly today starting with

16 threshold issues I think makes the most sense.  And if we

17 haven't convinced Your Honor, and I am confident that I will be

18 able to live up to this burden, that you can't dismiss this

19 just on legal issues.  And the only one who has to make that

20 decision is you and we pivot and we stay here until as long as

21 it takes and I appreciate you say this week to get it done.

22 They've asked for to get it done fast.  I heard you say, Your

23 Honor, that you were concerned we couldn't move fast enough.

24 We are here to resolve this because of the extreme importance.

25      I'll note that there are implications in here.  For

1  instance, we thought we were dealing with an extension of the

2  challenge period and we have reserves that are supposed to be

3  released on certain dates and there's no scenario where I will

4  agree to any release of the reserves, which are funding WARN

5  payments post -- wind-down payments, priority payments.  That

6  is an extreme prejudice.  I can't let that happen today, so I

7  want to address that issue which I think --

8           THE COURT:  But Mr. HIllman, I'm sorry to interrupt

9  you, but I'm just -- I didn't say the threshold issues.  I was

10 going to limit the factual presentation to the threshold issues

11 because there are a lot of facts that are said in the papers

12 that, you know, the bond holders take issue with, so -- but

13 they already take issue with them.

14           So that's why I'm more feeling, again just putting it

15 on the line, that we need to just address the threshold legal

16 and some of which are factual or mixed -- legal and factual

17 issues.

18           MR. HILLMAN:  Okay.

19           THE COURT:  To -- before getting into the complete

20 underlying merits of what the basis for the reconsideration

21 motion is and to do it very quickly because --

22           MR. HILLMAN:  I'm ready to do it right now.  Right

23 now.  The debtors, I assume, are prepared to address the legal

24 issues, threshold issues right now.  I assume Mr. Glenn, who

25 wanted to have his motion heard, can at least articulate the

1   legal issues right now.  We'll go through them one by one and

2   if Your Honor thinks there's enough for further hearings, then

3   we're going to stay here and get it done at your --

4   whatever Your Honor says is --

5           THE COURT:  Yeah.  Well, I mean, I think that -- I

6   think that, again, in fairness it's 3:00 today and there was

7   the -- in my mind, the initial confusion as to what exactly was

8   going to happen today and I thought we would talk about -- for

9   example, there's the motion to seal and there's -- as you said,

10  there's a lot of people that are interested in this.  And I

11  don't understand how -- I'm not clear -- not that I don't

12  understand.  I'm not clear on how that's going to work in this

13  context --

14          MR. HILLMAN:  Yeah.

15          THE COURT:  -- because, you know, there was -- there

16  was inadvertent, I believe, you know, disclosure of what was

17  supposed to have been confidential information, but I'm not

18  sure how -- some of it I saw in the papers that were coming

19  back at me, so I'm not sure how much of it really is

20  confidential, but I think we just need to -- that was my

21  thought.  My thought was -- you fleshed it out.  I didn't say

22  enough.  You -- I said -- I said I wanted to get going this

23  week and even as soon as tomorrow, but that -- to address the

24  threshold legal issues, which I believe, sir, are informed by

25  facts that are disputed and I need to make the call --

1          MR. HILLMAN:  Yeah.

2          THE COURT:  -- on those.  In order to make a complete

3   call, I need to -- for -- you know, for example, whether it's

4   newly discovered or they couldn't have -- they couldn't have

5   discovered it, you know, I know what your argument are and that

6   really what they say goes beyond that in the sense that it is

7   what they're saying is that you knew about it and you didn't

8   disclose it, you and the debtor, and all that.  And you know, I

9   want to hear about it.

10         And I think those issues are really out there.

11  They're here now.  They're front and center.  I think -- I

12  think, you know, people know what the issues are and they

13  define them in briefs that -- not yours, but the others that

14  extend, you know, 20 or so pages, so --

15         MR. HILLMAN:  Right.  But my -- I -- we'll defer to

16  exactly how Your Honor suggests.  The only thing I would say

17  is, you know, regardless of the facts, for instance, 60(b) says

18  what it says.  You can rule right now that you can't use 60(b)

19  to undo the interim order.  You can rule right now that you

20  can't use a reconsideration motion to eviscerate 364(e).  You

21  can't rewrite the Code.

22         THE COURT:  They said you didn't do it in good faith,

23  sir.  They said -- they're saying you're not proceeding in good

24  faith.

25         MR. HILLMAN:  In --

1              THE COURT:  That's what they're saying.

2              MR. KINOIAN:  Your Honor, if I may --

3              THE COURT:  Just let them have their little

4    discussion and then --

5              MR. SUSSBERG:  Good afternoon, Your Honor.

6              THE COURT:  Good afternoon.

7              MR. SUSSBERG:  Joshua Sussberg, Kirkland & Ellis, on

8    behalf of the debtors.  I would like a full trial.  We've been

9    questioned by -- I don't even know who he is.  He's calling us

10   non-candid.

11             THE COURT:  I mistook --

12             MR. SUSSBERG:  Feinstein --

13             THE COURT:  -- Creditors' Committee, sorry.

14             MR. SUSSBERG:  questioning our good faith.  We're

15   going to put our witnesses on the stand.  We're going to

16   demonstrate our good faith and demonstrate our good name and

17   have a full fair trial and actually get to where Mr. Glenn said

18   he didn't want to be, but somewhere not here because there's no

19   "there" there and we want to demonstrate that to Your Honor.

