```
                 UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEW JERSEY


IN RE:                    .      Case No. 23-13359-VFP
                          .
BED BATH & BEYOND, INC., .       M.L.K. Federal Building
et al.,                   .      50 Walnut Street, 3rd Floor
                          .      Newark, NJ 07102
              Debtors.    .
                          .      June 28, 2023
. . . . . . . . . . . .   .      10:36 a.m.


        TRANSCRIPT OF DEBTORS MOTIONS [18,29,644,724,773]
              BEFORE HONORABLE VINCENT F. PAPALIA
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis LLP
                          By:  RUSH U. S. HOWELL, ESQ.
                               JOSHUA SUSSBERG, ESQ.
                               EMILY E. GEIER, ESQ.
                               ROSS J. FIEDLER, ESQ.
                               OLIVIA ACUNA, ESQ.
                          601 Lexington Avenue
                          New York, NY 10022


For the U.S. Trustee:     Office of the United States Trustee
                          By:  FRAN B. STEELE, ESQ.
                          One Newark Center
                          1085 Raymond Boulevard, Suite 2100
                          Newark, NJ  07102




Audio Operator:           Mariela Primo

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
```

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For The Committee of          Pachulski Stang Ziehl & Jones
Unsecured Creditors:          By:  BRADFORD J. SANDLER, ESQ.
                              919 North Market Street, 17th Floor
                              Wilmington, DE  19801


                              Pachulski Stang Ziehl & Jones
                              By:  ROBERT J. FEINSTEIN, ESQ.
                                   PAUL J. LABOV, ESQ.
                              780 Third Avenue, 34th Floor
                              New York, NY  10017

For Sixth Street             Proskauer Rose
Specialty Lending, Inc.:     By:  DAVID M. HILLMAN, ESQ.
                                  MICHAEL MERVIS, ESQ.
                              11 Times Square
                              New York, NY 10036

Ad Hoc Committee and         Genova Burns
Bond Holders:                By:  DANIEL M. STOLZ, ESQ.
                              494 Broad Street
                              Newark, NJ  07102


                              Glenn Agre Bergman & Fuentes
                              By:  ANDREW K. GLENN, ESQ.
                              1185 Avenue of the Americas
                              22nd Floor
                              New York, NY  10036


                              GREGORY S. KINOIAN, ESQ.
                              8-15 Elaine Terrace
                              Fair Lawn, NJ  07410


For Texas Taxing             Linebarger, LLP
Authorities:                 By:  TARA L. GRUNDEMEIER, ESQ.
                              4828 Loop Central Drive, Suite 600
                              Houston, TX  77081


                              Ansell Grimm & Aaron, P.C.
                              By:  JOSHUA S. BAUCHNER, ESQ.
                              1500 Lawrence Avenue
                              Ocean, NJ 07712

3

TELEPHONIC APPEARANCES:

For the Pre-Petition          Davis Polk & Wardwell LLP
ABL Administrative            By:  MARSHALL HUEBNER, ESQ.
Agent:                        450 Lexington Avenue
                              New York, NY 10017


- - -

**I N D E X**

**WITNESSES**                                          **Page**
HOLLY ETLIN
  Direct Examination by Mr. Glenn              12
  Cross-Examination by Mr. Howell              76
  Cross-Examination by Mr. Huebner            107
  Redirect Examination by Mr. Glenn           113


Closing Arguments
  By Mr. Glenn                                127
  By Ms. Geier                                149
  By Mr. Hillman                              157
  By Mr. Sandler                              170
  By Mr. Huebner                              174
  By Mr. Sussberg                             179

Rebuttal Argument
  By Mr. Glenn                                180


**EXHIBIT**                                          **ID**. **EVD**.

BHG-1     Declaration, Holly Etlin, Motion for        20     21
            Entry of Interim and Final Orders
BHG-2     Budget, Initial                             22     26
BHG-3     Declaration, Holly Etlin, Debtors'          29     34
            Chapter 11 Petitions and First Day
            Motions
BHG-4     Budget                                      34     35
BHG-5     company's disbursements and collections     59     60
            from the week of 4/24 to 4/28
6         Transcript, First Day Hearing              112    113
9         Docket 729, final DIP order                 82     83
12        Chart                                       88     89

1  (At 10:36 a.m.)

2          MR. GLENN:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. GLENN:  Thank you for the extra time.  It helped

5  us to get organized in the shuffle of the papers working

6  overnight to get ready for today, so we really appreciate that.

7          THE COURT:  No.  No problem at all.

8          MR. GLENN:  Thank you.

9          THE COURT:  I'm glad to help in any way I can and

10 appreciate the effort in telling me.

11         MR. GLENN:  Thank you.  Your Honor, for the record,

12 Andrew Glenn, Glenn Agre Bergman & Fuentes, on behalf of the Ad

13 Hoc Bond Holder Group.

14         I believe we have an agreement on one thing and a

15 disagreement on another.

16         THE COURT:  Uh-huh.

17         MR. GLENN:  The agreement is that we're going to go

18 right into the evidence, with Your Honor's indulgence, and then

19 we'll deal with the law at closing if that's okay?

20         THE COURT:  I -- one of the things I have written

21 down here is waiving opening statements --

22         MR. GLENN:  Okay.  Good.

23         THE COURT:  -- and going right to the --

24         MR. GLENN:  Good.  We're on the same page there.  The

25 disagreement is that this is our motion and we have one

1  witness, and that's Ms. Etlin.  We -- it's our motion.  It's

2  our burden of proof.  We would like to go first with Ms. Etlin,

3  as I think the Rules of Procedure typically require.

4         Counsel, I believe, wants to make an application to

5  go first, which we disagree with.  So just wanted to --

6         THE COURT:  Okay.

7         MR. HOWELL:  Thank you, Your Honor.  Rush Howell from

8  Kirkland & Ellis on behalf of the debtors.

9         I wouldn't say necessarily disagreement, just another

10 option because it could be disjointed, in my experience, to

11 have the adverse direct and then the direct right after.  We

12 just propose we would start her with our direct and then he can

13 cross, but we're fine either way, Your Honor.

14        THE COURT:  But wasn't Ms. Etlin's direct admitted

15 into evidence already?  And then we -- at the first day

16 hearings and then we said parties could cross-examine, if they

17 wanted to, and, you know -- and I do realize that it's a little

18 bit of a procedurally different situation, but I think, though,

19 it is their case and is that -- this is the only witness, is

20 that right?

21        MR. GLENN:  It's the only witness, Your Honor.  Yes.

22        THE COURT:  Yeah.  And then, you know, I guess the

23 other issues that come up are whether, you know, this is, in

24 fact, cross-examination or a direct examination and then what

25 happens thereafter, which are subsidiary issues that I thought

1  of, but I don't know if you have --

2          MR. GLENN:  We're not going to -- the bondholder

3  group is not going to be doctrinaire about what happens after

4  the direct or my adverse direct and counsel's friendly direct

5  or cross.  Whatever Your Honor decides after that is fine with

6  us.

7          THE COURT:  Well --

8          MR. HOWELL:  I agree with that, Your Honor, and what

9  you propose makes sense.  The only point I want to raise is

10 that that's absolutely correct.  Her declaration was already

11 admitted into evidence at the interim and the final DIP

12 hearing.  But we are going to have some supplemental direct

13 that's not part of the declaration to explain a few things

14 related to the projections from Ms. Etlin today.  But we're

15 fine proceeding that way and we understand that he's going to

16 treat this as a cross, be able to lead, for instance, and

17 then --

18         THE COURT:  Right.  And the technical Rule, I guess,

19 is that cross is limited to the matters on direct, but that

20 wouldn't apply here.  So you could -- you know, you have

21 supplemental direct.  That's what goes in and that's what goes

22 in and that's -- I just think that, again, is kind of a

23 concession to the realities of the situation and the way this

24 should proceed.

25         MR. GLENN:  And, Your Honor, I just wanted to make

8

1  something very clear too.  I have no objection to counsel re-

2  plowing the ground that I have covered if he's prepared

3  Ms. Etlin, you know, just to make things smoothly.  I'm not

4  going to object if he asks the questions again and I think

5  that's going to make the --

6          THE COURT:  Right.

7          MR. GLENN:  -- the rest of the day go smoother.

8          THE COURT:  Okay.  Great.  Are those the --

9          MR. HOWELL:  Thank you, Your Honor.

10          THE COURT:  Are those -- those are the two issues.

11          So I -- actually, I'm saying that, you know, the bond

12  holder's case should be presented first because it is their

13  motion and I'm going to allow it to proceed that way, but with

14  all the other stipulations or agreements that we reached just

15  now.

16          The other housekeeping issue that I have is the issue

17  of the sealing and confidential documents and I just thought --

18  I'm not sure if the parties discussed that.  You probably did,

19  but I'm not aware of what the resolution was or if there was

20  one, but if you could tell --

21          MR. GLENN:  There has been.

22          THE COURT:  -- me that'd be great.

23          MR. GLENN:  There has been, Judge.  I think where we

24  are on that is all the exhibits that we're going to present

25  relate to the company's cash expenditures in the past.  I think

9

1   the controversial point, and one of the points that led us here

2   today is, how much is the Sixth Street deficiency claim going

3   to be, and that is contingent on a number of items, including

4   ongoing sales.

5          So I think what we're prepared to do, as discussed

6   with counsel, is we're going to present a range, a theoretical

7   range of outcomes.  We don't know where the case is going to

8   end up on those outcomes and it's unfortunate because if we

9   knew, as a matter of fact, that Sixth Street was going to be

10  paid in full out of their pre-petition collateral, we wouldn't

11  be here today.

12         So at one end of the range, I think we're stipulating

13  that's a possibility that the GUCs would not have any recovery

14  and other, hopefully better, outcomes down the road, they would

15  have a recovery and I think that's all we're prepared to

16  present to the Court today.

17         MR. HOWELL:  Yeah.  With that, Your Honor, that we

18  wouldn't have any confidentiality problems.  Obviously, we

19  don't want to go into any specifics related to that, but it

20  sounds like we're not going to.

21         I'm not sure, frankly, we even need any questions on

22  it if we both agree that there's a range where at one end, the

23  GUCs could not get anything under the contemplated settlement

24  arrangement and at the other end where they could, right?  And

25  I think that's relatively common sense as well.  But we don't

1  want to have somebody getting up and hypothesizing about

2  recoveries from asset sales and things like that that haven't

3  even occurred yet obviously.

4         THE COURT:  All right.  Mr. Hillman -- oh, you're

5  rising anyway.  S

6         MR. HILLMAN:  Good morning, Your Honor.  David

7  Hillman, Proskauer, on behalf of Sixth Street as DIP lender and

8  pre-petition lender, an agent for both facilities at FILO.

9  Valuation is inherently speculative.  I did hear from counsel

10 that there are low end of people's estimates.  There are high

11 ends of people's estimates, but I do note that Mr. Glenn said

12 Sixth Street's deficiency claim.  He may have his own view of

13 what values are, but I don't think -- believe that valuation

14 today has any relevance.  The issue is not before the Court and

15 it is still yet to be determined how assets will be monetized.

16        So, yes, I would want us to stay far away from

17 anything that will chill bidding and if people had a crystal

18 ball, I would like to know what tomorrow's winning lottery

19 ticket numbers are.  We don't know the value of the assets that

20 are yet to be monetized.  So with that, I would just --

21        THE COURT:  Well, isn't that -- doesn't that kind of

22 go to if there is a deficiency?  We don't know that, don't --

23 no one knows that at this moment.

24        MR. HILLMAN:  Correct.  Thank you.

25        THE COURT:  That's why I -- when he said -- Mr. Glenn

1  said "deficiency claim," which --

2           MR. HILLMAN:  That's why I --

3           THE COURT:  -- I don't --

4           MR. HOWELL:  Right.

5           THE COURT:  -- as I understand it, there may be one,

6  there may not be one and none of us sitting here right now

7  knows, although we're all hopeful that there may not be one,

8  but we don't know, okay?

9           MR. GLENN:  Thank you.

10          THE COURT:  All right.  So we -- yeah.  I -- so as I

11  understand it, the question was about blocking on Zoom.  But as

12  I understand what just transpired, that's not going to be

13  necessary.

14          MR. HOWELL:  Yeah.  We agree, Your Honor.  Obviously,

15  we reserve in case there's a question asked that surprises us

16  in that regard.  But I think we've -- with the exhibits that

17  have been presented to us and with our discussion, I think we

18  shouldn't have that confidentiality issue today.  Thank you.

19          THE COURT:  Certainly if it ventures into an area

20  that you believe is covered or Mr. Hillman believes is covered

21  or the Creditors Committee believes is covered, then stand up

22  and you will be heard.

23          MR. GLENN:  Thank you.

24          MR. HILLMAN:  Thank you, Your Honor.

25          THE COURT:  So with that, I think we're ready to

1  proceed.  So you call your first witness, sir.

2           MR. GLENN:  We call Holly Etlin, please.

3  H O L L Y  F E D L E R  E T L I N, WITNESS, SWORN

4           THE CLERK:  You may be seated.  Please state your

5  full name and business or work address for the record.

6           THE COURT:  Yeah.  You don't have to -- you can state

7  a business address.  You don't need to state any personal

8  address.

9           THE WITNESS:  Thank you, Your Honor.  So Holly Felder

10 Etlin.  I -- my business address is Alex Partners at 909 Third

11 Avenue, New York, New York 10019.

12          THE COURT:  Good morning.

13          THE WITNESS:  Good morning.

14                    DIRECT EXAMINATION

15 BY MR. GLENN:

16     Q    Good morning, Ms. Etlin.  Are you ready to roll?

17 A    Yes, Mr. Glenn.

18     Q    Thank you.  Now, Ms. Etlin, you have served as the

19 chief restructuring officer and chief financial officer of the

20 debtors for some time, correct?

21 A    Yes, I have.

22     Q    Okay.  And that's since approximately February of

23 this year?

24 A    I have actually worked with the debtors since December '22

25 and I was appointed as an officer as part of the first -- I

Etlin - Direct/Glenn                                          13

1  think first set round of amendments and default cures.  I was

2  appointed as CFO, interim CFO, and then, of course, with the

3  filing of these cases, I have taken on the title also of CRO

4  and the CFO is no longer interim.

5      Q    Okay.  And I consider you, and I believe you might

6  consider yourself, the preeminent financial advisor for

7  retailers going through restructurings, including Chapter 11

8  cases, correct?

9  A    Thank you very much.

10     Q    I'll take that as a yes.  And you have, in fact,

11 overseen a lot of retailer liquidations during your career,

12 correct?

13 A    Both successful restructurings and liquidations, yes.

14     Q    Okay.

15 A    I tend to believe the restructurings out -- outnumber the

16 liquidations, which is --

17     Q    We all do.

18 A    -- one of the -- which is one of the reasons I have

19 preeminent next to my name.

20     Q    There you go.  There you go.  Now, we worked together

21 on the Borders case.  I was debtor counsel and you were the

22 financial advisor in that case, correct?

23 A    I was the CRO and then the CEO in that case.  Yes.

24     Q    Okay.  Great.  And that actually was a liquidation,

25 as well, correct?

Etlin - Direct/Glenn                    14

1  A    It was unfortunately.

2       Q    And you know the group of liquidators that comes into

3  these cases, in liquidation cases, and bids and actually

4  conducts the liquidation sales, correct?

5  A    Yes, I do.

6       Q    Okay.  And you know the process for conducting going

7  out of business sales, correct?

8  A    Yes, I do.

9       Q    You're very familiar with that, right?

10 A    Yes, I am.

11      Q    Okay.  And you are also very good at forecasting what

12 the store GOB sales will generate, correct?

13 A    I actually usually rely on a model that we receive from

14 one of the major liquidation companies that plots out the sale

15 and what they expect to have happening, since they're actually

16 conducting the sale as our agent.

17      Q    Okay.  And you rely on those because you consider

18 that information to be accurate, correct?

19 A    Yes.  They're experts in plotting out the sale.

20      Q    Okay.  And the DIP financing in this case was 40

21 million dollars of new money, correct?

22 A    Yes.

23      Q    All right.  And you took in all that money in the

24 first week of the case after Judge Papalia approved the DIP

25 financing, correct?

Etlin - Direct/Glenn                                    15

1  A    Yes, we did.

2       Q    Okay.  Whose idea was it to have a single draw DIP

3  financing new money facility for the first week of the case?

4  A    I honestly don't remember exactly who originated the idea.

5  We had been in cash dominion where the bank swept all of our

6  cash every day and applied it against the loan, so we basically

7  had no cash.  And as part of the discussions with the ABL and

8  the FILO lenders prior to the bankruptcy, we indicated (a) that

9  we would want money advanced immediately upon that because, as

10 you know, we filed with three million dollars in the bank and

11 so it was part of an overall discussion.  I don't remember who

12 originated the discussion, but I certainly made a request for

13 DIP financing and for funds to be made available to us early in

14 the case.

15      Q    Okay.  But you didn't seek approval for DIP financing

16 in the second, third, fourth, fifth, sixth and so on?  You

17 didn't need new money for that period of time, correct?

18 A    I'm not sure I entirely agree with that.  I needed the new

19 money and then it flowed through.  We were disconnecting the

20 cash dominion process, so we were actually going to get to keep

21 our money and use it consistent with a fairly tightly

22 controlled budget.  So it would be typical, in my experience,

23 for the DIP loan to be made up front in a case.  So I don't --

24 I don't think I gave it much thought one way or the other.

25      Q    Okay.  But you took the cash in the first week of the

Etlin - Direct/Glenn                                            16

1  case, went in the bank account and then you used it for

2  reserves and other expenses, correct?

3  A    Yes.  It was very important to be able to show our

4  employees after the horrific prior four months of operation --

5  operating essentially in and out of default and in cash

6  dominion that we actually had sufficient money to pay them

7  certain things, for example, their WARN reserve.

8      Q    Okay.  But you didn't forecast any need for new money

9  DIP proceeds after the first week of the case, correct, only

10 the use of cash collateral?

11 A    The money is fungible, Mr. Glenn, and so that money came

12 in along with other monies and that was additional money.  I

13 actually asked the lenders for more than we received in the

14 form of a DIP because I felt it was very important, as you know

15 in these large cases, at the front of the case to really show a

16 more than adequate cash cushion.  And for a five billion-dollar

17 retailer with 800 stores operating with just a few million

18 dollars in the bank is not something that generates confidence

19 either in the employee base or the vendors.

20     Q    Okay.  But I just want to narrow in on my question.

21 You didn't forecast any need for new money financing in your

22 budget after the first week of the case?  Yes or no.

23         MR. HOWELL:  Objection.  Asked and answered.

24         THE COURT:  I don't believe she directly answered the

25 question.  So --

Etlin - Direct/Glenn                                    17

1              MR. GLENN:  I don't believe so either.

2              THE WITNESS:  So the forecast showed the money coming

3    in week one.  By virtue of it coming in week one, there was not

4    a need in week two or week three.

5              MR. GLENN:  Okay.

6    BY MR. GLENN:

7         Q    And you didn't forecast the need for any further

8    draws in those forecasts, right?

9    A    That is --

10        Q    After the first week?

11   A    There were forecasts floating around where I was asking

12   them for more money.  But ultimately, the forecast we settled

13   on was the one where I got what I got in week one. I wasn't

14   going to get any more from them, and that's what we have.

15        Q    Okay.  And as you sit here today, you don't know

16   whose idea it was to have one draw up front in the first week

17   of the case, do you?

18   A    In my experience, that's typical.

19        Q    I'm asking if you know, not whether it's typical --

20   A    No.

21        Q    -- in this case.  You don't know?

22   A    No.  I don't remember.

23        Q    Okay.  Who negotiated the DIP on behalf of the

24   debtors?

25   A    I did principally, along with help from K&E and some help

Etlin - Direct/Glenn                          18

1   from Lazard.

2       Q    Okay.  But even though you were the primary

3   businessperson, other than Lazard who negotiated this DIP, you

4   don't know whose idea it was to do a single draw at the

5   beginning of the case, do you?

6   A    No.

7       Q    Okay.  Now, your forecast did not indicate a need for

8   another DIP draw.  We talked about that.  Is that because you

9   had some degree of confidence that the GOB sales that you have

10  conducted and overseen during your career would produce the

11  cash showing it would not be necessary for another DIP draw?

12  A    No, that's not how I would characterize it at all.  The

13  way I would characterize it is, again, as I have already

14  stated, we wanted more money in the bank to operate the

15  business.  The business had been in a state of almost

16  pandemonium due to the shortage of cash and the deteriorated

17  nature of the business in the months leading up to the filing.

18          We were perpetually in default and we need -- we were

19  having a very difficult time understanding what vendors -- we

20  were paying literally to cut off notices.  In a five billion-

21  dollar company, we were paying literally store operations, when

22  somebody would stop picking up the trash because they were

23  stretched that far, and so it was very difficult for us to

24  predict what our cash needs would be.

25          And so, again, as I have stated before, I asked for

Etlin - Direct/Glenn                                          19

1  more money than we received.  We ultimately, in a back-and-

2  forth with the advisors and the principals to both the AB on

3  the FILO, settled on the preliminary budget and the preliminary

4  amount they would give us and I had to live within that and I

5  had to fund the things that I had to fund and I -- that was

6  where we ended up.

7       Q    And you have lived within that, haven't you?

8  A    So, yes, it's been painful at times, but yes.

9       Q    Okay.  And so as part of -- let me ask you this

10 question first.  As part of the DIP, the 40 million dollars,

11 the price of that to the company was the 200 million-dollar

12 roll-up given to the FILO lenders, among other things, correct?

13 A    Well, it was a uniform negotiation that also involved the

14 agreement by the lenders to allow us to fund certain reserves

15 at the very beginning of the case that were imperative for us

16 to retain our employee population and potentially preserve an

17 opportunity to sell the company as a going concern, which was

18 what was stated in court on the first days.  So we -- there was

19 that issue.

20      But there was also allowing us to fund certain

21 reserves and there were a whole bunch of other things that were

22 negotiated.  It was kind of a package deal.

23      Q    Okay.  But one of the charges that the lenders

24 imposed on the company, the obligations that the lenders

25 imposed on the company, was a two million-dollar roll up of

1  pre-petition debt in exchange for the 40 million dollars,

2  correct?

3  A    Yes.

4      Q    That was the debtors' idea to have them do that,

5  right?  That was the price they charged you?

6  A    That's correct.  That was --

7      Q    Okay.

8  A    -- that -- I -- proposal came from them.

9      Q    So I believe you have an exhibit binder in front of

10 you.  I hope.

11          MR. HOWELL:  No.

12          MR. GLENN:  No?  Does she need one?

13          THE WITNESS:  No, sir.

14          MR. GLENN:  Let me approach -- may I approach the

15 witness with that, Your Honor?

16          THE WITNESS:  It's a very, very, teeny, tiny desk

17 here.  This is going to get interesting.

18 BY MR. GLENN:

19     Q    Now tab 1 of your binder, which I think we're going

20 to call BHG-1 is your first day declaration in this case,

21 correct, in support of the DIP financing, right?

22 A    Yes.

23     Q    Okay.

24 A    It's my DIP declaration as opposed to my first day

25 declaration.

Etlin - Direct/Glenn                          21

1          MR. GLENN:  I offer Exhibit 1 into evidence, BHG-1.

2          MR. HOWELL:  No objection.

3          MR. GLENN:  Thank you.

4          (Exhibit BHG-1 Admitted Into Evidence.)

5     BY MR. GLENN:

6     Q    Now, as part of this declaration, there was no

7     disclosure of the cash that the company has at this point in

8     time, correct?

9     A    (No response.)

10    Q    You can take a moment to look at it.

11    A    Do you have Exhibit A that's referred to in my

12    declaration, because I believe there was an Exhibit A attached

13    that actually showed our budget and cash flow.

14    Q    The budget, I believe, was attached to the credit

15    agreement not your declaration.

16         MR. HILLMAN:  Which was --

17         MR. GLENN:  Which we have --

18         THE WITNESS:  Well --

19         MR. GLENN:  -- separate --

20         THE WITNESS:  -- in paragraph 17, it -- it references

21    the budget, "attached hereto as Exhibit A."

22         MR. GLENN:  Okay.

23    BY MR. GLENN:

24    Q    Well, we do have that.  It's tab 2, I believe, and

25    perhaps you can confirm that's what you're relating to.  We'll

Etlin - Direct/Glenn                                    22

1  call that BHG Exhibit 2.

2  A    Yeah.  I just wanted to look.  Some of our budgets

3  actually show beginning and ending cash and I just wanted to

4  make sure that I can answer your question accurately.

5       Q    Go ahead.  Uh-huh.

6  A    So I don't believe there's a specific disclosure, but as I

7  have stated, we had three million dollars.

8       Q    Okay.  So your testimony today is that you had three

9  million dollars, but this chart shows, in fact, a zero dollar

10 cash balance, correct?

11 A    I'm -- I'm not sure where you're reading a beginning cash

12 balance.

13      Q    Okay.  Well, there is no disclosure of cash balance.

14 There's a disclosure of ending cash of ten million dollars.  Do

15 you see that?

16 A    That's correct.  That was part of the DIP agreement, as

17 well, which was that we agreed to pay any excess generated in

18 the business to the lenders, first the ABLs, then the cash

19 collateral as the LCs, and then the -- the DIP and FILO.

20      Q    Okay.  So --

21 A    It was pegged at -- it was pegged at ten by agreement.  It

22 wasn't always ten during the case.

23      Q    Okay.  And your testimony today is that there was

24 three million dollars in a bank someplace, is that correct?

25 A    That's correct.

Etlin - Direct/Glenn                    23

1      Q     Okay.

2  A    On that Monday morning, yes.

3      Q     Was there any restricted cash in the system at that

4  point in time?

5  A    If by "restricted cash" you mean cash held at various

6  servicing agencies, sure, like FiServ and American Express.

7  But those were reserves that were not going to be returned to

8  us.

9      Q     Okay.  And was there any other cash in the system,

10 other than the three million dollars that you have identified

11 and the cash that was in those restricted accounts?

12 A    You're talking about on Monday morning after the filing of

13 the --

14     Q     Yes.

15 A    -- bankruptcy case?

16     Q     Yes.

17 A    So nothing had hit our bank accounts other than that.

18     Q     Okay.  We'll come back to that in a moment.

19 A    I'm sure you will.

20     Q     Now you have disclosed the current cash balance in

21 your other declarations that you filed in other bankruptcy

22 proceedings, have you not?

23 A    Sometimes I do.  Sometimes we -- I don't.  I mean in this

24 case, because we had effectively zero, I don't think it was a

25 big issue.

Etlin - Direct/Glenn                                   24

1       Q    Okay.  Now the first day hearing was on April 24th in

2    the afternoon, correct?

3    A    Yes, Monday afternoon.

4       Q    Okay.  And you filed bankruptcy, the Chapter 11

5    petitions, the evening before, correct?

6    A    On Sunday.  That's correct.

7       Q    Okay.  And up until that time, you had Friday sales,

8    Saturday sales, and Sunday sales that you were trying to

9    reconcile and understand what those actually produced, correct?

10   A    I wouldn't characterize this as trying to reconcile and

11   understand what they had produced.  Again, we were spending

12   most of our time focused on getting a five billion-dollar

13   public company with 800 stores and 12,000 employees into a

14   successful filing.  I did know what the sales were.  I do

15   receive daily sales reports as part of the management team.

16      Q    Okay.  When in the business day or the weekend -- at

17   what point in the day do you receive those reports?

18   A    I receive them at the beginning of the business day for

19   the prior day.

20      Q    Okay.

21   A    Generally sometime in the morning.  Sometimes they're

22   late.  We have been having continual systems issues.

23      Q    These are the sales reports, not the cash reports?

24   A    That's correct.

25      Q    Okay.  When do you first receive the cash reports for

Etlin - Direct/Glenn                          25

1  the prior periods?

2  A    For a weekend period?

3       Q    Let's start with the weekday?

4  A    It generally -- because the majority of the company sales

5  are via credit cards, there is a two to three-day business day

6  processing period from the date of the sale until we get the

7  report back from the credit card company.

8       Q    Okay.  And when does the cash hit your bank account?

9  A    Typically in pieces.  For weekends, it would hit Tuesday

10 afternoon and then also there's another piece that comes in on

11 Wednesday.  I believe American Express is a little bit slower

12 than Visa and MasterCard.

13      Q    Okay.  And what about Friday?  When would the Friday

14 cash hit the bank?

15 A    That would be the same.

16      Q    Okay.  So it would be Monday?

17 A    No.

18      Q    It would be Tuesday?

19 A    So it would Tuesday and Wednesday.

20      Q    So Friday, Saturday and Sunday you get on Tuesday?

21 A    Generally, yes.

22      Q    Okay.  And you have a sales report.  Let's talk about

23 that for a minute.  Now we have asked for a copy of those sales

24 reports, but we have not received them so I don't know what's

25 in them.  What did the sales reports reflect?

1  A    They reflect sales by store, gross sales by store, for the

2  applicable day.  Sometimes there are stores that are not online

3  and don't transmit properly, but generally it reflects -- it is

4  intended to reflect all stores, all sales, for the previous

5  day.  And then there are various cuts of the data relating to,

6  you know, by category of sales and, you know, pots and pans

7  versus linens and things like that, but I generally look at the

8  summary reports and look at the reports by region.

9         MR. GLENN:  Okay.  Let's go to the budget, BHG

10 Exhibit 2, which I offer into evidence.

11        MR. HOWELL:  No objection.

12        MR. GLENN:  Thank you.

13        (Exhibit BHG-2 Admitted Into Evidence.)

14 BY MR. GLENN:

15   Q    Okay.  So I think you have testified that this was

16 the budget that Judge Papalia saw on the first day in

17 connection with the DIP hearing, correct?

18 A    Yes, I believe so.

19   Q    Okay.  Now do you understand, as you sit here today,

20 what the standard is for approval of DIP financing on the first

21 day of the case as opposed to the second day of the case after

22 the Creditors Committee is formed?  I know you're not a lawyer.

23 You have done this a long time.  Do you have any understanding

24 of what the standard is?

25        MR. HOWELL:  I was just rising to object that it

Case 23-13359-VFP   Doc 1196   Filed 07/06/23   Entered 07/06/23 09:07:31   Desc Main
Document    Page 27 of 211

n - Direct/Glenn                              27

1  calls for a legal conclusion.

2         THE COURT:  Yeah.  I object -- I sustain the

3  objection to the extent he's asking for a legal conclusion.

4  But if Ms. Etlin has some understanding not legal

5  understanding, then --

6         MR. GLENN:  That's correct.  That's what I'm asking

7  for.

8         THE WITNESS:  I think -- I'm trying to remember a

9  case that I have done in the more than 35 years that I have

10 been doing this work where we didn't get the DIP approved on

11 the first day, at least as to a preliminary matter.  So --

12        MR. GLENN:  Okay.

13 BY MR. GLENN:

14    Q    But you understand the standard for that as a

15 layman -- layperson?

16 A    I'm sorry.  That's -- I cannot specifically recall.  If

17 you're trying to remind me about something, you could --

18    Q    No.

19 A    -- ask me --

20    Q    No.

21 A    -- specifically what -- what you understand the standard

22 to be.

23    Q    I'll get back to that in a moment.

24        Now, you prepared this budget with the Alex Partners

25 team and the Bed Bath & Beyond management team, correct?

WWW.JJCOURT.COM

Etlin - Direct/Glenn                                    28

1  A    Yes, we did.

2       Q    Okay.  And this shows, if you look at number one, the

3  column on the left, that the company does not have sufficient

4  liquidity to pay all of the expenses in this first chart, in

5  this first column I should say, without the DIP financing,

6  correct?

