# EXHIBIT A

Execution Copy

# SHOPPING CENTER LEASE

Between

ALMADEN PLAZA SHOPPING CENTER INC.,

LANDLORD,

AND

BUY BUY BABY, INC.,

TENANT

DATED: ~~January~~ *February 9*, 2010

PREMISES LOCATED

IN

ALMADEN PLAZA SHOPPING CENTER

SAN JOSE, CALIFORNIA

1643022 v10

Table of Contents

Page

| | | |
|---|---|---|
| SECTION 1. | DEFINITIONS AND BASIC TERMS | 1 |
| SECTION 2. | LEASE OF PREMISES | 10 |
| SECTION 3. | LEASE TERM | 11 |
| SECTION 4. | PAYMENT OF FIXED RENT | 13 |
| SECTION 5. | IMPROVEMENTS | 21 |
| SECTION 6. | REAL ESTATE AND OTHER TAXES | 31 |
| SECTION 7. | PERMITTED AND PROHIBITED USES | 34 |
| SECTION 8. | UTILITIES | 37 |
| SECTION 9. | MUTUAL RELEASE, WAIVER OF SUBROGATION AND MUTUAL INDEMNIFICATION | 38 |
| SECTION 10. | SIGNS | 40 |
| SECTION 11. | ALTERATIONS AND IMPROVEMENTS | 43 |
| SECTION 12. | ACCESS TO SHOPPING CENTER | 47 |
| SECTION 13. | COMMON AREAS | 47 |
| SECTION 14. | PARKING AREAS AND OTHER COMMON AREAS | 53 |
| SECTION 15. | INSURANCE | 56 |
| SECTION 16. | REPAIRS | 59 |
| SECTION 17. | TENANT DEFAULT | 61 |
| SECTION 18. | LANDLORD DEFAULT | 64 |
| SECTION 19. | LANDLORD'S ENTRY | 65 |
| SECTION 20. | FIRE AND OTHER CASUALTY | 66 |
| SECTION 21. | EMINENT DOMAIN | 69 |
| SECTION 22. | EXCLUSIVE IN CENTER | 71 |
| SECTION 23. | RIGHT TO MORTGAGE AND NON-DISTURBANCE | 75 |
| SECTION 24. | TENANT ASSIGNMENT AND SUBLETTING | 76 |
| SECTION 25. | NOTICE | 80 |
| SECTION 26. | SHORT FORM LEASE | 81 |
| SECTION 27. | ENTIRE AGREEMENT AND MODIFICATION | 81 |
| SECTION 28. | SEVERABILITY | 81 |
| SECTION 29. | GRAMMATICAL USAGES AND CONSTRUCTION | 82 |

1643022 v10

i

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| SECTION 30. | TABLE OF CONTENTS, LINE NUMBERING AND PARAGRAPH HEADINGS | 82 |
| SECTION 31. | NO JOINT VENTURE OR PARTNERSHIP CREATED BY LEASE | 82 |
| SECTION 32. | BROKER'S COMMISSION | 82 |
| SECTION 33. | RIGHTS CUMULATIVE; DEFINITION OF LANDLORD | 83 |
| SECTION 34. | NON-WAIVER | 83 |
| SECTION 35. | LIMITATION OF LANDLORD'S LIABILITY | 83 |
| SECTION 36. | SURRENDER OF PREMISES | 83 |
| SECTION 37. | SUCCESSORS AND ASSIGNS | 84 |
| SECTION 38. | FORCE MAJEURE | 84 |
| SECTION 39. | HOLD OVER | 84 |
| SECTION 40. | CONSENTS | 84 |
| SECTION 41. | DECLARATION OF CONTRACTUAL LIABILITY | 85 |
| SECTION 42. | QUIET ENJOYMENT | 85 |
| SECTION 43. | ESTOPPEL CERTIFICATE | 85 |
| SECTION 44. | COSTS | 85 |
| SECTION 45. | GOVERNING LAW | 86 |
| SECTION 46. | ATTORNEYS' FEES | 86 |
| SECTION 47. | PROTEST | 86 |
| SECTION 48. | CONDUCT OF BUSINESS OPERATIONS | 86 |
| SECTION 49. | ABATEMENT OF RENT CHARGES | 87 |
| SECTION 50. | WARRANTIES AND REPRESENTATIONS | 87 |
| SECTION 51. | ARBITRATION | 91 |
| SECTION 52. | LIENS | 92 |
| SECTION 53. | DEFINITION OF HEREUNDER, HEREIN, ETC | 92 |
| SECTION 54. | TENANT'S PROPERTY | 92 |
| SECTION 55. | TENANT'S RIGHT OF FIRST OFFER | 93 |
| SECTION 56. | LIMITATION OF TENANT'S LIABILITY | 94 |
| SECTION 57. | TENANT'S RIGHT OF TERMINATION | 94 |
| SECTION 58. | SURVIVAL OF OBLIGATIONS | 95 |

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| SECTION 59. | ENVIRONMENTAL MATTERS | 95 |
| SECTION 60. | EXECUTION OF THIS LEASE | 100 |
| SECTION 61. | TENANT'S TRADENAME | 100 |
| SECTION 62. | TIME OF THE ESSENCE | 100 |
| SECTION 63. | SERVICE OF PROCESS | 100 |
| SECTION 64. | WAIVER OF TRIAL BY JURY | 101 |

1643022 v10

Table of Contents
(continued)

Page

EXHIBIT A - Legal Description of Shopping Center

EXHIBIT B - Site Plan

EXHIBIT B-1 Premises Floor Plan

EXHIBIT B-2 Intentionally Deleted

EXHIBIT C - Rent Commencement and Expiration Date Agreement

EXHIBIT D - Required Condition of Premises on Delivery Date

EXHIBIT D-1 Elevations of Building and Shopping Center

EXHIBIT E - Permitted Encumbrances

EXHIBIT F - Sign Criteria

EXHIBIT F-1 Monument Signs, Banners and Temporary Sign

EXHIBIT G - Subordination, Non-Disturbance and Attornment Agreement

EXHIBIT H - Recognition Agreement

EXHIBIT I - Delivery Date Notice

EXHIBIT J - Delivery Date Certification

EXHIBIT K-1 Existing Exclusives

EXHIBIT K-2 Existing Leases

EXHIBIT L - Almaden Plaza Rules and Regulations

EXHIBIT M - Memorandum of Lease

EXHIBIT N   Form of Mechanics' Lien indemnification

1643022 v10

## LEASE AGREEMENT

**THIS SHOPPING CENTER LEASE AGREEMENT** ("Lease") is entered into as of January ___, 2010 ("Commencement Date") between ALMADEN PLAZA SHOPPING CENTER INC., a California corporation, having an office at 100 Bush Street, Suite 218, San Francisco, California 94104 ("Landlord"), and BUY BUY BABY, INC., a Delaware corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 ("Tenant").

### W I T N E S S E T H:

**SECTION 1. DEFINITIONS AND BASIC TERMS**. In this Lease, the following terms have the meanings shown. Other terms are defined elsewhere in this Lease.

Additional Rent:  Any money which Tenant is required to pay to Landlord under this Lease, other than Fixed Rent.

Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

Broker: Jim Fletcher Company and Terranomics Retail Services.

Building: The three story Building, outlined on Exhibit B, containing approximately two hundred seventeen thousand (217,000) square feet of Floor Area.

CCR Agreement: As defined in Section 50(j) of this Lease.

Common Areas: All areas of the Shopping Center available for the nonexclusive use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees.

1

Common Areas include but are not limited to all parking areas, driveways, truck serviceways, passageways, vestibules, escalators, elevators and vermaport, sidewalks, entrances, exits, lighting facilities, landscaped areas, telephone and electric rooms, adjacent corridors, stairwells, common ducts and shafts, and common utility lines. Common Areas shall not include loading docks and compactor bays leased to or exclusively used by one or more tenants.

Excused Periods: Any time during which Tenant cannot or will not conduct any business because of: (a) alterations or renovations being performed in and to the Premises, (b) damage or destruction, (c) eminent domain proceedings or actions that affect Tenant's normal conduct of business in the Premises, (d) Force Majeure, (e) diligent good-faith efforts by Tenant to assign Tenant's interest in this Lease or to sublease all or any part of the Premises not to exceed 365 consecutive days, or (f) any act or omission of Landlord that makes it infeasible for Tenant to conduct normal business operations (Tenant to provide Landlord Notice of such act or omission).

Exhibits. The following Exhibits are annexed hereto and made a part hereof:

> EXHIBIT A - Legal Description of Shopping Center
>
> EXHIBIT B - Site Plan
>
> EXHIBIT B-1 Premises Floor Plan
>
> EXHIBIT B-2 Intentionally Deleted
>
> EXHIBIT C - Rent Commencement and Expiration Date Agreement
>
> EXHIBIT D - Required Condition of Premises on Delivery Date
>
> EXHIBIT D-1 Elevations of Building and Shopping Center
>
> EXHIBIT E - Permitted Encumbrances
>
> EXHIBIT F - Sign Criteria
>
> EXHIBIT F-1 Monument Signs, Banners and Temporary signs
>
> EXHIBIT G - Subordination, Non-Disturbance and Attornment Agreement

2

1643022 v10

EXHIBIT H - Recognition Agreement

EXHIBIT I - Delivery Date Notice

EXHIBIT J - Delivery Date Certification

EXHIBIT K-1 Existing Exclusives

EXHIBIT K-2 Existing Leases

EXHIBIT L Almaden Plaza Rules and Regulations

EXHIBIT M Memorandum of Lease

EXHIBIT N Form of Mechanic's Lien Indemnification Agreement

Expiration Date: The date the Term ends.

Fee Owner: Raymond Perusina, as Trustee of the First Restatement of the Perusina

Family Revocable Living Trust dated July 26, 2000, successor in interest to the Decedent Shirley

Perusina, trustee, Danford Perusina and Arlene Perusina as Trustees of the Danford and Arlene

Perusina Family Trust dated April 3, 1992, and Albert Parmisano, Trustee of the Parmisano

Family Revocable Trust dated December 30, 1988.

Fixed Rent: The following amounts for the periods shown:

(i) For the period commencing on the Rent Commencement Date and

ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent

Commencement Date, at the rate of Four Hundred Fifty-Four Thousand One Hundred Eighty-

Eight and 00/100 ($454,188.00) Dollars per year [based on Twelve and 00/100 Dollars ($12.00)

per square foot of Floor Area in the Premises];

(ii) For the period commencing on the first February 1 occurring after

the tenth (10th) anniversary of the Rent Commencement Date and ending on the last day of the

original Term, at the rate of Four Hundred Ninety-Two Thousand Thirty-Seven and 00/100

3

($492,037.00) Dollars per year [based on Thirteen and 00/100 Dollars ($13.00) per square foot of Floor Area in the Premises];

        (iii)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Five Hundred Twenty-Nine Thousand Eight Hundred Eighty-Six and 00/100 ($529,886.00) Dollars per year [based on Fourteen and 00/100 ($14.00) per square foot of Floor Area in the Premises];

        (iv)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Five Hundred Sixty-Seven Thousand Seven Hundred Thirty-Five and 00/100 ($567,735.00) Dollars per year [based on Fifteen and 00/100 ($15.00) per square foot of Floor Area in the Premises];

        (v)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Six Hundred Five Thousand Five Hundred Eighty-Four and 00/100 ($605,584.00) Dollars per year [based on Sixteen and 00/100 ($16.00) per square foot of Floor Area in the Premises]; and

        (vi)    In the event Tenant exercises the fourth Renewal Option, for the fourth Renewal Period of four (4) years six (6) months, at the rate of Six Hundred Forty-Three Thousand Four Hundred Thirty-Three and 00/100 ($643,433.00) Dollars per year [based on Seventeen and 00/100 ($17.00) per square foot of Floor Area in the Premises].

Floor Area: The square footage of floors within any building in the Shopping Center (including the Premises) including all exterior areas and loading docks and compactor bays leased to or exclusively used by one or more tenants. All measurements pursuant to this paragraph shall be from the exterior of outside walls or store front and/or to the centerline of any common walls. In no event shall the Floor Area within the Premises include (i) space used for fire pump facilities, (ii) any heating and ventilation facilities and telephone and electric rooms,

4

(iii) passenger or freight elevators and vermaport and escalator areas, or (iv) adjacent corridors, stairwells, ducts and shafts.

Force Majeure: Any strike, inability to procure materials, power failure, restrictive governmental law or regulation, riot, insurrection, war, tornado, hurricane, earthquake or other unforeseeable weather condition of unusual severity or other reason of like nature, not the fault of the party delayed in performing work or doing acts required by this Lease, that causes a delay, hindrance in, or prevention from, the performance of any act required by the Lease (except the payment of a monetary sum to be paid by either party to the other party). A party wishing to invoke Force Majeure shall give the other party Notice of that intention within ten (10) days of the commencement of any event of Force Majeure and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Ground Lease: That certain Ground Lease, dated April 27, 1965, between Fee Owner (successor in interest to Mitchell M. Perusina and Anna E. Perusina, his wife, and Raymond Mitchell Perusina and Helen Catherine Perusina, his wife) as landlord, and Edgewater Holding Corporation (successor in interest to The Emporium Capwell Company) as tenant, as amended by the instruments set forth in Item 3 of Exhibit E, demising the Shopping Center.

Inducement Tenants: As defined in Section 5(b)(iii)(F).

Institutional Lender: A state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, REIT, a state or federally regulated lender or any other recognized lender.

Landlord's Special Improvements: As defined in Section 5(a)(viii).

1643022 v10

Law: Any judicial decision, statute, constitution, ordinance, resolution, regulation, rule, administrative order or other requirement of any government subdivision, agency or authority having jurisdiction over Landlord or Tenant, the Premises or the Shopping Center.

Lease Interest Rate: The then effective prime rate as announced from time to time by the Wall Street Journal plus two (2%) percent.

Notice: As defined in Section 25 of this Lease.

Original Tenant: Buy Buy Baby, Inc., a Delaware corporation.

Paying Agent: A corporation or other entity designated by Tenant in a Notice to Landlord to make payments of Rent under this Lease.

Percentage Rent: As defined in Section 4(c) of this Lease.

Permit Contingency Date: As defined in Section 5(e)(i) of this Lease.

Permit Contingency Deadline: As defined in Section 5(e)(i) of this Lease.

Permitted Use: Subject to Existing Exclusives (as hereinafter defined) as same may be modified in writing by Tenant and the tenants on Exhibit K-1, the sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of the following: (a) infant's, juvenile's and children's furniture, furnishings, beds (including, without limitation, mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, maternity clothing and related items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food or formula for infants, juveniles and children, feeding items, safety items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and

6

1643022 v10

recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, pregnancy books, magazines, computer software, audio and video cassettes or tapes, picture frames, portrait studio items and services, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items, hair cutting services, fitness center development and learning services, and any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the "Permitted Items") and for any other lawful retail use not prohibited by the provisions of Section 7(c) of this Lease. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use. Tenant's assignees, sublessees, licensees and concessionaires may use the Premises (or the applicable portion thereof) for the Permitted Use.

Premises: The area of the Building cross-hatched on Exhibit B-1, containing, as of the Commencement Date, an agreed-upon 37,849 square feet of Floor Area on the ground floor of the Building including one (1) loading bay and one (1) compactor pad within the loading bay, each for the exclusive use of Tenant. The Floor Area of the Shopping Center and the Premises shall be increased or decreased, as the case may be, and in accordance with the provisions contained within the definition of "Floor Area" in this Section 1, as walls which previously constituted outside walls become common walls, as walls which previously constituted common walls become outside walls. Any dispute between the parties with respect to the Floor Area of the Premises or the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 51 below.

7

Punch List Items: Any minor items of fit and finish that, when considered as a whole, do not adversely affect (i) the performance of Landlord's Special Improvements, or (ii) Tenant's ability to conduct its normal business operations in the Premises.

Rent: Fixed Rent and Additional Rent.

Rent Commencement Date: The date which is one hundred eighty (180) days after the later to occur of (x) the Delivery Date (as defined in Section 5(b)(iii)) and (y) the Permit Contingency Date. However, if the Rent Commencement Date occurs during the Slack Period (as defined below), then commencing on such Rent Commencement Date and continuing until the next following March 1, Tenant shall pay only (i) Tenant's Pro Rata Share of Taxes and Common Areas Charges, and (ii) three percent (3%) of Gross Sales (as defined in Section 4(d)(ii)) not to exceed one-half (½) of the amount of Fixed Rent which would otherwise have been payable with respect to such period (the amounts payable in clauses (i) and (ii) being hereinafter referred to as "Slack Rent"). Landlord and Tenant agree that any abatement of Fixed Rent and Percentage Rent (as defined in Section 4(d)(i)) which inures to the benefit of Tenant in accordance with the provisions of this paragraph shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. Within ten (10) days after the Rent Commencement Date, Landlord and Tenant shall execute a Rent Commencement and Expiration Date Agreement in the form provided in Exhibit C.

Shopping Center: The shopping center commonly known as Almaden Plaza Shopping Center, containing approximately five hundred fifty-eight thousand nine hundred thirty-nine (558,939) square feet of Floor Area, at the northwest corner of Almaden Expressway and Blossom Hill Road, San Jose, California, and more fully described in Exhibit A. In the event the legal description of the Shopping Center described in Exhibit A indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips

8

or gores between such parcels or lots which are not owned by Landlord. Landlord shall not
change the name of the Shopping Center without at least ninety (90) days prior Notice to Tenant,
and Landlord covenants and agrees not to include the name of any tenant (other than Tenant) in
the name of the Shopping Center.

    65% Tenants: As defined in Section 4(b)(i).

    Slack Period: That certain period commencing on December 1 and ending on the next
following February 28 (or February 29th, if applicable) after the Delivery Date.

    Slack Rent: As defined in the definition of Rent Commencement Date above.

    Sublease: That certain Lease, dated December 19, 1974 between Edgewater Holding
Corporation (successor in interest to Carter Hawley Hale) as sublandlord, and Landlord (as
successor in interest to Brothers International Corporation, the successor in interest to Chrysler
Realty Corporation) as subtenant, as amended by the instruments set forth in item 4 of Exhibit E,
subletting the entire Shopping Center.

    Substantially Completed or Substantial Completion: The completion of work with only
Punch List Items incomplete.

    Tenant's Permits: The governmental and sign permits which are necessary for the
performance of Tenant's Work and any business licenses which Tenant may be required to
obtain in order to open and operate its specific business (as opposed to a general retail business).
Tenant's Permits shall include any variances or similar special exceptions required in order to
install Tenant's signage as shown on Exhibit D-1 and Exhibit F-1.

    Tenant's Pro Rata Share: A fraction whose numerator is the Floor Area of the Premises
and whose denominator is the Floor Area of the Shopping Center at the December 31 of the
calendar year for which Tenant's Pro Rata Share of Taxes and Common Areas Charges (as
hereinafter defined) are being calculated; provided however that for purposes of calculating the

1643022 v10

numerator, during the Term the Floor Area of the Premises shall never be greater than thirty-seven thousand eight hundred forty-nine (37,849) square feet. Tenant's Pro Rata Share shall be redetermined any time Floor Area is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than eight (8%) percent. Floor Area shall be added to the Shopping Center on the earlier of (i) the date upon which the Floor Area is opened to the public for business, or (ii) at such time as an assessment for Taxes is made with respect to such Floor Area. Floor Area shall be removed from the Shopping Center on the earlier of (i) the date upon which the Floor Area is destroyed or otherwise physically removed, or (ii) at such time as an assessment for Taxes is removed with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

Tenant's Property: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any other personal property of Tenant that can be removed from the Premises without material damage thereto. Tenant's Property does not include electrical systems, HVAC and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

Term: Approximately fifteen (15) years beginning on the Rent Commencement Date and ending at midnight on January 31 following the fifteenth (15th) anniversary of the Rent Commencement Date. "Term" shall refer to the original Term and any Renewal Period exercised pursuant to Section 3(b) below, as the context shall require.

**SECTION 2. LEASE OF PREMISES.** As of the Commencement Date, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises together with all rights,

10

1643022 v10

*__benefits__*, privileges and easements, now or hereafter appurtenant thereto, arising out of any public or private grant or authority, including without limitation the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

### SECTION 3.  LEASE TERM.

(a)    Tenant shall have and hold the Premises for the Term, unless sooner terminated as herein provided.

(b)    Tenant may extend the original Term ("Renewal Option") for four (4) separate renewal periods as follows:  three (3) separate renewal periods of five (5) years each and one (1) separate renewal period of four (4) years six (6) months (each a "Renewal Period" and collectively, "Renewal Periods") upon the same terms and conditions as are herein set forth, except that Fixed Rent during such Renewal Periods shall be as set forth in the definition of "Fixed Rent" in Section 1 above.  Notwithstanding anything to the contrary contained herein, the Term of this Lease (including all Renewal Periods) shall not exceed thirty-four (34) years eleven (11) months.

(c)    If Tenant elects to exercise one or more Renewal Options, Tenant shall give Notice of such election to Landlord on or before the date which is one hundred eighty (180) days before the beginning of the Renewal Period or Renewal Periods for which the Term hereof is to be extended. To avoid inadvertent forfeiture of any Renewal Option, Landlord may not terminate this Lease, and the Term of this Lease shall not expire, until and unless Landlord notifies Tenant in writing and indicates that the Renewal Option to extend or to further extend, as the case may be, has not been exercised (which notification shall not be sent prior to the date

11

which is one hundred eighty (180) days before the beginning of the Renewal Period to which it

relates). Tenant's Renewal Option, in each instance, shall continue for a period of fifteen (15)

days after receipt of such Notice from Landlord; but if Tenant does not send Notice of the

exercise of such Renewal Option to Landlord within said fifteen (15) day period, Tenant's

Renewal Option shall terminate and the Term of this Lease shall expire on the date that is one

hundred eighty (180) days after the date Tenant received Landlord's reminder notice. If

Landlord fails to give Tenant such Notice prior to the expiration of the original Term or of any

extended Term, as the case may be, and if Tenant shall remain in possession of the Premises

after the expiration of the then current Term, then Tenant shall remain in possession as a tenant

from month to month, subject to the provisions of this Lease insofar as the same may be made

applicable to a tenant from month to month, but without the application of Section 39. If

Landlord then gives Tenant Notice and Tenant exercises its Renewal Option, then the effective

date of the exercise shall be retroactive to the expiration date of the original Term or of the

previously extended Term, whichever is appropriate.

(d)     With respect to any applicable Renewal Period during the Term, Tenant

may terminate this Lease by providing Landlord Notice of such intent at least one (1) year prior

to the termination date ("Tenant's Termination Notice"); provided, however, in no event shall the

termination date be sooner than the second anniversary of the first day of the applicable Renewal

Period. On the termination date specified in Tenant's Termination Notice, Tenant shall vacate

and surrender the Premises to Landlord in broom clean condition, in accordance with the terms

of this Lease, and as though the Lease expired at the natural expiration of the Term, and

Landlord and Tenant shall upon such termination be released from any and all liabilities

thereafter accruing hereunder (except as otherwise specifically stated in this Lease).

12

(e)    Kick-out Rights. Tenant shall have the right to terminate this Lease for any reason at its sole discretion as of the end of the tenth (10th) year of the Term by written notice to Landlord, which notice must be given no earlier than twelve (12) months prior to the end of the tenth (10th) year of the Term, and no later than six (6) months prior to the end of the tenth (10th) year of the Term. If Tenant notifies Landlord as aforesaid, then this Lease shall expire at the end of the tenth (10th) year of the Term, and if Tenant fails to so notify Landlord, then Tenant shall be deemed to have waived its right to terminate this Lease pursuant to this Paragraph. For the avoidance of doubt, the tenth (10th) year of the Term shall end on the first January 31st occurring after the tenth (10th) anniversary of the Rent Commencement Date.

