EXHIBIT C PART ONE

Copy ○

## LEASE

LANDLORD:    **3600 LONG BEACH ROAD, LLC,** a New York limited liability company

TENANT:    **KOHL'S DEPARTMENT STORES, INC.,** a Delaware corporation

PROPERTY:    Kohl's department store located at 3600 Long Beach Road, Oceanside, New York 11572.

DATE:    June _10_, 1999

## INDEX

| Article | | Page |
|---|---|---|
| I. | Premises and Term | 1 |
| II. | Options to Extend | 2 |
| III. | Floor Area | 2 |
| IV. | Construction | 3 |
| V. | Rent | 5 |
| VI. | Common Areas | 6 |
| VII. | Operation of Shopping Center | 12 |
| VIII. | Taxes | 14 |
| IX. | Right of Entry | 16 |
| X. | Utilities | 16 |
| XI. | Insurance and Restoration | 17 |
| XII. | Repairs, Alterations, Improvements and Replacements | 18 |
| XIII. | Trade Fixtures | 19 |
| XIV. | Subordination/Non-Disturbance | 20 |
| XV. | Assignment and Subletting | 20 |
| XVI. | Quiet Enjoyment, Representations and Title Insurance | 20 |
| XVII. | Surrender of Premises | 23 |
| XVIII. | Condemnation | 23 |
| XIX. | Defaults and Remedies | 24 |
| XX. | Tenant's Use of Premises | 27 |
| XXI. | Leasehold Mortgages | 28 |
| XXII. | Mechanic's Liens | 30 |
| XXIII. | Indemnification | 31 |
| XXIV. | Memorandum of Lease | 31 |
| XXV. | Estoppel Certificates | 31 |
| XXVI. | Brokerage | 32 |
| XXVII. | Miscellaneous | 32 |

#### Exhibits

| | |
|---|---|
| Exhibit A | Legal Description of the Land |
| Exhibit B | Site Plan of Shopping Center |
| Exhibit C | Description of Tenant's Work |
| Exhibit D | Intentionally Omitted |
| Exhibit E | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit F | Permitted Encumbrances |
| Exhibit G | Memorandum of Lease |
| Exhibit H | Sign Criteria |
| Exhibit H-1 | Tenant's Building Signage |
| Exhibit I | Prohibited Uses |
| Exhibit J | Exclusive Use Restrictions |
| Exhibit K | Guaranty of Lease |

G:\LEGAL\NEWSITES\OCEANSIDE\LEASE4.WPD
06/04/99

## LEASE

**THIS LEASE** is made and entered into as of the _10th_ day of June, 1999, by and between **3600 LONG BEACH ROAD, LLC**, a New York limited liability company having an office at 70 East Sunrise Highway, Suite 610, Valley Stream, New York  11581 ("Landlord") and **KOHL'S DEPARTMENT STORES, INC.**, a Delaware corporation having an office at N56 W17000 Ridgewood Drive, Menomonee Falls, Wisconsin 53051 ("Tenant").

## W I T N E S S E T H :

**WHEREAS**, Landlord is the owner of certain land located in the Town of Hempstead, Nassau County, New York, which is legally described in EXHIBIT A attached hereto and is depicted on the site plan attached hereto as EXHIBIT B (the "Land");

**WHEREAS**, the Land has been developed as a shopping center (the "Shopping Center") commonly known as "Caldor Plaza", which is operated as an integrated shopping area whereby tenants, and their customers and invitees, of the stores and buildings located in the Shopping Center may use on a non-exclusive basis the parking areas and other common facilities situated thereon;

**WHEREAS**, Landlord desires to lease to Tenant and Tenant desires to lease and rent from Landlord, upon the terms and conditions hereinafter set forth, the portion of the building constructed within the Shopping Center which contains 94,421 square feet of Floor Area (as hereinafter defined) and is designated as the "Kohl's Space" on EXHIBIT B, together with all appurtenant supports, loading docks, truck ramps, compactor pads and other outward extensions (collectively, the "Premises").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## PREMISES AND TERM

**SECTION 1.1.**  Landlord hereby leases and demises unto Tenant and Tenant hereby leases and takes from Landlord, for the Term (as hereinafter defined), at the rental, and upon the terms, covenants and conditions hereinafter set forth, the Premises and a non-exclusive right during the Term for the benefit of Tenant and Tenant's employees, customers, agents, licensees, concessionaires and invitees, to use in common with Landlord and all other occupants of the Shopping Center all of the Common Areas (as hereinafter defined) of the Shopping Center and all easements, rights, privileges and amenities otherwise appurtenant to the Land.

**SECTION 1.2.**

(a)    The term of this Lease (the "Term") shall commence on the Commencement Date (as hereinafter defined) and shall expire  on the last day of the twentieth (20th) full Lease Year (as hereinafter defined) to occur after the Rent Commencement Date (as hereinafter defined), subject to Tenant's extension options hereinafter contained.

(b)    The term "Commencement Date", as used herein, shall mean the date on which this Lease has been executed by both Landlord and Tenant.

(c)     The term "Rent Commencement Date", as used herein, shall mean October 1, 1999.

(d)     The term "Lease Year", as used herein, shall mean a 52/53 week year ending on the Saturday closest to the last day of January. The period from the Rent Commencement Date to the following Saturday closest to January 31 shall be considered a partial Lease Year. The first full Lease Year shall commence on the day following the last day of said partial Lease Year.

## ARTICLE II

## OPTIONS TO EXTEND

SECTION 2.1. Tenant shall have, and is hereby given, five (5) separate options to extend the Term of this Lease upon the terms, covenants, and provisions herein contained, for successive periods of five (5) Lease Years each. Each such option shall be exercisable by Tenant's giving notice to Landlord of Tenant's intention to exercise the same not less than twelve (12) months prior to the expiration date of the Term, or the expiration date of the then current extended Term, as the case may be; provided that, if Tenant shall fail to give any such notice within the aforesaid time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant notice of Landlord's election to terminate such option and Tenant may exercise such option at any time until the expiration of said thirty (30) day period.

SECTION 2.2. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term under any of the options set forth in Section 2.1 through inadvertent failure to give notice of exercise thereof within the time limits prescribed. Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to extend the Term for any of the aforesaid extended terms and if Landlord shall fail to give notice to Tenant of Landlord's election to terminate Tenant's right to extend this Lease under the option applicable thereto, then and so often as such event shall occur, the Term shall be automatically extended from year to year upon all of the terms and conditions then in effect, subject to Tenant's right under such option to extend the Term for the remainder of the extended term covered thereby and to Landlord's right to place the thirty (30) day limit on such option by a notice in the manner provided in Section 2.1.

## ARTICLE III

## FLOOR AREA

SECTION 3.1. The term "Floor Area" as used in this Lease means, with respect to the Premises and any other building or structure within the Shopping Center, the actual number of square feet of floor space within the exterior walls of all floors, measured to the center lines of all common walls and the exterior lines of all exterior walls, including any basements, and including stairs, interior elevators, escalators, air conditioning and other interior equipment rooms; but excluding (i) loading docks and platforms, transformer vaults, utility or mechanical penthouses or utility enclosures; (ii) patio or outside selling areas which are not heated or air conditioned; (iii) any mezzanine space (unless open to the general public and used for the conduct of a tenant's business); (iv) basement space (unless open to the general public and used for the conduct of a tenant's business); and (v) the Shopping Center's enclosed mall (if any) except for Floor Area occupied by kiosks. Landlord hereby certifies to Tenant that the Floor Area of the Premises is ninety-four thousand four hundred twenty-one (94,421) square feet and that the Floor Area of all building improvements located within the Shopping Center (including the Premises) is two hundred ten thousand seven hundred twenty-seven (210,727) square feet.

CONSTRUCTION

**SECTION 4.1.**

(a)    As used in this Lease, the term "Landlord's Work" shall mean the following:

(i)    The resurfacing of the parking lot of the Shopping Center with a re-sealing compound.  Prior to resealing the parking lot, Landlord shall remove failed base and sub-base, as necessary, and replace same.

(ii)    The restriping of the parking lot in accordance with the striping plan shown on EXHIBIT B.

(iii)    The replacement of existing parking lot lighting poles with new lighting poles containing metal halide fixtures.  Parking lot lighting shall be designed to a two footcandle minimum with a layout distributing a five footcandle minimum along the sidewalk in front of the Premises and designed according to photometric plans approved by Tenant.

Notwithstanding the foregoing, if Tenant elects to resurface the portion of the parking lot situated within Tenant's Protected Parking Area (as hereinafter defined), Landlord shall not be obligated to reseal the portion of the parking lot within Tenant's Protected Parking Area and Landlord shall make a contribution of $31,980.00 toward the cost incurred by Tenant in resurfacing the portion of the parking lot situated within Tenant's Protected Parking Area, such contribution to be taken in the form a credit toward the monthly installment of annual fixed rent first due and payable after Tenant substantially completes the resurfacing of the portion of the parking lot situated within Tenant's Protected Parking Area.

