Exhibit A



**BED BATH &**
**BEYOND**
Beyond any store of its kind.®

**Corporate Office 650 Liberty Avenue, Union, NJ 07083**

April 27, 2022

**VIA EMAIL**

**EMAIL TO**: Pat Westerhouse (pwesterhouse@castoinfo.com)

Re:    Lease Agreement dated December 6, 2012 (as amended, the *"Lease"*) between
Panama City Beach Venture II, LLC (*"Landlord"*) and Bed Bath & Beyond Inc.
(*"Tenant"*) for premises located in the Pier Park North Shopping Center in
Panama City Beach, Florida **[Store #1367]**

Landlord:

Capitalized terms used, but not defined herein, shall have the meaning(s) ascribed to
them in the Lease.

This letter shall confirm the agreement between Landlord and Tenant to modify the Lease
on the terms and conditions hereinafter set forth.

1.    Subject to applicable Legal Requirements, Landlord hereby consents to Tenant:
(a) using the four (4) parking stalls outlined in red on the attached Exhibit 1 (*"Curbside Pickup*
*Area"*) for curbside pickup for Tenant's customers; and (b) installing signs designating the
Curbside Pickup Area.

2.    Reference is hereby made to that certain waiver letter dated July 18, 2014 (the
"*Waiver Letter*") relating to the operation of a Texas Roadhouse restaurant. The Waiver Letter is
attached hereto as Exhibit 2. The parties hereto acknowledge and agree that the references in the
Waiver Letter to "7,300 square feet" are hereby deleted and replaced with "7,676 square feet".

3.    Landlord represents and warrants to Tenant that, as of the date hereof no third-
party consents or approvals (including, without limitation, with respect to the REA or any lender
or beneficiary of a deed of trust or mortgage) are required in order for the terms and provisions
of this letter agreement to be in full force and effect or, if any such consent is required, Landlord
has obtained same prior to its execution hereof.

4.    The terms and conditions of this letter agreement shall be binding upon, and inure
to the benefit of Landlord and Tenant and their respective successors and assigns. Except as

Page 2

specifically modified hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect.

5.      Please be advised that no individual who is employed by or who represents Tenant, and no individual or entity that contracts with Tenant or otherwise performs services on behalf of Tenant, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services. If any such improper actions are observed, contact our Legal Department (Attention: General Counsel) at Tenant's notification address and/or by telephone at 908-688-0888, so that the incident may be fully investigated.

6.      This letter agreement may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one letter agreement. The transmission of an image of any signed original document or document signed by DocuSign (or a similar application) will have the same binding effect as an original bearing an original signature.

Please sign below to confirm your agreement with the provisions of this letter agreement.

Very truly yours,

BED BATH & BEYOND INC.,
a New York corporation

DocuSigned by:

*Wade Haddad*

Wade Haddad,
SVP, Real Estate & Store Development

ACCEPTED AND AGREED
THIS 28 DAY OF April , 2022

PANAMA CITY BEACH VENTURE II, LLC,
a Florida limited liability company

By: Casto/CCM-US PPN, LLC,
    a Delaware limited liability company,
    Managing Member

    By: Casto/CCM-US Panama City, LLC,
        a Delaware limited liability company,
        Managing Member

By: _____
Name: J. Brett Hutchens
Title: Manager

DocuSign Envelope ID: FEB30916-FBDC-436C-BF94-CDEDD...

Page 3

## **Exhibit 1**



DocuSign Envelope ID: FEB30916-FBDC-436C-BF94-CDEDDB0188

Page 4

## **Exhibit 2**

**(Attached)**

Page 5



Beyond any store of its kind.™

*1367*

Corporate Office
650 Liberty Avenue
Union, NJ 07083
908/688-0888

July 18, 2014

**VIA FEDERAL EXPRESS**
Mary Patricia Baxter, Esq.
CASTO
5391 Lakewood Ranch Blvd., Suite 100
Sarasota, FL  34240

Re:   Lease Agreement dated December 6, 2012 (as amended, the "**Lease**") by and
between Panama City Beach Venture II, LLC ("**Landlord**"), and Bed Bath & Beyond
Inc. ("**Tenant**"), demising premises located at Pier Park North Shopping Center,
Panama City Beach, FL ("*Shopping Center*") [#1367]

Dear Jeff:

This letter withdraws and replaces the previous consent letter dated July 2, 2014.

Capitalized terms used, but not otherwise defined herein, shall have the meaning(s) ascribed to them in the Lease.

You have informed us of your desire to lease premises in the Shopping Center, specifically located on Outparcel A, as shown on the attached site plan, for the operation of a *Texas Roadhouse* restaurant. Section 5.2.3 of the Lease and Exhibit B restricts the square footage of any building area limited to 7,000 square feet, plus an outdoor seating area of no more than 1,500 square feet.  *Texas Roadhouse* wishes to build a restaurant of approximately 7,300 square feet, but only requires an outdoor seating area of approximately 750 square feet. Notwithstanding such Lease prohibition, Tenant hereby consents to the operation of the *Texas Roadhouse*, provided that Landlord, at all times during the term of Tenant's Lease, satisfies each of the following conditions:

1.    The restaurant will have a Floor Area of 7,300 square feet and outdoor seating area of approximately 750 square feet; and

2.    The restaurant will be operated in a manner consistent with other *Texas Roadhouse* casual restaurants.

Except as set forth herein, all other terms and conditions of the Lease remain in full force and effect.  This approval does not constitute an approval or waiver of any other provision in the Lease.  The site plan attached is solely for the purpose of identifying the permitted location of *Texas Roadhouse* and shall not be deemed Tenant's consent to any other matter thereon.

Very truly yours,

Seth Geldzahler
Vice President – Real Estate

Encl.
cc:    Steve Cohen
       Peter Russell

File # 2015062097, OR BK: 3748 PG: 887, Pages: 1 of 6, Recorded 11/12/2015 at 7:56 AM,
Bill Kinsaul, Clerk Bay County, Florida    Deputy Clerk RK Trans # 1284977

After Recording, Return to:

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attn: Alan M. Freeman, Esq.

(The Above Space for Recorder's Use Only)

## AMENDED MEMORANDUM OF LEASE

THIS AMENDED MEMORANDUM OF LEASE, made as of October _12_, 2015, by
and between PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company, having
an office c/o Casto Southeast Realty Services LLC, 5391 Lakewood Ranch Boulevard, Suite 100,
Sarasota, Florida 34240 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation,
having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

### Preliminary Statement

Landlord is the fee owner of certain real property located in the City of Panama City
Beach, Bay County, Florida, as more particularly described on Exhibit A hereto annexed,
together with improvements constructed or to be constructed thereon (the *"Shopping Center"*).
Landlord and Tenant have entered into a lease dated December 6, 2012 as amended by First
Amendment to Lease dated as of April 24, 2013 (the "First Amendment"), and further amended
by Second Amendment to Lease dated as of December 8, 2014 (the "Second Amendment") (the
Lease, the First Amendment and the Second Amendment collectively, the *"Lease"*) demising a
portion of the Shopping Center as more particularly described therein (the *"Premises"*) to
Tenant.

In connection therewith, Landlord and Tenant executed a Memorandum of Lease dated
December 6, 2012, which was recorded in the Official Records Book 3488, Pages 1359-1363, of
the Public Records of Bay County, Florida (the "Original Memorandum"), to confirm the demise
of the Premises and to provide notice to any interested party of such demise and of the terms and
provisions of the Lease.

The Original Memorandum included an inaccurate legal description of the Shopping
Center as its Exhibit A, and Landlord and Tenant have agreed, pursuant to the Second
Amendment, that Landlord shall, at its cost, record an amended Memorandum of Lease with the
correct legal description attached as Exhibit A.

NOW, THEREFORE, the parties state as follows:

1.    All capitalized terms used, but not otherwise defined, herein shall have the
meanings ascribed to them in the Lease.

2.    This Amended Memorandum of Lease hereby replaces the Original
Memorandum.

A-1
NY02DOCS\1704124.1\C061858\0328405

3.    The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term that shall expire on January 31, 2025 (the *"Initial Term"*).  Under the terms of the Lease, Tenant has the right to extend the Initial Term for four (4) separate and additional periods of five (5) years each after the expiration of the Initial Term.

4.    This Amended Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

(i)    that, subject to certain exceptions more particularly set forth in the Lease, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (including, without limitation, health and beauty care items but excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items.

(ii)    the restrictions set forth therein on Landlord's ability to lease certain portions of the Shopping Center for certain uses which are otherwise prohibited by the terms of the Lease;

(iii)    provisions set forth therein regarding Tenant's right to install and maintain signage upon the exterior of the Premises and upon a pylon and/or monument sign located at the Shopping Center;

(iv)    provisions set forth therein regarding Tenant's right to use (and to permit Tenant's customers, employees, agents and contractors to use) certain common areas of the Shopping Center (such as, without limitation, the parking facilities of the Shopping Center); and

(v)    provisions set forth therein regarding certain areas in the Shopping Center in which no improvements are to be constructed, or changes made without the consent of the Tenant.

5.    In addition to those terms hereinabove set forth, the Lease contains numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions.  The Lease and exhibits thereto are hereby incorporated by reference in this Amended Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded.  In the event of any conflict between the provisions of this instrument and the Lease,

File # 2015062097 BK: 3748 PG: 889, Pages: 3 of 6

the provisions of the Lease shall control.  This Amended Memorandum of Lease is not intended, and shall not be construed, to define, limit or modify the Lease.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended Memorandum of Lease as of the day and year first above written.

**LANDLORD**:

PANAMA CITY BEACH VENTURE II, LLC, a
Florida limited liability company

WITNESSES:

*Mary Ann Ferrill*
Mary Ann Ferrill

Name:

*Sheila Cowan*
Name:    Sheila  Cowan

By:  Casto/CCM-US PPN, LLC,
      a Delaware limited liability company,
      Managing Member

      By:  Casto/CCM-US Panama City,    LLC,
            a Delaware limited liability company,
            Managing Member

            By
            Name:   J. Brett Hutchens
            Title:    Manager

STATE OF Florida      )
                                  ) : ss.
COUNTY OF Waverton  )

On the 12 day of October  in the year 2015, before me, the undersigned, personally appeared J. Brett Hutchens, Manager of Casto/CCM-US Panama City,  LLC, a Delaware limited liability company, Managing Member of Casto/CCM-US PPN, LLC, a Delaware limited liability company, Managing Member of Panama City Beach Venture II, LLC, a Florida limited liability company, who is personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of Waverton, State of Florida.

Notary Public

My Commission Expires:

LESLIE PEREZ
Commission # EE 877328
Expires June 22, 2017
Bonded Thru Troy Fain Insurance 800-385-7019

File # 2015062097 BK:  3748 PG:  890, Pages: 4 of 6

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended Memorandum of Lease as of the day and year first above written.

**TENANT**:

WITNESSES:

BED BATH & BEYOND INC., a New York corporation

Name: Alan Freeman

By:

Name:  Allan N. Rauch
Title:   Vice President – Legal and General Counsel

Name: Zanna Lantzman

STATE OF NEW JERSEY    )
                                              ) : ss.
COUNTY OF UNION           )

On the ___ day of October  in the year 2015, before me, the undersigned, personally appeared Allan N. Rauch, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of Union, State of New Jersey.

Notary Public

**KATHLEEN P CURRIE**
ID # 17737
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires Nov. 2, 2018

My Commission Expires:

File # 2015062097 BK: 3748 PG: 891, Pages: 5 of 6

## Exhibit A

### Legal Description of Shopping Center

BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98 (PANAMA CITY BEACH PARKWAY - HAVING A 200 FT. RIGHT OF WAY) AND THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 35°44'09" EAST, ALONG SAID WESTERLY BOUNDARY FOR A DISTANCE OF 801.86 FEET TO A POINT ON THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE 3, AS PER PLAT RECORDED IN PLAT BOOK 20, PAGES 43 AND 44 OF SAID PUBLIC RECORDS; THENCE NORTHWESTERLY ALONG SAID BOUNDARY FOR THE FOLLOWING COURSES; NORTH 54°12'33" WEST, FOR A DISTANCE OF 936.98 FEET; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 181.15 FEET; THENCE NORTH 83°02'27" EAST, FOR A DISTANCE OF 153.65 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 438.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 32.56 FEET, SAID ARC HAVING A CHORD OF 32.55 FEET BEARING NORTH 04°49'44" WEST TO THE END OF SAID CURVE; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 173.24 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 1038.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 53.02 FEET SAID ARC HAVING A CHORD OF 53.01 FEET BEARING NORTH 01°14'10" WEST TO THE END OF SAID CURVE; THENCE NORTH 73°47'49" WEST, FOR A DISTANCE OF 416.42 FEET TO THE SOUTHWEST CORNER OF LOT 362, SAID PALMETTO TRACE PHASE THREE; THENCE CONTINUE NORTHWESTERLY ALONG THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE FOUR, AS PER PLAT RECORDED IN PLAT BOOK 21, PAGES 48 THRU 55 OF SAID PUBLIC RECORDS FOR THE FOLLOWING COURSES; NORTH 73°47'48" WEST, FOR A DISTANCE OF 195.25 FEET; THENCE NORTH 81°33'49" WEST, FOR A DISTANCE OF 261.92 FEET; THENCE NORTH 56°32'46" WEST, FOR A DISTANCE OF 391.01 FEET; THENCE LEAVING SAID SOUTHERLY BOUNDARY, NORTH 74°22'54" WEST, FOR A DISTANCE OF 191.70 FEET; THENCE NORTH 65°11'47" WEST, FOR A DISTANCE OF 67.49 FEET; THENCE SOUTH 77°13'17" WEST, FOR A DISTANCE OF 83.55 FEET; THENCE SOUTH 70°25'13" WEST, FOR A DISTANCE OF 117.07 FEET; THENCE NORTH 75°35'38" WEST, FOR A DISTANCE OF 150.95 FEET TO A EASTERLY RIGHT OF WAY LINE OF PIER PARK DRIVE; THENCE SOUTH 32°00'55" WEST, FOR A DISTANCE OF 619.72 FEET TO A NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98; THENCE SOUTH 54°15'13" EAST, FOR A DISTANCE OF 2,765.96 FEET TO THE POINT OF BEGINNING. SAID LANDS LYING IN AND BEING A PORTION OF SECTION 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA. CONTAINING 58.7265 ACRES, MORE OR LESS.


LESS AND EXCEPT THE ROOMS TO GO PARCEL:

COMMENCE AT THE INTERSECTION OF THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA AND THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98 (PANAMA CITY BEACH PARKWAY ~ HAVING A 200 FT. RIGHT OF WAY); THENCE NORTH 54°14'56" W, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 86.57 FEET, TO THE POINT OF BEGINNING; THENCE LEAVING SAID NORTHERLY RIGHT OF WAY LINE, NORTH 35°47'27" EAST, FOR A DISTANCE OF 313.95 FEET, TO A POINT ON A NON-TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 69.38 FEET; THENCE NORTHWESTERLY, ALONG SAID CURVE FOR AN ARC DISTANCE OF 107.21 FEET, SAID ARC HAVING A CHORD OF 96.86 FEET BEARING NORTH 08°21'49" WEST, TO THE END OF SAID CURVE; THENCE NORTH 54°14'34" WEST, FOR A DISTANCE OF 88.52 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 181.00 FEET; THENCE NORTH 54°14'56" WEST, FOR A DISTANCE OF 260.00 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 202.50 FEET, TO SAID NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98; THENCE SOUTH 54°14'56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A

File # 2015062097 BK:  3748 PG:  892, Pages: 6 of 6

DISTANCE OF 415.72 FEET, TO THE POINT OF BEGINNING. CONTAINING 2.5571 ACRES, MORE OR
LESS. SAID LANDS LYING IN AND BEING A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH,
RANGE 16 WEST, BAY COUNTY, FLORIDA.

After Recording, Return to:

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attn:  Alan M. Freeman, Esq.

---

(The Above Space for Recorder's Use Only)

## AMENDED MEMORANDUM OF LEASE

THIS AMENDED MEMORANDUM OF LEASE, made as of October 10, 2015, by and between PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company, having an office c/o Casto Southeast Realty Services LLC, 5391 Lakewood Ranch Boulevard, Suite 100, Sarasota, Florida 34240 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

Preliminary Statement

Landlord is the fee owner of certain real property located in the City of Panama City Beach, Bay County, Florida, as more particularly described on <u>Exhibit A</u> hereto annexed, together with improvements constructed or to be constructed thereon (the *"Shopping Center"*). Landlord and Tenant have entered into a lease dated December 6, 2012 as amended by First Amendment to Lease dated as of April 24, 2013 (the "First Amendment"), and further amended by Second Amendment to Lease dated as of  December 8, 2014 (the "Second Amendment") (the Lease, the First Amendment and the Second Amendment collectively, the *"Lease"*) demising a portion of the Shopping Center as more particularly described therein (the *"Premises"*) to Tenant.

In connection therewith, Landlord and Tenant executed a Memorandum of Lease dated December 6, 2012, which was recorded in the Official Records Book 3488, Pages 1359-1363, of the Public Records of Bay County, Florida (the "Original Memorandum"), to confirm the demise of the Premises and to provide notice to any interested party of such demise and of the terms and provisions of the Lease.

The Original Memorandum included an inaccurate legal description of the Shopping Center as its Exhibit A, and Landlord and Tenant have agreed, pursuant to the Second Amendment, that Landlord shall, at its cost, record an amended Memorandum of Lease with the correct legal description attached as Exhibit A.

NOW, THEREFORE, the parties state as follows:

1.      All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

2.      This Amended Memorandum of Lease hereby  replaces the Original Memorandum.

A-1
NY02DOCS\1704124.1\C061858\0328405

3.      The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term that shall expire on January 31, 2025 (the ***"Initial Term"***).  Under the terms of the Lease, Tenant has the right to extend the Initial Term for four (4) separate and additional periods of five (5) years each after the expiration of the Initial Term.

4.      This Amended Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

(i)      that, subject to certain exceptions more particularly set forth in the Lease, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (including, without limitation, health and beauty care items but excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items.

(ii)      the restrictions set forth therein on Landlord's ability to lease certain portions of the Shopping Center for certain uses which are otherwise prohibited by the terms of the Lease;

(iii)      provisions set forth therein regarding Tenant's right to install and maintain signage upon the exterior of the Premises and upon a pylon and/or monument sign located at the Shopping Center;

(iv)      provisions set forth therein regarding Tenant's right to use (and to permit Tenant's customers, employees, agents and contractors to use) certain common areas of the Shopping Center (such as, without limitation, the parking facilities of the Shopping Center); and

(v)      provisions set forth therein regarding certain areas in the Shopping Center in which no improvements are to be constructed, or changes made without the consent of the Tenant.

5.      In addition to those terms hereinabove set forth, the Lease contains numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions.  The Lease and exhibits thereto are hereby incorporated by reference in this Amended Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded.  In the event of any conflict between the provisions of this instrument and the Lease,

the provisions of the Lease shall control.  This Amended Memorandum of Lease is not intended, and shall not be construed, to define, limit or modify the Lease.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended Memorandum of Lease as of the day and year first above written.

**LANDLORD:**

WITNESSES:

*Mary Ann Ferrill*
Mary Ann Ferrill

Name: _____

PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company

By:  Casto/CCM-US PPN, LLC,
  a Delaware limited liability company,
  Managing Member

*Sheila Cowan*
Name: Sheila Cowan

  By:  Casto/CCM-US Panama City, LLC,
    a Delaware limited liability company,
    Managing Member

    By: _____
    Name:  J. Brett Hutchens
    Title: Manager

STATE OF Florida  )
        ) : ss.
COUNTY OF Sarasota )

   On the 12 day of October  in the year 2015, before me, the undersigned, personally appeared J. Brett Hutchens, Manager of Casto/CCM-US Panama City,  LLC, a Delaware limited liability company, Managing Member of Casto/CCM-US PPN, LLC, a Delaware limited liability company, Managing Member of Panama City Beach Venture II, LLC, a Florida limited liability company, who is personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of Sarasota, State of Florida

             _____
             Notary Public

My Commission Expires:



LESLIE PEREZ
Commission # EE 877328
Expires June 22, 2017
Bonded Thru Troy Fain Insurance 800-385-7019

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended Memorandum of Lease as of the day and year first above written.

**TENANT:**

WITNESSES:

BED BATH & BEYOND INC., a New York corporation

By: _____
Name:  Allan N. Rauch
Title:   Vice President – Legal and General Counsel

Name: Alan Freeman

Name: Zanna Lantzman


STATE OF NEW JERSEY    )
                        ) : ss.
COUNTY OF UNION         )

On the 7 day of October in the year 2015, before me, the undersigned, personally appeared Allan N. Rauch, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of Union, State of New Jersey.

_____
Notary Public

My Commission Expires:         **KATHLEEN P CURRIE**
                                ID # 17737
                                NOTARY PUBLIC
                                STATE OF NEW JERSEY
                                My Commission Expires Nov. 2, 2018

Exhibit A

Legal Description of Shopping Center

BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98 (PANAMA CITY BEACH PARKWAY - HAVING A 200 FT. RIGHT OF WAY) AND THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 35°44'09" EAST, ALONG SAID WESTERLY BOUNDARY FOR A DISTANCE OF 801.86 FEET TO A POINT ON THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE 3, AS PER PLAT RECORDED IN PLAT BOOK 20, PAGES 43 AND 44 OF SAID PUBLIC RECORDS; THENCE NORTHWESTERLY ALONG SAID BOUNDARY FOR THE FOLLOWING COURSES; NORTH 54°12'33" WEST, FOR A DISTANCE OF 936.98 FEET; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 181.15 FEET; THENCE NORTH 83°02'27" EAST, FOR A DISTANCE OF 153.65 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 438.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 32.56 FEET, SAID ARC HAVING A CHORD OF 32.55 FEET BEARING NORTH 04°49'44" WEST TO THE END OF SAID CURVE; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 173.24 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 1038.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 53.02 FEET SAID ARC HAVING A CHORD OF 53.01 FEET BEARING NORTH 01°14'10" WEST TO THE END OF SAID CURVE; THENCE NORTH 73°47'49" WEST, FOR A DISTANCE OF 416.42 FEET TO THE SOUTHWEST CORNER OF LOT 362, SAID PALMETTO TRACE PHASE THREE; THENCE CONTINUE NORTHWESTERLY ALONG THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE FOUR, AS PER PLAT RECORDED IN PLAT BOOK 21, PAGES 48 THRU 55 OF SAID PUBLIC RECORDS FOR THE FOLLOWING COURSES; NORTH 73°47'48" WEST, FOR A DISTANCE OF 195.25 FEET; THENCE NORTH 81°33'49" WEST, FOR A DISTANCE OF 261.92 FEET; THENCE NORTH 56°32'46" WEST, FOR A DISTANCE OF 391.01 FEET; THENCE LEAVING SAID SOUTHERLY BOUNDARY, NORTH 74°22'54" WEST, FOR A DISTANCE OF 191.70 FEET; THENCE NORTH 65°11'47" WEST, FOR A DISTANCE OF 67.49 FEET; THENCE SOUTH 77°13'17" WEST, FOR A DISTANCE OF 83.55 FEET; THENCE SOUTH 70°25'13" WEST, FOR A DISTANCE OF 117.07 FEET; THENCE NORTH 75°35'38" WEST, FOR A DISTANCE OF 150.95 FEET TO A EASTERLY RIGHT OF WAY LINE OF PIER PARK DRIVE; THENCE SOUTH 32°00'55" WEST, FOR A DISTANCE OF 619.72 FEET TO A NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98; THENCE SOUTH 54°15'13" EAST, FOR A DISTANCE OF 2,765.96 FEET TO THE POINT OF BEGINNING. SAID LANDS LYING IN AND BEING A PORTION OF SECTION 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA. CONTAINING 58.7265 ACRES, MORE OR LESS.


LESS AND EXCEPT THE ROOMS TO GO PARCEL:

COMMENCE AT THE INTERSECTION OF THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA AND THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98 (PANAMA CITY BEACH PARKWAY ~ HAVING A 200 FT. RIGHT OF WAY); THENCE NORTH 54°14'56" W, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 86.57 FEET, TO THE POINT OF BEGINNING; THENCE LEAVING SAID NORTHERLY RIGHT OF WAY LINE, NORTH 35°47'27" EAST, FOR A DISTANCE OF 313.95 FEET, TO A POINT ON A NON-TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 69.38 FEET; THENCE NORTHWESTERLY, ALONG SAID CURVE FOR AN ARC DISTANCE OF 107.21 FEET, SAID ARC HAVING A CHORD OF 96.86 FEET BEARING NORTH 08°21'49" WEST, TO THE END OF SAID CURVE; THENCE NORTH 54°14'34" WEST, FOR A DISTANCE OF 88.52 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 181.00 FEET; THENCE NORTH 54°14'56" WEST, FOR A DISTANCE OF 260.00 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 202.50 FEET, TO SAID NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98; THENCE SOUTH 54°14'56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A

DISTANCE OF 415.72 FEET, TO THE POINT OF BEGINNING. CONTAINING 2.5571 ACRES, MORE OR LESS. SAID LANDS LYING IN AND BEING A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA.

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE ("**Amendment**") is dated of _Deçember 5_, 2014 (the "**Effective Date**"), by and between PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company ("**Landlord**"), and BED BATH & BEYOND INC., a New York corporation ("**Tenant**").

### RECITALS

**WHEREAS**, Landlord and Tenant entered into that certain Lease dated December 6, 2012 ("**Original Lease**") for the lease of certain premises ("**Premises**") located in the Pier Park North Shopping Center in Panama City Beach, Florida ("**Shopping Center**").

**WHEREAS**, the Original Lease was amended by a First Amendment to Lease dated as of April 24, 2013 ("**First Amendment**") (the Original Lease and First Amendment shall collectively be deemed the "**Lease**").

**WHEREAS**, Landlord and Tenant entered into a Memorandum of Lease ("**MOL**") dated as of December 6, 2012 and recorded on March 1, 2013 in the Clerk's Office of Bay County, Florida in OR BK 3488 Pages 1359-1363, File #2013011899 with respect to the Shopping Center.

**WHEREAS**, U.S. Bank, National Association, a national banking association ("**Lender**") and Tenant entered into a Subordination, Non-Disturbance and Attornment Agreement ("**SNDA**") dated as of February 27, 2013 and recorded on March 1, 2013 in the Clerk's Office of Bay County, Florida in OR BK 3488 Pages 1364-1371, File #2013011900 with respect to the Shopping Center.

**WHEREAS**, Landlord and Tenant hereby express their mutual desire and intent, among other Lease modifications, to modify and/or replace certain exhibits to the Lease.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

### AGREEMENT

1. **Definitions**. All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms as set forth in the Lease.

2. **Legal Description**. Landlord and Tenant agree that the legal description attached as <u>Exhibit A</u> to the First Amendment and to each of the Original Lease, MOL and SNDA was incorrect and that the correct legal description is the one attached as <u>Exhibit A</u> to this Amendment. The parties hereby agree that <u>Exhibit A</u> of each of the Lease, MOL and SNDA shall be deemed deleted in their entirety and the <u>Exhibit A</u> attached to this Amendment shall be replaced in lieu thereof.

3. **Square Footage of the Premises.** Pursuant to Section 3.4.1 of the Lease, Landlord has delivered to Tenant a certification to Tenant by Landlord's licensed architect of the interior clear dimension and the Floor Area (with the dimensions on which it is based) of the Premises, showing the square footage of the Premises to be 23,774 square feet. Pursuant to Section 3.4.3, since the measurement of the Premises indicates a Floor Area of 23,900 square feet or less, then the Fixed Rent and any other applicable provision of the Lease (including, without limitation, Tenant's Pro Rata Share) is hereby adjusted accordingly to conform to the actual measurement and Tenant shall pay the appropriate increase of any Rent theretofore paid to Landlord, to the extent not already paid.

4. **Recordation of the MOL and SNDA.** Landlord shall, at its cost, have the MOL and SNDA re-recorded in the Clerk's Office of Bay County, Florida with the revised legal description. If required by the county, Landlord and Tenant shall execute, and Landlord shall cause to be executed by Lender, an amended or restated MOL and SNDA with the corrected legal description for recording, which shall be in form and substance as reasonably acceptable to all parties. Landlord shall provide Tenant with a copy of the re-recorded MOL and SNDA containing the recording information once same has been recorded in the Clerk's Office of Bay County, Florida.

5.    **Third-Party Rights**.  Landlord represents and warrants to Tenant that, as of the Effective Date, no third-party consents or approvals (including, without limitation, with respect to the Lender) are required in order for this Amendment to be in full force and effect.

6.    **Effect of Amendment**.    Except as herein modified, all other terms and conditions of the Lease shall remain unchanged and in full force and effect.  In the event of any conflict between the terms of the Lease and the terms of this Amendment, this Amendment shall control.  Each reference in the Lease to itself shall be deemed also to refer to the Lease as modified by this Amendment. This Amendment shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, successors and assigns.

7.    **Counterparts.**  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

8.    **Ethical Policy**.  It is the policy of Tenant and its parent company, subsidiaries and affiliates to conduct all its business transactions in accordance with the highest ethical standards: No individual who is employed by or who represents the company is permitted to solicit, accept or pay any bribe, kickback or any other improper payment of money, products or services in exchange for (i) the company's execution of this Amendment, (ii) any action taken by such individual on behalf of the company, or (iii) any action taken by a third party.  If any such improper actions are observed, please contact our Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties have duly executed this Amendment effective on the date first set forth above.

WITNESS:

<u>**LANDLORD**</u>:

PANAMA CITY BEACH VENTURE II,
LLC, a Florida limited liability company

By:  Casto/CCM-US PPN, LLC,
     a Delaware limited liability company,
     Managing Member

       By:  Casto/CCM-US Panama City,
          LLC,
           a Delaware limited liability
           company,
           Managing Member

_Leslie Perez_

         By: _____
         Name:  J. Brett Hutchens
         Title:   Manager

<u>**TENANT**</u>:

WITNESS:

BED BATH & BEYOND INC.,
a New York corporation

_____
Name:  Alan M. Freeman
Title:  Assistant Secretary

By: _____
Name:  Warren Eisenberg
Title:   Co-Chairman

<u>Exhibit A</u>

<u>Legal Description</u>

PIER PARK NORTHEAST TRACT

BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98 (PANAMA CITY BEACH PARKWAY - HAVING A 200 FT. RIGHT OF WAY) AND THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 35°44'09" EAST, ALONG SAID WESTERLY BOUNDARY FOR A DISTANCE OF 801.86 FEET TO A POINT ON THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE 3, AS PER PLAT RECORDED IN PLAT BOOK 20, PAGES 43 AND 44 OF SAID PUBLIC RECORDS; THENCE NORTHWESTERLY ALONG SAID BOUNDARY FOR THE FOLLOWING COURSES; NORTH 54°12'33" WEST, FOR A DISTANCE OF 936.98 FEET; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 181.15 FEET; THENCE NORTH 83°02'27" EAST, FOR A DISTANCE OF 153.65 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 438.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 32.56 FEET, SAID ARC HAVING A CHORD OF 32.55 FEET BEARING NORTH 04°49'44" WEST TO THE END OF SAID CURVE; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 173.24 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 1038.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 53.02 FEET SAID ARC HAVING A CHORD OF 53.01 FEET BEARING NORTH 01°14'10" WEST TO THE END OF SAID CURVE; THENCE NORTH 73°47'49" WEST, FOR A DISTANCE OF 416.42 FEET TO THE SOUTHWEST CORNER OF LOT 362, SAID PALMETTO TRACE PHASE THREE; THENCE CONTINUE NORTHWESTERLY ALONG THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE FOUR, AS PER PLAT RECORDED IN PLAT BOOK 21, PAGES 48 THRU 55 OF SAID PUBLIC RECORDS FOR THE FOLLOWING COURSES; NORTH 73°47'48" WEST, FOR A DISTANCE OF 195.25 FEET; THENCE NORTH 81°33'49" WEST, FOR A DISTANCE OF 261.92 FEET; THENCE NORTH 56°32'46" WEST, FOR A DISTANCE OF 391.01 FEET; THENCE LEAVING SAID SOUTHERLY BOUNDARY, NORTH 74°22'54" WEST, FOR A DISTANCE OF 191.70 FEET; THENCE NORTH 65°11'47" WEST, FOR A DISTANCE OF 67.49 FEET; THENCE SOUTH 77°13'17" WEST, FOR A DISTANCE OF 83.55 FEET; THENCE SOUTH 70°25'13" WEST, FOR A DISTANCE OF 117.07 FEET; THENCE NORTH 75°35'38" WEST, FOR A DISTANCE OF 150.95 FEET TO A EASTERLY RIGHT OF WAY LINE OF PIER PARK DRIVE; THENCE SOUTH 32°00'55" WEST, FOR A DISTANCE OF 619.72 FEET TO A NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98; THENCE SOUTH 54°15'13" EAST, FOR A DISTANCE OF 2,765.96 FEET TO THE POINT OF BEGINNING. SAID LANDS LYING IN AND BEING A PORTION OF SECTION 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA. CONTAINING 58.7265 ACRES, MORE OR LESS.

LESS AND EXCEPT THE ROOMS TO GO PARCEL:

COMMENCE AT THE INTERSECTION OF THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA AND THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98 (PANAMA CITY BEACH PARKWAY ~ HAVING A 200 FT. RIGHT OF WAY); THENCE NORTH 54°14'56" W, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 86.57 FEET, TO THE POINT OF BEGINNING; THENCE LEAVING SAID NORTHERLY RIGHT OF WAY LINE, NORTH 35°47'27" EAST, FOR A DISTANCE OF 313.95 FEET, TO A POINT ON A NON-TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 69.38 FEET; THENCE NORTHWESTERLY, ALONG SAID CURVE FOR AN ARC DISTANCE OF 107.21 FEET, SAID ARC HAVING A CHORD OF 96.86 FEET BEARING NORTH 08°21'49" WEST, TO THE END OF SAID CURVE; THENCE NORTH 54°14'34" WEST, FOR A DISTANCE OF 88.52 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 181.00 FEET; THENCE NORTH 54°14'56" WEST, FOR A DISTANCE OF 260.00 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 202.50 FEET, TO SAID NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98; THENCE SOUTH 54°14'56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 415.72 FEET, TO THE POINT OF BEGINNING. CONTAINING 2.5571 ACRES, MORE OR LESS. SAID LANDS LYING IN AND BEING A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA.

# BED BATH & BEYOND

Beyond any store of its kind."

**Corporate Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888

July 18, 2014

**VIA FEDERAL EXPRESS**

Mary Patricia Baxter, Esq.
CASTO
5391 Lakewood Ranch Blvd., Suite 100
Sarasota, FL  34240

> Re:  Lease Agreement dated December 6, 2012 (as amended, the "**Lease**") by and
> between Panama City Beach Venture II, LLC ("**Landlord**"), and Bed Bath & Beyond
> Inc. ("**Tenant**"), demising premises located at Pier Park North Shopping Center,
> Panama City Beach, FL ("***Shopping Center***") [#1367]

Dear Jeff:

This letter withdraws and replaces the previous consent letter dated July 2, 2014.

Capitalized terms used, but not otherwise defined herein, shall have the meaning(s) ascribed to them in the Lease.

You have informed us of your desire to lease premises in the Shopping Center, specifically located on Outparcel A, as shown on the attached site plan, for the operation of a ***Texas Roadhouse*** restaurant.  Section 5.2.3 of the Lease and Exhibit B restricts the square footage of any building area limited to 7,000 square feet, plus an outdoor seating area of no more than 1,500 square feet.  ***Texas Roadhouse*** wishes to build a restaurant of approximately 7,300 square feet, but only requires an outdoor seating area of approximately 750 square feet.  Notwithstanding such Lease prohibition, Tenant hereby consents to the operation of the ***Texas Roadhouse,*** provided that Landlord, at all times during the term of Tenant's Lease, satisfies each of the following conditions:

1.  The restaurant will have a Floor Area of 7,300 square feet and outdoor seating area of approximately 750 square feet; and

2.  The restaurant will be operated in a manner consistent with other ***Texas Roadhouse*** casual restaurants.

Except as set forth herein, all other terms and conditions of the Lease remain in full force and effect.  This approval does not constitute an approval or waiver of any other provision in the Lease.  The site plan attached is solely for the purpose of identifying the permitted location of ***Texas Roadhouse*** and shall not be deemed Tenant's consent to any other matter thereon.

Very truly yours,

Seth Geldzahler
Vice President – Real Estate

Encl.

cc:  Steve Cohen
     Peter Russell

**Deanna Lemley**

| | |
|---|---|
| **From:** | Sheila Hutchins |
| **Sent:** | Tuesday, July 15, 2014 11:52 AM |
| **To:** | Deanna Lemley |
| **Subject:** | Bed Bath & Beyond @ Panama City   567001-HO7881 |

Can you please add store #1367.

Thank you

**Sheila Hutchins**
Collections Representative III | Collections
250 Civic Center Dr | Suite 500
Columbus, Ohio 43215
P: 614-744-2040
F: 614-229-4307

Inspired ideas. Integrated real estate solutions.    **CASTO**

WEBSITE 🖥    EMAIL ✉    VCARD 📇    FACEBOOK 📘    TWITTER 🐦

1

| Database: | DONCASTO | Lease Profile | Page: | 1 |
| Lease Id: | 567001 - HO7881 | Casto | Date: | 7/15/2014 |
| Master Occupant Id: | HO006562-1 | | Time: | 02:20 PM |
| DC_PROFNODLQ | | | | |

| N | BED BATH & BEYOND #1367 | | B | BED BATH & BEYOND INC. |
| A | PANAMA CTY BCH VENTURE II, LLC | | I T | 650 LIBERTY AVENUE |
| M | 15600 PANAMA CITY BEACH PKWY | | L O | |
| E | Panama City          FL | | L | UNION          NJ     07083 |

| Legal Name | BED BATH & BEYOND INC. | | Tenant Id | BBB | Bed Bath & Beyond |
| Contact Name | | | Tenant Type Id | 5719 | MISC. HOMEFURNISHINGS STORES |
| Attention | LEASE ADMINISTRATION - #1367 | | | | |
| Phone No. | | | Tenant Fed ID: | | |
| Fax No. | | | | | |
| Email | | | | | |

### Suite Information

| | | | | Current Recurring Charges | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Suite Sqft | 23,770 | | | Effective | Monthly | Annual F Amount |
| Building Id | 567001 | | | Cat. | Description | Sqft. or Tax # | Effective Date | Monthly Amount | Annual Amount Q | PSF |
| Lease Id | HO7881 | Leased Sqft | | | | | | | | |
| Suite Id | B100 | Proposed Sqft | 23,400 | | | | | | | |

| Cat. | Description | Sqft. or Tax # | Effective Date | Monthly Amount | Annual Amount | F Q | PSF |
|---|---|---|---|---|---|---|---|
| 01 | Minimum Rent | B | 6/29/2014 | 17,550.00 | 210,600.00 | M | 8.86 |
| 02 | Common Area | B | 6/29/2014 | 2,925.00 | 35,100.00 | M | 1.48 |
| 08 | Insurance | B | 6/29/2014 | 1,462.50 | 17,550.00 | M | 0.74 |

| Occupancy Status | C Current | | |
| Execution | 12/6/2012 | Lease Start | 6/29/2014 |
| Expiration | 1/31/2025 | Rent Start | 6/29/2014 |
| DOP | 4/30/2014 | Vacate | |
| Alt Stop | | DOD | 4/30/2014 |
| Anc Date | 1/1/2050 | | |
| Go Dark Date | | Sec. Balance | 0.00 |
| Occupancy Date | 5/13/2014 | | |

| | Total Charges | 21,937.50 | 263,250.00 |
|---|---|---|---|
| | Plus Sales Tax of: | 1,425.94 | |

### Future Rate Changes

| | | | | | | F Q | PSF |
|---|---|---|---|---|---|---|---|
| 02 | Common Area | 23,770 | 1/1/2016 | 3,012.75 | 36,153.00 | M | 1.52 |
| 02 | Common Area | 23,770 | 1/1/2017 | 3,103.13 | 37,237.56 | M | 1.57 |
| 02 | Common Area | 23,770 | 1/1/2018 | 3,196.23 | 38,354.76 | M | 1.61 |
| 02 | Common Area | 23,770 | 1/1/2019 | 3,292.11 | 39,505.32 | M | 1.66 |
| 02 | Common Area | 23,770 | 1/1/2020 | 3,390.88 | 40,690.56 | M | 1.71 |
| 02 | Common Area | 23,770 | 1/1/2021 | 3,492.60 | 41,911.20 | M | 1.76 |
| 02 | Common Area | 23,770 | 1/1/2022 | 3,597.38 | 43,168.56 | M | 1.82 |
| 02 | Common Area | 23,770 | 1/1/2023 | 3,705.30 | 44,463.60 | M | 1.87 |
| 02 | Common Area | 23,770 | 1/1/2024 | 3,816.46 | 45,797.52 | M | 1.93 |
| 02 | Common Area | 23,770 | 1/1/2025 | 3,969.12 | 47,629.44 | M | 2.00 |

### Lease Notes

| Effective Date | Ref 1 | Ref 2 | Note |
|---|---|---|---|
| 12/6/2012 | ALLOWNC | | None |
| 4/22/2014 | ASGNSUB | | Cost Plus to sublease 18,300 sf of space. |
| 12/6/2012 | ASGNSUB | | Sec. 15.1 No assignment fee referenced. |
| 12/6/2012 | CAMREC | | Sec. 5.1.2 Fixed at $1.50/sf through 1st full CY. Beginning w/2nd full CY, 3% increase each year. |
| 12/6/2012 | COMMDTE | | Sec. 2.2.1 The 60th day following the Delivery Date (4/30/14 + 60 = 6/29/14). |
| 12/6/2012 | COTEN | | Sec. 1.1.3, 2.5, 22 As used herein, the "Initial Co-Tenancy Condition" shall mean that at least four (4) of the Inducement Tenants shall have accepted possession of its entire premises, such premises shall have been substantially completed, and each Inducement Tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising |

1              **Rent Commencement and Expiration Date Agreement**

2              THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as
3  of the 29th day of June, 2014, by and between PANAMA CITY BEACH VENTURE II, LLC
4  (***"Landlord"***) and BED BATH & BEYOND INC. (***"Tenant"***).

5                       W I T N E S S E T H :

6              WHEREAS, Landlord is the owner of a certain shopping center known as Pier Park
7  North Shopping Center (the ***"Shopping Center"***), situated in Panama City Beach, Florida;

8              WHEREAS, by that certain Lease Agreement dated as of December 6, 2012 (the
9  ***"Lease"***), Landlord leased a portion (the ***"Premises"***) of the Shopping Center to Tenant;

10            WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has
11  commenced; and

12            WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an
13  agreement setting forth certain information in respect of the Premises and the Lease.

14         NOW, THEREFORE, Landlord and Tenant agree as follows:

15       1.     The **Rent Commencement Date** occurred on **June 29, 2014**.

16       2.     The **Initial Term** of the Lease **shall expire on January 31, 2025**, unless Tenant
17  exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as
18  provided in the Lease.

19       3.     The date of commencement of the first Renewal Period shall be
20  **February 1, 2025**, if Tenant effectively exercises its option in respect thereof (the deadline for
21  such exercise being August 5, 2024), and if Tenant does so, the Term of the Lease shall expire
22  on **January 31, 2030**, unless Tenant exercises any option to further extend the Term of the Lease
23  or unless the Lease terminates earlier as provided in the Lease.

24       4.     The date of commencement of the second Renewal Period shall be
25  **February 1, 2030**, if Tenant effectively exercises its option in respect thereof (the deadline for
26  such exercise being August 5, 2029), and if Tenant does so, the Term of the Lease shall expire
27  on **January 31, 2035**, unless Tenant exercises any option to further extend the Term of the Lease
28  or unless the Lease terminates earlier as provided in the Lease.

29       5.     The date of commencement of the third Renewal Period shall be
30  **February 1, 2035**, if Tenant effectively exercises its option in respect thereof (the deadline for
31  such exercise being August 5, 2034), and if Tenant does so, the Term of the Lease shall expire
32  on **January 31, 2040**, unless the Lease terminates earlier as provided in the Lease.

33

1    6.    The date of commencement of the fourth Renewal Period shall be
2  **February 1, 2040**, if Tenant effectively exercises its option in respect thereof (the deadline for
3  such exercise being August 5, 2039), and if Tenant does so, the Term of the Lease shall expire
4  on **January 31, 2045**, unless the Lease terminates earlier as provided in the Lease.

5    7.    Capitalized terms used, but not defined, herein shall have the meanings ascribed
6  to them in the Lease.

7

8    IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and
9  Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

PANAMA CITY BEACH VENTURE II,
LLC, a Florida limited liability company

By:  Casto/CCM-US PPN, LLC,
      a Delaware limited liability company,
      Managing Member

      By:  Casto/CCM-US Panama City,
            LLC,
            a Delaware limited liability
            company,
            Managing Member

            By:
            Name:  J. Brett Hutchens
            Title:    Manager

**TENANT:**

BED BATH & BEYOND INC., a New York
corporation

By:
      Seth Geldzahler
      Vice President – Real Estate

10



June 12, 2014                                          VIA FEDERAL EXPRESS

Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Mr. Warren Eisenberg

Re:  **NOTICE OF CHANGE OF LANDLORD'S ADDRESS** – regarding Lease Agreement dated December 6, 2012 (the "Lease") by and between PANAMA CITY BEACH VENTURE II, LLC ("Landlord") and Bed Bath & Beyond, Inc. ("Tenant"), Store #1367, for premises ("Premises"), at Pier Park North Shopping Center, Panama City Beach, Florida

Dear Tenant:

It has come to our attention that a prior notice sent erroneously eliminated the primary notice address for Landlord.  Effective immediately, Landlord's address for notices and payments pursuant to the Lease shall be as set forth below.

**Landlord Address for Notice:**                   **Landlord Address for Payments:**
Panama City Beach Venture II, LLC              Panama City Beach Venture II, LLC
c/o Casto Southeast Realty Services, LLC       c/o Casto
5391 Lakewood Ranch Blvd., Suite 100           P.O. Box 1450
Sarasota, FL 34240                             Columbus, OH 43216
Attention: Legal Dept.                         (or such other address as Landlord may designate)

**With a copy of default notices to:**
Panama City Beach Venture II, LLC
c/o Casto
250 Civic Center Drive, Suite 500
Columbus, OH 43215
Attention: Legal Dept./Leasing

Please observe there is no change to the addresses that you currently use for submitting insurance certificates and, if applicable, sales reporting.

Please update your files and records accordingly.  Thank you.

Sincerely,
For Landlord:
PANAMA CITY BEACH VENTURE II, LLC
by Casto Southeast Realty Services LLC, agent

Chris Mueller
Property Manager, Pier Park North

cc:  Allan N. Rauch, Esq.            Jeffrey H. Kaplan, Esq.
     Bed Bath & Beyond, Inc.        Bryan Cave LLP
     650 Liberty Avenue             1290 Avenue of the Americas
     Union, NJ  07083               New York, NY  10104
     (via Fed-Ex)                   (via Fed-Ex)

941.552.2700 ▪ Fax 941.552.2701 ▪ castoinfo.com

## Assignment and Assumption Agreement

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "*Agreement*") is made and entered into as of the _____ day of _____, 2014, between COST PLUS, INC., a California corporation ("*Assignor*"), and PANAMA CITY BEACH VENTURE PCM LLC, a Florida limited liability ("*Assignee*").

W I T N E S S E T H :

WHEREAS, Assignor is currently the tenant under that certain lease dated February 19, 2007 by and between Cost Plus, Inc., as tenant, and KDI Panama Mall, LLC (as successor-in-interest to Panama City Mall, LLC, as landlord ("*Existing Landlord*"), as modified by (i) Acknowledgement of Commencement, dated as of July 18, 2008; (ii) Memorandum of Lease, dated February 19, 2007 and recorded on May 17, 2007 as Document #2007033078 of the official real property records of Bay County, Florida; and (iii) Subordination, Non-Disturbance and Attornment Agreement, dated February 19, 2007, and recorded on May 17, 2007 as Document #2007033079 of the official real property records of Bay County, Florida (collectively, the "*Existing Lease*") with respect to certain premises (the "*Existing Premises*") located at Panama City Mall in Panama City, Bay County, Florida; and

WHEREAS, upon the terms and conditions set forth in this Agreement, from and after the Effective Date (as hereinafter defined), (i) Assignor desires to assign to Assignee all of Assignor's right, title and interest in and to the Existing Lease, and (ii) Assignee desires to accept such assignment and assume all of the terms, covenants, conditions, obligations and liabilities of Assignor (as tenant) arising under the Existing Lease. As used herein, "*Effective Date*" shall mean the later of (a) the "Rent Commencement Date", as such term is defined in and determined under that certain lease, dated as of the date of this Agreement, between Panama City Beach Venture II, LLC, a Florida limited liability company, as landlord and Bed Bath & Beyond Inc., a New York corporation, as tenant, with respect to certain premises located in the shopping center commonly known as Pier Park North Shopping Center, located at the intersection of U.S. Highway 98 and Pier Park Drive in Panama City Beach, Florida) and (b) the date that Assignor delivers vacant possession of the Existing Premises to Assignee.

NOW THEREFORE, in consideration of the covenants and provisions herein contained and other good and valuable consideration, the receipt and legal sufficiency of which are hereby expressly acknowledged by all the parties hereto, the parties hereby agree as follows:

1.    Assignment.  Assignor hereby sells, assigns, transfers, sets-over, delivers and conveys unto Assignee all of the rights, titles, interests, benefits and privileges of Assignor, as tenant under the Existing Lease, TO HAVE AND TO HOLD unto Assignee, its successors and assigns.  Notwithstanding the foregoing, Assignor shall remain liable for discharging and performing all duties, obligations and liabilities of the tenant under the Existing Lease arising or accruing prior to the Effective Date.

2.    Assumption.  Assignee hereby assumes and agrees to discharge and perform all duties, obligations and liabilities of the tenant under the Existing Lease arising or accruing from

and after the Effective Date and shall not violate any of the covenants, restrictions or other provisions of the Existing Lease.

3.    Indemnity.    Assignor hereby agrees to indemnify, protect, defend and hold Assignee harmless from and against any and all losses, claims, damages, liabilities, costs and expenses (including attorneys' fees) directly or indirectly arising out of, or related to, any breach or default by Assignor under the Existing Lease accruing prior to the Effective Date. Assignee hereby agrees, from and after the Effective Date, to indemnify, protect, defend and hold Assignor harmless from and against any and all losses, claims, damages, liabilities, costs and expenses (including attorneys' fees) directly or indirectly arising out of, or related to, any breach or default by Assignee under the Existing Lease.

4.    Default.    Assignee shall immediately deliver to Assignor any notice from Existing Landlord alleging a default by Assignee under the Existing Lease and Assignee shall give Assignor a detailed explanation of the nature of the default and what steps Assignee is taking to cure such default. Assignee acknowledges and agrees that, without relieving Assignee of any liability under the Existing Lease and/or to Assignor, Assignor shall have the right, in addition to any rights or remedies under this Agreement, at law or in equity, to cure the default whereupon Assignee shall reimburse Assignor for any amounts (including, without limitation, attorney's fees and court costs) expended or incurred by Assignor to cure such default together with interest thereon at the lesser of (x) the then effective prime rate as published from time to time in the "Money Rates" section of The Wall Street Journal (or any successor publication thereto) plus two (2%) percent and (y) the maximum rate allowed by legal requirements from the date of the outlay until paid. Assignor may bring suit for the collection of such costs, fees and interest if not paid to Assignor within ten (10) days after demand therefor. The various rights and remedies reserved to Assignor under this Agreement are cumulative, and Assignor may pursue all rights and remedies, whether at the same time or otherwise.

5.    Exclusives.    Assignee hereby agrees that in no event shall Assignee lease, rent or occupy or permit the Existing Premises to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, (1) as a store whose primary use is the sale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the "*Bed Bath Exclusive Items*") or (2) which is or which shall become a retail operation that, as its primary use, sells goods and services that are substantially similar to all or substantially all of the Exclusive Items [such as, by way of illustration only, TJ Maxx and More, Mega Marshalls, and/or Home Goods] (a "*Direct Competitor*"), or (3) as a store whose primary use is the sale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (y) gourmet foods, beer and wine for off-premises consumption and/or (z) home décor products (which items, either singly or in any combination, are hereinafter referred to as the "*Cost Plus Exclusive Items*" and together with the Bed Bath Exclusive Items, the "*Exclusive Items*"). Notwithstanding the foregoing, any tenant, sublessee, licensee or other occupant shall have the right to utilize the Existing Premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable

portion of the aisle space adjacent to such sales, central and/or distribution area) not to exceed the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. In addition, the Exclusive Items shall not prohibit a furniture store such as Haverty's or Rooms To Go as they currently operate.  Upon breach of the aforesaid covenant and agreement by Assignee (which breach shall be deemed to include a breach of said covenant and agreement by Assignee's assignee, sublessee or other successor to the extent that Assignee shall no longer be the tenant under the Existing Lease), Assignor shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief; to cancel and revoke this Agreement and to recover possession of the Existing Premises and to be restored to Assignor's former leasehold estate under the Existing Lease; and/or to commence and prosecute an action against Assignee or any other violator for damages.  If any person or entity other than Assignee shall violate any of the exclusive provisions herein set forth, Assignee shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation.  If Assignee fails to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then such failure shall be deemed a default under this Agreement and Assignor shall have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Assignee's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under applicable legal requirements, to conduct and prosecute such legal proceedings in the name of Assignee, at Assignee's expense, and Assignee shall cooperate with Assignor with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Assignor in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

6.      Further Assignment/Subletting Rights.      Subject to the restrictions set forth in Paragraph 5 above, Assignor hereby agrees that Assignee shall have all further assignment and subleasing rights as may be permitted pursuant to the Existing Lease, subject to all of the provisions of this Agreement and the Existing Lease; provided that no assignment or subletting by Assignee to another entity shall reduce, diminish, or otherwise affect the liability of Assignee under the terms and provisions of this Agreement.  Assignee shall notify Assignor in writing of the occurrence of an assignment of the Existing Lease or sublease of the Existing Premises within ten (10) days prior to the date same becomes effective. Further, and anything contained in this Agreement to the contrary notwithstanding, in no event shall Assignee (or any successor, assignee or sublessee of Assignee) have the right to modify, revise and/or amend the Existing Lease without Assignor's consent, which consent may be withheld, conditioned or delayed in Assignor's sole and absolute discretion.

7.      Representations and Warranties.  Assignor hereby reaffirms, as of February 19, 2014,  (i) the statements made in the Tenant Estoppel Certificate attached hereto; (ii) the initial term of the Existing Lease expires on January 31, 2019; and (iii) the current annual minimum rent under the Existing Lease is $234,169.

8.      Requisite Power.  Assignor and Assignee represents and warrants to each other, effective as of the date of this Agreement, that (i) each has all the requisite power to enter into this Agreement and to consummate the transactions thereby contemplated, and (ii) the execution and delivery of this Agreement will not result in a breach of the terms or conditions of, or

constitute a default under, any agreement, instrument or obligation to which Assignor or Assignee is a party or by which any of its assets or property may be affected, or violate any order, writ, injunction or decree of any court, administrative agency or governmental body.

9.    <u>Cooperation</u>.  Assignor and Assignee agree to reasonably cooperate with the other in order to effectuate the provisions of this Agreement.

10.    <u>Binding Agreement</u>.  It is expressly agreed that all of the terms, covenants, obligations and provisions of this Agreement and Assignor's and Assignee's duties and obligations hereunder shall inure to the benefit of, and shall be binding upon, Assignor and Assignee and their respective successors and assigns.

11.    <u>Effectiveness</u>.  This Agreement shall not be effective and binding unless and until fully executed by the parties hereto.

12.    <u>Notices</u>.  Whenever any notice, demand, request, consent, approval or other communication ("*Notice*") shall or may be given to either of the parties by the other, it shall be in writing and, any legal requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery, as follows:

| | |
|---|---|
| if to the Assignee: | c/o Casto Southeast Realty Services LLC<br>5391 Lakewood Ranch Boulevard, Suite 100<br>Sarasota, Florida 34240 |
| if to Assignor: | Cost Plus, Inc.<br>200 4th Street<br>Oakland, California 94607<br>Attn: Real Estate Manager |
| with a copy to: | Bed Bath & Beyond Inc.<br>650 Liberty Avenue<br>Union, New Jersey 07083<br>Attn:  Allan Rauch, Esq. |

or to such other person or other address as may, from time to time, be specified by any party in a written notice to the other parties.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.  Any notice delivered by counsel to either party hereto shall be deemed delivered by such party.

13.    <u>Time of the Essence</u>.  Time shall be deemed of the essence under this Agreement and with respect to all of the provisions thereof.

14.    <u>Certificates</u>.  Each party shall, within thirty (30) days of a written request by the other, certify in writing as to the current status of the Existing Lease, including its validity, term, rent, and the existence of any amendments, defaults, off-sets or counterclaims.

15.     <u>Attorney Fees</u>.  If either Assignor or Assignee is required to enforce this Agreement, then the prevailing party is entitled to arbitration costs (if any), court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and attorney's fees incurred in any trial and appellate courts.

16.     <u>Captions</u>.  The captions of paragraphs contained herein are for convenience only and do not define, limit, construe or describe the scope or intent of such paragraphs.  The parties agree that each has contributed, through negotiation and otherwise, to the final version of this Agreement and that any rule of interpretation by which ambiguities or discrepancies are to be construed against the drafting party shall be invalid and inapplicable as to the interpretation of this Agreement.

17.     <u>Applicable Law and Construction</u>.  The laws of Florida shall govern the validity, performance and enforcement of this Agreement without regard to its conflicts of law principles. If one or more of the provisions of this Agreement is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had not been contained herein. Terms used herein, shall be applicable to one or more persons, as the case may be, and the singular shall include the plural and the neuter shall include the masculine and feminine and, if there be more than one, the obligations hereof shall be joint and several.

[SIGNATURE PAGES IMMEDIATELY FOLLOW]

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Agreement, as of the day and year first written above.

ASSIGNOR:

COST PLUS, INC., a California corporation

By: _____

Name:    Jane Baughman

Title:    President

STATE OF CALIFORNIA)
COUNTY OF ALAMEDA)

On the _10_ day of April, 2014, before me, a Notary Public in and for said State, personally appeared Jane Baughman, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature the entity upon behalf of which the person acted, executed the instrument.  I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

My Commission Expires: _9/1/14_

L. OKANO
Commission # 2040051
Notary Public - California
Alameda County
My Comm. Expires Sep 1, 2017

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Agreement, as of the day and year first written above.

ASSIGNEE:

PANAMA CITY BEACH VENTURE PCM LLC, a Florida limited liability company

By:  Casto/CCM-US PPN, LLC,
a Delaware limited liability    company, Manager

By: _____
Name:  J. Brett Hutchens
Title:   Manager

STATE OF Florida )
COUNTY OF Sarasota

On the ___ day of April, 2014 before me, the undersigned, personally appeared J. Brett Hutchins _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of Sarasota, State of Florida

_____
Notary Public

My Commission Expires:



LESLIE PEREZ
Commission # EE 877328
Expires June 22, 2017
Bonded Thru Troy Fain Insurance 800-385-7019

TENANT ESTOPPEL CERTIFICATE

To:     NS Income Opportunity REIT Holdings, LLC and its successors and assigns

And:    Northstar Realty Finance Corp. and its successors and assigns

And:    NRFC Sub-REIT Corp. and its successors and assigns

From:   Cost Plus, Inc., a California corporation ("*Tenant*")

Re:     Cost Plus Store #6349 – Panama City, Florida

        The undersigned is Tenant under that certain Lease Agreement dated as of February 19, 2007 (the "*Lease*") between KDI Panama Mall, LLC, as successor-in-interest to Panama City Mall, LLC (the "*Landlord*") and Tenant, demising premises (the "*Premises*") in the Panama City Mall Shopping Center (the "*Shopping Center*"), located in Panama City, Florida.  Tenant certifies, as of February 19, 2014, as follows:

1.  To Tenant's actual knowledge, the Lease is in full force and effect and has not been modified, amended or supplemented except as set forth on Schedule A attached hereto and made a part hereof.  As hereinafter used, the term "Lease" shall mean the Lease as modified, supplemented, and amended as set forth on Schedule A hereto.

2.  The Commencement Date of the Lease was July 15, 2008, and rent has been paid to date.

3.  Except as specifically permitted by the terms of the Lease, no rent or additional rent has been prepaid more than one month in advance.  There are no rental or other payments payable by Tenant with respect to the Lease except for those specifically set forth in the Lease.

4.  To Tenant's actual knowledge without inquiry, the Lease is free from default by Landlord, excepting any matters listed on Schedule B attached hereto and made a part hereof.  To Tenant's actual knowledge without inquiry, Tenant has no current right of offset against Rent, except as set forth on Schedule B attached hereto and made a part hereof.  Tenant makes no representation as to whether it has received any of the guarantees or warranties which Landlord is required to provide under the Lease.

5.  The Lease has not been assigned by Tenant and no portion of the Premises has been subleased.

6.  No security deposit is payable by Tenant under the Lease.

1

NS Income Opportunity REIT Holdings, LLC, et al
February 19, 2014
Page 2

7. Nothing contained herein shall amend, waive or rescind any of the terms or conditions of the Lease; waive Tenant's right to declare a default thereunder based on facts of which the undersigned does not have actual knowledge; waive Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records, as provided for in the Lease; or relieve the Landlord from any of its obligations under the Lease.

8. The undersigned is duly authorized to execute this Certificate. Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Lease.

TENANT:

COST PLUS, INC.

Dated: As of February 19, 2014

By: _____
Allan N. Rauch
Director and Authorized Signatory

J:\RealEst\COST PLUS\Stores\6102 (Dallas TX)\estoppel - Jan 2014

1

1785383.1\C061858\0364017

NS Income Opportunity REIT Holdings, LLC, et al
February 19, 2014
Page 3

## SCHEDULE A TO ESTOPPEL CERTIFICATE
## FOR STORE #6349, PANAMA CITY, FLORIDA

1. Subordination, Non-Disturbance and Attornment Agreement dated as of February 19, 2007 among Wachovia Bank, National Association as the Master Servicer for the First Union National Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2001-C3, Tenant, and Landlord; recorded on May 17, 2007 in the Bay County, FL Clerk's Office as File #2007033079, in OR BK 2924 at Page 1371.

2. Memorandum of Lease dated February 19, 2007; recorded on May 17, 2007 in the Bay County, FL Clerk's Office as File #2007033078, in OR BK 2924 at Page 1365.

3. Acknowledgement of Commencement dated as of July 18, 2008.

4. Letter dated August 30, 2013 from Panama City Mall, LLC regarding the sale of the Shopping Center to KDI Panama Mall, LLC, a new address for Rent payments, and the appointment of Hendon Property Management, LLC as the property manager.

J:\RealEst\COST PLUS\Stores\6102 (Dallas TX)\estoppel - Jan 2014

1

NS Income Opportunity REIT Holdings, LLC, et al
February 10, 2014
Page 4

### SCHEDULE B TO ESTOPPEL CERTIFICATE
### FOR STORE #6349, PANAMA CITY, FLORIDA

1. Tenant notified Landlord that a control joint in the concrete floor was widening and/or settling causing a potential trip hazard to Tenant's customers and employees. Landlord's contractor has applied "filler material" to a portion of the joint to determine its effectiveness. If this process proves successful, Landlord will presumably have the remainder of the control joint similarly filled. Pending resolution of this issue, Tenant reserves all of its rights and remedies available under the Lease regarding the control joint and any matters related thereto.

2. Tenant has a history of roof leaks at this store dating back two (2) years or more. The leaks (both new and repeat leaks) are so frequent it would suggest that either Landlord's contractor is not adequately equipped to handle this particular situation and/or the roof itself was improperly installed or has now outlived its useful life. These leaks are materially disrupting Tenant's business operations, and creating the potential for someone to slip on the wet floor resulting in serious injury. Tenant reserves all of it rights and remedies available under the Lease regarding these roof leaks and any matters related thereto, including, but not limited to its right to perform needed repairs at Landlord's expense.

## GUARANTY OF LEASE

As used in this Guaranty, the following terms shall have the following meanings:

<u>Guarantors</u>:  Don M. Casto III, an individual; Kensington Gardens Builders Corp., a Delaware corporation; and The St. Joe Company, a Florida corporation.

<u>Premises</u>:  That certain space occupied by Cost Plus at Panama City Mall, Panama City, Florida as more particularly described in the Lease.

<u>Lease:</u>  That certain Standard Form Lease dated February 19, 2007, between KDI Panama Mall, LLC (as successor-in-interest to Panama City Mall, LLC), as landlord ("<u>Landlord</u>"), and Cost Plus, Inc., a California corporation (together with its successors and assigns, being herein called "<u>Cost Plus</u>"), as tenant, as modified by (i) Acknowledgement of Commencement, dated as of July 18, 2008; (ii) Memorandum of Lease, dated February 19, 2007 and recorded on May 17, 2007 as Document #2007033078 of the official real property records of Bay County, Florida; and (iii) Subordination, Non-Disturbance and Attornment Agreement, dated February 19, 2007, and recorded on May 17, 2007 as Document #2007033079 of the official real property records of Bay County, Florida, as such lease may be amended from time to time.

<u>Assignment and Assumption Agreement</u>: That certain Assignment and Assumption Agreement, dated as of the ____ day of _____, 2014, between Cost Plus, as assignor and Panama City Beach Venture PCM, LLC, a Florida limited liability, as assignee ("<u>*Assignee*</u>").

## W I T N E S S E T H:

For good and valuable consideration paid by Cost Plus to Guarantors, the receipt and legal sufficiency of which is hereby acknowledged, Cost Plus has assigned to Assignee, and Assignee has assumed from Cost Plus, all of Cost Plus' right, title and interest in and to the Lease, and Assignee has agreed, from and after the Effective Date (as defined in the Assignment and Assumption Agreement) to (i) promptly and fully pay all Rent (as defined in the Lease) and (ii) perform and observe of all the other covenants, terms, conditions and agreements provided to be performed and observed by Cost Plus under the Lease (collectively, the "<u>Obligations</u>"). Guarantors hereby jointly and severally guarantee to Cost Plus the payment and performance of all of the Obligations under the Lease from and after the Effective Date and Guarantors hereby covenant and agree to and with Cost Plus that if Assignee shall default in the payment and/or performance of any of the Obligations, then Guarantors shall forthwith pay to Cost Plus any and all such Rent and any arrears thereof (including, without limitation, any late fees and/or interest

imposed by Landlord under the Lease), and/or faithfully perform and fulfill all of such other covenants, terms, conditions and agreements of the Lease.

1.     This Guaranty is an absolute and unconditional Guaranty of payment and of performance. It shall be enforceable against Guarantors, their successors and assigns, without the necessity for any suit or proceedings on Cost Plus' part of any kind or nature whatsoever against Assignee, and without the necessity of any notice of non-payment, non-performance or non-observance or any notice of acceptance of this Guaranty or any other notice or demand to which Guarantors might otherwise be entitled, all of which Guarantors hereby expressly waive; and Guarantors hereby expressly agree that the validity of this Guaranty and the obligations of Guarantors hereunder shall in no way be terminated, affected or impaired by reason of the assertion or failure to assert by Cost Plus against Assignee of any of the rights or remedies reserved to Cost Plus pursuant to the provisions of the Assignment and Assumption Agreement and/or Lease. Without limiting the generality of the foregoing, Guarantors agree that Cost Plus may enforce this Guaranty without the necessity at any time of resorting to or exhausting any other security, guaranties or other collateral given in connection with the Assignment and Assumption Agreement and/or the Assignee's obligations and liabilities thereunder and Guarantors hereby irrevocably waive any right to require Cost Plus to so resort to or exhaust any such security, guaranties or other collateral before enforcing this Guaranty in full against Guarantors. Since Guarantors are comprised of more than one (1) entity, then each such entity comprising Guarantors shall be jointly and severally liable for all of Guarantors' obligations and liabilities under this Guaranty.

2.     Guarantors' obligations under this Guaranty shall remain in full force and effect notwithstanding, and shall not be impaired or affected by, any of the following (whether or not Guarantors shall have had notice or knowledge thereof): (a) any amendment, extension or modification of or supplement to any of the terms of the Lease; or (b) any compromise, release, consent, extension, waiver, forbearance, indulgence or other action or inaction in respect to any of the terms of the Lease; or (c) any substitution or release, in whole or in part, of any security for the Lease or this Guaranty which may be held at any time by Cost Plus or its successors or assigns; or (d) any exercise or non-exercise by Cost Plus of any right, power or remedy under or in respect of the Assignment and Assumption Agreement and/or the Lease or any security held by Cost Plus with respect thereto, or any waiver of any such right, power or remedy; or (e) any bankruptcy, insolvency, reorganization, arrangement, adjustment, recomposition, liquidation or the like of Assignee, or the discharge or release of Assignee in any such bankruptcy proceeding; or (f) any limitation of Assignee's liability under the Lease, or any limitation of Assignee's liabilities which may now or hereafter be imposed by any statute, regulation or rule of law, or any illegality, irregularity, invalidity or unenforceability, in whole or in part, of the Lease or any term thereof; or (g) any sale, lease or transfer of any or all of the assets of Assignee to any other person, firm or entity; or (h) any assignment of the Lease, or any subletting of the Premises or any part thereof;

or (i) any modification or waiver of or change in any of the terms, covenants, conditions or provisions of the Lease; or (j) any extension of time that may be granted by Landlord or Cost Plus to Assignee; or (k) any changed or different use of the Premises, whether or not consented to by Cost Plus; or (l) any dealings or transactions or matters or things occurring between Cost Plus, Landlord and Assignee; or (m) any claim, counterclaim, cause of action, offset, recoupment or other right or remedy which Assignee may at any time have against Cost Plus; or (n) any other similar or dissimilar circumstances. Without limiting the generality of the foregoing, Guarantors' liability under this Guaranty shall not in any way be limited as a result of any limitation on Cost Plus' claims against Assignee in any bankruptcy proceeding (including any limitations provided in Section 502(b)(6) of the federal bankruptcy code or any similar law).

3.  In no event shall any subletting of all or any portion of the Premises by any party, or any assignment or assignments of the Lease by Assignee (regardless of whether the same are made with or without Cost Plus' consent and regardless of whether the same are made with or without notice to Guarantors) release Guarantors from any liability hereunder in any manner whatsoever.

4.  All of Cost Plus' rights and remedies under the Lease, the Assignment and Assumption Agreement or under this Guaranty are intended to be distinct, separate and cumulative, and no such right and remedy therein or herein mentioned, whether exercised by Cost Plus or not, is intended to be an exclusion of or waiver of any of the others.

5.  Until all the covenants and conditions in the Lease on Assignee's part to be performed and observed are fully performed and observed, Guarantors: (a) shall have no right of subrogation against Assignee by reason of any payments or acts of performance by Guarantors, in compliance with the obligations of Guarantors hereunder; (b) waive any right to enforce any remedy which Guarantors now or hereafter shall have against Assignee by reason of any one or more payments or acts or performance in compliance with the obligations of Guarantors hereunder; and (c) subordinate any liability or indebtedness of Assignee now or hereafter held by Guarantors to the obligations of Assignee to Cost Plus under the Assignment and Assumption Agreement.

6.  Should Cost Plus be obligated by any bankruptcy or other law to repay to Assignee or Guarantors or to any trustee, receiver or other representative of either of them, any amounts previously paid, then this Guaranty shall be reinstated in the amount of such repayment.  Cost Plus shall not be required to litigate or otherwise dispute its obligation to make such repayments if it in good faith and on the advice of counsel believes that such obligation exists.

7   Guarantors hereby (a) irrevocably consent and submit to the jurisdiction of any Federal, state, county or municipal court sitting in Panama City,

Florida with respect to any action or proceeding brought therein by Cost Plus against the Guarantors concerning any matters arising out of or in any way relating to this Guaranty or the Lease; (b) if the action shall be brought in any Federal, State, county or municipal court sitting in the city of Panama City, Florida, irrevocably waive all objections as to venue and any and all rights they may have to seek a change of venue with respect to any such action or proceeding; (c) agree that the laws of the State of Florida shall govern in any such action or proceeding and waive any defense to any action or proceeding granted by the laws of any other country or jurisdiction; and (d) agrees that any judgment rendered against them in any such action or proceeding shall be conclusive and may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law.  Guarantors hereby agree that address for notices given by Cost Plus and service of process under this Guaranty shall be at the address set forth Paragraph 11 below if sent in accordance with the notice provisions hereof.

8.    Guarantors hereby covenant and agree to and with Cost Plus that Guarantors may be joined in any action against Assignee in connection with the Lease and/or Assignment and Assumption Agreement relating to obligations of Assignee that are being guaranteed by Guarantors hereunder and that, with respect to such obligations only, recovery may be had against Guarantors in such action or in any independent action against Guarantors without Cost Plus first pursuing and exhausting any remedy or claim against Assignee.  Guarantors also agree that, in any jurisdiction, it will be conclusively bound by the judgment in any such action by Cost Plus against Assignee (wherever brought) as if Guarantors were a party to such action even though Guarantors are not joined as a party to such action, limited, however, to the obligations of Assignee that are being guaranteed by Guarantors hereunder.

9.    Guarantors warrant and represent to Cost Plus that (a) Guarantors have the full power, authority and legal right to execute and deliver, and to perform their respective obligations under this Guaranty including the payment of all moneys hereunder, (b) this Guaranty constitutes the legal, valid and binding obligation of Guarantors enforceable in accordance with its terms, (c) Guarantors shall derive substantial benefits, directly and indirectly, immediate and in futuro, from the entering into of the Assignment and Assumption Agreement with Assignee, and (d) any financial statements and other information furnished to Cost Plus prior to the date hereof is true and accurate in all material respects.  In the event that this Guaranty shall be held ineffective or unenforceable by any court of competent jurisdiction, then Guarantors shall be deemed to be an assignee under the Assignment and Assumption Agreement with the same force and effect as if Guarantors were expressly named as a joint assignee therein with joint and several liability.

10.    Guarantors shall, without charge at any time and from time to time, within thirty (30) days after request therefor by Cost Plus, certify by written instrument, duly executed, acknowledged and delivered to any party specified by Cost Plus that:

(a)  this Guaranty has been duly authorized, executed and delivered, is a valid and binding obligation upon Guarantors, enforceable in accordance with its terms and provisions and is unmodified and in full force and effect (or, if there has been modification, that the same is in full force and effect as modified and stating the modifications); and

(b)  whether or not there are any existing claims, set-offs or defenses against the enforcement of any of the agreements, terms, covenants or conditions of this Guaranty (and, if so specifying the same and the steps being taken to remedy the same).

11.    All notices required to be sent in accordance with this Guaranty to Cost Plus and Guarantors by one another shall be in writing and sent by (i) registered or certified mail, return receipt requested, posted in a United States post office station or letter box, or (ii) overnight courier service, and to the other party at the following address(es):

    Kensington Gardens Builders Corp.
    c/o CCM US, LLC
    1730 Massachusetts Avenue, NW
    Washington, DC 20036
    Attn: Vadim Nikitine


    And with a copy to:

    Don M. Casto III
    250 Civic Center Drive, Suite 500
    Columbus, Ohio 43215

    And with a copy to:

    Casto
    250 Civic Center Drive, Suite 500
    Columbus, Ohio 43215
    Attention: General Counsel

    And with a copy to:

    The St. Joe Company
    133 South WaterSound Parkway
    WaterSound, Florida 32413
    Attention: Kenneth Borick, General Counsel

And with a copy to:

Casto Southeast Realty Services LLC
5391 Lakewood Ranch Boulevard
Suite 100
Sarasota, Florida 34240

If to Cost Plus, Inc.:

200 4th Street
Oakland, California 94607
Attn: Real Estate Manager

with a copy to:

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attn:  Allan Rauch, Esq.

12.    Notices shall be deemed given, made and effective as of the date actually delivered to the required address(es) hereunder (whether or not the same is then received by other party due to a change of address of which no notice was given or any rejection or refusal to accept delivery).  The attorneys of either party shall be entitled to give notices on behalf of such attorney's client.  Cost Plus and Guarantors may designate by notice to the other given in the manner set forth above a different address for the giving of notices and copies thereof.

13.    Guarantors hereby waive notice of acceptance of this Guaranty, presentment and protest of the Assignment and Assumption Agreement and notice thereof, notice of default under the Lease, notice of any change in Assignee's financial condition, and all other notices to which Guarantors may otherwise be entitled.

14.    This Guaranty contains the sole and entire understanding and agreement with respect to its entire subject matter, and all prior negotiations, discussions, commitments, representations, agreements and understandings heretofore had with respect thereto are merged herein.  This Guaranty cannot be changed or terminated orally. This Guaranty may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

15.    In the event it shall become necessary for Cost Plus to employ counsel to enforce Guarantors' obligations under this Guaranty or any part thereof, Guarantors agrees to pay Cost Plus' attorneys' fees, including attorneys' fees on appeal

or in bankruptcy proceedings, and all other costs and expenses reasonably connected therewith, together with interest thereon at the then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent from the date on which such costs and expenses are incurred by Cost Plus until the date paid to Cost Plus by Guarantors.

16.     This Guaranty is, and shall be deemed to be entered into, under and pursuant to the laws of the State of Florida and shall be in all respects governed, construed, applied and enforced in accordance with the laws of said State; and no defense given or allowed by the laws of any other state or country shall be interposed in any action or proceeding hereon unless such defense is also given or allowed by the laws of the State of Florida.

17.     Guarantors' obligations shall be binding upon its successors and assigns and shall inure to Cost Plus' benefit and to the benefit of any successor in interest to Cost Plus.

[SIGNATURES PAGES IMMEDIATELY FOLLOW]

18.     To the extent permitted by law, Guarantors waive trial by jury in any action, proceeding or counterclaim in any way involving or connected with the Assignment and Assumption Agreement, the Lease or this Guaranty.

IN WITNESS WHEREOF, Guarantors has hereby executed this Guaranty as of the date hereinabove set forth.

_____

Don M. Casto III, an individual

STATE OF Ohio        )
COUNTY OF Franklin)

On the 22 day of April, 2014 before me, the undersigned, personally appeared Don M. Casto III_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of Franklin, State of Ohio .

_____
Notary Public

Molly P. Benadum
Notary Public, State of Ohio
My Commission Expires 12-09-2016

18.     To the extent permitted by law, Guarantors waive trial by jury in any action, proceeding or counterclaim in any way involving or connected with the Assignment and Assumption Agreement, the Lease or this Guaranty.

IN WITNESS WHEREOF, Guarantors has hereby executed this Guaranty as of the date hereinabove set forth.

The St. Joe Company

Name: _Marek Bakun_

Title: _SVP + Chief Financial Officer_

STATE OF _Florida_ )
COUNTY OF _Walton_ )

On the _24_ day of April, 2014 before me, the undersigned, personally appeared _Marek Bakun_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of _Walton_, State of _FL._ .

_Georgie R. Campbell_
Notary Public

GEORGIA R. CAMPBELL
Commission # EE 165699
Expires February 2, 2016
Bonded Thru Troy Fain Insurance 800-385-7019

1785388.1

18.    To the extent permitted by law, Guarantors waive trial by jury in any action, proceeding or counterclaim in any way involving or connected with the Assignment and Assumption Agreement, the Lease or this Guaranty.

IN WITNESS WHEREOF, Guarantors has hereby executed this Guaranty as of the date hereinabove set forth.


Kensington Gardens Builders Corp.

By: _____

Name: STEVEN LEVIN

Title: VICE PRESIDENT


~~STATE OF~~ DISTRICT OF COLUMBIA                    )

~~COUNTY OF~~ _____                    )


On the *18th* day of April, 2014 before me, the undersigned, personally appeared STEVEN LEVIN _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the ~~County of~~ _____, ~~State of~~ _____.
DISTRICT OF COLUMBIA

_____
Notary Public

HAROLD FOURNIER
NOTARY PUBLIC
MY COMMISSION EXPIRES 6/14/2017
DISTRICT OF COLUMBIA



January 24, 2014

Bed Bath & Beyond, Inc.          **VIA FEDERAL EXPRESS**
650 Liberty Avenue
Union, NJ  07083
Attn:  Mr. Warren Eisenberg

RE:    Lease Agreement dated as of December 6, 2012, as amended (the "Lease") by and
       between Panama City Beach Venture II, LLC ("Landlord") and Bed Bath & Beyond, Inc.
       ("Tenant") with respect to certain retail premises (the "Premises") located at Pier Park
       North Shopping Center, Panama City Beach, Florida (the "Shopping Center")

Gentlemen:

       In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on April 30, 2014.  This
notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of the Lease.
Notwithstanding the foregoing, in the event that the Premises are substantially complete prior to
that date, then we will coordinate an earlier Delivery Date if all parties are agreeable.

Very truly yours,
PANAMA CITY BEACH VENTURE II, LLC

By: _____
       James E. Conroy
       Vice President of Development

cc:    Allan N. Rauch, Esq.              Jeffrey H. Kaplan, Esq.
       Bed Bath & Beyond, Inc.          Bryan Cave LLP
       650 Liberty Avenue               1290 Avenue of the Americas
       Union, NJ  07083                 New York, NY  10104
       (via FedEx)                      (via FedEx)

941.552.2700 ▪ Fax 941.552.2701 ▪ castoinfo.com



September 25, 2013


BED BATH & BEYOND
650 LIBERTY AVENUE
UNION, NJ  07083

Re:  **NOTICE OF CHANGE OF LANDLORD'S ADDRESS** - pursuant to Lease Agreement ("Lease") by and between PANAMA CITY BEACH VENTURE II, LLC ("Landlord") and BED BATH & BEYOND INC. ("Tenant") for Storeroom Number BB&B, located in the Pier Park North,  , FL  . ("Premises")

Dear Tenant:

EFFECTIVE MONDAY, OCTOBER 14, 2013, Landlord's notice address pursuant to the Lease shall be as set forth below.

**Landlord's Address for Notices:**

**PANAMA CITY BEACH VENTURE II, LLC**
**c/o CASTO**
**Attention: Legal Department/Leasing**
**250 Civic Center Drive, Suite 500**
**Columbus, Ohio 43215**

Please note that the payment address pursuant to the Lease has not changed.

Please update your files and records accordingly.  Call (614) 228-5331 with questions.  Thank you.


Sincerely,
PANAMA CITY BEACH VENTURE II, LLC


By:    *Julie Engle*

Julie Engle
Senior Director|Commercial Property Management

BED BATH & BEYOND
567001 - HO7881

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE ("**Amendment**") is dated of April ⟨24⟩, 2013 (the "**Effective Date**"), by and between PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company ("**Landlord**"), and BED BATH & BEYOND INC., a New York corporation ("**Tenant**").

## RECITALS

**WHEREAS**, Landlord and Tenant entered into that certain Lease dated December 6, 2012 ("**Lease**") for the lease of certain premises ("**Premises**") located in the Pier Park North Shopping Center in Panama City Beach, Florida ("**Shopping Center**").

**WHEREAS**, Landlord and Tenant entered into a Memorandum of Lease ("**MOL**") dated as of December 6, 2012 and recorded on March 1, 2013 in the Clerk's Office of Bay County, Florida in OR BK 3488 Pages 1359-1363, File #2013011899 with respect to the Shopping Center.

**WHEREAS**, U.S. Bank, National Association, a national banking association ("**Lender**") and Tenant entered into a Subordination, Non-Disturbance and Attornment Agreement ("**SNDA**") dated as of February 27, 2013 and recorded on March 1, 2013 in the Clerk's Office of Bay County, Florida in OR BK 3488 Pages 1364-1371, File #2013011900 with respect to the Shopping Center.

**WHEREAS**, Landlord and Tenant hereby express their mutual desire and intent, among other Lease modifications, to amend the legal description of the Shopping Center and document the final REA pursuant to Section 12.6 of the Lease.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## AGREEMENT

1.      **Definitions.** All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms as set forth in the Lease.

2.      **Legal Description.** Landlord and Tenant agree that the legal description attached as Exhibit A to each of the Lease, MOL and SNDA was incorrect and that the correct legal description is the one attached as Exhibit A to this Amendment. The parties hereby agree that Exhibit A of each of the Lease, MOL and SNDA shall be deemed deleted in their entirety and the Exhibit A attached to this Amendment shall be replaced in lieu thereof.

3.      **Exclusive**. Clause (iv) of Section 13.2.2 shall be deleted in its entirety and the following clause (iv) shall be substituted in lieu thereof:

"**(iv)** furniture store [for example, Rooms To Go or Haverty's] selling frames and wall art as an incidental part of its sale of furniture and other furniture related items and accessories and other items normally sold in Rooms To Go and similar retail furniture stores."

4.      **Recordation of the MOL and SNDA.** Landlord shall, at its cost, have the MOL and SNDA re-recorded in the Clerk's Office of Bay County, Florida with the revised legal description. If required by the county, Landlord and Tenant shall execute, and Landlord shall cause to be executed by Lender, an amended or restated MOL and SNDA with the corrected legal description for recording, which shall be in form and substance as reasonably acceptable to all parties. Landlord shall provide Tenant with a copy of the re-recorded MOL and SNDA containing the recording information once same has been recorded in the Clerk's Office of Bay County, Florida.

5.     **REA**.  Landlord and Tenant agree that the REA attached hereto as <u>Exhibit B</u> is the final REA and that same has been approved by Tenant pursuant to the terms of Section 12.6 of the Lease.  Landlord shall provide Tenant with a copy of the REA containing the recording information once same has been recorded in the Clerk's Office of Bay County, Florida.

6.     **Third-Party Rights**.  Landlord represents and warrants to Tenant that, as of the Effective Date, no third-party consents or approvals (including, without limitation, with respect to the Lender) are required in order for this Amendment to be in full force and effect.

7.     **Effect of Amendment**.     Except as herein modified, all other terms and conditions of the Lease shall remain unchanged and in full force and effect.  In the event of any conflict between the terms of the Lease and the terms of this Amendment, this Amendment shall control.  Each reference in the Lease to itself shall be deemed also to refer to the Lease as modified by this Amendment.  This Amendment shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, successors and assigns.

8.     **Counterparts.**  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

9.     **Ethical Policy**.  It is the policy of Tenant and its parent company, subsidiaries and affiliates to conduct all its business transactions in accordance with the highest ethical standards:  No individual who is employed by or who represents the company is permitted to solicit, accept or pay any bribe, kickback or any other improper payment of money, products or services in exchange for (i) the company's execution of this Amendment, (ii) any action taken by such individual on behalf of the company, or (iii) any action taken by a third party.  If any such improper actions are observed, please contact our Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties have duly executed this Amendment effective on the date first set forth above.

**LANDLORD:**

WITNESS:

PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company

By:  Casto/CCM-US PPN, LLC,
     a Delaware limited liability company,
     Managing Member

     By:  Casto/CCM-US Panama City,
          LLC,
          a Delaware limited liability
          company,
          Managing Member

     By:
     Name:  J. Brett Hutchens
     Title:  Manager

**TENANT:**

WITNESS:

BED BATH & BEYOND INC.,
a New York corporation

Name: Alan M. Freeman
Title:  Assistant Secretary

By:
Name:  Warren Eisenberg
Title:  Co-Chairman

## Exhibit A

### Legal Description

BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98 (PANAMA CITY BEACH PARKWAY - HAVING A 200 FT. RIGHT OF WAY) AND THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 35°44'09" EAST, ALONG SAID WESTERLY BOUNDARY FOR A DISTANCE OF 801.86 FEET TO A POINT ON THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE 3, AS PER PLAT RECORDED IN PLAT BOOK 20, PAGES 43 AND 44 OF SAID PUBLIC RECORDS; THENCE NORTHWESTERLY ALONG SAID BOUNDARY FOR THE FOLLOWING COURSES; NORTH 54°12'33" WEST, FOR A DISTANCE OF 936.98 FEET; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 181.15 FEET; THENCE NORTH 83°02'27" EAST, FOR A DISTANCE OF 153.65 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 438.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 32.56 FEET, SAID ARC HAVING A CHORD OF 32.55 FEET BEARING NORTH 04°49'44" WEST TO THE END OF SAID CURVE; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 173.24 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 1038.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 53.02 FEET SAID ARC HAVING A CHORD OF 53.01 FEET BEARING NORTH 01°14'10" WEST TO THE END OF SAID CURVE; THENCE NORTH 73°47'49" WEST, FOR A DISTANCE OF 416.42 FEET TO THE SOUTHWEST CORNER OF LOT 362, SAID PALMETTO TRACE PHASE THREE; THENCE CONTINUE NORTHWESTERLY ALONG THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE FOUR, AS PER PLAT RECORDED IN PLAT BOOK 21, PAGES 48 THRU 55 OF SAID PUBLIC RECORDS FOR THE FOLLOWING COURSES; NORTH 73°47'48" WEST, FOR A DISTANCE OF 195.25 FEET; THENCE NORTH 81°33'49" WEST, FOR A DISTANCE OF 261.92 FEET; THENCE NORTH 56°32'46" WEST, FOR A DISTANCE OF 391.01 FEET; THENCE LEAVING SAID SOUTHERLY BOUNDARY, NORTH 74°22'54" WEST, FOR A DISTANCE OF 191.70 FEET; THENCE NORTH 65°11'47" WEST, FOR A DISTANCE OF 67.49 FEET; THENCE SOUTH 77°13'17" WEST, FOR A DISTANCE OF 83.55 FEET; THENCE SOUTH 70°25'13" WEST, FOR A DISTANCE OF 117.07 FEET; THENCE NORTH 75°35'38" WEST, FOR A DISTANCE OF 150.95 FEET TO A EASTERLY RIGHT OF WAY LINE OF PIER PARK DRIVE; THENCE SOUTH 32°00'55" WEST, FOR A DISTANCE OF 619.73 FEET TO A NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98; THENCE SOUTH 54°15'13" EAST, FOR A DISTANCE OF 2,765.96 FEET TO THE POINT OF BEGINNING. SAID LANDS LYING IN AND BEING A PORTION OF SECTION 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA. CONTAINING 58.7265 ACRES, MORE OR LESS.

**Exhibit B**

**REA**

# RECIPROCAL EASEMENT
# AGREEMENT

## BETWEEN

## PANAMA CITY BEACH VENTURE II, LLC

## AND

## BONEFISH II-PC PROPERTIES LLC

## PIER PARK NORTH PROJECT

## PANAMA CITY BEACH, FLORIDA

_____, 2013

## RECIPROCAL EASEMENT AGREEMENT

THIS RECIPROCAL EASEMENT AGREEMENT (the "Agreement") is made as of this _____ day of _____, 2013, between **PANAMA CITY BEACH VENTURE II, LLC**, a Florida limited liability company, having an address of 5391 Lakewood Ranch Blvd., Suite 100, Sarasota, Florida 34240 (together with its successors and assigns as provided herein, "Developer"), and **BONEFISH II-PC PROPERTIES LLC,** a Delaware limited liability company, having an address of c/o Rooms To Go, 400 Perimeter Center Terrace, Suite 800, Atlanta, Georgia 30346 (together with its successors and assigns as provided herein, "RTG").

### Preliminary Statement

A.    Developer is the owner in fee of certain real property located in Panama City Beach, Bay County, Florida, more particularly described in **Schedule A** annexed hereto (the "Developer Parcel"). Developer currently plans to construct on Developer Parcel the buildings and related parking and site facilities that are indicated on the site plan attached as **Schedule C** (the "Site Plan").

B.    RTG has acquired or is acquiring from Developer certain real property consisting of approximately 2.5571 acres, located contiguous to Developer Parcel (the "RTG Parcel"). The RTG Parcel is more particularly described in **Schedule B** annexed hereto. RTG currently plans to construct on the RTG Parcel an approximately 27,600 square single story Rooms To Go showroom building and related improvements (collectively, the "RTG Building").    The Developer Parcel and the RTG Parcel are herein collectively referred to as the "Parcels" or the "Project", and each individually as a "Parcel".

C.    Developer and RTG recognize that for the most favorable development of the Project, it is necessary that they agree and cooperate with respect to the operation and maintenance of their Parcels and the common curb cuts, roadways, driveways, aisles, walkways, sidewalks, detention ponds, drainage facilities, utilities and other common areas and facilities existing, or to be erected from time to time, within the Project (collectively, the "Common Areas"). Developer and RTG therefore intend herein to grant to each other certain reciprocal easements for pedestrian and vehicular ingress and egress over the common curb cuts, roadways, driveways, aisles, walkways and sidewalks for access and for delivery and to grant certain rights to install, utilize and maintain detention ponds, drainage facilities and other utility lines and site facilities within the Common Areas. Developer and RTG also intend herein to provide for certain obligations and restrictions with respect to the operation and maintenance of their respective Parcels and the Common Areas and facilities constructed and to be constructed thereon. Such easements, obligations and restrictions shall run to the benefit of, and bind the respective Parcels, and the owners from time to time of the Project or any portion thereof. The terms RTG or Developer shall be deemed to refer to such parties and the respective heirs, successors, grantees and assigns of such parties (individually the "Owner", or collectively, the "Owners").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, Developer and RTG hereby grant, covenant and agree as follows:

## ARTICLE I - GRANT OF EASEMENTS

**1.01** **Project Parking and RTG Protected Parking Area.** As used herein, (i) the term "RTG Protected Parking Area" shall mean parking area(s) containing the Required Spaces (defined below) and located on the RTG Parcel as shown on the Site Plan; (ii) the term "Required Spaces" shall mean the ninety-three (93) parking spaces located from time to time in the RTG Protected Parking Area; and (iii) the term "Permittees" shall mean the tenant(s) or occupant(s) of a Parcel, and the respective employees, agents, contractors, tenants, customers, invitees, and licensees of such tenant or occupant. None of the Required Spaces shall be used or counted at any time to satisfy the parking ratios required by applicable law for use of any improvements located on the Developer Parcel or on any land other than the RTG Parcel. The Developer Parcel shall at all times contain parking spaces sufficient in number and size to satisfy all parking ratios required by applicable law for the use and operation of the building improvements on the Developer Parcel without including in such calculation any parking spaces located in the RTG Protected Parking Area.

Parking spaces in the Common Areas of the Project shall be used only for the parking of private automobiles or similar vehicles of Permittees of tenants or occupants of the Project while such persons are present at the Project, and for no other purpose, except that trucks delivering merchandise may park from time to time in loading dock areas only. Without limiting the foregoing, except as otherwise expressly provided herein, no portion of the RTG Protected Parking Area or sidewalks located therein may be used by other tenants or Project occupants for special promotions, sidewalk sales, seasonal sales, truck parking, inventory storage, do it yourself or demonstration areas, park and ride or car pooling arrangements or for any other similar purposes. Any area designated for RTG employee parking shall be located on the RTG Parcel only. Any area designated within the Project as "Employee Parking" for tenants or occupants of Parcels other than the RTG Parcel shall not be located in the RTG Protected Parking Area. Developer shall use diligent, commercially reasonable efforts to enforce such parking restrictions and provisions of this Section.

**1.02** **Ingress Egress Easements and RTG Critical Access.** As used herein, the term "Critical Access and Driveways" shall mean those driveways and internal roadways designated as such on the Site Plan located within the Common Areas on the Developer Parcel, and (i) providing access from the RTG Parcel to Panama City Beach Parkway (U.S. Highway No. 98/State Road No. 30A) from both of the two curb cuts in the Project located closest to the RTG Parcel as shown on the Site Plan, and (ii) otherwise necessary for ingress, egress, access, maneuvering, loading and delivering by trucks to the RTG Parcel. Developer hereby grants and conveys to RTG for the benefit of the RTG Parcel a perpetual non-exclusive easement in, to, over and across the Critical Access and Driveways and other sidewalks, drives and walkways in the Common Areas as they exist from time to time for the purpose of access, ingress, and egress by RTG's Permittees. Developer shall not modify the location of the Critical Access and Driveways without RTG's prior written consent which may be granted or withheld in RTG's sole discretion, provided, however, RTG agrees that such consent shall not be unreasonably withheld as to insubstantial changes to the configuration and location of such Critical Access and Driveways which would, in RTG's opinion, not materially and adversely affect RTG's access to Panama City Beach Parkway (U.S. Highway No. 98/State Road No. 30A) from either of its two

access points. Notwithstanding the foregoing and as an absolute condition precedent to RTG's consent to any change in the location of the Critical Access and Driveways after the Effective Date, Developer shall, at no cost to RTG, provide an update to RTG's existing title policy insuring RTG's rights of ingress and egress over the relocated Critical Access and Driveways, subject only to those matters reasonably consented to by RTG. In addition, the Critical Access and Driveways and areas for truck access, maneuvering and loading, throughout the Common Areas shall be used only for pedestrian and vehicular traffic and no other purpose, and Developer shall make diligent, commercially reasonable efforts to keep such access ways open and unobstructed at all times. RTG hereby grants and conveys to Developer for the benefit of the Developer Parcel a perpetual non-exclusive easement in, to, over and across the sidewalks, drives and walkways in the RTG Parcel as they exist from time to time for the purpose of access, ingress, and egress by Developer's Permittees.

 **1.03** **Storm Water Drainage and Sanitary Sewer Easements.** Each Owner hereby grants to the other Owner, for the use and benefit of the Parcels, a perpetual, non-exclusive easement in, to, over, under, and across the Common Areas for the drainage and retention of surface waters from the Parcels into the retention and drainage areas and system for the Project located on the Parcels, together with a non-exclusive, perpetual easement for use of all underground or in-ground pipes, lines and related apparatus as may be reasonably necessary in connection with the drainage and retention of such surface waters flow and passage, sanitary sewers, storm drains, backflow devices, maintenance, connection, repair, relocation, and removal of storm water drainage and sanitary sewer service lines which will connect the improvements on the Parcels to storm water and sanitary sewer lines (the "Storm Water and Sanitary Sewer Easement"), and as otherwise may be required for issuance of an unconditional and permanent certificate of occupancy for the operation and use of the improvements to be constructed on the Parcels. The Storm Water and Sanitary Sewer Easement on the Developer Parcel, and the drainage and retention system constructed within such Storm Water and Sanitary Sewer Easement by Developer, shall be sufficient at all times for the drainage and retention of surface waters from the RTG Parcel into the retention and drainage system located on the Developer Parcel. No Owner shall alter or permit to be altered the surface of its Parcel or the portion of the Project drainage/retention system constructed on its Parcel if such alteration would materially increase the flow of surface water onto another Parcel either in the aggregate or by directing the flow of surface water to a limited area.

 **1.04** **"No-Build" Area Restriction.** No building improvements shall be constructed on the area of the Developer Parcel designated on the Site Plan as "No-Build Area" without first obtaining the prior written consent of the Owner of the RTG Parcel. Additionally, the parking field and driveways in the No-Build Area shall not be materially modified from the configuration shown on the Site Plan without the prior written consent of the Owner of the RTG Parcel.

 **1.05** **Utility Easements.** Each Owner hereby grants to the other Owner, for the use and benefit of the Parcels, a perpetual, non-exclusive easement in, to, over, under, and across the Common Areas of the Developer Parcel for the installation, operation, flow and passage, use, maintenance, connection, repair, relocation, and removal of water and gas mains, electrical power lines, cable television, telephone, internet and communication lines, power poles, junction boxes, lift stations, electrical transformers, fire hydrants, and other utility lines, pipes and related apparatus and facilities as exist from time to time (collectively, "Utility Lines") serving the Parcels (collectively, the "Utility Easement Areas") as may be necessary or required for issuance

of an unconditional and permanent certificate of occupancy for the initial operation and use of the improvements to be constructed on the Parcels. At the request of any Owner, the other Owner(s) shall grant utility easements to the private or public utility providing any utility service to a Parcel, provided such easement terms and conditions are reasonably consistent with easements typically required by such utility provider and do not unreasonably interfere with such Owner's use of its Parcel or the business operating thereon. Any new Utility Easement Areas shall be no wider than reasonably necessary to satisfy the requirements of the applicable private or public utility provider. All new Utility Lines shall be underground unless otherwise required by the utility provider or for backflow devices or other devices typically above ground (by way of example, but not limitation, meters and fire hydrants). Except as otherwise provided in this sentence, each Owner agrees that it shall not interfere with the other Owner's use of the Utility Lines or Utility Easement Areas, or interrupt utility service to the Parcels, and both RTG and Developer agree that (i) any maintenance of the Utility Lines shall be done in a manner so as not to materially interfere with or materially diminish utility services during normal business hours, and (ii) if any Utility Lines are to be relocated, then such relocation shall be coordinated so as to avoid any interruption in utility service and so as to minimize any detrimental effects on any Parcel or businesses operating thereon. Each Owner shall have such rights of ingress, egress and access to, over and across the other Owner's Parcel as may be reasonably necessary to fully utilize the utility easements granted herein.

    **1.06**   **Sign Easement**. RTG grants to Developer a perpetual, non-exclusive easement to install a ground sign in the approximate location noted on the Site Plan ("Shopping Center Sign"), together with the right to connect electric power to the sign. The Shopping Center Sign shall display only the name of the Project (currently Pier Park North) and logo and no tenant or occupant signage nor any third party advertising shall be permitted on the Shopping Center Sign. The design (including size, height, color and materials) and final location of the Shopping Center Sign and any future changes in such sign shall be subject to the prior written approval of RTG. Developer will also be obligated to pay at its sole expense all costs of installation of the Shopping Center Sign and following installation all maintenance, operating, repair and replacement costs shall be paid by Developer as Operating Costs of the Common Areas. Developer agrees that (i) any maintenance of the Shopping Center Sign shall be done in a manner so as not to materially interfere with the operation of the business on the RTG Parcel, and (ii) shall not damage any improvements on the RTG Parcel. Developer shall maintain any improvements for the Shopping Center Sign in accordance with the requirements for maintenance of the Common Areas set forth in Section 2.01 below.

    **1.07**   **Use of Easement Areas**. The benefits and burdens of the easements and rights granted hereunder shall run with the Parcels and shall be binding upon each Owner and its successors and assigns, and may be used by the Permittees of each Owner. Each Owner shall have the right to use and enjoy those portions of the affected areas located on its respective Parcel for any and all purposes not inconsistent with the rights, easements and privileges herein declared and provided that the general intent of the easements and other rights and benefits granted herein are not frustrated. Nothing herein shall be deemed to create a partnership or joint venture between the parties or render either party liable for the obligations of the other, except as specifically set forth herein. Developer shall not exact any charge or permit others to exact any charge for use of the Common Areas by Permittees of RTG. Further, nothing contained in this

Agreement shall be deemed to be a gift or dedication of any part of either of the Parcels to the general public or for any public use or purpose whatsoever. The easements granted herein may be used by the parties hereto and their successors, assigns, agents, employees, tenants, customers, invitees and licensees for the purposes intended, but neither party hereto shall have the right to assign, license, or otherwise grant or transfer, in part or in whole, their respective rights under the easements either granted under this Agreement to neighboring landowners or users for the benefit of their land; nor shall either party burden any easement granted herein beyond the limited purposes described herein.

**1.08 Restrictions.** The easements granted by this **Article I** shall be subject to the covenants and restrictions set forth in **Article III**.

**1.09 Benefits.** The easements granted in this Article I shall be for the benefit of, but not restricted solely to, the Owners of the RTG Parcel and Developer Parcel, and each such Owner may grant the benefit of such easements to the tenants and other occupants of the RTG Parcel and the Developer Parcel for the duration of such occupancy, and to the customers, employees, agents and business invitees thereof; but same are not intended nor shall they be construed as creating any rights in or for the benefit of the general public nor shall they benefit any real property outside of the Project.

## ARTICLE II - MAINTENANCE AND OPERATION

**2.01 Maintenance of Project and Common Areas.** Developer shall maintain, operate, repair and replace, or cause to be maintained, operated, repaired and replaced, the Common Areas located on both the RTG Parcel and the Developer Parcel, and all exterior portions of all building improvements located on the Developer Parcel, in first-class order, condition, and repair, consistent with other first-class retail shopping center management practices prevailing in the Panama City Beach, Florida area, and in full compliance with all applicable laws, permits, licenses, approvals, rules, regulations, ordinances, governmental and quasi-governmental requirements and local codes and with all private covenants, conditions and restrictions affecting the Project. RTG shall maintain, operate, repair and replace, or cause to be maintained, operated, repaired and replaced, all exterior portions of all building improvements located on the RTG Parcel, in first-class order, condition, and repair, consistent with other first-class retail shopping center management practices prevailing in the Panama City Beach, Florida area, and in full compliance with all applicable laws, permits, licenses, approvals, rules, regulations, ordinances, governmental and quasi-governmental requirements and local codes and with all private covenants, conditions and restrictions affecting the Project. "Common Areas" as used herein shall mean all portions of the Project intended for common use as shown on the Site Plan or as may exist from time to time, including but not limited to parking areas, roads, streets, drives, all Project drainage and retention systems, utility lines, all sidewalks and roadways, all parking areas, lighting, signage other than RTG Signage (hereafter defined), landscaped and planted areas, entrances to and exits from the Project, sidewalks, and all easements or other rights benefiting the Project hereunder or under any other instrument creating covenants, conditions, easements, restrictions, or other rights with respect to any portion of the Project. "Common Areas" as such term is used herein shall not, however, be deemed to include the dumpster/recycling or loading dock areas appurtenant to the building on the RTG Parcel:

Developer's obligations relative to the Common Areas shall include, but shall not be limited to, the following: repairing and replacing paving and curbing; restriping parking; keeping the Common Areas properly drained, free of water, mud, sand, rubbish and other obstructions and in a neat, clean, orderly and sanitary condition; providing and maintaining adequate trash receptacles for Common Area refuse and periodically collecting and removing all such Common Area refuse; maintaining signs, markers, painted lines and other means and methods of pedestrian and vehicular traffic control; maintaining all signage other than signage located on the RTG Building ("RTG Signage"), maintaining all planting and landscaped areas, maintaining and keeping all storm sewerage and drainage utilities and other utilities fully operational; providing liability insurance as hereafter provide, keeping the Common Areas insured; keeping the Common Areas open and operating with lights at least 3.5-4 foot candles from dusk to 11:00 p.m. seven days a week ("Normal Lighting Hours"); and keeping all signage suitably lighted throughout all Normal Lighting Hours. All maintenance, repairs and replacements performed by or for Developer shall utilize good quality workmanship and materials conforming to the original specifications. Developer shall retain the services of a qualified property manager in connection with the maintenance and operation of the Common Areas and promptly notify RTG of the name, address and telephone number of such manager.

    **2.02 Operating Costs.** "Operating Costs" as such term is used herein shall include any and all costs of maintaining, operating, repairing, and replacing the Common Areas (including, without limitation, the Critical Access and Driveways); and other costs incurred in keeping the Common Areas in the condition required by this Reciprocal Easement Agreement.

    **2.03 RTG Cost Share.** Commencing on the earlier of (i) the date RTG opens its store for business to the public on the RTG Parcel, or (ii) the Required Opening Date, and continuing thereafter, RTG shall pay to Developer an annual amount (the "RTG Cost Share") equal to One and 25/100 Dollars ($1.25), multiplied by the number of actual square feet of ground floor area in the Building constructed on the RTG Parcel, which amount shall increase annually by the lesser of (x) the CPI Increase (defined below), or (y) three percent (3%) over the amount payable with respect to the immediately preceding year, beginning with the first anniversary of the date RTG acquires title to the RTG Parcel. Developer acknowledges and agrees that the RTG Cost Share shall be deemed to cover all amounts due from the Owner of the RTG Parcel for payment of Operating Costs or otherwise in connection with the maintenance, operation, repair and replacement of the Common Areas of the Project. The term "CPI Increase", for purposes of this subsection, shall mean the annual percentage increase, if any, in the Index (defined below) for the immediately preceding calendar year. The term "Index" shall mean the then latest available "Consumer Price Index - Urban Wage Earners and Clerical Workers, South Urban Region, All Items (1982-84 - 100)", issued by the Bureau of Labor Statistics of the United States Department of Labor. In the event that the Index shall cease to use the 1982-84 average of 100 as the basis of calculation, or if a substantial change is made in the terms or number of items contained in the Index, then the Index shall be adjusted to the figure that would have been derived had the manner of computing the Index on the Effective Date not been altered. In the event the Index is published less frequently than monthly, and any reference or computation is or shall be made pursuant to this Amendment in which month or other period the Index is not published, such reference or computation shall be deemed to be the average of the Index so published immediately preceding and succeeding such month or other period concerning such reference or computation. In the event that the Index shall be discontinued or no longer published, Developer shall substitute a comparable price index or formula and such substitute price index or formula

shall have the same effect as if originally designated herein as the Index.

2.04   Taxes.   Developer and RTG anticipate that the RTG Parcel (including the building thereon and any and all personal property of RTG therein) will be separately assessed for Taxes (defined below). In the event the RTG Parcel is not so separately assessed and the Taxes attributable to the RTG Parcel are included in the assessment for Taxes on the Developer Parcel (including the RTG Parcel), then (i) upon written demand by the Developer upon RTG, Developer shall be entitled to reimbursement from RTG of the percentage of the Taxes which is equal to (x) with respect to the land assessment, the number of square feet of land contained within the RTG Parcel in proportion to the number of square feet of land contained within the Developer Parcel, and (y) with respect to the building assessments, the number of square feet of floor area in the building constructed on the RTG Parcel in proportion to the aggregate number of square feet of floor area in the buildings then constructed on the Developer Parcel, and (ii) Developer shall pay any and all Taxes due on its Parcel prior to delinquency, so as to obtain the maximum available discount, and before the assessments of any penalties. In the event that the RTG Parcel is separately assessed, then each Owner shall pay any and all Taxes due on its Parcel prior to delinquency and the assessments of any penalties. "Taxes" as used herein shall mean taxes, assessments, excises, levies, and other charges by any public authority, which are general or special, ordinary or extraordinary, foreseen or unforeseen, or of any kind and nature whatsoever, including, without limitation, all ad valorem and non-ad valorem taxes, personal property taxes, transit taxes, taxes or charges on vaults or vault space (unless such tax or charge is payable by a tenant directly), special or extraordinary assessments, government levies, and all other taxes or other similar charges, if any, which are levied, assessed, or imposed upon the applicable Parcel. Taxes shall also include but not be limited to, reasonable fees and expenses of consultants, attorneys, appraisers and experts in connection with efforts which to lower Taxes or to resist increased Taxes. Such costs and expenses shall be determined in accordance with generally-accepted accounting principles and allocated to any particular calendar year on the accrual method of accounting. However, such Taxes shall specifically exclude any rent tax, gross receipts tax, sales or transactions tax, profits tax, income tax, franchise tax, excise tax, inheritance tax, gift tax, transfer tax, any late payment, charge or penalty. Notwithstanding the foregoing, if at any time the present method of taxation of assessment shall be changed so that the whole or any part of taxes, assessments, excises, levies or other charges now assessed levied, charged, confirmed or imposed upon the applicable Parcel or appurtenances or facilities used in connection therewith, shall be discontinued or reduced and as a substitute therefor or in lieu thereof a tax, assessment, excise, levy or other charge shall be assessed, levied, charged, confirmed or imposed, whether wholly or partially as a special assessment or otherwise on rents, income, profits, sales or gross receipts derived from the applicable Parcels, then the substitute tax, assessment, excise, levy or other charge shall be deemed included within the term "Taxes".

## ARTICLE III - COVENANTS AND RESTRICTIONS

3.01   Use Restrictions on Project Excluding RTG Parcel. So long as the RTG Parcel is being used for the operation of a Rooms to Go furniture store (or its successor, transferee, or assign furniture or home furnishings store), no part of the Project other than the RTG Parcel shall be leased or sold to an occupant who either (x) uses two thousand (2,000) square feet or more of its gross leasable floor area for the sale or lease of furniture, home furnishings, lighting, accessories or mattresses (collectively, subject to the exclusions set forth below, "Protected

_____ "), or (y) derives more than ten percent (10%) of its total sales revenue from Protected Items, provided, however, the following occupants and uses (and no others) shall be deemed to be excepted from Protected Items: (1) sales of office furniture and patio furniture, (2) Warehouse Clubs such as Costco and Sam's and Department Stores and Discount Department Stores such as J.C. Penney and Wal-Mart, (3) home goods and home accessories specialty stores similar to Bed, Bath and Beyond, Kirkland's, Pier 1, Cost Plus, Pottery Barn, Crate and Barrel, Restoration Hardware, (4) Haverty's, (5) "high end" furniture retailers, such as Z Gallerie and Ethan Allen, (6) mattress stores not located within the area depicted on the Site Plan as the "No Mattress Store Area", and (7) arts and crafts specialty stores such as Michaels.

**3.02    Use Restrictions on RTG Parcel.** RTG agrees to honor the exclusive uses and restrictions as set forth on **Schedule D** attached hereto and made a part hereof ("Exclusives and Restricted Uses"), provided, however that no such use restriction now or hereafter in effect shall prohibit or restrict RTG from selling or leasing items which are commonly offered from time to time in other Rooms To Go showrooms in Florida, including, without limitation, rugs, mirrors, lamps, framed art and other accessories, and electronics. In addition to the sale or lease of Protected Items, the RTG Parcel may be used for any other lawful retail use consistent with the operation of a first class retail shopping center comparable to the Project; provided such uses are not Prohibited Uses, and provided, however, that the RTG Parcel shall not be used: (i) for any business whose use materially competes with the primary use of any other occupant of the Project who leases or occupies 25,000 square feet or more of gross floor area and has an exclusive for said use (for purposes hereof, "materially competes" shall mean more than ten percent (10%) of total sales or revenue from the Parcel are derived from such use); or (ii) for any use that would cause Developer to be in violation of any covenant it has then made to any then-existing tenant or occupant of the Project that then restricts the type or quantity of goods that may be sold by other tenants or occupants of the Project ("Exclusive Use Rights"), excluding only RTG's initial intended use for sale of the Protected Items, and sales of other items from less than two thousand (2,000) square feet of the Parcel for each category of such items. Developer shall advise RTG of such Exclusive Use Rights within fifteen (15) days after receipt of written request from RTG therefor, which RTG request shall recite Developer's loss of its right to enforce the Exclusive Use Rights against RTG if Developer does not timely respond, and if Developer fails to do so within such period, Developer shall be deemed to have waived any Exclusive Use Rights of which RTG has not received written notice accompanied by a complete copy of the Exclusive Use Rights.

**3.03    Prohibited Uses as to Project Generally.** No part of the RTG Parcel or the Developer Parcel may be used for any of the uses or operations set forth in the attached **Schedule E**.

**3.04    Outparcel Sales.** RTG acknowledges and agrees that Developer may sell fee simple title to one or more parcels comprising part of the Developer Parcel (each an "Outparcel"). Provided that all governmental parking ratio requirements for the Project and for such Outparcels are satisfied without the use of any parking spaces on the RTG Parcel, and provided that RTG maintains access to Panama City Beach Highway (U.S. Highway 98/ State Road 30A) substantially at the "Critical Access" points as shown on **Schedule C**, RTG agrees that no such sale will be deemed to materially adversely affect its ingress or access from the RTG Parcel.

**3.05 Signage.** Developer shall not knowingly take or permit to be taken any action which would require the size of any sign located on the RTG Parcel to be reduced or its location to be changed. Developer acknowledges and agrees that RTG may from time to time, if permitted by applicable law, increase the size and height of its signage, and otherwise change such signage so long as it remains located within the boundaries of the RTG Parcel, does not materially impair the visibility of the Developer Parcel, and any such changes do not require a reduction in the signage available to the Developer Parcel.

**3.06 Architectural Elements and Signage.** Developer hereby waives any and all objections it may have to the construction, repair, alteration, and renovation of RTG's standard architectural elements and logo signage from time to time. RTG shall, at its own expense, have the right to change or replace any of its building and directional signage and/or its other signage with its then current prototypical signage or awnings from time to time (and make any exterior repairs or alterations incidental thereto) but shall be responsible to assure that any change in its signage does not violate applicable legal requirements. Developer acknowledges that Rooms To Go's name and logo have been trademarked by Rooms To Go, and Developer shall not use such logo or name for any purpose without Rooms To Go's prior written consent except for purpose of identifying occupants of the Project. With respect to Developer Parcel, the name "Pier Park" (the "Mark") is the sole property of The St. Joe Company ("St. Joe") and/or a subsequent assignee or licensee thereof. Accordingly, Rooms To Go shall not without St. Joe's prior written consent, use the Mark in any manner other than as part of the name of the shopping center located on the Developer Parcel, Pier Park North, adjacent to which the Rooms To Go Parcel is located. Rooms To Go and Developer each agree to use all trademark legends, notices and disclaimers as are reasonably requested by the other from time to time in conjunction with any permitted use of the shopping center name or the Mark or the Rooms To Go logo or name. Neither RTG nor Developer shall seek to register with any state, federal or other registrar the shopping center name or the Mark or the Rooms To Go logo or name, nor any name, logo, or marks confusingly similar thereto.

**3.07 No Amendment without RTG Approval.** No changes whatsoever shall be made to this Reciprocal Easement Agreement which affect the RTG Parcel or decrease the benefits or increase the burdens created thereunder without RTG's prior written approval, which approval may be granted or withheld in RTG's sole discretion if RTG reasonably determines that such amendment may increase costs to RTG or have any material adverse affect on RTG or the RTG Parcel or the operation, use, and occupancy of the RTG Parcel for retail purposes.

**3.08 Lease Restrictions.** Any lease (a "Lease") entered into by an Owner with regard to all or any portion of the Parcels on or after the date of this Agreement shall contain a provision requiring that the use of the leased premises shall be subject in all respects to the provisions of this Reciprocal Easement Agreement, to the extent applicable to such Parcels that are the subject of the Lease, and that any failure by any such lessee (a "Lessee") to comply with the applicable terms of this Reciprocal Easement Agreement (i) shall be a default under the Lease and shall subject the Lessee to all rights in favor of any Owner hereunder to enforce the applicable covenants, conditions and restrictions of this Reciprocal Easement Agreement, to collect damages suffered by such Owner, and to enforce at law or in equity, all other remedies available to the Owner in the event of a default under the Agreement, and (ii) shall entitle the non-violating Owner to enforce the applicable covenants, conditions and restrictions of this

Reciprocal Easement Agreement and to collect directly from the Lessee damages that may be suffered by such non-violating Owner as a result of such violation or attempted violation, including without limitation the cost of enforcement. Each Owner shall use commercially reasonable efforts at its sole expense to enforce the terms of this Agreement against any of its Lessees and otherwise cause any Lessee or occupant of its Parcel to comply with this Reciprocal Easement Agreement.

**3.09   Exterior Construction.**     For so long as the lease between Developer and PetSmart, Inc. (or its successors and/or assignees) for premises within the Developer Parcel is in effect, except for the initial construction of the Developer Parcel and the RTG Parcel and any reconstruction of either Parcel following a casualty, no exterior construction shall take place on the Developer Parcel within the area designated on Schedule C as the "No Mattress Store Area" nor on the RTG Parcel between November 15 and January 1 of any calendar year.

## ARTICLE IV - LIABILITY AND INDEMNIFICATION

**4.01   Liability; Indemnification.**   Each Owner shall indemnify, defend, save and hold every other Owner, tenant, and occupant of the Project harmless (except for loss or damage resulting from the tortious acts of such other parties) from and against any damages, liability actions, claims, and expenses (including attorneys' fees in a reasonable amount) in connection with the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon such Owner's Parcel, or occasioned wholly or in part by any act or omission of said Owner, its tenants, agents, contractors, employees, or licensees.

**4.02   Liability Insurance.**   Each Owner shall maintain or cause to be maintained commercial general liability insurance insuring against claims on account of loss of life, bodily injury or property damage that may arise from, or be occasioned by the condition, use or occupancy of the Common Areas by the Owner and its tenants, agents, contractors, employees, licensees, customers and invitees, of such Owner or the occupants of its Parcels except as herein provided.   Said insurance shall be carried by a reputable insurance company or companies qualified to do business in the State in which the Project is located and having a limit of Three Million Dollars ($3,000,000.00) for each occurrence. Each Owner shall maintain or cause to be maintained contractual liability insurance, naming the other Owner as an additional insured, endorsed to cover said Owner's agreement to indemnify as set out in **Section 4.01**. Notwithstanding the foregoing, any Owner or party responsible to maintain such insurance who has a net worth of at least One Hundred Million Dollars ($100,000,000.00) may "self insure", or provide for a deductible from said coverage related to the Parcel, to the extent of one percent (1%) of the net worth of said Owner or party in its last annual or fiscal year as certified by an independent certified public accountant and computed in accordance with generally accepted accounting principles consistently applied.   Such insurance may be carried under a "blanket" or "umbrella" policy or policies covering other properties of the party and its subsidiaries, controlling or affiliated corporations. Each Owner shall, upon written request from the other Owner, furnish to the party making such request certificates of insurance evidencing the existence of the insurance required to be carried pursuant to this Section or evidence of a self-insurance capacity as hereinabove provided, as the case may be.

## ARTICLE V - CASUALTY AND EMINENT DOMAIN

### 5.01   Casualty.

(a)     If any of the buildings located on any Parcel is damaged or destroyed by fire or other cause, the Owner of such building shall promptly cause either: (i) the repair, restoration, or rebuilding of the building so damaged or destroyed, or (ii) the razing of any damaged building, the filling of any excavation, and performance of any other work necessary to put such building improvements in a clean, sightly and safe condition.

(b)     In the event any Common Area improvements are damaged or destroyed, Developer shall promptly cause the repair, restoration or rebuilding of the Common Area improvements to the extent necessary to restore the affected areas to their previously improved condition.   In performing such restoration, Developer shall adhere to the parking ratios required by applicable law and as set forth herein.

**5.02.   Casualty Insurance.**   In order to assure performance of their respective obligations under **Section 5.01**, the Owners of the respective Parcels shall cause to be carried "all risk" property insurance on all buildings and improvements on their respective Parcels in the amount of the replacement cost of such improvements, and in amounts at least sufficient to avoid the effect of any co-insurance provisions of such policies, except if the Owner of said Parcel, or party responsible for any required restorations, is permitted to "self insure" pursuant to **Section 4.02**. Any such insurance shall otherwise conform to the provisions with respect to insurance contained in **Section 4.02**.

**5.03   Release; Waiver of Subrogation.** Each Owner (each a "Waiving Party") each hereby releases the other from any liability for damage or destruction to any portion of the Project, whether or not caused by acts or omissions of the Waiving Party, its employees or agents, and hereby releases and waives any and all claims and right of recovery and/or any right of subrogation against the other party or its employees for damage, loss or injury caused by or resulting from fire and/or other perils, to the extent that any such claims for damages, losses or injuries are or would be covered by any special form property insurance policies that such party maintains hereunder.   Each Waiving Party shall look to its respective insurance coverage, without regard to deductibles or self insurance or self insured retentions, for recovery of any insured property damage.   Each Owner shall cause any special form property insurance policies that it maintains to contain a provision whereby the insurer waives any (a) rights of subrogation, and (b) rights of recovery against the other party. Each Owner agrees promptly to give each insurance company that has issued to it policies of special form property insurance written notice of the terms of such mutual waivers and to cause such insurance policies to be properly endorsed, if necessary, to prevent the invalidation thereof by reason of such waivers.

**5.04   Eminent Domain.** In the event the whole or any part of the Project shall be taken by right of eminent domain or any similar authority of law (a "Taking"), the entire award for the value of the land and improvements so taken shall belong to the Owner of the property so taken or to such Owner's mortgagees or tenants, as their interest may appear, and no other Owner shall have a right to claim any portion of such award by virtue of any interest created by this

Agreement. Any Owner of a Parcel which is not the subject of a taking may, however, file a collateral claim with the condemning authority over and above the value of the land being so taken to the extent of any damage suffered by such Owner resulting from the severance of the land or improvements so taken if such claim shall not operate to reduce the award allocable to the Parcel taken. In the event of a partial Taking, the Owner of the portion of the Project so taken shall restore the improvements located on the Common Areas of the Owner's Parcel as nearly as possible to the condition existing prior to the Taking without contribution from any other Owner and any portion of any condemnation award necessary therefor shall be held in trust and applied for such purpose.

## ARTICLE VI - REMEDIES

**6.01    Self-Help.**  In the event that Developer shall fail to perform any of its obligations, maintenance, repairs or replacements when and as required herein, RTG may give Developer written notice of such failure, specifying the particulars thereof. If after thirty (30) days from the date of such notice Developer does not remedy such failure, RTG will have the right to cause the failure to be resolved at its initial expense and shall be entitled to immediate reimbursement from the Developer of RTG's actual expenses plus ten percent (10%) for overhead expenses (collectively, the "Reimbursement"). If Developer fails to reimburse RTG upon demand, RTG will be permitted to off-set any Reimbursement against any RTG Cost Share thereafter due and RTG shall have a lien on the Developer Parcel in order to secure payment by Developer of the Reimbursement. Any such lien will be perfected only by recording a claim of lien in the Public Records of Bay County, Florida. Such lien will be subordinate and junior to and will in no way impair the lien of any institutional first mortgage recorded prior to the recording of the claim of lien, but such subordination shall not relieve any mortgagee or assignee of such mortgagee who obtains title to a Parcel from liability for Reimbursements falling due subsequent to the time such mortgagee or assignee obtains title. If not paid upon demand, the Reimbursement shall accrue interest at the rate of ten percent (10%) per annum from the date of demand therefor until paid in full together with all attorneys' fees and costs of collection at trial and on appeal and in the course of any bankruptcy actions or proceedings, and the claim of lien shall secure all such additional amounts. Notwithstanding the provisions set forth herein regarding notice, RTG may immediately effect any emergency work or repair reasonably necessary to maintain access, ingress and egress to the RTG Parcel from Panama City Beach Parkway (U.S. Highway No. 98/State Road No. 30A), to prevent damage to the RTG Parcel or the improvements located thereon, or to prevent imminent injury to persons or property, and RTG shall still be entitled to reimbursement from Developer and the lien rights as provided herein. In the event that RTG shall fail to perform any of its obligations under Section 5.01(a) herein when and as required herein, Developer may give RTG written notice of such failure, specifying the particulars thereof. If after thirty (30) days from the date of such notice RTG does not remedy such failure, Developer will have the right to cause the failure to be resolved at its initial expense and shall be entitled to immediate reimbursement from RTG of Developer's actual expenses plus ten percent (10%) for overhead expenses (collectively, the "Reimbursement"). If RTG fails to reimburse Developer upon demand, Developer shall have a lien on the RTG Parcel in order to secure payment by RTG of the Reimbursement. Any such lien will be perfected only by recording a claim of lien in the Public Records of Bay County, Florida. Such lien will be subordinate and junior to and will in no way impair the lien of any institutional first mortgage recorded prior to

the recording of the claim of lien, but such subordination shall not relieve any mortgagee or assignee of such mortgagee who obtains title to a Parcel from liability for Reimbursements falling due subsequent to the time such mortgagee or assignee obtains title. If not paid upon demand, the Reimbursement shall accrue interest at the rate of ten percent (10%) per annum from the date of demand therefor until paid in full together with all attorneys' fees and costs of collection at trial and on appeal and in the course of any bankruptcy actions or proceedings, and the claim of lien shall secure all such additional amounts.

**6.02    Injunctive and Other Remedies.**  In the event of a breach by any Owner of any obligation of this Agreement which is not cured after reasonable prior written notice or as is otherwise specified hereunder, the other Owner(s) shall be entitled to obtain an order specifically enforcing the performance of such obligation or an injunction prohibiting any such breach; the Owners hereby acknowledge the inadequacy of legal remedies and the irreparable harm which would be caused by any such breach, and/or to relief by other available legal and equitable remedies from the consequences of such breach.  Any action taken or document executed in violation of this Agreement shall be void and may be set aside upon the petition of the other Owner(s) of portions of the Project. Any costs and expenses of any such proceeding, including attorneys' fees in a reasonable amount, shall be paid by Defaulting Owner and, shall constitute a lien (as described in and limited by the provisions of subsection 6.01(b) above) against the land, and improvements thereon, or the interests therein, until paid.

**6.03    Nonwaiver.**  No delay or omission of any Owner in the exercise of any right accruing upon any default of any other Owner shall impair such right or be construed to be a waiver thereof, and every such right may be exercised at any time during the continuance of such default.  A waiver by any Owner of a breach of, or a default in, any of the terms and conditions of this Agreement by any other Owner shall not be construed to be a waiver of any subsequent breach of or default in the same or any other provision of this Agreement.  Except as otherwise specifically provided in this Agreement, (i) no remedy provided in this Agreement shall be exclusive but each shall be cumulative with all other remedies provided in this Agreement, and (ii) all remedies at law or in equity shall be available.

**6.04    Nonterminable Agreement.**  No breach of the provisions of this Agreement shall entitle any Owner or party to cancel, rescind or otherwise terminate this Agreement, but such limitation shall not affect, in any manner, any other rights or remedies which any party may have hereunder by reason of any breach of the provisions of this Agreement.  No breach of the provisions of this Agreement shall defeat or render invalid the lien of any mortgage or deed of trust made in good faith for value covering any part of the Project, and any improvements thereon.

**6.05    Force Majeure.**  In the event any Owner or any other party shall be delayed or hindered in or prevented from the performance of any act required to be performed by such party by reason of Acts of God, strikes, lockouts, unavailability of materials, failure of power, prohibitive governmental laws or regulations, riots, insurrections, the act or failure to act of the other party, adverse weather conditions preventing the performance of work as certified to by an architect, war or other reason beyond such party's control, then the time for performance of such act shall be extended for a period equivalent to the period of such delay.  Lack of adequate funds

Reciprocal Easement Agreement
Page 13

or financial inability to perform shall not be deemed to be a cause beyond the control of such party.

## ARTICLE VII - TERM

**7.01 Term.** This Agreement and the easements, rights, obligations and liabilities created hereby shall be perpetual to the extent permitted by law. If any of the privileges, covenants, conditions, restrictions or rights created by this Agreement would otherwise be unlawful or void for violation of (i) the Rule against Perpetuities or some analogous statutory provisions; (ii) the rules restricting restraints on alienation; or (iii) any other statutory or common law rules imposing time limits, then such provisions shall continue only until twenty one (21) years after the death of the survivor of the now living lawful decedents of Barack Obama, President of the United States.

## ARTICLE VIII - EFFECT OF INSTRUMENT

**8.01 Mortgage Subordination.** Any mortgage, deed to secure debt or deed of trust affecting any portion of the Project shall at all times be subject and subordinate to the terms of this Agreement, except to the extent expressly otherwise provided herein, and any party foreclosing any such mortgage, deed to secure debt or deed of trust, or acquiring title by deed in lieu of foreclosure or trustee's sale shall acquire title subject to all of the terms and provisions of this Agreement, subject to **Section 6.01** hereof. Each party hereto represents and warrants to the other parties that there is no presently existing mortgage, deed to secure debt or deed of trust lien on its Parcel, other than mortgage, deed to secure debt or deed of trust liens that are expressly subordinate to the lien of this Agreement and set forth on **Schedule F**.

**8.02 Binding Effect.** Every agreement, covenant, promise, undertaking, condition, easement, right, privilege, option and restriction made, granted or assumed, as the case may be, by either party to this Agreement is made by such party not only personally for the benefit of the other party hereto but also as Owner of a portion of the Project and shall constitute equitable servitude on the portion of the Project owned by such party appurtenant to and for the benefit of the other portions of the Project. Any transferee of any part of the Project shall automatically be deemed, by acceptance of the title to any portion of the Project, to have assumed all obligations of this Agreement relating thereto to the extent of its interest in its Parcel and to have agreed with the then Owner or Owners of all other portions of the Project to execute any and all instruments and to do any and all things reasonably required to carry out the intention of this Agreement and the transferor shall upon the completion of such transfer be relieved of all further liability under this Agreement except liability with respect to matters that may have arisen during its period of ownership of the portion of the Project so conveyed that remain unsatisfied.

**8.03 Non-Dedication.** Nothing contained in this Agreement shall be deemed to be a gift or dedication of any portion of the Project to the general public or for any public use or purpose whatsoever, it being the intention of the parties hereto and their successors and assigns and that nothing in this Agreement, expressed or implied, shall confer upon any person, other than the parties hereto and their successors and assigns, any rights or remedies under or by reason of this Agreement.

**8.04** **Responsibility.** Notwithstanding anything to the contrary contained in this instrument, each party to this Agreement shall be liable and responsible for the obligations, covenants, agreements and responsibilities created by this Agreement and for any judgment rendered hereon only to the extent of its respective interest in the land and improvements on the Developer Parcel and the RTG Parcel, as the case may be.

## ARTICLE IX - NOTICES

**9.01** **Notices.** Any notice, report or demand required, permitted or desired to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes upon receipt or refusal of receipt when sent by (i) registered or certified mail, return receipt requested, or (ii) personal hand delivery, or (iii) overnight courier service, to the parties at the addresses shown below or at such other address as the respective parties may from time to time designate by like notice.

| | |
|---|---|
| If to Developer: | Panama City Beach Venture II, LLC<br>c/o Casto Southeast Realty Services, LLC<br>5391 Lakewood Ranch Blvd., Suite 100<br>Sarasota, Florida 34240<br>Attn: Legal Dept.<br>Telephone: (941) 552-2700 |
| With a copy to: | Panama City Beach Venture II, LLC<br>c/o Casto<br>191 W. Nationwide Blvd, Suite 200<br>Columbus, Ohio 43215-2568<br>Attn: Legal Dept.<br>Telephone: (614) 228-5531 |
| With a copy to: | Greene Hamrick Perrey Quinlan & Schermer, P.A.<br>601 12th Street West<br>Bradenton, Florida 34205<br>Attn: Robert F. Greene<br>Telephone: 941-747-1871 |
| If to RTG: | Seaman Development Corp.<br>c/o Rooms To Go<br>400 Perimeter Center Terrace<br>Suite 800<br>Atlanta, Georgia 30346<br>Attention: Jeffrey H. Finkel, Senior Vice President<br>Telephone: (678) 475-0499 |
| With a copy to: | Rooms To Go<br>c/o Christine B. Fisher, Esq. |

Quarles & Brady LLP
300 North LaSalle Street, Suite 4000
Chicago, Illinois 60654
Telephone: (312) 715-5150

## ARTICLE X - MISCELLANEOUS

**10.01 Covenant of Title.** Developer represents, warrants and covenants that it is the holder of fee title in the Project, and that there are no easements, liens, encumbrances or other instruments which could result in termination or modification of this Reciprocal Easement Agreement by the holders thereof who have not consented to and joined in this Reciprocal Easement Agreement.

**10.02 Environmental Indemnification.** Each Owner hereby covenants and agrees to indemnify, protect, defend and hold the other Owners harmless from and against any and all suits, actions, claims, demands, penalties, damages, losses, costs, liabilities or expenses (including, without limitation, consultants' fees, investigation and laboratory fees, reasonable attorneys' fees, and remedial costs) which may at any time be imposed upon, incurred by or asserted or awarded against the other Owner to the extent caused by the breaching Owner's violation of any of its representations, warranties, covenants or other obligations with respect to compliance with Environmental Laws.

**10.03 Estoppel Certificates.** Upon the reasonable request of the other party from time to time, each Owner agrees to execute, acknowledge and deliver to the other within ten (10) business days after request, a written instrument in a form reasonably satisfactory to both parties duly executed and acknowledged (a) certifying that this Reciprocal Easement Agreement has not been modified except as set forth in such certificate and is in full force and effect as modified, (b) specifying the dates to which Assessments have been paid, (c) stating whether or not, to the knowledge of the party executing such instrument, the other party thereto is in default and, if so, stating the nature of such default, and (d) affirming such other factually accurate matters pertaining to the provisions or subject matter of this Reciprocal Easement Agreement as may be reasonably requested by the other party. Each party shall pay the reasonable expenses (including reasonable attorneys' fees) incurred by the other party in providing the second and any subsequent such certificate requested during any twelve (12) month period. Such instrument shall not have the effect of waiving, estopping any party from asserting or otherwise depriving any party of the benefit of any provision of this Reciprocal Easement Agreement that provides a right to contest any payment, to receive a refund of any overpayment, to adjust the amount of any past or future payment or to receive copies of or to audit or review any books or records of the other party.

### 10.04 Miscellaneous.

(a) If any provision of this Agreement, or portion thereof, or the application thereof to any person or circumstances, shall, to any extent be held invalid, inoperative or unenforceable, the remainder of this Agreement, or the application of such provision or portion thereof to any other persons or circumstances, shall not be affected thereby; it shall not be deemed that any such invalid provision affects the consideration for this

Agreement; and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

(b)     This Agreement shall be construed in accordance with the laws of the state where the Project is located.

(c)     The Article headings in this Agreement are for convenience only, shall in no way define or limit the scope or content of this Agreement, and shall not be considered in any construction or interpretation of this Agreement or any part hereof.

(d)     Nothing in this Agreement shall be construed to make the parties hereto partners or joint venturers or render either of said parties liable for the debts or obligations of the other.

(e)     This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto..Any assignment of Developer's rights and obligations hereunder shall be in writing, with a copy to all Owners.

(f)     This Agreement may be amended, modified, or terminated at any time by a declaration in writing, executed and acknowledged by all the parties to the Agreement or their successors or assigns. This Agreement shall not be otherwise amended, modified or terminated during the term hereof.

(g)     Any sums not paid when due hereunder shall be due interest at a rate (the "Interest Rate") equal to 4% in excess of the Prime Rate as announced from time to time by the *Wall Street Journal* (or any other reputable financial newspaper or magazine in the event the *Wall Street Journal* ceases to be published). In the event that any Owner owed money hereunder retains the services of an attorney at law to collect such amounts owed, the prevailing party shall reimburse the other Owner for its reasonable attorney's fees.

(h)     Except to the extent expressly prohibited or restricted by Article 1 and other terms and provisions of this Agreement or by applicable law, Developer may alter or reconfigure its Parcel and may construct thereon such revised, altered or additional improvements as Developer deems necessary or advisable. Such right shall include, but shall not be limited to, erecting, constructing and maintaining on its Parcel such structures and displays as may be reasonably necessary for the conduct of the business on or for disposing of its Parcel by sale, lease or otherwise. This Agreement shall not limit the right of each Owner at any time to establish on its Parcel additional easements, licenses, reservations and rights of ways to itself, to utility companies or to others as may from time to time be reasonably necessary for the proper development and use of the Parcels. Subject to the terms and provisions of this Agreement, Developer reserves the right to alter its construction plans and building designs as it deems appropriate in its discretion.

BALANCE OF PAGE INTENTIONALLY BLANK
SIGNATURE PAGES TO FOLLOW

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

Signed and acknowledged in the
Presence of:

DEVELOPER:

PANAMA CITY BEACH VENTURE II, LLC,
a Florida limited liability company

_____

Witness No. 1

By:    Casto/CCM-US-PPN, LLC, a Delaware
limited liability company, Managing Member

_____

(Print Name)

By: Casto/CCM-US PANAMA CITY, LLC,
a Delaware limited liability company,
Managing Member

By:_____

_____

Witness No. 2

Name:  J. Brett Hutchens
Title:   Manager

_____

(Print Name)

STATE OF FLORIDA
COUNTY OF _____

The foregoing was acknowledged before me this _____ day of _____, 2013, by J. Brett Hutchens, as Manager of Casto/CCM-US-Panama City, LLC, a Delaware limited liability company, Managing Member of Casto/CCM-US PPN, LLC, a Delaware limited liability company, Managing Member of Panama City Beach Venture II, LLC, a Florida limited liability company, on behalf of the company, ☐ who is personally known to me or ☐ who produced _____ as identification.

_____

NOTARY PUBLIC

My Commission Expires:

Signed and acknowledged in the
presence of:

RTG:

BONEFISH II-PC PROPERTIES LLC, a Delaware
limited liability company

Witness No. 1

_____

(Print Name)

By:_____
Name:_____
Title:_____

_____

Witness No. 2

_____

(Print Name)

STATE OF _____
COUNTY OF _____

The foregoing was acknowledged before me this ____ day of _____, 2013, by
_____ as _____ of   BONEFISH   II-PC
PROPERTIES LLC, a Delaware limited liability company, on behalf of the company, ☐ who is
personally known to me or ☐ who produced _____ as identification.

_____
NOTARY PUBLIC

My Commission Expires:

## JOINDER OF MORTGAGEE

The U.S. Bank, National Association, a national banking association ("US Bank"), the owner and holder of that certain Mortgage, Assignment of Leases and Rents and Security Agreement dated February 27, 2013 and recorded March 1, 2013 in Official Records Book 3488, Page 1296, of the Public Records of Bay County, Florida (the "Mortgage"), which Mortgage encumbers the "Developer Parcel," as defined in the foregoing Agreement, hereby consents to the recordation of the foregoing Agreement, and US Bank agrees that the lien of the Mortgage shall hereafter be subject and subordinate to the provisions of the foregoing Agreement.

Signed and acknowledged in the  
presence of:

**U.S. BANK, NATIONAL ASSOCIATION**  
a national banking association

_____

By:_____

Print Name:_____

Name:_____

Title:_____

[BANK SEAL]

_____

Print Name:_____

STATE OF _____

COUNTY OF _____

The foregoing was acknowledged before me this ____ day of _____, 2013, by _____ as _____ of U.S. Bank, National Association, on behalf of the bank, ☐ who is personally known to me or ☐ who produced _____ as identification.

_____

NOTARY PUBLIC

My Commission Expires:

## LISTING OF SCHEDULES

### SCHEDULE A

Developer Parcel

### SCHEDULE B

RTG Parcel

### SCHEDULE C

Site Plan

### SCHEDULE D

Exclusives and Restricted Uses

### SCHEDULE E

Prohibited Uses

### SCHEDULE F

Encumbrances of Title

## SCHEDULE A

### Developer Parcel

PIER PARK NORTHEAST TRACT

BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98 (PANAMA CITY BEACH PARKWAY - HAVING A 200 FT. RIGHT OF WAY) AND THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 35°44'09" EAST, ALONG SAID WESTERLY BOUNDARY FOR A DISTANCE OF 801.86 FEET TO A POINT ON THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE 3, AS PER PLAT RECORDED IN PLAT BOOK 20, PAGES 43 AND 44 OF SAID PUBLIC RECORDS; THENCE NORTHWESTERLY ALONG SAID BOUNDARY FOR THE FOLLOWING COURSES; NORTH 54°12'33" WEST, FOR A DISTANCE OF 936.98 FEET; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 181.15 FEET; THENCE NORTH 83°02'27" EAST, FOR A DISTANCE OF 153.65 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 438.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 32.56 FEET, SAID ARC HAVING A CHORD OF 32.55 FEET BEARING NORTH 04°49'44" WEST TO THE END OF SAID CURVE; THENCE NORTH 02°41'57" WEST, FOR A DISTANCE OF 173.24 FEET TO A POINT ON A CURVE CONCAVE TO THE EAST AND HAVING A RADIUS OF 1038.00 FEET; THENCE NORTHERLY ALONG SAID CURVE FOR AN ARC DISTANCE OF 53.02 FEET SAID ARC HAVING A CHORD OF 53.01 FEET BEARING NORTH 01°14'10" WEST TO THE END OF SAID CURVE; THENCE NORTH 73°47'49" WEST, FOR A DISTANCE OF 416.42 FEET TO THE SOUTHWEST CORNER OF LOT 362, SAID PALMETTO TRACE PHASE THREE; THENCE CONTINUE NORTHWESTERLY ALONG THE SOUTHERLY BOUNDARY OF PALMETTO TRACE PHASE FOUR, AS PER PLAT RECORDED IN PLAT BOOK 21, PAGES 48 THRU 55 OF SAID PUBLIC RECORDS FOR THE FOLLOWING COURSES; NORTH 73°47'48" WEST, FOR A DISTANCE OF 195.25 FEET; THENCE NORTH 81°33'49" WEST, FOR A DISTANCE OF 261.92 FEET; THENCE NORTH 56°32'46" WEST, FOR A DISTANCE OF 391.01 FEET; THENCE LEAVING SAID SOUTHERLY BOUNDARY, NORTH 74°22'54" WEST, FOR A DISTANCE OF 191.70 FEET; THENCE NORTH 65°11'47" WEST, FOR A DISTANCE OF 67.49 FEET; THENCE SOUTH 77°13'17" WEST, FOR A DISTANCE OF 83.55 FEET; THENCE SOUTH 70°25'13" WEST, FOR A DISTANCE OF 117.07 FEET; THENCE NORTH 75°35'38" WEST, FOR A DISTANCE OF 150.95 FEET TO A EASTERLY RIGHT OF WAY LINE OF PIER PARK DRIVE; THENCE SOUTH 32°00'55" WEST, FOR A DISTANCE OF 619.72 FEET TO A NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98; THENCE SOUTH 54°15'13" EAST, FOR A DISTANCE OF 2,765.96 FEET TO THE POINT OF BEGINNING. SAID LANDS LYING IN AND BEING A PORTION OF SECTION 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA.

LESS AND EXCEPT THE ROOMS TO GO PARCEL:

COMMENCE AT THE INTERSECTION OF THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA AND THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98 (PANAMA CITY BEACH PARKWAY ~ HAVING A 200 FT. RIGHT OF WAY); THENCE NORTH 54°14'56" W, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 86.57 FEET, TO THE POINT OF BEGINNING; THENCE LEAVING SAID NORTHERLY RIGHT OF WAY LINE, NORTH 35°47'27" EAST, FOR A DISTANCE OF 313.95 FEET, TO A POINT ON A NON-TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 69.38 FEET; THENCE NORTHWESTERLY, ALONG SAID CURVE FOR AN ARC DISTANCE OF 107.21 FEET, SAID ARC HAVING A CHORD OF 96.86 FEET BEARING NORTH 08°21'49" WEST, TO THE END OF SAID CURVE; THENCE NORTH 54°14'34" WEST, FOR A DISTANCE OF 88.52 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 181.00 FEET; THENCE NORTH 54°14'56" WEST, FOR A DISTANCE OF 260.00 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 202.50 FEET, TO SAID NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98; THENCE SOUTH 54°14'56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A

DISTANCE OF 415.72 FEET, TO THE POINT OF BEGINNING. CONTAINING 2.5571 ACRES, MORE OR LESS. SAID LANDS LYING IN AND BEING A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA.

## SCHEDULE B

### RTG Parcel

COMMENCE AT THE INTERSECTION OF THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA AND THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98 (PANAMA CITY BEACH PARKWAY ~ HAVING A 200 FT. RIGHT OF WAY); THENCE NORTH 54°14'56" W, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 86.57 FEET, TO THE POINT OF BEGINNING; THENCE LEAVING SAID NORTHERLY RIGHT OF WAY LINE, NORTH 35°47'27" EAST, FOR A DISTANCE OF 313.95 FEET, TO A POINT ON A NON-TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 69.38 FEET; THENCE NORTHWESTERLY, ALONG SAID CURVE FOR AN ARC DISTANCE OF 107.21 FEET, SAID ARC HAVING A CHORD OF 96.86 FEET BEARING NORTH 08°21'49" WEST, TO THE END OF SAID CURVE; THENCE NORTH 54°14'34" WEST, FOR A DISTANCE OF 88.52 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 181.00 FEET; THENCE NORTH 54°14'56" WEST, FOR A DISTANCE OF 260.00 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 202.50 FEET, TO SAID NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98; THENCE SOUTH 54°14'56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 415.72 FEET, TO THE POINT OF BEGINNING. CONTAINING 2.5571 ACRES, MORE OR LESS. SAID LANDS LYING IN AND BEING A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA.

## SCHEDULE C

Site Plan



## SCHEDULE D

### Exclusives and Restricted Uses

**Dick's Sporting Goods**

Competition

(a)     Landlord warrants and agrees that, during the term of this Lease, it will not enter into any lease, license agreement or other similar agreement nor permit any other premises in the Shopping Center (the "**Restricted Property**") to be used for the sale, rental and/or distribution, either singly or in any combination of: (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but not limited to, golf equipment and accessories); (iii) hunting, camping and fishing equipment and accessories; and/or (iv) athletic footwear (the "**Precluded Use Activity(ies)**"). In addition to the foregoing, Landlord shall be permitted one (1) Occupant within the Restricted Property operating primarily as a family shoe store in not more than nine thousand (9,000) square feet of LFA and located in the area between or inclusive of the proposed "Pier 1" and "Toys R' Us" as outlined on the Lease Plan.

(b)     Notwithstanding the foregoing Precluded Use Activity(ies) set forth in Subsection (a) above, the retail sale and/or distribution of the Precluded Use Activity(ies) shall be permitted in the lesser of (A) ten percent (10%) in the aggregate of any such Occupant's sales floor area (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (B) two thousand (2,000) square feet in the aggregate of such Occupant's sales floor area (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use).

(c)     Landlord further covenants and agrees that, during the term of this Lease, it will not enter into any lease, license agreement or other similar agreement nor permit any property owned or controlled by Landlord or its parent or affiliates, adjacent to, contiguous or within five (5) miles of the Shopping Center (the "**Additional Restricted Property**")to be used as a full line sporting goods store having forty thousand (40,000) square feet or more of sales floor space, such as, by way of example only, Academy, Sports Authority, Bass Pro, Cabellas, Gander Mountain or the like. The foregoing shall not be violated by Landlord, or its parent or affiliates acquiring an interest in any such land after the Effective Date as a result of its merger with or acquisition of the then-owner thereof, when an Occupant using at least forty thousand (40,000) square feet of sales floor area (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) as a full line sporting goods store is permitted on such land by any lease or other agreement in existence on the date of such merger or acquisition.

(g)     Notwithstanding anything contained herein, any retailer of over fifty thousand (50,000) square feet of LFA that may be a part of the Shopping Center and/or the Additional Restricted Property and operating a traditional full-line retail department store typically found in first class shopping centers (each of which are a "**Department Store**" and all of which, collectively, are referred to herein as the "**Department Stores**") shall not be subject to the provisions of

Subsection (a) and (c), above. However. in the event Landlord. or its parent or affiliates regains control of a Department Store premises or has approval rights of any use change of a Department Store premises. then the restrictions in Subsection (a) and (c), above shall again apply to such Department Store premises; provided, however, in the event Landlord or its parent or affiliates leases or sells such Department Store premises to a Department Store for use as a Department Store, such Department Store premises shall not be subject to the restrictions in Subsection 1.5 (a) and (c), above. Notwithstanding anything contained in this Section 1.5(g), a sporting goods superstore such as Academy, Sports Authority, Bass Pro, Cabellas, Gander Mountain or the like shall not be considered a Department Store as for the above and shall not be excluded from the restrictions set forth in Subsection (a) and (c), above.

## Michaels

Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center (other than the Premises) or any property contiguous to the Shopping Center (including, without limitation, any property that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, to (i) any store that operates in a manner which is similar to or substantially the same as Tenant's Primary Business (as hereinafter defined), including by way of example, but not limited to, Garden Ridge, A.C. Moore, Ben Franklin, Joanne Fabrics, Joanne Etc, Hobby Lobby, Old America, Waccamaw/Home Place, Pat Catans, and MJDesigns, or (ii) any store rendering picture framing services. This Section 16.4.1 shall not apply to any lessee whose lease was fully executed on the Effective Date hereof and is identified on Exhibit I as an "Existing Lease Not Subject to Tenant's Exclusive;" provided, however, that this exception shall not apply if (i) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive, or (ii) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns, or (iii) Landlord permits or agrees to  an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or (iv) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise.

As used in this Lease, the term "Tenant's Primary Business" shall mean the sale of arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, holiday themed décor, decorations and costumes, wedding or party goods (except apparel), scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations, or providing classes on any of the foregoing or any combination of the foregoing categories.

## Bed, Bath & Beyond

13.2.1  Except for the existing leases with Dick's Sporting Goods and Michael's Arts & Crafts which do not contain and are not bound by, Tenant's exclusive (the "*Excepted Leases*"), Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in

any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (but excluding health and beauty care items and excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand five hundred (2,500) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed five hundred (500) square feet.]. Notwithstanding the foregoing, tenants under Excepted Leases (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord and any such tenant requires the consent of Landlord to any assignment or subletting or to a change in the use of the applicable premises, in either case which would permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national: (i) department store [for example, Wal-Mart, Macy's, Target or Kohl's], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within the Shopping Center as such stores are currently operated (as of the Effective Date) or (iv) furniture store [for example, Rooms To Go or Haverty's] selling frames and wall art as an incidental part of its sale of furniture and other furniture related items and accessories and other items normally sold in Rooms To Go and similar retail furniture stores. In addition, and notwithstanding the restrictions set forth in Section 13.2.1 above, Tenant hereby consents to the operation of a Pier 1 Import store (as same typically operates), subject to and conditioned upon the following terms: (a) the Pier 1 Imports store shall be located in that portion of the Shopping Center as is designated on Exhibit B attached hereto, (b) the lease for the Pier 1 Import store shall then be in full force and effect, and (c) the Floor Area of the Pier 1 Import store shall not exceed 10,000 square feet of Floor Area.

*RTG will also honor the following exclusive rights granted by Developer to PetSmart, Inc. ("PetSmart") (its successors and/or assignees) provided PetSmart (or its successors and/or assignees) only operates their premises under the trade name "PetSmart" or such other name as may be used by Tenant at a majority of its stores operating in Florida, Alabama and Georgia, and further provided that PetSmart (or its successors and/or assignees) does not assign its lease or sublease to any furniture store, even to a store otherwise an excepted furniture store under*

*this REA (i.e., Bed, Bath and Beyond, Kirkland's, Pier 1, Cost Plus, Pottery Barn, Crate and Barrel, Restoration Hardware, Haverty's, Z Gallerie or Ethan Allen).*

## PetSmart

From and after the date hereof and continuing throughout the Term of the Lease, Tenant shall have the exclusive right in the Project to conduct any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of Tenant's Primary Business set forth below of the Fundamental Lease Provisions ("Tenant's Exclusive"). Other tenants or occupants of the Project may sell items included in Tenant's Exclusive (other than the retail sale of animals and/or pet services), provided such items sold are "incidental" to such tenants' or occupants' primary use and the floor area dedicated to said "incidental" sales does not exceed the lesser of (i) five percent (5%) or (ii) 500 square feet. Notwithstanding anything herein to the contrary, Tenant's Exclusive shall not apply to any national (meaning operating 50 or more stores in the continental United States) or regional (meaning operating 20 or more stores in Florida, Georgia and/or Alabama) full-line grocery store occupying 20,000 square feet or more of Gross Floor Area.

Tenant's Primary Business: The retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) food, accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, such as grooming, indoor boarding and pet day care, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment, (v) educational products and services related to any of the foregoing and (vi) office and storage uses incidental to the foregoing, subject to Paragraph 6A.

## SCHEDULE E

### Prohibited Uses

(1) Storage, use, release, or disposal, whether temporary or permanent, of any Hazardous Substance in violation of any Environmental Law (as defined herein). The term "Environmental Law" means any present or future federal, state or local laws, statutes, regulations, rules, or common law relating to the protection of the environment, human health, safety, or welfare, and includes, but is not limited to, the following statutes, as currently amended and any subsequent amendments, and any regulations, rules, guidance documents, or similar materials promulgated by administrative agencies or regulatory authorities: Clean Water Act; Clean Air Act; Emergency Planning and Community Right to Know Act; Comprehensive Environmental Response, Compensation, and Liability Act; Toxic Substances Control Act; Resource Conservation and Recovery Act; Endangered Species Act; Federal Insecticide, Fungicide, and Rodenticide Act, and Hazardous Materials Transportation Uniform Safety Act. The term "Hazardous Substance" shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, (a) asbestos and/or asbestos-containing products, whether or not currently friable; encapsulated, disturbed or released, and whether or not in violation of Environmental Laws; (d) polychlorinated biphenyls ("PCBs"), lead based paint, paint storage containers (including tanks) and their contents, petroleum and petroleum based derivatives, and urea formaldehyde; (e) any substance or material presenting a risk to human health or the environment under other applicable federal, state or local laws, ordinances, or regulations, as now or as may be passed or promulgated in the future, unless held and release in compliance with all Environmental Laws; or (f) any substance that after release into the environment and upon exposure, ingestion, inhalation, or assimilation will or may reasonably be anticipated to cause death, disease, behavior abnormalities, cancer, or genetic abnormalities.

(2) Adult" bookstores or cinemas or establishments for the sale of drug-related paraphernalia. For the purposes of this subparagraph, "Adult" bookstores or cinemas shall mean and include any establishments which sell or offer for sale or display any pornographic books, literature, or videotapes (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available by law for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality);

(3) Any "topless" bars, lounges, dance halls, massage parlors, photography studios or other establishments of any kind or nature advertising or displaying less than completely and opaquely covered human genitals, pubic regions, buttocks, or female breasts (below a point immediately above the top of the aureole), or human male genitals, even if completely and opaquely covered, if in a discernibly turgid state;

(4) Pawn shops;

(5) Any auction facility;

(6) Self-service laundromats or drycleaning plants, provided, however, drop-off stores shall be permitted as long as no drycleaning or other cleaning processing is performed on the RTG Parcel;

(7) Any unlawful use;

(8) Funeral parlor;

(9) Abortion clinic;

(10) HIV clinic; or

(11) Storage or distribution facility, other than as incidental to an otherwise permitted use.

SCHEDULE F

Mortgage Liens

1. Mortgage, Assignment of Leases and Rents and Security Agreement dated February 27, 2013, given by Panama City Beach Venture II, LLC, a Florida limited liability company, in favor of U.S. Bank, National Association, as Administrative Agent, recorded March 1, 2013 in Official Records Book 3488, Page 1296 of the Public Records of Bay County, Florida (as to Developer Parcel).

After Recording, Return to:

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attn:  Alan M. Freeman, Esq.

File # 2013011899
OR BK  3488  Pages 1359 - 1363
Recorded 03/01/13 11:20:46
Bill Kinsaul, Clerk
Bay County, FL
Deputy Clerk GB
Trans # 1135991

---

(The Above Space for Recorder's Use Only)

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE, made as of November ~~December~~ 6, 2012 by and between PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company, having an office c/o Casto Southeast Realty Services LLC, 401 N. Cattlemen Road, Suite 108, Sarasota, Florida 34232 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

### Preliminary Statement

Landlord is the fee owner of certain real property located in the City of Panama City Beach, Bay County, Florida, as more particularly described on Exhibit A hereto annexed, together with improvements constructed or to be constructed thereon (the *"Shopping Center"*). Landlord and Tenant, as of the date hereof, have entered into a lease (the *"Lease"*) demising a portion of the Shopping Center as more particularly described therein (the *"Premises"*) to Tenant.  In connection therewith, Landlord and Tenant have entered into this Memorandum to confirm the demise of the Premises and to provide notice to any interested party of such demise and of the terms and provisions of the Lease.

NOW, THEREFORE, the parties state as follows:

1.      All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

2.      The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term of approximately ten (10) years commencing on the Rent Commencement Date (the *"Initial Term"*).  Under the terms of the Lease, Tenant has the right to extend the Initial Term for four (4) separate and additional periods of five (5) years each after the expiration of the Initial Term.

3.      This Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

(i)      that, subject to certain exceptions more particularly set forth in the Lease, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping

A-1

NY02DOCS\1704124.1\C061858\0328405

Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (including, without limitation, health and beauty care items but excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items.

(ii)    the restrictions set forth therein on Landlord's ability to lease certain portions of the Shopping Center for certain uses which are otherwise prohibited by the terms of the Lease;

(iii)    provisions set forth therein regarding Tenant's right to install and maintain signage upon the exterior of the Premises and upon a pylon and/or monument sign located at the Shopping Center;

(iv)    provisions set forth therein regarding Tenant's right to use (and to permit Tenant's customers, employees, agents and contractors to use) certain common areas of the Shopping Center (such as, without limitation, the parking facilities of the Shopping Center); and

(v)    provisions set forth therein regarding certain areas in the Shopping Center in which no improvements are to be constructed, or changes made without the consent of the Tenant.

4.    In addition to those terms hereinabove set forth, the Lease contains numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions. The Lease and exhibits thereto are hereby incorporated by reference in this Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded. In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control. This Memorandum of Lease is not intended, and shall not be construed, to define, limit or modify the Lease.

[BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the parties hereto have executed this Memorandum of Lease as of the day and year first above written.

**LANDLORD:**

WITNESSES:

PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company

Name: Patricia A. Coderre

By:  Casto/CCM-US PPN, LLC,
     a Delaware limited liability company,
     Managing Member

Name: Julie Ann Soriero

     By:  Casto/CCM-US Panama City, LLC,
          a Delaware limited liability company,
          Managing Member

          By:
          Name: J. Brett Hutchens
          Title:   Manager

**TENANT:**

WITNESSES:

BED BATH & BEYOND INC., a New York corporation

Name: Alan M. Freeman

By:
Name:  Warren Eisenberg
Title:    Co-Chairman

Name: Deanna Glatzman

STATE OF NEW JERSEY    )
                                 ) : ss.

COUNTY OF UNION    )

        On the 2ᵗ day of November in the year 2012 before me, the undersigned, personally appeared _Werner Eisenberg_ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of Union, State of New Jersey.

_Kathleen C. Ferenchak_
Notary Public

My Commission Expires:    **KATHLEEN C. FERENCHAK**
**NOTARY PUBLIC OF NEW JERSEY**
**COMMISSION EXPIRES NOVEMBER 2, 2013**

STATE OF _Florida_    )
                             ) : ss.

COUNTY OF _Sarasota_    )

        On the 6 day of ~~November~~ December in the year 2012 before me, the undersigned, personally appeared _J. Trush Huening_ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of _Sarasota_, State of _Florida_

_Leslie Perez_
Notary Public

My Commission Expires:



LESLIE PEREZ
Commission # DD 901253
Expires June 22, 2013
Bonded Thru Troy Fain Insurance 800-385-7019

Exhibit A

Legal Description of Shopping Center

## PIER PARK NORTHEAST TRACT

BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF U.S.
HIGHWAY 98 (PANAMA CITY BEACH PARKWAY - HAVING A 200 FT. RIGHT OF
WAY) AND THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER
PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS
OF BAY COUNTY, FLORIDA; THENCE NORTH 35 DEGREES 44' 09" EAST, ALONG SAID
WESTERLY BOUNDARY FOR A DISTANCE OF 801.85 FEET, TO THE SOUTHERLY
LINE OF PALMETTO TRACE FUTURE PHASES; THENCE WESTERLY ALONG SAID
SOUTHERLY LINE FOR THE FOLLOWING COURSES: NORTH 54 DEGREES 12' 33" WEST FOR A
DISTANCE OF 936.98 FEET; THENCE NORTH 02 DEGREES 41' 57" WEST FOR A DISTANCE OF
503.85 FEET; THENCE NORTH 73 DEGREES 47' 49" WEST FOR A DISTANCE OF 449.57 FEET;
THENCE NORTH 81 DEGREES 33' 49" WEST FOR A DISTANCE OF 261.92 FEET; THENCE NORTH
56 DEGREES 32' 46" WEST FOR A DISTANCE OF 391.01 FEET; THENCE NORTH 74 DEGREES 22'
24" WEST FOR A DISTANCE OF 191.68 FEET; THENCE NORTH 65 DEGREES 11' 47" WEST FOR A
DISTANCE OF 67.49 FEET; THENCE SOUTH 77 DEGREES 13' 16" WEST FOR A DISTANCE OF
83.55 FEET; THENCE SOUTH 70 DEGREES 25' 13" WEST FOR A DISTANCE OF 117.07 FEET;
THENCE NORTH 75 DEGREES 35' 38" WEST FOR A DISTANCE OF 150.95 FEET, TO THE
EASTERLY RIGHT OF WAY LINE OF PIER PARK DRIVE; THENCE SOUTH 32 DEGREES 00' 57"
WEST, ALONG SAID EASTERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 619.77
FEET TO THE NORTHERLY RIGHT OF WAY LINE OF SAID U.S. HIGHWAY 98; THENCE SOUTH 54
DEGREES 14' 56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE
FOR A DISTANCE OF 2715.95 FEET TO THE POINT OF BEGINNING.  SAID LANDS LYING AND
BEING IN A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16
WEST, BAY COUNTY, FLORIDA.


LESS AND EXCEPT THE FOLLOWING ROOMS TO GO PARCEL:

COMMENCE AT THE INTERSECTION OF THE WESTERLY BOUNDARY OF PALMETTO TRACE
PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC
RECORDS OF BAY COUNTY, FLORIDA AND THE NORTHERLY RIGHT OF WAY LINE OF U.S.
HIGHWAY NO. 98 (PANAMA CITY BEACH PARKWAY ~ HAVING A 200 FT. RIGHT OF WAY);
THENCE NORTH 54°14'56" W, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE
OF 86.57 FEET, TO THE POINT OF BEGINNING; THENCE LEAVING SAID NORTHERLY RIGHT OF
WAY LINE, NORTH 35°47'27" EAST, FOR A DISTANCE OF 313.95 FEET, TO A POINT ON A NON-
TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 69.38 FEET; THENCE
NORTHWESTERLY, ALONG SAID CURVE FOR AN ARC DISTANCE OF 107.21 FEET, SAID ARC
HAVING A CHORD OF 96.86 FEET BEARING NORTH 08°21'49" WEST, TO THE END OF SAID
CURVE; THENCE NORTH 54°14'34" WEST, FOR A DISTANCE OF 88.52 FEET; THENCE SOUTH
35°45'04" WEST, FOR A DISTANCE OF 181.00 FEET; THENCE NORTH 54°14'56" WEST, FOR A
DISTANCE OF 260.00 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 202.50 FEET,
TO SAID NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98; THENCE SOUTH 54°14'56"
EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 415.72 FEET, TO
THE POINT OF BEGINNING. CONTAINING 2.5571 ACRES, MORE OR LESS. SAID LANDS LYING IN
AND BEING A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY
COUNTY, FLORIDA.

After Recording, Return to:

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attn: Alan M. Freeman, Esq.

---

(The Above Space for Recorder's Use Only)

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE, made as of ~~November~~ *December* 6, 2012 by and between PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company, having an office c/o Casto Southeast Realty Services LLC, 401 N. Cattlemen Road, Suite 108, Sarasota, Florida 34232 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

Preliminary Statement

Landlord is the fee owner of certain real property located in the City of Panama City Beach, Bay County, Florida, as more particularly described on Exhibit A hereto annexed, together with improvements constructed or to be constructed thereon (the *"Shopping Center"*). Landlord and Tenant, as of the date hereof, have entered into a lease (the *"Lease"*) demising a portion of the Shopping Center as more particularly described therein (the *"Premises"*) to Tenant. In connection therewith, Landlord and Tenant have entered into this Memorandum to confirm the demise of the Premises and to provide notice to any interested party of such demise and of the terms and provisions of the Lease.

NOW, THEREFORE, the parties state as follows:

1. All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

2. The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term of approximately ten (10) years commencing on the Rent Commencement Date (the *"Initial Term"*). Under the terms of the Lease, Tenant has the right to extend the Initial Term for four (4) separate and additional periods of five (5) years each after the expiration of the Initial Term.

3. This Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

   (i) that, subject to certain exceptions more particularly set forth in the Lease, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping

Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (including, without limitation, health and beauty care items but excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items.

(ii)    the restrictions set forth therein on Landlord's ability to lease certain portions of the Shopping Center for certain uses which are otherwise prohibited by the terms of the Lease;

(iii)    provisions set forth therein regarding Tenant's right to install and maintain signage upon the exterior of the Premises and upon a pylon and/or monument sign located at the Shopping Center;

(iv)    provisions set forth therein regarding Tenant's right to use (and to permit Tenant's customers, employees, agents and contractors to use) certain common areas of the Shopping Center (such as, without limitation, the parking facilities of the Shopping Center); and

(v)    provisions set forth therein regarding certain areas in the Shopping Center in which no improvements are to be constructed, or changes made without the consent of the Tenant.

4.    In addition to those terms hereinabove set forth, the Lease contains numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions. The Lease and exhibits thereto are hereby incorporated by reference in this Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded. In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control. This Memorandum of Lease is not intended, and shall not be construed, to define, limit or modify the Lease.

[BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the parties hereto have executed this Memorandum of Lease as of the day and year first above written.

**LANDLORD:**

WITNESSES:

PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company

Name: Patricia A. Coderre

By: Casto/CCM-US PPN, LLC,
    a Delaware limited liability company,
    Managing Member

Name: Julie Ann Soriero

    By: Casto/CCM-US Panama City,
        LLC,
        a Delaware limited liability
        company,
        Managing Member

        By:
        Name: J. Brett Hutchens
        Title:   Manager

**TENANT:**

WITNESSES:

BED BATH & BEYOND INC., a New York corporation

Name: Alan M. Freeman

By:
Name:  Warren Eisenberg
Title:    Co-Chairman

Name: Zanna Lantzman

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

On the 2ᵗʰ day of November in the year 2012 before me, the undersigned, personally appeared _Warren Eisenberg_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of Union, State of New Jersey.

_Kathleen C Ferenchak_
Notary Public

My Commission Expires:    **KATHLEEN C. FERENCHAK**
**NOTARY PUBLIC OF NEW JERSEY**
**COMMISSION EXPIRES NOVEMBER 2, 2013**

STATE OF _Florida_    )
                      ) : ss.
COUNTY OF _Sarasota_  )

On the 6 day of ~~November~~ _December_ in the year 2012 before me, the undersigned, personally appeared _J. David Hutchins_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the County of _Sarasota_, State of _Florida_

_Leslie Perez_
Notary Public

My Commission Expires:



LESLIE PEREZ
Commission # DD 901253
Expires June 22, 2013
Bonded Thru Troy Fain Insurance 800-385-7019

Exhibit A

Legal Description of Shopping Center

PIER PARK NORTHEAST TRACT

BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY 98 (PANAMA CITY BEACH PARKWAY - HAVING A 200 FT. RIGHT OF WAY) AND THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA; THENCE NORTH 35 DEGREES 44' 09" EAST, ALONG SAID WESTERLY BOUNDARY FOR A DISTANCE OF 801.85 FEET, TO THE SOUTHERLY LINE OF PALMETTO TRACE FUTURE PHASES; THENCE WESTERLY ALONG SAID SOUTHERLY LINE FOR THE FOLLOWING COURSES: NORTH 54 DEGREES 12' 33" WEST FOR A DISTANCE OF 936.98 FEET; THENCE NORTH 02 DEGREES 41' 57" WEST FOR A DISTANCE OF 503.85 FEET; THENCE NORTH 73 DEGREES 47' 49" WEST FOR A DISTANCE OF 449.57 FEET; THENCE NORTH 81 DEGREES 33' 49" WEST FOR A DISTANCE OF 261.92 FEET; THENCE NORTH 56 DEGREES 32' 46" WEST FOR A DISTANCE OF 391.01 FEET; THENCE NORTH 74 DEGREES 22' 24" WEST FOR A DISTANCE OF 191.68 FEET; THENCE NORTH 65 DEGREES 11' 47" WEST FOR A DISTANCE OF 67.49 FEET; THENCE SOUTH 77 DEGREES 13' 16" WEST FOR A DISTANCE OF 83.55 FEET; THENCE SOUTH 70 DEGREES 25' 13" WEST FOR A DISTANCE OF 117.07 FEET; THENCE NORTH 75 DEGREES 35' 38" WEST FOR A DISTANCE OF 150.95 FEET, TO THE EASTERLY RIGHT OF WAY LINE OF PIER PARK DRIVE; THENCE SOUTH 32 DEGREES 00' 57" WEST, ALONG SAID EASTERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 619.77 FEET TO THE NORTHERLY RIGHT OF WAY LINE OF SAID U.S. HIGHWAY 98; THENCE SOUTH 54 DEGREES 14' 56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE FOR A DISTANCE OF 2715.95 FEET TO THE POINT OF BEGINNING. SAID LANDS LYING AND BEING IN A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA.


LESS AND EXCEPT THE FOLLOWING ROOMS TO GO PARCEL:

COMMENCE AT THE INTERSECTION OF THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY COUNTY, FLORIDA AND THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98 (PANAMA CITY BEACH PARKWAY ~ HAVING A 200 FT. RIGHT OF WAY); THENCE NORTH 54°14'56" W, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 86.57 FEET, TO THE POINT OF BEGINNING; THENCE LEAVING SAID NORTHERLY RIGHT OF WAY LINE, NORTH 35°47'27" EAST, FOR A DISTANCE OF 313.95 FEET, TO A POINT ON A NON-TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 69.38 FEET; THENCE NORTHWESTERLY, ALONG SAID CURVE FOR AN ARC DISTANCE OF 107.21 FEET, SAID ARC HAVING A CHORD OF 96.86 FEET BEARING NORTH 08°21'49" WEST, TO THE END OF SAID CURVE; THENCE NORTH 54°14'34" WEST, FOR A DISTANCE OF 88.52 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 181.00 FEET; THENCE NORTH 54°14'56" WEST, FOR A DISTANCE OF 260.00 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 202.50 FEET, TO SAID NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98; THENCE SOUTH 54°14'56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 415.72 FEET, TO THE POINT OF BEGINNING. CONTAINING 2.5571 ACRES, MORE OR LESS. SAID LANDS LYING IN AND BEING A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16 WEST, BAY COUNTY, FLORIDA.

LEASE AGREEMENT

Between

PANAMA CITY BEACH VENTURE II, LLC,
A FLORIDA LIMITED LIABILITY COMPANY

Landlord

and

BED BATH & BEYOND INC.,
A NEW YORK CORPORATION,

Tenant

PIER PARK NORTH SHOPPING CENTER
PANAMA CITY BEACH, FLORIDA

Dated as of: ~~November~~ December 6, 2012

* * * * * *

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

* * * * * *

TABLE OF CONTENTS

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS .........................................................................1
    Section 1.1    Basic Terms and Definitions ...........................................................................1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE..................................4
    Section 2.1    Lease of Premises...........................................................................................4
    Section 2.2    Term. .............................................................................................................5
    Section 2.3    Delivery Date. ................................................................................................5
    Section 2.4    Unseasonable Delivery: Slack Period ...........................................................7
    Section 2.5    Initial Co-Tenancy Condition.........................................................................7

ARTICLE 3 IMPROVEMENTS ....................................................................................................8
    Section 3.1    Landlord's Work and Tenant's Work .............................................................8
    Section 3.2    Plan Approvals. ..............................................................................................8
    Section 3.3    Performance of Work. ..................................................................................10
    Section 3.4    Measurement; Adjustment of Rent. ..............................................................12

ARTICLE 4 FIXED RENT, TAXES: DETERMINATION AND PAYMENT ...........................12
    Section 4.1    Fixed Rent ....................................................................................................12
    Section 4.2    Payment of Rent ...........................................................................................13
    Section 4.3    Real Estate and Other Taxes. .......................................................................13

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES ...............................................15
    Section 5.1    Common Areas: Maintenance. ......................................................................15
    Section 5.2    Common Areas: Restrictions. .......................................................................15

ARTICLE 6 UTILITIES................................................................................................................17
    Section 6.1    Utility Service ...............................................................................................17
    Section 6.2    Interruption...................................................................................................18

ARTICLE 7 SIGNS  18
    Section 7.1    Tenant's Building Signage ............................................................................18
    Section 7.2    Pylon/Monument Signage .............................................................................18
    Section 7.3    Signage: Alteration/Removal/Allocation .....................................................18
    Section 7.4    Cooperation ..................................................................................................19
    Section 7.5    Signage and Building Restrictions and Criteria. ..........................................19

ARTICLE 8 ALTERATIONS AND IMPROVEMENTS.............................................................19
    Section 8.1    Alterations and Improvements. .....................................................................19

ARTICLE 9 REPAIRS ..................................................................................................................21
    Section 9.1    Tenant's Repairs...........................................................................................21
    Section 9.2    Landlord's Repairs .......................................................................................21
    Section 9.3    Legal Compliance Work ...............................................................................22

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION .....22
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification. .....22
    Section 10.2    Tenant's Insurance. .....................................................................................23
    Section 10.3    Landlord's Insurance...................................................................................23
    Section 10.4    General Insurance Requirements. ...............................................................24

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN ...................................25
    Section 11.1    Fire and Other Casualty...............................................................................25
    Section 11.2    Eminent Domain. .........................................................................................26
    Section 11.3    Abatement of Rent Charges .........................................................................27

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES ............................27
    Section 12.1    Quiet Enjoyment ..........................................................................................27
    Section 12.2    Authority ......................................................................................................27
    Section 12.3    Landlord's Covenants, Warranties and Representations..............................28
    Section 12.4    Environmental Matters..................................................................................29
    Section 12.5    Purchase and Sale Contract ..........................................................................30

Section 12.6      Reciprocal Easement Agreement ...............................................................31

ARTICLE 13 USES AND RESTRICTIONS .......................................................................32
Section 13.1      Permitted and Prohibited Uses. ..................................................................32
Section 13.2      Tenant's Exclusive in Center ......................................................................32
Section 13.3      Exclusives Which Tenant Must Honor. .......................................................33

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS ...............................................34

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING..........................................35
Section 15.1      Assignment and Subletting..........................................................................35
Section 15.2      Liability of Tenant .......................................................................................35
Section 15.3      Collateral Assignment .................................................................................35
Section 15.4      Cure Rights of Original Tenant. ..................................................................36
Section 15.5      Recognition Agreement ...............................................................................36

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION ...............................................36
Section 16.1      Tenant Default..............................................................................................36
Section 16.2      Landlord Default ..........................................................................................37
Section 16.3      Arbitration ...................................................................................................38

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
                  CERTIFICATE .........................................................................................38
Section 17.1      Right to Mortgage and Non-Disturbance ....................................................38
Section 17.2      Estoppel Certificate .....................................................................................39
Section 17.3      Mortgages and Ground Leases ....................................................................39

ARTICLE 18 NOTICE......................................................................................................39

ARTICLE 19 TENANT'S PROPERTY..............................................................................40

ARTICLE 20 END OF TERM ..........................................................................................40
Section 20.1      Surrender of Premises ..................................................................................40
Section 20.2      Hold Over ....................................................................................................40

ARTICLE 21 [INTENTIONALLY DELETED].................................................................40

ARTICLE 22 ONGOING CO-TENANCY .......................................................................40

ARTICLE 23 MISCELLANEOUS ...................................................................................41
Section 23.1      Loading Facilities........................................................................................41
Section 23.2      Liens............................................................................................................41
Section 23.3      Broker's Commission...................................................................................41
Section 23.4      *Force Majeure* ...........................................................................................41
Section 23.5      Consents ......................................................................................................41
Section 23.6      Costs............................................................................................................41
Section 23.7      Attorneys' Fees ...........................................................................................42
Section 23.8      Survival of Obligations ...............................................................................42
Section 23.9      Non-Waiver.................................................................................................42
Section 23.10     Rights Cumulative.......................................................................................42
Section 23.11     Definition of Landlord ................................................................................42
Section 23.12     Successors and Assigns ...............................................................................42
Section 23.13     Limitation of Landlord's Liability ..............................................................42
Section 23.14     Limitation of Tenant's Liability ..................................................................42
Section 23.15     Joint and Several Liability............................................................................43
Section 23.16     Severability..................................................................................................43
Section 23.17     Grammatical Usages and Construction .......................................................43
Section 23.18     Table of Contents, Line Numbering and Paragraph Headings....................43
Section 23.19     Definition of Hereunder, Herein, etc. .........................................................43
Section 23.20     Short Form Lease ........................................................................................43
Section 23.21     Entire Agreement and Modification.............................................................43
Section 23.22     No Joint Venture or Partnership Created by Lease ......................................43
Section 23.23     Tenant's Tradename .....................................................................................43
Section 23.24     Counterparts ................................................................................................43
Section 23.25     Waiver of Trial by Jury ...............................................................................44

Section 23.26    Use of Shopping Center Name..................................................................44
Section 23.27    Governing Law.............................................................................................45

EXHIBITS

Exhibit A        Legal Description of Shopping Center
Exhibit B        Site Plan
Exhibit C        Form of Rent Commencement and Expiration Date Agreement
Exhibit D        Specifications for Landlord's Work
Exhibit D-1      Exterior Elevations of the Premises, and Sidewalk Plan
Exhibit D-2      Exterior Elevations of the Shopping Center
Exhibit E        Permitted Encumbrances
Exhibit F        Signage
Exhibit G        Form of Subordination, Non-Disturbance and Attornment Agreement
Exhibit H        Form of Subtenant Recognition Agreement
Exhibit I        Form of Delivery Date Notice
Exhibit J        Form of Delivery Date Certification
Exhibit K-1      Existing Exclusives
Exhibit K-2      Existing Leases
Exhibit L        Prohibited Uses
Exhibit M        Signage Criteria

LEASE AGREEMENT

*December*

1

2  THIS LEASE AGREEMENT (*"Lease"*) is entered into as of ~~November~~ *11* , 2012 by
3  and between PANAMA CITY BEACH VENTURE II, LLC, a Florida limited liability company,
4  having an office c/o Casto Southeast Realty Services LLC, 401 N. Cattlemen Road, Suite 108,
5  Sarasota, Florida 34232 (after January 15, 2013, address shall be c/o Casto Southeast Realty
6  Services LLC, 5391 Lakewood Ranch Boulevard, Suite 100, Sarasota, Florida 34240 but
7  the foregoing shall not excuse Landlord from delivering to Tenant a change of address notice
8  pursuant to Article 18 hereof) (*"Landlord"*), and BED BATH & BEYOND INC., a New York
9  corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

10  WITNESSETH:

11  ARTICLE 1
12  BASIC TERMS AND DEFINITIONS

13  Section 1.1  Basic Terms and Definitions.  The following terms shall have the
14  meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

15  1.1.1  Additional Rent:  Any monies which Tenant is required to pay to
16  Landlord under the terms and conditions of this Lease, other than Fixed Rent.

17  1.1.2  Affiliate:  A corporation, partnership, limited liability company, person or
18  other entity which is controlling, controlled by, or under common control with, Landlord or
19  Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or
20  indirect, of the power to direct or cause the direction of the management and policies of a person
21  or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

22  1.1.3  Alternate Rent:  Fifty percent (50%) of the Fixed Rent otherwise payable
23  during the applicable period.

24  1.1.4  Common Areas:  All areas in the Shopping Center which are, from time to
25  time, available for the joint use and benefit of Tenant and other tenants and occupants of the
26  Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees,
27  customers and other invitees, including, but not limited to, any and all parking areas, parking
28  spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting
29  facilities, courts, landscaped areas, retention or detention areas, and utility lines serving such
30  common areas and facilities.

31  1.1.5  Common Areas Charges:  As defined in Section 5.1 hereof.

32  1.1.6  Delivery Date:  As defined in Section 2.3 hereof.

33  1.1.7  Effective Date:  The date hereof.

34  1.1.8  Event of Default:  As defined in Section 16.1 hereof.

35  1.1.9  Excused Periods:  Periods during which Tenant's failure to conduct the
36  operations of its business or any other business: (x) resulted from alterations or renovations being
37  performed in and to the Premises, (y) was caused by damage or destruction, eminent domain
38  proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord,
39  or its employees, agents, or contractors.

40  1.1.10  Exhibits.  The exhibits listed in the Table of Contents annexed to this
41  Lease have been agreed to by the parties and attached hereto, it being the intention of the parties
42  that they shall become a binding part of this Lease as if fully set forth herein.

43  1.1.11  Fixed Rent:  The following amounts for the periods indicated (subject to
44  adjustment pursuant to Section 3.4 hereof):

45  (a)  For the period commencing on the Rent Commencement Date and
46  ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of
47  Two Hundred Ten Thousand Six Hundred and 00/100 ($210,600) Dollars per year [based on
48  Nine and 00/100 ($9.00) Dollars per square foot of Floor Area in the Premises];

(b)       In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Two Hundred Twenty Eight Thousand One Hundred Fifty and 00/100 ($228,150) Dollars per year [based on Nine and 75/100 ($9.75) Dollars per square foot of Floor Area in the Premises];

(c)       In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Two Hundred Forty Five Thousand Seven Hundred and 00/100 ($245,700) Dollars per year [based on Ten and 50/100 ($10.50) Dollars per square foot of Floor Area in the Premises];

(d)       In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Two Hundred Sixty Three Thousand Two Hundred Fifty and 00/100 ($263,250) Dollars per year [based on Eleven and 25/100 ($11.25) Dollars per square foot of Floor Area in the Premises]; and

(e)       In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Two Hundred Eighty Thousand Eight Hundred and 00/100 ($280,800) Dollars per year [based on Twelve and 00/100 ($12.00) Dollars per square foot of Floor Area in the Premises].

1.1.12 Floor Area: The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas). The Floor Area of any tenant or other occupant of the Shopping Center who pays Taxes directly, as provided in Section 4.3.3, shall be excluded from the denominator of the fraction used to calculate Tenant's Pro Rata Share of Taxes. All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13 *Force Majeure*:   As defined in Section 23.4 hereof.

1.1.14 Ground Lessor: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 [Intentionally Deleted].

1.1.16 Hazardous Substances:   As defined in Subsection 12.4.1 hereof.

1.1.17 Inducement Tenants:   As defined in Subsection 2.3.1 hereof.

1.1.18 Landlord:   As defined in the preamble and Section 23.11 hereof.

1.1.19 Landlord's Mailing Address:   Casto Southeast Realty Services LLC, 401 N. Cattlemen Road, Suite 108, Sarasota, Florida 34232 (after January 15, 2013, address shall be c/o Casto Southeast Realty Services LLC, 5391 Lakewood Ranch Boulevard, Suite 100, Sarasota, Florida 34240 but the foregoing shall not excuse Landlord from delivering to Tenant a change of address notice pursuant to Article 18 hereof) or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof. Notwithstanding the foregoing, all Rent shall be mailed or otherwise delivered to Landlord at the following address: c/o Casto, 191 W. Nationwide Boulevard, Suite 200, Columbus, Ohio 43215. If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

1.1.20 Landlord's Work:   As defined in Section 3.1 hereof.

1.1.21 Lease Interest Rate: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

2

1.1.22 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23 <u>Mortgagee</u>: Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24 [Intentionally Deleted]

1.1.25 [Intentionally Deleted].

1.1.26 <u>Outparcels</u>: The five (5) parcels of land within the Shopping Center which are designated on <u>Exhibit B</u> as Outparcels A through E respectively.

1.1.27 <u>Permitted Use</u>: The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items, cosmetics, and drug remedies, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; alcoholic beverages for off-premises consumption or on-premises tastings; food and beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the **"Permitted Items"**); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) Twenty Three Thousand Four Hundred (23,400) square feet of Floor Area and (ii) one thousand (1,000) square feet of non-selling mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such non-selling space (or any space used for fire pump facilities or electrical switch gear) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option</u>: As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>: Four (4) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>: Fixed Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33 [Intentionally Deleted].

1.1.34 <u>Shopping Center</u>: The shopping center commonly known as Pier Park North Shopping Center, containing initially approximately 260,000 square feet of Floor Area, on the property located at the intersection of U.S. Highway 98 and Pier Park Drive in Panama City Beach, Florida and more particularly described in <u>Exhibit A</u> hereto. If Landlord elects to change the name of the Shopping Center, Landlord shall provide Tenant with at least ninety (90) days

3

prior notice thereof, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center. Although the site plan attached hereto as Exhibit B accurately depicts the Shopping Center, in the event of any conflict between the boundaries of the Shopping Center as shown on Exhibit B and the legal description of the Shopping Center set forth on Exhibit A, Exhibit A shall govern and control.

1.1.35  Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36  Taxes:  As defined in Section 4.3.3 hereof.

1.1.37  Tenant:  As defined in the preamble hereof.

1.1.38  Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39  Tenant's Permits:  As defined in Section 2.3.1(b) hereof.

1.1.40  Tenant's Property:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41  Tenant's Pro Rata Share:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as determined when the Shopping Center is constructed or as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than 9%.  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.42  Tenant's Work:  As defined in Section 3.1 hereof.

1.1.43  Term:  A period  (the "*Initial Term*") of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) *"Expiration Date"* shall mean the date on which the Term expires.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

4

Section 2.2    Term.

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the sixtieth (60th) day following the Delivery Date (hereinafter defined in Section 2.3.1 (the *"Rent Commencement Date"*).  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date, and Landlord shall deliver to Tenant a completed and signed IRS Form W-9 contemporaneously therewith; the delivery of the Form W-9 shall be a condition precedent to the payment of Rent.

2.2.2    Renewal Options.  Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth, except that the Fixed Rent during such Renewal Periods shall be as set forth in the definition of Fixed Rent in Subsection 1.1.11 above.  Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s), provided, however, that if Tenant fails to exercise a Renewal Option within the aforesaid 180 day time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant notice of Landlord's election to terminate such option and Tenant may exercise such option at any time prior to the expiration of such thirty (30) day period.  If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof.  If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    Delivery Date.

2.3.1    Definition.  Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business and any permits necessary for Tenant to obtain in order to perform Tenant's Work (collectively, *"Tenant's Permits"*)), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date,  (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work);

5

(c)     The Common Areas, and all of the improvements thereto shown on Exhibit B hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), if any, and construction, and development and use permits;

(d)     The representations and warranties of Landlord set forth in subparagraphs (a) through (j) of Section 12.3 below shall then be true and in effect;

(e)     Leases or other occupancy agreements shall have been entered into with at least four (4) of the following tenants or occupants (hereinafter collectively referred to as the **"Inducement Tenants"**) for a minimum initial term of at least ten (10) years on the following terms, for occupancy of the premises designated for them on Exhibit B; such leases shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant: (i) Dick's Sporting Goods; (ii) Ross; (iii) Kohl's; (iv) Michael's; (v) Toys R Us; (vi) Rooms to Go; (vii) Fresh Market; (viii) Petsmart or Petco; and (ix) Best Buy or HH Gregg; and

(f)     Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

2.3.2    Delivery Date.

(a)     Landlord shall give Tenant at least ninety (90) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the **"Delivery Date Notice"**). Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)     Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during the waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice (subject to, and to the extent of, any net delays caused by Tenant as a result of Tenant's failure to adhere to the deadlines for submission of plans pursuant to Article 3 ["**Tenant Delay**"] and any net delays caused by Force Majeure occurring after Landlord shall have given to Tenant the Delivery Date Notice), then, in addition to any other remedies available to Tenant under this Lease, Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of: (i) Seventy Five Thousand Dollars ($75,000), plus (ii) Three Thousand Five Hundred Dollars ($3,500) for each day that the Delivery Date established in the Delivery Date Notice is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

6

2.3.3  Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4  No Waiver.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4    Unseasonable Delivery: Slack Period.  If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on November 15th and ending on the March 1st next following (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to:

(a)  accept delivery of physical possession of the Premises; or

(b)  defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period (but Tenant shall continue to pay all Additional Rent to the extent required to be paid by Tenant hereunder); any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.  In the event that Tenant elects to defer the Delivery Date pursuant to this Section, the accrual of any per diem liquidated reimbursement under Section 2.3.2(b) above shall be suspended for the period of such deferment.

Section 2.5    Initial Co-Tenancy Condition.

2.5.1  As used herein, the *"Initial Co-Tenancy Condition"* shall mean that at least four (4) of the Inducement Tenants shall have accepted possession of its entire premises, such premises shall have been substantially completed, and each Inducement Tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising therein.

2.5.2  If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)  accept delivery of physical possession of the Premises; or

(b)  defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent (but Tenant shall continue to pay all Additional Rent to the extent required to be paid by Tenant hereunder) until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3  In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice.  Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be

7

1  satisfied within thirty (30) days after the date on which said termination notice is given.  If this
2  Lease is terminated hereunder, neither party shall have any further liability under this Lease,
3  except: (i) for those obligations which survive the expiration or other termination of this Lease
4  pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant
5  for all of its reasonable third-party costs and expenses incurred in connection with this Lease,
6  including, without limitation, costs associated with the preparation and review of plans and
7  specifications, attorney's fees, and the performance of Tenant's Work, not to exceed Fifty
8  Thousand Dollars ($50,000).

9                                    ARTICLE 3
10                                 IMPROVEMENTS

11          Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole
12  cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and
13  Exhibit F hereto and the "Final Landlord's Plans and Specifications" (hereinafter defined in
14  Section 3.2) (collectively, "***Landlord's Work***"), and shall deliver possession of the Premises to
15  Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own
16  cost and expense, do any and all work (hereinafter referred to as "***Tenant's Work***") which
17  Tenant desires to adapt the Premises to Tenant's use.

18          Section 3.2    Plan Approvals.

19          3.2.1    Preparation of Plans and Specifications.

20                  (a)    Landlord has delivered to Tenant drawings showing the proposed
21  footprint, column layout, and interior clear dimensions of the Premises (the "***Preliminary***
22  ***LOD***").

23                  (b)    Tenant has delivered to Landlord its revisions to the Preliminary
24  LOD (the "***Revised LOD***").

25                  (c)    Landlord has delivered to Tenant a final LOD which incorporates
26  all of Tenant's revisions contained in the Revised LOD and Tenant has approved the final LOD
27  (as approved by Tenant, the "***Certified LOD***"), which Certified LOD is attached hereto and
28  incorporated herein as part of Exhibit B.  Any further changes to the Certified LOD requested by
29  Landlord shall be subject to Tenant's prior written approval (which may be withheld in its sole
30  discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall
31  have reasonable approval rights within the confines of said Legal Requirements.  After Tenant
32  approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs
33  incurred and delays experienced by Tenant in connection with any further changes to the
34  Certified LOD required by Landlord..

35                  (d)    Within one hundred twenty (120) days after Tenant's receipt of
36  notice from Landlord of the anticipated Delivery Date, Tenant shall deliver to Landlord its
37  Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and
38  Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively,
39  "***Tenant's Plans***"), all of which shall be substantially consistent with the Certified LOD (as
40  same may be reasonably modified by Tenant, as noted above).

41                  (e)    Within sixty (60) days after receipt of Tenant's Plans, Landlord
42  shall prepare and deliver to Tenant, in a single submission, "***Landlord's Plans and***
43  ***Specifications***" (as defined in Exhibit D hereto), and each of the plans which collectively
44  constitute Landlord's Plans and Specifications shall be at least 85% complete, in Tenant's
45  reasonable judgment.  Landlord's Plans and Specifications shall be substantially consistent with
46  Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

47                  (f)    Within thirty (30) days after its receipt of Landlord's Plans and
48  Specifications, Tenant shall give Landlord notice of the respects, if any, in which said Plans fail
49  to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's
50  Plans, and/or Exhibits B, D, D-1, and F hereto.

51                  (g)    Within fifteen (15) days after the date on which Landlord receives
52  Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a

8

1  single submission, revised Landlord's Plans and Specifications, which shall be 100% complete
2  and shall address all of Tenant's comments.

3          (h)    Within fifteen (15) days after its receipt of the revised Landlord's
4  Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the
5  reasons why such approval cannot be granted.

6          (i)    In the event that the Landlord's re-submittal of Landlord's Plans
7  and Specifications is not approved by the Tenant, then Landlord shall further revise Landlord's
8  Plans and Specifications to address all Tenant comments and re-submit them to Tenant for
9  Tenant's review and approval.  The re-submittal described in the preceding sentence shall be
10  delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice that the
11  previous submittal has not been approved.  The process described in this subparagraph (i) and
12  subparagraph (h) above shall be repeated until Landlord has secured Tenant's approval of
13  Landlord's Plans and Specifications.  Landlord's Plans and Specifications as finally approved by
14  Tenant are referred to herein as the *"Final Landlord's Plans and Specifications"*.

15          (j)    Upon Tenant's approval of the Final Landlord's Plans and
16  Specifications, any further changes thereto shall be subject to Tenant's prior written approval.
17  Unless specifically noted on a separate summary sheet attached to the Final Landlord's Plans and
18  Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans,
19  Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the
20  Final Landlord's Plans and Specifications, then the terms and provisions of Tenant's Plans,
21  Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

22          (k)    All submissions by the parties of the Preliminary LOD, the
23  Revised LOD, the Certified LOD, the Tenant's Plans, the Landlord's Plans and Specifications,
24  the Final Landlord's Plans and Specifications, and the measurements required under
25  Section 3.4.1 and 3.4.2 below shall be made (or accompanied) by the computer files thereof
26  formatted in any version of *"Autocad 2002"* up to *"Autocad 2010"*.

27      3.2.2  Plan Changes.

28          (a)    Tenant shall have the right to make changes from the standards and
29  specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project
30  Manual", referred to in Exhibit D hereto (collectively, the *"Prototype*
31  *Standards/Specifications"*), and/or to require Landlord to subsequently make changes to
32  Landlord's Plans and Specifications and/or the Final Landlord's Plans and Specifications in
33  accordance therewith (the "*Changes"*).  Within ten (10) business days after receiving Tenant's
34  request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay,
35  that may be occasioned by such Change, which notice shall be accompanied by all back-up
36  supporting the cost increases or delays.  If Tenant fails to authorize such Change within five (5)
37  business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved
38  such Change.

39          (b)    Tenant shall pay to Landlord the net reasonable additional third-
40  party costs of Landlord's Work resulting directly and solely from the aggregate Changes
41  (exclusive of any charges for overhead and profit, other than sums not exceeding 5%
42  subcontractor profit and 5% general contractor profit thereon), taking into consideration any and
43  all actual costs and savings resulting from all Changes, in the aggregate (including, without
44  limitation, reasonable costs approved by Tenant in advance associated with any acceleration of
45  the work schedule which Tenant, at its sole option, may require).  Such payment shall be due and
46  payable within thirty (30) days after Tenant's receipt of backup information reasonably
47  supporting all such costs, including, without limitation, invoices, receipts and lien waivers of
48  subcontractors and materialmen, but in no event earlier than the Delivery Date.

49          (c)    [Intentionally Deleted].

50          (d)    If the Changes occur during the preparation of any of the plans
51  described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans
52  then being prepared shall be extended as reasonably necessary to incorporate such Changes.  If,
53  despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net
54  delay in the Substantial Completion of Landlord's Work (taking into consideration any time

9

1    reductions resulting from such changes), then: (i) the Rent Commencement Date shall be
2    determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the
3    dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of
4    days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice
5    is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the
6    Delivery Date shall be extended by the number of days of such net delay.

7              Section 3.3    Performance of Work.

8              3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good
9    and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only
10   new, first-class materials and in accordance with all insurance company requirements. Landlord
11   shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's
12   Permits. Landlord shall pay any and all impact fees and related governmental charges in
13   connection with the Shopping Center and the Premises. If Tenant's Permits cannot be obtained
14   because Landlord's Work has not been completed or has been performed improperly or by
15   reason of any then existing condition of the Shopping Center, Landlord shall remedy the
16   situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be
17   deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay
18   occasioned thereby.

19             3.3.2    Tenant acknowledges and agrees that this Lease is contingent upon
20   Landlord obtaining all necessary site plan and other governmental approvals as well as receiving
21   a commitment for construction financing acceptable to Landlord (the "*Approvals*") to construct
22   the Shopping Center substantially as shown on Exhibit B attached hereto. Landlord shall use
23   good faith commercially reasonable efforts to obtain the Approvals no later than July 15, 2013.
24   If Landlord is unable to obtain all such Approvals by July 15, 2013, then either Landlord or
25   Tenant shall have the right to terminate this Lease upon written notice to the other party
26   whereupon this Lease shall  thereafter be null and void and neither party  shall any further
27   liability to the other except for those obligations that expressly survive the termination of this
28   Lease. The date that Landlord obtains all the Approvals is hereinafter referred to as the
29   "*Approvals Satisfaction Date*" and Landlord shall give Tenant prompt written notice of the
30   occurrence of the Approvals Satisfaction Date. If either Landlord or Tenant shall terminate this
31   Lease pursuant to this Section 3.3.2, Landlord shall promptly reimburse Tenant, as Tenant's sole
32   monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred
33   in connection with this Lease (including, without limitation, costs associated with the preparation
34   and review of plans and specifications, attorney's fees, and the performance of Tenant's Work),
35   not to exceed in the aggregate Thirty Thousand Dollars ($30,000).

36             3.3.3    If: (a) Landlord's Work has not been commenced (*i.e.*, if Landlord has not
37   yet poured foundation footings for the Premises) within ninety (90) days after the Approvals
38   Satisfaction Date, or (b) the Delivery Date shall not have occurred within one hundred eighty
39   (180) days after the Approvals Satisfaction Date (subject to *Force Majeure*, not to exceed thirty
40   (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such
41   event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time
42   as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case
43   may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole
44   discretion, elect to:

45                      (i)       terminate this Lease, if Landlord shall fail to fully cure
46   such default within thirty (30) days after receiving Tenant's notice thereof, in which event
47   neither party shall have any further liability hereunder, except: (y) for those obligations which
48   survive the expiration or other termination of this Lease pursuant to the express terms of this
49   Lease, and (z) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole
50   monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred
51   in connection with this Lease (including, without limitation, costs associated with the preparation
52   and review of plans and specifications, attorney's fees, and the performance of Tenant's Work),
53   not to exceed Fifty Thousand Dollars ($50,000) and/or

54                      (ii)       if such failure results from a default by landlord hereunder,
55   upon thirty (30) days written notice to Landlord, avail itself of the remedies (except as limited as
56   provided below) set forth in subsections (a), (b), (c) and (d) of Section 16.2 below (provided,
57   however, that the cure period set forth therein shall not be applicable and Tenant's claim against

10

Landlord for monetary damages if Tenant terminates this Lease pursuant to Subsection 3.3.3(i)
above shall be limited by Subsection 3.3.3(i) and further provided that Tenant's self-help right in
subsection (a) shall be limited to the Premises, Tenant's signage and Tenant's loading and trash
removal facilities); and/or

(iii)    extend one or more times the dates set forth in clauses (a)
and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to
Landlord, and as to any extension granted with respect to the clause 3.3.2(b) above, in addition to
any other rights and remedies to which Tenant may be entitled, the Rent Commencement Date
shall be postponed by two (2) days for each day of the extension granted as to clause 3.3.2(b)
above.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the
subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in
equity.

3.3.4    Landlord's Work Performed After Delivery of Possession.  On or before
the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-
through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined).
Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-
through. Landlord shall complete any Punch List Items within fifteen (15) days after it receives
a copy of said punch list. If Landlord fails to complete any item on said punch list within said
15-day period, Tenant shall have the right to complete such item(s) using its own contractors and
receive reimbursement from Landlord for the reasonable costs and expenses thereof upon
demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed
after Tenant accepts physical possession of the Premises shall occur only "after hours", when
neither Tenant nor any of its agents, contractors, employees and servants are working within the
Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by
Tenant by reason of such "after hours" performance of Landlord's Work. As used herein, the
term *"Punch List Items"* shall mean such minor items of a cosmetic nature which, when
considered as a whole, do not adversely affect either the performance of Tenant's Work or
Tenant's ability to conduct its normal business operations in the Premises.

3.3.5    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter
upon the Premises for the purposes of inspecting the work, taking measurements, making plans,
erecting temporary or permanent signs and doing such other work as may be appropriate or
desirable without being deemed thereby to have taken possession or obligated itself to pay Rent,
provided, however, that Tenant shall not, during the course of such work, materially interfere
with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from
and against any and all claims or losses arising from Tenant's entry upon the Premises, except to
the extent caused by Landlord, its agents, employees, or contractors.

3.3.6    Work Requirements After Delivery Date.  Following the Delivery Date,
any construction by Landlord or other tenants or occupants of the Shopping Center affecting any
portion of the Shopping Center shall be subject to the following terms and conditions:

(a)    staging and storage of materials and parking of construction
vehicles shall not occur within the Critical Area (as defined in Section 5.2.2);

(b)    Landlord shall diligently ensure that, from and after Tenant's
opening for business to the public, no ingress, egress or passage of any construction, delivery and
related vehicles engaged in the performance of such work or other construction activities shall
take place except through the entrance/exit drive designated as the *"Construction Drive"* on
Exhibit B hereto; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and
sightly condition, and shall use reasonable efforts to ensure that such construction shall not
materially adversely interfere with the normal conduct of any business operations in the
Premises.

3.3.7    Tenant's Trailer.  Subject to compliance with applicable Legal
Requirements, Tenant may install a trailer for Tenant's exclusive use in conducting employee
interviews and recruiting, in accordance with Exhibit D hereto, in the location shown on Exhibit

11

B hereto.  Said trailer may be installed and operational at least forty-five (45) days prior to the
Delivery Date, and shall be removed within twenty (20) days after the Delivery Date.  Landlord
shall install, at Tenant's expense, utility hookups to the trailer in accordance with the
specifications set forth in Exhibit D hereto.  At Landlord's option, in lieu of permitting the
aforesaid trailer, Landlord may supply vacant space in the Shopping Center for the same period
as specified above for Tenant's trailer and having a size and location reasonably acceptable to
Tenant.  Such vacant space shall have utilities in accordance with the specifications set forth in
Exhibit D.

Section 3.4    Measurement; Adjustment of Rent.

3.4.1    Measurement of Premises and Shopping Center.  Within five (5) days after
the completion of the first course of masonry for the exterior walls of the Premises and demising
walls of the Premises (and at least sixty (60) days prior to the Delivery Date), Landlord shall
deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer
of the interior clear dimensions and the Floor Area (with the dimensions on which it is based) of
the Premises, the measurements of which shall be subject to confirmation by Tenant's licensed
architect, surveyor or engineer.  If Landlord shall fail so to deliver such certification to Tenant,
Tenant shall have the right to have any of such measurements made and certified to Landlord by
Tenant's licensed architect, surveyor or engineer.  If the interior clear dimensions and/or the
Floor Area of the Premises is less than that shown on the Certified LOD (as may be modified by
any applicable Changes), then Landlord shall correct such work to conform to the Certified LOD
(as may be modified by any applicable Changes).  Provided Landlord corrects such work to
conform to the Certified LOD, Tenant shall not have the right to terminate this Lease pursuant to
this Section 3.4.  At any time after substantial completion of construction of the Shopping
Center, upon Tenant's written request, Landlord shall deliver to Tenant a certification to Tenant
by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Shopping Center,
which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.

3.4.2    Measurement of Storage Area/Mezzanine.  Within five (5) days after the
substantial completion of the floor system for the office mezzanine and the installation of the
floor tracks for the walls enclosing it, Landlord shall deliver to Tenant a certification to Tenant
by Landlord's licensed architect, surveyor or engineer of the square footage of each of said non-
selling space(s), the measurements of which shall be subject to confirmation by Tenant's
licensed architect, surveyor or engineer.  If the square footage of the non-selling space on the
office mezzanine varies from that shown on the Final Landlord's Plans and Specifications, then,
at Tenant's request, Landlord shall correct such work to conform to the Final Landlord's Plans
and Specifications.

3.4.3    Adjustment of Fixed Rent and Tenant's Pro Rata Share.  Subject to the
foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate either
(a) a Floor Area less than the Floor Area of the Premises set forth in the Certified LOD, or (b) a
Floor Area of 23,900 square feet or less, then the Fixed Rent and any other applicable provision
of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be adjusted
accordingly to conform to the actual measurement, and Tenant shall receive a proportional
refund, or pay the appropriate increase, of any Rent theretofore paid to Landlord.  If the
measurement of the Premises indicates that the actual Floor Area of the Premises exceeds 23,900
square feet of Floor Area, neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by
reason thereof.  Landlord and Tenant shall each promptly execute and deliver to the other an
amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other
applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute between the
parties with respect to the Floor Area of the Premises, the square footage of said non-selling
space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance
with the provisions of Section 16.3 below.

ARTICLE 4
FIXED RENT, TAXES: DETERMINATION AND PAYMENT

Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and
continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal
successive monthly installments, in advance, on the first day of each and every calendar month
throughout the Term, except that Fixed Rent payable for any partial calendar month during the

12

1   Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without deduction or
2   set-off, except to the extent otherwise expressly provided herein.

3          Section 4.2    Payment of Rent. All Rent shall be mailed or otherwise delivered
4   to Landlord at the following address: c/o Casto, 191 W. Nationwide Boulevard, Suite 200,
5   Columbus, Ohio 43215 or, upon at least thirty (30) days' prior notice to Tenant, to such other
6   address as Landlord may from time to time designate. Landlord acknowledges and agrees that
7   for administrative purposes, Tenant has designated BBBY Management Corporation, a New
8   York corporation (the "*Paying Agent*"), to make all Rent payments due to Landlord under this
9   Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and
10  shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent,
11  and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of
12  Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such
13  payments of Rent had been made by Tenant directly to Landlord.

14          Section 4.3    Real Estate and Other Taxes.

15          4.3.1   Landlord shall pay on or before the due dates thereof all "Taxes" (defined
16  in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout
17  the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels
18  and lots that exclude any property not a part of the Shopping Center.

19          4.3.2   (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes
20  which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real
21  estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between
22  Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the
23  date on which the Term expires or earlier terminates, as the case may be, for the purpose of
24  computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the
25  taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance
26  thereof), Landlord shall exercise such option so as to maximize the number of installments, and
27  Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may
28  be added thereto for nonpayment thereof.

29          (b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued
30  by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and
31  proof of the payment of Taxes for the previous payment period, as well as copies of all notices
32  concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount
33  required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event
34  earlier than the fifteenth (15th) day prior to the date on which such Taxes would become
35  delinquent).

36          (c)    In the event that Landlord's Mortgagee shall require Landlord to
37  escrow monthly payments for Taxes, then, so long as such escrow shall be so required and all
38  other tenants and occupants of the Shopping Center are similarly required to make monthly
39  payments to Landlord with respect to Taxes, Tenant shall, in lieu of making payments pursuant
40  to subparagraph (b) above, pay Landlord monthly with each installment of Fixed Rent an amount
41  equal to one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's (or Landlord's
42  Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only.
43  Such payments shall be held in trust to be applied towards payment of the Taxes when the same
44  shall become due. Within thirty (30) days following the issuance by the taxing authority of the
45  bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail
46  reasonably satisfactory to Tenant, of the Taxes and Tenant's Pro Rata Share thereof for such year
47  (the "*Tax Reconciliation Statement*"). The Tax Reconciliation Statement shall be certified by
48  Landlord as being accurate and shall be accompanied by (x) copies of the applicable tax bills, (y)
49  a calculation of Tenant's Pro Rata Share of Taxes, and (z) payment to Tenant in the amount of
50  any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Pro
51  Rata Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly
52  installments paid by Tenant in respect of said fiscal tax year, Tenant shall pay to Landlord the
53  deficiency within thirty (30) days after receipt of such notice. If Landlord fails to timely remit to
54  Tenant the amount of any overpayment, Tenant shall have the right (in addition to any rights and
55  remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount
56  from payments of Rent next becoming due hereunder, together with interest thereon at the Lease

1    Interest Rate from the date such remittance is due until reimbursement or full satisfaction by
2    credit.

3         4.3.3  As used herein, "*Taxes*" shall mean all general, *ad valorem* real estate
4    taxes, and assessments for betterments and improvements that are levied or assessed by any
5    lawful authority on the Shopping Center (general or special), including any substitution therefor,
6    in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by
7    any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing
8    authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not
9    include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise,
10   capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease;
11   (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in
12   the state in which the Shopping Center is located), gross receipts or revenues of Landlord from
13   the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which
14   Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4)
15   assessment for a public improvement arising from the initial construction or expansion of the
16   Shopping Center or the Premises (it being agreed that all assessments imposed during the Term
17   which are permitted to be included within Taxes hereunder shall, for the purposes of computing
18   Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of
19   installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an
20   increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping
21   Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed
22   upon Landlord in connection with Landlord's development of the Shopping Center (including,
23   without limitation, trip generation fees). In addition, if the Outparcel(s) or the premises of any
24   tenant or occupant of the Shopping Center is separately assessed, then the Taxes associated with
25   or attributable to any of the foregoing shall be excluded from Taxes provided that the amount
26   payable by or with respect to such Outparcel, tenant or occupant includes an allocable share of
27   the Taxes on the Common Areas, and the denominator used to determine Tenant's Pro Rata
28   Share of Taxes shall be reduced by the Floor Area occupied by such Outparcel, tenant or other
29   occupant. All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the
30   Shopping Center were the only property owned by Landlord.  Landlord represents to Tenant that,
31   as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery
32   Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an
33   abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar
34   charges, or (iii) included in any special improvement district(s) which would result in higher
35   sales taxes or other similar impositions than would exist in the absence of such district(s).
36   Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full calendar year after
37   the Shopping Center has been completed and fully-assessed will be approximately $1.00 per
38   square foot of Floor Area in the Premises.

39         4.3.4  At Tenant's request, Landlord shall contest the amount or validity of any
40   assessed valuation or Taxes. If, as a result of any such contest or otherwise, any rebate or refund
41   of Taxes is received by Landlord, Tenant shall be entitled to Tenant's Pro Rata Share thereof by
42   way of reimbursement or credit (after deducting any reasonable and customary expenses incurred
43   by Landlord in connection with such contest). Notwithstanding the foregoing, if Tenant is the
44   sole occupant of the tax lot on which the Premises is located, then Tenant shall have the right to
45   contest the assessed valuation or Taxes without first requesting that Landlord do so.

46         4.3.5  Notwithstanding anything in this Lease to the contrary, Tenant shall be
47   responsible for and shall pay before delinquency all municipal, county or state taxes, levies and
48   fees of every kind and nature, including but not limited to general or special assessments,
49   assessed during the Term against any personal property of any kind, owned by or placed in the
50   Premises by Tenant.

51         4.3.6  Tenant shall be responsible for the payment of any sales tax (at the then
52   current rate) on Fixed Rent and/or Additional Rent payable under this Lease that may be
53   imposed by any applicable governmental authority, provided that such sales tax is customarily
54   paid by retail tenants in the State of Florida. Tenant acknowledges that the Fixed Rent amounts
55   in Section 1.1.11 and the amounts estimated for Taxes in Section 4.3.3 and insurance premiums
56   in Section 10.3.3 do not include any amounts attributable to the Florida Sales Tax.

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements (such charges and expenses as they pertain to the maintenance, repair, insuring and operation of the Common Areas hereinafter referred to as "***Common Areas Charges***").

5.1.2    Tenant's Fixed Share of Common Areas Charges.

(a)    Commencing on the Rent Commencement Date and continuing during the Term, Tenant shall pay to Landlord a fixed payment (the "***Fixed Share***") in consideration of Landlord's Common Areas Charges, which payment shall not include Tenant's Pro Rata Share of Landlord's insurance premiums payable pursuant to Section 10.3.3 hereof. Tenant's Fixed Share for the first partial calendar year in which the Rent Commencement Date occurs and the next full calendar year shall be One and 50/100 Dollars ($1.50) per square foot of Floor Area of the Premises (exclusive of Tenant's Pro Rata  Share of Landlord's insurance premiums payable by Tenant pursuant to Section 10.3.3 hereof, which Pro Rata Share of insurance shall not exceed $0.75 per square foot of Floor Area for the first partial calendar year in which the Rent Commencement Date occurs and the next full calendar year) payable in advance in equal monthly installments on or before the first day of each month.  At the commencement of the second full calendar year and each calendar year thereafter, Tenant's Fixed Share shall increase by three percent (3%) over Tenant's Fixed Share payable for the preceding calendar year, but Tenant's Pro Rata Share of insurance is not capped from year to year after the first full calendar year.   The manner in which Tenant's Fixed Share is used shall be determined by Landlord in Landlord's sole but reasonable discretion.  The parties acknowledge that Tenant's Fixed Share is irrespective of Landlord's actual Common Areas Charges and Tenant shall have no right to audit Landlord's books and records pertaining to Common Areas Charges.

(b)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.3    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1    Continuous Access.  No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August (through Labor Day), November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

5.2.2    No Alterations.  Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location, availability, or size of any Common Area

15

1  improvement located within the area designated as "Critical Area" on Exhibit B hereto, (the
2  "*Critical Area*"), from that shown on Exhibit B hereto; **(ii)** construct or permit to be constructed
3  any structures in the Critical Area of the Shopping Center (including, without limitation, any
4  buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on
5  Exhibit B hereto; or **(iii)** materially change the entrances or exits to and from the Shopping
6  Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common
7  Areas, or the number, location or layout of parking spaces, located within the Critical Area from
8  those shown on Exhibit B hereto. If Tenant is then operating its business in the Premises,
9  Landlord shall neither perform nor permit to be performed, any construction, repairs,
10 replacements or maintenance to any portion of the Shopping Center including the Premises
11 (other than emergency repairs to utilities and Common Areas) during the months of August
12 (through Labor Day), November and December of any year, without the prior consent of Tenant,
13 which consent may be withheld in Tenant's sole discretion.

14      5.2.3   Outparcels. In addition to the provisions of Subsection 5.2.2 above, during
15 the Term, the following restrictions shall encumber and bind the outparcels (collectively, the
16 "*Outparcels*" and individually, an "*Outparcel*") designated on Exhibit B hereto as Parcels A
17 through E: (a) no more than one building shall be constructed on any Outparcel; (b) no building
18 shall exceed one story in height; (c) no building shall exceed a maximum height of twenty-eight
19 feet (28') as measured from the finished floor level to the highest point on such building or
20 structure (inclusive of the height of all types of projections or architectural treatments or
21 embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards,
22 signs, satellite dishes and antennae); and (d) the Floor Area of any building constructed on an
23 Outparcel shall not exceed the Floor Area established therefor on Exhibit B hereto. For purposes
24 of this Subsection 5.2.3, the Floor Area of any building constructed on an Outparcel shall not
25 include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or
26 beverage service (exclusive of drive through or walk-up take-out food or beverage service)
27 unless Landlord receives rent from such areas and further provided that such outdoor areas for
28 each Outparcel do not exceed 1,500 square feet.

29      5.2.4   Parking Area. During the Term, Landlord shall maintain in the Shopping
30 Center, at a minimum, the greater of (i) the number of parking spaces required by applicable
31 Legal Requirements, without variance, or (ii) four (4.0) ground-level parking spaces for every
32 one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space
33 being at least nine (9) feet in width and eighteen (18) feet in length. Parking spaces shall at all
34 times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific
35 parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord
36 permit any person or entity to use the parking areas other than Tenant, the other tenants and
37 occupants of the Shopping Center, and their respective employees, agents, subtenants,
38 concessionaires, licensees, customers, and invitees. There shall be no charge whatsoever levied
39 for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight
40 parking in the Shopping Center.

41      5.2.5   Lighting. Throughout the Term, Landlord shall keep the Common Areas
42 fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk
43 until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*).
44 Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal
45 Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of
46 said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a
47 fraction, the numerator of which shall be the number of square feet of Floor Area within the
48 Premises and the denominator of which shall be the aggregate number of square feet of Floor
49 Area of all premises within the Shopping Center (including the Premises) open later than Normal
50 Hours (excluding, however, those tenants and occupants who separately control and pay for their
51 own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level
52 security lighting from one (1) hour after the close of business in the Premises until dawn.

53      5.2.6   Repairs. During the Term, provided Tenant is then open for business, any
54 construction or repair by Landlord permitted or required under this Lease and undertaken in the
55 Common Areas or in any other portion of the Shopping Center shall:

56      (a)    not be performed during the months of August (through Labor
57 Day), November, or December of any year, except in the event of an emergency or as may be
58 otherwise required by applicable Legal Requirements;

16

(b)    With respect to the Critical Area, be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)    be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7    Rules and Regulations.    Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8    Miscellaneous.

(a)    No Promotional Use.    Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.  Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)    Trash Compactor and Containers.    Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "**Trash Compactor Pad**"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "**Trash Container Pad**". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)    Shopping Carts.    Tenant shall not be permitted to store its shopping carts in exterior cart corrals located in the parking lot; provided, however, that Tenant shall have such right if any other tenant of the Shopping Center is permitted or otherwise uses cart corrals in the parking lot for the storage of shopping carts.  Notwithstanding the foregoing, Tenant shall have the right to have cart corrals on the sidewalk in front of the Premises provided same are permitted by Legal Requirements and do not materially interfere with normal pedestrian access over the sidewalks.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)    Cellular Towers.    No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center except the foregoing shall not prohibit dish or satellite antennas used solely and in an ancillary manner in connection with Tenant's (or other tenant's) business.

(e)    Temporary Storage Containers.    Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on Exhibit B hereto during the Term, subject to applicable Legal Requirements.

ARTICLE 6
UTILITIES

Section 6.1    Utility Service.    From and after the Delivery Date, and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer,

17

1  alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be
2  obligated to purchase utility service(s) directly from Landlord, or from any utility provider
3  designated by Landlord. Landlord shall provide separate utility meters exclusively serving the
4  Premises, at its sole cost and expense (including, without limitation, all connection and hook-up
5  fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver
6  by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises
7  prior to such date. Landlord shall not permit the capacity of utility lines available for use at the
8  Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit
9  Tenant and its telecommunications provider full and free access to, and use of, available
10 telecommunications conduits in the Shopping Center for the provision of telecommunications
11 service to the Premises, subject to such reasonable requirements as Landlord may impose.

12          Section 6.2      Interruption. Notwithstanding any provision of this Lease to the
13 contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of
14 Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the
15 affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored
16 within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is
17 unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably
18 abated during the period of disruption.

19                                    ARTICLE 7
20                                      SIGNS

21          Section 7.1      Tenant's Building Signage. Landlord shall supply and install
22 signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance
23 with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease. Thereafter,
24 Tenant shall have the exclusive right during the Term, at its sole cost and expense, without
25 Landlord's approval, to erect, maintain, and replace on the storefront and exterior walls of the
26 Premises, and on the side walls of any entrance design element, if any, signs (including, without
27 limitation, under-canopy or blade signs), banners (including temporary banners placed on the
28 storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings,
29 and flags of such size, design and color as Tenant, from time to time, may desire, subject to (i)
30 compliance with applicable Legal Requirements and Landlord's signage criteria attached hereto
31 as Exhibit M ("Signage Criteria"), and (ii) with respect to Tenant's banners and flags,
32 Landlord's approval, it being agreed that Landlord shall have no approval rights with respect to
33 (and Landlord's Signage Criteria shall not apply to) any signage shown on Exhibits D, D-1
34 and/or F, which signage is hereby approved by Landlord. Tenant may erect and maintain in the
35 interior of the Premises any signs it may desire, provided that same are professionally prepared.

36          Section 7.2      Pylon/Monument Signage. Landlord represents that the Shopping
37 Center shall not contain any pylons or monuments containing the name or names of tenants or
38 other occupants of the Shopping Center. However, if Landlord constructs or makes available to
39 any other tenant or tenants in the Shopping Center any signage located in the Common Areas
40 (including, without limitation, a pylon or monument sign), Landlord shall also include on such
41 signage Tenant's identification sign, as shown on Exhibit F hereto, which sign (i) shall be at least
42 as large as the sign made available to another tenant having the same or less Floor Area than
43 Tenant's Premises, and (ii) shall be located above the signs of all other tenants of the Shopping
44 Center having the same or less Floor Area than Tenant's Premises. Tenant shall pay for the cost
45 to fabricate and install Tenant's signage on any such future pylon or monument sign. Landlord
46 shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair,
47 and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord
48 shall not change or alter the location, structure, height or general appearance of the pylons or
49 monuments without obtaining Tenant's prior consent, such consent not to be unreasonably
50 withheld, conditioned or delayed. The cost of maintaining all pylons and monuments bearing
51 Tenant's sign panel(s) and the cost of any electricity used to illuminate them, shall be includable
52 in Common Areas Charges; however, neither the cost of individual tenants' signs thereon, nor
53 the cost of the construction of the pylons and monuments, shall be includable in Common Areas
54 Charges. If there are pylons or monuments for the Shopping Center that do not include any
55 tenants' names, then the cost of maintaining such pylons and/or monuments and the cost of any
56 electricity used to illuminate them, shall be includable in Common Areas Charges.

57          Section 7.3      Signage: Alteration/Removal/Allocation. Tenant shall have the
58 right, from time to time, without Landlord's approval, to change its signs on the storefront and

18

1    exterior of the Premises, as well as on any pylon or monument, provided that the area of the new
2    sign is no larger than the area of the sign which it replaces, the method of construction and
3    attachment is substantially the same, the new signage does not violate landlord's Signage Criteria
4    and such sign represents Tenant's (or Tenant's subtenant's) then prototypical sign.  Upon the
5    expiration or earlier 'ermination of the Lease, Tenant shall remove its signs from the fascia or
6    other exterior walls of the Premises and from any pylon or monument, and shall repair any
7    damage occasioned thereby.  The signage rights granted to Tenant pursuant to this Article 7
8    shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any
9    portion of the Premises.  All signage installed by Landlord and Tenant hereunder shall comply
10   with applicable Legal Requirements.

11            Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents
12   or applications which may be required by applicable Legal Requirements to permit the
13   placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or
14   on any pylon or monument, to which Tenant may be entitled under this Lease.

15            Section 7.5    Signage and Building Restrictions and Criteria.

16            7.5.1    During the Term, no exterior identification signs attached to any building
17   of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii)
18   signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed
19   transformers, provided that Tenant (and all other tenants/occupants of the Shopping Center) shall
20   have the right to employ any methods (other than exposed raceways, exposed neon tubes,
21   exposed ballast boxes, or exposed transformers) necessary for the installation of internally
22   illuminated self-contained channel letters; or (iii) paper or cardboard signs other than
23   professionally prepared interior window signs advertising special sales within the subject
24   premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however,
25   the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small
26   stickers or decals which indicate hours of business, emergency telephone numbers, credit cards
27   accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase
28   "no solicitation" or words of like import.  No billboard signs shall be permitted within the
29   Shopping Center.

30            7.5.2    Landlord shall not permit any obstructions (including, without limitation,
31   any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's
32   storefront, storefront signs or other exterior wall signs or any pylons, monuments or other
33   freestanding signs.  No premises in the Shopping Center containing less Floor Area than the
34   Floor Area of the Premises shall have: (i) building signage possessing more total square footage
35   than the total square footage available for use by Tenant, or a maximum height greater than the
36   maximum height of Tenant's building signage, as measured from the finished floor level to the
37   highest point on such signage, or (ii) a building and entrance design element higher, wider, or
38   which projects farther than the height, width, or projection of the building and entrance design
39   element of the Premises.

40                                ARTICLE 8
41                    ALTERATIONS AND IMPROVEMENTS

42            Section 8.1    Alterations and Improvements.

43            8.1.1    Tenant shall not perform any structural alterations or structural
44   improvements to the Premises (except to the extent same pertain to Tenant's Work) without the
45   prior approval of Landlord, provided, however, that Tenant's structural alterations of the exterior
46   of the Premises to conform to Tenant's then-current prototypical elevation shall not require
47   Landlord's consent provided that such structural alterations or improvements (a) are
48   architecturally harmonious with the balance of the Shopping Center and (b) do not increase
49   Landlord's repair and maintenance costs under Section 9.2 (unless Tenant agrees to pay for such
50   increases).  Prior to the commencement of construction of the proposed structural exterior
51   alterations or improvements described in the preceding sentence, Tenant shall provide Landlord
52   with copies of the plans therefor, which delivery of plans shall be for Landlord's information
53   only and not for Landlord's consent, unless Landlord within ten (10) days after its receipt of such
54   plans reasonably objects to the proposed exterior alteration or improvement as not being
55   architecturally harmonious with the balance of the Shopping Center or same is likely to increase
56   Landlord's repair and maintenance costs under Section 9.2 (unless Tenant agrees to pay for any

                                     19

1   such increases). All work performed by Tenant in connection with structural and non-structural
2   alterations or improvements shall be done at Tenant's sole cost and expense, in a good and
3   workmanlike manner and in compliance with all applicable Legal Requirements. The provisions
4   of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the
5   applicable provisions of Article 7 above.

6       8.1.2   Tenant may, from time to time, at its sole cost and expense, without the
7   prior approval of Landlord, make non-structural alterations and non-structural improvements to
8   the interior and/or exterior of the Premises as Tenant deems necessary or desirable, including,
9   but not limited to, electrical systems, heating, ventilation and air conditioning and other
10  mechanical systems, installation of fixtures and equipment, painting, and wall and floor
11  coverings.

12      8.1.3   Tenant shall have the right to subdivide the Premises into no more than
13  two (2) separate stores, each of which must contain at least 5,000 square feet of Floor Area and
14  shall have its own front entrance and access to the loading docks in the rear of the Premises, as
15  well as separately sub-metered utilities.

16      8.1.4   Tenant shall have the exclusive right to erect and maintain an antenna and
17  a satellite dish, and/or such other equipment as Tenant shall reasonably desire, on the roof of the
18  Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the
19  installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all
20  roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord,
21  (iii) maintains the area where roof penetrations are made while Tenant's equipment is present,
22  (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but
23  not limited to, the repair of the roof penetrations upon the removal of any equipment installed
24  thereon, and (v) erects and maintains such equipment in accordance with applicable Legal
25  Requirements.

26      8.1.5   Landlord shall execute and return to Tenant all appropriately completed
27  building department or equivalent applications reasonably necessary for Tenant to perform its
28  alterations within ten (10) days after Tenant's request therefor, and will reasonably cooperate
29  with Tenant in the permitting process, provided such cooperation imposes no costs or liability on
30  Landlord.

31      8.1.6   If any violation of any applicable Legal Requirement which is noted
32  against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents
33  Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then,
34  upon request by Tenant, Landlord shall promptly and diligently cause such violation to be
35  removed of record to the extent required to permit Tenant to obtain its building permit or
36  certificate of occupancy, as the case may be.

37      8.1.7   Landlord shall not make any alterations to the Premises (including,
38  without limitation, changing the design, color or materials of the exterior of the Premises) nor
39  shall Landlord construct an additional floor or floors above the Premises. Landlord shall neither
40  make nor permit to be made any alterations to the exterior architectural theme of the remainder
41  of the Shopping Center (as shown on Exhibit D-2 hereto) which would be inconsistent with a
42  first-class shopping center in the state in which the Shopping Center is located (exclusive of
43  other tenants' entrance features) without the prior consent of Tenant.

44      8.1.8   Tenant shall have the exclusive right to erect and maintain on the roof of
45  the Premises, a passive solar array for the production of electricity (the **"System"**), provided that
46  Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the System,
47  (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to
48  violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where
49  roof penetrations are made while the System is present, (iv) repairs any damage to the roof
50  caused by the making of the roof penetrations, including, but not limited to, the repair of the roof
51  penetrations upon the removal of any component of the System, and (v) erects and maintains the
52  System in accordance with applicable Legal Requirements. The System shall be deemed to be
53  part of Tenant's Property. Landlord acknowledges and agrees that Tenant or its Affiliate or
54  transferee shall be the exclusive owner and operator of the System and Landlord shall have no
55  right, title or interest in such equipment or any component thereof, notwithstanding that any such
56  equipment may be physically mounted or adhered to the Premises. Landlord acknowledges and

20

agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the environmental attributes of the System, and (iii) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever entitled, resulting from the environmental or related attributes of the System. Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System.

8.1.9    Landlord and Tenant agree that in the event that Tenant shall perform or cause to be performed any alterations or improvements (including without limitation Tenant's Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the benefit of such Energy Rebate. As used herein, an *"Energy Rebate"* shall be deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax credits, governmental grants, utility rebates or refunds) given by a governmental, non-governmental, private or public utility, or other entity as a result of efforts to conserve energy or other utilities or cause property or processes to be more environmentally friendly. If any such Energy Rebate is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate against the next succeeding installment(s) of Rent then payable under the Lease.

## ARTICLE 9
## REPAIRS

Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, and serving exclusively the Premises); and (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation,  repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises (including, without limitation, any fire pump facilities or electrical switch gear serving the Premises);

21

1          (e)    all electric, gas, water, sanitary sewer, and other public utility lines
2  and ducts in or passing through the Premises which do not exclusively serve the Premises; and

3          (f)    the non-structural elements of the Premises (including, without
4  limitation, the maintenance, repair and replacement of the HVAC units and the electrical,
5  plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the
6  first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the
7  extent any such non-structural elements are covered by any contractors', manufacturers',
8  vendors', or insurers' warranties or guarantees; and

9          (g)    any damage to the Premises or the Shopping Center which is
10  occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B)
11  any breach by Landlord of any provision of this Lease.

12      All repairs and replacements on Landlord's part to be performed hereunder shall be at
13  Landlord's sole cost and expense, performed in a good and workmanlike manner in accordance
14  with all applicable Legal Requirements, and without material interference with or disruption to
15  the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at
16  least five (5) days' prior notice of any repairs or replacements to, or which would otherwise
17  affect the normal conduct of any business operations in, the Premises (except in the case of an
18  emergency posing imminent risk of material harm to persons or property, in which event
19  Landlord shall only be required to give such notice as is reasonable under the circumstances).  If,
20  in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt
21  the normal conduct of any business operations in the Premises, Landlord shall perform such
22  repairs only after the regular hours of operation of Tenant and any other occupant of the
23  Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs
24  and expenses incurred by Tenant in connection with such "after hours" repairs, including,
25  without limitation, utilities charges and security expenses.  In the event Landlord does not
26  reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after
27  Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to
28  which it may be entitled under this Lease, at law, or in equity) to offset such amounts against
29  Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until
30  reimbursement or full satisfaction by credit.

31          Section 9.3    Legal Compliance Work.  Except as hereinafter expressly
32  provided, Landlord shall be responsible, at its sole cost and expense (and not includable in
33  Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined).
34  Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the
35  performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises
36  which are neither structural nor comprise the major building systems serving the Premises; or (b)
37  required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of
38  general applicability to tenants and occupants of the Shopping Center); provided, however, that
39  the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in
40  accordance with all Legal Requirements, and (y) the repairs required in this Lease.  As used
41  herein, "***Legal Compliance Work***" shall mean any obligation, addition, alteration, improvement,
42  or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part
43  thereof, as applicable, which may be required by reason of any Legal Requirement.

44                  ARTICLE 10
45     INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

46          Section 10.1    Mutual Release, Waiver of Subrogation and Mutual
47  Indemnification.

48          10.1.1 Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and
49  on behalf of anyone claiming under or through either one by way of subrogation, hereby release
50  and waive all rights of recovery and causes of action against each other and their respective
51  Affiliates from any and all liability for any loss or damage to property or resulting from damage
52  to such property (and, in either case, any resulting loss of business or rental income), whether
53  caused by the negligence or fault of the other party, which is normally insured under Special
54  Form property insurance (so-called "All-Risk") and time element insurance required to be
55  maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or maintains a
56  deductible (as either may be permitted hereunder), then the self-insuring party or the party

22

maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2    Tenant's Insurance.

10.2.1 Tenant's Insurance. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date, and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (so-called "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.

10.2.2 Self-Insurance. All insurance required to be maintained under this Section 10.2 may be: (i) insured under an individual policy covering this location, or a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (ii) self-insured by Tenant via a deductible, a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iii) insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.

Section 10.3    Landlord's Insurance.

10.3.1 Liability Insurance. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as an "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.

23

10.3.2 Special Form Property Insurance. Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (so-called "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], Ordinance or Law coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3; provided, however, that from the Rent Commencement Date through the end of the first full calendar year of the Term, Tenant's Pro Rata Share of Landlord's insurance premiums shall not exceed $0.75 per square foot of Floor Area of the Premises. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, insurance certificates and paid invoices) reasonably required by Tenant to verify the cost of Landlord's insurance. In no event shall Landlord's insurance costs include (i) any costs resulting from insurance deductibles (but such costs may be included in Common Areas Charges) or any payments made under any self-insurance policy maintained by Landlord; (ii) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under this Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under this Section 10.3 hereof); and/or (iii) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of Landlord's insurance premiums. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4   General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

24

1                                           ARTICLE 11

2                       FIRE AND OTHER CASUALTY; EMINENT DOMAIN

3                 Section 11.1    Fire and Other Casualty.

4                 11.1.1 (a)      Except as otherwise provided in this Section 11.1, if all or a
5 portion of the Premises, the Common Areas (including all improvements thereto) or other
6 buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall
7 promptly rebuild and restore the same to the condition existing immediately prior to such fire or
8 other casualty, which restoration shall include all Tenant's Work and all other leasehold
9 improvements performed by Tenant, and shall not include any of Tenant's Property. The
10 proceeds of the policies required to be obtained and maintained by Landlord pursuant to
11 Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such
12 rebuilding and restoration work. Landlord shall give Tenant at least ninety (90) days' prior
13 notice of the date on which the restoration work to the Premises will be Substantially Completed.
14 In the event Landlord's insurance proceeds are insufficient to complete such work, Landlord
15 shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in
16 the manner provided in this Section 11.1.1.

17                     (b)      Notwithstanding the foregoing, if any portion of the Premises are
18 so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the
19 Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and
20 expense of such rebuilding or restoration work is increased solely as a result of such changes
21 (taking into consideration any and all actual reduced and additional costs resulting from such
22 changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as
23 Additional Rent, the amount of such net increase, which amount shall be due and payable within
24 thirty (30) days after Landlord has delivered to Tenant backup information evidencing such
25 increase (including, without limitation, receipted invoices) as may be reasonably required by
26 Tenant (but in no event earlier than the occurrence of the date on which possession of the
27 restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial
28 completion of such rebuilding or restoration work is delayed solely as a result of such changes
29 (taking into consideration any and all reasonable time savings to Landlord resulting from such
30 changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately
31 adjusted to the extent of such net delay.

32                     (c)      If, in Tenant's reasonable judgment, any condition affecting, or
33 damage to, the Premises renders all or any portion of the Premises unusable for the conduct of
34 Tenant's business or, in the case of any condition affecting, or damage to, the Shopping Center,
35 materially interferes with the normal conduct of any business operations in the Premises, the
36 Rent shall be equitably reduced or totally abated based upon the extent to which the remaining
37 portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct
38 of business.

39             11.1.2 In the event that:

40                     (a)      Landlord does not commence the repair and restoration work to the
41 Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to
42 this Section 11.1 within one hundred eighty (180) days after the date of such destruction, or
43 thereafter fails to diligently pursue the completion of such repair and restoration work (subject to
44 such period as may be reasonably necessary for the adjustment of insurance proceeds, not to
45 exceed sixty (60) days in the aggregate); or

46                     (b)      the required repairs and restorations to the Premises, the Common
47 Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in
48 accordance with the provisions of this Section 11.1 within one (1) year after the date of
49 destruction (which period may be extended by reason of an event of *Force Majeure*, not to
50 exceed thirty (30) days in the aggregate, provided that Landlord shall have given Tenant notice
51 thereof promptly after its occurrence),

52 then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

53                     (i)      after giving thirty (30) days' prior notice to Landlord (and
54 Landlord's continued failure to commence and diligently pursue such repairs and restoration

1  work to completion), perform or complete, as the case may be, said work (or any portion thereof)
2  on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant
3  during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an
4  invoice therefor and, in default of any such payment, Tenant shall have the right to offset the
5  amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing
6  hereunder; provided, however, that Tenant's right to make such repairs and restoration on
7  Landlord's behalf shall be limited to the Premises, access routes to Tenant's loading dock,
8  Tenant's signage and trash facilities, and the Critical Areas; or

9                              (ii)       seek to obtain specific performance of Landlord's repair
10 and restoration obligations pursuant to the laws of the state in which the Shopping Center is
11 located; provided, however, that Tenant's right to seek specific performance shall be limited to
12 repair and restoration of the Premises, the Critical Area, and Tenant's loading and trash removal
13 facilities and Tenant's signage; or

14                             (iii)      terminate this Lease by thirty (30) days' notice to Landlord.

15 In addition to the foregoing, if, in the opinion of an independent licensed architect designated by
16 Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the
17 Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by
18 Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date
19 of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this
20 Lease by giving Landlord at least thirty (30) days' notice thereof.

21                              11.1.3  If the Premises are substantially destroyed by fire or other casualty during
22 the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area
23 thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of
24 such damage or destruction by giving notice within thirty (30) days following such damage or
25 destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term
26 for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof,
27 if available, within ten (10) days after receipt of the termination notice from Landlord.

28                              Section 11.2    Eminent Domain.

29                              11.2.1  As used in this Section 11.2, "**Taking**" or "**Taken**" shall mean a taking for
30 any public or quasi-public use by any lawful power or authority by exercise of the right of
31 condemnation or eminent domain or by agreement between Landlord and those having the
32 authority to exercise such right.

33                              11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the
34 date of vesting of title or transfer of possession, whichever is earlier, without further liability on
35 the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent
36 payable by Tenant hereunder.

37                              11.2.3  In the event that:

38                              (a)       any portion of the Premises shall be Taken so that it is
39 commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its
40 normal business in the Premises;

41                              (b)       as a consequence of any Taking: (i) portions of the Shopping
42 Center shall be divided or separated in any manner that it materially interferes with parking,
43 visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the
44 Shopping Center no longer has all of the entrances from both U.S. Highway 98 and Pier Park
45 Drive, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable
46 judgment, to conduct its normal business in the Premises;

47                              (c)       there occurs, in Tenant's reasonable judgment, a denial of adequate
48 access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any
49 easement granted under this Lease, whether or not a Taking shall have occurred;

50                              (d)       any portion of the Shopping Center shall be Taken which
51 materially interferes with parking, visibility or access to the Premises, and as a result of such

26

taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)    five (5%) percent or more of the parking spaces located in the Critical Area are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) 3.75 parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder.  During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below. Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.  In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.5  Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3    Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

## ARTICLE 12
## COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1    Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2    Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or

27

1     otherwise create any interest of Tenant in, the Premises or any other premises situated in the
2     Shopping Center unless and until the Lease is fully executed and delivered by Tenant and
3     Landlord.

4               Section 12.3   Landlord's Covenants, Warranties and Representations. To induce
5     Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and
6     represents to Tenant as follows:

7               (a)    As of the Delivery Date, Landlord shall have, good and marketable
8     fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens,
9     encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto.

10             (b)    In the event the legal description of the Shopping Center described
11    in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or
12    lot, Landlord represents that there exist no strips or gores between such parcels or lots which are
13    not owned by Landlord;

14             (c)    No third party consents or approvals are required in order for
15    Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work
16    (excluding, as of the Effective Date, governmental permits and approvals);

17             (d)    Tenant's use of the Premises for sale of "Permitted Items" (defined
18    in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction
19    granted to any other tenant or occupant in the Shopping Center;

20             (e)    As of the Delivery Date, the Shopping Center shall have access to
21    and from U.S. Highway 98 and Pier Park Drive, as shown on Exhibit B hereto, for the passage of
22    vehicular traffic;

23             (f)    This Lease does not violate the provisions of any instrument
24    heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping
25    Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this
26    Lease conflict with any rights granted by Landlord to any other tenant or occupant in the
27    Shopping Center (including, without limitation, any rights of first offer or first refusal or the
28    like);

29             (g)    As of the Delivery Date, there shall be no restrictions or other legal
30    impediments imposed by any public or private instrument which would prevent: (i) the use of the
31    Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other
32    Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's
33    Work once Landlord's Work is Substantially Completed and any permits for Tenant's Work
34    shall have been obtained;

35             (h)    As of the Delivery Date, there shall be no sign ordinances,
36    restrictive covenants, uniform sign plans or other signage restrictions which would prevent the
37    Premises from having the signage (including, without limitation, the square foot area and size of
38    letters) as depicted on Exhibit D-1 and Exhibit F hereof.

39             (i)    As of the Effective Date there is no "Related Land" (defined in
40    Section 13.1.2 below) in existence and as of the Delivery Date there will not be any Related
41    Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify
42    Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant
43    which memorializes the provisions of this Lease pertaining to or otherwise affecting Related
44    Land);

45             (j)    Attached hereto as Exhibit K-2 is a complete list of all fully
46    executed and delivered leases in effect on the Effective Date with respect to the Shopping Center
47    (the "*Existing Leases*") and Landlord represents to Tenant that except for the leases with
48    Michael's Arts and Crafts and Dicks Sporting Goods, all Existing Leases contain Tenant's
49    exclusive use provision as set forth in Section 13.2.1 below and the tenants under Existing
50    Leases are bound by Tenant's exclusive; and

51             (k)    Landlord shall promptly forward to Tenant any notice or other
52    communication received by Landlord from any owner of property adjoining or adjacent to the

28

Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance.

Section 12.4    Environmental Matters.

12.4.1 Definitions.

(a)    As used herein, the term *Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)    As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 Compliance with Environmental Laws. Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 Responsibility for Releases of Hazardous Substances. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except

29

1   in the event of an emergency or if compelled by applicable governmental authority, any work
2   performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any
3   time other than during the months of August (through Labor Day), November and December,
4   and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress
5   from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any
6   signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal
7   conduct of any business operations in the Premises.  If the presence of Hazardous Substances, or
8   Landlord's remediative work relative thereto, interferes with Tenant's normal business
9   operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so
10   long as such condition persists.

11           12.4.4 Standards.  Except as expressly provided herein, the parties agree that any
12   investigation or remediation of Hazardous Substances, or cure of a violation of Environmental
13   Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent
14   than necessary to meet the minimum standards of Environmental Laws applicable to properties
15   used in the manner the Shopping Center is being used.

16           12.4.5 Landlord's Representations and Warranties.  Except as disclosed in that
17   certain Phase I Environmental Site Assessment (File No. F-08-0371), dated July 10, 2008, and
18   prepared by Southern Earth Sciences, Inc., Landlord represents and warrants that: (i) Landlord
19   has received no Environmental Notices concerning the Shopping Center, the Premises or any
20   contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any
21   violation, or potential or alleged violation, of any Legal Requirement, including, without
22   limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous
23   properties, regardless of whether same has been cured; and (iii) to the best of Landlord's
24   knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the
25   Shopping Center, the Premises or any contiguous properties; and (B) no underground storage
26   tank exists at the Shopping Center or the Premises.  The foregoing representations and warranties
27   shall in no way serve to vitiate Landlord's obligations under this Article 12.

28           12.4.6 Documents.  Each party shall immediately notify the other party of the
29   notifying party's receipt of an Environmental Notice.

30           12.4.7 Indemnity.  Each party to this Lease shall indemnify, defend and hold the
31   other party, and its agents, servants, shareholders, directors, officers, partners, members and
32   employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions,
33   administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature
34   whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this
35   indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying
36   party's breach of any of its representations, warranties, covenants or other obligations under this
37   Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this
38   Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable
39   under this Section 12.4.

40           12.4.8 Survival.  The obligations of the parties under this Section 12.4 shall
41   survive the renewal, expiration, breach or earlier termination of this Lease.

42           12.4.9 Conflict.  In the event of any conflict between the provisions of this
43   Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall
44   control.

45           12.4.10 Radon.  Radon is a naturally occurring radioactive gas that, when it has
46   accumulated in a building in sufficient quantities, may present health risks to persons who are
47   exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found
48   in buildings in Florida.  Additional information regarding radon testing may be obtained from
49   your public health unit.  This notice is given pursuant to s. 404.056(8), Florida Statutes.
50   Notwithstanding the foregoing, Landlord acknowledges and agrees that nothing in this Section
51   12.4.10 shall diminish or vitiate Landlord's obligations under this Article 12.

52           Section 12.5   Purchase and Sale Contract.

53           12.5.1 Landlord represents and warrants to Tenant that, as of the Effective Date:
54   (a) it is the vendee under that certain Contribution Agreement (the "*Contract*") executed by the

current fee owner, The St. Joe Company, a Florida corporation ("*St. Joe*") which requires St. Joe to contribute the land described on Exhibit A and depicted on Exhibit B hereto to Landlord as of the date of closing on the construction loan; (b) the Contract is in full force and effect; and (c) Landlord has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contract. Landlord shall proceed diligently and in good faith to acquire fee title to the Shopping Center under the Contract.

12.5.2  In the event that Landlord and Tenant have executed a short form or memorandum of this Lease for recording pursuant to Section 23.20 below prior to Landlord's closing of title to the Shopping Center, Landlord shall cause such short form or memorandum to be duly recorded immediately after the deed of conveyance to Landlord, at Landlord's expense and after the recording of any mortgage or deed of trust made in favor of a construction lender in which event Landlord shall cause such lender to execute and deliver to Tenant, within thirty (30) days after the closing of such loan, a subordination, non-disturbance and attornment agreement, in recordable form, substantially in the form annexed hereto as Exhibit G, failing which Tenant shall have the rights set forth in Section 17.3 hereof. Within five (5) days after the closing of title to the Shopping Center pursuant to the Contract, Landlord shall give Tenant notice thereof.

12.5.3  In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease within one hundred eighty (180) days after the Effective Date, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Tenant so terminate this Lease, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third party costs and expenses (including reasonable legal fees) incurred by Tenant in connection with this Lease (and the provisions of Section 23.13 below shall not apply), including, without limitation, the preparation of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under the Contract, such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000). If Landlord's failure to acquire such fee title is attributable to Landlord's default or breach under the Contract, the provisions of Section 23.13 hereof shall not apply.

12.5.4  If this Lease is terminated pursuant to Subsection 12.5.3 above, and Landlord or its Affiliate acquires title to the Shopping Center within three (3) years after the date on which the Lease termination becomes effective hereunder, then Landlord shall offer to Tenant, at the time of Landlord's (or its Affiliate's) acquisition of title to the Shopping Center, the option to lease the Premises upon the terms and conditions of this Lease; provided, however, that all dates set forth in this Lease shall be appropriately extended. In the event Tenant elects, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord shall be free to lease the Premises to any other person or entity, upon economic terms which are not materially more favorable to the tenant than those contained in this Lease. The provisions of this Subsection 12.5.4 shall survive the termination of this Lease.

Section 12.6   Reciprocal Easement Agreement. Landlord and the owner ("*RTG*") of the parcel containing the premises designated as "Rooms to Go" on Exhibit B (the "*RTG Parcel")* are entering into a reciprocal easement agreement (the "*REA*") pursuant to which, inter alia, Landlord shall grant RTG certain cross-access and cross-parking rights between the Shopping Center and the RTG Parcel. Prior to the execution of the REA, Landlord shall deliver the final form of the REA to Tenant for Tenant's approval, such approval not to be unreasonably withheld, conditioned or delayed, provided, however, that Tenant shall have the right, in its sole discretion, to not approve the REA to the extent that it affects Tenant's exclusive rights under this Lease or the exemption in favor of Tenant (pursuant to which Tenant is exempted from the RTG exclusive) in the Agreement to Purchase Real Estate, dated April 6, 2012 ("*RTG Contract*") between Landlord and RTG or otherwise materially adversely affects Tenant's rights hereunder. Landlord covenants and agrees that the exemption in favor of Tenant contained in the RTG Contract shall be inserted into the REA. Once approved by Tenant, Landlord shall not amend or modify the REA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein.

31

Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the REA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the REA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the REA. Whenever, pursuant to the REA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

### ARTICLE 13
### USES AND RESTRICTIONS

Section 13.1    Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit L hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable, or the "Future Exclusives" (hereinafter defined in Subsection 13.3.2), to the extent then applicable.

13.1.2 Prohibited Uses. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center or any "Related Land" (hereinafter defined) for any of the "Prohibited Uses" that pertain to the Shopping Center or the Related Land, as the case may be (as set forth in Exhibit L hereto annexed), provided, however, that as to any future Related Land, the foregoing restriction shall not apply to the extent that any Prohibited Uses are otherwise permitted under leases entered into prior to the date on which such land becomes Related Land. As used in this Lease, the term *"Related Land"* shall mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled by Landlord or its Affiliate(s).

Section 13.2    Tenant's Exclusive in Center. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Except for the existing leases with Dick's Sporting Goods and Michael's Arts & Crafts which do not contain and are not bound by, Tenant's exclusive (the "*Excepted Leases*"), Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (but excluding health and beauty care items and excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand five hundred (2,500) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed five hundred (500) square feet.]. Notwithstanding the foregoing, tenants under Excepted Leases (and current or future assignees or sublessees of such tenants) shall nevertheless

32

1   be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between
2   Landlord and any such tenant requires the consent of Landlord to any assignment or subletting or
3   to a change in the use of the applicable premises, in either case which would permit the sale,
4   rental or distribution of the Exclusive Items; or (ii) Landlord permits or agrees to an expansion of
5   the applicable premises for the sale, rental, or distribution of the Exclusive Items.

6         13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to a
7   full-line national: (i) department store [for example, Wal-Mart, Macy's, Target or Kohl's],
8   (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home
9   improvement center [for example, Home Depot or Lowe's], commonly located in first-class
10  shopping centers in the state in which the Shopping Center is located, each occupying at least
11  80,000 square feet of Floor Area within the Shopping Center as such stores are currently
12  operated (as of the Effective Date) or (iv) furniture store [for example, Rooms To Go or
13  Haverty's] selling frames and wall art as an incidental part of its sale of furniture. In addition,
14  and notwithstanding the restrictions set forth in Section 13.2.1 above, Tenant hereby consents to
15  the operation of a Pier 1 Import store (as same typically operates), subject to and conditioned
16  upon the following terms: (a) the Pier 1 Imports store shall be located in that portion of the
17  Shopping Center as is designated on Exhibit B attached hereto, (b) the lease for the Pier 1 Import
18  store shall then be in full force and effect, and (c) the Floor Area of the Pier 1 Import store shall
19  not exceed 10,000 square feet of Floor Area.

20        13.2.3  The exclusive rights granted to Tenant in this Section 13.2 shall inure to
21  the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty
22  percent (50%) of the Floor Area of the Premises.

23        13.2.4  (a)     Upon breach of the aforesaid covenant and agreement by Landlord
24  (which breach shall not include a situation in which the lease between Landlord and any tenant in
25  the Shopping Center or in the Related Land prohibits the tenant therein from violating the
26  exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant
27  violates such exclusive rights, unless Landlord fails to comply with any of the provisions of
28  subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for
29  so long as such violation shall continue, and Tenant shall have all remedies given to it at law and
30  in equity and/or to commence and prosecute an action against Landlord or any other violator for
31  damages.

32        (b)     If any person or entity other than Landlord shall violate any of the
33  exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to
34  violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings,
35  and diligently prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to
36  promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same,
37  then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including,
38  without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b)
39  in the event the right set forth in (a) above is not permitted to be exercised under applicable
40  Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord,
41  at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such
42  prosecution (including, without limitation, by executing any documentation or authorization
43  reasonably required by Tenant in connection with such prosecution and by appearing at any
44  hearing or trial with respect to such prosecution).

45        Section 13.3   Exclusives Which Tenant Must Honor.

46        13.3.1  Tenant shall honor certain exclusives granted by Landlord to certain other
47  tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to
48  the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and
49  description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not
50  sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the
51  Premises to be occupied or used in violation of any such Existing Exclusive (except as may be
52  specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing
53  Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true
54  accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and
55  against all loss, cost, liability or expense (including, without limitation, reasonable legal fees)
56  incurred by Tenant by reason of the enforcement by any person or entity of such unlisted
57  Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a

separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which are executed from and after the Effective Date (hereinafter, *"Future Exclusives"*), and shall not sublease, occupy or use all or a portion of the Premises or permit all or a portion of the Premises to be leased, occupied or used, whether by Tenant or any sublessee, assignee, licensee or other occupant, in violation of any such Future Exclusive; provided, and on the condition that all of the following conditions are satisfied:

(a) The Future Exclusive shall bind Tenant only to the extent that it restricts Tenant from operating primarily for the same primary use as that engaged in by the beneficiary of the Future Exclusive (*e.g.*, primarily as a bookstore, an office supplies store, a sporting goods store, a toy store, *etc.*);

(b) Landlord shall notify Tenant of the granting of such Future Exclusive within ten (10) business days after the execution of a lease containing such Future Exclusive, and, at the time Tenant receives such notice, (i) Tenant shall not have previously entered into an assignment of this Lease or a sublease of the Premises (or any portion thereof) which specifically permits a primary use which would violate such Future Exclusive; or (ii) neither Tenant nor any assignee of this Lease or subtenant of the Premises (or any portion thereof) shall then be engaged in a primary use which would violate such Future Exclusive;

(c) the premises occupied by the tenant benefiting from such Future Exclusive shall contain at least twenty thousand (20,000) square feet of Floor Area;

(d) such Future Exclusive shall not relate to the sale, rental or distribution of soft goods, or men's, women's, and/or children's apparel or footwear (unless such Future Exclusive relates to specialized apparel, such as, for example, maternity apparel only, formalwear only, larger-sized apparel only, or uniforms only);

(e) Landlord and the tenant or occupant benefiting from the Future Exclusive shall have entered into a lease or other occupancy agreement for its premises within one (1) year after the Effective Date;

(f) the beneficiary of the Future Exclusive shall be a national or regional (as defined in Article 22) tenant of the Shopping Center; and

(g) no Future Exclusive shall be granted for the sale of any or all of the Exclusive Items.

13.3.3 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center or in any other property owned by Landlord or Landlord's Affiliate.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 and Section 12.4.3 hereof), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than three hundred sixty-five (365)

34

consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the "***Recapture Date***") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Notwithstanding the foregoing, Tenant shall have the right to nullify Landlord's termination by giving notice to Landlord (the "***Reopening Notice***"), within ten (10) days after receiving the Landlord's termination notice, of its decision to reopen the Premises for business (and in fact Tenant reopens for business fully stocked and staffed within thirty (30) days), whereupon Landlord's termination notice shall be rendered null and void.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1  Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease (including, without limitation, Section 13.1) and provided the proposed use is for retail sales.

15.1.2  In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises:  (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates;  (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the State of Florida; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2    Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the "***Original Tenant***") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least Two Hundred Fifty Million ($250,000,000) Dollars.

Section 15.3    Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith, provided that such collateral assignment complies with all of the terms of this Lease including, without limitation, the Permitted Use set forth in Section 1.1.27 hereof.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, "***Lender***" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.  Notwithstanding anything contained in this Section 15.3 to the contrary, in no event shall

35

1  Landlord's interest in the Shopping Center or the interest of a Mortgagee be subordinate to any
2  interest of any Tenant Lender.

3              Section 15.4   Cure Rights of Original Tenant.

4              15.4.1 Unless Tenant is then released from liability pursuant to Section 15.2
5  above, if Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to
6  said assignee or any future assignee in respect of any default, shall also give a copy of such
7  notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so
8  given to Original Tenant. Original Tenant shall have the same period after receipt of such notice
9  to cure such default as is given to Tenant therefor under this Lease.

10             15.4.2 If this Lease is terminated because of: (a) an Event of Default of such
11 assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of
12 the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State
13 or of the United States, or any other Legal Requirements affecting creditors' rights, then
14 Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have
15 the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by
16 Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord
17 (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of
18 the assignee hereunder, unless such Events of Default are personal to the assignee and/or not
19 reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall
20 not be obligated to cure such Events of Default as a condition to the exercise of its rights under
21 this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the
22 assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights
23 against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).
24 The term of said New Lease shall begin on the date of termination of this Lease and shall
25 continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall
26 otherwise contain the same terms and conditions as those set forth herein, except for
27 requirements which are no longer applicable or have already been performed. It is the intention
28 of the parties hereto that such New Lease shall have the same priority relative to other rights or
29 interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall
30 survive the termination of this Lease and shall continue in full force and effect thereafter to the
31 same extent as if this Subsection 15.4.2 were a separate and independent contract between
32 Landlord and the Original Tenant. From the date on which the Original Tenant shall serve
33 Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original
34 Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all
35 appurtenances thereto, as contemplated in this Lease.

36             Section 15.5   Recognition Agreement. In the event Tenant subleases all or any
37 portion of the Premises for a term of at least five (5) years, then, notwithstanding any other
38 provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an
39 agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in
40 recordable form.

41                              ARTICLE 16
42                    DEFAULT AND DISPUTE RESOLUTION

43             Section 16.1   Tenant Default.

44             16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days
45 after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid
46 Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be
47 performed or observed within thirty (30) days after its receipt of notice thereof from Landlord
48 specifying the nature of such default (or, if such default shall be of a nature that same cannot
49 reasonably be cured within thirty (30) days and Tenant does not commence to cure such default
50 on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion),
51 such circumstance shall constitute an *"Event of Default"*.

52             16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at
53 law or in equity (except that Landlord hereby expressly waives any rights to accelerate any
54 element of the Rent, and any right of distraint, which may be granted to it by law), including the
55 following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach as provided in Section 16.1.3 below, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default; provided, however, that if there are other vacancies in the Shopping Center at that time, Landlord may give preference to reletting the other vacant spaces. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2    Landlord Default. If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "*Landlord's Default*"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)     offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)     terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and  (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed, without limitation, that any water infiltration into the Premises from within or without the Premises, or mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may, at its election, and with reasonable prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3     Arbitration.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Panama City Beach, Florida, before one arbitrator in accordance with the procedural rules of the American Arbitration Association (or any successor thereto) then in effect.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1     Right to Mortgage and Non-Disturbance.  Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant  in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term

38

1  and on the same terms and conditions as contained herein, without the necessity of executing a
2  new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this
3  Lease which is specifically required hereunder and the Ground Lessor shall recognize and be
4  bound thereto.

5  Section 17.2  Estoppel Certificate.  Upon written request of Landlord or Tenant,
6  the other party, within thirty (30) days after the date of receipt of such request, shall execute and
7  deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide*
8  prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written
9  statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this
10  Lease is in full force and effect, if such is the case, and has not been modified, assigned,
11  supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to
12  which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's
13  actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of
14  such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend
15  the Lease Term have been exercised, if any. Each request for a written statement pursuant to this
16  Section 17.2 made within twelve (12) months of an earlier request for such a written statement
17  shall be accompanied by a payment, from the requesting party to the other party, in the amount
18  of $500 (increased by $100 on each date that the Fixed Rent increases pursuant to Section 1.1.11
19  hereof).

20  Section 17.3  Mortgages and Ground Leases.  If a mortgage, deed of trust, or
21  other security instrument, or any ground or underlying lease, encumbers the Shopping Center or
22  any part thereof on the date that Landlord acquires fee simple title to the Shopping Center (the
23  "*Acquisition Date*"), then within sixty (60) days after the Acquisition Date, Landlord shall
24  deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment
25  agreement substantially in the form attached hereto as Exhibit G, in recordable form, executed by
26  each and every holder of any mortgage, deed of trust or any other existing lien encumbering or
27  affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement
28  in the form and content described in clause (b) of Section 17.1 hereof, in recordable form,
29  executed by any Ground Lessor (and, as may be required, consented to by the holder of any
30  mortgage, deed of trust or other existing lien as aforesaid). Notwithstanding the foregoing, in
31  lieu of Landlord obtaining a subordination, non-disturbance and attornment agreement or fee
32  owner recognition agreement, Landlord may provide Tenant with written evidence that Landlord
33  has recorded Tenant's memorandum of lease (as required pursuant to Section 23.20 hereof) prior
34  to the recording of such mortgage, deed of trust, or other security instrument, or any ground or
35  underlying lease. Should Landlord fail to so deliver such instrument(s) within said 60-day
36  period, Tenant shall have the right by notice given to Landlord at any time prior to the date on
37  which such instrument(s) are delivered, to terminate this Lease, in which event, neither party
38  shall have any further liability hereunder, except: (i) for those obligations which survive the
39  expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii)
40  Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs
41  and expenses incurred in connection with this Lease, including, without limitation, the
42  preparation and review of plans and specifications, and the performance of Tenant's Work,
43  provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of
44  Fifty Thousand Dollars ($50,000).

45                              ARTICLE 18
46                                NOTICE

47  Subject to the further provisions of this Article 18, whenever it is provided herein that
48  any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may
49  be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to
50  the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by
51  registered or certified mail, postage prepaid, return receipt requested, or by any recognized
52  overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing
53  Address, Attention: General Counsel or to Tenant at Tenant's Mailing Address, with copies of
54  notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650
55  Liberty Avenue, Union, New Jersey 07083, and (ii) Jeffrey H. Kaplan, Esq., c/o Bryan Cave
56  LLP, 1290 Avenue of the Americas, New York, New York 10104, or to such other person or
57  other address as may, from time to time, be specified by either party in a written notice to the
58  other party. If Landlord shall consist of more than one person or entity, notices delivered by
59  Tenant to Landlord's Mailing Address shall be deemed to be delivered to, and effective notice to,

all such persons or entities comprising Landlord. All notices given in accordance with the
provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of
the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to
Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but
not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as
described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices
of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of
Common Areas Charges as described in Section 5.1 of this Lease.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by
Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber,
mortgage or create a security interest in or upon Tenant's Property in the Premises without the
consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord
waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or
security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord
hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to
Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably
satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's
Property.

## ARTICLE 20
## END OF TERM

Section 20.1   Surrender of Premises. At the expiration of the Term, Tenant will
quit and surrender the Premises in good condition and repair, excepting, however, reasonable
wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and
replacements to be made by Landlord hereunder.

Section 20.2   Hold Over. If Tenant fails to deliver possession of the Premises to
Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in
good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be
liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an
amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for
the month immediately preceding the last day of the Term as well as for all Additional Rent
payable by Tenant hereunder.

## ARTICLE 21
## [INTENTIONALLY DELETED]

## ARTICLE 22
## ONGOING CO-TENANCY

If, at any time during the Term, fewer than four (4) of the Inducement Tenants (as
defined in Section 2.3.1(e) hereof) or their Replacements (as defined below) are open for
business in the Shopping Center (such condition being hereinafter referred to as an "**Excess
Vacancy**"), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of
Fixed Rent during the period of such Excess Vacancy, and/or (ii) if Tenant pays Alternate Rent
hereunder for a period in excess of three hundred sixty-five (365) continuous days, to terminate
this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the
expiration of such 365-day period, at least sixty (60) days' prior notice, in which event this Lease
shall terminate on the date set forth in Tenant's notice of termination without further liability on
the part of either Landlord or Tenant, except: (A) for those obligations which survive the
expiration or other termination of this Lease pursuant to the express terms of this Lease, and
(B) Landlord, promptly after receiving a statement from Tenant showing the costs and expenses
of any alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such
costs and expenses based upon the unexpired portion of the Term. If Tenant does not terminate
this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-
day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall retain all
of its original rights under this Article 22 with respect to any future condition(s) of Excess
Vacancy. As used herein, the term "**Replacements**" shall mean national retail tenants or regional

40

retail tenants (defined as a tenant having at least twenty (20) stores, in the aggregate, in the states of Florida, Louisiana, Mississippi, Georgia and/or Alabama, operating under the same trade name as the premises to be operated in the Shopping Center and similar to the store to be operated in the Shopping Center) typically found in first-class shopping center and occupying at least eighty-five percent (85%) of the Floor Area occupied by the tenant whom they are replacing.

## ARTICLE 23
## MISCELLANEOUS

Section 23.1    Loading Facilities.    Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2    Liens.    Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3    Broker's Commission.    Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for The Shopping Center Group L.L.C. (the "*Tenant's Broker"*) and Strategic Retail Advisors (the "*Landlord's Broker*").  Landlord shall pay both the Tenant's Broker and Landlord's Broker a commission pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Tenant's Broker and Landlord's Broker), agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4    *Force Majeure*.    Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "*Force Majeure"*), then the performance of any such act shall be excused for a period equal to the period of the delay.  Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto.  A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of *Force Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5    Consents.    Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6    Costs.    Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7 Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8 Survival of Obligations. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9 Non-Waiver. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11 Definition of Landlord. The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 Successors and Assigns. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 Limitation of Landlord's Liability. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

42

Section 23.15 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u>. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 <u>Short Form Lease</u>. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum, which shall be in recordable form, and in such form and having such substance as either party shall reasonably request. Promptly after Landlord acquires fee simple title to the Shopping Center, Landlord, at Landlord's cost and expense, shall cause Tenant's memorandum of lease to be recorded in the public records of Bay County, Florida. Tenant shall cooperate with Landlord in the recordation thereof. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 <u>Entire Agreement and Modification</u>. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 <u>No Joint Venture or Partnership Created by Lease</u>. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 <u>Tenant's Tradename</u>. Except as a nominative fair use (e.g. to show the location of the Premises in the Shopping Center, to indicate that Tenant is a tenant in the Shopping Center, to announce the "Grand Opening" and "Coming Soon" of Tenant and the listing of Tenant's name on site plans, promotional materials and internet shopping center directories), Landlord shall not make use of Tenant's tradename [*i.e.*, *"Bed Bath & Beyond"*®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 <u>Waiver of Trial by Jury</u>. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26 <u>Use of Shopping Center Name</u>. The name "Pier Park" (the "*Mark*") is the sole property of The St. Joe Company ("*St. Joe*") and/or a subsequent assignee or licensee thereof. Accordingly, Tenant shall not, by virtue of this Lease or otherwise, acquire a right to use the Mark in any manner other than as part of the Shopping Center name, Pier Park North, in which Tenant's Premises is located. During the Term (other than use of the Mark as part of the Shopping Center name as permitted herein), Tenant agrees not to use any trade name, trademark, service mark or domain name that is substantially similar or likely to be confused with the Mark or the Shopping Center name. After termination of this Lease, Tenant shall not further use in any way the Mark or the Shopping Center name (whether alone or in combination with other words or designs). Tenant agrees not to use the Mark alone in any way, and also agrees not to use the Shopping Center name in any way not expressly permitted in this Lease, including, without limitation, as the legal name of an entity. Tenant shall not use the Mark or the Shopping Center name in a manner that adversely impacts upon the reputation of St. Joe or Landlord or the value of the Mark. Tenant agrees to use all trademark legends, notices and disclaimers as are reasonably requested by Landlord from time to time. Tenant shall neither commit, nor cause any third party to commit, any act challenging, contesting or in any way impairing or attempting to impair, St. Joe's right, title and interest in and to the Mark or Shopping Center name. Tenant shall not seek to register with any state, federal or other registrar the Shopping Center name or the Mark, nor any mark confusingly similar thereto. The provisions of this Section shall survive any termination of this Lease. Notwithstanding the foregoing, nothing in this Section shall prohibit Tenant from the nominative fair use of the Mark.

Section 23.27 <u>Ethical Conduct Policy</u>. It is the policy of Tenant and its subsidiaries and affiliates (collectively, *"the Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including, but not limited to, the U.S. Foreign Corrupt Practices Act). No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services. This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Lease, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party. Any individual or entity having a business relationship with the Company shall require any subcontractor (of any level) to adhere to the same standards and are expected to appropriately monitor their subcontractors to ensure such adherence. If any such improper actions are observed, please contact the Tenant's Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

Section 23.28 <u>Confidentiality</u>. Landlord shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the economic or other business terms of this Lease (including, without limitation, the Term and the Rent), except as required by Legal Requirements or for disclosure to Landlord's accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center, provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord.

[Signature page follows]

44

1
2          Section 23.27  Governing Law.  This Lease shall be governed by, construed, and
3   enforced in accordance with the laws of the State in which the Premises are located.

4          IN WITNESS WHEREOF, the parties have executed this instrument under seal the day
5   and year first-above written.

**LANDLORD:**

WITNESS:

PANAMA CITY BEACH VENTURE II,
LLC, a Florida limited liability company

By:  Casto/CCM-US PPN, LLC,
     a Delaware limited liability company,
     Managing Member

Patricia A. Coderre

By:  Casto/CCM-US Panama City,
     LLC,
     a Delaware limited liability
     company,
     Managing Member

By
Name:  J. Brett Hutchens
Title:    Manager

**TENANT:**

WITNESS:

BED BATH & BEYOND INC., a New York
corporation

By:
Name:  Alan M. Freeman          Name:  Warren Eisenberg
Title:  Assistant Secretary       Title:    Co-Chairman

6

1

## INDEX OF EXHIBITS

2     Exhibit A -     Legal Description of Shopping Center
3     Exhibit B -     Site Plan
4     Exhibit C -     Form of Rent Commencement and Expiration Date Agreement
5     Exhibit D -     Specifications for Landlord's Work
6     Exhibit D-1     Exterior Elevations of the Premises, and Sidewalk Plan
7     Exhibit D-2     Exterior Elevations of the Shopping Center
8     Exhibit E -     Permitted Encumbrances
9     Exhibit F -     Signage
10    Exhibit G -     Form of Subordination, Non-Disturbance and Attornment Agreement
11    Exhibit H -     Form of Subtenant Recognition Agreement
12    Exhibit I -     Form of Delivery Date Notice
13    Exhibit J -     Form of Delivery Date Certification
14    Exhibit K-1     Existing Exclusives
15    Exhibit K-2     Existing Leases
16    Exhibit L       Prohibited Uses
17    Exhibit M       Signage Criteria

18
19

1

Exhibit A

2

Legal Description of Shopping Center

3
4
PIER PARK NORTHEAST TRACT

5    BEGIN AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF U.S.
6    HIGHWAY 98 (PANAMA CITY BEACH PARKWAY - HAVING A 200 FT. RIGHT OF
7    WAY) AND THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE 2, AS PER
8    PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS
9    OF BAY COUNTY, FLORIDA; THENCE NORTH 35 DEGREES 44' 09" EAST, ALONG SAID
10   WESTERLY BOUNDARY FOR A DISTANCE OF 801.85 FEET, TO THE SOUTHERLY
11   LINE OF PALMETTO TRACE FUTURE PHASES; THENCE WESTERLY ALONG SAID
12   SOUTHERLY LINE FOR THE FOLLOWING COURSES: NORTH 54 DEGREES 12' 33" WEST FOR A
13   DISTANCE OF 936.98 FEET; THENCE NORTH 02 DEGREES 41' 57" WEST FOR A DISTANCE OF
14   503.85 FEET; THENCE NORTH 73 DEGREES 47' 49" WEST FOR A DISTANCE OF 449.57 FEET;
15   THENCE NORTH 81 DEGREES 33' 49" WEST FOR A DISTANCE OF 261.92 FEET; THENCE NORTH 56
16   DEGREES 32' 46" WEST FOR A DISTANCE OF 391.01 FEET; THENCE NORTH 74 DEGREES 22' 24" WEST
17   FOR A DISTANCE OF 191.68 FEET; THENCE NORTH 65 DEGREES 11' 47" WEST FOR A DISTANCE OF
18   67.49 FEET; THENCE SOUTH 77 DEGREES 13' 16" WEST FOR A DISTANCE OF 83.55 FEET; THENCE
19   SOUTH 70 DEGREES 25' 13" WEST FOR A DISTANCE OF 117.07 FEET; THENCE NORTH 75 DEGREES 35'
20   38" WEST FOR A DISTANCE OF 150.95 FEET, TO THE EASTERLY RIGHT OF WAY LINE OF PIER PARK
21   DRIVE; THENCE SOUTH 32 DEGREES 00' 57" WEST, ALONG SAID EASTERLY RIGHT OF WAY LINE,
22   FOR A DISTANCE OF 619.77
23   FEET TO THE NORTHERLY RIGHT OF WAY LINE OF SAID U.S. HIGHWAY 98; THENCE SOUTH 54
24   DEGREES 14' 56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE
25   FOR A DISTANCE OF 2715.96 FEET TO THE POINT OF BEGINNING.  SAID LANDS LYING AND BEING
26   IN A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH, RANGE 16
27   WEST, BAY COUNTY, FLORIDA.
28
29
30   LESS AND EXCEPT THE FOLLOWING ROOMS TO GO PARCEL:
31
32   COMMENCE AT THE INTERSECTION OF THE WESTERLY BOUNDARY OF PALMETTO TRACE PHASE
33   2, AS PER PLAT RECORDED IN PLAT BOOK 19, PAGES 42 AND 43 OF THE PUBLIC RECORDS OF BAY
34   COUNTY, FLORIDA AND THE NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO. 98 (PANAMA
35   CITY BEACH PARKWAY – HAVING A 200 FT. RIGHT OF WAY); THENCE NORTH 54°14'56" W, ALONG
36   SAID NORTHERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 86.57 FEET, TO THE POINT OF
37   BEGINNING; THENCE LEAVING SAID NORTHERLY RIGHT OF WAY LINE, NORTH 35°47'27" EAST,
38   FOR A DISTANCE OF 313.95 FEET, TO A POINT ON A NON-TANGENT CURVE CONCAVE TO THE
39   WEST AND HAVING A RADIUS OF 69.38 FEET; THENCE NORTHWESTERLY, ALONG SAID CURVE
40   FOR AN ARC DISTANCE OF 107.21 FEET, SAID ARC HAVING A CHORD OF 96.86 FEET BEARING
41   NORTH 08°21'49" WEST, TO THE END OF SAID CURVE; THENCE NORTH 54°14'34" WEST, FOR A
42   DISTANCE OF 88.52 FEET; THENCE SOUTH 35°45'04" WEST, FOR A DISTANCE OF 181.00 FEET;
43   THENCE NORTH 54°14'56" WEST, FOR A DISTANCE OF 260.00 FEET; THENCE SOUTH 35°45'04" WEST,
44   FOR A DISTANCE OF 202.50 FEET, TO SAID NORTHERLY RIGHT OF WAY LINE OF U.S. HIGHWAY NO.
45   98; THENCE SOUTH 54°14'56" EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, FOR A
46   DISTANCE OF 415.72 FEET, TO THE POINT OF BEGINNING. CONTAINING 2.5571 ACRES, MORE OR
47   LESS. SAID LANDS LYING IN AND BEING A PORTION OF SECTIONS 17 AND 20, TOWNSHIP 3 SOUTH,
48   RANGE 16 WEST, BAY COUNTY, FLORIDA.
49
50

51

1

2

Exhibit B

Site Plan





FLOOR PLAN
THE ABOVE FLOOR PLAN REPRESENTS TENANT'S CRITICAL DIMENSIONS

EXHIBIT 'B'

SHEET 2 OF 2

11.29.12

SITE PLAN

PANAMA CITY BEACH, FL

1
Exhibit C

2
Rent Commencement and Expiration Date Agreement

3     THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as
4     of the _____ day of _____, 201___, by and between _____
5     (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

6
WITNESSETH:

7     WHEREAS, Landlord is the owner of a certain shopping center known as
8     _____ (the *"Shopping Center"*), situated in _____, _____;

9     WHEREAS, by that certain Lease Agreement dated as of _____ __, 201__ (the
10    *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

11    WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has
12    commenced; and

13    WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an
14    agreement setting forth certain information in respect of the Premises and the Lease.

15    NOW, THEREFORE, Landlord and Tenant agree as follows:

16    1.    The Rent Commencement Date occurred on _____, 201___.

17    2.    The Initial Term of the Lease shall expire on January 31, 20___, unless Tenant
18    exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as
19    provided in the Lease.

20    3.    The date of commencement of the first Renewal Period shall be February 1,
21    20___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise
22    being ___[insert date]___), and if Tenant does so, the Term of the Lease shall expire on January
23    31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless
24    the Lease terminates earlier as provided in the Lease.

25    4.    The date of commencement of the second Renewal Period shall be February 1,
26    20___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise
27    being ___[insert date]___), and if Tenant does so, the Term of the Lease shall expire on January
28    31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless
29    the Lease terminates earlier as provided in the Lease.

30    5.    The date of commencement of the third Renewal Period shall be February 1,
31    20___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise
32    being ___[insert date]___), and if Tenant does so, the Term of the Lease shall expire on January
33    31, 20___, unless the Lease terminates earlier as provided in the Lease.

34    6.    The date of commencement of the fourth Renewal Period shall be February 1,
35    20___, if Tenant effectively exercises its option in respect thereof (the deadline for such exercise
36    being ___[insert date]___), and if Tenant does so, the Term of the Lease shall expire on January
37    31, 20___, unless the Lease terminates earlier as provided in the Lease.

38    7.    Capitalized terms used, but not defined, herein shall have the meanings ascribed
39    to them in the Lease.

40    IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and
41    Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

_____

By:_____

C-1

Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New York
corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

1

<u>Exhibit D</u>

2

Specifications for Landlord's Work

**Panama City Beach**
Exhibit D - Landlord's Work



Beyond any store of its kind.™

11·29·12

01-27-12

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

## I. Landlord's Plans & Specifications

A.   Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following :

1.   Tenant's Plans : Site-specific design-development drawings prepared by Tenant which shall include :

   a)   F1 - FIXTURE PLAN
   b)   F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
   c)   F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
   d)   F4 - LIGHTING PLANS AND NOTES
   e)   F5 - HIGH PILE STORAGE PLAN
   f)   Additional F-drawings as may be required to address atypical site-specific conditions

2.   Tenant's Prototype Drawings & Specifications -- [developed by Casco Corporation ,St. Louis, MO] which consist of :

   a)   Bed Bath & Beyond – PROTOTYPE VERSION 1.2011 – Drawings (dated 11/01/1)

| | |
|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule |
| A0.2 | Generic Site Requirements Plan |
| A1.1 | Site Details |
| A1.2 | Demolition Plan |
| A2.1 | Cable Clip/Store Fixture/Egress Path Plan & Notes |
| A2.2 | Floor Plan |
| A2.3 | Floor Finish Plans |
| A2.4 | Reflected Ceiling Plans & Notes |
| A2.5 | Roof Plan, Details & Notes |
| A3.1 | Finish Schedule, Storefront Types & Vestibule Elevations |
| A3.2 | Door Hardware, Door Schedules & Door Types |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/ Distribution Schedule |
| A4.1 | Exterior Elevations |
| A5.1 | Building Sections, Interior Wall Sections |
| A5.2 | Exterior Wall Sections |
| A5.3 | Exterior Wall Sections |
| A5.4 | Exterior Wall Sections |
| A5.5 | Interior Wall Sections |
| A5.6 | Alternate Scissor Lift Plan, Section, Specification & Notes |
| A6.1 | Exterior Details |
| A6.2 | Interior and Exterior Details |
| A6.3 | Slatwall Details |
| A7.1 | Large Scale Plans |
| A7.2 | Large Scale Plans & Partition Types |
| A8.1 | Interior Details |
| A8.2 | Interior Details |
| A8.3 | Customer Service Desk |
| A8.4 | Register Bays and Remote Service Desks |
| A9.1 | Interior Elevations |
| A9.3 | Alternate Plans, Elevations & Details |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule |
| A9.5a | (Alternate) – Vertical Core Sections |
| A9.5b | (Alternate) – Vertical Core Plans Elevation & Details |
| A9.6a | (Alternate) - Awning Elevations & Details |
| A9.6b | (Alternate) - Awning Details |
| A9.6c | (Alternate) - Awning Wall Sections |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details |
| S1.1 | Structural General Information & Typical Details |
| S2.1 | Foundation Plan |
| S2.2 | Roof Framing Plan |
| S3.1 | Foundation Details |
| S3.2 | Roof Framing Details |

| | |
|---|---|
| P1.1 | Plumbing Riser Diagrams and Fixture Schedule |
| P2.1 | Plumbing Floor Plan |
| P3.1 | Plumbing Enlarged Plans & Details |
| FP1.0 | Fire Sprinkler Plans & Details |
| FP1.1 | Fire Sprinkler Notes and Details |
| FA1.0a | Fire Alarm Plans & Notes Base System |
| FA1.0b | (Alternate) Fire Alarm Plans & Notes – Occupant Notification |
| FA1.0c | (Alternate) Fire Alarm Plans & Notes - Full Smoke Detection |
| FA1.1a | Fire Alarm Details - Base System |
| FA.1.1b | (Alternate) Fire Alarm Details – Occupant Notification |
| FA1.1c | (Alternate) Fire Alarm Details – Full Smoke Detection |
| FA1.2a | Fire Alarm Device Lists & Calcs - Base System |
| FA1.2b | (Alternate) Fire Alarm Device Lists & Calcs - Occupant Notification |
| FA1.2c | (Alternate) Fire Alarm Device Lists & Calcs - Full Smoke Detection |
| M1.1 | Mechanical General Information |
| M2.1 | Mechanical Floor Plan |
| M2.1a | (Alternate) Mechanical Floor Plan |
| M3.1 | Mechanical Enlarged Plans & Details |
| M4.1 | Mechanical Schedules |
| E1.1 | Electrical General Information & Schedules |
| E2.1 | Power Plan |
| E2.2 | Lighting Layout Plan |
| E2.3 | Lighting Circuiting Plan |
| E2.4 | Specialty Lighting Plans & Diagrams |
| E2.5 | Specialty Lighting Elevations |
| E3.1 | Electrical Large Scale Plans & Details |
| E3.2 | Lighting Sequencing |
| E3.3 | Electrical Details |
| E4.1 | Electrical Schedules |
| E4.2 | Electrical Diagrams |
| E4.3 | Power Wall Details, Security Details, Sign Schedule |
| E4.4 | Novar Wiring Details |
| E4.4a | (Alternate) Novar Wiring Details for Non-Lennox RTU's |
| E4.5 | ETM Wiring Details for Lennox RTU's |
| E4.5a | (Alternate) ETM Wiring Dtls for Non-Lennox RTU's |
| E5.1 | FTG Power, Lighting, Specialty Lighting |

   b)   Bed Bath & Beyond – PROTOTYPE VERSION 1.2011 – Project Manual (dated 11/01/11)

3.   Lease Exhibits : Landlord's Plans & Specifications shall conform to all provisions of the Final Lease Exhibits.

B. Landlord's Plans & Specifications shall also include the following items:

    1. All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center which tenant is designated to be on.

    2. Complete civil engineering documents that describe planned improvements to the Shopping Center.

    3. Geo-technical and Storm-water design reports.

C. Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements. Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings & Specifications". Such Requirements may include (but shall not be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas [incl. protection of openings through fire-rated partitions]; Disability access to mezzanine level, the minimum required per code [i.e. - ADA lift; limited use/limited application elevator; passenger elevator]; Second egress stair from the mezzanine level; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc.. Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

D. Hierarchy :

    1. In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern :

        a. Lease Exhibits B, D [excluding Tenant's Prototype], D-1, D-2 & F
        b. Tenant's Plans
        c. Tenant's Prototype Drawings and Specifications
        d. Landlord's Plans and Specifications

    2. To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised (prior to construction) to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant.

E. Quality Control Review :

    1. At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete full size set and one (1) complete ½ size set. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments

    2. Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

    3. Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant. Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications. Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease. Tenant reserves the right to immediately disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

    4. Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

## II. Site Specifications

A. All parking areas and traffic drives in the Shopping Center shall consist of a minimum 12" of compacted sub-base (95% compacted), 3" asphalt base, and 2" asphalt surface finish. Grading of these areas shall not exceed a slope of 2% unless specifically approved in writing by Tenant. Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited Light duty pavement design shall consist of 2' of asphalt over 6" Lime rock Base on stabilized sub grade or as required by code, per Landlord's civil drawings.

B. All truck access drives in the Shopping Center shall consist of a Heavy duty pavement design shall consist of 2' of asphalt over 6" Lime rock Base on stabilized sub grade or as required by code, per Landlord's civil drawings. Grading of these areas are not to exceed a slope of 3% unless specifically approved in writing by Tenant.

C. Tenant's truck ramp, Trash Compactor Pad and Trash Container Pad shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 6" Portland cement concrete surface finish. Tenant's truck ramp shall include #4 re-bars at 18" on center each direction. Tenant's recessed truck ramp shall not exceed slope of 6%.

D. If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

E. The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of Landlord's Plans & Specifications Landlord shall also provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

### III. **Building Requirements**

The following section both (a) highlights elements of Landlord's Work which are already specified in "Tenant's Prototype Drawings & Specifications" and (b) identifies project-specific elements of Landlord's Work which are in addition to the scope detailed in "Tenant's Prototype Drawings & Specifications" :

A.  Clear Height : All Building Systems shall be designed to allow Tenant to stock merchandise to 16'-6"a.f.f.  Various systems shall be designed to conform with the following criteria :
   1.  18'-4" minimum clear height to underside of all structural system components.
   2.  16'-6" minimum clear height to underside of all plumbing & electrical system components [excluding lighting]
   3.  17'-6" minimum clear height to underside of all mechanical system components [i.e. - ductwork]
   4.  19'-0" maximum clear height to underside of all mechanical supply and return ducts
   5.  16'-6" minimum clear height to underside of all fire protection sprinkler piping (main and branch lines)
   6.  1" minimum and 6" maximum from fire sprinkler heads to underside of roof/floor deck above
   7.  22'-0" maximum clear height at the lowest point of the underside of roof/floor deck above (excluding elevator override)

B.  Fire Protection : Landlord shall furnish and install both a fire alarm system and a fire sprinkler system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

   1.  Landlord shall issue one complete submittal each for : (i) the fire alarm system and (ii) the fire sprinkler system (per Sections 01340, 15300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval.  Each initial submittal must be received by Tenant's Consultant no later than (12) weeks prior to projected Delivery Date.  Prior to the commencement of Consultant's review, Landlord shall pay a fixed fee ($625 for Fire Alarm + $625 for Fire Sprinkler) directly to Tenant's Consultant.  If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant then Landlord shall revise the submittal to address all Consultant comments and resubmit.  Prior to the commencement of Consultant's review of any resubmittal, Landlord shall pay a fixed fee ($625 each) directly to Tenant's Consultant.  All payments must be made in US Dollars or the foreign equivalent thereof.

   2.  If monitoring has not already been established by Tenant, Landlord shall be responsible for monitoring the fire alarm system up to sixty 60 days following the Delivery Date.

   3.  Fire Alarm system components shall be purchased by the Landlord thru Tenant's National Account vendor :
       **FE Moran**
       33341 Kelly Road
       Fraser, MI 48026
       855-FE-MORAN (855-336-6726)
       contact:  BBB/Baby/CTS Coordinator
       e-mail: bbb@femoranalarm.com

   4.  The sprinkler system shall be designed to allow merchandise to be stored to 16'-6" AFF or within 24 inches of the underside of the roof deck. The system shall comply with 2007 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity and a limited amount of group A plastics on solid shelves, minimum 4-foot aisles [typical requirement = 0.49 GPM/sf over a 2000 sf area].

   5.  The sprinkler system shall NOT utilize a fire pump.  If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate any required Fire Pump outside of the Premises.  Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 8 of 2008 Edition), and shall otherwise maintain the fire pump.

   6.  Consulting Services : If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials. If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

   7.  Tenant's National Fire Protection Consultant :    Mr. Will Smith / Code Consultants, Inc. (CCI)
       2043 Woodland Pkwy, Ste. 300
       St. Louis, MO  63146-4136
       (314) 991-2633 [ph]
       (314) 991-4614 [fax]
       wills@codeconsultants.com

C.  Office Mezzanine Access : Prior to the development of Tenant's Plans, Landlord shall coordinate with the Authority Having Jurisdiction and advise Tenant of all applicable requirements regarding vertical transportation at the office mezzanine.  Tenant agrees that no more than (5) employees will occupy the mezzanine or offices at any given time.  Vertical transportation equipment installation by the Landlord shall be complete, fully code compliant and inspected and shall allow Tenant to fixture, merchandise and open for business to the public in the Premises.  All equipment shall be operational a minimum of (2) two weeks prior to the Delivery Date to allow for proper "burn-in" in accordance with Tenant's Prototype Specifications Sections 14205 and 14255.  Final locations of all equipment shall be in accordance with Tenant's Plans.

D.  Floor System : Landlord shall provide and install a concrete floor slab in accordance with "Tenant's Prototype Drawings & Specifications". The floor system shall utilize 4,000 psi concrete and maintain a minimum thickness of 4 inches.  The floor system shall be designed to accept a minimum 125 lbs. per square foot of live load. If rebar or pre-tensioned / post-tensioned steel is required, such reinforcement shall not be placed within the top 2 ½" of the concrete slab.

E.  Utilities : Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas, water, fire protection water, and phone services) are separately metered exclusive of all other tenants and occupants in the Shopping Center.  Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date.  Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date. If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

F.   Intumescent Paint : In the event that fire-proofing of exposed structural elements is required by code, then Landlord shall use intumescent fire resistant coating to achieve the required fire rating. Application shall be neat & clean and in accordance with manufacturer's recommendations.

H.   Landlord shall be obligated to provide a complete system (including installation of water proof membranes at the floor located above premise, overflow drains, drip pans, etc.) in order to mitigate any potential infiltration of water, sewage, etc. from plumbing systems related to restrooms, food preparation areas, break rooms, janitor's closets, and the like located above the Premises.   All related work shall be fully detailed within Landlord's Plans & Specifications and shall be subject to Tenant's review and approval.

I.   Security Equipment : Landlord shall provide and install new security equipment (including Electronic Article Surveillance [EAS] and Closed Circuit Television [CCTV]) in accordance with Tenant requirements.  Landlord shall purchase such equipment directly from Tenant's National Account Vendor (Sensormatic / Attn: Doug Thomas / 804-739-8144 / douglasthomas@adt.com).

## IV. Construction Coordination Requirements

A.   Schedule : Landlord shall provide Tenant with a milestone construction schedule prior to commencement of Landlord's Work. Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every month until Landlord's Work is complete.

B.   Photographs : Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a monthly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work.   All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address:  BBB.2000photos@bedbath.com

C.   Vendor Coordination : Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.

D.   Certification : Whenever testing, certification, or verification is required in Tenant's Prototype Drawings & Specifications, Landlord shall, at Tenant's request, provide Tenant with copies of tests, certifications, or verifications, and shall otherwise cooperate with Tenant's reasonable informational requests.

## V. Building and Site Signs

A.   Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only.  Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations.   Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date.  If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease.  If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

B.   Remote Building Sign(s) -- NA

C.   Pylon/Monument/Directional Signs -- Not Available

D.   Temporary Signs -- Commencing on the shell completion date if permitted by code, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below.  Landlord shall also remove the temporary banners on the date designated by the Tenant.  Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
   1.   Two double sided temporary banners mounted to the Premises bearing the phrase :
        Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
        Banner #2 - "Why Wait ? Shop Online" (side a) and "Now Open" (side b).
   2.   Four single-sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
        Banners #1 & #2 - "Coming Soon"
        Banners #3 & #4 - "Now Open"
   3.   One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
        "Now Hiring" (side a) and "Now Open" (side b).
At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.

Landlord shall secure banners through the following vendor:

Auna Foote / Corporate Identification Solutions
5563 North Elston Avenue
Chicago, IL 60630
(773) 763-9600 [ph]
(773) 763-9606 [fax]
afoote@corporateidsolutions.com
www.corporateidsolutions.com

## VI. Permits and Approvals

A.   Landlord shall be obligated to secure all permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises.  Such permits may include (but shall not be limited to) the following : Building Permit, Health Permit [for the sale of prepackaged foods], Fixture Permit, Seismic Permit, High Pile Storage Permit [for storage of merchandise above 12'-0-"] and Signage Permits.

If seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date.  Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications,

responses to inquiries from the authority having jurisdiction and monitoring status of the permit application. Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).

> Seizmic Inc.
> Sal Fateen /  Genie Fateen / Keri Putnam
> 161 Atlantic Street, Pomona, CA 91768
> (909) 869-0989 [ph]

Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.

## VII. Construction Closeout

A.  Electronic Format: Within sixty (60) days following the "Substantial Completion" date, Landlord shall be responsible for uploading all required documents to the Digital Reliance Inc. (DRI) website [http//www.closeoutassistant.com]. For additional information or assistance contact DRI at 614-430-5950. Special software is not required. All documents shall be uploaded in pdf format to the DRI website within thirty (30) days following "substantial completion". Landlord shall pay the mandatory $675 service fee to DRI prior to uploading files. All payments must be made in US Dollars or the foreign equivalent thereof. DRI will confirm submittal meets base requirements and shall inform Landlord or Landlord's Contractor if certain documents are missing. DRI will not review items for content. The content will be reviewed by the BBB Construction Manager after posting of all documents is complete. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord or Landlord's Contractor from BBB's Construction Manager. Landlord shall resubmit amended document(s) to DRI until approved by BBB's Construction Manager. Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700.

B.  Warranties : Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord shall forward a written report to Tenant outlining the condition of all warranty items.

C.  Late Closeouts : if Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed sixty (60) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D.  Final cost: Landlord shall provide Tenant with its final cost for all of Landlord's Work within sixty (60) days following the Substantial Completion Date.

E.  Energy Rebate Information : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy rebate programs that are in force by the Authority Having Jurisdiction and/or the utility provider.

1

Exhibit D-1

2

Exterior Elevations of Premises and Sidewalk Plan

3



1

Exhibit D-2

2

Exterior Elevations of the Shopping Center



EXHIBIT D-2
EXTERIOR CONCEPT ELEVATIONS
OF THE SHOPPING CENTER
PANAMA CITY BEACH, FL

Exhibit E

Permitted Encumbrances

1. Oil, gas and mineral reservations contained in Deed recorded in Deed Book 117, Page 232 and as conveyed in Book 692, Page 44 and subsequently assigned in Book 944, Page 945; Book 1214, Page 389; Book 1288, Page 348; Book 1288, Page 387; Book 1711, Page 226; and Book 1747, Page 262.

2. Utility Easement Agreement granted to the City of Panama City Beach, dated March 26, 2002 and recorded April 9, 2002 in Official Records Book 2131, Page 838.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

1                                    Exhibit F

2                                     Signage

3       •

# BED BATH & BEYOND

$4' - 9"$
$10' - 6"$
$3' - 10"$

ELEVATION

ELECTRICAL NOTES: ACTUAL NUMBER OF CIRCUITS TO BE DETERMINED BY A LICENSED ELECTRICAL CONTRACTOR
TOTAL AMPS — 21.0 A
TOTAL CIRCUITS — 2 20A RECOMMENDED
VOLTS — 120V
THIS SIGN WILL BE UL OR cUL LISTED AND IS INTENDED TO BE INSTALLED IN ACCORDANCE WITH THE
REQUIREMENTS OF ARTICLE 600 OF THE NATIONAL ELECTRICAL CODE AND/OR OTHER APPLICABLE LOCAL
CODES. THIS INCLUDES PROPER GROUNDING AND BONDING OF THE SIGN

| LED Module | Qty | Power Supply** | Qty | Elec. Connector | Qty | Sup ply Wire | Qty | End Cap | | Qty |
|---|---|---|---|---|---|---|---|---|---|---|
| GEWHPX52 | 506 Ft | GECLPSPH | 20 | GECLSC2 | 134 | GECLSW1 | 134 Ft | GECLEC1 | | 268 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Color | TETRA® Product *** | Description*** | | | | | | BREAKDOWN | | |
| Power White | Tetra Power White | 2 LED's/Ft | | | | Power White | Ft | In | Section(s) | P/S |

| | | | | |
|---|---|---|---|---|
| B | 32 | 0 | 4 | 1 |
| E | 31 | 0 | 4 | 1 |
| D | 79 | 0 | 4 | 1 |
| | 9 | 0 | 1 | 1 |
| B | 33 | 0 | 4 | 1 |
| A | 31 | 0 | 4 | 1 |
| T | 20 | 0 | 3 | 1 |
| H | 33 | 0 | 4 | 1 |
| & | 34 | 0 | 4 | 1 |
| B | 38 | 0 | 4 | 1 |
| | 7 | 0 | 1 | 1 |
| E | 34 | 0 | 4 | 1 |
| Y | 30 | 0 | 4 | 1 |
| O | 79 | 0 | 4 | 1 |
| | 18 | 0 | 3 | 1 |
| N | 34 | 0 | 3 | 1 |
| | 25 | 0 | 3 | 1 |
| D | 29 | 0 | 4 | 1 |
| | 79 | 0 | 4 | 1 |
| | 7 | 0 | 1 | 1 |
| Total P/S Amps | | | Total System Watts | |
| 30.0 Amps | | | 1473.2 Watts | |

** Power Supply Location

SELF-CONTAINED

Illumination

FACE LIT



*NOTE:
INSTALL TOGGLE SWITCH TO OPERATE
(ON/OFF) IN THE HORIZONTAL POSITION

1 SWITCH PER LETTER

COLOR NOTES:
RETURN 6"x .063 WHITE
TRIM TO MATCH RETURN
LTRS UNDER 42" USE 1" WHITE JEWELITE
LTRS 42" AND ABOVE USE L MOLD
PAINTED WHITE
FACE: 2447 WHITE ARISTECH ACRYSTEEL
LED: GE TETRA POWER WHITE 2 FT
INSIDE OF CAN TO BE PAINTED
SEMI GLOSS WHITE

.063 ALUM.
RETURN

1" JEWELITE
FACE

TOGGLE
SWITCH

.090 ALUM. BACK
STAPLED

POWER SUPPLY

1/2" CARFLEX CONDUIT x
15' CARFLEX WHIP

EQUIPMENT
GROUND

GE TETRA POWER
WHITE 2/ft

GELCORE SPLICE
CONNECTOR

3/8" NON-CORROSIVE LAG
BOLTS OR THREADED ROD
AS REQ'D

1/4" WEEP HOLE w/LIGHT
BAFFLE BEAD AROUND
INTERIOR SEAM

CROSS SECTION MOUNTING DETAIL
SCALE: NTS

GENERAL NOTE:
MINIMUM #8 SHEET METAL SCREWS
ARE TO BE USED FOR SECURING THE
FACE TO THE LETTER RETURN
THE MAXIMUM SPACING SHALL NOT
EXCEED "8" AND NO FEWER THAN
FOUR SCREWS ARE TO BE USED PER
FACE

IF NON-STANDARD PRODUCT
CHECK APPROPRIATE BOX BELOW
☐ – RED FACE
☐ – BLACK RETURNS
☐ – DARK BRONZE RETURNS

11·29·12

# EXHIBIT 'F'
## BUILDING SIGN
PANAMA CITY
BEACH, FL
SHEET 1 of 2





**TEMPORARY BUILDING BANNERS**
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)



LOCATION SHOWN ON EXHIBIT B.

**TEMPORARY SITE SIGNAGE**

4' x 8' - TYVEK

**TEMPORARY SITE BANNERS**



BANNER STYLE

CORNER STYLE

NOTE:
o VINYL TO BE RED (PMS 187 OR EQUIVALENT) BACKGROUND WITH WHITE LETTERS IN A SIMILAR FONT AS SHOWN
o TENANT'S SPECIFIED VENDOR TO PROVIDE, INSTALL AND REMOVE AS REQUIRED BY BBBY.
o TENANT TO APPROVE THE STYLE ( BANNER, CORNER, ETC) FOR EACH PANEL LOCATED ON PYLON. MONUMENT OR OTHER SIGN PANEL STRUCTURE.
o TENANT TO DETERMINE PHRASE (COMING SOON. NOW OPEN, ETC) ON TEMPORARY VINYL.

VINYL COLORS
PMS #7 RED
BLACK

**TEMPORARY NON STICK VINYL GRAPHIC**



4' x 20'
(VERSION 2)

TEMPORARY BANNERS (BUILDING OR BBB HIRING TRAILER)

NOTE
TEMPORARY SIGNAGE AS ALLOWED BY CODE

EXHIBIT `F    11.29.12
TEMP. BANNERS
PANAMA CITY BEACH, FL
SHEET 2 of 2

1        Exhibit G

2        Form of Subordination, Non-Disturbance and Attornment Agreement

3        THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
4   AGREEMENT, made as of the _____ day of _____, 201__, by and between
5   _____, a _____ [corporation] [limited] [general]
6   [partnership] [national banking association], having an office at
7   _____ (the "*Mortgagee*") and Bed Bath & Beyond
8   Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083
9   (the "*Tenant*").

10       WITNESSETH:

11       WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*"), covering a parcel
12  of land owned by _____, a _____ [corporation], [limited]
13  [general] [partnership] (the "*Landlord*") together with the improvements [to be] erected
14  thereon (said parcel of land and improvements thereon being hereinafter referred to as the
15  "*Shopping Center*" and being more particularly described on Exhibit A attached hereto and
16  made a part hereof); and

17       WHEREAS, by a certain Lease Agreement heretofore entered into between Landlord and
18  Tenant dated as of _____ (as amended and/or modified, the "*Lease*"), Landlord
19  leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease
20  (the "*Premises*"); and

21       WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is
22  hereby acknowledged; and

23       **[For mortgages existing as of the date Lease is executed:** WHEREAS, as an
24  inducement to Tenant to enter into the Lease, [Section 2.3.1/Section 17.3] thereof provides that
25  the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

26       WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the
27  non-disturbance of Tenant by the holder of the Mortgage; and]

28       **[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of
29  the Lease provides that the Lease shall become subject and subordinate to a mortgage
30  encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-
31  disturbance agreement is entered into with respect to such mortgage; and

32       WHEREAS, the parties hereto desire to effect the subordination of the Lease to the
33  Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

34       NOW, THEREFORE, in consideration of the premises and of the mutual covenants and
35  agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as
36  follows:

37       1.       Mortgagee hereby consents to and approves the Lease and the term thereof,
38  including the options to extend the term as set forth in the Lease, and covenants and agrees that
39  the exercise by Tenant of any of the rights, remedies and options therein contained shall not
40  constitute a default under the Mortgage.

41       2.       Tenant covenants and agrees with Mortgagee that the Lease hereby is made and
42  shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all
43  modifications and extensions thereof (and such subordination shall not lessen or diminish
44  Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

45       3.       Mortgagee agrees that so long as the Lease shall be in full force and effect, and so
46  long as Tenant shall not be in default under the Lease beyond any applicable notice and grace
47  period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

1                (v)    bound by any amendment or modification of the Lease made
2  without its consent (unless Mortgagee's consent is not required under the terms of the Mortgage);
3  notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for
4  amendments thereof upon the occurrence of certain events described in the Lease (such as, for
5  example, an amendment to the Lease confirming the measurement of the Premises), and, by its
6  execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and
7  Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the
8  Lease, without any consent on the part of Mortgagee or such new owner.

9             (c)    Tenant's obligations hereunder shall be effective only so long as
10  Mortgagee is bound to Mortgagee's obligations hereunder.

11     5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which
12  would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that
13  notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement
14  shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the
15  subject default within the same time period allowed Landlord under the Lease. It is understood
16  that the abatement provisions of this Section relate to abatements by reason of Landlord's default
17  and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate
18  rentals such as, for example, abatement upon casualty or condemnation.

19     6.    Neither the Mortgage nor any other security instrument executed in connection
20  therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any
21  trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant
22  or its subtenants or licensees on the aforementioned property regardless of the manner or mode
23  of attachment thereof.

24     7.    Any notices of communications given under this Agreement shall be in writing
25  and shall be given by registered or certified mail, return receipt requested, or by any recognized
26  overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the
27  address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee
28  may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of
29  Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath &
30  Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and
31  _____, or such other address or
32  persons as Tenant may designate by notice in the manner herein set forth.  All notices given in
33  accordance with the provisions of this Section shall be effective upon receipt (or refusal of
34  receipt) at the address of the addressee.

35     8.    This Agreement shall bind and inure to the benefit of and be binding upon and
36  enforceable by the parties hereto and their respective successors, assigns, and sublessees.

37     9.    This Agreement contains the entire agreement between the parties and cannot be
38  changed, modified, waived or canceled except by an agreement in writing executed by the party
39  against whom enforcement of such modification, change, waiver or cancellation is sought.

40     10.    This Agreement and the covenants herein contained are intended to run with and
41  bind all lands affected thereby.

42     IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination,
43  Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:                  _____

By:_____      By:_____
Name:_____      Name:_____
Title:  (Assistant) Secretary      Title:   (Vice) President

[SEAL]

**TENANT:**

ATTEST:                                    BED BATH & BEYOND INC., a New York
                                           corporation


By:_____              By:_____
Name: Alan M. Freeman                     Name:  Warren Eisenberg
Title: (Assistant) Secretary              Title:   Co-Chairman

[SEAL]

1          [INSERT APPROPRIATE JURAT FOR MORTGAGEE]

2   STATE OF NEW JERSEY          )
3                                ) : ss.
4   COUNTY OF UNION              )

5          On this ___ day of _____, 201__, before me personally came Warren Eisenberg
6   to me known, who being by me duly sworn, did depose and say that he is Co-Chairman of Bed
7   Bath & Beyond Inc., the corporation described in and which executed the above instrument and
8   that he signed his name thereto by order of the Board of Directors of said corporation.

9                                      _____
10                                     Notary Public
11  My Commission Expires:
12
13
14  _____

Exhibit H

Form of Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____,
201__, by and between _____, a [_____] [corporation]
[limited] [general] [partnership], having an address at
_____ ("*Landlord*"); Bed Bath & Beyond Inc., a New
York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083
("*Tenant*"); and _____, a [_____] [corporation]
[limited] [general] [partnership], having an address at
_____ ("*Subtenant*").

R E C I T A L S:

A.    Landlord and Tenant have entered into a certain Lease Agreement (the "*Lease*")
dated as of _____ __, 201__, a short form of which has been recorded in
_____, which demises certain premises (the "*Premises*") located in the
_____ Shopping Center, [City], [State], which Shopping Center is more particularly
described on Exhibit A annexed hereto and made a part hereof.

B.    Section 15.5 of the Lease provides that in the event Tenant subleases all or a
portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's
request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such
subtenant in the form attached to the Lease, in recordable form.

C.    Pursuant to a Sublease dated as of _____ (the "*Sublease*"), Tenant has
subleased [a portion of] the Premises to Subtenant (the "*Subleased Premises*").

D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease
with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein
contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(a)    that it is the fee owner of the Premises,

(b)    that the Lease is unmodified (except as may be otherwise set forth in
Exhibit B annexed hereto, if any) and is in full force and effect,

(c)    that the term of the Lease expires on _____, but is subject to
[four] renewal periods of [five] years each and

(d)    that Tenant is not in default under the Lease nor has any event occurred
which would after notice to Tenant and the passage of time become a default of Tenant under the
Lease.

2.    Landlord hereby acknowledges receipt of a copy of, and consents to and
approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the
exercise by Subtenant of any of its rights, remedies and options contained therein shall not
constitute a default under the Lease.

3.    Landlord agrees that whenever it has an obligation with respect to the Premises,
or its consent or approval is required for any action of Tenant under the Lease, then, to the extent
such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and
occupation thereof, it will perform such obligation in accordance with the terms and conditions
of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or
unduly delay such consent or approval.

4.    Landlord shall not, in the exercise of any of the rights arising or which may arise
out of the Lease or of any instrument modifying or amending the same or entered into in

substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.     In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

6.     Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.     Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "*Notice*") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and

_____, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.     No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

9.      This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By:_____
Name:   Warren Eisenberg
Title:   Co-Chairman

**SUBTENANT:**

By:_____
Name:_____
Title:_____

1       [INSERT APPROPRIATE JURATS FOR LANDLORD AND SUBTENANT]

2    STATE OF NEW JERSEY     )
3                                  ) : ss.
4    COUNTY OF UNION        )

5          On this ___ day of _____, 201__, before me personally came Warren Eisenberg
6    to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of
7    Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument
8    and that he signed his name thereto by order of the Board of Directors of said corporation.

9
10                                      Notary Public
11   My Commission Expires:
12
13
14   _____

<u>Exhibit I</u>

Form of Delivery Date Notice

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Lease Agreement dated as of _____, 201__ (the "*Lease*"), between [name of
        Landlord], as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as tenant ("*Tenant*"),
        with respect to certain retail premises (the "*Premises*") located in the _____
        Shopping Center,_____ [City], [State]_____.

Gentlemen:

        In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____,
201__. This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of
the Lease.

                                        [NAME OF LANDLORD]


                                        By:_____
                                        _____, (Vice) President

cc:     Allan N. Rauch, Esq.

1
<u>Exhibit J</u>

2
Form of Delivery Date Certification

3
[Letterhead of Landlord]

4
_____, 201__

5    [via Federal Express or other
6    recognized overnight delivery
7    service per Article 18 of the foregoing
8    lease]

9    Bed Bath & Beyond Inc.
10   650 Liberty Avenue
11   Union, NJ 07083
12   Attn: Warren Eisenberg

13   Re:    Lease Agreement dated as of _____, 201__ (the "***Lease***"), between [name of
14          Landlord], as landlord ("***Landlord***"), and Bed Bath & Beyond Inc., as tenant ("***Tenant***"),
15          with respect to certain retail premises (the "***Premises***") located in the _____
16          Shopping Center, _____[City], [State]_____

17   Gentlemen:

18           In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
19   certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
20   defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term is
21   defined in the Lease) will be deemed to be _____, 201__ . This notice shall constitute
22   the Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

23                                              [NAME OF LANDLORD]
24
25
26                                   By:_____
27                                          _____, (Vice) President
28   cc:    Allan N. Rauch, Esq.

J-1

Exhibit K-1

Existing Exclusives

**Dick's Sporting Goods**: Lease dated October 26, 2011

Section 1.5 of the Lease provides in part:

(a)     Landlord warrants and agrees that, during the term of this Lease, it will not enter into any lease, license agreement or other similar agreement nor permit any other premises in the Shopping Center (the "Restricted Property") to be used for the sale, rental and/or distribution, either singly or in any combination of: (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but not limited to, golf equipment and accessories); (iii) hunting, camping and fishing equipment and accessories; and/or (iv) athletic footwear (the "Precluded Use Activity(ies)"). In addition to the foregoing, Landlord shall be permitted one (1) Occupant within the Restricted Property operating primarily as a family shoe store in not more than nine thousand (9,000) square feet of LFA and located in the area between or inclusive of the proposed "Pier 1" and "Toys R' Us" as outlined on the Lease Plan.

(b)     Notwithstanding the foregoing Precluded Use Activity(ies) set forth in Subsection (a) above, the retail sale and/or distribution of the Precluded Use Activity(ies) shall be permitted in the lesser of (A) ten percent (10%) in the aggregate of any such Occupant's sales floor area (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (B) two thousand (2,000) square feet in the aggregate of such Occupant's sales floor area (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use).

(c)     Landlord further covenants and agrees that, during the term of this Lease, it will not enter into any lease, license agreement or other similar agreement nor permit any property owned or controlled by Landlord or its parent or affiliates, adjacent to, contiguous or within five (5) miles of the Shopping Center (the "Additional Restricted Property")to be used as a full line sporting goods store having forty thousand (40,000) square feet or more of sales floor space, such as, by way of example only, Academy, Sports Authority, Bass Pro, Cabellas, Gander Mountain or the like.  The foregoing shall not be violated by Landlord, or its parent or affiliates acquiring an interest in any such land after the Effective Date as a result of its merger with or acquisition of the then-owner thereof, when an Occupant using at least forty thousand (40,000) square feet of sales floor area (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) as a full line sporting goods store is permitted on such land by any lease or other agreement in existence on the date of such merger or acquisition.

(g)     Notwithstanding anything contained herein, any retailer of over fifty thousand (50,000) square feet of LFA that may be a part of the Shopping Center and/or the Additional Restricted Property and operating a traditional full-line retail department store typically found in first class shopping centers (each of which are a "Department Store" and all of which, collectively, are referred to herein as the "Department Stores") shall not be subject to the provisions of Subsection (a) and (c), above. However, in the event Landlord, or its parent or affiliates regains control of a Department Store premises or has approval rights of any use change of a Department Store premises, then the restrictions in Subsection (a) and (c), above shall again apply to such Department Store premises; provided, however, in the event Landlord or its parent or affiliates leases or sells such Department Store premises to a Department Store for use as a Department Store, such Department Store premises shall not be subject to the restrictions in Subsection 1.5 (a) and (c), above. Notwithstanding anything contained in this Section 1.5(g), a sporting goods superstore such as Academy, Sports Authority, Bass Pro, Cabellas, Gander Mountain or the like shall not be considered a Department Store as for the above and shall not be excluded from the restrictions set forth in Subsection (a) and (c), above.

Section 1.2(h) of the Lease provides:

Landlord covenants that no kiosk or obstruction (other than landscaping and/or curbing required by Legal Requirements) shall be placed in the No-Build Areas.

K-1-1

1    Section 1.4 of the Dick's Sporting Goods lease dated October 26, 2011 provides in part:
2

1.4    Restrictions on Use of Shopping Center.

Landlord agrees that during the term of this Lease and as long as any retail sales activity permitted by this Lease shall be conducted in the Demised Premises excluding interruptions (a) not exceeding one hundred eighty (180) consecutive days, or (b) due to alterations, restoration, casualty, taking and a Force Majeure Event, which shall be deemed to be the conduct of retail sales activity for purposes of this section, the Shopping Center shall not be used for any purpose that is inconsistent with a first-class shopping center, or the matters set forth in Exhibit I(A)("**Prohibited Uses**"), and specifically the Shopping Center shall not be used:

(a)    for more than ten thousand (10,000) square feet of general office space; provided, however, that no office space shall be permitted within the "**Tenant's Perimeter Area**", as outlined on the Lease Plan;

(b)    for any non-retail purposes (service providers (such as, but not limited to, repairs, alterations, nail salons, shoe repair, storage and offices incidental to retailing, and banks and small loan offices, shall be deemed retail);

(c)    for any entertainment purposes such as a bowling alley (except upscale bowling alleys incidental to a larger permitted use, such as Lucky Strike or similar establishments; provided, however, that no such establishment shall be permitted within Tenant's Perimeter Area), skating rink, bar, night club, discotheque, amusement gallery (except amusement galleries incidental to a larger permitted upscale use, such as Dave & Busters or similar establishments; provided, however, that no such establishment shall be permitted within Tenant's Perimeter Area), poolroom (except a pool room incidental to a larger permitted upscale use, such as Dave & Buster's or similar establishments; provided, however, that no such establishment shall be permitted within Tenant's Perimeter Area), massage parlor (except in conjunction with an upscale spa or fitness; provided,

3    however, that no such establishment shall be permitted within Tenant's Perimeter Area), sports facility or off-track betting club;

(d)    for any establishment which sells or displays pornographic materials;

(e)    for any establishment which sells or displays used merchandise or second hand goods;

(f)    for any health club or fitness center located within Tenant's Perimeter Area; or

(g)    for any restaurant or establishment selling food prepared on premises for consumption on or off premises (other than cafes incidental to an Occupant's primary use) located within two hundred (200) lineal feet of the Demised Premises.

4

## EXHIBIT I

A.    **PROHIBITED USES**

1.    Any use causing loud noises or offensive odors.
2.    Manufacturing or industrial facility.
3.    Dry cleaners (except facilities for drop of and pick up only).
4.    Mortuary or funeral parlor.
5.    Coin-operated laundry.
6.    Skating rink.
7.    Church.
8.    School
9.    Night club, including so-called "discos", "strip shows".
10.    Off-track betting parlors.
11.    Any business using outdoor space in its regular operations, such as lumber yards, boat sales yards and the like.
12.    Motor vehicle sales, rental or storage; the storage, use or disposal of hazardous substances in violation of all applicable laws, and warehousing and storage other than as incidental to a permitted retail use.
13.    Service station or truck stop, including washing facilities.
14.    Flea market.
15.    Tire, battery or automobile accessories store.
16.    A store selling so called "odd lot", "over stock", "factory reject", "sample", "floor model", "demonstrator", "closeout", "clearance", "discontinued", "cancellation", or "seconds", or other similar operation.
17.    Hotel, motel or other place of lodging.
18.    Banquet facility.
19.    Junk yard.

5
6
7
8    .

1
2    Exhibit A - Site Plan from Dick's Sporting Goods
3
4



5
6
7
8
9
10
11

**Michael's:**

Section 16.4 of the Lease dated October 27, 2011 provides in part:

Limitation on Use. Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center (other than the Premises) or any property contiguous to the Shopping Center (including, without limitation, any property that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, to (i) any store that operates in a manner which is similar to or substantially the same as Tenant's Primary Business (as hereinafter defined), including by way of example, but not limited to, Garden Ridge, A.C. Moore, Ben Franklin, Joanne Fabrics, Joanne Etc, Hobby Lobby, Old America, Waccamaw/Home Place, Pat Catans, and MJDesigns, or (ii) any store rendering picture framing services.   This Section 16.4.1 shall not apply to any lessee whose lease was fully executed on the Effective Date hereof and is identified on Exhibit I as an "Existing Lease Not Subject to Tenant's Exclusive;" provided, however, that this exception shall not apply if (i) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive, or (ii) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns, or (iii) Landlord permits or agrees to  an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or (iv) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise.

As used in this Lease, the term "Tenant's Primary Business" shall mean the sale of arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, holiday themed décor, decorations and costumes, wedding or party goods (except apparel), scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations, or providing classes on any of the foregoing or any combination of the foregoing categories.

Section 16.5 of the Michaels lease dated October 27, 2011 provides in part:

Neither Landlord nor any entity controlled by Landlord will use or lease (or permit the use, lease or sublease of) or sell any space in or portion of the Shopping Center during the Lease Term allowing for use as any of the Prohibited Uses set forth on Exhibit J to this Lease.

EXHIBIT J
TO
SHOPPING CENTER LEASE
BETWEEN
PANAMA CITY BEACH VENTURE, LLC
AND
MICHAELS STORES, INC.

PROHIBITED USES

1.  funeral establishment;

2.  automobile sale, leasing, repair or display establishment or used car lot, including body repair facilities and quick-lube and tire and battery facilities;

3.  auction or bankruptcy sale;

4.  pawn shop;

5.  outdoor circus, carnival or amusement park, or other entertainment facility;

6.  outdoor meetings;

7.  bowling alley;

8.  primarily pool or billiard establishment;

9.  shooting gallery;

10. off-track betting (provided that state sponsored lottery tickets shall not be prohibited);

11. refinery;

12. adult bookstore or facility selling or displaying pornographic books, literature, or videotapes (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality);

13. massage parlor (except in connection with a day spa);

14. any residential use, including but not limited to living quarters, sleeping apartments or lodging rooms;

15. theater, except that one (1) theater shall be permitted in the area depicted on Exhibit B as "Permitted Theater/Gym Area", but only so long as no gymnasium or health club is located in this area;

16. auditorium, meeting hall, ballroom, day care facility, school or other place of public assembly;

17. agency, department or bureau of any governmental authority or unemployment agency, service or commission;

18. gymnasium, health club, exercise or dance studio, except that one (1) gymnasium or health club shall be permitted in the Permitted Theater/Gym Area, but only so long as no theater is located in this area;

19. dance hall;

20. cocktail lounge, bar (except incidental to a permitted restaurant), disco or night club;

21. bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business;

22. video game or amusement arcade, except as an incidental part of another primary business;

23. skating or roller rink;

24. car wash, car repair or car rental agency;

25. temporary or seasonal stores which sell holiday (including without limitation, Christmas and/or Halloween) themed décor, decorations, costumes, artificial Christmas trees, Christmas lights, Christmas ornaments, and/or holiday themed party goods including without limitation, the following stores: Spirit Halloween stores, Always Christmas stores, and similar operations;

26. second hand store, close-out store, dollar store, auction house, or flea market;

27. restaurant or food use in-line with the Premises if within 150 feet of the perimeter of the Premises and in no event shall the Leasable Square Feet in the Shopping Center devoted to restaurants or food uses exceed ten percent (10%) of the Leasable Square Feet of the Shopping Center; or

28. non-retail use (which shall not prohibit in the Shopping Center such uses commonly referred to as "quasi-retail" or "service retail" such as a travel agency, real estate office, insurance agency, accounting service, etc., so long as same do not exceed ten percent (10%) of the Leasable Square Feet of the Shopping Center).

1   *Tenant's obligation to be subject to the foregoing use restrictions is subject to that certain*
2   *letter agreement between Tenant and Michaels Stores, Inc., dated as of April 5, 2012, a copy*
3   *of which is attached hereto.*
4



Beyond any store of its kind.™

Corporate **Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888
908/688-8385 **Fox**

April 5, 2012

Michaels Stores, Inc.
8000 Bent Branch Drive
Irving, Texas 75063

Re:     Modifications of Exclusive Use Provisions as to Michaels Stores, Inc., a Delaware
corporation (*"Michaels"*) and Bed Bath & Beyond Inc., a New York corporation
(*"BBB"*): Pier Park North Shopping Center, Panama City Beach, Florida (the
*"Shopping Center"*)

Ladies and Gentlemen:

Michaels and BBB are or are to become co-tenants in the Shopping Center.  This letter,
when executed by both parties, will confirm the agreement between Michaels and BBB
regarding covenants contained in their existing or prospective leases, and/or other recorded
instruments, which restrict the types of use and sales activities which may be conducted in the
Shopping Center (*"Exclusives"*).  In lieu of any Exclusives set forth in their existing or
prospective leases for space at the Shopping Center, and/or other recorded instruments, BBB
and Michaels agree as follows.

1.      As used herein, the following terms shall have the following meanings.

(a)     *"Affiliate"* shall mean a person or entity which controls, is controlled by,
or is under common control with, Michaels or BBB, as the case may be.  As used herein,
*"control"* shall mean the possession, direct or indirect, of the power to direct or cause the
direction of the management and policies of a person or entity, whether through the ownership of
voting securities or rights, by contract, or otherwise.

(b)     *"BBB Exclusive"* shall mean either: (1) the covenant(s) set forth in the
BBB Lease (or other instrument encumbering the Shopping Center) which restrict the types of
use and sales activities which may be conducted in the Shopping Center, or (2) the covenants
set forth in Exhibit A attached hereto, whichever is less restrictive.

(c)     *"BBB Lease"* shall mean the Lease existing or to be entered into
between BBB and the Landlord for premises at the Shopping Center.

5

Michaels Stores, Inc.
Pier Park North Shopping Center, Panama City Beach, Florida
April 5, 2012
Page 2

     (d)    *"BBB Premises"* shall mean the premises at the Shopping Center which are demised to BBB.

     (e)    *"Excused Periods"* shall mean periods during which: (a) material alterations or renovations are being performed in and to a party's Premises for a period not in excess of 365 days, (b) a party's Premises are being restored with reasonable efforts following damage, destruction, or taking in eminent domain, or (c) an event of *force majeure* prevents the operation of business within a Party's Premises.

     (f)    *"Michaels Exclusive"* shall mean either: (1) the covenant(s) set forth in the Michaels Lease (or other instrument encumbering the Shopping Center) which restrict the types of use and sales activities which may be conducted in the Shopping Center, or (2) the covenants set forth in Exhibit B attached hereto, whichever is less restrictive.

     (g)    *"Michaels Lease"* shall mean the Lease existing or to be entered into between Michaels and the Landlord for premises at the Shopping Center.

     (h)    *"Michaels Premises"* shall mean the premises at the Shopping Center which are demised to Michaels.

     2.    The Michaels Exclusive shall not apply to the operations in all or a portion of the BBB Premises of a store operating primarily as a home furnishings store or a store selling primarily the exclusive items listed in the BBB Exclusive (singly or in any combination). A store shall be deemed to be operating primarily as a home furnishing store or a store selling primarily the Exclusive Items listed in the BBB Exclusive (singly or in any combination) so long as it devotes fifty percent (50%) or more of the square footage within such store for the sale of the Exclusive Items listed in the BBB Exclusive (singly or in any combination).

     3.    The BBB Exclusive shall not apply to the operations in all or a portion of the Michaels Premises of a store operating primarily as an arts & crafts store or a store selling primarily the exclusive items listed in the Michaels Exclusive, singly or in any combination. A store shall be deemed to be operating primarily as an arts & crafts store or a store selling primarily the Exclusive Items listed in the Michaels Exclusive (singly or in any combination) so long as it devotes fifty percent (50%) or more of the square footage within such store for the sale of the Exclusive Items listed in the Michaels Exclusive (singly or in any combination).

     4.    The exclusive rights with respect to any particular category listed in the Michaels Exclusive shall terminate as to such category in the event that the Michaels Premises ceases to be used for the sale, rental or distribution of items contained in such category for in excess of nine (9) consecutive months (except for Excused Periods); provided, however, that the Michaels Exclusive shall be reinstated with respect to such category if the sale, rental or distribution of items contained in such category is resumed in the Michaels Premises, unless the sale, rental or distribution of items contained in such category has been commenced from the BBB Premises during the period in which the Michaels Exclusive had lapsed as to such category. Notwithstanding the foregoing, the Michaels Exclusive shall lapse in its entirety with respect to a non-Affiliated assignee of the Michaels Lease or a non-Affiliated sublessee of all or a portion of

1

Michaels Stores, Inc.
Pier Park North Shopping Center, Panama City Beach, Florida
April 5, 2012
Page 3

the Michaels Premises, if that assignee or sublessee fails to use at least fifty percent (50%) of the square footage that it occupies within the Michaels Premises for the sale, rental or distribution of the Michaels Exclusive Items noted in Exhibit B, singly or in any combination, for in excess of nine (9) consecutive months, except for Excused Periods.

5.    The exclusive rights with respect to any particular category listed in the BBB Exclusive shall terminate as to such category in the event that the BBB Premises ceases to be used for the sale, rental or distribution of items contained in such category for in excess of nine (9) consecutive months (except for Excused Periods); provided, however, that the BBB Exclusive shall be reinstated with respect to such category if the sale, rental or distribution of items contained in such category is resumed in the BBB Premises, unless the sale, rental or distribution of items contained in such category has been commenced from the Michaels Premises during the period in which the BBB Exclusive had lapsed as to such category. Notwithstanding the foregoing, the BBB Exclusive shall lapse in its entirety with respect to a non-Affiliated assignee of the BBB Lease or a non-Affiliated sublessee of all or a portion of the BBB Premises, if that assignee or sublessee fails to use at least fifty percent (50%) of the square footage that it occupies within the BBB Premises for the sale, rental or distribution of the BBB Exclusive Items noted in Exhibit A, singly or in any combination, for in excess of nine (9) consecutive months, except for Excused Periods.

6.    For purposes of this agreement, all references herein to "square footage" and/or "floor area" of a particular premises shall be deemed to include an allocable portion of the (i) aisle space adjacent to such selling space or floor area and (ii) storage space in such premises.

7.    This letter agreement shall be binding upon, and shall inure to the benefit of Michaels and BBB, and their respective Affiliates, successors, assignees and subtenants.

8.    It shall be a condition precedent to the agreements herein set forth that BBB and Michaels shall have entered into a lease or occupancy agreement for its Premises in the Shopping Center on or before eighteen (18) months after the date hereof; upon the satisfaction of such condition precedent, the provisions of this agreement shall continue in force for so long as the BBB Lease and the Michaels Lease (and any renewals, extensions or replacements thereof) remain in full force and effect.

9.    The Landlord in the Michaels Lease and the BBB Lease shall be entitled to rely on the terms and conditions set forth in this agreement only as between Michaels and BBB (and their respective assignees and sublessees in the Shopping Center).

[Signature page follows]

1

Michaels Stores, Inc.
Pier Park North Shopping Center, Panama City Beach, Florida
April 5, 2012
Page 4

Please sign both of the enclosed counterparts of this letter agreement and return to the undersigned one fully executed counterpart of this letter agreement to confirm your acceptance of and agreement to the foregoing. Thank you for your time and cooperation.

Very truly yours,

BED BATH & BEYOND INC.

By:
Seth Geldzahler
Vice President – Real Estate    ZL

AGREED TO AND ACCEPTED THIS
_____ day of _____, 2012.

MICHAELS STORES, INC.

By:
John J. Wyatt
Senior Vice President – Corporate Development

2

K-1-8

Michaels Stores, Inc.
Pier Park North Shopping Center, Panama City Beach, Florida
April 5, 2012
Page 5

## EXHIBIT A

### Form of BBB Exclusive

Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center or on any "Related Land" (hereinafter defined) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items; (c) housewares; (d) frames and wall art; (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of: (AA) Exclusive Items (except housewares) within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) one thousand five hundred (1,500) square feet of Floor Area within such tenant's or subtenant's premises and (BB) housewares within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of: (xx) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (yy) two thousand five hundred (2,500) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell the Exclusive Items referred to in (AA) above (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.] As used herein, the term *"Related Land"* shall mean land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned by Landlord or its Affiliate(s).

1

Michaels Stores, Inc.
Pier Park North Shopping Center, Panama City Beach, Florida
April 5, 2012
Page 6

## EXHIBIT B
### Form of Michaels Exclusive

Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center (other than the Premises) or any property contiguous to the Shopping Center (including, without limitation, any property that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord (the *"Related Land"*), to: (i) any "craft store" selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, holiday themed décor, decorations and costumes, wedding goods (except apparel), party goods, or (ii) any store selling scrapbooking/memory book supplies, accessories and/or decorations or other papercrafting (e.g., making greeting cards, gift bags, tags and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing classes on any of the foregoing or any combination of the foregoing categories (collectively, the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of: (AA) Exclusive Items (other than picture framing services, which shall not be permitted in any event and other than party goods) within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) one thousand five hundred (1,500) square feet of Floor Area within such tenant's or subtenant's premises and (BB) party goods within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of: (xx) five percent (5%) of the Floor Area of such tenant's or subtenant's premises or (yy) two thousand five hundred (2,500) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell the Exclusive Items referred to in (AA) above (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.]

**Kirkland's**:

Section 1.1 (Exclusive Use) of the Lease provides in part:

Landlord agrees not to lease, let, use or permit to be used, any portion of the Center now or at any time during the Lease Term or any extension thereof to any entity or other party that operates or makes use of its premises for sale of wall décor and/or lighting ("Tenant's Exclusive Use"). Other tenants and occupants of the Center may sell such items if the sale of such items does not constitute a primary use (i.e., such items are sold in the lesser of fifteen percent (15%) of a tenant's or occupant's premises or wall space). Notwithstanding anything herein to the contrary, Tenant's Exclusive Use shall not apply to either (a) the retail store of any regional or national retailer occupying more than 12,000 square feet of Rentable Area in the Center or (b) a Pier 1 Imports retail store operated under the lease for same between Landlord and Pier 1 Imports as of the Effective Date so long as such retail store sells substantially the same items as those sold at typical, national retail stores operating under the name of Pier 1 Imports. Tenant's Exclusive Use right shall be a covenant that binds Landlord and shall be a restriction upon the Center that runs with the land.

**The Men's Wearhouse**:

Section 20.04 of the Lease provides in part:

During the term of this Lease, so long as Tenant is operating the Premises solely for the use set forth in Section 4.01 hereof, Landlord shall not lease space in the Shopping Center to any tenant that uses a majority of its premises for the display and sale at retail of men's ready to wear suits, casual attire, accessories and shoes, or who uses their premises for the rental of men's formalwear and related accessories and shoes (the "Exclusive Use"). This provision shall not apply to the following: (i) any tenant or occupant that occupies at least fifteen thousand (15,000)

square feet; (ii) any tenant that is permitted to use its premises for the Exclusive Use by operation of law, court order, bankruptcy, or similar action, (iii) any store owned or operated by Tenant, or Tenant's parent, affiliate, subsidiary, franchisee, franchisor, or franchisee of Tenant's franchisor, or (iv) TJ Maxx, Marshall's, or Ross Dress For Less.

Section 4.01(a) provides in part:

Landlord will not lease space immediately adjacent to the Premises for a food use or for any other use that generates strong odors or smells detectable outside of such premises, provided such restriction shall not prevent Landlord for leasing such adjacent space to a yogurt shop or an ice cream shop or such other food use similar thereto that does not generates strong odors or smells detectable outside of such premises.

**Orange Leaf Frozen Yogurt**

Section 5.04 of the Lease provides in part:

Provided no Event of Default by Tenant is occurring and Tenant is continuously operating its business in the Premises principally and primarily for the purpose of (i) the sale of self-serve frozen yogurt, and (ii) operating a self-served dessert themed business, yogurt based or fruit based meal replacement business (the "Exclusive Use"), Landlord agrees that it shall not lease space in the Shopping Center to any future tenant for the primary and principal purpose of the Exclusive Use. Notwithstanding, Tenant's Exclusive Use shall not apply to: (i) Any tenant with a lease that predates the date of Tenant's Lease ("Existing Tenant") as set forth in Exhibit L, or its successors and/or assigns; nor (ii) Any restaurant or other tenant that does not operate primarily for the purpose of the Exclusive Use (i.e., a tenant deriving twenty-five percent (25%) or less of its annual Gross Sales from the Exclusive Use shall not be deemed in violation of this provision, but only if such sales are not "weigh and pay" or "by the ounce"). Tenant acknowledges certain tenants such as Coldstone Creamery, Kilwin's and Dairy Queen that as of the date of this Lease generally operate in the capacity of selling frozen dessert and/ or ice cream in a primary or incidental part of business. In no event shall Landlord permit any of these tenants, their assigns or any others in the Shopping Center, to sell their products as "self-served," "weigh and pay," or "by the ounce";  nor (iii) Any premises in the Shopping Center consisting of twenty thousand (20,000) or more square feet.

**Petco**:

Section 10 (a) of the Lease provides in part:

Landlord covenants and agrees that during the term of this Lease, so long as Tenant is not in default under the Lease beyond applicable notice and cure periods, Tenant shall have the exclusive right to engage in any and/or all aspects of the Pet Related Uses in the Shopping Center except for (i) the rights of any tenant whose existing lease as of the date hereof for its premises in the Shopping Center would permit such tenant to engage in such use, (ii) any tenant occupying in excess of thirty thousand (30,000) square feet of leasable floor area in the Shopping Center whose primary use is not that of a pet supply retailer, such as a Petsmart or Pet Supermarket, (iii) any store owned or operated by Tenant, or Tenant's franchisee, franchisor, or franchisee of Tenant's franchisor, or (iv) a supermarket or grocery store, or (v) incidental sales. As used herein, "incidental sales" means the sale or display for sale of such items or services, not as the primary use of a competing tenant and utilizing no more than one thousand (1,000) square feet of floor area. This covenant shall run with the land on which the Shopping Center is located so long as the Premises are used as a pet food and supply store.

The retail sale of pets (including but not limited to fish, birds, reptiles and other small animals), pet grooming, veterinary, boarding, day care and other pet services, pet food, pet training, pet accessories and other pet related services and products (all of the foregoing, the "**Pet Related Uses**")

Section 12 of the Lease provides in part:

No restaurant within one hundred (100) feet of the front door of the Premises, except with Tenant's permission, which Tenant may choose to give or deny in its sole discretion.

**Pier 1 Imports**:

Article 34 of the Lease provides in part:

During the term of this Lease, so long as TENANT is not in default of this Lease beyond any applicable cure period and open and operating the Premises (unless a closure is due to force majeure, casualty, condemnation, or remodeling) solely for the use set forth in Section 7.1 hereof, LANDLORD shall not lease, or permit to be leased, any space in the Shopping Center to any tenant (subject to the exceptions below) for the selling or displaying for sale wicker or rattan furniture or decorative household furnishings that are of an imported nature and are intended to be used in sunrooms, living, dining and kitchen areas and on patios, or housewares imported from the Far East or Europe customarily sold in Pier 1 Imports retail stores (the "Protected Merchandise"), unless the sale or display of the Protected Merchandise is on an incidental basis. As used herein, the term "incidental basis" is defined as the sale or display of the Protected Merchandise in an area not to exceed ten percent (10%) of the floor area for any other tenant or occupant within the Shopping Center. Provided, however, this provision shall not apply to the following: (i) any tenant that occupies at least eighteen thousand (18,000) square feet in the Shopping Center, (ii) any store owned or operated by TENANT, or TENANT'S parent, affiliate, subsidiary, franchisee, franchisor, or franchisee of TENANT'S franchisor, (iii) any out lots, outparcels or any space not owned, managed, or operated by LANDLORD, or (iv) specific tenants or occupants trading as Haverty's, Kirkland's, Rooms To Go, Bed, Bath & Beyond, Beall's/Beall's Outlet, T.J. Maxx/Home Goods or Home Goods, or Ross Dress For Less., or any of Ross' affiliates, subsidiaries, related companies, assignees or sublessees over which LANDLORD does not have approval rights.

**Ross Dress for Less:**

Section 15.3 of the Lease provides in part:

Without the prior written consent of Tenant, which consent may be withheld in the absolute and sole discretion of Tenant, no tenant or occupant of the Shopping Center (other than Tenant) may use, and Landlord, if it has the capacity to do so, shall not permit any other tenant or occupant of the Shopping Center to (a) use more than fifteen thousand (15,000) square feet of Leasable Floor Area of its premises for the Off Price Sale (as hereinafter defined) of merchandise, or (b) use its premises for the sale of whole bean and ground coffee, except for sales conducted by (i) a grocery store or supermarket, (ii) by a coffee retailer who occupies more than five thousand (5,000) square feet of Leasable Floor Area and operates fewer than two thousand (2,000) stores in the United States, or (iii) a retailer who obtains the majority of its revenue from the sale of donuts, bagels, bakery goods or sandwiches; (iv) Tim Horton's, Dunkin Donuts, Caribou Coffee, or Peet's Coffee & Tea; or (v) Bed, Bath & Beyond. For purposes of this Section 15.3, "Off Price Sale" shall mean the retail sale of merchandise on an everyday basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as T.J. Maxx, Marshalls, A.J. Wright, Fallas Paredes, Nordstrom Rack, Goody's, Factory 2U, Burlington Coat, Steinmart, Filene's Basement, Gordmans and Beall's Outlet.) Notwithstanding the foregoing, a maximum of two (2) tenants who occupy at least fifteen thousand (15,000) square feet of Leasable Floor Area in the Shopping Center other than Tenant, including Exempt Occupants (as defined below), shall be permitted to use their premises for the Off Price Sale of merchandise. The foregoing use restrictions shall not prohibit value price retail tenants such as Old Navy and Rue 21 nor apply to Exempt Occupants as provided below. … The foregoing use restrictions shall not apply to the Existing Tenants of the Shopping Center listed on **Exhibit K** who are occupying their premises in the Shopping Center pursuant to leases or occupancy agreements executed prior to the Effective Date, to the extent Landlord does not have the right, pursuant to such existing lease or occupancy agreement to restrict the use of the premises of the Existing Tenant. However, if Landlord has the right of consent to any change in use of the premises occupied by an Existing Tenant or if Landlord subsequently owns or controls the premises occupied by an Existing Tenant, Landlord shall not permit any use in such premises in violation of the use restrictions set forth in this Section 15.3.

Section 3.2.1of the Lease provides in part:

(a) General.

No part of the Shopping Center shall be used for office or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea market,"

mortuary, gymnasium, veterinary services or pet vaccination clinic or overnight stay pet facilities (except as an incidental use in conjunction with the operation of a pet store retailer, provided such pet store retailer is not located within two hundred (200) feet of the front and side perimeter walls of the Store), health club, dance hall, billiard or pool hall (except as an incidental use inside a restaurant), massage parlor, video game arcade (other than video games ancillary to and operated within a restaurant), bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, night club, on-premises consumption of alcoholic beverages except as incidental to a primarily restaurant use, Internet café, the sale of adult products or adult bookstores or adult audio/video products stores (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality).    No ATM or similar machine shall be permitted in the Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store, except if located wholly within the interior of another tenant's or occupant's premises.

No tenant or occupant of the Shopping Center, other than Tenant, shall be permitted to use one thousand five hundred (1,500) square feet or more of Leasable Floor Area of its premises primarily for the rental or sale of prerecorded audio or video merchandise or electronic games software and technological evolutions thereof.

Landlord shall not permit the sale of whole bean or ground coffee in the Shopping Center by national specialty coffee retailers who occupy less than five thousand (5,000) square feet of Leasable Floor Area, and who have more than two thousand (2,000) locations in the United States; provided, however, that the foregoing restriction shall not apply to a retailer who obtains the majority of its revenue from the sale of donuts, bagels, bakery goods or sandwiches, or to Tim Horton's, Dunkin Donuts, Caribou Coffee, or Peet's Coffee & Tea, or Bed, Bath & Beyond.

Further, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be permitted in the Shopping Center within two hundred thirty (230) feet of the front and side perimeter walls of the Store (i.e., within the area identified on the Site Plan as the "Restricted Use Area"). A "High Intensity Parking User" is a tenant or occupant whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with either customary shopping center practices or governmental regulations, whichever has a higher parking requirement. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses.

(b) Exceptions.

The Ross Prohibited Uses set forth in Section 3.2.1(a) above shall not apply to those tenants or occupants of the Shopping Center listed on **Exhibit K** who, in accordance with the terms of existing leases or occupancy agreements in effect on the Effective Date ("Existing Tenants"), cannot be prohibited from so operating, but only for the balance of the term(s) of such existing lease(s) or occupancy agreement(s). Landlord covenants and agrees that if Landlord has the right to consent to a change in use of the premises occupied by any such Existing Tenant, Landlord shall not consent to a change in use of the premises which violates the Ross Prohibited Uses.

Notwithstanding the prohibition on offices set forth in Section 3.2.1(a) above, retail service offices such as full service banks, real estate brokers and title companies, shall be permitted provided that (A) retail service offices in the aggregate do not exceed ten percent (10%) of the total Leasable Floor Area of the Shopping Center, (B) no single retail service office shall be greater than one thousand five hundred (1,500) square feet of Leasable Floor Area, and (C) no retail service offices may be located within two hundred fifty (250) feet of the front and side perimeter walls of the Store.

Notwithstanding the prohibition on massage parlors set forth in Section 3.2.1(a) above, first-class massage service providers, such as Massage Envy, which are typically found in retail shopping centers similar to the Shopping Center, shall be permitted provided that (A) no single massage service provider shall be greater than three thousand (3,000) square feet of Leasable Floor Area, and (B) no massage service provide may be located within two hundred fifty (250) feet of the Store.

**Shoe Carnival**:

Section 5.01 of the Lease provides in part:

A) As a material inducement to Tenant to enter into this Lease and during the entire Term of this Lease, provided Tenant is open and operating at the Shopping Center (excluding Permitted Closures and temporary closures for repairs and remodeling [temporary closures for remodeling not exceeding ninety (90) days in duration]), subject to the express limitations in paragraph "B" below, Tenant shall have the exclusive right within the Shopping Center to sell footwear (herein, the "Exclusive Use").

B) The Exclusive Use shall not apply to (i) tenants with leases dated prior to November 9, 2011 which have the express right to sell footwear per the terms of their lease or which have the right to operate for any lawful use (all of which, and the respective use provisions are identified in Exhibit F attached to this Lease), (ii) incidental sales of footwear by (a) Bed, Bath & Beyond, (b) Pier I, and (c) tenants occupying at least 25,000 square feet (iii) sales of footwear by tenants whose primary business is the retail sale of fashion and apparel merchandise (by way of example only: Ross Dress For Less; TJ Maxx; Marshall's; Bealls; Stein Mart; Cato's; Men's Warehouse), (iv) stand-alone out parcel tenants, provided such tenants do not operate primarily for the sale of footwear, (v) one (1) sporting goods store, (vi) one (1) specialty, full price, full service footwear retailer and one (1) non-branded, discount footwear retailer anywhere in the Shopping Center other than ""Building E"" of the Shopping Center (as designated on the Site Plan), provided in either case such tenant does not operate primarily for the sale of athletic footwear, does not occupy more than 3,200 square feet, and is located at least two hundred feet from the Premises, and (vii) tenants occupying not more than 3,200 square feet whose premises are located within ""Building E"" of the Shopping Center. provided such tenants do not operate primarily for the sale of athletic footwear. The phrase "incidental sales" shall mean the lesser of ten (10%) percent of such tenant's sales floor area or 3,000 square feet is used for the sale/display of footwear.

Section 15.10 of the Lease provides in part:

In no event shall a restaurant or any service uses (i.e., any use which does not sell merchandise at retail) be located immediately adjacent to the Premises.

**Ichiban Hibachi and Sushi Buffet**:

Section 5.04 of the Lease provides in part:

Provided no Event of Default by Tenant is occurring and Tenant is continuously operating its business in the Premises for the primary and principal purpose of operation of an oriental restaurant specializing in sushi and hibachi-cooked Chinese and Japanese cuisine served buffet style (the "Exclusive Use"), Landlord agrees that it shall not lease space in the Shopping Center to any future tenant for the primary and principal purpose of the Exclusive Use. Notwithstanding, Tenant's Exclusive Use shall not apply to: (i) Any tenant with a lease that predates the date of Tenant's Lease, or its successors and/or assigns; nor (ii) Any outparcels.

**Rooms To Go**:

Per Section 13 of the Agreement to Purchase Real Estate, dated April 6, 2012, as [to be] amended:

…and (v) so long as the Land is being used for the operation of a Rooms to Go furniture store (or its successor furniture store), a restriction providing that no part of the Shopping Center other than the Land shall be leased or sold to an occupant who either (x) uses two thousand (2,000) square feet or more of its gross leasable floor area for the sale or lease of furniture, home furnishings, or mattresses (collectively, subject to the exclusions set forth below in this 13(b)(v), "Protected Items"), or (y) derives more than ten percent (10%) of its total sales revenue from Protected Items, provided, however, the following items (and no others) shall be deemed to be excluded from Protected Items: (1) sales of office furniture and patio furniture, (2) Warehouse Clubs such as Costco and Sam's and Department Stores and Discount Department Stores such as J.C. Penny and Wal-Mart, (3) home goods and home accessories specialty stores similar to Bed, Bath & Beyond, Kirkland's, Pier 1, Cost Plus, Pottery Barn, Crate and Barrel and Restoration

1   Hardware, (4) Haverty's, (5) "high end" furniture retailers, such as Z Gallerie and Ethan Allen,
2   (6) mattress stores not located within the area depicted on Exhibit "A-2" as the "No Mattress
3   Store Area", and (7) Shopping Center leases that were executed prior to the Execution Date of
4   this Agreement (i.e., Dick's Sporting Goods and Michaels).

## EXHIBIT A-2 - ROOMS TO GO



1

<u>Exhibit K-2</u>

2

Existing Leases

3
4

| Tenant Trade Name |
| --- |
| Bed, Bath & Beyond |
| Dick's Sporting Goods** |
| Kirkland's (or Kirkland's Home) |
| Lee Nails & Spa** |
| The Men's Wearhouse |
| Michael's** |
| Orange Leaf Frozen Yogurt |
| PetCo |
| Pier 1 Imports |
| Ross Dress for Less |
| Shoe Carnival |
| Sushi & Hibachi Buffet |

1

Exhibit L

2

Prohibited Uses

3    As used in this Lease, the term "***Prohibited Uses***" shall mean any of the following uses:

4    A.    As to the Shopping Center, including the Premises (except as otherwise set forth below),
5    any of the following uses:

6    (1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust
7    or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to
8    intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in
9    whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

10    (2)    Any operation primarily used as a storage facility and any assembling,
11    manufacturing, distilling, refining, smelting, agricultural, or mining operation;

12    (3)    Any "second hand" store, "surplus" store other than the type operating in first-
13    class shopping centers (such as Play It Again Sports, as such store is operated on the Effective
14    Date);

15    (4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except
16    that this provision shall not prohibit the temporary use of construction trailers during periods of
17    construction, reconstruction, or maintenance);

18    (5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash
19    compactors or trash containers located near the rear of any building);

20    (6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house
21    operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event
22    (provided that if any such use is conducted by a third party in violation of the tenant's lease, then
23    Landlord's only obligation shall be to use commercially reasonable efforts to prevent the same);

24    (7)    Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner
25    that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-
26    site premises are located more than 150 feet away from the Premises);

27    (8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display
28    or body shop repair operation;

29    (9)    Any bowling alley or skating rink;

30    (10)    Any live performance theater, auditorium, meeting hall, sporting event, or other
31    similar intensive parking entertainment use;

32    (11)    Any living quarters, sleeping apartments, or lodging rooms;

33    (12)    Any veterinary hospital or animal raising or boarding facilities (except to the
34    extent permitted below and except as permitted in conjunction with the operation of a pet store
35    such as PetCo or PetSmart or other similar pet store occupying more than 9,000 square feet);

36    (13)    Any mortuary or funeral home;

37    (14)    Any "Pornographic Use", which shall include, without limitation: (x) a store
38    displaying for sale or exhibition books, magazines or other publications containing any
39    combination of photographs, drawings or sketches of a sexual nature, which are not primarily
40    scientific or educational [provided, however, that the sale of books, magazines and other
41    publications by a national bookstore of the type normally located in first-class shopping centers
42    in the State in which the Shopping Center is located (such as, for example, Books A Million and
43    Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use"
44    hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium
45    capable of projecting, transmitting or reproducing, independently or in conjunction with another
46    device, machine or equipment, an image or series of images, the content of which has been rated

or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club or chiropractor which may otherwise be permitted under this Exhibit L];

(15) Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16) Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption; provided, however, (i) Tenant shall be permitted to sell, on an incidental basis, alcoholic beverages for off-premises consumption and on-premises tastings, subject to applicable Legal Requirements and (ii) the foregoing shall not prohibit a first-class wine bar, wine or liquor store, and/or first class micro-brewery type establishment (by way of example, Total Wine, Wine World, Brew House or Brass Tap), provided same are located at least 150 feet from the closest demising wall of the Premises.

(17) Any catering or banquet hall;

(18) Any flea market, amusement or video arcade (except the foregoing shall not prohibit videos games as an incidental part of another tenant's business operation), pool or billiard hall, night club, discotheque, or dance hall; provided the foregoing shall not prohibit a Dave & Buster's type amusement operation so long as same is located in the "*Permissible Use Area*" designated on Exhibit B;

(19) Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20) Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21) Any unlawful use;

(22) Any pawn shop, check-cashing store, gun shop, or tattoo parlor except one first class check cashing store such as Amscot shall be permitted;

(23) Any church or other place of religious worship;

(24) Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility, except to the extent located on an "*Outparcel*" (as indicted on Exhibit B hereto) other than the "*Restricted Outparcel*" (as indicated on Exhibit B hereto) and except in conjunction with the operation of a typical warehouse club such as Costco or a grocery store such as Publix but only if such facility is located in front of the warehouse club or grocery store or if the warehouse club or grocery store is located in "*Future Pad*" (as indicated on Exhibit B hereto), only if such facility is located no closer to the Premises than Outparcel E;

(25) Any carnival, amusement park or circus;

(26) Any medical clinics except that medical offices and medical clinics of the type operated in first class shopping centers, of not more than 7,500 square feet in the aggregate, may be located within the Allowed Area (as indicated on Exhibit B hereto) (provided that in no event shall any so-called methadone clinics, blood banks, or drug or alcohol treatment or rehabilitation centers be located within the Shopping Center);

(27)   Any supermarket or boutique-type food store (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided that the foregoing shall not prohibit such store within the "***Permissible Use Area***" (as indicated on Exhibit B hereto) except that an upscale, boutique-type food store shall be permitted to be located within the Premises or within the premises shown on Exhibit B as "Dick's" or within the Permissible Use Area);

(28)   Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail or medical offices providing services commonly found in similar first-class shopping centers in the Panama City, Florida metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 150 feet away from the Premises, and not more than fifteen thousand (15,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

(29)   hotel/motel;

(30)   daycare center except one (1) daycare center shall be permitted in the Shopping Center, provided such daycare center shall contain no more than 4,500 square feet of Floor Area and shall be located only on an Outparcel (other than the "Restricted Outparcel");

(31)   veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 9,000 square feet of Floor Area and located at least 100 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises; no pet or pet supply store shall be located within 100 feet of the Premises;

(32)   children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's"), provided that the foregoing shall not prohibit such facility within the "Permissible Use Area";

(33)   karate center;

(34)   movie theater, provided that the foregoing shall not prohibit such use within the "Permissible Use Area";

(35)   restaurant serving meals for on- or off-premises consumption, provided the foregoing shall not prohibit such use if same is located at least 150 feet from the closest demising wall of the Premises;

(36)   beauty parlor or nail salon, provided the foregoing shall not prohibit such use if same is located at least 100 feet from the closest demising wall of the Premises;

(37)   health spa, exercise facility or similar type business, provided that the foregoing shall not prohibit such store or business within the "Permissible Use Area"; or

(38)   a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; provided that the retailers commonly known as "Christmas Tree Shops" and "Costco" and similar warehouse clubs shall be deemed not to violate the foregoing restriction.

B.   As to Related Land, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22, and 25 above.

EXHIBIT B

PIER PARK NORTH

SIGNAGE CRITERIA

INTRODUCTION:
These criteria are provided to establish a set of guidelines to contribute to uniform signage within the Pier Park North shopping center (the "Shopping Center").

ADMINISTRATION:
Prior to any fabrication, Tenant shall submit three (3) copies of detailed shop drawings or pdf's electronically for Landlord's approval. Drawings are to indicate sign size, color, placement, materials, construction details, and text. Plans are to be submitted to Casto Southeast Realty Services LLC, Attention: Rich Yaras, 55 E. Euclid Avenue, Suite 450, Mt. Prospect, Illinois 60056. No sign shall be erected without prior written approval from Landlord.

GENERAL:
1. Signage shall be limited to Tenant's trade name as set forth in the Lease.
2. Logos may be permitted if tastefully designed as determined by Landlord in its sole discretion.
3. Moving, audible or flashing signs will not be permitted.
4. Exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers will not be permitted.
5. Paper or cardboard signs shall not be permitted, other than professionally prepared interior window signs advertising special sales within the subject premises, nor shall temporary signs (exclusive of contractor signs) or stickers or decals be permitted; provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (a) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (b) a sticker or decal which contains the phrase "no solicitation" or words of like import.
6. Pictures, brand names, advertising product names or services offered shall not be permitted.
7. Tenant is responsible for obtaining all required sign permits at its sole cost and expense.
8. Landlord shall assign the sign location(s).

SIGN SIZE AND CONSTRUCTION:
The intent of these criteria is to encourage creativity to ensure the individuality of each tenant sign as opposed to similar sign design, construction and colors repeated throughout the project. Signs must be architecturally compatible with the entire Shopping Center.

The following types of construction will be allowed:

- Internally illuminated acrylic face channel letters
- Internally illuminated through face and halo channel letters
- Internally illuminated reverse pan channel letters (Raceways are not permitted)
- Skeleton neon behind flat cut out shapes and letters
- Open pan channel letters (Only in artistic letter style / font)
- Push through letter and logos in aluminum cabinets (Requires separate Landlord approval)
- Flat cut out dimensioned shapes and accents (Requires separate Landlord approval)

Signage on multiple elevations will be allowed, however, the signage allowed will be based upon Tenant's frontage. Stacked copy is permitted so long as the copy fits within the designated sign band without appearing crowded, looking inappropriate or out of scale and character with the adjacent signage.

Maximum signage overall length shall not exceed 70% of Tenant's frontage to avoid overcrowding adjacent tenant building signage. "Boxed" sign area shall not exceed 2 square feet for each linear foot of frontage, limited to 150 square feet maximum for tenants or occupants occupying less than 8,000 square feet. Maximum text size is limited to 3'-6" for tenants or occupants occupying less than 8,000 square feet; 48" for tenants or occupants occupying 8,000 square feet to 20,000 square feet; and the maximum size allowed per code for tenants or occupants occupying 20,000 square feet or more. Landlord reserves the right to amend or waive certain sign criteria for certain tenants or occupants.

- Signs shall utilize U.L. rated components
- All penetration(s) thru exterior wall construction shall be sealed with clear silicone sealant.
- Maximum depth of building signs shall be six inches (6").
- Landlord approval of Tenant signage is no guarantee that such signage shall be permitted by applicable governmental authorities, so it is strongly suggested that Tenant secure all permits prior to fabrication and installation of any signs.

If incorporated into the project, and unless waived by Landlord, Tenant is obligated at Tenant's expense to install blade signage on exterior of Premises in accordance with Landlord standard blade signage specifications.

MAINTENANCE:
All costs for maintenance of signs shall be Tenant's responsibility.

1

INSTALLATION AND REMOVAL:
It shall be Tenant's responsibility to repair any damage to sign band or facade at Tenant's expense when installing or removing its signage.

NO PYLON OR MONUMENT SIGNAGE:
No pylon or monument signage that includes individual tenant names is planned for this Shopping Center; unless provided for specifically in the Lease, Tenant shall not be entitled to place any signage on any pylon or monument sign in the Shopping Center.

1

O-2