20   We're happy to do it as soon as tomorrow.

21             THE COURT:  Let's do it.

22             MR. SUSSBERG:  Good.

23             MR. GLENN:  I object to that.  Your Honor, so what we

24   have here is a letter without any affidavit support where

25   they're going to tell the court what evidence they're going to

1  put on the stand.  Okay.  I've interviewed Ms. Etlin.  Do I

2  have one email from the debtors?  Do I have one email from

3  Sixth Street?  We asked for them to produce documents.  They

4  said, we're not going to give you anything.

5          So tomorrow I'm going to put -- they're going to put

6  a witness on the stand.  I get to cross-examine that witness

7  and I have no discovery, no evidence, no deposition, no

8  documents?  We're just compounding the due process issue.

9          I spoke to -- I want to be very clear with the Court.

10  Okay.  Kirkland was very gracious.  They made Ms. Etlin

11  available to me.  Okay.  I, Andrew Glenn, have not accused

12  Kirkland or Ms. Etlin or even Sixth Street of any intentional

13  misconduct.  Okay.  I want to make that very clear.  Okay.

14          But what I did gather from those interviews was a

15  fast-moving, fast-developing situation where they filed the

16  case on Sunday night and the Court heard the DIP hearing on

17  Tuesday and during that very compressed period things changed.

18  Things changed.  And those were not disclosed not because they

19  were hiding the ball necessarily.  I don't know.  They haven't

20  given me one email.  How could I possibly tell the Court that

21  they've done that?  I don't know.  But I am entitled to Rule 34

22  document production to understand that.

23          And you know what?  Mr. Sussberg and I know each

24  other.  Okay.  Maybe we go to a conference room at Kirkland and

25  we have that conversation tomorrow.  Maybe this is all

1 explained to me, but what I understand happened is that the

2 company at least knew about the blow-out sales weekend right

3 leading up to the filing and it changed things.  Okay.  And

4 what wasn't disclosed on day one, not necessarily for nefarious

5 purposes or whatever, was how much cash the company had.  Okay.

6 We were told that there was a 30 million-dollar hold.  That

7 creates the emergency where I think Your Honor would have the

8 basis, as you did act, to approve the final DIP.

9        Now, I told them over the weekend what we're going to

10 do after the series of interviews.  I said, you know what, the

11 Pachulski firm did their job.  There's a couple issues with the

12 make whole.  We looked at the perfection documents.  They're

13 perfected.  But what happened right before that hearing was the

14 disclosure of the actual DIP budget that -- performance for the

15 first time.  And so I told them we're going to move to

16 reconsider in advance.  I told Kirkland we're going to do it.

17 They sent me a letter, filed it under seal.  I instructed

18 Mr. Kinoian to file everything under seal so we wouldn't have

19 this fight.  Yes, that was a regrettable event.

20        But Mr. Hillman and I discussed he's going to Europe

21 for a vacation.  He said, "Let's not do this hearing until I

22 get back."  Fine.  There wasn't an urgency over the weekend

23 when he told me that.  This is a liquidation.  This is a

24 liquidation.  There's no overhang on this case.  They're going

25 to follow through with the liquidation if I win this case or if

1  I lose this case.  Let's do this right.  Let's have more

2  informal discovery which Mr. Sussberg has offered.

3       Failing that, I want documents.  I want the emails

4  between them.  I want their analysis of the cash going into

5  this case and I want the opportunity to depose these witnesses

6  before they take the stand before the Court as due process in

7  the Federal Rules of Civil Procedure allow.  Thank you.

8       THE COURT:  Sir, I'm looking at the application to

9  shorten time and it says, you want a hearing on the motion for

10 reconsideration today actually at 10:00 a.m.

11      MR. SUSSBERG:  Well, we were -- we're in a bizarre

12 procedural conundrum, Your Honor, and that conundrum is, as you

13 described.  You were expecting a letter.  I thought I might

14 send you a letter.  This is a different procedural construct

15 than what we discussed.  We were trying to fit within the

16 deadlines.  Okay.  We're not here -- we were never here.  I

17 talked to Mr. Hillman about this.  We didn't intend to have a

18 hearing before the court today.  We had it -- we intended to

19 have a hearing on the motion to seal today.

20      THE COURT:  Um-hum.  So Mr. Sussberg, is it a problem

21 to get him those emails and whatever documents you're going to

22 present to your witnesses?

23      MR. SUSSBERG:  Yes, we'll get them all the documents

24 and we'll do it quickly.  We do want this resolved as quickly

25 as we can.

1          THE COURT:  Okay.

2          MR. GLENN:  So, Judge, why don't you allow us the

3    opportunity to meet-and-confer over the next 24 hours to see if

4    we can come up with a resolution that works for us and

5    hopefully rather than arguing about this in front of you?

6          THE COURT:  Okay.

7          MR. HILLMAN:  Your Honor, David Hillman.  Only

8    because Mr. Glenn decided to bring me into this discussion, he

9    did send an email to me asking for documents.  I sent him an

10   email back.  I said, "What's the legal basis?"  He never

11   responded because he didn't have a legal basis.  He never -- he

12   never sought discovery.  Could have.  Never sought discovery,

13   never filed an objection to the initial DIP motion, final DIP

14   motion.  We all know what -- how contested matter discovery

15   works.  You file a motion.  You're entitled to 9014 discovery.

16          Never did that.  Could have done that.  Never filed

17   the request for 2004 -- or, in fact, I think in this

18   jurisdiction you may even have an ability to take 2000 -- never

19   sought to do that.