7  A    That's correct.

8       Q    Okay.  And we have here operating disbursements of 86

9  million, collections of 56 million and that creates an

10 operating cash flow deficit of 30 million dollars, correct?

11 A    That's correct.

12      Q    Okay.  And we see down below the color or the line

13 DIP flows with the 40 million dollars.  Doesn't that reflect

14 the inflow of the DIP financing?

15 A    Yes, it does.

16      Q    Okay.  Now you were in court in the first day.  I

17 believe Ms. Geier informed the Court that there was, "30

18 million-dollar hole that needed to be filled" in the first week

19 of the case, correct?

20 A    That's correct.

21      Q    Okay.  And that's a reference to this 30 million-

22 dollar negative cash flow position here, correct?

23 A    Yes.

24      Q    Okay.  Now I'd like you to go to Exhibit 3.  Exhibit

25 3, we'll call BHG-3, is your broader first day declaration,

Etlin - Direct/Glenn                          29

1  which was in support of generally all the other relief in the

2  case in providing the Court with background about the case,

3  correct?

4  A    Yes.

5     Q    Okay.  Now I'd like you to turn to paragraph 81 of

6  this document, please.

7  A    I'm sorry.

8     Q    I'm sorry.

9  A    The exhibit I have stops at paragraph 60.

10    Q    That's a problem.  Bear with me for a minute.

11         THE COURT:  Mine actually has it.

12         MR. GLENN:  Let me approach.

13         THE WITNESS:  It's a very, very, very --

14         MR. GLENN:  Swap this one out.

15         THE WITNESS:  -- long declaration.  It --

16         THE COURT:  Please.

17         THE WITNESS:  -- was a very long declaration.

18         THE COURT:  We don't expect you to memorize it.

19         THE WITNESS:  You're going to trade me?

20         MR. GLENN:  It's right here.

21         THE WITNESS:  Okie-dokey.

22         MR. GLENN:  Thank you.

23         THE WITNESS:  All right.

24         MR. GLENN:  Just one moment.

25                        (Pause)

Etlin - Direct/Glenn                              30

1  BY MR. GLENN:

2      Q    Now your declaration projected the proceeds of the

3  proposed sales of debtors' assets, correct?

4  A    I -- I'm sorry?

5           MR. GLENN:  One moment, please.

6           THE WITNESS:  Sure.

7  BY MR. GLENN:

8      Q    Well, do you recall projecting in your first day

9  declaration -- I'm going to find this because I don't have the

10  right paragraph number here -- approximately 718 million

11  dollars of proceeds from GOB sales?  Does that number --

12          THE COURT:  Wait.  Where are you?  Where are you --

13          MR. GLENN:  I'm just asking her because we're trying

14  to -- I'm trying to speed this up.

15  BY MR. GLENN:

16     Q    So do you remember projecting 718 million dollars of

17  proceeds from -- the sales of from the GOB sales?

18  A    I'm sorry, Mr. Glenn.  I would have to go look at this --

19     Q    Okay.

20  A    -- quickly.

21     Q    We'll come back to that.  Okay.  So when you filed

22  the Chapter 11 case, did you have an opinion about whether

23  there was enough collateral to repay the Sixth Street debt

24  without resort to any of the other unencumbered collateral?  In

25  other words, that their regular collateral would be sufficient?

1          MR. MERVIS:  Your Honor, first for the record,

2    Michael Mervis, Proskauer Rose.  I have the dubious pleasure of

3    being Mr. Hillman's partner.  The -- I object to the question

4    as in it calls for a legal conclusion about what was

5    unencumbered versus encumbered collateral pre-petition.

6          THE COURT:  I sustain it to the extent he's asking

7    for a legal conclusion.  But, again --

8          MR. GLENN:  I'm not.

9          THE COURT:  -- same -- handle it the same way if

10   Ms. Etlin has an understanding based on her extensive

11   experience of what she was dealing with at the time and in

12   negotiating, then she can testify to that without getting into

13   legal conclusions if you can.

14          MR. GLENN:  That's the question.

15          THE WITNESS:  So I'm not specifically recalling what

16   was collateral and what wasn't, but I would say the following.

17   When you're liquidating a business this large, there are things

18   that you can predict that you know what the proceeds are going

19   to be or that you can reasonably predict them within a range.

20   And then there's a whole host of other things, like, claims and

21   recovery of LCs and other kinds of things that there is a

22   fairly broad range around.

23          We were satisfied that within the period of the case

24   leading from the filing of the case to the creation of the

25   liquidating trust, which is the intent at the end of the case,

 1  that there would be sufficient cash to run the case and provide

 2  a recovery to the senior secured lenders.

 3        But that was my focus, not in coming to necessarily

 4  any formal conclusion as to somebody's ultimate recovery from

 5  their specific legal collateral.

 6        MR. GLENN:  Okay.

 7  BY MR. GLENN:

 8     Q    So let's turn to page 32, paragraph 81 of your first

 9  day declaration.  There's a section there that is under the

10  legend, "Value maximizing liquidations."

11  A    I'm sorry.  My first day declaration, paragraph --

12        MR. GLENN:  Exhibit 3.

13        THE WITNESS:  Yes.  Paragraph --

14        THE COURT:  The page --

15        THE WITNESS:  -- 81 --

16        THE COURT:  I don't have that.

17        THE WITNESS:  -- refers to NOLs.

18        MR. GLENN:  Yeah.  I think there's a problem with the

19  binders.  I'm going to have to come back to that.  We will fix

20  that.  Apologies.  Okay.

21  BY MR. GLENN:

22     Q    So the next subject we're going to cover is -- okay,

23  so the DIP budget again.  The DIP budget was prepared and

24  filed -- was filed at 11:47 the day before the first day

25  hearing, correct?

Etlin - Direct/Glenn                                      33

1  A    I'm not sure the time of the filing.  I'm not in charge of

2  that, but if, you know, Candy wants stipulate to the timing,

3  they can --

4       Q    Yeah.  It's on Exhibit 2.  It's at the very top.  It

5  gives a time stamp.  It's --

6  A    Okay.

7       Q    -- after 10:00 the night before.

8  A    That's not unusual in a situation like this.

9       Q    Okay.  Thank you.  And then the hearing was held the

10 next day, correct?

11 A    That's correct.

12      Q    Okay.  And then the judge approved the roll-up and

13 that was effective on the first day of the case, correct, in

14 the original DIP order?

15 A    (No response.)

16      Q    You don't know.  Okay.  I'll move on.  Okay.

17           THE COURT:  Yeah.  That's --

18           THE WITNESS:  I look at Your Honor.  Does --

19           MR. GLENN:  All right.

20           THE COURT:  That was -- yeah.  That was --

21           MR. GLENN:  It's in the record.  I don't -- that was

22 more for foundation.  Okay.

23 BY MR. GLENN:

24      Q    So the next question I have is, the second DIP

25 hearing, okay, you prepared a second budget the day -- it was

Etlin - Direct/Glenn                              34

1  published the day before the second DIP hearing, I believe, on

2  June 14th of 2023, correct?

3  A    Yes.

4      Q    Okay.  And the DIP budget was filed with the court at

5  11:47 p.m. that day and the hearing was held at 11:00 a.m. on

6  June 14th of 2023.  Does that sound correct to you?

7  A    I guess so.

8      Q    Okay.

9  A    I was --

10      Q    Okay.

11  A    -- present at the hearing.  Again, I'm not in charge of

12  making court filings, so --

13      Q    Fair enough.  And at that hearing, there was the

14  announcement of the settlement with the Committee, correct?

15  A    Yes.

16      Q    Okay.  Now let's go to that budget, which is

17  Exhibit 4 in your binder.

18          MR. GLENN:  Oh, and I offer Exhibit 3 into evidence,

19  BHG-3.

20          MR. HOWELL:  No objection.

21          THE COURT:  Okay.  It's admitted.

22          (Exhibit BHG-3 Admitted Into Evidence.)

23  BY MR. GLENN:

24      Q    BHG-4.  Now did you prepare this budget for

25  submission to the Court?

Etlin - Direct/Glenn                                        35

1  A    I'm sorry?

2       Q    Did you prepare this budget for submission to the

3  Court?

4  A    Yes.

5       Q    Okay.  And as we understand it, you can correct me if

6  I'm wrong, this is the first budget that was presented to the

7  Court and publicly announced to the stakeholders since the

8  budget presented to the Court at the first day hearing,

9  correct?

10 A    On the public record?  Yes.  However, we were required to

11 provide the ABL lenders, the FILO lenders and the UCC

12 professionals a weekly update to the budget.  So every week,

13 they received a variance report and an update to the forward

14 budget from the moment that the Committee was formed and hired

15 professionals.

16      Q    Okay.  Now I'm going to go back and forth between the

17 first DIP budget and the second DIP budget, so if you could

18 have them both at your fingertips so --

19 A    Give me a second.  I'm going to --

20      Q    Sure.

21 A    -- open up the binder.

22           MR. GLENN:  In the meantime, let's offer Exhibit 4

23 into evidence, please.

24           MR. HOWELL:  No objection, Your Honor.

25           THE COURT:  It's in evidence.

Etlin - Direct/Glenn                               36

1           (Exhibit BHG-4 Admitted Into Evidence.)

2           MR. GLENN:  Okay.

3  BY MR. GLENN:

4       Q    So let me know when you're ready.

5  A    Give me a sec.  Just trying not to mic -- knock the

6  microphone.  There's very little room up here.  Okay.

7       Q    Okay.  So the first week budget in this case, the

8  actual results for Week 1, show positive net cash flow of 89

9  million dollars and ending cash of 93 million dollars for the

10 first week of the case.  Are those numbers accurate?

11 A    Yes, they are.

12      Q    Okay.  And going back to your budget for the first

13 week, you projected ending cash of 10 million dollars.  So

14 apples to apples numbers between these two budgets, the actual

15 cash flow generated -- or the ending cash generated was 93

16 million dollars versus 10 million dollars in the budget by

17 which Judge Papalia approved the DIP financing, correct?

18 A    Yes, due to both a positive variance in cash receipts and

19 a positive variance in disbursements, which resulted from the

20 inability of our cash management bank to get our disbursement

21 accounts open timely.  They were focused on getting our payroll

22 accounts open and, unfortunately, operationally that bank is

23 not super fast.

24           And so we -- many of the things that we anticipated

25 making disbursements for in Week 1, we were unable to do so

Etlin - Direct/Glenn                                37

1  because the bank accounts weren't open.

2      Q    Okay.  Okay.  We're going to get to that.  I just

3  want to make sure that the Court understands what the numbers

4  mean.  Am I correct?  Ending cash in Exhibit 2 is the same

5  metric as the ending cash in Exhibit 4?

6  A    That's correct.

7      Q    Okay.  So there was an 83 million dollars positive

8  variance to the company, correct?

9  A    Yes.  Sort of.

10      Q    Okay.  And --

11  A    Sort of.

12      Q    Well, that's what the numbers say.  It's 83 million.

13  I'm just doing the math.

14  A    I understand it, but in -- in that number is also the

15  entire amount of the reserves because I didn't have an open

16  bank account to transfer it to and it was originally included

17  as a disbursement.  If I don't have a bank account to transfer

18  it to, it was sitting in the bank account.  It was segregated.

19      Q    I understand.  I understand.  I just -- we'll get to

20  that.  But I just want to make sure we start with the

21  foundation of the numbers.  Eighty three million dollars --

22  A    So do I.

23      Q    Okay.  Thank you.  Okay.  So, again, you may disagree

24  with me, but we're just going to do some math.  If we didn't

25  have the DIP in Week 1 and we subtracted that number from the

Etlin - Direct/Glenn                    38

1  93 million dollars, the company still would have had another --

2  53 million dollars of cash in the bank account at the end of

3  the first week, correct?  That's what the numbers say.

4  A    Of which 31 of it was reserves --

5       Q    Okay.  I'm just --

6  A    -- we had negotiated for.  So --

7       Q    Fair enough.

8  A    -- that's not available to me.

9       Q    Fair enough and we're going to get to that.  But

10  numerically, if we remove 40 million dollars from the system in

11  Week 1, the company still would have had the ability to pay all

12  the expenses that it actually paid in Week 1, correct?

13            MR. HOWELL:  Object.  Incomplete, hypothetical.  If

14  the question is, you know, is 93 million less 4053, she can

15  answer that, but I think it's far more complex than that

16  question.

17            MR. GLENN:  Well, he's going to have the opportunity

18  to elicit -- you know, to elicit that from the witness.  I just

19  want to understand if the company would have been able, with 40

20  million dollars less, to pay all of the expenses that it

21  actually paid in Week 1.  Isn't that what the numbers say?

22            THE COURT:  Is it -- is that -- so the question is

23  limited to week 1 and without -- just as a slice of time or --

24            MR. GLENN:  Yes, it is.

25            THE COURT:  -- it's a --

Etlin - Direct/Glenn                              39

1          MR. GLENN:  A slice of time.

2          THE COURT:  -- specific period of time without

3  considering all the other things that --

4          MR. GLENN:  Yes.

5          THE COURT:  -- come down the line and the reserve and

6  all that?

7          MR. GLENN:  Yes.  Yes.

8          THE WITNESS:  Your math is very good for a lawyer,

9  Mr. Glenn.

10          MR. GLENN:  Thank you.  You taught me well.

11  BY MR. GLENN:

12     Q    So let's go to the second period, okay?  That 93

13  million-dollar number is carried as the beginning cash in the

14  second column in Exhibit 4, do you see that?  There's 93

15  million dollars there, right?

16  A    Yes.

17     Q    Okay.  And there's ending cash of 69 million.  Do you

18  see that?

19  A    Yes.

20     Q    Okay.  So if the company never got the DIP, it still

21  would have had 29 million dollars in its bank account at that

22  point in time, correct?

23  A    But at that point, I needed to have 30 million -- one

24  million dollars in reserves.

25     Q    Okay.  When in this period did you pay the reserves?

Etlin - Direct/Glenn                                              40

1  A     Part of them were paid in Week 2 and part of them, I

2  think, were paid in Week 3.

3       Q     Okay.  So did the company suffer immediate and

4  irreparable harm because you did not pay those reserves in

5  Week 1?

6  A     So it would have had the company's employees known that

7  those reserves were not funded into a segregated account on

8  that day.  We assured them that that had happened.  So we had a

9  big problem with retaining employees given the disjointed and

10 very, very difficult process the company had been through.  And

11 we assured them, and I assured them in Week 1, even though it

12 wasn't technically segregated, that it was there, funded and

13 segregated.

14      Q     Okay.

15 A     So shame on me, I guess.

16      Q     Okay.  But the question is, the company is still

17 operating and it did not suffer immediate and irreparable harm

18 because you deferred those expenses, correct?

19 A     It did not suffer that harm because I told people that --

20 that they were funded and done even though they were not.

21      Q     Okay.  So let's go to the third week -- well,

22 actually, let me ask you this question first.  In Exhibit 4,

23 but not in Exhibit 2, there's a line at the bottom and it says

24 any weekly cash -- "Any weekly ending cash amount in excess of

25 10 million dollars is subject, in all respects, to paragraph 26

Etlin - Direct/Glenn                                    41

1  of the final order." What does that refer to?

2  A    That was added by counsel, but I think what it means is

3  that the fact that the lenders have not forced us to sweep down

4  to ten million doesn't mean that they don't have the right to

5  do so.

6       Q    Okay. All right. So let's talk next about this

7  first week. When did you learn what the actual receipts were

8  or what they were likely to be for the period of Friday,

9  Saturday and Sunday preceding the petition date?

10 A    When did I know that what they were likely to be?

11      Q    Yes.

12 A    Not until we actually saw them. The company had 300

13 million dollars in gift certificates outstanding and, as Your

14 Honor noted in day one, lots and lots of 20 percent coupons

15 everywhere in the world. So we didn't know exactly how much of

16 those sales would be offset by the redemption of those items

17 until we actually got the cash receipts. The company's systems

18 were just not set up to properly track that and we were always

19 reconciling in arrears to what we got.

20      Q    Okay. So when know or have some concrete

21 understanding what it was likely to be for that period of time,

22 Friday, Saturday and Sunday? When was the first time you

23 looked at the sales reports, you looked at the cash receipts?

24 When did you know what the range would look -- was likely to

25 be?

Etlin - Direct/Glenn                                    42

1            MR. HOWELL:  Just object to the compound question.

2    There were a lot of questions in there, I think.

3            MR. GLENN:  I'll rephrase it.

4    BY MR. GLENN:

5        Q     When did --

6            THE COURT:  What --

7            MR. GLENN:  -- you know what the cash position was

8    likely to be?

9            THE WITNESS:  Let me -- let me shortcut this for you.

10           MR. GLENN:  Sure.

11           THE WITNESS:  The company had had an extended history

12   up to that point because of the deteriorated nature of the

13   business of doing approximately five to five-point million

14   dollars in sales per day.  So upon the announcement of the

15   potential pending bankruptcy on that weekend, sales on Saturday

16   went up to six million and on Sunday, they went up to eight

17   million.  So that would be a million and another three million,

18   so maybe four million dollars more than normal.  Again, we

19   didn't know if that was all gift certificate activity or,

20   frankly, if we were giving up regular sales to gift certificate

21   activity.

22           The big change in sales didn't -- that is reflected

23   in the results for that week, that very first week of the case,

24   really didn't occur until Monday and I would not have known the

25   actual sales number for that until Tuesday morning we did 13

Etlin - Direct/Glenn                                          43

1  million dollars in gross sales on Monday.

2  BY MR. GLENN:

3       Q    Okay.  So --

4  A    And then it continued forward at that rate that week and

5  so that's why you see that big variance in that week.

6       Q    Okay.  So if the DIP hearing had been held one day

7  later, we would have had a lot more information than what we

8  actually had, right?

9  A    Not -- not necessarily because it depends on the

10 reconciliation of the cash if you're going to the cash

11 component.  Again, we were -- we had had an extended

12 negotiation with the DIP lenders about the restrictions on gift

13 certificates in the budget and we had proposed 40 million

14 dollars, 20 million dollars per week, for the first two weeks.

15 And potentially there was a budget we prepared at one point

16 that had 20 million dollars a week for four weeks.  We

17 ultimately settled on, in the court process, 10 million dollars

18 for each of those two weeks being cash in the form of gift

19 certificates in the budget.  The actual for those two weeks was

20 43 million dollars.

21      Q    Okay.  So --

22 A    Which would directly reduce cash receipts dollar for

23 dollar.  And we didn't know at that time what that level of

24 activity was.  We knew it was high in the stores anecdotally

25 from the store managers calling in and saying, "We're getting

Etlin - Direct/Glenn                                44

1 inundated with gift certificates.  Are we supposed to accept

2 them or not?"

3      Q    Okay.  So going back to the ending cash.  Okay.  You

4 have in your original budget 10 million dollars for each of

5 those periods and then going forward in the second budget, you

6 have 93, 69, 34, 36, 34, 24 and then it goes on from there.

7 Did I read that correctly?

8 A    I'm sorry.  What are -- what are you referring to?

9      Q    The ending cash in Exhibit 2 versus Exhibit 4?

10 Exhibit 2 has ending cash of 10 million dollars across the

11 board.  Then ending cash in the final DIP budget shows

12 significantly higher numbers for the first six or seven weeks,

13 correct?  Six weeks.

14 A    Yes.  We -- because of the surge in sales in those first

15 couple of weeks, we had a discussion with the DIP lenders

16 because we were concerned about what would happen after.

17 Remember we ended these cases substantially out of stock with

18 only 65 percent, approximately, of the normal inventory levels

19 in the stores and we were afraid with those high sales that we

20 would run out of inventory and that sales would tank which, as

21 you can see, is exactly what happened starting in Week 3 and

22 then continuing forward.

23      Q    Okay.  But --

24 A    So rather than pulling out money that they would have

25 trouble procedurally putting -- giving back to us under the

Etlin - Direct/Glenn                                        45

1  terms of the lending agreements, they left the cash in there so

2  that we could see -- we could cover operations and that they

3  didn't over-sweep cash at the beginning of the case.

4       Q    Okay.  So but the ending cash was projected to be in

5  every period 10 million dollars in the first budget and it's

6  tens of millions of dollars more than that in the budget you

7  filed before the second day.  That's what the numbers say,

8  right?  No commentary.  That's what the numbers say?

9  A    That is what the numbers say.

10       Q    Thank you.  Okay.  And then there's something else in

11  both of these that I want to draw the Court's attention to,

12  okay?  Let's look at the ABL balance numbers in the first one.

13  There's an 82 with parentheses, a 36 with parentheses and a 7

14  with parentheses in the first budget.  What does that refer to?

15  A    That's the amount outstanding on the ABL.

16       Q    Okay.  So why does the ABL, in your first budget, go

17  from 82 to 36 in those two periods?

18  A    That was the agreement that to the extent that there

19  were -- was cash available that we would be paying down the ABL

20  during that period of time.  The ABL sits in front of the FILO

21  and we were selling off their collateral.  At all periods of

22  time we were actually in the lending formula, over drafted.  We

23  entered this case with a negative 89 million-dollar overage --

24       Q    I'm going to ask you to answer the questions I have

25  asked.  Counsel can ask you questions on redirect -- on direct.

Etlin - Direct/Glenn                                          46

1          So the difference in that ABL pay-down is, am I

2    correct -- is the net cash flow is 45 and 10 is the ending cash

3    balance.  It's the delta.  It says 36.  Maybe that's rounding.

4    Is that the cash sweep that you're talking about to pay down

5    the ABL?

6    A    Yes, I believe so.

7          Q    Okay.  Now if we go to the second budget, there's a

8    pay down of 50 million dollars to the ABL in the second week,

9    correct?

10   A    That's correct.

11         Q    Okay.  And then the third week, 28 million, and then

12   the ABL is completely paid off, right?

13   A    That's correct.

14         Q    Okay.  So --

15   A    Except for the LCs.

16         Q    Except for the LCs.  Thank you.  Okay.  Now, am I

17   correct, based on all the numbers that you actually generated,

18   had you not taken the DIP, the ABL still would have been paid

19   off.  It just might have taken a little longer?

20         MR. HOWELL:  Again, object to the incomplete

21   hypothetical.  If it's just a math exercise, that's all it is,

22   but she's testified that there are a lot of other things that

23   went into it.

24         THE COURT:  Uh-huh.  I guess just can you restate --

25         MR. GLENN:  Sure.

1          THE COURT:  -- your question again?

2          MR. GLENN:  Sure.

3          THE COURT:  Okay.

4    BY MR. GLENN:

5      Q    Does the actual performance reflect, if you hadn't

6    had the DIP, that you would have been able to repay the ABL,

7    albeit maybe longer for -- you know, over a longer period of

8    time?

9          THE COURT:  You can -- if you know the answer that,

10   you can answer it.  If --

11         THE WITNESS:  Yeah.  Under this hypothetical, that

12   would be correct.

13         MR. GLENN:  Okay.  Thank you.

14   BY MR. GLENN:

15     Q    Now let's talk about rent.  Now going back to

16   Exhibit 2, you projected the payment of rent of 26 million

17   dollars in the first week of the case.  Do you see that?

18   A    Yes, I do.

19     Q    Thank you.  Okay.  And if you go to the one -- the

20   second budget, there's a number of 23 million dollars that's

21   paid in the second week of the case.  Do you see that?

22   A    Yes, I do.

23     Q    Okay.  And the deferral of those payments from Week 1

24   to Week 2 did not cause the company immediate or irreparable

25   harm, did it?

Etlin - Direct/Glenn                                    48

1  A     The rent is due on the first of the month.  In order for

2  the landlords to receive the rent on May 1, which was Monday of

3  Week 2, it needed to be paid and released on Friday.  I am very

4  conscious of the rules in this court which require me to pay

5  things on time.

6          So if you want to assert no irreparable harm, did any

7  banker -- did any landlord haul us into court jumping up and

8  down and screaming that they were not paid on time?  No, they

9  did not.  But do I intend to pay things on time and were they

10 budgeted to be paid on time?  They were and they were not

11 because our bank accounts weren't open.

12   Q     Well, that's not 100 percent true, is it, Ms. Etlin.

13 You made a stub rent payment during that week, didn't you?

14 A     We made some wires at the very last second to a few

15 landlords that we could get out the door, but we have 800

16 stores.  Those are a very complex set of ACH transactions and

17 the bank account necessary to do that was not open.  I got out

18 what I could via wire with people running around with their

19 hair on fire on Friday.

20   Q     And, in fact, you were behind on paying rent going

21 into the Chapter 11 case, were you not?

22 A     Yes, we were.

23   Q     Okay.  And so --

24 A     We were called in default and we were not allowed to pay

25 that by our lenders until we filed.

Etlin - Direct/Glenn                                      49

1      Q    Okay.  But the fact that you deferred the rent,

2   paying the rent, the day it was due as opposed to the Friday

3   before did not cause you immediate and irreparable harm, did

4   it?

5   A    No, it did not.

6      Q    Okay.  Now let's go back to the first DIP budget.

7   There's a line here called non-merch vendor expense and that's

8   14 million reflected here.  Do you see that?

9   A    Yes.

10     Q    Okay.  Now if we go to the actual performance for

11  that period, you only paid one million dollars of those

12  expenses, correct?

13  A    It's not entirely accurate.  In rush to put the original

14  DIP budget together, we included the amounts redeemed --

15  estimated to be redeemed for gift certificates into that line

16  rather than in the cash receipts line and in the actuals, it's

17  reflected as net against the cash receipts line.  So the cash

18  receipts have been appropriately reduced for the amount of gift

19  certificates actually redeemed.

20     Q    Okay.  So that number was adjusted to another line

21  item on this report and these robust results are net of the

22  expenses that you're identifying, these non-merchant vendor

23  expenses?

24  A    That's correct.

25     Q    Thank you.

1  A    Net of much larger number.  It was more than 20 million

2  dollars.

3      Q    Okay.  So you have, in the first budget, 83 million

4  dollars of non-merchandise expense in the first five weeks and

5  then you have 71 million dollars for the entire 13-week period

6  in BHG Exhibit 4, correct?

7  A    That's correct.

8      Q    Okay.  And is it your testimony that the delta

9  between those two numbers is only the -- was it the gift cards

10 or the coupons, whatever you just testified to?

11 A    No.  There were other differences.  Again, it's a five

12 billion-dollar company in a fairly substantial state of

13 disarray.  We did our best, based upon the run rate that we had

14 experienced pre-petition, to estimate post-petition.  We also

15 had to add in -- that line contains also charges for things,

16 like, freight and DC operations for our three PLs and we had to

17 undertake to take almost 200 million dollars out of our

18 distribution centers and shift it into the stores during that

19 period of time, so we needed to estimate what those charges

20 were going to be.  The ultimate run rate turned out to be much

21 more elongated than we had forecast and less than we had

22 forecast.

23     Q    Okay.  Let's talk about the payroll expense, once

24 again, so we have a clear record about this.  Exhibit 2 shows

25 payroll of 42 million dollars in the first week and Exhibit 4

Etlin - Direct/Glenn                                        51

1 shows 17 million dollars of payroll in the first week, correct?

2 A    That's correct.

3    Q    Okay.  And am I correct that the delta between those

4 two numbers or the reserves we have been talking about, the

5 WARN reserve and I think the severance priority claim reserve?

6 A    That's most of it and then there's another piece that was

7 a closing bonus that was due to managers of stores.  It hadn't

8 been fully processed as of Week 1.  We thought it would be and

9 it was ultimately paid in Week 2.

10   Q    Okay.  Now, the reserve is an account that you set up

11 to pay these liabilities at some future point in time, correct?

12 A    If you're referring to the WARN and the priority claims

13 reserves, that's correct.

14   Q    Yes.  Okay.  And those payments are made when you

15 give notice to the employees or actually fire them, correct?

16 A    It's paid to the employees as they exit the business.

17 That's correct.

18   Q    Okay.  And has that started happening?

19 A    So, yes.

20   Q    Okay.  But that -- those reserves were not -- strike

21 that.  The reserves are still in the reserve accounts today,

22 right?  Isn't that one of the disputes we're having, that

23 that's being held up pending this dispute?

24 A    The reserves still are sitting in those accounts pending

25 the departure that -- the major departure will have from the

Etlin - Direct/Glenn                                          52

1  business of people who are eligible for these New Jersey WARN

2  payments will be at the end of July, because it'll be the major

3  downsize in the corporate staff and the closure of the New

4  Jersey stores.  And so -- but, yes, they're still there and it

5  was important to be able to show our employees.  I --

6      Q    Okay.

7  A    I'm not going to go any further because you're going to

8  tell me not to answer things you haven't asked.

9      Q    Please.  Please.

10 A    So --

11     Q    I'm sure my colleague will ask you all these

12 questions.

13          So now isn't it the case --

14 A    Yes.  He's taking notes.

15     Q    Isn't it the case that even Sixth Street asked the

16 company to send out WARN notices before the filing to avoid a

17 pre-petition expense for this?

18          THE COURT:  One second.  There's a --

19          MR. MERVIS:  Yeah.  Your Honor, objection.  That's

20 hearsay.

21          THE COURT:  That is.  That where they had -- whether

22 Sixth Street asked Ms. Etlin to send out WARN Act notices is

23 hearsay, but, you know --

24          MR. GLENN:  Well, I'll withdraw the question and go

25 at it in a different direction.

Etlin - Direct/Glenn                                53

1  BY MR. GLENN:

2      Q    Ms. Etlin, did the company consider filing or

3  extending out the WARN notices before the Chapter 11 case?

4  A    There was an extensive discussion about when or if we

5  should provide WARN notices to employees.  As you know,

6  Mr. Glenn, in our own experience together, it is very

7  controversial and management is highly opposed to giving WARN

8  notices to employees until the very last moment specifically

9  because of the disruption it causes in the flow of the

10 business.  And so, yes, it absolutely was discussed and the

11 company was highly opposed.

12     Q    And creditors had asked you, or the company, to do

13 that and the company decided not to anyway, right?

14          MR. MERVIS:  Same objection, Your Honor.

15          THE COURT:  Same objection but --

16          MR. GLENN:  I think this goes to their state of mind.

17 It's not for the truth of the matter asserted.  It doesn't

18 matter whether it's true.  If they heard it and disregarded it,

19 that's independently relevant.

20          MR. MERVIS:  Well, I'm not sure that it's actually

21 relevant to this motion.  But I think it's only fair

22 (indiscernible).

23          THE COURT:  Well, just repeat your question again.

24          MR. GLENN:  I'll --

25          THE COURT:  Okay.

1          MR. GLENN:  I'll withdraw it.

2          THE COURT:  Okay.

3          MR. GLENN:  Okay.

4  BY MR. GLENN:

5      Q    So but the bottom line is, okay, you created this

6  reserve.  You asked the judge to have them funded in Week 1,

7  you didn't fund it in Week 2, and the payments actually won't

8  go out the door, the majority of them, until July.  Isn't that

9  a fair summary of what you have testified to?

10 A    No.

11     Q    Okay.  When are those payments actually going to be

12 made to the employees working?

13 A    Well, let's start with the first part of your

14 hypothetical, Mr. Glenn.

15     Q    Sure.

16 A    So the -- the money came in in Week 1.  It was accounted

17 for and segregated in our accounts, but it wasn't put into the

18 specifically designated bank account because we couldn't get

19 our lender to open that bank account.  As a matter of fact,

20 technically that bank account wasn't open for four weeks.  We

21 ultimately re-purposed a different bank account to hold this

22 stuff.