## SECTION 4. PAYMENT OF FIXED RENT.

(a)    Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay Landlord the Fixed Rent, in equal monthly installments, in advance, on the first day of every calendar month. Fixed Rent for any partial calendar month shall be prorated. Fixed Rent shall be paid without deduction or set-off (except as otherwise expressly provided herein). Rent shall be mailed or otherwise delivered to the address specified in Section 25 or to any other address Landlord designates by Notice to Tenant. All Rent shall be paid in appropriate legal tender of the United States. Landlord acknowledges and agrees that for administrative purposes, Tenant may designate Paying Agent to make all Rent payments to Landlord under this Lease. Tenant's designation of a Paying Agent (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights of Tenant to Paying Agent. Landlord shall not have any right to bring any actions against Paying Agent, and Paying Agent shall have no liability to Landlord for any obligation whatsoever (including, without limitation, the obligation to pay Rent). All payments of Rent received by

13

Landlord from Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

(b)     (i)     As used herein, the "Initial Co-Tenancy Condition" shall mean that each and every Inducement Tenant (as defined in Section 5(b)(iii)(F) below) plus national or regional retail tenants of the type typically found in first class shopping centers located in Santa Clara County, California and occupying 65% of the remaining leasable Floor Area in the Shopping Center (exclusive of the Premises and the premises leased by Inducement Tenants) (the "65% Tenants") shall have accepted possession of their respective entire premises, such premises shall have been substantially completed, and each Inducement Tenant and 65% Tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising therein.  Tenant acknowledges and agrees that the retail tenants currently occupying space in the Shopping Center qualify as 65% Tenants.

(ii)     If, on the Delivery Date as defined in Section 5(b)(iii) below, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(A)     accept delivery of physical possession of the Premises; or

(B)     defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of Article 5 and the continuing satisfaction of the Delivery Date Conditions (as defined in Section 5(b)(iii)); and

14

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Slack Rent in lieu of Fixed Rent and Percentage Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of Article 5.

(c)     In addition to the provisions above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least 120 days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.

(d)     Percentage Rent.

(i)     Commencing on the first day of the first full calendar year after the Rent Commencement Date and continuing throughout the remainder of the Term, Tenant shall pay Landlord annual percentage rent ("Percentage Rent") at the following rates (each a "Percentage Multiple"): four percent (4%) of Tenant's Gross Sales between $10,000,000 and $13,000,000 during such calendar year, plus three percent (3%) of Tenant's Gross Sales between $13,000,000 and $20,000,000 during such calendar year, plus one percent (1%) of Tenant's Gross Sales in excess of $20,000,000 during such calendar year (the foregoing levels of Tenant's Gross Sales are referred to herein as the "Sales Break Points"), provided that following each increase of Fixed Rent under this Lease, the Sales Break Points shall be increased

15

proportionately. For example, at the commencement of the eleventh (11th) year of the Term hereunder, Fixed Rent shall increase from $12.00 per square foot of Floor Area to $13.00 per square foot of Floor Area, and as a result the Sales Break Points shall each increase by 8.33% (1/12), such that for the eleventh (11th) through the fifteenth (15th) years of the Term, Tenant shall pay Landlord Percentage Rent at the following rates: four percent (4%) of Tenant's Gross Sales between $10,833,000 and $14,082,900 during such calendar year, plus three percent (3%) of Tenant's Gross Sales between $14,082,900 and $21,666,000 during such calendar year, plus one percent (1%) of Tenant's Gross Sales in excess of $21,666,000 during such calendar year.

(ii)    "Gross Sales" means the total actual sales price of all sales of merchandise or services arising out of or payable on account of all the business conducted in or from the Premises by or on account of Tenant and any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises, whether for cash or credit, including all orders for merchandise taken from or filled at or from the Premises, all deposits not refunded to customers, and gift certificates and/or gift cards (no matter where purchased) when redeemed at or from the Premises. A sale shall occur for purposes of this Lease, on the earliest of: (1) the transaction is first reflected in the records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (2) Tenant or any other person or entity operating its business in the Premises receives any part of the sales price, or (3) the goods or services are delivered to the customer. Tenant and the other persons and entities operating their business in the Premises shall record each sale when made using a cash register or cash registers, or such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. "Gross Sales" exclude (A) sales tax, gross receipts tax or similar tax, by whatever name called, (B) bona fide transfers or

16

exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any affiliates of Tenant, and returns to shippers and manufacturers for credit, (C) refunds or credits given to customers for merchandise purchased at the Premises and returned or exchanged, (D) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (E) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made because of such bad debts shall be included in Gross Sales when received, (F) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (G) sales to employees of Tenant at discount, (H) fees paid to independent third party credit card companies regarding sales charged to customers' credit cards, (I) proceeds from delivery, wrapping and check cashing services, (J) sums and credits received for loss or damage to merchandise, (K) separately stated service, finance and interest charges, (L) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise and/or (M) sales of inventory to jobbers or wholesalers. Notwithstanding anything to the contrary in the first paragraph of this subsection 4(c), for reporting purposes only (and for no other purpose including without limitation the calculation and payment of Percentage Rent), "Gross Sales" shall include sales to employees of Tenant at a discount and sales of inventory to jobbers and wholesalers.

(iii)    Tenant shall keep at the Premises or at its principal office complete records reflecting Gross Sales. Tenant may maintain its records in computerized form if those records provide the same information as written records and printed copies of such records are made available at Tenant's principal office for inspection by Landlord's representatives or representatives of the lessor under the Ground Lease who are engaged in inspecting and/or auditing Tenant's records as permitted herein. Tenant shall keep its records according to

17

generally accepted accounting principles and practices not less than two (2) years following the

end of the calendar year to which they relate. Within thirty (30) days after the end of each

calendar month, for informational purposes only, Tenant shall furnish Landlord and Fee Owner a

compilation showing the Gross Sales for such calendar month to the extent such reporting is

required under the Ground Lease. Within sixty (60) days after the end of each calendar year,

Tenant shall furnish Landlord and Fee Owner a compilation prepared by an officer of Tenant

showing the Gross Sales during the preceding calendar year and the amount of Percentage Rent,

if any, required to be paid by Tenant for such calendar year. The full amount of any Percentage

Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation.

Landlord, the lessor under the Ground Lease, or their respective auditor or employees may, upon

at least ten (10) days prior Notice to Tenant (but not more than once per year), inspect or audit

Tenant's records and any records of other persons and entities operating in the Premises

(including licensees) relating to Gross Sales. If lessor under the Ground Lease desires to inspect

Tenant's records or the records of any licensee of Tenant as aforesaid, Landlord shall pay for one

round-trip, coach class airline ticket, on an advance reservation basis, from San Francisco,

Oakland or San Jose, to Tenant's principal office and to the principal office of any licensee, as

the case may be, plus room charges for a single room for two nights at a business hotel in

reasonable vicinity to such offices, to defer the costs of the inspection by lessor under the

Ground Lease. In no event shall Landlord's obligations set forth in the immediately preceding

sentence be deemed an obligation of Tenant. If any audit discloses a deficiency in the Gross

Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent to Landlord on

account of such deficiency, and if the deficiency is more than four (4%) percent of the Gross

Sales reported by Tenant, and if as a result of such audit, Tenant owes additional Percentage

18

Rent, Tenant shall also pay Landlord's reasonable costs of the inspection or audit. Tenant makes no representation or warranty concerning the Gross Sales expected from the Premises.

        (iv)    Landlord and Fee Owner shall not disclose to any third party Tenant's Gross Sales or the Percentage Rent paid or payable by Tenant if that was not previously disclosed by Tenant to the third party or to the public generally. Landlord and the Fee Owner may disclose Tenant's Gross Sales as may be required by Law or to its accountants, attorneys, bona-fide prospective purchasers, or current or prospective lenders.

        (v)    With respect to the period commencing on the Rent Commencement Date and ending on the first December 31 following the Rent Commencement Date (the "Partial First Year"), no Percentage Rent shall be due from Tenant. Notwithstanding any other provisions of this subsection , if this Lease expires in accordance with the terms hereof on the Expiration Date, then the amount of Percentage Rent, if any, payable with respect to the three (3) months of the Term immediately preceding the Expiration Date [with such three (3) month period hereinafter referred to as the "End Months"], shall be determined by (a) calculating the Gross Sales for the twelve (12) month period prior to the End Months, and (b) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by twenty-five (25%) percent, and  with respect to the ten (10) months of the Term immediately preceding the End Months, shall be determined by (a) calculating the Gross Sales for the twelve (12) month period prior to the End Months, and (b) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by eighty-three and 33/100 (83.33%) percent, and in the event this Lease does not expire in accordance with the terms hereof on the Expiration Date, but instead terminates for any reason on a date other than January 31, then the amount of Percentage Rent, if any, payable with respect to the partial calendar year commencing upon the final January

19

1 to occur during the Term and ending on the termination date of this Lease (the "Partial Last Year") shall be determined by (a) calculating the Gross Sales for the twelve (12) month period prior to the termination date of this Lease, and (b) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the Partial Last Year and the denominator of which is three hundred sixty-five (365).

(vi)    In the event Tenant executes one or more license agreements with unrelated persons or entities (the "Licensees") for the purpose of permitting the Licensees to operate businesses or concessions within the Premises, then, the amount derived by multiplying the Floor Area of such licensed space by the average per square foot Gross Sales with respect to the remainder (i.e. unlicensed portion) of the Premises, but not the Gross Sales achieved by such Licensee(s) from such portion of the Premises nor the license fee, shall be included in Gross Sales for the purpose of calculating Percentage Rent. In no event shall the provisions of this subsection (vi) be applicable to portions of the Premises licensed to Licensees to the extent such licensed portions of the Premises exceed, in the aggregate, a Floor Area of two thousand (2,000) square feet at any one time (it being understood and agreed that in the event the total portion of the Premises licensed to Licensees exceeds a Floor Area of two thousand (2,000) square feet at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which will be entitled to the benefit of this subsection (vi)).

(vii)    Intentionally Omitted.

(viii)    Tenant shall have no obligation to pay all or any portion of the percentage rent payable under the Ground Lease or the Sublease but the foregoing shall not be

20

deemed to diminish or otherwise affect Tenant's obligation to report Gross Sales and pay Slack Rent and/or Percentage Rent to the extent required under this Lease.

(ix) Any dispute between the parties relative to the provisions of this Section 4(c), including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 51 of this Lease. If the dispute pertains to any matter in subsections (v) or (vi), then arbitrator conducting such arbitration shall have at least ten (10) years experience in shopping center retail leasing].

### SECTION 5. **IMPROVEMENTS**.

(a) Landlord's Obligations and Tenant's Work.

(i) Landlord shall deliver possession of the Premises to Tenant in the condition described in Exhibit D and Section 5(b)(iii) hereof. Except as aforesaid, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as "Tenant's Work") which Tenant desires to adapt the Premises to Tenant's use. Landlord shall have no responsibility or liability whatsoever for any loss of, or damage to, any fixtures, equipment, merchandise, or other property belonging to Tenant, installed or left in the Premises unless due to the negligent acts or omissions of Landlord, its contractors or agents; and Tenant's entry upon and occupancy of the Premises prior to the Rent Commencement Date shall be governed by and subject to all the provisions, covenants and conditions of this Lease (other than the obligation to pay Fixed Rent and Tenant's Pro Rata Share of Taxes and Common Areas Charges) until the occurrence of the Rent Commencement Date. Tenant shall pay any and all governmental charges in connection with Tenant's Work and all other work performed by or on behalf of Tenant in connection with the Premises. If Tenant's Permits cannot be obtained because of any

21

then existing condition of the Shopping Center not caused by Tenant, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

(ii)     Prior to the Commencement Date, Landlord has delivered to Tenant drawings showing the existing footprint, column layout, and interior clear dimensions of the Premises (the "Certified LOD") [Limits of Demised]. Landlord represents and warrants, to the best of its actual knowledge, that the Certified LOD is true and correct and accurately depicts the Building in which the Premises are located and Landlord acknowledges that Tenant is relying on the accuracy of the Certified LOD.

(iii)     Simultaneously with its applications for Tenant's Permits, Tenant shall deliver to Landlord Tenant's plans ("Tenant's Plans") depicting Tenant's Work. Landlord shall have no approval rights with respect to Tenant's Plans or the work contemplated thereby and they shall be deemed approved by Landlord, so long as they: (i) comply with all Laws, (ii) are substantially consistent with Exhibits B, D-1, and F attached hereto and with the Certified LOD, and (iii) do not require any structural modifications of the Premises or any other building in the Shopping Center. If Landlord's approval is required to certain aspects of Tenant's Plans, such approval shall be granted or withheld, with reasonable specificity, within fifteen (15) days after Landlord's receipt of the necessary Tenant's Plans. If Landlord shall fail to disapprove the same within said 15-day period, such aspects of Tenant's Plans shall be deemed approved. This Lease is subject to and conditioned upon Landlord's approval (or deemed approval) of Tenant's Plans. Tenant may, without Landlord's approval, from time to time modify Tenant's Plans provided such modifications: (x) do not reduce the structural soundness of the Building, (y)

22

comply with Law and (z) are substantially consistent with Exhibits B, D-1, and F attached hereto
and with the Certified LOD.

(iv)    Tenant's Work shall be performed in a good and workmanlike

manner, according to Law, utilizing only new, first class materials, and in accordance with all
insurance company requirements. Landlord hereby grants to Tenant, its agents, contractors and
subcontractors, a temporary, non-exclusive easement and right of use appurtenant to the
Premises in and to the Common Areas for the performance of Tenant's Work.  In the use of the
temporary easement, Tenant shall exercise reasonable care to minimize interference with the
operation of the Shopping Center.  In addition, Tenant shall have the right to stage and store
materials and park construction vehicles in the area labeled "Tenant's Staging Area" on Exhibit
B.  Prior to commencing construction, Tenant shall promptly apply and diligently pursue the
permits and approvals required for Tenant's Work, and Landlord shall cooperate with Tenant in
all respects in obtaining same, including without limitation the making of applications, and the
prompt execution and delivery of any documents.

(v)    If  the Delivery Date shall not have occurred by August 1, 2010

(which date is not subject to extension as a result of Force Majeure), Tenant, at Tenant's option,
may elect (I) upon the expiration of thirty (30) days Notice to Landlord with Landlord having
failed to cure fully such default, to terminate this Lease (in which event neither party shall have
any further liability hereunder [other than as set forth in Section 32 below] except that Landlord
shall be obligated to promptly reimburse Tenant in an amount not to exceed seventy-five
thousand ($75,000.00) Dollars, for Tenant's costs, damages and expenses incurred concerning
this Lease, including, without limitation, the preparation of plans and specifications for and the
costs of Landlord's Special Improvements), and/or (II) pursue the remedies set forth in Section

23

18 [except that the cure period set forth therein shall not apply], and/or (III) extend the Delivery

Date to any future date designated by Tenant in a Notice to Landlord (such future date "Extended

Date"). If Tenant elects to extend the Delivery Date and Landlord fails to perform as required on

the expiration of the Extended Date, Tenant may elect any of the foregoing options (I), (II)

and/or (III).

(vi)     Landlord represents, warrants and covenants to Tenant that, other

than those which may be required by Law, and those included in the SNDA's and RNDA's

required pursuant to Sections 5(b)(iii)(G) and 23, no other consents and approvals (including

without limitation under any Existing Leases (as defined in Section 50(f)) or under the CCR

Agreement) are necessary or required to be obtained to enable Tenant to perform Tenant's Work

(including without limitation, all signage permitted Tenant hereunder), as the case may be, or for

Landlord to enter into this Lease.

(vii)    Landlord shall pay Tenant the sum of Three Hundred Seventy-

Eight Thousand Four Hundred Ninety and 00/100 Dollars ($378,490.00) (the "Tenant

Allowance") in consideration for Tenant's construction of "Landlord's Special Improvements"

(defined below). Landlord shall pay the Tenant Allowance to Tenant within twenty (20) days

after all of the following have occurred:

(A)     Substantial Completion of Tenant's Work in accordance

with the Tenant's Plans, as certified by Tenant's contractor or architect, and

(B)     Landlord's receipt of all of the following:

24

1643022 v10

a.     at Tenant's discretion, either (y) a lien waiver from
Tenant's general contractor, or (z) an agreement regarding mechanics' and materialman's liens
executed by Bed Bath & Beyond Inc. in the form attached hereto as Exhibit N; and

b.     a temporary or permanent certificate of occupancy
(or its local equivalent), unless such certificate is not available for any reason other than Tenant's
failure to perform Tenant's Work in compliance with all Laws.

(viii)   If Landlord fails to provide Tenant with the Tenant Allowance
within twenty (20) days of Landlord's receipt of the applicable documentation or occurrence of
all of the events set forth above, then in addition to the rights and remedies under Section 18 of
this Lease, Tenant shall have the right to a credit against the installments of Rent next accruing
under this Lease, together with interest thereon at the Lease Interest Rate until fully reimbursed.
The Tenant Allowance is an offset (and not an inducement) for Tenant's construction, on behalf
of Landlord, of Tenant's Work (the "Landlord's Special Improvements") (which Landlord's
Special Improvements, together with any replacements thereof, when completed shall be the
property of Landlord, subject to use by Tenant of same during the Term of, and in accordance
with, this Lease).  Landlord alone shall be entitled to depreciate the Landlord's Special
Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect
to the Tenant Allowance.  Tenant shall be responsible for and herewith agrees to pay all costs of
Tenant's Work in excess of the Tenant's Allowance, and Tenant's Work (except for Landlord's
Special Improvements), together with any replacements thereof, shall be and remain the property
of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership
thereof, including, without limitation, depreciation of same as an asset for tax purposes.

25

1643022 v10

(b)    (i)    Landlord shall give Tenant at least fifteen (15) days prior notice of
the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the
"Delivery Date Notice"). Landlord's delivery of the Delivery Date Notice shall be a condition
precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the
contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date
established in the Delivery Date Notice. No event of Force Majeure occurring prior to the giving
of the Delivery Date Notice shall serve to delay the Delivery Date thereby established. If
Landlord fails to satisfy the Delivery Date Conditions (as hereinafter defined) by the Delivery
Date established in the Delivery Date Notice, or if Landlord changes the Delivery Date then, in
addition to any other remedies available to Tenant under this Lease, Landlord shall (A) credit
Tenant an amount against the initial installment(s) of Rent hereunder equal to three (3) days of
full Fixed Rent (i.e., computed without regard to any abatement or offset under this Lease,
whether pursuant to the definition of "Rent Commencement Date" or Section 4(b) hereof or
otherwise) payable under this Lease for each day that the Delivery Date is delayed (which credit
shall be deemed as reimbursement to Tenant for all reasonable costs incurred by Tenant,
including, without limitation, all temporary storage costs as a result thereof ("Tenant's Specified
Costs"), and  (B) pay to Tenant the additional liquidated sum of five thousand ($5,000) dollars in
reimbursement for costs and expenses incurred by Tenant by reason of additional work
performed by Tenant's employees at its corporate offices as a result thereof (it being
acknowledged and agreed by Landlord and Tenant that the liquidated sum referred to in this
clause (B) represents the parties' good faith agreement as to an amount which shall have been
incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment) (the
"Tenant's Administrative Costs"). Tenant is never obligated to accept as the Delivery Date any

26

date which is prior to the date then established by Landlord as the Delivery Date in the Delivery Date Notice.

(ii)     In the event Landlord shall have failed to pay any monies due to Tenant in accordance with this subsection 5(b) within fifteen (15) days after Tenant has notified Landlord of the amount of such monies, then Tenant shall have the right to offset such amounts, together with interest thereon at the Lease Interest Rate accruing from and after such fifteenth (15th) day after Tenant's notification, against the installments of Rent next accruing under this Lease.

(iii)     Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Section 5(b)(i) above and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "Delivery Date") following the day on which Tenant shall have received from Landlord the Delivery Date Certification annexed hereto as Exhibit J, which shall constitute Landlord's written certification that all of the following (the "Delivery Date Conditions") shall have occurred:

(A)     Possession of the Premises shall have been delivered to Tenant free of all leases (other than this Lease) and occupants, and Landlord shall then be the owner of either the fee simple estate and/or the subleasehold estate in the Shopping Center, and the Shopping Center shall be free and clear of any liens and encumbrances (except the "Permitted Encumbrances" described on Exhibit E);

(B)     All underlying zoning and site plan approvals necessary to enable Tenant to apply for and obtain the Tenant's Permits and to use the Premises for retail

27

purposes shall continue to be in full force and effect (exclusive of Tenant's Permits and the certificate of occupancy (or local equivalent) for the Premises to be obtained by Tenant following the completion of Tenant's Work), it being agreed that Tenant's obtaining of Tenant's Permits shall not be a condition to the occurrence of the Delivery Date;

(C)     The Common Areas (including, but not limited to, the monument signs required hereunder) and all of the improvements thereon depicted on Exhibit B and all off-site improvements shall be in their condition as of the Commencement Date. The Premises shall have been delivered free of all furniture, fixtures and equipment, free of all Hazardous Substances (as defined in Section 59 below), in broom-swept clean, secured condition with the roof watertight (and all gutters and downspouts in good working order), all systems and equipment in good working order, and the structural components (including without limitation the foundation, exterior walls and roof) in good order and repair, and Landlord shall have complied fully with the provisions of Exhibit D and Section 59 below;

(D)     To Landlord's knowledge, Landlord's Special Improvements, Tenant's signs and parking in the parking areas shall each be permitted by Law and not prohibited by any document by which Landlord or the Shopping Center is bound including, without limitation, any other tenant lease, the Ground Lease, the Sublease or the CCR Agreement;

(E)     Intentionally omitted;

(F)     Costco, Barnes & Noble, Ross and T.J. Maxx & More (the "Inducement Tenants", or individually, the "Inducement Tenant") and the 65% Tenants shall

28

each be currently open to the general public for business in the respective building sites in the Shopping Center designated for them on Exhibit B; and

(G) All SNDA's and RNDA's required pursuant to Section 23 shall have been delivered to Tenant in recordable form.

(c) Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall relieve Landlord of any obligation under this Lease, unless such obligation is expressly waived in writing by Tenant.

(d) Tenant's Right of Entry. Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

(e) Permits Contingency.

(i) Tenant shall apply for all of Tenant's Permits within ninety (90) days after the Commencement Date and use diligent efforts to obtain all of Tenant's Permits as soon as possible but in no event later than the first (1st) anniversary of the Commencement Date (the "Permit Contingency Deadline"), provided, however, that Tenant shall be permitted to extend the Permit Contingency Deadline for a period of thirty (30) days, upon Tenant giving notice to Landlord prior to the Permit Contingency Deadline, if any of Tenant's Permits were

29

initially denied by the applicable governmental authorities and Tenant is diligently pursuing an appeal with the applicable governmental authorities of its application for any of Tenant's Permits. Notwithstanding the provisions of this Article 5 to the contrary, if, despite Tenant's diligent efforts, all Tenant's Permits have not been obtained by the Permit Contingency Deadline, Tenant shall have the right, upon notice given to Landlord prior to the unconditional grant of all of Tenant's Permits, to: (a) delay its acceptance of physical possession of the Premises to the date on which all of the Tenant's Permits have been obtained, whereupon the Delivery Date shall be deemed to have occurred on such date (subject to the other provisions of this Article 5 and the continuing satisfaction of the conditions to the occurrence of the Delivery Date); or (b) terminate this Lease. Tenant's exercise of its rights under (a) above shall not preclude the subsequent exercise of its rights under (b) above. The date on which all Tenant's Permits are unconditionally granted is referred to herein as the "Permit Contingency Date".

          (ii)    If all of Tenant's Permits have not been obtained within ninety (90) days after the Permit Contingency Deadline for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option, upon notice given to Tenant prior to the unconditional grant of all Tenant's Permits, to terminate this Lease, provided, however, that Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, of Tenant's waiver of its rights under Subsection 5(e)(i) above, whereupon Landlord's termination notice shall be rendered null and void and the Permit Contingency Date shall be deemed to be the date which is ninety-one (91) days after the Permit Contingency Deadline.

          (iii)    In the event Tenant or Landlord elects to terminate this Lease pursuant to this Section 5(e), this Lease shall cease and be deemed canceled and terminated as of

30

the date set forth in Tenant's or Landlord's notice of such termination and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.