(b)    Landlord's Work shall be performed in a good and workmanlike manner, and in compliance with all applicable laws, ordinances, codes and regulations of all duly constituted authorities.

(c)    Landlord shall commence Landlord's Work promptly after the execution and delivery of this Lease, and Landlord shall substantially complete Landlord's Work on or before October 31, 1999 (the "Delivery Date").  If Landlord does not complete construction of Landlord's Work by the Delivery Date, subject to delays by reason of force majeure, as described in Section 27.11 hereof, but in any event on or before November 24, 1999, Tenant shall be entitled to three (3) days free rent for each 24-hour period beyond the Delivery Date until substantial completion of Landlord's Work.

(d)    In addition, if Landlord does not substantially complete construction of Landlord's Work by the Delivery Date, then Tenant shall have the right, but not the obligation, to assume control of Landlord's Work and to proceed to complete Landlord's Work with all reasonable dispatch.  If Tenant elects to take over Landlord's Work, Landlord shall reimburse Tenant for all costs incurred by Tenant in performing Landlord's Work.  Upon Tenant's substantial completion of Landlord's Work, Tenant shall provide Landlord with a detailed invoice of all costs incurred by Tenant to complete Landlord's Work (or such designated portion thereof).  Landlord shall reimburse Tenant for such costs within fifteen (15) days after its receipt of said invoice from Tenant.  If Landlord fails to reimburse Tenant as provided hereunder, Tenant may offset from the annual fixed rent provided hereunder the sums due from Landlord plus interest thereon at the Default Rate (as hereinafter defined).

(e)    Landlord shall unconditionally warrant and guarantee Landlord's Work against defective workmanship and material for a period of one (1) year from the date of substantial completion of Landlord's Work.

**SECTION 4.2**.

(a)    Tenant shall accept possession of the Premises in their current "as-is" condition. Tenant acknowledges that it is relying on its own investigation of the Premises, including, but not limited to, the physical condition of the Premises, and Tenant further acknowledges that Landlord makes no representation or warranty with respect to the Premises or any other matter pertaining to this Lease, except as specifically set forth in this Lease.

(b)    Tenant may enter upon the Premises on the Commencement Date and shall have the right to make such alterations, changes and improvements to the Premises as Tenant may deem appropriate to convert the Premises to a Kohl's department store, including, without limitation, the alterations, changes and improvements described on EXHIBIT C attached hereto and made a part hereof (collectively, Tenant's Work").

(c)    Tenant shall have the right to install in the Premises all trade fixtures and equipment which Tenant, in its sole discretion, may deem necessary or desirable (the "Fixturing").

(d)    In connection with Tenant's Work and with the Fixturing, Tenant shall select all personnel, labor, materials, equipment, services, utilities and other elements, enter into contracts therefor and determine and do any and all matters and things which Tenant, in its sole discretion, shall deem necessary or advisable.

(e)    Tenant's Work shall be executed in a good and workmanlike manner in accordance with all applicable regulations and requirements of any state or local government. All salvage work done at any time by Tenant pursuant to the provisions of this Section 4.2 shall belong to Tenant who shall not be accountable therefor to Landlord.

(f)    In performing Tenant's Work, Tenant shall ensure that Tenant's contractors shall possess good labor relations and be capable of performing quality workmanship and working in harmony with Landlord's contractors and subcontractors and with other contractors and subcontractors performing work at the Shopping Center. Tenant acknowledges that Landlord has advised Tenant that Landlord will use union labor at the Shopping Center. If Tenant's contractors are unable to work in harmony with Landlord's contractors, Tenant shall immediately take steps to end the labor disharmony.

(g)    During the performance of Tenant's Work, Tenant shall secure, pay for and maintain or cause its contractor to secure, pay for and maintain, as the case may be, the following forms of insurance coverage:

(i)    Worker's compensation insurance with statutory limits;

(ii)    Commercial general liability insurance (including completed operations, contractual liability and XCU coverage), with a combined single limit of Three Million Dollars ($3,000,000) per occurrence with respect to bodily injury and/or property damage (such insurance shall name Landlord as an additional insured as its interest may appear); and

(iii)    Comprehensive automobile liability coverage (including coverage for owned, hired and nonowned automotive equipment) with a combined single limit of One Million Dollars ($1,000,000) per occurrence for bodily injury and One Hundred Thousand Dollars ($100,000) per occurrence for property damage.

(h)    With respect to Tenant's Work, Tenant shall indemnify Landlord against any loss, liability or claim arising out of (i) any mechanic's liens filed against the Premises or (ii) the negligence or intentional misconduct of Tenant or its employees, agents or contractors.

SECTION 4.3.    Landlord hereby grants to Tenant, for use by Tenant and its servants, agents, employees and independent contractors, in connection with Tenant's Work and the Fixturing, all necessary or appropriate rights of access, ingress and egress to and from the Premises over the Common Areas of the Shopping Center during the course of Tenant's Work and the Fixturing and the right to do all such other things as may be incidental to Tenant's Work and the Fixturing.  During the course of Tenant's Work and the Fixturing, Landlord shall make available to those working on or in the Premises, for the parking of trucks and delivery vehicles for the storage of materials and for temporary structures and other matters incidental to construction, such portions of the Common Areas of the Shopping Center as may be required for the expeditious performance of Tenant's Work and the Fixturing.  Tenant shall cooperate reasonably with Landlord to the end and purpose that the use and enjoyment of the Shopping Center by the other tenants, occupants, customers and patrons shall be interfered with as little as reasonably possible; and Landlord shall cooperate reasonably with Tenant in all ways so that Tenant's Work and the Fixturing may proceed as expeditiously as possible.  In particular, Landlord shall make available to Tenant for use as a construction staging area the area designated on EXHIBIT B.  To the extent practicable, Tenant shall confine its construction activities to the designated staging area and to such other portions of the Common Areas which are reasonably designated by Landlord for such purpose.

## ARTICLE V

### RENT

SECTION 5.1.

(a)    Commencing with the Rent Commencement Date and continuing until the last day of the fifth (5th) full Lease Year of the Term, Tenant shall pay to Landlord an annual fixed rent at a rate of One Million Four Hundred Sixteen Thousand Three Hundred Fifteen and No/100 Dollars ($1,416,315.00) per year.

(b)    Commencing with the beginning of the sixth (6th) full Lease Year of the Term and continuing until the last day of the tenth (10th) full Lease Year of the Term, Tenant shall pay to Landlord an annual fixed rent at a rate of One Million Four Hundred Sixty-Three Thousand Five Hundred Twenty-Five and 50/100 Dollars ($1,463,525.50) per year.

(c)    Commencing with the beginning of the eleventh (11th) full Lease Year of the Term and continuing until the last day of the fifteenth (15th) full Lease Year of the Term, Tenant shall pay to Landlord an annual fixed rent at a rate of One Million Five Hundred Fifty-Seven Thousand Nine Hundred Forty-Six and 50/100 Dollars ($1,557,946.50) per year.

(d)    Commencing with the beginning of the sixteenth (16th) full Lease Year of the Term and continuing throughout remainder of the initial term, Tenant shall pay to Landlord an annual fixed rent at a rate of One Million Six Hundred Fifty-Two Thousand Three Hundred Sixty-Seven and 50/100 Dollars ($1,652,367.50) per year.

(e)    If Tenant exercises its first option to extend the Term, then during the first extension term, Tenant shall pay to Landlord an annual fixed rent at a rate of

One Million Seven Hundred Forty-Six Thousand Seven Hundred Eighty-Eight and 50/100 Dollars ($1,746,788.50) per year.

(f)    If Tenant exercises its second option to extend the Term, then during the second extension term, Tenant shall pay to Landlord an annual fixed rent at a rate of One Million Eight Hundred Forty-One Thousand Two Hundred Nine and 50/100 Dollars ($1,841,209.50) per year.

(g)    If Tenant exercises its third option to extend the Term, then during the third extension term, Tenant shall pay to Landlord an annual fixed rent at a rate of One Million Nine Hundred Thirty-Five Thousand Six Hundred Thirty and 50/100 Dollars ($1,935,630.50) per year.

(h)    If Tenant exercises its fourth option to extend the Term, then during the fourth extension term, Tenant shall pay to Landlord an annual fixed rent at a rate of Two Million Thirty Thousand Fifty-One and 50/100 Dollars ($2,030,051.50) per year.

(i)    If Tenant exercises its fifth option to extend the Term, then during the fifth extension term, Tenant shall pay to Landlord an annual fixed rent at a rate of Two Million One Hundred Twenty-Four Thousand Four Hundred Seventy-Two and 50/100 Dollars ($2,124,472.50) per year.