20          THE COURT:  No motion needed.

21          MR. HILLMAN:  Okay.  So it's not some surprise that

22   we're here and the thought that we should now stop the process

23   to have discovery is backwards.  He asked for it.  You -- I did

24   say to him that I'm leaving the country on Saturday.  Your

25   Honor said you're available to have this resolved before

1 Friday.

2       I think if this cloud continues it will be a big

3 mistake and I would urge the Court to please to stick with the

4 schedule.  Let's start today.  Let's start tomorrow.  This

5 notion of some deprivation of due process, that's made out of

6 whole cloth.  Thank you, Your Honor.

7       THE COURT:  Thank you.  Well, I think it's -- like I

8 said, I think it's fair to give him -- give Mr. Glenn, the bond

9 holders, the information that's going to be relied on in -- not

10 the affirmative case.  And really, it's their case.  The truth

11 is, it's their motion and it's really their case, but in -- in

12 this circumstance it's kind of somewhat flipped in a way.  But,

13 you know, it's their case.  They can -- you know, and if they

14 have something that they're going to rely on that's not in the

15 possession or control of the debtors, then you should give it

16 to them also and --

17       MR. FEINSTEIN:  Your Honor, could I be heard briefly

18 for the Committee, please?

19       THE COURT:  I'm sorry?

20       MR. FEINSTEIN:  It's Robert Feinstein, Your Honor.

21 May I be heard briefly for the Committee?

22       THE COURT:  Okay.  I thought you were here.  I'm

23 sorry.

24       MR. FEINSTEIN:  Yeah, I'm not sitting at counsel

25 table.  I'm on Zoom today.  Thank you, Your Honor.

1          Your Honor, I just want to point out one of the

2     predicates for the committee's settlement with the lenders and

3     with the debtor was to avoid the friction costs of the heavily

4     contested matter, discovery, trial proceedings in a case that's

5     already desperately thin.  So we're concerned about setting

6     this on a path of open-ended discovery and a trial and so forth

7     because it's just going to erode the estate in a significant

8     way.

9          And I think there are threshold questions, Your

10    Honor, at least from the Committee's perspective, that I think

11    should be addressed before we embark on that expensive course.

12    And specifically, from our perspective, Your Honor, the ad hoc

13    noteholders were in the courtroom on the first day when the

14    roll-up was approved and we've all agreed that was a

15    controversial thing.  It was tough on the unsecured creditors.

16    I watched it from a distance because we had no client at the

17    time.

18         But Mr. Glenn's partner was in the courtroom, knew

19    that there was a roll-up, and knew from Mr. Hillman's speech

20    that this was permanent, that this was not subject to being

21    rolled back.

22         So to conclude the hearing by saying nothing on this

23    issue is surprising to us.  What they've said was, we reserve

24    our rights.  And then from that -- the date of that hearing

25    through the end of May from the Committee's perspective, we

33

1  never heard from them, not an informal request, not a formal

2  request and, as somebody just noted, we all know the Bankruptcy

3  Rules.  If there was an issue about the entry of the interim

4  order, something that could be raised in the context of the

5  final order, let's start discovery.  The Bankruptcy Rules

6  provide for it, there's ample time to do it and yet there was

7  no discovery served.

8      And then you have the final hearing where, again, the

9  ad hoc lender's counsel showed up and essentially consented to

10 the entry of the final order so long as it contained the

11 corridor for them to extend the challenge period.  So, like

12 everybody else, we were surprised when the challenge request

13 didn't come but instead we got a reconsideration motion to

14 vacate both orders.

15     Because no objection was filed, Your Honor, one of

16 the threshold issues in our mind is, how can you move to

17 reconsider an order that you didn't object to.  That's both the

18 interim order and the final order and, again, the counsel for

19 the group was in the courtroom on both occasions.

20     So if the consequences of that can be determined on a

21 threshold basis, I don't think you ever get into who's and

22 what's to whom about the budget because there was more than

23 adequate due process.  In fact, the ad hoc noteholders had a

24 better chance than the Committee to avoid the roll-up because

25 they were in the courtroom on the first day, but they didn't

1  say anything.

2          So I -- to me, these are gating issues, Your Honor,

3  that if they're disqualifying to a reconsideration motion, like

4  lack of standing if you didn't file an objection now you move

5  to reconsider, we might save ourselves a lot of time and money.

6  The Committee's goal here was to save expense and try to

7  maximize value through a settlement that we still support

8  because it was the right thing based on the facts that -- on

9  the ground on the first day of the case when things were

10 uncertain.  So it'd be -- you know, have it second-guessed by

11 2020 hindsight by somebody who didn't object and had all this

12 opportunity to take discovery really is unfortunate, Your

13 Honor.  That's all I'll say.  Thank you.

14         THE COURT:  Okay.  All right.  It's telling me to

15 join audio.  I'm not sure why.

16         Yeah.  I think there has been a lot of opportunity

17 for discovery in this case and whatever -- for whatever reason

18 it didn't happen.  And I am concerned about the costs, but I'm

19 also concerned about having a hearing at -- that is on a full

20 record, so I'm -- that's what I'm going to do.  You can confer

21 between today and tomorrow at 10:00 when we will gather here

22 again and I'm not -- it's not going to be a long, drawn out,

23 you know, days-on-end hearing.  It's going to be hopefully

24 concluded within the day or if it has to spill over to

25 Thursday, then it spills over to Thursday a little bit.  But,

1  you know, keep your witnesses short and sweet and we'll get it

2  done.