23          It was incredibly important that I be able to stand

24 up in front of all of our employees who were absolutely

25 convinced that they were not going to be paid for this in this

Etlin - Direct/Glenn                                    55

1  case.  They did not believe management.  They were very

2  concerned and I had been asked individually at least 50 times

3  by employees, "Is my money safe?  Is my money in reserves?"  So

4  it was very important that I had it funded in Week 1 and set

5  aside.

6          So it is -- as to the second part of your question,

7  it is absolutely true.  The majority of it is not being paid

8  until the majority of our employees depart at the end of July.

9       Q   Okay.  So --

10 A   And it will sit segregated until that day so that they

11 know it's there for them and that they are assured in a process

12 that they find very scary that they will be able to be paid.

13         MR. GLENN:  Okay.  I'm going to try to ask this

14 question without raising confidentiality issues, but please

15 feel free to stand up and correct me if I'm plowing over ground

16 that shouldn't be plowed.

17 BY MR. GLENN:

18      Q   So unencumbered collateral, okay?  The unencumbered

19 collateral in this case, as you understand it and we have

20 talked about it, includes at least the lease designation rights

21 and the litigation rights.  Again, I'm asking you as a

22 layperson.

23         THE COURT:  Yeah.  Those -- they're both rising and

24 is --

25                         (Laughter)

Etlin - Direct/Glenn                                    56

1              MR. MERVIS:  As a layperson, Your Honor, to the

2    extent that has any relevance, that's fine.  The objection

3    obviously is it calls for a legal conclusion.

4              MR. HOWELL:  Same objection.

5              THE COURT:  Yeah.

6              MR. GLENN:  Okay.

7              THE COURT:  I --

8              MR. GLENN:  As a layperson.

9              THE COURT:  Okay.

10             THE WITNESS:  Yeah.  Yes.  It's my understanding as a

11   layperson that you cannot grant a security interest in lease

12   designation rights outside of bankruptcy.  That's not normally

13   done as --

14             MR. GLENN:  Okay.

15             THE WITNESS:  -- part of a lending environment.

16             MR. GLENN:  Okay.

17   BY MR. GLENN:

18        Q    Now, the WARN Act and priority reserve amounts in

19   this budget are approximately 23 million dollars, am I correct?

20   A    I think it's 21, but, yes, the -- the WARN piece and there

21   were -- but there other reserves on top of that, the priority

22   claims reserve and then, of course, the professional fee

23   reserve.

24        Q    Okay.  For the WARN Act reserve though?

25   A    Twenty-one.

Etlin - Direct/Glenn                          57

1    Q    Okay.  And isn't it the case that you valued the

2    lease designation proceeds well in excess -- I won't give the

3    exact number.  I won't give a range.  But isn't it the case

4    that you forecasted the lease designation auction to produce

5    well in X of that and, in fact, it has produced well in X of

6    that number -- well in excess of that number?

7  A    Yes.

8    Q    So there were other cash proceeds that you knew, or

9  believed, would be available to pay those WARN Act liabilities,

10 but you thought it was important that the employees knew that

11 they had that up front in the reserve account, isn't that what

12 we're talking about now?

13       MR. MERVIS:  Your Honor, I'm sorry.  I object to the

14 form of the question.  Well, I'm -- I object to the other

15 proceeds comment.  I think that is a misleading question.

16       THE COURT:  Other proceeds?

17       MR. GLENN:  Okay.  I'll rephrase the question.

18 BY MR. GLENN:

19   Q    There was value available to pay that reserve that

20 you -- that's so important to the company to fund, but you

21 wanted it funded on day one versus when the lease designation

22 proceeds came in, correct?

23 A    I'm not sure I would draw the conclusion that there was

24 value available to pay those things in a highly complex case

25 where there are multiple moving parts.  I couldn't guarantee

Etlin - Direct/Glenn                                          58

1  that and I certainly wasn't going to hang my hat on that.  So

2  the first part of your question, the answer is no.

3          The second part, the answer is absolutely.  I was

4  very clear with all the lenders that we needed that reserve

5  funded up front so that we could retain our employees in order

6  to maximize value in these cases.

7          MR. GLENN:  Okay.  Your Honor, can I have a five-

8  minute break so I can just wrap this up?  I think I'm close to

9  the end.  I want to make sure I cover everything I need to

10 cover.

11          THE COURT:  Sure.  And then let me just ask this

12 then.  Will other counsel -- I'm not limiting it.  It could be,

13 you know, the debtor, it could be the lender, it could be the

14 Creditors Committee, the -- would you be ready then to proceed

15 immediately after or would you still need another break?

16          MR. HOWELL:  I think I'd probably be ready to proceed

17 immediately after.  It kind of depends on what he goes into and

18 how long he goes after this break.  But I could try to do that,

19 yes, Your Honor.

20          THE COURT:  All right.  I'm just asking because I

21 just hate to break for five minutes now and then break -- and

22 then have ten minutes of testimony and then break again.  But

23 if you need it, you know, then I'm going to give it to you.  I

24 just was trying to get a handle on it.

25          MR. HOWELL:  Yeah.  I think we should be good.  So --

Etlin - Direct/Glenn                                    59

1              THE COURT:  Okay.

2              MR. GLENN:  Thank you.

3              MR. MERVIS:  And if it's helpful, I don't anticipate

4  having any questions.

5              THE COURT:  Oh.

6              MR. MERVIS:  So I mean we'll wait and see what

7  happens, but no.

8              THE COURT:  Okay.

9              MR. GLENN:  Okay.

10             THE COURT:  All right.  That is helpful.

11             MR. HUEBNER:  Your Honor?  Your Honor?  This is

12 Marshall Huebner of Davis Polk.  Good afternoon.  I represent

13 the ABL lenders, who you heard a very little bit about.  I only

14 have nine questions for Ms. Etlin and I will be ready.

15             THE COURT:  Okay.  That's fine.

16             MR. GLENN:  I'll be about five minutes.

17             THE COURT:  Yes.

18             MR. GLENN:  Thank you.

19             THE COURT:  Okay.  Well, just let us --

20             MR. GLENN:  Okay.

21             THE COURT:  Just let us know when you're back, okay?

22 Thank you.

23             MR. GLENN:  Thank you.

24             THE COURT:  Thank you.

25             (Off the record at 11:52 a.m.  Back on the record at

                             Etlin - Direct/Glenn                        60

 1  12:20 p.m.)

 2          MR. GLENN:  Thank you, Your Honor.  I think we'll be

 3  a little more efficient with that break.  I really appreciate

 4  it.

 5          THE COURT:  No problem.  We're on the continued

 6  direct examination of Ms. Etlin.

 7          MR. GLENN:  I don't believe I offered Exhibit 4, so

 8  I'm doing that now.

 9          MR. HOWELL:  No objection, Your Honor.

10          MR. GLENN:  Thank you.

11          THE COURT:  Oh, so --

12  BY MR. GLENN:

13     Q   Ms. Etlin, if you could please turn to Exhibit 5 in

14  your binder?

15  A    Yes, I have it.

16     Q   Okay.  So for the record, Exhibit 5 is a document

17  summarizing the company's disbursements and collections from

18  the week of April 24th to April 28th, correct?

19  A    Yes.

20          MR. GLENN:  Okay.  I offer Exhibit 5 into evidence.

21          MR. HOWELL:  No objection.

22          MR. GLENN:  Okay.

23          THE COURT:  Thank you.

24          (Exhibit BHG-5 Admitted Into Evidence.)

25  BY MR. GLENN:

1      Q    So this document reflects the cash that the company

2  had as of the close of business on each of these days, correct?

3  A    Yes.

4      Q    Okay.  And the cash balance on April 24th, which is

5  the day of the first DIP hearing, at least as of the end of the

6  day was 30 million dollars, rather than the three million

7  dollars starting number that you were talking about earlier,

8  correct?

9  A    But that included 12 million dollars in Canada, which we

10 obviously don't have access to because Canada was in its own

11 corresponding case.  So the actual correct number at the end of

12 Monday for the U.S. would be just under 18 million dollars.

13     Q    Fair enough.  Okay.  And that 18 million dollars

14 is -- your testimony is that that 18 million dollars was not

15 known or knowable when you took the stand at the first

16 appearing in this case?

17 A    That's correct.

18     Q    Okay.  Did you have any projection at all about the

19 sales that you would generate for that day before you took the

20 stand?  Anything?

21 A    So the projection as reflected in our budget, which we

22 were anticipating since the GOB wasn't set to start until later

23 in the week, I think we were projecting maybe six or seven

24 million dollars that day.

25     Q    Okay.  And --

Etlin - Direct/Glenn                                    62

1  A    In sales, not in collections.

2       Q    Okay.  So we see here 29 million on April 24th going

3  up to approximately 98 million on April 28th, correct?  Those

4  are the cash balances for those days?

5  A    Inclusive of Canada, again, which we have no access to.

6       Q    And the DIP?

7  A    So, yes.

8       Q    And the DIP, correct?

9  A    So the U.S. -- the U.S. is 88.

10      Q    Okay.  So you were able to pay all of the

11 disbursements reflected here.  We subtract the DIP and we

12 subtract the Canadian proceeds and you have tens of millions of

13 dollars in cash, correct?

14 A    That is correct.

15      Q    Okay.  Now let's go back --

16 A    At the end of the week.

17      Q    Okay.  Let's go back to Exhibit 2, which is the first

18 day DIP budget.  Okay.  Now we have talked about the issue of

19 immediate and irreparable harm and the deferral of rent and the

20 WARN Act reserve into Week 2.  I'd like you to focus on Week 2.

21 So we have here 45 million dollars of net cash flow and 10

22 million dollars of ending cash and you had repaid 36 million

23 dollars of the ABL, correct?

24 A    That was the forecast, yes.

25      Q    Okay.  So irrespective of payment of the ABL, we take

Etlin - Direct/Glenn                                      63

1  that away, how much cash would the company have had at the end

2  of Week 2 if we take the -- if we took out the two payments or

3  any payments of the ABL before the end of Week 2, how much cash

4  would the company have had under your -- under this budget?

5  A    If you added it back to the 10, we would have had 46

6  million.

7       Q    Okay.  So --

8  A    Which was approximately the amount of the net cash flow

9  for that week --

10      Q    Okay.

11 A    -- in Week 2.

12      Q    Okay.  And in Week 2, were the collections higher

13 than expected?

14 A    Yes, they were.

15      Q    Okay.  So based on actual results, am I correct,

16 without the DIP, you would have had enough cash to fund your

17 WARN Act reserve and pay the rent, but you couldn't have paid

18 down the ABL that week with no DIP, right?

19 A    I think that's the way the math works, yes.

20      Q    Okay.  Thank you.  Now, let's go to your first day

21 affidavit, and I think we have solved the mystery of where this

22 page is.  It says value maximizing liquidation on page 32.

23      MR. GLENN:  If the Court -- there's two documents in

24 one.  I think that's where even I was confused.  If you have

25 got to start at the beginning and go to page 32, you'll see

Etlin - Direct/Glenn                                            64

1  paragraph 81 and there's a legend there that says value

2  maximizing liquidation.

3  BY MR. GLENN:

4      Q    Are you there, Ms. Etlin?

5  A    Yes.

6      Q    Okay.  Now, it says here that the debtors estimate

7  that the aggregate net sale proceeds from all Sales, capital S,

8  will be approximately 718 million dollars.  Where did you get

9  that number from?

10  A    That's the estimated net proceeds from the GOB sales as

11  modeled by Hilco and agreed to by us and incorporated into our

12  forecast.  However, it does not include -- and net can be

13  confusing here, so just if I could take a moment?

14      Q    Sure.  Actually, I was going to ask you that.

15  A    So there's still 474 million dollars of actual corporate

16  costs with that same period of time and you can see that in

17  Exhibit 4.

18      Q    Okay.  So this projects not an amount that covers all

19  of the secured debt.  It shows a deficiency claim, is that what

20  you're testifying to?

21  A    No.  I'm just -- I'm not sure -- saying that there's a

22  deficiency claim.  I'm saying that this is just the GOB

23  proceeds.  It doesn't include the proceeds from all the other

24  assets that we would liquidate, all the other litigation cause

25  of action, all those other miscellaneous assets that a big

Etlin - Direct/Glenn                                65

1  company like this has.

2         But I'm pointing out that it is net proceeds, or

3  NOLV, net orderly liquidation value, as defined in this, which

4  is the net of the direct operating cost of the stores, but not

5  the operating cost of the company as a whole and there's

6  another 474 million dollars of expenses that you see in

7  Exhibit 4 associated with that.  However, this is only this

8  asset.  It's not the sale of the IP assets, the leases, other

9  kinds of things.

10    Q    So based on your first day declaration and the other

11 submissions to which you have personal knowledge for the first

12 day, did you disclose to the creditors whether there would be

13 sufficient coverage in the pre-petition collateral to pay the

14 ABL lenders and the FILO lenders?

15        MR. MERVIS:  Your Honor, it's the same -- well, I

16 have two objections.  Firstly, it calls for a legal conclusion

17 of what was and was not pre-petition collateral, but I

18 understand that the question is being asked based on her lay

19 understanding.

20        The second question -- the second objection I had,

21 Your Honor, is relevance.  I don't see how this is relevant to

22 what we're doing here.

23        MR. GLENN:  Well, I'll explain the relevance, Your

24 Honor.  We're going to, after Ms. Etlin steps down -- we're

25 going to provide the Court with some documents, if counsel will

Etlin - Direct/Glenn                                    66

1  indulge me, about the timing of the requests for NDA, the fact

2  it's been levied against us that we were hired, I think, three

3  hours before the first day hearing and, therefore, we were

4  there, we should have known everything, that we could have

5  objected.

6          And my point is that part of the reason we're here on

7  reconsideration is not only that there have been facts that

8  have been elicited since then, but the effect of this on the

9  first day I think is a highly relevant issue in terms of

10 whether Your Honor would consider vacating it.  So I don't

11 think -- I think this is a question of what was disclosed.  If

12 she knows the answer, she can disclose it, but I do think it is

13 relevant.

14         THE COURT:  The question, as I remember it, was

15 whether the pre-petition collateral was sufficient to pay all

16 the lenders?

17         MR. GLENN:  Was there any disclosure of whether the

18 pre-petition collateral, the GOB sales, other collateral, as

19 you understood it as a layperson, would or would not be

20 sufficient to repay the ABL loan and the FILO loan in

21 connection --

22         THE COURT:  Well --

23         MR. GLENN:  -- with the first day pleadings.

24         THE COURT:  -- I guess I'm just one -- you say was

25 there any disclosure is -- that kind of presumes that someone

Etlin - Direct/Glenn                                      67

1  asked about it or that there was a need --

2            MR. GLENN:  This is a --

3            THE COURT:  -- for that --

4            MR. GLENN:  -- notice issue.  This is notice, whether

5  they gave notice of the effect of this roll up on day one.

6  Counsel represented in court that the lenders already had

7  substantially all of the pre-petition -- all the collateral of

8  the company.  They did disclose at some other point the lease

9  designation and litigation was not part of that.  I think that

10 was in the papers.

11           My question is, did they tell their creditor body

12 what they projected the deficit, if any, in the FILO lenders

13 and the ABL lenders' recoveries would be, they would grab that

14 other collateral.

15           THE COURT:  Is --

16           MR. HOWELL:  My objection is an objection to facts

17 not in evidence that there even was such a number, right, and

18 that it would even be determinable at -- as of the first day of

19 the case as to exactly what the proceeds are going to be over

20 the entire course of the case.

21           I think it's the same issue we have already talked

22 about and so I think it's an unfair question to ask her whether

23 something was disclosed when we haven't established what that

24 was.

25           MR. GLENN:  That's a question for his --

Etlin - Direct/Glenn                                68

1            THE COURT:  -- well --

2            MR. GLENN:  -- his cross-examination.  This is a

3    question of whether there was disclosure.  He's right.  That's

4    not in evidence yet.  I'm trying to get it in evidence whether

5    or not there was, because I don't think there was and I don't

6    think that's a controversial point at this point.

7            THE COURT:  But that's what -- I guess that, I think,

8    was part of the objection is and what I'm having a little

9    trouble with myself is that there's assumptions built in there

10   that there was knowledge of that number and that it required to

11   be disclosed and I'm not sure that either of those things has

12   been established.

13           MR. GLENN:  I don't know that they were required to

14   disclose it.  I'm asking whether they did disclose it.  I will

15   ask the fund --

16           THE COURT:  But --

17           MR. GLENN:  -- the foundational --

18           THE COURT:  -- how can you --

19           MR. GLENN:  -- question --

20           THE COURT:  How can you disclose something if you

21   don't know it?

22           MR. GLENN:  We haven't established whether she knows

23   or not, so why don't I ask that question?

24           THE COURT:  Okay.  Well, that you weren't -- I don't

25   think you were at that point.  You were at --

Etlin - Direct/Glenn                                    69

1          MR. GLENN:  Oh --

2          THE COURT:  -- whether it was disclosed --

3          MR. GLENN:  -- I'll withdraw it --

4          THE COURT:  -- which I --

5          MR. GLENN:  -- and start over.

6          THE COURT:  -- which I --

7          MR. GLENN:  Okay.

8          THE COURT:  I am sustaining the objection.

9          MR. GLENN:  Thank you.

10  BY MR. GLENN:

11     Q    Did you, or anyone else on behalf of the company,

12  analyze the prospective recoveries of the ABL and FILO lenders

13  when the case was filed?

14          MR. HOWELL:  I'll just object to foundation as to

15  whether she knows whether anybody else in the company did

16  something or not as to --

17          MR. GLENN:  I'm asking her --

18          MR. HOWELL:  -- her personally --

19          THE COURT:  Whether she knows.

20          MR. HOWELL:  -- that's fine.

21          THE COURT:  She knows.

22          MR. GLENN:  Whether she knows.  That's the question.

23          THE WITNESS:  At the time of the filing?

24          MR. GLENN:  Yes.

25          THE WITNESS:  Before we'd set up any sale process,

Etlin - Direct/Glenn                                        70

1  before we'd gotten approval from the court to sell assets,

2  before any of that?

3           MR. GLENN:  Well, you have a disclosure here of $718

4  million in GOB sales.

5  BY MR. GLENN:

6      Q    My question is, did you build off of that and asset

7  what the creditor recoveries of the secured lenders was going

8  to be?  A range?  A number?  Anything.  To your knowledge.

9  A    No.

10     Q    Okay.  So when the company went into the bankruptcy,

11 the Chapter 11, it did not actually know what the effect of

12 that roll-up would be on general unsecured creditors?

13 A    You're asking me for a legal conclusion?

14     Q    No.  I'm asking you for a financial conclusion.

15 A    But they were secured creditor pre-petition.

16     Q    But they got the roll-up and I'm asking you, did the

17 company analyze what the effect of the roll-up would be on

18 unsecured creditors that was approved on the first day of this

19 case?  Was there any analysis done?

20 A    I'm not sure whether there was or there wasn't.  It wasn't

21 our focus.

22     Q    Okay.  Let's wrap this up.  So you have already paid

23 off the ABL lenders in full, correct?

24 A    As of this date?  Yes.

25     Q    Okay.  And that occurred weeks ago, correct?

Etlin - Direct/Glenn                           71

1  A     Yes.

2       Q    Okay.  And have you now paid off the DIP loan in

3  full?

4  A     No.

5       Q    Okay.  When do you project repayment of the DIP?

6            MR. MERVIS:  Your Honor, again, what is the relevance

7  of this?

8            THE COURT:  Mr. Glenn?

9            MR. GLENN:  Sure.  We're talking about the cost of

10 the roll-up that the Court approved and whether there's been

11 sufficient cash to repay the DIP over a very accelerated period

12 of time.  We paid 200 million dollars for a 40 million-dollar

13 facility.  What I would like to know is, how long is it going

14 to take or has it taken to pay that off in full out of the

15 company's cash flows?

16           THE COURT:  I'll let her answer the question.

17           MR. GLENN:  Thank you.

18           THE COURT:  Yes.

19           THE WITNESS:  So the answer to your question with

20 regard to the DIP is I don't know because certain asset

21 proceeds are being applied to certain aspects of the FILO loans

22 and certain other cash proceeds are being applied to the DIP

23 and that's determined by the FILO lenders themselves as opposed

24 to us.

25           MR. GLENN:  Okay.

Etlin - Direct/Glenn                                        72

1  BY MR. GLENN:

2     Q    Do you have any approximation of what the outstanding

3  DIP balance is today?

4  A    I'm sorry I don't.  I didn't check it before I walked into

5  court.

6     Q    Okay.  Now we have agreed to keep the potential

7  ranges of creditor recoveries, at the end of the day,

8  confidential.  But isn't it the case that we spoke last

9  Saturday, you and I, along with other people from Kirkland in

10 my office?

11 A    Yes, we did.

12    Q    Okay.

13 A    You ruined my Saturday afternoon.  Thank you --

14    Q    Okay.

15 A    -- very much.

16    Q    I'm sorry.  Well, okay.  And we filed the motion on a

17 Sunday.  Isn't it the case that during that conversation, the

18 lower end of the ranges were discussed and it was disclosed

19 that at the lower end of that range, the general unsecured

20 creditors, even with the Committee-sharing formula, could

21 recover nothing in this case?

22 A    You were asking questions about what we had forecast to

23 have turned to cash during the case and the lower end of the

24 range of what we would actually realize in cash potentially

25 during the case as opposed to during the liquidating trust

Etlin - Direct/Glenn                              73

1  period.

2          The lower end of that did show a deficiency, but it

3  didn't include assets that have a long tail associated with

4  them that will be received during the liquidating trust period

5  and, again, it was the low end of the range.

6     Q    Okay.  And isn't it the case that Sixth Street could

7  recover in the tens of millions, if not in the hundreds of

8  millions of dollars, in respect of its rolled-up plan?

9          MR. HUEBNER:  Your Honor, I object to the form of the

10 question to the extent that it calls for a legal conclusion.

11 It also calls for speculation.

12         THE COURT:  Yeah.  I think both those things are

13 correct.  So can you rephrase the question or --

14         MR. GLENN:  Sure.

15 BY MR. GLENN:

16    Q    You have testified as to lower end recoveries to

17 creditors based on the ultimate disposition in the sale

18 process.  I'm asking you if that happens, isn't it the case for

19 the lease designation and the litigation proceeds that Sixth

20 Street will recover in the tens of millions of dollars from the

21 unencumbered collateral, which benefits from the roll-up?

22         MR. HUEBNER:  It's the same objection, Your Honor.

23         THE COURT:  I think that was the same question.

24 BY MR. GLENN:

25    Q    I -- well, we have talked about projections of

Etlin - Direct/Glenn                                         74

1  recoveries.  I'm asking you the question, do you have personal

2  knowledge of what the recoveries are going to be for the lease

3  designation in the litigation?  Do you have those projections?

4  A   I have some preliminary numbers from the lease designation

5  recoveries.  All those transactions have not closed, but we

6  have preliminary auction results that have not been disclosed

7  to the public yet, so I believe you're aware of what they are.

8        MR. GLENN:  I am and I think what I would propose to

9  do is submit some kind of a confidential submission about what

10 those are so we don't get into that today.  That concludes my

11 questioning.  Thank you very much.

12       THE COURT:  Okay.  Thank you.

13       Are we ready to proceed with cross-examination/direct

14 examination in a way?

15       MR. KINOIAN:  Yes, Your Honor?  Just --

16       THE COURT:  Yes.

17       MR. KINOIAN:  -- one housekeeping.  Just want to make

18 sure that we have moved into evidence all of the five exhibits

19 that we have relied on up until now, which were 1, 2, 3, 4, and

20 5.  I just want to make sure the record is clear.

21       MR. HOWELL:  My luggage combination.  Yeah.  I think

22 we -- I believe all of those.

23       MR. GLENN:  Yes.

24       MR. HOWELL:  We didn't object to any and I believe

25 they were all admitted.

Etlin - Direct/Glenn                                      75

1           THE COURT:  Yeah.  I believe they're all in.

2           MR. KINOIAN:  Okay.  Thank you.

3           THE COURT:  I know they're all in.

4                      (Pause)

5           MR. HOWELL:  Your Honor, may I approach the witness

6  with a binder?

7           THE COURT:  Surely.

8           THE WITNESS:  Only if you take this one back.  There

9  isn't room for more than one up here.

10          MR. HOWELL:  And, Your Honor, I believe we have

11 provided a copy of this same binder to the Court before --

12          THE COURT:  I have --

13          MR. HOWELL:  -- we began.

14          THE COURT:  -- it right in front of me.

15          MR. HOWELL:  Terrific.

16          THE COURT:  Thank you.

17          MR. HOWELL:  And so thank you, Your Honor, Rush

18 Howell from Kirkland & Ellis on behalf of the debtors.

19          I suggest proceeding by me just going ahead and doing

20 this direct exam.  It's still in the movant's case, but I just

21 think it's more efficient than closing their case and opening

22 and then recalling Ms. Etlin again.

23          THE COURT:  I agree with that.

24          MR. HOWELL:  So --

25          THE COURT:  Is there --

                         Etlin - Cross/Howell                    76

1           MR. GLENN:  No objection.

2           THE COURT:  No objection.

3           MR. HOWELL:  So thank you.

4                        CROSS-EXAMINATION

5    BY MR. HOWELL:

6       Q    And good afternoon, Ms. Etlin.  I don't have a

7    clever -- I didn't have a clever pun ready like, are you ready

8    to roll, as Mr. Glenn did, but so I'll just say I think there's

9    a definite need for your testimony.  So thank you for being

10   here for my pun.

11   A    Mr. Howell, you're doing very well on three hours of

12   sleep.

13      Q    Yes.  Thank you.  So, Etlin, before I turned to just

14   a little bit of background --

15           MR. HOWELL:  And, Your Honor, I'll do my best not to

16   try too much on ground that we have already covered.

17   BY MR. HOWELL:

18      Q    But I want to ask you an important question, which is

19   as you sit here today, Ms. Etlin, do you still believe that

20   entering into the DIP was in the company's best interest?

21   A    Absolutely.

22      Q    Now I want to talk a little bit about your

23   background.  I think Mr. Glenn cut through some of it, so I'll

24   just ask a few questions.  How long have you been working in

25   the turnaround and restructuring space?

                         Etlin - Cross/Howell                      77

1  A    More than 35 years.

2       Q    And how many total --

3  A    I was 12 when I started, just for the record.

4                          (Laughter)

5            THE WITNESS:  So --

6            MR. HOWELL:  I remember that.  It was the Doogie

7  Howser of turnaround professional.

8  BY MR. HOWELL:

9       Q    Around how many total engagements have you worked on

10 in that space?

11 A    Oh, probably 60 or 70, maybe less.  You know when I --

12 when I do a company site assignment, it's generally full-time.

13      Q    And what's your role with the debtors here?

14 A    I am the CRO and CFO.

15      Q    You have you served in similar roles before this

16 case?

17 A    I absolutely have.

18      Q    What experience, if any, did you have with retail

19 companies prior to your work with the debtors?

20 A    I specialized in retail companies.  Approximately two-

21 thirds of my work over the past 35 years has been on retail

22 turnarounds and restructurings.

23      Q    And have you ever served as CRO, CFO or in a similar

24 function for a retail turnaround or a retail bankruptcy?

25 A    Yes and CEO.

Etlin - Cross/Howell                          78

1      Q    Are you a member of any organizations in the field of

2  turnaround work?

3  A    Yes.  The TMA, the ABI, the AIRRA, IWORK, INSOL.  I think

4  that's it.  It's an alphabet soup.

5           THE COURT:  A lot of acronyms.

6  BY MR. HOWELL:

7      Q    And have you received any accolades for your work in

8  the turnaround field?

9  A    Yes, I have.  I am admitted to the American College

10 Bankruptcy and also III, which are both invitation-only

11 honorary organizations.  I received three Turnaround of the

12 Year awards from the TMA for three different successful

13 turnarounds, two of them in the retail field and one of them in

14 the occasional not retail case.

15          And let's see what else.  I was named Woman of the

16 Year in restructuring a number of years ago.  I hold CTP and

17 CRA designations -- CIRA designations.

18     Q    Thank you.  So let's turn to your work with the

19 debtors.

20          You testified that you began work with Bed Bath &

21 Beyond around December of last year, is that right?

22 A    That's correct.

23     Q    And I know you covered this a bit, so I'll just ask

24 you at a high level to give the Court a picture of the debtors'

25 financial situation during the time period that you worked

Etlin - Cross/Howell                          79

1  there up until the filing of the bankruptcy.

2  A      Okay.  I'm going to try to keep my adjectives to a minimum

3  because the Kirkland at least have heard all of them to date.

4  But this was probably the most difficult retail case that I

5  have engaged in in that I was presented with a five billion-

6  dollar retail company that was out of inventory and out of

7  cash.

8          They had missed their sales forecast for the

9  Christmas holiday period by 40 percent, 4-0.  They were down on

10 comp store sales.  And in January and February and March, we

11 were down 60-plus percent in sales.  And what that physically

12 means is that you're not even covering the cost of running the

13 stores, much less the corporate overhead of the business.

14         The company was losing, from a cash perspective,

15 approximately 100 million dollars a month.  There was no money

16 to buy replacement inventory and so because we had an ABL

17 facility, each day when we sold off inventory and couldn't

18 afford to replace it, our borrowing base went down and so part

19 of the money that we collected had to go to pay down the

20 lenders because their borrowing base was going down.  It was

21 terrible.

22         We were in default the first time of multiple times

23 of default across four months.  In the January time frame, and

24 at that time prior to the first equity deal being done, we had

25 overdrafted the company by approximately 198 million dollars

Etlin - Cross/Howell                                    80

1  that was out of formula with the lenders.  It --

2            THE COURT:  What time period was that?

3            THE WITNESS:  So 198 million, it was right before the

4  equity money came in in February.  So we were in a very, very

5  deep, difficult hole.

6  BY MR. HOWELL:

7       Q    And you talked --

8  A    We did three -- three different equity traunch

9  transactions, one -- the publicly announced one with Hudson Bay

10 and then they had the market deal.  When Hudson -- when the

11 stock price fell to the point that Hudson Bay was no longer

12 willing to participate, we brought 350 million dollars

13 approximately money in equity into the business.  But, of

14 course, given the cash burn, that wasn't enough to stain --

15 sustain the company.  During that entire period of time,

16 management and we and our investment bankers were trying to

17 find somebody to actually buy the business or save the business

18 without a bankruptcy filing.

19 BY MR. HOWELL:

20      Q    And you talked about being in cash dominion a bit

21 during the first exam.  Was the company in that position

22 multiple times in 2023?

23 A    Continually until the filing.  One of the agreements of

24 the filing was that we would no longer be in cash dominion.  We

25 would no longer have our cash swept daily.

Etlin - Cross/Howell                    81

1    Q    And I want to move -- you talked about 198 million-

2    dollar over advanced in -- sometime in around February.  I want

3    to move forward to right before the filing.  Did the debtors

4    need a cash infusion at any point immediately prior to filing?

5    A    Oh, we did.  So -- and by the way, I want to put that in

6    context.  In all the years that I have been doing this work, I

7    never had a company be more than about 20 million dollars

8    overdrafted.  So 198 million was a -- was a record for me.

9         We hit -- we hit an 89 million-dollar over --

10   overdraft the week before we filed because we agreed with the

11   lenders that they would advance us an additional 54 million in

12   order for us to file these cases in an orderly fashion.

13   Q    And when did that additional 54 million dollars come

14   in?