(f)     Tenant's Leasehold Improvements.  Subject to Subsection 5(a)(viii), Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

(g)     Temporary Storage Containers.  Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on Exhibit B hereto during the Term, subject to applicable Law.

(h)     Trash Compactor and Containers.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the location designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the location designated on Exhibit B hereto as "Trash Container Pad".  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(i)     Shopping Carts.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use commercially reasonable efforts to remove same from the Common Areas.

31

(j)     Loading Facilities.  Tenant shall have the exclusive right to utilize the

loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a

year" basis.

### SECTION 6.  REAL ESTATE AND OTHER TAXES.

(a)     Landlord shall pay on or before the due dates thereof all real estate taxes

and assessments levied or assessed by any lawful authority on the land and improvements

comprising the Shopping Center, other than personal property taxes levied against tenants

("Taxes").  Starting on the Rent Commencement Date, Tenant shall be liable for the payment of

Tenant's Pro Rata Share of the Taxes which accrue during the Term.  Taxes shall not include

any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital,

or other tax or assessment upon Landlord or upon the Rent payable under this Lease; (2) taxes on

rents, gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest

for any tax or assessment which Landlord failed to timely pay (except if caused by Tenant's

default; (4) assessment for a public improvement arising from the initial construction or

expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed

during the Term which are permitted to be included within Taxes hereunder shall, for the

purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the

maximum number of installments permitted by the applicable taxing authority); (5) Taxes from

an increase in the assessment caused by a sale or ground lease of all or any portion of the

Shopping Center except for the Taxes from the first sale made during the Term which occurs

after the fifth (5th) anniversary of the Rent Commencement Date; (6) Taxes from any

construction work performed by or on behalf of a third party at the Shopping Center that

materially exceeds the general construction standard of the Shopping Center; (7) Taxes on

32

unimproved portions of the Shopping Center until the same are either improved by improvements or buildings which become an integral part of the Shopping Center or by incorporation of such portions into the Common Areas; or (8) fees imposed upon Landlord in connection with any redevelopment of the Shopping Center (including, without limitation, trip generation fees). If during the Term the present method of taxation is changed so that the whole or any part of the Taxes on real estate and improvements is discontinued and in whole or partial substitution therefor, taxes, assessments, levies, impositions, or charges are levied, assessed and/or imposed wholly or partially as a capital levy or otherwise on the rents, gross receipts, revenues, or profits received from real estate or the rents, gross receipts, revenues, or profits reserved herein or any part thereof, then such substitute taxes, assessments, levies, impositions, or charges, to the extent so levied, assessed, or imposed, shall be deemed to be Taxes for the purpose of this Lease. Landlord represents to Tenant that, as of the Commencement Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Landlord estimates that, in the absence of any changes in California's real property tax laws that would result in any increases in Taxes permitted by this Lease, the Tenant's Pro Rata Share of Taxes for the first full calendar year after the Rent Commencement Date will be approximately $2.16 per square foot of Floor Area in the Premises.

33

(b)     For the year in which the Rent Commencement Date occurs and the year
in which this Lease expires or sooner terminates, Tenant's Pro Rata Share of Taxes shall be
adjusted so that same is based on a ratio of the Term within the tax year to the full tax year.

(c)     Landlord shall submit to Tenant a copy of the bill for Taxes issued by the
applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes, proof of
payment of Taxes for the previous payment period and all notices concerning assessments,
changes of assessments, tax rates and changes thereto.  Provided Landlord has submitted to
Tenant the foregoing documentation, Tenant shall reimburse Landlord in the amount required by
this Section 6 within thirty (30) days after receipt of such bill.

(d)     If Tenant reasonably requests, Landlord shall contest the amount or
validity of any assessed valuation or Taxes.  If Landlord does not do so, Tenant may contest the
Taxes by appropriate proceedings conducted in good faith, in which event Landlord shall
cooperate with Tenant, execute any and all documents required in connection therewith and, if
required by any governmental authority having authority, join with Tenant in the prosecution
thereof.  If, as a result of any contest, any rebate or refund of Taxes is received, Tenant shall be
entitled to Tenant's Pro Rata Share thereof (after reasonable expenses incurred by Landlord
and/or Tenant concerning such contest are paid to the party that incurred such expense) for any
tax year, or part, that coincides with the Term of this Lease.

## SECTION 7. **PERMITTED AND PROHIBITED USES**.

(a)     The Premises may be used only for the Permitted Use.

(b)     (i)     Landlord covenants and agrees that the Shopping Center shall be
leased, operated, maintained and managed as a first class shopping center and that no part of the

34

Shopping Center or on any land (the "Related Land") contiguous or adjacent to the Shopping

Center (which shall include land that would be contiguous or adjacent to the Shopping Center

but for any intervening road, street, alley or highway) owned now or at any time in the future by

Landlord or any affiliated entity (referring to the actual Landlord from time to time, without

regard to land owned by any prior landlords, and excluding from the operation hereof any

business existing at the time any future landlord becomes Landlord hereunder) shall be used or

occupied for any of the following: any use prohibited by Law; pornographic use; "second-hand"

or "surplus" store (except that a "Play It Again Sports" as same currently operates or similar first

class, retail type store shall be permitted in the Shopping Center but not in the Building);

laundry or dry cleaner (except (1) that a drop-off facility with no dry cleaning activities shall be

permitted if it is not located in the Building, and does not have a Floor Area in excess of two

thousand (2,000) square feet and (2) the existing, approximately 2,000 square foot dry cleaners

identified on Exhibit B is permitted so long as its lease is in effect)); pawn shop; daycare center;

veterinary office (except if incidental to a regional or national retail pet supplies store normally

found in first class shopping centers in the State of California (such as Petsmart) which (i)

complies with the prohibitions in this Section 7 against noxious or offensive uses, and (ii) is not

located in the Building); living quarters; hotel/motel; manufacturing; bowling alley; off-track

betting parlor or other gambling establishment; bingo hall; funeral parlor; skating rink; nightclub,

discotheque or dance hall; so-called "head shop"; catering or banquet hall; children's

entertainment or activity facility (except that one such facility shall be permitted if it is not

located in the Building); video rental or viewing (except for a national or regional tenant of the

type commonly found in first class shopping centers in Santa Clara County, California and is not

located in the Building); meeting hall; auction hall; place of religious worship; sporting event;

karate center; auditorium; warehouse (except that the storage of merchandise incidental to a

35

retail business permitted hereunder shall not be deemed a warehouse use); theater; automobile repair shop, or any business servicing motor vehicles in any respect, including without limitation any quick lube oil change service, tire center or gasoline or service station or facility (except if located in its current location in or adjacent to the Costco building as shown on Exhibit B and operated by the same or a similar retailer with an incidental gas station [i.e., Costco, BJs, Sears]); supermarket (except that one gourmet supermarket shall be permitted, such as Trader Joe's, Whole Foods, Wild Oats as same currently operate or similar gourmet supermarket, provided such gourmet supermarket is not located in the Building); restaurant serving meals for on or off premises consumption (except if located in other than the Building and not inconsistent with a first class shopping center, and a "coffee bar" shall be permitted to be located within the Premises and within the premises leased to Barnes & Noble for so long as that lease or a replacement lease with a bookstore or similar retailer with an incidental coffee bar is in effect); beauty parlor (except that a beauty parlor shall be permitted if it is not located in the Building); nail salon; billiard parlor or pool hall; sales office or showroom for automobiles or other vehicles(except if located in the Costco building as shown on Exhibit B); an establishment serving alcoholic beverages for on or off premises consumption (except as incidental to a permitted restaurant hereunder); massage parlor; office (except that retail type offices, such a bank, insurance agency, travel agency, and medical office shall be permitted in the Shopping Center but not in the Building, provided such retail type offices are customarily included in first class retail shopping centers in the State of California, any medical office does not provide family planning services or drug and alcohol counseling, and the aggregate Floor Area of all office space in the Shopping Center does not exceed twenty thousand (20,000) square feet; and excluding office space used in connection with and ancillary to a permitted retail use hereunder); health spa, exercise facility or similar type business; car wash; a so-called "flea market"; carnival, amusement park or circus;

36

video/pinball arcade or game room; customer viewing, entertainment or educational uses; any

obnoxious use which adversely affects Tenant's use and enjoyment of the Premises and the

Shopping Center or diminishes the first class quality of the Shopping Center; or any other

non-retail uses (herein collectively called the "Prohibited Uses"). As of the Commencement

Date, Tenant acknowledges that the tenants operating under Existing Leases are not in violation

of any of the Prohibited Uses.

                (ii)      "Pornographic use" means without limitation a store displaying for

sale or exhibition books, magazines or other publications containing any combination of

photographs, drawings or sketches of a sexual nature, which are not primarily scientific or

educational, or a store offering for exhibition, sale or rental video cassettes or other like medium,

the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the

Motion Picture Rating Association, or any successor thereto. The sale of books, magazines, or

other publications by a national bookstore of the type normally found in first class shopping

centers in Santa Clara County, California (such as, for example, Borders or Barnes & Noble as

said stores currently operate) shall not be deemed a "pornographic use" hereunder. "Educational

uses" shall include without limitation a beauty school, barber school, reading room, place of

instruction, or any other activity, facility, school or program catering primarily to students or

trainees as opposed to shoppers, and (C) the term "obnoxious " shall include without limitation a

use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a

public or private nuisance, emits noise or sounds which are objectionable due to intermittence,

beat, frequency, shrillness or loudness, creates a hazardous condition,  or is used in whole or in

part as or for warehousing or the dumping or disposing of garbage or refuse.

37

(c)     Tenant covenants and agrees not to use the Premises for any of the

Prohibited Uses or the Existing Exclusives, to the extent then applicable.

**SECTION 8. UTILITIES**.

(a)     From the Delivery Date to the end of the Term, Tenant shall pay, and as

necessary shall contract for, in its own name, directly with the utility company servicing the

Premises, the cost and expense of all utility services to the Premises, including heat, air

conditioning, water, gas, electricity and telephone. Landlord represents and warrants that on the

Delivery Date, the Premises shall have the access to utilities as described on Exhibit D. Any

utilities serving the Premises which are not separately metered (i.e., gas and water) shall be

provided by the applicable utility to the Shopping Center, with Tenant's portion of such charges

charged to Tenant by Landlord on a pro rata basis (i.e. based upon the size of the Floor Area of

the Premises in relation to the total Floor Area of all tenants using such utilities). Tenant shall

pay such utility charges at the same rate that Landlord pays to the applicable utility provider,

together with capacity charges at the same rate that Landlord pays to the applicable utility

provider, with the understanding that Landlord shall not be permitted to make any profit from

such utility by way of increasing the rate charged to Tenant or otherwise. Landlord and Tenant

acknowledge and agree that Tenant's entry upon the Premises prior to the Delivery Date is not a

waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the

Premises prior to the Delivery Date. Landlord shall not permit the utility lines at the Premises to

be reduced or overloaded by other tenants of the Shopping Center.

(b)     If Landlord, its agents, contractors, servants or employees disrupt any

utilities servicing the Premises, Landlord shall promptly restore the affected utilities at

38

Landlord's sole cost and expense. If Landlord does not restore the disrupted utilities within twenty-four (24) hours after the Landlord knows of the disruption, and Tenant cannot conduct its normal business in the Premises due to the disruption, Rent shall be abated during the period of disruption.

## SECTION 9. MUTUAL RELEASE, WAIVER OF SUBROGATION AND MUTUAL INDEMNIFICATION.

(a) Landlord and Tenant, for themselves and for anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property and time element insurance required to be maintained hereunder or any other insurance policy now or hereafter issued covering the Premises or the contents thereof or the Shopping Center.

(b) Any property insurance policy carried by Landlord or Tenant insuring the Premises or the contents thereof or the Shopping Center shall provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto concerning any loss or damage covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided for in this Section. If any additional charge or increase in premium is made by the insurer because of this waiver of subrogation, then the party in whose favor the waiver was obtained shall pay such additional charge or increase in premium upon receipt of Notice. Failure to pay the increase in premium will void the release and waiver

39

benefitting such party but shall not affect the benefit of the corresponding release and waiver in favor of the other party.

      (c)    If Landlord or Tenant is self-insured or maintains a deductible (as may be permitted hereunder), then either the self-insured party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

      (d)   (i)    Except as otherwise provided in this Section, Tenant agrees to defend and indemnify Landlord and hold Landlord harmless (except for loss or damage (x) caused by the acts or omissions of Landlord, its agents, contractors, licensees, tenants [other than Tenant], occupants or employees, or (y) for which any of the respective parties listed in the foregoing clause (x) may be statutorily liable) from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (A) concerning loss of life, personal injury and/or damage to property caused by any occurrence in or upon the Premises, or (B) caused by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees.

          (ii)    Except as otherwise provided in this Section, Landlord agrees to defend and indemnify Tenant and hold Tenant harmless (except for loss or damage caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees) from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) concerning loss of life, personal injury and/or damage to property caused by any occurrence in or upon those portions of the Shopping Center not included within the Premises or other tenants'

40

leased premises, or (y) caused by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees.

**SECTION 10.    SIGNS**.

(a)    Tenant may, at its sole cost, install any signs it may desire in the interior of the Premises. Tenant shall also, at its own cost and expense and subject to Law (but subject to Section 5(a)(iii)) and the applicable provisions of Exhibit F, have the right to install on the exterior walls of the Building (and, as applicable, on the entrance design element) banners, awnings, flags and signs (including without limitation under-canopy (e.g. blade) signs) and replacement banners, awnings, flags and signs (including without limitation under-canopy signs) including temporary banners placed on the Building, in the locations identified on Exhibit D-1, of such size, design and color as Tenant, from time to time, may desire. Notwithstanding anything to the contrary contained in this Lease (including, without limitation, the signage criteria set forth in Exhibit F), Landlord shall permit Tenant to have the signage as shown on Exhibits D-1 and F-1 so long as it is in compliance with Law. In addition, as part of Landlord's Special Improvements, from and after the Commencement Date and continuing until the Rent Commencement Date, Tenant shall have the right, subject to Law, to install and maintain temporary banners on the exterior of the Building announcing "Grand Opening," "buybuyBaby Coming Soon", "Now Open" and/or "Hiring Now" as shown on Exhibit F-1. Landlord and Tenant acknowledge and agree that other tenants have signs on the exterior of the Building in the locations depicted on Exhibit D-1. Landlord covenants and agrees that subject to Existing Leases (as hereinafter defined) to the extent that Landlord does not have consent or approval rights, (i) no sign or logo utilized by any other tenant in the Shopping Center shall include the words "baby", (ii) no obstructions (including, without limitation, any trees, bushes or other

41

1643022 v10

landscaping, scaffolding or architectural details) shall obscure Tenant' Building signs or other

exterior wall signs or any monuments or other freestanding signs, (iii) in no event shall (A) the

"area of the sign" (as defined by applicable codes) utilized by any other tenant in the Shopping

Center occupying Floor Area less than Tenant exceed the "area of the sign" utilized by Tenant,

or (B) the height of the tallest sign letter (and, as applicable, height of the logo) utilized by any

other tenant in the Shopping Center occupying Floor Area less than Tenant exceed the height of

the tallest sign letter (and, as applicable, height of the logo) utilized by Tenant, and (iv) the

signage rights of all other tenants in the Shopping Center are subject to compliance with the

provisions of Exhibit F (and Landlord shall enforce same in a non-discriminatory manner).

Tenant may install and maintain, during the period commencing on the Commencement Date

and ending on the day prior to the Rent Commencement Date, a temporary sign near the main

entrance (Highway 85) to the Shopping Center which states: "Buy Buy Baby Coming Soon"

(which sign is more particularly shown on Exhibit F-1).

        (b)     Landlord shall during the entire Term, provide monument signs at

Blossom Hill Road and Almaden Expressway at the locations shown on Exhibit B. Tenant shall

have the right, at its sole cost and expense, to erect and maintain its identification sign, as shown

on Exhibit F-1 (and having colors as selected by Tenant), on the monument signs in the locations

shown on Exhibit F-1. In addition, if Landlord constructs or makes available to any other tenant

or tenants in the Shopping Center any other pylon or monument sign within the Common Areas

or on any Related Land or otherwise (other than the existing pylon sign on Highway 85), such

signage shall also include Tenant's identification sign (and having colors as selected by Tenant),

which shall be larger than any sign made available to other tenant or tenants occupying less Floor

Area than Tenant.

42

(c)     Tenant shall have the right, from time to time, without Landlord's approval, to change its exterior Building signs and any free standing signs provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same; Landlord, upon request, shall execute any consents or applications which may be required by law to permit the placement or installation of any signs by Tenant as provided in this Lease. Upon the expiration or sooner termination of the Lease, Tenant shall remove its signs and patch up any holes on the fascia or other exterior walls of the Premises or on any monument caused by the prior installation or the removal of such signs.

(d)     Landlord shall (A) at all times maintain all freestanding signs in good order and repair (and at all times allow Tenant reasonable access to maintain, repair and replace its signs thereon, at Tenant's cost and expense), and (B) not change or alter the location, structure, height or general appearance of the freestanding signs without obtaining Tenant's prior consent. The cost of maintenance of all freestanding signs (but not individual tenants' signs) and of the cost of any electricity used to illuminate them, shall be included in Common Areas Charges.

(e)     The signage rights granted to Tenant pursuant to this Section 10 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.

(f)     To the extent there is any conflict or inconsistency between the terms of this Lease and the Sign Criteria set forth on Exhibit F, the terms of this Lease shall govern.

**SECTION 11.**        **ALTERATIONS AND IMPROVEMENTS**.

43

(a)   (i)   Tenant shall not make any structural alterations or structural improvements to the Premises (except as contemplated by Landlord's Special Improvements) without the prior approval of Landlord. All work done in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable governmental requirements.

(ii)   Tenant may, from time to time, at its own cost and expense, without the approval of Landlord, make non-structural alterations and non-structural improvements to the Premises, provided that the structural integrity of the Premises shall not be adversely affected thereby.

(b)   Tenant may erect and maintain for its sole use an antenna and a satellite dish on the roof of the Building, provided (i) Landlord approves Tenant's plans for the installation of such equipment in advance, (ii) Tenant uses a contractor designated or approved by Landlord for all roof penetrations, (iii) Tenant maintains the area where roof penetrations are made while Tenant's equipment is present, and repairs the roof penetrations, when Tenant removes any equipment installed thereon, and (iv) Tenant's antenna or satellite dish does not materially interfere with any other antenna or satellite dish on the roof of the Building. Tenant agrees to indemnify and hold Landlord harmless from any and all liabilities, costs, damages, together with reasonable expenses, arising from or related to the installation, operation or removal of the antenna or satellite dish.

(c)   Landlord shall not make any alterations to the Premises or the exterior of the Building (including, without limitation, changing the design, color or materials of the exterior of the Premises or the Building). To the extent that Landlord implements a program to refurbish

44

1643022 v10

or renovate the exterior of buildings within the Shopping Center, Landlord shall include the exterior of the Building as part of such refurbishment or renovation, provided, however, that Landlord may refurbish or renovate the exterior of other buildings within the Shopping Center before Landlord refurbishes or renovates the exterior of the Building. Any such refurbishment and/or renovation shall (i) be performed at Landlord's sole cost and expense, and (ii) with respect to the Building, be subject to Tenant's reasonable prior approval. Landlord shall not make nor permit to be made any alterations to the exterior "architectural theme" of the remainder of the Shopping Center (exclusive of tenants', other than Tenant's, storefronts) without the prior consent of Tenant. With respect to any proposed building code, signage or related variance affecting the Shopping Center or any portion thereof, which, if granted, would adversely affect Tenant's rights or benefits under this Lease, Landlord shall, upon becoming aware of same, promptly notify of the Tenant thereof.

(d)     Tenant shall have the right, at its cost, subject to Sections 11(a) and 24(a)(ii), to subdivide the Premises into not more than two (2) separate stores, each of which may have its own front entrance and access to the loading dock in the rear of the Premises, as well as separately sub-metered utilities.

(e)     Landlord shall fully, promptly and diligently cooperate with Tenant and its architects and designers in obtaining any permits, approvals and certificates required to be obtained by Tenant concerning any alteration or improvement described in this Section, and shall execute all instruments reasonably required for such purpose. However, Landlord shall not be required to pay any costs or expenses, including, without limitation, attorneys' fees and disbursements, or suffer any liability in connection therewith. Landlord shall execute and return

45

to Tenant all appropriately completed building department or equivalent applications within ten
(10) days after Tenant's request therefor.

        (f)     If any violation of Law noted against the Shopping Center or the Premises
(other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for
any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall
promptly and diligently cure the same and cause such violation to be removed of record to the
extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the
case may be.

        (g)     All alterations and improvements made by Tenant shall become the
property of Landlord, and shall be surrendered to Landlord, upon the expiration or sooner
termination of this Lease. Tenant shall have no obligation to remove alterations or
improvements.

        (h)     Tenant shall have the right to erect and maintain on the roof of the
Premises, a passive solar array for the production of electricity (the *"System"*), provided that
Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the System, (ii)
uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate
or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof
penetrations are made while the System is present, (iv) repairs any damage to the roof caused by
the making of the roof penetrations, including, but not limited to, the repair of the roof
penetrations upon the removal of any component of the System, and (v) erects and maintains the
System in accordance with applicable Law. Tenant agrees to indemnify and hold Landlord
harmless from any and all liabilities, costs, damages, together with reasonable expenses, arising

1643022 v10

from or related to the installation, operation or removal of the System. The System shall be deemed to be part of Tenant's Property. Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator of the System and Landlord shall have no right, title or interest in such equipment or any component thereof, notwithstanding that any such equipment may be physically mounted or adhered to the Premises. Landlord acknowledges and agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the environmental attributes of the System, and (iii) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever entitled, resulting from the environmental or related attributes of the System. Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System. Upon any termination of this Lease by Tenant or by expiration of the Term or any extension, Tenant must remove the System upon such termination and repair any damage caused by the removal. If the termination is by Landlord, such removal shall be as soon as practicable after Tenant is notified of the termination.

**SECTION 12.**    **ACCESS TO SHOPPING CENTER.** All entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B shall not be interrupted or disturbed by Landlord during the Term except that Landlord may at any time close temporarily portions of such areas to prevent the acquisition of public rights therein; provided further that Landlord will furnish Tenant at least five (5) days prior Notice thereof, and the area closed shall be the minimum area necessary for the minimum

47

duration of time as legally required to prevent such acquisition of prescriptive rights. Tenant

may exclusively use the loading facilities and freight elevator at the Premises any time, subject to

Landlord's right of access described in the definition of "Premises" herein. All entrances, exits,

approaches and means of ingress and egress to and from the Premise shall not be interrupted or

disturbed or permitted to be disturbed by Landlord during the Term.

**SECTION 13.**        **COMMON AREAS**.

(a)        Landlord is solely responsible for the maintenance (including, without

limitation, snow, ice, rubbish and debris removal), repair, replacement, operation, landscaping,

adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security

and control of all Common Areas and shall comply with all Laws applicable thereto.

(b)        Tenant and its agents and employees shall comply with the rules and

regulations of the Shopping Center ("Rules") as established from time to time by Landlord, upon

at least thirty (30) days advance Notice, the current version of which are attached as Exhibit L.

Any modification of the Rules shall always (i) be reasonable, (ii) not adversely affect the

operations of Tenant's business on the Premises, and (iii) not adversely affect Tenant's rights

under this Lease. Landlord shall uniformly enforce the Rules against all tenants of the Shopping

Center and without prejudice against Tenant. In the event of any conflict between the Lease and

any rules or regulations, the Lease shall prevail.