(j)    The annual fixed rent payable under this Section 5.1 shall be payable to Landlord in equal, monthly installments in advance, on or before the first day of each month.

(k)    The annual fixed rent payable under this Section 5.1 and all additional rent payable pursuant to this Lease shall be payable to Landlord without notice or demand at the address for Landlord set forth in Section 27.9 hereof or at such other address as Landlord shall from time to time designate by notice to Tenant.

(l)    If the Rent Commencement Date shall be a day other than the first day of a calendar month or the Term shall expire or be terminated on a day other than the last day of a calendar month, annual fixed rent shall be prorated for such calendar months on a per diem basis.

## ARTICLE VI

### COMMON AREAS

**SECTION 6.1.**

(a)    The term "Common Areas" as used in this Lease means all those portions of the Shopping Center which shall be designated and improved for common use, including, without limitation, all parking areas; access roads; sidewalks; passageways; landscaped areas (including those adjacent to exterior walls of buildings); statuary and other works of art; malls, ramps, walks and arcades; and the like; but excluding portions of the Shopping Center which are used or intended for use by only one occupant and its employees, agents, customers, invitees and licensees.

(b)    At no cost or expense to Tenant (except to the extent provided in Section 6.3 hereof), Landlord shall police and maintain in good operating condition, order and repair at all times after the Premises are opened for business to the general public (and to keep in operation except as may be required to maintain in the required condition, order and repair), all Common Areas within the Shopping

Center, including, but without limitation, repairing and replacing any surface paving whenever necessary, keeping the same properly drained and free of snow, ice, water and rubbish and in a neat, clean, orderly and sanitary condition, providing adequate security in and for the Common Areas, maintaining suitable and adequate lighting in all Common Areas (and keeping same lighted during, and for at least one-half hour after, Tenant's business hours), maintaining such directional signs, markers and painted lines as may from time to time be necessary or proper for the control of parking and traffic in the Shopping Center and maintaining adequate accessways connecting all parking areas with the public streets abutting the Shopping Center.

(c)    Notwithstanding the foregoing, Landlord shall not be obligated to clear snow from the sidewalks immediately adjacent to the Premises.  Tenant shall, at Tenant's sole cost and expense, cause snow to be cleared from the sidewalk immediately adjacent to the Premises when necessary, and Landlord shall, at no cost to Tenant, cause the other tenants of the Shopping Center to clear the snow from the sidewalks immediately adjacent to their respective premises when necessary.

(d)    Notwithstanding the foregoing, if Tenant operates its business beyond 10:00 p.m. on any night, Tenant (together with other tenants keeping extended hours) shall reimburse Landlord for the extra cost incurred by Landlord in lighting the parking lot after 10:00 p.m. reasonably allocated to Tenant based on actual hours of operation beyond 10:00 p.m.

**SECTION 6.2**.  Landlord hereby grants to Tenant, during the term of this Lease, for the benefit of Tenant, Tenant's licensees and concessionaires, and their respective officers, agents and employees, and their respective customers, invitees, business guests and visitors, the non-exclusive right to use, for their intended purposes, all of the Common Areas as such areas may be constituted from time to time.  The rights hereby granted and reserved with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Land.  The benefit and the burden of such easements shall run with and bind the Land.

**SECTION 6.3**.

(a)    Commencing on the Rent Commencement Date and ending on the last day of the Term, provided that Landlord shall faithfully perform the covenants on its part to be performed with respect to the Common Areas and shall have completed all of the Landlord's Work required to be performed by Landlord pursuant to the provisions of Article IV hereof, Tenant shall pay to Landlord as additional rent an annual charge representing its contribution to the cost of the maintenance and operation of the Common Areas.  Such annual charge (hereinafter called the "Common Areas Charge") shall be computed by multiplying the Common Areas Expenses (as hereinafter defined) in each calendar year of the term by Tenant's Pro Rata Share (as hereinafter defined).  As used herein, the term "Tenant's Pro Rata Share" shall mean a fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the total Floor Area of all buildings in the Shopping Center, and as of the date hereof, Tenant's Pro Rata Share is forty-four and 81/100 percent (44.81%).  Notwithstanding the foregoing, Tenant's Pro Rata Share shall never be more than sixty percent (60%).  Prior to the Rent Commencement Date and thereafter from time to time Landlord shall estimate the Common Areas Charge for the remainder of the applicable calendar year and Tenant shall pay the estimated amount in equal monthly installments over the remaining portion of the calendar year.  Within forty-five (45) days after the expiration of each calendar year, Landlord shall notify Tenant of the actual Common Areas Charge due from Tenant for such calendar year and such statement shall be

binding upon Landlord and Tenant, subject to Tenant's right to audit the same pursuant to Section 6.3(c). If the Common Areas Charge for such calendar year shall be more than the estimated payments by Tenant, Tenant shall promptly pay the difference to Landlord. If the Common Areas Charge for the applicable calendar year is less than the estimated payment paid by Tenant for such calendar year, Landlord shall promptly refund to Tenant an amount equal to the difference between the estimated payments made by Tenant and the actual Common Areas Charge. If the Rent Commencement Date shall be a day other than the first day of a calendar month, payment for the first month shall be made on a pro rata basis and if the term of this Lease shall end on a day other than the last day of a calendar month, payment for the last month shall likewise be made on a pro rata basis.

(b)    As used herein, the term "Common Areas Expenses" shall mean the reasonable costs and expenses actually incurred by Landlord in the repair, maintenance and operation of the Common Areas, as determined, on a consistent basis, in accordance with generally accepted accounting principles and allocated to the calendar year on the cash method of accounting, and shall be limited to the following costs and expenses: charges for electricity for lighting of the Common Areas, the cost of repairing, maintaining and operating the Common Areas, including electrical and storm sewer systems; the wages of nonmanagement personnel employed in cleaning sidewalks and parking areas, snow removal, the removal of trash and similar work; the cost of maintaining landscaping, if any, in the Common Areas, including replacement of trees and shrubs, where necessary; the costs of repairing sidewalks and parking areas after the completion of the Landlord's Work; the wages of non-management personnel employed as security personnel and parking area attendants or the sums paid to unaffiliated third parties providing said services; the cost of equipment and supplies for the parking areas and for snow removal services; the cost of miscellaneous repairs to the Common Areas and to signs and fountains, if any, located therein; and the cost of general supplies consumed in the maintenance and operation of the Common Areas. Common Areas Expenses shall also include an administrative fee equal to five percent (5%) of the Common Areas Expenses (excluding insurance, utilities, snow removal and said administrative fee). In any event, the Common Areas Expenses shall not include the following:

(i)    reserves for future expenditures or liabilities maintained by Landlord;

(ii)    costs of maintaining or operating any enclosed common or mall areas;

(iii)    depreciation of the cost of constructing, erecting and installing the Shopping Center or any portion thereof, including the Common Areas;

(iv)    principal and interest payments pursuant to any mortgage that encumbers the Shopping Center or any portion thereof or rental or other payments pursuant to any ground lease;

(v)    real estate taxes and assessments and personal property taxes other than personal property taxes imposed upon property used in the operation, maintenance and repair of the Common Areas;

(vi)    except for the five percent (5%) administrative fee expressly set forth in this Section 6.3(b), management fees, administrative fees, leasing or sales commissions, broker fees, legal, accounting and other professionals' fees, advertising and promotional expenses, costs of customer service

booths, and costs of data processing services and other home office overhead expenses;

(vii)   premiums for liability insurance and property insurance (including all-risk and fire and extended coverage insurance) covering any portion of the Shopping Center other than the Common Areas and any excess premiums for liability insurance covering the Common Areas occasioned by the extra-hazardous use or activities of Landlord or occupants of the Shopping Center other than Tenant or their respective contractors, agents or employees;

(viii)   costs incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center other than Tenant or their respective contractors, agents or employees;

(ix)   costs incurred as a result of any deductible in any insurance policy;

(x)   costs attributable to goods and services provided by persons affiliated with Landlord to the extent such costs exceed the fair market value of such goods and services as reflected by costs for same generally available from unaffiliated sources in the market area;

(xi)   costs incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(xii)   costs related to buildings (e.g., roof), loading docks, ramps and related loading facilities and costs incurred by Landlord for alterations for other tenants;

(xiii)   costs of security for the Common Areas, including security guards, to the extent such security measures are reasonably required as a result of the customers or operations of an occupant of the Shopping Center other than Tenant;

(xiv)   costs (including fees, fines and penalties, and interest thereon) incurred due to violations by Landlord or any occupant of the Shopping Center (other than Tenant) of any applicable laws, rules, regulations or other governmental requirements;

(xv)   costs to comply with the requirements of any applicable laws, rules, regulations or other governmental requirements existing as of the date hereof, including Environmental Regulations (as hereinafter defined) and the "Americans with Disabilities Act";

(xvi)   the cost of any item that is treated or classified as a capital expenditure under either generally accepted accounting principles or Internal Revenue Code guidelines, including replacement/repaving of the parking areas and access drives (Any repair [exclusive of resealing and restriping of the parking area] of more than twenty percent (20%) of the parking area within the Shopping Center shall be deemed to be a replacement);

(xvii)   costs of which an occupant of the Shopping Center other than Tenant does not pay a pro rata share;

(xviii)   costs incurred by Landlord that are in whole or in part reimbursable by Tenant under another provision of this Lease;

(xix)   the cost of any utilities or other services, if any, separately sold by Landlord to Tenant and/or other tenants in the Shopping Center;

(xx)   the cost of clearing snow from the sidewalks immediately adjacent to the Premises and the premises of other tenants of the Shopping Center and the cost of providing lighting for the Common Areas after 10:00 p.m. (other than reduced "after hours" lighting required for security purposes); or

(xxi)   the costs incurred for the operation, maintenance and repair of any property located outside of the boundaries of the Shopping Center.