3          MR. HILLMAN:  Your Honor, I rise.  I appreciate the

4  speed.  There's two points.  One, I'm going to call

5  housekeeping, one is substantive housekeeping.  I want to make

6  sure that the reserve release date, as defined at paragraph 10,

7  does not happen until at least we continue for the hearings,

8  hopefully that get resolved.  So I would ask with the debtor's

9  permission that we all agree on the record that the reserve

10 release date is extended for at least one more day and then we

11 can determine what happens at the end of the day.

12         MS. GEIER:  Your Honor, Emily Geier for Kirkland on

13 behalf of the debtors.  The debtors can agree to the extension

14 of the release date.  We don't want to, you know, hold that and

15 over the heads of anyone.  It's not an uncapped extension, just

16 to be clear, Your Honor.  It will just continue until this

17 hearing has concluded.  If we need to discuss it further after

18 that, we can gauge further.

19         THE COURT:  Okay.

20         MR. HILLMAN:  Thank you.

21         THE COURT:  I appreciate that.

22         MR. HILLMAN:  And now in the substantive point, I'd

23 like to make an oral motion.  I recognize there's going to be a

24 hearing tomorrow.  Rule 60(b), what they moved under only

25 allows for reconsideration of final orders.  That's in the

1  text.  They have sought to reconsider using Rule 60(b), both

2  the interim order and the final order.  Based on the Rule --

3  the text of the plain language I would ask that the motion be

4  dismissed as it relates to the interim order and we can come

5  tomorrow at 10:00 to deal with reconsideration of the final

6  order.  That's my narrow oral motion for the Court's

7  consideration.

8          THE COURT:  I think -- didn't they cite a case or two

9  that says that you can reconsider the orders on -- even interim

10  orders on -- or non-final orders under 60(b)?  And I just

11  haven't had a chance to review it.  I know it says that --

12          MR. HILLMAN:  Well --

13          THE COURT:  I know that it says that.

14          MR. HILLMAN:  Oh, I'm not -- I don't believe that the

15  Ad Hoc Group has suggested that Rule 60(b) applies to interim

16  orders.

17          MR. KINOIAN:  Your Honor, if I may.  Again, Gregory

18  Kinoian for the Ad Hoc Bond Holder Group.

19          Your Honor, paragraph 4 of the final order is very

20  clear that upon approval of the final order it also reapproves

21  the interim order.  So essentially the interim order gets

22  rolled up into the final order.

23          So basically what counsel is saying is that if we had

24  tried to file a 60(b) motion on day two, they would have argued

25  that it's not a final order and that we would never have been

1   able to bring this information to Your Honor's attention.

2            THE COURT:  Okay.  All right.

3            MR. HILLMAN:  I didn't hear him say that you could

4   use 60(b) to reconsider an interim order, so I stand on the

5   motion and I didn't hear any explanation of why the words of

6   the statute don't say what they mean or any authority in any

7   case to stand for that proposition that the word "final" should

8   be restruck -- excuse me, struck from Rule 60(b), the statute

9   they rely upon.

10           THE COURT:  Yeah.  I just -- like I said, I want to

11  just -- I want to do this on the full record.

12           MR. HILLMAN:  Thank you, Your Honor.

13           THE COURT:  I appreciate your motion and oral motion,

14  but I just want to -- like I said, I had trial yesterday.  I

15  had motions this morning and I was trying to read these papers

16  and I just want to have an opportunity myself to satisfy myself

17  that this is being done correctly.

18           MR. HILLMAN:  Thank you.

19           MR. GLENN:  Your Honor, I just want to understand

20  your ruling.  So we're going to meet and confer.  What is your

21  expectation in terms of the timing of discovery and the

22  presentation of witnesses to Your Honor?

23           THE COURT:  My expectation is that you will talk to

24  Mr. Sussberg or whomever, Ms. Geier, whoever it is that you

25  need to talk to and exchange the documents that you're looking

1  to -- that you're looking to rely on tomorrow and then you can

2  put on your case and they can put on their case and that's

3  where it will go.

4        MR. GLENN:  Okay.  I'm just going to note for the

5  record my objection to that.  I would like to get all the

6  communications underlying what they're going to present.

7  Otherwise, I'm stuck cross-examining them on what they want to

8  present, which is not fair to me.

9        THE COURT:  I think there's an argument, sir, that

10  I'm giving you more than you're entitled to because you could

11  have asked for this 60 days ago.

12        MR. GLENN:  I --

13        THE COURT:  Okay.

14        MR. GLENN:  -- respectfully disagree, Judge.  This

15  information came out on the eve of the last hearing and --

16        THE COURT:  The result of all -- of the debtor's

17  results came out on the eve of the last hearing?

18        MR. GLENN:  Eve of the last hearing.

19        THE COURT:  Okay.

20        MR. SUSSBERG:  Judge, we're absolutely going to

21  confer with Mr. Glenn.  We'll get him the documents and we'll

22  be ready to go tomorrow.  Thank you, Judge.

23        THE COURT:  Does 10:00 work for everyone?

24        MR. HILLMAN:  Anything that works for Your Honor

25  works for us, Your Honor.

1          MR. GLENN:  We'll make it work.  Thank you.

2          THE COURT:  Okay.  Thank you.  All right.

3          So I don't -- Mr. Hillman raised a substantive issue

4    that I have -- I think is a substantive issue is what happens

5    with the seal.

6          MR. GLENN:  I believe that issue is now largely moot

7    because we've agreed on the redaction of certain items.  I

8    think by tomorrow one of those issues is the ultimate

9    disposition of the leases.  I don't -- I couldn't speak as to

10   whether that now can be disclosed, but I think that was of

11   the -- you know, the value of the lease designations is one of

12   the key items that was --

13         THE COURT:  Because in addition to being a legal

14   substantive issue, it's a practical issue because there's a lot

15   of people listening in on Zoom and participating via Zoom and

16   there's a lot of people here and what would we do.  Would we

17   empty out the courtroom and close out the Zoom or what would we

18   do?