15   A    The -- the week before the filing.  And so when we

16   measured it -- we measure our borrowing base on that Saturday.

17   So the Saturday night before we filed, we were at negative 89.

18   So we were approaching, you know, a fairly large number once

19   again.

20   Q    And did that context of the previous four months have

21   any influence on your views about the company's cash position

22   and need for a DIP heading into bankruptcy?

23   A    Absolutely.  And it not only had an impact online, the

24   company's employees was very well known inside the business

25   that the business was in trouble.  A number of management had

Etlin - Cross/Howell                          82

1  left.  People were bailing left and right.  They had no

2  confidence in management and were very, very concerned that not

3  only would they lose their jobs, but they wouldn't get any

4  notice and they wouldn't get paid.  So it was a very, very

5  difficult environment leading into that period.

6      Q    So did you view there was a need for that 54 million-

7  dollar cash advance in the week immediately proceeding filing

8  for bankruptcy?

9  A    Oh, absolutely.  And we needed the money that I

10 negotiated.  Again, I have testified that I had asked for a

11 much bigger DIP amount because I really wanted to be able to

12 show everybody that we had more than adequate cash to operate

13 since they were -- everybody had a little bit of PTSD going on

14 for the last six, seven, eight months.

15     Q    I just want to briefly turn in talking about the 54

16 million-dollar advance.  I want to briefly turn to Exhibit 9 in

17 our binder and specifically page 10, footnote 5.  And let me

18 ask you first, Ms. Etlin -- or I'll tell you.  This is the

19 final DIP order.  You have seen this document before?

20 A    Yes, I have.

21     Q    Okay.

22 A    It's quite voluminous.

23         MR. HOWELL:  And I'll offer Exhibit 9 into evidence.

24 It's, I think, Docket 729, the final DIP order.

25         MR. GLENN:  No objection.

Etlin - Cross/Howell                                    83

1           THE COURT:  It's in evidence.

2           (Exhibit 9 Admitted Into Evidence.)

3           MR. HOWELL:  Thank you, Your Honor.

4    BY MR. HOWELL:

5      Q    So if we look at -- we're just going to look at one

6    sentence, so sorry to do all this to do that -- but bottom of

7    page 10, footnote 5 talks about emergency rescue loan.  Do you

8    understand that to be the 54 million dollars we have been

9    talking about?

10   A    Yes, it is.

11     Q    And it says, "The emergency rescue loan reduced the

12   debtors' need for post-petition financing on a dollar-for-

13   dollar basis," do you see that?

14   A    Yes.

15     Q    And do you agree with that statement?

16   A    Yes.

17     Q    Okay.  You can put that away for now.  You talked a

18   bit about this so I'll just ask a general question, because I

19   think you have covered it some.  But you're familiar with

20   certain reserves set up by the company that were funded via

21   cash coming in from the DIP lenders both via the 40 million

22   and, I guess, the 54 in front?

23   A    Yes.

24     Q    And could you describe those reserves for the Court?

25   A    Certainly.  There are two that were intended to be funded

1   very much up front, although ended up being negotiated to be

2   funded a little bit over time.  And then there's also the

3   professional fee carveout and reserve that gets funded as the

4   fees are incurred.  The other two are loosely referred to as

5   the WARN reserve and that is the reserve for the New Jersey

6   Act.

7           THE WITNESS:  And I apologize, Your Honor, I don't

8   know the exact name.  We call it New Jersey WARN.

9           THE COURT:  No problem.

10          THE WITNESS:  It's -- it's the 90-day working notice

11  period, plus mandatory severance, and also PTO where it's

12  required to be paid.  And so it was 21 million dollars.  That's

13  the WARN reserve.  In addition, we had an additional amount

14  that was set aside to pay priority claims.  I think that was

15  approximately eight million dollars

16  BY MR. HOWELL:

17      Q    And you were at the first day hearing, correct?

18  A    Yes, I was.

19      Q    And at the first day hearing, Mr. Sussberg discussed

20  a dual track sales process to -- so that we could also attempt

21  to have a going concern.  Do you recall that?

22  A    I do.

23      Q    Okay.  And in your experience, would a going-concern

24  sale have been possible without an administration WARN reserve?

25  A    I don't believe so.  Again, it's -- I think I previously

Etlin - Cross/Howell                              85

1  testified today how many employees actually have asked me, both

2  individually and in groups, about whether or not they were

3  secure on that -- on that issue.

4      Q    And is there an effort for a going-concern sale going

5  on today?

6  A    We have an auction underway in New York that I'm

7  unfortunately missing for the Baby business and there may be a

8  going-concern sale for that.  We have already determined that

9  for Bed Bath & Beyond there will not be one and that sale to

10 Overstock closed this morning.

11     Q    Okay.  So I now want to move forward to talking about

12 these DIP budgets that came up quite a bit in your examination

13 by Mr. Glenn.  At the time of the filing, you submitted a

14 declaration related to the DIP financing in addition to your

15 first day declaration that's already been admitted into

16 evidence.  Do you recall that?

17 A    Yes.

18     Q    Okay.  Do you believe that declaration was accurate

19 at the time that you filed it?

20 A    Absolutely.

21     Q    In that declaration, did you discuss the debtors'

22 need for debtor-in-possession financing?

23 A    I did.

24     Q    In assessing the debtors' need for DIP financing, did

25 you work on putting together a DIP budget?

1  A     Yes, I did.

2        Q     Is that an exercise that you have done before this

3  case?

4  A     Just a few times.

5        Q     Around how many times in your career have you worked

6  on putting together a DIP budget?

7  A     Sixty, seventy times.

8        Q     And some of those are for retail companies, right?

9  In fact --

10 A     Most --

11       Q     -- the majority are for retail companies, right?

12 A     Most of them are for retail, yes.

13       Q     And can you describe just generally the process, not

14 in a ton of detail, but generally the process that goes into

15 putting together a DIP budget?

16 A     Well, usually at the time that we're preparing the DIP

17 budget, we have been in at the company for weeks, months,

18 sometimes many, many months, and have been handling the 13-week

19 rolling cash flow forecast process for the company.  So we look

20 at the run rates that we know about.  We look at other

21 activities that we're going to engage in.

22       For example, I previously testified this morning that

23 when there's a GOB sale involved, I typically take our chosen

24 liquidator and have them prepare the sales curve and the budget

25 along with us, so that the sales curve we're projecting is

Etlin - Cross/Howell                          87

1  consistent with what they expect to have happen in the sale,

2  and that's what we did here.  Hilco assisted us in preparing

3  that budget using their expertise in GOB sales to actually put

4  those numbers on the page and then we forecast anything else in

5  cash receipts that we knew about and then we put in the

6  disbursements.

7          It's, you know -- it is -- it's a science and an art

8  form both because you often cannot predict what will happen in

9  a case the first couple of weeks after the filing.  You don't

10 know -- for example, in this case, when you're going to get

11 bank accounts open.  It's usually something I can better

12 predict, but you don't know also who among your freight vendors

13 comes forward and demands immediate payment or they will stop,

14 you know, delivering inventory to the stores.  Sometimes that

15 takes -- you get that all resolved in the first week.

16 Sometimes it takes two or three or four weeks, which is what it

17 did here, and that's because, frankly, they were just so sick

18 of us not paying them that they were kind of slow to even call

19 and show up.

20     Q    And were you comfortable with the projections you

21 made at the time that you made them here?

22 A    Yes.

23     Q    Are DIP projections typically 100 percent accurate

24 when later compared to actual cash flows in your experience?

25 A    They never are.

Etlin - Cross/Howell                          88

1     Q    Why not?

2  A    For all the things I just described.

3     Q    Now would the cash projections have looked for week 1

4  and onward had the company not received the 54 million-dollar

5  advance on Friday before filing?

6  A    Yes.  Very.

7     Q    All right.  So obviously you're aware that the Bond

8  Holder Group has raised issues with the fact that the

9  projections ended up different from the actual results, right?

10 A    Yes.

11    Q    Okay.  So I'd like to walk through that a bit.  Have

12 you prepared any materials to assist the Court in understanding

13 why the actual results differed from projections?

14 A    I believe we prepared a table that was included in the

15 response by our counsel to the motion to reconsider.

16    Q    So I'll ask you to look at the last tab in your

17 binder and I'll ask --

18         MR. HOWELL:  I think we may be able to put this on

19 the screen to make it easier for folks.  It's Exhibit 12.  If

20 not, we have the hard copies but I'll have you turn to

21 Exhibit 12, which is this chart you were just referring to.

22         Thank you.

23 BY MR. HOWELL:

24    Q    Ms. Etlin, do you recognize the document that's put

25 on the screen in front of you?  Hopefully it's the same

Etlin - Cross/Howell                                    89

1  document?

2  A    It is and I do.

3      Q    All right.  And your -- was your team involved in

4  creating this document?

5  A    Yes.

6      Q    What is this document, just generally?

7  A    So it shows a comparison of the forecast of the original

8  budget for the week ended April 29th to the actuals and then it

9  has the variances highlighted in the far right-hand column.

10      Q    And this was based on information that was pulled

11  from just comparing the two DIP budgets, correct?

12  A    It's comparing the DIP budget to the actual results.

13      Q    Thank you.  Does it look accurate to the best of your

14  knowledge?

15  A    Yes.

16          MR. HOWELL:  I'd move to admit Exhibit 12.

17          MR. GLENN:  No objection.

18          THE COURT:  It's -- okay.  It's in evidence.

19          (Exhibit 12 Admitted Into Evidence.)

20  BY MR. HOWELL:

21      Q    Okay.  So I'd like to walk through these categories

22  and we have a couple numbers there.  So I want to start on

23  number 1, which is go forward collections.  What are go forward

24  collections?

25  A    Yeah.  So you'll see that we list both store liquidation

Etlin - Cross/Howell                              90

1    sales and go forward collections.  We were throughout -- almost

2    throughout the period of time we have been employed by the

3    debtors, we have been liquidating waves of stores, even pre-

4    bankruptcy.

5           And so we make a distinction between store

6    liquidation sales to sales that are actually under liquidation

7    with Hilco helping us, as our agent, from the collections of

8    stores that are not under liquidation.

9      Q    And for number 1, for go forward collections, we see

10   a forecast of 10 million and actual 56 million for a variance

11   of 46 million.  Do you have an understanding as to why that

12   variance occurred?

13   A    Yes.  The principal -- the principal reason was, it was

14   anticipated that the Hilco GOB sale would start earlier than it

15   did.  It didn't start until Thursday of that first week and we

16   had originally forecast to shift into liquidation potentially

17   as early as Monday.  But at the time, we needed them to land in

18   450 stores and commence liquidations all across the country.

19   It took an extra couple of days to really get that properly

20   organized and commenced.

21     Q    Okay.

22   A    So part of it is a shift between the two line items and

23   then part of it is the sales variance that Mr. Glenn and I were

24   already talking about.

25     Q    And we'll talk a little bit more about that sales

1 variance.  But I guess if you look at number 1 and 2, you're

2 kind of saying you ought to look at those in combination?

3 A    Correct.

4    Q    And just can you explain for the Court why that is?

5 A    Well, because the second one is store liquidation sales

6 and because the liquidation sale didn't start until later in

7 the week, we only had certain amounts of cash receipts coming.

8         Remember, if you start a sale on Friday, we only got

9 some minimal cash receipts on Thursday.  We got some minimal

10 cash receipts on Friday associated with that sale.  And then

11 rolled into the weekend, there wouldn't be cash receipts on

12 days that the bank is closed.

13    Q    And the total variance between the go forward

14 collections and store liquidation ends up around 11 million

15 dollars if combined, is that right?

16 A    Correct.

17    Q    Now, would that variance if -- had you known about

18 it, the 11 million dollars, have changed your mind about the

19 debtors' need for a DIP?

20 A    No.

21    Q  You talked about this a fair amount, but when were you

22 aware of the actual cash receipts that came in during the

23 weekend before filing?  So Mr. Glenn asked you about it a

24 couple times.  But Friday, Saturday, Sunday before filing, when

25 would you have known the actual cash receipts?

Etlin - Cross/Howell                                    92

1   A    Midday on Tuesday.

2        Q    Okay.  And did you have any preliminary reports of

3   cash receipts at the first day hearing?

4   A    No.  I just had some information on sales.  And as I have

5   testified, sort of the anecdotal commentary coming up from the

6   stores that they were getting presented with a lot of gift

7   certificates and the gift certificates were running way ahead

8   of our forecast.

9        Q    And so I just want to be clear.  I think you have

10  explained this.  But, you know, you didn't have the cash

11  receipts.  You did have the sales reports, for instance, from

12  Saturday and Sunday and you testified, obviously, you were very

13  busy getting ready to file a five billion-dollar company for

14  bankruptcy.  But I want to understand why it wouldn't be that

15  just those sales reports alone would have guaranteed that, hey,

16  come Tuesday, my cash receipts are going to be higher than I

17  thought they were?

18  A    Well, first of all, the -- the sales didn't really, as I

19  have testified that we were running at about five to five-and-

20  a-half million in sales per day prior to the filing.  On

21  Saturday, it ticked up to six million in that day.  So that's a

22  one million-dollar variance.  And on Sunday, I think it was

23  around eight million.  So now that's a three million -- so

24  between those two days, I was only ahead four million dollars.

25  That's not very much money.

Etlin - Cross/Howell                                          93

1          The big tick-up happened on Monday and I would

2   never -- I would not know until Tuesday even what those sales

3   were on Monday, because I don't get the sales report from

4   Monday until Tuesday.  Monday was 13 million and then --

5          Q    Correct.

6   A    -- it continued at that level through the week.

7          Q    So understood.  So you don't even see the large sales

8   up-tick until after the first day hearing.  But also even for

9   the smaller sales up-tick that occurred on Saturday and Sunday,

10  you testified that doesn't necessarily lead to higher cash

11  receipts when you see that on Tuesday.  And can you explain why

12  that is?

13  A    Sure.  So I think I previously testified the company had

14  about 300 million dollars in gross gift certificates

15  outstanding.  Now, probably some substantial number of that had

16  been lost and were not going to be collected.  But we had only

17  forecast getting, and this was, you know, very heavily

18  negotiated in the budget with the lenders -- we had only

19  forecasted actually being presented with 20 million in total

20  gift certificates in the first two weeks, 10 million each week.

21         And so if I sell you something for $100 and you you

22  have got a $20 gift certificate, I'm only going to collect $80

23  of cash because you're going to use your gift certificate like

24  cash.  It'll still show up as a sale of $100, so I'll see it in

25  the sales report and so what we were concerned about was how

Etlin - Cross/Howell                              94

1  many people really still have these live gift certificates and

2  were actually going to come in the stores and use them.  And as

3  we went through the weekend and we -- we were getting a lot of

4  feedback coming up through the store ops team saying, "Wow.

5  We're getting a lot of gift certificates presented."

6          So what we were worried about was we had forecast,

7  you know, the sale amounts that we had forecasted, we were

8  afraid that we were going to be, you know, disproportionate

9  with gift certificates.  And as it turned out, that was the

10  case.  We had people redeem about more than double what we had

11  forecast in the way of gift certificates, 40 --

12      Q    Right.  So --

13  A    -- 43 million dollars in the first two weeks.

14      Q    In other words, a lot of those customers that you

15  talked about rushing to the store would have grabbed their

16  coupons and said, I better use them now, so you may have a

17  lower percentage realization on your sales?

18  A    Right.

19      Q    Okay.

20  A    Right.  They grabbed their coupons and they grabbed their

21  gift certificates if they had them.

22      Q    Okay.  All right.  And then let's take a look at

23  the -- I don't think we talked about it earlier.  The third

24  line item there where there's the sales tax and other receipts.

25  Can you describe, if you have an understanding where that nine

Etlin - Cross/Howell                                    95

1  million-ish variance comes from?

2  A    It's principally due to a check from a vendor.  We had --

3  because the company had been in such a state of disarray with

4  regard to its vendors, many vendors had been prepaid for goods

5  that weren't entirely delivered or they were prepaid at face

6  value, but then the company had a rebate agreement with the

7  vendor that when they reached certain volume, they would get a

8  discount back.

9       And so we had three, four dozen large vendors who had

10 the equivalent of what we call a debit balance, which means

11 they owed us money because we'd pay -- been paying cash for

12 inventory for months and -- but when we took the discount,

13 ultimately reconciled, which we would do quarterly, and took

14 the discount they actually owed us money and we have been

15 chasing them for that money.

16      This is one of those vendors.  They had approved and

17 agreed with us on the payment and then they'd been saying "the

18 check is in the mail" for a period of time.  And we had

19 actually put this in Week 2 to be received because we didn't

20 believe when they told us they had processed the payment and it

21 actually arrived in Week 1.

22 Q    Okay.  So not something you knew at the first day

23 hearing that that would come in?

24 A    No.

25 Q    Okay.  And I want to ask, because now we have talked

1  about all the variance in collections.  But based on your

2  experience years as a turnaround professional, even if you had

3  known that the total collections would be around 21 million

4  dollars for Week 1, would you have then decided that there was

5  no longer a need for a DIP?

6  A    No.  I think I previously testified, I always wanted a DIP

7  and I actually wanted a much bigger one than they were willing

8  to give us.

9       Q    Okay.  So I want to now turn from collections to

10 disbursements and we can start there with number 3, payroll.

11 We see a forecast of 42 million and actual of 17 for a variance

12 of 25 million dollars.  Do you see that?

13 A    Yes, I do.

14      Q    And in the Bond Holder Group's filing, they

15 referenced statements from the first day about a 30 million-

16 dollar hold tied to payroll, statements that were made by the

17 debtors?  Do you recall seeing those statements in the motion

18 here?

19 A    I'm sorry?

20      Q    Sorry.  That was the three-hours-of-sleep question

21 right there.

22                     (Laughter)

23      The Bond Holder Group referred to some statements

24 made by debtors' counsel that we had to fill a 30 million-

25 dollar hole that were made during the first day hearing.  Do

Case 23-13359-VFP   Doc 1196   Filed 07/06/23   Entered 07/06/23 09:07:31   Desc Main
Document   Page 97 of 211

Etlin - Cross/Howell                                      97

1  you recall those statements being made?

2  A    I honestly don't.  I was working --

3       Q    Okay.

4  A    -- on about that much sleep at that point.

5       Q    But at that time, did you have -- were of the view

6  that there was a payroll hole that needed to be met right away

7  at the start of the case?

8  A    Yeah.  That -- that is the reserves that we have talking

9  about.  So that 25 million-dollar variance that you see is --

10 is basically two things.  It's the 21 million dollars in WARN

11 and PTO reserves, which I think we have more than adequately

12 discussed, and then I also testified that there's another for

13 million dollars of bonuses that we pay managers for staying

14 through liquidation sale.

15       We had a wave of store closures that we had started

16 pre-petition and we got authority in the first days under the

17 payroll motion to pay that bonus.  We thought we would pay it

18 Week 1 and it actually was paid in Week 2.

19       Q    And --

20 A    And then there's always a slight variance because, again,

21 there are, you know -- there are hourly payroll in here that

22 may or -- may go up or may go down for the distribution

23 centers.

24       Q    And when were those payments, those payroll payments,

25 that were budgeted for Week 1 actually made?

1  A    The ones that weren't made?

2       Q    Correct.

3  A    They're make -- made in Week 2.  And, again as I

4  testified, technically we probably should have shown it as a

5  disbursement because we had the money for the reserve and it

6  was segregated in our accounts.  It was -- it was just funky

7  the way we showed it and projected it in this, you know,

8  budget.

9       Q    Got it.  So it was already set aside in the first

10 week?

11 A    Yeah, it was already set aside in Week 1.

12      Q    If you had known you had an extra day or two to make

13 those payments, would that have changed your view as to whether

14 the debtors needed DIP financing?

15 A    No.

16      Q    All right.  Now turning to rent.  Again, the 25

17 million-dollar variance, could you explain to the Court your

18 understanding as to why that variance occurred?

19 A    Our bank accounts.  There -- under the -- under the

20 opiating procedures that major money center banks have these

21 days, they are required, when a company files bankruptcy, to

22 freeze all the bank accounts.  And then they wait to get a copy

23 of the court order authorizing the use of cash and authorizing

24 the cash management system to reopen those accounts.

25           The process internally and the internal control

Etlin - Cross/Howell                                99

1    process that exists governing that takes a while.  And one of

2    the biggest concerns we had about the timing of this filing was

3    we had a payroll due that week.  I could not miss payroll --

4    miss paying payroll and it had to be paid on Thursday.  It

5    needed to be funded on Wednesday.  The money had to be there

6    and that was part of the advance that we got the week before

7    was that was money that was actually then set aside to pay

8    payroll from that 54 million-dollar advance so that it would be

9    sitting in a segregated account ready to go.

10          But we still had to sweat through the internal

11   control process at the bank with them getting all the approvals

12   internally and everybody seeing the court's order and it goes

13   up the chain and down the chain and, you know, there's a lot of

14   people in a big bank that had to approve it.  And my experience

15   has been that it takes usually almost all they way until Friday

16   to get bank accounts open.  We were -- we were assured by the

17   lenders that they would do everything they could to get as many

18   of our bank accounts open by Thursday so that could happen.

19          They did get the payroll accounts open.  They did not

20   get most of our disbursements accounts open.  So while we were

21   able -- we had accounts open on Friday that we were able to

22   wire a million dollars from that we had wire information from

23   the landlords, the rest of those, you know, 500 landlord

24   payments, those go via ACH, which is like an electronic check,

25   Your Honor.

1          But it's a -- it's an input list that the bank has

2    that's associated with a specific bank account and that bank

3    account wasn't yet reopened.  So, you know, I wanted to pay the

4    rent on time.  The rent was due on Monday.  It had to go out on

5    Friday in order to be counted as on time and we just couldn't

6    do it.  It wasn't that the intent wasn't there.

7          Q    So you anticipated making those rent payments by

8    Friday on the -- when you filed the DIP budget, correct?

9    A    Yeah.  We thought we would be unusual and pay our rent on

10   time.

11         Q    Well, if you knew you had an extra day or two to make

12   the payments, would that have changed your view as to whether

13   the debtors needed DIP financing?

14   A    No.

15         Q    I think we already talked about the non-merch

16   payments on the adverse direct, so I'll just move onto Hilco

17   payments.  Who is Hilco?

18   A    Hilco is our liquidation agent.

19         Q    And what's the -- what's your understanding as to why

20   that four million-dollar variance occurred there between the

21   budget and the actuals?

22   A    Again, a bank account issue.

23         Q    Now over the period between when you filed the

24   initial projections April of -- April 23rd and then when the

25   final DIP budget was filed on June 13th that had the actuals,

1  were you trying to hide the actuals from third parties?  Was

2  that something you didn't want discovered?

3  A    No.  We were -- we were required under the terms of our

4  lending arrangements to provide -- well, first of all, we

5  were -- we're required to provide daily receipts and

6  disbursements to our lenders, then we're required to file a

7  weekly variance report, then were required to file with them an

8  updated budget every week.

9         And as soon as the Committee was formed and hired

10  professionals, they got all of those reports as well, including

11  we had a folder already prepared for them that went all the way

12  back to January with information of the various projections and

13  variance reports that they -- that they got access to on

14  May 18th was when we opened access for them.  So I assumed

15  that's about the time that A&M, who was who they hired, asked

16  for that access.  So everybody had all that information all the

17  way along and, frankly, a lot more information that I have had

18  to give anybody in a case.

19    Q    Did you think there was anything nefarious about the

20  missed projections here?

21  A    No.  And nobody ever said anything to me that was

22  nefarious.  I would have been pretty offended.

23    Q    And Bed Bath & Beyond --

24  A    Which would not been good for them, because when I get

25  offended people know that that's a problem.

Etlin - Cross/Howell                    102

1      Q    Had Bed Bath & Beyond missed projections before in

2   your experience while working at the company?

3   A    Yes.  It was a very difficult environment.  As I'd

4   previously testified, we had a hard time even understanding

5   what was due and payable because so many things had been not

6   paid and then were not paid.  Until then, the vendor threatened

7   to cut us off.

8           We had stores in the waves of liquidation that Hilco

9   was running for us in January and February.  Hilco actually had

10  to step in and pay certain expenses on our behalf and then just

11  bill us for it because we had last-minute refusals to pick up

12  trash, repair broken windows, escalators, fix HVAC units in

13  stores because those people had not been paid for months and

14  months and months.  So it was very, very difficult environment.

15          We did pretty good at payroll.  We did pretty good at

16  professional fees.  We did a decent job at sales and then

17  everything else we did the best we could to (a) manage it

18  within the cash we had and also try to predict it accurately.

19     Q    Did you believe the projections that you made at the

20  time that they were filed with the interim DIP budget?

21  A    Yes.  They were the best that we could do.

22     Q    And did you think they were made in good faith at

23  that time?

24  A    Oh, completely.

25     Q    Let me just ask you.  What is your understanding of

1 the downside if you decide we don't need a DIP.  We'll file

2 without it and you're wrong.

3        MR. GLENN:  Objection.  Calls for speculation.

4        THE COURT:  Well, there was a whole series of

5 questions right along the same lines about did you --

6        MR. GLENN:  And --

7        THE COURT:  -- need that --

8        MR. GLENN:  -- some of them were objected to, but --

9        THE COURT:  Right.  Right.  But we did allow the

10 testimony about whether there was, you know -- whether there

11 was sufficient funds for this, that, the other thing and can

12 you repeat the question, sir?

13        MR. HOWELL:  Yeah.

14 BY MR. HOWELL:

15    Q    The question is, in your experience in the turnaround

16 industry, what is the downside, if you decide that you don't

17 need a DIP and file without one and you're wrong?

18 A    Well, it depends on the situation.  I have filed a number

19 of cases where we had substantial cash at the time we filed.

20 We hadn't been in cash dominion with our cash swept and we

21 didn't need a 54 million-dollar over-advance the week before.

22 And in those cases, you know, that's fine.  We can survive on

23 cash collateral and we agreed to do so with our lenders.

24        But in this case that would have been devastating.

25 First of all, every employee in the company practically was

Etlin - Cross/Howell                                104

1  dialed into that first day hearing.  They were -- all wanted to

2  know that they were doing to have assurances that they were

3  going to continue to get paid and they viewed rightly or

4  wrongly that DIP loan as being critical.  I believed it was

5  critical.

6      Q    And did you have an understanding as to whether the

7  DIP lenders had a lien on cash collateral?

8  A    So to the best of my knowledge, they certainly did.

9      Q    And did you have an understanding as to whether they

10 would consent to the use of cash collateral like you described

11 has happened in other cases?

12 A    Not without a protracted negotiation and I would think

13 probably not given the situation.

14     Q    Did you have an understanding as to whether the DIP

15 lenders would advance the 54 million dollars the Friday before

16 the bankruptcy without also having the DIP?

17 A    Well, it was a whole unified negotiation that had gone on

18 for approximately ten days prior to the filing from the moment

19 we were defaulted for, I don't know, maybe it was the fifth or

20 sixth time, and it was what's going to get funded.

21          So, you know, first of all, they stopped funding and

22 then they -- we had to agree daily with the ABL advisors and

23 the FILO advisors what even was allowed to get paid daily.

24 Then we were negotiating the over-advance that would be

25 required, the DIP loan, the DIP budget and the reserves.  All

Etlin - Cross/Howell                    105

1  of that was going on simultaneously in that ten days and it was

2  all a package deal.

3      Q    And based on your experience with turnarounds and

4  restructurings, did you think it would be good business

5  judgment to begin these cases in litigation over the non-

6  consensual use of cash collateral?

7  A    I did that once with a company in Sacramento.  It filed in

8  Delaware where we litigated cash collateral for the first three

9  months of the case.  I would never do that again.  It was

10 painful beyond belief.

11         MR. HOWELL:  Just a few more questions and then if I

12 could have a minute to confer, I think I'll probably be close

13 to done.

14 BY MR. HOWELL:

15     Q    But, Ms. Etlin, when you filed your declaration on

16 April 23rd, did you believe a DIP was necessary?

17 A    Yes.

18     Q    When you came to court on April 24th, did you still

19 believe that a DIP was necessary?

20 A    Yes.

21     Q    Looking back today, do you still believe that a DIP

22 was necessary at the time of the filing of this case?

23 A    Yes.

24     Q    And based on your 30 years of -- 35 plus years, since

25 you were 12, of experience in turnaround situations, do you

Etlin - Cross/Howell                    106

1  think it was a reasonable exercise of the debtors' business

2  judgment to ask for a DIP on the first day?

3  A    Yes.

4          MR. HOWELL:  If I could have just one moment, Your

5  Honor.

6          No further questions.  Thank you.  Thank you,

7  Ms. Etlin.

8          THE COURT:  All right.  All right.  So now with the

9  kind of the cross, a redirect, recross, and it's 1:25 about,

10 I'm not --

11         MR. HUEBNER:  I think --

12         THE COURT:  -- sure how much Mr. Glenn has or it

13 seems --

14         THE WITNESS:  And, Your Honor --

15         THE COURT:  -- like it might be a good time --

16         THE WITNESS:  -- Mr. --

17         THE COURT:  -- to take a break.

18         THE WITNESS:  Mr. Huebner reminded you he was on the

19 phone.  I don't -- I don't know if he's still planning on

20 asking questions or not.

21         THE COURT:  Oh, right.  Yes, Mr. Huebner?

22         MR. HUEBNER:  Your Honor, good afternoon.  I have

23 four questions.  I think I'll probably need under 60 seconds if

24 that's okay with the Court?

25         THE COURT:  Yeah.  I was reminded by Ms. Etlin about

Etlin - Cross/ Huebner                    107

1  you.  I'm sorry I forgot, but it was getting close to a break

2  time.

3         MR. HUEBNER:  Oh, that's okay.  It will be under one

4  minute if now is convenient.

5         THE COURT:  Okay.  Go ahead, please.

6         MR. HUEBNER:  Sure.

7                       CROSS-EXAMINATION

8  BY MR. HUEBNER:

9      Q    Ms. Etlin, can you hear me clearly?

10  A    Yes, Mr. Huebner, and I would never forget about you.

11      Q    Thank you.  I'm -- just a very few quick things.

12         Number one, Mr. Glenn asked you to subtract

13  arithmetically a few times 40 million dollars from several

14  different numbers in the projections.  Do you remember that?

15  A    Yes, I do.

16      Q    I'm going to ask you a slightly different question on

17  the same topic.  Do you believe that if the company had entered

18  Chapter 11 with no DIP loan and no agreement on cash

19  collateral, and that was part of your announcement at the

20  filing, that all of those numbers, liquidity receipts,

21  disbursements would have been, as Mr. Glenn was suggesting, $40

22  million below the numbers they actually turned out to be?

23  A    Well, first of all, I wouldn't have had authority to even

24  make any disbursements, so I wouldn't have made payroll that

25  week.  That would have --

Etlin - Cross/ Huebner                    108

1      Q    Uh-huh.

2  A    -- been pretty awful.

3      Q    Right.  So you think on the whole, would those

4  numbers have been better or worse than 40 million dollars below

5  what they actually were?  Let's just take liquidity, for

6  example.

7  A    Well, first it -- getting technical here.  If I didn't

8  have an agreement with your -- with your clients and

9  Mr. Hillman's clients on use of cash collateral, you would have

10  just continued to sweep my cash.  So I wouldn't have had any

11  cash, right?

12      Q    Okay.  Let me move on, Ms. Etlin.  Two more questions

13  and then I'm done.  Obviously the company did file within an

14  announced DIP loan and with agreements with the lenders.  Do

15  you believe that that was helpful in keeping the company

16  together and in keeping employees at the stores doing their

17  jobs?