(c)        On and after the Rent Commencement Date, Tenant shall pay Tenant's Pro

Rata Share of the reasonable costs ("Common Areas Charges") paid by Landlord to operate,

maintain, insure and repair the Common Areas only, and an administrative fee ("Administrative

Fee") equal to seven (7%) percent of the foregoing amounts (excluding utilities, capital expenses,

48

and insurance premiums). Landlord shall be permitted to include the cost of patching, resealing and restriping the parking lot as Common Areas Charges (but not the cost of repaving the parking lot which shall be deemed a capital expense as treated below) to the extent such costs are incurred following the fifth (5th) anniversary of the Rent Commencement Date. Tenant shall pay its estimated Pro Rata Share of Common Areas Charges in monthly installments on the first day of each calendar month, in advance, based on Landlord's reasonable budget. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges from the Rent Commencement Date through the end of the first full calendar year of the Term exceed $2.57 per square foot of Floor Area per annum, and with respect to any other calendar year thereafter, in no event shall Tenant's Pro Rata Share of Common Area Charges (exclusive of insurance rate increases and utility rate increases during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges for the immediately preceding calendar year (exclusive of insurance rate increases and utility rate increases during such calendar year). Landlord shall give Tenant, upon Tenant's request, reasonable backup documentation and applicable evidence of prior bills and payments. Within ninety (90) days following the end of each calendar year, Landlord shall give Tenant a computation of Tenant's Pro Rata Share of Common Areas Charges for the prior calendar year (which computation shall, as applicable, be accompanied by an updated accurate site plan which shall show any change in the total Floor Area of the Shopping Center from that which previously existed), together with a reasonably detailed statement certified by Landlord and containing actual costs. If Tenant's Pro Rata Share of Common Areas Charges for the prior year is more than the aggregate monthly installments paid by Tenant during the prior year, Tenant shall pay to Landlord the difference within thirty (30) days after receipt of such Notice. If the aggregate monthly installments paid by Tenant for the prior year exceeds the actual amount due from

49

Tenant for such period, such excess shall be credited to payments of Common Area Charges next becoming due unless such credit to Tenant occurs during the last year of the Term in which event such excess shall be refunded by Landlord to Tenant simultaneously with submission of the detailed statement setting forth Tenant's Pro Rata Share of Common Areas Charges.

(d)     Common Areas Charges shall not include:     (i) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (ii) the cost of any replacements or capital improvements to the Common Areas if same can be capitalized under generally accepted accounting principles (except the cost of repaving the parking areas as opposed to patching may be included once during the Term and once during all Renewal Periods provided the costs are amortized on a straight line basis over the useful life in accordance with generally accepted accounting principles, and only the current year's costs included in Common Area Charges); (iii) the cost of investigating, monitoring or remedying any environmental condition or hazardous substances or wastes; (iv) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (v) the cost of maintaining, repairing or providing security for interior portions of buildings; (vi) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (vii) the cost of compliance with laws (including, without limitation, the cost of curing violations or contesting such laws or violations); (viii) costs from insurance deductibles or payments made under any self-insurance policy maintained by Landlord; (ix) costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 15 hereof and any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 15 hereof); (x) any part of Landlord's insurance premiums reimbursed to Landlord by any other tenant in the Shopping

50

Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise included as part of Common Areas Charges; (xi) costs of refinancing any debt encumbering the Shopping Center; (xii) sums paid or owed by Landlord to any tenant in the Shopping Center; (xiii) costs concerning the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (xiv) costs concerning a sale, ground leasing or sale-leaseback of all or part of the Shopping Center; (xv) costs of lawsuits or other legal actions (including, without limitation, arbitration and mediation) instituted or defended by Landlord, provided, however, the costs of a successful tax appeal incurred by Landlord pursuant to Section 6(d) shall be reimbursed to Landlord in accordance with Section 6(d); (xvi) late payment fees, penalties or interest; (xvii) ground rent; (xviii) depreciation; (xix) costs disproportionately incurred by or for any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (xx) electricity costs for lighting Common Areas earlier than dusk or later than 1:00 a.m. (other than low level security lighting); (xxi) advertising, entertainment and promotional costs for the Shopping Center (including without limitation holiday decorations); (xxii) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art in the Shopping Center; (xxiii) costs and expenses payable to Landlord or to an affiliate of Landlord if those costs and expenses are more than the costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (xxiv) repairs resulting from defects in the original construction of the Shopping Center arising within three (3) years after the Rent Commencement Date; (xxv) the cost of mechanized equipment (but not the straight line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (xxvi) any amounts payable under the Ground Lease or the Sublease not expressly permitted hereunder;

51

or (xxvii) except for the Administrative Fee, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including but not limited to overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses. If any tenant or other occupant of the Shopping Center maintains all or part of the Common Areas, or any facilities therein, or furnishes any services which would otherwise be included in Common Areas Charges, or pays directly for costs which would otherwise be included in the Common Areas Charges, its costs thereof shall be excluded in determining Tenant's Pro Rata Share. Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably pro rated. Landlord shall be required to repaint the exterior walls of the Building (including without limitation the Premises) as same may be reasonably required from time to time during the Term; the cost of repainting shall be deemed to be included within Common Areas Charges. However, the cost of repainting shall be included in Common Areas Charges not more often than once every five (5) years during the Term.

(e)     Within two (2) years of Tenant's receipt of Landlord's calculation of Tenant's Pro Rata Share of Common Area Charges, Tenant may audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share. Upon Tenant's request, Landlord shall give Tenant access to the relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) at Landlord's Management Office. In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the error exceeds four (4%) percent of Tenant's Pro Rata Share of Common Areas Charges, Tenant shall also have the right to immediate reimbursement from Landlord for the reasonable expenses of the audit. In case of an error in Tenant's favor,

Tenant shall immediately pay the undercharge to Landlord. Tenant shall keep the results of any audit confidential, but Tenant may disclose such information as may be required by Law, or to its accountants, attorneys or bona-fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 51 below.

(f)    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association other than an annual one hundred ($100.00) dollar payment for Landlord's promotional fund so long as other tenants in the Shopping Center are required to make a payment to such promotional fund. Tenant shall pay this amount within thirty (30) days of Tenant's receipt of an invoice.

(g)    During each business day, Tenant shall regularly and diligently remove its shopping carts from the Common Areas.

(h)    Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing, Landlord shall be permitted to conduct promotional events (the costs of, and maintenance for which shall not be included in Common Area Charges) in the area shown on Exhibit B provided that such events do not occur more frequently than six (6) times per calendar year for a duration of no more than one (1) week each, provided the same is permitted by applicable law. Tenant shall have the right to place a trailer on the Common Areas in an area immediately adjacent to the Premises for the purpose of conducting employee interviews and recruiting, which trailer shall be removed not later than the day before Tenant opens its business to the public.

53

1643022 v10

## SECTION 14.    PARKING AREAS AND OTHER COMMON AREAS.

(a)    Landlord shall not: (i) alter the area of the Shopping Center as shown of
Exhibit B, (ii) alter the location, availability or size of any building or improvement within the
"Critical Area" shown on Exhibit B; (iii) change the number, location, or layout of parking
spaces shown on Exhibit B; (iv) construct additional structures or buildings within the Critical
Area (including without limitation any kiosks, booths, signs or similar structures in the Common
Areas); or (v) within the Critical Area, change the entrances or exits to and from the Shopping
Center, or the curb cuts, roadways and sidewalks or other Common Areas within the Critical
Area, without obtaining Tenant's prior written consent in each instance, which consent may be
withheld by Tenant in its sole discretion without the application of Section 40 below with
respect to items (ii) and (iv) above. In the event Tenant consents to any such work, it shall be
performed by Landlord at any time other than during the months of August, November and
December, and shall be undertaken in such a manner so as to (A) not materially adversely affect
ingress to or egress from the Shopping Center, (B) have no material adverse effect on the
visibility of the Premises or any signs which contain Tenant's name, and (C) not otherwise
materially interfere with the normal conduct of Tenant's business in the Premises.
Notwithstanding the foregoing, if changes specified in clauses (i) through (v) are required by
Law, then Landlord shall give Tenant Notice thereof and an opportunity to contest same.
Landlord shall cooperate with Tenant and execute such documents as may be reasonably
requested by Tenant in connection with such contest. If such changes are nonetheless required
by Law, then Landlord shall not be prohibited from same under this Lease. Landlord shall not
designate specific parking spaces for use by any tenant or other occupant of the Shopping Center.
Notwithstanding the foregoing, Landlord shall maintain in the location identified on Exhibit B as

54

the "Expectant Mother Parking Area", a minimum of six (6) parking spaces reserved for the

exclusive use of expectant mothers and/or parents with infants who are customers of Tenant (the

*"Expectant Mother Parking Spaces"*).  The Expectant Mother Parking Spaces shall be

prominently marked and/or signed as reserved for expectant mothers and/or parents with infants

who are customers of Tenant.  Landlord shall use commercially reasonable and diligent efforts to

enforce the foregoing restrictions.  Landlord warrants and represents that the Shopping Center

will, except as provided in Section 21(d) below, at all times during the Term, contain the greater

of (I) the number of parking spaces required by Law, or (II) at least four (4.0) parking spaces for

every one thousand (1,000) square feet of Floor Area in the Shopping Center, with compact, full-

size and handicap spaces in the ratios required by Law.

       (b)     Parking spaces shall be clearly marked.

       (c)     The Common Areas shall be fully lighted by Landlord from dusk until one

(1) hour after the close of business in the Premises, with security lighting from one (1) hour after

the close of business in the Premises until dawn.

       (d)     Neither Tenant nor any other tenant or occupant of the Shopping Center

shall be permitted to park trucks or other vehicles servicing the Premises (or the premises of the

respective tenant) in the parking area designated for customer parking.  Tenant shall use

reasonable efforts to have its employees park their motor vehicles in the area designated as

"Employee Parking" on Exhibit B and Landlord shall take all reasonable measures to have other

tenants and occupants of the Shopping Center do the same.  No vehicle may block or impede

access to loading areas or roadways within the Common Areas.

1643022 v10

(e)    There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center (other than costs incurred in maintaining Common Areas, as provided in Section 13). Landlord shall not permit overnight parking in the Shopping Center, except that Tenant shall be entitled to park overnight in the parking lot located in front of the Premises one box truck that is used exclusively for delivery of merchandise purchased by Tenant's customers.

(f)    In the event any construction or repair which is permitted under the terms of this Lease is undertaken in the Common Areas or in any other portion of the Shopping Center during such time as the Premises shall be open for business to the public, all such construction or repairs shall be commenced following not less than five (5) days Notice to Tenant, and shall be conducted in a manner which will not materially interfere with the normal operation of Tenant's business in the Premises, including access to and visibility of the Premises from the parking lots, roads and highways abutting the Shopping Center.

**SECTION 15.    INSURANCE**.

(a)    Tenant, at its own cost and expense, shall keep in force throughout the Term: commercial general liability insurance insuring Tenant, naming Landlord as "additional insured" covering the Premises, with a combined single limit of liability of not less than Five Million ($5,000,000) Dollars for bodily injury, death and property damage liability; and standard "All-Risk" insurance, on a replacement cost basis, to cover the full insurable replacement value of Tenant's Property. Tenant shall cause to be kept in force during the performance of Landlord's Special Improvements and all future alterations "Builder's Risk" insurance, on a replacement cost basis, to cover the full insurable replacement value of Landlord's Special

56

Improvements and such alterations. Certificates evidencing Tenant's insurance coverage shall be delivered to Landlord prior to the Delivery Date.

(b)    Except liability insurance described above, Tenant may self-insure the risks that would otherwise have been covered under the other insurance policies required to be maintained by Tenant pursuant to the provisions of this Section if Tenant maintains a net worth of at least Fifty Million ($50,000,000) Dollars.

(c)    Landlord shall keep in force on and after the Commencement Date and throughout the Term (i) commercial general liability insurance covering the Common Areas insuring Landlord, naming Tenant as "additional insured", with a total combined single limit of liability of not less than Ten Million ($10,000,000) Dollars for bodily injury, death and property damage liability and (ii) "All-Risk" insurance (including loss of rents for a minimum period of one (1) year) providing for coverage for flood, earthquake (the premium for which shall be reimbursed by Tenant in accordance with subsection (d) below only to the extent the amount is commercially reasonable), windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises and Landlord's Special Improvements) and other insurable improvements in the Shopping Center. Landlord's insurance will not cover Tenant's Property. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant. All policies required to be obtained and maintained by Landlord pursuant to this Section shall provide that any loss shall be made payable to Landlord's institutional fee mortgagee, or if none, to Landlord; all proceeds of such policies shall be disbursed by such party in accordance

57

with the provisions of, and for the purposes set forth in, Section 20 hereof. Landlord shall

provide Tenant with duly executed certificates of all insurance described in this Section.

      (d)     Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the

reasonable insurance premiums for the policies required by subsection (c) above, as part of

Common Areas Charges. If the premiums for Landlord's insurance are increased as a result of

the use or other activity of any other occupant of the Shopping Center, Tenant's Pro Rata Share

shall not include the increased premium. If Landlord receives a dividend, credit, rebate or other

return of a premium (collectively, "Insurance Rebate") for which Tenant has paid a share, Tenant

shall receive Tenant's Pro Rata Share of the Insurance Rebate. For the calendar years in which

this Lease commences and terminates, Tenant's Pro Rata Share of any insurance premium for

such year shall be subject to a pro rata adjustment based on the number of days of said years

during which the Term is in effect. The provisions of this subsection 15(d) shall survive the

expiration or sooner termination of this Lease.

      (e)     Landlord's insurance required hereunder shall not have deductibles

exceeding One Hundred Thousand ($100,000) Dollars without Tenant's prior consent.

      (f)     All insurance required of Landlord and Tenant under this Lease shall be

maintained with insurance companies qualified to do business in the state in which the Shopping

Center is located, and rated at least A-VIII by the most current Best's Key Rating Guide (or its

equivalent, if such Guide ceases to be published). Landlord and Tenant may carry any insurance

under blanket policies covering other property provided the amount of total insurance available

shall be at least the protection equivalent to separate policies in the amount herein required.

Landlord and Tenant shall proceed diligently to have their insurers provide thirty (30) days [ten

58

(10) days in the event of non-payment of premium] Notice of cancellation to the other. During the Term, either party may request from the other duly executed certificates of insurance evidencing the insurance coverage required hereunder.

(g)     The liability insurance requirements under this Section shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. If the parties are unable to mutually agree upon such new limits within thirty (30) days of a written demand by one party upon the other, the determination of an independent insurance advisor selected by the parties' insurance advisors shall be binding upon the parties.

**SECTION 16.     REPAIRS**.

(a)     Except as elsewhere set forth in this Section, Tenant shall at its cost keep the non-structural interior of the Premises, including the plate glass, in good condition and repair, except for ordinary wear and tear, damage by fire or other casualty or eminent domain and any work done by Landlord. Tenant is not responsible for the maintenance or repair of the electrical, plumbing, mechanical and/or other utility systems serving the Premises but located outside thereof (except for the HVAC if located on the roof of the Building and exclusively serving the Premises), nor for any portions of such systems running through, in, under or across the Premises but not exclusively serving the same. Landlord shall provide Tenant with access necessary to perform its repair obligations.

59

(b)      Landlord shall, at its own cost and expense (and not includable in
Common Areas Charges), maintain, repair and replace the following:

(i)      HVAC units not exclusively serving the Premises, and the
electrical, plumbing and/or mechanical systems (x) serving the Premises but located outside
thereof, and (y) any portions thereof running through, in, under or across the Premises but not
exclusively serving the same;

(ii)     non-structural elements of the Premises and the Building damaged
by Landlord, its employees, agents or contractors;

(iii)    structural elements of the Premises, the Building and the Shopping
Center, including without limitation the roof joists, foundation, exterior walls [including the
repainting of the same, if applicable and as required] (except plate glass, storefront windows,
doors, door closure devices, window and door frames, molding, locks and hardware, and painting
or other treatment of interior walls), floor (but not the floor covering unless the same are
damaged as a result of a floor defect or settling), and structural portions of any building of which
the Premises may be a part;

(iv)     the roof, gutters, flashings, downspouts and scuppers;

(v)      the sewer, gas, wiring and public utility connections outside the
Premises; and

(vi)     all utility lines and ducts in or passing through the Premises that
serve other tenants and occupants in the Building and/or the Shopping Center or that are located
outside the Premises but that serve the Premises.

60

(c)    Other than as may be required solely as a result of Landlord's Special Improvements, Landlord shall, at its cost (not to be included in Common Area Charges), make any addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Building or any part thereof, required by Law in effect on or before the Commencement Date or enacted afterwards (such as The Americans with Disabilities Act) that is not required solely due to Tenant's specific use of the Premises.  Any work required solely due to Tenant's specific use and would not otherwise be required shall be made by and at the cost and expense of Tenant. As used in this Lease, the term "Tenant's specific use" shall not refer to general retail use.

(d)    Subsequent to Landlord's Special Improvements, any rebuilding, altering and repairing of structural portions of the Premises shall be made in accordance with plans and specifications approved by Tenant and Landlord.

(e)    Landlord shall have access to the Premises during Tenant's business hours upon at least two (2) days prior Notice (or without such Notice in case of emergency, i.e., posing imminent  material harm to persons or property) for inspection and to make any repairs or replacements required of it to be made; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises.

(f)    If Tenant replaces the HVAC units exclusively serving the Premises during the five (5) year period ending on the expiration or earlier termination of this Lease, then Landlord shall pay to Tenant, upon Tenant's delivery of possession of the Premises to Landlord, the then unamortized cost of such HVAC units determined according to the Internal Revenue

61

Code of the United States. The provisions of this subsection shall survive the expiration or earlier termination of this Lease.

(g)     Any repairs or replacement performed by Landlord shall not materially interfere with the normal conduct of Tenant's business in the Premises. To the extent that any repairs or replacements required of Landlord pursuant to this Section may materially interfere with the normal conduct of Tenant's business in the Premises if performed during Tenant's regular business hours, Landlord shall perform the same solely during the times that Tenant is not open for business.

**SECTION 17.     TENANT DEFAULT.**

(a)     Tenant shall be in default under this Lease ("Event of Default") if (i) Tenant does not pay Rent for a period of ten (10) days after receipt of Notice from Landlord specifying the amount and details of the unpaid Rent, or (ii) Tenant fails to perform or breaches any covenants of this Lease on Tenant's part to be performed, and Tenant does not cure such default within thirty (30) days after receipt of Notice from Landlord specifying the nature of such default. If the default described in this subsection (ii) cannot reasonably be cured within the thirty (30) day period, then same shall not be deemed an Event of Default if Tenant commences to cure the default within the thirty (30) day period and thereafter diligently prosecutes said cure to completion.

(b)     Upon an Event of Default, upon at least ten (10) days' additional Notice to Tenant (and Tenant's continued failure to cure such Event of Default), Landlord may terminate this Lease and all rights of Tenant hereunder by giving Tenant written notice of such election to terminate, and/or shall have shall have all remedies given to it under Law or in equity, including

62

without limitation, those set forth in California Civil Code Sections 1951.2 through 1954.1 and Code of Civil Proc. §§ 1161 et seq. which are hereby incorporated by reference (except that Landlord hereby expressly waives any right of distraint, which may be granted to it by Law). If Landlord terminates the Lease, Landlord may recover the following from Tenant:

(i)      The worth at the time of award of the unpaid Rent which had been earned at the time of such termination;

(ii)     The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

(iii)    the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could reasonably be avoided; and

(iv)     any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease, or which in the ordinary course of things would be likely to result therefrom, provided, however that notwithstanding anything to the contrary set forth in this Section 17 or under applicable Law, in no event shall Tenant be liable to Landlord for any consequential or punitive damages.

As used in the above clauses (i) and (ii), the "worth at the time of award" is computed by allowing interest at the Lease Interest Rate. As used in the above clause (iii), the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%).

63

(c)     Upon an Event of Default, Tenant shall also be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises, the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

(d)     Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after Notice shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period.

(e)     Landlord agrees to use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

(f)     Any Rent to be paid by Tenant which is not paid within ten (10) days after Tenant's receipt of a reminder notice from Landlord shall be subject to liquidated damages (and such amount shall not be deemed a penalty) in the amount of three (3%) percent of the amount past due (provided, however, that such late charge shall not be payable with respect to the first two (2) such late payments during any calendar year).

**SECTION 18.**     **LANDLORD DEFAULT.**  If Landlord fails to make any repairs or do any work required of Landlord by the provisions of this Lease, or if Landlord any time fails to observe or perform any other covenant and agreements to be performed and observed by

64

Landlord hereunder, and Landlord's failure continues for a period of thirty (30) days after Notice

thereof is given by Tenant to Landlord, or, if such failure or default requires more than thirty

(30) days to cure in the exercise of due diligence, unless Landlord commences to cure same

within said thirty (30) day period and thereafter diligently prosecutes the same to completion,

then Tenant, in addition to such other rights and remedies as may be available under this Lease,

or at law or in equity may:

      (a)    if the failure or default materially interferes with the normal conduct of

Tenant's business in the Premises, and is not cured within ten (10) days of receipt of an

additional Notice from Tenant,

      (i)    terminate this Lease and/or (ii) abate all payments of Rent

hereunder until the failure or default has been cured and Tenant is able to conduct its normal

business in the Premises, but in either case without waiving its rights to damages for Landlord's

failure to perform; and/or

      (b)    but shall not be obligated to, make such repairs or perform such work in

accordance with the provisions of this Lease all on behalf of and at the expense of Landlord;

and/or

      (c)    bring suit for the collection of any amounts for which Landlord is in

default, seek injunctive relief, or seek specific performance for any other covenant or agreement

of Landlord, without terminating this Lease; and/or

      (d)    offset against the Rent payable by Tenant hereunder for amounts owed by

Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing such

repairs or work, including costs and attorneys' fees, together with interest thereon at the Lease

65

Interest Rate. Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (i.e., posing imminent material harm to persons or property or material disruption to the normal operation of Tenant's business) shall exist, Tenant may at its election and without prior Notice to Landlord, exercise its rights in accordance with the foregoing subsections (b), (c) and (d) of this Section. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

**SECTION 19.**     **LANDLORD'S ENTRY.**  Landlord may enter the Premises during Tenant's business hours, upon at least forty-eight (48) hours prior Notice to Tenant, to show the Premises to prospective bona-fide purchasers and mortgagees of the Shopping Center. During the last six (6) months of the Term, Landlord may show the Premises to prospective bona-fide tenants. Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises.

**SECTION 20.**       **FIRE AND OTHER CASUALTY**.

(a)     Except as otherwise provided in this Section, if all or a part of the Premises, the Building or the Common Areas in the Shopping Center (the "Primary Restoration") is damaged by fire or other casualty, Landlord shall promptly rebuild and restore same to the condition existing immediately before the fire or other casualty (which restoration shall include Landlord's Special Improvements and leasehold improvements performed by Tenant). If all or a portion of the other building(s) or improvements of the Shopping Center (i.e. not covered by the foregoing Primary Restoration) shall be damaged by fire or other casualty, Landlord shall promptly either (x) rebuild and restore the same to substantially the same or better condition as that existing immediately prior to such fire or other casualty, or (y) raze the remaining portions

66

of such building(s) or improvements and pave such area for parking or landscape in sightly manner (such applicable work being hereinafter referred to as the "Additional Restoration"). The proceeds of the insurance policies required of Landlord pursuant to Section 15 shall, to the extent necessary, be used for the rebuilding and restoration work. If the insurance proceeds are insufficient to complete the work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section. If any part of the Premises is damaged or destroyed, Tenant may require Landlord to change the Premises during, and as part of, such rebuilding or restoration work. However, if the net cost and expense of such rebuilding or restoration work is increased as a result of changes required by Tenant (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount by which the net cost and expense of such rebuilding or restoration work was thereby increased, within fifteen (15) days after Landlord delivers to Tenant documentation in support of such increase in the net cost and expense. Landlord shall not be obligated to rebuild, restore or replace Tenant's Property. If, in Tenant's reasonable judgment, damage to the Premises renders all or any part of the Premises unusable for the conduct of Tenant's business, or in the case of damage to the Shopping Center, materially interferes with the normal conduct of Tenant's business in the Premises, a just proportion of Rent payable hereunder shall be abated, and such abatement shall terminate in accordance with the terms of Section 49 below. If fire or other casualty occurs during the period commencing on the Delivery Date and ending one day prior to the Rent Commencement Date, then, notwithstanding any other provision of this Lease (but subject to the Slack Period provisions set forth in the definition of "Rent Commencement Date" in Section 1 above), the Rent Commencement Date shall be deemed delayed one day for each

67

day which elapses between the occurrence of such fire or other casualty and the date upon which the damaged or destroyed area(s) are fully rebuilt and restored.