(c)    Landlord shall keep books and records which shall, for the purpose of verifying the Common Areas Expenses, be subject to examination by Tenant, its authorized representatives or accountants at reasonable times during business hours at Tenant's expense and in a manner which does not unreasonably interfere with the conduct of Landlord's business, but only during the period of three (3) years commencing with the delivery to Tenant of such certified statement.  After the expiration of such three (3) year period, Landlord may dispose of its books and records relating to the Common Areas Expenses for such calendar year unless Tenant shall have theretofore asserted a claim against Landlord with respect to the propriety of such statement, in which event, such books and records shall be preserved by Landlord until resolution of the dispute.  If Landlord's statement of Common Areas Expenses shall be overstated, Landlord shall pay to Tenant the amount by which the Common Areas Charge was overstated together with interest on the overstated amount at the Default Rate from the date of Landlord's statement. All examinations of Landlord's books and records shall be solely at Tenant's expense; provided, however, if Landlord's statement of Common Areas Expenses shall be overstated by five percent (5%) or more, Landlord shall promptly reimburse Tenant for Tenant's reasonable expenses of examination.

**SECTION 6.4**.  Landlord shall at all times throughout the Term operate, or cause the operation of, the Common Areas, including the parking areas, in the Shopping Center in a first-class manner.  No charge shall be made or imposed for parking within the Shopping Center without the prior approval of Tenant. All parking areas in the Shopping Center shall be operated primarily for the needs of Tenant and other occupants of the Shopping Center and their respective customers and invitees, and except for (i) the existing reciprocal easement agreement with the owner of the shopping center adjacent to the Shopping Center and (ii) an agreement with a tenant of said adjacent shopping center creating a no-build area within a portion of the Common Areas, Landlord shall not grant to any person, firm or corporation, not a tenant or occupant of the Shopping Center, any rights or privileges with respect to the Common Areas, including the parking areas. Landlord shall take all appropriate steps to insure that the employees of all other tenants in the Shopping Center do not use any parking spaces located within the portion of the Shopping Center identified on EXHIBIT B as "Tenant's Protected Parking Area" and Tenant shall take all appropriate steps to insure that Tenant's employees do park within Tenant's Protected Parking Area.  Landlord shall also promulgate reasonable rules, satisfactory to Tenant, regulating use of the Common Areas driveways and parking areas by trucks and other delivery vehicles. Without the prior written consent of Landlord, Tenant shall not store trailers in the Common Areas.

**SECTION 6.5**. Landlord shall not, without the prior written consent of Tenant, which consent may be withheld in Tenant's sole discretion, do the following:

(a)    make any change to the Premises;

(b)    close, restrict or otherwise alter the entrances to the Premises;

(c)    change the size, configuration and/or location of the parking areas situated within Tenant's Protected Parking Area or the location of the access drives of the Shopping Center outlined in blue on EXHIBIT B attached hereto;

(d)    construct or permit any third party or tenant of the Shopping Center to construct any improvements other than within the building areas designated on EXHIBIT B attached hereto or erect any kiosks in the Shopping Center;

(e)    add any land to the Shopping Center and/or grant any rights to use any of the Common Areas to other than the occupants of space in the Shopping Center and their respective employees, customers and business invitees except for the existing reciprocal easement agreement with the owner of the shopping center adjacent to the Shopping Center;

(f)    construct or permit the construction of an entrance to any portion of the Shopping Center or erect and display or permit the erection and display of freestanding signage by any third party or tenant of the Shopping Center within one hundred (100) feet of the Premises; and/or

(g)    reduce the parking ratio for the shopping center below the parking ratio in existence on the date hereof.

### SECTION 6.6.

(a)    If a Self-Maintenance Trigger Event (as hereinafter defined) shall occur, Tenant shall have the right, by giving Landlord at least ninety (90) days prior written notice, to assume responsibility for the maintenance and repair of the Common Areas located within the portion of the Shopping Center identified on EXHIBIT B as "Tenant's Self Maintenance Area".

(b)    If said Self-Maintenance Trigger Event shall occur and Tenant so exercises such option to assume responsibility for the maintenance and repair of the Common Areas located upon the Tenant's Self Maintenance Area, then the following shall occur:

(i)    Tenant shall thereafter so maintain and repair the Common Areas located upon the Tenant's Self Maintenance Area in the same manner and quality as required of Landlord under this Article VI;

(ii)    Tenant shall have no further obligation to pay to Landlord any Common Areas Charge otherwise provided under this Article VI for any period for which Tenant has assumed responsibility for the maintenance and repair of Common Areas upon the Tenant's Self Maintenance Area;

(iii)    Tenant shall carry the liability insurance required under Section 11.2 for the Common Areas located upon the Tenant's Self Maintenance Area, Landlord's obligation to carry liability insurance for the Common Areas shall exclude the Common Areas located upon the Tenant's Self Maintenance Area and Tenant shall have no further obligation to pay to Landlord any charges with respect to the liability insurance carried by Landlord; and

(iv)    The indemnity contained in Section 23.1 shall extend to all of Tenant's Self Maintenance Area and the indemnity contained in Section 23.2 shall not extend to the Common Areas located upon the Tenant's Self Maintenance Area.

(c)   Tenant shall have the right to cancel Tenant's election to be responsible for the maintenance and repair of Common Areas upon the Tenant's Self Maintenance Area by giving Landlord 90 days prior written notice of termination of such election, whereupon Landlord shall resume responsibility for the maintenance and repair of the Common Areas upon the Tenant's Self Maintenance Area in the same manner as otherwise called for under this Article VI and Tenant shall likewise resume paying the Common Areas Charge provided for hereunder.

(d)   As used herein, the term "Self-Maintenance Trigger Event" shall mean that Tenant has received from Landlord a statement of Common Areas Expenses from Landlord which provides that the Common Areas Charge (except the portion attributable to insurance, utilities and snow removal) is in excess of the Self-Maintenance Trigger Charge (as hereinafter defined).  Prior to the first day of second full calendar year of the Term to occur after the Rent Commencement Date, the term "Self-Maintenance Trigger Charge" shall mean One Hundred Forty-One Thousand Six Hundred Thirty-One and 50/100 Dollars ($141,631.50) per year.  For the second full calendar year of the Term to occur after the Rent Commencement Date and for each calendar year occurring thereafter, the term "Self-Maintenance Trigger Charge" shall mean One Hundred Forty-One Thousand Six Hundred Thirty-One and 50/100 Dollars ($141,631.50) per year, multiplied by a fraction, the numerator of which is the level of the Consumer Price Index (as hereinafter defined) on the first day of such calendar year and the denominator of which is the level of the Consumer Price Index on the first day of the first full calendar year to occur after the Rent Commencement Date.  As used herein, the term "Consumer Price Index" shall mean the Consumer Price Index for All Urban Consumers (CPI-U), U.S. City Average, published by the Bureau of Labor Statistics of the United States Department of Labor (base year 1982-84=100), or if publication of the Consumer Price Index is discontinued, a substitute index selected by Landlord and Tenant of comparable statistics computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Consumer Price Index.

## ARTICLE VII

## OPERATION OF SHOPPING CENTER

**SECTION 7.1.**  Throughout the term of this Lease, Landlord shall maintain the Shopping Center in continuous operation, in accordance with the standards observed by first class community shopping centers in the New York metropolitan area as a unified, retail shopping center providing quality, retail stores offering a broad range of retail services, attractive both in its physical characteristics and appearance and in its appeal to customers and trade.