19         MS. GEIER:  Yes, Your Honor.  We will meet and confer

20   and how to protect the confidential information that we don't

21   want out there.  It really goes to misapprehensions about

22   projected recoveries and we need to make sure that -- we'll

23   make sure that he has all the information necessary and we'll

24   propose something to Your Honor that --

25         THE COURT:  That would mean --

1          MS. GEIER:  -- makes sense.

2          THE COURT:  -- meet and confer.

3          MS. GEIER:  Yes.

4          THE COURT:  That's a good idea.  Okay.

5          And then -- and I'm not trying to open a Pandora's

6 box in any way.  I believe that at least from our point of view

7 we sealed the document as soon as we got notice that it was not

8 sealed.  And I'm not sure whether it was widely disseminated or

9 not widely disseminated or what.

10         MS. GEIER:  Your Honor, it was posted to public

11 dockets or -- you know, the various --

12         THE COURT:  Well, I know --

13         MS. GEIER:  -- subscriber --

14         THE COURT:  -- it was posted on our docket.

15         MS. GEIER:  -- subscriber sites that we all -- we all

16 know and love.  Those were posted instantly.  We spent a good

17 deal of the day getting them removed and trying to do damage

18 control.  You know, to counsel's credit, they joined us in that

19 effort, so it was not -- we can't say right now what the

20 discernable damage is, but there is certainly an unanswered

21 question there.

22         THE COURT:  Okay.  I was just hopeful because I see

23 from the docket markings that looks like it was filed around

24 1:00 a.m. on the 20 -- on the morning of the 25th.  So I was

25 thinking maybe it wasn't that widely disseminated, but --

41

1        MS. GEIER:  That's correct, Your Honor.  I think it

2   was -- it was up for -- from many, many hours --

3        THE COURT:  Yeah.

4        MS. GEIER:  -- into -- through the morning before it

5   was taken --

6        THE COURT:  Okay.

7        MS. GEIER:  Okay.

8        THE COURT:  That's it.  Thank you.

9        MR. KINOIAN:  Your Honor, Greg Kinoian again.  I'm

10  the one who inadvertently uploaded the declaration, which was

11  supposed to be filed under seal, which as mentioned, was filed

12  under seal.  And I realized that mistake.  Like the filing was

13  at 1:00 a.m.  I realized the mistake by 1:30 in the morning and

14  alerted my co-counsel about that.  And I had called chambers,

15  left messages for Ms. Hall, your senior law clerk, and also for

16  Mr. Phil Garris, your courtroom deputy, at 6:30 in the morning.

17  Ms. Hall called me at 8:15, 8:20 in the morning.  By 9:00 a.m.,

18  the entire docket of 982 was blocked from public view and I had

19  asked the assistant deputy in charge in the clerk's office,

20  Ms. Veloz Jimenez, whether or not the IT department would be

21  able to tell us who or how many people may have downloaded the

22  document in the interim and I did not get a response back on

23  that.

24        MR. SUSSBERG:  Judge, we're totally fine with this.

25  This happens.  There's a reason have pencils have erasers on

42

1  the end and we talk all the time with our folks about mistakes

2  and you've got to be able to fix them and identify them, so

3  it's fine.  We're moving forward.  Looking forward to having

4  our day in court.

5          THE COURT:  Okay.

6          MR. SUSSBERG:  Thank you.

7          MR. HILLMAN:  Your Honor, David Hillman for the

8  record.  Appreciate Mr. Sussberg.

9          I just wanted to reserve our rights on those issues

10 because if they're -- the information that flowed if it hits --

11 if it hurts anybody, it hurts our client's recovery first, so

12 our rights are fully reserved.  And part of the challenge is

13 when I stood before you and read into the record the settlement

14 that I reached with Mr. Glenn, at your suggestion we adopted

15 your proposal.  The very first thing was that Mr. Glenn's

16 clients would sign a non-disclosure agreement.  That never

17 happened.  Only Mr. Glenn signed the NDA.  I just found out

18 about this, this morning, another surprising fact.

19         So when we think about the consequences that flow

20 from what is effective a breach of a non-disclosure agreement,

21 it was a breach of an expectation that was read into the record

22 that this wasn't going to be just a frolicking detour of a

23 lawyer who submits an affidavit, but clients.

24         That hasn't happened here.  They didn't sign the NDA

25 and if I'm wrong Mr. Glenn will correct me.

1          MR. GLENN:  We have a client rep that has signed an

2    NDA.  None of the other clients saw any confidential

3    information.

4          THE COURT:  Were you going to give that to

5    Mr. Hillman so that --

6          MR. GLENN:  Sure.

7          THE COURT:  Yeah.  All right.  And I mean, I'm -- you

8    know, I guess the main parties at interest here are, of course,

9    the debtor, of course, the bond holders.  But the -- also the

10   Creditors' Committee and Mr. Hillman's client, so we're fine.

11         So whoever has witnesses, you should -- you know, you

12   should tell each other -- whoever the witness today, tell each

13   other who the witnesses are and so that they know.  Okay?

14         MR. SUSSBERG:  Yes, sir.

15         MR. FIEDLER:  Good afternoon, Your Honor.  Ross

16   Fiedler of Kirkland & Ellis on behalf of the debtors.  We can

17   now with Your Honor's permission turn to the agenda, hopefully

18   more exciting news.