18  A    Absolutely.  We had had trouble previously in some of the

19  first waves of liquidation with employees actually not showing

20  up for work because they were concerned about being paid.

21      Q    Sure.  And second-to-last question, what would have

22  happened to incoming receipts to cash had a large number of

23  employees just not shown up to work because, as you testified,

24  they were very afraid they would never have been paid?

25  A    We wouldn't have been able to open the stores.

Etlin - Cross/ Huebner                    109

1     Q    And how would that have affected cash receipts over

2 the opening weeks of the case?

3 A    There would have been no sales.

4     Q    Okay.  And then apologies for the final question,

5 which is a little bit sharp and then I'm done.  Having heard

6 what you heard today, having been cross-examined or directed or

7 both by Mr. Glenn, do you believe that any of your prior

8 testimony, including your first day declaration, was either

9 fraudulent or perjurious or do you stand by it today as being

10 true and correct based on what you knew at the time?

11 A    It's true and correct and how dare you use those terms.

12          MR. HUEBNER:  Thank you, Your Honor.  I have no

13 further questions.

14          THE COURT:  Okay.  So now we're at that same point.

15          MR. GLENN:  I do have questions.  I think it would be

16 humane to have some lunch now though --

17          THE COURT:  Well, I think --

18          MR. GLENN:  -- because --

19          THE COURT:  I think so, too.  You have been on the

20 stand for quite a while and it's time for a break here.

21          It is getting close to 1:30.  There are going -- you

22 have been here before.  There's some local deli up the street

23 and a pizzeria across the street, but how much time would you

24 like for lunch and --

25          UNIDENTIFIED SPEAKER:  As little as possible I would

1    say, Your Honor, so we can come back and wrap up the day.  That

2    would be my request.

3                THE COURT:  All right.

4                THE WITNESS:  We need to feed the witness.

5                UNIDENTIFIED SPEAKER:  Forty-five minutes?

6                THE COURT:  Well, I was going to say 1:15 -- I mean

7    actually it's 2:15.

8                UNIDENTIFIED SPEAKER:  Yeah.

9                MR. GLENN:  2:15.

10                THE COURT:  I lost --

11                MR. GLENN:  That's fine.

12                THE COURT:  I lost an hour there.  So --

13                UNIDENTIFIED SPEAKER:  Yeah.

14                THE COURT:  -- 2:15.  Why don't we come back at 2:15

15    and that'll be the redirect/recross and then --

16                MR. GLENN:  Yes.

17                THE COURT:  -- limited to anything that may come up

18    if there's any further need on the debtor other side.

19                MR. SUSSBERG:  Yeah.  And, Your Honor, any guidance

20    as far as closing argument is concerned from a timing

21    perspective?

22                THE COURT:  Yeah.  We -- I thought where you would --

23    where we would be was that we would finish up the testimony and

24    if you wanted to make your closing arguments, we would do that

25    today, as well, if it -- we finished up in time.

Etlin - Cross/ Huebner                    111

1           MR. SUSSBERG:  Yeah.  We would very much like that.

2           MR. GLENN:  That's fine.

3           THE COURT:  Sounds like everybody would like that, so

4   that's what we'll do.

5           MR. SUSSBERG:  Right.

6           THE COURT:  Great.

7           MR. SUSSBERG:  Thank you.

8           THE COURT:  Thank you.  Thank you.  Yeah, you know,

9   do -- before we go off the record, I just, on the reserves, I

10  just heard so many different numbers that I just want to -- I'm

11  looking at the interim order and it has a priority claims

12  reserve of 15 million, a wind down reserve of 5 million and a

13  WARN reserve of 16 million.

14          Are those -- those are the right numbers?

15          MR. HILLMAN:  Yeah.  The final was different than the

16  interim, Your Honor, because they would only count

17  (indiscernible).  So you're obviously correct.  That's what it

18  says in the interim.

19          At the final, same paragraph, there was a reduction

20  of five million dollars, so the aggregate of what you're

21  looking at there is 36.  The final is 31 because, as you

22  remember, the -- at the --

23          THE COURT:  Okay.

24          MR. HILLMAN:  -- at the final --

25          THE COURT:  That's what I was not --

Etlin - Cross/ Huebner                 112

1          MR. HILLMAN:  Yes.

2          THE COURT:  That's what I was not picking up on.

3          THE WITNESS:  Right.

4          MR. HILLMAN:  The final reflects the settlement with

5   the Creditors Committee and a number of other moving pieces, so

6   things changed.  But at the interim, you're 100 percent

7   correct.

8          THE COURT:  All right.  Okay.  Thank you.

9          MR. HILLMAN:  Thank you.

10          MR. GLENN:  Thank you.

11          (Off the record at 1:28 p.m.  Back on the record at

12   2:42 p.m.)

13          THE COURT:  Be seated.  Okay.

14          MR. GLENN:  As a housekeeping matter, Exhibit 6 is

15   the first day transcript that we have referred to in

16   Ms. Etlin's testimony.

17          COMPUTER VOICE:  Recording in progress.

18          THE COURT:  Okay.

19          MR. GLENN:  I'll start again.

20          THE COURT:  Okay.

21          MR. GLENN:  Exhibit 6 in our binder is the first day

22   transcript that we have referred to both on direct and cross of

23   the first day hearing.  I believe we have a stipulation to move

24   that into evidence.

25          THE COURT:  Okay.  Is there any objection to that?  I

Etlin - Redirect/Glenn                    113

1  can't imagine there's an --

2          MR. HOWELL:  No objection, Your Honor.

3          THE COURT:  Okay.

4          (Exhibit 6 Admitted Into Evidence.)

5          MR. GLENN:  Thank you.  Okay.

6                    REDIRECT EXAMINATION

7  BY MR. GLENN:

8      Q    Ms. Etlin, I'll try to be very quick here.  So you

9  testified earlier today that the "DIP" was not repaid and

10 someone told me that I asked a potentially inartful and vague

11 question, so I'm going to ask again.  Has the 40 million

12 dollars of new money been paid under the DIP?

13 A    So we have commenced making payments to the FILO lender in

14 accordance with the terms and conditions of the DIP.  However,

15 how that money is applied is up to them and it's my

16 understanding -- they tell us after the fact.  But it's my

17 understanding that some of the money that we have paid to them

18 has been applied to the new money DIP and some of it has been

19 elsewhere.  So --

20     Q    Can you --

21 A    -- I can't tell you that it was paid first or second or if

22 it's fully satisfied or not.

23     Q    Let me ask you a different question.  Do you know

24 whether that amount is more or less than 40 million dollars?

25 A    That we have paid to the lender?

Etlin - Redirect/Glenn                    114

1        Q    To the FILO lender, yes.

2    A    I believe it's more, but I'd have to look at the budget to

3    refresh --

4        Q    Okay.

5    A    -- my recollection.

6        Q    I'll move on.  So you testified about this 54 million

7    that was provided to the company the Friday or the weekend

8    before the filing, correct?

9    A    That's correct, yes.

10       Q    Okay.  And I want to be precise about that money.

11   Did they, ABL lenders or the FILO lenders, write the company a

12   check for that 54 million dollars or did they allow the company

13   to use 54 million dollars of receipts that otherwise they could

14   have swept and had dominion over?

15   A    So the 54 million was an advance to us outside of formula.

16   In other words, our bar -- we were limited at all times to

17   borrowing by the ABL borrowing base and we were not entitled to

18   that money in that week.  They actually overdrafted us to give

19   us that money.

20       Q    Okay.  But they didn't wire you the 54 million

21   dollars, did they?

22   A    They put it in our bank account.

23       Q    Okay.  And when you say "they," was it the ABL

24   lenders or the FILO lenders that put it in your bank account?

25   A    They both had to agree.

Etlin - Redirect/Glenn                     115

1    Q    That's not the question.  Who put the money into your

2    bank account, ABL or FILO?

3    A    I honestly don't know.

4    Q    Okay.  Now, you testified earlier on your counsel's

5    questioning about the use of cash collateral.  Now, I

6    understand that you prefer cash collateral and you like to

7    avoid cash collateral fights, but it's not uncommon for

8    companies to exist for a limited period of time or in some

9    circumstances the entire case on cash collateral, right?

10   A    In my experience, a multi-billion dollar retailer that's

11   not the case.

12   Q    Well, this is not really a multi-billion dollar

13   retailer anymore.  This is a retailer that's financing a

14   liquidation, right?

15   A    Yeah, but it still has the same complexities, Mr. Glenn.

16   It still has, you know, 500 stores, a billion dollars in

17   inventory, you know, 11, 12,000 employees, et cetera, so for a

18   company that size, the answer would be no.

19   Q    Okay.  And one of the things that cause you concern

20   is that the lenders would not provide you with cash collateral

21   during this Chapter 11 case, right?  They wouldn't agree to it?

22   A    I'm not sure that we had even approached them on that

23   topic.  I think it was always in the form of we need extra

24   money to be able to operate the case.

25   Q    Okay.  And in the case of the ABL lenders, they have

Etlin - Redirect/Glenn                    116

1 consented to your use of cash collateral during this case, have

2 they not?

3 A    So, yes.  Yes, they have in the context of the group deal.

4 Remember their -- their loans are also intertwined with those

5 of the FILO.

6     Q    Okay.  And on the 54 million dollars, do you know

7 whether the FILO loan balance went up by 54 million dollars

8 over last weekend?  Oh, I'm sorry, the weekend before the

9 filing?

10 A    So, again, I'm not sure who advanced the money.  I suspect

11 it was the ABLs that advanced the money.  But, again, the two

12 of them are bound together in a single borrowing base and a

13 single and a creditor agreement, it's the way these deals are

14 done when a FILO gets added behind an ABL, it's just two

15 different sets of lenders in the same facility taking different

16 kinds of risk.

17     Q    Understood.  But there's a difference between writing

18 a check and consenting to someone else writing the check.  And

19 in this case, with that 54 million dollars, it's likely that

20 the ABL lenders funded it and the FILO lenders just consented

21 to it, correct?

22        MR. MERVIS:  Objection, Your Honor.  First of all,

23 it's been asked and answered.  And second, there's no

24 foundation (indiscernible).

25        THE COURT:  Yeah.  You have got to go back a couple

Etlin - Redirect/Glenn                    117

1  of steps on that, I think, because, you know, first it was a

2  likely word and then, you know, you're not --

3          MR. GLENN:  Well, she testified --

4          THE COURT:  -- I don't think we --

5          MR. GLENN:  -- that she believed that.  That's where

6  that -- your belief is that the ABL lenders were the ones that

7  advanced that 54 million dollars, correct?

8          THE COURT:  That -- I'm sorry.  But that's part of

9  the reason I said that is that because she didn't really

10 testify to that.  She wasn't sure and that that's, I think --

11         MR. GLENN:  Okay.

12         THE COURT:  -- part of the objection here.

13 BY MR. GLENN:

14     Q    Well, can we clarify?  Do you believe it or not?

15 A    So, again, Mr. Glenn, I'm going to say that I wasn't sure.

16 If I had to guess, it would be the -- the revolver that did --

17 did it and the plain revolver would be the ABLs.  But that

18 meant also additional money because of the structure coming

19 ahead of the FILO lenders.  So it kind of involves both in a

20 fairly big way no matter whose cash it is.

21     Q    Okay.  And you'd agree with me, I think your budget

22 speaks to this, you're conducting liquidations for the primary,

23 if not exclusive benefit, of the ABL lenders and the FILO

24 lenders in this case, correct?

25 A    I'm conducting liquidation sales to maximize value of the

Etlin - Redirect/Glenn                        118

1  estate for all the parties.

2      Q    Okay.  Do you have any projections that one penny of

3  the GOB sales are going to go to anyone other than the ABL

4  lenders and the FILO lenders after all the other expenses?

5          MR. MERVIS:  Your Honor, this is not relevant to

6  anything.

7          MR. GLENN:  It's completely relevant.  She testified

8  on questioning that the company couldn't have lived off of cash

9  collateral, that that would not have been the right thing to

10  do.  I'm testing that now.

11          MR. MERVIS:  Well, except, Your Honor, that we're

12  several months into the case, right, and so what matters --

13          MR. GLENN:  I'm allowed to ask questions.

14          THE COURT:  Wait.  Wait.  Let --

15          MR. GLENN:  Sorry.

16          THE COURT:  Let him finish, sir.

17          MR. MERVIS:  What matters according to the motion and

18  (indiscernible) --

19          THE COURT:  Could you speak up?  I'm sorry.

20          MR. MERVIS:  Yes.  I was trying to bring my

21  temperature down, but -- yes.  I can speak louder.  What

22  matters according to the motion, as I read it, it is what was

23  known or knowable on day one.  These questions are about where

24  we are now.

25          MR. GLENN:  No.

Etlin - Redirect/Glenn                    119

1              THE COURT:  Uh-huh.

2              MR. MERVIS:  And that has nothing to do with the

3    60(e) motion, as far as I can tell.

4              MR. GLENN:  I can -- I'll withdraw the question and I

5    will deal directly with that.

6              THE COURT:  Okay.

7    BY MR. GLENN:

8         Q    You testified earlier, Ms. Etlin, that in your first

9    day declaration, that 718 million dollars projected for the

10   sales would be reduced by corporate overhead or other corporate

11   expenses and that would go down to a number in the 400 million-

12   dollar range, right?

13   A    Approximately, yes.

14        Q    Okay.  So using that number, which you put in the

15   first day of the case, that amount would not be enough to repay

16   the FILO lenders or the ABL lenders, would it?

17   A    So solely from inventory proceeds, that's correct.  But

18   we're selling other assets, all sorts of other assets, most of

19   which are their collateral.

20        Q    Right.  And those sales of their collateral are going

21   to go to them, right?

22   A    Until their liens are satisfied, that's correct.

23        Q    Uh-huh.

24   A    But as I have also previously testified, there are other

25   assets that will potentially, on the high end, will exceed

Etlin - Redirect/Glenn                    120

1  that.

2      Q    Okay.  Now we have had you testify about the

3  circumstances of this reserve for the WARN Act liability.  Now

4  isn't it the case that that reserve is going to go at least in

5  some part, and maybe you can clarify this, to the employees who

6  are assisting with the liquidation of the lender's collateral?

7  A    It's going to go to the employees who are assisting with

8  the liquidation of the entire business, which is not just the

9  liquidation of the collaterals.  As a matter of fact, the

10 majority of the employees who are working on the liquidation of

11 the inventory are not New Jersey residents, so it doesn't apply

12 to them.

13     Q    Okay.  You're not paying WARN Act liability claims

14 for anybody outside of New Jersey?  Is that your testimony?

15 A    So, no, because they all got WARN as applicable in other

16 states, which is a 60-day WARN notice and the stores are taking

17 90 days to liquidate.

18     Q    Right.  And isn't it the case that the reason that --

19 one of the reasons that reserve is being funded is that the

20 directors of Bed Bath & Beyond could be liable for that amount?

21 Isn't that one of the reasons why the company decided to fund

22 that reserve as part of the DIP?

23          MR. HOWELL:  Object to the extent it calls for a

24 legal conclusion.

25          THE COURT:  Yeah.  That does call for a legal

Etlin - Redirect/Glenn                    121

1  conclusion and I guess, you know, maybe the directors could be

2  liable, but certainly the employees would not be happy I don't

3  think.

4  BY MR. GLENN:

5      Q    Did anyone tell you in words or in substance that the

6  directors of the company could be liable if --

7  A    No, I don't recall having that discussion at all.  I

8  record the -- recall the discussion being solely about

9  attempting to comply with literally being the first test case

10 of the new law.

11     Q    Now, you testified that you wanted to avoid a cash

12 collateral fight and that a DIP is necessary in a multi-billion

13 dollar case like this.  Have you ever seen a lender succeed in

14 a case of this size, in a case of this complexity, in a case

15 where there's ongoing liquidations of stores where the lender

16 moved to lift the automatic stay to conduct that liquidation

17 process outside of the bankruptcy court?

18 A    Lift the automatic -- I'm sorry.  Maybe I just don't

19 understand your question.  Lift the automatic stay in a

20 bankruptcy to conduct something outside of bankruptcy?

21     Q    Exactly.

22 A    You mean, kick us out of bankruptcy?

23     Q    Yes.  Or to liquidate and foreclose on their

24 collateral outside of a bankruptcy in any retail company you

25 have ever been associated with?

Etlin - Redirect/Glenn                    122

1  A     Well, I have seen lenders attempt to foreclose on their

2  collateral, which resulted in a bankruptcy filing but I haven't

3  seen somebody take something that was already on file and put

4  it back out.

5        Q     Okay.  Now, you testified before on the cross-

6  examination about your concern that the lenders, after a

7  Chapter 11 filing, could sweep cash.  Do you recall testifying

8  to that?

9  A     Yes, because if we don't have authority to use their

10 collateral and we're selling their collateral, which is

11 inventory and turning it to cash, that's their collateral.

12       Q     Okay.  But you don't know whether they had the right

13 to sweep the cash collateral automatically or whether they

14 would have to go to the court before they would be able to do

15 that?

16 A     No.  That's a legal conclusion.

17             MR. GLENN:  Okay.  Nothing further.

18             THE COURT:  All right.

19             MR. HOWELL:  No questions, Your Honor.

20             THE COURT:  No questions?  Mr. Hillman or --

21             MR. HILLMAN:  No, Your Honor.  No questions.

22             THE COURT:  Mr. Huebner?

23             MR. HUEBNER:  Nothing, Your Honor.

24             THE COURT:  All right.  Well, Ms. Etlin, you may step

25 down.  Thank you for being here to testify today on such short

1    notice.

2              THE WITNESS:  Thank you, Your Honor.

3              (Witness excused.)

4              THE COURT:  All right.  I guess that leaves us to the

5    next step, which I think is closing argument unless somebody

6    has -- unless I missed something or maybe there's some exhibits

7    that has to be introduced into evidence or --

8              MR. GLENN:  No.  I think we're okay.

9              MR. HOWELL:  Nothing further from the debtors before

10   closing, Your Honor.

11             THE COURT:  All right.  So in other words, I'm not --

12   I don't recall everything that was in the exhibit books being

13   admitted into evidence.

14             MR. GLENN:  That's correct.

15             THE COURT:  So but that's the way we're leaving it?

16             MR. HOWELL:  Correct, Your Honor.

17             THE COURT:  Okay.  All right.  All right.  So then --

18   oh, I just broke the binder.  We're going to go to closing

19   arguments and are you prepared to do that now?  Do you need a

20   few minutes or --

21             MR. GLENN:  If you wouldn't mind giving us a few

22   minutes, I think that would be helpful.

23             THE COURT:  Yeah.  Because I'm going to ask for a few

24   minutes after the closing arguments are done to, you know -- to

25   gather my thoughts and do what I have to do, as well.

1          MR. GLENN:  Okay.

2          THE COURT:  So why don't -- why doesn't everyone take

3  a few minutes and, you know, maybe everyone prepares their --

4  whatever their closing statements are and that way it'll be

5  only that one break and the break by me.  Okay?

6          MR. GLENN:  Thank you, Your Honor.

7          THE COURT:  Thank you.  I have to put this back

8  together.

9          MR. HILLMAN:  Your Honor, it's 2:58.  What time would

10  you like us back?

11          THE COURT:  Well, Mr. Glenn, you said --

12          MR. GLENN:  Ten minutes.

13          THE COURT:  -- ten?  Yeah.  So why don't we say --

14  because lawyers always estimate short, why don't we say 3:15,

15  all right.

16          (Off the record at 2:58 p.m.  Back on the record at

17  3:20 p.m.)

18          THE COURT:  We are back on the record and I just -- I

19  neglected to ask one factual question about something in the

20  papers of the debtor that I had highlighted for myself, because

21  I don't recall hearing it in the testimony, but maybe I missed

22  it.

23          It's really right in the beginning in paragraph 2

24  that the second-to-last sentence is about actual cash results

25  have been posted publicly for weeks.  I heard testimony that

1  they were provided to the lenders and to the Creditors

2  Committee after it was formed, but I wasn't sure if that was

3  what publicly meant or if it was referring to something else.

4         And I think it's the -- it might be -- yeah.

5         MS. GEIER:  Good afternoon, Your Honor.

6         THE COURT:  Hi.

7         MS. GEIER:  Hi.  Good afternoon.  Emily Geier from

8  Kirkland & Ellis on behalf of the debtors.  I'm just glad to

9  stand up finally to have a moment up here to speak about a

10  couple things.  That is -- that's correct.  They were not

11  publicly posted.

12         Let me clarify that and we're happy to submit a

13  revised direction to clarify.  They were posted to the various

14  parties in interest that have access to those materials in

15  these cases.  Had a party requested discovery of those, we

16  would have happily provided those.  So not publicly posted, but

17  available starting as soon as the week was over.

18         THE COURT:  Okay.  So that's what you just said is

19  kind of the next sentence, this wholly non-controversial

20  information would have been readily available to movant at any

21  time is what --

22         MS. GEIER:  That's correct, Your Honor.  I think

23  there was the distinction -- there is just simply what we view

24  as, like, the public data room being the Committee.  The U.S.

25  Trustee has access to these -- this information and all the

1  various lenders.

2         So that is information that we would have made

3  available, but we are happy to correct that on both -- either

4  on the record or by submitting a filing.

5         THE COURT:  Well, I think I'm going to deem -- I'm

6  going to just deem this to be the results were post -- were

7  provided to the lenders and the Unsecured Creditors' Committee

8  for weeks.  Is that the --

9         MS. GEIER:  That's perfect, Your Honor.  Thank you.

10         THE COURT:  All right.  That's what I thought I heard

11 in the testimony.

12         MR. GLENN:  And there's no evidence of the rest of

13 that statement.  So that --

14         THE COURT:  Well, the publicly you --

15         MR. GLENN:  Publicly.  Well, even --

16         THE COURT:  Right.

17         MR. GLENN:  -- available to us.  Or even available to

18 us.  I have exhibits that show that they weren't available to

19 us and I didn't go into them because they weren't put into

20 evidence on Ms. Etlin's testimony.  So that's not in the

21 record.

22         THE COURT:  Okay.

23         MR. GLENN:  Okay.

24         THE COURT:  All right.  You can start --

25         MR. GLENN:  Thank you.

1          THE COURT:  -- Mr. Glenn.

2          MR. GLENN:  Thank you.  Thank you very much for your

3    time, Your Honor.

4          THE COURT:  Thank you for your presentations.  All

5    very professional.

6          MR. GLENN:  Thank you.

7          And we would have liked to have been here today with

8    full discovery, with complete access to all of the company's

9    books and records so we could verify what has been presented in

10   court today, but we're proceeding with what we have.  And what

11   we have is a narrow question before the Court.  Okay.

12         The question is, under Rule 6003, the Court's inquiry

13   on the first day of a bankruptcy for the incurrence of DIP

14   financing is very limited because there's no Creditors

15   Committee appointed yet.  We showed up after being hired after

16   a few hours.  There's no one there to protect general unsecured

17   creditors, other than the Court and the debtor, who has

18   loyalties to various stakeholders and not necessarily to

19   general unsecured creditors.  And that's why Bankruptcy Rule

20   6003 states that the only expenses for the incurrence of debt

21   that the Court can approve are those that would avoid immediate

22   and irreparable harm.

23         So what happened in this case?  The company, not at

24   its own insistence -- this is not necessarily the company's

25   fault because the company, as Ms. Etlin testified, wants money.

1  They want money.  No one is suggesting that a debtor shouldn't

2  get money.  That's not the inquiry in a first day of a case.

3        I'd like someone to give my debtors one billion

4  dollars, okay?  Obviously debtors want more liquidity rather

5  than less.  And having a DIP might be prudent having a "need

6  for a DIP might be important," but the expenditures and the

7  incurrence of that debt is limited under this Bankruptcy Rule

8  only to the expenses that would cause immediate and irreparable

9  harm.

10        Now, I asked Ms. Etlin a series of questions going to

11  that and she admitted, she admitted at least in some of the

12  categories, and the transcript will speak for itself, that the

13  deferral of those expenses did not, in fact, cause immediate

14  and irreparable harm.

15        Okay.  The Court, in the first day transcript, asked

16  the $64,000 question.  You asked, Your Honor, does the company

17  need a 40 million-dollar DIP and why now.  Those were your

18  questions.  So what you were told by the debtor is that there

19  was a 30 million-dollar liquidity hole and that they needed to

20  fill that liquidity hole up.  And if you look at the numbers,

21  that liquidity hole was caused by the WARN Act and priority

22  claim reserves and the payment of the rent, which they did not,

23  in fact, pay in the first week of the case and that wasn't

24  disclosed until the wind down DIP budget was published.

25        THE COURT:  But I'm sorry I have to interrupt you,

129

1  but wasn't that all -- that was what was learned after, and

2  I -- I'm not sure I agree all that she -- that Ms. Etlin did

3  say that there was any irreparable harm at all.  It was a post

4  facto.

5         And is that the way I'm supposed to analyze it on

6  that day when I'm told that there's no money forthcoming?

7  There's no money in the debtor and there's no money forthcoming

8  until -- unless this approved?

9         MR. GLENN:  Well, you're supposed to rely on those

10  representations, okay.  And if those representations prove to

11  be inaccurate as opposed, okay -- I understand this question.

12  You may not know, the company may not know, what money's coming

13  in.  Projections.  The stuff that deals with external

14  stakeholders, that is a different category and I'm going to get

15  to that.  I'm going to get to that.

16         But this, Judge, is the company telling you,

17  representing to the Court, they needed to pay those expenses in

18  Week 1.  They must.  They had to fill that hole.  That's what

19  they told you.  That's not an external factor.  That wasn't out

20  of their control.  That was something they told you.

21         They said that's what they needed to use that money

22  for and they didn't do it.

23         THE COURT:  Uh-huh.

24         MR. GLENN:  Okay?

25         THE COURT:  Well, they said --

1              MR. GLENN:  And so --

2              THE COURT:  Didn't they say they needed it for, among

3  other things, the reserves and to pay other expenses but also

4  to gain the confidence of the employees and the vendors and the

5  ability to at least try to sell as a going concern --

6              MR. GLENN:  They did.

7              THE COURT:  -- in whole or in part?

8              MR. GLENN:  They --

9              THE COURT:  Didn't she testify to that?

10             MR. GLENN:  She did.  But that's not the relevant

11 inquiry.  The inquiry is not whether it's going to inspire

12 confidence, okay?  We all want to inspire confidence.  That's a

13 laudable goal.  Okay.  But the legal standard is immediate and

14 irreparable harm.

15             THE COURT:  Well, that's the -- okay.  I'm sorry.  I

16 didn't finish it and then that's what she said was the

17 immediate and irreparable harm.  That's the testimony and it's

18 in the declarations.  It's in --

19             MR. GLENN:  Well, that's conclusory because what she

20 didn't testify to is, if that wasn't paid, what would have

21 happened, right?  You know, they didn't pay -- they paid the

22 rent two business days late.  Okay.  That was nothing to them.

23 Nothing.  Okay.

24             The WARN Act reserve, yes.  They wanted to inspire

25 confidence in their employees.  Okay.  They didn't pay that in

1  the first week.  Okay.  They didn't fund it in the first week.

2  Employees haven't received it, okay.  So the money was in the

3  system, okay.

4        We walked through the projections.  That money didn't

5  have pay -- be paid on day one -- Week 1.  Didn't have to be

6  paid on Week 2.  It had to be paid when the employees were

7  terminated and if you took out the $40 million, the money was

8  there.  It was there.  And so the failure to pay that money, as

9  a matter of fact, did not cause the company immediate and

10  irreparable harm.

11        THE COURT:  But, I'm sorry, maybe I'm not being clear

12  on my question, although I don't -- I know you used immediate

13  and irreparable harm repeatedly in your papers and there's no

14  quarrel about that.  But am I supposed to judge immediate and

15  irreparable harm after the fact or based on what's presented to

16  me?

17        MR. GLENN:  Based on what's presented to you.

18        THE COURT:  Right.

19        MR. GLENN:  And that's why this is newly discovered

20  evidence.  After the fact, it allows you to reconsider that

21  decision.

22        THE COURT:  Okay.  I understand.

23        MR. GLENN:  Okay.  If I tell the Court, you know,

24  Judge, this business is going to shut down.  It's going to shut

25  down if we don't pay landlord X, okay?  And then I pay landlord

1  X two or three weeks late.  That casts some doubt on what you

2  were told on day one.  You are allowed to rely on the debtors'

3  representations.  We are allowed to have the Court reconsider

4  those matters if those representations prove to be inaccurate.

5  So --

6          THE COURT:  Okay.

7          MR. GLENN:  -- what we have here is, okay, a 40

8  million-dollar DIP.  A DIP of 40 million dollars, one draw on

9  day one, okay.  It's not a DIP that goes to Week 2, Week 3,

10  Week 4, Week 5, Week 6.  One draw, okay.  And Ms. Etlin

11  testified that she doesn't even remember whose idea it was to

12  have the WARN draw.

13          And what happened in this case is that the lenders,

14  okay, I think they took advantage.  They perceived what you

15  perceived, which was they had a lever.  They had a cudgel where

16  the FILO lenders, that is, could roll up 200 million dollars

17  because this need was presented to the Court, okay.

18          And there was some colloquy during the first day

19  hearing, you know, and I think Mr. Sussberg originally thought

20  that it did not have to be approved on day one.  Mr. Hillman

21  insisted that it must be approved on day one.  And so Your

22  Honor did it based on those representations.

23          And, you know, no one blames the Court for what you

24  did.  I mean the courts do what you did all the time.  But this

25  is not a 300 million-dollar DIP.  This is not a DIP that needs

1 to be used for the complete span of the case.  Ms. Etlin said,

2 okay, this is a, you know, multi-billion company.

3        Okay.  Forty million dollars of new money for a

4 multi-billion company, by her testimony, is a rounding error.

5 It's a rounding error.  But what was the effect on us, on the

6 general unsecured creditors?  Okay.  The debtor doesn't know

7 and I think that was, you know, a really critical concession by

8 Ms. Etlin because she's very focused.  And Ms. Etlin is the

9 best, okay.  You know, she is literally the best.  No one's

10 here questioning Ms. Etlin's credibility.  She's the best, so

11 let's get that out of the way.  But Ms. Etlin, what she said

12 was, hey, I need to protect my employees, right?  I need to

13 start these GOB processes.

14        We looked at the 718 million dollars that was

15 projected for the GOB sales.  It said net amounts.  There's no

16 disclosure of any further reductions from those amounts.  So a

17 reasonable person looking at those numbers could conclude that

18 718 million dollars would cover the ABL loan and the FILO loan.

19        So, again, the roll-up, if that were the case, if

20 those were the numbers, wouldn't really effect us.  Okay.  We

21 allow roll-ups all the time in cases where the lender is

22 demonstrably over-secured because there's no real economic

23 effect on the ultimate recoveries.  What there is an effect on

24 is we can't restructure that debt using the tools in 1129.  We

25 can't do it.  And the lender bargains for that and we bite our

nose, bite our face to let that happen because that's the cost

of a potential reorganization.

What we have here, okay, is -- and I'll be candid

here.  It's a liquidation with a Hail Mary of a reorganization

and I -- God bless the debtor.  I hope they come through with

it.  Maybe they're going to find more money than we project,

but this is a liquidation.  It's a liquidation that started on

day one.  The budget on day one contemplated an immediate

liquidation.  And so what is the consequence of that?

The consequence of that is, the collateral that we're

dealing with is their collateral.  There's no evidence in the

record that that collateral would cover anything more than the

lenders.  So --

THE COURT:  Anything more than?