(b)     If (i) Landlord does not start the Primary Restoration and the Additional Restoration within one hundred twenty (120) days after the date of damage or destruction or does not diligently pursue the completion of such repair and restoration work, (ii) the Primary Restoration and the Additional Restoration cannot, in the opinion of an independent licensed architect designated by Tenant, be completed by Landlord in accordance with the provisions of this Section within twelve (12) months after the date of damage or destruction, or (iii) the Primary Restoration and the Additional Restoration is not actually Substantially Completed by Landlord within a period of twelve (12) months after the date of damage or destruction (which period may be extended by up to ninety (90) days by reason of Force Majeure), then Tenant may, at its sole discretion and option, to:  (A) with respect to (i) or (iii) above, after giving thirty (30) days prior Notice to Landlord, perform or complete, as the case may be, the Primary Restoration and the Additional Restoration (or any portion thereof) at a cost commercially reasonable at the time, on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days of Tenant's delivery to Landlord of an invoice and reasonably substantiating documents and mechanics lien releases therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Section 20(b),  that at Tenant's election all insurance proceeds payable (or, as applicable, paid) to Landlord or Landlord's mortgagee pursuant to Section 15 hereof shall be paid (or, applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or (B) with respect to (i) or

68

(iii) above, seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or  (C) with respect to (i), (ii) or (iii) above, terminate this Lease by thirty (30) days Notice to Landlord.  The exercise of the rights granted to Tenant herein shall be in furtherance of and not in limitation of any other rights Tenant may have pursuant to this Lease or in law or equity.

(c)    If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, either Landlord or Tenant shall have the right to terminate this Lease as of the date of such damage or destruction by giving Notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Section 3, if available, within ten (10) days after receipt of the termination Notice from Landlord.

**SECTION 21.    EMINENT DOMAIN.**

(a)    If all of the Building or the Premises is taken under the power of eminent domain, this Lease terminates on the effective date of taking without further liability on the part of either Landlord or Tenant except for an adjustment between the parties for the Rent payable by Tenant hereunder.  If:  (i) part of the Building or the Premises is taken under the power of eminent domain so that it is commercially unreasonable for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (ii) as a consequence of any taking under the power of eminent domain,  (A) part of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Building or Premises from other parts of the Shopping Center, or (B) there are no longer

69

1643022 v10

entrances to the Shopping Center from Almaden Expressway, Blossom Hill Road and State Highway 85, and as a result, it is not commercially reasonable for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iii) any part of the Shopping Center is taken that materially interferes with parking, visibility or access to the Building or Premises, and as a result of such taking it is commercially unreasonable for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iv) more than twenty-five percent (25%) of the buildings in the Shopping Center (other than the Building) are taken; then, within sixty (60) days of any such event, Tenant shall have the right to terminate this Lease by giving sixty (60) days Notice to Landlord, in which event this Lease shall so terminate without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for any share of the award for the taking pursuant to (c) below.  After any partial taking of the Premises, the Rent shall be equitably reduced or abated based upon the extent to which the remaining portion of the Premises may, in Tenant's sole but reasonable judgment, be utilized for its normal conduct of business.

(b)     If Tenant does not have the right to terminate this Lease or, having such right, elects not to exercise the same, Landlord, at its own cost and expense, shall within a reasonable time, repair any part of the Shopping Center, Common Areas, Building or Premises damaged by the taking, similar in physical appearance to the condition  immediately before the taking, pursuant to plans and specifications approved by Tenant (which shall include Landlord's Special Improvements and leasehold improvements performed by Tenant).  During the period of said repairs and restoration, Rent shall abate to the extent that the Premises may not, in Tenant's

70

reasonable judgment, be used by Tenant for the normal conduct of its business. The abatement shall terminate in accordance with the terms of Section 49 below.

        (c)      Tenant may claim an award for the unamortized cost of Tenant's Work in excess of any portion of the Tenant Allowance actually paid to Tenant, loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; but no award to Tenant shall reduce the award payable to Landlord.

        (d)      Notwithstanding the foregoing, if (i) five (5%) percent or more of the parking spaces shown on Exhibit B shall be taken under the power of eminent domain, or (ii) if any parking is taken within the Critical Area, or (iii) if so many of the parking spaces within the Shopping Center are so taken such that there are less than either (i) the number of parking spaces required by law, or (ii) four (4) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, then Tenant shall have the right to terminate this Lease in the same manner and with the same effect as set forth in subsection (a) above.

        (e)      Any dispute between the parties with respect to this Section 21 shall be resolved by arbitration in accordance with the provisions of Section 51 below.

        **SECTION 22.**      **EXCLUSIVE IN CENTER**.

Tenant's Exclusive.    To induce Tenant to execute this Lease, Landlord covenants and agrees that:

        (i)      Subject to fully executed and delivered leases in effect on the Commencement Date with the tenants listed on Exhibit K-2 hereof, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or in any Related Land to be

occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the
sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items
contained in any of the following respective categories of merchandise: (a) infant, juvenile and
children's furniture (including, without limitation, cribs and beds [including, without limitation,
mattresses and bedding]; changing tables; bedding; gliders, rockers (including coordinating
ottomans); high chairs; walkers; play yards and play pens; car seats and booster seats; cradles;
carriages and strollers; toy and clothing chests; swings; or any other furniture or furnishings
similar to the foregoing enumerated items) (collectively, *"**Restricted Furniture**"*); (b) clothing,
layettes, apparel, shoes and/or accessories for infants, juveniles and children 0-4 years in age
(collectively, *"**Restricted Clothing**"*); and (c) merchandise and products for use by infants,
juveniles and children 0-4 years in age (including, without limitation, toys; books; food; formula;
indoor and/or outdoor play and recreational equipment; audio and video cassettes or equipment;
safety items; feeding items; health and beauty care items; drug remedies; diapers; wipes;
bathroom items (including, without limitation, personal care devices and other bathroom
appliances, accessories and toiletries)) (collectively, *"**Restricted Products**"*) (which items in
clauses (a), (b) and (c) above, either singly or in any combination, are hereinafter referred to as
the *"**Exclusive Items**"*).  Notwithstanding the foregoing, any tenant or subtenant in the Shopping
Center shall have the right to utilize its respective premises for the sale, rental and/or distribution
of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle
space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five
percent (5%) of the Floor Area of any tenant or subtenant occupying in excess of six thousand
(6,000) square feet of Floor Area or ten percent (10%) of the Floor Area of any tenant or
subtenant occupying six thousand (6,000) square feet of Floor Area or less, or (y) two thousand
(2,000) square feet of Floor Area within such tenant's or subtenant's premises, provided that in no

72

event shall any tenant or subtenant have the right to use more than one thousand (1,000) square feet of Floor Area for the sale of Restricted Furniture. For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed five hundred (500) square feet. Notwithstanding the foregoing reference to "fully executed and delivered leases in effect on the date hereof," Landlord hereby agrees that current tenants of the Shopping Center (and current or future assignees or sublessees of such current tenants) shall nevertheless be subject to the restrictions contained in this Section in the event that the lease between Landlord and any such tenant requires Landlord's consent to any assignment or sublet or requires Landlord's consent in order to permit a change in the use of the applicable premises so as to allow for the sale, rental or distribution of the Exclusive Items, provided that the applicable lease provides that Landlord's consent to such assignment or sublet or change in use may be withheld by Landlord in its sole and absolute discretion.

(ii)     The exclusive rights granted to Tenant with respect to any respective category listed in this Section shall be conditioned upon Tenant using parts of the Premises for the sale, rental or distribution of items contained in such category (other than during Excused Periods and for periods of time not exceeding six (6) consecutive months). The exclusive rights granted to Tenant in this Section shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least ten thousand (10,000) square feet of the Premises, but only if the primary business of the assignee or sublessee is the sale of the Exclusive Items and subject to the limitations herein; and

73

1643022 v10

(iii)     Upon breach of the aforesaid covenant and agreement by Landlord

(which breach shall not include a situation in which Landlord has included in the lease between

Landlord and any tenant in the Shopping Center or in the Related Land a provision which

effectuates the exclusive rights granted to Tenant in this Section and, despite such inclusion, such

tenant has violated the exclusive rights granted to Tenant in this Section), the Rent payable

hereunder shall be reduced by fifty percent (50%) for so long as such violation shall be

continuing and Tenant shall have all remedies given to it at law and in equity, including, without

limitation, the right: to obtain injunctive relief, and/or to terminate this Lease, and/or to

commence and prosecute an action against Landlord for damages. If any person or entity other

than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in

writing to Landlord that it intends to violate any of said provisions, Tenant may promptly

commence appropriate legal proceedings and vigorously prosecute the same, at Landlord's

expense, to enjoin and prohibit any such violation. Tenant shall have the right (a) to conduct and

prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in

its own name, but at Landlord's expense, or (b) in the event the right set forth in (a) above is not

permitted to be exercised under applicable law, to conduct and prosecute such legal proceedings

in the name of Landlord, at Landlord's expense, and Landlord agrees to cooperate with Tenant

with respect to such prosecution (including, without limitation, by executing any documentation

or authorization reasonably required by Tenant in connection with such prosecution and by

appearing at any hearing or trial with respect to such prosecution).

(iv)     Tenant shall honor the exclusives granted by Landlord to other

tenants in the Shopping Center under leases executed before or within six (6) months after the

Commencement Date ("Existing Exclusives") but only if and to the extent such exclusives are

74

1643022 v10

listed on Exhibit K-1. If the lease containing an exclusive listed on Exhibit K-1 is not signed

within six (6) months after the Commencement Date, such exclusive shall not be binding upon

Tenant. Tenant shall not sublease, occupy, license or use the Premises (or any applicable portion

of the Premises), or permit the Premises (or, any applicable portion of the Premises) to be

subleased, occupied, licensed or used, whether by Tenant or any sublessee, assignee, licensee or

other occupant, in violation of any Existing Exclusive (except as may be specifically set forth on

Exhibit K-1). If any Existing Exclusive exists at the Shopping Center other than those listed on

Exhibit K-1, then, without limiting any rights or remedies then available to Tenant at law, in

equity or under this Lease, Landlord agrees to indemnify, defend and hold Tenant harmless from

and against all loss, cost, liability or expense (including, without limitation, reasonable legal

fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted

Existing Exclusive. In addition, Tenant shall be entitled to enter into a separate agreement with

any tenant or other occupant of the Shopping Center which deletes or modifies the corresponding

Existing Exclusive with regard to the Premises. Tenant shall give Landlord a copy of any such

agreement promptly following the full execution of such agreement.

**SECTION 23.**      **RIGHT TO MORTGAGE AND NON-DISTURBANCE.**

Landlord may subject and subordinate this Lease to the lien of any deed of trust now or hereafter

encumbering all or any part of the Shopping Center, and to any ground or underlying leases

encumbering all or any part of the Shopping Center. Each holder of any deed of trust shall

execute and deliver to Tenant an agreement, in recordable form, in the form of Exhibit G hereto

("SNDA"), or in such other form reasonably acceptable to the parties provided that such

alternate form includes the following:   (i) no default by Landlord under any such lien shall affect

Tenant's rights under this Lease so long as Tenant is not then in default of such obligations

75

beyond the applicable notice and grace periods provided herein; (ii) Tenant will not be named as

a party in any foreclosure or other proceedings with respect to any such lien; and (iii) the holder

of any such lien agrees that the insurance proceeds resulting from any fire or other casualty and

the proceeds payable from any taking by eminent domain will be made available for restoration

of the Premises, Building and Shopping Center to the extent provided in this Lease. Any

landlord under such ground or underlying lease shall execute and deliver to Tenant a recognition

agreement ("RNDA") in a form reasonably satisfactory to Tenant (and, as may be required,

consented to by the holder of any deed of trust or other existing lien), which shall include the

following provisions: (i) the landlord under the ground or underlying lease will not, in the

exercise of any of the rights arising or which may arise out of such lease, disturb or deprive

Tenant in or of its possession or its rights to possession of the Premises or of any right or

privilege granted to or inuring to the benefit of Tenant under this Lease, provided that an uncured

Event of Default does not then exist under this Lease; (ii) in the event of the termination of the

ground or underlying lease, Tenant will not be made a party in any removal or eviction action or

proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of

the Premises, and this Lease shall continue in full force and effect as a direct lease between such

landlord and Tenant for the remainder of the Term and on the same terms and conditions as

contained herein, without the necessity of executing a new lease; (iii) Landlord and Tenant shall

have the right to execute any amendment to this Lease which is specifically required hereunder

and the landlord under such ground or underlying lease shall recognize and be bound thereto;

and (iv) with respect to Tenant's reporting of Gross Sales to the Fee Owner as provided in

Section 4(d)(iii) hereof, Fee Owner agrees to be bound by the confidentiality requirements set

forth in Section 4(d)(iv) hereof.

76

**SECTION 24.**    **TENANT ASSIGNMENT AND SUBLETTING**.

(a)    (i)    Tenant may, from time to time, without the consent of Landlord, assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises provided that the Premises shall be used for retail-type purposes, or office and storage space provided same is incidental to such retail-type use.

(ii)    Except with respect to an assignment of this Lease to (a) an Affiliate of Tenant or (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates or (c) to any entity in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s), or (d) to any entity as may be required by Law, or (e) to any entity in conjunction with any transaction covered under Section 24(d) below, in the event Tenant proposes to assign this Lease or sublet any portion of the Premises, it shall first give notice thereof (the "***Assignment/Subletting Notice***") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of Tenant's Work in excess of any portion of the Tenant Allowance actually paid to Tenant and any alterations performed by Tenant to the Premises. Tenant agrees to provide Landlord with reasonable substantiation of Tenant's unamortized costs of Tenant's Work and any alterations performed by Tenant to the Premises within a reasonable period of time following Landlord's request. Following Tenant's issuance of the Assignment/Subletting Notice, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

77

(A)     giving notice to Tenant (the "***Termination Notice***") thereof within fifteen (15) business days after receipt of an Assignment/Subletting Notice from Tenant, and

(B)     paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises as of the Termination Date as set forth below less any amounts paid by Landlord to Tenant for tenant improvements including, without limitation, the Tenant Allowance set forth in Section 5(a)(vii), in which event this Lease shall automatically terminate on the ninetieth (90th) day (the "***Termination Date***") after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the "***Rescission Notice***"), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the

78

Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the

Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed

to have waived its termination rights hereunder with respect to such proposed assignment or

subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in

accordance with its Assignment/Subletting Notice.

(b)     No assignment, subletting, licensing or concessioning by Tenant shall

reduce, diminish, or otherwise affect the liability of Tenant hereunder.

(c)     All assignees, sublessees, licensees and concessionaires shall be permitted

to use the Premises (or the applicable portion thereof) for any retail purpose not specifically

prohibited by the provisions of Section 7(c) of this Lease. Landlord hereby acknowledges that

any sublessee of all or any portion of the Premises shall, subject to Tenant's prior written

approval, be entitled to all of the rights and benefits available to Tenant pursuant to the terms of

this Lease.

(d)     Tenant may collaterally assign Tenant's interest in this Lease to one or

more Institutional Lenders, as collateral security for an indebtedness or other obligation of

Tenant or any affiliated entity. Landlord shall execute all documentation reasonably requested

by Tenant in connection therewith.

(e)     If Tenant assigns Tenant's interest in this Lease, then if Landlord gives

Notice of any default, Landlord shall also give Notice to Original Tenant. No Notice of default

shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have

the same period after Notice to cure the default as is given to Tenant under this Lease. If this

Lease terminates because of an Event of Default of an assignee, Landlord shall give to Original

79

Tenant Notice thereof; and Original Tenant may cure any such Event of Default within ten (10) days of receipt of Notice (but only if such Event of Default is of a monetary nature or is otherwise reasonably susceptible of cure by Original Tenant, and, if such is not the case, Original Tenant shall not be obligated to cure such Event of Default as a condition to the exercise by Original Tenant of Original Tenant's rights set forth in this subsection (e)) and become Tenant under a new lease for the remainder of the Term of this Lease (including any Renewal Periods) upon all of the terms and conditions as then remain under this Lease. In the event this Lease is terminated as a result of a bankruptcy filing by said assignee or any future assignee which results in such assignee's rejection of tenant's leasehold interest in this Lease, then, upon Tenant's curing of such assignee's Event of Default as set forth above, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).

(f)     If Tenant subleases all or a portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

**SECTION 25.**     **NOTICE.**  Whenever notice is required or permitted by this Lease, it shall be a written notice sent by (a) certified mail, return receipt requested, or (b) Federal Express or other overnight delivery service with charges prepaid and with a receipt for any delivery, addressed as follows ("Notice"):

If to Landlord:     C. K. Kwan, President
                    Joshua Kwan, Managing Director
                    Brothers International Corporation
                    100 Bush Street, Suite 210

1643022 v10

San Francisco, CA 94104

With a copy to:   Timothy F. Downey, General Manager
Almaden Plaza Shopping Center
5353 Almaden Expressway, Suite 49
San Jose, CA 95118

and

Stephen L. Porter
Whitehead & Porter LLC
220 Montgomery Street, Suite 1850
San Francisco, California 94104

If to Tenant:   Buy Buy Baby, Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Mr. Eugene A. Castagna, President

With a copy to:   Allan N. Rauch, Esq.
Buy Buy Baby, Inc.
650 Liberty Avenue
Union, NJ 07083

and

Margaret F. Black, Esq.
Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, NJ 07102

Landlord or Tenant may designate any other person or address specified by Notice to the other party. Notice is effective on receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at 650 Liberty Avenue, Union, New Jersey 07083: (A) all bills, Notices (but not Notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 6(c) of this Lease, and (B) all budgetary information,

81

1643022 v10

Notices (but not Notices of default), statements, bills and related information pertaining to

Tenant's Pro Rata Share of Common Areas Charges as described in Section 13(c) of this Lease.

      **SECTION 26.**      **SHORT FORM LEASE.**  If requested by Tenant, Landlord shall

execute a memorandum for recording in the form attached hereto as Exhibit M.  In no event shall

the amount of Fixed Rent reserved hereunder be included in any such short form lease or

memorandum.  At the expiration of the Term or earlier termination of this Lease and on request

of Landlord, Tenant will execute a quit claim deed discharging the memorandum.

      **SECTION 27.**      **ENTIRE AGREEMENT AND MODIFICATION.**  This Lease

constitutes the entire agreement of Landlord and Tenant.  All prior agreements of Landlord and

Tenant, whether written or oral, are merged herein and are of no force and effect.  This Lease

cannot be changed, modified or discharged except by an agreement in writing, signed by

Landlord and Tenant.

      **SECTION 28.**      **SEVERABILITY.**  If any part of this Lease is held to be invalid,

void or unenforceable, by a court of competent jurisdiction, the remainder of the Lease shall

remain in full force and effect and shall not be affected, impaired, or invalidated.

      **SECTION 29.**      **GRAMMATICAL USAGES AND CONSTRUCTION.**  In this

Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice

versa, and plural terms shall be substituted for singular and singular for plural in any place in

which the context so requires.  This Lease shall be construed without regard to who drafted any

provision.  Any rule or construction that a document is to be construed against the drafting party

does not apply to this Lease.

**SECTION 30.**      **TABLE OF CONTENTS, LINE NUMBERING AND**

**PARAGRAPH HEADINGS.**  The table of contents and line numbering, if any, and section

headings are for convenience and do not define, limit or describe the scope or intent of this

Lease, nor in any way affect this Lease.

**SECTION 31.**      **NO JOINT VENTURE OR PARTNERSHIP CREATED BY**

**LEASE.**  This Lease does not create a principal and agent relationship or a partnership or joint

venture between the parties.

**SECTION 32.**      **BROKER'S COMMISSION.**  Landlord and Tenant warrant and

represent to the other that they did not deal with any real estate broker concerning this Lease,

except for the Broker.  Landlord shall pay Broker a commission pursuant to a separate

agreement.  Landlord and Tenant shall indemnify, defend, and save the other harmless from and

against any and all liabilities, costs, causes of action, damages and expenses, including, without

limitation, attorneys' fees concerning any claims made by any real estate broker, agent or finder

with respect to this Lease in breach of the foregoing representation.  The provisions of this

Section 32 shall survive the expiration or earlier termination of this Lease.

**SECTION 33.**      **RIGHTS CUMULATIVE; DEFINITION OF LANDLORD.**

Unless expressly provided to the contrary in this Lease, each and every one of the rights,

remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of

any other such rights, remedies and benefits allowed by Law.  If Landlord transfers its interest in

the Shopping Center, it shall be released and discharged from all covenants and obligations of

Landlord thereafter accruing, except (a) claims made by Tenant against Landlord at any time

relating to events occurring prior to the effective date of the transfer of such ownership interest,

83

and/or (b) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest.

**SECTION 34.** **NON-WAIVER.** The failure of Landlord or Tenant to enforce any provision, covenant or condition of this Lease shall never be deemed a waiver.

**SECTION 35.** **LIMITATION OF LANDLORD'S LIABILITY.** Except with respect to any insurance proceeds or condemnation awards received by Landlord that are required, by this Lease, to be applied to the repair or restoration of the Premises , the Building or the Shopping Center, Tenant shall look only to Landlord's estate and property in the Shopping Center (or the proceeds thereof, if any) and income derived from the Shopping Center, if any, for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process). No other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure to satisfy Tenant's remedies under this Lease.

**SECTION 36.** **SURRENDER OF PREMISES.** At the expiration of the Term or earlier termination of this Lease, Tenant will surrender the Premises in as good a condition as received (which shall include, if applicable, repair necessitated by Tenant's removal of Tenant's Property), reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder excepted. Landlord shall have the right, upon prior written notice to Tenant given at least thirty (30) days prior to the end of the Term, to require Tenant to remove Tenant's Property from the Premises at the expiration of the Term.

84

**SECTION 37.**        **SUCCESSORS AND ASSIGNS.**  This Lease binds and inures to

the benefit of Landlord and Tenant and their respective heirs, executors, administrators,

successors and assigns.

**SECTION 38.**        **FORCE MAJEURE.**  Except as may be otherwise expressly set

forth herein, if Landlord or Tenant is delayed, hindered, or prevented from, performing any act

required hereunder by reason of Force Majeure, then the performance of the act shall be excused

for the period of the delay.

**SECTION 39.**        **HOLD OVER.**  If Tenant holds over at the end of the Term, and

unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the

Term, Tenant shall be a tenant from month to month and the Fixed Rent shall be one hundred

twenty-five (125%) percent of the amount payable for the month immediately preceding the last

day of the Term.

**SECTION 40.**        **CONSENTS.**  Except as provided in this Lease, whenever

Landlord or Tenant is required to secure the consent or approval of the other, such consent or

approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned.  In

all matters contained in this Lease, both parties shall have an implied obligation of

reasonableness.

**SECTION 41.**        **DECLARATION OF CONTRACTUAL LIABILITY.**  If either

party consists of more than one person, then the persons constituting such party shall be jointly

and severally liable hereunder.

**SECTION 42.**        **QUIET ENJOYMENT.**  Provided an uncured Event of Default

does not then exist under this Lease, Tenant shall peaceably and quietly have, hold, occupy and

85

enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

**SECTION 43.** **ESTOPPEL CERTIFICATE**. Following Notice by Landlord or Tenant, the other within thirty (30) days following the Notice, shall execute and deliver, without charge, a written statement: (a) ratifying this Lease; (b) certifying, to the best of such party's knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (c) certifying, to the best of such party's knowledge, that all conditions and agreements under this Lease to be satisfied and performed have been satisfied and performed, except as shall be stated; (d) reciting the amount of advance Rent, if any, paid by Tenant and the date to which Rent has been paid; and (e) certifying to such other matters as the requesting party may reasonably require.