**SECTION 7.2.**  Landlord shall not, without the prior written consent of Tenant, at any time permit any occupant of space in the Shopping Center to:  (i) conduct or permit any bankruptcy sale unless directed by order of a court of bankruptcy or other court of competent jurisdiction or any fire or "going out of business" sale; (ii) use, or permit to be used, the sidewalks adjacent to such occupant's space, or any other portion of the Common Areas for the sale or display of any merchandise or for any other business, occupation, or undertaking; (iii) use, or permit to be used, any sound broadcasting system or amplifying device which can be heard outside of such space, except systems or devices located within such spaces which are intended for hearing within such spaces and are not audible more than twenty-five feet (25') outside of such spaces; (iv) use or permit the use of any portion of such space for any of the uses set forth in EXHIBIT I attached hereto; or (v) use, operate, or maintain such space in such manner that any of the rates for any insurance carried by Tenant shall thereby be increased, unless Landlord shall pay to

Tenant an amount equal to any such increase in rates on demand as each premium which shall include such increase shall become due and payable. In the event of a violation of this Section by an occupant of space in the Shopping Center, Landlord shall promptly use its best efforts, including the diligent prosecution of litigation, to prevent the continuance of such violation. Notwithstanding anything to the contrary contained herein, the provisions of this Section 7.2 shall not apply to any of the existing tenants of the Shopping Center (or their successors, subtenants and assigns) to the extent that the leases with such tenants permit the tenants thereunder to undertake without Landlord's consent an activity that would otherwise be prohibited under this Section 7.2.

**SECTION 7.3.**

(a)    No sign, symbol or advertisement shall be placed or maintained on or adjacent to the exterior walls (including both interior and exterior surfaces of windows) of, or above, any building or structure in the Shopping Center, except signs complying with a general sign criteria attached hereto as EXHIBIT H; provided, however, notwithstanding anything to the contrary contained herein, the general sign criteria attached hereto as EXHIBIT H shall not apply to any of the existing tenants of the Shopping Center (or their successors, subtenants and assigns) to the extent that the leases with such tenants permit the tenants thereunder to undertake without Landlord's consent an activity that would otherwise be prohibited under this Section 7.3(a). Tenant shall have the right to install one or more signs on the exterior walls of the Premises in accordance with the Building and Zoning Codes of the Town of Hempstead and the general sign criteria attached hereto as EXHIBIT H; provided, however, notwithstanding any contrary provision in EXHIBIT H, Landlord hereby approves and consents to Tenant's exterior signage described on EXHIBIT H-1.

(b)    Landlord has erected internally illuminated freestanding signs at the locations set forth on EXHIBIT B, which freestanding signs may not be altered or modified by Landlord without the prior written approval of Tenant, which approval shall not be unreasonably withheld; provided, however, Landlord may replace the existing sign panels of other tenants of the Shopping Center without Tenant's consent. Landlord shall not erect any freestanding tenant identification signs in any other location within the Shopping Center. Tenant's identification sign panel shall occupy the positions on such freestanding signs that were previously occupied by the sign panels of The Caldor Corporation (or its affiliate), and Tenant shall have the right to place and maintain Tenant's identification sign panels on such freestanding signs at Tenant's sole cost and expense in compliance with the Building and Zoning Codes of the Town of Hempstead. Notwithstanding anything to the contrary contained in EXHIBIT H-2, Tenant shall have the unqualified right to use its prototype sign panel and colors as the same may exist from time to time. Landlord shall maintain such pylon signs as a Common Areas Expense.

(c)    Tenant shall have the right to construct additional freestanding signs within the Shopping Center for the display of Tenant's sign panels (i) if such signs are permitted by the appropriate governmental authorities, (ii) if such signs are not prohibited by restrictions contained in the leases of other tenants of the Shopping Center to the extent such restrictions exist on the date of this Lease, and (iii) if Tenant has obtained the prior written consent of Landlord for such signs, which consent shall not be unreasonably withheld, delayed or conditioned. It shall be reasonable for Landlord to withhold its consent to the freestanding signs proposed pursuant to this Section 7.3(c) if the signs interfere with the visibility of other signs or buildings within the Shopping Center.

**ARTICLE VIII**

**TAXES**

**SECTION 8.1.**

(a)    Tenant shall pay as additional rent Tenant's Pro Rata Share of Real Estate Taxes (as hereinafter defined) which shall be assessed and levied during the Term (except for portions of the Term occurring prior to the Rent Commencement Date) and any extension thereof against the Shopping Center.

(b)    The term "Real Estate Taxes" as used in this Section shall be deemed to mean all city, county, school, town and village taxes assessed against the land and the buildings within the Shopping Center, and any and all other real estate taxes, assessments and other governmental levies and charges, general and special, ordinary and extraordinary, unforeseen as well as foreseen, of any kind and nature whatsoever that is assessed against the land and buildings within the Shopping Center.

(c)    The term "Real Estate Taxes" shall also include special assessments unless such special assessments are attributable to Landlord's Work, but if such special assessments are payable in installments, such special assessments shall be charged to Tenant only to the extent such installments are payable during the term of this Lease commencing with the Rent Commencement Date. Except as provided in the immediately preceding sentence, Real Estate Taxes shall be deemed an imposition during the year in which such Real Estate Taxes become a lien upon the Shopping Center irrespective of whether such Real Estate Taxes are payable during a preceding or a succeeding year.

(d)    Notwithstanding the foregoing, the term "Real Estate Taxes" shall not include any capital stock, franchise, estate, inheritance, devolution, succession, transfer, gift or income tax or tax of a similar nature which is or may become payable by Landlord or which may be imposed against Landlord, and except as provided in Section 8.1(e) below, the term "Real Estate Taxes" shall not include any taxes which may be imposed against the rents payable hereunder or upon the income or profits of Landlord by reason of any law now in force or hereafter enacted.

(e)    If at any time during the term of this Lease, the methods of taxation prevailing on the date hereof shall be altered so that, in lieu of or as a substitute for the whole or any part of the Real Estate Taxes now levied, assessed or imposed directly or indirectly on real estate and the improvements comprising the Shopping Center, there shall be levied, assessed and imposed a tax, assessment, levy, imposition or charge wholly or partially as a capital levy or otherwise, on the rents received therefrom or otherwise, then all such taxes, assessments, levies, impositions or charges or the part thereof so measured or based, shall be deemed to be Real Estate Taxes for the purposes hereof, to the extent such Real Estate Taxes would be payable as if the Shopping Center were the only property of Landlord subject to such Real Estate Taxes.

(f)    For any partial tax year falling within the term of this Lease, Real Estate Taxes shall be prorated based on the number of days in such tax period falling within the term of this Lease.

**SECTION 8.2**.

(a)    Unless a Monthly Tax Trigger Event (as hereinafter defined) shall occur, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after receipt by Tenant of Landlord's itemized statement showing the Real Estate Taxes due and the calculation of Tenant's Pro Rata Share thereof, but in no event shall Tenant be required to make any such payment more than ten (10) days prior to the date such Real Estate Taxes are required to be paid without penalty to the taxing authority; and provided, further, that if such Real Estate Taxes may be paid on an installment basis, Tenant shall not be required to pay more than Tenant's Pro Rata Share of the installment then due.

(b)    As used in this Lease, the term "Monthly Tax Trigger Event" shall mean that the mortgage of the Shopping Center requires Landlord to escrow Real Estate Taxes on a monthly basis.

(c)    If a Monthly Tax Trigger Event shall occur, then Tenant shall pay to Landlord Tenant's Pro Rata Share of Real Estate Taxes on a monthly basis in the manner hereinafter set forth. All monthly payments of Tenant's Pro Rata Share of Real Estate Taxes shall be paid at the same times as Tenant is required to pay monthly installments of annual fixed rent pursuant to Section 5.1 and shall be calculated by Landlord and paid by Tenant based upon one-twelfth (1/12) of Tenant's Pro Rata Share of the Real Estate Taxes for the preceding calendar year with an adjustment to be made between Landlord and Tenant within ninety (90) days following the end of each calendar year so if Tenant shall not have paid an amount sufficient to constitute Tenant Pro Rata Share of Real Estate Taxes for such calendar year, Tenant shall pay the difference to Landlord within thirty (30) days after the furnishing to Tenant of a copy of the tax bill in question together with a statement of Tenant's Pro Rata Share thereof, or if Tenant shall have paid an amount in excess of Tenant Pro Rata Share of Real Estate Taxes for such calendar year, Landlord shall pay the difference to Tenant prior to the expiration of said ninety (90) day period. If Tenant so requests, Landlord shall furnish Tenant with copies of the statements of Landlord escrow account with its mortgagee.

(d)    A tax bill submitted by Landlord shall be prima facie evidence of the amount of taxes assessed or levied as well as the items taxed. Landlord shall furnish copies of said tax bills to Tenant promptly after such tax bills are furnished to Landlord.

(e)    All payments of Real Estate Taxes made by Tenant under this Section 8.2 shall be held by Landlord or its mortgagee in trust solely for the purpose of paying Real Estate Taxes on the Land and improvements constituting the Shopping Center and for no other purpose.