19         THE COURT:  Sort of anti-climatic, but --

20         MR. FIEDLER:  Yeah.  As Ms. Geier --

21         THE COURT:  We needed to get there.  I thought that's

22   where we were going to start, but didn't quite work out that

23   way, but -- so I have to reorganize my stuff for a moment also.

24         MR. FIEDLER:  Yes, of course.

25         THE COURT:  Because I know -- see, I changed the pile

1  of my papers and there was a -- there was -- as I said at the

2  beginning, there was an amended agenda filing.

3          MR. FIEDLER:  I'm sorry, Your Honor.  None of the

4  matter -- the agenda items actually moved.  It just reflected

5  additional filing --

6          THE COURT:  Okay.

7          MR. FIEDLER:  -- since the prior Chapter --

8          THE COURT:  So why don't we go through it?  I have

9  them both now.

10          MR. FIEDLER:  Okay.  Great.  Well, Ms. Geier

11  definitely didn't bury the lead.

12          The next item on the agenda is the sale motion to

13  Overstock.com.  As Your Honor is aware, at the first day

14  hearing we discussed one of the key elements of the case, which

15  was a potential sale of all or a portion of the debtor's

16  assets.  We filed the bidding procedures motion, which Your

17  Honor approved at docket number 92.  We further amended that

18  order just to extend certain dates and deadlines throughout the

19  case, which proved very helpful as we ultimately reached a

20  stalking horse purchase agreement with Overstock.com.

21          That agreement contemplates a sale of certain

22  intellectual property and e-commerce assets of the Bed Bath &

23  Beyond.com banner for 21.5 million dollars in cash, such to

24  certain conditions.

25          We did file a selection of the stalking horse bidder

1   notice at docket 708, which Your Honor subsequently entered an

2   order approving the stalking horse bidder and the APA

3   memorializing that transaction at docket number 791.

4            Shortly thereafter, we held an auction with respect

5   to certain assets that were subject to the Overstock bid.

6   Unfortunately, that auction did not result in a qualified bid

7   for those assets that exceeded the value provided by the

8   Overstock bid.  And so we filed a notice of successful bidder.

9   That was at docket number 877 identifying Overstock as the

10  successful bidder and certain backup bidders.

11           So now we're here seeking approval of that

12  transaction on a final basis.  I'll just -- before I get into

13  anything else, Your Honor, I'd like to move the declaration of

14  Christian Tempke of Lazard into evidence in support of the

15  sale.  That was filed at docket number 1088.

16           THE COURT:  Right.  Any objections?  Having heard no

17  objections, I'll admit that into evidence.

18           (Declaration of Christian Tempke admitted into

19  evidence.)

20           MR. FIEDLER:  Thank you, Your Honor.

21           So just real quick before I get to a conclusion here,

22  I wanted to highlight one issue related to certain objections

23  that were filed related to a separation notice, not applicable

24  to the relief requested today.

25           In accordance with the bidding procedures, we did

1 file a notice of potentially assumed executory contracts and

2 leases to inform parties that we would potentially be seeking

3 to assign those leases or contracts through a sale.

4        That's not the case here.  We have an Overstock sale

5 that deals with IP assets.  No leases are being assigned.

6 There's only five IP contracts that are actually being

7 assigned.  So all of the objections and the notices and the

8 reservation of rights that have been filed, they don't relate

9 to this sale.  We've, you know, made a lot of progress in

10 letting folks know and trying to clear up that confusion, but I

11 don't think any of those objections need to be addressed today.

12        THE COURT:  Yeah, I think that, you know, it was

13 helpful that additional notice that was filed, you know,

14 clearing that up.  I think there was a lot of confusion and --

15        MR. FIEDLER:  Yeah, certainly.

16        THE COURT:  -- got that cleared up.

17        MR. FIEDLER:  And we did -- we filed the reply also

18 just to identify the contracts that were actually being

19 assigned.

20        THE COURT:  Um-hum.  And there's no objection as to

21 those.

22        MR. FIEDLER:  Correct, correct, Your Honor.

23        So with that, Your Honor, I'll submit that the

24 debtors believe that approval of the sale is an appropriate

25 exercise of the debtor's business judgment.  It maximizes value

47

1  of the debtor's estate and it -- it is supported by the DIP

2  lenders and the UCC.  So unless Your Honor or anyone else has

3  any questions or would like to be heard, we'd respectfully

4  request entry of the order.

5           I will note we -- I don't know if we've done it yet.

6  Have we filed a revised order?  If we haven't, we'll file it

7  and submit it to chambers shortly after the hearing.

8           THE COURT:  Okay.  And so -- yeah --

9           MR. DOSHI:  At an appropriate time, Your Honor, if I

10  may be heard.

11           THE COURT:  Yes, please.  Who is -- who is that,

12  please?

13           MR. DOSHI:  Sure.

14           THE COURT:  Doshi?

15           MR. DOSHI:  Yes.  Amish Doshi on behalf of Doshi

16  Legal Group on behalf of Oracle America, Inc.

17           THE COURT:  Okay.  Go ahead, sir.

18           MR. DOSHI:  It was my understanding there was going

19  to be a representation.  Perhaps counsel forgot in all the

20  hour-long prior discussion, but Oracle America, Inc. and the

21  debtors are parties to numerous, numerous contracts.  And I

22  understand that that portion of it relates to the sale that's

23  going to be going forward.