MR. GLENN:  I'm sorry.  The secured lenders and the

secured lenders' debts.  There might be other stuff out there.

Who knows?  I have got to deal with the information that I have

today, because if I waited longer to see what happens at the

end, I'm sure they would slaughter me even more than they're

trying to today.

But what was the cost of this, okay.  To give the

employees their reserve 20-some-odd million dollars, more than

half of the debt, that's in the record to pay the rent in the

first week that was ultimately moved.  That's really the nub of

that 40 million dollars.  Okay.

135

1    What did we pay for that?  Okay.  We paid for that

2 with 200 million dollars of notional value given to the secured

3 lenders to liquidate their own collateral.  Okay.  What this

4 really is, is the employees are being held hostage to do

5 something for the secured lenders to get them their money.

6    But where does that leave us?  Where does that leave

7 the general unsecured creditors?  We're paying a 200 million-

8 dollar tax on day one for 40 million dollars that is likely now

9 repaid.  So going back to the irreparable harm standard, there

10 is no evidence, at least no clear-cut evidence, of immediate

11 and irreparable harm that was presented to the Court that's now

12 been disproven, you know, with the deferral of those expenses.

13    And I venture to say, if Your Honor looks at the

14 charts in the brief, which are in the record and in evidence,

15 and you look at them and you say, okay, we take the position --

16 and there is an issue of fact about that, which -- for which we

17 don't have discovery, that the company did demonstrably better

18 than the DIP projections.

19    I would be astonished, astonished, if we waited four

20 days, three days, two days after the first DIP hearing when

21 those actual results that came in, if -- for them to establish

22 an immediate need, irreparable harm for the DIP financing.

23 Okay.  And so what the testimony is, is Ms. Etlin didn't

24 know -- that she didn't know, certainly with precision, what

25 happened over that weekend.  Again, we are the ones that bear

136

1  the cost of them moving forward on that day versus the next day
2  versus the next day.
3          But even if the Court looks at the budget that they
4  presented, okay, which now looks like a pretty much a worst
5  case scenario, they still had enough cash to live not forever
6  necessarily.  Okay.  This is their budget, okay?
7          So the question is, could they have waited two weeks,
8  three weeks for the dust to settle for general unsecured
9  creditors to come in to give the company a real bottoms-up
10  analysis like the Creditors Committee is supposed to do in
11  these cases.  I venture to say the outcome would have been
12  massively different.
13          So where does that leave us?  Certainly if you -- if
14  the Judge -- if Your Honor looks at the actual performance,
15  there was no need for a DIP.  I went through that with
16  Ms. Etlin.  The ABL lenders would have been repaid later in
17  time.  But, again, there was still no need for a DIP.  The 54
18  million dollars was not money that the FILO lenders loaned.
19  They consented to it and God bless them that they did.  They
20  didn't want a liquidation.  They were never going to move to
21  lift the automatic stay to liquidate their collateral.
22          I asked Ms. Etlin that question at the end because I
23  think it's important.  She wanted to avoid a contested cash
24  collateral fight.  Perfectly valid thing to do.  Okay.  But the
25  real question is, what alternative did the lenders have to

137

1  liquidate their own collateral, other than through the auspices

2  of this Court without a DIP when there was cash collateral

3  available to pay the expenses.  And I think what you hear is,

4  Ms. Etlin, in 30 years has never seen that.  And I'm sure Your

5  Honor would not let this company shut the door over three weeks

6  of the lenders were being unreasonable with their cash

7  collateral.

8         So where does that leave us?  It leaves us with a

9  budget that was approved and presented with the Court the day

10 before the second DIP hearing -- the night before, I think less

11 than 12 hours before Your Honor held the hearing to approve

12 that.

13        You have the Creditors Committee standing up in court

14 saying, we cut this deal with the lenders.  Okay.  And what

15 they said to the Court was, we wouldn't have done this deal but

16 for the roll-up.  So there's a nexus between the roll-up and

17 the resolution of the disputes with the lenders because but for

18 reconsideration of the first day order, there was nothing else

19 they can do.

20        Now, that necessarily is not the end of the inquiry.

21 It's not necessarily doomsday for us.  Okay.  What's doomsday

22 for us is, after that second DIP hearing when I asked the Court

23 for -- where I informed the Court that we were going to use

24 that additional time period to see for ourselves what our

25 fiduciary, the Creditors Committee, was doing.

138

1          And, you know, we were gratified to learn they did

2    the perfection analysis correctly.  But then this came up, this

3    wind-down second DIP budget came up and it was startling to us.

4    It just was because it showed so much more cash than what they

5    originally projected to generate and the actual proves that

6    they never needed the DIP, and those are just the numbers.

7          So we spent the next ten days working getting

8    informal discovery from the debtor.  Ms. Etlin graciously sat

9    for two interviews with me.  And the one that sealed the deal

10   was the one I asked her about where, you know, if we had become

11   convinced that this roll-up did -- was meaningless, right, that

12   there was enough value from the collateral such that the

13   unencumbered collateral was still left, we would never be here

14   today.

15         Judge, I have been doing this for 27 years, 27.  This

16   is the first time in 27 years that any of my clients has ever

17   moved for reconsideration in any bankruptcy case in any other

18   litigation because what we concluded was that that moment time,

19   where there was no or little due process for that first day,

20   was case determinative to us.  1.5 billion dollars.  One

21   billion dollars of bonds.  Okay.  We talk about the DIP

22   lender's money and the need for them to pay the employees.  How

23   much wages has the billion that we have paid, the other unpaid

24   trade claims generated, and there's been no one here for us.

25         So if you look at the standards, Judge, for

1  Rule 60(b), okay, Mr. Huebner asked Ms. Etlin, you know, has

2  there any evidence of fraud, misleading.  No one is suggesting

3  that and if that was conveyed by anybody, we certainly didn't

4  mean that, but I think a mistake was made.

5        I think there's newly discovered evidence that

6  warrants a look at this again.  And, frankly, what do we want?

7  We're not asking to subordinate the DIP lenders' 40 million

8  dollars of debt.  Okay.  I think under Swedland, that is what

9  is actually protected.

10        We can debate whether on a motion for reconsideration

11  364(e) even applies, because by its terms it doesn't.  But what

12  it does not protect under Swedland -- and Mr. Stolz reminded me

13  to tell you this.  That his view is that under Swedland and the

14  panels he's discussed on that the understanding is that it only

15  protects the new money and that's how we read it.  It's the

16  roll-up.

17        THE COURT:  You use that?

18        MR. GLENN:  I'll strike that.

19        THE COURT:  Yeah.

20        MR. GLENN:  Anyway.  So they don't have protection

21  for their pre-petition debt.  They didn't give the money to the

22  company for that pre-petition debt on a post-petition basis.

23  It's a roll-up.  It's a roll-up so they can get their 40

24  million dollars back.  The roll-up should be struck and we

25  should move on with the case in the way we think it should have

1   been handled on the first day of the case or the roll-up should

2   be reduced to a point that is appropriate for this case.  And I

3   don't think there's any amount, but that would be something the

4   Court can do.

5        I'm not aware of any precedent for a five times roll-

6   up.  Mr. Hillman suggested to you that this was more of a -- I

7   think a two or three times roll-up given that 54 million

8   dollars, but they didn't give the company that money.  That

9   money just was advanced by the ABL lenders.

10       So under Rule 364(e), you're allowed to reconsider

11  this even if they were in good faith.  Under <u>Swedland</u>, if

12  364(e) does apply, only their new money is protected.  That's

13  it.  And so what we're asking the Court to do is not

14  necessarily the -- to blow up the DIP in toto --

15       THE COURT:  But doesn't your motion ask to vacate

16  both loans?

17       MR. GLENN:  Well, I don't know -- you know, I think

18  it asks to vacate it, but doesn't -- I'm making clear.  It --

19  we're not asking for you to vacate it in toto.  I think what

20  you're --

21       THE COURT:  That's what --

22       MR. GLENN:  -- allowed to do --

23       THE COURT:  -- it says though.

24       MR. GLENN:  Well, I don't know if you can.  I don't

25  know what your --

1        THE COURT:  I know.  That's a hard one.

2        MR. GLENN:  It is a hard one.

3        THE COURT:  That -- when you talk extraordinary --

4        MR. GLENN:  It is extraordinary.

5        THE COURT:  -- that would be extraordinary.

6        MR. GLENN:  It is extraordinary.  And as I said --

7        THE COURT:  That would be extraordinary.

8        MR. GLENN:  -- I wouldn't ask for this relief if we

9 didn't think it was the difference between getting nothing and

10 something meaningful.  That's why we're here and, you know, the

11 unfortunate thing is, I said to the Court, and Mr. Sussberg

12 actually took me up on this, he said we could talk and see if

13 there was a way to resolve this to give us some assurance that

14 the roll-up either didn't hurt us or won't hurt us enough to

15 fight about.  I'm still waiting for that evidence.  Ms. Etlin

16 didn't testify about it.  She testified that she didn't even

17 really consider the effect of the roll-up.

18        And how is that significant?  Under, I think, one of

19 your decisions, Judge, to have a roll-up and to incur this kind

20 of financing, you have to take into account not just one

21 creditor, not just one creditor group, but all the creditor

22 groups in toto.

23        And I think the record is completely bereft.  There's

24 zero evidence that anybody, before that roll-up was put to the

25 Court, put any consideration into what that roll-up meant for

142

1  the recovery of general unsecured creditors.

2        THE COURT:  Well, I do.

3        MR. GLENN:  Okay.  But you're not the debtor and it's

4  the debtors whose judgment was proffered to the Court.  It's

5  their judgment and what you heard --

6        THE COURT:  But that's --

7        MR. GLENN:  -- from Ms. Etlin --

8        THE COURT:  -- the context I did.  That's the context

9  in which I considered it in that I was told it was absolutely

10 necessary and the product of months of negotiations with

11 numerous parties and was the best they could do and that's what

12 they needed to try to sell the debtor as a going-concern, in

13 whole or in part, to keep the employees happy, to keep the

14 vendors happy.

15       And I'm -- I guess my question to you is, what has

16 changed?  What is different about that now?  Where is the

17 difference after we have had a full day of testimony in which I

18 know you don't like that I didn't give you discovery, but

19 the -- I gave you some discovery and I think you had the option

20 ability to get discovery before this on your own without me,

21 but that's a whole other thing.

22       I just keep coming back to the whole Rule 60 standard

23 and your irreparable harm argument and it just seems me that

24 everything comes down what was said in the papers, that you can

25 make a -- I mean now you kind of, in all candor, you have

1 backed off a little bit because you said, you know, you're not

2 alleging any kind of fraud or misleading or anything like that

3 and I appreciate that.  I think it --

4          MR. GLENN:  We did in the papers in fairness, Judge.

5          THE COURT:  What?

6          MR. GLENN:  I mean the papers never mentioned fraud.

7 It mentioned mistake --

8          THE COURT:  Well, you said that --

9          MR. GLENN:  -- and newly discovered evidence.

10         THE COURT:  Not fraud.  Not fraud.  No.  You're

11 right.  Not fraud.  That it was misleading and that I wasn't

12 told things that they knew or should have known, right?  So

13 what is your -- you're a 27 year lawyer at least.  When

14 somebody says you don't say something to a court that they knew

15 or should have known, what is that sounding?

16         MR. GLENN:  I think they -- I think, you know --

17         THE COURT:  Wait, wait, wait.

18         MR. GLENN:  It's -- it means that they could have

19 done more to give the Court more information.  That's what it

20 means.

21         THE COURT:  It sounds --

22         MR. GLENN:  That's what it means.

23         THE COURT:  -- misleading and omissions can be fraud

24 and that's what it sounded like to me.  That's why I said it.

25         MR. GLENN:  Okay.  Well --

1          THE COURT:  Because -- and I think it came -- I think

2     it was repeatedly in the papers and even today, "known or

3     should have known."  That's in -- 27 year lawyer, that's in

4     every fraud --

5          MR. GLENN:  No.

6          THE COURT:  -- complaint, right?

7          MR. GLENN:  What I'll say to the Court is this.

8     Ms. Etlin told us that she did not have the cash receipts until

9     after the first day hearing, just as she testified here.  Okay.

10    But then she said, "Well, you know, I had the sales results

11    before that."  Okay.

12         And she didn't tell us in that conversation before we

13    filed the papers that she needed other information to sort out

14    what the actual number would be.  Okay.  She said -- she used

15    those words and that's why we filed the papers.  So I don't

16    think we have to hit that burden and if that's -- if we got

17    that wrong and Ms. Etlin, you know --

18         THE COURT:  But I'm going back to this.

19         MR. GLENN:  Yeah.

20         THE COURT:  I'm going back to -- let's get past that

21    a little bit, but I'm saying it goes back to your irreparable

22    harm thing and am I supposed to decide the irreparable harm

23    with the benefit of hindsight?

24         MR. GLENN:  If there's newly --

25         THE COURT:  It's always -- it's always, right?

145

1  Irreparable harm is always potential.  It's never that it's

2  right there, that the irreparable harm is right there and you

3  know without a doubt it's absolutely going to happen.  It --

4  but, in any event, you decide that on the basis of what is

5  going on at that time.

6        As opposed to, well, later on it turned out that, you

7  know, Bed Bath & Beyond didn't need to have a DIP financing

8  even though they were hemorrhaging cash.  They had three

9  million dollars in the bank the day they filed.  They were in

10 default six times on their loans.

11       They -- you know all those things.  I don't know.  I

12 think people were concerned about Bed Bath & Beyond and its

13 viability deeply.  And I was even concerned as just somebody

14 who was reading about it in the paper because it sounded like

15 they were in a lot of trouble and everything I heard here was

16 that they were even in more trouble than I knew or I thought.

17 And --

18       MR. GLENN:  Every debtor -- at least almost every

19 debtor that I deal with goes into bankruptcy with issues that

20 create concerns.  We're here because a company is in trouble.

21 Maybe this one was in deeper trouble than others granted.  But,

22 again, concern is not the standard.

23       The standard is immediate and irreparable harm.

24 Okay.  And the only evidence you were given of immediate and

25 irreparable harm was that there was a hole in the first week of

1  this case, a 30 million-dollar hole that needed to be filled.

2  That's what they told you.

3          You are 100 percent entitled to rely on that

4  representation and I am 100 percent entitled to come back to

5  you and say that representation was wrong.  Maybe it was a

6  mistake.  If it was a mistake, you're entitled to review it

7  under 60(b).  If it's newly discovered evidence that we found

8  out about afterwards that would have changed the calculus about

9  whether what you were told was actually true, 60(b) applies.

10 And I think that's where we're having this debate, which is I'm

11 not disagreeing with almost anything that you're saying.  It's

12 appropriate for you to be concerned, okay.  It's appropriate

13 for you to take into account how the world views a debtor

14 before Your Honor.  It's appropriate to look at a company like

15 this and try to preserve and protect it.  Okay.  There's

16 nothing wrong with that.

17          But Rule 6003 says that on the first day of the case,

18 which is a special day of the case unlike any other -- and in

19 this case, outcome determinative, you're only supposed to

20 approve expenses or financing for expenses to the extent

21 necessary to avoid immediate and irreparable harm.  Okay.

22          Now, we also wouldn't be here, right, if the cost of

23 paying for that allegedly was 40 million dollars.  Okay.  What

24 you were told and why we're here now was that the cost of that

25 immediate and irreparable harm that they represented was to

1  charge the general unsecured creditors 200 million dollars.

2         And so this is extremely prejudicial to us and I

3  think if you look at it this way, if you look at it that if you

4  balance the prejudice to the DIP lender, the prejudice to us,

5  the company's actual prejudice if those expenses had been

6  deferred, you have catastrophic -- potentially catastrophic

7  result for me.

8         You have a DIP lender who's going to get the same

9  recovery either way and you have a debtor that's going to be

10 able to pay all the expenses that it needs to pay anyway.

11 We're here because this hurt us and we have no other recourse

12 after the first day of the case to do anything about this.

13         THE COURT:  But what about a challenge and what about

14 discovery from April 24th to now?

15         MR. GLENN:  So --

16         THE COURT:  What about that?

17         MR. GLENN:  What about that, Judge?  I mean the

18 challenge was to determine the viability of their pre-petition

19 liens and claims.  Okay.  Mr. Hillman told you on day one that

20 the roll-up was final.  There was nothing left to challenge at

21 that point in time.  That was not preserved and so --

22         THE COURT:  Wait.  What was --

23         MR. GLENN:  -- and so we have no --

24         THE COURT:  -- what about if -- you say the make-

25 whole premium and all that -- all those other, the interest

1  rates and all that.  What -- that wasn't part of the challenge?

2              MR. GLENN:  That was part of the challenge.

3              THE COURT:  Yeah.

4              MR. GLENN:  But the challenge in the technical sense

5  of the term wasn't for the roll-up, because that was final on

6  day one.

7              THE COURT:  Right.  But --

8              MR. GLENN:  I mean if it's not final, let's -- I

9  think that if it's not final, then you're entitled to

10 reconsider everything.  Then you're not under the 60(b)

11 standard, Judge.

12             THE COURT:  No, no.  You -- believe me.  You have

13 said you want me to reconsider everything.  That's what the

14 order says.

15             MR. GLENN:  Yes.

16             THE COURT:  That's what the motion says.  So you're

17 already there.  You don't need anything more to get there.

18             MR. GLENN:  I'm just talking about whether it's a

19 challenge under the terms of the DIP order or a motion for

20 reconsideration or to vacate the DIP and I -- it's definitely

21 the latter, not the former.

22             THE COURT:  Okay.

23             MR. GLENN:  Thank you.

24             THE COURT:  Thank you.

25             Who is -- okay.  Ms. Geier.

1          MS. GEIER:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3          MS. GEIER:  Emily Geier from Kirkland & Ellis on

4    behalf of the debtors.

5          THE COURT:  Could you put the microphone closer to

6    you, because it's a recording thing that happens.

7          MS. GEIER:  How's that, Your Honor?  Oh.

8          THE COURT:  Oh, see.

9          MS. GEIER:  Wow.

10          THE COURT:  That's different.

11          MS. GEIER:  That was much better.  Okay.

12          THE COURT:  Yeah.  Okay.

13          MS. GEIER:  Now we can get started.  Okay.  Your

14    Honor, I'll try to keep this brief because I do believe that

15    Your Honor hit the majority of the points that I was going to

16    raise.  You know, among these specific issues that you raised,

17    Your Honor, I think that the immediate and irreparable harm --

18    just to speak in response to the points that were discussed.

19          On the immediate and irreparable harm, it is hard to

20    tell, based on this record, what is immediate and irreparable

21    harm if not the timely payment of obligations, if not the

22    maintenance of employees and keeping the stores open, if not

23    the pursuit of a going concern.

24          And I think what Your Honor was getting at was that

25    this inquiry about immediate and irreparable harm is

1  (indiscernible).  And how does one reach a conclusion about the

2  movant's motives from day one without ascribing some kind of

3  bad faith or some kind of intent there.

4          So if there was good faith intent, good faith belief,

5  as Ms. Etlin reaffirmed on the record multiple times today,

6  even regardless of what the changes were in the budge or the

7  actuals that the DIP need was there, as long as that good faith

8  held belief is present, I'm not sure that you can merely reach

9  a reconsideration or relief from final judgment on the basis

10  of -- it was a mistake.

11          Now that we see that, you know, the debtors failed to

12  get the money out the door because of banking issues, it was a

13  mistake.  And now that we see that, you know, we couldn't get

14  an account open to adequately, you know, reserve the funds in a

15  specific reserve account instead of just below the line and

16  sort of cash waiting until it had its bank account ready --

17          THE COURT:  Well, he's saying 60(b) says mistake.

18          MS. GEIER:  Right.  Right.  60(b) says mistake, but

19  mistake is evaluated on -- at the time that it occurred.  But

20  more importantly, there was no mistake.  And perhaps that's the

21  easiest way to put it is the substance into the inquiry is

22  there was no mistake, legal or factual.

23          The testimony really illustrates how frivolous this

24  motion was when you start Week 1 with three million dollars

25  after you had to receive and disburse 54 million dollars in

1  critical obligations just to get to that point.  There was an

2  up-tick of a mere 11 million dollars in sales, four million of

3  which Ms. Etlin noted on the record she either was or should

4  have been aware of at that time, but not the ultimate

5  conclusion of how much of that four million would actually be

6  seen by the debtors until after the first day hearing.

7          THE COURT:  But what about the 54 million?  I think

8  the argument is that that was really no skin off the ABL

9  lender's back -- I mean the FILO lender's back because, you

10  know, it was just in there anyway and --

11          MS. GEIER:  Right.  Well, Your Honor, I think the

12  most important point on the 54 million, aside from how critical

13  it was to actually get that funding and disburse it, is that

14  the consent was required of ABL, FILO.  They both had to

15  consent to that payment.

16          So we absolutely recognize that it is the FILO

17  effectively, and I think we said this at the first day,

18  effective -- and Mr. Hillman said on the record.  They

19  effectively loaned 54 million dollars before a DIP before we

20  even filed the cases, which is how, you know, in most ways you

21  would really frame this as a two-to-one DIP.

22          They did not want to loan those funds in advance of

23  the filing.  We absolutely needed because we were facing

24  shutoff notices and, like, as I believe Ms. Etlin said on the

25  record today.

1            THE COURT:  Well, again, the implication is that that

2    54 million really wasn't much of anything or much of anything

3    that would justify a 200 million-dollar roll-up.  I think

4    that's the argument that's being made.

5            MS. GEIER:  Yes, Your Honor.  Without those funds, we

6    wouldn't have been able to file Chapter 11, much less keep

7    stores open, much less pay our rent.  It would be the end,

8    ceasing of all operations.  So I think you can trust Ms. Etlin

9    when she says that those funds were absolutely necessary to

10   keep the lights on and freight moving around.

11           And I just want to note briefly on the disbursements

12   front, there was this idea that, well, it's not immediate

13   irreparable harm.  You know, you made a mistake.  You could

14   have just waited a couple of days to pay your landlords.  Well,

15   Your Honor, I'm sure that we both know that landlords are not

16   going to sit around and wait for their funds to come.

17           They absolutely needed to see and wanted to see and

18   actually requested to see the budget that had their line item.

19   This was very important to show those timely payment

20   obligations.

21           But moreover, it's in the Bankruptcy Code.  Section

22   265(d)(3) says on May 1, you owe the landlords those funds.

23   And so we had every intention, of course, to satisfy our legal

24   obligations while in Chapter 11 because that is the price of

25   admission.  That is the price of admission to Chapter 11

153

1  protections.  It's the same reason why the DIP with

2  construction -- constructed the way it was and the notice about

3  what the irreparable harm meant to the debtors, which was not

4  just merely can I keep the lights on, which also satisfied that

5  standard if that were to be it.  But it was the only path to

6  preserve a going concern.  The only path to ensuring those

7  immediate funding of operations and to the payment of all of

8  these various administrative and expense -- administrative

9  expense and priority claims without which there is a question

10 to be called on the first day whether we have a right to be

11 there.  So that was the debtors most important, you know,

12 negotiated benefit on that first day.  We fought very hard for

13 those reserves to be funded.  I'm not -- I hope that it's been

14 made abundantly clear.  Those funds have to be paid ahead of

15 general unsecured claimants.

16      And so without reserving them from the DIP liens,

17 there is not, you know -- there is no recovery to the unsecured

18 claims before that.  There is also --

19      THE COURT:  What about I think Mr. Glenn was saying

20 not really looking for the relief that we asked for in the

21 papers, but something short of that.

22      MS. GEIER:  I have not -- I don't think I even need

23 to ask the question.  The DIP is a deal baked -- I think we

24 said yesterday -- can't be unbaked.  The roll-up was the

25 essential component of their demands.  It wasn't possible to

1  get the 40 million dollars that we needed without that

2  component.

3         Would we have loved to have no roll-up?  Of course.

4  But without it now, to try to unwind that unwinds the rest of

5  the benefits and provisions.  The fact that the Unsecured

6  Creditors Committee and the debtors negotiated for in terms of

7  sharing of proceeds, which is a very significant benefit that

8  is not really being, as adequately noted here, would go away.

9         So you can't -- with a settlement, there are

10 compromises.  There are benefit and compromises.  There's no

11 guarantee about reaching the threshold because they are

12 projections, but projections aren't mistakes nor is the actual

13 to be considered newly discovered evidence, particularly when

14 it's available at the second day hearing.

15        You know, it was attached to the final order.  Newly

16 discovered evidence must be available but unknown and not part

17 of the record at the hearing.  So there's no -- it doesn't

18 satisfy even that threshold requirement to become newly

19 discovered evidence.

20        THE COURT:  Well, it's okay to do that one day before

21 and then all of a sudden it's not something new?  I mean people

22 don't have a chance to evaluate things and, you know, take a

23 breath and --

24        MS. GEIER:  I agree, Your Honor.  That --

25        THE COURT:  -- finalize it?

1          MS. GEIER:  I think that there is absolutely

2    something to that.  It's not newly discovered evidence because

3    it could have been examined with due diligence, which was not

4    performed.

5          Justice Alito said in <u>Better Box Communications</u>, he

6    noted that a movant did not show due diligence in its attempts

7    and denied a motion for reconsideration on this basis of newly

8    discovered evidence.  Specifically denying because the movant

9    "did not attempt to depose or subpoena anyone."  That's a

10   quote.  "Did not attempt to depose or subpoena anyone."

11         But what we're really getting at when we talk about

12   newly discovered evidence in that 24 hours or whatever exactly

13   it was before the hearing, you're talking about due process.

14   You're talking about whether a party has had notice and

15   opportunity to be heard.

16         And we hear that in the facts and circumstances are

17   somewhat limiting in this regard.  We had a deadline to get the

18   final DIP order on file, a milestone that needed to be

19   satisfied and a settlement that was believed to be very good

20   news to share with the Court.

21         So in that way, it didn't seem so bad on its face.

22   But here where the underlying fact is something that could have

23   been known, could have been found out just simply by subpoena

24   or deposition, then you're in the world that's more analogous

25   to <u>Metal Source Corp</u>, which is 136 B.R. 260, Western District

156

1  of Pennsylvania, where the interim wages order was entered.

2        The Committee sat on its rights and the

3  reconsideration motion was denied for the same reason.  There

4  was a lot of opportunity to dig into and to satisfy those due

5  process rights.  There was just no further inquiry there.  And

6  so I think maybe if we were on a different point in time here,

7  the discussion would be different.

8        But due process requires notice and an opportunity to

9  be heard.  The movant received actual notice and absolutely

10 received an opportunity to be heard.  In fact, at the hearing

11 stipulating that the only request that it would be seeking

12 would be potentially to seek cause to extend the challenge

13 period.  So based on --

14        THE COURT:  I think his argument is, though, that

15 he -- that's what they thought until they saw the budget and

16 had a chance to analyze it.

17        MS. GEIER:  That's correct, Your Honor.  And I'll

18 note that even the Supreme Court has ruled on this in the

19 United States Aid Funds v. Espinosa, 599 U.S. 260, disagreed

20 that bankruptcy noticing requirements violated due process.

21 Because where subsequent notice does give that notice or, and

22 this gets into another area which is actually something that

23 was not plead.

24        Rule 60(b)(4) is the provision that would be the

25 relevant provision for a violation of due process, but it was

1  not sought here, applies only in the rare -- to quote, "Rule

2  60(b)(4) applies only in the rare instance of where in

3  violation of due process that deprives a party of notice or the

4  opportunity to be heard," continuing, "and due process provides

5  notice reasonably calculated under the circumstances to apprise

6  interested parties of the pendency of the action and afford

7  them an opportunity present those objections."

8        So understood, Your Honor, about the ability to

9  review those documents.  It was tight timing.  Frankly, I think

10 that we have now accomplished that substantively.  And we -- I

11 think we have satisfied the record more -- more than needed

12 about where we were on the first day and whether that DIP need

13 was, indeed, required.

14       THE COURT:  Well, you're saying that it was -- that

15 the record, based on the first day hearings and what the --

16 what transpired subsequently in the time period that transpired

17 provided due process and also allowed for challenges and

18 allowed for discovery and things like that?

19       MS. GEIER:  That's correct, Your Honor.

20       THE COURT:  All right.  Thank you.

21       MS. GEIER:  Thank you, Your Honor.

22       THE COURT:  Mr. Hillman?

23       MR. HILLMAN:  Thank you, Your Honor.  David Hillman

24 Proskauer Rose, counsel for Sixth Street as the DIP agent and

25 the FILO agent.

1          So 64 days ago you entered the interim DIP order as a

2   motion for reconsideration.  As best I can tell, Rule 60(b), I

3   think the movants are alleging a mistake.  I stood before you

4   yesterday to try to shut this down before we had a one day

5   hearing, but you resisted that because Mr. Glenn, his clients

6   threw into question integrity, candor, the process.  You gave

7   them their day in court, which respectfully they did not

8   deserve.  But we're here.

9          And now you are asked to weigh the evidence of

10  whether or not the movants have met their burden to demonstrate

11  that you should use the extraordinary remedy of reconsidering a

12  DIP order entered 64 days ago, which I submit, and you haven't

13  heard anything to the contrary, the Ad Hoc Group has not

14  identified a case to demonstrate that that measure is

15  available.  And I'll come back to that, because I want to talk

16  about the evidence.  I want you to have an opportunity that you

17  asked for to weigh the evidence.

18         And here, I submit, there is a stunning failure of

19  evidence on the question of mistake, on the question of whether

20  there was a need for a DIP loan, the one that was presented to

21  you based upon any facts that were developed after the Court

22  entered the order.

23         On the one hand, you have the testimony of what

24  Mr. Glenn agreed was testimony from a pre-eminent expert in the

25  field of restructuring, Ms. Etlin.  He praised her experience

159

1  and she said, in her capacity as CEO, CFO, someone whose

2  expertise is beyond question, that in her business judgment as

3  a fiduciary for this debtor, there was a need for DIP financing

4  when the motion was presented.  She reaffirmed that there was a

5  need for DIP financing even after being confronted with

6  evidence of projections that showed differing collections and

7  sales and cash.  That's evidence.

8          Now let's look at the other side.  You have argument

9  from Mr. Glenn, who should have made his compassionate speech

10 on the first day of the case, not 64 days later.  And it would

11 have also failed on the first day of the case.  But we're not

12 here to judge what would have happened if he made it on the

13 first day of the case.  We're assessing on the 64th day.

14         And what does he do?  He's a lawyer.  No expert.

15 He's giving you his opinion.  He's making arguments.  He's

16 making arguments with the benefit and clarity of what he

17 perceives to be 20/20 hindsight on what he would do if he was a

18 trusted fiduciary to take what he believes was an alternative

19 path.

20         Well, guess what?  The debtors' view, certainly other

21 stakeholders, that that would have been a reckless and

22 frivolous exercise to go down a destructive path and take a

23 gamble.  He asked you to go down a path of what would have

24 happened.  Look, they might have recovered cash from a better

25 than expected GOB sales.  That's not how cases are run.

1        Imagine if they had done that and it would have been
2   the opposite and the cash wouldn't have been there.  Mr. Glenn
3   would come in here and say, why didn't you take a DIP.  You
4   would have avoided this issue.  To judge this decision with the
5   benefit of hindsight is dangerous.  And this notion of
6   immediate and irreparable harm, that was a case presented by
7   the debtors, reaffirmed today after hours of testimony.  I'm
8   not sure how long it lasted based upon facts that were known
9   and knowable on that day.  There's no evidence that says there
10  was other facts known or knowable.  Mr. Glenn asked Ms. Etlin,
11  "Did you know about these facts?"  She said, no, she did not
12  know about those facts on direct or cross or redirect.  She
13  said even knowing of those facts, it wouldn't have changed her
14  view.