**SECTION 44.** **COSTS.** Whenever this Lease requires the performance of an act by either party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

**SECTION 45.** **GOVERNING LAW.** This Lease shall be governed by California Law.

**SECTION 46.** **ATTORNEYS' FEES.** In any action or proceeding hereunder, the prevailing party shall be entitled to recover its reasonable costs and expenses, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other, then the party who has violated the covenant or warranty shall pay the reasonable

86

costs and expenses in such action or proceeding against the non-violating party, including

reasonable attorneys' fees, costs and expenses.

**SECTION 47.**    **PROTEST.**  Any time a dispute shall arise concerning money to

be paid or work to be performed, Landlord or Tenant may make payment or perform the Work

"under protest", which shall not be regarded as voluntary payment or performance, and such

party shall retain its right to institute suit for the recovery thereof.

**SECTION 48.**    **CONDUCT OF BUSINESS OPERATIONS.**  Subject to the

provisions of this Lease, Tenant shall open the Premises for business to the public for at least one

(1) day as a typical buybuyBaby store no later than one hundred twenty (120) days after the Rent

Commencement Date (which date shall be extended by reason of (A) damage or destruction,

eminent domain or Force Majeure, or (B) any act or omission of Landlord).  After initial

opening, Tenant is not required to open or operate any business in the Premises and may refuse

to conduct any business in the Premises, and Tenant shall not thereby incur any liability to

Landlord.  However, all of Tenant's obligations under this Lease shall continue unless terminated

as permitted below in this Section.  If Tenant does not operate any business for more than 365

consecutive days (excluding Excused Periods and prior to the Rent Commencement Date),

Landlord may, following Notice to Tenant given at any time within ninety (90) days after such

365 day period, cancel this Lease, in which case this Lease shall terminate upon the date which is

one hundred eighty (180) days after the date on which Tenant receives Landlord's termination

Notice, and Tenant shall be released from any and all liabilities thereafter accruing.  However,

Tenant may within ten (10) days after receipt of such termination Notice, give Landlord Notice

("Section 48 Rescission Notice") of its intention to open the Premises for business within sixty

87

(60) days after delivery of the Section 48 Rescission Notice, in which event the termination

Notice previously given by Landlord shall be deemed void.

**SECTION 49.**    **ABATEMENT OF RENT CHARGES.**    Notwithstanding any

other provisions of this Lease, if Fixed Rent and Additional Rent shall be abated pursuant to

Sections 20 or 21 above, the abatement shall end on the earlier to occur of: (a) the date when

Tenant reopens the Premises to the public for business; or (b) the expiration of sixty (60) days

after Landlord completes such repair and restoration work that Landlord is obligated to perform

hereunder and the interference with the operation of business in the Premises has ceased.

**SECTION 50.**    **WARRANTIES AND REPRESENTATIONS.**

To induce Tenant to execute this Lease, and in consideration thereof, Landlord warrants,

represents and covenants to Tenant that:

(a)    As of the date hereof, Landlord has good and marketable fee title to that

part of the Shopping Center identified as Parcel Four, Parcel Five, Parcel Six, Parcel Seven, and

Parcel Eight on Exhibit A and subleasehold title to that part of the Shopping Center identified as

Parcel One, Parcel Two and Parcel Three on Exhibit A under the Sublease, in all instances free

and clear of all easements, restrictions, liens, encumbrances, leases and the like, except the

Permitted Encumbrances described on Exhibit E, and various utility easements.  Landlord

represents, warrants and covenants to Tenant that such utility easements shall not adversely

affect Tenant's use and enjoyment of the Premises, Building or Shopping Center;

(b)    Tenant's use of the Premises for sale of Permitted Items will not violate

any exclusive provision or prohibited use restriction granted any tenant in the Shopping Center;

88

(c)     The Shopping Center has, and shall, on the Delivery Date, have access to State Highway 85, Almaden Expressway and Blossom Hill Road for vehicular traffic;

(d)     Except as required by Law, Landlord shall not reveal to anyone the Term of this Lease or the other business terms of this Lease (including, without limitation, the amount of Fixed Rent). The foregoing shall not apply if the information is contained in the memorandum of lease. Landlord shall use commercially reasonable efforts to cause the Broker to abide by this provision. Nothing contained herein restricts Landlord from disclosing such information to its accountants, attorneys, agents or other consultants, any bona-fide prospective purchasers of the Shopping Center or any current or prospective mortgagees or ground lessors of all or any portion of Landlord's interest in the Shopping Center;

(e)     This Lease does not violate any instrument previously executed by Landlord or binding upon the Shopping Center, and no rights granted by Landlord to Tenant in this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(f)     Annexed hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases ("Existing Leases") in effect on the date hereof with respect to the Shopping Center; and

(g)     Simultaneously with the execution and delivery of this Lease, Landlord shall deliver to Tenant (x) an agreement substantially in the form of Exhibit G hereto executed by each holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof and in form suitable for recording, and (y) an

89

agreement in the form and content described in Section 23 hereof executed by the landlord under any ground, underlying lease and any sublease lease of any level encumbering or affecting all or any part of the Shopping Center (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid) and in form suitable for recording. Should Landlord fail to so deliver each such document in the aforesaid manner, simultaneously with the execution and delivery of this Lease, then Tenant shall have the right by Notice to Landlord to terminate this Lease as of the date specified in said Notice, in which event neither party shall have any further liability hereunder [other than as set forth in Section 32 above] except that Landlord shall be obligated to promptly reimburse Tenant for all its costs, damages and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Landlord's Special Improvements. The provisions of this Section 50(g) shall be in addition to, and not in limitation of, Section 23 of this Lease.

(h)     Notwithstanding Section 14 of the Sublease to the contrary, the interest of Landlord (successor in interest to Chrysler Realty Corporation), as lessor, and Landlord (as successor in interest to Brothers International Corporation, the successor in interest to Carter Hawley Hale Stores Inc.), as lessee, under that certain Lease, dated December 19, 1974, as amended to date  (as amended, the "Sub-sublease") with respect to the demise of the Building , have merged and the Sub-sublease is null and void and of no further force and effect.

(i)     Neither Fee Owner (as defined in Section 1), Landlord nor any Affiliate is in default under the Ground Lease or the Sublease, as the case may be, and no act has occurred that with the passage of time or the giving of notice would constitute a default under the Ground Lease or the Sublease. During the Term, Landlord shall perform or caused to be performed all

90

obligations of Landlord, and the Affiliate under the Ground Lease and the Sublease, to the extent that either is in force. Landlord agrees to defend, indemnify and hold Tenant harmless from and against any and all claims, demands, causes of action, suits, damages, liabilities, of any nature whatsoever arising out of or in connection with the enforcement of, or claimed breach of the Ground Lease and the Sublease. Whenever any consent shall be required or requested from Landlord or the Affiliate under the Ground Lease or the Sublease, or an election made by Landlord or the Affiliate under the Ground Lease or the Sublease, such approval or election shall not be granted or made without the prior written consent of Tenant if such consent or election would adversely affect Tenant or Tenant's rights under this Lease. Neither Landlord nor the Affiliate shall amend, modify or terminate the Ground Lease nor the Sublease without the prior written consent of Tenant if such amendment, modification or termination would adversely affect Tenant or Tenant's rights under this Lease. Neither Landlord nor any Affiliate is in default under the CCR Agreement, and no act has occurred that with the passage of time or the giving of notice would constitute a default under the CCR Agreement. During the Term, Landlord and its Affiliates shall perform all obligations of Landlord and its Affiliates under the CCR Agreement. Neither Landlord nor its Affiliates shall amend, modify or terminate the CCR Agreement without the prior written consent of Tenant if such amendment, modification or termination would adversely affect Tenant or Tenant's rights under this Lease.

        (j)      The "Main Driveways" and "Protected Areas", each as defined in the Covenants, Conditions and Restrictions Agreement, dated August 30, 1995, between the Price Company, Brothers International and Edgewater Holding Corporation (the "CCR Agreement"), do not affect the Premises, the Building or Tenant's rights, benefits and remedies hereunder, or otherwise increase Tenant's obligations under this Lease.

<div align="center">91</div>

(k)     Other than the Fee Owner and Institutional Lender, no third party consents

or approvals are required in order for Landlord to enter into this Lease, or for the performance of

Tenant's Work (excluding, as of the Commencement Date, governmental permits and

approvals).

**SECTION 51.     ARBITRATION.**

(a)     When this Lease provides for arbitration (but not otherwise), the

arbitration shall be in Santa Clara County, California, before one arbitrator in accordance with

the procedural rules of the American Arbitration Association or any successor thereto, or with

the consent of both parties, pursuant to Code of Civil Procedure § 1280 and following.  The

decision of the arbitrator shall be final, but the powers of the arbitrator are hereby expressly

limited to the determination of factual issues.  The arbitrator shall have no power to reform,

supplement or modify this Lease.  The arbitrator shall make only required findings of fact

incident to the dispute, which shall be in writing.

(b)     Landlord and Tenant shall share equally in the cost and expenses of such

arbitration. Each shall separately pay its own attorneys' fees and expenses, unless the arbitrator

finds that Landlord or Tenant did not act in good faith, in which case the arbitrator may award all

or part of said costs, expenses and fees to the other party.

**SECTION 52.     LIENS.**  Within thirty (30) days after Notice of the filing thereof,

Tenant shall discharge (either by payment, bond, or otherwise) any lien against the Shopping

Center, Building or Premises that arises out of any payment due for, or purported to be due for,

any labor, services, materials, supplies or equipment alleged to have been furnished to or for

Tenant in, upon or about the Premises, including Landlord's Special Improvements.  Bed Bath &

92

Beyond Inc. agrees to indemnify and hold harmless Landlord from any loss, payment, claim or expense as a result of any such liens, including, without limitation, Landlord's reasonable attorneys' fees and costs. Similarly, within thirty (30) days after Notice of the filing thereof, Landlord shall discharge (either by payment, bond, or otherwise) any lien against the Premises that arises out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

**SECTION 53.** **DEFINITION OF HEREUNDER, HEREIN, ETC.** Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section or paragraph hereof.

**SECTION 54.** **TENANT'S PROPERTY**.

(a) All of Tenant's Property which may be installed or placed in or upon the Premises remains the property of Tenant. Landlord waives any right it may have in Tenant's Property. Tenant may assign, lien, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term, including at the expiration of the Term. Following Notice from Tenant, Landlord shall provide Tenant, within ten (10) days of Notice, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

(b)     To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives and agrees not to assert such lien or security interest.

(c)     Upon the expiration or earlier termination of this Lease, Tenant shall have the right (but not the obligation unless otherwise required pursuant to Section 36) to remove all or part of Tenant's Property from the Premises.

**SECTION 55.        TENANT'S RIGHT OF FIRST OFFER.**  Provided no uncured Event of Default exists under this Lease, Tenant may offer to lease additional space in the Building which may become available on and after the Commencement Date. If and when Landlord knows that space ("Offered Space") is or will be available, Landlord will give Tenant Notice (the "Offering Notice") of the terms Landlord will accept for the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area). If the Offering Notice states "NOTE, YOU HAVE FIFTEEN (15) DAYS TO RESPOND TO THIS OFFER," then Tenant shall have fifteen (15) days from receipt to respond to the Offering Notice. If Tenant accepts Landlord's offer, Tenant shall give Notice to Landlord and Landlord and Tenant shall enter into an amendment to this Lease for the Offered Space. The amendment shall contain  the terms and conditions set forth in the Offering Notice,  provide that the term shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 3), and  contain such other terms as either Landlord or Tenant may reasonably require.  Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first

94

1643022 v10

offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant. The term "substantially", as used herein, shall mean terms not materially different or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant. Any dispute regarding this Section 55 shall be resolved by arbitration in accordance with the provisions of Section 51 above.

**SECTION 56.** **LIMITATION OF TENANT'S LIABILITY**. Landlord and its successors and assigns shall have recourse only to the assets, if any, of Tenant and its successors and assigns, for any claim arising under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any Affiliate, subsidiary or related entity.

**SECTION 57.** **TENANT'S RIGHT OF TERMINATION**. If, at any time during the Term of this Lease any three of Costco, Barnes & Noble, Ross and TJ Maxx & More are not open and operating for retail purposes in the Shopping Center (i.e., less than three such Inducement Tenants are open and operating), and/or if at any time during the Term less than sixty-five percent (65%) of the gross leasable area of the Shopping Center (excluding the Premises and the premises leased by Costco, Barnes & Noble, Ross and TJ Maxx & More) is open and operating for retail purposes by national or regional tenants of the type typically found in first class Shopping Centers located in Santa Clara County, California, then Tenant may, in either instance, following Notice to Landlord:

(i)      If such condition continues for a period in excess of twelve (12) months, terminate this Lease, in which case this Lease shall terminate not earlier than the date that is sixty (60) days after the date of Tenant's Notice, and after such termination neither party shall have further liability to the other (except for those matters that expressly survive termination); and/or

(ii)      Immediately (and without diminishing Tenant's right to thereafter proceed under clause (i) above) discontinue paying Fixed Rent and Percentage Rent hereunder and, in lieu thereof, pay only Slack Rent.

**SECTION 58.**      **SURVIVAL OF OBLIGATIONS**. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or sooner termination of this Lease.

**SECTION 59.**      **ENVIRONMENTAL MATTERS**.

(a)      Definitions.

(i)      "Environmental Laws" means any Law concerning the protection of the environment, human health or safety.

(ii)      "Hazardous Substances" means each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law.

96

1643022 v10

(iii)    "Environmental Notice" means a summons, citation, directive, order, claim, Notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (A) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (B) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (C) any underground storage tanks on the Building or the Shopping Center.

(iv)    "Releasing" or "Release" means releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements.

(v)    "Compliance Costs" means consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(vi)    "Tenant Related Parties" means Tenant's agents, servants, employees, contractors or licensees.

(b)    Compliance with Environmental Laws.

97

Tenant shall comply with all the requirements of Environmental Laws governing its use of, possession and operations at, the Shopping Center, the Building and the Premises. Landlord shall comply with all the requirements of Environmental Laws relating to the Shopping Center, the Building and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

        (c)    Responsibility for Releases of Hazardous Substances.

Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises, the Building or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter "Tenant Releases"), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises, the Building or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Notwithstanding anything to the contrary in this Lease, if any Hazardous Substances are found in or on the Premises (including, without limitation, in the roof system thereof) or the Shopping Center which pre-date the Delivery Date, then Landlord shall promptly remove the same in compliance with all applicable laws at Landlord's sole cost and expense, subject to any rights it may have of indemnity against or contribution from third parties, and, to the extent such work delays Tenant's Work, then the Rent Commencement Date and the date on which Tenant is required to open for business under Section 48 hereof shall be delayed on a day for day basis for each day of such delay, and Landlord shall reimburse Tenant for any and all reasonable costs incurred by Tenant in connection with such delay. Except in the event of an emergency, any work performed by

98

1643022 v10

Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to: (A) not adversely affect ingress to or egress from the Shopping Center, (B) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (C) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises.

        (d)     Standards. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

        (e)     Landlord's Representations and Warranties.

        Landlord represents and warrants that:

        (i)     Landlord has received no Environmental Notices;

        (ii)     Landlord has no knowledge of, and has received no Notice of, any violation, or potential or alleged violation, of any governmental law, rule, statute, ordinance or regulation, including without limitation Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and

        (iii)     To the best of Landlord's knowledge, other than as set forth in the (x) Phase I Environmental Assessment Report, dated June 22, 1995 and prepared by Kleinfelder Inc., regarding the Shopping Center, and (y) that certain Asbestos Notice, dated as of April 8, 1999 prepared by Landlord regarding the Building: (A) no Hazardous Substances are located at,

99

on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises. Notwithstanding the foregoing, Landlord shall be solely liable for the existence and removal of all asbestos in and from the Premises and the ducts, chases and equipment serving the Premises.

(f)     Documents.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

(g)     Indemnity.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Environmental Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 59; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 59; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 59.

(h)     Survival.  The obligations of the parties under this Section 59 shall survive the renewal, expiration, breach or earlier termination of this Lease.

(i)      Conflict.  In the event of any conflict between the provisions of this Section 59 and any other provision of this Lease, the provisions of this Section 59 shall control.

**SECTION 60.         EXECUTION OF THIS LEASE**.  Tenant and Landlord each warrant and represent that the parties signing this Lease for each has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to this Lease.  This Lease is binding only

1643022 v10

when fully executed by Tenant and Landlord. This Lease may be executed in counterparts, each of which when taken together shall be deemed one and the same original.

**SECTION 61.**     **TENANT'S TRADENAME**. Landlord shall not make use of Tenant's tradename [*i.e.*, "*buybuy BABY*"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

**SECTION 62.**     **TIME OF THE ESSENCE**. Time is of the essence with respect to the parties' obligations under this Lease.

**SECTION 63.**     **SERVICE OF PROCESS**. For the purpose of serving notices under California Code of Civil Procedure Section 1161, et seq., Tenant represents to Landlord that Tenant's authorized agent for service of process in the State of California is Corporation Service Company, doing business in the State of California as CSC-Lawyers Incorporating Service, whose business address is 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833. Tenant shall have the right to appoint a new authorized agent for service of process in California, provided that Tenant shall notify Landlord in writing of the name and address of any such authorized agent.

**SECTION 64.**     **WAIVER OF TRIAL BY JURY**. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

[Remainder of page left blank intentionally]

101

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the day and year first above written.

WITNESS:

ALMADEN PLAZA SHOPPING CENTER INC., a California corporation

By:_____
Name: Jane Kwan
Title: Vice President

WITNESS:

BUY BUY BABY, INC., a Delaware corporation

_____
Name:  Alan Freeman
Title:  Assistant Secretary

By:_____
Name:  Eugene A. Castagna
Title:    President

102

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the day and year first above written.

WITNESS:

ALMADEN PLAZA SHOPPING CENTER INC., a California corporation

_____

By:_____
Name: Kwan Chi Kin
Title: President

WITNESS:

BUY BUY BABY, INC., a Delaware corporation

_____
Name:  Alan Freeman
Title:  Assistant Secretary

By:_____
Name:  Eugene A. Castagna
Title:    President

102

EXHIBIT A

Legal Description of Shopping Center



Title No. 09-**98010670**-MC
Locate No. CACTI7743-7743-2980-0098010670

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN JOSE, COUNTY OF SANTA
CLARA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL ONE:**

Beginning at the Northwesterly corner of that certain Parcel of Land conveyed to the City of San Jose, by Deed
Recorded May 27, 1968 in Book 8136 of Official Records at Page 606, Santa Clara County Records, said corner
lying also in the Easterly line of that certain 12.287 acre Parcel of Land described firstly in the Deed from the
Oseana Corporation, et al, to City Title Insurance Company, Recorded October 18, 1963 in Book 6236 of
Official Records at Page 482, Santa Clara County Records; thence leaving said point of beginning along said
Easterly line North 4 deg. 38' 28" West 945.44 feet to the Southwesterly corner of that certain 12.04 acre
Parcel of Land described in the Deed from Helen Armstrong to Emporium Capwell Company, recorded May 3,
1965 in Book 6942 of Official Records at Page 247, Santa Clara County Records; thence along the Southerly
line of said 12.04 acre Parcel North 72 deg. 32' 23" East 951.26 feet to the Northwesterly corner of that certain
Parcel of Land conveyed to the County of Santa Clara by Quitclaim Deed recorded October 17, 1973 in Book
0613 of Official Records, at Page 504, Santa Clara County Records; thence leaving said Southerly line of the
12.04 acre Parcel along the Westerly line of said Parcel conveyed to the County of Santa Clara South 4 deg.
37' 49" East 171.23 feet and South 7 deg. 40' 58" East 150.21 feet to the most Southerly corner thereof, said
corner lying on the Westerly line of Parcel C as said Parcel C is shown on that certain Record of Survey for
Almaden Expressway, recorded June 12, 1964 in Book 180 of Maps, at Page 15, Santa Clara County Records;
thence along the Westerly line of said Parcel C and along the Westerly line of Parcels E and D as shown on
that certain Record of Survey Map filed for record in Book 180 of Maps, at Page 19, Santa Clara County
Records, the following courses and distances: South 4 deg. 37' 49" East 72.13 feet, South 4 deg. 06' 42" East
387.40 feet, South 2 deg. 24' 30" West 88.19 feet, and South 4 deg. 06' 42" East 67.48 feet to the most
Northerly corner of Parcel D shown on that certain Record of Survey Map filed for record in Book 368 of Maps
at Page 21, Santa Clara County Records; thence leaving said Westerly line of Parcel D of said Record of Survey
recorded in Book 180 of Maps at Page 19, along the general Northerly line of said Parcel D of said Record of
Survey recorded in Book 368 of Maps at Page 21, along the following courses and distances: from a tangent
bearing of South 4 deg. 06' 42" East along a curve to the right with a radius of 66.43 feet through a central
angle of 89 deg. 31' 53" for an arc length of 103.80 feet; South 85 deg. 25' 11" West 177.29 feet; South 83
deg. 42' 16" West 105.05 feet; along a tangent curve to the left with a radius of 1087.00 feet through a central
angle of 14 deg. 16' 04" for an arc length of 270.68 feet and South 6 deg. 17' 45" East 12.39 feet to a point on
the general Northerly line of the hereinabove described Parcel of Land conveyed to the City of San Jose by
Deed recorded in Book 8136 of Official Records at Page 605; thence leaving said general Northerly line of
Parcel D along said general Northerly line of said Parcel conveyed to the City of San Jose North 67 deg. 33'
bearing of South 69 deg. 16' 26" West along a curve to the left with a radius of 1075.00 feet through a central
angle of 1 deg. 54' 06" for an arc length of 35.68 feet and South 67 deg. 22' 20" West 285.01 feet to the Point
of Beginning.

**PARCEL TWO:**

Beginning at a point on the Southerly line of that certain 12.04 acre parcel of land described in the deed from
Helen Armstrong to Emporium Capwell Company, recorded May 3, 1955 in Book 6942 of Official Records, at
Page 247, Santa Clara County Records, distant thereon South 72 deg. 32 min. 23 sec. West 314.91 feet from
the intersection of said Southerly line with the general Westerly line of that certain 0.216 acre parcel of land
shown on that certain Record of Survey of the Almaden Expressway recorded in Book 307 of Maps, at Page 38,
Santa Clara County Records; thence leaving said point of beginning along said Southerly line of the 12.04 acre
parcel South 72 deg. 32 min. 23 sec. West 445.99 feet; thence leaving said Southerly line North 4 deg. 06 min.
55 sec. West 102.91 feet and North 85 deg. 52 min. 48 sec. East 433.95 feet to the Point of Beginning.

**PARCEL THREE:**

Beginning at a point on the Southerly line of that certain 12.04 acre parcel of land described in the Deed from
Helen Armstrong to Emporium Capwell Company, recorded May 3, 1955 in Book 6942 of Official Records, at
Page 247, Santa Clara County Records, distant thereon South 72 deg. 32 min. 23 sec. West 71.44 feet from
the intersection of said Southerly line with the general Westerly line of that certain 0.216 acre parcel of land
shown on that certain Record of Survey of the Almaden Expressway recorded in Book 307 of Maps, at Page 38,

4

CLTA Preliminary Report Form - Modified (11/17/06)



EXHIBIT "A" (continued)

Title No. 09-**98010670**-MC
Locate No. CACT17743-7743-2980-0098010670

Santa Clara County Records; thence leaving said Point of Beginning along said Southerly line of the 12.04 acre parcel of land South 72 deg. 32 min. 23 sec. West 125.06 feet; thence leaving said Southerly line North 4 deg. 08 min. 39 sec. West 44.68 feet; thence North 85 deg. 48 min. 27 sec. East 118.60 feet and South 15 deg. 05 min. 31 sec. East 16.27 feet to the Point of Beginning.