**SECTION 8.3**. Throughout the Term, Landlord shall pay, or cause to be paid, all real estate taxes, assessments and other taxes, duties and charges in the same category imposed by any governmental or public authority which shall be assessed or levied against the Shopping Center or any part thereof or any buildings or other improvements thereon or any appurtenances thereto or fixtures therein or any tax, charge or duty which may be imposed, levied or be or become a charge in lieu of any such present tax, charge or duty (herein collectively called "taxes"). All such taxes shall be paid before they become delinquent and Landlord agrees to exhibit to Tenant receipted bills or other evidence of payment of such taxes from time to time at Tenant's request.

**SECTION 8.4**. At Tenant's reasonable request, Landlord shall contest in good faith by appropriate proceedings, or in any other manner permitted by law, in Landlord's name, any Real Estate Taxes assessed or levied against the Shopping Center. Tenant agrees

to cooperate with Landlord and to execute any documents reasonably required for such purpose. Such contest shall include appeals from any judgments, decrees or orders until a final determination shall be made by a court or governmental department or authority having final jurisdiction in the matter. Notwithstanding such contest, Landlord shall pay such Real Estate Taxes before the Shopping Center, or any portion thereof, may become subject to a sale by governmental authority by reason of the nonpayment thereof. Upon the final determination of any such contest by a court or governmental department or authority having final jurisdiction in the matter, Landlord shall pay the same, together with such fines, interest, penalties, cost and charges as may, in accordance with such determination, be payable in connection therewith; and Tenant shall pay to Landlord Tenant's Pro Rata Share thereof. Any tax refund, (after the deduction therefrom of all costs, fees and expenses, including reasonable counsel fees actually incurred and paid by Landlord in connection with such contest), shall be apportioned between Landlord and Tenant upon the basis of the allocability of such Real Estate Taxes under Section 8.1. Landlord shall notify Tenant promptly of any increased assessment of all or any part of the Premises in sufficient time for Tenant to request Landlord to contest the assessment.

SECTION 8.5. Tenant shall be responsible for and shall pay, before delinquency, all municipal, county, state or federal taxes, if any, assessed against Tenant's leasehold interest or against Tenant's personal property.

## ARTICLE IX

### RIGHT OF ENTRY

SECTION 9.1. Landlord reserves the right to enter the Premises during normal business hours upon at least forty-eight (48) hours prior written notice to Tenant (which notice may be sent to Tenant by facsimile transmission) to inspect the same. Landlord further reserves the right, upon at least forty-eight (48) hours prior written notice to Tenant (which notice may be sent to Tenant by facsimile transmission) (except in the case of emergencies, in which event Landlord shall only be obligated to give such notice as is practical under the circumstances), to enter the Premises for the purpose of performing any obligations of Tenant hereunder which Tenant has failed to perform; provided that such entry to the full extent practicable shall be limited to such times as Tenant is not open for business to the public, and provided further, that access to the Premises shall not be denied Tenant nor shall the business of Tenant be interfered with unreasonably.

## ARTICLE X

### UTILITIES

SECTION 10.1. Throughout the term of this Lease, Tenant will pay for all water, natural gas, electricity and other utility services furnished to or consumed by Tenant in the Premises. Tenant shall have the right to select the providers of all utility services if more than one provider is available. If Tenant is required to procure utility services from Landlord, Tenant shall pay Landlord for such utility services at the lesser of (i) the same rates charged to Landlord for such services from the providers thereof or (ii) the rates that Tenant would have been charged if Tenant obtained the utilities directly from the providers thereof. Landlord shall, as part of Landlord's Work, cause separate meters to be installed for the furnishing of all utilities to the Premises; provided that electric and water service for the Common Areas located upon the Tenant's Self Maintenance Area either shall be separately metered or provided off of the same metered lines servicing the Premises. Tenant shall receive all savings, credits, allowances, rebates or other incentives granted or awarded by any third party as a result of Tenant's specifications, Tenant's selection or Landlord's use of energy efficient equipment, fixtures, parts, components, bulbs or devices. Tenant's obligations under this Article X shall survive the expiration or sooner termination of this Lease.

## ARTICLE XI

### INSURANCE AND RESTORATION

**SECTION 11.1.**  At all times during the Term, Landlord shall cause all buildings and other improvements located within the Shopping Center to be insured against loss or damage by fire, lightning, and such other risks as are from time to time included in "extended coverage" endorsements in the state in which the Premises is located, in an amount and form so that the proceeds thereof are sufficient to provide for actual replacement in full of the buildings and improvements within the Shopping Center (said amount may exclude foundation and excavation costs and costs of underground flues, pipes and drains); such coverage to include "Comprehensive Boiler and Machinery" coverage, if applicable, as part of one or more policies of insurance.  Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the cost of such insurance, within thirty (30) days after receipt from Landlord of a paid invoice for same.

**SECTION 11.2.**  Commencing with the date of this Lease, Landlord and Tenant each agree, at no expense to the other party except as hereinafter provided, to maintain or cause to be maintained general public liability insurance against claims for contractual liability as well as personal injury or death and property damage occurring upon, in or about the Shopping Center (excluding the Premises), as to Landlord, and the Premises as to Tenant, such insurance in each case to afford protection to the limit of not less than $5,000,000 for combined single limit for personal injuries, including bodily injury or death (which limit may be included in an excess lines policy), and property damage to any number of persons arising out of any one occurrence.  To the extent that the general public liability insurance to be maintained by Landlord covers the Common Areas of the Shopping Center, Tenant shall be an additional insured thereunder.  Landlord shall furnish to Tenant a statement certifying the amount of the premium allocable to the Common Areas of the Shopping Center, and such amount shall be included in the Common Areas Expenses under Section 6.3 hereof.  In addition to the foregoing, the insurance coverage required under this Section shall extend to any liability of the parties arising out of the indemnities provided for in Article XXIII hereof.  The adequacy of the amounts of coverage of such policies shall be reviewed by the parties at least triennially so as to provide for minimum coverage to the then customary limits observed in similar first-class shopping centers.

**SECTION 11.3.**  All insurance provided for in this Article XI shall be effected under valid and enforceable policies issued by insurers of recognized responsibility with a minimum Alfred M. Best Company, Inc. (or any successor rating organization) general policyholder's Rating of B+/X, which shall contain a deductible of no more than $250,000.00 per occurrence and shall be primary and noncontributing.  Any insurance required to be maintained by Landlord or Tenant may be self-insured in whole or in part if the party obligated to insure shall then have and thereafter maintain a net worth of at least $100,000,000, or may be taken out under a blanket insurance policy or policies covering other premises, property or insureds in addition to the Shopping Center and the parties hereto, provided such policy or policies otherwise comply with this Article XI.  If any party shall elect to self-insure, the other party shall have all the benefits provided in this Article XI that it would have had the self-insuring party carried the required insurance.  The original of the initial policies or renewal policies, if any, as the case may be, shall be delivered to the primary named insured, and certificates thereof shall be delivered to the other party upon request.  Any insurance (other than the property insurance required to be maintained by Landlord under Section 11.1 hereof) required to be maintained by either party (the "insured party") shall name the other party (the "other party") and the other party's ground lessors and/or mortgagees as additional insureds as their respective interests may appear. Any policy required by this Article shall provide that such policy shall not be cancelled or materially changed without at least thirty (30) days prior written notice to the other party to this Lease.  If a party fails to maintain insurance in accordance with the provisions of this Article and if such party fails to correct such default after reasonable

notice from the other party hereto, such other party may purchase such insurance for such defaulting party and the defaulting party shall pay the cost thereof, plus interest thereon at the Default Rate.

**SECTION 11.4.**  In the event of damage to or destruction of the whole or any part of the improvements comprising the Premises by fire or any other casualty during the term of this Lease, such that it would be commercially unreasonable or unfeasible for Tenant, in Tenant's sole discretion, to conduct its business upon the Premises, a just proportion of Tenant's rent due under this Lease reflecting the adverse effect on Tenant shall be suspended and abated until the damaged portion of the Premises is rebuilt.  Except as otherwise provided in Section 11.5 hereof and in Section 11.6 hereof, in the event of damage to or destruction of the whole or any part of the improvements comprising the Premises by fire or any other casualty during the term of this Lease, Landlord shall, at Landlord's sole cost and expense, repair and restore such improvements to the same condition as existed immediately prior to the date of such casualty; provided, however, Landlord shall have no obligation to restore Tenant's trade fixtures, inventory and other personal property and the abatement described above shall not extend to the refixturing period.  All such repairs and restoration shall be performed in a commercially reasonable time and manner.