24           There is one aspect of our objection that we filed.

25  We were objecting to any transition services agreement to be

1 entered into between this buyer and the debtor.  And my

2 understanding is there is not going to be a TSA.  And if I can

3 have confirmation of that from the debtor's counsel as well as

4 purchaser, that issue would be resolved or at least for the

5 next sale.

6          MR. FIEDLER:  Confirmed, Your Honor.

7          THE COURT:  Did you hear that, sir?  It was --

8          MR. DOSHI:  Oh -- oh --

9          THE COURT:  It was confirmed by the debtor's counsel,

10 but I guess --

11          MR. DOSHI:  Great.  Thank you very much.

12          THE COURT:  Thank you.

13          Okay.  So I have reviewed this application and motion

14 and it really easily satisfies the tests that are set forth in

15 this circuit in adversaries.  It's a proper exercise of the

16 debtor's business judgment.  It was adequately -- more than

17 adequately noticed.  There was an auction sale, competitive --

18 well, it was in some sense a competitive bidding, but certainly

19 there was -- because there's two backup bidders for partial

20 assets, right?

21          MR. FIEDLER:  Correct, Your Honor.

22          THE COURT:  Yeah.  So there was interest and there

23 was bidding, but it didn't result in a higher bid, but

24 sometimes that happens and there's -- the price was negotiated

25 between very sophisticated parties, no indications of any

1    interest.  So I will approve that, conclude the sale.

2              MR. FIEDLER:  Thank you, Your Honor.

3              THE COURT:  Grant the motion.

4              MR. FIEDLER:  So next on the agenda is a motion to

5    approve the lease termination agreement with CP Venture Five.

6    This was filed at docket number 773.  An order shortening time

7    was entered shortly thereafter at docket number 783.

8              The objection deadline for this motion was yesterday

9    at noon, Your Honor.  No objections were received.  The deal

10   here is pretty simple, $260,000 paid to the debtors, plus a

11   waiver of all claims.  The debtors and their real estate

12   consultant believe the offer is above value and agreed to this

13   termination on that basis.  So absent any questions from Your

14   Honor, we'd respectfully request entry of the order.

15             THE COURT:  I had 265.  Is that -- 265 for that?

16             MR. FIEDLER:  Yes, 265.

17             THE COURT:  Right.  Okay.  All right.  Again, this is

18   even, you know, I guess in some sense easier because it's an

19   agreement between the parties and there's a significant

20   consideration being paid and it's also a lot of pre -- the

21   agreement marketing and efforts and deal the debtor came up

22   with in proper exercise of business judgment and really, I

23   don't even have to get in all those sort of issues.  Okay.

24             MR. FIEDLER:  Great.  Thank you, Your Honor.

25             So next on the agenda is another lease termination

50

1  motion with Agua Mansa.  This was filed at docket number 724

2  with an order shortening time entered by Your Honor at 732.

3  The objection deadline was also yesterday at noon.  No

4  objections were received.

5         The deal here relates to a warehouse in California.

6  The purchase price and termination fee is five million dollars.

7  Also, a nine million-dollar LC will be cancelled upon entry of

8  the order.  There'll be mutual releases for both parties.  This

9  is a location that the debtors have been marketing for quite

10 some time and no actionable offers were received for the

11 location outside of this lease termination agreement we have

12 today.

13        So unless Your Honor has any questions or any other

14 parties wish to be heard.

15        THE COURT:  Oh, somebody wishes to be heard --

16        MR. GOLD:  Yes, thank you.

17        THE COURT:  -- yeah.

18        MR. FIEDLER:  Mr. Gold, unsurprisingly.

19        MR. GOLD:  Good to see you live, Your Honor.  Ivan

20 Gold of Allen Matkins for the landlord, Agua Mansa --

21        THE COURT:  Good afternoon.

22        MR. GOLD:  -- Commerce, Phase 1, LLC.

23        We filed -- part of our deal, Your Honor, was a good

24 faith finding under 363(m) and we filed at docket 967 -- excuse

25 me, 997, the declaration of Douglas Roberts illustrating the

51

1  arm's length nature of the transaction and the lack of the

2  relationship between this landlord and the debtor.  Other than

3  the landlord/tenant relationship, the common management of

4  the -- the property manager of the landlord is also manager of

5  other Bed Bath & Beyond retail locations, but truly an arm's

6  length relationship with the requisite stuff.

7          I would move 997 and the proposed order uploaded by

8  the debtors.  I believe it's at 9 -- it's a revised form of

9  order.  It was uploaded previously, that we would ask entry

10  consistent with that order, Your Honor.

11          THE COURT:  So do I have the revised form of order?

12          MR. GOLD:  Yes.  I believe it's at 967.

13          THE COURT:  And I --

14          MR. GOLD:  That's reflected on the agenda.

15          THE COURT:  Do I have the revised -- do I need

16  revised orders on any of the prior ones?  Not you, Mr. Gold.

17          MR. FIEDLER:  Only on the sale order, Your Honor.

18          THE COURT:  On the sale order.  Okay.  We'll wait for

19  that one.

20          MR. FIEDLER:  Yeah.

21          THE COURT:  Okay.  Yeah.  Any objections to the

22  declaration being moved into evidence?

23          Having heard none, it will be admitted into evidence

24  and get those findings as well, sir.

25          (Declaration of Douglas Roberts admitted into

52

1  evidence.)

2         MR. GOLD:  Okay.  Thank you, Your Honor.  Have a good

3  afternoon.

4         THE COURT:  Thank you.  Thank you.  You, too.

5         So that is also approved and we have that revised

6  order.