15        So it's important that if the facts played out
16  differently later, that's not a mistake.  Every projection is
17  wrong.  Could imagine if every debtor has -- and every DIP
18  financing gets to be re-evaluated as we look down the field to
19  see how are things going.  No DIP lender would ever make a loan
20  if you can find yourself with the rug pulled out from you
21  because the debtors outperformed projections.  So I want to
22  walk through methodically.  I want to hit on every question
23  that you have, but I want to start with 364(e).

24        What do we know that's uncontroverted.  One, there is
25  no stay of the interim DIP order and there is no stay of the

1 final DIP order.  Yesterday, I sought to have this exercise

2 dismissed out of hand under 364(e) and you said to me, Your

3 Honor, that our good faith was put into question.  I didn't

4 hear anything today whatsoever that puts any evidence to

5 contradict the sworn and uncontroverted testimony of Mr. David

6 Kurtz, who's -- excuse me -- affidavit was part of the first

7 day and the final at Docket Number 36.  And there's testimony

8 supporting good faith at paragraph 2, 22, 23, 24, 29, 33, 35.

9       The Ad Hoc Group had -- was present at the first day

10 hearing.  Mr. Glenn's partner was here.  He showed up.  If you

11 may remember, he was the gentleman who was in Connecticut who

12 couldn't make the trip to Newark that day in April.  And he was

13 given the opportunity to cross Ms. Etlin.

14       He was given the opportunity to cross Mr. Kurtz and

15 he declined to do so saying that maybe they would reserve

16 rights specifically to the extent of DIP liens on avoidance

17 actions proceeds, which the first day your interim DIP said

18 that the DIP liens were not going to attach the DIP of

19 avoidance action proceeds until final order.  So that

20 reservation was ice in the winter.  Everything else was

21 available.  He could have probed.  He could have done what

22 Mr. Glenn did here today.  They chose strategically not to do

23 that.

24       Now I submit that the Ad Hoc Group in their papers --

25 your -- he was up here arguing supposed to be law, not

1  testimony.  No case from any jurisdiction of any court where

2  Rule 60(b) was used to eviscerate Rule 3 -- excuse me -- Rule

3  Section 364(e) when a creditor, like the Ad Hoc Group, had

4  notice and participated in a DIP hearing.

5          The relief they are seeking is completely

6  unprecedented and, as I mentioned yesterday, would absolutely

7  wreck havoc on the DIP financing market if DIP lenders can find

8  themselves after they have advanced capital to have the

9  protections eviscerated.

10         Now, you will -- all of a sudden, we start to dance

11  around this notice of, oh, we don't want to tear up the order.

12  I read the prayer for relief.  It says, "Tear up the order.

13  Vacate the order."  Instead, what Mr. Glenn says, he says, take

14  out the scalpel.  Let's just remove the things we don't like.

15         Well, that remedy's not available.  There's no

16  scenario where you can just cross out the aspects of the DIP

17  order that a particular creditor doesn't like.  I feel

18  compelled to also say, he says a billion dollars.  I believe

19  that the 2019 statement filed by Mr. Glenn is that his clients

20  own 14 percent of the billion dollars.  I think it's roughly

21  130, 150 million and the record needs to accurately reflect

22  that the indentured trustee, who represents the billion plus

23  dollars of bonds, is on the Creditors Committee.  And the

24  Creditors Committee will speak here and they have supported the

25  entry of the DIP order.

1            So it seems as though Mr. Glenn and his clients have

2      an issue with the indentured trustee and that this is just a

3      misdirected exercise.  So staying with 364(e), I wanted to

4      address the point that you asked Ms. Geier.

5            There's this notion of -- and it's made up because

6      there's no evidence, the 54 million-dollar rescue loan, on the

7      week before bankruptcy, it somebody else's money.  It's not the

8      DIP lenders.  Well, where's the evidence of that?  He asked

9      questions.  He doesn't know.  But yet he can stand up here and

10     say that it wasn't from the FILO lenders collateral?  That it

11     was -- let's roll back the film.  Let's talk about the facts as

12     opposed to what the argument that you heard.

13           And I'm glad that he put the transcript in the

14     record, because I stood before you on the first day at page 49,

15     lines 8 through 19, and I explained to you exactly what the

16     rescue loans were and I said they were -- the loan was

17     nominally made by the ABL lenders.  I was transparent and

18     direct.  But because of the over advance, the debtors had no

19     right, as Mr. Glenn says, to simply use cash.  We were -- the

20     lending syndicate was sweeping cash.  There was a request for a

21     new loan.  And as a result of the over advance, the economic

22     exposure of every dollar advance came from the FILO lenders.

23     So to suggest that it was not our dollars at risk is contrary

24     to reality.

25           Yeah.  I think you asked Ms. Geier, you know, I think

164

1  you said, "Weren't the funds in there anyway?"  I mean that's

2  what Mr. Glenn was suggesting.  It's just using the cash.

3  Well, that's how things work.  The company can't just use cash.

4  It was swept.  They don't have any control over it.  It was

5  swept.  They were in cash dominion.

6        THE COURT:  That was 54 million of your collateral is

7  what you're saying and that if you didn't allow the use of it,

8  the debtor --

9        MR. HILLMAN:  It was swept --

10       THE COURT:  -- would not --

11       MR. HILLMAN:  -- and re-advanced and every dollar of

12  the 54 million dollars that was re-advanced effectively reduced

13  the DIP, which would have been 94 million dollars down to 40.

14  And so it is absolutely appropriate when you look at the roll-

15  up, not as Mr. Glenn describes it as a five-to-one roll-up, but

16  to look at it as close to two to one.  Fifty-four plus 40, 94

17  million dollars to a 200 million-dollar roll up.

18       So I want to focus not only on the fact that the

19  relief sought under Rule 60(b) cannot rewrite the Bankruptcy

20  Code to take out 364(e), the fact that there is no stay, the

21  fact that there is no evidence on a lack of good faith, that's

22  case dispositive right there.  We should stop.  But like the

23  Ginsu knife commercial, wait, there's more.  We will continue

24  to make sure we cover everything.

25       So the other pieces, Your Honor, in the order you

1  entered at paragraph 35, you said specifically what would

2  happen if there was -- excuse me.  Do you mind if I just grab

3  my copy of --

4              THE COURT:  Yeah.

5              MR. HILLMAN:  -- the order?

6              THE COURT:  Which order are you talking about now,

7  the interim?

8              MR. HILLMAN:  I believe the paragraph numbers are the

9  same whether it's the interim order or the final order.  I just

10 picked up the final order.  I believe it's paragraph 35.  I'm

11 flipping to it now.  It's on page 78.  And it deals with no

12 modification or stay of this order.

13             Now, and I'm paraphrasing, that's based on the

14 findings in accordance with 364(e):

15         "Any modification, amendment or evictor shall not

16         affect validity enforcement of any advances previously

17         made hereunder or lien claim, including the roll-up

18         obligations for priority authorized or created hereby."

19             Even the order, which in effect memorialized what's

20 in the statute, the Bankruptcy Code 364(e) is another barrier.

21 I won't belabor the record on this point.  I made it yesterday.

22 Rule 60(b) doesn't apply to interim orders on its face.  Today,

23 you said you wanted to have a hearing on the merits, but I

24 think you can also use the terms of Rule 60(b), which I would

25 submit to you if you look at the Ad Hoc Group's objection --

1           THE COURT:  They took out the word.  I remember.

2           MR. HILLMAN:  They took out the --

3           THE COURT:  They took out --

4           MR. HILLMAN:  -- word "final."

5           THE COURT:  -- the word "final."  I remember that.

6    But doesn't the Court have inherent authority always to look at

7    its own orders?

8           MR. HILLMAN:  I would submit that whatever equitable

9    authority this court has, certainly the record doesn't justify

10   vacating that order.  I'm not aware of any authority, none had

11   been cited by the Ad Hoc Group that Rule 105 can be used in

12   isolation to trump another provision of the Bankruptcy Code

13   Rule 364(e).

14          I'd like to hit a reasonable time and that's another

15   part of the movant's burden.  I didn't hear a lot of air time

16   on this one.  Rule 60(c), did the Ad Hoc Group move within a

17   reasonable period of time.  This is another one, another point

18   that eviscerates the Ad Hoc Group's attempts to reconsider the

19   DIP order 64 days ago.  The facts, again, uncontroverted.  We

20   know they were here at the first day.  We know that they could

21   have sought discovery every single day until the final hearing.

22   It is not an excuse to say no one gave me information.  That's

23   not an excuse.

24          He's a trial seasoned litigator.  He knows what Rule

25   90-14 does if you file a DIP objection.  He knows the rules of

167

1  this court if you run -- file or seek 2004 discovery.  When he

2  asked discovery from me, I said, "What's your basis?"  He never

3  responded.

4          When the Third Circuit looks at -- and this was in

5  our letter to you, Your Honor, Diet Drugs decision -- when you

6  look at reasonable time, not surprising, it's a case-by-case

7  facts and circumstances, what's the reason for the delay?  The

8  practical ability for the litigant to learn of the ground

9  relied upon earlier and the prejudice to other parties.  None

10 of this was concealed.  It was all available.

11         Now I want to focus on prejudice, because prejudice

12 here is extreme.  This is high stakes litigation gamesmanship

13 and we know the prejudice is real because we, the FILO lenders,

14 relied on the interim DIP order.  We advanced 40 million

15 dollars and that was also based upon providing the 54 million

16 dollars just a few days earlier as part of a negotiated

17 package, which, as I submit, reduced the -- and you heard from

18 Ms. Etlin -- reduced the DIP on a dollar-for-dollar basis.

19 That's the testimony and we agreed to the reserves.

20         The notion that the reserves are so critical and it

21 is something that is conveniently put aside by the Ad Hoc Group

22 because it's not going into their pockets.  They don't care

23 about it.  They're myopically focused on their own self-

24 interest at -- as opposed to the fiduciaries, the debtor,

25 Ms. Etlin in particular, and you'll soon hear from the

1   Creditors Committee  -- fiduciaries have a different view.

2   They view the reserves as meaningful.

3          We agreed, as part of a negotiated, integrated

4   compromise, to allow the debtors to use, at the first day

5   hearing, 36 million dollars of our cash to fund things, that I

6   submit, we didn't have to agree to.  We didn't have to agree to

7   pay money for a wind down.  We didn't have to agree to have

8   money pay for some unsecured creditors.  We didn't have to

9   agree to the WARN claimants, but as every negotiated compromise

10  exists, the debtors made -- insisted on benefits on its parts

11  of the bargain.

12         I would like -- you know what?  I would like to

13  strike that from the motion, too.  The debtors wouldn't let me

14  do that.  Right?  You can't just take out the red pencil.  So

15  we have agreed to fund that.  And today -- you may remember

16  yesterday, we agreed to extend the time.  Today is the date

17  that our liens are supposed to be released on those funds.  So

18  there is urgency to dismiss this.  We have consented to

19  millions of dollars to fund the DIP budget.

20         Just looking at my notes to just make sure I hit

21  every other point.  I'm almost done.

22         Then there's this argument, not evidence, no argue --

23  just argument that this DIP cost 200 million dollars.  Where's

24  the evidence?  No.  Zero.  Zero.  In fact, at the beginning of

25  the case there was an agreement entered that said value is

169

1   inherently speculative.  We don't know what anyone's going to

2   get.  I heard the Ad Hoc Group agree, and I'm sure Your Honor

3   has this recollection, it could be well higher such that

4   general unsecured creditors, I have heard them referred to as

5   GUCs here, may be in the money or may not.  We still don't

6   know.  There's still time on the shot clock for assets to be

7   monetized.  And now he says there's a DIP that cost 200 million

8   dollars.  There's no evidence in the record.

9           THE COURT:  Well, I mean, you did get the roll-up,

10  sir.  I mean --

11          MR. HILLMAN:  There was a roll-up.

12          THE COURT:  So it wasn't ice in the winter, to use

13  your phrase.

14          MR. HILLMAN:  It is 100 percent true that in exchange

15  for the benefits we provided, we also received some benefits.

16  Right.

17          THE COURT:  Right.

18          MR. HILLMAN:  And that was one of the benefits we

19  provide --

20          THE COURT:  No.

21          MR. HILLMAN:  -- we received.

22          THE COURT:  It's a significant benefit and I was

23  concerned about it.  There's no doubt about it.  There's no --

24  that's why I asked you the question I asked you then.

25          MR. HILLMAN:  Yeah.  And we had this very same

170

1  exchange and I know that the U.S. Trustee raised the concern

2  and I made it clear that these were the only way that our

3  clients would provide the financing and none of that has

4  changed.

5         And then, so the last thing I think I would end with,

6  two points, is, again, argument.  Lenders took advantage of the

7  situation, I just want to vehemently --

8         THE COURT:  Everyone used whatever leverage they had.

9         MR. HILLMAN:  Thank you, Your Honor.

10        THE COURT:  I --

11        MR. HILLMAN:  I -- the --

12        THE COURT:  I got it.

13        MR. HILLMAN:  The last point that I would make is,

14  unless Your Honor has any questions for me, I would ask that

15  the Court swiftly and directly deny this motion and I would ask

16  that you do it today.  Thank you, unless Your Honor has any

17  questions for me.

18        THE COURT:  No.  No.  You hit them -- you hit them

19  all.  Thank you.

20        MR. HILLMAN:  Thank you.

21        THE COURT:  Thank you.  All right.

22        I'm going to hear from the Creditors Committee now.

23        MR. SANDLER:  Good afternoon, Your Honor.  Brad

24  Sandler, Pachulski Stang Ziehl & Jones, on behalf of the

25  Committee.

1          I am going to be --

2          THE COURT:  Good afternoon.

3          MR. SANDLER:  -- extremely brief, Your Honor.  I am

4    not going to repeat things that you have heard already.  I do

5    want to just point something out to you.  And I mentioned this

6    to you before, that the Committee consists of trade vendors,

7    landlords and the indentured trustee.

8          Collectively, the Committee represents call it

9    approximately $1.5 billion dollars of debt, a substantial

10   amount of unsecured debt.  I think I had mentioned in one of

11   our hearings what the primary focus of the Committee was.

12         It was to hopefully achieve a going concern,

13   hopefully achieve an estate that is administratively solvent

14   and to get value to our constituency in a form that each member

15   of the constituency likes, and that was the overall goal.

16         Obviously we're all aware of what happened at the

17   first day.  It's been discussed a lot.  The U.S. Trustee -- in

18   fact, I was -- even though the Committee wasn't formed yet, I

19   had listened to and watched the hearing.  I saw the U.S.

20   Trustee get up and she did a great job trying to argue against

21   the roll-up.  And the Trustee, before the Committee is formed,

22   often represents the interest of creditors.  And certainly she

23   did an admirable job.  At the end of the day, we know what

24   happened.

25         So when the Committee was formed, we came out.  We

172

1    took a lot of discovery.  We got tens of thousands of

2    documents, emails, conducted interviews, et cetera, and what we

3    decided to do was to go down a different path.  Why?  Because

4    we're fiduciaries.  Right?

5         We don't have the luxury of rolling the dice and

6    gambling with other people's money.  So what we ended up doing

7    was we decided to go down a different path.  We ended up

8    negotiating with the various parties, the FILO lenders.  The

9    ABL, as we all know, was being paid off, so they weren't really

10   part of the process.

11        We worked with the debtors.  And at the end of the

12   day, we came up with what the Committee believes is a value

13   maximizing settlement under the circumstances.  We believed it

14   when I mentioned it to you the first time when we were here on

15   June 14th and I believe it today.

16        In fact, if you look at the papers, the Ad Hoc Group,

17   they even have a chart in their showing that the benefit of the

18   settlement is higher than without the settlement if the roll-up

19   is granted.  And, of course, the -- what do we have?  We have

20   marshaling.  We have sharing of various assets.  We can't just

21   gamble with other people's money as a fiduciary.  And you have

22   two fiduciaries in this room.  Only two.  You have the

23   Committee and you have the debtors.  Both of whom support --

24        THE COURT:  You said?

25        MR. SANDLER:  What was that?

1          THE COURT:  Three.  Ms. Etlin too.  She's a --

2          MR. SANDLER:  Well, I'm counting her.

3          THE COURT:  -- she's the debtor.

4          MR. SANDLER:  I'm sorry.

5          THE COURT:  Yeah.  Yeah.

6          MR. SANDLER:  I'm counting her --

7          THE COURT:  Yeah, yeah, yeah.

8          MR. SANDLER:  -- on the debtors' side.

9          THE COURT:  She's a --

10         MR. SANDLER:  Although, she has been on the

11 Committee's side before and we would love to have her.

12         In any event, Your Honor, so the fiduciaries in this

13 case support the entry of the final DIP order.

14         THE COURT:  What about the --

15         MR. SANDLER:  They support --

16         THE COURT:  -- they said --

17         MR. SANDLER:  -- the settlement --

18         THE COURT:  -- you were hamstrung.  That's what their

19 whole argument was of the Ad Hoc Committee was that you were

20 hamstrung and you were negotiating from weakness.

21         MR. SANDLER:  Your Honor, it, you know, it's part of

22 the bankruptcy.  It happens.  If -- would we have liked to have

23 seen something different?  Sure.  We were dealt a hand of

24 cards.  I think that we have made the most.  We have made a

25 value maximizing settlement here and the Committee is fully

174

1    behind this.

2            And, again, the Committee represents about 1.5

3    billion dollars of unsecured debt.

4            THE COURT:  That includes the bondholders, too.

5            MR. SANDLER:  That includes -- correct.

6            THE COURT:  All right.

7            MR. SANDLER:  So, Your Honor, with that, I don't

8    think I need to say more than what has already been said, but

9    the Committee supports the entry of the final DIP order.

10           THE COURT:  That's --

11           MR. SANDLER:  Thank you.  And obviously denial of the

12   motion.

13           THE COURT:  I appreciate that.

14           MR. SANDLER:  Thank you, Your Honor.

15           THE COURT:  Okay.  We have one more.  I think

16   Mr. Huebner.

17           MR. HUEBNER:  Your Honor, I'll be quite fast for any

18   number of reasons, including the lateness of the hour.

19           Your Honor, imagine for a minute that this was the

20   DIP hearing on the actual day that it happened and Mr. Glenn

21   stood up and said, Your Honor, I'd like you to roll the dice

22   and reject all the testimony and not do the DIP because maybe,

23   just maybe, the debtors will eek through and you'll be able to

24   save the company without the roll-up.

25           I'm going to guess that he would have lost by an

1  extraordinarily wide margin in the face of the testimony from

2  the other fiduciary that that was unbelievably imprudent and

3  totally inappropriate.

4      Now, imagine the thought experiment where the DIP

5  hearing was two days later and the very preliminary results of

6  a weekend of disbursements and receipts was in and things

7  looked slightly rosier than when Ms. Etlin actually knew at the

8  hearing.  You heard her testify under oath today that it would

9  not have changed her decision, that having the 40 million-

10 dollar cushion was absolutely the right answer even had she

11 known.  So had the final DIP hearing been two days later,

12 once -- a few days' information of receipts and disbursements

13 were in, he still would have lost and he would have lost badly.

14      This is a 60(b) motion, which is one of the most

15 extraordinary motions known at law when a trial has finished

16 and someone says it was perverted and inappropriate as to

17 outcome that the entire trial should be shredded.  Newly

18 discovered evidence means things that existed at the time that

19 were, in essence, hidden from the court.  It is essentially

20 sort of lying by omission.  And we have nothing remotely, not a

21 whisper, of a hint, of a shred of the peppercorn of anything

22 like that.

23      What actually happened was that subsequent to the DIP

24 going into place and the announcement of the liquidity and the

25 agreement with the lenders and the ability to pay debts, the

1  company did somewhat better, which is great for everybody, then

2  was expected.  That's not newly discovered evidence.  That's

3  events that took place for the first time after entry of the

4  order.  Everything you heard today is, in essence, analytically

5  irrelevant to a 60(b) motion because it's realia that happened

6  after.

7          And as we'll talk about in one second, because of the

8  relief that this Court entered.  Why do I say because of?  I

9  only asked Ms. Etlin four questions, but I kind of think that

10 they were important questions.  Why?  Because what Mr. Glenn

11 kept trying to sort of create an atmosphere of is, if you

12 deduct 40 million dollars from the debtors' numbers, look, it

13 was okay so they could have done without the 40 million

14 dollars.

15         What Ms. Etlin testified to, as someone we have all

16 agreed is a living goddess who strides across the globe like a

17 calluses with 35 years of experience is, is that's not what

18 would have happened without the money, without being able to

19 tell employees, landlords, vendors, counter-parties that the

20 money was there and they were in the budget what might well

21 have happened would have been unthinkable disaster.

22         Her testimony then, but even more emphatically today

23 because it was my third question, I believe, is if employees

24 didn't hear that the money was there to fund their essentially

25 severance and had they not shown up, the receipts could have

1  been zero.

2          I believe Mr. Glenn's number was 714 million dollars

3  of post-petition receipts.  I'm not going to testify.  It's not

4  what lawyers are supposed to do.  I don't know the exact

5  number, but I know with 100 percent certainty the debtors had

6  taken in hundreds of millions of dollars of new receipts since

7  the petition date.  And Ms. Etlin testified today to give you

8  absolute complete comfort that that was because they had the

9  stability of an organized filing and sufficient liquidity and

10 that's why it worked.

11         Here's another thought experiment.  Imagine, Your

12 Honor, if a debtor came to you and said, Your Honor, we need to

13 buy liability insurance, you see those motions all the time,

14 right?  Comfort orders to buy insurance.

15         And then 90 days later, it's a 90-day policy,

16 Mr. Glenn moved for reconsideration and said, "Your Honor, no

17 one got hurt during the 90-day period.  So it turns out they

18 didn't need liability insurance, so please make the insured

19 give back the premium because based on things that happened

20 after the hearing, it's turned out to be imprudent that they

21 bought a policy because, look, once they have the policy they

22 sort of didn't need it, and that's kind of what he's asking

23 for.  He's saying there's no -- there was no need.  He said it

24 maybe 15 times.  There was no need for a DIP.  There was no

25 need for a DIP.  Well, unfortunately for him there's only one

1 witness and it's not his.

2         And that one has actually testified again and again

3 and again how much of a need there was for the DIP, because it

4 was the DIP that gave the entire ecosystem of Bed Bath & Beyond

5 everybody, employees, vendors, shippers, warehousemen, the

6 comfort they needed to do business, which brought in hundreds

7 of millions of dollars, which is why, and this is what I'll

8 close with and it was a great point by the two fiduciaries,

9 many people in this courtroom -- not us.

10         The ABL lenders were always incredibly over-secured,

11 right.  And just to be clear, Mr. Hillman and Mr. Glenn were

12 all right and the Committee said as well, we weren't really in

13 the equation because we had a massive collateral package.  The

14 FILO lenders had the junior lien on the FILO -- on the

15 collateral package, which is why, in fact, they had to consent

16 to the 54 million-dollar emergency loan.  The debtors couldn't

17 even get into Chapter 11 without it.  Our clients certainly

18 extended the loan, but in the real world, we were always over-

19 secured.  So that, like the business day before the bankruptcy

20 filing, loan really was part of the equation and so -- but I'm

21 not a fiduciary.  I'm not going to pretend otherwise.

22         But there are -- the whole, from my vision on the

23 camera, the entire left side of the courtroom is fiduciaries.

24 Debtors have sworn obligations to all stakeholders.  Committees

25 have sworn obligations to all unsecured creditors.  Ms. Etlin's

1 federal common law duties as a debtor officer override even

2 limitations in state law documents.

3         This is a through-the-looking-glass hearing.  They

4 are, like, 23 fiduciaries on one side who are peace and stand

5 by their decision.  All the evidence is theirs.  All the

6 testimony is theirs.  All the law is theirs.  On the other

7 side, you have one guy with a small subset of holders saying,

8 if I knew then what I know now, maybe you shouldn't have the

9 DIP, and even that is not right because the testimony of the

10 most experienced person in this courtroom is even if she knew

11 then what she knows now, she would have done exactly what they

12 did on the first day and that's uncontroverted.

13         So to even be in a world of 60(b) relief on a record

14 like this, with law like this, is really the telescope is

15 exactly backwards and we ask that the motion be denied.

16         And, Your Honor, thank you for allowing me to appear

17 by video.

18         THE COURT:  Thank you.  Thank you, sir.

19         MR. SUSSBERG:  Just very briefly.

20         THE COURT:  Mr. Sussberg?

21         MR. SUSSBERG:  Joshua Sussberg, Kirkland & Ellis.

22         First, I wanted to thank the Court and your staff.  I

23 don't think you were planning on having a Wednesday quite like

24 this, but I actually appreciated your suggestion yesterday,

25 because I think this was important.  I think we needed to have

1 a record and we needed to have the facts.

2         And I think the facts speak volumes, as does the law.

3 And I would just tell you, not to give the Court comfort, but

4 just because it's a fact, seven out of seven days of the week,

5 365 days of the year, even with the actuals being presented in

6 this circumstance, there is no company that we would be

7 advising not to get a DIP facility and not to have an

8 opportunity to try to reorganize the business as a going

9 concern.  Every single day.

10        And the testimony today was completely uncontroverted

11 that Ms. Etlin would do the same.  So there's no world in which

12 we would ever roll those dice and we really appreciate the

13 time, Your Honor.

14        THE COURT:  Thank you, sir.

15        Mr. Glenn?

16        MR. GLENN:  Very brief reply.  Yes, I stand alone

17 before the Court today.  Yes, the courtroom is filled with

18 people opposing the relief that we're seeking.

19        THE COURT:  It's not a numbers --

20        MR. GLENN:  It's not a numbers equation.  And

21 Mr. Huebner, what he told the Court, he's very, very

22 persuasive.  He's very compelling, but he is changing the

23 standard of what Your Honor is supposed to decide today.

24 They're all doing it.  They're all doing it.  Okay.

25        Mr. Huebner gave the example of an insurance policy.

1              THE COURT:  Yeah.  That's -- I understand.  That's --

2              MR. GLENN:  Okay.

3              THE COURT:  -- that's a little bit --

4              MR. GLENN:  If the cost of the insurance policy is

5    something massively expensive and there's no risk or no

6    material risk for that insurance policy, yeah, I think you can

7    reconsider that, but let's go to -- it infuriates me.  It

8    infuriates me their perspective on notice and due process and

9    reconsideration.  They think it's okay that they can file the

10   DIP budget the night before the first day.  When creditors are

11   scrambling to find lawyers, a lawyer shows up that day not

12   educated in the case and, therefore, just by showing up that

13   day, you have prejudiced your client because you don't know

14   what's going on.  You can't ask that witness intelligent

15   questions without discovery.  You may not have any background

16   in the case.  And what happened that day was final.  What

17   happened that day was final.  Mr. Hillman has told you that

18   over and over and over.

19            So then let's fast-forward to the second day hearing.

20   Oh, we had due process.  They filed another DIP budget the

21   night before the final hearing.  So what they're telling the

22   Court is that somehow we have an infinite, continual,

23   unmitigated obligation to seek discovery after a final order is

24   entered on all the components of that final order?  I dare the

25   Court and your clerks, you're going to work really hard to find

182

1  a case where -- that substantiates that theory of due process.

2  So we --

3          THE COURT:  I don't think that's either -- that -- I

4  didn't think what Mr. Huebner said was actually --

5          MR. GLENN:  I think Ms. Geier said that.

6          THE COURT:  -- an accurate --

7          MR. GLENN:  I think Ms. Geier said that.

8          THE COURT:  I'm sorry?

9          MR. GLENN:  Ms. Geier said that, that we had notice

10 and opportunity to be here both those times.

11         THE COURT:  Well, no, about the insurance policy?

12         MR. GLENN:  No.  I'm talking about the notice of the

13 hearing, that somehow we had -- because we were here, we're

14 bound and that we have no right to question what happened that

15 day with what we learned afterwards.

16         THE COURT:  No.  And I -- and, you know, I'm having

17 this hearing and --

18         MR. GLENN:  Exact -- and look.

19         THE COURT:  -- no one said --

20         MR. GLENN:  We appreciate it.

21         THE COURT:  No one said you didn't have a right to

22 file a motion for reconsideration.  It was just as I said

23 yesterday.  It was a surprise because --

24         MR. GLENN:  It was a surprise --

25         THE COURT:  -- after it was --

183

1          MR. GLENN:  -- to us, too.

2          THE COURT:  -- after it was talked about.

3          MR. GLENN:  It was a surprise to us, too.

4          THE COURT:  Yeah.

5          MR. GLENN:  So we understand what the Court is facing

6   and what you're hearing is from fiduciaries, from people who

7   are debtors' counsel all across the country.  Mr. Sussberg does

8   this everywhere.  And the question isn't need, as Mr. Huebner

9   said.  The question isn't whether Mr. Sussberg, in every one of

10  his cases, would refuse to go into a court without a DIP.

11          The narrow question before the Court is, did -- was

12  there immediate and irreparable harm for the company not to pay

13  the expenses that it was going to pay from the proceeds of the

14  DIP.  Ms. Etlin said repeatedly what Mr. Huebner just said.

15  He's right.  She said they thought they needed it.  That's not

16  the standard that the Court has to look at for this interim DIP

17  relief under Rule 6003.

18          THE COURT:  I think she said they thought they needed

19  it because it would cause irreparable and immediate harm to the

20  company.

21          MR. GLENN:  Yeah.  I --

22          THE COURT:  That's what I thought she testified to.

23          MR. GLENN:  -- I -- she might have said that, but

24  there's no evidence of the --

25          THE COURT:  She's --

1           MR. GLENN:  -- that conclusion.

2           THE COURT:  She's the chief financial officer, the

3   chief, now, executive officer of the company.  She was on the

4   lines and that's what she says.  That's, in my mind -- that's

5   evidence.

6           MR. GLENN:  Okay.

7           THE COURT:  I don't know.  Is that -- how is that not

8   evidence?

9           MR. GLENN:  Well, she didn't pay those expenses when

10  they were supposed to be paid and there was not immediate and

11  irreparable harm.

12          THE COURT:  Yeah.  And now we're back to the question

13  that I asked you before is, do I look at immediate and

14  irreparable harm retrospectively or when -- at the time of the

15  hearing when I was being asked to decide it.  And, you know, we

16  would all like to do things with the benefit of knowing later

17  on what happened after.  But she did testify that even if she

18  knew those things, she would still want the DIP and not because

19  it's in every case, but that's because what she wanted --

20  that's --

21          MR. GLENN:  That's --

22          THE COURT:  -- what she would have wanted.

23          MR. GLENN:  That's correct.  But that's -- what Holly

24  Etlin wants is important, but it's not the standard under Rule

25  6003.  The standard is immediate and irreparable harm.  They

185

1  told you if those payments weren't made in the first week, we

2  would have a disaster.  There was no disaster.  They were paid

3  in the second week.

4          THE COURT:  Okay.  That's --

5          MR. GLENN:  And --

6          THE COURT:  -- we are right back in --

7          MR. GLENN:  Yes.  It's --

8          THE COURT:  -- where we were.

9          MR. GLENN:  It's circle -- it's circular.  But what's

10 happened has disproven the very predicate of the DIP.