**PARCEL FOUR:**

Being all of remainder area #1, all of remainder area #3 and portions of Parcel B and remainder area #2 as said remainder areas and parcel are shown on that certain Record of Survey filed December 17, 1979, in Book 455 of Maps at Page 51, Santa Clara County Records, and a portion of that certain parcel of land described as Parcel 4 in the third amended Final Order of Condemnation recorded June 24, 1988, in Book K581, at Page 1916, Official Records of Santa Clara County, and a portion of that certain parcel of land described in the Grant Deed to Brothers International Corporation recorded June 29, 1988, in Book K587 at Page 158, Official Records of Santa Clara County, further described as follows:

Beginning at the Southwesterly corner of that certain parcel of land described as Parcel 48181-1 in the Final Order of Condemnation recorded December 31, 1992, in Book M569 at Page 1495, Official Records of Santa Clara County, said corner being a point on the Northeasterly line of said Parcel B;

Thence along the Southerly line of Parcel 48161-1, the following three courses:

1. North 68° 05' 24" East, 247.95 feet;

2. North 71° 57' 17" East, 530.03 feet; and

3. Easterly along the arc of a 785.04 foot radius, tangent curve to the right, through a central angle of 31° 51' 58", an arc distance of 436.61 feet to the Northwesterly corner of that certain parcel of land described in the Deed to the County of Santa Clara recorded October 26, 1994, in Book N646 at Page 6182, Official Records of Santa Clara County;

Thence along the Westerly line of last said parcel, South 4° 38' 39" East, 69.98 feet to the Southwesterly corner thereof;

Thence along the Southerly line of last said parcel, the following three courses:

1. Easterly along the arc of a 194.01 foot radius, non-tangent curve to the right, the center of which curve bears South 3° 25' 07" West, through a central angle of 6° 45' 04", an arc distance of 22.86 feet to a point of reverse curvature;

2. Easterly along the arc of a 317.47 foot radius tangent curve to the left, through a central angle of 14° 48' 50", an arc distance of 82.08 feet; and

3. North 85° 21' 21" East, 291.88 feet to the Westerly line of that certain parcel of land described in the Deed to the County of Santa Clara recorded October 17, 1973, in Book 613 at Page 500, Official Records of Santa Clara County;

Thence along said Westerly line, the following two courses:

1. Southerly along the arc of a 40.00 foot radius, non-tangent curve to the right, the center of which curve bears South 70° 06' 09" West, through a central angle of 15° 15' 26", an arc distance of 10.65 feet; and

2. South 4° 38' 25" East, 129.68 feet to the Southwesterly corner of last said parcel, said corner being a point on the Northerly line of that certain 20.562 acre parcel of land described as Parcel Two in that certain lot line adjustment permit recorded August 11, 1995, in Book N957 at Page 1612, Official Records of Santa Clara County;

Thence along the general Northerly line of said Parcel Two, the following eight courses:

1. South 72° 31' 56" West, 71.44 feet;

2. North 15° 05' 58" West, 16.27 feet;

3. South 85° 48' 00" West, 118.60 feet;

5

CLTA Preliminary Report Form - Modified (11/17/06)

1643022 v10

EXHIBIT "A" (continued)

Title No. 09-**98010670**-MC
Locate No. CACTI7743-7743-2980-0098010670

4.  South 4° 09' 06" East, 44.68 feet;

5.  South 72° 31' 56" West, 118.41 feet;

6.  South 85° 52' 21" West, 433.95 feet;

7.  South 4° 07' 22" East, 102.91 feet; and

8.  South 72° 31' 56" West, 186.24 feet to the Northwesterly corner of said Parcel Two;

Thence along the Westerly line of said Parcel Two, South 4° 39' 04" East, 945.67 feet to the Southwesterly corner thereof, said corner being also the Northerly corner of that certain parcel of land described in the Deed to the City of San Jose recorded May 27, 1968, in Book 8136 at Page 608, Santa Clara County Records;

Thence along the Northerly line of said City of San Jose parcel, South 67° 22' 20" West, 236.74 feet to a point in the general Northeasterly boundary line of the aforementioned Tract 3602;

Thence along said general Northeasterly boundary line, the following four courses:

1.  Westerly along the arc of a 20.00 foot radius, tangent curve to the right, through a central angle of 94° 30' 40", an arc distance of 32.99 feet;

2.  North 18° 07' 00" West, 168.71 feet;

3.  North 71° 53' 00" East, 110.00 feet; and

4.  North 18° 07' 00" West, 753.80 feet to the Northeasterly corner of said Tract 3602, said Northeasterly corner being also the Southeasterly corner of the aforementioned Parcel 4 of said Final Order of Condemnation;

Thence along the Easterly line of said Parcel 4, North 18° 07' 00" West, 11.00 feet to the Northeasterly corner thereof;

Thence along the general Northerly line of said Parcel 4, the following two courses:

1.  South 72° 31' 56" West, 93.08 feet; and

2.  Northwesterly along the arc of a 25.00 foot radius, tangent curve to the right, through a central angle of 86° 49' 14", an arc distance of 37.88 feet to the Northerly corner of said Parcel 4, said corner being a point on the aforementioned Northeasterly line of Parcel B as shown on said Record of Survey;

Thence along said Northeasterly line, the following two courses:

1.  Northerly along the arc of a 626.00 foot radius, tangent curve to the left, through a central angle of 21° 01' 10", an arc distance of 229.65 feet to a point of reverse curvature; and

2.  Northerly along the arc of a 574.00 foot radius, tangent curve to the right, through a central angle of 14° 43' 34", an arc distance of 147.53 feet to the point of beginning.

Excepting therefrom that portion thereof conveyed to the County of Santa Clara by Grant Deed recorded May 23, 1996, Series No. 13304480, Official Records, and being more particularly described as follows:

All that certain real property situated in the City of San Jose County of Santa Clara, State of California, being a portion of Parcel One as described in that certain Grant Deed recorded August 21, 1992 in Book M340 at Page 942, Official Records of Santa Clara County, described as follows:

Beginning at the most Northerly corner of said Parcel One;

Thence South 83 deg. 53' 55" West 50.32 feet along the Northerly line of said Parcel One to a point of cusp;

Thence Southeasterly along a non-tangent curve to the right with a radius of 52.00 feet, to which a radial line bears North 06 deg. 06' 05" West, through a central angle of 91 deg. 28' 16" for an arc length of 83.02 feet to

6

CLTA Preliminary Report Form - Modified (11/17/06)

 EXHIBIT "A" (continued)

Title No. 09-**98010670**-MC
Locate No. CACTI7743-7743-2980-0098010670

a point on the Easterly line of said Parcel One;

Thence Northerly along said Easterly line of North 04 deg. 37' 49" West 38.01 feet to a curve to the left;

Thence along said curve, concave Westerly, with a radius of 40.00 feet through a central angle of 22 deg. 26' 15" for an arc length of 15.66 feet to the True Point of Beginning.

Also excepting therefrom that portion thereof conveyed to the State of California by Grant Deed recorded August 27, 1998, Series No. 14357138, Official Records, and being more particularly described as follows:

Being a portion of Parcel B as said Parcel is shown on that certain Record of Survey filed December 17, 1979, in Book 455 of Maps, at Page 51, Santa Clara County Records, further described as follows:

Beginning at the Southwesterly corner of that certain Parcel of Land described as Parcel 48161-1 in the Final Order of Condemnation recorded December 31, 1992, in Book M569 at Page 1495, Santa Clara County Records, said corner being a point on the Easterly line of said Parcel B;

Thence along said Easterly line, Southeasterly along the arc of a 573.97 foot radius curve to the left, the center of which curve bears North 63 deg. 23' 58" East, through a central angle of 1 deg. 02' 11", an arc distance of 10.38 feet;

Thence leaving said Easterly line, North 13 deg. 46' 12" East, 12.67 feet to the Southerly line of said Parcel 48161-1;

Thence along said Southerly line, South 68 deg. 26' 17" West, 8.33 feet to the Point of Beginning.

**PARCEL FIVE:**

Beginning at the Southwesterly corner of said remainder area #2, said corner being also the Northwest corner of Tract 3602 as shown on the Map thereof filed May 7, 1964, in Book 178 of Maps at Page 14, Santa Clara County Records;

Thence along the Westerly line of said remainder area #2, North 18° 07' 00" West, 225.29 feet;

Thence leaving said Westerly line, Northerly along the arc of a 34.00 foot radius non-tangent curve to the left, the center of which bears North 48° 06' 41" West, through a central angle of 120° 00' 23", an arc distance of 71.21 feet to a point on the Westerly line of the aforementioned Parcel B;

Thence along said Westerly line of Parcel B and along the Westerly line of the aforementioned remainder area #3, North 18° 07' 00" West, 107.74 feet to the Northwesterly corner of said remainder area #3, said corner being a point on the Westerly prolongation of the Southerly line of that certain parcel of land described as Parcel 48161-1 in the Final Order of Condemnation recorded December 31, 1992, in Book M569 at Page 1495, Official Records of Santa Clara County;

Thence along said prolongated line, North 68° 05' 24" East, 48.28 feet;

Thence leaving said prolongated line, South 32° 01' 21" East, 65.14 feet;

Thence North 57° 58' 39" East, 19.13 feet to the Northeasterly line of said Parcel B;

Thence along said Northeasterly line, the following two courses:

1. Southerly along the arc of a 574.00 foot radius non-tangent curve to the left, the center of which curve bears North 56 deg. 55' 45" East, through a central angle of 8 deg. 35' 46", an arc distance of 86.12 feet to a point of reverse curvature; and

2. Southerly along the arc of a 626.00 foot radius, tangent curve to the right, through a central angle of 21° 01' 10", an arc distance of 229.65 feet to a point of reverse curvature, said point being the Northwesterly corner of the aforementioned Parcel 4 (K581 O.R. 1916);

Thence leaving said Easterly line, along the general Northerly line of said Parcel 4, the following two courses:

1. Southeasterly along the arc of a 25.00 foot radius tangent curve to the left, through a central angle of 86°

7

OLTA Preliminary Report Form - Modified (11/17/06)

EXHIBIT "A" (continued)

<span style="float:right;">Title No. 09-**98010670**-MC
Locate No. CACTI7743-7743-2980-0098010670</span>

49' 14", an arc distance of 37.99 feet; and

2.  North 72° 31' 56" East, 93.08 feet to the Northeasterly corner of said Parcel 4;

Thence along the Easterly line of said Parcel 4, South 18° 07' 00" East, 11.00 feet to the Northeasterly corner of said Tract 3602;

Thence along the Northerly line of said Tract 3602, South 72° 31' 56" West, 97.07 feet;

Thence leaving said Northerly line, Westerly along the arc of a 37.00 foot radius non-tangent curve to the left, the center of which curve bears South 45° 20' 19" West, through a central angle of 125° 36' 46", an arc distance of 81.12 feet to a point on said Northerly line of Tract 3602;

Thence along said Northerly line, South 72° 31' 56" West, 117.18 feet to the point of beginning.

Excepting therefrom that portion thereof as conveyed to the State of California by Grant Deed recorded August 27, 1998 as Instrument No. 14357139, of Official Records and being more particularly described as follows:

Being a portion of Parcel B as said Parcel is shown on that certain Record of Survey filed December 17, 1979, in Book 455 of Maps, at Page 51, Santa Clara County Records, further described as follows:

Beginning at the Southwesterly corner of that certain Parcel of Land described as Parcel 48161-1 in the Final Order of Condemantion recorded December 31, 1992 in Book M569 at Page 1495, Santa Clara County Records, said corner being a point on the Easterly line of said Parcel B;

Thence along said Easterly line Southeasterly along the arc of a 573.97 foot radius curve to the left, the center of which curve bears North 63 deg. 23' 58" East, through a central angle of 1 deg. 02' 11", an arc distance of 10.38 feet;

Thence leaving said Easterly line, South 13 deg. 46' 12" West, 28.71 feet to the actual Point of Beginning of this description;

Thence North 31 deg. 40' 28" West, 29.35 feet;

Thence South 9 deg. 23' 36" West 51.96 feet;

Thence South 80 deg. 36' 24" East, 17.00 feet to a line which bears South 13 deg. 46' 12" West from the actual Point of Beginning.

Thence North 13 deg. 46' 12" East, 29.92 feet to the actual Point of Beginning.

**PARCEL SIX:**

Being a portion of Parcel 48161-1 as described in the Final Order of Condemnation recorded December 30, 1992 as Instrument No. 11715821, in Book M569 of Official Records at Page 1495 Santa Clara County Records described as follows:

Beginning at the Easterly terminus of the course described as "S 72° 18' 08" W 530.00 feet" in said Parcel 48161-1; thence from said Point of Beginning, along the Southerly line of said Parcel 48161-1 S 72° 18' 08" W 83.09 feet; thence leaving said Southerly line N 71° 10' 17" E 397.18 feet; thence along a tangent curve to the right with a radius of 125.00 feet, through a central angle of 75° 05' 54" for an arc length of 163.84 feet; thence S 56° 16' 11" W 13.34 feet; thence S 4° 17' 49" E 28.37 feet; thence S 14° 10' 17" W 5.23 feet to said Southerly line of Parcel 48161-1; thence along said Southerly line from a tangent bearing of N 75° 49' 43" W along a curve to the left with a radius of 785.00 feet, through a central angle of 31° 52' 09" for an arc length of 436.64 feet to the point of beginning.

**PARCEL SEVEN:**

Being a portion of Parcel B as said Parcel is shown on that certain Record of Survey filed December 17, 1979, in Book 455 of Maps at page 51, Santa Clara County Records, further described as follows:

Commencing at the southwesterly corner of that certain parcel of land described as Parcel 48161-1 in the Final

<div align="center">8</div>

<span style="float:right;">CLTA Preliminary Report Form - Modified (11/17/06)</span>



EXHIBIT "A" (continued)

Title No. 09-**98010670**-MC
Locate No. CACTI7743-7743-2980-0098010670

Order of Condemnation recorded December 31, 1992, in Book M569 at page 1495, Santa Clara County Records, said corner being a point on the easterly line of said Parcel B;

Thence along said easterly line, southeasterly along the arc of a 573.97 foot radius curve to the left, the center of which curve bears North 63 deg. 23' 58" East, through a central angle of 1 deg. 02' 11", an arc distance of 10.38 feet to the actual Point of Beginning of this description;

Thence leaving said easterly line, South 13 deg. 46' 12" West, 28.71 feet to a point hereinafter referred to as Point "A";

Thence South 31 deg. 40' 28" East, 30.85 feet;

Thence North 58 deg. 19' 32" East, 19.13 feet to the aforementioned easterly line of Parcel B;

Thence along said easterly line, northwesterly along the arc of a 573.97 foot radius curve to the right, the center of which curve bears North 57 deg. 16' 09" East, through a central angle of 5 deg. 05' 38", an arc distance of 51.03 feet to the actual Point of Beginning.

**PARCEL EIGHT:**

Being a portion of Parcel B as said Parcel is shown on that certain Record of Survey filed December 17, 1979, in Book 455 of maps, at page 51, Santa Clara County Records, further described as follows:

Commencing at the herein above described Point "A";

Thence North 31 deg. 40' 28" West, 29.35 feet to the actual Point of Beginning of this description;

Thence continuing North 31 deg. 40' 28" West, 4.93 feet to the westerly prolongation of the southerly line of the hereinabove mentioned Parcel 48161-1;

Thence along said prolongated line, North 68 deg. 26' 17" East, 3.78 feet to a line, which bears North 9 deg. 23' 36" East from the actual Point of Beginning;

Thence South 9 deg. 23' 36" West, 5.66 feet to the actual Point of Beginning.

APN: 569-02-046, 569-02-047, 569-02-057, 569-02-061, 569-02-063, 569-02-064, 569-02-065, 569-02-066, 569-03-014, 569-03-015, 569-03-030, 569-03-032, 569-03-033

9

CLTA Preliminary Report Form - Modified (11/17/06)

1643022 v10

## EXHIBIT B

Site Plan

**Exhibit B**



LEGEND

⊠ : PREMISES

⧄ : CRITICAL AREA

A : BARNES & NOBLE
B : ROSS
C : TJ MAXX
D : TANDOORI BISTRO (FORMERLY DRY CLEANER)
E : AUTO REPAIR SHOP

ALMADEN PLAZA

5353 ALMADEN EXPRESSWAY
SAN JOSE, CALIFORNIA

KEY MAP

EXHIBIT B

SITE PLAN    PG 1 OF 2



TENANT'S TEMPORARY SIGN

STATE HIGHWAY 85

HIGHWAY 85 OFF RAMP

TEMPORARY STORAGE TRAILER

TENANT'S STAGING AREA

ALMADEN PLAZA W

EXISTING PARKING LOT

EXISTING PARKING LOT

EXPECTANT MOTHERS PARKING

CART CORRAL

EXISTING RESTAURANT BLDG. 'G'

EXISTING RETAIL BLDG. 'A'

EXISTING RETAIL BLDG. 'B'

EXISTING RETAIL BLDG. 'C'

EXISTING RETAIL BLDG. 'D'

EXISTING PARKING LOT

EXISTING RETAIL BLDG. 'H'

EXISTING RETAIL BLDG. 'J'

EXISTING RETAIL BLDG. 'M'

EXISTING RETAIL BLDG. 'E'

(E) PARKIN

EX RE BL

EXHIBIT B
ALMADEN PLAZA
PG 2 OF 2

## EXHIBIT B-1

### Premises Floor Plan

1643022 v10

EXHIBIT B-1



ALMADEN PLAZA
BUILDING A

buy buy Baby

EXHIBIT B-1
PG 1 OF 2



ALMADEN PLAZA, CA

EXHIBIT B-1

PG. 2 OF 2

## EXHIBIT B-2

Intentionally Omitted

1

EXHIBIT C
Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as

of the _____ day of _____, 200___, by and between ALMADEN PLAZA SHOPPING

CENTER INC. (*"Landlord"*) and BUY BUY BABY, INC. (*"Tenant"*).

## WITNESSETH:

WHEREAS, Landlord is the sublessee under that certain Sublease Agreement, dated

December 19, 1974 (as amended to date, the "Sublease") pursuant to which Edgewater Holding

Corporation ("Edgewater"), as successor in interest to Carter Hawley Stores Inc., subleases to

Landlord that certain shopping center known as Almaden Plaza Shopping Center (the

"*Shopping Center*"), situated in San Jose, California;

WHEREAS, by that certain Lease Agreement dated as of _____ __, 2010 (the

*"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has

commenced; and

WHEREAS, under Section 1 of the Lease, Landlord and Tenant agreed to enter into an

agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____, 20___.

2.    The Term of the Lease shall expire on January 31, 20___, unless Tenant exercises
any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in
the Lease.

3.    The date of commencement of the first Renewal Period shall be February 1,
20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the
Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to

1

further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the second Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the third Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

6.      The date of commencement of the fourth Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on July 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7.      Notwithstanding anything to the contrary contained herein, as provided in Section 3(e) of the Lease, Tenant shall have the right to terminate the Lease as of January 31, _____ **[insert date which is the last day of the 10th year of the Term]**, by notice to Landlord given not earlier than _____ **[insert date which is 12 months prior to expiration of 10th year of the Term]** and no later than _____ **[insert date which is 6 months prior to expiration of 10th year of the Term]**.

8.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and

Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

ALMADEN PLAZA SHOPPING CENTER INC., a California corporation

By:_____
Name:_____
Title:_____

**TENANT:**

BUY BUY BABY, INC., a Delaware

2

corporation

By:_____
Name:  Eugene A. Castagna
Title:   President

## EXHIBIT D

### Required Condition of Premises on Delivery Date

[See attached]

1



## buybuy BABY®

*Almaden Plaza, CA*

### Exhibit D – Required Condition of Premises on Delivery Date

### 02/03/10

[All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease. To the extent not inconsistent with the terms of this Exhibit D, the terms of the Lease regarding Landlord's work shall be deemed to supplement the provisions of the Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturer's specifications.]

1. Landlord agrees to perform any and all work necessary to delivery possession of the Premises to Tenant in the following condition:

2. Except as otherwise provided in this Lease and the exhibits thereto, Landlord shall deliver the Premises to Tenant in its present "As Is" physical condition. The foregoing reference to the Premises being delivered in "As Is" condition shall not relieve Landlord of any maintenance or repair obligations with respect to the Premises otherwise specifically set forth in this Lease as the responsibility of Landlord.

3. The Premises shall be delivered to Tenant by Landlord in a neat clean condition, free of all tenants and occupants, and free of all store fixtures, furniture, equipment, counters and refrigeration equipment and the like of prior occupants as detailed on attached photographs (Exhibit D Rider).

4. The Premises shall be delivered to Tenant by Landlord in broom clean, secured condition with the roof watertight (and all gutters, downspouts, roof drains in good working order), all systems and equipment (including, without limitation, the heating, plumbing, electrical systems, and air conditioning/ventilation systems) in good working order, and the structural components (including, without limitation, the foundation, exterior walls, structural supports and roof) in good order and repair.

5. All existing electric, gas, water (fire and domestic), sanitary and phone utilities serving the Premises shall be in good working order.

   Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date.

   Landlord has surveyed the Premises and attests that utilities are of sufficient size, capacity and pressure, with exception of the Fire Suppression as detailed below.

   **Electric-** 600 amp, 480/277v, 3 Phase service from Landlord's main electric room to Premises exclusively for Tenant. 400 amp, 480/277v, 3 Phase service from Landlord's main electric room to 3rd Floor/Roof exclusively for Tenants HVAC.

   **Telephone-** 50 pair in Premises.

   **Gas-**2 lb. gas pressure at 4500 MBH minimum gas line.

   **Domestic Water-**(1) 2" Domestic Water Service Lineand 50 PSI residual pressure at base of riser.

   **Fire Suppression-** (1) 8" or larger Fire Suppression Water Service Line providing a density of 55 PSI residual pressure at the base of the riser at 1500 gpm and a density of0.49 gpm per square foot over 2,000 square feet. Landlord shall allow tenant to modify, at Tenant's sole cost and expense the existing sprinkler riser in the Common Riser Room adjacent to the Premises in order to create a separate sprinkler main for Tenant, as long as such modification does not damage the other areas in the Building.

   **Sanitary-**(1) 4" minimum gravity fed Sanitary Waste Line.

6. Landlord shall allow Tenant to re-use and/or remove and dispose of existing RTU's (at Tenant's cost) serving the premises and associated ductwork, grilles, diffusers, accessories, related controls, etc..

7. Landlord shall allow Tenant to modify the existing raised entry element in accordance with the elevation shown on Exhibit D-1 to this Lease. Detailed plans shall be submitted by Tenant to Landlord for Landlord's approval in accordance with Lease Section 5. IMPROVEMENTS.


2/4/10

8.  The Premises shall be free from asbestos material and other Hazardous Substances. Tenant has received building ACM abatement report from Landlord.

9.  All work performed in the Premises, whether performed by Landlord or Tenant, shall be done in a good and first class workmanlike manner; in accordance with all applicable laws, ordinances, codes and insurance requirements.  Landlord agrees to fully cooperate with Tenant and to assist Tenant (including performing any work outside of the Premises required by governmental authority as long as such work is not triggered by TI and if it is, at Tenant's cost ) in obtaining all required building permits for Tenant's Work, and in obtaining an unconditional permanent certificate of occupancy, or the local equivalent thereof.

10. Tenant shall have the right to come onto the Premises in order to take measurements and in order to commence Tenant's Work, including fixturing, even while Landlord is completing Landlord's Work, but such entry by Tenant shall not be deemed a waiver of Landlord's obligation to fully complete Landlord's Work. Tenant agrees that any of its work conducted as aforesaid shall not unduly interfere with the completion of Landlord's Work.

11. In the event that additional on-site and/or off-site development work is required by governmental authorities in order for Tenant to obtain permits, use, or occupancy rights, Landlord shall perform such work at its sole cost and expense. If such work is trigged by Tenants TI work,  Landlord shall perform such work at Tenants sole cost and expense.

12. Tenant to assume lead role (at Tenant's cost and expense) in applying for TI permits. Landlord shall assist Tenant in obtaining all governmental and/or local approvals for Tenant modifications to the premises based on Tenant's Plans.