**SECTION 11.5.**  Notwithstanding anything contained herein to the contrary, if at any time after September 30, 2017, more than twenty-five percent (25%) of the Floor Area of the Premises is damaged or destroyed by fire or other casualty and the time to restore the damage or destruction (as reasonably estimated by Landlord) is greater than one hundred fifty (150) days, then Tenant shall have the right to terminate this Lease by giving Landlord written notice of such termination within forty-five (45) days after the date of such casualty, specifying a termination date of at least thirty (30) days and not more than ninety (90) days after the date of Tenant's notice of termination.  If Tenant does not give notice of termination within such forty-five (45) day period, Tenant shall be deemed to have waived such right of termination and Landlord shall remain obligated to repair and restore the Premises in accordance with the terms hereof.

**SECTION 11.6.**  If during the last two (2) years of the Term or any extended Term, more than twenty-five percent (25%) of the Floor Area of the Premises is damaged or destroyed by fire or other casualty and the time to restore the damage or destruction (as reasonably estimated by Landlord) is greater than one hundred fifty (150) days, then Landlord, at Landlord's sole option, may terminate this Lease by giving written notice to Tenant of Landlord's election to so terminate, such notice to be given within ninety (90) days after the occurrence of such damage or destruction.  If Landlord timely gives such notice to terminate, this Lease shall terminate thirty (30) days after the date of Landlord's notice to Tenant.  Notwithstanding the foregoing, if Tenant notifies Landlord within thirty (30) days after receipt of Landlord's notice of termination that Tenant desires to extend the Term for a period of five (5) years, this Lease shall not terminate but shall be extended for an additional five (5) years from the date of the termination of the then existing Term unless Tenant exercises any additional options to extend the Term as set forth in Section 2.1 hereof.

**SECTION 11.7.**  Section 227 of the Real Property Law shall not be applicable to the agreement between the parties hereto and the provisions of this Article XI shall control all of the rights of the parties in the event of fire or other casualty to the Premises.

**ARTICLE XII**

**REPAIRS, ALTERATIONS, IMPROVEMENTS AND REPLACEMENTS**

**SECTION 12.1.**  Subject to the provisions of Section 11.5, Section 18.2 and Section 18.3 hereof, Tenant shall, at its sole expense, keep the Premises and sidewalks

immediately adjacent to the Premises in good condition and repair and shall be responsible for any and all structural and non-structural maintenance and repairs thereto, ordinary wear and tear excepted.  In addition, Tenant shall, at Tenant's sole cost and expense, keep all of its accumulated papers, boxes, cartons, rubbish, garbage and trash in containers within the Premises or in trash compactors kept adjacent to the Premises, and Tenant shall, at Tenant's sole cost and expense, cause same to be removed as necessary.

**SECTION 12.2.**    At its own expense, Tenant may, at any time and from time to time during the term of this Lease, make any alterations, changes and improvements to the Premises; provided, however, (a) the structural integrity of the Premises shall not be adversely affected by any alteration, change or improvement performed by Tenant; (b) Tenant shall not make any alteration, change or improvement to the exterior of the Premises unless such alteration, change or improvement is architecturally harmonious with the other buildings in the Shopping Center; (c) the new improvements shall not involve the use of exterior materials that are of a lesser quality than those used in the initial construction of the Premises; (d) the fair market value of the Premises shall not be reduced by the proposed alteration, change or improvement and (e) unless the prior written consent of Landlord is first obtained, neither the building footprint of the Premises nor the Floor Area of the Premises shall be materially changed by the proposed alteration, change or improvement.  If the alteration, change or improvement affects the exterior of the Premises or the structural components of the Premises, Tenant shall give Landlord written notice of the alteration, change or improvement prior to the commencement of the alteration, change or improvement, and if Landlord so requests, Tenant shall provide Landlord with a copy of the plans and specifications for the alteration, change or improvement.

**SECTION 12.3.**  Landlord shall cooperate with Tenant in securing any building or other permits or authority necessary from time to time for any repair, alteration, change or improvement required or permitted to be performed by Tenant in, on, to or of the Premises, and if Landlord so requests, Tenant shall provide Landlord with a copy of such building permits.  Subject to Tenant's obligations under Section 17.1 hereof and the rights of any insurance company providing the insurance required hereunder, all salvage work done at any time by Tenant pursuant to the provisions of this Article XII shall belong to Tenant who shall not be accountable therefor to Landlord.   Any repair, alteration, change or improvement shall be executed in a good and workmanlike manner in accordance with all applicable regulations and requirements of any state or local government.  In performing any such repair, alteration, change or improvement, Tenant shall ensure that Tenant's contractors shall possess good labor relations and be capable of performing quality workmanship and working in harmony with Landlord's contractors and subcontractors and with other contractors and subcontractors  performing work at the Shopping Center, and if Tenant's contractors are unable to work in harmony with Landlord's contractors, Tenant shall immediately take steps to end the labor disharmony.

**SECTION 12.4.**  Any provision of this Lease to the contrary notwithstanding, during the course of any replacement, restoration, alteration, improvement or repair of or to the Premises, Tenant, its independent contractors and suppliers, and their respective servants, agents and employees, may use the parking areas within Tenant's Protected Parking Area for the parking of contractors' and materialmen's trucks and delivery vehicles, storage of materials, temporary structures and other matters incidental to construction; provided, however, that no such use shall unnecessarily interfere with the operation of the Shopping Center.

## ARTICLE XIII

### TRADE FIXTURES

**SECTION 13.1.**  Tenant may at any time during the Term install upon the Premises any and all trade fixtures and operating equipment which it may deem necessary or

advisable in connection with the conduct of its business. Any and all of such fixtures and equipment may at any time and from time to time during the Term be removed by Tenant from the Premises and Tenant will repair and restore, at its expense, any damage caused to the Premises by reason of such removal.

SECTION 13.2. Tenant may plan, design, construct, supervise and maintain upon the roof and/or the exterior of the Premises any air-conditioning and electrical equipment, alarm bells and equipment, antennas, satellite dishes and similar facilities which may protect or service the Premises, provided that the same do not unreasonably interfere with the operation of the Shopping Center, do not impair the structural integrity of the Premises, are reasonably screened from public view and comply with all applicable governmental codes, ordinances, rules, regulations and laws. Any such facility which shall be so installed or erected shall, unless and until Tenant shall remove the same, be maintained by Tenant at Tenant's own cost and expense and any damage to the Premises caused by the removal thereof shall be repaired and restored, at Tenant's expense, upon the expiration or earlier termination of the term of this Lease.

## ARTICLE XIV

### SUBORDINATION/NON-DISTURBANCE

SECTION 14.1. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage hereafter placed upon Landlord's interest in the Premises; provided, however, (a) no default by Landlord under any such mortgage shall affect Tenant's rights under this Lease, and (b) the subordination shall not become effective until the mortgagee of the mortgage encumbering Landlord's interest in the Premises executes a Subordination, Non-Disturbance and Attornment Agreement substantially in the form as set forth in EXHIBIT E attached hereto or such other form as may be reasonably acceptable to Tenant. At or prior to the date of Landlord's Notice of Commencement, Landlord shall cause to be delivered to Tenant a separate Subordination, Non-Disturbance and Attornment Agreement substantially in the form as that attached hereto as EXHIBIT E or such other form as may be reasonably acceptable to Tenant for each mortgage or deed of trust shown on the title insurance commitment delivered to Tenant in accordance with Section 16.5 hereof, duly executed by the holder of each such mortgage or deed of trust.

## ARTICLE XV

### ASSIGNMENT AND SUBLETTING

SECTION 15.1. Tenant shall have the right, at any time, to grant licenses or subleases of departments or concessions for the sale of merchandise and services in or from the portions of the Premises covered by such departments or licenses or assign this Lease or sublet all or any portion of the Premises; provided, however, no licensee, subtenant or assignee shall use the Premises or any portion therefor for a use that will violate the restrictive use covenants set forth in EXHIBIT J. Any license, sublease or assignment pursuant to this Section 15.1 shall not release Tenant from its obligations under this Lease and Tenant shall remain primarily liable for the payment of rental and all other amounts due under this Lease and for the performance of all of the provisions, covenants and conditions set forth in this Lease on Tenant's part to be performed.

## ARTICLE XVI

### QUIET ENJOYMENT, REPRESENTATIONS AND TITLE INSURANCE

SECTION 16.1. Landlord covenants, warrants and represents to Tenant that (a) it has full right and power to execute and perform this Lease and to grant the estate demised

herein, and (b) Tenant shall peaceably and quietly have, hold and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in any way appertaining thereto, during the full Term, free and clear of all liens and encumbrances except the permitted encumbrances ("Permitted Encumbrances") set forth in EXHIBIT F attached hereto.

**SECTION 16.2**.

(a)    The term "Environmental Regulations" shall mean all applicable environmental laws, rules, regulations and orders of any applicable governmental authority having jurisdiction over the Land.