7         MR. FIEDLER:  Great.  Turning, Your Honor, to the

8  last motion on my plate before I turn the podium over to my

9  colleague, Mr. Sloman, is the final cash management order.

10 We've adjourned this motion a few times to reach an agreement

11 with the United States Trustee on the terms of the final order,

12 specifically the 345(b) waiver.  We are very pleased to report

13 we have reached an agreement on that issue, which is reflected

14 in the revised proposed order that I believe was filed at

15 docket number 1075.

16        So unless Your Honor has any questions or the United

17 States Trustee would like to be heard, we'd respectfully

18 request entry of the order.

19        THE COURT:  Ms. Steele.

20        MS. STEELE:  Your Honor, just that I agree with

21 Mr. Fiedler's comments and the order does reflect a limited

22 waiver based on three specific accounts, which it actually

23 reflects what's happening with those accounts and with the

24 additional language in paragraph 5.  The U.S. Trustee has no

25 objection to the order being entered.

1          THE COURT:  And that's the one that was filed

2    yesterday as a final order at docket 1075.

3          MS. STEELE:  Yes, Your Honor.

4          MR. FIEDLER:  That's right, Your Honor.

5          THE COURT:  All right.  Well, I know just by the

6    adjournments and the language changes that this was also vetted

7    with the Trustee's Office and whomever else wanted to look at

8    it and this is the final product.  Is that -- I'm not going to

9    disturb it and I'll enter that order.

10         MS. STEELE:  Thank you, Your Honor.

11         MR. FIEDLER:  Great.  Thank you, Your Honor.

12         We just have one agenda item left.  I'll cede the

13   podium to my colleague, Mr. Sloman.

14         THE COURT:  Okay.

15         MR. SLOMAN:  Good afternoon.  Michael Sloman with

16   Kirkland & Ellis on behalf of the debtors for the record.

17         The last item on our agenda is the debtor's motion to

18   assume and assign certain leases to Burlington, which was filed

19   at docket number 644.  The motion seeks to sell six leases to

20   Burlington for the price of about 1.53 million dollars.  We've

21   negotiated with them and the other parties and we have filed a

22   revised order on the docket at docket 1090.  That reflects the

23   comments from the landlords and other parties in interest

24   and --

25         THE COURT:  And the -- I guess I know about -- I know

54

1  about two objections being resolved.  There was one other

2  objection as to the Texas lease.

3          MR. SLOMAN:  Yes, so there were three objections

4  filed on the docket.  Two were withdrawn this morning.  The

5  third with respect to source 788 with the Sherman lease, we are

6  adjourning that lease to the July omnibus hearing and will be

7  heard at a different date.  Their counsel is aware and agreed

8  to this.

9          THE COURT:  Okay.  I guess I didn't catch up with

10 that part of it yet.  I wasn't aware that --

11         MR. SLOMAN:  I believe it's on the amended agenda,

12 but --

13         THE COURT:  Were you aware of that, that this motion

14 is adjourned as to -- no.  So maybe you can just send a

15 confirming note to -- well, we have the revised order again,

16 you're saying?

17         MR. SLOMAN:  Yeah, and the revised order does not

18 include that store.

19         THE COURT:  Okay.  All right.  Yeah, and so I've

20 reviews this motion as well and so there was the assumption and

21 assignment to this particular leases to Burlington and there

22 were some objections that were filed, two of which were

23 withdrawn; one of which remains and adjourned to July 8th, you

24 said?  Yeah.  And that was the JMCR Sherman at 450 Travis

25 Street, Suite 250 in Dallas, Texas.

1           MR. SLOMAN:  Yes, that's correct.

2           THE COURT:  Okay.  Well, it's number 7 -- store

3   number 778.

4           MR. SLOMAN:  And they revised it.  It reflects that,

5   so that's been removed, so --

6           THE COURT:  I'm sorry?

7           MR. SLOMAN:  And the revised order reflects that's

8   been removed from this current package.

9           THE COURT:  Okay.  And does the revised order say the

10  motion is adjourned as to that one or --

11          MR. SLOMAN:  I don't believe so.  I think we noted on

12  end of it, but we can put something on the docket if that's

13  helpful.

14          THE COURT:  Okay.  All right.  And so the objections

15  to these -- to this motion were resolved or adjourned as to

16  that one lease and again bringing some benefit to the estate.

17  I know that they were extensively marketed and this is the

18  result that that was obtained after serious significant

19  professional efforts to market the leases and certainly makes

20  sense and will be approved as well.

21          MR. SLOMAN:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. SLOMAN:  I think that's it for today unless you

24  have anything further.

25          THE COURT:  I don't have anything further.  I guess

1  we'll see everyone tomorrow morning at 10:00 a.m.

2            MR. SLOMAN:  We'll see tomorrow morning.  Thank you.

3            THE COURT:  Thank you.  And I -- you know what I do?

4  Before we go, I do want to say, you know, I want to keep it

5  tight and, you know, deal with the threshold issues that are

6  affected by the facts and, you know, not -- we don't need to go

7  far, far astray.  We just need -- there's a number of factual

8  statements that were made by both sides and that's what I want

9  to focus on as to why this is an appropriate 60(b) motion and

10  that's what I want to focus and limit the hearing to, okay?

11            MR. SLOMAN:  Yes.

12            ATTORNEYS:  Thank you, Your Honor.

13            THE COURT:  Thank you.  Have a good afternoon.  See

14  you tomorrow.

15                        * * * * *

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, RUTH ANN HAGER, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Ruth Ann Hager

RUTH ANN HAGER

J&J COURT TRANSCRIBERS, INC.     DATE:  July 4, 2023