11         THE COURT:  Okay.

12         MR. GLENN:  Thank you.

13         THE COURT:  Thank you.

14         All right.  I just need -- well, it's 10 to 5:00 and

15 I would like to -- I would like to give you my decision today.

16 I don't know.  The only problem is that, you know, I have

17 people here that have other obligations.  But if we can stay

18 awhile, I'm -- I'd like to do it.  Is that -- yeah?

19         THE CLERK:  Yes.

20         THE COURT:  All right.  We have got the okay from the

21 important people.  We're going to -- I'm going to go back to my

22 office and give you my decision this afternoon.

23         MR. GLENN:  Thank you.

24         THE COURT:  Okay?  Thank you very much.

25         (Off the record at 4:49 p.m.  Back on the record at

1  6:11 p.m.)

2         THE COURT:  Okay.  I have reviewed the papers,

3  considered the testimony today, considered the arguments of

4  counsel, and I now have my decision, which not as in final --

5  not as organized and, as I would normally be, but I'm doing my

6  best to get this done as quickly as possible because I believe

7  this is a matter of substantial importance and to the case and

8  even beyond.

9         This matter is before the Court on the motion filed

10 by the Ad Hoc Bond Holders Group, which we'll call "AHB" or

11 "the group," to vacate the June 15, 2023 final order

12 authorizing the debtors to obtain post-petition financing,

13 utilize cash collateral, granting liens, the super priority

14 administrative expenses, granting adequate protection,

15 modifying the automatic stay, granting related relief, the

16 final DIP order, and actually also the interim order entered on

17 April 25, 2023.  That wasn't quite in the title, but it is in

18 the papers themselves.

19        The motion was filed with a request to shorten time

20 for the hearing to July 27, 2023, which was yesterday.  The

21 Court initially denied that request for shortened time

22 because -- as we'll also talk about later because that was not

23 what was contemplated in the prior proceedings before the Court

24 on June 14th where the AHB was to file a request to extend the

25 challenge period by no later than June 25th for a hearing on

1  June 27th, and I was quite -- as I indicated before, I was

2  quite surprised by that because the motion sought for brought a

3  relief and I -- then what -- an extension of the challenge

4  period under the final DIP order.  So I initially denied the

5  request to shorten time because it -- to me, it was a

6  completely different thing.  And I had trial that day, as I

7  indicated, and I didn't have time to review the actual motion

8  in detail and -- which sought vacation of the interim and final

9  DIP orders.

10        Notwithstanding that denial, the lenders, the ADL and

11  the FILO lenders, who I'll call the lenders immediately

12  objected and requested that I hear the matter right away and

13  the debtors also filed an objection and requested that I hear

14  the matter right away.

15        So since the bond holders asked for the hearing on

16  shortened time and everyone agreed that it should be heard on

17  shortened time, the principal parties in interest, including

18  the Creditors' Committee, I decided to hear the motion today,

19  but not before we had an evidentiary hearing to supplement the

20  record as to factual matters that were alleged in the papers

21  that I did not necessarily see in the cert -- the declarations

22  and certifications -- or declarations and other submissions of

23  the parties.  The AHB has filed various statements indicating

24  how many members it has and what their -- the amount of bonds

25  and principals that they represent.

188

1        But I think, Mr. Glenn, you basically said it's 150

2   million dollars in principal out of the basically billion

3   dollars of total bonds.  Is that accurate?

4        MR. GLENN:  It's a little bit more than that, but

5   that's --

6        THE COURT:  It's a little bit more than that, but I

7   think you said that -- I had one here that says 166 million and

8   another one that says 185, so I just -- I wasn't sure, but it

9   might be a little bit more than that.

10       The motion was filed with a supporting declaration of

11  Mr. Glenn and -- who represents the bond holder and -- bond

12  holders and also included certain charts and summaries that

13  were prepared by -- in support of the declaration that really

14  there's no -- and I don't think there's really any objection to

15  it other than that, you know, there's challenges as to the --

16  on the merits, so I am considering all of that.

17       And also, there is this motion to seal.  I guess

18  there -- the sealing is not much of an issue anymore.  There

19  was a redacted brief or motion filed on the docket and

20  Mr. Glenn's affidavit I think is part of that and is redacted.

21  Is that right, Mr. Kinoian?

22       MR. KINOIAN:  Mr. Glenn's declaration, there is not a

23  redacted version of that, so that actually is still the subject

24  of the seal, but I believe that the attachment to that

25  declaration has now been made part of the public record.

189

1          THE COURT:  All right.  So just as a procedural

2    matter, what -- the motion to seal is basically moot, isn't it,

3    except for -- as to the motion itself, the dec -- as redacted?

4    Is that --

5          MR. KINOIAN:  Yes, I think, Judge, if you wanted us

6    to do this, the declaration can be redacted consistent with the

7    motion given the record now where fewer things are

8    confidential.  I think the range of recoveries and that kind of

9    thing is the only thing that needs to be redacted from the

10   declaration.

11         THE COURT:  Oh.

12         MR. KINOIAN:  But I think as between the parties

13   there's an agreement on what should be redacted.

14         THE COURT:  All right.  Okay.  This Court has

15   jurisdiction over this matter under 28 U.S.C. 1334(b) in the

16   standard order referenced entered by the United States District

17   Court on July 10, 1984 as amended on September 18, 2012.  In

18   addition, this Court has jurisdiction to interpret and enforce

19   its own prior orders, Travelers Indemnity Company v. Bailey,

20   557 U.S. 137 at 151, a (2009) case, and that case involving a

21   confirmation order entered years earlier.

22          This is a core proceeding under 28 U.S.C.

23   157(b)(2)(A), (D), obtaining credit and (o) venue is proper

24   here under 28 U.S.C. 1408 and the Court issues the following

25   findings of fact and conclusions of law pursuant to Rule 7052

1 and to the extent any of them might constitute conclusions of

2 law they are adopted as such and the reverse is also true.

3         The debtors filed their voluntary petitions on

4 April 23, 2023 and appeared for first day hearings on April 24,

5 2023.  Holly Etlin, debtor's CFO and CRO, call her Ms. Etlin,

6 filed two declarations, one in support of first day motions

7 generally and one in support of the DIP financing.  Mr. David

8 Kurtz, Vice Chairman and global head of Restructuring at Lazard

9 Freres.  I don't even know how to say that exactly, and Co.,

10 filed a separate declaration in support of DIP financing.

11 Those declarations were admitted into evidence at the first day

12 hearing and have been admitted -- are part of the record here.

13         The lenders here are the ABL lenders with the ABL

14 facility of which approximately 80 million was outstanding in

15 principal at the time of the filing.  The FILO facility, there

16 was approximately 547 million outstanding at the time of the

17 filing, letters of credit at 102 million, financing at 61

18 million for a total of 791,500,000, approximately a secured

19 debt.

20         The unsecured debt of bond holders was about 1.2

21 billion as of the petition date and they are represented, at

22 least in part, by Mr. Glenn here and Mr. Kinoian.

23         JPMorgan Chase was the agent for the AB facility

24 prepetition and Sixth Street was the agents of the FILO

25 facility, but is now the agent for both the ABL and the FILO

1  facilities post-petition and the DIP loan.

2         At the April 24th first day hearing, as I indicated,

3  those extensive certifications, declarations of Ms. Etlin and

4  Mr. Kurtz were admitted into evidence without objection and I

5  think they were described as robust in certain of the papers

6  and I would say they were very detailed, very specific about

7  the substantial efforts that were made to obtain financing and

8  they did go in uncontroverted.

9         Also somewhat -- also relevant here is at that

10 hearing the Ad Hoc Group was represented by counsel and just go

11 into the case, but at that hearing they indicated to the Court,

12 we also did want to -- no objections today on an interim basis

13 but we do want you to -- you know, we do reserve rights to the

14 final hearing, particularly with no debt.  We may have issue

15 with certain incremental collateral liens on avoidance actions

16 going into the DIP.

17        So the -- even though the -- had just gotten into the

18 case, bond holders and their counsel were clearly on notice of

19 the case at that time and on notice of what was in the -- what

20 was in the DIP facility and the DIP order.  Perhaps not having

21 enough time to review it in detail, but did indicate they had

22 issues potentially with incremental collateral or liens and

23 that's part of the objections today and today is more than two

24 months later.

25        There was also -- there was also a hearing on May 31,

1  2023, which the bond holders were certainly on notice of and

2  I -- my recollection is that they were in attendance but

3  whether they were or weren't at that meeting -- at that

4  hearing, the Committee announced an agreement in principal was

5  reached among the DIP lenders, the Committee and the debtors on

6  the terms of a final DIP order.  And that agreement was

7  apparently not finalized until a couple of weeks later when on

8  June 13, 2023 the debtors filed a revised proposed order

9  approving the DIP order on a final basis, which contained the

10 wind-down budget that was admitted into evidence here today and

11 previously.

12        This is -- this was part of the surprise that I was

13 talking about earlier was at that hearing the Ad Hoc Group,

14 although they had not filed a formal objection, made it very

15 clear that the only relief they sought was an extension of the

16 challenge period.  And there was a brief break, a brief recess

17 at that time where that was discussed, that extension was

18 discussed among the lenders and also the debtor and an

19 agreement was reached.

20        Again, I have to quote there because at that time it

21 was again made clear to the court when I asked to clarify what

22 relief the bond holders were seeking, counsel stated to be

23 clear, judge, it's only the -- really the extension of a

24 challenge period, that's it.  And then the parties went out --

25 the parties also agreed on language that was incorporated into

1   the final DIP order that reflected that that said that AHB

2   would have the ability to seek an extension of the challenge

3   period by filing a request to do so with the Court by June 25,

4   2023 with the extension having to -- would be granted if cause

5   was shown for the extension.

6           That relief was not sought in the reconsideration

7   motion.  Just was not sought.  So I -- there's not really even

8   anything to address, as far as I am concerned on that because

9   that date has passed and there was no request so there's no

10  extension of the period.

11          And then on June 15th the order was entered, the

12  final DIP order was entered and at that time the Court directed

13  and as from everything I know the parties complied with a -- my

14  request to provide informal discovery to each other and

15  apparently there was even a meeting or a telephone meeting at

16  which the parties discussed the various matters between them

17  and the issues relating to this -- that form the basis of this

18  motion were brought up, is the way I would say it.

19          So the -- really, the basic challenge here is to the

20  roll-up feature of the 200 -- of the entire DIP financing

21  package, which included a 40 million-dollar DIP loan, initially

22  36 million dollars of reserves for the WARN Act claims, the

23  wind-down and priority administrative claims.  That was changed

24  to 31 million as part of the final order.  That the -- that

25  final DIP order provided for a challenge period that was

1  clearly set out with 60 days after the appointment of a

2  committee or after the committee's 75 days from the petition

3  date.  And then, as I indicated, that was modified as --

4              COMPUTER VOICE:  Recording in progress.

5              THE COURT:  Was it not recording all that time?

6              THE CLERK:  It was (indiscernible).

7              THE COURT:  Wow.

8              MR. HILLMAN:  Your Honor, the audio cut out for about

9  ten seconds, but now it appears to be back.

10             THE COURT:  I didn't quite hear that, but --

11             THE CLERK:  It cut out for like ten seconds.

12             THE COURT:  Oh, it cut off for ten seconds.  Well, I

13 don't know.  Those calls are gone forever, but I -- we'll -- I

14 will continue as best I can.

15             As I said, the principal objection relates to the

16 roll-up feature of the DIP financing package and I underline

17 the word "package" because the uncontroverted testimony was

18 that it was a package that each part of the financing

19 arrangement was integral to the entire whole and that without

20 all its pieces, there was no package and that was

21 uncontroverted.

22             Also uncontroverted was that the debtors were in dire

23 financial straits at the time of the filing.  As Ms. Etlin

24 testified today, the original DIP budget didn't include the

25 three million dollars of cash on hand at the time.  Ms. Etlin

1  didn't quite say this, but she did she three million dollars is

2  a very, very low amount of cash for a billion-dollar -- multi-

3  billion-dollar entity to have, for any entity to have and it

4  was -- it was a reflection of the dire financial straits that

5  the debtor was in, so dire that just days -- a few days, it was

6  Friday or Saturday, before the filing, 54 million dollars of

7  cash collateral, I'll call it, even though there wasn't a

8  petition at that time, 54 million dollars of cash collateral

9  was released from the hold or the dominion of the lenders so

10  that the debtors could get emergency -- and there's no other

11  way to describe it than financial that was needed to carry

12  forward.

13         And I will say unequivocally that when we were here

14  that first day and I heard about that 54 million being put in a

15  few days before the filing and the 40 million that was put in

16  the day or the day after the filing, I understand that it was

17  before the filing, but I also understand it was part of that

18  whole package that included that the interim order that

19  provided for the roll-up and that without that whole package

20  the entire transaction was not going forward.  And as was said

21  at the beginning of the first hearing, the iconic brand of Bed

22  Bath & Beyond and its ability to continue or hopefully continue

23  as a going concern in whole or in part would have been severely

24  jeopardized, if not destroyed and there would have been, as I

25  think the word I used at the time, was a potentially chaotic

196

1  situation where this entity no longer had the cash to go

2  forward.

3          And it was said to me at that time that there was a

4  30 million-dollar hole that needed to be plugged to make sure

5  that employees were paid and -- but not just make sure that

6  employees were paid, but also to provide the liquidity and the

7  confidence and the comfort to lenders to -- I'm sorry -- to

8  lessors, to vendors, to other parties in interest, potential

9  suiters that the debtor was alive and around and needed and had

10 the ability to continue going forward.

11         As I said, the gist of the argument here is that the

12 DIP financing was not necessary based on post-filing results

13 that were not in line with projections, but each of which was

14 explained today by Mr. Etlin.  And the implication that the

15 debtors and/or Ms. Etlin knew that the projections were wrong

16 and actually the revenues were significantly higher, expenses

17 significantly lower, cash flow significantly better were

18 refuted by Ms. Etlin and that she didn't know them until after

19 the budget was prepared and submitted to the Court.  But

20 Ms. Etlin also testified very credibly and forcefully that

21 the -- the word she used was "absolutely" when asked whether

22 the DIP financing facility was necessary and something that the

23 debtor needed to go forward.

24         And when asked whether -- if she knew the different

25 numbers that came out for a variety of factors -- I'll get into

1   that a little bit more later -- for a variety of factors she

2   knew that the different -- about the different number.  She

3   still would have thought that the facility was necessary to

4   avoid immediate and irreparable harm in the form of loss of

5   employee -- loss of employees, loss of confidence and the

6   ability of the debtor to go forward, loss of confidence by

7   landlords, loss of confidence by suiters, and the possible

8   shutdown -- immediate shutdown of the debtor because they had

9   no cash to pay.  And they were in, as I say, dominion that

10  weren't allowed to use cash collateral or those funds before

11  the filing without consent of the lenders or here an order of

12  the Court.

13          So then I think the debtors with utilizing the

14  business judgment of their chief restructuring officer and

15  financial officer of their management team and also Lazard --

16  the Lazard firm determined that the DIP financing was necessary

17  for all those reasons and to avoid immediate and irreparable

18  harm.  And I find that -- and I found that then and I confirm

19  that finding now in the sense -- on the basis of the testimony

20  that we had here that, you know, even without the -- even with

21  the "new" information Ms. Etlin thought the DIP facility was

22  absolutely necessary and far better alternative than litigating

23  over use of cash collateral.

24          And although there's lots of issues and lots of

25  arguments have been raised, ultimately the argument is that the

198

debtor and the lenders knew or should have known that the

projections were better than the -- that the reality was better

than the projections by the time the budget was filed and,

therefore, the DIP financing was not necessary and effectively

the 200 million-dollar roll-up was not necessary.

I disagree.  I find that those differing numbers were

not known at the time of the -- at the time that the order --

that the budget was presented and the order was entered.  I

find that there was no misleading of the Court or anyone by the

debtors in presentment of that budget.  And I also find I think

importantly and perhaps most importantly for these purposes

that you can't judge irreparable harm on the basis of what

actually happened later on.  You have to judge irreparable harm

and its immediacy when it's being presented to you and when

it's being presented -- when it was presented to me, there was

uncontroverted evidence of the immediate and irreparable harm

that would befall this debtor if the financing was not provided

and there was similar uncontroverted evidence that the

financing was not being provided without the roll-up and all

the other terms of the -- I think the word that was used was of

the holistic package.

So now let me get into the -- as Ms. Etlin testified,

as to the known or knowable discrepancy between a DIP budget as

filed originally with the interim order and then the final DIP

order, which is the argument that there was no need for the DIP

1  facility and which was effectively and forcefully refuted by

2  Ms. Etlin's testimony and the facts that you can't play -- you

3  can't have a gamble on forecasts being wrong to your benefit in

4  deciding whether to enter into a DIP facility, you have to use

5  your best judgment based on what's before you.  And what they

6  had before them was the situation I just described.

7           And then I'm sorry.  I didn't -- and this is part of

8  my lack of organization that I complained about a little bit --

9  a little while ago, we also had the declaration of Mr. Kurtz,

10 which described in detail the financing -- the efforts that

11 were going on for several months to try to obtain a better deal

12 and they couldn't do it.  They -- at the end of the day,

13 Mr. Kurtz's summary showed that there was over -- they were

14 contacted or contacted over 100 potential financiers or equity

15 investors or other kinds of investors and they couldn't come up

16 with a better deal than this one.

17          You know, and this is what they decided in their

18 business judgment to do on the basis of decades of experience

19 in restructuring and obtaining financing and I'm -- I

20 understand completely why they did it.  It's easy to

21 secondguess that now.  Whether you want to call it hindsight

22 being 20/20, Monday morning quarterbacking, whatever, the

23 analogy or simile or metaphor is, you can't base those kinds of

24 important decisions on post hoc knowledge that was not

25 available to you at the time.  You just can't do it.

1          And as I said, those variances were explained in the

2    unexpectedly high redemption of gift cards and the -- with a

3    lot of customers seeking to use those gift cards double or more

4    were redeemed in the initial couple of weeks, which led to the

5    sales jump.  There was a negative variance in the store

6    liquidation sales and because of a little bit delay of a start-

7    up of those sales.

8          So, you know, not only did the debtor -- not only did

9    Ms. Etlin testify that she didn't know about it at that time,

10   but how could -- how could she have -- how could she have done

11   that -- how could she have foregone entry into the DIP orders

12   on the basis of those things, even if she knew them and she

13   said she wouldn't.  So the -- I just can't fault them for not

14   being 100 percent accurate on their predictions.

15         And also, as I said, the disbursements were lower

16   than indicated in the budget.  That was because of a slight

17   delay in the rent and the payroll that weren't disbursed on

18   time.  And then there was the testimony that I -- you know,

19   that really did strike me as to the dire financial condition of

20   this debtor with six amendments to their credit facility was a

21   result of continuing defaults, the cash de minimis position

22   that caused them to be short on inventory that created further

23   bad will and bad perceptions and bad sales in the pre-filing

24   period, so that you just -- we just can't -- you can't require

25   a debtor to know about facts that hadn't yet occurred and base

1  their decisions on that.  I find that it was an appropriate

2  exercise of the debtor's better business judgment in entering

3  into the DIP facility.  But that is -- and those -- and that

4  those -- the claims were -- that were made on the basis of that

5  were effectively refuted by the debtor in today's testimony and

6  the other supporting declarations.

7          And then we go to Rule 60(b) under which this motion

8  was made and there are various -- there are various, you know,

9  objections here on various grounds that -- but generally, the

10 Rule 60(b) requires -- which is incorporated into Bankruptcy

11 Rule 9024 that a showing of -- and the grounds here are one,

12 two, and six; mistake, inadvertence, surprise, excusable

13 neglect, newly discovered evidence that with reasonable

14 diligence could not have been discovered in time to move for a

15 new trial under 59(b).  And six, any other reason that

16 justifies relief, the relief under Rule 60 and 9024 is

17 considered extraordinary.  See, for example, In Re: Lampman,

18 494 B.R. 218 at 222 (Bankruptcy Middle District, Pennsylvania

19 2013) and the cases cited by the parties, by all the parties.

20 Every -- no one really disagrees much on the standard.  Just

21 the applicability of the rules.

22          The party who seek such extraordinary relief bears a

23 heavy burden.  That's Plisko v. Union Railroad Company, 379

24 F.2d 15 at 17 (3d. Cir. 1967).  And the clauses that -- the

25 clauses are mutually exclusive and Sixth can't be used as --

1   this sixth catch-all can't be used as a method of circumventing

2   the filing and timing requirements of the other sections of the

3   rule, such as one and two.  And as best as I can tell from

4   this, it was -- the modified grounds were mistake and newly

5   discovered evidence that could not with reasonable diligence

6   been discovered in time to move for a new trial.  And like I

7   said, six, but it wasn't that -- I guess indirectly it was that

8   due process was not complied with because the bond holders

9   simply argue that they simply didn't have enough notice because

10  the initial budget was submitted the day before the hearing.

11  Same thing with the -- same with the final budget and requests

12  for information were rebuffed.

13        However, that doesn't explain why sophisticated

14  counsel representing parties with over 100 million dollars at

15  stake did not or chose not to file discovery requests with

16  entirely proper as a contested matter under 9014 and also as --

17  under Rule 2004 it doesn't even require a motion in this court,

18  just 2004 examination and production of documents.

19        And there's no question that the bond holders knew

20  about the roll-up, knew about the make whole, knew about the

21  interest provisions right from the beginning.  Even though they

22  were just in the case, they knew about it right from the

23  beginning and I have no objection, no formal objection from

24  them of any kind until this motion for reconsideration that was

25  filed more than two months after the case commenced and the

1  interim order was entered.  And that request seeks to undo

2  everything, although it was modified somewhat in an undefined

3  way, but the request was to vacate these orders.  After the

4  money went out, after all the employees were comforted, after

5  all the going-out-of-business sales occurred or mostly

6  occurred, after the auctions were occurring, after all the

7  things that allowed for an organized liquidation of this

8  debtor's assets with a possible sale as a going concern for all

9  or part, after all that was all -- after that is all done,

10 then, okay, let's just undo it.

11       The words "manifest injustice" are used in the  60(d)

12 if it would result in a manifested injustice cases -- in the

13 injustice cases describing that.  To me, in all candor, the

14 manifest injustice in the circumstances that we have here would

15 occur if this court were to vacate orders that were entered on

16 the basis of that testimony that I had before me in the form of

17 declarations and now confirmed in testimony today and without

18 any formal objection being filed in the two months since the

19 case commenced and that to me -- and let me just get to the

20 issue of whether I have authority to review the interim order

21 and then the final orders under Rule 60(b).  I certainly have

22 authority to review the final order under 60(b) in at least in

23 some sense I do.

24       For example, if it was procured by fraud I think that

25 would be an appropriate grounds for reconsidering that kind of

1  an order.  So while I do have that authority the argument has

2  been raised that by its terms it says -- the rule says the

3  final judgment and it does say that and I acknowledge that.

4        But as I said earlier, I think that the cases -- and

5  the cases cited by the bond holders say that under 105 and

6  under Court's inherent authority, the Court has the authority

7  to review its own orders at all times.

8        And in particular in this case, because with all due

9  respect and candor, Mr. Hillman, the argument that you can't

10 seek reconsideration of the interim order because it's not a

11 final order, but the final order -- but the interim order did

12 finalize the roll-up.  It is a bit of a circle that you can't

13 get out of if you -- if I were to adopt that interpretation and

14 I don't adopt it.  I could reconsider it if I wanted to, if I

15 found that there was sufficient grounds to do that, but I --

16 for the reasons I'm stating here there was no mistake.  To the

17 extent a mistake was alleged, there was no mistake by the

18 debtor or Ms. Etlin.

19       And then you go to, too, that newly discovered

20 evidence with reasonable diligence that could not have been

21 discovered in time to move for a new trial, that ground is not

22 satisfied at all either.  It's not -- it's really not even

23 close.  If there was an objection to be filed, it should have

24 been filed even as to the -- if there was a problem with the

25 make whole and the interest and anything else, it should have

1  been raised and the challenge could have been brought, but it

2  wasn't.

3          And I also find that this is -- and I'm not saying

4  it's without any legal basis at all, but I am saying it is --

5  has the effect of voiding the strictures of 364(e) which I

6  incorporated into both orders knowingly based on the records

7  that I had before me and confirmed today and confirmed in every

8  respect today.  Based on the record I have before me, I had to.

9  I had to do that.  So I have no basis for doing anything other

10 than that, but on the evidence with reasonable diligence that

11 could have been discovered.

12         If the debtors weren't being responsive, if the

13 Creditors Committee wasn't being responsive, could have come to

14 this court or you could have served formal discovery and got

15 the discovery that you needed and I would have done it -- I

16 would do that on -- to the extent it's needed on short notice

17 or whatever was required under the circumstances.  I have no

18 problem with that.

19         But in any event, where I was going was it does have

20 the effect of avoiding the strictures of the -- you know, the

21 stay provision in the sense that without -- so now without

22 getting the stay -- forget about not getting a stay.  Without

23 even filing an objection, the bond holders would effectively

24 get a stay because they also asked for -- they also asked for

25 discovery and a full evidentiary hearing and all this on two

1  days' notice without posting a bond.  And with -- so no risk at

2  all.  And 364(e) says that the reversal of modification on

3  appeal of an authorization under this section whether to obtain

4  credit -- I'm paraphrasing now -- or grant a priority lien does

5  not affect any -- the validity of any debts so incurred or

6  priority or liens so granted to an entity that extended such

7  credit in good faith, whether or not such entity knew or the

8  tendency to appear unless such authorization and incurring of

9  such debt and the granting of priority lien was stayed pending

10 appeal.  That didn't happen here.

11         Again, there was no objection, no formal objection

12 filed until and directly this motion for reconsideration more

13 than three months -- two months later.  And that incorporated

14 in part -- in large part -- not in large part, incorporated

15 directly into 364(e) was incorporated directly into the final

16 DIP order and -- both orders, actually and -- but was really --

17 was really extended by  me in this case by -- by applying it

18 to -- applying it to any modification amendment, vacatur of

19 this order shall not affect the validity, enforceability of any

20 advances previously made or liens created hereby.

21         And as was pointed out by the -- so now I will -- now

22 I will agree with Mr. Hillman that -- you know, that the

23 courts -- the better view, in my humble opinion, is that 364(e)

24 should apply in this instance, even if that language wasn't in

25 there because, as you would think, Bankruptcy Court

1  modifications of its own orders poses the same risks as does

2  reversal on appeal.  That's citing Kham & Nate's Shoes No. 2,

3  Inc., 908 F.2d at 1355 to 1356.  And the policy behind that and

4  which no one here will I think -- I don't -- can't -- I don't

5  believe anyone here will challenge that if creditors fear the

6  rug will be pulled out from under them, they will be headed

7  into wind and would -- it would overcome people's natural

8  reluctance to deal with a bankrupt firm, whether it was a

9  purchaser or lender by assuring them that so long as they are

10  relying in good faith on a bankruptcy judge's approval of a

11  transaction, they need not worry about their priority merely

12  because some creditor is objecting to the transaction.  And

13  that's the Sweet Land case, 16 F.3d 522 at 561.

14        So -- and then as to the timeliness of the motion

15  under (c) I'm also finding it's not timely because just waited

16  too long.  Could have done it before.  Could have made a

17  challenge.  Just waited too long.  Should have been done much

18  earlier before all this happened and all the benefits that were

19  obtained, including the benefits of the settlement with the

20  Creditors' Committee, which unwinding this -- at this point, it

21  just not only would be extraordinary relief, but would be

22  extraordinarily unjustified relief.

23        So then let me just -- I want to make sure I hit all

24  the arguments because, you know, it looks like there's been a

25  lot of paper filed in this, so I will try to be as thorough as

1 I can be.  Let me see.

2        Okay.  So the arguments that were made by the bond

3 holders I've addressed in some respects, but here I addressed

4 the argument -- I am finding that I have the ability to review

5 these interim order as these -- as the bond holders argued.

6        But as to cross-collateralization which, you know, I

7 guess this is the argument here is that the roll-up is in

8 effect, cross-collateralization.  And then I have to -- citing

9 a case that I decided that the business would not survive and

10 the proposed financing is in the best interests of the creditor

11 body as a whole, well, that wasn't exactly what I held because

12 what -- that was me describing what another court held, but

13 what I said was cross-collateralization is based on the

14 financing being cross-collateralized was necessary for the

15 debtor to seek reorganization and without the financing the

16 debtor would be forced to liquidate and unsecured creditors

17 would receive a greatly diminished recovery or no recovery at

18 all.  And that -- and then what I said is that's while a number

19 of cases say that the cross-collateralization is discouraged,

20 it is often used and even courts that discourage it have

21 approved its use.

22        And I find here where the reorganization purpose is a

23 liquidation that -- and permissible purpose is a liquidation,

24 that it does satisfy that standard.  It was -- this was

25 necessary for the debtor to do an effective liquidation that

1 will be hopefully transformed to a confirmed plan and a sale of

2 at least part of its business as a going concern, and that the

3 creditors, I think, would receive a greatly diminished recovery

4 if this was thrown into the chaos of no financing, and having

5 to use cash collateral, and employees possibly walking out, and

6 vendors just providing goods, and landlords seeking relief.

7 It's just -- it would be a very, very difficult situation that

8 I, again, find would result in irreparable -- immediate

9 irreparable harm.  I addressed already that the arguments that

10 the debtors' projections were wrong and that the order should

11 be reconsidered on that basis and the roll-up is unnecessary.

12      And then I have to note why couldn't the arguments

13 about -- let's say that you thought that the roll-up was done.

14 Why couldn't the arguments about the make-whole provisions and

15 the interest provisions, why couldn't that have been -- why

16 couldn't that have been addressed before.  That's a rhetorical

17 question because it could have.

18      Then as to denial of due process, I -- I'm now giving

19 the -- there's been more than due process from the very

20 beginning.  As I noted, the bond holders were on notice of this

21 case and the DIP order from the very beginning, yes, there

22 was -- it -- there was a few last minute filings, but that

23 didn't prevent them from seeking more information formally or

24 informally; formally if in-form requests were not heeded, as is

25 the indication, and maybe, you know, eventually they did get it

210

1  informally and that they filed this motion.

2          And then the argument is that if these facts had been

3  known to the debtor, the Court wouldn't have approved it and

4  the debtor wouldn't have needed the DIP facility and the roll-

5  up and all that.  And now that we have an even more complete

6  record than we had before, I confirmed the decision that I made

7  before -- that the debtor made before that the DIP financing

8  and package as an integrated whole was absolutely necessary to

9  the go-forward conduct of this case, rather than litigating

10  over cash collateral and trying to get other financing, that

11  the debtors could not do would have just resulted in a lot more

12  administrative costs, a lot more uncertainty and I believe

13  could easily have resulted in significant dimension recoveries

14  to creditors, if any recovery at all.

15          So I think that covers it and I am denying the motion

16  for reconsideration and I really -- I don't believe I have

17  anything else before me in terms of the motion to seal, except

18  for the -- you know, the seal as to the redacted portions and

19  that's it.

20          Thank you.  Thank you.  I appreciate everyone's

21  attention and professionalism and diligence and I hope everyone

22  thinks they got a fair shake.  I tried to give as fair a shake

23  as I could and so I've written up for all of us, hopefully.

24  Thank you.  Bye-bye.  Have a good evening.  Have a good 4th of

25  July as well.

211

1                                      * * * * *

2

## C E R T I F I C A T I O N

            I, RUTH ANN HAGER, court-approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of my ability.


/s/ Ruth Ann Hager

RUTH ANN HAGER

J&J COURT TRANSCRIBERS, INC.       DATE:  July 5, 2023