13. All Exit Signs shall be removed from the Premises at the Landlord's cost.

To Remain:  Storefronts, roll-up grill, merchandise security system

To Remove:  Pegboard









To Remove:  All cabinetry & counters at Customer Counter.
To Remain:  Ceilings, Partition Walls, Doors, Flooring.

To Remove:  Pallets

JTS 2/4/10    ALMADEN, CA    RIDER TO EXHIBIT D    PG 1 OF 8

To Remove:  Cabinetry @ Customer Counter





To Remove:  Gondola Shelves





To Remove: Gondolas.
To Remain: Conduit drops from ceiling, Flooring, Ceiling, Lighting.



To Remove: Furniture, Shelving System.

PG. 2 OF 8

To Remove:  All Debris and misc. fixtures



To Remove:  Gondola Shelving







To Remove:  Dispose of all misc. signage



To Remove:  Gondola Shelving

PG 3 OF 18

To Remove: All fixtures.
To Remain: Slat wall.

To Remove:  All wood pedestal bases







No Work at Restrooms



To Remove:  Wood pedestal bases

PG 4 OF 8



To Remove: Gondolas.

To Remain: Slat wall and laminate built-in millwork.

PG. 5 OF 8

To Remain: Glass Doors



To Remove: Railing





To Remain: Laminate built-in millwork.



To Remove: Dispose all misc. channel letter signs

PG. 6 OF 8



To Remove. Cabinets and pegboards.

No Exterior Work



To Remove: Cabinetry





To Remove: Wall mounted counter ledge



To Remain: Stairs

## EXHIBIT D-1

Elevation of Building and Shopping Center

1643022 v10

Exhibit D-1



ALMADEN PLAZA
BUILDING A

5353 ALMADEN EXPRESSWAY
SAN JOSE, CALIFORNIA

LOCATION OF TENANTS
TEMPORARY BANNERS

EXISTING ENTRY FEATURE FOR CIRCUIT CITY

EXTERIOR NORTH ELEVATION   1/16"   1

NEW CORNICE

STUCCO, SMOOTH
TROWEL FINISH
COLOR: STO
NA 209-0027,
FRENCH
VANILLA

11' X 22' BLUE & RED
SIGN

buybuy
BABY

STUCCO - FINISH
SMOOTH TROWEL
COLOR: BENJ
MOORE 2065-10,
ADMIRAL BLUE

RAISE
STOREFRONT

EXTERIOR
ELEVATION
EXHIBIT D-1
PG. 1 OF 1

EXHIBIT E

Permitted Encumbrances

1.     The lien of current year real estate taxes, not yet due and payable.

2.     (A) Deed of Trust dated December 1, 2000 given by Almaden Plaza Shopping Center, Inc. as borrower to Chicago Title Company as trustee for the benefit of Continental Wingate Capital Corp. recorded in the Official Records of Santa Clara County, California ("Official Records"), on December 8, 2000 as Instrument No. 15489038. (B) Assignment of Rents and Leases given by Almaden Plaza Shopping Center, Inc. to Continental Wingate Capital Corp., recorded in the Official Records on December 8, 2000 as Instrument No. 15489040. The foregoing Deed of Trust and Assignment of Rents and Leases were assigned by Continental Wingate Capital Corp. to Wells Fargo Bank, Minnesota, N.A., as Trustee for The Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2001-CK3 by Assignment recorded in the Official Records on July 11, 2003, as Instrument No. 17177533. Said Deed of Trust and Assignment of Leases and Rents were further assigned by Wells Fargo Bank, Minnesota, N.A., as Trustee for The Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2001-CK3 to Bank of America, N.A., as Trustee for The Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2001-CK3 by Assignment recorded in the Official Records on September 23, 2009, as Instrument No. 20441941. (C) UCC Financing Statement recorded in the Official Records on December 8, 2000 as Instrument No. 15489041, as amended by Assignment recorded in the Official Records on August 22, 2002 as Instrument No. 16434320, as amended by Assignment recorded in the Official Records on March 12, 2003 as Instrument No. 16879416, as amended by Continuation Statement recorded in the Official Records on September 9, 2005 as Instrument No. 18568765, as amended by Assignment recorded in the Official Records on September 23, 2009, as Instrument No. 20441943. All of the foregoing is subject to Section 23 of this Lease.

3.     (A)     Agreement and Lease, dated April 27, 1965 between Mitchell M. Perusina and Anna E. Perusina, his wife, and Raymond Mitchell Perusina and Helen Catherine Perusina, his wife, as landlord, and The Emporium Capwell Company, a California corporation, as tenant, a Memorandum of which was recorded May 4, 1965 in Book 6944, Page 88, Document #2843278, Santa Clara County Records.

        (B)     First Amendment to Agreement and Lease, dated December 15, 1974, between Mitchell M. Perusina, Anna E. Perusina, Raymond Mitchell Perusina and Helen Catherine Perusina, as landlord and Carter Hawley Hale Stores, Inc. (successor in interest to The Emporium Capwell Company), as tenant, recorded December 27, 1974 in Book B224, Page 48, Document # 4919694, Santa Clara County Records.

        (C)     Agreement of Merger of Carter Hawley Hale Stores, Inc., a California corporation into Carter Hawley Hale Stores, Inc., a Delaware corporation, recorded August 8, 1984 in Book I888, Page 353, Santa Clara County Records.

1

(D)  Assignment of Lease, dated July 26, 1984, between Carter Hawley Hale Stores, Inc., a California corporation and Carter Hawley Hale Stores, Inc., a Delaware corporation, recorded September 4, 1984, Book 1850, Page 14, Document # 8179537, Santa Clara County Records.

(E)  Second Amendment to Agreement and Lease, dated August 16, 1988, between Raymond Perusina a.k.a. Raymond Mitchell Perusina and Shirley L. Perusina, husband and wife, Danford Perusina and Arlene Perusina, husband and wife and Albert Parmisano and Katherine Parmisano, husband and wife, as landlord and Carter Hawley Hale Stores Inc., a Delaware corporation, as tenant, recorded September 2, 1988, Book K668, Page 816, Document # 9822584, Santa Clara Records.

(F)  Supplemental Memorandum of Lease, dated August 16, 1988, between Raymond Perusina a.k.a. Raymond Mitchell Perusina, and Shirley Perusina, husband and wife and Danford Perusina and Arlene Perusina, husband and wife, and Albert Parmisano and Katherine Parmisano, husband and wife, as landlord and Carter Hawley Hale Stores, Inc., a Delaware corporation, as tenant, recorded September 2, 1988, Book K668, Page 826, Document #9822585, Santa Clara County Records.

(G)  Amendment to Lease and Settlement Agreement, dated August 28, 1992, between Brothers International Corporation, a California corporation, as lessor, and Carter Hawley Hale Stores, Inc., a Delaware corporation, debtor in possession, as lessee, in which Edgewater Holding Corporation, a California corporation is shown as the assignee of record.

(H)  Third Amendment to Agreement and Lease, dated November 1, 1992, between Raymond Perusina, Shirley Perusina, Danford Perusina, Arlene Perusina, and Albert Parmisano, as landlord and Edgewater Holding Corporation, a California corporation, as tenant.

(I)  Fourth Amendment to Agreement and Lease, dated November 1, 1992, between Raymond Perusina, Shirley Perusina, Danford Perusina, Arlene Perusina, and Albert Parmisano, as landlord and Edgewater Holding Corporation, a California corporation, as tenant, guaranteed by and subleased to Brothers International Corporation, a California corporation, recorded January 30, 1997, Document #13595688, Santa Clara County Records.

(J)  Assignment of Ground Lease and Sublease, dated February 17, 1993, between Carter Hawley Hale Stores, Inc., a Delaware corporation, debtor in possession, as assignor and Edgewater Holding Corporation, a California corporation, as assignee, recorded January 30, 1997, Document # 13595687, Santa Clara County Records.

(K)  Fifth Amendment to Agreement and Lease, dated December 1, 1994, between Raymond Perusina, Shirley Perusina, Danford Perusina, Arlene Perusina and Albert Parmisano, as landlord and Edgewater Holding Corporation, a California corporation, as tenant.

(L)  Sixth Amendment to Agreement and Lease, dated March 25, 1999, between Raymond Perusina and Shirley Perusina, Danford Perusina, Arlene Perusina, Trustees of the Danford and Arlene Perusina Family Trust dated April 3, 1992 and Albert Parmisano, as landlord and Edgewater Holding Corporation, a California corporation, as tenant, recorded in Official Records on October 24, 2000, Instrument No. 15433433.

2

All of the foregoing contained in item #3 hereof is subject to Section 23 and 50(g) of this Lease.

4.  (A)  Sublease Agreement, dated December 19, 1974, between Carter Hawley Hale Stores, Inc., a California corporation (successor by merger to Broadway-Hale Stores Inc. which was the successor by merger to The Emporium Capwell Company, a California corporation), as landlord, and Chrysler Realty Corporation, a Delaware corporation, as tenant, a Memorandum of which was recorded December 27, 1974 in Book B224, Page 61, Document # 4919697, Santa Clara County Records.

(B)  Deed, dated October 14, 1977, from Chrysler Realty Corporation, a Delaware corporation to Almaden Plaza Associates, a California limited partnership, recorded October 18, 1977 in Book D217, Page 427, Document # 5817890, Santa Clara County Records.

(C)  Assignment and Assumption Agreement, dated October 14, 1977, between Chrysler Realty Corporation, a Delaware corporation and Almaden Plaza Associates, a California limited partnership, recorded October 18, 1977 in book D217, page 440, Document # 5817892, Santa Clara County Records.

(D)  Assignment of Lessor's Interest in Sublease executed by Carter Hawley Hale Stores, Inc., a California corporation, to Carter Hawley Hale Stores, Inc., a Delaware corporation, recorded September 4, 1984 in Book I850, Page 23, of Official Records.

(E)  Supplemental Memorandum of Sublease, dated June 28, 1988, between Carter Hawley Hale Stores, Inc., a Delaware corporation and Almaden Plaza Associates, a California limited partnership, recorded June 29, 1988 in Book K587, Page 110, Document # 9741642, Santa Clara County Records.

(F)  Assignment and Assumption of Lessees Interest in Sublease, dated June 28, 1988, between Almaden Plaza Associates, a California limited partnership and Pacific Capital Applications, Inc., a California corporation, recorded June 29, 1988 in Book K587, Page 140, Document # 9741645, Santa Clara County Records.

(G)  Assignment and Assumption of Lessees Interest in Sublease, dated June 28, 1988, between Pacific Capital Applications, Inc., a California corporation, as assignor, and Brothers International Corporation, a California corporation, as assignee, recorded June 30, 1988 in Book K587, Page 166, Document # 9741648, Santa Clara County records.

(H)  First Amendment to Sublease Agreement, dated August 16, 1988, between Carter Hawley Hale Stores, Inc., a Delaware corporation, as sublessor and Almaden Plaza Associates, a California limited partnership, as sublessee, recorded September 2, 1988 in Book K668, Document #9822586, Santa Clara County Records.

(I)  Acknowledgment of Sublease, dated December 18, 1991 between Raymond Perusina, Shirley L. Perusina, Danford Perusina, Arlene Perusina, Albert Parmisano, as lessors' successors in interest and Brothers International Corporation, a California corporation, as sublessee, recorded March 16, 1992 in Book M089, Page 1512, Document # 11272255, Santa Clara County Records.

3

(J) Assignment of Lessor's Interest in Sublease executed by Carter Hawley Hale Stores, Inc., a Delaware corporation, to Edgewater Holding Corporation, a California Corporation, recorded January 30, 1997 as Instrument No. 13595687, of Official Records.

(K) Second Amendment to Sublease, dated November 1, 1992, between Edgewater Holding Corporation, a California corporation, as sublessor, and Brothers International Corporation, a California corporation, as sublessee, recorded January 31, 1997, Document # 13597269, Santa Clara County Records.

(L) Assignment of Ground Lease and Sublease, dated February 17, 1993 between Carter Hawley Hale Stores, Inc., a Delaware corporation, debtor in possession, as assignor and Edgewater Holding Corporation, a California corporation, as assignee, recorded January 30, 1997, Document # 13595687, Santa Clara County Records.

(M) Assignment of Lessee's Interest in Sublease executed by Brothers International Corporation, a California corporation to Almaden Plaza Shopping Center, Inc., a California corporation, recorded December 8, 2000 as Instrument No. 15489037, of Official Records.

All of the foregoing contained in item #4 hereof is subject to Sections 23 and 50(g) of this Lease.

5. Easement granted to Pacific Gas and Electric Company, a California corporation recorded on July 20, 1933, Book 662, Page 8, of Official Records.

6. Easement granted to City of San Jose, recorded on November 7, 1963, Book 6263, Page 697, of Official Records.

7. Easement granted to City of San Jose, recorded on December 7, 1967, Book 7955, Page 636, of Official Records.

8. Easement granted to City of San Jose, recorded on December 7, 1967, Book 7955, Page 638, of Official Records.

9. Easement granted to San Jose Water Works, a California corporation, recorded on January 30, 1968, Book 8010, Page 261, of Official Records.

10. Easement granted to Pacific Gas and Electric Company, recorded May 3, 1968, Book 8111, Page 291, of Official Records.

11. Easement granted to Pacific Gas and Electric Company, recorded May 23, 1968, Book 8113, Page 365, of Official Records.

12. Easement granted to San Jose Water Works, a California corporation, recorded on November 12, 1968, Book 8330, Page 652, of Official Records.

13. Easement granted to Pacific Gas and Electric Company, recorded April 1, 1969, Book 8483, Page 142, of Official Records.

4

14. Easement granted to Pacific Gas and Electric Company, recorded January 14, 1971, Book 9187, Page 746, of Official Records.

15. Easement granted to City of San Jose, recorded August 27, 1973, Book 0536, Page 646, of Official Records.

16. Instrument regarding street access recorded on October 17, 1973, Book 0613, Page 504, of Official Records.

17. Easement granted to Pacific Gas and Electric Company, recorded August 8, 1975, Book B551, Page 494, of Official Records.

18. Easement granted to San Jose Water Works, recorded January 19, 1984, Book I241, Page 665, of Official Records.

19. Memorandum of Sublease dated June 19, 1979, between Almaden Plaza Associates and Service Merchandise Company, Inc., recorded July 24, 1986 in Book J778 at Page 667, of Official Records. The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

20. Easement granted to City of San Jose, recorded June 24, 1988, Book K581 at Page 1916, of Official Records.

21. Easement (for vehicular and pedestrian access and ingress and egress) between Almaden Plaza Associates and Brothers International Corporation, recorded September 2, 1988, Book K668, Page 860, of Official Records.

22. Easement (for installation and maintenance of sanitary sewer and storm drainage facilities) in favor of The People of the State of California, recorded December 31, 1992 as Instrument No. 11715821 in Book M569 at Page 1495. Director's Deed (conveying easements to the City of San Jose) recorded October 13, 1995 as Instrument No. 13054713 in Book P042.

23. Easement (regarding storm drain) granted to The Santa Clara County Traffic Authority, recorded November 23, 1993, Instrument NO. 12227328, Book N153, Page 0125, of Official Records.

24. Memorandum of Lease between Brothers International Corporation and Home Express, Inc., recorded August 4, 1994, Instrument No. 12606484, Book N549, Page 0495, of Official Records. Memorandum of Assignment of Lease executed by Home Express, Inc. to Sears Roebuck and Co., dated April 21, 1998, recorded April 22, 1998 as Instrument No. 14152187, of Official Records. The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

25. Instrument regarding street access recorded on October 26, 1994, Instrument No. 12699873, Book N646, Page 0618, of Official Records.

5

1643022 v10

26. Easement (regarding maintenance of traffic signal detectors and incidents thereto) granted to the County of Santa Clara recorded October 26, 1994, Instrument No. 12699873, Book N646, Page 0618, of Official Records.

27. Agreement (regarding Route 85 at Almaden Expressway) dated October 18, 1994 between The County of Santa Clara and Brothers International Corporation recorded November 18, 1994 as Instrument No. 12726218 in Book N673, Page 0718, of Official Records.

28. Easement granted to the City of San Jose recorded June 7, 1995, Instrument No. 12909766, Book N875, Page 1401, of Official Records.

29. Subordination, Attornment and Non-Disturbance Agreement regarding Mens Wearhouse Incorporated recorded October 10, 1995, Instrument No. 13046703, Book P034, Page 2110, of Official Records.

30. Notice of Granting of a Planned Development Permit in favor of Brothers International recorded December 8, 1995 as Instrument No. 13125778, of Official Records.

31. Notice of Granting of a Planned Development Permit in favor of Brothers International recorded November 21, 1996 as Instrument No. 13531688, of Official Records.

32. Easement granted to City of San Jose recorded July 17, 1996, Instrument No. 13369938, of Official Records.

33. Notice of Granting of a Planned Development Permit in favor of Brothers International recorded December 11, 1996 as Instrument No. 13548342, of Official Records.

34. Memorandum of Lease between Brothers International Corporation and Barnes & Noble Booksellers, Inc., recorded October 10, 1997, Instrument No. 13895022, of Official Records. The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

35. Instrument (regarding street access) recorded August 27, 1998, Instrument No. 14357138, of Official Records.

36. Subordination, Attornment and Non-Disturbance Agreement regarding Fresh Choice, Inc. recorded October 10, 1995, Instrument No. 13046702, Book P034, Page 2093, of Official Records. Instrument (regarding subordination of lease) executed by Continental Wingate Capital Corp. and Fresh Choice, Inc., recorded December 8, 2000 as Instrument No. 15489046, of Official Records.

37. Subordination, Attornment and Non-Disturbance Agreement regarding Strounds, Inc. recorded October 10, 1995, Instrument No. 13046706, Book P034, Page 2161, of Official Records.

6

38. Subordination, Attornment and Non-Disturbance Agreement regarding Chevys Inc. recorded October 10, 1995, Instrument No. 13046707, Book P034, Page 2178, of Official Records.

39. Memorandum of Lease between Brothers International Corporation and Bed Bath & Beyond, Inc., recorded April 16, 1999, Instrument No. 14758892, of Official Records. Amended Memorandum of Lease dated as of June 10, 2009 by and between Almaden Plaza Shopping Center Inc., as landlord and Bed Bath & Beyond Inc., as tenant recorded in the Santa Clara County Recorder on August 4, 2009 as Document #20376977.The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

40. Road Sublease dated May 8, 2001, executed by Edgewater Holding Corporation, Almaden Plaza Shopping Center, Inc. and Santa Clara County recorded May 30, 2001, Instrument No. 15700740, of Official Records.

41. Memorandum of Lease between Almaden Plaza Shopping Center, Inc. and Pacific Bell Wireless, LLC, recorded September 24, 2001, Instrument No. 15880995, of Official Records. The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

42. Non-Disturbance, Recognition and Attornment Agreement dated April 2, 1995 by and between Mitchell M. Purisina and Anna E. Purisina, his wife and Raymond Mitchell Purisina and Helen Catherine Purisina, his wife and T.J. Maxx of CA, LLC, recorded April 3, 2002 as Instrument No. 16191725, of Official Records.

43. Non-Disturbance, Recognition and Attornment Agreement by and between Mitchell Almaden Plaza Shopping Center, Inc. and T.J. Maxx of CA, LLC, recorded April 3, 2002 as Instrument No. 16191725, of Official Records.

44. Notice of Granting of a Planned Development Permit executed by City of San Jose recorded September 16, 2004 as Instrument No. 18006567, of Official Records.

45. Consent By Real Property Owner dated February 6, 2006 and recorded April 26, 2006, Instrument No. 18905041, of Official Records.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

7

EXHIBIT F

Sign Criteria

(attached)

1

EXHIBIT F

## SIGN CRITERIA
## ALMADEN PLAZA SHOPPING CENTER INC.

1.    **Tenant's Sign.** Tenant must install a sign on the stucco fascia of the building canopy of the Premises conforming to the following specifications:

   (a)    Only the name of the store is permitted on the sign.    Logos or reference to the merchandise are not permitted.

   (b)    Drawings of the sign prepared by the sign contractor are submitted to the Landlord for approval in duplicate before fabrication of the sign.

   (c)    Letters are to be porcelain enamel, 16 gauge steel, anodized aluminum or automotive grade baked aluminum.    Letter are to be 'channel' type with depth of channel proportioned to the size of the letters.    Plastic letter faces of approved colors may be used.

   (d)    Signs may not exceed 24 inches in height.    A 24 inch sign will be approved only if the Landlord believes that the store frontage, exposure, letter style and placement warrant letters of that height.

   (e)    The front face of the letters must not project more than 6 inches from the surface of the metal fascia.

   (f)    Sign installation must conform to the City of San Jose's regulations and Landlord makes no representation that Tenant's sign will so conform.

   (g)    Box type signs are not permitted.

   (h)    Flashing or blinking signs are not permitted.

   (i)    Skeleton tubing signs are not permitted.

   (j)    Crossovers of neon tubing between letters are not permitted.    Letters cannot be connected by visible metal tubing.

   (k)    If the Landlord believes that a neon type sign could be used properly on the face of the storefront and below the canopy, then a reverse-channel back lighted sign or a sign with fully enclosed letters with plastic faces may be installed.    The sign will otherwise conform to this section except the depth of letters will not exceed 5 inches.    The design, letter style and the sign's letter height will not exceed 10 inches.    The design, letter style and the sign's relation to other signs will be considered by the Landlord in approving or disapproving submittals for such signs.



- 1 - 2/4/10

EXHIBIT F
PAGE 1 OF 2

(l)  Under canopy signs will conform to the standards of design and construction established by the Center for the Mall Areas in which the store is located.

(m)  Wall plaques bearing the store's name may be considered as signs.  Drawings in duplicate must be submitted for the Landlord's prior approval.

(n)  The name of the store may be placed on the display window in plain gold leaf letters without shading of any kind.  Style, size and location must be approved by the Landlord.

(o)  The hours during which the store is open may be displayed on the entrance doors. Other signs are not permitted on doors or windows.

2.  **Tenant's Advertisements.**  Tenant shall include the name of the Center in any advertising of its business within the trade area, except for advertisements and signs in the Center.

3.  **Name of Center.**  The Tenant will use the name of the Center in all of Tenant's advertising for business for the Premises but will acquire no property right in the name.

4.  **Landlord's Signs.**  The Landlord may place signs on the exterior walls and roof of the Premises.

*Office Bible / AP Rules & Reg*

EXHIBIT F
PAGE 2 OF 2

EXHIBIT F-1

Monument Signs, Banners and Temporary Sign

**EXHIBIT F-1**



ALMADEN, CA

**EXHIBIT F-1**
PG 1 OF 4
BUY BUY BABY

**"BUY BUY" LETTER SECTION w/ SELF CONTAINED TRANSFORMERS**

**"BABY" LETTER SECTION w/ SELF CONTAINED TRANSFORMERS**

SIGN AREA

BOXED AREA = 242 sq.ft.
INDIVIDUAL LETTER AREA = 119 sq.ft.

- TOP ROW OF LETTERS = RED ACRYLIC FACES w/ "RED MAX" G.E. LUMINATION L.E.D. SYSTEM
- BOTTOM ROW OF LETTERS = BLUE ACRYLIC FACES w/ "BLUE MAX" G.E. LUMINATION L.E.D. SYSTEM
- ALL LETTERS TO HAVE WHITE RETURNS AND WHITE TRIM CAP RETAINER
- POWER REQUIREMENTS = TWO (2) 120V / 20A CIRCUITS (MAX.)
- POWER TO J-BOX AND FINAL ELECTRICAL CONNECTION BY G.C.'s ELECTRICIAN
- G.C. TO COORDINATE MOUNTING REQUIREMENTS WITH SIGN MANUFACTURER AND INSTALLER

JB
2/4/10









TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

TEMPORARY SIGN
(TENANT'S HIRING TRAILER)

TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

TEMPORARY SITE SIGN
(REFER TO EXHIBIT B FOR LOCATION)

TEMPORARY BANNER SIGNS

ALMADEN PLAZA
EXHIBIT 'F - 1'   PG 4 OF 4
BUY BUY BABY