(b)    The term "Hazardous Material(s)" shall mean any hazardous, toxic or radioactive substance, material, matter or waste which is or becomes regulated by any Environmental Regulation, and shall include asbestos, petroleum products and the terms "Hazardous Substance" and "Hazardous Waste" as defined in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") as amended, 42 U.S.C. §9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. §6901 et seq., and all environmental protection statutes of the state and municipality in which the Premises are located.

(c)    The term "Excluded Materials" shall mean Hazardous Materials (i) whose storage, disposal or presence on, in or under the Land does not constitute a violation of applicable laws or regulations; (ii) which may be present in (A) paints, glues, fuels, photocopy equipment, supplies, photographic chemicals and supplies, building materials, maintenance supplies, cleaning agents and solvents, (B) inventory held for sale at retail, (C) oil, gasoline or other fluid deposits released from passenger cars or maintenance vehicles parked at the Land, or (D) fertilizer, herbicides, insecticides, and pesticides applied by Tenant within the Land; (iii) in quantities commonly stored, found or maintained for similar uses by tenants in retail stores; and (iv) which are not used for manufacturing purposes.

(d)    Landlord represents and warrants to Tenant that to the best of the Landlord's knowledge, the Premises do not contain any Hazardous Materials, and Landlord covenants to Tenant that all requirements with respect to Environmental Regulations shall be complied with and satisfied in connection with Landlord's Work. Landlord shall indemnify and save Tenant harmless from all claims, liens, losses, damages and expenses, including without limitation reasonable attorneys' fees and expenses, arising out of Landlord's breach of this environmental representation, warranty and covenant. The obligations of Landlord under this Section 16.2(d) shall survive the termination of this Lease.

(e)    If it is determined that there are Hazardous Materials on, upon or within the Shopping Center or any other environmental conditions not caused by Tenant in violation of any Environmental Regulations or which result in action by either local, state or federal environmental agencies, then if in Tenant's reasonable opinion such violation and/or action materially impairs Tenant's ability to conduct business upon the Premises and Tenant ceases to operate from the Premises as a direct result thereof, all rent and charges payable by Tenant hereunder shall abate during such period as Tenant's ability to so operate is materially impaired and if such condition continues for in excess of twelve (12) months, Tenant shall have the right to terminate all of its rights and obligations hereunder by giving written notice to Landlord at any time after the expiration of such twelve (12) month period and so long as such condition continues.

(f)    Except for Excluded Materials, Tenant shall not cause or permit knowingly or unknowingly, any Hazardous Materials to be brought or remain upon, kept, used, discharged, leaked, or emitted in or about, or treated at the Land. Should Landlord consent in writing to Tenant bringing, using, storing or treating any Hazardous Material(s) in or upon the Land or if Tenant is allowed to bring, use, store or treat Hazardous Materials in or upon the Land pursuant to this Section 8.5, Tenant shall strictly obey and adhere to any and all Environmental Regulations, which in any way regulate, govern or impact Tenant's possession, use, storage, treatment or disposal of said Hazardous Material(s).

**SECTION 16.3.**  Without limitation of any other covenant, representation or warranty contained in this Lease, Landlord represents and warrants as an inducement to Tenant to enter into this Lease, that except as set forth in EXHIBIT J attached hereto and made a part hereof, no leases or other agreements affecting the Land conflict with this Lease or prohibit or restrict (i) the construction of the Premises and related improvements; or (ii) the use or occupancy of the Premises as a department store or for any other retail purposes, or the use of the Common Areas as contemplated in this Lease.

**SECTION 16.4.**  Within thirty (30) days after the date of this Lease, Tenant shall be afforded the opportunity to obtain a leasehold owner's title insurance policy, insuring Tenant's leasehold interest under this Lease, to be free and clear of all liens and encumbrances except the Permitted Encumbrances and to be written by a title insurance company licensed by the state in which the Premises is located.  If Tenant is unable to obtain said title insurance policy within said thirty (30) day period because of a defect in Landlord's title, Tenant shall have the right to terminate this Lease by written notice given to Landlord within fifteen (15) days after the expiration of said thirty day period.  If Tenant fails to terminate this Lease within said fifteen (15) day period, said right of termination shall be deemed to have been waived by Tenant.  Tenant shall pay the premium of the title insurance policy obtained by Tenant.

**SECTION 16.5.**  Landlord further covenants and agrees that, throughout the Term, so long as Tenant is operating a specialty department store within the Premises and is not itself violating the restrictions in this Section 16.5, no space within the Shopping Center shall be used by any occupant to operate a retail operation in which more than twenty percent (20%) of the Floor Area of the premises of the occupant (including the Floor Area of the aisles adjacent to the space where such merchandise is displayed) is used for the display and sale of clothing commonly referred to as close outs, manufacturer's overruns, other retailer's returned or excess inventory or manufacturer's seconds or imperfect merchandise; provided, however, the provisions of this Section 16.5 shall not apply to any of the existing tenants of the Shopping Center (or their successors, subtenants and assigns) to the extent that the leases with such tenants permit the tenants thereunder to undertake without Landlord's consent an activity that would otherwise be prohibited under this Section 16.5.  If Landlord shall be in breach of this covenant and shall fail to cure such breach within thirty (30) days after receipt of written notice from Tenant, Tenant shall have the option to seek such injunctive or other relief as may be available at law or in equity to force the cessation of the offending activity, and Landlord shall reimburse Tenant for all expenses incurred by Tenant (including reasonable attorney's fees and disbursements) in the enforcement of the provisions of this Section 16.5.  If Landlord fails to begin to cure the violation within the time set forth herein, in addition to Tenant's right to seek injunctive or other relief, and without waiving Tenant's right to seek injunctive or other relief at a later date should such violation continue, so long as such violation shall continue, the annual fixed rent otherwise due under this Lease shall be reduced by ten percent (10%) of the annual fixed rent otherwise due under this Lease.

**ARTICLE XVII**

**SURRENDER OF PREMISES**

**SECTION 17.1.**  At the expiration or earlier termination of the Term and subject to Tenant's rights under Section 13.1 of this Lease, Tenant covenants that it shall remove its trade fixtures, operating equipment and personal property from the Premises and it shall peaceably and quietly leave and surrender the Premises together with all alterations, changes and improvements then a part of the Premises vacant and in good order and condition; reasonable wear and tear, loss or damage by fire or casualty and condemnation excepted.

**SECTION 17.2.**  If Tenant remains in possession of the Premises after the expiration of the Term, and without the execution and delivery of a new lease, Tenant, at the option of Landlord, shall be deemed to be occupying the Premises as a tenant from month-to-month, at a minimum monthly rental equal to one and one-half times the monthly installment of annual fixed rent payable during the last month of the then current term, subject to all the other conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.

**ARTICLE XVIII**

**CONDEMNATION**

**SECTION 18.1.**  If all of the Premises shall be sold to or taken by any governmental authority under its power of condemnation or threat thereof ("Taking"), this Lease shall terminate on the date of the vesting of title to the condemned property or on the date of the taking of possession of such property by the condemning authority, whichever shall first occur.

**SECTION 18.2.**  Upon a Taking of more than ten percent (10%) of the Floor Area of the Premises; or if as a result of any Taking direct access between the Premises and Long Beach Road or Daly Boulevard, as shown on EXHIBIT B, is rendered unusable or materially impaired, Tenant shall have the right to terminate this Lease effective as of the date of such Taking by serving notice to that effect upon Landlord no later than forty-five (45) days after the vesting of title to the condemned property.

**SECTION 18.3.**  Upon a Taking of a portion of the parking areas located upon the Tenant's Protected Parking Area which shall result in a reduction of fifteen percent (15%) or more of the then existing total number of parking spaces upon the Tenant's Protected Parking Area or which shall result in a reduction of ten percent (10%) or more of the then existing total number of parking spaces upon the Shopping Center, Tenant shall have the right to terminate this Lease effective as of the date of such Taking by serving notice to that effect upon Landlord no later than forty-five (45) days after the vesting of title to the condemned property.

**SECTION 18.4.**  Upon taking of less than all of the Premises, if Tenant does not exercise its right to terminate this Lease under Sections 18.2 and/or 18.3 hereof, this Lease shall remain in effect for the balance of the Premises not so taken, rent shall be abated as provided below and Landlord shall, in a commercially reasonable prompt and diligent manner, restore the remainder of the Premises as near as possible to the condition it was in immediately prior to such taking.  Upon a Taking of any portion of the Land which results in a reduction in the number of parking spaces situated within the Shopping Center, annual fixed rent shall be reduced by an amount equal to the product of (a) ten percent (10%) of the annual fixed rent otherwise payable under this Lease, multiplied by (b) a fraction, the numerator of which is the square footage of the Land taken and the denominator of which is the square footage of the Land immediately prior to such Taking.